# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| **GARR KEITH HARDIN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LOUISVILLE JEFFERSON** | ) | Case No. 17-cv-419-DJH |
| **COUNTY METRO GOVERNMENT;** | ) | |
| **CITY OF LOUISVILLE; MEADE** | ) | |
| **COUNTY; Louisville Metro Police** | ) | **AMENDED COMPLAINT** |
| **Detectives MARK HANDY, JAMES** | ) | **AND JURY DEMAND** |
| **CLARK, KELLY JONES, and** | ) | |
| **ROBERT L. ENNIS** *in their* | ) | |
| *individual capacities;* **Louisville** | ) | |
| **Metro Police Sergeants CHARLES** | ) | |
| **EDELEN, JIM WOOSLEY** *in their* | ) | |
| *individual capacities;* **Louisville** | ) | |
| **Metro Police Major JAMES W.** | ) | |
| **GRIFFITHS,** *in his individual* | ) | |
| *capacity,* **Meade County Sheriff** | ) | |
| **JOSEPH GREER** *in his individual* | ) | |
| *and official capacities;* **Meade** | ) | |
| **County Sheriff's Deputy ERNIE** | ) | |
| **EMBRY and CLIFF WISE** *in their* | ) | |
| *individual capacities;* **Meade** | ) | |
| **County Coroner WILLIAM ADAMS** | ) | |
| *in his individual capacity,* **and** | ) | |
| **Kentucky State Police Crime Lab** | ) | |
| **Forensic Serologist ROBERT** | ) | |
| **THURMAN** *in his individual* | ) | |
| *capacity.* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

The Plaintiff Garr Keith Hardin, by and through his attorneys, the Simon Law Office and Neufeld Scheck & Brustin, LLP, alleges:

## **INTRODUCTION**

1.      Before their convictions were vacated, Jeffrey Clark and Garr Keith Hardin lost 22 years of their lives wrongfully incarcerated for a heinous 1992 murder they did not commit. Their convictions rested on fabricated statements they never made and forensic evidence the prosecution wrongly argued Hardin left behind on the victim's body after he killed her. DNA has now conclusively proven that that evidence was left by another man, not Hardin or Clark.

2.      Clark and Hardin's wrongful convictions were not an accident but rather the result of police misconduct.

3.      Facing a gruesome murder with little physical evidence, the Louisville Police Department (LMPD) assigned Detective Mark Handy to lead the LMPD investigation. Det. Handy had a reputation as a closer who could wrest a confession out of anybody.

4.      But, as Defendants knew, Det. Handy had earned his reputation through a pattern of investigative misconduct. Det. Handy's practice was to coerce confessions by lying to suspects about the evidence against them—including false or sham polygraph results, threats, and false promises of leniency. In order to make the confessions seem reliable, Det. Handy would feed suspects non-public details about a crime and then falsely claim that the details originated with the suspect.

5.      Det. Handy, working with the other Defendants including Sheriff Joseph Greer and subordinate officers from the Meade County Sheriff's Office (MCSO),

2

immediately focused the investigation on Hardin and Clark and developed the false theory that they had murdered the victim in a Satanic ritual killing.

6.     True to Det. Handy's playbook, he and other Defendants attempted to coerce confessions from Clark and Hardin by falsely telling them that they had failed polygraph examinations and exerting other pressure. But neither Clark nor Hardin would falsely confess to a crime that they did not commit.

7.     When the men refused to confess, Det. Handy simply fabricated inculpatory statements. He falsely reported that Hardin admitted sacrificing animals as a part of a Satanic ritual and later decided that he wanted to "do a human." This admission, like false confessions in Det. Handy's other investigations, included falsified details that were consistent with Det. Handy's theory of the crime. It became the linchpin of the case against Hardin and Clark. But nothing in the statement was true. Hardin had never sacrificed an animal or a human, and he never told Det. Handy that he had done so or wanted to try.

8.     The other Defendants knew about and built on Det. Handy's fabrication. They falsified or distorted additional evidence to convince the prosecution—and later the jury—that Hardin and Clark had sacrificed the victim as part of a Satanic ritual. Defendants persisted in this effort even after their own expert informed them that the murder did not resemble a ritual killing.

9.     For example, MCSO lead investigator Sheriff Joseph Greer conspired with Clark's estranged girlfriend, Amy Remsburg, to manufacture an inculpatory statement falsely accusing Clark of an interest in Satanism and murder. Remsburg had reason to falsely implicate Clark because he had witnessed her sexually abusing

her son and reported the abuse; Remsburg was later convicted.

10.     Defendants also misrepresented that a bloodstained handkerchief found in Hardin's home had been used to clean up after animal sacrifices to buttress Det. Handy's false and fabricated "admission." Hardin consistently maintained that the blood on the handkerchief was his own, but, on information and belief, Defendants either suppressed evidence that corroborated Hardin's account or deliberately failed to investigate it. DNA testing later proved Hardin right: the blood on the handkerchief was his.

11.     Sheriff Greer also conspired with jailhouse informant Clifford Capps to fabricate incriminating statements suggesting that Clark was involved in the murder. In exchange for leniency in his criminal cases, Capps told police—and later testified at trial—that Clark had confessed to committing the crime while the two were incarcerated together. Clark is innocent of the crime and never confessed; the purported confession was completely fabricated by Sheriff Greer and Capps. The benefits Capps received for his testimony were never disclosed to defense counsel. Defendants later suppressed an exculpatory letter proving that Capps's testimony was false.

12.     The only physical evidence purportedly tying either Clark or Hardin to the murder—a hair that Defendants claimed the perpetrator had left on the victim's sweatpants—was also a sham. Although Kentucky State Police serologist Robert Thurman falsely told the prosecutor that the hair matched Hardin's, in fact, post-conviction DNA testing excluded both Hardin and Clark as the source of the hair.

13.     In 1993, before Clark and Hardin went to trial, Defendants learned that

4

another man, James Whitely, had confessed to the murder. Unlike Clark and Hardin, Whitely has a long and violent criminal history. Instead of pursuing this lead, Defendants ignored it and continued their prosecution against Clark and Hardin.

14.    The evidence fabricated by Defendants led to Clark and Hardin's indictments. They were tried together in 1995, and, based on this same evidence, convicted and sentenced to life in prison.

15.    Clark and Hardin, who maintained their innocence at the time of their arrests and testified on their own behalf at trial, made repeated attempts to overturn their wrongful convictions. Between 1997 and 2004, Clark and Hardin collectively filed eight post-conviction petitions and appeals, which were each opposed. Defendants were in possession of exculpatory evidence which they had a legal and constitutional obligation to provide to Plaintiffs and the Courts in connection with each of these proceedings. Instead, Defendants, through affirmative acts or omissions, concealed or otherwise withheld exculpatory evidence from Clark and Hardin which, if provided, would have freed the men of their wrongful imprisonment. By failing to come forward with exculpatory evidence in connection with these proceedings, Defendants knowingly, recklessly, and/or negligently breached their legal and constitutional duties, resulting in the continued imprisonment of Clark and Hardin and the violation of their civil rights in connection with these proceedings, and the men sustained injuries.

16.    In 2013, the Kentucky Supreme Court ordered DNA testing of the physical evidence. This testing proved definitively that *none* of the hairs found on the victim could have come from Hardin or Clark—including the hair that purportedly

matched Hardin's hair under a microscope.

17.     Based on this new evidence, the Meade Circuit Court vacated Clark and Hardin's convictions and ordered a new trial.

18.     In 2016, Clark and Hardin were released on $5,000 bail. They had been continuously incarcerated since the date of their conviction.

19.     Faced with an unwinnable case and no physical evidence, the Office of the Attorney General moved to dismiss the murder indictments. The Commonwealth concluded that it could not rely on the testimony of Defendant Handy because it could not "put credibility into an unrecorded statement taken by a detective who has a documented history of fabricating details of a murder case…."

20.     On February 26, 2018, the Meade Circuit Court finally dismissed the murder indictments against Clark and Hardin.

## JURISDICTION AND VENUE

21.     This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Hardin's rights as secured by the U.S. Constitution.

22.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367.

23.     Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in the Western District of Kentucky, Louisville Jury Division, and the events giving rise to the claims asserted herein all occurred within this district and jury division.

## THE PARTIES

24.     Plaintiff Garr Keith Hardin is a 47-year-old resident of Brandenburg, Meade County, Kentucky.

25.     At all times relevant to this Complaint, Hardin was a resident of the Commonwealth of Kentucky and lived in the Western District of Kentucky, Louisville Jury Division.

26.     Defendant Louisville Jefferson County Metro Government ("Metro Government"), formed on January 6, 2003, when Jefferson County and the city of Louisville merged. The Metro Government is a municipality that is a political subdivision of the Commonwealth of Kentucky and is a municipality of the first-class with home rule as enabled, defined, and empowered under KRS 67C.101.

27.     The Metro Government is the successor of the municipality of Jefferson County and the City of Louisville and was the employer of Defendants Detectives Mark Handy, James Clark, Kelly Jones, Robert L. Ennis, Sergeants Charles Edelen and Jim Woosley, and Major James W. Griffiths. Since January 6, 2003, the Metro Government has been the employer of the aforementioned officers. Defendant Metro Government is responsible for all policies, practices and customs of the former Louisville Police Department, the Jefferson County Police Department, and the Louisville Metro Police Department (LMPD).

28.     At all times relevant to this Complaint, prior to January 6, 2003, the City of Louisville was responsible for all policies, practices and customs of the Louisville Police Department and Jefferson County was responsible for all policies, practices, and customs of the Jefferson County Police Department. Since the merger of

7

the Louisville and Jefferson County governments, the Louisville Police Department and the Jefferson County Police Department merged, and their successor entity is the LMPD.[1]

29.     Defendant City of Louisville, until January 6, 2003, was a political subdivision of the Commonwealth of Kentucky. At all times relevant to this Complaint until January 6, 2003, it was a city of the first-class with home rule as enabled, defined, and empowered under KRS 83.410–83.660, as well as KRS Chapter 83A, 91, and 91A. Until January 6, 2003, the City of Louisville was responsible for the policies, practices, and customs of the Louisville Police Department. The City of Louisville's successor is Metro Government. The City of Louisville is responsible for the acts of Defendants while employed by the City of Louisville and while acting under color of law and within the scope of their employment.

30.     At all relevant times, Defendants Mark Handy, James Clark, Kelly Jones, and Robert L. Ennis were police officers or detectives with the Louisville Police Department, or its successor LMPD, employed by Defendant City of Louisville and Metro Government, and acting under color of law and within the scope of their employment.

31.     At all relevant times, Defendants Charles Edelen, and Jim Woosley were police officers or sergeants with the Louisville Police Department, or its successor LMPD, employed by Defendant City of Louisville and Metro Government, and acting

---

[1] For simplicity, this Complaint refers to both the Louisville Police Department and its successor entity the Louisville Metro Police Department as "LMPD."

under color of law and within the scope of their employment.

32.     At all relevant times, Defendant James W. Griffiths was a police officer or major with the Louisville Police Department, or its successor LMPD, employed by Defendant City of Louisville and Metro Government, and acting under color of law and within the scope of his employment.

33.     Defendants Handy, James Clark, Jones, Ennis, Edelen, Woosley, and Griffiths are each sued in their individual capacities.

34.     Defendant Meade County is a political subdivision of the Commonwealth of Kentucky. At all times relevant to this Complaint, it was a county of the first-class with home rule as enabled, defined, and empowered under KRS 83.410–83.660, as well as KRS Chapter 83A, 91, and 91A. Meade County was/is responsible for the policies, practices, and customs of the Meade County Sheriff's Office. Meade County is liable for all torts committed by the Defendant Meade County Sheriff's Officers while employed by Meade County pursuant to the doctrine of *respondeat superior*. Meade County is responsible for the acts of Defendants while employed by and while acting under the color of law and within the scope of their employment.

35.     At all relevant times, Defendant Joseph Greer was an employee of the MCSO acting under color of law and within the scope of his employment. Greer had been the Sheriff of the MCSO since approximately 1982. As Sheriff, Greer was responsible for setting the policies and practices of the MCSO and is the final policymaker for police actions on behalf of Meade County. Greer is named in both his individual capacity and his official capacity.

36.     At all relevant times, Defendants Cliff Wise, and Ernie Embry were

9

officers with the MCSO, were employed by Defendant Meade County, and were acting under the color of law and within the scope of their employment for Meade County.

37.     Defendants Joseph Greer, Cliff Wise, and Ernie Embry are referred to Collectively as the "Meade County Defendants" and are each sued in their individual capacities.

38.     At all relevant times, Defendant William Adams was the Meade County Coroner, was employed by Defendant Meade County, and was acting under the color of law and within the scope of his employment for Meade County.

39.     At all relevant times, Defendant Robert Thurman was a forensic serologist with the Kentucky State Police, was employed by the Kentucky State Police, and was acting under the color of law and within the scope of his employment for the Kentucky State Police.

## FACTS

### The Murder of Rhonda Sue Warford

40.     Nineteen-year-old Rhonda Sue Warford disappeared in the early morning hours of April 2, 1992. Three days later, on April 5, 1992, her body was found stabbed to death in a field in Meade County, about 50 miles from her Louisville home.

41.     No murder weapon was found, and nobody—other than the actual perpetrator—witnessed Warford's kidnapping and murder.

42.     The Medical Examiner determined that Warford had eleven stab wounds, including defensive wounds on her hands, which the Medical Examiner later testified was evidence that she had struggled with her perpetrator. Warford was killed by a stab wound to the base of her skull that severed her brain stem.

10

43.     During the autopsy, the Medical Examiner found hairs in the victim's hands and on her sweatpants. No evidence incriminating Clark and Hardin was ever found, and no other physical evidence was introduced at trial.

44.     Clark and Hardin had absolutely nothing to do with the murder of Warford.

### The Investigation

45.     The investigation into Warford's murder was a collaboration between the MCSO, because her body was found in Meade County, and the LMPD, because she had disappeared from Louisville. LMPD Detectives James Clark and Hope Greer were originally assigned to investigate Warford's disappearance.

46.     When a routine missing person case became a gruesome homicide with no leads, LMPD supervisors Maj. Griffiths, Sgt. Edelen, and/or Sgt. Woosley reassigned Det. Handy to head the LMPD investigation. Det. Handy had a reputation for his ability to close even the toughest murder cases.

47.     As his supervisors knew, however, Det. Handy owed his remarkable success not to legitimate investigative techniques but to a pattern of misconduct.

48.     For example, during the unrelated February 1992 homicide investigation of Keith West, Det. Handy deliberately fabricated inculpatory evidence and suppressed exculpatory evidence. Among other misconduct, Det. Handy destroyed evidence of a witness's initial statement because the witness could not identify West, whom Det. Handy suspected of murder. Det. Handy, who had been recording the statement, stopped the tape, rewound it, and coerced the witness into giving a second statement identifying West. Det. Handy lied at trial about erasing the tape, but the

11

misconduct later surfaced.

49.     Det. Handy also orchestrated the wrongful prosecution of Edwin

Chandler, a man who was falsely convicted of murdering a gas station attendant. Det.

Handy zeroed in on Chandler despite a lack of any physical or testimonial evidence

linking him to the crime. Det. Handy and Defendant Det. Clark, his co-investigator,

administered a polygraph to Chandler, falsely told him that he failed, and coerced him

to falsely confess. To make the confession sound credible, Det. Handy fed Chandler

non-public details about the crime and falsely represented that they originated with

Chandler. Chandler's false confession was the critical evidence leading to his murder

conviction and his wrongful incarceration.

50.     When the investigation turned up physical evidence exonerating

Chandler, Det. Handy destroyed or suppressed it, including fingerprint and hair

evidence proving that Chandler had not committed the crime. Det. Handy's misconduct

led to Chandler's wrongful conviction and left the true killer free to continue

committing sickening crimes, including the brutal assault of a homeless man.

### Det. Handy fabricates evidence falsely suggesting that Hardin murdered Warford in a ritual sacrifice.

51.     The Warford investigation unfolded in a similar pattern. Det. Handy

zeroed in on Clark and Hardin despite an utter lack of physical or testimonial

evidence tying them to the crime. He then fabricated evidence and suppressed

exculpatory evidence in order to convict them of murder.

52.     Early in the investigation, members of Warford's family told Sheriff

Greer and Dets. Clark and Greer that Warford had been dating Keith Hardin, then 22

12

years old, and that Hardin and his good friend Jeff Clark worshipped Satan. For a time, Hardin had practiced modern Satanism, which forbids blood sacrifice and killing of any kind. At Warford's request, Hardin had tattooed an inverted cross on her chest. Clark never practiced Satanism.

53.     When approached by investigators, both Clark and Hardin cooperated fully. They each sat for multiple interviews and voluntarily gave saliva, blood, hair, and pubic hair samples.

54.     At the request of Det. Clark, Det. Ronald L. Ennis administered a polygraph to Clark and Det. Kelly Jones administered a polygraph to Hardin. Clark and Hardin both truthfully denied involvement in the Warford murder. Upon information and belief, Clark and Hardin either passed their polygraph examinations, or the polygraphs themselves were a sham designed solely to elicit confessions. Det. Jones and Det. Ennis drafted reports indicating that Clark and Hardin had failed. Det. Handy and Det. Greer falsely told Hardin that he failed his polygraph examination and tried to coerce him to confess. Hardin refused to falsely admit his guilt, and truthfully denied any involvement in Warford's murder. Undeterred, Det. Handy simply fabricated an inculpatory statement. Just as in the Chandler investigation, the fabricated admission included details that supported Det. Handy's theory of the crime.

55.     In his police report, Det. Handy falsely asserted that Hardin admitted sacrificing animals in Satanic ceremonies and had decided that he wanted to sacrifice a human. This statement was utterly fabricated. Hardin has never sacrificed an animal or a human, and he never told Det. Handy that he had done so or that he wanted to try. In fact, Hardin had practiced modern Satanism, which specifically

forbids human or animal sacrifice.

56.     On information and belief, Det. Handy, Det. Clark, Det. Greer, and Sheriff Greer each knew the importance of recording suspect interrogations for establishing the content and circumstances of those interrogations. Yet, despite the availability of recording equipment, which was used to record many other interviews in this case, Det. Handy, Det. Clark, and Det. Greer did not record *any* of the interrogations of Clark and Hardin.

57.     After Det. Handy fabricated Hardin's statement, Defendants began building a case that framed Warford's murder as a ritual killing connected to Satan worship.

58.     An expert on the occult, however, reported to Sheriff Greer that Warford's murder did not bear the hallmarks of a ritual murder.

59.     So, Det. Handy hedged his bets. To provide an alternative motive for the killing, Det. Handy fabricated a second statement from Hardin. After a second interview, Det. Handy falsely reported that Hardin admitted that he threatened to kill Warford out of jealousy.

60.     Despite learning that Warford's murder was not a ritual sacrifice, Defendants persisted in fabricating evidence supporting their baseless theory that the crime was related to Satanism. Defendants did this to better their chances of obtaining convictions against Clark and Hardin.

### *Defendants suppress or fail to investigate evidence that blood found on a handkerchief was not the result of an animal sacrifice.*

61.     During a search of Hardin's home, Defendants found a broken wine

14

glass and a handkerchief stained with blood. Hardin truthfully told Det. Handy and Sheriff Greer that he cut his own hand when the glass broke and used the handkerchief to wipe up the blood. In 2014, DNA testing proved Hardin correct: the blood was his.

62.     Det. Handy and Sheriff Greer, however, used the blood-stained handkerchief to corroborate Det. Handy's falsified claim that Hardin sacrificed animals. Det. Handy and Sheriff Greer falsely represented that the blood on the handkerchief came from animals Hardin had sacrificed in Satanic rituals.

63.     Serologist Thurman tested the handkerchief and confirmed that the stain was blood. On information and belief, he falsely reported that no further testing of the bloodstain could be done.

64.     On information and belief, Thurman did one of two things. He either tested the bloodstain to determine whether it was human blood, found that it was, and suppressed the results because they did not support Det. Handy's theory that the blood came from sacrificed animals. Or, he deliberately failed to test the blood so that no evidence would undermine that theory.

65.     Based on Thurman's misconduct, Sheriff Greer testified at trial that the blood came from animal sacrifice. No evidence was available to the defense to prove the truth: that the blood was Hardin's.

### Sheriff Greer attempts to coerce Clark and Hardin to confess.

66.     During the investigation, Sheriff Greer and other MCSO officers attempted to coerce Clark and Hardin to confess by threatening violence.

67.     During an interrogation and in the presence of other MCSO officers

15

including, on information and belief, Deputies Embry and Wise, Sheriff Greer placed a pistol on the table between himself and Hardin and said, in sum or substance, "Bad things can happen to people who don't cooperate."

68. Despite that threat, Hardin maintained his innocence and refused to falsely confess to a crime he did not commit.

69. Sheriff Greer repeated the procedure with Clark. During an interrogation with Det. Handy, Sheriff Greer falsely told Clark that Hardin was cooperating with police and implicating Clark in the murder. Sheriff Greer and Det. Handy told Clark that it would be better for him if he gave a specific statement inculpating Hardin. When Clark refused to falsely implicate his friend, Sheriff Greer placed a pistol on the table and said, in sum or substance, "You might want to reconsider that or bad things can happen."

### Defendants fabricate testimony inculpating Clark in the murder.

70. Sheriff Greer and Det. Handy fabricated a statement from Amy Remsburg, a former girlfriend of Clark's, who falsely portrayed him as a Satanist with an interest in murder.

71. Remsburg had a motive for framing Clark. Clark had caught her sexually abusing her eight-year-old son and told her family about the incident. Remsburg was later prosecuted for the sexual abuse and pleaded guilty.

72. Remsburg contacted Defendants with the specific purpose of fabricating evidence against Clark to silence him. During the interview, Sheriff Greer shaped Remsburg's statement by feeding her non-public details about the murder, including that the police believed it was a Satanic ritual sacrifice and that the fatal blow had

16

been a stab wound below the base of Warford's skull that severed her brain stem. Armed with this information, Remsburg falsely stated:

> a.   that Clark and Hardin had sacrificed a dog and a cat during a Satanic ritual;
>
> b.   that Clark had told her that he wanted to kill a human to see if he could get away with it;
>
> c.   and that Clark had told her that he knew how best to kill somebody with a knife and had demonstrated striking her neck.

73.   Sheriff Greer asked Remsburg whether Clark ever mentioned killing a person by severing her brain stem, thereby prompting Remsburg to adopt that detail. Remsburg later testified that Clark had mentioned knowing how to kill a person by severing the brain stem.

74.   Remsburg's statements inculpating Clark were false and fabricated. Clark was never involved in Satanism, never sacrificed an animal, and never expressed an interest in killing a human.

### *Defendants fabricate the testimony of jailhouse informant Clifford Capps.*

75.   Defendants continued their conspiracy to frame Clark and Hardin by procuring a false and fabricated statement from Clifford Capps, an inmate at the Meade County jail who was serving a 14-year sentence on multiple felony charges.

76.   On December 2, 1992, Sheriff Greer fabricated a statement for Capps falsely alleging that Clark confessed to Capps on two separate occasions. Sheriff Greer promised Capps leniency if he adopted the falsified statement and agreed to testify against Clark and Hardin.

77.   Once Defendants secured the false and fabricated statement from

17

Capps, they suppressed evidence that the statement was fabricated and that Capps was promised consideration to lie.

78.     In fact, Capps's sentence of incarceration was converted into probation under Kentucky's shock probation procedure just one week after Defendants fabricated his false statement. On information and belief, Sheriff Greer assisted in securing this relief.

79.     And after his parole was revoked in May of 1994, Capps gave false testimony at Clark and Hardin's trial regarding these two fabricated confessions.

80.     His false testimony was a product of undisclosed deals with Defendants. Defendants made good on their promises to Capps, and he was paroled just two months after his false testimony at trial.

### Defendants withhold exculpatory evidence destroying Capps's credibility.

81.     Before trial, Defendants obtained and suppressed a letter from Capps proving that he had falsified his allegations against Clark and Hardin.

82.     In 1993, Capps was slated to be a witness in an unrelated Colorado case. According to Capps, the Colorado defendant made incriminating statements to Capps and Kevin Justis, a fellow Meade County inmate.

83.     In June 1993, while interviewing Justis about the alleged statements, the Colorado defense counsel learned that Capps had written to Justis soliciting fictitious testimony against Clark and Hardin. Capps asked Justis to provide specific false testimony against Clark and Hardin that corroborated his own false claims. Capps suggested that the false testimony could benefit both of them through sentence reductions. Based on this letter, the Colorado prosecutors decided that Capps was not

18

credible to testify.

84.     The Colorado defense counsel conveyed this information to Sheriff Greer. On information and belief, Sheriff Greer shared it with Det. Handy.

85.     In December 1992 or January 1993, Justis told Sheriff Greer and Deputy Sheriff Wise that Capps had asked him to fabricate false testimony against Clark and Hardin to help him get out of jail. Justis furnished Sheriff Greer with a copy of Capps's letter.

86.     Sheriff Greer and the other Defendants withheld this material exculpatory evidence from Clark and Hardin and from the prosecution.

### Defendants manipulate Warford's time of death to inculpate Clark and Hardin.

87.     In order to make the case against Clark and Hardin seem plausible, Defendants had to manipulate Warford's time of death.

88.     Defendants initially believed that Warford's body was "fresh" when they found it on April 5, 1992, indicating that the murder happened the night of April 4. But Clark and Hardin had detailed alibis for that date.

89.     While Clark and Hardin had independent alibis for April 3–4, they were the only two people who could attest to each other's alibi in the early morning of April 2. Det. Handy conveyed this information to Sheriff Greer, who, with Meade County Coroner William Adams, asked the Kentucky State Medical Examiner's Office to date Warford's death on April 2.

90.     After receiving this request, the Medical Examiner opined that it was impossible to determine the exact date or time of Warford's death, and he conceded that

it could have happened on April 2.

91.     Defendants then built their case on the theory that Clark and Hardin murdered Warford in the early hours of April 2, 1992.

92.     But Defendants knew that the murder happened later. Shortly after Warford's body was discovered on April 5, 1992, a witness contacted the MCSO and reported seeing Warford alive on April 3, in Brandenburg, Kentucky. On information and belief, that information was relayed to Det. Handy.

93.     Defendants buried this exculpatory information. They did not record it in any police reports and did not tell the prosecution or defense counsel that the witness had seen Warford alive after her purported date of death. Defense counsel only learned of the witness's exculpatory evidence through its own independent investigation.

### *Defendants fail to investigate Clark and Hardin's alibi.*

94.     On the night of April 1, 1992, and the early morning hours of April 2, 1992, Clark and Hardin were in Clark's Louisville trailer, more than 50 miles from the Meade County field where Warford was murdered. Sometime after 1:00 A.M. on April 2, 1992, Clark drove Hardin to Hardin's parents' house, several blocks away. They stopped at a Chevron station, where Clark bought cigarettes. Several witnesses saw Clark and Hardin at the Chevron station and at Hardin's parents' house.

95.     Det. Handy and Sheriff Greer knew that Clark and Hardin's alibi would be easy to verify. The Chevron station had a surveillance camera that would have established when Clark and Hardin had stopped at the gas station. Yet, Det. Handy and Sheriff Greer deliberately failed to investigate the alibi. They questioned no

20

witnesses about Clark and Hardin's whereabouts on the morning of April 2, and they did not contact the Chevron station to obtain the surveillance video.

96.     On information and belief, the surveillance video was destroyed within a week after it was recorded in accordance with the Chevron station's usual practice, thus depriving Clark and Hardin of significant evidence corroborating their alibi.

### *Defendants fabricate and misrepresent physical evidence.*

97.     In an April 30, 1992 written report concerning the forensic analysis of hairs collected from the victim's body and clothing, KSP serologist Robert Thurman falsely reported that one hair recovered from the victim's sweatpants matched Hardin's head hair.

98.     In 2014, DNA testing definitively proved that the hair could not have come from Hardin.

99.      Thurman's 1992 assertion that the hair recovered from the victim's sweat pants matched a hair from Hardin was a fabrication. On information and belief, Thurman did not see a hair from Hardin that exhibited all the microscopic characteristics observed on the crime scene hair and thus fabricated the positive association. Moreover, Thurman knew that even if the hairs were microscopically indistinguishable, that all the science of hair microscopy allowed even in 1992, was to say that someone is included in a pool of people of unknown size, who could have contributed the hair. In fact, even when hairs are microscopically indistinguishable, they often come from different people. Thurman's failure to disclose this scientific fact to the prosecutor and the defense, which would have significantly undermined the evidentiary value of the hair (assuming he actually saw two microscopically

21

indistinguishable hairs), was intentional and misleading.

100.     Sheriff Greer later repeated Thurman's falsehood to the grand jury by testifying that one hair on the victim's pants "matched" Hardin's hair.

101.     Thurman and Sheriff Greer repeated that false statement again at trial. They testified that the hair found on Warford's pants matched Hardin's hair and was significant from an investigative standpoint.

102.     Similarly, Sheriff Greer misrepresented physical evidence taken from Clark's car.

103.     During interrogations with Defendants, Clark admitted to Det. Handy and Sheriff Greer that Warford had been in his car on several occasions, but not since December of the previous year.

104.     When a fingerprint of Warford's was lifted from Clark's car it simply confirmed Clark's story: Warford had been in Clark's car.

105.     Nonetheless, and without any scientific basis, Sheriff Greer falsely reported that the fingerprint was "fresh." Sheriff Greer knew at that time that fingerprints cannot be dated.

106.     Indeed, the Commonwealth's own expert at trial noted that fingerprints can remain on surfaces indefinitely and cannot be dated.

### *Defendants disregard exculpatory evidence regarding the hairs found in the victim's hand.*

107.     On April 30, 1992, KSP Defendant Thurman issued a lab report documenting that he examined three hairs collected from the victim's right hand.

108.     In the report, KSP Defendant Thurman stated that one hair was brown

22

and similar to the hair standards of Warford. He further noted the other two hairs were grey and were dissimilar to the hair standards of the victim, Clark, and Hardin, eliminating them as the source of those two hairs.

109.    Yet, in their quest to frame Clark and Hardin, Defendants intentionally ignored this exculpatory evidence and did not follow up on or investigate the source of the two hairs.

### *Defendants fail to investigate James Whitely, who confessed to the murder.*

110.    In September 1993, Warford's friend Eletha Nicole Madison revealed to the grand jury that Warford's ex-paramour James Whitely confessed to murdering her.

111.    Madison testified that Whitely admitted to picking Warford up from a Kroger parking lot near her house and taking her to a field in Meade County where an altercation ensued. Madison testified that Whitely admitted that after Warford threatened to prosecute him, he flew into a rage and murdered her.

112.    Unlike Clark and Hardin, Whitely is a convicted felon with a long criminal record, including convictions for drug possession, assault, harassment, and domestic violence. Defendants had reason to believe Madison's testimony—after all, they knew that the case against Clark and Hardin rested on fabricated evidence. Yet, Defendants refused to pursue Whitely and instead continued to frame Clark and Hardin for a murder that they did not commit.

***The supervisory defendants knew or had reason to know of the line officers'
misconduct.***

113.     Det. Handy, Det. Clark, and Det. Greer provided regular, detailed

reports to Maj. Griffiths, Sgt. Edelen, and Sgt. Woosley, who closely monitored the

investigation. Based on Det. Handy's history of misconduct, Maj. Griffiths, Sgt. Edelen,

and Sgt. Woosley had reason to know that the case against Clark and Hardin was built

on lies.

114.     Maj. Griffiths, Sgt. Edelen, and Sgt. Woosley also had reason to know

that Det. Handy, Det. Greer, and the other Defendants violated LMPD policies

concerning witness interrogation and the handling of evidence. Based on the

circumstances under which Hardin purportedly gave his inculpatory statements—in

an unrecorded conversation with Det. Handy—the supervisory Defendants knew or

should have known that the statements were fabrications.

115.     Sheriff Greer had final policymaking authority in the MCSO. As an

active participant in the misconduct described above, Sheriff Greer established

unconstitutional policies concerning witness interrogation and the handling of

evidence.

## CLARK AND HARDIN'S WRONGFUL PROSECUTION

116.     On May 7, 1993, Defendants sought and obtained indictments against

Clark and Hardin for capital murder. Defendants knowingly used false and fabricated

statements and evidence to initiate the charges against Hardin.

117.     The prosecution relied on the false narrative supplied by Det. Handy

and Sheriff Greer that Hardin was a hard-core Satanist who, with his friend Clark,

24

sacrificed Warford as part of a sick ritual.

118.    Based on this false theory, the prosecution sought the death penalty, arguing that Clark and Hardin had murdered Warford "for profit," namely the benefit earned from enhancing their standing with Satan.

119.    As Defendants knew, however, the only evidence supporting such a theory was Det. Handy's fabricated report and testimony claiming that Hardin had admitted to wanting to sacrifice a human being.

120.    Defendants also introduced serologist Thurman's false report and representation concluding that a single hair found on Warford's pants matched Hardin's. (DNA evidence has proven that it was not his.) Sheriff Greer falsely told the grand jury that the hair "match[ed]" Hardin's hair, knowing both that Thurman's report was falsified and that hairs cannot be matched to one another through microscopy. Sheriff Greer also falsely told the grand jury that investigators had found a "fresh" fingerprint of Warford's on the interior window of Clark's car. At the time of his testimony, Defendant Greer knew that this representation was false.

121.    Based on the fabricated statements, flawed and false forensic reports, and the Defendants' fabricated evidence, the grand jury indicted, and the case proceeded to trial in February of 1995.

122.    At trial, the prosecution continued to rely on the Defendants' falsified evidence. In his opening statement, the prosecutor repeated three times that Hardin had wanted to "do a human"—a fact that Det. Handy had utterly fabricated—and returned to the theme in his closing. The prosecutor also relied on Remsburg's fabricated statement, dictated by Sheriff Greer, that Clark had wanted to kill

25

somebody because it would be challenging.

123.    The only evidence at trial implicating Clark and Hardin in the murder had been fabricated or misrepresented by Defendants: Hardin's and Clark's supposed admissions to Det. Handy, Capps, and Remsburg, the hair that purportedly "matched" Hardin's, and the fingerprint taken from Clark's car that Sheriff Greer described as "fresh."

124.    Won over by the Defendants' falsified evidence, the Meade County jury convicted Clark and Hardin of murder and recommended a sentence of life imprisonment for each. The trial judge entered final judgment against them on May 18, 1995, and they began their term of incarceration.

## DEFENDANTS' POST-CONVICTION MISCONDUCT

125.    Despite their convictions, the men's horrific ordeals were not irremediable. Starting in 1998, after Clark and Hardin's direct appeals had been denied, both men attempted to prove their innocence and be released from their wrongful imprisonment through a series of post-conviction petitions to obtain new trials. The two men continued to request information from Defendants and exculpatory evidence that would have freed the men from their wrongful imprisonment at the time of these post-conviction petitions.

126.    Specifically, in 1998, Clark filed a petition for habeas corpus in federal court, which was denied. In 1999, Clark appealed, and, in 2001, his appeal was also denied. In 1999, Hardin filed a motion under RCr 11.42 for a new trial, which was denied in 2001. Hardin appealed, and, in 2003, the Kentucky Court of Appeals affirmed. In January 2003, Clark filed a separate motion under RCr 11.42 for a new

trial, and his motion was denied in that year. Clark appealed, and, in 2004, the Kentucky Court of Appeals affirmed. In 2004, Clark and Hardin each filed a motion under CR 60.02 for a new trial which were ultimately denied.

127.    Defendants, including Handy, Clark, Johns, Ennis, Edelen, Woosley, Griffiths, Sheriff Greer, Embry, Wise, Adams, and Thurman, knew about these proceedings, were in possession of exculpatory evidence to which Clark and Hardin were legally and constitutionally entitled to use in connection with their post-conviction proceedings, and knew or should have known that the exculpatory evidence in their possession, if provided to Hardin, Clark, the prosecutor, or the post-conviction Courts, would have freed the men from their wrongful imprisonment.

128.    Instead, Defendants affirmatively concealed or otherwise negligently and/or recklessly breached their legal and constitutional duties to come forward with this exculpatory evidence in connection with Clark's 1998 habeas petition, his 1999 appeal of the denial of that petition, Hardin's 1999 motion for a new trial, his 2001 appeal of the denial of that motion, Clark's 2003 motion for a new trial, his 2003 appeal of the denial of that motion, and Clark and Hardin's 2004 motions for a new trial.

129.    By breaching their legal and constitutional duties to come forward with exculpatory evidence specifically in connection with these post-conviction proceedings, Defendants violated Clark and Hardin's legal and constitutional rights, including their rights to rely on this evidence in support of their motions and petitions for post-conviction relief. The concealment of evidence in connection with these proceedings violated Clark and Hardin's civil rights, prohibited them from being freed, and caused

27

the men injuries.

## CLARK AND HARDIN'S EXONERATION

130.     In April 2013, the Kentucky Supreme Court directed the Commonwealth to release the physical evidence in the case for DNA testing, noting that the evidence presented against Clark and Hardin was "far from conclusive of their guilt" and that they were convicted based on "highly circumstantial evidence."

131.     After the DNA testing revealed that Clark and Hardin were, in fact, innocent of Warford's murder, post-conviction counsel moved for a new trial.

132.     In July of 2015, the Meade Circuit Court held an evidentiary hearing in which Hardin and Clark presented evidence of their innocence and the Defendants' misconduct.

133.     On July 14, 2016, the Meade Circuit Court vacated Clark and Hardin's conviction and ordered a new trial. The new trial was granted because of the overwhelming evidence that Clark and Hardin are innocent.

134.     To pressure Clark and Hardin to plead guilty, Meade County prosecutors indicted them both with kidnapping the murder victim, an aggravating felony that would have exposed them to the death penalty. In 2018, the Meade Circuit Court dismissed the new indictments as vindictive, finding that they "were not the product of good faith" and were brought only "in order to punish [Clark and Hardin] for standing on [their] legal rights."

135.     The Kentucky Attorney General took over the murder case and reevaluated the evidence against Clark and Hardin. Based on that review, the Commonwealth moved to dismiss the indictments against Clark and Hardin.

28

136.     The Commonwealth concluded that the DNA evidence showed that the hair found on the sweatpants "does not link to the defendants, and potentially points to an alternate perpetrator." And the test results from the bloody rag found with the chalice "now bolster defendants' credibility because Mr. Hardin has always maintained the blood on the rag was his."

137.     The Commonwealth also concluded that it could not rely upon Capps's false statement regarding Clark's confession based in part on Capps's history of perjury.

138.     Similarly, Defendant Handy's history of fabricating incriminating statements against innocent defendants prevented the Commonwealth from relying on his testimony. The Commonwealth observed: "[I]f this case were retried and Det. Handy (now Sgt. Handy) were called as a witness, the jury would learn about his handling of the Chandler case. The jury would further hear that Mr. Chandler was falsely imprisoned for almost ten years based in large part on the testimony of Det. Handy."

139.     "Put bluntly," the motion continued, "the Commonwealth cannot put credibility into an unrecorded statement taken by a detective who has a documented history of fabricating details of a murder case in his investigative summaries.…The Commonwealth cannot call Det. Handy as a witness to testify regarding the only unrecorded pretrial admission."

140.     In summary, the Attorney General's Office wrote: "Subsequent discoveries about the reliability of these witnesses, along with the development of more reliable scientific testing, leave the Commonwealth to conclude that there is no longer

sufficient evidence by which a reasonable jury could conclude the defendants are, in fact, guilty beyond a reasonable doubt."

141.    The Meade Circuit Court granted the Commonwealth's motion and dismissed the indictment on February 26, 2018.

142.    The dismissal of Clark and Hardin's indictment was a favorable termination of their prosecution.

### The Louisville Defendants' Pattern and Practice of Misconduct to Secure Wrongful Prosecutions and Convictions

143.    The investigative misconduct that led to Clark and Hardin's arrest, indictment, malicious prosecution, wrongful conviction and imprisonment was not an anomaly. Rather, it was simply the way Louisville police closed cases.

144.    Specifically, before, during, and since the unlawful investigation, prosecution, and conviction of Clark and Hardin, the City of Louisville and LMPD (the "Louisville Defendants"), by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by LMPD investigators, including but not limited to the following:

    a.    fabricating evidence;

    b.    failing to promptly document and disclose material, exculpatory and impeachment evidence to prosecutors;

    c.    destroying evidence;

    d.    failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations;

    e.    disregarding the Fifth and Fourteenth Amendment rights of criminal suspects and defendants; and

   f.  engaging in the ongoing affirmative concealment and coverup of police misconduct.

145. Before, during and after the unlawful investigation, prosecution, and conviction of Hardin and Clark, the Louisville Defendants, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline LMPD investigators regarding fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to the following:

   a.  conducting witness identification procedures, including photo arrays and live lineups;

   b.  maintaining physical evidence and accurately documenting investigative work;

   c.  documenting and promptly disclosing exculpatory and impeachment evidence to prosecutors;

   d.  conducting constitutionally adequate investigations with objectivity rather than tunnel vision; and

   e.  conducting custodial interrogations and witness interviews.

146. Pursuant to these unconstitutional policies, customs, or patterns and practices, municipal defendants' final policymakers abdicated and effectively delegated to detectives, including but not limited to defendants Handy, James Clark, Jones, Ennis, Edelen, Woosley, and Griffiths, the authority and discretion to conduct and supervise investigations with deliberate and reckless disregard for their constitutional duties and the rights of innocent suspects.

147. As a result, detectives, officers, and supervisors, including but not

limited to defendants Handy, James Clark, Jones, Ennis, Edelen, Woosley, and Griffiths, routinely and knowingly engaged in investigative misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

148.    The unconstitutional municipal policies, customs, and practices of investigative misconduct and failure to supervise, train and discipline police were reflected in the multiple acts of misconduct and illegality committed by multiple Louisville police officers, detectives and supervisors in relation to multiple suspects and witnesses in the Warford investigation, as described above.

### *The Louisville Defendants' Custom and Practice of Fabricating Inculpatory Evidence and Failure to Supervise and Discipline Police Regarding their Obligations not to Fabricate Evidence*

149.    By 1992, it was a well-established legal principle and a fundamental tenet of responsible police practices that fabricating evidence against a suspect violates the suspect's constitutional rights. Nonetheless, the municipal defendants, by and through their final policymakers and delegees, failed either to supervise their police to ensure they did not fabricate evidence, or to discipline police when they did. These municipal failures created an environment of impunity in which fabricating evidence was tacitly, and sometimes explicitly, authorized.

150.    These systemic municipal lapses and unconstitutional fabrications of evidence were the norm in 1992. For example, in 1992, LMPD officers Steve Clark and Joe Carroll falsely reported in their investigative notes that rape suspect **William Gregory** had volunteered guilty knowledge regarding a rape for which he had been arrested—a list of the items stolen from a rape victim's apartment— falsely claiming that they had not provided this information to Gregory. Officers Clark and Carroll

32

then testified to these false allegations at Gregory's trial. As Gregory was innocent of the rape in question, he could not have and did not volunteer the nonpublic information regarding the items stolen from the victim's apartment. This information was fed to him by LMPD officers Clark and Carroll, who were aware of the inculpatory value of nonpublic facts originating from a criminal suspect. The officers thereby fabricated this evidence to create probable cause to prosecute Gregory.

151.    In 1992, in accordance with these unconstitutional customs and practices, LMPD officers wrongly arrested, deliberately manufactured a case against, destroyed and ignored exculpatory evidence, maliciously prosecuted and covered up or withheld exculpatory and impeachment evidence from another innocent suspect, **Keith West**, who was wrongfully convicted of a crime for which he had he had acted in self-defense. West experienced many of the same types of misconduct that led to Clark and Hardin's wrongful conviction.

152.    Similarly, in accordance with these same municipal customs, practices, and lapses in training and supervision, in 1993, Det. Handy and other defendants deliberately fabricated a confession from murder suspect **Edwin Chandler**. After falsely telling him that he failed a polygraph and engaging in other coercive misconduct, Det. Handy and others coerced Chandler to confess. To make the confession sound more believable, they fed Chandler nonpublic facts about the crime and then misrepresented how his "confession" was elicited in order to make it appear that Chandler had guilty knowledge of nonpublic facts only the perpetrator could have known.

153.    In 1996, in accordance with the same unconstitutional customs and

33

practices, LMPD wrongly arrested, deliberately manufactured a case against, destroyed and ignored exculpatory evidence, maliciously prosecuted, and covered up or withheld exculpatory and impeachment evidence from another innocent suspect, **Kerry Porter**, who was wrongfully convicted of a crime he did not commit. LMPD officers manufactured two false inculpatory statements from jailhouse snitches by feeding them details of the crime. Porter was only exonerated after the news media obtained evidence from a subsequent investigation showing that a different suspect had committed the murder. Despite having this information, the LMPD cold case squad did nothing to inform Porter or his defense counsel of it. DNA evidence subsequently proved Porter's innocence.

154.    Here, LMPD Defendants Handy, James Clark, Jones, Ennis, Edelen, Woosley, and Griffiths, in accordance with the Louisville Defendants' unconstitutional policy or practice of manufacturing false evidence and failing to train, supervise, and discipline officers fabricated the evidence that led to Clark and Hardin's indictment and conviction. Specifically:

> a.   the false statement attributed to Hardin by Det. Handy that he had sacrificed animals for Satan and wanted to move on to humans;
>
> b.   the false statement attributed to Hardin by Det. Handy that he had threatened Warford before her murder;
>
> c.   the false hair evidence developed by serologist Thurman in coordination with Det. Handy and other LMPD Defendants;
>
> d.   the false bloodstain evidence developed by serologist Thurman in coordination with Det. Handy and other LMPD Defendants; and
>
> e.   the false statements of jailhouse informant Capps and Remsburg implicating Clark in the murders, which were fabricated by Sheriff Greer in coordination with Det. Handy and other LMPD

Defendants.

### *The Louisville Defendants' Custom and Practice of Suppressing* Brady *Evidence and Failure to Train, Supervise and Discipline OfficerRegarding* Brady *Obligations*

155.    In 1992, police had a clearly established constitutional duty to disclose exculpatory and impeachment information to prosecutors under *Brady v. Maryland*, *Giglio v. United States*, and their progeny. Failing to carry out these *Brady* disclosure duties posed obvious risks for criminal defendants, yet the Louisville Defendants utterly failed to supervise or train police in this regard. Specifically, the Louisville Defendants did nothing to ensure police understood their *Brady* duties and carried them out in practice.

156.    E. Douglas Hamilton, the LMPD Police Chief in 1992 and 1993, has testified under oath that in 1992, at the time of the Warford investigation, LMPD officers were "confused" about their *Brady* duty to disclose exculpatory information to prosecutors, but received no ordinary or remedial training on this duty.

157.    Despite Hamilton's admission, the Louisville Defendants took no action to properly train LMPD officers in how to meet their *Brady* obligations.

158.    As a direct result of the Louisville Defendants' deliberate indifference to the obvious risk this endemic *Brady* confusion posed to criminal defendants—and specifically to innocent suspects like Hardin and Clark—the confusion persisted throughout the 1992 Warford investigation and indeed for years thereafter without intervention from supervisors or policymakers.

159.    For example, as noted above, pursuant to this custom and practice, LPD officers in 1992 arrested, maliciously prosecuted and covered up or withheld

exculpatory and impeachment information—including evidence of their own misconduct—from another innocent suspect, William Gregory. As a result, Gregory was wrongly convicted of two rapes he did not commit and endured more than seven years of imprisonment before he was proven innocent and released.

160.    Gregory sued. In that action, *Gregory v. City of Louisville, et al.*, 444 F.3d 725 (6th Cir.), *reh'g denied* (2006), the Sixth Circuit found that the City of Louisville had been deliberately indifferent in failing to train LMPD officers on their *Brady* and *Giglio* disclosure obligations.

161.    Here, the very same municipal customs, practices and systemic lapses in training, as well as systemic lapses in supervision and discipline, led police to arrest, maliciously prosecute, and cover up and withhold exculpatory and impeachment information from Clark and Hardin, including:

> a.    the fact that Det. Handy and other LMPD Defendants withheld evidence that Capps had conspired with other jail; and
>
> b.    the fact that serology showed that the blood found on the handkerchief was human, not animal blood, or, alternatively, that no testing had been done on the bloodstains.

### The Louisville Defendants' Custom and Practice of Introducing Falsified Polygraph Evidence to Induce False Confessions

162.    Before, during and after the investigation, prosecution, and conviction of Clark and Hardin, the LMPD maintained a policy, custom, or pattern of fabricating false polygraph evidence to coerce confessions or to establish apparent probable cause to arrest criminal suspects. This policy, condoned by the Louisville Defendants, violated suspects' rights under the Fifth and Fourteenth Amendments to the Constitution. This custom and practice was maintained to assist the prosecution in

36

obtaining convictions, with deliberate indifference to the known obvious risk that such tactics would lead criminal suspects to falsely confess and be arrested without probable cause, be subjected to unfair trials, and wrongfully convicted.

163.    For example, Defendants Handy and Clark administered a polygraph to Edwin Chandler, falsely told him that he failed, and coerced a false confession out of him. To make the confession sound more believable, Det. Handy fed Chandler non-public details about the crime and falsely represented that they originated with Chandler. Chandler's false confession was the critical evidence leading to his murder conviction and his wrongful incarceration.

164.    Also, in the 1995 Mark Butcher murder investigation, LMPD officers administered a polygraph examination on a developmentally delayed suspect, John Elvis Rogers, and, on information and belief, misrepresented to Rogers that he failed the polygraph examination. But Rogers had passed the polygraph, a fact that the Supreme Court of Kentucky found should have been admitted at trial in support of Rogers' argument that he falsely confessed to the crime due to coercion by Payton and other LPD officers. *See Rogers v. Commonwealth*, 86 S.W.3d 29 (Ky. 2002).

165.    Similarly, in the 1998 Jordan Rowlett murder investigation, LMPD officers administered a polygraph examination on the suspect, Jamie R. Smith, and, on information and belief, misrepresented to Smith that she failed the polygraph examination. But Smith had passed the polygraph, a fact that the Kentucky Court of Appeals, after a remand from the Supreme Court of Kentucky, found should have been admitted at trial in support of Smith's argument that her statements were coerced by the LMPD officers. *See Smith v. Commonwealth*, No. 2000-CA-001735- MR,

2003 WL 21362056 (Ky. App. June 13, 2003) (unpublished).

166. Before, during and after the unlawful investigation, prosecution, and conviction of Clark and Hardin, the Louisville defendants, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline Louisville police officers regarding their obligation to avoid using fabricated and false polygraph examination results in their interrogations of criminal suspects.

167. In accordance with this policy, custom, or pattern and practice, policymakers for the LMPD abdicated and effectively delegated to detectives, including but not limited to Det. Handy, Det. Clark, Det. Greer, Det. Jones, and Det. Ennis, the authority and discretion to use impermissibly coercive tactics in interrogating criminal suspects, including fabricated and falsified polygraph evidence, and to conceal and misrepresent evidence of these coercive tactics in investigations, in communications with prosecutors, and at trial, with deliberate and reckless disregard for detectives' constitutional duties and the known or obvious risk that such conduct would lead to wrongful convictions.

### The Louisville Defendants' Final Policymakers and Delegees Were on Notice of the Systemic Unconstitutional Customs, Practices and Lapses in Training, Supervision and Discipline

168. The municipal defendants' unconstitutional policies, customs, or patterns and practices of investigative misconduct and failure to supervise and train detectives and officers were reflected in numerous prior cases and investigations of which the municipal defendants and their final policymakers were on notice before the Rhonda Warford murder investigation.

38

169.    For example, the municipal defendants knew and were on actual notice that defendant Handy had, in other prior felony investigations, destroyed evidence that had substantial power to prove suspects' innocence. Yet, the municipal defendants never conducted a meaningful internal investigation into his misconduct, never disciplined him, and did not ensure that he was more closely supervised despite the obvious risk he posed, leaving him free to act with impunity.

170.    Before the wrongful conviction of Clark and Hardin, Louisville's final policymakers were on actual and/or constructive notice of these unconstitutional customs and resulting misconduct of Defendants Det. Handy, Det. Greer, Det. Clark, and other Louisville police including Defendants named herein through, for example:

a.   their direct involvement in and knowledge of the rape investigations that led to the arrest, prosecution and conviction of William Gregory;

b.   their direct involvement in and knowledge of the murder investigation that led to the arrest, prosecution, and conviction of Edwin Chandler;

c.   their direct involvement in and knowledge of the murder investigation that led to the arrest, prosecution, and conviction of Keith West;

d.   defendants Det. Handy's and Det. Clark's widely known reputations for engaging in and condoning investigative misconduct of the type described above;

e.   specific publicity and notoriety generated from their conduct in highly publicized criminal proceedings prior to Clark and Hardin's convictions;

f.   prior published judicial decisions; and

g.   their participation in and knowledge of the investigation of the Warford murder and the prosecution of Clark and Hardin.

39

171.     Despite their notice of ongoing lapses of constitutional magnitude, the municipal defendants' supervisors and final policymakers, acting with deliberate indifference, failed to train, supervise, discipline, or otherwise remediate Louisville police officers.

## DAMAGES

172.     Hardin spent more than 22 years incarcerated for a crime he did not commit. He must now attempt to make a life for himself without the benefit of those life experiences that normally equip adults for that task.

173.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, negligent, and/or deliberately indifferent acts and omissions, Hardin sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 22 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

174.     Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, Hardin was stripped of the various pleasures of basic human experience, from the simplest to the most important,

which all free people enjoy as a matter of right. Hardin missed out on the ability to share holidays, births, funerals, and other life events with loved ones, the opportunity to fall in love, to marry, and the fundamental freedom to live one's life as an autonomous human being.

175.    Because of the foregoing, Hardin has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

## Count I - 42 U.S.C. § 1983
## Due Process

176.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

177.    As described more fully above, all Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Hardin of his constitutional right to a fair trial.

178.    In the manner described more fully above, Defendants conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Hardin could not and would not have been pursued.

179.    The Defendants' misconduct also directly resulted in the unjust criminal conviction of Hardin, thereby denying him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

180.    Because of this violation of their constitutional right to a fair trial,

41

Hardin suffered injuries including but not limited to emotional distress, as is more fully alleged above.

181.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Hardin's constitutional rights.

182.   Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence to Hardin, the prosecutor, and the Court in connection with Hardin's attempts to free himself from his wrongful imprisonment, including in connection with his 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

183.   By failing to provide known exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Hardin's legal and constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and new violations of his civil rights.

184.   The misconduct described in this Count was undertaken pursuant to a routine practice of the MCSO and LMPD to pursue wrongful convictions through reckless and profoundly flawed investigations and coerced evidence. In this way, the municipal defendants violated Hardin's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

185.   These widespread practices, so well-settled as to constitute *de facto* policy in the MCSO and LMPD, could exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the

problem, thereby effectively ratifying it.

186.    The widespread practices described in the preceding paragraphs could flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count II – 42 U.S.C. § 1983
## Fourth, Fifth, and Fourteenth Amendments Fabrication of False Evidence

187.    Each paragraph of this Complaint is incorporated as if restated fully herein.

188.    In the manner described more fully above, Defendants, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, false forensic reports, and fabricated statements attributed to Clark, Hardin, and witnesses, which were introduced at the grand jury and trial proceedings. Defendants knowingly fabricated this evidence and a reasonable likelihood exists that the false evidence affected the decision of the grand jurors and jurors that considered this false evidence.

189.    Defendants were acting under color of law and within their scope of employment when they took these actions.

190.    The Defendants' misconduct directly resulted in the unjust continued incarceration of Hardin, thereby denying him from his constitutional right to due process as guaranteed by the U.S. Constitution. In 1992, no reasonable officer would have believed that fabricating evidence was lawful.

191.    Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence to Hardin, the prosecutor,

and the Court in connection with Hardin's attempts to free himself from his wrongful imprisonment, including in connection with his 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

192.     By failing provide exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Hardin's legal and constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and new violations of his civil rights.

193.     As a direct and proximate result of the Defendants' actions, Hardin's constitutional rights were violated, and he suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count III – 42 U.S.C. § 1983
### Malicious Prosecution

194.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

195.     As described more fully above, all Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Hardin of his constitutional right to be free from unlawful prosecution and continued detention without probable cause.

196.     In the manner described more fully above, Defendants made, influenced and/or participated in the decision to prosecute Hardin for murder, for which

prosecution there was no probable cause, and which caused Hardin to suffer a deprivation of liberty. Their misconduct included falsifying evidence and withholding exculpatory and impeachment evidence.

197. The prosecution was ultimately resolved in Clark and Hardin's favor when the Meade Circuit Court vacated their convictions and dismissed the indictments against them. The vacatur and dismissal orders were both based on the lack of incriminating evidence against the innocent Plaintiffs.

198. The Defendants' misconduct directly resulted in the unlawful prosecution and continued deprivation of Hardin's liberty in violation of his constitutional rights.

199. Because of this violation of his constitutional rights, Hardin suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

200. The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Hardin's constitutional rights.

201. The misconduct described in this Count was undertaken pursuant to a routine practice of the MCSO and LMPD to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence. In this way, the municipal defendants violated Hardin's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

202. These widespread practices, so well-settled to constitute *de facto* policy

45

in the MCSO and LMPD, could exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

203.     The widespread practices described in the preceding paragraphs could flourish because the municipal defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count IV – 42 U.S.C. § 1983
## Supervisory Liability Against the Louisville and Meade County Defendants

204.     Each paragraph of this Complaint is incorporated as if restated fully herein.

205.     The continued wrongful detention of Hardin was caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Major Griffiths, Sergeant Edelen, and Sergeant Woosley, when they failed to adequately supervise, discipline, and train the individual Defendants.

206.     Specifically, these supervisory defendants were personally involved in the case against Hardin and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

207.     Furthermore, these supervisory Defendants failed to supervise Defendants in constitutionally adequate law enforcement practices, particularly those concerning interviews of suspects, the preparation of forensic reports, and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other Defendants to engage in a reckless investigation, to coerce and

46

fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Hardin.

208.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that Defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Hardin's constitutional rights.

209.    The personal involvement of Defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Hardin, including the above- mentioned injuries and damages.

210.    Defendant supervisors, through affirmative acts or omissions, breached their legal and constitutional duties to come forward with exculpatory evidence in connection with Hardin's 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

211.    By failing to come forward with exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Hardin's legal and constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and new violations of his civil rights.

212.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, or deliberate indifference

47

to Hardin's clearly established constitutional rights.

## Count V - 42 U.S.C. § 1983
## Failure to Intervene

213.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

214.     In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

215.     Because of the Defendants' failure to intervene to prevent the violation of Hardin constitutional rights, Hardin suffered pain and injury, as well as emotional distress.

216.     Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence to Hardin, the prosecutor, or the Court in connection with Hardin's attempts to free himself from his wrongful imprisonment, including in connection 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

217.     By failing to come forward with exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Hardin's legal and constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and new violations of his civil rights.

218.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Hardin rights.

48

219.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the MCSO and LMPD in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for the Municipal Defendants with final policymaking authority.

### Count VI - 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

220.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

221.    After Warford was murdered, Defendants reached an agreement amongst themselves to frame Clark and Hardin for the crime and to thereby deprive Hardin of his constitutional rights and his liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

222.    In this manner, Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

223.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

224.    As a direct and proximate result of the illicit prior agreement referenced above, Hardin's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

225.    Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence to Hardin, the prosecutor, and the Court in connection with Hardin's attempts to free himself from his wrongful

49

imprisonment, including in connection 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

226.    By failing to come forward with exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Hardin's legal and constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and new violations of his civil rights.

227.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

228.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the MCSO and LMPD in the manner described more fully in the preceding paragraphs and was tacitly ratified by policymakers for the municipal defendants with final policymaking authority.

## Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant City of Louisville

229.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

230.    The actions of LMPD officers in fabricating evidence and withholding material exculpatory information from Hardin and his counsel were undertaken pursuant to the policies and practices of the LMPD, described above, which were created, maintained, or ratified by policymakers for the City of Louisville with final policymaking authority.

231.    The policies and practices described in this Count were maintained and

50

implemented by the City of Louisville with deliberate indifference to Hardin's constitutional rights.

232.     As a direct and proximate result of the City of Louisville's actions, Hardin's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

233.     The City of Louisville is therefore liable for the misconduct committed by its officers.

## Count VIII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant Meade County

234.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

235.     The actions of Meade County Officers in withholding material exculpatory information, fabricating evidence, and attempting to coerce a confession, were undertaken pursuant to the policies and practices of the Meade County Sheriff's Office, described above, which were created, maintained, or ratified by policymakers for the Meade County Government with final policymaking authority, including Sheriff Joseph Greer.

236.     Defendant Meade County Sheriff's Office and its final policymaker Sheriff Joseph Greer decided to withhold material exculpatory information, fabricate evidence, and attempt to coerce a confession, as described above, Defendant Greer's decisions as final policymaker demonstrate Meade County's custom, pattern, practice, or policy of unconstitutional misconduct in homicide investigations.

237.     The policies and practices described in this Count were maintained and

implemented by the Meade County Government with deliberate indifference to Hardin's constitutional rights.

238.     As a direct and proximate result of the Meade County Government's actions, Hardin's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

239.     The Meade County Government is therefore liable for the misconduct committed by its officers.

## STATE LAW CLAIMS

### Count IX – Negligent Supervision

240.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

241.     The municipal defendants, as well as the supervisory Defendants Griffiths, Edelen, and Woosley, had a duty to properly train and supervise officers, detectives, and supervisor employees of the Louisville Police Department and the Meade County Sheriff's Department, and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

242.     Defendants supervisors, through affirmative acts or omissions, breached their legal and constitutional duties to come forward with exculpatory evidence in connection with Hardin's 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

243.     By failing to come forward with exculpatory evidence in connection with these post-conviction proceedings, Defendants violated Hardin's legal and

constitutional rights, including his right to rely on this evidence in support of his motions and petitions for post-conviction relief, and caused his continued imprisonment and other injuries.

244.    The municipal defendants and the supervisory defendants were grossly negligent and negligent in the training, supervision and discipline of Defendants, resulting in Hardin being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

245.    Because of this misconduct, Hardin suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

## Count X – Respondeat Superior

246.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

247.    In committing the acts alleged in the preceding paragraphs, Defendants were members and agents of the LMPD and MCSO Department, acting at all relevant times within the scope of their employment.

248.    Defendants City of Louisville and Meade County are liable as principals for all state law torts committed by their agents.

## Count XI – Malicious Prosecution

249.    Hardin hereby incorporates by reference the foregoing paragraphs and further alleges as follows.

250.    Defendants, all state actors, acting deliberately, recklessly and under color of law, acted individually and in concert to arrest and imprison Hardin for the murder of Rhonda Sue Warford, without probable cause or other legal justification.

251.     Defendants engaged in these acts despite knowing that probable cause did not exist to arrest or prosecute Hardin Defendants knew that there was no physical or testimonial evidence connecting Hardin to the crime. Yet defendants disregarded all the evidence pointing to Clark and Hardin's innocence.

252.     The only evidence incriminating Hardin, as Defendants knew, had been manufactured by police themselves.

253.     The prosecution against Clark and Hardin was finally dismissed in their favor based on the lack of incriminating evidence against them.

254.     No reasonable police officer would believe such a fabricated evidence, much less their own written and oral false reports concerning that evidence, could provide probable cause or even arguable probable cause to arrest, indict or prosecute a suspect.

255.     Defendants' actions directly and proximately caused Hardin's arrest, indictment, malicious prosecution, unfair trial, wrongful conviction, and deprivation of liberty, as well as all the ongoing injuries and damages set forth above.

**Count XII – Intentional or Reckless Infliction of Emotional Distress**

256.     Hardin hereby incorporates by reference the foregoing paragraphs and further alleges as follows.

257.     Defendants intentionally and/or recklessly, directly and proximately caused Hardin, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Hardin to refrain from a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation,

and e) maliciously prosecuting Hardin and causing his false arrest and imprisonment.

258.     Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence in connection with Hardin's 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

259.     By failing to provide the exculpatory evidence in connection with these post-conviction proceedings that would have freed Hardin, Defendants' actions caused him severe emotional distress as all hope that Hardin would be freed of his imprisonment was extinguished.

260.     The Defendants' actions caused Hardin to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

261.     The Defendants' actions caused Hardin to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

### Count XIII – Negligent Infliction of Emotional Distress

262.     Hardin hereby incorporates by reference all the foregoing paragraphs and further alleges as follows.

263.     Defendants, directly, proximately, and with negligence and/or gross negligence, caused Hardin, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Hardin to

refrain from a) compelling him to be a witness against himself, b) destroying evidence, c) fabricating evidence, d) withholding material, exculpatory and impeachment evidence, e) failing to conduct a constitutionally adequate investigation, and f) maliciously prosecuting Hardin and causing his false arrest and imprisonment, directly and proximately caused Hardin to be falsely arrested, maliciously prosecuted, and wrongly imprisoned.

264.    Defendants, through affirmative acts or omissions, breached their legal and constitutional duties to provide exculpatory evidence in connection with Hardin's 1999 motion for a new trial, his 2001 appeal of the denial of that motion, and his 2004 motion for a new trial.

265.    By failing to provide the exculpatory evidence in connection with these post-conviction proceedings that would have freed Hardin, Defendants' actions caused him severe emotional distress as all hope that Hardin would be freed of his imprisonment was extinguished.

266.    The Defendants' actions caused Hardin to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and post-conviction incarceration.

267.    The Defendants' actions caused Hardin to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

WHEREFORE, Plaintiff GARR KEITH HARDIN respectfully requests that this

Court enter judgment in his favor and against Defendants LOUISVILLE JEFFERSON COUNTY METRO GOVERNMENT, CITY OF LOUISVILLE,MEADE COUNTY, Louisville Metro Police Detectives MARK HANDY, JAMES CLARK, KELLY JONES, ROBERT ENNIS; Louisville Metro Police Sergeants CHARLES EDELEN, JIM WOOSLEY; Louisville Metro Police Major JAMES W. GRIFFITHS; Meade County Sheriff JOSEPH GREER; Meade County Sheriff's Deputies CLIFF WISE and ERNIE EMBRY, Kentucky State Police Crime Lab Forensic Serologist ROBERT THURMAN; Meade County Coroner WILLIAM ADAMS, and other unknown officers and employees from the Louisville Metro Police Department, Meade County Sheriff's Office and Kentucky State Police, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff GARR KEITH HARDIN hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**Respectfully submitted,**
May 1, 2018

/s/ Larry D. Simon
Larry D. Simon (Ky. Bar No. 64355)
Attorney at Law
Kentucky Home Life Building, 17th Floor
239 South Fifth Street
Louisville, Kentucky 40202-3248
(502) 589-4566

/s/ Nick Brustin
Barry Scheck*

57

Nick Brustin*
Emma Freudenberger*
Rick Sawyer*
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081

***Attorneys for Plaintiff Garr Keith Hardin***

*\* Appearing Pro hac vice*