

**Neufeld Scheck & Brustin, LLP**

Tel: [212] 965-9081  
Fax: [212] 965-9084

99 Hudson Street, 8th Floor  
New York, New York 10013  
nsbcivilrights.com

July 24, 2019

The Honorable Colin H. Lindsay  
United States Magistrate Judge  
United States District Court  
Western District of Kentucky  
Gene Snyder United States Courthouse  
601 West Broadway  
Room 208  
Louisville, KY 40202-2227

Dear Magistrate Judge Lindsay:

Plaintiffs Hardin and Clark write in advance of the joint telephone conference currently scheduled for August 29, 2019 to address Louisville Defendants' apparent discovery violations.[1]

### 1. Plaintiffs seek leave to request an evidentiary hearing to inquire into Louisville Defendants' discovery violations

Plaintiffs respectfully ask the Court to address apparent discovery violations by the Louisville Defendants, who failed to disclose the existence of an active investigation of the Rhonda Sue Warford murder until after Plaintiffs obtained evidence of that investigation from a third party. Among other documents responsive to discovery requests, Defendants failed to disclose interviews with Defendant Sheriff Greer and multiple third-party witnesses—some of whom Plaintiffs have already deposed. This episode has caused Plaintiffs to doubt that the Louisville Defendants have conducted a thorough and complete review of documents in their possession or that they have been fully forthright in their representations to Plaintiffs.

On July 31, 2018, in their first set of requests for production, Plaintiffs specifically requested that Louisville Defendants "[i]dentify and produce true and correct certified copies of any and all documents generated by, or in the custody of, the Louisville Jefferson County Metro Government concerning the investigation of the Rhonda Sue Warford Murder." Ex. A (Plaintiffs' July 31, 2018 Joint Requests for Production) at 6. Specifically Plaintiffs requested *inter alia* 1) the complete LMPD investigative files regarding the Rhonda Sue Warford Murder; 2) the complete investigative files of any other agency of the Louisville

---

[1] By letter dated July 24, 2019, Plaintiffs submitted a joint proposed amended Order approved by all parties requesting a six-month extension of fact discovery. That joint application remains pending.

Jefferson County; 3) affidavits, warrants, and transcripts, including but not limited to transcripts of any grand jury proceedings; interdepartmental memoranda and any other communications between investigative agencies, including but not limited to the LMPD, the MCSO, crime lab, and members of the news media and; 4) documents concerning any other suspects, from April 2, 1992 to the present. Ex. A at 6-7.

In its December 5, 2018, response, Louisville Defendants produced what it represented to be "the complete LMPD investigative file" and "the complete Evidence Technician Unit file," and represented that no responsive documents existed from any other Metro agency. Louisville Defendants also referred Plaintiffs to the "completed LMPD investigative file" and the "complete Evidence Technician Unit file" in response to our requests for affidavits, warrants, and transcripts …; news reports; and documents concerning any other suspects, from April 2, 1992, to the present. Louisville Defendants further represented that they were in possession of the Louisville Metro prosecution file which they believed contained documents duplicative to items disclosed in the LMPD investigative file. In reliance on the representation that complete LMPD files had been disclosed, Plaintiffs began scheduling deposition discovery of key witnesses including Kevin Justis, Clifford Capps, Defendant Sheriff Joseph Greer, and Defendant Cliff Wise. Ex. B, (December 5, 2018 Louisville/Jefferson County Amended Response to Plaintiff's First Joint Request for Production of Documents).

On January 25, 2019, Plaintiffs subpoenaed the Kentucky Office of the Attorney General for any documents related to the Rhonda Sue Warford Murder investigation. After a lengthy negotiation and search, the Kentucky OAG responded to our subpoena on June 21, 2019.

Although the Kentucky OAG itself had few documents, what they produced demonstrated LMPD had been conducting an extensive investigation that had never been disclosed. In oral and written representations, the OAG informed Plaintiffs that it had produced all documents in its possession; that it possessed no primary investigative documents, including recordings and transcripts of interviews with witnesses, and that those documents were in the possession of the LMPD.

These documents made clear that the Louisville Defendants' December 5, 2018 disclosure was deficient. From the OAG's response, Plaintiffs learned that the LMPD was leading an investigation into the Warford murder as early as May 2018—ten months after Plaintiffs filed this lawsuit and two months before our first discovery request. *See* Ex. C, (September 12, 2018 Kentucky Office of the Attorney General Memo KYOAG67)("The Department of Criminal Investigation is providing a supporting role to LMPD in this recently re-opened murder investigation…"). As a part of this investigation, the LMPD developed a significant body of evidence related to this lawsuit, including:

- An October 2018 unrecorded interview with Defendant Sheriff Greer and his counsel;
- Recorded interviews with witnesses who testified in Plaintiffs' criminal trial or postconviction hearings, including jailhouse informant Clifford Capps, who both gave false testimony against Plaintiffs, and Kevin Justis, who exposed Capps's lies and Defendants' investigative misconduct;
- Recorded interviews with three of the victim's family members and an additional third-party witness, Pamela Gibson; and

A buccal swab from alternative suspect James Whitely as well as new tips implicating him as the true killer. This evidence (and more) was responsive to any reasonable interpretation of Plaintiffs' discovery requests, but the Louisville Defendants neither disclosed it in December 2018 nor even mentioned that it existed.

Only after Plaintiffs disclosed the OAG's document production and made a specific request for investigation documents on July 7, 2019, did Louisville Defendants produce these documents. On July 10, 2019, the parties appeared in Meade County for the deposition of Clifford Capps. Moments before the deposition began, counsel for the Louisville Defendants handed Plaintiffs' counsel a disc and represented that he was unaware of the specific contents of the disclosure he was making. Plaintiffs proceeded with the deposition in good faith until a break when we learned for the first time that Louisville Defendants' disclosure contained numerous taped interviews of witnesses that it had been conducting for over a year. One of the recorded interviews was of Clifford Capps, the very witness Plaintiffs were deposing at the time.

Louisville Defendants' delay in disclosure was significant and prejudicial. For example, the late disclosure included an interview with Kevin Justis, a third-party witness who had already been deposed. Likewise, the late disclosure included proof that Capps had long been lying when he maintained that he received no benefit from Meade County for his testimony. It was not until hours *after* Capps's July 10, 2019 deposition that Plaintiff learned that Meade County Defendant Cliff Wise had a long relationship with Capps that included helping him out of tickets in the months leading up to Plaintiffs' criminal trial. Capps described this relationship as being part of the "good old boys system" that operated in Meade County at the time. These benefits were not disclosed to the prosecutor in advance of trial in 1995. The timing of Louisville Defendants' disclosure impacted Plaintiffs' ability to effectively depose both Capps and Defendant Cliff Wise, whose deposition took place just hours later on July 11, 2019.

Plaintiffs made a contemporaneous record of their concerns on the record on July 10, 2019, at the conclusion of Clifford Capps's deposition. When pressed for an explanation for

their late production, counsel for Louisville Defendants refused to provide one. Later than afternoon, counsel wrote the parties and represented that they have been attempting to obtain documents related to this investigation since March 18, 2019. *See* Ex. D (July 10, 2019 Email from Louisville Defendants' counsel).

Defendants' response makes clear they became aware of these documents as early as March 2019—two months before Plaintiffs scheduled any depositions. Yet, Louisville Defendants made no effort to inform Plaintiffs that it had become aware of missing documents. Had Plaintiffs not subpoenaed the Kentucky OAG file, we may never have learned about the existence of these documents. Although Louisville Defendants claim they never knew this discovery existed, they have provided no explanation for why they did not learn of these documents until March 2019 or what steps they took to respond to our July 2018 Request for Production. Even if true, Louisville Defendants' statement is a wholly insufficient excuse—it was their duty to investigate and find out what responsive documents their clients have and produce them.

Moreover, Louisville Defendants' explanation mischaracterizes the investigation as one conducted by the Kentucky Attorney General's Office. Both the oral representations by the Kentucky OAG as well as OAG's internal memos make clear that this is untrue. The current investigation into the murder of Rhonda Sue Warford is a Louisville Metro Police Department investigation. Ex. C. In light of their asserted ignorance about such key discovery as an ongoing investigation being conducted by LMPD over the past year, Plaintiffs cannot rely on *any* representations the Louisville Defendants have made to date about the completeness of their document production. Absent inquiry from the court, Plaintiffs fear they will be missing documents, prejudicing even more depositions in the future.

Plaintiffs should not be put in a position to proceed further until the appropriate disclosures have been completed by the Louisville Defendants. Plaintiffs have already deposed two third-party witnesses while unaware that Louisville Defendants were in possession of recorded interviews with them. Plaintiffs do not wish to unnecessarily delay progress in this case, and have already conducted Defendant Cliff Wise's previously scheduled deposition despite learning hours earlier that the recent investigation had turned up evidence of an undisclosed relationship between him and Capps. While Plaintiffs believe that a sanctions motion is premature at this point, we respectfully request that the Court intervene to inquire into Louisville Defendants failure to disclose. Without such intervention, we do not know the full scope of documents that exist or what prejudice Plaintiffs may have suffered because of Louisville Defendants failure to disclose.

## 2. Defendant Louisville Metro's Strategy Here is Eerily Similar to Their Approach in *Porter*

As this Court may recall, Defendant Louisville Metro took a similar approach to defending the *Porter* lawsuit. *Porter v. Louisville Metro, et al.* 12-CV-829(CRS). There, Defendant Louisville Metro, and their private co-counsel, declined to hire a single investigator throughout the litigation and instead used the Louisville Metro Police Department to conduct interviews of witnesses under the auspices of conducting a reinvestigation. Here, not a single private investigator has been disclosed by the Defendants' 26(a)(1) disclosures. Like *Porter*, Plaintiffs only discovered the underlying investigation through notification by a third-party. After extensive litigation, this Court granted the majority of Plaintiff Porter's discovery requests. Ex. E (August 12, 2015 Opinion) at 24-26. The resulting discovery exposed Defendant Louisville Metro's misdeeds and revealed that members of the cold-case unit: (1) threatened witnesses; (2) promised consideration to the former jailhouse informant in exchange for his cooperation with Defendants' in the lawsuit; (3) attempted to cajole the sole eyewitness into (mis)identifying Porter once again; and (4) otherwise harassed a number of witnesses (including but not limited to Francois Cunningham, Ralph Philpot, Greg Gully) for the purpose of winning the lawsuit, and not legitimately conducting a reinvestigation.

In spite of the above, Defendant Louisville Metro has apparently decided to use the same cold-case unit to investigate on their behalf in this litigation. Although different personnel are involved here, the strategy is a virtual page from the *Porter* playbook. A cursory review of the recording with Clifford Capps, the jailhouse informant in this case, reveals that Defendants' investigators were there to merely confirm Capps' version of events and assist him in characterizing the damning letter he wrote for Kevin Justis. The recording captures Defendants' investigator informing Capps, "we don't see where you were being deceitful" while providing guidance on how to characterize the letter he wrote to Mr. Justis. Of course, the recording itself includes additional areas of concern, such as Defendants' investigator attempting to broaden Capps' supposed knowledge of the case. And of course, all of this was withheld from Plaintiffs until seconds before Capps' deposition – preventing counsel from learning the nature of Defendants' misdeeds, and the significant exculpatory information that was (inadvertently) elicited from Capps during the recording.

## Conclusion

For the reasons discussed in this letter, and any others that may appear to this Court, we respectfully request a hearing to inquire into the reasonableness of Louisville Defendants' investigation in responding to discovery requests and whether any additional responsive documents exist.

/s/ Anna Benvenutti-Hoffman
Anna Benvenutti-Hoffman
*Counsel for Plaintiff Garr Keith Hardin*

cc:   All Counsel (via ECF)