**COMMONWEALTH OF KENTUCKY**
**MEADE COUNTY CIRCUIT COURT**

FILED

2009 JUL 13 P 3:09

MEADE CO CIRCUIT CLERK
EVELYN D. MEDLEY, CLERK

GARR KEITH HARDIN                    )
                                     )
                                     )
        v.                           )        CASE NO. 92-CR-043-2
                                     )
                                     )
COMMONWEALTH OF KENTUCKY  )

FILED UNDER SEAL

_____

**MOTION TO SEAL HARDIN'S MOTION FOR RELEASE**
**OF PHYSICAL EVIDENCE FOR DNA TESTING**

_____

Comes now, Garr Keith Hardin, through counsel, and requests that his Motion for
Release of Physical Evidence for DNA Testing be immediately sealed, with viewing of
said motion by this Court only.  Attached to the motion is an affidavit given by a witness
who provides vital information about another individual's involvement in the death of the
victim in this case.  The witness is aware that the alternate suspect is no longer in prison.
The witness is justifiably concerned that her safety would be at risk if here name and the
information were disclosed by any public source.  Even the information provided would
be recognized by the alternate suspect as having been provided by the witness, which
leads to an inherent risk of danger to the witness.  The alternative suspect has a record of
physical violence of which the witness is personally aware.

WHEREFORE, Mr. Hardin respectfully requests this Honorable Court to seal his
Motion for Release of Physical Evidence for DNA Testing, with said motion to be
viewed by this Court only.

1

213

CLARK 004555

Respectfully submitted,

Larry Simon
Simon Law Office
510 West Broadway, Suite 805
Louisville, KY 40402
Phone: 502-589-4566

Jason Kreag
The Innocence Project
100 Fifth Avenue, 3rd Floor
New York, NY 10011
212-364-5982

*Counsel for Mr. Hardin*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the original of this Motion was mailed, U.S. postage prepaid, to the Office of the Meade Circuit Court Clerk, Meade County Courthouse, 516 Hillcrest Drive, Brandenburg, KY 40108. The undersigned further certifies that a true and correct copy was served on the Commonwealth's Attorney, The Honorable Susan Streible, P.O. Box 249, Brandenburg, KY 40108 on this 10th day of July, 2009.

Larry Simon

214

CLARK 004556

**COMMONWEALTH OF KENTUCKY**
**MEADE COUNTY CIRCUIT COURT**

FILED
at
2009 JUL 13 P 3:09

MEADE CIRCUIT COURT
EVELYN ⟨illegible⟩ CLERK

**GARR KEITH HARDIN**                     )
                                          )
                                          )
        v.                                )        **CASE NO. 92-CR-043-2**
                                          )
                                          )
**COMMONWEALTH OF KENTUCKY**              )

**FILED UNDER SEAL**

---

**MOTION FOR RELEASE OF PHYSICAL**
**EVIDENCE FOR DNA TESTING**

---

**NOTICE**

Notice is hereby given that the above Motion for Release of Physical Evidence for DNA Testing shall be brought before the Court to be heard on July 23, 2009, at 23°, or as soon thereafter as the Court shall allow.

_(signature)_
Larry Simon
Counsel for Mr. Hardin

---

Comes now, Garr Keith Hardin, Defendant, through counsel, and requests this Court to order the release of certain items of biological evidence in the possession of the Commonwealth for DNA testing by an accredited laboratory. This request is made pursuant to *Bedingfield v. Commonwealth*, 260 S.W. 3d 805 (Ky. 2008), the interests of justice, this Court's inherent authority to ensure the veracity of its judgments, KRS 524.140, and Sections 1, 2, 16, 17, and 109 of the Kentucky Constitution.

1

215

CLARK 004557

## INTRODUCTION

This case involves a very straight forward request to pursue DNA testing on biological evidence that has been properly preserved in order to vindicate Garr Keith Hardin's long standing claim that he is innocent of the murder for which he was convicted in 1995.[1]  Specifically, Mr. Hardin requests 1) DNA testing on hairs collected from the victim's clenched hand; 2) to have the DNA profile compared to an alternate suspect; and 3) to have the DNA profile, if eligible, compared to the local, state, and national DNA databases.  Mr. Hardin and his co-defendant, Jeffery Clark, were excluded as possible sources of the hairs at their trial, and they presented this to the jury as evidence supporting their innocence.  However, because DNA testing was not available at the time of the trial, Mr. Hardin was prevented from establishing the identity of the person whose hairs remained in the victim's clenched hand.  There is little doubt that if this crime was being investigated today, both the Commonwealth and a defendant seeking to establish his innocence would actively pursue DNA testing on the hairs.

Mr. Hardin recognizes that a jury held that the Commonwealth provided sufficient evidence rendering him guilty beyond a reasonable doubt.  However, like in the 240 other DNA exonerations across the country, the jury, the judge, the Commonwealth, Mr. Clark, and Mr. Hardin were prevented from knowing the full story of the victim's death, because DNA testing on critical probative evidence was not available.  Undersigned counsel at the Innocence Project and Mr. Clark's counsel at the Kentucky Innocence Project have offered to pay for the cost of testing at a mutually agreed upon private laboratory.

---

[1] Mr. Hardin's co-defendant, Jeffery Clark, has also maintained his innocence throughout the proceedings, and he is seeking the same DNA testing.

2

CLARK 004558

Given DNA's "unparalleled ability both to exonerate the wrongly convicted and to identify the guilty," *Dist. Attorney's Office v. Osborne*, 129 S.Ct. 2308, 2312, 2009 WL 1685601 (2009), this case represents a textbook example of when post-conviction DNA testing should be granted. First, probative biological evidence was identified by the Commonwealth in the investigation of the victim's murder. Second, the biological evidence was analyzed using forensic procedures available at the time. Third, the evidence was properly preserved and remains in the custody of the Kentucky State Police Central Forensic Laboratory. Fourth, an alternate perpetrator has been identified and a reference sample of his DNA is available. Finally, DNA testing that was unavailable at the time of trial, is now available and can provide conclusive evidence of who committed the crime. NO?

## STATEMENT OF FACTS

**I.      FACTS AVAILABLE AND PRESENTED AT TRIAL.[2]**

On April 2, 1992, at approximately 12:30 a.m. the victim left her house, telling her mother that she was going out. Earlier that evening, the victim had a strange encounter with an unknown man. The victim told her mother that the man followed her home shouting that he wanted to marry her. This unknown man was never identified. When the victim did not return home after leaving in the early morning hours of April 2, her mother called the Louisville Police and reported her missing. The victim's fully clothed body was found on April 5, 1992, in a field in rural Meade County. An autopsy revealed that the victim was stabbed multiple times with a single-edged knife in her back, chest, and neck. Stab wounds to her hands indicated that she attempted to fight off the

---

[2] These facts are taken primarily from the Commonwealth's direct appeal brief.

3

217

CLARK 004559

perpetrator.  Crime scene investigators recovered several hairs from the victim's clenched hand.  They also preserved and collected the victim's fingernail scrapings.

Upon finding the victim, the police once again spoke to the victim's mother.  She told police that the victim's boyfriend was Mr. Hardin.  The victim's mother also told police that the victim, the victim's sister, Mr. Hardin, and Mr. Clark were all involved in Satanism.  This information about the possible links to Satanism focused the police's attention on Mr. Hardin and Mr. Clark.  Mr. Hardin and Mr. Clark, without seeking the assistance of counsel, agreed to participate in multiple interviews with police over the course of the next several days.

On April 6, 1992, Mr. Clark agreed to go to the Louisville Police Department where he was interviewed about the crime on two separate occasions that day.  Mr. Clark admitted knowing the victim.  He also admitted dating the victim's sister.  However, Mr. Clark denied any involvement in the crime, and he denied being involved in Satanism. Mr. Clark provided an alibi that he was with Mr. Hardin on the night of April 1, 1992, and the early morning hours of April 2, 1992.

On April 7, 1992, Mr. Hardin voluntarily sat for two interviews with Louisville Police.  Like Mr. Clark, he denied all involvement in the crime.  He also independently corroborated Mr. Clark's alibi, stating that he and Mr. Clark were together on the night of the crime and provided details of their activity, much of which the police were able to confirm.  Mr. Hardin also told police that he last saw the victim on March 29, 1992, after staying the night at her house.  Maintaining his innocence and wishing to cooperate with the investigation, Mr. Hardin agreed to provide hair samples to the police.

4

218

CLARK 004560

During his two interviews with the police on April 7, 1992, Mr. Hardin confirmed that he had been involved in Satanism, including participating in ritualistic sacrifices of small animals and assisting the victim in tattooing an inverted cross on her body just below her left shoulder. Despite admitting to police that he had been involved in Satanism, Mr. Hardin told police that he had given up the practice. During both interrogations on April 7, 1992, Mr. Hardin maintained his innocence; however, in the second interview, he admitted that he had a vision that the victim, wearing red clothes, was killed in a field.

The following day, police interviewed Mr. Clark for the third time. During the interview, Clark once again told police that he was not involved in Satanism, but he said he did not know whether Mr. Hardin practiced Satanism. Clark also told police that the last time the victim was in his car was in December 1991. When the police later found the victim's fingerprint in Mr. Clark's car, they argued that the print was evidence that Mr. Clark lied to them during the interrogation, basing their argument on the incorrect assumption that a fingerprint can be time dated.

Finally, on April 9, 1992, the police interviewed Mr. Hardin again. Mr. Hardin continued to maintain his innocence. However, he also told the police that he told the victim, just as he had told all his past girlfriends, that if she cheated on him, he would kill her.

The police did not interview Mr. Clark or Mr. Hardin again until May 5, 1992. Prior to that day, the police compared Mr. Hardin's hair to several hairs that they collected from the crime scene, including hairs that were in the victim's clenched hand. Only one hair was reported to be microscopically consistent with Mr. Hardin or Mr.

5

219

CLARK 004561

Clark.  That one hair was found on the victim's pants, and it was reported to be consistent

with Mr. Hardin's hair.  The State argued that this was inconsistent with Mr. Hardin's

claim that he had not seen the victim after March 29, 1992.  The State based this theory

on the fact that the victim's mother said she washed the victim's pants shortly before she

wore them on April 1, 1992.  They argued that washing the pants would have foreclosed

the possibility of an innocent explanation for a hair consistent with Mr. Hardin's to be on

the victim's pants.  The police also identified one of the victim's fingerprints in Mr.

Clark's car on May 4, 1992.

Police secured a search warrant to look for evidence of the crime at Mr. Hardin's

and Mr. Clark's residences on May 5, 1992.  The police seized several knifes from each

residence.  They also seized documents and books related to Satanism at Mr. Hardin's

home.  Following these searches, Mr. Clark was again interviewed by police on May 5,

1992.  Like in each of the prior interrogations, Mr. Clark maintained his innocence.

Mr. Hardin and Mr. Clark were indicted for the murder on May 7, 1992, at which

time the police investigation ended, a little more than one month after the crime.

Mr. Hardin and Mr. Clark were both convicted of murder after a joint trial that

lasted seven days.  Much of the evidence presented against them at trial involved

testimony attempting to connect both of them to Satanism.  This included testimony

offered by a State witness who was permitted to testify as an expert on Satanism and

testimony from acquaintances of Mr. Hardin and Mr. Clark who alleged that the two had

been involved in Satanism.  The trial court allowed the Satanism related evidence to

support the State's theory that Satanism was the motive for the murder.  In addition, the

State presented evidence from a jailhouse snitch who testified that on two separate

6

220

CLARK 004562

occasions Mr. Clark told him he committed the crime.  Aside from the fingerprint in Mr.

Clark's car that the State tried to "time date" and the one hair on the victim's pants, there

was no physical evidence connecting Mr. Hardin or Mr. Clark to the crime.  Mr. Hardin

and Mr. Clark were each sentenced to life imprisonment on May 18, 1995.

## II.    FACTS DEVELOPED POST-TRIAL SUPPORT THE NEED FOR DNA TESTING.

A review of the crime scene data and medical examiner's report suggests that the

victim could not have been murdered by Mr. Hardin and Mr. Clark in the early morning

hours of April 2, 1992, as was argued by the State.  Dr. John Hunsaker, III, the Assistant

Medical Examiner for the Commonwealth of Kentucky, reviewed the video of the crime

scene and the autopsy report.  Based on his review, Dr. Hunsaker concluded that it was

unlikely that the victim was killed and left in the field in Meade County during the early

morning hours of April 2, 1992.  Dr. Hunsaker's conclusions are based on the rigidity of

the victim's body indicating some stage of rigor mortis, the lack of any indication of

decomposition of internal organs noted in the medical examiner's report, and the fact that

the victim's corneas were clear.  Each of these facts supports Dr. Hunsaker's conclusion

that it is unlikely that the victim was killed on April 2, 1992.  Rather, she was killed

much closer to the time her body was found on the morning of April 5, 1992, during a

time period when Mr. Hardin and Mr. Clark could not have committed the murder.

In addition to Dr. Hunsaker's medical opinion, Mr. Hardin and Mr. Clark have

developed additional information supporting their long-standing innocence claims and

implicating another individual.  *Holmes v. South Carolina*, 547 U.S. 319 (2006)

(recognizing a constitutional right to present evidence of third party guilt).  *See* May 6,

2009 Affidavit of Eletha Nicole Madison, attached as Exhibit 1.  Eletha Nicole Madison

7

CLARK 004563

was a friend of the victim's in the years before her death.  In her affidavit, Madison reports that she, the victim, another friend named Pamela Gibson, and a man, identified as John Doe, were all acquaintances and occasional drinking buddies.  At the time, Ms. Gibson and John Doe were dating.  Ms. Madison recalls that immediately after the victim's murder, Ms Gibson came to Ms. Madison's house and told her that John Doe confessed to killing the victim.  According to Ms. Gibson, John Doe took the victim to a field in Meade County, where he got into an altercation with the victim, causing the victim to threaten to report him to his parole officer.  John Doe, who kept a hunting knife in his van, became enraged and stabbed the victim multiple times.  *Id.*

At the time of the crime, John Doe was a very large man in his thirties, and he had grey hair.  He was attracted to heavy-set women.  He was also familiar with Meade County, even having stated on at least one occasion prior to the victim's murder that he was going to take Ms. Madison to the woods in Meade County to party.

While Ms. Madison informed the grand jury of the information connecting John Doe to the crime prior to Mr. Hardin's and Mr. Clark's trial and conviction, additional facts pointing toward John Doe as the actual perpetrator have been developed since the trial.  Specifically, John Doe often hung out at the same Kroger's parking lot that the victim said she was going to on the night she last left her mother's house.  In addition, at the time of the crime, John Doe drove a white cargo van with no side windows that was consistent with the type of van authorities were searching for during the investigation.  Indeed, police meticulously searched Mr. Clark's mother's van prior to his arrest, but they did not find any physical evidence linking his mother's van to the crime.

8

222

CLARK 004564

Counsel for Mr. Clark has also confirmed that John Doe is on parole, and he lives outside of Meade County.  Finally, the Kentucky Innocence Project possesses certain items of physical evidence containing John Doe's DNA.  These items of evidence were discarded and abandoned by Mr. Doe and retrieved and preserved by the Kentucky Innocence Project.

Based on the advances in DNA technology and testing that greatly exceeds the reliability of microscopic hair analysis, the fact that the State maintains possession of the hairs that were examined before the trial, the new non-DNA evidence pointing to the culpability of one of the original suspects, John Doe, the fact that counsel for Mr. Hardin and Mr. Clark have offered to pay for the costs of DNA testing, and Mr. Hardin's and Mr. Clark's continued pleas that they were convicted of a crime that they did not commit, counsel for Mr. Hardin and Mr. Clark contacted the Meade County Commonwealth Attorney seeking consent for DNA testing in March 2009.  The Commonwealth Attorney declined the request on May 11, 2009, necessitating the filing of this motion.

## ARGUMENT

There is little doubt that using DNA analysis to identify the person whose hairs were found in the victim's clenched hand will provide information relevant to the circumstances of the victim's death and who committed the murder.  Furthermore, such DNA testing, even without any additional investigation, has the possibility to conclusively establish that Mr. Hardin and Mr. Clark did not murder the victim and that John Doe, who was known to authorities at the time of the crime, was the actual perpetrator.

9

CLARK 004565

Based on the nature of the murder and the presence of defensive wounds on the victim, investigating authorities immediately recognized the probative nature of the hairs found in the victim's clenched hand.  Recognizing their importance, the authorities properly collected, preserved, and used the hairs in their investigation of the crime. Specifically, the State microscopically compared the hairs from the crime scene to the reference hairs of the only two suspects who were questioned and arrested for the murder, Mr. Hardin and Mr. Clark.  However, when the hairs from the victim's clenched hand were determined to be inconsistent with Mr. Hardin's and Mr. Clark's hair, the analysis ended.  At the time of trial, Mr. Hardin, Mr. Clark, the police, the Commonwealth Attorney, the Judge, and the jury were precluded from knowing whose hairs were found in the victim's clenched hand following her struggle and ultimately violent death.

Fortunately, because of the availability of DNA testing, today we do not face the same barriers.  Autosomal STR DNA testing can be performed on any skin cells or root material attached to the hairs, and mitochondrial DNA testing can be performed on the shafts of the hairs to identify the person who contributed the hairs.[3]

## I.    DNA Testing of Hair Evidence Has Been Instrumental in Several Exonerations.

The DNA testing Mr. Hardin and Mr. Clark seek on the hairs from the victim's clenched hand is similar to the DNA testing on hair evidence that has established the

---

[3] In addition to the hairs found clenched in the victim's hand, police also collected the victim's bloody fingernail scrapings and clippings.  This evidence would be ideal for post-conviction DNA testing based on the violent and close-range physical struggle that led to the victim's death.  Testing using Y-STR analysis, which became widely used in forensic settings in 2004, identifies only male DNA and could be used to identify the perpetrator's DNA in the fingernails without it being masked by the victim's DNA. Unfortunately, while counsel for Mr. Hardin and Mr. Clark have confirmed that the victim's fingernail scrapings were collected and analyzed before trial using non-DNA methods, they have not been located.  In focusing on the hair in this motion, Mr. Hardin is not waiving his desire to pursue DNA testing on the fingernail scrapings if they are located.

10

224

CLARK 004566

innocence of several wrongfully convicted individuals.  Notably, in 2000, William

Gregory became the first wrongfully convicted person in Kentucky to be exonerated by

DNA evidence.  Mr. Gregory was convicted in 1993 for rape and attempted rape in two

separate incidents.  The conviction was built on the victims' identification of Mr.

Gregory and testimony offered by the State that hairs found in a nylon stocking worn by

the perpetrator to conceal his identity belonged to Mr. Gregory.  After maintaining his

innocence for several years, Mr. Gregory obtained post-conviction DNA testing on the

hair evidence, and the testing established his innocence.  *See* InnocenceProject.org, Know

the Cases: William Gregory, http://www.innocenceproject.org/Content/164.php.

Similarly, post-conviction DNA testing on hairs also established the innocence of

Michael Blair in 2008.  In 1994, Mr. Blair was convicted in Texas for the rape and

murder of a seven year old girl.  At the trial, part of the evidence against Mr. Blair

included microscopic hair analysis purportedly linking Mr. Blair to the crime.  However,

post-conviction DNA tests of the hairs excluded Mr. Blair and linked them to another

individual who had since died.  Fourteen years after his conviction, Mr. Blair's

conviction and death sentence were vacated.  *See* Tiara M. Ellis, *Appeals Court*

*Overturns Michael Blair's Conviction in Ashley Estell Case*, DALLAS MORNING NEWS,

June 25, 2008; InnocenceProject.org, Know the Cases, Michael Blair,

http://www.innocenceproject.org/Content/1545.php.

In addition to the cases of Mr. Gregory and Mr. Blair, post-conviction DNA

testing of hairs from the crime scene was instrumental in the exonerations of Ron

Williamson and Dennis Fritz in Oklahoma in 1999.[4]  Mr. Williamson's and Mr. Fritz's

---

[4] The convictions and exonerations of Mr. Williamson and Mr. Fritz were chronicled by John Grisham in *The Innocent Man: Murder and Injustice in a Small Town* (2006 Double Day).

225

CLARK 004567

murder convictions were vacated when the post-conviction DNA testing revealed that hairs that were said to have matched them at trial were not their hairs and when other probative biological evidence identified the DNA of one of the witnesses who testified against them at trial.  Before DNA testing established their innocence, each man was wrongfully incarcerated for eleven years, and Mr. Williamson spent five of those years on death row, coming within five days of execution at one point.  *See* InnocentProject.org, Know the Cases, Ron Williamson, http://innocenceproject.org/Content/295.php; InnocenceProject.org, Know the Cases, Dennis Fritz, http://innocenceproject.org/Content/152.php.

II.     **The Kentucky Legislature Has Recognized the Powerful Truth-Seeking Nature of DNA Testing and Its Ability to Establish the Innocence of a Convicted Defendant.**

In passing KRS 524.140, which requires the preservation of biological evidence, the Kentucky legislature clearly demonstrated that it understands and respects the ability of post-conviction DNA testing to establish the innocence of a convicted defendant.  The statute provides that "[n]o item of evidence gathered by law enforcement, prosecutorial, or defense authorities that may be subject to deoxyribonucleic acid (DNA) evidence testing and analysis in order to confirm the guilt or innocence of a criminal defendant shall be disposed of following the trial unless" certain conditions are met.  KRS 524.140(3)(b).  The evidence cannot be destroyed unless it was not introduced at trial, or, if it was introduced at trial, it cannot be destroyed without a court first holding an "adversarial" hearing on a motion to destroy the biological evidence.  *Id.*  The clear intent

12

226

CLARK 004568

of the Kentucky legislature is to ensure that biological evidence is available for post-conviction DNA testing.

III.     **This Court Has Discretion to Order the DNA Testing Sought By Mr. Hardin and Mr. Clark.[5]**

    A.  **The Kentucky Supreme Court Has Recognized the Procedure Through Which Mr. Hardin Is Seeking Access to the Biological Evidence for DNA Testing.**

The relief Mr. Hardin and Mr. Clark seek with this motion – access to physical evidence to pursue DNA testing that can prove their innocence and identify the actual perpetrator – is the same relief that was recognized by the Supreme Court of Kentucky in *Bedingfield v. Commonwealth*, 260 S.W. 3d 805 (Ky. 2008).  In *Bedingfield*, the Kentucky Supreme Court ultimately vacated Bedengfield's 1996 rape conviction and granted a new trial based on exculpatory DNA testing.  *Id.* at 815.  The Court recognized that the "procedural path" of Bedingfield's case included a post-conviction motion to release the physical evidence for DNA testing.  It was only after Bedingfield's post-conviction DNA testing motion was granted and after the exculpatory test results were obtained that Bedingfield sought to vacate his conviction and sentence pursuant to CR

---

[5] While Mr. Hardin relies on the Court's authority, he recognizes that KRS 422.285 (Kentucky's post-conviction DNA statute) does not provide authority for his request for post-conviction DNA testing.  KRS 422.285 is limited in scope to capital defendants, and Mr. Hardin is not serving a death sentence.  However, because 1) other Kentucky statutes recognize Hardin's liberty interest in establishing his innocence, *see* KRS 524.140, Kentucky Rule of Criminal Procedure 10.02 (outlining the grounds for which a conviction should be vacated and a new trial granted "in the interest of justice"), and Kentucky Rule of Civil Procedure 60.02 (outlining when a conviction can be overturned for "reason[s] of an extraordinary nature justifying relief"); 2) Commonwealth courts have inherent authority to order post-conviction DNA testing; and 3) the Kentucky Supreme Court has recognized the procedural path Mr. Hardin is taking to obtain access to the biological evidence for DNA testing, *see Bedingfield v. Commonwealth*, 260 S.W. 3d 805 (Ky. 2008); Mr. Hardin is pursuing DNA testing in Kentucky State courts.  *See Osborne* at 2321 (encouraging Osborne to pursue his request for access to biological evidence in Alaska State courts despite the fact that Alaska did not have a specific post-conviction DNA testing statute).  However, should the Kentucky State courts deny Mr. Hardin's request for access to evidence for DNA testing, Mr. Hardin will pursue relief in federal court.

13

226

CLARK 004569

60.02, RCr 10.02, and RCr 10.06(1). *Id.* at 806-807. Mr. Hardin is seeking to follow the same procedural path as Bedingfield. First obtain the post-conviction DNA tests through an order of the trial court. *Id.* at 807. Then, based on the exculpatory results, seek to have his conviction and sentenced vacated. *Id.*

**B.    The Court Possesses Inherent Authority to Grant the DNA Testing.**

In the same way that Mr. Hardin is seeking that this Court exercise its authority to order DNA testing that can confirm who committed the crime and verify the 1995 judgment of this Court, other trial courts have exercised their inherent authority to ensure the accuracy of their judgments. *See, Potter v. Eli Lilly and Comp.*, 926 S.W. 2d 449 (Ky. 1996) (rev'd on other grounds by *Hoskins v. Maricle*, 150 S.W. 3d 1 (Ky. 2004)). Regarding the authority of the courts, the Kentucky Supreme Court explained:

> [T]here are certain implied powers which are inherent in any Court of Justice in this State which arise from the very nature of their institution. Such authority is required because they are necessary to proper exercise of all other judicial authority. . . . [A] trial court has the authority and duty to determine that its judgments are correct and accurately reflect the truth in all respects.

*Potter*, 926 S.W. 2d at 453-54. In *Potter*, the Kentucky Supreme Court specifically noted that in exercising its authority the trial court posed no injury to the parties. *Id.* at 454. Rather the Court reasoned that "[t]he only result is that the truth will be revealed." *Id.* Here, Mr. Hardin and Mr. Clark seek access to the biological evidence so that the "truth [of who committed the murder] will be revealed." *Id.*

This Court's inherent authority to ensure that justice is served in the cases before it is fundamental and cannot be encroached upon by the other branches of the Kentucky government. *Smothers v. Lewis*, 672 S.W. 2d 62, 64 (Ky. 1984) (recognizing the exclusive judicial power of Kentucky courts pursuant to Section 109 of the Kentucky

14

CLARK 004570

Constitution and holding that a court has, "as incidental to its constitutional grant of power, inherent power to do all things reasonably necessary to the administration of justice in the case before it"). *See also Commonwealth v. Blincoe*, 33 S.W. 3d 533, 535 (Ky. App. 2000) (same).

      C.    **The State's Interest in Finality of Judgments Is Outweighed by the Truth-Seeking Power of DNA.**

Mr. Hardin recognizes that the Commonwealth's "interest in the finality of judgments and the timely imposition of sentences is axiomatic." *Baze v. Commonwealth*, 276 S.W. 3d 761, 768 (Ky. 2008). However, the interest in finality is severely undermined if post-conviction DNA testing establishes that Mr. Hardin and Mr. Clark did not commit the crime for which they have served approximately seventeen years in prison. Certainly the situation would be different had the DNA testing been available before trial, but it was not. Thus, the finality of Mr. Hardin's conviction can only be relied upon to the extent that we are willing to foreclose the powerful truth seeking nature of DNA to demonstrate who murdered the victim. As Justice Stevens eloquently expressed in his dissenting opinion in *Osborne*, "finality is not a stand-alone value that trumps a State's overriding interest in ensuring that justice is done in its courts and secured to its citizens. Indeed, when absolute proof of innocence is readily at hand, a State should not shrink from the possibility that error may have occurred." *Osborne* at 2337. (Stevens, J., dissenting).

    IV.    **Post-Conviction DNA Testing Serves the Public and Helps to Ensure that the Actual Perpetrator Does Not Remain Free.**

        A.    **DNA Testing Serves the Public Through Its Ability to Identify and Bring to Justice the Actual Perpetrators.**

15

CLARK 004571

The DNA testing Mr. Hardin and Mr. Clark seek has the potential to establish their innocence and identify the actual perpetrator approximately seventeen years after the crime. As is outlined above, some evidence against John Doe was presented to the Commonwealth during the investigation. Counsel for Mr. Hardin and Mr. Clark have collected additional evidence implicating John Doe in the murder and have also secured a DNA reference sample from him. If the requested DNA tests confirm that the hairs found in the victim's clenched hand are John Doe's hairs, this case will be yet another example in which the actual perpetrator remained free and able to commit additional crimes while the wrong people were in prison.

The actual perpetrator has been identified in approximately 44 percent of the DNA exonerations to date. InnocenceProject.org, Facts on Post-Conviction DNA Exonerations, http://innocenceproject.org/Content/351.php. Tragically, in many of these cases, the actual perpetrator committed more crimes while he remained free. Two recent exonerations from Texas demonstrate this point. In 2009 in Houston, Texas, Ricardo Rachell, was exonerated for a sexual assault for which he had served nearly seven years in prison. The post-conviction DNA testing in Mr. Rachell's case simultaneously established his innocence and identified the actual perpetrator, a man who had gone on to commit similar crimes to the one for which Mr. Rachell was wrongfully convicted. *See* Office of Harris County District Attorney Patricia R. Lykos, "Rachell Report" *available at* http://www.scribd.com/doc/13222558/Rachell-Report-Revised-w-Hpd-Logo-031109-2, and on file with undersigned counsel. Similarly, after Patrick Waller was exonerated in 2008 for a robbery and kidnapping that he did not commit, it was revealed that the actual perpetrators, who were identified through the DNA testing,

16

230

CLARK 004572

committed additional crimes.  To make matters worse, while the Dallas District Attorney's Office opposed Mr. Waller's original request for post-conviction DNA testing, one of the actual perpetrators was paroled for a different crime.  Certainly had the parole authorities known of the DNA evidence implicating the actual perpetrator for the crimes that Mr. Waller was convicted, the actual perpetrator would not have been paroled for the other crimes.  *See* "Patrick Waller Is Dallas County's 18th Wrongfully Convicted Citizen," Dallas County District Attorney Press Release, June 26, 2008, *available at* http://www.dallasda.com/news2008.html.

In addition to serving the general public interest, the ability of post-conviction DNA testing to simultaneously exonerate a wrongfully convicted person and identify the actual perpetrator also serves the interests of crime victims and their families.  Indeed, former United States Solicitor General Ken Starr recently filed a brief in the United States Supreme Court on behalf of several crime victims and family members of crime victims advocating for broader access to post-conviction DNA testing.  Brief *Amici Curiea* of Jeanette Popp, et al., *District Attorney's Office v. Osborne*, ___ U.S. ___ (2009) (No. 08-06).  The crime victims and their families supported a due process right for post-conviction DNA testing and recognized that such testing "serves and supports victims' rights."  *Id.* at 1.

### B. Mr. Hardin Qualifies for DNA Testing Under the National Institute of Justice's and the American Bar Association's Guidelines.

The ability of post-conviction DNA testing simultaneously to exonerate the wrongfully convicted and identify the actual perpetrators motivated the National Institute of Justice ("NIJ") and the American Bar Association ("ABA") to make recommendations

17

231

CLARK 004573

as to when post-conviction DNA testing should be granted.  Mr. Hardin and Mr. Clark qualify for the testing under both sets of guidelines. ? Who says?

In 1996, the NIJ published a report profiling the twenty-eight cases where DNA testing exonerated a previously convicted defendant.  *See* NAT'L INST. OF JUST., CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996), ("NIJ 1996 Report").  In response to the concerns raised in the report and to maximize the value of DNA evidence in the criminal justice system, then Attorney General Janet Reno established the National Commission on the Future of DNA evidence.  *See* NAT'L COMM'N ON THE FUTURE OF DNA TESTING, POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS (1999), ("NIJ 1999 Report").  The NIJ 1999 Report recommends that in cases such as Mr. Hardin's and Mr. Clark's, where biological evidence was collected and still exists and where favorable DNA test results could exonerate the defendant, DNA testing should be pursued.  NIJ 1999 Report at 4.

The ABA addressed post-conviction access to DNA testing in 2000, when the ABA House of Delegates passed a resolution urging federal, state, and local jurisdictions to adhere to the following principle concerning biological evidence collected during criminal investigations:

> All biological evidence should be made available to defendants and convicted persons upon request and, in regard to such evidence, such defendants and convicted persons may seek appropriate relief notwithstanding any other provision of law.

In 2007, in response to the resolution, the ABA enacted its standards for DNA evidence.  *See* ABA STANDARDS FOR CRIMINAL JUSTICE: DNA EVIDENCE (2007).  Under the ABA standards, a person should be able to secure post-conviction DNA testing if the

18

CLARK 004574

testing requested was not available at trial and if the results of the testing could create a

reasonable probability that the person is innocent.  ABA Report at 115.  The DNA testing

Mr. Hardin seeks qualifies under this standard.  Autosomal STR testing and

mitochondrial DNA testing were not available before Mr. Hardin's trial, and a DNA

match to John Doe, would provide more than a reasonable probability of Mr. Hardin's

innocence.

V.    **The Fact That the Jury Knew that the Hair in the Victim's Clenched Hand
      Did Not Belong to Mr. Hardin or Mr. Clark Is Immaterial to the Powerful
      Truth Seeking Nature of DNA.**

As is outlined above, the jury at Mr. Hardin's and Mr. Clark's trial knew that the

hairs clenched in the victim's hand were from someone other than Mr. Hardin or Mr.

Clark.  However, with respect to the DNA testing sought in this motion, the relevant

question is not whether the jury knew if the hairs belonged to Mr. Hardin or Mr. Clark.

Rather, the relevant question is, given the availability of DNA technology that can now

identify whose hairs were clenched in the victim's hand, does it make sense to preserve

the status quo of the jury's incomplete knowledge at the time of the trial?  Or, does it

make sense to use the available truth-seeking technology of DNA analysis to determine

who left the hairs and who killed the victim?  Examples of several post-conviction DNA

exonerations demonstrate the importance of the latter approach.

In 2006 in New York, Jeffrey Deskovic was exonerated after serving

approximately 16 years in prison for a crime he did not commit.  Mr. Deskovic was

convicted in 1996 of raping and murdering his 15 year-old classmate despite the fact that

early generation forensic tests performed before his trial confirmed and the jury knew

that semen found in the rape kit excluded him.  It was not until 2006 after a newly elected

19

CLARK 004575

District Attorney consented to Mr. Deskovic's long-standing request to use modern DNA analysis to obtain a profile from the semen that could be compared to other individuals did Mr. Deskovic win his freedom.  When the testing was performed, it matched a convicted murderer who was serving time for another offense, and the actual perpetrator provided a full confession that completely exonerated Mr. Deskovic.  *See* InnocenceProject.org, Know the Cases, Jeffrey Deskovic, http://innocenceproject.org/Content/44.php.

Similarly, in 1997, Entre Nax Karage was convicted of murdering his 14 year-old girlfriend, despite the fact that pretrial tests revealed that semen found in the victim excluded him.  When the State learned before trial that the semen did not match Mr. Karage, the State simply amended its theory and argued that the victim must have had other consensual sexual partners.  *Ex Parte Karage*, 2005 WL 2374440 (Tex. Crim. App. Sept. 28, 2005) (not designated for publication) ("[A]lthough at the time of Applicant's trial he was excluded as the contributor of the semen, the State did not know who the contributor was and proceeded on a theory that Applicant, a jealous boyfriend, killed his 14 year-old girlfriend out of a rage for seeing another man.") (internal quotations omitted).  Despite his conviction, Mr. Karage obtained post-conviction DNA testing, and the testing established the identity of the actual perpetrator, a man who had previously sexually assaulted another 14 year-old girl in the same area.  Mr. Karage served over six years for a crime he did not commit.  *See* InnocenceProject.org, Know the Cases, Entre Nax Karage, http://innocenceproject.org/Content/192.php.

Just as Mr. Deskovic and Mr. Karage established their innocence using evidence that even the juries knew excluded them at the time of their trials, Mr. Hardin and Mr.

20

234

CLARK 004576

Clark seek to have the foreign hairs found clenched in the victim's hand subjected to DNA tests. Such tests have the potential to identify who contributed the hairs during the violent murder and to establish Mr. Hardin's and Mr. Clark's innocence.

### CONCLUSION

Pursuant to *Bedingfield*, this Court's inherent authority to ensure justice is served, this Court's inherent authority to ensure the veracity of its judgments, KRS 524.140's requirement that biological evidence suitable for post-conviction DNA testing be preserved, and Sections 1, 2, 16, 17, and 109 of the Kentucky Constitution and for the previously stated reasons, Mr. Hardin requests the Court to 1) Grant his motion seeking DNA testing of the hairs found clenched in the victim's hand at a mutually agreed upon private laboratory at the expense of counsel for Mr. Hardin and Mr. Clark; and 2) Order a physical search of the relevant facilities in Meade County and the Kentucky State agencies for the victim's fingernail scrapings.

Respectfully submitted,

Larry Simon
Simon Law Office
510 West Broadway, Suite 805
Louisville, KY 40402
Phone: 502-589-4566

Jason Kreag
The Innocence Project
100 Fifth Avenue, 3rd Floor
New York, NY 10011
212-364-5982

*Counsel for Mr. Hardin*

21

235

CLARK 004577

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Mr. Hardin's Motion for Release of Physical Evidence for DNA Testing was mailed, U.S. postage prepaid, to the Office of the Meade Circuit Court Clerk, Meade County Courthouse, 516 Hillcrest Drive, Brandenburg, KY 40108.  The undersigned further certifies that a true and correct copy was served on the Commonwealth's Attorney, The Honorable Susan Streible, P.O. Box 249, Brandenburg, KY 40108 on this 10ᵗʰ day of July, 2009.

_____
Larry Simon

22

236

CLARK 004578

# EXHIBITS

Exhibit 1      May 6, 2009, Affidavit of Eletha Nicole Madison

i

237

CLARK 004579

## AFFIDAVIT OF ELETHA NICOLE MADISON

I, ELETHA NICOLE MADISON, having been duly cautioned and sworn, state as follows:

1.   My date of birth is February 14, 1973 and I live at 106 Middletown Square in Middletown, KY 40243.

2.   I met and became good friends with Rhonda Sue Warford in the late 1980s.  During our friendship, we used to sing in a band and hang out together.  Sometimes we would get together with friends or strangers and drink alcohol.  Rhonda's behavior, however, became riskier than I cared for.  She would often meet strangers at bars and local hangouts.  I warned Rhonda about her safety, but she continued with this behavior.  Shortly after Rhonda's family moved to her Whitney Avenue address in the early 1990s, I curtailed my behavior and did not hang out with her as much, although we were still friends.

3.   At the same time as my friendship with Rhonda, I was acquainted with Pamela Gibson.  Sometimes, the three of us would get together and hang out and drink.  Pam's behavior was also risky and I began to hang out with her less and less.

4.   Pam had a boyfriend in the late 1980s, recently released from prison, named John Doe.  John Doe, Rhonda, Pam, and I all knew each other and would hang out and drink together.  John Doe was a very large man and was attracted to full-figured women.  He was in his early 30s, but had some grey hair.

5.   One night, while walking to the local liquor store with a friend, John Doe picked us up in his van and took us through the drive-thru window.  He then announced that he was going to take us to the woods in Meade County to "party".  I panicked and tried to jump out of the moving van.  John Doe relented and took us home.  I never hung out with him after that.

6.   Immediately after Rhonda's death in 1992, Pamela Gibson came to my house and informed me that John Doe confessed (to her) that he picked Rhonda up at a Kroger's parking lot (just a few blocks away from her house) and took her to a field in Meade County.  While in Meade County, John Doe said or did something to Rhonda that caused her to threaten him with reporting his

238

CLARK 004580

behavior to his parole officer. John Doe became enraged and stabbed her multiple times, killing her. John Doe always kept a large, hunting-type knife in his van. I gave this information to Vickie Hardin, the sister of one of the co-defendants, Keith Hardin.

7. I testified at the grand jury proceedings and offered the above information. While at the courthouse, Pamela Gibson confronted me in the restroom. She accused me of lying and putting her in danger. She threatened me to not tell anyone about the "confession" of John Doe. She was scared of him and did not offer the same information to the grand jury.

8. Jeffrey Clark and Keith Hardin were convicted of the murder of Rhonda Warford. Based on the above-stated facts, I am firmly convinced that John Doe stabbed and killed my friend, Rhonda, rather than Mr. Clark and Mr. Hardin.

Further the affiant sayeth naught.

GIVEN UNDER MY HAND on this _CL_ day of _May_, 20_09_

_E Nicole Madison_
AFFIANT

NOTARY STATEMENT

Subscribed and sworn to before me by

_Eletha Nicole Madison_ on this _6th_ day of _May_, 20_09_.

_Dawn R. Bryant_

2

239

CLARK 004581

NOTARY PUBLIC
STATE AT LARGE, KENTUCKY

My Commission Expires: February 10, 2010

3

240

CLARK 004582

* * * TO BE FILED UNDER SEAL * * *   FILED

Oct

2009 JUL 15 P 2: 32

COMMONWEALTH OF KENTUCKY
MEADE CIRCUIT COURT
CASE NO. 92-CR-0043

MEADE CIRCUIT COURT
EVELYN SHACKLETTE, CLERK


JEFFERY D. CLARK                                    DEFENDANT


vs.               MOTION FOR RELEASE OF PHYSICAL
                     EVIDENCE FOR DNA TESTING


COMMONWEALTH OF KENTUCKY                    PLAINTIFF


**************************************************************

## NOTICE

Notice is hereby given that the above Motion for Release of Physical Evidence for DNA Testing shall be brought before the Court to be heard on July 23rd, 2009 at 1:00 p.m., EDT, or as soon thereafter as the Court shall allow.

_T. S. Shouse_____

Theodore S. Shouse

Counsel for the Defendant

***********************************************************************

Comes now the Defendant, by counsel, pursuant to the 5th, 6th, 8th and 14th Amendments to the United States Constitution, Bedingfield v. Commonwealth, 260 S.W.3d 805 (Ky. 2008), KRS 524.140 and Sections 1, 2, 11, 14, 16, 17 of the Constitution of the Commonwealth of Kentucky and respectfully requests this Honorable Court to grant the release of certain items of physical evidence currently in the possession

241

CLARK 004583

of the Kentucky State Police Central Forensic Laboratory, 1250 Louisville Road, Frankfort, Kentucky, for Deoxyribonucleic Acid (DNA) testing by an independent laboratory.  In support of the request, the Defendant submits the following:

1)     The Defendant and co-defendant, Garr Keith Hardin, were convicted by a jury in the Meade Circuit Court, under the above indictment, of murder for allegedly killing Rhonda Sue Warford.  The Defendant was sentenced to life imprisonment and is presently housed at Luther Luckett Correctional Complex in LaGrange, Kentucky.

2)     The key issue at trial was the identity of the victim's assailant.  The Commonwealth's theory was that Defendant and Hardin picked up Ms. Warford in Jefferson County in Defendant's vehicle and transported her to Meade County where she was murdered.

3)     The Defendant's defense at trial was one of complete innocence. Defendant has steadfastly maintained that he did not kill Ms. Warford and has never waivered from that claim.

4)     Latent prints taken through a trace lift matching the victim were found in the Defendant's car.

5)     A single hair found in the Defendant's vehicle was determined, through microscopic analysis, to be similar, but not identical, in appearance to Ms. Warford's hair.  Microscopic analysis of hairs collected from Ms. Warford's clothing found one hair to be similar, but not identical, in appearance to Hardin's hair.  Several hairs found in Ms. Warford's hand did not, under microscopic analysis, match or appear to be similar to either

2

242

CLARK 004584

*True*

the Defendant's or to Hardin's hair. The technology to test for DNA in the shaft of hair was not available at the time of the trial. ✓

6)   The presence of Ms. Warford's hair and prints in Defendant's vehicle may be explained by the fact that they were acquaintances. Ms. Warford had been a passenger in Defendant's vehicle several times in the five months immediately previous to her death. The presence of Hardin's hair on Ms. Warford's clothing may be explained by the fact that Hardin had been dating Ms. Warford for approximately six months. The presence of hairs in Ms. Warford's hand, however, which do not match nor are they similar in nature to the Defendant or Hardin, cannot be explained by the Commonwealth's theory as noted above.

7)   The presence of hairs in the victim's clutched hand creates a strong inference that Ms. Warford struggled with the person who killed her. The inference of a struggle is made even stronger by the Post Mortem Examination, which notes a defensive incisional wound on the left hand and another incisional wound on the right hand. *Post Mortem Examination,* ME-92-260, pg. 2, Dr. George R. Nichols II.

8)   The only logical explanation for the identity of the hairs is that they belong to an individual, *other than the Defendant and Hardin,* who is the actual killer of Rhonda Sue Warford.

9)   During its investigation of Defendant's case, the Kentucky Innocence Project (KIP) has talked to many people and discovered new information and evidence that indicate the victim did *not* die on Wednesday, April 2,

3

243

CLARK 004585

1992 but that in fact she was killed much closer to the time that her body was found.  In addition, a viable alternative suspect has been identified.

10)   KIP staff met with Dr. John Hunsaker III, who is the Assistant Medical Examiner for the Commonwealth of Kentucky.  Dr. Hunsaker reviewed the video from the crime scene and the Post Mortem Examination report by Dr. Nichols.  Dr. Hunsaker opined that it was unlikely the victim died on April 2nd for the following reasons:

a.  In reviewing the crime scene video, it appeared that the victim's body had some rigidity to its extremities, indicating some stage of *rigor mortis*.  Knowing the environmental conditions for that particular week, the rigidity was not the result of freezing and there is no documentation of frozen tissue in the post mortem report.

b.  *Rigor mortis* will come and go quicker in an obese person and even with a body outside in such environmental conditions it will not be affected due to the fact that body fat essentially serves as an insulator.

c.  He would expect to see some decomposition of internal organs some 80+ hours after death but none was noted in the post mortem examination report, which told him that Dr. Nichols did not see such decomposition.

d.  He also noted that the report stated that the cornea was clear.  He would again expect the cornea to be very cloudy within the given time frame of death.

4

244

CLARK 004586

11)  KIP personnel spoke with a woman identified as Eletha Nicole Madison. Please see the attached affidavit.   The information provided by Ms. Madison can be summarized as follows:

a.  Ms. Madison knew Rhonda Sue Warford.

b.  Ms. Madison knew that Rhonda Sue Warford had gone out with the alternative suspect, hereinafter referred to as John Doe,[1] prior to her death.

c.  Ms. Madison personally knew the alternative suspect at the time of Rhonda Sue Warford's death.  In fact, she had partied with him and others.

d.  Ms. Madison, the victim and many other young people of similar age would often meet late at night in a Kroger's parking lot that was located near the victim's home.

e.  Ms. Madison personally knew that John Doe had a preference for women with a large body frame such as Rhonda Sue Warford, and herself.

f.  Ms. Madison personally knew that John Doe drove a cargo van that did not have side windows.

g.  Ms. Madison personally knew that John Doe carried a knife in a sheath next to the driver's seat in the cargo van.

---

[1] The Defendant recognizes that the alternative suspect has not been charged or indicted for this crime and carries a presumption of innocence.  While Defendant has reason to believe this individual is the actual killer of Ms. Warford, the individual is not publicly identified in this motion out of respect for his privacy and constitutional rights.

5

245

CLARK 004587

h.  Shortly before Rhonda Sue Warford's death, John Doe had asked Ms. Madison, late at night, to get in the van with him.  While they were driving, John Doe told her they were going to **Meade County** to "party".

i.  Ms. Madison knew John Doe and his reputation so she was uncomfortable going with him alone to a strange place and refused to go with him that night.  She, in fact, told John Doe that if he did not stop the van and let her out that she would jump out of the van while it was moving.

12)  John Doe is currently on parole from prison.  Initially, he was on supervised parole but is now on unsupervised parole.

13)  KIP personnel have observed John Doe and have noted that he lives with a woman, presumably his wife, who is also of a large body frame.  John Doe lives outside of Meade County.

14)  The Kentucky Innocence Project has in its possession certain items of physical evidence that were discarded and abandoned by the alternative suspect.  Said items can be tested for a DNA profile to determine if there is a match to the hairs found in the victim's hand.

15)  The hair collected as part of the police investigation is still in the possession of the Kentucky State Police Central Forensic Laboratory.

16)  Nucleic DNA testing was in its infancy at the time of the Defendant's trial.  Nucleic DNA testing could be done on the roots or any skin cells that might be attached to the hairs collected as part of the Commonwealth's

6

246

CLARK 004588

investigation. If there is a root or skin cells attached to the hair and nucleic testing can be done on the material, the test results could be compared with results from the testing of the items in the possession of KIP. If the test results do not match the alternative suspect, i.e. John Doe, or the Defendant or Hardin, the results could be entered into the national DNA database known as CODIS to see if there is a "hit" or match with someone currently in the database.

17) Mitochondrial DNA (mtDNA) testing is a scientifically accepted DNA test that can provide a DNA profile from physical evidence such as hair, bone, teeth, etc., that was not available at the time of the Defendant's trial. Such testing does not require a root on a hair in order to provide results; any portion of the hair shaft can be tested.

18) Nucleic or mtDNA tests that exclude the Defendant as the source of the hair would prove to this Court and any reasonable jury that the Defendant was not the person who murdered Ms. Warford. The tests would support the Defendant's long-standing assertion that he is innocent of the crime for which he was convicted.

19) MtDNA test results of the hair found in the victim's clutched hand could also provide a definitive result for comparison with the alternative suspect's DNA profile that would be obtained from the evidence currently in the possession of KIP.

20) A report published in 1999 from the National Commission on the Future of DNA Testing, conducted by the National Institute of Justice at the

7

247

CLARK 004589

request of then Attorney General Janet Reno, entitled "Postconviction DNA Testing: Recommendations for Handling Requests," addresses DNA testing requests like the one in the case at hand. In that report, the Commission determined that all parties should concur to testing of evidence in cases where biological evidence was collected and still exists which, if tested, would exclude the Defendant of the charges. *See* page 3, September 1999, NCJ 177626. This recommendation was made, in part, due to the increasingly large number of wrongfully convicted individuals who have been exonerated by DNA testing within the last decade. In 1999, over 60 convictions in the United States had been vacated on the basis of DNA results. The number of exonerations since the report was published now stands at 232[2]; that is 172 exonerations in less than ten years since the publication of the report. Because evidence exists in the case at hand that will exclude the Defendant as the perpetrator of the crime for which he was convicted and because history proves that innocent individuals have in fact been wrongfully convicted, justice demands that the evidence be tested.

21)    DNA Diagnostics Center (DDC), a laboratory in Fairfield, Ohio, is fully equipped to conduct the requested and necessary tests in this case. DDC is accredited by the American society of Crime Laboratory Directors/Laboratory Accreditation Board, DDC.

---

[2] See www.innocenceproject.org

8

248

CLARK 004590

22)   Furthermore, the monetary costs of having DDC test the physical evidence at hand would not be an issue for the Court or the Commonwealth. The Kentucky Innocence Project and the Department of Public Advocacy have been the recipients of grant funds from a Byrne Grant, the Kentucky Bar Foundation's IOLTA fund, the Kentucky Bar Association itself, and most recently, a Bloodsworth Grant from the National Institute of Justice, for the purpose of funding such testing requests. Therefore, KIP will bear the total costs of the tests with the Commonwealth and its taxpaying citizens not having to pay for any of the costs for the testing.

23)   The Kentucky Innocence Project will provide shipping materials to the Kentucky State Police Crime Lab so that the evidence in the lab's possession can be shipped directly to DDC.

## ARGUMENT

The use of DNA testing in criminal cases was in its infancy at the time the charges in this matter were lodged against the Defendant and his co-defendant, Garr Keith Hardin. Nucleic DNA testing was the only type of testing available at the time and RFLP testing, the methodology used at the time, was not as definitive as current testing standards. Nucleic testing can only be done on extractions from the nucleus of cells and the RFLP procedure available in 1992 required a fairly large sample in order to get a profile from the test.

Mitochondrial DNA (mtDNA) testing, such as is requested by the Defendant, did not exist in 1992. MtDNA is found in all cells but is the only testing available for cells

9

249

CLARK 004591

that do not contain a nucleus, including material such as bones, teeth, hair, etc. MtDNA is maternally inherited so everyone from the same maternal familial line will have the same mtDNA profile, but mtDNA is still a powerful tool available to law enforcement and the judiciary in determining the identity of a donor of non-nucleic material. MtDNA testing is a Short Tandem Repeat (STR) test, a type of DNA testing that Kentucky has recognized as admissible, *per se*, in Kentucky's courts. See Fugate vs. Commonwealth, 993 S.W. 2d 931 (Ky. 1999).

In the case at bar, physical evidence was collected as part of law enforcement's investigation and sent to the Kentucky State Police crime laboratory, including fingernail scrapings and hair found on the victim's body. The crime lab returned the fingernail scrapings to the Meade County Sheriff's department, noting there was cellular material in that scraping but that it was too small to provide any type of serological value. STR DNA testing available today does not need as large a sample in order to obtain definitive results. Under current DNA testing standards and procedures, even miniscule samples can yield results and it is likely that a DNA profile could be obtained from the fingernail scrapings by using one of four testing methods: Nucleic, Y-STR, MtDNA or mini-STR.

The Meade County Sheriff's office has been very cooperative in allowing the Kentucky Innocence Project to search the associated investigative file for the fingernail scrapings. Unfortunately, however, those fingernail scrapings could not be found and appear to have been lost. The scrapings could be tested using one of the modern testing methodologies with results, probative in nature, that would exclude the Defendant as a donor of the material found under the victim's fingernail(s), **if** only they could be found.

10

250

CLARK 004592

As noted above, the victim fought her attacker and the logical conclusion about
the presence of the blood and/or skin cells underneath her fingernails, just as the hairs
found in her clutched hand, is that it came from the person who actually killed her.

The hairs found in the clutched hand of the victim were examined microscopically
by the Kentucky State Police crime lab.   The Sheriff's office recognized at the outset the
importance of those hairs in identifying the killer.   MtDNA testing, which tests the actual
shaft of the hair, did not exist at the time of the Defendant's trial.   There can be no doubt
that if such a crime were to occur today, especially in light of only circumstantial
evidence against an accused suspect, law enforcement would have the hairs tested using
mtDNA testing.

The Defendant, and co-defendant Hardin in a separate motion, are simply asking
for access to the physical evidence in order to conduct mtDNA testing, the same type of
testing law enforcement would seek today.   The United States Supreme Court recently
ruled that a convicted individual does not have a constitutional right to post-conviction
DNA testing.   See <u>District Attorney's Office for the Third Judicial District v. William G.</u>
<u>Osborne</u>, 2009 WL 1685601, 557 U.S. ___ (2009).   However, the Court made it
explicitly clear that access to physical evidence for post-conviction DNA testing should
be left to the respective state(s), through the state's legislature or the judiciary. *Id.*

The Supreme Court of Kentucky has recently addressed the importance, and
acceptance, of DNA testing in Kentucky:

> Preliminarily, we note that this Court has recognized the expansive advances in
> technology which have occurred over the course of the past decade concerning
> DNA testing technology.   As Appellant argues, and we concede, technological
> advances in the field now permit testing of minute sample sizes where were,
> heretofore, inconceivable even as recently as a few years ago.   It is a recognition
> of these advances in DNA testing which has led to grants of funding to the

11

251

Kentucky Innocence Project through IOLTA-which gave rise to the instant case-and various other agencies to aid in testing of unresolved or "cold cases," as well as disputed rulings. *See Walker v Commonwealth*, No. 2006-SC-000480-MR, 2007 WL 2404508, at *1 (Ky. August 23, 2007).

Bedingfield v. Commonwealth, 260 S.W. 3d 805, 809 (2008).

The Court went on to note that it is in the interest of justice in certain circumstances that evidence such as is at issue in this matter before the court be considered. "When newly discovered evidence is of such a nature that it is manifest to the conviction, substantially impacts the testimony of a material witness, *or would have probably induced a different conclusion by the jury had the evidence been heard, then assuredly, the interests of justice demand* that a criminal defendant is *entitled* to have such evidence set before the court." *Supra*, 810. The Defendant acknowledges that the hairs found in the victim's hand were found not to be similar in color, nature or characteristics to the Defendant or Hardin and were, therefore, not manifest to Defendant's conviction. However, the new evidence in the form of the DNA test results and profile, presented to a jury, would *probably induce a different conclusion*, especially if compared to another person who is indicated as the donor of the hair found in the victim's hand.

KRS 422.285 entitles a death row inmate to post-conviction DNA testing if certain criteria are met. There is no statute in Kentucky that entitles any other defendant to post-conviction DNA testing. However, the legislative intent of Kentucky's preservation statute, KRS 524.140, is clear. That statute provides:

No item of evidence gathered by law enforcement, prosecutorial, or defense authorities that may be subject to deoxyribonucleic acid (DNA) evidence testing and analysis in order to confirm the guilt *or innocence* of a criminal defendant

12

252

CLARK 004594

shall be disposed of following the trial unless...the evidence was not introduced at the trial, or if introduced at the trial was not the subject of DNA testing and analysis, and the defendant has been found guilty, pled guilty, or entered an Alford plea at the trial and the trial court has ordered the destruction of the evidence after an adversarial hearing conducted upon motion of either the prosecution or defendant

KRS 524.24(3)(b). (emphasis added)

The Kentucky legislature clearly intended that all evidence subject to DNA testing shall be preserved in order to prove innocence in post-conviction testing.  The statute expressly extends this preservation of evidence to anyone charged with a Capital offense, Class A felony, Class B felony, Class C felony or a Class D felony under KRS Chapter 510.  See KRS 524.140(1)(a) and (b).  It is counter intuitive to have a statute that preserves evidence for post-conviction DNA testing without being able to conduct such testing.

KRS 524.140 does not entitle a defendant convicted under one of the classes set forth in the statute to post-conviction DNA testing; it only requires preservation.  With no statute that specifically creates such an entitlement or sets out the procedures or guidelines for non-capital post-conviction DNA testing, we must look to KRS 422.285 to see what evidence can be tested.  KRS 422.285 does not require the evidence to have been material to the conviction of the defendant but permits testing of biological evidence that "...is *related to the investigation* or prosecution that resulted in the judgment of conviction...".  KRS 422.285(1)(emphasis added).

Law enforcement immediately recognized that the hairs found in the victim's clutched hand, as well as the fingernail scrapings, were important and were related to their investigation.  The investigators requested the Kentucky State Police crime lab to test and/or examine the hairs and the fingernail scrapings.  The scrapings were returned

13

*253*

CLARK 004595

untested because of the small size of the sample and it could not be tested.  The hairs remain at the crime lab and can be subjected to mtDNA testing today.

> Recognizing that post-conviction, newly discovered, non-match DNA evidence- that which, standing alone, neither explicitly exculpates or inculpates a defendant- is rarely addressed in case law, the *Dodds* court sought to discern the legal significance of such evidence. *Id. at 68-69* (citing 31 Cap.U.L.Rev. at 245).  In doing so, the court articulated that in order to warrant a claim of actual innocence, the evidence should be new, noncumulative evidence which was not obtainable with due diligence during trial and that would probably induce a different result upon retrial. *Id. at 69*.

<u>Bedingfield</u>, *supra*, 811-812, *citing* <u>People v. Dodds</u>, 801 N.E.2d 63 (2003).

The Defendant is asking for access to evidence from the investigation in order to conduct a type of DNA testing that did not exist at the time his trial.  The new evidence is the actual DNA test results, is non-cumulative and certainly was not obtainable during trial due to the fact mtDNA testing was not available at the time.  Test results indicating another individual is the donor of the hairs found in the clutched hand of the victim, who had defensive stab wounds to her hands, would probably induce a different result upon retrial.

## CONCLUSION

In this case, the unique opportunity exists to identify the true killer who has, to this date, "gotten away" with the murder of Rhonda Sue Warford.  The alternative suspect has been identified and biological material is available that can be tested to compare with a DNA profile that can be obtained from the hairs found in the victim's hand.  All of the requested testing will be done at no expense to the Commonwealth.

The hairs in question were related to the investigation of law enforcement, the hairs have been preserved as required by statute and, through its enactment of the preservation statute, the Kentucky legislature has made it clear that it was that body's

14

*254*

CLARK 004596

intent that post-conviction DNA testing of biological evidence shall be available in appropriate post-conviction actions.   The Kentucky Supreme Court has further recognized that when new evidence such as DNA test results would have probably induced a different conclusion by the jury that a criminal defendant is entitled to have such evidence brought before the court.

The interests of justice demand that the Defendant is entitled to have such evidence set before the court.

WHEREFORE, the Defendant respectfully requests this Honorable Court to order the Kentucky State Police Central Forensic Laboratory to release the following items of physical evidence for nucleic DNA testing if roots and/or skin cells are attached to the hair(s), or mitochondrial DNA testing if no root or skin cells are found, by DNA Diagnostics Center, 205 Corporate Court, Fairfield, Ohio 45014, with all costs of the testing, including the testing of the physical evidence collected from the alternative suspect, to be borne by the Kentucky Innocence Project on behalf of the Defendant:

Lab No.        92-2-1424

Case No.       MC-4-92-093

Exhibit 9      Hair from Right hand

FURTHERMORE, the Defendant does respectfully request the Court to order the collection of bucal swabs, furnished by DDC, from the Defendant by the appropriate parties of the Department of Corrections at Luther Luckett Correctional Complex, where the Defendant is currently incarcerated.   The collected bucal swabs shall be immediately sealed in the packaging material provided by KIP in the presence of KIP and DOC personnel, and a KIP representative shall cause the bucal swabs to be immediately

15

255

CLARK 004597

forwarded by express shipment to DDC. Said swabs will be used to establish a known standard for comparison with results from the other mtDNA testing.

Respectfully submitted,

Theodore S. Shouse
Kentucky Innocence Project
Department of Public Advocacy
100 Fair Oaks Lane, Suite 301
Frankfort, KY 40601
502-564-3948

Counsel for Defendant

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the original of this Motion for Release of Physical Evidence for DNA Testing was mailed, U.S. postage pre-paid, to the Office of the Meade Circuit Court Clerk, Meade County Courthouse, 516 Hillcrest Drive, Brandenburg, KY 40108. The undersigned further certifies that true and correct copies of the Motion for Release of Physical Evidence for DNA Testing were mailed, U.S. Postage pre-paid, to Honorable Susan Streible, Commonwealth's Attorney, P.O. Box 249, Brandenburg, KY 40108-0249, Hon. Larry Simon, 510 West Broadway, Suite 805, Louisville, KY 40402 on this the 8th day of July, 2009.

Theodore S. Shouse

16

256

CLARK 004598