IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| JEFFREY DEWAYNE CLARK and GARR KEITH HARDIN, | ) ) ) | HON. GREG N. STIVERS |
| Plaintiffs, | ) ) | HON. COLIN H. LINDSAY |
| v. | ) ) | Case No. 17-CV-419-GNS-CHL |
| LOUISVILLE JEFFERSON COUNTY METRO GOVT, et al., | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DET. MARK HANDY'S AND SGT. JIM WOOSLEY'S MOTION FOR SUMMARY JUDGMENT**

I.    INTRODUCTION

Plaintiffs Garr Keith Hardin and Jeffrey Clark each spent 22 years wrongly imprisoned for a brutal crime they had nothing to do with: the 1992 murder of Rhonda Sue Warford. Although Plaintiffs truthfully professed their innocence and had solid alibis, they were wrongly convicted due to misconduct by the investigating officers, including Louisville Police Department Detective Mark Handy and Sergeant Jim Woosley. Ultimately, after DNA testing excluded both men as the source of hairs found on the victim's body, and evidence of Handy's pattern of investigative misconduct was revealed, their convictions were vacated and charges dismissed.

Defendants' motion for summary judgment turns the summary judgment standard on its head. Under the familiar governing standard, the Court is required to credit Plaintiffs' evidence, draw inferences in Plaintiffs' favor, and disregard conflicting evidence the jury is not required to

1

believe. *See*, *e.g., Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 404 (6th Cir. 2022). Abundant evidence supports Plaintiffs' accounts: that they are actually innocent, that they did not make the statements Defendants attribute to them. While the law is clear that evidence must be credited, Defendants' motion ignores or improperly contests it. *See id.* Worse, Defendants' motion even ignores *uncontested facts* harmful to their case—such as those established by Handy's criminal convictions for perjury and tampering with evidence which led to wrongful convictions of two other innocent men during the same time period.

Defendants cannot dispute that if Handy and Woosley fabricated evidence used to cause Plaintiffs' wrongful convictions—including the incendiary claim that Hardin admitted he wanted "to do human sacrifices"—that that is a constitutional violation for which they may be held liable. Instead, Defendants dispute the facts, blithely asserting they did not fabricate anything. But that is not an argument they may make on summary judgment; Plaintiffs have abundant evidence that they did, and that evidence must be credited at this stage.

Similarly, Defendants cannot dispute that Defendant Handy's pattern of fabricating evidence, withholding exculpatory evidence, and committing perjury in criminal proceedings to bury his misdeeds—which ultimately led to his criminal convictions—was exculpatory and impeachment evidence that should have been disclosed before Plaintiffs' criminal trial. Instead, Defendants wholly ignore this claim altogether.

In short, the only disputes in this case are factual ones which must be resolved at trial. Defendants' motion for summary judgment should be denied.[1]

---

[1] Plaintiffs are no longer pursuing  a § 1983 claim for malicious prosecution (Count III) or state law claims for malicious prosecution (Count XI) or emotional distress (Counts XII and XIII) against these Handy or Woosley.

## II.     LEGAL STANDARD

Under the "well-recognized" Rule 56 standard, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Clay v. Emmi*, 797 F.3d 364, 370 (6th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Thus, on Defendants' motion for summary judgment, the Court "must believe [Plaintiffs'] evidence…and disregard [Defendants'] conflicting evidence that the jury is not required to believe," *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 404 (6th Cir. 2022) (cleaned up, internal citations and quotation marks omitted). "[T]he evidence is construed and all reasonable inferences are drawn in favor of" Plaintiffs. *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (internal citation and quotation marks omitted). The Court cannot "usurp the place of the jury by weighing the witnesses' relative credibility." *Clay*, 797 F.3d at 371. "[I]f [Plaintiffs are] able to demonstrate that there is a genuine issue of material fact in dispute, then Defendants are not entitled to summary judgment." *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017); *see* Fed. R. Civ. P. 56(c).

## III.     FACTUAL BACKGROUND

The facts, taken in the light most favorable to Plaintiffs as required, are as follows:

### A.  Plaintiffs Keith Hardin and Jeff Clark are innocent of the murder of Rhonda Warford.

On the evening of Wednesday, April 1, 1992, 19-year-old Rhonda Sue Warford had a bizarre encounter on her way back from the local Kroger's grocery store in Louisville, Kentucky. Ex. 42, Warford Dep. 42:8–43:11. A strange, "dirty, ugly old man" followed her down the street, yelling at her that he wanted to marry her and for her to have his babies. Ex. 42, Warford Dep. 42:13–43:11; 150:25–151:20; Ex. 83, Uniform Rep. 15; Ex. 71, KY Rep. This was the only time in her life Rhonda reported being subjected to such harassment. Ex. 42, Warford Dep. 150:25–

3

151:20; Ex. 41, Rogers Dep. 128:15–22. Hours later, at 12:30 am on Thursday April 2, 1992, Rhonda was last seen alive by her mother as she grabbed the door keys and left the house, saying only she was going "down here;" her family understood that to mean in the direction of the Kroger's. Ex. 42, Warford Dep. 44:7–19, 145:6–21; Ex. 41, Rogers Dep. 117:7–23; Ex. 72, Rogers Int., 7:19–8:17. Like many teens, Rhonda would sometimes engage in risky behavior like leaving the house without saying exactly where she was going, drinking alcohol with her friends, and even getting into cars with men she didn't know. Ex. 42, Warford Dep.134:10–25; 135:14–136:14; Ex. 29, Rogers Tr. 150:2–8; 157:20–159:10; Ex. 41, Rogers Dep. 115:1–22; Ex. 43, Barnes Dep. 30:14–23; 31:14–25; Ex. 30, Tyrell Tr. 14:10–16. Rhonda would sometimes walk down to the Kroger's parking lot to party with friends. Ex. 31, Jaegers Tr. 197:16–19; 199:24-200:8.

Wherever Rhonda went that night, it wasn't with her boyfriend Keith Hardin or his friend, Jeff Clark. Ex. 1, Hardin Decl.; Ex. 2, Clark Decl.; Ex. 18, Clark Tr. 227:1–9; Ex. 17, K. Hardin Tr. 72:4–75:23. Hardin last saw Rhonda several days earlier; Clark hadn't seen or talked with Rhonda since December of 1991. Ex. 1, Hardin Decl.; Ex. 2, Clark Decl.; Ex. 17, K. Hardin Tr. 72:4–10; Ex. 18, Clark Tr. 227:1–9. And, Clark and Hardin spent most of the night of April 1 and early the next morning cleaning Clark's trailer to get it ready to sell. Ex. 18, Clark Tr. 220:5–14; 220:23–221:20. Clark and Hardin left the trailer in the early morning hours, stopped by a local Chevron station to purchase cigarettes, and then Clark dropped Hardin off at his home before Clark arrived at his parents' home. *Id.* at 225:10–16; 226:1–19.

Rhonda had always told her mother when she was going out with Hardin; her mother liked Hardin, and Rhonda had no reason to hide going out with him. Ex. 43, Barnes Dep. 36:4–13; Ex. 41, Rogers Dep. 137:18–22; Ex. 42, Warford Dep. 132:9–133:20; Ex. 32, Warford Tr. 27:20–28:11. When Rhonda went out that night, she wasn't wearing her jewelry, which she would always

4

wear when she went out with Hardin, because she wanted to look her best. Ex. 42, Warford Dep. 75:19–76:11; 133:21–134:9; Ex. 41, Rogers Dep. 131:12–19.

When Rhonda was still not home and could not be located that day, her mother reported her missing to the LPD.[2] Ex. 42, Warford Dep. 46:15–49:23; Ex. 71, KY Rep. When asked by the reporting officer as to who Rhonda might be with, her mother described the strange man who had accosted her on the way back from Kroger's that evening. Ex. 42, Warford Dep. 146:2–16; 148:5–16; 150:11–24; Ex. 71, KY Rep. at LMPD 9. It was only in response to a question from the LPD officer as to whether Rhonda had a boyfriend who might know her location that her mother mentioned Hardin, explaining that she had contacted him, and he hadn't seen Rhonda since March 28. Ex. 42, Warford Dep. 146:20–147:21; Ex. 71, KY Rep. at LMPD 10.

Tragically, Rhonda's body was found three days later at 7:30 am on Sunday, April 5, 1992, approximately 50 miles away in a field in Meade County. Ex. 83, Uniform Rep. 2. She had been stabbed multiple times and her throat had been cut following a violent struggle. Ex. 83, Uniform Report 2; Ex. 44, Nichols Dep. I 157:5–8; Ex. 33, Nichols Tr. 140:01–141:7. She had defensive wounds on her hands; it was not possible to tell if she had had recent sexual activity or if she had been the victim of a sexual assault. Ex. 33, Nichols Tr. 141:3–5, 148:15–149:2. Two gray hairs were found clutched in her hand—the source of these hairs is still unidentified. Ex. 68, Dimick Aff. ¶¶ 34, 38–42; Ex. 69, DNA 1, 5.

---

[2] At all times relevant to this investigation, the relevant investigating agency was the Louisville Police Department (LPD). After Jefferson County and the City of Louisville merged to form the Louisville Jefferson County Metro Government in January 2003, the merged Louisville Metro Police Department (LMPD) became the successor to the LPD. Dkt. 1 at PageID #7. For simplicity, Plaintiffs refer to the police department as LPD throughout.

Based on the medical evidence, Rhonda was killed approximately 12–24 hours before her body was found; in other words, sometime during the day of Saturday, April 4, 1992. Ex. 67, Melinek Rep. 4; Ex. 44, Nichols Dep. I 153:5–10; 153:25–154:4. The medical evidence also indicates Rhonda was killed elsewhere, that her body spent a significant enough period of time in a location other than the field (such as in a truck or large vehicle) with flexed knees for rigor mortis to develop in that position, and that her body was left in the field only hours before it was discovered. Ex. 67, Melinek Rep. 3–4; Ex. 44, Nichols Dep. I 91:25–93:13; 104:1–105:10; Ex. 64, Melinek Dep. 191:19–192:11; 193:1–194:5; 196:18–198:16; 216:14–20. As of the time of the April 5 autopsy, investigators understood Rhonda had been killed on April 4 or early on April 5. Ex. 49, Greer Dep. I 15:16–16:24; 177:9–25; Ex. 40, Bill Adams Dep. 71:8–72:3; Ex. 44, Nichols Dep. I 181:12–16; 184:4–14; Ex. 73, Coroner Rep. at NSB 195; Ex. 74, KSP Exam.; Ex. 75, News Art.

Keith Hardin and Jeff Clark had nothing to do with Rhonda's disappearance or murder; they are absolutely innocent. Ex. 1, Hardin Decl.; Ex. 2, Clark Decl.; Ex. 17, K. Hardin Tr. 59:1–11; Ex. 18, Clark Tr. 265:9–12; Ex. 83, Uniform Rep. at 14. Hardin and Clark both cooperated voluntarily and fully with the investigation into Rhonda's murder. Ex. 13, Woosley Dep. 202:19–203:21; 225:14–21; Ex. 49, Greer Dep. I 143:11–20; Ex. 15, Clark Ev. Hrg. 113:2–3; 115:13–15; Ex. 39, Clark Dep. 325:13–326:19; Ex. 18, Clark Tr. 237:6–8; 271:3–6. At the time, Hardin was 22 years old, lived at home with his parents, and had recently lost his factory job at Town Talk because his car had broken down. Ex. 17, K. Hardin Tr. 59:12–19; Ex. 38, Hardin Dep. 27:15–28:15; 62:21–23; 64:11–23. Clark was 21 years old, and lived at home with his parents, where he spent time working on his broken-down car and a three-wheeler that he was going to sell at the

flea market and where he helped his parents with his younger siblings, picking them up from school Ex. 15, Clark Ev. Hrg. 114:7–8; 115:22–24; Ex. 18, Clark Tr. 227:16–20; 230:23–25, 231:3–5.

Both Hardin and Clark were voluntarily taken to the station and questioned multiple times, and they provided the Defendant Officers with an alibi for the night of Rhonda's disappearance and the days leading up to the discovery of her body. Ex. 50, Greer Dep. II 164:3–25; Ex. 15, Clark Ev. Hrg. 113:4–6; 114:12; 117:13–19. Several witnesses accounted for Clark and Hardin's whereabouts in Louisville during the time Rhonda was missing, including neighbors, a gas station attendant, family members, and friends. Ex. 18, Clark Tr. 221:24–233:14; Ex. 17, K. Hardin Tr. 73:16–75:23; 77:16–81:9; Ex. 19, W. Hardin Tr. 25:3–30:21; Ex. 20, Houser Tr. 9:3–11:17; Ex. 21, D. Cochran Tr. 67:1–69:4; Ex. 22, A. Cochran Tr. 28:22–29:18; 32:10–35:21; 46:12–47:1; Ex. 23, J. McMackin Tr. 155:7–157:25; Ex. 24, N. McMackin Tr. 151:1–152:23; Ex. 25, Pozzie Tr. 103:7–104:13; Ex. 26, Reese Tr. 89:16–90:18; Ex. 27, Calliver Tr. 97:5–100:7. As Meade County Sheriff Joe Greer admitted, Hardin and Clark had solid alibis starting Thursday, April 2 at 2:20 a.m. through Saturday, April 5 when the body was discovered; said Greer, they "alibied beautifully." Ex. 50, Greer Dep. II 164:8–25; 168:1–4; Ex. 49, Greer Dep. I 270:7–23; Ex. 28, Greer Tr. 141:21–142:17. Accordingly, Greer understood that if Rhonda was murdered on April 4 or the morning of April 5, Hardin and Clark could not have done it. Ex. 50, Greer Dep. II 160:6–161:25, 164:8–25, 165:17–25, 166:21–168:4.

No one ever claimed to have seen Clark or Hardin with Rhonda the night of her disappearance or at the scene where her body was found, and no murder weapon was found at the scene or in a search of their homes or vehicles. Ex. 28, Greer Tr. 115:1–3; Ex. 16, Greer Ev. Hrg. 93:4–13. Furthermore, the vehicle in which Rhonda's body was transported to the field where it was found would be expected to have significant amounts of bloodstain evidence. Ex. 67, Melinek

Rep. 4. At the time, Hardin did not have access to a working car. Ex. 19, W. Hardin Tr. 26:15–27:25; Ex. 38, Hardin Dep. 102:21–103:18; Ex. 15, Clark Ev. Hrg. 120:24–121:3. Clark's car, a Chevy Nova sedan, was thoroughly searched within days of the murder, and no hair, fiber or blood evidence linked to Rhonda was found anywhere including in the passenger area or the trunk. Ex. 104, Trial Stip. 2:13–3:7. Soil samples taken from Clark's car did not match the soil at the crime scene and his car's tires did not match the tire tracks found near where Rhonda's body was found. Ex. 104, Trial Stip. 2:13–3:7. Both Clark and Hardin voluntarily turned over their clothing and shoes and provided authorities with blood, saliva, head and pubic hair samples. Ex. 39, Clark Dep. at 325:15–21; Ex. 15, Clark Ev. Hrg. 115:6–12; Ex. 17, K Hardin Tr. 90:11–22; Ex. 3, Handy Tr. at 31:14–25; Ex. 122, Clark Samples. DNA testing has also excluded Hardin and Clark as the source of *all* tested physical evidence found on Rhonda's body—including the hairs found in Rhonda's hand. Ex. 68, Dimick Aff. ¶¶ 38, 42, 43.

**B. The true perpetrators of the Warford murder have not been prosecuted.**

Due to the botched investigation and premature fixation on the innocent Hardin and Clark described below, the true perpetrators of Rhonda Warford's murder have not been brought to justice. There are several plausible suspects.

*James Whitely*

Rhonda's friends Nicky Madison and Pam Gibson suspected a man who had partied with and dated Rhonda, James Whitely, of involvement in Rhonda's murder. Ex. 78, Madison SGJ at NSBMCSO 403–404, NSBMCSO 416–417, NSBMCSO 420–422. Ex. 79, Gibson SGJ at NSBMCSO 388–389, 396, 11. According to Madison, Whitely confessed to Gibson—his former girlfriend—that he and two other men, including a man named Bill, picked up Rhonda on the night of her disappearance, drove her to Meade County, attempted to rape her, and killed her. Ex. 78,

8

Madison SGJ at NSBMCSO 403–404; Ex. 106, Hall Inv. Memo at CLARK 000141. At his deposition, Whitely admitted to knowing several individuals named "Billy" and to hanging out with them in 1992. Ex. 53, Whitely Dep. 112:21–113:2. Troy Brock too said that Whitely was involved in Rhonda's murder. Ex. 79, Gibson SGJ at NSBMCSO 389.

Whitely had a long history of violence and violence against women, including assault for causing serious injury by means of a concrete slab and wooden board, assault on a police officer, resisting arrest, rape, terroristic threatening, and violation of an EPO/DVO. Ex. 53, Whitely Dep. 17:21–24; 38:19–22; 68:19–25; 70:10–71:25; 72:1–6; 79:18–80:14; 81:24–82:16; 83:18–25; 90:16–21; 91:23–93:25; 97:18–21; 98:10–13; 102:8–104:5; 104:25–105:9, 108:2–5; 108:20–110:16; Ex.116, Whitely Crim. In the early 90s he hung out with a local gang called the "Dirty White Boys" and drove a van with a bed in the back and no windows on the sides which he used for partying and in which he may have kept a long hunting knife. Ex. 53, Whitely Dep. 20:22–22:4; 48:2–49:14; 51:18–52:23; 60:19–64:6.

Whitely and a friend once took Madison and another underage girl in his van promising to buy them alcohol, but instead of driving them home, tried to abduct them and transport them to a location in Meade County. Ex. 78, Madison SGJ NSBMCSO 413, 417, 421; Ex. 41, Rogers Dep. 153:6–18. It was not until Madison threatened to jump out of the van that Whitely took her home. *Id.* Although Whitely had repeatedly partied with Rhonda, Gibson, and Madison, had a sexual relationship with Gibson, and had dated Rhonda, when deposed, Whitely lied and claimed he had never met any of the three women. Ex. 79, Gibson SGJ at NSBMCSO 394–395, 400; Ex. 78, Madison SGJ NSMCSO 404, 411–413, 415–419 3, 10–12, 14–18; Ex. 41, Rogers Dep. 151:2–156:14; Ex. 53, Whitely Dep. 23:5–25:7; 29:12–30:4; 54:15–60:12; 64:7–65:18.

*William "Billy" Mahan*

William "Bill/Billy" Mahan's suspicious behavior and incriminating statements led his co-workers to suspect he was involved in Rhonda's death and that he attempted to frame Clark for it. Ex. 80, Mattingly SGJ at 8–9; 18–19, 22–23, 27–30; Ex. 82, Mattingly Int. at 8–9, 15; Ex. 47, Mahan Dep. 131:11–21. Mahan and his father Jack worked with Clark; although they hung out some, ultimately, Clark and Mahan did not get along. Ex. 39, Clark Dep. 89:18–22; 187:7–25.

Mahan met Rhonda through Clark. Ex. 47, Mahan Dep. 62:23–64:3. He had ridden with Clark to pick up Rhonda at her house and had been to Meade County with Clark where the two had shot guns with Amy Remsburg's family. *Id.* at 52:22–54:1; 64:1–18; 146:10–13; Ex. 39, Clark Dep. 199:13–200:4.

Just days after Clark's arrest, the Mahans arrived at work with photographs of the remote location in Meade County where Rhonda's body was found, claiming they had learned the location from the Crime Stoppers TV program, even though that information had not been shared on the show. Ex. 80, Mattingly SGJ at 19–21; Ex. 47, Mahan Dep. 54:2–56:3; Ex. 48, Mattingly Dep. 65:21–68:21; 115:18–118:2. Mahan also volunteered that the hair found in Rhonda's hand at autopsy might have been his, implausibly suggesting that could be explained because he had been in Clark's car before. Ex. 80, Mattingly SGJ 28; Ex. 82, Mattingly Int. 14–16. The source of two gray hairs found in Rhonda's head has never been identified; at the time Rhonda was killed, Jack Mahan had black and gray hair. Ex. 68, Dimick Aff. ¶¶ 34, 38–42; Ex. 69, DNA 1, 5; Ex. 80, Mattingly SGJ 23; Ex. 84, Mahan Int. 8.

Mahan was "shaking in his shoes," turned white, and was "real nervous, pacing the floors back and forth like he had something really to worry about" when Sheriff Greer came by his workplace. Ex. 80, Mattingly SGJ at 27–28. When law enforcement came to interview Clark's co-

workers, Mahan told them to "try to think of all the bad things you can think about Jeff to tell this detective." Ex. 80, Mattingly SGJ at 18.

### C.  Meade County Sheriff's Office and Louisville Police Department investigate the Warford murder.

When Rhonda Warford's body was discovered on April 5, 1992, the Meade County Sheriff's Office was called in to investigate, led by Sheriff Joe Greer. Ex. 49, Greer Dep. I 13:19–21; 14:18–15:14; 226:1–6; Ex. 28, Greer Tr. 108:22–109:9. At the autopsy later that day, Greer observed Rhonda had an upside-down cross tattoo, which he understood to be related to Satanism, and fixated on it. Ex. 49, Greer Dep. I 214:4–14; 216:2–16; 217:3–218:5; 219:12–15; 293:11–21; Ex. 28, Greer Tr. 127:11–17. That same day, Greer interviewed Rhonda's boyfriend, Hardin, who was helping identify the body. Ex. 83, Uniform Rep. at 9–12. Hardin has Autism Spectrum Disorder, which causes deficits in social communication and cognition that lead his behavior to differ from that of a neurotypical person. Ex 120, Loftin Rep. 2–5. In particular, Hardin's limited facial expression can falsely suggest a lack of emotion, and his literal and concrete interpretation of conversation can lead to misinterpretations. *Id.* Another core symptom of ASD is an intense and restricted interest in a particular topic; in Hardin's case, that is world religions. *Id.* Up until a few months before Rhonda's murder, Hardin's focus had been on Neo-Satanism; he later studied Zen Buddhism and now Transcendental Meditation. Ex. 1, Hardin Decl.; Ex. 38, Hardin Dep. 20:1–21:1; Ex. 87, Hardin Ev. Hrg. 176:12–25; Ex. 120, Loftin Rep. 7.

As soon as Greer learned of Hardin's involvement with Satanism, he formed a theory the crime could be connected to Satanism. Ex. 49, Greer Dep. I 264:4–265:19. Greer requested the assistance of the LPD. Ex. 28, Greer Tr. 140:7–18. As of April 6, 1992, Hardin and his friend Clark

were suspects in the murder, even though no witness or physical evidence had implicated them. Ex. 49, Greer Dep. I 183:1–184:5.

### D.  Handy leads the Warford investigation for LPD.

In 1992 Detective Mark Handy was a very experienced detective for LPD; he acted as lead for LPD in the Warford investigation. Ex. 54, James Clark Dep. 39:13–16; 45:19–46:11; Ex. 55, Handy Chand. Dep. 20:18–21:16; Ex. 6, Handy Dep. I 69:14–70:8; 72:17–21; 83:6–9. Handy and Greer worked closely together during the investigation, they conducted interrogations together, maintained daily contact, and would keep each other updated on investigative steps. Ex. 49, Greer Dep. I 25:14–27:20; 315:13–16. At the outset Greer updated Handy on the evidence gathered so far; "after discussing everything with Handy" they focused the investigation on Hardin and Clark. Ex. 6, Handy Dep. I 118:1–4; 202:12–22; Ex. 83, Uniform Rep. at 13. When Greer and Handy interviewed or investigated together, Handy generally took the lead because he was more experienced. Ex. 50, Greer Dep. II 155:8–16; 241:1–24.

 Handy had a reputation for getting confessions and closing cases; he was brought in by supervisors for that purpose, and in this case his primary responsibility was interviewing the suspects. Ex. 54, James Clark Dep. 20:14–21:3; 25:4–25; Ex. 56, Julius Clark Dep. 132:19–133:12; Ex. 5, Handy Ev. Hrg., 227:15–228:7; 231:1–20; Ex. 13, Woosley Dep. 63:23–65:18; 77:8–78:11; 195:18–196:2; Ex. 57, Sherrard Dep. 110:4–111:1. Handy was brought onto this case by LPD Lieutenant Sherrard specifically to question suspects. Ex. 6, Handy Dep. I 259:3–19.

From the day Handy was assigned to the case—Monday, April 6—he was exploring Satanism as a motive for the murder. Ex. 6, Handy Dep. I 110:12–16; 111:14–112:11; 115:16–25; 121:2–122:6; Ex. 11, Handy Reps. 2–4. Handy had a close relationship with Ronald Holmes, who had trained him on occult crimes, and from that training Handy believed Devil-worshipping could

12

involve animal and even human sacrifice; based on his belief the Warford murder might have been a ritualistic killing he arranged to have Holmes consult on the case. Ex. 6, Handy Dep. I 97:3–98:1; 98:17–99:16; 107:23–109:15; Ex. 12, Handy Cert.; Ex. 54, James Clark Dep 55:17—57:22. Greer similarly believed from the outset the murder was related to Satanism and that both Hardin and Clark were involved. Ex. 49, Greer Dep. I 264:4–265:19; 269:5–13.

Handy and Greer's beliefs about Satanism and its connection to animal and human sacrifice were false, reflecting urban legends that were frequently perpetuated in law enforcement trainings like the one Handy attended. Ex. 86, Lowney Rep. 2–7. In reality, "dabbler" Satanists like Hardin were "harmless adolescents" who had been "typecasted by society as outcasts" and found a "thrill…engaging in activity perceived to be outside the bounds of societal norms." Ex. 86, Lowney Rep. 2–3, 5–6; Ex. 38, Hardin Dep. 122:6–14; 123:1–8.

Handy also understood at this point that Hardin and Clark were the only suspects they had identified, that there were no eyewitnesses to the crime, and no physical evidence implicating either of them. Ex. 6, Handy Dep. I 199:21–200:9; 201:8–12; Ex. 13, Woosley Dep. 194:20–195:22. A confession or inculpatory admission could be very important to the case. Ex. 62, Pierce Dep. 64:14–65:1.

### E.  Handy and Woosley fabricate that Hardin admits to wanting to do human sacrifice.

With this false theory that the Warford murder reflected satanic influence in mind, on April 7 Handy picked up Hardin to interrogate him, beginning the interview in the car on the way to the police station. Ex. 6, Handy Dep. I 105:07–107:14; Ex. 3, Handy Tr. 56:13–15; Ex. 83, Uniform Rep. at 13. The first thing Handy asked Hardin about was Satanism. Ex. 6, Handy Dep. I 127:24–128:5. Based on his misunderstanding that Satanism involved animal sacrifice that could progress

to human sacrifice, Handy asked Hardin whether he had ever performed any blood sacrifice or sacrificed animals; Hardin truthfully told him no, he hadn't. Ex. 1, Hardin Decl.; Ex. 38, Hardin Dep. 119:10–120:4; 122:6–14; Ex. 6, Handy Dep. I 107:23–109:15, 128:6–18, 129:2–7; Ex. 87, Hardin Ev. Hrg 153:1–13. Handy then asked if Hardin had ever sacrificed a human, and Hardin again truthfully said no. Ex. 1, Hardin Decl.; Ex. 38, Hardin Dep. 119:10–120:4; 122:6–14; Ex. 87, Hardin Ev. Hrg 153:14–21.

Instead of accurately reporting Hardin's statements, Handy did the opposite. Handy later falsely reported that during this conversation Hardin had made a highly inculpatory admission: that he first admitted he had sacrificed small animals, and then volunteered that he "got tired of looking at animals and began to want to do human sacrifices." Ex. 11, Handy Reps. at 7; Ex. 6, Handy Dep I 128:6–132:25. The statement Handy attributed to Hardin was "an extraordinarily inculpatory admission" and "very damning," particularly given that Defendants suspected Satanism might be the motive for the Warford murder. Ex. 57, Sherrard Dep. 140:2–141:6; Ex. 13, Woosley Dep. 198:16–201:17, 228:17–21; Ex. 14, Woosley GJ 27:3–12; Ex. 62, Pierce Dep. 27:4–22, 28:25–29:10; Ex. 6, Handy Dep. I 160:16–23, 166:25–167:8. It was the one obviously inculpatory admission that Handy reported Hardin had made. Ex. 57, Sherrard Dep. 140:2–141:16; Ex. 11, Handy Reps. at 5–8.

Woosley, who was also present in the car when Handy interviewed Hardin, was paying close attention to the interview and "heard every word" that was said. Ex. 6, Handy Dep. I 132:14–25; 138:2–13; Ex. 13, Woosley Dep. 27:9–17. Woosley initialed Handy's report recounting this fabrication, indicating he was endorsing it as accurate, even though it was not. Ex. 13, Woosley Dep. 149:7–20; Ex. 11, Handy Reps. at 8; Ex. 14, Woosley GJ 19:13–21:8; Ex. 1, Hardin Decl. Although he admitted this is the type of unusual statement that would stick in your mind if you

heard it, Woosley has repeatedly testified, both at the grand jury that indicted Handy and at his deposition in this case, that he has absolutely no memory of Hardin ever making that statement. Ex. 14, Woosley GJ 15, 19:13–20:1; Ex. 13, Woosley Dep. 134:24–137:18; 206:8–18.

### F.   Handy fails to take any basic steps he would have taken if Hardin had actually admitted to wanting to do human sacrifice.

Handy was a skilled and experienced interrogator. Ex. 13, Woosley Dep. 244:3–5; Ex. 57, Sherrard Dep. 110:4–111:1; Ex. 6, Handy Dep. I 69:14–70:8, 72:17–21, 83:6–9. As LPD supervisors all agreed, if any experienced investigator heard a murder suspect volunteer that he wanted to do human sacrifice, the investigator would want to follow up on that statement "as far as you could" to see if the suspect would give a full confession. Ex. 13, Woosley Dep. 203:22–205:23; Ex. 62, Pierce Dep. 29:11–30:14; Ex. 57, Sherrard Dep. 141:13–142:9; Ex. 85, Fischer Rep. 6–7. There is no legitimate law enforcement reason not to follow up on a statement like that if it was made. Ex. 13, Woosley Dep 205:24–206:2; 211:3–212:12; Ex. 85, Fischer Rep. 6–7. Indeed, Woosley could think of nothing more important than following up on that statement, if it was made. Ex. 13, Woosley Dep. 213:10–214:16; 217:4–7. And Handy himself admitted he understood it was important to follow up on any inculpatory statement a suspect makes to get the strongest admissions possible. Ex. 6, Handy Dep. I 76:7–77:18. But Handy did not ask Hardin any questions about this alleged admission—not during the multi-hour interview on April 7 at the station, and not during the follow-up interview on April 9. Ex. 13, Woosley Dep. 219:1–223:23; 227:2–228:9; Ex. 6, Handy Dep. I 172:24–173:8; 179:5–11.

15

Another Louisville detective, Hope Greer,[3] also interviewed Hardin on April 7, after first being briefed by Handy about "the information he had received from Keith Hardin" during his own interview that day. Ex. 111, H. Greer Rep. Although when switching interrogators the most important responsibility of the first detective is to ensure the second detective has all important information from the first interview, and although the single most important information Handy later claimed he received from Hardin was the admission about human sacrifice, Handy did not report this alleged admission to Hope Greer at the time. Ex. 13, Woosley Dep. 237:20–239:19; 241:5–243:23; Ex. 57, Sherrard Dep. 140:15–141:3; Ex. 54, James Clark Dep. 62:19–64:8. There is no legitimate police reason for Handy not to report this admission to Hope Greer if Hardin had actually said it; any competent investigator would have done so. Ex. 13, Woosley Dep. 243:24–245:6; Ex. 85, Fischer Rep. 6–7.

If a suspect was willing to speak and gave important information, either inculpatory or exculpatory, the LPD practice was to memorialize that information in a taped statement. Ex. 62, Pierce Dep. 65:12–66:5; 68:19–24; Ex. 57, Sherrard Dep. 135:13–137:6, 138:9–22; Ex. 13, Woosley Dep. 182:20–185:18; Ex. 54, James Clark Dep. 16:12–18:10; 32:4–33:2. Taking a taped statement from a willing suspect was "about as basic as it gets in a homicide division"; there was no legitimate reason not to take a taped statement if the suspect was willing. Ex. 62, Pierce Dep. 66:21–67:21; 68:25–70:15; 71:13–24; 75:24–76:13; 81:3–9; 83:15–23; Ex. 57, Sherrard Dep. 143:14–144:6; Ex. 85, Fischer Rep. 6–7; Ex. 6, Handy Dep. I 77:19–25; Ex. 13, Woosley Dep. 228:22–229:2.

---

[3] To avoid confusion with Sheriff Greer, LPD Detective Hope Greer is referred to by her full name.

16

Hardin and Clark couldn't have been more cooperative: they voluntarily went to the police station, answered any questions police had on multiple days, voluntarily took polygraphs and voluntarily gave blood and fluid samples. Ex. 13, Woosley Dep. 202:19–203:21; 225:14–21; Ex. 6, Handy Dep. I 179:12–25. According to LPD practice, if Hardin had given the statement about human sacrifice that Handy claimed, Handy was required to at least attempt to get a tape-recorded statement from him. Ex. 62, Pierce Dep. 87:2–90:8; Ex. 57, Sherrard Dep. 142:24–145:9; Ex. 59, Chavous Dep. 118:10–119:10; 119:18–120:5; 121:10–23; Ex. 56, Julius Clark Dep. 86:1–24; 87:12–25; Ex. 54, James Clark Dep. 32:4–33:2. Tape recorders were readily available and Handy admitted he understood at that time the best way to memorialize a statement was to tape record it. Ex. 36, H. Greer Tr. 124:3–12; Ex. 56, Julius Clark Dep. 88:1–14; Ex. 54, James Clark Dep. 33:3–10; Ex. 7, Handy Dep. II 34:20–23; 37:24–39:16. But even though he admits he had no reason to believe Hardin or Clark wouldn't have agreed to give a taped statement, Handy never even asked them to do so. Ex. 6, Handy Dep. I 298:12–25; Ex. 17, K. Hardin Tr. 89:19–90:2; Ex. 18, Clark Tr. 235:24–236:4.

Given LPD practices, Lieutenant Sherrard could not think of an explanation for Handy's failure to follow up on the alleged admission about human sacrifice or seek to get it on tape—other than that Handy fabricated it. Ex. 57, Sherrard Dep. 145:24–147:18. Defendant Meade County's police practices expert, Jack Ryan, agreed the statement "certainly should have been followed up on" if made, and that the failure to do so or seek to get a recorded statement is inexplicable. Ex. 46, Ryan Dep. 44:1–19. Plaintiffs' police practices expert former Chief Russ Fischer of the Miami-Dade Police Department described these failures as "significant irregularities and gross departures from minimally acceptable practices [which] should have raised concerns by any supervisor regarding the reliability of the alleged statement." Ex. 85, Fischer Rep. 7.

**G. Handy and Greer unsuccessfully attempt to coerce a confession from Clark.**

On April 8, 1992, Greer, Handy, and Coroner Bill Adams attempted to extract a confession from Clark while interrogating him at the Louisville Police Department.[4] Ex. 83, Uniform Rep. at 14; Ex. 40, Bill Adams Dep. 131:12–21; Ex. 50, Greer Dep. II 151:7–20; Ex. 39, Clark Dep. 28:13–30:10**.** At some point, Clark was taken to the break room, where Greer falsely informed Clark that Hardin was giving him up. Ex. 39, Clark Dep. 29:25–30:18. Greer stated that he and Handy were trying to help Clark, that their real target was Hardin, and suggested Clark probably would not do any jail time, he just needed to cooperate. *Id.* at 30:12–22. Clark truthfully maintained his innocence. *Id.* at 30:22–23. Greer switched tactics and attempted to feed Clark a story implicating Hardin—telling Clark to say that Rhonda was pregnant, and that all Clark did was help move the body. *Id.* at 30:24–31:4. When that didn't work, Greer pulled out a gun, laid it on the table, and said, "'You might want to reconsider what I have to say and think about what you have to say. I always get what I want. Don't I, Mr. Adams.' Talking to the Coroner. And the Coroner said, 'We always get what we want.'" *Id.* at 31:5–20.

As Greer and Adams threatened to frame Clark at best, or kill him at worst, Handy just stood there. *Id.* at 31:21–22. Clark begged the Defendants: "if you want to shoot me, shoot me, you know, because I don't know nothing and I'm not saying nothing." *Id.* at 31:21–25. Eventually, Handy took Clark back to the conference room, offering to protect Clark from Greer and Adams if he would just "tell me what I want to hear." *Id.* at 32:1–12. When Clark continued to truthfully maintain his innocence, Handy told Clark that they knew he was "guilty as hell." *Id.* at 32:10–33:22. Defendants then enlisted assistance from Sherrard, who threatened to force Clark to "dig

---

[4] Clark believes that Wise also was present for this coercive interrogation. Ex. 39, Clark Dep 149:7–16.

her up" before calling Clark a "fucking punk" and slamming him into some lockers. *Id.* at 33:15–34:5.

Greer admitted what Clark describes would be "serious misconduct" but denies he has ever done anything like that. Ex. 50, Greer Dep. II 146:3–11, 155:17–156:19. However, he admits to possessing a gun bearing a similar description to what Clark observed. Ex. 50, Greer Dep. II 142:4–18; Ex. 39, Clark Dep. 150:1–15. And Hardin describes Greer doing precisely the same thing during an interview in Meade County before he was arrested: laying a nickel-plated revolver on the table and threatening bad things happen to people who don't cooperate. Ex. 38, Hardin Dep. 217:1–220:22. A third person, Bill Mahan, who was interviewed by Handy and Greer later in the case independently described how either Handy, Greer, or another detective similarly placed their gun on the table to scare him. Ex. 47, Mahan Dep. 74:1–79:17; Ex. 6, Handy Dep. I 308:4–18; Ex. 84, Mahan Int. CAO_7835.

### H.  Handy fabricates other statements he attributes to Hardin and Clark.

Over the course of additional interviews with Hardin, Handy falsely reported other statements, including that Hardin allegedly "acknowledged that he had previously told Rhonda that if she ever cheated on him or left him that he would kill her." Ex. 11, Handy Reps. 14. That was another fabrication—Hardin had never made that threat to Warford (or anyone) and he never told Handy that he had. Ex. 17, K. Hardin Tr. 88:6–8; 89:5–18; Ex. 38, Hardin Dep. 307:16–21; 310:9–311:11. Notably, Greer's contemporaneous report of the same interview makes no mention of this alleged important admission. Ex. 83, Uniform Rep. 17.

Handy also fabricated statements by Clark, including that Clark allegedly "admitted that he had previously lied about owning a knife, that he owned several." Ex. 11, Handy Reps. 10; Ex. 6, Handy Dep. I 207:17–209:12. But that never happened; Clark never denied owning any knives

and never told Handy he had lied about owning knives. Ex. 39, Clark Dep. 74:8–75:16; Ex. 87, Hardin Ev. Hrg. 184:22–185:6; Ex. 63, Bart Adams Dep. 225:14–25. In reality, Handy asked Hardin and Clark if they had knives *on their person* in the police station, which they each truthfully denied. Ex. 39, Clark Dep. 74:14–24; 301:7–21; Ex. 17, K. Hardin Tr. 70:13–25; Ex. 38, Hardin Dep. 101:6–25; Ex. 15, Clark Ev. Hrg. 113:9–13. When asked if they owned knives in general— either by Handy or by any other officer—Hardin and Clark truthfully answered that they did. Ex. 39, Clark Dep. 74:8–75:16; 316:6–13; Ex. 17, K. Hardin Tr. 71:1–72:3; Ex. 38, Hardin Dep. 101:6–25; Ex. 87, Hardin Ev. Hrg. 201:21–24. There was no reason to lie about that; owning a knife is unremarkable. Ex. 39, Clark Dep. 301:7–21. As prosecutor Smith testified, "more so than not" of people in that part of the state to own knives—especially men. Ex. 52, Smith Dep. I 108:4– 6. And "everybody under the sun knew" that Clark had knives because he sold knives with his father at the flea market. Ex. 39, Clark Dep. 70:15–71:9; 71:19–73:2; 75:5–16; 316:6–13. Ex. 15, Clark Ev. Hrg. Tr. 116:7–11. (Again, Greer's contemporaneous report of the same interview does not mention the alleged admission.  Ex. 83, Uniform Rep. 14–15.)

Handy admits he understood each of these things he reported—the alleged prior threat to Rhonda, the alleged lies about access to knives—were important, damning admissions, the types of things that "can be used down the road to get a conviction." Ex. 6, Handy Dep. I 160:24–161:18.

### I.  Handy and Greer fabricate statements attributed to the victim's family.

On April 9, 1992, Defendants Handy and Greer conducted a joint interview of Mary Warford (Rhonda's mother), Michelle Rogers (Rhonda's sister), and Crystal Barnes (Rhonda's cousin and best-friend). Ex. 83, Uniform Rep. at 15–17; Ex. 11, Handy Reps. at 12. According to Mary Warford, Handy and Greer were present for the entire meeting. Ex. 42, Warford Dep. 123:22–124:7; 167:4–8. Although Greer's typical practice was always to record such statements,

and he had access to a tape recorder, he did not record this interview, instead summarizing statements attributed to the witnesses in his written report. Ex. 49, Greer Dep. I 248:1–16; 249:11–17; 282:14–284:9; Ex. 83, Uniform Rep. at NSB 15–17; Ex. 11, Handy Reps. at 12–13. At his deposition, Greer could not explain why he deviated from his practice by not recording this interview. Ex. 49, Greer Dep. I 282:14–284:9. Although Handy admitted he understood interviews with important witnesses should be taped, he did not tape this interview, either. Ex. 6, Handy Dep. I 287:21–288:5; 298:23–25; Ex. 42, Warford Dep. 122:13–22.

Greer's report ascribes statements to Rogers and Barnes that implicate Plaintiffs in the murder. Ex. 83, Uniform Rep. 15–17. In particular, Greer claimed they volunteered information that just happened to match the (false) theory he had already formed: that Hardin and Clark had engaged in animal sacrifice as part of the practice of Satanism, that Rhonda's murder was related to Satanism, and that Hardin and Rhonda had a violent, abusive relationship and he had threatened to kill her. Ex. 49, Greer Dep. I 264:4–265:19; 284:10–285:25; Ex. 50, Greer Dep. II 119:20–122:15. But none of this was true, and none was actually reported by Rhonda's family members.

Greer claimed Michelle Rogers independently volunteered, without any suggestion from him, that Clark "was weird like Keith, that they were into satanic worship, and that she knew for a fact that they had killed animals." Ex. 49, Greer Dep. I 284:10–286:21; Ex. 50, Greer Dep. II 119:20–122:15; Ex. 83, Uniform Rep. 16. But as Rogers testified at the criminal trial and at her deposition, she had no knowledge whether Clark (whom she had briefly dated) was involved in Satanism. Ex. 29, Rogers Tr. 141:22–142:2; Ex. 41, Rogers Dep. 119:1–4; 163:6–21. Indeed, he was never involved in Satanism but instead, was a Southern Baptist. Ex. 18, Clark Tr. 205:25–206:5; Ex. 39, Clark Dep. 102:20–23; 181:5–11. Rogers explained at her deposition that she only heard Hardin was involved in animal sacrifices after her sister's death, *from the police*. Ex. 41,

Rogers Dep. 132:4–133:5. The victim's own mother, Mary Warford, confirms that it was Greer and Handy who told the family during this interview that the murder could have been a satanic human sacrifice and that Hardin had been involved in animal sacrifice. Ex. 42, Warford Dep. 162:22–163:9. Greer admitted Rogers's trial testimony was the opposite of what he reported she had told him; he claimed she just didn't tell the truth at trial. Ex. 49, Greer Dep I 292:1–293:10; Ex. 50, Greer Dep. II 125:20–129:8. Although Handy was present for this interview, Handy admitted he had no memory of Barnes saying they were sacrificing animals, which he admitted he would have remembered. Ex. 6, Handy Dep. I 241:21–244:24; 246:2–250:11; Ex. 42, Warford Dep. 123:22–124:7; 167:4–8.

Similarly, Greer claimed Barnes volunteered to him her concern about Hardin's involvement in Satanism: he reported she "did not care too much for [Hardin].…he was in that satanic stuff and he was getting Rhonda in it." Ex. 83, Uniform Rep. at 16; Ex. 50, Greer Dep. II 120:19–121:19. Handy's report also claims that Barnes informed him that "Rhonda was only into devil worship to make Keith happy and that the reason that Rhonda put the upside down cross on her chest was to make Keith happy." Ex. 11, Handy Reps. 12–14. But at trial and at her deposition, Barnes explained otherwise. According to Barnes, she had no knowledge as to whether Clark, Hardin, or Rhonda were involved in Satanism prior to Rhonda's murder. Ex. 43, Barnes Dep. 17:9–18:12; Ex. 34, Barnes Tr. 203:10–204:13. Rather, Barnes first learned that Hardin may have been involved in Satanism after the murder *from the police*. Ex. 43, Barnes Dep. at 17:22–18:12. Greer acknowledged Barnes's trial testimony was also "completely different" from what he claimed she had told him; he said she didn't tell the truth at trial, either, although he couldn't explain why she would lie. Ex. 50, Greer Dep. II 129:22–131:2.

Greer also claimed that Barnes described a violent, abusive relationship between Hardin and Rhonda, and that Hardin had threatened to kill her: "she was sure that Keith Hardin smacked Rhonda around before," and "on Tuesday, 3-31-92, that Keith told her he would kill her if she ever ran around on him."  Ex. 83, Uniform Rep. 16. And Handy similarly reported that "Rhonda told [Barnes], that Keith Hardin told her, that if she ever left him or he ever caught her cheating on him that he would kill her." Ex. 11, Handy Reps. 14. As Barnes testified, this is also false. She thought Hardin was a quiet, nice guy; he never did anything to cause her concern and Rhonda never said anything bad about him. Ex. 43, Barnes Dep. 18:21–21:14. Rhonda's mother and sister confirmed this: before Rhonda's death, the family believed Hardin was good for Rhonda and supported their relationship. Ex. 42, Warford Dep. 125:24–126:22; 128:2–129:6; 132:9–133:6; Ex. 41, Rogers Dep. 136:7–23. At trial, Barnes testified she had never heard Hardin or Clark make any threats to Rhonda. Ex. 34, Barnes Tr. 204:14–17. Greer admitted this was inconsistent with what he claimed she had reported to him, and that he had no explanation for the inconsistency. Ex. 49, Greer Dep. I 321:24–323:3. Greer also could not explain why, if Barnes had actually reported such important information—that Hardin had previously threatened to kill Rhonda—he would not have tape recorded her statement. Ex. 49, Greer Dep. I 319:11–321:19.

### J. Handy fabricates an inculpatory admission from innocent Edwin Chandler, causing his wrongful conviction.

In the fall of 1993, Handy led the investigation into the robbery-murder of a Louisville gas station attendant. *See* Ex. 8, Handy Plea I; Ex. 7, Handy Dep. II 15:10–13; Ex. 77, Sherrard GJ 6:14–25; Ex. 62, Pierce Dep. 17:21–24; Ex. 88, O'Connell Ltr 2. Surveillance video captured the murder on tape, but Handy erased it. Ex. 77, Sherrard GJ 7:12–16; Ex. 13, Woosley Dep. 80:8–22, 82:7–10, 131:2–8; Ex. 57, Sherrard Dep. 16:5–14. Still needing to close the case, Handy fixated

on an innocent man, Edwin Chandler, as the perpetrator. *See* Ex. 7, Handy Dep. II 14:9–11; Ex. 13, Woosley Dep. 156:1–4; Ex. 88, O'Connell Ltr. 1–3; Ex. 54, James Clark Dep. 23:5–25:3. When Chandler truthfully denied any role in the murder, Handy impermissibly threatened that he would have Chandler's sister arrested and her children taken away if Chandler did not confess. Ex. 60, Chandler Dep. 207:5–15, 208:13–209:4; Ex. 13, Woosley Dep. 51:10–23; Ex. 62, Pierce Dep. 23:1–10; Ex. 54, James Clark Dep. 22:11–24; Ex. 46, Ryan Dep 61:4–16, 65:2– 5; Ex. 88, O'Connell Ltr 3. Handy also falsely promised that Chandler would receive only a five-year sentence if he confessed. Ex. 60, Chandler Dep. 218:2–10 ; 223:7–10; Ex. 88, O'Connell Ltr. 3; Ex. 62, Pierce Dep. 23:1–10; Ex. 13, Woosley Dep. 58:5–24. Handy's interrogation of Chandler, including the threats to the integrity of Chandler's family and Handy's false promise of leniency, was unconstitutionally coercive. Ex. 62, Pierce Dep. 27:19–18:9, 151:8–153:9, 163:6–13; Ex. 7, Handy Dep. II 194:16–19; Ex. 57, Sherrard Dep. 75:17–77:21; Ex. 46, Ryan Dep. 61:4–16 ; 65:2– 5; Ex. 88, O'Connell Ltr 5; Ex. 61, O'Connell Dep. 43:2-20 ; 60:19–61:7.

Although Handy's coercion caused the innocent Chandler to confess, Chandler did not know how the crime occurred. To falsely make the coerced confession appear reliable, Handy deliberately fed Chandler non-public details only the true perpetrator would know. Ex. 60, Chandler Dep. 214:13–215:4, 218:18–219:13, 223:11–20; Ex. 7, Handy Dep. II 14:16–23, 17:8– 11, 126:11–23; Ex. 13, Woosley Dep. 56:2–8; Ex. 62, Pierce Dep. 24:3–9; Ex. 54, James Clark Dep. 43:22–44:21.While taking Chandler's statement, Handy strategically stopped and started the recording to give Chandler direction as to what to say. Ex. 60, Chandler Dep. 223:25–225:4; *see also* Ex. 88, O'Connell Ltr. 2; Ex. 57, Sherrard Dep. 178:19–179:1. Handy also fabricated that Chandler had volunteered that a man in a Chicago White Sox hat was in the store just before the murder—a key detail Chandler was not aware of. Ex. 60, Chandler Dep. 226:18–228:4; Ex. 7,

24

Handy Dep. II 115:4–22, 126:11–16; Ex. 13, Woosley Dep. 56:2–57:14; Ex. 62, Pierce Dep. 17:25–18:19, 19:16–25. Handy's fabrication that Chandler volunteered the detail about the White Sox hat became central to Chandler's prosecution. Ex. 8, Handy Plea I 4; Ex. 7, Handy Dep. II 14:3-23. On February 7, 1995, less than a month before Clark and Hardin's trial began, Handy lied under oath about this key piece of evidence—denying that he fabricated Chandler's admission about the White Sox hat. Ex. 8, Handy Plea I 4; Ex. 7, Handy Dep. II 14:3-23. Handy's misconduct directly caused Chandler's wrongful conviction and the nine and a half years Chandler spent incarcerated for a crime he did not commit. Ex. 61, O'Connell Dep. 23:24–24:25; Ex. 7, Handy Dep. II 13:25–14:11.

### K. Handy fabricates statements against innocent Keith West and destroys an exculpatory tape.

During this same time period Handy's misconduct caused the wrongful conviction of yet another innocent man, Keith West. In early 1992, Handy led the investigation into a double shooting in Louisville. Ex. 7, Handy Dep. II 94:11 –21; Ex. 13, Woosley Dep. 63:8–15. There was no question that West committed the shootings, but West consistently asserted it was in self-defense against armed men who held him hostage in a moving vehicle and threated to sodomize him. Ex. 13, Woosley Dep. 94:19–95:2; Ex. 7, Handy Dep. II 66:6–13; Ex. 92, Lambert Hrg. 107:10–24, 117:16–20. Even though earlier in the day public defenders had obtained a signed court order mandating LPD permit them to speak to West, and had then provided LPD a statement signed by West that he did not want to speak with law enforcement, Handy interrogated West without first obtaining a signed *Miranda* waiver.  Ex. 105, Sherrard Inv. Ltr. 6–7; Ex. 10, Handy Inv. Ltr. 2–3; Ex. 90, Waiver; *see* Ex. 57, Sherrard Dep. 248:18–249:7, 250:22–251:5. Sherrard admits

Handy's interrogation was a violation of West's constitutional rights.  Ex. 57, Sherrard Dep. 248:1–249:14, 251:1-12.

That same day, Handy fabricated a statement from Robert Ross—an eyewitness to the crash of the vehicle in which West had been held hostage—incriminating West. Ex. 93, Ross Hrg. 24:17–25:1; 45:5–47:23; Ex. 57, Sherrard Dep. 265:4–267:20; *see also* Ex. 7, Handy Dep. II 33:22–34:4. Specifically, Handy instructed Ross to repeat information Handy provided to him. Ex. 93, Ross Hrg. 45:5–47:23; 68:10–24; *cf.* Ex. 7, Handy Dep. II at 57:15–23. Handy also intentionally destroyed portions of Ross's initial recorded statement that failed to match up with the fabricated information Handy wanted Ross to provide. Ex. 7, Handy Dep. II 34:20–35:15, 40:1–43:20, 48:6–49:14, 53:13–23, 56:12–20, 65:13–22, 76:2–14. During his deposition, Handy conceded that had the initial statement been included in the investigative file, it "of course" could have been used to impeach Ross at trial. Ex. 7, Handy Dep. II 42:17–21. He also explained that it would not have been unusual for him to record over an initial statement with a subsequent statement when a witness did not initially provide him with "the best information." Ex. 7, Handy Dep. II 47:1–9, 48:13–49:15.

On February 14, 1995, exactly one week after Handy's perjured testimony in the Chandler trial, Handy again lied under oath, first denying that he erased any portion of his interview with Ross before admitting to rewinding and recording over the interview tape.[5] *Compare* Ex. 107,

---

[5] Handy also falsely testified during the suppression hearing in West that Ross was a fugitive. Ex. 107, Supp. Hrg. Tr. 41:6–7. In truth, Ross was incarcerated just down the street from the courthouse, awaiting transfer to the Kentucky Department of Corrections. Ex. 93, Ross Hrg. 56:7–13, 57:11–17. This misrepresentation prevented Ross from being called at trial and revealing that his statement was fabricated. Ex. 92, Lambert Hrg.130:10–14, 192:6–9. During West's post-conviction hearing, Handy asserted his Fifth Amendment privilege when asked if he perjured himself. Ex. 121, Handy 2019 Hrg. 18:6–19:6; 30:8–31:2.

Supp. Hrg. Tr. 39:19–25, 40:25–41:2, 42:25–44:7, *with id.* at 44:12–25; Ex. 6, Handy Dep. I 74:1–14. Later that week, during West's criminal trial, Handy fed false information to another witness, Ruth Bowie, which supported the Commonwealth's theory that West was robbing the two perpetrators.[6] Ex. 94, Bowie Hrg. 92:5–24, 93:10–95:1, 96:14–97:4; Ex. 92, Lambert Hrg. 134:2–137:7. Both Ross and Bowie gave audio-recorded statements to a LPD officer at the scene of the vehicle crash which differed in several ways from their later, fabricated statements. Ex. 92, Lambert Hrg. 139:11–140:5; 152:12–19. Although it was his responsibility as lead investigator, Handy never turned over the two audio-recorded statements. Ex. 95, Schroering Hrg. 217:19–218:2; 223:14-23; Ex. 13, Woosley Dep. 93:7–13.

### L. Handy and Woosley withhold evidence of Handy's contemporaneous similar misconduct, for which he has now been criminally convicted.

In March 2021, Handy pled guilty to perjury in the first degree—a felony—for falsely testifying that Chandler volunteered the detail about the man in the White Sox hat. Ex. 8, Handy Plea I 4. Handy also pled guilty to first degree tampering with physical evidence—another felony—for destroying Ross's initial statement. Ex. 7, Handy Dep. II 31:20–32:1; Ex. 8, Handy Plea I 4.

Although Handy's prosecution and conviction did not occur until years later, his misconduct in these cases preceded Hardin and Clark's criminal trial, which began on February 28, 1995. Ex. 98, Opening Tr. 1–2. Handy, therefore, was required to disclose his prior misconduct to Kenton Smith, who was prosecuting Hardin and Clark, but nonetheless failed to do so. *See* Ex.

---

[6] Handy later asserted his Fifth Amendment privilege when asked about his fabrication and coercion of Bowie's trial testimony during West's post-conviction hearing. Ex. 121, Handy 2019 Hrg. 18:6–19:6, 28:22–30:7.

51, Heck Dep. 159:12–163:23; Ex. 85, Fischer Rep. 16–17, 20.  Woosley was also obligated to report any of Handy's misconduct of which he was aware—including Handy's coercive threats and perjury in the Chandler case—to the prosecutor and to Lieutenant Sherrard. Ex. 62, Pierce Dep. 163:6–164:13; Ex. 57, Sherrard Dep. 88:25–89:13. Smith was not aware of any of this prior misconduct by Handy; if he had known he would have disclosed it to the defense. Ex. 52, Smith Dep. I 35:4– 36:15; 67:1–25; 69:16–72:16; 120:5–122:16; Ex. 51, Heck Dep. 161:23–162:20. Neither Hardin, Clark, nor their lawyers knew this exculpatory evidence at the time. Ex. 1, Hardin Decl.; Ex. 2, Clark Decl.; Ex. 115, Bart Adams Decl.; Ex. 112, Rogers Decl.

If it was disclosed that Handy had threatened Edwin Chandler to get him to confess and then lied about it at trial, that would have been powerful impeachment evidence, making it difficult for Handy to be called as a prosecution witness in any case. Ex. 62, Pierce Dep. 167:5–168:13; Ex. 51, Heck Dep. 70:21–71:9. Handy himself admitted that if an officer lied about a significant material fact in one case, it would be difficult to believe him in the next case. Ex. 6, Handy Dep. I 31:5–18. And Handy specifically admitted that it would be reasonable for a juror to believe that an officer who lied about feeding non-public information to a suspect (as he has pled guilty to doing with respect to Edwin Chandler) may have lied in any criminal case. Ex. 7, Handy Dep. II 17:3–18:5; *see also* Ex. 13, Woosley Dep. 275:23–278:16 (admitting Handy's fabrication of evidence in Chandler and West is the same as the misconduct alleged in this case).

Even more troubling, much of Handy's misconduct was known to his supervisors at the time of the Hardin/Clark criminal trial in March 1995. Ex. 85, Fischer Rep. 24. Woosley was Handy's immediate supervisor in the Chandler case, and closely supervised him during the investigation. Ex. 13, Woosley Dep 29:6–30:17. He knew that Handy threatened Chandler to get him to confess and that Handy left that information out of his police reports. Ex. 13, Woosley Dep.

272:3–274:10, 282:8–14. Any supervisor reviewing the case file, as Woosley did, also would have known that Chandler's alleged admission about the White Sox hat was missing from Chandler's taped statement. *See* Ex. 13, Woosley Dep. 148:2–17, 173:6-24; *see also* Ex. 58, Burbrink Dep. 72:23–75:18, 107:5–10, 109:7–14. Finally, as Handy's supervisor, Woosley was responsible for ensuring that Handy testified honestly at trial—meaning that Woosley should have been aware of Handy's testimony in the case. Ex. 13, Woosley Dep. 275:12–21.

One of Woosley's responsibilities as supervisor included reviewing audio transcripts for the recorded statements in an investigation and talking to detectives about any problems in the transcripts. Ex. 13, Woosley Dep. 88:8–25. As Handy's direct supervisor, then, Woosley would have been aware of the time discrepancy in the Ross statement—something that should have prompted Woosley to take corrective action. Ex. 13, Woosley Dep. 88:8–25, 101:12–22. Woosley was obligated to disclose Handy's past misconduct under *Brady*. And because Handy's misconduct in Chandler and West was so similar to the misconduct alleged here, it "likely would have been critical to the jury's determination of guilt or innocence." *See* Ex. 85, Fischer Rep. 24–25; Ex. 13, Woosley Dep. 275:23–278:16.

**M. Hardin and Clark are wrongly convicted.**

Hardin and Clark were tried jointly beginning on February 28, 1995. Ex. 98, Opening Tr., 1–2. The case against them was "highly circumstantial." Ex. 96, KY Dec.17; Ex. 115, Bart Adams Decl.; Ex. 112, Rogers Decl. There were no eyewitnesses to the crime, and no witnesses connected Hardin or Clark to Warford during the time she disappeared. Ex. 49, Greer Dep. I 192:2–18. Nor did any witness even place Hardin or Clark in Meade County at any point from April 2 to April 5. Ex. 28, Greer Tr. 180:10–15. Despite extensive searches of their homes, clothes, and Clark's vehicle, no blood or fiber evidence incriminated them; soil samples from Clark's car did not match

the crime scene, and tire prints from the crime scene did not match any vehicle linked to them. Ex. 104, Tr. Stip. 2:13–3:7. Nor was the murder weapon ever found. Ex. 37, Closing Tr. 237:8–14; Ex. 16, Greer Ev. Hrg. 93:10–13. The only physical evidence even purporting to link Hardin or Clark to the victim and/or crime scene was: (1) Rhonda's fingerprint found in Clark's car (which had limited weight because it was undisputed she had traveled in his car and there was no way to say when the fingerprint was left); and (2) a hair reported to be microscopically similar to Hardin's found on Rhonda's sweatpants. Ex. 97, Motion at 3; Ex. 51, Heck Dep. 97:3–23; Ex. 35, Haun Tr. 11:11–17. The only other evidence implicating them were purported admissions from witnesses with credibility problems and reasons to lie, such as jailhouse informant Cliff Capps and Clark's ex-girlfriend Amy Remsburg. Ex. Greer Dep. I 44:9–19; 138:16–140:4; 298:18–301:24.[7]

Hardin and Clark testified that they were innocent and presented compelling alibi evidence covering almost the entirety of time from when Rhonda was last seen until her body was discovered. Ex. 50, Greer Dep. II 164:3-25; Ex. 15, Clark Ev. Hrg. 113:4–6, 114:12, 117:13–19; Ex. 18, Clark Tr. 221:24–233:14; Ex. 17, K. Hardin Tr. 73:16-75:23, 77:16–81:9; Ex. 19, W. Hardin Tr. 25:3–30:21; Ex. 20, Houser Tr. 9:3–11:17; Ex. 21, D. Cochran Tr. 67:1–69:4; Ex. 22, A. Cochran Tr. 28:19–29:18, 32:10–35:21, 46:12–47:1; Ex. 23, J. McMackin Tr. 155:7–157:25; Ex. 24, N. McMackin Tr. 151:1–152:23; Ex. 25, Pozzie Tr. 103:7–104:13; Ex. 26, Reese Tr. 89:16–90:18; Ex. 27, Calliver Tr. 97:5–100:11. Even the brief period Wednesday morning where Clark and Hardin alibied each other left an improbably small window of opportunity to commit the crime, as Rhonda was last seen at 12:30 am at her home in Louisville; her body was found

---

[7] The problems with the reliability and credibility of the Capps and Remsburg statements are discussed more fully in Plaintiffs' Response in Opposition to Meade County Defendants' Motion for Summary Judgment.

approximately an hour's drive away in rural Meade County, but Clark and Hardin were seen at a Louisville Chevron station buying cigarettes between 1 and 2 am, Clark dropped Hardin off at home in Louisville at around 2:15 am and was home himself by 2:30 am. Ex. 25, Pozzie Tr. 102:7–104:13, 112:5–14; Ex. 19, W. Hardin Tr. 25:3–26:14; Ex. 27, Calliver Tr. 96:6–100:11; Ex. 18, Clark Tr. 225:10–226:22; Ex. 37, Closing Tr. 229:20–230:4.

Hardin's alleged admission about wanting to do human sacrifice was an important part of the case: it was the first thing the prosecutor mentioned in his opening statement, the last thing he mentioned in his closing argument, and highlighted many other times in between. Ex. 52, Smith Dep. I 233:5–234:25; Ex. 63, Bart Adams Dep. 269:12–272:23; Ex. 98, Opening Tr. 8:1–5, 13:20–21, 15:11; Ex. 37, Closing Tr. 223:11–12, 225:2–5, 226:5–9, 237:15–17; Ex. 6, Handy Dep. I 162:18–163:3; Ex. 97, Motion at 2, 6; Ex. 99, Heck Hrg. 116:14–117:19. Handy, as the only witness to present evidence about this alleged admission at trial was thus a critical witness. Ex. 102, W. Rogers Ev. Hrg. 235:15–23. The prosecution also relied on other admissions Handy fabricated, including Hardin's alleged threat to Rhonda and Clark's alleged denial that he had ever owned knives. Ex. 98, Opening Tr. 13:2–3; Ex. 37, Closing Tr. 221:10–12, 226:6–11.[8]

Although Hardin and Clark truthfully denied making these admissions, the prosecution argued Handy was telling the truth and they were lying. Ex. 37, Closing Tr. 213:2–11, 216:2–5, 219:5–14, 220:4–9, 221:10–19, 222:5–12, 225:10–13. Hardin and Clark could not impeach Handy with his contemporaneous misconduct in other cases—including his strikingly similar perjury in

---

[8] In their recitation of the facts, Defendants recount additional hearsay statements—from witnesses including Tonya Greer and Vickie Budd—which are irrelevant because the prosecution did not even call them to testify at trial. *See* Dkt. 295-1 at 10–11. Even the ones called to testify had serious credibility problems. For example, of witness Hope Jaegers, one of the prosecutors noted during trial "Wildcard. She is nuts." Ex. 52, Smith Dep. I 298:2–24; Ex. 118, Prosecutor Note.

the Chandler prosecution just weeks before—because it was not disclosed. Ex. 63, Bart Adams Dep. 32:9–34:4, 239:4–242:8; Ex. 62, Pierce Dep. 167:7–168:13; Ex. 51, Heck Dep. 70:21–71:9; Ex 1, Hardin Decl.; Ex. 2, Clark Decl.; Ex. 115, Bart Adams Decl.; Ex. 112, Rogers Decl.

The jury convicted Hardin and Clark and sentenced both to life imprisonment. Ex. 81, Trial verdict, 244:8–15, 257:3–11. Given the weakness of the evidence presented, the verdict was a surprise. Ex. 115, Bart Adams Decl.; Ex. 112, Rogers Decl. After the trial, the prosecutor wrote a note to Handy thanking him for his help and apparently attributing the convictions to him: "the score remains Handy 2 Adams 0." Ex.117, Smith Letter.

### N. Based on new evidence of innocence, Hardin and Clark's convictions are vacated.

Both Plaintiffs appealed their convictions to the Kentucky Supreme Court. Ex. 96, KY Dec. The Court found Hardin made a "worthy argument" that he was entitled to a directed verdict of not guilty in light of the alibi evidence which made his commission of the crime impossible. Ex. 96, KY Dec. at 16. In ultimately denying that motion, the Court pointed to (1) the fabricated evidence Hardin had been involved in animal sacrifice; (2) the fabricated evidence Hardin had threatened to kill Warford; and (3) the fabricated evidence that Hardin and Clark had lied to the police. Ex. 96, KY Dec. at 16.[9]

Plaintiffs continued to assert their innocence in post-conviction proceedings, but for years those efforts failed. Ex. 39, Clark Dep. 268:6–269:22. After being denied parole, Clark was told by correctional officers that he was the "stupidest person to ever walk the face of the earth" to argue his innocence before the board. Ex. 15, Clark Ev. Hrg. 147:12–14. Hardin similarly

---

[9] The only evidence the Court pointed to that *wasn't* fabricated by Handy and/or Woosley was the hair similar to Hardin's found on Warford's clothing and the "occult material and knives" found at Hardin's home. Ex. 96, KY Dec. at 16.

understood his only chance of being paroled would be to accept responsibility for the crimes for which he had been convicted. Ex. 87, Hardin Ev. Hrg. 190:6–191:1, 193:18–194:7; Ex. 113, Houser Dep. 126:1–128:17, 225:2–226:24. Hardin and Clark falsely admitted responsibility to the parole board, telling them what they thought the board wanted to hear. Ex. 87, Hardin Ev. Hrg. 190:6–191:1, 193:18–194:7; Ex. 113, Houser Dep. 126:1–128:17, 225:2–226:24; Ex. 39, Clark Dep. 82:9–84:11. The board denied parole anyway.[10]

Finally, with the help of the Innocence Project and the Kentucky Innocence Project, Plaintiffs were able to present new evidence demonstrating their innocence. Ex. 39, Clark Dep. 269:19–22. At a 2015 evidentiary hearing, Plaintiffs introduced new mitochondrial DNA test results excluding Clark and Hardin as the source of the hairs found on Rhonda's sweatpants and in her hand. Ex. 103, New Tr. Ord. 7–14. They also presented DNA test results proving the blood found on the cloth seized from Hardin's home was his own blood (as he had always asserted) not animal blood as Defendants had claimed. Ex. 103, New Tr. Ord. 14–18. And they presented newly discovered evidence of Handy's misconduct in the Chandler case, which the court found was "the same misconduct" as alleged in this case and "significantly undermines Det. Handy's credibility." Ex. 103, New Tr. Ord. 18–21.[11] Meade County Circuit Judge Bruce Butler found this evidence demonstrated Hardin and Clark had been convicted based on false evidence and vacated their convictions. Ex. 103, New Tr. Ord. 23–24.

---

[10] As noted by the Kentucky Supreme Court, such statements are unreliable given the circumstances; Edwin Chandler also falsely attempted to accept responsibility to the parole board despite his actual innocence. *Commonwealth v. Clark*, 528 S.W.3d 342, 347–48 (Ky. 2017). For these reasons, the Attorney General's Office admitted both that it expected the statements to the parole board would be inadmissible in any prosecution and that, even if they were admitted, the jury would not credit them. Ex. 97, Motion at 11.

[11] During these post-conviction proceedings Handy continued to falsely deny he had committed any misconduct in the Chandler case. Ex. 119, Handy Ev. Hrg. 275:3–17.

After an "extensive review of the evidence," the Office of the Attorney General concluded there was insufficient evidence to support a prosecution of Hardin and Clark and moved to dismiss the indictments. Ex. 97, Motion 1, 11. The Attorney General highlighted the DNA testing excluding Hardin and Clark as the source of the hair on Ms. Warford's sweatpants: "What was once a crucial piece to the Commonwealth's case now supports…that neither defendant had anything to do with the murder of Ms. Warford." Ex. 97, Motion 5–6. And the Attorney General concluded it could not call Handy to testify about his claim that Hardin admitted to wanting to do human sacrifice: "Put bluntly, the Commonwealth cannot put credibility into an unrecorded statement taken by a detective who has a documented history of fabricating details of a murder case in his investigative summaries." Ex. 97, Motion 7; Ex. 99, Heck Hrg. 116:14–118:1, 130:1–131:4. In February 2018, the indictments were dismissed. Ex. 100, Dismiss. Ord.

## IV.    ARGUMENT

### A.  Handy and Woosley fabricated evidence.

As the Sixth Circuit has repeatedly recognized, a plaintiff makes out "a fabrication-of-evidence claim under § 1983" where "a defendant knowingly fabricated evidence against [a plaintiff], and…there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (internal citation and quotation marks omitted); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 815–16 (6th Cir. 2019); *Gregory v. City of Louisville,* 444 F.3d 725, 737 (6th Cir. 2006). Moreover, a "claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).[12] The

---

[12] [12] Although Defendants in one part of their brief acknowledge the governing standard, *see* Dkt. 295-1 at 33–34 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)),

law is equally clear an officer is not entitled to qualified immunity for such a fabrication of evidence. *See Jackson*, 925 F.3d at 825–26 (denying qualified immunity to officer who fabricated evidence in 1975); *Gillispie v. Miami Township, Ohio*, 18 F.4th 909, 918 n.2 (6th Cir. 2021) (holding fabrication had been clearly unconstitutional for decades before 1990).

Here, there is overwhelming evidence that Handy fabricated the incendiary admission which he attributed to Hardin: that Hardin allegedly had sacrificed animals but then "got tired of looking at animals and began to want to do human sacrifices." Ex. 11, Handy Reps. at 7. Handy reported and repeatedly testified that Hardin volunteered this damning admission about wanting to kill someone, while Hardin adamantly denies that he ever said it. Ex. 6, Handy Dep. 128:6–132:25; Ex. 11, Handy Reps. at 7; Ex. 38, Hardin Dep. 119:10–120:4; Ex. 17, K. Hardin Tr. 102:8–16. That alone is obviously sufficient to require a trial on this claim, as on summary judgment the Court "must resolve evidentiary disputes over specific historical facts…in favor of" Plaintiffs. *Gambrel*, 25 F.4th at 404.[13]

But that is just the tip of the iceberg. The statement Handy claimed Hardin made tracks law enforcement misconceptions about Satanism—misconceptions Handy admits he subscribed to at

---

elsewhere they muddle it, Dkt. 295-1 at 20–27, 39–40. As governing Sixth Circuit authority makes plain, there is no requirement to show a lack of probable cause for a fabrication claim. *Stemler*, 126 F.3d at 872. Nor is there an elevated standard for Plaintiffs' proof (i.e. "substantial showing"); rather, the regular summary judgment standard applies. *See, e.g., Jackson*, 925 F.3d at 806, 815–817.

[13] Defendants suggest that Woosley confirms Hardin made the statement Handy attributed to him. Dkt. 295-1 at 23. He does not. To the contrary, Woosley has repeatedly testified he had no memory of Hardin ever making that statement—even though he admitted he would have heard it if it was made, and that this is the type of statement that "sticks in your mind." Ex. 14, Woosley GJ 15, 19:13–20:1; Ex. 13, Woosley Dep. 134:24–137:18; 206:8–18. Of course, even if Woosley did testify that he heard this statement, that would not assist Defendants at this stage, as it would merely be additional conflicting testimony that would have to be disregarded on summary judgment. *See Gambrel*, 25 F.4th at 404.

the time—but not the actual practice. Ex. 86, Lowney Rep. at 2–7; Ex. 38, Hardin Dep. 122:6–14; 123:1–8; Ex. 6, Handy Dep. 97:22–98:1, 107:23–109:15, 129:2–7. At the time Handy conducted this interview of Hardin, he was operating on a theory that Warford's murder may have been a human sacrifice, motivated by Satanism. Ex. 6, Handy Dep. 99:10–16; 166:25–167:8. But in actuality, there is no indication the murder has any connection to Satanic ritual at all; even the "expert" Handy recommended they consult at the time, Ronald Holmes, wrote back several days after Handy's interview of Hardin that "this is not a true Satanic and ritualistic crime."  Ex. 101, Holmes Ltr. at NSBLMPD 127; Ex. 67, Melinek Rep. at 5. And, contrary to popular myth prevalent at the time, Satanism does not involve animal or human sacrifice at all. Ex. 86, Lowney Rep. 2–7; Ex. 66, Lowney Dep. 33:19–34:8; 171:1–25. Hardin adamantly denies not only that he ever made this admission to Handy, but that he ever sacrificed any animals. Ex. 17, K. Hardin Tr. 64:25–65:6; 88:18–21; Ex. 38, Hardin Dep. 123:1–8; 293:15–25.[14] Thus it was Handy's fabricated statement which falsely suggested to the jury that Hardin's acknowledged interest in Neo-Satanism was not just eccentric but dangerous, even homicidal.

Handy's own actions also demonstrate the admission was fabricated. Handy admits he understood the human sacrifice admission was incredibly damning at the time. Ex. 6, Handy Dep. I 160:16–23; 166:25–167:8. If Hardin had actually volunteered this statement, as Handy claims, there was no legitimate law enforcement reason not to (1) follow up on this admission to try to get more inculpatory statements, either during the multi-hour interview that day or during a follow-up

---

[14] At the time of trial, the prosecution argued remnants of blood on a chalice indicated Hardin had performed animal sacrifice; Hardin explained that was his own blood from when he had cut himself. Ex. 38, Hardin Dep. 120:5–13; Ex. 17, K. Hardin Tr. 03.07.1995 87:12–88:5; 92:18–24; 102:5–12; Ex. 37, Closing Tr. 5 222:5–12. Post-conviction DNA testing proved Hardin's account was accurate—the blood was his own.  Ex. 70, Heinig Aff. ¶¶ 8–9; Ex. 65, Heinig Dep. 38:23–41:20; Ex. 108, DDC Rep. 1; Ex. 109, DDC Rep. 2.

interview two days later; (2) seek to take a taped statement memorializing it; or (3) report the statement to Hope Greer, who was briefed by Handy before doing her own interrogation of Hardin that day. Ex. 13, Woosley Dep. 205:24–206:2; 211:3–212:12; 219:1–223:23; 227:2–228:9; 228:22–229:2; 243:24–245:6; Ex. 85, Fischer Rep. 6–7; Ex. 6, Handy Dep. I 77:19–25; 172:24–173:8; 179:5–11. It is undisputed Handy did none of these things. Handy's LPD Lieutenant, Gene Sherrard, could not think of an explanation for Handy's failure to follow up on the alleged admission about human sacrifice or seek to get it on tape—other than that Handy fabricated it. Ex. 57, Sherrard Dep. 145:24–147:18.  The jury can reasonably draw the same conclusion.

Finally, between the time Handy first fabricated the admission about human sacrifice and when he testified about it at trial, Handy falsely reported that another innocent man, Edwin Chandler, volunteered information which incriminated him in a murder. Ex. 13, Woosley Dep. 56:2–57:14. Although for years Handy lied under oath—causing Chandler to spend 9 ½ years in prison for a crime he did not commit—Handy has now pleaded guilty to fabricating that evidence in the Chandler case. Ex. 61, O'Connell Dep. 23:24–24:25; Ex. 7, Handy Dep. II 13:25–14:11; Ex. 89, Vacate Ord. ; Ex. 119, Handy Ev. Hrg. 275:3–17. The jury will be able to consider Handy's admitted fabrication of evidence against Chandler when, for example, evaluating Handy's motive, opportunity, and absence of mistake in fabricating evidence against Hardin and Clark. Fed. R. Evid. 404(b); *see* Ex. 6, Handy Dep. I 150:10–14; 151:17–152:6 (claiming he would never make up a statement in a police report and attribute it to a suspect); 198:5–21 (denying he would ever have a motive to fabricate evidence, saying he wouldn't do it in any case). The jury will also be able to consider Handy's perjury conviction when evaluating the credibility of Handy's testimony in this action that Hardin volunteered an admission that he wanted to sacrifice a human. Ex. 97, Motion at 7; Ex. 99, Heck Hrg. 116:14–118:1; 130:1–131:4; Fed. R. Evid. 608, 609. Mike

O'Connell, the Jefferson County Attorney, admitted Handy's conduct during the Chandler interrogation was "illegal in a variety of ways" and that Handy lied about it repeatedly before and at trial. Ex. 61, O'Connell Dep. 43:2–44:18. And as Handy acknowledged at his deposition, he was "the same honest detective in this case" as in all his cases, "no less; no more." Ex. 6, Handy Dep. I 32:9–13.

Handy's fabrication was used in devastating fashion against *both* Hardin and Clark at trial. Ex. 37, Closing Tr. 209-238. As closing arguments demonstrate, the Commonwealth wove Handy's fabricated statement into a narrative that described Hardin and Clark as Satan-worshiping murderers. *Id.* at 223:7–224:16; *see also* 225:2-13 (stating in part, "Who knows why people like Clark and Hardin do what they do? But Hardin told Handy and Woosley that he was tired of killing animals and wanted to do a human."). And while limiting instructions were provided at trial on certain topics, no limiting instruction was provided to the jury regarding Hardin's alleged statement. Ex. 110, 3/7/95 Tr. Instr. 157.

There is also abundant evidence that Woosley is jointly responsible for the fabrication. Handy testified that his questioning of Hardin about Satanism occurred in front of Woosley, and that Woosley "heard every word" that was said. Ex. 6, Handy Dep. I 132:14–25; 138:2–13. Woosley admitted it was a small car, he could hear anything that was said and he was paying close attention to what everyone was saying. Ex. 13, Woosley Dep. 27:9–17. In other words, a reasonable jury can conclude Woosley understood at the time that Hardin had never made the damning admission that Handy attributed to him. Yet after carefully reviewing Handy's report including the fabricated statement, Woosley initialed the report, which he admits amounts to sponsoring its accuracy. Ex. 13, Woosley Dep. 139:8–15; 148:18–149:12; Ex. 14, Woosley GJ 20:22–21:4.

38

Ample other evidence demonstrates Woosley condoned the fabrication at the time. As a supervisor, Woosley was required to closely review the investigative reports during the investigation and testified he did in this case. Ex. 13, Woosley Dep. 69:5–71:18; 139:8–15. At his deposition, Woosley admitted there was no legitimate reason for Handy not to follow up on the human sacrifice statement, if it was made, and he could think of nothing more important than doing so. Ex. 13, Woosley Dep. 205:24–206:2; 211:3–212:12; 213:10–214:16; 217:4–7. Woosley's failure to intervene as a supervisor to ensure Handy took these obvious steps with this cooperative suspect is evidence Woosley knew full well at the time Hardin had never made the admission Handy attributed to him. This is consistent with Woosley's actions in the Chandler case, where he admits he was aware of the threat Handy made that Chandler's sister's children would be taken away if he didn't confess, but did not report it. Ex. 13, Woosley Dep. 51:10–23; 53:7–14.

A reasonable jury could also conclude Woosley lied at his deposition to cover up for his and Handy's misconduct. Although Woosley initially accurately described the LPD practice that all suspect statements were taped, after being confronted with evidence that Handy never sought to take a taped statement from Hardin, he changed his testimony, falsely claiming the LPD practice would not have required taping. Ex. 13, Woosley Dep. 182:20–185:18; 214:17–217:3; 218:10–25; Ex. 62, Pierce Dep. 91:6–95:25. As LPD Major Jay Pierce testified, Woosley's revised testimony that there was no need to tape was "the opposite of what the practice was." Ex. 62, Pierce Dep. 94:22–95:6; 97:11–98:5.

In addition to the statement about human sacrifice, Handy fabricated other statements he falsely attributed to Hardin, Clark, and the victim's family members. Handy claimed that Hardin had admitted to threatening to kill Warford if she ever cheated on him or left him, but Hardin never made that threat and never told Handy he had. Ex. 17, K. Hardin Tr. 88:6–8; 89:5–18; Ex. 38,

Hardin Dep. 307:16–21; 310:9–311:11. (Handy also falsely claimed Warford's cousin, Crystal Barnes, had reported that Rhonda Warford had told her about a similar threat, but Warford had never told Barnes anything bad about Hardin and Barnes had had no concerns about Hardin at all. Ex. 43, Barnes Dep. 20:19–21:8). And Handy fabricated that Clark had first falsely denied owning any knives, and then Clark specifically admitted that he had lied on that point. Ex. 6, Handy Dep. I 207:17–209:12. That never happened; Clark never lied about owning knives and never told Handy he had. As Handy admits he knew they would be, these fabrications were used at trial to fortify the case against Hardin and Clark. Ex. 6, Handy Dep. I 161:3–:18.

Defendants utterly fail to deal with almost all of this evidence, and the few arguments they do raise make no sense. For example, Defendants make the bizarre assertion that these allegations of fabrication were already considered by the jury. Dkt. 295-1 at 35–39. By this they mean that Hardin and Clark have consistently denied making the statements that Handy fabricated, while he falsely claimed they had. But it is always the case in a claim about fabricated evidence that the fabricated evidence was wrongly credited at first, otherwise it would not have caused any injury. Defendants' own argument establishes the fabricated evidence affected the judgment of the jury— it was shown to the jury and the jury apparently (but wrongly) decided to credit it. Defendants also appear to suggest that the jury might not have relied on the fabricated evidence. Dkt. 295-1 at 39. First, that ignores the relevant standard. All Plaintiff must prove is that "[a] reasonable jury could find…that there is a reasonable probability the statement affected the jur[y]." *Jackson*, 925 F.3d at 817. Given the prominence this evidence had at trial, that standard is easily met.

Defendants' argument that courts have previously ruled on "the issue of Satanism" also completely misses the mark. Dkt. 295-1 at 36–39. The question presented in criminal appeals was whether evidence regarding practice of Satanism was admissible at trial under the Kentucky Rules

of Evidence. The courts did not consider whether Handy and Woosley fabricated the admission attributed to Hardin that he had sacrificed animals and wanted to try to do a human, let alone whether that fabrication prejudiced him. Nor could they; appellate courts "cannot reevaluate the evidence or substitute its judgment as to the credibility of the witness for that of the trial court and the jury." Dkt. 295-38 at 13–14. The standard of review on habeas is even more deferential. Dkt. 295-40 at 24–25.[15]

**B. Handy and Woosley withheld exculpatory evidence.**

An officer who withholds material exculpatory evidence may be held liable under § 1983. *See Jackson*, 925 F.3d at 813–14; *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009). This § 1983 *Brady* claim has three elements: (1) evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching" (2) is suppressed (3) causing prejudice. *Jackson*, 925 F.3d at 813–14. Prejudice is demonstrated if the suppressed evidence "considered collectively, not item by item," "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Bies v. Sheldon*, 775 F.3d 386, 398–99 (6th Cir. 2014) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435–37 (1995)). In other words, this means "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Jackson*, 925 F.3d at 815 (internal citation and quotation marks omitted). It has been clearly established for decades that officers are not entitled to qualified immunity for withholding exculpatory evidence in violation of *Brady*. *See Jackson*, 925 F.3d at 823–825 (holding no qualified immunity to officer who committed *Brady* violation in 1975).

---

[15] Defendants do not expressly argue these prior decisions have any estoppel effect. Nor could they. *See, e.g., Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) ("[V]acated rulings have no preclusive effect[.]" (citation omitted)); *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985).

A reasonable jury can conclude both Handy and Woosley withheld evidence of Handy's contemporaneous similar investigative misconduct, which would have been devastating impeachment evidence at trial. At trial, Handy testified at trial that Hardin and Clark made inculpatory admissions which they have always denied making. The prosecution argued Handy's testimony should be credited. But because Handy and Woosley suppressed it, neither the prosecution nor the jury knew of Handy's contemporaneous fabrication of evidence and perjury in another case, remarkably similar to his misconduct in this case.

Handy pled guilty to perjury in the first degree, based on his misconduct in the prosecution of Edwin Chandler, and tampering with physical evidence, based on his misconduct in the prosecution of Keith West. Ex. 8, Handy Plea I Specifically, Handy was convicted of giving "untruthful" testimony that "led to the wrongful conviction of Edwin Chandler" when he asserted that Chandler had told him nonpublic information that only the true perpetrator would know: that a man wearing a Chicago White Sox hat was in the store just prior to the murder. Ex. 8, Handy Plea I; Ex. 9, Handy Plea II at 9:22–12:13. Handy was also convicted of taping over the statement of a key witness in the West case. Although, at this stage Plaintiffs need only establish that a reasonable jury *could* find in their favor with respect to any material fact, based on collateral estoppel the jury is *required* to find that Handy fabricated evidence in the Chandler case and lied about it, including at Chandler's February 1995 trial. *See Whitehead v. Schwartz*, No. 3:18-CV-311-DJH-CHL, 2022 WL 1240423, at *2 (W.D. Ky. Apr. 27, 2022) (holding officers who had pled guilty to misconduct were precluded from contesting facts established by the guilty plea in subsequent § 1983 suit); *Stanley v. Smith*, No. 6:16-CV-264-REW-HAI, 2019 WL 4786053, at *4–8 (E.D. Ky. Sept. 30, 2019) (holding, where officer was criminally convicted, "collateral estoppel requires that the verdict be given preclusive effect" in § 1983 suit). Similarly, the jury is

42

*required* to find Handy tampered with evidence in the West case by recording over a witness statement.[16]

Moreover, evidence establishes far more extensive misconduct in each of these cases than what was covered by Handy's guilty plea. In addition to fabricating Chandler's false confession, Handy coerced it through unlawful threats to take away his sister's children and false promises of a five-year sentence if he confessed. Chandler Dep. at 207:5–15, 208:13–209:4, 218:2–10, 223:7–10; Ex. 13; Pierce Dep at 23:1–10; Ex. 54, James Clark Dep. 22:11–24; Ex. 46, Ryan Dep at 61:4–16, 65:2–5; Ex. 88, O'Connell Ltr. at 3; Ex. 61, O'Connell Dep. 43:2–44:18. And in West, Handy fed information to several witnesses to produce false inculpatory statements, deliberately destroyed inconsistent prior statements, and illegally interrogated West after his counsel stopped the interrogation pursuant to court order. Ex. 57, Sherrard Dep. at 248:8–249:7, 250:3–251:12, 251:22–253:7; Ex. 13, Woosley Dep. at 111:11–16; 123:2–124:7; Ex. 93, Ross Hrg. 45:5–47:23; 68:10–24; *cf.* Ex. 7, Handy Dep. II at 34:20–35:15, 37:14–18; 40:1–43:20, 48:6–49:14, 53:13–23, 55:6–13; 56:12–20, 57:15–23; 65:13–22; 76:2–14.

Similarly, Woosley *admits* he knew of Handy's threats to Chandler during the coercive interrogation, and that he did not report them. Ex. 13, Woosley Dep. 272:3–274:10, 282:8–14. But a reasonable jury can find he was aware of far more. From his close supervision of Handy in the Chandler case, including review of the case file, Woosley would have known that Chandler's alleged admission about the White Sox hat was missing from Chandler's taped statement. *See* Ex. 13, Woosley Dep. 29:6–30:17, 148:2–17, 173:6–24, 275:12–21; *see also* Ex. 58, Burbrink Dep.

---

[16] Indeed, given Handy's perjury conviction Plaintiffs could have sought partial summary judgment in their favor on these *Brady* claims. *See Whitehead*, 2022 WL 1240423 at *2–3 (granting partial summary judgment on liability for plaintiff based on defendants' criminal conviction); *Stanley*, 2019 WL 4786053 at *11 (same).

72:23–75:18, 107:5–10, 109:7–14. And from his review of the audio statements in West, Woosley would have been aware of the time discrepancy in the Ross statement—something that should have prompted Woosley to take corrective action. Ex. 13, Woosley Dep. 88:8–25, 101:12–22. In other words, Woosley had plenty of information from his review of the case file and direct work with Handy in Chandler and West to understand at the time that Handy had fabricated evidence in both cases and committed perjury. The jury can find Woosley did know, but turned a blind eye because Handy's investigative misconduct helped close cases. Indeed, Handy's misconduct in Chandler and West is strikingly similar to his fabrication of the "human sacrifice" statement by Hardin—which Woosley had personal knowledge was false but endorsed as accurate. Ex. 13, Woosley Dep. 275:23–278:16. In sum, Woosley was obligated to report Handy's misconduct in these other cases to the prosecutor and to Lieutenant Sherrard, but did not. Ex. 62, Pierce Dep. 163:6–164:13; Ex. 57, Sherrard Dep. 88:25–89:13.

Handy's extensive and blatant investigative misconduct—including perjury a month before he testified at the Hardin/Clark trial—is undoubtedly favorable evidence, because it impeaches the testimony of Handy, a key witness. *See, e.g., Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (impeachment of prosecution witness is favorable under *Brady*); *Jackson* 925 F.3d at 815  (*Brady* requires disclosure of "evidence affecting credibility" of a witness whose "reliability…may well be determinative of guilt or innocence") (internal citations and quotation marks omitted). Evidence of Handy's pattern of misconduct is also favorable because it "undermine[s] the ostensible integrity of the investigation." *Kyles*, 514 U.S. at 448–49 (finding material *Brady* violation where police suppressed evidence supporting an argument the police investigation was unreliable); *Bies*, 775 F.3d at 401 (same); *Gumm v. Mitchell*, 775 F.3d 345, 374–75 (6th Cir. 2014) (same).

44

There is also no dispute this evidence of Handy's misconduct was suppressed. Prosecutor Kenton Smith was not aware of any of this prior misconduct by Handy and would have disclosed it had he known. Ex. 52, Smith Dep. I 35:4– 36:15; 67:1–25; 69:16–72:16; 120:5–122:16; Ex. 51, Heck Dep. 161:23–162:20. Defense lawyers Bart Adams and Wallace Rogers, and Hardin and Clark themselves did not know of this impeachment material, either. Ex. 115, Bart Adams Decl; Ex. 112, Rogers Decl.; Ex. 1, Hardin Decl.; Ex. 2, Clark Decl.

And there can be no reasonable dispute this suppressed evidence was material. *See Mellen v. Winn*, 900 F.3d 1085, 1096–1101 (9th Cir. 2018) (in § 1983 wrongful conviction suit, holding suppressed evidence was material as a matter of law where it impeached credibility of person who claimed to be sole witness to key admission by criminal defendant). Indeed, courts have repeatedly found far less powerful impeachment evidence to be material. *See, e.g., Thomas v. Westbrooks*, 849 F.3d 659, 664–66 (6th Cir. 2017) (finding *Brady* violation for failure to disclose FBI's $750 payment to key witness, even though the witness had been impeached on other bases and circumstantial evidence incriminated the defendant); *Robinson v. Mills*, 592 F.3d 730, 736–38 (6th Cir. 2010) (finding *Brady* violation for failure to disclose that key witness was paid confidential informant for law enforcement, even though witness had been impeached on other bases); *Harris*, 553 F.3d at 1033–35 (holding suppressed evidence was material where it undermined credibility of key witness). Certainly, a reasonable jury could find the suppressed impeachment to be material, all that needs to be shown at this stage.

Handy's testimony—especially about the alleged admission by Hardin that he wanted to do human sacrifice—was a focus of the trial; the prosecutor highlighted it repeatedly, including in opening and closing. *See Harris*, 553 F.3d at 1033–34 (emphasizing that "the prosecution featured [evidence] in closing arguments" when finding impeachment of that evidence material). Critically,

Handy was the *only* witness to a number of the most damning statements attributed to Hardin and Clark: including not only the human sacrifice admission, but also Hardin's alleged admission that he had threatened Warford's life and Clark's alleged admission that he had lied about owning knives.  Handy himself admitted that if an officer lied about a significant material fact in one case, it would be difficult to believe him in the next case. Ex. 6, Handy Dep I 31:5–18. And Handy specifically admitted that it would be reasonable for a juror to believe that an officer who lied about feeding non-public information to a suspect (as he has pled guilty to doing with respect to Edwin Chandler) may have lied in any criminal case. Ex. 7, Handy Dep. II 17:3–18:5.

What's more, when evaluating materiality the suppressed evidence must be considered collectively and in light of the rest of evidence; "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 113 (1976); *see also Bies*, 775 F.3d at 401–03. Here, the evidence was exceedingly weak: Hardin and Clark had solid alibis covering almost the entire time Warford was missing, no witnesses linked them to the crime, and despite extensive searches no blood, fiber, soil or tire prints linked them to the crime or the crime scene. Given the weakness of the evidence the verdicts were a surprise. Ex. 115, Bart Adams Decl; Ex. 112, Rogers Decl. Especially given the closeness of the case, the suppressed evidence is obviously material.

Finally, after Handy's misconduct was disclosed, the prosecution determined it could not rely on veracity of Handy's reports, which was a basis for dismissing the charges: "Put bluntly, the Commonwealth cannot put credibility into an unrecorded statement taken by a detective who has a documented history of fabricating details of a murder case in his investigative summaries." Ex. 97, Motion at 7; Ex. 99, Heck Hrg.116:14–118:1; 130:1–131:4.

46

### C.  Woosley is liable as a supervisor.

There is no dispute over the governing standard: a supervisor may be held liable under § 1983 where he engages in "some active unconstitutional behavior" such as "at least implicitly authoriz[ing], approv[ing], or knowingly acquiesce[ing]" in his subordinate's unconstitutional conduct. *Peatross v. City of Memphis*, 818 F.3d 233, 241–242 (6th Cir. 2016) (internal citations and quotation marks omitted); *see also* Dkt. 295-1 at 44. Woosley's active misconduct detailed above—including his direct participation in the fabrication of the human sacrifice statement by initialing the fabricated document—more than meets this test. And from his conceded active review of the investigative reports, Woosley would have been aware at the time of the other glaring omissions in Handy's investigation. As his supervisor Lieutenant Sherrard admitted, these omissions are so striking as to suggest on their own that Handy fabricated the human sacrifice statement. In addition, there is evidence Woosley had endorsed Handy's misconduct in other cases, such as when he learned Handy had used an improper threat to elicit Chandler's confession but failed to report it.

### D.  Handy and Woosley are liable for failure to intervene.

Again, there is no dispute about the standard: an officer can be liable for failure to intervene when he "observed or had reason to know" of a fellow officer's constitutional violation and "had both the opportunity and the means to prevent the harm from occurring." *Hoskins v. Knox Cnty., Kentucky*, No. CV 17-84-DLB-HAI, 2018 WL 1352163, at *17 (E.D. Ky. Mar. 15, 2018) (internal citation and quotation marks omitted); Dkt. 295-1 at 44; *see also Peterson v. Heymes*, 931 F.3d 546, 556 (6th Cir. 2019) (holding officers could be liable for failure to intervene in investigative misconduct which caused plaintiff's wrongful conviction). The same evidence demonstrating Woosley's knowledge of and endorsement of Handy's fabrication of evidence supports liability

for failure to intervene, as well. Similarly, Handy is responsible for his failure to intervene in misconduct he observed with Sheriff Greer, such as Greer's fabrication of statements attributed to Rhonda's family members.

### E.  Handy and Woosley are liable for conspiracy.

A § 1983 civil conspiracy is "an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (internal citation and quotation marks omitted). An officer may be held liable if there is: (1) a single plan; (2) the officer shared in the general conspiratorial objective; and (3) an overt act was committed in furtherance of the conspiracy that caused injury. *Id.* Importantly, "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . [and] circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir.2000); *Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015).

Here, a reasonable jury could conclude that Defendants were "voluntary participants in a common venture to railroad" Plaintiffs. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir 2002). Handy and Woosley, on the one hand, and Greer, on the other, fabricated interlocking statements attributed to Hardin, Clark and other witnesses supporting the false claims that Hardin and Clark sacrificed animals as part of the practice of Satanism and that the murder of Rhonda Warford was somehow connected to that. This included fabrications arising out of interviews at which Handy, Greer, and Adams were present together, such as the April 9, 1992 interview of Warford's family members. They worked closely together through the investigation, conducting many investigative activities together. From the beginning of the investigation Handy, Greer and Adams engaged in joint unconstitutional tactics, unsuccessfully attempting to coerce a confession

48

from Clark through threats and false promises, and feeding him a false story that fit their inaccurate theory of the crime.

### F.  Woosley is liable for negligent supervision.

Under Kentucky law, a supervisor may be liable for negligent supervision where "he knew or had reason to know of the employee's harmful propensities; …the employee injured the plaintiff; and…the hiring, supervision or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005); Dkt. 295-1 at 47. Here, the exact same evidence demonstrating Woosley jointly participated in the fabrication with Handy demonstrates his liability under the lesser standard for negligent supervision. The jury can easily find Woosley had personal knowledge about Handy's fabrication of evidence in this case—because he was physically present for the interview and knew Hardin never said what Handy attributed to him. And Woosley also saw, from his admitted close review of the investigative reports, the glaring red flags that Handy was fabricating evidence— because there was no other logical explanation for his otherwise obvious investigative failures. And Woosley had personal knowledge of Handy's prior misconduct in the Chandler case, when Woosley knew Handy used improper threats to obtain his confession, and then improperly failed to report them. Had Woosley taken minimally appropriate action at any of these times to address Handy's ongoing misconduct, Hardin and Clark could easily have been spared their wrongful convictions and 22 years each of wrongful imprisonment.

### CONCLUSION

Plaintiffs respectfully requests that this Court deny Defendants' motion for summary judgment.

Dated: January 26, 2023

Respectfully submitted,

/s/Anna Benvenutti Hoffmann

Barry Scheck
Nick Brustin
Anna Benvenutti Hoffmann
Emma Freudenberger
Katie McCarthy
Owanaemi Briggs
Sophia Villarreal
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013


/s/Larry Simon
Larry D. Simon (Ky. Bar No. 64355)
Attorney at Law
American Life Building, Suite 200
471 West Main Street
Louisville, KY 40202

***Attorneys for Plaintiff Garr Keith Hardin***

/s/Elliot Slosar
Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson-Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607


***Attorneys for Plaintiff Jeffrey Clark***

## <u>CERTIFICATE OF SERVICE</u>

I, Camilo Duran, hereby certify that on January 26, 2023, I filed the foregoing document via the Court's CM/ECF System and thereby served a copy on all counsel of record.

<u>/s/ Camilo Duran</u>

*Attorney for Plaintiff Hardin*

Neufeld Scheck & Brustin, LLP