**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| **JEFFREY DEWAYNE CLARK and** | ) | |
| **GARR KEITH HARDIN,** | ) | |
| | ) | HON. GREG N. STIVERS |
| **Plaintiffs,** | ) | |
| | ) | HON. COLIN H. LINDSAY |
| **v.** | ) | |
| | ) | Case No. 17-CV-419-GNS-CHL |
| **LOUISVILLE JEFFERSON COUNTY** | ) | |
| **METRO GOVT, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' OPPOSITION TO LOUISVILLE JEFFERSON COUNTY METRO GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs Garr Keith Hardin and Jeffrey Clark each spent 22 years wrongly imprisoned for a brutal crime they had nothing to do with: the 1992 murder of Rhonda Sue Warford. Although Plaintiffs truthfully professed their innocence and had solid alibis, they were wrongly convicted due to misconduct by the investigating officers, including Louisville Police Department Detective Mark Handy and Sergeant Jim Woosley. Ultimately, after DNA testing excluded both men as the source of hairs found on the victim's body, and evidence of Handy's pattern of investigative misconduct was revealed, their convictions were vacated and charges dismissed.

Detective Handy's extraordinary pattern of investigative misconduct at the Louisville Police Department (LPD) in the early 1990s is beyond dispute. Handy has been criminally convicted based on his fabrication of evidence and perjury against Edwin Chandler and

1

tampering with evidence in a case against Keith West. But as Defendants admit, Handy's misconduct was far more extensive than what was covered by the plea agreement. Indeed, the Jefferson County Attorney, Mike O'Connell, was so "appalled and deeply troubled" by Handy's misconduct that he wrote to the judge presiding over Handy's prosecution to request a harsher sentence.

Handy's constitutional violations, in this case and others, were the direct result of systematic and supervisory failures by the LPD. The custom and culture of the LPD—coming from the very top, Chief of Police Doug Hamilton—was ratification of and acquiescence in blatant misconduct by detectives, including deception, so long as they were closing cases and obtaining convictions. The record establishes that LPD supervisors were on notice of Handy's misconduct at the time and turned a blind eye. Indeed, despite his blatant misconduct they intentionally brought him into cases because he would produce inculpatory evidence others wouldn't—because he would make it up. And Handy flourished in an environment where he knew he was protected by the "blue wall of silence"—his supervisors would ignore his misconduct.

The LPD had another, interlocking custom and practice: a complete failure to train or supervise on complying with *Brady* violations. In a civil rights suit arising out of another wrongful conviction from the early 1990s, *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006), the Sixth Circuit held that there is sufficient evidence of LPD's complete failure to train on *Brady* obligations that a jury could find it liable for the resulting wrongful conviction. *Gregory* controls here. The exact same evidence—plus more—in this case, compels the same result. The record demonstrates LPD failed to train or supervise on *Brady* disclosure obligations, and as a result, critical impeachment evidence of Handy's prior pattern of misconduct and

2

perjury was never disclosed. When that evidence ultimately came to light during post-conviction proceedings in this case, both the presiding court and the prosecutor found that Handy's credibility was decimated.

As a result of Louisville's systematic failures, including a failure to train and supervise on *Brady*, and messaging from the top that investigative misconduct and deliberate deception would be tolerated in service of closing cases, at least five innocent men were wrongly convicted and imprisoned, including Keith Hardin and Jeff Clark. Summary judgment should be denied.[1]

## LEGAL STANDARD

Under the "well-recognized standard of Rule 56,…'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Clay v. Emmi*, 797 F.3d 364, 370 (6th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Thus, on Defendants' motion for summary judgment, the Court "must believe [Plaintiffs'] evidence … and disregard [Defendants'] conflicting evidence that the jury is not required to believe," *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 404 (6th Cir. 2022) (cleaned up, internal citations and quotation marks omitted). "[T]he evidence is construed and all reasonable inferences are drawn in favor of" Plaintiffs. *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (internal citation and quotation marks omitted). The Court cannot "usurp the place of the jury by weighing the witnesses' relative credibility." *Clay*, 797 F.3d at 371. "[I]f [Plaintiffs are] able to demonstrate that there is a genuine issue of material fact in dispute, then Defendants are not entitled to summary judgment." *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017); *see* Fed. R. Civ. P. 56(c).

## FACTS

---

[1] Plaintiffs are no longer pursuing any claims against James Clark.

### A. Louisville lacked any policies or training on constitutional obligations during investigations.

From 1989 to 1995, the LPD had no written policies guiding investigators on how to comply with constitutional mandates during investigations.[2] Lieutenant Donnie Burbrink III testified as Louisville's 30(b)(6) representative about the policies and training in effect at the LPD in the early 1990s.[3] *See* Ex. 1, Burbrink Dep. 31:22–32:3. Burbrink testified that whatever policies and procedures existed at the LPD between 1989 and 1995 would have been memorialized in written form. *Id.* at 67:24–68:3. Burbrink also confirmed that all written policies and procedures were identified in the tables of contents from the 1990 and 1993 manuals. *Id.* at 63:20–65:11. But those written policies included no guidance on how to obey constitutional mandates. The written policy on "criminal investigations," which covered the physical assault squad, "was simply to show the organizational structure and break down the specific types of cases that each individual section would work." *Id.* at 100:20–101:25; Ex. 2, 1991 Manual, Crim. Inv. Sec. Burbrink suggested "the way detectives should conduct those investigations" would be covered in the "homicide procedures policy," but that policy also included no guidance on how to comply with constitutional mandates, either. Ex. 1, Burbrink Dep. 101:1–25; Ex. 3, 1985 Manual, Homicide; Ex. 4, 1996 Manual, Highlights. Burbrink's testimony is consistent with

---

[2] At all times relevant to this investigation, the relevant investigating agency was the Louisville Police Department (LPD). After Jefferson County and the City of Louisville merged to form the Louisville Jefferson County Metro Government in January 2003, the merged Louisville Metro Police Department (LMPD) became the successor to the LPD. Dkt. 1 at PageID #7. For simplicity, Plaintiffs refer to the police department as LPD throughout.

[3] Burbrink has been employed for the City of Louisville for more than two decades. Ex. 1, Burbrink Dep. 13:13–22. He reviewed policies from the Louisville Police department responsive to the timeframes at issue and was prepared to provide binding testimony on the issues discussed. *Id.* at 31:8–33:4, 34:2–21.

other officers' recollection about the absence of written procedures in the department. *See, e.g.*, Ex. 5, James Clark Dep. 83:25–85:1; Ex. 17, Pierce Dep. 284:11–17.

The policy gap at the LPD was not supplemented with training. There is no documentation of Louisville officers being trained between 1985 and 1995 on: (1) conducting criminal investigations, including homicides; (2) identifying and eliminating individuals as suspects; (3) conducting eyewitness identification procedures; (4) documenting investigative work and suspect and witness statements; (5) record keeping; or (6) interrogating or interviewing suspects and witnesses. Ex. 6, RFP to City 16; Ex. 1, Burbrink Dep. 58:1-60:1. Burbrink, testifying on behalf of the City, confirmed that it was his understanding that no such records exist and that the City had no documents that would indicate any formal internal or external training in these areas. Ex. 1, Burbrink Dep. 58:14–60:1, 62:9–14.

**B. Louisville lacked any policies or training on interviews and interrogations.**

In particular, during this time period there was no guidance in policy and procedure on how detectives should interview witnesses. *Id.* at 100:20–101:25. Specifically, between 1989 and 1995, the LPD did not have any written policy prohibiting the use of threats or coercive statements to witnesses or suspects. *Id.* at 150:5–17. Handy admitted he was unaware of any policies or procedures instructing him on how to handle witness or suspect interviews. Ex. 7, Handy Dep. II 100:24–101:20. He claimed instead that he based his interviews on his own "common sense" and interviews he had seen conducted by senior detectives. *Id.* at 102:11–20; Ex. 8, Handy Dep. I 69:14–19. Although the City admits that such threats are illegal, Ex. 9, O'Connell Dep. 43:9–20; *see* Ex. 1, Burbrink Dep. 150:5–17, Handy's direct supervisor, Woosley, claimed at his deposition that he did not understand that threatening to take a suspect's nieces and nephews away was illegal coercion; he claimed he thought that was the type of

deception that could be used in an interrogation. Ex. 10, Woosley Dep. 51:10–52:24. Other supervisors also testified they did not understand that promises of leniency or threats to take someone's children were illegal interrogation methods. Ex. 11, Pierce Chand. Dep. 21:9–14, 24:12–25:21. [4]

### C. Louisville lacked any policies or training on *Brady* obligations.

Between 1989 and 1995, there were no written *Brady* policies or procedures in place. Ex. 1, Burbrink Dep. 164:15–165:4; Ex. 15, 1990 Manual, TOC; Ex. 16, 1993 Manual, TOC.  There were also no written policies or procedures that provided guidance to officers on how to document exculpatory evidence in an investigative file. Ex. 1, Burbrink Dep. 45:13–23, 145:9–14. And there were no written policies or procedures on how to disclose exculpatory evidence gathered in a criminal investigation. *Id.* at 35:24–36:6, 145:9–14; Ex. 17, Pierce Dep. 284:2–17.

There was also no training on *Brady* obligations. *See id.* at 58:14–60:1, 62:9–14; Ex. 18, Hamilton Dep. 250:8–251:13. Louisville officers readily admit to a lack training about disclosing exculpatory evidence, Ex. 11, Pierce Chand. Dep. 81:10–82:6 (explaining that not all detectives in the Homicide Division were trained on the principle that good or bad evidence should be documented in the file).  Handy, for example, had "no idea" whether he received any training on documenting conversations with witnesses who wanted to exchange information for a deal. *See* Ex. 7, Handy Dep. II 25:20–26:20. Although he claimed that training on exculpatory evidence

---

[4] Between 1989 and 1995, the LPD also did not have written policies or procedures for one-on-one show ups in a criminal investigation. *See* Ex. 1, Burbrink Dep. 39:5–40:5. Neither did the department provide any formal training; officers instead created their own practices based on what they saw others do. *See id.* at 58:14–60:1, 62:9–14; Ex. 12, Tarter 3/17/03 Dep. in Gregory 19:17–25, 21:9–8; Ex. 21, Sherrard Dep. 172:18–22; Ex. 13, Sherrard Dep. in Gregory 63:11–19; Ex. 14, Carroll Dep. 182:1–183:10. As the Sixth Circuit held in *Gregory v. City of Louisville,* 444 F.3d 725, 754, 760–61 (6th Cir. 2006), this enabled a policy of unconstitutional use of suggestive show ups.

was "too basic . . .not to be in any quality training," Pierce could not recall any specific examples of the LPD providing such training to its officers. *See* Ex. 17, Pierce Dep. 248:3–18. When asked about whether he received any training on exculpatory evidence, Pierce instead responded with a story about on-the-job experience: early in his career he worked on a case that may have gone all the way to the Supreme Court on the exculpatory evidence issue. *Id.* at 244:11–23.

### D. Chief Hamilton knew detectives did not understand their *Brady* obligations and did nothing.

E. Douglas Hamilton was Chief of Police from 1990 to until he retired in 1999. Ex. 18, Hamilton Dep. 7:20–25. As Chief, Hamilton was responsible for ensuring that officers were properly trained, including that they understood their *Brady* obligations. *See id.* at 51:16–22, 52:5–8, 251:14–252:5. During his tenure, however, Hamilton was aware of widespread confusion in his department surrounding *Brady* obligations *See id.* at 248:18–25; 250:5–12. Hamilton admitted officers were often confused as to whether they were only required to disclose evidence they wanted to use at trial (in other words, inculpatory evidence); when asked if officers in his chain of command were clear on their obligation to disclose exculpatory evidence to the prosecutor, he responded "I don't believe it's crystal clear at all." *Id.* at 248:18–25; 250:5–12. Pierce, a supervisor in the department, echoed Hamilton's assessment of the office and explained that not all of the detectives in the Homicide Division understood the principle that all evidence connected with a trial, whether good or bad, should be documented in the case file. *See* Ex. 11, Pierce Chand. Dep. 81:16–82:6. At one point, Pierce revealed that he himself was unsure exactly what exculpatory evidence or *Brady* material meant. *Id*. at 19:4–11.

Despite knowing about the confusion in the LPD around *Brady*, and admitting it was his responsibility to address it, Hamilton could not identify a single thing he had done to remedy the situation. Ex. 18, Hamilton Dep. at 250:13–252:5. This created problems for supervisors in the

department. Pierce described how during the 1990s he had consistent problems for years with another homicide detective, Jenny Assef, not documenting her investigative actions in reports at all, which he recognized could lead to ultimate written reports being incomplete. Ex. 17, Pierce Dep. 265:19–266:6; 268:3–24. But Pierce could not direct Assef to written policies or procedures to correct these basic deficiencies, because there were not written policies or procedures addressing this subject in place. *Id.* at 284:2–17.

### E. Louisville had no requirement in place for disclosure of an officer's prior misconduct.

In addition to the general failure to have a *Brady* policy or training at all, there was also no specific requirement to disclose evidence of officer misconduct or discipline. No policies required supervisors to document allegations of misconduct in investigative letters without those allegations first being fully corroborated by the LPD. Ex. 1, Burbrink Dep. 161:18–162:2. No policy required documentation in an investigative file of disciplinary action against officers in the case. *Id.* at 162:17–24. Neither did any LPD policy, procedure, or practice ensure that a criminal defendant would be notified of any sustained allegations of misconduct against officers involved in a criminal investigation. *Id.* at 162:25–163:8.

### F. Louisville pressured detectives to close cases.

In contrast to his lack of attention to compliance with constitutional obligations, Chief Hamilton focused intensely on clearance rates, which he used to monitor the performance of a police department each year. Ex. 18, Hamilton Dep. 212:8–13. A case could be "cleared" so long as an arrest had been made. *Id.* at 212:14–24. Clearance rates were extremely important to detective sergeants, lieutenants, and supervisors in evaluating units and officers. *Id.* at 213:19–25. Indeed, clearance rates and convictions were the two most important factors in evaluating a detective's success. *Id.* at 214:1–13. Supervisors communicated as much to officers under their

8

command. *See* Ex. 19, Julius Clark Dep. 132:3–18. Officers also felt pressure to do a better job clearing cases. *See Id.* Chief Hamilton agreed an LPD detective's responsibility was to gain probable cause for an arrest, not to ensure that innocent people were not arrested. Ex. 18, Hamilton Dep. 245:19–246:3.

This emphasis on clearance rate and closing cases was successful: throughout most of the 1990's, the LPD prided itself on the clearance rate in the Crimes Against Persons Unit. *See, e.g.*, Ex. 20, Sherrard Unit Nomination; Ex. 18, Hamilton Dep. 211:25–12:7, 212:21–213:1. Former Chief Hamilton recalled, in particular, the Physical Assault Squad's extraordinary clearance rate as compared to other metropolitan areas and even other units within the LPD.[5] Ex. 18, Hamilton Dep. 211:25–12:7. In 1993, Sherrard nominated the Crimes Against Persons Unit for a Meritorious Unit Citation based on its extraordinary clearance rate and the Unit's results getting convictions.[6] Ex. 20, Sherrard Unit Nomination. In the nomination memo, Sherrard notes that other commanding officers had commented on the squad's "knack solving major investigations." *Id.* And Hamilton testified that more serious crimes—homicides, sex offenses, and assaults— were more likely to be cleared than the majority of all other crimes. Ex. 18, Hamilton Dep.

---

[5] The Physical Assault Squad was responsible for investigating homicides and was a subset of the Crimes Against Persons Unit. *See* Ex. 21, Sherrard Dep. 27:15–19; Ex. 1 Burbrink Dep. 76:2–8. The Unit also housed the Robbery Squad, the Domestic Violence Squad, and the Civilian Transcribers. Ex. 21, Sherrard Dep. 27:15–19. Sherrard served as the lieutenant in charge of the Crimes Against Persons Unit from 1990 to 1997. *Id.* at 12:1–3. Sherrard was directly above Woosley in the chain of command, *see id.* at 26:22–25, and Woosley in turn directly supervised Handy in the Physical Assault Squad and again after they both transferred to Robbery in 1995, Ex. 10, Woosley Dep. 89:10–25.

[6] Sherrard himself was later promoted to Chief of Police, although he was fired in early 2000 after he approved the Exceptional Valor Award for two white officers who shot a black teenager to death. Ex. 22, Mayor Fires Police Chief.

213:13–18. In fact, Hamilton held out the Physical Assault Squad as a model for the department in public appearances and written statements. *Id.* at 215:3–5.

### G.   Chief Hamilton condoned serious misconduct, including deception.

The LPD's policies and procedures acknowledged that the mechanism for maintaining the integrity, professionalism, and credibility of the department was a responsive and effective disciplinary system. Ex. 1, Burbrink Dep. 98:1–99:3. As the City admits, the purpose of effective discipline of officer misconduct is not only to punish past misconduct, but to prevent future misconduct. *Id.* at 98:1–6, 98:13–17. An effective disciplinary system prevents an officer from repeating misconduct committed in past investigations; if effective discipline is not implemented, however, the LPD risked creating repeat offenders who engaged in the same misconduct in various investigations. *Id.* at 98:18–99:3. "An investigative supervisor who does not instruct, correct, and hold subordinates accountable, serves to embolden a law enforcement officer who is inclined to not follow policy, engage in serious misconduct, and break the law." Ex. 23, Fischer Rep. 24.

The Chief of Police was responsible for the supervision and discipline of the department. Specifically, Hamilton was tasked with ensuring that proper mechanisms were in place so that when officers violated the rules and regulations, those violations would be uncovered. Ex. 18, Hamilton Dep. 57:4–58:6. He also was responsible for ensuring that officers understood what they were responsible for doing and not doing, for investigating misconduct, and for imposing discipline when officers violated the department's rules and regulations. *Id.* at 57:4–58:6, 65:5–10.

Supervisors were similarly responsible for ensuring that potential misconduct by officers under their command was reported and investigated. *See* Ex. 1, Burbrink Dep. 110:4–111:16,

113:1–13. Regardless of the allegation, supervisors had an obligation to follow up. *Id.* at 111:13–16, 115:18–22; Ex. 24, 1985 Manual, Sgt. Responsibilities 2. For instance, if a supervisor found misrepresentations in a case file the supervisor would have an obligation to inquire further. Ex. 1, Burbrink Dep. 110:4–111:12. If an officer allegedly engaged in serious misconduct, a prudent supervisor should have asked internal affairs to investigate. *Id.* at 93:3–18. And if a supervisor witnessed misconduct or learned about misconduct from a subordinate officer, the supervisor had an obligation to ensure an investigation took place by passing information up the chain of command. *Id.* at 114:12–115:17.

However, despite the acknowledgement that effective supervision required reporting of misconduct, the actual culture of the LPD was a universal understanding within the department that officers should *not* report one another for misconduct, known as the blue wall of silence. *See, e.g.*, Ex. 10, Woosley Dep. 288:17–20; Ex. 5, James Clark Dep. 31:1–8; Ex. 19, Julius Clark Dep. 37:17–38:12. Officers understood that those who reported misconduct by a fellow officer would face retribution, even if they reported something that affected performance, like a fellow officer's serious drinking problem. Ex. 19, Julius Clark Dep. 38:19–22, 39:8–40:14. Unsurprisingly, officers testified that they would have hesitated to report misconduct because of pressure to maintain the blue wall. Ex. 5, James Clark Dep. 31:18–25. Woosley, for example, admitted to failing to report officers who used excessive force despite witnessing such incidents over the course of his career. Ex. 10, Woosley Dep. 287:21–288:16.  He admitted his failure to report was due to the "blue wall of silence," and that officers were reluctant to report on other officers. *Id.* at 286:19–287:6; 288:11–20.  Although Woosley first claimed he would have reported criminal activities by fellow officers, he admitted he never did so. *Id.* at 287:7–20; 289:25–290:4. He also admitted he had been aware of officers who committed crimes and did

not report it, because officers understood they got a pass. *See id.* at 291:17–292:2. In other words, Woosley admitted officers could engage in misconduct in front of other officers and it would not be reported. *Id.* at 292:14–19. When pressed for an example of officer misconduct he had reported, Woosley avoided the question: he responded only with a hypothetical—claiming he would have reported an officer who was an armed robber. *Id.* at 292:22–293:3.

Woosley admitted if he had learned that a detective fabricated evidence—for example, documented that a suspect had made an incriminating statement he had not actually made—he would not necessarily report it, because of the blue wall of silence. *Id.* at 289:7–24. He also explained that multiple people likely were aware Handy threatened a suspect because no one was trying to hide the misconduct. *Id.* at 284:9–285:7. Handy admitted that there absolutely was a reluctance in 1992 and before for officers to report one another, and agreed that although there were many variables, he understood that if he engaged in misconduct it was unlikely it would be reported. Ex. 8, Handy Dep. I 281:6–281:13. Handy also admitted that, as he had done before, he again would record over portions of a witness interview without trying to fully cover his tracks because he had nothing to hide. *See* Ex. 7, Handy Dep. II 47:1–15. And Sherrard conceded that Handy's actions suggested he was comfortable engaging in misconduct in front of Sherrard and while under Sherrard's direct supervision. Ex. 21, Sherrard Dep. 41:9–23.  Handy knew that officers would not report on a fellow officer; "it was a different time." *See* Ex. 8, Handy Dep. I 279:16–23.

This followed the example of Chief Hamilton, who was ultimately responsible for ensuring that the chain of command was working and that officers were properly supervised and disciplined. Ex. 18, Hamilton Dep. 56:23–57:24. In spite of these obligations, officers under Hamilton's command faced few, if any, repercussions for serious wrongdoing. Hamilton readily

admits that he saw his primary responsibility in disciplinary cases as rescuing the employee. *Id.* at 207:2–5. To that end, officers in Hamilton's chain of command were not usually terminated if they either were found to or admitted to committing a crime such as criminal assault. *Id.* at 136:20–137:1. Neither would officers be terminated for perjury or making a material misrepresentation in a criminal investigation. *See id.* at 237:21–238:3. Indeed, Pierce observed that there were many people he thought would have been fired for untruthfulness but were not. Ex. 17, Pierce Dep. 214:10–22. Even bringing disciplinary charges for untruthfulness was rare, because Hamilton would only support charging untruthfulness if he believed it could be proven, which would generally require hard evidence such as a videotape or photograph. Ex. 18, Hamilton Dep. 142:20–143:1; 265:23–266:2; 267:21–268:4. Accordingly, Hamilton believed not all serious allegations—such as a detective fabricating evidence—even warranted investigation. *Id.* at 68:1–20.

### H. Louisville's failures to appropriately supervise and discipline misconduct caused multiple violations of constitutional rights.

As the following examples illustrate, the LPD's failure to appropriately discipline its officers, amplified by the department's lawless culture, allowed for the advancement of officers engaged in misconduct, and led to serious violations of constitutional rights.

1. Joe Carroll

Between 1985-1992, Officer Joe Carroll had a drinking and anger management problem which repeatedly escalated to physical violence. Ex. 14, Carroll Dep. 115:11–21; 116:2–16. At one point, Carroll's stepdaughter, Janet, called police after she heard yelling and screaming from her room. *Id.* at 120:18–121:6. When police arrived, Carroll called his boss, who came over. Carroll left, went to work, "and that was all there was to it." *Id.* at 121:6–10.

Most notably, however, Carrol physically assaulted members of his family, resisted arrest, fought with members of the Pensacola Police Department, was uncooperative in yielding his firearm, and damaged a police vehicle one night while on vacation in Florida in 1991. Ex. 25, Carroll Disciplinary Records 5. As a result, Carroll was criminally charged with three counts of aggravated battery of his wife and daughters, two counts of battery on a law enforcement officer, and one count of resisting arrest with violence—all felonies. *Id.* at 6. Carroll also was charged with criminal mischief for kicking a police vehicle door. *Id.*

The first officer on the scene saw Carroll standing on a balcony with a revolver. *Id.* at 3. Janet—by then a Louisville police officer herself, *id.* at 6—told the officer that Carroll had threatened to shoot his wife and daughter, that Carroll had Janet's three-year-old son inside, and that Carroll would shoot police. *Id.* at 3. When officers tried to speak with Carroll, "he said it was a god damn shame how he was being treated and [that] he was a police officer." *Id.* Carroll refused to cooperate with officer instructions, and intentionally struck an officer in the mouth, drawing blood. *Id.* Carroll also knocked off another officer's glasses in the struggle, and that officer's bracelet was also pulled off and broken. *Id.* Carroll had to be put in a full-Nelson so that he could be handcuffed, but continued to resist. *Id.* As for Carroll's family, Janet explained that Carroll injured them when he hit them with a glass object. *Id.* Carroll's daughter, Melissa, required six stitches to close a cut over her left eye. Ex. 18, Hamilton Dep. 191:13–16; Ex. 25, Carroll Disciplinary Records 15. Carroll's wife, Betty, had a cut lip. Ex. 18, Hamilton Dep. 191:17–20; Ex. 25, Carroll Disciplinary Records 4. Janet had several knots on her head and was dizzy from Carroll repeatedly striking her in the head. Ex. 25, Carroll Disciplinary Records 4. Finally, in the police vehicle after his arrest, Carroll kicked the passenger door open, striking another police vehicle. Ex. 18, Hamilton Dep. 199:19–200:17.

14

The incident became well known within the LPD. *Id.* at 155:7–16; Ex. 17, Pierce Dep. 212:9–213:17. In fact, word was already out the very next day—one of the Pensacola officers "had been receiving some heat about [the] arrest" from her lieutenant after someone from the LPD called and explained that it would be a shame for a "real fine officer" to lose his job over a "mistake." Ex. 25, Carroll Disciplinary Records 4.

After an extremely thorough investigation, Hamilton had no doubt about the charges against Carroll for physically assaulting and beating multiple members of his family, intentionally assaulting a police officer, and intentionally damaging police property. *See* Ex. 18, Hamilton Dep. 145:24–147:24, 149:5–7, 152:21–153:16; Ex. 25, Carroll Disciplinary Records 16, 20. Although abundant credible evidence established that Carroll had engaged in this misconduct, Carroll falsely denied it He denied assaulting anyone in his family except for Janet, his stepdaughter. *See* Ex. 18, Hamilton Dep. 162:13–163:11, 179:13–180:8. Carroll claimed he had only struck the Pensacola officer accidentally, giving two contradictory accounts of how it had happened. *See id.* at 174:6–175:23, 179:8–12, 182:1–185:24. As for the intentional damage to police property, Carroll again claimed it was an accident, offering two different inconsistent explanations. *See id.* at 176:23–179:7, 186:12–187:13.

Hamilton acknowledged that substantial evidence from independent civilian and law enforcement witnesses demonstrated that Carroll made at least six material misstatements concerning his misconduct. *See id.* at 185:25–187:13, 197:5–201:12, 261:3–262:16. Nevertheless, Carroll was not disciplined for lying to the LPD about his misconduct. *See* Ex. 25, Carroll Disciplinary Records 20; Ex. 18, Hamilton Dep. 201:16–24. Indeed, Hamilton never even considered bringing charges against Carroll for untruthfulness. Ex. 18, Hamilton Dep. 201:16–24.

15

Carroll was not terminated as a result of his criminal acts in Florida or his dishonesty. Ex. 25, Carroll Disciplinary Records 17. In fact, Hamilton admits that officers who were found to, or admitted to, criminal assault were not usually terminated. Ex. 18, Hamilton Dep. 136:20–137:1. Instead, Carroll received a brief suspension with additional requirements to attend six months of counseling and AA meetings. Ex. 25, Carroll Disciplinary Records 17–18, 21–22; Ex. 18, Hamilton Dep. 150:11–151:8. Yet Hamilton never formally evaluated whether Carroll complied with these additional requirements. Ex. 18, Hamilton Dep. 158:10–159:3. Hamilton also did not find it unusual or concerning that only six months after his findings against Carroll, Carroll received less supervision and more leeway because of his seniority. *Id.* at 239:20-240:7, 241:20–242:8. Hamilton in many cases offered Carroll up as a positive example because of Carroll's productivity and ability to close cases. *See id.* at 206:11–17, 207:18–209:4. Carroll went on to have a long career with the LPD, including as part of the Internal Affairs unit. *See* Ex. 14, Carroll Dep. 221:1–6; Ex. 26, Pierce Greg. Dep. 18:17–19:12. The LPD's failure to adequately discipline and supervise Carroll allowed him to remain on the force to violate William Gregory's constitutional rights less than two years later, resulting in Gregory's wrongful conviction.

2. William Gregory

In 1993, William Gregory was wrongfully convicted of rape, attempted rape, and burglary as the result of two 1992 attacks against two women in his apartment complex. Ex. 27, Greg. New Tr. Ord. 1. Both victims failed to identify Gregory from a photo pack, but later purportedly identified Gregory was their attacker despite the fact that he did not match the initial descriptions they gave. Ex. 28, Greg. Crim. Tr. 112:4–23; Ex. 12, Ex. 29, Greg. KY Civ. Tr. 114:2–116:18. The first victim identified Gregory after seeing him in the apartment complex they shared and after her mother and neighbor suggested Gregory might be the attacker. *See* Ex. 30,

16

Greg. LPD File 5043, 5050; Ex. 28, Greg. Crim. Tr. 69:15–22. The second victim later identified Gregory in a one-on-one show up. Ex. 29, Greg. KY Civ. Tr. 114:2–116:18. After spending nearly seven years in prison for crimes he did not commit, DNA evidence excluded Gregory as the source of the only physical evidence left at the scenes. *See* Ex. 31, Greg. DNA Rep. 2; Ex. 27, Greg. New Tr. Ord. 2–3. Gregory's convictions were vacated in 2000 and all charges were dismissed; in 2001, Gregory filed a civil case against the City of Louisville and individual LPD officers. *Gregory v. City of Louisville*, 444 F.3d 725, 735 (6th Cir. 2006).

As part of the larger series of misconduct in the case, Detectives Joe Carroll and Steve Clark fabricated evidence against Gregory, and Detectives Carroll, Clark, and John Tarter unconstitutionally withheld exculpatory *Brady* evidence, resulting in Gregory's conviction. Carroll and Clark's investigative notes state that, while on the phone with his girlfriend after his arrest, Gregory independently recounted exactly which items had been stolen from the victim's apartment. Ex. 30, Greg. LPD File 5085; Ex. 32, Greg. Carroll Notes 10. While Gregory did have such a conversation with his girlfriend, investigators previously had told Gregory what was missing from the apartment. Ex. 33, Gregory Dep. 223:7–20. Carroll and Clark's notes, however, falsely claimed that that they had not revealed these non-public details to Gregory. *See id.*; Ex. 30, Greg. LPD File 5085; Ex. 32, Greg. Carroll Notes 10. Gregory is innocent of these crimes, so the only way he could have learned what had been stolen was from Carroll and Clark. *See* Ex. 33, Gregory Dep. 223:7–20. Carroll falsely testified at trial that no one had told Gregory what was missing from the apartment. Ex. 28, Greg. Crim. Tr. 272:20–24.

While Gregory was in custody before his convictions, third and fourth victims were sexually assaulted by a man sharing the same description and using the same distinctive modus operandi as the perpetrator of the first two attacks. *See id.* at 61:7–62:6; Ex. 34, Schroering Greg.

17

Dep. 121:3–20; Ex. 35, Greg. Undisclosed LPD File 1627; Ex. 12, Tarter Greg. Dep. 62:13–25.

Tarter placed a wanted poster from the third case in his investigative file on Gregory. *See* Ex. 28,

Greg. Crim. Tr. 61:7–15. Tarter also was involved in the investigation of the fourth assault. *See*

Ex. 35, Greg. Undisclosed LPD File 1638, 1645. Before Gregory's trial, however, Tarter told

Gregory's defense attorney that the wanted poster had been misfiled in the Gregory investigation

file. Ex. 28, Greg. Crim. Tr. 61:7–15; Ex. 36, Polk Greg. Dep. 91:11–25. As for the fourth

assault, Tarter never disclosed its existence to prosecutors before trial. *See* Ex. 34, Schroering

Greg. Dep. 106:6–107:15, 121:3–20.

In 2006 the Sixth Circuit found sufficient evidence of fabrications and *Brady* violations

by multiple officers to meet Gregory's burden on his Section 1983 claims as well as a custom of

failing to train on *Brady* by Louisville. *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir.

2006). Mr. Gregory ultimately obtained a multimillion-dollar settlement from Louisville.

3.   Mark Handy

Mark Handy is another example during this same time period of the blatant misconduct

within the LPD and of how the department's culture not only failed to discipline officers but

fostered repeat offenders. *See* Ex. 1, Burbrink Dep. 98:18–99:3 (failure to properly adhere to

LPD's disciplinary policies risked creating repeat offenders); Ex. 23, Fischer Rep. 24

(supervisors who don't correct or hold subordinates accountable embolden those inclined to

engaged in serious misconduct). Handy undisputedly engaged in misconduct during the

investigations that led to the prosecutions of Keith West and Edwin Chandler, described below.

Ex. 7, Handy Dep. II 13:25–14:23, 31:20–32:1; Ex. 9, O'Connell Dep. 43:2–44:18. The City

admits that Handy's conduct during the West investigation was a violation of West's

constitutional rights. *See* Ex. 1, Burbrink Dep. 123:8-126:4, 134:14-135:3**.** It also characterizes

Handy's misconduct in the Chandler investigation as horrific, appalling, disturbing, and a human rights violation. Ex. 9, O'Connell Dep. 24:1–25, 63:1–64:4; Ex. 37, O'Connell Let. 5. Handy has since been convicted of perjury in the first degree in *Chandler* and tampering with physical evidence in *West*. Ex. 38, Handy Plea; Ex. 7, Handy Dep. II 13:25–14:23; 31:20–32:1. In the City's own view, however, Handy's guilty plea "does not begin to tell the story of what Handy did to Edwin Chandler." Ex. 37, O'Connell Let. 2–3.

Handy never faced any formal investigation or real consequences for his actions. Ex. 1, Burbrink Dep. 42:12–43:19. Instead, because his misconduct resulted in confessions, Handy enjoyed a reputation as a skilled interrogator with a knack for getting suspects to talk, whom supervisors brought in when they needed to secure confessions. *see* Ex. 10, Woosley Dep. 65:9–18, 67:1–68:7, 77:8–78:11; Ex. 21, Sherrard Dep. 37:9–20, 38:24–39:4, 110:4–111:1; Ex. 19, Julius Clark Dep. 76:15–18, 133:22–25; Ex. 5, James Clark Dep. 20:14–21:6, 25:4–25.

4.      Edwin Chandler

In the fall of 1993, Handy led the investigation into the robbery-murder of a Louisville gas station attendant. *See* Ex. 38, Handy Plea; Ex. 7, Handy Dep. II 15:10–13; Ex. 39, Sherrard GJ 6:14–25; Ex. 17, Pierce Dep. 17:21–24; Ex. 37, O'Connell Let. 2. Surveillance video captured the murder on tape, but Handy erased it. Ex. 39, Sherrard GJ 7:12–16; Ex. 10, Woosley Dep. 80:8–22, 82:7–10, 131:2–8; Ex. 21, Sherrard Dep. 16:5–14. Still needing to close the case, Handy fixated on an innocent man, Edwin Chandler, as the perpetrator. *See* Ex. 7, Handy Dep. II 14:9–11; Ex. 10, Woosley Dep. 156:1–4; Ex. 37, O'Connell Let. 1–3. When officers James Clark and Jay Pierce initially interviewed Chandler, he adamantly denied committing the crime. Ex. 5, James Clark Dep. II 22:2–19, 23:5–25, 24:16–25:3; Ex. 11, Pierce Chand. Dep. 109:16–21. Lacking a confession, Handy next interrogated Chandler and impermissibly threatened that he

would have Chandler's sister arrested and her children taken away if Chandler did not confess. Ex. 40, Chandler Dep. 207:5–15, 208:13–209:4; Ex. 10, Woosley Dep. 51:10–23; Ex. 17, Pierce Dep. 23:1–10; Ex. 41, Ryan Dep. 61:4–16, 65:2–5; Ex. 37, O'Connell Let. 3. Handy also falsely promised that Chandler would receive only a five-year sentence if he confessed. Ex. 40, Chandler Dep. 218:2–10, 223:7–10; Ex. 37, O'Connell Letter 3; Ex. 17, Pierce Dep. 23:1–10; Ex. 10, Woosley Dep. 58:5–24. Handy's interrogation of Chandler, including the threats to the integrity of Chandler's family and Handy's false promise of leniency, was unconstitutionally coercive. Ex. 17, Pierce Dep. 151:8–153:9, 163:6–13; Ex. 7, Handy Dep. II 194:16–19; Ex. 21, Sherrard Dep. 75:17–77:21; Ex. 41, Ryan Dep. 61:4–16, 64:16–65:5; Ex. 37, O'Connell Let. 5; Ex. 9, O'Connell Dep. 43:2-20; 60:19–61:7. Woosley, Handy's direct supervisor, was aware of Handy's threats at the time; he believes Pierce and Sherrard knew at the time, as well. Ex. 10, Woosley Dep. 51:17–23, 284:9–285:14. Handy did not try to hide what he was doing. *See id.* at 284:9–285:7.

Although Handy's coercion caused the innocent Chandler to confess, Chandler did not know how the crime occurred. To falsely make the coerced confession appear reliable, Handy deliberately fed Chandler non-public details only the true perpetrator would know. Ex. 40, Chandler Dep. 214:13–215:4, 218:18–219:13, 223:11–20; Ex. 7, Handy Dep. II 14:16–23, 17:8–11, 126:11–23; Ex. 10, Woosley Dep. 56:2–8; Pierce Dep. 24:3–9. While taking Chandler's statement, Handy strategically stopped and started the recording to give Chandler direction as to what to say. Ex. 40, Chandler Dep. 224:8–225:4; *see also* Ex. 37, O'Connell Let. 2; Ex. 21, Sherrard Dep. 178:19–179:1. Handy also fabricated that Chandler had volunteered that a man in a Chicago White Sox hat was in the store just before the murder—a key detail Chandler was not aware of. Ex. 40, Chandler Dep. 226:18–228:4; Ex. 7, Handy Dep. II 115:4–22, 126:11–16; Ex.

20

10, Woosley Dep. 56:2–57:14; Ex. 17, Pierce Dep. 17:25–18:19, 19:16–25. Handy's fabrication that Chandler volunteered the detail about the White Sox Hat would become central to Chandler's prosecution. Ex. 38, Handy Plea; Ex. 7, Handy Dep. II 14:3-23. Any supervisor reviewing the case file, as Woosley and Sherrard did, however, would have known that Chandler's alleged admission about the White Sox hat was missing from Chandler's taped statement. *See* Ex. 10, Woosley Dep. 148:2–17, 173:6-24, 175:8–25; *see also* Ex. 1, Burbrink Dep. 72:23–75:18, 107:5–10, 109:7–14.

On February 7, 1995, less than a month before Clark and Hardin's trial began, Handy lied under oath about this key piece of evidence—denying that he fabricated Chandler's admission about the White Sox hat. Ex. 38, Handy Plea; Ex. 7, Handy Dep. II 14:3-23. Sherrard sat at the prosecutor's table at trial and witnessed Handy's testimony, Ex. 21, Sherrard Dep. 39:22–40:1, 43:8–18, and as Handy's supervisor, Woosley also would have been responsible for ensuring that Handy testified honestly at trial, Ex. 10, Woosley Dep. 275:12–21. Handy's misconduct and the LPD's complicity directly caused Chandler's wrongful conviction and the nine and a half years Chandler spent incarcerated for a crime he did not commit. Ex. 9, O'Connell Dep. 23:24–24:25; Ex. 7, Handy Dep. II 13:25–14:11.

The misconduct in this case, however, did not end with Chandler's conviction. In November 1995, while Chandler's case was on appeal, John Gray, an eyewitness outside the Chevron station on the night of the murder, wrote a letter to the homicide unit stating that he had information about the case. Ex. 19, Julius Clark Dep. 40:23–41:6. As a result, Officer Julius Clark interviewed Gray in jail.[7] *Id.* at 40:23–41:6, 41:23–42:11, 43:16–44:4. Gray told Clark that

---

[7] During the time in question, Jay Pierce was Julius Clark's direct supervisor, and Pierce would also would have been kept in the loop on Clark's assignment to interview Gray. Ex. 19, Julius

the name of the killer was Percy Phillips. *Id*. at 44:13-17, 48:2–7, 55:13–56:14; *see also* Ex. 43, Gray Aff. at ¶ 6. Clark reported this interview to Handy and Sherrard, but rather than following up on Gray's eyewitness account—which could easily have been confirmed by testing the fingerprint left at the scene—Handy and Sherrard told Clark that because Chandler had confessed and had been convicted, they would do nothing. *See* Ex. 19, Julius Clark Dep. 54:16–25, 62:1–14, 63:12–23, 80:5–9; Ex. 44, Palombi Aff. at ¶ 7; *see also* Ex. 21, Sherrard Dep. 156:6–15, 164:9–17.

In 1997, counsel for Chandler spoke to Julius Clark about his 1995 interview with John Gray. Ex. 44, Palombi Aff. at ¶¶ 1–2. Although Clark remembered taking extensive notes and learning the name of the perpetrator from Gray, Clark inexplicably was unable to locate his notes. Ex. 44, Palombi Aff. at ¶¶ 4–5; Ex. 19, Julius Clark Dep. 145:23–146:6; Ex. 21, Sherrard Dep. 163:20–164:8. Pierce, Clark's direct supervisor at the time, recalled Clark as a competent and careful detective. Ex. 11, Pierce Chand. Dep. 86:14–17, 87:3–17, 88:4–11. Pierce and Sherrard stated that if Clark conducted an interview with Gray, they would expect to see documentation of the interview in Chandler's file. Ex. 11, Pierce Chand. Dep. 86:14–17, 87:3–17, 88:4–11; *see* Ex. 21, Sherrard Dep. 160:11–18, 166:19–167:3. During his deposition, Clark acknowledged that the most likely explanations for his inability to locate a record of his interview with Gray were that someone—probably Handy—removed Clark's report from Chandler's file or that Sherrard directed Clark not to write a report the time, contrary to established practice. Ex. 19, Julius Clark Dep. 83:25–84:25. It would take the LPD 14 years from the time of Clark's interview with Gray to run Percy Phillips's fingerprints against the print at the

Clark Dep. 43:11–20, 44:9–12; *see also* Ex. 11, Pierce Chand. Dep. 85:1-4, 86:5–9; Ex. 21, Sherrard Dep. 164:24–165:1.

scene, eventually confirming Gray's account that Phillips was the true killer. Ex. 19, Julius Clark Dep. 56:15-19, 57:1–4, 60:9–61:1; Ex. 45, Phillips Fingerprint Rep.

Approximately 10 years after his conviction, Chandler was exonerated. Ex. 37, O'Connell Let. 3. Chandler subsequently brought a civil rights suit which Louisville Metro eventually settled for $8.5M. *Id.*

5.    Keith West

During this same time period misconduct within the LPD caused the wrongful conviction of yet another innocent man, Keith West. In early 1992, Handy led the investigation into a double shooting in Louisville. Ex. 46, West Ind.; Ex. 7, Handy Dep. II 94:11–21; Ex. 10, Woosley Dep. 63:8–15. There was no question that Keith West committed the shootings, but West consistently asserted it was in self-defense against armed men who held him hostage in a moving vehicle and threated to sodomize him. Ex. 10, Woosley Dep. 94:19–95:2; Ex. 7, Handy Dep. II 66:6–13; Ex. 47, Lambert Hrg. 107:10–24, 117:16–20.

Shortly after the shooting, officers stopped West and took him to the LPD for questioning. Ex. 21, Sherrard Dep. 227:8-228:2; Ex. 48, Sherrard Inv. Ltr. 4. Sherrard, a supervisor of the LPD Physical Assault Squad,[8] participated in West's interrogation. Ex. 21, Sherrard Dep. 26:6–13; 235:4–13, 239:11–21. His goal was to obtain an inculpatory statement from West. *Id.* at 239:22–25. During the interrogation, Sherrard learned that a public defender was on the phone requesting to speak with West. Ex. 48, Sherrard Inv. Ltr. 6. Sherrard refused to let them speak. *Id.* Shortly after, a public defender arrived at the station, requesting to meet with

---

[8] Woosley, a supervisor of the unit who directly supervised Handy and who reported directly to Sherrard, described Sherrard as being a "hands-on" supervisor who was "familiar with what was going on." Ex. 10, Woosley Dep. 73:12–74:2. Sherrard actively participated in investigations. *Id.* at 116:3–24.

West. *Id.*; Ex. 21, Sherrard Dep. 237:20–23. Sherrard again denied access to West. Ex. 21, Sherrard Dep. 239:4–10; 240:6–14. Sherrard testified that he was concerned that if he permitted West and the public defender to speak, "they would've immediately stopped the questioning." *Id.* at 240:15–24. Instead, Sherrard and the other LPD officers who were present continued their interrogation. *Id.* at 241:9–15; 242:8–12. Thereafter, two public defenders returned to the station with a signed court order mandating that LPD permit them to speak with West. *Id.* at 243:10–20; Ex. 48, Sherrard Inv. Ltr. 6–7. Sherrard allowed West to leave because Sherrard lacked probable cause to initiate charges against West at that time. Ex. 21, Sherrard Dep. 243:19–244:1.

Before West left the station, the public defenders provided Sherrard with a form indicating that the office represented West and that he did not want to speak with law enforcement. Ex. 21, Sherrard Dep. 247:15–25. Nevertheless, Handy interrogated West without obtaining a signed *Miranda* waiver. Ex. 49, Waiver; *see* Ex. 21, Sherrard Dep. 248:8–249:7, 250:3–251:12, 251:22–253:7; Ex. 10, Woosley Dep. 123:2–124:7.

That same day, Handy fabricated a statement from Robert Ross—an eyewitness to the crash of the vehicle in which West had been held hostage—incriminating West. Ex. 50, Ross Hrg. 24:17–25:1, 45:5–47:23; Ex. 51, Supp. Hrg. Tr. 42:5-8; Ex. 21, Sherrard Dep. 265:4–267:20; *see also* Ex. 7, Handy Dep. II 33:22–34:4. Specifically, Handy instructed Ross to repeat information Handy provided to him. Ex. 50, Ross Hrg. 45:5–47:23; 68:10–24; *cf.* Ex. 7, Handy Dep. II 55:6–13, 57:15–23. Handy also intentionally destroyed portions of Ross's initial recorded statement that failed to match up with the fabricated information Handy wanted Ross to provide. Ex. 7, Handy Dep. II 34:20–35:15, 37:14–18; 40:1–43:20, 48:6–49:14, 53:13–23, 56:12–20, 65:13–22, 76:2–14; *see also* Ex. 21, Sherrard Dep. 259:2–11, 266:23–268:3; Ex. 10, Woosley Dep. 99:10–15, 108:7–14. During his deposition, Handy conceded that had the initial statement

been included in the investigative file, it "of course" could have been used to impeach Ross at trial. Ex. 7, Handy Dep. II 42:17–21. He also explained that it would not have been unusual for him to record over an initial statement with a subsequent statement when a witness did not initially provide him with "the best information." Ex. 7, Handy Dep. II 48:13–49:14.

On February 14, 1995, exactly one week after Handy's perjured testimony in the Chandler trial, Handy again lied under oath, first denying that he erased any portion of his interview with Ross before admitting to rewinding and recording over the interview tape. *Compare* Ex. 51, Supp. Hrg. Tr. 39:19–25, 40:25–41:2, 42:25–44:7, *with id.* 44:12–25; Ex. 7, Handy Dep. II 74:1–14. Later that week, during West's criminal trial, Handy fed false information to another witness, Ruth Bowie, which supported the Commonwealth's theory that West was robbing the two perpetrators.[9] Ex. 53, Bowie Hrg. 92:5–24, 93:10–95:1, 96:14–97:4; Ex. 47, Lambert Hrg. 134:2–137:7. Both Ross and Bowie gave audio-recorded statements to a LPD officer at the scene of the vehicle crash which differed in several ways from their later, fabricated statements. Ex. 54, Schroering Hrg. 223:3–18; Ex. 47, Lambert Hrg. 139:11–140:5; 152:12–19. Although it was his responsibility as lead investigator, Handy never turned over the two audio-recorded statements. Ex. 54, Schroering Hrg. 217:19–218:2; 223:14-23; Ex. 10, Woosley Dep. 93:7–13.

In March 2021, Handy pled guilty to perjury in the first degree—a felony—for falsely testifying that Chandler volunteered the detail about the man in the White Sox hat. Ex. 38, Handy

---

[9] Handy later asserted his Fifth Amendment privilege when asked about his fabrication and coercion of Bowie's trial testimony during West's post-conviction hearing. Ex. 52, Handy Hrg. 18:6–19:6; 28:22–30:7.

Plea. Handy also pled guilty to first degree tampering with physical evidence—another felony—for destroying Ross's initial statement. Ex. 7, Handy Dep. II 31:20–32:1; Ex. 38, Handy Plea.

6.   Louisville's failure to discipline Handy.

There is substantial evidence that Handy's supervisors were well aware of his misconduct during the Chandler, West, and Hardin/Clark investigations. *See* Ex. 23, Fischer Rep. 15, 22–25. At least by 1993, multiple supervisors in the chain of command knew that Handy had destroyed evidence in a homicide investigation. Ex. 10, Woosley Dep. 81:16–82:3; Ex. 21, Sherrard Dep. 16:5–8. And although others likely also were aware, Woosley admits to knowing that Handy threatened Chandler during his interrogation. *See* Ex. 10, Woosley Dep. 51:17–23, 284:9–285:14; *see also* Ex. 1, Burbrink Dep. 72:23–75:18, 107:5–10, 109:7–14; Ex. 21, Sherrard Dep. 39:22–40:1, 43:8–18. Woosley also was responsible for closely reviewing Handy's reports and case files. Ex. 1, Burbrink Dep. 72:23–75:18, 107:5–10; Ex. 23, Fischer Rep. 22–23. Sherrard was Woosley's immediate supervisor; he regularly communicated and collaborated with Woosley on investigative and personnel matters. Ex. 23, Fischer Report 23. Woosley and Sherrard either knew about Handy's actions or were willfully blind to his conduct—no other explanation exists for their inaction in the face of the many red flags and investigative failures in Handy's investigations. *See* Ex. 23, Fischer Rep. 15, 23–24.

The various red flags and departures from minimally acceptable police practices should have been immediately evident to any minimally trained and experiences supervisor and should have triggered additional supervision and corrective action. Ex. 23, Fischer Rep. 15. Consistent with the LPD's culture at the time, however, Handy was never investigated, much less disciplined. Ex. 1, Burbrink Dep. 42:13–43:19, 45:4–47:19; Ex. 7, Handy Dep. II 105:21–106:3. He was not supervised any differently or required to attend additional trainings. Ex. 10, Woosley

Dep. 82:15–83:25. Woosley, for example, never even inquired into whether Handy had engaged in misconduct in his other cases, and no one reviewed Handy's other investigations for misconduct or red flags. *See* Ex. 10, Woosley Dep. 84:4–85:3. Instead, supervisors relied on Handy to secure confessions from reluctant—and sometimes innocent—suspects. *See* Ex. 10, Woosley Dep. 67:1–68:7, 77:8–78:11; Ex. 21, Sherrard Dep. 37:9–20, 38:24–39:4, 110:4–111:1; Ex. 19, Julius Clark Dep. 133:22–25; Ex. 5, James Clark Dep. II 20:14–21:61, 25:4–10. In other words, the LPD prized Handy's results obtaining confessions, even if false and obtained illegally, over compliance with constitutional limitations.

       7.      Hardin/Clark

In 1992, Handy also acted as lead for LPD in the investigation into the murder of Rhonda Warford and remained on the case as lead detective through trial in 1995. Ex. 5, James Clark Dep. 39:13–16; 45:19–46:11; Ex. 42, Handy Chand. Dep. 03.07.2012 20:18–21:16; Ex. 8, Handy Dep. I 69:14–70:8; 72:17–21; 83:6–9. Handy was brought onto this case by LPD Lieutenant Sherrard specifically to participate in the suspect interviews. Ex. 8, Handy Dep. I 259:3–19. Handy had a reputation for getting confessions and closing cases; he was often brought in by supervisors for that purpose. Ex. 5, James Clark Dep. 20:14–21:3; 25:4–25; Ex. 19, Julius Clark Dep. 132:19–133:12; Ex. 55, Handy Ev. Hrg., 211:24–212:14; 215:22–216:13; Ex. 10, Woosley Dep. 63:23–65:18; 77:8–78:11; 195:18–196:2; Ex. 21, Sherrard Dep. 110:4–111:1.

At the outset of the investigation, Handy understood that Rhonda's boyfriend Keith Hardin and his friend Jeff Clark were the only suspects law enforcement had identified, that there were no eyewitnesses to the crime, and no physical evidence implicating either of them. Ex. 8, Handy Dep. I 199:21–200:9; 201:8–12; Ex. 10, Woosley Dep. 194:20–195:22; Ex. 17, Pierce Dep. 64:14–65:1. Handy also had a false theory, shared by Meade County Sheriff Greer who has also investigating

the crime, that the murder was related to Satanism. Ex. 8, Handy Dep. I 110:12–16; 111:14–112:11; 115:16–25; 121:2–122:6; Ex. 56, Handy Reps. 2–4; Ex. 57, Greer Dep. I 264:4–265:19; 269:5–13; Ex. 58, Lowney Rep. 2–7.

With this false theory that the Warford murder reflected satanic influence in mind, Handy fabricated an inculpatory statement he attributed to Hardin. Handy falsely reported that during a conversation in the car on the way to the station, Hardin had first admitted he had sacrificed small animals, and then volunteered that he "got tired of looking at animals and began to want to do human sacrifices." Ex. 56, Handy Reps. 7; Ex. 8, Handy Dep. I 128:6–132:25. Just as he did with the White Sox hat in *Chandler*, this was a complete fabrication; Hardin had never sacrificed animals or wanted to try human sacrifice and never told Handy he had. Ex. 59, Hardin Decl.; Ex. 60, Hardin Dep. 119:10–120:4; 122:6–14; Ex. 61, Hardin Ev. Hrg 153:1–21. The statement Handy attributed to Hardin was "an extraordinarily inculpatory admission" and "very damning," particularly given that Defendants suspected Satanism might be the motive for the Warford murder. Ex. 21, Sherrard Dep. 140:2–141:6; Ex. 10, Woosley Dep. 198:16–201:17; 228:17–21; Ex. 62, Woosley GJ 27:3–12; Ex. 17, Pierce Dep. 27:4–22; 28:25–29:10; Ex. 8, Handy Dep. I 160:16–23; 166:25–167:8. It was the one obviously inculpatory admission Handy reported that Hardin had made. Ex. 21, Sherrard Dep. 140:2–141:16; Ex. 56, Handy Reps. 5–8.

Woosley, who was also present in the car when Handy interviewed Hardin, was paying close attention to the interview and "heard every word" that was said. Ex. 8, Handy Dep. I 132:14–25; 138:2–13; Ex. 10, Woosley Dep. 27:9–17. Woosley initialed Handy's report recounting this fabrication, indicating he was endorsing it as accurate, even though it was not. Ex. 10, Woosley Dep. 149:7–20; Ex. 56, Handy Reps. 8; Ex. 62, Woosley GJ 19:13–21:8; Ex. 1, Burbrink Dep. 109:7–14; Ex. 59, Hardin Decl. Although he admitted this is the type of unusual statement that

would stick in your mind if you heard it, Woosley has repeatedly testified, both at the grand jury that indicted Handy and at his deposition in this case, that he has absolutely no memory of Hardin ever making that statement. Ex. 62, Woosley GJ 15, 19:13–20:1; Ex. 10, Woosley Dep. 134:24–137:18; 206:8–18.

As multiple LPD detectives and supervisors admit, Handy's complete failure to take obvious opportunities to follow up on Hardin's alleged statement, readily apparent from a review of the file, were inexplicable for an experienced detective like Handy—if the statement Handy attributed to Hardin was actually made. Ex. 10, Woosley Dep. 244:3–5; Ex. 21, Sherrard Dep. 110:4–111:1; Ex. 8, Handy Dep. I 69:14–70:8; 72:17–21; 83:6–9. Given LPD practices, Lieutenant Sherrard could not think of an explanation for Handy's failure to follow up on the alleged admission about human sacrifice or seek to get it on tape—other than that Handy fabricated it. Ex. 21, Sherrard Dep. 145:24–147:18. Defendant Meade County's police practices expert, Jack Ryan, agreed the statement "certainly should have been followed up on" if made, and that the failure to do so or seek to get a recorded statement is inexplicable. Ex. 41, Ryan Dep. 44:1–19. Plaintiffs' police practices expert former Chief Russ Fischer of the Miami-Dade Police Department described these failures as "significant irregularities and gross departures from minimally acceptable practices [which] should have raised concerns by any supervisor regarding the reliability of the alleged statement." Ex. 23, Fischer Rep. 7.

Over the course of additional interviews with Hardin, Handy fabricated other inculpatory statements, including that Hardin allegedly acknowledge previously threatening Rhonda, Ex. 56, Handy Reps. 14; Ex. 63, K. Hardin Tr. 88:6–8; 89:5–18; Ex. 60, Hardin Dep. 307:16–21; 310:9–311:11; and that Clark allegedly admitted that he had lied to the police when he falsely denied owning knives, Ex. 56, Handy Rep. 10; Ex. 8, Handy Dep. I 207:17–209:12; Ex. 64, Clark Dep.

74:8–75:16; Ex. 65, Clark Ev. Hrg. 239:3–22; 260:11–261:1; Ex. 65 Clark Ev. Hrg. 184:22–185:1; Ex. 66 Bart Adams Dep. 225:14–25. Handy admits he understood each of these things he reported—the alleged prior threat to Rhonda, the alleged lies about access to knives—were important, damning admissions, the types of things that "can be used down the road to get a conviction." Ex. 8, Handy Dep. I 160:24–161:18.

Together with Sheriff Greer, Handy also fabricated inculpatory statements attributed to Rhonda's family which corroborated the fabrications he attributed to Hardin. Ex. 67, Uniform Rep. 15–17; Ex. 56, Handy Reps. 12. Ex. 68, Warford Dep. 123:22–124:7; 167:4–8. For example, Handy claimed Rhonda's cousin, Crystal Barnes, described how Hardin had gotten Rhonda into "devil worship," and recounted that Hardin had previously threatened to kill Rhonda. Ex. 56, Handy Reps. 12–14. But at trial and at her deposition, Barnes explained how this was false. According to Barnes, it was the police who told her that Hardin and Rhonda were involved in Satanism, not the other way around. Ex. 69, Barnes Dep. 17:9–18:12; Ex. 70, Barnes Tr. 203:10–204:13. And she had never heard Hardin make any threats to Rhonda; she thought Hardin was a quiet, nice guy; he never did anything to cause her concern and Rhonda never said anything bad about him. Ex. 70, Barnes Tr. 204:14–17; Ex. 69, Barnes Dep. 18:21–21:14. Rhonda's mother and sister confirmed this: before Rhonda's death, the family believed Hardin was good for Rhonda and supported their relationship. Ex. 68, Warford Dep. 125:24–126:22; 128:2–129:6; 132:9–133:6; Ex. 71, Rogers Dep. 136:7–23.

Handy also participated in a coercive—albeit unsuccessful—interrogation of Clark with Sheriff Greer and Coroner Adams at the Louisville Police Department. Ex. 67, Uniform Rep. 14; Ex. 72, Bill Adams Dep. 131:12–21; Ex. 73, Greer Dep. II 151:7–20; Ex. 64, Clark Dep. 29:25–34:5. Greer told Clark he probably would not do any jail time, if he just cooperated with him and

Handy to implicate Hardin, feeding him a false story. *Id.* at 30:12–31:14. When that didn't work, Greer pulled out a gun, laid it on the table, and told Clark to reconsider because, "'I always get what I want,'" while Handy stood watching. *Id.* at 31:5–22.  Handy later told Clark they knew he was "guilty as hell" and offered to protect him if he would just "tell me what I want to hear." *Id.* at 32:1–33:22. Defendants then enlisted assistance from Sherrard, who threatened to force Clark to "dig her up" before calling Clark a "fucking punk" and slamming him into some lockers. *Id.* at 33:15–34:5.

        8.    Kerry Porter

In 1997, Kerry Porter was arrested for the murder of Tyrone Camp. Ex. 77, Port. Op. 11.[10] A year later, Porter was wrongful convicted through the withholding of exculpatory evidence by LPD officers Rodney Kidd, Julius Clark, and Gene Sherrard. *Id.* at 20–21. As a result of misconduct, Porter was wrongly convicted for more than a decade before his exoneration was prompted by the City's own reinvestigation of the case. *Id.* at 21.

The widespread withholding of exculpatory evidence in the *Porter* case was driven by the City's failure to train officers on critical aspects of criminal investigations. At Porter's 1998 trial, the Commonwealth presented jailhouse informant Greg Gully as a witness who had nothing to gain by testifying. Ex. 74, Port. Crim Tr. PL1897, PL1899, PL1901, PL1905-06; Ex. 75, Gully Port. Dep. 12. Porter's civil litigation, however, revealed that Gully was a professional informant for the LPD. Ex. 75, Gully Port. Dep. 41–43; Ex. 77, Port. Op. 10. Moreover, Kidd had promised Gulley significant consideration before Gully implicated Porter in Camp's murder. Ex. 75, Gully Port. Dep. 44. At the time, Gully had been "trying to get [his] situation over," and Kidd "said that

---

[10] On June 9, 2017, the court unsealed docket item 264, Memorandum Opinion, and docket item 265, the accompanying Order (together, "Port. Op."). Ex. 76, Port. Unsealing Ord.

he could give [Gully] a deal." *Id.* at 44, 118. Withholding this evidence enabled the prosecutor to argue that "no deals have been made with Mr. Gully, and the fact that he has a pending indictment down in Division Number 2, if there were no deals made, there were no deals made." Ex. 74, Port. Crim Tr. PL 1108; Ex. 78, Chauvin Port. Dep. 335.

Second, Francois Cunningham became friends with Juan Sanders, Tyrone Camp's true killer, in the early 1990's. Ex. 79, Cunningham Port. Dep. 13. In late 1996, Sanders offered Cunningham fifty-thousand dollars to kill Tyrone Camp. *Id.* at 22–24. In making the offer, Sanders informed Cunningham of the times and locations that Tyrone Camp could be found. The plan that Sanders explained to Cunningham was to have Camp killed when "he got in from work, he said he'd be getting out of his truck. Walk right up to his truck and blow him away…" *Id.* at 26. But Sanders didn't just describe the plan for Tyrone Camp's death; he also showed Cunningham the weapon that was to be used. *Id.* at 24, 26–27. While Cunningham declined the invitation, Sanders would later confess to Cunningham that he committed the murder and that he collected the insurance policies. *Id.* at 31, 36. In 1997, Cunnigham provided this information to Sherrard and another police officer. *Id.* at 3–34. Cunningham came forward "because [he] knew someone was locked up for something they didn't do." *Id.* at 127.

Finally, on January 6, 1998, Kidd and Clark interviewed Ralph Philpot at the Fayette County Detention Center. Ex. 80, Port. Philpot Aff. 1–2; Ex. 81, Kidd Port. Dep. 279–87; Ex. 82, Julius Clark Port. Dep. 69–74; Ex. 83, Port. LPD File 315–17. That interview resulted in a fabricated statement created by Detective Kidd and Clark. Ex. 80, Port. Philpot Aff. 1–2; Ex. 83, Port. LPD File 315–17. Additionally, consistent with their prior interactions with Gully, Kidd and Clark promised Philpot consideration in exchange for agreeing with what they wanted him to say.

Ex. 80, Port. Philpot Aff. 1. The detectives withheld this information from Porter and the Commonwealth. Ex. 78, Chauvin Port. Dep. 389-390, 403; Ex. 84, Port. Kingren Aff. 6.

## ARGUMENT

Although a municipality may not be held liable under § 1983 "on a *respondeat superior* theory—in other words, *solely* because it employs a tortfeasor," the municipality itself is liable for constitutional violations it causes. *See Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (internal citation and quotation marks omitted). In particular, a municipality is liable where its policy or custom causes a constitutional violation, such that the municipality's deliberate conduct is the moving force behind the injury. *Jackson*, 925 F.3d at 828.

> There are four methods of proving a municipality's illegal policy or custom: the plaintiff may prove (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Wright v. City of Euclid, Ohio*, 962 F.3d 852, 880 (6th Cir. 2020) (internal citation and quotation marks omitted).

Here, there is interlocking evidence of systematic failures at the LPD which demonstrate that the City itself was responsible for the constitutional violations in this case. First, the LPD failed to train or supervise on *Brady* obligations. Second, the LPD had a custom of tolerance and acquiescence in unconstitutional misconduct—including by the Chief of Police himself—which permitted investigative misconduct to occur.

## I.     Louisville may be held liable for its failure to train and supervise on *Brady*.

In *Gregory*, the Sixth Circuit reviewed precisely this circumstance—the LPD's failure to provide any training on *Brady* obligations in the early 1990s—and found there was sufficient evidence that the LPD was responsible for the resulting constitutional violation to require a trial.

*Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006). The Sixth Circuit highlighted the evidence that there was *no* training on *Brady* obligations, "a significant constitutional component of police duties with obvious consequences for criminal defendants." *Id.* It held such a "failure to train on the proper handling of exculpatory materials has the 'highly predictable consequence' of constitutional violations." *Id.* (quoting *Board of County Com'rs of Bryan County v. Brown,* 520 U.S. 397, 409 (1997)). As a result, it concluded the City's "custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the City and the causal connection to the constitutional violations experienced by Plaintiff." *Gregory*, 444 F.3d at 754.

More recently, the Sixth Circuit reached the same result in *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019). Again, the court considered a department's failure to train on *Brady* obligations. Although Cleveland contended it had provided adequate training, the Court found there was a genuine dispute of material fact on this point, as some officers testified they had not received any training. *Id.* at 835–836. Because a reasonable jury could disbelieve the city's evidence and credit the alternate evidence that there was no *Brady* training provided, it was for a a jury to determine whether Cleveland's customs and practices caused the constitutional violation. And as the *Jackson* court reaffirmed, an absence of training on officers' *Brady* obligation is sufficient evidence to support a finding of deliberate indifference. *Jackson*, 925 F.3d at 836–37.

The *Gregory* decision controls here. The Gregory investigation and prosecution occurred at the same time as the investigation in this case: the crimes were in 1992, Gregory was convicted in 1993, whereas here murder was April 1992 and trial in February 1995. The evidence is clear LPD policies and training on *Brady* were the exact same during this whole period: there were no policies, and no training. The 30(b)(6) witness for the LPD confirmed there were no written *Brady*

policies or procedures in place, including *no* written policies or procedures providing guidance on how to document exculpatory evidence in an investigative file, and *no* written policies or procedures on how to disclose exculpatory evidence gathered in a criminal investigation. Ex. 1, Burbrink Dep. 35:24–36:6, 45:13–23, 145:9–14; 164:15–165:4; Ex. 15, 1990 Manual, TOC; Ex. 16, 1993 Manual TOC; Ex. 17, Pierce Dep. 284:2–17. Of course, given that there were no *Brady* policies at all, there were certainly no policies requiring the disclosure of the particular type of *Brady* material relevant here: evidence of prior misconduct by an investigating officer. Ex. 1, Burbrink Dep. 161:18–162:2; 162:17–24; 162:25–163:8.

Nor was there any training to investigators on their *Brady* obligations. *See* Ex. 1, Burbrink Dep. 58:14–60:1, 62:9–14; Ex. 18, Hamilton Dep. 250:8–251:13; Ex. 11, Pierce Chand. Dep. 81:10–82:6; Ex. 7, Handy Dep. II 25:20–26:20; Ex. 17, Pierce Dep. 244:11–23, 248:3–18. Indeed, one former detective, Hope Greer, explained here were no specific training requirements for detectives at all. Ex. 85, H. Greer Greg. Dep. 255:3–24. That is consistent with the testimony of LPD's 30(b)(6) witness that there was no documentation to suggest any training was provided to LPD officers between 1989 and 1995 on a broad range of investigative topics (including documentation), and no documents that indicate any training was provided in these areas, either internal or external. Ex. 6, RFP to City 16; Ex. 1, Burbrink Dep. 58:1-60:1; 62:9–14.

Chief Hamilton's testimony—which the Court also considered in the *Gregory* decision—acknowledges not only that detectives were confused about their *Brady* obligations but that he was aware of the confusion at the time. *See* Ex. 18, Hamilton Dep. 248:18–25; 250:5–12. As Chief, Hamilton was responsible for ensuring that officers were properly trained, including that they understood their *Brady* obligations. *Id.* at 7:20–25; 51:16–22, 52:5–8, 251:14–252:5. But Hamilton acknowledged he was aware of some very basic and widespread confusion among detectives about

35

their obligations under *Brady*. Hamilton admitted officers were often confused as to whether they were only required to disclose evidence they wanted to use at trial—that is, *inculpatory* evidence. *Id.* at 248:18–25; 250:5–12. That is the opposite of the *Brady* obligation, which requires the disclosure of evidence helpful to the suspect, either because it is exculpatory or it is impeaching. *Jackson*, 925 F.3d at 814. Hamilton further suggested he believed officers thought they were only required to amass evidence until an arrest, and had no obligation after that." Ex. 18, Hamilton Dep. 248:18–25; 250:5–12. Chief Hamilton agreed an LPD detective's responsibility was to gain probable cause for an arrest, not to ensure that innocent people were not arrested. *Id.* at 245:19–246:3. That, too, is completely inconsistent with the *Brady* obligation.

Despite acknowledging his awareness of this problem of confusion regarding *Brady* obligations, Hamilton admitted he took no steps to correct it. *Id.* at 250:13–252:5. It is unsurprising that widespread confusion about *Brady* obligations persisted in the department. *See* Ex. 11, Pierce Chand. Dep. 19:4–11, 81:16–82:6. Nor is it surprising that so many detectives committed *Brady* violations during this period. *See* Facts Section H, *supra*. A reasonable jury can conclude that Louisville's complete failure to train and supervise on officer's *Brady* obligations was the moving force behind the constitutional violations in this case.

## II. Louisville may be held liable for its acquiescence in and ratification of its officers' misconduct, including by Chief Hamilton.

A municipality is also liable if it has "a custom of tolerance or acquiescence of federal rights violations." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 880 (6th Cir. 2020). And "[a] plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Id* at 882. In *Wright*, the Sixth Circuit found the testimony of one sergeant that he had *never* heard of a use of force incident by a City officer that seemed

inappropriate sufficient to create a genuine issue of material fact as to whether City ratified excessive force—even though the only specific examples of failures to investigate and punish officer excessive force post-dated the violence against the plaintiff. *Id.* at 882.

There is ample evidence from which a reasonable jury could find such a custom of tolerance or acquiescence of constitutional violations here. Officers understood that even blatant misconduct would not be reported or disciplined due to the culture of not reporting fellow officers for misconduct, the "blue wall of silence." And there is evidence that the message from the top, including from Chief Hamilton as embodied in Carroll investigation, was that the department was not serious about disciplining corruption, including in particular investigative misconduct in the service of closing cases. Indeed, there is more than enough evidence from which a jury could find that Handy's open and notorious investigative misconduct was well-known, and that supervisors were on notice, as the evidence demonstrates, that Handy lied repeatedly to the LPD about his own misconduct. Despite this abundant record of egregious investigative misconduct, Handy was not only kept on force and permitted to run investigations, but given leeway to do so with little supervision.

As the City admits, a key purpose of effective discipline of officer misconduct is to prevent future misconduct, and a lack of accountability and effective discipline risks creating repeat offenders who engaged in the same misconduct in various investigations. Ex. 1, Burbrink Dep. 98:1–99:3. As Chief Fischer of the Miami Dade Police Department describes, "[a]n investigative supervisor who does not instruct, correct, and hold subordinates accountable, serves to embolden a law enforcement officer who is inclined to not follow policy, engage in serious misconduct, and break the law." Ex. 23, Fischer Rep. 24.

But the record is clear there was nothing like effective discipline or accountability for officer misconduct. To the contrary, the overwhelming culture of the LPD was a universal understanding within the department that officers should *not* report one another for misconduct, known as the blue wall of silence. *See, e.g.*, Ex. 10, Woosley Dep. 288:17–20; Ex. 5, James Clark Dep. 31:1–8; Ex. 19, Julius Clark Dep. 37:17–38:12. Officers understood that those who reported misconduct by a fellow officer would face retribution, even if they reported something that affected performance, like a fellow officer's serious drinking problem. Ex. 19, Julius Clark Dep. 38:19–22, 39:8–40:14. Unsurprisingly, officers testified that they would have hesitated to report misconduct because of pressure to maintain the blue wall. Ex. 5, James Clark Dep. 31:18–25; Ex. 8, Handy Dep. I 276:11–279:23.

For example, Woosley—Handy's direct supervisor—admitted he had never reported even criminal conduct he observed by fellow officers, due to the "blue wall of silence." Ex. 10, Woosley Dep. 286:19–288:20; 289:25–290:4; 291:17–293:3. Critically, Woosley admitted if he had learned that a detective fabricated evidence (as Handy did again and again in cases Woosley supervised) that Woosley would not necessarily report it, because of the blue wall of silence. *Id.* at 289:7–24.

Handy, too, recognized that he was operating in an environment where officers would not report on a fellow officer; as he admitted at his deposition, "it was a different time." *See* Ex. 8, Handy Dep. I 279:16–23. Sherrard conceded that Handy's actions suggested he was comfortable engaging in misconduct in front of Sherrard and while under Sherrard's direct supervision. Ex. 21, Sherrard Dep. 41:9–23. Woosley explained that multiple people likely were aware Handy threatened Edwin Chandler because no one was trying to hide the misconduct. Ex. 10, Woosley Dep. 284:9–285:7. Handy described how recording over portions of a witness interview—which became the basis for his tampering with evidence conviction—was something he did repeatedly

38

and how he did not try to cover his tracks because he had nothing to hide. *See* Ex. 7, Handy Dep. II 47:10–15.

The tolerance for serious misconduct followed the example of Chief Hamilton, who failed to impose effective discipline or increased supervision even for the most serious misconduct, including criminal assault, perjury, or making a material misrepresentation. Ex. 18, Hamilton Dep. 56:23–57:24, 136:20–137:1, 207:2–5, 237:21–238:3. Hamilton believed not all serious allegations—such as a detective fabricating evidence—even warranted investigation. *Id.* at 68:1–20. As a result, many officers stayed on the force despite known untruthfulness. Ex. 17, Pierce Dep. 214:19–22.

Chief Hamilton's lackadaisical response to criminal misconduct and material misrepresentations by officers under his command is best epitomized by the case of Joe Carroll. *See* Facts Section H.1., *supra*. Carroll had a history of physical violence against family for which he was not held accountable. In one particular incident while on vacation in Pensacola, Florida, Carroll assaulted several family members badly enough that they needed medical attention, resisted arrest, refused to hand over his firearm and damaged a police vehicle. Ex. 25, Carroll Disciplinary Records 5, 15; Ex. 18, Hamilton Dep. 191:13–16. The incident was serious enough that Carroll was charged with several felonies. Ex. 25, Carroll Disciplinary Records 6. Although an extremely thorough investigation clearly demonstrated Carroll had intentionally engaged in this serious misconduct, Carroll lied to the LPD, falsely denying responsibility for almost all of it and offering demonstrably false and internally inconsistent explanations contradicted by physical evidence and a number of credible witnesses. S*ee, e.g.*, Ex. 18, Hamilton Dep. 145:24–147:24, 149:5–7, 174:6–175:23, 176:23–180:8. Despite these obvious and material lies to the LPD, Carroll received no consequences for his dishonesty. *See* Ex. 25, Carroll Disciplinary Records 20; Ex. 18,

Hamilton Dep. 201:16–24. To the contrary, Hamilton worked to "rescue" Carroll's career, put him back out investigating cases with no additional supervision, and even offered him up repeatedly as a positive example because of his ability to close cases. Ex. 18, Hamilton Dep. 206:11–17, 207:18–209:4. The following year, Carroll closed one of those cases by fabricating evidence, sending innocent William Gregory to prison. *See* Facts Section H.2., *supra*.

Chief Hamilton consistently put pressure on his detectives to improve their clearance rates through arrest and convictions. Ex. 18, Hamilton Dep. 212:8-24; 213:19–214:13. Supervisors communicated the pressure to improve clearance rates, and officers felt pressure to improve. *See* Ex. 19, Julius Clark Dep. 132:3–18. This emphasis on clearance rate and closing cases was successful: throughout most of the 1990's, the LPD prided itself on the extraordinary clearance rate. *See, e.g.*, Ex. 20, Sherrard Unit Nomination; Ex. 18, Hamilton Dep. 211:25–12:7, 212:25–213:7. But, predictably, many of these cases were "cleared" by fabricating evidence, hiding exculpatory evidence, and otherwise violating the constitution, leading to many convictions of innocent men. A reasonable jury can conclude that Louisville's acquiescence in and ratification of its officers' misconduct was the moving force behind the constitutional violations in this case.

**III.    Louisville may be held liable under Kentucky law for its negligent supervision of Handy and others.**

"Kentucky's recognition of torts based upon negligent hiring, negligent training, negligent supervision, and negligent retention is well established." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 336 n.10 (Ky. 2014). Under Kentucky law, an employer may be liable for negligent supervision where it "knew or had reason to know of the employee's harmful propensities; …the employee injured the plaintiff; and…the hiring, supervision or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005); Louisville Br. at 20. An employer may similarly be held liable

for negligent training "if he or she knew or had reason to know of the risk that the employment created." *Hensley v. Traxx Mgmt. Co.*, 622 S.W.3d 652, 659 (Ky. Ct. App. 2020). These "torts require that the employer's failure to exercise ordinary care in managing an employee creates a foreseeable risk of harm to the plaintiff." *Short v. Marvin Keller Trucking, Inc.*, 570 F. Supp. 3d 459, 467 (E.D. Ky. 2021).

Here, the City is liable for its negligent supervision of Handy and others in at least two ways. First, the record establishes a complete failure to train and supervise detectives on complying with their obligations under *Brady v. Maryland*. Second, the City may be held liable under state law for failing to implement any policy to ensure its' detectives' compliance with *Brady* obligations. The same evidence that establishes *Monell* liability also proves negligent supervision. However, the bar is lower for negligent supervision, which requires only a showing of negligence (i.e. lack of reasonable care) not the higher deliberate indifference standard under § 1983.

There is ample evidence the City "knew or had reason to know of the risk that the employment created." *Hensley*, 622 S.W.3d at 659. The City was aware of the general issue both with *Brady* compliance and with the culture of tolerating misconduct (i.e. blue wall of silence). The LPD knew or should have known of specific problems with Handy—notice that he was fabricating evidence, withholding evidence, committing perjury in other cases. Woosley knew of Handy's fabrication of the Hardin statement, and Sherrard admitted Handy's deviations from procedure were inexplicable if Handy hadn't fabricated statement. The LPD failed to take any action, at any time. This easily meets the standard for negligent supervision.

## IV. Sovereign immunity does not shield the City from liability.

Although Louisville/Jefferson County Metro Government—which was established in 2003—is entitled to assert sovereign immunity to state law claims under Kentucky law,

municipalities are not. *See Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 164 (Ky. 2003). It was the City of Louisville whose negligence is at issue here; the Louisville/Jefferson County Metro Government is sued solely as the City of Louisville's successor. And "the City of Louisville was never insulated by sovereign immunity." *Metro Louisville/Jefferson County Government v. Abma*, 326 S.W.3d 1, 14 (Ky. Ct. App. 2009). As a result, sovereign immunity cannot be asserted in this suit. *See Id.* (rejecting argument that Louisville/Jefferson Metro Government can assert sovereign immunity in suit based on actions taken by City of Louisville employees before the merger).

## V.     Neither collateral estoppel nor res judicata bar Plaintiffs' claims.

Louisville curiously asserts that claims against it are barred by collateral estoppel or res judicata. As a preliminary matter, neither applies at all, because the basic requirement of a final judgment is not met.[11] It is undisputed that Plaintiffs' criminal litigation ended with the state court vacating their convictions and the Commonwealth dismissing all charges against them. Ex. 86, New Tr. Ord.; *Comm. v. Clark,* 528 S.W.3d 342, 348 (Ky. 2017) (affirming the trial court's decision vacating Plaintiffs' convictions). The consequences of this fact are clear: because "the criminal judgment[s have] been vacated," the trial court's "interlocutory rulings have been vacated too. And vacated rulings have no preclusive effect[.]" *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) (citation omitted)). Indeed, the Sixth Circuit has repeatedly held that when a judgment is vacated, ""for whatever reason," the trial court's factual findings are also "deprived of [] conclusive effect as collateral estoppel." *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985); *see also, Webb v. Compton,* 98 S.W.3d 513, 516 (Ky. App. 2003) ("Once the judgment upon which a plea of *res judicata* is based is set aside, the issue is no longer a viable one."); *Gillispie v. City of Miami Twp*,

---

[11] Indeed, the only intact criminal judgment here is Handy's conviction for perjury and tampering with evidence.

2020 WL 5629677, at *16 (S.D. Ohio Sept. 21, 2020) (vacatur of conviction nullified its preclusive effect including "for interlocutory orders, such as the Ohio trial court's 1991 decision denying [plaintiff's] motion to suppress").

Indeed, federal courts around the country addressing precisely the same question raised here—a § 1983 wrongful conviction plaintiff seeking, after vacatur of his conviction, to relitigate issues initially decided against him in underlying criminal proceedings—have routinely held collateral estoppel does not apply. *See, e.g.*, *Mills v. City of Covina*, 921 F.3d at 1169–70 (holding "Mills's reversed conviction and the factual determinations underlying that conviction lack conclusive effect" in subsequent § 1983 suit "because his reversed conviction was not final"); *Gilliam v. Sealey*, 932 F.3d 216, 232–33 (4th Cir. 2019) ("[C]ollateral estoppel does not prevent [plaintiffs] from litigating voluntariness of their confessions because [after the convictions were vacated] there is no valid and final judgment on the issue."); *Evans v. Katalinic*, 445 F.3d 953, 955–56 (7th Cir. 2006) (describing defendants' assertion that collateral estoppel barred post-exoneration re-litigation of the state trial court's ruling denying suppression of evidence as "an absurd argument, for any number of reasons" including the vacatur of plaintiff's convictions).

Furthermore, Plaintiff is not seeking to relitigate the same issues raised in the criminal proceedings. *See Yeoman v. Ky Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998) ("[I]ssue preclusion bars relitigation of any issue that has been *actually litigated and finally decided*" (emphasis added)). Louisville notes Plaintiffs previously litigated "evidentiary issues…around evidence of Satanism." Dkt. 287-1 at 10. The question presented in criminal appeals was whether evidence regarding practice of Satanism was admissible at trial under the Kentucky Rules of Evidence. The courts did not consider whether Handy and Woosley fabricated the admission attributed to Hardin that he had sacrificed animals and wanted to try to do a human, let alone

43

whether that fabrication prejudiced him. Nor could they; appellate courts "cannot reevaluate the evidence or substitute its judgment as to the credibility of the witness for that of the trial court and the jury." Dkt. 295-38 at 13–14. The standard of review on habeas is even more deferential. Dkt. 295-40 at 24–25.[12]

## VI.    The borrowed servant doctrine does not apply.

The borrowed servant doctrine has no conceivable application here. First, Louisville cannot dispute LPD Detectives are *generally* employees of and agents of Louisville. *See, e.g., Nazar v. Branham*, 291 S.W.3d 599, 607 (Ky. 2009), *as modified on denial of reh'g* (Aug. 27, 2009) ("[U]nder traditional agency law, the issue of control is determinative, and since the nurses were paid, trained, and employed by the hospital their agency status was clear."). To avoid liability for its negligent supervision, Louisville would bear a heavy burden of establishing, despite the employer relationship, that it had *no* agency relationship with its detectives when they investigated this case: "[i]n borrowed servant cases, agency for one party is only destroyed by agency for another if the fulfillment of one role requires the abandonment of the other." *Nazar*, 291 S.W.3d at 607. That certainly is not the case here, Handy and Woosley remained LPD detectives throughout their work in this investigation. They conducted their own investigative activities— including questioning witnesses at the LPD station—and fabricated their own written reports. There is no evidence Meade County had any role supervising LPD detectives. Nor could Meade County have disciplined Handy for his prior misconduct in other cases or ensured that that impeachment material was disclosed here.

---

[12] As explained in Plaintiffs' Memorandum in Opposition to Meade County Defendants' Motion for Summary Judgment, collateral estoppel would not apply to litigation regarding suppressed *Brady* material about Clifford Capps, either. But that is not relevant here because Plaintiffs' claims against Louisville do not relate to Capps.

Furthermore, "[w]here the facts are in dispute and the evidence is contradictory or conflicting, the question of agency, like other questions of fact, is to be determined by a jury." *Nazar*, 291 S.W.3d at 606. Louisville has certainly not established as a matter of law that it had no agency relationship with its own detectives during this investigation. *See Nazar*, 291 S.W.3d at 608 (holding there was no basis for a "borrowed servant" theory of vicarious liability against doctor who testified he "supervised" nursing staff during operation, where nurses worked for hospital).

## CONCLUSION

Plaintiffs respectfully requests that this Court deny Defendant's motion for summary judgment.

Dated: January 26, 2023

<div style="margin-left:40%">

Respectfully submitted,

/s/Anna Benvenutti Hoffmann

Barry Scheck
Nick Brustin
Anna Benvenutti Hoffmann
Emma Freudenberger
Katie McCarthy
Owanaemi Briggs
Sophia Villarreal
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013


/s/Larry Simon
Larry D. Simon (Ky. Bar No. 64355)
Attorney at Law
American Life Building, Suite 200
471 West Main Street
Louisville, KY 40202

</div>

*Attorneys for Plaintiff Garr Keith Hardin*

/s/Elliot Slosar
Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson-Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607

*Attorneys for Plaintiff Jeffrey Clark*

## <u>CERTIFICATE OF SERVICE</u>

I, Lucia Geng, hereby certify that on January 26, 2023, I filed the foregoing document via the Court's CM/ECF System and thereby served a copy on all counsel of record.

<u>/s/ Lucia Geng</u>

*Paralegal*

Neufeld Scheck & Brustin, LLP