# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### AT LOUISVILLE

JEFFREY DEWAYNE CLARK
GARR KEITH HARDIN

       PLAINTIFFS

V.                          CIVIL NO. 3:17-CV-00419-DJH-CHL

LOUISVILLE JEFFERSON COUNTY
METRO GOVERNMENT, *ET AL.*,

        DEFENDANTS.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiffs Jeffrey Clark and Garr Keith Hardin spent 22 years wrongfully imprisoned for a crime they did not commit: the 1992 murder of Rhonda Warford. While Plaintiffs truthfully maintained their innocence, law-enforcement officers from several agencies set about to close the case by any means necessary instead of solving it. Defendants' actions had the tragic effect of victimizing Plaintiffs, their families, and Warford's family. It also allowed the true killer(s) to remain free. The Meade County Defendants accomplished this task by committing egregious misconduct, including the fabrication of evidence. The time of death. Statements for the victims' family. Even a jailhouse informant. Meanwhile, Defendants withheld the very exculpatory evidence that would have prevented Plaintiffs' wrongful convictions in the first place. The ample evidence described below warrants a trial. A trial where Plaintiffs can finally obtain the justice they deserved decades ago. Defendants' Motion should be denied.

## STANDARDS

Under the "well-recognized standard of Rule 56,…'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Clay v. Emmi*, 797 F.3d 364, 370 (6th Cir. 2015). Thus, on Defendants' motion, the Court "must believe [Plaintiffs'] evidence … and disregard [Defendants'] conflicting evidence that the jury is not required to believe." *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 404 (6th Cir. 2022) (cleaned up). "[T]he evidence is construed and all reasonable inferences are drawn in favor of" Plaintiffs. *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (internal citation and quotation marks omitted). The Court cannot "usurp the place of the jury by weighing the witnesses' relative credibility." *Clay*, 797 F.3d at 371. "[I]f [Plaintiffs are] able to demonstrate that there is a genuine issue of material fact in

dispute, then Defendants are not entitled to summary judgment." *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017); *see* Fed. R. Civ. P. 56(c).

**FACTS**

The facts, taken in the light most favorable to Plaintiffs, as required, are as follows:

## I.      HARDIN AND CLARK ARE INNOCENT OF RHONDA WARFORD'S MURDER

Rhonda Sue Warford was last seen alive by her mother as she left their house around 12:30 a.m. on Thursday, April 2, 1992. Ex. 1, Warford Dep. 44:7–19; 145:6–21; Ex. 2, Rogers Dep. 117:7–23; Ex. 3, Rogers Int., 7:19–8:17. Like many teens, Rhonda would sometimes engage in risky behavior like leaving the house without saying exactly where she was going, drinking alcohol with her friends, and even getting into cars with men she didn't know. Ex. 1, Warford Dep. 134:10–25; 135:14–136:14; Ex. 4, Rogers Tr. 150:2–8; 157:20–159:10; Ex. 2, Rogers Dep. 115:1–22; Ex. 5, Barnes Dep. 30:14–23; 31:14–25; Ex. 6, J. Tyrell Tr. 14:10–16; Ex. 7, Jaegers Tr. 197:16-19. And just hours before she disappeared, Rhonda was harassed on her way home from the local grocery store by a "dirty, ugly old man." Ex. 1, Warford Dep. 42:8–43:11; 42:13–43:11; 150:25–151:20. Ex. 8, Uniform Rep. NSBMCSO 15; Ex. 9, KY Rep. at LMPD 9; Ex. 1, Warford Dep. 146:2–16; 148:5–16; 150:11–24; 150:25–151:20; Ex. 2, Rogers Dep. 128:15–22.

Tragically, Rhonda's body was found three days later at 7:30 am on Sunday, April 5, 1992—over 50 miles away in a field in Meade County. Ex. 8, Uniform Rep. at NSBMCO 2. She had been stabbed multiple times, had defensive wounds on her hands, and her throat had been cut following a violent struggle. Ex. 8, Uniform Rep. at NSBMCO 2; Ex. 10, Nichols Dep. I at 157:5-8; Ex. 11, Nichols Tr. at 140:01–141:7, 141:3–5. Two gray hairs were found clutched in

2

her right hand—the source of these hairs is still unidentified. Ex. 12, Dimick Aff. ¶¶ 34, 38–42; Attachment G to Dimick Report at 1, 5.[1]

Wherever Rhonda went that night, it wasn't with her boyfriend Keith Hardin or his friend, Jeff Clark. Ex. 13, Clark Tr. 227:1–9; Ex. 14, K. Hardin Tr. 73:2–75:23. Rhonda always told her mother when she was going out with Hardin; her mother liked Hardin, and Rhonda had no reason to hide going out with him; and Rhonda would also always wear her jewelry when she went out with Hardin because she wanted to look her best. Ex. 5, Barnes Dep. 36:4–13; Ex. 2, Rogers Dep. 137:18–22; Ex. 1, Warford Dep. 132:9–133:20; Ex. 15, Warford Tr. 27:20–28:11; Ex. 1, Warford Dep. 75:19–76:11; 133:21–134:9; Ex. 2, Rogers Dep. 131:12–19.  But on April 2nd, Rhonda was not wearing her jewelry and she told her mother only that she was going "down here"—not that she was going out with Hardin—when she left the house. Ex. 1, Warford Dep. 44:7–19; 75:19–76:11; Ex. 2, Rogers Dep. 117:7–23; 131:12–19; Ex. 3, Rogers Int. 7:19–8:17.

Keith Hardin and Jeff Clark had nothing to do with Rhonda's disappearance or murder; they are absolutely innocent. Ex. 14, K. Hardin Tr. 59:1–11; Ex. 13, Clark Tr. 265:9-12, 227:1-9; Ex. 8, Uniform Rep. at NSBMCSO 14. Based on medical evidence, Rhonda was killed approximately 12–24 hours before her body was found; in other words, sometime during the day of Saturday, April 4, 1992. Ex. 16, Melinek Report 4; Ex. 10, Nichols Dep. I 153:5–10; 153:25–154:4; Ex. 17, Nichols Dep II 48:2–23. Hardin and Clark both had solid alibis starting Thursday, April 2 at 2:20 a.m. through Sunday, April 5 when the body was discovered—with witnesses accounting for their whereabouts in Louisville during the time Rhonda was missing, including

---

[1] Although true perpetrators of Warford's murder have not been brought to justice, due to Defendants' premature fixation on the innocent Hardin and Clark, there are several plausible suspects. Plaintiffs incorporate by reference the record implicating Whitely and Mahan, as set forth in their Response to Defendants Handy and Woosley's Motion. Dckt. No. 314 at 8-11.

neighbors, a gas station attendant, family members, and friends. Ex. 18, Greer Dep. II 164:8–25; 168:1–4; Ex. 19, Greer Dep. I 270:7–23; Ex. 20, Greer Tr. 141:21–142:17; Ex. 13, Clark Tr. 221:24–233:14; Ex. 14, K. Hardin Tr. 73:16-75:23; 77:16–81:9; Ex. 21, W. Hardin Tr. 25:3–30:21;  Ex. 22, V. Howser 03.07.95 TT 9:3–11:17; Ex. 23, D. Cochran Tr. 67:1–69:4;  Ex. 24, A. Cochran Tr. 28:22–29:18; 32:10–35:21; 46:12–47:1; Ex. 25, J. McMackin Tr. 155:7–157:25; Ex. 26, N. McMackin Tr. 151:1–152:23; Ex. 27, Pozzie Tr. 103:7–104:13; Ex. 28, Reese Tr. 89:16–90:18; Ex. 29, Calliver Tr. 97:5–100:7. Clark hadn't seen or talked with Rhonda since December of 1991. Ex. 13, Clark Tr. 227:1-9.

No witness ever claimed to have seen Clark or Hardin with Rhonda the night of her disappearance or at the scene where her body was found, and no murder weapon was found at the scene or in a search of their homes or vehicles. Ex. 20, Greer Tr. at 115:1–3; Ex. 30, Greer Ev. Hrg. 93:10–13. The medical evidence also indicates that Rhonda was killed elsewhere and kept someplace (like a truck or a large vehicle) with flexed knees long enough for rigor mortis to develop in that position before her body was transported and left in the field only hours before it was discovered. Ex. 16, Melinek Report at 3–4; Ex. 10, Nichols Dep. I 90:24–93:13; 104:1–105:10; Ex. 31, Melinek Dep. 191:19–192:11; 193:1–194:5; 196:18–198:16; 216:14–20. At the time, Hardin did not have access to a working car. Ex. 21, W. Hardin Tr. 26:15–27:25; Ex. 32, Hardin Dep. 102:21–103:18; Ex. 33, Clark Ev. Hrg. 120:24–121:3. And Clark's car was thoroughly searched within days of the murder: no hair, fiber, or blood evidence linked to Rhonda was found anywhere including in the passenger area or the trunk; soil samples taken from his car did not match soil samples from the crime scene; and his car's tires did not match the tire tracks found near the scene. Ex. 34, March 2, 1995 Trial Tr. 2:18–3:7. DNA testing has

also now excluded Hardin and Clark as the source of *all* tested physical evidence found on Rhonda's body—including the hairs found in Rhonda's hand. Ex. 12, Dimick Aff ¶¶ 38, 42, 43.

## II.    MEADE COUNTY'S UNCONSTITUTIONAL INVESTIGATION

When Rhonda Warford's body was discovered on April 5, 1992, the Meade County Sheriff's Office was called in to investigate, led by Sheriff Joe Greer. Ex. 19, Greer Dep. I 13:19–21; 14:18–15:14; 226:1–6; Ex. 30, Greer Tr. 108:22–109:9. The Meade County Coroner, William Adams, assisted Greer in the investigation. Ex. 35, Bill Adams Dep. 49:1–24. Greer and Adams both went to the crime scene and observed the body that morning and then attended the autopsy. Later that day, Greer and Adams interviewed Hardin—who helped identify her body—and Rhonda's mother, sister, and family friend.  Ex. 8, Uniform Rep. at NSBMCSO 9-12.

The following day, on April 6, Louisville Police Department (LPD) Detective Mark Handy was assigned to assist Meade County in the investigation; Handy was brought in specifically to participate in suspect interviews, as he had a reputation for getting confessions and closing cases. Ex. 8, Uniform Rep. at NSBMCSO 12-13; Ex. 36, LMPD Reps.; Ex. 37, James Clark Dep. II 20:14–21:3; 25:4–25; Ex. 38, Sherrard Dep. 110:4–111:1; Ex. 39, Handy Dep. I 259:3–19. Greer and Handy worked closely together throughout the Warford investigation: they conducted suspect and witness interviews together, maintained daily contact, and kept each other updated on investigative steps. Ex. 19, Greer Dep I 315:13–16; 25:24–27:20; Ex. 39, Handy Dep I 118:1–4; Ex. 8, Uniform Rep at NSBMCSO 13–15.

At the April 5 autopsy, Greer observed that Rhonda had an upside-down cross tattoo on her chest; he understood this symbol to be related to Satanism and began to fixate on it. Ex. 19, Greer Dep. I 214:4–14; 216:2–16; 217:3–218:5; 219:12–15; 293:11–21; Ex. 20, Greer Tr. 127:11–17; Ex. 8, Uniform Rep at NSBMCSO 10. After learning that Hardin had been involved

5

in Satanism,[2] Greer quickly formed a theory that the crime was connected to Satanism and human sacrifice. Ex. 19, Greer Dep. I 264:4–265:19. Handy shared Greer's theory that the crime had Satanic motivations; right away he suggested they reach out to Ronald Holmes, who'd trained Handy on "occult crimes," to see if the murder was a ritualistic killing. Ex. 39, Handy Dep I 93:12–14; 97:3–98:1; 98:17–99:16; 107:23–109:15; Ex. 90, Training Record.[3]

As of April 6, 1992, Hardin and Clark were being investigated as suspects even though Greer agreed they had not been implicated in the crime by any witness or physical evidence. Ex. 19, Greer Dep. I 183:1–184:5; 269:5–13; Ex. 39, Handy Dep I 199:21–200:9; 201:8–12. Hardin and Clark both cooperated fully with the investigation from the start, agreeing to go to the police station for interviews on multiple days: Clark was interviewed by Greer, Adams, and Handy on April 6 and April 8, and Hardin was interviewed by Handy on April 7, then by Greer, Adams, and Handy on April 9. Ex. 8, Uniform Rep. at NSBMCSO 12–14–15; 17; Ex. 36 LMPD REP 19–22; 24–26; 40–41; Ex. 19, Greer Dep. I 143:11–21; Ex. 39, Handy Dep. I 179:12–25. Each time they were interviewed, Hardin and Clark waived their rights and answered any questions police had—including providing alibis for the days Rhonda was missing. Ex. 18, Greer Dep. II 164:3-25; Ex. 33, Clark Ev. Hrg. 113:4–6; 114:12; 117:13–19. They also voluntarily submitted to polygraph examinations; turned over their clothing and shoes; and provided blood, saliva, head and pubic hair samples. Ex. 19, Greer Dep. I 143:11–21; Ex. 33, Clark Ev. Hrg. Tr. 113:2–

---

[2] Hardin has Autism Spectrum Disorder, which causes an intense and restricted interest in a particular topic. Ex. 40, Loftin Report 2–5. Up until a few months before Rhonda's murder, Hardin's focus had been on Satanism; now, it is transcendental meditation. Ex. 32, Hardin Dep. 20:1–21:1; Ex. 41, Hardin Dec. ¶ 2. Ex. 40, Loftin Report 7.

[3] Handy and Greer's beliefs about Satanism—and its connection to animal and human sacrifice—were false, reflecting urban legends that were perpetuated in law enforcement trainings like the one Handy had attended. Ex. 42, Lowney Rep. 2–3, 5–6.

3; 115:6–14; Ex. 43, Clark Dep. Tr. 325:13-326:19; Ex. 13, Clark Tr. 237:6-8; 271:3-6; Ex. 39, Handy Dep. I 179:12–25; Ex. 14, K. Hardin Tr. 90:11-22; Ex. 44, Handy Tr. at 31:14-25.

### A. Meade County Defendants Use Illegal Interrogation Tactics

On April 6, Clark was twice interrogated by Greer and Adams. Ex. 8, Uniform Rep. at NSBMCSO 13. In both interviews, he truthfully denied having any knowledge about or anything to do with Rhonda's murder. *Id*.; Ex. 45, Clark Dec. at ¶2; Ex. 43, Clark Dep. at 43:9-24. Two days later, on April 8, Greer, Handy, and Adams attempted to extract a confession from Clark at LPD.[4] Ex. 8, NSBMCSO 14; Ex. 35, Adams Dep at 131:12–21; Ex. 18, Greer Dep II at 151:7–20; Ex.43, Clark Dep at 28:13–30:10. At some point, Clark was taken to the break room, where Greer falsely informed Clark that Hardin was giving him up. Ex. 43, Clark Dep at 29:25–30:18. Greer stated that he and Handy were trying to help Clark, that their real target was Hardin, and suggested Clark probably would not do any jail time, he just needed to cooperate. *Id.* at 30:12–22. Clark truthfully maintained his innocence. *Id.* at 30:22–23. Greer switched tactics and fed Clark a story implicating Hardin—telling Clark to say that Rhonda was pregnant, and that all Clark did was help move the body. *Id.* at 30:24–31:4. When that didn't work, Greer pulled out a gun, laid it on the table, and said, "You might want to reconsider what I have to say and think about what you have to say. I always get what I want. Don't I, Mr. Adams?'" speaking to Coroner Adams. *Id.* at 31:5–20.  Adams responded: "We always get what we want." *Id.*

As Greer and Adams threatened to frame Clark at best, or kill him at worst, Handy just stood there. *Id.* at 31:21–22. Clark pleaded with the Defendants: "if you want to shoot me, shoot me, you know, because I don't know nothing and I'm not saying nothing." *Id.* at 31:21–25. Eventually, Handy took Clark back to the conference room, offering to protect Clark from Greer

---

[4] Wise also was present for this coercive interrogation. Ex. 43, Clark Dep 149:7–16.

and Adams if he would just "tell me what I want to hear." *Id.* at 32:1–12. When Clark continued to maintain his innocence, Handy told Clark that they knew he was "guilty as hell." *Id.* at 32:10–33:22. Defendants then enlisted LPD Lt. Eugene Sherrard, who threatened to force Clark to "dig her up" before calling Clark a "fucking punk" and slamming him into lockers. *Id.* at 33:15–34:5.

Greer admitted Clark's description amounts to "serious misconduct" but denies he has ever done anything like that. Ex. 18, Greer Dep. II at 146:3–11; 155:17–156:19. However, he admits to possessing a gun bearing a similar description to what Clark observed. *Id*. at 142:4–18; Ex. 43, Clark Dep at 150:1–15. And Hardin describes Greer doing precisely the same thing during an interview in Meade County before he was arrested: laying a nickel-plated revolver on the table and threatening bad things happen to people who don't cooperate. Ex. 32, Hardin Dep. 217:1–220:22.  As Greer's own police practices expert acknowledges: attempting to coerce a statement from Clark, or any witness, by putting a gun on the table would be "totally outside" any kind of generally accepted practice and illegal. Ex. 46, Ryan Dep. 218:8–14.

**B. Meade County Defendants Fabricate Inculpatory Evidence**

**(1) Rhonda Warford's Family**

The next day, on April 9, Greer and Handy jointly interviewed Mary Warford (Rhonda's mother), Michelle Rogers (Rhonda's sister), and Crystal Barnes (Rhonda's cousin and best friend). Ex. 8, Uniform Rep. NSBMCSO at 15–17; Ex. 47, 4/9/92 Handy Report at LMPD 411. According to Mary Warford, Handy and Greer were both present for the entire meeting. Ex. 1, Warford Dep. 123:22–124:7; 167:4–8. Although Greer's typical practice was to always record such statements, and had access to a tape recorder, he did not record the interviews, instead summarizing statements in his written report. Ex. 19, Greer Dep. I at 248:1–16; 249:11–17; 282:14–284:9; Ex. 8, Uniform Rep. at NSBMCSO 15-17; Ex. 47, 4/9/92 Handy Report at LMPD

411–412. At his deposition, Greer could not explain why he deviated from his practice by not recording the interviews. Ex. 19, Greer Dep. I at 282:14–284:9. Although Handy admitted he understood interviews with important witnesses should be taped, he did not tape the interviews either. Ex. 39, Handy Dep. I at 287:21–288:5; 298:23–25; Ex. 1, Warford Dep. 122:13–22.

Defendant Greer's report ascribes statements to Barnes, Rogers, and Warford that implicate Plaintiffs in the murder. Ex. 8, Uniform Rep. at NSBMCSO 15-17. Greer claimed that they volunteered information that just happened to match the (false) theory he already formed: that Hardin and Clark engaged in Satanic animal sacrifice, that Rhonda's murder was related to Satanism, that Hardin and Rhonda had a violent, abusive relationship, and that Hardin threatened to kill her. Ex. 19, Greer Dep. I 264:4–265:19; 284:10–285:25; Ex. 18, Greer Dep. II 119:20–122:15. None of this was true and none of this was reported by Rhonda's family.

Greer claimed Rogers independently volunteered that Clark "was weird like Keith, that they were into satanic worship, and that she knew for a fact that they had killed animals." Ex. 19, Greer Dep. I 284:10–286:21; Ex. 18, Greer Dep. II 119:20–122:15; Ex. 8, Uniform Rep. NSBMCSO 16. But as Rogers testified at the criminal trial and at her deposition, she had no knowledge whether Clark (whom she had briefly dated) was involved in Satanism. Ex. 4, Rogers Tr. 141:22–142:2; Ex. 2, Rogers Dep. 119:1–4; 163:6–21. In fact, Clark was never involved in Satanism but instead was a Southern Baptist. Ex. 13, Clark Tr. 205:25-206:5; Ex. 43, Clark Dep. Tr. 102:12-23; 181:5-11. Rogers further explained at her deposition that she only heard Hardin was involved in animal sacrifices after her sister's death *from the police*. Ex. 2, Rogers Dep. Tr. at 132:4–133:5. The victim's own mother, Mary Warford, confirms that it was Greer and Handy who told the family that the murder could have been a satanic human sacrifice and that Hardin had been involved in animal sacrifice. Ex. 1, Warford Dep. Tr. at 162:22–163:9. Greer admitted

Rogers's trial testimony was the opposite of what he reported she told him; he claimed she just didn't tell the truth at trial. Ex. 19, Greer Dep I 292:1–293:10; Ex. 18, Greer Dep. II 125:20–129:8. Although Handy was present for this interview, Handy testified he had no memory of Barnes saying they were sacrificing animals, which he admitted he would have remembered. Ex. 39, Handy Dep. I 241:21–244:24; 246:2–250:11; Ex. 1, Warford Dep. 123:22–124:7; 167:4–8.[5]

Similarly, Greer claimed Barnes volunteered to him her concern about Hardin's involvement in Satanism: he reported she "did not care too much for [Hardin]….he was in that satanic stuff and he was getting Rhonda in it." Ex. 8, Uniform Rep.  NSBMCSO 16; Ex. 18 Greer Dep. II 120:19–121:19. Handy's report also claims that Barnes informed him that "Rhonda was only into devil worship to make Keith happy and that the reason that Rhonda put the upside down cross on her chest was to make Keith happy."  Ex. 47, 4/9/92 Handy Report at LMPD 411–413. Barnes explained otherwise at trial and at her deposition: she had no knowledge as to whether Clark, Hardin, or Rhonda were involved in Satanism prior to the murder. Ex. 5, Barnes Dep. at 17:9–18:12; Ex. 49, Barnes Tr. 203:10–204:13. Rather, Barnes first learned that Hardin may have been involved in Satanism after the murder *from the police*. Ex. 5, Barnes Dep. at 17:22–18:12. Greer acknowledged Barnes's trial testimony was "completely different" from what he claimed she had told him; he said she didn't tell the truth at trial, either. Ex. 18, Greer Dep. II 129:22–131:2. Greer also claimed that Barnes described a violent, abusive relationship between Hardin and Rhonda, and that Hardin had threatened to kill Rhonda: "she was sure that Keith Hardin smacked Rhonda around before," and "on Tuesday, 3-31-92, that Keith told her he would kill her if she ever ran around on him." Ex. 8, Uniform Rep. NSBMCSO 16. Handy

---

[5] Greer relayed his same false theory to Defendant Thurman the next morning when he called to "fill him in" on the case, including parallel details—like the fact, Hardin was "weird," and that Hardin and Clark both purportedly being "avid devil worshippers." Ex. 48, Thurman Report

reported similarly. Ex. 47, 4/9/92 Handy Report at LMPD 412. As Barnes testified, this is also false. She thought Hardin was a quiet, nice guy; he never did anything to cause her concern; Rhonda never said anything bad about him; and she never heard Hardin or Clark make any threats to Rhonda. Ex. 5, Barnes Dep. 18:21–21:14; Ex. 49, Barnes Tr. 204:14–17. Rhonda's mother and sister confirmed this: before Rhonda's death, the family believed Hardin was good for Rhonda and supported their relationship. Ex. 1, Warford Dep. 125:24–126:22; 128:2–129:6; 132:9–133:6; Ex. 2, Rogers Dep. at 136:7–23. Greer admitted Barnes' testimony was inconsistent with what he claimed she had reported to him, but he has no explanation for why. Ex. 19, Greer Dep. I 321:24–323:3. Greer also could not explain why, if Barnes had actually reported such important information—that Hardin had previously threatened to kill Rhonda—he would not have tape recorded her statement. *Id*. at 319:11–321:19. Because Handy and Greer jointly interviewed these witnesses, they both knew these witnesses did not actually volunteer information regarding Hardin and Clark both engaging in Satanism or sacrificing animals.

### (i) Handy fabricates other inculpatory witness statements with Greer's knowledge

Greer also knew or should have known that Handy fabricated another related, highly inculpatory admission attributed to Hardin: that Hardin volunteered he was "tired" of sacrificing animals and wanted to do human sacrifice. Ex. 59, LMPD 26; Ex. 39, Handy Dep I 128:6–132:25. Although Greer was not physically present when Hardin purportedly made this admission, Greer testified that he learned about it from Handy shortly after. Ex. 19, Greer Dep. I at 266:21-267:14. But Greer and Handy decided *together* that Handy should pick up Hardin for interrogation on April 7, Ex. 8, Uniform Rep. at NSBMCSO 13; the two were in contact throughout the investigation, Ex. 19, Greer Dep I at 27:5-11; 315:7-24; and Greer was told about Hardin's April 7 interview later that evening—but only that Hardin took a polygraph and

11

submitted samples, *not* that he'd apparently volunteered wanting to "sacrifice a human." Ex. 8, Uniform Rep. at NSBMCSO 13. Greer also went to LPD the next morning to meet with Handy and "discuss what had taken place," yet there is no mention in Greer's report of Handy telling him *anything* about Hardin having made such a statement the day before. *Id*. at 14.

Right after interviewing Rhonda's relatives on April 9, Greer and Handy went together to re-interview Hardin. *Id*. at 17; Ex. 36, LMPD Reps. at 40–41**.** Neither investigator asked Hardin *a single* follow-up question about his purported interest in satanic sacrifice, even though he had allegedly just told Handy he'd been sacrificing animals and wanted to sacrifice a human. *Id.* Notably**,** Greer did ask Hardin follow-up questions about *other* statements he'd purportedly made to Handy on April 7.[6] Ex. 8, Uniform Rep. at NSBMCSO 17.

---

[6] Indeed, there is ample evidence that Greer knew or should have known Handy fabricated other inculpatory witness statements in the case. For one, Greer testified that he received, reviewed, and maintained copies of LPD investigative letters as part of his investigative file, including Handy's letters. Ex. 19, Greer Dep I 29:4–16; 123:18–21. But Handy's April 9 letter directly contradicts Greer on this point: according to Handy, Hardin "again" denied owning a knife and allegedly stated he "did not know if Clark owned a knife either." Ex. 36, LMPD Reps. at 40; Ex. 44, Handy Tr. 22:13–18. Handy also falsely reported that during this interview Hardin "acknowledged that he had previously told Rhonda that if she ever cheated on him or left him that he would kill her." Ex. 36, LMPD Reps. at 50. Greer's contemporaneous report of the same interview makes no mention of this alleged important admission. Ex. 8, Uniform Rep. at NSBMCSO 17. That's because Hardin never made that threat to Warford (or anyone), and he never told Handy—or Greer—that he had. Ex. XX, Hardin TT 03.07.1995 88:6–8; 89:5–18; Ex. 32, Hardin Dep. 307:16–21; 310:9–311:11. Nor are those the only examples of fabrications by Handy that would've been obvious to Greer when he read Handy's letters; Handy also fabricated statements by Clark in interviews Greer was present for, including that Clark allegedly "admitted" on April 8 "that he had previously lied about owning a knife, that he owned several." Ex. 36, LMPD Reps. at 36; Ex. 39, Handy Dep I 207:17–209:12. But again, Greer's report of their April 8 re-interview of Clark makes no mention of this alleged admission, and Clark never denied owning knives, let alone told Handy he'd lied about owning them, Ex. 43, Clark Dep. 74:8–75:16; Ex. 13, Clark Tr. 239:3–22; 260:11–261:1; Ex. 33, Clark Ev. Hrg. Tr. 184:22–185:1; Ex. 50, Bart Adams Dep. 225:14–25; Ex. 8, Uniform Rep. at NSBMCSO 14–15.

**(2) Clark's Ex-Girlfriend, Amy Remsburg**

Early in the investigation, on April 6, Greer and Adams learned that Amy Remsburg (now Hatfield), who previously lived in Meade County, had a prior romantic relationship with Clark. Ex. 8, Uniform Rep. at NSBMCSO 12; Ex. 19, Greer Dep I at 135. Greer admits that no one ever told him Remsburg had information relating to the Warford homicide, and he had no reason to believe she had such information. Ex. 19, Greer Dep I at 136:22–137:3. But Greer and Adams knew Remsburg and her family; one of his deputies was even related to Remsburg. *Id*. at 134:14-136:2; 305:6-12; Ex. 35, Adams Dep. 43:12-17; 148:3-13. Greer also knew that Remsburg was "very angry" with Clark and had taken out a warrant against him. Ex. 8, Uniform Rep. NSBMCSO 12; Ex. 36, LMPD Reps. 21. In fact, there were major problems between Clark and Remsburg because Clark had seen Remsburg sexually abusing her young son and reported her. Ex. 13, Clark Tr. 241:15-20; Ex. 43, Clark Dep. 47:20–53:7; Ex. 50, Bart Adams Dep. 244:8-15. Remsburg was later prosecuted for raping her son multiple times and pled guilty to having a sexual relationship with him. Ex. 51, Hatfield Dep. 3, 82–83, 150–52; 159:17–160:18.

On April 10, Greer and Adams took a statement from Remsburg at the Meade County Sheriff's Department. Ex. 8, Uniform Rep. at NSBMCSO 17-18; MSCO 1310–1344. Unlike with Warford, Rogers, and Barnes the day prior, Greer tape recorded the statement from Remsburg. *Id.* In the statement, Remsburg appears to volunteer information that—again—happened to match Greer's (false) theory: (1) Clark was into satanic worship; (2) Clark and Hardin would "always go do weird stuff" at a place with lots of satanic signs; (3) Clark and Hardin had killed a cat and a dog "for satanic stuff; and (4) Clark knew the "best ways" to kill someone with a knife and had pointed spots on her neck. *Id*. But again, none of that was true.

13

As Greer concedes, Remsburg had a major motive to lie against Clark given their history. Ex. 19, Greer Dep. I 139:4–13. And he knew Remsburg was "very angry" with Clark, and that she "started in on [Clark] the minute [he] talked to her." *Id*. at 138:11-15. But he testified that her statements against Clark were credible because she was able to volunteer that Clark and Hardin were into Satanism and sacrificed animals. *Id*. at 140:12-19; 252:7-253:10. However, the previous evening, Adams conducted an interview of Remsburg at her home.  Ex. 35, Bill Adams Dep. 131:22-132:1; Ex. 8, Uniform Rep. at NSBMSCO 293. Adams testified that his goal for the interview was to get as much information as possible about Clark and that he was especially careful to document what he learned because this was the first interview of his career. Ex. 35, Bill Adams Dep. 1-13; 49:6-11. He documented all the information provided by Remsburg, who never mentioned anything about Satanism, in a memorandum.  *Id*. at 172:14-173:10; 150:14-17; Ex. 8, Uniform Rep. at NSBMSCO 293-294. As Adams testified, if Remsburg had mentioned anything about Satanism, he would have written it down.  Ex. 35, Bill Adams Dep. at 162:14-17. The memorandum is also void of Clark allegedly having a desire to kill someone by severing their brain stem.  *Id*. at 150:18-22; *see also* Ex. 8, Uniform Rep. at MSCO 293-294.

Greer denied being present for this interview and claimed to have never seen Adams' memorandum. Ex. 19, Greer Dep I at 136:25-137:9; 253:18-255:14. But Adams was present for the interview of Remsburg the next morning. Ex. 8, Uniform Report at NSBMCSO 297.  There, Adams informed Greer that she didn't provide any direct information implicating Clark in the murder. Ex. 35, Bill Adams Dep. at 180:8-23; Ex. 8, NSBMCSO 293-294. Only *after* Greer and Adams had an unrecorded conversation with Remsburg before taping her statement did Remsburg allegedly volunteer, for the first time, incriminating information about Clark and Hardin's involvement in Satanism. Ex. 19, Greer Dep I at 141:1-9; Ex. 8, Uniform Report

NSBMCSO 304. While Greer admits he was aware that Remsburg had her own motives to lie against Clark, he did not conduct *any* investigation to corroborate any of her allegations. Ex. 19, Greer Dep. I at 139:20-140:4; 298–99; 303.

### (3) Time of Death

As of the time of the April 5 autopsy, Greer and Adams understood that Rhonda was killed within 24 hours of being found on April 4 or early on April 5. Ex. 19, Greer Dep I 15:16–16:2; 177:9–25; Ex. 35, Bill Adams Dep. 71:8-72:3; Ex. 10, Nichols Dep. I 181:12–14; 184:4–14; Ex. 8, Uniform Rep. at NSBMCSO 195; Ex. 52, KSP Exam. This understanding was based on their own observations at the scene: Greer and Adams both reported that the body was "fresh" when they found it, with no insects or animal predation. Ex. 8, Uniform Rep. NSBMCSO 554, 560; Ex. 19, Greer Dep I 15:11-19; Ex. 35, Bill Adams Dep. 76:21;22. It was also based on the autopsy they attended; as Greer reported to the media, "[i]t was determined that death had occurred no more than 12 hours before," and that Rhonda had "died of multiple stab wounds late Saturday night or early yesterday [Sunday] morning." Ex. 53, News Arts. (CAO 7258, 7257).

In his April 5 Coroner's report, Adams also documented the time of death as "4-4-92 or early 4-5." Ex. 8, Uniform Rep. NSBMCSO 195; Ex. 35, Bill Adams Dep. 124:11-14. He understood this time of death would be used by Greer in the investigation. *Id*. at 79:1-8. This was in fact their theory early in the investigation. Ex. 19, Greer Dep I 177:9-178:14; Ex. 35, Bill Adams Dep 124:11-14. Greer also listed the date of death as "between April 4 and 5" or "on April 5" in his early reports. Ex. 8, Uniform Rep. NSBMCSO 233; Ex. 19, Greer Dep I 177:9-25; 180:5-17; 186:25-187:6; 189:10-15.

But as Greer and Adams began to investigate Clark and Hardin, they determined both had solid alibis for April 4 to the morning of April 5. Ex. 8, Uniform Rep. NSBMCSO 14 ("Upon

discussion with Adams and determining both Clark and Hardin had alibis for Saturday night 4-4-92."); Ex. 19, Greer Dep I 270:7-23. Accordingly, Greer understood that if Rhonda was murdered on April 4 or the morning of April 5, Hardin and Clark could not have done it. Ex. 18, Greer Dep. II 160:6–161:25; 164:8–25; 165:17–25; 166:21–168:4. Nothing changed medically between April 5, when the body was discovered and the autopsy conducted, and May 5, when arrest warrants were sought. Ex. 10, Nichols Dep. I 187:1-19. Greer now admits that Clark and Hardin's alibis were the reason he concluded that the crime had to have occurred early on April 2. Ex. 19, Greer Dep I 271:3-18. Rather than look for the true perpetrator, Greer and Adams falsely reported that Rhonda was killed on April 2—the only time during her disappearance when Clark and Hardin were alibied only by each other. Ex. 8, Uniform Rep. NSBMCSO 338.

On May 7, 1992, Adams signed Warford's Death Certificate. Ex. 54, Death Certificate; Ex. 35, Bill Adams Dep. 211:14-20. According to Adams, he only completed the portion from certifier down. Ex. 35, Bill Adams Dep. 68:4-6. The funeral home was responsible for filling out the top portion—including the "date of death"—which is generally filled out within days of death based on information from the coroner and then sent to him for completion. *Id*. at 90:17-21; 94:11-20; 101:7-16. But, as Adams admitted at his deposition, the "2" in "April 2, 1992" date-of-death section is in a different typeface than the rest of the portion filled out by the funeral home. Ex. 54, Death Certificate; Ex. 35, Bill Adams Dep. 91:1-12.



Adams agreed that sometime after the funeral home created the document, someone used whiteout and a typewriter with a smaller font to change the date of death at the top was changed. Ex. 35, Bill Adams Dep. 98:4-12. Although he could not give any explanation for why this "2" came from a different typewriter, *Id*. at 95, 96:10-14, he agreed it the "2" could be smaller because it came from *his* typewriter. *Id*. at 213:2-9; 99:3-8.



Like Adams, Greer also fabricated the time of death in an official report. The first page of Uniform Offense Report was signed by Greer on April 6, 1992. Ex. 8, Uniform Rep. NSBMCSO 1. As of April 6, Greer and Adams both believed that Rhonda was killed on April 4 or early April 5. On that day, Greer provided pre-examination information to use in Clark's polygraph and specifically told the examiner that Warford had been stabbed to death "around midnight on 4-4-92." Ex. 55, Polygraph Pre-Test Int. But the entry for "Date of Offense" on Greer's offense report is *April 2, 1992*:



It is clear from the report that, as with the Death Certificate, white-out was used and the "date of offense" changed. Ex. 8, Uniform Rep. NSBMCSO 1.

### C. Meade County Defendants Withhold Exculpatory Evidence (Clifford Capps)

At trial, jailhouse informant Clifford Capps testified that Clark confessed to him that he and Hardin murdered Rhonda while they were confined together in the Meade County Jail. Ex. 56, Capps Tr. I 75:9-15; Ex. 57, Capps Tr. II 139-148. Clark and Hardin are innocent of the crime and never confessed to Capps. Ex. 13, Clark Tr. 238:5-13; Ex. 43, Clark Dep. 214:4-7; Ex. 45, Clark Dec. 2. But the Commonwealth emphasized Capps' incriminating testimony in its closing, arguing that he was credible, had no motivation to lie, and was historically honest about his own crimes. Ex. 58, 3/7/95 Tr. 235:7-15; 235:20-21; 236:20-24. This was false.

By 1992, Greer knew Capps well. Ex. 19, Greer Dep. Tr. I 41:17-20. Capps, according to Greer, was *always* involved in crimes of dishonesty. *Id.* at 43:5-8. Capps was also known to lie to law enforcement in investigations. *Id.* at 54:9-17, 44:9-19. Greer knew that Capps' credibility issues were significant at the time he obtained a statement from him in December 1992:

Q:  Sure.  But you were aware at the time you took Mr. Capps statement that he had lied to other officers in your agency before?

A:  **Probably lied to every police officer that ever investigated anything on him until you get him what they call, ma'am, pardon my French, nut cutting time**.  Then they might turn around and –

Q:  Yeah.

A: -- do a little talking.

*Id.* at 98:16-24. (emphasis added)

Given Capps' serious credibility issues, Greer *now* admits that he "was skeptical" of Capps' assertions that Clark confessed. *Id*. at 99:5-7; 99:1-4 ("[C]an't say I disbelieved it, but I can't say I believed it."). Yet, Greer did not document in any report or tell the prosecutor that Capps had a reputation within the department for being a liar. *Id*. at 100:16-101:16; 101:14-16.

Greer had ample reason to know that Capps was lying here. In the December 2, 1992 statement taken by Greer and Deputy Wise, Capps claimed that Clark confessed to him while in Meade County Jail, and that Hardin had sent Clark a note saying he should "stick to your story." Ex. 59, Capps St. MCSO 950; Ex. 60, Wise Dep. Tr. 41:24-42:7; Ex. 59, Capps St. MCSO 958. But Greer met with Capps on a prior occasion while he was still in the Meade County Jail—after Clark allegedly "confessed" to him—and Capps did not provide Greer with any information implicating Clark or Hardin at that time. Ex. 19, Greer Dep. I at 63:6-17, 66:22-67:22, 70:5-17, 73:9-18. Even though Greer now admits to being skeptical of Capps' statement, he took no steps to corroborate it during the investigation. *Id*. at 82:20-83:14, 100:1-15.  Nor did he document his skepticism in any report about the interview. *Id*. at 100:16-101:16; 101:14-16.

Ample evidence demonstrates that Greer and Wise withheld additional exculpatory evidence relating to Capps. Another inmate, Kevin Justis, was incarcerated with Hardin, Clark, and Capps at the Meade County Jail. Ex. 61, Justis Dep. 28:13-18. On November 17, 1992, Capps wrote Justis a letter "asking [him] what to say to help [Capps] get out on shock probation." *Id*. at 33:11-25, 32:13-33:5; Ex. 62, Capps Letter. As Justis explains, Capps "was asking me to lie to get him out on shock probation;" in particular, Capps suggested that Justis "remember" that Hardin had "jokingly" admitted to the murder." Ex. 61, Justis Dep. at 39:1-24; *see also* 37:6-17, 39:25-43:8 But Justis said Hardin was "adamant about he did not do it," and Justis had no knowledge of anything Capps wanted him to falsely report. *Id*. at 134:11-24; 44:13-17.

In December 1992, Justis provided a copy of this letter to Greer and Wise. *Id.* at 91:15-25. He "handed [Sheriff Greer] the letter and let him read it and told him [Capps] was lying, and I didn't want them to put them on the witness stand and put people in jail for something they

19

didn't do…" *Id.* at 91:15-25. Defendant Greer then "ran [Justis] off a copy at that courthouse," which allowed Justis to provide the letter to his mother for safekeeping. *Id*. at 16, 53-54. Justis' account is corroborated by neutral witnesses like Harvey Palefsky, an attorney in a separate case who conducted an interview with Justis in 1993 where he maintained that he "gave it to the Sheriff that they ran copies off of, he's got it at the courthouse." Ex. 63, Palefsky Aff. ¶7; Ex. 64, Palefsky Dep. 40:14-20; Ex. 65, Frei Aff. ¶¶ 9–10. Greer and Wise deny seeing the letter until after Plaintiffs' trial, but Justis is certain he provided it to them years before Plaintiffs' criminal trial.  Ex. 64, Palefsky Dep. 45:13-24; Ex. 61, Justis Dep. 91:3-25. The letter was not disclosed or known to Plaintiffs before trial. Ex. 50, Bart Adams Dep 37:14-39:7; Ex. 19, Greer Dep. II 44:11-22.

## III.    **HARDIN AND CLARK ARE WRONGLY CONVICTED**

Hardin and Clark were tried jointly beginning on February 28, 1995. Ex. 34, Opening Tr., 1–2. The case against them was "highly circumstantial." Ex. 66, KY Dec. 17; Ex. 50, Bart Adams Dep. 189:9-190:3; Ex. 77, Adams Decl. ¶4. The only physical evidence even purporting to link Hardin or Clark to the victim and/or crime scene was: (1) Rhonda's fingerprint found in Clark's car (which had limited weight as it was undisputed that she traveled in his car and there was no way to date the fingerprint); and (2) a hair reported to be microscopically similar to Hardin's found on Rhonda's pants. Ex. 68, Motion at 3; Ex. 69, Heck. Dep. 97:3–23; Ex. 70, Haun Tr. 11:11–17.

Plaintiffs testified that they were innocent and presented compelling alibi evidence covering almost the entirety of time from when Rhonda was last seen until her body was discovered. *See,* Section I. Even the brief period Wednesday morning where Clark and Hardin alibied each other left an improbably small window of opportunity to commit the crime, as

20

Rhonda was last seen at 12:30 am at her home in Louisville; her body was found approximately an hour's drive away in rural Meade County, but Clark and Hardin were seen at a Louisville Chevron station buying cigarettes between 1 and 2 am, Clark dropped Hardin off at home in Louisville at around 2:15 am and was home himself by 2:30 am. Ex. 27, Pozzie Tr. 102:7–104:13, 112:5–14; Ex. 21, W. Hardin Tr. 25:3–26:14; Ex. 29, Calliver Tr. 96:6–100:11; Ex. 13, Clark Tr. 225:10–226:22. At trial, the prosecution relied on incriminating testimony from Capps and Remsburg, who repeated the inculpatory information fed to her by Greer regarding Clark and Hardin's alleged involvement in Satanism and the manner of death. Ex. 51, Remsburg Dep. Tr. 319:10-25. The jury convicted Clark and Hardin and sentenced both to life imprisonment. Ex. 71, Verdict 244:8–15, 257:3–11.

Plaintiffs continued to assert their innocence in post-conviction proceedings, but for years those efforts failed. Ex. 43, Clark Dep. 268:6–269:22; Ex. 32, Hardin Dep. 306:11-307:9. Finally, with the help of the Innocence Project and the Kentucky Innocence Project, Plaintiffs were able to present new evidence demonstrating their innocence. Ex. 43, Clark Dep. 269:19–22. At a 2015 evidentiary hearing, Plaintiffs introduced new mitochondrial DNA test results excluding Clark and Hardin as the source of the hairs found on Rhonda's sweatpants and in her hand, along with other newly discovered evidence, including Handy having committed "the same misconduct" in another case as alleged here. Ex. 73, New Tr. Ord. 7–14, 18–21.[7] Clark and Hardin's convictions were both vacated in 2017. *Id*. 23–24. The following year, after an "extensive review of the evidence," the Attorney General concluded there was insufficient evidence to support a prosecution of Hardin and Clark and moved to dismiss the indictments. Ex. 68, Motion 1, 11. In February 2018, all charges were dismissed. Ex. 72, Dismiss Ord.

---

[7] During those post-conviction proceedings, Handy continued to falsely deny that he committed misconduct in Chandler. Ex. 75, Handy Ev. Hrg. 222, 268-9, 277, 282-3, 300.

## ARGUMENT

I.  **A TRIAL IS WARRANTED ON PLAINTIFFS' DUE PROCESS *BRADY* CLAIM AGAINST DEFENDANTS GREER AND WISE (COUNT I)**

An officer who withholds material exculpatory evidence may be held liable under § 1983. *See Jackson v. City of Cleveland*, 925 F.3d 793, 813–14 (6th Cir. 2019); *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009). This § 1983 *Brady* claim has three elements: (1) evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching" (2) is suppressed (3) causing prejudice. *Jackson v. City of Cleveland*, 925 F.3d 793, 813–14 (6th Cir. 2019). Prejudice is demonstrated if the suppressed evidence "considered collectively, not item by item," "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Bies v. Sheldon*, 775 F.3d 386, 398–99 (6th Cir. 2014) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435–37 (1995)). In other words, "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Jackson*, 925 F.3d at 815 (internal citations marks omitted).

### A. Capps' Reputation for Dishonesty and History of Lying

A reasonable jury could easily conclude Greer and Wise withheld critical evidence of Clifford Capps' reputation for dishonesty and his history of lying to law enforcement, which would have been devastating impeachment evidence against a key witness.[8] There were no eyewitnesses to Warford's murder, and—while other witnesses testified that Clark and Hardin had an interest in knives or Satanism—Capps was the only witness who purported to link Clark and Hardin directly to the crime. *Id.* His testimony that Clark confessed to him while they were incarcerated together was some of "[t]he most incriminating testimony" offered at trial. Ex. 73,

---

[8] Plaintiffs voluntarily dismiss their state-law claims against the Meade County Defendants for: Negligent Supervision (Count IX); Respondeat Superior (Count X); Intentional Infliction of Emotional Distress (Count XII); and Negligent Infliction of Emotional Distress (Count XIII). Plaintiffs only pursue their state-law malicious prosecution claim against Defendants Greer (Count XI).

Order New Trial 4. Capps was the only third-party witness called twice by the Commonwealth and, in closing, the Commonwealth wrapped its arms around Capps and his alleged propensity for being truthful to law enforcement in criminal prosecutions:

> Let's talk about Cliff Capps.  Let's talk about Cliff Capps because again, it's kind of terrible what we do to people when we bring them in here to testify…  Now, I don't know anybody that has been treated – we sit here and we talk about these cases.  *Now I told you all, I told you all that defendants never came in here and told you they did it.  But you know, there's one exception to that rule.  Every time Cliff Capps got in trouble and my Lord all mighty, it was a bunch, every time he admitted it and he took his punishment…*

Ex. 58, Closing Tr. 235:7-15. (emphasis added).

But at his deposition, Greer admitted that—prior to 1992—he "most definitely" knew that Capps was involved with crimes of dishonesty, including "stealing from his mother." Ex. 19, Greer Dep. I 41:17–24. Greer also knew that, prior to 1992, Capps had lied to Meade County officers in other criminal investigations, including falsely denying that he committed crimes. *Id.* at 44:9–19. Greer even admitted that Capps had "probably lied to every police officer that ever investigated anything on him." *Id.* at 98:16–24. This evidence is undoubtedly favorable because it impeached Capps, a key witness for the Commonwealth. *See, e.g., Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (impeachment of prosecution witness is favorable under *Brady*); *Jackson*, 925 F.3d at 815 (*Brady* requires disclosure of "evidence affecting credibility" of a witness whose "reliability…may well be determinative of guilt or innocence") (cleaned up). Indeed, Greer now admits that—given what he knew about Capps' reputation for lying to law enforcement in 1992—he was skeptical of Capps' claim that Clark confessed to him: "I can't say I disbelieved it, but I can't say I believed it…. I'm skeptical." Ex. 19, Greer Dep I 99:3–7.

There is no dispute that Greer's skepticism of Capps and his knowledge that Capps had lied before in other investigations was suppressed. Greer affirmatively testified that he did not document or otherwise turn over anything to the prosecution reporting that Capps had lied to officers in his agency in the past or that he was skeptical of Capps. Ex. 19, Greer. Dep I 100:16–101:20. Prosecutor Smith confirmed that he did not withhold anything related to Capps that would have aided the defense in diminishing his credibility or could have potentially been used to impeach Capps. Ex. 76, Smith Dep. 83:9–22. Clark, Hardin, and defense counsel were all unaware of this critical impeachment evidence. Ex. 45, Clark Decl. ¶6; Ex. 41, Hardin Decl. at ¶6; Ex. 77, Adams Decl. ¶7–9; Ex. 78, Rogers Decl. ¶7–8. Had defense counsel been aware, they would have used this information to impeach Capps at trial. *Id.*; Ex. 77, Adams Decl. ¶¶ 7–9.

Defendants' brief does not even acknowledge Greer's damning admissions on this point, let alone argue that this suppressed evidence was not material. For good reason: there can be no reasonable dispute. Courts have repeatedly found far less powerful impeachment evidence to be material. *See, e.g., Thomas v. Westbrooks*, 849 F.3d 659, 664–66 (6th Cir. 2017) (finding *Brady* violation for failure to disclose FBI's $750 payment to key witness, even though the witness had been impeached on other bases and circumstantial evidence incriminated the defendant); *Robinson v. Mills*, 592 F.3d 730, 736–38 (6th Cir. 2010) (finding *Brady* violation for failure to disclose that key witness was paid confidential informant for law enforcement, even though witness had been impeached on other bases); *Harris*, 553 F.3d at 1033–35 (holding suppressed evidence was material where it undermined credibility of key witness); *Mellen v. Winn*, 900 F.3d 1085, 1096–1101 (9th Cir. 2018) (in § 1983 wrongful conviction suit, holding suppressed evidence was material as a matter of law where it impeached credibility of person who claimed to be sole witness to key admission by criminal defendant).

Moreover, when evaluating materiality, the suppressed evidence must be considered collectively with the rest of evidence; "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 113 (1976); *see also Bies*, 775 F.3d at 401–403. Here, the evidence was exceedingly weak: Hardin and Clark had a solid alibi covering almost the entire time Rhonda was missing, no witnesses linked them to the crime, and despite extensive searches no blood, fiber, soil or tire prints linked them to the crime or the scene. Given the closeness of the case, a reasonable jury could find the suppressed impeachment to be material.

### B.  Capps' Letter to Justis and Additional Impeachment Evidence

There is also ample evidence for a reasonable jury to conclude that Greer and Wise withheld additional impeachment evidence relating to Capps—including his November 1992 letter to Justis. While Greer and Wise deny receiving this letter until after Plaintiffs' trial, Justis has consistently maintained that he provided Greer and Wise with the letter in December 1992. Ex. 61, Justis Dep. 49:2-21, 52:24-54:25. That alone is sufficient to require a trial on this claim, as on summary judgment the Court "must resolve evidentiary disputes over specific historical facts…in favor of" Plaintiffs. *Gambrel v. Knox Cnty., KY*, 25 F.4[th] 391, 404 (6th Cir. 2022). But Justis' account is also corroborated by multiple neutral witnesses, including defense counsel in another case involving Capps and Justis who recalled that Greer had acknowledged his awareness of the letter and its contents in 1993.[9] Ex. 63, Palefsky Aff. at ¶3; Ex. 64, Palefsky Dep. at 29.  On their motion, Defendants improperly fail to credit any of this evidence.

---

[9] At his deposition, Greer claimed the first time he saw the letter was in 2015, and that he had no idea it existed before. Ex. 19, Greer Dep I 244:19–23; 37:17–39:2. But in March 1995, Wise documented that he and Greer went to Justis' home and got an envelope postmarked November 18, 1992 containing "one small lined sheet of paper and one larger sheet of paper"—in other words, the November 17, 1992 letter. Ex. 88, MSCO 909; Ex. 62, Capps. Corres.

Instead, Defendants focus on a portion of the March 10, 1995 statement given by Justis where he admits to not telling Defendant Greer about *a* letter when they met at the courthouse. Dckt. 286-2 at 13; Ex. 79, Justis St. 3. As Justis explained, the letter he was referring to—and didn't tell Greer about—was "the one I passed [from Hardin to Clark]," not *the* letter from Capps. Ex. 61, Justis Dep. 80:1-13, 84:2-16. Justis further testified that, before Greer and Wise turned on the tape recorder, they specifically discussed the letter from Capps seeking to get Justis to lie against Plaintiffs. *Id.* at 85:21-86:18. And during that unrecorded conversation, Greer threatened him and told him "to change my story 15 different times, and I ain't changing it, and I ain't changing it today." *Id.* at 122:2-4; 121:16-122:5, 126:3-127:14. At a minimum, whether Greer and Wise had the letter before the criminal trial is a factual dispute that must be resolved by a jury. *See, e.g.*, *Moran v. Al Bastic LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (holding "credibility judgments and weighing of the evidence are prohibited" at this stage).

Defendants' arguments to the contrary are unavailing. For one, Greer and Wise maintain they didn't disclose Capps' letter to the defense prior to trial because they claim they did not find out about it until after. Ex. 19, Greer Dep. I 34:7-24; 37:10-14; 53:23-54:12; Dckt. 286-2 at 5. They nevertheless try to argue that the letter was not suppressed because "trial counsel either knew about, or should have known about, the existence of the Capps letter." Dkt. 286-2 at 12. Defendants speculate that because Attorney Adams questioned Capps in a cursory fashion about not being called as a prosecution witness in a Colorado case, he somehow knew about the existence of the letter. *See id.* at 13–14. But as Adams has explained, although he knew that Capps was not called to testify in Colorado, he did not have Capps' November 1992 letter or any specific knowledge of the circumstances surrounding the decision not to call him in that case. Ex. 77, Adams Decl. ¶¶ 10-11. As a result, Attorney Adams asked Capps only five questions

26

regarding the Colorado case at trial; notably, none relate to Capps' having fabricated statements there as well. Dckt. 286-25 at TR Trx 1440-41.

As Attorney Adams has unequivocally attested, had he known about the letter—or Capps' request that Justis testify falsely—he would have cross-examined Capps about it at trial and would have called Justis to testify. Ex. 50, Bart Adams Dep. 259:19-260:10; 260:11-14; Ex. 77, Adams Decl. ¶10-11. Hardin's attorney attests to the same. Ex. 78, Rogers Decl. ¶7–8. Simply put, this did not happen because they did not know about. Further, Defendants cannot in good faith argue that the defense attorneys "should have" known about Capps' letter—even if they suppressed it—because Capps and Justis appeared on the Commonwealth's witness list. Dkt. 286-2 at 13. For one, more than 40 witnesses appeared on the Commonwealth's disclosures. Ex. 80, Witness List. Attorney Adams tried to interview Capps before trial, but he would not speak to the investigator. Ex. 77, Adams Decl. ¶12. And Defendants withheld the very information that would have prompted a reason to interview Justis. *Id*. at ¶11.

Critically, Defendants' argument "stretches the concept of reasonable diligence too far." *Boss v. Pierce*, 263 F.3d 734, 741 (7th Cir. 2001). As the Sixth Circuit has emphasized: "At no point have we or the Supreme Court offered any support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Barton v. Warden, S. Oh. Corr. Fac.*, 786 F.3d 450, 468 (6th Cir. 2015) (cleaned up) (rejecting argument that defendant "could have uncovered [] evidence on his own because he was given a copy of a police report" that included a witness's contact information); *see also, e.g.*, *Jefferson v. United States*, 730 F.3d 537, 546 (6th Cir. 2013) ("[W]e cannot accept the government's argument that Jefferson had knowledge of the factual predicate underlying his *Brady* claim based on his unsubstantiated suspicion that the prosecution withheld

evidence regarding deals with cooperating witnesses. This is especially so given the prosecution's representation that it had fulfilled its obligations under *Brady* and *Giglio*.").

Finally, the suppressed evidence of Capps' letter and circumstances surrounding his request that Justis also falsely testify against Plaintiffs was not merely "cumulative or superfluous to the other impeachment evidence" but rather went to the heart of the prosecution's case against them. *Barton*, 786 F.3d at 469; *see also*, *e.g.*, *Joseph v. Coyle,* 469 F.3d 441, 472 (6th Cir.2006) ("We have little trouble assuming that, if all five items [of impeachment evidence] had been completely undisclosed, they certainly would have been material/prejudicial under *Brady*."); *Puertas v. Overton*, 342 F. Supp. 2d 649, 657 (E.D. Mich. 2004), *aff'd,* 168 F. App'x 689 (6th Cir. 2006). Had this suppressed evidence been disclosed, Capps could have been directly impeached about his testimony in *this* case rather than on his informant status generally. *See Banks v. Dretke*, 540 U.S. 668, 702 (2004) ("The State argues that Farr was heavily impeached [at trial], rendering his informant status merely cumulative. The record suggests otherwise. Neither witness called to impeach Farr gave evidence *directly relevant* to Farr's part in Banks's trial." (cleaned up)). This is especially true when considered collectively alongside the other damning impeachment evidence Greer suppressed regarding Capps' dishonesty and history of lying in investigations. *Kyles,* 514 U.S. at 436 (holding undisclosed evidence must be considered collectively, rather than piecemeal); *see also United States v. Frost,* 125 F.3d 346, 383 (6th Cir. 1997); *Schledwitz v. United States*, 169 F.3d 1003, 1011–12 (6th Cir. 1999).

## C. Preclusion Is Not Relevant Because Plaintiffs' Convictions Were Vacated

Defendants' main challenge to Plaintiffs' *Brady* claim involving Justis is premised on their assertion that Plaintiffs are precluded from arguing that Greer and Wise had the November 1992 Capps letter in their possession before the criminal trial. Dkt. 286-2 at 5–12. First, even if

collateral estoppel applied here—which it does not—it would apply *only* to that limited issue (i.e., whether Greer and Wise had the letter before trial) and not to the clearly exculpatory impeachment evidence that Greer has now admitted he knew and did not disclose about Capps. *See Yeoman v. Ky Health Policy Bd.*, 983 S.W.2d 459, 465 (Ky. 1998) ("[I]ssue preclusion bars relitigation of any issue that has been *actually litigated and finally decided"* (emphasis added)). Greer's knowledge of Capps' reputation for dishonesty and lies in other criminal investigations was never raised or addressed during the state criminal proceedings, and Defendants cannot challenge Plaintiffs' *Brady* claim on this point.

Even with respect to the Capps letter, Defendants' collateral estoppel argument fails because there is no "prior judgment" to which preclusion can attach where, as here, Plaintiffs' criminal convictions have been vacated. It is undisputed that Plaintiffs' criminal litigation ended with the state court vacating their convictions and the Commonwealth dismissing all charges against them. Ex. 73, Order New Trial; *Comm. v. Clark,* 528 S.W.3d 342, 348 (Ky. 2017) (affirming the trial court's decision vacating Plaintiffs' convictions). The consequences are clear: because "the criminal judgment[s have] been vacated," the trial court's "interlocutory rulings have been vacated too. And vacated rulings have no preclusive effect[.]" *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) (citation omitted)). Indeed, the Sixth Circuit has repeatedly held that when a judgment is vacated, "for whatever reason," the trial court's factual findings are also "deprived of [] conclusive effect as collateral estoppel." *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985); *see also, Webb v. Compton,* 98 S.W.3d 513, 516 (Ky.App. 2003) ("Once the judgment upon which a plea of *res judicata* is based is set aside, the issue is no longer a viable one."); *Gillispie v. City of Miami Twp*, 2020 WL 5629677, at *16 (S.D. Ohio Sept. 21, 2020)

(vacatur of conviction nullified its preclusive effect including "for interlocutory orders, such as the Ohio trial court's 1991 decision denying [plaintiff's] motion to suppress").[10]

And even if collateral estoppel could be applied here despite the vacatur—and it cannot—Plaintiffs still would not be barred from pursuing their § 1983 *Brady* claim because the question to be decided is "not identical" to the one considered by the state trial court (i.e., whether Greer and Wise had the letter before trial). *See e.g.*, *Stemler v. Florence*, 350 F.3d 578, 588 (6th Cir. 2003) ("While there is identity of the parties, and the action was resolved the merits," plaintiff's "claim of violation of [his] substantive due process rights" was not barred by prior state court determination because "there [was] no identity of the causes of action); *see also Presbyterian Child Welfare Agency of Buckhorn, Kentucky, Inc. v. Nelson Cnty. Bd. of Adjustment*, 185 F. Supp. 2d 716, 720 (W.D. Ky. 2001) (*res judicata* does not preclude claim based on a controversy distinct from the earlier suit); *Yeoman*, 983 S.W.2d at 465 ("[F]or claim preclusion the apply, the subject matter of the subsequent suit must be identical.").

Finally, Defendants' *Rooker-Feldman* challenge has no more merit than their preclusion arguments. The *Rooker-Feldman* doctrine prevents federal review of an extant state court *judgment*, where a party seeks "what in substance would be appellate review of [that] judgment in a United States district court." *Doe v. Mann,* 415 F.3d 1038, 1041 (9th Cir. 2005) (emphasis). But there is no extant state court judgment here, so the doctrine does not apply. *See e.g.*, *Gillispie*, 2020 WL 5629677, at *16 ("[*Rooker-Feldman*] doctrine does not apply because the applicable state court judgments were vacated; essentially, they do not exist for this Court to review and reject.").

---

[10] Federal courts around the country addressing the same question raised here—an exoneree seeking, after exoneration, to relitigate issues initially decided against him in underlying proceedings—have routinely held collateral estoppel doesn't apply. *See Mills v. City of Covina*, 921 F.3d at 1169–70; *Gilliam v. Sealey*, 932 F.3d 216, 232–33 (4th Cir. 2019); *Evans v. Katalinic*, 445 F.3d 953, 955–56 (7th Cir. 2006).

## II.     A TRIAL IS NECESSARY ON FABRICATION (COUNT II)

As the Sixth Circuit has repeatedly recognized, a plaintiff makes "a fabrication-of-evidence claim under § 1983" where "a defendant knowingly fabricated evidence against [a plaintiff], and…there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (internal citation and quotation marks omitted); *see also Jackson*, 925 F.3d at 815–16; *Gregory,* 444 F.3d at 737. "[W]hether evidence is 'fabricated' will often turn on circumstantial evidence[.]" *Ferris v. City of Cadillac*, 726 F. App'x 473, 479 (6th Cir. 2018). Moreover, a "claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

### A.  Time of Death

Here, there is overwhelming evidence that Greer and Coroner Adams fabricated evidence that Rhonda was murdered early on April 2—including altering their official reports to reflect that she was killed on that date rather than April 4 or 5. This false evidence was critical to the prosecution because, as Greer admits, if Rhonda was killed on April 4 or 5—as he and Adams originally believed— then Clark and Hardin had alibis for that time and could not have committed the crime. Ex. 18, Greer Dep. II 160:6–161:25, 164:8–25, 165:17–25, 168:1–4; Ex.19, Greer Dep. I 270:7–23; Ex. 20, Greer Tr. 141:21–142:17.

Based on Greer and Adams' own testimony, their original theory regarding time of death was based on the medical evidence from the crime scene and autopsy because they did not have any suspects at that point.[11] Ex. 50, Bart Adams Dep. 124, 189; Ex. 19, Greer Dep. I 177–178;

---

[11] There is no reasonable dispute that this fabricated evidence influenced the prosecution. The date of the crime in the indictments—"on or about April 2, 1992"—matches the doctored April 2 date in Greer's offense report and Adams' death certificate.  Ex. 82, Clark and Hardin Indictments CAO 5699; HARDIN

Ex. 8, Uniform Rep. NSBMCSO 195; Ex. 52, KSP Exam. Once Greer and Adams zeroed in on Clark and Hardin as suspects, they began investigating their alibis. Ex.8, Uniform Rep. NSBMCSO 13–15. In doing so, they determined that Clark and Hardin "alibied beautifully" for Saturday April 4. Ex. 81, Greer GJ 9. Greer now admits that the reason he determined the crime happened on April 2 was *because* Clark and Hardin were alibied by other people the rest of the time. Ex. 19, Greer Dep I. 271. Adams similarly admitted that the only new evidence he learned after April 5 was that Clark and Hardin had an alibi for that time. Ex. 35, Bill Adams Dep 197–200.

As Plaintiffs' police practices expert has opined, the fact that a suspect has an alibi is never a basis to change the reported time of death. Ex. 83, Fischer Rep. 14. Greer and Adams' own admissions—coupled with the obviously doctored dates on the Meade County offense report and Commonwealth of Kentucky Death Certificate—would easily allow a jury to conclude that Defendants fabricated evidence that the crime happened on April 2 to frame Plaintiffs, rather than properly exclude them as suspects.

Greer and Adams do not argue there is no evidence to support this fabrication claim. Instead, they appear to argue that they changed the date of death based on advice from the medical examiner, Dr. George Nichols, and did not "knowingly fabricate" the time of death. Dckt. 282-2 at 24-26. To the extent Defendants are actually arguing Dr. Nichols advised them to change the time of death, that is clearly a "factual dispute about what happened" that must be resolved by the jury at trial as a jury could easily reach the opposite conclusion on this record. *Gambrel*, 25 F.4th at 405. For instance, although Greer documented a discussion with Adams on April 8 about calling Nichols "to see if it was possible that her (Warford) death could have been

18564. At trial, the Commonwealth argued that Clark and Hardin were together at this time and had the opportunity to commit the murder. Ex. 58, 3/7/95 Trial Tr. 230–232.  Thus, on this record, summary judgment must be denied and the issue decided by a jury.

sooner, possibly Thursday morning, 4-2-92," Ex. 25, NSB 14–15, neither he nor Adams documented the results of the phone call (if it happened). Adams also testified he doesn't "really remember" what Dr. Nichols told him on that call. Adams Dep. 84:13-16. These admissions, along with the altered documents, provide ample evidence from which a jury could conclude the fabrications were made knowingly. *See, e.g., Moldowan*, 578 F.3d at 389 (on intent, jury could find bad faith failure to disclose based solely on evidence of suppression itself).

It is undisputed that nothing changed medically between April 5, when Dr. Nichols completed his examination, and April 24, when he issued his final report. Ex. 10, Nichols Dep. I 187:1-19. Nichols testified he would not have relayed to Adams that there was any reason to change the estimate for when death occurred after the autopsy. *Id.* at 187:22-188:3.[12] In fact, when shown the altered Death Certificate, Dr. Nichols expressed concern over the circumstances: "Had I seen it, I would have asked him: 'Who did it and why was it done.'" *Id*. at 200:15-24; Ex. 16, Melinek Report 5. According to Dr. Nichols—who Defendants credited as "immensely qualified"—if Adams used whiteout to change the time of death on the death certificate, that "would make [Nichols] question his motive for doing it." Ex. 10, Nichols Dep. I. 202:3-8.  Dr. Nichols also expressed concerns about the appearance of Greer changing the date of death his police report, saying this makes him "question [Greer's] motive" as well. *Id*. at 209:14-22; *see also* Ex. 83, Fischer Report 14.

---

[12] At his deposition, when asked for his best estimate of when Rhonda died, Dr. Nichols testified that his best estimate was that she was killed within 24 hours of being found. Ex. 10, Nichols Dep I 154. From this testimony, a jury could certainly conclude that—if asked by Adams or Greer during the investigation for his best estimate—Nichols would have given the same answer. At trial, Nichols was not asked this question. Rather, he was asked "Could this death have occurred on April 2" and answered, "Yes, it could." Ex. 10, Nichols Dep. I 80:15-21. As he clarified at his deposition, "anything is possible." *Id.*

### B.  Witness Statements

There is also ample evidence for a jury to find that Greer fabricated inculpatory statements from multiple witnesses. Notably, Defendants do not even address Plaintiffs' claim that Greer falsely reported that Warford, Rogers, and Barnes made inculpatory statements during their April 9 interview. As such, Greer has waived any argument on this point. *See, e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (holding that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (cleaned up)); *Ricks v. Pauch*, No. 17-12784, 2020 WL 1640166, at \*25 (E.D. Mich. Apr. 2, 2020) ("Defendants were obligated to explain why they are entitled to summary judgment, but their brief makes no attempt to do so. But it is not for the court to search the record and construct arguments. Parties must do that for themselves.").

Regardless, a reasonable juror could certainly credit the account of these three witnesses over Greer's self-serving testimony that he never fed information to them. Ex. 19, Greer Dep I 285:15-16; Ex. 18, Greer Dep. II 130:22. First, these witnesses had every motive to be cooperative and truthful with the police. Ex. 1, Warford Dep. 150:20-24; Ex. 2, Rogers Dep. 23:12-15; Ex. 5, Barnes Dep. 14:15-19. Second, the false information attributed to them was consistent with Greer and Handy's theory of the case going into that meeting. Ex. 19, Greer Dep. I 121:8-12; Ex. 18, Greer Dep. II 122:11-15. Third, although Greer recorded a statement from Remsburg the very next day, he notably deviated from his usual practice of recording witness interviews when interviewing the victim's family and best friend—who were far more likely to have relevant information about Rhonda and the crime. Ex. 19, Greer Dep. I. 282:18-283:11. Greer also could not explain why, if Barnes, Rogers, and Warford had reported such important information—including that Hardin had previously threatened to kill Rhonda— he

would have deviated from his practice of taking tape recorded statements. Ex. 19, Greer Dep. I 319:11–321:19. Fourth, although Handy was present for the entire meeting, his report deviates in significant respects from Greer's. According to Handy, this means either he left the room *or* that he did not hear the witnesses provide the information documented in Greer's report.  Ex. 39, Handy Dep. Tr. 250:1-20. Finally, Adams testified that he did not recall learning anything about Satanism from visiting the Warford residence on the evening of April 9 when these interviews took place.  Ex. 35, Bill Adams Dep. Tr. 134:13-21.

A jury could also find that, although Greer knew this evidence was manufactured, he nevertheless introduced it in the grand jury—testifying that Rhonda's family informed him "they hated Keith Hardin and they hated Jeff Clark so bad it was pathetic. I mean, Sa – 'I think they're in Satanic. They got my daughter into Satanic worshipping. Uh, they like to kill animals.'" [13] Ex. 81, Greer GJ 7. The Commonwealth also capitalized on these statements at trial; arguing, for example, that there was evidence Hardin was "extensively involved in Satanism." Ex. 84, 2/28/95 Tr. 7-8. The Commonwealth also put on incriminating testimony from Clark's ex-girlfriend Remsburg. Ignoring this, Defendants argue there is not "a scintilla of evidence" to support the argument that Greer fabricated this testimony. Dkt. 286-2 at 22. In doing so, they wholly and improperly ignore clear evidence from which a jury could find that—as with Warford, Rogers, and Barnes - Greer fed Remsburg false information about Clark (like that he practiced Satanism and sacrificed animals), which she then adopted at trial.

First, based on Adam's contemporaneous memorandum alone, a jury could conclude that Greer fed Remsburg this information because she did not report *anything* about Clark's

---

[13] Greer introduced additional fabricated statements attributed to witnesses from his reports, like "We're talking about Clark or Hardin and Satanic. Rhonda don't get messed with it."  Ex. 81, Greer GJ  10.

purported involvement of Satanism to Adams during her April 9 interview.[14] Ex. 35, Bill Adams Dep. 131:22-132:1; Ex. 8, Uniform Rep. NSBMSCO 293-294. Additionally, given ample evidence that the incriminating events Remsburg describes—such as Clark practicing Satanism or Clark and Hardin purportedly killing animals—never happened, it would not have been possible for her to know this information unless it was fed to her. Indeed, the events she testified to track non-public information known to Greer and Adams from the autopsy (e.g., Clark allegedly telling her how to kill a person by stabbing them in the brain stem) and Defendants' theory of the case, including the statement Handy fabricated from Hardin about sacrificing animals. There is also direct evidence that Greer and Adams (along with Handy) were feeding this sort of information to other witnesses at the time, ie: Rogers and Barnes.

Finally, Remsburg had an obvious motive to lie against Clark, as he had reported her for sexually abusing her son. Even though Greer was aware of Remsburg's serious credibility issues, he admits that he took no steps whatsoever to corroborate any of her allegations against Clark. Ex. 19, Greer Dep. I 139:20-140:4. His failure to conduct any follow up investigation on statements from an obviously incredible witness further illustrates that he knew her statements

---

[14] Like Remsburg, there is sufficient evidence for a jury to conclude that Greer and Wise fabricated Capps' statement. First, Clark has always denied Capps' allegation. Ex. 13, Clark Tr. 238:5-13; Ex. 43, Clark Dep. Tr. 214:4-7.  Second, Capps' letter to Justis demonstrates his willingness to fabricate false evidence for benefits. Third, the withholding of Capps' letter to Justis by Greer and Wise is circumstantial evidence of fabrication. *Ferris*, 726 F. App'x at 479. Fourth, Greer and Wise deviated from their standard practice and spoke to Capps prior to turning on a recording device and claim to have no idea what was discussed prior to turning on the recorder.  Ex. 60, Wise Dep. Tr. 42:22-44:22; Ex. 19, Greer Dep. I 92:16-93:5. Deviation from standard practices is circumstantial evidence of fabrication.  *Ferris*, 726 F. App'x at 479; *Gregory*, 444 F.3d at 744 n.8.  Fifth, while Capps' recorded statement claims that Clark confessed to him in the Meade County Jail, Ex. 59, Capps St. 10:19-11:10, Greer now admits that Capps had no information when they first met.  Ex. 19, Greer Dep. I 63:6-17, 66:22-67:22, 70:5-17, 73:9-18. Sixth, Capps does not deny the fabrication, instead, he claims to have no memory of anything relating to this case.  Ex. 85, Capps Dep. 30:24-31:17.  Thus, at trial Plaintiffs will present circumstantial evidence of fabrication while Greer, Wise, and Capps will inform the jury that they have no recollection of what transpired prior to a recorder being turned on.  Finally, even though Greer now admits to being skeptical of Capps' statement, he took no steps to corroborate it during the investigation.  Ex. 19, Greer Dep. I 82:20-83:14, 100:1-15.  A jury could easily surmise that no investigative steps were taken to corroborate Capps' statement because they fabricated it.

were false and demonstrates this is a triable claim that must be weighed by a jury: "When witnesses tell differing stories, therefore, we cannot credit the story of the witness that we find more believable.  That is the jury's job." *Gambrel*, 25 F.4th at 404 (cleaned up).

## III.     THE RECORD PRESENTS A TRIABLE ISSUE ON PLAINTIFFS' FAILURE TO INTERVENE CLAIM (COUNT V)

There is no dispute over the governing standard: an officer can be liable for failure to intervene when he "observed or had reason to know" of a fellow officer's constitutional violation and "had both the opportunity and the means to prevent the harm from occurring." *Hoskins v. Knox Cnty., Kentucky*, No. CV 17-84-DLB-HAI, 2018 WL 1352163, at *17 (E.D. Ky. Mar. 15, 2018) (internal citation and quotation marks omitted). As shown above, Wise was present for the fabricated statements of Capps and Remsburg but did nothing to stop Greer from manufacturing evidence. The same evidence demonstrating Wise's knowledge of and endorsement of Greer's fabrication of evidence supports liability for failure to intervene as well. There is ample evidence for a reasonable jury to find that Greer and Adams knew that the other fabricated the time of death to frame Plaintiffs but did nothing to intervene to stop a violation of Plaintiffs' constitutional rights.

## IV.     THE RECORD PRESENTS A TRIABLE ISSUE ON PLAINTIFFS' CONSPIRACY CLAIM (COUNT VI)

A § 1983 civil conspiracy is "an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (internal citations and quotations omitted). Liability is proper when there is: (1) a single plan; (2) the officer shared in the general conspiratorial objective; and (3) an overt act was committed in furtherance of the conspiracy that caused injury. *Id*. Importantly, "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . .

[and] circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir.2000); *Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015).

Here, a reasonable jury could easily conclude that Defendants were "voluntary participants in a common venture to railroad" Plaintiffs. *Jones v. City of Chicago*, 856 F.3d 985, 992 (7th Cir 2002). As discussed above, Greer and Adams, on the one hand, and Handy, on the other, fabricated interlocking statements attributed to Hardin, Clark and other witnesses supporting the false claims that Plaintiffs sacrificed animals as part of the practice of Satanism and that the murder of Rhonda was somehow connected to that. This included fabrications arising out of interviews at which Handy, Greer, and Adams were present together, such as the April 9, 1992 interview of Rhonda's family members and false inculpatory admissions allegedly made during their joint interviews of Clark and Hardin on April 6, 8 and 9. A jury could also reasonably conclude that Greer, Adams, and Handy worked together in unsuccessfully attempting to coerce a confession from Clark on April 8 through threats and false promises. Defendants' bare assertion that "the record evidence does not support" a conspiracy claim here is thus wholly improper. *See Clay v. Emmi,* 797 F.3d 364, 370 (6th Cir. 2015).[15]

## V.    THE RECORD PRESENTS A TRIABLE MALICIOUS PROSECUTION CLAIM (COUNT III)

"A malicious-prosecution claim has four elements: (1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the

---

[15] Defendants' argument that Plaintiffs' conspiracy claim fails "as a matter of law" under the intracorporate conspiracy doctrine is also wholly misplaced. That doctrine bars conspiracy claims only "where two or more employees *of the same entity* are alleged to have been acting within the scope of their employment when they allegedly conspired together to deprive the plaintiff of his rights." *Jackson*, 925 F.3d at 818 (emphasis added). For one, Defendants themselves argue that the Meade County Sheriff's Department and the Meade County Coroner's Office are not the same entity. Dckt. 286-2 at 4, 24 (arguing Adams was not a member of MSCO). There's also no question that Greer, Wise, and Adams are not shielded by this doctrine where, as here, Plaintiffs have evidence demonstrating that they conspired with actors aside out of Meade County, in particular Detective Handy at the Louisville Police Department.

decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty ... apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Jackson*, 925 F.3d at 820 (cleaned up). Defendants challenge only the first two elements and so have conceded, as they must, that Plaintiffs suffered a deprivation of liberty and that the criminal proceedings resolved in their favor. Dckt. 286-2 at 30–37.

The first element is met where, as here, an officer includes "misstatements and falsehoods in his investigatory materials" and those materials influence a prosecutor's decision to bring charges." *Jackson*, 925 F.3d at 820–21; *see also*, *Mills*, 869 F.3d at 482–83 ("Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in [their] investigatory materials…ultimately influenced [a plaintiff's] continued detention.'"). Thus, the same evidence that proves Plaintiffs' fabrication of evidence claim above also establishes participation. *See, e.g., Mills*, 869 F.3d at 482–83 (finding that forensic examiner participated in plaintiff's continued detention by fabricating DNA report provided to prosecutors); *Sykes*, 625 F.3d at 316–17 (holding fact that investigative materials containing officer's knowing misstatements were in the prosecutor's possession and were relied upon by the prosecutor constituted evidence of influence); *Webb*, 789 F.3d at 664 (finding that officer aided in decision to prosecute by misdating phone recording which was later presented as evidence).

Greer's arguments to the contrary—that the Commonwealth decided to present the case to the grand jury and that he relied on information developed by other investigators in his presentation of the case—are unavailing. Dckt. 286-2 at 32.  For one, Greer need not have personally decided to prosecute Plaintiffs; it is enough that he "influence[d]" or "play[ed] a role" in their prosecution or continued detention. *Mills*, 869 F.3d at 482–83; *Tlapanco v. Elges*, 969

F.3d 638, 655 (6th Cir. 2020) (explaining that investigating officer "does not escape liability just because someone else (e.g., the prosecutor) made the actual decision to prosecute…"). And relatedly, officers may not "insulate [decisions] from challenge" by relying on other officers to take action. *See, e.g.*, *United States v. Baker*, 976 F.3d 636, 643 (6th Cir. 2020) (explaining that if arrest warrant turns out to be invalid, "'illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.'"). The Sixth Circuit holds that "sw[earing] out the warrant affidavit" is enough to "influence[ ] or participate[ ] in the prosecution decision." *Miller v. Maddox*, 866 F.3d 386, 390–91 (6th Cir. 2017). In addition to Greer's fabrications in investigatory materials, he also presented that fabricated evidence to the grand jury (as discussed further below). Accordingly, the first element of the malicious prosecution claim is satisfied.

As for the second element, it is well-settled that "in section 1983 cases, the existence of probable cause usually poses a jury question." *Webb*, 789 F.3d at 665 (cleaned up); *accord Gregory*, 444 F.3d at 751. Probable cause exists only where "facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Webb,* 789 F.3d at 660 (cleaned up). On Defendants' motion for summary judgment, the probable cause analysis may only be conducted after "[g]iving [Plaintiff] all reasonable inferences from the factual record." *See King*, 852 F.3d at 582 (reversing district court's grant of summary judgment to defendants for failure to consider probable cause record in light most favorable to plaintiff). The Sixth Circuit has routinely reversed decisions granting summary judgment where defendants failed to establish conclusively that there was no fact issue on probable cause. *See, e.g.*, *Gregory*, 444 F.3d at 750–51. This record presents a genuine dispute of material fact about whether probable cause existed; thus, the claim survives summary judgment.

Defendants' arguments to the contrary fail. First, they argue that the grand-jury indictment conclusively determines the existence of probable cause.  Dckt. 286-2 at 35. "But a *tainted* grand-jury indictment cannot provide a basis for probable cause." *Leath v. Webb*, 323 F. Supp. 3d 882, 895 (E.D. Ky. 2018) (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017)). There is a "'long-held exception to that general rule'—'when the defendant knowingly or recklessly presented false testimony to, or omitted other critical information from, the grand jury in order to obtain that indictment,' the presumption of probable cause is rebuttable." *Hoskins*, 2018 WL 1352163 at *8. As the Sixth Circuit holds, a plaintiff may rebut the probable cause presumption when he satisfies the following:

> (1) A law-enforcement officer, in the course of setting a prosecution in motion either knowingly or recklessly makes false statements (such as affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omission do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*King*, 852 F.3d at 587-88.

Here, a reasonable jury could easily conclude that Greer presented false fabricated evidence and knowingly or recklessly made false statements at the grand jury, thus rebutting the probable cause presumption. *Jones*, 690 F. App'x at 335. For example:

- At the grand jury, Greer testified that Rhonda's family informed him "they hated Keith Hardin and they hated Jeff Clark so bad it was pathetic.  I mean, Sa – 'I think they're in Satanic. They got my daughter into Satanic worshipping.  Uh, they like to kill animals.'" Ex. 81, Greer GJ Tr. 7. But as described above, Warford, Rogers, and Barnes did not hate Plaintiffs and had no knowledge prior to Rhonda's death that anyone was involved in Satanism.

- Greer also testified that a head hair found on Rhonda's sweatpants "matched" Hardin's: "I don't give them no benefit of the doubt on Exhibit 16. Hardin's hair on her red sweatpants."  *Id*. at pg. 14. According to the State's forensic analyst, he reported that a

hair from Rhonda's sweatpants was similar in characteristics to and *could have* come from Hardin, not that it was Hardin's hair. Dep. Ex. 48, Thurman Rep. In fact, Greer's own contemporaneous notes documents that Thurman told him prior to the grand jury one hair was "significantly similar" to Hardin's, not that it was Hardin's. Ex. 8, Uniform Rep. NSBMCSO 20–21.

- Greer also testified that they "caught" Plaintiffs in several lies, including about their involvement in satanic worship and owning knives. Ex. 81, Greer GJ 11. But, as discussed above, Clark never participated in Satanism nor told police that he did. And neither Plaintiff ever lied to police about owning knives. Relatedly, Greer testified that they'd "been to the Valley Station Satanic Hill a few times," which was false based on information he had fed to Remsburg. *Id.*

- Greer also testified that Mary Warford informed him that "Mr. Hardin put that [an inverted cross] on her daughter, sewed it on with a needle and thread with dye." Ex. 81, Greer GJ 7-8. Greer testified that was "a sign of Satanism." *Id.* But Warford denies Greer's testimony, testifying that she was unaware that her daughter had tattoos at the time she went missing. Ex. 1, Warford Dep. Tr. 67:16-20. ("I did not know about them until after she was found.") *Id.* at 194:4-7. And Greer has now admitted that he observed the tattoo at the April 5 autopsy and knew it had been put on with ink—not sewn with a needle and thread as there were no needles or thread visible. Ex. 19, Greer Dep. I 218:6-16. Greer had no explanation for why he testified falsely. *Id*. at 220:1-8.

- Greer also testified that Louisville Professor Ronald Holmes opined that "it's hard to say if it's Satanic or not Satanic." Ex. 81, Greer GJ Tr. 16. Not so. Ex. 8, Uniform Rep. NSBMSCO 290-291. Holmes' letter unequivocally informed Greer that there was *no* evidence that the murder was satanically motivated. Ex. 86, Letter from R. Holmes.

As Greer's own police practices expert agreed: when a law enforcement officer seeks probable cause, that officer has to report the facts as they were reported to him—he cannot change witness statements or facts to fit his theory of the case.[16] Ex. 46, Ryan Dep. at 132:23–133:11. He further agreed that if Greer made up or falsely attributed inculpatory statements to

---

[16] Greer also testified that there was a "fresh" print from Rhonda in Clark's car. Ex. 81, Greer GJ 15. While he claims this was told to him by an LPD evidence technician during the investigation in 1992, at trial in 1995, the technician expressly testified that: (1) she had been with the evidence Unit for four years; she could not tell how old a print was; and she couldn't even guess whether it was "probable" that a print was not old without guessing. Ex. 70, Haun Tr. 11, 14. This testimony undercuts Greer's argument that there's "no proof" he knew fingerprints couldn't be dated—and therefore fabricated that Rhonda's print was "fresh"—as a jury could easily credit that the evidence technician would have relayed the same information to Greer when asked in 1992.

witnesses – as a jury could find here - that would be "totally inappropriate" and a fabrication. *Id.* 157:9–14; 158:1–7; 165:22–166:2; 177:6–9.

Simply put, the presumption of probable cause is easily rebutted. And Greer's argument that, even if his fabricated evidence were discounted, probable cause would have existed anyway, Dckt. 286-2 at 35-36, is fundamentally flawed. That's because exculpatory evidence necessarily factors into probable cause. *See Gardenhire*, 205 F.3d at 318 ("[A]n officer cannot look at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest."). In *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999), the Sixth Circuit explained that "officers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." *Id.* at 372 (*citing BeVier v. Hucal*, 806 F.3d 123, 128 (7th Cir. 1986) (explaining that reasonable avenues of investigation must be pursued before concluding probable cause exists)).  Here, a reasonable jury could easily find that probable cause did not exist by considering just two factual issues: (1) if Defendants did not have a legitimate basis to change Rhonda's date of death—as Greer, Adams, Dr. Nichols, and Plaintiffs' expert Dr. Milenik have all testified—then the jury could determine that Rhonda died within 24 hours of her recovery on April 5, 1992; and (2) as Greer admits and knew at the time, Plaintiffs "alibied beautifully" for that time period, meaning they could not have killed Rhonda. Ex. 81, Greer GJ  9.  A trial is warranted.[17]

---

[17] Plaintiffs continue to pursue Count XI of their Complaints alleging a state-law malicious prosecution claim against Greer. "Excepting malice, Kentucky's elements resemble those of a § 1983 malicious-prosecution claim . . . ." *Hoskins*, 2020 WL 1442668, at *41; *Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016). "Malice may be inferred from a lack of probable cause." *Massey v. McKinley,* 690 S.W.2d 131, 133 (Ky.Ct.App. 1985); *Oakley v. Ballard Cnty.*, 2013 WL 275641, at *2 (Ky. Ct. App. Jan. 25,

## VI.    A TRIAL IS NECESSARY ON PLAINTIFFS' *MONELL* CLAIM AGAINST DEFENDANTS MEADE COUNTY (COUNTS VIII )

A municipality can be directly liable under § 1983 for constitutional violations caused by a "policy or custom" of the municipality. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). To show the municipality had such a policy or custom, the plaintiff must prove one or more of the following four methods: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions: (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of acquiescence of federal rights violations." *Jackson,* 925 F.3d at 828 (citing *Burgess v. Fischer,* 735 F.3d 462, 478 (6th Cir. 2013)). A "policy or custom does not have to be written law; it can be created by 'those whose edits or acts may fairly be said to represent official policy.'" *Paige v. Coyner,* 614 F.3d 273, 284 (6th Cir. 2010) (quoting *Monell,* 436 U.S. at 694).

### A.  Meade County is Liable for Defendant Greer's Acts as Policymaker

"[A] single unconstitutional act or decision, when taken by an authorized decisionmaker, may be considered a policy and thus subject a county to liability." *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 260 (6th Cir. 2015). Because "'*Monell* is a case about responsibility,'…with respect to a single decision, municipal liability is appropriate 'where the decisionmaker possesses final authority to establish policy with respect to the action ordered.'" *Bible Believers*, 805 F.3d at 260 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478, 481 (1986)).

For example, in *Bible Believers*, the Sixth Circuit found the direct involvement of a final policymaker (there the corporation counsel) in the unconstitutional decision "easily resolves the

---

2013).  Plaintiffs have presented sufficient evidence that a trial is warranted against Greer for malicious prosecution, as described above.

matter of municipal liability." 805 F.3d at 260. Whether or not her "misstatement of the law in a letter" constituted an official policy, "her direction and authorization for the Deputy Chiefs to threaten the Bible Believers with arrest…is certainly an action for which she "possesse[d] final authority to establish municipal policy." *Id.*; *see also Paterek v. Village of Armada, Michigan*, 801 F.3d 630, 651–52 (6th Cir. 2015) (holding where plaintiffs allege constitutional violations stemming from the decision of an official with final decision-making authority related to the particular policy at issue, "the Village is liable if a jury finds in Plaintiffs' favor"); *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (analyzing "single-act theory" of municipal liability based on a sheriff's involvement in a particular incident of excessive force, but finding no liability in that instance because the sheriff was not directly involved in causing the constitutional violation).

Here, the question of Meade County's liability is similarly "easily resolve[d]." *Bible Believers*, 805 F.3d at 260. As Sheriff, Greer was the chief policymaker in the MCSD. Ex. 18, Greer Dep. II 107:13-19.  As such, he had policymaking authority over how to conduct criminal investigations. *Id.* at 107:22-108:5, 108:18-25. Deputy Ernie Embry confirms that the practices of the department came from Greer. Ex. 87, Embry Dep. 85:5-12. There was no question Greer was in charge; he made all the decisions, and all policies came from him. *Id.* at 84:3–23. As Greer admits, if he openly failed to document and disclose exculpatory evidence as a policymaker, that would be the policy of the MCSD. Ex. 18, Greer Dep. II 107:22-108:5.

As described above, Greer's failings in the Warford investigation are limitless – he withheld a plethora of exculpatory evidence while fabricating false evidence to fit his narrative.[18]

---

[18] The record here clearly demonstrates not just that Greer was the policymaker but that he was acting with this policymaking authority as Sheriff when he developed the practices in place at the MCSD, including those he followed in this case.  The misconduct that Greer committed during the underlying

All the same misconduct in the investigation that establishes Greer's own individual liability, also establishes the liability for Meade County. But there's more.  Although Greer personally enjoys immunity for some of his unconstitutional actions—notably, his testimony— "municipalities do   not   enjoy immunity from   suit—either absolute or   qualified—under § 1983." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166 (1993). As a result, Meade County can be held liable for any unconstitutional acts Greer took as a final decisionmaker, including his false testimony at the grand jury and at trial.

Finally, Meade County contends that since no constitutional violations occurred, the County is not the "moving force" behind Plaintiffs' injuries. Dckt. No. 286-2 at 42. But a reasonable jury could find Greer committed numerous constitutional violations, including withholding exculpatory evidence and fabricating false statements. There can be no dispute that Greer is the moving force behind his own unconstitutional actions. A trial is warranted.[19]

## B.  Defendant Meade County is Liable for its Failure to Train Officers

"In order to show that a municipality is liable for a failure to train its employees, a plaintiff 'must establish that: 1) the County's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the County's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury.'"  *Jackson*, 925 F.3d

---

investigation, and encouraged subordinate officers to commit, distinguishes this case from most. Accordingly, Defendants' reliance on *Hoskins* fails.

[19] Meade County also seeks summary judgment as to Plaintiffs' "punitive claims against the Meade County government…"  Dckt. 286-2 at 49.  While Plaintiffs agree that they cannot seek punitive damages against Meade County, the same is not true for Greer, Wise, and Adams.  *Smith v. Wade*, 461 U.S. 30, 56 (1983)(holding that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.")  Given that Plaintiffs' § 1983 claims are based on Defendants' egregious misconduct, Plaintiffs' punitive damages claims against the individual Defendants must survive.

at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).  A reasonable jury

could find in Plaintiffs' favor on each of these elements.

### 1. Meade County Lacked Policies and Training Instructing Officers on its *Brady* Obligations

"When determining whether a municipality has adequately trained its employees, 'the

focus must be on adequacy of the training program in relation to the tasks particular officers

must perform." *Jackson*, 925 F.3d at 834 (citing *City of Canton v. Harris*, 489 U.S. 378, 390

(1989)).  Here, MCSD had *no* policies and procedures governing: (1) conducting a homicide

investigation; (2) documenting and disclosing exculpatory evidence; and (3) questioning

witnesses or suspects in a criminal investigation.  Ex. 87, Embry Dep. at 23:19-24:4; Ex. 89,

MCSD 9/7/2018 RFP Resp. at 22.  Greer—MCSD's policymaker—explains, "I did not maintain

any written Policies and Procedures while the Sheriff for Meade County, Kentucky."  Ex. 18,

Greer Dep. II 107:13-19.

MCSD had no training either. Ex. 18, Greer Dep. II 17-22; Ex. 19, Greer Dep. I 105:23-

106:3. Greer became Meade County Sheriff in 1982. Greer had limited experience as a constable

and no training: "Sir, we wasn't required to have any law enforcement training up into years as a

Sheriff of Meade County."  Ex. 19, Greer Dep. I 20:16-18, 21:7-16*;* 128:8-14. By 1992,

according to Greer, "if you were over 21 and had a second-grade education, you could be elected

sheriff in Meade County or any other county in the State of Kentucky." *Id.* at 68:12-20.

Wise confirms that no formal training was provided at the MCSD. Ex. 60, Wise Dep.

61:3-62:21; 63:25-64:9. So does Embry, who reveals that it wasn't until 1994 or 1995 that

formal training began at the MCSD. Ex. 87, Embry Dep. 25:2-7; 92:5-13.  As coroner and the

primary assisting investigator in the Warford homicide, Adams had no training and knowledge of

policies regarding critical police functions like conducting or documenting[20] witness interviews and interrogations. Ex. 19, Greer Dep I 13:22-14:5; Ex. 35, Bill Adams Dep. 39:3-11; 39:18-22; 42:2-6; 141:21-24; 146:1-7.

Due to the absence of formal training, MCSD's only training was Greer's example.[21]  Ex. 18, Greer Dep. II 104:3-5; 106:15-20; Ex. 87, Embry Dep. 85:5-12.  But, as Greer admits, he was not qualified to lead a homicide investigation. Ex. 18, Greer Dep. II at 237:13-22; Ex. 19, Greer Dep. I 226:16-18.  Before 1992, MCSD had never been the primary investigating agency for a homicide. *Id.* at 23:17-20.  According to Greer, his work in the underlying Warford investigation is an example of how he believed officers should properly document and disclose exculpatory evidence.  Ex. 18, Greer Dep. II 106:21-25; *Id.* 107:1-8.  As such, subordinate officers had no concept of the requirement to document and disclose *Brady* evidence.  Ex. 87, Embry Dep. 87:19-88:1 (Q: "Do you understand what *Brady* obligations are?" A: "What now?").

A reasonable jury could conclude that MCSD officers received no training "in their *Brady* obligations generally or in their obligation to provide witness statements to prosecutors." *Jackson*, 925 F.3d at 836.  And a reasonable jury could conclude that Greer's actions as policymaker demonstrate that Greer encouraged and enabled subordinates to violate the citizens' constitutional rights by withholding exculpatory evidence and fabricating false evidence.

## 2.  Meade County's Failure to Train Amounted to Deliberate Indifference

Single-incident liability is available where the need for more or different training is so obvious that a plaintiff's injury is a "highly predictable consequence" of deficient training. *Connick*, 131 S. Ct. at 1361; *Canton*, 489 U.S. at 390; *Bd. of the Cnty. Comm'rs of Bryan Cnty.*

---

[20] The same goes for Deputy Embry.  Ex. 87, Embry Dep. 86:2-13, 87:3-18
[21] Defendant Greer provided no training on homicide investigations.  Ex. 19, Greer Dep. I 22:20-23:20.  As Embry describes, the practices of the department came directly from Greer.  Ex. 87, Embry Dep. 85:5-12.

*v. Brown*, 520 U.S. 396, 409 (1997). Here, *Jackson* controls. 925 F.3d at 834–37. In *Jackson*, "none of the rules in [the city's] Manual explicitly mandated disclosure of exculpatory witness statements to prosecutors." *Id.* at 835. Officers testified they could not recall any training about disclosing exculpatory evidence, or that none was provided. *Id.* at 835-36. The Sixth Circuit concluded that a reasonable jury could find failure-to-train and deliberate indifference. *Id*. at 837.

The facts here are the same. Meade County had no policies governing disclosing exculpatory evidence and officers testified they never received training on it. A reasonable jury could find that Meade County was deliberately indifferent to the risk of *Brady* violations.[22] *See Jackson*, 925 F.3d at 837 (reversing district court's decision denying summary judgment because jury could find that municipality "did not in fact train its officers in their disclosure obligations," creating triable issue of deliberate indifference).

### 3. Meade County Was the "Moving Force" Behind Plaintiffs' Constitutional Injuries

Drawing inferences in Plaintiffs' favor, a reasonable jury could conclude that Meade County's failure to train was the "moving force" behind Plaintiffs' constitutional injuries. *See Ouza*, 969 F.3d at 267 (reversing district court's decision granting summary judgment because jury could find that municipality's "deliberate indifference" about training officers on "recurring situations" was "moving force behind Plaintiff's constitutional injuries"); *Virgil v. City of Newport*, 545 F. Supp. 3d 444, 492 (E.D. Ky. 2021) (relying on *Jackson* and denying summary judgment based on failure to train officers to disclose *Brady* evidence). A trial is warranted.

---

[22] A reasonable jury can also find that Meade County's failure to train on other critical police functions – such as witness interviews and interrogations – contributed violating Plaintiffs' constitutional rights.

## VII.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants are not entitled to qualified immunity for Plaintiffs' federal claims.[23] [24]  *See,*

*e.g.*, *Gregory, 644* F.3d at 760; *Mooney v. Holohan*, 294 U.S. 103 (1935), *Pyle v. Kansas*, 317

U.S. 213 (1942), and *Napue v. Illinois*, 360 U.S. 264 (1959) (standing for the proposition that it

has been clearly established for nearly 100 years that fabricating evidence for use against a

criminal defendant violates due process); *Jackson*, 925 F.3d at 824 (holding that it was clearly

established law by 1975 that police officers had  duty to disclose exculpatory evidence);

*Windswor v. Tennessean*, 719 F.2d 155, 165 (6th Cir. 1983) (recognizing "freedom from a

governmental conspiracy to violate one's civil rights is a clearly established right)."[I]ndividuals

have a clearly established Fourth Amendment right to be free from malicious prosecution by a

defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff'

by, for example, 'knowingly or recklessly' making false statements that are material to the

prosecution either in reports or in affidavits filed to secure warrants." *King*, 852 F.3d at 582–83

(quoting *Webb*, 789 F.3d at 660, 665). As the Sixth Circuit recognized recently in *Gillispie*

"[t]hose rights were clearly established by 1990 and have been readily applied at that level of

generality since."  18 F.4th at 918.

DATED:  January 26, 2023                              Respectfully submitted,

                                                                              s/ Elliot Slosar

---

[23] Adams argues that he is "entitled to qualified immunity" on Plaintiff's fabrication claim. Dckt. No. 286-2 at 24. He presents the Court with no argument supporting his assertion for fabricating the time of death. *Id*. None exists. iTwas clearly established by 1992 that fabrication of evidence was a due process violation. *See, e.g.*, *Gregory, 644* F.3d at 760; *Mooney*, 294 U.S. 103, and *Napue*, 360 U.S. 264 (1959)
[24] Defendants argue that it "is unclear whether Plaintiffs aver their state law claims against Meade County. To the extent they do, said claims are barred by County's sovereign immunity from same." Dckt. 286-2. Defendants' argument is moot as Plaintiffs do not bring state-law claims against Meade County. Sovereign immunity does not apply to Plaintiffs' federal claims against Meade County.

/s/Elliot Slosar
Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607

**_Attorneys for Plaintiff Jeffrey Clark_**

/s/Anna Benvenutti Hoffmann
Barry Scheck
Nick Brustin
Anna Benvenutti Hoffmann
Emmra Freudenberger
Katie McCarthy
Owanaemi Briggs
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013

/s/Larry Simon
Larry D. Simon (Ky. Bar No. 64355)
Attorney at Law
American Life Building, Suite 200
471 W. Main Street
Louisville, KY 40202

**_Attorneys for Plaintiff Garr Keith Hardin_**

**CERTIFICATE OF SERVICE**

I, Elliot Slosar, hereby certify that on January 26, 2023, I filed the foregoing document via the Court's CM/ECF System and thereby served a copy on all counsel of record.

/s/ Elliot Slosar
*Attorney for Plaintiff Clark*