UOR 1
Rev. 5-97

## UNIFORM OFFENSE REPORT
### COMMONWEALTH OF KENTUCKY

**AGENCY COPY**

AGENCY: _Meade Co. Sheriff Dept_ ORI: _Ky 0820000_   3. CASE NO: _MC-4-92-083_   CITATION NOIS: _____

TITLE OF INVESTIGATION: _A_   □ DEGREE □ _Murder_   1. ☒ FELONY   2. □ MISDEMEANOR   3. □ OTHER
4. □ VIOLATION   5. □ ORDINANCE   6. □ TECHNICAL

STATUTE: _507.020 (Knife)_   6. VIOLATION CODE _09040_   COMPLEXITY   ☒ SUPPLEMENTARY □

7. REPORTED BY _McCarty   Harold   K_
LAST   FIRST   MIDDLE   PHONE _(502)547-6938_
9. HOW REPORTED CODE: ( / )   TIME   RECEIVED _08:30_ DISPATCHED _08:35_   ARRIVED _09:00_ CLEARED _12:30_

8. ADDRESS _RT 2, Box 220 Irvington Ky 40146_   MONTH _April_ DAY _5_ YEAR _1992_

### LOCATION

10. EXACT LOCATION OF OFFENSE _Appx 150 ft off Ky 823   5 miles west of Dono_   SECTOR NO. _____

11. LOCATION   1. □ INSIDE   3. □ URBAN   2. ☒ OUTSIDE   4. □ RURAL

CITY _Midway_   COUNTY _Meade_ 082   STATE _Ky_   ZIP _____   12. LOCATION TYPE: _Field/woods_   *CODE: _10_

13. VICTIM'S: (PERSONAL CRIME ONLY)   1. □ CAR   3. □ HOME   2. □ BUSINESS   4. □ PROPERTY   _NA_

14. OFFENDERS: (PERSONAL CRIME ONLY)   1. □ CAR   3. □ HOME   2. □ BUSINESS   4. □ PROPERTY

*LOCATION CODES: 01-AIR/BUS/TRAIN TERM; 02-BANK/S&L; 03-BAR/N. CLUB; 04-CHURCH; 05-COMMERC/OFFICE BLDG; 06-CONSTR. SITE; 07-CONV. STORE; 08-DEPT/DISCNT STORE; 09-DRUG STORE/DR. OFFICE/HOSPITAL; 10-FIELD/WOODS; 11-GOVNT/PUB BLDG; 12-GROCERY; 13-HWY/RD/ALLEY; 14-HOTEL/M; 15-LAKE/WATERWAY; 16-LIQUOR STORE; 17-PKING LOT/GARAGE; 18-RES./HOME; 19-SCHOOL; 20-SPECIALTY STORE; 21-OTHER; 22-GAS STATION.

15. TIME OF OFFENSE   EXACT □ ESTIMATE ☒
DAY OF WEEK: _Thurs_ DATE: _4/2/92_ TIME: _02:00_
16. WEATHER CONDITIONS: 1. ☒ CLEAR   2. □ CLOUDY   3. □ RAIN   4. □ SNOW
17. LIGHTING CONDITIONS   1. □ GOOD   2. ☒ POOR   3. □ NOT APPLICABLE

WEAPON OR TOOLS INVOLVED   1. □ NO   2. ☒ YES   3. ☒ SPECIFY _Knife_
18. OFFENSE RELATED TO:   1. □ ALCOHOL   2. □ DRUG   3. □ COMPUTER   4. ☒ UNKN.   4. □ OTHER

20. VEHICLES INVOLVED   1. □ AUTO   2. □ TRUCK   3. □ OTHER _Unk_
21. STOLEN VEHICLE RECOVERED   A. ( ) STLN RECOV'D LOCALLY; B. ( ) STLN LOCALLY/RECV'D OTHER JURISD; C. ( ) STLN OUT OF TOWN RECOV'D. LOCALLY _NA_   (SEE JACKET FOR CODES)
22. OPERATION ID _NA_   1. □ YES   2. □ NO
SSN _NA_

### VALUE

23. 1. VEHICLES   S $ _____ R $ _____
RECOVERED PROPERTY CONDITION [  ]
2. OTHER PROPERTY (VALUE/CODE, RECOV'D PROPERTY CONDITION CODE)
S $ _____ R $ _____
RECOVERED PROPERTY CONDITION [  ]
S $ _____ R $ _____
RECOVERED PROPERTY CONDITION [  ]
S $ _____ R $ _____
RECOVERED PROPERTY CONDITION [  ]
S $ _____ R $ _____
RECOVERED PROPERTY CONDITION [  ]

18. TOTAL VALUE   S $ _____ R $ _____
24. ARSON ( ) STRUCTURE UNINHABITED
TYPE PROPERTY ___ A □ B □ C □ D □ E □ F □ G □ H □ I □ J □   AMOUNT OF LOSS $ _____

25. LARCENY BY TYPE   1. □ POCKET PICKING   2. □ PURSE SNATCHING   3. □ SHOPLIFTING   4. □ FROM MOTOR VEHICLES $ _____
5. □ MOTOR VEHICLE PARTS & ACCESSORIES $ _____   6. □ BICYCLES $ _____   7. □ FROM BUILDINGS $ _____
8. □ FARM EQUIPMENT $ _____   9. □ FROM ANY COIN OPERATED $ _____   10. □ LIVESTOCK $ _____   11. □ ALL OTHER $ _____

26. BURGLARY ONLY:   1. □ FORCIBLE ENTRY   2. □ NO FORCE   3. □ ATTEMPTED   27. POINT OF ENTRY _____

28. TYPE COERCION (EXTORTION/BLACKMAIL VIOLENCE ONLY)   A.( ) MISUSE AUTHOR; F. ( ) THREAT/FORCE; P. ( ) THREAT OF PROSECUTION/HARMED REPUTATION; D. ( ) OTHER
29. OFFENSE INVOLVING DRUGS (SEE JACKET FOR "TYPE" CODE)   TYPE ( ); QUANTITY ( ); VALUE ($ )

### VICTIM DATA

30. NAME: _Warford, Rhonda Sue   104 E Whitney Ave   Louisville, Ky 40282   367-84_   (502)
LAST   FIRST   MIDDLE   ADDRESS   CITY   STATE   ZIP   PHONE NO.

31. DOB: _____   AGE _19_
MONTH  DAY  YEAR
32. SEX   1. □ M   2. ☒ F
33. RACE   1. ☒ WHITE   2. □ BLACK   3. □ AMERICAN INDIAN OR ALASKAN NATIVE   4. □ ASIAN OR PACIFIC ISLANDER
34. ETHNIC ORIGIN   H □ HISPANIC   N ☒ NOT HISPANIC
35. OCCUPATION _Part Time Babysitter_
36. VICTIM TYPE: CODE ( _I_ )   *I-INDIVID; B-BUS; C-FIN/INST; G-GOV; R-RELIG. ORG; S-SOCIETY; O-OTHER; U-UNKN.

37. MARITAL STATUS:   1. □ MARRIED   2. ☒ SINGLE   3. □ DIVORCED
38. HANDICAPPED ( ) YES ( ) NO   IF YES, CODE: ( )   A. ( ) VISUAL; B. ( ) HEARING; C. ( ) PHYS. DISABLED; D. ( ) MENTAL.
40. HOW INJURED: ( ) ACCIDENTAL ( ) SELF-INFLICTED ( ) UNKN.

39. VICTIM STATUS: 1. INJURY TYPE N □ NONE;
B □ APPARENT BROKEN BONES;   S □ DEATH;   I □ POSS. INT. INJURY
L □ SEVERE LACERATION;   M □ APPARENT MINOR INJURY;
O □ OTHER MAJOR INJURY;   T □ LOSS OF TEETH;   U □ UNCONSCIOUS
41. MEDICAL ATTEN. REQUIRED ( ) YES ( ) NO   IF REFERRED, TO WHOM? _____
42. VICTIM UNDER INFLUENCE? □ NO   ☒ YES SPECIFY: _Waiting Test Rslts_

43. KENTUCKY RESIDENT STATUS: F. ☒ FULL-TIME; P. □ PARTTIME; N □ NON RESIDENT
44. CARRIED FOR UCR BY CONTRIBUTOR: ☒   OTHER AGENCY   2. □

45. STATUS OF CASE:   U □ UNFOUNDED;   A □ OPEN;   I □ CLOSED;   C □ CLEARED BY ARREST;   S □ SUMMONED/INDICTED;   E □ EXCEPTIONALLY CLEARED;*   *BASIS FOR E:   A □ DEATH;   B □ PROS. DECLINED;   C □ EXTRDN DECLINED   D □ REFUSED TO COOP;   E □ JUVEN CUSTODY;   F □ ADULT IN CUSTODY
46. POLICE/KILLED OR ASSAULTED:   1. _____   _NA_

47. AGGRAVATED ASSAULT/HOMICIDE CIRCUMSTANCES CODE: _07_   01-ARGUMENT; 02-GANGLAND; 03-JUV. GANG; 04-INCARCERATED; 05-LOVERS QUARREL; 06-OTHER FELONY; 07-UNKN; 08-OTHER

48. NEGLIGENT MANSLAUGHTER CODE:   30-CHILD PLAY W/WEAPON; 31-GUN CLEANING ACCID.; 32-HUNTING ACCIDENT; 33-OTHER NEGL. WEAPON HANDLING; 34-VEHIC. NEGL.; 35-OTHER   _NA_

49. JUSTIFIABLE HOMICIDE CIRCUMSTANCES CODE: _____   A-ATTACKED P-OFFICER; B-ATTACKED FELLOW P. OFFICER; C-ATTACKED CIVILIAN; D-FLIGHT FROM CRIME; E-COMMISSION OF CRIME; F-RESISTING ARREST; G-UNABLE TO DETERMINE.

50. OFFICER MAKING REPORT _____ 921
51. BADGE I.D. NO.
52. DATE _4/6/92_   _Page 1_
53. TIME SPENT _30 Hrs_
54. REVIEWED BY _____   PURSUANT TO KRS 15A.190 and KRS 17.150

NSHMC8D-00001   MSC0001

CONTINUATION PAGE/SUPPLEMENTARY REPORT
UNIFORM OFFENSE

RI KY0820000

Case No. MC-04-92-093

TLE OF INVESTIGATION Murder KRS 507.020

Violation Code 09040

OPSIS:

On Sunday April 5, 1992, at approximately 07:30 hours victim, Rhonda Sue Warford, body was found at the edge of a field of KY 823 approximately nine miles west of Brandenburg KY.

US OPERANDI:

Victim had been stabbed several times and her throat had been cut.

TE AND TIME OF CURENCE:

Between 4/2/92, 00:30 hours and 4/5/92, 07:30 hours.

CUSED:

TNESS(ES):

See Attached List

CLEN PROPERTY:

N/A

IDENCE AND HOW RKED:

See Attached List.

IDENCE DISPOSITION:

Sent to Crime Lab.

SSIBLE SUSPECTS:

1. Jeffrey Dewayne Clark, DOB: ███████, SSN: ███████, White Male, 4519 COD Dr Louisville KY 40272, telephone number 933-0554. Also 3510 Newburg Rd C-9 Louisville KY.
2. Garr Keith Hardin Jr., DOB: ███████ SSN: ███████ 10774 Terry Brown Rd Louisville KY 40272, telephone number 937-0852.

VESTIGATION:

Investigation follows.

**NSBMCSO 00002**

**... OF POLICE OFFICERS
.D WITNESSES:**

1. Joseph E. Greer, Sheriff of Meade County, Case Officer.
2. Clifford Wise, Deputy, Meade County Sheriff's Office.
3. Tim Livers, Deputy, Meade County Sheriff's Office, Photographed.
4. Ernie Embry, Deputy, Meade County Sheriff's Office, Received call at residence.
5. William Sego, Deputy, Meade County Sheriff's Office, Canvassed area.
6. Earl Smith, Deputy, Meade County Sheriff's Office.
7. Dan McCubbin, Trooper, Kentucky State Police, Tire casting, sketch of area.
8. William Adams, Coroner of Meade County, Case Officer.
9. Louisville Crime Lab-evidence.
10. Eugene Sherrard, Louisville Police Department Detective Lieutenant (Physical Assault Unit).
11. Hope Greer, Louisville Police Department, Detective, (Physical Assault Unit) 588-2408, 2473.
12. James Clark, Louisville Police Department, Detective, (Physical Assault Unit) Case Officer, 588-2408, 2473.
13. Mark Handy, Louisville Police Department, Detective, (Physical Assault Unit) 588-2408, 2473.
14. Robert L. Ennis, Jefferson County Police Department, Detective, Polygraph Operator, telephone number 588-2107, 2111.
15. Robert L. Smith, Jefferson County Police Department, Detective, Evidence Technician Unit.
16. Jerry Dugon, Louisville Police Department, Detective, Evidence Technician Unit, 588-2536.
17. Dr. George Nichols, State Medical Examiner.
18. Harold K. McCarty, DOB: 9-28-25, SSN: 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, Rt 2 Box 220 Irvington KY, Telephone number 547-6938.
19. Wanda McCarty, DOB: 4-28-36, same address as Mr. McCarty.
20. Marjorie Hardesty, property owner, 1170 Hardesty-Raymond Rd Webster KY, Telephone number 547-7832.
21. Mike Cummings, Deputy, Meade County Sheriff's Office, Photographs.
22. Joe Wood, Deputy, Meade County Sheriff's Office, Crime Lab.
23. Donna Allen, Sergeant, Louisville Police Department, Evidence Technician Unit, 588-2540.
24. Etienne Bennett, Louisville Police Department, Evidence Technician Unit.
25. Margaret Haun, Louisville Police Department, Evidence Technician Unit.
26. Mary Warford, mother, 104 E Whitney Ave Louisville KY 40214, Telephone number 367-8438.

NSBMCSO 00003

MC-04-92-093-3

:ST OF POLICE OFFICERS
;D WITNESSES CONTINUES:

27. Michelle Rogers, sister, (22:35 hours 4-5-92 I.D. Victim) 4519 Hazelwood Ave Apt 18 Louisville KY, Telephone number 367-7536.

28. Jackie Armstrong (22:35 hours 4-5-92 I.D. Victim) 6407 Venango Louisville KY, Telephone number 933-9849, DOB: 10-5-67 SSN: 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.

29. George Machado, Oxford Police Officer (22:35 hours 4-5-92 I.D. Body) 4519 Hazelwood Ave Apt 18 Louisville KY, Telephone number 367-7536.

30. Vicky Howser, 4801 Haney Way Louisville KY, Telephone number 937-5158.  Keith Hardin sister also called Meade County.

31. Tonya Tyrell, telephone number 368-3786.

32. Jimmy McMackin, Clark's Alibi, 10404 Greentree Upper left Apt Louisville KY 40272, telephone number 933-9143.

33. Noel McMackin, Clark's Alibi, Shepherdsville KY.

34. Eddie Thrasher, Clark's Alibi.

35. Tammie Rogers, sister, 4519 Hazelwood Apt 26 Louisville KY 40214, telephone number 361-9968.

36. Brooke Quire (lives with Boyfriend "Nick").

37. Crystal Barns, 1009 Hachaway Ave Louisville KY, telephone number 368-0655.

38. Jeffrey Warford, brother, lives at home.

NSBMCSO 00004

LIST OF EVIDENCE:

1.  Bloody leaves from face of victim (Louisville).
2.  Bloody leaves by keys (Louisville).
3.  Blood sample from victim (Louisville).
4.  Key rings (Frankfort).
5.  Rape kit from victim (Louisville).
6.  Hair sample from victim (Louisville).
7.  Hair and nail scrapings from victim's right hand (Louisville).
8.  Hair and nail scrapings from victim's left hand (Louisville).
9.  Hair found on victim's right hand (Louisville).
10. Paper bags used to bag victim's left hand (Louisville).
11. Paper bags used to bag victim's right hand (Louisville).
12. Soil sample from entrance scene (Frankfort).
13. Soil from possible suspect vehicle (Frankfort).
14. Red, white, and black jacket victim was wearing (Louisville).
15. Blue shirt victim was wearing (Louisville).
16. Red sweat pants victim was wearing (Louisville).
17. White bra victim was wearing (Louisville).
18. White canvas shoes victim was wearing (Louisville).
19. Suspect sample kit (Clark).
20. Tire mold (Frankfort).
21. Suspect sample kit (Hardin).
22. Dirty white running shoes (Clark).

NSBMCSO 00005

INVESTIGATION

On 4-5-92, at approximately 08:30 hours this officer was contacted by Deputy Sheriff Ernie Embry who stated that he had just received a call from his father-in-law, Harold K McCarty, stating that he and his wife had found what appeared to be a body off KY 823.   Embry stated that he was told by McCarty that he and his wife, Wanda McCarty, were out looking for some real estate that was for sale in that area.

A meeting place was set up whereby I met with Deputy Embry and McCarty at KY 79 and KY 428 and followed Deputy Embry who had McCarty with him to the location.   Upon arrival, pulling off the highway into an open field, trying not to disturb the area, I saw what appeared to be a body laying face down next to a fence approximately 150 feet from the roadway (KY 823),  and off to the left of a dirt and gravel road that leads in to the open field (also see sketch of area).

Upon approaching the body as careful not to disturb the scene, I determined it was a fully clothed white female wearing white canvas tennis shoes, red sweat pants, and what appeared to be a dark blue shirt and multi-colored jacket (red, white, and black).   Exact description and sizes of clothing obtained at Medical Examiner's Office.

This Officer then notified the Meade County Dispatch Service to send out teletypes to other agencies to check their missing persons report for someone fitting this description and also contact the Meade County Coroner, William Adams, Deuty on Duty William Sego, Deputy Cliff Wise and Earl Smith.   Also this officer requested for Deputy Livers to come to the scene to do all of the photographing for the Sheriff's Office and Coroner's Office.   Trooper Dan McCubbin of Kentucky State Police was requested to the scene to do the sketching.        While waiting for the above to arrive, this Officer talked to Mr. McCarty. Mr. McCarty advised that he and his wife, Wanda, were out looking for some real estate that was for sale on KY 823 and happened to pull off road (KY 823) into the field and according to Mr. McCarty, his wife, Wanda, saw it first and thought it was a "Mannequin".   Upon looking further, they realized it was possibly a body.   McCarty stated they immediately left the scene and returned to their home in Irvington I and called their son-in-law, who they knew to be a Deputy Sheriff in Meade County and told him what they found.

MSCO001133

MC-04-92-093-5

This Officer and Deputy Sheriff Embry proceeded to check the area while careful not to disturb the scene. It was then Deputy Embry found a large blood spot on some leaves and also laying near the blood spot was a key ring (exact description to come later after crime scene investigation). Blood spot and key ring were approximately 30 feet from the body (exact determination to be shown on sketch). Also it was noted at this time there were no drag marks or tire tracks or foot prints in the grass between the body, the blood spot and key ring.

After arrival of Coroner William Adams and other Police Officers, an extensive crime scene investigation began. The area was checked for foot prints, tire tracks, weapons, and anything out of the ordinary. The crime scene was photographed by Deputy Livers. A sketch of the area was made by Trooper McCubbin and the scene was video taped by this Officer. Leaves were collected from the spot near where the key ring was found (approximately 30 feet from body). Underneath the leaves, the ground was saturated with blood. The key ring was collected, which consisted of two key rings attached. On one of them, two keys and purplish colored disc with "World's Greatest Mom" on it, the other a red and brown teddy bear with "Best Grandma" on it. Also attached to one of the key rings was a chain with green magnet with metal center "100 Grade Lane" printed on it. A finger nail clipper with Revlon brand name, a black scrapper with Kentucky Lottery and Winner on it. Both leaves and key rings with the above items to be sent to the Frankfort Crime Lab.

Prior to removing the body a search was made of the immediate area where the body was laying.

The feet and hands of the victim were bagged before attempting to remove her. Upon rolling her body over, leaves were collected from the victim's face and neck area, packaged to be sent to the Jefferson Regional Crime Lab. The body was removed from the scene to be taken to the Medical Examiner Office in Louisville KY for examination and autopsy and to collect any evidence that could possibly be found on victim.

This Officer and Coroner William Adams proceeded to Louisville Kentucky with the body leaving Deputy Sego, Deputy Livers, Deputy Smith, Deputy Embry, and Trooper McCubbin to make a complete search of the area to include using a metal detector to search the area.

NSBMCSO 00007

MSCO001134

Also Trooper Dan McCubbin was to plaster cast one tire track that was found that could possibly be evidence (mold to be sent to Crime Lab). The OfficerS that were left at the crime scene departed at approximately 12:30 hours.

Upon arrival at the Medical Examiner Office, an examination was made of the body, finger prints, nail scrapings, hair taken off of both hands, and photographs were taken by Detective Robert L. Smith, Jefferson County Police Department, Evidence Technician Unit. These items were turned over to this Officer to be taken to the Crime Lab, except photographs that will be turned over to this Officer at a later date. Also blood and victim assault kit were taken and given to this Officer to be taken to the Jefferson Regional Crime Lab. The following clothing was removed and turned over to this Officer to go to the Jefferson Regional Crime Lab. Pair of white canvas deck shoes, green and brown trim, size 10 M, red and white jacket with black sleeves with UNLV on sleeve and "Running Rebel" on breast, size XL, brand name Apexon Varsity, blue long sleeve knit shirt with pocket "check point", size XL. White lacy bra, pink underwear. Red sweat pants "Jerzees", size XL 40. Also silver chain removed from wrist, which is being retained in evidence room.

Further examination of the body revealed that she had an inverted cross tattoo over her left breast, that she had 11 stab wounds to the upper torso, and her throat had been cut from center to right. Also were two defensive wounds on right hand. According to Dr. Nichols, the fatal wound was to the back of the neck. Also according to Dr. Nichols the type of weapon was probably a hunting type knife 5"-6" blade with a width of 1 1/4-1 1/2 inches and that the perpetrator was right handed, as the throat cut and neck wound were consistent with being done from behind.

It was also determined that the victim was 5'11 1/2", 221 pounds, long brown hair, hazel eyes, and approximately 20 years of age. There were no drag marks either on her back or stomach to indicate she had been dragged, leading this Officer to believe that she was killed in the proximity of where the keys and large blood spots were located (see diagram). Thus indicating she had been carried and laid or thrown face down where the body was found. Further examination of the body did not reveal that she had been physically abused I.E. broken bones, beat up etc.

After completion of the autopsy, this Officer along with Coroner William Adams returned to the Meade County Sheriff's Department and secured all evidence obtained from the scene and from the Medical Examiner Office.

Also an update was given to Meade County Dispatch about victim, so that all agencies could be notified to check their Missing Person's Reports. It was also decided that WHAS T.V. would be contacted to air portions of this case, in hopes that we would get assistance in identifying the victim.

At approximately 19:13 hours 4-5-92, the Meade County Dispatch received a call from a Ms. Vicky Howser, wanting to talk to someone about the body that had been found in Meade County.   Upon returning the phone call, Ms. Howser stated that her brother's girl friend had been missing since late Wednesday night, 4-1-92, or early Thursday morning, 4-2-92, and that the description that was on T.V. matched her brother's girl friend. The name of the missing girl was Rhonda Warford, age 19, and that a Mrs. Mary Warford, mother of Rhonda, had reported her missing to the Police. Ms. Howser was not sure if it was Louisville Police Department or Jefferson County Police Department, but that the address of Rhonda and her mother was 104 E Whitney was in the city. From this I assumed that Louisville Police Department took the report and so instructed Deputy Livers, who was on Duty in the Dispatch to find out.   Also I obtained the phone number, address, and name (Keith Hardin, Vicky Howser's brother) from Ms. Howser, so myself and Coroner William Adams could make contact with him.   It was decided that we would proceed to Louisville and make contact with Howser's brother (Hardin). Prior to leaving, a call was received from Mrs. Mary Warford, who had also seen what was released to WHAS T.V.   She confirmed that she had a daughter missing and what she had seen on T.V. matched her description, and confirmed she had reported her missing to Louisville Police Department on 4-2-92.   Mrs. Warford was advised that this Officer and Coroner William Adams were in route to Louisville and would be to her home. It was decided to go to the boy friend's first, as to not alarm the mother, if in fact, are victim was the Warford girl.   After departing and enroute to Louisville, this Officer was contacted by radio and advised that Louisville Police Department did have a Missing Person's Report on

NSBMCSO 00009

Rhonda Sue Warford, age 19, white female, and did match the description of the victim, except their report showed white pants instead of red. It was also requested from Louisville Police Department that a Officer meet us at the Warford's residence when we got there.

Upon arrival at the Hardin's residence where he lived with his parents and talking to Garr Keith Hardin, he stated that he was the boy friend of Rhonda Sue Warford. He also stated he had a flyer with Ms. Warford's picture on it and a photo of Ms. Warford. Upon examining the flyer and photo, we were sure that we had found Ms. Warford, but did not tell Hardin of this. After talking to Hardin further, he stated that the last time he had seen her in person was Saturday night, 03-28-92, at approximately 7:00 P.M., and talked to her on the phone Wednesday, 4-1-92, at approximately 3:00 P.M. and that she was in good spirits. Hardin was asked if Ms. Warford usually wore any type of jewelry or type of tattoos. He stated that she had an inverted cross above her left breast. Also in reference to jewelry, he stated that she sometime wore a silver chain around her wrist and he had a neck chain that Ms. Warford had given him that matched. Hardin was asked if he would let me take the photo and neck chain with me. He complied, only if I would see that he got them back, which I assured he would. Hardin stated that he had been going with Ms. Warford since December 14, 1991, and had known her for approximately one month prior. While at the Hardin residence, we were advised to contact a Detective Clark of Louisville Police Department, Physical Assault Unit. Upon contacting Detective Clark, it was decided that we would meet him at the Third District Police Station on Taylor Blvd. After departing the Hardin residence, we proceeded to the Third District where we met with Detective James Clark and also Detective Hope Greer of the Louisville Police Department, Physical Assault Unit, whereby we discussed the case with them, and explained to them what we had found in Meade County. Detective Clark showed this Officer the Missing Person's Report on Ms. Warford that their Department had on file and turned a copy of the report over to this Officer. We were all sure that she was the murder victim, Rhonda Sue Warford. Upon departing the Police Station, myself, along with Adams, Detective Clark and Greer proceeded to the Warford's residence at 104 E Whitney. Upon arrival, w talked to Mrs. Mary Warford, who is the mother o Rhonda Sue Warford and to Michelle Rogers, a sister of Rhonda's. Mrs. Warford stated that her

NSBMCSO 00010

MSCO001137

daughter had went to the grocery (Krogers) Wednesday night, 4-1-92, at approximately 7:00 P.M. and upon returning she (Rhonda) told her that a man followed her shouting that he wanted to marry her. Mrs. Warford told us that shortly after midnight, approximately 00:30 hours on 4-2-92, that her daughter took the house keys and left stating that "I'm going down there". She also stated that is the last time she saw or heard from her. She also stated that she filed the Missing Person's Report. Mrs. Warford gave a description of her daughter that matched the victim perfectly. As for the inverted cross, she stated that Rhonda's boyfriend, Keith, put it on her, that it was above her left breast. She also stated, along with her daughter Michelle Rogers, that Keith and his friend Jeff Clark (Jeffrey D. Clark) were into satanic worship. Upon discussing this further, it was learned that Keith and Jeff used to live in a trailer together off Newburg Rd, but both had moved back home after Keith and Jeff had a falling out but were back friends again. All of the Police present got the impression that Keith and Jeff were not liked in the Warford home.

Mrs. Warford was advised by Coroner William Adams that it was very possible that we had found their daughter and that she had been murdered, and that we would need someone from the family to go to the Medical Examiner's Office for a positive identification.

Detective Clark advised this Officer that due to the satanic material in Rhonda's room that he thought that Evidence Technician Unit of Louisville Police Department needed to be called to process her room, which was done. Also several items out of Rhonda's room were turned over to Detective Clark by Mrs. Warford, in hopes that it could help in the investigation.

Several things were discussed, but due the hysteria any type of statements were impossible to take at this time, this would be done later.

The family decided that Michelle Rogers, a sister, and Jackie Armstrong would go with myself, Adams, and Detective Greer to the Medical Examiner's Office, where we would be met by George Machoda, boy friend of Michelle. It was decided by Detective Clark that he would stay at the Warford's residence and wait and assist the Louisville Police Department Evidence Technician Unit. Upon arrival at the Medical Examiner's Office at 22:35 hours, the young lady that was found at approximately 07:30 hours the same

NSBMCSO 00011

MSCO001138

morning, 4-5-92, was positively identified as Rhonda Sue Warford by Michelle Rogers, Jackie Armstrong, and George Machado. Upon returning to the Warford's residence, Coroner Adams met with the family to discuss the release of the body and other arrangements, and that they would be contacted at a later date for statements on anything that might help in the investigation. After talking to Detective Clark and the Evidence Technician Unit Personnel, Detective Clark decided he would open a case so he could take possession of photos and any other evidence that might be obtained and subsequently relay to this Officer. Myself and Adams departed the residence at approximately 23:50 hours 4-5-92, and returned to Meade County. After arriving at the Meade County Dispatch, Hardin and Clark were LINK/NCIC computer checked for vehicle ownership and criminal history. (Also see Detective Clark's reports of 04-05-92).

4-6-92, 07:30 hours, after ariving at Meade County Dispatch, this Officer was informed that Hardin did not have any vehicles registered in his name nor any criminal history. Clark was determined to have a 1982 pick-up with expired plates of 1990, License number TFO-333, a 1974 Chevrolet Nova, two door, blue (Later to be determined to be primer), License number YVR-572 expires 6-30-92, and a 1975 Pontiac, brown with expired plates 6-30-90. Also Clark showed a criminal history on warrants taken by Amy Remsburg, who used to live near Payneville KY.

All evidence collected from the crime scene and Medical Examiner's Office were packaged and numbered to be taken to the Jefferson Regional Crime Lab in Louisville, with the exception of key rings, dirt samples, and tire mold which was packaged and numbered, but to go to the Frankfort Crime Lab.

Prior to my leaving for the Crime Lab in Louisville and to the Louisville Police Department, Deputy Sheriff Sego was instructed to canvas the area of KY 823 and see if anyone might have seen anything.

At approximately 10:00 hours 4-6-92, this Officer and Coroner William Adams proceeded to the Crime Lab in Louisville. After arrival and turning over evidence to the Crime Lab, we proceeded to Louisville Police Department, Physical Assault Unit where we made contact with Detective Lieutenant Gene Sherrard, who was briefed as to what had taken place in Meade County and to what had taken place. We asked for their assistance

NSBMCSO 00012

MSCO001139

in the investigation. Detective Mark Handy was assigned to assist in the investigation along with Detective Greer and Clark, who was already working on the case. After discussing everything with Handy, it was decided that a Jeff Clark would be picked up, since his name had come up Sunday evening, 4-5-92, at the Warford's residence, and who also was a friend of Rhonda's boy friend, Keith Hardin.

Detective Handy accompanied by this Officer and Adams proceeded to Clark's residence in Valley Station. Upon arrival, Clark agreed to accompany us back to Louisville Police Department. After arriving back at Louisville Police Department, Clark agreed to talk to us about this whereabouts turning the time period since Rhonda was reported missing. He also agreed to submit to a suspect sample kit and a polygraph. Clark seemed to have an alibi for this time period and furnished names of persons that could vouch for him, which we would check out later. Clark denied anything to do with the Murder of Rhonda Sue Warford and stated he had not seen her since December 1991. Dr. Tracy Corey, Medical Examiner's Office was contacted, who came to the Louisville Police Department Physical Assault Unit Office and Clark gave his consent to the suspect kit being taken. Upon completing the test kit, was turned over to this Officer to be taken to the Louisville Crime Lab. Clark was then taken to the Jefferson County Police Headquarters, whereby he again consented to be given a polygraph by Detective Robert L. Ennis. After completion, it was Ennis's opinion that Clark did not completely tell the truth. Clark was returned to the Louisville Police Department Homicide, whereby he was again interrogated and again denied any knowledge of Rhonda's Murder. Clark was then returned to his residence by myself and Adams, who then returned to Meade County. (Also see Detective Handy's report of 04-06-92).

Tuesday, 4-7-92, this Officer contacted Detective Handy, Louisville Police Department, and it was decided that he would pick up Keith Hardin, the boy friend of Rhonda's, and approach him the same way Clark was interrogated. Later in the evening, this Officer was contacted by Detective Greer, who stated that Hardin had taken the polygraph and submitted to a suspect test kit, (see Detective Handy's report on Hardin's interview 04-07-92). Also on Tuesday evening, this Officer met with Adams, and it was decided that we would send an Officer to Rhonda's funeral Wednesday morning, 4-8-92, and attempt to photograph some of the persons coming to the

NSBMCSO 00013

MSCO001140

funeral.  Deputy Mike Cummings was contacted and assigned this job.  Upon further discussion with Adams and determining that both Clark and Hardin had alibis for Saturday night, 4-4-92, we decided to contact Dr. Nichols, Medical Examiner, Wednesday morning 4-8-92, to see if it was possible that her (Warford) death could have been sooner, possibly Thursday morning, 4-2-92.  Both Clark and Hardin were alibiing each other for Wednesday night,  4-1-92, and Thursday, 4-2-92, stating they were together drinking and at Clark's trailer off Newburg Road looking for a snake that got loose in the trailer and that they were together until at least 03:00 hours 4-2-92, and that Clark was driving his 1974 Chevrolet Nova (License number YVR-572).  Also Deputy Joe Wood was contacted to make arrangements to go to the Frankfort Crime Lab next date, 4-8-92.

4-8-92, evidence to be taken to Louisville Crime Lab and Frankfort Crime Lab was turned over to Deputy Joe Wood.  This Officer accompanied by Adams then proceeded to the Third District Police Station in Louisville off Taylor Blvd.  Upon arrival I advised Captain Thompson, Station Commander of my intentions to have a Deputy in the immediate area of the funeral home, in an attempt to photograph persons and vehicles as arrive and depart for visitation.  We then proceeded to the funeral home, whereby I talked to the management as to obtaining a copy of the visitation register and they stated they would copy and hold it for me.  We then proceeded to the Louisville Police Department downtown to meet with Detective Handy, where a meeting had been set up with other personnel to discuss what had taken place so far, and to also review the video tape and photographs from the crime scene and autopsy.  It was decided that we would pick up Jeff Clark again and see if he would consent to us having his vehicle taken to Louisville Police Headquarters downtown to be checked by the Evidence Technician Unit Personnel.  Upon arrival at Clark's residence, he agreed to letting us have the car, which we agreed to return after processing.  Also Clark agreed to go with us back to Louisville Police Department.  After talking to Clark at length at Louisville Police Department, he again denied any knowledge or having any part in the Murder of Rhonda Sue Warford and maintained that he and Hardin were together on Wednesday night, 4-1-92, and Thursday, 4-2-92, and that they did not see Rhonda nor had he talked to her, but he did kn that Hardin had talked to her at 15:00 hours 4-1-92.  Upon completion of the interview, Clark

agreed to turn over his shoes that he was wearing, since he had stated that he was wearing them Wednesday night, 4-1-92, (shoe to be sent to the Jefferson Regional Crime Lab). Also Clark was advised that his vehicle would be returned to him Thursday morning, 4-9-92. At approximately 18:30 hours we departed Louisville Police Department and returned to Meade County. (Also see Detective Handy's report of 04-08-92).

4-9-92, 11:00 hours upon returning to Louisville, I met with Detective Handy, who stated that he had talked to Warford's family and stated that he had set up a meeting for us with them at 12:00 hours at their residence. Myself, Detective Handy, and Detective Mason proceeded to the Warford's residence. Upon arrival and talking to Mrs. Mary Warford, she stated that her daughter, Rhonda, had went to the store around 7:00 P.M. and returned at approximately 7:30 P.M. on Wednesday, 4-1-92, her daughter told her that a dirty looking man had followed her, yelling that he wanted to marry her, and her to have his baby. She told her mother she didn't know him. Mrs. Warford stated that her daughter didn't go back out again until she left and didn't come home. Mrs. Warford stated that at around 11:00-11:30 P.M. Rhonda made a phone call to her friend, Crystal Barns. Mrs. Warford stated that she told Rhonda that she shouldn't, because Crystal would be in bed. Mrs. Warford stated the call was about if, "she wanted to go shopping next day with her." Mrs. Warford stated that she went to bed around 12:00 midnight, that around 12:30 A.M. Rhonda came into room and got the house keys told her that she was going "Down Here" and left. When we asked about the clothes that Rhonda had on, she stated that she had "white sweat" pants on along with everything else shown on Missing Person's Report. I enquired if she was sure they were white and that Rhonda had two pair; also she had other colors too. I asked her daughter, Michelle Rogers, to check Rhonda's clothing, whereby both white pair were found. At this time Mrs. Warford stated that she had to have changed before she left, since both white pair were there. Mrs. Warford was asked if her daughter was in habit of leaving like that, considering the time, and also not taking her purse or billfold. She stated no, unless it was with a friend or someone she knew real well. In reference to Rhonda's boy friend, Keith Hardin, she stated that to the best of her knowledge the last time he was at her residence to see Rhonda was on 3-28-92, and that he left around 7:00 P.M. in the evening. Also she knew that Rhonda had

MSCO001142

talked to Hardin on the phone on Wednesday, 4-1-92, at approximately 3:00 P.M., but she was not aware of what the phone conversation was about. She also stated that Rhonda was in good spirits all day Wednesday. Mrs. Warford was asked if she had seen Rhonda with any jewelry on Wednesday night. She stated she didn't see any, but that she did have a cloth type band with elastic in it; she believed the color to be black with orange and other colors in it.

Upon talking to Crystal Barns, she stated that Rhonda had called her Wednesday night, 4-1-92, at approximately 11:30 P.M., after she was in bed asleep. She stated Rhonda wanted to know if she (Crystal) wanted to go shopping Thursday, 4-2-92, with her and her mother. She stated that Rhonda was in good spirits and didn't tell her of any plans of going out that night. Crystal was asked if she knew Keith Hardin, Rhonda's boy friend. She stated she did and did not care too much for him. She stated that he was in that satanic stuff, that he was getting Rhonda in it. She stated that Rhonda was crazy about Keith, and that Rhonda had told her she felt that Keith was trying to break it off, and that Rhonda stated she had been telling Keith that she was pregnant and Keith didn't like that. Also according to Crystal, she was sure that Keith Hardin smacked Rhonda around before. As for Jeff Clark, Crystal stated that Rhonda did not like him. She also stated that Keith and Jeff had parted friendship for a while, that she was sure that it was over Rhonda, but they had gotten back together in the last three weeks (Keith and Jeff). Also Crystal stated that Rhonda told her on Tuesday, 3-31-92, that Keith told her he would kill her if she ever run around on him. Upon talking to Michelle Rogers, sister of Rhonda's, she stated that Rhonda would never leave the house that late unless with a friend. She also stated that she knew Clark, Hardin's friend, that she had been out with him before, that she was not ever a girl friend of his, that he was weird just like Keith, that they were in satanic worship, that she knew for a fact that they had killed animals and that they had a lot of knives. She also knew that Keith had put the inverted cross on Rhonda. When asked about Rhonda telling Keith that she was pregnant, she stated that Rhonda wanted to get pregnant and that Keith would get mad when Rhonda would tell him that she would miss her period. Also she stated she had been to Jeff's trailer with Rhonda that Jeff didn't want her there and that when Jeff and Keith's friendship broke-up. It was probably over Rhonda. She also stated that Rhonda told Keith that he needed to get off

NSBMCSO 00016                                    MSCO001143

his butt and get a job. When asked Michelle would Rhonda leave the house for that time at night without her purse or billfold, she stated that it had to be either with a friend or to go see Keith, never with a stranger or another boy. She stated that Rhonda had not been out with any other boy since she started going with Hardin in December 1991. After leaving the Warford's residence, we proceeded to the Hardin's residence, to pick up Hardin again. Hardin was not at home, so Detective Handy left a card on the door telling him to call Louisville Police Department when he got home. Shortly after arriving back at Louisville Police Department, Detective Handy made contact with Hardin, who agreed to talk to us. Handy, along with myself, returned to Hardin's residence, picked up Hardin, and returned to Louisville Police Department. Upon talking to Hardin, he again denied having any involvement in the Murder of Rhonda Sue Warford. Again stating that he was with Jeff Clark Wednesday night, 4-1-92, and Thursday morning, 4-2-92, that they were drinking and was over at Jeff's trailer looking for a snake that got loose. He admitted to owning several knives, which before he told Detective Handy he didn't have any. He stated that Jeff took him home around 3:00 A.M. in the morning. Upon completion of the interview, this Officer returned Hardin to his residence in Valley Station and returned to Meade County. (Also see Detective Handy's report of 04-09-92).

4-10-92, this Officer contacted Sergeant Allen, Evidence Technician Unit, Louisville Police Department as to the evidence that was obtained from Clark's Chevrolet Nova. After giving her my case number, she stated they would take it to the Jefferson Crime Lab for me. Also in reference to photo's of car, they were not ready, but would call when they were ready. As for stand up pictures, they had been sent to Physical Assault Unit. Upon calling Lieutenant Sherrard, he stated that the pictures were in. His Office called that I could pick them up.

4-10-92, at approximately 14:00 hours Amy Remsburg, the ex-girl friend of Jeff Clark, came to the Sheriff's Office, whereby a taped statement was taken (see statement). She stated that she met him on August 5, 1990. They lived in Louisville in her house, that she owned at that time. Ultimately, they moved out, April of 1991; her ex-husband got the residence. She moved in with her grandmother in Louisville and Clark moved back home with his parents. When asked what kind of relationship they had in

NSBMCSO 00017

MSCO001144

Louisville, she stated that it was stormy, that he was into satanic worshiping, and that he had all types of knives and guns. When asked if they ultimately got back together, she stated that she believed it was the first part of May 1991 that they moved in with her mom and dad, who lived in the Payneville area off Ky 376 in Meade County. She also stated she was pregnant at the time. She also told this Officer that the relationship worsened, and he became more violent. After approximately four weeks, her mom and dad made him move out for fear of her having a miscarriage, and also due to his violent behavior. Again she stated they got back together again, and that he purchased a trailer that was located in the Newburg (Louisville) area and they moved into it. She again stated that things did not get any better, that he stuck a gun in her mouth and threatened to kill her, and when she got a chance this time she moved out permanently around July 1991 and left Kentucky, because of fear that he would find her and hurt her after she walked out on him. When Ms. Remsburg was asked about Keith Hardin, she stated that Hardin was a friend of Jeff's, but she would not discuss Hardin with her. She also stated that Jeff, upon at least one occasion, took her to an area where there were a lot of satanic symbols, satanic things. When I asked her if it was in the Valley Station area, she stated it was. Around July 10 or 11th 1991, she did call Child Protection Agency in Louisville and talked with Barbara Bangino and Tracy Hord about the abuse she and her son, Randy, were taking. She stated the last time she could remember seeing him was in October or November 1991. (Also see Detective Clark's report of 04-10-92).

4-11-92, After being contacted by Etienne Bennett of the Evidence Technician Unit of the Louisville Police Department and after discussing the evidence that they had obtained out of Jeff Clark's car, copies of all Lab reports submitted by this Officer were faxed to Ms. Bennett. Also this Officer was contacted by Detective Clark of the Physical Assault Unit of Louisville Police Department, where again the evidence was discussed and clarification of what this officer had submitted.

4-13-92, this Officer talked with Detective Hope Greer of the Louisville Police Department Homicide Division. She advised she would make contact with Tonya Tyrell and James Tyrell to set up an interview time, and would let me know when.

Later on in the day (4-13-92) Detective Greer, advised that the interview was scheduled for 16:00 hours the next day (4-14-92). Detective Greer advised me that Tonya's last name was not Tyrell, but "Greer". Also Detective Greer advised she would get Detective Handy to assist in the interviews.

4-14-92, Meade County Coroner William Adams and I met with Detectives Greer and Handy at their office at the Louisville Police Department, where it was decided that both Tonya Greer and James Tyrell would be brought for their interview. It was also decided that Detective Greer and William Adams would interview Tyrell, and Detective Handy and myself would interview Greer. The interviews took place at approximately 16:30 hours. Tonya stated that she had known Rhonda Warford for about a year and a half. The last time she had seen her was around February 14, 1992. Greer said had talked to her on the phone sometime in March 1992. Also she stated that Rhonda had called her Monday or Tuesday, 3-30-92 or 3-31-92, but that she had not been home to take the call. Greer advised that she knew both Keith Hardin and Jeff Clark. She had been to the trailer, where they both used to live on Newburg Rd. On one occasion, she heard Keith tell Rhonda that if she ever cheated on him he would kill her. As for Jeff Clark, she stated that on one occasion, he pointed a small silver gun at her (Tonya) and threatened her with it. Greer said she was aware that Keith and Jeff were in Devil worship, and that she advised Rhonda to get out of it. Also Greer was aware that Keith had put the inverted cross on Rhonda. During the interview with Tonya, the name of "Tim" came up. Detective Handy advised that he would attempt to locate and interview the subject. Upon completion of the interview, and after talking to Detective Greer and Coroner Adams, it was concluded that neither Greer or Tyrell were involved in the Murder of Rhonda Sue Warford. (Also see Detective Handy's reports of 04-14-92).

04-16-92, at approximately 13:00 hours this officer, Detective Bill Greer Louisville Police Department, a TV crew from WLKY Channel 32, and support personnel proceeded to the Warford Homicide Scene. A re-enactment of the crime was filmed for the TV News Special "Crime Stoppers" to be aired Monday, April 27, 1992, provided no suspects had been arrested prior to that date. Upon completion of the re-enactment, we departed the crime scene. At approximately 15:00 hours I returned to the Meade County Sheriff's Department.

MSCO001146

04-24-92, at approximately 12:00 noon this officer proceeded to Louisville Police Department Physical Assault Unit to meet with Detective Clark. Upon arrival, I reviewed their case file on the Warford Homicide investigation, copies of the reports to date, and received copies of these reports. After discussing the case progress with Detective Clark and Detective Greer, this officer returned to Meade County.

04-28-92, Detective Clark of Louisville Police Department called for this officer and the call was returned. After reviewing a statement of Amy Remsburg, it was decided that an interview with Billy Mahan, a possible witness in an assault 2+ years ago allegedly committed by suspect Clark, would be appropriate and we also discussed the general direction of the investigation.

04-29-92, this officer returned a call from Detective Clark Louisville Police Department and was briefed on an interview of Bill Mahan and was advised it was a positive interview and the interview concluded at Louisville Police Department with a taped statement taken from Mahan. (See Louisville Police Department).

04-29-92, this officer again returned a call to Detective Clark Louisville Police Department where he requested the post mortem fingerprint cards of victim Warford be relayed to the Louisville Police Department Evidence Technician Unit for comparison to fingerprints found inside the vehicle of suspect Clark. These prints in the vehicle had been excluded from both suspect Clark and suspect Hardin.

04-29-92, this officer was advised by Kentucky State Police Elizabethtown of an anonymous call stating a Sherry Burton white female 30 years of age 5'2" Bro/Bro residing at 9600 Yarmouth Valley Station may have information reference the Warford homicide. The caller also advised subject may be wanted in Indiana. This information was relayed to Detective Clark Louisville Police Department.

04-30-92, this officer relayed victim Warford's post mortem fingerprints to Sergeant Allen Louisville Police Evidence Technician Unit for comparison and returned to Meade County.

04-30-92, at approximately 15:45 hours I received a call from Jefferson Regional Crime Lab Technician Robert Thurman. He advised me he had completed his tests of samples submitted by this department and from the Evidence Technician Unit

NSBMCSO 00020

MSCO001147

H-Hogan
Did not know us
about Hair on

technicians reference the Warford homicide case, Evidence Technician Unit case 0402292. He stated that one hair found on the red sweatpants worn by the victim at time of death was significantly similar to hair samples from suspect Keith Hardin. He also stated that reference the Louisville Police Department Evidence Technician Unit samples, sample three contained one hair significantly similar to samples from victim Warford, sample four contained two hair significantly similar to sample from victim Warford, sample eight contained one hair significantly similar to victim Warford, sample thirteen contained several hair significantly similar to victim Warford. Technician Robert Thurman advised official written report would be forthcoming in approximately one week. This officer advised Sergeant Allen, Evidence Technician Unit of the hair results and inquired if any results were back on the fingerprint comparison of the Warford's prints that I had dropped off early this date, which I was advised that the results were not yet available.

04-30-92, at approximately 20:00 this officer met with Meade County Coroner William Adams to advise of results of crime lab analysis and receive a copy of post mortem report on victim Warford from Chief Medical Examiner George Nichols.

05-01-92, talked with Louisville Police Department Detective Greer Physical Assault Unit she stated that her and Detective Handy talked at Louisville Police Department and decided Detective Handy would interview Warford's family to verify all information reference the red sweatpants worn by victim at time of death, also any additional information and clarification.

05-04-92, at approximately 06:30 hours this officer took a bracelet recovered from the body of the victim to the Jefferson Regional Crime Lab. This bracelet was recovered and sealed at the time of autopsy, but inadvertently left from list of evidence to be submitted to Lab. Upon arrival, this officer met with Robert Thurman, who is an examiner with the lab, who took possession of the bracelet. Also at this time we discussed evidence that had been previously submitted. Thurman advised that the reports were completed and after their review I should be receiving them. Upon departing the lab, I proceeded to the Louisville Police Department Homicide Unit to meet with Detective Clark to discuss the information that I had received from the Crime Lab. Shortly after arrival, a report was received from Sergeant Ernest Jones

NSBMCSO 00021

MSCO001148



Supervisor Identification Bureau Jefferson County Department of Corrections on the Comparison of Rhonda Warford's fingerprints and the fingerprint lifted from Jeffrey Clark's vehicle. The print was positively identified as Rhonda Warford's. After discussing the case with Lieutenant Sherrard, Detective Clark, Detective Handy, and Detective Greer, it was decided to go ahead and obatin arrest warrants for both Keith Hardin and Jeffrey Clark. It was also decided to obtain search warrants for both residences where they were living, and the mobile home that Clark owned off Newburg Rd. This officer then contacted Meade County Attorney Robert A. Miller and briefed him of the plan of action, and also for him to make contact with the Commonwealth Attorney Kenton R. Smith and have him to call me at Louisville Police Department, so he could be briefed. Shortly thereafter he called and was advised. It was decided that myself and Detective Clark would spend the day working on search warrants. Also it was decided that due to the time that it would take to do this and also for me to get the arrest warrants, that Louisville Police Department Homicide officers and myself and my personnel would meet at 07:30 hours 05-05-92 at Dixie Highway (31W) and Valley Station road. From there would proceed to the residences to be searched and to arrest both subjects. Also while there (Louisville Police Department) at approximately 09:30 hours I received a call from Crime Stoppers, stating that Rhonda's boyfriend had just called, stating that "Dale" had picked Rhonda up at the coroner grocery, that "Freddy" was with him, that they were in a black camaro. He also stated that victim's mother knew about it and that "Freddy" lived on 7th street by car lot. At approximately 17:30 hours, after work on the search warrants had been completed, this officer departed Louisville Police Department and returned to Meade County. Upon arrival back, this officer met with Meade County Attorney, Robert Miller, and obtained warrants for the arrest of Garr Keith Hardin Jr. and Jeffrey Dewayne Clark charging them with Murder. These warrants were then taken to Trial Commissioner, James R. Watts, for his signature. This officer then met with Deputy Clifford Wise, Deputy Joe Wood, Deputy Tim Livers, and Coroner William Adams and briefed them to what had taken place in reference to the case and to the plan of action on the morning of 05-05-92.

05-05-92, at approximately 06:30 hours this officer along with Deputy Clifford Wise, Deputy Joe Wood, Deputy Tim Livers, and Coroner William

NSBMCSO 00022

MSCO001149

Adams proceeded to Louisville KY whereby we met with officers of the Louisville Police Department Homicide Unit at the prearranged location. After breaking down into teams, it was decided that myself and Detective Handy would with the search team to Clark's residence and arrest Jeffrey Clark and Detective Clark and Detective John Tartar would go with another search team to the Hardin's residence and arrest Keith Hardin and we would transport both accused to the Louisville Police Department Homicide Unit leaving the search teams to do their job. Upon arrival at the Clark's residence it was determined that he was not there. After having a Louisville Police Department Beat Officer check at Automotive Specialist located off Taylor Blvd his vehicle was located. Myself and Detective Handy then proceeded to that location. Prior to our arrival he was taken into custody by Louisville Police Department Beat Officers and upon are arrival it was decided that he would be transported by them (Beat Officers) to Louisville Police Department Headquarters. We met Beat Officers at Louisville Police Headquarters and took custody of Clark and took him to the Louisville Police Department Homicide Unit. It was learned at this time that Detective Clark and Detective Tartar had already arrived with Keith Hardin. After advising Jeffrey Clark of his rights (signed rights statement), he denied any knowledge of the Warford Murder. In reference to Keith Hardin, he was advised of his rights (signed rights statement). He also talked to his attorney and was advised not to say anything. After the search teams returned to the office ad talking to Lieutenant Sharrard it was decided that items taken in the search that needed to be sent to the Crime Lab would be sent through their Evidence Technician Unit and that other items taken would be gone through by myself and Detective Clark as to their value.

05-05-92, at approximately 14:30 hours Jeffrey Clark and Garr Keith Hardin Jr. were transported back to Meade County whereby they were processed and lodged in the Meade County Jail. Also Lab reports were received by mail when I returned to Meade County.

05-06-92, both Hardin and Clark were arraigned in the Meade District Court and held without bond.

05-07-92, the Warford Murder case was presented to the Meade County Grand Jury. At approximately 16:00 hours, the Grand Jury returned Indictments against Garr Keith Hardin Jr. and Jeffrey Dewayne Clark charging them with Capital Murder. Both

subjects were arraigned in Meade Circuit Court before the Honorable Sam Monarch, Judge Meade Circuit. Both subjects were held without bond.

NSBMCSO 00024

MSCO001151

NSBMCSO 00025

MSCO001152

## CORONER'S INVESTIGATION REPORT

DATE 4-5-92 TIME CALLED     10-8          10-97          10-98

PERSON CALLING: Meade Co Dispatch

LOCATION OF CALL: Ky 823 1½ mi W of Ky 261 Approx 150 ft in a field.

NAME OF DECEASED

HOME ADDRESS                              BIRTHPLACE

DATE OF DEATH 4-4-92 TIME early 4-5     DATE OF BIRTH          SSN

AGE     HEIGHT     WEIGHT     SEX f     RACE w     MARITAL STATUS

NEXT OF KIN                    RELATIONSHIP          HOME PH:

ADDRESS                                           WORK PH:

POLICE AGENCY Meade Co     OFFICER T. Greer     PHONE

WITNESSES GIVE NAME, ADDRESS, PHONE, DOB, SSN BELOW:                547-6938

1 HAROLD K. McCARTY, ████████████████ Rt 2, Box 220 Irvington, Ky 40146

2 Wanda McCARTY, ███████████     SAME     SAME

3 MARJORIE HARDESTY 1170 HARDESTY-RAYMOND RD WEBSTER 547-7832

5

6

PHOTOS TAKEN BY 924 Det Smith 921     TIME
                    Jeff Co.

AUTOPSY ORDERED BY C-1     PERFORMED BY Nichols DATE 4-5-92

TOX SAMPLE TAKEN BY Nichols     SENT TO DHR     RPT REC

HISTORY:

Found 0730, 4-5-92, By witnesses 1+2, Evidence obtained,
Clothing see list, rape kit, hair, blood sample, fingernail
scrapings, tezure from 2 locations, set of Kugs.

KENTUCKY STATE POLICE
CRIME LABORATORY

Request for Examination

Case No. *MC-4-92-093*

Laboratory No. _____

TO:  Crime Laboratory

FROM: *Joseph E. Greer, Sheriff*

DEPARTMENT: *Meade Co. Sheriff Dept*
*Court House*
*Brandenburg, Ky 40108*

OFFENSE: *Murder*
DATE: *4-4-92 - 4-5-92*
COUNTY *Meade*
VICTIM: *Rhonda Sue Warford*
SUSPECT OR ACCUSED: *None*
INVESTIGATING OFFICER: *Joseph E. Greer*
DEPARTMENT: *Meade Co. S.O.*

EXHIBITS: *Ex. #4, Key rings w/ keys and other items
attached.*

[stamp:] DATE REC. *4-8-92* TIME *1335*
SGT. *JOSEPH*
*WOOD*  BY *DJG*
*MEADE Co. S.O.*

CASE HISTORY: *Victim found murdered near wooded
Area edge of field in Meade Co.*

EXAMINATION REQUESTED: *See if any latent prints can be
lifted off exhibit.*

_____*4/8/92*_____    _____    _____
·Date                 Reviewed by          Officer Making Request

Attach additional pages if needed.

10:30 PM
April 9, 1992

Amy Remsburg
3905 Jarboe-Sink Road
Rhodelia, KY  40161
496-4607

Amy knows Jeff Clark.  She lived with him but was not
married.  Jeff was married to Teresa and has a baby with
Donna Warren (933-7614).  Amy last saw Jeff in September of
1991 when Heather (Jeff's child) was in the hospital.  She
met him through Tony Medley who lives off Dearing Road in
Valley Station in August of 1990.  She lived with him October
1990 until July 1991.  She left because he put a gun to her
head.  Jeff has been to Meade County with Amy.  Amy has taken
him around all roads from Midway Road from Irvington back to
Battletown and Rhodelia.  Amy had been on 823 with Jeff
twice.  This happened in January-February 1991.  She lived
with Jeff on Newburg Road for the months of June and July of
1991.  He was very abusive and drank excessively.  Amy
reported him to child welfare.  Tracy Hord and Barbara
Gambino were the social service workers who worked the case.
Bill Mahane had someone living with him in September 1991
named Keith Hardin.  Jeff did not want Amy to know any of his
friends. Jeff's friends - James and Kim, married, Donna,
Stacie - long blond hair, drove a Camero - and Michelle.
Jeff told Amy that when he was in Alabama he killed a nigger.
Said he cut Jeff's right arm first.  Jeff has scars at top
right of both thighs.  Jeff threatened to choke her to death.

New Year's Eve of 1991 Jeff broke out windows of Amy's car, an Omni.   Jeff knows Jarred Hardesty & Debbie & Harold Fackler (Fackler Road).   Jeff also knows where Billy Shaw lives.   Jeff has a black handled knife with serated edge, smooth on other side and compass on top.   He has a knife like you skin a deer with in its own case.   The black knife had a case that went on belt and tied to leg.   A smaller knife that was black and had a black case.

ATTEST:   Amy Remsburg
          April 10, 1992

NSBMCSO 00294

MCSO000151

SHERIFF JOE GREER:   It is April 10, 1992.  The time is five minutes after 2 p.m. in the afternoon.  The place of this interview is the Meade County Sheriff's Department.

Present during this interview is myself Joseph E. Greer, Sheriff of Meade County; William Adams, Coroner of Meade County and Amy Remsburg, Social Security number is ███████ The date of birth is ███████ Her address is 3905 Jarboe Sinks Road, Rhodelia, Kentucky 40161.  Telephone number is 496-4607.

Amy you've consented to this interview haven't you?

AMY REMSBURG:   Yes sir.

SHERIFF JOE GREER:   This interview being in reference to a Jeffrey Clark who I believe you are familiar with, is this correct?

AMY REMSBURG:   Yes ir.

SHERIFF JOE GREER:   Okay.  Amy, I'll start by asking you a few questions.  Do you know Jeffrey Clark?

AMY REMSBURG:   Yes sir.

SHERIFF JOE GREER:   When is the first time you ever met him?

AMY REMSBURG:   August 15th of 1990.

SHERIFF JOE GREER:   Ah, where were you at when you met him then?

AMY REMSBURG:   I was at my house.

MCSO000070

SHERIFF JOE GREER:   Whereabouts?

AMY REMSBURG:   It's at 7511 Cane Run Road, Lot 202.

SHERIFF JOE GREER:   Okay, you were living in Louisville at the time that you met him?

AMY REMSBURG:   Yes sir.

SHERIFF JOE GREER:   I think ultimately you started dating him, is this correct?

AMY REMSBURG:   Yes sir.

SHERIFF JOE GREER:   And I believe that ya'll become boyfriend/girlfriend.

AMY REMSBURG:   Yes sir.

SHERIFF JOE GREER:   Ah, and probably at one time had the intention of getting married, is this correct?

AMY REMSBURG:   Yes sir.

SHERIFF JOE GREER:   Okay, and when was this now?

AMY REMSBURG:   It was ah, met him August the 15th of 1990.

SHERIFF JOE GREER:   1990.  Ah, what took place then?  Did ya'll move in to some place or did you move in...

AMY REMSBURG:   I already had a house.  I had a trailer of my own.  I was going through the divorce and ah, you know, we become close and everything, and ah, he scared me at

AMY REMSBURG:       times the way he'd do certain things, but I thought
                    well, it's just me.

SHERIFF JOE GREER:  Okay.

AMY REMSBURG:       So, I said okay when he wanted to move in in October,
                    and he did.

SHERIFF JOE GREER:  Okay, and that was in October 1990.

AMY REMSBURG:       Yes sir.

SHERIFF JOE GREER:  Out on Cane Run Road.

AMY REMSBURG:       Yes sir.

SHERIFF JOE GREER:  Okay, ah, did ya'll ultimately move somewhere else or...

AMY REMSBURG:       No, it was probably April of '91 that my ex-husband
                    got the house, and so I had to move, and at that time
                    I moved in with my grandmother and he moved in with
                    his mom and dad.

SHERIFF JOE GREER:  Okay, now where did your grandmother live?

AMY REMSBURG:       She lives at 2205 Glen Court, Louisville, Kentucky.

SHERIFF JOE GREER:  In Louisville?

AMY REMSBURG:       Uh huh.

SHERIFF JOE GREER:  So you moved in with her.

AMY REMSBURG:       Yes sir.

3.

NSBMCSO 00297                                    MCSO000072

SHERIFF JOE GREER:   And ah, he moved back in on Cod Street or Cod Avenue...

AMY REMSBURG:   Cod Drive.

SHERIFF JOE GREER:   Cod Drive in Valley Station back with his parents.

AMY REMSBURG:   Un huh.

SHERIFF JOE GREER:   During this period, let's say 'til you moved out of the home that your ex-husband got in the divorce...

AMY REMSBURG:   Un huh.

SHERIFF JOE GREER:   I would say, probably right?

AMY REMSBURG:   Right.

SHERIFF JOE GREER:   Ah, what kind of a relationship did ya'll have?  Was it a good relationship?  Stormy?

AMY REMSBURG:   It was stormy.  Very stormy.  Ah, like I said, there was times that I could trust him and there was times that he scared me.  Like when one of his friends was coming to see him every night but was gettin there an hour and hour and a half early and he wanted to know what was going on.  What was I doing with this man.  And hadn't been doing nothing, but yet he makes me go in the bedroom and is talking to Randy and Randy told him nothing.  He come in there and he was mad and he choked me until I couldn't breathe.

SHERIFF JOE GREER:   Now you said Randy.

4.

**NSBMCSO 00298**

MCSO000073

AMY REMSBURG:           Randy.  I don't remember Randy's last name.  I'm thinking Combs?

SHERIFF JOE GREER:      But it was a friend of

AMY REMSBURG:           Of Jeff's.

SHERIFF JOE GREER:      of Jeff's.

AMY REMSBURG:           Right.

SHERIFF JOE GREER:      Ah, this was while you were living in the home, is this correct?

AMY REMSBURG:           Right. At my house.

SHERIFF JOE GREER:      Ah, did you ever get any inkling or know anything about maybe him being in some type of satanic...

AMY REMSBURG:           Yes.  Yes.  Now he told me that him and Keith Hardin had, when they were younger, was into  this satanic stuff.  I mean he just, to talk about murder to him it was a thrill.  It was a challenge to kill somebody.

SHERIFF JOE GREER:      Now this was in 1990.

AMY REMSBURG:           Yes sir.

SHERIFF JOE GREER:      And part of '91?

AMY REMSBURG:           Right.

SHERIFF JOE GREER:      (inaudible) while you were living at your home.

AMY REMSBURG:           Right.  He'd...

SHERIFF JOE GREER:   Did Keith ever come over to the house.

AMY REMSBURG:   No.  I never met Keith.  He wouldn't let me meet Keith. He didn't want me to know Keith.

SHERIFF JOE GREER:   Did he, did you know in fact though that he was meeting Keith at other places?

AMY REMSBURG:   He had talked about seeing Keith here or seeing Keith there, but I never got to meet him.  You know.  I couldn't picture the guy if I'd seen him, you know.

SHERIFF JOE GREER:   Ah, while you were with him in your home did you know him to have any type of weapons or...

AMY REMSBURG:   Yes sir.  He had ah, one, two, three, four knives that I can remember.  Then he had ah, 357.  He had a shotgun. He had a .22.  He had a, it's a magnum - ah, big gun - police gun.  You know ah, what are they.  I don't know what a...

SHERIFF JOE GREER:   Big one.

AMY REMSBURG:   It was ah, yeh.  It was a pistol, but it was one of the big ones, and the knives that he had, one is I'm wanting to say, is a survivor knife.  It's got the compass on the top.  It's about this long; has jagged edges on one side, smooth edge on the other.  Then he had a butterfly knife, and then there's a black one - I mean it was sharp.  It was about this long...

6.

NSBMCSO 00300

MCSO000075

SHERIFF JOE GREER:    Okay.  You're saying about that long,  What do you estimate the inches to be on that one?

AMY REMSBURG:    Oh...

SHERIFF JOE GREER:    Six inch blade.  Five inch blade?

AMY REMSBURG:    The blade was probably five to six inches and then the handle was maybe two to three inches?    You know what I'm saying?

SHERIFF JOE GREER:    (inaudible)

AMY REMSBURG:    It was.  And it's got two little silver things that come out on it, like, you know...

SHERIFF JOE GREER:    Stoppers.

AMY REMSBURG:    Right.  That's what they are.  I knew they were.  It's got things on it and then ah, it had a black case with it and the survivor knife had a case and then ah, one I'm wanting to say, is like a hunting knife like you would skin a deer with.  It's got the wooden handle...

SHERIFF JOE GREER:    The regular old wooden handle?

AMY REMSBURG:    Right...

SHERIFF JOE GREER:    The type that you see down at Battletown or Payneville

AMY REMSBURG:    Right.  Yeh.

7.

MCSO000076

SHERIFF JOE GREER:     That ah, survival knife.  Did that have the rough edges on it?

AMY REMSBURG:          Uh huh.

SHERIFF JOE GREER:     But the other one, the black handled one with that razor sharp blade, as you call it - about six inch blade - that was a plain...

AMY REMSBURG:          It was a plain one and it was a long.  It was a slender long slender - you know, big at the top and got slender. I do, you know, remember that.  He carried it in the car Now I know that between his car seats at all times he had a knife and that was the one that he carried between the seats.

SHERIFF JOE GREER:     Was that?

AMY REMSBURG:          And...

SHERIFF JOE GREER:     Okay, go ahead.

AMY REMSBURG::         And the glove compartment he always had the 357 in there

SHERIFF JOE GREER:     Was that up until late '91?

AMY REMSBURG:          Oh yeh.

SHERIFF JOE GREER:     He always had a knife?

AMY REMSBURG:          Yes.  Ah...

SHERIFF JOE GREER:     Even when he moved out of the house?

8.

NSBMCSO 00302

MCSO000077

AMY REMSBURG:     Even when we moved out of my house, you know, in with my grandmother and his mom, he still had the knife and gun with him at all times.

SHERIFF JOE GREER:     Well, let me throw you a hypothetical...

AMY REMSBURG:     Okay.

SHERIFF JOE GREER:     If ah, four days ago I seen his car and it didn't have a knife or a weapon of some type in it...

AMY REMSBURG:     (Interruping Joe Geer) I would be very surprised.

SHERIFF JOE GREER:     (inaudible) IT would be unusual?

AMY REMSBURG:     Yes sir.  He constantly.  We even got pulled over in Jefferson County for speeding and he was taking the 357 to his dad's to sell, trade or something, and he had it in a diaper bag and the cop saw it, reached in and pull-ed it out and ran a check on it.  You know, the serial number, whatever, made sure it was a, I guess a clean gun, you know?

SHERIFF JOE GREER:     (inaudible) clear.  Not stolen.

AMY REMSBURG:     Right. Okay, and ah, so, I mean at that time, you know, it was even loaded.  The officer unloaded it.  It was constantly loaded.  He unloaded it and told Jeff if he was going to have that gun, it went in the glove compart ment with the shells in there and locked.  That he could not have it in the diaper bag or anywhere else on the car or in the trunk, so.

SHERIFF JOE GREER:   Okay.   Before I turned the tape on awhile ago, ah, we were talking just, you know, briefly to see what you might know or might could help us.   You mentioned something about an incident took place at Iroquois.

AMY REMSBURG:   Him and his wife at that time, which was Teresa - I don't know her last name except for Clark, ah, they were in Iroquois Park and there was some more girls, I don't remember their names, that were playing Frisbee.   Well, a black guy caught their Frisbee and took it away from them and was playing with them, teasing them or whatever.   And they asked for it back and he wouldn't give it back and Jeff intervened and told him to give it back and he wouldn't so he stabbed the black guy.   And, the only way I knew about that was Bill told me that he saw it and he was there and that's exactly what happened, and that the guy did have to go to the hospital.

SHERIFF JOE GREER:   Now who's Bill?

AMY REMSBURG:   Bill Mayhan.   That is a guy that he works with out at Papercone.

SHERIFF JOE GREER:   Papercone.   Is that a company?

AMY REMSBURG:   Yes sir.   It's at National Turnpike.   I don't know the street number.

10.

SHERIFF JOE GREER:   Papercone at National Turnpike.   Bill McComb?

AMY REMSBURG:   No.   His name is Bill Mayhan.

SHERIFF JOE GREER:   Bill Mayhan.   Okay.   Bill Mayhan.

AMY REMSBURG:   Yeh.   They work for Papercone.

SHERIFF JOE GREER:   Do you know when this might have been?   Was it prior to you meeting him was this correct?

AMY REMSBURG:   Right.   It was.   I would have to say either June to August of '89, or June to August of '90.   Somewhere in that time span.

SHERIFF JOE GREER:   Now.   Ya'll moved out of the house.

AMY REMSBURG:   Uh huh.

SHERIFF JOE GREER:   Moved in with your grandmother.

AMY REMSBURG:   I did.   Yes.

SHERIFF JOE GREER:   You did.   And he moved back home.

AMY REMSBURG:   Uh huh.

SHERIFF JOE GREER:   Did ya'll ultimately get back together

AMY REMSBURG:   Yes sir.

SHERIFF JOE GREER:   at a location?

AMY REMSBURG:   Yes, and I believe it was the first part of May we moved in down at my mom and dad's.   He was staying down there with me and he got to where, I was trying to miscarriage

AMY REMSBURG:        and everything.  And...

SHERIFF JOE GREER:   Okay.  You were pregnant

AMY REMSBURG:        Yes sir, I was pregnant.

SHERIFF JOE GREER:   this time by his child, is this correct?

AMY REMSBURG:        Yes.  Yes sir.

SHERIFF JOE GREER:   Now you said, moved down to your mom and dad's.  Is
                     that down on what we call Dead Horse Holler Road

AMY REMSBURG:        Yes sir.

SHERIFF JOE GREER:   376 - back out of Payneville.

AMY REMSBURG:        I always refer to it as Dead Horse Holler Road.  Even
                     when I speak to Jeff or anyone else

SHERIFF JOE GREER:   That is the road that you turn at...

AMY REMSBURG:        Right.

SHERIFF JOE GREER:   Hardesty Grocery and go down towards Dead Horse Holler.

AMY REMSBURG:        Yes sir.

SHERIFF JOE GREER:   Now was your mom and dad, were they in Ohio at the time
                     or were they living there?

AMY REMSBURG:        No.  My mom was staying down there with me because I was
                     having so much trouble.  And he got to being so hateful

12.

NSBMCSO 00306

MCSO000081

AMY REMSBURG:         and everything towards me that mom made him move out because of the stress and strain I was under was causing me to have the baby early, so.

SHERIFF JOE GREER:    Okay.  Now.  Amy.  Can you tell me the time - the approximate time that you moved down at your (inaudible)

AMY REMSBURG:         The end of April of '91 or the first part of May, because I know May 5th was the first day I tried to have the baby early and I was at my mom and dad's, so I'm saying like either the end of April or the beginning of May.

SHERIFF JOE GREER:    How long did ah, Clark, Jeff Clark live down there at that house.

AMY REMSBURG:         Jeff lived down there for maybe, I'm thinking, four weeks a month, something like that.  Not very long because of the stress and strain I was under.

SHERIFF JOE GREER:    Okay.  While Jeff was living down there with you and with your mom was home, was Joe gone?

AMY REMSBURG:         Yes.  My dad was in Ohio working.

SHERIFF JOE GREER:    He was in Ohio.

AMY REMSBURG:         Right.

SHERIFF JOE GREER:    Did he work in Louisville at that time?

AMY REMSBURG:         Yes sir.  He would drive back and forth.

SHERIFF JOE GREER:    From.  He would drive back and forth from the house

AMY REMSBURG:          To Louisville.

SHERIFF JOE GREER:     back to Louisville.

AMY REMSBURG:          Every day.

SHERIFF JOE GREER:     And where was he working at then?

AMY REMSBURG:          Ah, Papercone.

SHERIFF JOE GREER:     Papercone.

AMY REMSBURG:          Un huh.  Now he also worked for Automotive Specialist -
                       that's out there off of, I'm thinking, New Cut.  There's
                       New Cut and then National Turnpike's on over a little
                       bit and he would work with Carrie.  I don't remember
                       Carrie's last name.  But he was working for Carrie's
                       dad, Dexter, working on cars and then he would go to
                       work at Papercone.  He'd get home anywhere from 12:30
                       to 1 o'clock every night, you know, and then...

SHERIFF JOE GREER:     That's the time Jeff got home, 12:30 or 1 o'clock?

AMY REMSBURG:          Right.  One o'clock.  Right.

SHERIFF JOE GREER:     What was Jeff's route, if you know, when he left ah...

AMY REMSBURG:          Most of the time...

SHERIFF JOE GREER:     your house...

AMY REMSBURG:          Uh huh.

SHERIFF JOE GREER:     for Louisville.

AMY REMSBURG:      Most of the time when he left from my house it was 376
to 144, from 144 to 79, from 79 back over to 144, and
then I'm not for sure what the name of that road is, but
that big golf ball sits upon; you know...I can't think o
it...

SHERIFF JOE GREER:   Right near 448?

AMY REMSBURG:      Yeh.  448 and then from 448 to 1638, 1638 up to Dixie
Highway.  Usually he turned off at Dixie Highway on to
Gene Snyder Freeway, from the Freeway he would either
go Stone Street or New Cut.  It'd depend on if he was
going Stone Street he was going to his mom and dad's
out that a way and over to work and if he went to ah, Ne
Cut he was automatically going to Carrie's and going to
work from there.

SHERIFF JOE GREER:   Okay.  You say he lived down here - he was here for abou
four months 'til your mom got tired of what was going on

AMY REMSBURG:      Four weeks.

SHERIFF JOE GREER:   Four weeks, and told him to leave.

AMY REMSBURG:      Uh huh.  Right.

SHERIFF JOE GREER:   While he was down here on weekends or weeknights, days
off or anything like that, did he ever go out on his own

AMY REMSBURG:      Yeh, there were times that he left on his own without me
Yes.

SHERIFF JOE GREER:   Where would he go to that you know of?

**NSBMCSO 00309**                          15.                        MCSO000084

**AMY REMSBURG:** That I know of.  I know that one time ah, he was mad at me because I didn't want to go with him because he had threatened me and everything and so he went down my mom and dad's up to that Dead Horse Holler Road.  That road right there at the end of mom and dad's.  He went up there and he either went straight or he turned up by next to Gene Sutton, going that way.  Now I don't know where he went from there.

**SHERIFF JOE GREER:** Do you ever know of him going to Dead Horse Holler Tavern while you all were living there?

**AMY REMSBURG:** He would go up there and turn around, I guess.  I don't know, it just.  He would make quick turns up there, or go up there and come right back.

**SHERIFF JOE GREER:** Do you feel that he knew the area down here where ya'll were living.

**AMY REMSBURG:** He knows it pretty well.  Not excellent, but probably you know, good enough that if he wanted to get somewhere he could get there.  I mean that's...

**SHERIFF JOE GREER:** He should know where Dead Horse Holler Tavern is...

**AMY REMSBURG:** Yes sir.  Yes sir.  I, he's been there with me.  I mean we didn't go in and drink,  but like I said, to turn around and everything, yes sir, he knows exactly where it's at.  I made a point to show it to him because he didn't believe there's a such place and I did.  I made it a point to show that to him.

SHERIFF JOE GREER:   That's the scenic...

AMY REMSBURG:   Yeh, that's the scenic (Joe Greer and Amy talking together was inaudible).

AMY REMSBURG:   The Corner.  Everybody thinks the Corner is so big and I even took him there and showed him where that was because, you know, he wanted to know.  Sure, I'll show you where they're at,  you know.

SHERIFF JOE GREER:   Anybody that goes down there has to get showed the Dead Horse Holler... _TAVERN_

AMY REMSBURG:   Right.

SHERIFF JOE GREER:   I mean, we both know that.

AMY REMSBURG:   And I lived there - it's a big thing.

SHERIFF JOE GREER:   You're aware, Amy, that a young lady _was found_ (inaudible piece _murdered NOT_ of interference of tape) too far from your mom and dad's house.  Do you think he would know this road?

AMY REMSBURG:   Yes sir.  We've been out it.  Like I said, we've been out that specific road twice that I can remember, was on that road twice.  But I mean, as far as going out Dead Horse Holler Road, that one we've been out a millio and one times and you know, we'd turn to go toward Raymond or we'd go the other way.  And I mean, you know.

SHERIFF JOE GREER:   Out by Gene Sutton's.

AMY REMSBURG:   Yeh.

SHERIFF JOE GREER:    Or turn to go to Logsdon's, come out there at Logsdons on 823?

AMY REMSBURG:    Right.  Now, he's been there, like I said, several times.

SHERIFF JOE GREER:    What happened Amy, down here that ah...

AMY REMSBURG:    (tape skipped - inaudible) where He got to where he was just, I mean he would come in at nights from work and if he had talked to somebody that knew me previously, Well, did you sleep with this one, or did you do this or you do that, and I mean I was under a stress and it was like, "No, Jeff, I didn't." Well, so and so says you are, and I just couldn't handle, I mean, the stress and everything. He was always hateful and so I had to get out.  And then, after the baby was born I thought, okay, he'll calm down, the baby's here, he'll become a father and take to it and everything, and gee, the middle of June, the end of June when I moved in at his house which is on Newburg Road, 3510...

SHERIFF JOE GREER:    Okay, let me interrupt you there.

AMY REMSBURG:    Okay.

SHERIFF JOE GREER:    He left here.  He stayed about four weeks.  He left at what, about the first of June?

AMY REMSBURG:    Un huh.

18.

NSBMCSO 00312

MCSO000087

SHERIFF JOE GREER:    Where did he go then when he left?

AMY REMSBURG:    He stayed with his mom and dad.

SHERIFF JOE GREER:    Okay.  And then you had the child.

AMY REMSBURG:    Uh huh.

SHERIFF JOE GREER:    You wanted to try to make a go of it,

AMY REMSBURG:    Right.

SHERIFF JOE GREER:    So ya'll made contact with each other again?

AMY REMSBURG:    Right.

SHERIFF JOE GREER:    And is that when he rented the trailer?

AMY REMSBURG:    He bought the trailer.

SHERIFF JOE GREER:    He bought the trailer out off Newburg

AMY REMSBURG:    Yeh.  It's 3510 Newburg Road, Lot C9.

SHERIFF JOE GREER:    and then ya'll moved into there.

AMY REMSBURG:    Right.

SHERIFF JOE GREER:    That was around the first of June '91?

AMY REMSBURG:    Right.

SHERIFF JOE GREER:    Okay.  How long did that last?

AMY REMSBURG:    Oh.  Not very long, 'cause after we moved in there, he just was constantly on my little boy.  I mean he was abusive to Randy and I turned him in to Child Protection

MY REMSBURG:

Agency, and talked with Barbara Bangino and Tracy Hord, up there, those two people. They took Randy's state- ment; they took mine. And then, I guess it was about July the 10th or the 11th, my mom come to see me, and he told me my parents weren't welcome there. My dad was with him - or with her, and so I tried to get Randy out of the house 'cause I knew that Jeff was abusive and I just more or less told Randy he was going and he went. You know, he was fine and he went with them. That night Jeff come home; he was upset at me because Randy wasn't there. He wanted to know why my parents were there and ah, wanted to know why I didn't make Randy stay. And I just told him, well, that Randy wanted to go and I felt that Randy would be better off staying there for awhile And he said "Okay." And he got to talking. He was hate- ful. He went out to the car and brought in his gun. I believe it was the 357. He brought it in. He said. He sat down in the chair that was to the right of me and he said, "You know, this is my only real friend right here." And I just looked at him and said, "Whatever." you know, and he said, "No, whatever your butt." And he come over there and got in my face and he said, "Open your mouth!" And all I could to was say, "No, Jeff." Shook my head no. He said, "Open it!" He cocked it back and he told me to open it and at that point and time I was scared enough, I opened my mouth. He asked me questions. He said, "Bitch, you want to die don't you!? You want to die!" I shook my head no 'cause I

AMY REMSBURG:        couldn't talk 'cause the gun was in my mouth and he asked me, he says ah, "Do you ever want to see Randy alive again?" I shook my head yes. He said, "Do you want Heather to stay alive?" I shook my head yes, and he looked at me and said, "My God. I'm going to bed." He slowly moved the gun out and he went to bed. He took the gun to bed with him. He turned around and looked at me and said, "Are you coming to bed?" Well, I didn't want to say no and take a chance of being dead anyways, I said, "I'll be there in a little bit, I want to get Heather to sleep first." He said okay, so I layed down on the couch. He went to bed. He was out like a light. He sleeps like a log. So, I slept on the couch with one eye open, it seemed like, all night long and the next day he got up and he asked me, he said, "You going to be here when I get home tonight?" I wasn't about to say no and not be there or him stay home all day to watch me or something, so I told him I said, "Yeh, I'll be here." He said, "Everything okay?" I said, "Oh yeh, everything's fine." As soon as he left I went next door, because we didn't have a phone, I went next door and I called my grandmother to come and get me (Barbara Shaw). She come and got me. We packed clothes, we packed dishes, we packed what- ever we could get in the car to take with me to get out because I couldn't live there, and I mean, I just couldn't handle that - him putting a gun to my head - it just tore me up, so I left.

**SHERIFF JOE GREER:** That was when, July?

**AMY REMSBURG:** Yes sir. About...

**SHERIFF JOE GREER:** Where did you move?

**AMY RESMBURG:** I stayed with my grandma Shaw for awhile.

**SHERIFF JOE GREER:** (Inaudible) moved in with your Grandmother...

**AMY REMSBURG:** Right, and he was still constantly calling me, doing this, doing that, and so in order to get out from near him at all, I went to Ohio and stayed with my mom and dad for a little while then I come back in August when they could come down and I took my warrant out for him, and he was like, "Well, why did you wait so long to do it?" "Well, I mean I couldn't go and do it right away 'cause you was right there at my feet everytime I turned around." He said, "Oh, well, what-ever."

**SHERIFF JOE GREER:** Okay, when was the last time that you seen Jeff Clark?

**AMY REMSBURG:** The last time I can remember seeing him, I mean being close to me, would have been in September. As far as seeing him in a car parked in a driveway would have bee around October or November of '91.

**SHERIFF JOE GREER:** Where was that?

**AMY REMSBURG:** That was at my sister Annette's house.

22.

MCSO000091

SHERIFF JOE GREER:   Annette's house.

AMY REMSBURG:   Annette Hardesty.

SHERIFF JOE GREER:   Now during all this time though, you had never seen Keith Hardin.

AMY REMSBURG:   No sir.

SHERIFF JOE GREER:   But he had talked about Keith.

AMY REMSBURG:   Right.  He had talked about Keith several times.  Well there's a road that's in Louisville that's something to do with satanic people out it or something, and he talked about how him and Keith would always go out there and do weird stuff.  I mean weird stuff.

SHERIFF JOE GREER:   Was this in Valley Station?

AMY REMSBURG:   Yes sir.  Yes sir, you would turn like you was going toward Kosmosdale before you get to Kosmosdale you would turn down that road and then there was that big, it's a gravel road, you've got to go up a hill then it curves around and everything.  I don't know the name of it.

SHERIFF JOE GREER:   You've never been up there had you?

AMY REMSBURG:   Yeh.  I'd been up there one time.  He showed me.

SHERIFF JOE GREER:   Is that the place where they've got the carvings on the trees(?), satanic inverted crosses, satanic signs?

23.

AMY RESMBURG:         Yes sir.  Like the devil thing, the "X" or the circle with the knives through it.

SHERIFF JOE GREER:    While Jeff and you were together, let's say at the trailer.  Let's go there first.  Did he ever talk to you about him and Keith or him and anybody else, (inaudible---a sneeze).

AMY REMSBURG:         Yes.  He told me that a cat and a dog at one time they killed it to do something for satanic stuff.  I mean, like I said, he told me that if he could kill somebody it would be a challange.  That would be a challange to him.  And I said, "Jeff, why would it be a challange "Just to see if I could get away with it, just to see i I could really do it."

SHERIFF JOE GREER:    Did he ah, did he ever explain to you ah, how, what...

AMY REMSBURG:         He told me several times how he could kill a person or what he could do to a person and things like

SHERIFF JOE GREER:    With a knife?  Did he ever tell you?

AMY REMSBURG:         Ah.

SHERIFF JOE GREER:    Maybe  how or the best place to..

AMY REMSBURG:         Oh yeh, he'd tell you right away where the best place to get um.  That's like if he was going to kill somebo with a gun, he wouldn't go for the head, he would go through the arms and with a knife he would go here, ar there was  other places, I'm not...

SHERIFF JOE GREER:   Did he ever mention ah, the brain stem?  Through the neck?

AMY REMSBURG:   Right.  Yeh.  But, I don't know how he put it though. It wasn't "Well, you know, I'll just stab 'um here," or whatever, it was like, well you know there's all kinds of places, he would push on my neck and show me tender spots in my neck that would, you know, he'd say that you could get a person there, like, there's one right here, that he said, right behind your ear that would really do somebody in, and then as far as like to break your arm or something, he would show you how he could do it and everything.  He'd push just as hard as he could, but not do it, but he would show you that he could do it.  And I mean, he'd grab you in certain places, like at pressure points, he knew, I don't know how he knows them, but he knows where all your pressure points are.  He has talked about needles. He could take needles and do acupunctures or something to somebody and show you all their tender spots.

SHERIFF JOE GREER:   Did he ever mention to you that ah, maybe, ah, he wanted to tattoo...(tape slipped - inaudible) you...

AMY REMSBURG:   Yeh, he always wanted ah, I can't, the circle with like a star in it or something...

SHERIFF JOE GREER:   I'll tell you what I'll do.  I'll just show you a picture

AMY REMSBURG:   Okay.

25.

MCSO000094

SHERIFF JOE GREER:   And ah, then you can see if ah,

AMY REMSBURG:   This one right here.  It's like I said, the circle
with the star in it.  Okay, now, he did...

SHERIFF JOE GREER:   What's that one called, is that a writing there?

AMY REMSBURG:   Oh, okay, that one.  Now he thought that one was neat.
Ah, he AC/DC, Ozzie and Kizz, he's got.  He thinks
that's...That knife is just like the one that he has.
That black knife is just like that one.  Like I said,
it was fat and then it got slender and it had the little
points on the side of it or whatever.  Now that's a
knife just like that little black one.  It's not little,
but I mean, it's got a carrying case to it too.

SHERIFF JOE GREER:   It's called a Sword of Power.  It's aggressive force
used in satanic rituals.

AMY REMSBURG:   Oh, I didn't know what it was.  All I know is he had one

SHERIFF JOE GREER:   Did he ever mention anything to you about ah, him and
(tape skipped - inaudible)

AMY REMSBURG:   No, not that I know of.  I don't remember him saying
that, but I do remember, he's got a scar on his right
arm.  It's about from here to there.

SHERIFF JOE GREER:   About four inches?

AMY REMSBURG:   Yeh.  About four inches or five.  And I asked him one
time whenever I first started going out with him, I
said, "How'd you get that?"  He says, "You don't want
to know."  I said, "Yeh, I do.  How'd you get that?"

26.                    MCSO000095

AMY REMSBURG:    He looked at me and he said, ah, "A nigger stabbed me." I said, " Do what?" He said, "Yeh, when I lived in Alabama." He said a black guy stabbed him and that he killed him. That's exactly his words, that he killed him, and I'm like, "Whoa, wait a minute Jeff." At that point and time, that was in September of '90, yeh, of '90, and I kept thinking, whoa, wait a minute, what am I getting into. You know, I want a criminal background on this dude. So, I went to Officer Hayden in Louisville and I was trying to figure out, you know, if he had a criminal background. They couldn't tell me, you know what I'm saying. They can't let me know if he's got one or not, even if I'm dating him, that's not my business. And so Officer Hayden said, well that he couldn't tell me. I said, okay, you know, I tried. So, I mean, I kept going on with him and everything and that's the only thing that ever really scared me to know about his past was that you know, yeh, he had been in satanic, he had used cocaine, he had used dope. Ah, let's see, he used that LSD one time, I think he said, and he said it went for a trip and he never would use it again. Ah, but I don't know, it was just.

SHERIFF JOE GREER:    What ah, Amy, what kind of vehicles did he have when...

AMY REMSBURG:    When I was with him at one time he had a Pontiac Formula it was a newer one - '88, '89, somewhere around in there He wrecked it one night so he decided he wasn't going to pay for it no more, so he let them repo it. Then he had

**NSBMCSO 00321**

MCSO000096

27.

AMY REMSBURG:        a white car.  It was a Camero or a Z28, something like that, with a blue in it.

SHERIFF JOE GREER:   If I show you a car do you think you could recognize it?

AMY REMSBURG:        Well yeh, 'cause I've drove both of them cars.

                     Oh, yes!  I know that car exactly.  That's his Nova - Chevy Nova that he has - yes, yes sir.

SHERIFF JOE GREER:   What color was that car when you ah

AMY REMSBURG:        Ah, when I knew it?

SHERIFF JOE GREER:   Blue?

AMY REMSBURG:        Yeh.  It was a blue.  It was.

SHERIFF JOE GREER:   And this is the car that he always kept a knife down in ah...

AMY REMSBURG:        In between the seats.  Well, all of his cars, his truck he has a Chevy S-10 that he's redoing, ah, and he's got this car and then he had the white Camero and he had a al like I said, the black one, but he let it get repoed and then the blue one, or the white one, the Camero was in my name.  It was mine, but when I left he took it.  Heker it, so I don't know what he done with it.  Then his dad more or less bought this one for him, helped him buy it.

SHERIFF JOE GREER:   Is that basically about the color of it when you knew it had that primer and that white on it?

AMY REMSBURG:        Yes.  Yep.

**NSBMCSO 00322**

28.

MCSO000097

SHERIFF JOE GREER:   What blue was on it at that time, do you know?

AMY REMSBURG:   It was ah, it's not a real light blue, but not a real dark blue, a medium.

SHERIFF JOE GREER:   Had he painted that white over it?

AMY REMSBURG:   Yeh.  He painted the white over it himself.

SHERIFF JOE GREER:   Okay.  But you could still see the blue tint coming through on it?

AMY REMSBURG:   Right, right.  Un huh.

SHERIFF JOE GREER:   Okay.

AMY REMSBURG:   Yeh, that color blue.  But I mean it was.  He was going to redo it you know.  He had talked about he was going to redo it, so, I guess he's going to redo it, huh.

BILL ADAMS:   You and I were talking earlier.  Last night when I interrupted you at your house and talked with you for a few minutes.  You made the statement that in his trailer (Amy Remsburg intrupping Mr. Adams) he used to hide stuff.

AMY REMSBURG:   Right. Uh huh.

BILL ADAMS:   Can you describe where those places are?

AMY REMSBURG:   Yeh.  Ah.  In his living room unless he's redone the panelling or anything.  There's a little shelf, there's doors down there, but to the left of it there's a loose piece of panelling that I seen him put things down in

MCSO000098

AMY REMSBURG:   there before.  He put pot down there.  Okay.  Then in the hallway there's a loose piece.  It's near the furnace.  I don't know exactly what piece, but I do know there are pieces that are loose.  And then in his bathroom, if you're standing towards the mirror looking at the mirror in front of the sink, to your right there was places he could hide things.

SHERIFF JOE GREER:   Okay, one other thing, brought that up when you mentioned hiding in the trailer, ah, was he into snakes?

AMY REMSBURG:   Yes sir.  Yes.  He never.  I never would let him have a snake.  To me that was god awful.  I just could not stand a snake around me.  After he - after I left, he got a snake.  He had a - I done forgot now what kind of snake it was - a boa constrictor maybe?

SHERIFF JOE GREER:   A big un.

AMY REMSBURG:   A big un!  I mean.

SHERIFF JOE GREER:   It got big enough probably to eat a pig.

AMY REMSBURG:   Right.  I mean a big snake!  And, I mean, I didn't want nothing to do with that snake.  Nothing at all.  You keep that snake to yourself.  He said it died.  Now I don't know.  That's just what he said.  'Cause he kept tying to get me to come back and I said, "No, you've got a snake, I don't want you back buddy."  I wouldn't you know, no.  And he said (inaudible). iT DiEd ,..

SHERIFF JOE GREER:   You say Amy, from when it started out it wasn't bad with him.

NSBMCSO 00324

MCSO000099

30.

AMY REMSBURG:          Right.

SHERIFF JOE GREER:     But it progressively got worse.

AMY REMSBURG:          Right.  Yes.

SHERIFF JOE GREER:     Has he got a violent temper?

AMY REMSBURG:          Yes.  Yes sir.  I mean there were times that, like
New Years eve of '91.  I mean, we was at a party over
at Lori and her husband's.  I don't know their last
name, and ah, I mean, Randy - that friend that I was
telling you about he accused me of having an affair
with - was there and he got to talking about my little
boy real bad.  You know, saying bad things about him
and that made me cry.  Jeff smacked me for no reason
he smacked me.  I stormed out the door and he come
after me and he said, "Well let's just go, let's just
go.  I'm driving."  And he had been drinking and I said
no and I had the keys.  Well, he took a beer bottle and
busted out the car window.  My window to my Dodge Omni.
And so, at that time, Lori's husband come out there to
get him.  He got Lori's husband down on the car with
that broken beer bottle in his hand and everybody just
stood back and kept saying, "No, Jeff, no."  And he, he
dropped it, he, you know, let him up.  I can't think of
his name.  He let the boy up.  He said, "Come on let's
go!"  And I knew if I didn't go and I called the cops
when he come back none of us would be alive.  I knew
that for a fact 'cause he had threatened me so many

AMY REMSBURG:    times, "I'll kill you, I'll kill you. No problem. I'll kill you!" And so, when he told me to go that he was okay, that nobody else would bother me, that, you know, he wouldn't bother me, that I'd be fine. When he told me that I thought okay. So I got in the car and left with him. I went back over to my trailer and I layed down on the couch because I was sick and he took that knife, that picture - the knife I showed you? He took it and layed it down beside me on the couch. He said, "Now if Randy or any of them come," he says, "I'll stab 'um." And on the stove he had a big pan of water boiling. Well when Randy and them got there I told them I told them, I said, "Go on and go, I'm fine right now," I said, "Go on and go." Well, they were determined they was going to get me out of the house. Jeff took that big pan of water and threw at them. Well, he didn't hit none of them 'cause they ran. Well, as I was shutting the door, Randy come back in. He kicked it and he hit me. Well when he hit me I drew back and punched him. I know he was trying to help me, but I mean, he hit me with the door and he was coming in my house, so to keep Jeff from hurting 'um, I thought well I'll punch him, he'll go away. Well, I hit him and he left. You know. Then we went to Jeff's mom and I had told Jeff's mom that he had put the gun to my head once before, before July, and I mean I didn't think anything of it. That was in January and I didn't think much of it 'cause I thought, okay, it was my fault. I pestered

NSBMCSO 00326 him too much, I caused it. But in July when I didn't

32.

AMY REMSBURG:        do anything I knew that was wrong.

SHERIFF JOE GREER:   I was getting out of hand.

AMY REMSBURG:        Right. It was too much for me.

SHERIFF JOE GREER:   How much, while ya'll were together. How many times or..

                     (tape slipped - inaudible)
AMY REMSBURG:        The whole time we was together it was very seldom. He didn't even really want anybody to know that he was associating with him still, because if his mom and dad knew that he was associating with him he'd be in trouble because they don't want him around him. They don't like Keith - for some reason, I don't know why - they just don't like Keith at all. And, when I mentioned Keith's name in front of them one time, boy! Jeff flew up at me like a bomb. "You don't mention his name. You don't tell 'um who I talk about!" "Well, I was just mentioning a conversation we had, you know, and if they knew Keith. "Yeh, they know Keith. You just stay out of it."

SHERIFF JOE GREER:   They don't like him, in other words.

AMY REMSBURG:        No they don't like him. Jody and Danny neither one like him.

SHERIFF JOE GREER:   Ah. You probably don't know, but I need to ask you any- way. Do you know Rhonda Sue Worford?

AMY REMSBURG:        No ah, I don't know her.

BILL ADAMS:      Okay.  Can I ask a question?  Last night I asked you about some friends of his and you mentioned Michelle.

AMY REMSBURG:    A Michelle.  Yes.  And (Bill Adams interrupted).

BILL ADAMS:      And you described her to me.

AMY REMSBURG:    Uh huh.

BILL ADAMS:      Can you describe Michelle to me again.

AMY REMSBURG:    Michelle is a kinda.  She's not real short but she's not real tall.  She's a long blonde.  She's ah, she's a nice looking girl.  You know what I'm saying?  And she's, she good natured and everything and Jeff was mean to her.

BILL ADAMS:      Did Jeff ever date her that you know of?

AMY REMSBURG:    He dated her, yes.  He dated her and one night that he had called me and she was there, I mean, you know, he was still bothering me in October and November of '91, and she was with him and ah, I said, "What'd she say?" And he said, "It's none of your business." and he smacked her.  Well, at that time she got up and went outside and Bill Mayhan (Jeff's friend) was there, and so Bill come back in and said Michelle asked me to take her home, so I'm taking her home.  And Jeff hung up on me, so I don't know what happened after that.

And there was a girl named Stacy that I had met once. She drove a white Camero, I believe it was.  She was

NSBMCSO 00328

MCSO000103

AMY REMSBURG:          kinda tall, slender girl, brown hair, long.

SHERIFF JOE GREER:     Was that Jeff's friend too?

AMY REMSBURG:          Uh huh.  That was a friend of Jeff's.

SHERIFF JOE GREER:     This will conclude the interview.  The time is ten

minutes until three in the afternoon. *This Interview* (tape slipped) *was Taped*

in the Meade County Sheriff's Department.  Present

at the ending of the interview are the same persons

present at the beginning.  And Amy, during this

interview that tape has not been turned off has it?

AMY REMSBURG:          No sir.



# City of Louisville

### DIVISION OF POLICE

633 W. Jefferson Street • Louisville, KY 40202-2786

JERRY E. ABRAMSON
MAYOR

THOMAS T. KUSTER
Director of Safety

DOUGLAS HAMILTON
Chief of Police

April 5, 1992

```
        Re:  Foreign Homicide Investigation
    Victim:  Rhonda Sue Warford W/F/19
   Address:  104  E. Whitney Avenue
  Location:  9 Miles Southwest of Brandenburg,
             KY, Off of Kentucky 823, 150 ft.
             Off of the Highway, at the Edge
             of a Field
      Date:  Sunday, April 5, 1992
             (Date PAS Notified)
      Time:  2015 Hours (Time PAS Notified)
      Date:  April 5, 1992 (Date Victim Found)
      Time:  0730 Hours (Time Victim Found)

      File:  92070

   Subject:  Original Notification, Information
             from Meade County Dispatcher, Tim
             Livers, Meeting with Meade County
             Sheriff, Joe Greer and Meade County
             Coroner Bill Adams, Delivering
             Death Notification to Family,
             Supplementary Scene Investigation,
             and Collecting of Evidence

   Submitted by:  Detective James E. Clark
```

Major James W. Griffiths
Commander C.I.S.

**NSBMCSO 00552**

MSCO001157

Major James W. Griffiths
92070
Page 2


Sir:

On Sunday, April 5, 1992 while in the PAS Office working on a unrelated matter, I received a telephone call from a male subject who identified himself as Tim Livers. Mr. Livers went on to elaborate that he was a dispatcher for Meade County. He went on to explain to me that the City of Louisville had a missing person on one Rhonda Sue Warford. He went on to explain that Ms. Warford's body was found in their jurisdiction on today's date, in the early part of the morning.

At that point, Mr. Livers explained to me that Meade County Sheriff Joe Greer and Meade County Coroner Bill Adams was currently in Louisville, Kentucky. He went on to explain to me that Sheriff Greer had requested that he call our office and request some assistance in delivering the death message to the family. He went on to explain to me that the family lived at 104 E. Whitney Avenue and that a positive identification of the body also needed to obtained.

At that point, Mr. Livers explained to me that he would contact Sheriff Greer and Coroner Adams and have one of them contact our office. I then explained to Mr. Livers that we would be glad to assist the Meade County Officials in anyway possible. At that point, I noted that Mr. Livers had contacted our office at approximately 2015 Hours with his original call.

At approximately 2020 Hours, I received a call from a male subject who identified himself as Coroner Bill Adams. After conferring with Mr. Adams, it was decided that I, along with Detective Hope Greer of the PAS would meet Sheriff Greer and Coroner Adams at the 3rd District.

Consequently, I, along with Detective Greer proceeded to the 3rd District and I noted that we arrived at approximately 2050 Hours.

We were met at this location by two W/M's who identified themselves as Sheriff Joe Greer and Coroner Bill Adams. We then proceeded to the assembly room of the 3rd District where Sheriff Greer and Coroner Adams briefed us on this ongoing investigation.

Sheriff Greer went on to explain to us that on today's date, around 0730 Hours, a male and a female went out on Kentucky Road 823 to look at some property. Sheriff Greer stated that the man had to use the restroom so they pulled off the road. He stated that the man saw what looked like a mannequin in a field. He stated that the man subsequently

Major James W. Griffiths
92070
Page 3

went closer and determined this to be a corpse. Sheriff
Greer stated that it was at this point that the male subject
informed the authorities.

In response to questioning, Sheriff Greer explained to
us that the body appeared to be fresh. He stated the victim
was wearing red sweat pants, blue long sleeved shirt, and a
windbreaker. He stated that they found some tire tracks and
a set of keys at the scene. He went on to explain to us
that they found some blood that was covered by some leaves
which could possibly indicate that the victim was killed
where her body was found.

In response to questioning, Sheriff Greer states that
the body was autopsied in Louisville, KY. He stated that
Dr. Nichols performed this autopsy. He stated that Dr.
Nichols' preliminary exam indicated that the victim had been
stabbed eleven (11) times mostly in the chest area. He
stated that none of these wounds located in the front of the
victim's body was fatal. He stated that the fatal stab
wound to be the back of the neck which penetrated the brain
stem. He went on to explain to us that the victim had de-
fensive wounds and that fingernail scrapings were obtained.

In response to questioning, Sheriff Greer explained to
us that Dr. Nichols had stated that the stab wounds to the
chest were initiated from behind. He stated that this indi-
vidual appeared to be right handed and possibly used a hunt-
ing knife.

At that point, after conferring with Sheriff Greer, De-
tective Greer, and Coroner Adams, it was determined that we
would proceed to 104 E. Whitney to deliver the death message
to the family.

It is noted that we arrived at the afore mentioned lo-
cation at approximately 2124 Hours. I also noted that the
Missing Person Report stipulated that the victim's mother's
name was Mary A. Warford.

After knocking on the door and identifying ourselves we
were subsequently introduced to a W/F who stated that she
was Mary A. Warford. Ms. Warford was then taken to a back
bedroom. At that point, I explained to Ms. Warford that a
body had been found in Meade County and had been tenta-
tively identified as her daughter. We then requested that
some family member accompany the sheriff along with the
coroner to 810 Barret Avenue to make a positive identifica-
tion of the body. It is noted that Detective Greer accompa-
nied Sheriff Greer and Coroner Adams to 810 Barret Avenue.
I noted that Ms. Warford did not make the positive ID. Be-

Major James W. Griffiths
92070
Page 4


cause Ms. Warford was extremely emotionally distraught, the victim's sister, Michelle Rogers, and a cousin, Jackie Armstrong, subsequently went and identified the body and a positive ID was made.

It is noted that when these individuals proceeded with Detective Greer to 810 Barret Avenue, the following supplementary scene investigation was then conducted.

SCENE INVESTIGATION

Before the supplementary scene investigation was initiated at approximately 2200 Hours, I notified the dispatcher to have ETU meet me at this location to take pertinent photographs. I noted that ETU Technicians Paul Smith, Teresa Haun, and Jerry Dudgeon showed up a short time later. A copy of this ETU report will be obtained and placed in the file as part of the permanent record.

104 E. Whitney is noted to be located on the South side of Whitney Avenue. The numerals 1 0 4, along with the alphabet letter "D", are noted to be located on the West side of the door just above a black mail box. As you enter the door, and proceed South, you enter a hallway. Proceeding down this hallway, and on the North side of the hallway, is a bedroom that has been identified as the victim's bedroom. Evidence was collected from this bedroom and this room will be described in detail. The first wall described in this room will be the North wall. On the West end of this wall, and just South of the North wall, is a bed. This bed is noted not to be made up and numerous sheets cover this bed. Continuing East, and East of the bed, is a pair of women's green shoes. Just South of these shoes, and on the floor, is a ashtray. Continuing East of this ashtray, and on the floor, is a blue tin container. Just South of this container, and on the floor, are two books. Just East of this book, and South of the North wall, is a wooden/brass stand. On top of this stand are three framed pictures of a young white male, a framed picture of a adult male, and a ceramic jewelry box. Located underneath this stand are numerous books. Located behind this stand, is a closet. On this closet are numerous wall mounts. Just East of this door, and on the floor, is a chair. Located on the back of this chair is a pair of bluejeans. Located on the wall, and above this chair, is a framed picture of a young white male. Located on the floor, and just North of the chair previously mentioned, is a light colored trash receptacle. Continuing East, and East of the chair previously mentioned, is a red shopping bag. This will be the last item noted on the North wall.

NSBMCSO 00555

MSCO001160

Major James W. Griffiths
92070
Page 5

The next wall described will be the East wall. The first item noted on the East wall, and attached to the wall, is a large framed brass wall mount which has numerous photographs located within it. Below this, and on the wall, is a cloth wall mount in the shape of a heart. Just South of this wall mount, is a large mirror. Continuing South, and just South of this mirror, is a wooden wall mount that says "I love you". Continuing South, is a window that is noted to be closed at this time. A pair of white curtains cover this window. Below this window, and just West of the East wall, is a wooden stand. Below this stand, is a stuffed teddy bear and a stuffed doll. Located on this stand is a grass flower holder with a yellow unknown flower in it. Just South of the window previously mentioned, is a calendar. This will be the last item described on the East wall.

The next wall described will be the South wall. The first item noted on the South wall is a closet. After opening this closet, numerous purses, shoes, shirts, and pants, are noted within this closet. These items all appear to belong to a female. Located just West of this closet, is a large blue wall mount that shows the outline of the city of Boston. Below this, and just North of the South wall, is a Samsung color television set. Located on top of this television set is a framed picture of two W/F's, a glass desk mount that says "I love you", a black remote control and a ceramic teddy bear. Located just West of this television set, and on the wall, is a wall mount that says "Corona Extra Imported Beer from Mexico". Just West of this, and on the wall, is a wall mount in the shape of a winged horse. Continuing West, is the door to this room. This will be the last item described on the South wall.

The last wall described will be the West wall. It is noted that a portion of the bed previously mentioned, is located just East of the West wall. Located above this bed, is framed picture of a outdoor scene. These are the only items noted at this time on the West wall.

At that point, and after terminating the supplementary scene investigation, I met with ETU Technician Paul Smith and the following items were then collected: One book titled "Pet Cemetery", one book titled "The Scream", one photograph of a W/M that is in a framed holder in the shape of a heart, one blue, metal, first aide container with the wordings "Rhonda's Things" on it, one pamphlet, one photograph with two W/M's and a W/F and a small child in it, one blue folder, one yellow note pad with handwriting on it, one white and brown purse, one small "Holy Bible", one white and blue wallet, one miniature photo album, one binder full of poems, and Meade notebook. It should be noted that the blue

Major James W. Griffiths
92070
Page 6


metal container that is previously mentioned contained numerous papers, an Official Kentucky Driver's Manual, a photograph of a W/M and a W/F, a pencil, a electrical plug, a photograph of a W/M in a tuxedo, a photograph of two W/F's, and numerous hand-written notes.

I also noted that the white and brown purse contained numerous hand-written notes, numerous personal papers, one "Bic" ink pen, three pennies, and numerous receipts.

The billfold was noted to contain a license, numerous personal cards, ticket stubs, a small piece of paper that said Marie - 368-2356, and numerous photographs of children.

After collecting these items, and after conferring with other PAS Detectives I then proceeded back to the PAS Office to assist in the paperwork in the above styled case.

It is noted that ICN MC4-92-093 is the Meade County report number.  Physical Assault File #92070 was opened to cover this matter.

The investigation into the above styled case is continuing.

Respectfully submitted,

*James E. Clark*

Detective James E. Clark
Physical Assault Squad
Criminal Investigation Section

kk

NSBMCSO 00557

MSCO001162