1 UNITED STATES DISTRICT COURT

2 WESTERN DISTRICT OF KENTUCKY

3 CIVIL ACTION NO. 3:17-CV-00419-DJH

4

5 JEFFREY DWAYNE CLARK,

6 PLAINTIFF

7

8 VS.

9

10 LOUISVILLE JEFFERSON COUNTY METRO GOVERNMENT, ET AL.,

11 DEFENDANTS

12

13 AND

14

15 GARR KEITH HARDIN,

16 PLAINTIFF

17

18 VS.

19

20 LOUISVILLE JEFFERSON COUNTY METRO GOVERNMENT, ET AL.,

21 DEFENDANTS

22

23 DEPONENT:  GEORGE R. NICHOLS, II, M.D.

24 DATE:      JANUARY 28, 2020

25 REPORTER:  LINDSEY N. JOHNSON

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

2

```
 1              APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, JEFFREY DWAYNE CLARK:

 4   ELLIOT SLOSAR

 5   LOEVY & LOEVY

 6   311 NORTH ABERDEEN

 7   THIRD FLOOR

 8   CHICAGO, ILLINOIS 60607

 9   TELEPHONE NO.: (312) 243-5900

10   E-MAIL: ELLIOT@LOEVY.COM

11   (VIA TELEPHONE)

12

13   ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

14   NICK BRUSTIN

15   KATIE MCCARTHY

16   NEUFELD SHECK & BRUSTIN, LLP

17   99 HUDSON STREET

18   EIGHTH FLOOR

19   NEW YORK, NEW YORK 10013

20   TELEPHONE NO.: (212) 965-9081

21   E-MAIL: NICK@NSBCIVILRIGHTS.COM

22   E-MAIL: KATIE@NSBCIVILRIGHTS.COM

23

24   AND

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                   APPEARANCES (CONTINUED)

 2

 3   LARRY SIMON

 4   ATTORNEY AT LAW

 5   KENTUCKY HOME LIFE BUILDING

 6   239 SOUTH FIFTH STREET

 7   SUITE 1705

 8   LOUISVILLE, KENTUCKY 40202

 9   TELEPHONE NO.: (502) 822-2074

10   E-MAIL: LARRYSIMONLAWOFFICE@GMAIL.COM

11

12

13   ON BEHALF OF THE DEFENDANTS, MEADE COUNTY, JOSEPH GREER,

14   ERNIE EMBRY, CLIFF WISE, AND WILLIAM ADAMS:

15

16   ROBERT K. BOND

17   ANDREW T. GARVERICH

18   COLEMAN LOCHMILLER & BOND

19   2907 RING ROAD

20   ELIZABETHTOWN, KENTUCKY 42702

21   TELEPHONE NO.: (270) 737-0600

22   E-MAIL: RKBOND@CLBLEGAL.COM

23   E-MAIL: AGARVERICH@CLBLEGAL.COM

24

25   AND
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, LOUISVILLE METRO

 4   GOVERNMENT, JIM WOOSLEY, JAMES CLARK, ROBERT ENNIS,

 5   KELLY JONES, JAMES GRIFFITHS:

 6

 7   PETER F. ERVIN

 8   ANNALE TAYLOR

 9   ASSISTANT COUNTY ATTORNEY

10   600 WEST JEFFERSON STREET

11   LOUISVILLE, KENTUCKY 40202

12   TELEPHONE NO.: (502) 574-6336

13   E-MAIL: PETER.ERVIN@LOUISVILLEKY.GOV

14   E-MAIL: ANNALE.TAYLOR@LOUISVILLEKY.GOV

15

16   ON BEHALF OF THE DEFENDANT, MARK HANDY:

17

18   WILLIAM BRAMMELL, JR.

19   DRESSMAN, BENZINGER, LAVELLE, PSC

20   321 WEST MAIN STREET

21   SUITE 2100

22   LOUISVILLE, KENTUCKY 40202

23   TELEPHONE NO.: (502) 630-1302

24   E-MAIL: BBRAMMELL@DBLLAW.COM

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, ROBERT THURMAN:

PETER J. ROSENE MCBRAYER

500 WEST JEFFERSON STREET

SUITE 2400

LOUISVILLE, KENTUCKY 40202

TELEPHONE NO.: (502) 327-5400

E-MAIL: PROSENE@MCBRAYERFIRM.COM

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                        INDEX

2                                              Page

3    DIRECT EXAMINATION BY MR. BOND             9

4    EXAMINATION BY MR. ERVIN                   42

5    CROSS EXAMINATION BY MS. MCCARTHY          46

6    REDIRECT EXAMINATION BY MR. BOND           213

7    RE-EXAMINATION BY MR. ERVIN               217

8    RECROSS EXAMINATION BY MS. MCCARTHY        235

9    FURTHER DIRECT EXAMINATION BY MR. BOND     241

10   FURTHER EXAMINATION BY MR. ERVIN           243

11   FURTHER CROSS EXAMINATION BY MS. MCCARTHY  244

12   FURTHER DIRECT EXAMINATION BY MR. BOND     245

13

14                     DEFENSE EXHIBITS

15                                             Page

16   D65 CV                                     10

17   D66 RULE 26 DISCLOSURE                     13

18   D67 MEDICAL EXAMINER FINAL DIAGNOSIS

19        COMPLETED 4/24/1992                   15

20   D68 COLOR PHOTOS FROM AUTOPSY              39

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

1                    PLAINTIFF EXHIBITS

2                                        Page

3    P47 COLOR PHOTOS OF BODY IN LEAVES        90

4    P48 HANDWRITTEN CASE NOTES                245

5    P49 CASE FILE                             245

6    P50 NEWSPAPER ARTICLE                     176

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                      STIPULATIONS

2

3   The deposition of GEORGE R. NICHOLS, II, M.D., taken at

4   The Fiscal Court Building located at 531 Court Place,

5   Suite 900, Louisville, Kentucky 40202, on Tuesday, the

6   28th day of January 2020 at 9:35 a.m.  Said deposition

7   was taken pursuant to Notice for use in accordance with

8   Federal Rules of Civil Procedure.

9

10

11

12  It is agreed that Lindsey N. Johnson, being a Notary

13  Public and Court Reporter for the State of Kentucky, may

14  swear the witness.

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        PROCEEDINGS
 2              COURT REPORTER:  Do you swear or affirm that
 3         the testimony you are about to give will be the
 4         truth, the whole truth, and nothing but the truth?
 5              THE WITNESS:  I do.
 6                        DIRECT EXAMINATION
 7    BY MR. BOND:
 8         Q.   State your name for the record, please, sir.
 9         A.   I am George Riley Nichols, II.
10         Q.   Dr. Nichols, please provide me your
11    professional address.
12         A.   6013 Brownsboro Park Boulevard, Suite D,
13    Louisville, Kentucky 40207.
14         Q.   Tell us what you consider your current
15    profession to be, sir.
16         A.   I'm a -- I'm a consulting forensic
17    pathologist.
18         Q.   And did you have a previous association with
19    the Commonwealth of Kentucky?
20         A.   I was the first chief medical examiner, a
21    position I held from July 1, 1977 until I retired on
22    September 1, 1997, serving at the pleasure of six
23    consecutive governors.
24         Q.   Okay.  Does the name Dr. John Hunsaker, III
25    ring a bell with you?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.    Of course.  John worked for me.

 2      Q.    **How long did he work for you?**

 3      A.    He -- I think he was appointed five years

 4 in -- into my -- into my appointment as -- as the -- the

 5 medical examiner, and he retired two years ago.

 6      Q.    **He worked for you that entire time?**

 7      A.    Until I -- until I retired.

 8      Q.    **Until you retired?**

 9      A.    Yeah, yes.

10      Q.    **Okay.**

11      A.    He was -- he was actually on the staff of the

12 University of Kentucky College of Medicine, but he

13 was -- he reported to me.

14      Q.    **So if you said five years in, that would mean**

15 **'82 until you retired in '97?**

16      A.    I think that's about correct.

17      Q.    **Okay.  Would you, for the record, please**

18 **provide us your qualifications to practice your**

19 **profession?**

20      A.    CV has been --

21      Q.    **May I, please?**

22      A.    You may.

23      Q.    **Okay.  Move to introduce that as Exhibit 65.**

24      (DEFENDANTS' EXHIBIT 65 MARKED FOR IDENTIFICATION)

25      A.    This is a year old.  That was published on the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   1st of January, 2019.
 2               MR. BOND:  Okay.  Do you have a sticker,
 3        ma'am.  I apologize.
 4               COURT REPORTER:  Uh-huh.
 5               MR. BOND:  Thank you.
 6   BY MR. BOND:
 7        Q.   28, isn't it?
 8        A.   Yes.
 9        Q.   Okay.  Thank you.  And how long have you
10   practiced forensic pathology?
11        Q.   And how long have you practiced forensic
12   pathology?
13        A.   I finished my training in the summer of 1977.
14        Q.   And how many forensic autopsies have you
15   performed through the years?
16        A.   About 10,000.
17        Q.   And how many of those have been associated
18   with a murder?
19        A.   The percentage?
20        Q.   Yeah.
21        A.   Ten percent probably.
22        Q.   Okay.  So approximately 1,000?
23        A.   Yes.
24        Q.   Okay.  And how many times have you testified
25   in court regarding forensic autopsy?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A.    Hundreds, if not thousands.

2       Q.    Okay.  And how many times have you testified

3   as an expert in the field of forensic pathology?

4       A.    In -- in court or --

5       Q.    Yes, sir.

6       A.    -- or sworn testimony in deposition?

7       Q.    Or by deposition.

8       A.    Probably 10,000 times.  When I was the medical

9   examiner, I gave testimony at least once a week for 20

10  years.

11      Q.    Okay.

12      A.    I brought with me a copy of the Rule 26

13  detailing my sworn testimony for the last -- I've

14  forgotten how many years this is for.

15      Q.    Okay.  Let's introduce that as Exhibit 67.

16  Thank you, sir.

17              THE WITNESS:  You're welcome.

18              MR. GARVERICH:  What's 65?

19              MR. BOND:  65 is his CV.

20              MR. GARVERICH:  Okay.

21              THE WITNESS:  Correct.

22              MR. GARVERICH:  65 is the CV?

23              MR. BOND:  Yeah.

24              MR. GARVERICH:  So is that 66?

25              THE WITNESS:  Autopsy --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUSTIN:  That's just the CV from a Rule

2      26 report; is that my -- is that right?

3          MS. MCCARTHY:  It's your --

4          MR. BOND:  I apologize.

5          MR. BRUSTIN:  Is that just the CV from a Rule

6      26 report?

7          MR. BOND:  Yes.

8          THE WITNESS:  No.  Well, this is --

9          MR. BOND:  Well, this is his CV.

10         MS. MCCARTHY:  Current?

11         MR. BOND:  This is his 26 disclosure.

12         THE WITNESS:  65 is my curriculum vitae.

13         MS. MCCARTHY:  Okay.  And --

14     A.   As a second -- as a -- as a -- a different

15 exhibit, Number 66 is my -- a copy of my Rule 26

16 declaration.

17   (DEFENDANTS' EXHIBIT 66 MARKED FOR IDENTIFICATION)

18 BY MR. BOND:

19     Q.   Okay.  And how many states have you testified

20 in as a --

21     A.   More than half.

22     Q.   How many federal court systems have you

23 testified?

24     A.   At least ten.

25     Q.   How many outside the Commonwealth of Kentucky?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Nine?

 2         A.    It would be eight.

 3         Q.    Eight?  Okay.

 4               So western district, eastern district, eight

 5    other states?

 6         A.    Correct.

 7         Q.    Okay.  And have you ever been disqualified

 8    from testifying as a forensic pathologist expert in any

 9    court per a Daubert challenge regarding your testimony?

10         A.    Not that I'm aware of.

11         Q.    Okay.  Let's turn our attention to 1992 and

12    Rhonda Sue Warford.

13         A.    Yes.

14         Q.    Okay.  Ask you to examine this document and

15    ask you if you recognize it.

16         A.    Yes.  This is a copy of the autopsy report

17    that I -- I performed and signed about the findings of

18    the death of Rhonda Sue Warford.  It also has attached

19    to it a series of color photographs.

20         Q.    Okay.  Move to introduce that as 67.  This

21    copy that was made for me when I got back last night is

22    not Bates-stamped in any manner, but we went on the

23    computer and found that it's Bates-stamped ME01 to 026.

24               MR. BRUSTIN:  Which -- what's the -- which

25         numbers are those?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. GARVERICH:  ME --

 2              MR. BOND:  ME01 to 026.

 3              MS. MCCARTHY:  That includes the photographs?

 4              MR. GARVERICH:  Yes.

 5              MR. BOND:  Including the photographs, yes,

 6         ma'am.

 7              MR. BRUSTIN:  This is number?

 8              MR. BOND:  67.

 9              THE WITNESS:  67.

10              MR. BRUSTIN:  Thanks.

11         (DEFENDANTS' EXHIBIT 67 MARKED FOR IDENTIFICATION)

12    BY MR. BOND:

13         Q.   Do you recollect that you first had occasion

14    to see the body of Rhonda Sue Warford on

15    April 5, 2000 -- or 1992?

16         A.   Yes, it was 1992.

17         Q.   Yeah.  And it was brought to you by Mr. Adams,

18    who was accompanied by Sheriff Greer?

19         A.   Correct.

20         Q.   Did you know or have a working relationship

21    with Bill Adams as a corner?

22         A.   Yes.

23         Q.   Did you have a working relationship with Joe

24    Greer as a sheriff?

25         A.   Yes.  I have worked cases with both of those
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020
16

1    men.

2         Q.    Okay.  What's the purpose of a forensic

3    autopsy?

4         A.    To -- to establish the identity of a person,

5    to establish the cause and manner of death, to recover

6    evidentiary materials which may be outside or inside

7    of -- of a dead human being, to document the presence of

8    forces that have been delivered from the outside into

9    the inside of the body, and to document the existence of

10   any natural disease.

11        Q.    Okay.  And in that capacity, did you examine

12   the body of Rhonda Sue Warford?

13        A.    Yes, I did, beginning at 12:00 p.m. -- I'm

14   sorry, 2:00 p.m.

15        Q.    On the 5th?

16        A.    Yes.

17        Q.    And was it delivered to you in a properly

18   generally accepted standard, i.e., a body bag?

19        A.    A zippered, not ever previously used body bag.

20        Q.    Okay.  Please describe to us her physical

21   characteristics upon your first view.

22        A.    Well, she's a young woman, a big young woman.

23   She's 71 and a half -- and a half inches tall and 221

24   pounds.  She has -- she's clothed.  There's blood all

25   over her body and soaked into her clothing.  She has



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    obvious wounds to the external surfaces of -- of her

2    body, all of which are -- are due to some instrument

3    that produces -- that has a cutting edge that produces

4    wounding.  And the woundings are either incisions, which

5    are cuts, by definition, a wound that is -- that is

6    longer than it is deep, or stab wounds, a wound that is

7    deeper than it is long.  She died as a result of

8    the -- of these assaults, including the immediate cause

9    of death is an amazing injury, which I've seen only

10   twice in my career, a knife being placed through the

11   skin at the base of the skull, finding an entry point

12   into the spinal -- the spinal canal to sever the

13   brainstem.

14          Now, the brainstem is, if you like, the

15   processor for the hard -- the hard drive.  Once you

16   destroy the hard drive, everything's all over and done

17   with.  So this is going to be a close to instantaneous

18   death with that -- that injury.

19          To get to -- to this point, the assailant has

20   to have placed Ms. Warford's chin near her chest, flexed

21   the spine, which opens a potential space between the

22   vertebra and the base of the skull.  And only in that

23   position can you get a knife into the -- the contents of

24   the spinal cord, because the disc, the vertebral bodies,

25   interlock.  So the only way you can get the -- the space

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  open is to -- to manipulate the -- the spine. And that

2  had been done.

3          She also has another potential wound of -- of

4  lethality if she had not received medical attention,

5  which is a stab wound to the chest, producing an injury

6  to the -- to the left lung, causing hemorrhage from the

7  left lung into the left pleural space.  This wound is

8  associated with damage to firm structures inside of the

9  body.

10          The knife passed through two ribs to fracture

11 them and to then -- then pierce the underlying lung.  So

12 this is not a -- this is not a thin-bladed weapon.  It

13 can't be.  A paring knife or a -- or a steak knife,

14 even, would not be able to do the injury to the bone

15 that was done.

16          She has another potential wound of lethality

17 involving a cut wound of her -- of her throat, if you

18 would like, which severs the external jugular vein, not

19 the common jugular vein or the internal jugular vein,

20 which contains more blood.  Neither of the carotid

21 arteries were injured, and neither -- and the voice box

22 was -- was not injured.  She could theoretically have

23 bled from that sufficiently to develop a hypovolemic

24 shock or, more likely, if she didn't have a -- a

25 compression dressing over the defect in the skin, as she

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  sat up, because of negative pressure, she would have

2  sucked air into that vein, causing what's called an air

3  embolus, or a gas lock, through the -- the blood

4  channels in the lung.

5          So she has one for sure lethal injury, she has

6  one potential lethal injury, and one other possible

7  lethal injury. She also shows evidence of -- of being

8  conscious during the -- the time of the assault.  She

9  has defensive injuries to her hand, the small cut marks

10 that are present, in which people who are struggling

11 with an assailant will -- to protect themselves, will --

12 will put their hands up, and therefore, they -- they

13 will be injured in that fashion, or they might grab for

14 the blade simply to protect your -- your head and face.

15         So that's what she has.  She has no underlying

16 natural diseases at all.  She's not on birth control

17 pills, and she's not pregnant, because she has a corpus

18 luteum in one of her ovaries.  Blood -- she does

19 have -- an interesting mark on her body is a crucifix

20 above her left breast.  It's an inverted Crucifix rather

21 than a normally erected crucifix.  The -- that

22 supposedly is a -- is a sign of -- of Saint Peter, who

23 was crusaded in that fashion.  There are other sources

24 who say it's -- it's somehow satanic.  The answer to me

25 is, I don't know.  I just observed it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Blood was removed from -- from her body.  It

2    was sent to the toxicology lab where no drugs were

3    detected, no alcohol was detected.  I found -- as I was

4    disrobing her, I found hairs to be present inside of

5    her -- her panties, which were packaged up, and along

6    with a -- a standard sexual assault kit, the evidence

7    was orderly packaged, and along with the clothing, also

8    handed to Sheriff Greer.

9          Also present, in addition to Sheriff Greer

10   and -- and Mr. Adams, was Detective Bob Smith, who was a

11   evidence -- evidence detective for the Jefferson County

12   Police Department, who was there to take photographs and

13   to assist in the collection of -- of -- of -- and

14   labeling of evidence.

15        Q.   Okay.

16        A.   That's it.

17        Q.   Do the photographs that are attached to

18   Exhibit 67 reflect some of the testimony that you have

19   shared with us here today?

20        A.   Yes.

21        Q.   Okay.  And could you exhibit those to us that

22   would show us -- the photographs, if I'm counting

23   correctly, folks, start on number -- page 12, okay?  And

24   what I'm doing right now is numbering them so we can

25   identify them for the record, okay?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUSTIN:  Can we agree to put in -- to

2     replace this exhibit with a Bates-stamped exhibit?

3          MR. BOND:  I don't care.  This is what was at

4     the office when I got there last night, and I

5     wasn't going to try to recreate it, but...

6          MR. BRUSTIN:  Not today, but I think it would

7     potentially be -- it's easier to deal with.

8          MR. BOND:  That's fine.  I don't have any

9     problem with that.

10     A.   Well, the last one in the package, the way

11 that they're -- they're put together for me, shows a

12 small incised shallow wound of her right index finger.

13  BY MR. BOND:

14     **Q.   That would be 26 if that's the last**

15 **photograph.**

16     A.   The one before it is a -- a photograph of the

17 left flank, left axilla, or armpit, and left breast.  It

18 shows two stab wounds that have somewhat a different

19 configuration. Because as the knife is placed in, it

20 creates one path, and if it is pulled out in a different

21 direction, it will cause a V-shaped pattern.  There's

22 also a shallow incisional wound present on the -- on the

23 chest below the -- the -- the level of the breast.  The

24 next one shows blood on her face, her clothing pulled up

25 high to -- toward her face, a bunch of blood-soaked oak

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   leaves, and in my hand, a label that says ME80 -- 92-

2   260, which is the autopsy and case number.

3            The one leading up to that is -- is a

4   photograph of the red pants that she was wearing showing

5   a -- a white tennis-type shoe that has some mud on the

6   upper outer surface of -- of the -- the shoe.  No major

7   mud or blood was present on -- on either shoe, so I -- I

8   couldn't convince myself that she had been dragged.

9            MR. BRUSTIN:  I apologize.  Would it be

10       possible, for the record, to indicate what page

11       number we're talking about when we're talking about

12       a picture?

13            THE WITNESS:  I can't.  They aren't paged --

14       they're not paginated.

15            MR. BOND:  And let me -- let's go off record

16       for just a second, if that's okay.

17                 (OFF THE RECORD)

18   BY MR. BOND:

19       Q.   Doctor, I hate to ask you, but if you would go

20   through the photographs again since they do have numbers

21   on them.  If you look, the numbers are probably in the

22   lower right-hand corner of each one, and if you could

23   just explain to us --

24       A.   Well --

25       Q.   -- what each picture depicts.  Excuse me.  I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

23

```
 1   apologize.

 2        A.   Go find it.

 3        Q.   Right there (indicating).

 4        A.   Right there (indicating).  Okay.

 5        Q.   Okay.

 6        A.   Okay.  The first is ME011, and this is a

 7   photograph of her body as -- as she is unzipped from --

 8   in -- while still in the bag.  You can see blood caking

 9   her face, the oak leaves, as I talked about, the fact

10   that she's -- she's clad in a red -- red hoodie and red

11   pants.  A black either garment or towel is present on

12   the skin of her -- of her abdomen.

13        Q.   No, here you need to -- now, if you would --

14   if you would address this one next.

15        A.   I will.

16        Q.   Okay.  Thank you.  Because I think it's going

17   to be 12.

18        A.   That's what it says.

19        Q.   Yes, sir.

20        A.   These are arranged in no particular order I

21   can -- that I can think of, but this is -- shows a T-

22   shirt that she's wearing that has a cartoon-like figure

23   on its front and a large amount of -- of -- of clotted

24   blood on her, and on the garment, and on a leaf.  13

25   shows an incision someplace on her body that's -- that's
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  fairly -- well, this is a stab wound that is fairly

2  deep, I presume.  I don't know exactly where on her body

3  this is from, but this is produced with a single-edged

4  weapon.  The -- there's blunting of the -- of the end of

5  the -- the right end of the -- of the mark on the skin,

6  indicating that it is a single-edged blade.

7      Q.   Would that not be her neck?

8      A.   It's probably her neck, but from -- from this

9  picture, I can't tell what it is.

10     Q.   Okay.

11     A.   This -- this is 14, and it's another

12 photograph of the shirt showing a cartoon figure of, it

13 looks like, a moose wearing red boots and holding a

14 musket.  I don't know what it is.  Again, there's blood

15 and leaves.

16     Q.   Yes, sir.

17     A.   The next is a photograph of the left side of

18 her -- of her body as she's still in the body bag

19 showing the black garment or towel, whichever it -- it

20 may be, and her clothing as I have described.  That was

21 15.

22          16 is a photograph of her neck showing an

23 incised wound, which is deep but does not sever either

24 artery or enter the voice box.  You can also see the

25 tattoo of the inverted cross in the upper left-hand

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 25 of 247 PageID #:
25462
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
25

1    portion of the view.  Another -- another incised wound

2    or stab wound is present in the -- in the -- the left

3    neck below the large wound.

4           17 shows two stab wounds in the back of her

5    neck at the base of the skull.  One of these is

6    associated with a -- about an inch-and-a-half

7    penetration causing severance of the -- of the brainstem

8    and subarachnoid hemorrhage.  It has an irregular

9    configuration, either indicating that she was moving

10   when it happened or that the -- the blade was moved as

11   it was taken out.  There's an -- an additional wound

12   that is visible on the lower right portion of her neck

13   and a shallow wound present near the right scapula.

14          18, an incised wound of the lateral surface of

15   the right hand.  It's a cut -- defensive cut wound.

16          19 shows an additional shallow stab wound in

17   the occipital scalp, which only penetrated the -- the

18   scalp and the -- and the galea.  It did not penetrate

19   the skull.

20          20 shows the same wounds that we've been

21   discussing.

22          21 shows the -- her left axilla with two

23   wounds in the left thorax and one in the -- in the --

24   near the left shoulder. Stab wounds in the -- the chest

25   are there twice, and the incisional -- the -- the wound

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 26 of 247 PageID #:
25463
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

26

1    in the apex of the axilla looks to be a stab wound also.

2            22, an x-ray of the left breast showing a stab

3    wound, which is associated with penetration into the

4    left chest cavity, and once again, the inverted cross.

5            23 is a photograph of the right -- a portion

6    of the right lower extremity, primarily the right leg

7    and foot.  The leg is closed.  There is no blood that I

8    can see, or did see, on the shoe.  There is some mud on

9    its upper lateral surface, the shoe that is.

10            24, a photograph before we attempted to clean

11    her up showing where her clothes are around her lower

12    face.  There's a large amount of blood and organic

13    matter, including oak leaves.

14            25, the left lateral surface of her body

15    showing the -- the wound of the breast, the left breast,

16    one of the -- of the stab wounds penetrating into the

17    left chest, and a shallow incised wound below the left

18    breast.

19            And last, number 29, a very shallow incisional

20    wound of the mid-third of the right index finger,

21    another defensive injury.

22            MS. MCCARTHY:  Just for the record, I think

23        that's 26.

24            MR. BOND:  Excuse me?

25            MS. MCCARTHY:  The last one is ME 26.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

27

```
 1                    THE WITNESS:  26.  You're -- that's correct.
 2         Not 29. Thank you.  I can't count.
 3                    MR. BOND:  I thought that's what he said.
 4                    THE WITNESS:  No.
 5    BY MR. BOND:
 6         Q.   Oh, gotcha.  Okay.  Thank you.
 7         A.   You're welcome.
 8         Q.   Okay.  And I think what we -- what got us to
 9    the photographs were your mention of the defensive
10    wounds, and the -- I think the photographs reflect two
11    of those?
12         A.   Correct, involving the right hand.
13         Q.   Yes, sir.  During your examination, did you
14    attempt to extract any scrapings from under her
15    fingernails?
16         A.   I believe we did.
17         Q.   Were you successful -- or was there anything
18    present?
19         A.   Not that I saw, but we did it.
20         Q.   Correct.
21         A.   The return on that's actually pretty slim.
22         Q.   Okay.  You said there were drag marks?
23         A.   No.  I said I could not determine drag
24    marks --
25         Q.   Okay.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A.    -- looking at -- at her -- her shoes.

2       Q.    Okay.  And cause of death was the stab wound,

3  and the fatal wound was the sever -- severed brainstem?

4       A.    Correct.

5       Q.    Okay.  When you sever the brainstem, does

6  bleeding of the body -- of the person still take place,

7  or does it cease with that act?

8       A.    It ceases fairly quickly.  It's not an

9  immediate cessation because the heart is capable of

10 continuing to pump without neurologic input.  But

11 it -- it happens very quickly. You lose the ability to

12 ventilate immediately, and you lose the ability to

13 maintain blood pressure.  So death would be very close

14 to instantaneous.  Certainly the cessation of -- of

15 brain function is done at that point.

16      Q.    Okay.  Part of your forensic examination was

17 to determine -- and you've already mentioned the

18 infliction of the wound to the brainstem.

19           Her neck would have had to have been bowed

20 with her chin down; is that correct?

21      A.    Yes.

22           MR. BRUSTIN:  Objection to form.

23      Q.    Okay.  Did you attempt to determine whether or

24 not she had engaged in any sexual activity in close

25 proximity?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Yes, I found a hair that I didn't know who it

2   belonged to.  Placed that into an -- in an envelope.  I

3   then did a visual inspection and -- and -- and withdrew

4   materials from various places on and inside of her

5   introitus, placing them in appropriate devices for their

6   shipment to the state crime lab.

7          I also removed a -- a sample of vaginal fluid

8   and examined that right then with a microscope to see if

9   I could -- I could find mobile, motile spermatozoa.  I

10  found none.

11     Q.   And the clothing on her lower half from her

12  hips down, all of that was intact, her pants and her

13  panties?

14     A.   Yes.

15     Q.   None of it was torn that you found?

16     A.   None.

17     Q.   Okay.  So about the time of death?

18     A.   Good luck.

19     Q.   Okay.  Tell us about that.

20     A.   We've tried for decades, if not a hundred

21  years or more, to determine the -- the -- the time of

22  death.  We've tried -- we've tried to do it with -- with

23  things that we know happened postmortem, muscle

24  stiffness, pooling of blood.  By -- by the way, her

25  blood was pooled on her front surface, not her back

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  surface, indicating she had been placed facedown or she

2  with her -- in a facedown position.

3        The cooling -- cooling of the body has been

4  looked at, all sorts of -- of chemical and biochemical

5  tests have been tried, and all have been proved to be

6  not useful to come even close to -- to medical

7  certainty.

8        You can come up with somebody -- me opine,

9  "Well, it is -- these are valuable with medical

10  probability."  Well, 51 percent doesn't count in

11  criminal law.  Now, it's a coin flip.  You got -- you

12  have to have a -- a -- a higher threshold than that

13  for -- for any test to -- to be admitted to.  So the

14  answer is, I don't know.

15  **Q.   Well, any opinions that you express have to be**

16  **based upon reasonable degree of medical probability or**

17  **certainty, correct?**

18        MS. MCCARTHY:  Objection.  Form.

19     A.   They're two different terms.  In some states,

20  they are -- they are actually the same.  In Kentucky,

21  they're two different terms.  I mean, certainty, from a

22  medical standpoint, is determined in -- in -- in the

23  clinical laboratory, and the standard there is 95

24  percent assurance.  So when the blood is taken from your

25  arm and it's tested, you have a 95 percent assurance

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 31 of 247 PageID #: 25468
The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

31

 1  that the test is correct.  That way your doctor can

 2  interpret what it means.

 3          Now, would you want somebody to -- to take you

 4  to the operating room with a test that's a coin flip?  I

 5  don't think so.

 6      Q.   Okay.  So you're not able to determine the

 7  time of death?  Is that the simple statement?

 8      A.   I'm unable to determine the time of death in

 9  any case unless there's -- there is surveillance video,

10  which will document when things happen.

11      Q.   Okay.

12      A.   Beyond that, I -- I don't think I've ever

13  given testimony about when somebody died.

14      Q.   Okay.  Statutory duty of the coroner to

15  establish the date of death?

16      A.   It is -- it is -- that falls upon the coroner,

17  and God help them.

18      Q.   Okay.  And are you aware if there was a change

19  in the content of the death certificate, between 1992

20  and today, as what the coroner could place in the death

21  certificate regarding the time of death?

22          MS. MCCARTHY:  Objection to form.

23      A.   The only death certificate I have in front of

24  me is one that was filled out by Coroner Adams, and I'm

25  trying to see when he signed it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. BRUSTIN:  What are we referring to,

 2     please?

 3          THE WITNESS:  The death certificate.

 4          MR. BRUSTIN:  Sir?

 5          MS. MCCARTHY:  Did you bring that with you?

 6          MR. BOND:  He brought.  I don't know.

 7          THE WITNESS:  Yes.

 8          MR. BRUSTIN:  So let's mark it and make it an

 9     exhibit.

10          MR. BOND:  Well, you can do that when it's

11     your turn.

12          MR. BRUSTIN:  Well, if he's going to be

13     talking about something, I want to know what it is

14     and see it.

15          MR. BOND:  He's identified it.

16          MR. BRUSTIN:  I want to see it.

17          MR. BOND:  Well, you -- share it with him,

18     okay?

19          MR. BRUSTIN:  Can we make copies of it?

20          MR. GARVERICH:  I believe it's previously

21     been marked, Nick.

22          MR. BRUSTIN:  Today?

23          MR. BOND:  No.

24          MR. GARVERICH:  Not today.  In prior

25     depositions.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

33

```
 1              MR. BOND:  Okay.

 2              MS. MCCARTHY:  I don't think --

 3              MR. GARVERICH:  Exhibit 35.

 4              MR. BRUSTIN:  I --

 5              MR. GARVERICH:  Plaintiffs' Exhibit 35.

 6              MR. BRUSTIN:  All I'm saying is I -- I would

 7        just appreciate it if he's going to be asking -- if

 8        he's going to be talking about it, I would love a

 9        copy of it.

10              MR. GARVERICH:  No, no.  And I understand it.

11        I'm just saying it's already been identified

12        in our --

13              MR. BRUSTIN:  I don't think we have it with

14        us.

15              Would it be possible to make a copy of this if

16        he's going to be talking about it?

17              MR. BOND:  That's -- we'll make them --

18              MR. GARVERICH:  Defer to --

19              MR. BRUSTIN:  Thank you very much.  I

20        appreciate it.

21        BY MR. BOND:

22        Q.    Okay.  Were you able to determine if the

23        wounds were inflicted by a right-handed versus left-

24        handed person?

25        A.    Not really.  They -- there are many
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

34

1  that -- that should be inflicted by a right-handed

2  person because of the internal passage of them,

3  especially in her chest.  But you know, you can -- the

4  same person can be standing over someone straddling

5  their chest inflicting wounds and then standing over

6  their head inflicting wounds, so they'll look in

7  the -- in the opposite direction of handedness.

8       Q.   Okay.  They've turned around, so --

9       A.   Correct.

10      Q.   Okay.  You determined that she wasn't

11  pregnant?

12      A.   She was not pregnant.  She, in fact, was

13  ovulating.

14      Q.   Okay.  Tell me what lividity is.

15      A.   It's the pooling of blood that happens

16  postmortem as -- on the basis of the activity of

17  gravity.

18      Q.   And had lividity occurred in the person of Ms.

19  Warford?

20      A.   Yes, and it was on the frontal surface of her

21  body.

22      Q.   And what would that tell us?

23      A.   That she either died facedown, or somewhere

24  shortly after death, she was placed facedown and

25  maintained in that position for, because the lividity

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 35 of 247 PageID #:
25472
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
35

1  was fixed, at least eight hours.

2      Q.    Okay.  When does lividity -- when is the onset

3  of lividity?

4      A.    It begins immediately with -- with cessation

5  of -- of -- of life function.  It is visible, depending

6  upon the pigmentation of the person, at about four

7  hours.  It will continue to develop and be blanchable,

8  meaning you poke your finger into it, and it becomes

9  pale again, until about eight hours when the lividity

10  will be fixed.  You can touch it, push it, it won't

11  change.

12      Q.    Like putting your finger on that wall?

13      A.    Correct.

14      Q.    Okay.  And I've just realized I failed to ask

15  you: Based upon your examination, do you have an opinion

16  as to what the last stab wound was?

17      A.    I can -- no, I can't tell you which -- which

18  is the last stab wound.  I can tell you the -- the --

19  the one that would be immediately incapacitating would

20  be the brainstem injury.

21      Q.    Well, but because of the lack of bleeding

22  thereafter, would that assist you in determining whether

23  or not that was the last stab wound?

24      A.    No.

25      Q.    Okay.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I can't tell.  There --

 2        Q.   Okay.

 3        A.   There -- there may -- may have been more --

 4   more injuries that were present after she -- she was

 5   actually dead.

 6        Q.   Okay.  Tell me what rigor mortis is.

 7        A.   It's the stiffening of the muscles by the

 8   buildup of lactic acid.  Lactic acid occurs in -- in all

 9   cells as -- as they live, and if we don't have an

10   effective vascular system to remove it, it builds up.

11   And that's what it is.

12        Q.   Had that occurred here?

13        A.   Yes.

14        Q.   And can you tell to what extent?

15        A.   She had rigor mortis.

16        Q.   Okay.  Now, we subpoenaed and provided the

17   records that are introduced as 67, pages 1 through 26,

18   from the ME's office.  We've been provided additional

19   photographs from the Defendants that I want you to look

20   at and see if you --

21             MR. BRUSTIN:  You mean Plaintiff?

22             MR. BOND:  Excuse me?

23             MR. BRUSTIN:  You mean Plaintiff?

24             MR. BOND:  I apologize.  Okay.  By you-all,

25        okay? Fair enough?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 37 of 247 PageID #:
25474
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

37

1           MR. BRUSTIN:  Well, Plaintiffs.

2           MR. BOND:  I know that, Nick, okay?

3           MS. MCCARTHY:  Can we just identify them for

4       the record?

5           MR. GARVERICH:  Sure.

6           MR. BOND:  Excuse me?

7           MS. MCCARTHY:  Can we identify them for the

8       record? They --

9           MR. BOND:  I was just going to have him look

10      at them first and then identify them, but he can do

11      them as he goes if that's how he chooses.

12      A.    CA0018461, a -- a photograph of her face from

13  the chin up showing mud present on her face,

14  discoloration of her right cheek, rigor mortis -- excuse

15  me, livor mortis, and organic matter from the -- the

16  scene of her -- of her demise.

17          18466 is a photograph with her eyes being

18  held -- eyelids being held open in which you can see

19  that the -- the -- the cornea are still clear.  And

20  there's no evidence of petechial injury to -- petechial

21  hemorrhages in the whites of the eyes.

22          18467, a similar photo, but farther away,

23  showing blanching of the skin on her chin, which has

24  been spared from the formation of -- of livor mortis

25  because the blood can't get there.  Her chin is in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 38 of 247 PageID #: 25475
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

38

1   contact with the ground, or some other surface, and the

2   blood can't drain into there.

3           Next one is 18463, a photograph of the right

4   side of her face, showing discoloration of -- of her

5   right cheek near the -- the -- the right naris.

6           18462 is very similar to what we discussed

7   before, a photograph of the face, primarily the right

8   side from the chin up.

9           18468 is a very similar photograph to one I've

10  described before.

11          18465 is very similar to one that I've

12  discussed before, showing blanching of the chin and

13  discoloration of the right side of the face.

14          And last, 18464 is another in a series of

15  photographs taken from the same direction by probably

16  the same photographer.

17   BY MR. BOND:

18      **Q.    Do you recognize those as photographs that may**

19  **have been taken, or were taken, during the autopsy?**

20      A.    Oh, I'm sure that this was taken at -- at --

21  during the autopsy.

22      **Q.    Okay.   That's what --**

23      A.    Whether these were taken by -- by me or by

24  Detective Smith from the Jefferson County Police

25  Department, I can't tell you.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q.    Okay.

2      A.    I mean, 27 years ago is a long time to

3  remember everything.

4      Q.    Okay.  Let's collectively introduce these

5  eight photographs collectively as 68.  I'm going to put

6  it at the top right-hand corner of the first photo.

7              MS. MCCARTHY:   Sure.

8      (DEFENDANTS' EXHIBIT 68 MARKED FOR IDENTIFICATION)

9      Q.    Did your postmortem examination result in any

10 finding that this body had been froze and thawed,

11 anything of that nature?

12             MS. MCCARTHY:   Objection.   Form.

13     A.    No.

14     Q.    Okay.  Did it show any decompensation of the

15 internal organs?

16     A.    No.

17     Q.    Do you have any explanation for that if, in

18 fact, she was killed on April the 2nd, 1992?

19     A.    That she was in a -- in a -- a -- a local

20 atmosphere which was cool.

21     Q.    Okay.  Well, I think during your trial

22 testimony, you said it was close to the temperature that

23 was maintained in the morgue.

24     A.    Well, the -- the temperature that I was

25 offered to testify about, not -- was -- was about

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that -- the same temperature as my morgue.

2       Q.   42 degrees?

3       A.   Right.

4       Q.   Okay.  Okay.  You mentioned clear corneas.

5            And Dr. Hunsaker, in a court filing in support

6  of some motions filed in one of these cases, I think it

7  was the post judgment effort, indicated that the lack of

8  cloudiness in the corneas would assist in determining

9  the time of death?

10      A.   It's --

11           MS. MCCARTHY:  Objection to form.

12      A.   It's an estimate only.

13      Q.   Okay.  Well, the -- does the lack of any

14  cloudy -- clouding in -- of the cornea in this instance

15  assist you in determining the time of death?

16      A.   In my opinion, no.

17           MR. BOND:  Thank you.  That's all I've got.

18           THE WITNESS:  Hold it.  We've got to deal

19      with the death certificate.

20           MR. BOND:  Well, they're going to ask you

21      about that, okay?

22           THE WITNESS:  All right.

23           MR. GARVERICH:  Hang on.

24  BY MR. BOND:

25      Q.   Look in -- at the beginning of your postmortem

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  exam, and there are other -- two other doctors

2  identified.

3      A.    No.  One -- one is a doctor.

4      Q.    I apologize.

5      A.    The other guy is a tech.

6      Q.    Okay.

7      A.    Dr. Paul Fearneyhough, and I've -- I've

8  spelled his name for the court reporter.

9      Q.    Okay.  Do you know if he took any photographs?

10  That -- that's going to be the question.

11      A.    I would have been taking the -- taking the

12  photographs.  I dictated everything?  I -- I would have

13  taken the photographs.

14      Q.    So the answer --

15      A.    Paul -- and Paul was a third or fourth-year

16  resident in pathology who -- who was on a rotation at

17  the ME office for at least two months.  So that was his

18  duty.

19      Q.    Okay.

20      A.    And Brian Fitzgerald was an -- was an autopsy

21  technician whose job was to help collect evidence,

22  help -- help to -- to move the bodies from point A to

23  point B, take x-rays, and clean up the mess.

24          MR. BOND:  Okay.  I appreciate your time very

25      much. Fortunately, or unfortunately, these other

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 42 of 247 PageID #:
25479
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
42

```
 1        folks are going to get an opportunity to ask you

 2        some questions.

 3               THE WITNESS:  Well, that's okay.

 4               MR. BOND:  Let me switch out.

 5               MR. ERVIN:  I think we're all right.

 6               MR. BOND:  You okay?  Okay.

 7               MR. ERVIN:  I'm close enough we can

 8        communicate, right?

 9               MR. BOND:  Okay.

10               THE WITNESS:  What?

11                  EXAMINATION

12   BY MR. ERVIN:

13        Q.    Doctor, in my review of the photographs as you

14   walked us through, there were apparently three stab-type

15   wounds to the back of the neck or base of the skull?

16        A.    Correct.

17        Q.    All within a couple of inches of one

18   another --

19        A.    True.

20        Q.    -- if not closer?

21               Would that suggest to you that there were

22   apparently, then, three efforts to cause the type of

23   injury that ultimately would have been a fatal injury?

24               MS. MCCARTHY:  Objection.  Form.

25        A.    Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL    Document 317-10    Filed 01/26/23    Page 43 of 247 PageID #:
25480
The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020
43

1    Q.   Okay.  You said that the return on fingernail

2    scrapings is pretty slim.  What do you mean by that?

3        A.   Unless the nails are broken by activity of the

4    nail on an assailant, the return of positivity on things

5    that are scraped, just in a hundred cases, the return

6    would be extremely slim.  So we did it.  We went through

7    the motions.

8        Q.   You weren't surprised by the lack of evidence

9    as a result, though?

10       A.   That's correct.  Now, this is -- this is --

11   this technology that was available in 1992 is different

12   than it is today.  Today we have touch DNA and a whole

13   bunch of other things that -- that could well be -- be

14   found at a much higher return rate than what we were

15   doing then.

16       Q.   Was there -- as you viewed her hands, fingers,

17   fingernails, did it appear that there had been a

18   struggle that would have involved her hands in that way?

19           MS. MCCARTHY:  Objection.  Form.

20       A.   No.

21       Q.   If you go through and look at the photographs

22   that are attached to Exhibit 67, are there exemplars in

23   there of lividity that you can identify for us?  Or in

24   any of the photographs --

25       A.   Well, sure.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   -- that have been introduced today?

2     A.   Let's -- let's -- let's look at 022, which is

3 the photograph of the left breast wound and the -- and

4 the inverted crucifix.

5          That pink stuff is not blood.  That's lividity

6 after -- after her body has been primarily cleaned.  So

7 that's in the skin, not on the skin.

8     Q.   All right.  Is that -- that blood, it -- so

9 it's in the skin and not below the surface of the skin?

10     A.   Yeah -- no, no, it's --

11     Q.   Or is it both?

12     A.   It's below the surface of the skin confined to

13 blood vessels.  It's not going to come out of the blood

14 vessel unless there's an injury or if she's been --

15 she's been dead long enough that hemolysis has occurred,

16 meaning that the red blood cells have exploded, and they

17 will leak through the capillary bed and -- and get stain

18 into the tissues.

19     Q.   And when does that generally occur?

20     A.   It's another temperature-dependent phenomenon.

21     Q.   All right.

22     A.   It can actually occur when you're alive.

23 There are a whole bunch of diseases that produce

24 hemolysis, and they are all very bad.

25     Q.   All right.  After death, would it be your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 45 of 247 PageID #: 25482
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

45

1   opinion then that cooler temperatures would lessen the

2   probability of its occurrence?

3       A.   Yes.

4       Q.   Rigor mortis, there's been some testimony or

5   suggestion that rigor mortis fades with the passage of

6   time.

7       A.   It does.  It also is a temperature-dependent

8   phenomenon.  And there's some people who there have been

9   reports of instant rigor, in -- in cases of -- of

10  battlefield deaths, hand-to-hand combat, with instant

11  rigor mortis being observed. There's some cases where

12  you'll never find rigor mortis, because a little old

13  lady who doesn't have enough muscle mass to -- for it to

14  form.

15      Q.   As I understand your opinion then, whether you

16  talk about rigor mortis, whether you talk about clarity

17  of corneas, you're not satisfied that there is any clear

18  indicator to establish time of death?

19           MS. MCCARTHY:  Objection.  Form.

20      A.   Determination of the time of death is purely

21  fictional.

22      Q.   Is that your opinion based on a reasonable

23  degree of medical probability?

24      A.   Certainty.

25      Q.   Your opinion based on a reasonable degree of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 46 of 247 PageID #:
25483
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
46

1   medical certainty, meaning that you believe it's a 95

2   percent or more correct opinion?

3       A.   Yes.

4           MR. ERVIN:  Thank you, sir.  That's all I

5       have.

6           MR. BRAMMELL:  I don't have any questions.

7           MR. ROSENE:  No questions.

8           MR. BOND:  You-all want to take a break or --

9           MS. MCCARTHY:  Yeah, let's take a break.

10          MR. BRUSTIN:  Yeah, let's take about ten

11      minutes.

12          MR. BOND:  Ten minutes, sir?

13          THE WITNESS:  Who me?

14          MR. BOND:  Yeah.

15          MR. SLOSAR:  Hey, Nick, were you going to

16      call me?

17          MR. BRUSTIN:  Yeah.

18      (OFF THE RECORD)

19              CROSS EXAMINATION

20   BY MS. MCCARTHY:

21      Q.   All right.  Dr. Nichols, I'm going to

22   introduce myself for the record.  I'm Katie McCarthy.

23   I'm one of the counsel for Plaintiff, Keith Hardin, in

24   this case.

25      A.   Nice to meet you.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Nice to meet you as well.

2          And I understand that you've testified quite a

3    bit in court and in depositions, correct?

4    A.    Yes, ma'am.

5    Q.    But just going to go over a couple of ground

6    rules.

7          So if I ask you a question you don't

8    understand, let me know, and I'll rephrase it.

9    A.    Yes.

10   Q.    And if you answer, I'm going to assume you

11   understood it.

12   A.    Yes.

13   Q.    And if you want to take a break, just let me

14   know, but if I've posed a question to you, I ask that

15   you answer it before we take a break, okay?

16   A.    Okay.

17   Q.    All right.  Now, when Mr. Bond was questioning

18   you, there was something you wanted to say about the

19   death certificate.

20   A.    I was asked a question about -- about if I was

21   aware of any changes in the death certificate, and I was

22   about to state that the only death certificate I have

23   ever seen to this point is one that was signed by Mr.

24   Adams on the 7th of May, 1992.

25   Q.    The only death certificate you've seen in this



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   case, correct?

 2        A.   Oh, yeah.

 3        Q.   Okay.

 4        A.   In this case, yes.

 5        Q.   All right.  And that certificate gives a date

 6   of death, correct?

 7        A.   Of April 2, 1992.

 8        Q.   Okay.  And it looks like you brought quite a

 9   few things with you here to testify?

10        A.   I've made copies of my handwritten notes, I

11   have a -- a thing called a case profile, which is a -- a

12   database of when I got what I got, and -- and a

13   financial statement that shows that I have billed $3,000

14   for the retention as an expert in this case, and I

15   presume it's been paid.  It says, "paid."

16        Q.   Okay.  So to be clear, the -- you've been

17   retained by defense counsel in this case?

18        A.   Yes.

19        Q.   As an expert witness?

20        A.   Pardon?

21          MR. BOND:  I've -- I paid him as a witness.

22        I don't know that there's a formal engagement as an

23        expert of ours.  He was the Commonwealth's witness.

24   BY MS. MCCARTHY:

25        Q.   What's your --
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BOND:  We can debate -- he's been paid
 2         for the time that he has shared with us.
 3              MS. MCCARTHY:  Sure.
 4    BY MS. MCCARTHY:
 5         Q.   So what's your understanding of your
 6    relationship with the Defendants?
 7         A.   He asked me to -- he asked me to -- if I --
 8    how much I remember this case.  And I said, "I remember
 9    some stuff, but you better go find it."  And that's it.
10         Q.   Okay.  So these documents were provided to you
11    by counsel?
12         A.   Of course.  I no have -- no longer have access
13    to the medical examiner's office records.  They have to
14    be provided through the medical examiner's office via
15    counsel.
16         Q.   Okay.  So let's talk about you have your notes
17    there, you said, copies of your notes?
18         A.   Blue -- blue pages that are copied over here.
19         Q.   Okay.  And so on the next break, let's make
20    copies of those notes.
21         A.   Oh, it's for the court reporter.  I mean,
22    it's -- I've done it.
23         Q.   Okay.  Well, I want to see them. You've
24    already made the copies?
25         A.   Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

50

1    Q.   Okay.  And what's your understanding of your

2    relationship as an expert for the Defendants?

3        A.   Same as it was for the Commonwealth, to

4    determine, if I could, what the -- the cause and manner

5    of death of this -- of this woman was, and the

6    weaknesses of my scientific abilities to -- to determine

7    the -- the time of this woman's death.

8        Q.   Okay.  And how much have you been paid to date

9    by --

10       A.   $3,000.

11       Q.   And that's your standard fee, correct?

12       A.   That's my retention fee, correct.

13       Q.   Okay.  And what is your role going forward in

14   this case?

15       A.   I don't know.  I haven't been asked.

16       Q.   All right.

17       A.   The only person who's asked me to do anything

18   so far, other than read everything, is you (indicating).

19            MR. BRUSTIN:  You're pointing at me, Nick

20       Brustin.

21            THE WITNESS:  I am.

22       Q.   Okay.  So we definitely will want to make

23   copies of these on the break.

24            And then there's a disk in the folder that you

25   brought.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

51

1          What's that?

2     A.    That's a disk that contains what I received on

3 the 29th of July, crime scene photographs, video

4 testimony of me in the 1995 trial, which I did watch and

5 realized that time is unfair in 25 years.

6     Q.    Fair enough.  And which Defendant retained you

7 in this case?

8          MR. BOND:  Object to the form of the

9     question.

10    Q.    Which counsel has retained you?

11    A.    Whoever Mr. Bond represents is, I assume, who

12 retained me.

13    Q.    Okay.  And how many conversations did you have

14 with Mr. Bond or anyone from his office in advance of

15 this deposition?

16    A.    Well, he's been in my office at least two

17 times, if not three.  I don't know if we've talked on

18 the phone any.

19    Q.    Okay.  And --

20    A.    I'm sure somebody was -- was on the phone with

21 my secretary to schedule this.

22    Q.    All right.  So when was the first time that

23 Mr. Bond came to your office?

24    A.    Don't know.

25    Q.    Approximately?  A week ago?  Two weeks ago?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 52 of 247 PageID #:
25489
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
52

```
 1        A.   No, no, no, no.  This is a long time,
 2   about -- about the time of the retention, and the
 3   retention was -- I first received case records on this
 4   on the 19th -- let's see, on the 24th of July in 2019.
 5        Q.   Okay.
 6        A.   So sometime around that point was, I'm sure,
 7   when -- when we had a telephone conversation or a
 8   conversation in my office.
 9        Q.   All right.  And approximately how long was
10   that conversation?
11        A.   Don't know.  I make no attempt to track
12   conversations with attorneys or, in the old days, police
13   officers.
14        Q.   You don't track your hours to bill them?
15        A.   If there's something to bill.
16        Q.   Okay.  And you said you met with Mr. Bond a
17   second time?
18        A.   I'm sure it was at least twice.
19        Q.   Okay.  Do you have a sense of when that was?
20        A.   No, I don't.  I -- I told you I don't keep
21   records.
22        Q.   So you couldn't tell me whether that was also
23   in July or whether it was last week?
24        A.   I can't tell you.  I do not know.
25        Q.   You don't know?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 53 of 247 PageID #: 25490
The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

53

1     A.    You may ask me that a thousand times.  The

2  answer is, I do not know.

3     Q.    Okay.

4     A.    I could probably go back and look at -- look

5  at the -- the office log and determine if it's somehow

6  necessary.

7     Q.    Well, was it last week?

8     A.    No.

9     Q.    All right.  This month?

10     A.    No.

11     Q.    Okay.  So it was before January 2020?

12     A.    Yes.

13     Q.    Was it around Christmas?

14     A.    No.

15     Q.    Was it before then?

16     A.    I don't know.

17     Q.    Well --

18     A.    I do not know.  I have no recall of when it

19  was, and I have no record in this file to indicate

20  when -- when we -- we met or what we did.

21     Q.    Okay.  So absolutely no memory of when you

22  met, how long you met, what you talked about when you

23  met?

24     A.    Correct.

25     Q.    Okay.  And what are those notes there?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 54 of 247 PageID #:
25491
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
54

1    A.   Those are notes that I performed -- let's see,

2  on the 25th of July, 2019, I spent one hours looking

3  at -- at -- Mr. -- Mr. Bond was there for -- for this

4  one, but if we -- he -- my note says, "Meade County

5  people.  April 2nd.  Possible time of death." Did I tell

6  Bart Adams the time of death?  No.  "Hardin was the

7  boyfriend of Rhonda introduced by Charles.  No trial

8  dates yet.  My testimony incoming from the 1995 trial

9  event. Need complete" --

10    Q.   Yeah.  Sir?

11    A.   -- "ME92-260 form file from the ME office."

12    Q.   Okay.  So, first of all, it appears you do

13  make notes of meetings with attorneys and how long they

14  last, right?

15    A.   If I remember to do it.

16    Q.   Okay.  Well, it looks like you remembered to

17  do it here?

18    A.   Yes.

19         MS. MCCARTHY:  So I think what we should do

20    right now is take a break and make copies of all of

21    the notes that the witness brought with him.

22              (OFF THE RECORD)

23  BY MS. MCCARTHY:

24    Q.   Dr. Nichols, you've been testifying as a

25  consulting expert since the 1990s, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A.    Actually, before that.

2              MR. BOND:  Objection to the form of the

3        question, but that's fine.

4        A.    Before that.  I -- I performed consultation

5    services. While I was the chief medical examiner,

6    directed that the -- the professional funds from that be

7    placed in an education and research foundation to

8    support the cost of the medical examiner's office for

9    the people.

10       Q.    So you have testified as an expert in

11   hundreds, if not thousands, of cases?

12       A.    Yes.

13       Q.    Okay.  And in this case, you're retained?

14       A.    Yes.

15       Q.    As a Rule 26 expert, correct?

16       A.    Yes.

17       Q.    As you've been in countless of cases, right?

18       A.    Yes.

19       Q.    And your expectation is that you'll be paid to

20   write a report, right?

21       A.    If I'm asked to write a report, I clearly

22   will.  The autopsy pretty much speaks for itself.

23       Q.    And to testify at your deposition today?

24       A.    Yes.

25       Q.    And at trial, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

56

```
 1        A.   Yes.
 2        Q.   Okay.  And you mentioned that you are familiar
 3   with Mr. Bill Adams?
 4        A.   I am.
 5        Q.   Okay.  How did you know him?
 6        A.   He -- he was a deputy coroner when there was a
 7   physician coroner in -- in Meade County.  Then he became
 8   the coroner in a -- I've worked with him with -- about
 9   multiple death -- death cases when I was the medical
10   examiner.
11        Q.   But no other homicide cases, right?
12        A.   I don't remember.  I -- I'm sure there must
13   have been some other homicide case in Meade County.
14        Q.   Pretty rare in Meade County?
15        A.   I don't know -- I don't know how often they
16   occur.
17        Q.   Okay.
18        A.   It's pretty much of a peaceful place.
19        Q.   Great.  What was your opinion of Mr. Adams as
20   a coroner?
21        A.   He always did whatever I asked him to do.
22        Q.   Okay.  So if you told Mr. Adams to do
23   something, that's what he would do?
24        A.   I -- he would try to comply with it, with the
25   task.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Okay.  Did you consider him a competent
 2   coroner?
 3        A.   As far as I know, yes.
 4        Q.   Nothing to make you question his integrity as
 5   a coroner?
 6        A.   No.
 7        Q.   Okay.  What about Sheriff Greer?  How did you
 8   know him?
 9        A.   I think I met Sheriff Greer on a -- a case
10   that was -- also involved Coroner Adams.  That's what
11   I -- that's what I remember about the -- about the --
12        Q.   Not this case?
13        A.   I had met him before.
14        Q.   Okay.  What case was that?
15        A.   I have no idea.
16        Q.   Was it a homicide?
17        A.   I do not know.
18        Q.   Okay.  So it was before this case?
19   Approximately how much before this case?
20        A.   I don't know.
21        Q.   All right.  What was your experience with
22   Sheriff Greer in that case?
23        A.   He seemed like a pleasant man who was -- who
24   was interested in trying to solve an issue about the
25   death of a person.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   Okay.  Was that issue the time that the person

2  had died?

3      A.   I'm unaware.

4      Q.   Did he come to the autopsy in that case?

5      A.   I don't believe so.

6      Q.   But he did in this case?

7      A.   Yes.

8      Q.   Okay.  All right.  Are you familiar with

9  Detective Mark Handy?

10     A.   Yes.

11     Q.   Have you worked with him before?

12     A.   I've been involved in cases in which Handy was

13  the detective, yes.

14     Q.   Have you had any direct interaction with him?

15     A.   Of course.  He would come to the autopsy

16  table, and he would say, "What's that?"  And I would

17  tell him what it was.

18     Q.   All right.  What's your opinion of Mr. Handy?

19     A.   I thought he was a -- he was a -- a diligent

20  public servant.

21     Q.   Okay.  Is that still your opinion of him?

22     A.   Not right now.

23     Q.   Okay.  Why is that?

24     A.   Because of a series of -- of -- of cases that

25  involved Detective Handy in which the outcome of juris

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  prudence was at least altered.

2      Q.    Okay.  Has that made you think back on the

3  cases that you had with Detective Handy to see if

4  there's anything concerning there?

5      A.    No.  The -- the police department were --

6  officials were there to obtain evidence, transport

7  evidence, take photographs, ask the pathologist about

8  injuries and marks, and that's all they were there for.

9      Q.    Okay.  But sometimes they would ask about time

10  of death, right?

11     A.    Yeah, and I would -- I would always say, "I

12  don't know."

13     Q.    Never had any idea?

14     A.    I do not know.

15     Q.    Okay.  Do you know Detective James Clark?

16     A.    Jimmy Clark, yes.

17     Q.    Okay.  What was your opinion of him?

18     A.    He was a funny little guy who took a while to

19  get -- to get used to being around dead people.

20     Q.    Oh, yeah?  Queasy?

21     A.    In the beginning he was, yeah, but that

22  happens with a lot of people.

23     Q.    Okay.  What about Kelly Jones?  Familiar with

24  that name?

25     A.    No.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1       Q.      Robert Ennis?

2       A.      No.

3       Q.      Okay.  Charles Edlin?

4       A.      I don't think so.

5       Q.      Jim Woosley?

6       A.      I know Jim Woosley.

7       Q.      Okay.

8       A.      As a -- as a matter of fact, I've known --

9  known him for a long time.  He's from Grayson County,

10  Kentucky, where my progenitor is hailed.  He's a --

11  after he retired from the police department, he has

12  pursued a career as a -- as a security consultant in

13  multiple countries in the -- in the world, and he's

14  a -- he's a nice man.

15      Q.      So you know him personally, not just

16  professionally?

17      A.      Correct.

18      Q.      Would you consider him a friend?

19      A.      I would consider him an acquaintance.

20      Q.      Okay.  Have you spoken with him about this

21  case?

22      A.      I have not.

23      Q.      Have you spoken with any of the individuals we

24  just talked about --

25      A.      No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

61

1      Q.    -- about this case?  Not with Sheriff Greer?

2      A.    I've not spoken with Sheriff Greer at all.  I

3   saw and talked to Mr. Adams at -- as he attended a

4   funeral where I -- I gave the eulogy for a man who had

5   been my executive assistant for 30 years.  So --

6      Q.    And when was that?

7      A.    Back in December or November.  I -- I would

8   have to look at my calendar to see what the date was.

9   His name was David Jones.

10     Q.    So this past December?

11     A.    Yes.

12     Q.    After you had already been retained as an

13  expert in this case?

14     A.    Yes.

15     Q.    Okay.  Did you talk to Mr. Adams about the

16  case?

17     A.    No.  I talked to Mr. Adams about how he was

18  feeling.

19     Q.    How he was feeling?  What did he say?

20     A.    He said, "I'm getting along."

21     Q.    Okay.  He didn't tell you that he was

22  subpoenaed to testify in this case?

23     A.    It was about his health status, not about

24  anything to do with this case.

25     Q.    Okay.  Not a word about this case?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

62

```
 1        A.    No.
 2        Q.    All right.  By the way, you have extensive
 3   experience as a medical examiner, right?  Are you
 4   familiar with the process of testing blood to see
 5   whether it's animal blood or human blood?
 6        A.    Certainly.
 7        Q.    And that's a standard practice, right?
 8        A.    Yes.
 9        Q.    So something that you might do in the autopsy
10   would be to take a sample that would be sent out to be
11   tested, right?
12        A.    Multiple samples were submitted to -- to the
13   crime lab from whole blood sources.
14        Q.    Right.  And the expectation would be that
15   those can be tested to determine if it's animal blood or
16   human blood, right?
17        A.    Quite true.
18        Q.    And that was absolutely true in 1992?
19        A.    Yes.
20        Q.    There's no reason why the blood in this case
21   that was -- you took couldn't have been tested for that?
22        A.    True.
23        Q.    Okay.  Do you know an individual, Robert
24   Thurman?
25        A.    I don't think so.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   And anyone with medical training would know

2   that in 1992, there was testing you could do to

3   determine if blood came from an animal or from a human?

4      A.   True.

5      Q.   All right.  Dr. Nichols, have you ever been

6   arrested?

7      A.   No.

8      Q.   Have you ever been sued?

9      A.   No.

10      Q.   Okay.  What is the test to distinguish between

11   animal blood and human blood?

12      A.   Right now it's DNA.

13      Q.   What would it have been in 1992?

14      A.   I don't know.  You would have to ask someone

15   working in the serology laboratory.

16      Q.   But it was certainly your understanding that

17   it could be determined in 1992?

18      A.   Yes.

19      Q.   And if there were a question, that's the test

20   that would be done?

21      A.   Yes.

22      Q.   Okay.  All right.  So you said you've

23   performed over 10,000 autopsies?

24      A.   Ten thousand postmortem exams, yes.

25      Q.   Okay.  And have you been present for but not

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    personally performed more than that?

2         A.    Oh, yeah.

3         Q.    How many?

4         A.    I've supervised another 30,000 or so.

5         Q.    Okay.  So you've been present for or performed

6    approximately 40,000 postmortem exams?

7         A.    I supervised 30,000 was my answer.

8         Q.    Right.  So you were either present for or

9    supervised 40,000?

10        A.    Correct, but I may not have been in the

11   premise when I was supervising.  I was reading reports

12   from other medical examiners employed by the state.

13        Q.    Would those reports include pictures that they

14   had taken at the autopsy?

15        A.    They may or may not have.  Depends upon

16   the -- where I was examining the -- the reports.

17   The -- there's no central warehouse for -- for a medical

18   examiner's photographs in the State of Kentucky then,

19   and I don't know about now.  But with offices in

20   Madisonville, Frankfort, and Louisville, I would have

21   to -- to see the photographs.  I would have to go to

22   that office to examine the photograph.

23        Q.    Okay.  So what constituted supervising these

24   postmortem exams?

25        A.    At least reading the investigative material

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  from the -- the -- that the coroners have filled out and

2  looking at -- at the -- the descriptions of -- of what

3  they found and the conclusions that were issued.

4      Q.   Okay.  And when you were doing that, you would

5  be looking for -- to ensure that their findings were

6  medically sound, right?

7      A.   Correct.  To make sure that the people

8  were -- were getting -- were getting what they paid for.

9      Q.   Okay.  So you would look at their

10  determination about the cause of death?

11      A.   I would read the entire report and see what

12  the conclusions were.

13      Q.   Okay.  And what if you had a concern about the

14  report? What would you do?

15      A.   We would have a conference.

16      Q.   Okay.  And can you give me an example of a

17  concern that you might have had?

18      A.   Wrong manner and wrong -- wrong cause of

19  death.  In -- in one particular case.  We had a long

20  talk, and that particular person resigned.

21      Q.   Okay.  And what did you think was wrong about

22  the cause of death?

23      A.   I don't remember the exact details, but she

24  was wrong.

25      Q.   Okay.  So wrong in this context would be

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 66 of 247 PageID #:
25503
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
66

1    saying it was a natural death when it was a homicide,

2    right, something of that nature?

3        A.   A homicide is a determination, and natural,

4    but not causes of death.  Those are manners of death.

5    Two different issues.  The cause of death is that event

6    which initiates a chain of event, however short or

7    protracted, that results in the death of a human being.

8    The manner of death is actually a statistical thing that

9    you have to do for vital statistics. They would

10   give -- give us five choices.

11          A determination must be made in only those

12   five choices to fill out a death certificate.

13       Q.   Okay.  So she was wrong about the cause of

14   death?

15       A.   And the manner of death, as I remember.

16       Q.   Okay.  Can you be more specific?

17       A.   No.

18       Q.   Okay.

19       A.   I don't remember the details.

20       Q.   Okay.  Why did she resign?

21       A.   She did not like being a forensic pathologist.

22       Q.   Oh, well, it sounded like you had a

23   conversation with her about her findings and then she

24   resigned.

25       A.   That's correct.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   How many women medical examiners were there at

2  that time in the State of Kentucky?

3      A.   Let's see, Dr. Weakley-Jones in Louisville,

4  and this particular person in -- in Lexington/Frankfort.

5  Two.

6      Q.   Okay.  Out of how many?

7      A.   Eight.

8      Q.   All right.  So you recall speaking to this

9  individual, and then how soon after did she resign?

10     A.   Within a week.

11     Q.   Okay.  Fair to say that she resigned as a

12  result of the conversation she had with you?

13     A.   She said she didn't like performing -- being a

14  forensic pathologist.

15     Q.   Okay.  But you can't remember anything about

16  the cause or manner of death in that case?

17     A.   No.

18     Q.   All right.  So you've performed or supervised

19  tens of thousands of autopsies, and you've testified in

20  court thousands of times as well?

21     A.   Yes.

22        MR. ERVIN:  We've established all of that.

23        MS. MCCARTHY:  All right.  Thanks.  Thanks

24    for the reminder.

25  BY MS. MCCARTHY:



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   And you understand that when you testify, the
2  goal is to tell the truth, right?  It's not to get a
3  conviction in a criminal case?
4    A.   Well, I have no interest in who wins a
5  particular case, either civil or criminal.  I am there
6  to impart to the -- the trier of facts what I know.
7    Q.   And only what you know, right?
8    A.   Correct.
9    Q.   Right.  You're not just going to say what the
10 party that pays you wants you to say?
11   A.   That is embarrassing to you to have said that.
12   Q.   I don't feel embarrassed.
13       That's --
14       MR. BRUSTIN:  Me neither, for the record.
15   Q.   That's not what you're going to do, right?
16   A.   What?  Repeat the question.
17   Q.   You don't just say what the party that pays
18 you wants you to say?
19   A.   Of course not.
20   Q.   Okay.  Your job is to provide unbiased
21 scientific testimony, right?
22   A.   Correct.
23   Q.   Okay.  And you understand that in good
24 science, you follow the evidence that's in front of you,
25 right?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A.   Yes.

2      Q.   And if that evidence changes, then you change

3  or amend your opinion, correct?

4      A.   Yes.

5      Q.   And that's something you've done, right?

6      A.   Sure.

7      Q.   That just is good science?

8      A.   Yes.  And I don't remember when, and I don't

9  remember exactly why, but yes, I have done that.

10      Q.   You're certain you have changed your opinion?

11      A.   Yes.

12      Q.   All right.  Okay.  So in addition to being a

13  consulting expert, have you published articles?

14      A.   I have.  They're contained in my curriculum

15  vitae. None about -- about -- about stabbing that I'm

16  aware of.

17      Q.   Sure.  And how many have been published in

18  peer-reviewed journals?

19      A.   I think 20 or 24.

20      Q.   Okay.  And have you been asked to be a peer

21  reviewer for any journals?

22      A.   No.

23      Q.   Are you familiar with the American Journal of

24  Forensic Medicine and Pathology?

25      A.   Of course.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    What's the reputation of that journal?

2      A.    It's good.

3      Q.    Good?  Just good?

4      A.    Yeah.  I think I have -- have one or more

5  articles that have been published in it.

6      Q.    Okay.

7      A.    It's a peer-reviewed journal originally headed

8  by DiMaio, and I think now edited by Molina.

9      Q.    And so DiMaio, it's an individual who has a

10  reputation in the forensic community, correct?

11      A.    Yeah.  He was a medical examiner in San

12  Antonio for a gazillion years.

13      Q.    And he's written textbooks, right?

14      A.    Yes.

15      Q.    And handbooks?

16      A.    Yes.

17      Q.    Okay.  And so you would give his findings

18  credence, right?

19      A.    Yes.

20      Q.    What about the Journal of Forensic Sciences?

21      A.    I read that also.  I'm a -- still a member of

22  the -- of the American Academy of Forensic Sciences, and

23  that's their publication.

24      Q.    Highly reputable, right?

25      A.    Well, they publish some of my stuff, so I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   don't know how -- how high their reputation is.

2         Q.    Fair enough.  That is a question.

3               What about the Academic Forensic Pathology

4   Journal?

5         A.    I no longer belong to the -- to the National

6   Association of Medical Examiners, and I no longer am

7   provided that journal.

8         Q.    Why do you no longer belong to the National

9   Association of Medical Examiners?

10        A.    Well, for one thing, I'm not a medical

11  examiner any longer.

12        Q.    Right.  You're just a consulting expert?

13        A.    I'm a consulting forensic pathologist.

14        Q.    Okay.  So you are not actively working for any

15  department or entity right now as a medical examiner?

16        A.    No.

17        Q.    Okay.  But you are, of course, familiar with

18  the National Association of Medical Examiners?

19        A.    I was on the board of directors twice.

20        Q.    Okay.  Are you familiar with their star award?

21        A.    No.

22        Q.    Okay.  All right.  And I believe you were

23  asked by Mr. Brustin, but you know a Dr. Judy Melinick?

24        A.    I -- I know who she is, and we may have bumped

25  into each other at a NAME meeting.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    What's your understanding of her reputation?

2    A.    She's a forensic pathologist in San Francisco.

3  That's all I know.

4    Q.    Okay.  Our understanding that she is one of

5  the top medical examiners in the country.

6    A.    I don't know how you rate medical examiners.

7    Q.    Okay.  Well, one thing you could look at,

8  right, is whether they've been a peer reviewer for any

9  of these reputable journals, right?

10    A.    Well, that's -- that would be one thing you

11  should look at.

12    Q.    Okay.  So if Dr. Melinick has been a -- is a

13  peer reviewer for the American Journal of Forensic

14  Medicine and Pathology, the Journal of Forensic

15  Sciences, and the Academic Forensic Pathology Journal,

16  that would be a sign that she is a highly qualified and

17  credentialed medical examiner, correct?

18    A.    True.  And -- and another thing is longevity

19  in -- in the same job.  Most medical examiners are

20  government -- government employees.  And if they stay

21  in -- in the same job for a period of years rather than

22  becoming peripatetic going from place to place, that's

23  an indicator of good work -- good work outcome.

24    Q.    Okay.  So fair to say that, for example, ten

25  years in a single medical examiner's office as the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

1   medical examiner, that would be an indicator of good

2   work and good outcome, right?

3        A.   Yes.

4        Q.   Okay.  Particularly if that's the medical

5   examiner's office in San Francisco?  That's a really big

6   city?

7        A.   It's a really big city, but she's not the only

8   medical examiner there.  There would have to be more

9   than one medical examiner for San Francisco.

10        Q.   Yes, I would think so.

11             But ten years in that office, it's a lot of

12   experience doing postmortem exams?

13        A.   Absolutely.

14        Q.   Okay.  And another thing you might look at,

15   right, is someone's publications in peer-reviewed

16   literature?

17        A.   Yes.

18        Q.   Okay.  So you said you have many, correct?

19        A.   I said --

20        Q.   You've published many times in peer-reviewed

21   literature?

22        A.   I -- I said I've published, I believe, 24.

23        Q.   Okay.  And if Dr. Melinick has published even

24   more than that, that's a sign that she is a highly

25   credentialed and qualified forensic pathologist?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A.    Yes.

2      Q.    And she also served on the board of directors

3   of NAME.

4      A.    Yes.

5      Q.    Another indication that she's highly qualified

6   and credentialed, right?

7      A.    Yes.

8      Q.    Okay.  And she received their star award in

9   2018. You're not familiar with that, but that would be

10   an indication if she's being honored by NAME that she

11   is?

12          MR. BRAMMELL:  I'm going to object to the

13          question because he's already testified he doesn't

14          know what that is.

15      Q.    I think -- if NAME is giving an award to a

16   medical examiner, an annual award, that's an indication

17   to you that that person has done something deserving of

18   an award, right?

19      A.    It's an indication that the members of -- of

20   NAME or the board of directors feel that way.

21      Q.    Okay.  And can you think of some reasons that

22   they would -- what criteria would they look at for

23   giving that award?

24          MR. BRAMMELL:  Objection.  Speculation.

25      A.    I have no idea.



Kentuckiana Reporters          502.589.2273 Phone
P.O. Box 3983                 502.584.0119 Fax
Louisville, KY 40201    schedule@kentuckianareporters.com
                        www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 75 of 247 PageID #: 25512
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

75

 1              MR. GARVERICH:  Objection to the form of the

 2       question.

 3              MS. MCCARTHY:  Okay.  Just quickly, did we

 4       get copies of the notes back?

 5  BY MS. MCCARTHY:

 6       Q.    All right.  So Dr. Nichols, you testified

 7  earlier that you believe you've never given a time of

 8  death in a case?

 9       A.    I don't believe I ever have.

10       Q.    You've never given testimony on the time of

11  death?

12       A.    I've given testimony about an estimation of a

13  time of death.

14       Q.    Okay.  So you agree that you can estimate an

15  interval of death, right?

16       A.    Right.  I mean, an -- an estimate is nothing

17  more scientific than a weather forecast.

18       Q.    Okay.  So you would say that there's no

19  disagreement in the medical community that giving a

20  estimate of time of death is more scientific than the

21  weather forecast?

22       A.    It's no more scientific than the weather

23  forecast -- too many variabilities.

24       Q.    Okay.  So you testified earlier that it's just

25  a coin flip?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   If it -- if it comes to a probability, that's

2  51 percent, that's almost a coin flip.

3      Q.   Okay.  And you would say that there's

4  agreement in the medical community that giving an

5  interval of death is just the probability of 51 percent,

6  just a coin flip?

7      A.   It's an estimate, and I don't know what the

8  percentage is for the correctness of an estimate.

9      Q.   Okay.  But there's no doubt that medical

10  examiners across the country do look at factors and give

11  intervals for time of death, right?

12      A.   Other practitioners may.  I find it to be

13  non-informed.

14      Q.   So you've never done it?

15      A.   Not that I'm aware of.

16      Q.   You would never give an interval for the time

17  of death?

18      A.   Without biologic testing, maggots, or without

19  a video surveillance, I don't know how you could reach

20  an -- anything beyond estimate.

21      Q.   My question is, either when you're practicing

22  as the medical examiner for the Commonwealth of

23  Kentucky, or as a consulting expert, you have never

24  given an opinion that was an interval for time of death?

25      A.   As an estimate, yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q.    Okay.

2        A.    But beyond that, never.

3        Q.    So you've -- you have estimated time of death

4    before?

5        A.    Right, but it's an estimate.

6        Q.    Okay.  When have you estimated time of death?

7        A.    I don't know what case it was in.  It may be

8    many cases.  I don't know.  But it's always been

9    qualified.  If somebody asks me about this, it

10   is -- it -- this is strictly an estimate.

11       Q.    Okay.  But you have been able to give an

12   estimate before, right?

13       A.    Right, but I -- I don't think the -- my

14   estimate is any more valid than anybody else's.

15       Q.    Well, certainly if you're asked to give an

16   estimate, you're going to try your best to give the most

17   reliable estimate possible, correct?

18       A.    Yes.

19       Q.    And there are things you can look at to do

20   that?

21       A.    There are things that happen in the postmortem

22   interval, yes.

23       Q.    Right.  Okay.  So I want to talk about every

24   time that you have given an estimate of the time of

25   death.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   I have no idea.

2      Q.   Okay.  Well, let's start with when you were

3    the medical examiner for the Commonwealth of Kentucky.

4      A.   I have no idea how many times, or if I did it,

5    on an annual basis or weekly basis.  There's no way to

6    prove that.  I mean, I have no data to resurrect that

7    information from.

8      Q.   Okay.  So it could have been on a weekly

9    basis?

10     A.   Could have been.

11     Q.   Okay.  Could have been on a daily basis?

12     A.   But every time it was always "This is an

13   estimate."

14     Q.   Okay.  But when a -- coroners come to you and

15   you're performing a postmortem exam, you could have been

16   having conversations with the coroner about an estimate

17   of time of death?

18     A.   Yes, but it's always no more than an estimate.

19     Q.   Okay.  And every time that you provided an

20   estimate, you would give that warning: "It's just an

21   estimate"?

22     A.   Yes.

23     Q.   Okay.  But when you would do that, you would

24   be looking at several factors to give your best

25   estimate, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Correct.

2      Q.   Okay.  And one of those factors would be rigor

3   mortis, right?

4      A.   Yes.

5      Q.   Okay.  And you agree that in general, full

6   rigor is set by about 12 hours after death, right?

7      A.   In general, yes.

8      Q.   Okay.  And then it disappears by about 24

9   hours outside of death?

10      A.   In general, yes.

11      Q.   Okay.  So in general, that's what you would

12   expect to see, right?

13      A.   No, that's what is reported to -- to occur.

14      Q.   Okay.  And also, in your vast experience, that

15   is what you've seen?

16      A.   Not always.

17      Q.   Well, there is exceptions to every rule,

18   right, but in general, that's what you see?

19      A.   Yes.

20      Q.   Okay.  And you mentioned earlier that there

21   are instances, for example, of instant rigor?

22      A.   Yes.

23      Q.   When there's hand-to-hand combat, you said, in

24   the field?

25      A.   Yes, in cases of certain -- certain infectious



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1 │ disease processes where lactic acidosis is overwhelming

 2 │ while the person is alive.

 3 │     Q.   Okay.  And the reason -- withdrawn.  If there

 4 │ is a violent struggle, you would expect rigor to set --

 5 │ the onset to be faster after death, right?

 6 │     A.   If there's major exertion of the muscles, yes.

 7 │     Q.   Okay.  Because that muscular exertion before

 8 │ death decreases the ATP in the muscles, right?

 9 │     A.   Correct, and also causes lactic acid to form.

10 │     Q.   Okay.  And a violent struggle in a knife fight

11 │ would be one example of muscular exertion prior to death

12 │ that might speed up rigor, right?

13 │     A.   It could.  It depends on how long the -- the

14 │ event occurred before incapacitation happened.

15 │     Q.   Okay.  And in this case, Dr. Nichols, you were

16 │ never asked under oath to give an estimate about the

17 │ range of death?

18 │     A.   I have read my testimony again yesterday, and

19 │ I did not offer a time of death.  I was asked, "Could

20 │ this death have occurred on April 2nd?"  And I said,

21 │ "Yes, it could."

22 │     Q.   Right.  You were only answering the questions

23 │ that were asked of you, right?

24 │     A.   Correct.

25 │     Q.   And the question that was asked of you was,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    "Is it possible that Ms. Warford was killed on April

 2    2nd?" right?

 3          A.    And I said, "It could have occurred then."

 4          Q.    Right.  As in --

 5          A.    April --

 6          Q.    -- anything is possible, right?

 7          A.    Yes.

 8          Q.    That is not the same as giving your best

 9    estimate of when her death was most likely to have

10    occurred?

11                MR. GARVERICH:  Objection to the form of the

12          question.

13          A.    I'm hesitant to -- to testify about anything

14    in which I am estimating anything.

15          Q.    But, again, you said that you have done that

16    before? You've provided estimates?

17          A.    I'm sure I have when I've been compelled to on

18    the witness stand.

19          Q.    But you didn't do that here?  You didn't

20    provide an estimate?

21          A.    No one asked me to until we got to court, and

22    I was asked that one question, I think, by Mr. Adams.

23          Q.    Right.  But that question that he asked you

24    was not to give an estimate of her time of death.  It

25    was, is it -- "Was it possible she was killed at a
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 82 of 247 PageID #:
25519
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
82

1  specific date and time?"

2      A.   That's correct.

3      Q.   And that is the question you answered?

4      A.   That's correct.

5      Q.   And that question was not, "Dr. Nichols, can

6  you give us your best estimate of when her death

7  occurred?"

8           That's not the question he asked you, right?

9      A.   Yes.

10     Q.   So to be clear, that's not the question you

11  were answering?

12     A.   That's not the question I'm answering.

13     Q.   Okay.  All right.  And you mentioned here that

14  Ms. Warford was in full rigor when she arrived for the

15  autopsy, correct?

16     A.   Correct.

17     Q.   Okay.  And you can tell that because her leg

18  joints were locked?

19     A.   Yes, and her fingers were stiff, and her jaw

20  was clinched.

21     Q.   Okay.  And, again, full rigor generally sets

22  in by about 12 hours, right?

23     A.   Yes.

24     Q.   And if there was a violent struggle, you might

25  expect to see rigor set in earlier than that?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          A.    I might, yes.

2          Q.    Okay.  Well again, if there's this muscular

3     exertion prior to death, if there is a struggle, then

4     something you would see is an earlier onset of rigor?

5          A.    Not necessarily.  Depends upon how long the

6     struggle took place.

7          Q.    Okay.

8          A.    How much time did it occur?  If this -- if

9     this happens in a two to three-minute interval, there's

10    not going to be very much ADP alteration or -- or lactic

11    acid buildup from muscle activity because it's too fast.

12         Q.    Okay.  If there is a lengthy struggle, then

13    you would expect to see rigor onset even faster?

14         A.    Yes.

15         Q.    Okay.  And in this case, it's clear from the

16    defensive wounds that Ms. Warford had that there was a

17    struggle, though you don't know for how long?

18         A.    That's correct.  She does have evidence of

19    defensive injury, that she was alive and conscious

20    during the attack.

21         Q.    Okay.  And certainly if rigor -- if the onset

22    of rigor is sooner, then you would expect it to have

23    dissipated sooner as well?

24         A.    Yes.

25         Q.    Okay.  So for example, if you found a body

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

84

```
 1   three-and-a-half, four days later, you would not expect
 2   full rigor to be there anymore?
 3       A.   Depends upon what time of the year.
 4       Q.   Okay.  In the springtime?
 5       A.   Depends upon how hot it is.
 6       Q.   Okay.  So what -- what's the likelihood, in
 7   your experience, that a body could be in a -- outside in
 8   the elements for three-and-a-half days and still be in
 9   full rigor in April?
10       A.   Depends upon the temperature.
11       Q.   Okay.  Again, how many times have you seen
12   that happen?
13       A.   Not very frequently, but I have.
14       Q.   Okay.  So it would be highly infrequent to see
15   that, correct?
16       A.   It would be infrequent, correct.
17       Q.   That would be the outside bound of what you
18   had ever seen?
19            MR. GARVERICH:  Objection to form.
20       A.   I don't know that I can answer that question,
21   because I don't remember every case.  I would have to go
22   through stacks of files to be able to answer that
23   question.
24       Q.   Do you remember actually seeing a body still
25   in full rigor after over three days had passed?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    I don't know.

2      Q.    Okay.  So --

3      A.    The answer is I don't know.

4      Q.    Right.  So you have no memory of actually

5   having seen, in your entire experience as a medical

6   examiner, a body that was outside for over three days

7   that was still in full rigor?

8      A.    I do not know, but it would -- it's all

9   temperature dependent.

10      Q.    Okay.  If it's not freezing outside --

11      A.    Not -- it is not freezing here.  We know that.

12   The temperature is 42 degrees.  It's not freezing.

13      Q.    I'm asking you in general, over the course of

14   your decades and tens of thousands of postmortem exams,

15   have you ever seen a body in nonfreezing temperatures

16   that was outside for over three days that was still in

17   full rigor?

18      A.    I don't know.

19      Q.    So as you sit here today, you have no memory

20   of ever having seen that?

21      A.    No, but I can't tell you that I haven't seen

22   it either.

23      Q.    Well, certainly it would be something

24   exceptional that would stick out in your mind if you

25   had?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 86 of 247 PageID #: 25523
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

86

1      A.    No.   It may be stuck in a memory bank that

2  doesn't exist anymore.  I've been doing this for 40

3  years.

4      Q.    Well, you remember that there was an amazing

5  injury in this case that you had only seen twice, right?

6      A.    Yes.

7      Q.    Okay.  So again, it would be pretty amazing to

8  see a body that had been left for three-and-a-half days

9  that was still in full rigor in nonfreezing weather?

10         MR. BRAMMELL:  Object.

11     Q.    That would be pretty amazing, right?

12         MR. BRAMMELL:  Asked and answered.

13     A.    It would be very unusual.

14     Q.    Okay.  And it seems that you do have a memory

15  of things that are very unusual, right?

16         MR. BRAMMELL:  Object to form.

17     A.    Specific injuries, yes.  Rigor mortis and

18  livor mortis, no.

19     Q.    Okay.  So to be clear, even though it would be

20  very unusual, as you sit here today, you have absolutely

21  no memory of ever having seen a body outside for over

22  three days in nonfreezing weather that was still in full

23  rigor?

24     A.    Not that I recall.

25         MR. BRAMMELL:  Object.  Asked and answered



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1          four times.

2          Q.    And if a body were inside, not outside, you

3    would expect to see the dissipation of rigor even

4    faster, correct?

5          A.    Is it heated or not?

6          Q.    Room temperature.

7          A.    It would form quicker, and it would go away

8    quicker.

9          Q.    Okay.  Dr. Nichols, you did not go to the

10   field where the body was found in this case?

11         A.    I did not.  I was at -- in the medical

12   examiner's office in Louisville when I was telephoned

13   about the death.

14         Q.    And you weren't shown any pictures or videos

15   of the scene?

16         A.    At that moment, I don't believe so.

17         Q.    Have you reviewed any since then?

18         A.    Yes.

19         Q.    Okay.  What were those photos that you

20   reviewed?

21         A.    A dead -- a dead lady in a -- a poorly wooded

22   area with -- with a whole bunch of -- of organic matter

23   around her, primarily leaves.

24         Q.    And were you shown any video of the crime

25   scene?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 88 of 247 PageID #:
25525
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
88

1        A.    No.

2        Q.    Okay.  Are you aware that a video exists?

3        A.    It doesn't surprise me.

4        Q.    Okay.  Is that something you would want to see

5    if you were forming an opinion in this case?

6        A.    I don't know how the video is going to help me

7    any more -- any at all.  I'm going to be looking in a

8    detailed fashion at the person.

9        Q.    Okay.  And the reason it wouldn't help you

10   with rigor is it's so clear here that Ms. Warford was in

11   full rigor when she arrived at the autopsy.

12       A.    She was in rigor when I got her.

13       Q.    Okay.  And you noticed that -- you know she

14   was in rigor because her legs were in an unnatural

15   position, correct?

16       A.    Yes, and because her jaws were clinched

17   and -- and her fingers were -- were stiffened.

18       Q.    Right.  And let's look at some of the crime

19   scene photos.

20             All right.  So I want to show you some

21   pictures from the crime scene, which sounds like you may

22   have already reviewed.

23             In reviewing those pictures, what

24   conversations did you have with counsel about what you

25   observed from the crime scene?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.    I don't think I talked to the counsel at all

2  about -- about the crime scene.  There was really not

3  great value, from my standpoint, about the images seen

4  at the crime scene, other than the fact it's a dead --

5  this is a dead lady in a -- in a rural area.

6    Q.    All right.  Well one thing that you can tell

7  from rigor, right, is whether the person was killed

8  where they were found or not?

9         MR. BRAMMELL:  Object to the form of the

10    question.

11   A.    Maybe.

12   Q.    Well, if the body is in an unnatural position,

13  that's not how it's found, and rigor is set in, then you

14  know that the body was left for a period of time

15  someplace else, right?

16   A.    It was -- it could have been in that same

17  place.  It was altered in its position.

18   Q.    Okay.  So you didn't have any conversations

19  with counsel about conclusions you drew after viewing

20  crime scene photos for the first time?

21   A.    No.

22         MS. MCCARTHY:  We can mark this as

23    Plaintiffs' 47.

24         MR. BRUSTIN:  Mark the first page, please.

25         MR. BOND:  Collectively, then.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

90

```
 1                  Do you know how many there are, Kate?

 2            MS. MCCARTHY:  Well, they're Bates.

 3            MR. BRAMMELL:  They go from Bates stamp --

 4            MR. BOND:  Okay.  You got them Bates stamped.

 5       Okay.

 6            MR. BRAMMELL:  -- beginning to the end.

 7            MR. BOND:  Would you just identify --

 8            MS. MCCARTHY:  Yeah.

 9            MR. BRUSTIN:  Does everybody have one?

10       (PLAINTIFFS' EXHIBIT 47 MARKED FOR IDENTIFICATION)

11  BY MS. MCCARTHY:

12       Q.   Okay.  So what's been marked as Plaintiffs' 47

13  is Bates NSBLMPD 588 -- or sorry, 585 through 593, okay?

14            MR. BOND:  There's got to be more than eight

15       photos.

16            MS. MCCARTHY:  I have two photos to a page.

17            MR. BOND:  Excuse me?

18            MS. MCCARTHY:  There are two photos to a

19       page.

20            MR. BOND:  Oh, you're -- okay.  There are

21       two.  Okay.

22            MR. BRAMMELL:  18 photos.

23  BY MS. MCCARTHY:

24       Q.   All right.  Dr. Nichols, if you could look at

25  the bottom, NSB 588?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A.    Yes, there are two images on that page.

2        Q.    Okay.  And the top image, the first thing you

3   notice when you look at this, right, is that the legs

4   are not in a natural position, correct?

5        A.    Well, they're not in the position you would

6   expect for a dead person to be in.

7        Q.    Well, they're sticking straight up in the air.

8        A.    They're flexed.

9        Q.    Up into the air?

10       A.    Correct.

11             MR. GARVERICH:  Objection to the form of the

12       question.

13       Q.    Against the force of gravity?

14       A.    Yes.

15       Q.    Okay.  And that is not how -- and you can see,

16   also, that one of her feet is above the other foot,

17   resting above the other foot.  You see that?

18       A.    I do.

19       Q.    That's an extremely unnatural position to find

20   a body in, isn't it?

21       A.    It is.

22       Q.    In particular, if she's been left outside in

23   the wind and in the elements, right?

24       A.    Yes.

25       Q.    You would not expect -- even if someone had

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   placed her legs up there, the pull of gravity would have

2   brought them back down, correct?

3        A.   Unless she was already in rigor mortis, yes.

4        Q.   Okay.  So it's clear from these pictures that

5   she was not killed where the body was found?

6        A.   I don't know how you can state that, because

7   there could have been something that was brought to the

8   scene that she was in and she was placed at the scene by

9   another.

10       Q.   Okay.  So to be clear, you're saying she could

11  have been brought to the scene in a container and then

12  placed there?

13       A.   A backseat of a car.

14       Q.   Okay.  It is not possible, based on the way

15  rigor has formed here, that she was killed right here

16  and left in that position?

17       A.   She would not have been in that position if

18  she was killed right there.

19       Q.   It's not possible?

20       A.   Correct.

21       Q.   Okay.  So because there's nothing to support

22  her legs remaining upright for hours while rigor formed?

23            MR. BOND:  Object to the form of the

24       question.

25       A.   Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.   That is common sense?

2      A.   Yes.

3      Q.   And it is also something that you can say with

4   a degree of medical certainty, correct?

5      A.   Yes.

6      Q.   Okay.  So as you just mentioned, one

7   possibility is that her body was kept in a contained

8   space, like the backseat of a car or the trunk of a car,

9   for a period of time while she formed rigor?

10     A.   Yes.

11     Q.   And then that the body was carried and dumped

12  into the field, right?

13     A.   Yes.

14     Q.   Okay.  And if, in fact, that is what happened,

15  her body was kept inside someplace, you would expect

16  that the onset of rigor and the dissipation of rigor

17  would be even faster, correct?

18     A.   No.  If she's in the trunk of a car, no,

19  because that's going to assume the -- the ambient

20  temperature of where the car is.

21     Q.   Okay.  If a car is in a garage?

22     A.   No.  How many heated garages are there?

23     Q.   Okay.  So you think if she is kept in a car

24  for a long enough time to form rigor out of the elements

25  contained, no impact on timing of rigor?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

94

```
 1        A.   I think -- no.  I think it would be the same

 2   estimate of timing of rigor that we talked about before.

 3        Q.   Okay.  And that is, in general, you would

 4   expect full rigor at about 12 hours, eight to 12 hours,

 5   right?

 6        A.   Yes.

 7        Q.   And you would expect to see it dissipate by 24

 8   hours, right?

 9        A.   Under -- in generalities, yes.

10        Q.   So in terms of the timing of rigor, it's your

11   testimony that there would be absolutely no effect on

12   her body being kept inside in a car and being out in the

13   field in the elements?

14             MR. ERVIN:  Object to the form of the

15        question.

16             MR. BOND:  Object to the form of the

17        question.

18        A.   Unless it's -- she's -- she would not be

19   subjected to the precipitation from above.  Other than

20   that, should be the same temperatures in -- in a car or

21   the trunk of a car than outside as -- outside is.  So

22   there's -- it's -- there's no difference.

23        Q.   Okay.  So it's your opinion that being kept in

24   the trunk of a car, insulated, would be the same

25   temperature as out in an open field?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 95 of 247 PageID #:
25532
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
95

```
 1          A.    If your car is insulated --
 2               MR. BOND:  Object to the form of the
 3      question.
 4          A.    -- it's -- it -- it can only be insulated
 5      with -- to contain the -- the heat that's within it.
 6      There's no heater back there that's going to make it
 7      come to room temperature. She's going to -- if it's 48
 8      degrees on the outside, it's going to be 48 degrees in
 9      the trunk of the car.  I don't understand
10      your -- your -- your thought process at all.
11          Q.    Okay.  So no impact whatsoever if she's
12      kept -- what about if she's kept inside a home?
13          A.    Then the -- the -- everything would be speeded
14      up.
15          Q.    Right.  Okay.  So if she's kept inside a home,
16      you would expect the onset and the dissipation of rigor
17      to be faster?
18          A.    Yes.
19          Q.    If she's kept anywhere where the temperature
20      is higher than outside, you would expect a faster onset
21      and dissipation of rigor?
22          A.    Depends upon --
23               MR. BOND:  Object to the form of the
24      question.
25          A.    Depends upon how much higher.  Let's just say
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  room temperature.

 2       Q.   Okay.

 3       A.   So 72 degrees.  Yes, it should -- she

 4  should -- everything should be speeded up compared with

 5  being outside with 42 degrees.

 6       Q.   All right.  So 42 degrees is the temperature

 7  of your morgue, right?

 8       A.   Yes.

 9       Q.   Okay.  So you're saying it doesn't matter if

10  she is kept somewhere that's 65 degrees?  That would

11  have no impact, unless it's at 72 degrees, on the timing

12  for onset or dissipation of rigor?

13            MR. ERVIN:  Objection to the form.

14       A.   I've seen people go from normal human beings

15  until they're found three days later in the summer

16  around here, and they are green, bloated, and

17  horrendously decomposed in -- in three days.  So there's

18  huge variation of the effects of the microenvironment on

19  the dead person.

20       Q.   Right.  Huge variations in the effect of the

21  environment.  So my question is, Between 42 degrees and

22  72 degrees, if she's kept somewhere 62 degrees, it's

23  your testimony that would have no impact on the onset

24  and dissipation of rigor?

25       A.   No.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BOND:  Object to form.

2     A.   Anything that's -- that is closer -- that's

3  closer to room temperature will cause speeding up of

4  what we expect to happen after death.

5     Q.   Okay.  So not just for rigor?  Any postmortem

6  changes would be sped up if she's kept closer -- the

7  closer she is to room temperature?

8     A.   Yes.

9     Q.   And obviously if it's above room temperature,

10 even faster?

11    A.   Yes.

12    Q.   And also if she's kept away from other

13 elements, like participation that you mentioned?

14    A.   True.

15    Q.   You would expect, again, a faster onset for

16 postmortem changes?

17    A.   Yes.

18    Q.   Okay.  You mentioned you've seen bodies that

19 were green and bloated.  That's because of -- why do you

20 see that?

21    A.   Our bacteria.

22    Q.   Okay.  And how does that usually begin?

23    A.   Begins with gaseous distention of the

24 gastrointestinal tract and then escape of the -- of the

25 coliform and other bacteria into the bloodstream.  And



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   they metabolize our blood glucose, and they make gases.

 2   Putrescine and cadaverine are the ones that you smell,

 3   plus a whole bunch of others.  And they get bloated, and

 4   they don't look like human beings at all.

 5        Q.   Okay.  And when you see any stage of that, if

 6   that's present in an autopsy, you would note that in

 7   your report?

 8        A.   Yes.

 9        Q.   You would be obligated to do that?

10        A.   Yes.  This woman was not in any form of

11   decomposition that I could tell then or -- or now.

12        Q.   Okay.  No decomposition whatsoever?

13        A.   No.

14        Q.   And if it had been, it would be documented in

15   your report, and it would be visible in the photographs?

16        A.   Yes.

17             MS. MCCARTHY:  So do you -- you still want to

18        break for --

19             MR. ROSENE:  If that's convenient for you.

20             MR. BRUSTIN:  Could we just take a 30-second

21        break? Because I want to make sure we get one thing

22        in before lunch.

23             MR. ROSENE:  Sure.

24        (OFF THE RECORD)

25   BY MS. MCCARTHY:
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 99 of 247 PageID #: 25536
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

99

1    Q.   All right.  Dr. Nichols, you made it clear in

2  this case to Mr. Adams and Sheriff Greer that there was

3  no medical basis for giving a time and date of death

4  here?

5    A.   Correct.

6    Q.   You made that clear to them at the autopsy?

7    A.   I told them I didn't know when she died.

8    Q.   And at any point if they had asked you after,

9  the most you would say is, "It's possible"?

10    A.   Yes.

11    Q.   You -- there was no medical basis for giving

12  an exact time -- date and time of death in this case?

13    A.   Correct.

14    Q.   And you communicated that to them clearly?

15    A.   I believe so.

16    Q.   Well, certainly that was your practice?

17    A.   Yes.

18    Q.   And you have no reason to doubt that you

19  didn't do that here?

20    A.   No, but I don't remember the conversation from

21  25 years ago.

22    Q.   Well, you've already told us that you would

23  never give a specific date and time of death.

24    A.   Unless there was video with -- with valid

25  tape.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

100

```
 1        Q.   Okay.  There's no videotape here, is there?

 2        A.   No nothing.

 3        Q.   Okay.  So you would have told them there's no

 4   medical basis for a specific day and time of death in

 5   this case?

 6        A.   Correct.

 7             MS. MCCARTHY:  Okay.  We can take a break.

 8                  (OFF THE RECORD)

 9   BY MS. MCCARTHY:

10        Q.   All right.  Dr. Nichols, did you have lunch

11   with any of counsel for the Defendants?

12        A.   No.

13        Q.   Okay.  Did you speak with them at all during

14   the break?

15        A.   No.

16             MR. BOND:  Told you.

17        Q.   Okay.  So before we broke for lunch, you were

18   looking at what we marked as Plaintiffs' 47, which had

19   crime scene photos, right?  And you had testified that

20   it was clear from the photos that the victim had formed

21   rigor not at the scene, correct?

22             MR. ERVIN:  Objection to the form of the

23        question.

24        A.   No, I don't know whether she somehow could

25   have been positioned leaning up against a tree with her
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

101

```
1   legs like that, that somehow she could have -- could
2   have done that at the -- the scene.  I can't tell you.
3   But the most probable thing is that she was transported
4   there in a vehicle of some type, in a backseat or
5   a -- or a trunk, or maybe even a -- a pickup truck.
6       Q.   Okay.  So let's break this down.  Most
7   probable she was transported there in a vehicle.
8            Based on everything you've seen for her
9   injuries, your expectation is that vehicle would be
10  covered in forensic evidence, right?
11      A.   Blood.
12      Q.   Blood everywhere?
13      A.   There should be blood, yes.
14      Q.   That would be almost impossible to clean that
15  vehicle?
16           MR. BOND:  Object to the form of the
17      question.
18      A.   I can't answer that question.  I'm not an
19  expert on vehicle cleaning.
20      Q.   Okay.  But if she is -- if she is killed, say,
21  in a home, originally, based on the level of wounds that
22  she has here, you would expect there to be a lot of
23  blood?
24      A.   I would expect transfer evidence in the form
25  of blood to occur at the place where the assault
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

102

1   happened and -- and postmortem.

2       Q.   Right.   So then if she's placed in a car, and

3   that's where she forms this rigor, you would expect

4   there to be a lot of blood there as well?

5       A.   I would expect blood to be there, yes.

6       Q.   Okay.   And you understand that in this case,

7   they searched both the Defendants' vehicles and found

8   nothing?

9       A.   I neither know nor care.

10      Q.   Okay.   No one talked to you about that?

11      A.   I neither know nor care.

12           MR. BRUSTIN:   Didn't answer.

13      Q.   Did anyone talk to you about the fact --

14      A.   I don't remember.

15      Q.   Okay.   So as you sit here today, you have no

16  memory of someone telling you they searched Mr. Hardin

17  and Mr. Clark's vehicles and found nothing?

18      A.   Why would I need to know that?

19      Q.   That's not my question, sir.

20           My question is, do you recall that happening?

21      A.   No, I do not.

22      Q.   Okay.   Because no one told you that?

23      A.   Not that I recall.

24      Q.   All right.   So you said though that it's

25  possible she was put up against a tree to form rigor.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 103 of 247 PageID #: 25540
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

103

1              Now, if you're looking at Plaintiffs --

2              MR. BRAMMELL:  Object to form.  I don't think

3        that's what he said.

4        Q.    You said one possibility is that her legs

5    could have been placed against a tree and that's how she

6    entered rigor.

7        A.    That she -- her back had been placed against a

8    tree and -- and her legs had been placed in that

9    fashion, crossed in front of her.  So when she is

10   formed -- she has formed rigor in that position, they

11   put her back -- they put her down, then she's going to

12   have that type of positioning.

13       Q.    Okay.  So her legs are pointing -- she's

14   facedown when she's -- where the body is found, right?

15       A.    She is there, yes.

16       Q.    Okay.  And her legs are sticking straight up

17   into the air?

18       A.    Her legs are flexed.  Her knees are flexed.

19       Q.    Okay.  And you're looking, for example, at

20   Plaintiffs' 47, Bates NSB 588.  It's the page that

21   you're on.

22              You can see there's no tree there behind her

23   legs, correct?

24       A.    I didn't say that she wasn't moved at the --

25   at the scene of the body recovery.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 104 of 247 PageID #:
25541
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
104

1      Q.    Okay.  So, again, it is clear that she was not

2   killed where the body is found?

3      A.    Correct.

4      Q.    There is no question about that?

5      A.    In that exact location and that portion of

6   the -- the -- of the woods or field, whichever it -- it

7   wants -- you should describe it as, correct.

8      Q.    Right.  She formed rigor elsewhere?

9      A.    Yes, but I can't tell you that it couldn't

10  have occurred someplace out there in the woods.

11     Q.    And she was moved after she formed rigor?

12     A.    Yes.

13     Q.    Okay.  And she's found on the edge of a tree

14  line, correct?

15     A.    Yes.

16     Q.    You're saying you don't know if she could have

17  been killed in the field and moved elsewhere?

18     A.    I do not know that.

19     Q.    Okay.  So for her to have been killed in the

20  open field, could that have happened?  No trees?

21     A.    She could have been killed there and then

22  placed against a tree after she's dead.

23     Q.    Okay.  So we're talking about an open field,

24  and then there's a tree line on the edge, right?

25     A.    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 105 of 247 PageID #: 25542
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
105

1    Q.    Okay.  That's your understanding?

2    A.    It's not heavily wooded.

3    Q.    Okay.  So you're saying it's possible that she

4    is killed in the open field, taken and put up against a

5    tree, left there long enough to form full rigor, and

6    then moved again?

7    A.    It's possible.  I already told you that it's

8    more probable that -- that the -- the positioning

9    indicated in these photographs would be transporting a

10   dead person in a motor vehicle.

11   Q.    Okay.  And you've testified that there's no

12   evidence that she was dragged on the ground?

13   A.    None that I could see on her -- on her body,

14   and these photos do not seem to show drag marks.

15   Q.    Okay.  That is, there's no drag marks either

16   on her Skin, nor is there a lot of dirt on her clothing?

17   A.    Including her shoes.

18   Q.    And that's where you would expect to see it if

19   she had been dragged?

20   A.    Yes.

21   Q.    You also said that she's a big young woman?

22   A.    221 pounds.

23   Q.    And five-eleven and a half, right?

24   A.    Big woman.

25   Q.    So it would take more than one person to carry

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  her a long distance?

2       A.    Depends on who the guy is that's carrying her.

3       Q.    **Right.  So if it's --**

4       A.    But most men singularly could not lift and

5  move this woman as a 221-pound deadweight.

6       Q.    **Unless you have Jason Momoa, probably going to**

7  **need more than one person to move a woman this large in**

8  **full rigor?**

9       A.    Arnold Schwarzenegger for my age.  Thank you.

10      Q.    **Fair enough.  But short of that, the**

11 **expectation, much more likely two people moved this**

12 **woman's body?**

13      A.    Or ten.

14      Q.    **Right.  More than one person moved the body?**

15      A.    More likely than not, yes.

16      Q.    **Okay.  And you of course know that there is no**

17 **science of looking at a bloodstain and saying that**

18 **that's where a person was killed, right?**

19      A.    That's absolutely correct, nor can

20 you -- can you do anything other than estimate the

21 volume of -- of blood that's in the -- in the stain.

22      Q.    **And certainly -- and you can't estimate the**

23 **volume of blood when someone is killed in a field like**

24 **this, can you?**

25      A.    That's what I just testified to, correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    You cannot estimate?

2    A.    You cannot.

3    Q.    Right.  Because there's the -- there's leaves,

4    there's soaking into the soil.

5           You have no idea the quantity of blood that's

6    there?

7    A.    That's -- that's what I testified to, yes.

8    Q.    Right.  And so the quantity of blood would

9    tell you nothing about whether or not she was killed

10   there or elsewhere?

11   A.    Correct.

12   Q.    Okay.  And certainly, you would not be able to

13   look at a bloodstain in a field and say that it had been

14   sitting there saturating for five days?  That is not

15   something that you could say?

16        MR. BOND:  Objection to the form of the

17        question.

18        MR. GARVERICH:  Objection.

19   A.    I -- I do not possess that ability.

20   Q.    Well, it's not possible scientifically to even

21   say that it had been saturating there for two hours?

22   A.    There may be somebody who can say that.  I

23   can't.

24   Q.    Well, are you familiar with anyone in the

25   scientific field who could give that sort of testimony?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 108 of 247 PageID #: 25545
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
108

1    A.   I don't know on what basis they would give it.

2    Q.   As far as you know, there is no science to say

3    you can look at a bloodstain and tell how long it had

4    been there?

5    A.   That's also correct.

6    Q.   Or whether that's where the person was

7    actually killed?

8    A.   Yes.

9    Q.   And you would never tell somebody that that

10   was possible?

11   A.   No.

12   Q.   And if they had asked you, you would have told

13   them, "That's nonsense"?

14   A.   I would have told them, "I don't know," and I

15   don't know how we could find it out.

16   Q.   And you wouldn't know that because there's no

17   science behind it?

18   A.   None that I'm aware of.

19   Q.   And in your decades of experience as a medical

20   examiner, that's something you probably would have been

21   aware of?

22   A.   I would hope so.

23   Q.   Well, certainly if there was a way to look at

24   blood and tell how long it had been there, that's

25   something the medical community would be interested in?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 109 of 247 PageID #: 25546
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
109

 1       A.    There is no way to do that.

 2       Q.    **Right.**

 3       A.    The only way you can do anything with -- with

 4  bloodstains is if there's -- if there's evidence of

 5  active bleeding from the person who is -- who is

 6  bleeding left at the scene.

 7       Q.    **Right.  So, for example, if someone's carotid**

 8  **artery has been severed and there's a blood splatter,**

 9  **that can tell you something?**

10       A.    It's spatter.

11       Q.    **Spatter.**

12       A.    Yes, that can tell you something.

13       Q.    **Okay.  That can actually tell you the location**

14  **of where the person sustained that injury?**

15       A.    Yes.

16       Q.    **But short of that, there's nothing that you**

17  **can say from the blood at a scene?**

18       A.    Correct.

19       Q.    **Okay.  And there are lots of possible**

20  **explanations for how blood can be deposited in this case**

21  **in this field, right?**

22            MR. BOND:  Objection to the form of the

23       question.

24       A.    Oh, I guess.  I'm sure it could be another --

25  another mammal that could have bled at the -- at that



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1    specific point in that field.

 2        Q.    Okay.  Well, fair enough.

 3              You talked about how the wound that severed

 4    the brainstem, soon thereafter, the heart would cease to

 5    beat, right?

 6        A.    Correct.

 7        Q.    So you would lose blood pressure, right?

 8        A.    Well, you -- well, with cardiac standstill,

 9    you lose -- you -- you have no blood pressure.

10        Q.    But there's a difference between active

11    bleeding and passive bleeding, right?

12        A.    I don't know what you're talking about,

13    "passive bleeding."

14        Q.    So for example, when you perform a postmortem

15    exam and you cut into a body, there is blood there?

16        A.    There is blood there, but that's not -- it's

17    not bleeding at all.  It's just loss of -- of blood from

18    the containment system, which is called arteries and

19    veins.

20        Q.    Right.  So it's not actively bleeding, but

21    there can be passive blood loss?

22        A.    Of course.  And there's going to be passive

23    blood loss from this lady because of her internal

24    injuries and the holes in her skin.

25        Q.    Right.  And she's got holes in her front and



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  holes in her back, right?

2      A.   Correct.

3      Q.   Eleven different stab wounds?

4      A.   Yes.

5      Q.   Okay.  So there's a lot of possible

6  explanations, including if she's being carried by two

7  people and she's dropped in the middle of the field, you

8  would expect to see some blood where she was dropped?

9      A.   Yes.

10     Q.   And then certainly where she's ultimately

11 found, it's not surprising that there's blood there as

12 well, right?

13     A.   No, it's not surprising.

14     Q.   The -- she's got holes that the blood is going

15 to leak out of while she's left there?

16     A.   I think that's what I just testified to.

17     Q.   So to be clear, the blood in either of those

18 locations tells you nothing about where she was killed?

19     A.   It tells me only that she -- her body was

20 where it was viewed in this photograph.

21     Q.   It doesn't tell you where she was killed?

22     A.   No.

23     Q.   It wouldn't even allow you to draw an

24 inference about where she was killed?

25     A.   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    Not a -- certainly not a reliable inference,

2  right?

3      A.    Is that a question?

4      Q.    Uh-huh.

5      A.    It -- I would not interpret it as anything

6  other than what I've just said.

7      Q.    Okay.  Dr. Nichols, do you hunt?

8      A.    No.

9      Q.    Never?

10     A.    If I can shoot it, it's a sick animal, because

11  I'm a terrible shot.

12     Q.    So you've attempted hunting?

13     A.    I have gone to the firing range.

14     Q.    Okay.  Sounds maybe better for everyone then

15  if you're not.

16          But certainly as the chief medical examiner

17  for the Commonwealth, and in your general practice now

18  as a consultant, you have seen bodies that have been

19  affected by wildlife?

20     A.    Of course.  There's no evidence of wildlife

21  postmortem activity at all on her body that I -- I could

22  see.

23     Q.    Right.  So there's absolutely no evidence of

24  either predation by an animal here, right?

25     A.    Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Or of insect activity?

2    A.    Too cold for insects.

3    Q.    Even in April?

4    A.    At the temperature ranges that have been

5  discussed here, 42 degrees or 48 degrees, 32 degrees as

6  the -- as the coldest, insects are not very active at

7  that point.

8    Q.    Okay.  But certainly predators and scavengers

9  are?

10    A.    Of course.

11    Q.    Or April, springtime, you're going to expect

12  there--

13    A.    There are no marks to indicate animal activity

14  on her body.

15    Q.    And that's something that if you had seen, you

16  would have documented, right?

17    A.    Of course.

18    Q.    And it's something that you look for?

19    A.    Yes.

20    Q.    You looked very carefully in this case?

21    A.    I assume I did.

22    Q.    And certainly that's something you would

23  expect Coroner Adams to have paid attention to as well?

24    A.    Yes.

25    Q.    Okay.  So you agree if he testified he would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 114 of 247 PageID #:
25551
The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020
114

1    have been able to identify if predators had attacked the

2    body and they hadn't, you agree with that testimony,

3    right?

4         A.   Yes.

5         Q.   And Sheriff Greer, who also looked at the

6    body, his testimony was that it was pristine.  You would

7    agree with that?

8         A.   I don't know if I would ever use that word

9    about a dead -- a dead person, but there's no evidence

10   of decomposition, and there's no evidence of -- of

11   animal postmortem activity.

12        Q.   Okay.  And as someone who's lived in Kentucky

13   for a while and has been medical examiner, you know that

14   there are a lot of different types of animals that can

15   prey on the body?

16        A.   Including coyotes.

17        Q.   That's a big one, right?

18        A.   Well, not -- depends upon what you define as

19   big. It's about the size of a small -- a medium-sized

20   dog.  But they're very active in portions of Kentucky,

21   and we've got raccoons and opossums, and foxes, and

22   stuff.

23        Q.   And there are birds, also that can prey on a

24   body?

25        A.   There are.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.    Vultures?

2    A.    Crows and vultures primarily.  Some -- some of

3    the -- some of the eagles.  That's about it.

4    Q.    Okay.  So in April, in the springtime, you

5    have a body covered in blood, the expectation is if it

6    would have been left out there, there would be some sign

7    of animal predation, right?

8    A.    Can't answer that question.

9         MR. BOND:  Objection to the form of the

10    question.

11    A.    I don't have any idea how -- how you

12    could -- you could conclude that on any -- any means of

13    actual science.  I don't know how it could be done.

14    Q.    Okay.  So based on your experience of having

15    conducted over 10,000 autopsies, have you ever seen a

16    body that was left out in a field for over a day in the

17    springtime, covered in blood, where there was no sign of

18    animal activity?

19    A.    Yes.  Except for the laying of -- of insect

20    eggs in -- in warmer climates, yes.

21    Q.    Okay.  How many times have you seen that?

22    A.    I have no idea.

23    Q.    Would you say --

24    A.    It would be a guess, and I'm not supposed to

25    testify to guesses.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.   Okay.  Well, talk about an estimate, then.

2         Would you say you've seen it five times?

3     A.   Fifty.

4     Q.   Okay.

5     A.   That's my -- that's my estimate.

6     Q.   How about a body that's been left out in a

7 field covered in blood in the spring for over two days

8 and there's no sign of animal predation?

9       MR. GARVERICH:  Objection to the form of the

10    question.

11     A.   I have no idea.

12     Q.   Have you ever seen that?

13     A.   I don't know.

14     Q.   As you sit here today, you don't have a memory

15 of having seen that?

16     A.   I do not --

17       MR. BOND:  Objection to the form of the

18    question.

19     A.   I do not know the answer is the answer.

20       MR. BRUSTIN:  Didn't answer.

21     Q.   Okay.  My question is, as you sit here today,

22 can you think of a single case where there's a body left

23 out in a field in the springtime covered in blood where

24 you saw no sign of animal predation whatsoever?

25     A.   Look, I stopped doing this job for -- for the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   people 20 years ago.  That's a long time.  I have --

2   while I have a good memory, it's not -- I'm not able to

3   answer your question. The only way it could -- we could

4   know this is by going back through the files of the

5   cases that I actually performed. That's it.

6          So I can't give you an -- a -- even a

7   guesstimate.  I can give you the SWAG method, scientific

8   wild ass guess.  If that's what you want, I'll do it.

9   But beyond that, I can't do it.

10      Q.   Okay.  So let's talk about if I wanted to

11  figure out every case where you've talked about time of

12  death, how would I do that?  What would I look at?

13      A.   First of all, you're not going to find

14  anything in -- in the case record where I've talked

15  about the time of death.

16      Q.   As a consultant, you've never been hired to

17  give an opinion on time of death?

18      A.   I don't believe that I've ever given an

19  opinion as a consultant on the time of death.

20      Q.   What about on an interval of death?

21      A.   I may have -- may have given a -- provided an

22  estimate, but beyond that, never.

23      Q.   Okay.  So if I wanted to figure out the cases

24  in which you've provided an estimate on time of death,

25  how would I go about doing that?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

118

```
 1        A.   You would have to get a court order from

 2   various -- various attorneys, through various attorneys,

 3   because their records are privileged in my -- in my

 4   office.

 5        Q.   Okay.  Well, you can tell me the names of

 6   cases you've worked on.

 7        A.   You can look at them yourself.  It's in the

 8   Rule 26.

 9        Q.   Okay.  So if we go through the Rule 26, you'll

10   be able to tell me --

11        A.   No.

12        Q.   -- which of these cases you talked about --

13        A.   No.

14        Q.   -- an estimate for time of death?

15        A.   No.  I would have to go back into the files

16   and read it.

17        Q.   Okay.  And those files are in your office,

18   right?

19        A.   Yes.

20        Q.   So that's something you could do?

21        A.   I could do.  I'm not going to unless I'm

22   compelled.

23        Q.   Okay.  And what if I wanted to figure out, as

24   a medical examiner, when you gave estimates of time of

25   death?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A.    You get permission from the medical examiner's

2   office to go through those files.

3       Q.    **So those files are still there, too?**

4       A.    They should be.

5       Q.    **Well, clearly this whole file was there,**

6   **right?**

7       A.    Excuse me?

8       Q.    **This whole file was there, right?**

9       A.    This -- what I have been told is the entire

10  file was copied and sent to me.

11      Q.    **You've given estimates for time of death**

12  **hundreds of times?**

13      A.    Estimates, yes.

14      Q.    **No question about that?**

15      A.    Yes.  But beyond that, never.

16      Q.    **Okay.  And one of the things you would**

17  **consider in doing that would be whether there are signs**

18  **of predation?**

19      A.    Predation.  And we -- we talk about this stuff

20  ad infinitum at this point.

21      Q.    **Okay.  All right.  In the cases that you**

22  **worked on, either as a medical -- as the chief medical**

23  **examiner for Kentucky or consulting, how many times have**

24  **you seen bodies that have been left out in the field or**

25  **in the woods?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    I don't know.  I would have to go back through
2  the files to be able to give you that number.
3      Q.    Well, safe to say you've seen it more than ten
4  times?
5      A.    I have no idea how many times.  Probably at
6  least ten times per year --
7      Q.    At least ten?
8      A.    -- when I -- when I was the medical examiner.
9      Q.    Okay.  And you were medical examiner for 20
10  years, right?
11      A.    Correct.
12      Q.    1977 to 1997.  So it's at least 200 times that
13  you've seen it, right?
14      A.    Probably, yes.
15      Q.    Could certainly be more than that?
16      A.    Could be less, but my -- my estimate is 20
17  times per year.  This is a fairly rural state.
18
19
20      Q.    Okay.  And so you've had at least 200 cases,
21  bodies left out in a field, right?
22      A.    That is my --
23          MR. BOND:  Objection.  Asked and answered.
24      A.    That is my estimate, yes.
25      Q.    Okay.  Seen around 200 cases where the bodies

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   have been left out.

2            And how --

3            MR. BRAMMELL:  Objection.  Asked and

4       answered.

5       Q.   It's possible you've seen many more than 200

6   cases --

7       A.   Since it's an estimate, I could have seen more

8   or I could have seen less.

9       Q.   Okay.  And in the at least 200 cases that

10  you've seen where the body was left out in the field,

11  how many of those cases have you ever seen where for

12  three days the body was left out and there's no sign of

13  animal activity?

14           MR. ERVIN:  Objection to the form of the

15      question.

16      A.   I do not know.

17      Q.   That would be extremely exceptional, wouldn't

18  it?

19           MR. BOND:  Object to the form of the

20      question.

21      A.   If I don't know what -- how many times I've

22  seen it, I don't know whether it would be exceptional or

23  not.

24      Q.   Well, you --

25      A.   You're going down an alley that I can't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

122

1  possibly answer.

2      Q.    Is it something you've seen?  Have you seen

3  that?

4      A.    Yes, and I already told you that.

5      Q.    You've seen a body that was left out for over

6  three days have no signs of animal activity?

7      A.    The answer to that is, I don't know.  I would

8  have to go back to the files to look.

9      Q.    There's no question you've seen predation in

10  cases that you've worked on?

11      A.    Of course.

12      Q.    That is most commonly what you see when you're

13  finding bodies out in the rural area here in Kentucky,

14  right?

15      A.    I have seen predation on those -- those field

16  finds, yes.

17      Q.    That is -- that is what you expect to see when

18  you find a body out in a field, right?  In your

19  experience, that is what you see?

20          MR. BOND:  Object.  Asked and answered.

21      A.    I estimate that I've seen that more frequently

22  than no predation.

23      Q.    Well, we just talked about the fact that there

24  are lots of animals, like coyotes and opossums, and

25  foxes, and rats, and birds?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.   I've seen it with dogs, but not out -- out in

 2 the field.

 3      Q.   Okay.  So, again, in the at least 200 cases

 4 that you've seen where a body has been left out, in the

 5 majority of those cases, there has been animal

 6 predation?

 7      A.   I don't know.  I cannot answer the question

 8 without -- without having access to the cases and going

 9 through them one at a time.

10      Q.   As you sit here today, do you remember a

11 single case where you didn't see signs of animal

12 predation when the body was left out and covered in

13 blood?

14      A.   Right this instance, I do not remember a

15 single case in which there was no predation for a three-

16 day exposure, but that doesn't mean it didn't happen.

17 If my -- if my last interaction with this is 25 years

18 ago.  You're asking a whole lot from an old man's brain.

19      Q.   Okay.  And as you sit here today, you don't

20 remember a single case where the body had been left out

21 for two days where there were no signs of animal

22 predation?

23           MR. BOND:  Objection.  Asked and answered.

24      A.   Let's see, I don't remember.

25      Q.   Okay.  So you don't remember a single case, as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 124 of 247 PageID #:
25561
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
124

1  you sit here today, where for one day the body was left

2  out and you didn't see signs of predation?

3       A.   Oh, I'm sure that's happened.  I can't give

4  you the specific case.

5       Q.   Okay.  You're sure it happened, but you have

6  no memory of ever having seen that?

7            MR. GARVERICH:  Objection to the form of the

8       question.

9       A.   I said, I'm sure it happened.  I have no

10 memory of the exact -- the exact case.

11      Q.   Okay.  Now in this case, you agree there's

12 absolutely no sign of predation, right?

13           MR. BOND:  Objection.  Asked and answered at

14      least two or three other times.

15      Q.   And that is more consistent with the body

16 having been kept not in the field than having been in

17 the field for a long period of time, right?

18      A.   The longer it's exposed to potential animal

19 mutilation, then the greater the chance of it being

20 mutilated.

21      Q.   Right.  The longer exposure, greater chance of

22 predation?

23      A.   Of course.

24      Q.   And if a body has been left out for 84 hours

25 in a field, you would absolutely expect to see some



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 125 of 247 PageID #: 25562
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
125

1  predation there?

2      A.   I don't know about absolute.

3          MR. BRAMMELL:  Objection to the form of the

4      question.

5          MR. BOND:  Objection to the form of the

6      question.

7          MR. GARVERICH:  Objection to the form of the

8      question.

9  BY MS. MCCARTHY:

10     Q.   It would be incredibly unlikely if a body had

11 been left out for 84 hours, three-and-a-half days in a

12 field, to see no signs of animal predation in Meade

13 County, Kentucky?

14     A.   I would have to --

15         MR. ERVIN:  Objection to form.

16     A.   -- speculate to answer that question.  I don't

17 know.

18     Q.   Who would you talk to to figure that out?

19     A.   Oh, probably a -- a game warden who happen --

20 happens upon these things with some frequency.  Law

21 enforcement officers in -- in the rural area who -- who

22 find dead bodies.  That would -- that would be it.

23     Q.   But you were the medical examiner for the

24 Commonwealth of Kentucky.  You see more bodies than any

25 law enforcement officer.


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I've seen lots of bodies.  I -- I don't in any

 2   way consider myself to be an expert in the occurrence

 3   rates of animal predations on dead bodies left in a

 4   field.

 5        Q.   And all I'm asking is: In -- based on your

 6   experience and what you know about living in Kentucky,

 7   it would be extraordinary for a body to have been left

 8   out for three-and-a-half days and there be no sign of

 9   predation?

10             MR. GARVERICH:  Objection.

11             MR. BOND:  Objection to the form of the

12        question.

13             MR. BRAMMELL:  Objection.  Asked and answered

14        three or four times.

15        A.   Extraordinary is a word that I don't think

16   I've ever used about any dead body in my professional

17   life.

18    BY MS. MCCARTHY:

19        Q.   It would be amazing?  That's a word you've

20   used today.

21             MR. ERVIN:  Objection to the form of the

22        question.

23        A.   It would be amazing maybe as I'm describing

24   wounding, I think is when I used the "amazing."

25        Q.   Okay.  It would be amazing to find a bloody
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   body that had been left in a field for three-and-a-half

2   days that had no signs of predation?

3            MR. BOND:  Object to the form of the

4       question.

5            MR. BRAMMELL:  Objection to form.

6       A.   I don't know the answer to your question.  You

7   can ask it a zillion times.

8       Q.   Well, you have a lot of experience, sir.

9            You've been qualified as an expert in courts

10  all across the country, right?

11      A.   I've been qualified as an expert, but never

12  about animal predation.

13      Q.   I -- but you've been qualified as an expert on

14  the basis of your experience as a medical examiner,

15  right?

16      A.   Yes, but I do not claim to have any expertise

17  in the occurrence rates of animal predation.

18      Q.   And I don't need you to have experience in

19  that.

20           My only question is -- not asking you about

21  your expertise.  I'm asking you about your experience.

22  It would be amazing, in your experience, for there to be

23  a bloody body left out in a field in Meade County for

24  three-and-a-half days and there be no sign of animal

25  predation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

128

```
 1              MR. GARVERICH:  Objection.  Asked and
 2        answered.
 3              MR. BOND:  Objection.
 4              MR. ERVIN:  Objection.
 5              MR. BRAMMELL:  Objection.  Asked and
 6        answered.
 7        A.   I don't know.
 8    BY MS. MCCARTHY:
 9        Q.   Now, if a body is kept inside a house, you
10   would expect that there would not be signs of animal
11   predation, right?
12        A.   True.
13        Q.   If a body is kept in a car, you wouldn't
14   expect to see signs of animal predation?
15        A.   If the windows were rolled up and it was in
16   the backseat, no.  Or in the trunk, no.
17        Q.   Okay.  And you understand, based on your
18   experience, that all of the animals that you mentioned,
19   the coyotes, the opossums, foxes, are attracted to the
20   scent of blood?
21        A.   Yes.
22        Q.   And here there's blood not only in the body,
23   but generally at the scene?
24        A.   Yes.
25        Q.   It would be extremely unlikely for that body
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   to have been left there in a pool of blood for three-

2   and-a-half days and there not be a single animal that

3   preyed on it?

4              MR. BOND:  Object.  Asked and answered.

5              MR. ERVIN:  Object to form.  A hundred times.

6       A.   I don't know the answer to your question.

7       Q.   Can animals tell a difference between human

8   blood and animal blood?

9       A.   I don't know that either.

10      Q.   So let's talk about something that's in your

11  report, okay?

12      A.   Sure.

13      Q.   All right.  Your report, which I think we

14  entered as an exhibit.  I believe it's Exhibit 67.

15             MR. BOND:  There should be one, sir, that's

16      marked with a sticker.  Or she's handing it to you.

17             THE WITNESS:  Okay.  Good.  Thank you.

18      There, you get that back.

19             MR. BOND:  May have been Nick's.

20             THE WITNESS:  There we go.  Thank you.

21  BY MS. MCCARTHY:

22      Q.   All right.  So on the first page of your

23  postmortem examination of the body, second page of this

24  exhibit, your report clearly states that the cornea are

25  clear, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes, and the photographs already document

 2   that.

 3        Q.    Right.  In those photographs, as documented in

 4   your report, there's no question the cornea are

 5   completely clear?

 6        A.    They're clear.

 7        Q.    Right.  There's no clouding?

 8        A.    They are clear.

 9        Q.    There is no clouding, sir?

10        A.    There is no clouding.  They are clear.

11        Q.    Okay.  That's what you observed at the

12   autopsy, right?

13        A.    Yes.

14        Q.    And that's what you've told us here under

15   oath?

16        A.    Yes.

17        Q.    Okay.  And the reason that's something that

18   you recorded in your report is that changes in the eyes

19   are some of the earliest postmortem changes, right?

20        A.    They can be, yes.

21        Q.    Okay.  So that has significance for timing?

22        A.    Yes.  They -- they -- they cloud especially if

23   the -- if the eyelids are open.

24        Q.    Right.  So if the eyelids are open, the

25   expectation is the film forms quickly and it clouds,
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

131

```
 1   right, usually within hours?
 2        A.   Well, there's also corneal drying that occurs.
 3   It's not film, per se.  It's -- it's -- it's the lack of
 4   lubricants on -- on the -- the outer surface of the eye.
 5        Q.   Okay.  When the eyes are open after death, you
 6   get corneal clouding very quickly?
 7        A.   Yes, and you also get dry changes in the
 8   whites of the eyes.
 9        Q.   Okay.  Now, if the eyes are closed, the
10   corneas still cloud, right?
11        A.   They will -- they will after death eventually,
12   yes.
13        Q.   Okay.  And generally, you would see corneal
14   clouding within 12 to 24 hours of death if the eyes are
15   closed?
16        A.   They -- that was when it should -- it should
17   occur, or at least it's reported to have occurred,
18   within 24 hours.
19        Q.   That's what the literature says, and that's
20   what your experience has shown, right?
21        A.   I'd have to go back and see what -- what the
22   designations are of -- of cornea in a thousand cases to
23   be able to answer that about my own experience.
24        Q.   Okay.  Well, you're recording it in your
25   report here.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1          I presume you recorded that in every

2    postmortem report?

3        A.    I did.

4        Q.    Okay.  So --

5        A.    I've made --

6        Q.    -- something you paid attention to in all of

7    your cases?

8        A.    True, but I've made no effort to -- to compile

9    a percentage of cases in which there -- which corneal

10   clouding is beginning or complete.

11       Q.    Okay.  But as you've said, you were giving

12   estimates for time of death often as the medical

13   examiner, right?

14            MR. BOND:  Objection to the form of the

15       question.

16       A.    I said -- the most that I would -- would --

17   would issue would -- would be an estimate.

18       Q.    Absolutely.  But the reason that you look at

19   and record whether the cornea is clouded is to help you

20   give that estimate of time of death?

21       A.    That's part of it, yes.

22       Q.    Okay.  So then you had a sense, from your

23   experience, of what it meant when the cornea was clouded

24   for time of death versus if it wasn't, right?

25       A.    I did.  It's also a temperature-dependent

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1 | phenomenon.

 2 |     Q.   Okay.  But in general, what you saw was if

 3 | it's less than 24 hours, no corneal clouding; over 24

 4 | hours, there's clouding?

 5 |        MR. BOND:  Object to the form of the

 6 |     question.

 7 |     A.   You're asking me questions about generalities,

 8 | and I'm specifically looking -- looking at a report of

 9 | Rhonda Sue Warford.

10 |     Q.   Right.  Yeah.  You're -- you are aware that

11 | the literature on the subject gives the clouding window

12 | as 12 to 24 hours?

13 |     A.   That's what the literature states, yes.

14 |     Q.   Okay.  And your experience is consistent with

15 | the literature?

16 |     A.   I don't know whether it is or it isn't.  I've

17 | never attempted to establish it.

18 |     Q.   Okay.  Well, if you were asked in a case to

19 | give an estimate of time of death, you looked at whether

20 | the cornea were clouded, right?

21 |     A.   That's part of it.  We've already talked about

22 | livor --

23 |     Q.   Okay.

24 |     A.   -- livor mortis and rigor mortis.  We've

25 | talked about all that.  We haven't talked about body



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    cooling, but I don't know the answer to that either.

2        Q.    I'm talking to you about corneal clouding.

3            So when you're giving an estimate for time of

4    death, that's something that you looked at in every

5    single case, and when you looked at it, what you thought

6    was, "Oh, the corneas aren't clouded.  It's been less

7    than 24 hours since the body was killed"?

8            MR. BRAMMELL:  Object to the form of the

9        question.

10       Q.    Since the person died?

11       A.    I did not make -- make that conclusion.  I

12   made no conclusion about when this person died, period.

13   I offered no testimony about it.  I do not know when she

14   died.

15       Q.    I'm not asking you about Rhonda Sue Warford,

16   I'm asking you in general.

17           You recorded in every single case that you

18   worked on whether the cornea were clouded or whether

19   they weren't.

20           It clearly meant something to you, right?

21       A.    But what it means through that -- the -- the

22   20 years I did this, I would have to go back through the

23   files and make a -- a study to see if we could -- if we

24   could determine how corneal cloudiness related to the

25   interval of death.  It's never been --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 135 of 247 PageID #: 25572
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
135

1      Q.   Sir, is that --

2      A.   It's never been done.

3      Q.   Is that -- is that what you do to provide

4   testimony in every case?

5      A.   No, of course not.  I've never been asked

6   questions like -- about -- about a body like this before

7   when I've already said I don't know at least 150 times.

8      Q.   Okay.  Well, here's a question for you.

9   You've testified in this case, both at trial and under

10  oath in your deposition, that livor mortis appears

11  around four hours and is set by eight hours.  That

12  testimony you've given?

13     A.   Oh, I agree.

14     Q.   Okay.  So did you go back through every case

15  that you've done and do a study to see whether that was

16  accurate?

17     A.   No.  That was in generalities.  You are

18  correct.

19     Q.   Okay.  So again, you knew both what the

20  literature said and your own experience, and from that,

21  you were able to say, in general, when livor mortis is

22  fixed, right?

23     A.   Yes.

24     Q.   Okay.  And for corneal clouding, you

25  understood that the literature said 12 to 24 hours,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   right?

 2       A.   Yes.

 3       Q.   That was consistent with your experience, and

 4   so you relied on it, right?

 5       A.   I don't know that I relied upon my description

 6   of the cornea at all in coming to my conclusion of I

 7   don't know when the interval of death is.

 8       Q.   Okay.  When you were asked by Mr. Bond about

 9   livor mortis, why didn't you tell him you had to go

10   through every one of your reports to give him an

11   interval?

12       A.   I can give you a generality --

13            MR. BOND:  Object to the form of the

14       question.

15       A.   -- a generality window, but I can't tell --

16   tell you that that generality applies to -- to

17   Ms. Warford.

18       Q.   Okay.  What's your generality window for the

19   cornea are clear?  Withdrawn.  Okay.  The 48 hours for

20   livor mortis is based on the literature, right?

21       A.   Yes.

22       Q.   Okay.  And the literature here says that

23   corneal clouding is 12 to 24 hours of death, right?

24       A.   Yes.

25            MR. BOND:  Object.  Asked and answered.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   Okay.  So when you were asked to give an

2    estimate in a case for time of death, your consideration

3    would be if the cornea aren't clouded, time of death was

4    less than 24 hours prior?

5    A.   If that's the only thing that that

6    determination is made by, yes.

7    Q.   Right.  That is a factor that you look at when

8    you're giving an estimate of time of death?

9    A.   Yes, and we know the value of estimate.  It's

10   the same thing -- the scientifically based estimate is a

11   weather forecast.

12   Q.   Okay.  So there's consensus in the medical

13   examiner community that there is no difference between

14   looking at all of these factors, rigor, cornea clearing,

15   lack of predation, putrification, no difference in

16   looking at that and giving an interval for time of death

17   and forecasting the weather?

18   A.   Correct.

19   Q.   Okay.  It's a coin flip?

20   A.   Yes.

21   Q.   Fifty-one percent?

22   A.   That's probable.

23   Q.   That's it?

24   A.   An estimation doesn't even have to reach 51

25   percent.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL Document 317-10 Filed 01/26/23 Page 138 of 247 PageID #: 25575
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
138

1      Q.   Okay.  So when medical examiners across the

2   country are giving testimony with intervals of time of

3   death, what they're really doing is giving a coin-flip

4   guess?

5      A.   What --

6           MR. GARVERICH:  Objection to the form of the

7      question.

8      A.   What source are you quoting for medical

9   examiners all doing this?

10     Q.   You've done it in many cases you've worked on.

11     A.   I have given an estimate, yes, but I don't

12   know that the cornea are -- have anything to do with

13   anything other than -- other than it is a sign that

14   someone is -- has -- has been -- has recently died.

15     Q.   Okay.  So when the cornea is clear, it's a

16   sign that the person recently died?

17     A.   Yes.

18     Q.   Okay.

19     A.   As opposed to died multiple days ago.

20     Q.   Well, it's more than that.

21          It's a sign that they died within the last 24

22   hours, right?

23     A.   It is a sign that favors 24-hour interval of

24   death, yes.

25     Q.   Twenty-four hours or less?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.   Yes.

2      Q.   Okay.  And when you combine that with other

3  factors, for example, the onset of full rigor mortis,

4  right, that also indicates 24 hours or less?

5      A.   That's what the textbooks will tell you.

6      Q.   Well, you've already said --

7      A.   I've already told you about the temperature

8  and environmental variability for all these signs

9  that -- that happen.  You know, I testified -- because I

10 wasn't asked a direct question, if it -- if this could

11 have happened on April 2nd, and I said, "It's possible."

12 I offer no testimony and no opinion beyond the threshold

13 of "it's possible" in this entire case.

14     Q.   Right.  And anything is possible?

15     A.   Yes.

16          MR. BRAMMELL:  Object to the form.

17     Q.   That is all that your testimony meant here,

18 right?

19     A.   Yes.

20     Q.   April 2nd is not your best estimate of when

21 this occurred?

22          MR. BOND:  Object to the form of the

23     question.

24     A.   I've never given an estimate of when -- when

25 this death occurred.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

140

1    Q.    Okay.  So in your time as the medical

2   examiner, you ever seen a body that's been dead for more

3   than three days where the cornea were completely clear?

4    A.    If so, I do not remember it.

5    Q.    Okay.  So as you sit here today, you have no

6   memory of ever having seen a body dead for more than

7   three days with completely clear cornea?

8    A.    I do not remember if I have.

9    Q.    That would be amazing?

10    A.    That would be 20-plus years ago.

11    Q.    But again, that would be highly exceptional to

12   see that?

13    A.    It would be highly exceptional that I

14   remembered those details after all these years.

15    Q.    Okay.  So you know what the literature says,

16   right? Twelve to 24 hours?  We've already agreed that's

17   generally what you see?

18    A.    Generally, yes.

19    Q.    Okay.  It would exceptional, then, for a body

20   that had been dead for over 80 hours to have completely

21   clear cornea?

22    A.    It would be very unusual.

23    Q.    Very unusual.  Okay.

24          And if a body had been dead for two-and-a-half

25   days, it would be very unusual for the cornea to still



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

141

```
 1    be completely clear?

 2         A.   Yes.

 3         Q.   If a body had been dead for two full days, it

 4    would be extremely unusual for the cornea to be

 5    completely clear?

 6         A.   Yes, but I've given no advice to anyone about

 7    when the -- this -- the date of this death ever in sworn

 8    testimony or in conversation.  It's clearly never been

 9    in a report.  So why are we going through all of this

10    stuff when I've testified -- when I have never given an

11    opinion?

12         Q.   Okay.  And so you're right.  It would be

13    highly unusual a body two days had been dead and

14    there's -- cornea are completely clear.

15              Highly unusual, right?

16              MR. ERVIN:  Objection to the form.

17         A.   Yes.

18         Q.   All right.  Are you familiar, I'm sure, with

19    the phenomenon of green belly?

20         A.   Oh, yeah.

21         Q.   Okay.  And if that's something you had seen

22    here, you would have documented it?

23         A.   Of course.  And I would have described the

24    loops of intestines as being distended with gas -- with

25    foul-smelling gas.  I would have.  It was not true.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

142

1      Q.   Okay.  So there is absolutely no sign of

2  decomposition here?

3      A.   That's correct.

4      Q.   Because that would have been the first sign of

5  decomp?

6      A.   No external sign of decomposition, no internal

7  sign of decomposition.

8      Q.   But the first external sign of decomposition

9  is the green belly, right?

10     A.   It may well be, yes.

11     Q.   Well, if that's what DiMaio says in his

12 textbook, you would agree with that, right?

13     A.   That's -- that's Dr. DiMaio's opinion.  I

14 don't know if it is the first sign alone.  It certainly

15 appears in decomposition fairly early.

16     Q.   Okay.  And if you have a body that's fairly

17 early in decomposition, the thing that you would expect

18 to see is a greenish discoloration of the skin over the

19 right iliac fossa, right?

20     A.   Yes, and I -- that was not there.  This woman

21 is not decomposed.

22     Q.   There is not a single sign of decomposition

23 here?

24     A.   I've testified to that.

25          MR. ERVIN:  Objection to the form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 143 of 247 PageID #: 25580
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
143

```
 1          question.
 2                    MR. BRAMMELL:  Objection.
 3          Q.    Okay.
 4                    MR. ERVIN:  The horse is dead.
 5          Q.    The body is dead.
 6                    All right.  And in your experience, it would
 7          be highly unusual for a body that had been left out for
 8          three days, three-and-a-half days, and there be no sign
 9          of decomposition?
10                    MR. BOND:  Object to the form.
11          A.    With all of the disclaimers that I've talked
12          about in answers to your other questions, yes.
13          Q.    It would be highly unusual for the body to
14          have been left out for two-and-a-half days and there be
15          no sign of decomposition?
16                    MR. BOND:  Object to the form of the
17          question.
18          A.    It's really temperature dependent.
19          Q.    In this temperature, it would be highly
20          unusual for a body to have been left out for
21          two-and-a-half days and there be no sign of
22          decomposition?
23                    MR. GARVERICH:  Objection to the form of the
24          question.
25          A.    I don't know that that's true.  The only way
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

144

1  we could know that would be to kill some people and let

2  them out -- and then put them out outside in a field

3  with a -- a -- a guaranteed temperature of 42 degrees

4  and watch what happens.

5      Q.   I'm not asking you to know it.

6          My question is, in your experience, it would

7  be highly unusual in these temperatures for a body to

8  have been left out for two-and-a-half days and there be

9  no sign of decomposition?

10     A.   Yes.

11     Q.   Okay.  And in fact, in your experience, it

12 would be very unusual for a body that had been left out

13 for two days in these conditions to show no sign of

14 decomposition?

15         MR. BOND:  Object to the form of the

16     question.

17     A.   Yes.

18     Q.   Okay.  I understand, Dr. Nichols, that you

19 have never been asked before to give an opinion on the

20 interval for time of death.

21     A.   In this case, correct.

22     Q.   Okay.  So I want to talk to you now about your

23 best, most reliable estimate for time of death in this

24 case, right?

25     A.   I don't have one.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 145 of 247 PageID #: 25582
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
145

 1        Q.    Okay.

 2        A.    I don't know when she died.

 3        Q.    **I'm not asking you to know when she died.**

 4   **That --**

 5        A.    What are you asking me, then?

 6        Q.    **There's -- you can't know when she died, can**

 7   **you?**

 8        A.    I wasn't there, and I've seen no -- no

 9   videotape.

10        Q.    **Right.  It's not -- it's not proper to give a**

11   **specific date and time of death unless there's a video**

12   **recording of when it happened, right?**

13        A.    Unfortunately, the coroner, to appease the --

14   a vital statistics portion of the health department, has

15   to assign a day of death.

16        Q.    **Okay.  And that's something that the coroner**

17   **would speak with you about before doing, in general,**

18   **right?**

19        A.    They may or they may not.

20        Q.    **Well --**

21        A.    I don't remember about -- talking to Bill

22   Adams about the interval of death in this case at all.

23        Q.    **Okay.  Now, no one has asked you in this case**

24   **to give your best estimate, but that is something that**

25   **you did all the time as a medical examiner and now as a**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 146 of 247 PageID #: 25583
The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020
146

1   consulting expert, right?

2       A.   As an estimate, yes.

3       Q.   Okay.  And the things that you look at when

4   you're giving that estimate are rigor, whether the

5   corneas are clear, the absence of predation, and whether

6   or not there has been decomposition, right?

7       A.   Yes.

8       Q.   Okay.  And you don't just look at those

9   factors in isolation; you look at them all together,

10  correct?

11      A.   Yes, and the -- and the environment around the

12  decedent.

13      Q.   Okay.  So you have already said that for rigor

14  and for -- for there -- the body to be in full rigor,

15  for there to be clear corneas, for there to be no signs

16  of predation for a body found out in the field, and

17  there -- for there to be absolutely no decomposition, a

18  body that had been dead for over three-and-a-half days

19  would be extremely unusual?

20           MR. BOND:  Object to the form of the

21      question.

22      A.   Yes.

23      Q.   That would not be something you had ever seen

24  before?

25      A.   I do not know the answer to that question.  I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

1    may have seen it before.

2        Q.   And you've also told us for a body that's in

3    full rigor with clear cornea, no signs of decomposition,

4    and no animal predation, it would be extremely unusual

5    for that body to have been left out for three days?

6        A.   Yes.

7        Q.   Okay.  And you've told us, under all those

8    circumstances, it would be extremely unusual for that

9    body to have been left out for two-and-a-half days?

10       A.   Yes.

11       Q.   And, in fact, it would be extremely unusual

12   for that body to have been left out for even two days?

13       A.   Yes.

14       Q.   What is the best estimate time of death with

15   these factors is within a day?

16           MR. BOND:  Objection to the form of the

17       question.

18       A.   In generalities, yes.  In specifics, with this

19   woman, no.  Her own body habitus is going to insulate

20   her from -- from lots of things.  She's got a large,

21   thick layer of fat that's -- that's going to change

22   the -- the -- the cooling of the body And therefore, may

23   slow decomposition itself.

24       Q.   Okay.  Right.  So let's talk about that.

25           Two things:  One, the body is found fully

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  clothed, right?

2      A.    She's fully clothed, yes.

3      Q.    Okay.  Clothing can act as an insulation,

4  right?

5      A.    Yes.

6      Q.    Okay.  And having a lot of fat also acts as an

7  insulator, right?

8      A.    Yes.

9      Q.    Okay.  And that's -- right.  So if she's

10 killed somewhere else and then she's put in the field,

11 what you would expect, in fact, is that there would be

12 more heat in the body because of the clothing and her

13 fat insulation, right?

14     A.    Yes.

15     Q.    And so you would expect to see these processes

16 sped up?

17     A.    Not necessarily.  If -- depends on -- I mean,

18 I can't predict how this woman's body is -- the rate of

19 body cooling in this woman.  That's what you're asking

20 about.  It's unknown.

21     Q.    Okay.  And so when you're saying that the

22 layers of body fat affect body cooling, where are you

23 getting that from?

24     A.    I guess that would have to be from my

25 experience.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Q.    That would be from your experience.  Okay.

2                So you didn't have to go take an inventory of

3     every case you've ever done to figure that out?

4          A.    Yes.

5          Q.    You're confident in saying that?

6          A.    I'm confident in saying that the fat layer --

7     increased fat layer would act as an insulator for the

8     body.

9          Q.    Okay.  Talk to me about a case where that

10    happened, where you've seen that.

11         A.    Can't help you.

12         Q.    Okay.  Well, if the body is kept at a warmer

13    temperature, then, in fact, you would expect the onset

14    of rigor to be faster, right?

15         A.    Yes.

16         Q.    And then you would expect the dissipation of

17    rigor to be faster, right?

18         A.    Depends upon how long the body is warm.

19         Q.    But in general, that's what you would expect

20    to see.

21               The dissipation would also be faster?

22         A.    Yes.

23                MR. BOND:  Objection to the form of the

24         question.

25         Q.    Right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           And you would expect if you have clothing and

2   increased body fat such that there's less heat loss,

3   that the corneas would cloud quicker, right?

4       A.   I don't know.

5       Q.   Well, you said that's temperature dependent,

6   right?

7       A.   And -- and exposure to moving air and whether

8   or not the lids are open or not.

9       Q.   Okay.  So with respect to temperature, what

10  you mean is, if the body is warmer, you see the clouding

11  faster?

12      A.   Yes, but there are other factors that -- that

13  cause it to happen.

14      Q.   Sure.  But you said the reason you can't say

15  in this case is because she had a large layer of fat.

16      A.   That wasn't the only reason.  I said I don't

17  know when this woman died.

18      Q.   And I'm not asking you to tell me when she

19  died.  I'm asking for your best estimate.

20      A.   I'm not going to give you one because I don't

21  know.

22          MR. BRUSTIN:  You already did.  Let's keep

23      going.

24      Q.   What do you mean by "layer of fat"?

25      A.   Her --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 151 of 247 PageID #: 25588
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
151

```
 1                    MR. GARVERICH:  Are we referencing trial
 2       testimony?
 3                    MS. MCCARTHY:  No.  He just said it now.
 4                    MR. GARVERICH:  Okay.  Well, just clarify.
 5                    THE WITNESS:  Three-centimeter midline
 6       panniculus.
 7       BY MS. MCCARTHY:
 8            Q.   All right.  Three centimeters, that's a lot of
 9       fat?
10            A.   Fairly -- fairly thick amount.
11            Q.   Okay.
12            A.   About a -- almost two inches.
13            Q.   And what is the scientific significance of
14       that?
15            A.   Just that it -- it's there and it's present,
16       and it acts as an insulator.
17            Q.   Okay.  Right.  So body insulators like
18       clothing and fat decrease the rate of heat loss, right?
19            A.   Yes.
20            Q.   And therefore, decrease the rate of body
21       cooling, right?
22            A.   Yes.
23            Q.   So, again, the expectation would be in someone
24       who's fatter, if they had heat to retain, these
25       processes of rigor and clouding would onset faster?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

152

```
 1              MR. BOND:  Object to the form of the
 2      question.
 3      A.   Yes.
 4      Q.   Okay.  So again, in all of that, that she's a
 5  large woman with a lot of fat, found fully clothed, in
 6  full rigor, with completely clear cornea, in a field
 7  with absolutely no predation, the most reliable
 8  interval, based on that, is that she was killed within a
 9  day?
10              MR. BOND:  Object to the form of the
11      question.
12      A.   That may well be an estimate, yes.
13      Q.   Well, it absolutely is an estimate.
14           I'm asking you:  Is it the most reliable
15  estimate?
16              MR. BOND:  Object to the form of the
17      question.
18      A.   Given the portions of the question I was
19  asked, yes.
20      Q.   Okay.  Based on everything you've seen now, if
21  you had been asked on the stand to give an estimate,
22  that's the best estimate you would have given?
23      A.   No.  I would have answered, "I don't know."
24      Q.   So why can you not give an estimate in this
25  case when, as you've already told us, you give estimates
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  in other cases?

2      A.   Because -- because estimates are of no value

3  in terms of science.

4      Q.   But that -- that's not the question.

5           If you were asked -- I'm asking you now, under

6  oath, for your best estimate.  That's your best

7  estimate, under 24 hours, right?

8      A.   My best estimate is that she was -- she died

9  more proximate to the time her body was found.  That's

10  my best estimate.

11     Q.   Okay.  In other cases where you're asked to

12  estimate the time of death, you give intervals, right?

13     A.   I don't think I've testified to estimations of

14  cause -- of time of death --

15     Q.   You've already --

16     A.   -- in years.

17     Q.   You've done it, right?

18     A.   I may have back a long, long time ago, but

19  in --

20     Q.   Well, sir, you get -- you get paid to give

21  testimony, right?

22     A.   I got paid to give testimony and tell the

23  truth when I was working for the people also, thank you

24  very much.

25     Q.   Okay.  All right.  And so telling the truth,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

154

```
 1    if you were asked under oath in this case, based on what
 2    you've seen, what your best estimate is of when she was
 3    killed, it's within 24 hours?
 4         A.   As an estimate, true.
 5         Q.   Okay.  All right.
 6              MR. BOND:  And I'm not asking you to stop.
 7         Just whenever you get to an appropriate interval,
 8         okay?  I'd like to take a break.  I would.
 9              MS. MCCARTHY:  Yeah, I can --
10              MR. BOND:  I mean, I'm -- you can go ahead.
11         If you're still in a rhythm, go ahead.
12              MS. MCCARTHY:  Actually --
13              MR. BOND:  I'm not asking you to stop this
14         second.
15              MS. MCCARTHY:  Now is good.
16                   (OFF THE RECORD)
17    BY MS. MCCARTHY:
18         Q.   All right.  Dr. Nichols, during the break, did
19    you have any conversation about this case with counsel?
20         A.   No.
21         Q.   Okay.  All right.  Earlier today you testified
22    that at the autopsy, you could say that lividity had
23    been fixed?
24         A.   Yes.
25         Q.   You can't say whether lividity was fixed at
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   the scene?

2       A.   No.

3       Q.   All right.  Now, with respect to the wound to

4   the brainstem --

5       A.   Yes.

6       Q.   -- you said that was an amazing injury you've

7   only seen twice in your career?

8       A.   That's correct.

9       Q.   You obviously remember that as you sit here

10  today?

11      A.   And I do remember the other --

12      Q.   You didn't have to do any inventory of your

13  cases?

14      A.   I do remember the other case also.

15      Q.   Okay.  Because it's exceptional?

16      A.   Yes.

17      Q.   All right.  And you told us here today that,

18  in fact, to inflict that injury, you would have to have

19  pulled the head down and put the knife in the exact

20  space between the vertebrae, right?

21          MR. BOND:  Object to the form of the

22      question.

23      A.   Yes.

24      Q.   Okay.  And you also said that it looked like

25  there were other attempts to inflict that wound in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 156 of 247 PageID #:
25593
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
156

1  neck?

2      A.   That there are two other wounds adjacent to

3  it.

4      Q.   Okay.  Well --

5      A.   There's one at the base of the skull, and

6  there's one -- one below it.

7           COURT REPORTER:  Can we go off the record

8       real quick?

9           MS. MCCARTHY:  Sure.

10     (OFF THE RECORD)

11 BY MS. MCCARTHY:

12     Q.   All right.  Dr. Nichols, you're very careful

13 in your opinions to be clear when you can say something

14 with medical certainty, right?

15     A.   Yes.

16     Q.   Okay.  So what is the scientific basis for

17 saying, in this case, the head was held down when the

18 neck was stabbed?

19     A.   Because that opens up a very small space to

20 allow the knife to enter without hitting in the bones.

21     Q.   Okay.  Why couldn't the body have been laying

22 on the ground when she was stabbed through the neck?

23     A.   Because that wouldn't open up the space.  She

24 could have -- her head -- face could have been -- been

25 positioned on the ground, but you have to open up the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

157

1  space.  The -- the -- the head must be -- head and neck

2  must be flexed.

3      Q.    Right.  So there has to be movement, right?

4      A.    Yes.

5      Q.    And you've already talked about this was a

6  violent struggle, correct?

7      A.    Yes, in the fact that she was conscious and

8  has defensive injury.

9      Q.    Okay.  So it's possible that the victim here

10  is moving her neck, and that's how the space is opened,

11  right?

12      A.    Could be.

13      Q.    Okay.  So that's possible, right?

14      A.    Yes.

15      Q.    It's possible that she herself is looking down

16  instead of having her head held down, right?

17      A.    Yes.

18      Q.    Okay.  So why were you able to testify that

19  the assailant here held her head down when he stabbed

20  her?

21      A.    That's the most probable thing that

22  her -- her -- why her head was in the position it was

23  in, was it was pushed in, probably by a hand at the back

24  of her scalp, rather than if she's -- she clearly was

25  not twisting her head -- her head and neck around

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  because those wounds are at very close proximity to each
 2  other in the -- in the back of her head and in the back
 3  of her neck.  There's no...
 4       Q.   All right.  Let's look at the wounds.
 5            So Exhibit 67.
 6            MR. BOND:  Which page, please?
 7            MS. MCCARTHY:  It is ME20.  It's very small.
 8            MR. BOND:  Oh, you're looking at those?
 9  Okay.  I thought you --
10            MS. MCCARTHY:  Oh, yes, the autopsy photos.
11            MR. BOND:  No, no, you're fine.
12  BY MS. MCCARTHY:
13       Q.   It's the one that looks -- I think you might
14  have just been on it.
15       A.   Oh, there's 20.
16       Q.   Yes.
17            Okay.  So to be clear, the wounds we are
18  talking about, there's the one to the brainstem, right?
19       A.   Yes.
20       Q.   Okay.  And then there's one several inches
21  down her neck?
22       A.   Yes.
23       Q.   And then there's one on her skull that --
24       A.   Her -- her scalp.
25       Q.   Right.  Those are the injuries you're
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    testifying about?

2         A.   Yes.

3         Q.   Okay.  And you're saying that these are --

4    would it appears to you is that these are attempts to

5    stab the neck?

6         A.   Yes.

7         Q.   Okay.  But if the person is holding her neck

8    down to open up that space, why are they having to stab

9    all around there to do that?

10                  MR. GARVERICH:  Objection to form.

11        A.   Because she's wiggling.

12        Q.   Okay.  And your scientific basis for saying

13   that is what?

14        A.   I mean, that's -- the scientific basis is that

15   there's no reason for her to be unconscious at -- at

16   that moment until she's stabbed in the brainstem, so she

17   is capable of movement.

18        Q.   Well, she's sustained a lot of other serious

19   injuries, right?

20        A.   Yes, but none that would be incapacitating

21   immediately.

22        Q.   Well, there's no question that she was stabbed

23   and had her lung punctured before her brainstem injury,

24   right?

25        A.   That's true, but the -- for that to -- to have



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    been immediately incapacitating is impossible.  She

2    would have to have lost more blood or had a big hemo --

3    a big pneumothorax to go with the hemothorax.

4         Q.   Okay.  So I just want to be completely clear.

5    There's nothing scientific that tells you that this stab

6    wound is anything more than dumb luck of a person

7    stabbing around the neck?

8         A.   That the path of the fatal wound, there's

9    nothing -- there's -- as I said, it's someone who is

10   experienced with doing this or is tragically lucky.

11        Q.   Okay.  So tragically lucky is one option?

12        A.   The other is experienced.

13        Q.   Okay.  What sort of experience would a person

14   need to be able to inflict this very precise injury?

15        A.   Someone who has -- who has done it before,

16   maybe on -- on other mammals.

17        Q.   Okay.  So you would be looking at medical

18   training?

19        A.   Medical training.  Hunters.

20        Q.   Hunters aren't trained to hold an animal's

21   neck down and do this, are they?

22        A.   No.  There are some -- there are some people

23   who -- who decapitate their animals and take the heads

24   back also.

25        Q.   Okay.  So are hunters trained to hold the neck



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    of the animal down when they stab them?

2            MR. GARVERICH:  Objection to the form of the

3        question.

4            MR. BRAMMELL:  I'm going to object to the

5        question. He's not qualified to answer this

6        question.

7            THE WITNESS:  I'm not a hunter.  I don't

8        know.

9    BY MS. MCCARTHY:

10       Q.   Okay.  The only training you're aware of is

11   medical training, right?

12       A.   Medical training would -- would be the one

13   that would be the most -- the most ordinary, yes.

14       Q.   Okay.  What else?

15       A.   That's about it.

16       Q.   Military training?

17       A.   Don't know.  Never been in the military.

18       Q.   So the only training you're aware of that

19   would teach you to hold the neck down to get that spot

20   would be medical training?

21       A.   Yes.

22       Q.   And it's based on giving a spinal tap, right?

23       A.   Analogous to a spinal tap, yes.

24       Q.   Okay.  And when you're giving a spinal tap,

25   the individual you're administering that to is generally

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 162 of 247 PageID #:
25599
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

162

 1   laying on a table, correct?

 2        A.   Sideways unless they could sit up.

 3        Q.   Right.  And that's why you're trained to pull

 4   their head down to open up that space?

 5        A.   Most spinal taps are not given in the cervical

 6   spine. They're given in the lumbar spine, so...

 7        Q.   Right.  You have to maneuver the body to open

 8   up the space?

 9        A.   You -- that's correct.

10        Q.   Because the body is not in motion, correct?

11        A.   The body is not in motion.  It is being bent

12   deliberately to -- to expose a potential space.

13        Q.   Are you testifying to a degree of medical

14   certainty that that's likely what happened here?

15        A.   No.

16             MR. BOND:  Object to the form of the

17        question.

18        A.   Not to medical certainty.  Medical

19   probability, yes.

20        Q.   Okay.  So 51 percent?

21        A.   Yes.

22        Q.   Coin flip?

23        A.   Yes.

24        Q.   Okay.  So what we have -- so if it's not just

25   dumb luck, then the most likely suspect here would be a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

163

1   medical student or a doctor with medical training?

2       A.   There are others who have medical training,

3   surgical technicians, who would be exposed to the same

4   training -- training procedures.

5       Q.   So the most likely suspect would be someone

6   with medical training?

7       A.   That's what you asked me earlier, and the

8   answer was, "yes."

9       Q.   Okay.  And certainly this was an amazing

10  injury that you had only seen twice in your whole

11  career?

12      A.   Correct.

13      Q.   Was this the first time you saw it?

14      A.   I believe the other case happened -- preceded

15  it.

16      Q.   Okay.  So this was the second time -- second

17  of only two times you had ever seen it in your career?

18      A.   Yeah.

19      Q.   Certainly Sheriff Greer and Coroner Adams were

20  present when you were performing the autopsy?

21      A.   Yes.

22      Q.   No doubt in your mind you commented to them

23  about how amazing this injury was?

24      A.   I'm sure I said, "I haven't seen it before.

25  Or if I've seen it before, it's extremely rare."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q.   Okay.  And you would have told them it's

 2   extremely rare because someone would need specific

 3   knowledge and training to be able to administer this

 4   wound?

 5             MR. ERVIN:  Objection to the form of the

 6        question.

 7      A.   Or luck.

 8      Q.   Right.  But -- okay.  So luck is one option.

 9             But the reason that this is such an

10   exceptional injury is because to purposely inflict it

11   would require knowledge and training, right?

12             MR. ERVIN:  Objection to the form.

13      A.   Yes.  You could be -- she -- if -- this could

14   be done by pure luck simply because the assailant was,

15   unfortunately, lucky.

16      Q.   Okay.  So again, there's -- there is nothing

17   scientific that tells you this wasn't anything but dumb

18   luck?

19      A.   True.

20      Q.   And if it wasn't someone with training, then

21   it means it was dumb luck?

22      A.   True.

23      Q.   Okay.  But if you're talking to Sheriff Greer

24   and Coroner Adams at the autopsy, you would have told

25   them it was an amazing injury, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

165

```
 1        A.    Yes.
 2        Q.    But you would not have been telling them, for
 3   example, "Oh, you would have had to hold the neck down
 4   to administer this blow."  That's not what you would
 5   have been talking about during the autopsy?
 6        A.    I don't know.  I don't know what I was asked.
 7        Q.    Well, you only answer questions that you're
 8   asked, right?
 9        A.    Yes.
10        Q.    So if they didn't ask you, you weren't
11   answering that?
12        A.    I don't know.  I do not remember.
13        Q.    Okay.  So it's your testimony that this was
14   either dumb luck, or it was administered by someone with
15   medical training to know to hold the neck down and how
16   to administer this wound?
17             MR. ERVIN:  Objection to the witness's
18        qualification.
19             MR. BOND:  Objection.
20        A.    Yes.
21        Q.    And was it your understanding that either of
22   the Defendants in this case had any medical training
23   whatsoever?
24        A.    I have no idea.
25        Q.    Okay.  All right.  You've said you had no
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 166 of 247 PageID #:
25603
The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020
166

1    idea, for example, whether the Defendants' vehicles or

2    houses were searched, about their training.

3            You had no idea about the -- law enforcement's

4    theory of this case?

5        A.   Correct.

6        Q.   All right.  You didn't have any idea of it at

7    the autopsy?

8        A.   No.

9        Q.   Or at trial?

10       A.   No.

11       Q.   All right.  Okay.  So you had no idea that

12   they were claiming that the victim was killed in the

13   field where she was found, and that's where rigor set

14   in?

15           MR. ERVIN:  Objection to the form of the

16       question.

17       A.   I knew nothing about the -- the -- the state's

18   theory of the death.

19       Q.   Okay.  Because if they had asked you whether

20   rigor could have set in where the body was found, you

21   would have told them, "That is not possible"?

22           MR. ERVIN:  Objection to the form of the

23       question.

24       A.   I would have told them that -- that the

25   position of the legs in rigor mortis indicate that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 167 of 247 PageID #:
25604
The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020
167

1  the -- that she was dumped there after rigor mortis had

2  set in.

3      Q.   In other words, you would have told them it is

4  not possible that rigor mortis set in where the body was

5  found?

6      A.   Exactly where the body was found, true.  But

7  once again, there's a tree, and I don't know if there's

8  a rock or something else that she could have been placed

9  on after she died.

10     Q.   Well, there's -- it's not just after she died,

11  right? You know she was not killed where she was found?

12     A.   Correct.

13     Q.   And she was kept someplace else where rigor

14  was formed, and to the extent she was moved, it had to

15  be hours after she was killed?

16     A.   True.

17     Q.   And if anyone had asked you that, you would

18  have told them that?

19     A.   Yes.

20     Q.   Okay.  Okay.  All right.  And again, you've

21  mentioned that the coroner has to put a date of death,

22  correct?

23     A.   Correct.

24     Q.   Okay.  And in your experience, that's

25  something the coroner might speak to you about at the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 168 of 247 PageID #:
25605
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
168

1   autopsy, right?

2       A.   Yes.

3       Q.   Would be a reasonable time for them to ask

4   questions of you related to time of death?

5       A.   Yes.

6       Q.   Okay.  That's certainly something that Coroner

7   Adams would do?

8       A.   Yes.  And I would have looked at him and said,

9   "Bill, I don't know when she died."

10      Q.   Right.  But you could give him an estimate of

11  when she died?

12      A.   I -- I don't remember ever giving him an

13  estimate, or anybody an estimate, of when she died.

14      Q.   Okay.  Well, let's look at a few things here.

15          So in Exhibit 67, Defendants' Exhibit 67, I'm

16  on ME8, which is the yellow page there.

17      A.   Yeah.

18      Q.   Okay.

19          MR. BOND:  Now, there's two yellow pages.

20          THE WITNESS:  Yes, there are.

21          MS. MCCARTHY:  Eight, the very yellow one.

22          THE WITNESS:  Okay.

23  BY MS. MCCARTHY:

24      Q.   Okay.  And you see it's entitled, "Coroner's

25  Authorization for Postmortem Exam"?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A.    I do indeed.

2      Q.    I'm guessing you've seen a lot of these forms?

3      A.    Yes.

4      Q.    Okay.  And it's signed by Mr. Adams?

5      A.    Yes.

6      Q.    Okay.  And this is the form that you would

7  have received with the body to conduct the examination?

8      A.    Yes.

9      Q.    Okay.  So is this filled out prior to the

10  autopsy?

11      A.    Yes.

12      Q.    Okay.  And you can see there are some question

13  marks on this page, correct?  Age?

14      A.    Well, she's an unknown white female.  That's

15  the first one.

16      Q.    Right.  So at this point, when you're

17  conducting the autopsy -- well, withdrawn.  The point

18  where the body is found, she has not been identified?

19      A.    Correct.

20      Q.    At the point you're conducting the autopsy,

21  she had not been identified?

22      A.    Correct.

23      Q.    Okay.  And then you see "date of death?"

24      A.    And time of death.

25      Q.    Right.  So prior to the autopsy, when

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Mr. Adams filled this out, he had not put in even an

2    estimate of date of death or time of death?

3        A.   True.

4            MS. MCCARTHY:  Okay.  Now I want to use prior

5        exhibits, Larry.

6            MR. BRUSTIN:  Larry, can we get --

7            MS. MCCARTHY:  The big one, 25.

8            MR. BRUSTIN:  I need two copies of it.

9        Unless you have your own copy.

10           Do you have your own copy?

11           MS. MCCARTHY:  No.  It's so big.

12           MR. SIMON:  I've got a -- I've got another

13       binder.

14           MR. ROSENE:  What exhibit is this?

15           MR. GARVERICH:  Is this the reorganized --

16           MS. MCCARTHY:  It's Exhibit 25.

17           MR. GARVERICH:  Is that the one you're

18       talking about, the one you-all relabeled?

19           MS. MCCARTHY:  It is.

20           MR. GARVERICH:  Okay.

21           MS. MCCARTHY:  The very unwieldy one.

22           MR. BRAMMELL:  So it's Plaintiff Exhibit 25?

23           MS. MCCARTHY:  It is.  That's correct.

24           MR. GARVERICH:  This is Exhibit 25.

25           MR. BOND:  Oh, this whole thing is?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 171 of 247 PageID #:
25608
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
171

1              MR. GARVERICH:  Yes.

2              MS. MCCARTHY:  Yeah, yeah.

3              MR. BOND:  Okay.  Gotcha.  I'm sorry.  Okay.

4              MS. MCCARTHY:  No, I can understand -- I can

5       understand why you would think that.

6              MR. BOND:  Well, okay.

7              MR. BRUSTIN:  Here we are.

8              MR. BOND:  Well, it doesn't matter.  I've got

9       all of it.  You-all have broken it down into two

10      binders.

11             MR. SIMON:  Yeah, that's all.

12             MR. BOND:  Okay.  Yeah.  Okay.

13             MR. BRUSTIN:  Do you want us to wait, Peter?

14             MR. ERVIN:  No, go ahead.

15  BY MS. MCCARTHY:

16      Q.   Okay.  So based on that document, it's fair to

17  say that Mr. Adams did not have an estimate of time of

18  death prior to the autopsy?

19      A.   Correct.

20      Q.   All right.  Now, I'm going to direct you to

21  that binder.  There are Bates stamps in the bottom left,

22  and if you could go to 195.

23             MR. BOND:  I'm just going to point to him

24      where the Bates is, okay?

25             MR. BRUSTIN:  Thank you.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

172

```
 1                  MR. BOND:  That's it right here (indicating).

 2                  THE WITNESS:  I see it.

 3                  MR. BOND:  Okay.  195?

 4                  MS. MCCARTHY:  Yes, please.  One more page.

 5   BY MS. MCCARTHY:

 6         Q.    Okay.  You see that?  195?

 7         A.    Says -- heading is, "Coroner's Investigation

 8   Report"?

 9         Q.    Correct.

10         A.    Okay.

11         Q.    All right.  If you flip to -- well, let's

12   start at the top.

13              So it's dated April 5, 1992, which is the date

14   you conducted the autopsy, correct?

15         A.    Yes.

16         Q.    Okay.  And you note there is no name of the

17   deceased there yet?

18         A.    Yes.

19         Q.    Do you understand that later in the day, after

20   the autopsy, Ms. Warford's identity did come to be

21   known?

22         A.    Yes.

23         Q.    And the -- in fact, her family members came

24   down to your office to identify the body, correct?

25         A.    True.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.   So it appears that this investigation report

2    was filled out prior to her identity being known?

3    A.   Yes.

4    Q.   Okay.  And in fact, this is what Coroner Adams

5    would have been filling out while you were conducting

6    the autopsy?

7    A.   I don't know when he filled it out.

8    Q.   Well, certainly it's after you filled out --

9    after you had completed the autopsy, correct?

10              MR. GARVERICH:  Objection to the form of the

11        question.

12   Q.   You can see down here, "Tox sample taken by

13   Nichols. Autopsy ordered by C1, performed by Nichols"?

14   A.   Right.

15   Q.   Right?

16   A.   Yes.

17   Q.   Okay.  So it appears that this is being filled

18   out based on information from the autopsy, right?

19   A.   Yes.

20   Q.   And if you look at the next page, you see

21   "homicide" is indicated, right?

22   A.   Yes.

23   Q.   As the manner of death?

24   A.   Yes.

25   Q.   And primary cause of death, as you've told us,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    "multiple stab wounds," and lists the stab wounds?

2        A.    Yes.

3        Q.    Again, that's information coming from the

4    autopsy you were conducting, correct?

5        A.    Yes.

6        Q.    Okay.  And back on the first page of the

7    report, it says, "Date of death."  Do you see that?

8        A.    Yes, I do.

9        Q.    Okay.  And it says, "4-4-92 or early 4-5,"

10   right?

11       A.    That's what it says.

12       Q.    Okay.  So it appears from the -- between the

13   time that Mr. Adams filled out the authorization before

14   the autopsy to after the autopsy, he now has an estimate

15   of time of death?

16       A.    That's what this report indicates.

17       Q.    And that estimate is consistent with what

18   you've told us is your most reliable estimate for time

19   of death?

20       A.    Yes.

21       Q.    Okay.  So more than likely it was something

22   that you and Mr. Adams discussed, and you blessed this

23   time of death, right?

24            MR. ERVIN:   Objection to the form of the

25       question.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 175 of 247 PageID #: 25612
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
175

1          A.   I don't know whether I voiced that or not.  I

2     can't tell you.  I do not remember.  This event is now

3     27 years ago.

4          Q.   Okay.  But again, this is -- this has been

5     filled out after the autopsy, but even before her

6     identity has been learned, right?

7               MR. BRAMMELL:  Objection to the form of the

8          question.

9          Q.   And there's now a date of death filled in?

10         A.   Look, that form entirely was filled out by

11    Coroner Adams.  I had nothing to do with anything on

12    that form in terms of writing on it.

13         Q.   Okay.  But the only person qualified to give

14    an estimate would have been you?

15              MR. BRAMMELL:  Objection.

16              MR. BOND:  Objection to the form of the

17         question.

18         A.   I don't know that I'm qualified to give an

19    estimate.

20         Q.   Well, certainly -- so Mr. Adams is an elected

21    coroner, correct?

22         A.   He is, indeed.

23         Q.   And he has no medical training?

24         A.   Other --

25              MR. GARVERICH:  Objection to the form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 176 of 247 PageID #: 25613
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
176

1    question.

2        A.    Other than through the -- the -- the coroner

3    system, correct.

4        Q.    Right.  He has no -- he does not have an MD?

5        A.    Correct.

6        Q.    You do?

7        A.    Well, yes.

8        Q.    Okay.  And so you are the person qualified to

9    give a best estimate for time of death?

10       A.    I do not remember giving anyone an estimate of

11   the time of this woman's death.

12       Q.    Okay.  Well, if you had been asked, this is

13   the best estimate you would have given, but you would

14   have told them, "It's just an estimate," right?

15       A.    Of course --

16            MR. ERVIN:  Objection to the form of the

17       question.

18       A.    -- if somehow I did it, I would have said,

19   "The estimate is that."

20       Q.    Okay.  Okay.  So -- all right.  I just want to

21   mark this as Plaintiffs' 50 quickly before moving on.

22   All right.  This is an article that was published in the

23   Meade County Messenger, all right?

24       (PLAINTIFF'S EXHIBIT 50 MARKED FOR IDENTIFICATION)

25       A.    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

177

```
 1        Q.   Do you see that?  Okay.  And can I direct you
 2   to the second paragraph?
 3        A.   You may.
 4        Q.   Can you read that paragraph?
 5        A.   "The fully dressed victim was" --
 6        Q.   Yeah, sorry.  Let me know when you're done.
 7        A.   -- "was" --
 8             MR. BRUSTIN:  Just read it to yourself.
 9   Sorry.
10             THE WITNESS:  Pardon me?
11             MR. BRUSTIN:  You don't need to read it out
12   loud. Just read it to yourself.
13             THE WITNESS:  Oh.
14             MS. MCCARTHY:  And just let me know when
15   you're done.
16             THE WITNESS:  That wasn't what I thought I
17   was directed to do.
18             MS. MCCARTHY:  My apologies.
19             THE WITNESS:  Okay.
20   BY MS. MCCARTHY:
21        Q.   Okay.  So no surprises in this article, right?
22        A.   Other than the fact that it was determined
23   that the death had occurred no more than 12 hours
24   before, and one particular wound to the back of the head
25   was the actual cause of death.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q.   Well, okay.  Well, let's break that up.

2      A.   The first phrase --

3      Q.   The one wound is not --

4      A.   The first phrase we're going to talk about?

5      Q.   Well, first I want to clarify.

6           It shouldn't be a surprise to you that one

7  particular wound to the back of the neck was the actual

8  cause of death?

9      A.   It's not a surprise.

10     Q.   It's not a surprise because you determined

11 that?

12     A.   Yes.

13     Q.   Okay.  You also determined the victim's height

14 and weight, right?

15     A.   Yes.

16     Q.   That she had suffered 11 knife wounds to her

17 body, front and back, right?

18     A.   Yes.

19     Q.   And you had sent lab tests out that hadn't

20 been completed, right?

21     A.   Correct.

22     Q.   Okay.  So it's clear here that it was also

23 determined at the autopsy that the death had occurred no

24 more than 12 hours before.  You see that?

25     A.   I see that.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020

179

1     Q.   Okay.  So --

2          MR. ERVIN:  Is there a question?

3     Q.   As to your best estimate, after the autopsy

4   would have been 12 to 24 hours, right?  That's what this

5   shows here.

6     A.   That's my best estimate.  I don't know who's

7   responsible for this quote.  It certainly was not me.  I

8   don't believe I've ever spoken to a reporter from --

9   from any publication in Meade County, Kentucky.

10    Q.   So it appears what happened is that you

11  discussed it with Mr. Adams and Sheriff Greer, who were

12  present, and they relayed this to the press, right?

13         MR. BOND:  Object to the form of the

14    question.

15         MR. ERVIN:  Object to the form of the

16    question.

17    A.   Someone relayed it to -- to the press, not me.

18    Q.   Right.  You didn't talk to the reporter?

19    A.   No.

20    Q.   But you did have discussions with Mr. Adams

21  and Sheriff Greer about the victim and about the time of

22  death and the manner of death?

23    A.   Yes.

24    Q.   Okay.  And -- okay.  Okay.  So -- and

25  certainly if they were reporting to the press a time

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 180 of 247 PageID #:
25617
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
180

1   frame of death that you did not agree with, you would

2   have said something about that, right?

3        A.    No.  I would not ever have read that paper.

4        Q.    Okay.  If they had told you a time frame of

5   death that you --

6        A.    Who's "they"?

7        Q.    Coroner Adams had suggested to you --

8        A.    That's a "he," not a "they."

9        Q.    Coroner Adams, Sheriff Greer -- right.  If

10  Coroner Adams had suggested to you a time estimate that

11  you did not agree with, you would have told him that?

12       A.    Yes.

13       Q.    And in fact, he said that if there were any

14  disagreements with you, you would win?

15       A.    Who said that?

16       Q.    Coroner Adams said that when he was deposed in

17  this case.

18       A.    I have no idea what he said in his deposition,

19  but I'm glad he deferred.

20       Q.    Yes.  Well, and as the coroner, he should

21  defer to you on matters like time of death?

22       A.    One hopes.  I have no jurisdiction to -- to

23  compel them to do that.

24       Q.    But that is absolutely your expectation,

25  right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    Yes.

 2        Q.    Because you are the individual with the

 3   medical training and experience?

 4        A.    Quite true.  But each county coroner is an

 5   elected constitutional office, and they have guidelines

 6   by which they are supposed to operate.  I can't fire

 7   them if they don't do it.

 8        Q.    No, but if you had a real problem in this case

 9   or in any case with a time of death being estimated by

10   Coroner Adams, you would have let him know that?

11        A.    Absolutely.

12        Q.    Okay.  So again, it's clear from Coroner

13   Adams' investigation report that the -- after the

14   autopsy, the best estimate for time of death was 4-4-92

15   or early 4-5, right?

16        A.    Yes.

17             MR. ERVIN:  Objection to the form of the

18        question.

19        Q.    Okay.  And then we also disposed Sheriff Greer

20   in this case, okay?  He was present at the autopsy too,

21   right?

22        A.    He was.

23             MS. MCCARTHY:  Okay.  And do we have other --

24        the other exhibits, Larry?

25             MR. BOND:  There's your other -- I don't know
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        if that's your other binder.
 2             MR. BRUSTIN:  No, that's part two.
 3             MS. MCCARTHY:  Like I want the actual other
 4        exhibits.
 5             MR. BRUSTIN:  What exhibits?
 6             MS. MCCARTHY:  21 and 22.
 7             MR. BRUSTIN:  21 and 22?
 8             MR. SIMON:  Blue binders.
 9             MR. BRUSTIN:  Is there two copies of it?
10             MR. SIMON:  Yeah.
11             MR. BRUSTIN:  Doctor?
12             THE WITNESS:  All right.  Let me get some
13        surface room here.
14             MR. BOND:  Kate, are you done with this one,
15        or are you --
16             MS. MCCARTHY:  I think we're probably going
17        to go back to it, but...
18             MR. BOND:  Okay.  I'll leave -- I'm going to
19        leave it here.
20             MR. BRUSTIN:  That's the only copy?  Oh, you
21        have one more.  Yeah, thanks, Larry.  Just one
22        more.  Thank you.
23             MR. SIMON:  Can you reach?
24   BY MS. MCCARTHY:
25        Q.   All right.  If you could turn to Exhibit 21?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 183 of 247 PageID #: 25620
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
183

1       A.    Yes.

2       Q.    It's entitled, "Kentucky State Police Crime

3   Laboratory Request for Examination."

4       A.    Yes.

5       Q.    This is a document you've seen before, right?

6   Sorry. Withdrawn.  Not this specific document.

7       A.    I have not seen --

8            MR. BOND:  Can you hold on just a second,

9       please?

10      A.    -- this specific document.

11      Q.    Right.  But you are familiar with these

12  requests for examination?

13      A.    Of course.

14      Q.    Okay.  And this one here is from Joseph Greer,

15  right?

16      A.    That's what it indicates.

17      Q.    To the KSP Crime Laboratory, right?

18      A.    Yes.

19           MR. BRAMMELL:  Kate, can you hold on just one

20      second while we find the exhibit?

21           MS. MCCARTHY:  Sure.

22           MR. BOND:  You're fine.  I asked you, and you

23      just kept on.  I'm sneaking a peek --

24           MS. MCCARTHY:  Sorry.  I truly didn't hear

25      you.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BOND:  No, no.  That's -- I understand

2      that.  I'm looking at his, so go ahead.

3  BY MS. MCCARTHY:

4      Q.   Okay.  So if you look at offense here, it says

5  "murder," right?

6      A.   That's what it says.

7      Q.   And the date is 4-4-92 to 4-5-92?

8      A.   Yes.

9      Q.   And again, that's consistent with your best

10 estimate of when this occurred?

11     A.   Yes.

12     Q.   And it's consistent with what Coroner Adams

13 put in his investigation report?

14     A.   Yes.

15     Q.   Okay.  And you see down at the bottom, this

16 report is dated April 8, 1992?

17     A.   That submission form is, yes.

18     Q.   Okay.  And it's signed by Sheriff Greer?

19     A.   It's -- it's "James E.G."

20     Q.   Yeah, yes.

21     A.   I presume that's Greer.

22     Q.   And you can see his name written out and

23 printed at the top, right?

24     A.   Yes, I did see that.

25     Q.   Okay.  And so as of April 8th, Sheriff Greer

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    was writing that the murder had occurred between April

2    4, 1992, and April 5, 1992, when the body was found?

3            MR. ERVIN:  Objection to the form of the

4        question.

5            MR. BOND:  Object to the form of the

6        question.

7        Q.    Right?

8        A.    Yes.

9        Q.    Okay.  And I will tell you that he testified

10   in this -- in his deposition in this case that as of

11   April 8th, the prosecution's theory of the

12   case -- withdrawn.  He testified that as of April 8th,

13   law enforcement's theory of the case was that the victim

14   was killed between April 4th and April 5th?

15           MR. ERVIN:  Objection to the form of the

16       question.

17           MR. BOND:  Could you get a date and a page,

18       please?

19           MS. MCCARTHY:  Greer's deposition --

20           MR. BOND:  I mean -- yeah, please.

21           MS. MCCARTHY:  First one's page 177.

22           MR. BOND:  Do you have a line, please?

23           MS. MCCARTHY:  I do not have a line.

24           MR. BOND:  Okay.  That's fine.  Okay.

25       Volume I or Volume -- well, they run total, yeah.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1                MS. MCCARTHY:  Volume I.
 2                MR. BOND:  Yeah.  Thank you.
 3    BY MS. MCCARTHY:
 4         Q.   So that theory would be consistent with what
 5    you saw at the autopsy, right?
 6         A.   Yes.
 7         Q.   Okay.  And you never told -- there's only one
 8    autopsy done in this case, right?
 9         A.   Yes.
10         Q.   And after the autopsy, you had sent things out
11    to be tested to the lab, right?
12         A.   Yes.
13         Q.   But you didn't have any further involvement
14    with the body after this, the autopsy?
15         A.   Absolutely none.
16         Q.   And the autopsy was conducted on April 5th at
17    2:00 p.m.?
18         A.   Correct.
19         Q.   Okay.  So nothing -- and it was completed on
20    April 5, 1992, would you say?
21         A.   The gross examination was, yes.
22         Q.   Right.  So the gross examination was completed
23    by 3:00 p.m.?
24         A.   Probably two-hour exam.
25         Q.   Two hour?  Okay.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1              So by approximately 4:00 p.m. on April 5th,
 2    the gross examination of Ms. Warford had been completed?
 3         A.    Yes.
 4         Q.    And nothing had changed medically between
 5    April 5th and April 8th, right?
 6         A.    True.
 7         Q.    And in fact, nothing changed medically between
 8    April 5th, when you completed the gross exam, and
 9    April 24th, when you signed the final report in this
10    case?
11         A.    True.
12         Q.    The toxicology came back negative?
13         A.    Correct.
14         Q.    There were no surprises?  No poison that was
15    found, right?
16         A.    Also correct.
17         Q.    There were no changes in science that occurred
18    in the interim?
19         A.    No, no.  Nothing changed.
20         Q.    Nothing changed.  All right.  Absolutely the
21    same.
22              And so certainly you did not relay to Coroner
23    Adams that there was any reason to change the estimate
24    for when death occurred after the autopsy?
25                   MR. ERVIN:  Objection to the form of the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020
188

```
 1   question.
 2        MR. BOND:  Object to the form.
 3   A.    True.
 4        MS. MCCARTHY:  Okay.  Sorry.  I need the
 5   earlier binder.
 6        MR. BRUSTIN:  Which exhibit?
 7        MS. MCCARTHY:  17.
 8        MR. BRUSTIN:  Here it is.
 9        MR. SIMON:  Here's the second copy.
10        MR. BRUSTIN:  Thanks, Larry.  There's 17.
11        MS. MCCARTHY:  I'm sorry to pile the binders
12   up.
13        THE WITNESS:  Yes, it is.
14        MS. MCCARTHY:  This one.
15        THE WITNESS:  Are we done with this one for a
16   while?
17        MS. MCCARTHY:  I would keep it.
18        THE WITNESS:  All right.
19        MS. MCCARTHY:  Sorry.
20        THE WITNESS:  Just trying to stack up --
21   stack stuff up here.
22        MR. BRUSTIN:  Yeah, you can put -- here, I
23   got it.
24        THE WITNESS:  I got it.
25        MR. BRUSTIN:  Yeah.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

189

```
 1              THE WITNESS:  Yeah.
 2              MR. BRUSTIN:  17?
 3              MS. MCCARTHY:  Yes.
 4              MR. BOND:  Your 17?
 5              MS. MCCARTHY:  Plaintiffs' --
 6              THE WITNESS:  Exhibit 17?
 7              MR. BRUSTIN:  Yes, sir.
 8              MS. MCCARTHY:  Yes.
 9              THE WITNESS:  Okay.
10              MS. MCCARTHY:  Plaintiffs' 17.
11              THE WITNESS:  Well, the tab says "17."  The
12      exhibit is marked as Exhibit 16.
13              MS. MCCARTHY:  It is, yes.  It's --
14              MR. SIMON:  Pay no attention to that.
15              MS. MCCARTHY:  That's crazy making.
16      BY MS. MCCARTHY:
17          Q.    So this -- and I'll represent to you that this
18      is a copy of the Meade County offense report for the
19      Warford murder, okay?
20          A.    Okay.
21          Q.    So now, unfortunately, it cuts off on some of
22      the pages at the bottom, but if you could go to what is
23      page 13.
24              MR. BOND:  What page, please?
25              MS. MCCARTHY:  Page 13.  It's MC04929313.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              It's -- yeah.  It does have the number on the

 2      bottom.

 3                  THE WITNESS:  13, is that what you want?

 4                  MS. MCCARTHY:  That is what I want.

 5                  THE WITNESS:  All right, fine.

 6  BY MS. MCCARTHY:

 7      Q.    Okay.  So I'm looking at the top paragraph,

 8  second full sentence, "Upon further discussion."  Do you

 9  see that?

10      A.    Yes.

11      Q.    Okay.  Can you read the rest of that paragraph

12  to yourself and let me know?

13      A.    Well, I can tell you what it says.  That "We,"

14  whoever the investigators are, "decided to contact Dr.

15  Nichols on the morning of April 4th to see if it was

16  possible that her" --

17      Q.    I'm sorry.

18      A.    -- "her death" --

19      Q.    Just to be clear, April 8th.

20      A.    April 8th.  Excuse me.

21            -- "that her death could have been possibly on

22  the 2nd of April."

23      Q.    Okay.  So I'll tell you that Sheriff Greer

24  authored this report, and the "we" he's referring to is

25  him and Coroner Adams, all right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 191 of 247 PageID #:
25628
The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020
191

1      A.    Okay.

2      Q.    Coroner Adams testified that he may have asked

3  you whether there's any way your opinion could have been

4  wrong about time of death on the 8th.

5            MR. BOND:  Objection to the form of the

6      question.

7      A.    Is that indicated on these pages of typed

8  material?

9      Q.    It is not.  What -- based on what you see

10  here, it appears that Sheriff Greer and Mr. Adams

11  contacted you on April 8th, right?

12      A.    Yes.

13      Q.    And they asked if it was possible that Ms.

14  Warford was killed on April 2nd?

15            MR. ERVIN:  Objection to the form of the

16      question.

17      A.    I don't remember what I said, but probably

18  consistent with what I testified to, it's possible.

19      Q.    And what you mean by that is, anything is

20  possible?

21      A.    Yes.

22      Q.    Okay.  And you would have told them that

23  if -- when they asked you that question?

24      A.    Yes.

25      Q.    All right.  You -- all you're saying is that



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

192

```
 1    you cannot definitely rule it out?

 2         A.    Correct.

 3         Q.    But that doesn't make it a reliable estimate.

 4         A.    No, it's -- but at -- at -- at best, it's an

 5    estimate.

 6         Q.    Right.

 7         A.    We've been through all that.

 8         Q.    Yes.  And, again -- so -- and I want to be

 9    really clear about April 2nd, okay?  The -- April 2nd --

10         A.    Okay.

11         Q.    -- the victim disappears at 12:30 -- last seen

12    at 12:30 a.m., okay?  She's found 7:30 a.m. on the 5th,

13    which is Sunday, and you conduct your autopsy at 2:00

14    p.m. on the 5th, that Sunday?

15         A.    That's correct.

16         Q.    Okay.  So the theory is that she's -- that

17    they're asking you about is that she's killed before

18    3:00 a.m. on April 2nd, okay?  So --

19         A.    Yes.

20         Q.    So what --

21              MR. BOND:  Well, object -- if that was a

22         question.  I don't know that you couched that as a

23         question, but if you did or intended to, object to

24         the form of the question, okay?

25              MS. MCCARTHY:  Fair enough.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 193 of 247 PageID #:
25630
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
193

```
1   BY MS. MCCARTHY:
2       Q.   Okay.  So let's take 2:00 a.m. on April 2nd to
3   2:00 p.m. on April 5th.
4            What we're talking about there is three-and-a-
5   half days, right?
6       A.   Yes.
7       Q.   84 hours, correct?
8       A.   Yes.
9       Q.   Okay.  So if you said that was -- that 84
10  hours was possible, it was only because anything is
11  possible, right?
12      A.   Yes, that's what I just --
13           MR. ERVIN:  Objection to the form of the
14      question.
15      A.   -- I just answered your question with.
16      Q.   84 hours is not a reliable estimate of the
17  time of death in this case?
18      A.   There's no such thing as a reliable estimate.
19      Q.   It's not an estimate of when she was killed in
20  this case?
21      A.   In my opinion, it's not.
22      Q.   Right.
23      A.   Because that's on the basis only of
24  estimation.
25      Q.   Right.  And again -- and it -- it is
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 194 of 247 PageID #:
25631
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
194

1   medically -- it's -- it is improper, unless there is

2   video footage, to give a specific day and time of death,

3   right?

4        A.   Yes.

5        Q.   **That cannot be done?**

6        A.   In this case, it cannot be done.

7        Q.   **Unless there is an eyewitness to the murder,**

8   **that cannot be done?**

9        A.   A reliable eyewitness to the murder.

10       Q.   **Fair enough.  Otherwise, what you can do is**

11  **give a best estimate of the time -- a time interval in**

12  **which death happened?**

13       A.   Correct.

14       Q.   **Okay.  Let's look at Exhibit 35.  So now**

15  **you're back -- and that binder, I think we're done with,**

16  **the one that's currently in front of you.**

17            THE WITNESS:  All right.

18            MR. BOND:  The one we just closed?

19            MS. MCCARTHY:  This -- the one through --

20       yes.

21            MR. BOND:  We're back with one through 25?

22            MR. GARVERICH:  Keep Staples in business with

23       all of the binder purchases.

24            THE WITNESS:  All right.  Are we -- is this -

25       - is this 20 we're looking at?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 195 of 247 PageID #: 25632
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
195

1           MR. BOND:  35, I think.

2           MR. SIMON:  There's a second blue binder on

3       top of the white one.

4           MR. GARVERICH:  Are we going with 35?

5           THE WITNESS:  Yeah, 35?

6           MR. GARVERICH:  I think it's right here.

7           THE WITNESS:  All right.  Good.

8           MR. GARVERICH:  You see this tab right here?

9           THE WITNESS:  I got it.  I got it.

10          MR. GARVERICH:  Okay.

11          THE WITNESS:  All right.  Okay.

12   BY MS. MCCARTHY:

13      Q.   Okay.  So let me get there as well.

14           All right.  What we have here is a

15   Commonwealth of Kentucky certificate of death, right?

16      A.   Yes.

17      Q.   And you've certainly seen these before?

18      A.   Yes, and specifically I just attempted to

19   discuss this document earlier in my testimony.

20      Q.   You did.  So you've definitely seen this one

21   before as well?

22      A.   Yes, but I didn't see it until -- until the --

23   the trial was getting ready to start.

24      Q.   Okay.  But this death certificate is an

25   official document.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

```
 1        A.    Correct.

 2        Q.    And as you've told us, it is the coroner's

 3   duty to fill out the date of death, right?

 4        A.    Correct.

 5        Q.    And again, Mr. Adams testified in this case,

 6   and he said he's responsible for filling out from

 7   certifier down on this form.

 8        A.    Correct.

 9        Q.    And it's the funeral home that fills out the

10   top portion?

11        A.    Also correct.

12        Q.    And in fact, it would be improper for Coroner

13   Adams to fill out the top portion instead of the funeral

14   home, right?

15             MR. ERVIN:   Objection to the witness's

16        qualification.

17        A.    That would be correct.

18        Q.    And in fact, you can see here that this was

19   filled out.

20             If you look at the top portion, it was filled

21   out in two different typewriters, right?

22        A.    Yes.

23        Q.    You can see the top one has all capital

24   letters, and the bottom one does not?

25             MR. BOND:   Objection to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.    And they're different fonts also.

 2        Q.    Exactly.  And so it's obvious that there are

 3   different typewriters being used here?

 4        A.    Yes.

 5        Q.    Okay.  And Adams told us that he used his

 6   typewriter to fill it out, and that he always used the

 7   same typewriter, okay?

 8        A.    Okay.

 9        Q.    All right.  So do you see the date that

10   Coroner Adams filled out the bottom portion?

11        A.    Yes.  May 7, 1992.

12        Q.    Okay.  So approximately one month after the

13   autopsy was conducted, right?

14        A.    Yes.

15        Q.    During that time, nothing medically or

16   scientifically changed about the best estimate for when

17   Ms. Warford's death occurred?

18        A.    True.

19              MR. BOND:  Objection to the form of the

20        question.

21        Q.    And we saw that both -- that both

22   Coroner Adams and Sheriff Greer filled out documents

23   putting that 4-4 to 4-5-92 time frame after the autopsy,

24   right?

25        A.    There is one note about the 4-4 to --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

198

```
 1        Q.   Well, we saw it in the --

 2        A.   -- to 4-5.

 3        Q.   We saw that in the coroner's investigation

 4   report, right?

 5        A.   Yes, and in whatever Greer typed up.

 6        Q.   Okay.  So in Adams and in Sheriff Greer's

 7   documents, right?

 8        A.   Right.

 9        Q.   Okay.  Now, if you look at the certifier

10   portion here, do you see the date of injury at the

11   bottom?

12        A.   Date of injury is April 2, 1992.

13        Q.   Okay.

14        A.   Unknown time.

15        Q.   All right.  You would agree that April 2, 1992

16   is definitely different than April 4th to April 5, 1992?

17        A.   Yes.

18        Q.   So now we're talking about three-and-a-half

19   days before instead of within the past day, right?

20        A.   Yes.

21             MR. BOND:  Object to the form of the

22        question.

23        Q.   And again, there's nothing that would have

24   changed in your medical opinion to say that April 2,

25   1992, was the date that Ms. Warford was killed?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                MR. ERVIN:  Objection.  Asked and answered
 2       many times.
 3       A.   Yes.
 4       Q.   Nothing had changed?
 5       A.   Nothing had changed.
 6       Q.   Okay.  And you see the 2 down here,
 7  April 2, 1992?
 8       A.   Yes.
 9       Q.   Do you see that?  All right.
10            Can I direct you to the date of death at the
11  top portion that should be filled out by the funeral
12  home?  Do you see that?  It's in the top right.
13       A.   Yes, April 2, 1992.
14       Q.   Okay.  And if you look at that 2, it's a
15  different font, isn't it?
16       A.   Seems to be.  I'm not a typewriter expert.
17       Q.   Fair enough.  I will tell you that even
18  Coroner Adams, when he looked at this report, agreed
19  that it was certainly written with a different
20  typewriter -- different than the funeral home.  And you
21  see the 2 and the date of death at the top portion where
22  the funeral home is supposed to fill it out is the same
23  as the 2 at the cause of death portion filled out by
24  Coroner Adams?
25            MR. GARVERICH:  Objection to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020
200

```
 1        A.    It certainly is similar, if not the same.
 2        Q.    Okay.  And so if -- if, in fact, Coroner Adams
 3   had whited out and changed the date of death, that would
 4   have caused you to question his honesty and integrity?
 5             MR. ERVIN:  Objection.  Form of the question.
 6             MR. BOND:  Objection.
 7        A.    Had I seen it, I would have asked him: "Who
 8   did it and why was it done?"
 9        Q.    Okay.  Because it's not appropriate for the
10   coroner to change the date of death on the official
11   death certificate for the Commonwealth of Kentucky?
12             MR. ERVIN:  Objection to the form of the
13        question.
14             MR. BOND:  Objection.
15        A.    I'm not sure that the -- that -- that the --
16   that the coroner can change the official certificate of
17   death without going -- getting approval from vital
18   statistics.
19        Q.    Right.  If it has to be done, then that needs
20   to be Documented, and there has to be a reason for it?
21        A.    And it has to go through vital statistics for
22   approval.
23        Q.    And if it doesn't, then it's not proper?
24        A.    Correct.
25        Q.    Can you think of any legitimate explanation
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 201 of 247 PageID #: 25638
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
201

1    for doing that in this case?

2         A.   I know of none, but then I -- my signature or

3    name is not on this document.

4              MR. BOND:  Kate, may I ask you, was the death

5         certificate introduced as a separate document

6         earlier?

7              MS. MCCARTHY:  It's Exhibit 35.

8              MR. BOND:  Okay.

9              MS. MCCARTHY:  And I guess it's now also --

10             MR. BOND:  You-all had it copied and

11        everything.  I didn't know if you-all introduced

12        it.

13             MR. SIMON:  Yeah, it's 35.

14             MS. MCCARTHY:  It's -- it was introduced in

15        Mr. Adams' --

16             MR. BOND:  Okay.  That's fine.

17             MS. MCCARTHY:  -- deposition.

18             MR. BOND:  I didn't mean to interrupt.  I

19        just -- I don't want to hold this in my lap until

20        I...

21   BY MS. MCCARTHY:

22        Q.   And absent a legitimate reason for changing

23   the date of death, that would cause you to question

24   Mr. Adams' honesty and integrity --

25             MR. ERVIN:  Objection to the form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

202

```
 1        question. You have no evidence that he changed any

 2        dates.

 3        Q.    -- if, in fact, he whited out and changed the

 4   date here?

 5             MR. BOND:  Object to the form of the

 6        question.

 7        A.    It would make me question his motive for doing

 8   it.

 9        Q.    All right.  And now --

10        A.    Do we need another binder?

11        Q.    Oh, no.  This -- I apologize, but we -- we do

12   need the other binder.  But I think -- no, we do.  We

13   need this one, and we need that one.

14             MR. BRUSTIN:  Underneath white?  Part two?

15             MR. BOND:  What are you referencing?

16             MS. MCCARTHY:  No, no.  We need 17 and 25.

17             MR. GARVERICH:  All of Plaintiffs' exhibits?

18             MS. MCCARTHY:  We need --

19             MR. BRUSTIN:  So we -- I think we may be done

20        with that one now.

21             MS. MCCARTHY:  Well --

22             THE WITNESS:  All right.  Well, that's fine.

23        Let me get it schlepped back together here.

24             MS. MCCARTHY:  I don't want to -- I don't

25        want to overpromise and under delivery.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

203

```
 1                MR. BOND:  17 is all one binder.

 2                MR. SIMON:  17 is -- 17 is --

 3                MR. BOND:  Let me -- 25.  I'm sorry.

 4                MS. MCCARTHY:  Yeah, 25 is all one binder,

 5        so...

 6                THE WITNESS:  All right.  You want that one?

 7                MR. BRUSTIN:  I'll put it right here.

 8                THE WITNESS:  It's a present.

 9                MS. MCCARTHY:  Okay.  Let me --

10                THE WITNESS:  All right.

11                MS. MCCARTHY:  I'll need 17, though.

12                MR. BOND:  I'm just going to leave it here.

13                MS. MCCARTHY:  Where did it go?  Is that 17

14        there?

15                MR. BRUSTIN:  No.

16                MS. MCCARTHY:  Is there another copy of that

17        binder over here?

18                MR. BOND:  Are you going to read them -- are

19        you going to read them together, Kate?

20                MS. MCCARTHY:  I am, but I need --

21                THE WITNESS:  Off the record.

22                     (OFF THE RECORD)

23        BY MS. MCCARTHY:

24           Q.   Okay.  All right.  So I have to ask you to

25        forgive me, but let's just look at this big binder.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL Document 317-10 Filed 01/26/23 Page 204 of 247 PageID #: 25641
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
204

1    A.    The big white binder?

2    Q.    That big white binder.

3    A.    Okay.

4    Q.    Which is all Plaintiffs' Exhibit 25.

5    A.    All right.

6    Q.    And all I need you to do is go to the first

7    page.

8    A.    The one with the death certificate on it?  No,

9    that's the -- that's the police report.

10   Q.    It does look like a death --

11   A.    No, that's the police report.

12   Q.    Okay.  So just to be clear for the record,

13   we're on Plaintiffs' Exhibit 25, NSB 1, and it's

14   Uniform Offense Report"?

15   A.    Yes.

16   Q.    You see "Agency: Meade County Sheriff's

17   Department"?

18   A.    Yes, and I see the time and date.

19   Q.    Okay.  So right.

20         If you look down at the bottom, you see it's

21   dated April 6, 1992?

22   A.    I wasn't referring to that.  I was looking at

23   the time of the offense.

24   Q.    Well, first you see it's signed at the bottom?

25   A.    Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

205

```
 1        Q.    By Sheriff Greer, correct?
 2        A.    Correct, on 4-6-92.
 3        Q.    4-6-92.  Okay.  And we looked before at a
 4   request for Examination that Sheriff Greer submitted on
 5   April 8, 1992?
 6        A.    To the crime lab.
 7        Q.    Yes.
 8        A.    Yes.
 9        Q.    And he listed the date of death there as
10   4-4-92 to 4-5-92?
11        A.    Correct.
12        Q.    And, in fact, he testified at his deposition
13   that his theory of the case on April 8th was that Ms.
14   Warford was killed between April 4th and April 5th,
15   okay?
16        A.    Yes.
17             MR. ERVIN:   Objection to the form of the
18        question.
19        A.    Okay.
20        Q.    And so April 6, 1992 is before April 8th,
21   right?
22        A.    I believe so.
23        Q.    Okay.  So, now, if you can look at the time of
24   offense --
25        A.    I did.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

206

1        Q.    -- filled out here.

2        A.    It says, "Thursday, April 2, '92 at 02:00

3    a.m."

4        Q.    Okay.  So Sheriff Greer is sent a request for

5    examination on April 8th listing the date of death as 4-

6    4 to 4-5, right?

7        A.    Yes.

8        Q.    He testified that was his theory as of April

9    8th, right?

10            MR. ERVIN:  Objection to the form of the

11       question.

12       A.    Yes.

13       Q.    But now we are looking at a document dated

14   April 6th where he has put the time of the offense as

15   4-2-92.

16       A.    Yes.

17       Q.    Okay.  Does that give you cause to question

18   Sheriff Greer's integrity and honesty?

19            MR. BOND:  Object to the form of the

20       question.

21            MR. ERVIN:  Object to the form of the

22       question.

23       A.    I don't know -- I don't know what his motive

24   was.

25       Q.    And because let's look a little closer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1          You see -- "time of offense," you can read

2     that clearly on the document, correct?

3          A.    Yes.

4          Q.    And then it appears that it says "exact date"?

5          A.    Yes.

6          Q.    But you can't read that, can you?  You can

7     only read "EXA"?

8          A.    Yes.

9          Q.    And it -- what it looks to be there is white-

10    out in that space, correct?

11              MR. ERVIN:  Objection to the form of the

12         question.

13              MR. BOND:  Objection.

14         A.    I don't know --

15              MR. ERVIN:  What does white-out look at on

16         a -- look like on a 30-year-old copy made a hundred

17         times?

18              MR. BRUSTIN:  Just like that.

19              MS. MCCARTHY:  Well, it looks exactly like

20         what you see on this page.

21              MR. ERVIN:  Oh, really?  You're so qualified.

22              MR. BOND:  Whoa, whoa, whoa.

23         Let's -- let's -- ask a question.  Let's say --

24              MR. BRUSTIN:  Keep talking, Peter.

25              MR. ERVIN:  You're an expert in white-out.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
208

```
 1                MR. BRUSTIN:  No, no, keep talking, Peter.
 2        Keep -- give a speech about what it is.  Tell us
 3        what you think it is.
 4                MR. BOND:  Nick, please.
 5                MR. BRUSTIN:  No, no, he started it.
 6                MR. BOND:  No.  Come on, guys.  Let's go.
 7        Move on.
 8                MR BRUSTIN:  Tell us what you think it is.
 9                MR. BOND:  Next question, please.
10                MR. BRUSTIN:  Keep going, Kate.
11   BY MS. MCCARTHY:
12        Q.   There's no question that the word "exact date"
13   is obscured here; do you see that?
14        A.   I see "exact" is incomplete.
15        Q.   And you can't even see "date" there, but
16   presumably that's what it says, right?
17        A.   Well, there is a date in the next line.
18                MR. BOND:  Object to the form of the
19        question.
20        Q.   All right.  Now, do you see anywhere else on
21   this document where the wording is obscured?
22        A.   On the printed form, no.
23        Q.   Okay.  So it looks like what happened here is
24   that at some point after April 6th, Sheriff Greer whited
25   out the date that had been written there and
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 209 of 247 PageID #: 25646
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
209

```
 1    put "4-2-92."
 2               MR. ERVIN:  Objection to the form of the
 3         question.
 4               MR. BOND:  Objection to the form of the
 5         question.
 6               MR. ERVIN:  Lack of foundation, calls for
 7         speculation.
 8    BY MS. MCCARTHY:
 9         Q.   Do you agree, based on what you've seen here,
10    that that's what looks like happened?
11               MR. ERVIN:  Objection to the question.
12               MR. BOND:  Objection.
13         A.   Yes.
14         Q.   Okay.  And that would cause you to question
15    the honesty and integrity of Sheriff Greer?
16               MR. ERVIN:  Objection to the form of the
17         question.
18               MR. BOND:  Objection.
19         A.   I would question his motive.
20         Q.   Okay.  Now -- okay.  You'd question his
21    motive, right?
22         A.   Yes.
23         Q.   You -- fair to say you haven't read the grand
24    jury testimony in this case?
25         A.   No.  And like many of these documents which
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 210 of 247 PageID #: 25647
The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020
210

1   are being presented to me, I clearly have never seen the

2   request by -- the -- of uniform offense report filled

3   out by Sheriff Greer. Never seen it before.

4       Q.   Would a proper motive for changing the time of

5   death in a law enforcement offense report be that the

6   suspects -- you had learned that the suspects you had in

7   mind had an alibi for the likely time of death?

8           MR. ERVIN:  Objection to the form of the

9       question.

10      A.   You're asking the wrong person.  I am not a

11  sworn officer.

12          MR. BOND:  Objection to the form of the

13      question.

14          MR. ERVIN:  Objection to the form of the

15      question.

16          MR. GARVERICH:  Objection to the form of the

17      question.

18  BY MS. MCCARTHY:

19      Q.   But as a citizen of Kentucky, that does give

20  you some concern, doesn't it?

21          MR. BRAMMELL:  Objection.

22          MR. ERVIN:  Objection to the form of the

23      question.

24          MR. BOND:  Objection.

25      A.   I don't vote in Meade County.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 211 of 247 PageID #:
25648
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
211

1    BY MS. MCCARTHY:

2        Q.    And you're probably glad you don't.

3             MR. BOND:  Well, please, Kate.

4             MR. BRAMMELL:  Objection.

5             MR. BOND:  Come on.

6             MR. BRAMMELL:  Argumentative.

7             MR. GARVERICH:  Pretty insulting, from a

8        resident of Meade County.

9             MR. BOND:  It's a comment.  It's not a

10       question.

11            MR. ERVIN:  Wonder if we'll have any jurors

12       from Meade County.

13   BY MS. MCCARTHY:

14       Q.    And just to be crystal clear for the record,

15   all the references that we've been making here to

16   "coroner" or "Mr. Adams" refers to Bill Adams?

17       A.    William.

18       Q.    Yes.

19       A.    Yes.

20       Q.    Not to Bart Adams?

21       A.    Not to attorney, Bart Adams.

22       Q.    And you have no recollection, as you sit here

23   today, of meeting with attorney Bart Adams in connection

24   with this case?

25       A.    I don't remember if Bart ever -- if Bart came

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 212 of 247 PageID #:
25649
The Deposition of DR. GEORGE NICHOLSON, taken on January 28, 2020
212

 1    by the office or not.

 2              MR. BOND:  Objection.

 3        A.    He usually does in cases in which I'm going to

 4    testify and he's going to cross examine me.

 5        **Q.    But as you sit here right now, you have no**

 6    **independent recollection of having a conversation with**

 7    **attorney Bart Adams about this case?**

 8        A.    No.

 9              MS. MCCARTHY:  No further questions.

10              THE WITNESS:  May I close the binder?

11              MS. MCCARTHY:  You may.

12              MR. BOND:  No, hang on just a second.

13              MR. BRUSTIN:  Can we stay in the same

14    position, or you want to move?

15              MR. BOND:  We -- we're fine.  I mean, I'm

16    fine if you-all stay there.  I'm not going to --

17              THE WITNESS:  Who's next?

18              MR. BOND:  I believe I am.  Well, I

19    apologize. Elliot's on the phone.

20              MR. BRUSTIN:  Elliot, do you have questions?

21              THE WITNESS:  Wake up --

22              MR. BOND:  He went to sleep.

23              THE WITNESS:  Wake up, Elliot.

24              MS. MCCARTHY:  Elliot's riveted.

25              MR. BOND:  Does he waive?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLAS, taken on January 28, 2020

213

```
 1                MR. BRUSTIN:  And I'm going to make sure --
 2                MR. BOND:  Can I go ahead?
 3                MR. BRUSTIN:  Why don't you go first, and
 4        then if he --
 5                MS. MCCARTHY:  I think --
 6                MR. GARVERICH:  Can we take a quick break?
 7                MR. BRUSTIN:  Yeah, sure.
 8                MR. GARVERICH:  If that's okay with you.  If
 9        you don't want to, that's fine.
10                MR. BOND:  No, let's just go ahead.  I want
11        to get done --
12                MR. GARVERICH:  All right.
13                MR. BOND:  -- okay?  I don't want to be
14        accused of talking to the witness.
15                        REDIRECT EXAMINATION
16     BY MR. BOND:
17        Q.   Doctor, is it a fair statement that you've
18     been asked numerous questions today by counsel that you
19     were not asked during the trial in February or March?  I
20     think you testified in March of 1995; is that a fair
21     statement?
22        A.   Yes.
23        Q.   Were you questioned about the clearness or
24     cloudiness of the cornea in 1995?
25        A.   No.
```
Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

214

1      Q.   Were you questioned about anything other than

2  the possible time of death?

3      A.   Well, I was asked about why this woman died --

4      Q.   Okay.  Well, I apologize.

5      A.   -- and the results of her autopsy.

6      Q.   Poor question, great answer.  I'm sorry.

7      A.   But, yes, I was -- I was asked referencing the

8  time of death.

9      Q.   Were you ever --

10     A.   All I was asked about was the -- is it

11  possible that she --

12     Q.   Right.

13     A.   -- that she -- she died on the 2nd of April,

14  and my answer was, "Yes."

15     Q.   Were you ever asked by anybody, Kenton Smith

16  or Bart Adams, if it was possible that she could have

17  been killed on April the 3rd?

18     A.   No.

19     Q.   Were you asked by Kenton Smith or Bart Adams

20  if it was possible that she was killed on April the 4th?

21         MR. BRUSTIN:  Are you talking about at trial?

22         MR. BOND:  At trial.

23     A.   No.

24     Q.   I -- yeah, okay.  Thank you.

25     A.   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   No.  So the only question that was posed to
 2   you was posed to you by the Commonwealth of whether or
 3   not it was possible that she was killed on
 4   April the 2nd?
 5        A.   I think it was by Mr. Adams, Mr. Bart Adams.
 6        Q.   I think -- I think the trial transcript
 7   reflects that Mr. Smith asked that.
 8        A.   Okay.
 9             MS. MCCARTHY:  I think that's correct.
10        A.   If it's Mr. Smith, then he's obviously the
11   Commonwealth.
12        Q.   Okay.  I think it's accurate.
13             MS. MCCARTHY:  I would agree with that.
14        A.   Well, I was asked by one -- one attorney, and
15   one attorney only, and my answer was, "Yes, it's
16   possible."
17        Q.   And I meant to ask you at the very beginning.
18   You intimated at the very beginning of this that the
19   only attorney that you had talked to about today was Mr.
20   Brustin, or that you had talked to Mr. Brustin.
21        A.   No.
22        Q.   Okay.  I misunderstood you.  I thought he said
23   that you had.
24        A.   No.
25             MR. BRUSTIN:  We never met, right, sir?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    THE WITNESS:  No, sir.

 2    BY MR. BOND:

 3         Q.    Okay.  I misunderstood.  I thought he said he

 4    had.

 5         A.    Nope.

 6         Q.    Because you-all pointed at each other.

 7                MR. BRUSTIN:  No.  We talked off the record

 8         for a moment.

 9         Q.    Okay.

10         A.    That was the other digit.

11         Q.    Okay.  Let me ask you, counsel referenced to

12    read page 1 of Exhibit 25 and Exhibit 27 -- or excuse

13    me, 17.

14               Do you still have the -- it's this one I've

15    got my -- it's the blue one on the bottom.

16         A.    All right.  I got 17.

17         Q.    Look at that document.

18         A.    Which one do you want?  One?

19         Q.    17.

20         A.    17.  Okay.  Got it.

21         Q.    Date -- look in the middle of the page, "Date

22    and time of the occurrence."  Do you see that?

23         A.    Yes.

24         Q.    Between "4-2-92, 0300 hours and 4-5-92, 0730

25    hours.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.    That's what's -- that's --

2      Q.    **Did I read that accurately?**

3      A.    That's what's on this report concerning --

4  concerning the uniform offense.

5           MR. BOND:  Okay.  That's all I have.  I

6      appreciate your time, sir.  Thank you.

7           MR. BRUSTIN:  Who's next?  Peter?

8           MR. ERVIN:  I'll go.

9                RE-EXAMINATION

10  BY MR. ERVIN:

11     Q.    **Doctor, let me direct your attention back to**

12  **that uniform offense report.**

13     A.    Yes, sir.

14          MR. BOND:  17 here?

15          MS. MCCARTHY:  I think you mean 25.

16          MR. ERVIN:  I don't know what -- I think that

17      was in the front page of 25.

18          THE WITNESS:  I got it.

19          MR. BOND:  Okay.

20          THE WITNESS:  Yes.

21  BY MR. ERVIN:

22     Q.    **You weren't asked to me what the important**

23  **question was regarding the time of offense.  It looks**

24  **like what is clearly legible is that that date and time**

25  **are marked as estimated.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 218 of 247 PageID #: 25655
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
218

1      A.    Yes.

2      Q.    Is that a fair statement?

3      A.    Yes, it's estimated -- an estimated date and

4   time of death by -- filled out by Sheriff Greer.

5      Q.    Does that cause you any concern that he would

6   estimate the date and time of death?

7      A.    No.

8      Q.    As 4-2-92, 2:00 a.m.?

9      A.    That's what his opinion is.  How he came to

10  that -- to that conclusion, I don't know.

11     Q.    Okay.  And if he had -- let's assume that he

12  whited out where it said "exact" to mark in "estimate."

13          Does that cause you to question his

14  motivation?

15     A.    The question was about why he would mark

16  anything out.

17     Q.    Yeah.

18     A.    And I -- I don't know what his motive was in

19  marking anything out on this form.

20     Q.    Right.  But we know he left clearly the fact

21  that it was an estimated time and perhaps marked out

22  that it was an exact time?

23          MR. BRUSTIN:  Objection to form.

24     Q.    Correct?

25     A.    Oh, certainly it indicates intact estimate and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    a -- a checkmark in a box next to it.

 2         Q.   Nobody has tried to obliterate that from your

 3    experience in document examination?

 4         A.   I am not a document expert.

 5         Q.   Oh, you're not?  Boy, you were asked a lot of

 6    questions about document expertise today.

 7              MR. BRUSTIN:  Just a couple.

 8         Q.   Don't know why.

 9              And while we're at that, let's go to another

10    document you were asked about in terms of document

11    alteration, and that is the death certificate.

12         A.   Yes.

13         Q.   Can you get your copy in front of you?

14         A.   I got one.

15              MR. BOND:  Is it okay if he references what

16         he brought versus the --

17              MR. BRUSTIN:  Sure.

18              MR. BOND:  Okay.

19              MS. MCCARTHY:  You didn't alter it, did you?

20              MR. BOND:  Excuse me?  Come on, Kate, please.

21    BY MR. ERVIN:

22         Q.   You may recall that --

23              MR. BOND:  Elliot and I had this conversation

24         yesterday.  You weren't here.  Please.

25              MR. BOND:  I know that was made in jest.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MR. ERVIN:
 2       Q.    You may recall that questions to you about the
 3   death certificate were predicated with the fact that the
 4   responsibility for the assignment of the date and time
 5   of death is that of the coroner and not the funeral
 6   home; is that correct?
 7               MR. BRUSTIN:  Objection.
 8               MS. MCCARTHY:  Objection.  Form.
 9       A.    Well, that would be the time -- the time of
10   death would be established by the coroner, but
11   obviously, the top information is -- is filled out by
12   the funeral director.
13       Q.    Sure.  But if the funeral director is going to
14   defer to the coroner, he may leave blank time of death
15   for the coroner to fill that in, mightn't he?
16               MS. MCCARTHY:  Objection to form.
17       A.    Yes, that's possible.
18       Q.    That's certainly at least as plausible as some
19   suggestion that Bill Adams surreptitiously came in and
20   changed a death certificate, isn't it?
21               MS. MCCARTHY:  Objection.  Form.
22       Q.    Isn't that at least as plausible as that idea?
23               MS. MCCARTHY:  Objection.
24       A.    Yes, if it --
25               MR. SLOSAR:  Calls for speculation.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020

221

```
 1        Q.   Because it's the coroner's responsibility to
 2   make that determination, correct?
 3        A.   Yes.
 4        Q.   All right.  Let me point out to you as well in
 5   terms of the 9C, city, town, or location of death on
 6   that death certificate?
 7        A.   Yes.
 8        Q.   Would it appear that that was filled in by the
 9   same font as used in the information filled out below by
10   Coroner Adams?
11        A.   Well, certainly the town of Webster is -- is
12   in -- is in a --
13        Q.   Yes.
14        A.   -- a -- the same -- a similar type of font as
15   we know was used by Coroner Adams.
16        Q.   And just as plausibly, the funeral director,
17   being in Louisville, Kentucky, may not have known the
18   closest town to where this woman's body was found.  Is
19   that a fair statement?
20             MS. MCCARTHY:  Objection.
21        A.   Sure.
22             MS. MCCARTHY:  Form, calls for speculation.
23        Q.   While we're guessing, do you agree with that?
24        A.   Yes.
25        Q.   Okay.  And might have left it then to the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    coroner to fill that?

 2              MS. MCCARTHY:  Objection.  Speculation.

 3        Q.    Do you agree with that?

 4              MS. MCCARTHY:  Form.

 5        A.    Yes.

 6        Q.    All right.  No more speculative than the idea

 7    that Bill Adams, whom you had no reason to question the

 8    integrity of, surreptitiously changed a death

 9    certificate, is it?

10              MS. MCCARTHY:  Objection.  Form, speculation,

11        foundation.

12        A.    No.

13        Q.    All of your testimony today about how the body

14    got to where it got, in the condition -- by that I mean

15    the position it was in, is all speculation.  Is that a

16    fair statement?

17              MS. MCCARTHY:  Objection.

18        A.    Yes.

19              MS. MCCARTHY:  Mischaracterizes testimony.

20        A.    I have -- I have no -- no scene to -- to --

21    proof of -- of -- proof of body -- of body and blood

22    transfer to -- to any vehicle.

23        Q.    All right.  Did you know that there was a

24    large bloody area about 50 feet away from that body in

25    the field?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 223 of 247 PageID #:
25660
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
223

```
 1        A.    No, but --

 2              MS. MCCARTHY:  Objection.

 3        A.    -- it wouldn't surprise me.

 4        Q.    Okay.  Wouldn't surprise you that she may have

 5   been killed 50 feet way, bled out substantially there in

 6   the field, and then her body was picked up and moved to

 7   where it came to rest and was found?

 8        A.    She certainly could have been killed in the

 9   field and picked up after the body -- in that site by

10   one or more people.

11        Q.    And if a body is carried and laid out prone on

12   the Ground, and the legs come back to rest against a

13   bush, a wire in a fence, a tree, whatever, it may have

14   the effect of holding them in the position while rigor

15   mortis sets in.  Is that a fair statement?

16        A.    Yes.

17        Q.    Is that just as plausible as any other theory

18   of how they got in the shape they were today as any

19   other theory you gave today?

20              MS. MCCARTHY:  Objection.

21        A.    Yes.

22        Q.    In fact, do you know that Coroner --

23              MR. BOND:  Adams.

24        Q.    -- Adams testified at trial that her feet were

25   resting on a bush at the location where she was found?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1              MS. MCCARTHY:  Objection.

2       A.    I did not know that.

3       Q.    **Okay.**

4              MS. MCCARTHY:  How would he know?

5       Q.    **Would that explain to you how her legs came to**

6  **be found in the position they were in?**

7       A.    Of course.

8       Q.    **All of the questions you were asked today**

9  **about estimating time of death were related to textbook**

10 **principles.  Is that a fair statement?**

11      A.    Yes.

12      Q.    **In other words, the textbook says, "12 to 24**

13 **hours on the appearance of cloud," correct?**

14      A.    Yes.

15             MS. MCCARTHY:  Objection.

16      Q.    **The textbook says, 20 -- or "Four to 24 hours**

17 **for the onset and dissipation of rigor mortis," correct?**

18             MS. MCCARTHY:  Objection.  Form.

19      A.    Yes.

20      Q.    **The textbook talks about the formation or the**

21 **appearance of lividity four hours to eight hours,**

22 **correct?**

23      A.    Yes.

24      Q.    **One variable that isn't in the textbooks,**

25 **though, that wasn't addressed to you in relation -- with**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 225 of 247 PageID #:
25662
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
225

1    you in relationship to those questions that you kept

2    trying to point out is temperature.  Is that a fair

3    statement?

4              MS. MCCARTHY:  Objection.  Mischaracterizes

5        testimony, form.

6        A.    Yes.

7        Q.    And you're not aware of any studies that

8    discuss the onset or dissipation of rigor mortis at,

9    say, 30 degrees, 40 degrees, 50 degrees, 60 degrees; is

10   that right?

11       A.    No, and also in the field rather than in a

12   laboratory setting.

13       Q.    Yes, sir.  You do know that in your laboratory

14   setting, at 42 degrees in the morgue, you don't expect

15   to see the onset of -- at least not in early hours at

16   all -- or strike that.  You expect the occurrence of

17   decomposition to take far longer to occur in the

18   controlled setting in the lab at 42 degrees than it

19   would occur on a 85-degree day in May in Kentucky; is

20   that a fair statement?

21             MS. MCCARTHY:  Objection.  Form.

22       A.    Yes.

23             MS. MCCARTHY:  Calls for speculation.

24       Q.    And in this case, Mr. Adams did ask you

25   questions regarding the condition of this body and the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   temperature involved.  And those temperatures ranged

2   from mid-50s by day to low 20s by night.

3       A.   Yes.

4       Q.   Will you agree with me that in early April,

5   let's say April 5th, for example, that we have more

6   nighttime than we do daytime?

7           MS. MCCARTHY:  Objection.

8       A.   Yes.

9       Q.   It's before the equinox?

10      A.   Yes.

11      Q.   Or before the solstice?

12      A.   Vernal.

13          MS. MCCARTHY:  Do you want to agree with him?

14   He doesn't --

15      A.   Vernal -- vernal solstice.  Vernal solstice.

16   Solstice.

17      Q.   Just after the equinox, I guess.

18          In other words, the exposure of this body to

19   subfreezing temperatures occurred longer than the high

20   temperatures?

21          MS. MCCARTHY:  Objection.  Speculation, form.

22   You can't say that.

23      A.   It -- she would be cooled for -- for longer

24   than she would be heated by the effect of the

25   environment or the sun.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 227 of 247 PageID #: 25664
The Deposition of DR. GEORGE NICHOLS II, taken on January 28, 2020
227

1    Q.   Yes, sir.  And to the extent her body was

2    shaded, it would be all the more that her body would

3    remain cool?

4    A.   True.

5    Q.   And the longer the body remains cool, the

6    longer rigor mortis holds on, correct?

7         MS. MCCARTHY:  Objection.

8    A.   Yes.

9    Q.   The longer the body remains cool, the less

10   likely the occurrence of decomposition, correct?

11   A.   Yes.

12   Q.   And all of the other factors that one might

13   consider in relationship to the estimation of a time of

14   death, based on textbook materials, would be augmented

15   by the cooler temperatures.  Is that a fair statement?

16        MS. MCCARTHY:  Objection.  Form.

17   A.   Yes.

18   Q.   And did you notice in particular, in

19   relationship to the clouding of the corneas, that in the

20   photographs, her eyes were closed?

21   A.   Yes.

22   Q.   And that would have the effect of lessening

23   the time -- or lengthening the time of occurrence of

24   clouding of her corneas.  Is that a fair statement?

25        MS. MCCARTHY:  Objection.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

228

```
 1        A.   The time would be lengthened.  Yes, sir.
 2        Q.   And how much, we don't know?
 3             MS. MCCARTHY:  Objection.  Form.
 4        A.   We don't have any scientific proof of how long
 5   it takes.
 6        Q.   All right.  When you agreed with the attorneys
 7   in the trial of this case that Rhonda Warford's death
 8   might have occurred on April the 2nd, 1992, that meant
 9   that you didn't have enough evidence to rule that out as
10   a possibility.  Is that a fair statement?
11        A.   Yes.
12             MR. SLOSAR:  Objection to form.
13        Q.   All these forms that you were asked about, the
14   uniform offense report, that coroner report that he
15   sends in, the death certificate, were you aware of what
16   Bill Adams had written on any of those forms before
17   looking at them today?
18        A.   The only form --
19             MS. MCCARTHY:  Objection.  Form.
20        A.   The only form I had seen was the -- was the
21   authorization for postmortem examination --
22        Q.   Okay.
23        A.   -- issued with the arrival -- before the
24   arrival of the body, then an unknown white female at the
25   medical examiner's office.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.   Yes, sir.  And that didn't contain an estimate
 2   for the time of death?
 3        A.   Question mark, question mark.
 4        Q.   Yes, sir.  Were you interviewed for this
 5   story?  I don't know what exhibit number this was.
 6        A.   No.
 7        Q.   In the paper?  I just want to be sure that I
 8   understand some of the marks that we're talking about on
 9   Ms. Warford's body. Let me direct your attention
10   back to --
11             MR. BOND:  Now, those are mine, and they're
12        full sized.
13             MR. ERVIN:  I need -- I've got a 67 here.
14             MR. BOND:  Here, here.
15             MR. ERVIN:  Here, I've got it.  I've got it.
16   BY MR. ERVIN:
17        Q.   You got Exhibit 67?
18        A.   Yes.
19        Q.   Okay.  Looking at the photographs that we
20   looked at, ME19?
21        A.   19?  Okay.  Let me get there.  Okay.
22        Q.   I see -- I think what I see here are three
23   stab wounds.
24        A.   You are correct.
25             MS. MCCARTHY:  Objection.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q.   Okay.  The two lower stab wounds are within

2    one or two milliliters of one another --

3              MS. MCCARTHY:  Objection.  Form.

4    Q.   -- is that a fair statement?

5    A.   They are adjacent, yes.

6    Q.   They are adjacent.

7              Almost touching, but apparently two different

8    wounds?

9              MS. MCCARTHY:  Objection.

10   A.   Correct.

11   Q.   And then the upper wound would appear to be,

12   these are inches down here, two inches higher at the

13   base of the skull?

14   A.   Correct, in the occipital scalp.

15   Q.   All right.  Now, which of these three wounds

16   do you believe would have been the fatal wound?

17   A.   The bottom one.

18   Q.   The bottom one.

19              So does your -- in your autopsy, are you able

20   to track where that wound went?

21   A.   Yes, that's the one that went between the

22   first cervical vertebra and the base of the skull to

23   sever -- to sever the brainstem a distance of -- by --

24   by finger measurement, a measurement of 1.5 inches.

25   Q.   Okay.  One thing I wanted to ask you about,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    this paper account.

2          It says that the knife was estimated to

3    measure five to six inches long and one and one-half

4    inches wide.

5          Did you give that estimate?

6          MS. MCCARTHY:  Objection.  Form.

7    A.    I may have -- may have told Coroner Adams that

8    or -- Coroner Adams that because deepest wound path

9    was -- was about four inches.  That was the one that

10   went through the ribs.  So the -- the -- the blade

11   itself was probably an inch or so longer than -- than

12   the -- the tract.

13   Q.    Well, that makes the assumption that I didn't

14   stick the blade into the hilt, though, correct?

15   A.    Yes.  It could be three feet.

16   Q.    Could be three feet.

17         All you know is that it was at least four

18   inches, right?

19   A.    Yes.

20   Q.    Is that a fair statement?

21   A.    Yes.

22   Q.    To a certainty -- the only thing you can

23   really say to a certainty is that it must have been at

24   least four inches long?

25         MS. MCCARTHY:  Objection.  Asked and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    answered.

2    A.    Correct.

3    Q.    **All right.**

4    A.    The same goes for -- for the -- the defect on

5    the skin.

6    Q.    **Yes.**

7    A.    Depending upon how wide -- how rapidly the --

8    the knife blade widens.

9    Q.    **All right.  In terms of the wound to the back**

10   **of the neck, discussion of how that can occur, I**

11   **understand you believe there must be flexion in the neck**

12   **to open the vertebrae to allow that to occur?**

13         MS. MCCARTHY:  Objection.  Form.

14   A.    Yes.

15   Q.    **And certainly that would present the easiest**

16   **path. Isn't that a fair statement?**

17         MS. MCCARTHY:  Objection.

18   A.    True.

19   Q.    **Do you know whether it's possible for someone**

20   **with a knife, let's say of a hunting type, a fairly**

21   **heavy blade, to, with force, cause a blade to go between**

22   **the vertebrae and cause the injury that you observed?**

23         MS. MCCARTHY:  Objection.  Foundation, form.

24   A.    It's possible.  Beyond that, I -- I can't give

25   you any more information.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-10   Filed 01/26/23   Page 233 of 247 PageID #: 25670
The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
233

1        Q.    Okay.  You don't know whether that is actually

2   as probable as some other means of causing the injury,

3   do you?

4            Ms. MCCARTHY:  Objection.  Form.

5        A.    No, or just pure blind luck.

6        Q.    Yes, sir.  So it could have been, as you first

7   opined, that her neck was extended, either by force or

8   for some other reason, her neck was extended, to permit

9   someone with some expertise to find their way to the

10  opening in the vertebrae, correct?

11            MS. MCCARTHY:  Objection.  Form,

12       mischaracterizes testimony.

13       A.    Yes.

14       Q.    All right.  But we do know that there were

15  three stab wounds in the same area?

16       A.    Yes.

17       Q.    Only one made it?

18       A.    Only one made it to the -- the brainstem.

19       Q.    Yes, sir.  And once that brainstem was

20  severed, at least from your experience, there would be

21  no reason to stab her again, would there?

22            MS. MCCARTHY:  Objection.  Form, foundation.

23       A.    Well, she certainly was not going to resist

24  after that.

25       Q.    She would be limp at that moment, wouldn't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    she?

2        A.   Yes.

3        Q.   Okay.  And then the second plausible way this

4    occurred would be, as you said, dumb luck?

5        A.   Yes.

6        Q.   And then it would also be as plausible that

7    sufficient force behind a strong enough blade might go

8    between the vertebrae and cause this injury?

9            MS. MCCARTHY:  Objection.  Mischaracterizes

10           testimony. The witness never said that.

11       A.   It could be possible.

12       Q.   All right, sir.  Is it any less probable than

13    any of the other -- the other two theories?

14       A.   I don't know.

15           MR. ERVIN:  Okay.  I believe that's all I

16           have, sir. Thank you.

17           THE WITNESS:  Thank you.

18           MR. BRAMMELL:  I have no questions.

19           MR. ROSENE:  None from me.

20           MS. MCCARTHY:  Okay.  Let's take a couple

21           minutes.

22           MR. BRUSTIN:  We have more questions.

23           MS. MCCARTHY:  Yes.

24               (OFF THE RECORD)

25               RECROSS EXAMINATION

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

235

```
 1   BY MS. MCCARTHY:
 2       Q.   Okay.  Dr. Nichols, I'm going to show you what
 3   has been previously marked as Plaintiffs' 41, and this
 4   is the videotape taken on April 5, 1992 at the crime
 5   scene, okay?
 6           MR. BRUSTIN:  Give him the places you're
 7       pointing.
 8           MS. MCCARTHY:  I will.
 9       Q.   So I'm going to start at 5:25, thereabouts.
10   Go to -- at 5:18 now.  In particular, I want to direct
11   your attention to the victim's legs, okay?  All right.
12   So I stopped at 5:30.
13           What you saw there is the victim in the field
14   with her legs straight up in rigor mortis, correct?
15       A.   Yes, they are fully flexed at the knee.
16       Q.   Yes.  And there's no tree behind her legs?
17       A.   Not there, no.
18       Q.   No rocks?
19       A.   No nothing.
20       Q.   There's nothing that could support the weight
21   of her legs behind her?
22       A.   There's --
23           MR. ERVIN:  Objection to the form of the
24       question.
25       A.   -- nothing where the body has been filmed or
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-10  Filed 01/26/23  Page 236 of 247 PageID #: 25673
The Deposition of DR. GEORGE NICHOLS, taken on January 28, 2020
236

1    videoed.

2        Q.    Okay.  So there's nothing where the body is

3    found that could have supported her legs to form rigor

4    at that spot, correct?

5            MR. ERVIN:  Objection to the form of the

6        question.

7        A.    That's right.

8        Q.    Okay.  So --

9        A.    I testified to that earlier.

10       Q.    Right.  Then you were asked -- so in order for

11   the victim to have been killed in the field, she would

12   have had to be killed in a different spot in that field?

13       A.    Yes.

14       Q.    Up against a prop?

15       A.    A thing.

16       Q.    To keep for hours to set into full rigor

17   mortis?

18       A.    True.

19       Q.    And then the perpetrators would have had to

20   come back?

21       A.    Who says they left?

22       Q.    Okay.  So we have two possibilities.  She

23   absolutely is not killed where she's found.

24       A.    That's correct.

25       Q.    So for her to have been killed in the field,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020
237

1    she had to be killed somewhere else in the field against

2    a thing or a prop, and her body had to remain there for

3    several hours to form rigor, correct?

4        A.   Yes.

5        Q.   The perpetrators either remained at the scene

6    of the crime for several hours waiting for the body to

7    form rigor and then moved her, right?

8        A.   Yes.

9        Q.   Or they left and came back and then carried

10   the body hours later?

11       A.   Yes.

12       Q.   Okay.  So are there any other possibilities

13   from the scene of how she could have been killed in that

14   field?

15       A.   Not that I've seen.

16       Q.   Okay.  And so, in fact, it is not just as

17   plausible that that is what happened as Ms. Warford was

18   killed elsewhere and then moved to the scene and left

19   there?

20            MR. ERVIN:  Objection to the form of the

21       question.

22       A.   Yes.

23       Q.   Right.  The far more likely explanation is

24   that she is killed not in the field, and then

25   transported, most likely in a vehicle, carried, and



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   dumped in the field?

2           MR. ERVIN:  Objection.  Not qualified, calls

3       for speculation.

4       A.   That would be the easiest explanation.

5       Q.   That is, based on everything you've seen here

6   in your experience, by far, the more likely explanation?

7       A.   Yes.

8       Q.   It is the most likely explanation for what

9   happened?

10      A.   Yes.

11      Q.   Okay.  And I asked you questions for several

12  hours earlier, right?

13      A.   Oh, I agree you did.

14      Q.   You haven't forgotten that, but I never

15  stopped you at any point from testifying about the

16  effects of temperature.

17           I didn't cut you off, right?

18      A.   No.

19      Q.   There's nothing you want to change about the

20  testimony that you gave me earlier?

21      A.   I would have to read it to be able to answer

22  that question.

23      Q.   Certainly nothing springs to mind?

24      A.   No, but I don't remember it verbatim.

25      Q.   Okay.  And then -- my apologies.  Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Sorry.  Can we go off the record for just one minute?

2                    (OFF THE RECORD)

3    BY MS. MCCARTHY:

4       Q.    Okay.  At trial, Dr. Nichols, you were asked

5    some questions about the area of the body below the

6    skull and above the first vertebra --

7       A.    Yes.

8       Q.    -- correct?

9             And you were, in fact, asked about the

10   relative strength of that particular area of the body.

11      A.    Yes.

12      Q.    Do you recall that testimony?

13            And what you testified to was that it's not

14   particularly strong, right?

15      A.    Correct.

16      Q.    It's not particularly strong.  It's difficult

17   to get into that space?

18      A.    Correct, because of the alignment of the

19   bones.

20      Q.    Right.  So to inflict that amazing wound that

21   you saw here severing the brainstem, it's not about the

22   force of the blow, it's about the precision of the blow?

23      A.    Yes.  That may be from -- from skill and

24   training, or it may be plane, stupid, dumb, lethal luck.

25      Q.    Right.  So either specialized skill and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    training or dumb luck, right?

2        A.    Yeah.

3        Q.    It is not related to how forcefully you stab

4    the knife into the person's neck?

5        A.    It has to be pushed in with enough force.

6        Q.    With enough force.

7              But unlike the puncture to the left lung that

8    went through two ribs, there you need a significant

9    amount of force, right?

10       A.    True.

11       Q.    Because to break two ribs requires incredible

12   force?

13       A.    And to penetrate into the lung.

14       Q.    Right.  Here, the ligament are on the back

15   surface of the neck is not particularly strong?

16       A.    True.

17       Q.    What it is, is hard to access?

18       A.    The space is a potential space that is

19   difficult to access, and that's for preservation of us.

20       Q.    Yes.  And so the key here would be to have the

21   training to know to put the head down and where to place

22   the blade, right?

23       A.    Yes.

24       Q.    Or complete dumb luck?

25       A.    I've seen dumb luck kill plenty of people.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q.    But it's not about the amount of force used in

2    the blow?

3              MR. ERVIN:   Objection to the form.

4      A.    The lethal injury, that's correct.

5              MS. MCCARTHY:   Okay.   No further questions.

6              MR. BOND:   I've just got a couple.

7                   FURTHER DIRECT EXAMINATION

8    BY MR. BOND:

9      Q.    You testified based upon science available to

10   you in 1992, not to 2020, didn't you?

11     A.    Yes.

12     Q.    Okay.   I think the video that you were shown

13   was head-on, I believe, as opposed to from the -- from

14   one of the sides.   I want to show -- I just want to show

15   you a different angle --

16              MS. MCCARTHY:   That's --

17     Q.    -- whatever it is, okay?

18              MS. MCCARTHY:   Sure.   And just to be clear

19         for the record, the video has many angles.   The

20         clip --

21              MR. BOND:   That you -- that --

22              MS. MCCARTHY:   -- was from a particular

23         angle.

24              MR. BOND:   And that's what I'm referencing,

25         what you just showed him.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

242

```
 1              MS. MCCARTHY:  Sure.
 2    BY MR. BOND:
 3        Q.    Okay.  Let me show you some of the pictures
 4    that they introduced, 588.  And I'm going to reference
 5    you to the top figure --
 6        A.    Yes.
 7        Q.    -- or the top picture.
 8        A.    Yes.
 9        Q.    I want you to look closely at that picture
10    from the side and see if you notice anything.
11        A.    Well, I noticed a branch of a -- of a small
12    tree or shrub extending near her right foot.
13        Q.    And --
14        A.    And the left foot is between the right foot
15    and -- and that branch, twig, or trunk of whatever that
16    thing is.
17        Q.    And does it not appear that that branch that
18    you found in that picture on your own just now runs just
19    below the hem of that pant leg, is where it looks like
20    it's resting?
21        A.    It looks like it's resting on the pants that
22    cover the distill third of the shin of the right leg.
23        Q.    Well, I think you can see just a hair of the
24    red just above the branch, can't you?
25              MS. MCCARTHY:  Objection.  Form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLS, II, taken on January 28, 2020

243

```
 1        Q.    It's not very artful, but I think it's
 2   accurate.
 3        A.    Well, there's -- there's clothing --
 4             MS. MCCARTHY:  Leading.
 5        A.    -- toward the head, her head --
 6        Q.    Yeah.
 7        A.    -- between her head and the branch.
 8             MR. BOND:  Okay.  Thank you, sir.  That's all
 9   I've got.
10             FURTHER EXAMINATION
11   BY MR. ERVIN:
12        Q.    Doctor, in your experience -- you grew up in
13   Kentucky, I think, didn't you?
14        A.    Just a poor old boy from the west end trying
15   to keep in Fall City beer and White Castle hamburgers.
16        Q.    You're familiar with grapevines in Kentucky,
17   aren't you?
18        A.    Oh, yeah.
19        Q.    Do you think a grapevine the size of my little
20   finger would be strong enough to hold that woman's legs
21   up?
22        A.    I doubt it.
23        Q.    You doubt it?
24        A.    Yeah.
25        Q.    A grapevine?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   I doubt it.  But all I can say is I doubt it.

 2   Again, we -- this is -- I -- I can -- I've been asked

 3   many questions today which I -- the answers to which I

 4   believe are speculation.

 5              MR. ERVIN:   Okay.  Thank you.  That's all I

 6        have.

 7                    FURTHER CROSS EXAMINATION

 8    BY MS. MCCARTHY:

 9        Q.   Dr. Nichols, nothing you saw just now in that

10   photograph, which you've been shown before, changes

11   anything about your testimony, correct?

12        A.   Correct.

13        Q.   And again, it was Coroner Adams who was at the

14   scene, not you?

15        A.   Yes.

16        Q.   And if he testified in his deposition that it

17   didn't appear that any of these branches could hold the

18   weight of the large woman, you have no reason to

19   disagree with that?

20        A.   Correct.

21              MS. MCCARTHY:   Okay.  No further questions.

22              MR. BOND:   And I forgot to ask one question.

23              Mr. Ervin:   I'm going to object to the form of

24   that question because I don't think that's what his

25   testimony was.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BRUSTIN:  Well, we'll see.

 2              MR. BOND:  The record will speak for itself.

 3         I've just got one question.

 4                   FURTHER DIRECT EXAMINATION

 5    BY MR. BOND:

 6         Q.    And I forgot to ask you.  One thing that we do

 7    know is that Rhonda Sue Warford was killed after 12:30

 8    a.m. of the 2nd because that's when she left the house

 9    and wasn't seen thereafter, correct?

10         A.    That's what you just informed me, yes.

11         Q.    Okay.  If that's factual, we would know the

12    event at least happened after that moment?

13         A.    Yes.

14              MR. BOND:  Okay.  That's all.

15              MR. BRUSTIN:  Assuming her -- the witness is

16         telling the truth.

17              MR. BOND:  Well, I think that's the testimony

18         that she elicited earlier that --

19              MR. BRUSTIN:  Right, right.  That's fine.

20         Yes.

21              MR. BOND:  -- that's what Ms. Warford said.

22              MR. BRUSTIN:  Yes.

23              MR. BOND:  Okay.  I'm done, okay?

24              MS. MCCARTHY:  All right.

25         (PLAINTIFF'S EXHIBIT 48 MARKED FOR IDENTIFICATION)
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE NICHOLLS, taken on January 28, 2020

246

1    (PLAINTIFF'S EXHIBIT 49 MARKED FOR IDENTIFICATION)

2   (DEPOSITION CONCLUDED AT 3:42 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1               CERTIFICATE OF REPORTER

2           COMMONWEALTH OF KENTUCKY AT LARGE

3

4 I do hereby certify that the witness in the foregoing

5 transcript was taken on the date, and at the time and

6 place set out on the Title page hereof by me after first

7 being duly sworn to testify the truth, the whole truth,

8 and nothing but the truth; and that the said matter was

9 recorded by me and then reduced to typewritten form

10 under my direction, and constitutes a true record of the

11 transcript as taken, all to the best of my skills and

12 ability. I certify that I am not a relative or employee

13 of either counsel, and that I am in no way interested

14 financially, directly or indirectly, in this action.

15

16

17 

18

19

20

21

22 LINDSEY N. JOHNSON,

23 COURT REPORTER / NOTARY

24 COMMISSION EXPIRES ON: 05/29/2022

25 SUBMITTED ON:  02/07/2020

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com