In the Matter Of:

COMMONWEALTH OF KY vs GARR KEITH HARDIN

PROCEEDINGS - 2.28.95

*February 28, 1995*



800.211.DEPO (3376)
EsquireSolutions.com

TR Tx 00001

1

2

3

4

5

6

7      TRANSCRIPT OF CLARK AND HARDIN V. LOUISVILLE JEFFERSON COUNTY

8                          METRO GOVT et al

9

10

11

12                  DATE RECORDED:  FEBRUARY 28, 1995

13

14

15

16

17

18

19

20

21

22

23

24   Job No.:  J3589219

25



800.211.DEPO (3376)
EsquireSolutions.com

1          MR. SMITH:  Yes.

2          THE COURT:  Mr. Rogers, I think you got another bite

3    at the apple, sir.

4          MR. ROGERS:  No, I, -- I just wanted to know if that

5    was a question he was asking or a statement.

6          MR. SMITH:  I don't have any other questions.

7          THE COURT:  Are we all finished?

8          MR. ROGERS:  Yes, sir.

9          THE COURT:  Thank you for being with us.  You're free

10   to go.  Call your next witness.

11         MR. ADAMS:  Dr. George Nichols.

12         THE COURT:  While he's doing this, ladies and

13   gentlemen, I have no way of knowing how you feel.  I'm trying to

14   guess, -- guestimate and give you a break about every hour and

15   15 minutes, hour and a half.  If at any time you feel like you

16   need to get up and stretch your legs, go to the restroom, bring

17   it to my attention.  Okay?  I don't want anybody sit over there

18   and suffer.  Doctor, if you will please come around.  Do you

19   solemnly swear or affirm the testimony you are about to give

20   will be the truth, the whole truth, and nothing but the truth so

21   help you God?

22         DR. GEORGE NICHOLS:  I do.

23         THE COURT:  Please be seated.

24         DR. GEORGE NICHOLS:  Thank you.

25         THE COURT:  Mr. Smith, you may go forwards.

1          MR. SMITH:  Tell us your full name for the record,

2    please.

3          DR. GEORGE NICHOLS:  George R. Nichols the second.

4          MR. SMITH:  And Dr. Nichols, what's your occupation?

5          DR. GEORGE NICHOLS:  I'm a physician and forensic

6    pathologist.

7          MR. SMITH:  What's that?

8          DR. GEORGE NICHOLS:  Well, the word pathology is the

9    study of human disease and the body's reaction to that disease

10   process.  It is a specialty of medicine.  The word forensic

11   means law applied.  Therefore, theoretically anything having to

12   do with the law and human disease is the purview of a forensic

13   pathologist.  In actuality and in practice the vast amount of a

14   forensic pathologist professional time is spent associated with

15   a dead human being.  A person who dies suddenly and unexpectedly

16   while in apparent good health, a person who dies as the result

17   of the application of physical forces to his or her body and a

18   person who dies as the result of chemical intoxication or

19   poisoning.

20         MR. SMITH:  Where are you employed or maybe rather

21   whom are you employed by doctor?

22         DR. GEORGE NICHOLS:  I am the Chief Medical Examiner

23   for the Commonwealth of Kentucky.  A position I have held since

24   July 1, 1977.

25         MR. SMITH:  Where do you work at?

1          DR. GEORGE NICHOLS:  I can work anyplace in the

2   Commonwealth of Kentucky.  My office is at 810 Barrett Avenue,

3   Louisville, Kentucky 40204.  That's the old Kentucky Baptist

4   Hospital.

5          MR. SMITH:  Now, when you say you are the Chief

6   Medical Examiner there, doctor, are you in charge of the

7   particular area of what you do?

8          DR. GEORGE NICHOLS:  Yes, I direct a series of

9   physicians and other scientists who perform post mortem

10  examinations and other tests at the request of the coroners and

11  deputy coroners throughout the 120 counties of the Commonwealth.

12         MR. SMITH:  How many doctors do you have that work

13  underneath you?

14         DR. GEORGE NICHOLS:  Full time nine.  Part time

15  several additional others.

16         MR. SMITH:  And tell the jury briefly what education

17  and training you have that qualifies you, --

18         MR. ROGERS:  Judge, I would stipulate.

19         MR. ADAMS:  We'll stipulate Dr. Nichols as an expert

20  in the field of forensic pathology.  Yeah.

21         THE COURT:  All right.  Then with that, you may go, --

22  may or may not go forwards as your choice.

23         MR. SMITH:  Now, Dr. Nichols, tell the jury whether or

24  not you have been involved with Rhonda Sue Warford?

25         DR. GEORGE NICHOLS:  Yes.  I first came up on her body

1  that was subsequently identified as Rhonda Sue on the 5th of

2  April, 1992.

3          MR. SMITH:  Now, in order to be a forensic

4  pathologist, I mean, basically what you do would be perform

5  autopsies.  Would that be a fair statement?  If it's not,

6  elaborate please.

7          DR. GEORGE NICHOLS:  Yes.  The physicians in my office

8  and throughout the state perform autopsies or post mortem

9  examinations and additionally in Madisonville and Louisville, we

10 perform examinations on people who are injured, but not fatally

11 injured by criminal action.

12         MR. SMITH:  And what is the purpose of performing an

13 autopsy or forensic evaluation?

14         DR. GEORGE NICHOLS:  The purpose of an autopsy is to

15 establish the cause of death, to eliminate any other cause of

16 death, to document the nature, direction, and severity of forces

17 which have been applied onto and within a human body to document

18 any underlying disease process which may be found.  To remove,

19 recover, and document and allow further study of any type of

20 evidence which may be present on or within a body.

21         MR. SMITH:  How did the body of Rhonda Sue Warford get

22 to you, if you know?

23         DR. GEORGE NICHOLS:  Transported at the request of the

24 Meade County Coroner, Mr. Bill Adams.

25         MR. SMITH:  And did you see Coroner Adams there at



1  your offices?

2          DR. GEORGE NICHOLS:  Coroner Adams was there.  Sheriff

3  Greer was there.

4          MR. SMITH:  Have you had involvement with Sheriff

5  Greer in the past?

6          DR. GEORGE NICHOLS:  Yes.

7          MR. SMITH:  And have you worked cases with Sheriff

8  Greer in the past?

9          DR. GEORGE NICHOLS:  Yes.

10          MR. SMITH:  Have you worked cases with Coroner Adams

11  in the past?

12          DR. GEORGE NICHOLS:  Yes.

13          MR. SMITH:  Have you found Sheriff Greer's work to be

14  anything but first rate?

15          MR. ROGERS:  Objection, Judge.

16          THE COURT:  Sustained.  Sustained.

17          MR. ROGERS:  I don't think he's qualified, --

18          MR. SMITH:  Have you worked with various sheriffs

19  throughout the state and Commonwealth of Kentucky?

20          DR. GEORGE NICHOLS:  Yes.

21          MR. SMITH:  How would you compare Sheriff Greer's

22  work, --

23          MR. ROGERS:  Objection, Judge.  He's, --

24          MR. SMITH:  Can we approach?

25          THE COURT:  Yeah.  Let me, -- let me talk to you.

1  Doctor, just sit tight for a second.

2  ---

3          THE COURT:  Let's go forward.  I'm sorry.

4          MR. SMITH:  Dr. Nichols when or did you examine the

5  body of Rhonda Sue Warford?

6          DR. GEORGE NICHOLS:  Yes.

7          MR. SMITH:  The manner in which the body was

8  transported to you, was it in within generally accepted

9  standards and methods of doing this type of thing?

10         DR. GEORGE NICHOLS:  The body had been placed in a, --

11  a non-previously used zipper disaster pouch.  It was brought

12  expediently to the hospital, -- to the former Baptist Hospital,

13  now the office of the Medical Examiner.  Yes.  That's the way it

14  should have been done.

15         MR. SMITH:  Would you please describe the body as far

16  as physical characteristics?  And I'm talking about height, and

17  weight?

18         DR. GEORGE NICHOLS:  Yes, sir.  The body had a height

19  of 71.5 inches.  That's 5'11".  Weight of 221 pounds.

20  Moderately to markedly obese white female.

21         MR. SMITH:  What did you do?  Tell the jury what you

22  did as far as examining the body and what your findings were,

23  please.

24         DR. GEORGE NICHOLS:  Thank you.  I did an autopsy.  An

25  autopsy is simply an examination hopefully by a skilled

1  physician of a person who happens to be dead.  Paying careful

2  attention to everything on and about the body.  Whether it's

3  clothing or hairs or any other type of evidence which may be

4  present on the body or on the clothing.  I, -- I, if I performed

5  this exam, as I did, make my observations and talk about this

6  person dictating what I'm seeing as I'm seeing it.  Using a foot

7  operated controlled dictation system.  Photographs are taken by

8  myself and by others.  In this particular examination, I was

9  assisted by a resident physician, Dr. Paul Fernehoe and by a

10  forensic autopsy technician, Mr. Brain Fitzgerald.  The body was

11  received fully clothed.  The clothing was examined on the body

12  and then again as it was removed.  The clothing was then placed

13  in separately labeled containers for, -- for trans, -- for me to

14  give that, -- that clothing and all the other evidence directly

15  to Sheriff Greer.  So, the clothing was removed.  Then an

16  external examination of all the body surfaces was performed.

17  Following that, the biggest surgical procedure that can be

18  performed in medicine was performed.  Examining, -- examining

19  all of the internal structures with the intention to come to the

20  conclusions as I have talked to you before.  This examination

21  was performed and the examination of her body demonstrates one

22  mark present on her body.  An inverted crucifix or cross present

23  below the left clavicle, or shoulder blade.  Collar bone, excuse

24  me.  There are no injuries to her hands that would be indicative

25  of being in a fight, breaking nails, and scraping, -- scraping



1   her fingernails on an assailant.  There are no injuries from

2   being beaten.  No injuries from being pushed from a substantial

3   height onto the ground or onto a carpeted surface.  The injuries

4   to her body are all as the result of an instrument with a

5   cutting edge.  Specifically, because at least three of the

6   injuries demonstrated a single edged knife as opposed to a

7   double edged knife.  The injuries were present on multiple body

8   surfaces including injuries to her back, in which there are at

9   least five, -- five wounds including one to the left axilla or

10  armpit.  There are also to the frontal surface of her body.  The

11  injuries are basically stab wounds.  There are some incisional

12  wounds and let me explain to you the difference.  A stab wound

13  is a wound that is produced by an instrument with a cutting

14  surface that is deeper than it is long.  It is produced by

15  thrust.  The word incision or cut is an injury also made by an

16  instrument with a cutting edge, which is longer than it is deep.

17  It's like the, -- the instrument is passed this way.  So, she

18  has both evidence of stab and cuts.  Primarily the wounds

19  however are stab wounds.  She has certain peculiar evidence that

20  she was alive and able to struggle against the knife that was

21  employed.  She has what's called defensive injury.  Now, if we

22  are conscious and not intoxicated and not incapacitated and

23  there is someone who is threatening us with an object, be it a

24  baseball or in this case a knife, then what we tend to do is

25  involuntarily bring our hands up about our faces to protect our



1   faces.  And in so doing we frequently will wind up with defense

2   injuries on the hands and forearms.  In her, -- in her case

3   there is a one inch cut wound on this surface of the right hand.

4   There is also a four tenths of an inch cut wound present on the

5   mid-portion of the right index finger.  So, there is evidence of

6   at least for a short amount of time a struggle involving the

7   decedent, the assailant, and a weapon.  Shall I continue?

8           MR. SMITH:  Please.

9           DR. GEORGE NICHOLS:  Certainly.

10          MR. SMITH:  You're doing good.

11          DR. GEORGE NICHOLS:  The injuries to her body are the

12  type that I've seen multiply with stab wounds and with cut

13  wounds.  Although, as it turned out internally the cut wounds

14  were not lethal at all.  There was however one injury that

15  clearly that I was frankly amazed that it, -- that the, -- it

16  caused the amount of internal damage that it did.  Now, when

17  stab wounds are directed inside, what the exactly they touch

18  defines the amount of damage to a human being.  It's not like

19  the neighbors can be injured.  The knife has to actually touch

20  what's there producing the internal cut.  And she has, -- she

21  had two stab wounds at the base of her skull and as my report

22  will indicate if you, -- I started, -- I happen to have taken

23  her clothing off and started examining her back.  So, I'm

24  talking about her back in my report.  That is what I looked at

25  first before I looked at her front.  And she has some stab

1  wounds to her back and then two, -- two stab wounds to the upper

2  portion of her neck at the base of the skull.  And I said, oh,

3  that didn't do anything.  Well, as it turned out internally one

4  of those wounds did and in fact one of the wounds at the base of

5  the skull is shows that there is a tract of a knife that entered

6  through the skin, passed from the back toward the front, and

7  actually severed the brain stem of her body.  Brain stem.

8  That's the lower portion here that's contained within the skull.

9  Up above is the brain like from my ears up.  The brain stem is

10 the area where messages are received from below coming up the

11 spinal cord, messages are received from the brain and there is a

12 processing center inside.  It's responsible for where the brain

13 makes life function occur.  For breathing, for blood pressure,

14 for heart output.  That was severed as a result of that one

15 particular entry.  Very unusual.  Injuries to the front surface

16 of her body were associated with wounds going into her chest

17 cavity resulting in internal hemorrhage and her inside of her

18 left chest cavity as a result of a piercing wound of the upper

19 lobe of the left lung causing blood to spill into the left chest

20 cavity.  This wound was produced by a substantial knife because

21 the wound tract itself internally passed not only through the

22 muscle between the two ribs, but actually through two ribs.  It

23 takes a substantial knife to do that.  So, she has internal, --

24 definite evidence of internal, -- of two types of lethal

25 internal injuries.  One immediately incapacitating.  The brain

1  stem injury.

2          MR. SMITH:  Now, wait a minute.  What do you mean

3  immediately incapacitating?  That's lawyer talk or medical talk

4  or something, but put it in where I can understand it.

5          DR. GEORGE NICHOLS:  The injury that she suffered is

6  exactly analogous to what we do in high school or early college

7  biology classes in which a maneuver is called piffling the

8  front.  In which an instrument is placed into the back of the

9  neck at the base of the skull of the front.  It is pushed

10  forward and it severs the brain stem.  Causes immediate

11  cessation of life function.

12          MR. SMITH:  Killed her.

13          DR. GEORGE NICHOLS:  Immediately.  One of the few

14  times in medicine where that happens.  She additionally has as I

15  told you another lethal injury, but one which would take longer

16  to account for her demise with a piercing injury due to a knife

17  wound of the upper lobe of her left lung resulting in spillage

18  of sufficient quantity of blood in her left chest cavity for her

19  to go into shock and death.  The remainder of the examination

20  showed the existing of no existing natural diseases.  Oh, I

21  forgot.  There was also a large cut mark on the neck.  Many

22  times with knife injuries this can be a lethal injury.  In her

23  case, it wasn't.  While there was a cut mark, a large cut mark,

24  on the frontal surface of her neck, the injury was not deep

25  enough in the right places to cause even incapacitation of the

1  decedent.  It missed the major arteries.  It missed the airway.

2  It missed the large veins of the neck.  It severed only the

3  external jugular vein.  So, there would have been substantial

4  amount of blood loss externally from that wound.  But there

5  would, -- she would not have died, in my opinion, from that

6  wound.  The remainder of that examination showed no evidence of

7  any existing natural disease.  Showed no evidence of any type of

8  other internal trauma to her body.  Blood was removed and urine

9  was removed from her body.  They were sent to the, -- to the

10  state toxicology laboratory as we routinely do where they were

11  analyzed for the presence of drinking, -- ethyl or drinking

12  alcohol and the usual drugs of abuse.  The report indicates that

13  there is no blood alcohol.  Zero blood alcohol to be present in

14  her body at the time of her death and no evidence of any type of

15  drug.

16          MR. SMITH:  Were there any drag marks on her body?

17          DR. GEORGE NICHOLS:  Yes, on her lower extremities

18  evidence that there was, -- I believe that's correct.  Let me

19  see.  I have to look at my report.  Let's see.

20          THE COURT:  Gentlemen, I trust you have a copy of Dr.

21  Nichols report?

22          MR. ADAMS:  Yes, sir, we do.

23          THE COURT:  Very good.

24          DR. GEORGE NICHOLS:  No.

25          MR. SMITH:  Were there any scrapes on her ankles or

1   hands or what I would call carry marks, if you know?

2             DR. GEORGE NICHOLS:  No.

3             MR. SMITH:  Now, to make sure I understand.  Within a

4   reasonable degree of medical probability, tell the jury what the

5   cause of death was.

6             DR. GEORGE NICHOLS:  Medical certainty, she died as a

7   result of stab wounds of her body.

8             MR. SMITH:  Can you tell us the sequence of the

9   wounds, doctor?

10            DR. GEORGE NICHOLS:  Well, clearly the wound to the

11  chest that caused injury to the left lung had to have occurred

12  sometime before the injury to the back of the neck or the base

13  of the skull.  And the reason for that is that as soon as this

14  injury occurred, she would have had no ability to bleed.

15  Internally or externally.  Because that would have ceased any

16  type of life function at that point.  No pumping would have

17  occurred.  So, the injury to the lung had to precede the fatal,

18  -- the imminently fatal injury at the base of the skull.

19            MR. SMITH:  Doctor, I'm going to use a model here for

20  demonstrative purposes only.  Would this model aid you in

21  showing the jury where the wounds were at the base of the skull?

22            DR. GEORGE NICHOLS:  Yes.

23            MR. SMITH:  All right.  Would you please take that

24  model and demonstrate to the jury where the wounds to the back

25  of the neck or the base of the skull were?

1    DR. GEORGE NICHOLS:  Okay.  The only thing that is

2 unusual about this model is the fact that the neck bones here,

3 the vertebrae, are absolutely straight and we, human beings, are

4 kind of bent a little crooked.  So, there is an actual curve

5 that occurs with, -- with the neck bones.  And the injury, --

6 there were two stab wounds.

7    MR. SMITH:  Would you please, -- you kind of talk a

8 little loud like me, doctor.  Please come around here and, --

9 or, yeah.  Go on up there and speak loudly and show the jury,

10 please.

11    DR. GEORGE NICHOLS:  There were two stab wounds here

12 just at the base of the skull.  One of which, the larger of

13 which, was associated with a wound trajectory toward the face

14 with a knife entering between the small space, between the

15 cervical vertebrae, one, and the base of the skull.  Deep to

16 this, right below where my finger is, is where the brain stem

17 is.  And the knife was passed forward approximately an inch

18 maximally, severing the brain stem at this point.

19    MR. SMITH:  Thank you.  What kind of, -- how would you

20 characterize this wound, Dr. Nichols, as being easy or difficult

21 to inflict?

22    DR. GEORGE NICHOLS:  I believe that for my, -- from

23 the time that I started the exam, showing the two wounds at the

24 base of skull, until I finally was internally enough to see the

25 damage from it, my opinion went from ah, it didn't do anything

1  to boy, either real lucky or real good.

2            MR. SMITH:  The person inflicting these wounds?

3            DR. GEORGE NICHOLS:  Correct.

4            MR. SMITH:  Now, tell us whether or not you examined

5  the body of Rhonda Sue Warford to make any determination whether

6  she had been engaged in any type of sexual activity or not.

7            DR. GEORGE NICHOLS:  The standard evidentiary

8  materials for the determination of sexual activity were obtained

9  during the course of the examination.

10           MR. SMITH:  And what was your findings on that?

11           DR. GEORGE NICHOLS:  That material went to Sheriff

12 Greer, which was analyzed by the state crime laboratory.  The

13 only thing that I personally analyzed was a wet preparation

14 taken from the vaginal vault of the decedent, which showed

15 evidence of no motile spermatozoa.  Explain it to you?

16           MR. SMITH:  Please.

17           DR. GEORGE NICHOLS:  Okay.  This exam is a multi-part

18 exam.  And different people will look at different portions of

19 the evidence that is obtained at the time of the autopsy or when

20 a woman presents herself to a hospital emergency room.  What the

21 physician primarily does at this point is to obtain all of the,

22 -- the information.  All of the evidence.  Orderly package it,

23 make sure that the packaging is secure, and then it will be

24 transported by a police officer or sometimes a civilian to a

25 crime laboratory where most of the examination occurs.

1   Generally, the physician will only be responsible for examining

2   fluid that's removed from the vagina to see whether or not there

3   are motile sperm.  And sperm has a finite time in which it will

4   still remain moveable.  Eventually, it will stop moving.  His

5   little tails fall off and his little head explodes.  That's what

6   happens biologically to a sperm.  The wet prep was examined by

7   me.  I found no evidence of a motile spermatozoa or evidence of

8   any type of detectable spermatozoa that I could see with unaided

9   light source.

10          MR. SMITH:  Well, did you have an aided light source?

11          DR. GEORGE NICHOLS:  Well, that would require phase

12  microscopy and no, we don't have that.  This is the standard way

13  of examining, -- making the determination of the presence of

14  absence of motile sperm.

15          MR. SMITH:  Are you in a position to give an opinion

16  then, doctor, of whether Rhonda Sue Warford had or had not

17  engaged in any sexual intercourse or activity prior to the time

18  of her death?

19          DR. GEORGE NICHOLS:  No, I'm not.  Clearly, she is of

20  child bearing age.  Women of child bearing age rarely will have,

21  -- be injured as a result of sexual activity whether it's

22  consensual or forced.  The absence of spermatozoa means nothing

23  in terms of whether or not a woman has been involved with sexual

24  activity.

25          MR. SMITH:  So, you can't tell us one way or the

1   other?

2           DR. GEORGE NICHOLS:  Correct.

3           MR. SMITH:  If she had had engaged in sex and if there

4   had been an ejaculation, would it have been something you could

5   have told?

6           DR. GEORGE NICHOLS:  Had the sperm been there for a

7   short enough amount of time so that they could, -- were still

8   swimming about, yes.

9           MR. SMITH:  What's a short period of time?

10          DR. GEORGE NICHOLS:  Sperm motility is clearly for

11  most men and most women who don't have anti-sperm antibodies,

12  spermatozoa, human spermatozoa will be motile for anywhere from

13  24 to 48 hours.

14          MR. SMITH:  Now, tell us about, -- educate us a little

15  bit doctor about the determining a time of death.

16          DR. GEORGE NICHOLS:  The best we can do is do estimate

17  the interval of death.  I have to answer questions in terms of

18  medical certainty like what the cause of death is.  In terms of

19  medical probability, in terms of medical consistency, those are

20  the guidelines upon which I as a medical expert witness must

21  testify.  There is no medical certainty, no medical probability

22  in the, -- in our present ability to determine the interval from

23  when a death occurred until the body is examined.  We have all

24  seen too many movies, watched too many reruns of Perry Mason,

25  listened to reports from Los Angeles, in concerning this

1  determination.  It is a fictional act rather than a factual act.

2  If I am asked about this, then I will tell you that it is an

3  estimate at best and it is clearly not scientific and clearly

4  does not bear the type of testimony that it is frequently given.

5       MR. SMITH:  Realizing then that you can't tell us with

6  any degree of accuracy when the death of Rhonda Sue Warford

7  occurred, can you tell us that she could have been killed in the

8  early morning hours of April the 2nd of 1992?

9       DR. GEORGE NICHOLS:  Yes, I can.  She may have.

10       MR. SMITH:  Can you tell by these wounds whether the

11  assailant of Rhonda Sue Warford was right or left handed, with

12  any degree of accuracy?

13       DR. GEORGE NICHOLS:  No.  Some wounds are clearly more

14  consistent with a right handed person.  But there is very

15  internal courses where they could have actually been inflicted

16  by a left handed person.

17       MR. SMITH:  Can you tell us whether the wounds to

18  Rhonda Sue Warford were inflicted from either in front of her or

19  behind her?

20       DR. GEORGE NICHOLS:  Both.  They're frontal injuries

21  and there are injuries to the back.

22       MR. SMITH:  Now, in reviewing your report I had to

23  call you one day and I said, Dr. Nichols, was does this corpus

24  luteum mean that I see in your report.

25       DR. GEORGE NICHOLS:  It's a normal ovary doing what



1  it's supposed to do which is to make eggs.

2        MR. SMITH:  So, at the time you examined the body of

3  Rhonda Sue Warford, she was not pregnant at that time?

4        DR. GEORGE NICHOLS:  Absolutely not.

5        MR. SMITH:  Was she in what we country boys would call

6  the fertile stage at that time?

7        DR. GEORGE NICHOLS:  She's what you country boys would

8  call the fertile stage.  It's called mittelschmerz from the

9  German and the ladies of the jury will recognize it as a minor

10  amount of abdominal pain associated with ovulation.

11        MR. SMITH:  And I think you told me earlier that you

12  hadn't been to the scene.

13        DR. GEORGE NICHOLS:  That's correct.  I was at, -- I

14  was at the office, not at the scene.

15        MR. SMITH:  Right.  Right.  And you would differ to

16  the coroner as far as where she was killed?

17        DR. GEORGE NICHOLS:  Certainly.

18        MR. SMITH:  Is there anything else in your autopsy

19  report, Dr. Nichols, or your findings that are significant that

20  we haven't covered?

21        DR. GEORGE NICHOLS:  Let me see.  Yes.  Last, -- last

22  sentence, page one.  In the fact that lividity is present

23  anteriorly.

24        MR. SMITH:  What was that?

25        DR. GEORGE NICHOLS:  Lividity is present anteriorly

1   and it is fixed.

2              MR. SMITH:  What does that mean?

3              DR. GEORGE NICHOLS:  That means that she died or was

4   placed fairly rapidly after she died face down.  Because of the

5   pooling of blood and further that she had been in that location

6   long enough so that it was, -- that the discoloration from the

7   pooling of blood stayed there.

8              MR. SMITH:  Lividity?

9              DR. GEORGE NICHOLS:  Correct.

10             MR. SMITH:  So, from that examination shortly after

11  she was killed she was placed in the position, --

12             DR. GEORGE NICHOLS:  She either died face down or

13  shortly after, -- after she died, she was placed face down.

14             MR. SMITH:  Okay.  Thank you, doctor.

15             THE COURT:  You finished, Mr. Smith?

16             MR. SMITH:  Yes, sir.

17             THE COURT:  Mr. Adams.

18             MR. ADAMS:  Dr. Nichols, could you please tell us from

19  your autopsy the minimum dimensions that the murder weapon must

20  have had?

21             DR. GEORGE NICHOLS:  Minimum dimension?  Well, --

22             MR. ADAMS:  What was the deepest wound?

23             DR. GEORGE NICHOLS:  That's, -- well, all right, fine.

24  Deepest wound tract was approximately four inches.  That going

25  through the, -- through the breast into the left chest cavity

PROCEEDINGS - 2.28.95                                          February 28, 1995
COMMONWEALTH OF KY vs GARR KEITH HARDIN                                     153

1  and piercing the upper lobe of the left lung on its lingular

2  segment.

3          MR. ADAMS:  And what was the width of that particular

4  wound?

5          DR. GEORGE NICHOLS:  Let me check.  1.25 inches.

6          MR. ADAMS:  So, at the very minimum, we must be

7  dealing with a weapon that is at least four inches long and at

8  the four inch depth on the knife it must be at least 1.25 inches

9  wide, is that correct?

10          DR. GEORGE NICHOLS:  No, that's not correct.

11          MR. ADAMS:  Okay.

12          DR. GEORGE NICHOLS:  Unfortunately, that's, -- that's

13  not the way the knife injuries work.  Knife injuries as we know

14  they have a point for which is responsible for the internal push

15  with the deep, -- deeping, -- deepening injuries.  They also

16  have one or in some cases two surfaces that cut so that the

17  knife as it goes in as it's is withdrawn out may cause an

18  additional cut making an injury tract of let's say three

19  quarters of an inch appear to be an injury tract of an inch and

20  a quarter because it's a stab and a cut.  That's why one of her

21  injuries in her axilla, her armpit is a V.  And you get a V

22  injury from a knife wound because the knife goes in at one point

23  and then because most knife injuries don't immediately

24  incapacitate the victim, the victim tries to get away or move

25  from the decedent and the knife comes out at a different angle

1   causing a V.  When actually, it's only one wound.

2          MR. ADAMS:  Now, you indicated earlier in your direct

3   testimony that at least one of the knife wounds had at one sharp

4   edge and one blunt edge.  Is that correct?

5          DR. GEORGE NICHOLS:  There are three, -- three wounds

6   that, -- that show definite single edge knife activity.

7          MR. ADAMS:  Single edge?

8          DR. GEORGE NICHOLS:  Correct.

9          MR. ADAMS:  And please tell the ladies of the

10  gentlemen of the jury which wounds they are.

11         DR. GEORGE NICHOLS:  They are, -- let's see.  1.5, --

12  1.25 inch vertical stab wound, anterior left shoulder.

13         MR. ADAMS:  That's the one that's four inch deep?

14         DR. GEORGE NICHOLS:  Yep.

15         MR. ADAMS:  Okay.

16         DR. GEORGE NICHOLS:  The lower, -- the lower injury of

17  the base, -- the base of the skull.  The fatal injury here at

18  .75 inches and let's see.  Stab wound of the left, -- the

19  anterior left shoulder.

20         MR. ADAMS:  The, -- what were the other piercing

21  wounds?  In other words, where other than the slashing type.

22  Were there other piercing type wounds?

23         DR. GEORGE NICHOLS:  Yes.  They were primarily

24  frontal.  And there was only, -- there were two others that went

25  full thickness through the soft tissues of, -- of the chest.

1   One of which actually hit, -- struck a rib, but none of which

2   communicated further internally.  So, there is only one that

3   went deep internally, one stab wound that caused jugular venous

4   injury, and obviously the wound to the base of the skull.

5        MR. ADAMS:  Okay.  Now, let me ask you about the wound

6   at the base of the skull.  The one that cut the brain stem.  Can

7   you tell us how deep that wound was?

8        DR. GEORGE NICHOLS:  Approximately an inch and a half

9   maximum.

10       MR. ADAMS:  1.5 inches max?

11       DR. GEORGE NICHOLS:  Yes.

12       MR. ADAMS:  And what was its width?

13       DR. GEORGE NICHOLS:  .75.

14       MR. ADAMS:  Would the usual scientific principles

15  apply with that type of a life ending injury?  In other words,

16  could we say that at 1.5 inches on this knife it would be .75

17  inches wide?

18       DR. GEORGE NICHOLS:  Unless it's brought at different

19  angle.

20       MR. ADAMS:  And we just don't know?

21       DR. GEORGE NICHOLS:  That's correct, sir.

22       MR. ADAMS:  No way to tell?

23       DR. GEORGE NICHOLS:  Impossible.

24       MR. ADAMS:  Okay.  Is there any indication at all

25  scientifically that there was more than one knife involved in

1  this attack?

2          DR. GEORGE NICHOLS:  No.  However, there could be.

3          MR. ADAMS:  Right.

4          DR. GEORGE NICHOLS:  There, -- but there is no

5  indications that there is more than one.

6          MR. ADAMS:  Please tell the ladies and gentlemen again

7  about the injury that I think you indicated broke two ribs.

8          DR. GEORGE NICHOLS:  One of the stab, -- the stab

9  wound that's fatal enters in the, -- in the upper inner quadrant

10 of the left breast is directed inward and slightly downward.

11 Going through the soft tissues, breast tissues, into and through

12 the skin.  Through the soft tissues of the breast.  Into both, -

13 - into two ribs, severing the, -- severing the ribs and cutting

14 the intercostal musculature between the two.

15         MR. ADAMS:  Okay.

16         DR. GEORGE NICHOLS:  Strong knife.  We are not talking

17 about a steak knife or a peering knife.  We're talking about an

18 instrument that possesses a substantial heft.

19         MR. ADAMS:  Could you tell whether or not that

20 particular blow was, -- was that a downward entry wound?

21         DR. GEORGE NICHOLS:  It goes in and slightly down.

22         MR. ADAMS:  Could you tell, doctor, whether or not

23 that would have been administered from the front of the person

24 or from behind the person?

25         DR. GEORGE NICHOLS:  It would be very difficult to, --

1  to administer that from behind.  You would have to reach totally

2  around a big woman and be able to, -- to, -- a tall woman also

3  and be able to thrust with a sufficient force to go through two

4  ribs would be very difficult and it would have to be done left

5  handedly.

6          MR. ADAMS:  Okay.  Now, that wound was delivered while

7  she was alive I take it?  There was blood surround that wound?

8          DR. GEORGE NICHOLS:  Yes.

9          MR. ADAMS:  Okay.  Now, you, -- you were using your

10  left hand when you were describing that to the ladies and

11  gentlemen of the jury.  Can you tell which hand that would have

12  been delivered by?

13          DR. GEORGE NICHOLS:  It's clearly more consistent with

14  a person standing in front of the victim using his right, -- his

15  or her right hand.

16          MR. ADAMS:  Okay.  Now, that particular blow if it

17  broke two ribs, you've indicated that it was a large knife, a

18  strong knife.

19          DR. GEORGE NICHOLS:  Yes.

20          MR. ADAMS:  Would the person delivering that blow had

21  to have been a very strong person?

22          DR. GEORGE NICHOLS:  I don't think so.

23          MR. ADAMS:  You don't think it would have made any

24  difference?

25          DR. GEORGE NICHOLS:  No, I think I could do it and I

1  weigh 150 pounds.

2      MR. ADAMS:  Okay.  The wounds to the back of the neck,

3  -- or let me ask you this.  What are, -- what other wounds are

4  consistent with a right handed person?

5      DR. GEORGE NICHOLS:  The auxiliary wound which is the

6  arm pit wound when which the wound is directed upwardedly would

7  be, -- is consis, -- is a right handed thrust.

8      MR. ADAMS:  Okay.

9      DR. GEORGE NICHOLS:  But most of the others, I can't

10  tell at all.

11      MR. ADAMS:  Just that it could be right, left, --

12      DR. GEORGE NICHOLS:  That's correct.

13      MR. ADAMS:  Especially the ones to the back?

14      DR. GEORGE NICHOLS:  That's correct.

15      MR. ADAMS:  Okay.

16      DR. GEORGE NICHOLS:  Especially since that, -- those

17  wounds could have been, -- could have been inflicted from a

18  person standing, -- a person at, -- above the head, beside

19  either side of the head, or actually straddling the upper back.

20      MR. ADAMS:  Just no way to tell.

21      DR. GEORGE NICHOLS:  Exactly.

22      MR. ADAMS:  Okay.  Were any of the wounds delivered

23  after, -- after the blow to the back of the head or the cut the

24  brain stem?  Could you tell if any were delivered after that

25  blow? Were there any that didn't have any bleeding, --

1        DR. GEORGE NICHOLS:  No.

2        MR. ADAMS:  -- accompanying them?

3        DR. GEORGE NICHOLS:  No.  All wounds were associated

4    with hemorrhage into the wounding tracts.  And as I've said that

5    would have been minimal if any bleeding after the injury to the

6    brain stem.

7        MR. ADAMS:  So, then the last blow was the injury to

8    the brain stem as far as you can tell?

9        DR. GEORGE NICHOLS:  Yes.

10        MR. ADAMS:  Okay.  Now, --

11        THE COURT:  Go ahead.

12        MR. ADAMS:  Thanks.  The, -- the injury here that, --

13    that killed Ms. Warford as I understand it, is just directly

14    below the skull and above the first vertebrae.

15        DR. GEORGE NICHOLS:  Correct.

16        MR. ADAMS:  What, -- this woman as you said was 5'11",

17    weighed 221 pounds.  Tell us about the relative strength of this

18    particular area in the human body.

19        DR. GEORGE NICHOLS:  It's not particularly strong.

20    There is a ligament that runs along the back surface of it and

21    there is a disk space that runs through there.  It's not

22    particularly strong.  It is, -- it is difficult to get into the

23    space.

24        MR. ADAMS:  Uh-huh.

25        DR. GEORGE NICHOLS: Because it's unlike the

1   straightness of the spine there in normal people there is a bend

2   to the spine which decreases the available space.  So, getting

3   into the space is the difficulty here.  Not in, -- not in, --

4   not like you're having to force an object past a very strong

5   portion of the body.  It's because of the fact that the

6   vertebrae will line up the way that they do that the spaces are

7   basically potential spaces.  It's kind of like if you have to a

8   spinal tap on a baby or an adult.  The doctors and nurses do all

9   sorts of manipulations to the back to open up the little tiny

10  space in which we're going to put in a needle to remove spinal

11  fluid.  You can't just walk up to somebody and get into that

12  space.

13          MR. ADAMS:  Okay.  And when you said that the person

14  who delivered this blow was either really lucky or really good,

15  do you mean that if he was not really lucky that he must have

16  had some type of special training in order to be able to deliver

17  this blow?

18          DR. GEORGE NICHOLS:  Some type of experience whether

19  it's special training.  I mean, I'm sure that certain hunters

20  use this particular maneuver to, -- to more humanely dispatch

21  their, -- their injured, but not dead prey.

22          MR. ADAMS:  So, special training or special experience

23  in having delivered this type of blow?

24          DR. GEORGE NICHOLS:  Yes.

25          MR. ADAMS:  Would you, -- would it be fair for me to



1  say that if the person was really good and really knew what they

2  were doing that they had delivered this type of blow before?

3            DR. GEORGE NICHOLS:  Yes, but it doesn't have to be on

4  a person.  It could be on an animal.

5            MR. ADAMS:  I understand.  I understand that

6  completely.  So, from your experience in what you've seen is it

7  a fair statement for me to make that the person that delivered

8  this blow either had experience in hunting and dealing with

9  animals and killing them humanely or that he had special

10 experience and special training in the killing of human beings?

11           DR. GEORGE NICHOLS:  Or he was lucky.

12           MR. ADAMS:  Or he was dead lucky?

13           DR. GEORGE NICHOLS:  Yes.  Correct.

14           MR. ADAMS:  Okay.  All right.  Dr. Nichols, could you

15 tell me please what, -- at what temperature can you expect the

16 human body to freeze?  I mean, is it like 32 degrees like water?

17           DR. GEORGE NICHOLS:  It will freeze at 32 degrees, but

18 it's going to take some time for it to happen especially if it's

19 clothed.

20           MR. ADAMS:  How long would it take for it to happen?

21           DR. GEORGE NICHOLS:  That depends upon whether or not

22 the relative body fat content.  It depends upon the clothing.

23 Whether or not the clothing is moist.  Depends upon whether or

24 not there is any wind.

25           MR. ADAMS:  Okay.  I sent you the climatological

1   survey for the period in question.  Is that correct?

2            DR. GEORGE NICHOLS:  You certainly did.

3            MR. ADAMS:  And that was what, a year, year and a half

4   ago?  What's the cover letter on there, George?

5            DR. GEORGE NICHOLS:  Well, Mr. Adams, I hate to tell

6   you, that's two years ago.

7            MR. ADAMS:  Two years ago.  Okay.  Now, what we see in

8   this climatological information that was furnished to us by the

9   authorities is that if you would go, -- let me make sure we're

10  on the same page here.  That would be for the month of April.

11           DR. GEORGE NICHOLS:  All right.  Let me find it.

12           MR. ADAMS:  It would be behind the second one.

13           DR. GEORGE NICHOLS:  It is.

14           MR. ADAMS:  (Inaudible).

15           DR. GEORGE NICHOLS:  Right.

16           MR. ADAMS:  Right here.

17           DR. GEORGE NICHOLS:  Got it.

18           MR. ADAMS:  Is that April?

19           DR. GEORGE NICHOLS:  It says, March.

20           MR. ADAMS:  April is the, --

21           DR. GEORGE NICHOLS:  Right.  Here.  Do me a favor.

22  Okay.

23           MR. ADAMS:  You can mark by the arrows.  Right here.

24  Elizabeth Town and Hardensberg and Lychfield.  Closest

25  surrounding.  We have marked there by arrows, doctor, Elizabeth

1  Town, Hardensberg, and Lychfield.  Correct?

2          DR. GEORGE NICHOLS:  Yes.

3          MR. ADAMS:  Now, we see that the high temperatures, --

4  let's go to Elizabeth Town, go from 56 to 59 degrees from the

5  first to the, -- I'm sorry.  Not 59, 51.  From 1st to the 5th of

6  April of 1992.  Is the correct?

7          DR. GEORGE NICHOLS:  Correct.

8          MR. ADAMS:  And then you have lows going from 22 to

9  31.  Is that correct?

10          DR. GEORGE NICHOLS:  That is correct.  Actually, --

11  yes, that is correct.

12          MR. ADAMS:  And if we look at the 3rd day of the month

13  all the way down you go to Hardensberg, that's 22 degrees.  And

14  if you go to Lychfield, the low is 20 degrees.  Is that correct

15  information I've given you?

16          DR. GEORGE NICHOLS:  Yes.

17          MR. ADAMS:  That particular evening with the low of

18  down to 20 degrees, the 3rd would have been Friday night,

19  Saturday morning.  Is that insufficient time and insufficient

20  temperature for a body to freeze if it's left out in the

21  elements?

22          DR. GEORGE NICHOLS:  I don't know.

23          MR. ADAMS:  Okay.

24          DR. GEORGE NICHOLS:  There are a whole bunch of

25  questions that you want answered, prosecution wants answered,

1  and the jury wants answered that the fact is we don't have the

2  data on.  And the reason why is we haven't killed enough people

3  and done experiments with them.  Because that's what we would

4  have to do.

5           MR. ADAMS:  I'm very proud of you, Dr. Nichols, for

6  not doing that.  I'm not, -- you've known me for a long time.

7  You know I'm not trying to badger you or anything.  I'm just

8  trying to get to what's going on here.

9           DR. GEORGE NICHOLS:  No, the answer is, I don't know.

10          MR. ADAMS:  Right.

11          DR. GEORGE NICHOLS:  Because, -- because of the fact

12 that, -- that even though it's cold, it's 20 degrees, she has, -

13 - her body has been, -- has been as high as in the 50s.  As to

14 whether or not the exposure to 20, -- 20 degree climate that

15 night, clothed, lying in a, -- in proximate, -- actually, on the

16 ground, which is going to be warmer, she would have frozen, I

17 don't know.

18          MR. ADAMS:  Okay.  Let me ask you this.  Had she

19 frozen, would there have, -- would you have been able to see any

20 signs of it in your autopsy?

21          DR. GEORGE NICHOLS:  No.  It would have been noticed

22 in the field.

23          MR. ADAMS:  Been noticed in the field?

24          DR. GEORGE NICHOLS:  Correct.

25          MR. ADAMS:  Explain that to me, please.

PROCEEDINGS - 2.28.95                                    February 28, 1995
COMMONWEALTH OF KY vs GARR KEITH HARDIN                              165

1          DR. GEORGE NICHOLS:  By palpating of the body.

2   Tissues, human tissues, when they freeze are just, -- behave

3   just exactly the same as other mammalian tissues.  That if you

4   go to the grocery store, you know by feeling, touch whether or

5   not the chicken is frozen or not.

6          MR. ADAMS:  So, if the body had froze on Friday night,

7   Saturday morning, there is no way that your autopsy could have

8   told us anyway?

9          DR. GEORGE NICHOLS:  That's correct.

10         MR. ADAMS:  Okay.  And just as you differed, --

11         DR. GEORGE NICHOLS:  Well, let me say one thing.

12  Excuse me.

13         MR. ADAMS:  Yes, sir.

14         DR. GEORGE NICHOLS:  It clearly could not have frozen

15  all the way through.

16         MR. ADAMS:  Oh, I understand.

17         DR. GEORGE NICHOLS:  You're talking about partial

18  freezing?

19         MR. ADAMS:  Absolutely.

20         DR. GEORGE NICHOLS:  Okay.

21         MR. ADAMS:  Absolutely.  Right.  Okay.  And just as

22  you differed to Coroner Adams as to, I think, the coroner here

23  that his opinion is that she was killed at the scene because of

24  the amount of blood, would you also differ to whatever experts

25  were at the scene as to whether or not the body was fresh?

1          DR. GEORGE NICHOLS:  Of course.  It is, by the way,

2   Coroner Adams.  Mr. Adams.

3          MR. ADAMS:  Okay.  I just wanted to make sure.  Sorry.

4   Okay.  So, bottom line from state medical examiner's view here

5   as far as time of death, there is absolutely no way that you can

6   tell us anything about it at all?

7          DR. GEORGE NICHOLS:  Impossible for me to say that.

8          MR. ADAMS:  Except to say that lividity had set up and

9   there was lividity in the body?  The settling of the blood.

10          DR. GEORGE NICHOLS:  Lividity was set up, it was

11  fixed, it was on the frontal surface of her body.

12          MR. ADAMS:  And under the conditions as you know them

13  to be from me furnishing you with this information, can you give

14  us a rough idea of how long it would have taken for that

15  lividity to sit up?  To set up.

16          DR. GEORGE NICHOLS:  The lividity would have started

17  from the time that she died.  It would have been present, -- it

18  would have been present in an observable fashion within

19  approximately four hours.  It would have been, -- would have

20  been fully developed within approximately eight hours and set

21  within eight hours.  It however would not have gone away for a

22  substantial amount of time because of the fact that it's cold.

23          MR. ADAMS:  Okay.  And if the investigators that

24  arrived at the scene and found the body and if they say that

25  they saw lividity there, then the best thing you can tell us

1  that the body had been there for a minimum of four hours?

2          DR. GEORGE NICHOLS:  Or like eight if they push on it

3  and it doesn't go away.

4          MR. ADAMS:  Okay.  If they touched it?

5          DR. GEORGE NICHOLS:  I'm, -- they, -- I'm sure they

6  touched her.

7          MR. ADAMS:  Maybe.  All right.  Four to eight hours?

8          DR. GEORGE NICHOLS:  Yes.  At the minimum.

9          MR. ADAMS:  At the minimum. Okay.  See if I have

10  anything else.  Are you familiar with a condition, -- I'm going

11  to try to pronounce this correctly, osteochondrodysplasia.

12          DR. GEORGE NICHOLS:  Osteochondrodysplasia.

13          MR. ADAMS:  Okay.  Now, do you know that term means?

14          DR. GEORGE NICHOLS:  Yeah.  It's an abnormality of the

15  growth of the bone and the cartilage at the end of the bone.

16          MR. ADAMS:  Okay.  If a person suffered from that

17  disease in their right arm and had been operated on that right

18  arm, would you expect to see a lessening, -- a great lessening

19  of the strength in that right arm?

20          DR. GEORGE NICHOLS:  Depends upon what procedure is

21  performed.

22          MR. ADAMS:  Okay.

23          DR. GEORGE NICHOLS:  And the answer is, I don't know.

24          MR. ADAMS:  Okay.  Dr. Nichols, thanks very much.

25          DR. GEORGE NICHOLS:  You're welcome.

1          THE COURT:  Mr. Rogers.

2          MR. ROGERS:  I don't have any questions, Your Honor.

3          MR. SMITH:  Very brief.

4          THE COURT:  Mr. Smith.

5          MR. SMITH:  Dr. Nichols, were her panties or underwear

6   that you took off, were they intact?

7          DR. GEORGE NICHOLS:  Yes.

8          MR. SMITH:  No damage to them that you could see?

9          DR. GEORGE NICHOLS:  No.

10          MR. SMITH:  And you can't tell us whether there were

11   two people, three people, or one person that inflicted these

12   wounds?

13          DR. GEORGE NICHOLS:  That's correct.

14          MR. SMITH:  And these wounds could have been inflicted

15   by different types of knives?

16          DR. GEORGE NICHOLS:  That is correct.  Given certain

17   parameters.

18          MR. SMITH:  Right.  Do you remember the whether or not

19   the inside of the body was very cold or not?  And maybe that's a

20   bad question.

21          DR. GEORGE NICHOLS:  That's a fair question.  That is

22   a fair question considering the fact that we're now, -- we have

23   just finished pretty much finished winter.  Bodies that are

24   exposed to extremes of temperature for a substantial amount of

25   time will cause actual frostbite to occur on the fingers or at

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1    least "maximum cold discomfort" including sometimes frostbite on

2    the fingers of the doctors and technicians who are performing

3    the exam.  I felt and remembered no experience resembling cold

4    exposure to my fingers.

5              MR. SMITH:  And the body came to you in a plastic bag

6    or a body bag?

7              DR. GEORGE NICHOLS:  A body bag.  Yes.

8              MR. SMITH:  Okay.  I'm going to hand you what has been

9    marked for identification purposes as Commonwealth's Exhibits

10   58, 59, 60, and 61.  Let the record reflect that I've previously

11   shown them to opposing counsel.  Please take a second and review

12   those pictures, Dr. Nichols.  Can you identify those pictures,

13   Dr. Nichols?

14             DR. GEORGE NICHOLS:  Yes.  These are, -- these are

15   photographs of the decedent.

16             MR. SMITH:  And do those photographs fairly and

17   accurately portray and depict the decedent at the time that you

18   performed the autopsy and the wounds that you have been

19   describing for us here today?

20             DR. GEORGE NICHOLS:  Yes.

21             MR. SMITH:  We'll move to introduce into evidence,

22   Your Honor, pursuant to the previous identification marks on the

23   pictures.

24             THE COURT:  Mr. Adams?  Mr. Rogers?

25             MR. ADAMS:  No objection, Judge.

1          MR. ROGERS:  No objection.

2          THE COURT:  Let them be marked.

3          MR. SMITH:  I don't have any further questions, --

4          THE COURT:  After you mark them, pass them up to me.

5          MR. ADAMS:  Oh, I do.  Dr. Nichols, you have seen

6   photographs of the scene, --

7          THE COURT:  Can't leave them at the Clerk.  If you

8   introduce them, leave them with the Clerk.

9          MR. SMITH:  I will.  I was, -- as soon as he got

10  finished, I've got some other ones that's previously been

11  introduced and I was going to show them to the jury that I

12  hadn't yet.  I was trying to keep them separate.

13         THE COURT:  Okay.

14         MR. ADAMS:  You have seen photographs of the scene

15  that you know that the young lady was found just outside of a

16  tree line with a pretty dense woods?

17         DR. GEORGE NICHOLS:  Yes.

18         MR. ADAMS:  You were aware of that?  And in your

19  experience and obviously, I don't know the answer to this

20  question or I wouldn't be asking it.  In your experience when

21  you find somebody that has been, -- if the Commonwealth's theory

22  that she was out there from the 2nd, I guess they are trying to

23  alleged 2:30, three o'clock, whatever, a.m. Thursday the 2nd

24  until Sunday the 5th at about 7:30 or eight o'clock.  We're

25  talking about Thursday morning, all of Friday, all of Saturday,

1  and Sunday morning.  Do you expect to see any type of

2  decomposition when you see a body that may have been dead for

3  that long?  That's the first question and secondly, I know that

4  you've done autopsies on persons that have suffered from animals

5  coming up and tearing at their skin after they have been killed,

6  would you expect to see that in a person that's been in an open

7  woods or dead for four days?

8        MR. SMITH:  Answer to the first question.  Given the,

9  -- given the climatological data, I doubt it.  The average

10  temperature is somewhere around 42 degrees, which is just about

11  exactly the same as the temperature of the morgue.  Meaning, no

12  decomposition because the temperature is such that would inhibit

13  bacterial growth.  So, I would not expect to find much of that.

14        MR. SMITH:  Now, wait a minute.  Unless the doctor is

15  familiar with the Dead Horse Holler area, --

16        THE COURT:  Wait a minute.  If we're going to argue

17  something, let's do it in my office.

18        MR. SMITH:  Yeah.  I'm sorry.

19        THE COURT:  If you'll excuse us a moment, please.

20  ---

21        THE COURT:  Doctor, whether or not you've been to Dead

22  Horse Holler, I'm going to let you answer the question if you

23  can.

24        DR. GEORGE NICHOLS:  Thank you, Your Honor.  I haven't

25  been there, but I do, -- I do as a matter of fact possess a ball

1  cap from the tavern in the same location.

2          THE COURT:  You are a member of the elite few.

3          DR. GEORGE NICHOLS:  Thank you.

4          THE COURT:  Okay.  Let's go forwards, Mr. Adams.

5          MR. ADAMS:  In your experience, Dr. Nichols, would you

6  expect a body that was found next to a heavily wooded area where

7  you might expect to have animals there to be unmarked by animals

8  or attacked by animals if it's been there for a period of four

9  days?

10         DR. GEORGE NICHOLS:  Obviously, the longer that it's

11 exposed in the area that we're talking about, the greater the

12 chance that it's going to have post mortem carnivore activity in

13 terms of whether it should have happened that day or within one

14 day period or a four day period, I can't answer that.

15         MR. ADAMS:  I knew you were going to say that.

16 Thanks.

17         THE COURT:  Anybody else?

18         MR. SMITH:  No.  Judge, -- doc, when the body was

19 delivered to you, it was fully clothed, is that correct?

20         DR. GEORGE NICHOLS:  Yes.

21         MR. SMITH:  Panties were on underneath her sweatpants,

22 that's correct?

23         DR. GEORGE NICHOLS:  Yes.

24         MR. SMITH:  Okay.  You found hairs on her panties that

25 turned out to be animal hair, correct?  Or do you know?

1          DR. GEORGE NICHOLS:  I didn't not subsequent, -- I

2  didn't analyze it.  I don't know what it turned out to be.

3          MR. SMITH:  All right.

4          DR. GEORGE NICHOLS:  I recover.

5          MR. SMITH:  But there were, -- there were hairs taken

6  off her panties underneath her sweatpants?

7          DR. GEORGE NICHOLS:  Yes.

8          MR. SMITH:  Okay.  And so, you haven't seen the KSP

9  report as to what the, --

10          DR. GEORGE NICHOLS:  It's not in my case file.

11          MR. SMITH:  And, -- and there would be no way of

12  knowing how long those hairs had been on there?

13          DR. GEORGE NICHOLS:  That's, -- I don't even know for

14  sure that that's what they are.

15          MR. SMITH:  Okay.

16          DR. GEORGE NICHOLS:  I don't know.

17          MR. SMITH:  But you sent that off to be analyzed by

18  the KSP lab?

19          DR. GEORGE NICHOLS:  No.  I gave that to Sheriff

20  Greer.

21          MR. SMITH:  To Sheriff Greer.  Okay.  Thank you, sir.

22          THE COURT:  We all finished?

23          MR. SMITH:  Yeah.

24          THE COURT:  Doctor, thank you ever so much for being

25  with us.