EXHIBIT
135



MR. SMITH: We'll call Mrs. Warford, your Honor, Mary Warford.

THE COURT: Bring her around, please. Ma'am, if you would, come around to my right there at the base of the step. Stop there. Now, face me and raise your right hand. Do you solemnly swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. WARFORD: I do.

THE COURT: Please be seated. Okay. Mr. Smith, you may go forward, sir.

MR. SMITH: Tell us your full name for the record, please.

MS. WARFORD: Mary Alice Warford.

MR. SMITH: And, Ms. Warford, tell me, do you have any daughters?

MS. WARFORD: Yes, I do.

MR. SMITH: And what are their names?

MS. WARFORD: Tammy, Michelle, Rhonda.

MR. SMITH: Now, Tammy -- what's Tammy's last name?

MS. WARFORD: Rogers.

MR. SMITH: And what's Michelle's last name?

MS. WARFORD: Rogers.

MR. SMITH: Do you have any sons?

MS. WARFORD: Yes.

MR. SMITH: What's his name?

MS. WARFORD: Jeff.

MR. SMITH: Are you married?

MS. WARFORD: Yes.

MR. SMITH: Who are you married to, Ms. Warford?

MS. WARFORD: James Warford.

MR. SMITH: Now -- and Rhonda Sue Warford was your daughter.

MS. WARFORD: Yes.

MR. SMITH: How old was Rhonda Sue Warford in April of 1992?

MS. WARFORD: 19.

MR. SMITH: Where did you live in April of 1992, Ms. Warford?

MS. WARFORD: 104 East Whitney Avenue, Louisville, Kentucky.

MR. SMITH: Now, whereabouts is that?

MS. WARFORD: It's off of 3rd Street in the south end.

MR. SMITH: If you were going there from Brandonburg, like -- well, did you come down here this morning?

MS. WARFORD: Yes.

MR. SMITH: That was a stupid question. I'm sorry. What I want to get at is how you got here. Let's talk about it so it might be easier for us to understand, such as myself who apparently seems very stupid. How did you go home last night?

MS. WARFORD: We -- I don't know the name of these streets here, but we went out here and made a --

MR. SMITH: Did you go up Dixie Highway?

MS. WARFORD: Right.

MR. SMITH: All right.

MS. WARFORD: Yes.

MR. SMITH: From the time that you're on Dixie Highway, tell me how you get to your house.

MS. WARFORD: We go straight down Dixie Highway and sometimes we go straight and sometimes we take the Gene Snyder Freeway.

MR. SMITH: All right. If you go straight down Dixie Highway, how do you get there?

MS. WARFORD: Well, we turn on -- I think it's West Pages Lane and go around that way.

MR. SMITH: All right. And once you get on West Pages Lane, do you turn right on West Pages off of Dixie or left?

MS. WARFORD: Right.

MR. SMITH: You turn right, and after you go down West Pages Lane, where do you go? And I don't remember street names very well myself, but just generally tell us.

MS. WARFORD: I think it brings you out -- back out to 3rd Street, back around in that vicinity.

MR. SMITH: All right. And do you, yourself, drive, Ms. Warford?

MS. WARFORD: Yes.

MR. SMITH: And if you go up Gene Snyder, how do you go?

MS. WARFORD: Straight -- straight through --

MR. SMITH: And what road --

MS. WARFORD: -- get off the --

MR. SMITH: -- do you take off of Gene Snyder?

MS. WARFORD: Southern Parkway and 3rd Street ramp.

MR. SMITH: Okay. And is East Whit -- did you say East Whitney?

MS. WARFORD: Right.

MR. SMITH: Is east Whitney off of Southern Parkway or 3rd Street?

MS. WARFORD: It's off of 3rd Street.

MR. SMITH: 3rd Street and Southern Parkway run together, don't they?

MS. WARFORD: They're side by side.

MR. SMITH: Okay. Good. And that's the area that you live in?

MS. WARFORD: Right.

MR. SMITH: All right. Do you still live there, Ms. Warford?

MS. WARFORD: Yes.

MR. SMITH: Now, who lived there with you in April of 1992?

MS. WARFORD: My husband, James, Rhonda, and my son, Jeff.

MR. SMITH: Now, I want to take you back to the date of April of 1992. Okay? Now, on that day, did Rhonda go out anywhere on that day?

MS. WARFORD: April the 1st?

MR. SMITH: Or prior -- and I'm talking about prior to that night, yes.

MS. WARFORD: Not until 7:00 that afternoon.

MR. SMITH: All right. Do you know where she went?

MS. WARFORD: Down the street to Kroger's.

MR. SMITH: All right. And she came back from there?

MS. WARFORD: Right.

MR. SMITH: Now, what time -- tell us whether or not Rhonda told you anything about having any plans to go out that night.

MS. WARFORD: No.

UNIDENTIFIED: Objection.

THE COURT: I'll let her answer the question.

MS. WARFORD: No.

MR. SMITH: On other occasions if Rhonda was going out, would she tell you?

MS. WARFORD: Yes. She told me every -- she told me every time she'd go somewhere.

MR. SMITH: Where she was going?

MS. WARFORD: Always knew where she's at.

MR. SMITH: Where she was going and what time she'd be home?

MS. WARFORD: Right. Or she'd tell up on me, let me know if she wasn't coming back home.

MR. SMITH: Now, after Rhonda got back from Kroger's that day, did you see her?

MS. WARFORD: Yes.

MR. SMITH: What were the color of her clothes that she had on, at that time, Ms. Warford?

MS. WARFORD: She had on white stretch pants and her UNLB jacket.

MR. SMITH: Now, you later turned in a missing person's report on Rhonda.

MS. WARFORD: Right. The next day.

MR. SMITH: And what were the color of clothes that you listed on that missing person's report?

MS. WARFORD: White stretch pants.

MR. SMITH: Now, did you later find out that she didn't have on those white stretch pants?

MS. WARFORD: I didn't know until Sunday afternoon.

MR. SMITH: How did you find out that she didn't have on those white pants?

MS. WARFORD: I found them in the dirty clothes, in my laundry room.

MR. SMITH: Excuse me a minute, Ms. Warford. Ms. Warford, I would like to show you what has been marked for identification purposes as Commonwealth Exhibit 116. And I ask you if you can identify this exhibit?

MS. WARFORD: Can you turn them around so I can see the front part of them, please? Can I touch them?

MR. SMITH: Absolutely.

MS. WARFORD: Yes.

MR. SMITH: All right. What -- whose pants are these?

MS. WARFORD: They were mine.

MR. SMITH: Now, on the night of April the 1st of 1992, tell us whether or not those pants had been washed and were clean.

MS. WARFORD: Yes, they were clean.

MR. SMITH: Now -- and they belong to you?

MS. WARFORD: They're mine.

MR. SMITH: Now, let's talk about what happened after Rhonda got back from Kroger's. First of all, do you all live in a house or an apartment?

MS. WARFORD: House.

MR. SMITH: And where -- did Rhonda have her own bedroom?

MS. WARFORD: Yes.

MR. SMITH: Do you and your husband have your own bedroom?

MS. WARFORD: Yes.

MR. SMITH: Did your son have his own bedroom?

MS. WARFORD: Yes.

MR. SMITH: How many phones were in the house?

MS. WARFORD: One.

MR. SMITH: Where was that phone at?

MS. WARFORD: It was in my living room at the time.

MR. SMITH: All right. At what time?

MS. WARFORD: What time are you speaking of?

MR. SMITH: Okay. Well, Rhonda is back from Kroger's, some time --

MS. WARFORD: After --

MR. SMITH: -- after 7:00 rolled in.

MS. WARFORD: In the living room.

MR. SMITH: All right. Did that phone have a long cord on it?

MS. WARFORD: Yes, it had a long cord.

MR. SMITH: Would you all carry that phone from room to room?

MS. WARFORD: Right.

MR. SMITH: Now, what time did you go to bed that night?

MS. WARFORD: Around 12:15, 12:20.

MR. SMITH: Now, were you awake -- strike that -- tell us whether or not you heard Rhonda call Crystal Barnes.

MS. WARFORD: Yes.

MR. SMITH: Were you awake at that point in time?

MS. WARFORD: Yes.

MR. SMITH: And what point in time was that?

MS. WARFORD: Twenty minutes to 11:00.

MR. SMITH: All right. You're up. Rhonda makes a phone call to Crystal Barnes about 20 minutes before 11:00; is that right?

MS. WARFORD: Right.

MR. SMITH: Were there any other calls that came into the house before you went to bed?

MS. WARFORD: No.

MR. SMITH: And, then, you went to bed 12:00 to 12:15?

MS. WARFORD: I had to make my husband's lunch first. I quit watching TV at 12:00. I got into bed about 12:15 to 12:20.

MR. SMITH: All right. You quit watching TV at 12:00, made your husband's lunch, and then you went to bed?

MS. WARFORD: Right.

MR. SMITH: When you went to bed, where was the telephone?

MS. WARFORD: In the living room, where Rhonda set it back down.

MR. SMITH: That's where the phone is when you went to bed?

MS. WARFORD: Yes.

MR. SMITH: Now, if the phone is in the living room and you're in your bedroom and it rings, can you hear it?

MS. WARFORD: No.

MR. SMITH: If the phone is in Rhonda's room and if it rings, and you're in your bedroom, can you hear it?

MS. WARFORD: No.

MR. SMITH: What is the next thing that you remember, after going to bed, Ms. Warford?

MS. WARFORD: I was -- I was in bed for about five minutes and she comes into my bedroom.

MR. SMITH: All right.

MS. WARFORD: And gets into my purse. And I can hear her getting the keys out and I asked her where she is going.

MR. SMITH: What did she say?

MS. WARFORD: She said, down here.

MR. SMITH: Down here?

MS. WARFORD: That's all she said.

MR. SMITH: Had she ever used that term, down here, before?

MS. WARFORD: Not just two words.

MR. SMITH: Now, tell us whether or not that's the last time you saw her alive.

MS. WARFORD: Yes.

MR. SMITH: Now --

MS. WARFORD: Excuse me, I didn't really -- I couldn't really see her. I could only hear her. That's why I did not know she had changed clothes.

MR. SMITH: Okay. All right. It's dark in your bedroom?

MS. WARFORD: Right.

MR. SMITH: Now, what did you do next? Go to sleep?

MS. WARFORD: Yes, I sure did.

MR. SMITH: What time the next morning did you wake up, if you remember?

MS. WARFORD: 4:30 in the morning.

MR. SMITH: Why did you get up so early?

MS. WARFORD: I had to use the bathroom.

MR. SMITH: All right.

MS. WARFORD: And, then, I went and checked the room -- checked to see if she's back, but she wasn't. And I went and locked all my locks on my door.

MR. SMITH: All right. You get up at around 4:30 in the morning to use the bathroom, she's not there. Where is the telephone at that point in time?

MS. WARFORD: I didn't even check to see where it was.

MR. SMITH: Now, when did you get up again?

MS. WARFORD: Around 10:20 that next morning.

MR. SMITH: And what did you do when you got up the next morning?

MS. WARFORD: Well, before I got up, I heard the phone ring two -- two different times, but I didn't get up to answer it. And I got it -- when I did get up, I went straight from the bathroom straight to see if she was in there, but she wasn't and I -- there is where I found the telephone on her bed and I picked it up, and went to the living room with it.

MR. SMITH: The telephone was in her bedroom, on the bed?

MS. WARFORD: Right.

MR. SMITH: All right. Now, I thought you told me earlier that if the phone rang and it was in Rhonda's room that you couldn't hear it in your room.

MS. WARFORD: Well, let me tell you something, the doors were open. My husband got up and went to work that morning.

MR. SMITH: Okay.

MS. WARFORD: He left the doors open.

MR. SMITH: All right. And when you went to bed that night, were the doors open?

MS. WARFORD: We close our doors.

MR. SMITH: And if the doors are closed, can you hear the telephone ring?

MS. WARFORD: No.

MR. SMITH: All right. Now, what, if anything, did you do with the phone the next day?

MS. WARFORD: I pushed redial to see if Rhonda made another call and I got Crystal, my niece.

MR. SMITH: You pushed redial, and on your phone, if you -- what happens on your phone if you push redial?

MS. WARFORD: It gets the person that you made the last call to.

MR. SMITH: So, the next morning you pushed redial and it rang into Crystal?

MS. WARFORD: Right. And she told me that she had called me, so that was -- she was one of the ones that called me that morning that I didn't answer the phone.

MR. SMITH: Okay. The phone rang twice that morning --

MS. WARFORD: Right.

MR. SMITH: Now, do you have anything on that telephone that allows you to tell who has called in?

MS. WARFORD: Yes, *69.

MR. SMITH: *69?

MS. WARFORD: Yes.

MR. SMITH: Well, I have awful lot of trouble with mechanical devices. Now -- so, I don't know -- I can't even program a VCR or anything else. Tell me what you mean by *69.

MS. WARFORD: You push *69 and it gives you back the last person that called into your home.

MR. SMITH: And is *69 -- is that the little funny

looking thing, is that what you're calling the star on a telephone?

MS. WARFORD: Right.

MR. SMITH: All right.

MS. WARFORD: Then, 6 and 9.

MR. SMITH: And it's a key that you push?

MS. WARFORD: Right.

MR. SMITH: And then the number 69?

MS. WARFORD: Right.

MR. SMITH: All right. So, you got up, you press redial and you got Crystal.

MS. WARFORD: Right.

MR. SMITH: And, then, you pressed *69 and what happened then?

MS. WARFORD: I didn't push *69 because the two calls I got that morning blocked that call out if she had got a call that night.

MR. SMITH: So, if you press *69, that would let you know the last --

MS. WARFORD: Call that --

MR. SMITH: -- call that came in.

MS. WARFORD: Right, right.

MR. SMITH: Right. And you knew that you had gotten those calls that morning.

MS. WARFORD: Right.

MR. SMITH: All right. Now, had you ever -- first of all, where was Rhonda's purse and billfold the next morning?

MS. WARFORD: In her room.

MR. SMITH: Now, had you ever seen Rhonda go out before like that without her billfold and purse?

MS. WARFORD: She didn't take her purse all the time.

MR. SMITH: What about her --

MS. WARFORD: But most of the time she took her purse.

MR. SMITH: And what about her billfold?

MS. WARFORD: Well, it was inside her purse, so it went along with the purse.

MR. SMITH: Now, was the defendant, Keith Hardin, ever in your home, March of 1992?

MS. WARFORD: Yes.

MR. SMITH: What would be the occasions when the Defendant, Keith Hardin, would be in your home?

MS. WARFORD: Come see Rhonda.

MR. SMITH: Did you ever feed him over there?

MS. WARFORD: Yes, he ate at my house.

MR. SMITH: You saw him eat?

MS. WARFORD: Yes.

MR. SMITH: And did you ever see him write over at your house?

MS. WARFORD: Yes.

MR. SMITH: Was he right or left-handed?

MS. WARFORD: Left-handed.

MR. SMITH: Were you ever around the defendant, Clark?

MS. WARFORD: Two or three times.

MR. SMITH: Where did you see him at?

MS. WARFORD: In my home.

MR. SMITH: Was he right or left-handed?

MS. WARFORD: He was right-handed.

MR. SMITH: Now, during the time -- were you in the courtroom when we were questioning the jury, earlier in this trial -- right before the trial got started?

MS. WARFORD: Yes, the very beginning.

MR. SMITH: Did you observe the two defendants writing in this courtroom?

MS. WARFORD: Yes, I did.

MR. SMITH: What did you observe about the two defendants writing in this courtroom?

MS. WARFORD: Keith was writing right-handed and Jeff was writing left-handed.

MR. SMITH: Now, what, if anything, did you know about the defendant, Hardin, and this devil worship stuff we've been hearing about?

UNIDENTIFIED: (Inaudible).

THE COURT: Whom? Do you want your objection to the form of the question?

UNIDENTIFIED: Since the question is directed at Mr.

Hardin. I don't know if I have any standing at this point.

THE COURT: You're not objecting to the form?

UNIDENTIFIED: Asking if she knows anything about it. I --

THE COURT: How long?

UNIDENTIFIED: What she knows.

THE COURT: (Inaudible).

MR. SMITH: You can answer Ms. Warford, if you remember.

MS. WARFORD: All I remember seeing was Ouija Board in his trunk of his car.

MR. SMITH: Did you --

MS. WARFORD: And hearing about a knife under the front seat of his car.

MR. SMITH: You heard about a knife under the front seat of the defendant, Hardin's --

MS. WARFORD: Right.

MR. SMITH: -- car? Did you ever observe the inverted cross that had been placed on your daughter?

MS. WARFORD: No.

MR. SMITH: Didn't know anything about it?

MS. WARFORD: No.

MR. SMITH: Did -- tell us whether or not you ever saw Rhonda Sue Warford leave the house in this manner before that night.

MS. WARFORD: No.

MR. SMITH: You saw your daughter that day, previous that day, on occasion. You were around each other.

MS. WARFORD: Yes.

MR. SMITH: What was her demeanor, what did you observe about her?

MS. WARFORD: I couldn't tell anything different. She was the same person.

MR. SMITH: Not bad mood, good mood, just regular?

MS. WARFORD: Good mood, you know, the usual.

MR. SMITH: Now, I'm going to hand you what has been marked for identification purposes as Commonwealth Exhibit No. 1. Handing you Commonwealth Exhibit No. 1, I ask you, Ms. Warford, can you identify that?

MS. WARFORD: It's my daughter, Rhonda.

MR. SMITH: And does that photograph fairly and accurately portray and depict how she looked on or about April the 1st of 1992?

MS. WARFORD: No, she was 18, I believe, on this picture.

MR. SMITH: All right. Does this photograph fairly and accurately portray and depict how she looked when she was 18?

MS. WARFORD: Yes.

MR. SMITH: Had she changed much in looks from --

between the years of 18 and 19?

MS. WARFORD: Her hair wasn't like the same. It was more longer and straight.

UNIDENTIFIED: Judge, we don't have any objection.

MR. SMITH: Thank you.

THE COURT: You'll waive foundation?

UNIDENTIFIED: Yes, we'll waive foundation.

MR. SMITH: Move to introduce, your Honor. Now -- I'm now going to hand you what has been marked for identification purposes as Commonwealth Exhibit No. 2 and I'll ask you if you can identify that.

MS. WARFORD: It's Rhonda's calendar she kept on her door.

MR. SMITH: Did you give that to the detectives?

MS. WARFORD: Yes.

MR. SMITH: Move to introduce the calendar, your Honor, into evidence as Commonwealth Exhibit --

THE COURT: Objections?

MR. SMITH: -- No. 2.

THE COURT: Let it come in. Hand it back to me, (Inaudible).

MR. SMITH: That's all the questions I have, Ms. Warford. Please answer the other lawyers' questions.

MS. WARFORD: Okay.

THE COURT: Mr. Adams, you may cross.

MR. ADAMS: Thank you, Judge. Ms. Warford, when -- were you aware of approximately when Rhonda met Keith Hardin?

MS. WARFORD: Yes.

MR. ADAMS: And tell the ladies and gentlemen of the jury about when that was.

MS. WARFORD: Around the 1st of November of 1992 -- excuse me -- '91.

MR. ADAMS: '91.

MS. WARFORD: '91.

MR. ADAMS: Okay. About the 1st of November of '91. And then after a period of time, she actually started dating or going with Mr. Hardin; is that correct?

MS. WARFORD: She met Jeff Clark first.

MR. ADAMS: Right. I understand that. And, then -- but after a period of time --

MS. WARFORD: He introduced Keith to Rhonda and it was within, I'd say, the next couple weeks.

MR. ADAMS: That they started actually dating?

MS. WARFORD: Yes.

MR. ADAMS: Okay. And Rhonda spent the night over at the trailer several times, correct?

MS. WARFORD: Right.

MR. ADAMS: And every time that she did that, she would call you and let you know where she was?

MS. WARFORD: She wouldn't call me because he had his

phone took out.

MR. ADAMS: Well --

MS. WARFORD: She would tell me before she --

MR. ADAMS: She would tell you --

MS. WARFORD: -- left.

MR. ADAMS: -- beforehand.

MS. WARFORD: Right.

MR. ADAMS: She had absolutely no problem whatsoever ever telling you that she was with Keith, correct? She always told you she was with him?

MS. WARFORD: Or going somewhere with him.

MR. ADAMS: Or going somewhere with him. Okay. Was it her -- in reading some of this discovery, it appears that from time to time, she might go out for a pack of cigarettes or something and then just come back? So --

MS. WARFORD: It was down the street.

MR. ADAMS: Okay. And when she went down to get a pack of cigarettes or whatever it might be, did she just say, I was going down the street or I'm going down there? Is that how she usually described it?

MS. WARFORD: No.

MR. ADAMS: Tell the ladies and gentlemen of the jury what she would say.

MS. WARFORD: She would say, mom, can I have some money for cigarettes? I'm going to the store to get cigarettes.

Buy me a pack of cigarettes.

MR. ADAMS: Okay. But she did use the term that she was going down for cigarettes or she was going down there in the past when she was going to get cigarettes; is that correct?

MS. WARFORD: No.

MR. ADAMS: It's not correct?

MS. WARFORD: My girl has always referred to the store as going to Kroger's.

MR. ADAMS: Okay.

MS. WARFORD: Not going down there, down here.

MR. ADAMS: Well, what did you take it that evening to mean when she said she was going down there? Did you take it to mean anything?

MS. WARFORD: That's the only two words she said to me. I -- you know --

MR. ADAMS: Okay.

MS. WARFORD: I was drifting away.

MR. ADAMS: Sure. Did she have -- not have her own set of keys to the house?

MS. WARFORD: No.

MR. ADAMS: She did not?

MS. WARFORD: Uh-uh.

MR. ADAMS: So, whenever she left or came back in, you always had to let her in, if the door was locked?

MS. WARFORD: Right. Her father or me or her brother.

MR. ADAMS: All right. Did -- when she got in your purse that particular evening, do you know whether or not she took a buck or two, or did she take any money at all --

MS. WARFORD: No.

MR. ADAMS: -- do you know? Okay. And in the past, whenever she went anywhere with Keith, she would always tell you that she was going to be with Keith and where she would be; is that correct?

MS. WARFORD: Right.

MR. ADAMS: Thank you. That's all I have.

THE COURT: Mr. Rogers?

MR. ROGERS: Mr. -- may we approach just a second before I ask a question? Judge, obviously, I want to ask her about the information she gave to the police concerning a strange man following Rhonda home from Kroger's. Now, obviously, that's hearsay, but she has testified to hearsay in saying Rhonda was going down here or something like that. I think that it should be admissible for the purposes of showing that there might be some -- something else involved here, other --

THE COURT: Let's go in my chambers and talk about this.

(IN CHAMBERS)

THE COURT: Let's come back to order. Ladies and gentlemen, we have agreed among the attorneys that we're going

to modify the procedure with respect to the examination of Ms. Warford to some extent. Mr. Rogers has agreed to temporarily terminate his cross examination and let the Commonwealth go back and present some additional information on direct. So, Mr. Smith, you may go forward.

MR. SMITH: Ms. Warford, were you aware that Kroger's closed at 12:00?

MS. WARFORD: Yes.

MR. SMITH: Now, when Rhonda went to Kroger's earlier in the day and when she -- around 7:00 I think you told us earlier. All right? When she got back from Kroger's, did she tell you anything about seeing any man say anything to her?

MS. WARFORD: She said an old, dirty-looking man followed her back up the street, hollering at her.

MR. SMITH: An old, dirty-looking man followed her back up the street from Kroger's hollering at her?

MS. WARFORD: Right.

MR. SMITH: Did she seem scared or anything to you?

MS. WARFORD: No.

MR. SMITH: And what did she say this old, dirty-looking man said to her as he followed her up the street?

MS. WARFORD: She said that he wanted to marry her and her to have his children.

MR. SMITH: And was that all she told you about this --

MS. WARFORD: Yes.

MR. SMITH: -- crazy (inaudible).

MS. WARFORD: Yes.

MR. SMITH: Okay. That's all, your Honor.

THE COURT: Okay, Mr. Rogers.

MR. ROGERS: Ma'am, just to pick up where Mr. Smith left off, had anything like that ever happened before? I mean, had she ever told you anything that happened before?

MR. SMITH: Objection.

THE COURT: Go ahead.

MR. ROGERS: Okay. Had she ever told you or -- that anything had ever happened to her like that before?

MS. WARFORD: No.

MR. ROGERS: Okay. And, apparently, from what I understand, it wasn't anybody she recognized or anything?

MS. WARFORD: No.

MR. ROGERS: Now, isn't it correct that on the night of April the 5th, when the police came to your house and told you that they found Rhonda, you told them about that, didn't you, the guy from Kroger?

MS. WARFORD: I think so, yes.

MR. ROGERS: Yeah, Detective Hope Greer, the blonde headed lady that --

MS. WARFORD: Uh-huh.

MR. ROGERS: Okay. And, then, again on April the 9th,

you told Detective Handy about this guy from Kroger, didn't you?

MS. WARFORD: Yes.

MR. ROGERS: Okay. Do you know of your own personal knowledge or not, ma'am, whether or not the police did any work to follow up on this, try to locate this person or anything?

MS. WARFORD: I don't know if they did or not.

MR. ROGERS: Did the police ever come back and ask you for any additional information about this incident?

MS. WARFORD: No.

MR. ROGERS: Now, when you said Rhonda went to Kroger at 7:00 p.m., how do you know she went to Kroger?

MS. WARFORD: Because she asked me I needed anything from the store and I wrote a check and she took it and got me some things.

MR. ROGERS: So, that's how you know she went to Kroger --

MS. WARFORD: Right.

MR. ROGERS: -- and not some place else? Now, when the police came to your house on April the 5th to tell you Rhonda had been missing, did they tell you at that time that she had been wearing red sweat pants?

MS. WARFORD: I think I got that off the news.

MR. ROGERS: You got that from the news?

MS. WARFORD: Uh-huh, she was reported in red pants.

MR. ROGERS: Now, again, to make sure I'm

understanding here, Rhonda has got this -- you've got this phone in your house with a long phone cord --

MS. WARFORD: Yes.

MR. ROGERS: -- that you can take into the rooms?

MS. WARFORD: Yes.

MR. ROGERS: And when she takes it in her room and closes the doors, you could not hear it ring?

MS. WARFORD: No.

MR. ROGERS: So, if she took the phone in her room while you were in the bedroom, it is possible that she could have gotten a phone call and you wouldn't have heard it come in?

MS. WARFORD: Right.

MR. ROGERS: And, again, as I understand what your testimony was from direct, the only thing that Rhonda told you when she left is she was going -- and I think you said, down here?

MS. WARFORD: Down here.

MR. ROGERS: And she had never said anything to you like that before. So --

MS. WARFORD: No.

MR. ROGERS: Okay. Do you know whether or not Rhonda was in the habit of walking, maybe, to the Kroger parking lot to meet people there?

MS. WARFORD: No, she wasn't.

MR. ROGERS: Was not?

MS. WARFORD: No.

MR. ROGERS: Now, you said you got up about 4:30 in the morning and you checked and she was not there; is that correct?

MS. WARFORD: Right.

MR. ROGERS: At that point in time, were you concerned over her whereabouts?

MS. WARFORD: Not really because she always come back. I knew she'd be back.

MR. ROGERS: Again, did sometimes she stay out late at night or early morning hours like that?

MS. WARFORD: Yes.

MR. ROGERS: And, also, I believe that you said that -- or the way I understood you to put it is that she usually takes her purse out, but she doesn't always?

MS. WARFORD: Yes.

MR. ROGERS: Okay. So, the mere fact that she did leave her purse at home on this occasion was not entirely out of the ordinary?

MS. WARFORD: Wasn't just her purse she left behind. She had four rings and she always wore her rings, always. They were left right -- laying right on her dresser.

MR. ROGERS: And, again, do I understand your direct testimony was that when Rhonda was going somewhere with Keith or going to meet Keith, she always told you about that?

MS. WARFORD: Didn't go -- she didn't go nowhere to meet him.

MR. ROGERS: Okay. But -- so, when she went somewhere with Keith, she told you, I am going with Keith?

MS. WARFORD: Right.

MR. ROGERS: And what you're telling me now is, she never went anywhere to meet Keith; is that correct?

MS. WARFORD: Right. He always picked her up at the house.

MR. ROGERS: Now, in connection with this investigation, isn't it correct that you furnished the police with some names of some people you thought they had to talk to, in connection with Rhonda's disappearance?

UNIDENTIFIED: Write it down.

MS. WARFORD: Could you repeat the question?

MR. ROGERS: Okay. Did -- let me just ask you, did you tell the police they might ought to talk to her ex-boyfriend, James Tyrell?

MR. SMITH: Objection.

THE COURT: I'll let her answer that.

MS. WARFORD: No.

MR. ROGERS: You did not?

MS. WARFORD: No.

MR. ROGERS: Okay. Did you -- how long did she date James?

MS. WARFORD: (No audible answer).

MR. ROGERS: Do you remember about how long she and James went together? Again, about how long did her and James date?

MS. WARFORD: I'm not sure. I think it was around 11, 8, 9 months. I'm not sure.

MR. ROGERS: Okay. And at one time, they were engaged, were they not?

MS. WARFORD: Yes.

MR. ROGERS: Okay. Ultimately ended up -- they didn't get married, they broke off the engagement; is that correct?

MS. WARFORD: (No audible answer).

MR. ROGERS: Did you ever witness James perpetrate any acts of violence against Rhonda?

MR. SMITH: Objection. Withdrawn. Go ahead.

THE COURT: I'm going to let her answer the question.

MS. WARFORD: One time, I saw them arguing in the bedroom. But I never have heard -- saw him hit her.

MR. ROGERS: Did you ever witness an act where James pushed Rhonda off a porch when they were arguing?

MS. WARFORD: No.

MR. ROGERS: And you never told anybody you had seen anything like that?

MS. WARFORD: Think so.

MR. ROGERS: All right. You never saw that, right?

MS. WARFORD: Nope.

MR. ROGERS: Did you furnish the police -- or tell the police that they might ought to talk to a guy named, Tim Geary or Tim Gary?

MS. WARFORD: I brought the name up, yes.

MR. ROGERS: Okay. And that's when you called in Crime Stoppers and talked to a detective and passed that information onto him?

MS. WARFORD: I didn't call them. They called me.

MR. ROGERS: The police called you and asked about that, ma'am? I mean, is that what I understand you to say?

MS. WARFORD: The Crime Stoppers people did, yes.

MR. ROGERS: And where did -- who called you, do you remember?

MS. WARFORD: I don't remember. I could have been Bruce Dunbar. I don't remember.

MR. ROGERS: And Bruce Dunbar is not a police officer, is he, ma'am?

MS. WARFORD: No.

MR. ROGERS: Okay. He's a new reporter?

MS. WARFORD: Right.

MR. ROGERS: Okay. But you did pass that name of Tim Geary or Tim Gary on to law enforcement authorities that they might want --

MS. WARFORD: At some point.

MR. ROGERS: Okay.

MS. WARFORD: But I don't remember when.

MR. ROGERS: What about Tim Geary or Tim Gary -- I mean, why did you think they ought to talk to him? I mean, obviously, you gave them his name for some reason. How come?

MR. SMITH: Objection.

THE COURT: Here's the point where we open the door, we're going to go all the way. Do you want to talk about it?

MR. ROGERS: Can -- yeah.

(IN CHAMBERS)

THE COURT: Okay. Let's go forward, Mr. Rogers. Thank you for your patience.

MR. ROGERS: Besides the instances we have discussed here of you furnishing information to the police of this gentleman from -- following her home from Kroger's and the possibility of the name of Tim Gary or Tim Geary, did you give any additional information to the police of names other than Mr. Hardin or Mr. Clark that the police might want to talk to in connection with Rhonda's disappearance?

MS. WARFORD: No, I don't think so.

MR. ROGERS: Okay. That's all I have for you, ma'am. Thank you.

THE COURT: Mr. Smith?

MR. SMITH: Ms. Warford, are you sure that there were reports about the red pants because I'm not showing there were

any.

MR. ADAMS: Excuse me, what was the statement? Could I hear the question again, please?

MR. SMITH: Are you sure there were news reports about the red pants because I'm not showing that there were any.

THE COURT: If I were --

MR. ADAMS: Objection to the testimony. I don't have any objection to the question. May we approach?

THE COURT: You may. Please do.

MR. ADAMS: He can certainly ask the question, are you sure? But to say, I am not showing any reports. That's testimony.

THE COURT: Right. I agree with that.

MR. ADAMS: Thank you.

THE COURT: But with respect to her testimony, she said I may have got it from the news.

MR. ADAMS: That's fine. I understand why he's asking. I just don't -- I object to him saying --

THE COURT: Do you understand what his objection is? He's objecting that you're testifying.

MR. SMITH: That she don't have any reports?

THE COURT: Rephrase your question.

MR. SMITH: Are you sure that you saw any news reports about the red pants?

MS. WARFORD: After she was found.

MR. SMITH: You're sure?

MS. WARFORD: Yes.

MR. SMITH: I thought a while ago you said --

MR. ADAMS: Objection, Judge. It's his own witness, badgering his own witness. She --

MR. SMITH: No, I'm not badgering her.

MR. ADAMS: She has been asked twice and answered twice.

MR. ROGERS: And previously testified on direct, I think she said, may. I think she said, may, previously.

THE COURT: I'm going to let you ask her one final time and that's it.

MR. ADAMS: Judge, that --

MR. SMITH: I'll withdraw it.

MR. ADAMS: Thank you.

THE COURT: Are you finished? Okay. Finish up.

MR. SMITH: Nothing further this witness, your Honor.

THE COURT: Mr. Adams?

MR. ADAMS: No further questions.

THE COURT: Mr. Rogers?

MR. ROGERS: No, I have no further questions, Judge. Thank you.

THE COURT: Okay. May she be finally excused?

MR. ADAMS: Yes, sir, as far as Mr. Clark is concerned.

THE COURT: Mr. Rogers, finally?

MR. ROGERS: Yes, Judge.

THE COURT: Mr. Smith, finally?

MR. SMITH: Yes, sir.

THE COURT: Ms. Warford, thank you for being with us. You are free to go. You can stay in the courtroom. You can go back to the witness room and do whatever you'd like. Other than, I want to admonish you not to discuss any questions that you were asked or any answers that you gave or any aspect of this case with anyone other than the attorneys that are involved. Do you understand that?

MS. WARFORD: Yes.

THE COURT: Okay. Free to go. Ladies and gentlemen of the jury, you've been here an hour and a half. Are all of you in good shape or do you need to stretch your legs or -- all of -- anybody need a break? I'll give you about a 10-minute recess while we get our next witness ready to go forward.

Ladies and gentlemen of the jury, it is your duty not to permit anyone to speak to or to communicate with you on any subject connected with this trial and any attempt to do so should be immediately reported by you to the Court. Do not converse or discuss among yourselves any subject connected with the trail, nor form or express any opinion thereon to until the case is finally submitted to you for determination.

If anyone should state anything within your hearing