

**Judy Melinek, M.D.**

3739 Balboa Street #102
San Francisco, CA 94121

**E** drjudymelinek@pathologyexpert.com
**T** 415/850/7056
**W** *www.pathologyexpert.com*

April 13, 2022

Katie McCarthy
Nick Brustin
Neufeld, Scheck & Brustin LLC

99 Hudson Street, 8th Floor
New York, NY 10013
**E** nick@nsbcivilrights.com; katie@nsbcivilrights.com
**T** (212) 965-9081 (Main)

RE: Clark & Hardin v Louisville Jefferson County Metro Government, et al. (Civil Action #3:17-CV-00419-DJH)

Dear Mr. Brustin,

I have reviewed the following material you have sent me regarding the above case:

1. Postmortem examination and toxicology report for Warford, Rhonda Sue ME-92-260

2. Scene and autopsy photos

3. Video of the scene starting at 9:20 a.m., April 5, 1992

4. National Oceanic and Atmospheric Administration (NOAA) Climatological data from Kentucky, March and April 1992

5. Weather Charts from Weather Underground for Louisville International Airport dated April 1-5, 1992

6. LMPD files (19 files)

7. Meade County Files (7 files): Meade County emergency dispatch center public service log, summary of a police call to the medical examiner's office, autopsy request, Coroner's investigation report, Uniform offense report for case No. MC-04-92-093 and supplementary reports, final diagnosis report.

## PathologyExpert, Inc.

8.  Sworn Statements of Clifford E. Capps to Sheriff Joe E. Greer, December 2, 1992

9.  Reports of Forensic Laboratory Examination for case No. MC-4-92-093

10. Louisville Division of Police Evidence Technician Unit Supplemental Evidence Report

11. Testimony of William R. Adams, Meade County Coroner, March 2, 1995

12. Testimony of DA Embry

13. Testimony of Dr. George Nichols

14. Depositions of George R. Nichols, II, MD, dated January 28, 2020, and associated exhibits

15. Joe Greer Deposition Transcript

16. Bill Adams Deposition Transcript

17. Marked exhibits: #17: Excerpts from MCSO Omnibus Report, #20: Greer GJ Testimony, #21: KSP Request for Examination Greer, #22: Greer request for examination, #25: MCSO Police File, and #35: Certificate of Death

I am a forensic pathologist who works as an independent consultant in both criminal and civil matters. My education is notable for my undergraduate degree from Harvard University (magna cum laude), a medical degree with honors from the University of California Los Angeles School of Medicine, and pathology residency at UCLA Medical Center. I trained in forensic pathology at the Office of Chief Medical Examiner in New York City from 2001-2003. During that time it was part of my duties to identify the human remains from the World Trade Center terrorist attacks of 9/11/2001. I was an Assistant Medical Examiner at the Office of the Chief Medical Examiner in San Francisco for nine years. I worked as a contract pathologist for the Alameda County Sheriff Coroner's Office from May 2013 until June 2020, and for three months operated as interim chief forensic pathologist in response to the emergence of SARS-CoV2 and the COVID-19 pandemic. I am currently practicing forensic pathology and performing coronial and forensic autopsies in Wellington, New Zealand, and am a Clinical Senior Lecturer at the Department of Pathology and Molecular Medicine, Otago University School of Medicine.

PathologyExpert, Inc.

I have published in the medical literature on the topics of pathology, surgical complications, transplantation surgery, toxicology, and immunology. I have been qualified as an expert witness in the fields of pathology, forensic pathology, postmortem toxicology interpretation, trauma interpretation, and cause of death determination over 190 times in California, New York, Florida, Utah, Colorado, Illinois, Missouri, Iowa, and Texas. I am currently licensed to practice medicine in both California and New Zealand. I am board certified in anatomic, clinical, and forensic pathology, and I routinely interpret autopsy reports, toxicology reports, medical records, and police reports to determine time of death, mechanisms of injury, and cause of death, and to evaluate the contributory effects of natural disease or intoxicants.

I have investigated many homicides in my career and I have been qualified in court to opine on the time of death, mechanism of injury, and manner of death based on my own and others' autopsy reports, photographs, and scene reports. I have taught forensic pathology to undergraduates, medical students, and resident doctors at New York University, Stanford University, and the University of California San Francisco Medical Center, and have been an invited lecturer at the University of California Hastings College of the Law, the University of California Davis, and at Barts & The London School of Medicine. Postmortem death scene investigation is something that I am qualified to do as part of my job for a medical examiner or coroner. Based on my experience, training, and published treatises, it is possible to make a reasonable and likely estimate of the postmortem interval (the amount of time between death and when the body was found) based on the physical condition of the remains in the context of the ambient temperature.

After reviewing the above-referenced sources in this case, it is my opinion that Ms. Rhonda Sue Warford died from multiple stab wounds, and the manner of her death is a homicide. Based on the positioning of her body at the scene and the absence of postmortem predation by animals, she was most likely killed elsewhere, placed in a face-down position with her legs flexed at the knees in order to facilitate transport (such as in the trunk of a car), and then dumped in the field hours before her body was

PathologyExpert, Inc.

discovered. Her body does not have any signs of having been dragged for a long distance in the leaves and dirt, so evidence of tire marks at the scene should have been carefully searched for. If she had been transported to this location from elsewhere in a vehicle, I would also expect that there would have been significant amounts of blood stain evidence in the vehicle from the front and back locations of multiple stab and incised wounds to her body. The lack of corneal clouding or tache noir (drying of the conjunctivae), and the presence of anterior fixed lividity and marked rigor mortis yields a time of death probably greater than 8 hours but within approximately 12-24 hours of the time her body was found. If Ms. Warford had been dead for over two days, I would expect that, at the documented ambient temperatures, rigor mortis would have been passing and there would have been further noticeable putrefactive changes to the body—such as green discoloration to the abdomen and/or some skin slippage—as well as the possibility of  postmortem production of alcohol in her blood stream from bacterial action of decomposition. Bodies that have been frozen and then thawed to room temperature also show accelerated decomposition, and the internal organs would be noticeably colder to the autopsy pathologist in the known timeframe of this case, so it is unlikely that this scenario occurred. The scene and autopsy findings indicate that Ms. Warford was killed closer to the time she was found dead than to the time she was last seen alive.

The pathologist's testimony at trial suggesting that the stab wound to the neck with its associated brainstem injury would have required medical knowledge or would have to have been been inflicted by a hunter or by someone else with butchering skill is speculative and not based in medical science (Dr. Nichols' testimony page 147, depo 158-164). All that is required to inflict this wound is a flexed neck position. This can occur during a fight, as there is movement of the victim's body during the struggle and she could have reflexively flexed her neck down in a cowed, defensive posture. If someone had special training to kill an animal quickly, they wouldn't need to stab their human victim 11 times, and it is unlikely the victim would have defensive injuries. Dr. Nichols also testified that the cut to the brainstem would have caused immediate incapacitation, which is correct. I disagree, however, that this wound is necessarily the last in the sequence of wounds, and that all bleeding would immediately stop. The

PathologyExpert, Inc.

heart has its own pacemaker and can still beat on its own, even after fatal trauma to the brain stem; this is why a functioning heart can be transplanted out of a brain-dead patient on mechanical ventilation as part of organ donation surgery. The idea that the body would immediately stop bleeding after the brain stem is severed is not supported by science. Passive bleeding out of open wounds from gravity or manipulation of the body is always possible. There is a pool of blood found at the scene in the field which is removed from the body's final resting location, but this fact does not indicate Ms. Warford was killed at the scene, as the coroner testified in trial; it just indicates that her body was first placed to rest in one location before being moved to its final resting location further away from the road and closer to the trees, where she would be less likely to be seen. There is nothing about this death scene that appears ritualistic or staged to suggest Satanic or occult worship.

It is common practice in forensic pathology for coroners and police to consult with medical experts when establishing the legal time of death for the death certificate or incident report, based on the physical characteristics of the deceased's body at the scene or at autopsy. It is inappropriate to change the time of death on a medical record based exclusively on testimonial evidence of the absence of an alibi for a chief suspect when that testimonial evidence contradicts the observed medical evidence of the postmortem interval based on the condition of the body.

The pertinent facts of the case that lead me to these conclusions are:

1. According to the the Meade County dispatch public service log, a complaint of a possible dead body was reported on 04/05/92 at 8:47, and they arrived at the scene at 09:16 hours. The victim was described as a female 25+/- years old with brown hair and hazel eyes, 5'11" to 6'0, 221 pounds, wearing red sweat pants and sweat shirt, probably brand name "Apex" based on a logo on the shoulder. Victim's legs were bagged and it is noted that she was "drug to the point where she was found."

2. According to the police call received by the medical examiner's office, Meade County dispatch reported that a body had been found in a field next to a fence, off Kentucky 823 approximately 1.2 miles from Kentucky 261. Upon arrival the officer

PathologyExpert, Inc.

determined that the body was of a female, lying face-down with her lower legs up, fully clothed. The scene was videotaped and photographed and the decedent's hands and feet were bagged. She was rolled onto a body bag and it was noted that leaves were stuck to her face and there was a stab wound in her jacket. Evidence at the scene was collected by Meade County officers. The body was transported to the Medical Examiner's office in Louisville. Following the release of the description of the victim on television, there were calls received by Meade County Dispatch from Vicky Houser (the sister of the victim's boyfriend) and Mary Warford (mother) regarding a missing person named Rhonda Warford who had been missing since April 1 or the early morning of April 2, 1992. The body of Rhonda Sue Warford was positively identified at 20 to 35 hours by Michelle Rogers, Jackie Armstrong and George Machoda.

3. According to the Coroner's Investigation Report, the decedent was found at 0730 on 4/5/92. The date of death was listed as "4-4-92 or early 4-5." The Continuation Page/Supplemental report indicates that the date and time of occurrence was between 4/2/92 at 00:30 hours and 4/5/92 at 07:30 hours. The primary cause of death was listed as multiple stab wounds: incision of brain stem with subarachnoid hemorrhage; stab wounds of left lung with left hemothorax; defensive injuries of right hand. The manner of death was homicide.

4. According to the Uniform Offense Report dated 4/6/92, the estimated time of offense was listed as 4/2/92 at 02:00. The date and time of occurrence in the continuation page/supplementary report indicates the date and time of occurrence as between 4/2/92 00:30 hours and 4/5/92 at 07:30 hours. Only two possible suspects are listed: Jeffrey Dewayne Clark and Garr Keith Hardin Jr. List of evidence includes a rape kit, hair and nail scrapings from the victim, soil samples from the scene and suspect vehicle, the victim's clothing, and a tire mold. The investigation was notable for a blood spot and key ring approximately 30 feet from the body. Underneath the leaves near the key ring, the ground was "saturated with blood." A plaster cast of a tire track at the scene was also collected. At autopsy an inverted cross tattoo was noted on the victim's left breast. The victim had 11 stab wounds, and her throat had been cut from center to right. There were two defensive wounds of the right hand. There were no drag marks noted on her back or stomach,

**PathologyExpert, Inc.**

leading the officer to believe that she was killed proximal to the location of the keys and the large blood spots. Mary Warford reported that the tattoo of the inverted cross was given to Rhonda Warford by her boyfriend, Keith Hardin. She said that Keith Hardin and his friend Jeff Clark were "into Satanic worship." She reported that Rhonda Sue was last seen alive at 00:30 on 4/2/92 when she took the house keys and left, saying, "I'm going down there." Earlier, on 4/1/92 at approximately 7:00 p.m., Rhonda had reported to Mary that she had gone to Kroger's grocery store and a man had followed her, shouting that he wanted to marry her. Rhonda Sue Warford's body was positively visually identified by Michelle Rogers (her sister), Jackie Armstrong and George Machado (the sister's boyfriend). Jeff Clark was interviewed and it was reported that he had an alibi for the time period, and he provided the police with witnesses who could vouch for him. He agreed to take a polygraph test. It was determined that he "did not completely tell the truth." Keith Hardin was interrogated and also gave a polygraph. Upon further discussion with Coroner William Adams and determining that both Clark and Hardin had alibis for Saturday night 4/4/92, the officers decided on Wednesday morning, 4/8/92, to contact Medical Examiner Dr. George Nichols to see if it was possible that Warford's death could have  occurred sooner, possibly Thursday morning, 4/2/92. Both Clark and Hardin were alibiing each other for Wednesday night 4/1/92 and Thursday 4/2/92 until at least 03:00 hours. Crystal Barnes reported that Rhonda Sue Warford had called her on Wednesday night 4/1/92 at around 11:30 p.m. and wanted to go shopping with her on 4/2/92. She reported that Rhonda was crazy about Keith Hardin, and that Rhonda had told her she felt that Keith was trying to break off their romance, and that Rhonda said she had been telling Keith that she was pregnant. Barnes reported that Keith Hardin had put the inverted cross tattoo on Rhonda, and that she knew Jeff Clark, Hardin's friend. She said he was weird, just like Keith, and that Keith Hardin and Jeff Clark engaged in Satanic worship, and that she knew for a fact that they had killed animals and that they had a lot of knives.

5. According to the postmortem examination report of Rhonda Sue Warford, the autopsy was conducted on April 5, 1992 at 2:00 p.m. by Dr. George R. Nichols II. The decedent was dressed in a thin, red, zippered jacket, blue long-sleeved shirt,

PathologyExpert, Inc.

white underwire bra, red pants, red panties, and white canvas deck shoes. There was no observed injury to the internal or external genitalia. Lividity was described as fixed over the medial surfaces of the upper extremities, face and anterior chest. There were stab wounds at the right scapula, base of the skull, left axilla, right breast, left shoulder, left axilla, left breast, and occipital scalp. There were also incised wounds at the left hand, right index finger and neck. Internally, there were 1.5 liters of blood in the left pleural cavity. Stab wounds enter the left lung and there is diffuse subarachnoid hemorrhage at the base of the brain associated with a skull defect at the foremen magnum. Microscopic lung sections were notable for atelectasis. The final diagnosis report indicated that the cause of death was due to multiple stab wounds of the body.

6. Toxicology report was negative for alcohol or drugs of abuse.

7. Scene photos show the decedent's body on the edge of a thinly wooded area, in the bright sun, lying prone on dry brown leaves and grass. There are tire tread marks in the soft dirt track. Decedent is clad in red pants and a thin red jacket over a black shirt. She appears obese. Her legs are flexed at the knees, defying gravity. There is a thin branch or vine behind her legs which is leaning against her left ankle, but it does not appear there is any associated injury or indentation of the skin. The decedent's outer right ankle has a linear scar. The bottom sole of the right athletic shoe has a brown stain on it, but the shoes are white and do not have any mud stains on the upper portion. The decedent's arms are extended above her head at the shoulders, and the jacket appears to be pulled up, exposing the lower back. The left side of the decedent's face is against the ground. There are two stab wounds to the back of her neck below the hairline. There is no lividity visible in the photo. Bags are placed over the decedent's hands and feet, and she is rolled onto her back into a body bag. Once the body is flipped over, there are adherent leaves visible on the face and abdomen. The decedent's legs are still flexed at the knees, defying gravity, and her arms are still extended outward and above her head. A closeup of her abdomen shows a diagonal linear abrasion or superficial incised wound. Her face has caked shiny red blood on it. In one closeup photo of her face, she has anterior lividity on her face, her pupils are clearly visible, and there is no tache noir (postmortem drying of the whites of the eye), even though her eyes are

⬤ PathologyExpert, Inc.

not completely closed. Aerial views show the location of the body at the edge of a
field bounded by trees, near a main road with a dirt path partially leading into the
field. There are photos taken of blood in the grass and dry leaves which appears to
have been underneath the decedent's body, but also in another area removed from
the body. The decedent's clothing is blood-soaked and her white shirt and bra are
stained bright red with blood.

8. Autopsy photos show that at the medical examiner's office the decedent still has
her legs flexed at the knees in rigor mortis, even after she has been flipped over
onto her back on the gurney. Lividity has partially redistributed onto the back. The
decedent's eyes are partially open and the corneas are shiny and clear, and reflect
the light. The whites of the eyes are visible and not darkened. There are red
diagonal marks across the lips and chin suggestive of dragging. There is dried
blood on the face and facial lividity with pallor over the forehead, tip of the nose,
and chin. A monochromatic tattoo of an inverted cross is at the upper left chest,
below the clavicle.

9. Video of the scene starting at 9:20 a.m., April 5, 1992 shows the rigidity of the limbs
as the victim's body is manipulated. The anterior lividity is consistent with the prone
position.

10. National Oceanic and Atmospheric Administration (NOAA) Climatological data from
Kentucky, March and April 1992, shows maximum temperature and minimum
temperature for Hardinsburg, approximately 18 miles away from the location of the
body. Daily precipitation for Rough River Dam, KY (approximately 32 miles away)
was negligible between 4/2/92 and 4/5/92.

| Temperature (°F) | Maximum | Minimum |
|---|---|---|
| 4/2/92 | 39 | 29 |
| 4/3/92 | 44 | 22 |
| 4/4/92 | 51 | 40 |
| 4/5/92 | 53 | 29 |

Soil temperatures

# PathologyExpert, Inc.

| Temperature (°F) | Maximum | Minimum |
|---|---:|---:|
| 4/2/92 | 55 | 46 |
| 4/3/92 | 57 | 47 |
| 4/4/92 | 56 | 45 |
| 4/5/92 | 57 | 46 |

11. Weather Charts from Weather Underground for Louisville International Airport dated April 1-5, 1992 indicate air temperatures between 30° and 44°F on 4/2/92; 28° to 48°F on 4/3/92; 40° to 51°F on 4/4/92; and between 34° and 57°F on 4/5/92.

12. LMPD files include the Kentucky Missing Persons report which indicates that Rhonda Warford was reported as missing on 04/02/92 at 12:30 a.m.. She was last seen wearing white stretch pants, a red, white and black windbreaker, and white "KEDS" tennis shoes. The mother was in contact with her boyfriend who stated that he had not seen her since March 28. According to the physical assault squad cover and analysis sheet, the victim's body was found 9 miles southwest of Brandenburg, off KY 823, in a field. The victim died of multiple stab wounds. She was found by the mother and father-in-law of a sheriff's deputy who had gone to look for some property that was for sale. Sheriff Joe E. Greer advised that the body was "relatively fresh" when they found it. Sheriff Greer stated that approximately 50' away from the body they located keys in the field, and in an area covered with leaves they found a pool of blood beneath the leaves. The victim was dressed in red sweatpants, a blue long-sleeved shirt, a multi-colored windbreaker, white bra, and pink panties. The decedent had 11 stab wounds to the front chest area, and her throat was partially cut. Dr. George Nichols, who performed the autopsy, reported that the stab wound to the back of the neck, which severed the brain stem, was the fatal wound. The decedent was estimated at 210-220 pounds and 5'11 inches tall. Mary Warford, the victim's mother, reported that on April 1, 1992 at 7 p.m., Rhonda went down to the Kroger's Grocery Store and upon returning home reported that a man was following her and shouting that he wanted to marry her. Shortly after midnight on April 2, 1992, Rhonda came into her room and got her mother's house key. Her mother asked her where she was going and she said, "I'm going down there." That was the

## PathologyExpert, Inc.

last time she saw or heard from Rhonda. Rhonda Sue Warford's body was visually identified by her sister, Michelle Rogers.

13. Clifford E. Capps stated to Sheriff Joe E. Greer on December 2, 1992 that he had been lodged in a jail cell with Jeff Clark. Clark was there on a murder charge. He said that Clark told him the police had confiscated his car, and that they thought that Clark had put the body in trash bags in the car. Clark told Capps that the only evidence the police found was some hair or a fingerprint, but that this was natural because she was his girlfriend. Capps stated that Jeff Clark "never admitted to doin' the murder—or he did in other conversations." Capps claimed that Clark talked about Keith Hardin killing and sacrificing people like it was a game, and that he used to be into devil worship. Capps also claimed that Kevin Justus had given him a note from Keith Hardin to pass on to Jeff Clark, and it said "just keep cool and stick to your story and everything will be fine. They don't know anything and they don't have anything." Capps claimed that Jeff Clark had admitted to murdering and killing the girl on two different occasions; Clark said it in a joking manner the first time, but the second time he was "dead serious." Capps stated that Jeff Clark had also said that he and Keith Hardin had stopped at an all night gas station on the night of the murder and that there were a couple of guys there, but that the videotape had gotten erased. Capps said Clark had told him he had an alibi but the police had brushed it off.

14. Reports of Forensic Laboratory Examination for case No. MC-4-92-093 and Louisville Division of Police Evidence Technician Unit Supplemental Evidence Report show that no semen was found in samples taken from the sexual assault collection kit from Rhonda Warford. Latent prints and examination for blood and semen with an alternate light source were conducted on a 1974 Blue Chevrolet Nova, VIN No. 1X27H4L124299. Results appear negative.

15. William "Bill" R. Adams, the Meade County Coroner, testified at trial that he ran a local funeral home and had been coroner for 11 years. His coroner training involved over 100 hours through the Kentucky Justice Cabinet. He testified that he responded to the scene of death when the body of Rhonda Sue Warford was found. The sheriff videotaped the scene and took photographs while he stood back. Then they proceeded to make a search of the surrounding area, put bags over the

PathologyExpert, Inc.

victim's hands and feet, and rolled her over into a body bag. Coroner Adams then removed her from the scene and took her to the Medical Examiner's Office in Louisville. He said he examined her "superficially" at the scene. When he was at the scene he noted that her knees were "bent back up toward her back" and that a thorn bush was "probably helping hold them up that way." A little distance from her there was a big area of blood on the ground or blood soaked leaves, and next to that was a set of keys. Adams believed Rhonda Sue Warford was killed in that field and there was no doubt about it in his mind. He stated that the decedent's legs were "up in the air" because her legs were resting against a thorn bush, and it was not an indication that rigor had set in and that the body had been "placed there." He stated that he didn't look at the body's lividity until the autopsy, and when he did "the lividity was still there." The lividity was still present on the frontal part of her body, indicating that it was fixed. Adams said he couldn't tell how fresh the body was. He thought the death was relatively recent, and that the body was "relatively fresh," and by that he meant she had died in the last "day, two days, three days." He testified that near the body there was a "fence roll" and on the other side of it there was a wooded area. He stated that the amount of blood by the keys indicated that she bled in that area prior to being moved toward the fence roll. He did not find anything at the scene that indicated a Satanic ritualistic killing, to include carvings, pentagrams, candles, wax drippings or salt.

16. DA Embry testified that he does intake investigative work for the Cabinet for Human Resources. He testified that he attended seminars in Satanism. His degree was in criminology and sociology. Embry testified that Satanism involves ritual sacrifice to include killing humans. He testified that he did not think the killing of Rhonda Sue Warford was a ritualistic killing, but he was allowed to testify as to what Satanists think and why they do "that," i.e. ritualistic killings. He testified that the inverted cross tattoo on the breast of Rhonda Sue Warford's body was a symbol of Satanism. He testified that the scene of Warford's death was not consistent with a Satanic ritualistic killing. Embry had never investigated a Satanic ritualistic killing. He testified that in traditional Satanism, in order to be empowered by making a sacrifice one must leave a sign of some sort, such as marking of the body, taking part of the body out (e.g. the heart), in order to be empowered. The body in a ritual

PathologyExpert, Inc.

killing would be placed so that the head would point South and the feet North, which was not the case in the positioning of Rhonda Sue Warford's body at the scene.

17. Dr. George Nichols testified in court that Rhonda Sue Warford was 5'11" and weighed 221 pounds. He described her wounds, including two stab wounds at the upper neck, at the base of her skull. He stated that one of those wounds severed her brain stem. He said that wound would have been immediately incapacitating. He testified that there were drag marks on her lower extremities, then corrected himself to say there were not. He stated that on sexual assault examination he saw no evidence of motile spermatozoa. When asked about determining time of death, Dr. Nichols said the best he can do is to estimate the interval of death, but then agreed that Rhonda Sue Warford may have been killed in the early morning hours of April 2, 1992. He said that lividity was anterior and it was fixed, which indicated that she died face down or was placed face down shortly after death. He stated that there would have been minimal if any bleeding after the injury to the brain stem. He testified that the nature of the wound to the brain stem was such that it was caused by someone with experience hunting, or that the assailant made a lucky stab. He said that had Warford's body been frozen it would have been noticed in the field, by feeling the tissues. Dr. Nichols said it was impossible for him to say the time of death. He did state that for fixed lividity to occur, Warford would have had to have been in that position for approximately eight hours. He did not remember the body causing him "maximum cold discomfort" to his fingers to indicate that it had ben frozen. He stated that he would not expect to see decomposition because the average temperature was somewhere around 42 degrees, just about the same temperature as the morgue. He stated that a body left near a wooded area for longer would have a greater chance of having exhibited postmortem carnivore activity.

18. George R. Nichols, II, MD testified in his deposition that he could not determine drag marks on Rhonda Sue Warford's body. He said that she had blood pooled on the front the of her body, indicating that she was placed in a face-down position. He was unable to determine the time of death. He stated that because lividity was fixed, it indicated that she was face down for at least 8 hours. He opined that

# PathologyExpert, Inc.

Warford's body was in rigor mortis. He noted that her corneas were clear—not clouded—but stated that finding does not assist him in determining the time of death. The internal organs were not decomposed and did not have an explanation for the lack of decomposition if Rhonda Sue Warford was killed on 4/2/92. Dr. Nichols agreed that full rigor mortis is set by about 12 hours after death and that it disappears by about 24 hours after death (p.79). He testified that Rhonda Sue Warford was in full rigor when she arrived for autopsy (p.82). He agreed that a violent struggle could cause rigor mortis to set in earlier than 12 hours. He stated that it would be very unusual for a body left out in non-freezing weather for 3-1/2 days to still be in full rigor. He agreed that in the video the decedent's legs were seen to be flexed up in the air against the force of gravity (p.91). He agrees that Rhonda Sue Warford would not have ben in that position if she had been killed right there (p.92) Dr. Nichols agreed that Warford's body had no decomposition whatsoever (p.98). He agreed that it was clear that Warford was not killed where her body was found (p.104). Dr. Nichols could not estimate the quantity of blood lost in the leaves and soil. He testified that there was no evidence of animal predation on her body (p.112). He agreed that if the corneas aren't clouded, time of death should be less than 24 hours (p.137), and that if the corneas are clear it is a sign that the person had died recently (p.138). In his best estimate, Rhonda Sue Warford was killed within 24 hours of when she was found (p.154). Dr. Nichols testified that Warford's body could not have been lying on the ground when she was stabbed through the neck because that wouldn't open up the space necessary for the path of the knife (p.156). He testified that if he had been asked about whether rigor could have set in where the body was found, he would have said that the position of the legs in rigor mortis indicated that this body was dumped there after rigor mortis had set in (p. 167). He agreed that Warford's body was kept someplace else where rigor formed, and to the extent that she was moved, it had to have been hours after she was killed (p.167). Dr. Nichols said that nothing had changed medically between April 5 when he completed the gross exam and April 24 when he signed the final report, and there was no reason to change the estimate for when the death occurred (p.188). He agreed that the victim disappeared at 12:30 a.m. on 4/2, was found at 7:30 a.m. on Sunday 4/5, and that the autopsy was performed at 2 p.m. on

⬭ PathologyExpert, Inc.

the same day she was found (p.192). He testified that the knife path to the back of the neck could occur with flexion of the neck to open the vertebrae, but that this could occur from "just pure blind luck" (p.234). In reviewing the video from the scene he agreed that there was nothing where the body was found to provide support to her legs at that spot so that they would have become fixed by rigor mortis in the posture they were found (p.236). Dr. Nichols stated that in order for the victim to have been killed in that field, she would have had to have been killed at a different spot in the field so that the legs would have been propped up, and then subsequently moved to the final resting position after rigor had set in (p.237). He agreed that the easiest and most likely explanation is that Rhonda Sue Warford was killed elsewhere and then transported in a vehicle (p.238). In his opinion a grapevine the size of a little finger would not be strong enough to hold up her legs (p.244).

19. Coroner Bill Adams testified in his January 6, 2020 deposition that body temperature, lividity and rigidity can be used to estimate the time of death (p.34-38). He said he had no training that would help him determine time of death from a blood stain (p.39). He testified that between April 5, 1992 and May 7, 1992 he made the determination that the murder of Rhonda Sue Warford had occurred on April 2 rather than April 4 to April 5 (p.69). He initially wrote that Warford died on April 4 or 5 because she was found in the morning on April 5 (p.70). In 1992 he didn't understand that the absence of insects or predators having attacked the body could be used to indicate how long the body had been there (p.77). He asked Dr. George Nichols whether it was possible that Warford had been killed on Thursday night, April 2, and, knowing George, he would have said "Sure. It's possible" (p. 84). Adams used that and the fact that lividity had fully set by the time of the autopsy to conclude that the death had occurred on April 2 (p.86). Adams stated that back in 1992 he didn't know when lividity sets in and when it dissipates (p.89). He said it was possible that the "2" in April 2 on the date of death was a smaller type because it came from his typewriter (p.95). He acknowledged that on the video the decedent's legs are crossed in an unnatural position and defying gravity (p.108). Adams acknowledged that the branches couldn't have held the weight of the decedent's legs (p.108). He said that her legs were resting against a thorn bush (p.122). Initially he had told Sheriff Joe E. Greer that the estimate of the time of

# PathologyExpert, Inc.

death was April 4 or 5 because the death was recent; within hours or a day (p. 125). Adams was subsequently present for the interrogation of Jeff Clark and the interview with Amy Remsburg (p.140). He was not aware of a witness named Billy Wayne Carter who reported seeing the victim, Rhonda Sue Warford, in a car on the Saturday night after the date when she was supposed to have been murdered (p. 153). Adams agreed that there was no information given to him by Dr. Nichols that caused him to change the date of death from April 4 or 5 to April 2 (p. 162). He agreed that he was just trying to assist Sheriff Greer in his investigation (p.179). He did observe the interview between Sheriff Greer and Amy Remsburg but did not recall that Remsburg alleged that Jeff Clark confessed to her that he murdered Rhonda Sue Warford (p.182). Adams said he would have asked Dr. Nichols questions to determine the date of death (p.187). He may have written the date as April 4 or April 5, 1992 on the coroner's investigative report as the date of death before he ever went to the autopsy (p.188). A month later he put the date of death on the death certificate (p.189). At the time he wrote the date on the investigative report he was not aware of Jeff Clark's or Keith Hardin's alibis and had not participated in or observed any of the witness interviews (p.190). Adams testified that there was nothing in the postmortem report that would have caused him to change or alter the date of death from April 5 to April 2 (p.195-196). He had not learned any additional information about the condition of Rhonda Sue Warford's body. The only thing different that he knew of was that the suspects had alibis for the 4th and 5th of April (p.197-200).

20. Sheriff Joe E. Greer testified that Coroner Bill Adams assisted him in investigating the homicide and participated in interrogations of Jeff Clark and Keith Hardin, and accompanied him when he went to speak to the victim's family. Sheriff Greer testified that at the scene the body of the decedent "appeared to be in pretty good shape. No types of insects, anything like that. In fact, the body was—I'd say looked pristine" (p.15). This led them to believe that the victim had died within a day or so of being found (p.16). He described the body at the scene as face-down and "hanging over a fence." He stated that the body doesn't get touched until the coroner gets there. He testified that the estimated date of death of April 4 or April 5, which he wrote on a request to the Kentucky State Police crime lab, came from the

**PathologyExpert, Inc.**

coroner (p.177). Sheriff Greer said that he could not determine the date of death (p.187). As far as he knew, nothing was done after the initial autopsy that would have given Coroner Bill Adams additional information to change Rhonda Sue Warford's date of death (p.190-192). He thought Warford's body was transported to the Coroner face-down (p.213). During his investigation he came to learn that both Jeff Clark and Keith Hardin had alibis for all times other than the Thursday night after the decedent disappeared (p.270). Sheriff Greer relied on Coroner Adams to give him the time of death (p.271) but did not speak directly to Dr. Nichols (p.274). Sheriff Greer thought that the blood saturation on the clothing indicated that the body had been at the scene for a long period of time (p.276-277).

These opinions are based on my experience and training, as well as my knowledge of the peer-reviewed forensic medical literature. I am relying on the information you have provided me at the present time; thus, my opinions may change if other information is offered to me for review. The forensic methodology employed in my work in this case is identical to the methodology I employ when I perform an autopsy or write a report as part of my job for the medical examiner or coroner's office, or in my work as a medico-legal expert in other cases involving questions about the postmortem interval. It is also consistent with the standards of my profession. I review the referenced records and then I analyze that information in the context of the current peer-reviewed medical literature.

I am available to testify to these opinions in a mediation hearing, deposition, or trial, if necessary. Please feel free to contact me at the above address and phone number if you have any questions or need further clarification.

Sincerely,

Judy Melinek, M.D.

Selected References:

# PathologyExpert, Inc.

1. Collins KA. Autopsy Performance & Reporting, Third Edition. 2017, College of American Pathologists, Northfield, IL

2. DiMaio VJ and Dana SE. Handbook of Forensic Pathology. 2007, CRC Press, Boca Raton, FL

3. DiMaio VJ and DiMaio D. Forensic Pathology Second Edition. 2000, CRC Press, Boca Raton, FL

4. Dolinak D, Matshes E, Lew E. Forensic Pathology Principles and Practice. 2005, Elsevier Academic Press, Burlington, MA

5. Dolinak D, Matshes E. Medicolegal Neuropathology: A Color Atlas. 2002, CRC Press, Boca Raton, FL

6. Ellison D, Love S, et al. Neuropathology: A reference text of CNS pathology, Second edition. 2004, Mosby, Philadelphia, PA

7. Itabashi HH et al. Forensic Neuropathology: A Practical Review of the Fundamentals. 2007, Elsevier Academic Press, Burlington, MA

8. Madea B. Estimation of the Time Since Death. Third Edition. 2016, CRC Press, Boca Raton, FL

9. Spitz WU. Spitz and Fisher's Medicolegal Investigation of Death, Fourth Edition, 2004, Charles C Thomas Publisher LTD.

10. Wetli CV, Mittleman RE, Rao VJ. An Atlas of Forensic Pathology. 1999, ASCP Press. Chicago, IL

Enclosures:
1. Dr. Melinek's curriculum vitae
2. Dr. Melinek's testimony in last 4 years
3. Dr. Melinek's contract and fee schedule

# C.V. Including List of Publications

# Judy Melinek, M.D.

PathologyExpert, Inc.
3739 Balboa Street #102
San Francisco, Ca 94121
Phone: (415) 850-7056
*drjudymelinek@pathologyexpert.com*

## EDUCATION

**Harvard University:** Cambridge, MA                                                        1987 – 1991

> B.A. in Biology *magna cum laude*, June 1991.  John Harvard Scholarship, 1989-90.  Harvard College Scholarship, 1988-89.  Elizabeth Cary Agassiz Certificate of Merit, 1987-88.

**UCLA School of Medicine:** Los Angeles, CA                                                  1991 – 1996

> M.D. with honors, May 1996.  Dean's Scholar for outstanding thesis, Edith and Carl Lasky Memorial Award for research achievement, Viola G. Hyde Scholarship for excellence in surgery.

**Armed Forces Institute of Pathology:** Bethesda, MD                                          2001, 2003

> Basic Forensic Pathology Course, 2001; Neuropathology Course, 2003

**Imaging Forensics:** San Francisco, CA                                                       June 2010

> Digital Forensics Photography Class with George Reis; San Francisco Police Department Training

## EXPERIENCE

**PathologyExpert Inc., San Francisco**                                                  2004 – Present

> Contract with Communio Inc. in New Zealand serving as coronial and forensic pathologist for Wellington area (population 500K) starting August 2020. Contract with Alameda County Sheriff Coroner's Office May 2013 - June 2020. Interim Chief Forensic Pathologist during COVID-19 Pandemic, 2020. Associate Clinical Professor, UCSF Dept. of Pathology, 2013-2015. Research Associate, UC Davis Department of Environmental Toxicology, 2015 - 2020. Honorary Lecturer in the Centre for Clinical Pharmacology within the William Harvey Research Institute, Queen Mary University of London 2019-2022; Clinical Senior Lecturer at the Department of Pathology and Molecular Medicine, Otago University School of Medicine, 2020- present.

**Office of the Chief Medical Examiner, San Francisco**                              July 2004 – April 2013

> Assistant Medical Examiner. Assistant Clinical Professor, UCSF (2004-2013). Teaching award 2007-2008.  Trained UCSF pathology residents, Medical Examiner Investigators and Technicians.

**Santa Clara County Office of Medical Examiner-Coroner**                             July 2003 – June 2004

> Assistant Medical Examiner – Coroner. Adjunct Clinical Instructor, Stanford University Medical Center. Senior forensic pathologist directing a staff of 17 for ten months following resignation of the Chief Medical Examiner.   Revised death certification, identification and evidence protocols. Child death review team.

**Office of Chief Medical Examiner, City of New York**                                July 2001 – June 2003

> Clinical Instructor in Forensic Medicine, New York University. Forensic Neuropathology Fellowship. Examined remains from World Trade Center (9/01-8/02) and American Airlines Flight 587 crash (11/01).

**Department of Pathology, UCLA**          July 1993-June 1994; July 1997 – June 2001
   Pathology Post Sophomore Fellowship; Pathology Residency and Chief Resident.

**Beth Israel-Deaconess Medical Center, Boston, MA**          July 1996 – Dec 1996
   Department of General Surgery - Internship.  Primary surgeon in 61 operations.


## RESEARCH

**Brigham and Women's Hospital, Boston**          Summer 1988, January 1990  – May 1991
   Center for Neurological Diseases – Undergraduate Biology thesis, "Protein Kinase C Activity Correlates with Memory T-Cell Function" presented at FASEB conference in Atlanta, GA in April, 1991.

**Department of Neurology, UCLA**          Summer 1992
   With Jean Merrill, Ph.D. and Nobel laureate Louis J. Ignarro, Ph.D., researched NO synthesis in Multiple Sclerosis.

**Department of Transplantation, UCLA**          Dec 1993-March 1996, Nov 1998 – 2001
   Liver Transplant Program – Pathology consultant for research investigating rejection, ischemia-reperfusion injury and Hepatitis C recurrence.  Assisted in over 100 liver procurements & transplants.


## OTHER EXPERIENCE

**Peer Reviewer**

| | |
|---|---|
| The American Journal of Forensic Medicine and Pathology | Oct. 2009 – Present |
| Forensic Science International Synergy - Editorial Board | April 2020– Present |
| Journal of Forensic Sciences | Nov. 2014 |
| Academic Forensic Pathology | Dec. 2012 |
| CDCP Sponsored NAME Toxicology Panel for Opiate Deaths | Jan. 2012 – 2013 |
| Electrical Muscular Disruption Device (EMDD) Literature Review Panel – NIJ | 2007 – 2011 |
| Journal of Forensic and Legal Medicine – Elsevier Press | October 2007 |

**Professional Lectures and Presentations**

| | |
|---|---|
| "Forensic Fundamentals" New Zealand Coroners Continuing Education, Wellington, NZ | Sept. 2, 2021 |
| "The Working Stiffs: Forensic Science from the U.S. Comes to New Zealand" Co:Lab meeting, Wellington, NZ | Nov. 13, 2020 |
| "Police-Involved Shootings in the USA" Deaths in Custody 3 – International Case Studies, virtual conference hosted by Dept. of Pathology, University of Ottawa, Ottawa, Canada | Sept. 26, 2020 |
| "In Custody Deaths and Public Relations in a Digital Age" Deaths in Custody 2 – International Case Studies, virtual conference hosted by Dept. of Pathology, University of Ottawa, Ottawa, Canada | August 8, 2020 |
| "Forensic Pathology in Homicide Cases" Forensic Training Series, Santa Clara Alternate Defender's Office – Santa Clara, CA | May 6, 2020 |
| "The Working Stiffs: Get Your Murder Scene Right" NorCal Murder Writers of America - (on line: https://www.crowdcast.io/e/mwa-norcal-event-get) | April 11, 2020 |
| "The Working Stiffs: Writing and Publishing the Experiences of a Forensic Pathologist in Both Fiction and Non-Fiction" AAFS – Anaheim, CA | Feb. 18, 2020 |
| "Forensic Pathology in Homicide Cases" California Public Defenders Association – San Diego, CA | Sept. 14, 2019 |
| José G. Albernaz Golden Apple Distinguished Lecture, East Carolina University | Aug. 5, 2019 |

| | |
|---|---|
| "Current Topics in Emergency and Forensic Medicine," University at Sea | Mar. 25-30, 2019 |
| "Consulting 101" National Association of Medical Examiners – West Palm Beach, FL | Oct. 14, 2018 |
| "Pediatric Death Investigation," "Child Abuse & Neglect/NCIP Zavion Johnson" and "Officer Involved Shootings, In-Custody Deaths and High Profile Cases" California Sheriff Coroners Association – Santa Rosa, CA | Sept. 18, 2018 |
| "What Trial Attorneys Need to Know about Forensic Pathology" California Public Defenders Association – Berkeley, CA | Sept. 15, 2018 |
| "Science Matters: Tapestry of Trials" American Academy of Forensic Sciences – Seattle, WA | Feb 20, 2018 |
| "Forensic Pathology" Defense Investigator Training Academy, Long Beach, CA | Oct 23, 2017 |
| "Website Design, Social Media and Marketing," Forensic Expert Witness Association – San Francisco, CA | May 19, 2017 |
| "Working Stiff: The Real Work of a Forensic Pathologist," Genentech – South San Francisco, CA | April 18, 2017 |
| "The Forensic Pathologist and Medical-Legal Cases," Bay Area Chapter of Northern California Legal Nurse Consultants – South San Francisco, CA | April 11, 2017 |
| "Officer-Involved Shooting Incidents" and "Excited Delirium Syndrome," NAME Interim Meeting – New Orleans, LA | Feb 14, 2017 |
| Medical Examiners Conference – Neenah, WI | |
| "Officer-Related Fatalities" and "High Profile Cases," Wisconsin Coroners and Medical Examiners Conference – Neenah, WI | Oct 24, 2016 |
| "Blunt and Sharp Trauma," Daytona Beach Death & Crime Scene Investigation Conference – Daytona Beach, FL | Sept. 14, 2016 |
| "Forensic Training and Public Relations in a Digital Age," American Academy of Forensic Sciences – Las Vegas, NV | Feb 25, 2016 |
| "Pediatric Death Investigation" and "Officer-Related Fatalities," Alameda County Sheriff and Pleasanton Police Department | Feb 18, 2016 |
| "How to Retain, Prepare and Present Experts at Trial Ethically and Effectively" Bar Association of San Francisco (BASF) | Dec 1, 2015 |
| "Officer-Related Fatalities" and "High Profile Cases," Daytona Beach Death & Crime Scene Investigation Conference – Daytona Beach, FL | Sept 10, 2015 |
| "Advanced Criminal Law: Forensic Pathology," University of San Francisco Law School | Feb 7, 2015 |
| "Forensic Pathology for the Primary Care Practitioner," University at Sea | Sept. 21-28, 2014 |
| "Medical Detectives: The Real CSI," UCSF Osher Mini Medical School for the Public | Feb. 5, 2014 |
| "Advanced Criminal Law: Forensic Pathology," San Francisco Law School | Feb. 2, 2013 |
| "Science & the Law: Forensic Pathology," UC Hastings College of the Law | 2012 – 2015 |
| "Introduction to Pre-Health Professions" Recurrent guest lecturer, Science – 235 San Francisco State University. | 2007 – 2011 |
| "Death Certification" Recurrent guest lecturer, UCSF Resident Orientation | 2010 – 2011 |
| AACC Outstanding Speaker Award: "Pairing Clinical and Post-Mortem Findings for Interpretative Purposes: The Medical Examiner's Perspective" and Panel Discussion SOFT/TIAFT – San Francisco, CA | Sept 27, 2011 |
| "A Facilitated or Unavoidable Fall from a Roof – An Unusual In-Custody Death" National Association of Medical Examiners – Alaska | Aug 12, 2011 |
| "In-Custody Deaths: An Introduction to the Role of the Medical Examiner" Sudden Death, Excited Delirium & In-Custody Death Conference – Las Vegas, NV | Nov 28, 2007 |
| "Vertebral Artery Dissection Complicating Occipital Injection of Heparin for Treatment of Thoracic Outlet Syndrome" National Association of Medical Examiners – Savannah, GA | Oct 17, 2007 |

## Consulting & Media *(for additional listings see www.drworkingstiff.com)*

| | |
|---|---|
| Curious Life and Death of...: Brittany Murphy, Brain Jones, and Pablo Escobar | 2020 |
| Mythbusters, Discovery Channel, "Bite the Bullet" episode | August, 2014 |
| Forensic pathology consultant, National Organization of Parents of Murdered Children, Inc., Cincinnati OH *(pro-bono).* | |
| Script and on-set consultant in forensic pathology for NBC television program *E.R.* | 2009 – Present |

## ACTIVITIES AND MEMBERSHIPS

| | |
|---|---|
| Member, International Association of Coroners and Medical Examiners (IAC&ME) | 2016 – 2020 |
| Member, National Association of Medical Examiners (NAME) | 2000 – Present |
|     Board of Directors | 2016 – 2021 |
|     STAR Award | Oct. 2018 |
|     Ad-hoc committee on social media policy | 2018 – 2021 |
|     Ad-hoc committee on workforce development | 2020 – 2021 |
|     International relations subcommittee | 2018 – 2019 |
| ME/Coroner Media Guidelines Consensus Work Group for SAVE - Suicide Awareness Voices of Education | 2018 – 2019 |
| National Commission on Forensic Science/Medicolegal Death Investigation Subcommittee | |
| Medicolegal Autonomy & Independence Project Member | 2015 – 2017 |
| CDCP Sponsored NAME Toxicology Panel for Opiate Deaths | 2012 – 2013 |
| NAME Medical Examiner Independence Ad Hoc Committee, Chair | 2011 – 2013 |
| NAME Death Certification Improvement Ad Hoc Committee | 2009 – 2010 |
| NAME Membership Ad Hoc Committee | 2006 – 2007 |
| Member, American Academy of Forensic Sciences (AAFS) | 2000 – Present |
| Member, California Society of Pathologists | 2006 – 2007 |
| Member, College of American Pathologists | 1998 – 2002 |
| Member, American Society of Clinical Pathologists (ASCP) | 1998 – 2002 |
| Member at Large (AMA Alternate Delegate), ASCP Resident Physician's Section | 1999 – 2000 |
| Board of Directors Resident Representative, Los Angeles Society of Pathologists | 1998 – 2000 |
| Student Representative, AMA Advisory Panel on Women Physician Issues | 1994 – 1996 |

## PROFESSIONAL LICENSES

American Board of Pathology:

| | |
|---|---|
|     Board Certified in Anatomic & Clinical Pathology | August, 2001 |
|     Board Certified in Forensic Pathology | November, 2002 |
| New York State: Physician, License Number: 220265-1 *(lapsed)* | Issued: 1/30/01 |
| State of California: Physician and Surgeon, License Number: A65951 | Issued: 7/3/98 |
| Medical Council of New Zealand Practicing Certificate, Special Purpose | Issued: 8/17/20 |
|     Registration Number: 85445   HPI Number: 27FHQP | |

**PUBLICATIONS** *(*peer reviewed)*

1. Heads I Win, Tails You Lose: The Antivax Protests— Judy Melinek, MD, on COVID-19, disinformation, and the "new normal" *MedPage Today* March 18, 2022 (https://www.medpagetoday.com/opinion/working-stiff/97749)

2. Bad Falls and Bad Calls: Speculation on Bob Saget's Death - Second-guessing the forensic pathologist was bad science and lazy journalism. *MedPage Today* Feb 23, 2022 (https://www.medpagetoday.com/opinion/working-stiff/97330)

3. *Confusion between firearms and electrical weapons as a factor in police shootings. Kroll MW, Melinek J, Martin JA, Brave MA, Williams HE. *Forensic Science, Medicine and Pathology* https://doi.org/10.1007/s12024-022-00457-6 Published Online 24 Jan 2022

4. Op Ed: Pay-Per View Autopsy: Sideshow or Science? *MedPage Today* Jan 11, 2022 (https://www.medpagetoday.com/opinion/working-stiff/96606)

5. We Now Know Gabby Petito's Cause of Death— Coroner gives update. Melinek J. *MedPage Today* October 15, 2021 (https://www.medpagetoday.com/opinion/working-stiff/95069?no=trw)

6. Op Ed: We Know the Manner of Gabby Petito's Death. But What's the Cause? — All we have at this stage is public speculation. Melinek J. *MedPage Today* September 30, 2021 (https://www.medpagetoday.com/opinion/working-stiff/94788)

7. Op Ed: Cognitive Bias Is Influencing Forensic Pathology Decisions — Here are ideas for how to minimize it. Melinek J. *MedPage Today* September 24, 2021 (https://www.medpagetoday.com/opinion/working-stiff/94686)

8. Op Ed: Surfside Collapse: Beyond the Immediate Aftermath— A forensic pathologist's perspective on "the last responders" Melinek J. *MedPage Today* July 8, 2021 (https://www.medpagetoday.com/opinion/working-stiff/93471?trw=no)

9. Op-Ed: Forensic Pathology's Dirty Secret — Why do we eat our own? Melinek J. *MedPage Today* May 19, 2021 (https://www.medpagetoday.com/blogs/working-stiff/92683)

10. Op-Ed: A Meditation on Grief — Life goes on, but death is final and the pain will never go away. Melinek J. *MedPage Today* April 12, 2021 (https://www.medpagetoday.com/blogs/working-stiff/92054)

11. Op-Ed: Forensic pathologist: The real key to the Chauvin verdict. Melinek J. *CNN.com.* April 7, 2021 (https://edition.cnn.com/2021/04/06/opinions/chauvin-verdict-key-pathology-melinek/index.html)

12. Op-Ed: Criminal Confessions, Forensic Bias — No one is immune to prejudice. *MedPage Today.* *(https://www.medpagetoday.com/blogs/working-stiff/91462)*

13. *Cognitive bias in forensic pathology decisions, including responses to Letters to the Editor. Dror I, Melinek J, Arden J, Kukucka J, Hawkins S, Carter J, Atherton DS *J Forensic Sciences.* 2021; 66, 5:1751-1757. *(https://onlinelibrary.wiley.com/doi/epdf/10.1111/1556-4029.14697)*

14. Op-Ed: Toxic Work Environment? Here's How to Cope -- or Escape — Following #FreeFauci this week, I know exactly how the man felt. Melinek J *MedPage Today.* January 27, 2021 (https://www.medpagetoday.com/blogs/working-stiff/90914)

15. Op-Ed: The Cost of Liability — How U.S. healthcare reform can go forward - the view from a U.S. doctor living in New Zealand. Melinek J *MedPage Today.* January 23, 2021 (https://www.medpagetoday.com/blogs/working-stiff/90858)

16. Aftershock. Melinek J and Mitchell TJ. Hanover Square Press. January 7, 2021

17. Culture Shock: Why New Zealand's Response to COVID-19 Worked — A first-hand account from a doctor from the U.S. who lives in New Zealand. *MedPage Today.* November 24, 2020 (https://www.medpagetoday.com/blogs/working-stiff/89867)

18. I Quit the U.S. Due to COVID Threat — Here's what I learned in my new home. Melinek J. *MedPage Today.* October 6, 2020 (https://www.medpagetoday.com/blogs/working-stiff/88984)

19. Death Counts and Despair— Are we growing numb to the COVID carnage? Melinek J. *MedPage Today.* August 18, 2020 (https://www.medpagetoday.com/blogs/working-stiff/88141?no=trw&vpass=1)

20. The U.S. COVID-19 Failure Is Federal. Melinek J. *MedPage Today.* June 30, 2020 (https://www.medpagetoday.com/blogs/working-stiff/87351)

21. Forensic Pathologist Breaks Down George Floyd's Death. Melinek J. *MedPage Today.*  June 5, 2020 (https://www.medpagetoday.com/blogs/working-stiff/86913)

22. When Did COVID-19 Arrive and Could We Have Spotted It Earlier? — A forensic pathologist investigates. Melinek J. *MedPage Today* May 4, 2020 (https://www.medpagetoday.com/blogs/working-stiff/86291)

23. How Accurate Is the Coronavirus Death Toll? — A forensic pathologist's perspective. Melinek J. *MedPage Today* April 13, 2020 (https://www.medpagetoday.com/infectiousdisease/covid19/85925)

24. Forensic Pathologists Are Preparing for COVID-19 — What's the protocol when dealing with a dead body? Melinek J. *MedPage Today* March 30, 2020 (https://www.medpagetoday.com/infectiousdisease/covid19/85684?twr=no)

25. Will That Prevent COVID-19? A Pathologist Grades Coronavirus Precautions — From fist bumps to face masks — an evaluation of disease determent. Melinek J. *MedPage Today* March 5, 2020 (https://www.medpagetoday.com/blogs/working-stiff/85241)

26. Influenza Vaccination and Migration at the U.S. Southern Border. Sunderji A, Narvaez Mena K, Winickoff J, Melinek J, Sharfstein J. *AJPH.* February 5, 2020 e1

27. The Press and Professional Destruction: How lazy reporting misrepresents forensic pathology. Melinek J. *MedPage Today* January 30, 2020 (https://www.medpagetoday.com/blogs/working-stiff/84625)

28. First Cut. Melinek J and Mitchell TJ. Hanover Square Press. January 7, 2020

29. Workplace Decorations: Bringing Cheer or Deepening Wounds? *MedPage Today* December 19, 2019 (https://www.medpagetoday.com/blogs/working-stiff/84004)

30. Dirty, Smelly, Raw: The Future of Forensic Pathology. How can we encourage young doctors to join the field? *MedPage Today* December 10, 2019 (https://www.medpagetoday.com/blogs/working-stiff/83802)

31. Jeffrey Epstein: Hanging or Strangulation? A forensic pathologist on the new accusations. Melinek J. *MedPage Today* November 1, 2019 (https://www.medpagetoday.com/blogs/working-stiff/83087)

32. What Would You Say to New Med Students? Three unconventional lessons. Melinek J. *MedPage Today* (https://www.medpagetoday.com/blogs/working-stiff/82604)

33. Social Justice is Good Medicine - You can be both a scientist and a social justice advocate. Melinek J. *MedPage Today* September 26, 2019 (https://www.medpagetoday.com/publichealthpolicy/medicaleducation/82390)

34. * Two Cases of Tandem Bullets - One Homicide and One Suicide. Khau A and Melinek J. *Am J Forensic Med Pathol* 2019 Sep;40(3):262-265.

35. I Got Subpoenaed as a Witness. What Do I Do? - You're the expert, you can do this. Melinek J. *MedPage Today* July 23, 2019 (https://www.medpagetoday.com/blogs/working-stiff/81169)

36. Hey, Where Are the Dead Inmate's Organs? Another thing you probably didn't know about the pathologist's job. Melinek J. *MedPage Today.* July 3, 2019 (https://www.medpagetoday.com/blogs/working-stiff/80840)

37. How Mentoring Gives Me Hope - Our Future is in Good Hands. Melinek J. *MedPage Today* June 25, 2019 (https://www.medpagetoday.com/blogs/working-stiff/80689)

38. Your Patient Died. Now What? - Do's and (one big don't) from an expert forensic pathologist. Melinek J. *MedPage Today* May 14, 2019 (https://www.medpagetoday.com/blogs/working-stiff/79819)

39. How Not to Get Sued - Don't get on the wrong side of medical malpractice subpoena. Melinek J. *MedPage Today* April 16, 2019 (https://www.medpagetoday.com/blogs/working-stiff/79262)

40. Jury Selection, Expert Witnesses and Good Teachers. Melinek J. *Forensic Magazine* March 14, 2019. (https://www.forensicmag.com/news/2019/03/jury-selection-expert-witnesses-and-good-teachers)

41. Embrace Your Revulsions - Even doctors get grossed out. Melinek J. *MedPage Today* February 21, 2019 (https://www.medpagetoday.com/blogs/working-stiff/78146)

42. Opioids Are Killing American Men, But They're Not the Leading Cause of Death. Melinek J. *Men's Health.* Dec 3, 2018 (https://www.menshealth.com/health/a25378646/life-expectancy-report-leading-cause-of-death/)

43. Dear NRA: This Isn't Just My Lane, It's My %@$#! Highway. Melinek J. *MedPage Today* November 29, 2018 (https://www.medpagetoday.com/blogs/working-stiff/76580)

44. The NRA told doctors to "stay in your lane" on guns. I'm a doctor. This is my lane. Melinek J. *Vox.com* November 12, 2018 (https://www.vox.com/first-person/2018/11/12/18087262/doctors-guns-thousand-oaks-nra)

45. Don't Lie About Dying Patients' Pain — Because sometimes, yes, they suffered. Melinek J. *MedPage Today* September 27, 2018 (https://www.medpagetoday.com/publichealthpolicy/ethics/75347)

46. Doctor on the Stand: Fact Witness or Expert? Melinek J. *Forensic Magazine* September 20, 2018. (https://www.forensicmag.com/article/2018/09/doctor-stand-fact-witness-or-expert#.W7ltOZVN02Y.twitter)

47. My Father Killed Himself — Advice from a Physician and Suicide Survivor. Melinek J. *MedPage Today* August 16, 2018 (https://www.medpagetoday.com/psychiatry/depression/74589)

48. 'CSI' is Dead Wrong about Forensics – Five ways fictional TV crime shows fail. Melinek J. *MedPageToday* June 14, 2018. (https://www.medpagetoday.com/pathology/generalpathology/73499)

49. The Hidden Costs of the Opioid Epidemic. Melinek J. *Forensic Magazine.* June 2018. 15, 2:20-21(https://digital.forensicmag.com/forensics/june_2018/MobilePagedReplica.action?pm=2&folio=20#pg20)

50. Even Dead Patients Complain – Well, their families do. Melinek J. *MedPageToday* May 10, 2018. (https://www.medpagetoday.com/primarycare/generalprimarycare/72803)

51. How to Set up a Forensic Consulting Practice. Melinek J. *Forensic Magazine.* March 6, 2018 (https://www.forensicmag.com/article/2018/03/how-set-forensic-consulting-practice)

52. The Importance of Expert Witness Consult Work. Melinek J. *Forensic Magazine.* December 13, 2017 (https://www.forensicmag.com/article/2017/12/importance-expert-witness-consult-work)

53. Reasonable Uncertainty: The Limits and Expectations of an Expert's Testimony. Melinek J. *Forensic Magazine* September 2017, 14, 3:18-19 (https://www.forensicmag.com/article/2017/09/reasonable-uncertainty-limits-and-expectations-experts-testimony)

54. * Which Knife was Used? - Using a Porcine Model to Assess Stab Wound Size. Zohn A, Melinek J. *Am J Forensic Med Pathol.* 2017 Sep; 38(3):180-183

55. Jury Duty: Inside the Box. Melinek J. *Forensic Magazine* June 2017 14,2:23-24. (https://www.forensicmag.com/article/2017/06/expert-witness-jury-duty-inside-box)

56. How to Find a Qualified Forensic Pathology Expert. Melinek J. *Forensic Magazine.* March 2017, 14,1:22-23 (http://www.forensicmag.com/article/2017/03/how-find-qualified-forensic-pathology-expert#.WNMewiS-3_U.twitter)

57. * Gunshot Wound Trajectory Analysis Using Forensic Animation to Establish Relative Positions of Shooter and Victim. Galligan A, Fries C, Melinek J. *Forensic Science International* 2017 Feb; 271:e8-e13. doi: 10.1016/j.forsciint.2016.12.039. Epub 2017 Jan 5

58. Infant Death Investigation: Asphyxia or SIDS? Melinek J. *Forensic Magazine* December 6, 2016, 13,4:14-15(http://www.forensicmag.com/article/2016/12/infant-death-investigation-asphyxia-or-sids)

59. * Dissecting and Streamlining the Medical Record Acquisition Process in Death Investigation Systems. Croom N and Melinek J. *Academic Forensic Pathology* December 2016 6(4): 679-690

60. * Catching a Bullet: Gunshot Wound Trajectory Analysis Used To Establish Body Position.

Butler B, Fries C, Panock J, Jorden M and Melinek J. *Academic Forensic Pathology* December 2016 6(4): 739-745

61. How Designer Drugs and the Opioid Epidemic Affect Modern Forensic Practice. Melinek J. *Forensic Magazine* September 2016, 13,3:18-19(http://digital.forensicmag.com/forensics/september_2016/MobilePagedReplica.action?pg=18#pg18)

62. Mind Your Manners: Where Death Certification Ends and Prevention Begins. Melinek J. *Forensic Magazine* June 2016, 13,2:18-19 (http://digital.forensicmag.com/forensics/june_2016/MobilePagedReplica.action?pg=18#pg18?)

63. After a Violent Death: What the Victim's Family Needs to Know. Melinek J. Parents of Murdered Children *Survivors* Spring Newsletter Volume 34, Issue 1, March 2016

64. What Would You Do? Ethics and the Forensic Expert. Melinek J. *Forensic Magazine* March 4, 2016, 13, 1:18-19 (http://www.forensicmag.com/articles/2016/03/ethics-and-forensic-expert-what-would-you-do?et_cid=5157302)

65. Justice Scalia's Unexamined Death Points to a Problem (Opinion) *CNN.com* February 18, 2016 (*http://www.cnn.com/2016/02/18/opinions/justice-scalia-no-autopsy-melinek/*)

66. Forensic Radiology and the Medical Examiner. Melinek J. *Forensic Magazine* December 23, 2015, 12,6:16-17(*http://www.forensicmag.com/articles/2015/12/forensic-radiology-and-medical-examiner*)

67. Five Case Studies in Forensic Toxicology. Judy Melinek. *Forensic Magazine* October 22, 2015, 12,5:20-21 (*http://www.forensicmag.com/articles/2015/10/five-case-studies-forensic-toxicology*)

68. 7 Common Mistakes Regarding Autopsy Reports. Melinek J. *Forensic Magazine* September 9, 2015. (http://www.forensicmag.com/articles/2015/09/7-common-mistakes-regarding-autopsy-reports)

69. What Michael Brown's Autopsy Tell Us (Opinion) *CNN.com* August 21, 2014 (http://www.cnn.com/2014/08/20/opinion/melinek-michael-brown-autopsy/)

70. Working Stiff: Two Years, 262 Bodies and the Making of a Medical Examiner. Judy Melinek & T.J. Mitchell. Scribner Books, New York, August 2014. New York Times Bestseller E Book & Science Book Lists. #1 Best Seller on Amazon Law Enforcement Biographies & Memoirs.

71. * The Ethics of Being a Retained Expert Witness. Melinek J. *Academic Forensic Pathology* 2013, 3 (3): 281-288

72. * Forensic Considerations in Bariatric Surgery Patients. Melinek, J. and Lemos, N.P. *Academic Forensic Pathology* 2013, 3(1): 13-21

73. * Medical Examiner's Independence is Vital for the Health of the American Legal System. Luzi SA, Melinek J, Oliver WR. *Academic Forensic Pathology* 2013, 3(1): 84-92

74. * NAME Position Paper: Medical Examiner, Coroner, and Forensic Pathologist Independence. Melinek J, Thomas LC, Oliver WR, Schmunk GA, Weedn VW. *Academic Forensic Pathology* 2013, 3(1): 93-98

75. * Recommendations for the Investigation, Diagnosis, and Certification of Deaths Related to Opioid Drugs. *Academic Forensic Pathology* 2013, 3(1): 62-76

76. * NAME Position Paper: Recommendations for the Investigation, Diagnosis, and Certification of Deaths Related to Opioid Drugs. *Academic Forensic Pathology* 2013, 3(1): 77-83

77. * Vertebral Artery Dissection Complicating Occipital Injection of Heparin for Treatment of Thoracic Outlet Syndrome. Melinek J, Hart AP. *Am J Forensic Med Pathol.* 2012 Mar;33(1):76-9

78. * New Records of Carrion Feeding Insects Collected on Human Remains.  Honda J, Melinek J, Happy C. *Pan-Pacific Entomologist* 2008, 84(1):29-32

79. Medical Illustrations for Chapter 19, Forensic Neuropathology, Armbrustmacher, V. and Hirsch, C. Spitz & Fisher's *Medicolegal Investigation of Death.* 4th Edition. Editor: Werner U. Spitz. Charles C. Thomas, Springfield, Illinois, 2006. *Figures 1-6, 13, 66 and 67;* credit on page 1072.

80. * Anthropological and Radiographic Comparison of Vertebrae for Identification of

Decomposed Human Remains. Mundorff AZ, Vidoli G, Melinek J. *Journal of Forensic Sciences,* 2006 Sep;51(5):1002-1004.

81. * Postmortem Suture Analysis of Anastomotic Suture Line Disruption Following Carotid Endarterectomy. Melinek J, Lento P, Moalli J. *Journal of Forensic Sciences* 2004 Sep;49(5):1077-81.

82. Santa Clara County Police Chief's Association Child Abuse Protocol for Santa Clara County Law Enforcement. Update 2004 May.

83. * Death Following Gastric Bypass Surgery For Morbid Obesity. Melinek J, Livingston EH, Cortina G, Fishbein MC. *Archives of Pathology & Laboratory Medicine.* 2002 Sept 126:1091-1095

84. * Inhalational Anthrax: Gross Autopsy Findings. Gill J and Melinek J. *Archives of Pathology & Laboratory Medicine.* 2002 Aug. 126:993-994

85. * Bucillamine, a Thiol Antioxidant, Prevents Transplantation-Associated Reperfusion Injury. Amersi F, Nelson SYK, Shen XD, Kato H, Melinek J, Kupiec-Weglinski JW, Horwitz LD, Busuttil RW, and Horwitz MA. *Proceedings of the National Academy of Sciences* 2002 June 99:8915-8920.

86. * Heme oxygenase-1 gene therapy: a novel immunomodulatory approach in liver allograft recipients? Ke B, Shen XD, Melinek J, Gao F, Ritter T, Volk HD, Busuttil RW, Kupiec-Weglinski JW. *Transplantation Procedings.* 2001 Feb-Mar 33(1-2):581-2

87. * Amelioration of hepatic ischemia/reperfusion injury with intercellular adhesion molecule-1 antisense oligodeoxynucleotides. Ghobrial R, Amersi F, Stecker K, Kato H, Melinek J, Singer J, Mhoyan A, Busuttil RW, Kupiec-Weglinski JW, Stepkowski SM. *Transplantation Proceedings.* 2001 Feb-Mar 33(1-2):538

88. * A novel iron chelator in combination with a P-selectin antagonist prevents ischemia/ reperfusion injury in a rat liver model. Amersi F, Dulkanchainun T, Nelson SK, Farmer DG, Kato H, Zaky J, Melinek J, Shaw GD, Kupiec-Weglinski JW, Horwitz LD, Horwitz MA, Busuttil RW. *Transplantation.* 2001 Jan 15; 71(1):112-8

89. * Upregulation of Heme Oxygenase-1 Protects Genetically Fat Zucker Rats from Ischemia/ Reperfusion Injury. Amersi F, Buelow R, Kato H, Ke B, Coito AJ, Zhao D, Zaky J, Melinek J, Lassman CR, Kolls JK, Alam J, Ritter T, Volk HD, Farmer DG, Ghobrial RM, Busuttil RW and Kupiec-Weglinski JW. *Journal of Clinical Investigation* December 1, 1999 104(11):1631-1639

90. The New ASCP Comprehensive Review Course for Anatomic and Clinical Pathology. Melinek J. *RPS News* Winter 1999 13(4): 2-3

91. * Significance of Early Aminotransferase Elevation after Liver Transplantation. Rosen HR, Martin P, Goss J, Donovan J, Melinek J, Rudich S, Imagawa DK, Kinkhabwala M, Seu P, Busuttil RW. *Transplantation* January 15, 1998 65(1):68-72

92. * Randomized Controlled Trial to Evaluate Flush and Reperfusion Techniques in Liver Transplantation. Millis JM, Melinek J, Csete M, Imagawa DK, Olthoff KM, Neelakanta G, Braunfeld M, Sofer M, ChanS, Pregler J, Yersiz H, Tamura K, Shackleton CR, Shaked A, Jurim O, Busuttil RW. *Transplantation* February 15, 1997 63(3):397-403

93. * Lack of Correlation between the Magnitude of Preservation Injury and the Incidence of Acute Rejection, Need for OKT3 or Conversion to FK506 in Cyclosporine Treated Primary Liver Allograft Recipients. Shackleton CR, Melinek J, Martin P, Millis JM, Olthoff KM, Imagawa DK, Jurim O, Shaked A, McDiarmid SV, Goldstein LI, Busuttil RW. *Transplantation* September 27, 1995 60(6):554-558

94. * Living-Donor Liver Transplantation at UCLA. Jurim O, Shackleton CR, McDiarmid SV, Martin P, Shaked A, Millis JM, Imagawa DK, Olthoff KM, Maxfield A, Pakrasi AL, Melinek J, Ament M, Vargas J, Goldstein LI, Busuttil RW. *The American Journal of Surgery* May 1995 169:529-532

95. * Microglial Cell Cytotoxicity of Oligodendrocytes Is Mediated through Nitric Oxide. Merrill JE, Ignarro LJ, Sherman MP, Melinek J, Lane TE. *The Journal of Immunology* August 15, 1993 151: 2132-2141

96. * Increased Protein Kinase C Activity in Human Memory T Cells. Höllsberg P, Melinek J, Benjamin D, Hafler DA. *Cellular Immunology* June 1993 149(1):170-179

## REVIEWS

*Working Stiff: Two Years, 262 Bodies and the Making of a Medical Examiner.* Judy Melinek & T.J. Mitchell. Scribner Books, New York, August 2014.

> "Haunting and illuminating...the stories from [Dr. Melinek's] average workdays should also transfix the reader with their demonstration that medical science can diagnose and console long after the heartbeat stops." — New York Times

> "In this engrossing tale of how Melinek became a forensic pathologist, she pulls back the sheet to show readers just what goes on after someone dies... Armchair detectives and would-be forensic pathologists will find Melinek's well-written account to be inspiring and engaging."— Publishers Weekly

> "Spellbinding. . . . Melinek is movingly empathetic toward the families of victims. . . . An unforgettable story." — Booklist (starred review)

*First Cut.* Judy Melinek & T.J. Mitchell. Hanover Square Press, New York, January 2020.

> "A strong series launch…While Jessie's gutsy personality will endear her to readers, it's the meticulous detail that distinguishes this novel…Fans of Patricia Cornwell's Kay Scarpetta will be pleased."
>
> —Publishers Weekly

*Aftershock.* Judy Melinek & T.J. Mitchell. Hanover Square Press, New York, January 2021.

> "Judy Melinek and T.J. Mitchell are gifted storytellers... if CBS or NBC comes calling in a month or so, it will not be a surprise." —San Francisco Chronicle

# Prior Testimony

Dr. Judy Melinek Four-Year Testimony List April 2018 - April 2022

| # | Name of Case | Court | Depo/Grand Jury/Prelim/Trial/ Hearing |
|---|---|---|---|
| 1 | Larry Babcock v State of Iowa, Case No: PCCV070058 | Des Moines, IA | 6/5/18 D |
| 2 | People of the State of California v Rickey Roberts, Case No: 15027520 | San Francisco, CA | 6/11/18 T |
| 3 | LeGrier v City of Chicago, Case No: 15 L 12964 | Chicago, IL | 6/19/18 T |
| 4 | Karen Garcia v Tri-Modal Distribution Services, Inc., Case No: BC536714 | Los Angeles, CA | 7/17/18 D |
| 5 | Qixing Yuan, et al, v The Legends at Willow Creek, LP, et al Case No.: 34-2015-00186315 | Sacramento, CA | 8/1/18 D |
| 6 | Brandon Villarreal, et al, v County of Monterey, et al Case No.: CV 157295 | San Francisco, CA | 8/9/18 D |
| 7 | People v Randall K. Marshall (MCN: 17015667) | San Francisco, CA | 11/27/18 T |
| 8 | Sun Cha Hong, et al, v Grancare, LLC dba Parkview Healthcare Center, et al case #RG17844319 | Oakland, CA | 12/13/18 D |
| 9 | Cilvia Ornelas Flores; Dick Ornelas v Disabled Medical Transport; Mario Moya Jr.; Omar Arias; Does 1-50 case#PSC1502847 | Palm Springs, CA | 12/17/18 D |
| 10 | People of the State of California v  Abdul Bey (#1-186596-3) | Martinez, CA | 1/25/19 H |
| 11 | People of the State of California v James Rickleffs (#12022732) | San Francisco, CA | 2/14/19 T |
| 12 | Genova v Johnson (#17CV0454) | San Luis Obispo, CA | 3/5/19 D |
| 13 | Carnathan v BWA (#17-1-0096 (HTN)) | San Francisco, CA | 3/18/19 D |
| 14 | People of the State of California v Caleb Burrett (#2016034898) | Ventura County, CA | 3/21/19 T |
| 15 | Hales Public Safety Officer's Benefits Program Hearing, PSOB Claim # 2009-271 | San Francisco, CA | 5/7/19 H |
| 16 | People of the State of California v  Derick Ion Almena and Max Cardin Harris, #17CR017349 | Oakland, CA | 5/8/19 T (non-retained expert) |
| 17 | People of the State of California v Joshua Caleb Stepp, Case No.: VCF273216A (retrial) | Visalia, CA | 6/11/19 T |
| 18 | People of the State of California v Anthony Morales, 18-CR-019843 | Oakland, CA | 7/16/19 T (non-retained expert); 12/10/2019 T (re-trial, non-retained expert) |
| 19 | People of the State of California v Jonathan Jackson, 2-323860-7; 5-170598-7 | Martinez, CA | 9/23-24/19 T |
| 20 | Mary Lou Brown v St. Francis Hospital (#CJ-2015-3865) | Tulsa, OK | 10/1/2019 D |
| 21 | People of the State of California v Olivier Abdella, Kaveh Bayat, Tiffany Li (#16-005932) | San Mateo, CA | 10/15/2019, 10/22/2019 T |
| 22 | People  of the State of California v Sean McGeough (#17F7066) | San Andreas, CA | 11/15/2019 T |
| 23 | People of the State of California v David Vigil (#178803) | Oakland, CA | 11/20/2019 T (non-retained expert) |
| 24 | People of the State of California v Manuel Anthony Lopez (#C1629739) | San Jose, CA | 3/12/2020, 3/16/2020, 5/18-20/2020 T |
| 25 | Richard Morgan, et al, v Care Solutons Associates, et al (RG19005315; RG19041582) | Oakland, CA | 6/1/2020 D (non-retained expert) |
| 26 | MANINDER SINGH, individually and as Heir of the Estates of JASVIR KAUR and KEWAL SINGH and SIRBHAI SINGH; GURDEV SINGH, as Heir of the Estates of JASVIR KAUR and KEWAL SINGH and NIRBHAI SINGH; SURJIT KAUR, individually and as Heir of the Estate of KEWAL SINGH; LAKHVIR HANS, as Heir of the Estate of KEWAL SINGH; and SHERYL BELL, administrator of the Estates of KEWAL SINGH and JASVIR KAUR and NIRBHAI SINGH v NISSAN MOTOR COMPANY LTD.; NISSAN NORTH AMERICA, INC.; ADVANTAGE OPCO, LLC d/b/a ADVANTAGE RENT-A- CAR; CLIFFORD H. BUSCH; DOES 1 through X, inclusive; and ROE CORPORATION 1 through X, inclusive  Case #: AC-17-751024-C | Clark County, NV | 1/29/2021 D |
| 27 | ESTATE OF GIL BEN-KELY by ANTONELLA BEN-KELY as the duly appointed representative of the Estate and as the widow and heir of Decedent GIL BEN-KELY; SHON BEN-KELY, son and heir of the Decedent GIL BEN-KELY; NATHALIE BENKELY-SCOTT, daughter and heir of the decedent GIL BEN-KELY, GWENDOLYN WARD, as Personal Representative of the ESTATE OF CRAIG SHERWOOD, deceased, GWENDOLYN WARD, individually and as surviving spouse of CRAIG SHERWOOD; GWENDOLYN WARD, as mother and natural guardian of ZANE SHERWOOD, surviving minor child of CRAIG SHERWOOD, Plaintiffs, v SPEED VEGAS, LLC, a foreign-limited liability<br>company; VULCAN MOTOR CLUB, LLC d/b/a WORLD CLASS DRIVING, a New Jersey<br>limited liability company; SLOAN VENTURES 90, LLC, a Nevada limited liability company; MOTORSPORT SERVICES INTERNATIONAL, LLC, a North Carolina limited liability company; AARON FESSLER, an individual; the ESTATE OF CRAIG SHERWOOD and AUTOMOBILI LAMBORGHINI AMERICA, LLC, a foreign limited liability company; TOM MIZZONE, an individual; SCOTT GRAGSON, an individual; PHIL FIORE aka FELICE FIORE, an individual; DOES I-X; and ROE ENTITIES I- X, inclusive, Defendants  (case No: A-17-757614-C_ | Clark County, NV | 3/5/2021 D |
| 28 | Nimfa Pontillas, Plaintiff, v Fidelity Life Association, A Mutual Legal Reserve Company and Does 1-50, case no: 8:19-cv-02211-JLS-KES | Los Angeles, CA | 4/23/2021 D |
| 29 | Estate of Wayne Steven Anderson v California Highway Patrol Officer John Marsh and Does 1-20 (Case No: 1:14-cv-01599-TLV-SAB) | Contra Costa County, CA | 5/28/21 D |

1

| # | Name of Case | Court | Depo/Grand Jury/Prelim/Trial/Hearing |
|---|---|---|---|
| 30 | People of the State of California v Omar Herrera | San Francisco, CA | 7/1/21 T |
| 31 | Katherine Wu Rice University Title IX Hearing | Houston, TX | 7/26/21 H |
| 32 | People of the State of California v Victoria Soledad Garcia | San Mateo, CA | 9/3/21 T |
| 33 | Merrick v State of Washington (Case No. 19-2-00099-19) | Seattle, WA | 3/11/22 D |
| 34 | Rosalind Ibarra, as the Special Administratrix of the Estate of Jorge Martinez, deceased, v Cheyenne Lee, Scott Walton, Sheriff of Rogers County in his Official Capacity, and The Board of County Commissioners of Rogers County (case no.: 20-cv-00598-TCK-JFJ) | Tulsa, OK | 3/18/22 D |

# Fee Schedule

 **PathologyExpert, Inc.**

**Judy Melinek, M.D.**
3739 Balboa Street #102
San Francisco, CA 94121
**E** drjudymelinek@pathologyexpert.com
**T** 415/850/7056
**W** *www.pathologyexpert.com*

## FEE SCHEDULE

| | |
|---|---|
| Non-Refundable Retainer<br>*Applied to first 3 hours of review* | $2,250.00 |
| Review of materials and reports and provision of initial oral opinion | $750.00/hour |
| Advance fee for written report<br>*Covers 5 hours of time; additional hours billed at regular hourly rate of $750/hr* | $3,750.00 |
| Advance testimony preparation fee<br>*Covers 2 hours of preparation time; additional time billed at $750/hr* | $1,500.00 |
| Deposition fee — Due at deposition | $750.00/hour |
| Testimony at hearing or trial<br>*Including travel and waiting time* | $750.00/hour |
| Cancellation Fee for Testimony<br>*Within 48 hours/2 business days*<br>*On day of testimony* | $750.00<br>$1,125.00 |
| Travel time | $750.00/hour |
| Travel Costs (hotel, flight, meals & ground transportation) | Billed at Cost |
| Autopsy & Tissue Examination, Evidence and Slide Review | $750.00/hour |
| Project-based Administrative Support | $70.00/hour |
| Late Payment Fee — for payment received >30 days from invoice date | 2% of unpaid balance |

**NOTE:**
PathologyExpert, Inc.'s EIN is 46-2971456. A W9 form will be furnished upon request.

SCIENCE ON YOUR SIDE