1        IN THE UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF KENTUCKY

3             LOUISVILLE DIVISION

4            HON. JUSTIN WALER

5          MAG. COLIN H. LINDSAY

6          CASE NO. 17-CV-419

7

8        JEFFREY DEWAYNE CLARK AND

9         GARR KEITH HARDIN,

10              Plaintiffs

11

12                 V.

13

14          LOUISVILLE JEFFERSON

15        COUNTY METRO GOVT, ET AL.,

16             Defendants

17

18

19

20

21

22

23   DEPONENT:  DR. GEORGE R. NICHOLS

24   DATE:      SEPTEMBER 6, 2022

25   REPORTER:  JESSE HARP



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

2

```
 1            APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, JEFFERY DEWAYNE CLARK:

 4   Katie McCarthy, Esquire (Appeared via videoconference)

 5   Amy Staples, Esquire

 6   Loevy & Loevy

 7   311 North Aberdeen

 8   3rd Floor

 9   Chicago, Illinois 60607

10   Telephone No.: (312) 243-5900

11   E-mail: amy@loevy.com

12

13   ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

14   Nick Brustin, Esquire

15   Neufeld, Scheck & Brustin, LLP

16   99 Hudson Street

17   8th Floor

18   New York, New York 10013

19   Telephone No.: (212) 965-9081

20   E-mail: nick@nsbcivilrights.com

21    (Appeared via videoconference)

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1                 APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, MEADE COUNTY:

4    Andrew T. Garverich, Esquire

5    Keith Bond, Esquire (Appeared via videoconference)

6    Coleman Lochmiller & Bond

7    2907 Ring Road

8    Elizabethtown, Kentucky 42701

9    Telephone No.: (270) 737-0600

10   E-mail: agarverich@clblegal.com

11          rkbond@clblegal.com

12

13   ON BEHALF OF DEFENDANT, MARK HANDY:

14   Madison Johnson, Esquire

15   Dressman, Benzinger & Lavelle, PSC

16   221 East Fourth Street

17   Suite 2500

18   Cincinnati, Ohio 45202

19   Telephone No.: (502) 630-1309

20   E-mail: mgamble@dbllaw.com

21   (Appeared via videoconference)

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              APPEARANCES (CONTINUED)

 2

 3  ON BEHALF OF THE DEFENDANT, JIM WOOSLEY:

 4  Joey Klausing, Esquire

 5  O'Bryan, Brown & Toner

 6  401 South Fourth Street

 7  Suite 2200

 8  Louisville, Kentucky 40202

 9  Telephone No.: (502) 585-4700

10  E-mail: klausing@obtlaw.com

11  (Appeared via videoconference)

12

13  ON BEHALF OF THE DEFENDANT, ROBERT THURMAN:

14  Ed Monarch, Esquire

15  McBrayer, PLLC

16  500 West Jefferson Street

17  Suite 2400

18  Louisville, Kentucky 40202

19  Telephone No.: (502) 888-1834

20  E-mail: emonarch@mcbrayerfirm.com

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

5

```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, LOUISVILLE METRO

 4   GOVERNMENT, JAMES CLARK, ROBERT ENNIS, KELLY JONES AND

 5   JAMES GRIFFITHS:

 6   Lee Sitlinger, Esquire (Appeared via videoconference)

 7   Abigail Fletcher, Esquire

 8   Sitlinger Law

 9   320 Whittington Parkway

10   Suite 304

11   Louisville, Kentucky 40222

12   Telephone No.: (502) 589-2627

13   E-mail: atudor@sitlingerlaw.com

14           Lsitlinger@sitlingerlaw.com

15

16   Also Present: Lucia Geng, paralegal for Neufeld, Scheck

17   & Brustin (Appeared via videoconference); Dana Grant,

18   paralegal for Dressman Benzinger LaVelle (Appeared via

19   videoconference), PSC; Emilia Lopez, Videographer

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS taken on September 06, 2022

6

```
 1                            INDEX

 2                                              Page

 3    PROCEEDINGS                                 8

 4    DIRECT EXAMINATION BY MS. MCCARTHY         10

 5

 6

 7                          EXHIBITS

 8    Exhibit                                   Page

 9    177 - Designation                          37

10

11

12               REQUESTS FOR PRODUCTION

13

14    1 - Dr. Nichols' Notes

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1            STIPULATION

2

3    The VIDEO deposition of DR. GEORGE NICHOLS was taken at

4    KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE

5    101, LOUISVILLE, KENTUCKY 40202 on TUESDAY the 6TH day

6    of SEPTEMBER 2022 at approximately 10:06 A.M.; said

7    deposition was taken pursuant to the KENTUCKY Rules of

8    Civil Procedure.

9

10   It is agreed that JESSE HARP, being a Notary Public and

11   Court Reporter for the State of KENTUCKY, may swear the

12   witness.

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R. NICHOLS, taken on September 06, 2022

8

```
 1                    PROCEEDINGS

 2

 3        VIDEOGRAPHER:  My name is Emilia Lopez, I'm

 4   the Videographer today, and Jesse Harp -- reporter.

 5   Today is the 6th day of September 2022.  The time

 6   is 10:06 a.m.  We're at the offices of Kentuckiana

 7   Court Reporters in Louisville, Kentucky to take the

 8   deposition of Dr. George Nichols in the matter of

 9   Jeffrey Dewayne Clark and Garr Keith Hardin versus

10   Louisville Jefferson County Metro Government et

11   al., pending in the US District Court of Western

12   District, Kentucky Louisville Division.  Case

13   number 17-CV-419.

14        MS. MCCARTHY:  I think -- good morning,

15   Dr. Nichols.  Can you hear me okay?

16        MS. STAPLES:  Katie, the court reporter's

17   still speaking.

18        MS. MCCARTHY:  Oh, we can't hear anymore.

19        VIDEOGRAPHER:  Oh.  Will the counsel please

20   identify themselves with the -- for the record,

21   starting with the plaintiff's counsel?

22        MS. STAPLES:  Oh, Amy Robins --

23        MS. MCCARTHY:  Yes.

24        MS. STAPLES:  Amy Robinson Staples for the

25   plaintiff, Jeffrey Clark.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        MS. MCCARTHY:  And Katie McCarthy for the
 2   plaintiff, Keith Hardin.
 3        MR. BRUSTIN:  Nick Brustin, also for the
 4   plaintiff, Keith Hardin.
 5        MR. GARVERICH:  Andrew Garverich for the
 6   defendants, Meade County.
 7        MR. MONARCH:  Ed Monarch for Robert Thurman.
 8        MR. BRUSTIN:  On Meade County defendants, be
 9   the same.
10        MS. FLETCHER:  Abigail Fletcher at Sitlinger
11   for the City of Louisville Metro Government.
12        MS. JOHNSON:  Madison Johnson for defendant
13   Mark Handy.  Also have Dana Grant, who's a
14   paralegal for us, as well.
15        MR. KLAUSING:  Joey Klausing for Detective
16   Woosley.
17        VIDEOGRAPHER:  Is that everybody?
18        MR. GARVERICH:  I believe so.
19        COURT REPORTER:  Okay.  Could you please raise
20   your right hand?  Do you solemnly swear or affirm
21   the testimony you're about to give is the truth,
22   the whole truth, and nothing but the truth?
23        THE WITNESS:  I do.
24        COURT REPORTER:  Thank you.  You can begin.
25        MS. MCCARTHY:  All right.  Go through this
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      again.

2                      DIRECT EXAMINATION

3   BY MS. MCCARTHY:

4        Q      Good morning, Dr. Nichols.

5        A      Good morning.

6        Q      Can you hear me okay?

7        A      Yes, I can hear you and I can see you.

8        Q      Great.  I'm not sure if you remember me, but I

9   took your deposition in this case a couple years back.

10  So I'll just introduce myself again for the record.  I'm

11  Katie McCarthy, and I'm one of the counsel for the

12  plaintiff, Keith Hardin, in this case.  Okay.  Before we

13  get started, do you bring anything with you today for

14  your deposition?

15       A      I brought with me the case profile, which

16  lists everything that I have -- have received and have

17  read and/or studied.  I also brought the -- a copy of

18  the notice of deposition.

19       Q      Okay.  And when you say case profile, you --

20  did give testimony previously in this case, correct?

21       A      1995 and 2000.  January 2000.

22       Q      Yeah.  Good memory.  And so the case profile,

23  is that the same case profile that you brought with you

24  in January 2020?

25       A      There have been other things that have been --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE R.   NICHOLS taken on September 06, 2022

11

```
 1   have been added to it, which -- which in -- since

 2   January 2020.  Let's see, we've got -- I received a copy

 3   of my trial transcript on -- on January 27, 2020.  And I

 4   received a -- my deposition given in January 2020 on the

 5   -- the 10th of May 2021.  Received on the 10th of August

 6   2022 is the deposition of Judy Melinek, MD., on

 7   August 11, 2022, defendant Thurman's designation of

 8   unretained expert, George Nichols, and the expert

 9   witness disclosure of William C. Rodriguez, III, PhD.

10        Q    All right, let me make sure I have all that.

11   So back in January, you received a copy of your child's

12   testimony.  That's in 1995, the Rhonda Sue Warford

13   homicide trial, correct?

14        A    Correct.

15        Q    And then in -- on May 10th of this year, you

16   received your deposition transcript of your prior

17   testimony in this case?

18        A    Incorrect -- 2021.

19        Q    Oh, okay.  20 -- okay.  May 10, 2021.

20        A    Correct.

21        Q    Okay.  And when did you receive the deposition

22   of Dr. Melinek?

23        A    On the 10th of August 2022.

24        Q    Okay.  And you also received it -- a

25   designation of your own testimony in August 2022?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    That is -- that is my designation.  Yes.  Not

2  testimony in August.  It's my designation compiled by an

3  -- by a litigant.

4    **Q    All right.  And you received, you said, the**

5  **disclosure -- factual report of William C. Rodriguez?**

6    A    That's not what I said.  What I said is I --

7  I've received a disclosure, not his report.

8    **Q    Okay.  And have you taken any notes for**

9  **yourself in this case, since your deposition in January**

10 **2020?**

11   A    I did.  I did not bring them.  I was not

12 directed to, and therefore I did -- did not feel

13 compelled to bring them.

14   **Q    Okay.  But of course you can make a copy of**

15 **those notes available to us, correct?**

16   A    If the court asks, of course.

17   **Q    In January 2020, when you testified, you**

18 **brought your notes with you then, right?**

19   A    Yes.

20   **Q    Okay.  And you didn't have any issue turning**

21 **them over in that deposition?**

22   A    No, I did not.  But as the result of --

23   **Q    Okay.**

24   A    As the result of an almost eight-hour

25 deposition, I decided I was not going to bring anything

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  else that was going to -- I would have to pack from a

2  parking lot into an office building.

3      Q     Okay.  And so going to make a request right

4  now that, for the production of those notes, which you

5  can do after this deposition, okay?

6      A     If I'm given a notice to provide them, they

7  will be provided.

8      Q     So it's your position that unless the court

9  orders you, you will not turn those notes over?

10     A     I will turn them over.  It would be very nice

11  if I had something other than a Zoom request.

12     Q     But you -- did you review your deposition

13  testimony in this case since you received it?

14     A     Yes.

15     Q     Okay.  When was the last time you looked at

16  that testimony?

17     A     Of my deposition testimony?

18     Q     Yes.

19     A     The last time I reviewed that was last week,

20  which was also the same time that I reviewed Melinek's

21  deposition and the expert witness disclosure of

22  Dr. Rodriguez, and the same time that I read my

23  designation as a -- as an unretained expert.

24     Q     Okay.  And -- but you received your deposition

25  back in May 2021?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    Did you review it back then when you received

 3   it?

 4        A    No.  I hoped this whole thing was going to go

 5   away.

 6        Q    Okay.  So you didn't read defendant Thurman's

 7   designation of you as an unretained expert until last

 8   week?

 9        A    I -- I knew that I had not been retained by

10   verbal -- verbal conversation that I had had with --

11   with defense attorney.  And by the way, the only

12   attorney I've spoken with since -- since the -- the last

13   deposition was Mr. Monarch, who was in my office in

14   April 2022 for one hour and 20 -- and 15 minutes.

15        Q    Okay.  So my question, though, was you didn't

16   review your designation that was prepared -- compiled

17   by, I take it, Mr. Monarch until last week?

18        A    Correct.  It -- it wasn't received in until

19   the 11th of August.  And in the interval, there was this

20   thing called COVID that -- that infected my life.

21        Q    Okay.  You saw that the designation of you as

22   an unretained expert was dated June 10, 2022, right?

23        A    Let me see.  You'll have to tell -- show me

24   which page the --

25        Q    All right.  I'm looking at the Certificate of
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Service on page 5.

 2         A    I see it right there.

 3         Q    You were provided four -- a copy of four

 4    volumes was e-mailed at this 10th day of June 2022.  You

 5    see that?

 6         A    All right.  I do now.  Thank you very much.

 7         Q    Okay.  So do you accept this designation of

 8    your anticipated testimony was prepared as of

 9    June 10, 2022, correct?

10         A    Yes.

11         Q    Okay.  But you were not provided a copy of

12    this designation until August 11, 2022?

13         A    That's when it arrived in my office.  Yes.

14         Q    Two months later.  And that -- you didn't

15    receive it until August 11th because all the -- had --

16    the -- I take it you didn't have access to this prior to

17    August 11, 2022, because it hadn't been sent to you yet

18    by counsel, correct?

19         A    That's correct.

20         Q    Okay.  Now, with respect to your deposition,

21    which you gave on January 28, 2020 -- yeah -- I was

22    obviously there.  I took part of your deposition.  And

23    fair to say that you were very prepared when you gave

24    that testimony back in January 2020?

25         A    Yes, based upon my -- my testimony given in
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 the trial, which occurred in 1995.  My memory is fairly

2 good, although declining as I age.  But I -- it needed a

3 boost.

4      Q    Of course.  As you saw, when you reviewed your

5 deposition testimony, that prior to giving that

6 testimony, you had to review your post-mortem report,

7 your testimony, as well as photographs from the autopsy

8 and crime scene, correct?

9      A    Yes.  And I have reviewed those again, same

10 materials that I had testified about in the trial and in

11 the deposition partially.

12      Q    Okay.  So Dr. Nichols, you performed the post-

13 mortem examination of Rhonda Sue Warford back in April

14 1992?

15      A    April 5th, I believe, along with a resident

16 physician, Dr. Paul Fearnyhough.  Ms. Court Reporter,

17 you'll have to get it the spelling later.

18      Q    Okay.  And when you performed that post-mortem

19 examination, you were already a very experienced medical

20 examiner.

21      A    Yes.  At that point, I had performed thousands

22 of examinations and supervised a numerous other

23 thousands.

24      Q    Okay.  And your examination and documentation

25 of that examination of Ms. Warford was as diligent as,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  and as thorough, as any other examination you've done,

 2  right?

 3       A    I hope so.  And so far, I believe that to be

 4  correct.

 5       Q    You have not seen anything that would make you

 6  question the thoroughness of your examination of

 7  Ms. Warford --

 8       A    No.  I did a complete examination of her body.

 9  I don't have any -- it took me about two hours to do it.

10  The single gunshot wound I could do a thorough

11  examination in about -- about 25 or 30 minutes.  This

12  was much more complex examination, which went with a lot

13  of evidence that had to be handled in -- in -- in the

14  correct fashion.  And to receive the evidence was

15  Sheriff Greer, with the assistance of Jefferson County

16  Police Department, Detective Bob Smith.  And the

17  evidence went where it was supposed to go to get the --

18  the proper types of analysis.

19       Q    Okay.  And you performed a complete

20  examination of both Ms. Warford's external body and her

21  internal organs, correct?

22       A    Of course.

23       Q    Okay.  And you also either took or ensured

24  that photographs were taken during the autopsy?

25       A    Yes, I'm sure that -- that either I or



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1  Mr. Brian Fitzgerald, who's an autopsy technician, took

 2  multiple photographs, which were retained in the medical

 3  examiner's office.  I don't know if Sheriff -- I don't

 4  remember if Sheriff Greer or Coroner Adams took another

 5  separate set of -- of photographs.  That, I don't

 6  remember.

 7      Q     And after performing your complete examination

 8  of Ms. Warford's body, you prepared the post-mortem

 9  report, correct?

10      A     Actually, I was dictating it during the time

11  that -- that I did the examination, which began at

12  2:00 p.m. on April 5, 1992.

13      Q     And that dictation was memorialized in your

14  post-mortem examination report, right?

15      A     Correct.  ME92-250, which I signed on the 24th

16  of April 1992.

17      Q     And that would be the final report dated

18  April 24, 1992, correct?

19      A     Yes.

20      Q     And that was done after you had received the

21  toxicology results?

22      A     Correct.  And I had examined the -- the

23  microscopic slides of -- of the organs in her body.

24      Q     And so nothing about the observations that you

25  made of Ms. Warford's body on April 5, 1992 had changed



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1   by April 24, 1992.

 2        A    Well, of course not.

 3        Q    So you testified at trial in this case in

 4   1995, right?

 5        A    Correct.

 6        Q    Okay.  And as you've told us in advance of

 7   trial, you also reviewed your report.

 8        A    Yes.

 9        Q    Okay.  And you are prepared to testify at

10   trial, right?

11        A    That has been my practice for 40 years.

12        Q    Right.  And that you've done -- it's my

13   understanding that you've performed over 10,000 post-

14   mortem examinations and supervised at least 30,000,

15   right?

16        A    Yes.

17        Q    And you've testified thousands of times.

18        A    Also, correct, both in criminal and civil

19   matters.

20        Q    Okay.  And at the trial in 1995, you were

21   asked -- can you tell us what the -- at the trial in

22   1995, you were not asked to give your best estimate of

23   Ms. Warford's time of death.

24             MR. GARVERICH:  Objection.

25        A    Correct.  The only question I was asked was by

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    Mr. Bart Adams, who was therefore the -- one of the
2    Defendants.  And Mr. Adams had asked me, "Is it possible
3    that Ms. Warford died on the -- on April 2nd?"  And I
4    said, "Yes, it is possible."  That was the only
5    testimony that was -- that was offered because that was
6    the only question asked.
7         Q    And you -- so, you were not answering the
8    question at trial, can you give us your best estimate of
9    when Ms. Warford's death occurred?
10        A    I was not.
11        Q    And that's because you weren't asked that
12   question, right?
13        A    I'm limited as to what I can say in court, by
14   what question I am asked.
15        Q    And so you weren't answering that question
16   because no attorney asked you that question, right?
17        A    That's what I've already stated, today, again.
18        Q    Okay.  And now I -- at your deposition in
19   January 2020, you were also very prepared to give your
20   testimony there, right?
21        A    Yes.
22        Q    You had carefully reviewed all the relevant
23   materials.
24        A    Including my testimony in the trial of 1995.
25        Q    And including your post-mortem report, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE R.  NICHOLS  II, taken on September 06, 2022

21

```
 1        A     Of course.  And the photographs.
 2        Q     Okay.  And in your deposition, you clearly
 3   expressed your views on the questions that were asked of
 4   you, right?
 5        A     Yes.
 6        Q     Okay.  You've -- you are a professional
 7   witness, right?
 8        A     I am a professional --
 9        Q     Aren't you?
10        A     I'm a professional forensic pathologist.  And
11   part of the job of a forensic pathologist is to give
12   meaningful testimony in courts of law.
13        Q     Right.  And you've testified under oath many,
14   many times
15        A     Thousands.
16        Q     Okay.  And I take it, in your deposition in
17   January 2020, you were honest in your testimony.
18        A     Yes.
19        Q     And no one -- no one cut off your answers.  It
20   was a fair deposition, right?
21        A     It was a brutally long deposition.
22        Q     In terms of the questions that were asked of
23   you, they were fair, right?
24              MR. MONARCH:  Objection to the form.
25        A     They were fair.  They were repetitive.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

1        Q     And the answers that you gave were thorough.

2        A     I don't know.  I haven't had the -- the

3   opportunity to go back and read that testimony and

4   determine the number of times I answered questions from

5   you as, "I don't know."

6        Q     Well, Dr. Nichols, the answers that you gave

7   were your own answers.  You never said something in your

8   deposition you didn't mean.

9        A     True.

10        Q     And you received your deposition in May 2021

11   and reviewed it.  Well, withdrawn.  I guess, after your

12   deposition, you didn't review and ask to change any of

13   the testimony.

14        A     That's not the purpose of me reviewing --

15   reviewing a -- my testimony in -- in a deposition.  I

16   just want to know what I was asked and what I answered.

17   I don't know how you can -- you can say, okay, let's do

18   a do-over.  It doesn't work that way.  I've never --

19        Q     Well --

20        A     No, no.  Listen.  I've been in hundreds, if

21   not thousands, of depositions and no one has ever asked

22   me to -- to find a mechanism to change or modify my

23   testimony.

24        Q     My apologies.  I think my question was in-

25   artful.  You're familiar with the practice of reading

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    and signing after giving deposition testimony, right?

2        A    I was not given the opportunity to read and

3    sign this.  It came to me completed by the court

4    reporter.

5        Q    Okay.  Well, you have reviewed your deposition

6    in advance of your testimony here today, right?

7        A    Yes, I have.

8        Q    Okay.  And that the deposition testimony that

9    you gave in this case in January 2020, you were very

10   careful about the answers that you gave, right?

11       A    I attempted to be.  Yes.

12       Q    Well, you're always very careful about the

13   answers that you give, right?

14       A    I hope so.

15       Q    And you -- and when you reviewed your

16   deposition testimony, I take it there wasn't anything in

17   your answers that you thought was inaccurate or

18   misleading, right?

19            MR. MONARCH:  Objection to the form.

20            MR. BRUSTIN:  Same.

21       A    If they were inaccurate, there was -- it was

22   not in an attempt to be misleading.  I can't tell you

23   that everything I've said was totally accurate.  I'm a

24   human.  We make errors.

25       Q    But certainly it was accurate and fair to the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    best of your recollection?

 2        A    Correct.

 3        Q    And you didn't notice in reviewing your

 4    testimony, any inaccuracies?

 5             MR. MONARCH:  Objection to the form.

 6             MR. BRUSTIN:  Same.

 7        A    Not that I remember, no.

 8             MR. SITLINGER:  This is Lee Sitlinger.  I'd

 9        like to object.  This question has been asked

10        100 times already.  It's unnecessarily lengthening

11        the deposition. I find it objectionable to form to

12        continue to ask the same thing over and over and

13        over in a different manner.

14             MS. MCCARTHY:  Your formal objection is noted.

15             MR. SITLINGER:  Thank you.  But the court

16        reporter notes it, not you.

17             MR. BRUSTIN:  Hey, Lee?  Lee, we're -- maybe

18        you haven't.  I think you haven't been around to

19        expect this before, but we've come to an agreement

20        that all we're going to be doing, and I'm as much a

21        blame for this as anybody, but we've agreed all

22        we're going to do is do form objections.  So if you

23        could please abide by that.  I know you're new to

24        the case, but we'd all appreciate if you would.

25        Thank you.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 25 of 79 PageID #:
26003
The Deposition of DR. GEORGE R.  NICHOLS taken on September 06, 2022
25

 1          MR. SITLINGER:  I'll try to do that.  But I

 2     mean, I can see where these depositions take all

 3     day unnecessarily.  I think it's an abuse of the

 4     system to continue to do it in this manner.

 5          MR. BRUSTIN:  Well, the time is not to do it

 6     -- the time is not to talk about it at deposition.

 7     If you want to file something, you feel free to do

 8     that. Don't interrupt with that issue, please.

 9          MR. SITLINGER:  I'll represent my client as

10     best I can.

11   BY MS. MCCARTHY:

12     Q    Okay.  So Dr. Nichols, in your deposition,

13   back in January 2020, you were asked for the first time

14   to give your best estimate for when Ms. Warford was

15   killed, right?

16     A    Yes.  And I was asked that on multiple

17   questions.  And -- and every time -- true -- the vast

18   majority of the question I -- I said, I don't give

19   estimates.  That's not my job.  It is clearly not

20   evidentiary as -- because an estimate, scientifically

21   based estimate, is at best the equivalent of a weather

22   forecast.  And we know how correct those are.

23     Q    Well, Dr. Nichols, you did testify that, if

24   asked to give an estimate, you would give the most

25   reliable estimate possible, right?



Kentuckiana Reporters                                   502.589.2273 Phone
30 South Wacker Drive, 22nd Floor                        502.584.0119 Fax
Chicago, Illinois 60606                          schedule@kentuckianareporters.com
                                                  www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

26

```
 1        A    I was forced, eventually, to -- to -- to give
 2  -- give an estimate, but then I -- I had hours worth of
 3  -- of answering questions about the lack of scientific
 4  validity of -- of an estimate.
 5             MS. MCCARTHY:  Keith, you're not muted. Keith?
 6             MR. MONARCH:  Keith.  Madam Court Reporter,
 7        can you mute him?
 8             MS. MCCARTHY:  Could you -- could you ask
 9        Keith to mute, please?
10             COURT REPORTER:  Keith?
11             MS. MCCARTHY:  Yes.
12             COURT REPORTER:  Or --
13             THE WITNESS:  Keith, mute.  Thank you.
14             MS. MCCARTHY:  Okay.  So would it be possible
15        to tilt that down a bit so I can see --
16             COURT REPORTER:  Oh, sorry.
17             MR. MONARCH:  I'll help.  Tell me when.
18             MS. MCCARTHY:  That looks perfect.  Thank you.
19        And no, I appreciate you muting, Mr. Bond.
20  BY MS. MCCARTHY:
21        Q    All right, so Dr. Nichols, I think, just want
22  to talk to you a bit more about the testimony that you
23  did give back in January of 2020.  And in your
24  deposition, you did agree that you can estimate the
25  interval of death, correct?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

27

1      A    Yes.  Estimate.  Yes.

2      Q    And, in fact, you've given estimates for time

3  of death hundreds of times.

4      A    Yes.  But always as an estimate, not when it

5  actually happened.  And in the interval, I have read

6  something else.  I went to the Oxford English Language

7  Dictionary and Merriam Webster's Dictionary, and looked

8  up the word, "estimate."  Would you like to know what it

9  means, since you asked me that hundreds of times?

10  According to Oxford, it's "To roughly calculate or judge

11  the value, quantity or extent of something."  The

12  synonyms are, "approximate, guess, and judge."  And in

13  Webster it's, "To judge tentatively or approximately the

14  value, worth or significance of something." Notice the

15  words, and words mean something.  So the word here is,

16  estimate, and I just read you the definitions of it.

17      Q    And -- okay.  Dr. Nichols, you have

18  approximated time of death hundreds of times in court

19  under oath.

20      A    No.

21           MR. MONARCH:  Objection.

22      A    That's incorrect.

23      Q    Okay.  You were asked, on page 119 of your

24  deposition, "You've given estimates for time of death

25  100s of times." Answer: "Estimates.  Yes." Question. "No

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   question about that?" Answer.  "Yes."

2        A    Estimates, yes, but not a true interval.

3        Q    So the estimates that you gave, those were

4   under oath in depositions in court, right?

5        A    Yes.

6        Q    And if you're asked to give an estimate, you

7   do your best to give the most reliable estimate

8   possible?

9        A    That's true, but only after I've explained to

10  the jury what an estimate is.

11       Q    Well, you, as the former medical examiner for

12  the Commonwealth of Kentucky, and now as an expert

13  forensic pathologist, do try your best to get the most

14  reliable estimate when you're asked, right?

15       A    True.  And in that deposition also, I said,

16  "Well, it's a guess." And I was confirmed that it's a

17  guess, amazingly enough, that the Oxford English

18  Language Dictionary.

19       Q    Well, you -- when asked to give your most

20  reliable estimate of time of death, you said that there

21  are things that happen in the post-mortem interval

22  factors that you look at, right?

23       A    Yes.

24       Q    You don't simply pull your most reliable

25  estimate out of thin air.  You do look at several post-



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    mortem factors to determine the most reliable estimate,

2    right?

3         A    Yes.  Those include livor, rigor.  For

4    Dr. Melinek, cloudiness of -- of the human cornea, and -

5    - and the body positioning and a few of -- and to the

6    activity of carnivores that may be -- the body may be

7    exposed to.  There's a whole -- whole bunch of factors.

8    And there's no one magic formula that allows for all

9    these variables to -- to tell you when it really

10   happened.

11        Q    Those factors you mentioned, livor, rigor,

12   corneal clouding, carnivore activity, those were all

13   factors that you looked at in this case, and you gave

14   your best estimate of time of death, right?

15        A    Yes.

16        Q    And you don't look at each factor in

17   isolation, you look at the factors in conjunction,

18   right?

19        A    That's the second time you've asked me that

20   question.

21        Q    Is the answer yes?

22        A    Yes.

23        Q    And of course, just because something is

24   possible doesn't mean that it's likely, right?

25        A    Anything may be possible.  It is, fortunately

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   for you, unlikely that lightning will strike you.

2       Q    Okay.  And so when you said that Ms. Warford

3   could have been killed at 2:00 a.m. on April 2nd, the

4   trial of 1995, you were saying that as in, it could

5   happen, anything was possible, right?

6            MR. MONARCH:  Objection to the form.

7       A    That's what I -- that's the -- the question

8   dealt with possibility.  And the answer was -- was to

9   that question.  Yes, it is possible.

10      Q    But there are -- but there is some scientific

11  basis for determining time of death using multiple

12  factors.

13      A    For estimating it.  Use the word correctly.

14  Not determining.  It's an estimate, at best.

15      Q    Okay.  Well, you can give an estimate and that

16  estimate is a reasonable probability, right?

17      A    No.  It is no more than a guess, according to

18  the Oxford English language dictionary.  In fact -- in

19  fact, I believe somewhere along the way, whether it was

20  in -- it was in the -- the deposition or someplace else.

21  I believe I -- I described this as the SWAG methodology,

22  that scientific wild ass guess, because it supposedly is

23  based on science and it actually is a guess.  "So I

24  don't know," is the answer to when this lady died.  I've

25  said that in 1992, 1995, 2000, and I'm saying it again

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  today in 2022.  I do not know when she died.

2  **Q  No one knows the exact time that Ms. Warford**

3  **was killed, do they?**

4  MR. MONARCH:  Objection.

5  A  Correct.  And why are we having this

6  discussion?  We got -- we have experts involved in this.

7  One who says routinely, "I don't know." One who has been

8  hired by one side, who -- who makes the death occur at

9  -- early in the morning on -- on April 2nd in the field

10  where she was found.  And another who makes it more

11  approximate to -- to the -- the -- when her body was

12  found 7:30 a.m. on the 5th of April.  Hers was primarily

13  based upon corneal clouding.  So we have two estimates

14  from two scientifically based people.  They can -- they

15  are mutually exclusive.  The only one who got it right

16  for this, as far as Dr. Nichols is concerned, is me.  "I

17  don't know," is the correct answer.

18  **Q  You don't know exactly when this Ms. Warford**

19  **was killed, but you have given your best estimate of the**

20  **post-mortem info, right?**

21  A  Correct.  And I've told you that's nothing

22  more than a scientific wild ass guess.  It is not, in

23  any way, meaningful to the courts.

24  **Q  Well, you looked at the factors that you**

25  **listed, which gave a scientific basis for putting an**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  interval on -- you looked at the factors that provide

2  for a basis for determining or estimating post-mortem

3  interval, right?

4      A     Yeah.  And it's interesting, if you look at

5  the literature, there's very few papers that are

6  entitled, Determining the Post-Mortem Interval.  Almost

7  all are, Estimating the -- the Post-Mortem Interval.  So

8  the scientists who write peer reviewed papers know that

9  what they're talking about, at this point, cannot be

10  proven.

11     Q     As a forensic expert, you have certain

12  expertise based on your experience and your training,

13  right?

14     A     I have certain things that I can do with

15  reasonable medical certainty.  Beyond that, it -- it

16  slips to 51 percent, a coin flip, medical probability.

17  And below that, it ranges anywhere from less than 1

18  percent to 99 percent if you don't -- if you make an

19  estimate.  But there's no way of -- of knowing what an

20  estimate is really worth in terms -- I have to testify

21  with reasonable medical certainly, that means of

22  confidence rate of 95 percent.  Or testify with

23  reasonable medical probability, 51 percent.  I've

24  hesitated to give any meaningful testimony about an

25  estimate, which is -- who knows what it is.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 33 of 79 PageID #: 2601
The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

33

1      Q    Well, Dr. Nichols, medical examiners are

2   allowed to testify under oath about estimates, right?

3      A    I'm very hesitant to do that.  I will explain

4   to the jurors what an estimate is and let them make

5   their determination of the value of what I'm going to

6   estimate.

7      Q    Dr. Nichols, I'd appreciate if you could

8   listen to my question, and I'm happy to ask it again,

9   but my question is --

10      A    Oh, Mr. McCarthy, the last thing I want to do

11   is listen to that question again.  I've had enough of

12   this.  I've had enough of this.  I had -- I had six

13   hours of this in January 28, 2000, that I remember,

14   unfortunately, almost every minute of.  I refer to this,

15   to my -- my friends, as the McCarthy Marathon.

16           MS. MCCARTHY:  I see.  All right.  Let's take

17      -- let's take a five-minute break.

18           COURT REPORTER:  Is that fine with everyone?

19           MR. MONARCH:  Yes, that's fine.

20           THE WITNESS:  Fine with me.

21           COURT REPORTER:  Okay.  Going off record.  The

22      time is 10:44 a.m.

23                (OFF THE RECORD)

24           COURT REPORTER:  We're back on the record for

25      the deposition of a Dr. Nichols, who's time is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        10:53 a.m.

 2    BY MS. MCCARTHY:

 3        Q    Dr. Nichols, is Ed Monarch present with you in

 4    the room?

 5        A    Yes, he is seated to my left.

 6        Q    Okay.  Did you discuss anything when

 7    Mr. Monarch during the break we just took?

 8        A    No.

 9        Q    Okay.  So I just want to put on the record now

10    that in advance of your deposition, it was represented

11    to us by Keith Rosine that the documents you had

12    reviewed were your lab report, Bates stamped ME 1 to 26,

13    and certain crime scene photos, LMPD-736 to 744.  It

14    appears now that you have also been provided with your

15    deposition transcript, Dr. Melinek's deposition

16    transcript, Dr. Rodriguez's disclosure, and your

17    designation.  And that there are notes that you have

18    kept in your file that have not yet been provided to us.

19    So I just asks now that if you can, you provide those

20    notes during a break so that we don't have to reopen

21    your deposition?

22        A    No, it can't be done.  I don't have them with

23    me.  They're in my office.  I don't know if my secretary

24    is even in the office because, she too, has been sick.

25        Q    Okay.  Where is your office located?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

35

```
 1        A    It's in the Eastern suburbs of the City of

 2   Louisville.

 3        Q    How far away is it?

 4        A    Probably ten miles.

 5        Q    Okay.  Have you -- or could you call your

 6   secretary on a break to see if she's there?

 7        A    I can do that.  No, I didn't.

 8        Q    Okay.  I just think it's in everyone's

 9   interest if, at all possible, Dr. Nichols, that we have

10   the notes now so that we can ask you questions about

11   them.  Otherwise, we will have to leave your deposition

12   open.

13        A    Can't be done.  I mean, I'm sorry.  The reason

14   I didn't bring it is because somebody who wrote the --

15   the -- the notice did not include what they wanted me to

16   bring, other than me.

17        Q    Well, Dr. Nichols, in January of 2020, when

18   you had been retained by the Meade County defendants,

19   you appeared with your case file, including the notes,

20   which were marked as exhibits to your deposition, as

21   you're well aware, because you reviewed that at the

22   deposition.  So it appears to be a departure from that

23   practice that you didn't bring the notes.  Regardless,

24   I'm making the request now.  I want a copy of those

25   notes. We are entitled to a copy of the notes.  It
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  sounds like you can take steps, including calling your

2  assistant to see if she's in, to procure them during a

3  break, or even go get them during lunch break.

4       A    I'm not going to -- I will not do that.

5            MR. MONARCH:  I'm going to object to the

6       mischaracterization.  Move the strike that

7       preamble.

8            MR. MONARCH:  You know, the rules do provide

9       that for repetitive and harassing questions, that

10      the witnesses got the authority to terminate the

11      deposition. And we've already been through a

12      lengthy repeat of what Dr. Nichols has testified to

13      earlier.  And we haven't covered much, if any, of

14      the disclosure that we offered for him.  So I will

15      -- I inform the deponent of that rule, and that is

16      what I want to say.

17 BY MS. MCCARTHY:

18      Q    So Dr. Nichols, it is your position that you

19 will not even call your assistant to see if it's

20 possible to produce these notes during the deposition?

21      A    She's been sick also.  You know, and she's not

22 in -- in the office, or even if she is, she's not

23 feeling well.  I'm not going to put her through any

24 length of -- of effort on your part, when you had the

25 opportunity, or someone else who was on your side, had

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

1   the opportunity to specify exactly what you wanted me to

2   -- to bring.  And I was asked by the Meade County

3   Attorney -- the Meade County representatives to make

4   copies and have them available at the time of the

5   January 2020 deposition.  I was not asked by anybody

6   today.

7       Q    Did Mr. Monarch ask you not to bring the notes

8   with you?

9       A    No.

10      Q    Okay.

11      A    It was my decision alone.

12      Q    Well, again, our position is, we are entitled

13  to the notes and again, we will leave your deposition

14  open if we're not going to receive them today.  So let's

15  talk now about the designation.  Do you have a copy of

16  that, Dr. Nichols?

17      A    I believe that I do, yes.

18      Q    Okay.  And it's entitled, "Defendant Thurman's

19  Designation of Un-retained Expert, George Nichols, MD."

20  You can mark this as plaintiff's 177, make it an

21  exhibit.  Let me know when you have it in front of you.

22                  (EXHIBIT 177 MARKED FOR IDENTIFICATION)

23      A    I have it in front of me.

24      Q    Okay.  Now, you didn't write this?

25      A    I did not but --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 38 of 79 PageID #:
26016
The Deposition of DR. GEORGE R.  NICHOLS taken on September 06, 2022
38

```
 1               MS. MCCARTHY:  But --

 2        A     Assume Mr. Monarch did.

 3        Q     Okay.  So I'm going to talk to you about some

 4   of what Mr. Monarch wrote in this designation for you.

 5   So if you could look on the first page, the second

 6   paragraph in the middle, the sentence that begins,

 7   "Ms. Warford's body." Do you see that sentence?

 8        A     Yes.

 9        Q     Okay.  Says "Ms. Warford's body did not

10   demonstrate evidence of significant decomposition,"

11   right?

12        A     Yes.  Correct.

13        Q     And of course, no evidence of significant

14   decomposition is not the same as no decomposition

15   whatsoever, is it?

16        A     It's an adjective to modify -- use to modify

17   another word.

18        Q     Okay.  And as you've told us, repeatedly,

19   words mean something, right?

20        A     Yes, they do.

21        Q     Okay.  And at your deposition in January of

22   2020, before you had been retained by Mr. Monarch --

23               MR. MONARCH:  Objection.

24        Q     You were asked, question: "No decomposition

25   whatsoever?" Answer: "No." Question: "And if it had
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 39 of 79 PageID #:
2601.7
The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022
39

```
 1   been, it would be documented in your report, and it

 2   would be visible in the photographs?" Answer: "Yes."

 3           MR. MONARCH:  Objection to form.

 4           MR. GARVERICH:  Same.

 5           MR. MONARCH:  Is that a questions?

 6   BY MS. MCCARTHY:

 7       Q    Okay.  So it -- Ms. Warford's body showed no

 8   decomposition whatsoever, right?

 9       A    That's correct.

10       Q    Okay.  And that is different than saying

11   "there were no" - "there was no evidence of significant

12   decomposition?"

13       A    I'm not responsible for the terms expressed in

14   this five-page declaration.

15       Q    Okay.  But you would agree that that sentence

16   is not accurate, as written?

17       A    It certainly is not what I would've -- I

18   would've written.

19       Q    And it's not what you would testify to?

20       A    Correct.

21       Q    Okay.  Now, if you turn to the second page of

22   the designation.

23       A    Yes.

24       Q    Okay.  See the second paragraph begins with,

25   "Regard to attempting to time Ms. Warford's death."
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Yes.

2      Q     Okay.  In the middle of that, there's a

3   sentence, "To the extent that there was moisture still

4   in her skull, it could have drained toward the eye." You

5   didn't write those words, did you?

6      A     I did not.

7      Q     And you wouldn't have written those words,

8   would you?

9      A     No, because there won't be -- there would be

10  blood in the skull, but not "moisture."

11     Q     Okay.  Also, what basis is there for saying

12  that she was in a moist environment?

13     A     There is none, other than fact that, if the

14  brain would've been considered to be moist.

15     Q     Okay.  And based on the NOAA data from the

16  closest weather stations, there was none to trace

17  amounts, of rain in the time interval during which

18  Ms. Warford was missing?

19          MR. MONARCH:  Objection.

20     Q     So I take it then, there is no basis to say

21  that she was in a moist environment.

22          MR. GARVERICH:  Object.

23          MR. MONARCH:  Objection to the form.

24     A     That would be correct.  If there has -- if the

25  Nation Weather Service's records show that there was no

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   significant moisture from the sky, then there's no

2   reason why she would be moist.

3        Q    So what is moisture in the skull?

4        A    Beats me.  I just told you, it's going -- it's

5   going to be blood contained in the bone marrow in the --

6   in parts of the cranium.

7        Q    All right.  And now, the next sentence says,

8   "There was an absence of corneal clouding," that

9   Ms. Warford's corneas were clear, right?

10       A    Correct.

11       Q    Okay.  Next sentence, "The main cause of

12  corneal clouding is exposure to air, which did not occur

13  with her eyelids shut." You didn't write those words?

14       A    I did not write those words.

15       Q    You wouldn't write those words, would you?

16       A    If you're asking a question, I would say, the

17  main reason for corneal clouding is the movement of air

18  over open -- open eyes.  If I was asked the question.

19       Q    Well, there's different processes that happen

20  in the eyes after death, right?

21       A    Yes.  Some extent -- some studied extensively,

22  especially by Dr. John Coe, and Dr. Coe was a forensic

23  pathologist in -- in Minnesota.  And he thought he had

24  found the definitive answer to determining the post-

25  mortem interval in a scientific means.  He was studying

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the vitreous fluid and its -- the potassium content in

2  the fluid.  He thought he had it right.  And then when

3  other forensic pathologists, using exactly the same

4  methodology, could not reproduce the formula that Coe

5  had -- had produced.  It -- it is still done, but it is

6  not going to reach the level of medical, even

7  probability.

8        Q    Right.  Dr. Nichols, corneal clouding -- the

9  drying out of eyes is one contributing factor to corneal

10  clouding, right?

11       A    Yes.  There's also decomposition and future

12  faction, and the presence of -- of -- of a bacteria

13  entering into the bloodstream, causing biochemical

14  abnormalities within the -- the retinal vessels and

15  with, eventually, into the -- the vitreous, and

16  eventually into the cornea, which is in it -- the cornea

17  is in a separate chamber, a separate room, if you would

18  like, in the eye from -- from where the vitreous is.

19       Q    In other words, corneal clouding has more to

20  do with metabolic changes in the cornea after there's no

21  longer blood flowing there, right?

22       A    That's what is thought to occur.  The last

23  paper I read about this was that there they -- the --

24  the -- I think it was French -- French authors, that

25  there was, "More research to be done in this field,"

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   using different methodology than they have used to study
 2   what happened in the cornea.
 3        Q     But you would agree the main cause of cornea
 4   clouding is metabolic changes?
 5        A     It is a change.  It is one of -- of -- of the
 6   -- the changes that happen in the cornea.  The primary
 7   one, and the one that I've seen more often than anything
 8   else is going to be the presence of air -- moving air to
 9   the exposed surfaces of the funnel portion of the eye,
10   resulting in corneal clouding and darkening of the
11   whites of the eyes, so-called tache noire.  And that is
12   all as the result of air movement.
13        Q     Right?  And so tache noire is an artifact of
14   drying of the eyes, right?
15        A     Correct.  And corneal clouding may well be a
16   -- an artifact induced post-mortem by the movement of
17   the air, drying -- literally drying out the cornea.
18        Q     But these are two separate phenomena, right?
19   So in tache noire, what you see is a brown of black band
20   in the eyes, right?
21        A     You see a discoloration of the whites of the
22   eye, as I said.
23        Q     Okay.  And that happens when eyes are partly
24   open or exposed to the air?
25        A     Yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.  Corneal clouding does occur even when

2 the eyes are closed?

3      A      True.  And that would be as a result of

4 metabolic problems that occur post-mortem, or some anti-

5 mortem diseases that can cause early onset of corneal

6 clouding.

7      Q      And corneal clouding is when the corneas

8 become more opaque over time, right?

9      A      They become opaque.

10     Q      Well, it's a process, right?

11     A      The degree of -- of opaque is variable.

12     Q      Ms. Warford had completely clear cornea?

13     A      Yes.

14     Q      And in this designation, it states that the

15 main cause of corneal clouding is exposure to air, which

16 did not occur with her eyelids shut?

17     A      Correct.

18     Q      You would not have written that sentence?

19     A      No, I would've written -- I would've --

20 actually probably would've written that, "Under these

21 conditions there are no studies that -- for the

22 conditions --"

23     Q      But I'm asking you about the prior sentence,

24 that corneal clouding doesn't occur with eyelids shut?

25 That's not something that you would testify to?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Corneal clouding will not occur early on with

2    the eyes shut.  It can occur with the eyes closed.  But

3    the -- the -- the interval of -- of death is longer than

4    the -- if it -- the eye's exposed to air.  That's what

5    I'm trying to tell you.

6      Q     So in your deposition, you were asked,

7    question: "Now, if the eyes are closed, the corneas

8    still cloud, right?"  Answer: "They will.  They will

9    after death, eventually yes." Question: "Okay.  And

10   generally you would see corneal clouding within 12 to

11   24 hours of death if the eyes are closed?" Answer: "They

12   -- that was when it should occur.  Or at least it's

13   reported to have occurred within 24 hours," right?

14     A     That was what I said, and that's correct.  In

15   the onset of corneal clouding would be as -- as

16   published is between 12 and 24 hours.

17     Q     Okay.  And so in other words, you would not in

18   fact, write or testify to the fact that corneal clouding

19   doesn't occur if eyelids are closed?

20     A     No, I would not.  I've already testified that

21   it would, and it could.

22     Q     And you agree that if the corneas are not

23   clouded, as they were in Ms. Warford's case, then that

24   indicates that the time of death was likely less than

25   24 hours prior?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R. NICHOLS taken on September 06, 2022

46

```
 1              MR. GARVERICH:  Objection to form.

 2              MR. SITLINGER:  Same.

 3        A     Pardon me?  You have to repeat that question.

 4        Q     Sure.  In getting your most reliable estimate

 5   of time of death, your consideration if corneas -- the

 6   corneas are not clouded, is that the time of death was

 7   less than 24 hours prior, right?

 8              MR. GARVERICH:  Objection to form.

 9              MR. SITLINGER:  Same.

10        A     First of all, we're -- you're using the

11   estimate word again.  I will not definitively give even

12   an estimate about the -- the time of this woman's death.

13   I have told -- I've told you that repeatedly.  I do not

14   know when she died.  You can discuss this from now until

15   the next trial date, the answer is going to be same --

16   the same.  I do not know.  And again, there are two

17   experts who are already involved in this, Melinek and

18   Rodriguez who time the event totally different.  They

19   estimate is a.m., April 2.  And I can't tell from

20   Melinek's deposition what her -- her estimate is, but

21   it's -- it's based upon corneal cloudiness.  Therefore,

22   the -- it's a different time than -- than Rodriguez.  So

23   I don't know when this happened.  You can keep asking me

24   this forever.  The answer is going to be -- continuously

25   be, I do not know with reasonable medical probability.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  51 percent I don't know.  And actually with -- at

2  95 percent confidence medical certainty, I don't know.

3  You're beating a dead hog.  We don't kill dogs down

4  here.

5      Q    So Dr. Nichols, I'm just going to say that I

6  don't appreciate the tone that you are using with me.

7  I'm here during my job asking you questions.  And I am

8  entitled to ask you the question.  If you don't answer

9  it, I can ask it again.  So I'm going to ask the

10  questions that I need to ask.  You're here under oath.

11  You're being paid for your time and you have in fact,

12  given a best estimate of Ms. Warford's time of death,

13  haven't you?

14          MR. GARVERICH:  Object to form.

15      A    I have.  And on about page 300, I think of the

16  deposition I did not in -- in trial give -- give an

17  estimate at all.  So after repeated questioning about

18  the same -- from the same question or to the same

19  witness, I eventually said yes, if I'm determined -- if

20  I am made to give a best estimate, my best estimate is

21  this.

22      Q    And specifically on page 153 of your

23  deposition, you testified, "My best estimate is that she

24  died more approximate to the time her body was found.

25  That's my best estimate," right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

48

```
 1        A    Yes.

 2        Q    And on page 154 of your deposition, you

 3   testified that based on what you've seen, your best

 4   estimate of when she was killed is within 24 hours?

 5        A    That was what my best estimate was because I

 6   was forced to give an estimate.  I'd also told you that

 7   -- that I don't -- don't believe there's any scientific

 8   value in an estimate of the interval of death.

 9        Q    Okay.  So when you gave your best estimate

10   that Ms. Warford was killed within 24 hours of being

11   found on April 5th, one of the factors that you

12   considered in doing that was the fact it was her corneas

13   being clear, right?

14        A    That was one of them.  And the fact that there

15   was no predation.

16        Q    So cornea figure, no predation.  What other

17   factors did you consider in giving that best estimate?

18        A    That's it.  There's no way that rigor can be

19   assessed in -- in conditions that are analogous to a

20   morgue, a medical examiner's morgue.  There's no way you

21   can assess the -- the present -- the development of --

22   of rigor mortis and -- and how long it will stay in a

23   cool environment.  That's it.

24        Q    Okay.  We'll come back to the morgue.  So on

25   the -- I'm back at the paragraph in the designation that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R. NICHOLS, taken on September 06, 2022

49

1   was prepared by counsel for you on corneal clouding and

2   the sentence, "And it is certainly possible that corneal

3   clouding would not have occurred by April 5, 1992 if her

4   body had been at that location position since

5   April 2, 1992." You didn't write that, correct?

6        A    I didn't write anything in -- on these pages.

7        Q    "Certainly possible" is not your language?

8        A    I obviously answered the question in the file

9   about possibility.  So if I'm asked a question about

10  possibility, I will respond.

11       Q    And -- well, "certainly possible" is not the

12  same thing as "likely," is it?

13       A    True.

14       Q    And "certainly possible" is not the same thing

15  as "probable," is it?

16       A    Also true.

17       Q    It is not likely that Ms. Warford could have

18  been killed over 80 hours prior, and there was no film

19  and no clouding whatsoever on the recording, is it?

20            MR. GARVERICH:  Objection to form.

21            MR. MONARCH:  Same.

22       A    It would be highly unusual.  And I think I

23  used that -- that term in other sworn testimony.

24       Q    Now what -- on page 1 now of the designation

25  that was prepared by counsel, and we've already talked

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 50 of 79 PageID #:
26028
The Deposition of DR. GEORGE R. NICHOLS, taken on September 06, 2022
50

1   about the fact that in fact -- hold on.  We've already

2   discussed that there was no evidence decomposition

3   whatsoever in Ms. Warford's body, right?

4        A    Yes.

5        Q    Okay.  And now the sentence says that, "The

6   weather on the day Ms. Warford's body was missing was

7   similar in temperature to a morgue cooler." Now, a

8   morgue cooler is kept at one consistent temperature,

9   correct?

10       A    Correct.

11       Q    Okay.  And obviously there were large

12  variations in the temperature during the days that

13  Ms. Warford was missing, right?

14       A    And the -- and the ambient temperature, yes.

15            MR. GARVERICH:  Objection.

16       A    From a -- from the -- in the 30s to -- to when

17  it was almost 50 degrees Fahrenheit.

18       Q    She was not left out in freezing weather?

19       A    She was not exposed to freezing weather as far

20  as I know.

21       Q    Well, you've seen the weather data from those

22  days, right?

23       A    Yes.  Those are not taken next door.  Those

24  are nearby sources.

25       Q    Okay.  Within 20 miles.  So you wouldn't



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS taken on September 06, 2022

51

```
1    expect a huge variation?

2         A     You're asking me that?

3         Q     I am.

4         A     I'm not a -- I'm not a meteorologist.

5         Q     Well, as you testified on page 85 of your

6    deposition, "It is not freezing here.  We know that the

7    temperature is 42 degrees.  It's not freezing," right?

8               MR. GARVERICH:  Objection to form.

9         A     If that's what I said, then that was my

10   opinion.

11        Q     Okay.  And in your post-mortem examination of

12   Ms. Warford, you didn't see any indication that the body

13   had been frozen and then thawed?

14        A     Correct.

15        Q     No -- had Ms. Warford been frozen, that --

16   that is something that you would've felt when you

17   performed the autopsy, correct?

18        A     No.  As long if her body came -- and came --

19   if her cord temperature was, she was frozen all the way

20   through, totally frozen, it'd take -- it would take some

21   time for her to thaw her internal organs and my hands

22   would've been very cold.

23        Q     And you did not have any sensation of your

24   hands staying very cold when you performed the autopsy?

25        A     No.  Her temperature was analogous to a body
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that had just been brought from the cooler, the morgue

2    cooler to the autopsy room.  So I know what that is.  My

3    -- my fingers know what that is.

4        Q    No evidence whatsoever of any maximum cold

5    discomfort?

6        A    You mean frostbite?  That's the only thing

7    you're going to be able to see is going to be frostbite,

8    cold discomfort.

9        Q    Well, and you would also feel cold exposure in

10   a body that has been frozen?

11       A    If it -- if it is hawed out, no.  Think about

12   your chicken when it's -- when it thaws out totally

13   before you cook it.  It's chicken.

14       Q    Well, bodies that have been frozen and thawed

15   to room temperature, in fact show accelerated

16   decomposition, don't they?

17       A    They may.  The reason for that is that the gut

18   as is -- is if it's thawed will become weakened and will

19   allow the escape of pathogenic organisms from the

20   intestinal tract into the bloodstream and disseminate

21   throughout the body.

22       Q    Okay.  And here, when that happens, the

23   internal organs are noticeably colder to the autopsy

24   pathologist, right?

25       A    No, not if the core temperature is -- has come



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   back to -- to whatever the other tissues are in their

2   temperature.  The only -- the only reason if it -- the

3   body gets frozen all the way through, it will take

4   longer for the liver, let's say, to thaw out.

5       Q    And no evidence of that, right?

6       A    None.

7       Q    And obviously a morgue cooler that's set at a

8   steady temperature is different from a body being out in

9   a field where the temperature is variable going up and

10  down?

11      A    That's exactly correct and you -- you got it.

12  And that's why we can't determine with any scientific

13  basis the post-mortem interval, because the studies that

14  have been done primarily were done on people who die in

15  hospitals or rapidly are taken to the medical examiner's

16  office and placed in a cooler with -- with successive

17  testing of fluids and body parts.  Since that -- and you

18  just pointed it out, that the real world outside is

19  totally different than the morgue in an ME office.  And

20  those variables are why you can't determine with any

21  degree of medical probability the time of someone's

22  death.

23      Q    So the analogy in this designation that the

24  weather on the days her body was missing was similar in

25  temperature to a morgue cooler is problematic, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1              MR. GARVERICH:  Objection to the form.

2              MR. SITLINGER:  Same.

3      A     Like it's not a steady state like it would be

4  in the morgue.  Other than that, it -- it's not warm

5  enough to cause early decomposition.  That's going to be

6  in temperatures above -- above 85, especially if there's

7  sun exposure.

8      Q     And in fact, as you've seen from the video and

9  the crime scene photos that Ms. Warford's body was in

10  the sun when it was discovered, right?

11     A     Yes.

12             MR. GARVERICH:  Objection to form.

13             MR. MONARCH:  Same.

14     Q     Okay.  And of course, a body in the field is

15  going to have different levels of sun exposure over the

16  course of the day, because the sun moves, right?

17     A     Yes.  The sun moves and there were some trees

18  near where her body was.

19     Q     But certainly even if the ambient air

20  temperature is cool, a body in direct sunlight be warmer

21  than the ambient air temperature?

22     A     Of course.

23     Q     And also, you know, the fat acts as an

24  insulator, right?

25     A     It certainly does both for -- for cooling down

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  and -- and heating up.  Both ways.

2      Q    In other words, an obese individual is going

3  to retain body heat longer than say a small child?

4      A    Correct.

5      Q    And Ms. Warford was in fact obese?

6      A    Yes.  221 pounds.

7      Q    And also a body that's clothed is going to

8  retain heat longer than a nude body?

9      A    True.

10     Q    Even when a body is kept in the morgue cooler,

11 which is a steady state temperature, you still observed

12 rigor mortis, correct?

13     A    Yes.

14     Q    And rigor mortis can occur more quickly if

15 there's been heavy exertion or struggle?

16     A    Yes.

17     Q    So I'm looking again now at the designation

18 that was prepared by counsel for you.  And it says that

19 in the middle of page 2, "And it is certainly possible

20 that Ms. Warford could have remained in rigor mortis for

21 three-and-a-half days in the ambient temperatures

22 presented in Meade County, Kentucky from April 2nd to 5,

23 1992," do you see that?

24     A    Yes.

25     Q    And "certainly possible," those are not words

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 56 of 79 PageID #:
26034
The Deposition of DR. GEORGE R. NICHOLS, taken on September 06, 2022
56

1    that you selected, right?

2         A    Correct.

3         Q    But you would agree with this statement to the

4    extent, but anything is possible, right?

5         A    Yes.

6              MR. GARVERICH:  Object to form.

7         Q    That is not the same thing as saying, it's

8    likely that Ms. Warford remained in rigor mortis for

9    three-and-a-half days in the ambient temperatures

10   present there from April 2nd to April 5th?

11        A    True.

12        Q    And it's not the same thing as saying it's

13   probable that Ms. Warford remained in rigor mortis for

14   three-and-a-half days in the ambient temperatures

15   presented in Meade County, right?

16        A    Yes.

17        Q    And in fact it would be very unusual in your

18   experience to see a body in non-raising temperatures

19   that was still in full rigor after three-and-a-half

20   days?

21        A    Yes.  Unusual.

22        Q    In fact, very unusual, right?

23        A    It would be unusual.

24        Q    On page 86 of your prior deposition you were

25   asked, "It would be pretty -- pretty amazing to see a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    body that had been left for three-and-a-half days that

2    was still in full rigor in non-freezing weather.

3    Question: That should that be pretty amazing, right?"

4    Answer: "It would be very unusual."

5         A    I will not disagree with myself.

6         Q    Based on your experience that it would be very

7    unusual for a body that's been left three-and-a-half

8    days in weather that's non-freezing to be in full rigor,

9    it is more likely that Ms. Warford's body had been there

10   for less than three days?

11        A    I didn't say that and I'm not going to say

12   that now.  I don't know where her body was other than

13   where her body was found.  And I assume that -- that the

14   two findings of blood in the field represent blood from

15   her -- her body.  So we have bleeding either active or

16   passive that has occurred in a -- from an assumed dead

17   -- single dead body.

18        Q    Well, that -- there was blood in the field

19   underneath where her body was found, right?

20        A    Yes.  Along with her car keys.

21        Q    Well, there are two separate locations for

22   blood in the field?

23        A    They're in --

24        Q    One is underneath the body.

25        A    Yes.  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022

58

1  Q  Okay.  And the second was approximately 30

2 from the body near a set of car keys?

3  A  With a set of car keys in it.

4  Q  Okay.  We're going to get to that.  But

5 although you know where Ms. Warford's body was found,

6 you do not know where she was killed, right?

7  A  Correct.

8  Q  And you would expect that if she had been kept

9 inside -- killed and kept inside before being taken to

10 the field, that the onset dissipation of rigor would be

11 faster, right?

12  A  Yes.  And so would its disappearance.

13  Q  Okay.  The onset and dissipation of rigor

14 would both be faster?

15  A  Correct.

16  Q  Okay.  And that would be true also if she were

17 kept somewhere inside, say in a home or in a car, and

18 therefore wasn't exposed to the elements like

19 precipitation?  You would expect rigor to be faster in

20 its onset and dissipation?

21  A  No.  Only if -- only if the interior of the

22 car is heated, this excludes her -- the presence of her

23 body in the trunk of a vehicle.  It has -- it would have

24 to be in the heated passenger compartment.

25  Q  Well, Doctor, that wasn't the question I just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   asked you.

2        A    Okay.

3        Q    The question I asked you, you would expect the

4   onset and dissipation of rigor to be faster if a body is

5   kept inside a shelter and so not exposed to elements

6   like precipitation?

7        A    You're taking --

8             MR. GARVERICH:  Object to the form.

9        A    You're taking one portion of the atmosphere,

10  one condition, the moisture in the atmosphere, and

11  making an assumption that you can get rid of all the

12  other conditions that -- that she was exposed to.  I'm

13  telling you that unless there is an engine going on with

14  heat and air conditioning, when it's -- when it -- to

15  approximate the conditions in a dwelling, then a car

16  only eliminates one.  Rain or some other form of -- of

17  precipitation.

18       Q    Right.  Well, in your deposition, you are

19  asked, question, "Any post-mortem changes would be sped

20  up if she's kept closer -- the closer she is to room

21  temperature?" Answer, "Yes." Question.  "And also if

22  she's kept away from other elements like precipitation

23  that you mentioned?" Answer, "True." Question, "You

24  would expect again a faster onset for post-mortem

25  changes?" Answer, "Yes." So if a body is kept inside or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   away from elements like precipitation, you would expect

2   a faster onset of post-mortem changes.

3              MR. GARVERICH:  Objection to form.

4       A    I don't know how I can answer that question.

5   You're -- you're mixing things up here in the question

6   that was asked to me in my deposition.  What I attempted

7   to tell you is, is that if we moisten the skin or --

8   and/or the clothing that -- that -- that post-mortem

9   changes will undoubtedly be -- be speeded up and -- and

10  whether whatever the post-mortem change you're -- you're

11  talking about.  That's all I'm saying.  I can't tell you

12  how much.  And there were questions also asked of -- of

13  me in that -- that deposition concerning, "Well, how

14  about in a -- in a garage?" And then I asked a question

15  to -- in that to answer that question, "How many heated

16  garages do you know?" Because all that does, a garage is

17  just like a car alone.  It does not account for cooling

18  of the body.

19      Q    Okay.  Well, I didn't ask you about how much

20  of a rate.  My question was just a body that's kept

21  closer to ambient temperature, kept away from other

22  elements, you would expect to see post-mortem changes

23  onsets quicker?

24      A    Yes.  The only -- the only ambient thing

25  you're -- you're -- you're not -- think you've changed

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 61 of 79 PageID #:
26039
The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022
61

1    is what falls out of the sky.

2        Q    In your deposition in January 2020, you

3    testified that you had no memory of ever seeing a body

4    in non-increasing temperature in full rigor after three-

5    and-a-half days.  It's been about a year-and-a-half

6    since then.  Have you -- in the interim seen a body in

7    non-freezing temperature still in full rigor after

8    three-and-a-half days?

9        A    Not that I'm aware of.  It doesn't mean it

10   can't happen.

11       Q    Have any such cases come to your mind?

12       A    No.

13       Q    Okay.  And certainly you met with Mr. Monarch

14   in advance of this deposition, right?

15       A    Yes.

16       Q    And you discussed with him the contents of the

17   designation that you prepared?

18       A    Yes.

19       Q    Okay.  And you knew that the issue was your

20   estimate of the time of death, right?

21       A    Oh, that was fairly obvious a long time ago.

22       Q    Okay.  So since you were deposed in January

23   2020 through today, you've understood a key issue in

24   this case is the post-mortem interval, right?

25       A    Correct.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And in all that time, still, as you sit

2    here today, you do not have any memory of seeing a body

3    in non-freezing temperature in full rigor after three

4    days.

5    A    I do not.

6    Q    And looking again at the paragraph on rigor

7    mortis in the designation that was prepared by counsel

8    for you, the final sentence, "There's nothing about

9    rigor mortis being present on April 5th that would

10   exclude the possibility that Ms. Warford was killed soon

11   after midnight on April 2nd," you see that?

12   A    Yes.

13   Q    You didn't write those words, did you?

14   A    No.

15   Q    And there is nothing about it being present

16   that would exclude the possibility, as you would agree,

17   another way of saying anything's possible, right?

18        MR. GARVERICH:  Objection to form.

19   A    Yes.  There is however another expert involved

20   with this -- in this matter, who has concluded that the

21   death occurred after midnight on the 2nd.

22   Q    Well, Ms. Warford was last seen alive around

23   approximately 12:30 a.m. on April 2nd, right?

24        MR. GARVERICH:  Objection to form.

25   A    Correct.  I'm just really telling you what I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  have read from the designation of Dr. Rodriguez, who is

 2  an --

 3       Q    Okay.  And --

 4       A    -- an imminently qualified forensic

 5  anthropologist.

 6       Q    Great.  And we will talk about him as well and

 7  his opinions, but it is your understanding that his

 8  opinion is that her death occurred shortly after

 9  midnight on April 2nd?

10       A    Correct.

11       Q    And that's based solely on rigor mortis.

12       A    I don't know what it's all based on.  I have

13  not read his report.  I've only read his designation.

14       Q    Okay.  And when you say "his designation," do

15  you have that in front of you?

16       A    Let's see.  I do not.  No, I do not have it.

17       Q    Do you -- I can put it up on the screen, but

18  do you recall it being entitled, "Forensic Anthropology

19  Consult Case Regarding the Post-mortem Interval?"

20       A    Yes.  That's specifically what he addressed

21  and he is a forensic -- a forensic odontologist.

22       Q    Okay.  And it's four pages.  A little onto the

23  fifth?

24       A    Yes.

25       Q    That sound about right for what you reviewed?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS taken on September 06, 2022

1      A     Yes.

2      Q     Okay.  So you did in fact review the report

3  that was prepared by Dr. Rodriguez?

4      A     That was what was sent to me.  Yes.

5      Q     Okay.  And it's your understanding that his

6  opinion is she was killed shortly after midnight on

7  April 2nd?

8      A     That was what I took away from it.  Yes.

9      Q     Okay.  And what did you take to be his basis

10  for that conclusion?

11      A     The persistence of -- of rigor -- of rigor

12  mortis in -- in a cold, relatively cold temperature, and

13  lack of predation.  No animal -- no animal activity.

14      Q     The lack of predation you would take to be

15  consistent with her having been killed closer in time to

16  when she went missing than when she was found?

17      A     I was surprised that that was his conclusion.

18  That he -- he talked about predation, as I remember, and

19  he -- he concluded that she -- that she died on the

20  second.

21      Q     Okay.  So, you were the medical examiner for

22  the Commonwealth of Kentucky for 20 years?

23      A     And two months.  Who's counting?

24      Q     20 years and two months.  Okay.  And I --

25  during that time, you did see hundreds of cases where

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    bodies have been found in -- left out in fields, right?

2        A    Absolutely.  This is a rural -- rural state.

3        Q    Yes.  And so although you can't exclude the

4    possibility that Ms. Warford was killed soon after

5    midnight on April 2nd, because there was no surveillance

6    footage and no eye witnesses, the fact that full rigor

7    was present on April 5th does tell you something about

8    the likelihood that she was killed three-and-a-half days

9    prior?

10       A    I don't know when she was killed.  I do not

11   know -- I do not know when she was killed.  You can ask

12   that question a million different ways, and the answer

13   is still, I don't know when she was killed.

14       Q    And Dr. Nichols, I am going to ask my

15   questions.  I'm going to ask them my way and if you

16   answer them, this will go a lot more efficiently, but

17   you're free to answer --

18       A    I'm also --

19       Q    -- my question, though.

20       A    I'm also free to leave.

21       Q    My question, Dr. Nichols, is full rigor being

22   present on April 5th does tell you something about the

23   likelihood that Ms. Warford's body was out for three-

24   and-a-half days in non-freezing weather, doesn't it?

25       A    Gentlemen.  Ladies.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 66 of 79 PageID #:
26044
The Deposition of DR. GEORGE R.  NICHOLS taken on September 06, 2022
66

1      Q    Dr. Nichols, what is your basis for concluding
2   this deposition?
3      A    I don't want to be subjected to you.  I would
4   be glad to talk to the judge about this.  I have never
5   ever done this before, and --
6      Q    Dr. Nichols, I have not raised my voice with
7   you.
8      A    You've asked the same question.  Goodbye.
9           MS. MCCARTHY:  Ed, can you please instruct
10          Dr. Nichols that I'm entitled to ask my questions?
11          MR. MONARCH:  I -- Katie I'm -- he is not a
12          retained witness.  He is a -- he has factual
13          knowledge in this case back to 1992.  We provided a
14          disclosure. You've insisted the whole time of going
15          back through the deposition that he's given before.
16          You've repeated the question a thousand times.  I
17          have to agree with Dr. Nichols that this has been
18          repetitive.  We still -- we're an hour, two hours
19          into this deposition or more, and we have not
20          gotten past the single question of when did he die
21          -- when did she die?  And the answer has been
22          repeatedly, "I don't know," "I don't know", "I
23          don't know."  And so if he's going --
24          MS. MCCARTHY:  And you prepared a five-page
25          designation for Dr. Nichols with respect to the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    post- mortem interval.  That is what this

2    deposition is about. The last question that I asked

3    him before he walked out was whether full rigor

4    being present tells us something about the

5    likelihood of how long she was left out.  I have

6    never asked Dr. Nichols to give me the exact time

7    that Ms. Warford died, but this an issue based on

8    your expert disclosure for Dr. Nichols.  I don't

9    know if you want to go try to get him and bring him

10   back.  If we have to go to the court, we can go to

11   the court.

12       MR. MONARCH:  I don't know what gives you the

13   impression that I have any ability to control

14   Dr. Nichols?  I --

15       MS. MCCARTHY:  Well, you --

16       MR. MONARCH:  -- I don't.

17       MS. MCCARTHY:  -- paid him.

18       MR. MONARCH:  I pay him for the time that is

19   expended.  I have not paid him any retainers.  I

20   have not paid him an advance.  That is why he is

21   not a retained expert.  He is somebody that I have

22   only paid for the time that has been expended.  I

23   have no control over this witness, and basically

24   I'm - I -- in my disclosure as an unretained

25   expert, I told you the questions that I was going

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to ask him at trial.  I assume he'll sit and answer

2    those questions because I'll deliberately move

3    through them.  But you know, I --

4         MR. BRUSTIN:  Sorry to interrupt.  This is

5    Nick.  I'm sorry to interrupt.  Would it be -- and

6    I don't even know.  It sounds like you don't

7    control and that -- that's -- I would disagree, but

8    it would -- I think it would be better for

9    everybody to get this done today.  Would you mind

10   trying to see if we can get him back in?

11        MR. MONARCH:  You know, I doubt that he's even

12   there anymore.  I'll look out the door, but --

13        COURT REPORTER:  Do you want to go off the

14   record?

15        MR. MONARCH:  Yeah.  Might as well.

16        COURT REPORTER:  Do you-all want to go off the

17   record?  This is the court reporter.  He's --

18        MR. MONARCH:  Yeah.  Wait one second.

19        MR. BRUSTIN:  Well, no hang on.  Does any

20   other counsel have a statement they'd like to make

21   at this time on the record?

22        MS. MCCARTHY:  I think we should stay on the

23   record.

24        MR. MONARCH:  Yeah.  He's gone.  Like I said,

25   I -- he's a fact witness.  I -- my disclosure was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   the questions that I was going to ask him.  I can't

2   make him sit here through repetitive questioning

3   and that is -- I've got nothing -- I've got no

4   ability to control this situation.

5       MR. BRUSTIN:  Yeah.  Well, I know I appreciate

6   you -- your trying to now describe differently what

7   your disclosure was, but that's not what your

8   disclosure is, but in any case, I think it would be

9   in everybody's interest, including yours, if you

10  could try to get him back in.  If you're not

11  willing to do that, don't do it.

12      MR. MONARCH:  I did.  I just stuck my head out

13  the door.  He's gone.

14      MS. MCCARTHY:  Well, I assume you have his

15  contact information, Ed, and, you know, Amy has

16  driven in for this deposition.  We're all here.

17  We're prepared to go.  Obviously, it would been

18  preferable he brought his notes with him, but

19  either way, when I -- my intention was to get

20  through this today.

21      MR. MONARCH:  Well, you know, you can ask me

22  the same question a hundred times the same as

23  you've asked Dr. Nichols the same question a

24  hundred times, there's not a thing I can do about

25  it.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       MR. BRUSTIN:  Yeah.  I think actually that's

2 not what's happening here.  I think you know that.

3 You keep saying that and we can say it a nice way

4 as if it's not offensive, but it is.  It --

5       MR. BOND:  So let's address the issue at hand.

6 Let's not get personal okay.

7       MR. BRUSTIN:  I'm not.  That's not -- but he's

8 getting personal.  That's -- I'm not

9       MR. MONARCH:  I'm not getting personal.  I

10 can't fix this.

11       MR. BRUSTIN:  She has the right to ask

12 questions.  That's her right.

13       MS. MCCARTHY:  And he is a professional

14 witness.  This is what he does.  It's his job.  We

15 know that Judge Lindsay will look at the

16 transcript.  There's not -- he -- he's not

17 answering the question.  I think he must be here.

18 The sole issue with him is the post- mortem

19 interval.  That's what we're here to talk about. So

20 again, you know, Ed, you can all say, I don't think

21 it helps you that I ask the same questions again

22 and again, but that isn't the case here, and

23 Dr. Nichols did not have a basis to walk out where

24 we are paying him for its time.

25       MR. MONARCH:  Well, I don't know what I can do

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 71 of 79 PageID #:
26049
The Deposition of DR. GEORGE R.  NICHOLS, taken on September 06, 2022
71

1    to allay your frustrations in this situation.  I

2    have no control over this witness.  He is not my

3    retained witness.  I -- so --

4        MS. MCCARTHY:  Okay.

5        MR. MONARCH:  -- that's the only answer I can

6    provide you.

7        MS. MCCARTHY:  Okay.  So it's pretty clear

8    your position is you won't even try calling him.

9        MR. MONARCH:  I know him well enough to know

10   that he's not going to walk back in that door.  I

11   do know that.  I -- he told you upfront at the

12   beginning of deposition, he wasn't going to be

13   subjected to repeated questions.  He told you

14   upfront that he didn't know the date and time of

15   death.  And yet two hours later, we've not ventured

16   beyond that subject.  So I don't know what to say

17   other than I told you what questions I'm going to

18   ask him at trial, and you elected to focus on one

19   thing and that -- and he has left and it's not --

20   I --

21       MR. BRUSTIN:  So just to be clear, so despite

22   having met with him for more than an hour, provided

23   the materials, and paid him, you are telling us now

24   you have no ability to call him on his cell phone

25   and ask him if he will continue this deposition,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   which you know, the court will require.

2        MR. MONARCH:  I -- A, I don't know what the

3   court will require. B, I know that there's no way

4   that this person's going to come back in the door

5   after he has gotten up and walked out.  I've seen

6   him in depositions many, many times, and this is

7   the first time I've ever seen him walk out of a

8   deposition, presumably because he was questioned

9   for eight hours previously on exactly the same

10  subject that he's been questioned for two hours

11  more on today.  And you know, that's --

12       MS. MCCARTHY:  Apart, as you know, Ed, it was

13  the new county defendant who noticed his prior

14  deposition.  I have never subjected him to eight

15  hours of questioning.  It's not even entitled under

16  the federal rules, but also you have now --

17       MR. MONARCH:  Seven.

18       MS. MCCARTHY:  -- produced all the other

19  expert materials to him.  You sent him his

20  deposition, Melinek's deposition, Rodriguez's

21  report, and you prepared this designation of him,

22  so we are, of course, entitled to ask him about the

23  content of what's in here, which is what I'm doing.

24  I -- it sounds like you have both a professional

25  and maybe a personal relationship with Dr. Nichols.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    All counselors are here today.  We've reserved the

2    court reporter's office.  Amy has come down, as I'm

3    sure you have traveled there too, so please, would

4    you at least try calling him to see if he will come

5    back so we can get this done?

6        MR. MONARCH:  Again.  I am -- I think the

7    answer here is that we need to reschedule and

8    reconvene after we've discussed this matter with

9    the court, because he's not coming back, and I do

10   not have a personal relationship with him.  I've

11   known him as a witness in many prior cases.  That's

12   how I know him.  In fact, this is the first time

13   that I have ever put him forth as a witness, but

14   he's not, again, a retained expert on my behalf.  I

15   didn't -- I did not gain his agreement to review

16   this material.  I simply asked him what I -- I am

17   required under the rules to tell you what questions

18   I'm going to ask him at the trial of this matter.

19   That's what I'm required to do, and that's what I

20   did through that disclosure.  If I had retained him

21   as an expert, I would have listed him as a retained

22   expert, but I don't have any control over this,

23   this witness. He is free to exercise his own will

24   under the rules of -- if he believes that he's

25   being harassed, and apparently he did.  So --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUSTIN:  So --

2          MR. MONARCH:  -- I --

3          MR. BRUSTIN:  -- before we stop with that, Ed,

4     do you mind if we just take 30 minutes --

5     30 seconds to talk.  Want to decide whether to

6     address the hour now. Amy, are you around?

7          MS. STAPLES:  Yeah.  Give me a call.

8          MR. MONARCH:  Sure.

9          MS. STAPLES:  And hey before we --

10          MR. BRUSTIN:  Let's take two minute break.

11          MS. STAPLES:  Before we take that break, I

12     think it's important that we go ahead and put on

13     the record how much time we actually were on the

14     record. It's way less than two hours, but I think

15     we need to know how long we've had on the record

16     with them thus far.

17          COURT REPORTER:  I can --

18          MS. STAPLES:  If you can do that when we come

19     back, that's fine.

20          COURT REPORTER:  Oh, when we come back.  Yeah.

21     Okay.

22          MS. MCCARTHY:  Okay.  So let's take a couple

23     minutes and --

24          COURT REPORTER:  Going off the record.  The

25     time is 11:52.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-17   Filed 01/26/23   Page 75 of 79 PageID #:
26053
The Deposition of DR. GEORGE R. NICHOLS taken on September 06, 2022
75

1           (OFF THE RECORD)

2       COURT REPORTER:  We're back on record at

3    12:01.

4       MS. MCCARTHY:  Okay.  So just going to put on

5    the record that the witness, Dr. Nichols terminated

6    the deposition.  He has since -- he left.  We do

7    have to cancel the deposition and we know that the

8    court is going to want the transcript, so we will

9    put in our request for that and we will go to the

10   court regarding Dr. Nichols, his notes, and his

11   appearance at his deposition to finish the

12   remainder.

13      MR. BRUSTIN:  Yeah.  Well actually, hopefully

14   we don't have to do -- well, we may have to go on

15   the notes, but hopefully we can just get the notes,

16   but if you could let us know that, Ed, if you --

17   that would be helpful.

18      MR. MONARCH:  Yeah.  I mean, I think you-all

19   have listed him as an unretained expert as well,

20   which kind of puts us on even footing.  I have a --

21   I mean, I know he is -- he was questioned for

22   247 pages last time, and all about the same basic

23   issue, and he's repeated the answer so many times

24   that -- and he told us upfront that he --  I don't

25   -- and the other thing that I guess has been

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    implied here is that I have a cell phone number for
2    him.  I do not.  I have only his business number,
3    the same as any other witness in this case, so any
4    other party in this case.  So I have contacted him
5    through his office every time.  We know that he's
6    not there, and so there's no purpose of me
7    attempting to contact him here today.
8          MR. BRUSTIN:  We just assumed that you had it.
9    I'm sorry.
10         MR. MONARCH:  Yeah.
11         MS. MCCARTHY:  Yeah.
12         MR. MONARCH:  That's it.
13         MS. MCCARTHY:  I mean, as you know, Ed, we
14   disclosed him.  We have never met with Dr. Nichols.
15   We've never paid Dr. Nichols.  We've never sent
16   Dr. Nichols any materials.  That disclosure was
17   based on his prior deposition testimony.  The
18   designation that you put forth after multiple
19   meetings with Dr. Nichols and paying him, as well
20   as providing him with other materials and expert
21   materials, includes several things that he did not
22   speak to in his deposition, and so I -- would not
23   say we are in any way on even footing and that ours
24   is a proper disclosure on a unretained expert, but
25   regardless, I think at this point it makes sense to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DR. GEORGE R.  NICHOLS taken on September 06, 2022

77

1   address this through the court.

2        MR. MONARCH:  I agree with the last thing you

3   said.  It makes more sense to address this through

4   the court than otherwise.  So I guess we're done

5   here.

6        COURT REPORTER:  Did you want to know --

7        MS. STAPLES:  Yeah.  Can you tell us how long

8   we were on the record, please?

9        COURT REPORTER:  Yes.  As of right now, it's

10  been an hour and 40 minutes but the last 10 minutes

11  or so, that was just between everybody.

12       MR. BRUSTIN:  What time did the deposition

13  start though?

14       COURT REPORTER:  It started at 10:06 a.m., and

15  we had a break.

16       MR. BRUSTIN:  No, I agree.  I'm just trying to

17  find out -- and when did you make note of when

18  Dr. Nichols left?

19       MS. MCCARTHY:  When my question's still on.

20       COURT REPORTER:  At 11:40.

21       MR. GARVERICH:  11:40

22       MR. BRUSTIN:  Okay, Andrew, is that on your

23  clock?

24       MR. GARVERICH:  That's on the videographer.

25       MR. BRUSTIN:  Okay.  Okay.  Thanks Andrew.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    MR. GARVERICH:  Okay.  Folks, are we done?

2    MR. BOND:  Yes.

3    MR. MONARCH:  Yep.

4    MR. GARVERICH:  I think so.

5    MR. BRUSTIN:  Thank you all.  Appreciate it.

6    MR. BOND:  Nice meeting you all.

7         (DEPOSITION CONCLUDED AT 12:05 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1              CERTIFICATE OF REPORTER

2          COMMONWEALTH OF KENTUCKY AT LARGE

3

4   I do hereby certify that the witness in the foregoing

5   transcript was taken on the date, and at the time and

6   place set out on the Title page here of by me after

7   first being duly sworn to testify the truth, the whole

8   truth, and nothing but the truth; and that the said

9   matter was recorded digitally by me and then reduced to

10  typewritten form under my direction, and constitutes a

11  true record of the transcript as taken, all to the best

12  of my skill and ability.  I certify that I am not a

13  relative or employee of either counsel, and that I am in

14  no way interested financially, directly or indirectly,

15  in this action.

16

17

18  

19

20

21

22  JESSE HARP,

23  COURT REPORTER/NOTARY

24  COMMISSION EXPIRES:  01/28/2023

25  SUBMITTED ON:  09/08/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com