Case 3:17-cv-00419-GNS-CHL   Document 317-18   Filed 01/26/23   Page 1 of 256 PageID #:
26058

```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF KENTUCKY
 2                 HON. CHARLES R. SIMPSON III
                     MAG. COLIN H. LINDSAY
 3                   CASE NO. 17-CV-419

 4

                    JEFFREY DEWAYNE CLARK,
 5                        PLAINTIFF

 6                          VS.

 7                   LOUISVILLE JEFFERSON
               COUNTY METRO GOVERNMENT, ET AL.,
 8                       DEFENDANTS

 9

10               HON. CHARLES R. SIMPSON III
                    MAG. COLIN H. LINDSAY
11                   CASE NO. 17-CV-420

12                  GARR KEITH HARDIN,
                         PLAINTIFF

13                          VS.

14                   LOUISVILLE JEFFERSON
15             COUNTY METRO GOVERNMENT, ET AL.
                         DEFENDANTS
16

17

18

19

20

21

22

23

24   DEPONENT:   JOE GREER
     DATE:       NOVEMBER 4, 2019
25   REPORTER:   ELIZABETH HARLOW
```



```
 1                       APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, JEFFREY DEWAYNE CLARK:

 4   AMY STAPLES

 5   ELLIOT SLOSAR

 6   LOEVY & LOEVY

 7   311 NORTH ABERDEEN

 8   THIRD FLOOR

 9   CHICAGO, ILLINOIS 60607

10   TELEPHONE NO.: (312) 243-5900

11   E-MAIL: AMY@LOEVY.COM

12           ELLIOT@LOEVY.COM

13   (MR. SLOSAR APPEARED VIA TELEPHONE)

14

15   ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

16   NICK BRUSTIN

17   LEN H. KAMDANG

18   NEUFELD SCHECK & BRUSTIN, LLP

19   99 HUDSON STREET

20   EIGHTH FLOOR

21   NEW YORK, NEW YORK 10013

22   TELEPHONE NO.: (212) 965-9081

23   E-MAIL: NICK@NSBCIVILRIGHTS.COM

24           LEN@NSBCIVILRIGHTS.COM

25
```



```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

 4   LARRY D. SIMON

 5   SIMON LAW OFFICE

 6   THE KENTUCKY HOME LIFE BUILDING

 7   239 SOUTH FIFTH STREET

 8   17TH FLOOR

 9   LOUISVILLE, KENTUCKY 40202

10   TELEPHONE NO.: (502) 822-2074

11   E-MAIL: LARRYSIMONLAWOFFICE@GMAIL.COM

12

13   ON BEHALF OF THE DEFENDANTS, LOUISVILLE JEFFERSON METRO

14   GOVT AND LOUISVILLE METRO POLICE OFFICERS, INDIVIDUALLY:

15   PETER F. ERVIN

16   JEFFERSON COUNTY ATTORNEY

17   531 COURT PLACE

18   SUITE 900

19   LOUISVILLE, KENTUCKY 40202

20   TELEPHONE NO.: (502) 574-6336

21   E-MAIL: PETER.ERVIN@LOUISVILLEKY.GOV

22

23

24

25
```



```
 1                    APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, MEADE COUNTY:

 4   KEITH BOND

 5   ANDREW GARVERICH

 6   COLEMAN LOCHMILLER & BOND

 7   2907 RING ROAD

 8   ELIZABETHTOWN, KENTUCKY 42702

 9   TELEPHONE NO.: (270) 737-0600

10   E-MAIL: KBOND@CLBLEGAL.COM

11           AGARVERICH@CLBLEGAL.COM

12

13   ON BEHALF OF THE DEFENDANT, MARK HANDY:

14   ANDREW PELLINO

15   DRESSMAN BENZINGER LAVELLE, PSC

16   321 WEST MAIN STREET

17   SUITE 2100

18   LOUISVILLE, KENTUCKY 40202

19   TELEPHONE NO.: (502) 630-1301

20   E-MAIL: APELLINO@DBLLAW.COM

21

22

23

24

25
```



```
 1                  APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, ROBERT THURMAN:

 4   PETER J. ROSENE

 5   MCBRAYER PLLC

 6   500 WEST JEFFERSON STREET

 7   SUITE 2400

 8   LOUISVILLE, KENTUCKY 40202

 9   TELEPHONE NO.: (502) 327-5400

10   E-MAIL: PROSENE@MCBRAYERFIRM.COM

11

12   ALSO PRESENT:  MAGGIE PATTERSON, VIDEOGRAPHER

13                  KATIE GLESING, VIDEOGRAPHER IN TRAINING

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                          INDEX

 2                                                    Page

 3   PROCEEDINGS                                        8

 4   DIRECT EXAMINATION BY MR. BRUSTIN                  9

 5   CROSS EXAMINATION BY MR. PELLINO                 177

 6   EXAMINATION BY MR. ROSENE                        209

 7   EXAMINATION BY MR. ERVIN                         214

 8   REDIRECT EXAMINATION BY MR. BRUSTIN              232

 9   RECROSS EXAMINATION BY MR. PELLINO               249

10   RE-EXAMINATION BY MR. ERVIN                      250

11

12                         EXHIBITS

13                                                    Page

14      9     LETTER FROM DETECTIVE MARK

15            HANDY DATED APRIL 6, 1992              190

16     10     LETTER FROM DETECTIVE MARK

17            HANDY DATED APRIL 8, 1992               14

18     11     LETTER FROM DETECTIVE MARK

19            HANDY DATED APRIL 9, 1992              191

20     26     MICHELLE ROGERS TESTIMONY

21            TRANSCRIPT 3-01-95                     125

22     27     CRYSTAL BARNES TESTIMONY

23            TRANSCRIPT 3-01-95                     129

24     D12    AMY REMSBURG INTERVIEW EXCERPT         205

25
```



```
 1                          STIPULATION

 2

 3    The VIDEO deposition of JOE GREER taken at FIRST

 4    CHRISTIAN CHURCH, 1811 NORTH MILES STREET,

 5    ELIZABETHTOWN, KENTUCKY 42701 on MONDAY, the 4TH day of

 6    NOVEMBER, 2019 at approximately 9:29 a.m.; said VIDEO

 7    deposition was taken pursuant to the FEDERAL Rules of

 8    Civil Procedure. It is agreed that ELIZABETH HARLOW,

 9    being a Notary Public and Court Reporter for the State

10    of KENTUCKY, may swear the witness.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1              PROCEEDINGS
2       VIDEOGRAPHER:  My name is Maggie Patterson.
3  I'm the videographer today, and Elizabeth Harlow is
4  the court reporter.  Today is the 4th day of
5  November, 2019.  The time is 9:29 a.m.  We're at
6  the First Christian Church located at 1811 North
7  Miles Street, Elizabethtown, Kentucky, to take the
8  deposition of Joe Greer in the matter of Jeffrey
9  Dewayne Clark versus Louisville Jefferson County
10 Metro Government, et al. and Garr Keith Hardin
11 versus Louisville Jefferson County Metro
12 Government, et al., pending in the US District
13 Court, Western District of Kentucky, Case numbers
14 17-CB-419 and 17-CB-420.  Will the counsel please
15 identify themselves for the record?
16      MS. ROBINSON-STAPLES:  Amy Robinson-Staples
17 for the plaintiff, Jeffrey Clark.  Elliot Slosar
18 for the plaintiff Jeffrey Clark is also on the
19 phone.
20      MR. KAMDANG:  Len Kamdang on behalf of Keith
21 Hardin.
22      MR. BRUSTIN:  Nick Brustin, Keith Hardin.
23      MR. SIMON:  Larry Simon, Keith Hardin.
24      MR. GARVERICH:  Andrew Garverich on behalf of
25 the Meade County defendants.
```



```
 1              MR. BOND:  Keith Bond on behalf of Meade
 2         County defendants.
 3              MR. PELLINO:  Andrew Pellino for Mark Handy.
 4              MR. ROSENE:  Peter Rosene on behalf of Robert
 5         Thurman.
 6              MR. ERVIN:  Peter Ervin on behalf of
 7         Louisville Metro and other Metro authorities.
 8              VIDEOGRAPHER:  Sir, will you please raise your
 9         right hand for the reporter?
10              COURT REPORTER:  Do you solemnly swear or
11         affirm the testimony you're about to give is the
12         truth, the whole truth, and nothing but the truth?
13              THE WITNESS:  Yes, I do.
14              COURT REPORTER:  Thank you.
15                        DIRECT EXAMINATION
16    BY MR. BRUSTIN:
17         Q    Good morning, Sheriff.
18         A    Good morning, sir.
19         Q    Last time we met it was August of this year.
20    I want to ask you first some questions about what you've
21    done to prepare yourself since that time, okay?  Have
22    you read any additional documents since your last
23    deposition?
24         A    Some.
25         Q    What did you read?
```



1    A    Some of the transcript from that hearing.

2    Q    Of your deposition?

3    A    Of my deposition.

4    Q    So you read some of your deposition?

5    A    Some of it.

6    Q    Okay.

7    A    Most of the time was spent in doctors' offices

8    and the hospital.

9    Q    Fair enough.  And I should ask you about that

10   first.  Do you have any -- I know you talked a bit about

11   your health conditions last time.  Are there any

12   additional health conditions that you think might affect

13   your ability to testify here today?

14   A    Let's hope not.

15   Q    Okay.  And please, sir, if you're having any

16   discomfort -- or any discomfort that makes it impossible

17   for you to continue, or difficult for you to continue,

18   please let us know.

19   A    I would, sir.

20   Q    All right.  But aside from your physical

21   issues, is there any of your health conditions that you

22   think might affect your memory?

23   A    No.

24   Q    Okay.

25   A    I don't think so.



1    Q    Or your ability to concentrate and answer

2  questions?

3    A    That could be a problem, but we'll work on

4  that.

5    Q    Fair enough.  Would you promise to let me know

6  if that happens?

7    A    Yes, sir, I would.

8    Q    All right.  And if at any time you need to

9  take a break, just let us know, okay?

10   A    Yes, sir.

11   Q    We'll do the best we can.  Okay.  You

12 mentioned that one of the things you reviewed were

13 portions of your deposition transcript from last time,

14 right?

15   A    Yes, sir.

16   Q    Any other documents, pieces of paper that you

17 reviewed about this case?

18   A    No, sir.

19   Q    Did you have time -- I think your attorney

20 mentioned you met last week briefly on the case?

21   A    Yes, correct, sir.

22   Q    How long did you meet for in the case?

23   A    Maybe an hour.

24   Q    Okay.  Any other meetings with your attorneys

25 either by phone or in person since your last deposition?



1      A    Only to call and find out how my health was.

2      Q    Okay.  Nothing substantive?

3      A    No.

4      Q    All right.  Have you spoken to anybody else

5  about the case?

6      A    No, I have not.

7      Q    Nobody?

8      A    Nobody.

9      Q    All right.  Reviewed any other pieces of paper

10  about the case since your last deposition?

11      A    No.

12      Q    Okay.  Are you aware of what other people have

13  testified to in this case from any source?

14      A    No, I'm not.  I wish I was.

15      Q    All right.  You said you wish you were.  Is

16  there --

17      A    No.

18      Q    -- a reason why you didn't read them?

19      A    No, I didn't have them, sir.

20      Q    Okay.

21      A    They weren't furnished to me.

22      Q    Fair enough.

23      A    I think that was a no-no.

24      Q    Okay.

25           MS. ROBINSON-STAPLES:  Nick, can you place



```
 1        that closer to Mr. Greer?
 2              MR. BRUSTIN:  Yeah.
 3              MS. ROBINSON-STAPLES:  Thank you.
 4              MR. BRUSTIN:  You mind, sir?
 5              THE WITNESS:  No.
 6              MR. BOND:  Yeah.  Now we -- we've got a
 7        recording device.  We're not going to have another
 8        recording.
 9              MR. BRUSTIN:  Yeah, was that someone listing?
10              MS. ROBINSON-STAPLES:  It's Elliot, sir.
11              MR. BOND:  I apologize.  I'm sorry.  Who's on?
12              MS. ROBINSON-STAPLES:  Elliot.
13              MR. BOND:  Okay.  Okay.  I apologize.
14   BY MR. BRUSTIN:
15        Q    All right.  Now, I want to add, last time you
16   were here, we asked you some questions about your
17   interactions with Mr. Capps.  Do you recall those
18   questions?
19        A    Basically, I do.  I might have forgot some of
20   it.
21        Q    Fair enough.  I'm going to ask you a few more
22   follow up questions that have come since then, okay?
23        A    Okay.
24        Q    All right.  So first of all, you understand
25   how the -- you understood how the Meade County jail was
```



1   set-up back when you were there as Sheriff?

2       A    Basically, I do.  Yes, sir.

3       Q    Okay.  And according to -- let me show him

4   this actually.  This is -- so take a look at Exhibit 10.

5            MR. BOND:  Where's the other copy?

6            MR. BRUSTIN:  I'll just give you a copy if you

7       don't mind.

8            MR. BOND:  Okay.

9            MR. BRUSTIN:  Is that okay?  That's

10      Exhibit 10.

11           MR. BOND:  Yeah, that's fine.

12  BY MR. BRUSTIN:

13      Q    Okay.  Take a look at Exhibit 10, and take a

14  look at page -- Exhibit 10 is a copy of the statement

15  that you took from Clifford Capps on December 2, 1992.

16      A    Yes, sir.

17      Q    And this is something you reviewed prior to

18  your last deposition, correct?

19      A    A little bit.

20      Q    Okay.  But you remember this?

21      A    Basically, I can remember.

22      Q    Okay.  Good.  So let's take a look, and I'm

23  looking at the page numbers on the bottom right corner.

24      A    Yes, sir.

25      Q    Let's take a look at page 4.  All right.  If



1  you could read to yourself lines 5 on Page 4 through

2  line 23 on Page 4, okay?

3       A    Okay, sir.  Okay, sir.

4       Q    Okay.  And so you see here he's telling you

5  about his interaction, Capps is telling you about his

6  interaction with Jeff Clark along with Jerry Mabry,

7  right?

8       A    Yes, sir.

9       Q    And you understood from your time --

10  withdrawn.  You've already told us that the jail was

11  just a walk down the hall for you, right?

12      A    Yes, sir.

13      Q    All right.  And so you knew very well what the

14  layout was like?

15      A    Yes, sir.

16      Q    And you were free to go in and out of that

17  jail?

18      A    Yes, sir.

19      Q    And you did, routinely?

20      A    Yes, sir.

21      Q    All right.  And so when he's talking to you,

22  you know exactly what he's describing in terms of the

23  layout, right?

24      A    Basically, yes, sir.

25      Q    And so you know the common area where he --



1  that he's describing where he and Jerry and Jeff Clark,

2  according to Capps, would talk, right?

3       A    Yes, sir.

4       Q    And what he's telling you is that he and Jerry

5  and Jeff would talk in that common area, correct?

6       A    Yes, sir.

7       Q    And by the way, the cells were right next to

8  one another, right?

9       A    Yes, sir.

10      Q    And if you were talking in your cell, you

11  would be able to hear it in the cell next door, right?

12      A    Should be able to.

13      Q    Should be able to, right?

14      A    Now, the new layout of the jail, I'm not that

15  familiar with.

16      Q    But the old layout of the jail --

17      A    Yeah, I was.

18      Q    -- there would be a common area and two cells

19  right next to each other?

20      A    Yes, sir.

21      Q    You certainly be able to hear what the other

22  two were talking about if you wanted to?

23      A    If you wanted to.

24      Q    All right.  Now take a look at page 11 of this

25  interview.



```
 1        A    Okay, sir.
 2        Q    And if you take a look at line 11 -- read to
 3   yourself line 11 to line 24.
 4        A    Okay.
 5        Q    Okay.  And here he's telling you that it's
 6   possible or that he doesn't know one way or another
 7   whether or not Jerry Mabry heard the same alleged
 8   confession, correct?
 9        A    Yes, sir.
10        Q    Now take a loo --
11             MR. BOND:  Objection to the form of question.
12        Transcript speaks for itself.
13        Q    -- now take a look at page 10.  If you could
14   read line 16.  I should've done it the other way around,
15   but I didn't.  So if you could read line 16 to -- why
16   don't you read line 16 to line 25.
17        A    Okay, sir.
18        Q    Okay.  And here, he's talking about hearing
19   this alleged confession from Jeff Clark while he's
20   sitting at a desk and Jeff Clark is some distance away,
21   correct?
22        A    (No verbal response.)
23             MR. BOND:  Object to the form of the question.
24        Q    He's not actually saying where Jeff Clark
25   is --
```



1    A    Right, yeah.

2    Q    -- but he's sitting at the desk.

3         MR. BOND:  Object to the form of the question.

4    Where does it say "sitting at a desk"?

5    Q    It doesn't here.  He describes it elsewhere,

6    sitting in a desk.  But do you know that there'd be

7    desks in the cell?

8    A    In the old cells there were desks.

9    Q    In the common area?

10   A    Yeah.  If you go in the jail, the cells on the

11   left had desks.

12   Q    Okay.  And was they -- and the desk -- was the

13   desk facing the common area?

14   A    I'm not sure, sir.

15   Q    You're not sure anymore?  Okay.  But

16   presumably if -- you would expect that if -- withdrawn.

17   Now, you would agree that, according to what you just

18   read, what this suggests is it's very possible that

19   Jerry Mabry may have heard the same conversation, right?

20   A    I'm not sure.  I don't know, sir.

21   Q    Well that's what he's describing.  He's saying

22   he may have heard, right?

23   A    He may have.

24        MR. BOND:  Object to the form of the question.

25   Q    Is that an accurate description of what he's



```
 1   describing?

 2        A    I'd say so.

 3        Q    Okay.  And as an experienced law enforcement

 4   man, like you, the first thing you'd be thinking is, "I

 5   wonder if Jerry Mabry heard this," right?

 6        A    Knowing Jerry Mabry, I don't know what he'd

 7   say to you.

 8        Q    Okay.  You don't know till you ask, right?

 9        A    No, I don't think I asked.

10        Q    Okay.  Well, that was my next question.

11   Obviously, Jerry Mabry is potentially another important

12   witness here, correct?

13        A    Not to me.  He wasn't.

14        Q    Okay.  So what Jeff Clark has described --

15   what Capps is describing --

16        A    Uh-huh.  Yes, sir.

17        Q    -- is a conversation that he had with Jeff

18   Clark, where Jeff Clark, according to Capps, admitted to

19   committing this crime.

20        A    According to his statement.

21        Q    Okay.  If that's true, that's a very important

22   piece of evidence in the case, correct?

23        A    Only if Jerry Mabry heard it.

24        Q    Listen to what I'm saying.  If what Capps is

25   telling you is true, if Jeff Clark really admitted to
```



1   committing this crime, that's an important piece of

2   evidence?

3        A    No doubt.

4        Q    Okay.  And you've already told us you knew

5   Capps, as a general matter was a liar, right?

6        A    Take him or leave him.

7        Q    You knew that oftentimes he lied, right?

8        A    Yes.

9        Q    Okay.  And so it would be important to know

10  whether or not if -- withdrawn.  You've also told us

11  that other people who are in that cell, if they were

12  listening, would've been able to hear communications

13  between Jeff Clark and Capps if they happened, correct?

14       A    That's possible.  Yeah.

15       Q    All right.  And so what would have been very

16  important to do to determine whether or not Capps was

17  telling the truth would be to talk to other people in

18  the cell, correct?

19       A    Yes, sir.

20       Q    All right.  And if in fact those other people

21  in the cell said, "I could hear everything they were

22  talking about, and I never heard anything like that,"

23  that would be important evidence suggesting that Capps

24  was lying, correct?

25       A    Yes, sir.  Could be



```
 1        Q    And, on the other hand, if they said, "Oh, I
 2   heard exactly the same thing," that would be important
 3   evidence supporting the admission, correct?
 4        A    Yes, sir.
 5        Q    All right.  And I take it, obviously, as soon
 6   as you heard this information and you were asking
 7   yourself -- you saw on the transcript you were asking
 8   questions about Jerry Mabry, right?
 9        A    Yes, sir.
10        Q    What you must have done as soon as you talked
11   to Capps is you walked over to the jail, and you spoke
12   to Jerry Mabry.
13        A    I don't think I did.
14        Q    Well, you've told us this was the biggest case
15   in your career.
16        A    Well, one of them.
17        Q    You told us it was the biggest case in your
18   career.
19        A    Yeah.
20        Q    By the way, probably the second biggest arrest
21   you've ever made was arresting Melanson, the serial
22   killer, right?
23        A    Yes, sir.
24        Q    That was probably this -- that was -- that was
25   probably the second biggest case you were ever a part
```



1  of.

2       A    That's hard to say, sir.  I can -- call --

3  recall other cases.

4       Q    Fair enough.  Fair enough.  Mellon -- Melanson

5  and this case were two of the biggest cases, if not the

6  biggest cases, you worked on?

7       A    Yes.

8       Q    Very important cases to you.

9       A    I didn't work on Melanson.

10      Q    Okay.  Well, you made the arrest.

11      A    Well, I was with Tommy Stiles.

12      Q    Okay.  And you worked with Tommy Stiles all

13  the time, right?

14      A    Yes.

15      Q    Tommy Stiles was someone you worked closely

16  with, correct?

17      A    Very much so.

18      Q    All right.

19      A    Yes, sir.

20      Q    He was someone you spoke to on a daily basis?

21      A    If he was on duty, I spoke to him.

22      Q    All right.  So back in 1991 through 1993,

23  let's say, you would speak to Tommy Stiles every day?

24      A    Probably.  If he wasn't on vacation or gone

25  hunting.



JOE GREER                                          November 04, 2019
CLARK vs LJCMG                                                    23

```
 1        Q    Not only did you work together, you were good
 2   friends?
 3        A    Yes, very much so.
 4        Q    And if anything hap -- and you would routinely
 5   talk about the cases that you had together, correct?
 6        A    Some of them, yes.
 7        Q    And you would talk about the important cases
 8   that were going on at the time, right?
 9        A    Yes, some of them.
10        Q    For example, one of the things you told us is
11   that Melanson, when he was in your jail, was nothing but
12   trouble, right?
13        A    Understatement of the year, sir.
14        Q    Okay.  And so and that was Tommy Stiles' case,
15   right?
16        A    Yes, it was.
17        Q    And you were very interested in what was
18   happening in Tommy Stiles' investigation on Melanson,
19   correct?
20        A    Well, really it was hard not to.
21        Q    Did you -- you couldn't help it, right?  It
22   was a big deal.  And you and Tommy Stiles were talking
23   on a regular basis about what every -- all the different
24   things that were going on with Melanson and his case,
25   right?
```



```
 1        A    Not every day.

 2        Q    Right.  Routinely.

 3        A    But he -- if something come up he'd let me

 4   know.  Like Judge Monarch's getting sued, Kenton Smith's

 5   getting sued.

 6        Q    Any big break --

 7        A    Going to sue everybody else.

 8        Q    Sure.

 9             MR. BOND:  Let him finish, Nick.

10        Q    Any big break in the case or any big issue in

11   the case and you and Tommy Stiles would of course

12   discuss it, correct?

13             MR. BOND:  Object to the form of the question.

14   Go ahead.

15        A    Sometimes we did, yes.

16        Q    All right.  And by the way, you were -- you

17   would probably be in the jail at least a few times a

18   day, right?

19        A    No, sir.

20        Q    How often would you be in the jail?

21        A    Maybe once a week.  Once every two weeks.

22        Q    All right.  But anytime you wanted to go in

23   and talk to somebody, you could just pop over and do it?

24        A    No.  Hit the doorbell and asked if I could

25   come in.
```



```
 1        Q    No one ever said no to you, right?

 2        A    No.

 3        Q    All right.  So obviously, when you learned

 4   that -- you told us that you didn't learn that Capps was

 5   claiming Jeff Clark admitted to committing this crime

 6   until December of 1992?

 7        A    That's correct.

 8        Q    And you're sure about that, right?

 9        A    I'm pretty sure of that.

10        Q    All right.  And so after you interviewed --

11   after you interviewed Capps, why didn't you talk to

12   Mabry?

13        A    I really don't know, sir.

14        Q    Can you think of any legitimate police reason

15   why you would not have spoken to Mabry?

16        A    Probably Jerry Mabry hated my guts.  That's

17   one good reason.  The next reason, he's not known to

18   talk to the police.  In fact, he'd probably give you the

19   finger and tell you to get out.

20        Q    Okay.  So one way to solve the problem of him

21   not liking you would be what?

22        A    Ask him.

23        Q    Or have someone else ask him, right?

24        A    Yeah.

25        Q    You have other people that worked for you,
```



1  right?

2      A    Yeah.

3      Q    Did you have any -- what other officers could

4  you have sent?

5      A    I really didn't use too many officers out of

6  my department on this case.

7      Q    Well, you used --

8      A    Cliff Wise.

9      Q    -- did you -- you could've sent Wise?

10     A    I could have.

11     Q    He was working this case, right?

12     A    Uh-huh.  Well, not working it.  He was

13 involved in it, okay?

14     Q    Okay.  I got him all over paperwork on the

15 case.  How about Adams?  He was all over it right?

16          MR. BOND:  Object to the form of the question.

17     A    Sir, he's the coroner.  He could have -- he

18 would have the authority.

19     Q    He's the coroner who came -- who came with you

20 on all the interviews, right?

21     A    Yeah.  He had the authority.

22     Q    Right?  Why -- what would be the cons -- so

23 you don't know if Mabry is going to speak to you until

24 you ask him, right?

25     A    That's true.



```
 1        Q    And it would be very important to know what he
 2   has to say, if he's willing to tell you, correct?
 3        A    Yes.
 4        Q    And it would have taken 30 seconds, right?
 5             MR. BOND:  Objection to the form of the
 6        question.
 7        A    You're right.
 8        Q    And this was one of the most important cases
 9   of your career?
10        A    Very important case, sir.
11             MR. BOND:  Nick, we've established that.
12        You've got three hours.
13        Q    Why wouldn't you go talk to him?
14        A    Sir, I just don't know.  I didn't --
15        Q    Did you forget?
16        A    I could have.  I don't know.
17        Q    Okay.  Is that probably what happened?  You
18   just forgot to talk to Mabry?
19        A    I'm not going to say that.  I don't know why I
20   didn't.
21        Q    In addition to Mabry, he also mentioned
22   somebody else being in the cell, right?  Charlie Peters?
23             MR. BOND:  What page please, if you're
24        referencing the statement?
25        Q    Page 9.  He says that Charlie Peters was
```



```
 1    somewhere else, right?
 2        A    I think so.
 3        Q    Yeah.  But you know that Capps lies all the
 4    time, right?
 5            MR. BOND:  I'm going to object to form of the
 6        question.
 7        A    I didn't say he lied all the time, sir.
 8        Q    Okay.
 9        A    You have to get -- get the evidence on him,
10    then he would usually come clean.
11        Q    Okay.  So you could've talked to Jerry Mabry.
12    You also could have talked to the jailer and find out
13    who was in the cell that night, right?
14        A    Yes.  No, I knew who was on the cell.
15        Q    Who else was in the cell?
16        A    Mabry and this other guy and Jeff Clark.
17        Q    How do you know that?
18        A    One thing -- Capps told me.
19        Q    Right.  But Capps has lied to you in the past?
20        A    You're using that term pretty loosely.
21        Q    I'm sorry.  Capps has told you things that
22    weren't true in the past?
23        A    Yes, he has.
24        Q    Okay.  And so you didn't know whether that was
25    true or not?
```



1            MR. BOND:  Asked and answered.  I mean, I'm

2      going to enforce the three hours, okay?  Do what

3      you want.

4      Q    Let me ask you this way: Would you agree that

5  it was a serious investigative failure not to speak to

6  Mabry?

7      A    He should have been spoken to, okay?  I'll

8  admit that.

9      Q    Look, I'm asking you if you admit what I'm

10  saying --

11           MR. BOND:  Let him finish.  Let him finish.

12           MR. BRUSTIN:  Did you have more to say?

13           MR. BOND:  Let him finish, Nick.

14           MR. BRUSTIN:  I'm asking if he has more to

15      say?

16           MR. BOND:  Go ahead.

17      A    I should've talked to him.  I realize that.

18  BY MR. BRUSTIN:

19      Q    Okay.

20      A    But I didn't.

21      Q    Okay.  You should've talked to Mabry.

22      A    Yes, that's correct.

23      Q    You should've gone and checked with the jailer

24  who was actually in the cell, correct?

25      A    I want to be truthful on this answer.  I think



1    I did talk to the jailer.  I think --

2         Q    Oh, because last time you told us you didn't.

3         A    -- that's right.  I think I did.

4         Q    All right.  And you talked to the jailer and

5    you said is there any paperwork on who is in the cell?

6         A    I know I told him to keep them separated,

7    okay?

8         Q    Told who to keep who separated?

9         A    Clark and Hardin.

10        Q    When they were first arrested?

11        A    That's right.

12        Q    Okay.  But that has nothing to do --

13        A    No, it doesn't.

14        Q    -- with who's in the cell with Clark, correct?

15        A    It don't.

16        Q    And if Clark was not in the cell with Capps,

17   that would suggest that Capps is lying, correct?

18        A    I won't go that far, sir.

19        Q    Capps is saying that they shared a cell and

20   that's when he confessed to him.

21        A    Yeah.

22        Q    If they weren't sharing a cell, he couldn't

23   have heard that confession?

24        A    That's correct.

25        Q    All right.  So another investi -- another very



 1  basic investigative step would be to find out if they

 2  were, in fact, in the cell together?

 3       A    I took Capps word for it.

 4       Q    Okay.  And you would agree that what you

 5  should have done, since Capps had a history of telling

 6  you things that weren't true, would be to ask the jailer

 7  who was a 100 yards away from your office?

 8       A    Probably should've, yes.

 9       Q    Okay.  That was another investigative failure,

10  correct?

11       A    Yes.

12       Q    All right.  And you -- another investigative

13  failure was not finding out who else was in the cell, if

14  anybody, correct?  It was a four-person cell.

15            MR. BOND:  Objection to the form.

16       A    I -- I took Capps word for who was in cell.

17       Q    And again, we know that Capps had a history of

18  telling you things that weren't true, correct?

19       A    Sometimes, yes.

20       Q    Okay.  And so the proper -- the proper way to

21  investigate that statement would it be to talk to the

22  jailer and find out who, in fact, was in the cell,

23  correct?

24       A    Yes.

25       Q    Because the jailer didn't lie to you in the



JOE GREER                                      November 04, 2019
CLARK vs LJCMG                                              32

1   past, right?

2        A    No.

3        Q    All right.  But you chose not to do any of

4   those things?

5        A    That's correct.

6        Q    And the reason you chose not to do any of

7   those things is because you understood that Capps was

8   likely lying to you, correct?

9             MR. BOND:  Objection.  I object to the form.

10       A    You're sitting here saying that he'd lie to me

11  on everything.  He did not lie to me on everything, but

12  he did lie to me.

13       Q    All right.

14       A    I'm not going to say he didn't.

15       Q    The reason, Sheriff Greer, that you didn't go

16  and do any of those basic investigative steps, talk to

17  Mabry, talk to the jailer, is because you knew or that

18  you suspected that Capps was probably lying, right?

19            MR. BOND:  Objection to the form.

20       A    No.  I didn't suspect it -- that he was lying.

21  I tried to get to the truth.

22       Q    How did you do that?

23       A    I referred it to Kenton to interview him.

24       Q    Kenton -- you told us earlier that Kenton

25  referred it to you to interview?



1      A     Back again he did.  He didn't interview him
2   like I suggested.
3      Q     Okay.  So what you said is after you
4   interviewed him you referred him to the Kenton to
5   interview?
6      A     Yeah.  My case was over.
7      Q     Okay.  But Kenton told you to interview him to
8   determine if he was telling the truth, right?
9      A     Right.
10         MR. BOND:  Object to the form of the question.
11     Q     All right.  Now you've told us that -- take a
12   look at page -- take a look at Page 5.  And if -- for
13   clarity, if you want, you can look on Page 4 so you can
14   get context.  Look at the last -- 21 through 25 on Page
15   4.  And then line 1 through 10 on Page 5.
16     A     Okay.  How far down now?
17     Q     Okay.  In here he's talking about Hardin's
18   role, correct?
19     A     Yes.
20     Q     Now you said that you -- you've told us that
21   the reason you brought Justis and Capps to Breckinridge
22   County to interview them was because of an alleged note
23   that was passed, correct?
24     A     Yes.
25     Q     Okay.  And the note, according to you and



JOE GREER                                    November 04, 2019
CLARK vs LJCMG                                              34

1   their description, was a note that was passed between

2   Clark and Capps to Justis and Hardin, correct?

3        A    No.  It was from Hardin to Justis to Capps to

4   Clark.

5        Q    Okay but it implicated all four men?

6        A    Yeah.

7        Q    Okay.  And that's why you were bringing down

8   Justis and Capps to talk about it?

9        A    Yeah.  And he refused to talk to me.

10       Q    Okay.  What specifically did he say to you?

11  "I won't -- I refuse to speak to you.  I'm not answering

12  any questions"?

13       A    I've got nothing to say to you.

14       Q    Okay.  And you left it at that?  You asked him

15  one question.  He says, "I have nothing to say to you."

16       A    No.  We might have said a couple other words.

17  I said, "Why not?"  You know, words to that effect.  I'm

18  not sure that's what I said.

19       Q    Okay.

20       A    But he said, "I have nothing to say to you."

21       Q    Okay.  But you knew they were down there

22  because they're -- because of this alleged note being

23  passed between Hardin and Clark?

24       A    Did I know they were in Breckinridge County?

25       Q    That's why they were there.



```
 1         A    Yes.
 2         Q    Okay.  And so when you told us you didn't know
 3    until they got there, was that Capps heard an alleged
 4    confession?
 5         A    When I interviewed him.
 6         Q    Okay.  That's the first time you ever heard
 7    that?
 8         A    That's the first time I ever heard it.
 9         Q    And that was a shocking revelation to you,
10    right?
11         A    Well, yeah.  I guess you could say it was.
12         Q    Okay.  And it was -- you were very careful to
13    make sure that you, given that shocking revelation, that
14    you followed up on -- asked all the important questions,
15    right?
16         A    Yes.
17         Q    Okay.  Now, can you explain on Page 10 -- on
18    Page 10, you see that Hardin is mentioned, right?  You
19    just read it.
20         A    Uh-huh.
21              MR. BOND:  No, he read Page 4.
22         Q    I'm sorry, Page 4, you see that Hardin is
23    mentioned, right?
24         A    Yes.
25         Q    Okay.  Can you explain why didn't you ask
```



```
 1    Capps any questions about Hardin?
 2              MR. BOND:  Objection to form.
 3        A    Well, not really.  I can't -- I went by what
 4    Capps was telling me and followed that line of
 5    questioning.  I don't -- I don't know why didn't.
 6        Q    Why wouldn't you ask him any questions about
 7    did Hardin say anything?  Did Hardin make any
 8    admissions?
 9        A    Hardin didn't talk to Capps.
10        Q    Okay.  How do you know that?
11        A    I'm going by what Justis told me later.  And
12    but what Capps told me at the time.  The note went from
13    Hardin -- from Hardin to Justis to Capps to Clark.
14        Q    Okay.  Now you understood that Justis and
15    Capps had passed the note between one another, correct?
16        A    That's what I was told.
17        Q    So presumably -- and you knew Justis and Capps
18    are friends?
19        A    Yeah.
20        Q    Okay.  And so presumably Justis and Capps had
21    talked about it, right?
22        A    I don't remember if this was entered or not
23    with Justis, but I think he might have told me they did
24    not discuss it.
25        Q    Okay.
```



1      A    I could be wrong.

2      Q    All right.  Well, Justis made it clear he

3   didn't want to be involved, according to you, right?

4      A    That's right.

5      Q    Okay.  What would have been a good

6   investigative tool to find out what happened between

7   Justis and Capps?

8      A    Ask them.

9      Q    Ask who?

10     A    Capps and Justis.

11     Q    Why didn't you?

12     A    I did, and Justis refused to talk to me.

13     Q    No, no, no.  Why didn't you ask Capps?

14     A    I don't know.

15     Q    Capps was more than happy to talk to you,

16   right?

17     A    Yeah.

18     Q    Why didn't you ask Capps what he said to

19   Justis?

20     A    I don't know.  I didn't.

21     Q    You didn't ask a single question about it,

22   right?

23     A    I don't guess so if that's the statement.

24     Q    Capps had told you that they had passed a

25   note.  Justis had refused to talk to you about it,



```
 1   right?
 2       A    Yes.  The basic -- the most basic thing you do
 3   next is you ask Capps, "Hey, why isn't Justis talking to
 4   me?  What does he know?"
 5            MR. ERVIN:  Objection.
 6            MR. BOND:  Is that question or a statement?
 7       A    No.  I didn't ask Capps that.  I'd already
 8   released Capps, I guess.
 9       Q    Let me tell you why you already released
10   Capps.
11            MR. BOND:  Woah.  Woah.  Woah.  You're not
12       going to tell him anything.  You're going to ask
13       him questions.
14   BY MR. BRUSTIN:
15       Q    You already released Capps?  You were talking
16   to Capps on a -- in a sworn statement.
17       A    Yes, but he went back to the jail.
18       Q    When you were talking to Capps -- I'm showing
19   you the transcripts of you talking to Capps.
20       A    Right.
21       Q    Why didn't you ask Capps?  You have Justis
22   sitting in the same courthouse, right?
23       A    Yes.
24       Q    What did Justis -- why isn't Justis talking to
25   me?  What did he say?  What does he know?  Why didn't
```



```
 1   you ask Capps that?
 2       A    He wasn't in the room, he had already been
 3   returned to the jail.  Maybe I should have called him
 4   back and ask him that, but I didn't.
 5       Q    Are you talking about Justis or Capps?
 6       A    Capps.
 7       Q    Well, you spoke to both Justis and Capps
 8   before you went on tape.
 9       A    This is correct.  Yes.
10       Q    So you knew --
11       A    No.  No, not Justis.
12       Q    So you had -- you're saying you had not spoken
13   to Justis before you spoke to Capps?
14       A    No.
15       Q    You sure about that?
16       A    I'm very sure about that.
17       Q    You remember the specific order that you spoke
18   to them?
19       A    Yes.  We interviewed Capps first with a court
20   reporter.  And he got done, the jailer took him back, I
21   had Justis brought over.
22       Q    All right.  But we know that you had spoken to
23   both of those men before you did the tape, right?
24       A    Yes.
25       Q    Okay.  That was before you did the tape
```



1  record?

2      A    Yes.

3      Q    You spoke to both of them before you even

4  agreed -- had planned to do the tape recording?

5      A    No.  I planned to do the tape recorder --

6      Q    All right.

7      A    -- okay?  On both of them if they would do it.

8      Q    All right.  And so your claim is that you

9  didn't ask Capps any questions about Justis because you

10  hadn't spoken to Justis yet?

11      A    I hadn't spoken to the Justis yet.

12      Q    All right.  And as soon as you were done with

13  Capps, you walked over and spoke to Justis, right?

14      A    I had him brought over.

15      Q    They were both there, weren't they?

16      A    Yes.  But they had to be brought over from the

17  jail.

18      Q    Okay.  And so then Capps was brought back to

19  the jail?

20      A    Yes.  He was taken back to the jail by a

21  deputy.  I was done with him.

22      Q    How far away was that?

23      A    200 yards.

24      Q    Okay.

25      A    They had to go out of the building across the



```
 1   street.

 2       Q    So you would have had to walk 200 yards to ask

 3   Capps some follow-up questions?

 4       A    Well, time you come out of the -- upstairs,

 5   courtroom, down the steps, out the door, and across the

 6   road.

 7       Q    In a homicide case?  You don't want to walk

 8   those 200 yards?  That's why you didn't ask Capps any

 9   follow-up questions?

10            MR. ERVIN:  Objection to the form.

11            MR. BOND:  Argumentative.

12       Q    I'm sorry.  Let me ask you straight.  Why

13   didn't you walk 200 yards to app -- to ask Capps what

14   Justis told him?

15       A    Rephrase that again.

16       Q    Sure.  Why didn't you walk the 200 yards to

17   ask Capps in the jail what Justis had told him?

18       A    When did Justis tell Capps anything?

19       Q    You know that they passed -- they were there

20   because they had passed notes.

21       A    They passed the note in the jail.

22       Q    Did you ask -- did you think it might be

23   important to know whether they had spoken about anything

24   else in relation to Hardin and Clark?

25       A    In hindsight, maybe I should have.  I don't
```



```
 1   know.
 2        Q    Let me try this theory.  You see if this makes
 3   sense.  The reason you didn't talk to Capps about Justis
 4   is because Justis had already told you about the letter,
 5   right?
 6             MR. PELLINO:  Objection to form.
 7             MR. ERVIN:  Objection.
 8        A    Letter?  How about the note?
 9        Q    Justis had already told you that he lied about
10   the letter, that they lied that the -- that he had
11   received a letter and he had showed it to you, right?
12             MR. BOND:  Object to the form of the question.
13        You can go ahead and answer.
14        Q    The reason that you didn't ask Capps a single
15   question about Justis is because you knew that Capps had
16   sent a letter to Justis indicating that it was all a
17   lie.  Right?
18        A    I'd heard they had.  I had not seen that
19   letter.
20        Q    Okay.  So at the time, you're looking at this
21   interview in December of 1992?
22        A    Yes.
23        Q    By this time, you know about this letter,
24   right?
25        A    When was the trial?
```



```
 1        Q    Trial's not until after this, a couple of
 2   years after.
 3        A    That's when I found it out.  After the --
 4        Q    After the trial?
 5        A    -- After the trial.
 6        Q    Okay.  So nobody mentioned the letter before
 7   then?
 8        A    No, I didn't know anything about it.
 9        Q    All right.
10        A    If I did, and had it, it'd went to the
11   commonwealth's attorney.
12        Q    All right.
13        A    Bart Adams made me aware.
14             MR. BOND:  That's it.
15        A    Okay.
16        Q    Bart Adams made you aware of what?
17        A    The letter.  And didn't explain it to me, but
18   made me aware that there was a letter.
19        Q    And as you've already told us, you didn't even
20   see that letter until 2015 when you testified at the
21   post-conviction?
22        A    That is correct.
23        Q    And you're sure about that, right?
24        A    Yeah, I'm very sure about that.
25        Q    You're as sure about that as you are that
```



1   Justis never told you about the letter in December of

2   1992, correct?

3        A    Justis wouldn't even talk to me.

4        Q    All right.  And you're as sure you didn't see

5   that letter as you are that Justis wouldn't talk to you,

6   right?

7             MR. BOND:  Nick, let's put the finger down and

8        quit the waving at my client, please.

9             MR. BRUSTIN:  Fair enough.

10            MR. BOND:  Please.

11       A    I found out about that letter -- no content of

12  that letter from Bart Adams, after the trial.  The next

13  time I heard about that letter was a hearing in Meade

14  Circuit Court in front of Judge Butler -- Butler, and

15  showed me that letter, and I made the statement, I don't

16  know what you're talking about.

17  BY MR. BRUSTIN:

18       Q    Okay.  Because --

19       A    I have never seen it.

20       Q    -- because if you had had that letter --

21       A    It would have went to the Commonwealth's

22  attorney.

23       Q    And you would have investigated it, right?

24  You would have -- you would have talked to Capps about

25  it?



1        A    Whatever Kenton Smith wanted to do.  My case

2   was closed.  I mean -- it was in his hands.

3        Q    Okay.  Well we'll get to that in just a

4   minute.  If you look at Page 2 of this document --

5             MR. BOND:  Of the statement?

6             MR. BRUSTIN:  Yes.

7             MR. BOND:  Okay.

8   BY MR. BRUSTIN:

9        Q    Line 16 to 18 -- actually 16 all the way to

10  24, right?

11       A    Okay.

12       Q    Now, by the way, you knew from being called

13  over to the jail -- withdrawn -- there was always

14  problems with Melason -- Melanson in that jail, right.

15       A    Pretty well.  Yes.

16       Q    Okay.  And you knew there was a period of

17  time, as Capps was telling you, that he was in a cell

18  with Roy Melanson?  You'd actually seen that, right?

19       A    Hadn't seen it, but I was told he was.

20       Q    Okay.  You knew that from before?

21       A    Yeah.

22       Q    Okay.  And he's also telling you here that

23  there was a period of time where he was also in -- and

24  you also knew that he was in the cell with Kevin Justis

25  and Roy Melanson for a period of time?



1          A     That's how I found out, in the statement.

2          Q     In this statement?  You didn't know that

3    before?

4          A     No.

5          Q     Before you knew that Mabry -- that Capps was

6    there.  It was only this statement when you knew that he

7    was there with Justis?

8          A     Yes.

9          Q     All right.

10         MR. BOND:  Let me object to the form of the

11         question whatever, it doesn't say that he, Justis,

12         and Mabry were in the cell with Melanson --

13   BY MR. BRUSTIN:

14         Q     Did you understand there was a period of time

15   -- you knew by the time of this statement that Justis, -

16   - Mab -- Justis, Capps, and Melanson were in a cell

17   together?

18         A     I don't know about Justis, and I can't swear

19   to that, but I knew Capps was in the cell with Melanson.

20         Q     Melanson and also with Mabry?

21         A     Yes.

22         Q     Okay.

23         A     I would presume.  I didn't know that until the

24   statement was taken.  But I did know that Melanson was

25   in a cell with Capps.



```
 1        Q    Now, when you spoke to Bart Adams and you
 2   learned about this letter --
 3        A    Yes.
 4        Q    You've already told us that you never saw that
 5   letter until 2015, correct?
 6        A    That's correct.
 7        Q    But obviously, you tried to get it, right?
 8        A    I told him to come --
 9             MR. BOND:  Object to the form of the question.
10             Mr. Brustin:  Okay.
11             MR. BOND:  Go ahead.
12        A    I told him that he needed to forward that
13   letter to the Commonwealth's attorney.
14   BY MR. BRUSTIN:
15        Q    Okay.
16        A    And, never offered me a copy of it, it was
17   dropped, and I kept -- Bart, I don't know what you're
18   talking about.
19        Q    Well, but you know -- you never took any steps
20   to get the letter?
21        A    No.
22        Q    Why not?
23        A    I did not.  Left that up to Bart.  Bart had
24   the letter, not me.
25        Q    All right.  By the way, you knew, based on
```



1  your communications with the DA and the Louisville

2  Police Department, that Capps became an important

3  witness at the Hardin and Clark trial, correct?

4       A    Yes.

5       Q    The statement that he allegedly heard became

6  an important piece of evidence in the case?

7       A    Apparently the Commonwealth's attorney thought

8  so.

9       Q    All right.  And obviously the letter that was

10  being described to you, by Adams, if it existed, would

11  be as you've already told us, you saw the letter --

12      A    No letter was described to me.  It was just

13  that there is a letter.

14      Q    Okay.

15      A    Okay?

16      Q    All right.  And so the reason -- and so when

17  you were interviewing -- when you were interviewing

18  Capps in 95 --

19           MR. GARVERICH:  Objection.

20      Q    -- when you were interviewing Justis in '95,

21  you had no idea what was actually in the letter,

22  correct?

23      A    I didn't.

24      Q    All right.  And that's why when you saw the

25  letter in your deposition, you agree that was a very



1  troubling letter.  It suggests that Capps was lying,

2  correct?

3       A    No, it didn't suggest Capps was lying.  It

4  suggested there was a letter.  And I did not read it.

5  It was showed to me by you-all's attorney, and I said

6  "Ma'am, it's the first time I ever seen it."

7       Q    Sheriff Greer, the last time you testified, I

8  showed you the letter --

9       A    Uh-huh.

10       Q    -- And you looked at it, you read it, and it

11  suggests that Capps was lying.  That's what you told me?

12       A    Yes.

13       Q    Okay.

14       A    In that letter?

15       Q    Right.

16       A    Yeah.

17       Q    Now --

18       A    Okay.  I misunderstood you.

19       Q    And what you're telling us is, in 1995, you

20  didn't have the benefit of that letter, correct?

21       A    No.

22       Q    So you didn't have the information that, in

23  fact, it appeared Capps was lying?

24       A    I didn't know anything about it.

25       Q    Because if you'd had that information, it



1   would have caused you to do things very differently,

2   correct?

3        A    Most definitely.

4        Q    So for example, that letter -- withdrawn.  If

5   in fact Capps lied to you, and during the trial of Clark

6   and Hardin, that would mean that Capps committed a

7   crime, correct?

8            MR. BOND:  Object to form of the question.  Go

9        ahead.

10       A    I'm not suggesting anything.

11       Q    Listen to my question, sir.

12       A    I heard it.

13       Q    If he actually lied, if, in fact, he committed

14  perjury at the trial and he lied to you under oath, that

15  would be a crime, right?

16       A    Yes.

17           MR. BOND:  Object to form of the question.  He

18       didn't testify to him.

19       Q    A crime -- well, that's fair.  If he testified

20  at the trial, certainly that would be a crime?

21       A    If he committed perjury, it would.

22       Q    All right.  And also, potentially, conspiracy

23  to commit perjury or conspiracy with Justis, right?

24       A    Yeah.

25           MR. BOND:  Object to the form of the question.



1    Q    If the letter -- if you had known about the
2    letter, you would have investigated Capps for committing
3    a crime in your jurisdiction, correct?
4    A    I would've turned it over to the
5    Commonwealth's attorney, the letter, which ultimately, I
6    guess I did to the assistant Commonwealth's attorney,
7    and let Kenton take it from there.
8    Q    Well, wait a minute.  If, in fact, Capps lied,
9    why wouldn't you have investigated him for committing a
10   crime on your own?
11   A    You're kind of confusing things here a little
12   bit.  I didn't even know what the letter said.
13   Q    I'm saying -- I'm asking you -- if you had,
14   you would have investigated Capps for committing a
15   crime?
16        MR. BOND:  Object to the form of the question,
17     go ahead and answer.
18   A    I would have made sure the Commonwealth's
19   attorney knew it.
20   Q    All right.  Now, let's take a look at the 1995
21   interview of Justis.  Exhibit -- so where it says --
22   where's my copy?  Here, let's skip this --
23        MR. BOND:  Justis?
24        MR. BRUSTIN:  Here you go.
25        THE WITNESS:  Oh my goodness.



1           MR. BRUSTIN:  Thanks, guys.  Exhibit 14
2      please.
3           MR. BOND:  Len, do you know what page it is in
4      your-all's master book, by chance?  I'm just
5      asking.
6           MR. KAMDANG:  No, because I had it marked as
7      Exhibit 3 --
8           MR. BOND:  That's fine.  Okay.  Just asking.
9           MR. KAMDANG:   -- he's admitted the next
10      exhibit.  Yeah.
11           MR. BOND:  Thank you.
12   BY MR. BRUSTIN:
13      Q    Now if you take a look at Page 974, those
14   small numbers in the bottom right corner.
15      A    Okay.
16      Q    You there?
17      A    Uh-huh.
18           MR. BOND:  Help him out.
19      A    I'm here.
20      Q    So this is you asking Justis questions.  If
21   you read the first hop -- top of the half -- top half of
22   the page.
23      A    Uh-huh.
24      Q    Let me know when you're done.
25      A    I've got a different page -- that entry.  What



1   page of the statement are you on?

2        Q     Page 2.

3        A     Okay, Thank you.

4        Q     Starts with the date as March 10.

5        A     Okay.  Got it.  Thank you.

6        Q     Yeah.  Okay.  And so right at the beginning of

7   this interview with Justis -- this is an important

8   interview by the way, right?

9        A     Yeah.

10       Q     And right at the beginning of the interview

11  with Justis, he tells you where you can find that

12  letter, right?

13       A     Yes.

14       Q     Says his mother has it?

15       A     His mother has it.

16       Q     That's the woman you told us doesn't like you

17  very much, right?

18       A     That's correct.

19       Q     Is that why you didn't go and get the letter?

20       A     I eventually did go get the letter.

21       Q     Well you told that you didn't see the letter

22  until 2015, correct?

23             MR. BOND:  Doesn't mean he saw it.

24       A     I didn't see the letter, but the letter was

25  picked up from Mrs. Justis by myself and Detective



1    Stiles and taken back to my office in an envelope.  Huh?

2        Q    And you didn't read it?

3        A    I did not read it.

4        Q    Why not?

5        A    I give it to one of the girls, I'm not sure

6    which one, to type up a letter stating what was in the

7    envelope.  One full page, one three-line or four-line

8    page, put it back in the envelope, and give it back to

9    me.  And later on that afternoon, I give it to Steve.

10       Q    The question is: Why didn't you read it?

11       A    I don't -- I just didn't, sir.

12       Q    You were tasked with interviewing Justis --

13       A    That's correct.

14       Q    -- about an alleged -- and about an alleged

15   letter which suggested that Capps was lying at trial,

16   correct?  That's what you were told?

17       A    Yes.

18       Q    Okay.  And you interviewed Capps without the

19   letter?

20       A    Yes.

21       Q    You in -- I'm sorry.  You interviewed Justis

22   without the letter?

23       A    Yes.

24       Q    And obviously, it would have been much more

25   effective to interview Justis if you actually had the



1   letter -- could -- and could ask him about it, right?

2        A    Yes, but I didn't have it.

3        Q    Okay.  You received it a few days later?

4        A    Yes.

5        Q    Okay.  Why didn't you interview Justis about

6   the letter once you had it?

7        A    (No verbal response.)

8        Q    Let me withdraw the question.  Why didn't you

9   read the letter so you could talk to Justis about it?

10       A    I believe Justis -- when we got the letter,

11  Justis, I believe, had been transferred back out of the

12  Meade County Jail.  Don't quote me on it, but I think he

13  was.

14       Q    Okay.  But you didn't even read the letter?

15       A    I give the letter to the commonwealth's

16  attorney's office.

17       Q    But the question is --

18            MR. BOND:  Asked and answered.

19       Q    Why wouldn't you read it?

20            MR. BOND:  Asked and answered.

21       Q    Have you read it?

22            MR. BOND:  Answer it again, Joe.

23       Q    Have you read it, sir?  So if you -- together,

24  you told him --

25       A    Yeah.  It was a jogged-up bunch of mess.



1        Q     I'm sorry?

2              MR. BOND:  Just answer his question.  Go

3        ahead.

4        Q     What did you just say?  What?

5        A     I said it was -- I didn't make half sense out

6    of the letter, and you probably didn't either.

7        Q     Okay so now you're telling us, in fact, you

8    did read the letter?

9        A     Only with the attorneys and with you.

10       Q     All right.  So you were tasked with this very

11   important job of interviewing Justis about a potentially

12   exculpatory letter, correct?

13       A     That's correct.

14       Q     Then you received the letter a few days later?

15       A     Yes.

16       Q     And you never read it?

17       A     No.  I turned it over to the commonwealth's

18   attorney.

19       Q     But the question was, and you've already told

20   us this is one of the biggest cases of your career, and

21   you continued to follow it afterward, why would you not

22   read that letter?

23             MR. BOND:  Asked and answered for about the

24       fifth time.  You can waste your three hours all you

25       want.



1       A    I didn't read it, sir.

2       Q    The question is why?

3       A    I give it to the co -- my case was done.  I

4    turned this over to the commonwealth's attorney for his

5    discretion because it was, in my opinion, it had to be

6    exculpatory evidence.  It had to be.

7       Q    The truth is, Sheriff, you knew exactly what

8    was in that letter because you knew it since 1992,

9    right?

10           MR. BOND:  Objection.

11      A    What are you saying?

12      Q    You knew exactly what was in that letter

13   because Justis told you about it.  And now --

14      A    You're calling me a liar, and I don't

15   appreciate that.

16      Q    I am, sir.  I am, sir.

17      A    I don't appreciate it.

18      Q    Okay.

19      A    I did not know nothing about that letter.

20      Q    That's our entire claim, sir, is that you're

21   lying.

22           MR. BOND:  Okay let's ask --

23      A    Good.

24           MR. BOND:  Whoa.  Let's ask questions.  Let's

25       not make comments.  He's answered your question.



```
 1        You've called him a liar; he's acknowledged that.
 2        Let's move on.
 3   BY MR. BRUSTIN:
 4        Q    Sir, you've told us that you were an extremely
 5   ethical sheriff, right?
 6        A    Try to be.
 7        Q    And the last thing you want on your watch is
 8   to have a witness that lied to you without being --
 9   without that being investigated, right?
10             MR. BOND:  Objection to the form.
11        A    I don't like to be lied to.
12        Q    Okay.  And then you receive a letter --
13   according to you, you receive a letter that indicates
14   that an important witness in a murder case lied, right?
15        A    Uh-huh.
16        Q    And you decide not to even read it?
17        A    No I didn't.  I give it to the commonwealth's
18   attorney's office.  It's up to him to handle it how he
19   wanted it handled.  And if he's seen that, I'm sure the
20   commonwealth's attorney would have indicted Mr. Capps.
21        Q    Can you explain -- you were tasked -- what was
22   the specific task you were asked to accomplish in
23   interviewing Justis about this letter?
24        A    The letter, where it was at, how long he had
25   had it, or who had it.
```



1    Q    How about whether -- what it said, and whether

2  it was true?  Were you asked to do that?  Isn't that the

3  important part?

4    A    Yes.

5    Q    Okay.  You were tasked with interviewing

6  Justis and finding out what this letter said and whether

7  or not Capps was telling the truth or not, right?

8    A    Well also, there's something else.  Capps had

9  maintained that he'd given this letter -- or Hardin had

10  given him the letter, which I think Capps had denied

11  before, I'm not sure.  That confirmed that Capps did get

12  a note from Hardin because Justis said he got the note

13  and give it to Capps, who give it to Clark.  That helped

14  -- I think it helped Capps' credibility a little bit.

15  Again, his credibility was up to the commonwealth's

16  attorney.

17         MR. BOND:  That's it, Joe.  That's it, Joe.

18    Q    Take a look at page 974.

19    A    Okay.

20    Q    In the middle it says -- you see where it

21  says, "you advised"?

22    A    Uh-huh.

23    Q    Read that, and then read what Kevin Justis

24  tells you.

25    A    "You advise your mother should have" --



1     Q   Just read it to yourself.  Then read what

2  Kevin Justis tells you.  Read all the way through to the

3  bottom.

4     A   Uh-huh.  Uh-huh.  Okay.

5     Q   So he's telling you, very clearly, that this

6  letter is asking him to lie --

7     A   I read it.  Yeah.

8     Q   -- right?  That's a --

9     A   Yeah, it's there.  I see it.

10     Q   It's right there, right?

11     A   Uh-huh.

12     Q   And obviously, it would be very important to

13  quest if it's true and that you -- withdrawn.  You know

14  from reading the letter that's exactly what it says,

15  right?

16        MR. BOND:  Object to the form of the question.

17     A   When I finally read the letter, yes.

18     Q   That's what it says, right?  It asked him to

19  lie?

20     A   Yeah.

21     Q   Okay.  And so it would be very important, you

22  would agree, to question Justis once you had the letter

23  about it, right?

24     A   Uh-huh.

25     Q   Yes?



1        A    Yes.

2        Q    Okay.  And by the way, the Just -- the letter

3    confirms exactly what Justis told you.  He gives you an

4    accurate description of it?

5        A    Yes.  That's why I went to the commonwealth

6    attorney's office.

7        Q    All right.  And it would be very important to

8    then interview Capps about that letter, right?

9        A    Not through me.

10       Q    Well somebody should have done it, right?

11       A    Uh-huh.

12       Q    Who should have done it?

13       A    Commonwealth's attorney.

14       Q    Okay.  Wouldn't be independently your

15   obligation to do it?

16       A    No.

17       Q    Okay.

18       A    If he requested it.

19       Q    Now you went with Stiles to get the letter

20   from the mother's house right?

21       A    Stiles went with me.

22       Q    Okay.  And did Stiles read the letter?

23       A    No.

24       Q    Neither of you read the letter?

25       A    No.



```
 1        Q    Why didn't you read the letter when you took

 2   it?

 3             MR. BOND:  Asked and answered.

 4        Q    No, no, no.  When you got the letter from the

 5   house --

 6        A    Yes.

 7        Q    You got it in an envelope?

 8        A    Yes.  Sealed.

 9        Q    Well, then you went back and unsealed it,

10   right?

11        A    I didn't.

12        Q    Who did?

13        A    One of the girls in the office.  I told them

14   what we had, type me up a letter, what's in that

15   envelope, let me have it back or ended up -- I don't --

16   I even forgot that in the 15 July hearing or whenever it

17   was -- I even got --

18        Q    Wait.

19        A    Go ahead.

20        Q    Type up what letter?

21        A    The cover letter to Steve Crebessa, to the

22   commonwealth's attorney's office.  Give them that.

23        Q    Did you make a copy of the letter for your

24   file?

25        A    Yeah.  It's in the case report.
```



JOE GREER                                    November 04, 2019
CLARK vs LJCMG                                              63

1      Q    Okay.  So there is a copy of letter in your

2   sheriff's file?

3      A    Yeah.

4           MR. BOND:  Nick, in fairness, maybe better as

5       a note, it's like on maybe a three-by-five sheet of

6       paper.  It's been discussed.

7           THE WITNESS:  On my letterhead.

8   BY MR. BRUSTIN:

9      Q    Okay.  And who filed that away?

10      A    What do you mean, "Who filed it away?"

11      Q    Who put it in the sheriff's file?

12      A    I did.  I had to.  It's in there.

13      Q    Okay.  But if you put in the sheriff's file,

14   you're saying you put it in the sheriff's file and you

15   just didn't read it?

16      A    I didn't re -- no.  There is -- a copy of that

17   letter was not in the sheriff's file.  Only my cover

18   letter to the commonwealth's attorney -- the assistant

19   attorney.

20      Q    Got it.  All right.  Was the envelope sealed?

21   From the mother?

22      A    When it come from the mother, it was sealed.

23      Q    All right.  Now Kevin Justis told you in an

24   interview that Kevin -- that Capps had written him a

25   letter asking him to lie, right?



1      A     Uh-huh.  Yeah.

2      Q     Okay.  Now obviously there would be a lot of

3  important follow-up questions --

4      A     Uh-huh.

5      Q     -- when he told you that, right?

6      A     Uh-huh.

7      Q     You'd want to know, did you speak to Capps

8  about this, did you -- did he ask you to lie in any

9  other context, did he tell you he lied, all kinds of

10  questions that it would raise, right?

11          MR. BOND:  Object to the form of the question.

12     Go ahead.

13     A     Every one of these statements went to the

14  commonwealth's attorney, okay?

15     Q     So you were interviewing Justis to determine

16  whether or not he was telling the truth, correct?  That

17  was one of the reasons?

18     A     Yes.

19     Q     Okay.  And you were also interviewing Justis

20  to determine whether or not Capps was telling the truth

21  at trial, right?

22     A     Well, it ended up that way.

23     Q     Okay.  And so you'd want -- once he told you

24  about a letter, an actual letter that Capps sent to him,

25  you'd want to know what else Capps said to him, right?



```
 1   That would be a reasonable way to investigate the issue,
 2   right?
 3        A    That's your opinion.
 4        Q    Why didn't you ask Justis any other questions
 5   about the letter or about communications you had with
 6   Capps?  How come?
 7        A    I just didn't.
 8        Q    Why?
 9        A    I didn't, sir.
10        Q    I'm asking you why.  Can you think of a
11   legitimate law -- can you think of a legitimate law
12   enforcement reason why you didn't ask those follow-up
13   questions?
14             MR. ERVIN:  Objection to the form.
15             MR. BOND:  Object to the form.  Go ahead and
16        answer it, Joe, again.
17        A    Sir, I didn't ask him any questions like that.
18   I turned this statement over to the commonwealth's
19   attorney to let him look at it, and I'm out of it.
20   BY MR. BRUSTIN:
21        Q    But going into this interview, you knew there
22   was an alleged letter, right?  Bart Adams told you that?
23        A    Yes.
24        Q    And you asked him about the alleged letter?
25        A    Tell you the truth after Bart Adams told me,
```



 1  | the year had went by.  I just forgot about it.
 2  |     Q    Well Bart Adams told you, then you interviewed
 3  | Justis, right?
 4  |     A    How long --
 5  |     Q    How long did this interview take?  About five
 6  | minutes?
 7  |     A    What, with Justis?
 8  |     Q    Yeah.
 9  |     A    No, a little longer than that.
10  |     Q    In here, you don't ask him a single question
11  | about his communications with Capps and lying, right?
12  |          MR. ERVIN:  Object to the form of the
13  |     question.
14  |     A    Okay.
15  |     Q    Nothing, right?
16  |     A    No, nothing.
17  |     Q    Any reason for that?  Any good law enforcement
18  | reason why you didn't ask any of those?
19  |     A    No.
20  |          MR. ERVIN:  Object to the form of the
21  |     question.
22  |          MR. BOND:  Object to form.
23  |     A    No.  I didn't.
24  |     Q    Right.  I know you didn't.  Any reason why you
25  | didn't?  You know the difference, right?



```
 1        A    Yeah, I know the difference.

 2        Q    So you don't do something, and then there's a

 3   reason why you don't do something.  You were the sheriff

 4   involved in a homicide investigation.  Why didn't you

 5   ask Justis any follow-up questions about the letter or

 6   his communications with Capps?

 7             MR. ERVIN:  Object to the form of the

 8        question.

 9        A    I just didn't, sir.

10        Q    Did you forget?

11        A    No.  I just didn't.

12        Q    You chose not to.

13        A    Apparently I did, didn't I?

14        Q    Now you've already told us that you had a

15   close working relationship with Tommy Stiles.

16        A    Yeah.

17        Q    You saw him all the time.  Daily?

18        A    Yes.

19        Q    And you've also told us in your past

20   deposition that you arrested Melanson with Stiles in

21   Meade County, correct?

22        A    I was with him.

23        Q    And he was in your jail for a long time?

24        A    Quite a long time.

25        Q    And he was nothing but trouble?
```



```
 1        A    That's true.

 2        Q    And you also understand today that --

 3   withdrawn.  You knew at the time that Roy Melanson was a

 4   suspected killer out of Colorado who was also suspected

 5   of being a serial killer?

 6        A    That's correct.

 7        Q    He was also wanted in Texas for possible

 8   murder?

 9        A    That's correct.

10        Q    Pretty unusual to have a potential serial

11   killer in your jail, right?

12             MR. ERVIN:  Object to the form of the

13        question.  It's not his jail.

14        Q    Pretty unusual, in your experience, to have a

15   potential serial killer in the Meade County Jail,

16   correct?

17        A    I would agree with that.

18        Q    And you're the one who arrested him?

19        A    Tommy Stiles arrested him, served with state

20   police.  That's his case.  I was with him.

21        Q    Okay.  He brought you with him?

22        A    Me and Tommy run around together a lot.

23        Q    Okay.  Why did he bring him with you for --

24   why did you go with him for the Melanson arrest?

25   Because it was a big deal, right?
```



```
 1        A    Not real --
 2             MR. ERVIN:  Object to the form.
 3        A    Not really.
 4        Q    Melanson arrest wasn't a big deal?
 5        A    It was a big deal to Tommy, and it was a big
 6   deal to me, but I think the reason I went with him -- he
 7   might have come home and says, "Hey, Joey, you want to
 8   ride with me?"
 9        Q    Now you understood that Capps and Kevin Justis
10   were both subpoenaed to testify against Melanson in
11   Colorado?
12        A    That's correct.  I didn't know that for a
13   while.
14        Q    All right.  Well you understood that
15   eventually -- withdrawn.  You understood as a general
16   matter, the statement that Capps allegedly heard from
17   Melanson was something to the effect of Melanson told
18   him that there was a place in Colorado that was a good
19   place to bury bodies, right?
20             MR. ERVIN:  Object to the form of the
21        question.
22        Q    As a general matter?
23        A    To tell you the truth, I don't remember what
24   you're saying there.
25        Q    You don't remember what the admission was?
```



```
 1        A    No.

 2             MR. ERVIN:  Object to the form of the

 3        question.

 4        Q    But you did understand at some point Capps

 5   allegedly heard some kind of admission from Melanson,

 6   correct?

 7        A    I found out after he went to Colorado and they

 8   didn't use him --

 9        Q    Okay.

10        A    -- sent him back.

11        Q    All right.  And you learned -- and obviously,

12   this was all a very big deal for Tommy Stiles.

13        A    Not really.  Tommy Stiles had a pretty well

14   established record for arrests.  Some serious, some not

15   as serious.

16        Q    You're missing my point.  I meant -- probably

17   didn't ask you the right question.

18        A    Okay.

19        Q    This arrest of Melanson for Tommy Stiles, and

20   what was happening with Capps and Justis --

21        A    Uh-huh.

22        Q    -- was important to Tommy Stiles because it

23   was a big case?

24        A    Yes.

25             MR. BOND:  Object to the form of the question.
```



```
1        Q    Okay.  And obviously, during this time period
2   after -- between when Melanson was arrested and when
3   Capps and Justis were brought to Colorado, you were
4   talking to Stiles about the progress in the Melanson
5   investigation, correct?
6        A    Probably did, because I heard more out of
7   Judge Monarch's office than I did from anybody.
8        Q    Okay.  And so --
9        A    He was screaming.
10       Q    Okay.  So one of the things you were regularly
11  talking to Tommy Stiles about during that time period
12  was the Melanson case, correct?
13            MR. ERVIN:  Object to the form of the
14       question.
15       A    Probably would have mentioned it, yeah.
16       Q    All right.  And you were the person, by the
17  way, who would -- who arrested -- I'm sorry.  Your --
18  the sheriff's department was the agency that arrested
19  Kevin Justis in 1992.  You told us that in your last
20  deposition?
21       A    Probably, yeah.
22       Q    And certainly you knew of both Justis and
23  Capps in 1992?
24       A    Yes.
25       Q    And did you -- you also told us that it was
```



1  routine for people in the jail to ask to speak to you

2  during that time period.  Prisoners?

3      A    Some of them did.  Some of them didn't.  I

4  mean --

5          MR. BRUSTIN:  Okay.  So I'm going to show this

6      one.  Have we marked this yet?  Justis with

7      Palefsky.

8          MR. KAMDANG:  That's Exhibit 2?

9          MR. BOND:  You want to take a break?

10 BY MR. BRUSTIN:

11     Q    I don't need to.  Take a look at Exhibit 2 in

12 the binder.

13     A    What's that sir?

14     Q    Exhibit 2.

15     A    Uh-huh.

16     Q    Okay.  Now, this is an interview that took

17 place in June 28th of 1993 in the LaRue County jail.

18 Okay, how far is LaRue County from you?

19     A    Seventy-five miles maybe.

20     Q    Okay.  Now if you take a look at page -- let's

21 start on Page 7, and this is Palefsky, one of the

22 criminal defense lawyers from Colorado --

23     A    On this same area.

24     Q    -- on the Melanson case, interviewing Justis

25 in 1993, okay?  Are you with me?



1      A    No, I'm trying to find it.

2      Q    But I want to make sure you have the context.

3           MR. BOND:   That was this is.

4      A    Oh, okay, yes.

5      Q    So now take a look at Page 7.

6      A    This isn't numbered too good.  Help me find

7    page -- Page 3.

8      Q    The number is on the top-left corner.

9      A    I see it now, sir.  All right.  I've found it.

10     Q    Okay.  Now, he's being asked questions.  But

11   you understand back in -- you know what, just do it this

12   way.  See where it says "Palefsky" -- it says he was --

13   it says -- right here, about three lines, four lines

14   down?

15     A    Uh-huh.

16     Q    Do you see that?  Read Palefsky's statement,

17   and then read all the way through where it says "now"

18   about eight lines down.

19     A    Okay.

20     Q    Chance to read that?

21     A    Uh-huh.

22     Q    All right.  Now first of all, you understand

23   that -- you understand, as you've already told us, that

24   back in April of 1992 both Justis and Capps were in your

25   jail, right?  In the Meade County Jail.



1        A    Meade County, I'm sure it were.

2        Q    Okay.  And you told us that you recall that

3   there was a statement that they signed for Tommy Stiles

4   about Melanson when they were in the jail.

5        A    I'm not sure of that sir.

6        Q    Well, you knew that -- you certainly learned

7   that later?

8        A    Yeah.

9             MR. GARVERICH:  Objection to form of the

10       question.

11            MR. BOND:  Object to the form.  You've never

12       testified.

13  BY MR. BRUSTIN:

14       Q    You certainly learned that later, correct?

15       A    I'm -- I'm sure I did.

16       Q    Okay.  And he's describing, and there's a --

17  it says "Inaudible" for the second name.  But it said,

18  at -- on 4-15-92 at 8:27 p.m. Justis wrote out a

19  statement for Tommy Stiles concerning Melanson, correct?

20       A    Uh-huh.

21       Q    Yes?

22       A    I see that.

23       Q    Okay.  And that would have been a time -- that

24  would have been long before Capps gave you any statement

25  about Clark, correct?



1     A    Yes.

2     Q    Okay.  And now take a look at page -- same

3   interview, Page 18.

4     A    Okay, sir.

5          MR. BOND:  Nick, just identify what's at the

6     top, just so we're on the same page.  Page 18?

7          MR. BRUSTIN:  Page 18.  It says, "No, he" --

8          MR. BOND:  Okay.

9          MR. BRUSTIN:  Now, it's a little bit -- it's a

10     little bit hard to follow, but he gets back to the

11     letter that he wrote -- the statement that he

12     wrote.  It says -- where it says "Palefsky."

13     That's what you wrote.  Do you see that?  About

14     five lines down.

15          MR. BOND:  Object to the form of the question.

16     Go ahead and answer it.  You can't really read it.

17   BY MR. BRUSTIN:

18     Q    Just about five lines down.  Do you see where

19   it says, "That's what you wrote"?

20     A    Yes.  I said --

21     Q    Okay.  So now read all the way to the bottom

22   of the page.

23     A    Okay.

24     Q    So he's suggesting that when they wrote the

25   statement for Tommy Stiles --



1        A    Uh-huh.

2        Q    -- that you were there as well, right?

3        A    I don't remember.

4             MR. BOND:  Object to the form of the question.

5        Q    But certainly, that's possible.  In other

6    words, that's something you might have done.

7        A    It could have been possible.

8        Q    Okay.

9        A    But I don't remember it.

10       Q    All right.  As you told us that you were very

11   -- you were very close to Tommy Stiles, right?

12       A    Yes.

13            MR. BOND:  Just listen to his question.

14       Q    And you were certainly interested in what was

15   happening in the Melanson case, correct?

16       A    Yeah.

17       Q    Okay.

18       A    Somewhat.

19       Q    And if Justis and Capps were giving a

20   statement about Melanson to Stiles in the Meade County

21   Jail, that's something you may very well have witnessed?

22       A    Could have, but I don't remember it.

23       Q    Okay.  You certainly have no reason to believe

24   that Justis was lying about that, right?

25       A    No.



1    Q    Okay.  And so, in fact, you may well have

2  known in April of 1992, that Capps and Justis had given

3  a statement indicating some type of admission from

4  Melanson, correct?

5         MR. BOND:  I'm going to object to the form of

6      the question.

7    A    Sir, I didn't even --

8         MR. BOND:  This, in no way, says that he's

9      writing a statement for Tommy Stiles.

10   Q    If you read the entire -- if you read the

11  entire document, that's certainly what it suggests.

12  It's a little tough to follow, but we know that there

13  was a -- we know from other sources there was a

14  statement given in April of '92 to Stiles.  So the

15  question is, if that happened and given how close you

16  were with Stiles, Justis may well be right.  You could

17  have been there as well, correct?

18         MR. BOND:  Object to the form of the question.

19      I'm going to submit that she is from Colorado, not

20      Tommy Stiles taking a statement.  I'm not going to

21      let you bastardize the facts.

22  BY MR. BRUSTIN:

23   Q    Correct?

24   A    Okay, I think --

25   Q    You agree?



```
 1        A     Sir, I don't even remember this.

 2        Q     Okay.  Well, you certainly -- you remember

 3   learning about it later.  You know that they were

 4   brought to Colorado to testify against Melanson?

 5        A     I found out later.

 6        Q     And you learned that they had -- you learned

 7   that they had allegedly heard some type of incriminatory

 8   -- incriminating statement from Melanson?

 9        A     Well, I'm sure they wouldn't have been

10   subpoenaed to go to Colorado and waste the money if

11   something hadn't had happened.

12        Q     Okay.

13        A     But I don't know what happened.

14        Q     And certainly you would agree that if Stiles

15   took a statement from Capps and Justis in the Meade

16   County Jail, in April of '92, he likely would have told

17   you about it at least?

18        A     Not necessarily sir.  He could have, but not

19   necessarily.

20        Q     All right.  So you're not -- as you sit here

21   today, you agree that certainly, you may well have

22   witnessed that statement as Justis suggests?

23             MR. BOND:  Object to the form of the question.

24             MR. ERVIN:  Object to the form of the

25        question.
```



1     A    I can't say one way or the other, sir.  I

2  don't remember.

3     Q    Fair enough.  But you certainly may have

4  learned about it from Stiles in conversation -- in your

5  daily conversations, correct?

6          MR. ERVIN:  Objection.

7          MR. BOND:  Object to the form of the question.

8     A    I don't know.  You want me to give you an

9  answer that I can't give you.  I don't know.

10     Q    All right.

11     A    I mean, I didn't know everything Tommy done,

12  but I know quite a bit what he done.

13     Q    Well, this was a big deal though, right?

14  Taking a statement from Capps and Justis about Melanson.

15          MR. ERVIN:  Object to the form.

16     A    Sir, not my case.  There's a lot Tommy done on

17  this case that I wasn't aware of.  Also --

18          MR. GARVERICH:  Just answer the question,

19     Sheriff.

20     A    Okay.

21          MR. BOND:  You're done.

22          MR. ERVIN:  Let's take a break, please.

23     Q    Okay.

24          VIDEOGRAPHER:  The time is 10:44, and we're

25     off the record.



```
 1                    (OFF THE RECORD)

 2           VIDEOGRAPHER:  The time is 10:59 and we are

 3       back on the record.

 4   BY MR. BRUSTIN:

 5       Q    Okay.  Sheriff Greer, you recall you testified

 6   in the 2015 hearing about a number of these issues,

 7   correct?

 8       A    Yes.

 9           MR. BOND:  Object to the form of the question.

10       Q    And if you would take a look at -- with your

11   counsel's assistance, and I appreciate it -- if you

12   could take a look at your testimony beginning on page --

13           MS. ROBINSON-STAPLES:  Tell him it's touch

14       screen.

15           MR. BRUSTIN:  I'm the worst at this --

16           MR. STAPLES:  It's touch screen --

17           MR. KAMDANG:  It's touch.

18           MR. STAPLES:  You can just touch it.

19           MR. BRUSTIN:  Oh -- if you take a look at

20       page, beginning on Page 97.

21           MR. GARVERICH:  Well, I'm probably looking at

22       a different transcript than what you're looking at.

23       You're probably looking at the entirety of it.  I'm

24       looking at just his testimony.

25           MR. BRUSTIN:  All right.  Then let's go off
```



1      the record for a minute.

2             MR. GARVERICH:  Okay.

3             MR. BOND:  Okay let's see if we can find

4      something.

5             MR. DRUSTIN:  You know what we're going to do

6      -- why don't we --

7             VIDEOGRAPHER:  The time is 11:01 and we are

8      off the record.

9                    (OFF THE RECORD)

10             VIDEOGROPHER:  The time is 11:05 and we are

11      back on the record.

12  BY MR. BRUSTIN:

13      Q    Now, Sheriff as you've told us, there was only

14  one meeting, in the history of the world, where you

15  spoke to Justis about that letter, correct?

16             MR. BOND:  Object to the form of the question.

17      A    Say that again.

18      Q    You've already told us there was only one time

19  when you actually spoke to Justis about the letter.

20      A    That I can remember, yes.

21      Q    Okay.  And you told us that was because Kenton

22  Smith told you to do it?

23      A    Was Justis?

24      Q    Yes.

25      A    I don't think I said that, sir.



| 1 | Q | Did it on your own? |
|---|---|---|

1      Q    Did it on your own?

2      A    I did it on my own.

3      Q    Okay, because you knew it was important to

4  investigate?

5      A    Well, sure.

6      Q    Whether it was true or not.

7      A    Whether it's true, it needs to be checked by

8  the Commonwealth's attorney for --

9      Q    Okay.

10      A    -- exculpatory evidence --

11      Q    All right.  So let's take a look --

12      A    -- or by the circuit judge.

13      Q    Let's take a look at Page 97.

14          MR. GARVERICH:  Is this large enough print, or

15      you want me to zoom in?

16      A    No, that's okay.

17          MR. GARVERICH:  Okay.

18      Q    By the way, that interview that you conducted

19  with Justis was at his home, correct?

20      A    I'm not sure, sir.

21      Q    Okay.  Well I think this may remind you.  Take

22  a look at page -- begin on Page 97, line 23.  This is

23  from July 13, 2015, at the post-conviction hearing.  So

24  begin on line 23, on Page 97, all the way through line

25  22 on Page 98.



```
 1              THE WITNESS:  Breckinridge County Jail, I
 2      remember that.
 3              MR. GARVERICH:  Start there.
 4              THE WITNESS:  Okay.
 5              MR. GARVERICH:  And this next page.
 6       A    Okay.  Uh-huh.
 7  BY MR. BRUSTIN:
 8       Q    You've read it?
 9       A    Uh-huh.
10              MR. GARVERICH:  How far do you want him to go
11      down?
12              MR. BRUSTIN:  Down to line 22.
13       A    Yeah.
14  BY MR. BRUSTIN:
15       Q    You read it, right?
16       A    Yes.
17       Q    Okay.  Now, here, you're testifying about how
18  concerned you were that you could have played a role in
19  putting an innocent person in prison, correct?
20       A    Just wanted evidence -- wanted it right.
21       Q    Let's look at what you said.
22       A    Yeah.
23       Q    You said --
24              MR. BOND:  Reference the line.
25       Q    Line 8, "The one part of this case, man, that
```



1  has bugged me for 20 years, is did I have evidence that

2  could have been beneficial to these two young men

3  sitting here and I covered it up?"

4       A    I agree with that.

5       Q    Okay.  And you were very concerned about

6  that --

7       A    Yes.

8       Q    -- when you went and spoke to Justis.

9       A    Yes.

10      Q    Okay.  And you wanted to do everything in your

11 power to investigate this claim to make sure that you

12 gave all of the relevant evidence to the other side,

13 right?

14           MR. ERVIN:  Objection.

15           MR. BOND:  Objection.

16      A    Or to the Commonwealth's attorney.

17      Q    To the Commonwealth Attorney.  Now, a little

18 further down, you say that, "Now if his mother said that

19 she gave me a letter, I would call her a liar."

20      A    Yes.

21      Q    You just told us the mother gave you the

22 letter.

23      A    Back when she'd given me the letter, okay,

24 we're talking about at this period, already had the

25 letter, I think.  Didn't I?



```
 1              MR. BRUSTIN:  Nope.

 2       A    I don't know.  You've got me confused now.

 3       Q    Well, are you confused, sir?  You knew --

 4  you've -- you've only -- there's only one recorded

 5  statement --

 6       A    And yes.

 7       Q    -- that we're aware of where you spoke to

 8  Justis, and that was in 1995, correct?

 9       A    Yes.

10       Q    And you're discussing that interview right

11  here, right?

12       A    Yes.

13       Q    In this testimony?

14       A    Yes.

15       Q    And you're making clear that he said in the

16  interview that his mother had it, right?

17       A    I think that's what was said.

18       Q    Okay.

19       A    Yes.

20       Q    And you just told us a minute ago that you

21  went and got the letter from his mother, but you didn't

22  read it.

23       A    I didn't.

24       Q    Okay.  And then you're testifying under oath

25  that the mother never gave you the letter, right?  Which
```



1  is true?

2      A    She gave me the letter, sir.

3      Q    So then why did you say, "Now if his mother

4  said she gave me a letter, I would call her a liar."

5  That's your words, right?

6      A    That's right.  But that was back if she said

7  she'd give it to me.  Okay, not then, that was back.

8  But when I go -- went to get the letter on that date,

9  she gave it to me.

10     Q    Why is there no mention of that in your

11 testimony?

12     A    I don't know.

13     Q    All right.  Let's look a little further down,

14 line 25.

15         MR. BOND:  Same page?

16     Q    Yep.  "Question: 'And what about this letter

17 that he wrote to Kevin Justis?  I mean, you know what it

18 says essentially.' Answer: 'I don't know that he did or

19 he didn't.  I don't think.  I know I've never seen that

20 letter.  I don't think.'" Right?

21     A    Yeah.

22     Q    In fact, you just told us that you knew he

23 wrote the letter because you picked it up from the

24 mother's house.

25     A    That's correct.



JOE GREER                                          November 04, 2019
CLARK vs LJCMG                                                   87

1        Q    So what are you talking about here?  You said,

2   "I know I've never seen that letter."

3        A    That's correct.

4        Q    That's not true.  You had the -- you held the

5   letter in your hand, and according to you, never read

6   it, right?

7        A    That's when I picked it up from a mother and

8   took it back to the Sheriff's office.

9        Q    But you're saying, "I don't know that he did

10  or he didn't," in terms of the letter, right?

11       A    When was this statement made?

12       Q    This is 2015.

13       A    Okay.

14            MR. BOND:  This is the July hearing.

15       Q    That's right.

16       A    Okay.

17       Q    You're being asked.

18       A    Okay.

19       Q    "'And what about this letter that he wrote to

20  Kevin Justis?  I mean, you know what it says

21  essentially.' Answer: 'I don't know that he did or he

22  didn't.'"

23       A    That's correct.

24       Q    You're saying you don't even know if there's a

25  letter, right?



1      A    I didn't know.

2      Q    You picked it up from her house, according to

3  you.

4      A    I think we're getting confused here.

5      Q    Yeah.  What are we confused about?

6           MR. BOND:  Woah there, don't cut him off.

7  Calm down.

8      Q    What are we confused about?  I am very

9  confused.

10     A    When the letter was picked up from my mother,

11  was it picked up before this?

12     Q    You've already -- we have one interview, 1995.

13  It's on a tape recorder.  When he tells you it's at his

14  mother's house and you say you and Stiles went there

15  afterwards to get the letter.

16     A    That's correct.

17     Q    And now you're testifying under oath in 2015,

18  you didn't even know if the letter exists?

19          MR. BOND:  Object to the form.

20     A    No.  That wasn't -- I said I'd never seen that

21  letter.  Nor have I read that letter.

22     Q    So you held it in your hands --

23     A    No.

24     Q    -- according to the police department --

25     A    I didn't hold it in my hands.



1              MR. BOND:  Let him finish the question.

2        Q    You took the letter.  You brought Stiles with

3    you to the mother's house, you took the letter in an

4    envelope, you brought it to the police, to your -- to

5    the sheriff's department --

6        A    That's correct.

7        Q    -- you wrote a cover letter, you sent it off,

8    and you never read it.  You're still sticking by that

9    story?

10       A    Yes, sir.  I am.

11       Q    And that's consistent with the testimony I

12   just read to you?

13       A    I told your other attorney on that hearing

14   that had never, and I appreciated her bringing it up.

15       Q    Another thing you say page 99, line 6.

16   "Question: 'You think Clifford Capps is more trustworthy

17   maybe than Mr. Justis.' Answer: 'Well, I've arrested

18   Capps a few times.  He's never lied to me.'"  Do you see

19   that?

20       A    Yes.  I see it.

21       Q    That's not true, right?

22       A    No.

23       Q    He lied to you all the time, right?

24       A    Not all the time, sir.

25       Q    Okay.  Let's be really -- let's be very



1  specific now.  You are testifying under oath in this

2  hearing?

3       A     Yes.

4       Q     You've told us here that there were many times

5  when Capps lied to you, correct?

6       A     Yes.  Over the years, yes.

7       Q     And there are many times when he lied to all

8  of the officers that he worked with, right?

9       A     Yes.

10       Q     His reputation was that as a -- of a liar,

11  correct?

12       A     That's the way you put it.

13       Q     You agree with that, sir?

14       A     Not all the way.

15       Q     So when you testified under oath, "He's never

16  lied to me," that wasn't truthful testimony?

17       A     No that was not true.  He had lied to me.

18       Q     Okay.  So you lied under oath?

19       A     I guess I did, didn't I?

20       Q     Is this the only time you lied under oath

21  during this hearing?

22       A     That's the only time.

23       Q     Is this the only time you lied under oath in

24  your career?

25       A     I hope it is.  And I didn't know I lied on



1    that one, but I got it now.

2              MR. BOND:  Object to form.

3              MR. GARVERICH:  Answer the questions.

4         Q    As you sit here today, you remember you -- I'm

5    going to go through in a minute.  But you knew Capps

6    very well, right?

7         A    Yeah.

8         Q    If -- it's a general matter, as you described

9    during your last deposition, he routinely lied to you,

10   correct?

11        A    Yes.

12        Q    And you didn't forget that when you were

13   testifying here, did you?  You just didn't want to say

14   it?

15        A    No.  Sir, there was a lot that I forgot at

16   that deposition, and I can explain it.  My wife was just

17   taken into Norton's infirmary in a hospital, critical

18   condition.  I asked him to get me on that stand and get

19   me out of there because the doctors were screaming.

20   Well, the only one that really tried to help me was your

21   attorney.

22        Q    You volunteered he never lied to you.  No one

23   even asked you.

24        A    I sure did.

25             MR. BOND:  Asked and answered, Nicholas, move



```
 1        on.  You're not going to sit here and brow beat
 2        him.
 3              MR. BRUSTIN:  All right.
 4              MR. BOND:  You can do that with the jury, but
 5        you're not going to do it with him here today.
 6              MR. BRUSTIN:  Okay.
 7              MR. BOND:  Let's move on.
 8   BY MR. BRUSTIN:
 9        Q    Now you were from the same town growing up as
10   Capps, right?
11        A    I don't even know where Capps growed up at.
12        Q    According to Mr. Capps, he said that he worked
13   -- you and he worked together.  You did plumbing back in
14   the 90s; is that true?
15        A    Sir, I don't even know how to plumb.  I can't
16   even put a faucet on.
17        Q    Okay.  So that would be an example of Capps
18   lying, right?
19        A    And he said that I --
20        Q    Listen to me, sir.  Did you ever do plumbing
21   with Capps in the 90s?
22        A    No.
23        Q    Okay.  Did you ever -- would you ever work in
24   plumbing?
25        A    No.
```



```
 1        Q    Okay.  So Capps testifying under oath in his
 2   deposition that he worked plumbing with you would be a
 3   lie, correct?
 4        A    It sure would be.
 5             MR. BOND:  Object to the form of the question.
 6        Q    Just another example of Capps lying, right?
 7        A    Yeah.
 8        Q    Which he did all the time?
 9             MR. BOND:  You're wasting your three hours.
10        Let's go on.  I mean, you can only ask him so many
11        times, Nick.  I mean --
12             MR. BRUSTIN:  I like you Keith.
13             MR. BOND:  Excuse me?
14             MR. BRUSTIN:  I said I like you.
15             MR. BOND:  Well, Elliot says I love him, so
16        there's a lot of affection in this room.
17   BY MR. BRUSTIN:
18        Q    It's funny.  Now according to Capps, he also
19   testified that you suspected him in a murder back in the
20   90s, but you cleared him.  He made that up too, right?
21        A    I don't know what you're talking about.
22        Q    According to Capps, he and his buddy were on a
23   surveillance camera at 2:30 in the morning in a murder
24   case at a grocery store in Meade County.  You suspected
25   them initially, but then you found the other guys who
```



```
 1   did it.  Did that ever happen?

 2        A    That's the Garr-Leola case.  Yes.

 3        Q    That did happen?

 4        A    The murder happened.

 5        Q    Okay.  Do -- was Capps ever a suspect in that

 6   case?

 7        A    Not that I know of.

 8        Q    Okay.  You certainly never suspected him,

 9   right?

10        A    No.

11        Q    And so to the extent that -- according to

12   Capps, he and his friend were prime suspects in that

13   case; is that true?

14        A    The only thing he's doing he's embellishing

15   his career.

16        Q    Okay.  The only thing -- he's a -- he's a --

17   he's a liar, not a killer, right?

18             MR. BOND:  Object to the form of question.

19        A    Well, I hope he's not a killer.

20        Q    But you certainly never -- you certainly never

21   suspected Capps?

22        A    No.

23        Q    So to the extent he's suggesting that you did,

24   he's lying, right?

25        A    He's not telling the truth.
```



1    Q    All right.  Now you told us in your last

2  deposition -- oh, I'm sorry, one other thing.  Take a

3  look back at Exhibit 14.  No.  That's wrong.  Where is

4  Palefsky interview.  I just had it, is that 14?

5              MR. KAMDANG:  It's 2.

6              MR. BRUSTIN:  Oh 2, Exhibit 2.  I think you're

7      right there.

8              MR. BOND:  He's there.

9  BY MR. BRUSTIN:

10     Q    Good.  Now --

11     A    The Justis/Palefsky conversation.

12     Q    So this is -- so just to give you some

13  context --

14     A    Uh-huh.

15     Q    -- Sheriff, this is Melanson's criminal

16  defense lawyer, his legal aid lawyer interviewing Justis

17  in LaRue County, okay?  And he brings -- He comes from

18  Colorado, he flies from Colorado --

19     A    Yes.

20     Q    -- with his investigator, Vercellus.

21     A    Which I don't know.

22     Q    Listed right here, that's his investigator,

23  I'm representing that to you --

24     A    Okay.

25     Q    -- to interview Justis.  That's how important



1    they thought Justis was, okay?

2         A    Apparently they did.

3         Q    Apparently they thought he was very important,

4    right?

5         A    Yeah.

6         Q    And it appears that way, right?

7         A    Yes.

8         Q    When a criminal defense lawyer flies down to

9    your county to interview a witness, they must think

10   that's an important witness, right?

11        MR. BOND:  Objection to form of the question.

12   Go ahead.

13        A    I would think so.

14        Q    All right.  So now take a look at page 16.

15        A    Turned right to it.

16        MR. BOND:  Just at the top Nick, to make sure

17   like the first few words we'll make sure we're on

18   the same page, "He was trying to do the same" --

19        MR. BRUSTIN:  Yeah.

20        MR. BOND:   -- okay.

21   BY MR. BRUSTIN:

22        Q    All right.  And then you go about four lines

23   down it says, "Okay."  Do you see that?

24        A    Yes.

25        Q    It says, "'Okay.  And Joe Greer has this



1  letter?  Do you know what Greer did with this letter?

2  Justis: 'No, I can't think back.  He ran me off a copy

3  of that courthouse and I gave a copy off to my mother

4  and my mother ran a copy,'" okay?  So this is Justis

5  telling Palefsky --

6       A    Uh-huh.

7       Q    -- in 1993 that you have the letter, right?

8       A    Yes.

9       Q    And obviously, Palefsky felt that letter was

10  important enough to fly down to Kentucky, right?

11            MR. BOND:  Objection.

12       A    I don't know why he flew down.

13            MR. BOND:  Let me object to the form of the

14       question.  You've made statement, not asked a

15       question about it.

16  BY MR. BRUSTIN:

17       Q    Okay.  Take a look at page --

18            MR. BOND:  And we're not going to admit that

19       that's true.

20       Q    Okay.  Take a look at page 17 again, third --

21  fourth line down.

22       A    Uh-huh.

23       Q    But do you know -- "'Do you know what Greer

24  did with that letter or what he' -- Justis: 'Well when I

25  gave them a letter we went down there and he gave me a



```
 1   copy and that's the last time I seen of him and the
 2   letter.'"  See that?
 3        A    Uh-huh.
 4        Q    Again, telling him that you have the letter,
 5   right?
 6        A    Yes.
 7             MR. BOND:  Well, I object to the form of the
 8        question.  He's not telling him anything.  That's
 9        Justis talking to Palefsky.
10             MR. BRUSTIN:  I'm sorry Justis telling --
11             MR. BOND:  I object to the form of the
12        question.
13   BY MR. BRUSTIN:
14        Q    Justis, that's what I meant.  That was a bad
15   question.  Justis telling Palefsky that you had the
16   letter --
17        A    Yes.
18        Q    -- right?
19        A    Uh-huh.
20        Q    If he wants to letter, he's telling him go to
21   Greer, right?
22        A    Yes.  Apparently that's what he's saying.
23        Q    And you understand today that Palefsky's
24   testimony under oath --
25        A    Uh-huh.
```



1   Q    -- is that after he went and met with Justis -
2   - he flew down here to meet with Justis -- he got on the
3   phone and called you and asked if you had the letter,
4   right?
5   A    Sir, I don't know nothing about that phone
6   call.
7   Q    And my question is: Do you understand that's
8   what he's testified to?
9   A    That's what he testified to, yes.
10  Q    And based on what he's learning from Justis --
11       MR. BOND:  Let me -- let me instruct him not
12       to answer to anything that we have told him.
13       MR. BRUSTIN:  Fair enough.
14       MR. BOND:  It just popped in my mind, okay?
15  BY MR. BRUSTIN:
16  Q    Okay.  We're certainly not suggesting there's
17  any type of waiver.  So Sheriff, you would agree that
18  based on what you just read from the interview with
19  Palefsky and Justis --
20  A    Uh-huh.
21  Q    -- that would appear to be the next reasonable
22  stop based on what Justis told him, to call you and ask,
23  right?
24       MR. ERVIN:  Object to form.
25       MR. BOND:  Objection to the form of the



1       question.  I don't even understand that.

2   BY MR. BRUSTIN:

3       Q    Based on what you've read from Palefsky's

4   interview, you would expect that if Palefsky is a

5   competent lawyer, the next thing he would do would be to

6   call you and ask if you had the letter, right?

7            MR. BOND:  Objection, would the counsel just

8        ask questions.  Go ahead and answer Joe if you can.

9       A    Sir, if he said that he called me, then I

10  don't think he's much of an attorney.

11      Q    So Palefsky is a liar if he says he called

12  you?

13      A    Point blank.

14      Q    All right.  Your testimony is: "Although

15  Justis told him the night -- although he flew to

16  Kentucky to interview Justis.

17      A    Uh-huh.

18      Q    Justis told him you had the letter.

19      A    Uh-huh.

20      Q    Your testimony is Palefsky is lying when he

21  say he called you after this interview, correct?

22      A    Yeah and said -- I think I also said he picked

23  up a copy or was going to pick up a copy.  I didn't have

24  a letter to give him.

25      Q    Your -- when he says he called you and you



 1  told him you have -- you told him that you had received

 2  a letter, he's lying, correct?

 3       A    Yes.  He's lying.

 4       Q    Okay.  You've already told us in your last

 5  deposition how important it was to document every

 6  investigative step in the investigations that you

 7  conduct, correct?

 8       A    Uh-huh.  Yes.

 9            MR. BOND:  Well, I'm going to object to the

10       form of the question.  That's not what he testified

11       to, but go ahead.

12  BY MR. BRUSTIN:

13       Q    And one of the things that deputy Wise said

14  about you, was that even if you had a suspect in mind

15  and you fi -- and if you found information that would

16  lead to another suspect, you would never ignore that

17  evidence; is that true?

18       A    No.  I wouldn't.

19       Q    You would always follow up?

20       A    I would follow up.

21       Q    He described you as an investigative vacuum

22  cleaner.  You would take all the evidence you get, write

23  it down, and turn it over; is that true?

24            MR. BOND:  Objection, more than one question.

25       A    I'm sure I might have overlooked some of it



1  but I've tried to.

2      Q    Your practice was to write it all down, the

3  good, the bad, and turn it over, right?

4      A    I tried to.

5      Q    And that's what you did in this case, correct?

6      A    Tried to.

7      Q    Did you fail at any places?

8      A    When my case was finished, I turned everything

9  over to the Commonwealth's attorney.

10     Q    All right.  But as you were --

11     A    Now, if he had any instructions for me he

12  would have given them to me.

13     Q    As you were investigating, you were careful to

14  write down every piece of evidence you got, correct?

15     A    I tried to.

16     Q    And in 1992, you understood you had an

17  obligation to turn over all evidence that might tend to

18  show the suspects were innocent, correct?

19     A    Yes.

20     Q    And that would include impeachment evidence.

21  In other words, evidence that could be used to discredit

22  a witness for the prosecution, correct?

23     A    Yes.

24     Q    And you knew about that obligation long before

25  1992?



1        A     Yes.

2        Q     Now another thing you told us -- by the way,

3   in your view, if you had any doubt in your mind about

4   whether a piece of evidence was exculpatory or

5   impeaching, you would error on the side of disclosing it

6   to the prosecutor so they could decide what to do with

7   it, correct?

8        A     Anything.  Not just what I thought, if I even

9   looked at it and it looked like there was something

10   wrong with it, it goes to the Commonwealth's attorney.

11        Q     And you took that obligation seriously, right?

12        A     Yes.

13        Q     Now, another thing you've told us is, because

14   of how small your department was and your budget, you

15   were not able to provide much training to your officers;

16   fair to say?

17        A     In what I could sir, most of it on-the-job

18   training.

19        Q     But you were very limited in what you could

20   do?

21        A     That's correct.

22        Q     All right.  And you were the most experienced

23   law enforcement officer in the county?

24              MR. BOND:  At what time?

25        Q     In 1992, you were the most experienced law



1  enforcement officer and the sheriff?

2       A    In the sheriff's department, probably so.

3       Q    All right and the primary way in which you

4  supervised and train was leading by example, correct?

5       A    Tried to.

6       Q    In other words, you had officers in your chain

7  of command follow your lead as to what was proper law

8  enforcement practice, correct?

9       A    Sir, they worked their own cases.  Sometimes

10  they did it and follow and charges made and I never seen

11  them.

12      Q    All right.  Let me give you -- let me tell you

13  what I'm talking about.

14      A    Okay.

15      Q    You've already told us that you didn't have

16  much budget or ability to provide formal training for

17  your officers?

18      A    During that period, yes.

19      Q    All right.  So for example one of the things

20  that Wise testified to, was that prior to 1992 he had no

21  formal training about what information needed to be

22  disclosed to the prosecutors, and you would agree with

23  that, right?

24           MR. BOND:  Object to the form of the question.

25      A    Who testified to that?



```
 1        Q    Wise.

 2             MR. BOND:  Cliff.

 3        A    Cliff Wise.

 4        Q    Wise.  I'm pronouncing it wrong.  I'm sorry.

 5   Wise.

 6        A    Okay.

 7             MR. BOND:  I don't think he's answered your

 8        question.

 9        Q    He hasn't.  Wise testified that prior to 1992

10   he didn't have any formal training on what kind of

11   evidence to provide to the prosecutor; would you agree

12   with that?

13        A    I know -- I know what he testified to.  But I

14   would almost disagree with some of it, because I have

15   more confidence in Cliffy.  I think he would sit and

16   figured it out or brought it to my attention.

17        Q    That's -- what he's saying is he didn't have

18   it -- what he's always saying is that he didn't receive

19   any formal training?

20        A    He did not.

21        Q    Okay.  And you agree with that then?

22        A    Yeah.

23        Q    Okay.  Then in other words, nobody trained

24   Cliff Wise about the constitutional obligation to

25   disclose exculpatory evidence, correct?
```



```
1                  MR. ERVIN:  Objection to form.

2                  MR. BOND:  Objection to form.  Go ahead.

3        A     Probably not.

4        Q     Okay.  The way he would learn that is through

5   common sense?

6        A     Uh-huh.

7        Q     Right?

8        A     Uh-huh.

9        Q     Yes?

10       A     Yes.

11       Q     Or through watching what you did?

12       A     That or Kentucky State Police or the

13  Commonwealth's attorney, the county attorney.  Cliff was

14  good at asking questions.

15       Q     The manner in which you supervised and trained

16  on an officer's obligations to disclose exculpatory

17  evidence was primarily through your example?

18       A     That's it.

19       Q     Do what I do, correct?

20       A     Yes.

21       Q     And you would hold this case out as an example

22  of how you properly document and disclose exculpatory

23  evidence, correct?

24                 MR. ERVIN:  Object to form.

25       A     Yes.
```



1    Q    It would be fair for us to look at this case

2    as an example of how you trained and supervise your

3    officers on their obligations to document and disclose

4    exculpatory evidence, correct?

5              MR. ERVIN:  Objection to the form.

6              MR. BOND:  Object to the form.

7    Q    Yes?  You have to answer out loud.

8    A    Yes.

9    Q    Now, you understood that as the sheriff, it

10   was your obligation to model appropriate behavior,

11   correct?

12   A    Yes.

13   Q    You were the chief law enforcement officer in

14   the sheriff's department, correct?

15   A    Yes.

16   Q    The buck stopped with you?

17   A    Yes.

18   Q    You were the chief policymaker?

19   A    Yes.

20   Q    There was nobody above you?

21   A    No, not really.

22   Q    If for example, you were openly failing to

23   document and disclose exculpatory evidence, that would

24   be the policy of the department, right?

25             MR. ERVIN:  Objection to the form.



```
 1            MR. BOND:  Object to the form.  Go ahead and
 2       answer, Joe.
 3   BY MR. BRUSTIN:
 4       Q    Hypothetically?
 5       A    Hypothetically, yes.
 6       Q    If for example, you were coercing --
 7   attempting to coerce witnesses into making statements,
 8   that would be the policy of the department based on how
 9   you trained and supervised, correct?
10            MR. BOND:  Object to the form of question.
11       A    Not necessarily, sir.
12            MR. BOND:  Go ahead.
13       Q    But certainly, you were the final policymaker
14   in the sheriff's department, correct?
15       A    Yes.  But sir, there's deputies that makes --
16   that -- that took statements from defendants that I
17   wasn't even aware of.
18       Q    Okay.  But the way -- the manner in which you
19   supervised and trained those deputies, --
20       A    Uh-huh.
21       Q    -- likewise, --
22       A    Uh-huh.
23       Q    -- was through them watching what you did,
24   right?
25       A    Yes.
```



```
 1        Q    Now, Wise also testified that it was your
 2   practice to record all interviews that you conducted on
 3   a tape recorder; is that correct?
 4        A    Tried to.
 5        Q    You even had a portable tape recorder, he
 6   remembered.
 7        A    What do you mean portable?
 8        Q    It's the one you carried around to tape record
 9   when you're outside the office.
10        A    Sometimes I did, sometimes I didn't.
11        Q    He said you would tape interviews -- tape
12   record interviews without exception.  Do you agree with
13   that?
14        A    I can't really agree with that.  Sometimes, I
15   did, and there's a few times I didn't.
16        Q    Well, he testified that one of the reasons
17   that you did is because you understood that witnesses
18   often change stories, and that's why it was important to
19   tape record all of their various statements, correct?
20        A    Yes.
21        Q    He said that it was your practice to both
22   record interviews with a tape recorder and to document
23   the interviews in a report, you did both things; is that
24   true?
25        A    Tried to.
```



1          MR. ERVIN:  Objection to the form.

2     Q    And that was particularly important with

3  witnesses in a case that you knew were problematic for

4  one reason or another, correct?

5          MR. BOND:  Objection to the form.

6     Q    And a problematic witness is a witness that,

7  you knew, might have a reason to lie, right?

8     A    Yes.

9          MR. BOND:  Object to the form of the question.

10    Q    A problematic witness is a witness who you

11  know might have a history of lying, right?

12    A    Yes.

13    Q    An example of a -- a textbook example of a

14  problematic witness would be Clifford Capps, right?

15    A    A little bit.

16    Q    Okay.  Or Amy Remsburg, right?

17    A    No, I can't say that about Amy.

18    Q    Well, Amy Rems --

19    A    I didn't know her that well.

20    Q    Amy -- but what you know is that Amy Remsburg

21  was accused of raping her children, right?

22    A    Yes.

23    Q    That makes her a problematic witness, right?

24         MR. GARVERICH:  Object to the form.

25         MR. BOND:  Object to the form.



1    Q    Let me withdraw the question.  You knew that

2    Amy Remsburg was not only accused of raping her

3    children, she was convicted of raping her children?

4         MR. BOND:  Object to the form of question.  Go

5    ahead, Joe.

6    A    Sir, you know what I'm going to tell you.  I

7    didn't know she was convicted.

8    Q    Until later on?

9    A    Until later on.

10   Q    All right.  But you did know -- you did know,

11   at the time, that Amy Remsburg had a tumultuous

12   relationship, a difficult relationship with Jeff Clark,

13   right?

14        MR. BOND:  Object to form.  Please identify

15   what you mean by "at the time."

16        MR. BRUSTIN:  Fair enough.

17        MR. BOND:  Just --

18   BY MR. BRUSTIN:

19   Q    At the time -- at the time you were

20   investigating Amy Remsburg in this case, you understood

21   that she had had a sexual relationship with Jeff Clark?

22        MR. BOND:  Object to the form of question.

23   A    Yes.

24   Q    And that both parties had alleged that that

25   relationship was problematic, it was --



JOE GREER                                        November 04, 2019
CLARK vs LJCMG                                                112

```
 1          A     Uh-huh.

 2          Q     -- there were problems in it, right?

 3          A     Yes.

 4          Q     And that, necessarily, makes Amy Remsburg a

 5    problematic witness, someone who may have a motive to

 6    lie --

 7          A     Uh-huh.

 8          Q     -- right?

 9          A     Could have.

10          Q     Okay.

11          A     Yes.

12          Q     So for that reason, Amy Remsburg was a

13    problematic witness.

14          A     I didn't make that decision.

15          Q     I'm just talking about as a general matter, --

16          A     Uh-huh.

17          Q     -- how you operated as a sheriff.

18          A     Uh-huh.

19          Q     You -- given what you knew about Amy Remsburg

20    at the time, she was one of those problematic witnesses

21    that would be very important to tape record, correct?

22          A     Yes.

23          Q     Because she may have a motive to lie.

24          A     Uh-huh.

25          Q     Yes?
```



1    A    Yes.

2    Q    Same was Clifford Capps.  He had a history of

3  lying to you in the past, correct?

4    A    Sometimes.

5    Q    And that's why it would be very important to

6  carefully document and tape record everything Clifford

7  Capps said to you, correct?

8         MR. BOND:  I think that's the 23rd time.  Go

9    ahead and answer.

10   A    Yes.

11        MR. BOND:  I lost count, I'm sorry.

12   Q    All right.  He -- and -- Cliff Wise also

13  testified that it was very important that even when you

14  were conducting interviews with the Louisville Police

15  Department, you were still very careful to document the

16  interview from your perspective, correct?

17   A    Just briefly in my case report.  I took their

18  letters, and they were filed with my case report.

19   Q    Well he said that even in a joint

20  investigation, you documented all the steps that your

21  department took.  You didn't just rely on their

22  paperwork; is that true?

23   A    No.  Case reports -- when is that?

24   Q    Wise also testified that you understood it was

25  critically important to write down all of the details



1  that you receive when you were conducting an interview;

2  is that true?

3      A    Tried to.

4      Q    All right.  Now, you recall the interview --

5  how much time is on the record?

6          COURT REPORTER:  One hour, 45 minutes, 32

7      seconds.

8          MR. BOND:  And counting.

9      Q    All right.  Do you recall the interviews that

10  you conducted with Crystal Barnes and Michelle Rogers?

11  And let me give you a little more information.

12  Hopefully it will help you.

13      A    Yeah.

14      Q    Barnes is Ms. Warford's cousin --

15      A    Yes.

16      Q    -- who spoke to her on the night -- allegedly

17  spoke to her on the phone the night she disappeared.

18  And Rogers is the sister who had a -- who had some type

19  of relationship with Jeff Clark?

20      A    I understood that, yes.

21      Q    Okay.  And obviously, those were two

22  potentially important interviews, correct?

23      A    Sir, I don't even really remember the

24  interviews, it's been so long.

25      Q    Given their relationship to the victim, --



1       A     Yeah.

2       Q     -- you would understand, at the time, they

3    were potentially important interviews, correct?

4       A     Yes.

5       Q     Okay.

6       A     To a certain extent.

7       Q     Okay.  Especially if you have Crystal Barnes

8    who may have been the last -- withdrawn.  The last

9    person to speak to a murder victim when she disappears

10   is obviously an important witness, right?

11      A     Yes, could be.

12      Q     All right.  And you would know that as an

13   experienced sheriff, by that point in time?

14      A     Uh-huh.

15      Q     Yes?

16      A     Yes.

17            MR. BOND:  You need to say yes, Joe, for the

18      record, okay?

19      A     Yes.  All right.

20      Q     Can you explain why there was no interview,

21   there was no recording, and no written notes for the

22   interview of Barnes or Rogers in your file?

23            MR. GARVERICH:  Objection to the form of the

24      question.

25      A     You're telling me there weren't, so I -- I



1   have to agree with it.

2        Q    Any explanation as to why there wasn't.

3        A    No.  No explanation.

4        Q    There should have been, right?

5        A    Not necessarily.

6        Q    Okay.  The only records -- I'm sorry.  There's

7   no tape recording.  Any explanation for that?

8        A    No.

9        Q    All right.  So let's take a look at -- where

10  is this?

11            MR. KAMDANG:  It looks like a police binder.

12       Exhibit 20 --

13            MR. BRUSTIN:  Oh man.

14            MR. KAMDANG:  You want the LPD one?

15            MR. BRUSTIN:  Yeah.  Where is it?

16            MR. KAMDANG:  That's Exhibit 32.  You want to

17       review it?

18            MR. BRUSTIN:  Probably.

19            MR. KAMDANG:  All right.

20            MR. BRUSTIN:  So exhibit -- this is Exhibit --

21            MR. KAMDANG:  Pretty sure it's 25.

22            MR. BRUSTIN:  Does he have this?

23            MR. KAMDANG:  Yeah.  What's the number that

24       you want?

25            MR. BRUSTIN:  It's -- if you could take a look



1    at page --

2           MR. KAMDANG:  615?  That's in --

3           MR. BRUSTIN:  No.  562.

4           MR. KAMDANG:  That's in the other one.  Okay.

5           MR. BOND:  Is it in this book?

6           MR. KAMDANG:  Yeah.

7           MR. BRUSTIN:  Yeah.  Yeah.  562.

8           MR. BOND:  Page 562.  Your-all's 562.

9           MR. BRUSTIN:  Yes.

10          MR. BOND:  Okay.

11          MR. BRUSTIN:  But it's in that order.  Yeah.

12          MR. BOND:  Okay.  This -- give that to me.

13   That goes in the file.  All right.  This is theirs.

14          MR. BRUSTIN:  This is not right.

15          MR. BOND:  At the top, Major James W.

16   Griffiths, say from or page 5, is that the

17   reference?

18          MR. BRUSTIN:  Oh.  Never mind.  I'm sorry.

19          MR. BOND:  I went to all that work, and you

20   don't want to look at it?

21          MR. BRUSTIN:  I'm going to look at a different

22   one.

23          MR. BOND:  No.  He doesn't want to look at it.

24          MR. GARVERICH:  Do we need to keep the same

25   binder or get the previous one?



```
 1            MR. BRUSTIN:  It's the same binder.  If you
 2       could turn to -- I'm going to go way back to
 3       page 16.
 4            THE WITNESS:  He's really going back.
 5            MR. BOND:  First word at the top, "talked to
 6       Hardin?"
 7            MR. BRUSTIN:  Yup.
 8            MR. BOND:  Okay.  Right here.  Now, just as a
 9       reference, this is part of his investigation for
10       the --
11            MR. BRUSTIN:  This -- that's right.  This is
12       your omnibus sup report.
13            MR. BOND:  Okay now.  And this is --
14            MR. BRUSTIN:  This is your --
15            MR. BOND:  It looks like on the previous page,
16       it says 499211 --
17            MR. BRUSTIN:  Yeah, if you look --
18            MR. BOND:   -- hours.
19  BY MR. BRUSTIN:
20       Q    If you look at the first full paragraph on
21  page 16, it begins, "Upon talking to Crystal Barnes, she
22  stated that Rhonda had called her."  Do you see that?
23       A    Uh-huh.
24       Q    Yes?
25            MR. BOND:  Yes.
```



1    A    Yes.

2    Q    This is your -- this is your description of

3  your interview with Crystal Barnes, right?

4    A    I guess.  Yes.

5    Q    And by the way, your -- based on who Crystal

6  Barnes was, you had every reason to expect that she

7  would want to help the victim as much as she could,

8  correct?

9    A    Yes.

10    Q    There was no ulterior motive that you were

11  aware of for Crystal Barnes, right?

12    A    What's that again?

13    Q    In other words, you would expect that Crystal

14  Barnes would want to do everything she could to help the

15  victim.  They were close.

16    A    Yes.

17    Q    All right.  And according to you, she

18  volunteered -- and let's go -- we're going to go to the

19  bottom of the page, the line beginning -- it's about ten

20  lines up, "Unless with a friend," you see that?

21    A    Uh-huh.  Yes.

22    Q    The first sentence there says, "She also

23  stated."  Read that to yourself, about all the way down

24  to "knives."

25    A    Okay.



| | | |
|---|---|---|
| 1 | Q | So according to your notes of this |
| 2 | interview -- | |
| 3 | A | Uh-huh. |
| 4 | Q | -- with Ms. Barnes, she volunteered that Keith |
| 5 | Hardin and Jeff Clark were into satanic worship, right? | |
| 6 | A | Yes. |
| 7 | Q | And that they had killed animals as part of |
| 8 | that satanic worship, correct? | |
| 9 | A | Yes. |
| 10 | Q | She just -- on her own, volunteered it, |
| 11 | correct? | |
| 12 | A | Yes. |
| 13 | Q | Oh.  I apologize.  I'm sorry.  I'm actually |
| 14 | going to go further up the page where it says, "She | |
| 15 | stated." | |
| 16 | A | Okay. |
| 17 | Q | I skipped -- |
| 18 | | MR. BOND:  Where -- Okay.  I'm sorry. |
| 19 | Q | Says, "She stated she did not care too much |
| 20 | for him.  She stated that he was in that satanic stuff, | |
| 21 | that he was getting Rhonda in it."  Right? | |
| 22 | | MR. BOND:  Okay.  That's where it just |
| 23 | started. | |
| 24 | A | Yeah. |
| 25 | | MR. BOND:  Okay. |



1    Q    That's what Crystal Barnes volunteered to you?

2    A    Yes.

3    Q    Right?

4    A    Yes.

5    Q    And you never -- you never gave that

6    information to her, she volunteered it to you, correct?

7    A    Yes.

8    Q    And that happened to match what you had

9    already learned in the case, correct?

10   A    Uh-huh.

11   Q    Yes?

12   A    Yes.

13   Q    Okay.  And all we have to document that this

14   is what she said to you is your description in your

15   report, correct?

16   A    That's correct.

17   Q    You chose not to make a tape recording of this

18   statement, correct?

19   A    That's correct.

20   Q    And then, going further down, you're

21   describing your conversation with Michelle Rogers.  Who

22   -- that's what I just showed you before.

23   A    Right.

24   Q    That was actually Michelle Rogers.

25   A    Yes.



```
 1        Q    It says, "Upon talking to Michelle Rogers'
 2   sister."  And she's describing, even more specifically,
 3   according to you, --
 4        A    That's correct.
 5        Q    -- that not only were they into satanic stuff,
 6   they were actually sacrificing animals, right?
 7        A    That's correct.
 8        Q    And she volunteered that to you without any
 9   prompting, right?
10        A    Yes.
11        Q    And that matched your theory of the case?
12        A    Yes.
13        Q    It matched what Handy had told you Keith had
14   volunteered in the car?
15        A    Yes.
16        Q    Okay.  And again, all we have to memorialize
17   that statement -- alleged statement, --
18        A    Uh-huh.
19        Q    -- is your description of it in your report.
20             MR. BOND:  Object to the form of question.
21        Q    Another interview that you decided not to tape
22   record?
23        A    That's correct.
24        Q    Okay.  Did you forget your tape recorder that
25   day?
```



JOE GREER                                      November 04, 2019
CLARK vs LJCMG                                             123

1        A    No.   But all names were furnished to the

2    Commonwealth's attorney with the copy of this case

3    report.   He would have picked -- in fact, they were all

4    subpoenaed, I believe.

5        Q    Okay.   And did you forget to bring your tape

6    recorder that day?

7        A    No.

8        Q    Why didn't you tape record it?

9        A    I don't know.

10       Q    So you told us you had a practice of tape

11   recording.

12       A    Yeah.

13       Q    We have two important witnesses.

14       A    Yes.

15       Q    Both of them you decided not to tape record.

16       A    That's correct.

17       Q    Any legitimate law enforcement reason for

18   doing that?

19       A    No.

20            MR. ERVIN:   Objection to the form of the

21       question.

22            MR. BOND:   Objection to the form.

23       Q    Okay.   Now, let's take a look at -- if you

24   take a look on page 16 also, it says in the middle of

25   the page, right in the middle, first line it says, "and



1  Keith didn't like that."

2        MR. GARVERICH:  Right there.

3    A    I got it.

4    Q    Also according to Crystal, she was sure that

5  Keith Hardin smacked Rhonda around before.  She's

6  describing a history of violence for Keith Hardin,

7  right?

8    A    Yes.

9    Q    And that's important, right?

10   A    Uh-huh.

11   Q    Yes?

12   A    Yes.

13   Q    Also, all we have for that statement is your

14  description of it in the report, no tape recording?

15   A    That's right.

16   Q    All right.  And again, both Crystal Barnes and

17  Michelle Rogers are witnesses who you believe are --

18  have every reason to want to be honest to help their --

19        MR. KAMDANG:  Case.

20   Q    -- to help the case, right?

21   A    Yeah.

22   Q    Let's take a -- let's look at their trial

23  testimony.  And specifically, I'm going to read to you

24  from Rogers' testimony on page 141.

25        MR. GARVERICH:  Do you have a copy of that?



JOE GREER                                   November 04, 2019
CLARK vs LJCMG                                            125

```
 1              MR. BRUSTIN:  I do.  Let's mark --
 2              MR. KAMDANG:  26.
 3              MR. BRUSTIN:  I don't think -- have you --
 4      have we marked the trial already?
 5              MR. KAMDANG:  No.
 6              MR. SIMON:  It's a new exhibit.
 7              MR. KAMDANG:  I think this is 26 -- or 26.
 8              MR. BOND:  I think 26 is in front of your
 9      notebook.
10              MR. BRUSTIN:  All right.  So this is -- I'm
11      just going to give you a portion of 26.  And
12      this --
13              MR. BOND:  You're going to mark it 26?
14              MR. BRUSTIN:  I thought we said it was -- it's
15      not -- it already -- it hasn't been marked.
16              MR. SIMON:  It's not been marked.
17              MR. BRUSTIN:  Well, let's mark it as 26 then.
18                  (EXHIBIT 26 MARKED FOR IDENTIFICATION)
19   BY MR. BRUSTIN:
20      Q    And just for your reference sir, this is
21   testimony from the '95 criminal trial?
22      A    Uh-huh.
23      Q    Okay?
24      A    Uh-huh.  Yes, sir.
25      Q    All right.  And if you could take a look at
```



1  page 141, this is --

2       A    75.

3       Q    -- Rogers?

4            MR. GARVERICH:  Yeah, that's 141.

5       A    Okay.

6       Q    The bottom of page 141 --

7       A    Uh-huh.

8       Q    -- line 22 --

9       A    Yes.

10      Q    Read that to line 2 on page 142.

11      A    To what pa -- number, 142?

12      Q    Yup, page -- line 2 on page 142.

13           MR. GARVERICH:  Why don't you start there?

14      Q    Okay?

15      A    Uh-huh.

16      Q    And this is different from what she told you,

17  right?  Here she's saying --

18      A    That's correct.

19      Q    -- here she's saying that she had no knowledge

20  of Jeff Clark being involved in Satanism.

21      A    That's right.

22      Q    That's completely different than what you --

23  according to you, she told you and you -- and you didn't

24  tape record, right?

25      A    That's correct.



JOE GREER                                    November 04, 2019
CLARK vs LJCMG                                            127

1        Q    Any explanation for that?

2        A    No explanation, except she didn't tell Mr.

3   Smith the truth.

4        Q    Okay.

5        A    That's the only thing I can tell you.

6        Q    It's not that you misrepresented what she told

7   you, it's that --

8        A    No, I didn't misrepresent.

9        Q    -- she didn't tell the truth at trial?

10        A    No.

11        Q    So when she was under -- when she was under --

12   withdraw.  The only time she's tape recorded is that the

13   trial, right?

14        A    That's it.

15        Q    All right.  And if you take a look at page

16   142, line 15 to 18 --

17        A    142, okay.

18             MR. GARVERICH:  Did you say 15 to 18?

19        A    15 to 18.

20        Q    If you take a look at page 142, line 3 --

21   beginning on line p -- line 3, she's being asked

22   questions about Keith Hardin's involvement in Satanism,

23   right?

24        A    Uh-huh.

25        Q    See that?



| 1 | A | Yes. |
|---|---|------|

```
 1        A    Yes.

 2        Q    And read down the page.

 3        A    Uh-huh.  Turn the page?

 4        Q    Just read to the bottom of the page.

 5        A    I got it.

 6        Q    No mention of animal sacrifices, right?

 7        A    No.  None.

 8        Q    That's completely different than what she told

 9   you, right?

10        A    That's correct.

11        Q    And no explanation for that either, right?

12             MR. ERVIN:  Object to form.

13             MR. GARVERICH:  Object to form.

14        A    Guess she didn't want to tell the truth.

15        Q    Why would Rogers ever want to protect Hardin

16   and Clark?

17             MR. GARVERICH:  Objection to form

18        A    I don't know, sir.

19        Q    You know -- but you stand by the fact that she

20   told you --

21        A    Oh, I most definitely do.

22        Q    Okay.  You didn't provide her that

23   information.  She --

24        A    No.

25        Q    -- she gave it to you?
```



```
1              MR. BOND:  Object to the form of the question.
2         Go ahead and call him a liar.  Let's get it over
3         again, okay?
4         A    Yeah.
5    BY MR. BRUSTIN:
6         Q    Okay.  And you have no explanation for that
7    contradiction?
8         A    No.  She just didn't tell the truth, sir.
9         Q    Okay.  So Rogers is a liar?
10             MR. ERVIN:  Objection.
11        A    You're losing [sic] that -- using that term
12   very loosely, sir.
13        Q    I'm sorry.
14        A    I won't say a liar.  She just didn't tell the
15   truth.
16        Q    Rogers didn't --
17        A    Maybe she had a reason --
18        Q    Fair enough.
19        A    -- I don't know.
20        Q    Rogers didn't tell the truth at trial, right?
21        A    Of course, she may --
22        Q    Now take a -- let's take a look at what Barnes
23   said.  This is 27.
24             MR. KAMDANG:  Marking this as this 27.
25                  (EXHIBIT 27 MARKED FOR IDENTIFICATION)
```



1      Q     This is from also March first trial.

2      A     Okay.

3      Q     If you take a look at page 204 --

4            MR. BOND:  That page, I believe, Joe.

5      A     Okay.

6      Q     Read page 204, line 2 to 13.

7      A     Okay.

8      Q     Read it?

9      A     Yes.

10     Q     And again could it -- this is Barnes

11  testifying that she had no knowledge of Keith Hardin or

12  Jeff Clark being involved in Satanism, right?

13     A     That is correct.

14     Q     Completely different, according to you, than

15  what she told you, right?

16     A     Completely different.

17     Q     Okay.  Any explanation as to why the victim's

18  sister would lie?

19           MR. ERVIN:  Objection to the form.

20     A     I don't know sir.

21     Q     Okay.

22     A     I just know they didn't tell the truth.

23     Q     All right.  So Barnes didn't tell the truth

24  when she said she had no knowledge that they were

25  involved in Satanism, or at least that's different than



JOE GREER
CLARK vs LJCMG

November 04, 2019
131

1    what she told you?

2        A    That's correct.

3        Q    All right.  You also interviewed Tonya Greer

4    and James Terrell?

5        A    Yes.

6        Q    Right?  And in fact, Tonya Greer and, at

7    least, James Terrell was at some point a person of

8    interest in this case, correct?

9        A    Possibly.

10       Q    Well, he was someone who was alleged to have

11   been making unwanted calls to the victim.

12       A    Calls, yes.

13       Q    And someone you we're looking at as a possible

14   suspect?

15       A    Yes.

16       Q    Someone who has a motive, potentially, to lie?

17       A    Yes.

18       Q    And some -- potentially, someone who could

19   have committed this crime, right?

20            MR. BOND:  Is that a question?

21            MR. BRUSTIN:  Yes.

22       A    Not in my opinion.

23       Q    Well, initially, when you were looking at him,

24   he was a person who was potentially someone who could've

25   committed that crime?



```
 1        A    He needed to be interviewed and questioned,
 2   no --
 3        Q    Okay.  An important interview, correct?
 4        A    Yes.
 5        Q    Also an important interviewed to tape record,
 6   right?
 7        A    Uh-huh.
 8        Q    Yes?
 9        A    Yes.
10        Q    Why didn't you tape record this interview?
11        A    I don't know that I did or didn't.
12        Q    Well, I'm representing to you there's no repr
13   -- there's no tape recording in the file.
14        A    Okay.
15        Q    That means you didn't, right?
16        A    That means I didn't.
17        Q    Why didn't you?
18        A    I just didn't, sir.
19        Q    Okay.  Can you think of any legitimate law
20   enforcement reason as to why you veered from your
21   practice of taping important interviews?
22             MR. ERVIN:  Objection to the form of the
23        question.
24             MR. GARVERICH:  Objection to the form of the
25        question.
```



```
 1        A    Sir, I just didn't.

 2             MR. BRUSTIN:  Okay.  Tonya Greer and James

 3        Terrell are both important interviews, right?

 4        A    Uh-huh.

 5        Q    Yes?

 6        A    They needed to be interviewed.  Let's put it

 7   that way.  Their name came up.

 8             MR. GARVERICH:  You want to take a break?

 9             THE WITNESS:  No.

10             MR. GARVERICH:  Okay.

11   BY MR. BRUSTIN:

12        Q    What did you do to make -- to investigate

13   whether or not Tonya Greer and James Terrell knew

14   anything about or were involved in the murder of Rhonda

15   Sue Warford?

16        A    I believe one of the -- and I could be wrong,

17   I have to look at the file -- that one of the detectives

18   from homicide might have talked to them.

19        Q    And what did they -- how did -- how did they

20   rule them out?

21        A    You have to look at the letter, sir.

22        Q    Now, you -- I think you told us earlier that

23   you and Mabry didn't have a good relationship, right?

24        A    No, we didn't.

25        Q    All right.  And you would agree though that
```



1  one of the reasonable things to do with Mabry, given

2  your relationship, would have been to send other

3  officers to talk to him, correct?

4      A    Yeah, but in my opinion he wouldn't have

5  talked but -- yeah, right.  Yes, sir.

6      Q    And two of the officers that you wou -- may

7  have sent could've been Cliff Wise, correct?

8      A    Possibly.

9      Q    You may have even send Tommy Stiles.  He did

10 favors like that for you, right?

11     A    Yeah.

12     Q    And you trusted him, right?

13     A    Oh, yes.

14     Q    Those would be two people that you would

15 reasonably rely on to speak to someone like Mabry to see

16 if he would give you information?

17     A    Well, not Tommy.

18     Q    Well, Tommy was an experienced investigator,

19 right?

20     A    Yes, but Mabry didn't like Tommy a lot.

21     Q    According to -- Mabry when we spoke to him,

22 told us that he was, in fact, approached by two officers

23 in the jail, Wise and Stiles, and questioned.

24     A    Okay.  That's good.  I didn't know that.

25          MR. BOND:  Let's discuss something here.  Why



1   haven't we been provided that?

2      MR. BRUSTIN: Provided information --

3      MR. BOND: That you spoke to --

4      MR. BRUSTIN: -- that I spoke to him about?

5      MR. BOND: Yeah.

6      MR. BRUSTIN: Why would -- how would you be --

7      MR. BOND: If you got a 26(a) disclosure --

8      MR. BRUSTIN: How would you provide -- well,

9   Mabry's not a Rule 26 --

10     MR. BOND: Did you have a Rule 26(a)

11   disclosure --

12     MR. BRUSTIN: -- rules aren't -- he on a Rule

13   26 list, I'm assuming.

14     MR. BOND: Right, okay.

15     MR. GARVERICH: His statement is?

16     MR. BRUSTIN: We don't have to give you any

17   statements. We don't -- I didn't say we had a

18   statement.

19     MR. BOND: Tell us what you're going to

20   testify to.

21     MR. BRUSTIN: We don't have to -- guys let's

22   talk about that later. I -- we can interview

23   witnesses. You -- we haven't -- we --

24     MR. BOND: Well he may not answer now, but go

25   ahead.



```
 1    BY MR. BRUSTIN:
 2        Q    All right.  Assuming -- well, first of all, do
 3    you deny that you sent Stiles and Wise to talk to Mabry?
 4        A    I didn't know.  First I heard that right here.
 5        Q    So you didn't send them?
 6        A    No.
 7        Q    All right.
 8        A    They went on their own.
 9        Q    By the way, based on your dealings with Mabry,
10    any reason to question his -- ba -- any reason to
11    question his honesty?
12        A    Personally, me?
13        Q    Yes.
14        A    I'd question anything Mabry done.
15        Q    Because why?
16        A    Let the answer stand for itself, sir.
17        Q    If -- did he have a history of lying you?
18        A    He had a history of not cooperating with you.
19        Q    Well, that's a little different.  Did Mabry --
20    you've talked about --
21        A    No.  Mabry's never lied to me.  He just ain't
22    told me anything.
23        Q    Okay.  So you have no reason -- unlike Capps,
24    you have no reason, based on your experience with Mabry,
25    to question his honesty?
```



```
 1                MR. ERVIN:  Objection to the form.
 2        A    One way or the other, no.
 3        Q    Okay.  He didn't -- he wasn't someone who made
 4   up stories to you.  He just didn't want to talk to you.
 5        A    That's it.
 6        Q    Now, do you recall two witnesses named Billy
 7   Wayne Carter and Melinda Mihalik who alleged to have
 8   seen Rhonda Sue Warford days after she went missing?
 9        A    I -- I'm aware of that.
10        Q    Okay.
11        A    LMPD detectives ran that down.
12        Q    Okay.  But you spoke to Billy Wayne Carter
13   when he called in, right?
14        A    I don't remember, sir.
15        Q    Well, according to Mr. Carter --
16        A    Okay.
17        Q    -- he contacted the Sheriff's department and
18   spoke to someone he believed was named Greer.  Do you
19   deny speaking to Billy Wayne Carter?
20        A    I don't remember, sir.
21        Q    Okay.  But obviously, if somebody called and
22   told you that they had seen Rhonda Sue Warford, that
23   would be an important person to interview, correct?
24        A    Yes.
25        Q    Especially after she -- withdraw.  If somebody
```



```
 1    called and told you they had seen Rhonda Sue Warford
 2    after she allegedly disappeared, that would be an
 3    important person to interview, right?
 4         A    Yes.
 5         Q    Critically important, right?
 6         A    Yes.
 7         Q    All right.  And that's the kind of interview
 8    that should be done in person, correct?
 9         A    I have a que -- where was she seen at by this
10    Mr. Carter?
11         Q    Well, that's what you do the interview for.
12    To final that out, right?
13         A    I don't remember talking to Mr. Carter.
14         Q    But assuming that Carter claims he saw Rhonda
15    Sue Warford, that's someone who is important to
16    interview, correct?
17         A    I would say so -- yeah.
18         Q    It's important to tape record that interview,
19    correct?
20         A    According to what department your with.
21         Q    Well, in your department, where your practice
22    was to tape record --
23         A    We would try to tape record it.  Yes, sir.
24         Q    Why didn't you tape record Billy Wayne
25    Carter's interview?
```



```
1        A    I don't even remember talking to Billy Wayne
2   Carter, sir.  If you said I did, I guess I did.  You say
3   he talked to somebody like Greer?
4        Q    Yep.
5        A    Okay
6        Q    Now, according to Keith Hardin -- withdrawn.
7   There were times -- there were a number of witnesses
8   that you were interviewing in this investigation in
9   Meade County, correct?
10       A    In Meade County?
11       Q    Yes.
12       A    Not very many.
13       Q    But there were some, right?
14       A    Very few, sir.
15       Q    All right.
16       A    And I can't even tell you one that I did.
17       Q    There were certainly places in Meade County
18  for you to conduct interviews, correct?
19       A    Yes.
20       Q    You did that as part of your job all the time?
21       A    Yes.
22       Q    And you had interview rooms in Meade County,
23  right?
24       A    My office.
25       Q    Okay.  And it was a small room?
```



1      A      Yes.

2      Q      Where you sometimes conducted interviews,

3   correct?

4      A      Yes.

5      Q      And had a door.  right?

6      A      Yes.

7      Q      You also had interview rooms at the courthouse

8   and the jail, correct?  That you could use.

9      A      Back in the back state police office.  We

10  could use it sometimes.

11     Q      You were free to use those rooms as you saw

12  fit, correct?

13     A      If they weren't busy.

14     Q      You didn't even have to ask, right?

15     A      No.

16     Q      You could just go in there and do it?

17     A      Yes.

18     Q      As from time to time, you were interview

19  witnesses in there?

20     A      Yes.

21     Q      And those are also -- there were some small

22  rooms back there for you to do interviews, correct?

23     A      One or two.

24     Q      Okay.

25     A      Very few.



 1         Q    But there was a couple of small rooms?

 2         A    Uh-huh.

 3         Q    Yes?

 4         A    Yes, one of them was the VA room, so we

 5    couldn't use it too much.  And the other one was a

 6    little small office --

 7         Q    Okay.

 8         A    -- just across from dispatch.

 9         Q    That you would sometimes use for your

10    interviews?

11         A    Yes.

12         Q    Particularly of people who were being housed

13    at the jail?

14         A    Most of interviews done back there was by the

15    state police.

16         Q    Okay.

17         A    Sometimes deputies.

18         Q    And sometimes you?

19         A    Very seldom.  Mine was done in my office.

20         Q    All right.  But you were certainly free?

21         A    Oh, I was free --

22         Q    Let me finish the question.  You were

23    certainly free to take prisoners from the jail, bring

24    them to that office, and interview them if you wanted

25    to?



```
 1        A    Yes.

 2        Q    And you would do that from time to time?

 3        A    Very few times, but I did.

 4        Q    Now, back then, you owned a lot of guns that

 5   you kept at home, right?

 6        A    Yes.

 7        Q    Including, you had one -- one gun that was a

 8   nickel-plated revolver?

 9             MR. BOND:  Objection to the form of the

10        question.

11        A    Yes.

12        Q    And that was a gun you were proud of?

13        A    Yes.

14        Q    It was a very nice gun?

15        A    Yes.

16        Q    And that was a gun that you would carry around

17   with you from time to time?

18        A    Mainly, yes.

19        Q    Okay.  By the way, the only time you ever had

20   contact with Keith Hardin was this case, correct?

21        A    That's correct.

22        Q    As far as you know, you never saw him any

23   other time?

24        A    No.

25        Q    Now, you deny carrying that nickel-plated
```



```
1    revolver when you were with Keith Hardin, correct?

2         A    I don't even know if I had one on or not.  I

3    wasn't around Keith Hardin that much.  All right?

4         Q    But during the times when you were Keith --

5    when you were with Keith Hardin, you were never wearing

6    that revolver, correct?

7         A    I don't know, sir.

8         Q    You --

9         A    I don't remember.

10        Q    You testified under oath at your last

11   deposition --

12        A    Probably wasn't.

13        Q    -- that you weren't carrying a weapon during

14   that time.

15        A    Probably wasn't.  I don't remember.

16        Q    According to Keith Hardin, you placed the gun

17   on the table and you threatened him.  Do you deny doing

18   that?

19        A    He is a little liar.

20        Q    All right.  According to Keith Hardin, is he a

21   liar in the same way that Palefsky is a liar?

22        A    Yeah.

23        Q    Is he a liar in the same way that Clark is a

24   liar?

25        A    Yes.
```



```
 1        Q    Is he -- I meant a different Clark.  Is he a
 2   liar -- is he a liar in the same way that Crystal Barnes
 3   is?
 4             MR. BOND:  Object to the form.
 5        A    Wouldn't call Crystal.  She just didn't tell
 6   the truth, sir.  You call it a liar, call it what you
 7   want to, okay?
 8        Q    Okay.  According to -- and according to --
 9   more specifically, according to Keith Hardin, you pulled
10   out this nickel-plated revolver, you put it on the table
11   in front of him, and you said that bad things happen to
12   people who don't cooperate with him.
13        A    Where did this --
14             MR. BOND:  Let's couch it, Nick.  Keith Hardin
15        alleges that happened in Meade County, Kentucky.
16             MR. BRUSTIN:  That's correct.
17        A    Where in Meade County, Kentucky?
18   BY MR. BRUSTIN:
19        Q    In the small room in the courthouse, that you
20   told us you sometimes do interviews.
21        A    I have never interviewed Keith Hardin when he
22   was in Meade County.
23        Q    All right.  But you denied --
24        A    He had lawyered up.
25        Q    Okay.  You deny pulling out a revolver and
```



1    threatening him as he describes, correct?

2        A    Most definitely I do.

3        Q    All right.  But you would agree, the same way

4    you denied getting that justice letter in 1992, right?

5            MR. BOND:  Nick, quit the wagging, okay?

6        You're not going to sit here --

7            MR. BRUSTIN:  Well, you seem --

8            MR. BOND:  Woah.  Let me finish.

9            MR. BRUSTIN:  All right.  I'll withdraw it.

10       You seemed upset, so that's why I was acting -- I

11       was --

12           MR. BOND:  Responding.

13   BY MR. BRUSTIN:

14       Q    -- responding.  But here's the point.  You --

15   you're just as sure that Kevin Justis never told you

16   about that letter in 1992 as you are that you never

17   threatened Keith Hardin, correct?

18       A    Yeah.

19           MR. BOND:  Objection to the form.

20       Q    All right.  Now, if you never had any contact

21   with Keith Hardin, and you weren't wearing a gun at that

22   time, how would Keith Hardin know that you had a nickel-

23   plated revolver?

24           MR. BOND:  Object to the form of the question.

25       A    I don't know.  I don't even know if I was



```
 1  wearing a gun, sir.  I've told you, I don't know if I
 2  had one on or not.  I didn't wear a gun all the time.
 3       Q    All right.  But you would agree that if you
 4  set -- if you put a gun on the table, and you said, "Bad
 5  things happen to people who don't cooperate," that would
 6  be serious misconduct?
 7       A    That would be a lie, too.
 8       Q    If it happened, you would understand --
 9       A    Yes.
10       Q    -- that would be serious misconduct?
11       A    Yes.  I've never done nothing like that.
12       Q    It would be a constitutional violation?
13            MR. BOND:  Object to the form.
14       A    I don't know what it'd be.
15       Q    All right.  You would never do that, right?
16       A    No.
17       Q    Same way you would never lie under oath,
18  right?
19       A    I try not to.
20       Q    Sometimes you --
21       A    You've accused me of it.
22       Q    Sometimes you do though, right?
23       A    No, I try not to.
24            MR. ERVIN:  Object to the form.
25            MR. BOND:  Object to the form.  Don't answer
```



1          that.  Let's move on.  Wasting time.  Where are we

2          on time, please, ma'am?

3               VIDEOGRAPHER:  Two hours, 17 minutes, four

4          seconds.

5     BY MR. BRUSTIN:

6          Q    Now, the Meade County Sheriff deputies wore

7     brown or khaki uniforms, right?

8          A    Brown.

9          Q    How about the state police?

10         A    Gray.

11              MR. BRUSTIN:  Let's take a -- let's take a

12         two-minute break?

13              MR. BOND:  Yeah.

14              VIDEOGRAPHER:  The time is 12:07, and we are

15         off the record.

16                   (OFF THE RECORD)

17              VIDEOGRAPHER:  The time is 12:15, and we are

18         back on the record.

19              MR. BOND:  How much time left, please, ma'am?

20              VIDEOGRAPHER:  We are at two hours, 18

21         minutes, 47 seconds.

22              MR. BRUSTIN:  Wait a minute.  We were at 2:17

23         when --

24              VIDEOGRAPHER:  We were at 2:17:54.

25              MR. BRUSTIN:  All right.  All right.



1          MR. PELLINO:  I just ran it to 2:18.

2          MR. BRUSTIN:  I know.  Now it's like 2:19.

3          MR. GARVERICH:  Let's keep on going, Nick.

4    BY MR. BRUSTIN:

5      Q    All right.  Sheriff Greer, you've told us now

6    that, according to Capps, he heard -- he heard Jeff

7    Clark make an admission concerning the Rhonda Sue

8    Warford murder, correct?

9      A    Uh-huh.  I don't think it was -- Capps said

10   twice.  Once was a joke, and the other one was more

11   serious.

12     Q    That's right.  And you understand that -- you

13   understand, certainly today, that according to Capps, he

14   heard some inculpatory statements from Melanson while

15   they were together, even before the Rhonda Sue Warford

16   murder, correct?

17     A    Yes.

18     Q    And by the way, based on what you've seen

19   today, you agree it's possible that you learned from

20   Stiles about those admissions before Rhonda Sue Warford,

21   correct?

22     A    Possibly.

23     Q    All right.  And so -- and if you knew that --

24   obviously, if you knew about the Melanson statements,

25   that would be another reason to suspect whether or not



1  Capps was telling you the truth.  When you have someone

2  who gets -- who has a history -- withdrawn.  Other than

3  Melanson and Rhonda Sue Warford, what other cases, that

4  you're aware of, did Capps allege that he received

5  information from the suspect that were admissions?

6      A    Sir, I can't tell you.  I don't know of any,

7  really.

8      Q    Well, you said "really."  There were some

9  others.  You just can't --

10     A    There could -- there could have been.

11     Q    Okay.

12     A    Okay?

13     Q    There could have been other cases.  You have -

14  - you -- as you sit here today, you have a general

15  recollection of other cases where Capps came forward and

16  provided information from suspects, correct?

17         MR. BOND:  Object to the form of the question.

18         MR. ERVIN:  Objection.

19         MR. BOND:  That's not what he said.

20     A    No, I -- I can't sit and say that.

21  BY MR. BRUSTIN:

22     Q    Okay.  Do you have -- as you sit -- I'm asking

23  you: As you sit here today, do you have some

24  recollection of there being -- even if you can't

25  remember the names of the cases -- there being some



1   other cases where Capps came forward?

2        A    I don't really have any recollection.

3        Q    You don't?

4        A    No, I don't.

5        Q    All right.  Anyway, you would agree, though,

6   that to the extent that you were aware of the Melanson

7   admissions, alleged admissions, that would be even more

8   reason to be skeptical of what Capps was telling you?

9        A    Back up.  I don't know when Melanson and Capps

10  did all this thing.  That's absolved.

11       Q    You've been --

12       A    Was it before or after?

13       Q    Okay.  Assuming, I'm -- all I'm asking you is,

14  assuming you knew before, you would agree that would be

15  another reason to suspect the credibility of Capps when

16  he told you about Clark?

17       A    Sir, didn't I tell you earlier that I didn't

18  even know they went to Colorado?

19       Q    All right.  Now, you would agree that Capps is

20  not a particularly likable person?  Would you agree with

21  that?

22       A    Could be.

23       Q    All right.  He's not someone that people are

24  dying to make admissions to, is he?

25            MR. GARVERICH:  Objection to the form of the



```
 1        question.  You can answer.
 2        A    I don't know.
 3        Q    Well, generally, was it your under -- was it
 4   your experience that the people in the jail didn't
 5   really like Capps?
 6        A    I can't really say that.  I -- I don't know.
 7        Q    All right.  Now, according to Jeff Clark --
 8   withdrawn.  Did you interview Jeff Clark in this case?
 9        A    With Handy.
10        Q    Okay.  And that was at the Louisville Police
11   Department, correct?
12        A    That's correct.
13        Q    You were also with Bill Adams, correct?
14        A    Bill was there, I think, a couple times.
15        Q    All right.  He was someone you were bringing
16   with to lots of interviews?
17        A    What's that now?
18        Q    He was someone you brought with you to a lot
19   of interviews in this case?
20        A    Sometime he'd come, sometime he didn't.
21        Q    All right.  But by the way, this is the only
22   case you've ever done, that you can recall, where you
23   were bringing Bill Adams with you on interviews,
24   correct?
25             MR. BOND:  Object to the form of question.  Go
```



1        ahead and answer.

2        A    Now.  Back up on that.

3        Q    Other cases you did too?

4        A    I'm sure.  They were over, like, 20-something

5    years.

6        Q    Okay.  In any case, do you remember spending

7    some time with Jeff Clark in the break room of

8    Louisville Police Department?

9        A    No.

10        Q    You know where the break room was though,

11    right?

12        A    Is that that big room where they interview

13    people?

14        Q    I believe so.

15        A    Okay.

16             MR. BOND:  Well, let's not believe.

17        Q    You know what?  I don't know.

18        A    Okay.

19        Q    That's --

20             MR. BOND:  Have you been there?

21             MR. BRUSTIN:  I've seen pictures.

22        A    That's where Detective Handy interviewed him

23    one time, and I was there.

24        Q    Okay.  And did you tell -- did you tell Clark

25    that you could help him if he helped you?



1        A    No.

2        Q    You deny doing that?

3        A    I deny doing that.

4        Q    Do you deny telling Clark that he won't do a

5   jail or anything if you just cooperates?

6        A    No.

7        Q    You deny that?

8        A    I deny that.

9        Q    The same way you denied knowing about the

10  letter in 1992?

11       A    That's correct, sir.

12       Q    And did you -- isn't it true that you told

13  Jeff Clark that Rhonda was pregnant, and all he needed

14  to say was that Keith did it, and he helped Keith move

15  the body?

16       A    No.

17       Q    You never said anything like that?

18       A    No.

19       Q    And that -- well, first of all, you would

20  agree that when you were interviewing Jeff Clark, he did

21  not make any admissions to you?

22       A    No.

23       Q    And according to --

24       A    And I didn't do much of the interviewing.

25       Q    Okay.  And according to -- but as you've



1   already told us, when you were doing interviews with the

2   Louisville Police Department, you were very comfortable

3   asking questions, correct?

4        A    Yes.

5        Q    But that's --

6        A    If I had any.

7        Q    All right.

8        A    I didn't have too many.

9        Q    Right.

10       A    They did --

11       Q    But --

12       A    -- a very profession job.

13       Q    All right.  And when you were doing -- and I

14  think you're describing it -- when you were with Handy,

15  Handy was taking the lead, correct?

16       A    And doing a fine job.

17       Q    Well, we know he's -- he does a fine job.  But

18  when you were with --

19            MR. BOND:  Let's spare the comments.

20       Q    When you were with Handy --

21       A    Yes.

22       Q    By the way, do you understand that Handy is

23  being prosecuted for perjury in two of his case --

24       A    I've seen it on --

25       Q    -- two of his cases?



1       A     -- television, sir.

2       Q     Okay.  But you still think that Handy is a

3    "fine detective," right?

4       A     In this case here, outstanding job.  Very

5    polite.  Did not mistreat prisoners.  Did a good job.

6       Q     A model investigation, right?

7       A     In my opinion, yes, sir.

8       Q     All right.  But when you and Handy were doing

9    interviews, Handy was in charge?

10      A     Yes.

11      Q     You let him take the lead?

12      A     Yes.

13      Q     He was calling the shots?

14      A     Yes.

15      Q     Because he was more experienced?

16      A     Yes.

17      Q     Now, according to Jeff Clark, when he failed

18   to make the admissions that you were seeking, you pulled

19   a gun, you laid it on the table.

20      A     Oh, I've -- that is not true, sir.  I have

21   never done nothing like that.  Okay?

22      Q     And according to Jeff Clark, he said, "You may

23   want to reconsider what I have to say, and think about

24   what I have to say."  You deny doing that?

25      A     I deny doing it.



1    Q    And according to Jeff Clark, Bill Adams backed

2    you up, and said that you always get what you want?

3    A    I haven't talked to Bill Adams, but that's a

4    question you need to ask him.

5    Q    Okay.  But that is true?  As the sheriff in

6    Meade County, you were used to getting what you want,

7    right?  You were the boss.

8         MR. BOND:  Object to the form of the question.

9    A    Not really, sir.

10   Q    And you would agree that to the extent that's

11   true, in other words, if you had laid a gun on the table

12   in front of Clark to try to get him to make admissions,

13   that would be serious misconduct?

14   A    Yes, it would.  And you know -- I don't

15   want --

16   Q    What?

17        MR. BOND:  Answer his question.

18   Q    You know what?

19   A    He has a reason to lie.  I don't.

20   Q    Okay.  What's his reason to lie?  What's his

21   reason to lie now, knowing that -- since he's been

22   exonerated?

23        MR. ERVIN:  Objection.

24        MR. BOND:  Objection to form of the question.

25   A    In my opinion, sir, he hasn't been exonerated.



1    Q    Wow.

2    A    The court exonerated him.  Okay.

3    Q    You believe he's guilty?

4    A    But a jury convicted him.  Yes, I think he's
5    guilty.

6    Q    Okay.  And the reason -- and that's why --
7    because you think he's guilty, that's why you buried the
8    letter in 1992, correct?

9    A    No.

10        MR. GARVERICH:  Object to the form of the
11        question.

12   Q    All right.  How come at your last deposition,
13   you told us that you didn't know one way or another
14   whether or not Clark and Hardin were guilty?

15   A    I didn't tell you that, sir.

16   Q    All right.  Let's take a look at --

17   A    If I did tell you that during that
18   explanation, then I'd say I'm a liar.

19   Q    You're as convinced today as you were back
20   then that they're guilty, right?

21   A    Yes, and it took a while to find that -- to do
22   that.

23   Q    And what is it that make -- keeps you
24   convinced today that they're guilty?

25   A    One, polygraph.  Both deceptive.



```
1        Q     Okay.

2        A     The statements from -- that the LPD detectives

3   took from people in Louisville about cutting animals

4   heads off, threatening the resource officer, this Clark.

5        Q     Okay.

6        A     And -- and things like that.

7        Q     All right.

8        A     And then, the note.

9        Q     Okay.

10        A     When Justis finally admitted that he did pass

11   that note, that halfway told me that maybe Capps is

12   credible.

13        Q     So you still think Capps is credible on this

14   issue?

15        A     Ken did.

16        Q     Okay.  So fair to say, though, that you

17   believe they're guilty based on information that other

18   people obtained?

19        A     That's right.

20        Q     And that you rely on and trust?

21        A     That's right.

22        Q     No informa -- you didn't receive any personal

23   information that caused you to believe they were guilty?

24             MR. GARVERICH:  Objection to form.

25             MR. BOND:  Objection to form of question.
```



1        A     In my opinion, sir.

2        Q     Sir, did you uncover it yourself.  Did you?

3        A     No.

4        Q     Okay.  You were -- all the evidence suggesting

5   they were guilty was from other officers and what they

6   reported to you, correct?

7        A     Uh-huh.  And statements.

8        Q     All right.  Now, take a look if you would.

9   You've already told us in your last deposition that you

10  listed April 5th as the date of -- as the date of death

11  on the report --

12       A     Uh-huh.

13       Q     -- because it was your belief, based on the

14  info from the coroner, that Warford had been killed on

15  that day, correct?  Initially.

16       A     Initially.  I don't call, technically, dates

17  of death.

18       Q     Okay.

19       A     The coroner does that.

20       Q     Okay.  And you're relying on that?

21       A     I'm relying on that.

22       Q     All right.

23       A     And if -- if he says it was on this day, it's

24  on that day.

25       Q     All right.



```
 1        A    I can't question it.
 2             MR. GARVERICH:  Just respond to the question,
 3        Joe.
 4        Q    Now, take a look at Exhibit --
 5             MR. KAMDANG:  Is that 4?
 6             MR. BRUSTIN:  No.  Take a look at page -- your
 7        Omnibus Report.  Page --
 8        A    Is that your glasses?
 9   BY MR. BRUSTIN:
10        Q    13.
11             MR. BOND:  Is that your number 13?
12        Q    Yes, sir.  Okay.  If you could read the
13   beginning of the second paragraph, see where it says,
14   "Sample kit and a polygraph," a few lines down?
15             MR. BOND:  Is that in the left-hand margin?
16             MR. BRUSTIN:  Yeah.
17        A    I had it.  Hold on.
18             MR. GARVERICH:  He's got it.
19        A    All right.  I've got it.
20        Q    And this is describing -- it says, "Clark
21   seemed to have an alibi for this time period, and
22   furnished names of persons that could vouch for him,
23   which we will check out later."
24        A    That's not in this.
25             MR. BOND:  Yeah, it is.  Right here.
```



1     A   Okay.  Okay.  Okay.

2     Q   And if you take a look at page 14, top of the

3 page.

4     A   If I can get it turned.

5         MR. BOND:  Here, let me get it for you, Joe.

6     A   Okay.

7     Q   Okay.  Just read the first full sentence.

8     A   Starting with, "Deputy Mike Cummings"?

9     Q   Nope.  You're right.  That is the first full

10 sentence.  The second full sentence, "Upon further

11 discussion."

12         MR. BOND:  We can't count here.

13     A   Okay.  What do you want to know?

14     Q   Okay.  You familiar with that.  I'm going to

15 ask you some questions in a minute.  I want to just -- I

16 want to familiarize you with --

17     A   Okay.

18     Q   -- some of the things that you're -- that you

19 determined.

20     A   Okay.

21     Q   So this is evidence of you determining that

22 both Clark and Hardin had good alibis for the initial

23 time of death, correct?

24         MR. BOND:  Object to the form of the question.

25     A   Uh-huh.



JOE GREER
CLARK vs LJCMG

November 04, 2019

162

1              MR. BOND:  Go ahead and answer.

2        Q    That's what you're stating in your report?

3        A    Uh-huh.

4        Q    Yes?

5        A    Yes.

6        Q    Okay.  And then, you even testified about this

7   in the grand jury?

8        A    Yes.

9        Q    In substance, you said, "They thought the

10  murder was Saturday night, but Clark had an alibi, so

11  they just kept working backwards.  He had an alibi for

12  Friday, and then Thursday.  On Wednesday, Keith and Jeff

13  were the only people who could vouch for each other."

14  And that's accurate, correct?

15       A    If it's in there it is, yes.

16       Q    Okay.  In other words, what you're saying is,

17  there were lots of people who could vouch for their

18  alibis on all days except for Wednesday, right?

19       A    I don't know.

20       Q    Well, we can take a look at it.  Let's look at

21  Exhibit 20, Page 161.

22       A    Yeah.

23            MR. GARVERICH:  Exhibit?

24            MR. KAMDANG:  20.

25            THE WITNESS:  What page?



1    BY MR. BRUSTIN:

2         Q    161.

3         A    Well, that's hard to turn.

4              MR. BOND:  When you say 161, your 161?

5              MR. BRUSTIN:  No.  It's the 161 of the

6         document.  It's our 189.  No it's -- it's MCS

7         189 --

8              MR. BOND:  Okay.

9              MR. BRUSTIN:  -- and then 161 at the bottom.

10             MR. BOND:  I just want the records, so we

11        can --

12             MR. BRUSTIN:  Yeah.  You're right.

13             MR. BOND:  -- all know what we're talking

14        about.  What do you want him to reference?

15   BY MR. BRUSTIN:

16        Q    The bottom of the page, it says, "Greer," and

17   then "We let him go back," and "alibi."  Do you see

18   that?  Let me know if you know where I'm reading from.

19        A    I don't see where --

20        Q    So read that, and then the next paragraph, and

21   then to the top of the next page.

22        A    Okay.

23        Q    So what you're saying here --

24        A    Uh-huh.

25        Q    What you're describing to the grand jury under



```
 1   oath --

 2        A    Uh-huh.

 3        Q    -- is that Clark and Hardin had very reliable

 4   alibis for the initial time of death, which is the night

 5   before, correct?  Night before the body was found?

 6             MR. ERVIN:  Objection to the form.

 7        A    I don't think I'm saying that.

 8        Q    What you're saying is they had alibis for --

 9   you investigated, and the only time period where they

10   didn't have alibis from people who could vouch for them,

11   they were only vouching for each other, was the

12   Wednesday night or Thursday morning?

13        A    Right.

14        Q    Okay.

15        A    They vouched for each other.

16        Q    Right.  Other than that, they had solid

17   alibis.  There were other times when other people were

18   vouching for them, correct?

19             MR. ERVIN:  Objection to form.

20        Q    And you believe them to be solid alibis?

21             MR. ERVIN:  Object to form of the question.

22             MR. BOND:  Objection to the form.

23        Q    I'm not asking you to read from this.  That's

24   your -- that was your belief, correct?

25        A    Yes.
```



JOE GREER                                    November 04, 2019
CLARK vs LJCMG                                            165

1       Q    Based on your investigation?

2       A    Yes.

3            MR. ERVIN:  Objection to the form.

4       Q    Okay.  And so in other words, that's why you

5   went back to the coroner to see if they could change --

6   if they could, consistent with science, change the time

7   of death, correct?

8            MR. ERVIN:  Objection to the form.

9       Q    You believe that if Keith Hardin and Jeff

10  Clark committed this crime --

11      A    Yes.

12      Q    Because they had good alibis after Thursday

13  morning, you believe the crime must have been committed

14  earlier, correct?

15           MR. ERVIN:  Objection to the form.

16      A    I relied on the coroner.

17      Q    Okay.  But you understood that if this crime

18  actually occurred on the 4th late at night, or the 5th

19  in the morning, as the coroner initially stated, you

20  understood that Clark and Hardin had good alibis for

21  those time periods?

22           MR. ERVIN:  Objection to the form.

23           MR. BOND:  Object to the form.  But go ahead

24      and answer.

25      A    Yes.



```
 1   BY MR. BRUSTIN:
 2        Q    You understood that if, in fact, the crime
 3   occurred on -- late at night on the -- at night on the
 4   4th, or in the morning of the 5th, when the body was
 5   found, Clark and Hardin didn't commit the crime,
 6   correct?
 7             MR. BOND:  Object to the form of the question.
 8        A    No.  I didn't form that opinion.
 9        Q    Well, you knew they good alibis for that time?
10        A    I don't know.  According to them.  No.
11        Q    According to the people you interviewed.
12   Remember?  You've already told us.
13        A    Right.  Right.  Okay.
14        Q    For those time periods, they had good alibis.
15             MR. BOND:  Well, let's not argue with each
16        other, okay?  Ask a question.  Let him answer.
17             MR. BRUSTIN:  I think he may have just been
18        confused about the time.
19        A    Yes, I was.
20   BY MR. BRUSTIN:
21        Q    You -- okay.  You understood that if the crime
22   occurred on the evening of 4-4, or the morning of 4-5,
23   when they had good alibis, they couldn't have committed
24   the crime, correct?
25        A    That's correct.
```



```
1        Q    And you stand by that today?

2        A    Yeah.

3             MR. BOND:  I think he needs to take a break.

4             MR. BRUSTIN:  I'm just about done.

5             MR. BOND:  No.  No.  I don't believe you.  No.

6             MR. BRUSTIN:  I really am.

7             THE WITNESS:  I believe him.

8   BY MR. BRUSTIN:

9        Q    Same book.

10       A    Okay.

11            MR. KAMDANG:  614.

12            MR. GARVERICH:  Did you say 614, then?

13            MR. KAMDANG:  614, yep.

14            MR. GARVERICH:  Your-all's number?

15            MR. KAMDANG:  Yep.

16  BY MR. BRUSTIN:

17       Q    Okay.  And by the way, you would agree that

18  the time to investigate alibis is as near in time to the

19  crime as you can, correct?

20       A    Yes.

21       Q    And you endeavor to do that, correct?

22       A    Tried to, yes.

23       Q    And you did a careful job of investigating

24  their alibis?

25       A    Tried to.
```



JOE GREER
CLARK vs LJCMG

November 04, 2019

168

1     Q    And you concluded that they had good alibis,

2  supported by lots of individuals, after Thursday

3  morning, correct?

4     A    Yes.

5          MR. ERVIN:  Objection to the form.

6          MR. BRUSTIN:  Oh, no.  Just the top stuff.

7      There.  All right.  Take a look at Page 6.  I'm

8      sorry.  So this is Exhibit --

9          MR. KAMDANG:  25.

10         MR. BRUSTIN:  25, our page 615.

11         THE WITNESS:  I got it.

12 BY MR. BRUSTIN:

13    Q    In the bottom of the page on 615 where it

14 says, "Interview of Timothy Tabb," do you see that?

15    A    Uh-huh.  Yes, sir.

16    Q    Could you just read the next page which

17 describes it, and then tell me when you're done?

18         MR. GARVERICH:  He can read it to himself.

19         MR. BRUSTIN:  Please.  Okay.  Where's the

20     information about that?

21         THE WITNESS:  Okay, sir.

22         MR. BRUSTIN:  Where is the other information?

23     Where is it quickly described?  I can just show him

24     quickly.  So you have that in mind?

25    A    Yeah.



```
 1   BY MR. BRUSTIN:
 2       Q    This is Timothy Tabb telling you in your
 3   unrecorded interview that --
 4       A    Not me.
 5            MR. GARVERICH:  Objection.
 6       A    Detective Handy.
 7       Q    Detective Handy.  I'm sorry.  Thank you.  This
 8   is Timothy Tabb telling Handy that the only reason he
 9   called Rhonda Sue Warford's house is because he got a
10   wrong number?
11       A    That's correct.
12       Q    Did that seem credible to you?  What other
13   information did you have about Timothy Tabb?
14       A    Didn't have that much.
15       Q    Well, you had information that he may have
16   reason to harass Rhonda Sue Warford, right?
17       A    That's correct.
18       Q    And did you find -- and that was credible
19   information, right?
20       A    Uh-huh.
21       Q    Yes?
22       A    Yes.
23       Q    So did you think that it was an amazing
24   coincidence that Timothy Tabb was alleged to have been
25   harassing Rhonda Sue Warford, but he told you the only
```



1  reason you called her house is because he got a wrong

2  number?

3        MR. BOND:  Object to form of the question.

4     A    He told Handy this, not me.

5     Q    But you were certainly reading the

6  information, right?

7     A    Yes.

8     Q    That's an amazing coincidence, right?

9        MR. BOND:  Object to the form of the question.

10    Q    Would you agree that's an amazing coincidence?

11 So if you take --

12       MR. BOND:  Wait.  You want to answer --

13       MR. BRUSTIN:  Well, he's not answering.

14       MR. BOND:   -- the pending question?

15 BY MR. BRUSTIN:

16    Q    Yeah.  I do.  Would you agree that's an

17 amazing coincidence?

18    A    Yes.

19    Q    All right.  Take a look at page 585, that's

20 our page numbers.

21       MR. BOND:  Do you want him to hang onto 616?

22       MR. BRUSTIN:  No.

23       MR. BOND:  I just --

24       MR. BRUSTIN:  No, thanks.

25       MR. BOND:   -- didn't wanted him to flip back



1    and forth.

2        MR. BRUSTIN:  Where is it?

3        MR. BOND:  And just a question, are the

4    markings on there your-all's, or were they ours,

5    meaning Joe's?  See the lines?  Are those your-

6    all's markings?

7        MR. BRUSTIN:  Yes.

8        MR. BOND:  Okay.

9        MR. BRUSTIN:  I don't -- actually, I don't

10   know.

11       MR. BOND:  Okay.  Okay.

12       MR. BRUSTIN:  I -- presumably.

13       MR. BOND:  Well --

14   BY MR. BRUSTIN:

15       Q    So 585, and I'd like you to start reading at

16   the bottom where it says, "Mr. Hardin then told me that

17   a girl."     So read that paragraph, and it ends in

18   this -- top of the next page.

19       A    Okay.

20       Q    All right.  So this is Keith Hardin allegedly

21   reporting that Tonya was giving out Rhonda's number --

22       A    Uh-huh.

23       Q    -- for boys to harass her, correct?

24       A    Yes.

25       Q    And that one of those boys was Tim?



1      A    Yes, according to the statement, yeah.

2      Q    Okay.  And now we know that, in fact,

3  according to Tim, he did call Rhonda Sue Warford, right?

4      A    Yes.

5          MR. BOND:  I object to the form of the

6      question.

7      Q    But he claims it was a wrong number, right?

8      A    Yes.

9      Q    Given the information that Keith Hardin is

10  providing here, that doesn't make any sense; does it?

11         MR. BOND:  Object to the form of the question.

12      Q    Let me ask you this way: As an experienced

13  investigator, when you look at Keith Hardin's

14  statement --

15      A    Go ahead.

16      Q    -- along with what Tim said to Handy, you

17  would agree it appears that Tim is lying?

18         MR. BOND:  Object to the form of the question.

19      A    I -- I can't say that.  I didn't --

20      Q    What did --

21      A    -- I didn't interview --

22         MR. BOND:  Let him finish, Nick.  Just because

23      you don't like the answer.

24      A    I didn't --

25         MR. BRUSTIN:  I like it actually.



1    A    -- I didn't interview him, Detective Handy

2    did, and I think at the end of that interview, he says

3    "I have no further."

4    Q    All right.  But you would agree that the

5    implication, if in fact -- if you've got information

6    that he's been given her number to harass her, he admits

7    to calling her and says it was a wrong number, that's

8    not a very plausible explanation, right?

9    A    No.

10    MR. BOND:  Object to the form of the question.

11    Go ahead and answer, though, if you can.

12    A    No.

13    Q    You agree it's not plausible?

14    A    Well, I cou --

15    MR. BOND:  Object to the form of the question.

16    Different question.

17    Q    Based on just -- I know you weren't there.

18    A    No.

19    Q    But based on reviewing these documents, you

20    would agree that Tim's explanation that he had a wrong

21    number is not plausible?

22    MR. BOND:  Object to the form of the question.

23    Go ahead and answer, Joe, if you can.

24    A    I can't answer that.  I don't know.

25    Q    You would -- you would agree that Tim Tabb



```
 1   need to be -- needs -- based on the information you see

 2   here, there should have been further investigation into

 3   him?

 4        A    I -- I can't say that, and -- and I won't.

 5        Q    Okay.  Now, would it be fair to say that this

 6   is the only case in your career -- withdrawn.  Can you

 7   think of any other case in your career where you asked

 8   the coroner whether or not they could change the date of

 9   death?

10        A    No.  I've never asked a coroner to do that.  I

11   didn't in this one.

12        Q    All right.  Can you think of any other case

13   where you went back to the coroner and said, are you

14   sure about the date of death?

15            MR. ERVIN:  Object to form.

16            MR. BOND:  Object to the form of the question.

17       You're confusing the coroner with the state medical

18       examiner.  Just so we can accomplish what's you're

19       trying to do.

20   BY MR. BRUSTIN:

21        Q    Are there any other cases that you're aware of

22   where you went to the state medical examiner --

23        A    I've never been to the state medical examiner.

24        Q    Well, in this case, you went to the coroner --

25        A    Uh-huh.
```



1      Q    -- and you asked if they were sure about the

2 time of death.

3          MR. BOND:   Object to the form of the question.

4      A    I -- I don't know that I did that or Bill

5 furnished it.   That's -- ask Mr. Adams.

6      Q    All right.   Would it be fair to say, though,

7 this is the only case you can recall where the date of

8 death in the coroner's report was subsequently changed?

9          MR. BOND:   Objection.

10          MR. GARVERICH:   Objection to form.

11      A    I -- I can't say that they were ever changed,

12 but to sit here and say that we didn't argue about it

13 sometimes will be different.

14      Q    Well, you understand that in the initial

15 reports, the date of death in your reports was listed as

16 the 5th, right?

17      A    Yes.

18      Q    And that later that changed, correct?

19      A    Yes.

20      Q    Can you think of any other case you were

21 involved in investigating where the date of death

22 changed?

23      A    I -- I can't think of one, but there could

24 have been.

25      Q    Can you think of any you sit here today?



1    A     No.

2    Q     Okay, that's it.  Thank you.

3          MR. BOND:  Okay.  Hold on.

4          THE WITNESS:  Thank you.

5          MR. BOND:  Where are we time-wise, please,

6    ma'am?

7          VIDEOGRAPHER:  Two hours, 46 minutes.

8          MR. BOND:  2:46, okay.

9          MR. BRUSTIN:  All right.  I say I'm done, but

10   I may -- depending on what you guys ask, I may have

11   some follow-up.

12         MR. BOND:  That's fair.  I'm not saying that.

13   I just wanted to -- I just wanted to get --

14   identify the time.  Let's take a break for a

15   second.  Let's talk logistics.

16         VIDEOGRAPHER:  The time --

17         MR. BOND:  Do you need -- do you want to take

18   a lunch break?

19         VIDEOGRAPHER:  The time is 12 --

20         THE WITNESS:  No.

21         MR. BOND:  I'm sorry.  Go ahead.

22         VIDEOGRAPHER:  The time is 12:44, and we are

23   off the record.

24             (OFF THE RECORD)

25         VIDEOGRAPHER:  The time is 12:45, and we are



```
 1        back on the record.
 2              MR. BOND:  You-all pick.
 3              MR. PELLINO:  I'll go ahead and get us
 4        started.  You're ready?
 5                        CROSS EXAMINATION
 6   BY MR. PELLINO:
 7        Q    Sheriff Greer, I'm Andrew Pellino.  I
 8   represent Detective Mark Handy.
 9        A    Yes, sir.
10        Q    All right.  I want to start with the Clifford
11   Capps letter.  It kind of moved very quickly, went
12   through some various points of time, and so I want to
13   make sure I've got it straight in my mind.  Did you ever
14   know of the existence of the Clifford Capps letter prior
15   to the trial of Mr. Hardin and Mr. Clark in 1995?
16        A    No.
17              MR. BRUSTIN:  Objection to form.
18        Q    Did you only become aware of the existence of
19   that letter after the trial of Mr. Hardin and Mr. Clark
20   in 1995, when it was brought to your attention by Bart
21   Adams?
22        A    That's correct.
23        Q    All right.  You were asked some questions
24   about things, whether or not you asked Mr. Capps in your
25   interview in December of 1992, specifically, whether or
```



1  not you'd asked him about that letter in 1992.  If you

2  didn't know about it till 1995 --

3        A     I didn't know about a letter.

4        Q     Let me finish my question.

5              MR. BOND:  Let him finish.

6              THE WITNESS:  Okay.

7        Q     If you didn't know about the letter until

8  1995, could you have possibly asked Clifford Capps --

9        A     No.

10       Q     -- about the letter in 1992?

11             MR. BRUSTIN:  Objection to form.

12       A     No.

13       Q     I think there was some semantics going on in

14 terms of this letter and seen versus read, and so I just

15 want to clear this up as well.  You said that the

16 letter, what you know now to be the letter, was handed

17 to you by Justis' mother sometime in 1995?

18       A     I some -- I don't know the date, but yes.  I

19 think the date's -- on something.

20       Q     But you never read the letter at that point?

21       A     No.  I did not read it.

22       Q     And you didn't really even read the letter

23 until this lawsuit came about?

24       A     I didn't read the letter till that nice lady

25 that you-all had for an attorney showed it to me, and I



JOE GREER
CLARK vs LJCMG

November 04, 2019
179

1    told her, "I never seen this letter before."

2        Q    Okay.

3        A    And I didn't halfway read it then.  I read it

4    better, I guess, when they showed it to me.

5        Q    And so when you say you didn't -- you hadn't

6    seen the letter, what you meant by that was that you

7    hadn't read the letter?

8        A    I hadn't read the letter.

9        Q    Okay.  I think in the first part of your

10   deposition, you were asked some questions about a

11   relationship that Cliff Wise may have had -- a business

12   relationship that Cliff Wise may have had with Clifford

13   Capps.  And I think Mr. Wise cleared this up in his

14   deposition that that relationship was sometime after

15   these events, but my question to you is, do you have any

16   knowledge -- did you have any knowledge of Clifford

17   Wise's business dealings in and around the time that

18   this case was going on?

19            MR. BRUSTIN:  Objection to form.

20       A    Not really, except bum a porta potty for my

21   sister down on the farm.

22       Q    Okay.

23       A    I didn't keep up with the porty pot business.

24   But he had a good business.

25       Q    Was he even operating that porta potty



1  business when this case was being investigated in 1992?

2       A    I'm not even sure.

3       Q    Would you have known --

4       A    Good question.

5       Q    -- then -- yeah -- who his business associates

6  were?  Who his employees were or anything like that?

7       A    Him and -- a gentlemen by the name of Stan

8  Hessler become partners and formed this business, and

9  they ultimately broke up.

10      Q    Do you know when they formed that business?

11      A    I have no idea, sir.

12      Q    Several points throughout your deposition, you

13  had indicated that your investigation had concluded at a

14  certain point in time, that from that point forward, it

15  was Kenton Smith that was directing --

16      A    Uh-huh.

17      Q    -- investigative steps in the investigation;

18  is that accurate?

19      A    That's correct.

20      Q    Okay.

21           MR. BRUSTIN:  Objection to form.

22      Q    When, in your mind, did your investigation

23  complete?  Was that the time of the arrest and the

24  arraignment of Mr. Clark and Mr. Hardin?

25      A    Yes.



1      Q    All right.  And I think your omnibus report

2   that we've been looking at today concludes with the date

3   May 7th of 1992.  Does that sound about the time that,

4   in your mind, that your investigation would have

5   concluded?

6      A    I'd say so.  I'm not real positive of it.

7      Q    So in terms of the investigative steps from

8   that point going forward, would it have been Ken Smith

9   that would've been directing you and what he wanted to

10  do in terms of that investigation?

11     A    Oh, he could have been directing me or even

12  another police officer.  But he would normally come back

13  to me because I was the case officer.

14     Q    I think the discussion with Mr. Justis took

15  place -- at that point after you had completed your

16  investigation, it was now being directed by Kenton

17  Smith.  Is that --

18     A    What's that now?

19     Q    -- accurate?  The discussion that you had with

20  Mr. Justis?

21     A    Yes.

22          MR. BRUSTIN:  I'm sorry.  I apologize.  I --

23          MR. BOND:  Well, that's what you get.

24          MR. BRUSTIN:  I know.  Well, I didn't -- I --

25          MR. BOND:  Go ahead.



1          MR. BRUSTIN:  I didn't really understand the

2      question.  I think it got broken up.

3          MR. PELLINO:  I'm still in the midst of asking

4      it.

5          MR. BRUSTIN:  That's why.

6          MR. PELLINO:  Yeah.

7          MR. BRUSTIN:  I should be quiet then.

8   BY MR. PELLINO:

9      Q    No, that's all right.  So the time that you

10  met with Mr. Justis, at that point in time, it was Ken

11  Smith that was directing you in terms of what he wanted

12  for that investigation at that point?

13     A    Yes, we talked about it.

14         MR. BRUSTIN:  Objection to form.

15     A    And they got them both in Breckinridge County.

16  They were lodged in other facilities in other places.

17     Q    I think in the first part of your deposition,

18  maybe again here this morning, you were asked about the

19  efforts that you made to corroborate or to vet further

20  what Mr. Capps was telling you.  Was one of those

21  efforts going and trying to speak with Mr. Justis?

22     A    That's correct.

23     Q    And you were told that he wouldn't talk to

24  you; is that accurate?

25     A    He told me himself he wouldn't talk to me.



```
1   Outside of the grand jury room, Breckinridge County
2   Courthouse.
3        Q    And in terms of talking to the other
4   individuals that may have been in the cell or may have
5   overheard something at the jail, at that point in time,
6   when you were talking to Mr. Capps and Mr. Justis, was
7   it Kenton Smith that would have been the one to say,
8   "Hey, go talk to Mr. Mabry," or go talk to whoever?
9            MR. BRUSTIN:  Objection to form.
10       Q    Would it have been his call at that point?
11       A    Well, it could have been my call too.
12       Q    There was some questions about what's been
13  termed to be a pre-interview discussions that you may
14  have had with witnesses before you began the tape
15  recording or before you began to record a note.  Would
16  you have ever shared details of your investigation with
17  the witness during the pre-interview to try to prejudice
18  or influence what they were going to tell you during the
19  interview?
20           MR. BRUSTIN:  Objection to form.
21       A    The people that I interviewed already knew
22  about it.  I didn't have to tell them.
23       Q    Was that a tactic of yours to, in a pre-
24  interview, tell the witness certain --
25       A    No.
```



1    Q    -- details that they wouldn't otherwise know

2    unless you told them?

3    A    No...

4         MR. BRUSTIN:  Objection to form.

5    Q    That wasn't something that you did?

6    A    No.  That's something you normally wouldn't

7    do.

8    Q    We looked at your trial testimony from July of

9    2015, and I think you said in the first part of your

10   deposition that you were there in body, but you weren't

11   there in mind.

12   A    That day was --

13   Q    What did you mean by that, sir?

14   A    My mind was on my wife, that they had rushed

15   her to Norton's Hospital in Louisville, which

16   ultimately, she lived for a little while longer and

17   passed away.  That's where my mind was at, and I got the

18   Commonwealth Attorney -- attorney, and the Attorney

19   General's office was representing Meade County or --

20   whatever, for this hearing, to please get me on and get

21   me out of there.  Well, they didn't do it, and your

22   attorney apologized for it.

23   Q    Do you think that that affected --

24   A    I wasn't there --

25   Q    I'm sorry.  Go ahead.



1       A    -- I wasn't there.  No.

2       Q    Did that --

3       A    I don't even know half of what I even said.

4       Q    Do you think that affected the way you

5    testified in July 2015?

6            MR. BRUSTIN:  Objection to form.

7       A    There's no doubt it did.  Sitting there

8    worrying about your wife you been married 50-something

9    years.

10      Q    Despite that, did you do your best to testify

11   truthfully and --

12      A    I tried to.

13      Q    -- honestly and answer all the questions you

14   were asked?

15      A    -- and thank God for their --

16           MR. BOND:  Let him finish.  Go ahead, Andrew.

17      Q    Sure.  Despite that, did you do your best to

18   try to testify honestly and thoroughly answer the

19   questions you were asked?

20      A    I tried to, with their attorneys' help.

21      Q    In the first part of your deposition, you were

22   asked about information that you gave to the grand jury,

23   and the criticism, as I remember it, was that you were

24   testifying about medical knowledge or giving medical

25   opinions, and specifically regarding that the victim in



1   this case, Rhonda Warford, hadn't been sexually

2   assaulted.  Do you remember that line of questioning?

3       A    Yes.

4       Q    All right.  Were you the only witness who

5   testified to the grand jury?

6       A    Yes.

7       Q    Were you relaying that information based upon

8   what you were told by the medical examiner and the

9   coroner?

10          MR. BRUSTIN:  Objection to form.

11      A    That's correct.

12      Q    All right.  So in that scenario, you weren't

13  giving an opinion, you were relaying information --

14      A    Information.

15      Q    -- from the investigation that had been done

16  by the coroner and the medical examiner who could make

17  that determination in terms of sexual assault; is that

18  accurate?

19      A    That's correct.

20          MR. BRUSTIN:  Objection to form.

21          MR. PELLINO:  We've looked at some of the

22      investigative letters.  I want to give you -- and

23      I'll make these the first, second, and third

24      Exhibit to your deposition.

25          MR. BOND:  These have already been introduced,



```
 1          is that what you're saying?
 2               MR. PELLINO:  I'm not sure if they have or
 3          not.  I think we've referred to them.  I don't know
 4          if they were made an exhibit or not.
 5               MR. KEMDANG:  If you are in sequential --
 6               MR. PELLINO:  But this is the --
 7               MR. KEMDANG:   -- with your last exhibit was
 8          Exhibit 8.  You have 9 now there.
 9     BY MR. PELLINO:
10          Q    This is the investigative letters from April
11     6th, April 8th, and April 9th of 1992.
12               MR. BRUSTIN:  What is this?  I'm sorry.
13               THE WITNESS:  Are investigative letters.
14               MR. BRUSTIN:  What page?
15               MR. PELLINO:  It's Bates LMPD 00399 through
16          00402.
17               MR. BRUSTIN:  Are you marking it?
18               MR. PELLINO:  Yeah.  I'm going to mark those
19          Exhibit 1, 2, and 3.
20               MR. BRUSTIN:  Are you going to give us one?
21               MR. PELLINO:  Sure.
22               MR. BRUSTIN:  Okay.  So I have it handy.
23          It'll be easier.
24               MR. PELLINO:  Yeah.
25               MR. BRUSTIN:  Thank you.
```



```
 1        MR. PELLINO:  I was just trying to --
 2        MR. BRUSTIN:  Fine.  We've got --
 3        MR. PELLINO:   -- I've got so many copies of
 4   these floating around.
 5        MR. BRUSTIN:  I can find it, but this is
 6   easier if you don't mind.
 7        MR. PELLINO:  Sure, I don't mind.
 8        MR. BOND:  Do you want to mark them
 9   individually or collectively?
10        MR. PELLINO:  Individually, 1, 2, and 3.  Here
11   you go there.
12        MR. BRUSTIN:  This is 2?
13        MR. PELLINO:  That's 3.
14        MS. ROBINSON-STAPLES:  Andrew, we had been
15   doing the exhibits sequentially, in a running
16   order.
17        MR. BRUSTIN:  Yeah, you --
18        MS. ROBINSON-STAPLES:  We've gone through the
19   first few depositions.
20        MR. KEMDANG:  Or it's just 9, 10, 11?
21        MR. PELLINO:  There's not going to be
22   another 1.
23        MR. KEMDANG:   -- because of the last
24   plaintiffs -- the last defense Exhibit was 8.
25        MR. PELLINO:  I'm okay keeping them
```



1    collectively.  So we're on 28, 29 and 30?

2        MR. KEMDANG:  No, no, no.

3        MR. BOND:  No.

4        MR. KEMDANG:  Because the defendant's last one

5    was 8, so that this would be 9, 10 and 11.

6        MR. PELLINO:  Thank you.  Okay.

7        MR. KEMDANG:  Yeah.

8        MR. PELLINO:  All right.  Yeah, that's fine.

9        MR. BRUSTIN:  Just give us the dates, which is

10   which.

11       MR. PELLINO:  8 will be the April 6, 1992,

12   LMPD --

13       MR. BOND:  Number 9.

14       MR. BRUSTIN:  9.

15       MR. BOND:  Number 9, what we --

16       MR. PELLINO:  That would be a 9?  All right.

17   9 will be the April 6,1992 and it's Bates LMPD399

18   through 402, 10 will be April 8th, 1992 Bates

19   LMPD385 through 387 and 11, April 9, 1992 Bates 388

20   through 391.

21       MR. BRUSTIN:  I'm missing 10.

22       MR. PELLINO:  Here you go.

23       MR. BRUSTIN:  Thanks.

24       MR. BOND:  Do you have stickers so I can mark

25   it.



 1              COURT REPORTER:  The stickers are right here.

 2              MR. BOND:  Just blank ones?

 3              MR. PELLINO:  Do you have the stickers?

 4              VIDEOGRAPHER:  Here we go.

 5              MR. PELLINO:  Thanks, Keith.

 6              MR. BOND:  Yes, sir.

 7              MR. GAVERICH:  Andrew, I think Exhibit 10 has

 8      already been identified as Exhibit 7.  Does that

 9      sound right, Larry?

10              MR. KAMDANG:  4-9-92 report, Interview with

11      Mary Warford by Handy is 7.

12              MR. GAVERICH:  And it's --

13              MR. KAMDANG:  Is that what 10 is?

14              MR. PELLINO:  No.  10 is the Jeff Clark.

15              MR. GAVERICH:  Oh, I apologize.

16              MR. PELLINO:  That's all right.

17              MR. BOND:  You can go ahead.

18              MR. GAVERICH:  I'm sorry number 11.  I'm

19      sorry.

20              MR. BOND:  Go ahead and ask if you wish.

21      BY MR. PELLINO:

22        Q    Yeah.  So Sheriff Greer, what I've handed you

23      what we've now marked as Exhibits 9, 10, and 11,

24      collectively, the defense exhibits, are the

25      investigative letters by Detective Mark Handy from April



```
 1   6, 1992, and that was an interview that was done with
 2   Jeff Clark that you and Mr. Adams were present for.
 3   April 8, 1992, interview of Jeff Clark that you and Mr.
 4   Adams were present for again, and then April 9, 1992,
 5   interview of Keith Hardin that you were present for.
 6   Detective Handy testified at the trial of Keith Hardin
 7   and Jeff Clark about the contents of these investigative
 8   letters in the interviews that were done with Mr. Hardin
 9   and Mr. Clark.
10                    (EXHIBIT 9 MARKED FOR IDENTIFICATION)
11                    (EXHIBIT 10 MARKED FOR IDENTIFICATION)
12                    (EXHIBIT 11 MARKED FOR IDENTIFICATION)
13        Q    Do you recall him testifying about that at the
14   trial?
15        A    I was in there for part of it.
16        Q    All right.  And then you testified after him,
17   and you were asked about whether or not you had heard
18   his account of these interviews and whether or not those
19   were accurate.  Do you remember testifying that you had
20   heard his account --
21        A    Yes.
22        Q    -- that you believe him to be accurate?
23        A    Yes.
24        Q    All right.  Is that still your opinion today?
25        A    Yes.
```



1          MR. BRUSTIN:  Objection to form.

2     Q    And with respect to those investigative

3  letters, you were receiving copies of those throughout

4  the course of your investigation of Mr. Clark --

5     A    Yes, I was.

6     Q    -- and Mr. Hardin?

7          MR. BOND:  Let him finish.

8     A    Yes.

9     Q    And were you reviewing those?

10    A    Yes.

11    Q    If there had been something in the

12 investigative letters from Detective Handy to you that

13 was either inaccurate or untruthful, would you have

14 brought that to the attention of someone?

15    A    Yes.

16    Q    Would you have brought that to the attention

17 of maybe Detective Handy?

18    A    Detective Handy or Lieutenant Gerard.

19    Q    One of his superiors?

20    A    Uh-huh.

21    Q    Did that ever happen?

22    A    No.

23    Q    And you never had to do that because the

24 information in these investigative letters was accurate

25 as you recalled it --



```
 1        A    As I recall it.

 2        Q    -- being present for those; is that true?

 3        A    Yes.

 4        Q    Were the investigative letters, those reports

 5   -- we talked about the grand jury -- were those ever

 6   submitted to the grand jury or was it just your

 7   testimony?

 8        A    My testimony.  They were in the file.  I'm

 9   sure of that.  Kenton's file.

10        Q    Now, were the investigative reports ever

11   submitted to the judge to secure the arrest warrant for

12   Mr. Clark or Mr. Hardin?

13        A    No.

14        Q    They wouldn't have been, right?

15        A    No.

16        Q    When the arrests of Mr. Hardin and Mr. Clark

17   were made, were those made in good faith?

18        A    Yes, in Jefferson County.

19        Q    In arresting them, did you believe that your

20   actions were lawful and proper?

21        A    Yes.

22        Q    Did you believe that Mr. Hardin and Mr. Clark

23   had committed arrestable offenses at the time that you

24   arrested them?

25        A    My opinion --
```



1          MR. BRUSTIN:  Objection to form.

2     A     -- they had.

3     Q     And you wouldn't have sought out the arrest

4  warrants if you didn't believe that, right?

5     A     Well, the county attorney, the late Judge

6  Miller, and the late Mr. Watts, they agreed they were.

7  They signed them.

8     Q     Did you make those arrests for the purpose of

9  depriving Mr. Hardin or Mr. Clark of their

10  constitutional rights?

11    A     No.

12         MR. BRUSTIN:  Objection to form.

13    Q     Did you make those arrests because you were

14  harboring any malice or ill-will towards Mr. Hardin or

15  Mr. Clark?

16         MR. BRUSTIN:  Objection to the form.

17    A     No.

18    Q     Did you make those arrests because you wanted

19  to harm Mr. Clark or Mr. Hardin in any way?

20    A     No.

21    Q     Did you believe there's probable cause to make

22  those arrests?

23    A     Yes.

24    Q     During your involvement with Detective Mark

25  Handy in the investigation of Mr. Clark and Mr. Hardin



1  for the murder of Rhonda Warford, did you ever observe

2  or learn from some other means that Detective Handy had

3  fabricated any evidence against Mr. Clark or Mr. Hardin?

4      A    No.

5      Q    Did you ever hear, observe, or learn from some

6  other means that Detective Handy had failed to document

7  and disclose material, exculpatory, and impeachment

8  evidence to the prosecutors?

9      A    No.

10     Q    How about that he had ever destroyed any

11 evidence?  Did you ever hear that or observe that?

12     A    No.

13     Q    How about that Detective Handy fed Mr. Hardin

14 or Mr. Clark non-public details about the crime, and

15 then falsely claimed that the details had come from

16 them?  Did you ever --

17     A    No.

18     Q    -- see him do that --

19     A    No.

20     Q    -- or observe him do that or hear --

21     A    No.

22     Q    -- him doing that?  Going back to the grand

23 jury testimony -- I'll make this -- I guess we're on 12

24 now.

25          MR. BOND:  Yes, it would be.



```
1              MR. KAMDANG:  It's 30 and it's --

2              MR. BRUSTIN:  You marking the grand jury

3        testimony?

4              MR. PELLINO:  Yeah.

5              MR. BRUSTIN:  You've already marked it.

6              MR. PELLINO:  What's the exhibit?

7              MR. KAMDANG:  Number's 20.  Give me one

8        second.  Exhibit -- Plaintiff's Exhibit 20.

9              MR. BOND:  20?

10             MR. GAVERICH:  Yes.

11             MR. KAMDANG:  20.  Yeah.

12  BY MR. PELLINO:

13       Q    All right.  Exhibit 20, here's a copy of the

14  page I want to ask you about.

15             MR. BOND:  Just for the record, plaintiffs.

16       Is this a portion of that, Andrew?

17             MR. PELLINO:  It is, yeah.  And --

18             MR. BOND:  Just for the record, it's

19        identified as Hardin 444 outside of an exhibit

20        identification.

21  BY MR. PELLINO:

22       Q    And then the pagination at the bottom is 159.

23  And just to orient you, this is your description of the

24  night that you spoke to Ms. Warford's family after

25  identifying the body, or prior to identifying the
```



1  body --

2      A    Prior to that.

3      Q    -- but talking to the family when you had

4  suspected that it was Rhonda Warford.  And what they

5  told you was, and this is your testimony to the grand

6  jury, "There is no use for us to try to get too much out

7  of them, except that they hated Keith Hardin.  They

8  hated Jeff Clark so bad, it was pathetic.  I mean 'I

9  think they're in satanic.  They got my daughter into

10  satanic worshiping. They liked to kill animals.'"  Is

11  that an accurate representation of what Rhonda Sue

12  Warford's family told you that night?

13          MR. BRUSTIN:  Objection to form.

14      A    Well, what they told the Louisville detective.

15  I wasn't there when this was done.

16      Q    Would you have told the grand jury that if

17  that wasn't accurate information?

18      A    No.

19          MR. BRUSTIN:  He just said he wasn't there.

20          MR. BOND:  Is that an objection?

21          MR. BRUSTIN:  That was an, "Are you kidding?"

22  BY MR. PELLINO:

23      Q    Was that accurate representation of what the

24  Louisville Metro detective told you that the family

25  said?



```
 1              MR. BRUSTIN:  Objection to form.
 2       A    It's what they wrote, yes, sir.
 3       Q    So the day that Rhonda's body was found, you
 4  or her family at least, was representing to the police
 5  that Keith Hardin and Jeff Clark practice Satanism; is
 6  that accurate?
 7              MR. BRUSTIN:  Objection to form.
 8       A    Yes, and they represent that.
 9       Q    And that they like to kill animals?
10              MR. BRUSTIN:  Objection to form.
11       A    Yes.
12       Q    If we go on, testimony follows, "You know, and
13  then they -- I think that night maybe it was the next
14  day, I got out that Rhonda broke up their friendship
15  back in December of '91 when they lived -- Jeff Clark
16  and Hardin lived in a trailer.  Rhonda came between that
17  friendship.  And I think he came out there for Ms.
18  Warford that night and maybe her, one of her daughters.
19  They got back together three weeks prior to her being
20  missing."  Is that accurate representation of --
21       A    Yes.
22       Q    -- what you learned from the family?
23              MR. BRUSTIN:  Objection to form.
24       A    Yes.
25       Q    So they were telling you that they believed
```



1  that Rhonda Sue Warford was responsible for coming

2  between the friendship of Mr. Clark and Mr. Hardin?

3         MR. BRUSTIN:  Objection to form.

4     A    And say anyway to that, yes.

5     Q    And that the two of them, Mr. Hardin and Mr.

6  Clark, had apparently reconciled this friendship --

7     A    Yes.

8     Q    -- three weeks before Rhonda was murdered?

9     A    Yes.

10        MR. BRUSTIN:  Objection to form.

11    Q    I'm going to ask you about the -- Ms. Barnes

12 again.  In your account of this report and this -- I've

13 got this as Bates NSC1143.  I think there was a

14 different pagination with the exhibits, but I'll hand

15 you a copy of it.

16    A    Okay.

17    Q    Kind of midway down that second paragraph,

18 "She stated that he was in that satanic stuff, that he

19 was getting Rhonda in it.  She stated that Rhonda was

20 crazy about Keith and that Rhonda had told her she felt

21 that Keith was trying to break it off.  That Rhonda

22 stated that she'd been telling Keith that she was

23 pregnant, and --

24    A    Uh-huh.

25    Q    -- Keith didn't like that."  Do you recall Ms.



1  Barnes telling you that?

2      A    I recall Ms. Barnes telling me that, yes.

3      Q    Did you hear from other witnesses about a

4  belief that Ms. Warford had that she was pregnant in or

5  around the time that she was murdered?

6           MR. BRUSTIN:  Objection to form.

7      A    I -- I -- I vaguely remember somewhere I'd

8  heard it.  I don't even know who from, but didn't turn

9  out that way so just dropped it.

10     Q    It didn't turn out that way that she was --

11     A    She was pregnant.

12     Q    -- pregnant?

13     A    Yeah.

14     Q    Do you recall there being a concern that

15  perhaps one of the motivations for Mr. Hardin to kill

16  Ms. Warford was that she was pregnant and he didn't want

17  to have a baby or didn't want her to have a baby?

18          MR. BRUSTIN:  Objection to form.

19     A    I didn't really hear that.

20     Q    All right.  Going on to Ms. Barnes, "Also

21  according to Crystal she was sure that Keith Hardin

22  smacked Rhonda around before." Do you recall her telling

23  you that?

24     A    Yes.

25     Q    "As for Jeff Clark, Crystal stated that Rhonda



1  did not like him.  She also stated that Keith and Jeff

2  had parted friendship for a while, that she was sure

3  that it was over Rhonda, but they had gotten back

4  together in the last three weeks."

5      A    Uh-huh.

6      Q    Do you remember Ms. Barnes telling you that?

7      A    Yes.

8      Q    And that sort of echoed what you had heard

9  from Ms. Warford's family, correct?

10     A    Yes.

11     Q    About their friendship?

12     A    Yes.

13     Q    That Rhonda had at some point had gotten in

14 between the friendship of Mr. Hardin and Mr. Clark?

15     A    Yes.

16     Q    And that they had apparently reconciled that

17 friendship just three weeks before she was murdered?

18         MR. BRUSTIN:  Objection to form.

19     A    Yes.

20     Q    We looked at Ms. Rogers' statements to you

21 earlier, and I think we reviewed these that she told you

22 that both Mr. Hardin and Mr. Clark practiced Satanism,

23 that they had killed animals and that they had lots of

24 knives.  Is that --

25     A    Yes.



```
 1        Q    -- accurate in your interview of her?
 2        A    Yes.
 3        Q    She also told you that Rhonda wanted to get
 4   pregnant and that Keith would get mad when Rhonda would
 5   tell him that she had missed her period.  Do you
 6   remember her telling you that?
 7        A    I remember that part, yes.
 8        Q    And that sort of matched what you had heard
 9   from Ms. Barnes about Rhonda being pregnant, Keith
10   trying to break it off with her?
11        A    Yes
12        Q    Did you just make these things up in --
13        A    No.
14        Q    -- your statements from these witnesses?
15        A    It'd be hard to make up.
16        Q    Would you have had any motivation to --
17        A    No.
18        Q    -- to make these things up?
19             MR. BOND:  Let him finish.
20        A    No motivation.
21        Q    Were you lying when you made these recordings
22   of what these witnesses told you about what they said to
23   you?
24             MR. BRUSTIN:  Objection.
25        A    No.
```



```
 1              MR. BRUSTIN:  What recording?

 2      A    No.

 3      Q    I'm going to make this the next -- well, this

 4  is still part of your omnibus report, and this is the

 5  memorialization of your conversation with Tonya Greer.

 6              MR. BOND:  Isn't that previously introduced.

 7              MR. BRUSTIN:  Yeah, this is his omnibus

 8      report.

 9              MR. BOND:  Okay.

10  BY MR. PELLINO:

11      Q    MSC1146.  Did you review that entire statement

12  earlier when you were being asked questions, Sheriff

13  Greer, earlier today?  If you didn't, take a minute and

14  look at that statement.  Let me know when you're

15  finished.

16      A    Yes.

17      Q    Is that accurate memorialization of what Ms.

18  Greer told you?

19              MR. ROSENE:  Objection to form.

20      A    Ms. -- well, it used to be Torel, Ms. Greer

21  was interviewed by Joe Greer and Bill Adams.  And I

22  believe it was both Tonya Greer and James Terrell who

23  had been brought to their -- in for their interview.  It

24  was also decided that Detective Greer and William Adams

25  would interview Torel, and Detective Handy and myself
```



```
 1   would interview Greer.  The interview took place at
 2   approximately 16:00.  That's what I was looking for.
 3        Q    If you go midway down, that first paragraph it
 4   says, "On one occasion she heard Keith tell Rhonda that
 5   if she ever cheated on him he would kill her."  Do you
 6   recall Ms. Greer telling you that?
 7        A    I remember -- I think it was Hope Greer or
 8   Bill Adams told me that.
 9        Q    Would you have put that in your report if they
10   hadn't --
11        A    Yes.
12        Q    -- given you that information?
13        A    That's why it's there.  I didn't -- they's
14   statements to them because I didn't interview them.
15        Q    It goes on, "And Greer said she was aware that
16   Keith and Jeff were in devil worship, that she advised
17   Rhonda to get out of it.  Also, Greer was aware that
18   Keith had put the inverted cross on Rhonda."  Do you
19   recall that --
20        A    Yes.
21        Q    -- information being provided to you?
22        A    I recall that.
23             MR. PELLINO:  I don't think this has been
24        introduced yet as an exhibit.  This is the
25        statement that you took from Ms. Remsburg?
```



```
 1        MR. BOND:  For the record, what he's handed me
 2   is identified as LMPD00525.
 3        MR. BRUSTIN:  What's this going to be?
 4        MR. PELLINO:  Has this been introduced as an
 5   exhibit yet?
 6        MR. BRUSTIN:  I think so -- I'm not sure.
 7        MR. KAMDANG:  I don't think it has been.  No.
 8        MR. BRUSTIN:  So you might as well mark it
 9   just in case.
10        MR. KAMDANG:  Mr. Garverich was right.  That
11   11 was previously marked as Defendant's Exhibit 7
12   so --
13        MR. BOND:  Remsburg statement.
14        MR. KAMDANG:  No.  What was previous -- what
15   he tried to admit as 11 was already marked as 7.
16   So I repose marking this as 11.
17        MR. PELLINO:  Let's just keep it the way it is
18   and we'll have the one duplicate.  I'll try to -- I
19   had forgotten that we --
20        MR. BOND:  We'll have a duplicate --
21        MR. KAMDANG:  It's fine.
22        MR. PELLINO:   -- we'd had running exhibits.
23   I'll, in the future be mindful of that.
24        MR. KAMDANG:  Defendant's Exhibit 12.
25   (DEFENSE EXHIBIT 12 MARKED FOR IDENTIFICATION)
```



1  BY MR. PELLINO:

2      Q    All right.  So this is page 24 of the recorded

3  statement that you took from Ms. Remsburg.  Your

4  question: "While Jeff and you were together, let's say

5  at the trailer.  Let's go there first.  Did he ever talk

6  to you about him and Keith or him and anybody else?"

7  Then Amy Remsburg, her answer, "Yes.  He told me that a

8  cat and a dog at one time they killed it to do something

9  for satanic stuff.  I mean, like I said, he told me that

10  if he could kill somebody it would be a challenge.  That

11  would be a challenge to him.  And I said 'Jeff, why

12  would it be a challenge?' 'Just to see if I could get

13  away with it, just to see if I could really do it.'"  Do

14  you recall Ms. Remsburg telling you that she had heard

15  about Mr. Clark killing animals?

16      A    She told me about it.

17          MR. ROSENE:  Objection to form

18      Q    Does this statement that we have -- does this

19  accurately reflect what Ms. Remsburg told you on the day

20  of your interview?

21      A    Yes.

22          MR. BRUSTIN:  Objection to form.

23      Q    Do you recall her telling you that Mr. Hardin

24  and Mr. Clark practiced Satanism?

25      A    Yes.



JOE GREER                                          November 04, 2019
CLARK vs LJCMG                                                  207

```
 1      Q    Was that a common thing that you would hear
 2   from witnesses during your investigation of Mr. Clark
 3   and Mr. Hardin?
 4           MR. BRUSTIN:  Objection to form.
 5      A    Most of them.  Yes.  Yes.
 6      Q    Were you telling those witnesses to say that
 7   about Mr. Clark and Mr. Hardin?
 8      A    No.  They didn't tell me.  A lot of it, they
 9   told LPD detectives.
10           MR. BOND:  Are you okay?
11           THE WITNESS:  Yeah.
12           MR. GARVERICH:  You want to take a break?
13           THE WITNESS:  No.
14           MR. GARVERICH:  Okay.
15           THE WITNESS:  No.  Get it over with.
16   BY MR. PELLINO:
17      Q    We've -- and I don't want to belabor this.
18   We've heard a lot about the Capps letter, and we've
19   heard Justis' interpretation of that letter.  Have you
20   heard the saying that no coin is so thin that it doesn't
21   have two sides.  Have you heard that?
22      A    Oh, I've heard that.  I've heard it before.
23      Q    Has anyone ever --
24           MR. BOND:  I need relevance, that's a good
25           question.
```



```
1        Q    -- shown you what Mr. Capps has said about
2    what that letter meant?  I mean he's the author.  Right?
3        A    Well, I looked at it --
4             MR. PELLINO:  Don't --
5             MR. BOND:  Don't share that.
6             MR. PELLINO:   -- that was a bad question.
7             MR. GARVERICH:  He's not asking that Joe.
8             MR. PELLINO:  Out you outside of you --
9             MR. BOND:  You pointed at me.  I was afraid he
10       was going to s --
11   BY MR. PELLINO:
12       Q    Outside of your counsel, you've not seen Mr.
13   Capps' testimony about what he meant by that letter?
14       A    No.
15            MR. BRUSTIN:  Objection to form.  Well, if he
16       saw it with counsel, that's not privileged.
17            MR. BOND:  I didn't say that.
18            MR. BRUSTIN:  That was the question.
19   BY MR. PELLINO:
20       Q    Are you aware that Mr. Capps has testified
21   that what he meant by that letter was asking Mr. Justis
22   to tell the police what Mr. Justis had previously told
23   him about Mr. Hardin and Mr. Clark?
24            MR. BRUSTIN:  Objection to form.
25       A    I didn't know that.
```



1    Q    Have you ever had witnesses that you had

2    talked to in the course of investigation, that have told

3    you things that, then later, when it came time to

4    testify and face a potential perpetrator of a crime,

5    they had kind of second thoughts, got cold feet, or kind

6    of amnesia about what they had previously told you?

7            MR. BRUSTIN:  Objection to form.

8    A    Numerous.

9    Q    That's happened to you before?

10   A    To include police.

11           MR. PELLINO:  That's all the questions I have

12      for you.  Thank you.  I appreciate it.

13                (OFF-THE-RECORD CONVERSATION)

14                     EXAMINATION

15   BY MR. ROSENE:

16   Q    Sheriff, I'm Peter Rosene, and I represent

17   Robert Thurman.  I just have a couple of questions for

18   you.  You said in your last deposition, I believe, that

19   you do know Robert Thurman.

20   A    I know him quite well.

21   Q    Okay.  And as I recall, you said that you know

22   him professionally, but not exactly personally, correct?

23   A    I knew him personally when he lived in Midway,

24   which is part of Meade County.

25   Q    Okay.  What were your personal interactions



1    with him?

2         A    Just friends.

3         Q    Can you elaborate on that?

4         A    No.  I can't.  I was Sheriff, and he went to

5    work for the state police.

6         Q    Okay.  So -- and I believe also from the last

7    deposition you said that other than the Warford

8    investigation, most of what Mr. Thurman did for you was

9    drug testing; is that correct?

10             MR. BOND:  Objection to form.

11        A    Yes.  And hair testing.

12        Q    And hair testing?

13        A    Yes.

14        Q    Okay.

15        A    Before that it was drug.

16        Q    Sorry?

17        A    Before that was drug --

18        Q    Okay.

19        A    -- well, drug testing.

20        Q    What kind of drug testing?

21        A    All.  You name it.

22        Q    Okay.

23        A    Heroin, cocaine, meth, marijuana.

24        Q    Okay.  Let's see.  And I believe -- did you

25    also say that Mr. Thurman lived in Meade County briefly



1   at one time?

2        A    At one time he did.

3        Q    Okay.  Was that during the Warford

4   investigation?

5        A    No.  It was prior.

6        Q    Prior to?

7        A    Yes.

8        Q    Okay.  You don't happen to know around what

9   time that was, do you?

10       A    No I don't.

11       Q    Okay.  All right.  Now, can you explain your

12  understanding of Mr. Thurman's role in the 1992

13  investigation of Ms. Warford?

14       A    Well, there was hair samples sent to him.

15  Also clothing to see if they could get anything off of

16  it.  A lot of clothing and et cetera like that.

17       Q    Okay.  How frequently would you say that you

18  interacted with Mr. Thurman over the course of the

19  initial 1992 investigation of the Warford murder leading

20  up to the 1995 trial?

21       A    Just a few times.  That was about it.

22       Q    What did you-all discuss during those

23  interactions?

24       A    Well, sometimes we discussed hair that -- that

25  was submitted or just things like this.



JOE GREER                                          November 04, 2019
CLARK vs LJCMG                                                  212

1      Q    Okay.  All right.  Now did you read Mr.
2  Thurman's lab report?
3      A    Yeah, and didn't make a bit of sense to me.
4      Q    And I realize that you're not in that
5  profession.  So I understand that, but you did read it,
6  correct?
7      A    I read it.
8      Q    Okay.  Do you happen to remember -- do you
9  happen to remember a part of the report that discussed a
10  broken chalice --
11     A    No.
12     Q    -- wrapped in white cloth?
13     A    No -- no I didn't.
14     Q    Okay.
15     A    That's surprised me because it come up in
16  trial.
17     Q    Right.  So no discu -- during the discussions
18  between the investigation and the 1992 trial --
19     A    No.
20     Q    -- nothing like that ever came up?
21     A    Keith never told me about it.
22     Q    Do you remember what the significance was of
23  these items at trial?
24     A    Nope.
25     Q    Did Mr. Thurman or anyone else ever discuss



1   these items with you --

2        A    No.

3        Q    -- or hair testing?

4        A    No.

5        Q    Okay.

6        A    Well, I'm not -- Bart Adams did.

7        Q    Okay.  What did Bart Adams say?

8        A    I made a mistake on calling one of them, and

9   he made a mistake on the other one, and I called him

10  out, and he called me out.

11       Q    Okay.

12       A    And we parted friends, and I don't remember

13  what it was.

14       Q    Okay.  Did you ever direct Mr. Thurman not to

15  test any blood stains related to the broken chalice and

16  the cloth?

17       A    No.

18       Q    Did you ever ask Mr. Thurman to do anything

19  unethical with regard to any of the evidence in this

20  case?

21       A    No, sir.  I'd be in a penitentiary if I've

22  done that.

23       Q    Is it your opinion that Mr. Thurman was

24  reliable?

25       A    Most --



```
 1              MR. BOND:  Objection to form.
 2      A    -- definitely.
 3      Q    Is your opinion that he was ethical?
 4      A    Yes.
 5              MR. BOND:  Objection to form.
 6              MR. ROSENE:  Think it's all I have.  Thank
 7      you.
 8                      EXAMINATION
 9   BY MR. ERVIN:
10      Q    Sheriff, my name is Peter Ervin, and I
11   represent Louisville Metro and some of the officers
12   employed by --
13      A    Yes, sir.
14      Q    -- Louisville Police Department.  Sheriff, I
15   want to try to be brief, but I think it's important that
16   the jury understand what's going on with you right now,
17   and particularly, health-wise.  And let me ask you
18   first, how old are you sir?
19      A    83.
20      Q    Are you married?
21      A    My wife is deceased.
22      Q    And when did she pass away?
23      A    2016, January the 3rd, at 12:01.
24      Q    Did you have anything to do with her care
25   before she passed away?
```



```
 1       A    I took care of her.  I had to leave the

 2   courthouse.  I was detective for the Prosecutor's

 3   Office, and I had to leave the courthouse to go take

 4   care of her.  It got to where I had to pick her up and

 5   move her anywhere she wanted to go, get her to the

 6   hospitals, and that's what put me down.

 7       Q    Yes, sir.  And when was it that you left your

 8   detective job?

 9       A    I left it in 2006.

10       Q    And then she passed away 10 years later?

11       A    Uh-huh.

12       Q    You took care of her during those 10 years?

13       A    Took care of her.

14       Q    I've noticed a couple of times today you've

15   grimaced, apparently in some kind of distress or pain.

16   Is that a fair statement?

17       A    That's fair to say, sir.

18       Q    Can you tell me, just, generally what the

19   state of your health is right now.

20       A    I just got done with a lung doctor in Norton

21   Cancer Center.  They found a glob on this side of my

22   lungs, and they're going in Wednesday and try to get it

23   out, and then I can't walk.  I fall every time.  I have

24   to use a walker.  That happened while I was trying to

25   take care of my wife.  Don't know what happened.  Went
```



1   to Norton Leatherman Spine Center.  They were going to

2   operate because I had broke my back too -- fell and

3   broke my back and my hip.  And then they'd called me

4   again and decided that if they tried to operate -- to my

5   neck, they'd kill me, so I'm going to have to live with

6   the way I limp and I fall quite often.  I try not to.

7   I'm bruised up pretty good.  This arm, I wore a long

8   sleeved shirt so you couldn't see that.  I can't help

9   it.  I tried.

10      Q    Yes, sir.

11      A    Hell of a way for a career to go down though.

12      Q    I want to ask you a few particular questions

13  about some of the examination that you've had.  Now,

14  before I leave your health, this -- whatever you have on

15  your lungs.  Is that affecting you right now?

16      A    Hurts when I sit here and try to cough.  Yeah

17  it hurts.

18      Q    All right.

19      A    And it's hurting right now.

20      Q    You know, you were asked a lot of questions

21  about why you did this, why you didn't do that.  A lot

22  of those questions were prefaced about somebody with so

23  much experience as an investigator.  Did you -- do you

24  feel like you're that kind of a person?

25      A    No.



1        Q     Objection to form.

2        A     Are you a highly educated --

3        Q     No.

4        A     -- police investigator?

5        Q     No.

6        A     Objection to form.

7        Q     How long were you Sheriff, sir?

8        A     21 years.

9        Q     At any time before 1992 when you began the

10   investigation of Rhonda Sue Warford's depos -- or death,

11   had you had any formal training as a Sheriff or in

12   investigations?

13       A      In-service training at Richmond --

14       Q     All right.

15       A     -- a week or two.

16       Q     What does that mean?

17       A     Well fingerprinting, weapons, driving.

18   Nothing really about investigations.

19       Q     Had anyone -- had you ever had any courses on

20   how to conduct interviews?

21       A     No.

22       Q     Had you had any courses on what was relevant

23   evidence versus what's not relevant evidence in a case?

24       A      Picked it up on my own or with the help of the

25   state police or Prosecutors Office.



1    Q    All right.  So you had no formal training?

2    A    No formal training.  No, sir.

3    Q    And so what you knew about Investigations was

4  what you had learned on your own?

5    A    That's correct, sir.

6    Q    What I understood from your testimony the last

7  time that we were together Mr. Greer was that you had

8  not regularly engaged in the investigation of homicides.

9  Is that a fair statement?

10    A    I might have worked a couple of what we call

11  cut and dried cases, but I assisted with numerous with

12  the state police and a...

13    Q    Had you ever been the lead investigator on a

14  homicide that you recall?

15    A    Probably.  Not very many.  It's what I call

16  maybe cut and dried cases.

17    Q    Okay.  What do you mean by that?

18    A    Well the evidence was so good, just put them

19  in jail and forget it.

20    Q    They were holding the smoking gun.

21    A    Yeah.  That's it.

22    Q    Okay.  This would have been the only homicide

23  you ever investigated where you had to go beyond the

24  smoking gun in the defendant's hand?

25    A    Yes, sir.



1    Q    Okay.  Nobody stepped up and confessed to

2  killing Rhonda Sue Warford.  Did they?

3    A    No, sir.

4    Q    Okay.  And would that account for why you

5  might have had the coroner with you during the course of

6  some of the investigation?

7    A    Mr. Adams is an ex-paramedic, EMT, funeral

8  director, knows anatomy of a body pretty well, and we

9  rely on him, state police relies on him.  They know we

10  got a body, we better not touch that body till that

11  coroner gets there.  That's the way it is.

12    Q    Yes, sir.

13    A    If you do, you're going to get your wrath from

14  Bill Adams.

15    Q    All right.  And is that why you would have him

16  with you during the course of --

17    A    That's true.

18    Q    -- some of this investigation?

19    A    Help me.

20    Q    And did you understand that under Kentucky

21  law, he has some latitude in whether he might conduct an

22  investigation?

23    A    Oh, I know he --

24         MR. BRUSTIN:  Objection to form.

25    A    Yes, he does.



1    Q    Okay.  Now, it's fair to say though that the

2    coroner was not a medical doctor, was he?

3    A    No, he was not a medical doctor.

4    Q    And so for questions that would be appropriate

5    for a medical doctor, in this case at least, you would

6    expect to get the information from the state medical

7    examiner.  Is that a fair statement?

8    A    Some of it, but I didn't talk to the medical

9    examiner.  Mr. Adams did, and come up -- I don't even

10   know how he come up to the time of death.

11   Q    Okay.  Okay.  Did you -- in fact, was there

12   ever a specific time of death established?

13        MR. BRUSTIN:  Objection to form.

14        MR. BOND:  Either you know or don't know.

15   A    Oh, I don't.  We might have put an estimate on

16   it.

17   Q    Okay.

18   A    That's what we usually do.

19   Q    Right.

20   A    We may put a date and an estimate.

21   Q    Yes, sir.  Unless you're there, you can't say

22   to a certainty the specific time?

23   A    You have to be there when it happens.

24        MR. BRUSTIN:  Objection to form.

25   Q    All right.



1    A    Okay.

2    Q    You were asked some questions about testimony

3 that you gave to the grand jury in regard to information

4 that you had from either Mr. Adams or the state medical

5 examiner, Dr. Nichols --

6    A    Uh-huh.

7    Q    -- and one of them was about the fact that

8 there was no evidence of a sexual assault.  Do you

9 recall that?

10   A    Yes, I do.

11   Q    Was that significant to you?

12        MR. BRUSTIN:  Objection to form.

13   A    Yes, it was.  I believe it was.

14   Q    And what is -- what in terms of investigating

15 the murder of someone, what's the significance in this

16 case that there was no sexual assault?

17        MR. BRUSTIN:  Objection to form.

18   A    No sexual assault, that means this wasn't a

19 stranger, in my opinion.  And that's not only my

20 opinion, that's other police officer's opinion too.  She

21 wasn't sexually assaulted.  Did she know her attacker?

22   Q    That's the implication?

23   A    That's one of the implications, the main one.

24   Q    You asked some questions about Mr. Capps and

25 whether he'd ever been suspect in a murder case.  Do you



JOE GREER
CLARK vs LJCMG

November 04, 2019
222

1  recall that?

2      A   I recall the gentleman here asking me.

3      Q   All right.

4      A   I can't really know of any of that -- that --

5      Q   Let me ask you this question.  If I understood

6  your testimony, earlier testimony, generally, unless

7  they had the -- you had a cut and dry case, somebody

8  else would investigate the murders in Meade County.  Is

9  that a fair statement?

10     MR. BRUSTIN:  Objection to form.

11     A   Mainly Detective Stiles.

12     Q   Yes, sir.

13     A   If he wasn't on vacation, and Lord God, I wish

14 he hadn't been on vacation when this case happened.

15     Q   I understand.

16     A   He'd be sitting here instead of me.

17     Q   You would've never been the lead investigator

18 in this case if Detective Stiles had been on duty when

19 you-all were --

20     A   If he hadn't been on vacation hunting out

21 West, in Colorado --

22     Q   It would've been his case?

23     A   It would have been his case.

24     Q   Yes, sir.  All right.  My point is that do you

25 know whether Detective Stiles may have ever identified



1  Capps as a suspect in a case?

2      A    No.

3      Q    You don't know?

4      A    I don't know that.

5      Q    Oh.

6      A    He could have, but I don't know it.

7      Q    All right.  And while we're talking about Mr.

8  Capps, I recall your testimony was that there were times

9  when you would arrest or you had occasion where you

10  arrested him, and you don't think he wasn't telling you

11  the truth about whether he'd done it or his whereabouts

12  at the time whatever the crime was.  You didn't believe

13  him; is that right?

14      A    Yeah, and I'd tell him so.

15      Q    And you'd tell him so.

16      A    Uh-huh.

17      Q    And as I recall it then, if you were able to

18  give him some evidence about the fact that, "Cliff,

19  we've got you.  You need to come clean with me," then he

20  would tell you the truth and come clean?

21      A    You could get it out of him then.

22      Q    Yes, sir.  My point is, is that -- was Cliff

23  making stuff up to bring to you?

24          MR. BRUSTIN:  Objection.

25      A    I worried about, and I think I told you, I



```
 1  worried about the note that was passed.  He sounded very

 2  sincere when he talked to me.  He didn't tell me that

 3  much, but the clincher really on that note was Justis.

 4  And that's a few -- few years later.

 5              MR. ERVIN:  Yes, sir.  And Justis

 6      corroborated --

 7      A    He collaborated the note from Hardin, to him,

 8  to Capps, to Clark.

 9      Q    Yes, sir.

10      A    And that meant something to me.

11      Q    Yes, sir.

12      A    And it meant something to Kenton Smith.

13      Q    And I believe you said, you don't know of any

14  other situation where Capps had come to you as some sort

15  of a jail house snitch?

16      A    Snitch, no.

17      Q    No?

18      A    No.

19              MR. BRUSTIN:  Objection.

20      Q    Now, according to Mr. Jeffrey Dewayne Clark,

21  according to his complaint, he represents that on

22  December the 2nd, 1992, "Sheriff Greer fabricated a

23  statement for Capps.  Falsely alleging, that Clark

24  confessed to Capps on two separate occasions.  Sheriff

25  Greer promised Capps leniency if he adopted the false
```



JOE GREER
CLARK vs LJCMG

November 04, 2019
225

1   statement and agreed to testify against Clark and

2   Hardin."  Is that a true statement?

3       A    No, sir, it is not.

4       Q    Well, let me ask you: What authority do you

5   have as the sheriff, when you were sheriff of Meade

6   County, to grant to a defendant leniency?

7       A    I don't have that authority.  I can also --

8   and I have said this.  I've told them, "I'll speak to

9   the prosecutor.  But I can't help you.  It's up to the

10  prosecutor."  And I ain't going to say that maybe every

11  once in a while he helped the defendant.  Wasn't on a

12  murder case or anything like that.  He had helped them.

13  But then there's some cases, you'll go to hell.  I ain't

14  going to help him.

15      Q    My question is, were you trying to help Capps

16  in this case?

17      A    No.

18           MR. BRUSTIN:  Objection to form.

19      A    No.

20      Q    In fact, did Capps get any special leniency

21  that you're aware of?

22      A    I'm not aware of it.  I'm not aware of it.

23      Q    But you didn't ask for it?

24      A    No, I did not ask for it.  No.

25      Q    You asked a question about a fellow named



```
 1    Carter.  And whether you'd gotten a call from someone
 2    named Carter who said that he had seen Rhonda Warford,
 3    sometime after she disappeared, but before her death.
 4    Do you recall being asked that question?
 5         A    I -- I don't recall it.  He -- the gentlemen
 6    here asked me about it.  I don't recall it.
 7         Q    Sure.  But you did take notes in your
 8    investigative file; is that right?
 9         A    Yes.
10         Q    If you had gotten a call like that, if
11    somebody called you and said, "Hey, I've seen Rhonda
12    Warford alive after she was missing and before you found
13    her," is that the kind of thing that you would have made
14    a note of?
15              MR. BRUSTIN:  Objection to form.
16         A    Yes, but that's not all I would've done.  I'd
17    find out where they lived in Louisville, if that's where
18    it's at.  I'd notify Lieutenant Gerald with homicide and
19    get him to assign a detective to run it down for me.
20    That's what I did on some of them.
21         Q    Sure.  But you didn't --
22         A    Because they did a good job.
23         Q    But the fact that you didn't record it in your
24    notes, the fact that you didn't call a detective in
25    Louisville, or wherever it was, if this person had made
```



1   that call, does that indicate to you it didn't happen?

2           MR. BRUSTIN:  Objection to form.

3      A    I don't remember the call, sir.  I don't

4   remember a call like that.

5      Q    Well, here's my question --

6      A    And he said --

7      Q    -- if you --

8      A    -- here's the name Greer.  Talk to someone by

9   the name of Greer.  Well, I'm the only Greer in the

10  sheriff's department --

11     Q    Yes.

12     A    -- back then.

13     Q    If you'd gotten that call, wouldn't you have

14  written it down?

15     A    Well, sure.

16          MR. BRUSTIN:  Objection to form.

17     Q    And the fact that you didn't write it down

18  doesn't that tell you you didn't get the call?

19          MR. BRUSTIN:  Objection to form.

20     A    I don't remember getting it, sir.  Never heard

21  the name, really.

22     Q    Would you deny that you got the call if you

23  didn't write down?

24     A    I'll deny I got the call.

25     Q    All right, sir.



```
 1          MR. BRUSTIN:  Did you say you deny you got the
 2     call?
 3     A    I don't remember it.
 4          MR. GARVERICH:  That's not question right now.
 5     A    Oh, okay.
 6     Q    Getting back to Capps and this fellow, Mabry.
 7     A    Yes.
 8     Q    Is Mabry still around; do you know?
 9     A    I have no idea.
10     Q    If you talked to Mabry, and he had said, "I
11  don't remember hearing Clark say those things," if he
12  wasn't able to corroborate what Capps told you, that
13  doesn't mean Capps was lying to you, does it?
14     A    No.
15          MR. BRUSTIN:  Objection to the form.  You've
16     just described Brady material.
17          MR. ERVIN:  Let me ask you --
18          MR. BRUSTIN:  As a lawyer for the city.
19          MR. ERVIN:  You've made your objection.  Now,
20     may I ask my questions?
21          MR. BRUSTIN:  Its' just so -- It's just so
22     shocking I had to say something, but go ahead.
23          MR. ERVIN:  Well, I'm glad I was able to shock
24     you.
25          MR. BRUSTIN:   -- keep asking, keep asking but
```



1  it's just

2      MR. ERVIN:  I'm glad I was able shock you.

3      MR. BRUSTIN:  -- it's just amazing your lack

4  of knowledge --

5      MR. ERVIN:  This point in your career, you're

6  such an amazing attorney.  I'm glad I was able to

7  shock you.

8      MR. BRUSTIN:  I don't hear --

9      MR. ERVIN:  I'm really proud of it.

10      MR. BRUSTIN:  I don't hear that --

11      MR. ERVIN:  I'm very proud of it --

12      MR. BRUSTIN:   -- I don't hear that kind --

13      MR. ERVIN:   -- I'm very proud of it.

14      MR. BRUSTIN:  I don't think that kind of stuff

15  too often.

16      MR. ERVIN:  I'm very proud of it.

17      MR. BRUSTIN:  You should be.

18      MR. ERVIN:  I'm very proud of it.

19      MR. BRUSTIN:  It takes a lot to shock me.

20      MR. ERVIN:  Good.

21      MR. BRUSTIN:  That kind of misunderstanding of

22  the law --

23      MR. ERVIN:  Thanks very much.

24      MR. BRUSTIN:   -- for a civil rights defense

25  lawyer --



1        MR. ERVIN:  Appreciate it.

2        MR. BRUSTIN:  -- that's pretty impressive.

3        MR. ERVIN:  Appreciate it.  Yeah.  Good.

4        MR. BRUSTIN:  Go ahead.  Keep asking.

5        MR. ERVIN:  Good.

6        MR. BRUSTIN:  Follow up with it.

7        MR. ERVIN:  Good.

8        MR. BRUSTIN:  Keep going.  Well, you should be

9   focusing on your witness to the allegations.

10       MR. ERVIN:  Counsel, be quiet.

11       MR. BRUSTIN:  Focus on your questions, not me.

12       MR. ERVIN:  Be quiet.

13       MR. BOND:  Please let's go.  Please.

14       MR. ERVIN:  Be quiet.

15       MR. BRUSTIN:  Don't tell me to be quiet.

16       MR. BOND:  May I ask --

17       MR. ERVIN:  We're off the record.

18       MR. BOND:  Let's move on.

19       MR. ERVIN:  Off the record.

20       MR. BRUSTIN:  You need a break?

21       COURT REPORTER:  Are we off the record,

22   counsel?

23       MR. ERVIN:  Yeah.  His questioning, we're off

24   the record.

25       COURT REPORTER:  Time is 1:44.  We are off the



```
 1          record.
 2                  (OFF THE RECORD)
 3              VIDEOGRAPHER:  The time is 1:53, and we are
 4          back on the record.
 5    BY MR. ERVIN:
 6         Q    Now, Sheriff Greer, before we were interrupted
 7    by the colloquy of counsel, my question was, if Mabry
 8    had denied that he heard -- that he heard what Clark
 9    told Capps, does that mean Capp is lying to you about
10    what he heard?
11         A    No.
12              MR. BRUSTIN:  Objection to form.
13              MR. ERVIN:  I believe that's all I have, sir.
14          Thank you.
15              MR. BOND:  Of what's been asked.  Please.  So
16          we don't get down to arguing.
17              MR. BRUSTIN:  Sure.  And now --
18              MR. BOND:  What I'm saying is --
19              MR. BRUSTIN:  That's all I'm going to do --
20              MR. BOND:  So we don't debate that, okay?
21          Please?
22              MR. BRUSTIN:  Yep.  There's no need.  Won't be
23          a need.  And I'm going to start -- I'm going to
24          start -- I'm going to go backwards.  I'm going to
25          go with the questions that were most recent and
```



1    follow up on a few of those, okay?

2         THE WITNESS:  That's fine, sir.

3         MR. BRUSTIN:  So --

4         MR. BOND:  I'm sure you forget the first ones.

5              REDIRECT EXAMINATION

6    BY MR. BRUSTIN:

7    Q    One of the questions you were -- you were just

8    asked is whether or not if Mabry had told you that he

9    was in the cell and there was no admissions.

10   A    Uh-huh.

11   Q    If that happened, and you're denying that

12   happened, right?

13   A    Yeah.

14   Q    Okay.  If Mabry had told you, "I was in that

15   cell, there was no admissions.  I would've heard that."

16   That would be what's called classic exculpatory

17   evidence, right?

18   A    I agree.

19        MR. ERVIN:  Object to form.

20   Q    That's evidence that -- that's evidence that

21   you have to give to the prosecutor so the prosecutor can

22   give to the defense.

23   A    Most definitely.

24   Q    It's evidence that will be used to cross-

25   examine Capps, right?



1        A    Yeah.  I agree.

2             MR. ERVIN:  Objection to the form.

3        Q    All right.  That would be evidence tending to

4    show that Capps might not be telling the truth, right?

5        A    I agree.

6             MR. ERVIN:  Objection to the form.

7        Q    All right.  Now, you were asking questions

8    about your testimony to 2015 here.  And it sounds like

9    that was a very traumatic time in your life.  You were

10   going through some terrible things with your wife.  I

11   can only imagine how difficult that was.  All that being

12   said though, would it be fair to say, you were still

13   doing your best?  Withdrawn.  You understood that you

14   were testifying in court about matters of great

15   importance?

16       A    Yes.

17       Q    Certainly of great importance to Mr. Clark and

18   Mr. Hardin?

19       A    Yes.

20       Q    And you did your best to listen to the

21   questions?

22       A    Yes.

23       Q    And to tell the truth if you could?

24       A    Yes.

25       Q    And you understood that if you couldn't do



1   that, you had an obligation to report that?

2        A    Yes.

3        Q    All right.  You have admitted, I think, for

4   the first time here, your second day of your deposition,

5   that you believe that you were not qualified to be the

6   lead investigator in this homicide case; is that true?

7             MR. BOND:  Objection to form.

8             MR. GARVERICH:  Objection.

9        A    Well, I was the only one they had.

10            MR. BOND:  But go ahead.

11            MR. BRUSTIN:  Well, let me try a different

12       way.  You said this was the first homicide case

13       where there wasn't a readily known -- where were --

14       withdrawn.  You said this was the first homicide

15       case where there wasn't a clear suspect in your

16       career were you were lead detective, correct?

17       A    Generally, yes.

18  BY MR. BRUSTIN:

19       Q    All right.

20       A    Okay.

21       Q    And that the only reason you were lead

22  detective in this case was because -- is because Stiles

23  was on vacation?

24       A    That's right.

25       Q    All right.  In other words you understood that



```
 1    Stiles was far more qualified than you to conduct a
 2    homicide investigation.
 3         A    Most definitely, sir.
 4         Q    All right.  You understood as the Sheriff of
 5    Meade County, one of your obligations was not to engage
 6    in activities that were beyond your capabilities.  Would
 7    you agree with that, sir?
 8         A    Well, all sheriffs do it though.
 9         Q    Do you agree with that, sir?
10         A    I agree with it.
11         Q    All right.
12         A    I agree with it.
13         Q    And another obligation you had as Sheriff of
14    Meade County was to make sure that you obtained
15    sufficient training to do your job properly, correct?
16              MR. GARVERICH:  Objection, in the form of
17         question.
18         A    Try to, okay.
19         Q    Well, no.  Your obligation as sheriff --
20         A    Yes.
21              MR. BRUSTIN:   -- was to ensure that you had
22         sufficient training to do your job appropriately.
23              MR. BOND:  Object to the form of the question.
24         A    Yes, if you can get it -- that --
25              MR. BOND:  It's not a statutory requirement of
```



JOE GREER                                          November 04, 2019
CLARK vs LJCMG                                                   236

```
 1          being a sheriff.
 2          A    No it's not.
 3   BY MR. BRUSTIN:
 4          Q    But you understood that to be your obligation?
 5          A    My obligation --
 6          Q    And you understood --
 7          A    -- not the KRS.
 8          Q    You understood that if you didn't believe you
 9   were qualified to be the lead investigator in a homicide
10   case, you had an obligation to ensure that you got other
11   people to help you with it, correct?
12          A    (No verbal response.)
13          Q    But you told us in your first day of your
14   deposition that you considered yourself to be one of the
15   leading investigators in this case?
16          A    I was --
17          Q    Okay.
18          A    -- technically.
19          Q    All right.  But you understood that you
20   weren't qualified to do that?
21          A    I was qualified to know that I needed help.
22          Q    Well, as you've admitted, candidly, you were
23   not qualified to be lead investigator in a homicide
24   investigation of this magnitude.  Isn't that true, sir?
25               MR. BOND:  Object to form of question.  That's
```



1        not what he testified to, Nick, and I'm not going

2        to sit here and let you bas --

3            MR. BRUSTIN:  I'm not saying he did.  I'm

4        asking if not --

5            MR. BOND:  I'm not going to let you bastardize

6        what he's testified --

7            MR. BRUSTIN:  Let me change -- let me change

8        it, because I don't mean it that way.

9            MR. BOND:  Well, that's what you're doing.

10           MR. BRUSTIN:  No -- I'm going to ask it -- I

11       don't.

12   BY MR. BRUSTIN:

13       Q    You would agree, sir, that you were not

14   qualified to be lead investigator in this serious

15   homicide investigation; isn't that true, sir?

16       A    Basically, but I was all they had.

17       Q    All right.  But you weren't qualified to do

18   it?

19       A    There's a lot of things I do that I'm not

20   qualified for, but I do it.

21       Q    All right.  And this was one of those things?

22       A    Yes.

23       Q    And because of your lack of qualifications,

24   you understood you had an obligation to be even more

25   careful in terms of documenting evidence that you were



JOE GREER                                          November 04, 2019
CLARK vs LJCMG                                                  238

1  gathering, correct?

2       A    Yes.

3       Q    And so it's even a bigger problem here, given

4  your absence of qualifications -- withdrawn.  During the

5  course -- during the course of the deposition, you

6  acknowledged there were a number of interviews that you

7  didn't properly document, correct?

8       A    Yes

9            MR. ERVIN:  Objection to the form.

10      Q    And you would agree that based on your lack of

11 qualifications, those failures of documentation are even

12 more egregious.

13           MR. GARVERISH:  Objection --

14           MR. ERVIN:  Objection --

15           MR. BOND:  Objection to the form of the

16      question.  That's -- that is not proper.  I'll call

17      a recross.  That's not what was covered.

18 BY MR. BRUSTIN:

19      Q    All right.  What -- why -- you mentioned that

20 -- you were asked questions about your testimony at the

21 grand jury that there was no sexual assault in this

22 case?

23      A    Yes.

24      Q    I have not seen a single report that says

25 anything like that.  Where did you get that information



JOE GREER                                             November 04, 2019
CLARK vs LJCMG                                                       239

```
 1   from?
 2        A    Lab report I think, isn't it?
 3             MR. BOND:  All right.  You tell him.
 4        A    Yeah.  I think it's lab report --
 5        Q    Think the lab report says there was no sexual
 6   assault?
 7        A    I believe it did, or maybe Dr. Nichols'
 8   report.
 9        Q    When you testified to the grand jury, did you
10   have an obligation to tell the grand jury that you were
11   simply repeating things that other people had told you?
12        A    That's correct, I think.
13        Q    And you didn't do that.  Did you?
14        A    Thought I did.
15        Q    Nope.
16        A    Okay.  I didn't.
17        Q    But you had an obligation to do that, right?
18        A    Yes.
19             MR. ERVIN:  Objection to the form.
20             MR. BOND:  That's an objection.  That's not --
21        that's an inaccurate statement.
22   BY MR. BRUSTIN:
23        Q    Now, you were asking questions about Adams's
24   authority to conduct investigations as a coroner?
25        A    Yes.
```



1      Q    Remember those questions?

2      A    Uh-huh.

3      Q    First of all, your understanding of Adam's

4    role in this case was that he was assisting you in

5    conducting --

6      A    That's correct.

7      Q    -- interviews, correct?

8      A    Yes.

9      Q    Not as his role as a coroner, but based on

10   your trusting his knowledge and abilities, correct?

11     A    Yes.

12     Q    You didn't bring him to your interviews of

13   witnesses because he was the coroner, right?

14     A    Probably did.

15     Q    Well, but you brought him because he was

16   someone that you trusted?

17     A    Yes, very much so --

18     Q    And because you also were a little concerned

19   about conducting these interviews based on your lack of

20   experience?

21          MR. GARVERISH:  Objection to the form of the

22          question.  You can answer.

23     A    The way you're putting that, that just don't

24   sound right.

25     Q    Well, then don't ans -- then say it's not



```
1    true.  All right.  Now certainly, because of your lack

2    of experience, you had even -- it was even more

3    important for you to accept the leadership of the LPD

4    detectives in this case, correct?

5              MR. ERVIN:  Objection to the form.

6              MR. PELLINO:  Same objection.

7         A    Yes.

8         Q    In particular, Detective Handy, correct?

9              MR. ERVIN:  Objection to form.

10        A    All of them.

11        Q    Including --

12        A    I contacted Lieutenant Sherrard.

13        Q    Okay.  But Detective Handy, as you know from

14   looking at the reports, was the primary detective

15   interviewing witnesses, correct?

16        A    He was one of them, most definitely.

17        Q    And he was -- you were certainly deferential

18   to him in the investigation; fair to say?

19        A    What do you mean by that?

20        Q    You let him call the shots.  You let him

21   decide what was going to be done.  You let him --

22        A    Well, sometimes I suggested too, okay?

23        Q    But generally, he took the lead?

24        A    Yeah.

25        Q    Now, speaking of Detective Handy, you
```



1  understand that he is now being prosecuted for

2  fabricating evidence in two separate cases, correct?

3           MR. PELLINO:  Objection to form.

4      A    I heard it on the news.

5      Q    All right.  And you understand that he is

6  being accused of doing exactly what we're accusing him

7  here, of providing non-public information to witnesses

8  and then lying about it afterwards, right?

9           MR. PELLINO:  Objection to form.

10          MR. ERVIN:  Objection to form.

11     Q    You understand that's the allegation?

12     A    Yes, that's the allegation.

13     Q    And you understand he is actually going to

14  trial, that he's been -- he has been indicted and is

15  going to trial concerning those allegations?

16     A    That's what I heard on the news.

17     Q    All right.  Has anybody from the LPD ever come

18  to talk to you about his conduct in this case?

19     A    No.

20     Q    As far as you know, there is no investigation

21  from the LPD into Handy's conduct in this case?

22     A    I don't know if there is.

23     Q    You would certainly be a good person to ask.

24     A    Yes.

25     Q    You spent a lot of time with him, right?



1      A    Yes.

2      Q    You would expect that if anybody in the LPD

3  was interested in investigating Handy's misconduct in

4  this case, you'd be good person talk to?

5           MR. ERVIN:  Objection.  Form.

6           MR. BOND:  Objection to the form of question.

7      A    Yes.

8      Q    Now, you said on redirect that everything you

9  did after the arrest was at the direction of Kenton

10  Smith?

11      A    A lot of it.  Yes.  99 percent of it was.

12      Q    But you already told us when I asked you, that

13  when you decided to speak to Justis about that letter,

14  that was your own decision, not Kenton Smith's, correct?

15      A    Are you talking about the one at the

16  Breckinridge County courthouse?

17      Q    That's -- no.  I'm talking about when Adams

18  called --

19           MR. BOND:  You have to tell which one you are

20      re --

21      Q    When Adams called you --

22      A    Uh-huh.

23      Q    -- after the trial --

24      A    Uh-huh.

25      Q    -- and told you about the letter --



```
1        A    Uh-huh.

2        Q    -- you, on your own, went and talked to Kevin

3   Justis, correct?

4        A    I believe I run that by Kenton Smith, sir.  I

5   believe I did.  I could've not, okay?  But I got Tommy

6   to go with me.

7        Q    When you testified in the hearing in 2015,

8   there was no mention of Kenton Smith.  All you testified

9   to --

10       A    Okay.

11       Q    -- was that you were so --

12       A    Okay.

13       Q    -- concerned about it, you went and talked to

14   him.

15       A    Okay.

16       Q    And that's true; isn't it, sir?

17       A    Okay.  Could be.

18       Q    There was -- you certainly had authority to

19   investigate -- withdrawn.  If you became aware of

20   evidence in this case that could be exculpatory

21   evidence, you understood that you certainly had the

22   authority to investigate it on your own?

23       A    Yes.

24       Q    And that's what happened with Justis, when

25   Adams called you and said --
```



```
 1              MR. BOND:  Please say Bart, because you've
 2        talked about Bill Adams also.  Just --
 3              MR. BRUSTIN:  Okay.
 4              MR. BOND:   -- differentiate please.
 5   BY MR. BRUSTIN:
 6        Q    When -- what's the first name?
 7              MR. BOND:  Bart.
 8        A    Bart.
 9        Q    When Bart Adams called you in 19 -- after the
10   trial and told you about this letter, which you claim
11   you've never seen --
12              MR. BOND:  I want to object to the form of
13        question before you even finish.
14        Q    Let me try it again.  When Bart Adams called
15   you in 1995 after the trial and told you about the
16   letter from Capps to Justis, as you testified to at the
17   2015 hearing --
18        A    Uh-huh.
19        Q    -- you were so concerned that you went with
20   Stiles to talk to Justis, correct?
21        A    Yes.
22        Q    Because you had authority to do that?
23        A    Yes.
24        Q    And you could argue you had the obligation to
25   do that, right?
```



1    A    Yes.

2    Q    You had an obligation to fully investigate

3  those allegations of this letter, correct?

4    A    Yes.

5         MR. ERVIN:  Objection to the form.

6    Q    To determine whether or not it was true?

7         MR. ERVIN:  Objection to the form.

8    Q    To determine whether the letter had been sent

9  -- you had an obligation to determine whether the letter

10  had been sent?

11   A    Okay.

12   Q    And you had an obligation to determine whether

13  the letter indicated that Capp's had lied, correct?

14        MR. ERVIN:  Objection.

15        MR. BOND:  Objection to the form.

16   A    I draw the line on that one, sir.

17   Q    Now, do you recall you were asking questions

18  about reading the report from Thurman that you didn't

19  understand?

20   A    Yes.

21   Q    And the reason that you read the report from

22  Thurman is because you understood in a case of this

23  magnitude you were going to read every piece of paper

24  that came in, correct?

25        A    And then I didn't know what I was reading,



1   sir.

2       Q    I understand that.  And you still read it,

3   right?

4       A    Yes.  And Judge Monarch didn't understand it

5   either.

6       Q    Right.  But it was your job to read every

7   piece of paper that came into this case, right?

8       A    Uh-huh.

9            MR. ERVIN:  Objection.

10           MR. ROSENE:  Objection to the form.

11      Q    Every report.  Right?

12      A    Yes.

13      Q    Everything, you read it.  You wanted to

14  understand it.  That was your job?

15      A    Never did, but I wanted to.

16      Q    Okay.  Except for one thing.  The only thing

17  in this case you didn't read was the letter you picked

18  up from Justis' mother, right?

19      A    Yeah.

20      Q    Everything else, you read?

21      A    So?

22      Q    The one thing you chose not to read in this

23  case was the letter that Capps wrote to Justis --

24           MR. ERVIN:  Objection.

25      Q    -- right?



```
 1              MR. BOND:  Is that a question?

 2              MR. BRUSTIN:  Yes.

 3       Q    Now, sir --

 4              MR. BOND:  Asked and answered.  Let's go.

 5       Move.

 6       A    I did not reject that first letter.

 7       Q    That's the only thing you didn't read.

 8       A    That's right.

 9       Q    Now you told us you didn't understand what

10   Thurman's report said?

11       A    Really didn't.

12       Q    Okay.  And what you had to do is you had -- so

13   in order to describe what Thurman's findings were to the

14   grand jury, you had to talk to Thurman first, correct?

15       A    I talked to him on the phone, but I don't

16   remember really what was said.

17       Q    All right.  And even --

18       A    And I talked to Kenton about it.

19       Q    Fair enough.  Even though you don't remember

20   what was said, given that you didn't understand the

21   report, and your practice is, would it be fair to say,

22   that you must have talked to Thurman about what the

23   report meant?

24       A    I'm sure I did.

25       Q    All right.  And that's how you were able to
```



1  testify about his findings at the grand jury --

2      A    In fact, sir --

3      Q    -- is that true?

4      A    -- I believe Mr. Smith was present and the

5  phone rang, and it was --

6      Q    Okay.

7      A    -- Thurman calling me.

8      Q    Fair enough.

9          MR. BOND:  Answer his question.

10     Q    But I'm asking something a little different.

11     A    Okay.

12     Q    The reason you were able to testify at the

13  grand jury about Thurman's findings is based on what

14  Thurman reported to you when you spoke to him on the

15  phone, correct?

16     A    That's correct.

17         MR. BRUSTIN:  That's it.

18         MR. SLOSAR:  Okay guys, I'm going to give you

19      one shot at a redirect as long as its within.

20                  RECROSS EXAMINATION

21  BY MR. PELLINO:

22     Q    And I just have -- does anybody have mind that

23  I have one -- I just have one question for you, Sheriff

24  Greer.  And the question has been begged, if you were

25  asked about your opinion of detective Mark Handy's



```
 1   conduct in his investigation of the Clark and Hardin

 2   murder, what would your opinion be of that?

 3        A    Very much so.  Very above board.  No

 4   harassment, no bad mouthing.  He did a good job.  Now, I

 5   don't know nothing about his past, except I do know that

 6   he just won a case up in Louisville about a week and a-

 7   half ago.

 8             MR. PELLINO:  That's all the questions I have.

 9        A    Judge upheld it.  No, Handy done a superb --

10             MR. BOND:  You've answered the question.

11        A    -- but all detectives did.

12             MR. BOND:  Anybody else?

13                     RE-EXAMINATION

14   BY MR. ERVIN:

15        Q    Sheriff, when you testified in that July,

16   2015 hearing, when your wife had been taken to the

17   hospital --

18        A    Yes.

19        Q    -- that was 20 years after the trial in the

20   Clark and Hardin case, wasn't it?

21        A    Yes, sir.

22        Q    Well, now 24 years --

23        A    Yes, sir.

24        Q    -- after that time.  But four years ago, when

25   you were in that hearing and testifying about things
```



JOE GREER                                          November 04, 2019
CLARK vs LJCMG                                                   251

```
 1   that had occurred 20 or more years before, who were the

 2   lawyers representing you in that hearing?

 3        A    Commonwealth attorney out of Breckinridge.

 4   He's out of Grayson County, but he's handled me,

 5   Breckinridge and Grayson.  And there was attorney there

 6   from the attorney general's office, which I don't know

 7   who that was.

 8        Q    Had you ever met with the attorney from the

 9   attorney general's office before?

10        A    No.

11        Q    Had you ever met with the lawyer from

12   Breckinridge County before?

13        A    No.  I was cold turkey on that one.

14        Q    Yeah, that makes a difference, doesn't it?

15             MR. BRUSTIN:  Objection.

16        A    It makes a lot of difference.

17        Q    In other words, nobody brought out written

18   transcripts of the testimony for you to read to refresh

19   your memory of what had happened, did they?

20             MR. BRUSTIN:  Objection to form.

21        A    No.

22        Q    Did anybody bring your investigative file and

23   have you review that before you testified?

24        A    No.

25             MR. BRUSTIN:  Objection to the form.
```



1        Q    Did they show you any of Mr. Thurman's letters
2    or information before you testified?
3        A    No.
4        Q    Did they show you any of the investigative
5    letters about what this witness or that witness said
6    before you testified?
7             MR. BRUSTIN:  Objection.  He wasn't shown that
8        before this deposition.
9             MR. ERVIN:  Sir?
10            MR. BOND:  What's that got to do with the
11       question asked?
12            MR. BRUSTIN:  It's just --
13            MR. BOND:  Go ahead.  Go ahead and --
14            MR. ERVIN:  Counsel, please.  Your colloquy is
15       unnecessary.
16            MR. BRUSTIN:  Okay.  Objection to form.
17            MR. ERVIN:  Thank you.
18       A    I think that I've seen the LPD reports.
19   Letters, they call them.
20   BY MR. ERVIN:
21       Q    Right.
22       A    Plus my case report --
23       Q    But had you seen those --
24            MR. BRUSTIN:  He's not done answering --
25            MR. ERVIN:   -- in preparation --



```
 1             MR. BRUSTIN:  Hold on.

 2             MR. ERVIN:   -- for that hearing?

 3             MR. BRUSTIN:  Hold on.

 4             MR. ERVIN:  Counsel, please.  You've had your

 5       time.

 6             MR. BRUSTIN:  He wasn't done answering.  Don't

 7       interrupt him.

 8             MR. ERVIN:  Hey, you're not objecting for him.

 9       You don't represent him.

10             MR. BRUSTIN:  Listen to me.

11             MR. ERVIN:  Be quiet.

12             MR. BRUSTIN:  He's going to answer --

13             MR. ERVIN:  Be quiet.

14             MR. BRUSTIN:  No.  No.  No.  No.  No.  No.

15       He's going to answer the question.

16             MR. BOND:  I'm going to leave.

17             MR. GARVERISH:  Off the record.

18                  (OFF THE RECORD)

19  BY MR. ERVIN:

20       Q    The question is were you able to meet -- and

21  you didn't meet with either of those lawyers, did you?

22       A    No, I did not.

23       Q    And nobody brought to you any records to

24  review to prepare you for that hearing, did they?

25             MR. BRUSTIN:  Objection to form.
```



1        A    No, they did not.

2        Q    Did anybody give you any records to review to

3   prepare for that hearing?

4        A    Yes, they did.

5        Q    Who was that?

6        A    Attorney for the -- attorney for The Innocence

7   Project.

8        Q    Do you know what she gave you?

9        A    Yes.

10       Q    What?

11       A    Something about doing with the color or the

12  automobile.  And I had it wrong.  I've done forgot the

13  color of that automobile, and she corrected me.  Which -

14  - and there's a couple of things other -- she showed me,

15  I think one sheet, I had a few questions on it.  But

16  there --

17       Q    That was --

18       A    -- was questions.

19       Q    That was what their lawyer gave you?

20            MR. BRUSTIN:  At the -- he's talking about --

21       Q    Right?

22       A    Yes.

23       Q    And that was immediately before the hearing

24  started?

25            MR. BRUSTIN:  At the hearing.



```
 1        Q    Sir?

 2        A    What's that, sir?

 3        Q    Immediately before the hearing started or

 4   during the hearing?

 5        A    No, it was during the hearing.

 6        Q    Okay.  It was during the hearing?

 7        A    During the hearing.

 8        Q    Believe that's all I have.  Thank you.

 9             MR. BRUSTIN:  Done.

10             VIDEOGRAPHER:  The time is 2:14, and we are

11        off the record.

12                   (DEPOSITION CONCLUDED AT 2:14 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1        CERTIFICATE OF REPORTER

2        COMMONWEALTH OF KENTUCKY AT LARGE

3

4   I do hereby certify that the witness in the foregoing

5   transcript was taken on the date, and at the time and

6   place set out on the Title page here of by me after

7   first being duly sworn to testify the truth, the whole

8   truth, and nothing but the truth; and that the said

9   matter was recorded stenographically and mechanically by

10  me and then reduced to typewritten form under my

11  direction, and constitutes a true record of the

12  transcript as taken, all to the best of my skill and

13  ability.  I certify that I am not a relative or employee

14  of either counsel, and that I am in no way interested

15  financially, directly or indirectly, in this action.

16

17

18

19  *Elizabeth Harlow*

20

21  ELIZABETH HARLOW,

22  COURT REPORTER/NOTARY

23  COMMISSION EXPIRES:  04/06/2022

24  SUBMITTED ON:  11/13/2019

25

