1              IN THE UNITED STATES DISTRICT COURT

2                 WESTERN DISTRICT OF KENTUCKY

3                  HON. CHARLES R. SIMPSON III

4                   MAG. COLIN H. LINDSAY

5                    CASE NO. 17-CV-419

6

7                  JEFFREY DEWAYNE CLARK,

8                        PLAINTIFF

9                           V.

10    LOUISVILLE JEFFERSON COUNTY METRO GOVT., ET AL.,

11                       DEFENDANTS

12

13                 HON. CHARLES R. SIMPSON III

14                    MAG. DAVE WHALIN

15                   CASE NO. 17-CV-420

16

17                  GARR KEITH HARDIN,

18                        PLAINTIFF

19                           V.

20    LOUISVILLE JEFFERSON COUNTY METRO GOVT., ET AL.,

21                       DEFENDANTS

22

23   DEPONENT:  SHERIFF JOSEPH GREER

24   DATE:      AUGUST 7, 2019

25   REPORTER:  SHELBY LODA

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

2

```
 1              APPEARANCES

 2

 3  ON BEHALF OF THE PLAINTIFF, JEFFREY DEWAYNE CLARK:

 4  ELLIOT SLOSAR

 5  AMY ROBINSON-STAPLES

 6  LOEVY & LOEVY

 7  311 NORTH ABERDEEN STREET, THIRD FLOOR

 8  CHICAGO, ILLINOIS 60607

 9  TELEPHONE NO.: (312) 243-5900

10  E-MAIL: ELLIOT@LOEVY.COM

11  AMY@LOEVY.COM

12

13  ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

14  LEN H. KAMDANG

15  NICK BRUSTIN

16  NEUFELD SCHECK & BRUSTIN, LLP

17  99 HUDSON STREET

18  NEW YORK, NEW YORK 10013

19  TELEPHONE NO.: (212) 965-9081

20  EMAIL: LEN@NSBCIVILRIGHTS.COM

21  NICK@NSBCIVILRIGHTS.COM

22

23  AND

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    APPEARANCES (CONTINUED)

 2

 3    LARRY D. SIMON

 4    ATTORNEY AT LAW

 5    THE KENTUCKY HOME LIFE BUILDING

 6    239 SOUTH FIFTH STREET

 7    THE SEVENTENTH FLOOR

 8    LOUISVILLE, KENTUCKY 40202

 9    TELEPHONE NO.: (502) 589-4566

10

11    ON BEHALF OF THE DEFENDANTS, LOUISVILLE JEFFERSON COUNTY

12    METRO GOVT. AND LOUISVILLE METRO POLICE OFFICERS,

13    INDIVIDUALLY:

14    PETER F. ERVIN

15    JEFFERSON COUNTY ATTORNEY

16    531 COURT PLACE, SUITE 900

17    LOUISVILLE, KENTUCKY 40202

18    TELEPHONE NO.: (502) 574-6621

19    EMAIL: PETER.ERVIN@LOUISVILLEKY.GOV

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1
 2                    APPEARANCES (CONTINUED)
 3
 4   ON BEHALF OF THE DEFENDANT, MEADE COUNTY:
 5   KEITH BOND
 6   ANDREW T. GARVERICH
 7   COLEMAN LOCHMILLER & BOND
 8   2907 RING ROAD
 9   ELIZABETHTOWN, KENTUCKY 42702
10   TELEPHONE NO.: (270) 737-0600
11   EMAIL: AGARVERICH@CLBLEGAL.COM
12   KBOND@CLBLEGAL.COM
13
14   ON BEHALF OF THE DEFENDANT, MARK HANDY:
15   ANDREW PELLINO
16   DRESSMAN BENZINGER LAVELLE, PSC
17   321 WEST MAIN STREET
18   LOUISVILLE, KENTUCKY 40202
19   TELEPHONE NO.: (502) 630-1301
20   EMAIL: APELLINO@DBLLAW.COM
21
22
23
24
25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, ROBERT THURMAN:

4    PETER J. ROSENE

5    MCBRAYER, PLLC

6    201 EAST MAIN STREET, SUITE 900

7    LEXINGTON, KENTUCKY 40507

8    TELEPHONE NO.: (859) 231-8780

9    EMAIL: PROSENE@MMLK.COM

10

11   ALSO PRESENT:  JEFFREY DEWAYNE CLARK, PLAINTIFF

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

6

1                             INDEX

2                                               Page

3

4     PROCEEDINGS                                8

5     DIRECT EXAMINATION BY MR. SLOSAR           9

6     CROSS EXAMINATION BY MR. BRUSTIN           224

7

8                           EXHIBITS

9                                               Page

10

11        18    TRANSCRIPT DATED MARCH 2, 1995      24

12        19    TRANSCRIPT OF CLIFFY WISE DATED

13              JULY 11, 2019                      49

14        20    GRAND JURY TRANSCRIPT              174

15        21    REQUEST FOR EXAMINATION            175

16        22    REQUEST FOR EXAMINATION            179

17        23    SUMMARY OF LAB REPORTS             215

18        24    PHOTOGRAPHS                        215

19        25    MCSO POLICE FILE                   282

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    STIPULATION

 2

 3   The VIDEO deposition of SHERIFF JOSEPH GREER taken at

 4   FIRST CHRISTIAN CHURCH, 1811 NORTH MILES STREET,

 5   ELIZABETHTOWN, KENTUCKY on WEDNESDAY the 7TH day of

 6   AUGUST, 2019 at approximately 10:30 a.m.; said

 7   deposition was taken pursuant to the KENTUCKY Rules of

 8   Civil Procedure. It is agreed that SHELBY LODA, being a

 9   Notary Public and Court Reporter for the State of

10   INDIANA, may swear the witness.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 8 of 325 PageID #: 26321
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

8

```
1                    PROCEEDINGS
2         COURT REPORTER:  We are now on the record.
3    Today is the 7th day of August 2019.  We're here to
4    take the deposition of Joseph Greer.  Will the
5    counsel please identify themselves for the record?
6         MR. SLOSAR:  Elliot Slosar for plaintiff Jeff
7    Clark.
8         MS. ROBINSON-STAPLES:  Amy Robinson-Staples
9    for plaintiff Jeff Clark.
10        MR. BRUSTIN:  Nick Brustin for plaintiff Keith
11   Hardin.
12        MR. KAMDANG:  Len Kamdang for plaintiff Keith
13   Hardin.
14        MR. SIMON:  Larry Simon for plaintiff Keith
15   Hardin.
16        MR. ROSENE:  Peter Rosene on behalf of Robert
17   Thurman.
18        MR. ERVIN:  My name is Peter Ervin.  I am
19   counsel for Louisville Metro Government and
20   individual defendants -- or individual former
21   employees of Louisville Metro Government.  I want
22   to state for the record that it is now 10:24 a.m.
23   That this deposition was noticed for 9:00 a.m.
24   That defense counsel were all present at 9:00 a.m.
25   or before and available for this deposition and
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        that as a result of an apparent error by
 2        plaintiff's counsel, an hour-and-a-half of time has
 3        been wasted by five defense counsel.
 4             MR. PELLINO:  Andrew Pellino on behalf of
 5        Detective Mark Handy.
 6             MR. BOND:  Keith Bond on behalf of Meade
 7        County defendants.
 8             MR. GARVERICH:  Andrew Garverich, also on
 9        behalf of the Meade County defendants.
10             COURT REPORTER:  Sir, will you please raise
11        your right hand?  Do you solemnly swear or affirm
12        the testimony you are about to give will be the
13        truth, the whole truth, and nothing but the truth?
14             THE WITNESS:  I do.
15             COURT REPORTER:  Thank you.
16
17                  DIRECT EXAMINATION
18   BY MR. SLOSAR:
19        Q    Good morning, Sheriff.  How are you doing?
20        A    Fine, sir.
21        Q    Can you hear me okay?
22        A    Yes, sir.
23        Q    Okay.  My name is Elliot and it's nice to meet
24   you today and I want to go over some of the rules for us
25   before we get started.  Does that sound okay to you?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Fine, sir.

 2        Q    Okay.  I'm going to ask you a lot of questions

 3   today and if at any point in time you want to take a

 4   break and go talk to your lawyer or get something to eat

 5   or enjoy the sun, you just let us know, all right?

 6        A    Yes, sir.

 7        Q    The only thing that I'll ask is that if there

 8   is a question pending that you answer the question first

 9   before taking a break.  Is that all right with you?

10        A    Yes, sir.

11        Q    Okay.

12        A    A lot of information.

13        Q    There are lot of lawyers in here today.  The

14   ones that matter most for your purposes are the ones on

15   either side of you and I'm going to ask you a lot of

16   questions and I expect that these gentlemen will make

17   some objections to those questions.  So all I'll ask is

18   that you allow for them to make their record and in

19   almost every occasion, you're going to still answer the

20   question.  Is that all right?

21        A    Yes, sir.

22        Q    Okay.  I tend not to ask questions perfectly.

23   And so if there's a question that I ask you and you

24   don't understand what I'm asking, let me know and I'll

25   ask it a better way.  Is that all right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

11

```
1        A    Yes, sir.
2        Q    In that same respect, if you answer a question
3   that I ask of you, I'm going to assume that you
4   understood what was being asked; is that fair?
5        A    Yes, sir.
6        Q    Okay.  Sheriff Greer, how old are you?
7        A    83.
8        Q    And have you ever given a deposition before?
9        A    It's been a while.
10       Q    It's been a while?
11       A    Yes, sir.
12       Q    When was the last time you gave a deposition?
13       A    Guessing --
14            MR. BOND:  Don't guess.
15       Q    Approximately.  Give me the approximate year.
16  We won't hold you to it.
17       A    In the early 2003, 2004, something like this.
18       Q    Okay.  And, again, we're not going to hold you
19  to that.  It's an approximate year based on your
20  recollection.  Generally, what type of case was it that
21  you were deposed in?
22       A    Accident case.
23       Q    Okay.  And were you testifying as a witness or
24  a party in that case?
25       A    Witness and a party.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     Q    And a party.  All right.  Were you a defendant

2  in that case, sir?

3     A    The county was.

4     Q    The county was.  Okay.  And you were --

5     A    I was sheriff.

6     Q    -- were you still sheriff at the time?

7     A    I was sheriff.

8     Q    Okay.

9     A    So it had to be prior to 2003, okay.  I

10  retired in 2003.

11     Q    Okay.  So you retired and when -- can you give

12  us the years that you were the sheriff of Meade County?

13     A    Deputies and everything?

14     Q    Just the elected sheriff?

15     A    I got elected in 2000 -- or 1981.  Took office

16  January 1, 1982.

17     Q    And how long did you hold the position of

18  sheriff, sir?

19     A    Approximately 21 -- a little better than 21

20  years.

21     Q    How many elections did you have to win to be

22  sheriff that long?

23     A    Five.

24     Q    Five elections.

25     A    It'd be five.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

13

1      Q     And during the time that you were sheriff in

2   those 21 years, was your chief deputy Cliff Wise?

3      A     No, sir.  Stan Heslep was chief deputy for a

4   while and he went to work CID at Fort Knox, criminal

5   investigation at Fort Knox.  And then Cliff Wise become

6   chief deputy.

7      Q     And do you recall approximately how many years

8   deputy wise was with you?

9      A     Oh, he was chief deputy probably 20 years, 19,

10  20 years.

11     Q     Was he your right-hand man?

12     A     Yes.  He was.

13     Q     Yeah.  And was he your right-hand man during

14  the underlying investigation into the death of Rhonda

15  Sue Warford?

16     A     No.

17     Q     Who was?

18     A     Me.

19     Q     Okay.  You were the lead investigator from

20  Meade County in that investigation, right?

21     A     That's correct.

22     Q     And the person who was assisting you from the

23  Meade County Sheriff's Department, would that have been

24  Deputy Wise?

25     A     No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL Document 317-19 Filed 01/26/23 Page 14 of 325 PageID #: 26327
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

14

```
 1        Q     Who would it have been?

 2        A     Actually, Coroner Bill Adams.

 3        Q     Okay.  And Mr. Adams was assisting you in

 4   investigating that homicide; is that right?

 5        A     That's correct.

 6        Q     Mr. Adams participated in the interrogations

 7   of Mr. Clark in that case; is that right?

 8        A     I believe he did.

 9        Q     Yeah.  Mr. Adams also joined you in

10   interrogating Keith Hardin as well.

11        A     I believe he did.

12        Q     Yeah.  And Mr. Adams was with you when you

13   went to go speak to the victim's family; is that right?

14        A     Yes.  He was.

15        Q     Yeah.  You were in close contact with Mr.

16   Adams; is that right?

17        A     Yes.

18        Q     Yeah.  And you were in contact with Mr. Adams

19   even dating all the way back to when you first went to

20   the crime scene and called him over?

21        A     That's correct.

22        Q     Yeah.  And that was on April 5, 1992; is that

23   right, sir?

24        A     That's correct.

25        Q     Yeah.  And when you were at the crime scene on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    April 5, 1992, you and Mr. Adams had an opportunity to

 2    examine the body of the victim; is that right?

 3                MR. BOND:  Object to the form of the question.

 4        Q    That's fair.  You can still answer, sir.

 5        A    More Mr. Adams than me.

 6        Q    Well, you saw the body as well, right?

 7        A    Yes.  I did.

 8        Q    And you both saw the body together when you

 9    were at the crime scene?

10        A    That's correct.

11        Q    Yeah.  And you had an ability to make certain

12    observations of the body when you were at the crime

13    scene with Mr. Adams on April 5, 1992; is that right?

14        A    That's correct.

15        Q    And one of those observations that you made

16    was that the body appeared to be fresh.

17        A    The body appeared to be in pretty good shape.

18    No types of insects, anything like that.  In fact, the

19    body was -- I'd say looked pristine.

20        Q    Yeah.  And that caused you to believe that

21    from the very beginning that the death of Ms. -- of the

22    victim who wasn't yet identified at that point?

23        A    Was not.

24        Q    That -- what your observations led you to

25    believe that the victim had died within a day or so of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you finding the body, correct?

2          A    I believe so, yes.

3          Q    And you -- in fact, you wrote that information

4    in a number of police reports during your underlying

5    investigation.  Do you recall that?

6          A    Yes.

7          Q    And do you recall during the underlying

8    investigation how you would document physical evidence

9    that was being sent off to the Kentucky State Police

10   laboratory?

11         A    That's correct.

12         Q    Yeah.  And each time you would make those

13   requests, it was your practice in 1992 to document the

14   different items of physical evidence that you were

15   sending off, right Sheriff?

16         A    That's correct.

17         Q    Yeah.  And it was your practice when you were

18   documenting that type of information to document the

19   date that you were sending that evidence off, correct?

20         A    That's correct.

21         Q    And it was your practice to document the

22   evidence that you were sending off; is that right?

23         A    That's correct.

24         Q    And that's because you wanted to keep track of

25   what was going to the Kentucky State Police laboratory,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

correct?

    A    That's correct.

    Q    And you would also document on there the date
that you believed that the victim was killed; isn't that
right?

    A    I believe that is.

    Q    Yeah.  And we're going to go through some of
those forms a little bit later on today, okay, sir?

    A    Okay.

    Q    Now, Coroner Adams, do you recall by 1992 how
long he had been the coroner of Meade County for?

    A    Oh, I'd say at least five years and I'm not --
don't hold me to that.

    Q    We're not.  If that's an approximate number --

    A    He had been coroner for a while.

    Q    Okay.  Now, had Mr. Adams participated in any
other homicide investigations with you prior to the
Warford one?

    A    I didn't have too many.  I worked with the
state police on a lot of them but so did Mr. Adams work
with the state police.

    Q    Okay.  Let me ask you the question in a better
way, okay, Sheriff?

    A    Okay.

    Q    Had Mr. Adams, in a homicide case prior to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    1992, ever participated in interview with you of a

2    suspect?

3        A    No.

4        Q    Okay.  So the Warford case was the first time

5    that you can recall Coroner Adams participating in the

6    interviews of suspects in a homicide case with you?

7        A    Sir, I just don't know.

8        Q    All right.

9        A    That's the best way to answer that one.

10       Q    That's fair enough.

11       A    I don't remember.

12       Q    It's been a long time.

13       A    Been a long time, sir.

14       Q    Now, let's go through a little bit of your

15   background, okay, Sheriff?

16       A    Yes, sir.

17       Q    Okay.  Tell us where did you go to high school

18   at?

19       A    Masonic Home Kentucky in Louisville, Kentucky.

20   Orphans' home.

21       Q    And after graduating from high school, what

22   did you do next in your career?

23       A    I joined the service.

24       Q    And what branch of the service did you join?

25       A    Army.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Okay.  And what years were you in the Army,

2  sir?

3      A      I went -- oh, my goodness.

4      Q      You don't have to tell us where you went, but

5  just the general years if you can recall.

6      A      '52, '53 I joined the Army.  One of those

7  dates.  It's been so long.

8      Q      Yeah.

9      A      I'll stick with that, '52 maybe.

10      Q      Okay.  At some point, did you get out of the

11  Army?

12      A      Yes.  I did.

13      Q      Did you get an honorable discharge?

14      A      Yes.  I did.

15      Q      And what did you do after you got that

16  honorable discharge, sir?

17      A      Really, did a little convalescing at Ireland

18  Army Hospital.  Then, I decided I'd run for constable.

19      Q      What made you want to be a constable?

20      A      I don't know.

21      Q      Now, I've been trying to figure this out,

22  Sheriff.  What exactly is it that constables do?

23      A      You don't need them.

24      Q      But when you wanted to be a constable, did

25  you --



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 20 of 325 PageID #:
26333
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

20

1      A     One reason, we didn't have any law in Meade

2   County back then.

3      Q     Okay.

4      A     We had a sheriff who didn't have a deputy

5   because the deputy stayed drunk and he fired him.  So I

6   helped the sheriff's department.  His name -- the

7   sheriff was Dave Ross, as a constable.  I didn't want a

8   deputy sheriff badge.  And once he went out of office in

9   '73, I became a deputy under another sheriff.

10      Q     Now, is it fair to say and this is, you know,

11   I have very limited knowledge from some constables out

12   in Eastern Kentucky so it may have been different down

13   in Meade County, but is it fair to say that as a

14   constable that you weren't required to have any law

15   enforcement training?

16      A     Sir, we wasn't required to have any law

17   enforcement training up into years as a sheriff of Meade

18   County.

19      Q     Okay.

20      A     When I was a deputy, it was me and a sheriff.

21   We done everything.  We didn't have the state police --

22           MR. BOND:  We need to take a break.

23           MR. SLOSAR:  Okay.  We're going to -- we're

24        going to take about a five to ten-minute break and

25        go off the record, okay, Sheriff?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            COURT REPORTER:  The time is 10:37 a.m.  We
 2       are off the record.
 3                    (OFF THE RECORD)
 4            COURT REPORTER:  The time is 10:54 a.m.  We
 5       are back on the record.
 6  BY MR. SLOSAR:
 7       Q    All right, Sheriff.  I believe before we went
 8  on a break, I was asking you some questions about what
 9  the purpose of constables were in the Commonwealth of
10  Kentucky and I believe you responded that constables
11  weren't required to have any law enforcement training;
12  is that right?
13       A    They're not required to have really anything.
14       Q    Okay.
15       A    And -- but back then, neither were sheriffs
16  and deputies.
17       Q    And prior to 1992 -- when did you become
18  sheriff?
19       A    1981.
20       Q    Okay.
21       A    I was elected in '81 and become sheriff in
22  '82.
23       Q    When you were elected sheriff in 1981, were
24  there any -- was there any training at the Meade County
25  Sheriff's Department?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

22

```
 1        A    Only OJT, on-the-job training or what we could
 2   get help with.  There was no training from the state or
 3   anything --
 4        Q    Yeah.
 5        A    -- back then --
 6        Q    And --
 7        A    -- in 1982.
 8        Q    And from -- did the Meade County Sheriff's
 9   Department prior to 1992 when the Warford investigation
10   happened, was there any formal training being provided
11   at that agency?
12        A    What year did you say?
13        Q    '92.
14        A    Yes.
15        Q    And what formal training was provided?
16        A    We finally was able to get deputies sent for
17   in-service training.  Also, in house training through
18   the county attorney.  Experienced people would train
19   them.
20        Q    Were you one of those people, sir, who would
21   train officers prior --
22        A    Yes.
23        Q    -- to 1992?
24        A    Yes.
25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREGORY, taken on August 07, 2019

```
 1                MR. BOND:  Let him finish his question, Joe.
 2        Q    I think you know where I'm going.  A lot of
 3   these questions are going to be easy, so Sheriff, prior
 4   to 1992, what type of training were you giving to
 5   deputies at the Meade County Sheriff's Department?
 6        A    19 what?
 7        Q    '92.
 8        A    We met usually once a month.  We talked over
 9   cases.  We put deputies, inexperienced ones with
10   experienced ones to work burglary, accident, anything
11   like this.  It was just strictly OJT, on-the-job
12   training.
13        Q    And is it fair to say that prior to 1992, the
14   Meade County Sheriff's Department wasn't typically
15   handling homicide investigations?
16        A    Only assisting.
17        Q    Yeah.  So prior to the Warford case, can you
18   think of another homicide investigation that your agency
19   had been the lead investigative agency on?
20        A    Really probably not any.
21        Q    Okay.  And Warford, would you consider the
22   Meade County Sheriff's Department or the Louisville
23   Police Department as the lead investigating agency?
24        A    Oh, the sheriff's office.
25        Q    Okay.  But the lead -- the Louisville Police
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 24 of 325 PageID #:
26337
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
24

 1   Department assisted your office in investigating the

 2   Warford homicide; is that right?

 3        A    That's correct.

 4        Q    And Detective Handy was the lead investigator

 5   from Louisville that you would work with?

 6             MR. BOND:  Objection to form.

 7        A    I disagree with that.

 8        Q    You disagree with that?

 9        A    Yes.

10        Q    Sir, do you recall testifying previously at a

11   trial in 1995?

12        A    Yes.

13        Q    Yeah.  And do you recall taking the oath prior

14   to testifying at trial?

15        A    Yes.  I do.

16        Q    Okay.  And so same similar oath as the one you

17   took here today; is that right?

18        A    That's correct.

19        Q    Okay.  Bear with me.  Sir, I'm going to show

20   you what we'll mark as Exhibit 18.  It is your trial --

21   a transcript of your trial testimony on March 2, 1995.

22   Here you go, Sheriff.

23             (EXHIBIT 18 MARKED FOR IDENTIFICATION)

24             MR. BOND:  Object to its introduction.  You're

25         trying to impeach him with prior inconsistent



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        statement with the introduction of the entire

 2        transcript.

 3              MR. SLOSAR:  I'm --

 4              MR. BOND:  Not the proper way to do it.

 5              MR. SLOSAR:  I'm going to move to refresh his

 6        memory first.  Here you go, Keith.  Sorry, it's

 7        heavy.

 8              MR. BOND:  No.  That's fine.  I appreciate it.

 9        The objection is on the record.  Thank you.

10              MR. SLOSAR:  It should be --

11              MR. BOND:  Do you want this one back?

12              MR. SLOSAR:  No.  Thank you.

13   BY MR. SLOSAR:

14        Q    Sir --

15              COURT REPORTER:  Mr. Slosar, would you put

16        your lapel mic back on?

17              MR. SLOSAR:  Yes.

18              MR. BOND:  Just wait.

19   BY MR. SLOSAR:

20        Q    Bear with me one moment, sir.  I'm going to

21   ask you a couple of other questions before we get into

22   this, okay, sir?

23        A    Okay.

24        Q    Now, do you recall working with Detective

25   Handy on the Warford investigation?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A     Yes.  I do.

2       Q     Okay.  And, in fact, you participated in some

3  interrogations with Detective Handy; is that right?

4       A     That's -- or listened in, or both.  Okay.

5       Q     Yep.  And at some point, you were in almost

6  daily contact with Detective Handy; is that right?

7       A     Majority of the time.

8       Q     Yeah.  And you would keep Detective Handy

9  apprised of the investigative steps that your agency was

10  taking, correct?

11      A     Yes.

12      Q     Yeah.

13      A     Which most of it was Jefferson County.

14      Q     Yeah.

15      A     So he already knew it.

16      Q     Sure.  And Detective Handy would keep you

17  apprised of the investigative steps that his agency was

18  taking, correct?

19      A     Not only Detective Handy.

20      Q     But other law enforcement officers as well?

21      A     Yes.

22      Q     Yeah.

23      A     Present.

24      Q     So you were in constant contact with Detective

25  Handy prior to Mr. Clark and Mr. Hardin's criminal trial

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    in 1995 --

2           MR. BOND:  Object to the form of the question.

3       Q    -- is that fair?

4           MR. BOND:  That's not what he said.

5       Q    All right.  Let me withdraw the question.  Is

6    it fair to say that prior to initiating charges against

7    Jeff Clark and Keith Hardin, that you were in frequent

8    contact with Mr. Handy?

9       A    And others.

10      Q    And others.  Okay.

11      A    Yes.

12      Q    Who were some of the other Louisville police

13   officers that you were in frequent contact with during

14   the underlying investigation?

15      A    Sir, I can't remember names.  I'll tell you

16   who's the supervisor -- well, Lieutenant Sherrard.

17      Q    Okay.

18      A    He's the one that would tell the detectives,

19   "Help Greer out.  Help Greer out," and whoever was

20   available, that's who helped me.

21      Q    Okay.  And sometimes -- and in fact, did

22   Lieutenant Sherrard participate with you in the

23   interrogation of Jeff Clark in April of 1992?

24      A    Say that again, sir.

25      Q    Sure.  Do you recall Lieutenant Gene Sherrard

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   ever participating in any questioning of Mr. Clark or

2   Mr. Hardin in April of 1992?

3       A   Sir, I don't remember.

4       Q   It's been a long time.

5       A   By the way, Hope Greer is another detective

6   that was involved.

7       Q   Okay.  Hope Greer is not related to you,

8   right?

9       A   Married a cousin of mine that I didn't know

10  about.

11      Q   So when you learned about her during the

12  underlying investigation, did you and Ms. Hope Greer

13  have any conversations about whether you were related or

14  not?

15      A   No.  Not really.

16      Q   No.  When did you find out that you were

17  related to Hope?

18      A   Well, I wondered why a Greer was there and so

19  I -- who was she married to before.  She wasn't married.

20  She had already divorced Greer.  That's how I found out,

21  just asking.  But we didn't discuss it much.

22      Q   Sure.

23      A   Because I -- I was in contact with her quite a

24  little bit but it was case-related.

25      Q   And is it fair to say that -- do you recall

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Hope Greer drafting some police reports relating to her

2    investigative duties in this case?

3        A    Yes.

4        Q    Yeah.  And when Hope Greer -- and during the

5    underlying investigation, did you get a copy of the

6    reports that Hope Greer drafted?

7        A    Yes.  They call them letters.

8        Q    Letters.  Yeah.

9        A    Yes.

10       Q    And when you would get a copy of these

11   investigative letters from the Louisville Police

12   Department, would you review those letters?

13       A    Yes.

14       Q    Yeah.  And would you maintain those letters as

15   part of your investigative file?

16       A    Yes.

17       Q    Yeah.  Now, let's back up a little bit.  Prior

18   to investigating the Warford case, had you ever worked

19   on any criminal investigations with an employee of the

20   Kentucky State Police laboratory named Robert Thurman?

21       A    Yes.  I knew Robert.

22       Q    Yeah.  How did you know Mr. Thurman?

23       A    He had done a lot of drug testing for me.

24       Q    Oh, okay.  And so fair to say you knew him

25   throughout the years?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    Also, I believe he lived in Meade County at

2   one time.

3       Q    Oh, okay.  Did you consider Mr. Thurman a

4   friend of yours prior to '92?

5       A    Friend, you know it's hard to say.  I had no

6   contact with him except through the crime lab.

7       Q    Could you count on him for his vote when you

8   were running in your elections?

9       A    He didn't -- he moved out of Meade County, I

10  believe.

11      Q    Okay.  Now, in those other investigations that

12  preceded the Warford case, these drug testing cases.

13      A    Uh-huh.

14      Q    Would you maintain contact with Mr. Thurman in

15  those investigations?

16      A    Only to get the reports.

17      Q    Sure.  Would you ever talk to Mr. Thurman on

18  the phone about the results of any testing that he was

19  doing?

20      A    Called him and asked him when I was going to

21  get the test because they was backlogged so bad, that's

22  all.

23      Q    Sure.  But it's fair to say that you knew how

24  to get in contact with Mr. Thurman if you needed to,

25  right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Oh, yes.

2      Q    Yeah.  And if Mr. Thurman told you what the

3  results were, you would rely on his representations to

4  make decisions in your criminal investigations; is that

5  right?

6      A    He was the authority, not me.

7      Q    Yeah.  You certainly didn't know how to do,

8  you know, testing of materials to determine what

9  substance they were, correct?

10      A    Field tests.  Yes.

11      Q    Okay.  Field tests.

12      A    Yes.

13      Q    But you didn't have any scientific background

14  on determining --

15      A    No.  I did not.

16      Q    You didn't do any comparisons of the hairs,

17  for instance, in this case to determine whether they

18  were a match to any of the defendant's, correct?

19      A    Did not.

20      Q    Okay.  And you relied upon Mr. Thurman's

21  testing in the results that he retrieved from that

22  testing to make decisions; is that fair?

23      A    Him or what other lab technician that might

24  have done it.

25      Q    Fair enough.  But you certainly weren't doing



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

```
 1   those types of testing yourself, correct?

 2        A    No, sir.

 3        Q    Okay.  Now, aside from Mr. Thurman prior to

 4   April of '92, did you have -- had you ever worked on any

 5   criminal investigations with a Detective James Clark

 6   from the Louisville Police Department?

 7        A    No.

 8        Q    Okay.  Prior to April of '92 had you ever

 9   worked on any criminal investigations with an officer by

10   the name of Kelly Jones?

11        A    No.

12        Q    Prior to April of '92 had you ever worked on

13   any criminal investigations with an officer by the name

14   of Robert Ennis?

15        A    No.

16        Q    Prior to April of '92 had you ever worked on

17   any criminal investigations with a Mr. Charles Ed Lynn

18   (phonetic)?

19        A    No.

20        Q    Prior to April of '92 had you ever worked on

21   any criminal investigations with an officer by the name

22   of Jim Woosley?

23        A    No.

24        Q    Prior to April of '92 had you ever worked on

25   any criminal investigations with James Griffiths?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.

 2        Q    Prior to April of '92 did you know Mark Handy?

 3        A    No.

 4        Q    Okay.  Had you ever worked on any criminal

 5   investigations prior to the Warford case with Detective

 6   Handy?

 7        A    Not aware of any.

 8        Q    Okay.  And prior to April of '92 had you ever

 9   worked on any criminal investigations with Lieutenant

10   Gene Sherrard?

11        A    No.  Just knew him.

12        Q    Okay.  And how'd you know Mr. Sherrard?

13        A    His dad used to be post commander at Post Four

14   at Elizabethtown back years and years ago.

15        Q    So did you know Gene when he was growing up?

16        A    No.  I didn't.

17        Q    No.  Okay.  But you knew his dad?

18        A    Uh-huh.

19        Q    What was his dad's name?

20        A    I can't think of it.

21        Q    Okay.

22        A    It's too many years.

23        Q    Okay.  Fair enough.  Now, is it fair to say

24   that this case is one that is -- sticks out in your

25   mind?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

1        A    Most definitely.

2        Q    Yeah.  Fair to say that this was the biggest

3    case of your career?

4             MR. BOND:  Object to the form.  Go ahead and

5        answer.

6        A    Yes.

7        Q    Yeah.  And did you keep track of what was

8    going on with this case after Jeff Clark and Keith

9    Hardin were convicted in March of 1995?

10       A    Yes.  After the trial was over, I had received

11   a phone call from Mr. Bart Adams, a lawyer for Mr. Clark

12   telling me about a "letter" and I supposedly had a copy

13   of it.  I told Mr. Adams, "Bart, I don't know what

14   you're talking about."  And we talked for a little

15   while.  Immediately after hanging up, I called Kenton

16   Smith the Commonwealth attorney prosecutor and advised

17   him of the phone call.

18       Q    And from that conversation with Mr. Adams, you

19   were pretty upset; is that right?

20       A    Most definitely.

21       Q    Yeah.  And you had known -- and that phone

22   call related to a letter that Kevin Justis had received

23   from Clifford Capps; is that right?

24       A    That's what I was informed by Mr. Adams.

25       Q    Yeah.  And you knew Mr. Justis' family prior

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to March of 1995; is that right?

2        A    Yes.

3        Q    Yeah.  In fact, you knew them pretty well; is

4    that right?

5        A    Kevin's dad, I thought the world of.  The

6    mother hated my guts.

7        Q    Yeah.  And how did that come to be, Sheriff?

8        A    Because she said I was picking on her son.

9        Q    And when do you recall first having like those

10   types of issues with his mother?

11       A    Sir, I don't remember.

12            MR. BOND:  Object to the form of the question.

13       Go ahead and answer.

14       A    I don't remember.

15       Q    How long -- when do you first recall coming

16   into contact with Kevin Justis?

17       A    Sir, I don't remember.  Seen his dad quite

18   often.  But I really don't remember.

19       Q    You knew who Kevin Justis was, though, in

20   1992; is that fair?

21       A    Yes.

22       Q    Yeah.  And you were familiar with -- in 1992

23   is it fair to say that Kevin Justis was charged with

24   criminal offenses in Meade County?

25       A    That's correct.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Yeah.  Your agency initiated those charges?
 2        A    I believe so.
 3        Q    Were you one of the officers who questioned
 4   Mr. Justis about those charges prior to his prosecution?
 5        A    No.  I don't believe I was.
 6        Q    Okay.  Well, prior to 1990 -- and this letter
 7   issue that Mr. Adams called you about, this related to a
 8   letter that Mr. Justis had received from Clifford Capps;
 9   is that right?
10             MR. BOND:  Objection.  Asked and answered.
11        He's already answered that question.
12             MR. SLOSAR:  I haven't asked him about Capps.
13        If he -- he briefly talked about the letter.
14             MR. BOND:  No.  You said a letter between
15        Capps and Hardin.
16             MR. SLOSAR:  No.  I --
17             MR. BOND:  He said that's what Mr. Adams told
18        him.
19             MR. SLOSAR:  Let me clear it up, okay.
20   BY MR. SLOSAR:
21        Q    Sheriff, this letter that was at issue --
22        A    Yes.
23        Q    -- in this March '95 phone call.  This was a
24   letter that was given to Mr. Justis from Clifford Capps.
25   Is that your understanding?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Mr. Capps.

 2        Q     Clifford Capps.

 3        A     Yes.  Give to Justis.

 4        Q     Yes.

 5        A     Yes.

 6        Q     Yeah.  And you reviewed that letter, correct?

 7        A     Sir, I had not.

 8        Q     Well, I'm asking you since 1995, you've had a

 9  chance to review that letter, right?

10        A     In 2015 a hearing was held in Meade Circuit

11  Court and a nice lady, Ms. Hall I think her name was,

12  had the letter, give it to me and let me look at it.  I

13  looked at it and I says, "Ma'am, I have never seen this

14  letter before."

15        Q     And so --

16        A     And I hadn't.

17        Q     Okay.  So it's your testimony that the first

18  time you ever saw the letter from Clifford Capps to Mr.

19  Justis was in 2015 at the evidentiary hearing?

20        A     Yes.

21        Q     Okay.  And I want to show you --

22              MR. SLOSAR:  Do we -- I know I have an exhibit

23        binder.  Do we have an extra one of these for him?

24        These are the other ones?  Okay.  Thank you.

25        Sorry.  I just want to make sure I'm not doubling
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 38 of 325 PageID #: 26351
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

38

```
 1        up.
 2   BY MR. SLOSAR:
 3        Q     I'm going to show you, sir, what previously
 4   has been marked as Plaintiff's Exhibit number 1.  Please
 5   take a look at that.  Is this the letter that you first
 6   saw in 2015, Sheriff?
 7        A     That's it.
 8        Q     Okay.  Before 2015 you never saw this letter?
 9        A     No.
10        Q     Okay.  And if somebody said that you had seen
11   this letter prior to 2015, would they be lying?
12        A     Yes.  They would.
13        Q     Okay.  So if somebody said that you saw this
14   letter in March of 1995, would that be a lie?
15              MR. BOND:  Object to the form of the question.
16        Q     You can answer, sir.
17        A     I did not see this letter until the attorney
18   give it to me at the March or April, whatever date that
19   hearing was, in July of 2015.  I had never seen it yet.
20   I guess that's it.  I hadn't.
21        Q     Okay.  Okay.  So in 1995 you did not see this
22   letter, correct?
23        A     No.
24        Q     In 1992, you did not see this letter, correct?
25        A     No.  I don't know if the letter even existed.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     2015 first time you ever saw it?

 2        A     Yes.

 3        Q     Sir, let me ask you this: You had some

 4   interactions with Mr. Justis.  You knew of him in 1992?

 5        A     Yes.

 6        Q     Okay.  And you also knew in 1992 of Clifford

 7   Capps; is that right?

 8        A     Yes.

 9        Q     Yeah.  In fact, you had previously

10   investigated Mr. Capps for a homicide in Meade County;

11   is that right?

12        A     No.  I did not.

13        Q     Well, tell me, do you remember the murder

14              of --

15        A     Gardiola?

16        Q     Yes.  And that happened -- when approximately

17   did that happen, sir?

18        A     Sir, I don't know when that happened.

19        Q     Okay.  Does February 21, 1987 seem familiar?

20        A     I don't know.  I participated in it with the

21   state police.

22        Q     Do you remember the murder of Ms. Gardiola

23   that happened at the Five Star; is that right?

24        A     Yes.

25        Q     And it was a robbery and a murder, correct?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

40

1      A    Yes.

2      Q    And during that investigation, Mr. Capps was a

3  suspect; isn't that right?

4      A    Not with me he wasn't.

5      Q    Well, another law enforcement agency was

6  taking the lead on that investigation; is that right?

7      A    That's correct, Kentucky State Police.

8      Q    Yeah.  Which officer was it?

9      A    They had a committee back then made up of

10  several officers that investigated homicides.  Who all

11  they were, Tommy Stiles was one of them.  I don't

12  remember all of them's name, but I knew every one of

13  them.

14      Q    And you -- during that investigation, you kept

15  in contact with Officer Stiles from the Kentucky State

16  Police; is that right?

17      A    Yes.

18      Q    Yeah.  And you also kept in contact with other

19  members of the Kentucky State Police; is that right?

20      A    Mainly Tommy Stiles.

21      Q    Yeah.  And at some point in that

22  investigation, isn't it true that Mr. Capps was a

23  suspect in the homicide?

24      A    Not with me he wasn't.

25      Q    But did you ever come to learn that the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Kentucky State Police officers, at some point, suspected

2    Mr. Capps of committing that murder?

3          A    No.  That wasn't brought to my attention.

4          Q    It wasn't brought to your attention?

5          A    No.  It wasn't.

6          Q    So if Deputy Wise testified in a deposition

7    that Mr. Capps was a suspect in that homicide, would he

8    have been lying?

9          A    No.  I can't say Deputy Wise would lie.  He

10   might know something I didn't know.

11         Q    If Deputy Wise said that you knew that Mr.

12   Capps was a suspect in that homicide, would that not be

13   true?

14         A    I think Deputy Wise made a mistake because to

15   me, Cliff Capps, I consider him to do a lot of things. I

16   wouldn't consider him to be a murderer.

17         Q    What things would you have considered Cliff

18   Capps to have done prior to 1992?

19         A    Cold checks, stealing from his mother, stuff

20   like this.

21         Q    So you knew -- prior to 1992, you knew that

22   Clifford Capps was involved in crimes of dishonesty; is

23   that right?

24         A    Oh, most definitely.

25         Q    Yeah.  You knew that Mr. Capps had issues with

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   lying; is that fair?

2       A    Well, when -- yes, but when you put it down to

3   him, he would always tell the truth.  When you had

4   enough to convince him, hey, man, you're lying.

5       Q    So mister -- so at some point in the

6   investigations, prior to 1992, you had interactions with

7   Mr. Capps; is that right?

8       A    Yes.  I did.

9       Q    Yeah.  And at some point in those criminal

10  investigations, you suspected that Mr. Capps had

11  committed various crimes of dishonesty; is that fair?

12      A    He got arrested for them.

13      Q    Yeah.  And at some point in your questioning

14  of Mr. Capps, he -- at some point, he would ultimately

15  confess to committing those crimes; is that right?

16      A    Sir, you keep in mind, I'm not the only

17  officer that talked to Cliff Capps.  You're saying that

18  I did it all.  No.  I had a department.  Cliff Wise

19  might have talked to Capps --

20      Q    I see.

21      A    -- unbeknownst to me or one of the other

22  deputies.

23      Q    Fair enough.  But they kept you informed,

24  right?

25      A    Sometimes they did and sometimes they didn't.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q    All right.  Well, you're the sheriff so you

2    would have ultimately known when people were charged

3    with crimes at the Meade County Sheriff's Department?

4        A    Yes.  I would know.

5        Q    Okay.  And you knew prior to 1992 that

6    Clifford Capps was charged with various crimes relating

7    to dishonesty; is that fair?

8        A    Yes.

9        Q    Okay.  And in fact, you knew that at some

10   point in those criminal investigations that Mr. Capps

11   had initially denied involvement in those crimes; is

12   that right?

13           MR. BOND:  Object to the form of the question.

14       Go ahead and answer, Joe.

15       A    Yeah.

16       Q    Yeah.

17       A    I'd say sometimes he'd deny everything.

18       Q    Yeah.  You knew that prior to 1992 that

19   sometimes Mr. Capps lied to officers at your law

20   enforcement agency, correct?

21       A    Which most --

22           MR. BOND:  Object to the form.

23       A    -- criminals do.

24       Q    Yeah.  And Mr. Capps was a criminal like the

25   others, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

44

```
 1        A    That's right.
 2        Q    Nothing different than him and other people
 3   coming in there and lying about crimes that they
 4   committed, correct?
 5        A    That's right.
 6        Q    Yeah.
 7        A    And you get enough pressure you can put on
 8   them and say, hey, let's have the truth.
 9        Q    Yeah.  And fair to say that you were aware
10   prior to 1992 that Mr. Capps had some credibility
11   issues?
12        A    I could say yes.
13        Q    Yeah.
14        A    He probably did.
15        Q    Yeah.  Because he lied to officers at your
16   department relating to criminal investigations, correct?
17        A    Yes.
18        Q    Yeah.  And that happened prior to 1992, right?
19        A    Yes.
20        Q    Yeah.  But let me ask you this, did you -- I
21   heard that -- did you used to call Deputy Wise, did you
22   call him Cliffy?
23        A    Cliff, yeah.  Cliffy.
24        Q    Yeah.
25        A    Yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER taken on August 07, 2019

```
 1        Q    He told us that some people call him Cliffy,
 2   so I didn't know what you referred --
 3        A    I did.
 4        Q    Okay.  Did you -- I heard that Deputy Wise had
 5   a -- like a septic business in Meade County.  Were you
 6   ever aware of that?
 7        A    Yes.
 8        Q    Okay.  And you ever help him out with that
 9   business?
10        A    No.  I didn't.
11        Q    It seems like a dirty job.
12        A    He's still in it.
13        Q    He's still in it?
14             MR. BOND:  Object.  Let's ask questions about
15        the case.
16        Q    All right.  Let's get back to the case,
17   Sheriff, did -- when was the first time that you learned
18   that Mr. Capps was referring business to Deputy Wise's
19   septic business?
20             MR. BOND:  Object to the form of the question.
21        Q    You can answer.
22        A    Sir, you're telling me something I didn't
23   know.
24        Q    Okay.  Did Deputy Wise -- prior to Mr. Clark's
25   trial, did Deputy Wise ever tell you that Clifford Capps
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  had referred customers to his septic business?

2       A    No.

3       Q    No.  Is that something that you would have

4  wanted to known prior to Mr. Clark and Mr. Hardin's

5  trial?

6       A    It's hard for me to believe that Cliffy would

7  even take any information from Capps.  Maybe he did, but

8  I was not aware of it.

9       Q    Okay.  And if you were made aware that there

10 was this type of business transaction going on between

11 Mr. Capps and Mr. Wise, is it fair to say that you would

12 have disclosed that type of information to Kenton Smith

13 prior to Mr. Clark and Mr. Hardin's criminal trial?

14      A    Not necessarily expose it.  I'd have got with

15 Cliffy and asked him what's going on.

16      Q    Sure.  And if Mr. Wise confirmed it, would you

17 have memorialized that and turned it over to the

18 Commonwealth?

19           MR. BOND:  I'm going to object to the form of

20      the question.  Those are not facts in evidence.  Go

21      ahead.

22      A    Not really.

23      Q    No.  You wouldn't have done that?

24      A    No.

25      Q    No.  And is that because prior to 1995, nobody

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 47 of 325 PageID #:
26360
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
47

1   had ever told you that you had to document that type of

2   information?

3          MR. ERVIN:  Objection to the form of the

4       question.

5       Q    You can answer, sir.

6          MR. ERVIN:  It implies somebody needed to tell

7       him or needed to declare.

8       Q    You can answer, sir.

9       A    My case was over.

10      Q    Well, I'm saying prior to trial?  That prior -

11  - so the trial was -- the conviction was in March of

12  1995.

13      A    Uh-huh.

14      Q    So I'm saying that if deputy -- if you learned

15  information like that that Mr. Capps was referring

16  people to mister -- to Deputy Wise's septic business

17  prior to trial, would you have documented that and

18  disclosed it to the Commonwealth?

19      A    I would have just -- I would have told the

20  Commonwealth attorney, not necessarily document it.

21      Q    Okay.  But you would have made sure that the

22  Commonwealth attorney knew that type of information,

23  correct?

24      A    Yes.

25      Q    Yeah.  And that's because you want to be as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   careful as you can be with disclosing evidence to the
 2   Commonwealth in a homicide case, right?
 3          MR. BOND:  Object to the form of the question.
 4     A    I would --
 5          MR. BOND:  Go ahead.
 6     Q    You can answer, sir.
 7     A    I would have confronted Cliffy with it.
 8     Q    Sure.  But after you confronted Cliffy, after
 9   you confronted Mr. Wise, you would have also disclosed
10   that to the Commonwealth, correct?
11     A    Yes.
12     Q    Yeah.  Because in a criminal investigation,
13   especially a homicide, it's important to document
14   everything, right?
15     A    That's correct.
16     Q    And it's important especially in a homicide
17   investigation to document every investigative step that
18   you take.  Is that right, Sheriff?
19     A    Yes.  But most of the time once my case was
20   over, everything I got on it, I referred it to the
21   Commonwealth attorney, i.e., Capps' statement.  I
22   referred that to the Commonwealth attorney to see how he
23   wanted to handle it.
24     Q    Sure.  And, sir, I'm going to show you --
25          MR. SLOSAR:  Do we have this -- do we have
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

49

```
 1        enough copies for an exhibit?

 2             MR. BOND:  Yeah.

 3             MR. SLOSAR:  Thank you.

 4   BY MR. SLOSAR:

 5        Q    Let's -- we're going to mark this as Exhibit

 6   number 19.  And, sir, there's a lot of documents so --

 7   thank you.  There's a lot of documents so I'm going to

 8   do my best to -- and I'm going to refer you, sir, to

 9   page 23.  Okay.  You take a look at that.  It's a little

10   bit small so you let me know --

11             (EXHIBIT 19 MARKED FOR IDENTIFICATION)

12             MR. BOND:  Let me see it first.  Let me see it

13        first.

14        Q    -- if you can't see it, I could try to get you

15   a --

16             MR. PELLINO:  What are you showing him?

17             MR. SLOSAR:  I'm showing him the deposition

18        transcript of Cliff Wise.  Here you go.  Keith,

19        here's an extra copy for you.

20             MR. BOND:  Okay.

21             MR. SLOSAR:  It's at 23.  Pass these around.

22             THE WITNESS:   Which one did you say?

23             MR. BOND:  Page 23, Joe.

24   BY MR. SLOSAR:

25        Q    Yeah, 23.  It's a little box so I apologize,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Sheriff Greer.  It's in the left-hand corner.

2        A    Okay.

3        Q    Sir, did you have a chance to read that,

4    Sheriff?

5        A    Yes.  I have.

6        Q    Okay.  And it's your recollection that prior

7    to Mr. Clark and Mr. Hardin's criminal trial in 1995,

8    that you had no knowledge of this business relationship

9    between Mr. Capps and Deputy Wise; is that right?

10            MR. BOND:  Let me object to the form of the

11       question.  I was told at a deposition that I

12       misstated the evidence and that's what's going on

13       here.  Cliff Wise stated later in his deposition --

14            MR. BRUSTIN:  You shouldn't be doing this.

15       This is --

16            MR. BOND:  Oh, I'm going to do it, Nick.  You

17       did the same thing.

18            MR. BRUSTIN:  You should not be speaking

19       objection.  This is totally inappropriate.

20            MR. BOND:  I'm going to do the same thing you

21       did.  He gave you the date that the relationship

22       commenced.  Because it's when he purchased the

23       business from some whatever --

24            MR. BRUSTIN:  You are instructing your witness

25       what to say.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BOND:  I am -- he has no reference to what
 2       I'm saying, Nick.
 3              MR. BRUSTIN:  You are instructing the witness.
 4              MR. BOND:  I am not.
 5              MR. BRUSTIN:  Please stop.
 6  BY MR. SLOSAR:
 7       Q    Sheriff, prior to March of 1995, is it fair to
 8  say that you have no knowledge that Clifford Capps had
 9  referred customers to Deputy Wise's septic business?
10       A    I had no knowledge.
11       Q    Okay.  And if you had been informed of that,
12  you would have confronted Deputy Wise --
13       A    And then --
14              MR. BOND:  Let him finish his question.
15       Q    -- and then you would have disclosed this
16  information to the Commonwealth attorney.  Is that
17  right, sir?
18       A    Yes.  I would have.
19       Q    Now, Sheriff, after -- you have a good
20  recollection of testifying in 2015, that was down in
21  Meade County; is that right?
22       A    That's right.
23       Q    In front of Judge Butler?
24       A    Yes.
25       Q    Yeah.  Is Judge Butler -- do you consider him
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 52 of 325 PageID #:
26365
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

52

1   to be a friend of yours?

2        A     I know Judge Butler.

3        Q     Yeah.  You probably know him well from all

4   those years that you were down there in Meade County as

5   the sheriff.

6        A     I knew him when he was county attorney of

7   Breckenridge County.

8        Q     Yeah.  Now, sir, after that evidentiary

9   hearing, do you recall having any conversations with

10  attorneys back in the judge's chambers?

11       A     I talked to Ms. Hall for a minute.

12       Q     Okay.  And who is Ms. Hall?

13       A     Or whatever her name is?

14       Q     Is it Linda Smith?  Is that the person you're

15  thinking about?

16       A     Linda.  That's -- I'm getting mixed -- yes.

17       Q     Okay.

18       A     The attorney for Innocence Project.

19       Q     Okay.  Was she nice to you?

20       A     Very nice.

21       Q     Yeah.  And --

22       A     She was trying to get me out of there, sir. My

23  wife had been admitted to Norton's hospital in critical

24  condition and I was there in body, but I was not there

25  in mind.  Judge Butler knew it, but I got kindly shafted

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 53 of 325 PageID #:
26366
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
53

1  a little bit on that one.  The Commonwealth attorney at

2  that time had promised me that he would get me in there

3  and get me out of there because the doctors was

4  screaming to get from Harrison County to Norton's.  But

5  they didn't get me in there and out of there and I

6  assure you your lawyer was not told about it.  Because

7  she tried -- when she found out, she tried to get me out

8  of there.

9       Q    I'm sure she did, sir.  And I'm sorry.

10      A    She did.

11      Q    And I'm sorry you were going through that.

12           MR. BOND:  Let's ask questions.  Let's not

13      comment.

14      Q    Sheriff, do you want to take a break.

15           MR. BOND:  No.  We're fine.

16      A    No.  I'm fine.

17      Q    Okay.  Now, Sheriff, after that hearing, did

18  you tell Ms. Smith that you were so grateful for the

19  opportunity to get some things off your chest?

20      A    Yes.  And thank her for bringing that letter

21  out because I didn't know nothing about it, and I

22  thanked her for it.

23      Q    And is it fair to say that when you reviewed

24  that letter a few minutes ago and I'll give it back to

25  you.  This is Plaintiff's Exhibit number 1.  I'm sorry,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Sheriff.  That if you -- from reading this letter, would

2    you agree with me that if you -- if somebody had known

3    about this back in 1992, that it should have been

4    disclosed to the Commonwealth?

5        A    Sure.

6        Q    Sure.  And would you agree with me that from

7    reading -- as a law enforcement officer throughout your

8    years of experience that this letter appears to show --

9    what does this letter appear to show you, sir?

10       A    It appears to show me but I'm not the decision

11   maker on it, the Commonwealth attorney is.  It appears

12   to me it is exculpatory.

13       Q    Yeah.  And does this letter from you reading

14   it --

15       A    I have never read the letter.

16       Q    Well, did you read it here today?

17       A    I've looked at it.

18       Q    Why don't you read it and I'm going to ask you

19   some questions, okay, Sheriff?

20           MR. SLOSAR:  Do you have that list?  I'm

21       sorry.

22           MR. BOND:  You've got to speak up.  I'm hard

23       of hearing.  What are you asking me?

24           MR. SLOSAR:  Do you have a list?

25           MR. BOND:  Of what I gave him?  Yeah.  He's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 55 of 325 PageID #: 26368
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

55

1    seen the letter.

2         THE WITNESS:   I've seen it.  I've just never

3    read it.

4         MR. BOND:  At a break, I can run down to the

5    office and copy -- these are my handwritten notes

6    of what we gave him.  I meant to have it typed up

7    and I didn't.  It references Bates stamps is what

8    it does.

9         MR. SLOSAR:  Are you okay if I just --

10        MR. BOND:  Yeah.  You can look at it.  I don't

11   care.  Well, let me say, whatever I gave him is

12   referenced there.  I won't promise you it

13   references the Bates stamp of Meade County

14   Sheriff's Office, okay.

15   BY MR. SLOSAR:

16        Q    Sir, can you look at the back side of that

17   too?

18        A    Uh-huh.

19        MR. BOND:  Oh, okay.  Now, for the record,

20   that's a separate page in the doc -- in actuality.

21        MR. SLOSAR:  Yeah.  But it's all Plaintiff's

22   Exhibit number 1.

23        MR. BOND:  That's right.  But I -- I want him

24   to know that it's a separate page in.

25        MR. BRUSTIN:  It's a separate page but it is a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        single letter that is two pages long.
 2             MR. BOND:  Well, we don't know that -- if
 3        that's true or not, but --
 4             MR. SLOSAR:  All right.
 5             MR. BOND:  -- there's two pages.
 6             MR. SLOSAR:  Well, that's not an issue for
 7        here.
 8             MR. BOND:  Right.
 9  BY MR. SLOSAR:
10        Q    Sir, have you had a chance to read Plaintiff's
11  Exhibit number 1?
12        A    Yes.
13        Q    Okay.  And you would agree that's exculpatory,
14  correct?
15        A    That's up to the Commonwealth attorney but I
16  thought it was.
17        Q    If you knew about this in 1992, then you
18  should have produced it to the Commonwealth attorney,
19  correct?
20        A    Question.  Was this letter known in 1992?
21        Q    Well, that's a different issue.  So --
22        A    Okay.
23        Q    -- we're going to ask you about that, but I'm
24  saying would you agree that if you were provided this
25  letter in 1992, that it should have then been turned
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    over to the Commonwealth?

2        A    Most definitely.

3        Q    Okay.  And from looking at this letter, all

4    your -- how many years of law enforcement experience do

5    you have, Sheriff?

6        A    About 30-something.

7        Q    Okay.  In this letter, assuming -- and

8    Clifford Capps -- I'll represent to you that Clifford

9    Capps has admitted to writing this letter, okay?

10       A    Okay.

11       Q    From all your years of law enforcement --

12           MR. BOND:  To him?

13           THE WITNESS:    Not to me, he hasn't.

14           MR. SLOSAR:  No.  I'm saying that he --

15       Clifford Capps has testified that he wrote the

16       letter.

17           MR. BOND:  Okay.  I thought you --

18           MR. SLOSAR:  There's no actual dispute about

19       that.

20           MR. BOND:  I may have misunderstood you.  I

21       thought you said to him -- wrote the letter to him.

22    BY MR. SLOSAR:

23       Q    Sir, from you reviewing this letter, as -- in

24    all your years of law enforcement experience, does it

25    appear to you that Mr. Capps is trying to get somebody

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to tell a story?

2         MR. BOND:  Object to the form of the question.

3    A    Yes.

4    Q    Yeah.

5    A    And from your review of this letter, what does

6    it look like Mr. Capps is trying to do?

7    A    To get Mr. Justis to go along with everything.

8    Q    From reading this letter, is it fair to say

9    that it looks like Mr. Capps is trying to get Mr. Justis

10   to lie against Mr. Clark?

11        MR. BOND:  Object to the form of the question.

12   Q    You can answer.

13   A    My opinion, I believe so.

14   Q    Yeah.  And is it fair to say that from looking

15   at this letter, it looks like Mr. Capps is also trying

16   to get Mr. Justis to lie against Mr. Hardin, and that's

17   on the back side?

18   A    Yes.

19   Q    Yeah.  Fair to say that from your review of

20   this letter based on all your years of law enforcement

21   experience that this casts some serious credibility

22   issues for Mr. Capps?

23        MR. BOND:  Object to the form of the question.

24   A    Well, I let the Commonwealth attorney decide

25   that.  That's why I referred it to him.  I didn't take

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  an opinion on Capps one way or the other when this first

2  come to my attention because I know Cliff Capps.  So I

3  referred it to the Commonwealth attorney, told him what

4  was said, and see how he wanted to handle it.  There for

5  a while, I thought the Commonwealth attorney was going

6  to talk to Capps, but I found out later apparently he

7  didn't because he had Capps brought to Breckenridge

8  County where I took a statement from Capps, also had Mr.

9  Justis brought there to see if he could confirm what Mr.

10  Capps was saying as far as this note being passed in the

11  Meade County Jail.

12      Q      And when you spoke to Mr. Justis in

13  Breckenridge County --

14      A      He refused to talk to me.

15            MR. BOND:  Let him finish his question.

16      Q      When you tried to speak to Mr. Justis in

17  Breckenridge County, in that conversation did Mr. Justis

18  tell you about this information that Mr. Capps said?

19            MR. BOND:  Object to the form of the question.

20      A      Mr. Justis wouldn't even talk to me.

21      Q      But you did -- and this is -- you did talk to

22  Mr. Justis in Breckenridge County or try to talk to him

23  prior --

24      A      I did try, yes.

25      Q      -- prior to trial, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

60

```
 1        A    Yes.  On 1992 I believe it was.

 2        Q    Yeah.  And why is it that you went to

 3  Breckenridge to try to talk to Mr. Capps and Mr. Justis

 4  on the same day?

 5        A    That's the term -- the time that I could get

 6  them there.  I went to Mr. Smith and also Judge Monarch

 7  and asked him could I use their court reporter and they

 8  said yes, so I had an OPA issued and they on -- I

 9  thought I did on Capps, but he did show up down there.

10  Somebody got him down there and Justis because I wanted

11  to try to really pin Capps down.

12        Q    How did you first find out that Mr. Capps may

13  have had information relating to this case?

14        A    The deputy jailer said Capps wanted to see me.

15        Q    Was that --

16        A    He didn't tell me why.

17        Q    Was that --

18        A    He only knew who the deputy jailer was.

19        Q    Was the deputy jailer Benny Bruner?

20        A    He was the jailer.

21        Q    Do you remember who the deputy jailers were

22  back then?

23        A    Oh, my God, sir.  No idea.  That happens all

24  the time, hey, Sheriff, this one wants to see you, or

25  deputy this guy wants to see you.  I didn't know what
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Capps wanted.

2      Q    And if you didn't know what mister -- did you

3  speak to Mr. Capps prior to going to Breckenridge

4  County?

5      A    Yes.  When he -- I brought him up there.  I

6  wanted to find out what he had to say, and this is when

7  he told me that Justis had give him a note that Hardin

8  had give to Justis.  Justis to pass on to Jeff.

9      Q    Uh-huh.  And did you have that conversation

10  with Mr. Capps in Meade County?

11      A    Yes.

12      Q    Yeah.  And do you recall how much -- how --

13  later, we're going to go through your statement that you

14  took from Mr. Capps, the transcribed statement.

15      A    Yeah.

16      Q    And that happened in Breckenridge County; is

17  that right?

18      A    No.

19      Q    Where that --

20      A    From Mr. Capps?

21      Q    Yes.

22      A    Yes.

23      Q    Yeah.  And I will represent to you that that

24  statement has been previously introduced as Exhibit 10

25  and it's from December 2, 1992, okay.  How much time



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  passed between the time that you first learned that Mr.

2  Capps had information relating to the murder and the

3  time that you actually took his statement in December of

4  1992?

5      A    Oh, it was a few months, six, seven months, I

6  think, somewhere like that.

7      Q    So six or seven months had passed?

8      A    I think.  I'm not sure.

9      Q    And when you first spoke to Mr. Capps, that

10 was in the Meade County Jail; is that right?

11     A    Yes.

12     Q    We're talking sometime in the summer of 1992;

13 is that right?

14     A    Yes.

15     Q    Well, Mr. Clark wasn't charged until May of

16 1992.  Is that right, sir?

17     A    Yes.

18     Q    Yeah.  So it couldn't have been before May of

19 '92, right?

20     A    It could not.

21     Q    Hopefully, it wasn't because then we'd have

22 some bigger issues, but assuming that it was sometime

23 after Mr. Clark's incarceration in early May of 1992, do

24 you recall who was present when you first had this

25 meeting with Mr. Capps?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A      Just me.

2       Q      Just you.  Okay.  Wasn't it like a practice of

3   yours in 1992 to always have a witness with you when you

4   were --

5       A      Normally.

6       Q      Yeah.  And why was it important to have a

7   witness with you when you were doing interviews in a

8   criminal investigation?

9       A      On this, I did not know what Capps wanted

10  until he was brought to my office.  And after he told me

11  this, he was taken back to the jail and that's when I

12  called the Commonwealth attorney.

13      Q      And in that initial conversation with Mr.

14  Capps, what information did he provide to you, Sheriff?

15      A      He stated that Justis had give him a note that

16  he -- let's see.  Hardin to Justis, Justis to Capps, and

17  Capps to Mr. Clark.

18              MR. BRUSTIN:  Can we take a 30-second break?

19              MR. SLOSAR:  Sure.  We'll have a short break.

20              COURT REPORTER:  The time is 11:21 a.m.  We're

21      off the record.

22                          (OFF THE RECORD)

23              COURT REPORTER:  The time is 11:50 a.m.  We

24      are back on the record.

25  BY MR. SLOSAR:



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q    Sir, I want to go back to where we were.  I

2  want to ask you some questions about the first time you

3  met with Mr. Capps which I believe you testified would

4  have been sometime in the summer of 1992; is that right?

5      A    I'm just not for sure.  I can't -- I can't go

6  back that many years and remember.

7      Q    Sure.  A few --

8      A    I do know that he had one of the jailers to

9  tell him -- tell me he wanted to see me but didn't tell

10  me why.

11      Q    Sure.

12      A    The jailer didn't or the deputy jailer.

13      Q    So the jailer -- the deputy didn't tell you --

14  did the deputy tell you that Mr. Capps had information

15  relating to the murder of Rhonda Warford?

16      A    No.

17      Q    And --

18      A    Just that Capps wanted to see me.

19      Q    And to you, that probably wasn't a very

20  strange request, right?

21      A    No, because several prisoners sometimes want

22  to see me.

23      Q    Yeah.  And you're the sheriff and these

24  inmates want some of your time for various reasons; is

25  that fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     That's true.

2      Q     Okay.  So when you first learned that Mr.

3  Capps wanted to see you, you had no idea what it was

4  about; is that right?

5      A     No idea, sir.

6      Q     Did you eventually tell the deputy to bring

7  Mr. Capps over?

8      A     Yes.  I did.

9      Q     Okay.  And he was brought over to your office;

10  is that right?

11      A     To my office which was just right outside the

12  jail.

13      Q     And, again, I know you don't know the exact

14  day, but I believe that ten to 15 minutes ago you

15  testified that this would have been about five to six

16  months before you took his eventual statement; is that

17  right?

18      A     Yes.

19      Q     Okay.

20      A     And I could be wrong on that a month or two, I

21  don't know.

22      Q     Okay.  Is it fair to say that in this initial

23  conversation with Mr. Capps, that he didn't tell you

24  anything about Jeff Clark allegedly confessing to him

25  about the murder?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

66

```
 1        A    Not in that initial one, no.
 2        Q    Yeah.  And he didn't tell you that because if
 3   he did, you would have memorialized that in a police
 4   report or taken a recorded statement from Mr. Capps; is
 5   that right?
 6        A    No.  I would still turn it over to the
 7   Commonwealth attorney and let him make a decision.
 8        Q    Of course you would but you would have done
 9   that -- you would have made that decision close in time,
10   correct?
11        A    Yes.
12        Q    Yeah.  So in some way, it would have been
13   memorialized close in time to when Mr. Capps would have
14   given you that type of significant information, correct?
15        A    That's correct.
16        Q    Yeah.  That's because this is a homicide case,
17   correct?
18        A    Right.
19        Q    And it's important to make sure that
20   information in homicide cases especially are documented;
21   is that right?
22        A    That's correct.
23        Q    Yeah.  And that's the way you were trained; is
24   that right?
25        A    That's correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 67 of 325 PageID #:
26380
The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019

67

1      Q   And that's the way that you wanted other

2  deputies at your department to be trained as well,

3  correct?

4      A   Yes.

5      Q   Yeah.  And, in fact, you did your best to

6  train other deputies like Cliff Wise on their obligation

7  to document information in criminal investigations; is

8  that right?

9      A   That's correct.

10     Q   Yeah.  And you did that through some in-

11  service training.  Is that what you testified to

12  earlier?

13     A   In-service training, riding with state police,

14  getting involved with state police cases, meeting with

15  the county attorney.  There's a lot of different ways

16  that we did it.  And then finally, we got it where we

17  could send them to school.

18     Q   Okay.  And it probably took a lot of money to

19  send them to school; is that right?

20     A   No.

21     Q   No.  No money?  Did you get a state grant?

22     A   No.  They passed legislation requiring

23  deputies to have a police training and we got that

24  through the legislation.  Sheriffs didn't have to but in

25  my case, I was too old.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

68

1      Q     So by 1992, is it fair to say you were never

2  required to get any formal law enforcement training at

3  EKU?

4      A     No.  But when I went in as a deputy sheriff

5  with Ridenour, they did let us go to Richmond for two

6  weeks.

7      Q     Did you do that, sir?

8      A     Yes, I did.

9      Q     Okay.  And would that have been sometime in

10  the 1980s?

11      A     About '80 -- '82, '83, something like that.

12      Q     Okay.  But by 1992, sheriffs in the

13  Commonwealth of Kentucky had not been required to go to

14  the formal trailing; is that right?

15      A     That's correct.

16      Q     So as the sheriff, you didn't have any formal

17  outside training?

18      A     Sir, if you were over 21 and a second-grade

19  education, you could be elected sheriff in Meade County

20  or any other county in the State of Kentucky.

21      Q     Okay.  Without any law enforcement training at

22  all?

23      A     You -- most of them were farmers.

24      Q     And so in this initial conversation sometime

25  during the summer of 1992, in your office, in that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    initial conversation, Mr. Capps did not tell you
 2    anything about Jeff Clark confessing to him, correct?
 3         A    No.  He didn't tell me nothing like that.
 4         Q    Okay.  And what do you recall -- and nobody
 5    else is present for this conversation.  It's just you
 6    and Mr. Capps?
 7         A    That's correct.
 8         Q    Okay.  Now, what do you recall -- actually,
 9    strike that.  In this initial conversation with Mr.
10    Capps, were you aware that he was incarcerated on some
11    Meade County charges?
12         A    I'm sure he was.  I'm not positive, okay.
13         Q    But he was in your jail, right?
14         A    He was in our jail.
15         Q    And people in your jail are charged in Meade
16    County, right?
17              MR. BOND:  Object to the form of the question.
18         Q    You can answer.
19              MR. BOND:  He already has.
20         Q    Do you have anything else, sir?
21         A    No.  That -- that's it.
22         Q    Okay.  So in this initial conversation with
23    Mr. Capps, did he talk to you about seeing if he can get
24    any deal on his pending case?
25         A    Never mentioned a word to me.  Didn't ask me
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   to and if he had of, that's not me.  The only thing I

2   can do is sometimes I might recommend to the county

3   attorney to cut him some slack, but on Capps, I never do

4   anything on him.

5        Q    Okay.  So in this initial conversation, you

6   already said Mr. Capps did not tell you anything about

7   any supposed confession.  What information did he

8   provide to you in this initial meeting?

9        A    When he told me about the note being passed

10   from one to the other to the other, I did ask him did he

11   read the note and he said he did.  And I says, "Then

12   what did this note say."  It said, "Hardin told Jeff to

13   keep his mouth shut.  They don't have nothing against

14   us."

15        Q    And would you agree with me, sir, that

16   certainly is not a confession, correct?

17        A    No.

18        Q    And it's certainly -- was it a surprise to you

19   as the sheriff of Meade County that codefendants were

20   telling each other to shut up about a criminal case?

21        A    No.  That don't surprise me a bit, sir, over

22   the years.

23        Q    Okay.  So it wouldn't have raised your eyebrow

24   one bit, correct?

25        A    Well, yes.  It would in the sense that -- I'm

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 71 of 325 PageID #:
26384
The Deposition of SHERIFF JOSEPH GREENE taken on August 07, 2019
71

1   trying to figure out how to say this to you.  He told

2   him to keep his mouth shut.  This is something Kenton

3   Smith, our prosecutor, needed to know.  And that's

4   exactly what I relayed to him , what Capps had to say.

5   Now, Kenton, you want to believe him.

6       Q    Well, let me -- let's back up a little bit,

7   Sheriff.  I just -- I know that there are separate

8   interactions that you have with Kenton Smith and I know

9   some of those occurred in 1995.  Some of those occurred

10  before trial between 1992 and '95 so I want to try to

11  break it down a little bit, okay, so that things don't

12  get muddled together, okay?  Because at some point in

13  1995 you get that call from Mr. Adams and you ultimately

14  reach out to Kenton Smith, right?

15      A    Yes.  Most definitely.

16      Q    Yeah.  And, at that point, eventually you

17  signed an affidavit for Mr. Smith, correct?

18      A    Yes.

19           MR. BOND:  Object to the form of the question.

20      Q    Yeah.  And that affidavit was typed out,

21  right?

22      A    Yes.

23      Q    And Kenton Smith was -- or somebody from the

24  Commonwealth attorney's office typed that out for you to

25  sign; is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

72

```
 1        A    I'm sure they did, yes.  I didn't.

 2        Q    Yeah.  You weren't typing out affidavits back

 3   in 1995 --

 4        A    No.

 5        Q    -- right?  I wasn't either.  Now, I want to

 6   focus on the summer of 1992, okay?  Did Mr. Capps -- is

 7   it fair to say that in this initial meeting with Mr.

 8   Capps where he's talking about a note being passed from

 9   Keith Hardin, is it fair to say that in this initial

10   meeting that Clifford Capps doesn't tell you anything

11   resembling the fact that that note included a confession

12   from Keith Hardin about the murder of Rhonda Sue

13   Warford?

14        A    No.  No.

15        Q    That note doesn't include any information like

16   that, right?

17        A    No.

18        Q    No.  Because if it did, that would have been

19   something that you would have documented and passed on

20   to the Commonwealth, right?

21             MR. BOND:  Object.  Asked and answered for

22        about the fifth time.

23             MR. SLOSAR:  I appreciate the objection.

24   BY MR. SLOSAR:

25        Q    Is that right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      Right.

2      Q      Yeah.  That's because you knew you had to

3  disclose information in a pending criminal case,

4  correct, sir?

5      A      What I told you what the note what he told me

6  is basically that was it.  There wasn't that much in

7  that note except, you know, the note being passed, and

8  did you read it?  Yes, I did.

9      Q      Okay.  Now, in this conversation with Mr.

10  Capps, did you take any notes during that?

11      A      No.

12      Q      Okay.

13      A      Just passed it on to the Commonwealth

14  attorney.  My case was already done.  It'd all been

15  turned over to the Commonwealth.

16      Q      Okay.  But you didn't create any police

17  reports, correct?

18      A      No.  Did not.

19      Q      Okay.  And did you take any formal statement

20  from Clifford Capps relating to this information you

21  learned during the summer of 1992?

22      A      No.

23      Q      Okay.  Now, when is the next time you had an

24  interaction with -- well, after this conversation -- let

25  me withdraw those questions.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           MR. BOND:  You didn't ask one yet.

2      Q    About how long did your meeting with Mr. Capps

3  last?

4      A    A minute, minute-and-a-half.

5      Q    So he didn't have that much information to

6  tell you, right?

7      A    No.

8      Q    Okay.  It wasn't that meaningful to your case,

9  right?

10          MR. BOND:  Object to the form of the question.

11     A    I thought it would be meaningful to tell the

12 Commonwealth attorney about it.  Let him make any

13 decisions on it.

14     Q    Sure.  But there was nothing in -- there was

15 no -- Mr. Capps did not provide you with any information

16 in this initial meeting that implicated Jeff Clark or

17 Keith Hardin in the murder of Ms. Warford, correct?

18     A    No.

19     Q    That's correct.

20     A    Just to keep their mouth shut.  That's the

21 only -- if that means anything, take it for what it's

22 worth.

23     Q    So you send Mr. Capps back to his jail cell,

24 right?

25     A    Yeah.  The deputy jail, yeah, took him back.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Knocked on the jail and said, "I'm done with him."

 2        Q    Okay.  So you're the Sheriff.  You have more

 3   important things to do than sit around with Mr. Capps in

 4   your office, right?

 5        A    Well, I thought it was important enough to

 6   notify the Commonwealth attorney.  Here I didn't want to

 7   be hanging with something and me not do nothing about

 8   it.

 9        Q    And are you saying -- and is that Commonwealth

10   attorney Kenton Smith?

11        A    That's Kenton Smith.

12        Q    Okay.  Now, you didn't do that in any sort of

13   written form, right, sir?

14        A    No.  Called him on the telephone.

15        Q    It's fair to say that it's been a very long --

16   it's been, what, almost 30 years.

17        A    Almost 30 years, sir.

18        Q    Yeah.  Yeah.  You don't know what day you

19   would have informed him of that?

20        A    No idea, sir.

21        Q    You have no idea whether that was in person or

22   over the phone, right?

23        A    I think it was over the phone.

24        Q    But you don't have any --

25        A    I'm thinking.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     -- specific recollection?

 2        A     No.

 3        Q     Okay.  Now, when was the next time that you

 4   received any information indicating that Clifford Capps

 5   wanted to speak with you again?

 6        A     I didn't get any information.  I wanted to

 7   talk to him because Kenton Smith, I thought he was going

 8   to interview him and next thing we know, months go by,

 9   nobody's interviewed him.  And I think, again, Mr. Smith

10   told me to go ahead and interview him which I did.  But

11   I had to do it in Breckenridge County because I wanted

12   to get it done and Capps had already been transferred

13   out of Meade County Jail.  In fact, I think it was two

14   to three weeks after he passed that note.  And then, Mr.

15   Justis had been transferred.  One of them to St. Mary's,

16   the other one to Frankfort.  I'm not sure where they was

17   transferred to.

18        Q     What were you supposed to interview him about?

19              What was Kenton Smith supposed to interview

20   him about if Mr. Capps didn't have any actual knowledge

21   that implicated Mr. Clark and Mr. Hardin in a murder?

22        A     See what -- Mr. Smith wanted to talk to him.

23   See what else he might have, what he didn't have.  I

24   don't know.

25        Q     But you questioned Mr. Capps and he didn't
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 77 of 325 PageID #: 26390
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

77

1    have any specific knowledge that implicated the

2    defendants, correct?

3         A    Sir, when I -- when he told me about passing

4    the notes, I only talked to Capps for about a minute-

5    and-a-half.

6         Q    Because he didn't have any information, right?

7         A    That's all he give me.

8         Q    Yeah.  So why -- okay.  Now, at some point,

9    you end up going to Breckenridge County and taking a

10   court recorded statement from Clifford Capps; is that

11   right?

12        A    That's correct.

13        Q    Okay.  Why did you go to Breckenridge County

14   in December of '92 to take that statement?

15        A    Really, I can't give you a good reason except

16   I wanted to get it done and I knew Justis was supposedly

17   had a OPA to be in Breckenridge County.  So I had Mr.

18   Smith to get Capps down there, too.

19        Q    So --

20        A    Both of them were not in Meade County Jail.

21        Q    Sure.

22        A    They were in foreign jails.

23        Q    So you wanted to make sure that both Justis

24   and Capps were available in December of 1992 for you to

25   speak to both of them in Breckenridge County --



Kentuckiana Reporters                                           502.589.2273 Phone
P.O. Box 3983                                                   502.584.0119 Fax
Louisville, KY 40201                          schedule@kentuckianareporters.com
                                                  www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

78

1      A      Yes.

2      Q      -- right?

3      A      That's correct.

4      Q      And you went through a lot of work to make
5  sure that that could happen, correct?

6      A      I didn't.  The Court did.

7      Q      Somebody did on your behalf, right?

8      A      The Court did on my behalf or on Kenton's
9  behalf.

10      Q      And you made those requests so that you can
11  interview Mr. Justis and Mr. Capps relating to this
12  investigation, correct?

13      A      That's correct.

14      Q      Yeah.  And what -- why, though, did you want
15  to meet with Mr. Justis in December of 1992?

16      A      To see if I could verify what Capps had told
17  me at that minute-and-a-half meeting that we had -- that
18  Hardin give Justis a note to pass on to Cliff Capps to
19  give to Mr. Clark.

20      Q      Sir, are you sure that -- well, sir, weren't
21  you going to speak with Mr. Justis in December of 1992
22  about the note that Mr. Capps passed on to Mr. Justis?

23          MR. BOND:  Object to the form of the question.

24      Q      You can answer.

25      A      I think that's what I just said.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 79 of 325 PageID #:
26392
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
79

1       Q    Okay.  So you wanted to talk to Mr. Justis

2    about the note that Capps had passed along to him,

3    correct?

4       A    Yes.

5       Q    Okay.  And it was important for your

6    investigation to learn from Mr. Justis about the

7    contents of the notes that Mr. Capps -- the note that

8    Mr. Capps had passed onto him, correct?

9       A    Yes.

10      Q    Yeah.  And that's because you were involved in

11   a homicide investigation that you believed you needed to

12   make sure that you held up to your investigative duties

13   on, correct?

14      A    Yes.

15      Q    And you were one of the lead investigators in

16   that case, correct?

17      A    Yes.

18      Q    And so the reason why you went to Breckenridge

19   in December of 1992 was to sort of sort out this stuff

20   between Mr. Justis and Mr. Capps; is that right?

21      A    Yes.

22      Q    Now, why is it that you wouldn't have wanted

23   to speak to Mr. Justis and Mr. Capps back during the

24   summer of '92 when they were still at Meade County.

25      A    They got transferred.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    They got transferred so it was just out of
2  your control?
3    A    Yeah.  I could have went to Franklin County
4  Jail or somewhere else.  I'm really not sure when they
5  got transferred.
6    Q    When Mr. Capps -- do you know -- when Mr.
7  Capps came to you during the summer of '92, do you
8  recall whether Mr. Justis was still in your jail at the
9  time?
10   A    I'm not sure, sir.
11   Q    Okay.  And this is -- I apologize.  I should
12 have asked this stuff earlier, but back in 1992 did the
13 jail keep any sort of rosters as to the inmates who were
14 incarcerated in the Meade County Jail on any given day?
15   A    Oh, I'm sure they did.
16   Q    Okay.
17   A    I don't know.  I wasn't a jailer, so I didn't
18 work in the jail so --
19   Q    Okay.
20   A    -- I'm sure they had booking information.
21 They'd better have.
22   Q    So back in Meade County in 1992, do you know
23 whether you could have -- whether the jailer had access
24 to information as to whether Mr. Capps was ever in the
25 same cell as Mr. Clark?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 81 of 325 PageID #: 26394
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

81

```
1        A    I can only tell you what I was told.

2        Q    What were you told?

3        A    I was told that they were separated which was

4   a requirement of us when they were lodged in the Meade

5   County Jail.  Make sure they stay apart.  Then how Capps

6   and Justis got their assignments I have no idea.

7        Q    So prior to trial, you had been informed by

8   somebody at the Meade County Jail that Mr. Clark and Mr.

9   Capps were never in the same cell together, correct?

10       A    Mr. Hardin?

11       Q    Mr. Clark and Mr. Capps.

12       A    Well, they were in the same cell.

13       Q    Who told you that?

14       A    I don't know.

15       Q    Did you ever request any records to

16  corroborate or disprove that Mr. Clark and Clifford

17  Capps were never in the same cell?

18       A    They were in the same cell.

19       Q    Well, I'm asking you something -- you never

20  personally saw Jeff Clark in a cell with Clifford Capps,

21  correct?

22       A    No.

23       Q    Okay.  And what I'm asking you is something a

24  little bit different which is: Did you ever -- Mr. Capps

25  ultimately gave you a statement --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 82 of 325 PageID #: 26395
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

82

1      A    Uh-huh.

2      Q    -- in December of '92 that Jeff Clark

3  confessed to him when they were in a cell together,

4  correct?

5      A    That's in that statement.

6      Q    Yeah.

7      A    But that wasn't given to me on the initial

8  contact.

9      Q    Yeah.

10      A    Okay.

11      Q    The statement that he gave to you in December

12  of 1992 was completely different than what he told to

13  you originally, correct?

14      A    Right.

15      Q    Okay.  But in the -- in the statement from

16  December of 1992, Mr. Capps does say that they were in

17  the same cell together when these confessions supposedly

18  happened.  Do you recall that, sir?

19      A    Yes.

20      Q    Okay.  Did you take any steps to corroborate

21  or disprove -- did you take any steps to determine

22  whether Mr. Capps was ever in the same cell as Mr. Clark

23  at the Meade County Jail?

24      A    No.  Really only -- I think the only way is

25  what Capps told me.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        Q     Sure.  So Capps tells you this and you don't
 2   do anything --
 3        A     No.
 4        Q     -- to verify it, correct?
 5        A     No.
 6        Q     Okay.  You never make any request of the
 7   jailer for records --
 8        A     No.  I did not.
 9        Q     -- to verify it?  Okay.  And would you agree
10   with me that if there were records indicating that Mr.
11   Clark and Mr. Capps were never in the same cell together
12   that that would be a pretty big issue given Mr. Capps'
13   statement to you?
14        A     I agree with you.
15        Q     Yeah.  It would cause you some concerns
16   regarding his credibility, correct?
17        A     That's true.
18        Q     Yeah.  If you had done any type of
19   corroboration to disprove Mr. Capps' statement -- well,
20   let me withdraw that question.  So to your knowledge,
21   you have to -- you make certain requests to meet with
22   Mr. Justis and Mr. Capps on the same day in December of
23   1992; is that right?
24        A     That's correct.
25        Q     Okay.  And how is it -- I know that you had a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   court reporter there when you took the statement; is
 2   that right?
 3        A    Yes.
 4        Q    Okay.  And that court reporter -- how did you
 5   request that court reporter?
 6        A    I asked Judge Monarch --
 7        Q    So you asked the judge?
 8        A    -- if I could use her.
 9        Q    Okay.  Was that the judge's court reporter?
10        A    Yes.  It was.
11        Q    And where -- with Judge Monarch, that was in
12   Meade County, right?
13        A    It was motion day.
14        Q    Okay.  How far -- this is -- I'm from Chicago
15   so I apologize.  I know, I know, I saw the eye roll.  So
16   how far is Breckenridge County from Meade County?
17        A    About 30 miles.
18        Q    Okay.  I promise I'm not a bad guy.  Your
19   lawyer over there likes me, I think.  So he'll vouch for
20   me.
21             MS. ROBINSON-STAPLES:  Objection.
22        Q    But when you went to go see Mr. Capps and Mr.
23   Justis on December of '92 --
24        A    Uh-huh.
25        Q    -- did you take anybody with you?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 85 of 325 PageID #: 26398
The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019

85

```
 1        A    No.  By myself.
 2        Q    Now, again, in 1992, it was your practice to
 3   have a witness --
 4        A    Sir --
 5             MR. BOND:  Let him finish.
 6        Q    -- with you, right?
 7             MR. BOND:  Let him finish.
 8        A    Are you finished?
 9        Q    I'm finished.
10        A    Sir, I had a department with very limited
11   personnel and if you pull a person out, that means
12   sometimes you had to handle stuff yourself.  In this
13   case, I was going into another courthouse, another
14   court, with a judge's permission to use his court
15   reporter and if you don't come up with any better
16   witnesses than that, I don't think you'd ever come up
17   with any.
18        Q    Okay.  Now, and, again, the statement that Mr.
19   Capps gave you in December of '92 completely different
20   than what he told you in the summer, correct?
21             MR. BOND:  Object to the form of the question.
22        Q    You can answer.
23        A    He didn't tell me much --
24        Q    Yeah.
25        A    -- at the original meeting.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Well, he certainly didn't tell you that

2 anybody confessed a murder to him, right?

3    A    No.  He did not.

4    Q    Yeah.  Now, sir, at some point when you met

5 with Mr. Capps on December -- and I'm actually going to

6 give you this exhibit, it's Exhibit number 10 from

7 before.  Let me give this to you, Sheriff.  And you

8 reviewed a bunch of documents before this deposition; is

9 that right?

10    A    Yes.

11    Q    Yeah.  And probably saw so many documents that

12 you got tired of reading; is that right?

13    A    My mind just went blank.

14    Q    Well, I know one of the documents that you

15 didn't read at all was the letter from Mr. Capps to Mr.

16 Justis, correct?

17    A    I did not.

18    Q    Yeah.  You were given it, but you didn't read

19 it?

20    A    I looked at it --

21    Q    Yeah.

22    A    -- but I didn't read it.

23    Q    Okay.  Let me give you this one, okay.  This

24 is Exhibit number 10.  It's double sided, all right.

25 Now, was the court reporter who was typing this up, was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   she typing it up while you were in the room with Mr.
2   Capps or was she recording it and typed it up later?
3       A    I think she recorded it and typed it up later.
4   She took shorthand or both.
5       Q    I see.  What kind of device did she have?
6       A    She used two.  She used a tape recorder and
7   the other one, too.
8       Q    Okay.  Now, is it fair to say -- it looks like
9   from looking at this.  I'm looking at the actual page 1,
10  it's really just the back side of the first -- of the
11  cover page.  Do you see that, sir?
12      A    Uh-huh.
13      Q    Okay.  Is that a yes?
14      A    Yes.
15      Q    Yes.  I'm sorry.  Sheriff, you've been doing
16  so great with answering stuff that it's just the uh-huhs
17  are hard for the court reporter --
18      A    I know that.
19      Q    -- and it's my fault.
20      A    I apologize.
21      Q    It's my fault because I didn't talk to you
22  about it earlier.  Now, it doesn't give a time on here
23  that the interview actually starts.  Do you agree with
24  that from looking at the first page?
25      A    I am seeing that and that is very seldom ever



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 88 of 325 PageID #: 26401
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

88

1    happens, sir.

2        Q    Now, I know on the last -- I know that if you

3    go to page 15, sir, that there's a time that it ends,

4    and it looks like it ends at 25 to 12 Meade County time

5    and 25 to 11 Breckenridge County time.

6        A    That's correct.

7        Q    Okay.  So Breckenridge County and Meade County

8    were in different time zones?

9        A    One-hour difference.

10       Q    That is complicated and it's only about 30

11   miles away; is that right?  Did you ever have problems

12   being late in Breckenridge County for stuff?

13       A    No.

14       Q    No.  All right.  But there's no time that this

15   actually begins, according to the typewritten statement,

16   correct?

17       A    Sir, that should have never happened.

18       Q    Okay.  And is it fair to say that it was your

19   practice in December of 1992 that when you took tape

20   recorded statements to always put on those statements

21   the time that it actually begins?

22       A    Normally, I think we do.  It's -- I haven't

23   seen none of my old statements from years ago, so but

24   normally we put the time it starts and the time it ends,

25   and who's present at the beginning and who's present at

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 89 of 325 PageID #: 26402
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

89

1  the end.

2      Q     And why is it important to document that type

3  of information in a statement, Sheriff?

4      A     It's just important and it should have been

5  done in this one.

6      Q     Yeah.

7      A     Now, we did get the ending time.

8      Q     Sure.

9      A     So...

10      Q     But there's no indication of what time it

11  started, correct?

12      A     No.

13      Q     Okay.  And that was contrary to your practice

14  at the time, correct?

15      A     Yes.  And probably hers, too.  But one thing

16  about it, once it started, nobody -- it never did stop.

17  It went just straight through.

18      Q     Sure.  Now, the actual recording, do you have

19  a copy of that?

20      A     No.  I do not.

21      Q     Did you maintain a copy of that in your

22  investigative file?

23      A     No.  Did not.

24      Q     Fair to say there's no way for us to listen to

25  the recording today?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

90

```
 1      A     No.

 2      Q     Did you ever turn over the actual recording to

 3   the Commonwealth?

 4      A     No.  The Commonwealth had it.  That's who done

 5   the interview --

 6      Q     Well --

 7      A     -- or did the reporting.

 8      Q     The court reporter typed it up, correct?

 9      A     Uh-huh.

10      Q     Yes?

11      A     Yes.

12      Q     Okay.  And I know the Commonwealth -- the

13   person who actually typed it was the judge's secretary,

14   correct?

15      A     I'm sure.  Yes.

16      Q     That's who you said you went to, Judge

17   Monarch, right?

18      A     Yes.

19      Q     Okay.  But it wasn't -- Kenton Smith wasn't

20   typing this up for you?

21      A     No.  She did.  Ms. Fox.  I'm sure she did.

22      Q     Yes.  Now, what I'm asking you is and after

23   she typed it up, the recording was destroyed, correct?

24      A     I don't know.

25      Q     Okay.  Well, you never --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A    I never did get it.

2        Q    Okay.  So you never recovered the recording

3    from Mr. Capps' interview and maintained that as part of

4    the investigation?

5        A    No.  I relied on this.

6        Q    Okay.  Now, sir, in December of 1992, it was

7    also your practice to conduct a pre-interview prior to

8    turning on a recorder, correct?

9        A    In this case, no, because I'm not running the

10   show.  Ms. Fox is running the show.  She's doing the

11   recording.  But normally in our statements, i.e. almost

12   like the state police, before you start, turn your tape

13   recorder on, you do a brief synopsis of what you're

14   going to be interviewing the subject for.

15       Q    Sure.

16       A    Yes.  We did that.

17       Q    Yeah.  And that's because you want to go over

18   the questions that you're going to give to the witness,

19   correct?

20       A    You just give a brief synopsis to let them

21   know why we're going to record it.  You agree to the

22   recording, et cetera, et cetera.

23       Q    Now, in this case, though, you did conduct an

24   unrecorded pre-interview with Clifford Capps on December

25   2, 1992 prior to turning on the recorder.  Isn't that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   right, Sheriff?

 2        A     On this one?

 3        Q     Yes.

 4        A     No.

 5        Q     Sir --

 6        A     I don't know.  Just to tell you the truth.

 7        Q     I'm going to point you to page 7, okay?  And I

 8   want to see if it refreshes your memory at all.  Do you

 9   see at line 8 where it says, "Greer: Prior to us --

10        A     Uh-huh.

11        Q     -- going on tape here a while ago you said

12   something about his ex-girlfriend Amy Livers, Amy

13   Remsburg as she is now.  What did she say about that?"

14   Do you see that, sir?

15        A     Yes.  I'm just looking at it.

16        Q     Yeah.  Does that refresh your memory as to

17   whether you did an unrecorded pre-interview with Mr.

18   Capps on December 2, 1992 prior to taking his recorded

19   statement?

20        A     Yes.  We did.

21        Q     Yeah.

22        A     I see it.

23        Q     Sitting here today, do you remember what

24   information you gave to Mr. Capps during the pre-

25   interview?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

93

```
 1        A     No, sir.  I don't.
 2        Q     Sitting here today, do you recall what
 3    information Mr. Capps gave to you during the pre-
 4    interview?
 5        A     No.  I don't.
 6        Q     Do you recall how long that pre-interview
 7    lasted?
 8        A     According to this, it's just moments.
 9        Q     I'm sorry?
10        A     Well, it says here, "Prior to going on tape
11    here a while ago, you said something about ex-
12    girlfriend."
13        Q     Yeah.  So a while ago indicates that the pre-
14    interview took some time, right?
15              MR. BOND:  Object to the form of the question.
16        A     Not necessarily, sir.
17        Q     Well, a while -- we don't know when you
18    started the actual recording, right?
19        A     That's right.  You're right.
20        Q     Okay.  And this is on page 7 of your
21    recording, right?
22        A     Uh-huh.
23        Q     Yes.
24        A     It'd be nice if I had a beginning date on this
25    -- or time on this, wouldn't it?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Hey --

2      A     But I don't.

3      Q     I know.   And that's -- you know, don't get

4   upset at me about that.

5      A     Well, I'm not.   It ain't your fault, sir.

6      Q     Now, Sheriff, sitting here today, you have no

7   independent memory of anything that you said to Mr.

8   Capps prior to the recording being turned on on December

9   2, 1992, correct?

10      A     No.  I don't.

11      Q     And, again, you don't remember any information

12   he gave to you?

13            MR. BOND:  Prior to turning on the recording.

14      A     Prior to turning on the recording, no.   I

15   don't.

16      Q     During the pre-interview -- and do you -- did

17   you take any notes during your December 2, 1992 meeting

18   with Mr. Capps?

19      A     No.

20      Q     Did you create any police reports --

21      A     No.

22      Q     -- regarding this?   And why not, sir?

23      A     My case was over.   This -- this is up to

24   Kenton Smith from then on.

25      Q     Okay.   Sure.   So you didn't create any notes

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    or police reports that would in any way refresh your

2    memory as to the conversation that you had with Mr.

3    Capps prior to the recorder being turned on, correct?

4         A    No.

5         Q    Okay.  So I'm going to refer you, sir, to

6    page 3 --

7         A    Of this statement?

8         Q    -- of your -- yes, of your statement.  I'm

9    sorry.  Of Mr. Capps' statement, the statement that you

10   took.

11        A    Okay.

12        Q    Okay.  And looking at line 21, there's a

13   question that says, "Okay, Mr. Capps, while you were in

14   the same cell with Mr. Clark in the Meade County Jail,

15   was there any types of discussions or things about why

16   he was in jail talking about between you and him, or any

17   remarks made by him, or by you, either one, about the

18   charges that he was in there on, the charge that he was

19   in there on."  Do you see that question, sir?

20        A    Yes.  I do.

21        Q    Okay.  Is it fair to say that during the pre-

22   interview that Mr. Capps did not give you any

23   information indicating --

24        A    He could have, sir.

25        Q    He could have?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    He could have.  Yes.  I don't remember.

2    Q    **But you don't have any memory of it?**

3    A    No.  And I didn't have no notes made on it, so

4  I don't know.

5    Q    **Well, Mr. Capps would have had to give you**

6  **information like that if you were going to ask that**

7  **question, right?**

8    A    Probably.

9    Q    **Yeah.  You were basing --**

10    A    Sure.

11    Q    **-- yeah.  During the pre-interview that wasn't**

12  **recorded, would you have asked Mr. Capps why he didn't**

13  **provide this information to you before?**

14    A    No.

15    Q    **No.  You wouldn't have confronted him on why**

16  **his statement on December 2nd was so different than what**

17  **he had originally given to you?**

18         MR. BOND:  I'll object to the form of the

19    question.

20    A    Okay.  First thing, I told you, sir, we only

21  met for about a minute, minute-and-a-half.  He just told

22  me what he wanted to see me about, about passing the

23  notes.  And I think I even told him that the

24  Commonwealth attorney would be getting a hold of him.  I

25  referred him onto the Commonwealth attorney.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

97

```
 1        Q    But he didn't tell you -- we've already gone
 2   over this so I'm not going to belabor it.
 3        A    Uh-huh.
 4        Q    But he didn't tell you anything in that
 5   initial meeting about confessions to murder, right?
 6        A    No.  He did not.
 7        Q    Yeah.  So and as a law enforcement officer, is
 8   it fair to say that you have training or that you've
 9   been trained to have some skepticism regarding
10   statements from inmates in the jail?
11        A    Uh-huh.
12        Q    Is that a yes?
13        A    Yes.
14        Q    Yeah.  And why is it that law enforcement
15   officers are trained to be skeptical of statements from
16   jailhouse inmates?
17        A    Sometimes jailhouse informants don't work out.
18        Q    Yeah.  A lot of times, in your experience, are
19   jailhouse informants looking for a deal?
20        A    I'd have to answer yes on that.
21        Q    Yeah.
22        A    I believe so.
23        Q    Yeah.  And yeah, they want to get out of jail,
24   right?
25        A    I agree.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Yeah.  And sometimes in your experience,
 2   jailhouse informants jailhouse informants have been
 3   known to give false statements to law enforcement in
 4   order to get a deal; is that right?
 5        A     Yes.
 6        Q     Yeah.  So you've got to be very skeptical --
 7   prior to 1992, you knew that it was important to make --
 8   to corroborate information provided to you by a
 9   jailhouse informant; is that fair?
10        A     Right.
11        Q     Yeah.
12        A     Sir, this is why I referred it to the
13   Commonwealth attorney.  I did not -- you know, the
14   credibility issue.  Leave it up to the Commonwealth
15   attorney.
16        Q     Sure.  But you were aware at the time you took
17   Mr. Capps' statement that he had lied to other officers
18   in your agency before?
19        A     Probably lied to every police officer that
20   ever investigated anything on him until you get him what
21   they call, ma'am, pardon my French, nut cutting time.
22   Then they might turn around and --
23        Q     Yeah.
24        A     -- do a little talking.
25        Q     Yeah.  When you took Mr. Capps' statement in
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   December of 1992, you didn't necessarily believe what he

 2   was saying, correct?

 3        A    I can't say I disbelieved it, but I can't say

 4   I believed it.

 5        Q    Yeah.  You were skeptical?

 6        A    I'm skeptical.  That's why I want this to go

 7   to the Commonwealth attorney.

 8        Q    Sure.  You were skeptical that Mr. Capps was

 9   giving you a statement saying that Jeff Clark confessed

10   to a murder, sir, right?  Isn't that right?

11        A    Uh-huh.  Yes, sir.

12        Q    Yeah.  And is it fair to say that someone

13   should have taken investigative steps to corroborate the

14   information that Mr. Capps was providing in the

15   statement?

16        A    I left this up to the Commonwealth attorney.

17   My case is closed.

18        Q    And I'm not -- I understand that Mr. Clark and

19   Mr. Hardin were charged by then, but what I'm saying,

20   sir, is, should someone based on your law enforcement

21   experience in 1992, should someone have taken steps to

22   investigate and corroborate the statement given by Mr.

23   Capps in December of '92.

24             MR. BOND:  Object.  Asked and answered.

25             MR. PELLINO:  Objection.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

100

```
 1        Q     You can answer, Sheriff.  You can answer.
 2        A     It's hard to answer.  You know, I got this
 3   statement.  Turned it over to the Commonwealth attorney.
 4   The Commonwealth attorney wanted anything looked into
 5   that, he would have got a hold of me and we would have
 6   looked into it.
 7        Q     Okay.
 8        A     But apparently he bought the statement, didn't
 9   he, because he used him to testify in court.
10        Q     And you didn't take any investigative steps to
11   corroborate it, correct?
12        A     No.  No.
13        Q     You never documented it in any type of police
14   report --
15        A     No.  Didn't --
16        Q     Let me -- I'm sorry, Sheriff.  A lot of my
17   questions are easy and so I apologize.  You didn't
18   document in any type of police report that you were
19   skeptical of the information that Mr. Capps was giving
20   you, correct?
21        A     No.  I did not.
22        Q     In fact, you didn't document anything in a
23   police report?
24        A     Didn't document anything, sir.
25        Q     Did you ever document -- you didn't document
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    anything in a police report prior to Mr. Clark and Mr.

2    Hardin's 1995 trial that Mr. Capps had lied to officers

3    in your agency in the past, correct?

4         A    No.

5         Q    And you didn't document in any type of police

6    report that Mr. Capps had lied to law enforcement other

7    cases until it was, "nut cutting time."  Is that what

8    you said?

9         A    Uh-huh.

10        Q    Is that yes?

11        A    Yes.

12        Q    You didn't document that at all, right?

13        A    No.

14        Q    Didn't turn anything over like that to the

15   Commonwealth, right?

16        A    No.

17        Q    You expected that the Commonwealth was going

18   to investigate this on their own unless they needed you;

19   is that fair?

20        A    That's correct.

21             MR. SLOSAR:   Okay.  Can we take just a

22        couple minute break?  Is that okay?

23             MR. BOND:  Well, yeah.  That's fine.

24             MR. SLOSAR:  Let's go off the record.

25             MR. BOND:  It's 12:30.  We haven't been going

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

102

```
 1        all that long, but I don't know what Joe's body

 2        clock is.  Whether or not we're going to do a lunch

 3        break now.

 4             COURT REPORTER:  Are we ready to go off the

 5        record?

 6             MR. SLOSAR:  Yes.

 7             COURT REPORTER:  The time is 12:30 p.m.  We

 8        are off the record.

 9                      (OFF THE RECORD)

10             COURT REPORTER:  The time is 1:33 p.m.  We are

11        back on the record.

12   BY MR. SLOSAR:

13        Q    Good afternoon, Sheriff.

14        A    Thank you, sir.

15        Q    Now, I want to -- I want you to focus your

16   attention a little bit on that exhibit that's in front

17   of you and I want to go through some of these pages

18   together.  Is that all right, sir?

19        A    Yes, sir.

20        Q    Okay.  Now, and let me see -- you know what,

21   I've actually -- I've got a copy here that's single

22   sided.  Would it be okay if I give you a copy of that,

23   so you don't have to look at the back side of some

24   pages.  It's the same exhibit, but --

25        A    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

103

```
 1        Q      -- I'll just have you look at this.

 2              MR. BOND:  Is that the exhibit itself?

 3              MR. SLOSAR:  It's the --

 4              MR. BOND:  Hand that back to him is what I'm

 5        saying so we don't lose it.

 6              MR. SLOSAR: Yeah.  Yeah.  Okay.  I see.

 7              MR. BOND:  Yeah.

 8   BY MR. SLOSAR:

 9        Q      This way it'll a little bit easier for you to

10   go through, okay?

11        A      Yes, sir.

12        Q      Sir, I'd like for you to turn to page number

13   2.  Are you there?

14        A      Yes, sir.

15        Q      Okay.  Now, in this bottom paragraph, I

16   believe earlier you testified that you didn't do -- you

17   didn't take any investigative steps to corroborate the

18   statement that Mr. Capps gave to you in December of '92;

19   is that right?

20        A      I did not.

21        Q      Okay.  And, sir, is it fair to say that Kenton

22   Smith had assigned your sheriff's department to be one

23   of the investigative agencies involved in the Warford

24   murder investigation?

25        A      He didn't.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

    1        Q      He didn't.

    2        A      No.

    3        Q      Okay.  But is it fair to say that Kenton

    4    Smith, his role was to prosecute the case?

    5        A      That's correct.

    6        Q      Okay.  Kenton Smith wasn't investigating the

    7    case, correct?

    8        A      No.

    9        Q      And the investigation was in the hands of your

   10    department, correct?

   11        A      Well, to say that he didn't do any

   12    investigation, I would be wrong because he did.  He

   13    stepped in with all feet.

   14        Q      Okay.  Can you -- sitting here today, do you

   15    know -- can you tell us the name of a single witness

   16    that Kenton Smith interviewed in your presence?

   17        A      Didn't interview none in my presence.

   18        Q      Okay.  All right.  Sitting here today, can you

   19    name a single interview that Kenton Smith did with a

   20    witness outside of your presence?

   21        A      Well, I know supposedly a satanic expert.

   22        Q      Okay.  That's fair.  An expert witness.  Was

   23    that Dr. Holmes?

   24        A      No.

   25        Q      Okay.  A different satanic expert witness?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Okay.

2    A   Yes.

3    Q   Is that a yes?

4    A   Yes.

5    Q   Yes.

6    A   I'm sorry.

7    Q   I saw which way you were shaking but it's

8 easier for the court reporter.  Okay.  But fair to say,

9 you know, Kenton Smith, he wasn't interviewing witnesses

10 like Mr. Capps in the jail, correct?

11    A   No.  He wasn't.

12    Q   Okay.  That was your job, right?

13    A   Yes, sir.

14    Q   Yeah.  And it was your job to corroborate

15 information that you got from witnesses like Mr. Capps;

16 is that right?

17    A   Yes.

18    Q   Okay.  Now, I just want to ask you some

19 questions.  There are some names here in the last

20 paragraph on page 2.  Do you see --

21         MR. BOND:  Page 2.

22    Q   -- the name Roy Melanson?

23    A   Yes.

24    Q   Is that a name that you're familiar with, sir?

25    A   Very much so.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

106

```
1        Q    Okay.  And why are you familiar with Mr.

2   Melanson's name so well?

3        A    Mr. Melanson was a killer out of Colorado

4   which national headlines all over the United States,

5   also wanted in Texas for possible murder.  He got lodged

6   in our jail, myself and Detective Stiles arrested him in

7   Meade County.  Lodged him in the Meade County Jail and

8   from then on I don't know how long Melanson was in our

9   jail, but it was a long time.  He ended up suing Judge

10  Monarch, Kenton Smith and anybody that got in his way,

11  he sued.

12       Q    Did he sue you too?

13       A    No.

14       Q    Well, you must have --

15       A    He didn't sue me and Tommy.

16       Q    You must have stayed on his good side.

17       A    Ultimately, they sent detective in here from

18  Colorado.  Finally, one morning at 6:00 in the morning,

19  this is probably three years later, he's still in our

20  jail and don't hold me to them times.  A detective

21  showed up with a complaint.  Judge Monarch ordered his

22  extradition.  Within an hour, he was in a car on his way

23  to the airport going back to Colorado, cussing everybody

24  in the country.

25       Q    You-all were probably pretty excited about
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

107

```
 1   getting him out of your jail, right?

 2        A    Oh, he was nothing but trouble.

 3        Q    Yeah.  Now, since Mr. Melanson, he was alleged

 4   to have been a serial killer; is that right?

 5        A    That's correct.

 6        Q    Yeah.  And is it fair to say that Mr. Melanson

 7   would have been kept in a single cell while he was in

 8   the Meade County Jail?

 9        A    I'm not sure.  I have nothing to do with jail

10   assignments in the Meade -- in the jail, okay?  I -- I

11   don't really know.  I think he was general public.

12   General -- I don't know.

13             MR. BOND:  If you don't know, you don't know.

14        Don't assume.

15        A    I just don't know.

16        Q    Okay.  Okay.  That's fine.  That's fair.

17   That's fair, Sheriff.  Now, at some point, you came to

18   learn that Mr. Capps was giving a statement against Mr.

19   Melanson; is that right?

20        A    That's correct.

21        Q    Yeah.  And at some point prior to Mr. Clark's

22   trial, you had found out that Mr. Capps was alleging

23   that Mr. Melanson confessed to him, correct?

24             MR. BOND:  Object to the form of the question.

25        A    I don't know that, okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

108

```
 1      Q    Okay.  Well, you had learned prior to March of
 2  1995 that Mr. Capps said that Mr. Melanson confessed to
 3  him.  You knew that, right?
 4      A    On --
 5           MR. BOND:  Object to the form of the question.
 6      A    On Melanson?
 7      Q    Yes.
 8      A    No.  I don't know that.
 9      Q    You didn't know that?
10      A    For right now, I'm hearing it from you.
11      Q    You never knew that before today?
12      A    Did not.
13      Q    Well, at some point, Mr. Capps was extradited
14  to Colorado.  Do you recall that?
15      A    Mr. Capps was subpoenaed along with Justis to
16  testify against Mr. Melanson in Colorado.
17      Q    How you were first made aware of that,
18  Sheriff?
19      A    Detective Stiles.
20      Q    Okay.  Detective --
21      A    State police.
22      Q    And you found that out before Mr. Clark's
23  trial; is that right?
24      A    I'm not sure but I think so.
25      Q    Okay.  And did -- and did you have to help
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

109

```
1    extradite them or who took care of that?
2         A    I had nothing to do with it.  In fact, I
3    didn't even know they had left until they had already
4    gone.
5         Q    Okay.  Now, prior to Mr. Just -- and that's
6    the same Mr. Justis we had talked about earlier today,
7    right?
8         A    Yes.  Uh-huh.
9         Q    And that's the Justis that you had spoken to
10   in 1992 down in Breckenridge --
11             MR. BOND:  Object to the form of the question.
12        Q    -- is that right?  Is that right, sir?
13        A    Yes.
14        Q    Yes.  And when you spoke to Mr. Justis in
15   Breckenridge, the court reporter was not present,
16   correct?
17        A    Right outside the door and the door was open.
18        Q    Okay.  But that court reporter wasn't actually
19   with you and Mr. Justis?
20        A    She was not.  She was still sitting in her
21   chair.
22        Q    Okay.  And did you speak with Mr. Justis
23   before or after you took Mr. Capps' statement on
24   December 2, 1992?
25        A    After.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

110

```
 1        Q    Okay.  Because you wanted to find out -- or
 2   you wanted to talk to Mr. Justis about the letter that
 3   Mr. Capps had written him, correct?
 4        A    Not a letter.  Notes.
 5        Q    Notes.
 6        A    A letter is this.  When we refer to a letter,
 7   that's the letter.
 8        Q    What --
 9        A    We didn't know nothing about no letter then.
10        Q    What notes are you referring to, sir?
11        A    The one that passed from Hardin, to Justis, to
12   Capps, to Mr. Clark.  That's the note I'm talking about.
13        Q    Is this the note that Mr. Capps allegedly had
14   told you about when you met with him in the summer of
15   '92?
16        A    That is correct, sir.
17        Q    Okay.  And, in fact, you would have wanted to
18   speak to Mr. Justis about that note back after you first
19   learned about it in the summer of '92, correct?
20        A    When I found out about it, I wanted to talk to
21   Justis about it.
22        Q    Yeah.  Yeah.  Because you --
23        A    But he wasn't in the Meade County Jail.
24        Q    Because you wanted to see if that note still
25   existed?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      Corroborate it.

2      Q      **Right?**

3      A      I wanted to find out.

4      Q      **Yeah.  You wanted to know what was in that**

5  **note, right?**

6      A      No.  I wanted to know if what Justis -- or

7  Capps had told us was the truth.  Did this note go

8  through a chain.  That's what I wanted to know to

9  collaborate what Capps had told me.

10      Q      **And when you met with Mr. Justis in December**

11  **of 1992, he told you -- he talked to about that note,**

12  **correct?**

13      A      No.  He didn't tell me hi, bye, or get lost. I

14  don't want to talk to you and that was the end of the

15  conversation.

16      Q      **When you met with Mr. Capps on December 2,**

17  **1992, did he tell you that you should go speak to Mr.**

18  **Justis about a confession that Mr. Clark or Mr. Hardin**

19  **made to Justis in the county jail?**

20      A      No.

21      Q      **Mr. Capps never told you anything like that?**

22      A      No.

23      Q      **No.  And prior to looking at that letter, did**

24  **Mr. -- had Mr. Capps ever told you at any point in your**

25  **career that Mr. Hardin or Mr. Clark had confessed to him**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 112 of 325 PageID #: 26425
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
112

1  in the county jail -- that he confessed to Mr. Justis?

2      A    No.  Not Justis, no.

3      Q    Okay.  So Mr. Capps never told you, Sheriff,

4  hey, you should go talk to Mr. Justis, he has some

5  similar knowledge that I have?

6      A    No.

7      Q    Never said anything like that to you?

8      A    No.

9      Q    Because if he had, you would have went to go

10  talk to Mr. Justis?

11     A    Yes.  The only thing he told me is how that

12  note was transferred in the jail.

13     Q    And Justis was implicated in the note passing,

14  correct?

15     A    Yes.

16     Q    Yeah.  And that's why you wanted to go --

17     A    Justis admitted it.

18     Q    And that's why you wanted to go talk to him?

19     A    That's exactly right.

20     Q    And you're saying that Justis admitted to you

21  that he received a note?

22     A    Yes.  It's in his statement in what, '94.  I'm

23  not sure when we took it, but...

24     Q    So prior to 1995, you had multiple

25  conversations -- prior to Mr. Clark's trial in 1995, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

113

1  had multiple conversations with Mr. Justis?

2       A    No.

3       Q    You did not?

4       Q    No.

5       A    Well, in 1992, you met with Mr. Justis in the

6  Breckenridge County Jail?

7       A    That's correct.

8       Q    Yep.  In 1994, you met with Mr. Justis again?

9       A    I'm not sure when it was, but we met, and I

10  took a statement from him which is in the file.

11      Q    And that was the statement about Mr. Capps,

12  correct?

13      A    Yeah.  It ended up there.

14      Q    Yeah.

15      A    Yes.  And he -- that's when he told me he was

16  involved in the note passing.  At first, he denied it

17  and then he admitted that, yes, he did get the note from

18  Hardin and I get them confused.  To Hardin, to Capps, to

19  Justis, to Capps, to Mr. Clark.

20      Q    Mr. Justis also told you in that conversation

21  he had never heard any confession from Mr. Clark or Mr.

22  Hardin, correct?

23           MR. BOND:  Object to the form of the question

24      because I don't know which one you're referencing,

25      please.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    BY MR. SLOSAR:

2        Q    This one where you took his statement.

3        A    From Justis?

4        Q    From Mr. Justis, yeah.

5        A    No.

6        Q    Yeah.  He didn't tell you that that ever

7    happened, correct?

8        A    No.

9        Q    And in fact, he always maintained that neither

10   of these, neither Mr. Clark or Mr. Clark -- neither Mr.

11   Clark nor Mr. Hardin had ever confessed to him, correct?

12       A    That's correct.

13       Q    Yep.  Now, you never created any police

14   reports about that, correct?

15       A    I did not.

16       Q    Okay.  Now, I want to ask you some questions

17   about this paragraph where it says, "Roy Melanson and

18   Jerry Maybury (phonetic)."  Do you see those names, sir?

19       A    Yes.  I do.

20       Q    Do you know Jerry Maybury?

21       A    Yes.  I do.

22       Q    Okay.  How do you know Mr. Maybury?

23       A    From being arrested.

24       Q    Okay.  Now, according to Mr. Capps, he was in

25   a cell with Roy Melanson and Jerry Maybury at the Meade

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

115

```
 1    County Jail.  Do you see that?
 2         A    Yes.  I do.
 3         Q    Okay.  Did you take any steps to determine
 4    whether Mr. Maybury, Mr. Melanson, and Mr. Capps were
 5    ever in a cell together?
 6         A    Mr. Maybury wouldn't talk to nobody, okay.
 7         Q    Okay.
 8         A    And Melanson, I didn't mess with.  Didn't talk
 9    to him at all.
10         Q    Sure.  But you were the sheriff of Meade
11    County in 1992, correct?
12         A    Yes.  Uh-huh.
13         Q    Yeah.  And you knew the jailer, right?
14         A    Yes.
15         Q    Who was the jailer back then?
16         A    I think it was Benny Bruner, but I could be
17    wrong.
18         Q    Yeah.  And the -- did the jailer report to
19    you?
20         A    No.  No.
21         Q    But you reported the same -- it was actually
22    the jail and the sheriff's department were in the same
23    building, right?
24         A    Yes.  But a jailer is elected in Kentucky.
25         Q    Fair enough.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 116 of 325 PageID #:
26429
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
116

```
 1        A      Just like the sheriff.

 2        Q      I understand.

 3        A      I have nothing to do with the jail.

 4        Q      About -- you, in 1992, you could literally

 5   walk to the jailer's office without stepping outside,

 6   correct?

 7        A      I could walk to the jail entrance and bang on

 8   the door and somebody would come to the door.  Then once

 9   you went in that side of that door, you had to go

10   through another door.

11        Q      How long would it have taken you to get from

12   your office to the jailer's office back in 1992?

13        A      Inside or the first door?

14        Q      Inside.

15        A      Five minutes.  It takes a jailer to open the

16   door.  You might have to wait 20 minutes for them to

17   come up and let you in.

18        Q      What about from to the entrance door?

19        A      Oh, my God, I could walk that in 15 seconds.

20        Q      15 seconds.  Same building, right?

21        A      Yeah.

22        Q      During the winter --

23        A      Right outside of my office back of the hall.

24        Q      During the wintertime you don't even have to

25   leave the building, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019

117

1       A       No.

2       Q       Is that correct?

3       A       That's correct.

4       Q       Okay.  And did you ever take any steps to go

5    to the jail to determine whether Mr. Capps was ever in

6    the same cell as Mr. Melanson or Mr. Maybury?

7       A       I only took Capps' word for it.

8       Q       Just Capps' word for it?

9       A       That's correct, sir.

10      Q       Never tried to get any documents to verify

11   whether Mr. Capps was ever in a cell with any specific

12   person prior to Mr. Clark and Mr. Hardin's trial in

13   March of 1992, correct?

14      A       Did not, sir.

15      Q       Okay.  Now, looking at the next page.

16              MR. BOND:  Page 3.

17              MR. SLOSAR:  Page 3.  I appreciate that,

18       Keith.

19   BY MR. SLOSAR:

20      Q       Specifically line 18.  Do you see where Capps

21   says that he was approximately in the same cell with Mr.

22   Clark for two to three weeks?

23      A       I see that.

24      Q       Okay.  And Mr. Capps reveals that he left on

25   May 19th.  Do you see that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  A  Yes. To go to Frankfort Regional Jail.

2  Q  Sure. And do you recall that Mr. Clark was

3 arrested on or about May 7, 1992?

4  A  Yes.

5  Q  Okay. So if Mr. Clark was arrested on May 7,

6 1992, and Mr. Capps was sent to Frankfort on May 19th,

7 they could not have been in the same cell together for

8 three weeks. Would you agree with that?

9  A  I don't know how long they were together, sir.

10  Q  All right. Well, that's 12 days. You would

11 agree that 12 days is not three weeks, correct?

12  A  That's right. I agree with that.

13  Q  Okay. But you didn't take any steps to verify

14 whether in the 12 days that Mr. Capps claims he was in

15 the Meade County Jail at the same time as Jeff Clark,

16 you didn't take any steps to verify whether they were

17 ever in the same cell together, correct?

18  A  I did not.

19  Q  Okay. You didn't take any steps to

20 corroborate any of the information that Mr. Capps

21 provided to you, correct?

22  A  Did not.

23  Q  Okay. Now, on page 5, and this is -- I'm

24 going to refer you to the first paragraph. But in this

25 paragraph, Mr. Capps' starting to tell you some of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

119

1    story that he says Mr. Clark gave to him, okay?  And

2    specifically, I'm going to refer you to page -- or

3    line 3.

4         A    Okay.

5         Q    Line 2, really.  Do you see where it says,

6    "The police had told him that he had a -- they thought

7    him and Keith Hardin, who was also in jail for murder,

8    they thought they had a -- thought they had a put the

9    body in trash bags and put it in the car -- in the trunk

10   of the car, Jeff's Nova that is.  And Jeff said that

11   they did this.  They did.  He didn't say -- he didn't

12   say he did this.  He said the police thought they did

13   this to stop from leaking blood anywhere in the floor so

14   nothing would be found."  Do you see that, sir?

15        A    I see it.

16        Q    Okay.  And Mr. Capps told you that on December

17   2, 1992; is that right?

18        A    That's correct.

19        Q    Okay.  Now, Sheriff, isn't it true that you

20   have always believed that Ms. Warford was killed in a

21   location near where her body was found?

22        A    Yes.

23        Q    Yeah.

24        A    And in fact, during your investigation, you

25   believed that she was killed where there was some spots

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 120 of 325 PageID #: 26433
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
120

```
 1   -- some blood --

 2       A    That's correct.

 3       Q    -- that was pooled on the ground, correct?

 4       A    That's correct.

 5       Q    It was never your theory that Ms. Warford was

 6   put in a trash bag and placed in the back of a car and

 7   driven to where the body was found, correct?

 8       A    I had never heard that before.

 9       Q    Yeah.  It certainly wasn't your theory of the

10   case, correct?

11       A    No.

12       Q    And that -- what Mr. Capps said is not

13   consistent with any of the investigation that you

14   conducted?

15       A    That's correct.

16       Q    Yeah.  In fact, it's inconsistent with your

17   investigation, correct?

18       A    I think in his statement, he's saying that Mr.

19   Clark told him all this; is this correct?  Okay.

20       Q    I understand what Mr. Capps is saying but what

21           I'm saying is: When Mr. Capps tells you that

22   Jeff Clark is saying this, you knew that that didn't

23   match up with your investigation?

24       A    It did not match up with our investigation.

25       Q    Yeah.  You knew that that would not, based on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   your investigation, have been how the real killer or

2   killers disposed of Ms. Warford's body, correct?

3       A    Wasn't like this.

4       Q    Yeah.  You didn't believe -- if Mr. Capps was

5   telling you that Jeff Clark confessed to doing that, you

6   certainly would not have believed this part of that

7   story, correct?

8       A    Believe it or not, I don't know that Clark

9   didn't tell him that.

10      Q    Well, that's a different question than what

11  I'm asking you but what I'm -- when you're a law

12  enforcement officer, one of your responsibilities --

13      A    I knew this was not the way.

14           MR. BOND:  Let him finish his question, Joe.

15      A    Okay.

16      Q    You knew it wasn't what?

17      A    The way.

18      Q    Yeah.  You knew that was not the way Ms.

19  Warford was killed, correct?

20      A    That's correct.

21      Q    Yeah.  And so if Mr. Capps said that Jeff

22  Clark told him that, you would have had some pretty good

23  skepticism of whether that was really true, correct?

24      A    I'm trying to figure out how to answer.  It --

25  be more than likely, hey, what's going on here.  But,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  again, this is back to the Commonwealth attorney.  I'll
 2  let him look at it and seen what's said.
 3      Q    I understand that, Sheriff Greer, but what I'm
 4  asking you is when you're taking this statement from
 5  December 2, 1992, and Mr. Capps says that Jeff Clark
 6  confessed to putting the body in a trash bag and moving
 7  it in the trunk that isn't -- you did not believe that
 8  that was credible based on the investigation that you
 9  had conducted prior to taking this statement.
10          MR. BOND:  Object to the form of the question.
11      Q    Correct?
12          MR. BOND:  That's not what you said there.
13      Q    You can answer, sir.
14      A    He said that the police thought that.
15      Q    You never seen -- prior to today, you --
16      A    That's right.
17      Q    You've never seen a police report that
18  indicated that --
19      A    That is correct.
20      Q    -- that any law enforcement officer thought
21  that there was a trash bag with Ms. Warford put in it
22  and driven to the scene in the Nova, correct?
23      A    I agree.
24      Q    You definitely -- in your interrogations of
25  Mr. Clark, you never informed him that that was the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    police theory of the case, correct?

2         A     No.

3         Q     You never accused Mr. Clark of putting Rhonda

4    Warford's body in a trash bag and placing that bag in

5    the trunk of this car, correct?

6         A     No.

7         Q     And no other law enforcement officer in your

8    presence, in April of '92 when you interrogated Mr.

9    Clark on several occasions, no other law enforcement

10   officer provided information like that to Jeff Clark,

11   correct?

12        A     Correct, sir.

13        Q     And to your knowledge, you participated in

14   each of Mr. Clark's interrogation at the Louisville

15   Police Department between April 6th and April 9th of

16   1992, correct?

17        A     I'm sure I did, yes.

18        Q     Yeah.  And if you didn't, other law

19   enforcement officers would have told you what happened

20   in those interrogations?

21        A     It also would have been in their letters.

22        Q     Exactly.  And to your knowledge, no police

23   officer had ever told Mr. Clark that Ms. Warford was put

24   into a trash bag that was placed in the back of his car

25   so that blood wasn't leaked --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

124

```
 1        A     No.

 2        Q     -- correct?

 3        A     Correct, sir.

 4        Q     Okay.  So when you -- when Mr. Capps told you

 5   this information in his December 2, 1992 statement, fair

 6   to say that you were skeptical of it?

 7        A     Well, sir, who's to say that Mr. Clark didn't

 8   tell him this.  I wasn't there.  I don't know.  Capps is

 9   saying this is what Clark told him.

10        Q     Sir, but you knew in your presence --

11        A     I knew it wasn't -- that's not what happened.

12        Q     You knew that wasn't true?

13        A     That's correct.

14        Q     Yeah.

15        A     But is Clark lying or is Capps lying?

16        Q     And that's a decision that somebody had to

17   make, correct?

18        A     A jury.

19        Q     A jury.  Okay.  Well, as a law enforcement

20   officer, isn't it true that one of your responsibilities

21   is to not take statements from people who are providing

22   false information?

23        A     You don't ever want to do that.

24        Q     Yeah.  And in order to determine -- and isn't

25   it true as a law enforcement officer that you need to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

125

1    corroborate information that people are giving you in

2    order to verify whether it's true or false?

3         A    Yes.

4         Q    Yeah.  And you need to especially do that with

5    people like Mr. Capps who are jailhouse informants,

6    correct?

7         A    Correct.

8         Q    And even more so with Mr. Capps, you would

9    need to vet whatever information he gives because he had

10   a history of not being truthful with your law

11   enforcement agency prior to this, correct?

12        A    Well, sir, most criminals that you arrest are

13   not truthful with the police --

14        Q    Sure.

15        A    -- until you can break it -- break them and

16   get it out of them.

17        Q    Were you able to do that as a law enforcement

18   officer?

19        A    Confessions?

20        Q    Yeah.

21        A    Well, Lord, yes.

22        Q    Yeah.  How would you do that?

23        A    Talk to them, cry with them, by them Cokes,

24   give them cigarette, any way you can to get them to

25   talk.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

126

```
 1        Q     You'd do anything that --
 2        A     Legally.
 3        Q     Sure.  You'd do anything you could legally do
 4   to get somebody to give a confession?
 5        A     Sure.
 6        Q     Would you lie to them?
 7        A     No.
 8        Q     Wouldn't lie to them?
 9        A     No.
10        Q     Legally you could have lied to them?
11        A     That's correct.
12        Q     Yeah.
13        A     I try not to do that.
14        Q     Okay.  Would you yell at them?
15        A     No.
16        Q     No.  Wouldn't do that either?
17        A     No.  You get more with sugar than you get with
18   vinegar, okay, and that's the way I treated them.
19        Q     What kind of sugar would you give them to get
20   somebody to confess?
21        A     It's hard to say, sir.  Anything you can use.
22        Q     Say that if they gave you a statement that you
23   might be able to go to the Commonwealth attorney and get
24   them a deal?
25        A     No.  That's the Commonwealth attorney.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Would you ever tell somebody to get a

2  confession you'd see what you could do?

3     A    I've told them this: I will talk to the

4  prosecutor.  It's up to him, not up to me.

5     Q    So you've told people that?

6     A    Well, sure.

7     Q    Sure.  And you would tell people that to get

8  statements, right?

9     A    No.  Not usually.  Sometimes you might have to

10  udge (phonetic) a little bit on that.

11     Q    All right.  And there wasn't anything saying

12  you couldn't, right?

13     A    That's right.

14     Q    Yeah.  And there weren't any rules in place

15  saying that you had to document when you would give some

16  sugar like that, right?

17     A    No.  You just sit there and talk to them and

18  talk to them and see what you can get out of them, and

19  pretty soon, they might say they done it, and if they

20  did, then we go into a taped statement.

21     Q    And that would all happen in the pre-

22  interview, right?

23     A    Yes.

24     Q    Yeah.  So that part of giving sugar would not

25  have been recorded, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    No.

2      Q    It wasn't your practice to record that type of

3  stuff in a --

4      A    Sir, I've sat in on many interview with the

5  state police and that was their practice too.  I've seen

6  them sit there and con them until they get what they

7  want and then you go into a taped statement.

8      Q    And did you learn how to conduct interviews

9  and interrogations from on the job experience with the

10  state police?

11     A    Some and then myself, you know.  Don't -- I

12  don't want to sit here and try to brag, okay.

13     Q    Yeah.

14     A    I have got confessions, numerous.

15     Q    Were you pretty good at it?

16     A    Yes, sir.  I was.

17     Q    Yeah.

18     A    Yes, sir.  I was.

19     Q    Sheriff, what -- just out of curiosity, what -

20  - when you were sheriff in 1992, did you use to wear a

21  police uniform, a sheriff uniform?

22     A    Yes.  I did.

23     Q    Yeah.  What did that look like?

24     A    It was brown.

25     Q    It was brown.  Did you have to wear a hat or

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

129

```
 1   anything?

 2        A    No.  We didn't wear hats.

 3        Q    Okay.

 4        A    Cost too much money.  Couldn't afford them.

 5        Q    Fair enough.  Did the sheriff's department at

 6   least provide you with a service weapon?

 7        A    No.  You provided your own.

 8        Q    Okay.  And back in 1990 --

 9        A    Eventually, I did end up buying everybody in

10   the department Glocks.

11        Q    When did that happen?

12        A    Oh, that was maybe 2000.

13        Q    So that was almost at the time you retired?

14        A    Yeah.

15        Q    Okay.  Now, back in 1992, did you have a

16   revolver back then?

17        A    Probably not real sure.

18        Q    Okay.

19        A    I know I had a revolver.

20        Q    Was it a nickel plated?

21        A    No.

22        Q    What did it look like?

23        A    Blue steel.

24        Q    Oh, blue steel.  Okay.  So would that be

25   silver?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

130

```
 1        A     No.  Blue steel is like this book.
 2        Q     Oh, it's like black?
 3        A     Yeah.  A blackish color.
 4        Q     Okay.  I've never --
 5        A     Called blue steel.
 6        Q     Okay.  I have very little experience with
 7   guns, so...  And would you wear that when you were on
 8   duty?
 9        A     Sir, I very seldom wore a gun.
10        Q     How come?
11        A     Just didn't.
12        Q     Yeah.
13        A     I don't --  I've sat here and for me to
14   explain it.  I don't know.
15        Q     Back in the --
16        A     I just didn't wear a gun.
17        Q     Back in 1992, if you wore a gun, would it have
18   been a revolver?
19        A     No.  It would probably have been a
20   semiautomatic.
21        Q     Do you recall what kind?
22        A     Probably been a Glock, probably.
23        Q     Are you guessing, sir?
24        A     Yeah.
25        Q     I don't think anybody wants you here to guess.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    So if you don't remember --

 2         A    Okay.

 3         Q    All right.

 4              MR. BOND:  That's not what he said.  Elliot,

 5         you asked him --

 6              MR. SLOSAR:  He started with first that he was

 7         a revolver, then he went to a Glock.

 8         A    No.  No.  No.  No.

 9              MR. BOND:  Go ahead.

10    BY MR. SLOSAR:

11         Q    Sir, sitting here today, do you have an

12    independent recollection of the type of gun you had in

13    1992?

14         A    Wore or had?

15         Q    Let's go had, broader.  You probably had more

16    than one gun.

17         A    Oh, probably had 50 or 60.

18         Q    50 or 60 guns.

19         A    Uh-huh.

20         Q    Where did you store those guns back then?

21         A    In my safe.  I didn't have them in the

22    sheriff's office.  They're personal weapons.

23         Q    So you had them at home?

24         A    Yes.

25         Q    Why did you have so many guns?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

132

```
 1          A     I don't know.  Just ended up having them.
 2          Q     Did they all work?
 3          A     Some of them was junk.
 4          Q     Did you ever try them out every so often to
 5   make sure they would work?
 6          A     Very seldom, sir.
 7          Q     Okay.  In 1992, then, would one of your 50 or
 8   60 guns have been a revolver?
 9          A     Didn't carry it I don't think.  Well, take
10   that back, sir.  Every once in a while, I'd carry a
11   small Colt, a five-shot or six-shot, inch, two-inch
12   barrel, something like that.  Very seldom.  But very
13   seldom did I carry a gun.
14          Q     Yeah.  Just wasn't your usual practice?
15          A     Right.  Was not my practice.
16          Q     Fair to say you only carried a gun in around
17   1992 when you really needed it?
18          A     Sir, I probably didn't carry a gun in 1990
19   that much.  And as time went by, it got less and less
20   and less.  Everybody laughed about it.
21          Q     Now, I'm going to turn your attention back to
22   this statement, sir.
23          A     What page?
24          Q     Let's look at page 7.
25          A     Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Now, on page 7 beginning at line 8, do

2  you see the question: "Prior to us going on tape here a

3  while ago, you said something about his ex-girlfriend,

4  Amy Livers, Amy Remsburg as she is now.  What did he say

5  about that?"  Do you see that, sir?

6    A    Yeah.  I see it.

7    Q    And, again, that's a little bit we were

8  talking about earlier how you conducted a pre-interview

9  with Mr. Capps before the recorded statement; is that

10  right?

11    A    Yes.  But I don't know if this come out in the

12  pre-interview or not, but it come out in this statement.

13    Q    Well, you're telling him here that a while

14  ago --

15    A    Okay.  I see what you're saying.  Yeah.  His

16  ex-girlfriend.

17    Q    Yeah.

18    A    Yes.

19    Q    So it must have come out before the recording?

20    A    Yes.

21    Q    Okay.  Now, you knew -- you know who Amy

22  Remsburg is, correct?

23    A    Yes.  I knew who it is.

24    Q    Yeah.  Yeah.  And in fact, you knew her prior

25  to the Warford murder investigation, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

134

 1       A    Not that much.  I know she'd been in our

 2  office a couple of times.

 3       Q    Yeah.  And how did you know that she had been

 4  in your office a couple of times?

 5       A    I seen her.

 6       Q    Yeah.  And you knew what she was in there for,

 7  right?

 8       A    Sometimes I did, sometimes I didn't.  She was

 9  in there a couple three times.  It was usually over

10  domestic.

11       Q    Yeah.  And did you know the names of the

12  people that she was having domestic incidents with?

13       A    I can't remember, sir.

14       Q    Yeah.  You also knew Ms. Remsburg's parents,

15  right?

16       A    Knew them.

17       Q    Yeah.

18       A    That's just per se I knew them.

19       Q    How did you know them?

20       A    Well, being sheriff of Meade County, I went by

21  their house a lot, seen them a lot, but we weren't good

22  friends or anything like that, but I did know them.

23       Q    And about how long had you known them prior to

24  taking Ms. Remsburg's statement in this case?

25       A    Of, I've knew Livers' for a good while,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   especially her grandmother.  I knew them quite a few

2   years.

3        Q    How did you first come in contact with Ms.

4   Remsburg about the Warford investigation?

5        A    I ran NCIC and her name came up in the NCIC

6   which she had taken charges against Mr. Clark and after

7   seeing all that, I believe I called her and asked her to

8   come into the office.  I believe that's what happened.

9        Q    Now, who is Deputy Livers?

10       A    He was in charge of dispatch.

11       Q    Uh-huh.  And he was in charge of dispatch in

12   1992; is that right?

13       A    And a part time deputy, too.

14       Q    And you're familiar with dispatch logs, right,

15   sir?

16       A    Yes, I am.

17       Q    And Meade County used to have -- they had

18   dispatch -- they used dispatch logs back in --

19       A    Back then they did.

20       Q    In 1992?

21       A    Yeah.

22       Q    And you were aware at the time you took Ms.

23   Remsburg's statement that Deputy Livers was her uncle,

24   correct?

25       A    Uncle or cousin, I'm not sure.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

136

1  Q You knew they were related?

2  A Yes, I did.

3  Q When was the first time you talked to Deputy

4 Livers about Ms. Remsburg cooperating in your

5 investigation?

6  A I don't know that --

7  MR. BOND:  Object to the form of the question.

8 Go ahead.

9  A I don't know that I did but I could have.  But

10 I don't know that I did.

11  Q Don't remember one way or the other?

12  A No.

13  Q Okay.  Now, approximately when did you first

14 come into -- so after you do your NCIC search, what from

15 that made you want to talk to Ms. Remsburg?

16  A About the -- I think the charges she brought

17 against Mr. Clark.

18  Q And how is that relevant to the Warford

19 homicide?

20  A It'd be nice to talk to her because she knows

21 Mr. Clark.

22  Q So you're just looking for people that know

23 Jeff Clark?

24  A Yes.

25  Q At the time, nobody had ever told you or come

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   to you saying that Ms. Remsburg had any information

2   relating to the murder, correct?

3        A    No.  Not until I brought her in.

4        Q    So where did you first talk to Ms. Remsburg

5   at?

6        A    Sheriff's office.

7        Q    Did you talk to her at her house prior to

8   that?

9        A    No.  No.

10       Q    When you talked to her at the sheriff's

11  office, the first conversation you had with her, that

12  was not recorded, correct?

13       A    What about it?  Repeat that.

14       Q    You did an interview with Ms. Remsburg at the

15  sheriff's department that was initially not recorded,

16  correct?

17       A    I don't remember ever doing a recording of a

18  conversation with her without a -- being recorded.  I

19  could have but I don't remember it.

20       Q    Well, it was your practice to do pre-

21  interviews?

22       A    Sir, I had her brought into the sheriff's

23  office in reference to what I'd got on the NCIC hit and

24  wanted to talk to her about Mr. Clark.

25       Q    Yeah.  You had no idea whether she was going

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 138 of 325 PageID #: 26451
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
138

1   to know anything about the murder, right?

2       A    No.  But you had to find out.

3       Q    Sure.  But it was just a -- for you, this was

4   just sort of like a fishing --

5       A    Fishing expedition.

6       Q    Yeah.

7       A    That's correct.

8       Q    Yeah.  So there would be no reason for you to

9   record an interview with somebody who might not even be

10  a witness, correct?

11      A    Well, it's according to what she said when I

12  talked to her at the very beginning which wasn't

13  recorded, very little.  "Do you know Jeff Clark?"  "Yes,

14  I know him."  Yes.  She started in on Jeff Clark the

15  minute I talked to her.

16      Q    You knew she was angry at Jeff Clark, right?

17      A    Very much so.

18      Q    Yeah.  And, sir, when -- Sheriff, when is it

19  that you first learned that Ms. Remsburg was being

20  accused of molesting children?

21      A    I believe -- sir, I'm just not sure.

22      Q    But you found that out, right?

23      A    Yeah.  Ultimately, I did, yes.

24      Q    Yeah.  Yeah.  And that caused you some

25  concerns about the credibility of the statement she gave

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
139

1  against Mr. Clark, correct?

2     A    Not that much.  No.  It didn't.  She gave a

3  pretty devastating statement.

4     Q    Sure, but you learned that Mr. Clark was one

5  of the people accusing Ms. Remsburg of molesting

6  children; isn't that right?

7     A    Yes.

8     Q    Yeah.  And would you agree with me, sir, that

9  that type of allegation would provide a motive for Ms.

10  Remsburg to want to --

11     A    Yes.  That's why I took the taped statement

12  and referred it to Kenton Smith, the Commonwealth

13  attorney.

14     Q    Fair to say you didn't do any investigation to

15  corroborate whether Ms. Remsburg's statement was true or

16  false?

17     A    The state police, I believe, worked that case.

18     Q    I'm asking --

19     A    So I didn't, no.

20     Q    Sure.  I'm asking you a different question

21  which is: Is it fair to say that after you took Ms.

22  Remsburg's statement --

23     A    Uh-huh.

24     Q    -- you didn't conduct any investigation to

25  determine whether her statement against Mr. Clark was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 140 of 325 PageID #: 26453
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
140

1  truthful or not?

2       A    No.  I did not.

3       Q    Didn't do any corroboration?

4       A    No.

5            MR. SLOSAR:  Let's go off.

6            COURT REPORTER:  The time is 2:13 p.m.  We are

7       off the record.

8                    (OFF THE RECORD)

9  BY MR. SLOSAR:

10      Q    Sheriff?

11      A    Yes, sir.

12      Q    Now, in the pre-interview, is it fair to say

13  that one of the reasons why you believed her statement

14  was credible is because she was the person who brought

15  up the sacrificing of animals?

16      A    She did bring that up, I'm sure, but also, she

17  brought up that he lived down there with her on 376 and

18  they roamed the countryside on four-wheelers and she

19  specific said the area where Ms. Warford was found.

20      Q    Yeah.

21      A    You'd have to read that whole statement.  I

22  don't remember what all it says.

23      Q    Okay.  You didn't do any investigation to

24  corroborate that, correct?

25      A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q    Okay.  Now, you don't recall in the pre-
2   interview what you told her, right?
3             MR. BOND:  Object to the form of the question.
4        Q    You can answer.
5        A    I just don't remember what I done, sir.
6        Q    Yeah.  But specifically, prior to turning on a
7   recorder, you don't remember what you said to her,
8   correct?
9        A    No.  I don't.
10       Q    Okay.  And you don't recall what she said to
11  you, correct?
12       A    No.  I don't.
13       Q    Sir, going back to -- now, in this statement
14  with Capps looking at line 14, do you see where it
15  says --
16            MR. BOND:  What page, please?
17            MR. SLOSAR:  Oh, I'm sorry.
18            MR. BOND:  I just want to make sure you're on
19       the same page.
20  BY MR. SLOSAR:
21       Q    Are you on page 7, Sheriff?  I'm sorry about
22  that.
23            MR. BOND:  He's got a habit of flipping it.  A
24       bad habit.
25       A    7.  Yes, sir.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

142

```
 1      Q     Line 14.  Do you see where it says, "Ah, he
 2   said that if he had done the murder and dumped the body
 3   down at the firehouse that would be a good way to scare
 4   her, put the fear of God into her.  And that, ah, she
 5   had charges against him in Jefferson County that she was
 6   obsessed with him claiming that they were married, and
 7   all of his girlfriends called at his house all the time.
 8   He said it would be a good way to scare her if he had
 9   done it."  Do you see that, sir?
10      A     Yeah.  I see it.
11      Q     Okay.  Now, again, that information that's
12   contained here conflicted with all of the evidence
13   relating to your theory of the murder of Rhonda Warford,
14   correct?
15      A     Yes.
16      Q     Yeah.  That if Mr. Clark had told Mr. Capps
17   this, that would have been completely inconsistent with
18   your investigation, correct?
19            MR. BOND:  Object to the form of the question.
20      A     I guess, yes.
21      Q     Okay.  Your theory of the case was never that
22   a murder was done of Ms. Warford and the body dumped at
23   the fire house, correct?
24      A     Well, I know it wasn't.
25      Q     Yeah.  And it didn't happen that way, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     No.

2      Q     So again, this is a situation where either Mr.

3   Clark or Mr. Capps was not telling the truth, correct?

4      A     That's true.

5      Q     Yeah.

6      A     Yeah.

7      Q     And you didn't take any steps to corroborate

8   the information that Mr. Capps was saying, correct?

9      A     No.  Because Mr. Clark wouldn't talk.  He's

10   the one that could corroborate it.

11      Q     Well, Jeff Clark always voluntarily cooperated

12   with you, right?

13      A     Yes.  He did.

14      Q     Never requested a lawyer --

15      A     No.

16      Q     -- right?

17      A     Yes.

18      Q     Was agreeable to doing polygraph examinations,

19   correct?

20      A     Yes.

21      Q     Voluntarily gave you his saliva standards,

22   correct?

23      A     Both flunked the polygraph, too.

24      Q     We're going to get to that, sir.

25      A     Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Are you a polygraph examiner?

2    A    No.  I'm not, sir.

3    Q    You ever been --

4    A    I sure believe in them.

5    Q    Oh, you do?

6    A    Yes.  I do.

7    Q    You know they're not admissible in court,

8    though, right?

9    A    I understand that, sir.

10    Q    You knew in 1992 they weren't admissible in

11    court, right?

12    A    Yes, sir.

13    Q    Okay.

14    A    I knew it all along.

15    Q    You knew that polygraph exams in 1992 could

16    not be used for probable cause, right?

17    A    That's right.

18    Q    Yeah.  You knew you couldn't consider that

19    when initiating charges, correct?

20    A    I knew that.

21    Q    Yep.  Now, do you see at the bottom of page 20

22    -- page 7, sorry, line 25.  Do you see where Capps says,

23    "Ah, he said that the police said the body was found

24    within a few miles of the house, a small way to the

25    house, in a back road by the woods but not too far from

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 145 of 325 PageID #: 26458
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
145

1    the road either."

2        A    I see that.

3        Q    Okay.  That's what Mr. Capps told you on

4    December 2, 1992, correct?

5        A    That's correct.

6        Q    And, again, that was inconsistent with where

7    the body was actually recovered, correct?

8        A    Sir, that's just almost to the point where the

9    body was found.

10       Q    Oh, you're saying that this did match up with

11   your investigation?

12       A    Yes.

13       Q    Okay.

14       A    The body was found oh, about two miles from

15   the Livers' house on a -- off a country road 823 at the

16   edge of the woods just off the highway.

17       Q    And is it fair to say that only the real

18   killer or law enforcement would know where the body was

19   found?

20            MR. BOND:  Object to the form of the question.

21       A    Oh, I'm sure the killer had to know.

22       Q    You knew where the body was found, right?

23       A    Yes.  Yeah.  I was taken to it.

24       Q    By April 5, 1992, you knew exactly where the

25   body was found because you were at the crime scene,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   correct?

2      A    That's correct.

3      Q    Okay.  And so prior to December 2, 1992, that

4   -- you had known where the body was recovered, correct?

5      A    Yes.

6      Q    And, again, you don't recall what information

7   you talked to Mr. Capps about in the pre-interview prior

8   to the recorder being turned on, correct?

9      A    I don't remember.

10      Q    And you don't have any notes that would

11   refresh your memory?

12      A    I do not.

13      Q    Now, do you see where Mr. Capps says on line 8

14   -- well, actually, let's go back to your question.  Do

15   you see your question line 4, "Did he talk of any other

16   things like sacrificial things to try to put in place or

17   anything like that?  Did he mention being in devil

18   worship or words to that effect?"  Do you see that, sir?

19      A    On page 7?

20      Q    Oh, I'm sorry, on page 8.  I apologize,

21   Sheriff.  Line 4.

22          MR. BOND:  That was intentional.

23      Q    Line 4.  Now, I'm ahead of you on this.

24          MR. BOND:  Page 8, line 4, Joe, was his

25      reference.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

147

```
 1        Q    I'm just asking you about your question.
 2        A    Uh-huh.  Now, what's the question?
 3        Q    So sir, based on the transcript that we've
 4   reviewed so far, if you want to go back and look at
 5   things, you can.  Is it fair to say that in this
 6   statement that you were the first person in the recorded
 7   statement to bring up sacrificing and devil worship to
 8   Mr. Capps?
 9        A    I guess, yes.
10        Q    Yeah.  And when Mr. Capps met with you during
11   the summer of 1992 in your office for about a minute to
12   a minute-and-a-half, he didn't tell you that he had any
13   information implicating Mr. Clark or Mr. Hardin in devil
14   worshiping or Satanism?
15        A    No.  That come out of LPD in the investigation
16   up there it was brought up.
17        Q    Yeah.  And you learned through LPD's
18   investigation that Mr. Hardin was allegedly involved in
19   modern day Satanism; is that right?
20        A    Yes.
21        Q    Yeah.
22        A    From Ms. Warford, Ms. Warford's daughter, LPD
23   picked up on it and, naturally, I was informed of it.
24   That's the reason the question.
25        Q    Okay.  So you were asking Mr. Capps this
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    information not because he had told you this but because

2    you knew about this from your investigation, correct?

3        A    Yes.

4        Q    You were the first one that brought it up to

5    him, correct?

6        A    I'm sure I did --

7        Q    Yeah.

8        A    -- because I asked him was anything discussed

9    like that.

10       Q    Do you see where Mr. Capps says, line 10.  "He

11   talked about killing people and sacrificing people like

12   it was a game.  He said he used to be in devil

13   worshiping but he wasn't anymore, and he thought that

14   Keith Hardin was into devil worshiping."  Do you see

15   that, sir?

16       A    Yes.  I see it.

17       Q    Were you aware of any physical evidence that

18   was ever recovered from any search warrant of Jeff

19   Clark's residence that indicated that he was at all

20   involved in --

21       A    Did not.  No, sir.

22       Q    -- any type of Satanism --

23       A    No, sir.

24       Q    -- or devil worshiping?

25       A    No, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    In fact, all the investigation that you had

2  conducted certainly didn't turn up any of that type of

3  evidence, correct?

4      A    No.

5      Q    Is that correct?

6      A    That's correct, sir.

7      Q    Okay.  All right.  At the bottom of this

8  page --

9      A    8?

10     Q    Page 8.  Yes.  I apologize.  Line 21.  It

11  says, "You told me a short while ago when I was talking

12  to you before we went on, again, on this, this recording

13  about a note.  Tell me about this note."  Do you see

14  that?

15     A    Yes.

16     Q    Do you see where you -- where you say again --

17  "before we went on again" on this.  Do you see that?

18     A    Yes.

19     Q    Yeah.  Did you stop the recorder at some

20  point --

21     A    No.

22     Q    -- during your conversation with Mr. Capps?

23     A    No.

24     Q    And why did you say "before we went on again"

25  in this question?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Probably at the very beginning, I mentioned
 2   the note to him that it was -- that he said was passed
 3   in the jail and that's the reason.  That's the only
 4   reason I know.
 5        Q     Would you agree that looking at this it could
 6   be construed as you stopping and starting the recorder?
 7        A     Yes.  But we never do that.
 8        Q     But you also -- it was also your practice to
 9   always put at the beginning of the recording what time
10   you start, right?
11        A     Yes.
12        Q     And you didn't do that here, right?
13        A     I don't know.  Never did look.  I didn't.
14        Q     You should.  You should look.  Look and tell
15   me if there's a time that you started this meeting --
16   this recorded statement.
17        A     There's not.
18        Q     There's not.  That's against your practice,
19   right?
20        A     That's against my practice.  Yes, sir.
21        Q     And it was also your practice in 1992 to have
22   a deputy with you or a witness with you during a
23   recorded statement, correct?
24        A     Well, this was done in Breckenridge County,
25   okay, and with the court reporter.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

151

1    Q    Deputy Wise was still working at the Meade

2    County Sheriff's Department, correct?

3    A    I'm sure he was.  Yes.

4    Q    Could have brought him with you, right?

5    A    No.

6    Q    Could not have?

7    A    No.  Why would I need to?  I'm using the court

8    reporter who is a sworn officer of the Court.  That's

9    the court reporter done this one.

10   Q    Fair to say though, sir, that you did not

11   necessarily follow all of your practices when you took

12   Mr. Capps' December 2, 1992 statement?

13   A    That's correct.  I didn't need to.

14   Q    Yeah.  So even though it was your regular

15   practice to not stop a recording, you don't have any

16   independent --

17   A    This here, I didn't record this.  Jane Fox,

18   the court reporter, is the one that done this statement.

19   I'm sure she didn't turn it off and on.  She could have,

20   I guess.

21   Q    If you asked her to, she would have, right?

22   A    I wouldn't do that.

23   Q    But if you asked her, she would have

24   followed --

25   A    I doubt it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

152

1      Q      You doubt it?

2      A      Knowing Ms. Fox, I doubt it.

3      Q      What did -- you -- prior to getting Mr. Capps'

4   statement, your testimony is that you didn't -- well,

5   originally, Mr. Capps came to you and talked about a

6   note in the Meade County Sheriff's Department, right?

7      A      That's correct.  The jailer brought -- the

8   deputy jailer brought him up.

9      Q      Okay.  That was about five to six months

10  before you took this?

11     A      That's correct.

12     Q      Okay.  And between the time Mr. Capps first

13  told you and the time Mr. Capps gave you this recorded

14  statement, did you make any efforts to talk to Mr.

15  Justis about the note?

16     A      No.  I didn't and I don't know why but I

17  didn't.

18     Q      Well, you wanted to talk to Mr. Justis after

19  talking to Mr. Capps on December 2, 1992?

20     A      I don't know that this --

21            MR. BOND:  Let him finish his question, Joe.

22     Q      You wanted to talk to him after taking Capps'

23  statement, correct?

24     A      Yes.

25     Q      Yeah.  And on page 10, sir, can you turn

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL Document 317-19 Filed 01/26/23 Page 153 of 325 PageID #: 26466
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
153

1    there, line 3?

2        A    Uh-huh.

3        Q    You say, "I'm referring to a piece of paper

4    that's laying in front of us that you had give me

5    earlier today."

6        A    Uh-huh.

7        Q    And Capps says, "Yes, sir."  Do you see that,

8    sir?

9        A    I see it.

10       Q    Okay.  And this is something that Capps had

11   written about the note; is that right?

12       A    Yes.

13       Q    Okay.  It wasn't the note itself, correct?

14       A    No.  It wasn't the note itself.

15       Q    Yeah.  And this is something that you and Mr.

16   Capps would have talked about during the pre-interview;

17   is that right?  And I'll represent to you, sir, that

18   there's nothing in this recording where Mr. Capps gives

19   you a note so I'm going to assume he did that before you

20   turned the recorder on.

21       A    Well, he didn't give me a note.

22       Q    His -- something -- any -- the piece of paper

23   that Capps gave you, he did that prior to you turning on

24   a recorder, correct?  I understand it's not an actual

25   note relating -- you know, from Keith Hardin, Kevin

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   Justis, or Jeff Clark, but Mr. Capps gave you some piece

 2   of paper that he wrote on prior to you turning on a

 3   recorder, correct?

 4        A    Sir, I don't remember.  I'm confused on this

 5   one myself.

 6        Q    Okay.

 7        A    Go back to page 9 at the very bottom.

 8        Q    What page, sir?

 9        A    Page 9, the very bottom.

10        Q    What line are you at, Sheriff?

11        A    25.

12        Q    Okay.

13        A    24, 25.

14        Q    Okay.  So there, you're asking him if he had

15   written it down for you?

16        A    For me.

17        Q    Yeah.

18        A    There.

19        Q    Yeah.  You asked him to write it down?

20        A    Uh-huh.

21        Q    Okay.  And did you ask him to write it down

22   before you turned on the recorder?

23        A    Oh, yes.  This was during the interview, I

24   think.

25        Q    During the pre-interview, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     During the interview is where I asked him to

2    do it.

3      Q     Okay.  Now, sir, let's look at page 10, line

4    20 or line 19.  This is Capps talking.  Are you there?

5      A     Uh-huh.

6      Q     So this is where Capps tells you two different

7    occasions, Jeff admitted murdering and killing the girl?

8      A     Uh-huh.

9      Q     "Ah, the first time we were talking about it,

10   he said in a joking manner, yeah, I did it, you know.

11   But it's not like in a guilty manner.  Kind of laughed

12   about it afterwards."  Do you see that, sir?

13     A     I see it, sir.

14     Q     Okay.  So in this part -- well, first of all,

15   by this time, Mr. Capps had never informed you that Jeff

16   Clark had ever confessed to him to killing Rhonda Sue

17   Warford, correct?

18     A     I mean --

19     Q     Prior to that?

20     A     No.

21     Q     Yeah.

22     A     Had not.

23     Q     And this is after about five to six months

24   after he first contacted you --

25     A     Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      -- correct?

2      A      Uh-huh.

3      Q      And he doesn't give you any specific details

4  of anything that Jeff allegedly said, correct?

5      A      No.  Except the first time, it was in a joking

6  manner.  The second time, he said it was serious.

7      Q      Yep.  And the second time he says, if you

8  continue reading, that Capps was writing a letter to his

9  ex-girlfriend and Jeff asked if he thought that -- if he

10  thought -- "if I thought that he did it, and I told him

11  I didn't have any idea.  Then he said things that I

12  could read from the first day, and I said, yeah.  I did

13  it.  Then the next time, he changed his tune.  Yeah.  We

14  did it.  If they even knew, and this time when he said

15  that, I just turned around and looked at him.  I was

16  sitting at a desk in my cell."  Do you see that, sir?

17      A      Yes.  I see it.

18      Q      Sir, isn't it true that in 1992 that inmates

19  did not have desks in their cells in the Meade County

20  Jail?

21      A      Yeah, they had a little work desk didn't they,

22  a metal desk they could write at.  Yeah.

23      Q      It's your testimony here today that in April

24  of 1992 that inmates like Mr. Capps had a desk in their

25  jail cell?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 157 of 325 PageID #: 26470
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
157

1           MR. BOND:  Watch your --

2           THE WITNESS:  I see it.

3      A    They had little metal things they could sit at

4  in their cells.

5      Q    And you never did any investigation to

6  corroborate whether Mr. Capps' cell had that, correct?

7      A    Well, I think every cell had them.

8      Q    You never did any investigation to determine

9  whether Mr. Capps and Mr. Clark were even in the same

10 jail cell?

11     A    That's correct.  I didn't.  I took his word

12 for it.

13     Q    Now, Sheriff Greer, do you see at line 11.

14     A    On the --

15     Q    On page 11.

16     A    Okay.

17     Q    Where it says, "you, let's go back to this

18 note just a minute.  Ah, earlier this morning, ah, when

19 I was talking to you before we went on tape, you said

20 that he asked you if you had read that note."

21     A    That's correct.

22     Q    So you talked to Mr. Capps about this note

23 before you started recording; is that right?

24     A    Uh-huh.

25     Q    Yes?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes.

 2        Q     Yes.  And again, that's part of the

 3   conversation that you don't recall specifically what you

 4   told Mr. Capps, correct?

 5        A     No.

 6        Q     You don't recall what information you provided

 7   to Mr. Capps, correct?

 8        A     No.

 9        Q     You don't recall what information he provided

10   to you either, correct?

11        A     No.

12        Q     That's correct, right?

13        A     Uh-huh.

14        Q     Yes?

15        A     That's correct.

16        Q     Okay.  Sorry.  Now, you asked -- Sheriff

17   Greer, you asked Mr. Capps, do you think that Jerry

18   Maybury knows anything at line 21 and 22.  Do you see

19   that?

20        A     Yes.  I see it.

21        Q     Did you ever make any attempts to talk to

22   Jerry Maybury?

23        A     I don't know, sir.  I'm not sure but I'm

24   sitting here thinking I did.

25        Q     You didn't -- you certainly didn't document --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

159

```
 1        A    No.  I didn't document it.

 2        Q    -- any information that you learned in a

 3   report, correct?

 4        A    No.  No.  I did not.

 5        Q    And in looking at page 14, sir, do you see

 6   where it says, line 7, where Capps -- oh, I'm sorry.

 7   I'll wait for you to get there.

 8        A    My fingers are bigger than -- you said 14?

 9        Q    Page 14, line 7, yes.

10        A    Okay.

11        Q    Sir, do you see where Mr. Capps tells you,

12   "Yes, sir, I have?"

13        A    Uh-huh.

14        Q    "I told you exactly what Jeff Clark has told

15   me.  I have never spoke to Keith Hardin.  I've seen him

16   one time in court."  Do you see that, sir?

17        A    I see it.

18        Q    So according to Mr. Capps, Keith Hardin never

19   provided any type of confession or inculpatory statement

20   to him, correct?

21        A    He did not.  They didn't even speak, I don't

22   guess.  In fact, I know they didn't.

23        Q    Now, you asked Mr. Capps if he would be

24   willing to take a polygraph test, right?

25        A    That's correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    That's because you really believe in polygraph

2 exams; is that right?

3    A    I do believe in them, sir.

4    Q    Now, sir, I'm going to refer you back to

5 Plaintiff's Exhibit number 1.  Do you have that in front

6 of you?  Let me ask you before you read that, sir. Would

7 you agree -- so in this statement, Clifford Capps, Mr.

8 Capps tells you that Keith Hardin has never confessed to

9 him, correct?

10        MR. BOND:  Let me object to the form.  This

11    statement speaks for itself.

12    Q    He says Keith Hardin has never spoken to him

13 prior to December 2, 1992.

14    A    That's what -- yes.

15    Q    Is that right?  Okay.

16    A    That's correct.

17    Q    And you took this statement December 2, '92,

18 correct?

19    A    That's correct.

20    Q    At the Breckinridge Jail?

21    A    Yeah.  At the Breckenridge County -- or

22 Breckenridge County Courthouse.

23    Q    Same day that you saw Mr. Justis at the

24 Breckenridge Courthouse, correct?

25    A    That's correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    All right.  If you look at -- and would you

2  agree that -- well, look at Plaintiff's Exhibit number

3  1.  Go to the back side.  This is the -- well, actually,

4  looking at the first side, Sheriff, can you tell me the

5  date of this letter?

6    A    11-17 of '92.

7    Q    That's about two-and-a-half weeks before you

8  took Mr. Capps' recorded statement; is that right?

9    A    That's correct.

10    Q    Okay.  Now, on the back of this letter, do you

11  see where it says, "Remember this, Keith jokingly

12  admitted to the murder.  They were driving a black Nova.

13  Keith said Jeff wanted to dump the body down there to

14  scare his ex."  Do you see that, sir?

15    A    I see it.

16    Q    That is absolutely inconsistent with what Mr.

17  Capps told you on December 2, 1992, correct?

18    A    That's true.

19    Q    One of those is a lie, correct?

20    A    If Capps wrote that -- yeah, if Capps wrote

21  that, yes.

22    Q    Mr. Capps has admitted to writing that.

23    A    Okay.  Good.

24    Q    That's not in dispute, sir.

25    A    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  And in fact, it could be that both Mr.

 2   Capps' statement to you and that letter -- well, let me

 3   withdraw that.  From an experienced law enforcement

 4   officer like yourself, assuming that Mr. Capps wrote

 5   that letter, what he told you on December 2, 1992 would

 6   have been false, correct?

 7        A    But, sir, I didn't have this letter.

 8        Q    That's not what I'm asking you.  I'm asking

 9   you --

10        A    Yes.

11        Q    If he wrote that, Clifford Capps' statement to

12   you was false, correct?

13        A    Well, could be but I let the Commonwealth

14   attorney determine that.

15        Q    Well, your job as a law enforcement officer is

16   to find the truth, right?

17        A    That's correct, sir.

18        Q    Right.

19        A    My case had been closed and went to the grand

20   jury.  I referred everything to the Commonwealth

21   attorney.  What he wanted me to do, I would do it.

22        Q    Sure.  But when you're investigating a case,

23   especially a serious case like a homicide, you want to

24   make sure that you arrest the right person, right?

25        A    That's correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 163 of 325 PageID #: 26476
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
163

1      Q    Yeah.  And as a law enforcement officer would
2  you agree that the worst possible thing would be the
3  wrongful conviction of an innocent person?
4      A    Yes.
5      Q    Yeah.  You would never want that to happen on
6  your watch?
7      A    No.  I wouldn't want it to happen.
8      Q    And so if you learned of evidence prior to Mr.
9  Clark and Mr. Hardin's trial that Clifford Capps lied in
10  his statement to you, that's something that should have
11  been disclosed, correct?
12     A    Yes.  But, sir, I didn't have that.  I didn't
13  know.  We're bringing this up now.  I didn't have that
14  letter to know that possibly Clifford Capps was lying.
15     Q    Yeah.  But now that you have that, have you
16  come to a belief that Mr. Capps was lying to you?
17     A    I don't know.  I don't know.
18     Q    You question it, right?
19     A    Yeah.
20     Q    Yeah.
21     A    But I didn't have this then and I'm sure we
22  know the Commonwealth attorney didn't have it.
23     Q    And back then, though, before you're saying
24  that you didn't know about this letter so putting the
25  letter aside, even at the time you took Mr. Capps'

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    statements --

2        A    Yes.

3        Q    -- his statement on December 2, 1992, you

4    questioned his credibility, correct?

5        A    I don't -- I don't want to say, questioned it,

6    I would say Kenton, you know Capps as well as I do.  You

7    make that decision.

8        Q    But you had experiences with Mr. Capps in your

9    law enforcement community that Kenton Smith wasn't a

10   part of, correct?

11       A    Well, yeah.

12       Q    Yeah.  You knew that Mr. Capps had lied to

13   deputies under your watch on a number of different

14   criminal offenses, correct?

15       A    That's correct.

16       Q    And I forget the phrase you used earlier, it

17   was something about like, something with nuts.

18            MR. BOND:  Nut cutting time.

19       A    Nut cutting time.

20       Q    Nut cutting time.  You knew that Clifford

21   Capps lied to law enforcement officers from your agency

22   until it was nut cutting time; is that right?

23       A    That's it.

24       Q    And you knew that prior to taking his

25   statement?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A     But so does all the other people you arrest.

2       Q     **But you knew that prior to December 2, 1992,**

3  **correct?**

4       A     Yes.

5       Q     **Yeah.  You didn't document that in any police**

6  **report, correct?**

7       A     No.

8             MR. SLOSAR:  Okay.  Let's take a quick break,

9        okay, sir.

10            THE WITNESS:  Okay.

11            MR. SLOSAR:  Is that okay?

12            COURT REPORTER:  The time is 2:42 p.m.  We are

13       off the record.

14                      (OFF THE RECORD)

15            COURT REPORTER:  The time is 2:59 p.m.  We are

16       back on the record.

17  BY MR. SLOSAR:

18       Q     **Now, Sheriff Greer, based upon the statement**

19  **that Mr. Capps gave to you, is it fair to say that you**

20  **knew that -- that you were made aware at least by Mr.**

21  **Capps in this December 2, 1992 interview that Mr. Clark**

22  **allegedly confessed to him during his stay in the Meade**

23  **County Jail?**

24       A     Yes.  According to this statement, yes.

25       Q     **Yeah.  And you interviewed Mr. -- you met with**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

166

```
 1    Mr. Capps when he was still incarcerated in the Meade
 2    County Jail; is that right?
 3         A    Just when he passed that note.
 4         Q    Yeah.  And at the time you interviewed Mr.
 5    Capps, he never told you a single thing indicating that
 6    Jeff Clark had confessed to him, correct?
 7         A    Not at that first one.  He just said that the
 8    note was passed and who did it and what and that was the
 9    end of it.
10         Q    When you met with Mr. Capps on December 2,
11    '92, did you confront him as to why, if there was really
12    a confession by Jeff Clark, why he didn't tell you that
13    when he met with you in your office at the Meade
14    County --
15         A    No.  I didn't because, you know, I don't know
16    what the circumstances were, what I was doing, what --
17    you know, what the jail was doing.  I just know that the
18    jailer -- deputy jailer brought him up.  In fact, I
19    think they buzzed me and said Capps wanted to speak to
20    me.  They didn't tell me why and that's when he told me
21    about the note being passed and basically almost the end
22    of the conversation was that.
23         Q    My question is a little bit different,
24    Sheriff.
25         A    Okay.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 167 of 325 PageID #: 26480
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
167

```
 1        Q    My question is: Isn't it concerning to you
 2   that Mr. Clark allegedly confessed to committing a
 3   murder to Mr. Capps repeatedly in the Meade County Jail
 4   prior to Mr. Capps coming to you about this note?
 5             MR. BOND:  Object to the form of the question.
 6             MR. GARVERICH:  Objection.
 7             MR. BOND:  That's not the testimony.  Object
 8         to the form of the question.
 9   BY MR. SLOSAR:
10        Q    Isn't it concerning to you that Mr. Capps
11   never told you that Jeff Clark confessed to him when he
12   came to you at the Meade County Jail?
13        A    He did not.
14        Q    Yeah.  And isn't it concerning -- wasn't it
15   concerning to you when, you know, Mr. Capps is telling
16   you in December of 1992 that this confession happened,
17   wasn't it concerning to you that Mr. Capps didn't tell
18   you this before when you met with him five or six months
19   before?
20             MR. BOND:  Object to the form of the question.
21        A    That's hard to answer.  No, it was concerning
22   to the fact that I didn't talk to him when he brought
23   that note up and I was going to refer it onto the
24   Commonwealth attorney.
25        Q    I know, but when he met with you, if he had
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 168 of 325 PageID #: 26481
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
168

1    told you in the summer of 1992, if he had told you, hey,

2    somebody confessed to murder -- Jeff Clark confessed to

3    this murder, this Warford murder, you would have told

4    Cliff to stay a little longer and tell you what he knew,

5    right?

6         A    Well, next question then to you, sir, is how

7    do I know when Capps heard this information from Clark?

8    Was it after the note?  All he wanted to tell me is

9    about the notes being passed and keep your mouth shut.

10        Q    Sure.  So let's assume it's after the note,

11   okay?

12        A    Uh-huh.

13        Q    That you -- Mr. Capps comes to you.  All he

14   knows by then is the note and then he gets eventually

15   shipped off --

16        A    He gets shipped out.

17        Q    -- to a different jail, right?

18        A    Yes.

19        Q    Prior to December 2, 1992, after Clifford

20   Capps was removed from the Meade County Jail, May of

21   '92.  In that five to six-month gap, did Mr. Capps ever

22   contact you to let you know that Jeff Clark had

23   confessed to him?

24        A    No.

25        Q    Never wrote you a single letter, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

169

```
 1      A      No.

 2      Q      Never made a single phone call, right?

 3      A      No.

 4      Q      Was never brought to your office, right?

 5      A      No.

 6      Q      You never --

 7      A      He wasn't in Meade County.

 8      Q      Sure.  He didn't make one attempt, that you're

 9   aware of, to let you know that he allegedly heard a

10   confession, correct?

11      A      That's true.

12      Q      Yeah.  And then you showed up at the

13   Breckenridge County Jail on December 2, 1992, correct?

14      A      That's true.

15      Q      And at the time you showed up, Clifford Capps

16   had never told you that he had any knowledge of a

17   confession from Jeff Clark, correct?

18      A      That's true.

19      Q      Sir, and again, you have no independent memory

20   of any information that Mr. Capps provided to you in the

21   pre-interview that took place before the recording was

22   turned on, correct?

23      A      No.

24      Q      And you have no recollection of any

25   information you provided to Mr. Capps, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        A    No.

2        Q    Is that correct?

3        A    That's correct.

4        Q    Okay.  Sir, I want to talk to you -- do you

5   remember a little bit earlier today we were talking

6   about the crime scene and --

7        A    Yes.

8        Q    -- you showing up on April 5, 1992.  Do you

9   recall that?

10       A    Yes.

11       Q    And I believe that it was -- that you were

12  first notified by a Deputy Embry; is that right?

13       A    That's correct.

14       Q    Okay.  And after being notified by Deputy

15  Embry that there was a potential body located --

16       A    That's correct.

17       Q    -- what did you do?

18       A    I proceeded to the scene.  Met with Deputy

19  Embry's mother and father, who were out looking at land,

20  had seen this person hanging over a fence.  I don't know

21  if that's the way they put it and thought it was a

22  mannequin and they went down to look and they says, "Oh,

23  my God."

24       Q    And --

25       A    And they called Ernie.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

1    Q    Yep.  And then you came to the scene, right?

2    A    I come to the scene.

3    Q    And when you found out what was going on, you

4    did everything that you could to clear the scene; is

5    that right?

6    A    I did.

7    Q    You didn't want that scene to be contaminated

8    in any way?

9    A    I didn't want it to be contaminated.  They'd

10   already run cars over the road.

11   Q    And, in fact, you eventually made a phone call

12   to Coroner Adams; is that right?

13   A    That's correct.

14   Q    Okay.  And you told Mr. Adams, "Get over

15   here," right?

16   A    He -- you don't touch the body until the

17   coroner gets there in the State of Kentucky.

18   Q    Yeah.  And, sir -- Sheriff, I'm sorry.  Do you

19   recall when you got to the scene you went to go look at

20   the body, right?

21   A    I didn't go right up on it, no.

22   Q    Okay.  But you went close enough to see it,

23   right?

24   A    Oh, yeah.  I walked around and made sure I

25   didn't try to mess anything up.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 172 of 325 PageID #:
26485
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
172

1       Q     I understand.  And the body was facedown; is
2   that right?
3       A     Yes.  Hanging over a fence.
4       Q     Yeah.  And do you recall the leg sticking up a
5   little bit --
6       A     Yes.
7       Q     -- in rigor mortis?
8       A     I believe I do.
9       Q     Okay.  And when Coroner Adams eventually got
10  to the scene, was the body still face down?
11      A     Yes.  Still the way it was because we couldn't
12  touch it.
13      Q     And was the leg still sticking up a bit?
14      A     I'm sure it was.  I don't remember, sir.
15      Q     Yeah.  And at the crime scene, do you recall
16  Coroner Adams telling you that the body appeared to be
17  in rigor mortis?
18      A     I don't remember that, sir.
19      Q     Okay.  But the leg was sticking up, correct?
20      A     Yes.
21      Q     Okay.  And to you, that was a sign that the
22  body was fresh; is that right?
23      A     Well, that and the appearance of the body
24  itself.
25      Q     Okay.  And throughout -- you eventually went

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to the autopsy, is that right, Sheriff?

2        A    That's correct.

3        Q    And Mr. Adams was there as well?

4        A    Yes.

5        Q    Okay.  And that was down in Louisville?

6        A    Louisville.  Yes, sir.

7        Q    Yeah.  And you were present when the body was

8    examined; is that correct?

9        A    Yes.

10       Q    Yeah.  And during that examination, isn't it

11   true that Coroner Adams told you that he believed that

12   Ms. Warford had been killed on either April 4th or April

13   5th of 1992?

14       A    Bill didn't tell me that.

15       Q    Who told you that?

16       A    I don't think anybody did.

17       Q    You came to the belief early in the

18   investigation that the body -- that Ms. Warford was

19   killed either on April 4th or April 5th of '92, correct?

20       A    My case report says --

21       Q    I'll give you your case report, sir.  We're

22   going to -- I'm actually going to give you a couple of

23   other exhibits first, so hold on one moment, okay?

24       A    Okay.

25       Q    I'm going to hand you what we'll mark as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
174

```
 1  plaintiff's Exhibit 20.  It's your grand jury testimony.
 2  There seems to be an error on it because it says it's
 3  May 7, '93 but I believe it was actually 1992.  It's
 4  just the way that it was produced in this case.  It's
 5  here also.  But I just want -- for the record.
 6                  (EXHIBIT 20 MARKED FOR IDENTIFICATION)
 7          MR. BOND:  That's fine.  That's not my
 8      problem.
 9          MR. SLOSAR:  We're not -- obviously, this is
10      what we're all going by.  I've got an extra.
11          MR. BOND:  No.  Do you have the exhibit
12      itself?  I don't want to lose the exhibit.
13          MR. SLOSAR:  I have the original and we have a
14      binder --
15          MR. BOND:  Okay.
16          MR. SLOSAR:  We're good on that.  Yeah.  Yeah.
17          MR. BOND:  Okay.  May, I, please?
18          MR. SLOSAR:  Yes.  I'm sorry.  Avoiding
19      obstacles that I've apparently set up myself over
20      here. Here you go.  I will pass this around.
21  BY MR. SLOSAR:
22      Q    Sir, do you recall testifying at the grand
23  jury?
24      A    Yes.  I do.
25      Q    Okay.  And I am also going to hand you,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Sheriff, what we'll mark as Plaintiff's Exhibit 21. Here

2  you go, sir.  Here's a copy for your attorney, too.

3  Thank you, Sheriff.

4              (EXHIBIT 21 MARKED FOR IDENTIFICATION)

5          MR. BOND:  That's meant for me, Joe.  You've

6      got the same thing.  Thank you.

7      Q    Sheriff, do you recognize Plaintiff's Exhibit

8  21?

9      A    That's this one?

10     Q    Yes.  It's a request for examination.  Do you

11 see that, Sheriff?

12     A    Yes.

13     Q    Okay.  And is that your signature at the

14 bottom of this request?

15     A    Yes.  It is.

16     Q    And from looking at this -- and is it during

17 the Warford investigation, did you make out different

18 requests to the KSP crime laboratory for the testing of

19 physical evidence?

20     A    Oh, I made a bunch of them out, I think.

21     Q    We're going to show you some of those, okay?

22     A    Okay.

23     Q    And is it fair to say that you did everything

24 you could to be accurate when you made these requests?

25     A    I tried to be.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Yeah.  Because it was the homicide case and
 2   you wanted to be as accurate as you could be, right?
 3        A     I wanted to be.
 4        Q     Yeah.  And you were careful in the
 5   descriptions of the evidence that you were submitting,
 6   correct?
 7        A     Yes.
 8        Q     Yeah.  And you were careful in documenting
 9   which case the evidence was being submitted in relation
10   to, correct?
11        A     That's correct.
12        Q     So on these forms you would write down the
13   name of the victim, Rhonda Sue Warford; is that right?
14        A     That's correct.
15        Q     And you did that in this case, correct?
16        A     That's correct.
17        Q     And that's your handwriting, correct?
18        A     That's correct.
19        Q     All right.  And right below that, you would
20   write who the investigating officer was submitting this
21   and that was yourself; is that right?
22        A     That's correct.
23        Q     And then you would also date these requests as
24   to the date that you were actually sending them off to
25   KSP; is that right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A    That's correct.

 2        Q    Okay.  And on this particular form, you sent

 3   the key rings with keys and other items attached as

 4   Exhibit number 4 on April 8, 1992; is that right?

 5        A    That's correct.

 6        Q    Okay.  And according to this request for

 7   examination, the offense was murder; is that right?

 8        A    That's correct.

 9        Q    And that murder occurred between April 4, 1992

10   and April 5, 1992; is that right?

11        A    Yes.

12        Q    Okay.  And because that's -- as of April 8,

13   1992, your theory of the case was that Ms. Warford was

14   killed between April 4th and April 5th, correct?

15        A    Yes.

16        Q    Yeah.

17        A    I wasn't to begin with.  What I put on my

18   report was -- what do you call it.  I can't even think

19   of the word.  It wasn't -- what am I trying to say?

20   Estimate.

21        Q    Sure.  Yeah.

22        A    And this -- this 4-4-92, 4-5-92 came from the

23   coroner.

24        Q    That came from the coroner, right?

25        A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

178

1      Q      And that came from the coroner's evaluation of
2   Ms. Warford's body at the scene, right?

3      A      Whatever the coroner does.  I'm not a coroner.

4      Q      Yeah.  You're not the person estimating the
5   time of death, right?

6      A      No.

7      Q      Nope.  You're just taking what the coroner
8   gives you and using that to assist your investigation,
9   correct?

10     A      That's correct.

11     Q      So as of April 8, 1992, the coroner had
12  informed you that his belief was that Ms. Warford was
13  killed between April 4th and April 5, 1992, correct?

14     A      That's correct.

15     Q      Okay.

16     A      If that's what I put, that's what he told me.

17     Q      Sure.  Because you're not going to write
18  things down incorrectly in your reports?

19     A      No.

20     Q      Yep.  All right.  Sir, I'm going to show you
21  what we'll mark as --

22     A      Do you want this one back?

23     Q      I'm going to have you keep that, sir.

24     A      Okay.

25     Q      I am terrible with originals, so it's --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

179

1        A       Okay.

2        Q       -- much better in your hands than mine.  I'm

3    going to hand you, Sheriff, what we've marked as Exhibit

4    number 22, okay.  Here's a copy for your counsel.  Let

5    me give you this one because I didn't write on it.

6    Sorry, Joe.  These fitted suits, I'm afraid that I'm

7    going to rip it if I throw it over there.  Sheriff,

8    looking at page 1 of this.  Do you recognize your

9    handwriting on here?

10              (EXHIBIT 22 MARKED FOR IDENTIFICATION)

11       A       Yes.  I do.

12       Q       Okay.  And according to this request, when did

13   you fill this document out?  Are you able to see that?

14       A       That top one was on 4-6 of '92.

15       Q       Okay.  And you signed this request, right?

16       A       Yes.  I did.

17       Q       Yep.  And you were sending an attached list of

18   physical evidence which is located on page 2 to the

19   Kentucky State Police --

20       A       That's correct.

21       Q       -- laboratory; is that right?

22       A       Yes.  That's correct, sir.

23       Q       Is it fair to say that you were sending that

24   physical evidence because you wanted to have it tested

25   in relation to the homicide?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A    That's correct, sir.

2    Q    Okay.  And according to this document, was

3  this in relation to the murder of Rhonda Sue Warford?

4    A    Yes.  It was.

5    Q    Okay.  And on this document, did you list the

6  date of death as April 5, 1992?

7    A    That's correct.  I did.

8    Q    So it's April 6, 1992, it was your belief

9  based on information you received from the coroner that

10  Ms. Warford had been killed on April 5, 1992; is that

11  correct?

12    A    That's why it's there.

13    Q    Yeah.

14    A    I didn't come up with that.

15    Q    You would have got that information from the

16  coroner, correct?

17    A    That's correct.

18    Q    All right.  And the coroner would have been

19  Mr. Adams; is that right?

20    A    That's correct.

21    Q    Okay.  Now, looking at the list on page 2, is

22  that all your handwriting, Sheriff?

23    A    Yes.

24    Q    Okay.

25         MR. BOND:  Joe --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A      No.  Wait just a minute, sir.
 2        Q      Well, sure.  I want you to take a look at this
 3   and if you don't see any handwriting on here that's
 4   yours, I want you to let me know.
 5             MR. BOND:  Hold on just a second because what
 6        he's got in his hand is different.  This is front
 7        and back.  What he's got is --
 8             MR. SLOSAR:  His is single sided.
 9             MR. BOND:  Okay.
10             MR. SLOSAR:  Yeah.  Yeah.
11             MR. BOND:  When you say, "Page 2."
12             MR. SLOSAR:  Yeah.  Yeah.  So --
13             MR. BOND:  I just wanted him on the same page.
14             MR. SLOSAR:  We're trying to -- at least what
15        I've told our staff is to always have a set of
16        single sided for the witness to try to make it a
17        little bit easier.
18             MR. BOND:  That's fine.
19             MR. SLOSAR:  We we're going to try to do that.
20             MR. GARVERICH:  He's on the page behind that,
21        Joe.  The second page of that exhibit.
22             MR. BOND:  Right there.
23             THE WITNESS:  Okay.
24             MR. BOND:  And just for the record, 1351 so
25        there's no confusion.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1                 MR. SLOSAR:  Yep.  Yep, MSCO.

 2    BY MR. SLOSAR:

 3         Q     Sheriff, do you recognize your handwriting on

 4    this sheet?

 5         A     A whole bunch if 1 through 18.

 6         Q     Okay.  And this is -- these are different

 7    pieces of physical evidence that you wanted tested to

 8    help solve the homicide; is that right?

 9         A     That's correct.

10         Q     And I'm going to ask you about some of these

11    specific numbers.  So for number 4, were you requesting

12    to have latent print testing done on the key rings?

13         A     That's correct.

14         Q     Okay.  For number 5, were you requesting that

15    a rape kit be tested?

16         A     That's correct.

17         Q     Okay.  And for number 6, were you requesting

18    testing of a hair sample from Ms. Warford's head?

19         A     That's correct.

20         Q     And for 7 and 8, were you requesting nail

21    scrapings from both of her hands?

22         A     That's correct.

23         Q     Okay.  And for number 9, were you requesting a

24    hair found on her right hand?

25         A     That's correct.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

183

```
 1        Q    Okay.  And for 12 and 13 were you requesting
 2   that testing be done on soil to compare it between the
 3   scene and Jeffrey Clark's vehicle?
 4        A    Yeah.  I guess.
 5        Q    Okay.  He was your suspect at that time,
 6   correct?
 7        A    Yes.
 8        Q    As of April 6, 1992, Jeff Clark was a suspect
 9   in the homicide.  Is that right, sir?
10        A    Yes.
11        Q    Okay.  And you would agree with me that Mr.
12   Clark, according to your notes here, was a suspect prior
13   to your interview with Ms. Remsburg?
14        A    Yes.
15        Q    Yeah.  He was a suspect prior to the statement
16   you took from Mr. Capps, right?
17        A    Yes.
18        Q    He was a suspect prior to any physical
19   evidence implicating him in the murder, correct?
20        A    Yes.
21        Q    Same thing with Keith Hardin, right?
22        A    Yes.
23        Q    By April 6, 1992, nobody had implicated Keith
24   Hardin in the murder, correct?
25        A    What's that now?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q    By April 6, 1992 --

2        A    No.

3        Q    -- nobody had implicated Keith Hardin in the

4   murder, correct?

5        A    I don't think so.

6        Q    Now, do you see on here, number 16, where it

7   says, "Victims red sweat pant"?

8        A    Yes.

9        Q    Okay.  And is that the sweat pant taken from

10  Ms. Warford, sir?

11       A    I'm -- we're going back 30 years.  I don't

12  remember.

13       Q    All right.  I don't think there's going to be

14  a dispute about that.

15       A    Help me out.

16       Q    So we'll move on.  I have a question for you,

17  though, where it says next to it about a hair, is that

18  your handwriting?  One hair similar to Hardin's?

19       A    That's not my writing.

20       Q    Do you know whose writing that is?

21       A    I have no idea, sir.

22       Q    Do you know who wrote that on there?

23       A    Uh-uh.

24       Q    No.  Is that a no?

25       A    No.  I don't know.  It's not my writing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 185 of 325 PageID #: 26498
The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019
185

1      Q     You certainly did not write that on there on

2   April 6, 1992 --

3      A     No.

4      Q     -- right?  All right, sir.  Let's go to page

5   1352.  It's the next page.

6          MR. BOND:  Flip over.  When he's referencing

7      numbers, he's talking about this one here.

8      Q     Oh, I'm sorry.  Yeah.  I'm just going to keep

9   telling you to turn to the next page.

10     A     Which one are on now?

11     Q     So this is -- at the bottom it says, "4892,"

12  do you see that?  Bottom left-hand corner?

13     A     And that's not my writing.

14     Q     The bottom left is not your handwriting?

15     A     The whole thing's not my writing.

16     Q     Well, what about the signature on the bottom

17  right hand corner?

18     A     Not mine.

19     Q     Really?  You're saying that somebody forged

20  your signature on here?

21     A     No.  Not saying that.  One of the girls

22  probably filled this out for me.

23     Q     Then signed it for you?

24     A     Yes.

25     Q     Okay.  So you're saying you did not sign this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

186

1    document?

2        A    No.  I didn't sign it.

3        Q    Okay.

4        A    But I authorized it.

5        Q    Okay.  Would you have seen this document --

6        A    Yes.

7        Q    -- before it went out?

8        A    Yes.

9        Q    Okay.  And if this document were incorrect,

10   would you have made changes to it?

11       A    I would have done it over, probably.

12       Q    You certainly would not have let documents be

13   submitted to KSP --

14       A    No.

15       Q    -- that were inaccurate with your signature on

16   it, correct?

17       A    No.  Would not have.

18       Q    Okay.  Now, according to this document,

19   additional evidence was being submitted to the KSP

20   laboratory on April 8, 1992, is that right, sir?

21       A    That's correct.

22       Q    Okay.  And this was physical evidence relating

23   to the murder of Rhonda Sue Warford; is that right?

24       A    That's correct.

25       Q    And according to this crime laboratory report,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 187 of 325 PageID #:
26500
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
187

1  the date of the murder is listed as April 5, 1992; is

2  that right?

3       A     That's correct.

4       Q     And that's based on the information you

5  learned from the coroner?

6       A     Yes.  I can't determine it.

7       Q     Okay.  All right.  Sheriff, we're going to go

8  to the next page which has a 1353 at the bottom, okay?

9       A     Uh-huh.

10      Q     Do you see your signature in the bottom right

11 hand of this page?

12      A     That's not mine.  That's the same one that

13 done the -- this one -- did this one, too, one of the

14 girls.

15      Q     All right.  But you would have reviewed this

16 document --

17      A     I would have reviewed it --

18      Q     -- before it went out?

19      A     -- before it went out.

20      Q     Okay.  And this document says that it was

21 completed on April 8, 1992; is that right?

22      A     That's correct.

23      Q     Okay.  And, again, this is the submission of

24 physical evidence relating to the murder of Rhonda Sue

25 Warford; is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

1        A      That's correct.

2        Q      And, again, the date of Ms. Warford's death is

3    listed as April 5, 1992; is that right?

4        A      That's correct.

5        Q      That's information that you received from the

6    coroner, correct?

7        A      That's correct.

8        Q      Now, sir, I'm going to ask that you turn to

9    the next page.

10       A      Uh-huh.

11       Q      This is 1354 at the bottom right.  Do you see

12   your handwriting on this page?

13       A      Yes.  This is my handwriting.

14       Q      Okay.  So you filled this out, correct?

15       A      That's correct.

16       Q      And in this, you're requesting that KSP

17   compare evidence for suspect sample kits of Jeff Clark

18   and Keith Hardin; is that right?

19       A      That's correct.

20       Q      Or, you know what, I apologize.  Let me go

21   back.  In this request, you're requesting that a suspect

22   sample kit be compared for Keith Hardin; is that right?

23       A      That's correct.

24       Q      Okay.  And you're also requesting that dirty

25   white running shoes from Jeff Clark be tested as well,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

1    correct?

2         A    That's correct.

3         Q    And, again, this is in relation to the death

4    of Rhonda Sue Warford; is that right?

5         A    That's correct.

6         Q    And by this time, Jeff Clark and Keith Hardin

7    were both listed as suspects as of April 9, 1992; is

8    that right?

9         A    That's correct.

10        Q    And, again, the date of Ms. Warford's death on

11   here is listed as April 5, 1992?

12        A    That's correct.

13        Q    And that's based upon information you received

14   from the coroner, Bill Adams, correct?

15        A    That's correct.

16        Q    Now, sir, I'm going to ask you to turn to the

17   next page.  Do you see your handwriting on there?

18        A    Uh-huh.  Yes.  I do.

19        Q    Okay.  And according to this document, did you

20   fill out this request on May 1, 1992?

21        A    I didn't fill it out, but I signed it.

22        Q    Okay.  And did you sign it on May 1, 1992?

23        A    Yes.

24        Q    And was this in relation to the testing of

25   physical evidence relating to the murder of Rhonda Sue

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Warford?

2        A    That's correct.

3        Q    And, again, on here, the date of Ms. Warford's

4    death is listed as April 5, 1992, correct?

5        A    That's correct.

6        Q    That's based upon information you received

7    from the coroner, correct?

8        A    Correct.

9        Q    Now, between April 5, 1992 when Ms. Warford's

10   body was recovered and May 1, 1992, are you aware of any

11   autopsies that occurred other than the one that you were

12   physically present at?

13       A    That's the only one.

14       Q    Okay.  So to your knowledge, the coroner, Bill

15   Adams, did not do any additional autopsies on Ms.

16   Warford's body after April 5th and April 6th of 1992,

17   correct?

18       A    No.

19       Q    Is that correct?

20       A    That's correct, sir.

21            MR. BOND:  Well, let me object to the form of

22       the question.

23       Q    Okay.  After the initial autopsy that you were

24   present at, to your knowledge, the coroner did not

25   perform any additional autopsies on Ms. Warford's body,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

191

 1    correct?

 2         A    The coroner --

 3              MR. BOND:  Object to the form of the question.

 4    Go ahead, Joe.

 5         A    The coroner doesn't do the autopsies.  He's

 6    not qualified to that.

 7         Q    Fair enough, the medical examiner did not?

 8         A    Medical examiner.  That was the only autopsy

 9    that was done.

10         Q    Okay.  And the coroner was present, right?

11         A    Yes.

12         Q    And to your knowledge, the medical examiner

13    didn't do any autopsies on Ms. Warford outside of the

14    one that you were physically present at, correct?

15         A    That's correct.

16         Q    So nothing, to your knowledge, was done after

17    May 1st of 1992 that would have caused the medical

18    examiner to reconsider the date of Ms. Warford's death,

19    correct?

20         A    The medical examiner doesn't determine death.

21         Q    Okay.  Nothing was done after the initial

22    autopsy that would have given the coroner, Mr. Adams --

23         A    Right.

24         Q    -- additional information to change Ms.

25    Warford's death, correct?  Is that correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    That's correct.

2      Q    Okay.  Now, Sheriff, you submitted a lot of

3  physical evidence to the Kentucky State Police

4  laboratory, correct?

5      A    Yes.

6      Q    Yeah.  And I know that all those requests

7  aren't contained in that exhibit, but is it fair to say

8  that you believed that the physical evidence might lead

9  you to find the real killer of Ms. Warford?

10     A    Well, you always hope it will.

11     Q    Yeah.  And is it fair to say to this day

12  you're unaware of a single eyewitness?

13     A    That's right.

14     Q    Okay.  So this isn't a case where you can rely

15  upon an eyewitness, right?

16     A    That and really rely upon the evidence either.

17     Q    Well, and we're going to get there.

18     A    Okay.

19     Q    And this is also a case where, you know, the

20  jailhouse informants, Mr. Capps, had some credibility

21  issues prior to trial.  Would you agree with that?

22     A    Well, I didn't determine that.

23     Q    All right.  You had some concerns about the

24  truthfulness of Mr. Capps' December 1992 statement when

25  you took it, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     You've always got concerns.

 2        Q     Yeah.  And you had -- you especially had

 3   concerns with Mr. Capps based on your prior history with

 4   him, correct?

 5        A     That's true.

 6        Q     And you expected law enforcement to

 7   investigate and corroborate the information that Mr.

 8   Capps provided prior to the 1995 trial, correct?

 9              MR. PELLINO:  Objection to form.

10        Q     You can answer.

11        A     I don't understand what you mean.

12        Q     You expected that somebody would have vetted

13   Mr. Capps' 1992 statement prior to letting him testify

14   at trial, right?

15        A     Well, I kind of --

16              MR. PELLINO:  Objection to form.

17        A     Well, I kind of figured the Commonwealth

18   attorney would.

19        Q     Okay.  Sure.  So, you know, and Sheriff, at

20   some point you started receiving summaries back from a

21   person who you spoke about earlier named Robert Thurman

22   from the KSP laboratory.  Do you recall that?

23        A     Yes.

24        Q     Okay.  And Mr. Thurman is somebody that you

25   had worked with on prior --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

194

1        A     I knew Mr. Thurman.

2        Q     Okay.  And in fact, Mr. Thurman started

3    providing you with information before you testified at

4    the grand jury in May of 1992, correct?

5        A     That's correct.

6        Q     Okay.  And I believe you testified previously

7    that on one occasion, Mr. Thurman, about a week before

8    the grand jury, had a phone conversation with you where

9    he discussed the results of the testing that he had

10   conducted so far; is that right?

11       A     Kenton Smith was present too when I got the

12   phone call --

13       Q     Okay.  And -- oh, sorry.

14       A     -- which I believe he furnished information in

15   reference to a hair that might have -- and I don't

16   remember, sir -- come off of her clothes or off of her.

17   It was similar in characteristics as so-and-so Hardin's

18   or some -- he made a mistake.

19       Q     You now know that that was wrong, correct?

20       A     Oh, yeah.

21       Q     Yeah.

22       A     I found that out pretty fast when I got the

23   report.  See, I didn't have the written report back.

24       Q     So you knew as soon as you saw that report

25   that that was not true?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
195

1          A     Yes.

2          Q     Yeah.  And is it fair to say that that's a

3     pretty big misrepresentation?

4          A     Not really, because I think the criteria had

5     changed at the crime lab at that time of how you

6     classify similarities and stuff like that and apparently

7     he used the old classification and didn't use the good

8     one.  Now, that you have to get into Thurman but I'm

9     not --

10         Q     Well, did he ever --

11         A     -- an expert.  I'd heard this.

12         Q     When he talked to you, did he ever say, hey,

13    Sheriff Joe, I'm using the old --

14         A     No.  No.  He didn't.  No.

15         Q     He -- and, in fact, prior to you testifying to

16    the grand jury, Mr. Thurman actually told you that there

17    was a match; isn't that right?

18              MR. BOND:  I object to the form of the

19         question.

20         A     I don't remember him saying that.  He --

21         Q     Isn't it true --

22         A     -- I don't know.

23         Q     Isn't it true that prior to testifying at the

24    grand jury that Mr. Thurman told you that the hair found

25    on Ms. Warford's sweatpants was a match to Keith Hardin?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 196 of 325 PageID #: 26509
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
196

1           MR. BOND:  Object to the form of the question.

2      A    I don't remember.  That's the best way for me

3  to answer that now because I don't.

4      Q    Well, let me see if I can refresh your memory,

5  okay, Sheriff?

6      A    Uh-huh.

7      Q    You recall testifying to the grand jury?

8      A    That's correct.

9      Q    Okay.  And you were under oath then just like

10  you're under oath today, correct?

11      A    That's correct.

12      Q    Okay.  And back then your memory would have

13  been a little bit better as to the conversation you had

14  with Mr. Thurman; is that right?

15      A    That's correct.

16      Q    Okay.  And I want to refer you, sir, to page

17  193, and it's going to --

18           MR. BOND:  And he's using the Bates numbers

19      here.

20      Q    And it's going to lead on to 194.

21           MR. BOND:  He's using the numbers in the --

22      Q    I'm sorry.  If you're using those numbers, I'm

23  looking at 165 and you can go to the last line, Sheriff.

24      A    Let me see it.

25      Q    The 165 number is actually much bigger so it's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    a lot easier to use.  So if you go to the last line,

2    you'll see something that says, "Smith: In other words,

3    the hairs matched."  Answer -- or the next page, the

4    first line, "Greer: They matched."  Do you see your

5    testimony there, sir?

6        A    I see it.

7        Q    Okay.

8        A    Yeah.  And that testimony would have been

9    based upon representations that Mr. Thurman made to you

10   prior to the grand jury, correct?

11       A    That's correct.

12       Q    Okay.  So prior to you testifying at the grand

13   jury, Mr. Thurman had told you that the hair matched,

14   correct?

15       A    Yes.

16       Q    Yeah.

17       A    Seeing this now, it's not -- I don't know.  I

18   do know by looking at this.

19       Q    Exactly.  And Mr. Thurman told you

20   specifically that the hair matched Keith Hardin that was

21   found on the victim, correct?  And you can -- it's

22   actually in the page before, Sheriff.  So if you want to

23   look at 165, it's about the fifth line down of that --

24   of the paragraph.  I'll start reading it with you.  It

25   says -- it's about halfway down.  "And then we checked

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 198 of 325 PageID #:
26511
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
198

1    what she was wearing the last few days.  She had a lot

2    of red sweatpants or white sweatpants.  That's what she

3    wore Wednesday.  So then we come up with Exhibit 16, red

4    sweatpants.  They compare the 21C which is, ah, that's

5    an Exhibit number 21C which happens to be out of the

6    assault kit that we took off of Keith Hardin the

7    boyfriend.  One hair."  And then Mr. Smith asked you:

8           "In other words, the hairs matched."  And your

9    answer was: "They matched."

10   A    Uh-huh.

11   Q    Does that refresh your memory?

12   A    Yes.

13   Q    Okay.  So Mr. Thurman told you prior to your

14   testimony that the hair found on the victim's sweatpants

15   matched Keith Hardin, correct?

16   A    That's correct.

17   Q    Okay.  And if Mr. Thurman had told you a

18   different qualification like they were similar, you

19   would have testified that they were similar --

20   A    Similar.

21   Q    -- correct?

22   A    That's correct.

23   Q    You would not have testified to the grand jury

24   that the hair on the sweatpants matched Keith Hardin

25   unless that's the characterization that Mr. Thurman gave

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    to you, correct?

2        A    Yes.

3        Q    **Yeah.**

4        A    That's correct.

5        Q    **Because you certainly were telling the truth**

6    **at the grand jury, correct?**

7        A    Oh, yes.

8        Q    **Just like you're telling the truth today?**

9        A    I hope I am.

10       Q    **All right.  And, Sheriff, would you agree that**

11   **one of the basis of you initiating charges against Keith**

12   **Hardin and Jeff Clark for the murder of Rhonda Sue**

13   **Warford was the fact that Mr. Thurman had told you that**

14   **the hair matched?**

15       A    Not only that.

16       Q    **But that was part of it, right?**

17       A    That was part of it.  All of it's part of it.

18   The fingerprint was part of it.  The --

19       Q    **But the -- oh, I'm sorry.  You keep going. I'm**

20   **not going to interrupt you.  You keep going.  The**

21   **fingerprint was part of it, the hair was part of it.**

22       A    And the statements from individuals in

23   Louisville that was taken by LP -- Louisville Police

24   detectives.

25       Q    **Okay.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

200

```
 1      A    They was some pretty harsh statements that
 2 they had took from individuals --
 3      Q    Sure.
 4      A    -- against Mr. Hardin.
 5      Q    But they hadn't -- but none of those
 6 individuals had direct knowledge of the murder --
 7      A    That's correct.  They didn't.
 8      Q    -- correct?
 9      A    But that's all --
10           MR. BOND:  Let him finish.  Let him finish.
11      Q    So the physical -- let's talk about the
12 physical -- did the statement that Mary Warford and her
13 family gave to you and Coroner Adams and during those
14 interviews, that wouldn't have formed probable cause for
15 murder, correct?
16      A    That's hearsay.
17      Q    Yeah.  But it's not only hearsay, that
18 certainly wouldn't have given you probable cause to
19 initiate charges against Mr. Clark and Mr. Hardin for
20 murder, correct?
21      A    That's correct.
22      Q    Okay.
23      A    The grand jury did that, not me.
24      Q    Sure.  But that wouldn't have even given you
25 probable cause to go to the grand jury, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 201 of 325 PageID #: 26514
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
201

1       A     Well --

2       Q     Well, Sheriff, let me ask it this way: If it

3   did give you probable cause, why wouldn't you have

4   charged Mr. Clark and Mr. Hardin immediately after going

5   to talk to Rhonda Sue Warford, or I'm sorry, Mary

6   Warford, her mother?

7       A     I followed the directions of the Commonwealth

8   attorney.

9       Q     Yeah.

10      A     Okay.  He said -- we went through it with him

11  and he said present it to the grand jury.  Meet with me

12  before you do.  I did.

13      Q     Sure.  And you would have relayed to the

14  Commonwealth attorney in that conversation the

15  information that Mr. Thurman gave to you?

16      A     He knew it.

17      Q     He knew it.

18      A     He was present when the phone call come in.

19      Q     That's right.  Mr. -- and so Mr. Smith would

20  have been present when Mr. Thurman told you that the

21  hairs were a match, correct?

22      A     That's correct.

23      Q     Okay.  And that was part of the decision-

24  making process to initiate murder charges, correct?

25      A     That's correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Now, this is a little bit confusing for

2    me and so I don't know if you're going to remember, but

3    even outside of the phone call with Mr. Thurman, did you

4    ever see him in person at the Kentucky State Police

5    laboratory to discuss --

6         A    No.

7         Q    -- the results?

8         A    No.

9         Q    Okay.  By the time you testified at the grand

10   jury on May 7, 1992, you had -- had you received any

11   official reports from Mr. Thurman?

12        A    Yes.  They were all turned over to Kenton

13   Smith, the Commonwealth attorney.

14        Q    Okay.  Had you personally received them prior

15   to testifying, or did they go to Mr. Smith?

16        A    They come to me and I furnished them to Mr.

17   Smith.

18        Q    Okay.  Is it fair to say that sitting here

19   today, you're not sure of the exact results that you

20   would have received in those reports?  And let me ask

21   you a better way.  That's a bad question.  I'll withdraw

22   the question.  There was a lot of physical evidence that

23   you received, and the results came back at different

24   times; is that fair?

25        A    That's correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 203 of 325 PageID #: 26516
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
203

1      Q     Okay.  And when the results came back at
2   different times, they would actually be written down in
3   different reports.  Is that your recollection?
4      A     That's correct.
5      Q     Is it fair to say that sitting here today, you
6   can't testify one way or the other the exact reports
7   that you received prior to testifying at the grand jury?
8      A     Well, I think we might have received them all.
9   They come in at different times.  But anytime I got one,
10  I give it to the Commonwealth attorney.
11     Q     I understand that, but sitting here today, you
12  don't have an independent memory?
13     A     No.  I do not.
14     Q     Okay.  But you do remember that phone call
15  with Mr. Thurman --
16     A     Yes.  I do.
17     Q     -- that happened before the grand jury?
18     A     Yes.
19     Q     Okay.  And so when you were testifying at the
20  grand jury, you were testifying in part based on your
21  recollection of what Mr. Thurman told you, correct?
22     A     That's correct.
23     Q     Now, sir, I'm going to refer you to page --
24  it's like the bigger number in the center of page 167.
25     A     Next to the last page?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

204

1    Q    You know, yeah.  Yeah.

2    A    Okay.

3    Q    Yeah.  Now, on here, do you see it's like

4    really the first paragraph from you where you were

5    talking about a print, and Mr. Smith says, "And I mean

6    they don't last forever in other words."  And you say:

7    "Oh, I questioned that.  I -- I had -- I had to Kenton

8    because I knew maybe in December she could have been in

9    this car, but I went to them and I asked them, could

10   this be an old print."  Do you see that, sir?

11   A    I see it.

12   Q    Okay.  When you were saying that you went to

13   them, are you referring to Mr. Thurman?

14   A    No.  I'm referring to the evidence technicians

15   at the Louisville Police Department.

16   Q    Okay.

17   A    Down in the basement, they had a bunch of

18   women and men going through that vehicle and doing this

19   and doing that, and one of the ladies -- I don't know

20   who it is.  In fact, I think she passed away -- found

21   the print, found two, I think, one smudged, couldn't get

22   it, the other one, and I did ask her.  So I don't know

23   anything about fingerprints and how -- I can lift them

24   and send them into the crime lab.  And I asked her, "Is

25   this a old print?"  She says, "Oh, no, this is a fresh

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 205 of 325 PageID #: 26518
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
205

1    print."

2         Q    And --

3         A    That was told to me.

4         Q    -- did you ask her how she could -- what sort

5    of scientific testing she did to determine that?

6         A    She -- hey, I go by what she told me.  She is

7    the evidence technician, not me.  Now, the print was

8    brought to the Louisville homicide office and turned --

9    turned over to Department of Corrections.  I don't

10   remember his name, who is an authority on reading

11   prints, and he identified the print as Rhonda Sue

12   Warford's.

13        Q    Now --

14        A    Now, he did testify in the original trial,

15   though.

16        Q    Now, you also told the grand jury, though,

17   that "The fingerprint there, you might lift it tomorrow,

18   but as time goes by, dust will keep piling on that

19   fingerprint, because remember moisture -- moisture. This

20   was a fresh print."  Do you see that, sir?

21        A    Yes.  I see it and that's what I was told by

22   the --

23        Q    Did you have any --

24        A    -- evidence technician.

25        Q    Did you have any specific training to --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

206

```
 1        A     No.

 2        Q     -- support any of that testimony?

 3        A     No.

 4        Q     Had anybody ever given you any type of report

 5   that gave you a basis for testifying to that effect?

 6        A     Only what the evidence technician told me at

 7   the Louisville Police Department.

 8        Q     And she never wrote that down, right?

 9        A     No.

10        Q     You never asked her to write that down?

11        A     No.

12        Q     She's not living, right?

13        A     I don't think so.

14        Q     She's never testified to that effect here --

15        A     No.

16        Q     -- right?

17        A     No.

18        Q     And before today, you've never provided any

19   testimony that this lady who's now dead at the --

20        A     Sir, I --

21        Q     -- Louisville Police Department told you --

22        A     -- think she's passed away, okay.

23        Q     Sure.  Do you know what she looks like?

24        A     Lord, 30 years ago, no.  I don't -- don't

25   know.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

207

```
 1        Q    How do you she's dead?
 2        A    Huh?  I'd heard that.  I don't even know who I
 3   heard it from that she had passed away.  That's like
 4   that young lady, I'll never recognize her from 30 years
 5   from now, either.
 6        Q    Did you ever write down the -- any of the --
 7   when you spoke to this person in the basement of the
 8   Louisville Police Department; is that right?
 9        A    Yes.
10        Q    Do you know what day you spoke to her?
11        A    Lord, no.
12        Q    Was anybody with you?
13        A    No.  Not that I know of.
14        Q    Did you take any --
15        A    There could have been.
16        Q    Did you take any notes in this conversation?
17        A    No.  Just talked to her, because she's --
18        Q    I'm sorry.  Did you ever ask Lieutenant
19   Sherrard to have that person write a report for you?
20        A    No.  I didn't.
21        Q    And in this case, there was actually a
22   fingerprint match done; is that right?
23        A    Yes.  There was.
24        Q    Okay.  Did you ever ask the person who
25   conducted the fingerprint match to put any of this
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    information about dating a latent print -- did you ever

2    ask that person to include that information in their

3    report?

4        A    No.  I don't know.  They could have for all I

5    know.  I don't know.

6        Q    Well, sitting here today you don't remember --

7        A    No.

8        Q    -- ever seeing a report like that, right?

9        A    No.

10       Q    And you would agree with me that at the time -

11   - well, during the underlying investigation, the fact

12   that Ms. Warford's print was in Jeff Clark's Nova, that

13   wasn't necessarily incriminating in terms of the murder.

14   Is that fair to say?

15       A    Well, I don't know.

16       Q    Okay.  Well, let me ask you a different way:

17   Prior to going to the grand jury, you had been informed

18   that Ms. Warford had actually been in Mr. Clark's car in

19   December of 1991; is that right?

20       A    Yes.

21       Q    So there's no real dispute that Ms. Warford

22   would have been in the car prior to her murder; is that

23   right?

24       A    Yes.

25       Q    Yeah.  The dispute that what you were trying

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   to figure out is whether you can date a latent print as

2   being from the murder or from before; is that fair?

3       A    That's correct.

4       Q    Yeah.  And that's a pretty big development in

5   your investigation if you're able to date a latent

6   print.  Would you agree with that?

7       A    Well, sir, when this case went to trial, the

8   "fingerprint expert" testified at that trial and said it

9   can't be done.

10      Q    Could not, right?

11      A    Could not.  He don't know when that print was

12  put on there, and that's what he testified to.

13      Q    Sure.

14      A    That's why I didn't testify to that at the

15  trial.

16      Q    Yeah.  But at the grand jury, did you tell the

17  grand jurors that there was no way to date a latent

18  print?

19      A    No.

20      Q    No.  In fact, you told the grand jury that you

21  could actually date --

22      A    I sure did.

23      Q    -- a latent print and that this was not an old

24  print, right?

25      A    That's right.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 210 of 325 PageID #: 26523
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
210

1    Q    And because it was not an old print, that's

2    part of the reason why you believed that Mr. Clark and

3    Mr. Hardin committed the murder, correct?

4    A    I just thought she was in the car within

5    reason of the murder, okay?  That's what I thought.

6    Q    And you are basing that off of something that

7    an unknown evidence technician told you at the

8    Louisville Police Department who you don't remember her

9    name, correct?

10   A    Well, there's also one other person.  The

11   person that read this print, Department of Corrections,

12   we asked him that about the print, and he couldn't say

13   one way or the other to us.

14   Q    Oh, and that happened prior to you testifying

15   at the grand jury, right?

16   A    Yes.

17   Q    Yeah.  Did you tell the grand jurors that you

18   talked to this other person?

19   A    No.  I didn't.

20   Q    Did you tell the grand jurors that this other

21   person at the Department of Corrections told you that

22   there was no way one way or the other to date a latent

23   print?

24   A    No.  I think he halfway said it's a fresh

25   print.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Well, you just testified --

2    A    I know what I just said, but --

3    Q    So now you're saying something different?

4    A    No.  I'm not.

5         MR. BOND:  Let him finish, Elliot.

6    Q    This person from the Department of --

7         MR. BOND:  Let him -- whoa.  Whoa.  Whoa.

8    Whoa.  Let him finish.

9    Q    What did this person --

10        MR. BOND:  Let him finish.

11   A    The man told me that he really couldn't say

12   whether it was old or -- or fresh.

13   Q    Fair enough.

14   A    Okay.

15   Q    Is that a Jefferson County --

16   A    Department of Corrections.

17   Q    Okay.

18   A    Yes.

19   Q    You spoke to this person prior to the grand

20   jury, right?

21   A    Oh, yeah.  Right after the print was turned

22   over.

23   Q    And you knew by the time you went to the grand

24   jury that it was an important piece of information to

25   know as to whether the latent print was old or fresh; is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   that right?

2        A    Yes.

3        Q    Yeah.  Okay.  And you didn't testify to the

4   grand jury -- you didn't reveal to the grand jury

5   anything about this Department of Corrections person

6   saying that you couldn't tell one way or the other,

7   correct?

8        A    No.  I didn't.

9        Q    Okay.  And you made a decision to not inform

10  them of that, correct?

11       A    That's correct.

12       Q    You could have done that.  You just didn't do

13  it, correct?

14       A    I just didn't do it.

15       Q    Yeah.  Now, sir, you know, and I apologize to

16  have to show this stuff.  It was --

17       A    That's okay.

18       Q    It was a terrible crime scene that you had to

19  go to --

20       A    That's fine.

21       Q    -- right?  But the crime scene itself was

22  something that you probably want to forget, right?  Are

23  you okay, Sheriff?

24       A    Yeah.

25       Q    You sure?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Yeah.

2      Q    You want to take a little break?

3      A    No.  I'm fine.

4      Q    You okay?  Okay.  The crime scene was -- no

5  crime scene is good, but this was an especially horrific

6  one --

7      A    Yes.

8      Q    -- is that fair?  Okay.  And when you were at

9  the crime scene, at some point, Ms. Warford's body was

10  turned over; is that right?

11      A    Yes.

12      Q    Yeah.  And on Ms. Warford's body you were --

13  were you eventually able --

14      A    Wait just a minute.  Let me think about that

15  what you just said, said was it turned over.

16      Q    It's a bad question.  What I meant to ask you

17  was: Was it turned over to be face up at some point?

18      A    I don't think it was.  I think she was

19  transported --

20      Q    Okay.

21      A    -- and I could be wrong --

22      Q    Okay.

23      A    -- on her face.

24      Q    Now, you went to Louisville at some point with

25  Coroner Adams, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Yes.

 2      Q    Yeah.  And --

 3      A    But not with the body.

 4      Q    Not with the body but the -- you were there

 5  when the medical examiner did the autopsy, correct?

 6      A    Yeah.  That was later on, yes.

 7      Q    Yeah.  And --

 8      A    In fact, the next day.

 9      Q    At that autopsy you saw -- you observed a

10  tattoo of an inverted cross on Ms. Warford --

11      A    That's correct.  I did.

12      Q    -- is that right?  And you were able to

13  visually observe that tattoo, correct?

14      A    Yes.

15      Q    Okay.  And I'm going to show you -- and I'm

16  sorry, Sheriff.  I'm going to show you something that

17  we're going to mark, and you know what, I'm going to

18  hand you what we'll mark as Plaintiff's Exhibit 23 first

19  just so we keep things in order.  I'm not going to ask

20  you about that right now.  Here's a copy for your

21  counsel.  And then I'm going to show you what we'll mark

22  as Exhibit 24, which are two very disturbing photographs

23  and I'm sorry about this, Sheriff.  I'm just going to

24  ask you a couple of questions.  There's a copy for your

25  lawyer.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                    (EXHIBIT 23 MARKED FOR IDENTIFICATION)

2                    (EXHIBIT 24 MARKED FOR IDENTIFICATION)

3          MR. BOND:  How many photos?

4          MR. SLOSAR:  Just two.

5          MR. BOND:  Just the two.  Okay.

6          MR. SLOSAR:  There's just --

7          MR. BOND:  Thank you.

8          MR. BRUSTIN:  What number is this?

9          MR. SLOSAR:  24.

10         MR. BRUSTIN:  They're both 24?

11         MR. SLOSAR:  23 and 24.  Yeah.  It's a group

12    exhibit for 24.

13         MR. BOND:  24 is the photos.

14         MR. SLOSAR:  Yeah.

15   BY MR. SLOSAR:

16     Q    Now, Sheriff, I'll represent to you that these

17   were photographs that were produced during this

18   litigation from your lawyers and I believe that they

19   came from the autopsy, okay?

20     A    I'm sure they did.

21     Q    Okay.  And do you remember photographs being

22   taken at the autopsy?

23     A    I didn't take them.

24     Q    Okay.  But were you there when they were

25   taken?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    I was there.

2       Q    Okay.  Now, looking at the first page, and

3  this is MCO272, do you see the inverted cross that's on

4  Ms. Warford's body?

5       A    Yes.  I do see it.

6       Q    Is that a tattoo, sir?

7       A    I don't know.

8       Q    I'm sorry.

9       A    I don't know.

10      Q    Well, do you observe that to be a tattoo of an

11  inverted cross?

12      A    That's what I observed, yes.

13      Q    Okay.  And that's what you observed it to be

14  back in 1992 when you were at the autopsy on April 5th

15  and April 6, 1992, correct?

16      A    Yes.

17      Q    Okay.  And you're familiar with tattoos, right

18  Sheriff?

19      A    Yes.

20      Q    Yeah.  And it was your understanding in April

21  of 1992 that ink was used to put tattoos on, correct?

22      A    Yes.

23      Q    Yeah.  And you knew that by the time you

24  testified at the grand jury, correct?

25      A    (No verbal response)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Sir?

 2        A     Yes.

 3        Q     Okay.  Sir, now, the tattoo became an

 4   important part of your investigation.  Would you agree

 5   with that?

 6        A     No.  I wanted to find out -- fact volunteered

 7   -- well, it was told how it was put on.

 8        Q     Well, the fact that there was an inverted

 9   cross tattoo on Ms. Warford's body, that became an

10   important part of your investigation, correct?

11        A     I wanted to know how it got on there if that's

12   what you mean.

13        Q     Sure.  You wanted to know who did it, right?

14        A     Yes.

15        Q     Yeah.

16        A     Yes.

17        Q     That was important to you?

18        A     Yes.

19        Q     And what I'm asking is a little bit more

20   general.  I'm not trying to confuse --

21        A     Okay.

22        Q     -- you on this one.  But like the fact that

23   there was an inverted cross, that was something that you

24   wanted to investigate to figure out why that was there?

25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q     Right?

 2        A     Yes.

 3        Q     Okay.  So not just who put it there but why it

 4   was there, right?

 5        A     Yeah.

 6        Q     Okay.  Now, sir, from looking -- when you were

 7   at the autopsy, you didn't see any thread inside of that

 8   tattoo, correct?

 9        A     No.  No.

10        Q     Okay.  You didn't see any needles popping out,

11   correct?

12        A     No.  I didn't look that close.

13        Q     Yeah.  You knew at the time of the autopsy

14   that this looked to be a standard tattoo that was done

15   with ink, right?

16        A     Yes.

17        Q     Yeah.  Sir, I'm going to refer you back to

18   your grand jury testimony and I'm going to ask for you

19   to turn to page 160 at the bottom and you just let me

20   know when you get there, okay?

21        A     160?

22        Q     Yeah.

23        A     I'm 60.

24        Q     You're on that?

25        A     Uh-huh.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  Now, if you look at the first full

2  paragraph where it says, "Keep in mind", do you see

3  that, sir?

4      A    Yes.

5      Q    Okay.  And it says, "Keep in mind what I said

6  while ago when I interviewed Hardin, 'Has she got any

7  marks, scars, or tattoos,' and I guess he neglected to

8  tell me that he sewed an inverted cross on her left --

9  over her left breast but made a point of it, you know."

10 Do you see that, sir?

11     A    Yes.

12     Q    And then you informed the grand jury that

13 sewing an inverted cross on Ms. Warford's breast was a

14 sign of Satanism; is that right?

15     A    Yes.

16     Q    Okay.  Sir, at the time that you informed the

17 grand jury of this, you knew from being at the autopsy

18 that the tattoo -- that the tattoo was actually done in

19 ink, correct?

20     A    I don't know how it's done.  I know who done

21 it.

22     Q    Okay.  But you didn't see any thread --

23     A    No.

24     Q    -- at the body?

25     A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

220

```
 1        Q    But you told the grand jury that Mr. Hardin
 2   sewed an inverted cross on Ms. Warford's body, correct?
 3        A    Yes.
 4        Q    Why would you tell the grand jury that Mr.
 5   Hardin sewed an inverted cross on the body when you knew
 6   that it was a tattoo done with ink?
 7        A    I don't know.  Maybe he could have used ink on
 8   the thread.  I don't know, sir.
 9        Q    But there wasn't any thread or needles on the
10   body?
11        A    No.  No.
12        Q    You knew --
13        A    The cross was there.
14        Q    At that time that you testified to the grand
15   jury, you knew that Ms. Warford did not have a cross
16   sewed with thread on her body, correct?
17        A    Well, the way you put it, no.  I wouldn't
18   have, but I really don't understand where you're coming
19   from.
20        Q    Well, what I'm coming from, it simply isn't
21   true that the cross was sewed onto Ms. Warford's body.
22   Would you agree with that?
23             MR. BOND:  Object to the form of the question.
24        Q    That's not true.
25             MR. PELLINO:  Object to the form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A    I don't know.  I put what I put, and I don't

 2   know how I come up with it, but I know Michelle, her

 3   sister, is the one that told me who done it.

 4        Q    Yeah.  But that's not what I'm asking.  What

 5   I'm asking is when you went to the autopsy, you knew

 6   that this was a standard tattoo that was on Ms. Warford,

 7   correct?

 8        A    I knew it was a tattoo put on by somebody,

 9   yes, sir.

10        Q    Yeah.  And when you went to the autopsy, there

11   was no evidence there that gave you any reason to

12   believe that somebody sewed a tattoo on with a needle

13   and thread, correct?

14             MR. BOND:  Object to the form of the question.

15        Q    You can answer.

16        A    Michelle, which is sister of Warford, Ms. --

17   or Rhonda Sue, said -- told me that he -- that Hardin

18   had sewed that tattoo on her.  That's where that came

19   from.  Not from me.

20        Q    Okay.  Well, when you went to the autopsy, you

21   saw that wasn't true, correct?

22        A    Not necessarily.

23        Q    All right.

24        A    I don't know how they do it.  I'm not a tattoo

25   artist.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

```
 1        Q    Will you please show me in that photograph
 2   where you see any evidence that something was sewed onto
 3   the body of Rhonda Sue Warford?
 4             MR. BOND:  Object to the form of the question.
 5        A    I don't know, sir.
 6        Q    You don't see any thread there, right?
 7        A    No.  I do not.
 8        Q    And you would agree with me that sewing
 9   something onto somebody's body is a violent act, right?
10        A    Yes.
11             MR. BOND:  Object to the form of the question.
12        Q    Yeah.  And in fact you told the grand jury
13   that sewing something onto somebody's body is a form of
14   Satanism, correct?
15        A    I don't know.  Did I?
16        Q    You did.
17        A    Okay.
18        Q    Is that right?
19        A    Yes.
20        Q    Yeah.  But getting a tattoo -- if somebody
21   gets a tattoo, is that a form of Satanism?
22        A    No.  Not necessarily.  Everybody in the
23   country's got tattoos now.
24        Q    Yeah.  And there -- when by the time you
25   testified at the grand jury, you knew what you actually
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

223

1    observed when you saw the autopsy, correct?

2        A    Yes.

3        Q    Yeah.  And you knew that there wasn't any

4    thread or needles?

5        A    Yes.  I knew that.

6            MR. SLOSAR:  Yeah.  All right.  Let's take a

7        short break.

8            THE WITNESS:  Okay.

9            COURT REPORTER:  The time is 3:55 p.m.  We are

10       off the record.

11                    (OFF THE RECORD)

12           COURT REPORTER:  The time is 4:09 p.m.  We are

13       back on the record.

14           MR. BRUSTIN:  Let me just state for the

15       record, counsel for Mr. Clark has stopped

16       questioning now, but is reserving the right through

17       negotiation or court to -- court order to continue

18       questioning. Hopefully, we can come to agreement on

19       the total amount of time, but he has not completed

20       his questioning.  He's ceding it so that I can ask

21       questions today.

22           MR. BOND:  And we don't, by that statement,

23       agree that he has successfully done that.  We'll

24       try to work things out if we can.  It's something

25       we'll address with the Court September the 5th.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1              MR. BRUSTIN:  Yeah.  If necessary.
 2              MR. BOND:  I'm saying, if we can't resolve it.
 3              MR. BRUSTIN:  That's right.
 4                     CROSS EXAMINATION
 5   BY MR. BRUSTIN:
 6        Q    Sheriff Greer, good morning -- or good
 7   afternoon.  I'm Nick Brustin.  I represent Mr. Hardin.
 8        A    Yes, sir.
 9        Q    And I'm going to be asking you some questions
10   today.  Get started at least.  Let me know if you're not
11   feeling well enough to answer questions and we'll stop
12   for the day, but as long as we can go, let's try it,
13   okay?
14        A    Okay.
15        Q    You feeling okay right now?
16        A    I'm doing fine, sir.
17        Q    Good.  You know, as I was looking through
18   documents while you were questioning, I think I may have
19   figured out the fingerprint person that you spoke to in
20   the lab.  Do you recognize -- do you remember the name
21   Margaret Hahn (phonetic)?
22        A    Yes.  I remember that name.
23        Q    Is that the person that told you that -- in
24   the lab, the woman in the lab who told you that she
25   believed they were fresh prints?  Does that refresh your
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   recollection about that?

2        A    I'm not sure, but it could be.

3        Q    It could be her?

4        A    Yes.

5        Q    Do you remember any other women working in the

6   lab --

7        A    Yeah.  There was two or three.

8        Q    -- who did fingerprint stuff?

9        A    I don't know.  They was all tearing that car

10  to pieces.

11       Q    Okay.  But does that ring a bell that it could

12  have been Margaret Hahn?

13       A    It could have been Margaret.

14       Q    And so in other words, it could have been

15  Margaret Hahn who told you before the grand jury that

16  they were fresh prints?

17       A    Yes.

18       Q    And to the best of your recollection today,

19  that's probably what happened, correct?

20            MR. BOND:  Object to the form.

21       A    Yes.

22       Q    All right.  Now, I just want to ask you a

23  couple of general questions about your duties and

24  responsibilities on this case.

25       A    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q     So one of the things you've already told us is
2   that you were the lead in the case?
3        A     That's correct, sir.
4        Q     Okay.  In other words, you were the lead
5   detective on the case?
6        A     That's correct, sir.
7        Q     And my understanding from things you've said
8   here, and other places is that you took those
9   obligations very seriously?
10       A     I tried to.
11       Q     You told us this was the biggest case in your
12  career?
13       A     That I worked.
14       Q     That you ever worked?
15       A     Yes, sir.
16       Q     One of the only murder cases that you were
17  ever lead detective on, correct?
18       A     That's it, sir.
19       Q     This is the only one?
20       A     I've tried to been thinking about that.  It's
21  been so many years.  I --
22       Q     In any case, this is the one that stands out
23  in your mind?
24       A     Oh, most definitely.
25       Q     And I noticed there were some news reports
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   from way back when when you represented to the press

 2   that you were going to do everything in your power to

 3   bring the people that committed this horrible crime to

 4   justice.  Do you remember --

 5       A    Yes.

 6       Q    -- saying those things?

 7       A    Yes.

 8       Q    And you meant it when you said it, right?

 9       A    Yes.

10       Q    This was a mission for you.

11       A    Yes.

12       Q    To find the people that did this crime?

13       A    That's correct.

14       Q    And eventually you made arrests of Keith

15   Hardin and Jeff Clark, correct?

16       A    That's correct.

17       Q    And that was probably the biggest day of your

18   police career?

19       A    Well, I didn't probably call it that, but

20   you're basically probably right.

21       Q    At the time you believed they committed the

22   crimes?

23       A    Yes.

24       Q    And you were proud of the work you did on the

25   case?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.

2    Q    And you wanted to do everything in your power

3  within the bounds of the law to ensure that they were

4  brought to justice through the -- through their

5  prosecution, correct?

6    A    That's correct.

7    Q    You wanted to assist the DA in every way

8  possible?

9    A    That's correct.

10   Q    And anything the DA asked you to do you took

11  very seriously?

12   A    I tried to do it.

13   Q    Now, as a -- as a sheriff in 1992, your job --

14  one of your jobs was to arrest -- investigate any crimes

15  that you became aware of in your jurisdiction, correct?

16   A    That's correct.

17   Q    And you took that obligation very seriously?

18   A    Yes.

19   Q    Regardless of the source, if you received

20  information that someone in your jurisdiction committed

21  a felony, you would ensure it was investigated?

22   A    Either me or the state police.

23   Q    One way or another --

24   A    It's going to be investigated.

25   Q    -- if you have information that someone

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 229 of 325 PageID #: 26542
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
229

1    committed a crime --

2        A     Yeah.

3        Q     -- you'll make sure it's investigated?

4        A     It's going to get investigated.

5        Q     You don't need a DA to tell you that.  You do

6    it on your own, correct?

7        A     Right.  Or the dispatch in this case if I'm

8    not around, they'll call the state police to come and

9    work it.  I mean, that's the way it is in these rural

10   counties.

11       Q     And now you're -- I think you've told us, you

12   didn't have any formal training on conducting a homicide

13   investigation --

14       A     No.

15       Q     -- correct?  The only training you ever had

16   was watching state police do it, correct?

17       A     Yes.

18       Q     Or watching Louisville Police Department

19   officers and supervisors do it, correct?

20       A     Yes.

21             MR. BOND:  Object to the form of the question.

22       Q     It was complete on-the-job training, correct?

23       A     Yes.

24       Q     And so I take it that because you were the

25   lead investigator in this case, likely for the first

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  time, you were being especially careful to go by the

2  book and to do everything according to proper procedure

3  and training, correct?

4      A    I tried to.

5      Q    And one of the things you understood through

6  your experience that it was very important to do was to

7  continually, as you're interviewing witnesses, assess

8  their credibility and reliability, right?

9      A    That's correct.

10     Q    There's a variety of ways you would do that,

11 correct?

12     A    Correct.

13     Q    You're looking for inconsistencies in their

14 statements, correct?

15     A    Yes.

16     Q    You're looking for things that they tell you

17 that just don't make common sense, correct?

18     A    Yes.

19     Q    And you also told us that as an interrogator,

20 you were very effective at getting confessions.

21     A    I have been, yes, sir.

22     Q    One of the things you were good at is

23 recognizing when someone was telling you something that

24 didn't make sense and then calling them on it, correct?

25     A    That's correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

231

```
 1        Q      And you were good at making -- at figuring out
 2   when someone wasn't telling you the truth?
 3        A      Tried to be.
 4        Q      And it was tough to pull the wool over your
 5   eyes; fair to say?
 6        A      Oh, it's been done but it was hard.
 7        Q      Okay.  And in this case, when you were
 8   interviewing witnesses in this case, you understood one
 9   of your jobs was to assess the credibility and
10   reliability?
11        A      Yes.
12        Q      Using the tools that you would use throughout
13   your career when talking to witnesses and suspects,
14   correct?
15        A      That's correct.
16        Q      Is what they're telling me, does it make sense
17   -- does it make common sense, correct?
18        A      Yes.
19        Q      Are there contradictions that I should be
20   questioning this witness about to see if they're really
21   telling me the truth, correct?
22        A      Yes.
23        Q      And you're always looking for those things.
24   You want to -- you're always, when you're talking to a
25   witness, the last thing you want to do is rely on a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 232 of 325 PageID #: 26545
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
232

1  witness who's lying, correct?

2      A    I don't want any witness to lie.

3      Q    And so you're looking with real scrutiny at

4  any witness who's telling you things or looking to make

5  sure that what they're telling you is the truth,

6  correct?

7      A    Well, in this case here, after my case was

8  done and this other stuff come up, I relied more on the

9  Commonwealth attorney to assess --

10     Q    Well --

11     A    -- everything that was going on.

12     Q    -- let me give you an example.  One of the

13  things that you said to Clifford Capps when you were

14  interviewing him at the direction of Kenton Smith was

15  you offered to do a polygraph exam?

16     A    That's correct.

17     Q    That came from you, correct?

18     A    That's correct.

19     Q    And that was one of the tools at your disposal

20  to assess whether or not someone's telling the truth?

21     A    Yes.

22     Q    Kenton Smith didn't tell you to offer a

23  polygraph test?

24     A    No.

25     Q    You did that all on your own, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

```
 1        A     I did it on my own.

 2        Q     Because when Kenton Smith told you to

 3   interview Clifford Capps, you took that responsibility

 4   very seriously, right?

 5        A     I tried to.

 6        Q     And you understood that you were -- he could

 7   have asked anybody else to interview Clifford Capps, but

 8   he asked you, right?

 9        A     That's correct.

10        Q     He didn't ask Handy, right?

11        A     No.

12        Q     He didn't ask the state police?

13        A     No.

14        Q     He asked you.

15        A     No.  He asked me.

16        Q     And so you understood even though you had

17   completed your investigation and had made an arrest you

18   were very proud of, it was your job to interview

19   Clifford Capps to determine whether or not he was

20   reliable and credible, correct?

21        A     That's correct.

22        Q     That was your job when you went into interview

23   Clifford Capps?

24        A     That's correct.

25              MR. ERVIN:  Objection to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Now, Clifford Capps you understand that

2  assuming that our paperwork is correct, that the only

3  overlap between Clifford Capps and Jeff Clark, at your

4  jail, was May 7th to May 19th, 12 days?

5      A     Yes.  I think that was it.

6      Q     Okay.  So it was during those 12 days when, if

7  Clifford Capps is telling the truth, he was passed a

8  letter through Justis to give to Clark, correct?

9      A     That's correct.

10     Q     And that same time period --

11     A     No.  No letter.

12     Q     A note.  I apologize.  Let's be very specific.

13 You -- and you're a precise man, right?

14     A     Well, I --

15     Q     You try to be.

16     A     -- wasn't a letter.

17     Q     You try to be precise, right?

18     A     I try to be.

19     Q     Especially with that letter because you know

20 that letter doesn't look so good, right?

21           MR. BOND:  Object to the form.  Argumentative.

22     Let's move on.

23     Q     Sheriff Greer, you understand that during that

24 12-day period if Clifford Capps was telling you the

25 truth that during those -- during that period, he both

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  had the letter passed from Justis, the note passed from

2  Justis, correct?

3       A    (No verbal response.)

4       Q    And also, he allegedly heard two separate

5  confessions from Jeff Clark, correct?

6       A    That's correct.

7       Q    That all happened while he was next door to

8  you, correct?

9       A    Yes.

10      Q    And now, as you told us, this was after Jeff

11  Clark's arrest?

12      A    Yes.

13      Q    Okay.  And the arrest you're most proud of in

14  your career, yes?

15      A    I just figured we had the case solved.  Let's

16  don't use most proud.

17      Q    Okay.  You had the case solved and it was the

18  biggest case of your career.

19      A    No doubt.

20      Q    And within days, you've got Clifford Capps,

21  someone you know to be a liar, correct?

22      A    Uh-huh.  Yes.  I know he's lied.

23      Q    Come into -- he's a liar.  That's what you

24  know him as, right?

25      A    Yeah.  I know he's lied.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

236

```
 1        Q    You also know his dad very well, right?
 2        A    Yes.
 3        Q    He was a friend of yours?
 4        A    Who, his dad?
 5        Q    Yeah.
 6        A    No.
 7        Q    You knew him pretty well.
 8        A    I didn't know Capps' dad.
 9        Q    Oh, you didn't.
10        A    I think he was deceased.  I knew his mother
11   quite well.
12        Q    You knew his mother quite well.  Well, in any
13   case, he comes to you with a -- according to you, he
14   comes to you and says that there was a note passed from
15   Justis through Hardin to him about not talking to the
16   police, correct?
17        A    That's correct.
18        Q    And you thought that that conversation was
19   important enough not to write down but to call Kenton
20   Smith immediately and tell him about it, correct?
21        A    Yes.
22        Q    He left your office and you called Kenton
23   Smith and you told him what you had heard, right?
24        A    What -- I told him what Capps had come up and
25   told me.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  And Kenton Smith didn't give you any

2   direction about what you should do?

3      A     I was under the impression he said he'd talk

4   to him.

5      Q     You remember that specifically, Kenton Smith

6   saying I'm going to talk to him about it?

7      A     I don't remember but I think, sir.  I could be

8   wrong there, but I know I thought Kenton was going to

9   talk to him.

10     Q     All right.

11     A     That's why I called Kenton.

12     Q     Would it be fair to say that you're someone

13  who prides himself in having a lot of common sense?

14     A     Yes.

15     Q     And one of the things you were thinking when

16  Capps came and talked to you that day was is he telling

17  me the truth?  Did this really happen, right?

18     A     Exactly.

19     Q     Okay.  And as a man with common sense, there

20  would be a lot of ways for you to figure that out,

21  right?

22     A     Yes.

23     Q     One thing you could have done is you could

24  have walked next door and you could have asked Justis,

25  hey, did you pass this note.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 238 of 325 PageID #: 26551
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
238

1      A    I don't think Justis was in jail there at that

2   time.  He wasn't --

3      **Q    You remember today he wasn't there?**

4      A    No.  I don't.  I didn't think he was.

5      **Q    You remember thinking he wasn't there?**

6           MR. ERVIN:  Objection to the form of the

7      question.

8      **Q    Is that what you're telling us?**

9      A    Well, I don't know if Justis had been

10   transferred or not.

11     **Q    All right.**

12     A    That's what I'm trying to say.

13     **Q    You told us you said almost nothing to Capps.**

14   **It was a very brief conversation?**

15     A    Very brief.  Very brief.  And --

16     **Q    Okay.  Obviously, one of the things you said**

17   **to Capps when he tells you is if you have any more**

18   **information, please bring it to me, right?**

19     A    No.  I don't think I told him that, sir.

20     **Q    Why wouldn't you tell him that?**

21     A    Because I wanted to go through Kenton Smith

22   and let him assess what Capps had said because I didn't

23   know whether I believed Capps or not.

24     **Q    Okay.  So right then, you had doubts about**

25   **whether or not Capps was telling you the truth?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Yeah.

2      Q    All right.  And you never went over to see if

3  Justis was there?

4      A    No.  I didn't.

5      Q    You never asked Capps if he was there?

6      A    No.  I didn't.

7      Q    You never went over to see if you could find

8  the note?

9      A    No.  I didn't.

10     Q    Those are all things you could have done,

11 right?

12     A    That's correct.

13     Q    But even without doing any of those things,

14 you didn't believe Capps because he's a liar?

15          MR. BOND:  Object to the form of the question.

16     Q    Right?

17     A    I had my doubts.

18     Q    Okay.  And then magically, a few months later,

19 you meet with Capps again?

20     A    That's correct.

21     Q    And he tells you for the first time that

22 during that same time period he had taken two

23 confessions from Jeff Clark?

24          MR. BOND:  Object to the form of the question.

25     Q    Right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1              MR. BOND:  Go ahead an answer.

 2       A    Yes.

 3       Q    And as soon as he said that to you, based on

 4  your many years of experience, the first thing that had

 5  to go through your head was, wait a minute, why didn't

 6  he tell me that when he came to me three months ago,

 7  right?

 8       A    No.  That didn't go through my head, sir.

 9       Q    You never thought about that?

10       A    No.  I didn't.

11       Q    How did you not think about that?

12       A    Because he just basically said, he give me the

13  note, I want you-all to know about it.  That's when I

14  says, I'll get a hold of Kenton Smith and see how he

15  wants to handle it.

16       Q    You're missing my point.  You talked to him

17  three months later --

18       A    I know what you're -- okay.

19              MR. BOND:  I'm going to object.

20              MR. ERVIN:  I'm going to object to the

21       drama --

22              MR. BOND:  That's it.

23              MR. ERVIN:  -- of counsel.  Please calm down,

24       counsel.

25              MR. BOND:  We're talking about a point not a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    question.

 2  BY MR. BRUSTIN:

 3    Q    So how did you not consider when you talked to

 4  him three months later about that 12 of 14-day time

 5  period when he's in jail --

 6    A    Right.

 7    Q    -- how did you not think, wait a minute, why

 8  didn't you tell me about the confession when you were

 9  there?  That never crossed your mind?

10    A    Actually, it didn't, sir.

11    Q    Okay.  Now, obviously, if you were actually

12  concerned about assessing his reliability in retrospect,

13  that should have been the first question you asked him,

14  right?

15    A    Could have been.

16    Q    Now, by the way, you told us when you

17  described Capps earlier today that Capps was the kind of

18  person that would initially lie to you, right?

19    A    That's right.

20    Q    But if you were a good cop and you showed him

21  the evidence and you put it to him, you could usually

22  get him to tell the truth.

23    A    That's correct.

24    Q    And so you understood when you were meeting

25  with Capps in December of 1992, you had been successful

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

242

1   in the past at getting Capps to tell the truth when he

2   initially lied, correct?

3        A    That's correct.

4        Q    And you would do that by confronting him with

5   things that didn't make sense in his story, correct?

6        A    That's correct.

7        Q    If you wanted Capps -- if you wanted to get

8   the truth out of Capps, you knew exactly how to do it,

9   right?

10       A    Yeah, I guess.

11       Q    But you didn't take a single step to assess

12  whether what he was telling you on -- in December of

13  1992, you didn't take a single step to determine whether

14  what he was telling you was truthful or not, did you?

15       A    No.

16       Q    Why not?

17       A    Back to the Commonwealth attorney, sir.

18       Q    But he put you in charge.

19            MR. BOND:  Well, let him finish his answer,

20       Nick.

21       A    I interviewed him because the Commonwealth

22  attorney wanted him interviewed.  When I got done and

23  got the copies, I sent them to Kenton.  Let him assess

24  and evaluate what all was said in that interview. That's

25  all I can say.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    You just told us under oath --
 2        A    Yes.
 3        Q    -- that the reason you were -- you understood
 4   your task in interviewing him was to determine whether
 5   or not he was reliable and credible.  Do you remember
 6   testifying to that --
 7        A    Yes.
 8        Q    -- just a few minutes ago?
 9        A    Yes.
10        Q    And you didn't take a single step, not one,
11   during that interview to make that assessment, did you?
12        A    No.  I did not.
13        Q    The question is: Why didn't you?  Did you
14   forget?
15             MR. BOND:  Object.  Asked and answered.
16        A    I just didn't, sir.
17        Q    Do you have any reason why you didn't in the
18   most important case in your career?
19        A    No.  I don't.
20        Q    All right.  Now, when you talked to Mr. Adams
21   about the letter that you claim you didn't see until
22   2015, you remember that conversation of that?
23        A    Yes.
24        Q    Adams described to you what that letter said,
25   correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1          A     Bart Adams.

2                MR. BOND:  Let's use Bart versus Bill, okay.

3                MR. BRUSTIN:  Sure.  Bart is the one --

4                MR. BOND:  Just for the record.

5                MR. BRUSTIN:  I don't know firsthand.  Is

6          Bart --

7                THE WITNESS:  It's Bart Adams, yeah.

8                MR. BOND:  Well, there's Bill Adams who's the

9          coroner who's a party --

10               MR. BRUSTIN:  I got you.

11               MR. BOND:  -- and when you said Adams --

12               MR. BRUSTIN:  Let me do that.

13               MR. BOND:  -- because that's what he talked

14         about all the time.

15               MR. BRUSTIN:  Let me ask the question again so

16         it's clear.

17               MR. BOND:  Yeah.  Please.  Okay.

18    BY MR. BRUSTIN:

19         Q     You spoke -- you've told us now that you never

20    saw the letter until 2015, correct?

21               MR. BOND:  Object to the form of the question.

22         That's not what --

23         A     Yes.  That's what I said.

24         Q     Okay.  But you spoke to Bart Adams years

25    before that and he described what was in that letter to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you?

2      A    No.  Bart didn't quite describe that much to

3  me.

4      Q    All right.  So you had a conversation with

5  Bart Adams where he -- when he told you in substance

6  that there was a letter between Capps -- let me finish -

7  - a letter between Capps and Justis that in his view

8  indicated Capps was lying, correct?

9      A    That's right.

10      Q    Okay.  And obviously in the most important

11  case of your career when Bart Adams called you, your

12  first question must have been, well, wait a minute. What

13  are you talking about?  Where is that letter, right?

14          MR. BOND:  Object to the form.

15      A    That's exactly.

16      Q    And Bart Adams described to you what was in

17  that letter, correct?

18      A    You're using described everything.  No.  He

19  didn't everything but he told me there was a letter that

20  Capps sent to Justis telling him to back up his story.

21      Q    Okay.  In other words, what Bart Adams

22  believed was that that letter suggested Capps was lying,

23  correct?

24      A    Yes.

25          MR. BOND:  Object to the form of the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. ERVIN:  Objection.

2     Q    Okay.  And so as a conscientious honest

3  detective, you must have had lots of questions for him

4  about where is that letter?  Can I see it?  Where is --

5     A    I did ask him where it was at.

6     Q    What did he tell you?

7     A    He didn't answer one way or the other.  I

8  don't even think he said he had it.  I don't know.

9     Q    He refused to answer you?

10    A    No.  And that's not what I'm saying, sir.  I

11 don't know what he said.  I asked him where is this

12 letter.

13    Q    Okay.

14    A    And he didn't give me an answer.

15    Q    Did you ask anybody else about the letter?

16    A    Who?

17    Q    Did you go to Kenton Smith and say I'm

18 hearing --

19    A    Sure I called Kenton Smith.

20         MR. BOND:  Well, let's let everybody finish.

21         MR. BRUSTIN:  All right.

22         MR. BOND:  Please.

23         MR. BRUSTIN:  Okay.

24 BY MR. BRUSTIN:

25    Q    Did you ask him to tell you what was in the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

```
 1   letter that made him believe he was lying?
 2        A     I think I just told you.
 3        Q     Okay.  Now, when you interviewed -- you
 4   interviewed Justis --
 5        A     Yes.  I did.
 6        Q     -- at the direction -- when you interviewed
 7   Justis --
 8        A     Yes.
 9        Q     -- about the letter, why didn't you ask him
10   about whether there was any communications with Capps
11   indicating that Capps was lying?
12        A     Which interview?
13        Q     The interview you were asked to conduct on
14   behalf of Kenton Smith.
15        A     That's down at Breckenridge County Court,
16   right?
17        Q     The question is: Why didn't you question him
18   about the interaction with Capps?
19        A     He refused to talk to me.  Later --
20        Q     This was a full interview.
21        A     Well, that's later.
22        Q     Okay.  In that interview, why didn't you ask
23   him about his interaction with Capps and whether Capps
24   asked him to lie?
25        A     Well...
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    All right.  Let's talk about something else

 2   for a few minutes.  So first of all, let's take a look

 3   at -- I want to ask you a couple of general questions

 4   about how you took statements and I think I understand

 5   it.

 6        A    Okay.

 7        Q    The way you took statements in this case was

 8   that you would take a -- anytime you were doing an

 9   interview, you would try to do a taped statement,

10   correct?

11        A    Yes.

12        Q    And you did that with every witness that you

13   interviewed, correct?  Anything that -- anybody who had

14   anything relevant to tell you, you took a taped

15   statement, correct?

16        A    Yes.

17        Q    And for most if not all of those witnesses you

18   would also conduct a pre-interview?

19        A    Yes.

20        Q    And there would be no documentation of that

21   pre-interview, correct?

22        A    No.

23        Q    Whatever happened in the pre-interview, that

24   was between you and the witness, no documentation,

25   correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A     That's correct.

 2      Q     No matter what that witness said in the pre-

 3 interview, no documentation, correct?

 4      A     It was basically what was said in the

 5 statement.

 6      Q     For each one, you're sure of that today?

 7      A     Well...

 8      Q     In any case, regardless of what they told you

 9 in the pre-interview, no documentation of it, correct?

10      A     That's correct.

11      Q     So your method of taking statements was to

12 tape record the statement, not to type reports, correct?

13      A     That's right.

14      Q     All right.  Other people in your department

15 would type reports.  Some people did it that way.  They

16 would do memos about interviews?

17      A     Yes.

18      Q     Okay.  I want to show you an example of that.

19 So take a look at the --

20            MR. BRUSTIN:  Is that the right binder for

21      him?

22            MR. BOND:  This is the one you-all gave me.

23      Q     Let's take a look at this one.

24            MR. BOND:  Is that a different one?

25            MR. ERVIN:  Those are all the marked exhibits.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 250 of 325 PageID #: 26563
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
250

1          MR. BRUSTIN:  These are the marked exhibits.

2          MS. ROBINSON-STAPLES:  They have already been

3      introduced.

4          MR. BRUSTIN:  Is this the one we want him to

5      look at?

6          MR. BOND:  Nick, I think this is yours unless

7      you want me to read it.

8          MR. BRUSTIN:  No.

9          MS. ROBINSON-STAPLES:  This is the marked

10      exhibits.

11          MR. BRUSTIN:  We're going to mark this as 25.

12      This is the -- this is our best effort to put

13      together the police file from the county, okay?

14          MR. BOND:  MC -- for the record, MCSO police

15      file (reorganized).

16          MR. BRUSTIN:  That's right.

17          MR. BOND:  Correct?

18          MR. BRUSTIN:  Yes.

19          MR. BOND:  Okay.

20  BY MR. BRUSTIN:

21      A    All right.  So first thing I want you --

22          MR. BOND:  We've got -- okay.  We've got that.

23      **Q    All right.  Take a look at the tab, "Witness**

24  **statements."**

25          MS. ROBINSON-STAPLES:  This is it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    Okay.  If you could take a look at the witness

2    statement section.  Are you there?  And the Bates stamp

3    number is 293 on the left.

4             MR. BOND:  No.  That's your -- what now?

5             MR. BRUSTIN:  They're consecutively marked.  So

6       get to 293.

7             MR. BOND:  Oh.  Go to 293.  Okay.  Remsburg?

8             MR. BRUSTIN:  Yeah.

9             MR. BOND:  April 9, '92.

10             MR. BRUSTIN:  Yes.

11             MR. BOND:  Just to make sure we're on the

12       correct one.

13   BY MR. BRUSTIN:

14    Q    Now, before we get to this, sir, Sheriff

15   Greer, I'm sorry.  I'm going to ask you just a

16   preliminary question first.

17    A    Okay.

18    Q    Before we get to this.  You mentioned that one

19   of the things that was so striking to you -- I'm not

20   going to refer to the document yet.  You mentioned that

21   one of the things that was so striking to you about Amy

22   Remsburg's pre-interview statement to you was she

23   volunteered to you that Jeff Clark had told her that

24   they were sacrificing animals and were even thinking

25   about sacrificing humans, correct, in terms of Satanism?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BOND:  I'm going to object to the form of
 2         that question.
 3         Q    Let me do it a little more -- let me do it one
 4    step at a time.
 5              MR. BOND:  Nick, I don't remember -- I'm not
 6         trying to argue with you.
 7         Q    One of the things you told us that was
 8    striking about Amy Remsburg's testimony is she
 9    volunteered to you that Keith Hardin and Jeff Clark were
10    -- because of their interest in Satanism were into
11    sacrificing animals, correct?
12         A    Yes.
13              MR. BOND:  I'm going to object.
14         Q    All right.
15              MR. BOND:  Go ahead.
16         Q    And that was consistent with what Detective
17    Handy had told you that Keith Hardin allegedly
18    volunteered to him, correct?
19         A    Yes.
20         Q    And that was striking to you and was one of
21    the things that made you believe that this person who
22    wasn't necessarily credible -- didn't necessarily seem
23    credible was, in fact, credible, correct?
24         A    Yes.
25         Q    And she told you those things in the pre-
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 253 of 325 PageID #: 26566
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
253

1   interview, correct?

2        A    To tell you the truth, I don't remember.

3        Q    Okay.  But you remember her volunteering that

4   information to you?

5        A    I think so, yes.

6        Q    Okay.  And that was -- that was something that

7   struck you as making her seem reliable, correct?

8        A    Well --

9        Q    One of the things.

10       A    One of the things, yes.

11       Q    All right.  Now, take a look at -- now take a

12  look at this memo 293 to 294.

13            MR. BOND:  Do you want him to look at the

14       whole thing?

15            MR. BRUSTIN:  Yeah.

16            MR. BOND:  Okay.  Okay.

17  BY MR. BRUSTIN:

18       Q    What I want you to do is look at this long

19  enough so you could tell me that this appears to be a

20  memo -- this appears to be a memo that another officer

21  in the county took of Amy Remsburg the night before you

22  interviewed her.  Okay.  See if you can verify that for

23  me by looking at it.

24       A    You know, that's funny.  I've never seen this

25  before.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1         Q     You agree that's what it appears to be,

2    though, correct?

3         A     I'm trying to see who took the interview.

4         Q     It doesn't even say, right?

5         A     Huh?

6         Q     It doesn't even say, right?

7         A     It doesn't say.  I don't know nothing about

8    it.  This is the first I've ever seen it.

9         Q     Okay.  No.  I'm telling you this was in the

10   file and it appears to be an interview that was

11   conducted by some officer on April 9th at 10:30 p.m.,

12   correct?

13        A     That's what it appears to be.

14        Q     Okay.  And as you're telling us, you know you

15   didn't take this interview?

16        A     No.  I did not.

17        Q     It appears to be in one of your deputies,

18   correct?

19              MR. BOND:  Well, let me object to the form --

20        A     Yeah.  I'd like to know who.

21              MR. BOND:  -- form of the question.

22        Q     And I think what you're telling us is that you

23   didn't even realize until you're seeing this now that

24   this happened, correct?

25        A     I didn't know it happened, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    All right.  But you'll see and admit -- but
 2   you would agree that this appears to document an
 3   interview that was conducted at 10:30 p.m. on April 9th
 4   of Amy Remsburg by other officers from the county,
 5   correct?
 6             MR. BOND:  Let me object to the form of the
 7        question.
 8        Q    That's what it appears to be?
 9        A    I'd like to know where it come from.
10        Q    That's what it appears to be, though.  It's a
11   memo from some other --
12        A    Yeah.
13        Q    -- officer?
14        A    I'd like to know where it come from.
15             MR. BOND:  Nick, we agree it's in our case,
16        okay?
17             MR. BRUSTIN:  Okay.
18   BY MR. BRUSTIN:
19        Q    And you would agree that when you read this
20   memo there's no mention of anything about Satanism or
21   sacrificing animals, correct?
22        A    Yeah.  There's not.
23        Q    And it appears -- so it appears when she
24   talked to these other officers the night before, she
25   didn't mention anything about Satanism, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     That's true.

2      Q     **It appears that she --**

3      A     Whatever this -- whatever it says.

4      Q     **It appears that she saved that for you during**

5  **a pre-interview, right?**

6      A     I guess because it's not in here.

7      Q     **All right.  And --**

8            THE WITNESS:  Have you ever seen this before?

9            MR. BOND:  Hold on.  Just answer his

10     questions.

11           THE WITNESS:  Okay.

12  BY MR. BRUSTIN:

13     Q     **All right.  Very quickly, Sheriff, could -- do**

14  **you have any medical conditions that you in any way**

15  **believe affect your memory?**

16     A     Oh, no doubt about it.

17     Q     **What medical conditions are those?**

18     A     I've fallen 20 times on concrete, hitting my

19  head and my memory's going.  Worse -- I'm getting worse

20  in the last week.

21     Q     **Okay.  But I take it, and you correct me if**

22  **I'm wrong, you've been careful to tell us the things**

23  **that you do remember, and you don't remember?**

24     A     I try to.  I'm trying to.

25     Q     **Okay.  And your memory is not as good as it**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 257 of 325 PageID #:
26570
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
257

```
 1   used to be but you're being careful to try to tell us

 2   what you remember?

 3        A    When you get 80-some years old, yours not

 4   either.

 5        Q    Okay.  Are you taking any medications that you

 6   believe affect your memory?

 7        A    I don't know.  I'm taking about -- I don't

 8   know.  I'm taking so many, I don't know.

 9        Q    But you certainly haven't been diagnosed with

10   Alzheimer's dementia or --

11        A    No.  No.

12        Q    -- anything like that?

13        A    No.  No.

14        Q    Nothing that directly affects your -- you

15   haven't been told by any doctor that your memory has

16   been directly affected by any health condition, have

17   you?

18        A    Dr. Bosly is worried about it over at

19   Brandenburg.  She says, "Joe, you hit your head.  I'm

20   beginning to worry about you."  And I think I'm going to

21   be set up to go get some tests.

22        Q    Have you had any tests about it?

23        A    No.

24        Q    And is it your short-term memory or long-term

25   memory?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Well, I'd say both because I can't sometime
 2   remember my own phone number.
 3        Q     Okay.  But for example, one of the things you
 4   were able to do in preparation for today is you were
 5   able to read the long list of documents that your
 6   counsel provided to you?
 7        A     I've tried to.
 8        Q     You spent many hours doing that?
 9        A     Oh, my God, yes.
10        Q     50, 100?
11        A     Yes.  And last night I went brain dead on
12   every bit of it.
13        Q     And I take it in reading all those things,
14   that helped refresh your recollection about this case?
15        A     A lot of run together, sir.
16        Q     Okay.  But it did help?
17        A     It helped.  There's no doubt and I've been
18   wrong on some of it.
19        Q     Right.  By the way, you mentioned with Capps
20   that you had come to know his ways from other cases. Did
21   Capps ever provide you information about a suspect in
22   another case?
23        A     No.
24        Q     This is the only one?
25        A     This is the only one.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   Q   And by the way, when Capps came to visit you,

2   when he asked to see you, he didn't seem nervous or

3   scared, did he?

4   A   No.

5   Q   He was -- he seemed --

6   A   Not as far as I can remember.

7   Q   He seemed happy to give you information about

8   Jeff Clark and Keith Hardin?

9   A   Yeah.  Come up there.  I asked him what he

10  wanted.

11  Q   Okay.  And he didn't seem to be hiding

12  anything, right?

13  A   No.

14  Q   And it's your testimony he didn't ask you for

15  anything in return?  He said he was just coming up --

16  A   No.  He did not.  He did not.

17  Q   He was just coming up out of the goodness of

18  his heart?

19  A   Yep.  Well, you know he probably had a motive,

20  but not with me.

21  Q   Well, that was my next question.  Based on

22  your interaction with Capps, there was always a motive.

23  He didn't do anything -- he didn't do anything that

24  didn't help him, fair to say?

25  A   I'll go along with that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    So he must have had a motive for coming

2  forward?

3         MR. BOND:  Object to the form of the question.

4    Q    In your view?

5    A    In my view, yes.

6    Q    And you didn't do anything to investigate

7  that?

8    A    What, his motive?

9    Q    Yes, sir.

10   A    No.  I didn't.

11   Q    Now, I take it that certainly during the time

12 that you were interviewing Capps, in addition to calling

13 Kenton Smith, you also called Handy and Sherrard about

14 the information you found, correct?

15   A    I don't know.  I don't remember.

16   Q    You don't remember if you called Handy and

17 Sherrard?

18   A    Sir, I don't remember.

19   Q    Fair enough.  Would it be fair to say that

20 given your focus on this case and the scope of

21 involvement of the LPD, although you can't specifically

22 remember it, you likely would have kept Handy and/or

23 Sherrard in the loop about the Capps conversations?

24        MR. PELLINO:  Objection to form.

25   A    Why Handy?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Because Handy was the person you've already

2   told us you were talking to most every day about the

3   case.

4      A      Probably so.

5      Q      So Handy would be a logical person to call,

6   right?

7      A      If I did.

8      Q      Okay.

9      A      I don't know that I did.

10      Q      Would it be fair to say that based how careful

11   you were and how conscientious you were you believed you

12   would have called one of them?

13      A      I don't know, sir.  Not right now I don't

14   know.

15      Q      Now, by the way, although they may not exist

16   today, you understand that the jail was certainly

17   keeping track of who was in each cell, correct?

18      A      No doubt in my mind.

19      Q      There's no doubt in your mind that in 1992 or

20   1993 if you wanted to find out who was in a particular

21   cell on a particular day, there would have been

22   paperwork on it, correct?

23      A      Yes, sir, they would have.

24      Q      You could tell exactly from the paperwork

25   whether or not Keith Hardin was in a cell with Justis in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 262 of 325 PageID #: 26575
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
262

```
 1    any given day, correct?

 2        A    Yeah.  Should be.

 3        Q    And the same with Capps?

 4        A    Yes.

 5        Q    During the time that they overlapped in prison

 6    -- in jail, you would be able to figure out from the

 7    paperwork whether, in fact, they shared a cell for one

 8    day or every day, right?

 9        A    That's true.

10        Q    And you took no steps to do that?

11        A    No.  It was furnished to me by Capps, now take

12    his word for it.

13        Q    But you told you us you didn't take Capps'

14    word on anything.

15             MR. BOND:  Object to the form.

16        A    I didn't say I told his word on this either,

17    did I?  I said, whether you take his word for it.  He's

18    the one who told me.

19        Q    When Capps spoke to you absent evidence to the

20    contrary, you would generally assume he was lying, fair

21    to say?

22        A    Most time.

23        Q    If you were to read, sir --

24             MR. BOND:  Wait just a second.  Are you okay?

25             THE WITNESS:  I'm okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BOND:  Okay.

2   BY MR. BRUSTIN:

3      Q    You would agree, sir, that if you were to read

4   the December 2nd transcribed statement of your interview

5   with Clifford Capps --

6      A    Yes.

7      Q    -- there would be no way for anybody reading

8   that to know that months before Clifford Capps had come

9   to you and talked to you about the note, correct?

10     A    You're right.

11     Q    No way you would ever be able to see that?

12     A    Never.

13     Q    If you were reading the transcribed statement

14  that you took, you would come away, if you're reading

15  it, that that was the first time he was coming to you

16  and giving you this confession, correct?

17     A    I agree.

18     Q    Okay.  Now, you've already told us about some

19  of the things that you knew about the crime during the

20  investigation and I want to ask you about a few other

21  things.

22     A    Okay.

23     Q    As an experienced police officer, one of the

24  things that you were constantly doing while you were

25  investigating this case is trying to compare what you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    were hearing from other people based on the evidence as
 2    you knew it, correct?
 3         A    That's correct.
 4         Q    And you were also coming up with theories as
 5    to how you thought the murder may have been committed?
 6         A    Yeah.
 7         Q    You may not have been wedded to them, but you
 8    were open to being wrong, but you were coming up with
 9    theories about how you believed it was committed?
10         A    That's correct.
11         Q    And one of the theories you came up with,
12    given where the body was dumped and where the murder
13    took -- you believe took place, was that the person, at
14    least one of the people who brought the person there
15    knew the area well, correct?  It was one of your
16    theories?
17         A    Yes.
18         Q    And that was a theory you had early on in the
19    case?
20         A    That's correct.
21         Q    Another theory you had early on in the case,
22    especially after you heard about Keith Hardin's
23    involvement in Satanism was that this crime could have
24    been somehow connected with his involvement in Satanism,
25    correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

265

```
 1        A     Yes.
 2        Q     And I take it you knew, from your police work
 3   at the time, that whether you heard it through training,
 4   or you heard it through other sources that sometimes
 5   people who were involved in Satanism were also
 6   interested in doing things like animal sacrifices,
 7   right?
 8        A     Yes.
 9        Q     You knew that before this case?
10        A     Well, I knew that's what usually is involved
11   in Satanism.
12        Q     That's stuff you'd heard?
13        A     Yeah.  Yeah.
14        Q     And you'd also heard that sometimes animal
15   sacrifices could turn into human sacrifices?
16        A     Well, I've heard that, yes.
17        Q     And that's something you had heard before this
18   case?
19        A     Yes.
20        Q     And one of the things that you were thinking
21   as you were investigating this case?
22        A     Not right off the bat.
23        Q     Well, after you -- after --
24        A     Yeah.
25        Q     -- you learned information from the victim's
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   mother about Keith Hardin's involvement in Satanism?

 2       A    Yes.

 3       Q    That was one of the things you were thinking,

 4   correct?

 5       A    Yes.

 6       Q    And certainly after Handy told you that Hardin

 7   had admitted to sacrificing animals and wanting to move

 8   onto humans, that was really your theory of the case,

 9   right?

10            MR. PELLINO:  Objection to form.

11            MR. BOND:  Object to the form.

12       Q    It was a bad question.  At some point --

13            MR. BOND:  Are you withdrawing it?

14            MR. BRUSTIN:  Yes.

15            MR. BOND:  Okay.

16   BY MR. BRUSTIN:

17       Q    But at some point -- I'll ask a different

18   question.

19            MR. BOND:  I don't want him answering two,

20       okay.

21       Q    I'm going to -- answer this question: At some

22   point, Handy told you that Hardin had told him he

23   sacrificed animals and in substance wanted to move onto

24   humans, right?

25            MR. PELLINO:  Objection to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 267 of 325 PageID #:
26580
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
267

1        A     Okay.  You said Handy told me.

2        Q     **Yes.**

3        A     I can't remember whether -- now, if it's in

4     his letter, I read it.

5        Q     **You learned it either through reading it or**

6     **him telling you.**

7        A     Thank you.  Because I don't remember Handy

8     telling me this.

9        Q     **All right.  But you learned it soon after it**

10    **allegedly happened, correct?**

11       A     Yes.  I think it's in the letter and I could

12    be wrong.

13       Q     **Okay.**

14       A     If it's not in the letter then I don't

15    remember him telling me that.

16       Q     **All right.  And certainly you assumed that**

17    **Handy was telling the truth about hearing that, correct?**

18       A     Most definitely.

19       Q     **You had no reason to know at that time that**

20    **Handy had a habit of fabricating statements from**

21    **witnesses, right?**

22             MR. ERVIN:  Objection to form.

23       A     Well, I had respect for Handy.  Handy did not

24    do nothing wrong in this case that I know of.

25       Q     **Okay.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 268 of 325 PageID #: 26581
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
268

```
 1      A    He worked hard trying to help me.  And other -
 2  - not only him, other detectives, Sherrard told him,
 3  help him out.
 4      Q    All right.  In any case, you were not present
 5  when Hardin had allegedly told Handy that he sacrificed
 6  animals.
 7      A    I was not.
 8      Q    And you were not present when Hardin allegedly
 9  told Handy that he wanted to move on to human sacrifice,
10  correct?
11      A    No.
12      Q    And you took Handy at his word when you
13  learned about it, correct?
14      A    I don't know.  I don't know if it's in the
15  letters.  Handy didn't tell me this.
16      Q    I'm not asking you how you learned it.  When
17  you learned it, you took Handy at his word, whether you
18  read it, or he told you?
19      A    I'd have to, yes.
20      Q    Okay.  And so going forward from that point in
21  time, your theory of the case was that this could be
22  related to Satanism?
23      A    I kindly got that impression the night we went
24  to Ms. Warford's house.
25      Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 269 of 325 PageID #: 26582
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
269

1       A     Okay.

2       Q     All right.  And that's a --

3       A     Because what Ms. Warford said and what

4    Michelle said.

5       Q     Fair enough.  And you also remember that when

6    you spoke to Jeff Clark, he denied being involved in

7    Satanism, correct?

8       A     Yes.

9       Q     And your theory was that Jeff Clark was lying

10   about that and he really was involved, right?

11      A     Yes.

12      Q     That was your theory early on?

13      A     Yes.

14      Q     One of the things that Mr. Wise testified to

15   was that one of your favorite sayings as a sheriff was

16   if you don't write it down, it didn't happen.  Was he

17   accurate about that?

18      A     Halfway, yes.  Yeah.

19      Q     That's a motto you lived by, right?

20      A     Not necessarily lived by.  It's when things

21   come up, say they was working a case.  Well, how do you

22   know that?  Well, he told me.  I said, "Did you write it

23   down?"

24      Q     So that's something that you did say?

25      A     Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    If you don't write it down, it didn't happen?

2    A    I have said that, yes.

3    Q    And you said that because you understood it to

4    be true, correct?

5    A    Yes.

6         MR. ERVIN:  Objection to the form.

7    Q    Now, I can show it to you if I need to but

8    hopefully I won't because I think you'll remember this.

9    During the course of your interviews with Clark and

10   Hardin, you came to learn either through interviews you

11   conducted or interviews that you read from other

12   officers that they both had alibis for all times other

13   than the Thursday night after she disappeared, correct?

14   A    I'm trying to think.

15   Q    I could show you a report.

16   A    Yeah.

17   Q    Do you want to see it?

18   A    No.  No.  I don't need to see it.

19   Q    You remember that.  You checked their alibis

20   and the only window for this crime to have occurred

21   based on the information you were receiving was the

22   night she disappeared, correct?

23   A    Yes.

24   Q    And that's one of the reasons why you

25   concluded as a factual matter that that had to be the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 271 of 325 PageID #: 26584
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
271

1    time when the crime occurred, correct?

2        A    Yes.

3        Q    And after you determined that the murders had

4    to happen on Thursday evening, that's when you and Adams

5    went back to the medical examiner to see if there was

6    any way that he could have been wrong about the time of

7    death, right?

8            MR. ERVIN:  Object to the form.

9        A    Sir, there's one little mistake in that.

10       Q    Okay.

11       A    I don't know where it come from.  I didn't go

12   back to the medical examiner.

13       Q    Adams did?

14       A    Adams did.

15       Q    All right.  And you relied on Adams very

16   heavily, correct?

17       A    Well, he's -- he has to give me the time of

18   death.

19       Q    Okay.

20       A    That's the coroner's job.

21       Q    All right.  And what Adams reported back to

22   you was that, in fact, the medical examiner was able to

23   change the time of death, right?

24       A    I don't know.

25           MR. BOND:  Object to the form of the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 272 of 325 PageID #: 26585
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
272

1      A     No.  He didn't report back to me.

2      Q     All right.  By the way, did Adams have any

3    training in law enforcement?

4      A     In coroner's duties.

5      Q     Coroner's duties?

6      A     Probably yeah.  He probably better than a lot

7    of police.

8      Q     Okay.  But coroner's duties had nothing to do

9    with interviewing witnesses, correct?

10     A     No.

11     Q     And coroner's duties had nothing to do with

12   documenting criminal investigations, correct?

13     A     He did hold a coroner's inquest.

14     Q     Coroner's inquest.  But he certainly had no

15   training or experience in interviewing suspects, right?

16     A     Well, technically, he probably didn't but he

17   was pretty good at it sometimes.

18     Q     Well, other than this case, do you remember

19   ever taking Adams with you to interview suspects?

20     A     No.  I can't remember doing it.  Okay.

21     Q     Best you can recall today, you never did it?

22     A     No.  Never did.

23     Q     The best you can recall today, the only time

24   you ever took your coroner with you to interview

25   witnesses or suspects was this case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 273 of 325 PageID #: 26586
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
273

1    A    This case here, yes.

2    Q    Why did you take Adams with you to interview

3  witnesses or suspects?

4    A    Because he's the coroner of Meade County and

5  he wanted to go.  He wanted to help.  And I'm

6  shorthanded and with his knowledge, it helps.

7    Q    His knowledge about what?

8    A    Everything.  He's a better doctor than some of

9  the doctors we've got.

10   Q    Okay.  But as far as you know, Adams had no

11 medical training, correct?

12   A    Paramedic, EMT.

13   Q    He had paramedics training?

14   A    I think he did.

15   Q    Okay.  And so based on his paramedic training,

16 would you rely on --

17   A    And I'm just saying I think he did.  I know he

18 was an EMT instructor because he instructed me.

19   Q    In first aid?

20   A    In EMT.

21   Q    Okay.

22   A    I was a trained emergency medical technician.

23 I let it expire and he was my instructor.

24   Q    And so I take it that after the first time you

25 talked to the medical examiner, you never talked to him

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    again about the case?

2        A    I really didn't talk to Dr. Nichols that much.

3    In fact, I don't even know that I did.  I know I spoke

4    to him, but I don't know if I -- if he says I did, I

5    did, but I don't remember talking to Dr. Nichols.

6        Q    Okay.

7        A    I seen him.

8        Q    But you understood that Dr. Nichols was the

9    only person who was qualified to provide you with

10   medical evidence, correct?

11       A    Most definitely.

12       Q    And you would never represent medical evidence

13   that you received from someone who wasn't a medical

14   expert, correct?

15       A    No.  I wouldn't.

16       Q    That would be irresponsible, correct?

17       A    It would be.

18       Q    That would be a misrepresentation, correct?

19       A    I would say it would be.

20       Q    All right.  Take a look at the grand jury,

21   which is Exhibit 20.

22            MR. BOND:  Is that it, Joe?

23            THE WITNESS:  Right here, I believe.

24       A    What page, sir?

25       Q    I may have the wrong page.  Look in the book

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 275 of 325 PageID #: 26588
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
275

1    on page 330.

2                MR. BOND:  In the book?

3                MR. BRUSTIN:  I'm sorry.  Exhibit 26.

4                MR. ERVIN:  25.

5                MR. BRUSTIN:  25.

6                MR. BOND:  330?

7                MR. BRUSTIN:  330, please.  The grand jury.

8                THE WITNESS:  I've got it right there.

9                MR. BOND:  Well, they want to reference

10      theirs, right here.

11                THE WITNESS:  Oh, okay.

12                MR. ERVIN:  Nick, can you give us the page.

13                MR. BOND:  It's page 153.

14                MR. BRUSTIN:  It's 153.  Thank you.

15                MR. BOND:  It's the first page.

16                MR. ERVIN:  Okay.  I've got it.  Thank you.

17    BY MR. BRUSTIN:

18        Q     Actually, take a look at 332 which is 155.

19                MR. BOND:  Right here.

20        A     Okay.

21        Q     Take a look at 155 and look at the middle of

22    the page.  It says, "Greer: The only thing that's on

23    these clothes."  Do you see that?

24        A     Uh-huh.

25        Q     Read that paragraph to yourself.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BOND:  This paragraph.

2          THE WITNESS:  Uh-huh.

3     A    Okay.

4     Q    And what you're suggesting here to the grand

5 jury is that based on the saturation of the blood in the

6 clothing, it appears the body had been there about five

7 days, correct?

8     A    Well, I really don't know.

9     Q    Well, here's what you said.

10    A    Well, I'm saying that the ground was saturated

11 with blood in one area.

12    Q    And you're suggesting that that suggested --

13 you were suggesting to the grand jury is that meant the

14 body had been there approximately five days, correct?

15    A    I was trying to find where I said it had been

16 there five days.

17    Q    Again, this area of the blood, it was

18 saturated five days later?

19    A    Okay.

20    Q    Right?

21    A    No.  Five days later I would have been down

22 there.

23    Q    Oh, okay.

24    A    I'd been back there.  Okay.  Again, this area

25 of the blood --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019

277

```
 1              MR. BOND:  No.  No.  No.  There's no question,
 2      Joe.
 3         Q    Okay.  All right.  But certainly what you're
 4      suggesting here is that the saturation of the blood
 5      suggests that the body had been there a long period of
 6      time, correct?
 7              MR. BOND:  Object to the form of the question.
 8         A    Well --
 9              MR. BOND:  Words speak for themselves.  Go
10      ahead and answer his question, Joe.
11         A    The condition of the body when we found it was
12      pretty good shape so that means it'd been dead there --
13      been there a couple, three days, wouldn't it?
14         Q    Just common sense, right?
15         A    Yeah.
16         Q    And so basically what you're saying is another
17      thing that as a matter of common sense you were thinking
18      was that because there was so much blood saturation the
19      body could have been there a long time?
20         A    Yeah.
21         Q    And that --
22         A    I think that's what I said by putting the time
23      of death the way I did.
24         Q    Right.  That was just based on your common
25      sense?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 278 of 325 PageID #: 26591
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
278

1      A      Well, on these case reports, are these crime

2  lab reports?

3      Q      But you --

4      A      That's the time I come up with from the

5  coroner.

6      Q      Right.  No medical person told you that the

7  saturation of the blood --

8      A      Yeah.

9      Q      -- indicated that --

10      A      No.  No.  That's my opinion.

11      Q      That was just your opinion?

12      A      That was my opinion.

13      Q      That was just your lay medical opinion?

14      A      My thoughts.

15      Q      On medical issues?

16      A      Yes.

17      Q      Do you think that was appropriate to tell the

18  grand jury your thoughts about medical evidence --

19      A      Yes.

20      Q      -- without support?

21          MR. BOND:  I'm going to object to the form of

22      the question.  Go ahead.

23      A      Yes.

24      Q      How is it appropriate for you to tell the

25  grand jury your thoughts about medical issues without

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

279

```
 1    receiving that information from a trained medical

 2    expert?

 3            MR. ERVIN:  Object to form.

 4      A    My opinion.

 5      Q    Well, what was the basis for your opinion?

 6    You're not a doctor.

 7      A    No.  I don't have to be a doctor to have an

 8    opinion, sir.

 9      Q    Okay.  And you thought that was perfectly

10    appropriate?

11      A    Yes.

12      Q    Perfectly appropriate --

13      A    And so did the Commonwealth attorney.

14      Q    Sure.  Perfectly appropriate to give the grand

15    jury your --

16      A    My thoughts.

17      Q    -- your thoughts about the medical evidence?

18      A    Yes.

19            MR. GARVERICH:  Objection to form.

20      Q    Now, by the time that you interviewed Crystal

21    Barnes, and Michelle Rogers, and Rhonda Warford --

22            MR. BOND:  Not Rhonda.

23      A    Rhonda's the deceased.

24            MR. BOND:  Just so we don't have to clean it

25    up later.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 280 of 325 PageID #: 26593
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
280

```
 1              MR. GARVERICH:  Amy Remsburg.

 2              MR. BRUSTIN:  Amy Remsburg.  Thank you.

 3   BY MR. BRUSTIN:

 4       Q    By the time you interviewed those three

 5   people, you also had information from the medical

 6   examiner, and Mr. Adams, about the size that they

 7   believed the knife was that caused the death of Ms.

 8   Warford, correct?

 9       A    I don't remember that, sir.  I could have but

10   I don't remember it.

11       Q    Well, do you remember being told generally

12   that it appeared to be a five or six-inch blade?

13       A    I believe I do.

14       Q    All right.  And also you believe that you,

15   based on what you were told or what you observed, you

16   also believed that the person who committed the murder

17   knew something about anatomy because of the placement of

18   the death wound?

19       A    Did I say that?

20       Q    I'm asking you if that was one of the things

21   you --

22       A    No.

23       Q    -- felt.  You don't remember knowing that?

24       A    No.

25              MR. GARVERICH:  You good?  Want to take a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019

281

```
1        break?
2             THE WITNESS:  No.  I'm okay.
3             MR. BOND:  Nick, I'm not trying to rush you,
4        but maybe an hour at the most and I'm not even
5        going to say we can get there.
6             MR. BRUSTIN:  Okay.
7             MR. BOND:  Okay.
8             MR. BRUSTIN:  I'm not going to be done, but
9        we'll do what we can.
10            MR. BOND:  Well, I know you're not near done.
11            MR. BRUSTIN:  Yeah.
12            MR. BOND:  I know -- I understand that.
13            MR. BRUSTIN:  Yeah.  That's fine.
14            MR. BOND:  I'm just making an observation.
15            MR. BRUSTIN:  I understand.  So I'm going
16       to -- I think with that in mind, though, I'm going
17       to skip around a bit.
18   BY MR. BRUSTIN:
19       Q    Now, do you recall your interview and
20   reviewing your interview with Michelle Rogers, correct?
21       A    I remember a statement, but I don't remember
22   anything about it.
23       Q    All right.  Let me see if I can refresh your
24   recollection without showing it to you and tell me if I
25   did.  Do you remember that according to that interview --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-19  Filed 01/26/23  Page 282 of 325 PageID #: 26595
The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019

282

1  your report of that interview, she told you that Jeff

2  Clark was weird like Keith and they were into --

3      A    Are you sure I took Michelle's statement?

4      Q    **Yep.  It's in your report.**

5      A    That I took it?

6      MR. GARVERICH:  Which report?

7      Q    **Take a look at page 16.**

8      A    I know she was talked to and I could have --

9      MR. BOND:  Joe, wait.  Just a second.

10      MR. GARVERICH: I might be in the recorded

11  statement.

12      MR. BRUSTIN:  That's fine.

13  BY MR. BRUSTIN:

14      Q    **Take a look at page 16 of Exhibit 25.  I'm**

15  **going by the numbers on the left.**

16      MR. BOND:  Right.  Correct.  Let me -- okay.

17  We've got a page 16, Nick.

18      Q    **And you look in the middle of the page,**

19  **actually about two thirds of the way down the page, it**

20  **says, "Upon talking to Michelle Rogers, sister of**

21  **Rhonda's."**

22      MR. BOND:  See right there where my finger is?

23      A    Yeah.  I see it.

24      Q    **You're describing a conversation that you had**

25  **with her, correct?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Yes.

2      Q     And by the way, there is -- I will represent

3  to you that there is no taped statement in the file of

4  that conversation.

5      A     There is not.

6      Q     All right.  That would be an example of a

7  conversation that --

8      A     Right.

9      Q     -- you diverted from your typical routine of

10 taking a statement?

11     A     That's correct.

12     Q     Okay.  And, instead, what you did is you tried

13 to summarize it here in your report?

14     A     That's correct.

15     Q     Okay.  Why didn't you take a taped statement

16 of her?

17     A     I don't know.  I just didn't.

18     Q     Okay.  You certainly had access to tape

19 recorders, right?

20     A     Oh, no doubt.

21     Q     You had access -- you were able to take taped

22 statements whether you were in the sheriff's department

23 or out?

24     A     That's correct.

25     Q     You had the ability to do both things?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A    Uh-huh.

2        Q    And you have no recollection why you didn't

3    tape the statement?

4        A    I don't.  I really don't.

5        Q    But you would agree that that's contrary to

6    your practice?

7        A    Well, yes, I guess so.

8        Q    Okay.

9        A    I'll go along with that.

10        Q    And according to this summary of what she

11    said, she told you --

12             MR. BOND:  Let's read.

13        Q    -- that she knew Clark?

14        A    Uh-huh.

15        Q    That he was weird like Keith.  That they were

16    into satanic worship, and that they had killed animals.

17    Do you see that?

18        A    Yeah.  I see it.

19        Q    And it just happens to be exactly what Amy

20    Remsburg told you, correct?

21        A    I've never compared them.

22        Q    But this is something that she simply

23    volunteered to you --

24        A    Yes.

25        Q    -- without you --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREENE, taken on August 07, 2019

285

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | You didn't suggest it to her? |
| 3 | A | Yeah. |
| 4 | Q | This came out of her mouth, correct? |
| 5 | A | Yes. |
| 6 | Q | It was something that she thought was |
| 7 | | important to tell you, correct? |
| 8 | A | Yes. |
| 9 | | MR. BOND:  No.  Who's she? |
| 10 | | MR. BRUSTIN:  She being Michelle Rogers. |
| 11 | | MR. ERVIN:  Object to the form. |
| 12 | BY MR. BRUSTIN: | |
| 13 | Q | Right? |
| 14 | A | Uh-huh. |
| 15 | Q | You didn't feed that information to her? |
| 16 | A | No. |
| 17 | Q | She gave it to you? |
| 18 | A | No. |
| 19 | Q | And this was entirely consistent with your |
| 20 | | theory of how the crime was committed, right? |
| 21 | | MR. BOND:  Object to the form of the question. |
| 22 | Q | You thought it was a satanic killing and you |
| 23 | | thought that Jeff Hardin [sic] was also involved in |
| 24 | | Satanism, right? |
| 25 | A | Yes.  You mean Jeff Clark? |

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

286

```
 1        Q     Jeff Clark.  And would it be fair to say that
 2   that was one of the most important things that she
 3   volunteered to you?
 4             MR. BOND:  Object to the form of the question.
 5        Q     In your view?
 6        A     Yeah.  I needed to know.  So she -- we set --
 7        Q     She brought it up all on her own?
 8        A     Uh-huh.
 9        Q     Yes?
10        A     Uh-huh.  Yes.  She did.
11        Q     You didn't have to rip it out of her --
12        A     No.
13        Q     -- and she --
14             MR. BOND:  Object to the form of the question.
15        Q     Okay.  And she didn't seem scared to tell you
16   that stuff, right?
17        A     No.  She was concerned about her sister's
18   death.
19        Q     And she told you that she'd heard that
20   directly from Jeff Clark, right?
21        A     If that's what it says in there, yes.
22        Q     Take a look at this.  And another thing she
23   told you is that they had a lot of knives, right?
24        A     Yes.
25        Q     And that they had seen them with a lot of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  knives, right?

2      A    Yes.

3      Q    And this is the victim's sister, right?

4      A    That's correct.

5      Q    Someone who has, as far as you knew it, every

6  incentive to want to make sure that the people who did

7  this horrible crime are brought to justice?

8      A    That's correct.

9          MR. BOND:  Well, something fell on the floor,

10     guys.  I don't know if that's -- I don't have a

11     clue what it is.  There's a transcript down there

12     if that's what you're looking for.

13         MS. ROBINSON-STAPLES:  Thank you.

14         MR. ERVIN:  Transcript and a list.

15 BY MR. BRUSTIN:

16     Q    All right.  While we're waiting for that.  Now,

17 by the way, prior to this case, you knew that Valley

18 Station in Meade County was a place that sometimes

19 people who are involved in Satanism would use, right?

20         MR. GARVERICH:  Objection to the form.

21     A    No.

22         MR. BOND:  Shut that door.  Thank you, sir.

23     Q    Now, I'm going to see if this refreshes your

24 recollection.  I was asking you questions about the

25 manner in which the victim was stabbed and in your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  report, one of the things you mention is she had 11 stab

2  wounds to the upper torso and her throat had been cut

3  from center to right.  According to Dr. Nichols, the

4  fatal wound was to the back of the neck?

5      A    That's correct.  That's from Dr. Nichols.

6      Q    Okay.  Now, does that refresh your

7  recollections that -- recollection that based on that

8  information one of the things you were theorizing, not

9  certain of but theorizing, is that the killer knew

10 something about anatomy and how to kill people?

11     A    Kind of leads you to believe that.

12     Q    Right.

13     A    Yes.

14     Q    Another thing that was in your mind is the

15 possibility once you heard it?

16     A    I'd say somebody knew what they were doing.

17     Q    And that was something that you went into this

18 investigation thinking in your head it was a possibility

19 based on what Dr. Nichols told you?  In other words, as

20 you were interviewing witnesses -- I'll withdraw the

21 question.  As you were interviewing witnesses, one of

22 the things was that in your mind based on what Dr.

23 Nichols told you is that perhaps the person who

24 committed this crime knew something about anatomy and

25 how to kill somebody?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Not necessarily.

 2        Q    But you just said that's --

 3        A    I know what you're saying.

 4        Q    That was a possibility in your mind.

 5             MR. BOND:  Well, let him finish, please, Nick.

 6        A    Anything's a possibility.  Okay.

 7        Q    Well, as you've told us --

 8        A    Yes.

 9             MR. BOND:  Let him finish.  Go ahead.

10        Q    Based on evidence you were hearing from

11   medical people and other sources, you were trying to

12   figure out how this crime occurred, right?

13        A    Yes.

14        Q    And one of the theories based on that

15   particular piece of evidence, the number of stab wounds,

16   the location of the stab wounds, the fact that the fatal

17   wound was right in the back of the neck led you to

18   believe that the person who did this might, not

19   necessarily, but might know something about anatomy,

20   correct, right?

21             MR. BOND:  Objection to the form.

22        A    I don't know how to answer that.  I don't

23   know.

24        Q    Okay.  All right.

25             MR. PELLINO:  Page 141.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

```
 1        Q     Take a look at page -- I'm going to read this
 2   to you.
 3        A     Okay.
 4        Q     This is testimony from -- I don't have a copy
 5   so I'm going to read it.
 6              MR. BOND:  What is it?  We may have it with
 7        us.
 8              MR. BRUSTIN:  Fine.  This is the Hardin trial,
 9        the testimony from March 1, 1995, the testimony of
10        Michelle Rogers, on page 141 and 142, okay.
11              MR. BOND:  It may be on the -- we don't have
12        it.
13              MR. GAVERICH:  Michelle Rogers, the testimony.
14   BY MR. BRUSTIN:
15        Q     I'm going to read it to you, though.
16        A     Okay.
17        Q     I'm going to read it to you.  I assume it's
18   accurate.
19              MR. BOND:  We'll respond based upon what
20        you're reading from your computer.
21              MR. BRUSTIN:  Fair enough.
22              MR. BOND:  Fair enough?
23              MR. PELLINO:  Have you guys produced
24        transcripts with pages.  I don't think we have
25        those page numbers.  Those transcripts.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 291 of 325 PageID #: 26604
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
291

 1          MR. BRUSTIN:  You don't have the entire

 2     transcript?

 3          MR. PELLINO:  Not that you've produced with

 4     page numbers.  You're talking about from the trial?

 5          MR. BRUSTIN:  I'm actually using the page

 6     numbers from the trial.

 7          MR. BOND:  You-all have not produced any

 8     transcripts.

 9          MR. BRUSTIN:  You guys don't have the trial

10     transcript?

11          MR. PELLINO:  We don't have your page numbers.

12          MR. BRUSTIN:  No.  This is not my page

13     numbers.  This is the page number from --

14          MR. PELLINO:  From your transcription of the

15     trial, right?

16          MR. BOND:  See what we're saying?

17          MR. BRUSTIN:  I do now.

18          MR. BOND:  Go ahead and do it --

19          MR. BRUSTIN:  We're so not hiding it.

20          MR. BOND:  We'll work out the semantics later.

21          MR. BRUSTIN:  Yeah.  Fair enough.

22          MR. BOND:  Okay.

23          MR. BRUSTIN:  I got you.  I forgot that it

24     wasn't -- that it was on video.

25     BY MR. BRUSTIN:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

292

```
 1        Q    All right.  The question was: Were there ever
 2   any -- and it says, "sometimes," but it must be
 3   statements -- it says, "sometimes made to you by
 4   defendant Jeff Clark regarding Satanism."  Presumably,
 5   it has to be statements.  And the answer is no.  And
 6   then it says, "Were you aware of whether or not
 7   defendant Jeff Clark was involved in Satanism?"  And her
 8   answer is: "No."
 9        A    Okay.
10        Q    But you would agree that that is the exact
11   opposite of what she told you?
12        A    Yes.
13        Q    Any explanation as to why the victim's sister
14   would tell you that Jeff Clark was involved in Satanism
15   but testify at the trial that she had no knowledge of
16   him being involved in Satanism?
17             MR. BOND:  Okay.  Let me object to the form of
18        the question in that you're reading in a context
19        and we don't know what the rest of the transcript
20        says.
21             MR. BRUSTIN:  Fair enough.
22             MR. BOND:  But we'll limit it to what you've
23        read.
24        A    I was not in the courtroom for her testimony.
25   I didn't know what she testified to and I never read it.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   BY MR. BRUSTIN:
 2        Q    Okay.
 3        A    The report.
 4        Q    But you certainly deny misrepresenting what
 5   she told you in your report?
 6        A    No.
 7        Q    You didn't do that?
 8        A    No.
 9        Q    You have no explanation as to why --
10        A    I have no idea.
11        Q    Okay.  Now, by the way, you recall that when
12   you were speaking with Keith Hardin and his sister on
13   that first day, he volunteered to you that the victim
14   had a inverted cross tattooed on her body, correct?  You
15   asked about tattoos or things of that nature and he told
16   you, yes.  She had a --
17        A    I think he did.
18        Q    Okay.
19        A    Yes.
20        Q    He didn't seem to be hiding that, correct?
21        A    No.
22        Q    Let me read this to you about the length of
23   the blade and see if this refreshes your recollection.
24   This is from your omnibus report on page 8.
25             MR. BOND:  It there a Bates stamp number or --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1          MR. BRUSTIN:  Yeah.  It's 00 -- I'm sorry.

2     It's 08.

3          MR. BOND:  Oh, out of your all's book?

4          MR. BRUSTIN:  Yes.

5          MR. BOND:  Okay.

6  BY MR. BRUSTIN:

7     Q    But it's a 4-5-92, it says, "Greer and Adams

8  learned on 4-5-92" -- let me just know when you've got

9  it -- "that postmortem exam revealed murder probably

10 committed by a right hander using a five to six-inch

11 blade."  Does that refresh your recollection about

12 knowing the medical examiner's view of the length of the

13 blade?

14    A    Not really.

15    Q    But if it's written there --

16    A    If it's written there, that's what it -- yes.

17 That's what it'd be.

18    Q    In other words, you would have known -- by 4-

19 5-92 going into the interviews with witnesses, you would

20 have known if the medical examiner would have believed

21 that the blade was five to six inches long?

22    A    Yes.  If it's in that report.

23         MR. BOND:  You okay?

24         THE WITNESS:  Yeah.

25    Q    And you also understood that prior to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   interviewing Amy Remsburg or any of the other witnesses,

2   that Jeff Clark had denied having any knowledge of Meade

3   County, correct?  Maybe with the question more simple.

4   When you initially talked to Jeff Clark, he denied

5   having any knowledge of Meade County, correct?

6        A    I'm not sure.

7        Q    **You don't remember that today?**

8        A    In fact, I thought he said he did.  I could be

9   wrong.

10       Q    **He did not.  You're wrong about that.**

11       A    Okay.

12       Q    **But --**

13            MR. BOND:  Well, let's ask questions.  Let's

14       not comment.

15            MR. BRUSTIN:  Fair enough.

16            MR. BOND:  Okay.  And, Nick, if you want to

17       reference a report, we'd be happy for him to read

18       it with you.  Okay.

19            MR. BRUSTIN:  Yeah.

20   BY MR. BRUSTIN:

21       Q    **If you look at the memo at page -- his memo at**

22   **page 568.**

23            MR. BOND:  In here page 568?

24            MR. BRUSTIN:  Yeah.

25            MR. BOND:  So you're going to testimony,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      right?  No.  I'm sorry.

2          MR. BRUSTIN:  Left number 568.  This.

3          MR. BOND:  That's what I'm going to.

4          MR. BRUSTIN:  Yep.

5          MR. BOND:  Oh, okay.  You're -- okay.  This

6      page right here, Joe.

7          MR. BRUSTIN:  Yeah.

8          MR. BOND:  But now for the record --

9          MR. BRUSTIN:  It's an LPD memo.

10         MR. BOND:  It's an LPD memo.

11  BY MR. BRUSTIN:

12      Q    And obviously to the extent that LPD memos are

13  in the county's folder, you would have been reading

14  those carefully for information in those memos; fair to

15  say?

16      A    Yes.  I tried to.  Yes.

17      Q    Okay.  And this memo indicates if you take a

18  look --

19      A    Well, he's -- that's the boss there.

20      Q    Okay.  First paragraph in this April 6th

21  interview.  That he's indicating in this first paragraph

22  that he had no knowledge of Meade County, correct?

23      A    Yes.

24         MR. BOND:  Well, let me object to the form of

25      the question.  That's not -- let me object to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     form of the question.

2   BY MR. BRUSTIN:

3       Q     In substance what that paragraph indicates is

4   that Jeff Clark is denying having knowledge of Meade

5   County, correct?

6             MR. GARVERICH:  Objection.

7             MR. BOND:  Object to the form.  The paragraph

8       speaks for itself.  It says a lot.

9   BY MR. BRUSTIN:

10      Q     Among other things, that's one of the things

11  he suggesting there is that he didn't know Meade County

12  well, correct?

13      A     Yes.  That's --

14      Q     He'd only been there a few times.

15            MR. BOND:  Well, that's different than your

16      other question.

17            MR. BRUSTIN:  Fair enough.

18  BY MR. BRUSTIN:

19      Q     You agree with that, though, correct?

20      A     Yes.  This is who he told Hope Greer, I

21  believe.  He's the boss.

22      Q     Okay.  And you -- and so as of April 6th or

23  thereabouts you would have understood that that was Jeff

24  Clark's position.  That he wasn't very familiar with

25  Meade County?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

```
 1        A     Yes.

 2        Q     And that was inconsistent with your theory of

 3   who committed the crime, correct?

 4        A     Yes.

 5        Q     You believed he might be lying?

 6        A     Yes.

 7        Q     When you interviewed Amy Remsburg, you

 8   believed that he might be lying about knowing Meade

 9   County well?

10        A     Yes.

11        Q     And during your time with Amy Remsburg, she

12   just happened to volunteer that, in fact, Jeff Clark did

13   know Meade County well, correct?

14              MR. BOND:  Object to the form of the question.

15        Go ahead and answer.

16        A     In fact, I think she said he lived down there

17   with her on some -- on occasion.

18        Q     Now, by the way, at the time that you

19   interviewed Amy Remsburg, you knew that she had an order

20   of protection against Jeff Clark?

21        A     I didn't at the time, but I found out.

22        Q     Soon after, correct?

23        A     Yep.

24        Q     So you knew that they had a history?

25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     And you knew, obviously, they weren't getting
 2   along, correct?
 3        A     Apparently, they weren't.
 4        Q     And you already told us that you also learned
 5   subsequently about allegations that she had raped her
 6   children?
 7        A     I heard the allegations, yes.
 8        Q     And that Jeff Clark had raised those
 9   allegations, correct?
10        A     Yes.
11        Q     At some point?
12        A     Yes.
13        Q     And obviously, you would agree that
14   allegations that she had raped her children would
15   provide her a motive to say bad things about Jeff Clark,
16   right?
17        A     I'm not inside of her mind.  I don't know.
18        Q     Well, as a matter of common sense, if you're
19   talking to a witness --
20        A     Uh-huh.
21        Q     -- who is being accused of raping her child
22   and is giving you information about the man who's
23   accused her of raping her child, you would expect, as a
24   matter of common sense, she might have a reason to say
25   bad things about that person?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A    She might have a reason.

2      Q    **Especially if those allegations were true,**

3  **right?**

4           MR. ERVIN:  Objection to the form.

5      A    If they were true.

6      Q    **And you understand, for your knowledge of the**

7  **situation, that in fact Amy Remsburg was convicted of**

8  **raping her child multiple times, correct?**

9           MR. BOND:  Object to the form of the question.

10     A    Believe it or not sir, I wasn't.

11     Q    **Okay.  You know today?**

12     A    Yes.  I know today, yes.

13     Q    **You know today that within a few years of this**

14  **crime, Amy Remsburg was convicted of raping her child,**

15  **correct?**

16          MR. BOND:  Object to the form of the question.

17     A    I know now.

18     Q    **You know now?**

19     A    Yeah.

20     Q    **Okay.  And so it appears that when Jeff Clark**

21  **made a complaint that she had raped her child, it was**

22  **true?**

23          MR. BOND:  Object to the form of the question

24          if the form of the question is in relationship to

25          his allegation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    BY MR. BRUSTIN:

2         Q    And I understand that you didn't know this at

3    the time of the investigation, but it appears, given

4    that she pled guilty to raping her child multiple times,

5    that when Jeff Clark made that allegation that she raped

6    her child, it was likely true?

7              MR. BOND:  Object to the form of the question.

8         A    I didn't know she'd pled guilty.

9         Q    Well, she did.  I can represent that to you

10   that she did from the Court records we've seen.

11        A    Oh, no.  You don't have to.

12        Q    Okay.  You certainly heard that either she

13   pled guilty or she was convicted, correct?

14        A    I did hear that, yes.

15        Q    And do you remember when you heard that?

16        A    No idea.  I'm trying to think of the police

17   officer that worked the case.

18        Q    Okay.  So at some point within a couple of

19   years of the conviction of Hardin and Clark, you learned

20   that Amy Remsburg had been convicted of raping her

21   children, correct?

22             MR. BOND:  Object to the form of the question.

23        A    I don't know how long it was, but I did hear

24   it, okay.

25        Q    It was within a couple of years wouldn't you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    say?

2        A    Probably.

3        Q    Okay.  And so obviously when you learned that

4    she had been convicted of raping her children, you

5    understood that that was evidence that suggested that

6    one of the key witnesses in your case against Clark and

7    Hardin was probably not credible?

8            MR. BOND:  Object to the form of the question.

9            MR. ERVIN:  Objection to the form.

10           MR. GARVERICH:  Object to the form.

11       A    Sir, I can't answer that.  Who prosecuted Amy

12   Remsburg, what county?  Meade?  Jefferson?

13   BY MR. BRUSTIN:

14       Q    It was Meade County.

15       A    Then Kenton Smith would have had to prosecute

16   her.

17       Q    Okay.

18       A    And he's the one that prosecuted Jeff now.

19       Q    Right.  Did you ever talk to Kenton Smith

20   about the fact that your star witness --

21       A    He already knew it, sir.

22           MR. BOND:  Let him finish his question.  Okay.

23       Go ahead.

24       Q    You've already told us that Amy Remsburg was a

25   very important witness, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

303

 1      A     Yes.

 2      Q     And obviously you knew at the time that she

 3  came forward that she potentially had a motive to want

 4  to hurt Jeff Clark given the order of protection?

 5            MR. BOND:  Object to the form of the question.

 6      A     I can understand that, sir.

 7      Q     Okay.  And you agree with that?

 8      A     Yes.  But let's go back to the -- the Kenton

 9  Smith trying her.  Kenton Smith would know whether she's

10  credible or not.  He is a prosecutor, Commonwealth

11  attorney, not Joe Greer.

12      Q     Okay.

13      A     I can't interfere -- yeah, Kenton Smith throw

14  the book at me.

15      Q     It sounds like what you're saying as a general

16  matter today is that to the extent things weren't

17  followed upon in this case, it was the fault of Kenton

18  Smith.

19            MR. BOND:  Object to the form of the question.

20      Q     Is that a fair characterization of what you've

21  said today?

22      A     No.  No.

23            MR. BOND:  Object to the form of the question.

24      A     That's not what I've said.

25      Q     All right.  Well, you would agree -- putting

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   aside who knew it, you would agree that the fact that

2   Amy Remsburg raped her children would cast doubt on her

3   credibility and reliability?

4           MR. ERVIN:  Objection to form.

5           MR. BOND:  Object to the form of the question.

6   A    I'm sure Kenton Smith would have thought of

7   that, wouldn't you think?

8   Q    I'm asking if you thought of it.

9   A    He prosecuted her.  What I thought?  I didn't

10  even know it.

11  Q    Okay.  Did you ever speak to -- well, you told

12  us you knew it at some point.  Did you ever speak to

13  Kenton Smith -- did you ever in your life at any time

14  speak to Kenton Smith about the fact that Amy Remsburg

15  was convicted of raping her children?

16          MR. BOND:  Object to the form of the question.

17  A    Not that I can remember.

18          MR. BRUSTIN:  Let's take a two-minute break.

19          MR. BOND:  That's fine and, guys, if he can

20      last, I'm going to shut it down at 6:00 at the

21      latest.

22          MR. BRUSTIN:  Okay.

23          MR. BOND:  Okay.  Just to give you a window.

24      Okay.

25          COURT REPORTER:  The time is 5:31 p.m.  We are

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        off the record.

 2                        (OFF THE RECORD)

 3            COURT REPORTER:  The time is 5:34 p.m.  We are

 4        back on the record.

 5   BY MR. BRUSTIN:

 6        Q     Sheriff, you mentioned earlier that you knew

 7   Amy Remsburg from earlier.  She had been in the station

 8   a few times?

 9        A     I didn't know her that well.

10        Q     You knew her family a bit?

11        A     I knew her grandmother more than I did

12   anybody.

13        Q     And you knew she had been in the station for

14   various offenses?

15        A     I'd seen her in my office a couple of times.

16        Q     And you knew that she had a reputation for not

17   being a particularly trustworthy person, fair to say?

18        A     Well, I can't say that now.

19        Q     Well, what do you remember her being in the

20   sheriff's department for?

21        A     She had a vulgar mouth.

22        Q     Okay.

23        A     I can't even remember what she was raising

24   heck about.  I just can't remember, sir.

25        Q     Okay.  Now, you -- I take it during the course
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   -- you got to know the people in the community.  It
 2   wasn't that big of a community, right?
 3        A    Well, I've been there for years.
 4        Q    And you knew, for example, eventually you knew
 5   that Amy Remsburg and Clifford Capps went to school
 6   together, correct?
 7        A    I did not know that.  Thank you.
 8        Q    You never learned that before -- before me
 9   telling you?
10        A    No.
11        Q    This is the first you're hearing of it?
12        A    Didn't know that.
13        Q    Now, another thing that you --
14             THE WITNESS:  Oh, gosh.
15             MR. BOND:  You okay?
16             THE WITNESS:  Yeah.
17   BY MR. BRUSTIN:
18        Q    Another thing you told -- you testified to in
19   the grand jury at page 339.
20             MR. BOND:  You're using your numbers.
21             MR. BRUSTIN:  Exhibit 20, yeah.
22             MR. BOND:  Okay.  I just -- 339.
23             MR. BRUSTIN:  Let's go for the big exhibit.
24        Yeah.  Let's do 339.
25             MR. BRUSTIN:  Here's 399, Joe.  It's 162,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    guys.

2          MR. GARVERICH:  Thank you.

3          MR. BOND:  Any particular spot?

4   BY MR. BRUSTIN:

5      Q    Yeah.  So middle of the page, the top third of

6   the page where it says, "This came out through numerous

7   interviews.  Do you see that?

8      A    Yes.

9      Q    It says, "This came out through numerous

10  interviews.  Again, keep in mind, no sexual assault,

11  clothes clean.  Her panties were clean.  She was not

12  beat up.  All she did and it's sad, she was cut to

13  death.  Keeping all this in mind, we've ruled out a

14  stranger abduction."  Do you see that?

15     A    Yes.

16     Q    And this is another example of your giving

17  your own opinion testimony about medical issues,

18  correct?

19          MR. BOND:  Object to the form of the question.

20     A    Yes.

21     Q    Okay.  This is you telling the grand jury what

22  you make of the medical and forensic evidence at the

23  scene, correct?

24          MR. BOND:  Object to the form of the question.

25     A    Sir, if I was doing wrong, I think the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

308

1  Commonwealth attorney would have stopped me or any other

2  prosecutor would stop you.

3      **Q     There we go again, Kenton Smith's fault,**

4  **right?**

5      A    No.  I'm not blaming Kenton Smith.

6          MR. BOND:  I'm going to object --

7      A    No, that's --

8          MR. BOND:  No.  Hush.  That wasn't a question.

9          We're going to -- stays away.          MR.

10  BRUSTIN: Fair enough.

11          MR. BOND:  We'll answer all your questions.

12          MR. BRUSTIN:  All right.

13          MR. BOND:  We're not going to debate life with

14      you, okay.

15          MR. BRUSTIN:  That's fine.  That's fine.

16  BY MR. BRUSTIN:

17      **Q     So no medical person told you they had ruled**

18  **out a sexual assault, correct?**

19      A    No.  They hadn't.

20      **Q     And by the way, you understood through**

21  **experience that often times when there's a sexual**

22  **assault, there is no physical evidence of the sexual**

23  **assault.  You knew that from experience, correct?**

24      A    Yes.

25      **Q     So no doctor had told you that a sexual**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   assault had been ruled out, correct?

 2       A    That's right.

 3       Q    You made that assessment on your own, correct?

 4       A    Yes.

 5       Q    And that's what you told the grand jury that

 6   we, meaning you, had ruled out sexual assault?

 7            MR. GARVERICH:  Objection to form.

 8       A    Yes.

 9       Q    Nobody else had ruled out sexual assault. That

10   was in your head, right?

11       A    Yes.

12            MR. BOND:  Object to the form of the question.

13       Q    And the same thing with the stranger

14   abduction.  You had ruled out a stranger abduction in

15   your head, correct?

16       A    Yes.

17       Q    No doctor had told you that the physical

18   evidence suggested there was no stranger abduction,

19   right?

20            MR. GARVERICH:  Objection.

21            MR. BOND:  Object to the form of the question.

22       A    No.

23       Q    No forensic people told you that there was --

24   that the forensic evidence suggested this couldn't have

25   been a stranger abduction, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

310

```
 1        A    No.

 2             MR. GARVERICH:  Objection.

 3        Q    That was something that you thought in your

 4   head and you told the grand jury that's what the

 5   evidence showed, correct?

 6             MR. BOND:  Object to the form of the question.

 7        Go ahead.

 8        A    Yes.

 9        Q    And you thought that was perfectly

10   appropriate?

11        A    Yes.

12        Q    By the way, you didn't discuss with Kenton

13   Smith the basis for that testimony, did you?

14        A    No.

15        Q    He may have assumed you got it from a doctor,

16   right?

17             MR. GARVERICH:  Object to the form.

18             MR. BOND:  Object to the form of the question.

19        He can't assume anything that Kenton Smith --

20   BY MR. BRUSTIN:

21        Q    Anyway, you didn't discuss it with him?

22        A    What's that?

23        Q    You didn't discuss that with him either?

24        A    No.  I did not.

25        Q    Now, by the way, you understood that both
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  Keith Hardin and Jeff Clark took polygraph exams,

2  correct?

3       A    Yes.  I am.

4       Q    Was it your understanding that the purpose of

5  that polygraph exam was to determine whether or not they

6  were telling the truth?

7       A    And their involvement in this case.

8       Q    Okay.  In other words, you never understood

9  that that polygraph exam was a tool to try to get a

10 confession?

11      A    Yeah.  I understand that.

12      Q    Well, was it both?

13      A    Polygraph is a good investigative tool and as

14 an attorney, you know that.

15      Q    Okay.

16      A    Sometimes if you've got a good polygraph

17 operator like Detective Ennis from the Jefferson County

18 Police Department who is retired is probably the -- one

19 of the best polygraph operators in the State of Kentucky

20 who took Clark's.

21      Q    All right.  And he represented to you that

22 Clark failed, right?

23      A    Yes.  He did.  It's in a report in the file.

24 You've got a copy, I'm sure.

25           MR. BOND:  Okay.  Let me object to the form of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of SHERIFF JOSEPH GREER taken on August 07, 2019

 1          the question because it may have been to somebody

 2          else from who he read a report.

 3    BY MR. BRUSTIN:

 4          Q    Okay.  But you understood that he was honestly

 5    reporting to you that he determined through the

 6    polygraph that he was lying?

 7               MR. BOND:  Object to the form of the question.

 8          Go ahead and answer, Joe.

 9          A    I don't think he used the term lied.

10          Q    Well, that he failed --

11          A    Deceptive.

12          Q    Okay.  That he showed deception.

13          A    I think so.

14          Q    All right.  That's what he told you and you

15    believed him.

16               MR. BOND:  Object to the form of the question.

17          A    Yes.  I believed him.

18          Q    In other words, you were under the impression

19    that the polygraph actually determined that Hardin --

20    that Clark was being deceptive?

21               MR. BOND:  Object to the form of the question.

22          A    The polygraph operator determined that.

23          Q    Was it appropriate in your view for a

24    polygraph operator to have a polygraph that the person

25    taking it didn't show deception and to claim it showed

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    deception to try to get a confession?

2         A    No.

3         Q    That would never be appropriate, right?

4         A    I've never heard of anything like that.

5         Q    And that certainly didn't happen here to your

6    knowledge?

7         A    To my knowledge, it didn't happen.

8         Q    And your understanding was the polygraph could

9    only be used as a tool to get a confession if it in fact

10   showed deception?

11             MR. BOND:  Objection.

12        A    Polygraph can be used to lead to other

13   evidence that might come out in the polygraph test

14   that's been asked.  It's also a tool -- I've had quite a

15   few polygraphs run in the KSP in Frankfort and have had

16   a couple three run in Jefferson County and for a while,

17   I had my own polygraph operator that I sent to school in

18   Florida.

19        Q    Okay.

20        A    A good polygraph operator like Sergeant Ennis,

21   nine times out of ten he'll get a confession by time

22   that polygraphs over.

23        Q    Whether deceptive or not?

24        A    Well, that's right.

25             MR. BOND:  Object to the form of the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 314 of 325 PageID #: 26627
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
314

1      Q      Okay.

2      A      That's what a good polygraph -- if you've got

3    a good one, he can do it, and then sometimes he can't.

4    I've seen KSP polygraph operators do it.

5      **Q      You've seen polygraph operators from the LPD,**

6    **or your own polygraph operator get a confession even**

7    **when the polygraph didn't show deception, right?**

8            MR. ERVIN:  Objection to the form.

9      A      That's -- that's not what I said.  They got

10   the confession before the polygraph was over.

11     **Q      Okay.  So your understanding was the polygraph**

12   **was a good tool --**

13     A      It's a good investigative tool, yes.

14           MR. BOND:  Joe, let him finish.

15     **Q      -- to get a confession?**

16           MR. BOND:  Well, in fairness, let him finish,

17           just like he needs to let you finish, okay.

18     **Q      In your experience, the polygraph was a good**

19   **investigative tool primarily to get a confession?**

20     A      Not necessary to get an infection -- a

21   confession.  It's -- use it in a lot of ways, I guess. I

22   don't know.  I did.

23     **Q      Well, do you have an understanding as to why**

24   **Keith Hardin's polygraph was taken by the LPD and**

25   **Clark's was taken at the sheriff's department?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      LPD set those up.  I didn't.

2      Q      **Well, you were in charge, right?**

3      A      That's right but they set up the polygraphs.  I

4  don't rule Louisville Police Department.  I told them

5  what we'd like to have.  They agreed to take them, so

6  they set them up for me.

7      Q      **Now, the interviews that you conducted with**

8  **Michelle Rogers, Mary Warford, and Crystal Barnes, those**

9  **were all conducted with Detective Handy, correct?**

10     A      I'm not sure.  If you say they are.

11     Q      **If the reports say that?**

12     A      If the report says it, that's true.

13     Q      **Okay.  And you conducted lots of interviews**

14  **with Handy, correct?**

15            MR. BOND:  Object to the form.

16     A      Yeah.  I guess.

17            MR. BOND:  Are you talking about in general or

18      in this case.

19            MR. BRUSTIN:  In this case.

20            MR. BOND:  Okay.  Still object to the form.

21  BY MR. BRUSTIN:

22     Q      **Have you ever worked with Handy in any other**

23  **case besides this one?**

24     A      No.

25     Q      **Now, one of the things you learned early on in**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

316

1   the case was that according to Mary Warford, Rhonda ran

2   into a strange man in Kroger's the night that she

3   disappeared at about 7:30, correct?

4        A    That's what somebody told me.

5        Q    And, obviously, that was an important lead,

6   correct?

7        A    Yes.

8        Q    What did you do to follow up on that lead?

9        A    We tried to find that person.

10       Q    Okay.  And so what did you do to try to find

11  that person?

12       A    Went to Kroger's.

13       Q    Okay.

14       A    And also LPD went to Kroger's and see what

15  they could dig up.  Couldn't dig up nothing.

16       Q    Okay.  And so that was a lead that you were

17  never able to close.  You just couldn't find any

18  evidence supporting it?

19       A    That's right.

20       Q    But that remained a mystery throughout the

21  investigation?

22            MR. BOND:  Object to the form of the question.

23       Q    Let me ask a better question: You were never

24  able to prove or disprove whether that person was

25  connected to this crime?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    That's correct.

2      Q    And fair to say that other than going to the

3  Kroger's that first night to inquire about that person,

4  you --

5      A    I don't believe it was the first night, sir.

6      Q    Well, the report came in, according to your

7  report, on 4-5-92.

8      A    Okay.

9      Q    Would it have been within a day or so of that?

10     A    Yes.

11     Q    It would have been very important to go there

12  as quickly as possible, correct?

13     A    Yes.

14     Q    And would it be fair to say that other than

15  going to the Kroger's on one occasion that was the sum

16  total of your investigation --

17     A    No.  LP --

18          MR. BOND:  Go ahead.

19     A    LPD went and was checking out -- said somebody

20  had seen her down there after midnight.  Kroger's was

21  closed.  They closed at midnight.

22     Q    Okay.

23     A    So she couldn't have been down there at

24  midnight.

25     Q    She couldn't have been in a place that was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 318 of 325 PageID #: 26631
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
318

1   closed?

2       A    Apparently, LPD said no.

3       Q    Okay.  So your understanding is that LPD

4   investigated that?

5       A    That part of it, LPD.

6       Q    Okay.  What did you do, if anything?

7       A    What do you mean?

8       Q    In regard to that tip?  That was all done by

9   LPD?

10          MR. BOND:  Was it a stranger or at Kroger?

11          MR. BRUSTIN:    Stranger.

12      A    Couldn't go no further.

13   BY MR. BRUSTIN:

14      Q    Okay.  Now, according to your notes of the

15   interview with Ms. Barnes, let's take a look at page 16.

16          MR. BOND:  Of your -- of 25?

17          MR. BRUSTIN:  Yes, please.  Is that right? 16?

18      That can't be right.

19          MR. BOND:  Okay.  That's part of his book, his

20      case report.  And, Nick, just for reference, I

21      think it's associated with April the 9th starting

22      on page 15 if that's what you're trying to

23      reference, okay.

24          MR. BRUSTIN:  Yeah.  Oh, okay.  It is 16.

25   BY MR. BRUSTIN:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

319

```
 1        Q     Take a look at 16.  This is your omnibus
 2   report, correct?
 3        A     Yes.
 4        Q     And if you take a look at first full
 5   paragraph, upon talking to Crystal Barnes?
 6        A     Yes.  I see it.
 7        Q     And Crystal was another person who, in your
 8   view, had every reason to want to help find these
 9   killers, correct?
10        A     Yes.
11        Q     And according to your report, in the middle of
12   the page, Rhonda -- Keith had threatened to kill Rhonda,
13   correct?  She ran around on him?
14             MR. BOND:  Is that the exact statement or is
15        that your paraphrase?
16             MR. BRUSTIN:    That's my paraphrasing
17        meaning, also Crystal.  Is that a fair
18        paraphrasing?
19             MR. BOND:  I'm trying to find it.
20             MR. BRUSTIN:  I'm sorry.
21             MR. BOND:  Nick, I really am.
22             MR. BRUSTIN:  No.  No.  No. It's hard to find.
23        It's the sentence that begins, "Run around on him."
24        That's the first line about three quarters down the
25        page.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 320 of 325 PageID #: 26633
The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019
320

 1          MR. BOND:  Okay.  Right here.  "Run around on
 2      him, upon talking to Michelle."  Is that where you
 3      are?
 4          MR. BRUSTIN:  Yeah.  It's just above it.  I'm
 5      sorry.
 6          MR. BOND:  Okay.
 7          MR. BRUSTIN:  "Last three weeks."  That's
 8      where it starts.
 9          MR. BOND:  Okay.  It starts with, "Also
10      Crystal, the last three weeks Keith and Jeff."
11  BY MR. BRUSTIN:
12      Q    Do you see that, that sentence?
13      A    Yes.  I see it.
14      Q    In other words, what she told you was that
15  Keith had threatened to kill Rhonda if she ran around on
16  him, correct?
17      A    Yes.
18      Q    And this is another example of a statement
19  that you did not --
20      A    Did not record.
21      Q    That you did not record.  Again, contrary to
22  your procedure?
23      A    That's right.
24      Q    And this is a statement where she's giving you
25  very important information, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

321

```
 1        A     It's in the case report.
 2        Q     Well, what could be more important in a
 3   homicide investigation than your key suspect threatening
 4   to kill the victim, right?
 5        A     Right.
 6        Q     Yet, you decided not to tape record that
 7   statement?
 8        A     That's correct.
 9        Q     Any idea why you would do something like that?
10        A     I just didn't.
11        Q     Why wouldn't you tape it?
12        A     I just didn't, sir.
13        Q     Okay.
14        A     How else can I answer you?
15        Q     Well, do you have any explanation as to why --
16        A     I have no explanation.  I didn't tape it.
17        Q     Okay.  But you certainly -- you swear today
18   that what she told you was accurately documented here?
19        A     Yes.
20              MR. BOND:  You okay?
21              THE WITNESS:  Yeah.
22              MR. BOND:  We're about done for the day.
23   BY MR. BRUSTIN:
24        Q     Line -- this is from line 14 on page 204 of
25   the transcript.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of SHERIFF JOSEPH GREER, taken on August 07, 2019

322

```
 1              MR. BOND:  Of what?
 2              MR. BRUSTIN:  Of the trial of -- Hardin trial.
 3         Question from Mr. Smith --
 4              MR. BOND:  Who's testifying?
 5              MR. BRUSTIN:  Crystal Barnes' testimony.
 6    BY MR. BRUSTIN:
 7         Q    "When you were out of the trailer, when you're
 8    out at the trailer did you ever hear either of the
 9    defendants threaten Rhonda Sue Warford."  Answer: "No,
10    sir."  You would agree that that's inconsistent with
11    what she told you?
12              MR. BOND:  Object to the form of the question.
13         A    Yes.
14         Q    She made it very clear that she believed that,
15    in fact, Keith Hardin had threatened Rhonda Warford,
16    correct?
17         A    Yes.
18         Q    No explanation for that?
19         A    I have no explanation, sir.
20              MR. ERVIN:  Objection.
21              MR. BOND:  Object to the form of the question
22         as we stated earlier, Nick, in context of limited
23         reference to the transcript.
24    BY MR. BRUSTIN:
25         Q    But you would agree that that's an important
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  contradiction on one of the most important things she

2  allegedly told you?

3      A    Yes.  I do.

4          MR. ERVIN:  Object to the form.

5          MR. BOND:  Object to the form of the question.

6      I've got to get that in for the record, okay.

7          THE WITNESS:  Okay.

8          MR. ERVIN:  It's not a contradiction.

9          MR. BRUSTIN:  Not to you, Mr. Ervin.

10         MR. ERVIN:  Not to me, Mr. Nick.

11         MR. BRUSTIN:  Yeah.  But you're going to --

12     you've been proven wrong many times before in your

13     career.

14         MR. BOND:  Now come on, guys.

15         MR. ERVIN:  Keep on proving, Nick.  Keep on

16     proving.

17         MR. BOND:  And Nick, I would just -- if you

18     can -- if you're close to a natural jumping off

19     point, please.

20         MR. BRUSTIN:  Sure.

21         MR. BOND:  Okay.  I don't want to cut you off

22     if you're close to finishing up a jumping off

23     point, but we're getting close.

24         MR. BRUSTIN:  May do one more thing or may not

25     and we'll be done, okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        MR. BOND:  That's like being half pregnant.

2        MR. PELLINO:  While he's looking for that, can

3    you-all go ahead and send us the transcript that

4    you have of the trial so that in the next

5    deposition we're all on the same page?

6        MR. BRUSTIN:  Yeah.

7        MR. BOND:  I thought we'd all stick around and

8    talk about a few things before we all departed.

9        MR. BRUSTIN:  Sure.

10       MR. BOND:  Okay.  That's my preference.  If

11   everybody wants to leave, that's fine, too.

12       MR. GAVERICH:  You don't have to stick around,

13   Joe.

14       THE WITNESS:  Okay.

15       MR. BRUSTIN:  This is a good place to stop.

16       MR. BOND:  I apologize.

17       MR. BRUSTIN:  Good place to stop.

18       MR. BOND:  Okay.  Good deal.

19       THE WITNESS:  You want your book back don't

20   you, sir?

21       MR. BOND:  No.  That's a gift to us.

22       COURT REPORTER:  The time is 5:54 p.m.  We are

23   off the record.

24            (EXHIBIT 25 MARKED FOR IDENTIFICATION)

25            (DEPOSITION CONCLUDED AT 5:54 P.M.)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-19   Filed 01/26/23   Page 325 of 325 PageID #: 26638
The Deposition of SHERIFF JOSEPH OLDHAM, taken on August 07, 2019
325

1                    CERTIFICATE OF REPORTER

2                       STATE OF INDIANA

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page here of by me after

7    first being duly sworn to testify the truth, the whole

8    truth, and nothing but the truth; and that the said

9    matter was recorded stenographically and mechanically

10   by me and then reduced to typewritten form under my

11   direction, and constitutes a true record of the

12   transcript as taken, all to the best of my skill and

13   ability.  I certify that I am not a relative or

14   employee of either counsel, and that I am in no way

15   interested financially, directly or indirectly, in this

16   action.

17

18

19

20   

21

22   SHELBY LODA,

23   COURT REPORTER/NOTARY

24   COMMISSION EXPIRES:  12/10/2023

25   SUBMITTED ON:  08/23/2019

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com