PROCEEDINGS   3.02.95                                        March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                              1

7   TRANSCRIPT OF CLARK AND HARDIN v. LOUISVILLE JEFFERSON COUNTY

8                    METRO GOVT et al

12              DATE RECORDED:   MARCH 2, 1995

24   Job No.:   J3633820

Exhibit 18
Sheriff Greer
Date 8/7/19



1          THE COURT:   Okay.  Any redirect, Mr. Smith?

2          MR. SMITH:   No, your Honor.

3          THE COURT:   May Deputy Wise be finally excused?

4          MR. SMITH:   Yes.

5          MR. ADAMS:   Yes.

6          MR. ROGERS:   Yes.

7          THE COURT:   Finally -- finally excused, Mr. Rogers?

8          MR. ROGERS:   Yeah.

9          THE COURT:   Thank you.  You're free to go, sir.

10   Deputy Wise, don't discuss your testimony with respect to this

11   case with anyone other than the attorneys involved until the

12   case is finally resolved.

13          DEPUTY WISE:   Yes, sir.

14          THE COURT:   Call your next witness.

15          MR. SMITH:   Sheriff Joe Greer.

16          THE COURT:   Turn around to be sworn, please.

17          MR. SMITH:   We better approach the bench.  We probably

18   better go back --

19                         (IN CHAMBERS)

20          THE COURT:   Sheriff, turn around and be sworn.  Do you

21   solemnly swear or affirm that the testimony you are about to

22   give will be the truth, the whole truth, and nothing but the

23   truth, so help you God?

24          SHERIFF GREER:   I do.

25          THE COURT:   Please be seated.  Ladies and gentlemen,



1   during the next few minutes, you will, in all probability, see

2   the Sheriff and maybe other court personnel put on gloves prior

3   to handling the evidence.  I want you to understand that that's

4   normal -- just a normal or cautionary procedure any time we're

5   handling exhibits that have been exposed to bodily fluids, and

6   you're not to draw any inferences other than that.  Simply a

7   health precautionary matter.  Go forward, Mr. Smith.

8          MR. SMITH:  Tell us your full name, please.

9          SHERIFF GREER:  Joseph E. Greer.

10         MR. SMITH:  And your occupation, sir.

11         SHERIFF GREER:  I'm Sheriff of Meade County.

12         MR. SMITH:  How long have you been Sheriff of Meade

13  County?

14         SHERIFF GREER:  Since 1981.

15         MR. SMITH:  Prior to being Sheriff in 1981, what

16  experience did you have with law enforcement, very briefly?

17         SHERIFF GREER:  I was Commonwealth Detective for the

18  46th Judicial District, City Police Chief, and Deputy Sheriff.

19         MR. SMITH:  Obviously, since I am not that old, you

20  weren't Commonwealth Detective under me.

21         SHERIFF GREER:  Mr. Stone.

22         MR. SMITH:  All right.  Now, how did you get involved

23  in investigating the murder of Rhonda Sue Warford?

24         SHERIFF GREER:  I received a call from Deputy Sheriff

25  Ernie Embry.



1          MR. SMITH:   Now, Ernie Embry's mother-in-law is who?

2          SHERIFF GREER:   McCarty's from Irvington.

3          MR. SMITH:   And they were the ones that actually came

4   across the body of Rhonda Sue Warford down there on April the

5   5th, Sunday morning?

6          SHERIFF GREER:   Yes, sir.

7          MR. SMITH:   So, Deputy Sheriff Ernie Embry called you

8   and you went down there?

9          SHERIFF GREER:   That's correct.

10         MR. SMITH:   And based up on your investigation, were

11  you able to determine whether there had been any tampering or

12  moving of the crime scene?

13         SHERIFF GREER:   No.

14         MR. SMITH:   Since the time that Ms. McCarty came upon

15  the body.

16         SHERIFF GREER:   No, except the roadway leading in,

17  when I met with them, they were parked back that road.  So, that

18  vehicle, I told them to leave it there for the time being and I

19  parked my vehicle out on the highway and blocked the driveway.

20         MR. SMITH:   The McCarty's vehicle was parked back that

21  road?

22         SHERIFF GREER:   I believe it was.

23         MR. SMITH:   Now, what did you do, Sheriff Greer?

24         SHERIFF GREER:   The first thing I did, I observed --

25  well, I was informed that they thought it was a mannequin and



1  they had walked up to observe it and found out it, in fact, was

2  a human being.  I was called.  I went out there.  I did go up to

3  the scene to see what I had.  I definitely had a body.  I

4  returned back to my car, called for other personnel to come out,

5  also to locate Bill Adams, the coroner, and get him out there.

6  I had Trooper McCubbin called.  Mr. Adams was in Louisville on

7  another case, so basically, we waited for Mr. Adams to get

8  there.

9          MR. SMITH:  And what was your purpose for having

10  Trooper McCubbin come down?

11          SHERIFF GREER:  I wanted a sketch of the area.  We use

12  him, not only does the county, but the state police uses him a

13  lot to make sketches for any crimes that's committed in the

14  county or any crime scene.

15          MR. SMITH:  What was the purpose of calling the

16  coroner down there?

17          SHERIFF GREER:  We had a death, that's his job.

18          MR. SMITH:  Was Deputy Livers down there?

19          SHERIFF GREER:  Yes, Deputy Livers runs my dispatch

20  service for the county and he also -- the Coroner's Office uses

21  him for photographs and so do I.

22          MR. SMITH:  Now, after Coroner Adams got there, what

23  did you all do?

24          SHERIFF GREER:  We did a little preliminary, not

25  around the body, but the area itself, like the puddle of blood



1 that was found.  The keys were found not disturbed, just to

2 basically see what we had until he showed up and to get

3 involved.

4          MR. SMITH:  And have you reviewed the sketch that has

5 previously been introduced into evidence by Trooper McCubbin?

6          SHERIFF GREER:  Yes, I have.

7          MR. SMITH:  Okay.  And you're talking about a puddle

8 of blood and some keys --

9          SHERIFF GREER:  That's correct.

10         MR. SMITH:  -- and where the body was.  And is that

11 based upon your knowledge and being down there, is the sketch

12 accurate of about where those items were found?

13         SHERIFF GREER:  That's correct.

14         MR. SMITH:  Did you -- tell us whether or not you saw

15 any marks on the ground indicative of drag marks.

16         SHERIFF GREER:  No, there weren't any, not to my

17 knowledge.  I couldn't find any or any other officers with me.

18         MR. SMITH:  Now, we have heard about one tire cast

19 that was taken that didn't match up with anything, right?

20         SHERIFF GREER:  That's correct.

21         MR. SMITH:  All right.  Now, were there other tire

22 marks down there?

23         SHERIFF GREER:  Yes, there were.

24         MR. SMITH:  Were these other tire marks castable,

25 would be my word?



PROCEEDINGS  3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
112

1          SHERIFF GREER:  In Trooper McCubbin's opinion, they

2    weren't.  I had left the scene, prior to this being done with

3    Mr. Adams to proceed to Louisville with the body.

4          MR. SMITH:  Now, we have heard talk in this case about

5    footprints.  Did you see any footprints down there?

6          SHERIFF GREER:  Trooper McCubbin calls them

7    footprints.  I think, previously, I called them impressions.  I

8    still call them impressions.  We're talking about grass that's

9    this tall and it appeared to look like some -- where somebody

10   could have stepped and knocked the grass down.  Yes, I did see

11   that.  Footprints, legible, that could be lifted, no.  There

12   wasn't anything like this.

13         MR. SMITH:  Now, tell us whether or not you canvased

14   the scene there.  By canvas, I mean walking around, looking

15   around that part for anything else.

16         SHERIFF GREER:  To a certain extent I did.  Trooper

17   McCubbin, Deputy Livers, they did a lot more of it than I did.

18   I did notice what appeared to be two impressions that could have

19   been tire tracks, just the way the diagram said.  Naturally, the

20   blood I seen.  Everything else was done after I left, except

21   what myself and Mr. Adams did.  We did look around to a certain

22   extent, but most of that was done after I left.

23         MR. SMITH:  Now, we have a picture of the spot of

24   blood on the ground that's previously been introduced into

25   evidence.  You've seen that.



1          SHERIFF GREER:   Yes, I have.

2          MR. SMITH:   How would you describe, for the jury, the

3    spot of blood where that was, in your own words?  Describe that

4    to the jury.

5          SHERIFF GREER:   It was saturated with blood, this one

6    area was.   It was saturated.

7          MR. SMITH:   Now, you're holding your hands about 18

8    inches apart or maybe a foot?

9          SHERIFF GREER:   I would say about this big, something

10   like this.   Don't hold me to that, but right at it.

11         MR. SMITH:   Now, there is a picture that has been

12   introduced into evidence of keys or a key chain or whatever that

13   was found there.

14         SHERIFF GREER:   That's correct.

15         MR. SMITH:   Is that the key chain that you're talking

16   about?

17         SHERIFF GREER:   Yes, it was down from -- a bit down

18   from where the body was at.

19         MR. SMITH:   Now, again, backing up to when Coroner

20   Adams got down there, tell us what went on there.

21         SHERIFF GREER:   Mr. Adams, naturally, had to say we

22   had a body -- a deceased person.   That's his job.   After that,

23   photographs were taken extensively by Deputy Livers of the body

24   and all around it.   After this was done, the hands and feet were

25   bagged.   Then, the body was removed and myself and Mr. Adams



1  took the body to Louisville.

2          MR. SMITH:   The hands and feet were bagged?

3          SHERIFF GREER:   That's correct.

4          MR. SMITH:   Why do -- why did you bag the hands and

5  feet?

6          SHERIFF GREER:   To preserve anything that could bear

7  any trace evidence, anything that might give us something to go

8  on.

9          MR. SMITH:   Now, let me change course here a minute on

10 you.  Tell the jury whether or not you sent an officer out to

11 canvas the various neighborhood to see if --

12         SHERIFF GREER:   Yes, I did.

13         MR. SMITH:   And there was no results of that?

14         SHERIFF GREER:   No, Deputy Segul [ph] -- well, he

15 wasn't the only one, there was other officers, too.

16         MR. SMITH:   Now, after the body of Rhonda Sue Warford

17 was prepared and then fastened, then what did you do?

18         SHERIFF GREER:   Mr. Adams, as he testified previously,

19 did what he did.  The body was placed in a new body bag and was

20 taken to Louisville.

21         MR. SMITH:   Did you use any other techniques to

22 examine the scene there?

23         SHERIFF GREER:   Yes, I had a metal -- instructed when

24 I left to get a metal detector out there to see if we could find

25 some type of a weapon.



1          MR. SMITH:   And that was done and no weapon was found

2    there at the scene?

3          SHERIFF GREER:   Nothing was found.

4          MR. SMITH:   All right.   Now, you then accompanied

5    Coroner Adams to Dr. Nichols' Office?

6          SHERIFF GREER:   That's correct, on Baird [ ph] Avenue.

7          MR. SMITH:   What was -- and I assume there was when

8    the autopsy was taken that Dr. Nichols told us about?

9          SHERIFF GREER:   That's correct.

10         MR. SMITH:   Now, what was done with the body as far as

11   evidence there at the autopsy, Sheriff Greer?

12         SHERIFF GREER:   After Dr. Nichols had done what he had

13   done, Detective -- I think it's been stipulated, Detective Smith

14   from Jefferson County Evidence -- we had called Jefferson County

15   to see if they could assist us with one of their evidence

16   technicians to come over, whereby he collected certain types of

17   hair, off what he could find on the body.   And, then, her

18   clothes was bagged and marked for -- to go to the crime lab --

19         MR. SMITH:   All right.

20         SHERIFF GREER:   -- at a later date.

21         MR. SMITH:   Now, let's talk about the clothes at this

22   point in time.   At this point, I'd ask that you come down and

23   let's talk about the clothes.   Go ahead and let's go through the

24   clothes that were provided to you.

25         SHERIFF GREER:   This is a red and white -- red, white,



1  and black UNLV [ph] jacket that was taken off of the victim,

2  Rhonda, by Dr. Nichols and turned over to me.

3          MR. SMITH:  And you were there when it was taken off?

4          SHERIFF GREER:  Yes, and he turned it over to me.

5          MR. SMITH:  All right.  Would you pull it out, please?

6  Have we marked that for --

7          SHERIFF GREER:  Yes, it's been marked.  I just got to

8  find out where --

9          UNIDENTIFIED:  It's No. 114.

10          MR. SMITH:  That had been marked as identification

11  purposes as No. 114.  And that was the jacket --

12          SHERIFF GREER:  UNLV jacket, yes, she had on.

13          MR. SMITH:  Now, Sheriff Greer, looking at -- how did

14  that get torn, if you know?

15          SHERIFF GREER:  It was cut off of her by the Medical

16  Examiner, Dr. Nichols.

17          MR. SMITH:  Okay.  Now, do you see -- holding that, do

18  you see any puncture wounds?

19          SHERIFF GREER:  It's -- Mr. Smith --

20          MR. SMITH:  You can't tell?

21          SHERIFF GREER:  You can't tell.

22          MR. SMITH:  Okay.  Good to know.  All right.  Move to

23  introduce that into evidence, your Honor.

24          THE COURT:  Okay.  Let's do this.  I doubt very

25  seriously that the jury will want to take that back to the jury



1  room and handle it.  If you want the jury to see it, show it to

2  them -- let Joe show it to them.

3          MR. SMITH:  Walk over there now and just hold it up

4  where they can see it, Joe.

5          MR. SMITH:  I feel like I need to move this

6  introduction.  I don't have any problem with it not going to the

7  jury room.

8          THE COURT:  Well, it can go to the jury room.  I just

9  didn't assume they'd want to take it out of the bag and handle

10  it.

11          MR. SMITH:  Right, right.

12          THE COURT:  I assume there were no objections to its

13  introduction?

14          MR. ADAMS:  No, sir.

15          THE COURT:  It will be admitted.

16          MR. SMITH:  Please identify the next item, Sheriff

17  Greer.

18          SHERIFF GREER:  White canvas shoes that came off of

19  the victim, Rhonda.

20          MR. SMITH:  And, now, could you show them the shoes?

21          UNIDENTIFIED:  118.

22          MR. SMITH:  They have been marked for identification

23  purposes as what?

24          UNIDENTIFIED:  118.

25          MR. ADAMS:  No. 18.



1          MR. SMITH:  Let me see the bottom of them, please.

2   Okay.  And, Sheriff Greer, were the shoes taken off of Rhonda

3   Sue Warford there at the autopsy?

4          SHERIFF GREER:  Yes, sir, it is.

5          MR. SMITH:  Would move to introduce.  Please show them

6   to the other attorneys, please.  Put that evidence sticker on

7   the other one, please, Joe.  Now, Joe, wait a minute.  Before

8   you get to that.  Tell us about the red sweat pants that had

9   been marked --

10         UNIDENTIFIED:  116.

11         MR. SMITH:  They have been marked as Commonwealth's

12  Exhibit 116.  Tell us whether or not those are the red sweat

13  pants that were taken off of Rhonda Sue Warford at the autopsy.

14         SHERIFF GREER:  That's correct.  They were.

15         MR. SMITH:  Okay.  We'd so move to introduce the last

16  two items into evidence, your Honor.

17         MR. ADAMS:  No objection.

18         MR. SMITH:  Now, Joe --

19         THE COURT:  They will be accepted -- they will be --

20         MR. SMITH:  Let me back up here a minute.  When the

21  red sweat pants were taken off, who took them off?

22         SHERIFF GREER:  Dr. Nichols.

23         MR. SMITH:  And --

24         SHERIFF GREER:  Or his assistant.

25         MR. SMITH:  All right.  And you were there?



1        SHERIFF GREER:   Yes, I was there.

2        MR. SMITH:   And were they handed to you?

3        SHERIFF GREER:   Yes, they were.

4        MR. SMITH:   And what did you do with them?

5        SHERIFF GREER:   I bagged them.

6        MR. SMITH:   And after you bagged them, what did you

7  with them?

8        SHERIFF GREER:   They were brought back to the evidence

9  room and taken to the crime lab the next morning.

10       MR. SMITH:   Okay.   Now, the evidence room here in

11  Meade County Courthouse?

12       SHERIFF GREER:   That's correct.

13       MR. SMITH:   And is that under your dominion and

14  control?

15       SHERIFF GREER:   Yes, it is.

16       MR. SMITH:   And who has keys to that, other than you

17  and your staff?

18       SHERIFF GREER:   Well, not all my staff.

19       MR. SMITH:   All right.

20       SHERIFF GREER:   Deputy Sheriff Wise, Cliff Wise.

21       MR. SMITH:   Just you and Deputy Sheriff Wise are the

22  only ones that have the keys?

23       SHERIFF GREER:   That's correct.

24       MR. SMITH:   And it was placed in there for safe

25  keeping?



1          SHERIFF GREER:   That's correct.

2          MR. SMITH:   And, then, the next day you took it to the

3  crime lab?

4          SHERIFF GREER:   Yes, we brought it out myself and Mr.

5  Adams assisted me as the coroner.   We labeled it, you know,

6  what's on the outside of the things (inaudible) put in the case

7  report numbers and stuff on.

8          MR. SMITH:   And the red sweat pants were taken to the

9  crime lab?

10         SHERIFF GREER:   Yes, they were.

11         MR. SMITH:   And the red sweat pants also spent the

12  night in the evidence room back here?

13         SHERIFF GREER:   That's correct.

14         MR. SMITH:   And other than being in the evidence room,

15  they hadn't been out of your sight?

16         SHERIFF GREER:   No, they haven't.

17         MR. SMITH:   All right.

18         SHERIFF GREER:   Well, they were while they were at the

19  crime lab.

20         MR. SMITH:   Right.   And you transported them yourself

21  to the crime lab?

22         SHERIFF GREER:   No, I didn't.   Deputy Sheriff Cox

23  transported these to the --

24         MR. SMITH:   All right.   Let's talk about the next

25  item.



1           SHERIFF GREER:   White bra.

2           MR. SMITH:   And what has that been marked for

3   identification purposes?

4           UNIDENTIFIED:   117.

5           MR. SMITH:   117?  Pull that out and show it to the

6   other lawyers, please.  Go ahead and approach the jury and show

7   it to them, please, Joe.  We'd so move that that item be

8   introduced into evidence, your Honor.

9           MR. ADAMS:   No objection.

10          MR. SMITH:   And I can't remember if I did the sweat

11  pants or not, but I so move on that, also.

12          THE COURT:   All items, so far, will be accepted as

13  evidence.

14          MR. SMITH:   Now, what is the next item, Sheriff Greer?

15          SHERIFF GREER:   This was a blue shirt worn by the

16  victim, Rhonda Sue.

17          MR. SMITH:   All right.  Would you pull that out,

18  please?  Exhibit, what is it?

19          THE COURT:   115.

20          MR. SMITH:   115?  And, Sheriff Greer, the reason we

21  marked these as Commonwealth Exhibit 115 for trial is you had

22  previously marked them 15 and, so, we put a 1 in front of the

23  number, right?

24          SHERIFF GREER:   That's correct.

25          MR. SMITH:   Trying to keep things straight.  All



1  right.  And what is this item, Sheriff Greer?

2          SHERIFF GREER:  That's the blue shirt she had on.

3          MR. SMITH:  And that was -- and all these items were

4  taken off of Rhonda Sue Warford there at the autopsy?

5          SHERIFF GREER:  Yes, by either Dr. Nichols or his

6  assistants who were helping him.

7          MR. SMITH:  Please show that exhibit to the other

8  attorneys, please.

9          SHERIFF GREER:  This one will show some stab wounds,

10  Mr. Smith.

11          MR. SMITH:  Huh?

12          SHERIFF GREER:  This one shows some stab wounds.

13          MR. SMITH:  Okay.  We'd so move that that item be

14  introduced into evidence, your Honor.

15          THE COURT:  Let it come in.

16          MR. SMITH:  Now, Sheriff Greer, I did not have you

17  bring the panties or underwear that Rhonda Sue Warford was

18  wearing.  They were --

19          SHERIFF GREER:  They were still sealed in the sexual

20  assault kit.

21          MR. SMITH:  Now, what -- yes.  Now, at the autopsy,

22  you also took what's called a sexual assault kit.

23          SHERIFF GREER:  Yes, Dr. Nichols sealed it -- or him

24  or his assistant, one of them.

25          MR. SMITH:  And her panties are sealed in that sexual



1   assault kit?

2          SHERIFF GREER:   That's correct.

3          MR. SMITH:   And there wasn't any damage done to the

4   panties.  I mean, they were intact?

5          SHERIFF GREER:   They were intact, yes.

6          MR. SMITH:   And could you find any evidence whatsoever

7   that Rhonda Sue Warford had been sexually assaulted?

8          SHERIFF GREER:   There was no evidence that I could

9   see.

10         MR. SMITH:   Now, at this point in time -- now, Sheriff

11  Greer, at this point in time, I'm going to hand you Commonwealth

12  Exhibits 11, 12, and 62.  Let the record reflect, they have been

13  shown to opposing counsel.  And ask if you can identify those

14  photographs?

15         SHERIFF GREER:   Yes, I can.

16         MR. SMITH:   Please identify those three photographs

17  for the jury.

18         SHERIFF GREER:   Exhibit 12 is an aerial view of the

19  area where Ms. Warford was found.  Also, Exhibit 11 is an aerial

20  view of the area where Ms. Warford was found.

21         MR. SMITH:   Now, how do you get aerial photographs,

22  such as this?

23         SHERIFF GREER:   I conned somebody into flying me.

24         MR. SMITH:   Who flew you?

25         SHERIFF GREER:   I believe it was Mr. Brewington [ph].



1          MR. SMITH:  Flew you over the crime scene?

2          SHERIFF GREER:  And scared me.

3          MR. SMITH:  And you were actually up there.

4          SHERIFF GREER:  Yes, sir.

5          MR. SMITH:  Did you take the photographs or did

6    someone else take them?

7          SHERIFF GREER:  No, I took the photographs.

8          MR. SMITH:  And do the photographs there of the aerial

9    view fairly and accurately depict and portray how the aerial

10   view looked like on that date when you were up there?

11         SHERIFF GREER:  That's correct.

12         MR. SMITH:  Now, identify that other photograph for

13   me, please.

14         SHERIFF GREER:  This is a photograph of her ankle.

15   This was taken at the scene, where the body was found.

16         MR. SMITH:  That's a photograph of the ankle of Rhonda

17   Sue Warford?

18         SHERIFF GREER:  That's correct.

19         MR. SMITH:  All right.  Why did you take that

20   photograph, Sheriff Greer?

21         SHERIFF GREER:  Well, you know, considering where I

22   thought that she was killed and where the body was found, it

23   appeared to me she had to be carried.  And I took this because

24   it looks like there could be bruises on it where she was picked

25   up by her ankles.



1              MR. SMITH:  And do those three photographs fairly and

2    accurately depict and portray the -- what you have told us that

3    they are?  The ankle and then the two aerial photographs?

4              SHERIFF GREER:  Yes, sir.

5              MR. SMITH:  Move to introduce those photographs into

6    evidence, your Honor, as Commonwealth's Exhibits, as previously

7    marked.

8              MR. ADAMS:  No objection.

9              MR. ROGERS:  On the aerials, would you just ask him if

10   that depicts -- I don't when he took these, whether it was last

11   week or -- I mean, this has been two years ago.  So, would you

12   ask him or elicit information priming as to does that represent

13   the time -- or fairly represent the way the scene was when it

14   happened or if there's been any major change in that case?

15             MR. SMITH:  Joe, how close in proximity to April the

16   2nd did you go up in the airplane and take the photographs?

17             SHERIFF GREER:  I believe it was about two weeks,

18   could be three weeks, later.

19             MR. SMITH:  Within a month after?

20             SHERIFF GREER:  Yes, it was within a month, I'm sure.

21             MR. SMITH:  And the aerial photographs would fairly

22   and accurately portray and depict how that scene looked within a

23   month after --

24             SHERIFF GREER:  Yes.

25             MR. SMITH:  -- the killing?



PROCEEDINGS   3.02.95                                    March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                       126

1           SHERIFF GREER:  Yes.

2           MR. SMITH:  We then, again, so move, your Honor.

3           THE COURT:  Are there any objections?

4           MR. ROGERS:  That's fine, Judge.

5           THE COURT:  We request to show the jury without

6    suspension of questioning, your Honor.

7           MR. SMITH:  Bear with me just a minute, Sheriff.

8    After going to the autopsy, Sheriff Greer, and you came back

9    home that night?

10          SHERIFF GREER:  That's correct.

11          MR. SMITH:  All right.  What did you do next, if

12   anything?

13          SHERIFF GREER:  We received a call from a Ms. Vicky

14   Houser that possibly this could be the girlfriend of, I believe

15   it's her brother, Keith.

16          MR. SMITH:  Keith Hardin, the defendant?

17          SHERIFF GREER:  And we got an address -- we might have

18   called there first, but maybe not.  But I know we did proceed to

19   Keith Hardin's residence on Terrytown Road or --

20          MR. SMITH:  Did you speak with Mr. Hardin on that

21   occasion?

22          SHERIFF GREER:  At the house?

23          MR. SMITH:  Yes.

24          SHERIFF GREER:  Yes, I did.

25          MR. SMITH:  All right.  What did he tell you at the



1    house?

2           SHERIFF GREER:  In fact, I believe Mr. Hardin

3    furnished me with a copy of a flyer that -- where she had been

4    missing, apparently ones that they had handed out.  It wasn't a

5    copy of the missing person's report that's on file with the

6    local police.

7           MR. SMITH:  Did you ask the defendant, Hardin, about

8    any -- well, first of all, at this point in time, did you know

9    who the body was?

10          SHERIFF GREER:  No, I did not.

11          MR. SMITH:  Now, what, if anything, did the defendant,

12   Hardin tell you about identification marks on the body?

13          SHERIFF GREER:  I'm not sure, Mr. Smith, whether I

14   asked him about the -- an inverted cross or anything.  I believe

15   I did because that's one thing that stood out, you know, that

16   was on her body.  I don't know if I did or Mr. Adams did, but I

17   think he was asked.

18          MR. SMITH:  Now, you have been the investigating

19   officer primarily handling this case.

20          SHERIFF GREER:  Yes.

21          MR. SMITH:  That's one reason you've been sitting

22   here, trying to help me --

23          SHERIFF GREER:  That's correct.

24          MR. SMITH:  -- present this case.  Now, ultimately,

25   tell us whether or not the defendant, Clark was interviewed in



1    your presence.

2                SHERIFF GREER:   Yes, he was.

3                MR. SMITH:   And who conducted the interview or

4    interviews?

5                SHERIFF GREER:   First, Mr. Smith, prior to going to

6    the Louisville the night, we contacted Jefferson County Police

7    and Louisville Police on missing persons.   Okay?   And we were

8    ultimately met at Third District by Detective Greer, Hope Greer

9    and Jim Clark.   We had left the Hardin residence and went to the

10   Third District to meet with them because we were sure that the

11   person we had was Rhonda Sue Warford and then we went onto the

12   Warford residence.   Later, on the first interview, I think it

13   was 4/6, Detective Handy had an interview with Mr. Clark in the

14   Physical Assault Unit Office there at Homicide.   And I was

15   present and Mr. Adams was present.

16               MR. SMITH:   Now, you heard Detective Handy describe

17   the interview and what was said by the defendant, Clark.

18               SHERIFF GREER:   That's correct.

19               MR. SMITH:   And tell the jury whether or not Detective

20   Handy's version and statement were consistent with what you

21   overheard.

22               SHERIFF GREER:   They were.

23               MR. SMITH:   Now --

24               SHERIFF GREER:   On 4/8 was another interview that I

25   was present, along with Mr. Adams and Detective Handy where he



1   conducted another interview.  Only, this time, there -- okay.

2           MR. SMITH:  Only, this time, what?

3           SHERIFF GREER:  On his first statement, he had denied

4   having any knives or owning any knives.  But on this interview

5   of 4/8, he admitted to having several knives.

6           MR. SMITH:  Now, and you overheard Detective Handy

7   give his recount of that interview on --

8           SHERIFF GREER:  Yes, I did.

9           MR. SMITH:  -- the 8th, also?

10          SHERIFF GREER:  Yes, I did.

11          MR. SMITH:  And, again, was Detective Handy's recount

12  -- or the way that interview transpired and what was said, was

13  that accurate?

14          SHERIFF GREER:  Yes.

15          MR. SMITH:  Now, do you remember taking or being

16  involved when any other statements were taken from the

17  defendant, Clark?

18          SHERIFF GREER:  No.

19          MR. SMITH:  At any time, did you overhear anyone

20  describe in any detail to the defendant, Clark, what was done to

21  Rhonda Warford?

22          SHERIFF GREER:  I believe, Mr. Smith, on the 8th,

23  later on in the evening -- I think it was Hope Greer might have

24  mentioned something about it.  I'm not sure.  I'd have to look

25  at Hope's --



1        MR. SMITH:   Please look and see.

2        SHERIFF GREER:   No, it's not in there.

3        MR. SMITH:   So, you don't know?

4        SHERIFF GREER:   No.

5        MR. SMITH:   All right.   Now, when was the first time

6   that you saw the defendant, Clark's, automobile, Sheriff Greer?

7        SHERIFF GREER:   That would have been on the 8th, I

8   believe.   No, on the 6th, the first time I seen it.   That was in

9   his driveway.

10       MR. SMITH:   And was he doing anything with the vehicle

11  at that point in time?

12       SHERIFF GREER:   He was working on it.

13       MR. SMITH:   What was he doing to it?

14       SHERIFF GREER:   Working on the side, rear quarter

15  panel, I believe -- right rear quarter panel.

16       MR. SMITH:   Could you tell what type of work he was

17  doing to it?

18       SHERIFF GREER:   Sanding.

19       MR. SMITH:   Sanding the vehicle?

20       SHERIFF GREER:   That's correct.

21       MR. SMITH:   Did you see any paint or anything around

22  the vehicle?

23       SHERIFF GREER:   No, I didn't.

24       MR. SMITH:   Now, were you there -- we've heard that

25  the vehicle was processed by the Evidence Technician Unit,



1  otherwise referred to at ETU.  Were you there when that was

2  done?

3          SHERIFF GREER:  No.  The vehicle was towed to the ETU

4  Unit and Detective Handy had had it towed with Mr. Clark's

5  consent.  It was placed in the basement and was turned over to

6  ETU, whatever their procedure is.  I was not there for the

7  processing, nor I know of any police officer that was, except

8  the ETU Units.

9          MR. SMITH:  All right.  Now, when the defendant,

10  Clark, was being interviewed by Handy, did you hear him say

11  anything about any Chevron station?

12          SHERIFF GREER:  No.

13          MR. SMITH:  All right.  Did you later find out about

14  him making some contention about a Chevron station?

15          SHERIFF GREER:  Yes, you informed me.

16          MR. SMITH:  And I asked you to check it out --

17          SHERIFF GREER:  That's correct.

18          MR. SMITH:  All right.  And could you do anything

19  about that?

20          SHERIFF GREER:  No, I think Mr. Adams had already

21  talked to him after he had interviewed his client and,

22  apparently, they're subpoenaed here to testify.

23          MR. SMITH:  Now, what did you do next on the case,

24  Detective -- I mean, Sheriff Greer?

25          SHERIFF GREER:  I was present on an interview with Mr.



1  Hardin on 4/9 of '95 -- or '92 with Detective Handy. It was

2  later, I believe, Mr. Clark -- or Mr. Hardin told Handy he

3  didn't own any knives. But, later that evening, I believe it

4  was on the way home, me and Mr. Hardin was talking a little bit

5  and I probably mentioned to him, everybody is saying you got a

6  lot of knives. And he told me, yes, he owned a bunch of knives.

7          MR. SMITH: Now, you were there --

8          SHERIFF GREER: It was not in Handy's presence. Okay?

9          MR. SMITH: Okay.

10         SHERIFF GREER: Because I was in on the first -- on

11 the interview with him when he said he didn't have any knives.

12 But, later, he told me he did have knives.

13         MR. SMITH: You were there with Detective Handy when

14 Detective Handy interviewed the defendant, Hardin?

15         SHERIFF GREER: That's correct.

16         MR. SMITH: And you heard Detective Handy give his

17 recount of that interview?

18         SHERIFF GREER: That's correct.

19         MR. SMITH: And was that an accurate account of that

20 interview?

21         SHERIFF GREER: Yes, it was.

22         MR. SMITH: Did the defendant, Hardin, give you any

23 excuse or reason of as to why he had lied to you all?

24         SHERIFF GREER: No, he didn't. I don't think he ever

25 told Detective Handy that he had knives. He told me. He had



PROCEEDINGS   3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
133

1   told Detective Handy that he didn't own any knives.

2        MR. SMITH:   And, subsequently, did you interview

3   Crystal Barnes?

4        SHERIFF GREER:   I was present while she was

5   interviewed.

6        MR. SMITH:   And you were present when Michelle Rogers

7   was interviewed?

8        SHERIFF GREER:   That's correct.

9        MR. SMITH:   And you, subsequently, interviewed Amy

10  Remsburg?

11       SHERIFF GREER:   That's correct.

12       MR. SMITH:   Were you aware of whether or not Detective

13  Hope Greer had interviewed James and Tonya Tyrell?

14       SHERIFF GREER:   Yes, I was at the Homicide Unit when

15  this was done.

16       MR. SMITH:   You were there when they interviewed the

17  Tyrell's?

18       SHERIFF GREER:   Yes.

19       MR. SMITH:   And based upon that interview, were you

20  able to rule them out?

21       MR. ROGERS:   Objection, Judge.  I -- that's pretty far

22  out speculation.

23       THE COURT:   Well, wait a minute.  I'll sustain the

24  objection to the question in the present form.  Okay?

25       MR. SMITH:   Now, what can you tell us -- we have heard



PROCEEDINGS 3.02.95                                    March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                        134

1   the fact that there were some hairs in Rhonda's hands that

2   matched neither of these two defendants.  Tell me what you know

3   about that, Sheriff Greer.

4         .    SHERIFF GREER:  Mr. Adams enlightened me, after a

5   suppression hearing, a short time ago -- I think it was last

6   year, I believe -- that there were two standards of hair in her

7   hand that was dissimilar -- dissimilar -- with any standards

8   that were submitted by me.

9             MR. SMITH:  Submitted by you?

10            SHERIFF GREER:  By me or the Evidence Technician Units

11  in Louisville.

12            MR. SMITH:  All right.  And what can you tell us about

13  that?

14            SHERIFF GREER:  Nothing.

15            MR. SMITH:  We have the person that will be down from

16  the lab to talk about that?

17            SHERIFF GREER:  That's correct.  When I received

18  information on 4/30 of '95 --

19            THE COURT:  4/30 of '95?  We have --

20            SHERIFF GREER:  4/30 of '92.  I am sorry, sir.

21            THE COURT:  We haven't got there yet.  Okay.

22            SHERIFF GREER:  I talked to the Evidence Technician at

23  the Kentucky State Police Crime Lab and I was only informed

24  about -- at that time, on 4/30, according to my case report as

25  what matched --



1          MR. SMITH:  Okay.

2          SHERIFF GREER:  -- Rhonda Sue, either from the pants

3   or from the car.  When I also went to the crime lab on 5/4 --

4   no, it's still 4/30 of '92 -- they told me I would get the

5   official report in probably a week.  Which I -- what I was doing

6   on 4/30 --

7          THE COURT:  Mr. Rogers, you're dying to say something.

8   Hold up, Sheriff.

9          MR. ROGERS:  Can we ask what standards were submitted

10  so we know what we're talking about here?  I mean, before he

11  goes into this, what standards were submitted?

12         SHERIFF GREER:  Rhonda Sue Warford, Mr. Hardin, and

13  Mr. Clark.

14         MR. ROGERS:  And we're talking about standards, in

15  other words, hair was obtained from the two defendants and hair

16  -- you got hair from Rhonda Sue Warford and these were submitted

17  to the lab to see if there was any comparison made?  That's what

18  you're talking about, standards?

19         SHERIFF GREER:  Yes.  Out of what I sent from my

20  department, also what ETU sent out of the Louisville Police,

21  these were submitted to them -- or the lab to use to do any

22  comparison with.

23         MR. SMITH:  Now, we have heard talk about a person

24  I'll refer to as the Kroger man, for lack of a better word.  I

25  think we heard about a dirty, old man or something.  Was that



1   checked out?

2          SHERIFF GREER:   It was my understanding that when this

3   was found out, the Detective James Clark would check into this.

4   And I noticed in his letters that he submitted, he did go to

5   Kroger's.   You know, what's in his report, he can testify to.

6          MR. SMITH:   Couldn't turn anything up on that?

7          SHERIFF GREER:   Apparently not.

8          MR. SMITH:   All right.   Please answer Mr. Adams'

9   questions.

10         THE COURT:   Let me do this.   I have had the jury here

11  for an hour and 45 minutes.   Do you all need to stretch your

12  legs?   It seems to be unanimous with respect to that issue.

13  Ladies and gentlemen of the jury, it is your duty not to permit

14  anyone to speak to or to communicate with you on any subject

15  connected with this trial.   And any attempt to do so should be

16  immediately reported by you to the Court.   Do not converse or

17  discuss among yourselves any subject connected with the trial or

18  form or express any opinion thereon until the case is finally

19  submitted to you for determination.

20         If anyone should state anything within your hearing

21  about this case, promptly bring this matter to the attention of

22  the Court.   Sheriff Greer, I need to admonish you, at this time,

23  not to discuss any questions that you've been asked, any answers

24  you gave, or any aspect of this case with anyone other than the

25  attorneys involved.   With that, ladies and gentlemen, we'll take



1    a 15-minute break.   You got coffee back there for them, Gorman

2    [ph]?

3              MR. GORMAN:   Yes, sir.

4                          ( RECESS )

5              THE COURT:   Let us come to order.   Okay, Mr. Adams.

6    First, each of you waive the roll call of the jury?

7              MR. ADAMS:   Yes, sir.

8              MR. SMITH:   Yes.

9              THE COURT:   Go forward.

10             MR. ADAMS:   Sheriff Greer, you have indicated to the

11   ladies and gentlemen of the jury that there was a vehicle parked

12   up the road from the crime scene when you arrived; is that

13   correct?

14             SHERIFF GREER:   I believe they were.

15             MR. ADAMS:   On the dirt --

16             SHERIFF GREER:   But I also said -- I could be wrong,

17   too.   I think so.

18             MR. ADAMS:   Okay.   Well, let me ask you this.

19             SHERIFF GREER:   That's a long time ago.

20             MR. ADAMS:   I understand.   But the tire impression

21   that you did take -- that was taken there, was that compared

22   against the other vehicles that were there, do you know?

23             SHERIFF GREER:   I'm not sure.   But Trooper McCubbin

24   handled that.   In fact, I didn't know a tire track had been

25   lifted until later.



1          MR.  ADAMS:  How much later, Sheriff Greer?

2          SHERIFF GREER:  Probably two or three days because it

3   went into the lab even later.

4          MR.  ADAMS:  Okay.

5          SHERIFF GREER:  I'd have to look at the lab report.

6          MR.  ADAMS:  So, then, essentially, there were other

7   vehicles there, but you don't know if they were parked up the

8   road and you don't know if the tire impression that was taken

9   was caused by one of the vehicles that was up the road because

10  you don't know if they were there or not?

11         SHERIFF GREER:  Mr.  Adams, I think I told you before,

12  this area, there was numerous --

13         MR.  ADAMS:  Right.

14         SHERIFF GREER:  -- tire tracks.  Not by police

15  vehicles because once I got there, nobody went in.

16         MR.  ADAMS:  Right.  And we've heard Trooper McCubbin

17  say that they were not -- that was the only one that an

18  impression could be taken of.

19         SHERIFF GREER:  That's correct.

20         MR.  ADAMS:  All right.  When you had your -- the

21  people that work for you there, did they take any photographs of

22  these other tire tracks that were there that you're aware of?

23         SHERIFF GREER:  Yes, I'm sure they did.

24         MR.  ADAMS:  Okay.  Were those photographs used to go

25  back and --



PROCEEDINGS  3.02.95                                          March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                           139

1          SHERIFF GREER:   On Mr. Hardin's?   Yes, they were.

2          MR. ADAMS:   And on Mr. Clark's?

3          SHERIFF GREER:   Yes.

4          MR. ADAMS:   And they --

5          SHERIFF GREER:   Mr. Hardin -- I'll let him ask.

6          MR. ADAMS:   -- totally eliminated?

7          SHERIFF GREER:   Yes.

8          MR. ADAMS:   Not only the tire cast, but also the

9   photographs eliminated any vehicles, correct?

10          SHERIFF GREER:   That's correct.

11          MR. ADAMS:   Okay.   Very good.   Now, it's pretty

12   unusual, is it not, for you to get the Louisville Police

13   Department involved in a homicide investigation here in Meade

14   County?

15          SHERIFF GREER:   In this case, really not, Mr. Adams.

16          MR. ADAMS:   Well, as I -- we've had over --

17          SHERIFF GREER:   Right.

18          MR. ADAMS:   -- three years, we've had a lot of

19   discussions.

20          SHERIFF GREER:   Right.

21          MR. ADAMS:   So, what -- is it not true that on this

22   particular occasion, what you would have normally done was

23   called in the state --

24          SHERIFF GREER:   If Detective Styles wasn't on

25   vacation, he would probably be sitting here and I'd be in the



1  witness room.

2          MR. ADAMS:  Gotcha.  Okay.

3          SHERIFF GREER:  Is that what you were trying to get

4  to?

5          MR. ADAMS:  Yes, sir.

6          SHERIFF GREER:  Okay.

7          MR. ADAMS:  Normally, State Police would have handled

8  this investigation?

9          SHERIFF GREER:  Yes, because they got state wide

10 jurisdiction.

11         MR. ADAMS:  Right.  And that's who --

12         SHERIFF GREER:  I don't go into somebody else's

13 bailiwick, so I called on the Louisville Police Homicide Unit to

14 open a foreign investigation to assist in this case because all

15 of the work appeared to be going to be done in Louisville.

16         MR. ADAMS:  So, that's how Louisville got involved?

17         SHERIFF GREER:  That's correct.  I requested their

18 assistance.

19         MR. ADAMS:  Now, when you arrived at the scene and you

20 discussed the situation with Coroner Adams, did you come to the

21 conclusion that this was a relatively fresh body?

22         SHERIFF GREER:  No weeks.

23         MR. ADAMS:  Sir?

24         SHERIFF GREER:  No weeks.

25         MR. ADAMS:  I don't --



1          SHERIFF GREER:  A few days, yes.

2          MR. ADAMS:  The answer is, yes, you came to the

3   conclusion it was a fresh body?

4          SHERIFF GREER:  Yes.

5          MR. ADAMS:  Okay.

6          SHERIFF GREER:  Within reason, yes, sir.

7          MR. ADAMS:  And how did you come to that conclusion,

8   Sheriff Greer?

9          SHERIFF GREER:  By the appearance of the body.

10         MR. ADAMS:  Okay.

11         SHERIFF GREER:  And --

12         MR. ADAMS:  Did you --

13         SHERIFF GREER:  -- the blood.

14         MR. ADAMS:  Did you feel the body?

15         SHERIFF GREER:  No, I did not.

16         MR. ADAMS:  Did you feel for temperature?

17         SHERIFF GREER:  No.  That's Mr. Adams' department.

18         MR. ADAMS:  Did you feel for lividity?

19         SHERIFF GREER:  No, I did not touch the body

20   whatsoever.

21         MR. ADAMS:  Okay.  I noticed in your Grand Jury

22   testimony, when you appeared before the Grand Jury, that you

23   indicated to the ladies and gentleman of the Grand Jury that

24   once you interviewed Hardin and Clark, you found out that they

25   alibied beautifully, is the words that you used before the Grand



1   Jury on Saturday, Friday, and Thursday; is that correct?

2            SHERIFF GREER:  Yes.

3            MR. ADAMS:  All right.  Meaning that the alibi had

4   been checked out and there was no reason to doubt it.  When you

5   say alibied beautifully, is that what you meant?

6            SHERIFF GREER:  Well, they alibied each other --

7            MR. ADAMS:  We understand that.

8            SHERIFF GREER:  -- on one.  Okay?

9            MR. ADAMS:  For -- we will concede to you --

10           SHERIFF GREER:  Okay.

11           MR. ADAMS:  -- that the alibi for Thursday is up until

12  2:20 a.m. on the 2nd.  Now, excluding that, which I understand

13  that you think may be suspect, do you agree with me that you

14  told the ladies and the gentlemen of the Grand Jury that for the

15  balance of Thursday, Friday, and Saturday, both of these

16  gentlemen alibied beautifully?

17           SHERIFF GREER:  Yes.

18           MR. ADAMS:  Okay.  When you found out that they

19  alibied beautifully, is that when your initial impression that

20  this was a relatively fresh body, did it change in any way

21  because you discovered that they alibied beautifully for

22  Thursday, Friday, and Saturday?

23           SHERIFF GREER:  Not really, Bart.  I'm not an

24  authority on bodies.  I knew this body hadn't been there too

25  long.  To me, that's just a few days.



1          MR. ADAMS:   Okay.  So, a few days is what you meant at

2    the time?

3          SHERIFF GREER:   Yeah.

4          MR. ADAMS:   And the fact that they alibied beautifully

5    for the balance of Thursday, Friday, and Saturday did not change

6    your opinion in any way once you found out about those alibies?

7          SHERIFF GREER:   Not really.

8          MR. ADAMS:   Okay.  All right.

9          SHERIFF GREER:   To me, at that time, they weren't

10   suspects.

11         MR. ADAMS:   All right.  Okay.  Let's go, Sheriff

12   Greer, and talk about some of the evidence that was collected in

13   this particular case and how it came back to you.  Oh, first of

14   all, before we do that, you said that you were present when

15   Michelle Rogers was interviewed?

16         SHERIFF GREER:   I believe I was, at the house.

17         MR. ADAMS:   At the house.  You were not --

18         SHERIFF GREER:   I was in the car, too.  I took my car

19   and drove everybody down there.

20         MR. ADAMS:   Were you there when Hope Greer talked to

21   her?

22         SHERIFF GREER:   I was driving, sir.  I heard them

23   talking.  What was actually discussed, I can't say, except Hope

24   was complaining because I was driving too fast.

25         MR. ADAMS:   Okay.  Let me ask you this, during those



1  conversations, did you overhear Michelle or anyone else say to

2  Detective Hope Greer that my sisters and I have gotten into cars

3  many times with fellows we barely knew and never thought about

4  what would happen to us?

5           SHERIFF GREER:  I can't say that I did, Bart.

6           MR. ADAMS:  Did you hear anybody else say it?

7           SHERIFF GREER:  If it was said, I don't -- I just

8  didn't get it.

9           MR. ADAMS:  Okay.  Now, you got involved in this

10  investigation and you've heard Detective Handy say that you were

11  kind of the guy calling the shots.  Do you agree with that?

12           SHERIFF GREER:  To a certain extent.

13           MR. ADAMS:  Okay.

14           SHERIFF GREER:  To a certain extent.  I called them

15  when I come up with anything.  And I'd ask them to do things and

16  they'd tell me they were going to do things.  I guess you'd say

17  it's joint more than anything because they had opened up a

18  foreign homicide investigation.

19           MR. ADAMS:  Okay.

20           SHERIFF GREER:  I'd asked them to.

21           MR. ADAMS:  All right.  Now, here's what I'd like to

22  do with you, Sheriff Greer, if you could, so that the ladies and

23  gentlemen of the jury can more fully understand the dynamics of

24  what was going on back at that time.

25           SHERIFF GREER:  Okay.



1          MR. ADAMS:  Okay.  You have your entire case report
2    there in front of you --

3          SHERIFF GREER:  Yes, I do.

4          MR. ADAMS:  -- do you not, sir?  All right.  Let's run
5    through a little bit of this physical evidence.  Is it correct
6    that the first physical evidence that was sent off to the State
7    Crime Lab was that that was collected from the inventory of Jeff
8    Clark's car?

9          SHERIFF GREER:  No, mine was sent first.

10         MR. ADAMS:  Okay.  Tell me what that was.

11         SHERIFF GREER:  Right there.

12         MR. ADAMS:  Okay.  All of this --

13         SHERIFF GREER:  Along with what Detective Smith took
14   at the autopsy.

15         MR. ADAMS:  Okay.

16         SHERIFF GREER:  The evidence technician.  Mine went
17   first.  You'll notice in my case report, Mr. Adams, after they
18   did their thing, they called me and asked me to fax a copy of my
19   case reports that I had submitted because they were going to use
20   that to what they had to compare with what they got.

21         MR. ADAMS:  Okay.  So, this goes off and, also,
22   including the two head hairs that were found in Rhonda's right
23   hand?  Did that go in at the same time?

24         SHERIFF GREER:  If that's -- yes.

25         MR. ADAMS:  Okay.



1       SHERIFF GREER:  That would have went in the same time

2    from the autopsy.

3       MR. ADAMS:  All right.  So, that would have been --

4    maybe it was sent off the 6th, on Monday.

5       SHERIFF GREER:  Next day.

6       MR. ADAMS:  Sent off on 4/6.

7       SHERIFF GREER:  The next day.

8       MR. ADAMS:  Okay.  4/6/92.  Now, would you tell the

9    ladies and the gentlemen of the jury when the report was

10   received back, indicating that the head hairs found in Rhonda

11   Warford's right hand were dissimilar to either one of these

12   defendants, eliminating them as being the source of the hair?

13      SHERIFF GREER:  Okay.  The date if 4/30 of '92.  He

14   told me, at this time, I'd stop by the lab -- I think it might

15   have been on that day.  I'm not really sure.  It would be about

16   a week after that.

17      MR. ADAMS:  About a week after that --

18      SHERIFF GREER:  After 4 -- in fact, I think it was a

19   little longer than that.

20      MR. ADAMS:  Okay.

21      SHERIFF GREER:  In fact -- well, I'm sure it was.

22      MR. ADAMS:  Okay.

23      SHERIFF GREER:  I don't believe I had the lab reports

24   when the Grand Jury met and that was on the 7th, I believe or

25   something like that.



PROCEEDINGS  3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
147

1          MR. ADAMS:   The 7th of May?

2          SHERIFF GREER:   I think so.

3          MR. ADAMS:   Okay.

4          SHERIFF GREER:   Don't hold me to that.

5          MR. ADAMS:   Regardless of that, the report was

6   completed on April the 30th, 1992.

7          SHERIFF GREER:   Yes.

8          MR. ADAMS:   You got a physical copy of it a week or

9   two afterwards, correct?

10          SHERIFF GREER:   Yes.   Somewhere in that vicinity.

11   Okay?

12          MR. ADAMS:   And, Sheriff Greer, over the past three

13   years, I have gained a lot of respect for you and I hope you

14   have for me and I do not want to embarrass you with a series of

15   questions.

16          SHERIFF GREER:   I made a mistake reading the lab at a

17   suppression hearing.

18          MR. ADAMS:   Okay.   Well, let me -- I know.   But let me

19   run through it because it's important for this jury to

20   understand what happened.   Okay?

21          Now, you got the lab report back a couple weeks

22   afterwards, which is in '92 --

23          SHERIFF GREER:   Yes.

24          MR. ADAMS:   -- correct?   You went through the lab

25   report and read it when you got it --



PROCEEDINGS  3.02.95                                   March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                      148

1          SHERIFF GREER:  Yes.

2          MR. ADAMS:  -- or did you?  Okay.  And in reading that

3   lab report, you missed something that was pretty critical?

4          SHERIFF GREER:  That's correct.  I did.

5          MR. ADAMS:  And, in fact you went all the way through

6   the balance of 1992 and into about February or March of 1993 --

7          SHERIFF GREER:  That's correct.

8          MR. ADAMS:  -- without realizing that the two head

9   hairs that were found in her hand --

10         SHERIFF GREER:  That's correct.

11         MR. ADAMS:  -- were dissimilar.

12         SHERIFF GREER:  That's correct.

13         MR. ADAMS:  You did not know that, right?

14         SHERIFF GREER:  You brought it to my attention, sir.

15         MR. ADAMS:  As a matter of fact, we had a hearing in

16  which you were under oath and we kind of got into it --

17         SHERIFF GREER:  Yes, we did.

18         MR. ADAMS:  -- and then we went back over here to your

19  office and I went through the lab report with you and showed it

20  to you and you said, my God, you're right.

21         SHERIFF GREER:  I think my remarks were, damn, Bart,

22  you're right.

23         MR. ADAMS:  Okay.  All right.  So, you realized that

24  these two head hairs were dissimilar, eliminating these boys

25  from being the sources, it was around February or March of '93



 1   when we were having the hearing?

 2          SHERIFF GREER:   That's correct.

 3          MR. ADAMS:   Okay.  All right.  So, we got that.  So,

 4   when you had discussions with members of the Louisville Police

 5   Department and your prosecutor, you did not -- you didn't know

 6   or you misunderstood or you did not know that these two head

 7   hairs, at that time, did not belong to these boys?

 8          SHERIFF GREER:   Did not.

 9          MR. ADAMS:   Did not know that.  Okay.  Now, let's run

10   through this other evidence that was given -- that came in and

11   came back to you.  Okay?

12          SHERIFF GREER:   Okay.

13          MR. ADAMS:   First of all, let's go to the inventory

14   that was taken of Jeff Clark's car on April the 8th.

15          SHERIFF GREER:   Okay.

16          MR. ADAMS:   Would you like to please go to that, sir?

17          SHERIFF GREER:   Yes.

18          MR. ADAMS:   Okay.  And let me see if I can find it,

19   also.  Do you have it yet, Sheriff?

20          SHERIFF GREER:   Which one are you looking at, Bart?

21          MR. ADAMS:   Well, I've not found it yet.  It would be

22   this one right here.  (Inaudible).

23          SHERIFF GREER:   What's your exhibit numbers?

24          MR. ADAMS:   Exhibits 1 -- is that the return, Judge?

25          THE COURT:   Yes.



1        MR. ADAMS:   Okay.  All right.  Now, let's talk about

2   that for just a second.  On 4/8/92, members of the Louisville

3   Division of Police, Evidence Technician Unit, with my client's

4   permission, Detective Handy had the car taken --

5        SHERIFF GREER:   That's correct.

6        MR. ADAMS:   -- down to the basement of the Louisville

7   Police Headquarters and they went over it with a fine-tooth

8   comb?

9        SHERIFF GREER:   That's correct.

10        MR. ADAMS:   Okay.  They looked for fibers, correct?

11        SHERIFF GREER:   Yes, sir.

12        MR. ADAMS:   Fibers that may have come off of any of

13   this --

14        SHERIFF GREER:   Any of her clothes, yes.

15        MR. ADAMS:   Anything whatsoever.

16        SHERIFF GREER:   Yes.

17        MR. ADAMS:   And they looked in the passenger area and

18   they looked in the trunk?

19        SHERIFF GREER:   That's correct.

20        MR. ADAMS:   That's correct?  Okay.  And --

21        SHERIFF GREER:   I would assume they did, sir.  I was

22   not there.

23        MR. ADAMS:   Okay.  Well, you got a report there.

24        SHERIFF GREER:   According to this, they did.

25        MR. ADAMS:   Right.  Okay.  Now, tell the ladies and



1   the gentlemen of the jury, when the report came back to you on

2   the fibers, indicating that there was nothing in Jeffrey Clark's

3   car fiber-wise, tying these clothes that she was wearing at the

4   time of her death to that vehicle.

5         SHERIFF GREER:   And that was from the Louisville

6   Police Department, Mr. Adams.

7         MR. ADAMS:   Yes, sir.   Detective Greer, it might be of

8   some help, if you know right off the top of your head, I will

9   ask this question in a different way.

10        SHERIFF GREER:   Okay.

11        MR. ADAMS:   Had you received back the fiber

12  information, indicating that there was -- they could find no tie

13  to the car and these clothes by the time these boys were

14  arrested on 5/5/92?

15        SHERIFF GREER:   No.

16        MR. ADAMS:   You did not have that information?

17        SHERIFF GREER:   I think I can refer to 4/30 of '92.

18        MR. ADAMS:   Okay.

19        SHERIFF GREER:   Page 20 of my case report, Bart.

20        MR. ADAMS:   Page 20?

21        SHERIFF GREER:   I believe it's 20.   Page 21.

22        MR. ADAMS:   Hold on here a minute, Sheriff, let me

23  find it real quick.

24        SHERIFF GREER:   Page 20 of the case report.   I had

25  received a call of 4/30 of '92 from Mr. Thurman for me to return



1    a call to him.  I did call him.  He gave me a verbal over-the-

2    phone on 4/30, stating that he found one hair on red sweat

3    pants, worn by the victim, significantly similar to Mr. Hardin's

4    standard.

5             MR. ADAMS:  Okay.

6             SHERIFF GREER:  He also stated that the Louisville

7    Police Department Evidence Technician Unit samples, sample 3 --

8    that would be A3 in their report, contained one hair

9    significantly similar -- out of the car, I'm talking about.

10            MR. ADAMS:  Right.  In the passenger compartment --

11            SHERIFF GREER:  About the car, right.

12            MR. ADAMS:  -- of the car.

13            SHERIFF GREER:  Right.  And, then, fourth same, 8, I

14   believe was the next one, and 13.

15            MR. ADAMS:  Okay.

16            SHERIFF GREER:  Several.

17            MR. ADAMS:  Now --

18            SHERIFF GREER:  That's what I got until I got a

19   report.

20            MR. ADAMS:  Right.  So, at this point, on 4/30 when

21   you receive information that there were head hairs found in Jeff

22   Clark's passenger compartment, similar to hers --

23            SHERIFF GREER:  Yes.

24            MR. ADAMS:  -- you were aware of the fact that Mr.

25   Clark -- and you were satisfied, I'm sure -- that Ms. Warford



1   had been in that car, several, many times prior to mid-December

2   of 1991?

3                SHERIFF GREER:   Yes, sir.

4            MR. ADAMS:   Okay.

5                SHERIFF GREER:   Very much so.

6            MR. ADAMS:   So, from an investigative standpoint, in

7   your mind, there was --

8            MR. SMITH:   Objection.

9            MR. ADAMS:   Present sense of question at the time.

10           THE COURT:   Ask the question and I'll rule.

11           MR. ADAMS:   At the time you received the information

12  on 4/30/92, you were aware of the fact that she had been in that

13  automobile, in the passenger compartment and that particular

14  piece of evidence was not of great significance to you at that

15  time?

16               SHERIFF GREER:   Not the contents out of the automobile

17  were not.

18           MR. ADAMS:   Now, what did become significant to you,

19  because of what you were told, was the fingerprint that was

20  found in the passenger compartment; is that correct?

21               SHERIFF GREER:   That and, also, the one hair off of

22  her.

23           MR. ADAMS:   The one -- and the one hair on --

24               SHERIFF GREER:   Off of the --

25           MR. ADAMS:   That was similar.



1        SHERIFF GREER:   Yes.

2        MR. ADAMS:   Determined to be similar.

3        SHERIFF GREER:   Yes, that was similar.

4        MR. ADAMS:   Okay.

5        SHERIFF GREER:   Microscopic characteristic.

6        MR. ADAMS:   Right.   Okay.   Now let's go on to the

7   serological evidence, the blood evidence, that was sent off to

8   the lab.   Okay?

9        SHERIFF GREER:   Yes, sir.

10        MR. ADAMS:   And what I'm talking about is anything

11   that would link these defendants --

12        SHERIFF GREER:   There was nothing, sir.

13        MR. ADAMS:   There was none whatsoever?

14        SHERIFF GREER:   No, sir.

15        MR. ADAMS:   Okay.   And when did you get that

16   information back?

17        SHERIFF GREER:   Some of it was on 4 -- on the lab

18   dated 4/30 of '92, which I got a couple weeks later.

19        MR. ADAMS:   Right.   But, however, as you told the

20   ladies and gentlemen of the jury, what you knew on 4/30/92 --

21        SHERIFF GREER:   Is this.

22        MR. ADAMS:   -- was in your report?

23        SHERIFF GREER:   That's it.

24        MR. ADAMS:   And that's it.   That's all you knew.

25   Okay.   Well, I'm not saying all you knew.   As far as the --



1           SHERIFF GREER:  Right.

2           MR. ADAMS:  -- the lab reports, that's all you knew at

3   that time.

4           SHERIFF GREER:  That's correct, sir.

5           MR. ADAMS:  Okay.  So, you did not have advantage of

6   the knowledge on 5/5/92 when there was a decision to --

7           MR. SMITH:  Objection.  Approach.

8           THE COURT:  Could you approach, Mr. Adams?

9           MR. ADAMS:  Yes.

10          THE COURT:  I am kind of curious now.  Where we going?

11          MR. ADAMS:  I am going to show that at the time the

12  decision was made to arrest these gentlemen that all of this

13  exculpatory evidence ended -- evidence that turned out to be not

14  evidence against them whatsoever was not in his possession.

15          THE COURT:  How is that relevant?  That's going behind

16  the indictment.  Aren't you a little -- let's go to my chambers.

17                      (IN CHAMBERS)

18          THE COURT:  Go forward, sir.

19          MR. ADAMS:  Thank you.  Sheriff Greer, because of the

20  fact that our notebooks are, I'm sure, assembled differently,

21  let me ask you to do this for us.  If you will identify for the

22  jury, in your case report, the scientific tests that were sent

23  off to the lab, first of all, what they were and then when you

24  received the results back.

25          SHERIFF GREER:  What I sent.



1          MR. ADAMS:  Or what anybody in the case sent.

2          SHERIFF GREER:  What I sent --

3          MR. ADAMS:  We'll start off with you.

4          SHERIFF GREER:  Okay.  Exhibit, four keys, ring, and

5   keys and other items attached.  Okay?

6          MR. ADAMS:  Yes, sir.  And those were Rhonda Sue

7   Warford keys?

8          SHERIFF GREER:  Found in the field.

9          MR. ADAMS:  Found in the field.  Okay.

10         SHERIFF GREER:  Next one was -- this all went up on

11     4/6 of '92, except -- let me see the key chain a minute.

12     4/8 of '92 on the key chain.  Okay?

13         MR. ADAMS:  Yes, sir.

14         SHERIFF GREER:  Bloody leaves from face of victim.

15  Bloody leaves by keys.  Blood sample from victim.  Key ring --

16  to latent prints, too.

17         MR. ADAMS:  Blood sample from victim, that was a

18  standard taken from her body?

19         SHERIFF GREER:  Right.

20         MR. ADAMS:  At the -- right.

21         SHERIFF GREER:  At the -- the, what I call rape kit.

22         MR. ADAMS:  Yes, sir.

23         SHERIFF GREER:  Victim hair sample from head.  Hair

24  and nail scraping from right hand.  Hair and nail scrapings from

25  left hand.  Hair sample on right hand.  Bag used to bag left



800.211.DEPO (3376)
EsquireSolutions.com

1  hand, bag used to bag right hand.  Soil sample from entrance

2  scenes.  Soil from possible suspect vehicle.  Victim's red,

3  white, and black jacket.  Victim's blue shirt, victim's red

4  sweat pants.  White bra, and white canvas shoes.

5          MR. ADAMS:  Of those things that you sent in Sheriff

6  Greer, the nail scrapings under the right and left hand --

7          SHERIFF GREER:  Right.

8          MR. ADAMS:  -- did you receive results back from that?

9          SHERIFF GREER:  Yes.

10          MR. ADAMS:  And they were negative as to --

11          SHERIFF GREER:  Negative, that's correct, sir.

12          MR. ADAMS:  -- tying these boys into anything.

13          SHERIFF GREER:  That's correct, sir.

14          MR. ADAMS:  Okay.  Could you tell the ladies and

15  gentlemen of the jury when you got that result back, if you --

16          SHERIFF GREER:  It would have been -- 4/30 was the

17  date of some of the reports.

18          MR. ADAMS:  Right.

19          SHERIFF GREER:  It would have been after that.  A

20  week, week and a half, two weeks.

21          MR. ADAMS:  Would it have been after May the 5th, '92?

22          SHERIFF GREER:  Yes.

23          MR. ADAMS:  Thank you, sir.

24          SHERIFF GREER:  Yes.  There was another report sent

25  out on 4/8 of '92, that tire casting went up.



1          MR. ADAMS:  The tire casting.  Okay.  We know all

2    about that one.  We can skip that.

3          SHERIFF GREER:  Okay.  Also, the sexual assault kit

4    was given to me after it was taken from -- LPD, they had that

5    done.  It was given to me and I sent it in.

6          MR. ADAMS:  Right.  And we know -- you were present

7    when Dr. Nichols testified?

8          SHERIFF GREER:  Yes, I was.

9          MR. ADAMS:  And Dr. Nichols said that you can't tell

10   anything from the --

11         SHERIFF GREER:  That's correct.

12         MR. ADAMS:  She may have had sex.  She may not have,

13   who knows.

14         SHERIFF GREER:  What he says.

15         MR. ADAMS:  Yes, sir.

16         SHERIFF GREER:  Uh-huh.  Also, I'm showing a suspect

17   kit on Mr. Hardin going in and one going in on Mr. Clark.  Also,

18   I'm showing here where --

19         MR. ADAMS:  Are those the hair samples?

20         SHERIFF GREER:  The kit that the doctors take.

21         MR. ADAMS:  Okay.

22         SHERIFF GREER:  They seal them, also.

23         MR. ADAMS:  For the rape kit, right.

24         SHERIFF GREER:  Right, rape kit.

25         MR. ADAMS:  Blood, etc.  Okay.



PROCEEDINGS  3.02.95                                    March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                        159

1           SHERIFF GREER:  I'm also showing here on 4/9 of '92, a

2    pair of dirty white running shoes of Clark's were sent in.

3           MR. ADAMS:  Clark's.  Okay.

4           SHERIFF GREER:  Yes, (inaudible).

5           MR. ADAMS:  Now, those were sent in for soil

6    comparison.

7           SHERIFF GREER:  Yes, that's correct.

8           MR. ADAMS:  And were they also sent in to see if there

9    was any blood on them?

10          SHERIFF GREER:  Yes.

11          MR. ADAMS:  Okay.  And both of those came -- well, one

12   came back with --

13          SHERIFF GREER:  Correct you right here, only --

14          MR. ADAMS:  I'm sorry?

15          SHERIFF GREER:  -- examination requested.

16          MR. ADAMS:  Okay.

17          SHERIFF GREER:  Compare with anything that was

18   submitted to you previously in this case.  That's what went, the

19   shoes and the kit.

20          MR. ADAMS:  Soil, etc.?

21          SHERIFF GREER:  Yeah, everything.

22          MR. ADAMS:  Okay.  Now, when did you get back the

23   information that the tennis shoe from Clark did not match up to

24   anything in the case?  Rhonda Sue Warford's blood, soil at the

25   scene, etc.?  Did that come back to you after 5/5/92?



PROCEEDINGS   3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
160

1        SHERIFF GREER:   Yes.

2        MR. ADAMS:   Okay.

3        SHERIFF GREER:   Also, on 5/1 of '92, okay?

4        MR. ADAMS:   Yes, sir.

5        SHERIFF GREER:   I had overlooked sending a silver

6    chain bracelet.   I had that checked.   That was Rhonda's.

7        MR. ADAMS:   That was Rhonda's, so --

8        SHERIFF GREER:   Yes, I had it sent in.   By looking at

9    Louisville ETU's reports, it shows they sent 4/13 of '92, they

10   had submitted trace evidence and etc. from the car.

11       MR. ADAMS:   Okay.   Detective Greer, can you tell from

12   looking at those -- I'm sorry, Sheriff Greer, can you tell from

13   looking at those notes when the soil that was taken from Jeff

14   Clark's car was sent in to be compared with the soil from the

15   scene?   I might be able to help you with that real quick.   It

16   might be the one thing that I can help you with.   Yep.   Well,

17   let me ask you this, based upon this report, was that soil

18   sample sent in on 4/8/92?

19       SHERIFF GREER:   Yes.

20       MR. ADAMS:   And was it completed on 6/5/92?

21       SHERIFF GREER:   That's correct.

22       MR. ADAMS:   And the results were that the soil sample

23   from the vehicle was not the same as the soil --

24       SHERIFF GREER:   That's correct.

25       MR. ADAMS:   -- at the scene?



1          SHERIFF GREER:   That's correct.

2          MR. ADAMS:   And that was received on 6/5/92?

3          SHERIFF GREER:   Yes.   That's when LPD received it.

4          MR. ADAMS:   Right.   And you may have gotten it even

5    later than that?

6          SHERIFF GREER:   Yeah.

7          MR. ADAMS:   Okay.   See, I think we can probably cut

8    this a little bit short.   Probably driving everybody crazy.   Let

9    me just ask an all-encompassing question and we might be able to

10   get it done.

11         SHERIFF GREER:   Yes, sir.

12         MR. ADAMS:   Okay.   Of all of the soil samples,

13   exhibits, everything that was sent in to the State Crime Lab, of

14   all of those things, we have the similar hair to Keith Hardin's

15   on the red pants?

16         SHERIFF GREER:   That's correct.

17         MR. ADAMS:   Okay.   And we have one fingerprint in the

18   back compartment.

19         SHERIFF GREER:   That's correct.

20         MR. ADAMS:   Back passenger compartment.   Now, of all

21   of those things that came back negative and all of those things

22   that came back, indicating that these boys were not involved.

23   Okay?

24         SHERIFF GREER:   Yes, sir.

25         MR. SMITH:   Objection.



1          THE COURT:  That's drawing a conclusion.  Rephrase

2   your question.

3          MR. ADAMS:  Okay.  Let me -- those things that do not

4   --

5          THE COURT:  Those things that fail to form a

6   connection.

7          MR. ADAMS:  Fail to form a -- thank you, Judge, very

8   much.  Those things that failed to form a connection to these

9   two young men --

10          SHERIFF GREER:  Yes.

11          MR. ADAMS:  -- were those reports received by you

12   after May the 5th, 1992?

13          SHERIFF GREER:  Yes, I believe they were.  With the

14   exception of the hair and the fingerprint.

15          MR. ADAMS:  Oh, sure, because that was -- you learned

16   of that on 4/30.

17          SHERIFF GREER:  Well, I learned before that --

18          MR. ADAMS:  Okay.

19          SHERIFF GREER:  -- on the fingerprint as to where it

20   come from and the -- you know, the reservations that I had, Mr.

21   Smith had.

22          MR. ADAMS:  Okay.  Well, let's talk about that just a

23   minute.

24          SHERIFF GREER:  Be glad to.

25          MR. ADAMS:  Let's talk about that.  When were you made



1   aware of the fact that there was a fingerprint from Rhonda Sue

2   Warford found in Jeff Clark's car?

3             SHERIFF GREER:  When was I made aware?

4             MR. ADAMS:  Yes, sir.

5             SHERIFF GREER:  4/30.

6             MR. ADAMS:  On 4/30.  Okay.

7             SHERIFF GREER:  Right.  That's -- I believe that's the

8   date Sergeant Jones came up.

9             MR. ADAMS:  That was the first, sir, that you knew of

10  it?

11            SHERIFF GREER:  That it was hers.

12            MR. ADAMS:  Okay.  You knew there was a print found.

13  You just didn't know --

14            SHERIFF GREER:  Yes.

15            MR. ADAMS:  Okay.

16            SHERIFF GREER:  My concern, along with, you know, that

17  was just --

18            MR. SMITH:  I don't think --

19            THE COURT:  Hold it, hold it, hold it, hold it, hold

20  it, hold it.

21            MR. ADAMS:  Want me to ask?

22            THE COURT:  I love him like a brother, too, but I'm

23  not sure he's qualified to answer this one.

24            MR. ADAMS:  Well, I haven't asked it yet.

25            THE COURT:  I know what you're going to ask him.  I'm



1   at least even with you, Mr. Adams, on that.  Let's go to the

2   office.

3                    (IN CHAMBERS)

4           THE COURT:  Okay.  Let's come back to order.  Okay.

5   Go forward.  Let's have order.  Go forward.

6           MR. ADAMS:  Sheriff Greer, was your reservation of the

7   fingerprint information you received based upon the fact that

8   you were aware that the deceased in this case had been in Mr.

9   Clark's car many times prior to December the 15th, 1991?

10          SHERIFF GREER:  I won't say many times, but December -

11  - November/December 1991.

12          MR. ADAMS:  Okay.

13          SHERIFF GREER:  Yes, that's correct.

14          MR. ADAMS:  That's what your reservations were based

15  upon?

16          SHERIFF GREER:  That's correct.

17          MR. ADAMS:  Okay.  When did you become aware of the

18  fact, if you can tell us, that Mr. Smith had been notified by me

19  that there was an individual who was working at this Chevron

20  convenient station and the cigarettes?  When were you first come

21  aware --

22          SHERIFF GREER:  I'm not sure --

23          MR. ADAMS:  -- of that?

24          SHERIFF GREER:  -- sir.  I can't answer that.

25          MR. ADAMS:  I mean, it's a couple years ago?



PROCEEDINGS   3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
165

1       SHERIFF GREER:  I can't even say that.

2       MR. ADAMS:  When did you become aware of the fact that

3   the defense had discovered the lady across the street who saw

4   Mr. Clark come in at 2:20 a.m., that you heard me refer to in my

5   opening statement?

6       SHERIFF GREER:  I think Mr. Smith might have informed

7   me of that.

8       MR. ADAMS:  And he got the information from me?

9       SHERIFF GREER:  That's correct.

10      MR. ADAMS:  Okay.  Have any of the knives that have

11  been introduced into evidence or that you know intend to be

12  introduced into evidence been found to have any blood on them,

13  similar to the blood of Rhonda Sue Warford?

14      SHERIFF GREER:  No.

15      MR. ADAMS:  Okay.  Do you know whether any of the

16  knives that are here or that may be intended to be introduced

17  into evidence have been shown to the State Medical Examiner so

18  that he might examine them?

19      SHERIFF GREER:  I don't know.  They've been sent to

20  the crime lab, but I don't know whether they've been shown to

21  him or not.

22      MR. ADAMS:  Sheriff Greer, I want to thank you for

23  your honesty now and over the last two and a half, three years.

24  Thanks very much.

25      THE COURT:  Mr. Rogers, do you have any questions of



1   Sheriff Greer?

2           MR. ROGERS:  Yes, Judge.  I couldn't pass up my

3   opportunity here to talk to a Sheriff.  Sheriff, I have talked

4   to Mr. Smith here and I'm going to ask you a couple questions

5   here.  (Inaudible) questions which may call for some hearsay,

6   but I don't believe he's going to object to it.  When you first

7   got to the scene, did you talk to the people who had found the

8   body?

9           SHERIFF GREER:  Yes, I did.

10          MR. ROGERS:  Okay.  Did they tell you that they had

11  moved or done anything to the scene?

12          SHERIFF GREER:  They said they took one -- walked over

13  and took one look and run.

14          MR. ROGERS:  Okay.  So, they didn't --

15          SHERIFF GREER:  No.

16          MR. ROGERS:  -- mess it?  Okay.

17          SHERIFF GREER:  No.

18          MR. ROGERS:  Also, did they tell you whether or not,

19  when they went into where the body was found, if the gate was

20  opened or closed?

21          SHERIFF GREER:  It was open.

22          MR. ROGERS:  Okay.  And that information you got from

23  them?  Okay.  Now, one of the first contacts you made in

24  connection with this case was with Keith Hardin, his mother, and

25  his sister, correct?



1          SHERIFF GREER:  That's correct.

2          MR. ROGERS:  Okay.  You went to their --

3          SHERIFF GREER:  And I think there was a man -- a male

4    gentleman there, too.

5          MR. ROGERS:  Okay.

6          SHERIFF GREER:  Could have been the father.

7          MR. ROGERS:  You went to their house because Vickie

8    Houser, his sister, called you?

9          SHERIFF GREER:  That's correct.

10         MR. ROGERS:  And when you got there, as I understand,

11   you were given a copy of a flyer of a missing person?

12         SHERIFF GREER:  That's correct.

13         MR. ROGERS:  Which turned out to be Rhonda Warford.

14         SHERIFF GREER:  That's correct.

15         MR. ROGERS:  And did you speak with them about that

16   flyer, any of the information on it?  Okay.  Let me ask --

17         SHERIFF GREER:  I really don't remember.

18         MR. ROGERS:  Okay.  Do you remember whether or not,

19   when you went in and got a copy of the flyer from Mr. Hardin and

20   Vickie Houser, if you said to them, this is her, but she had on

21   red pants?

22         SHERIFF GREER:  No, I don't remember.

23         MR. ROGERS:  Okay.

24         SHERIFF GREER:  I don't.

25         MR. ROGERS:  You don't remember doing it?  Okay.



1          SHERIFF GREER:  No, I don't.

2          MR. ROGERS:  Do you remember telling Vickie Houser

3   that besides the red pants, she had on a sports wind breaker?

4          SHERIFF GREER:  I don't remember that.

5          MR. ROGERS:  Okay.  Were --

6          SHERIFF GREER:  I do remember, I think, telling Keith

7   that looked like her.

8          MR. ROGERS:  Okay.

9          SHERIFF GREER:  I did tell him that.

10          MR. ADAMS:  I'm sorry, Judge, I didn't understand that

11   response.

12          MR. SMITH:  I didn't either, Judge.

13          MR. ROGERS:  I think -- go ahead, a little louder.

14          THE COURT:  You told Keith that -- what -- did or did

15   not look like her?

16          SHERIFF GREER:  When he gave me the flyer, I says, it

17   does look like her.

18          THE COURT:  There was a photograph on the flyer?

19          SHERIFF GREER:  Yes.

20          MR. ROGERS:  I don't think it's in question that the

21   person on the flyer was her.  He's just --

22          THE COURT:  May I ask, restate one of the -- or repeat

23   one of the questions that you asked because I didn't understand

24   his response.

25          MR. ROGERS:  Which question was that, sir?



1              THE COURT:  You asked -- Mr. Rogers asked you if you

2      discussed the description or the clothing that Ms. Warford was

3      wearing at the time she was found and you said, I don't know.

4      Do you not --

5              SHERIFF GREER:  I don't remember discussing --

6              MR. ROGERS:  Whether you did or did not, is that what

7      you're telling us?

8              SHERIFF GREER:  I don't remember discussing it with

9      him, your Honor.

10             MR. ROGERS:  Okay.  Were any photographs ever

11     released, to your knowledge, to the press of the clothing that

12     the victim was wearing?

13             SHERIFF GREER:  No, there was a photograph released to

14     the press, I believe, of a picture that Mrs. Warford --

15             MR. ROGERS:  Right.

16             SHERIFF GREER:  -- furnished.

17             MR. ROGERS:  Essentially, this photograph, would that

18     be correct?

19             SHERIFF GREER:  I believe that is it.

20             MR. ROGERS:  Okay.  Is that jacket that she has on in

21     that picture the same one as you've got here?

22             SHERIFF GREER:  No.

23             MR. ROGERS:  Okay.  Okay.  So, that sports -- or the

24     wind breaker jacket, UNLV, I mean, what's UNLV in case these

25     people -- these people may not be a basket --



1          SHERIFF GREER:  Nevada Las Vegas.

2          MR. ROGERS:  Right.  It's -- they play basketball.

3   Ain't got no football team, do they?

4          SHERIFF GREER:  Not my favorite team.

5          MR. ROGERS:  Okay.  I don't like them, too.  Anyway,

6   so, would you say that that piece of clothing -- or would you

7   characterize that as a sports wind breaker?

8          SHERIFF GREER:  Yes.

9          MR. ROGERS:  And I guess what I'm getting at is would

10  there be anyone outside the investigative personnel that would

11  know that the victim was wearing a sports wind breaker if they

12  had not been told by the investigative personnel?

13         SHERIFF GREER:  Unless they got it off of the news,

14  maybe.  I don't know.

15         MR. ROGERS:  Okay.  Now, that's what --

16         SHERIFF GREER:  I don't know.

17         MR. ROGERS:  -- I'm trying -- do you know if the news

18  ever reported she was wearing a sports wind breaker?

19         SHERIFF GREER:  I don't know.

20         MR. ROGERS:  Okay.

21         SHERIFF GREER:  I didn't see it, if they did.

22         MR. ROGERS:  Now, you -- I think you said you met

23  Detective Hope Greer and Jimmy Clark there in Louisville after

24  you had talked to the Hardin's?

25         SHERIFF GREER:  Yes, we went -- we got a call from the


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1  Hardin's and Ms. Hardin let me use her phone to call.  I think

2  Bill made the call and we met at Third District Police Station

3  on Taylor Boulevard.  Is that -- I think that's where it's at.

4           MR. ROGERS:  Could be.

5           SHERIFF GREER:  That's where I met them.

6           MR. ROGERS:  But would you recognize Jimmy Clark if

7  you saw him?

8           SHERIFF GREER:  Quite well, yes, sir.

9           MR. ROGERS:  Would you agree with me he's black?

10          SHERIFF GREER:  Yes, sir, he is.

11          MR. ROGERS:  Okay.  That's who we're talking about.

12  Okay.  And Hope Greer is the lady who testified here.

13          SHERIFF GREER:  That's correct.

14          MR. ROGERS:  Okay.  Now, you heard -- you sat here and

15  I believe that you heard Hope Greer testify; is that correct?

16          SHERIFF GREER:  That's correct.

17          MR. ROGERS:  And she did testify that in her interview

18  with Keith Hardin, he told her he did own a knife, isn't that

19  correct?

20          SHERIFF GREER:  Yes, he did.

21          MR. ROGERS:  Okay.  Now, getting down the sequence of

22  events here, you and Detective Handy interviewed Keith Hardin on

23  April 7, right?

24          SHERIFF GREER:  I'm showing April the 9th.

25          MR. ROGERS:  Were you --



1           SHERIFF GREER:  (Inaudible) 7th interview, I don't

2   believe, sir.

3           MR. ROGERS:  Maybe --

4           SHERIFF GREER:  Correct me.  April the 7th, Mr.

5   Rogers, I wasn't present.

6           MR. ROGERS:  You were not there?

7           SHERIFF GREER:  No, I wasn't.

8           MR. ROGERS:  Okay.

9           SHERIFF GREER:  I wasn't present.

10          MR. ROGERS:  So, on April 7, when you say he told

11  Detective Handy he didn't have any knives, that's from --

12  gleaming from what's in the report, right?

13          SHERIFF GREER:  I didn't say April 7.

14          MR. ROGERS:  Oh, okay.

15          SHERIFF GREER:  A while ago, I said the 4/6 on Clark

16  and 9 on Mr. Hardin.

17          MR. ROGERS:  But you did hear Detective Hope Greer

18  testify that after Handy interviewed him on the 7th, she

19  interviewed him, correct?

20          SHERIFF GREER:  That's correct, on the 9th.

21          MR. ROGERS:  And that after -- and, at that point, he

22  told her he did own a knife?

23          SHERIFF GREER:  That's correct.

24          MR. ROGERS:  Okay.  And, then, apparently, on the 9th,

25  he told you and Detective Handy he didn't have any knives, but



1   later that day he told you that he did?  So, we've got no, yes,

2   no, yes?

3               SHERIFF GREER:  We got no, yes, and yes.

4               MR. ROGERS:  Oh, okay.

5               SHERIFF GREER:  Haven't we?

6               MR. ROGERS:  Now, do you know, from the records, that

7   there was some testimony here that he kept a knife under the

8   seat of his car?  Do you know whether your representative, Mr.

9   Livers, ever ceased a knife from that search warrant from under

10  the seat of his car?

11              SHERIFF GREER:  I think there was one (inaudible).

12              MR. ROGERS:  Okay.  I think we've maybe beat these

13  hair samples to death, so let's talk about the Kroger man.  You

14  indicated to me that it was your understanding that Detective

15  Jimmy Clark had gone to Kroger to try to follow up on Ms.

16  Warford's statement that some strange guy followed her home; is

17  that correct?

18              SHERIFF GREER:  It was discussed with Detective Clark.

19  He stated that the next day that he would go to Kroger's, check

20  the area, and also talk to the Kroger personnel to see if she

21  was down there after midnight, but he found out the store was

22  closed.

23              MR. ROGERS:  Okay.

24              SHERIFF GREER:  That was my understanding of it.

25              MR. ROGERS:  Okay.  Now, do you know or is there any



1  information in the file in there, any letters from Detective

2  Clark or any other personnel, yours or Louisville Police

3  Department, that, in fact, they did ask the people at Kroger

4  about this strange guy or that they did, in fact, canvas the

5  neighborhood to try to --

6          SHERIFF GREER:  I have nothing in my file, except that

7  he went to Kroger's.

8          MR. ROGERS:  And, basically, when he went to Kroger's,

9  I think the interview -- he talked to the guy and found out the

10  store was closed.

11          MR. SMITH:  Objection.  I mean --

12          MR. ROGERS:  Jimmy Clark is going to be here, but --

13          THE COURT:  Well, we're pushing hearsay a long way.

14          MR. ROGERS:  Okay.  We'll stop.

15          THE COURT:  Kind of keep it in the realm of reason.

16          MR. ROGERS:  Okay.  Now, at any time when you were

17  present with Mr. Hardin, did he ever indicated he would object

18  to having his statements or interviews tape recorded?

19          SHERIFF GREER:  No.

20          MR. ROGERS:  Okay.  There were no tape-recorded

21  interviews done with him, were there?

22          SHERIFF GREER:  There weren't, no.

23          MR. ROGERS:  Okay.  There were tape-recorded

24  interviews done with other people in this case, though, were

25  there not?



1          SHERIFF GREER:  I believe there were, yes, sir.

2          MR. ROGERS:  There was a tape-recorded interview done

3    with Bill Mayham.  You were present at one of those interviews,

4    right?

5          SHERIFF GREER:  I did it.

6          MR. ROGERS:  And -- you did that?  It was you and

7    Detective Handy, right?

8          SHERIFF GREER:  I went up there and had him to come

9    there to -- I made the contact to him, per instructions from Mr.

10   Smith.

11         MR. ROGERS:  Right.  And Detective Handy was present,

12   right?

13         SHERIFF GREER:  That's correct.

14         MR. ROGERS:  Okay.  Now, in connection with that,

15   Detective Handy didn't turn the tape recorder on and off, did

16   he?

17         SHERIFF GREER:  It's my tape recorder.

18         MR. ROGERS:  You didn't turn it on and off, did you?

19         SHERIFF GREER:  (No audible response given).

20         MR. ROGERS:  Okay.  Also, there was a taped statement

21   taken from a lady named Amy Remsburg, correct?

22         SHERIFF GREER:  That's correct.

23         MR. ROGERS:  Okay.  I guess one of the questions -- I

24   don't understand is, if you taped statements from witnesses like

25   these people, why don't you tape statements from people that



1          MR. SMITH:  Were you in the --

2          SHERIFF GREER:  A little more.

3          MR. SMITH:  -- military?

4          SHERIFF GREER:  Yes, I was.

5          MR. SMITH:  What did you do in the military?

6          SHERIFF GREER:  I was the Army Security Agency.

7          MR. SMITH:  All right.

8          SHERIFF GREER:  Criminal investigation.

9          MR. SMITH:  So, you did criminal investigations in the

10  Army, also.

11          SHERIFF GREER:  Yes, sir

12          MR. SMITH:  All right.  And have you had training

13  experience in obtaining and finding evidence?

14          SHERIFF GREER:  To some extent, okay?

15          MR. SMITH:  And have you had experience and training

16  in looking for and finding and uncovering trace evidence?

17          SHERIFF GREER:  Not really, Mr. Smith.

18          MR. SMITH:  All right.  Have you been taught what to

19  look for as far as what's on clothes and that type of thing?

20          SHERIFF GREER:  I've been taught to preserve.

21          MR. SMITH:  All right.

22          SHERIFF GREER:  And send in to the appropriate --

23          MR. SMITH:  Right.  Because you are not qualified in

24  analyzing --

25          SHERIFF GREER:  I am not.



PROCEEDINGS  3.02.95                                     March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                        183

1           MR. SMITH:  -- evidence.  Right.  But you are trained

2    in preserving evidence?

3           SHERIFF GREER:  That's correct.

4           MR. SMITH:  All right.  What type of evidence were you

5    attempting to preserve when you requested that car be processed?

6           SHERIFF GREER:  I will -- at that -- to process that

7    car, we was trying to find out if there was any type of trace

8    evidence in it.

9           MR. SMITH:  All right.

10          SHERIFF GREER:  That's the reason the car was

11   processed.

12          MR. SMITH:  Give us some examples of trace evidence.

13          SHERIFF GREER:  We're looking for fiber --

14          MR. SMITH:  All right.

15          SHERIFF GREER:  -- hair --

16          MR. SMITH:  Fiber -- what type of fiber, Joe?

17          SHERIFF GREER:  Off of clothes.

18          MR. SMITH:  All right.  So, like if I sit in this

19   chair and I get up, fibers from my pants?

20          SHERIFF GREER:  That's what they're looking for, yes.

21          MR. SMITH:  Okay.  And there were no fibers from

22   Rhonda Sue Warford's clothes in the car that you can tell

23   anyway?

24          SHERIFF GREER:  There was not.

25          MR. SMITH:  All right.  And that's not unusual, is it?



1          SHERIFF GREER:  No, not really.

2          MR. SMITH:  All right.  Now, the car was also

3   processed to see if there was any of her blood.

4          SHERIFF GREER:  That's correct.

5          MR. SMITH:  All right.  And there was none of her

6   blood in the car?

7          SHERIFF GREER:  That's correct.

8          MR. SMITH:  And, then, you have the car processed to

9   see if there was any of her hair in there?

10          SHERIFF GREER:  That's correct.  That's part of the

11   trace evidence.

12          MR. SMITH:  And in your response to Mr. Adams'

13   questions, there was.

14          SHERIFF GREER:  That's correct.

15          MR. SMITH:  And, then, the car is processed for

16   fingerprints?

17          SHERIFF GREER:  That's correct.

18          MR. SMITH:  In response to Mr. Adams' questions, her

19   fingerprint was in there?

20          SHERIFF GREER:  That's correct.

21          MR. SMITH:  Now, we also heard about soil samples

22   taken --

23          SHERIFF GREER:  Yes, sir.

24          MR. SMITH:  -- from the car.  And we heard -- we might

25   have even stipulated -- I think we stipulated that they didn't



1  match.

2           SHERIFF GREER:  That's correct.

3           MR. SMITH:  Now, when we talk about soil samples, I

4  think of soil, and I mean dirt.

5           SHERIFF GREER:  We're talking about from the scene,

6  dirt taken.  We're talking about looking for any type of dirt

7  that's on the tires, under the car, anywhere, to make a

8  comparison to what was taken from the scene.

9           MR. SMITH:  Okay.  And we couldn't find any dirt on

10  the car from the scene.

11          SHERIFF GREER:  No, there was none.

12          MR. SMITH:  Now, when Clark told you all he left at

13  1:00 --

14          SHERIFF GREER:  That's correct.

15          MR. SMITH:  All right.  Hardin says they left at 3:00.

16          MR. ADAMS:  Objection.  That is not the evidence.

17          THE COURT:  I agree with Mr. Adams.  That's not the

18  evidence.

19          MR. SMITH:  Do you remember what Hardin told about

20  what time they left?

21          SHERIFF GREER:  He didn't tell what time they left.

22  He told them what time they got home, between 3:00 and 3:30 --

23          MR. SMITH:  Okay.

24          SHERIFF GREER:  -- according to his statement.

25          MR. SMITH:  Okay.  So, Clark says they left at 1:00.



1   Hardin says they got home at 3:00 to 3:30?

2          SHERIFF GREER:   That's correct.

3          MR. SMITH:   Is that the way the Court remembers it?

4          THE COURT:   The way I remember it.

5          MR. SMITH:   Thank you.   Now, neither Hardin or Clark

6   said anything about any Chevron station.

7          SHERIFF GREER:   No, they didn't.

8          MR. SMITH:   And now we've heard that the defendant,

9   Clark, supposedly got home at 2:20?

10          SHERIFF GREER:   That's correct.

11          MR. SMITH:   All right.   Now, did the defendant, Clark,

12   make any statements before about getting home at 2:20?

13          SHERIFF GREER:   The only statement Mr. Clark made is

14   when they left the trailer, around 1:00.

15          MR. SMITH:   Did the defendant, Clark, tell you where

16   he had been in that time period, from the time he left the

17   trailer to when he did get home?

18          SHERIFF GREER:   No, he didn't.

19          MR. SMITH:   And, initially, they both told you they

20   didn't have any knives, either one of them?

21          SHERIFF GREER:   That's correct.

22          MR. SMITH:   Did either one of them ever offer you any

23   explanation for why they lied to you?

24          SHERIFF GREER:   No, they didn't.

25          MR. SMITH:   And you're not contending that one of



1   these knives is the murder weapon, are you?

2           SHERIFF GREER:   No, I'm not.

3           MR. SMITH:   And have you yet figured out a way to pull

4   the drain on the Ohio River?

5           MR. ADAMS:   Objection, Judge.

6           MR. ROGERS:   Not in evidence, Judge.

7           THE COURT:   I'll sustain that.

8           MR. SMITH:   Okay.   Now, down at the scene, you did

9   walk all around the scene?

10          SHERIFF GREER:   To a certain extent, yes, sir.

11          MR. SMITH:   Could you see any sign whatsoever of any

12  struggle?

13          SHERIFF GREER:   No.

14          MR. SMITH:   Now, regarding any hairs in the hand that

15  don't belong to these two -- okay -- you're not saying these are

16  the only two involved in this?

17          SHERIFF GREER:   No.

18          MR. ADAMS:   Judge, I am going to object.   I haven't

19  heard Sheriff Greer say one word about -- you know, we got a

20  Grand Jury indictment here.

21                          (IN CHAMBERS)

22          THE COURT:   Okay.   Let's go forward.   We're going to

23  leave the Ohio River where it is and go on with the trial.

24          MR. SMITH:   Now --

25          THE COURT:   Just a minute.   We've got a juror out in



1  the restroom.  Maybe it would be appropriate to ask everyone

2  else, are all of you in good shape or anybody need a break?  If

3  somebody needs to take a trip, wave your hand.  Okay.  Let's go

4  forward, sir.

5          MR. SMITH:  Now, you've told us that -- strike that.

6  Did both defendants or one defendant bring shoes to you and say,

7  Mr. Sheriff, these are the shoes I had on that night?

8          SHERIFF GREER:  No.

9          MR. SMITH:  One of them did?

10          SHERIFF GREER:  Well, he had them on.  We asked him

11  for them, he gave them to us.

12          MR. SMITH:  Okay.  And those shoes were sent off and

13  there wasn't anything on those shoes.

14          SHERIFF GREER:  No, there weren't.

15          MR. SMITH:  That's all I have.

16          MR. ADAMS:  Sheriff Greer, isn't it true that upon the

17  execution of the search warrant, every pair of shoes that he

18  owned were taken out of his house?  Didn't you all take a bunch

19  of shoes out of his house?

20          SHERIFF GREER:  I'd have to look at the search

21  warrant.

22          MR. ADAMS:  Take a look.

23          SHERIFF GREER:  I wasn't in on any of the search

24  warrants, so I didn't know.  But whatever -- regardless of what

25  was taken, there was no dirt found to match --



1          MR. ADAMS:  Right.

2          SHERIFF GREER:  -- the area.  Okay?

3          MR. ADAMS:  Right.  Okay.  While you're looking for

4  that, I'll just ask you a couple of other questions.  If you --

5  do you remember, Joe, that they took the shoes out of his house

6  --

7          SHERIFF GREER:  Yes.

8          MR. ADAMS:  -- with the search warrant?  Okay.

9          SHERIFF GREER:  I didn't think he was talking about

10  that.  I thought he was talking about up where he was

11  interviewed.

12          MR. ADAMS:  I understand.  Now, when he was

13  interviewed, you were talking to him about, what were you

14  wearing that night?  And he said, well, I was wearing these

15  shoes, right?

16          SHERIFF GREER:  That's correct.

17          MR. ADAMS:  And, then, you said, can we have the shoes

18  --

19          SHERIFF GREER:  That's correct.

20          MR. ADAMS:  -- and he said, sure.

21          SHERIFF GREER:  That's correct.

22          MR. ADAMS:  He didn't come in and say, hey, boys, this

23  is a little misdirection -- take these shoes and run.

24          SHERIFF GREER:  Did not.

25          MR. ADAMS:  Right?



PROCEEDINGS  3.02.95                                    March 02, 1995
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.                        190

1           SHERIFF GREER:  No.

2           MR. ADAMS:  And besides that, you got all the shoes in

3    his house when you went in there --

4           SHERIFF GREER:  That's correct.

5           MR. ADAMS:  Okay.  So, let's put that issue to rest.

6    Now, when you came aware of the fact through a communication

7    from me and Kenton Smith about the lady who lives across the

8    street, who saw him come in at 2:20 a.m. --

9           SHERIFF GREER:  Uh-huh.

10          MR. ADAMS:  Okay?  Did you avail yourself of the

11   opportunity to go out and interview her about the statement that

12   she had made to me during our investigation?

13          SHERIFF GREER:  No.  I called Louisville Homicide and

14   told them about Mr. Smith's letter.

15          MR. ADAMS:  Okay.

16          SHERIFF GREER:  And --

17          MR. ADAMS:  You don't know what they did, if anything?

18          SHERIFF GREER:  No, I don't.

19          MR. ADAMS:  Okay.  Then, there became a point in time

20   where, during the investigation, I hired an investigator --

21          SHERIFF GREER:  That's correct.

22          MR. ADAMS:  -- and we find -- and you've met him.

23          SHERIFF GREER:  Yes.

24          MR. ADAMS:  He's talked to you --

25          SHERIFF GREER:  That's correct.



PROCEEDINGS   3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
191

1        MR. ADAMS:  Gerry Hall, 25 years with the Jefferson

2   County Police Department --

3        SHERIFF GREER:  That's correct.

4        MR. ADAMS:  -- as a homicide detective.  We find this

5   fellow at the Chevron station.  Okay?  I notify Mr. Smith.  He

6   notifies you.

7        SHERIFF GREER:  Uh-huh.

8        MR. ADAMS:  Right?

9        SHERIFF GREER:  That's correct.

10       MR. ADAMS:  Did you follow the same procedure and tell

11  Louisville --

12       SHERIFF GREER:  That's correct.

13       MR. ADAMS:  -- Police Department, that here is a

14  witness and said he saw Jeff between 1:00 and 2:00 a.m. on April

15  the 2nd?

16       SHERIFF GREER:  I called him after I got Mr. Smith's

17  letter.

18       MR. ADAMS:  And you don't know what they did to follow

19  up on that?

20       SHERIFF GREER:  No, I don't.

21       MR. ADAMS:  Okay.  But this has been known to you for

22  quite some time?

23       SHERIFF GREER:  That's correct.

24       MR. ADAMS:  And you gave it to LPD because you looked

25  at them as the lead organization?



PROCEEDINGS  3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
192

1    SHERIFF GREER:  Yes, sir, up there.

2    MR. ADAMS:  And you don't know what they did with it?

3    SHERIFF GREER:  No, I don't.

4    MR. ADAMS:  Never an effort to hide these people from

5  you that you're aware of?

6    SHERIFF GREER:  No.

7    MR. ADAMS:  Thank you, sir.

8    THE COURT:  Mr. Rogers?

9    MR. ROGERS:  Sheriff, since you have been talking to

10  Mr. Kenton Smith about trace evidence and all this stuff, let's

11  say that I am sitting here in this chair and I'm trying to think

12  about what to ask you next here and I'm scratching my head, and

13  as I get up, a hair falls on the chair.

14    SHERIFF GREER:  That's correct.

15    MR. ROGERS:  If someone else sits on that, it might

16  cling to their clothing, wouldn't it?

17    SHERIFF GREER:  It's possible, yes, sir.

18    MR. ROGERS:  Okay.  Whether they have sweat pants or

19  whatever else on, right?

20    SHERIFF GREER:  That's correct.

21    MR. ROGERS:  Okay.  And there's no telling how long

22  that hair has been on there.  I mean, they could carry that

23  around for days with them?

24    THE COURT:  That calls for conclusion.  He's not

25  qualified to answer and say that.



PROCEEDINGS 3.02.95
CLARK & HARDIN vs LOUISVILLE JEFFERSON CO.

March 02, 1995
193

1          MR. ROGERS:   Okay.  Now, when you talked to Keith

2    Hardin and he told you he got home about 3:00 or 3:30, did he

3    say that was an estimate or did he say, I looked at the clock

4    and I know I got home exactly at 3:30, or do you remember how he

5    put that to you?

6          SHERIFF GREER:   The question wasn't asked by me.

7          MR. ROGERS:   Oh, okay.

8          SHERIFF GREER:   It was asked by the detective that was

9    --

10          MR. ROGERS:   Do you remember how the question was

11   asked and how he responded?  And what I'm talking about, was

12   that just an estimate or was he saying, that is the exact,

13   absolute time?

14          SHERIFF GREER:   He was asked what time he got home and

15   he -- I think his remarks were, between 3:00 and 3:30.

16          MR. ROGERS:   Okay.  Did you ask how he -- or did

17   anybody ask how he knew that was what time it was?  I mean, like

18   whether he looked --

19          SHERIFF GREER:   No.

20          MR. ROGERS:   -- at a clock or anything?  Okay.

21          SHERIFF GREER:   Their interview speaks for itself.

22          MR. ROGERS:   Okay.  Now, talk about the knives again.

23   You've heard both Handy and Hope Greer testifying or being cross

24   examined, correct?

25          SHERIFF GREER:   Yes, sir.



1      MR. ROGERS:  And isn't it correct we talked about that

2  Detective Handy asked him if he had any knives and Hope Greer

3  asked him if he owned any knives; isn't that correct?

4      SHERIFF GREER:  I think that was it.

5      MR. ROGERS:  Okay.  Is it possible that a person could

6  --

7      MR. SMITH:  Objection.

8      MR. ROGERS:  -- differentiate --

9      THE COURT:  Again, it's self-explanatory.  You're

10  asking him for a conclusion.

11      MR. ROGERS:  And did you ask -- or do you remember Mr.

12  Hardin being asked, specifically the question, when you left

13  Jeff's trailer, did you stop anywhere on your way home?

14      SHERIFF GREER:  I believe they might have been asked

15  how they come home.  I'm not really --

16      MR. ROGERS:  I mean, but that would mean the route

17  they got home?

18      SHERIFF GREER:  Yeah, I don't remember if that was

19  asked.

20      MR. ROGERS:  And do you remember Mr. Hardin being

21  asked, was there anyone who saw you going home or any witnesses

22  who could -- who saw you on your way home?

23      SHERIFF GREER:  No, that wasn't asked.

24      MR. ROGERS:  Okay.  Do you have any reason at all, in

25  the investigative reports and the personal investigation you've



1           SHERIFF GREER:  Mr. Adams, I don't remember being told

2    that.

3           MR. ADAMS:  Nobody was ever told that they went by

4    Bashford Manor on the way home, were they?

5           THE COURT:  He can't testify to what anybody else was

6    told.

7           MR. ADAMS:  Were you ever told they went by Bashford

8    Manor?

9           SHERIFF GREER:  I didn't hear it.  Okay?

10          MR. ADAMS:  That's all.  Thank you, sir.

11          THE COURT:  Mr. Rogers?

12          MR. ROGERS:  Nothing further.

13          THE COURT:  We finished with Sheriff Greer, at this

14   time?

15          MR. ADAMS:  Yes, sir.

16          MR. SMITH:  Yes, sir.

17          MR. ROGERS:  Yes, sir.

18          THE COURT:  Sheriff, you can return to counsel table

19   as Commonwealth's representative.  Call your next witness.

20          MR. SMITH:  Robert Thurman.

21          THE COURT:  Sir, if you'd come around.  Stop, if you

22   would, at or near the foot of the step, face me, and raise your

23   right hand, sir.  Do you solemnly swear or affirm the testimony

24   you are about to give will be the truth, the whole truth, and

25   nothing but the truth, so help you God?

