UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
Case No. 3:17-CV-00419-DJH


JEFFREY DEWAYNE CLARK            )
and GARR KEITH HARDIN           )
                                )
                Plaintiff,      )
                                )
VS.                             )
                                )
LOUISVILLE/JEFFERSON COUNTY     )
METRO GOVERNMENT, ET AL         )
                                )
                Defendants.     )




 VIDEO DEPOSITION OF GARR KEITH HARDIN, JR.



The deposition of GARR KEITH HARDIN, JR.,
taken before Lynn B. Kornick, Court Reporter
and Notary Public in and for the
Commonwealth of Kentucky, on the 27th day of
March, 2019, beginning at 9:01 A.M., at the
offices of the Jefferson County Attorney,
located at 531 Court Place, Suite 900,
Louisville, Kentucky.




-------------------------------------------

Lynn B. Kornick
Court Reporter & Videographer
11915 Brookmoor Drive
Louisville, Kentucky  40243
502.500.7627
lynnkornick@msn.com

APPEARANCES


FOR THE PLAINTIFFS:
    Amy Robinson Staples, Esq.
    Loevy & Loevy
    18 Village Plaza
    PMB 181
    Shelbyville, KY  40065


    Elliot R. Slosar, Esq.
    Loevy & Loevy
    311 N. Aberdeen Street, 3rd Floor
    Chicago, IL  60607


    Nick Brustin, Esq.
    Richard W. Sawyer, Esq.
    Neufeld, Scheck & Brustin, LLP
    99 Hudson Street, 8th Floor
    New York, NY  10013


    Larry D. Simon, Esq.
    239 South Fifth Street, Suite 1700
    Louisville, KY  40202


FOR THE DEFENDANTS:
    Peter F. Ervin, Esq.
    Annale Taylor, Esq.
    Office of Jefferson County Attorney
    531 Court Place, Suite 900
    Louisville, KY  40202


    Robert K. Bond, Esq.
    Andrew T. Garverich, Esq.
    Coleman Lochmiller & Bond
    2907 Ring Road
    P.O. Box 1177
    Elizabethtown, KY  42072-1177

(APPEARANCES - CONTINUED):

      Andrew D. Pellino, Esq.
      William H. Brammell, Jr., Esq.
      Dressman Benzinger LaVelle PSC
      321 West Main Street, Suite 2100
      Louisville, KY  40202


      James R. Hollon, Esq.
      McBrayer - Lexington
      201 East Main Street, Suite 900
      Lexington, KY  40507


ALSO PRESENT:
      Andrea Grant, Videographer
      502.612.9793


INDEX

                                  PAGES

Examination by Mr. Ervin        4-178
                                312-313

Examination by Mr. Bond        178-253

Examination by Mr. Hollon     253-278

Examination by Mr. Pellino    278-309

Examination by Mr. Brustin    309-312


EXHIBITS


Defendants':
No. 1 Book of Shadows excerpted pages   136
No. 2 Transcript of Interview with
       Handy 04.07.1992         163
No. 3 Transcript of Interview with
       Greer 04.07.1992         164
No. 4 Transcript of interview with Handy
       04.09.1992         166
No. 5 Amended Complaint        188

4

1        GARR KEITH HARDIN, JR.,
2    called upon oral examination by counsel for
3    Defendants Louisville/Jefferson County Metro
4    Government, Jim Woosley, Charles Edelen,
5    Kelly Jones, Robert Ennis and James
6    Griffiths, having been first duly sworn, was
7    examined and testified as follows:
8        (VOLUME 1 of 2 OF VIDEO RECORDING)
9
10   DIRECT EXAMINATION
11   BY MR. ERVIN:
12       Q.  Tell us your full name, please.
13       MR. BRUSTIN:  I'm sorry, Mr. Ervin.
14   I don't want to interrupt, but I wanted to
15   say one thing before we start.
16       MR. ERVIN:  Sure.
17       MR. BRUSTIN:  So, as you probably
18   are all aware, Mr. Hardin suffers from some
19   neuropsychic limitations.  And so I think,
20   having listened to the deposition yesterday,
21   some of the questions were pretty vague and
22   overbroad.
23       I think you're going to have a very
24   tough time getting answers from Mr. Hardin
25   that are meaningful because of his

5

1    limitations if those are the kinds of
2    questions you're asking.  I wanted to just
3    say that upfront.
4        MR. ERVIN:  Thank you.
5        Q.  (BY MR. ERVIN)  Would you tell us
6    full name, please, sir?
7        A.  My name is Garr Keith Hardin, Jr.
8        Q.  And where do you live?
9        A.  I live in Meade County, Kentucky.
10       Q.  Where in Meade County?
11       A.  I live in Brandenburg.
12       Q.  What is your address?
13       A.  178 Thornhills Lane.
14       Q.  How long have you lived there?
15       A.  Just over a year.
16       Q.  Do you live there with anyone?
17       A.  I live alone.
18       Q.  Have you lived with anyone since you
19   were released from prison?
20       A.  Yes, I have.  I lived with my
21   sister, Vickie.
22       Q.  All right.  And when did you move in
23   with your sister, Vickie?
24       A.  On the same day I got released from
25   incarceration.

6

1        Q.  Where does she live?
2        A.  Just right down the road, in
3    Brandenburg.
4        Q.  Have you lived -- did you live there
5    at her house the entire time until you got
6    your own place?
7        A.  Yes, sir.
8        Q.  All right.  Is where you live a
9    house?
10       A.  It's a single-wide trailer.
11       Q.  Single-wide trailer?
12       A.  (Nods head)
13       Q.  Are you on a piece of ground or are
14   you in a trailer park?
15       A.  I'm on a piece of ground, five
16   acres.
17       Q.  Who owns that trailer and lot?
18       A.  My landlord's name is Roger Allen.
19       Q.  Had you known Mr. Allen before you
20   began renting the trailer?
21       A.  I briefly met him.  My sister,
22   Vickie, has known him for years.
23       Q.  Your first name, Garr, is a little
24   bit of an unusual name.  Can you tell me how
25   you got that name?

7

1        A.  It's an old family name.  It
2    actually originally comes from Scandinavia.
3    The English translation of it is spear and,
4    what I understand, what I was told when I
5    was younger, that the doctor that delivered
6    my grandmother's children, his name was
7    Garr.  So her last child, male, she named
8    him after the doctor.
9        Q.  All right.  And then you were named
10   after --
11       A.  My father.
12       Q.  -- your father.
13       A.  Yes.
14       Q.  Are you employed?
15       A.  Yes, I am.
16       Q.  Where do you work?
17       A.  I work out in Shepherdsville at a
18   warehouse for Geek Squad.
19       Q.  I'm sorry, I didn't understand.
20   Geek Squad?
21       A.  Geek Squad, yes.
22       Q.  Okay.  What do you do for Geek
23   Squad?
24       A.  I take refurbished computers and
25   laptops, and I put them inside boxes.

8

1    Q.  Is that sort of a factory setting
2  where you do that then?
3    A.  It's a warehouse.
4    Q.  Warehouse.
5    A.  Yes.
6    Q.  And you do that 40 hours a week?
7    A.  Well, right now, we're working 10
8  hours a day, five days a week, plus six days
9  on Saturdays.
10   Q.  Okay.  So you're getting overtime as
11  well?
12   A.  Yes, sir.
13       MR. BRUSTIN:  Objection to the form.
14  Are you getting paid overtime?  Is that the
15  question?
16       MR. ERVIN:  Yes.
17       THE WITNESS:  Yes.
18       MR. BRUSTIN:  Okay.
19   Q.  (BY MR. ERVIN)  What is your wage
20  there, sir?
21   A.  11.55 an hour.
22   Q.  Okay.  Do you own an automobile?
23   A.  Yes, sir, I do.
24   Q.  When did you obtain your current
25  driver's license?

9

1    A.  I'm trying to remember.  It was
2  shortly after I got out.
3    Q.  Okay.  When did you buy your
4  automobile?
5    A.  I guess about a year after I got
6  out.  I had another vehicle before the one I
7  have now --
8    Q.  All right.
9    A.  -- and traded it in.
10   Q.  How did you get the first vehicle
11  you had?
12   A.  Well, we was looking for another
13  automobile for me when I got out.  So we
14  found a used car lot, got a Mustang, and
15  drove that for about a year.  I like trucks,
16  so I traded that in for a pickup truck, the
17  four-wheel drive.  That's what I have now.
18   Q.  What is it you're driving now?
19   A.  A Ford Ranger, 2010.
20   Q.  How were you able to afford the
21  first vehicle?
22       MR. BRUSTIN:  Objection to the form.
23  You can answer if you understand.
24   A.  Well, it's like low payments.
25   Q.  Okay.

10

1    A.  Yes.
2    Q.  When did you first get a job after
3  you were released from prison?
4    A.  I worked for my brother-in-law,
5  Wayne Underwood.  He's a contractor.  He
6  does trim carpentry.
7    Q.  What did you do for Wayne?
8    A.  I was a general laborer helping out
9  other carpenters and, at the same time, I
10  was being trained to do carpentry.
11   Q.  Had you had any experience in
12  carpentry before?
13   A.  No, sir.
14   Q.  How long did you do that?
15   A.  About a year and a-half.
16   Q.  Did you go to work for Geek Squad
17  after you had worked in carpentry?
18   A.  Oh, no, sir.  I've worked for a
19  couple of other warehouses.
20   Q.  Were they all located in
21  Shepherdsville?
22   A.  One of them was.
23   Q.  Where was the other?
24   A.  The other one is in Riverport, in
25  Louisville.

11

1    Q.  But aside from the carpentry, have
2  you done any work outside of warehouse work?
3    A.  No.
4    Q.  Do you have your high school
5  diploma?
6    A.  Yes, sir, I do.
7    Q.  You got that from Doss?
8    A.  Yes.
9    Q.  What year did you graduate?
10   A.  1988.
11   Q.  Are you able to pay your rent by
12  yourself?
13   A.  Yes, sir.
14   Q.  And your payment on your truck?
15   A.  Yes, sir.
16   Q.  Okay.  Who keeps your checkbook?
17   A.  I do.
18   Q.  Are the utilities in your name at
19  that residence?
20   A.  Well, they're in my landlord's.  I
21  pay him $400 a month.
22   Q.  Okay.  So the 400 includes the rent
23  and the utilities?
24   A.  Yes, sir.
25   Q.  Okay.  How did you find the Geek

**12**

1    Squad job?
2        A.  Through a temp service.
3        Q.  What was the name of that service?
4        A.  Malone.
5        Q.  Had you gotten other jobs through
6    Malone?
7        A.  Yes, I have.  I'm trying to remember
8    the name of it now.  Game Stop.
9        Q.  Game Stop?
10       A.  Yes.
11       Q.  Do you feel like that -- do you like
12   your job?
13       A.  Yes, sir, I do.
14       Q.  Do you feel like it's the kind of
15   work that you're good and capable of doing?
16       MR. BRUSTIN:  Objection to the form.
17   If you understand what he's asking you, you
18   can answer.
19       A.  Yes, sir.  I like it.  I'm hoping
20   for full-time.
21       Q.  Okay.  Are you still on Malone's
22   payroll at present?
23       A.  Yes, sir.
24       Q.  Okay.  How long will that continue;
25   do you know?

**13**

1        A.  Well, until I get hired on
2    full-time.
3        Q.  Do you know when that might occur?
4        A.  I have no idea.
5        Q.  Have you had any difficulty getting
6    a job since you were released?
7        A.  Well, at first, yes.
8        Q.  What was the problem?
9        A.  Well, I was going around putting
10   applications in everywhere and everyone was
11   doing backgrounds checks, and that prevented
12   me from getting some jobs.
13       Q.  Can you tell me what job that you
14   applied for that you didn't get because of
15   it?
16       A.  Oh, I put applications in all over
17   Louisville, around Riverport, and no one
18   wanted to hire me because I had charges
19   pending against me.
20       Q.  Did anyone tell you that?
21       A.  There was a couple places did.
22       Q.  Can you tell me which places they
23   were?
24       A.  Oh, gosh.  I'm trying to remember.
25   One of them was a distillery where they

**14**

1    house whiskey barrels there.  The place
2    started with a D.  Something like Dragon or
3    something like that is the name of it.  It's
4    in Riverport.
5        Q.  Any other place that you recall
6    specifically?
7        A.  Yes.  Right now, I can't recall the
8    name of it.
9        Q.  Have you had any education past your
10   high school?
11       A.  No, sir.
12       Q.  Did you take any education or
13   vocational-type courses while you were in
14   prison?
15       A.  No, sir.
16       Q.  How did you spend your day while you
17   were in prison?
18       MR. BRUSTIN:  Objection to the form.
19   It calls for a narrative.  Do you understand
20   the question?
21       THE WITNESS:  Yes, sir.
22       MR. BRUSTIN:  Try to answer it the
23   best you can.
24       THE WITNESS:  Okay.  Well, I had a
25   job in prison.  I started out as a janitor,

**15**

1    and I moved on to being a grievance aide.  I
2    helped inmates with any complaints, problems
3    they'd have.  Worked in an office setting.
4    I would read books a lot on my free time.
5    Go out on the yard, walk the loop.
6        Q.  (BY MR. ERVIN)  Can you tell me,
7    what did you do as a grievance aide
8    specifically?  How would you help someone?
9        A.  Well, they'd come to me with any
10   type of problem.  I'd help them fill out
11   paperwork stating their complaint, the date,
12   if there's any witnesses, and I'd take it
13   and turn it in to the grievance clerk.
14       We'd talk about it, and then a boss
15   would come in who is a staff member.  The
16   grievance clerk was another inmate, but the
17   supervisor was a staff member of the prison,
18   and she'd take if it we couldn't handle it
19   and she'd take it to staff where we can't,
20   to settle the situation.
21       Q.  I've gathered, from what I've read
22   about this case and about you, in
23   particular, that you enjoy reading.
24       A.  Yes, sir, I do.
25       Q.  Was there a particular type of book

16

1    you enjoy reading?
2        MR. BRUSTIN:  Objection to the form.
3    Vague, overbroad.  Go ahead.  Answer, if you
4    can.
5        A.  Okay.  I like reading history,
6    especially ancient history.  I like studying
7    world religions and philosophies.
8        Q.  What are you currently reading?
9        A.  Well, right now, I just recently got
10   a book by Michael Harner called Way of the
11   Shaman.  It's a pretty interesting book.
12       Q.  All right.  And the shaman is sort
13   of an Indian physician --
14       A.  Yes, sir.
15       Q.  -- or doctor?  And you've had
16   occasion to study satanic religion; is that
17   correct?
18       A.  Yes, sir, in my earlier years.
19       Q.  How was it that you developed an
20   interest in that?
21       A.  Well, it's more of a process --
22       MR. BRUSTIN:  I'm going to object to
23   the form, but go ahead.
24       A.  Okay.  It's more of a process.  I've
25   always been interested in Native American

17

1    spirituality and, somewhere in high school,
2    someone introduced me to Wicca, which is a
3    nature-based, earth religion.  So that it's
4    a whole lot like the Native American
5    religion, but it's from Europe.  So I
6    started exploring that.
7        And there's warnings in the book to
8    stay away from the darker side of the
9    occult.  So I was kind of intrigued.  Okay,
10   what's the darker side?
11       I started exploring that, and that
12   led me to black magic witchcraft and, from
13   there, that's where I was introduced to
14   Satanism.
15       Q.  Okay.  Had you grown up following a
16   particular religion as a child?
17       A.  Yes, sir.  I was raised as Baptist.
18       Q.  Are your parents still living?
19       A.  No, sir.
20       Q.  Both of them are deceased?
21       A.  Yes, sir.
22       Q.  Were you baptized?
23       A.  No, I haven't been.
24       Q.  Go ahead.  So you transitioned into
25   reading about Satanism; is that correct?

18

1        A.  Yes, sir.
2        Q.  Did there come a point where you
3    would say you were a part of the religion?
4        MR. BRUSTIN:  Objection to the form.
5    Do you understand what he's asking you?
6        THE WITNESS:  Yes, sir.
7        MR. BRUSTIN:  Okay.  You can answer.
8        THE WITNESS:  Well, I started out
9    just studying for a while, you know, get to
10   know it better before I just jump into it,
11   and it sounded appealing to me, and
12   mysterious.  So I gave it a shot and started
13   practicing it for a while.
14       Q.  (BY MR. ERVIN)  All right.  What did
15   it mean to practice the religion?
16       A.  Just say the prayers from the
17   satanic bible, and the chants and
18   meditations.
19       Q.  Would you do that -- how frequently
20   would you do that?
21       A.  Well, in Satanism, there's six
22   different holidays, you know, six times a
23   year.  So that's when I would do them, about
24   six times a year.
25       Q.  Okay.  Did you engage in any study

19

1    between those six different dates?
2        A.  Well, I was always studying on the
3    occult and just gaining more knowledge.
4        Q.  Okay.  How would you do that?  What
5    materials would you use?
6        MR. BRUSTIN:  Objection.  Do you
7    want to put a time on this?
8        Q.  During the time that you were
9    practicing the satanic religion --
10       MR. BRUSTIN:  Well, we haven't put a
11   time on that.
12       MR. ERVIN:  Well, he's answering the
13   question.
14       Q.  (BY MR. ERVIN)  Do you recall when
15   you were practicing the satanic religion?
16       A.  Do you mean years or?
17       Q.  Yes, sir.
18       MR. BRUSTIN:  How old you were.
19       A.  I was about maybe 16, 17 years old
20   when I started.
21       Q.  All right.  You were born in -- was
22   it August --
23       A.  Yes, sir.
24       Q.  -- of 1969?
25       A.  Yes, sir.

20

1    Q.  So, in about 1985 is when you began,
2  to the best of your recollection?
3    A.  Yes, sir.  It's right around there.
4    Q.  And then for how long did you
5  practice?
6    A.  Until about the beginning or middle,
7  I guess, of January of 2001, 2002.  Not
8  about 2000 -- what am I saying?  1992.
9    Q.  Okay.  I was going to say, I believe
10  --
11    A.  Yeah.
12    Q.  -- I read in your testimony --
13    A.  Yes.
14    Q.  -- that mid-January or so of 1992 is
15  when you discontinued the practice.
16    A.  Yes, sir.
17    Q.  Why did you discontinue the
18  practice?
19    A.  It became less important to me after
20  I met Rhonda Warford.  You know, I was
21  spending more time with her, started liking
22  her a whole lot and started loving her, and
23  Satanism and the occult just became less
24  important to me.  I started slacking off on
25  rituals and just not really caring about it

21

1  much more.
2    Q.  When were the six holidays?
3    A.  Oh, gosh.  That's kind of jumping
4  around a little bit.  I don't know if I can
5  get them in order.
6    Q.  Don't have to be in any order.
7    A.  Okay.
8    Q.  Just as you recall it, sir.
9    A.  Okay.  October 31st, that's like one
10  of the big ones.  Halloween.  And April
11  30th, called Walpurgisnacht.  It's a German
12  word.
13    Q.  Do you know what that means?
14    A.  It has to do with Saint Walpurgis.
15  It's a celebration for her, and it somehow
16  became like a black magic celebration, I
17  don't know.  I can't really remember the
18  details.
19    Q.  All right.
20    A.  And Candlemas, which is February
21  2nd.  That originally started out like a
22  Catholic holiday or something, the best I
23  can remember.  And then there's the -- both
24  solstices and equinoxes.
25    Q.  What would you do on the solstice or

22

1  equinox?
2    A.  Well, pretty similar to any other
3  day that I would practice.  You know, do the
4  chants and the rituals from the satanic
5  bible.
6    Q.  What were the nature of the rituals
7  that you engaged in?
8    A.  Mostly just worship.
9    Q.  How would you do that?
10    A.  Just saying the rituals, ceremonies.
11  It's kind of hard really to remember
12  exactly.
13    Q.  Did you light candles?
14    A.  Oh, yes, sir.
15    Q.  Candles were a big part of it?
16    A.  Yes, sir.
17    Q.  And then when you say saying the
18  rituals, were there certain prayers that you
19  would recite or --
20    A.  Yes, sir.
21    Q.  And who were your prayers to?
22    A.  It was to Satan.
23    Q.  Are snakes or serpents part of the
24  satanic religion?
25    A.  No, sir.

23

1    Q.  Are you practicing any particular
2  religion now?
3    A.  No, sir.  I'm just practicing
4  meditation.
5    Q.  How often do you do your meditation?
6    A.  Every day.
7    Q.  When do you do it?
8    A.  Mostly in the mornings before I eat
9  breakfast.
10    Q.  How long do you meditate?
11    A.  Normally, right around 30 minutes.
12    Q.  Do you set a timer?
13    A.  No, sir.
14    Q.  When did you first meet Rhonda
15  Warford?
16    A.  Oh, gosh.  I think it was around
17  maybe September of 1991.
18    Q.  Had you had a girlfriend before
19  Rhonda?
20    A.  Yes, sir.
21    Q.  Who was that?
22    A.  Her name was Sherry Sterling, I
23  think is her last name.
24    Q.  And when did you go with her in
25  relationship to when you began going with

24

1 Rhonda?
2    A.  Well, we met in high school through
3 her brother.  I'm trying to remember.
4    MR. BRUSTIN:  He doesn't want you to
5 guess, but give him your best estimate if
6 you can tell him how long you thought you
7 were dating.
8    THE WITNESS:  We dated probably
9 about a year, year and a-half.
10    Q.  (BY MR. ERVIN)  Okay.  How long
11 after you stopped dating Sherry was it
12 before you started dating Rhonda?
13    A.  I guess probably a couple of years
14 most likely.
15    Q.  All right.
16    A.  I'm not for sure.
17    Q.  Had you dated anyone between Sherry
18 and Rhonda?
19    A.  No, sir.
20    Q.  And let me preface my next question
21 by saying this, Mr. Hardin.  Some of the
22 questions that are going to be asked of you
23 today will be personal.
24    It's not because we have a desire to
25 expose your personal life, but it's

25

1 necessary that it come out for us to
2 understand this case.  Okay?
3    A.  Okay.
4    Q.  And so I want to ask you, had your
5 relationship with Sherry, had that been a
6 sexual relationship?
7    MR. BRUSTIN:  So I'm going to object
8 to the question, and his motive for asking
9 you questions, don't worry about that.
10 Okay?  We can debate that.  You just answer
11 his question.  Okay?
12    THE WITNESS:  Okay.  Yes, sir.
13    Q.  (BY MR. ERVIN)  It had been?
14    A.  Yes, sir.
15    Q.  Okay.  Had you been engaged in a
16 sexual relationship with anyone other than
17 Sherry before you met Rhonda?
18    A.  Yes, sir.
19    Q.  Who was that?
20    A.  Oh, gosh.  I can't even remember her
21 name.
22    Q.  Okay.  Was that before or after
23 Sherry?
24    MR. BRUSTIN:  Objection to the form,
25 asked and answered.

26

1    A.  I think it was after.  It wasn't
2 really a relationship.  It was just sex.
3    Q.  Okay.  Was it a one-time occurrence
4 or was it someone who you met for a while?
5    A.  It was someone I knew for a while.
6    Q.  Okay.  Do you recall how long the
7 relationship lasted?
8    MR. BRUSTIN:  Objection to the form.
9    A.  I'd say right around a month or so.
10    Q.  How did you meet Rhonda?
11    A.  I met her through Jeff Clark.
12    Q.  And do you recall the circumstances
13 of that first meeting?
14    A.  Well, we met actually in Jeff's car.
15 Jeff went and picked me up.  Then we went
16 and picked Michelle, Rhonda's sister, up
17 with Rhonda.  We just went out running
18 around one night, and that's how I met her.
19    Q.  All right.  How did you know
20 Michelle, Rhonda's sister?
21    A.  Through Jeff.
22    Q.  Okay.  So had Jeff known Michelle
23 before you met Rhonda?
24    MR. BRUSTIN:  Objection to the form.
25 Do you know how Jeff knew her?

27

1    THE WITNESS:  Not exactly.
2    MR. BRUSTIN:  He doesn't want you to
3 guess.  Tell him what you know.
4    THE WITNESS:  I don't know --
5    Q.  (BY MR. ERVIN)  My question was just
6 simply this.  Had Jeff known Michelle before
7 you were introduced to Rhonda?
8    A.  Yes.
9    MR. BRUSTIN:  Objection to the form.
10    Q.  What did you do the first time you
11 met Rhonda?  What did you all do?
12    A.  Well, we just talked a little bit,
13 got to know each other.  I liked her and she
14 liked me.
15    Q.  Where were you living at the time?
16    A.  At the time, I was living with my
17 parents.
18    Q.  Were you employed?
19    A.  Yes, I was.
20    Q.  Where were you employed?
21    A.  I was working for a company called
22 Town Talk.
23    Q.  And what did you do for them?
24    A.  I worked in the embroidery section.
25 I was the one who would deliver work to all

28

1    the machines where they embroidered them.
2    Q.  Okay.  Did they sew labels on
3    uniforms, or what type of embroidery?
4    A.  Just all kinds of things for country
5    clubs and just about anything.
6    Q.  Where was that located?
7    A.  In Riverport, in Louisville.
8    Q.  Did you have an automobile?
9    A.  Yes, sir.
10   Q.  What did you have?
11   A.  I had a Monte Carlo.  I can't recall
12   the year right now.
13   Q.  Is that what you drove to and from
14   work?
15   A.  Yes, sir.
16   Q.  Tell me, how did your relationship
17   with Rhonda progress?
18   MR. BRUSTIN:  Objection to the form.
19   Do you understand what he's asking you?
20   THE WITNESS:  Yes, sir.
21   MR. BRUSTIN:  Okay.  Go ahead and
22   answer.
23   THE WITNESS:  Well, our relationship
24   started getting closer as we started liking
25   each other more and more and started seeing

30

1    A.  Oh, no, she didn't.
2    Q.  Did you invite her to?
3    A.  No.
4    Q.  Why?
5    A.  I just always preferred to practice
6    alone.
7    Q.  There came a time where you -- or
8    did there come a time where you put a tattoo
9    on Rhonda?
10   A.  Yes, sir.
11   Q.  When was that?
12   A.  It was shortly after we met.  She
13   asked me if I'd put it on her, so I did.
14   Q.  What did she ask you for?  What did
15   she ask you to do?
16   A.  She asked me if I'd put a tattoo on
17   her.
18   MR. BRUSTIN:  Are you asking what
19   the tattoo was?
20   MR. ERVIN:  No.
21   Q.  (BY MR. ERVIN)  Did she ask you just
22   -- did she ask you generally just put a
23   tattoo on me or did she ask for a specific
24   tattoo?
25   A.  Well, she asked for a specific

29

1    more of each other pretty much every day.
2    Q.  (BY MR. ERVIN)  Did you -- you would
3    have had a -- you met her in September of
4    1991, as I recall; is that right?
5    A.  Yes, sir.
6    Q.  So the first -- actually, the first
7    holiday you would have had in the satanic
8    worship would have been the fall equinox.
9    A.  Yes, sir.
10   Q.  Is that right?
11   A.  Yes, sir.
12   Q.  And did you practice it on that
13   date?
14   A.  I can't remember if I did or not.
15   Q.  All right.  Then what about
16   Halloween of that year?  Do you recall
17   whether you practiced it on that date?
18   A.  The best I can remember, I think I
19   did.
20   Q.  Okay.
21   MR. BRUSTIN:  He doesn't want you to
22   guess.  He wants to know if you remember it.
23   Q.  Your best recollection is fine.  Do
24   you recall whether Rhonda participated with
25   you?

31

1    tattoo.
2    Q.  And what was that?
3    A.  An inverted cross.
4    Q.  What is an inverted cross?  Does
5    that have a specific meaning to your
6    knowledge?
7    MR. BRUSTIN:  Objection to the form.
8    You can answer.
9    A.  Yes, sir.
10   Q.  And what is that?
11   A.  It means anti-Christian.
12   Q.  Is it generally associated with
13   Satanism?
14   MR. BRUSTIN:  Objection to the form.
15   You can answer.
16   A.  Yes, sir.  Most of the time.
17   Q.  Is that the way you interpreted it?
18   A.  Yes, sir.
19   Q.  Okay.  Did you have any tattoos or
20   body marks that indicated an inverted cross?
21   MR. BRUSTIN:  Objection to the form.
22   Are you asking what tattoos he had then,
23   now?  Would you put it in time, please?
24   MR. ERVIN:  I said did you, so I --
25   I'll be more specific.

32

1    Q.  (BY MR. ERVIN)  Did you then have
2  any tattoos or body marks of an inverted
3  cross?
4    MR. BRUSTIN:  Objection to the form.
5  You can answer.
6    A.  No, sir.  Not of an inverted cross.
7    Q.  Do you now?
8    A.  No, sir.
9    Q.  Did you have any tattoos or body
10  marks associated with Satanism?
11    MR. BRUSTIN:  Objection to the form.
12  You can answer.
13    A.  Yes, I did.  I used to have 666 on
14  my arm here (indicating).  It was a homemade
15  tattoo.  It's covered up now with a wolf's
16  head.
17    Q.  Okay.  Who made the tattoo
18  originally?
19    A.  The 666 tattoo?
20    Q.  Yes, sir.
21    A.  I did.
22    Q.  How did you -- how do you make a
23  homemade tattoo?
24    A.  You take a needle, wrap thread
25  around the point and dip it in Indian ink

33

1  and just (gestures).
2    Q.  What's Indian ink?
3    A.  It's an ink you can use for
4  tattooing.  It's not toxic, so you can use
5  it safely.
6    Q.  Where did you get Indian ink?
7    A.  You can get them like at any art
8  supply place.
9    Q.  Did you have any other tattoos or
10  markings on your body at the time that you
11  were dating Rhonda?
12    A.  Yes, sir.
13    MR. BRUSTIN:  Objection the form.
14  Go ahead.
15    A.  Yes, sir.
16    Q.  What was that?
17    A.  It's a hooded figure.  A black hood
18  with glowing red eyes coming out from under
19  the hood.
20    Q.  And what was that symbolic of?
21    MR. BRUSTIN:  Objection to the form.
22  You can answer.
23    A.  At the time, I liked it because it
24  just kind of -- just evil-looking,
25  mysterious-looking.

34

1    Q.  Would it be symbolic of Satan or the
2  devil?
3    MR. BRUSTIN:  Objection to the form.
4    A.  I didn't think so.  Just something
5  mysterious and evil-looking.
6    Q.  Did you get that tattoo as a part of
7  your satanic worship?
8    A.  Well, not really as part of it.  I
9  just wanted to get a tattoo.  It was kind of
10  something dark.
11    Q.  All right.  Was that a professional
12  tattoo or did you make that?
13    A.  It was a professional tattoo.
14    Q.  When did you get that?
15    A.  I got it when I was 19 years old, I
16  believe.
17    Q.  Were your parents aware of that?
18    A.  Yes, sir.
19    MR. BRUSTIN:  Aware of the tattoo?
20    MR. ERVIN:  Yes.
21    Q.  (BY MR. ERVIN)  What was your
22  parents' opinion of the tattoo?
23    MR. BRUSTIN:  Objection to the form.
24  If you know, you can answer.
25    A.  They didn't like it.

35

1    Q.  Were they aware that you had begun
2  the practice of satanic worship?
3    A.  Yes, sir.
4    Q.  And what was their feeling on that?
5    MR. BRUSTIN:  Objection to the form.
6    A.  They didn't like that whatsoever.
7    Q.  What did they tell you about that --
8    MR. BRUSTIN:  Objection.
9    Q.  -- or say to you about that?
10    MR. BRUSTIN:  Objection to the form.
11    A.  I can't remember what they said.
12    Q.  But you understood they did not
13  approve.
14    A.  Yes, sir.
15    Q.  Did anyone other than your parents
16  tell you that they didn't approve of your
17  satanic worship?
18    MR. BRUSTIN:  Objection the form.
19    A.  No one else ever spoke to me about
20  it.
21    Q.  Did Jeff Clark ever talk to you
22  about it?
23    A.  No, sir.
24    Q.  Did his parents --
25    MR. BRUSTIN:  I'm just -- hold on a

36

1    second.  Are you saying he didn't or you
2    don't remember if he did?  Be clear.
3         MR. ERVIN:  Counsel, I asked him the
4    question and he answered it.  You're now
5    asking or feeding him the opportunity to
6    come up with qualifications.
7         MR. BRUSTIN:  No.  I wanted to make
8    sure he under --
9         MR. ERVIN:  I object to that.
10        MR. BRUSTIN:  I want to -- for the
11   reasons I stated on the record, I want to
12   make sure he's listening to your question
13   and understands it.
14        MR. ERVIN:  Well, I understand and
15   --
16        MR. BRUSTIN:  I assume you want --
17        MR. ERVIN:  -- that's his
18   responsibility --
19        MR. BRUSTIN:  I assume you want --
20        MR. ERVIN:  -- from the get go.
21        MR. BRUSTIN:  -- accurate answers,
22   correct?
23        MR. ERVIN:  Absolutely.  And I feel
24   I --
25        MR. BRUSTIN:  So let's do that.

37

1         MR. ERVIN:  -- got an adequate
2    answer.  It was a straightforward answer.
3    It didn't need to be qualified.
4         MR. BRUSTIN:  There's no question
5    pending.  Ask another question.
6         Q.  (BY MR. ERVIN)  Did Jeff Clark's
7    mother ever talk to you about satanic
8    worship?
9         MR. BRUSTIN:  Objection to the form.
10   Tell him what you recall.
11        A.  No, sir, she never did.
12        Q.  Okay.  Did Jeff Clark ever
13   participate in satanic ritual with you?
14        A.  No, sir.
15        MR. SLOSAR:  Just for the record, on
16   behalf of Plaintiff Clark's team, we are
17   joining all the objections made by counsel
18   for Mr. Hardin.  I assume that the
19   defendants are okay with that.
20        MR. ERVIN:  Fine by me.
21        MR. BRUSTIN:  And I assume that's
22   the same -- we had the same understanding
23   for yesterday.
24        MR. ERVIN:  Yes, sir.  Yes, sir, it
25   was.

38

1         Q.  (BY MR. ERVIN)  Do you know why
2    Rhonda asked you to put an inverted cross on
3    her?
4         MR. BRUSTIN:  Objection to the form.
5    Calls for speculation.  Tell him what you
6    know, if anything.
7         A.  Well, she never gave me an
8    explanation.  She just asked me and I just
9    -- okay.
10        Q.  She knew that you were involved in
11   satanic worship, correct?
12        MR. BRUSTIN:  Objection to the form.
13   Go ahead.
14        A.  Yes, sir.
15        Q.  And she gave you no reason why she
16   wanted an inverted cross.
17        MR. BRUSTIN:  Objection to the form,
18   asked and answered.  Tell him again.
19        A.  No, sir, she didn't.
20        Q.  How did you put the cross on Rhonda?
21        A.  The same way I tattooed the 666.
22   With needle and thread -- thread wrapped
23   around it.
24        Q.  Do you know whether Rhonda ever
25   participated in satanic ritual?

39

1         A.  I have no idea.
2         Q.  Did she ever tell you that she had?
3         A.  No, sir.
4         Q.  Did she ever tell you that she
5    wanted to?
6         A.  No, sir.
7         Q.  But she wanted a symbol associated
8    with satanic worship tattooed on her body.
9         MR. BRUSTIN:  Objection to the form.
10        Q.  Is that correct?
11        A.  Yes, sir.
12        Q.  Aside from candles, were there any
13   other materials that you would use during
14   the course of the practice of the rituals?
15        A.  Well, there are certain things you
16   have besides candles, like a chalice or like
17   a ritual knife or short sword.
18        Q.  What would be the purpose of the
19   chalice?
20        A.  It holds the liquid.  You'll drink
21   wine out of it or whatever you want.
22        Q.  What would be the purpose of the
23   knife?
24        A.  You use that -- basically point to
25   the directions.  You'd use a knife kind of

40

1    like some people would use what's called a
2    magic wand.  You just focus and directs your
3    attention to one point.
4        Q.  What type of knife did you use?
5        A.  I used a dagger.
6        Q.  Usually, when I think of a dagger, I
7    think of something straight with an edge on
8    both sides of it.
9        A.  Yes, sir.
10       Q.  All right.  It came to a point; is
11   that correct?
12       A.  Yes, sir.
13       Q.  And did it have finger guards on it?
14       A.  Yes, sir.
15       Q.  And how long was the blade on that?
16       A.  I can't remember.  I don't know.
17       Q.  Okay.  It was bigger than an average
18   pocket knife, wasn't it?
19           MR. BRUSTIN:  Objection to the form.
20       A.  Yes, sir.
21       Q.  All right.  You know, a dollar bill
22   is about six inches long.  Was it about the
23   size of a dollar bill?
24           MR. BRUSTIN:  Objection to the form.
25       A.  The blade itself?

41

1        Q.  Yes, sir.
2        A.  Yes, sir.
3        Q.  All right.
4            MR. BRUSTIN:  That was a 10, by the
5    way.
6            MR. ERVIN:  A 10.  A dollar's the
7    same.
8            MR. BOND:  Maybe it was 10 times as
9    long.
10       Q.  (BY MR. ERVIN)  When did you get
11   that knife?
12           MR. BRUSTIN:  The dagger.
13       A.  I can't recall.  I don't know.
14       Q.  Okay.  Was it the -- did you
15   routinely use that knife or dagger during
16   your rituals?
17       A.  Yes, sir.
18       Q.  Are there books that taught you how
19   to use the dagger in your rituals?
20           MR. BRUSTIN:  Objection to the form.
21       A.  Yes, sir.
22       Q.  What specifically did you read about
23   the use of daggers in the rituals?
24       A.  Well, throughout the occult, the
25   most preferred knife to use for rituals are

42

1    daggers.
2        Q.  When you refer to the occult, is
3    that what you call the satanic religion or
4    the worship of Satan?
5            MR. BRUSTIN:  Objection to the form.
6    It mischaracterizes his testimony.  Explain
7    what you mean by occult again.
8        A.  Well, occult is more of an umbrella
9    term.  Satanism is part of the occult, yes.
10       Q.  Okay.  What specifically were you to
11   do with the dagger during the course of a
12   ritual?
13           MR. BRUSTIN:  Objection to the form.
14       A.  Well, as I was saying earlier, it's
15   used to just basically point out like the
16   four carnal directions and then to direct
17   your focus in just one area (gestures).
18   Just focus the energy.
19       Q.  Okay.  Would you spin it and focus
20   your energy in the direction where it
21   stopped randomly?  How would you do this?
22           MR. BRUSTIN:  Objection to the form.
23       A.  No.
24           MR. BRUSTIN:  Mischaracterizes his
25   testimony.

43

1        A.  No, sir.
2            MR. BRUSTIN:  Tell him again how you
3    would use the knife.
4        A.  You'd hold it in your hand.  Usually
5    in both hands --
6        Q.  Yes, sir.
7        A.  -- with the point out, and you're
8    calling out the four directions just
9    focusing all the -- your attention -- in
10   that direction.
11       Q.  Did you use it the same way each
12   time that you used it?
13       A.  Yes, sir.
14       Q.  Did you ever use it for any other
15   purpose in the rituals?
16       A.  No, sir.
17       Q.  Did you have pets growing up?
18       A.  Yes, sir.
19       Q.  Do you have a pet now?
20       A.  No, sir.
21       Q.  What type of pets did you have
22   growing up?
23       A.  Dogs.
24       Q.  Anything other than a dog?
25       A.  To the best of my recollection, no,

**44**

1    sir.  Just dogs.
2        Q.  Did you have knives or access to
3    knives as you grew up?
4        MR. BRUSTIN:  Objection to the form.
5    You want to know about knives during his
6    entire childhood, adulthood?
7        MR. ERVIN:  As he grew up --
8        MR. BRUSTIN:  Objection to the form.
9        MR. ERVIN:  -- from a child to an
10   adult.
11       THE WITNESS:  Yes, sir.
12       Q.  (BY MR. ERVIN)  What type of knives
13   did you have?
14       A.  I grew up as an outdoorsman, hunting
15   and fishing.  So I had hunting knives,
16   pocket knives.
17       Q.  Okay.  How many knives would you say
18   that you had at the time that you were
19   dating Rhonda?
20       A.  Oh, I've never really counted them.
21   I don't know if it was a dozen knives or
22   more.
23       Q.  A dozen or more would be your best
24   estimate?
25       A.  Yes.

**45**

1        MR. BRUSTIN:  Objection to the form.
2        Q.  When did you first begin to hunt?
3        A.  I wasn't even a teenager yet.  In my
4    pre-teens, I'd say.
5        Q.  All right.  Who did you hunt with?
6        A.  Family, relatives who hunted.
7        Q.  Okay.  What did you hunt?
8        A.  I started out hunting squirrels and
9    rabbits.
10       Q.  What firearm did you use?
11       A.  Mostly a .410 shotgun.
12       Q.  Did you ever hunt with anything
13   other than a .410?
14       A.  Yes, sir.
15       Q.  What was that?
16       A.  I hunted with a high-powered rifle.
17   Hunt deer.
18       Q.  Did you ever kill a deer?
19       A.  Yes, sir.
20       Q.  How old were you when you got your
21   first deer.
22       A.  I was in high school.  I can't
23   remember what age.
24       Q.  It was buck only then, I believe,
25   wasn't it?

**46**

1        A.  Yes, sir.
2        Q.  You got a buck?
3        A.  Yes, sir.
4        Q.  Did you kill more than one deer?
5        A.  No, sir.
6        Q.  You killed only the one deer?
7        A.  Yes, sir.
8        Q.  All right.  Did you clean the deer?
9        A.  I helped.  I didn't know how, so I
10   had to watch how it's done.
11       Q.  All right.  Who helped you clean
12   your deer?
13       A.  One of my relatives.  An uncle, I
14   believe, who helped me.
15       Q.  Do you recall his name?
16       A.  I'm trying to remember.  I've had
17   relatives who's died and I'm trying to --
18   that's bad.  I can't remember his name.
19       MR. BRUSTIN:  That's okay.  We can
20   leave it blank and if you remember it --
21       THE WITNESS:  Okay.
22       MR. BRUSTIN:  -- you can put it in.
23       Q.  (BY MR. ERVIN)  The rifle that you
24   used to kill the deer, was it your rifle?
25       A.  No, sir.

**47**

1        Q.  Had you borrowed it?
2        A.  Yes, sir.
3        Q.  Who did you borrow it from?
4        A.  From the same uncle.
5        Q.  Okay.  The .410, was it yours?
6        A.  Yes, sir.
7        Q.  How did you get that gun?
8        A.  My parents got it for me for
9    Christmas one year.
10       Q.  Did you own any other firearms?
11       A.  No, sir.
12       Q.  From the time you got the .410 until
13   the time that you began dating Rhonda, did
14   you have occasion to own any other firearms?
15       A.  No, sir.  Just that one .410.
16       Q.  Did you have a BB gun?
17       A.  I did when I was younger.  Long
18   before I ever met Rhonda.
19       Q.  Yes, sir.  How old were you when you
20   got a BB gun?
21       A.  I can't remember my exact age.
22       Q.  How many BBs do you guess that you
23   shot through that gun?
24       MR. BRUSTIN:  Objection to form.
25       A.  I don't know.  Probably thousands.

48

1    Q.  Thousands.  Did you ever shoot
2  birds?
3    A.  Oh, no, sir.  I was taught not to
4  kill anything unless you plan on eating it.
5    Q.  All right.  So no black birds or
6  anything.
7    A.  No, sir.
8    Q.  All right.  Did you ever shoot birds
9  with your .410?
10    A.  No, sir.
11    Q.  Did you ever hunt on your own with
12  the .410?
13    A.  I did once, yes.
14    Q.  All right.  What was that occasion?
15    A.  It was rabbit hunting.
16    Q.  What about deer hunting?  Were you
17  alone at that time or with your uncle?
18    A.  With my uncle.
19    Q.  Were you all in a stand together or
20  --
21    A.  No, we was in a ground blind.
22    Q.  Ground blind?  Do you recall -- I
23  may have asked -- but what your age was when
24  you shot the deer?
25    A.  I just remember I was in high

49

1  school.  I can't remember what age I was.
2    Q.  Okay.  Were there any rituals that
3  went along with the cleaning of the deer?
4    A.  No, sir.
5    Q.  Okay.  Just a matter of getting the
6  deer cleaned and hung?
7    A.  Yes, sir.
8    Q.  All right.  Did you all skin the
9  deer yourself?
10    A.  Yes, sir.
11    Q.  Cut it up yourself?
12    A.  Yes, sir.
13    Q.  Did you eat the deer?
14    A.  Yes, sir.
15    Q.  Did you like it?
16    A.  Very much, yes.
17    Q.  Have you had occasion to deer hunt
18  since you've been released?
19    A.  No, I haven't.
20    Q.  Do you have the desire to go?
21    A.  I'd like to go deer hunting, yes.
22    Q.  Do you own any firearms now?
23    A.  Yes, sir, I do.
24    Q.  What are the firearms you own now?
25    A.  Well, they belonged to my father.

50

1  Two revolvers.  I've got a Colt .45 and a
2  .41 Magnum.
3    Q.  The .41's a Smith?
4    A.  Ruger, I think.
5    Q.  A Ruger?
6    A.  Yes, sir.
7    Q.  What about the .45?
8    A.  It's Colt.
9    Q.  It's a Colt?
10    A.  Yes, sir.
11    Q.  Is it a single-action?
12    A.  No, sir.  It's a revolver.
13    Q.  During the time that you were dating
14  Rhonda, was there ever a time that you and
15  she argued over something?
16      MR. BRUSTIN:  Objection to the form.
17  You can answer.
18    A.  Yes, we've had a couple of
19  disagreements.  Everyone has disagreements
20  in relationships, so.
21    Q.  Sure.
22    A.  Yes.
23    Q.  Can you identify for us what the
24  disagreement or disagreements were?
25    A.  I -- now, I can't recall what it

51

1  was.
2    Q.  Did Rhonda -- had she dated before
3  she dated you?
4      MR. BRUSTIN:  Objection to the form.
5    A.  Yes, sir.
6    Q.  She'd had other boyfriends?
7      MR. BRUSTIN:  Objection to the form.
8    A.  Yes, sir.
9    Q.  And were you aware of any of the
10  former boyfriends that she had had?
11    A.  She told me about one of them.
12    Q.  All right.  And who was that?
13    A.  I believe his name is James Terrell
14  (phonetic).
15    Q.  James Terrell?
16    A.  Yes.
17    Q.  Or Tyrell (phonetic)?
18    A.  Tyrell.  I don't know how to say his
19  last name.
20    Q.  All right.  And what did she tell
21  you about him?
22    A.  He mistreated her.
23    Q.  Did she tell you how he mistreated
24  her?
25    A.  He'd hit her and she -- he shoved

52

1    her off the front porch once.
2        Q.  How did that make you feel?
3        A.  It made me angry.
4        Q.  Did you ever have occasion to meet
5    him?
6        A.  No, I've never met him.
7        Q.  Did you want to meet him to express
8    your anger?
9        MR. BRUSTIN:  Objection to the form.
10       A.  Well, I thought it'd be best that I
11   don't meet him.
12       Q.  Well, why was that?
13       MR. BRUSTIN:  Objection to the form.
14       A.  We might end up getting into a
15   physical conflict with each other.
16       Q.  And that would be because of your --
17   the way you felt about Rhonda?
18       MR. BRUSTIN:  Objection to the form.
19       A.  Yes, sir.
20       Q.  Okay.  Did you ever have any
21   disagreements with Rhonda about her former
22   boyfriends or Mr. Tyrell?
23       MR. BRUSTIN:  Objection to the form.
24   You can answer.
25       A.  No, sir.

53

1        Q.  Do you recall any other matter for
2    which you may have had a disagreement with
3    Rhonda?
4        MR. BRUSTIN:  Objection to the form.
5    He hasn't told you about any disagreements
6    he had with Rhonda.  Do you remember any?
7        THE WITNESS:  No, I can't remember
8    what they were.
9        Q.  (BY MR. ERVIN)  Do you recall
10   whether Rhonda ever became concerned during
11   your relationship that she may have been
12   pregnant?
13       A.  No.
14       MR. BRUSTIN:  Objection to the form.
15   You can answer.
16       A.  No, sir.
17       Q.  (BY MR. ERVIN)  Did she --
18       MR. BRUSTIN:  No, sir, that she
19   didn't?  Is that what you're saying?
20       THE WITNESS:  No, she didn't tell me
21   she was pregnant.
22       Q.  (BY MR. ERVIN)  Was that ever a
23   concern for you?
24       MR. BRUSTIN:  Objection to the form.
25   Was what a concern for him?

54

1        Q.  (BY MR. ERVIN)  The fact that she
2    may become pregnant, was that ever a concern
3    for you during the course of your
4    relationship with her?
5        MR. BRUSTIN:  Objection to the form.
6    You can answer.
7        A.  No, sir.
8        Q.  What kind of birth control was
9    Rhonda taking?
10       A.  None that I was aware of.  I always
11   used a condom.
12       Q.  You faithfully used condoms?
13       A.  Yes, sir.
14       Q.  What condoms did you use?
15       MR. BRUSTIN:  Objection to the form.
16   You can answer if you remember.
17       A.  Ones I use now.  Trojan.
18       Q.  Where did you purchase them?
19       A.  The drugstore.
20       Q.  Are you in a relationship now?
21       A.  Not at the moment.
22       Q.  Have you been since you've been
23   released from prison?
24       A.  Yes, sir.
25       Q.  With whom?

55

1        A.  Two different women.
2        Q.  How did you meet these women?
3        A.  Well, one of them, Robin Heitz, I
4    met her through my sister, Vickie.  They
5    used to work together.  She likes the
6    outdoors and I like the outdoors, so Vickie
7    introduced us.
8        Q.  All right.  Who discontinued the
9    relationship?
10       A.  I did.
11       Q.  And was there a reason?
12       A.  Well, our relationship we had just
13   kind of faded away.
14       Q.  Who was the other person?
15       A.  The other woman was named Dana
16   Basham.
17       Q.  How did you meet Dana?
18       A.  Through my sister, Vickie, again.
19   They worked together at the bakery where
20   they work now.
21       Q.  That relationship's no longer,
22   though?
23       A.  Correct.
24       Q.  Why was that relationship ended?
25       A.  I had to break up with her because

56

1  of her family.  They like too much drama; I
2  don't.
3    Q.  How would you describe -- would you
4  describe your relationship with Jeff Clark
5  as being a close relationship?
6    MR. BRUSTIN:  Objection to the form.
7  Are you asking today?  Are you asking five
8  years ago?  1992?  What are you asking?
9    Q.  In 1991, how would you describe your
10  relationship with Jeff Clark?
11    MR. BRUSTIN:  Objection to the form.
12  During the entire year?
13    Q.  In 1991, how would you describe your
14  relationship to Jeff Clark?
15    MR. BRUSTIN:  Same objection.
16    A.  We were pretty close.  We were like
17  brothers.
18    Q.  All right.  Would you see each other
19  generally daily?
20    MR. BRUSTIN:  Objection to the form.
21  He's asking you about the entire year of
22  1991 now.
23    A.  Not daily, but pretty often.
24    Q.  All right.  Was there a -- and when
25  did you first meet Jeff?

57

1    A.  We met in high school.
2    Q.  Do you recall about what year of
3  high school?
4    A.  No, I can't.  I don't know.
5    Q.  Did you have classes together in
6  high school?
7    A.  No, sir.
8    Q.  How was it that you met?
9    A.  We rode the same school bus.
10    Q.  Did you all live close together?
11    A.  Yes, sir.
12    Q.  How far were your houses from one
13  another?
14    A.  Oh, he lived about two blocks away
15  from where I lived.
16    Q.  So you could walk to one another's
17  home?
18    A.  Yes, sir.
19    Q.  Were you always good friends?
20    MR. BRUSTIN:  Objection to the form.
21  You mean from the time they met until today?
22    Q.  From the time you met until the time
23  you started dating Rhonda?
24    A.  Yes, sir.
25    Q.  Was there ever a time when you all

58

1  didn't associate with one another?
2    MR. BRUSTIN:  Objection to the form.
3    Q.  And by that, I mean, a period of
4  months or years.
5    A.  Yes, sir.
6    Q.  When was that?
7    A.  It's when -- when he met Amy
8  Remsburg or whatever her last name is.
9    Q.  Yes, sir.
10    A.  They got married and that's the last
11  I'd seen of him until his marriage came to
12  an end.
13    Q.  How long did the marriage last?
14    A.  I have no idea.
15    Q.  What's your best recollection of how
16  long a period that was?
17    MR. BRUSTIN:  Objection to the form.
18    A.  Oh, honestly, I don't even know when
19  he did get married.  You know, I wasn't
20  invited to the wedding or nothing.  He just
21  kind of disappeared out of my life for a
22  while.
23    Q.  Do you know when that was in
24  relationship to when you met Rhonda?
25    MR. BRUSTIN:  Objection to the form,

59

1  foundation.
2    A.  I can't recall exactly how long it
3  was.
4    Q.  Do you recall whether his mother had
5  ever expressed a concern to your parents
6  about your practice of satanic worship?
7    MR. BRUSTIN:  Objection to the form.
8  Calls for speculation.
9    A.  I have no idea.  My parents never
10  said anything to me about her saying
11  anything, so I don't know.
12    Q.  Okay.  Did Jeff Clark ever tell you
13  that he didn't like your practice of satanic
14  worship?
15    MR. BRUSTIN:  Objection to the form.
16  You can answer.
17    A.  Yes, sir.
18    Q.  When was that?
19    A.  It was before I moved in the trailer
20  with him.
21    Q.  How long before you moved in the
22  trailer did he tell you that?
23    A.  I'm wanting to say a month, but now
24  I'm not real sure.
25    Q.  And so were there any -- what was

60

```
1   the purpose of him telling you that; do you
2   know?
3        MR. BRUSTIN:  Objection to the form.
4   Do you know why he told you that?
5        THE WITNESS:  No, I don't.
6        Q.  (BY MR. ERVIN)  How did it come up
7   that he told you that?
8        A.  I can't really recall right now.
9        Q.  You just recall that he told you he
10  didn't like it.
11       A.  Yes.
12       MR. BRUSTIN:  Objection to the form.
13       Q.  And the best of your recollection,
14  he told you that a month before you moved
15  into the trailer.
16       MR. BRUSTIN:  Objection to the form.
17  It's an approximation, as you know.
18       A.  Yes, sir.
19       Q.  How was it that you moved into the
20  trailer?
21       MR. BRUSTIN:  Objection to the form.
22  You mean, did he have a moving truck?  Do
23  you mean -- what do you mean?  I don't
24  understand the question.
25       Q.  How was the decision made that you
```

61

```
1   would move into the trailer?
2        A.  He asked me if I wanted to move out
3   of my parents' house, and we'd live
4   together.
5        Q.  When was that?
6        MR. BRUSTIN:  Objection to the form,
7   foundation.
8        A.  I don't remember the month, but it
9   was in 1991.
10       Q.  Were you dating Rhonda at the time?
11       MR. BRUSTIN:  Objection to the form.
12  You're asking when he first moved in?
13       MR. ERVIN:  Yes.
14       THE WITNESS:  It's close to about
15  the same time we met.
16       Q.  (BY MR. ERVIN)  Did you have an
17  arrangement when you moved in the trailer in
18  terms of sharing rent and expenses?
19       A.  Yes, sir.
20       Q.  What was that arrangement?
21       A.  We'd pay half and half.
22       Q.  Okay.  Were you employed at the time
23  that you moved in?
24       A.  Yes, sir.
25       Q.  And where were you employed at that
```

62

```
1   time?
2        A.  I was working for the Town Talk
3   company.
4        Q.  And I apologize for my lapse of
5   memory.  Was that warehouse work?
6        A.  No, sir.  It was factory work.
7        Q.  Factory work.  And you were doing
8   what?
9        A.  I was working in the embroidery
10  section.
11       Q.  Right.
12       A.  Yeah.
13       Q.  And you would carry the materials to
14  them.
15       A.  Yes, sir.
16       Q.  And how long did you have that job?
17       A.  I had it -- I can't -- it was about
18  a year.  Maybe a year and a-half.
19       Q.  Did you continue to work that job
20  after you moved in with Jeff Clark?
21       A.  Yes, I did, until my car broke down
22  on me and I wasn't able to get to work.  So
23  I lost my job.
24       Q.  Where was the -- did you say that
25  factory was at Riverport?
```

63

```
1        A.  Yes, sir.
2        Q.  How far was Riverport from where you
3   all lived?
4        A.  Probably about a 30-minute drive.
5        Q.  What was the problem with your car?
6        A.  Well, something I've never heard of
7   before.  The distributor cap somehow came
8   loose and it turned, you know, from just the
9   vibration in the motor, and it lost the
10  connection with the motor and that's like
11  the electrical system on the car.  So my car
12  wouldn't start.
13       Q.  How'd you find out it was the
14  distributor cap?
15       A.  Just by tinkered -- excuse me --
16  tinkering around with everything and
17  discovered that it was loose.
18       Q.  Now, Jeff had had some mechanic
19  experience, hadn't he?
20       A.  Yes, sir.
21       Q.  Did he help you figure out what was
22  wrong with it?
23       A.  Yes, he did.
24       Q.  Did you all get it running?
25       A.  Yes, we did.
```

64

1    Q. How long did it take to get it
2  running?
3    A. Just a few minutes.
4    Q. Okay. In terms of from when it
5  first broke down until you got it running,
6  how long was that?
7    A. Probably about a week.
8    Q. Did you have any other problems with
9  your car after that?
10   A. No, sir.
11   Q. Was your car running during the
12 entire period -- aside from that breakdown
13 -- was your car running during the entire
14 time that you dated Rhonda Warford?
15   MR. BRUSTIN: Objection to the form.
16   A. It was running right up until about
17 the end. That's when my car broke down
18 right before she was killed.
19   Q. Okay. What was the matter with your
20 car?
21   A. It's the same problem. The
22 distributor cap. It was just that one
23 occasion.
24   Q. Okay. Were you able to fix it
25 again?

65

1    A. Well, it just happened that once,
2  but yes.
3    MR. BRUSTIN: I think you're missing
4  the timing.
5    MR. ERVIN: Yeah, and let me figure
6  that out.
7    Q. (BY MR. ERVIN) Did you have trouble
8  with the distributor cap while you were --
9  near the time that Rhonda was killed?
10   MR. BRUSTIN: Objection to the form.
11   A. Yes, sir.
12   Q. Okay. And the trouble that you had
13 took about a week for you to figure out and
14 repair, is that correct?
15   A. Yes, sir.
16   Q. And if I understand your testimony,
17 you were working at the embroidery factory
18 up until the time that you had the
19 distributor cap trouble with the Monte
20 Carlo.
21   A. Yes, sir.
22   Q. Okay. So did you live up to your
23 end of the bargain in living in the trailer
24 with Jeff?
25   MR. BRUSTIN: Objection to the form.

66

1  You can answer.
2    A. I did up to a time, until after I
3  lost my job. I was still paying, but I was
4  running out of money.
5    Q. So you were paying your half of the
6  rent and other costs associated with the
7  trailer?
8    A. Yes, sir.
9    MR. BRUSTIN: When it's a good time,
10 do you mind if we take a break?
11   MR. ERVIN: Sure. We'll take a
12 break now.
13   MR. BRUSTIN: Sure. Thank you.
14   (OFF THE RECORD, 10:03-10:15 A.M.)
15   MR. BRUSTIN: Mr. Ervin, before you
16 go on, Keith wanted to make one correction.
17 You asked him a question about whether he
18 had practiced any rituals with anybody else,
19 and he wanted to change that answer.
20   MR. ERVIN: All right. How would
21 you change that answer, sir?
22   THE WITNESS: Well, I have performed
23 one ritual with two other people at the same
24 time. Two girls.
25   Q. (BY MR. ERVIN) When did that occur?

67

1    A. Let's see. Around 1988, I'd say.
2    Q. Okay. Was this soon after you had
3  become involved in the satanic worship?
4    MR. BRUSTIN: Objection to the form.
5  The term "satanic worship" is your term, not
6  his term. So.
7    Q. What -- how should I refer to your
8  practice of that religion? What would suit
9  you?
10   A. Well, most of the times, I just use
11 the word "occult." More of an umbrella
12 word, but, you know, I can say Satanism.
13   Q. Sure. So, if I said Satanism, you
14 would understand I was talking about the
15 practices that you may call occult, correct?
16   A. Yes, sir.
17   Q. And have you sometimes referred to
18 them yourself as Satanism?
19   A. Yes, sir.
20   Q. All right. The time that you
21 engaged in the performance of this ritual
22 with two other girls or women, was that soon
23 after you began the study or practice of
24 Satanism?
25   A. No, sir. I'd been in for a while.

68

1    Q. All right. How was it that you had
2  occasion to practice the rituals with these
3  two girls?
4    A. Well, at the time, I was dating
5  Sherry Sterling and she was kind of
6  interested a little bit, and her best
7  friend, Jennifer Payne, was really
8  interested.
9      So I've been teaching her, because
10  she asked me -- you know, she was like my
11  student. I was teaching her everything I
12  knew. I let her make a copy of my Book of
13  Shadows, and we performed the ritual
14  together so she can get a feel for it.
15    Q. What's your Book of Shadows?
16    A. It's a handwritten book, kind of
17  like our diary, basically, of all the
18  rituals, the spells and chants that you use.
19    Q. Kind of like a journal that one
20  might keep?
21      MR. BRUSTIN: Objection to the form.
22  Are you asking him how he created it? What
23  was in it? Do you understand what he's
24  asking you?
25      THE WITNESS: Yes, sir. It's like a

69

1  journal or a diary.
2    Q. (BY MR. ERVIN) After you had or
3  practiced the ritual -- what type of a
4  ritual did you practice with these two young
5  women?
6    A. They were just a regular
7  worship-type ritual.
8    Q. Did it occur on one of the holidays
9  or was it just something that you practiced
10  with them?
11    A. Just something I practiced with them
12  at the time.
13    Q. So you didn't have to wait for or
14  you didn't need to wait for a particular
15  holiday to engage in ritual practices. Is
16  that a fair statement?
17      MR. BRUSTIN: Objection to the form.
18    A. Yes, sir.
19    Q. And were there occasions when you
20  did practice it between holidays?
21    A. Well, that was the only time.
22    Q. That was the single occasion when
23  you practiced a ritual between one of the
24  holidays?
25    A. Yes, sir.

70

1    Q. Had Rhonda ever expressed an
2  interest in Satanism to you?
3    A. No, sir.
4    Q. Did you interpret the fact that she
5  wanted an inverted cross tattooed on her
6  body as an interest in Satanism?
7      MR. BRUSTIN: Objection to the form.
8  You can answer.
9    A. Well, she never talked to me about
10  the occult or Satanism but, you know, I
11  figured she wanted me to tattoo her with an
12  inverted cross maybe as a way of getting
13  closer to me.
14    Q. Yes, sir. Did you ever provide her
15  any reading materials on the subject?
16    A. No, sir.
17    Q. To your recollection, what the last
18  time that you saw Rhonda?
19    A. The best I can remember, I believe
20  it was the weekend before she disappeared.
21    Q. Before I go further, I want to ask
22  you. Before we started the deposition, your
23  attorney made reference to the fact that you
24  may have some difficulty understanding some
25  of the questions or questions of a certain

71

1  type. Do you recall that?
2    A. Yes, sir.
3    Q. Do you know what he's talking about?
4      MR. BRUSTIN: Objection to the form.
5  Are you asking him if he understands what he
6  suffers from?
7    Q. I'm asking if you know what your
8  lawyer -- just the question I asked. Do you
9  know what your lawyer was talking about when
10  he said you may have difficulty with certain
11  questions?
12      MR. BRUSTIN: I'm going to object to
13  the form. If you understand, you can
14  answer.
15    A. Yes. I've been diagnosed with
16  Asperger's Syndrome.
17    Q. When did you have that diagnosis?
18    A. It was when I was still
19  incarcerated.
20      MR. BRUSTIN: Objection to the form,
21  but go ahead.
22    A. It was when I was still incarcerated
23  in prison. I can't recall the year.
24    Q. Okay. What is your understanding of
25  how that affects you?

---

72

1          MR. BRUSTIN:  Objection to the form.
2   You can answer.
3       A.  Well, what I understand of it, it
4   helps -- I've got difficulty learning things
5   different from most people.
6       Q.  Do you understand what the
7   difficulty is or how it's different from
8   other people?
9       A.  Not exactly.
10      Q.  Do you recall who told you that you
11  had Asperger's?
12      A.  I can't recall his name, but he's
13  out of UofL.  He was sent by the Innocence
14  Project.  They hired him.
15      Q.  Okay.  Did he conduct what you
16  understood to be a psychological
17  examination?
18         MR. BRUSTIN:  Objection to the form.
19      A.  Yes, sir.
20      Q.  Had you ever had a psychological
21  examination performed before?
22         MR. BRUSTIN:  Objection to the form.
23      A.  No, sir.
24      Q.  Have you had any psychological
25  examinations performed since that one?

---

73

1          MR. BRUSTIN:  Objection to the form.
2       A.  No, sir.
3       Q.  After your session with Doctor --
4   was the examination that you had with Dr.
5   Connor?
6          MR. BRUSTIN:  Objection to the form.
7       A.  I can't recall his name.
8       Q.  You don't recall his name?
9          MR. BRUSTIN:  And just for the
10  record, as you can imagine, Mr. Ervin, we're
11  going to have a full neuro-psych workup for
12  Mr. Hardin that you'll get and probably --
13  get much better information from the doctors
14  about what he actually suffers from than
15  from Mr. Hardin.
16         MR. ERVIN:  Sure.  Sure.  I just
17  want to know what Mr. Hardin's understanding
18  of it is and whether he had any examinations
19  since the one that you had in prison at the
20  request of the Innocence Project.
21      Q.  (BY MR. ERVIN)  Are you aware of any
22  other psychological examinations that you
23  have had since the one you had in prison?
24         MR. BRUSTIN:  All right.  So I'm
25  going to object to the form, and I'm going

---

74

1   to ask him not to answer the question.  What
2   you can ask him is has he had any
3   examinations.  You can't ask him what his
4   lawyers may have told him to do.
5          MR. ERVIN:  Counsel, I didn't ask
6   him what his lawyers told him to do.
7          MR. BRUSTIN:  You did.  You may not
8   have meant to, but you did.
9          MR. ERVIN:  No, sir.
10         MR. BRUSTIN:  I heard you ask that.
11         MR. ERVIN:  I didn't.
12         MR. BRUSTIN:  So I want to be
13  careful on -- privilege is obviously --
14         MR. ERVIN:  Sure.
15         MR. BRUSTIN:  -- something we have
16  to be --
17         MR. ERVIN:  Sure.
18         MR. BRUSTIN:  -- let me finish.
19         MR. ERVIN:  And if he's --
20         MR. BRUSTIN:  Let me finish.
21         MR. ERVIN:  -- if I ask him --
22         MR. BRUSTIN:  Let me finish.
23         MR. ERVIN:  -- privileged --
24         MR. BRUSTIN:  Let me finish.
25         MR. ERVIN:  Let me finish my

---

75

1   question --
2          MR. BRUSTIN:  I want to finish my
3   objection.
4          MR. ERVIN:  -- before you object.
5          MR. BRUSTIN:  I did.
6          MR. ERVIN:  Okay?
7          MR. BRUSTIN:  I did.  All I'm saying
8   is you can ask him about whether he had an
9   examination.  You can't ask him about at the
10  direction of his lawyer, which you did.  You
11  might not have meant to, but you did.
12         MR. ERVIN:  I disagree whether I can
13  ask whether he had one at the direction of
14  his lawyer.  But I'm going to re-ask the
15  question --
16         MR. BRUSTIN:  Appreciate it.
17         MR. ERVIN:  -- and if you instruct
18  him not to answer, that's your prerogative.
19         MR. BRUSTIN:  I appreciate it.  I
20  appreciate you re-asking the question in a
21  different way.
22      Q.  (BY MR. ERVIN)  Now, other than the
23  examination -- psychological -- let's get
24  something straight first.  You had one
25  psychological examination while you were in

---

76

1   prison, if I understand you correctly.
2       MR. BRUSTIN: Objection.
3   Q. Is that right?
4       MR. BRUSTIN: Objection to the form.
5   Calls for a medical conclusion. Asked and
6   answered. You can answer again.
7   A. Yes, sir. Just that one.
8   Q. All right. And your understanding
9   was that that occurred at the direction of
10  the Innocence Project; is that correct?
11      MR. BRUSTIN: You can answer that
12  yes or no.
13  A. Yes, sir.
14  Q. All right. Since that time, have
15  you had any other psychological
16  examinations?
17      MR. BRUSTIN: Objection to the form.
18  You can answer.
19  A. I've been a couple of times to an
20  office at UofL, and I just quit going,
21  because they just spit you in and out so
22  quick, you don't have time to even explain
23  anything, talk to them.
24  Q. All right.
25      MR. BRUSTIN: So just, if you don't

77

1   mind, and I think it'll help this move
2   along. He was seeing a therapist there.
3   That's what he's talking about.
4       MR. ERVIN: Well, if you will please
5   let me ask the witness the question and I'll
6   let him testify.
7       MR. BRUSTIN: Sure. You go ahead.
8   You're doing great.
9   Q. (BY MR. ERVIN) How was it you had
10  occasion to go to the University of
11  Louisville?
12      MR. BRUSTIN: If you -- okay -- so
13  if anyone -- if you had any communications
14  with lawyers about it, you're not allowed to
15  talk about that. Okay?
16      THE WITNESS: Okay.
17      MR. BRUSTIN: You understand?
18      THE WITNESS: Yes.
19      MR. BRUSTIN: Okay.
20      MR. SAWYER: Including staff of
21  lawyers' offices.
22      MR. BRUSTIN: Yeah. Anyone you --
23  so, in fact, you can answer why you wanted
24  to go. You can answer that.
25      THE WITNESS: Okay.

78

1   Q. (BY MR. ERVIN) Well, my first
2   question is why did you go to the University
3   of Louisville?
4       MR. BRUSTIN: And again, if he has
5   to answer that based on communications with
6   counsel, he can't. So you can ask him --
7       MR. ERVIN: I'm asking him the
8   question. If you want to instruct him not
9   to answer --
10      MR. BRUSTIN: That's not how it
11  works.
12      MR. ERVIN: -- that's your
13  prerogative.
14      MR. BRUSTIN: That's now how it
15  works.
16      MR. ERVIN: Yes, that's how this one
17  works, sir.
18      MR. BRUSTIN: You know what? It's
19  not how it works.
20      MR. ERVIN: Yes, sir.
21      MR. BRUSTIN: Let me tell you how it
22  works.
23      MR. ERVIN: Yes, sir.
24      MR. BRUSTIN: You need to be
25  careful, as all lawyers do, not to ask

79

1   questions that invade the attorney-client
2   privilege. My job is to protect the
3   attorney-client privilege. It's a very
4   important privilege, as you know.
5       So I would appreciate, especially
6   with Mr. Hardin, for you to ask questions
7   that don't necessarily invade the
8   attorney-client privilege, if you can.
9   That's all I'm asking. That seems like a
10  reasonable request.
11  Q. (BY MR. ERVIN) Why did you go to
12  the University of Louisville?
13      MR. BRUSTIN: Again, you can answer
14  if you don't have to talk about your
15  communications with any attorney or any
16  staff of any attorney. Okay?
17      THE WITNESS: Okay. I wanted to try
18  to get a better understanding of Asperger's,
19  or what I might have.
20  Q. (BY MR. ERVIN) All right. Who did
21  you see at the University of Louisville?
22  A. I can't recall. It's been a couple
23  of years.
24  Q. Did they set you up to go to a
25  clinic-type of a service?

80

```
1          MR. BRUSTIN:  Objection to the form.
2     A.  No, sir.
3     Q.  You don't recall who you saw?
4     A.  I can't remember the guy's name.
5     Q.  Did you see the same person each
6  time that you went?
7     A.  Yes.  I've only been twice.
8     Q.  All right.  And how long did you see
9  the person on the occasions that you went?
10    A.  Most of the times, it was about five
11  minutes or under.  They were just spitting
12  people in and out of the office real quick.
13    Q.  Okay.  Do you recall where the
14  office was?
15    A.  It's downtown at UofL.
16    Q.  Was it associated with the hospital
17  downtown on Jackson Street?
18    A.  Yes, sir.
19    Q.  All right.  And your best
20  recollection is that you had two visits that
21  were approximately five minutes long.
22        MR. BRUSTIN:  Objection to the form,
23  asked and answered.
24    A.  Yes, sir.
25    Q.  And you didn't get the answers that
```

81

```
1  you were looking for, in terms of what
2  Asperger's was or how it may affect you.
3         MR. BRUSTIN:  Objection to the form.
4     A.  Correct.  He just wanted to give me
5  a prescription and say "next."  So that's
6  all it was.
7     Q.  Do you have an understanding of how
8  it affects you or makes you different from
9  what someone might call average?
10        MR. BRUSTIN:  Objection to the form.
11  That's exactly the question you asked before
12  just a few minutes ago.  You can tell him
13  what your understanding is, if any, again.
14    A.  Well, my best knowledge of it is I
15  just learn different from other people.
16  Maybe a little bit slower.
17    Q.  Okay.  How did you learn that Rhonda
18  was missing?
19    A.  From one of my sisters, Vickie.  She
20  saw something on the news about a body being
21  found in Meade County, and that's around the
22  time that Rhonda was missing.
23        MR. BRUSTIN:  He's asking you not
24  how she was found, how you learned that she
25  was missing.
```

82

```
1          MR. ERVIN:  I'll ask him the
2  question, please.  Okay?
3          MR. BRUSTIN:  Is it your goal to
4  trick him?
5          MR. ERVIN:  My goal --
6          MR. BRUSTIN:  I assume it's not.
7          MR. ERVIN:  No, sir.  That's not my
8  goal.
9          MR. BRUSTIN:  Okay.
10         MR. ERVIN:  But I know how to ask a
11  follow-up question.  I really don't need
12  your assistance.
13         MR. BRUSTIN:  Okay.
14         MR. ERVIN:  And even if I'm screwing
15  up in your opinion --
16         MR. BRUSTIN:  Okay.
17         MR. ERVIN:  -- I don't need your
18  assistance.
19         MR. BRUSTIN:  All right.
20         MR. ERVIN:  Okay?  I'll conduct the
21  examination of this witness.
22         MR. BRUSTIN:  And I'll make sure the
23  questions are proper and clear.  That's all
24  I want to do.
25         MR. ERVIN:  Thank you.  Thank you so
```

83

```
1  much.
2          MR. BRUSTIN:  Okay.
3          MR. ERVIN:  I really appreciate it.
4  I'm glad you're here today.
5          MR. BRUSTIN:  I'm glad we're on the
6  same page.
7          MR. ERVIN:  Thank you.  Thank you.
8     Q.  (BY MR. ERVIN)  Now, my question was
9  when did you learn that Rhonda was missing?
10         MR. BRUSTIN:  Objection to the form.
11  You can answer.
12    A.  On what?  The date or?
13    Q.  Yes, sir.  Your best recollection.
14    A.  I can't remember what day it was.
15    Q.  All right, sir.  Do you remember how
16  you learned she was missing?
17    A.  Her mother called me on the day
18  after she went missing and asked me if
19  Rhonda was there with me, and I told her no.
20  Said Rhonda didn't come home that night.
21    Q.  And what was your thought at that
22  time?
23         MR. BRUSTIN:  Objection to the form.
24    A.  Well, at first, I didn't really know
25  what to think, if she was out running around
```

84

1   with some of her friends or what.  I didn't
2   know.
3       Q.  Did you have any further
4   conversation with her mother at that time?
5       A.  No, sir.
6       Q.  When did you next have occasion to
7   talk with anyone about the fact that Rhonda
8   was missing?
9       MR. BRUSTIN:  Objection to the form.
10  It's vague.  It's overbroad.  It's
11  confusing.  You can answer if you understand
12  it.
13      A.  Well, my sister, Vickie, and I, we
14  was talking about it trying to figure out
15  where Rhonda might be, you know, who she
16  might be with.
17      Q.  Is Vickie an older sister?
18      A.  Yes, sir.
19      Q.  Do you have any other siblings
20  besides Vickie?
21      A.  Yes.  I have two other sisters
22  besides her.
23      Q.  And what -- are they older or
24  younger?
25      A.  Older.

85

1       Q.  Is Vickie the closest to you --
2       A.  Yes, sir.
3       Q.  -- in age?
4       MR. BRUSTIN:  Just a minute.  I'm
5   sorry.  Just to make sure -- you pause.
6   Make sure he gets his question completed.
7   Give me a chance to object.  Just take your
8   time.  Okay?
9       THE WITNESS:  Okay.
10      Q.  (BY MR. ERVIN)  Are you and Vickie
11  the two youngest children?
12      A.  Yes, sir.
13      Q.  Are you the baby?
14      A.  Yes, sir.
15      Q.  What did you and Vickie discuss
16  about where Rhonda may be?
17      MR. BRUSTIN:  Objection to the form.
18  Are you asking him the day -- you want to
19  put a time on it?
20      MR. ERVIN:  We have the time on it,
21  Counsel.
22      MR. BRUSTIN:  We do not.
23      MR. ERVIN:  We were talking about
24  the first discussion he had about Rhonda
25  after he found out she was missing, and

86

1   that's the occasion that we're talking
2   about.
3       MR. BRUSTIN:  Okay.  That's just not
4   clear, but I'll let you answer it -- you can
5   ask it anyway you want.
6       MR. ERVIN:  Thank you.
7       MR. BRUSTIN:  I object to the form
8   --
9       MR. ERVIN:  Thank you, sir.
10      MR. BRUSTIN:  -- for a number of
11  reasons.
12      MR. ERVIN:  And that's what the
13  rules permit.
14      MR. BRUSTIN:  Okay.
15      MR. ERVIN:  You can object to the
16  form.
17      MR. BRUSTIN:  That's what I'm doing.
18      MR. ERVIN:  You can object to the
19  form of every question I've asked, which is
20  about 90 percent anyway.
21      MR. BRUSTIN:  That's not true, but
22  go ahead.
23      MR. ERVIN:  And -- well, maybe it's
24  83.
25      MR. BRUSTIN:  Yes, plenty.

87

1       MR. ERVIN:  I'm sorry.
2       MR. BRUSTIN:  You've asked plenty --
3       MR. ERVIN:  I'm sorry.
4       MR. BRUSTIN:  You have asked plenty
5   of questions that not objectionable.
6       MR. ERVIN:  I'm sorry.  I'll do my
7   best.
8       MR. BRUSTIN:  Good.
9       MR. ERVIN:  Thank you.
10      MR. BRUSTIN:  That's all we can all
11  do as lawyers.
12      MR. ERVIN:  Sure.  Sure.
13      Q.  (BY MR. ERVIN)  Now, during that
14  time that you were speaking with Vickie
15  about Rhonda's whereabouts, what did you all
16  talk about?
17      MR. BRUSTIN:  Objection to the form.
18      A.  I can't remember our exact words,
19  what all we did say.
20      Q.  Did you make any effort to find
21  Rhonda?
22      MR. BRUSTIN:  Objection to the form.
23  You can answer.
24      A.  Yes, we did.
25      Q.  What did you do?

88

1    A. Well, we went to her parents' house.
2    They made up flyers about her missing. We
3    got those flyers or pamphlets, whatever you
4    want to call them.
5    Q. Yes, sir.
6    A. We started putting them all over the
7    place.
8    Q. Okay.
9    MR. BRUSTIN: Just to be clear, you
10   said flyers, right?
11   THE WITNESS: Flyers.
12   Q. (BY MR. ERVIN) Did you do anything
13   else to find Rhonda?
14   MR. BRUSTIN: Objection to the form.
15   You can answer.
16   A. I didn't really know what else to
17   do, where else to look. I just stayed by
18   the phone hoping she'd call.
19   Q. All right. So you didn't go to any
20   destination or look for her in any
21   particular place?
22   A. I didn't know where to look. So,
23   no.
24   Q. And, at this time, you had been
25   dating Rhonda for -- from September,

89

1    sometime in September, until this was the
2    first of April, correct?
3    A. Yes, sir.
4    Q. Six months or more, and you didn't
5    know where to look for Rhonda?
6    MR. BRUSTIN: Objection to the form.
7    A. The only place we went is her house
8    and Jeff's trailer. Rhonda's been to my
9    parents' house. That's the only places
10   we've ever been.
11   Q. Okay. You all had never been
12   anywhere else?
13   MR. BRUSTIN: Objection to the form.
14   A. Yes, we were. There was a place
15   around the corner from where she lives.
16   It's like a little pool hall. We'd been
17   there a couple of times and played pool.
18   Q. All right. Had you ever been to any
19   other destination with Rhonda?
20   A. The best I can remember, we haven't.
21   Q. When was the first time that you had
22   occasion to see Jeff Clark after you found
23   out Rhonda was missing?
24   A. The best I can remember, I think it
25   was the day after that I found out that she

90

1    disappeared, and he came to my parents'
2    house.
3    Q. Did you all discuss what had
4    happened to Rhonda at that time?
5    A. Yes, we did.
6    Q. What did you all discuss?
7    A. Well, I told Jeff that Rhonda is
8    missing, and he was just joking with me, you
9    know, well, maybe she found somebody else.
10   Q. Did you have occasion to talk to him
11   any further about Rhonda's whereabouts
12   before her body was found?
13   MR. BRUSTIN: Objection to the form.
14   A. I can't recall. I don't know. I
15   don't remember.
16   Q. When was the last time that you had
17   spoken with Rhonda?
18   MR. BRUSTIN: Objection to the form.
19   You can answer.
20   A. I believe it was the day -- the day
21   before. I can't remember exactly which day
22   she disappeared. She told me about a man
23   that scared her when she was walking to the
24   grocery store.
25   Q. If my recollection of the dates are

91

1    correct, you had that conversation on April
2    1st, and Rhonda went missing early in the
3    morning hours of the next day, April 2nd.
4    Is that what your recollection is?
5    A. Yes, sir.
6    Q. All right. When was the last time
7    you had seen Rhonda before that conversation
8    with her on April 1st?
9    MR. BRUSTIN: Objection to the form,
10   asked and answered.
11   A. I believe it was the weekend before
12   she disappeared.
13   Q. Do you have any recollection of the
14   dates of that?
15   A. I'd have to look at a calendar. I
16   don't know.
17   Q. Do you have a recollection of about
18   how long it was between the last time you'd
19   seen her and this April 1st telephone call?
20   MR. BRUSTIN: Objection to the form.
21   A. I can't remember how many days it
22   was.
23   Q. Okay. Had you talked to Rhonda the
24   day before this telephone call of April 1st?
25   MR. BRUSTIN: Objection to the form.

92

1   A.  I can't remember if we did or not.
2   Q.  Did you have a habit of speaking to
3   her on a daily basis?
4   A.  No.  It might be a day or two when
5   we didn't talk to each other.
6   Q.  Where were you living at the time of
7   Rhonda's disappearance?
8   A.  I had moved back in with my parents.
9   Q.  Why was that?
10  A.  I lost my job, and I was living with
11  Jeff in the trailer, and I couldn't help him
12  pay rent anymore.  So I moved out.
13  Q.  Was there ever any disagreement
14  between you and Jeff about the maintenance
15  of the trailer?
16  MR. BRUSTIN:  Objection to the form.
17  Do you understand what he means?
18  THE WITNESS:  With paying rent or?
19  Q.  (BY MR. ERVIN)  Well, you paid the
20  rent until you lost your job; is that
21  correct?
22  A.  Yes, sir.
23  Q.  Did you ever have any disagreements
24  with Jeff about how the trailer was
25  maintained in terms of its cleanliness?

93

1   A.  Not that I can recall.  I don't
2   know.
3   Q.  Did you ever have any disagreements
4   with Jeff about your living there at all?
5   A.  Just at the end when I wasn't able
6   to pay rent.
7   Q.  Did you leave voluntarily or were
8   you asked to leave?
9   A.  Asked me to leave.
10  Q.  Was Rhonda a regular visitor there
11  at the trailer?
12  MR. BRUSTIN:  Objection to the form.
13  You can answer.
14  A.  Yes, sir.
15  Q.  Was there ever a time that Jeff
16  asked her not to return to the trailer?
17  MR. BRUSTIN:  Objection to the form,
18  foundation.
19  A.  Yes, sir.
20  Q.  When was that?
21  A.  It was shortly before I moved out.
22  I can't put a date on it.  I don't know.
23  Q.  Do you know why he had asked her not
24  to come back?
25  MR. BRUSTIN:  Objection to form.

94

1   A.  No, I don't know.
2   Q.  Did you ask why he had asked her not
3   to come back?
4   A.  No.  I mean, they just wasn't really
5   getting along at the time.  So I didn't ask.
6   Q.  Do you know what the trouble between
7   them was?
8   A.  No, I don't.  I've asked both of
9   them.  Neither one would tell me.
10  Q.  How did you learn that Rhonda had
11  been killed?
12  A.  Joe Greer and another officer came
13  to my parents' house, and they're the ones
14  who told us that she had been killed.
15  Q.  Do you recall when that was?
16  A.  I want to say the 5th?  I'm not real
17  sure.
18  Q.  Okay.  April 5th --
19  A.  Yes, sir.
20  Q.  -- of 1992?
21  A.  Yes, sir.
22  Q.  Did they ask you any questions about
23  her death at that time?
24  MR. BRUSTIN:  Objection to the form.
25  A.  I can't remember what they did ask.

95

1   I was just so devastated to hear she'd been
2   killed.
3   Q.  Did you attend her funeral?
4   A.  Yes, sir.
5   Q.  Did any of your family members go
6   with you to her funeral?
7   A.  Yes, sir.
8   Q.  Who went with you?
9   A.  Both my parents, and I think all
10  three of my sisters went as well.
11  Q.  Where was her funeral?
12  A.  I can't think of the name of the
13  funeral home.
14  Q.  Do you know where she's buried?
15  A.  Yes, I do.
16  Q.  Where is that?
17  A.  I think it's called Evergreen
18  Cemetery.
19  Q.  Is that in Jefferson County?
20  A.  Yes, sir.  My family actually
21  donated one of our family plots to have her
22  buried, because her family couldn't afford
23  it.
24  Q.  Do you have family buried there as
25  well then?

96

1      A.  I think so, yes.
2      Q.  Are your parents buried there?
3      A.  My mother is, I believe.
4      Q.  Your mother is?
5      A.  Yeah, I think that's the cemetery
6  she's in.
7      Q.  All right.  Where is your father
8  buried?
9      A.  He was cremated, and his ashes was
10  taken to his mother's grave.  It's out in
11  the country, in Mount Washington.
12      Q.  Do you recall telling the police
13  that you had had a sort of a dream or a
14  vision regarding Rhonda's death?
15      MR. BRUSTIN:  Objection to the form,
16  vague.  Tell him what you remember about
17  that, if anything.
18      A.  I remember it was more of a
19  nightmare.  Just something bad happening to
20  her.  I can't really remember any details or
21  even back then.  All I know, it was just --
22  I had a nightmare about her.
23      Q.  Did you tell them that she was
24  wearing red at the time?
25      MR. BRUSTIN:  Objection to the form,

97

1  asked and answered.  Tell him again.
2      A.  No, sir.  I couldn't tell them any
3  detail other than it was just a nightmare.
4      Q.  All right.  Do you recall whether
5  you told them that your vision or dream was
6  of her screaming in a field?
7      MR. BRUSTIN:  Objection to the form,
8  when he just told you it was a nightmare.
9      A.  I don't remember telling them that
10  she was out in a field screaming.  Just a
11  nightmare and something bad was happening.
12      Q.  All right.  Let me ask you.  Do you
13  consider it -- is a nightmare a dream?
14      A.  Well, yes, a bad dream.
15      Q.  Yeah, it's a bad dream.  So it's a
16  dream, a type of dream, correct?
17      A.  Yes, sir.
18      Q.  All right.  Do you remember telling
19  the police that, in this dream, Rhonda was
20  killed?
21      MR. BRUSTIN:  Objection to the form.
22  You can answer.
23      A.  No, sir, I didn't.  I don't
24  remember.
25      Q.  Do you deny that you told them that?

98

1      MR. BRUSTIN:  Objection to the form.
2  You can answer.
3      A.  I don't remember telling them the
4  details.  I can't remember.
5      Q.  Do you think you would have told
6  them details that you remembered about the
7  dream?
8      MR. BRUSTIN:  Objection to the form.
9      A.  The best I can remember, it just
10  wasn't a clear dream where I can give
11  anybody details.
12      Q.  All right.  But you had a dream of
13  something bad happening to Rhonda --
14      MR. BRUSTIN:  Objection to the form.
15      Q.  -- correct?
16      A.  Yes, sir.
17      Q.  And you had that dream before
18  Rhonda's death, correct?
19      MR. BRUSTIN:  Objection to the form.
20  Are you asking before she died or he learned
21  of her death?
22      MR. ERVIN:  The question was clear,
23  Counsel.
24      MR. BRUSTIN:  It was not.
25      MR. ERVIN:  Yes.

99

1      MR. BRUSTIN:  But I will object to
2  the form.
3      MR. ERVIN:  Before her death was the
4  question.  Will you please read the question
5  back?
6      THE REPORTER:  I was still getting
7  in the -- the one question I missed was that
8  one because --
9      MR. ERVIN:  All right.
10      THE REPORTER:  -- I'm still getting
11  in all the objections.
12      MR. ERVIN:  All right.
13      MR. BRUSTIN:  He doesn't even know
14  when her death was.
15      THE REPORTER:  I can get it for you
16  if you want to wait a second.  Do you want
17  me to?
18      MR. ERVIN:  No.
19      MR. BRUSTIN:  If you want to
20  continue asking questions you can.  I'm
21  going to object to the form.  That's all I'm
22  doing.
23      THE REPORTER:  With all the
24  colloquy, you know, I'm a few words off the
25  end of each sentence or the question.

100

1    MR. ERVIN:  Sure.
2    Q.  (BY MR. ERVIN)  Do you recall having
3  this dream before her death?
4    MR. BRUSTIN:  Objection to the form,
5  foundation.
6    A.  No, sir.
7    Q.  When did you have the dream?
8    A.  It was after I found out that she'd
9  been killed.
10   Q.  After you found out she had been
11 killed?
12   A.  Yes, sir.
13   Q.  Did you take a nap after the police
14 came to your house?
15   A.  No, sir.
16   Q.  What night was it that you had the
17 dream?
18   A.  I don't remember if it was a day or
19 two later.  I have no idea.
20   Q.  Do you recall being asked by the
21 police whether you had knives?
22   MR. BRUSTIN:  Objection to the form.
23 You can answer.
24   A.  Yes, sir.
25   Q.  And what did you tell the police?

101

1    MR. BRUSTIN:  Objection to the form.
2  Are you asking him about all the
3  conversations he had with the police about
4  knives, the one conversation?  It's very
5  vague and broad.
6    Q.  The first time that you were asked
7  by the police whether you had knives, what
8  did you tell them?
9    MR. BRUSTIN:  Objection to the form.
10 You can answer.
11   A.  Well, when Detective Handy asked me
12 if I had a knife, he just asked me, do you
13 have a knife.  I didn't know if he meant if
14 I had one on me then, so I just told him no.
15 And later, when Hope Greer asked me, and I
16 told her I do have some knives.
17   Q.  All right.  Did you see Hope Greer
18 the same day that you saw Handy; do you
19 recall?
20   A.  I can't recall.  I don't know.
21   Q.  But your recollection is that the
22 first time Hope Greer asked you whether you
23 had knives, you told her yes; is that
24 correct?
25   A.  Best of my memory, yes.

102

1    Q.  And was it Hope Greer that you told
2  about the dream that you had had?
3    A.  Yes, sir.
4    Q.  And did you tell her about that
5  dream the first time that you saw her?
6    MR. BRUSTIN:  Objection to the form,
7  foundation.  You can answer.
8    A.  I can't remember if it was the first
9  time or second time.  I don't know.
10   Q.  All right.  Do you know how many
11 times you talked with Hope Greer?
12   A.  I would say no more than twice.
13   Q.  Do you recall being asked whether
14 Jeff Clark had knives --
15   MR. BRUSTIN:  Objection to the form.
16   Q.  -- by the police?
17   A.  I can't remember.  I don't know.
18   Q.  You don't know?
19   A.  I can't remember.
20   MR. BRUSTIN:  Objection to the form.
21   Q.  At the time that you spoke to Rhonda
22 on that April 1st, it had been a few days
23 since you'd seen one another; is that
24 correct?
25   MR. BRUSTIN:  Objection to the form.

103

1    A.  Yes, sir.
2    Q.  Did you all make arrangements to see
3  one another again at that time?
4    A.  No, sir.
5    Q.  Why?
6    A.  Well, my car was broke down at the
7  time.
8    Q.  Your car was broken down when you
9  saw her the last time you'd seen her,
10 correct?
11   A.  Yes, sir.
12   Q.  How did you get together?
13   A.  My parents took me to her house.  I
14 stayed the night.
15   Q.  All right.  And then how did you get
16 home?
17   A.  My parents came and picked me up
18 again.
19   Q.  All right.  So your parents could
20 have taken you to see Rhonda again, correct?
21   MR. BRUSTIN:  Objection to the form.
22   A.  That was the last time.
23   Q.  All right.  But there wasn't any
24 reason why they couldn't take you to see her
25 again, right?

104

1       MR. BRUSTIN:  Objection to the form.
2       A.  That's correct.
3       Q.  All right.  So the fact that your
4    car was broken down wouldn't have prevented
5    you from seeing Rhonda, would it?
6       MR. BRUSTIN:  Objection to the form.
7       A.  That's true.
8       Q.  And if your parents didn't give you
9    a ride, you could have gotten a ride with
10   Michelle; is that right?
11      A.  No.  Michelle and I wasn't very
12   close.  I didn't even know her phone number
13   or anything.
14      Q.  Did Michelle live somewhere other
15   than where Rhonda lived?
16      A.  Yes, sir.
17      Q.  Where did Michelle live?
18      A.  Lived in some apartment complex.  I
19   don't know the name of it.
20      Q.  Did Rhonda have any other siblings
21   at home?
22      A.  She has a younger brother.
23      Q.  What was his name?
24      A.  His name is Jeff.
25      Q.  Jeff?  So, when you spoke to Rhonda

105

1    on April 1st, you didn't make arrangements
2    to see her again?
3       A.  No, sir.
4       MR. BRUSTIN:  Objection to the form,
5    asked and answered twice.
6       Q.  Why didn't you make arrangements to
7    see her again?
8       MR. BRUSTIN:  Objection to the form.
9    Asked and answered four times.
10      A.  I don't know.
11      Q.  Did she want to see you?
12      MR. BRUSTIN:  Objection to the form.
13   Calls for speculation.
14      A.  I don't know.  I mean, I don't know
15   what she was thinking.
16      Q.  During that phone conversation,
17   didn't she tell you that she wanted to see
18   you?
19      MR. BRUSTIN:  Objection to the form.
20   Answer again.
21      A.  I can't recall.  I don't know.  All
22   I remember about that last phone call is she
23   told me about some old man who scared her
24   when she was going to Kroger's, or coming
25   back from Kroger's.

106

1       Q.  During that phone call, did you tell
2    her that you wanted to see her again?
3       MR. BRUSTIN:  Objection to the form.
4       A.  The best I can remember, I did.  You
5    know, I told her I couldn't get to her
6    because my car was broken down.  I don't
7    know if my parents wasn't available at the
8    time.  I don't know.
9       Q.  What did you do that evening of
10   April 1st?
11      A.  Well, that evening, Jeff came and
12   got me, asked me if I'd help him search for
13   a snake.  It's a little baby, tiny snake,
14   that got loose out of its enclosure, its
15   cage, and he had trouble finding it.  So he
16   asked me if I'd help him.
17      Q.  How were you getting along with Jeff
18   at that time on April 1st?
19      A.  We seemed to be getting along pretty
20   good.
21      Q.  Were you seeing him on a regular
22   basis at that time?
23      MR. BRUSTIN:  Objection to form.
24      A.  It was more like off and on.
25      Q.  Do you recall whether he was still

107

1    working his job at Papercone at that time?
2       A.  My best memory, I think he was.
3       Q.  Could he have given you a ride to
4    Rhonda's house?
5       MR. BRUSTIN:  Objection to the form.
6       A.  Well, Jeff was working night shift
7    at the time.
8       Q.  Is that your recollection?
9       A.  Yes, sir.
10      Q.  If he weren't working night shift,
11   do you know of a reason he couldn't have
12   given you a ride to Rhonda's house?
13      MR. BRUSTIN:  Objection to the form.
14      A.  No, sir.
15      Q.  In fact, as your friend, you would
16   expect he would have if you had asked; would
17   you not?
18      MR. BRUSTIN:  Objection.
19      A.  Yes, sir.
20      Q.  So what were you and Jeff doing with
21   the snake?
22      A.  Well --
23      MR. BRUSTIN:  Go ahead.
24      A.  We was searching for it.
25      Q.  Where?

108

1    A. In his trailer. We was tearing his
2  trailer apart trying to find it.
3    Q. Okay. Was Jeff living in the
4  trailer at the time?
5    A. I think he was right before he moved
6  back with his parents.
7    Q. So, at the time on April 1st, to
8  your recollection, Jeff was still living in
9  the trailer?
10    MR. BRUSTIN: Objection to the form.
11    A. I can't say for certain if he really
12  was still there or back in with his parents.
13    Q. Okay. Did you all do anything other
14  than look for the snake that night?
15    MR. BRUSTIN: Objection to the form.
16    A. Well, had a couple beers, and we
17  didn't get drunk or anything, not even a
18  buzz. And when he took me home, we stopped
19  at a Chevron station. I stayed in the car.
20  He went to buy some cigarettes and, from
21  there, he took me straight home.
22    Q. What was it about him buying the
23  cigarettes that stands out in your mind?
24    MR. BRUSTIN: Objection to the form.
25    A. Well, when he got back to the car,

109

1  he told me that there were some guys there
2  inside the store causing some trouble. So I
3  remember that.
4    Q. Did you all find the snake?
5    A. Not the night I was there. I don't
6  know if he found it on his own. I don't
7  know.
8    Q. Did you make any other stops that
9  night that you recall?
10    A. Not that I can recall.
11    Q. Do you know what the nature of the
12  disturbance was with the people in the
13  Chevron store?
14    A. No, I don't.
15    Q. What time did you go home that
16  night?
17    A. Best I can remember, it was around
18  two o'clock, maybe 2:30 in the morning.
19    Q. Do you recall what vehicle or
20  automobile you all were riding in?
21    A. We were in Jeff's car, his Nova.
22    Q. Do you know, had he had any trouble
23  with the operation of that automobile?
24    MR. BRUSTIN: Objection to the form.
25    A. Yes, sir. He was having trouble

110

1  with his battery. So, when he came to pick
2  me up, we took the battery out of my car,
3  put it in his.
4    Q. When did that exchange occur, him
5  using your battery?
6    A. It was on that one night.
7    Q. It was on that day --
8    A. Yes.
9    Q. -- April 1st?
10    A. Yes, sir.
11    Q. Had he used your battery anytime
12  before then?
13    A. Not that I remember. It was just
14  that one time.
15    Q. Did he return the battery that next
16  day?
17    MR. BRUSTIN: Objection to form.
18    A. Well, he dropped me off that night
19  -- yeah, I think it was the next day,
20  because he had to drive home. So, yes.
21    Q. So you saw him the next day when he
22  returned the battery.
23    MR. BRUSTIN: Objection to the form.
24    A. I think it was the next day, yes.
25    Q. Did you all look at your car to

111

1  determine why it wasn't running that day?
2    A. Yes. We was trying to find out what
3  was wrong with my car.
4    Q. Do you recall when you got it fixed
5  in relationship to the time that you found
6  out Rhonda had been killed?
7    MR. BRUSTIN: Objection to the form.
8    A. I can't remember. I don't know.
9    Q. Did you go with the police to the
10  police station after you found out Rhonda
11  was killed?
12    A. Yes, sir.
13    Q. Who did you go with?
14    A. The first time, I think it was with
15  Detective Handy. I think that was the first
16  one. I'm not real sure --
17    Q. All right.
18    A. -- which detective it was.
19    Q. Did you talk with Detective Handy at
20  the police station?
21    A. Yes, sir.
22    MR. BRUSTIN: Objection to the form.
23  Sorry.
24    Q. Did you talk with Detective Handy in
25  the car on the way to the police station?

112

1    A.  I think we did.  I'm not real sure.
2    Q.  Do you have any recollection of what
3  your conversation, if any, was with him on
4  the way to the police station?
5    A.  I can't remember even if we did have
6  a conversation.  I can't say what anything
7  would be about.  I don't know.
8    MR. ERVIN:  All right.
9    MR. BRUSTIN:  Peter, do you mind if
10  we take a 10-minute break?
11    MR. ERVIN:  Not at all.  Let's make
12  it five.
13    MR. BRUSTIN:  Sure.
14    (OFF THE RECORD, 11:03-11:16 A.M.)
15    MR. BRUSTIN:  Mr. Ervin, if you
16  don't mind, Mr. Hardin had just a couple of
17  clarifications he wanted to make on the
18  record.
19    One clarification relates to the
20  timing of whether he had the nightmare
21  before he learned -- at the time he learned
22  of her being missing or at the time of her
23  death.  He wanted to make a clarification
24  about that.
25    MR. ERVIN:  All right.

113

1    Q.  (BY MR. ERVIN)  Do you have a better
2  recollection now of when you had the dream?
3    A.  Well, I shouldn't have answered the
4  way I did before, because it was unclear
5  exactly when I had the nightmare.
6    Q.  Yes, sir.
7    A.  So I shouldn't have answered it the
8  way that I did.
9    Q.  That's all right.
10    A.  Yeah.
11    Q.  I understand.  So do you have a
12  better recollection now of when that
13  occurred?
14    A.  Honestly, I can't remember if the
15  dream was after I found out she disappeared
16  or after I found out she was killed.
17    Q.  Okay.
18    MR. BRUSTIN:  And then one other
19  small clarification.  You asked him when he
20  went to the police station in relation to
21  when he was told of the murder.
22    Q.  When was that?  When did you go to
23  the police station?
24    A.  I believe it was the day after.
25    Q.  All right.  How did you get there?

114

1    A.  The police gave me a ride downtown.
2    Q.  And that was Detective Handy?
3    A.  I believe so, yes.
4    Q.  All right.  And that was the ride
5  where you don't recall whether there was
6  conversation?
7    A.  Right.
8    MR. BRUSTIN:  Thank you.
9    Q.  Was anyone else in the vehicle with
10  you and Detective Handy?
11    A.  I can't remember if anyone else was
12  in the car with us or not.
13    Q.  Do you recall a Sergeant Woosley?
14    A.  I remember his name, but I don't
15  know if he was in the car with us or not.
16    Q.  All right.  You just can't remember?
17    A.  Right.
18    Q.  All right.  One other thing I meant
19  to ask you regarding your condition -- your
20  medical condition.  Do you take any
21  medications?
22    MR. BRUSTIN:  Objection to the form.
23  You can answer.
24    A.  No, sir.
25    Q.  So you're not taking any medications

115

1  today?
2    A.  Correct.
3    Q.  All right.  You made mention of the
4  fact that the person you saw at UofL wanted
5  only to give you medications, but wouldn't
6  give you information about your condition or
7  why you needed them, I guess.  Is that a
8  fair statement?
9    MR. BRUSTIN:  Objection to form.
10    A.  Yes, sir.
11    Q.  All right.  Do you recall what
12  medication he wanted you to take?
13    A.  I can't remember the name.  Some big
14  long word.  I don't know.
15    Q.  All right.  All right.  So do you
16  remember who Sergeant Woosley was?
17    A.  I remember his name, but I can't put
18  a face to the name.
19    Q.  Okay.  Do you remember a Robert
20  Ennis?
21    A.  No, I don't.
22    Q.  Do you remember a Kelly Jones?
23    A.  No, sir.
24    Q.  Do you remember a Charles Edelen?
25    A.  No, sir.

**116**

```
 1        Q.  Do you know who James Griffiths is?
 2        A.  No, sir.
 3        Q.  Do you know who James Clark is?
 4        A.  Yes, sir.  I remember him.
 5        Q.  Who was he?
 6        A.  He was a detective.  He's
 7   African-American.  He's the only one that
 8   was talking politely to me.
 9        Q.  All right.  So James Clark is the
10   only member -- was he a member of the
11   Louisville Police Department?
12        A.  I think so, yes.
13        Q.  And as you recall it, he was the
14   only police officer who was nice to you.
15        A.  Yes, sir.
16        Q.  Do you feel like that he treated you
17   appropriately?
18        MR. BRUSTIN:  Objection to the form,
19   foundation.
20        A.  Yes, sir.
21        Q.  Do you feel like that he did
22   anything to cause you any harm?
23        MR. BRUSTIN:  Objection to form.
24        A.  No, sir.
25        Q.  Do you know of any reason why you
```

**117**

```
 1   should make any claims against James Clark?
 2        MR. BRUSTIN:  Objection to form.
 3        A.  No, sir.
 4        Q.  Detective Mark Handy.  Do you
 5   remember who he was?
 6        A.  Yes, sir.
 7        Q.  How did he treat you?
 8        MR. BRUSTIN:  Objection to the form.
 9        A.  Well, I use the term, "jerk."  You
10   know, that's the way he acted towards me.
11        Q.  All right.  You felt like he was a
12   jerk?
13        A.  Yes, sir.
14        Q.  All right.  What did he do that made
15   you feel that way?
16        MR. BRUSTIN:  Objection to form.
17        A.  Just his whole attitude.  He was
18   very unprofessional.  Just his whole
19   personality, the way he'd act toward me.
20        Q.  All right.  And what was it about
21   his personality?
22        MR. BRUSTIN:  Objection to form.
23        A.  Well, he acted like a smart aleck.
24        Q.  Did he ever make any threats to you?
25        A.  No, sir.
```

**118**

```
 1        Q.  Did he treat you -- did he do
 2   anything to you that you had a problem with
 3   other than acting like a jerk?
 4        MR. BRUSTIN:  Objection to the form.
 5        A.  No, sir.
 6        Q.  Do you know, why did you sue
 7   Detective Handy?
 8        MR. BRUSTIN:  Objection to the form.
 9        A.  Well, when he was interviewing me,
10   he was twisting things around that I said
11   and making up lies I didn't find out at the
12   time until trial.
13        Q.  What lies did he make up?
14        MR. BRUSTIN:  Objection to the form.
15        A.  He -- I'm trying to remember
16   everything.  He twisted things around, like
17   he said that I denied having any knives.
18   Even after I talked to Hope Greer, Detective
19   Greer, he continued saying that after I told
20   her that I did have knives.
21        I'm trying to remember.  I'm having
22   trouble --
23        MR. BRUSTIN:  Take your time.  It's
24   okay.  He just wants to know all the lies he
25   told.
```

**119**

```
 1        Q.  Let me ask another question, Mr. --
 2        A.  Okay.
 3        Q.  -- Hardin, and I don't mean to be
 4   difficult.  If I ask a question you don't
 5   understand, that's my fault.  Okay?
 6        A.  Okay.
 7        Q.  It's my job to communicate with you.
 8   All right?
 9        A.  Okay.
10        Q.  Did you discuss with Detective Handy
11   anything about your practice of Satanism?
12        MR. BRUSTIN:  Objection to the form.
13   You can answer.
14        A.  Yes, sir.
15        Q.  Do you recall what you told him
16   about that?
17        A.  Yes.  He was asking me if I perform
18   blood sacrifice, sacrifice animals or
19   anything, and I told him no.
20        Q.  So he did ask you about that?
21        A.  Yes, sir.
22        Q.  Okay.  And you told him no.
23        A.  Correct.
24        Q.  Do you recall anything else that he
25   was asking you about your practice of
```

120

1   Satanism?

2      MR. BRUSTIN:  Objection to the form.

3      A.  He asked me if I ever sacrificed a

4   human, besides animals, and I told him no.

5      Q.  Do you recall any other questions he

6   had for you specifically about your practice

7   of Satanism?

8      MR. BRUSTIN:  Objection to the form.

9      A.  I'm trying to remember.  He asked me

10  about the chalice I had, the goblet --

11     Q.  Yes, sir.

12     A.  -- what I drunk in -- if I had drunk

13  animal blood, and I told him no.

14     Q.  Anything else specifically that he

15  asked you about it that you recall?

16     MR. BRUSTIN:  Objection to form.

17     A.  Right now, I can't recall.

18     Q.  Okay.  All right.  Do you remember

19  what you told him about your practice of

20  Satanism?

21     MR. BRUSTIN:  Objection to form.

22  You can answer.

23     A.  I'm trying to remember.

24     Q.  Let me try to ask a better question.

25     A.  Okay.

121

1      Q.  Did you explain to him how you

2   practiced Satanism in a way similar to the

3   way you've explained it to me today?

4      MR. BRUSTIN:  Objection to the form.

5      A.  Yes, sir.

6      Q.  All right.  Do you know whether --

7   did you show him your -- or did he have a

8   copy of your Book of Shadows to your

9   knowledge?

10     A.  Well, they had it in evidence.

11     Q.  Do you recall whether you explained

12  that to Detective Handy?

13     A.  I can't recall.

14     Q.  Do you recall whether you were

15  interviewed by anyone other than Detective

16  Handy?  And I know you mentioned Handy

17  Greer.  Do you recall being interviewed by

18  anyone else?

19     A.  Besides Sheriff Greer, no.

20     Q.  All right.  So you were interviewed

21  also by Sheriff Greer?

22     A.  Yes, sir.

23     Q.  And when were you interviewed by

24  Sheriff Greer?

25     MR. BRUSTIN:  Objection to form.

122

1      A.  I can't remember the date exactly

2   when it was.

3      Q.  Do you know whether it was the first

4   or second day that you were interviewed?

5      A.  I can't remember.  I don't know.

6      Q.  In your practice of Satanism, is

7   there any sacrifice involved?

8      A.  No, sir.

9      MR. BRUSTIN:  Objection to the form.

10  You're asking about back then when he was

11  doing it, right?

12     MR. ERVIN:  Yes.  During the time

13  that you practiced Satanism.

14     THE WITNESS:  No, sir.

15     Q.  (BY MR. ERVIN)  Was there any

16  self-sacrifice involved?

17     A.  What do you mean by self-sacrifice?

18  I don't understand.

19     Q.  Well, for example, on Ash Wednesday,

20  Catholics fast.

21     A.  Oh.

22     Q.  Any of that involved in Satanism?

23     MR. BRUSTIN:  Objection to the form.

24     A.  No, sir.  Not to my knowledge

25  anyway.

123

1      Q.  Do animals play a role in the

2   practice of Satanism?

3      A.  Not in the branch of Satanism I

4   followed, which is modern day Neo-Satanism.

5   It forbids blood sacrifice.

6      Q.  So it specifically addresses the

7   subject and forbids it?

8      A.  Yes, sir.

9      Q.  All right.  Did the older version of

10  Satanism include sacrifice?

11     MR. BRUSTIN:  Objection to the form.

12     A.  Traditional Satanism?  Yes.

13     Q.  What type of sacrifice would

14  traditional Satanism include?

15     A.  About anything they want to

16  sacrifice.

17     Q.  Anything from a cricket to a human?

18     MR. BRUSTIN:  Objection to the form.

19     A.  Yes, sir.

20     Q.  All right.  When you would have --

21  when you would chant or pray in your

22  practice of the occult, what did you pray

23  for?

24     A.  Well, mine was mostly just worship

25  more than anything else.

124

```
1      Q.  All right.  And who were you
2   worshipping?
3      A.  I was worshipping Satan.
4      Q.  Do you believe today that Satan
5   exists?
6         MR. BRUSTIN:  Objection to the form.
7      A.  I believe evil exists.
8      Q.  Yes, sir.  Is that the way you
9   viewed Satan when you were engaged in the
10   practice of the religion --
11        MR. BRUSTIN:  Objection to the form.
12      Q.  -- of Satanism?
13      A.  No, sir.  Just like the power of
14   witchcraft and magic.
15      Q.  So you didn't view Satan as a being
16   in a human-type of form as we know it.
17      A.  Correct.  More like a force.
18      Q.  A force.  Is that the way you view
19   it now?
20        MR. BRUSTIN:  Objection to the form.
21   You can answer.
22      A.  Yes, sir.
23      Q.  Okay.  So you were worshipping that
24   force.
25      A.  Yes, sir.
```

125

```
1      Q.  Which you perceived to be evil.
2         MR. BRUSTIN:  Objection to form.
3      A.  Well, at the time, I didn't really
4   think of Satan as evil, you know, as crazy
5   as that might sound.  You know, something
6   like that.  But I just didn't think of him
7   as evil.
8      Q.  Have you used that to describe
9   Satanism, though?  An evil force?
10        MR. BRUSTIN:  Objection to the form.
11      A.  Well, I do now but, back then, I
12   don't think I did.
13      Q.  Okay.  Has your perception changed
14   --
15      A.  Yes, sir.
16      Q.  -- or just the way you describe it?
17      A.  Yeah, my whole perception has
18   changed.
19      Q.  All right.  Why do you view it as
20   evil now?
21      A.  Well, back then, I was just younger
22   and dumber and just exploring stuff I
23   shouldn't even mess with and, now, I can see
24   things totally different.
25      Q.  So you don't think Satanism is
```

126

```
1   different today than yesterday, but you
2   understand it better today than you did
3   then.
4         MR. BRUSTIN:  Objection to the form.
5   Mischaracterizes his testimony.
6      Q.  Is that a fair statement?
7      A.  Well, I see it as evil now, yes.
8      Q.  All right.  Was it evil then?
9         MR. BRUSTIN:  Objection to the form,
10   asked and answered.  Tell him again.
11      A.  Well, back then, when I was
12   practicing Satanism, I didn't think of it as
13   evil or Satan as evil.
14      Q.  Okay.  How did you perceive it?
15        MR. BRUSTIN:  Objection to form,
16   asked and answered.
17      A.  Just saw it as just a force of
18   magic, force of the occult.
19      Q.  Okay.  Was it magic like pulling a
20   rabbit out of a hat or a different type of
21   magic?
22        MR. BRUSTIN:  Objection to the form.
23      A.  More like witchcraft-type magic.
24      Q.  All right.  And how do you describe
25   witchcraft-type magic?
```

127

```
1      A.  It's kind of hard to put a
2   definition on it.  The ability to, oh,
3   change things at your will or --
4      Q.  All right.
5      A.  -- I don't know.  It's hard to put a
6   definition.
7      Q.  It includes the idea of, through
8   your will, causing bad things to happen to
9   people, doesn't it?
10        MR. BRUSTIN:  Objection to the form.
11      A.  Well, it can cause good things as
12   well.
13      Q.  All right.  Now, I want you to
14   answer my question.  It includes the idea
15   that, through your will, you can cause bad
16   things to happen to people, doesn't it?
17        MR. BRUSTIN:  Objection to the form.
18      A.  Yes, sir, you can.
19      Q.  And, in fact, there were occasions
20   when you would pray or chant chants to cause
21   bad things to happen to people; were there
22   not?
23        MR. BRUSTIN:  Objection to the form.
24      A.  There was one occasion, yes.
25      Q.  All right.  Tell me about that
```

128

1 occasion.

2 A. Well, a girl that I was friends

3 with, her ex-boyfriend was coming around her

4 and causing all kinds of trouble, and she

5 didn't want him around. He was kind of the

6 violent type, you know, wanted to beat up on

7 women and stuff. So she told me about it.

8 So I made an image of him out of

9 wax, and I took it and broke its left leg.

10 Within a month or later, he was walking

11 around with a cast on his left leg. A

12 coincidence maybe. I don't know.

13 Q. All right. Is that similar to

14 voodoo, as you understand it?

15 MR. BRUSTIN: Objection to form.

16 A. Yes, sir.

17 Q. Okay. And Rhonda had a similar

18 experience with an old boyfriend as well,

19 correct?

20 MR. BRUSTIN: Objection to form.

21 Vague.

22 A. Yes, sir.

23 Q. This Tyrell, correct?

24 A. Yes, sir.

25 Q. You understood he had been -- had

129

1 mistreated Rhonda; is that right?

2 A. Yes, sir.

3 Q. Had you prayed for anything bad to

4 happen to him?

5 A. No, sir. That's about the time when

6 I was leaving Satanism, when she told me

7 about him.

8 Q. Mr. Hardin, I'm going to hand to you

9 a three-page document and ask you if you can

10 identify it and tell me where it comes from.

11 A. Okay.

12 MR. BRUSTIN: You want to come with

13 -- do you have one for me? Thank you very

14 much. It's in a different order though.

15 Let's see.

16 A. (Reviews document) Yes, sir, I

17 recognize it.

18 Q. All right. What is it?

19 A. These, I believe, are from the Book

20 of Shadows here.

21 Q. And this is something that you

22 wrote?

23 A. Yes, sir. I copied it out of some

24 of the books that I read.

25 Q. Is this all in your handwriting?

130

1 MR. BRUSTIN: Objection to the form.

2 You're talking about three pages?

3 MR. ERVIN: Yes, sir.

4 MR. BRUSTIN: Do you want to mark it

5 or not going to do that or?

6 MR. ERVIN: Yes, sir. Let's get it

7 identified first.

8 MR. BRUSTIN: Okay.

9 MR. ERVIN: If you don't mind

10 really, Nick, I'll ask the questions.

11 MR. BRUSTIN: I just want it to be

12 orderly. That's all.

13 MR. ERVIN: Sure.

14 MR. BRUSTIN: And so, I was just

15 asking if we were going to mark it.

16 MR. ERVIN: And I'm sure when you

17 take a deposition, you'll have a style that

18 maybe I'll like or won't like. But I know

19 yours will be more orderly than mine. I'm

20 sure.

21 MR. BRUSTIN: I'm not saying that.

22 I'm really not.

23 MR. ERVIN: I'm sure.

24 MR. BRUSTIN: Don't take it

25 personally. I'm just trying to make it

131

1 clear.

2 MR. ERVIN: No, I'm not taking it

3 personally. I'm just -- I just -- I want

4 you to understand that --

5 MR. BRUSTIN: I'm just -- all I'm

6 saying is --

7 MR. ERVIN: -- I'm going to take the

8 deposition --

9 MR. BRUSTIN: Sure.

10 MR. ERVIN: -- the way I want to

11 take the deposition.

12 MR. BRUSTIN: That's fine. I'm just

13 looking at it --

14 MR. ERVIN: If you have an

15 objection, you make your objection.

16 MR. BRUSTIN: You're talking about

17 three pages -- one doesn't have any

18 Bates-stamp on it -- and two other pages. I

19 just want it to be clear. But you're right.

20 MR. ERVIN: Sure.

21 MR. BRUSTIN: It's up to you to ask

22 any way you want.

23 MR. ERVIN: You are exactly right.

24 Thank you, sir.

25 Q. (BY MR. ERVIN) Now, do the contents

132

1  of each of these three pages -- short of
2  where it may say exhibit or have a
3  Bates-stamp number --
4      MR. BRUSTIN:  Oh.  I missed the
5  Bates-stamp number.  Sorry.
6      Q.  -- do the content of these three
7  pages, is it all in your handwriting?
8      A.  Yes, sir.
9      Q.  All right.  On the top page that I
10  handed you is a title, Book of Shadows.  Was
11  that the first page of your Book of Shadows?
12      A.  I believe so.
13      Q.  Did you have more than one Book of
14  Shadows?
15      A.  I had one, best I can remember.
16      Q.  Okay.  Would it be a -- and did you
17  keep it like it's reflected in this
18  photograph, in a three-ring binder?
19      A.  Yes, sir.
20      Q.  Okay.  Would you make additions to
21  it as you progressed in your study of the
22  religion?
23      MR. BRUSTIN:  Objection to form.
24      A.  Well, no.  Once I had it written,
25  that was kind of final.

133

1      Q.  Okay.  How long did it take you to
2  write your Book of Shadows?
3      A.  Well, not long, actually.  Probably
4  a month to get stuff copied down from
5  different books.
6      Q.  Okay.  This on the -- and I'm going
7  to call it, and we'll put a paper clip or
8  something on this.
9      (THE WITNESS PROVIDES DOCUMENT TO
10  THE REPORTER)
11      THE REPORTER:  The three together?
12      MR. ERVIN:  Yes, ma'am.
13      Q.  (BY MR. ERVIN)  And the first page
14  of that, let's call that your title page.
15  Is that all right with you?
16      A.  (Nods head)  That's fine.
17      MR. BRUSTIN:  Could you please
18  identify the Bates-stamp number just so
19  we're all clear?
20      MR. ERVIN:  Bates-stamp is
21  MSCO-000516.
22      MR. BRUSTIN:  Thank you.
23      Q.  (BY MR. ERVIN)  Do you see that,
24  sir?  In the lower left corner?
25      A.  Oh.  Yes.

134

1      Q.  All right.  And we're going to call
2  that your title page.  Okay?
3      MR. BRUSTIN:  Objection to the form.
4      A.  Okay.
5      Q.  All right.  And then there's a
6  paragraph that appears under the title.  Do
7  you see that?
8      A.  Yes, I see it.
9      Q.  Does that paragraph essentially sum
10  up your understanding of the practice of
11  Satanism?
12      MR. BRUSTIN:  Objection to form.
13  Vague, overbroad, confusing.
14      A.  Well, it's something I copied out of
15  one of the books.  It's like a little
16  prayer.
17      Q.  All right.  Is that a prayer that
18  you would say whenever you were practicing a
19  ritual?
20      A.  Well, not this one, no.  It's just
21  something I just added to it.
22      Q.  Okay.  Was it significant that you
23  put it on the title page of your book?
24      A.  Well, at the time, I just liked it.
25  So that's why I put it there.

135

1      Q.  Okay.  Is this what you liked about
2  Satanism --
3      MR. BRUSTIN:  Objection to the form.
4      Q.  -- what's written there?
5      A.  Well, it's, I guess, part of what
6  drew me.
7      Q.  Yes, sir.  And it would appear to
8  me, in reading it, that it's a sort of an
9  empowering religion -- a self-empowering
10  religion.  Do you agree with that?
11      MR. BRUSTIN:  Objection to the form.
12      A.  Yes, sir.  It's more humanism-type
13  religion more than anything else.
14      Q.  All right.  And did you believe in
15  this at the time?
16      MR. BRUSTIN:  Objection to form.
17      A.  At the time, yes.
18      Q.  All right.  And would that be the
19  entire time that you were practicing
20  Satanism?
21      MR. BRUSTIN:  Objection to form.
22      A.  Yes, sir.
23      Q.  All right.  And there's more to your
24  Book of Shadows than what I've provided
25  here; is that correct?

136

1    A. Yes, sir.
2    Q. All right. So this is just partial.
3    A. Yes.
4        MR. ERVIN: All right. We're going
5    to mark that as Exhibit 1 to your
6    deposition.
7        (THE DOCUMENT WAS MARKED FOR
8    PURPOSES OF IDENTIFICATION AS DEFENDANTS'
9    EXHIBIT 1.)
10       MR. BRUSTIN: Peter, would you mind
11   just identifying the other two Bates-stamped
12   pages, please?
13       MR. ERVIN: The other two
14   Bates-stamped pages are Clark 001146 and
15   Clark 001147.
16       MR. BRUSTIN: Thank you.
17   Q. (BY MR. ERVIN) During the time of
18   your relationship with Rhonda, we've
19   discussed the fact that you used -- or you
20   took responsibility, I guess you would say,
21   for the birth control; is that correct?
22       MR. BRUSTIN: Objection to the form.
23   A. Yes, sir.
24   Q. Did you ever have any discussion
25   with Rhonda about changing that

137

1    responsibility?
2        MR. BRUSTIN: Objection to form.
3    A. No, sir.
4    Q. There was never any discussion about
5    whether maybe she should take the pill or
6    some other form of -- practice some other
7    form of birth control as the female in the
8    relationship?
9        MR. BRUSTIN: Objection to the form.
10   A. No, sir. I never talked about it
11   because I always had condoms.
12   Q. Was there an occasion when Detective
13   Handy and Sheriff Greer interviewed you at
14   the same time?
15       MR. BRUSTIN: Objection to form.
16   Tell him if you remember.
17   A. At the same time? I can't remember
18   if they did at the same time or not.
19   Q. All right. Do you recall having
20   given a polygraph examination or a lie
21   detector test?
22   A. Yes, sir.
23   Q. Do you recall when that was?
24   A. I don't know. I can't think exactly
25   when it was, but I do remember taking it.

138

1    Q. Okay. Do you have any feeling about
2    whether or not the examination was conducted
3    properly?
4        MR. BRUSTIN: Objection to the form.
5    A. Well, knowing what I know now, they
6    told me that I failed it. I found out later
7    that I didn't fail the polygraph test.
8    Q. How did you find that out?
9        MR. BRUSTIN: Objection to the form.
10   If you learned that through discussions with
11   attorneys, you cannot answer.
12   A. That's how I learned.
13   Q. Okay. That's all right. Have you
14   ever seen the results of the polygraph
15   examination?
16   A. No, sir.
17   Q. Do you know whether they exist
18   anywhere?
19   A. I have no idea.
20   Q. Have you ever seen any reports of
21   the examination?
22   A. No, I haven't.
23   Q. You only know what someone else has
24   told you.
25       MR. BRUSTIN: Objection to the form.

139

1    Don't answer that. Don't answer it. It's
2    privileged, and you know it's privileged.
3    Q. Do you know anything beyond what
4    somebody else has told you about the
5    polygraphs?
6        MR. BRUSTIN: You can answer that.
7    A. No, sir.
8    Q. Okay. Did you have more than one
9    polygraph examination?
10   A. Just one.
11   Q. Do you know who conducted that
12   examination?
13   A. I have no idea. I don't know.
14   Q. Do you recall who was present during
15   that examination?
16   A. Yes, sir.
17   Q. Who was that?
18   A. Detective Hope Greer.
19   Q. So she was present. Did she
20   administer the polygraph examination or did
21   someone else?
22   A. Someone else did.
23   Q. All right. Anyone besides the --
24   I'm going to call the person who conducted
25   the examination a polygrapher. Okay?

140

1    A.  Okay.
2    Q.  Anyone else in the room besides the
3  polygrapher and Detective Hope Greer?
4    A.  No, sir.
5    Q.  How did you feel about talking with
6  Detective Greer?  Did she treat you fairly?
7    MR. BRUSTIN:  Objection to form.
8    A.  I thought so, yes.
9    Q.  Did she make you feel uncomfortable?
10   A.  No, sir.
11   Q.  Did she act like a jerk?
12   A.  No, sir.
13   Q.  All right.  Do you know of anything
14  that she did wrong or that would have caused
15  you any harm?
16   MR. BRUSTIN:  Objection to the form,
17  asked and answered.  Tell him again.
18   A.  Well, she never treated me bad or
19  anything.  About the nightmare I had, I know
20  some things was added to it that I didn't
21  say.
22   Q.  What are you referring to?
23   A.  Well, about her wearing red.
24   Q.  Yes, sir.
25   A.  I never told them that she was

141

1  wearing red.  I didn't really see red, just
2  -- just unclear nightmare, basically.
3    Q.  So you didn't -- you feel like she
4  was not truthful in telling the jury that
5  you told her that Rhonda was wearing red in
6  your dream.
7    MR. BRUSTIN:  Objection to form.
8    A.  Correct.
9    Q.  Is that correct?  Was there any
10  other part of her testimony that you felt
11  was untruthful?
12   MR. BRUSTIN:  You may answer.
13   A.  That's the only thing I can really
14  think of that she said.
15   Q.  Okay.  Did you review any materials
16  in preparation for this deposition?
17   A.  Yes, sir.
18   Q.  Do you recall what it was that you
19  looked at?
20   A.  I've had several different pages to
21  go over in a short period of time.
22   Q.  All right.  Who wrote the pages?
23   MR. BRUSTIN:  Objection to form.
24   A.  I can't say who wrote them.  I don't
25  know, just copies I was handed.

142

1    Q.  Did you read any of the testimony
2  from the trial?
3    A.  Yes, sir.
4    Q.  Did you read any testimony from your
5  parole hearing?
6    A.  Yes, sir.
7    Q.  And I believe you had two hearings;
8  is that correct?
9    A.  Yes, sir.
10   MR. BRUSTIN:  Just to be clear, it's
11  not testimony.
12   MR. ERVIN:  Sure.  Sure.
13   Q.  (BY MR. ERVIN)  Did you read any of
14  your statements to the parole board?
15   A.  Yes, sir.
16   Q.  All right.  Both of them?
17   A.  Yes, sir.
18   Q.  All right.  Did you read any of your
19  testimony in the evidentiary hearing on your
20  motion for a new trial, which I believe
21  occurred in 2015?
22   A.  I can't recall.  It's -- see, I had
23  to read so much in such a little time.
24   Q.  Sure.  Did you have occasion to
25  review any of the video from the trial?

143

1    A.  I've seen a little bit.  It's been
2  years, or a year or so, I guess.  It's been
3  a while.
4    Q.  All right.  Why did you have
5  occasion to review what you did?
6    MR. BRUSTIN:  You can't answer that.
7  So I'm going to claim privilege on that.
8  You can ask him what he reviewed, when he
9  reviewed it.  That's all fair game.  Not why
10  he reviewed it.
11   Q.  Do you recall what you reviewed?
12   MR. BRUSTIN:  Objection to the form.
13  Tell him if you remember anything else.
14   A.  I'm not sure.
15   Q.  Okay.  Do you know how long it took
16  you to review it?
17   A.  Just seemed like a few minutes.  It
18  might have been longer.  I don't know.
19   Q.  I want to hand to you a copy of an
20  Amended Complaint filed in your case.  I'm
21  going to ask you if you've seen that before.
22   A.  (Reviews document)  I guess I've
23  seen this.
24   Q.  When did you see that?
25   MR. BRUSTIN:  Objection to form.

144

1    A.  This -- I was given this yesterday.
2    Q.  Had you seen it at any time before
3  yesterday?
4    A.  I don't think I had.
5    Q.  Can you articulate why you are suing
6  Detective Handy?
7        MR. BRUSTIN:  Objection to the form.
8  You can answer, if you can.
9    A.  Well, he's done wrong against me and
10  other people, twisting things around and
11  lying against people.
12    Q.  So you feel like that he told lies
13  about the evidence in your case.
14    A.  Yes, sir.
15    Q.  And that you shouldn't have been
16  charged with murder and wouldn't have been
17  except for that.
18        MR. BRUSTIN:  Objection to the form.
19  Calls for a legal conclusion.  You can
20  answer.
21    A.  Yes, sir.
22    Q.  If I understand it correctly, you
23  think that he made -- he told lies or made
24  misleading statements that caused you to be
25  prosecuted for murder.

145

1        MR. BRUSTIN:  Objection to the form.
2  Mischaracterizes his testimony.  Asked and
3  answered.  You can answer.
4    A.  Yes, sir.
5    Q.  Well, you understand that -- I mean,
6  your claim is either that he lied or that he
7  had caused charges to be brought without any
8  evidence to support them; is that right?
9        MR. BRUSTIN:  Objection to the form.
10  That's argumentative.  Calls for a legal
11  conclusion.  If you understand it, you can
12  answer.  If you don't, tell him.
13    A.  I'm not sure.
14    Q.  All right.  Do you think that a
15  person should have evidence to substantiate
16  their claim before they are charged with a
17  crime?
18        MR. BRUSTIN:  Objection to the form.
19  Calls for legal conclusion, and so
20  completely irrelevant as to be harassing.
21  But you can answer.
22    A.  Yes, sir.
23    Q.  You think they ought to have the
24  evidence to prove what you'd done wrong
25  before they would sue you, correct?

146

1        MR. BRUSTIN:  Same objection.
2    A.  Yes, sir.
3    Q.  And you don't feel like Detective
4  Handy had evidence to prove you had done
5  wrong or that he made up the evidence,
6  correct?
7        MR. BRUSTIN:  Objection to form.
8    A.  Correct.
9    Q.  Let me direct your attention to
10  Paragraph 62 of your Complaint.  That's on
11  Page 15.
12        MR. BRUSTIN:  Do you have a copy for
13  me?
14        MR. ERVIN:  Sure.
15        MR. BRUSTIN:  I'm sorry, you said
16  Paragraph 15?
17        MR. ERVIN:  Paragraph 62 --
18        MR. BRUSTIN:  Oh.
19        MR. ERVIN:  -- on Page 15.
20        MR. BRUSTIN:  Gotcha.
21    Q.  (BY MR. ERVIN)  It says that (reads
22  from document) Handy and Greer used the
23  blood-stained handkerchief to corroborate
24  Handy's falsified claim that Hardin
25  sacrificed animals and that Handy and Greer

147

1  falsely represented that the blood on the
2  handkerchief came from animals Hardin had
3  sacrificed in satanic rituals.
4    Do you see that?
5    A.  Yes, sir, I do.
6    Q.  Did Detective Handy testify to that
7  at the trial?
8        MR. BRUSTIN:  Objection to the form,
9  foundation.  The testimony obviously speaks
10  for itself, which there's a transcription of
11  it, but tell him what you know.
12    A.  I'm trying to remember.
13        MR. BRUSTIN:  And it's vague and
14  confusing.
15    Q.  Do you know whether Handy testified
16  to that at trial?
17        MR. BRUSTIN:  Objection to the form.
18  Are you asking if he testified to Paragraph
19  62?  You can answer.
20    A.  I want to say yes, but I'm not sure.
21  I can't remember.
22    Q.  All right.  James Clark is the
23  detective who you said was nice to you.  Do
24  you know of any reason why you would sue
25  him?

148

1      MR. BRUSTIN:  Objection to the form.
2  Cause for legal conclusion.  You can go --
3  go ahead.
4      A.  I can't think right now.  I don't
5  know.
6      Q.  All right.  You testified you don't
7  know who Kelly Jones, Robert Ennis, Charles
8  Edelen, Jim Woosley or Major Griffiths were;
9  is that correct?
10     MR. BRUSTIN:  Objection to form,
11  asked and answered.
12     A.  Correct.
13     Q.  Would it be fair to say then that
14  you don't know why you would sue them?
15     MR. BRUSTIN:  Objection to the form.
16  Calls for legal conclusion.  You can answer
17  again.
18     A.  All I can say -- the names are just
19  vague to me.
20     Q.  All right, sir.
21     MR. BRUSTIN:  You do know, Mr.
22  Ervin, that he didn't write the Complaint,
23  right?
24     Q.  Is it your testimony, Mr. Hardin,
25  that you didn't write this 57-page, 13-count

149

1  Complaint?
2      A.  That's correct.
3      Q.  All right.  I want to talk to you
4  about when you went to the parole board.  Do
5  you recall that?
6      A.  Yes, sir.
7      Q.  I believe the first occasion that
8  you testified or spoke with the parole board
9  was in 2006.  Is that your recollection?
10     A.  I think so, yes.
11     Q.  What did you do -- did you do
12  anything to prepare for your parole hearing?
13     A.  Yes, sir, I did.
14     Q.  What did you do?
15     A.  Well, in prison, it's common
16  knowledge that, to go see the parole board,
17  you have to confess to a crime.  It doesn't
18  matter if you did it or not.  They might let
19  you have parole if you just man up to it and
20  say you did it.
21     So I would sit and try to come up
22  with some type of a story to tell them so I
23  might have a better chance of making parole.
24     Q.  Okay.  And is that what you did?
25     MR. BRUSTIN:  Objection to the form.

150

1      A.  Yes, sir.
2      Q.  When did you come up with your story
3  in relationship to when your hearing was?
4      MR. BRUSTIN:  Objection to the form.
5  Are you talking about the first hearing?
6      MR. ERVIN:  Yes.
7      THE WITNESS:  Well, it's something
8  I've been trying to come up with for a
9  while, because I knew what day my parole was
10  going to be on.  So I was trying to come up
11  with some type of story.  I mean, I don't
12  know exactly how long before I saw the
13  parole board.  It was just something I had
14  to come up with.
15     Q.  (BY MR. ERVIN)  All right.  Did you
16  write it down?
17     A.  No, sir.
18     Q.  What did you do to come up with it?
19     A.  Well, I knew I had to confess to a
20  crime.  Didn't matter if I did it or not.  I
21  had to confess to it, hoping that I would
22  make parole.
23     Q.  All right.  I mean, was it something
24  you would think about as you would go to
25  sleep or when did you put your story

151

1  together in your mind?
2      MR. BRUSTIN:  Objection to the form.
3      A.  Well, it wouldn't be before I go to
4  sleep.  It was during the daytime I was
5  trying to come up with something to say
6  something to them.
7      Q.  All right.  Did you talk to anybody
8  about the story that you were going to tell?
9      A.  No, sir.
10     Q.  Did you tell anybody that you were
11  going to come up with a story to tell?
12     A.  No, sir.
13     Q.  Did you have any relatives or
14  friends who came to that hearing with you?
15     A.  No, sir.
16     Q.  Had you talked to anybody who -- had
17  you asked anybody to help you prepare for
18  that hearing?
19     A.  No, sir.
20     Q.  Did anyone offer you any help in
21  preparing for that hearing?
22     A.  No, sir.
23     Q.  Did anyone tell you you had to admit
24  guilt before you could be released on
25  parole?

152

```
 1          MR. BRUSTIN:  Objection to the form,
 2    asked and answered.  Tell him again.
 3          A.  Well, it was something I heard from
 4    inmates and it's just common knowledge in
 5    prison.
 6          Q.  Okay.  Do you recall what facility
 7    you were in at the time of your first parole
 8    hearing?
 9          A.  Yes, sir.  I was in Eastern Kentucky
10    Correctional Complex.
11          Q.  Did you understand that Mr. Clark
12    was there at the same time that you were
13    there?
14          MR. BRUSTIN:  Objection to the form.
15          A.  Well, he was there for a short time.
16    Then he got transferred to another facility.
17          Q.  Okay.  During the time that he was
18    there and you were there, did you have
19    occasion to see one another?
20          A.  Off and on, yes.
21          Q.  Did you all ever have occasion to
22    talk with one another?
23          A.  Yes, sir.
24          Q.  When was that?
25          A.  It was mostly when we was out on the
```

153

```
 1    yard or in the chow hall.
 2          Q.  All right.  What were you -- was
 3    your all's visits friendly?
 4          MR. BRUSTIN:  Objection to form.
 5          A.  Yes, sir.
 6          Q.  Did Mr. Clark ever express to you
 7    any anger about your all's situation when
 8    you saw each other at Eastern?
 9          A.  I think there was one time, the best
10    I can remember, yes.
11          Q.  Can you tell me what was said in
12    that conversation?
13          A.  Oh, gosh, that was so many years
14    ago, I -- I can't remember exactly what he
15    did say, but I remember we did have a little
16    bit of a heated argument, I guess you can
17    say.
18          Q.  What was the nature of the argument?
19          MR. BRUSTIN:  Objection to form.
20          A.  I'm trying to remember.  I can't
21    remember exactly what it was.  I just
22    remember that we had a little bit of an
23    argument.
24          Q.  Okay.  Was the argument physical at
25    all?
```

154

```
 1          A.  No, sir.
 2          Q.  During the time that you were being
 3    questioned or interviewed by the police
 4    officers before your arrest, did the police
 5    ever tell you that Clark had confessed or
 6    was saying that you had done anything wrong
 7    in relationship to Rhonda Warford?
 8          A.  Not to my knowledge.
 9          Q.  So they never said that you were
10    confessing -- or that Clark was confessing
11    and throwing you under the bus?
12          MR. BRUSTIN:  Objection to form.
13          A.  No, sir.  At the time when -- it was
14    right after we was arrested, best I can
15    remember, they had us both in separate
16    rooms.  They was telling me that Jeff Clark
17    was telling them everything, putting
18    everything on me.
19          Q.  Is that right?  Who told you that?
20          A.  I can't remember which detective.
21          Q.  So when did you talk to Clark about
22    that?
23          MR. BRUSTIN:  Objection to form.
24    Mischaracterizes his testimony.  Foundation.
25    Go ahead.
```

155

```
 1          A.  I can't remember when it was, but I
 2    found out that they were telling him the
 3    same thing about me.
 4          Q.  Did Clark tell you that?
 5          MR. BRUSTIN:  Objection to form.
 6          A.  Yes, sir.
 7          Q.  When did you all have that
 8    conversation?
 9          A.  It might have been after we both
10    went to prison.  I can't remember exactly
11    when it was.
12          Q.  Well, so, if I understand you,
13    during one of your interviews -- and I
14    believe you had two; is that correct?
15          MR. BRUSTIN:  Objection to form.
16    Mischaracterizes his testimony.  He said at
17    least two.
18          A.  Well, I was interviewed by police
19    officers more than twice.  I can't remember
20    exactly who and when.
21          Q.  Okay.  My question is, when you
22    found that out, didn't you want to talk to
23    Clark and find out why he was throwing you
24    under the bus?
25          MR. BRUSTIN:  Objection to form.
```

156

1  Mischaracterizes his testimony.  Foundation.
2  You can answer.
3      A.  Well, we were just talking, not -- I
4  believe I told Jeff that they were telling
5  me that he was confessing to everything and
6  throwing everything on me, and that's when
7  he told me that they were telling him the
8  same thing.
9      Q.  All right.  Now, I want to try and
10  put that in a timeframe.  Okay?  Was that
11  after they told you that -- immediately
12  after they told you -- that Jeff was
13  confessing and putting everything on you, or
14  did you wait to have that conversation
15  sometime later after you were in jail?
16      MR. BRUSTIN:  Objection to the form,
17  asked and answered.  Tell him again if you
18  remember.
19      A.  Well, we were kept separate from
20  each other, wasn't able to talk to each
21  other right away.
22      Q.  Right.  But you both went home,
23  correct?
24      MR. SLOSAR:  Objection to form.
25      MR. BRUSTIN:  Objection.

157

1      A.  I can't remember if that's when we
2  was arrested or we was about to go back
3  home.  I don't know.
4      Q.  Well, I need to try and put it in
5  perspective with you.  So I want to walk it
6  back -- walk back through it with you.
7      MR. BRUSTIN:  Do you mind?  We've
8  gone about another hour and 15.  Do you mind
9  if we take another couple-minute break?
10      MR. ERVIN:  Why don't we go ahead
11  and take a lunch break?
12      MR. BRUSTIN:  It's a little early
13  for lunch, but do you want to take a lunch
14  break?
15      MR. ERVIN:  Yeah, let's take a lunch
16  break.
17      MR. BRUSTIN:  Okay.
18      (OFF THE RECORD, 12:09-1:14 P.M.)
19      (LUNCH RECESS)
20      (VOLUME 2 of 2 OF VIDEO RECORDING)
21      Q.  (BY MR. ERVIN)  Mr. Hardin, do you
22  recall that you came to this conference room
23  for a while yesterday during the deposition
24  of Jeffrey Clark?
25      A.  Yes, sir.

158

1      Q.  Were you accompanied by anyone when
2  you came here yesterday?
3      A.  Yes, sir, I was.
4      Q.  Who was that?
5      A.  Let's see.  You were here.
6      MR. BRUSTIN:  Yes.
7      A.  And Mr. Simon, I believe.
8      Q.  All right.  Were you accompanied by
9  any females?
10      A.  Not that I can recall.
11      Q.  No woman was with you yesterday?
12      MR. BRUSTIN:  Not -- objection to
13  the form.  Do you want to be more specific?
14      Q.  Did a woman come to the building
15  with you yesterday?
16      A.  Oh, yes.  I thought you were talking
17  about lawyers.  Yes, my sister.
18      Q.  Okay.
19      A.  Vickie.
20      Q.  Did she drive you here, or why was
21  she here?
22      A.  Yeah, she drove me here.
23      Q.  When did she move to Brandenburg?
24      A.  Oh, gosh.  I can't remember what
25  year it was.  I was in prison when she moved

159

1  there.
2      Q.  All right.  And you went to
3  Brandenburg because she was there.
4      A.  Yes, sir.
5      Q.  Is she employed?
6      A.  Yes, she is.
7      Q.  Where does she work?
8      A.  She works at a bakery called Mom's
9  -- no, Cake Mom's Bakery.
10      Q.  Where is that located?
11      A.  It's in Brandenburg.
12      Q.  When you testified or had your
13  parole board hearing in 2014, did you spend
14  time preparing the story you were going to
15  tell for that hearing?
16      MR. SLOSAR:  Objection to form.
17      MR. BRUSTIN:  Objection to the form.
18      A.  Yes, sir.
19      Q.  And did you prepare in a similar way
20  to what you had done before your first
21  hearing?
22      MR. BRUSTIN:  Objection to form.
23      A.  Yes, sir.
24      Q.  All right.  Did anyone assist you in
25  preparing for that hearing?

160

1     A.  No, sir.
2     Q.  Did anyone tell you what you should
3  or shouldn't say during that hearing?
4     A.  No, sir.
5     Q.  Do you recall what story you told
6  that parole board?
7     A.  Just barely.
8     Q.  Can you tell us what the story was?
9     A.  Well, again, I confessed to
10  something I didn't do.  Told them probably a
11  little bit more detail than I did the first
12  time I went.
13     Q.  Why was that?
14     A.  Well, I was trying to make it sound
15  a little more believable.
16     Q.  Do you recall any of the detail that
17  you gave?
18     A.  Not really.  No.
19     Q.  Did you tell them that Jeff Clark
20  had participated in the murder as well?
21        MR. BRUSTIN:  Objection to form and
22  foundation.
23     A.  Yes, sir.
24     Q.  Why did you tell them that Jeff was
25  involved in the murder?

161

1     A.  Well, they asked me specifically if
2  the co-defendant was there and if he had got
3  involved, so I said yes.
4     Q.  Okay.  Do you know what he had said
5  in his parole hearing?
6        MR. BRUSTIN:  Objection to the form.
7     A.  At the time, no.
8     Q.  Did you know what he had said in his
9  2006 parole hearing?
10     A.  Not at the time.
11     Q.  Have you since had occasion to see
12  what he had told the parole board?
13     A.  Yes, sir.
14     Q.  When did you see that?
15     A.  I can't recall exactly when it was.
16     Q.  Do you recall what he told the
17  parole board?
18     A.  Vaguely.
19     Q.  Do you recall that he told the
20  parole board that you had killed Rhonda?
21     A.  Yes, sir, I remember that.
22     Q.  And that his participation was only
23  to help you move the body?
24     A.  Yes, sir.
25     Q.  Was that true?

162

1        MR. BRUSTIN:  Objection to form.
2     A.  No, sir.
3     Q.  Before we took our break, we were
4  talking about when you had an interview with
5  the police, and that they had told you that
6  Jeff was denying any responsibility and
7  laying everything off on you.  Do you recall
8  that?
9     A.  Yes, sir.
10     Q.  Have you had -- since, or during the
11  lunch break, did you recall when that
12  interview occurred?
13        MR. BRUSTIN:  Objection to form,
14  asked and answered.  Do you understand?  If
15  you don't, tell him.
16     A.  I don't understand it.
17     Q.  Okay.  Probably a poor question.
18        After we broke for lunch, did you
19  have occasion to think further about when
20  that interview in which the police had told
21  you that Jeff Clark was laying off on you?
22  Did you have occasion to consider further
23  when that may have occurred?
24        MR. BRUSTIN:  Objection to the form.
25     A.  I can't remember.

163

1     Q.  Okay.  Did you remember how many
2  interviews there were or how many days you
3  interviewed?
4     A.  There's definitely more than two.  I
5  don't know exactly how many it was.
6        MR. ERVIN:  All right.  Let me hand
7  to you a document that we'll ask the
8  reporter to make as Exhibit 2 to your
9  deposition.
10        MR. BRUSTIN:  Thank you.
11        (THE DOCUMENT WAS MARKED FOR
12  PURPOSES OF IDENTIFICATION AS DEFENDANTS'
13  EXHIBIT 2.)
14     Q.  (BY MR. ERVIN)  Can you tell us the
15  date of that document?
16     A.  April 7, 1992.
17     Q.  And does that refer to an interview
18  with you?
19     A.  Yes, it does.
20     Q.  Do you know whether that was the
21  first interview that you had?
22     A.  I really don't know.
23        MR. ERVIN:  Okay.  Let me hand to
24  you a document that we'll ask the reporter
25  to mark as Exhibit 3 to your deposition.

164

1      MR. BRUSTIN:  Just so we don't all
2  get confused, do you mind marking these as
3  either Defendants' Exhibit 3 or --
4      THE REPORTER:  I am.
5      MR. BRUSTIN:  You are?
6      THE REPORTER:  Mm-hmm (affirmative).
7      MR. BRUSTIN:  Or Hardin Exhibit 3?
8  I don't know how you want to do it going
9  forward just so we don't get confused.
10     THE REPORTER:  Sorry.
11     MR. BRUSTIN:  Peter?
12     MR. ERVIN:  Yes.
13     MR. BRUSTIN:  Just so we don't get
14 confused when we mark deposition exhibits,
15 do you want to -- is that how you're going
16 to do -- are you going to do new for each
17 deposition?
18     MR. ERVIN:  Yes.
19     MR. BRUSTIN:  You do?  Okay.  All
20 right.
21     (THE DOCUMENT WAS MARKED FOR
22 PURPOSES OF IDENTIFICATION AS DEFENDANTS'
23 EXHIBIT 3.)
24     Q.  (BY MR. ERVIN) Can you tell us the
25 date of this document?

165

1      A.  April 7, 1992.
2      Q.  And does it refer to an interview
3  with you?
4      A.  Yes, sir.
5      Q.  And who does it say submitted the
6  interview?
7      A.  Detective Hope Greer.
8      Q.  And you recall that you were
9  interviewed by Detective Hope Greer; is that
10 correct?
11     A.  Yes.
12     MR. BRUSTIN:  Objection to the form.
13 Asked and answered.  Just let him --
14     Q.  Is that right, sir?
15     A.  Yes, sir.
16     Q.  All right.  And you also recall in
17 regard to Exhibit 2 to your deposition, the
18 interview conducted by Detective Handy, that
19 you were interviewed by him, correct?
20     MR. BRUSTIN:  Objection to the form.
21 Mischaracterizes his testimony.
22     A.  Yes, sir.
23     Q.  Do you recall having been
24 interviewed by Detective Handy?
25     MR. BRUSTIN:  Objection to form.

166

1  He's not asked you this document
2  (indicating).  He's just asking you in
3  general.  You don't need to look at that.
4      THE WITNESS:  Okay.
5      MR. BRUSTIN:  Thank you.
6      THE WITNESS:  Yes, sir.
7      MR. ERVIN:  All right.  Now, let me
8  hand to you what we'll mark as Exhibit 4 to
9  your deposition.
10     (THE DOCUMENT WAS MARKED FOR
11 PURPOSES OF IDENTIFICATION AS DEFENDANTS'
12 EXHIBIT 4.)
13     Q.  (BY MR. ERVIN)  Can you tell us the
14 date of this interview?
15     A.  April 9, 1992.
16     Q.  And does this document include
17 reference to an interview with you?
18     A.  Yes, sir.
19     Q.  And it shows that it was submitted
20 by Detective Mark Handy; is that correct?
21     A.  Yes, sir.
22     Q.  Do you recall that Detective Handy
23 had interviewed you a second time?
24     MR. BRUSTIN:  Objection to the form,
25 asked and answered.  You can answer.

167

1      A.  Yes, I think he did.
2      Q.  Okay.  Are you aware of any
3  interview that you gave after April 9th of
4  1992?
5      MR. BRUSTIN:  Objection to the form,
6  foundation.
7      A.  I can't recall.  I don't know.
8      Q.  Okay.  You're not aware of another
9  interview --
10     MR. BRUSTIN:  Objection to the form.
11     Q.  -- is that right?
12     MR. BRUSTIN:  That mischaracterizes
13 his testimony.  He just told you he doesn't
14 remember when they were.
15     A.  Right.  I can't remember.  I don't
16 know.
17     MR. ERVIN:  Counsel, please, limit
18 objection to the form, and don't coach the
19 witnesses as to how to testify.
20     MR. BRUSTIN:  Well, what I was
21 objecting to is that your question was --
22 you haven't done this much, but you've done
23 it some, but what you clearly trying to do
24 is to trick him into saying he remembered
25 something he didn't.  I wanted to prevent

168

1  that from happening and object to it.
2  That's what you heard.
3      MR. ERVIN:  I appreciate the fact
4  that you're a mind reader and know what my
5  intentions are.  Okay?
6      MR. BRUSTIN:  I've seen a lot of
7  lawyer tricks.
8      MR. ERVIN:  Right.  I'm sure you
9  have.  You've probably seen every trick in
10  the book, haven't you?
11      MR. BRUSTIN:  I've seen a lot of
12  them.
13      MR. ERVIN:  I'm sure you have.  Now,
14  limit your objections to form, please.
15      MR. BRUSTIN:  Okay.
16      MR. ERVIN:  That's what the rules
17  require, isn't it?
18      MR. BRUSTIN:  Please don't try to
19  trick him up.
20      MR. ERVIN:  You know that.
21      MR. BRUSTIN:  Please.
22      MR. ERVIN:  You know that; don't
23  you?  You've read the rule book, right?
24      MR. BRUSTIN:  I have not impeded
25  your deposition.

169

1      MR. ERVIN:  You are and you're
2  coaching your witness.
3      MR. BRUSTIN:  I'm not.
4      MR. ERVIN:  To form is your
5  objection.
6      MR. BRUSTIN:  Go ahead.
7      MR. ERVIN:  Thank you, sir.
8      Q.  (BY MR. ERVIN)  You don't have any
9  memory of any interview you gave the police
10  after April 9th --
11      MR. BRUSTIN:  Object.
12      Q.  -- of 1992; is that right?
13      MR. BRUSTIN:  Objection to the form.
14  Asked and answered.  Mischaracterizes his
15  testimony.  It's harassing and confusing.
16  You can answer it again.
17      Q.  Now you can answer the question.
18      A.  Well, it happened so many years ago,
19  it's hard to really be clear on it.  I'm not
20  sure.  I don't know.
21      Q.  And that's my question.  You don't
22  know of any other interview you gave,
23  correct?
24      MR. BRUSTIN:  Objection to the form.
25  It's a different question.  Mischaracterizes

170

1  his testimony.  Asked and answered, and now
2  it's definitely harassing.
3      Q.  Go ahead and answer, please.
4      A.  Correct.
5      Q.  All right.  Now, of these three
6  interviews that we have documented -- oh,
7  you hired a lawyer, didn't you?
8      MR. BRUSTIN:  Objection to the form.
9      Q.  Before you were arrested, you hired
10  a lawyer, didn't you?
11      A.  Yes, sir.
12      Q.  What was your lawyer's name?
13      A.  Wallace Rogers.
14      Q.  All right.  When did you hire Mr.
15  Rogers?
16      A.  I can't remember if it was after
17  Rhonda disappeared or after her body was
18  found.
19      Q.  Okay.  Had you talked to a lawyer
20  between the time that Rhonda had disappeared
21  and her body was found?
22      MR. BRUSTIN:  Objection to the form.
23  You can answer.
24      A.  I can't recall.  I don't know.
25      Q.  Did you talk to any lawyers other

171

1  than Mr. Rogers?
2      A.  Not that I'm aware of.
3      Q.  Now, I want to get back to what I
4  was asking before we broke for lunch, and
5  that is your recollection of when or what
6  day you were being interviewed that it was
7  suggested to you that Jeff Clark was laying
8  the crime off on you.  Do you remember that?
9      A.  I don't remember exactly what day it
10  was.
11      Q.  You remember that that -- or you
12  told us that that occurred, correct?
13      A.  Yes.
14      Q.  Do you remember what day it was?
15      MR. BRUSTIN:  Objection to form.
16  Asked and answered.  Tell him again.
17      A.  I don't remember what day it was.
18      Q.  All right.  Do you know whether it
19  occurred in one of these three interviews?
20      MR. BRUSTIN:  Objection to form.
21  Assumes there's only three interviews.
22  Mischaracterizes his testimony.  You can
23  answer.
24      A.  I'm not sure.  I can't say.
25      Q.  Okay.  After you found out that

172

1    Jeffrey Clark or they told you that Jeffrey
2    Clark was laying it off on you, did you talk
3    to Jeff Clark about it?
4        MR. BRUSTIN:  Objection to form,
5    asked and answered.
6        A.  Yes.
7        Q.  When did you have that discussion
8    with him?
9        MR. BRUSTIN:  Objection to form,
10   asked and answered.  Tell him again.
11       A.  I believe it was after we were
12   incarcerated.
13       Q.  Now, you were incarcerated on May
14   5th, if memory serves.  Do you recall if
15   that's when you were arrested?
16       A.  I think it was.
17       Q.  And at least according to the
18   exhibits that we've offered, the fifth (sic)
19   exhibit being the last, there was an
20   interview on April 9th, correct?
21       MR. BRUSTIN:  Objection to form.
22   The document speaks for itself.
23       MR. SLOSAR:  Just, Peter, for
24   clarification, I only see four exhibits
25   here.  Is there a fifth exhibit?

173

1        MR. ERVIN:  Maybe it's four.
2        MR. SLOSAR:  Okay.  Sorry.
3        MR. ERVIN:  It's probably me.
4        MR. BRUSTIN:  I think it's just
5    four.
6        MR. ERVIN:  I'm not very smart, as
7    you can tell.  I don't even know the Rules
8    of Civil Procedure.
9        MR. SLOSAR:  I'm not making any
10   accusations.  I just wanted to make sure I
11   wasn't missing something.
12       MR. ERVIN:  Like I said, probably my
13   mistake, because I can't even count.
14       MR. BRUSTIN:  I think you can count,
15   but we do have -- but there's only four
16   exhibits, just for the record, so we could
17   be all clear and not have to worry anybody
18   being smart or anything like that.  There
19   are four exhibits that have been marked.
20       MR. ERVIN:  Good, good.  Well,
21   there's one smart person in the room, we
22   know.
23       Q.  (BY MR. ERVIN)  Now, Mr. Hardin, do
24   you know whether you were interviewed at any
25   time between April 9th and May 5th?

174

1        MR. BRUSTIN:  Objection to the form,
2    asked and answered.  Tell him again.
3        A.  I can't recall any interviews then.
4        Q.  And you're telling us that you did
5    not talk to Jeffrey Clark about whether he
6    had laid off on you during his interview
7    with the police?
8        MR. BRUSTIN:  Objection to the form.
9    Mischaracterizes his testimony.  Asked and
10   answered.
11       A.  The subject did come up.  We talked
12   about it a little bit.
13       Q.  Did you ever talk about it before
14   your arrest?
15       MR. BRUSTIN:  Objection to form.
16   Asked and answered.  Tell him again.
17       A.  I don't believe we did.
18       Q.  Before your arrest, did you all talk
19   about your interviews?
20       A.  Not that I can remember.
21       Q.  Really?
22       MR. BRUSTIN:  Which part of his
23   answer didn't you understand?  Is "really"
24   the question?
25       Q.  You didn't talk about your

175

1    interviews?
2        MR. BRUSTIN:  Object.
3        Q.  You were being interviewed in a
4    murder investigation; isn't that correct?
5        A.  Yes.
6        MR. BRUSTIN:  Objection to the form.
7    Asked and answered.  Argumentative.
8        Q.  And you didn't talk to the person
9    who you knew was being accused along with
10   you in that murder investigation; is that
11   what you're telling us?
12       MR. BRUSTIN:  Objection to the form.
13   Asked and answered.  Argumentative.  The
14   third time you've asked it.
15       A.  Yes, sir.
16       Q.  You weren't curious to know what
17   Clark had told the police?
18       MR. BRUSTIN:  Objection to the form.
19       A.  Well, I just assumed that he didn't
20   tell the police nothing like that.  Thought
21   I knew him pretty good back then.
22       MR. BRUSTIN:  Just to be clear, and
23   I will instruct you this on the record.  He
24   does not -- he wants to know your memory.
25   He does not want you speculating.  Tell him

176

1    what you remember.  Okay?
2         THE WITNESS:  Okay.
3         Q.  (BY MR. ERVIN)  I think that you
4    were telling me that that was an assumption
5    you made at the time; isn't that right, Mr.
6    Hardin?
7         MR. BRUSTIN:  Objection to the form.
8         A.  Yes, sir.
9         Q.  All right.  In fact, you made that
10   assumption because you and Clark were good
11   friends, weren't you?
12        MR. BRUSTIN:  Objection to the form.
13        A.  Yes, sir.
14        Q.  In fact, you would consider Clark to
15   have been your best friend at the time,
16   wouldn't you?
17        MR. BRUSTIN:  Objection to the form.
18        A.  Yes, sir.
19        Q.  Now, did you and Clark get together
20   during the time between April 9th and May
21   5th?
22        A.  I can't remember if we did or not.
23        Q.  Leading up to the date of Rhonda's
24   death, you all saw each other if not every
25   day, every other day, every third day; did

177

1    you not?
2         MR. SLOSAR:  Objection to form.
3         MR. BRUSTIN:  Objection to form.
4         A.  I can't remember how often we did
5    see each other, even if we did.
6         Q.  Did you see each other at least
7    weekly?
8         MR. BRUSTIN:  Objection to form.
9         A.  I can't remember.  I don't know.
10        Q.  Anyhow, he was your best friend,
11   correct?
12        MR. BRUSTIN:  Objection to form,
13   asked and answered.
14        A.  Yes, sir.
15        Q.  And you're telling the jury that you
16   didn't talk to your best friend about a
17   murder investigation that you and he were
18   the subject of --
19        MR. BRUSTIN:  Objection to form.
20   There's no jury in this room.
21        Q.  -- between the time --
22        MR. BRUSTIN:  Otherwise, object to
23   it.
24        Q.  -- that you were interviewed on
25   April 9th and your arrest on May 5th.

178

1         MR. BRUSTIN:  Objection to form.
2    Asked and answered four times, or five
3    times.
4         A.  To the best of my memory.
5         Q.  To the best of your memory, you did
6    not talk about it?
7         A.  Correct.
8         MR. BRUSTIN:  Same objection.
9         Q.  To the best of your memory, did you
10   have occasion to see him at any time in that
11   26 days?
12        MR. BRUSTIN:  Objection to form,
13   asked and answered, exactly like that.
14        A.  I can't remember if we did see each
15   other then.  I don't know.
16        MR. ERVIN:  I believe that's all I
17   have, sir.  Thank you.
18        MR. BRUSTIN:  Can we take a -- just
19   a -- you guys are switching -- just a
20   30-second restroom break?
21        (OFF THE RECORD, 1:37-1:44 P.M.)
22        MR. BOND:  Sir, my name is Keith
23   Bond and, for simplistic purposes, I will
24   say I represent the Meade County Defendants.
25   Okay?  I'm here simply to ask you some

179

1    questions to try to learn about this
2    situation.
3         I would simply ask that, if you
4    don't understand a question that I ask you,
5    please tell me.  I'll try to do a better job
6    of asking.  If I continue to struggle, I
7    know Mr. Brustin will clear it up for us.
8    Okay?
9         THE WITNESS:  Okay.
10        MR. BOND:  Okay.  At any time that
11   you want to take a break, you tell me.
12   We'll stop and we'll come back when you're
13   ready.  I simply ask that you answer the
14   question that's pending.  Okay?
15        THE WITNESS:  Okay.
16        MR. BOND:  Okay.
17
18   CROSS EXAMINATION
19   BY MR. BOND:
20        Q.  Do you know who Joe Greer is?
21        A.  Yes, sir.
22        Q.  Okay.  Who is Greer?
23        A.  He was sheriff of Meade County.
24        Q.  In 1992.
25        A.  Yes.

180

1    Q. Okay. And that's what we are going
2  to talk about is 1992. I appreciate that.
3  Do you know who Cliff Wise is?
4    A. Yes. He's one of the deputies.
5    Q. Okay. Did you know him before 1992?
6    A. No, sir.
7    Q. Okay. Ernie Embry, do you know who
8  Mr. Embry is?
9    A. He's also one of the deputies in
10  Meade County.
11    Q. Okay. Did you ever meet him?
12    MR. BRUSTIN: Objection to form.
13    Q. I mean, did you ever meet Ernie
14  Embry in 1992?
15    A. I can't remember. I mean, there's
16  so many different police officers, you know,
17  from Louisville and Meade County. I'm not
18  sure exactly --
19    Q. I'm just asking your best memory,
20  sir. That's all I'm asking.
21    A. Right.
22    Q. If you don't remember, that's the
23  answer.
24    A. Yeah, I don't remember.
25    Q. And "I don't know" is a correct

181

1  answer, if, in fact, that's the answer.
2    A. Okay.
3    Q. Okay?
4    A. Okay.
5    Q. Do you know Bill Adams, in April of
6  1992?
7    A. I'm familiar with his name.
8    Q. Do you know who he was, or is?
9    A. I can't remember right now.
10    Q. Okay. If I told you that, in 1992,
11  he was the Coroner for Meade County --
12    A. Okay.
13    Q. -- would that refresh your
14  recollection and help you identify who he
15  was?
16    A. Yes, sir.
17    Q. Okay. Prior to today, you mentioned
18  that you had reviewed some things, and you
19  had mentioned that you had reviewed some
20  trial testimony. Is my memory correct about
21  that statement of yours?
22    A. Yes, sir.
23    Q. Okay. Was that a written transcript
24  of somebody's trial testimony versus a
25  video? Did you read it versus watch it?

182

1    A. Yes, sir.
2    Q. Okay. Whose trial testimony did you
3  read?
4    MR. BRUSTIN: Objection, asked and
5  answered. Go ahead.
6    MR. BOND: Well, he hasn't
7  identified who.
8    MR. BRUSTIN: I thought he did, but
9  go ahead. Sorry.
10    MR. BOND: No, sir.
11    Q. (BY MR BOND) Do you want me to
12  restate it?
13    A. Whose trial?
14    Q. Whose trial testimony, or whose
15  testimony, period, did you read prior to
16  coming here today?
17    A. I read about mostly mine, my
18  testimony.
19    Q. Okay. Did you read your trial
20  testimony from March of 1995, a written
21  transcript of it?
22    A. Yes.
23    Q. Okay. Then you had a hearing July
24  13th of 2015. Did you likewise read a
25  written transcript of that testimony?

183

1    MR. BRUSTIN: Objection, asked and
2  answered, but you can answer it again.
3    A. I don't think I did read anything
4  from that one.
5    Q. Okay. Did you read any transcript
6  from the July 2015 hearing?
7    A. I don't believe I did.
8    Q. Okay. Did you read anyone else's
9  trial testimony in March of 1995, other than
10  your own?
11    A. I'm trying to remember.
12    Q. Okay. Let me just ask individuals.
13    MR. BRUSTIN: If it's helpful for
14  the record, and you tell me if it's not, if
15  it's helpful for the record, I can tell you
16  that he did have the 2015 testimony if that
17  might -- if you want to ask about it.
18    MR. BOND: Are you telling me he, in
19  fact, did read the July --
20    MR. BRUSTIN: I know he had it. I
21  think he may be confused, but I know that he
22  had that testimony.
23    MR. BOND: Okay.
24    MR. BRUSTIN: If this helps you --
25    MR. BOND: No, no, no. I appreciate

184

1   the help.
2        MR. BRUSTIN:  If there's stuff like
3   that, I think it might help.
4        MR. BOND:  No.  I'm not -- I'm here
5   to find out.
6        MR. BRUSTIN:  Yep.
7        MR. BOND:  Okay.  Your counsel has
8   indicated that you may have, in fact, had
9   the July 13, 2015 transcript --
10       MR. BRUSTIN:  I apologize.
11       MR. BOND:  -- of your testimony.
12  But I may be learning different.
13       MR. BRUSTIN:  I misspoke.
14       MR. BOND:  Okay.
15       MR. BRUSTIN:  I'm not -- I can't
16  represent that he did.  He may have.  I
17  can't --
18       MR. BOND:  Well, let me ask this.
19  Can you represent that you gave it to him,
20  because you made that statement.  If --
21       MR. BRUSTIN:  I did make the
22  statement.
23       MR. BOND:  -- that's a misstatement,
24  that's fine.
25       MR. SAWYER:  It may be a

185

1   misstatement.
2        MR. BRUSTIN:  That was a
3   misstatement.
4        MR. BOND:  Okay, okay.  Let's move
5   on.  Let me do it this way.
6        Q.  (BY MR. BOND)  Did you read the
7   trial testimony of Jeff Clark?
8        A.  Yes, sir.
9        Q.  Okay.  Did you read the trial
10  testimony of Mark Handy?
11       A.  I think I did, yes.
12       Q.  Okay.
13       MR. BRUSTIN:  Just to be clear, are
14  you asking him about recently or at any
15  time?
16       MR. BOND:  Well, I'm going to ask
17  him when, when I identify what all he has
18  read.
19       MR. BRUSTIN:  Okay.
20       Q.  (BY MR. BOND)  Next quest -- or you
21  can tell me as we through go it when you
22  read it.  I don't care.  Okay.  I'm simply
23  here to find out.  Okay?
24       A.  (Nods head)
25       Q.  When did you -- well, let me ask you

186

1   this.  Did you read the trial testimony of
2   Joe Greer?
3        A.  I don't think I did.
4        Q.  Okay.  Did you read the trial
5   testimony of Hope Greer?
6        A.  No, I don't think I did.
7        Q.  Okay.  Did you read the trial
8   testimony of Robert Thurman?  He was the
9   person that worked for the Kentucky State
10  Police that did some lab work.
11       A.  Yes.
12       Q.  Okay.  Did you read all of those
13  transcripts at the same time?  And I don't
14  mean literally in one sitting, but did you
15  read them recently or did you read them five
16  years ago, all at the same time?  Can you
17  help me there?
18       MR. BRUSTIN:  Objection to form.
19  You can answer.
20       A.  It was recently, just trying to cram
21  maybe a little bit too much in a little bit
22  of a too small amount of time.
23       Q.  And we've done the same thing.  Let
24  me ask you this, and I forgot.  Did you read
25  the trial testimony of Cliff Wise?

187

1        A.  I don't believe I did.
2        Q.  Did you read the trial testimony of
3   Ernie Embry?
4        A.  I don't think I did.
5        Q.  Did you read any trial testimony of
6   Bill Adams?
7        A.  I don't think so.
8        Q.  Okay.  Did you read the trial
9   testimony of Dr. George Nichols, the
10  Kentucky State Medical Examiner at the time?
11       A.  I don't remember.
12       Q.  Okay.  Is it a fair statement that
13  you can only remember reading trial
14  testimony of those folks associated with
15  Louisville Police Department?
16       MR. BRUSTIN:  Objection to form.
17       A.  Well, I don't remember everything
18  from Louisville Police Department either.
19  Everything -- it's been so many years ago,
20  you know.
21       Q.  Well, you said you read them
22  recently, though.  Last week, correct?
23       A.  Yes.
24       Q.  Okay.  And the record will reflect
25  who you identified.

188

1    Have you read the Amended Complaint
2  that was shown to you earlier?
3        MR. BRUSTIN:  Objection to form.
4  Asked and answered.  Do you know what he's
5  talking about?
6        THE WITNESS:  Is it this
7  (indicating) you're talking about?
8        MR. BOND:  Okay.  You've got -- let
9  me just show it to you.
10       THE WITNESS:  Okay.
11       MR. BRUSTIN:  It's exhibit --
12  whatever it was.
13       THE WITNESS:  Yes.
14       MR. BOND:  It was not introduced.
15  I'm going to introduce it now, though, I
16  think, and let's mark it Defendants' Exhibit
17  5.
18       MR. BRUSTIN:  Perfect.
19       (THE DOCUMENT WAS MARKED FOR
20  PURPOSES OF IDENTIFICATION AS DEFENDANTS'
21  EXHIBIT 5.)
22       MR. BOND:  And does anybody need a
23  copy, because I'm going to go through it at
24  some point, folks.
25       MR. SLOSAR:  I'm good.  Thank you.

189

1        MR. BOND:  Excuse me?  Well, I don't
2  want to get fussed at for not having enough
3  copies.
4        MR. SLOSAR:  Here, we'll take one
5  Thank you.
6        MR. BOND:  Anybody else want one?
7  I've got one more left.
8        MR. SLOSAR:  I heard it was
9  well-written.
10       MR. BRUSTIN:  It's a great read.
11       MR. BOND:  I'll refrain.  Mr.
12  Hardin, please don't think for one second
13  our side discourse is any disrespect
14  whatsoever.  Okay?  Lawyers sometimes have
15  to laugh.  Otherwise, we wouldn't make it
16  through the course of a day.
17       And I'm not showing any disrespect
18  to you whatsoever if we kid back and forth.
19  Okay?  Or if we talk about basketball or
20  anything.  We're just trying to get through
21  the day, too.  Okay?
22       THE WITNESS:  Okay.
23       MR. BOND:  I appreciate that very
24  much.
25       Q.  (BY MR. BOND)  Now, I don't know if

190

1  the question was answered.  Have you
2  actually read this in total?
3        MR. BRUSTIN:  Objection to the form.
4        Q.  The Amended Complaint in total?
5        A.  I received this yesterday when I was
6  here, so I went through it last night.
7        Q.  Okay.  Let me ask you this.  In
8  going through it last night, did you read
9  anything in it that you vehemently disagreed
10  with?
11       MR. BRUSTIN:  Objection to form.
12       Q.  Let me ask it this way.  Did you
13  read -- in reading it last night, is there
14  anything in there that you disagree with?
15       MR. BRUSTIN:  Objection to form.
16       A.  I'm trying to even remember what's
17  all in there, to tell the truth.
18       Q.  Okay.  Sir, if you don't remember --
19       A.  Yeah.
20       Q.  -- that's an acceptable answer.
21       A.  Right.  Yeah, I don't remember.
22       Q.  Let me ask you this.  As you read
23  through it, did you make any notations on
24  it, like "incorrect" or "maybe not" or "no,"
25  anything of that nature?

191

1        A.  No, I didn't.
2        Q.  Did you make any notations on it
3  whatsoever?
4        A.  None at all.
5        Q.  In reading it, did you attempt to
6  cross-reference the trial testimony that you
7  read last week with the content of the
8  Amended Complaint?
9        MR. BRUSTIN:  Objection to the form.
10       A.  No, sir.
11       Q.  For instance, did you attempt to
12  marry up the statement that was read to you
13  earlier, I think on Page 15, Paragraph 62.
14  Did you attempt to marry up that statement
15  with any of the trial testimony that you
16  read of Mr. Handy?
17       A.  (Reviews document)
18       MR. BRUSTIN:  Objection to form.
19       A.  Page 16?  What?
20       Q.  Page 15, sir, Paragraph 62.  That's
21  the one that Mr. Ervin read to you earlier.
22       A.  Okay.  Yeah, I remember this.
23       Q.  Do you remember my question, please?
24       A.  No.  Could you repeat it?
25       Q.  Here was my question.

192

1     A. Okay.
2     Q. You told me earlier that you read
3  Mr. Handy's trial testimony, correct --
4        MR. BRUSTIN: Objection.
5     Q. -- last week?
6        MR. BRUSTIN: Objection to form.
7     A. Yes.
8     Q. Okay. Did you attempt to look at
9  Paragraph 62, for instance, and read his
10 testimony to see if Paragraph 62 is
11 factually accurate?
12       MR. BRUSTIN: Objection to form.
13    A. Well, I know that's not true, that
14 the blood on the handkerchief was mine.
15    Q. Well, do you know if Detective Handy
16 testified at trial regarding the blood on
17 the handkerchief?
18       MR. BRUSTIN: Objection to the form.
19 Asked and answered.
20    A. I can't remember.
21    Q. And that's fine. And you haven't
22 read Sheriff Greer's testimony from trial,
23 have you?
24       MR. BRUSTIN: Objection to the form.
25 Asked and answered.

193

1     A. No.
2        MR. BOND: Just laying the
3  foundation. If I don't, then you'll object
4  to no foundation. Okay?
5        MR. BRUSTIN: You laid a foundation
6  with the first time you asked it.
7        MR. BOND: Well, I'm just trying to
8  help him, Nick.
9        MR. BRUSTIN: I know you're just
10 trying to be helpful.
11       MR. BOND: Okay.
12    Q. (BY MR. BOND) You haven't read his
13 testimony. Therefore, you would not know if
14 Sheriff Greer testified at trial about the
15 blood on the handkerchief; would you?
16       MR. BRUSTIN: Objection to form. He
17 was there.
18    A. I can't remember.
19    Q. Well, do you remember, from being
20 present March 3rd and 7th of his testimony,
21 whether he testified regarding the blood on
22 the handkerchief?
23    A. I can't remember.
24    Q. Okay. Let's talk about the inverted
25 cross. You testified earlier that you had

194

1  placed an inverted cross, I believe, on
2  Rhonda's left -- above her left breast,
3  correct?
4     A. Yes, sir.
5     Q. And you did that while you were
6  residing with Jeff Clark, correct?
7     A. Yes, sir.
8     Q. And did he come into the trailer
9  while you were doing that?
10    A. Yes, he did.
11    Q. Okay. Did he make any comment to
12 you about what you were doing?
13    A. I think he might have asked what I
14 was doing, and he didn't see what I was
15 doing, what I was putting on her, but.
16    Q. Okay. Do you mean that he didn't
17 see the fact that you were putting an
18 inverted cross on her; is that what you
19 mean?
20    A. Correct, yes.
21    Q. Okay. Did he hang around or did he
22 go on about his business or go into another
23 room?
24    A. Just went about his business.
25    Q. Okay. Where did you practice your

195

1  rituals?
2     A. Mostly, there's a place, I guess,
3  about a mile from home back in the woods
4  where I would go.
5     Q. I've read somewhere -- and I've read
6  a lot, and I may be wrong. Was that the
7  place off West Pages Lane?
8     A. East Pages.
9     Q. East Pages.
10    A. Yes.
11    Q. Okay. And that runs between Dixie
12 Highway and Stonestreet?
13    A. Yes.
14    Q. Is that where Waverly Park is?
15    A. Yes, right next to it. Well,
16 Waverly Hills used to be an insane asylum.
17    Q. Right.
18    A. Waverly Hills, yeah.
19    Q. Is that the area you're talking
20 about?
21    A. Yes, sir. Right below it.
22    Q. And you would go up there and
23 practice your rituals up there?
24    A. Yes, sir.
25    Q. Okay. Now, I grew up in that end of

196

1  town, and I always heard of a place called
2  Devil's Backbone.  Is that the same place or
3  someplace different?
4       MR. BRUSTIN:  Objection to form.
5       A.  I think that's two different places.
6       Q.  Is that off Blevins Gap Road?
7       A.  Yes.  That place is.
8       Q.  Okay.  So have you been to Devil's
9  Backbone out over off Blevins Gap Road?
10      A.  I've been over around in that area,
11 but not actually there.
12      Q.  Did you ever practice any rituals at
13 Devil's Backbone off Blevins Gap Road?
14      A.  No, sir.
15      Q.  Were all of the rituals that you did
16 perform there at Waverly Hills?
17      A.  Most of them.
18      Q.  Where else would you have done them?
19      A.  Some of them I did at home, my
20 parents' house.
21      Q.  At your parents' house.  Did you
22 ever practice any ritual at the trailer?
23      A.  No, sir.
24      Q.  Did you play Dungeons and Dragons
25 also?

197

1       A.  I did in my earlier teens for a
2  short period of time.
3       Q.  Did you ever buy the book, Dungeons
4  and Dragons?
5       A.  No.
6       Q.  Did you ever achieve the level of
7  dungeon master?
8       A.  No, sir.  I didn't play it long
9  enough.
10      Q.  What level did you achieve during
11 the time that you played it, if you
12 remember?
13      A.  I was just on like the lowest
14 levels.  See, I didn't play it long enough.
15      Q.  Do you know who the dungeon master
16 was in the game?
17      A.  I can't remember it.  It wasn't one
18 of my friends.  It was like a friend of a
19 friend of a friend, something like that.
20      Q.  Okay.  Well, wasn't the dungeon
21 master empowered with the ability to kill
22 someone and bring them back to life?
23      MR. BRUSTIN:  Objection to the form.
24 You're asking about it generally as opposed
25 to specifically?

198

1       MR. BOND:  Yes.  Yeah.  I'm asking
2  if he knew that.
3       MR. BRUSTIN:  I think he was
4  answering it specifically, but.
5       MR. BOND:  Yeah.
6       THE WITNESS:  Well, characters of
7  the game, he could.
8       Q.  (BY MR. BOND)  Okay.  You've talked
9  about this dagger that you've used in your
10 rituals.
11      A.  Yes.
12      Q.  Was that dagger confiscated pursuant
13 to the search warrant in April of 19 -- or
14 in April or May of 1992?
15      A.  It was one of the knives, yes.
16      Q.  Okay.  So you still had it in your
17 possession, correct?
18      A.  Yes.
19      Q.  And was it at your house or was it
20 at the trailer?
21      A.  It was at the house.
22      Q.  Okay.  It was still at your parents'
23 home.
24      A.  Yes.
25      Q.  And that was on Tarrytowne?

199

1       A.  Yes.
2       Q.  How close is Tarrytowne to where you
3  performed your rituals?
4       MR. BRUSTIN:  Objection to the form.
5       A.  About probably a mile away at the
6  most.
7       Q.  Okay.  How close was your parents'
8  house at Tarrytowne to Devil's Backbone out
9  off Blevins Gap Road?
10      A.  Hmm.  I don't know if it's two
11 miles, three miles.  I don't know.
12      Q.  Okay.  If you don't know, that's
13 fine.
14      A.  Right.
15      Q.  Okay.  Did you ever drive from your
16 parents' home to Devil's Backbone out off
17 Blevins Gap Road?
18      A.  I've been in that area before, but
19 I've never actually been there to Devil's
20 Backbone.
21      Q.  Maybe not distance-wise.  How long
22 would it take you to drive from your
23 parents' home on Tarrytowne to the Devil's
24 Backbone area out off Blevins Gap Road?
25      A.  I don't know.  It wouldn't take

200

```
1   long.  I mean, I don't know, I'd say five
2   minutes, 10 minutes.  I don't know.
3       Q.  Okay.  And time-wise, how long would
4   it take you to get from your parents' home
5   on Tarrytowne to the Waverly ritual site?
6       A.  Probably about five minutes.
7       Q.  You said you read your trial
8   testimony; is that correct?
9       A.  Yes, sir.
10      Q.  How many times have you read it?
11      A.  At least once.
12      Q.  Well, had you ever read it during
13  the process of any of your appellate work
14  that was on your behalf?
15      MR. BRUSTIN:  Objection to form.
16      A.  I'm not sure.
17      Q.  Okay.  And let me make sure.  I want
18  to make sure that I completely understand
19  what you have done and haven't done.
20      You said you've read it.  Have you
21  ever watched your trial testimony?
22      A.  I've just seen bits and pieces of
23  it.
24      Q.  You've never watched it from the
25  beginning of your testimony until you
```

201

```
1   concluded your testimony at trial?
2       A.  Correct.
3       Q.  Did you watch a video of your July
4   13, 2015 testimony?  Did you ever watch that
5   video?
6       A.  The parole board hearing?
7       Q.  No, sir.  You had an evidentiary
8   hearing in Meade Circuit Court on July 13,
9   2015, on a motion for new trial.  Do you
10  remember that?  That's the hearing I'm
11  talking about.
12      A.  I get dated confused, so.
13      Q.  And I understand that, and that's
14  why I said it was the evidentiary hearing on
15  your motion for a new trial, and I believe
16  your lawyer's name was Ms. Smith.  You went
17  down to Brandenburg, and you asked Judge
18  Butler to give you a new trial.  Do you
19  remember that date?
20      A.  I don't remember the date, no.
21      Q.  Well, do you remember going to court
22  that day and the hearing being held?
23      A.  I've been to so many different court
24  days, it's -- I get them confused.
25      MR. BRUSTIN:  Do you remember the
```

202

```
1   evidentiary hearing in 2015 that led to the
2   reversal of your conviction?
3       MR. BOND:  Well, led to a new trial
4   date is what that hearing led to.
5       MR. BRUSTIN:  Fine.
6       MR. BOND:  Well, if --
7       MR. BRUSTIN:  No, no.  You're right.
8       MR. BOND:  -- you're going to
9   correct me --
10      MR. BRUSTIN:  Actually --
11      MR. BOND:  -- I'm going to correct
12  you.
13      MR. BRUSTIN:  -- you're right.
14  Keith, do you remember it?
15      THE WITNESS:  I remember being at
16  the hearing.
17      Q.  (BY MR. BOND)  And all I'm asking,
18  sir, is if you remember watching a video of
19  that hearing --
20      MR. BRUSTIN:  Afterward.
21      Q.  -- afterward.
22      A.  I can't remember.  I don't know.
23      Q.  If you don't remember, that's fine.
24  That's completely acceptable.  Okay?  Let's
25  move on.
```

203

```
1       Now, at trial, you testified that
2   you left the trailer on April 2nd about 1:00
3   to 1:30 in the morning and arrived home at
4   3:00 to 3:30 in the morning.  Do you
5   remember that?
6       MR. BRUSTIN:  Objection to the form.
7   You're asking him if he remembers testifying
8   to that?
9       MR. BOND:  Well, that's what he
10  testified to.  I'm asking him does he
11  remember testifying to that.
12      MR. BRUSTIN:  Okay.  I object to the
13  form.  You can answer.
14      A.  Yes, sir.
15      Q.  Okay.  So it took you two hours to
16  get from Newburg Road to Tarrytowne Road,
17  correct?
18      MR. BRUSTIN:  Objection to form.
19      A.  No, it doesn't take that long.  You
20  had to go around all the back roads.
21      Q.  Well, your testimony at trial was
22  that you tried to avoid Dixie Highway,
23  because there were a lot of police and
24  Jeff's car was loud, right?
25      A.  Right.
```

204

1      MR. BRUSTIN:  Objection to the form.
2  You're asking if he remembers his testimony.
3  Do you want to show him his testimony or you
4  want to just see if he remembers it?
5      MR. BOND:  Well, you all have got a
6  transcript.  Show it to him.
7      MR. BRUSTIN:  You're asking
8  questions about it.  Do you want to show it
9  to him or not?
10     MR. BOND:  No, I don't.
11     MR. BRUSTIN:  Okay.  So --
12     MR. BOND:  I'm asking him.
13     MR. BRUSTIN:  -- I just want to make
14 sure we're clear.  He's asking you if you
15 remember giving that testimony.
16     THE WITNESS:  Yes, sir.
17     Q.  (BY MR. BOND)  Okay.  And you said
18 that you got on the Watterson Expressway and
19 got off at Taylor Boulevard, correct?
20     MR. BRUSTIN:  Objection to the form.
21     A.  Yes, sir.
22     Q.  Do you remember testifying to that?
23     A.  Yes, sir.
24     Q.  Okay.  And then do you remember
25 testifying that you turned left onto Taylor

205

1  Boulevard and headed towards Third Street or
2  old Third Street Road to go home?
3      MR. BRUSTIN:  Objection to the form.
4  He's asking you if you're remembering today
5  testifying to that.
6      MR. BOND:  What's the objection to
7  my form?  That's exactly what I said.
8      MR. BRUSTIN:  I understand.  The way
9  to -- the proper way to do this, I would
10 suggest, is to show him the testimony.
11     MR. BOND:  Well, I'm relying --
12     MR. BRUSTIN:  You don't have to rely
13 on -- we have an extra transcript.
14     MR. BOND:  I'm like Mr. Ervin, and
15 I'm doing the questioning.
16     MR. BRUSTIN:  We have a transcript.
17     MR. BOND:  If he doesn't -- I dont
18 have a transcript.  No.
19     MR. SLOSAR:  I think Peter has a
20 transcript.
21     MR. BOND:  Excuse me?
22     MR. SLOSAR:  I think -- at least
23 yesterday, I think, Peter had a transcript
24 about some of the trial.
25     MR. BOND:  I don't know if Peter had

206

1  a transcript or not yesterday.  Okay?  I
2  don't have a transcript with me.  Okay.  I'm
3  just asking if he remembers, and he said he
4  did.
5      MR. BRUSTIN:  All right.  Can we
6  take a break, please?
7      MR. BOND:  Excuse me?
8      MR. BRUSTIN:  Can we take a break?
9      MR. BOND:  No.
10     MR. BRUSTIN:  I want to take a
11 break.
12     MR. BOND:  For what?
13     MR. BRUSTIN:  I was being polite.  I
14 want to take a break and talk to my client.
15     MR. BOND:  Let the record reflect --
16     MR. ERVIN:  Is there a question on
17 the table?
18     THE REPORTER:  Mm-hmm (affirmative).
19     MR. BOND:  -- that counsel doesn't
20 agree to take a break.
21     MR. BRUSTIN:  There's a question
22 pending?
23     THE REPORTER:  There is a question
24 on the --
25     MR. BOND:  Go ahead.  Go ahead.

207

1      MR. BRUSTIN:  Nope.  Not if there's
2  a question pending.
3      MR. BOND:  I'm not going to argue.
4      MR. BRUSTIN:  I didn't mean to do
5  that.
6      MR. BOND:  Yeah, there was a
7  question.
8      MR. BRUSTIN:  I didn't mean to do
9  that.  Answer the question and then we'll
10 take a break.
11     Q.  (BY MR. BOND)  Did you turn left
12 onto Taylorsville Road, or, excuse me,
13 Taylor Boulevard?  Excuse me.
14     MR. BRUSTIN:  Objection to the form.
15     A.  I can't remember the details if I
16 said I turned left or right.  I don't know.
17     MR. BRUSTIN:  Now, can we take a
18 break?
19     MR. BOND:  Take a break.
20     MR. BRUSTIN:  Thank you very much.
21     MR. BOND:  Go tell him what you want
22 to tell him.
23     (OFF THE RECORD, 2:11-2:13 P.M.)
24     Q.  (BY MR. BOND)  Sir, I've been
25 provided a copy of your trial testimony from

208

1     March 7, 1995, as transcribed and certified
2     by Laura J. -- and I'm going to spell the
3     last name -- K-O-G-U-T -- Kogut.  And does
4     that look like a transcript that you
5     previously read last week?  It may be in a
6     different format, but.
7          MR. BRUSTIN:  Take a minute and look
8     at it.  Look at the pages.
9          A.  (Reviews document)
10         Q.  Does that look like it?
11         A.  Yes.  Mine had four pages --
12         Q.  Right.  I said it may have been in a
13    --
14         A.  Yeah.
15         Q.  -- different --
16         A.  Yeah.
17         Q.  -- format.  Okay.  I understand
18    that.  Okay, turn to Page 21, please, sir.
19         A.  (Complies with request)
20         Q.  Go to Line 14.  You were asked what
21    time did you leave --
22         A.  Okay.  Four different -- 14 --
23         Q.  Well, 21.
24         MR. BRUSTIN:  The page number is on
25    the right corner.

209

1          THE WITNESS:  Oh, okay.
2          MR. BOND:  I'm sorry.  Okay.  Thank
3     you.
4          MR. BRUSTIN:  Twenty-one.  It goes
5     19, 20, 21, 22.
6          THE WITNESS:  Okay.
7          MR. BOND:  Okay.
8          MR. BRUSTIN:  You started.
9          MR. BOND:  You ready?
10         MR. BRUSTIN:  Yeah.
11         THE WITNESS:  Yeah.
12         Q.  (BY MR. BOND)  And if we flip to
13    another page, it'll be in the same format.
14    Okay?
15         A.  Okay.
16         Q.  Okay.  Line 14, sir.
17         A.  Okay.
18         Q.  (Reads from document)  What time did
19    you leave his trailer and head for home?
20    And your answer was I'd say it was around
21    between one o'clock, 1:30 in the morning.
22         Did I read that accurately?
23         A.  Yes, sir.
24         Q.  Okay.  And then jump down to Page
25    22, right below that.

210

1          A.  Okay.
2          Q.  (Reads from document)  And on Line
3     11, it says, What time did you tell the
4     police that you got home.  How about that?
5     And Line 13, your answer was I told the
6     police I got home around three o'clock or
7     3:30 in the morning.
8          Did I read that accurately?
9          A.  Yes, sir.
10         Q.  So your testimony at trial was you
11    left between 1:00 and 1:30 and you got home
12    between 3:00 and 3:30, correct?  That's what
13    you testified to at trial under oath,
14    correct?
15         A.  Yes, sir.
16         Q.  So that would be a two-hour window.
17    From 1:00 to 3:00 or 1:30 to 3:30, correct?
18         MR. BRUSTIN:  Objection to the form.
19         A.  Yes, sir.
20         Q.  Okay.  And it doesn't take two hours
21    to travel from Jeff's trailer to Tarrytowne
22    Road, does it?
23         A.  No.
24         Q.  We know you stopped at the Chevron
25    station.  Do you remember that?

211

1          A.  Yes, sir.
2          Q.  And he went inside.
3          A.  Yes.
4          Q.  Bought some cigarettes and came back
5     out; is that correct?
6          A.  Yes, sir.
7          Q.  Okay.  Did he tell you that he got
8     into a verbal exchange with some people at
9     the store or in the store?
10         MR. BRUSTIN:  Objection to form.
11    Asked and answered.
12         A.  Yes, sir, he did.
13         Q.  Okay.  Let's look at Line -- Page
14    22, Line 7.  To your recollection --
15         MR. BRUSTIN:  You there?
16         THE WITNESS:  Yes.
17         MR. BOND:  Excuse me.  I'm sorry.
18         Q.  (BY MR. BOND)  Starting on Line 6,
19    please.
20         A.  Okay.
21         Q.  (Reads from document)  To your
22    recollection, do you remember Jeff speaking
23    to anybody or saying anything to anybody?
24    Answer:  No, sir, I didn't.
25         Did I read that accurately?

212

1    A. Yes, sir.
2    Q. Okay. Why did it take you all two
3  hours to get home?
4        MR. BRUSTIN: Objection to the form.
5  Mischaracterizes his testimony. You can
6  answer, if you understand it.
7    A. I don't know. I might have gotten
8  the time wrong. I don't know.
9    Q. Did you all go to Waverly that night
10  on your way home?
11    A. No, sir.
12    Q. Did you go to Devil's Backbone out
13  off Blevins Gap Road --
14        MR. BRUSTIN: Objection.
15    A. No.
16    Q. -- on your way home that night?
17        MR. BRUSTIN: Objection to form.
18    A. No, sir.
19        MR. BOND: Excuse me?
20        MR. BRUSTIN: I said objection to
21  form.
22        MR. BOND: Okay.
23    Q. (BY MR. BOND) That night, April
24  2nd, the morning of April 2nd?
25        MR. BRUSTIN: There's no foundation

213

1  for any of it, but go ahead. Have at it.
2        MR. BOND: Thank you.
3    Q. (BY MR. BOND) Did you?
4    A. No, sir.
5    Q. Okay. You were in a relationship
6  with Rhonda for about five or six months,
7  correct?
8    A. Yes, sir.
9    Q. Did you know that she kept a daily
10  calendar?
11    A. Not at --
12        MR. BRUSTIN: Hold on. Objection.
13  What -- know when? Know at the time?
14        MR. BOND: Yes.
15    Q. (BY MR. BOND) Did you know -- in
16  the time that you all were seeing each
17  other, did you know that she kept a daily
18  calendar?
19    A. No, sir.
20    Q. Since you were arrested, have you
21  been shown a daily calendar that she kept?
22    A. I've only heard of it.
23    Q. You've not seen it.
24    A. Correct.
25    Q. Okay. When did you move out of the

214

1  trailer in 1991 or '92?
2        MR. BRUSTIN: Objection to form.
3  Asked and answered. You can answer again,
4  if you recall.
5    A. I can't remember when it was.
6    Q. Okay. Do we agree that Rhonda went
7  missing the morning of April 2, 2000 --
8  excuse me, 1992?
9        MR. BRUSTIN: Objection to form.
10    A. Yes, sir.
11    Q. Okay. And do we agree that she was
12  missing from that date until the date she
13  was found on April 5, 1992?
14    A. Yes, sir.
15    Q. Do you remember telling either
16  Detective Handy or Detective Greer -- I've
17  got to figure out a way to separate it. I'm
18  going to call Hope Greer "Detective Greer"
19  and Joe Greer "Sheriff Greer." Okay?
20    A. Yeah.
21    Q. Okay. Telling one of them that you
22  and Rhonda spoke every day.
23        MR. BRUSTIN: Objection to form.
24  You can answer.
25    A. We spoke almost every day.

215

1        MR. BRUSTIN: He's not asking you
2  that.
3    Q. Do you remember telling them, one of
4  them, that you spoke -- you and Rhonda spoke
5  every day?
6    A. I don't remember saying that. I
7  don't know.
8    Q. Okay. But you just said that you
9  spoke almost every day --
10        MR. BRUSTIN: Objection to the form.
11    Q. -- correct?
12    A. Yes.
13    Q. Okay. Can you explain to me why,
14  from April 2nd till April 5th, you didn't
15  make any effort to communicate with her, if
16  you spoke to her almost every day before
17  then?
18    A. Well, she was missing then, wasn't
19  she?
20    Q. Did you go looking for her?
21    A. I didn't know where to look.
22    Q. Who were Rhonda's friends in April
23  of 1992, besides yourself?
24    A. I know a girl, Hope Jaggers, or
25  whatever.

216

1    Q. Hope Jaggers?
2    A. Jaggers, yes.  She's the only one I
3  knew of.
4    Q. Did you call Hope Jaggers and say,
5  "Have you seen Rhonda?"
6    A. I didn't know what her phone number
7  is or even where she lives.
8    Q. Didn't try to find her to ask her?
9    A. I didn't know where she lived at.  I
10  didn't know her.
11    MR. BRUSTIN:  Just answer his
12  question.
13    Q. Okay.  Excuse me.  My question was,
14  did you try to find her so you could ask
15  her?
16    A. No.
17    MR. BRUSTIN:  I'm sorry.  Just for
18  the record, just listen to his questions and
19  answer his questions.  Okay?
20    MR. BOND:  Yeah.
21    THE WITNESS:  Okay.
22    MR. BOND:  I'm not trying to trick
23  you, sir.  I'm just trying to find out
24  information.  Okay?  He'll protect you if he
25  thinks I'm trying to trick you.  Okay?

217

1    Q. (BY MR. BOND) Tell me what Joe
2  Greer did that harmed you.
3    MR. BRUSTIN:  Objection to the form.
4  You can answer.
5    A. Well, one of the times when he took
6  me to Meade County, he took me to a small
7  room, had me sit on one side of the table.
8  He'd sit on the other side, and he had
9  several deputies line up in behind him, and
10  he pulled his revolver out and put it on the
11  table of me -- out in front of him -- and he
12  told me bad things happen to people who
13  don't cooperate with him.
14    Q. You're saying that incident took
15  place in Brandenburg, Meade County,
16  Kentucky.
17    A. Yes, sir.
18    Q. Was that before or after you were
19  arrested?
20    A. Before.
21    Q. So you're saying that Joe Greer
22  transported you to Meade County, Kentucky to
23  conduct an interview.
24    MR. BRUSTIN:  Objection to form,
25  mischaracterizes his testimony.  You can

218

1  answer.
2    A. Yes, sir.
3    Q. Well, let me ask it this way.  Did
4  Joe Greer take you to Meade County, Kentucky
5  to conduct an interview?
6    MR. BRUSTIN:  Objection to form.
7    A. Yes, sir.
8    Q. Okay.  Was that before or after
9  Rhonda was found?
10    MR. BRUSTIN:  Objection to form.
11  Asked and answered.  You can answer.
12    MR. BOND:  This is the first I've
13  ever heard of him going to Brandenburg.
14    MR. BRUSTIN:  Well, certainly --
15    MR. BOND:  So it hasn't been asked
16  and answered.  Go ahead.
17    MR. BRUSTIN:  It has actually, but
18  go ahead.
19    MR. BOND:  No, it hasn't.  Go ahead.
20    THE WITNESS:  I can't remember if it
21  was before or after.  I don't know.
22    MR. BOND:  That's fair.  Okay.
23    Q. (BY MR. BOND) Was it before you
24  were arrested or was it when -- the day you
25  were arrested?

219

1    MR. BRUSTIN:  Objection to form.
2  Foundation.
3    A. It was before I was arrested.
4    Q. Where did this interview take place
5  in Brandenburg, Meade County, Kentucky?
6    A. In one of the rooms at the
7  courthouse or jail, whichever one you want
8  to call it.
9    Q. Well, I need to differentiate -- I
10  need you to differentiate for me, because
11  the courthouse and the jail are two
12  different places.
13    A. Right.
14    Q. Okay.  Was it the courthouse or the
15  jail?
16    MR. BRUSTIN:  Objection to form.
17  Tell him what you remember.
18    A. All I remember it was just a
19  small room, a lot smaller than this.
20    Q. Okay.  And you said that Sheriff
21  Greer was there and some other people were
22  there.
23    A. Yeah, a lot of deputies.
24    Q. Do you know who -- excuse me, I
25  didn't mean to interrupt you.  Do you know

220

1  who any of those people were?
2      A.  No.
3      Q.  Did you not know who they were back
4  then?
5          MR. BRUSTIN:  Objection to form.
6      A.  No, I didn't.
7      Q.  Okay.  What kind of gun did Sheriff
8  Greer place on the table?
9      A.  It was a pretty gun, actually.
10         MR. BRUSTIN:  Pretty what?
11         THE WITNESS:  Pretty gun.
12         MR. BOND:  I think he meant
13  pretty-pretty.
14         THE WITNESS:  Yeah, it --
15         MR. BOND:  Right?
16         THE WITNESS:  Yes.
17     Q.  (BY MR. BOND)  What color?
18     A.  It was nickel-plated.  I can't
19  remember what color the handles were, but it
20  was a pretty revolver, you know.
21     Q.  A nickel-plated revolver.
22     A.  Yes.
23     Q.  What else did he do that harmed you
24  in any manner?
25         MR. BRUSTIN:  Objection to form.

221

1  Calls for legal conclusion.  You can answer.
2          MR. BOND:  Well, he's alleged that
3  he's been injured.  Go ahead.
4          MR. BRUSTIN:  I know exactly what
5  he's alleged.  Same objection.  You can
6  answer.
7          MR. BOND:  Go ahead.
8          THE WITNESS:  That's about the only
9  thing I can remember that interview.
10  Sitting there just staring at his gun after
11  he basically threatened me.
12     Q.  (BY MR. BOND)  Okay.  But let's say
13  that you're correct, that, in fact, that
14  happened, and we contest that.  Okay?  You
15  didn't confess to anything, did you?
16     A.  No, sir.
17         MR. BOND:  We've introduced the
18  Complaint as Exhibit 5.  Would you please
19  hand him Exhibit 5, please, ma'am?
20         (THE REPORTER COMPLIES WITH REQUEST)
21         MR. BRUSTIN:  Close that up.  Thank
22  you.
23         THE REPORTER:  (Receives document)
24  Is this marked?
25         MR. BRUSTIN:  This is --

222

1          THE REPORTER:  You didn't mark --
2          MR. BRUSTIN:  I don't think we
3  marked it.  Did we mark it?
4          MR. BOND:  No, I didn't introduce
5  it.
6          MR. BRUSTIN:  You don't want it?
7          MR. BOND:  No.  No.  It's not mine.
8          MR. BRUSTIN:  Okay.
9      Q.  (BY MR. BOND)  Go to Paragraph 6,
10  please, sir.  Oh, I'm sorry, Page 3,
11  Paragraph 6.
12     A.  (Complies with request)
13     Q.  (Reads from document)  It says, true
14  to Detective Handy's playbook, he and other
15  defendants attempted to coerce confessions
16  from Clark and Hardin by falsely telling
17  them that they had failed polygraph
18  examinations and exerting other pressures.
19         I want to focus on two things there.
20  It says, "Detective Handy, he and other
21  defendants."  Who do you mean, "other
22  defendants"?
23         MR. BRUSTIN:  Objection to form.
24  Could you ask him a factual question?
25         MR. BOND:  Well, I'm asking -- well,

223

1  I'm going to ask him a factual question
2  after he identifies who these defendants
3  were that exerted other pressures on him.
4          MR. BRUSTIN:  That's what I mean.
5  Ask him that.
6          MR. BOND:  Okay.
7      Q.  (BY MR. BOND)  Who are the other
8  defendants that exerted other pressure on
9  you?
10         MR. BRUSTIN:  Objection to form.
11  You can answer.
12         MR. BOND:  You suggest the form and
13  then object to it?  Okay.
14         MR. BRUSTIN:  Yes.  I'm not -- well,
15  I wasn't -- never mind.  Go ahead.  If you
16  remember, tell him.
17     A.  I don't remember right now.
18     Q.  Well, was it Joe Greer --
19         MR. BRUSTIN:  Objection.
20     Q.  -- other than the gun incident you
21  just related.
22     A.  I don't remember.  I don't know.
23     Q.  And I'm going to ask you each Meade
24  County Defendant.  Did Cliff Wise do
25  anything to you to exert other pressure on

224

1    you to obtain a confession?
2         A. I can't remember. I don't know.
3         Q. Okay. Well, we may eventually try
4    this case, and you're going to have to
5    identify who did what in order to
6    substantiate the factual allegation in
7    Paragraph 6.
8         So I'm simply asking today if you
9    remember, other than the gun incident with
10   Joe Greer, you say you don't know anything
11   about Cliff -- or you don't remember
12   anything today about Cliff Wise, correct?
13        A. Correct.
14        Q. Nothing --
15        MR. BRUSTIN: Well, hold on. Before
16   you -- you asked a questions now. So he has
17   now misstated the law to you on what we have
18   to prove. Either he's doing it on purpose
19   or he doesn't understand. But in any case,
20   all you have to do is answer what you know.
21        MR. BOND: Let the record reflect
22   that I'm stupid. Okay. Let's go on. Okay?
23        MR. BRUSTIN: So if -- don't worry
24   about the legal issues. Just tell him what
25   you remember.

225

1         THE WITNESS: Okay.
2         MR. BOND: Okay.
3         Q. (BY MR. BOND) Did Ernie Embry exert
4    any other pressure on you to coerce a
5    confession out of you?
6         MR. BRUSTIN: Objection to form.
7    You can answer.
8         A. I don't remember.
9         Q. Okay. Did Bill Adams exert any
10   other pressure on you to coerce a
11   confession?
12        A. I don't remember.
13        Q. Okay. Go to Paragraph 8, please,
14   sir.
15        A. (Complies with request)
16        Q. (Reads from document) Again, the
17   other defendants knew about and built on
18   Detective Handy's fabrication.
19        Who are the other defendants that
20   knew about and built on Detective Handy's
21   fabrication?
22        MR. BRUSTIN: Objection to form.
23   You can answer.
24        A. I don't know.
25        Q. Okay. (Reads from document) The

226

1    next sentence says they falsified or
2    distorted additional evidence to convince
3    the prosecution and later the jury.
4         Okay. We don't know who "they" are,
5    correct?
6         MR. BRUSTIN: Objection to the form.
7    You didn't read the whole sentence, but it
8    doesn't matter. Objection to form.
9         Q. What was falsified or distorted?
10        MR. BRUSTIN: Objection to form.
11   You've got to read the whole sentence.
12        MR. BOND: I'm asking the question.
13        MR. BRUSTIN: Okay. Objection to
14   form.
15        THE WITNESS: I don't remember. I
16   don't know.
17        MR. BOND: Okay. That's fair.
18        Q. (BY MR. BOND) Go to Paragraph 10.
19        A. (Complies with request)
20        Q. (Reads from document) It says
21   defendants also misrepresented that a
22   blood-stained handkerchief found in Hardin's
23   home had been used to clean up after animal
24   sacrifices to buttress Handy's false and
25   fabricated admission.

227

1         Did I read that accurately?
2         A. Yes, sir.
3         Q. Okay. Do you know of anyone that
4    testified at your trial -- that testified
5    that the blood-stained handkerchief had been
6    used to clean up after animal sacrifices?
7         MR. BRUSTIN: Objection to form.
8    The testimony speaks for itself.
9         A. I can't remember.
10        Q. Okay. Do you know if your attorneys
11   asked to obtain the handkerchief and have it
12   tested?
13        MR. BRUSTIN: Okay. Hold on. I
14   can't imagine how he could answer that
15   question without invading the privilege.
16   I'm going to instruct him not to answer --
17        MR. BOND: Well, there --
18        MR. BRUSTIN: -- unless it was a
19   public --
20        MR. BOND: -- could have been a
21   motion made --
22        MR. BRUSTIN: If it was --
23        MR. BOND: -- which is part of the
24   record.
25        MR. BRUSTIN: Yeah. I don't think

228

1  he would know that, but you can ask him that
2  way.  But, otherwise, I can't let him
3  answer.
4      Q.  (BY MR. BOND)  Well, are you aware
5  if the record reflects --
6      MR. BRUSTIN:  Fair enough.
7      Q.  -- that your counsel had requested
8  to test the handkerchief?
9      MR. BRUSTIN:  Do you understand?
10     A.  Yes.
11     Q.  Did he file a motion asking to have
12  that -- to take possession of and test the
13  handkerchief; do you know?
14     MR. BRUSTIN:  Objection to form.
15  You can answer.
16     A.  Yes, sir.
17     MR. BOND:  Okay.  And Nick, we've
18  also gotten an 1142 waiver here to appoint.
19  I can't remember what was alleged or not, so
20  I'm not going to go down that road.  But
21  that is an issue down the road.
22     MR. BRUSTIN:  Okay.
23     MR. BOND:  Okay?
24     Q.  (BY MR. BOND)  Do you know Clifford
25  Capps?

229

1      A.  I don't know him personally, but I
2  know who he is.
3      Q.  Do you know who he is by a result of
4  being involved in this trial?
5      A.  Yes, sir.
6      Q.  Okay.  Were you ever incarcerated in
7  a cell with him?
8      A.  No, sir.
9      Q.  Okay.  Do you know Kevin Justis?
10     A.  Yes, sir.
11     Q.  Were you in a cell with him?
12     A.  Yes, sir.
13     Q.  Okay.  Did you ever have any
14  conversations with him?
15     MR. BRUSTIN:  Objection to form.
16     A.  No.
17     MR. BRUSTIN:  About anything?
18     MR. BOND:  Yeah, about anything, and
19  then I'm going to finite it.  Okay?
20     MR. BRUSTIN:  Okay.
21     THE WITNESS:  Well, not about the
22  case or anything, because I know --
23     Q.  (BY MR. BOND)  So you never talked
24  to him about this case.
25     A.  Correct.

230

1      Q.  Okay.  Let's see.  Go to Paragraph
2  13 on that same page, Page 4.  It's the very
3  last line on the page.
4      A.  (Complies with request)
5      Q.  (Reads from document)  In 1993,
6  before Clark and Hardin went to trial,
7  Defendants learned that another man, James
8  Whitely, had confessed to the murder.
9      Okay.  Did I read that accurately?
10     A.  Yes, sir.
11     Q.  Have you read the grand jury
12  transcripts?
13     A.  I can't recall if I have or not.
14     Q.  Do you know if any witnesses have
15  testified before the Meade County Grand Jury
16  regarding James Whitely?
17     MR. BRUSTIN:  You can answer that
18  yes or no.
19     A.  I don't know.
20     Q.  Okay.  Let's go to the very last
21  sentence of Paragraph 15, and I just want to
22  ask a broad question.  It's actually at the
23  very end of it, and it says, "And the men
24  sustained injuries."
25     You see where I see that at the very

231

1  end of Paragraph 15?
2      A.  Yes.
3      Q.  It's something that nobody's asked,
4  is what injuries have you sustained?
5      MR. BRUSTIN:  Well, first of all,
6  before you ask that, do you want -- well, it
7  doesn't matter.  I object to the form.
8  Calls for a narrative.  It's overbroad,
9  confusing, but you can answer.
10     Q.  Tell me how you've been harmed or
11  injured.
12     MR. BRUSTIN:  Objection.  Same
13  objection.
14     Q.  Okay.  Go ahead.
15     A.  Well, we had to go through --
16  psychologically through all this.
17     Q.  Okay.  During your incarceration,
18  did you seek any psychological counseling?
19     A.  No, sir.
20     MR. BOND:  I'm just asking.
21     MR. BRUSTIN:  Oh, no, I understand.
22     MR. BOND:  I'm trying to find out.
23  Okay.
24     MR. BRUSTIN:  It was a fair question
25  about damages.  Go ahead.

232

```
 1              MR. BOND:  Okay.
 2       Q.  (BY MR. BOND)  You've testified
 3   about the five-minute effort for
 4   prescription and see you later, bye,
 5   correct?
 6       A.  Yes.
 7       Q.  And have you gone to any counseling
 8   since you've been released?
 9       A.  No, sir.
10       Q.  Are you scheduled to go to any
11   counseling?
12       A.  We're looking for someone for me to
13   go see right now.
14              MR. BOND:  Okay.  Is that what you
15   were talking about earlier?
16              MR. BRUSTIN:  No, it's different.
17   Yeah, it's a number of things, but if you
18   want to ask him, I think -- just listen to
19   his question.  If you want to ask him if he
20   currently has an appointment with anybody,
21   you can ask him that.
22              MR. BOND:  I thought I just did.
23              MR. BRUSTIN:  Okay.
24              MR. BOND:  You said no, but we're --
25   I said are you looking.
```

233

```
 1              MR. BRUSTIN:  Okay.
 2              MR. BOND:  I don't want to invade
 3   the attorney-client privilege --
 4              MR. BRUSTIN:  I can't --
 5              MR. BOND:  -- that's what I'm afraid
 6   I'm going to hear --
 7              MR. BRUSTIN:  No, I concede that.
 8              MR. BOND:  -- and I don't want to --
 9   I don't want him to blurt out something that
10   violates that.
11              MR. BRUSTIN:  Sure.  So let's take
12   it a step at a time.
13              MR. BOND:  Okay.
14       Q.  (BY MR. BOND)  Have you looked into
15   getting any counseling?
16       A.  By myself, no.
17       Q.  Okay.  Let's skip over, please, sir,
18   several pages.  Let's go over to Page 14,
19   please, sir.
20       A.  (Complies with request)
21       Q.  (Reads from document)  Paragraph 56.
22   It says, on information and belief,
23   Detective Handy, Detective Clark, Detective
24   Greer and Sheriff Greer each knew the
25   importance of recording suspect
```

234

```
 1   interrogations for establishing the content
 2   and circumstances of those interrogations.
 3       Did I read that accurately?
 4       A.  Yes, sir.
 5       Q.  Okay.  I've just learned today that
 6   there was an interrogation or a questioning
 7   of you in Brandenburg.  Was that
 8   interrogation recorded?
 9       A.  No, sir.
10       Q.  Okay.  When you were questioned at
11   the Louisville Police Department, who
12   conducted those investiga -- or those
13   interrogations?
14       And what I mean by that was
15   Detective Handy asking the questions?  Was
16   Detective Greer asking the questions, or was
17   Sheriff Greer asking the questions?
18              MR. BRUSTIN:  Objection to form.
19       A.  Well, they'd basically take turns.
20       Q.  Okay.  Are you aware that Sheriff
21   Greer did, in fact, tape an interview of Amy
22   Remsburg?
23       A.  No, I didn't know that.
24       Q.  Look at Paragraph 57.
25       A.  (Complies with request)
```

235

```
 1       Q.  (Reads from document)  After
 2   Detective Handy fabricated Hardin's
 3   statement, Defendants began building a case
 4   that framed Warford's murder as a ritual
 5   killing connected to Satan worship.
 6       Did I read that accurately?
 7       A.  Yes, sir.
 8       Q.  Okay.  What do you know that Sheriff
 9   Greer did to help build a case that framed
10   Warford's murder as a ritual killing?
11              MR. BRUSTIN:  Objection to form.
12       A.  I don't know.  I can't remember.
13       Q.  Okay.  Then let me just ask
14   collectively.  What did Deputy Wise, Deputy
15   Embry or Coroner Adams do to begin building
16   a case that framed Warford's murder as a
17   ritual killing?
18       A.  Can't remember.
19              MR. BRUSTIN:  When you have -- when
20   you're in a good place, do you mind if we
21   take --
22              MR. BOND:  We can stop.
23              MR. BRUSTIN:  -- a restroom break?
24              MR. BOND:  Yeah, yeah.  That's fine.
25   Not a problem.
```

236

1      (OFF THE RECORD, 2:40-2:50 P.M.)
2      Q.  (BY MR. BOND)  Let me just revisit
3  something so I make sure I understand.  I
4  want to go back to this interview back in
5  Brandenburg with Sheriff Greer and the gun.
6  You said you could not identify the other
7  individuals in the room.  Okay?
8      A.  (Nods head).
9      Q.  Correct?
10     A.  Correct.
11         MR. BRUSTIN:  Objection to form.
12     Q.  Did they have on uniforms?
13     A.  Yes, sir.
14     Q.  Okay.  What color were their
15  uniforms?
16     A.  They were all brown or khaki.
17     Q.  Did they all have on uniforms?
18     A.  The best I can remember, yes.
19     Q.  Okay.  That's all I'm asking, sir --
20     A.  Yes.
21     Q.  -- is the best to your memory.
22  Okay.  Let's move on.  Let's go to Page 19,
23  please, sir.  Paragraph 89.  (Reads from
24  document)  While Clark and Hardin had
25  independent alibis for April 3-4, they were

237

1  the only two people who could attest to each
2  other's alibi in the early morning of April
3  2.
4         Detective Handy conveyed this
5  information to Sheriff Greer, who with Meade
6  County Coroner William Adams, asked the
7  Kentucky State Medical Examiners Office to
8  date Warford's death on April 2.
9         Did I read that accurately, please?
10     A.  Yes, sir.
11     Q.  What facts do you have to
12  substantiate that allegation?
13         MR. BRUSTIN:  Objection to form.
14  You can answer.
15     A.  I don't know.
16     Q.  Are you aware that, in your original
17  Complaint, you sued Dr. George Nichols, the
18  State Medical Examiner, but in your Amended
19  Complaint, you haven't made him a party to
20  this lawsuit?
21         MR. BRUSTIN:  Objection to form.  I
22  think that mischaracterizes the Complaint.
23         MR. BOND:  Excuse me?
24         MR. BRUSTIN:  I think that's a
25  mischaracterization of the Complaint.

238

1         MR. BOND:  Well --
2         MR. BRUSTIN:  But you can ask it.
3  I'm just stating it for the record.
4         MR. BOND:  Well, is he a party to
5  this suit now?
6         MR. SLOSAR:  I believe that Nichols
7  was sued by Plaintiff Clark.
8         MR. BOND:  I'm sorry?
9         MR. SLOSAR:  I believe that Nichols
10  was sued by Plaintiff Clark.  I'm not sure
11  --
12         MR. SAWYER:  That's accurate.
13  Nichols was sued by Plaintiff Clark.  He was
14  not sued by Plaintiff Hardin, and I believe
15  we dismissed him from both cases when we
16  consolidated them.
17         MR. BOND:  Okay.  That's fair.
18  Okay.
19     Q.  (BY MR. BOND)  Do you have any
20  information, evidence, facts to substantiate
21  the allegation that Sheriff Greer and
22  Coroner Adams asked Dr. George Nichols to
23  change the date of death?
24     A.  I don't know.
25     Q.  Okay.  You don't know -- I just want

239

1  to make sure I understand the answer.  Do
2  you not know of any evidence or you just
3  don't know, period?
4     A.  I just don't know.
5     Q.  Okay.  That's fair.  Go to Paragraph
6  92.  On the next page, I'm sorry.  (Reads
7  from document)  Defendants knew that the
8  murder happened later.  Shortly after
9  Warford's body was discovered on April 5, a
10  witness contacted the Meade County Sheriff's
11  Office and reported seeing Warford alive on
12  April 3 in Brandenburg, Kentucky.  On
13  information and belief, that information was
14  relayed to Detective Handy.
15         Did I read that accurately?
16     A.  Yes, sir.
17     Q.  Okay.  Next paragraph, continuing.
18  (Reads from document)  Defendants buried
19  this exculpatory information.  They did not
20  record in any police report and did not tell
21  the prosecution or defense counsel that the
22  witness had seen Warford alive after her
23  purported date of date.  Defense counsel
24  only learned of the witness's exculpatory
25  evidence through its own independent

240

1  investigation.
2      Did I read that accurately?
3      A.  Yes, sir.
4      Q.  Who found that out through their own
5  independent investigation?
6      MR. BRUSTIN:  Objection to form.  So
7  if your answer requires you to -- if you
8  don't know, that's fine.  But if your answer
9  requires you to discuss communications you
10  had with one of your attorneys, then you
11  can't answer it.  You understand?
12      THE WITNESS:  Yes.
13      MR. BRUSTIN:  Okay.
14      THE WITNESS:  I can't answer it.
15      Q.  (BY MR. BOND)  Did you make any
16  allegation against Mr. Rogers that he failed
17  to properly investigate your defense of the
18  case?
19      MR. BRUSTIN:  Objection to the form.
20  Calls for legal conclusion.  You can answer
21  if you understand.
22      MR. BOND:  Well, he filed an 1142
23  claim against Mr. Rogers.
24      MR. BRUSTIN:  Well, his lawyers did.
25      MR. BOND:  He had to provide the

241

1  information for the factual basis for the
2  allegation.
3      MR. BRUSTIN:  Okay.  You can answer
4  the question if you understand it.
5  Objection to the form.
6      A.  Yes, sir.
7      Q.  (BY MR. BOND)  You complained about
8  the job that Mr. Rogers did, correct?
9      A.  Yes, sir.
10      Q.  Was part of that based upon the fact
11  of not being able to locate certain
12  witnesses?
13      MR. BRUSTIN:  Objection to the form.
14      A.  I can't remember right now.
15      Q.  And that's fair, okay, if you don't
16  remember.  Do you know who this person in
17  Paragraph 93 is that they're referencing?
18  What the name of that individual is?
19      A.  No, sir.
20      Q.  Okay.  Go to Paragraph 1 -- well, we
21  need to read 100 and 101 together, Page 22.
22  Paragraph 100 and 101.
23      (Reads from document)  Sheriff Greer
24  later repeated Thurman's falsehood to the
25  Grand Jury by testifying that one hair on

242

1  the victim's pants matched -- and that's in
2  quotes -- Hardin's hair.
3      Did I read that accurately?
4      A.  Yes, sir.
5      Q.  Okay.  (Reads from document)  And
6  then the next paragraph reads, Thurman and
7  Sheriff Greer repeated that false statement
8  again at trial.
9      Do you know if that's factually
10  accurate?  That Sheriff Greer testified at
11  trial that the hair found on Warford's pants
12  matched you.
13      MR. BRUSTIN:  Objection to form.
14  You can answer.
15      A.  I can't remember.
16      Q.  But you were present and the
17  testimony says what it says.  Okay.  Read
18  Paragraph 102.  (Reads from document)
19  Similarly, Sheriff Greer misrepresented
20  physical evidence taken from Clark's car.
21      Did I read that accurately?
22      A.  Yes, sir.
23      Q.  Do you have any independent
24  recollection that Sheriff Greer
25  misrepresented any physical evidence taken

243

1  from Clark's car?
2      A.  I don't know.
3      Q.  Okay.  There's this big issue about
4  the testimony of a fingerprint found in Jeff
5  Clark's car, correct?
6      MR. BRUSTIN:  Objection to form.
7      Q.  Correct?
8      A.  Yes.
9      Q.  And there's an allegation that
10  Sheriff Greer testified at trial that the
11  print was fresh.  Do you know if that's
12  factually accurate?
13      MR. BRUSTIN:  Objection to form.
14      A.  Yes, sir.
15      Q.  You're saying that he testified at
16  trial that the print was fresh.
17      MR. BRUSTIN:  Same objection.
18      A.  Yes, sir.
19      Q.  Okay.  Go to Page 23, Paragraph 110,
20  and it's -- the title associated with these
21  is "Defendants failed to investigate James
22  Whitely who confessed to the murder."
23      Did I read that accurately?
24      A.  Yes, sir.
25      Q.  (Reads from document)  It says, in

244

1    September 1993, Warford's friend, Eletha
2    Nicole Madison, revealed to the grand jury
3    that Warford's ex-paramour, James Whitely,
4    confessed to murdering her.
5        Did I read that correct?
6    A. Yes, sir.
7    Q. (Reads from document)  Madison
8    testified that Whitely admitted to picking
9    Warford up from a Kroger parking lot near
10   her house and taking her to a field in Meade
11   County, where an altercation ensued.
12   Madison testified that Whitely admitted
13   that, after Warford threatened to prosecute
14   him, he flew into a rage and murdered her.
15       Did I read that accurately?
16   A. Yes, sir.
17   Q. Do you know if that paragraph
18   accurately reflects exactly what Madison
19   told the Meade County Grand Jury?
20       MR. BRUSTIN:  Objection to form.
21   A. I don't know.  I'm not sure.
22   Q. Do you know if Madison told the
23   Meade County Grant Jury that Whitely killed
24   her because she was going to accuse Whitely
25   of raping her?

245

1    A. I'm not sure.
2    Q. Okay.  Do we agree, though, that the
3    proof in the case shows that Rhonda Warford
4    was not sexually assaulted before she was
5    killed?
6        MR. BRUSTIN:  Objection to form.
7    A. Yes.
8    Q. I mean, you know that, don't you?
9    A. Yes, sir.
10       MR. BRUSTIN:  Same objection.
11   Q. Okay.  So, if Madison told them that
12   Whitely was going to kill her because he had
13   raped her and he didn't want to get turned
14   in, we would know by the physical evidence
15   that that was a lie, wouldn't we?
16       MR. BRUSTIN:  Objection to the form
17   for so many reasons, but objection.
18   A. Yes, sir.
19   Q. Right?
20   A. (Nods head)
21   Q. Okay.  Thank you.  When a case is
22   tried, do you know who makes a decision on
23   what evidence to put on and what not to put
24   on in the prosecution of a crime?
25   A. I have no idea.

246

1        MR. BOND:  Okay.  Give me just a
2    second.  I think I'm done, but I want to
3    look at my notes and make sure.  Okay, I've
4    been reminded.
5    Q. (BY MR. BOND)  Let's go back to the
6    Meade County incident.  Were you taken to
7    Meade County only one time for an interview?
8        MR. BRUSTIN:  Objection to form.
9    Q. Before you were taken down there
10   after you were arrested.
11   A. I can't remember if it was more than
12   once or not.
13       MR. BRUSTIN:  He said he can't
14   remember if it's one --
15       MR. BOND:  Okay.  I'm digesting it.
16   Okay.
17       MR. BRUSTIN:  I thought you didn't
18   hear it.  That's all.
19       MR. BOND:  No, no, sir.  I am hard
20   of hearing, but I heard it.
21       THE WITNESS:  Sometimes I mumble.
22       MR. BOND:  Sometimes we all do.
23   Okay.
24   Q. (BY MR. BOND)  And was there just
25   one gun incident?

247

1    A. Yes, sir.
2        MR. BOND:  Give me just a moment.
3    Q. (BY MR. BOND)  At any time after you
4    were arrested until today, have you seen
5    Rhonda's calendars?
6    A. No, sir.
7    Q. Jeff Hardin (sic) testified at
8    trial, and he testified yesterday, that the
9    last time that he saw Rhonda was in December
10   of 1991.  Do you remember his testimony at
11   trial to that effect?
12       MR. BRUSTIN:  Objection to form.
13   A. Jeff Clark.
14   Q. Excuse me?
15   A. You called him Jeff Hardin.
16   Q. Jeff Clark.  I apologize.
17   A. I knew what you were talking about.
18   Q. I apologize.
19       MR. BRUSTIN:  Why don't you ask it
20   again, if you don't mind?
21       THE WITNESS:  Yes.
22       MR. BOND:  Okay.  That's fair.
23   Q. (BY MR. BOND)  Jeff Clark testified
24   yesterday, and I believe at trial, that the
25   last time that he saw Rhonda Warford was in

248

1    December of 1991. Do you remember him
2    testifying at trial about that?
3        MR. BRUSTIN: Objection to form.
4        Q. To that fact?
5        A. To the best of my memory, yes.
6        Q. During any of the times that you
7    interacted with Rhonda, did you ever find
8    her to be untruthful with you?
9        A. No, sir.
10       Q. And I believe her calendar -- it's
11   interesting, you said there was a pool hall
12   around the corner from her house where you
13   all would go, correct?
14       A. We've been there once or twice.
15       Q. Been there with Jeff?
16       MR. BRUSTIN: Objection to form.
17   Jeff who? You should ask.
18       MR. BOND: I wish I could think of
19   something cute, but I can't. Jeff Clark.
20       Q. (BY MR. BOND) Did Jeff Clark and
21   you and Rhonda go to the pool hall on
22   occasion?
23       MR. BRUSTIN: Objection to form.
24       A. I can't remember if Jeff was with us
25   or not.

249

1        Q. Well, if Rhonda's calendar showed,
2    in February in 1992, that the three of you
3    all went there and had a good time, would
4    you have any reason to question that entry
5    on her calendar?
6        MR. BRUSTIN: Hold on. Objection to
7    form. It mischaracterizes what the calendar
8    says. Did the calendar say Jeff Clark?
9        MR. BOND: I think that's exactly
10   what it says.
11       MR. BRUSTIN: It says Jeff Clark on
12   there?
13       MR. BOND: Yeah, it did.
14       MS. STAPLES: No, it didn't.
15       MR. SLOSAR: Wait, I'm sorry. That
16   actually is a really material
17   misrepresentation. We have a copy of the
18   calendar if you want to put it into the
19   record in question.
20       MR. BOND: Well, you can do that
21   when you do some --
22       MR. SLOSAR: But you can't at --
23   when, you know, the federal rules -- you
24   know we're proceeding here just as if we
25   were at trial. You're not allowed to lie to

250

1    people at trial.
2        MR. BOND: Whoa. Wait a second.
3    Don't you dare accuse me of lying.
4        MR. SLOSAR: I'm saying the calendar
5    does not say that.
6        MR. BOND: Okay. Show -- give me
7    the calendar. Where is the exhibit --
8    yesterday.
9        THE REPORTER: I have them here.
10   Just a second.
11       MR. BRUSTIN: Just look at the
12   calendar.
13       MR. SLOSAR: Here's a complete
14   calendar.
15       THE REPORTER: Here you are. Those
16   are my exhibits from yesterday, so.
17       MR. SLOSAR: There is only one page
18   from yesterday.
19       MR. BOND: (Reviews document) Okay.
20   Have you all got it in front of you?
21       MR. SLOSAR: We do. And the
22   birthdate -- if you look, two pages before,
23   this is what I think one of your co-counsel
24   found out yesterday, which is why they asked
25   my client for his birthdate, the Jeff that

251

1    she's talking about is a completely
2    different --
3        MR. BRUSTIN: Can you speak up,
4    Elliot? I don't think she's got it.
5        MR. SLOSAR: The Jeff that she's
6    talking about, not only does it not say
7    Clark -- but, I mean, we can talk about it
8    -- but Rhonda has a --
9        MR. BOND: It doesn't say Jeff
10   Clark. (Reads from document) It says me,
11   Keith -- and you correct me if I'm reading
12   it incorrectly. Okay? It says, me, Keith
13   and Jeff went and played pool. It was fun.
14   I love Keith.
15       MR. SLOSAR: Exactly. There's -- I
16   don't disagree with that. I'm saying it
17   doesn't say Jeff Clark, which is what you
18   said.
19       MR. BOND: If I -- well, I'm saying
20   Jeff Clark. I'm saying that Jeff -- you're
21   correct, it doesn't say Jeff Clark. It says
22   Jeff.
23       MR. SLOSAR: She has a brother named
24   Jeff, so we need, you know, a better --
25       MR. BOND: Okay.

252

```
 1          MR. SLOSAR:  That's all I'm saying
 2   is you can't create something.
 3          MR. BOND:  Okay.  That's fair.
 4      Q.  (BY MR. BOND)  Did you run around
 5   with any other Jeffs?
 6          MR. BRUSTIN:  Objection to form.
 7      A.  No, sir.  I was around Rhonda's
 8   brother, Jeff.
 9      Q.  Okay.  You think it could have been
10   Jeff, her brother?
11      A.  Most likely, because I don't
12   remember --
13      Q.  Do you remember Jeff --
14          MR. BRUSTIN:  Whoa, whoa, he didn't
15   finish answering.
16          MR. BOND:  That's fair.  I'm sorry.
17      A.  I don't remember Jeff Clark, Rhonda
18   and myself playing pool together.
19      Q.  (BY MR. BOND)  You remember Jeff,
20   the brother, playing pool?
21      A.  Yes.
22      Q.  Okay.  What's Jeff's last name?
23      A.  Warford.
24      Q.  Okay.  Do you know where he lives
25   now?
```

253

```
 1      A.  I have no idea.
 2          MR. BOND:  Okay.  I believe that's
 3   it.  Thank you.
 4          MR. BRUSTIN:  Yep.
 5          MR. BOND:  Appreciate your time.
 6          MR. BRUSTIN:  Yep.
 7          (OFF THE RECORD, 3:07-3:16 P.M.)
 8          MR. HOLLON:  Hi, Mr. Hardin, my name
 9   is Jason Hollon, and I represent Robert
10   Thurman in this matter.  I have just a few
11   questions for you this afternoon.
12          I want to start out by saying that
13   I'm not interested in any information that
14   your attorney has told you.  None of my
15   questions are designed to get into that.
16   I'm just trying to gather information
17   related to your claims in this case.
18          If, at any time, you don't
19   understand the question, please just let me
20   know.  I'll try to rephrase it and make it a
21   better question.
22          THE WITNESS:  Okay.
23
24   CROSS EXAMINATION
25   BY MR. HOLLON:
```

254

```
 1      Q.  Do you know who Robert Thurman is?
 2      A.  He's the -- I can't think what it's
 3   called -- the scientist that examined the
 4   hair.
 5      Q.  Okay.
 6      A.  Is that him?
 7      Q.  Okay.  Can you articulate the
 8   reasons why you sued Robert Thurman in this
 9   matter?
10          MR. BRUSTIN:  Objection to form.
11   You can answer.
12      A.  Well, he said that the hairs were
13   similar to mine.  DNA proved that they
14   weren't my hair at all.
15      Q.  Okay.  Do you have any other
16   personal knowledge as to Mr. Thurman's
17   involvement in this case?
18          MR. BRUSTIN:  Objection to form.
19      A.  Not that I can recall right now.
20      Q.  What did Robert Thurman do to cause
21   you damages in this matter?
22          MR. BRUSTIN:  Are you asking --
23   objection to form.  You asking what his
24   damages were or are you asking him what?
25      Q.  What did Robert Thurman do?
```

255

```
 1          MR. BRUSTIN:  Okay.  Objection to
 2   form.  You can answer.
 3      A.  Well, he's one of them that is
 4   credited with my incarceration.
 5      Q.  Okay.  And how did he do that?
 6          MR. BRUSTIN:  Objection to form.
 7      A.  Well, by saying that the hair was
 8   similar to mine.
 9      Q.  What evidence do you believe that
10   Mr. Thurman, Mr. Robert Thurman, fabricated
11   against you?
12          MR. BRUSTIN:  Objection to form.
13      A.  Do you mind rephrasing that a little
14   bit?
15      Q.  In your Complaint, you've alleged
16   that Mr. Thurman, Mr. Robert Thurman,
17   fabricated evidence against you, and I'm
18   asking you what type of evidence do you
19   believe he fabricated against you?
20          MR. BRUSTIN:  Objection to form.
21   Answer it again.
22      A.  Like I said, he said that the hair
23   was similar to mine.
24      Q.  Anything else?
25      A.  His testimony led to my
```

256

1  incarceration for 22 years.
2      Q. His testimony about the hair?
3      A. Yes, sir.
4      Q. Did Robert Thurman ever threaten you
5  at any time?
6      A. No, sir.
7      Q. Was Robert Thurman ever at the
8  police station or in Louisville or in
9  Brandenburg during any of your
10  interrogations, interviews, at any time?
11      A. I don't recall him being there.
12      Q. Did you happen to know Robert
13  Thurman prior to your criminal case?
14      A. No, sir.
15      Q. Do you have any reason to believe
16  that Robert Thurman had anything against
17  you?
18      A. Not to my knowledge.
19      Q. You've alleged in your Amended
20  Complaint that the defendants had an
21  agreement to act against you.  Who do you
22  believe was a party to that agreement?
23      MR. BRUSTIN:  Objection to form.
24  Calls for a legal conclusion among other
25  problems.

257

1      MR. HOLLON:  Are you instructing him
2  not to answer?
3      MR. BRUSTIN:  Oh, no, no, no.  I'm
4  sorry.  Just objecting to the form.  You can
5  go ahead and answer.  I apologize.
6      THE WITNESS:  Okay.
7      MR. HOLLON:  Do you want me to
8  restate the question?
9      THE WITNESS:  Yes, please.
10      MR. BRUSTIN:  Sorry about that.
11      MR. HOLLON:  That's fine.
12      Q. (BY MR. HOLLON) I said, in your
13  Amended Complaint, you've alleged that there
14  was an agreement among the defendants to act
15  against you.  I asked you who do you believe
16  was a party to that agreement?
17      MR. BRUSTIN:  Same objection.
18      A. I don't remember right now.
19      Q. Okay.  And that's fine.  Do you have
20  any knowledge -- other than what's been
21  conveyed to you by anyone else -- about any
22  conversations between Robert Thurman and the
23  prosecutors in your criminal case at any
24  time?
25      MR. BRUSTIN:  Okay.  So you can -- I

258

1  guess the first question is -- do me a
2  favor.  Ask him if he has -- ask him a yes
3  or no if he has any knowledge, and that will
4  take care of the problem, I think --
5      MR. HOLLON:  Okay.
6      MR. BRUSTIN:  -- if you don't mind.
7      MR. HOLLON:  Okay.
8      Q. (BY MR. HOLLON) Do you have any
9  knowledge about any conversations that
10  Robert Thurman had with the prosecutors in
11  your case?
12      MR. BRUSTIN:  Please answer that yes
13  or no.
14      A. No.
15      Q. Do you have any knowledge related to
16  any conversations between Robert Thurman and
17  any of the other defendants in this case?
18      MR. BRUSTIN:  Answer yes or no.
19      A. No.
20      Q. Are you aware that Robert Thurman
21  prepared a series of forensic examination
22  reports related to your case?
23      A. No.
24      Q. Okay.  Have you ever -- so you've
25  not seen a forensic report in this case?

259

1      MR. BRUSTIN:  Objection to form.
2      A. Not that I can recall.
3      Q. Okay.  So is your understanding of
4  Robert Thurman's involvement in this case
5  his testimony at trial?
6      MR. BRUSTIN:  Objection to form.
7      A. Yes, sir.
8      Q. Okay.  If you will pull out the
9  Amended Complaint.  Do you still have it?
10      MR. BRUSTIN:  We do.  I think it's
11  right there (indicating).  Top one.
12      MR. HOLLON:  Should be an exhibit.
13  Is it Exhibit 5?
14      THE REPORTER:  Yes, sir.
15      MR. HOLLON:  Okay.  If you could
16  hand that to him, please.
17      MR. BRUSTIN:  Yep.
18      MR. HOLLON:  And if you'll look at
19  -- I've got it being Page 21.  It's
20  Paragraph 97.  Let me make sure that's
21  right.
22      MR. BRUSTIN:  That's right.
23      MR. HOLLON:  Okay.
24      MR. BRUSTIN:  Let him know when
25  you're there.  Okay?

260

1    THE WITNESS: I'm there.
2    Q. (BY MR. HOLLON) (Reads from
3  document) This paragraph state that, in an
4  April 30, 1992 written report concerning the
5  forensic analysis of hairs collected from
6  the victim's body and clothing, KSP
7  Serologist Robert Thurman falsely reported
8  that one hair recovered from the victim's
9  sweatpants matched Hardin's head hair.
10    Did I read that accurately?
11    A. Yes, sir.
12    Q. Is it your testimony that you don't
13  have any knowledge relating to this written
14  report?
15    MR. BRUSTIN: Objection, asked and
16  answered.
17    A. Correct.
18    Q. Okay. So you don't know if it says
19  that the hair matched your head hair?
20    MR. BRUSTIN: Objection to form.
21  Are you asking him if he saw the report or
22  are you asking him about conversations he
23  had?
24    MR. HOLLON: I'm not asking about
25  conversations he had. Just strike that

261

1  question.
2    MR. BRUSTIN: Fair enough.
3    Q. (BY MR. HOLLON) Do you remember
4  being present during a hearing on a motion
5  to suppress related to search warrants in
6  your criminal case?
7    A. No, I don't.
8    Q. Okay. Your Amended Complaint also
9  makes claims related to a broken chalice and
10  a handkerchief or cloth?
11    A. Yes.
12    Q. What is your personal knowledge
13  about that?
14    A. Well, the chalice broke and I tried
15  to catch it, and it cut my hand, and I used
16  the handkerchief to blot the blood on my
17  hand.
18    Q. Okay. And what knowledge do you
19  have of Robert Thurman's involvement with
20  that piece of evidence?
21    A. I can't recall right now.
22    Q. Okay. You've alleged that Robert
23  Thurman tested the handkerchief or the cloth
24  and confirmed that the stain was blood, and
25  then you allege that, on information and

262

1  belief, he falsely reported that no further
2  testing on the blood stain could be done.
3    Do you remember making that
4  allegation?
5    MR. BRUSTIN: Objection to the form.
6  He didn't write the Complaint.
7    A. No.
8    Q. You've also alleged that Robert
9  Thurman either tested the blood stain from
10  the cloth and chalice and determined that it
11  was human blood, found that it was, and
12  suppressed those results.
13    Do you have any personal knowledge
14  relating to that?
15    A. No, sir.
16    Q. Or, in the alternative, you've
17  alleged that he deliberately failed to test
18  the blood so no evidence would undermine
19  Detective Handy's theory. Do you have any
20  personal knowledge about that?
21    A. No, sir.
22    Q. What evidence do you allege that Mr.
23  Thurman failed to come forward with?
24    MR. BRUSTIN: Objection to form.
25    A. I can't remember right now.

263

1    Q. Do you have any knowledge, beyond
2  what someone else told you, for believing
3  that Robert Thurman deliberately failed to
4  test the blood on the cloth and chalice?
5    MR. BRUSTIN: Objection to form.
6  You understand?
7    A. Do you mind repeating that?
8    Q. Do you have any personal knowledge,
9  beyond what your attorneys or anyone else
10  may have told you, about Robert Thurman's
11  failing to test the chalice and cloth?
12    A. No, sir.
13    Q. Okay. Did you testify at trial
14  relating to the chalice and cloth?
15    A. Yes, sir.
16    Q. Do you remember what you said at
17  trial?
18    A. Not my exact words, no.
19    Q. Okay. Is it similar to what you
20  said earlier, that you dropped it and cut
21  yourself?
22    A. Yes.
23    Q. Okay. Do you remember if anyone
24  else testified at your trial about the
25  chalice and cloth?

264

1      MR. BRUSTIN:  Objection to form.
2   The testimony speaks for itself.
3      A.  I'm trying to think.  Someone did,
4   but I can't remember who it was.
5      Q.  Okay.  Do you remember if your mom
6   testified at your trial about the chalice
7   and cloth?
8      MR. BRUSTIN:  Same objection.
9      A.  I don't remember.
10     Q.  Okay.  And I think I heard you say
11  earlier that you recently reread Robert
12  Thurman's testimony from trial; is that
13  correct?
14     MR. BRUSTIN:  Objection.  Do you
15  remember reading Robert Thurman's testimony?
16     A.  I don't remember.
17     Q.  Okay.  Because I think you told Mr.
18  Bond that you had, but you're saying now you
19  don't remember reading Robert Thurman's
20  testimony?
21     MR. BRUSTIN:  I think for the record
22  he was mistaken.  We didn't give him Robert
23  Thurman's testimony.
24     Q.  Okay.  But you were present at trial
25  -- at your trial in 1995, correct?

265

1      A.  Yes.
2      Q.  Do you remember Robert Thurman
3   testifying?
4      A.  I do, but I don't remember his exact
5   words.
6      Q.  Do you remember if he testified
7   about the chalice and the cloth?
8      A.  I can't remember.
9      Q.  Did you hear Mr. Thurman testify at
10  your trial that he was trained in hair
11  comparisons?
12     MR. BRUSTIN:  Objection to form.
13     A.  I'm trying to remember.  I'm not
14  exactly sure, but.
15     MR. BRUSTIN:  He doesn't want you to
16  guess.
17     THE WITNESS:  Yes.
18     MR. BRUSTIN:  Tell him what you
19  remember.  Just do the best you can.
20     THE WITNESS:  I probably should say
21  no, because I can't remember.
22     MR. HOLLON:  Okay.  That's fine.
23     MR. BRUSTIN:  But if you don't
24  remember, you can't -- you should just tell
25  him.

266

1      THE WITNESS:  Okay.  Yeah.
2      MR. BRUSTIN:  Tell him what you
3   remember.  That's what he wants.
4      MR. HOLLON:  Right.
5      THE WITNESS:  Okay.
6      MR. HOLLON:  And if you don't
7   remember, tell --
8      THE WITNESS:  Yeah.
9      MR. HOLLON:  -- me you don't
10  remember.
11     THE WITNESS:  I don't remember.
12     Q.  (BY MR. HOLLON)  Okay.  You
13  testified earlier about Thurman's report
14  that said your hair or his test -- strike
15  that.  That's a bad question.
16     You testified earlier about Thurman
17  finding that one of the hairs from Ms.
18  Warford's sweatpants was similar to one of
19  your hairs; is that right?
20     MR. BRUSTIN:  Objection.
21     A.  Yes.
22     Q.  What basis -- what is your basis for
23  thinking that that's an inappropriate
24  conclusion?
25     MR. BRUSTIN:  Objection to form.

267

1      A.  Well, DNA proved that it wasn't my
2   hair.
3      Q.  Okay.  Do you have any other basis
4   for that conclusion?
5      A.  No.
6      Q.  Okay.  Do you remember whether Mr.
7   Thurman testified at your trial that there
8   were two grey hairs and a brown hair found
9   in Warford's right hand?
10     MR. BRUSTIN:  Objection to form.
11     A.  Yes, I remember that.
12     Q.  Okay.  Do you recall Mr. Thurman
13  testifying that he couldn't test those grey
14  hairs?
15     A.  Yes.
16     Q.  Okay.  Do you remember Mr. Thurman
17  testifying that those grey hairs didn't
18  match or weren't similar in color and
19  characteristics to any of the hairs that he
20  tested?
21     MR. BRUSTIN:  Objection.  The
22  testimony speaks for itself.
23     A.  Yes.
24     Q.  Okay.  Do you remember if Mr.
25  Thurman testified that he found several

268

1  hairs on Ms. Warford's sweatpants?
2       MR. BRUSTIN:  Same objection.
3    A.  Yes.
4    Q.  And you remember that Mr. Thurman
5  testified that one of those hairs from Ms.
6  Warford's sweatpants was similar in
7  characteristics to your hair, correct?
8       MR. BRUSTIN:  Objection.
9    A.  Yes, sir.
10   Q.  Do you remember if Mr. Thurman
11  testified at your trial that any of the
12  other hairs that were found on Ms. Warford's
13  sweatpants were similar in characteristics
14  to any of the other standards he tested?
15   A.  I don't remember that.
16   Q.  Do you recall if Mr. Thurman
17  testified at your trial that any hairs found
18  in a car matched any of your hair standards?
19       MR. BRUSTIN:  Objection.
20   A.  I don't remember that.
21   Q.  Okay.  Do you recall Mr. Thurman
22  testifying at your trial that he did not
23  have the ability in his lab to complete a
24  test that would establish whether hair is,
25  as a matter of fact, the same as another

269

1  hair?
2       MR. BRUSTIN:  Objection to form.
3    A.  I don't remember that.  I don't
4  know.
5    Q.  Do you remember Mr. Thurman
6  testifying about the characteristics he
7  looks at when he makes hair comparisons?
8       MR. BRUSTIN:  Objection.
9    A.  I don't remember.
10   Q.  Okay.  Do you recall Mr. Thurman
11  testifying at your trial that he does not
12  know if the hair he found on Warford's
13  sweatpants was actually your hair, but it
14  might be?
15       MR. BRUSTIN:  Objection.
16   A.  I don't remember him saying that.
17   Q.  Do you recall your attorney using
18  the word "match" at your trial --
19       MR. BRUSTIN:  Objection.
20   Q.  -- in reference to the hairs?
21       MR. BRUSTIN:  Same objection.
22   A.  I just remember someone using the
23  word "match" but I can't recall who it was.
24   Q.  Okay.  And what does the word
25  "match" mean to you in the context of hair

270

1  comparison?
2       MR. BRUSTIN:  Objection to form.  Do
3  you know?
4    A.  Match is more than similar.  Match,
5  to me, means exact.
6    Q.  Could it mean that the
7  characteristics of a hair match?
8       MR. BRUSTIN:  Objection to form.
9    A.  I don't know.  I'm not a scientist.
10  I don't know.
11   Q.  Do you have any reason to believe,
12  beyond what someone else told you, that Mr.
13  Thurman did not examine the hairs in a
14  manner that was consistent with his
15  training?
16       MR. BRUSTIN:  Objection to form.
17   A.  I don't know.
18   Q.  You don't know if you have any
19  knowledge?
20   A.  I mean I'll say no.
21   Q.  Did you personally examine the
22  hairs?
23   A.  No.
24   Q.  Do you know anyone who did examine
25  the hairs?

271

1    A.  No.
2    Q.  What evidence or facts do you have
3  to support that Thurman manufactured blood
4  evidence with Detective Handy?
5       MR. BRUSTIN:  Objection to form.
6    A.  I don't know.
7    Q.  And what evidence or facts do you
8  have to support that Thurman manufactured
9  hair evidence with Detective Handy?
10       MR. BRUSTIN:  Same objection.
11   A.  I don't know.
12   Q.  You don't know of any facts that you
13  have?
14       MR. BRUSTIN:  You know of no facts,
15  right?
16       THE WITNESS:  Right.
17   Q.  (BY MR. HOLLON)  Okay.  So, whenever
18  I'm asking you these questions and you're
19  saying "I don't know," does that mean you
20  don't know of any facts?
21       MR. BRUSTIN:  I think that's -- I
22  think that's not a fair question.  I think
23  you should ask that -- I think that's too
24  broad.
25   Q.  (BY MR. HOLLON)  Okay.  Well, let's

272

1    go back.  I asked what evidence or facts do
2    you have to support that Thurman
3    manufactured blood evidence with Detective
4    Handy?
5         Mr. BRUSTIN:  So what's the
6    question?
7         Q.  And you said "I don't know,"
8    correct?
9         A.  Correct.
10        Q.  Did you mean that you don't know of
11   any facts?
12        A.  Well, more like I don't really
13   remember.
14        MR. BRUSTIN:  Today, you don't know.
15        THE WITNESS:  Right.
16        Q.  (BY MR. HOLLON)  Okay.  Are you
17   going to know when we go to trial in this
18   matter?
19        MR. BRUSTIN:  Objection.  How could
20   that possibly be an appropriate question?
21   Is he going to read the reports?
22        MR. HOLLON:  Are you instructing him
23   not to answer?
24        MR. BRUSTIN:  I'm not, but come on.
25   That's just a terrible question.  You can

273

1    answer, if you understand it.  Go ahead.
2    Would you repeat that?  I'm sorry.
3         Q.  (BY MR. HOLLON)  Are you going to
4    know these facts whenever we go to trial?
5         MR. BRUSTIN:  Objection.  Calls for
6    speculation.  Calls for a legal conclusion.
7    Calls for an expert opinion.  You can
8    answer.
9         A.  Well, I guess I'm going to have to
10   do some studying.
11        Q.  Okay.  Do you believe that it was
12   Robert Thurman's goal to get you convicted
13   of this crime?
14        MR. BRUSTIN:  Objection to form.
15   Calls for speculation.
16        A.  I don't know.
17        Q.  You don't know if you believe that?
18        MR. BRUSTIN:  He doesn't know if
19   it's his goal.
20        Q.  Okay.  So I just want to make sure
21   that I'm clear, that the evidence that you
22   believe that Mr. Thurman fabricated against
23   you is the hair evidence and the cloth from
24   the chalice; is that correct?
25        MR. BRUSTIN:  Objection to form.

274

1         A.  Yes.
2         Q.  Is there anything else?
3         MR. BRUSTIN:  Objection.
4         A.  Not that I recall.
5         Q.  Okay.  And aside from those two
6    things, is there any other exculpatory
7    evidence or other evidence that you believe
8    he did not provide to your counsel or to law
9    enforcement or the prosecutors?
10        MR. BRUSTIN:  Objection to form.
11        A.  No.
12        Q.  At what point do you believe that
13   Mr. Thurman should have intervened to
14   protect your rights?
15        MR. BRUSTIN:  Objection to the form.
16   Foundation.  Calls for expert opinion.
17        A.  I don't know.
18        Q.  Okay.  Other than what we've talked
19   about here related to the hair evidence and
20   the broken chalice and cloth, are there any
21   other actions taken by Robert Thurman that
22   you believe violated your rights?
23        MR. BRUSTIN:  Objection to form.
24        A.  No.
25        Q.  I want to show you one thing from

275

1    your Amended Complaint.  If you'll look
2    back, I think Mr. Bond directed your
3    attention to this.  It's Paragraph 101 on --
4    I think mine's Page 23.  I have a different
5    copy.
6         MR. BRUSTIN:  Just let him know when
7    you're there.
8         Q.  I have a different copy than you, I
9    think.
10        A.  I'm there.
11        MR. BRUSTIN:  I think ours is 22.
12        THE WITNESS:  Mm-hmm (affirmative).
13        MR. HOLLON:  I'm not sure how that
14   --
15        MR. BRUSTIN:  I don't know either.
16        MR. HOLLON:  Yeah.
17        MR. BRUSTIN:  But it's definitely
18   101 on 22 on ours.
19        MR. HOLLON:  And I'm going to read
20   it to make sure we have the right version,
21   but.
22        MR. BRUSTIN:  Fine.
23        Q.  (BY MR. HOLLON)  (Reads from
24   document)  101 reads, Thurman and Sheriff
25   Greer repeated that false statement again at

276

1  trial. They testified that the hair found
2  on Warford's pants matched Hardin's hair and
3  was significant from an investigative
4  standpoint.
5       Did I read that correctly?
6    A. Yes, sir.
7    Q. Do you remember if Robert Thurman
8  testified that the hair that was on
9  Warford's pants was significant from an
10 investigative standpoint?
11      MR. BRUSTIN: Objection to form.
12 You can answer.
13   A. Don't remember.
14   Q. Okay. Do you remember submitting to
15 a sexual assault evidence collection kit?
16   A. Yes, I do.
17   Q. And in connection with that, did you
18 submit a head hair?
19   A. Yes.
20   Q. Did you submit a pubic hair?
21   A. Yes.
22   Q. A blood sample?
23   A. Yes, I did.
24   Q. Do you remember if there was
25 anything else involved in that kit?

277

1    A. Saliva. That's what I can remember.
2    Q. Okay. And was that during one of
3  your interviews or meetings with law
4  enforcement?
5    A. Yes.
6       MR. BRUSTIN: Just to be clear, I
7  don't think you meant this, but you didn't
8  suggest it was a single hair, did you --
9       MR. HOLLON: No.
10      MR. BRUSTIN: -- he submitted?
11      MR. HOLLON: I did not mean -- I was
12 trying to -- there was a head hair, head
13 hairs, correct?
14      THE WITNESS: Yes.
15   Q. (BY MR. HOLLON) And pubic hairs?
16   A. Yes.
17   Q. Okay. Do you know what color hair
18 James Whitely has or had at the time in
19 1992?
20   A. I don't know.
21      MR. BRUSTIN: Objection.
22 Foundation.
23      MR. HOLLON: I think we can take a
24 break and let me review my notes, but.
25      MR. BRUSTIN: Sure.

278

1       (OFF THE RECORD, 3:42-3:46 P.M.)
2       MR. HOLLON: Thank you, Mr. Hardin,
3  for your time. I don't have any further
4  questions for you.
5       THE WITNESS: Thank you.
6       (OFF THE RECORD, 3:46-3:47 P.M.)
7       MR. PELLINO: Mr. Hardin, I'm Andrew
8  Pellino. I represent Detective Mark Handy.
9
10 CROSS EXAMINATION
11 BY MR. PELLINO:
12   Q. I want to take you back to April
13 1st, late that night, early morning April
14 2nd. You and Jeff were out at the trailer.
15 You said you'd been tearing it up looking
16 for the snake.
17      Why didn't you all just spend the
18 night at the trailer that night?
19      MR. BRUSTIN: Objection to form.
20 You can answer.
21   A. I don't know.
22   Q. You had been drinking that night?
23      MR. BRUSTIN: Objection to form.
24 Asked and answered.
25   A. Very little. Didn't even have a

279

1  buzz.
2    Q. You had been using drugs that night?
3    A. No, sir.
4    Q. Okay. Have you previously made
5  statements that you'd been using drugs that
6  night?
7    A. I can't remember. I don't know.
8    Q. If you had, would that have been a
9  lie?
10      MR. BRUSTIN: Objection to form.
11 Foundation. Mischaracterizes his prior
12 testimony. Do you understand what he's
13 asking you?
14   A. I can't recall using any drugs that
15 night.
16   Q. And my question was, if you had
17 previously made a statement that you all had
18 been using drugs that night, would that have
19 been a lie?
20      MR. BRUSTIN: Objection to form.
21   A. Well, I can't remember right now if
22 we were. I mean, we was drinking beer. I
23 don't remember drugs being involved that
24 night.
25   Q. Is it possible that you guys had

280

1    been using drugs that night?
2         MR. BRUSTIN:  Objection to form.
3    Calls for speculation.  Tell him your memory
4    again.
5         A.  I don't remember any drugs.  I just
6    remember the beer.
7         Q.  Did you and Mr. Clark discuss just
8    spending the night at the trailer that night
9    rather than driving home?
10         MR. BRUSTIN:  Objection to form.
11    Foundation.
12         A.  No, we didn't even think about it.
13    We just decided we'd go home instead.
14         Q.  But you told us you took that kind
15    of unusual route home because you wanted to
16    avoid the police on Dixie Highway.
17         MR. BRUSTIN:  Objection to the form.
18    Mischaracterizes his testimony.  Asked and
19    answered.
20         Q.  Is that accurate, sir?
21         A.  Yes, sir.
22         Q.  What other reason would you have to
23    take that unusual route home other than to
24    avoid the police on Dixie Highway?
25         A.  That's the only reason.

281

1         Q.  Why were you concerned with running
2    into the police that night?
3         MR. BRUSTIN:  Objection to form.
4         A.  Well, we always liked to try to
5    avoid the police as much as we can.  Just
6    don't want to have to deal with them.
7         Q.  Mr. Clark told us that you all were
8    trying to clean the trailer up.  What
9    efforts did you undertake that night to
10    clean trailer up?
11         A.  Well, we had tore it apart looking
12    for the snake and we were trying to
13    straighten things back up as we went along.
14         Q.  So you were just trying to clean
15    back up the mess that you made looking for
16    the snake?
17         A.  Yes.
18         Q.  How much time did you spend in the
19    trailer that night?
20         A.  We was there pretty much most of the
21    night.
22         Q.  How many hours, sir?
23         A.  I'm trying to remember.  I can't
24    even remember what time we got there to the
25    trailer.  It's hard to say how many hours.

282

1    I don't remember when we got to the trailer.
2         Q.  I think I've seen you testify
3    previously that you think you got there
4    around 5:30.  Does that sound right?
5         MR. BRUSTIN:  Objection to form.
6    Does it sound right that he testified that
7    to that or does it sound right he got there
8    at 5:30?  What are you asking him?
9         Q.  Sir, does it sound right that you
10    got to the trailer about 5:30 that night?
11         MR. BRUSTIN:  Objection to the form.
12    You can answer.
13         A.  I can't recall.  I don't know.
14         Q.  Where did you all get the beer that
15    you were drinking that night?
16         A.  I don't know what store he got it
17    from.  I don't know.
18         Q.  Did you stop on the way to the
19    trailer to pick up the beer?
20         A.  I think it was already in the
21    refrigerator.
22         Q.  Okay.  How much beer was in the
23    fridge at the trailer?
24         A.  Not a lot.  Probably about a
25    six-pack at the most.  I don't know.

283

1         Q.  And I think you told us earlier you
2    don't know whether or not Mr. Clark was
3    still living at the trailer at that time?
4         MR. BRUSTIN:  Objection to form.
5    Asked and answered.  Tell him again.
6         A.  He was living at his parents' but he
7    still had the trailer.
8         MR. BRUSTIN:  Are you done?
9         THE WITNESS:  Yes.  I -- I don't
10    know.
11         MR. BRUSTIN:  You don't know.  Okay.
12         Q.  (BY MR. PELLINO)  My question, sir,
13    was do you know whether Mr. Clark was still
14    living in the trailer in April of 1992?
15         MR. BRUSTIN:  Objection to form.  Do
16    you know?
17         A.  I don't know.
18         Q.  Prior to your incarceration -- you
19    said you don't remember if you'd been doing
20    drugs that night in April 1992.  Prior to
21    your incarceration, was there ever a time in
22    your life you were using drugs?
23         MR. BRUSTIN:  Objection to form.
24    That's exactly the opposite of what he said.
25    You -- I can't imagine that that could have

284

1    been by accident, but that's exactly the
2    opposite of what he told you. So please
3    don't affirmatively mischaracterize his
4    testimony. That is not appropriate. You
5    want to rephrase the question, please?
6         MR. PELLINO: I'm not going to
7    rephrase it.
8         Q. (BY MR. PELLINO) Can you answer
9    that question, sir? Did you understand it?
10        A. You're basically asking me if I have
11   ever done drugs?
12        Q. Prior to your incarceration.
13        MR. BRUSTIN: You can answer that.
14        A. Yes, I experimented with drugs at
15   one time.
16        Q. Okay. Did you use PCP?
17        A. I've tried it once.
18        Q. All right. Did you use
19   methamphetamines?
20        A. No.
21        Q. What about marijuana?
22        A. Yes.
23        Q. What about hallucinogens?
24        A. I've tried that once.
25        Q. Okay. Tell me when you used those

285

1    in relationship to when you were living in
2    the trailer.
3         MR. BRUSTIN: Objection to the form.
4         A. It was before I ever moved to the
5    trailer.
6         Q. Okay. When?
7         MR. BRUSTIN: Objection to the form.
8         A. While I was a teenager. I was in
9    high school, experimenting.
10        Q. So all that happened while you were
11   a teenager in high school?
12        A. Yes.
13        Q. Did you ever observe Mr. Clark using
14   any drugs while you were living together in
15   the trailer?
16        A. No, sir.
17        Q. Did you ever observe Mr. Clark
18   acting in a violent manner towards any women
19   while you were living in the trailer?
20        A. No, sir.
21        Q. Did you ever observe Mr. Clark put a
22   gun to a woman's head while you were living
23   in the trailer?
24        A. No.
25        Q. Are you aware that there have been

286

1    statements taken of women who allege that
2    Mr. Clark had put a gun to their head?
3         MR. SLOSAR: Objection to the form.
4         MR. BRUSTIN: Objection.
5         A. No. I've never heard that before.
6         Q. Never before I just said it?
7         A. Right.
8         Q. Did Mr. Clark ever tell you any
9    stories about that having happened?
10        A. No, sir.
11        Q. You had told us that you had talked
12   to Rhonda on April 1st of 1992, correct?
13        A. Yes.
14        Q. Okay. What time was that when you
15   spoke to her?
16        MR. BRUSTIN: Objection to form.
17   Asked and answered. Tell him what you
18   remember.
19        A. I'm not real clear on the time,
20   exactly what time it was, when she called
21   me. I'm not clear on it. I don't know.
22        Q. But you were at your house?
23        A. Yes.
24        Q. So this was before you went to the
25   trailer?

287

1         A. Yes.
2         Q. Does that help you narrow it down at
3    all in terms of the time of day?
4         A. Well, I can't exactly say exactly
5    what time it was when she called me.
6         Q. Have you told us everything that you
7    remember about that conversation?
8         MR. BRUSTIN: Objection to form.
9         A. Everything I can remember at this
10   time, yes.
11        Q. And that was about her telling you
12   about the guy that followed her from Kroger?
13        A. Yes.
14        MR. BRUSTIN: Objection to form.
15        Q. And that's it. That's all you
16   remember about that conversation?
17        MR. BRUSTIN: Same objection.
18        A. Yes, sir.
19        MR. BRUSTIN: Asked and answered.
20   Mischaracterizes his testimony.
21        Q. Do you remember anything else about
22   that conversation?
23        MR. BRUSTIN: Same objection.
24        A. No, sir.
25        Q. What was your response when Rhonda

288

1  told you that this guy had followed her?
2  Did you tell her, you know, not to go out
3  with any strangers that night?
4       MR. BRUSTIN:  Objection to form.
5       A.  I can't remember exactly what I told
6  her, you know.
7       MR. BRUSTIN:  That's all he's asking
8  you.
9       A.  Yeah.  I can't remember.
10      Q.  Did you have any response when she
11  told you that she felt like that guy had
12  followed her from Kroger?
13      A.  Yes.  I wanted to go there, you
14  know, but I couldn't.  My car was broken
15  down.
16      MR. BRUSTIN:  He's not asking you
17  what you wanted to do.  He's asking you if
18  you said anything, if you remember saying
19  anything.  That's what he's asking you.
20  Either you do or you don't.
21      A.  I don't.
22      Q.  Did you ask your mom to drive you
23  over to Rhonda's house that night?
24      MR. BRUSTIN:  Objection.  That was
25  specifically asked and answered.

289

1       A.  No, sir.
2       Q.  And did you ask your father to drive
3  you there that night?
4       MR. BRUSTIN:  Same objection.
5       A.  No, sir.
6       Q.  And what about Mr. Clark, did you
7  ask him for a ride over there that night?
8       MR. BRUSTIN:  Same objection.
9       A.  No, sir.
10      Q.  What time did you get the call from
11  Rhonda's mother on April 2nd?
12      A.  It was in the morning, probably like
13  mid-morning, I guess.
14      Q.  Were you still asleep when you got
15  the call?
16      A.  No, I was up.
17      Q.  Were you the one that answered the
18  phone?
19      A.  No, my mother answered the phone.
20      Q.  Had Rhonda's mother ever called you
21  before, looking for Rhonda?
22      A.  I think she has, yes.
23      Q.  Okay.  When did that happen prior to
24  April 2nd of 1992?
25      A.  I don't really know what day it was

290

1  or anything, but she called to ask if Rhonda
2  was with me.
3       Q.  And was Rhonda with you at that
4  time?
5       A.  Yes.
6       Q.  All right.  Had Rhonda's mother ever
7  called looking for Rhonda when Rhonda wasn't
8  with you?
9       A.  No.
10      Q.  So April 2, 1992 was the first time
11  that Rhonda's mother ever called you looking
12  for Rhonda where she didn't know where
13  Rhonda was and neither did you.
14      MR. BRUSTIN:  Objection to form.
15      A.  Correct.
16      Q.  And what did you do the rest of that
17  day?
18      A.  Stayed by the phone hoping Rhonda
19  would call.
20      Q.  And you never left your house?
21      MR. BRUSTIN:  Objection to form.
22      A.  Well, I did go to my sister,
23  Vickie's, house.  I think it was later that
24  day, and the next day, I think, it was, too.
25      Q.  What did you go over to Vickie's

291

1  house for?
2       A.  She invited me over.  So I just went
3  to her house.
4       Q.  Were you still worried about
5  Rhonda's whereabouts?
6       A.  Yes, of course.
7       Q.  So what did you go over to Vickie's
8  for?  Just a social visit or --
9       MR. BRUSTIN:  Objection to form.
10      A.  I think she invited me for dinner or
11  something like that.
12      MR. BRUSTIN:  He doesn't want you to
13  guess.  Tell him what you remember.
14      Q.  Why did Vickie call Sheriff Greer to
15  report that Rhonda was missing?
16      MR. BRUSTIN:  Objection to form.
17  Calls for speculation.  You can answer, if
18  you know.
19      A.  Because she saw on the news there
20  was a body in Meade County that someone
21  found.  She told Sheriff Greer that Rhonda
22  was missing.
23      Q.  Sir, why didn't you call Sheriff
24  Greer to tell him that Rhonda was missing?
25      A.  Well, I didn't anything was on the

292

1  news about a body being found in Meade
2  County until Vickie told me.
3      Q.  Did Vickie tell you that before or
4  after she called Sheriff Greer?
5      A.  I don't remember.
6      Q.  Did Vickie ever discuss with you
7  that she was planning to call Sheriff Greer
8  to report that Rhonda was missing?
9      A.  No.
10     Q.  All right.  So when did you come to
11  know that Vickie had called Sheriff Greer to
12  report that Rhonda was missing?
13     A.  It was the same day, sometime after
14  she called Sheriff Greer.
15     Q.  Okay.  What day was that, sir?
16     A.  I don't know.
17     Q.  Well, if we use April 2nd as a
18  reference point for you -- that was the day
19  that Rhonda's mom called you to tell you
20  that Rhonda was missing to ask and see if
21  she was at your house -- how many days after
22  that was it that Vickie called Sheriff
23  Greer?
24     A.  I don't know.
25     Q.  Do you think it was that day?

293

1      MR. BRUSTIN:  Objection to form,
2  foundation.
3      A.  I don't know what day it was.
4      Q.  Detective Mark Handy never
5  threatened you during the course of the
6  investigation of Rhonda Warford's death,
7  correct?
8      A.  Correct.
9      Q.  And the allegations that you have
10  made are that you believe that Detective
11  Handy lied about statements that you made
12  during the course of the investigation; is
13  that accurate?
14     A.  Yes, sir.
15     Q.  Have you told us today everything
16  that you believe Detective Handy to have
17  lied about in those statements?
18     MR. BRUSTIN:  Objection to the form.
19  Tell him everything you remember about
20  Handy's lies.
21     A.  Well, he lied when I told him I did
22  not perform blood sacrifice on animals or
23  humans.  I never told him that.  He did ask
24  me, and I told him no.  I denied it, because
25  I didn't perform blood sacrifice.

294

1      And he asked about a knife, you know
2  and I told him I didn't have a knife,
3  because I thought he was asking me if I had
4  a knife on me that time.  I just
5  misunderstood his question, I guess.
6      That's all I can recall right now.
7      MR. BRUSTIN:  Do you recall any
8  other lies is the question that he said
9  about you?  If you do or don't, that's fine.
10  If you remember anything, tell him.
11     A.  No.
12     Q.  Take all the time you need, sir.
13     A.  That's all I can think of right now.
14     Q.  And you said that you had reviewed
15  his trial testimony from when he testified
16  in 1995?
17     MR. BRUSTIN:  Let me state for the
18  record, if you don't mind, I think he was
19  mistaken about that.  I don't believe we
20  gave it to him.  I think he was just
21  mistaken.  But you can ask him about it.
22     Q.  Okay.  Were you mistaken when you
23  testified just about an hour ago that you
24  had reviewed Detective Handy's trial
25  testimony?

295

1      A.  Yes, sir.
2      Q.  Okay.  Have you reviewed anybody's
3  trial testimony, or are you mistaken about
4  everybody?
5      A.  I'm trying to remember.
6      MR. BRUSTIN:  As we've represented,
7  he was provided his own testimony.
8      Q.  Were you mistaken about all the
9  other individuals that you had said you
10  reviewed their testimony?
11     MR. BRUSTIN:  Objection to form.
12  There was one other individual.  Tell him
13  what you remember.  That's all you can do.
14     A.  I'm having trouble remembering it
15  right now.
16     MR. BRUSTIN:  You know what?
17     MR. BOND:  Well, Nick, why don't we
18  eliminate the -- why don't you just tell us
19  who you gave him.  I mean, that'll set the
20  record straight.
21     MR. BRUSTIN:  That's my --
22     MR. BOND:  I mean, we're not --
23     MR. BRUSTIN:  No, I think that's --
24     MR. BOND:  -- trying to --
25     MR. ERVIN:  Yeah.

296

```
1        MR. BRUSTIN:  I think that's a good
2   idea.
3        MR. BOND:  We're not trying to
4   perpetrate anything.
5        MR. BRUSTIN:  That's a good idea.
6   Right.  So he was --
7        MR. PELLINO:  I just want to ask him
8   --
9        MR. BRUSTIN:  No, no, no, that's
10  fine.
11       MR. PELLINO:  -- if he's reviewed --
12       MR. BRUSTIN:  Do you want me to tell
13  you what we gave him?
14       MR. PELLINO:  That'd be great.
15       MR. BRUSTIN:  Okay.  So we've given
16  him his own --
17       MR. SAWYER:  We gave him all the
18  testimony from the date March 7th, I believe
19  -- let me double check that -- which
20  included, I mean, there's his testimony and
21  his sister's testimony.
22       MR. BRUSTIN:  And Jeff Clark's?
23       MR. SAWYER:  No.
24       MR. BRUSTIN:  Okay.
25       MR. SAWYER:  There's also a short
```

297

```
1   testimony from Sheriff Greer.  There's --
2        MR. BRUSTIN:  Does you have that?
3        MR. SAWYER:  Yeah, I have it.
4        MR. BOND:  Now, he said earlier he
5   didn't.
6        MR. BRUSTIN:  We're telling you what
7   we gave him.
8        MR. SAWYER:  We're telling you what
9   we gave him.
10       MR. BOND:  Okay.
11       MR. GARVERICH:  And when he said
12  testimony from Greer, is that trial
13  testimony?  I just want to get the --
14       MR. SAWYER:  Yes.  This is all --
15       MR. GARVERICH:  -- if it's the right
16  case.
17       MR. SAWYER:  Yes, it's all from the
18  trial.  It's --
19       MR. GARVERICH:  I just want to
20  clarify.
21       MR. SAWYER:  What we provided him
22  was the entire day of March 7, 1995.
23       MR. GARVERICH:  Okay.
24       MR. SAWYER:  So --
25       MR. BOND:  Well, Joe testified two
```

298

```
1   days.
2        MR. SAWYER:  Yeah, that's the second
3   time he testified.
4        MR. BRUSTIN:  Anything else?
5        MR. SAWYER:  No, that's -- I believe
6   that's all.
7        MR. BRUSTIN:  That's all the
8   testimony he's been provided?
9        MR. SAWYER:  That's -- yes, to my
10  knowledge.
11       MR. BRUSTIN:  We'll make sure, but
12  that's our understanding as of right now.
13       MR. BOND:  So I just want to make
14  sure I understand.  You gave him the trial
15  testimony from March 7 --
16       MR. SAWYER:  1992.
17       MR. BOND:  -- regardless of who it
18  was.
19       MR. SAWYER:  Correct.  We just gave
20  him the entire day of testimony.
21       MR. BOND:  Okay.  Okay.
22       MR. SAWYER:  I don't think that he
23  reviewed the entire thing, but.
24       MR. BOND:  Well, he can tell us
25  that.
```

299

```
1        MR. BRUSTIN:  Is there any other
2   testimony that he was provided?
3        MR. SAWYER:  Not to my knowledge.
4        MR. BOND:  Now, just so we
5   understand -- Andrew makes a good point --
6   that was a transcript --
7        MR. SAWYER:  Correct.
8        MR. BOND:  -- versus a video?
9        MR. SAWYER:  Correct.
10       MR. BRUSTIN:  And we will double
11  check with our paralegal to make sure, but
12  that's our understanding.
13       MR. SAWYER:  And we will correct the
14  record if there was anything else provided.
15       MR. BOND:  Okay.
16       MR. PELLINO:  Thank you all.
17       MR. BOND:  I didn't mean to
18  interrupt, Andrew.  I'm sorry.
19       MR. PELLINO:  No, it's all right.
20  I'm glad we sorted that out.
21    Q.  (BY MR. PELLINO) You were present
22  when Detective Handy testified at your trial
23  in 1995, correct?
24    A.  Yes, sir.
25    Q.  All right.  Was there anything that
```

300

1  you remember about him testifying about that
2  you disagree with that you want to tell me
3  about today?
4      MR. BRUSTIN:  Objection to form.
5      A.  Well, it's basically what I've
6  already said.  I told you about the animal
7  sacrifice and human sacrifice.
8      Q.  Anything else?
9      A.  Well, yeah, the knives.
10     Q.  What you've told us already.
11     A.  Yes.
12     MR. BRUSTIN:  He's asking if there's
13  anything else.
14     THE WITNESS:  No, that's it.
15     Q.  (BY MR. PELLINO)  Okay.  Now, you
16  were present when he testified at the
17  evidentiary hearing in 2015, correct?
18     A.  Yes.
19     Q.  All right.  Is there anything that
20  you remember from hearing his testimony in
21  2015 that you disagree with and you want to
22  tell me about today?
23     A.  My best is just the same thing.
24     Q.  All right.  You told us earlier
25  about a confrontation that you and Mr. Clark

301

1  had while the two of you were both
2  incarcerated at the Eastern Correctional
3  Facility.  Do you remember that?
4      A.  I remember it happening, but I can't
5  remember exactly what it was about.
6      Q.  Was the confrontation about your
7  prosecution for the murder of Rhonda
8  Warford?
9      A.  Like I say, I can't remember what it
10  was about.  It was so many years ago.  I
11  just remember something happening like that.
12     Q.  And how often did you and Mr. Clark
13  talk while the two of you were incarcerated
14  at Eastern?
15     A.  Not very much.
16     Q.  Could it have been just that one
17  time when he confronted you in the yard?
18     MR. BRUSTIN:  Objection to the form.
19     A.  It may have been.  I can't really
20  say yes or no.
21     MR. BRUSTIN:  Do you mind if we take
22  just a two-minute break?
23     MR. PELLINO:  Sure.
24     MR. BRUSTIN:  You can -- if it's a
25  good point for you.  Is that okay?

302

1      MR. PELLINO:  Yeah, I don't have
2  much more, but we can take a break.
3      MR. BRUSTIN:  If you don't mind.
4      MR. PELLINO:  Yeah.  No, not --
5      MR. BRUSTIN:  Thank you very much.
6      MR. PELLINO:  -- at all.
7      MR. BRUSTIN:  Appreciate it.
8      MR. PELLINO:  Sure.
9      (OFF THE RECORD, 4:07-4:10 P.M.)
10     MR. BRUSTIN:  And let me just state
11  for the record, and I really appreciate that
12  you're almost done.  I really -- I'm a
13  little concerned about his ability to
14  continue answering questions.
15     He's getting really tired.  I can
16  see it on him, but I'm going to let him keep
17  going.  But I really would appreciate it if
18  you could wrap it up.  I think we can get it
19  done today.
20     MR. PELLINO:  And I will, but I
21  mean, if you feel like you have to suspend
22  the deposition --
23     MR. BRUSTIN:  No, I think we --
24     MR. PELLINO:  -- I'm not going to
25  fight you about that.

303

1      MR. BRUSTIN:  I think we can get it
2  done.
3      MR. PELLINO:  Okay.
4      MR. BRUSTIN:  I'm going to watch
5  him, though.
6      Q.  (BY MR. PELLINO)  Mr. Hardin, when
7  we broke, I was asking you about a
8  confrontation that you had with Mr. Clark in
9  the yard at Eastern Correctional Facility,
10  and I want to ask you sort of a similar
11  question.
12     Did you ever have any confrontations
13  with any of Mr. Clark's friends in the yard
14  or at any other time while you were at
15  Eastern Correctional Facility?
16     A.  No, sir.
17     Q.  All right.  So none of his friends
18  confronted you about the prosecution -- your
19  prosecution or Mr. Clark's prosecution for
20  the murder of Rhonda Warford?
21     A.  That's correct.
22     Q.  Did you ever have any problems with
23  any of Mr. Clark's friends or associates in
24  prison?
25     A.  No.

304

1    Q.  And what about your friends and
2  associates?  Did they ever have any problems
3  with Mr. Clark?
4        MR. BRUSTIN:  Objection, foundation.
5  He told you he hadn't any.
6    A.  No, sir.
7    Q.  How would you characterize your
8  relationship with Mr. Clark today?
9    A.  We're not close.  Hardly ever even
10  speak to each other now.
11    Q.  And what's the reason for that?
12    A.  Well, just through the years, we
13  just kind of went our separate ways.
14    Q.  What did Rhonda Warford think about
15  Mr. Clark?
16        MR. BRUSTIN:  Objection to form.
17  Calls for speculation.
18    A.  I don't know.  I can't say what
19  someone else thinks.  I don't know.
20    Q.  Well, I've seen statements that
21  you've made where you've described that she
22  didn't like Mr. Clark.
23    A.  (Nods head)
24    Q.  Is that accurate?
25        MR. BRUSTIN:  Objection to form.

305

1    A.  Yes.
2    Q.  Why didn't she like him?
3        MR. BRUSTIN:  Objection.  You can
4  answer.
5    A.  I don't know.  I've asked both of
6  them, and neither one of them has ever told
7  me an answer.
8    Q.  Well, what's your understanding of
9  Mr. Clark's feelings about Ms. Warford?  Did
10  he like her?
11        MR. BRUSTIN:  Objection to form.
12    A.  Well, all three of us were close
13  friends for a while, and I don't know, we
14  just kind of went separate, I guess.
15    Q.  Something happened before her death
16  --
17        MR. BRUSTIN:  Objection to form.
18  Mischaracterizes his testimony.
19    Q.  -- and she and Mr. Clark were no
20  longer friends.  Is that what you're telling
21  me?
22        MR. BRUSTIN:  Mischaracterizes his
23  testimony.  Objection.
24    A.  Well, they didn't have so much to do
25  with each other.  I mean, I can't say they

306

1  hated each other or nothing like that.
2    Q.  Well, you said they were close and
3  then they weren't; is that accurate?
4        MR. BRUSTIN:  Objection to form.
5    A.  Yes.
6    Q.  All right.  So what happened?
7        MR. BRUSTIN:  Objection to form.
8    A.  I don't know what happened between
9  them.  Like I said, I've asked both of them,
10  and neither one of them would tell me.
11    Q.  Did you petition the Innocence
12  Project to request that they take your case?
13    A.  Yes, sir.
14    Q.  Okay.  When did you first do that?
15    A.  Oh, back in the 1990s, I guess.  I
16  can't really know.  I wrote to every
17  Innocence Project in the United States.
18    Q.  Literally every single one?
19    A.  Every one I could get ahold of an
20  address of, yes.
21    Q.  All right.  The best that you can
22  remember, can you just tell us which
23  Innocence Projects that you sent
24  applications to?
25    A.  Well, I remember one of them was

307

1  called the Centurion Ministries.  I saw them
2  on the news one night and Vickie got the
3  address for me, and she looked up the
4  address of several others.
5        There's Kentucky's Innocence
6  Project.  There's New York Innocence
7  Project, and a couple more out west
8  somewhere.  I can't recall the names of them
9  right now.
10    Q.  All right.  It sounds like Vickie
11  kind of takes care of you; is that accurate?
12        MR. BRUSTIN:  Objection to form.
13    A.  Yes, sir.
14    Q.  That been that way your whole life?
15    A.  She's like a mother hen.
16    Q.  Are you aware of anyone ever making
17  accusations that you had threatened to kill
18  Rhonda Warford?
19        MR. BRUSTIN:  Objection to form.
20    A.  I've never made any threats like
21  that.
22    Q.  And I had a little bit of a
23  different question.  Are you aware that
24  anyone has ever accused you of making that
25  threat?

308

1    A. Yes. Someone, Hope Jaggers or
2  whatever her name is. I always mispronounce
3  her last name. She's the one who said that
4  I threatened Rhonda.
5    Q. When did you learn that Ms. Jaggers
6  had accused you of threatening to kill
7  Rhonda Warford?
8    A. I believe it was at trial time.
9    Q. Anybody else?
10   MR. BRUSTIN: Anybody else what? If
11 you could make it clear, please.
12   MR. PELLINO: Sure.
13   Q. (BY MR. PELLINO) Anybody else ever
14 accuse you of threatening to kill Rhonda
15 Warford?
16   A. No, sir.
17   Q. Do you know or do you have any
18 theory about why Ms. Jaggers would have
19 accused you of threatening to kill Rhonda
20 Warford?
21   MR. BRUSTIN: Objection to form.
22 Calls for speculation. You can answer.
23   A. No, I don't.
24   MR. PELLINO: I believe that's all I
25 have, sir, so --

309

1    MR. BRUSTIN: I have a couple of
2  questions.
3    MR. PELLINO: Hold on one second.
4  Let me check.
5    MR. BRUSTIN: Oh, sure.
6    MR. PELLINO: Yeah. I believe
7  that's all I have. Thank you very much,
8  sir.
9    THE WITNESS: Thank you.
10   MR. BRUSTIN: I have a couple of
11 questions.
12   THE VIDEOGRAPHER: Are you going to
13 stay where you are?
14   MR. BRUSTIN: Yeah. Does anybody
15 mind if I do that? Great. Just a couple of
16 followup questions for you. Okay?
17   THE WITNESS: Okay.
18   MR. BRUSTIN: And we're almost done.
19
20 CROSS EXAMINATION
21 BY MR. BRUSTIN:
22   Q. Keith -- and let's start with what's
23 most recent. Okay? Did you ever tell
24 Detective Hardin (sic) about any threats
25 that you made to Rhonda?

310

1    A. Detective Hardin?
2    Q. Detective Handy. Let me ask it --
3    MR. BOND: Object to the form of the
4  question.
5    MR. BRUSTIN: Let me ask another
6  question. Not a good start. Mr. Hardin --
7    MR. BOND: Facts not in evidence.
8    MR. BRUSTIN: Yeah.
9    Q. (BY MR. BRUSTIN) Mr. Hardin, did
10 you ever tell Detective Handy that you made
11 any threats to Rhonda?
12   A. Well, he asked me about them and I
13 told him no.
14   Q. Okay. And did you hear -- did you
15 ever tell him anything about making any
16 threats to any girlfriends?
17   MR. ERVIN: Object to the form.
18   A. No, sir.
19   Q. And did you hear him testify about
20 that at trial?
21   A. Yes, sir.
22   MR. ERVIN: Objection to form.
23   Q. Did he testify honestly about that
24 at trial?
25   MR. ERVIN: Objection.

311

1    MR. PELLINO: Objection to form.
2  Leading.
3    A. No.
4    Q. What did he say at trial about that;
5  do you recall?
6    MR. ERVIN: Objection to form.
7    A. He said I've threatened Rhonda and
8  I've threatened other girlfriends as well.
9    Q. Did you ever say that to Detective
10 Handy?
11   A. No, sir.
12   Q. You were asked a couple of questions
13 about -- I can't remember which, frankly,
14 which defendant's lawyer asked you, but you
15 were asked some questions about whether --
16 where your injures were. Do you remember
17 those questions?
18   A. Yes, sir.
19   Q. Just, generally, what were your
20 primary injuries as a result of what the
21 defendants did to you?
22   MR. ERVIN: Objection to the form.
23   A. Well, all the psychological I had to
24 go through. You know, I was grieving my
25 girlfriend and had to be interviewed by the

312

1  police, but I understand that, you know.
2      Q.  I'm asking you for the injuries.
3      A.  Yeah.  Then having to lose my
4  freedom for 22 years for something I didn't
5  do.
6      Q.  Okay.  You were asked some questions
7  about when in time you first contacted a
8  lawyer.  Okay?
9      A.  Mm-hmm.
10     Q.  Did you contact a lawyer at any time
11  prior to learning that the police thought
12  you were a suspect?
13         MR. ERVIN:  Objection to the form.
14     A.  No.
15         MR. BRUSTIN:  Okay.  I think that's
16  all I have.  Everybody good?
17         MR. ERVIN:  Nope.
18
19  REDIRECT EXAMINATION
20  BY MR. ERVIN:
21     Q.  Mr. Hardin, did you -- did anyone
22  mistreat you while you were in prison?
23         MR. BRUSTIN:  Objection to form.
24     A.  No, sir.
25     Q.  So you don't have any injury from

313

1  that.
2         MR. BRUSTIN:  Are you asking
3  physical injury, mental injuries?
4         MR. ERVIN:  Yes.
5         MR. BRUSTIN:  Physical injuries.
6         MR. ERVIN:  Physical injury.
7         MR. BRUSTIN:  Objection to form.
8  You can answer.
9         THE WITNESS:  No, sir.
10        MR. ERVIN:  Okay.  That's all I
11  have.
12        THE VIDEOGRAPHER:  Ready to go off?
13        MR. BRUSTIN:  We're done?
14        MR. BOND:  I don't have any.  I
15  wouldn't dare.
16
17     (Deposition concludes at
18  approximately 4:20 P.M.)
19     (Further, the deponent sayeth
20  naught.)
21
22
23
24
25

314

STATE OF KENTUCKY
COUNTY OF JEFFERSON

    I, Lynn B. Kornick, Court Reporter and
Notary Public in and for the Commonwealth of
Kentucky, State-at-Large, hereby certify
that, at the time and place stated herein,
the foregoing testimony was reported by me
and transcribed under my personal direction
and supervision and that said typewritten
transcript is complete and accurate to the
best of my ability and understanding; that
the appearances are as set forth in the
caption; that prior to giving the testimony
the witness was first duly sworn by me; that
I am not related by blood or marriage to any
of the parties hereto; and that I have no
interest in the outcome of this case.
    My Commission as Notary Public
expires June 14, 2020.
    Given under my hand the 5th day of
April, 2019, at Louisville, Kentucky.

    _____
    LYNN B. KORNICK, REPORTER
    NOTARY PUBLIC