1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF KENTUCKY

3             AT LOUISVILLE

4      FILE NO. 3:17-CV-00419-JRW-CHL

5

6        JEFFREY DEWAYNE CLARK &

7          GARR KEITH HARDIN,

8            PLAINTIFFS

9

10               V.

11

12      LOUISVILLE JEFFERSON COUNTY

13     METRO GOVERNMENT, ET AL.,

14         DEFENDANTS

15

16

17

18

19

20

21

22

23  DEPONENT:  BILL ADAMS

24  DATE:      JANUARY 6, 2020

25  REPORTER:  LACEE TOWNSEND

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                              APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF, JEFFREY DEWAYNE CLARK:

 4    AMY ROBINSON-STAPLES

 5    ELLIOT SLOSAR

 6    LOEVY & LOEVY

 7    311 NORTH ABERDEEN STREET

 8    THIRD FLOOR

 9    CHICAGO, ILLINOIS 60607

10    TELEPHONE NO.: (312) 243-5900

11    E-MAIL: AMY@LOEVY.COM

12            ELLIOT@LOEVY.COM

13

14    ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

15    NICK BRUSTIN

16    KATE FETROW

17    NEUFELD SCHECK & BRUSTIN, LLP

18    99 HUDSON STREET

19    EIGHTH FLOOR

20    NEW YORK, NEW YORK 10013

21    TELEPHONE NO.: (212) 965-9081

22    E-MAIL: NICK@NSBCIVILRIGHTS.COM

23            KATEF@NSBCIVILRIGHTS.COM

24    AND

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              APPEARANCES CONTINUED

 2

 3   LARRY D. SIMON

 4   THE SIMON LAW OFFICE

 5   THE KENTUCKY HOME LIFE BUILDING

 6   239 SOUTH FIFTH STREET

 7   SUITE 1705

 8   LOUISVILLE, KENTUCKY 40202

 9   TELEPHONE NO.: (502) 822-2074

10

11   ON BEHALF OF THE DEFENDANTS, LOUISVILLE JEFFERSON COUNTY

12   METRO GOVT. AND LOUISVILLE METRO POLICE OFFICERS,

13   INDIVIDUALLY:

14   PETER F. ERVIN

15   JEFFERSON COUNTY ATTORNEY

16   JEFFERSON HALL OF JUSTICE

17   600 WEST JEFFERSON STREET

18   LOUISVILLE, KENTUCKY 40202

19   TELEPHONE NO.: (502) 574-6336

20   E-MAIL: PETER.ERVIN@LOUISVILLEKY.GOV

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              APPEARANCES CONTINUED

 2

 3   ON BEHALF OF THE DEFENDANT, MEADE COUNTY:

 4   ANDREW T. GARVERICH

 5   KEITH BOND

 6   COLEMAN, LOCHMILLER & BOND

 7   2907 RING ROAD

 8   ELIZABETHTOWN, KENTUCKY 42702

 9   TELEPHONE NO.: (270) 737-0600

10   E-MAIL: AGARVERICH@CLBLEGAL.COM

11           KBOND@CLBLEGAL.COM

12

13   ON BEHALF OF THE DEFENDANT, MARK HANDY:

14   ANDREW PELLINO

15   DRESSMAN BENZINGER LAVELLE, PSC

16   321 WEST MAIN STREET

17   SUITE 2100

18   LOUISVILLE, KENTUCKY 40202

19   TELEPHONE NO.: (502) 630-1301

20   E-MAIL: APELLINO@DBLLAW.COM

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

```
 1              APPEARANCES CONTINUED

 2

 3   ON BEHALF OF THE DEFENDANT, ROBERT THURMAN:

 4   PETER J. ROSENE

 5   MCBRAYER, PLLC

 6   500 WEST JEFFERSON STREET

 7   SUITE 2400

 8   LOUISVILLE, KENTUCKY 40202

 9   TELEPHONE NO.: (502) 327-5400

10   E-MAIL: PROSENE@MMLK.COM

11

12   ALSO PRESENT:  KAITLYN THOMAS, VIDEOGRAPHER

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                    INDEX

2                                          Page

3    PROCEEDINGS                             8

4    DIRECT EXAMINATION BY MR. BRUSTIN       9

5    EXAMINATION BY MR. SLOSAR              171

6    CROSS EXAMINATION BY MR. ERVIN         214

7    EXAMINATION BY MR. ROSENE              226

8    RE-EXAMINATION BY MR. SLOSAR           227

9    REDIRECT EXAMINATION BY MR. BRUSTIN    238

10   RECROSS EXAMINATION BY MR. ERVIN       260

11   FURTHER DIRECT EXAMINATION BY MR. BRUSTIN   261

12

13                  EXHIBITS

14                                          Page

15    35   CERTIFICATE OF DEATH - MCSO 1     67

16    36   CRIME SCENE PHOTOGRAPH           104

17    37   CRIME SCENE PHOTOGRAPH           104

18    38   CRIME SCENE PHOTOGRAPH           104

19    39   CRIME SCENE PHOTOGRAPH           104

20    40   CRIME SCENE PHOTOGRAPH           104

21    41   CRIME SCENE VIDEO FOOTAGE        107

22    42   BILL ADAMS GRAND JURY TESTIMONY  122

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

7

```
 1                        STIPULATION

 2

 3   The VIDEO deposition of BILL ADAMS taken at KENTUCKIANA

 4   REPORTERS, LLC, 730 WEST MAIN STREET, SUITE 101,

 5   LOUISVILLE, KENTUCKY 40202 on MONDAY, the 6TH day of

 6   JANUARY 2020 at approximately 10:15 a.m.; said VIDEO

 7   deposition was taken pursuant to the FEDERAL Rules of

 8   Civil Procedure.

 9

10   It is agreed that LACEE TOWNSEND, being a Notary Public

11   and Court Reporter for the State of INDIANA, may swear

12   the witness.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                      PROCEEDINGS
 2          VIDEOGRAPHER:  Good morning.  My name is
 3     Kaitlyn Thomas.  I'm the video technician today, and
 4     Lacee Townsend is the court reporter.  Today is the
 5     6th day of January, 2020. The time is 10:15 a.m.  We
 6     are at the offices of Kentuckiana Reporters located
 7     in Louisville, Kentucky to take the deposition of
 8     Bill Adams in the matter of Jeffrey Dewayne Clark
 9     and Garr Keith Hardin versus Louisville Jefferson
10     County Metro Government, et al., pending in the
11     United States District Court for the Western
12     District of Kentucky at Louisville, File Number
13     3:17-CV-00419-JRW-CHL.  Will counsel please identify
14     themselves for the record?
15          MR. BRUSTIN:  Nick Brustin of Neufeld,
16     Scheck & Brustin for the plaintiff, Keith Hardin.
17          MS. FETROW:  Kate Fetrow, Neufeld,
18     Scheck & Brustin for the plaintiff, Keith Hardin.
19          MR. SIMON:  Larry Simon for the plaintiff,
20     Keith Hardin.
21          MS. ROBINSON-STAPLES:  Amy Robinson-Staples
22     with Loevy & Loevy for the plaintiff, Jeffrey Clark.
23          MR. ROSENE:  Peter Rosene with McBrayer on
24     behalf of Defendant Robert Thurman.
25          MR. PELLINO:  Andrew Pellino on behalf of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Detective Mark Handy.
 2             MR. ERVIN:  Peter Ervin on behalf of
 3        Louisville Metro Government and others.
 4             MR. GARVERICH:  Andrew Garverich on behalf of
 5        the Meade County defendants.
 6             MR. BOND:  Keith Bond on behalf of Meade County
 7        defendants.
 8             VIDEOGRAPHER:  Mr. Adams, will you please raise
 9        your right hand to be sworn in by the reporter?
10             COURT REPORTER:  Do you solemnly swear or
11        affirm the testimony you're about to give will be
12        the truth, the whole truth, and nothing but the
13        truth?
14             THE WITNESS:  I do.
15             COURT REPORTER:  Thank you.
16                          DIRECT EXAMINATION
17   BY MR. BRUSTIN:
18        Q    Good morning Mr. Adams.
19        A    Good morning.
20        Q    How old are you, sir?
21        A    How old now?
22        Q    Yes.
23        A    70.
24        Q    And do you have any health conditions that
25   would in any way affect your ability to testify here
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

10

1    today?

2        A    Not that I know of.  I have a pacemaker and

3    heart disease, but so far as I know, I'm good.

4        Q    **Are you taking any medications that you**

5    **believe would in any way affect your memory?**

6        A    No.  Not that I know of.

7        Q    **All right.  And what have you done to prepare**

8    **yourself for this deposition here today?**

9        A    I've gone through my case file and talked to

10   the attorneys.

11       Q    **Okay.  Well, let's talk about more**

12   **specifically.  First of all, how much time have you**

13   **spent since you were served with the Complaint in this**

14   **case, reviewing documents?**

15       A    Three, four days.  Probably five.

16       Q    **Five full days?**

17       A    At different times.  An hour or two at a time.

18       Q    **Okay.  So approximately ten hours reading**

19   **documents, maybe more?**

20       A    I would guess, yeah.

21            MR. BOND:  Don't guess.  Don't guess.

22       Q    **What documents have you reviewed?**

23       A    The autopsy report, my initial coroner's

24   investigative report.

25       Q    **Your two-page report?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A     Two page.

2       Q     **Your coroner's report.  The two-page typed**

3  **report you're talking about?**

4       A     I reviewed that, but also there's just a

5  single document that I would have started that day that

6  she was found.

7       Q     **Do you have that here with you?**

8       A     No, I didn't bring it with me.

9            MR. BRUSTIN:  Do you know what he's talking

10       about?  Do you know what he's talking about?

11            MR. BOND:  Yeah.

12            MR. BRUSTIN:  Is it 25?

13            MR. BOND:  It's been disclosed.  I mean, we've

14       provided everything that was in his file, including

15       the photographs.

16            MR. BRUSTIN:  No, I'm sure you have.

17            MR. BOND:  Yeah.

18            MR. BRUSTIN:  I'm not sure what he's referring

19       to.  I have his two-page report.

20            MS. FETROW:  This one?

21            MR. BRUSTIN:  No, that's different.

22  BY MR. BRUSTIN:

23       Q     **What else have you reviewed while we're**

24  **looking?  I'm showing you -- be careful not to -- is**

25  **this what you're talking about?  It's from Exhibit 25**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    and it's Bates stamped 157.

2           MR. BOND:  Just a question, is this the

3      one-page report --

4           MR. BRUSTIN:  Yeah.  That's it.

5           MR. BOND:  -- that he's referencing?

6           THE WITNESS:  Yes.

7    BY MR. BRUSTIN:

8       Q    That's it?

9       A    Yes.

10      Q    Great.  All right.  Okay.  What else have you

11   reviewed besides your typed report and the one-page

12   report?

13      A    The documents of the interviews that I was

14   present or witnessing.

15      Q    Okay.  What else?

16      A    I think I had the sheriff, part of his

17   documents that I reviewed.

18      Q    Okay.  What else?

19           MR. BOND:  I don't want to testify for him, but

20      we gave him his trial testimony.

21      Q    Okay.  Did you read your --

22      A    Yeah.

23      Q    -- trial testimony?

24      A    I did, yes.

25      Q    Did you read anybody else's testimony?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A    Trial testimony?  No.

2             MR. BRUSTIN:  Okay.  Did you provide him any

3     other documents --

4             MR. BOND:  No.

5             MR. BRUSTIN:  -- if you don't mind telling me?

6             MR. BOND:  No.

7             MR. BRUSTIN:  Okay.

8  BY MR. BRUSTIN:

9        Q    And would it be fair to say that your

10  recollection of the events in this case is vague?  It's

11  been a long time.

12       A    It would be very fair to say that.

13       Q    For example, you don't remember any of the

14  specifics of the interviews that you conducted?

15  Withdrawn.  Would it be fair to say that you don't

16  remember any of the specifics on the interviews that you

17  participated in?

18       A    Not really, no.

19       Q    And also fair to say that you didn't take the

20  lead in any interview that was conducted?

21       A    No, I did not.

22       Q    You were there to observe primarily?

23       A    Primarily, yes.

24       Q    Okay.  How much time did you spend meeting

25  with lawyers for the county in preparation for today?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    I'm not allowed to ask you about your conversations, but

2    I am allowed to ask you how long you spent with them.

3         A    Probably three hours.

4         Q    Okay.  And when were those meetings?

5              MR. BOND:  Now, let me clarify for him.  I'm

6         not trying to, you know, he's not talking about just

7         this past week.  He's talking about every time we've

8         gotten together.

9    BY MR. BRUSTIN:

10        Q    So let me ask a better question.  Since you

11   were named as a defendant in this case, how many

12   meetings have you had with lawyers?  Substantive

13   meetings where you talk about the case.

14        A    Four maybe.

15        Q    Okay.  For a total of how many hours?

16        A    Four or five hours probably.

17        Q    Total?

18        A    Yeah.

19        Q    And who was present for those meetings?

20        A    Myself and Mr. Bond and Mr. Garverich for part

21   of them.

22        Q    Okay.  Anybody else present for any of those

23   meetings?

24        A    No.

25        Q    Okay.  Was Sheriff Greer present for any of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

15

```
 1   those meetings?

 2       A    No.

 3       Q    Was any other person present for any of those

 4   meetings?

 5       A    No.

 6       Q    Okay.  All right.  So you've had substantive

 7   conversations about the case with your attorneys,

 8   correct?

 9       A    Yes.

10       Q    All right.  Since you were named as a

11   defendant, who else have you talked with about the case?

12           MR. BOND:  Besides us?

13           MR. BRUSTIN:  Yes.

14       A    I haven't.

15       Q    Okay.  Nobody in the world?  Have you

16   discussed either the circumstances of the case back then

17   or the exoneration, or the civil case?

18           MR. BOND:  Object to form of the question.

19       A    Do what now?  I don't --

20       Q    Sure.  Have you discussed with anybody in the

21   world the reversal of the conviction, the underlying

22   investigation, or this civil rights case that you're a

23   defendant?

24           MR. BOND:  Object to the form of the question.

25       Go ahead and answer.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     I probably have discussed with my son or my

2  wife the fact that I don't understand how the

3  exoneration took place.

4      Q     You still believe they're guilty?

5      A     A jury found them guilty.

6      Q     Okay.  And that's good enough for you?

7      A     That's -- I thought we had all this.

8      Q     So you believe they're guilty?

9           MR. BOND:  Objection, asked and answered.

10     Let's move on.

11     A     I presume, yeah.

12     Q     All right.  Do you have any family -- your

13  son's not in law enforcement, is he?

14     A     No.

15     Q     Do you have any family in law enforcement?

16     A     No.

17     Q     All right.  So you've never spoken to

18  Sheriff Greer about the case?  Let me do it this way.

19  Since they were convicted, Hardin and Clark were

20  convicted, have you had any conversations with

21  Sheriff Greer about the case?

22     A     Not that I remember.

23     Q     All right.  And just to be specific, since you

24  were -- since the conviction was overturned, reversed,

25  have you had any conversations with anybody, any of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

17

1   defendants in the case, Sheriff Greer, Defendant Handy,

2   anybody like that --

3        A    No.

4        Q    -- about the case?

5        A    No.

6        Q    Do you see -- do you continue to have a

7   relationship with Sheriff Greer?

8        A    I do, we're friends.

9        Q    Okay.  How often do you see him?

10       A    Probably once a week maybe.

11       Q    Okay.  What's the context of when you see

12  Sheriff Greer now?

13       A    He opens up the local Ford dealership every

14  morning and makes the coffee.  I have a funeral home, so

15  he is in there periodically.

16       Q    Okay.  Would it be fair to say he's one of

17  your closest friends?

18       A    It would be fair to say that.

19       Q    And he's been your closest friend for many

20  years?

21       A    For many years.

22       Q    Including at the time of the investigation of

23  this case?

24       A    Right.

25       Q    Would it be fair to say he's your closest

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    friend, one of them?

2        A    One of them.

3        Q    Your families are close?

4        A    Yes.

5        Q    All right.  And are you also close with

6    Cliff Wise?

7        A    I am not as close as with Joe Greer.

8        Q    Okay.  But he's a friend of yours?

9        A    He is a friend of mine.

10       Q    And how often do you see Cliff Wise?

11       A    Probably once a month or...

12       Q    Okay.  And you were good friends with

13   Cliff Wise also back at the time of the investigation of

14   this case?

15       A    I was.  We live in a small county.

16       Q    Okay.  But you haven't spoken despite the fact

17   that Sheriff Greer is one of your best friends, you

18   haven't talked to him about this case at any time since

19   the conviction?

20       A    Not that I remember.

21       Q    Why is that?

22       A    Why would I?

23       Q    Well, when you were named as a defendant in

24   this case, were you upset?

25       A    I was.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

19

```
 1       Q    And you understood Sheriff Greer was named as
 2   a defendant, right?
 3       A    I did.
 4       Q    Why didn't you talk to him about it?  Let me
 5   give you an example.
 6            MR. BOND:  Well, let me interject here.  Don't
 7        discuss anything that I have told you.
 8       Q    Okay.  Did you consider, for example, that you
 9   might want to ask Sheriff Greer, "Man, is there anything
10   you could have done wrong here that may have caused this
11   conviction, even if it was just an accident?"  Did you
12   have that thought in your mind?
13       A    No, I don't think we did anything.
14       Q    Okay.  Your confident you did everything right
15   here?
16       A    To the best of our ability at the time.
17       Q    Okay.  So anything else you did to prepare for
18   this deposition?
19       A    Not really.  I didn't know what else to do to
20   prepare for it.
21       Q    All right.  Back in 1992, had you ever worked
22   or met Detective Handy before?
23       A    Not until this case.
24       Q    All right.  How about Ernie Embry?
25       A    Ernie's a friend of mine.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1     Q     Okay.  Also, a good friend of yours?

2     A     Fairly good.

3     Q     All right.  What about Robert Thurman?  Are

4  you friends with him as well?

5     A     No.

6     Q     How about James Clark?

7     A     No.

8     Q     Did you know any of the Louisville police

9  detectives or supervisors that worked this case prior to

10  this case?

11     A     No.

12     Q     Not even Sherari?

13     A     No.

14     Q     Had you -- did you know Kent Smith before this

15  case?

16     A     Yes.

17     Q     Okay.  How did you know Kent Smith?

18     A     He's the local attorney.  I know his mom, his

19  dad.

20     Q     Okay.

21     A     As I said, small town.

22     Q     Got you.  Fair to say Kenton Smith is also a

23  friend of yours?

24     A     Yes.

25     Q     Someone you're close friends with?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

21

1      A     Some.

2      Q     Similarly to Cliff Wise, once a month or so?

3      A     Probably not that much.

4      Q     But you also haven't talked to Kent Smith

5   about this case?

6      A     No.

7      Q     Have you testified in court in connection with

8   a criminal proceeding before?  Other than this case.

9      A     Once or twice maybe.

10     Q     Okay.  Have you ever been deposed before?  Had

11  your deposition taken?

12     A     Not that I remember.

13     Q     Okay.  I should remind you, by the way, what

14  the rules are here.  I'm sure that your attorneys have

15  told you what to expect, but I'm going to be asking you,

16  I've already started asking you a series of questions.

17  You're answering them under oath.  If at any time you

18  don't understand my question or even part of the

19  question, tell me and I'll rephrase it, okay?

20     A     Okay.

21     Q     If you answer the question, I'm going to

22  assume you understood it, fair enough?

23     A     Okay.

24     Q     If you want to take a break that's fine, just

25  let me know, and please answer the question pending

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    before taking a break, okay?

2        A    Okay.

3        Q    All right.  So let's start with some

4    background stuff.  First of all, let's go through your

5    career beginning with when you graduated from high

6    school.  What year did you graduate from high school?

7        A    1967.

8        Q    All right.  And what did you do after that?

9        A    I went to mortuary school.

10       Q    Okay.  Where at?

11       A    Kentucky School of Mortuary Science.

12       Q    Okay.  Was that a family business, or

13   something that you just wanted to do?

14       A    My -- I grew up at the funeral home.  My

15   stepfather had the business when I was growing up.

16       Q    Okay.  And did you get a degree in mortuary

17   science?

18       A    I got the diploma from the mortuary school.

19       Q    Okay.  And how many years is that?  How many

20   year program is that?

21       A    The school was one-year program, and it's a

22   two-year apprenticeship.

23       Q    Okay.  And what is the -- what is the course

24   of study include?

25       A    Anatomy, physiology, microbiology, embalming.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q      Okay.

2     A      Mortuary law.

3     Q      Okay.  And it's a one-year training program?

4     A      Yes.

5     Q      And at the end of which you get a training

6  certificate?

7     A      A diploma.

8     Q      It's not a degree like a college degree?

9     A      Not back then it wasn't.

10    Q      Okay.  Any other higher education besides

11  that?

12    A      No.

13    Q      Any other medical type -- withdrawn.  You also

14  mentioned that you did an apprenticeship after that?

15    A      As a part of that training, yes.

16    Q      In the same year, or two years after?  How did

17  it work?

18    A      I did my apprenticeship a few years after.

19    Q      Okay.  Who did you do it with?

20    A      Hardy Funeral Home in Shively.

21    Q      Okay. And as a result of that training what

22  were you able to do?  What did they teach you how to do?

23    A      Embalm bodies, conduct funerals, make funeral

24  arrangements.

25    Q      Anything else?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     Not as far as that.

2        Q     All right.  Did it give you any training in

3   terms of conducting autopsies?

4        A     No.

5        Q     Or determining -- making medical

6   determinations about things like time of death?

7        A     No.

8        Q     All right.  Have you had any additional

9   medical type training since then?

10       A     I took a coroner's basic training course and

11  many in-service courses, and I was also an emergency

12  medical technician.

13       Q     Okay.  So let's first talk about training.

14  And then we'll talk about your experience.  So you took

15  the coroner's basic training.  Is that a state course?

16       A     Yes.

17       Q     And who gives that course?

18       A     Department of Criminal Justice.

19       Q     Okay.  And was that when you -- you elected to

20  be coroner?

21       A     I was elected coroner, yes.

22       Q     Okay.

23       A     -- I was the deputy prior to that.

24       Q     All right.  And when were you elected coroner?

25       A     1982?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

25

1    Q    And all right.  So we're going to do this
2  together.  So between '67 you went to mortuary school.
3  Your apprenticeship is done in '70.  What did you do
4  next?
5    A    I don't really understand what you're asking.
6    Q    **What was your next job?**
7    A    I worked at the funeral home.
8    Q    **For how long?**
9    A    Until now.
10   Q    Okay.  So you've always worked at the
11 funeral home?
12   A    I have, yes.
13   Q    Okay.  Have you had any other job since 1967
14 along with the job in the funeral home?
15   A    As I said, I was an EMT.
16   Q    Okay.  When did you become an EMT?
17   A    1970, I think, maybe.
18   Q    Okay.  And what was the training you received
19 to become an EMT?
20   A    It was Kentucky's basic emergency medical
21 technician class.
22   Q    Okay.  And how long is that training?
23   A    I'm not sure.
24   Q    **Approximate.**
25   A    13, 15 weeks.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Okay.  And what was the course of study there?

2  Basic emergency medical?

3     A    Yeah.

4     Q    What kinds of things did you learn?

5     A    How to splint fractures, how to bandage

6  wounds, how to give CPR, how to give mouth to mouth

7  resuscitation.

8     Q    Got you.  All right.  And then you became an

9  emergency -- an EMT.  And how long did you work as an

10  EMT for?

11     A    Until I think 1976.

12     Q    So you had your funeral home, but you're also

13  an EMT during that time?

14     A    Yes.

15     Q    In 1976 what happened?

16     A    The county took over ambulance service.

17     Q    Okay.  And did you have another second job at

18  that time?

19     A    I was the deputy coroner.

20     Q    When did you become a deputy coroner?

21     A    1970.

22     Q    Okay.  So in 1970 you were -- you had your --

23  you had a funeral home, you were an EMT, and you were

24  the deputy coroner?

25     A    (NO VERBAL RESPONSE.)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

27

```
 1        Q     Who were you working for in 1970?

 2        A     Same funeral home I'm at now,

 3   Hager Funeral Home in Brandenburg.

 4        Q     Well, who were you working for as the deputy

 5   coroner?  Who did you report to?

 6        A     I think Kenneth Hager was the coroner at that

 7   time.

 8        Q     Okay.  And how many years did you remain the

 9   deputy coroner?

10        A     Until I was elected coroner.

11        Q     And that was in 1982?

12        A     I think.

13        Q     Okay.  And what were your duties and

14   responsibilities as deputy coroner?

15        A     Basically the same duties as the coroner.

16        Q     Which included what?

17        A     Investigating deaths.

18        Q     For what purpose?

19        A     To determine cause and manner and identity.

20        Q     Cause and manner and identity of perpetrator?

21        A     No.

22        Q     Identify of?

23        A     Who's dead.

24        Q     Who did it?

25        A     Identify of the dead person.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q     Oh, got you.  So cause, manner, identify of

2    the dead person.  And you've talked about -- so did you

3    receive your coroner basic training in 1970 when you

4    became deputy coroner, or was it sometime later?

5        A     I really don't remember.

6        Q     Okay.  You have no idea whether -- so you may

7    have started as deputy coroner before you had the

8    training?

9        A     Possibly.  I don't remember.

10       Q     Okay.  Fair enough.  How long was the deputy

11   coroner training?

12       A     It's the same basic training the coroners had.

13       Q     Okay.  Okay.  So how long?  13, 15 weeks kind

14   of thing?

15       A     No.  More like a week.

16       Q     About a week?  Yeah?

17       A     I'm really not sure.

18       Q     Okay.  And I'm -- and I appreciate that.  I

19   don't want you to guess, but I do want you to give me

20   your best estimate.  So let's try to do that.  Was it

21   somewhere around a week or two, or was it more like

22   six months?  Can you estimate that?

23            MR. BOND:  I don't want you guessing, Bill.  If

24       you're going to answer his question, answer his

25       question.  If you can't, you can't.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      I don't really know.

2      Q      All right.  So you can't tell me whether or

3  not the coroner training was one week or six months or

4  two years?

5      A      I took many different training classes over

6  the years.  I don't remember which was what.

7      Q      Fair enough.  Let's do it any way that's more

8  comfortable for you to do it.  Tell me about the

9  different training classes that you took in

10  connection -- any type of medical training classes you

11  took.  You took the coroner basic training, which you

12  can't remember how long that was.

13      A      Right.

14      Q      What did you learn in the coroner basic

15  training, what topics?

16      A      Identifying how someone is dead, to identify

17  that they are dead --

18      Q      So what did you learn there?

19      A      -- for sure.

20      Q      What were the different topics you learned for

21  that?

22      A      Do they have a pulse?

23      Q      So checking a pulse.

24      A      Discolorations, lividity.  Again, over the

25  years, many different things.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Tell me.  That's -- this is your opportunity

2    to tell me about them.  I want to know what your medical

3    training was.

4        A    Different types of injuries.

5        Q    Well, let's start with -- let's start with you

6    remember anything else you learned in your basic coroner

7    training?

8        A    No.

9        Q    Okay.  You think you learned about determining

10   whether someone was dead, you learned something maybe

11   about lividity.  Anything else you remember about it?

12       A    Not really.

13       Q    All right.  What other training courses?

14   You've now told me about everything you remember about

15   your coroner basic training, your EMT training, your

16   mortuary science training.  What other courses have you

17   had over the years that have provided you medical

18   training or scientific training?

19       A    I attended what they call a masters conference

20   for medical examiners and coroners in

21   Saint Louis University School of Medicine.

22       Q    And what was that -- when was that, first of

23   all?

24       A    They have it every other year, and I went

25   through it three different times.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 31 of 262 PageID #:
27113
The Deposition of BILL ADAMS, taken on January 06, 2020
31

1    Q    For how long?

2    A    It's usually a week.

3    Q    A week.  And what do you learn there?

4    A    Many different things.

5    Q    Like what?

6    A    How to tell if a baby was submerged in water

7    and burped.

8    Q    Okay.

9    A    Different injuries caused by motor vehicle

10   incidents.

11        MR. BOND:  Tell him what you can remember.

12   That's all you can do.

13   A    Trying to determine the difference between a

14   suicide and an accident and a homicide.

15   Q    Anything else you remember?

16   A    (NO VERBAL RESPONSE.)

17   Q    Okay.  So you went to the masters conference

18   two or three times.  You had a bunch of different

19   topics.  Was it different lectures every day?  Is that

20   how it would work?

21   A    Different lectures, different speakers.

22   Q    Any tests that you took as a result of those?

23   A    No.

24   Q    Okay.  Any -- by the way, any other

25   certifications that you have?  Or do you have any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   certifications other than the more -- I assume you have

2   a mortuary certification?

3        A    I do.

4        Q    Anything else?  EMT certification?

5        A    I gave that up when I --

6        Q    Anything else?

7        A    Obviously I've got Kentucky Funeral Directors'

8   embalmers license.  When I was coroner, I had a

9   coroner's certification, which I don't have now

10  obviously.

11       Q    Okay.  And that was -- the coroner's

12  certification you got after taking that basic course?

13       A    Right.

14       Q    Okay.  All right.  So now you've told us about

15  a bunch of different trainings including your master's

16  conference training.  What other training have you had,

17  medical training?

18       A    Again, different seminars that I've attended,

19  but --

20       Q    Like what?

21       A    I attended a homicide seminar in Detroit.

22       Q    For how long?

23       A    That lasted three or four days.

24       Q    What was that on?

25       A    Basically in homicide deaths that --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

33

```
 1        Q     What did you learn there?

 2        A     At the time, Detroit was the murder capital of

 3   the world.

 4        Q     You don't need to go to Detroit for a

 5   conference to know that.  What did you learn at your

 6   Detroit conference, the medical conference?  What did

 7   they teach you about medicine, anything?

 8        A     Not really.  More about identifying, you know,

 9   a lot of these conferences had gunshot wounds and that

10   kind of thing.

11        Q     Identifying gunshot wounds?

12        A     To an extent.

13        Q     Okay.  As a result of any of these trainings,

14   did you develop any areas of expertise?

15             MR. BOND:  Object to the form of the question.

16        Go ahead and answer if you can.

17        A     Can you repeat it?

18        Q     Sure.  As a result of any of these trainings

19   or your experience, did you develop any areas that you

20   consider yourself an expert in?

21        A     Not really.

22        Q     All right.  In any of the -- any other

23   trainings you can think of that you went to, medical

24   type trainings?  And it sounds like the Detroit training

25   wasn't a medical type training, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

34

```
1        A     They all had something to do with dead people.
2        Q     Okay.  Geez.  All right.  Any other training
3   you remember?
4        A     No.
5        Q     All right.  Would it be fair to say that
6   you've never had any training on determining time of
7   death?
8        A     I'm not sure that's a fair question.
9        Q     Well, what part don't you understand?
10       A     As part of some of the seminars, they
11  discussed time of death.
12       Q     Okay.  What did you learn about it?
13       A     That it's in an ambiguous thing for one thing.
14       Q     Anything else you learn besides its ambiguous?
15       A     (NO VERBAL RESPONSE.)
16       Q     What are the different -- did you learn about
17  the different factors you looked to to determine time of
18  death?
19       A     Some, yes.
20       Q     What did you learn about it?
21       A     Temperature.
22       Q     You mean body temperature?
23       A     Not necessarily the body temperature,
24  environmental temperatures.
25       Q     So you learned that body temperature is not
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  relevant to time of death?

2        MR. BOND:  Objection.  That's not what he said.

3     A   I didn't say that.

4     Q   Is body temperature relevant to time of death

5  under certain circumstances?

6     A   I'm sure it could be, yes.

7     Q   Okay.  You learned that outside temperature

8  could be relevant though?

9     A   Yes.

10    Q   Where did you learn that?  Somewhere?

11    A   Somewhere.

12    Q   Okay.  What else?  What other factors did you

13  learn about?

14    A   Post-mortem lividity is an indication.

15    Q   Okay.  Where did you learn about that?

16    A   It's some of the seminars.

17    Q   Okay.  And what did you learn about -- what

18  can post-mortem lividity tell you about time of death?

19    A   I'm not sure as much about -- I don't really

20  know.  Just --

21    Q   When does lividity set in when someone dies?

22  What's the timeframe?

23    A   For it -- for post- mortem lividity to occur?

24    Q   Yes.

25    A   If I remember correctly, it's around four



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    hours.

2        Q    Okay.  And when does it dissipate?

3        A    Can't answer that.

4        Q    All right.  What other -- do you remember any

5    training on lividity?

6        A    Not specifically.

7        Q    Okay.  Even generally?

8        A    I'm sure there was some as part of the

9    training.

10       Q    All right.  What about -- what other factors?

11   You've got lividity, you've got body temp, you've got

12   outside temperature, what else did you learn about time

13   of death, determining time of death?

14            MR. BOND:  Object to the form of the question.

15       Go ahead and answer though.

16       A    I don't really know what you're looking for

17   here.

18       Q    What are the different factors you were

19   trained in in regard to determining time of death?

20   Anything else?

21       A    Rigor mortis.

22       Q    Okay.  What did you learn about rigor?

23       A    It has an onset and it dissipates.

24       Q    Okay.  And when does it have an onset?

25       A    When?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

37

```
 1      Q    Yes.  After somebody dies, when does rigor set

 2  in?

 3      A    It's variable.

 4      Q    Based on what?

 5      A    Again, temperature.

 6      Q    What else?

 7      A    Time.

 8      Q    And what -- at what temperatures -- withdrawn.

 9  What are the variables -- withdrawn again.  When does

10  rigor typically set in when someone dies?

11      A    After several hours.

12      Q    And when does rigor typically dissipate?

13  Within 24 hours or so, correct?  24 to 48?

14      A    Possibly, yes.

15      Q    You agree with that?

16      A    I would think.

17      Q    All right.  Any other -- and do you remember

18  where you received that type of training?

19      A    Not really.

20      Q    Okay.  Anything else about time of death

21  related training that you may have had over the years if

22  you recall?

23      A    Not that I remember.

24      Q    Receive any training -- fair to say you

25  haven't received any training on blood flow, how that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

38

1    might help you determine time of death?

2         A    Again, I don't understand what your --

3         Q    I'll be more specific.  You have no training

4    that would allow you to determine, for example, whether

5    or not a blood stain at a crime scene could help you

6    determine time of death, correct?

7         A    That would be correct.

8         Q    You have no -- and you have no reason to

9    believe that anybody can look at a blood stain at a

10   crime scene to determine the time of death, correct?

11        MR. GARVERICH:  Objection to the form of the

12   question.  You can answer.

13        A    I can't answer for anybody else.

14        Q    Okay.  You're not aware of any science that

15   would allow you to look at a blood stain at a crime

16   scene to determine a time of death; fair to say?

17        A    I think that is...

18        Q    You receive any training about what happens

19   about whether or not a body can bleed after death?

20        A    As far as formal training, no.

21        Q    But you understand from your experience that

22   of course a person can bleed after death, correct?

23        A    Sure.

24        Q    And I take it that you've not had any training

25   on conducting witness interviews; fair to say?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     I probably have had a class in -- I'm not sure

2    if them conducting witness interviews though.

3      Q     Okay.  You -- as you sit here today, you don't

4    recall any training that you received on conducting

5    witness interviews --

6      A     No.

7      Q     -- fair to say?

8      A     Fair to say.

9      Q     And you don't -- you didn't receive any

10   training on conducting interrogations; fair to say?

11     A     Yes.

12     Q     And you certainly -- that certainly wasn't one

13   of your duties and responsibilities as a coroner in

14   1992; fair to say?

15     A     That's fair to say.

16     Q     At most, you would be a witness, nothing more?

17     A     An observer.

18     Q     And you certainly have not received any

19   training on documenting witness interviews or

20   interrogations; fair to say?

21     A     Not that I remember.

22     Q     Okay.  And I take it -- in fact, the only

23   documentation that you created in this case was the

24   two-page type report and then the other one-page report

25   that we just looked at, right?  As far as you recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

40

```
 1        A    I think there was one other thing.
 2        Q    What else do you think you --
 3        A    I think I talked to Amy Remsburg.
 4        Q    You're the one who did that memo the night
 5   before?
 6        A    I think so.
 7        Q    Okay.  All right.  So the three documents you
 8   created in this case was a document for your interview
 9   with Amy Remsburg the night before the tape interview,
10   right?
11        A    Right.
12        Q    And your two-page type report?
13        A    Uh-huh.
14        Q    Yes?
15        A    Yes.
16        Q    And the one-page coroner's report that we
17   looked at earlier today?
18        A    Yes.
19        Q    Okay.
20        A    And the medical part of the death certificate.
21        Q    Got you.  All right.  And by the way, and
22   we're going to talk about it a little bit later, but
23   when you -- do you have any independent recollection of
24   meeting with Amy Remsburg the night before?
25        A    I do not.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    All right.  You know you did, but you don't

2  remember what you said to her and what she said to you?

3    A    No, not other than what was in that.

4    Q    Okay.  And by the way, you haven't read --

5  have you read any testimony from anybody else in this

6  case?

7         MR. BOND:  In this case?

8    Q    Well, two things.  First of all, have you read

9  any deposition testimony from this case?

10   A    No.

11   Q    Have you read any trial testimony for anybody

12 else in this case?

13   A    No.

14   Q    No testimony at all?

15   A    No.

16   Q    Except for yours?

17        MR. GARVERICH:  Just his own.

18   A    My own.

19   Q    Yeah.  All right.  And so -- but I take it

20 though -- so you have no memory of actually speaking

21 with Amy Remsburg, right?

22   A    No, I don't.

23   Q    And certainly at that time, as you've told us,

24 do you remember if you were interviewing her alone or

25 with somebody else?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I do not remember.

2    Q    Okay.  But at the time that you interviewed

3  her, you weren't aware of any rules and regulations or

4  training on how you had to document that interview; fair

5  to say?

6    A    That's fair.

7    Q    And you weren't aware of any rules and

8  regulations on how you had to conduct that interview;

9  fair to say?

10        MR. BOND:  Object to the form of the question.

11     I don't know if there's any rules or regulations on

12     how to interview somebody.  Object to the form.

13  BY MR. BRUSTIN:

14    Q    Yeah.  You just did it the way it made sense

15  to you?

16    A    Yes.

17    Q    There weren't any -- and as far as you knew it

18  there weren't any limitations on what information you

19  could provide to her for example, right?

20    A    Not that I knew of.

21    Q    Okay.  And you just conducted it the way it

22  made sense to you, right?

23    A    Yeah.

24    Q    And you don't remember specifically what you

25  asked her today?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    I do not.
 2        Q    Okay.  You don't remember anything you asked
 3   her, and you don't remember anything specifically she
 4   told you, right?
 5        A    No, I don't.
 6        Q    And that interview wasn't tape recorded,
 7   right?
 8        A    No, not that.
 9        Q    And who else was present?  You said just the
10   two of you?
11        A    I don't remember.
12        Q    All right.  But I take it you did that initial
13   interview that night because you knew Amy Remsburg,
14   right?
15        A    I knew her.
16        Q    You knew her family, you knew her people?
17        A    I knew some of her people.
18        Q    And that's why you went there the night before
19   to talk, right?
20        A    That, I don't know.  I don't remember.
21        Q    All right.  But you do remember knowing her
22   family?
23        A    Some of them, yes.
24        Q    Now, you mentioned that in 19 -- that you
25   became a deputy coroner in, was it '70?  No.  '76?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A       '70.

 2        Q       '70.  And then coroner in '82.  So how much

 3   time would you spend on average as the coroner

 4   between -- let's say between '70 and '82?  I know you

 5   had two other jobs, so how much of your work life was as

 6   coroner?

 7        A       I don't know how you answer that.

 8        Q       Five hours a week, ten hours a week?

 9        A       Some weeks 30 hours, some weeks one hour or

10   none.

11        Q       All right.  And let's say -- and then does

12   that stay the same after each year you became coroner?

13        A       Sure.

14        Q       Okay.  And how long did you remain coroner

15   for?

16        A       I retired in 2002, I think.

17        Q       All right.  And remind me again, how often

18   were the elections of coroner?

19        A       Every four years.

20        Q       Okay.  And --

21        A       One term was five years.

22        Q       Okay.  And did you retire in 2002, or were you

23   not elected?

24        A       I retired.

25        Q       Okay.  Did you run for any other office, by
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the way?

2        A    No.

3        Q    But -- and you're not able to tell me on

4    average how much time you would spend in your coroner

5    duties?

6        A    Again, we're a small county.

7        Q    Okay.  Well, let's do it this way.  Between

8    1982, when you became -- all right, let's go -- let's do

9    this.  Between 1970 when you became a deputy coroner in

10   1992 at the time of this case, can you estimate how many

11   cases you reviewed that you believed were homicides?

12   Would it be fair to say less than five?

13       A    Probably five.  Less than ten.

14       Q    Less than ten.  And how many cases of those

15   ten did you look at where the perpetrator and the cause

16   of death weren't immediately clear, like in this case?

17           MR. BOND:  Object to the form of the question.

18       Go ahead and answer if you can, Bill.

19       A    I would say three or four probably.

20       Q    Three or four before this one?

21       A    I don't know before or after.

22       Q    Okay.  Would it be fair to say that in your

23   entire career as a coroner, whether it's deputy or

24   coroner, you've only looked at say four or five cases

25   where the perpetrator and cause of death wasn't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   immediately clear?

2       A    I would say that's fair.

3       Q    According to Sheriff Greer, in 1992,

4   Meade County wasn't typically handling homicide

5   investigations, they were only assisting in homicide

6   investigations.  Is that consistent with your memory of

7   how things were working back then?

8       A    Yes.

9       Q    And in fact, what Sheriff Greer said was that

10  he couldn't remember a single homicide investigation

11  that Meade County Sheriff's Department was taking the

12  lead on prior to the Warford investigation.

13      A    Sure.

14      Q    Is that consistent with your memory?

15          MR. BOND:  I thought you were done, excuse me.

16      Object to the form of the question.

17      A    Do what now?

18      Q    Is that consistent with your memory?  This was

19  the first homicide investigation that Sheriff Greer's

20  department took the lead on?

21      A    I don't remember.  As far as I know.

22      Q    All right.  And that he claimed it was the

23  biggest case he ever worked.  Is this the biggest case

24  you ever worked?

25          MR. GARVERICH:  Objection.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

47

```
 1           MR. BOND:  Object to the form of the question.
 2      Go ahead and answer if you can.
 3      A    I wouldn't say it was the biggest or the -- it
 4  was a case.
 5  BY MR. BRUSTIN:
 6      Q    Just another case for you?
 7      A    Not just another case, but maybe not the most
 8  important case or...
 9      Q    Any other --
10      A    I find it hard to classify what's most
11  important case.
12      Q    Okay.  Other homicides that come to mind
13  investigating?
14      A    There are a couple.
15      Q    Which ones?
16      A    One of a baby that was murdered.
17      Q    When was that?
18      A    I don't know when.
19      Q    All right.  Anything else?
20      A    Another case out in Jefferson County where it
21  was a homicide, but I don't remember when that was
22  either.
23      Q    All right.  But this was one of the most
24  serious cases you ever were involved in?
25      A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

48

```
 1        Q    And any other case that you can recall where
 2   you participated as an observer in interviews?
 3        A    Occasionally.
 4        Q    Okay.  Any cases before this one where you
 5   participated as an observer in interviews?
 6        A    That I can't answer.
 7        Q    Okay.  Would it be fair to say you did that in
 8   less than two or three cases?
 9        A    Probably.
10        Q    Okay.  Do you have any specific recollection
11   of doing it?
12        A    Not really.
13        Q    All right.  But it's possible that, given your
14   lack of specific memory, that this was the first case
15   where you were ever asked to sit in on interviews?
16             MR. BOND:  Object to the form of the question.
17        Go ahead and answer.
18        A    I'm not sure I was asked to sit in on an
19   interviews.  I rode along and sat in on interviews.
20        Q    All right.  Well, certainly Sheriff Greer was
21   in charge of the investigation, correct?
22        A    Yes.
23        Q    And you couldn't sit in on a witness interview
24   unless he allowed it, correct?
25        A    Probably.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q    What was the -- well, you tell me.  What was

2    the process of how you came to be sitting in on

3    interviews?  Did you ask Sheriff Greer?  Did he ask you?

4    How did it happen?

5      A    "I'm going to Louisville.  You want to ride?"

6    "I'll ride with you."

7      Q    Okay.  Well, there was no more specific

8    conversation about you being involved in police

9    interviews in a homicide case?

10          MR. BOND:  This case or just --

11          MR. BRUSTIN:  This case.

12          MR. BOND:  Okay.  The way you phrased the

13       question, I didn't...

14     A    Okay.  Can you repeat?

15   BY MR. BRUSTIN:

16     Q    Sure.  How did you come to be sitting in on

17   witness interviews in this case?  Did you ask

18   Sheriff Greer if you could do it?  Did he ask you?

19          MR. BOND:  Objection.  Asked and answered.  Go

20       ahead Joe -- Bill, excuse me.

21     A    I rode with him.

22     Q    You just happened to be in the car with him?

23     A    He probably asked me to ride or I may have

24   asked him to ride.

25     Q    All right.  Was it your understanding that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

1   typically what would happen when there was a homicide in

2   Meade County is that the state police, and particularly

3   Investigator Wise, would be the lead investigator?

4          MR. GARVERICH:  Objection to form of the

5      question.

6      A    Investigator Wise wasn't the state police.

7      Q    I'm sorry.  Investigator Stiles.

8      A    He was a state police detective.

9      Q    Okay.  And was it your understanding that

10  typically when there was a murder in Meade County, the

11  state police, and particularly Stiles, would be the lead

12  investigator?

13     A    I couldn't say particularly Stiles.

14     Q    All right.

15     A    I would say state police.

16     Q    All right.  And was it your understanding that

17  the only reason that the state police didn't --

18  withdrawn.  What was your understanding as to why the

19  state police didn't take the lead in this case?

20     A    I'm not sure I had an understanding.

21     Q    All right.  What other -- other than --

22  withdrawn.  Were there any Louisville Police Department

23  investigators or state police investigators who

24  participated in evaluating or maintaining the crime

25  scene?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 51 of 262 PageID #:
27133
The Deposition of BILL ADAMS, taken on January 06, 2020

51

```
 1        A     There was a state trooper.

 2        Q     Who was that?

 3        A     Dan McCoven, I think.

 4        Q     Okay.  Anybody else?  And I know ultimately

 5   Mr. Thurman did some testing, but anybody else who

 6   participated from outside agencies in evaluating or

 7   maintaining the crime scene?

 8        A     Not that I remember.

 9        Q     And would it be fair to say that, to your

10   knowledge, Sheriff Greer had very limited experience in

11   investigating serious crimes like homicides?

12            MR. BOND:  Object to form of the question.  Go

13        ahead and answer, Bill.

14        A     I can't answer that.

15        Q     Okay.  Are you aware of any experience that

16   you had?

17        A     I'm not aware of, but as I said, "I can't

18   answer that."

19        Q     All right.  And would it be fair to say that

20   nobody from the Louisville Police Department has come to

21   you to ask you any questions about your involvement in

22   this case since the conviction; fair to say?

23        A     That's fair.

24        Q     And nobody from the Louisville Police

25   Department has come to ask you any questions about
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Detective Handy's involvement in this case; fair to say?
 2        A    Not that I know.
 3        Q    Nobody from the state attorney general's
 4   office of the DA's office has come to ask you any
 5   questions about Detective Handy's --
 6        A    No.
 7        Q    -- work in this case; fair to say?
 8        A    No, they have not.
 9        Q    Did you do any work with Detective Handy --
10   withdrawn.  After you met Detective Handy in this case,
11   did your path's ever cross again?  Did you work any
12   other cases together?
13        A    We didn't work any other cases together.  Our
14   paths did cross.
15        Q    How?
16        A    He was chief deputy coroner in
17   Jefferson County for a while.
18        Q    Okay.  And in that context, what was your
19   relationship?
20        A    I knew him from this case.  If we met in the
21   hallway, we said "Hi" to each other.
22        Q    Okay.  Did your professional lives cross in
23   any way?
24        A    No.
25        Q    No work together?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    No.

2      Q    You ever socialize with Detective Handy?

3      A    No.

4      Q    So Detective Handy ended up having the same

5   job in which county was it?

6      A    Jefferson.

7      Q    Jefferson County is the coroner that you had?

8   He was in the city?

9      A    He was the deputy coroner.

10     Q    Deputy coroner.  So it was not -- it wasn't

11   your -- withdrawn.  So you weren't assisting

12   Sheriff Greer in the work or investigation in regard to

13   interviews and interrogations, you were simply

14   observing; fair to say?

15     A    That's fair to say.

16     Q    You would not characterize yourself as

17   participating in the investigation; fair to say?

18     A    I would not.

19     Q    And anybody who would suggest that would be

20   mistaken?

21     A    So far as I know.

22     Q    For example, you deny participating in any of

23   the interrogations of Clark and Hardin; fair to say?

24     A    I didn't participate.  I was there.

25     Q    Okay.  But you didn't say a word, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

54

```
 1       A    Not that I remember.
 2       Q    According to Sheriff Greer, he didn't -- he
 3  testified that you had never participated in an
 4  interview with him prior to 1992.  Do you have any
 5  reason to dispute that?
 6       A    No.
 7       Q    And you also said the only time he can recall
 8  ever taking you, the coroner, with him to interview
 9  witnesses or suspects was this case.  Any reason to
10  dispute that?
11            MR. BOND:  Object to the form of the question.
12     Go ahead and answer.
13       A    Not that I remember.
14       Q    You also testified that the reason he took you
15  to interview witnesses and suspects in this case is
16  because you wanted to go; is that true?
17       A    That's possible, yes.
18       Q    And why did you want to go?
19       A    It was a different case than I had ever
20  worked.
21       Q    You were interested?
22       A    I was interested.
23       Q    Okay.  Did you have any special relationship
24  with the Warford family?
25       A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

55

1      Q     Another reason that Sheriff Greer gave was

2    that he was very short handed at this time.  Is that

3    your understanding as well?

4           MR. BOND:  Object to the form of the question.

5      Go ahead and answer if you know.

6      A     I don't know.

7      Q     We had trained deputies at the time, right?

8    Or he had deputies that worked for him.

9      A     He had deputies, yes.

10      Q     But for most of the interviews, it was you

11    that accompanied him, correct?

12      A     The few that I went on.

13      Q     All right.  And I take it that as a result of

14    that -- as a result of you -- withdrawn.  Would it be

15    fair to say that you had what could only be

16    characterized as a unique involvement in this

17    investigation as compared to other Meade County

18    investigations?

19           MR. BOND:  Object to the form of the question.

20      A     Sure.

21      Q     All right.  And I take it because of that, you

22    were certainly interested in getting information about

23    what was happening in the case, even for things that you

24    weren't participating?  Let me try it a different way.

25    You've already told us that Sheriff Greer was one of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    your best friends.

2        A    Right.

3        Q    You had a -- for a variety of reasons you were

4    very interested in this case, right?

5        A    Right.

6            MR. BOND:  Object to the form of the question.

7        Q    You were also participated in a lot of -- you

8    also were present in a lot of interviews, a number of

9    interviews?

10       A    A few interviews.

11       Q    Okay.  And, so I take it that for all of those

12   reasons when you would talk to your good friend Sheriff

13   Greer during the time of this investigation, you would

14   get updates about what he was learning and what

15   information he was getting on the case?

16       A    I would say not on a consistent basis.

17       Q    Why not?

18       A    Actually, I think I was more interested in the

19   process.  I had never been to -- how to word this?  I

20   had never been involved in an investigation between

21   multiple agencies and was fascinated with how it worked.

22       Q    Okay.  But certainly, you understood -- so

23   there were -- it sounds like -- withdrawn.  I take it,

24   although it didn't happen all the time, you certainly

25   were getting updates at times from Sheriff Greer about

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    what was happening in the case?

2            MR. BOND:  Object to the form of the question.

3        Go ahead and answer.

4        A    I'm sure I did.  I don't remember.

5        Q    **And where was your office in relation to his**

6    **office?**

7        A    The only office I have had would have been at

8    the funeral home.

9        Q    All right.

10       A    His office was in the courthouse.

11       Q    All right.  And I take it though that at that

12   time you would see him most every day?

13       A    I wouldn't say every day.

14       Q    **Every other day?**

15       A    I would say several times a week probably.

16       Q    All right.  And certainly, your understanding,

17   given -- you said you were fascinated by the multi-

18   jurisdictional nature of the investigation, right?

19       A    Right.

20       Q    One of the things that interested you.  And I

21   take it your understanding was that, given Sheriff

22   Greer's lack of experience in conducting as lead

23   investigator in a homicide case, your understanding and

24   your observation was that Detective Handy and the

25   Louisville police detectives were taking the lead for



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    the most part?

 2              MR. BOND:  Object to the form of the question.

 3              MR. ERVIN:  Object to the form.

 4              MR. PELLINO:  Objection to the form of the

 5         question.

 6         A    I can't say that.

 7    BY MR. BRUSTIN:

 8         Q    All right.  But certainly, you understood that

 9    both you and Sheriff Greer were doing your very best to

10    make sure that Detective Handy and the other officers

11    learned everything that you were doing in the case; fair

12    to say?

13              MR. BOND:  Let me object to the form of that

14         question.  Go ahead and answer.

15         A    Repeat that one time.

16         Q    Sure.  You and, even more so Sheriff Greer,

17    were making sure that anything that you participated in

18    the case, you were just -- you were providing that

19    information to the Louisville detectives, particularly

20    Detective Handy?

21         A    I'm sure that they were advised.

22         Q    All right.  And so for example, you were

23    talking -- you were speaking to Detective Handy about

24    your observations of a crime scene and your crime scene

25    reports, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 59 of 262 PageID #:
27141
The Deposition of BILL ADAMS, taken on January 06, 2020
59

 1        A     Again, probably.  I don't know.

 2        Q     All right.  But given how you conducted

 3   business back then, although you may not remember it,

 4   fair to say you're sure that you did?

 5             MR. BOND:  Object to the form of the question.

 6        Asked and answered.

 7        A     If I was asked, probably.  Yes.

 8        Q     According to Sheriff Greer this was one of the

 9   biggest cases of his career, one that sticks out in his

10   mind, and that he was keeping track of what was going on

11   in the case even after Jeff Clark and Keith Hardin were

12   convicted in March of 1995.  Do you recall that was the

13   same for you back then?

14             MR. BOND:  Object to the form of the question.

15        A     I can't say that.

16        Q     Fair to say though that you were following --

17   you said you mentioned this is only the second time

18   potentially that you ever testified in court, correct?

19        A     Possibly.

20        Q     All right.  And so certainly you were

21   interested in what happened at the trial and what

22   happened after the trial; fair to say?  This is a big

23   deal for you?

24             MR. BOND:  Why don't you answer the question?

25        A     I was interested.  I'm not sure after the



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 60 of 262 PageID #:
27142
The Deposition of BILL ADAMS, taken on January 06, 2020
60

1    trial if I was.

2        Q    Was it your understanding though that once

3    Louisville Police Department became involved that they

4    became the lead investigators on the case?

5            MR. PELLINO:  Object to the form.

6        A    I can't say that either.

7        Q    You don't know one way or the other?

8        A    I don't know.

9            MR. BRUSTIN:  All right.  Let's take a

10   two-minute break.

11           VIDEOGRAPHER:  Off the record at 11:13.

12                   (OFF THE RECORD)

13           VIDEOGRAPHER:  Back on record at 11:25.

14   BY MR. BRUSTIN:

15       Q    Okay.  Mr. Adams, I'm going to be asking you a

16   bunch of questions about your work at the crime scene

17   and the days after that.  And a lot of this is based on

18   what Sheriff Greer has told me.  And I really want to

19   just know if you agree with most of it, but I'll ask you

20   specific questions, okay?

21       A    Okay.

22       Q    So I take it that from the time you went to

23   the crime scene you were in close contact with

24   Sheriff Greer about what you were observing and finding

25   at the scene; fair to say?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 61 of 262 PageID #:
27143
The Deposition of BILL ADAMS, taken on January 06, 2020
61

```
 1        A      Yes.

 2        Q      And on April 5th, which is -- which was a

 3   Sunday morning, correct?

 4        A      If I remember correctly, yes.

 5        Q      You were called, and you and Sheriff Greer

 6   went to examine the body of Ms. Warford?

 7             MR. BOND:  Object to the form of the question.

 8        Q      You didn't know it was her then, but you --

 9        A      I did not know it was her then.

10        Q      But that's what happened, right?

11        A      Yes.

12        Q      And you were there with -- you were there for

13   the purpose of, as you talked about your

14   responsibilities, determining cause and time and

15   identity; fair to say?

16        A      Yes.

17        Q      And you did your very best to do those things?

18        A      Yes.

19        Q      Okay.  You recognize right away that this was

20   potentially a homicide?

21        A      I think so.

22        Q      Okay.  And you knew this was an unusual

23   situation?

24             MR. BOND:  Object to the form of the question.

25        Q      For you?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A     Fair.

2       Q     And you were doing your very best to do a good

3  of job as you possibly could?

4       A     Yes.

5       Q     And to carefully observe and report what you

6  found at the time?

7       A     Yes.

8       Q     Okay.  So now let's take a look at -- so I'm

9  going to have you -- okay.  So take a look at what's

10  already been marked as Exhibit 25 in this case, okay?

11  And --

12          MR. BOND:  Plaintiffs' Exhibit 25.

13      Q     Plaintiffs' Exhibit 25.  And this is -- and

14  it's Bates stamped -- our Bates stamp is 195, and it's

15  also MCSO157.  Do you see that?

16      A     Yes.

17      Q     All right.  And this is the coroner's

18  investigation report that you created in this case?

19      A     Yes.

20      Q     Okay.  And --

21      A     Preliminary.

22      Q     Preliminary.  It's the preliminary coroner's

23  investigation?

24      A     Right.

25      Q     And it's the only coroner's investigation

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    report that you created?

2        A    Other than the two page --

3        Q    Well, let's mark that right now too.  No,

4    that's not it.  His report.  Two-page report.  I think

5    it's right there.  Let's do this.  So if you can take a

6    look at 192.

7                MR. BOND:  Now, 192.

8                MR. BRUSTIN:  Exhibit --

9                MR. BOND:  Your number?

10               MR. BRUSTIN:  Yeah.  It's our number 192.

11               MR. BOND:  Well, you gave us both numbers

12       earlier.

13               MR. BRUSTIN:  Right.  But the only way it's in

14       order is my number.  So if you look at 192.

15   BY MR. BRUSTIN:

16       Q    So this is 195.  Go a few back.

17       A    Okay.

18       Q    This is the other report that you create,

19   correct?

20       A    Yes.

21       Q    And both of these reports were created on

22   April 5th?  It says on top, "Date: April 5, 1992, right?

23               MR. BOND:  Let him answer the question, Nick.

24       A    195 was only for --

25       Q    Okay.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

64

```
 1        A     April the 5th on this would indicate that's

 2    when I was called and doesn't mean that that type

 3    written report --

 4        Q     Okay.

 5        A     -- was created that day.

 6        Q     It may have been a couple of days later?

 7        A     It could have been a week later or two weeks

 8    later.

 9        Q     All right.  You don't recall?

10        A     I don't recall.

11        Q     Okay.  But you did create the coroner's

12    investigation report on 4-5-92?

13        A     I did.

14        Q     And these are the two reports that you created

15    in this case?

16        A     Yes.

17        Q     And the memo with Remsburg?

18        A     And the medical part of this.

19        Q     Okay.  And this coroner's investigation report

20    is an important document in your duties as a coroner,

21    correct?

22        A     It is.  It's a preliminarily.

23        Q     Okay.  Well, it didn't change in any way.  It

24    stayed the same.  This is the only report -- this is the

25    only investigation report that you created?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A     Yes.

2     Q     And it's an important document?

3     A     For my information.

4     Q     Right.  And you gave this to the medical

5     examiner, correct?

6     A     No, probably not.

7     Q     Okay.  But certainly, you were in

8     communication with the medical examiner, and you shared

9     your thoughts and the information in this report with

10    the medical examiner, correct?

11    A     Part of it, possibly.

12    Q     Okay.  And one of the things that you mention

13    in this report is you put the date of death, correct?

14    A     At that time.

15    Q     Okay.  Sir, what I would like you to do if you

16    can and I'm going to let you explain it, but if you can

17    answer my question with a yes or no, or just a

18    straightforward way, that would be helpful.

19         MR. BOND:  He doesn't have to answer it the way

20      you want it.  He can answer it the way he wants to

21      answer it.

22         MR. BRUSTIN:  He needs to answer.

23    BY MR. BRUSTIN:

24    Q     You can explain to me.  I just want you to

25    answer my question.  One of the things you have here is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   date of death, correct?

2        A    Yes.

3        Q    All right.  And in a variety of cases, you

4   would have no idea when the date of death is, and you

5   would put nothing, correct?

6        A    I wouldn't say that.

7        Q    Well, there could be cases like that,

8   certainly, right?

9        A    There could be.

10       Q    All right.  In this case, you wrote date of

11  death 4-4-92 or early 4-5, right?

12       A    Preliminarily, yes.

13       Q    That's what you chose to put in this report?

14       A    That's what I put on this piece of paper.

15       Q    And you never created a different report that

16  put a different date of death, correct?

17       A    The death certificate.

18       Q    And the death certificate is what page?

19            MR. BOND:  We don't know because we're using --

20       and I'm not being flippant, Nick.  We're just trying

21       to use your number.

22            MR. BRUSTIN:  All right.  You know what we'll

23       do --

24            MR. BOND:  To be honest, I don't know that it's

25       been introduced.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUSTIN:  This is fine.  We're just going

2     to mark this as a separate exhibit, and we'll make

3     copies for everybody.  Let's do that right now.  You

4     can make copies here, right?

5          MR. SLOSAR:  I've got some copies.

6          MR. BRUSTIN:  Oh, you do?  Great.

7          MR. SLOSAR:  It's 159.  MSCO159.

8          MR. BRUSTIN:  Then we don't need to do that.

9     It's 159?

10          MR. BOND:  Right.

11          MR. BRUSTIN:  No, what is that in our --

12          MR. SLOSAR:  No.  I don't think -- I don't know

13     that it's been marked yet, but this -- I got --

14          MR. BRUSTIN:  You don't have the Bates stamp we

15     have for 25 -- in Exhibit 25?  No.  Okay.  So let's

16     just mark it now.

17          MR. SLOSAR:  Here you go.

18          MR. BRUSTIN:  Thank you.  What number are we

19     on?

20          COURT REPORTER:  35.

21          MR. PELLINO:  I think 35.

22          MR. BOND:  Yeah, we're at 35, sorry.

23          (EXHIBIT 35 MARKED FOR IDENTIFICATION)

24     BY MR. BRUSTIN:

25          Q    Okay.  So this is a document -- Exhibit 35 is



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

68

```
 1    Bates stamped MCSO159, and this is the certificate of
 2    death, correct?
 3         A    It is.
 4         Q    Which portion of this document did you fill
 5    out?
 6         A    The portion from certifier down.
 7         Q    Okay.  And this is part of your official
 8    duties and responsibilities?
 9         A    Yes.
10         Q    All right.  When did you create this document?
11         A    I signed it May 7, 1992.
12         Q    Okay.  And so between April 5, 1992 and
13    May 7, 1992, you determined that the death -- that the
14    murder occurred on April 5 at some point as opposed --
15    I'm sorry, it occurred on April 2nd at some time as
16    opposed to April 4th or 5th, correct?
17         A    That was my best guesstimate.
18         Q    So let me try again just to make sure we're on
19    the same page.  What you wrote here for date pronounced
20    dead -- withdraw.  What you wrote here for date of
21    injury is April 2, 1992, correct?
22         A    Yes.
23         Q    No qualifier, that's what you wrote?
24         A    That's what I wrote.
25         Q    Okay.  And that changed from your initial
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    estimate of death of April 4th to April 5th?

2        A    Yes.

3        Q    Okay.  And we're going to talk about all the

4    reasons why that changed, but first of all, I want to go

5    back to your initial estimate of the time of death,

6    okay?

7        A    Okay.

8        Q    All right.  And first of all, as you told us,

9    you took your obligations very seriously, right?

10       A    Right.

11       Q    And there were a variety of reasons based on

12   what you observed at the scene why you determined that

13   the murder likely occurred late on the 4th or early on

14   the 5th, correct?

15           MR. GARVERICH:  Objection to the form of the

16       question.  You can answer.

17       A    A variety of reasons?

18       Q    Yes.  There was a variety of things that you

19   saw at the scene in your -- you observed that indicated

20   to you that, in your own words, indicated it was a fresh

21   body.

22           MR. GARVERICH:  Objection to form of the

23       question.  You can answer.

24       A    I wrote this down.  She was found that

25   morning.  To my knowledge, at that particular time that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 70 of 262 PageID #: 27152
The Deposition of BILL ADAMS, taken on January 06, 2020

70

1    morning, it could have been April 4th or 5th.

2        Q    Okay.

3        A    That's why I wrote that down.

4        Q    And you didn't write that down just out of

5    nowhere.  It was based on things you had observed at the

6    scene, correct?

7        A    The fact that she was there and she was found

8    that morning.

9        Q    That's -- so the only reason -- you're telling

10   us the only reason that you put time --

11           MR. BOND:  Nick, let's quit wagging the finger.

12       We've got to --

13       Q    You put the time of death --

14           MR. BOND:  Whoa.  Whoa.

15       Q    -- at April 4th -- I'm not wagging any finger.

16           MR. BOND:  Yes, you are.

17       Q    No, I'm not.  The only reason you put

18   April 4th or April 5th as time of death was because the

19   body was found on the 5th?

20       A    That's true.

21       Q    No medical reason?

22       A    No.

23       Q    Nothing that you observed at the scene caused

24   you to believe that she had recently been murdered?

25       A    As I said, she was found that morning.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

71

1    Q    I'll try it again.  Nothing that you observed
2  at the scene caused you to believe that she had recently
3  been murdered?
4    A    I don't really know what you're trying to say.
5    Q    Do you deny --
6         MR. BOND:  Well, that's it.  He's trying to say
7     it, not you.  You answer his question.
8    Q    Do you deny telling Sheriff Greer on April 5th
9  and in the days following that you believe the murder
10  had occurred within a day of finding the body?
11   A    I may have.  I don't remember.
12   Q    All right.  You certainly don't deny
13  commenting that?
14   A    No.
15        MR. BOND:  Object to form of the question.
16   Q    And my question to you is you told him that --
17  first of all, you remember you did tell him that,
18  correct?
19        MR. GARVERICH:  Objection to the form of the
20     question.
21        MR. BOND:  Object to the form.  Asked and
22     answered.
23   A    I didn't say that.
24  BY MR. BRUSTIN:
25   Q    Sheriff Greer claims that you told him that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    do you have any reason to dispute it?

2           MR. BOND:  Object to the form of the question.

3      A    No, I guess not.

4      Q    All right.  And the reason that you determined

5    that the murder had occurred late on the 4th or early in

6    the morning on the 5th is because of certain things you

7    observed at the scene.  For example, the absence of

8    predation?

9           MR. ERVIN:  Objection to form.

10     A    Absence of what?

11     Q    There was no indication of any animals

12   attacking the body, right?

13     A    That would not have been in my thought

14   process.

15     Q    Okay.  You sure about that?

16     A    I'm sure of that.

17     Q    All right.  Certainly, you understood when you

18   saw the body that the body was in full rigor, correct?

19     A    I did not understand that.

20     Q    Okay.  What was your understanding about

21   whether or not the body was in rigor mortise?

22     A    At this time, I don't remember.  I --

23     Q    All right.

24     A    I don't remember.

25     Q    Let me do it this way.  Certainly, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  recall -- withdraw.  In 1992, you were certainly -- it

2  was closer in time to your experience as a coroner than

3  today?  You've been retired for a long time, right?

4      A    Right.

5      Q    And so your knowledge of things like rigor was

6  probably better back then, right?

7      A    I wouldn't say necessarily, so no.

8      Q    Okay.  So fair enough.  So when you saw the

9  body, you had no idea whether the body was in rigor?

10     A    No.

11     Q    You didn't notice that when the legs were bent

12  and standing on their own, that would indicate to you,

13  as a coroner, that it was in rigor?

14         MR. ERVIN:  Objection to the form.

15         MR. BOND:  Objection to the form of the

16     question.

17         MR. GARVERICH:  Objection to the form of the

18     question.

19  BY MR. BRUSTIN:

20     Q    I'm going to show you pictures.  Have you

21  looked at pictures?

22     A    Show me a picture.

23     Q    Have you looked at pictures?

24     A    I have seen pictures.

25     Q    Okay.  And your -- you can't say as a coroner,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

74

1  as a coroner for more than 20 years, you can't say that

2  when you observed the body, the body appeared to be in

3  full rigor based on the position of the legs?

4      A    I don't remember.  The position of the legs

5  would not feel me -- or indicate to me whether or not

6  she was in rigor.

7      Q    Okay.  Have you looked at the pictures in

8  preparation for today?

9      A    I looked at the pictures.  I have, yes.

10     Q    You mean you looked at the pictures that were

11 taken at the scene?

12     A    I think so, yes.

13     Q    Okay.  And nothing about those pictures

14 indicated anything to you about whether the body was in

15 rigor?

16     A    I don't remember whether or not the body was

17 in rigor.

18     Q    I'm asking you a different question.

19     A    I know we rolled her over and put her in a

20 body bag which would indicate to me that her legs were

21 straightened out at that point.

22     Q    Okay.  All right.  So your belief is that the

23 body wasn't yet in rigor?

24     A    I didn't say "wasn't yet in rigor."

25     Q    All right.  Before we get to that, in looking

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   at the photographs that you saw in this case in

2   preparation for today, you didn't make any observations

3   about whether or not the body was in rigor before it was

4   put in the body bag?

5       A    How would a photograph tell you that?

6       Q    I'm asking you.

7            MR. BOND:  Well, he answered the question.

8       Q    And by the way, I'm not just making this up.

9   I've obviously talked to somebody.  That's why I'm

10  asking you.

11      A    Go right ahead.

12      Q    So there's nothing about the photographs that

13  you saw that would indicate rigor?

14      A    No.

15      Q    Okay.  And so the only reason that you wrote

16  4-4 or 4-5 as time of death was because you found the

17  body on 4-5?

18      A    As far as I know, that's true.

19      Q    There was no other reason?

20      A    Not that I'm aware of.

21      Q    And nothing you've seen on any documents that

22  you reviewed?

23      A    No.

24      Q    According to Sheriff Greer, the body looked

25  pristine.  Do you recall telling him that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

76

1          MR. BOND:  Object to the form of the question.

2     A    I do not recall telling him that.

3     Q    Do you recall making an observation that the

4  body looked pristine?

5     A    I do not remember making that observation.

6     Q    Do you recall making the observation that

7  they're not -- there did not appear to be any sign of

8  animals or insects having gotten to the body?

9     A    I don't remember making that observation.

10    Q    All right.  And is it your testimony that in

11  1992, you didn't understand to be the absence of insects

12  or predators having attacked the body to indicate in any

13  way how long the body had been there?

14    A    No.

15    Q    In your experience, that was not a relevant

16  factor?  At least you certainly weren't aware of it

17  being a relevant factor?

18    A    No.

19    Q    In your experience, you don't recall --

20         MR. BOND:  He wasn't finished, Nick.  Go ahead.

21    A    I would have been able to identify if insects

22  or predators had attacked the body.  They had not.

23    Q    Okay.

24    A    To my knowledge.

25    Q    And have you ever been to a scene of a death,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

77

```
 1    whether it be a crime scene or the scene of -- any scene

 2    of a death outside where there was indications that

 3    animals or insects had gotten to the body?

 4        A    Yes.

 5        Q    But you were just not aware that that would

 6    indicate how long the body was out in the open?

 7        A    Fair to say.

 8        Q    Did you have an understanding as to why

 9    insects and animals come to feed on a dead body?  You

10    know what the science of it is?

11        A    Not totally, no.

12        Q    What's your understanding of it?

13        A    Decomposition.

14        Q    All right.  According to Sheriff Greer, he

15    thought that the leg sticking up and the appearance was

16    a sign that the body was fresh.  Do you remember telling

17    him that?

18            MR. BOND:  Object to the form of the question.

19        A    I don't remember telling him that.

20        Q    Do you remember noticing that the legs were

21    sticking up?

22        A    I do remember that.

23        Q    That didn't indicate to you that the legs were

24    in rigor?

25        A    No.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

78

1    Q    Okay.  Do legs typically stand up on their own
2  when someone is dead?  Have you ever seen that before
3  when it wasn't in rigor?
4    A    I can't say that I have, no.
5    Q    Okay.  Do you understand it's by general
6  principals of physics, legs can't stand up on their own
7  unless they're in rigor?
8         MR. BOND:  Object to the form of the question.
9    Q    Based on gravity?
10         MR. BOND:  Object to the form of the question.
11   A    Based on gravity it would depend on how the
12  legs were.
13   Q    Okay.  You were certainly -- according to
14  Sheriff Greer, as of April 8th, the theory was that
15  Warford had been killed between April 4th and April 5th.
16  That's what he put in his report.  And that date comes
17  from you.  Any reason to dispute that?
18         MR. BOND:  Object to the form of the question.
19   A    No.
20   Q    He testified that he's not the person
21  estimating the time of death.  He's just taking whatever
22  the coroner gives him, and he used that to assist in his
23  investigation.  Any reason to dispute that?
24   A    No.
25         MR. BOND:  Object to the form of the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

1      Q    You understood that when you -- you certainly

2    don't dispute that you gave Greer an estimate for time

3    of death, right?

4      A    Right.

5      Q    And you understood that Sheriff Greer was

6    going to use that estimate in conducting his

7    investigation, correct?

8      A    Right.

9      Q    And you understood that it was important for

10   you to give him his accurate and estimate as you could

11   at the time, correct?

12     A    At the time.

13     Q    You understand that generally full rigor

14   mortise sets in within 12 to 24 hours, correct?

15     A    No, I don't understand.

16     Q    You don't have an understanding one way or

17   another whether that's true or not?

18     A    That's true.

19     Q    You have no idea, as you sit here today,

20   whether -- when rigor mortise sets in?

21     A    It's a period after death.

22     Q    Okay.  Do you have any understanding as to

23   when -- do you have any reason to dispute that rigor

24   mortise typically starts to dissipate before two days?

25     A    I can't say that that's true.  I don't know.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

80

1    Q    You just don't know one way or the other?

2    A    I do not.

3    Q    Do you know anything about what cornea's, the

4    eyes, look like after death?

5    A    No.

6    Q    Okay.  Did you ever learn from any source that

7    clouding of the cornea begins a half hour to two hours

8    after death according to the medical literature?

9         MR. BOND:  Object to form.

10   Q    You never heard that before?  You never heard

11   that after death cornea's cloud?

12   A    No.

13   Q    The first you're hearing it is me telling you?

14   A    As far as I know.

15   Q    Okay.  And I'm going to show you the video of

16   the crime scene in just a minute, but before I do, what

17   infor -- let me do it this way.  According to

18   Sheriff Greer, he testified that if the crime occurred

19   the evening of 4-4 or the a.m. of 4-5, both Keith Hardin

20   and Jeff Clark had alibis that made it so they could not

21   have committed the crimes at that time.  Fair to say

22   that's your understanding as well based on your

23   communications with Sheriff Greer?

24   A    I can't say that.

25   Q    You can't say one way or another?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.
 2        Q    You can't dispute it, but you certainly
 3   don't -- you can't say whether that's true or not?
 4        A    I cannot.
 5        Q    You just don't remember?
 6        A    I don't remember.
 7        Q    He further stated that they -- that he
 8   concluded that they had alibis supported by lots of
 9   individuals after Thursday morning.  Any reason to
10   dispute that?
11             MR. BOND:  Object to the form of the question.
12        A    I don't know.
13        Q    You just don't remember it one way or another?
14        A    I do not.
15             MR. BOND:  Object to the form of the question.
16        Q    And you also --
17             MR. BOND:  Whoa.  Let him finish.
18             MR. BRUSTIN:  I think he has.
19             MR. BOND:  I don't believe so, but go ahead.
20   BY MR. BRUSTIN:
21        Q    Did you finish?
22        A    Repeat the question.
23        Q    Fair enough.  You have -- you don't recall one
24   way or another whether or not it was determined by
25   Sheriff Greer and others that Hardin and Clark had
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   alibis supported by lots of individuals after Thursday

2   morning?

3            MR. BOND:  Object to the form of the question.

4       Go ahead and answer.

5       A    I do not know.

6       Q    You're not saying they didn't, you just don't

7   remember one way or another?

8       A    I do not remember.

9            MR. BOND:  Objection.

10      Q    You certainly don't dispute it?

11      A    I can't dispute it.  I don't remember it.

12      Q    Okay.  And you don't dispute that

13  Sheriff Greer told you that?

14           MR. BOND:  Object.

15      Q    You just don't remember?

16           MR. BOND:  Object to form of the question.

17      A    I don't remember it.

18      Q    According to Sheriff Greer, after he

19  determined that the murders had to happen on Thursday

20  evening, you went back to the medical examiner to see if

21  there was any way that he could have been wrong about

22  the time of death.  Do you agree with that?

23           MR. BOND:  Object to the form of the question.

24      A    I can't answer that for sure.  I may have

25  asked George Nichols his opinion.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q    And by the way, you recall that you were

2 present for interviews with Jeff Clark?

3      A    Yes.

4      Q    And you recall him giving specific information

5 about where he was after Thursday morning in those

6 interviews, correct?  Withdrawn.  You recall him giving

7 information about where he was the entire time period,

8 correct?

9      A    I don't recall it totally.  I remember him

10 talking about it.

11      Q    Okay.  Do you remember him talking about where

12 he was at different times --

13      A    Yes.

14      Q    -- and who he was with?

15      A    I presume.

16      Q    All right.  And certainly, you would have

17 remember -- although you don't remember it today, you

18 certainly knew it then if you were sitting there,

19 correct?

20      A    I would say so, yes.

21      Q    And you don't have any reason to dispute that

22 you would have, given your unusual involvement in this

23 case, that you would have discussed it with

24 Sheriff Greer?

25      A    I can't dispute it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

84

```
 1        Q    All right.  And you certainly don't dispute
 2   that you went back to Nichols to see if he could change
 3   the time of death?
 4        A    I didn't -- he doesn't do the time of death.
 5   I do that.
 6        Q    Okay.  You certainly don't dispute that you
 7   went back to Nichols to see if he could give you
 8   information that would allow you to change the time of
 9   death, correct?
10             MR. BOND:  Object to the form of the question.
11        A    I don't think I asked for information to
12   change the time of death.
13        Q    What did you do?
14        A    I would have asked him, "Is this possible?"
15        Q    Okay.  And what did he tell you?
16        A    Knowing George -- I don't really remember.
17   Knowing George Nichols, he would have said, "Sure.  It's
18   possible."
19        Q    Okay.  Like anything's possible, right?
20        A    Sure.
21        Q    Okay.  And that was enough for you to change
22   the time of death in the death certificate?
23        A    Not totally.
24        Q    Okay.  So let's do this now.  Tell me all
25   the -- other than the alibis, the good alibis, what
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

85

1  other information did you learn between the time that

2  you estimated the time of death at 4-4 or 4-5 to when

3  you changed it to 4-2?

4       MR. GARVERICH:  Object.

5       MR. BOND:  Object to the form of the question.

6  A    The information that I would have used is she

7  disappeared the night of the 1st or the 2nd.  The

8  lividity was set when we got to the ME's office.  After

9  we had turned her over, it didn't dissipate.  And based

10 on that -- if you look on -- above my signature on the

11 death certificate it says, "The best of my knowledge

12 death occurred at the time, date, and place and due to

13 the cause as stated."

14 Q    Okay.  So...

15 A    To the best of my knowledge, that was my best

16 guess.

17 Q    So okay I understand.  Your time -- so on the

18 report your time of death changed from April 4 or

19 April 5th to April 6th -- I'm sorry, it changed from

20 April 4th or April 5th to April 2nd, correct?

21      MR. ERVIN:  Objection to the form.

22 Q    Right?

23 A    Based on the information I just gave you.

24 Q    Okay.  And I want to make sure I have all the

25 information.  So the only thing that changed and caused

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you to change the time of death was the fact that she

2    disappeared on the 2nd and the fact that lividity had

3    fully set by the time of autopsy, correct?

4         A    Yes.

5         Q    Anything else?

6         A    No.

7         Q    Anything else you learned from M.E. Nichols

8    that would have -- that caused you to change time of

9    death?

10        A    No.

11        Q    Now, what is your understanding as to --

12   withdrawn.  You understand that lividity is typically

13   fixed within 24 hours, correct, of death?

14        A    I don't know of a specific time.

15        Q    All right.  And you didn't know a specific

16   time then?

17        A    Probably not, no.

18        Q    All right.  Well, then if you didn't know a

19   specific time as to when lividity sets, how could that

20   have caused you to change the time of death?

21        A    Lividity will go away if it's not set.

22        Q    Okay.  And lividity goes away as early as

23   24 hours, correct?

24        A    I don't know.

25        Q    All right.  And you didn't know then?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    No.
 2        Q    So if you don't know when lividity sets and
 3   you don't know when lividity goes away, how could that
 4   be information that could responsibly cause you to
 5   change the time of death?
 6        A    It was information in my mind that I could
 7   use.
 8        Q    But you didn't know what --
 9             MR. BOND:  Well, let him -- now, he wasn't
10        finished, Nick.
11             MR. BRUSTIN:  I didn't want to interrupt him.
12        A    Okay.
13             MR. BOND:  Well, you do, but let him finish.
14             MR. BRUSTIN:  I actually don't.
15        A    Actually, if you look at today's death
16   certificates in Kentucky, it has actual date of death,
17   date found.  We would have been all through with all of
18   this because if the death certificate had been that way
19   back then, it would have been date found and we're done.
20        Q    Okay.  Were you -- you understood because of
21   the way death certificates were done and the reports
22   were done, that if you didn't have a good faith basis to
23   put a time of death, you weren't supposed to put a time
24   of death, right?
25        A    I didn't put the time of death.  I put a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

88

```
 1    date --
 2        Q    Let me try it again.  If you -- that was a bad
 3    question.  If you didn't have a good faith basis to put
 4    a date of death, you understood you were to put no date,
 5    correct?
 6        A    We're required to put a date.
 7        Q    You were required to put a date even if you
 8    didn't know one?
 9        A    Your -- to the best of my knowledge is what it
10    says.
11        Q    Okay.  And --
12        A    I need to go to the restroom.
13            MR. BRUSTIN:  Okay.
14            MR. BOND:  Let's just take a break.
15            VIDEOGRAPHER:  Off the record at 11:59.
16                    (OFF THE RECORD)
17            VIDEOGRAPHER:  Back on the record at 12:05.
18    BY MR. BRUSTIN:
19        Q    Okay.  Mr. Adams, when we took a break did you
20    discuss any of these issues with your attorney during
21    the break?
22        A    No.
23            MR. GARVERICH:  Objection to the form.
24        Q    Okay.  Mr. Adams, I was asking you some
25    questions about lividity.  I think you were clear, but I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    want to make sure.  Back in 1992, you didn't know when

2    lividity sets in and when lividity dissipates, correct?

3        A    I would say that's correct.

4        Q    You didn't know whether it was hour or

5    two hours or more, correct?

6        A    Correct.

7        Q    You had no idea whether or not that entire

8    process likely occurred within a day or hours or more,

9    right?

10       A    Right.

11       Q    You had no idea what the science said about

12   that?

13       A    Right.

14       Q    Because you didn't ask anybody, right?

15       A    Not that I remember.

16       Q    All right.  So then how would -- given that

17   you didn't understand when lividity sets in and when

18   lividity dissipates, how could that have caused you to

19   change the time of death?  Responsibly.

20           MR. BOND:  Object to the form of the question.

21       A    All I can say is I did the best I knew how.

22       Q    Okay.  Now, let's take a look at this

23   document, which is Exhibit 35, okay?  You mention that

24   you created the portion of this document beginning with

25   where it says, "certify," right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A     Yes.

2     Q     Everything down from there.

3     A     Uh-huh.

4     Q     And that's something that you typed on your

5   computer, correct?  I'm sorry, not a computer, your

6   typewriter.

7     A     Probably a typewriter.

8     Q     Okay.  You had a typewriter to use, correct?

9     A     I did.

10     Q     Where was your typewriter?

11     A     Probably at my office at the funeral home.

12     Q     Okay.  You used the same one all the time?

13     A     Right.

14     Q     Okay.  And that's where you typed up this

15   portion of the document?

16     A     I'm sure it was.

17     Q     Okay.  And you didn't touch the portion of the

18   document above it, correct?  That's not for you?

19     A     No.

20     Q     Who does that?

21     A     Funeral home does that.

22     Q     Okay.  You're not supposed to touch that,

23   correct?  That's not part of your duties and

24   responsibilities?

25     A     No.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

91

1    Q    All right.  And you can tell by the way that
2    the -- you could even tell when you looked at the top
3    portion of this that the typewriter that was used for
4    the top part is different than the typewriter you use.
5    It has much bigger print, right?
6    A    Right.
7    Q    It's obvious, right?
8    A    Uh-huh.
9    Q    You agree with me?
10   A    Yeah.
11   Q    Okay.  It's significantly bigger?
12   A    It is a bigger type.
13   Q    Okay.  And I will represent to you that the
14   date you signed this May 7, 1992 is when Sheriff Greer
15   went to testify in the grand jury.  And you knew that at
16   the time, correct?
17   A    I can't say that I knew.
18   Q    It was a bad question.  Let me try a different
19   way.  I'm representing to you that Sheriff Greer
20   testified on May 7, 1992.  I know you don't remember it
21   today, but would it be fair to say that you would have
22   known that at the time you signed it?
23   A    I wouldn't say so.
24   Q    Okay.  You may have had no idea that was the
25   same day he was testifying?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      I might not have.

2      Q      Certainly you would have known generally that

3   he was going to be testifying in the grand jury, fair to

4   say, given your involvement in the case?

5      A      At some point, sure.

6      Q      Okay.  And it may just be a coincidence that

7   you signed this death certificate on May 7, 1992?  You

8   may not have even known that he was testifying, correct?

9      A      That's correct.

10     Q      All right.  But on May 7, 1990 -- withdrawn.

11   And you didn't know -- withdrawn.  You remember knowing

12   that Sheriff Greer was going to testify at the grand

13   jury that there were reasons why you were determined the

14   death occurred on April 5th?  I'm sorry, the death

15   occurred on April 2nd.

16         MR. BOND:  Object to the form of the question.

17     A      Rerun it.

18     Q      Were you aware that Sheriff Greer was going to

19   go into the grand jury and talk about the various

20   reasons why he determined, based on his consultation

21   with you, that the death occurred on April 2nd as

22   opposed to April 4th or 5th?

23         MR. BOND:  Object to the form of the question.

24     A      I don't know.  I'm sure he would.

25     Q      Okay.  You knew he was going to do that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 93 of 262 PageID #:
27175
The Deposition of BILL ADAMS, taken on January 06, 2020
93

1      A    I didn't know what he was going to testify.

2      Q    Well, you knew that this document giving the

3   date of injury is April 2nd would give him the medical

4   basis to do that, correct?

5           MR. BOND:  Object to the form of the question.

6      Q    It's an official document.  Withdrawn.  This

7   is an official document that you knew would be used in

8   court, correct?

9      A    I didn't know it would be used in court.

10     Q    Did you know it might be used in court?

11     A    Anything can be used in court.

12     Q    Well, did you know -- did you consider this to

13  be an official document?

14     A    It is a death certificate of the

15  Commonwealth of Kentucky.

16     Q    Is it fair to refer to it as an official

17  document?

18     A    I'm sure it is, yes.

19     Q    All right.  And you understood that

20  Sheriff Greer was going to be relying on this document

21  to give the time of death, correct?

22          MR. BOND:  Object to the form of the question.

23     A    I don't know what Sheriff Greer was going to

24  rely on.

25     Q    You had no idea he might rely on this?  You

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  had no conversation about it that you can recall.

 2      A    No.

 3      Q    All right.  But certainly, this document does

 4  provide Sheriff Greer a written report that says the

 5  date of death is April 2, 1992, right?

 6      A    It does.

 7      Q    All right.  Now, if you take a look at the top

 8  of this document, you see where it says, "date of death"

 9  on top?

10      A    I do.

11      Q    And it says, "Date of death: April 2, 1992."

12  Who fills out the top of this?

13      A    Funeral home.

14      Q    All right.  And the funeral home fills this

15  out at the time that they're involved in the case,

16  literally in the case, correct?

17      A    They fill it out and send it to me.

18      Q    But the time that they're involved in the case

19  would be within days of the death?

20      A    Right.

21      Q    Okay.  So can you explain how it's possible

22  that the funeral home would have put April 2, 1992 as

23  the date of death when back at the time of the funeral,

24  you were sure that the date of death was April 4th or

25  5th?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           MR. BOND:  Object to the form of the question.

2      A    I did not say I was sure at the time of the

3  funeral.

4      Q    You're right.  Let me rephrase it.  You're

5  absolutely right.  Let me re-frame it.  The initial

6  report that you created gave the date of death as

7  April 4th or April 5th.  Can you explain how it's

8  possible that the funeral home director would have put

9  April 2nd at the time of the funeral?

10     A    I don't know.

11     Q    All right.  Let me give you a theory, and you

12  tell me if this is right.  You'll notice that if you see

13  it says, "April 2, 1992" there?

14     A    I saw it.

15     Q    And you will see that the 2 there is smaller

16  than the other numbers on the page, correct?

17     A    Yes.

18     Q    That's because the 2 came from your typewriter

19  and not from the funeral director's typewriter, correct?

20     A    I can't say that.

21     Q    Well, what happened was you whited out the

22  date of death, which was April 4th or 5th, and you put

23  in April 2nd, correct?

24     A    I can't say that.

25     Q    Isn't that what looks like happened here?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 96 of 262 PageID #: 27178
The Deposition of BILL ADAMS, taken on January 06, 2020

96

 1        A     I can't say that either.

 2        Q     Does it --

 3        A     It's possible, I don't know.

 4        Q     What other possibilities are there?

 5        A     I don't know.

 6        Q     Can you think of any -- can you think of any

 7   explanation as to how your typewriter could have been

 8   used to put that 2 there if you didn't do it?

 9        A     I can't say it was my typewriter.

10        Q     All right.  But you know it wasn't the -- you

11   know it's different than the funeral director's

12   typewriter?

13        A     It's different than the funeral director's

14   typewriter.

15        Q     All right.  And can you think of any

16   legitimate explanation as to how the funeral director

17   who was involved in -- who was involved at the time of

18   the funeral, which is before your estimate of the time

19   of death change, could it possibly put in April 2nd?

20        A     I don't know.

21        Q     Okay.  Would you agree that the only

22   explanation that makes sense -- I respect you don't

23   remember -- but the only explanation that makes sense is

24   that you change the time of death at the top of the

25   page?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

97

1     A     I wouldn't say it's the only explanation.

2     Q     Okay.  Give me another explanation.

3     A     I don't have another explanation.

4     Q     Why don't you take a minute to think about

5  one.  Can you think of any other explanation in the

6  world as to what could have happened?

7     A     I know the funeral home is going to rely on

8  the date of death, the -- I have a funeral home, so I

9  know.

10    Q     They're going to rely on your initial report?

11    A     They're going to -- they're going to rely on

12  whatever the coroner or doctor says is the date of

13  death.

14    Q     Okay.  And you understood that it was -- you

15  understood that it would be improper for you -- you've

16  already told us that the only part of this document

17  you're properly supposed to write on is the bottom half

18  of this, correct?

19    A     Unless the funeral home may have asked me to

20  change it.

21    Q     Ah.  And that would have been appropriate?

22    A     That could have been.

23    Q     Okay.  And when would the funeral home have

24  asked you to change it?  How would they have -- how

25  would the funeral home have been involved after the time

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   of the funeral, such that they would be asking to change

2   the date of death?

3       A    They would be waiting on certified copies of

4   the death certificate.

5       Q    So what could have happened is -- well, you

6   couldn't have signed this document unless you had a date

7   of death on top, correct?  This -- the first part of

8   this document is completed before you sign it, correct?

9       A    Right.

10      Q    And so at some time after they completed this

11  document the date of death on top was changed, right?

12      A    I'll agree with that.

13          MR. ERVIN:  Objection to the form.

14      Q    And the date of death, the 2 on the date of

15  death just happens to match exactly with the 2's that

16  your typewriter produces, correct?

17          MR. BOND:  Object to the form of the question.

18      A    I can't say.

19      Q    Well, take a look.

20          MR. BOND:  Is there a question?

21      Q    Yes.  Do you agree with me?  They matched with

22  the two's that you --

23      A    I can't agree that they totally match.  I

24  don't know.  I'm not a typewriter expert.

25      Q    Only can say that it's certainly a different

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    typewriter?

2        A    I'll agree to that.

3        Q    It looks like your typewriter, right?

4        A    Possibly.

5        Q    Possibly or it looks like it?

6            MR. BOND:  Asked and answered.  Go ahead and

7        answer if you can, Bill.

8        A    Possibly.

9        Q    Is that going to be the same in front of a

10   jury if they're looking at the same document?

11           MR. BOND:  Whoa.  Don't answer that.  Don't

12       answer that.  We're not going to argue.  We're going

13       to ask questions, and he'll response.  No, you're

14       not.  You're arguing with him.

15   BY MR. BRUSTIN:

16       Q    If you're sitting --

17           MR. BOND:  That's a statement that we're not

18       going to answer.

19       Q    If you're sitting in front of a jury in this

20   case --

21           MR. BOND:  Don't answer it, Bill.

22       Q    -- are you going to tell them that that's

23   not -- typewriter?

24           MR. BOND:  Don't answer it, Bill.  He's arguing

25       with you.  Let's go on.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

100

```
 1   BY MR. BRUSTIN:

 2        Q    All right.  What appears -- would you agree

 3   Mr. Adams, what appears to have happened here is that in

 4   order for Sheriff Greer to be able to testify to the

 5   time of death as being April 2nd, you whited out the

 6   date of death on the top of this document and changed it

 7   to April 2nd so it would be consistent?

 8             MR. ERVIN:  Objection to the form.

 9             MR. GARVERICH:  Object to the form.

10        Q    That appears to be what happened, right?

11             MR. BOND:  Objection to form.

12             MR. PELLINO:  Objection to the form.

13        A    I did not say that.  I don't remember.

14        Q    You certainly don't deny it?

15             MR. BOND:  Whoa, objection.  Answer the

16        question, Bill.

17        A    I don't remember.

18        Q    And you don't deny it?

19        A    I don't remember it.

20        Q    That's the best you can do?

21        A    That's the best I'm going to do.

22        Q    Okay.  You would agree though that it would be

23   improper for you to white out the date of death on top

24   and change it to April 2nd, correct?

25        A    Not if the funeral home asked me to do that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

101

1    Q    Well, the only way the funeral home would know

2  to change it is if you told them the time of death was

3  different.  How could the funeral home possibly know

4  there's a different time of death?

5         MR. BOND:  Objection to the form.

6    Q    Wait a minute.  Let me withdraw the question.

7  Funeral home directors don't determine times of death,

8  right?

9    A    Correct.

10   Q    That's what coroner's do and that's what --

11 that's what medical examiner's do, to the extent it can

12 be done, correct?

13        MR. BOND:  Object to the form of the question.

14   A    Coroners, doctors.

15   Q    Not funeral directors?

16   A    No.

17   Q    Okay.  So there would be no conceivable reason

18 in the world for a funeral director to ask you to change

19 the time of death, right?

20   A    There is a possibility, yes.

21   Q    What could be the conceivable reason for a

22 funeral director to ask you to change the time of death?

23   A    If he had sent the death certificate to me

24 with a date that I thought was incorrect, I could have

25 called him and said, "I think this date on top is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  incorrect," and he might have said, "Rather than mail it

2  back to me and totally redo the document, can you change

3  it?"  That's a possibility.

4      Q    Okay.

5      A    I'm not saying that's what happened.

6      Q    All right.  And, so the only two possibilities

7  you can think of are either you whited it out on your

8  own and typed it in, or you called the funeral director

9  and he told you to do that, right?

10          MR. BOND:  Object to the form of the question.

11     A    I don't remember if I did it or not.

12     Q    All right.

13     A    That's --

14     Q    And by the way, there's nothing indicating,

15  other than the fact that the number 2 is smaller than

16  the other letters here, there's nothing indicating that

17  this document was altered, correct?

18          MR. ERVIN:  Objection to the form.

19          MR. BOND:  Object to the form of the question.

20     A    Not that I know.

21     Q    All right.  So now let's take a look at the

22  crime scene video.  So, first of all, have you

23  reviewed -- I'm going to do a couple of things.  First,

24  I'm going to mark some photos as exhibits, and then I'm

25  going to show you the crime scene video.  But before I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

103

```
 1    do that, have you reviewed the crime scene video in
 2    preparation for today?
 3         A    I'm not sure that I ever saw the crime scene
 4    video.
 5         Q    Ever?
 6         A    Ever.
 7         Q    Okay.  But --
 8              MR. BOND:  Just for my logistics, how are we
 9         going to make this an exhibit to the deposition?
10         How do we want to accomplish that?
11              MR. BRUSTIN:  The same way we did the last one.
12         What we're going to do is we're going to play it and
13         we'll describe it, and then we will make it an
14         exhibit as a drop box.
15              MS. FETROW:  Shared.
16              MR. BRUSTIN:  Shared.
17              MS. FETROW:  It has been shared.
18              MR. BOND:  Well, how are we going to attach it
19         to the court's original?
20              MS. FETROW:  I will send it to the court
21         reporter.
22              MR. BOND:  Okay.  Okay.
23              MR. BRUSTIN:  Okay?
24              MR. BOND:  I'm just logistic.
25              MR. BRUSTIN:  Yeah.  And --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

104

```
 1              MR. BOND:  How we're going to do it.
 2              MR. BRUSTIN:  Yeah.  So before I do that
 3         though, let me first mark these.  What number are we
 4         on?
 5              MR. BOND:  36, I think.
 6              COURT REPORTER:  36 is the next one.
 7              MR. BRUSTIN:  Mark this as 36, please.  Guys,
 8         this is 36.
 9              MR. GARVERICH:  36.
10              MR. BRUSTIN:  This is 37.
11              MR. GARVERICH:  This is 37.  Sorry.
12              MR. BRUSTIN:  38.  39.  That is 40.
13   BY MR. BRUSTIN:
14         Q    Okay.  So I want you to take a minute and I
15   want you to review these pictures.
16              (EXHIBIT 36 MARKED FOR IDENTIFICATION)
17              (EXHIBIT 37 MARKED FOR IDENTIFICATION)
18              (EXHIBIT 38 MARKED FOR IDENTIFICATION)
19              (EXHIBIT 39 MARKED FOR IDENTIFICATION)
20              (EXHIBIT 40 MARKED FOR IDENTIFICATION)
21         A    Okay.
22         Q    And I'm going to ask you -- and I want to tell
23   you, before you review them, I'm going to ask you some
24   questions about rigor, okay?  And you've observed rigor
25   in a variety of death suits; fair to say?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

105

1      A     I have.

2      Q     You know what it looks like, right?

3      A     I do.

4      Q     Okay.  And one of the telltale signs of rigor

5   is that when you move the body, it stays in the same

6   position, correct?

7      A     Yes.

8      Q     All right.  So I want you to take a moment and

9   look through these pictures with the -- and I'm going

10  to -- with the idea that I'm going to be asking you

11  questions about this body in rigor, okay?

12     A     Okay.

13     Q     Have you looked at them all?

14     A     I've seen them, yes.

15     Q     These are all the pictures you reviewed before

16  today?

17     A     Yes, I've seen all of them.

18     Q     All right.  So now I'm going to play you the

19  video.  And we'll describe the video as what was sent to

20  us by --

21          MS. FETROW:  From the Commonwealth files.

22     Q     -- from the Commonwealth files.  And it's

23  dated April 5, 1982 and it --

24          MS. FETROW:  '92.

25     Q     '92, sorry.  And it's -- what's the time

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

106

```
 1    stamps?
 2             MS. FETROW:  We're at 6:25.
 3             MR. BRUSTIN:  Well, no what's the entire?  I
 4        want to -- how long is it?
 5             MS. FETROW:  It's 15 minutes and four seconds.
 6    BY MR. BRUSTIN:
 7        Q    15 minutes and four seconds.  And we'll send
 8    you the entire thing, but right now we're going to be
 9    playing from --
10             MS. FETROW:  6:25.
11        Q    -- 6:25 and this was taken at 9:30 in the
12    morning on 1992.  And by the way, you were present for
13    the taking of this video, correct?  You were there?
14        A    I'm sure I was.
15        Q    Okay.  So what's captured on the video, you
16    were seeing live?
17        A    I would say so, yes.
18        Q    Okay.
19             MS. FETROW:  Okay.
20             MR. BRUSTIN:  And we're playing what length?
21             MS. FETROW:  Playing until 6:33.  So eight
22        seconds.
23             MR. BRUSTIN:  So we're playing what?
24             MS. FETROW:  It's 6:25.  Bates stamped 6:25.
25             MR. GARVERICH:  That's when you're starting?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

107

```
 1              MS. FETROW:  We're starting at time stamp 6:25.
 2              MR. GARVERICH:  Okay.
 3                     (PLAYS VIDEO)
 4              MR. BOND:  Are we done looking?
 5              MR. BRUSTIN:  And then we're going to show
 6       another section.
 7                     (PLAYS VIDEO)
 8              MR. BRUSTIN:  Just describe what it is.
 9              MS. FETROW:  We're beginning at 10:40.
10              MR. BRUSTIN:  And going to where?
11              MS. FETROW:  Going to 10:52.
12                     (PLAYS VIDEO)
13              MR. GARVERICH:  And the whole video is going to
14       be Exhibit 41?  Is that --
15              MR. BRUSTIN:  Yes.
16              MR. GARVERICH:  Okay.
17              MR. BRUSTIN:  Is there --
18              MS. FETROW:  Yeah.  But those are the best
19       sections.
20              MR. BRUSTIN:  Okay.
21       BY MR. BRUSTIN:
22          Q    All right.  So now you've had a chance to
23       review the pictures and the video of the body, correct?
24              (EXHIBIT 41 MARKED FOR IDENTIFICATION)
25          A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And they were clear, you were able to see the

2  pictures --

3    A    Yes.

4    Q    -- and you were able to see the video?  And I

5  will refer you specifically to photographs 38 and 37.

6  Did you have a chance to look?

7    A    Yes.

8    Q    And you can tell from this photograph that --

9  and I also want you to take -- you could tell from this

10  photograph -- and also take a look at photograph 40 and

11  39.  You can tell, and you remember from the scene, that

12  the branches were not such that they could hold up the

13  legs, correct?

14        MR. GARVERICH:  Objection to the form of the

15     question.

16    Q    Of this large woman.

17    A    They don't appear to be.

18    Q    Okay.  And you can tell that the legs are in

19  an unnatural position that defies gravity, correct?

20        MR. BOND:  Object to the form of the question.

21    Q    For a dead body?

22    A    The way her feet are back?

23    Q    Her feet are in the air and crossed, correct?

24        MR. BOND:  Go ahead and answer, Bill.

25    A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

109

1      Q      That's an unnatural position?

2      A      That is an unnatural position.

3      Q      That's not the way a body would naturally

4   rest, correct?

5      A      No.

6      Q      And you can tell from 37 that when the body is

7   turned over her legs are in the same position, correct?

8      A      They appear to be, yes.

9      Q      Okay.  All of these photographs and the video

10  indicate that this woman is in full rigor, correct?

11     A      I can't say that for sure.

12     Q      What other information do you need to

13  determine whether or not the body is in rigor?

14            MR. BOND:  Object to the form of the question.

15      That's not what you asked previously.

16     Q      Is it full rigor?

17     A      I don't remember whether she was or not, and

18  without having the body there, I don't know.

19     Q      Well, are you suggesting that you would

20  need -- as a -- that a medical -- withdrawn.  Are you

21  suggesting that a medical professional would need to

22  actually see the body as opposed to the photographs and

23  the video?

24     A      I'm saying I probably would.

25     Q      All right.  Is there anything -- would you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

110

1    agree that these photos suggest full rigor?  All of the

2    signs of full rigor.  They're resting in unnatural

3    position that you wouldn't have absent rigor.  When the

4    body is turned over, if it wasn't full rigor, they would

5    have straightened, correct?

6         A    Should have.

7         Q    Okay.  All of the -- all of the photos and

8    everything in the video you just sought indicates the

9    body is in full rigor, correct?

10        A    I've told you, I can't say whether or not she

11   was in full rigor.

12        Q    I understand that.  Everything that you've

13   seen, the photographs and the video, everything you've

14   seen in there indicates that she is in full rigor?

15        A    Possibly.

16        Q    There's nothing in there that suggests she's

17   not, correct?

18        A    No.

19        Q    Everything about this suggests that she is?

20        A    I can't say that.

21        Q    What other information would you need to

22   determine whether or not she's in full rigor?

23        A    The body.

24        Q    Why?  What information would that give you

25   additionally that you don't have here?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

111

```
 1       A     If I could move her or not.
 2       Q     But obviously you wouldn't even have done
 3   that, right?
 4       A     Not ordinarily.  That's --
 5             MR. BOND:  37.  I think, Nick.
 6             THE WITNESS:  That's the one.
 7             MR. BOND:  I heard what you said.  I think
 8       that's what you were looking for.
 9             MR. BRUSTIN:  Yeah.
10             MR. BOND:  You may have another picture that we
11       haven't seen.
12             MR. BRUSTIN:  Right.
13   BY MR. BRUSTIN:
14       Q     In 37, that's her being put in the body bag,
15   correct?
16       A     Yes.
17       Q     With her legs bent exactly as they were when
18   she was found?
19       A     It appears to be.
20       Q     It appears to be exactly the same?
21       A     Yes.
22       Q     Okay.  And obviously, you would expect that if
23   she was not in rigor, when you turned the body over, the
24   legs would have straightened?
25       A     You would have expected that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

112

1      Q    Okay.  That's what you expect based on your

2    experience of seeing many people in rigor, full rigor?

3      A    If she was not in rigor, you would --

4      Q    All right.

5      A    -- suspect that.

6      Q    All right.  And at the time you did

7    understand, although you didn't understand lividity, you

8    did understand rigor and how it -- and how quickly it

9    usually sets in, correct?

10          MR BOND:  Object to the form of the question.

11      Go ahead.

12      A    I can't give you a time on rigors.

13      Q    All right.  Would it be fair to say that this

14    refreshes your recollection that one of the reasons you

15    initially decided that the crime happened the 4th or the

16    5th --

17      A    I can't answer that.

18      Q    -- is because of the fact that the body

19    appeared to be in full rigor?

20      A    I can't answer that.

21      Q    All right.  Now, certainly, to the extent you

22    had any doubts about the body being in full rigor, you

23    would have done what you suggested, which is to try to

24    bend the legs, right?

25      A    I can't say that either.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Well, one of the things you would be trying to
2  determine at the scene was whether or not the body was
3  in full rigor.  You understood that was important for
4  time of death.

5    A    No, I didn't understand that.

6    Q    You didn't know that at the time?

7    A    No.

8    Q    Okay.  Now, you would agree that you
9  determined -- withdrawn.  Did you determine that the
10  murder took place at the scene?  Withdrawn.  Did you
11  determine that the murder took place at the scene where
12  the body was found?

13    A    That was my impression.

14    Q    Okay.  And assuming that this body is in full
15  rigor as the photo suggest, do you have an explanation
16  as to how she could have been killed at the scene and
17  her legs could have taken this position before rigor set
18  in?

19    A    An explanation of why the legs were in that
20  position?

21    Q    We've already established that there's no --
22  that the legs are in an unnatural position, correct?

23    A    Correct.

24    Q    And that the branches, based on pictures and
25  your view of the scene, couldn't have held the weight of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

114

1   this large woman's legs, correct?

2       A    That's correct.

3       Q    The -- what this means -- what this -- so if

4   she was killed at the scene, her legs couldn't have been

5   in this position before rigor had set in.  I wouldn't

6   have stayed, right?

7       A    They may have.

8       Q    How?

9       A    If you look at the knees, they're bent back

10  toward her buttocks.  If someone placed her legs like

11  that, they could have stayed there.  Where that's my

12  guess.

13      Q    What about gravity?

14      A    Gravity is falling down toward her.

15      Q    So her legs would have stayed in that -- you

16  believe that her legs would have stayed in that position

17  after she was dead without rigor setting in?

18      A    I think that's possible.

19      Q    Okay.  Take a look at picture 38.  Do you see

20  that her left leg is resting against her right leg,

21  correct?

22      A    I do.

23      Q    And that her right leg is slightly higher?

24      A    Uh-huh.

25      Q    Are you suggesting it's possible that she

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

```
 1   could have been killed and her legs would have stayed in

 2   that position you're seeing in 38 without rigor having

 3   set in?

 4        A    I'm suggesting that they could have been

 5   placed there and possibly stayed there.  I don't know.

 6        Q    And how could they have stayed in that

 7   position without having rigor set in?  Wouldn't gravity

 8   have caused them to move?

 9        A    I don't know.

10        Q    You would agree it's a problem, right?

11        A    I can see where they could have stayed there.

12        Q    How?

13        A    The gravity is toward her buttocks.

14        Q    But she's got one leg resting against the

15   other leg.  How could they have stayed in that position

16   naturally?  Look at it.  Look at 38.

17             MR. BOND:  Answer if you can, Bill.

18        Q    You're looking at that picture.  How could

19   that natural -- how could that be a natural position?

20        A    I can't answer that part.  I didn't say it was

21   a natural position.

22        Q    All right.  But the only way -- once she is

23   dead, she has not control over her legs --

24        A    That's true.

25        Q    -- right?  And gravity would have an effect on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1    her body, right?

 2         A    It should, yes.

 3         Q    All right.  The more likely explanation here

 4    is that this person was killed somewhere else, rigor set

 5    in, and she was placed there with her legs in that

 6    position, correct?

 7         A    I can't say that.

 8         Q    Well, you would agree that that is an

 9    extraordinarily unlikely position for a body to be

10    resting without rigor having set in?

11         A    Without someone having placed it in that

12    position.

13         Q    But even if you placed it in that position,

14    you would expect gravity to have an effect on that

15    position, correct?

16              MR. BOND:  Object.

17         A    I think --

18              MR. BOND:  Asked and answered.

19         A    -- I already answered that.

20         Q    All right.  One explanation was that she could

21    have been in the trunk of a car, right?

22         A    I can't say that.

23         Q    All right.  You would agree that one

24    explanation would be that she -- rigor had set in

25    somewhere else and then she was put in -- the body was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

117

```
 1  put here after, correct?
 2       A    That's possible.
 3       Q    Do you have any reason -- based on the
 4  position of the feet, would you agree that it's more
 5  likely?
 6       A    I can't say that.
 7       Q    It's your position, as a 20-year coroner, that
 8  what could have happened is that her legs could have
 9  been placed in this position after death but before
10  rigor and stayed in this position to form rigor?
11       A    I think that's possible.
12            MR. BOND:  Are you done with these now?  I just
13       don't want them to get trapped in this binder.  I'm
14       going to give --
15            MR. BRUSTIN:  Yeah.  Thank you very much.  I
16       think I'm done with those.  Thank you.
17            MR. BOND:  Okay.  Would you hand those to her?
18       If you need them back, I can hand him my copies.
19  BY MR. BRUSTIN:
20       Q    Now, as you've already told us, you have --
21  you don't have any reason to believe that blood stained
22  evidence or saturation of blood can tell anything about
23  time of death, correct?
24       A    Not to my knowledge.
25       Q    Okay.  So if you take a look at Exhibit 25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    again, page 332, and I'm going by the pages on the left

2    side.

3         MR. GARVERICH:  You're saying 332?

4         MR. BRUSTIN:  332.

5         MR. BOND:  Your 332?

6    Q    My 332.

7    A    Okay.

8    Q    If you take a look at this page where it says,

9    "Greer, the only thing that's on those clothes."

10   A    Okay.

11   Q    If you can read that paragraph to yourself.

12   Just the first -- read the first document.

13   A    Okay.

14   Q    You're not aware of any science that would

15   allow Sheriff Greer to testify that the blood had

16   saturated the scene for five days, correct?

17   A    I -- no, not that I know of.

18   Q    And you certainly didn't tell Sheriff Greer

19   that you believe, as a coroner, that the blood had

20   saturated for five days, correct?

21   A    No.

22   Q    You have any idea where he got that from?

23   A    No.

24   Q    Appears he just made it up, right?

25        MR. GARVERICH:  Objection to the form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 119 of 262 PageID #: 27201
The Deposition of BILL ADAMS, taken on January 06, 2020
119

1      question.

2          A     I didn't say that.

3          Q     So it didn't come from you?

4          A     I don't remember if it did.

5          Q     Well, you didn't have that knowledge, so if

6      you -- if it came from you it's because you made it up,

7      right?

8              MR. ERVIN:  Objection to the form.

9              MR. GARVERICH:  Objection to the form.

10             MR. BOND:  Objection to form.

11     BY MR. BRUSTIN:

12         Q     You've already told us that you had no basis

13     to determine blood --

14         A     I understand that.

15         Q     So you wouldn't have told him that, right?

16         A     I don't think so, no.

17         Q     And if you did, it would have been made up

18     because you didn't believe it?  You didn't know it?

19             MR. ERVIN:  Objection to the form.

20             MR. BOND:  Object to the form of the question.

21         A     If I did tell him that, it was something that

22     I would have thought at the time.

23             MR. BOND:  Right.

24         Q     But you have no reason to think that's true?

25         A     I don't remember.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

120

```
1        Q    At trial, the trial of Keith Hardin and
2   Jeff Clark -- withdrawn.  At the trial, Nichols
3   testified on page 165 and 66 that he deferred to your
4   opinion that she was killed at the scene because of the
5   amount of blood at the scene.  Did you tell that to
6   M.E. Nichols?
7        A    I would have probably relayed to him the
8   amount of blood I saw at the scene, yes.
9        Q    And you understood that a body can bleed
10  profusely after death, correct?
11             MR. BOND:  After what?
12             MR. BRUSTIN:  After death.
13             MR. BOND:  Okay.
14  BY MR. BRUSTIN:
15       Q    I mean, many hours later, right?
16       A    It can --
17       Q    Let me give you an example.  If you have a
18  knife wound in a victim and the knife wound was facing
19  up.  When you faced the victim down, at that time, they
20  might bleed profusely?
21       A    That's possible, yes.
22             MR. BOND:  Nick, when you get to a junction
23        that you think is a good stopping point, let's take
24        a break.  Maybe for 30 minutes?
25             MR. BRUSTIN:  Sure.  Give me five more minutes
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 121 of 262 PageID #: 27203
The Deposition of BILL ADAMS, taken on January 06, 2020
121

```
 1      or so...?
 2            MR. BOND:  Yeah.  I'm just saying, yeah.  When
 3      you get to a natural break point.  I'm not asking
 4      you to stop this second.
 5  BY MR. BRUSTIN:
 6      Q     Take a look -- let's mark this.
 7            MS. FETROW:  42.
 8      Q     42, please.  42, guys.
 9            COURT REPORTER:  41.
10            MR. BRUSTIN:  Oh, 41.
11            MR. GARVERICH:  I thought 41 was the video.
12            MR. BRUSTIN:  41 is the video, 42.
13            MR. GARVERICH:  Sorry.
14            MR. BOND:  For the record Bill, I thought this
15      is your trial testimony.  I apologize.
16            MR. BRUSTIN:  I said that, didn't I?
17            MR. BOND:  Is that correct?
18            MR. BRUSTIN:  It's trial testimony.
19            MR. BOND:  Okay.
20            MR. BRUSTIN:  I'll identify it once we get --
21            MR. BOND:  Okay.
22  BY MR. BRUSTIN:
23      Q     Yeah.  I'm showing you what's been marked for
24  identification as Exhibit 42, and this is our
25  transcription of your videotape trial testimony from
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    March 2, 1995, okay?

2            (EXHIBIT 42 MARKED FOR IDENTIFICATION)

3        A    Okay.

4        Q    Have you -- and you said you reviewed this in

5    preparation for today?

6        A    Yes, I have.

7        Q    All right.  If you take a look at page 49.

8            MR. BOND:  Upper right-hand corner.

9        A    Oh, okay.

10       Q    Yes.  Read lines 13 to 22.

11       A    Okay.

12       Q    You read it?

13       A    I read it.

14       Q    In here, you're suggesting that her legs were

15   being held up by the thorn bush, correct?

16       A    I said they were resting against the

17   thorn bush.

18       Q    Well, if they're resting against the

19   thorn bush, that means the thorn bush is holding them

20   up, correct?

21       A    I don't remember.  That's what I said.

22       Q    That's what you suggested here, correct?

23       A    Yes.

24       Q    Okay.  But you know from looking at the video

25   just now and from your testimony that obviously that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

123

```
 1    thorn bush could not have held up that large woman's
 2    legs, right?
 3            MR. ERVIN:  Objection to the form.
 4            MR. PELLINO:  Objection to the form.
 5      A    I can't say that after reading this.  I don't
 6    know.
 7      Q    Well, you do recall just a moment ago
 8    testifying --
 9      A    I remember saying that, yes.
10      Q    Okay.  And it's obvious from the photographs
11    that that thorn bush couldn't hold up heavy legs,
12    correct?
13            MR. ERVIN:  Objection to the form.
14            MR. PELLINO:  Objection to the form.
15      A    Again, I don't remember.
16      Q    Okay.  I'm not asking you about your memory.
17    You just saw pictures and you saw a video, and it's
18    obvious from both, as you've just testified, that those
19    bushes couldn't hold up two legs.
20      A    They don't appear that they could hold up
21    two legs.
22      Q    Right.  So what it appears what happens is
23    during the trial, you misrepresented that the thorn bush
24    could hold up the legs, correct?
25            MR. ERVIN:  Objection.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

124

```
 1          MR. PELLINO:  Object to the form of the
 2     question.
 3          MR. GARVERICH:  Object to the form of the
 4     question.
 5          MR. BOND:   Object to the form of the question.
 6     A    I don't think so.
 7  BY MR. BRUSTIN:
 8     Q    Okay.  It was very important to you that there
 9  be a conviction in this case; fair to say?
10     A    I can't say that.
11     Q    Initially, you told -- you've already told us,
12  you told Sheriff Greer that your initial estimate of the
13  time of death was the 4th or 5th, correct?
14     A    Initially.
15     Q    And that you believe the body was fresh,
16  correct?
17     A    I'm not sure I would ever use the word
18  "fresh."
19     Q    Is that a word you would use?
20     A    Not with -- no.
21     Q    But obviously fresh means within a day; fair
22  to say?
23     A    I can't answer that.  I don't use that word.
24     Q    You never use that word, right?
25     A    Not that I'm aware of.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

125

1      Q    The word you would use for fresh would be
2  recent, correct?

3      A    Recent.

4      Q    And recent would mean within a few hours or a
5  day; fair to say?  By general terms.

6      A    That would be reasonable.

7      Q    Okay.  Any time after that is not recent,
8  right?

9      A    Right.

10      Q    All right.  Now take a look at page 53.  And
11  read to yourself line six to line 18.

12      A    Okay.

13      Q    Now, here what you've just told us is that
14  recent means within hours or a day, correct?

15      A    Yes.

16      Q    And here in the testimony at trial, you're
17  acknowledging -- telling Sheriff Greer that the body
18  appeared to have recently been murdered, correct?

19          MR. BOND:  Object to the form of the question.

20      A    This is what I remembered at the time I
21  testified.

22      Q    I'm not asking you about -- I'm asking you
23  about your acknowledging you had a conversation with --
24  well, you can take a look at the page before to make
25  sure.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 126 of 262 PageID #:
27208
The Deposition of BILL ADAMS, taken on January 06, 2020
126

 1      A      Yeah, I'm --

 2             MR. BOND:  Wait for a question.

 3      Q      Take a look on line -- page 52, line 24 to

 4  page 53, line five.  Okay?

 5      A      Okay.

 6      Q      Here you're acknowledging discussing with

 7  Greer that the body was recent, correct?

 8      A      Yes.

 9      Q      And you've just told us your definition of

10  recent, the basic definition of recent is within hours

11  or a day, correct?

12             MR. BOND:  Object to the form of the question.

13      Go ahead and answer Bill.

14      A      In my estimation now.

15      Q      Okay.  But at trial, what you testify to is

16  that your definition of recent meant anywhere between

17  one to three days, right?

18      A      Yes.

19      Q      Okay.  But that's a different definition of

20  recent, correct?

21      A      It is.

22      Q      And that's not a -- that's not an accurate or

23  an honest definition of recent, is it?

24             MR. BOND:  Object to form of the question.

25      A      I cannot say that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

127

```
 1        Q     The reason that you made it three days is
 2   because you knew that you're telling Sheriff Greer at
 3   the scene that it had recently been killed was
 4   inconsistent with you changing the time of death to
 5   April 2nd, correct?
 6        A     That is not correct.
 7        Q     That's why you changed your commonsense
 8   definition of recent from hours to three days, right?
 9        A     I can't say that.
10        Q     What other conceivable reason could you have
11   suggested to the jury under oath that recent could be
12   three days?
13        A     If my sister came to see me recently, it could
14   have been a week ago.
15        Q     All right.  Are we talking about visits from
16   your sister or a time of death?
17             MR. BOND:  Don't answer that Bill.
18        Q     You understood --
19             MR. BOND:  Whoa.  Whoa.  Whoa.
20        Q     You understood --
21             MR. BOND:  Bill, hang on.
22             THE WITNESS:  I'm going to take a break.
23             MR. BOND:  Okay.
24             MR. ERVIN:  Why don't we go to lunch?
25             MR. BRUSTIN:  Okay.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1              VIDEOGRAPHER:  Off the record at 12:55.

 2                     (OFF THE RECORD)

 3              VIDEOGRAPHER:  Back on the record at 1:55.

 4         THE WITNESS:  Can I say something?

 5         MR. BRUSTIN:  Sure.

 6         THE WITNESS:  I apologize for my brief exit.  I

 7    think it was nerves and a befuddled brain.

 8         MR. BRUSTIN:  Okay.

 9         THE WITNESS:  But I do apologize.

10         MR. BRUSTIN:  Sure.  No offense taken.

11 BY MR. BRUSTIN:

12    Q    So you've told us that you were present for

13 the autopsy, correct?

14    A    I think so, yes.

15    Q    And you were paying attention to what was

16 being done?  Obviously, that's something that matters to

17 you, correct?

18    A    Yes.

19    Q    And you noticed that the victim had a tattoo

20 of an inverted cross on her body?

21    A    I'm sure I did.  I don't remember that now,

22 but it's been in all the reports.

23    Q    Okay.  And it was a -- you certainly

24 understood it was a traditional tattoo that was done

25 with ink?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

129

1      A     Uh-huh.

2      Q     Yes?

3      A     That, I don't know.

4      Q     You didn't see anything about the tattoo

5  suggesting it was anything other than a traditional ink

6  tattoo; fair to say?

7      A     I remember a tattoo.

8      Q     Okay.  Nothing specific -- nothing about it?

9      A     Nothing about it.

10     Q     And you understood that tattoos were not

11  put -- were not sewn into a body, they were put on with

12  an ink pen, correct?

13     A     I know they're not sewn in.

14     Q     You've never heard of a tattoo being sewn into

15  a body?

16     A     No.

17     Q     And there was no suggestion that the tattoo on

18  the victim was sewn into her body, correct?

19     A     Not that I remember.

20     Q     And do you recall that there was a fingerprint

21  found on one of the suspects -- which car was that?

22         MR. BOND:  The Nova.

23     Q     There was a fingerprint found on the Nova that

24  matched the victim.

25     A     I don't really remember that part.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    All right.  But you understood there's nothing
 2   in your training that ever suggest -- that would ever
 3   suggest that you can tell how old a fingerprint is,
 4   correct?
 5        A    That's true.
 6        Q    And to the best of your knowledge, you don't
 7   believe that there's any science that allows you to tell
 8   the age of a fingerprint?
 9        A    You would have to ask a fingerprint expert.
10        Q    Okay.  Certainly nobody ever said that to you,
11   right?
12        A    No.
13        Q    Not in this case or any other?
14        A    Not that I remember.
15        Q    All right.  What I would like you to do now is
16   I would like to -- you've described for a me a few of
17   the things that you did in the case, but you've told us
18   that you reviewed the police reports, the omnibus report
19   that was created by Sheriff Greer?
20        A    Right.
21        Q    And I take it one of the reasons you did that
22   was to refresh your recollection about the various
23   activities that you participated in?
24        A    Tried to.
25        Q    All right.  So I would like you to list for me
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  all the different activities that you participated in,

2  and I will start by giving you what you've already told

3  us about.  You've told us, excuse me, that you

4  participated in -- you were present at the crime scene

5  the day the body was found?

6       A    Right.

7       Q    And that you went to the autopsy?

8       A    Yes.

9       Q    All right.  And you told us about a few

10 reports that you created?

11      A    Yes.

12      Q    And that you also went -- you were present for

13 an interrogation of Jeff Clark?

14      A    I think so, yes.

15      Q    And you -- I think you told us that you don't

16 remember the specifics of that interrogation except that

17 you weren't participating, you were just observing?

18      A    Right.

19      Q    You don't remember saying a word during that

20 interrogation?

21      A    I do not.

22      Q    And you also did a pre -- you did an interview

23 of Amy Remsburg at her home the night before she was

24 interviewed on tape?

25      A    That's what the report said.  I really don't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 132 of 262 PageID #:
27214
The Deposition of BILL ADAMS, taken on January 06, 2020
132

1   remember doing that.

2        Q    Okay.  Anything else that you did in this

3   case?  Tell me the other things -- the other witness

4   interviews that you participated in.

5        A    I was present for a witness interview with

6   James Tyrell, I think.

7        Q    Okay.  What else?

8        A    And with Amy Remsburg.

9        Q    Were you at the taped interview with

10  Amy Remsburg?

11       A    Yes, I think so.

12       Q    Okay.

13       A    And I don't remember any others.

14       Q    Okay.  Now, one of the things you were doing

15  early on in the investigation is you were talking to

16  Sheriff Greer about theories of how the crime occurred;

17  fair to say?

18       A    I don't know if it was about theories of how

19  it occurred.  I would have talked to him about the

20  things that we actually saw.

21       Q    You weren't talking about different issues and

22  things relating to motive and how the crime occurred?

23       A    I don't think so.

24       Q    Do you recall -- according to Sheriff Greer,

25  one of the theories early on in the case was given where

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

133

```
1   the body was dumped at least one of the people who
2   brought the person there knew the area very well.  That
3   was the area early in the case.  Do you recall that
4   being discussed with Sheriff Greer?
5            MR. BOND:  Object to the form of the question.
6        A    I don't recall discussing it with him.  I do
7   remember it being --
8        Q    You remember thinking that at some point?
9        A    Thinking of it.
10       Q    And you remember it early on in the case?
11       A    I think so.
12       Q    All right.  And another thing he mentioned is
13  that early on in the case, given Keith Hardin's
14  involvement in Satanism, the theory was that the crime
15  could have been conducted to his belief or prior belief
16  in Satanism?
17           MR. BOND:  Object to form of the question.  Go
18       ahead and answer.
19       A    I remember hearing that.  I don't --
20       Q    You remember talking about that early on in
21  the case; fair to say?
22       A    I remember hearing about it.  I don't know if
23  I talked about it.
24       Q    Okay.  But you certainly remember hearing
25  about it early on in the case?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 134 of 262 PageID #: 27216
The Deposition of BILL ADAMS, taken on January 06, 2020
134

1      A     Yes.

2      Q     And at least in your mind, you believe that

3  that could have been one of the motivating factors here?

4            MR. BOND:  Object to the form of the question.

5      Go ahead and answer if you can.

6      A     I'm sure I considered that.

7      Q     Did you know anything about Satanism at that

8  time?

9      A     No.  Not really.

10     Q     What did you know?

11     A     I know that there were people that practice

12  Satanism.

13     Q     Okay.  According to Sheriff Greer, he got the

14  impression that this case could be related to Satanism

15  the night they went to Warford's house.  Do you recall

16  that?  Were you present when he went to Warford's house?

17     A     I went to Warford's house, yes.

18     Q     And you remember learning about Hardin's

19  involvement in Satanism at that time?  Did it refresh

20  your recollection?

21     A     I really don't remember that.

22     Q     According -- do you recall discussing --

23  withdrawn.  According to Sheriff Greer, at some point in

24  time, he learned from you that you believed there was a

25  five to six-inch blade involved in the crime.  Do you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   recall first making that determination and secondly

2   reporting it to Greer?

3          A    I would not have --

4               MR. BOND:  Objection to the form of the

5       question.  Go ahead and answer.

6          A    I would not have made that assumption myself.

7   That would have been something that Dr. Nichols would

8   have told me.

9          Q    Okay.  So you certainly had no -- you had

10  no -- you didn't have the foundational knowledge to make

11  that determination?

12         A    That's right.

13         Q    And you would have never told that to

14  Sheriff Greer as coming from you; fair to say?

15         A    Not coming out of my knowledge.

16         Q    Okay.  And you remember hearing that

17  information from the M.E.?

18         A    Not really.

19         Q    Now, did you know -- were you familiar with a

20  place called Valley Station in Meade County?

21         A    Valley Station --

22              MR. BOND:  Object to form.

23         A    -- is not in Meade County.

24         Q    Where is it?

25         A    It's in Jefferson County.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

```
 1        Q     How far is it from Meade County?

 2        A     From Meade County, it's probably ten,

 3   12 miles.

 4        Q     And were you familiar with Valley Station?

 5        A     I know where Valley Station is, yes.

 6        Q     Were you aware that, by rumor or other

 7   sources, that that is a place sometimes people would go

 8   to practice Satanism?

 9        A     No.

10        Q     Okay.  Were you present -- withdrawn.  Take a

11   look at page 11.

12             MR. BOND:  Your 11?

13             MR. BRUSTIN:  Exhibit 25.  My 11.

14             MR. BOND:  Your 11?

15             MR. BRUSTIN:  Yeah.

16             MR. BOND:  Did you say to 25, Nick?

17             MR. BRUSTIN:  Sorry?

18             MR. BOND:  Did you say through 25?

19             MR. BRUSTIN:  Exhibit 25, yeah.

20             MR. BOND:  You want him to look at the whole

21        thing or you have a specific?  And for the record, I

22        believe you're referencing as part of

23        Sheriff Greer's omnibus report, correct?

24             MR. BRUSTIN:  Yes.

25             MR. BOND:  Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

BY MR. BRUSTIN:

    Q    Were you present for the interview of
Krystal Barnes or Michelle Rogers?

    A    Not that I remember.

    Q    Now according to Detective Handy at the trial
he testified that he became involved in the
investigation when you and Sheriff Greer came to him
requesting assistance.  Do you recall that?

    A    I don't recall specifically asking a
particular detective.

    Q    Do you recall going to the LPD with --

    A    I recall going to LPD with Sheriff Greer.

    Q    Okay.  And that was within a day of the --
that was the same day as the -- the day the body was
found?

    A    I'm not sure about that.

    Q    All right.  And you certainly don't dispute
that you talked to Detective Handy, you just don't
recall today, correct?  You agree?

    A    I don't recall.

    Q    You don't dispute it, but you don't recall it?

    A    Right.

    Q    And according to Handy, he interviewed
Jeff Clark on April 6th.  And it was you and Handy and
Greer who picked him up and brought him to the office,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

138

```
 1    the LPD office.  Do you recall that?
 2         A    I remember being at the LPD office.  I'm not
 3    sure I was with them when they picked him up.
 4         Q    All right.  And would it be fair to say that
 5    you don't recall any of the substance of that interview?
 6         A    No, not really.
 7         Q    Not really or no?
 8         A    No.
 9              MR. BOND:  I think you-all were -- he talked in
10         the negative to your negative question.  I just want
11         to make sure.
12    BY MR. BRUSTIN:
13         Q    As you sit here today, you have no
14    recollection of what was said or done during the
15    interview of Jeff Clark?
16         A    No.  I was there.  I don't remember what was
17    said or done.
18         Q    Okay.  You don't recall one way or another,
19    for example, whether or not at some point in time
20    Sheriff Greer put his gun on the table; fair to say?
21         A    If that happened, I never saw it.
22         Q    Okay.  You're sure about that?
23         A    I'm sure about that.
24         Q    Sheriff Greer did have a gun though, correct?
25    He carried a nickel-plated gun in his holster.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 139 of 262 PageID #: 27221
The Deposition of BILL ADAMS, taken on January 06, 2020
139

1      A     I don't know if he had a gun with him at that
2    point or not.
3      Q     You know he carried a nickel-plated gun
4    though, correct?
5      A     I know that a lot of times he did not have a
6    gun.
7      Q     And a lot of times, he carried a
8    nickel-plated --
9      A     And sometime -- and I don't know what kind of
10   gun he carried.
11     Q     You don't remember him ever carrying a
12   nickel-plated gun?
13     A     A gun was a gun, you know?  I don't know.
14     Q     All right.  In any case, you remember none of
15   the specifics of the interview with Jeff Clark?
16     A     No.
17          MR. BOND:  Objection.  Asked and answered.
18     Q     And you never reviewed any reports concerning
19   the interview of Jeff Clark to determine whether or not
20   they were accurate?
21          MR. PELLINO:  Objection to form.
22     A     I saw the reports.  I don't -- whether they
23   were accurate or not, I don't know.
24     Q     You didn't see that as your role to determine
25   whether they were accurate?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

140

```
 1        A     Right.
 2        Q     And you can't say today one way or another
 3   whether or not the reports are accurate?
 4        A     No.
 5        Q     Now, according to Amy Remsburg, she testified
 6   at the trial that before -- withdrawn.  You testified
 7   that you were present for a taped interview with
 8   Sheriff Greer and Amy Remsburg, correct?
 9        A     Yes.
10        Q     And why were you present for that interview?
11        A     I have no idea.  I was just there.
12        Q     Okay.  But you remember being there?
13        A     I remember being there.
14        Q     You don't remember what was said by
15   Sheriff Greer or what was said by Amy Remsburg, correct?
16        A     Not word for word, no.
17        Q     Do you remember any of it?
18        A     No, not really.
19        Q     Okay.  Do you remember, for example, that
20   before the tape recorder was turned on Sheriff Greer did
21   a pre-interview?
22        A     No, I don't remember that.
23        Q     Okay.  You don't remember it one way or
24   another?
25        A     No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

1      Q     You're not saying it didn't happen, you just

2   don't remember?

3      A     I don't remember.

4      Q     And for example, you don't recall what

5   information Sheriff Greer provided to Amy Remsburg prior

6   to the tape recorder being turned on; fair to say?

7           MR. BOND:  Object to the form of the question.

8      A     No.

9      Q     And you don't recall what information

10  Amy Remsburg provided to Sheriff Greer prior to the tape

11  recorder being turned on?

12          MR. BOND:  Object to the form of the question.

13     A     No.

14     Q     And by the way, you didn't know whether or not

15  there was anything wrong with doing an interview before

16  the taped interview; fair to say?

17          MR. ERVIN:  Object to the form of the question.

18          MR. BOND:  Object to the form of the question.

19     A     No.

20  BY MR. BRUSTIN:

21     Q     You don't know what the policies and training

22  are for police officer on conducting pre-interviews,

23  right?

24     A     No.

25     Q     Now, would it be fair to say that one of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 142 of 262 PageID #: 27224
The Deposition of BILL ADAMS, taken on January 06, 2020
142

 1  things is -- because of your expertise as a coroner, one

 2  of the things that you did discuss with Amy Remsburg was

 3  your understanding as to how the victim died?

 4      A    I may have.

 5      Q    That's the kind of thing you may have

 6  discussed with her?

 7      A    I may have in general terms.

 8      Q    That she was stabbed, for example?

 9      A    I might have said she was stabbed.

10      Q    And I know you don't remember specifics, but

11  that's one of the things that would be a general

12  recollection of discussing with her; fair to say?

13          MR. BOND:  Objection to the form of the

14      question.

15      A    I don't remember it.

16      Q    Now, at the time you interviewed Amy Remsburg,

17  you understood that Amy Remsburg had a history with

18  Jeff Clark, correct?

19      A    I don't remember.

20      Q    Okay.

21      A    I talked to Amy Remsburg.  I don't remember

22  what made me talk to her.

23      Q    Do you remember ever learning that Amy

24  Remsburg had a history with Jeff Clark?

25      A    I did learn that at some point.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

143

```
 1        Q     Okay.  And you learned that they each had
 2   allegations against the other for domestic violence,
 3   right?
 4              MR. BOND:  Object to the form of the question.
 5        A     I'm not sure.
 6        Q     You learned at some point that Amy Remsburg
 7   had plead guilty to raping one of her children, correct?
 8              MR. BOND:  Object to the form --
 9        A     I did not --
10              MR. BOND:  -- of the question.
11        A     -- learn that, no.
12        Q     You never learned that?
13        A     Not that I can remember at all.
14        Q     The first you're hearing that Amy Remsburg was
15   convicted of raping one of her children was me telling
16   you?
17              MR. BOND:  Object to the form --
18        A     Right.
19              MR. BOND:  -- of the question.
20        A     Yes.
21        Q     You didn't know that she was ever accused of
22   abusing her children; fair to say?
23        A     I did not.
24        Q     First you've hearing of that is me saying it
25   to you?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A     Yes.

2       Q     You never discussed that with Sheriff Greer?

3       A     No.

4       Q     Or learned it from any other source?

5             MR. BOND:  Excuse me, Nick.  I don't know that

6       he heard you.

7       Q     Or learned it from another source.

8       A     No.

9             MR. BOND:  (Phone rings) They're telling you

10      your time's almost up.

11      Q     Okay.  Take a look at two -- Exhibit 25, page

12      293 and 294.

13            `MR. BOND:  Again, you're referencing

14      your-all's numbers, just so the record's --

15            MR. BRUSTIN:  I am.  It's also MSC150 and 151.

16            MR. BOND:  Right.

17      A     Okay.

18 BY MR. BRUSTIN:

19      Q     You with me?

20      A     I'm with you.

21      Q     And this is the report that you created of

22      your interview with Amy Remsburg?

23      A     Yes.

24      Q     And although you don't remember the interview,

25      there's no question that this is your document you've

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 145 of 262 PageID #: 7227
The Deposition of BILL ADAMS, taken on January 06, 2020
145

```
 1   created, correct?

 2        A    I think not.  I think it is mine.

 3        Q    And how do you know it's a document you

 4   created?

 5        A    I don't know for sure, but I'm pretty sure it

 6   is.

 7        Q    Okay.  And how did you come to be in

 8   Amy Remsburg house at 10:30 on April 9th?

 9        A    I told you, I don't remember.

10        Q    You have no memory whatsoever?

11        A    No.

12        Q    All right.  Fair to say though that you must

13   have been alone, or you would have mentioned that you

14   were with somebody in this report?

15        A    Not necessarily.  I don't know.

16        Q    So you may well have been with Sheriff Greer?

17        A    I don't know.

18        Q    All right.  Let me try it this way.  Fair to

19   say that you didn't feel qualified at this time to

20   conduct interviews on your own?

21        A    Probably not, no.

22        Q    All right.  So there must have been somebody

23   else with you?

24             MR. BOND:  Object to the form of the question.

25        A    I don't know.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.  But you certainly weren't qualified to

2   do an interview of an important witness in a homicide

3   case; fair to say?

4      A    That's fair to say.

5      Q    But it appears from this memo that's exactly

6   what you did, right?

7      A    At the time, that is probably what I did.

8      Q    Okay.  And you have no idea how you came to do

9   that?

10     A    No, I don't.

11     Q    And tell me more specifically about your

12  relationship with Amy Remsburg's family.

13     A    I knew her ex-husband.

14     Q    Which one?

15     A    Padgett.

16     Q    And how did you know Padgett?

17     A    I just -- he was native to a farm that I

18  worked on some.

19     Q    Was he a friend of yours?

20     A    A good acquaintance.

21     Q    Okay.

22     A    Not a -- I wouldn't say a friend.

23     Q    All right.  Somebody who you liked?

24     A    Yeah.  I had no problems with the guy.

25     Q    Any reason to ever question Mr. Padgett's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    honesty or credibility?

2        A    Not to me.  I never had --

3        Q    Okay.  And what did you know about

4    Mr. Padgett's relationship with Amy Remsburg?

5        A    Nothing really.  I just --

6        Q    Did you know that they have had marital

7    problems that involved the court system?

8        A    I knew they were divorced.

9        Q    Did you know there was orders of protection

10   out against the two of them?

11       A    No.

12       Q    What did you know about Amy Remsburg from

13   Mr. Padgett?

14       A    Not anything really.

15       Q    Okay.  Well, what other connection -- I'm

16   trying to figure out why you were sent out there.  What

17   other connection did you have to Amy Remsburg?

18       A    I don't know.  Was she a Livers maybe?

19       Q    A what?

20       A    Was her maiden name Livers?  Do you know?

21       Q    I don't.

22            MS. ROBINSON-STAPLES:  Yes.

23       Q    Yes, I do know.

24            MR. BOND:  I think we all agree that she was.

25       Q    Okay.  And how do you know the Livers?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A     Well, one of the deputy sheriffs, Tim Livers,

2    and I are good friends.  We play golf.

3      Q     And what was the relationship between

4    Tim Livers and Amy Remsburg?

5      A     I don't know.

6      Q     Okay.  But you were good friends with

7    Tim Livers?

8      A     Right.

9      Q     Better friends with Tim Livers than, for

10   example, Sheriff Greer would be with Tim Livers?

11     A     I wouldn't say that.

12     Q     Okay.  You know them equally well?

13     A     Right.

14     Q     Does that refresh your recollection about what

15   you knew about Amy Remsburg before you interviewed her?

16     A     No, does not.

17     Q     Okay.  And what other connections?  Do you

18   have any connection with her parents?

19     A     Not that I know of.

20     Q     Okay.  In any case, you met with her.  It

21   looks like you met with her at 10:30 at night at her

22   house, right?

23     A     That's what's written down.

24     Q     Okay.  And I take it that when you wrote this

25   report, you did your best to describe everything, she

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   told you?

 2        A    I think so.

 3        Q    And any sense from this document how long you

 4   spent with her?

 5        A    No.

 6        Q    But would it be fair to say that your goal

 7   would have been to get as much information from her as

 8   you could about what she knew about Jeff Clark?  Did it

 9   appear that's what you were doing based on reading the

10   report?

11        A    I presume.

12        Q    And she talked to you about an alleged fight

13   that she had with Jeff Clark, right?

14        A    I presume.

15        Q    She also mentioned Keith Hardin, right?  It

16   says Bill Mahan had someone living with him in

17   September 1991 named Keith Hardin.  That's why you wrote

18   that down.

19             MR. BOND:  Seven lines from the bottom, Bill.

20        A    Okay.  Yes.

21        Q    And she talked to you about someone that Jeff

22   allegedly killed in Alabama?

23        A    That was mentioned.

24        Q    Okay.  You remember any investigation into

25   whether there were any deaths in Alabama that he might
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    be responsible for?

2        A    No, I don't know.

3        Q    That's not your job, right?

4        A    That's not my job.

5        Q    Do you know how this report came to be

6    created?

7        A    No, not really.

8        Q    Would it be fair to say that in your entire

9    career as a coroner, this is the only witness interview

10   report you've ever created?

11       A    I'd say that's fair.

12       Q    And you just have no memory of it whatsoever?

13       A    No, I do not.

14       Q    And you would agree that there's no mention in

15   here anywhere in this interview of Satanism; fair to

16   say?

17       A    Not that I see.

18       Q    And there's no suggestion here that Jeff Clark

19   had some special knowledge about how to kill someone by

20   severing their brain stem?  Nothing about that in here,

21   correct?

22       A    I don't think so.

23       Q    She makes some allegations about Jeff being

24   violent, but nothing about that, right?

25       A    Not that I see.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

151

```
 1        Q    And the next day, April 10th at 2:00 p.m., you
 2   can see on page 295 you went back with Sheriff Greer to
 3   interview Amy Remsburg, correct?
 4        A    That's --
 5             MR. BOND:  Well, object to form of the
 6        question.  It alleged that they went back to her
 7        residence.  I don't believe that's accurate.  When
 8        you say, "went back."
 9   BY MR. BRUSTIN:
10        Q    Yeah.  This interview is conducted at the
11   Meade County Sheriff's Department, correct?
12        A    Right.
13        Q    And you were present for it again?
14        A    I was there.
15        Q    And you have no memory of how this interview
16   came to be or why you were there?
17        A    I don't.
18        Q    Now, if you take a look at page 328 line --
19   the first three lines.
20        A    Okay.
21        Q    You're reminding Ms. Remsburg about some
22   questions you asked her the night before, right?
23        A    I presume.
24        Q    That's what it says, right?
25        A    That's what it says.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    And you're also asking your own questions
2   here?  You're participating in the interview?
3      A    Very minimally.
4      Q    But you felt comfortable doing that?  You
5   didn't ask permission, you just did it?
6      A    Right.
7      Q    Right?
8      A    Right.
9      Q    You felt comfortable asking this witness a
10  question in a homicide investigation?
11     A    I guess I did ask.
12     Q    Now, you also told us that you interviewed
13  James Tyrell?
14          MR. BOND:  Object to the form of the question.
15     A    I did not interview him.  I was present.
16     Q    And how did you come to be present for that
17  interview?
18     A    Again, I don't remember.
19     Q    Do you remember conducting with Hope Greer?
20     A    I remember, yes.  Her being there.
21     Q    What was your understanding as to Hope Greer's
22  relationship with Sheriff Greer?
23     A    She was a police officer, and he was a police
24  officer.
25     Q    And you never reviewed those reports in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 153 of 262 PageID #: 27235
The Deposition of BILL ADAMS, taken on January 06, 2020
153

1  connection with that interview to determine whether or

2  not they were accurate; fair to say?

3      A    Not my --

4      Q    That wasn't your role, right?  Correct?

5      A    Correct.

6      Q    Now, do you recall at some point learning

7  about a witness named Billy Wayne Carter who called

8  Sheriff Greer to tell him that he allegedly saw the

9  victim in a car on Saturday night after the date she was

10 allegedly murdered?

11     A    I do not.

12     Q    You don't remember hearing anything about

13 that?

14     A    No.

15     Q    The first your hearing of that is me telling

16 you right now?

17     A    Right now.

18     Q    You're not aware of -- not just limiting it to

19 a name, you're not aware of any witness coming forward

20 and claiming that at the time of the investigation --

21     A    No.

22     Q    -- that they had seen Rhonda Sue Warford in a

23 car after April 2nd?

24     A    I do not.

25     Q    Now, do you recall learning information that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   on the night she disappeared Ms. Warford encountered a

2   strange man in the Krogers?  You recall learning that?

3       A    No, I don't know that he was in Krogers or...

4       Q    Do you recall learning that generally

5   Ms. Warford had an incident involving an unidentified

6   man on the night she disappeared that wasn't

7   Keith Hardin or Jeff Clark?

8       A    I remember hearing that, yes.

9       Q    You remember learning what investigation, if

10  any, was done into that allegation?

11      A    I have no idea.

12      Q    Take a look at page 613.  Now -- and 614.

13  This indicates that on April 14th you and Sheriff Greer

14  went to the LPD to do some witness interviews, correct?

15      A    It indicates that I was there.

16      Q    Okay.  You recall why you came to be there on

17  that day?

18      A    Again, I probably rode to Louisville.

19      Q    Just because you were interested in this

20  multijurisdictional --

21      A    Right.

22      Q    -- investigation?  Wanted to sit in on

23  interviews if you could?

24      A    Yeah.

25      Q    That's the only reason?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

155

1      A    As far as I know.

2      Q    Do you remember learning allegations that

3  Tonya Greer had given out number her --

4  Rhonda Sue Warford's number to people, including someone

5  named Timothy Half to harass her?

6      A    I don't remember that, no.

7      Q    Best of your knowledge, you never learned

8  about it?

9      A    No.

10     Q    What was your relationship with

11 Clifford Capps?

12     A    I didn't have a relationship with him.

13     Q    Did you know Clifford Capps?

14     A    No.

15     Q    Do you know who I'm talking about when I say

16 the name Clifford Capps?

17     A    I've heard the name, but I don't know who it

18 is or...

19     Q    Do you have any idea what Clifford Capps' role

20 was in this case?

21     A    No.

22     Q    You never heard from any source that

23 Clifford Capps allegedly heard a confession from

24 Jeff Clark in this case?

25     A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Now, were you familiar with the Roy Melton

2  case, correct?

3     A    No.

4     Q    You don't know who Roy Melton is?

5     A    No.

6     Q    But you have no idea who Clifford Capps is?

7     A    No.

8     Q    You know who Kevin Justice is?

9     A    No.

10     Q    You never heard that name before as far as you

11  can recall?

12     A    I've heard the name, but I don't know in what

13  context.

14     Q    Did you ever hear of there being allegations

15  that Kevin Justice heard a confession from Keith Hardin

16  in this case?

17     A    No.

18     Q    Do you remember learning from any source that

19  Sheriff Greer received information that inmates in the

20  jail had heard confession from Jeff Clark or

21  Keith Hardin?

22     A    No.

23     Q    First you're hearing it is me telling you?

24     A    Yes.

25     Q    All right.  You've already talked a little bit

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    about Investigator Stiles' role in the state police.
 2    I'm going to ask you some more specific questions.  I
 3    take it he was the state police investigator that was
 4    assigned to Meade County?  One of them?
 5         A    He was the detective out of post four --
 6         Q    Okay.
 7         A    -- in Elizabethtown.
 8         Q    And how far was post four from the sheriff's
 9    department?
10         A    30 miles.
11         Q    But --
12         A    Roughly.
13         Q    Okay.  You understood that Stiles and
14    Sheriff Greer were close?
15         A    I knew they worked together.
16         Q    And Stiles was routinely either in the jail or
17    in the sheriff's department; fair to say?
18         A    I don't know if it's routinely.
19         Q    Do you remember seeing Stiles in town all the
20    time?
21         A    I saw him frequently.
22         Q    Okay.  It would be someone you're friendly
23    with?
24              MR. BOND:  Excuse me?
25         A    I didn't hear you.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

158

1      Q      Someone you were friendly with?

2      A      We talked.

3      Q      You understood that he would help out

4    Sheriff Greer in county investigations?

5             MR. BOND:  Object to form of the question.

6      A      He's a state police detective.  That's --

7      Q      Now, were you familiar with how the jail

8    worked in Meade County?

9      A      How the jail worked?

10     Q      Yes.  You spend any time there?

11     A      No.

12     Q      You had no involvement in questioning

13   Keith Hardin; is that correct?

14     A      Not that I remember.

15     Q      You weren't present for any interviews of

16   Keith Hardin?

17     A      The only time would have been the night that

18   we found her.

19     Q      Okay.  And you don't remember any of the

20   substance of your interview with Keith?  You don't

21   recall any of the specifics of what Keith Hardin said to

22   you and Sheriff Greer or what was said to him the night

23   you visited his home; fair to say?

24     A      That's fair to say.  I would have been asking

25   him did he know this individual.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

159

```
 1        Q    All right.  And you certainly don't remember
 2   him saying anything incriminating on that night; fair to
 3   say?
 4        A    Not that I'm aware of.
 5        Q    If he had, you would remember it, right?
 6        A    After this long, I'm not sure what I remember.
 7   You reminded me of that constantly today.
 8        Q    Do you remember learning that any polygraph
 9   would be done in this case?
10        A    I remember hearing that they were.  I had
11   nothing to do with those.  Never saw any reports or
12   anything.
13        Q    Now, you understood that -- what was your
14   understanding as to results of those polygraphs?
15        A    I don't really know.
16        Q    You don't remember hearing -- you don't
17   remember learning that Jeff Clark or Keith Hardin
18   allegedly failed polygraphs; fair to say?
19        A    Not to my knowledge.
20        Q    Now, would it be fair to say you understood
21   that according -- that Sheriff Greer considered himself
22   to be an experienced interrogator, someone who's good at
23   getting confessions?
24             MR. ERVIN:  Object to the form.
25        A    I don't know what Joe Greer thought about.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

160

```
 1        Q    Okay.  Back in 1992 there were times when
 2   Sheriff Greer would wear his uniform and times when he
 3   wouldn't; fair to say?
 4        A    That's true.
 5        Q    Sometimes he would wear civilian clothes?
 6        A    Sure.
 7        Q    As often as wearing a uniform?
 8        A    Yeah.
 9             MR. BOND:  Well --
10        A    That I can't answer.
11             MR. BOND:  -- let's clarify so there's no --
12        you mean an official --
13             MR. BRUSTIN:  Yeah.
14             MR. BOND:  Okay.
15   BY MR. BRUSTIN:
16        Q    Sometimes he would be in uniform, sometimes he
17   wouldn't; fair to say?
18        A    Fair to say.
19        Q    Sometimes he had a gun, sometimes he wouldn't?
20        A    Right.
21        Q    Sheriff Greer made the rules.  He was the
22   sheriff; he was in charge.
23        A    Yeah, pretty much.
24        Q    Now, you -- were you aware that -- in the
25   Meade County building where the sheriff's office was,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

161

```
 1  there was -- do you remember there being a small room
 2  where interview -- where witness interviews were
 3  sometimes conducted?
 4      A    Not really.
 5          MR. BRUSTIN:  Okay.  Now, do you recall that
 6      one of the things that was stated -- just give me
 7      one second.  Let's take -- actually, let's take a
 8      two-minute break.
 9          VIDEOGRAPHER:  Off the record at 2:40.
10                      (OFF THE RECORD)
11          VIDEOGRAPHER:  Back on the record at 2:50.
12  BY MR. BRUSTIN:
13      Q    Before I forget, Mr. Adams, one other follow
14  up question about your interview with Amy Remsburg the
15  night before the taped interview.  So that interview was
16  on April -- hang on, April 10th, April 9th.  And
17  obviously by then you were well aware of the allegations
18  that Keith Hardin was involved in Satanism, you've
19  already told us, correct?  More than a month after --
20  that's more than a week after the body -- I'm sorry,
21  it's more than a few days after the body was found.
22  Certainly, by then you had visited the Warford's, and
23  you were aware -- start again.  By April 10 -- by
24  April 9th when you were interviewing Amy Remsburg, you
25  certainly were aware of the allegations that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 162 of 262 PageID #: 27244
The Deposition of BILL ADAMS, taken on January 06, 2020
162

1  Keith Hardin was involved in Satanism?

2      A   I may have been.  I don't know.

3      Q   Sheriff Greer just testified that you learned

4  that in the investigation long before that.  Any reason

5  to dispute that?

6      A   No.

7          MR. BOND:  Well, let me object to the form of

8      the question.  When you say "we," do you mean Joe or

9      him individually?

10         MR. BRUSTIN:  Joe.

11         MR. BOND:  Okay.

12         MR. BRUSTIN:  Mr. Greer.

13  BY MR. BRUSTIN:

14     Q   Now, certainly to the extent that Amy Remsburg

15  mentioned anything about Satanism in your interview, you

16  would have written it down; fair to say?

17     A   I should have, yeah.

18     Q   All right.  Now, I want to go now to the

19  interview that you sat in on and did not participate in

20  with Jeff Clark, okay?  Actually, one other area before

21  I get to that.  And I think you were clear about this,

22  but I just want to make sure.  You did not receive a

23  single piece of information from Dr. Nichols that caused

24  you to change the time of death; fair to say?

25     A   No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

163

```
 1        Q     You agree with me?
 2        A     Yeah.  It's my job to.
 3        Q     Okay.  There's no information -- you agree
 4   that there's no information that Dr. Nichols gave to you
 5   that cause you to change the date of death or --
 6   withdrawn.  There is no information that Dr. Nichols
 7   gave to you that in any way effected your decision to
 8   change the date of death from April 4th or 5th to
 9   April 2nd; fair to say?
10             MR. BOND:  Object to the form of the question.
11        A     That's fair to say.
12        Q     You agree?
13        A     I -- that's my job is to do that.
14        Q     It wasn't from any information he gave you?
15        A     Not that I can recall.
16        Q     Okay.  Now, back to your interview with
17   Jeff Clark.  Now, do you recall that at some point when
18   you're interviewing Jeff Clark, you went to a little
19   breakroom?
20             MR. ERVIN:  Objection to the form.
21             MR. BOND:  Objection to the form of the
22         question.
23        A     I don't recall, and I wasn't interviewing
24   Jeff Clark.
25        Q     I'm sorry.  When you were observing, the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

164

```
 1    interview do you recall being in a breakroom at some
 2    point?
 3         A    No, I don't.
 4         Q    You just don't recall one way or another?
 5         A    No.
 6         Q    Now, do -- I take it you do recall that at
 7    some point Sheriff Greer suggested to Jeff Clark that if
 8    he would corroborate, he might spend little or no time
 9    in jail?
10         A    Not aware of that.
11         Q    Do you remember the theory at that time being
12    that Keith Hardin killed Ms. Warford and that Jeff Clark
13    simply helped facilitate moving the body?
14         A    That I don't remember.
15         Q    You don't remember.  So you're not disputing
16    that Sheriff Greer told Jeff Clark that he would not
17    spend time in jail if he corroborated, you just don't
18    remember one way or another?
19         A    I do not remember.
20              MR. BOND:  Object to form.
21         Q    May have happened, may not have happened.  You
22    don't remember?
23         A    I don't remember.
24         Q    And do you remember at some point there being
25    a theory that Rhonda may have been pregnant, but at
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

165

```
 1   least it was thought that she was pregnant?
 2       A    That I don't remember at all.  I don't have
 3   any knowledge of that.
 4       Q    Now, you do recall that during the
 5   interrogation -- it was an interrogation of Jeff Clark
 6   that you observed, correct, trying to get him to
 7   confess?  That's what it appeared to be.
 8       A    I don't know.
 9       Q    Well, did it appear -- from watching TV shows
10   on interrogations, did it appear to be that?
11            MR. BOND:  Well, let me object to the form of
12       that question.
13       Q    From watching police shows and seeing
14   interrogations on TV, did it seem to be an
15   interrogation?
16            MR. BOND:  Object to the form of that question
17       to.
18       A    They were asking him --
19            MR. BOND:  I guess I'm wondering why you're
20       referring to Law and Order.
21       Q    Did it appear they were trying to get a
22   confession?
23       A    I don't know.
24       Q    Okay.  You do recall Jeff Clark denying any
25   involvement in the crime, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

1        A    I don't even remember that for sure.

2        Q    You think he may have confessed to the crime?

3        A    Again, I don't know.

4        Q    Now, according to Jeff Clark, at some point

5   during the interview, Sheriff Greer pulled out his gun,

6   laid it on the table and said, "You might want to

7   reconsider what I have to say and think about what you

8   have to say.  I always get what I want.  Don't I,

9   Mr. Adams?"  Do you recall him saying that?

10       A    No, I don't recall that.  I don't remember any

11  gun.

12       Q    Okay.  You don't remember him taking a gun out

13  at any time?

14       A    No, I do not.

15       Q    Okay.  And you -- is it fair to say you deny

16  that that happened?

17       A    I would deny that that happened.

18       Q    All right.  You don't remember anything else,

19  but you know that didn't happen?

20            MR. BOND:  Object.  Let's not argue with him.

21      Ask another question.

22       Q    You don't remember anything else that happened

23  during the interview or the interrogation, except that

24  that didn't happen; fair to say?

25       A    That's fair to say.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

167

```
 1        Q    And according to Mr. Clark, you said, "Yes, we
 2   always get what we want."  You deny saying that?
 3        A    I deny that.  I don't --
 4        Q    All right.  Now, by the way, to your
 5   knowledge, is there anything illegal about doing that?
 6        A    I don't know.
 7        Q    You just don't remember it happened?
 8        A    I --
 9             MR. BOND:  Objection.  That's not what he said,
10        Nick.
11        Q    Is it --
12             MR. BOND:  Let's not bastardize what his answer
13        was, okay?
14   BY MR. BRUSTIN:
15        Q    Is it possible that that happened, you don't
16   remember it?
17        A    If I took a gun out laid it here in front of
18   you, would you remember it?
19        Q    I think I would.
20        A    Okay.  I think I would too.  That would be
21   enough off the cuff I should remember that, and I don't
22   remember it happening.
23        Q    All right.  Now, you certainly weren't
24   carrying a gun, correct?
25        A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      Q     Did you ever carry a gun as part of your
 2   duties and responsibilities?
 3      A     I have back years ago, but very seldom than
 4   not.
 5      Q     Do you recall any discussions with Jeff Clark
 6   about him owning knives?
 7      A     No.
 8      Q     All right.  Take a look at --
 9            MR. BOND:  Is that a different volume or
10      something?
11            MR. BRUSTIN:  It's a different volume.  It's
12      part two of Exhibit 25.
13            MR. SIMON:  You may not have it broken down
14      into two parts, but --
15            MR. BOND:  Excuse me?
16            MR. SIMON:  It's still considered 25.
17            MR. BRUSTIN:  It's just big.
18   BY MR. BRUSTIN:
19      Q     Take a look if you would at Exhibit 25, it's
20   702.  I'm going by the left numbers.
21      A     I don't see the numbers.  Oh, okay.
22            MR. BOND:  Bill, they're within the picture.
23      A     Yeah, I see.  Okay.
24      Q     And do you recall finding these keys at the
25   crime scene?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

169

```
 1        A     I remember there being keys.
 2        Q     And I take it, it was your expectation that
 3   these keys would be investigated and determined what the
 4   source was?
 5        A     I would guess.
 6        Q     Did you have any involvement in that?
 7        A     No.
 8        Q     Do you know whether or not these keys were
 9   tested for fingerprints?
10        A     No.
11        Q     Or anything else?
12        A     I don't know.
13        Q     Do you recall learning anything about where
14   these keys came from?
15            MR. BOND:  Do you mean outside the context of
16        the crime scene?
17            MR. BRUSTIN:   From any source.
18            MR. BOND:  Okay.  Okay.
19   BY MR. BRUSTIN:
20        Q     Do you have any knowledge of where these keys
21   came from?
22        A     The crime scene --
23        Q     Okay.
24        A     -- I presume.
25        Q     Okay.  And, so your understanding, given what
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

170

```
 1    the crime scene was like, is that these keys were either

 2    from the victim or from one of the perpetrators?

 3         A    Possibly.

 4         Q    I mean, they were a full set of keys that just

 5    happened to be next to the victim.

 6         A    Right.

 7         Q    Okay.  But you have no understanding as to

 8    what investigation, if any, was done with the keys?

 9         A    No.

10         Q    You expected that it would be, but you don't

11    know what --

12         A    No, I do not.

13         Q    Is there any other activity that you

14    participated in this case that you haven't told us

15    about?

16         A    Not that I'm aware of.

17              MR. BRUSTIN:  Okay.  I think that's all I have.

18              MR. SLOSAR:  I've got some questions.  Can we

19         take a short break --

20              MR. BOND:  Yeah.

21              MR. SLOSAR:  -- so we can switch around?  Is

22         that okay?

23              MR. BOND:  So we all can change places.

24              VIDEOGRAPHER:  Off the record at 3:00.

25                   (OFF THE RECORD)
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

171

```
 1              VIDEOGRAPHER:  Back on the record at 3:10.
 2                       EXAMINATION
 3   BY MR. SLOSAR:
 4        Q    Sir, good afternoon.  My name is
 5   Elliot Slosar, and I represent one of the other
 6   plaintiffs, Jeff Clark.  I just have a few questions for
 7   you today, okay?
 8        A    Okay.
 9        Q    Can you hear me okay?
10        A    I can hear you.
11        Q    Okay.  In front of you I believe is Exhibit
12   number 25, and I have pointed you directly to a page I
13   wanted to ask you about.  It's NSB293, and I believe
14   this is a memo that Mr. Brustin was asking you about
15   earlier today.  Do you recall being asked some questions
16   about this memo --
17        A    Yes.
18        Q    -- that you created?  And this is a document
19   that you created, right sir?
20        A    To my knowledge.
21        Q    And would you have created this close in time
22   to the April 9, 1992 interview that you did with
23   Ms. Remsburg?
24        A    I'm sure I would have.
25        Q    And this was -- I believe you testified
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    earlier this was the only witness interview in your

2    career that was part of a homicide investigation that

3    you documented in some sort of memorandum; is that

4    right?

5        A    Yes.

6        Q    Okay.  And, so you would have been especially

7    careful when you created this memorandum to include any

8    information in here that was relevant to the

9    investigation that you were assisting with; is that

10   right?

11            MR. ERVIN:  Objection to the form.

12       Q    You can answer, sir.

13       A    I think so.

14       Q    Okay.  And certainly -- and you've reviewed

15   this memorandum today during the deposition; is that

16   right?

17       A    Yes.

18       Q    And sitting here today, do you recall any

19   additional information that Ms. Remsburg would have

20   provided to you that isn't contained in here?

21       A    No.

22       Q    Okay.  And certainly if Ms. Remsburg had told

23   you that she had knowledge directly relating to the

24   homicide investigation that you were working on, you

25   would have put that in this memorandum, right sir?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

173

1      A     Yes.

2      Q     If Ms. Remsburg had told you on April 9, 1992

3   that somebody confessed to doing a murder, you certainly

4   would have put that in this memorandum, correct?

5      A     I'm sure I would have.

6      Q     Yeah.  And sitting here today, you certainly

7   have no recollection of Ms. Remsburg ever telling you

8   that anybody ever confessed to you to this murder,

9   correct?

10     A     No.

11     Q     Now, the following day -- well, let me ask you

12  this.  When you met with Ms. Remsburg on April 9, 1992,

13  were there any other law enforcement officers with you?

14     A     I don't remember.

15     Q     Okay.  Do you recall whether Sheriff Greer was

16  present?

17     A     I don't remember.

18     Q     Okay.  Well if Sheriff Greer was present, is

19  it fair to say that he should have -- that he would have

20  created a memorandum?

21     A     I would think.

22     Q     Okay.  But given that you're the one that

23  created this memorandum, would that lead you to believe

24  that it may have just been yourself with Ms. Remsburg?

25     A     Like I said, I don't remember.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

174

```
 1        Q    Okay.  And you certainly, during your
 2   April 9, 1992 interview with Ms. Remsburg, you certainly
 3   weren't telling her what to say, right?
 4        A    No.
 5        Q    Okay.  You were just asking Ms. Remsburg some
 6   questions about the case; is that right?
 7        A    I would guess.
 8        Q    Did you happen to record that meeting with
 9   her, sir?
10        A    Not that I remember, no.
11        Q    Okay.  Did you have a little tape recorder
12   back then?
13        A    I'm not sure I did.
14        Q    Okay.  Now, when you were meeting with
15   Ms. Remsburg on April 9, 1992, during this meeting that
16   you had with her, did she give you any indication to
17   believe that she was lying to you?
18        A    Not that I recall.
19        Q    Okay.  Did she seem resistant to any of the
20   questions that you were asking her, or would you
21   characterize her as being cooperative that night?
22        A    Like I say, I really don't even remember being
23   there.
24        Q    Is it fair to say that if Ms. Remsburg on
25   April 9th, when you were meeting with her, is it fair to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   say that if she refused to answer any questions that

2   that's something that you may have documented in your

3   report?

4        A    I would think so.

5        Q    Sure.  Is it fair to say that if you believe

6   that Ms. Remsburg was lying to you about certain

7   information, that you would have documented that in here

8   to?

9        A    I would think so.  I don't -- like I said, I

10  don't remember the interview or being there or...

11       Q    Sure.  But if she provided you any information

12  that you believe could be relevant any way to the

13  homicide of Rhonda Warford, you certainly would have

14  documented that?

15       A    I think so, yes.

16       Q    Yeah.  Now, the next day on April 10, 1992, do

17  you recall participating in an interview with

18  Sheriff Greer and Ms. Remsburg?

19       A    I was there, yes.

20       Q    And is it fair to say that -- okay.  You know

21  what, sir?  If you look in your memorandum, this

22  two-page document that we went over.  At the top I

23  believe it says that -- it says, "10:30 p.m." Do you

24  see that, sir?

25       A    I do.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Now, do you recall would that have been the
2  time that you began interviewing Ms. Remsburg on
3  April 9, 1992?
4    A    I don't recall.
5    Q    Okay.  May that have been the time that you
6  finished the interview?
7    A    I don't recall.
8    Q    Okay.  But is it fair to say that this would
9  have -- that the time you put on there would have had
10  something to do with either the time that you began or
11  the time that you ended your interview with
12  Ms. Remsburg?
13    A    I really don't recall.  I would think so.
14    Q    Okay.  Now, if you look at the next page, it
15  says 294, do you see where it says at the bottom, it
16  says, "Attest," and then it had the name typed out
17  Amy Remsburg?
18    A    I do.
19    Q    What does that mean, sir?
20    A    I am guessing that she signed it as saying
21  that's what she said.
22    Q    Okay.  So your --
23    A    Or she -- like I said, I really don't remember
24  this at all.  She may have written this out, and I just
25  typed it.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Q    Oh, so Ms. Amy Remsburg, when you met with her

2     on April 9, she may have actually written a statement in

3     her own handwriting during that meeting.  Is that your

4     testimony, sir?

5          A    I don't know.

6          Q    Okay.  Okay.  Could that --

7          A    I'm telling you I don't remember.

8          Q    Could that have been what happened though?

9          A    I don't know.  Could have.

10         Q    Now, would you agree with me that you would

11    only write the word "a text" with Amy Remsburg's name

12    with it if she had actually signed a document reflecting

13    the statement that you typed out?

14         A    Most probably.

15         Q    Okay.  Because if Amy Remsburg doesn't sign

16    this as saying that this information is true, then you

17    would just sign the report yourself because you're the

18    person who created it, right?

19         A    I would think, yeah.

20         Q    But here you typed this up and it has

21    Amy Remsburg name next to it, and it says,

22    "April 10, 1992" below that.  Did I read that right?

23         A    You read that right.

24         Q    Okay.  So is it fair to say that -- well, if

25    Ms. Remsburg wrote out her own statement and signed it,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    would you have used that statement to type it up in the

2    form that we're looking at here?

3         A     If that was the case.  I don't know.

4         Q     And would you have given Ms. Remsburg's

5    statement, would you have passed that statement onto

6    Sheriff Greer since he was the lead officer from the

7    Meade County --

8         A     If I had a --

9         Q     -- part of this case.

10        A     -- statement like that, I would have, yes.

11        Q     Okay.  And you certainly would have expected

12   Sheriff Greer to maintain Ms. Remsburg's written

13   statement as part of the investigative file; is that

14   fair?

15        A     If it was there.  I don't --

16        Q     Because you weren't -- you certainly weren't

17   in charge of maintaining that investigative file?

18        A     No.

19        Q     Okay.  That would have been something that

20   Sheriff Greer or the Louisville Police Department would

21   have been doing on their own, right?

22        A     (NO VERBAL RESPONSE.)

23        Q     Now, is it fair to say that -- well, the next

24   day on April 10, 1992 you actually participated in a

25   questioning of Ms. Remsburg with Sheriff Greer; is that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    right?

2         A    I think I asked a question, yes.

3         Q    Okay.  And is it fair to say that prior to

4    that meeting with Ms. Remsburg on the 10th that you

5    would have shared with Sheriff Greer this statement and

6    the information that you obtained from Ms. Remsburg the

7    night before?

8         A    I'm sure I would have.  I -- like I said, I

9    really don't remember.

10        Q    But you certainly would have wanted Sheriff

11   Greer to be apprised of all the information that you

12   learned from Ms. Remsburg on April 9 before you took a

13   statement from her on April 10th; is that fair?

14        A    Did I take a statement from her April 10th?

15        Q    That's fair.  Let me ask the question a better

16   way.  That's fair.  So is it fair to say that you

17   certainly would have provided Sheriff Greer with the

18   information that you obtained and learned from

19   Ms. Remsburg on April 9th, that you would have provided

20   information to Sheriff Greer on the 10th before he

21   obtained a statement from her; is that fair?

22        A    I would presume that would be the case.

23        Q    Because you certainly -- you were just trying

24   to assist Sheriff Greer in the investigation.  You

25   weren't trying to keep him in the dark about anything,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    right?

2        A    No.

3        Q    You would have shared with him whatever

4    information you learned so that he could use his law

5    enforcement experience in questioning Ms. Remsburg; is

6    that fair?

7        A    That's fair.

8        Q    And certainly you would have apprised

9    Mr. Greer that when you met with Ms. Remsburg the night

10   before that she didn't give you any direct information

11   that implicated Mr. Clark or Mr. Hardin for murder; is

12   that fair?

13           MR. ERVIN:  Objection to the form of the

14       question.

15       Q    You can answer.

16       A    Repeat it for me.

17       Q    Fair enough.  Let me see if I can remember it.

18   Is it fair to say that you would have at least informed

19   Sheriff Greer prior to the April 10, 1992 interview with

20   Ms. Remsburg, that you would have informed him of the

21   information that Ms. Remsburg provided you the night

22   before?

23       A    I would have, sure.

24       Q    Sure.  And is it fair to say that you would

25   have informed Sheriff Greer that Ms. Remsburg didn't



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

181

1    share with you that she had any direct personal

2    knowledge relating to the Warford homicide?

3           MR. ERVIN:  Objection to the form of the

4       question.

5       Q    Would you have shared that with the sheriff?

6       A    Yeah, I would have.

7       Q    Sure.  Because you would have wanted the

8    sheriff to know exactly what she told you so that he

9    could assess whether she was telling him the truth in

10   the next day; is that fair?

11      A    I would have wanted to know what I knew.

12      Q    Sure.  And I think I want to make sure I have

13   this right, but I think that it was your testimony that

14   you were mostly an observer during the April 10th

15   interview between Sheriff Greer and Ms. Remsburg; is

16   that right?

17      A    That's correct.

18      Q    You asked very few questions in that

19   interview; is that right, sir?

20      A    Right.

21      Q    Sheriff Greer took the lead, right?

22      A    He did.

23      Q    Yeah.  And you don't recall sitting here today

24   how long Sheriff Greer talked to Ms. Remsburg for before

25   a recorder was turned on; is that fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

182

```
 1        A     I don't recall at all.

 2        Q     Were you even a part of the conversation that

 3   happened between Ms. Remsburg and Mr. Greer before a

 4   recorder was turned on?

 5        A     Was --

 6              MR. BOND:  Object to the form of the question.

 7        A     Was there a conversation, I don't know.

 8        Q     Mr. Greer's testified that there was a pre-

 9   interview, but do you have any recollection of even

10   being present for that?

11        A     I don't have any memory of that.

12              MR. BOND:  Let him finish, Bill.  Let him

13     finish.

14        Q     So you may have been there, you may not have

15   been there, right?

16        A     Right.

17        Q     Okay.  And you don't have any notes or

18   anything at home that would refresh your memory as to

19   what was said before a recorder was turned on?

20        A     No.

21        Q     Okay.  Now, at some point in this transcribed

22   interview on April 10th between Sheriff Greer and

23   Ms. Remsburg, where you were mostly an observer, do you

24   recall Ms. Remsburg alleging that Jeff Clark confessed

25   to her that he did the murder of Ms. Warford?  Do you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 183 of 262 PageID #: 27265
The Deposition of BILL ADAMS, taken on January 06, 2020
183

1    recall that?

2       A    No, I don't.

3       Q    And certainly if that's what Ms. Remsburg was

4    alleging on April 10, 1992, that certainly isn't any --

5    she didn't provide you with any of that information the

6    night before, right, sir?

7       A    No.

8            MR. ERVIN:  Objection to the form of the

9       question.

10      Q    Because if she provided - - Ms. Remsburg had

11   provided you that information the night before, you

12   would have wrote that down in your report, right?

13      A    I would think so, yes.

14      Q    Absolutely.  And then you would have not only

15   wrote that information down, you would have given it to

16   Sheriff Greer so that he knew about this big development

17   that would have happened in the case, right?

18      A    I would think so.

19      Q    But she didn't tell you anything like when you

20   met her on the 9th, right, sir?

21      A    Not that I'm aware of.

22      Q    Yeah.  And your report certainly doesn't

23   anything like that, right?

24      A    No.

25      Q    Okay.  Now, you don't have any independent

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

184

1    memory of sitting in a room at the sheriff's department

2    with Ms. Remsburg and Mr. Greer when she was giving a

3    statement on April 10th, is that your testimony, sir?

4         A    I really don't.

5         Q    Okay.  So sitting here today, you don't have

6    any independent recollection of, when you were sitting

7    in that room, whether you believe that she was telling

8    the truth or whether that she was lying?

9         A    No, I don't.

10        Q    Okay.  And there's nothing -- there's no sort

11   of documents or -- that would refresh your memory as to

12   what you believed at the time?

13        A    No.

14        Q    So let's switch gears a little bit.  Okay,

15   sir?  I think -- do you see that little pink note?

16        A    Yes.

17        Q    I'm going to ask for you to turn to that.  You

18   know, you were asked a lot of questions earlier about --

19             MR. BOND:  What's the page?

20             MR. SLOSAR:  Oh, I'm sorry.  You know what?

21     That's my fault.

22             THE WITNESS:  195.

23             MR. SLOSAR:  195.  Yeah.  Exhibit 25 at 195.

24             MR. BOND:  I don't have a pink note.

25   BY MR. SLOSAR:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1        Q     Yeah.  But you were asked a lot of

2    questions -- and this is the coroner's investigation

3    report that you would have drafted; is that right, sir?

4        A     Yes.

5        Q     Okay.  And is it fair to say that you would

6    have completed this report after -- well, let me

7    withdraw that question.  Did you ultimately go to the

8    autopsy with Dr. Nichols and Sheriff Greer?

9        A     Yes.

10       Q     Okay.  And was that -- I believe that was

11   on -- was that on April 5, 1992, or was that on

12   April 6th.  Do you recall?

13       A     I think it was the afternoon of the 5th.

14       Q     Okay.  And you -- is it fair to say that after

15   the autopsy that that's when you would have completed

16   the coroner's investigation report that is Exhibit 25 at

17   195?

18       A     I probably would have completed this before we

19   ever went to the autopsy, this part of it.

20       Q     Well, the bottom you certainly -- do you see

21   where it says, "The bottom autopsy ordered by C1,

22   performed by Nichols, date 4-5-92, tox sample taken by

23   Nichols, sent to DHR."  Do you see that, sir?

24       A     I do see that, yes.

25       Q     Okay.  So certainly, you would have completed

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 186 of 262 PageID #: 27268
The Deposition of BILL ADAMS, taken on January 06, 2020
186

 1    that portion of this report after the autopsy, right?

 2        A    Most likely.

 3        Q    Yeah.  Because you -- you're not in the

 4    business of hypothesizing what's going to happen, you're

 5    in the business of documenting what actually happened,

 6    right?

 7        A    Right.

 8        Q    Okay.  And you would have no way to know who

 9    the tox sample was sent to without actually being

10    present when that happened, fair?

11        A    I would have known who they standardly sent

12    detox ecology sample to.

13        Q    Well, you wouldn't have known --

14        A    Now, I wouldn't have known what they sent.

15        Q    Sure.

16        A    And at this point, still don't know what they

17    sent.

18        Q    Fair enough.  Is it fair to say that you would

19    have completed this entire report that we're looking at,

20    at 195, would not have been complete until after you

21    left the autopsy, fair?

22        A    Probably not as far as the entire page --

23        Q    Sure.

24        A    -- that's there.

25        Q    Yeah.  And at the autopsy, obviously you would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  have been talking with Dr. Nichols about the findings

2  that he's making and observations that he's making from

3  the victim's body; is that fair?

4      A    I'm sure we had a discussion.

5      Q    Sure.  And part of the discussion that you

6  would have had with Dr. Nichols would have been about

7  the condition of the body, correct?

8      A    The discussion would have been more attuned, I

9  think, wounds and --

10     Q    The manner of death; is that right?

11     A    Right.

12     Q    Okay.  But it also -- you would have also

13  discussed with Dr. Nichols then about the condition of

14  the body in order to determine, or at least

15  preliminarily, the data death as well, fair?

16         MR. BOND:  Object to the form of the question.

17     Go ahead and answer, Bill.

18     A    I would have asked him questions.  I probably

19  wouldn't have got any kind of straight answer.

20     Q    But sitting here today, you certainly don't

21  have any independent recollection of whether you got

22  straight answers or not, right?

23     A    No.

24     Q    Okay.  But --

25     A    I know Dr. Nichols.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

188

1    Q    Okay.  And you have a good opinion of him,
2  sir?
3    A    I do.
4    Q    Okay.  He was the state medical examiner for
5  decades, right?
6    A    For a long time.  I don't know how long.
7    Q    Okay.  And certainly, after leaving the
8  autopsy, observing it yourself, and having a
9  conversation with Dr. Nichols, you at least issued a
10 preliminary finding on your coroner's investigation
11 report that the date of death was April 4, 1992 through
12 April 5, 1992; is that right, sir?
13      MR. BOND:  Objection to the form.
14   A    That may have been before I ever went to the
15 autopsy.
16   Q    Well, certainly you don't have any independent
17 recollection sitting here today whether you made --
18 whether you wrote that down before or after, right?
19   A    No, I don't.
20   Q    Okay.  And certainly, if you learned any
21 information in the autopsy itself that lead you to
22 believe that was wrong, you would have corrected it,
23 right, sir?
24   A    Probably not on this report.
25   Q    Well, you would have corrected it on another

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

189

1    report, right?

2         A    I put it on the death certificate what my

3    opinion was.

4         Q    Sure.  And that was on May 7, 1992.  That was

5    more than a month later; is that right?

6         A    Right.

7         Q    Okay.  And certainly, on this report, you

8    wouldn't -- you would have wanted this to be as accurate

9    as possible because this was a serious investigation; is

10   that right?

11        A    This report is more a memorandum for my mind

12   rather than an official report, report.

13        Q    Sure.  But this is based upon your

14   observations and beliefs at the time you wrote it, fair?

15        A    Fair.

16        Q    Yeah.  At the time you wrote this report, you

17   didn't have any information about any potential suspects

18   in the case, fair?

19        A    That's true.

20        Q    At the time you wrote this report, you hadn't

21   participated in any witness interviews, correct?

22        A    Yeah.  Had not.

23        Q    At the time you wrote this report, you haven't

24   participated or observed any interrogations of suspects

25   like Jeff Clark, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

190

```
1        A    That's right.
2        Q    And certainly at the time you wrote this
3   report, you weren't aware of Mr. Clark or Mr. Hardin's
4   alibis between April 2nd and April 5, 1992 because you
5   hadn't yet learned of them --
6        A    Right.
7        Q    -- correct?  Okay.  Now, if you look at
8   Petitioner's Exhibit -- I'm going to forward you -- I'm
9   going to ask for you -- sir, do you remember receiving I
10  believe it's called a post-mortem report from
11  Dr. Nichols?  Do you remember?
12       A    An autopsy report?
13       Q    Yes.  Do you recall receiving that?
14       A    Yes.
15       Q    Okay.  Let me --
16            MR. BOND:  It's 203.
17       Q    Can you turn to page 203, sir?  Thank you.  I
18  have -- let me just --
19            MR. BOND:  Well, it starts on 198.
20       Q    Are you there, sir?
21            MR. BOND:  It's in here twice.
22       A    It is.  It starts --
23            MR. BOND:  Once it starts on 198 and the second
24       time it starts on 203.
25       Q    Oh, no.  That's terrible.  Well, how about we
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   start with 203.  Is that okay?

2        A    That's fine.

3        Q    Is that okay?  All right.  And sir, do you

4   recognize that document?

5        A    I do.

6        Q    Okay.  And what do you recognize this document

7   to be just generally?

8        A    An autopsy report.

9        Q    Okay.  And this is an autopsy report that you

10  would have received during the underlying investigation

11  into the death of Rhonda Sue Warford; is that right,

12  sir?

13       A    I would have received it sometime after the

14  autopsy was done, yes.

15       Q    Sure.  But this is a report that basically

16  would have been -- documents the observations made by

17  Dr. Nichols during the autopsy that you were present at;

18  is that fair?

19       A    Yes.

20       Q    And that autopsy took place on April 5, 1992,

21  right, sir?

22       A    Yes.

23       Q    And my understanding is -- well, do you have

24  any independent recollection of -- while Dr. Nichols is

25  performing the autopsy, do you have any independent

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  recollection of exactly how many people were in that

2  room?

3       A    I do not.

4       Q    When Dr. Nichols was doing the autopsy, do you

5  recall him verbally providing information about his

6  observations of the autopsy for somebody to write down?

7       A    If I'm not mistaken, he would have been using

8  a tape recorder.

9       Q    Okay.  And so out loud, Dr. Nichols would have

10  been recording in some manner the observations that he

11  was making when he was looking at the body of

12  Rhonda Sue Warford --

13       A    Yes.

14       Q    -- is that -- and you would have been present

15  during that process; is that right, sir?

16       A    I was there.

17       Q    Yeah.  And certainly, this was a case that I

18  think earlier you said you had already expressed an

19  interest in it because of the multi-jurisdictional

20  nature of it; is that right?

21       A    Well, at that -- at the time of the autopsy,

22  I'm not sure we had a multi-jurisdictional case.

23       Q    Fair enough.  But at least at the time of the

24  autopsy, it would have been an important case because it

25  was a homicide; is that fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1       A    That's -- that's fair.

 2       Q    And it's fair to say that back in the early

 3  1990s that homicides were not a common occurrence in

 4  Meade County?

 5       A    In Meade County there were very few.  Very few

 6  even today.

 7       Q    Well, I'm happy to hear that.  And, so I'm

 8  sure -- and the brutal nature of this homicide was

 9  particularly egregious in something that would have

10  interested you as a coroner; is that fair?

11       A    That's fair.

12       Q    Okay.  Now, so the observations that

13  Dr.  Nichols is making, you recall him making those

14  observations verbally into some sort of recorder method;

15  is that fair?

16       A    I'm guessing that's what happened.

17       Q    Okay.

18       A    That was standard.

19       Q    And so nothing necessarily in this post-mortem

20  examination report would have been a surprise to you

21  because you were present when Dr. Nichols was making

22  these observations; is that fair?

23       A    Yeah.  As far as I know.

24       Q    And certainly you, you know, as a coroner, as

25  the Meade County coroner, you were making your own
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   observations when you were at the autopsy on

2   April 5, 1992, right?

3       A    To an extent.

4       Q    Sure.  And is it fair to say that you weren't

5   coming to any disagreements that you can recall with the

6   observations that Dr. Nichols is making?

7       A    No.

8       Q    Because certainly if you had come to any

9   disagreements, you and Dr. Nichols probably would have

10  discussed it and reached a resolution as to any

11  differences; is that fair?

12      A    If we had disagreements, Dr. Nichols would

13  have won.

14      Q    All right.  All right.  But sitting here

15  today, you don't recall any discussions with Dr. Nichols

16  about observations that you disagreed with; is that

17  right?

18          MR. BOND:  Object to the form --

19      Q    Okay.

20          MR. BOND:  -- of the question.

21      Q    So there's nothing in this post-mortem

22  examination report that would have impacted your

23  opinion, as the Meade County coroner, between the time

24  that the autopsy was done on April 5 and the time that

25  you received this report in late April; is that fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BOND:  I'm going to object to the form of

2      the question.

3      Q    You can answer.

4          MR. BOND:  It states completed.  It doesn't say

5      when he received it.

6      A    I don't know when I received the report.

7      Q    Okay.  Well, we can actually get to that real

8  quick, sir.  If you -- on -- you know, I don't have --

9      A    I would say it would have been after

10 April 24th.

11     Q    Yes.  And you would say that because that's

12 the date that it was completed, correct?

13     A    That's what it says.

14     Q    Fair enough.

15         MR. SLOSAR:  Do you know the LCSO number for

16     this report?

17         MS. ROBINSON-STAPLES:  Actually, Nick has the

18     binder.  I think it would be in here.  That makes

19     sense.

20 BY MR. SLOSAR:

21     Q    Sir, I'm going to ask for you to turn to --

22 it's going to be page 21 of Exhibit 25.  I'll come over

23 and show you.  All right.  So this is Exhibit number 25,

24 page 21 on the NSB Bates.  Sir, according to page 21, do

25 you see where it says, "April 30, 1992"?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

196

```
 1        A    I do.
 2        Q    It's about midway through the page, and it
 3   says that at approximately -- basically 8:00 p.m., "This
 4   officer met with Meade County Coroner, William Adams,
 5   who advised of results of crime lab analysis and receive
 6   a copy of post-mortem report on victim Warford from
 7   Chief Medical Examiner, George Nichols."  So according
 8   to Sheriff Greer's report, on April 30, 1992, you
 9   provided Sheriff Greer with a copy of the post-mortem
10   report from Dr. Nichols; is that right?
11        A    I'm sure I probably did.
12             MR. BOND:  Wait a minute.
13        Q    Do you have any reason to not believe that?
14             MR. BOND:  Let me get my objection on the
15        record, okay --
16             MR. SLOSAR:  Sure.  What is it?
17             MR. BOND:  -- before you ask the next question.
18        Object to the form of the question.
19   BY MR. SLOSAR:
20        Q    Okay.  Do you have any independent memory of
21   providing Dr. Nichols' report to Sheriff Greer on
22   April 30, 1992?
23        A    Not an independent memory, no.
24        Q    Okay.  But you certainly have no reason to
25   dispute it sitting here today?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

197

```
 1        A     No.
 2        Q     Now, do you recall between April 24th and
 3   April 30th, do you recall when you would have first
 4   received Dr. Nichols post-mortem report?
 5             MR. BOND:  Object to the form of the question.
 6        A     No recollection.
 7        Q     Okay.  Do you know whether --
 8        A     US mail, that's all I can tell you.
 9        Q     Sure.  I know it's been a long time.  But do
10   you know whether you had any communication with
11   Dr. Nichols between the 24th and the 30th about the
12   findings in his report?
13        A     I would guess not.
14        Q     Okay.
15        A     But I don't know.
16        Q     No independent memory --
17        A     No.
18        Q     -- right, sir?  Okay.  Now, you know,
19   certainly you reviewed the post-mortem report prior to
20   today's deposition; is that right?
21        A     I --
22        Q     Okay.  And there's nothing in the post-mortem
23   report that would have caused you to change or alter the
24   date of death from April 5th --
25        A     No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, M.D. on January 06, 2020

198

```
1        Q    -- to April 2nd, right?

2        A    No.

3        Q    Okay.  And between April 30, 1992 and

4   May 7, 1992, when you completed your death certificate

5   that was in Exhibit number 35, is it fair to say that in

6   that time frame, you didn't learn any additional

7   information relating to the condition of Ms. Warford's

8   body that would have caused you to change your opinion

9   as to the date of death?

10       A    Not the condition of her body.

11       Q    Okay.  Is it fair to say that you did, between

12  April 30, 1992 and May 7, 1992 when you completed the

13  death certificate, that in that time frame, you would

14  have had knowledge relating to the alibi information

15  relating to Jeff Clark and Keith Hardin?

16       A    That I don't recall.

17       Q    Well, I believe earlier Mr. Brustin asked you

18  some questions about participating as an observer in the

19  interrogation of Jeff Clark.  Do you recall being asked

20  questions about that?

21       A    I do.

22       Q    Okay.  And certainly, Jeff Clark provided his

23  alibi information when you were observing his

24  interrogation.  Do you generally recall that?

25       A    I'm sure he may have.  I don't know.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

199

1    Q    Okay.  Well, Sheriff Greer documented that in

2  a report, you wouldn't have any reason to disbelieve it?

3    A    No.

4    Q    Okay.  So certainly, at the time -- by

5  May 7, 1992, you would have had knowledge that Mr. Clark

6  and Mr. Hardin had an alibi for April 4th and

7  April 5, 1992; is that right?

8    A    I may have.

9    Q    Okay.  But between April 30, 1992 when you met

10 with Mr. Greer and gave him the post-mortem report and

11 May 7, 1992, you certainly didn't learn any information

12 relating to the condition of Ms. Warford's body that

13 would have caused you to change the date of death,

14 correct?

15   A    Again, not the condition of the body.

16   Q    Okay.  And sitting here today, outside of

17 learning that the two suspects had alibis for the

18 4th and 5th, is there a single piece of additional

19 information that you learned between April 30, 1992 and

20 May 7, 1992 when you completed your death certificate

21 that would have caused you to change the date of death?

22        MR. BOND:  Object to the form of the question.

23   Go ahead, Bill.

24   Q    You can answer.

25   A    The only thing that was different is I knew

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

200

1    that when she disappeared on April the 1st or 2nd --

2        Q    Uh-huh.

3        A    -- and based on the fact that that was the

4    last time she was seen, or anybody talked to her, that I

5    knew of, that's what I would have based that on.

6        **Q    Now sir, do you recall -- and this must have**

7    **been one of the more tragic parts of your job as a**

8    **coroner.**

9            MR. BOND:  Let's ask questions.  Let's not

10           comment, okay?

11           MR. SLOSAR:  Let's stick to objections that are

12           a part of the federal rules.

13           MR. BOND:  Let's stick to questions.

14           MR. SLOSAR:  So give me -- Keith, give me a

15           rule, and then make an objection based on a rule,

16           and then I'll respond to it, okay?  But I'm not

17           sitting here being disrespectful.

18           MR. BOND:  You comment, I'm going to comment.

19           MR. SLOSAR:  I'm actually being really

20           respectful to your client because I'm about to ask

21           him about when he has to go ask victim's families to

22           identify bodies, so...

23           MR. BOND:  Ask questions.

24           MR. SLOSAR:  Make legitimate objections.

25   BY MR. SLOSAR:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

201

```
 1        Q    Sir, I imagine that one of the difficult parts
 2   of your role as a coroner is having to speak to victim's
 3   families to ask them to identify their loved ones
 4   remains; is that fair?
 5             MR. BOND:  That's good.
 6        A    That's -- it is a difficult part of the job.
 7        Q    And in this case, do you recall being present
 8   when yourself and other law enforcement officers had to
 9   go speak to the Warford family to ask for them to
10   identify the remains that were discovered?
11        A    I know I was there.
12        Q    Yeah.  And do you recall participating in that
13   conversation with Ms. Warford's loved ones?
14        A    I -- I would have been the one to tell her
15   that we thought probably that we had found her daughter
16   and that we needed somebody to verify that it was, in
17   fact, her daughter.
18        Q    Uh-huh.  And in fact, there were other law
19   enforcement officers with you; is that right, sir?
20        A    I'm sure there were.
21        Q    Now, my understanding is that this meeting
22   with Ms. Warford's relatives would have happened in the
23   evening hours of April 5, 1992, and I am looking at that
24   same report that you have, and I'm particularly looking
25   at page 10.  So if you go to page 10 --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

202

```
 1              MR. BOND:  Is that the number?
 2              MR. SLOSAR:  I believe the number should be the
 3         same at the beginning.
 4              MR. BOND:  I mean, are you using the number at
 5         the bottom when you say, "page 10"?
 6              MR. SLOSAR:  I think that they're the same for
 7         that report.  At least, I hope.  Hopefully they are.
 8         I'll get it.  I will clarify that right now though.
 9         You know what, you are right, Keith.  It is page 11.
10              MR. BOND:  Page 11.  Okay.
11              MR. SLOSAR:  But your objection is still
12         frivolous.
13              MR. BOND:  You're using their numbers.  That's
14         what I'm asking.
15              MR. SLOSAR:  I am.  Yeah.  So this is page 11.
16              MR. BOND:  Okay.
17              MR. SLOSAR:  But I still have issues with your
18         objection.  The --
19              MR. BOND:  Excuse me?
20              MR. SLOSAR:  I still have issues with your
21         objection earlier.
22              MR. BOND:  I have issues with your comments,
23         but let's move on.
24    BY MR. SLOSAR:
25         Q    All right.  So I'm looking at -- about halfway
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

```
 1   through page 11 sir, do you see where it says,
 2   "Ms. Warford was advised by Coroner William Adams that
 3   it was very possible that we had found their daughter
 4   and that she had been murdered.  And that we would need
 5   someone from the family to go to the medical examiner's
 6   office for positive identification."  Do you -- is
 7   that -- did I read that right?
 8        A    Yes.
 9        Q    Do you have any independent memory of having
10   to express that to Ms. Warford's family on that date?
11        A    Not really.
12        Q    Okay.  Now, if you go to the page before it
13   and this has a number ten and you look at the last line,
14   so just right next to it.  Look at that last line.  It
15   says, "Sister of Rhonda's.  Ms. Warford stated that her
16   daughter had went to the grocery, Krogers, Wednesday
17   night, April 1, 1992 at approximately 7:00 p.m.  And
18   upon returning she, Rhonda, told her that a man followed
19   her shouting that he wanted to marry her."  Do you see
20   that part, sir?
21        A    I see that.
22        Q    Okay.  And Ms. Warford told us that shortly
23   after midnight, approximately 30 hours, on April 2, 1992
24   that her daughter took the house keys and left, stating
25   that 'I'm going down there.'  She also stated that that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

204

```
 1    is the last time she saw or heard from her."  You see
 2    that, sir?
 3         A    I see that.
 4         Q    And this was a part of a conversation where
 5    you were present at.  Is that right, sir?
 6         A    I'm sure I was.
 7         Q    You certainly didn't leave the home with
 8    Sheriff Greer or another law enforcement member --
 9         A    No.
10         Q    -- talking, right?  So on April 5, 1992, you
11    would have been on notice that Ms. Warford was missing
12    beginning at approximately 12:30 a.m. on April 2, 1992,
13    correct?
14         A    It was the 1st, wasn't it?
15         Q    Well, that -- you're right.  About midnight on
16    April the 1st just after 12:30.
17         A    Just after midnight.
18         Q    Yeah.  You would have known that information
19    on April 5th '92, right, sir?
20         A    Yes.
21         Q    You would have known that information before
22    Ms. Warford's body was even identified by her family at
23    the medical examiner's office, correct?
24         A    Yes.
25         Q    You certainly would have known that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    information before you completed -- fully completed your

2    preliminary results form on -- that we went over

3    earlier, right, sir?

4         MR. GARVERICH:  Objection to the form of the

5    question.

6         Q    You can answer.

7         MR. GARVERICH:  You can answer.

8         A    I don't know if we -- I would have had that

9    information before I completed the top part of that

10   form.

11        Q    Okay.  You --

12        A    As I told you, that form was a memorandum form

13   that I use.

14        Q    Fair enough.  You certainly would have known

15   this information from the Warford's about her missing

16   since basically April 1, 1992 before you completed the

17   bottom part of that form, correct?

18        A    Not necessarily.

19        Q    Well, you likely would have, right, sir?

20        A    I don't think so.  I don't know.

21        Q    Well, you certainly -- even though -- you knew

22   before April 30, 1992, when you handed Sheriff Greer the

23   post-mortem report, you certainly knew that Ms. Warford

24   was missing by April 1st?

25        A    Sure.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

1     Q    Yeah.  That's something that you knew by

2  April 5, 1992, correct?

3     A    Late that day.

4     Q    Yeah.  And on April 5, 1992, you still

5  believed that the date of death was April 4th or

6  April 5, 1992?

7     A    I didn't say that.

8     Q    Well, that's what your preliminary report

9  says, correct?

10    A    That morning of April the 5th I probably knew

11  that.

12    Q    Well, there's no time limit, right, sir?

13    A    There's no time on it.

14    Q    There's no time.

15    A    I don't remember.  I don't know.

16    Q    And then on May 7, 1992, you were informed

17  that Sheriff Greer was going to the grand jury?

18         MR. BOND:  Object --

19    A    I don't think so.

20         MR. BOND:  -- to the form of the question.

21    Asked and answered.

22    Q    Well, on May -- sir, do you recall May 5, 1992

23  weren't you with Sheriff Greer at the Louisville Police

24  Department, and I'm looking at page -- keep doing

25  this -- I'm looking at page 22 is the Bates number.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 207 of 262 PageID #: 27289
The Deposition of BILL ADAMS, taken on January 06, 2020
207

1    Just let me know when you get there.  Do you see at the

2    very bottom of page 22 it says, "May 5th '92 at

3    approximately 6:30 hours, this officer along with

4    Deputy Clifford Wise, Deputy Joe Wood, Deputy Livers,

5    Tim Livers, and Coroner William Adams, proceeded to

6    Louisville, Kentucky where he met with officers of

7    Louisville Police Department homicide unit at the

8    prearranged location," do you see that, sir?

9         A    I see that.

10        Q    Okay.  Do you have any independent memory of

11   participating in a meeting at the Louisville Police

12   Department on May 5, 1992?

13        A    I don't.

14        Q    Well, at that meeting, do you see in the third

15   line it says, "After breaking down into teams, it was

16   decided that myself and Detective Handy would, with the

17   search team, search Clark's residence and arrest

18   Jeffrey Clark, and Detective Clark and

19   Detective John Tarter would go with another search team

20   to the Hardin's residence and arrest Keith Hardin, and

21   we would transport both accused to the Louisville Police

22   Department homicide unit, leaving the search teams to do

23   their job."  Do you see that, sir?

24        A    I see that.

25        Q    And according to this document, you were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    present when there was a discussion of law enforcement

2    officers in both agencies -- 23 -- where it was decided

3    that Mr. Clark and Mr. Hardin were going to be arrested

4    for the murder of Rhonda Sue Warford; is that right?

5        A    I was probably there.  I'm not sure I was

6    privy to that particular meeting.

7        Q    Well, you would -- you have no independent

8    memory sitting here today of whether you were or were

9    not, right?

10       A    That's true.

11       Q    According to the report, you were present at

12   the police department, and there certainly would be no

13   reason for you to go from Meade County to Louisville to

14   go sit outside of a meeting that's taking place about a

15   case that you're working on; is that fair?

16       A    That I don't know.

17       Q    That would be a waste of your time, wouldn't

18   it?

19       A    As I said earlier, Joe and I were friends.  If

20   he wanted me to ride to Louisville with him, I would

21   have rode to Louisville with him.

22       Q    Have you ride with Sheriff Greer to Louisville

23   at 6:30 a.m. to go to the Louisville Police Department

24   to sit outside of a meeting on a case that you assisted?

25       A    I'm not saying that's what happened.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

209

1    Q    Okay.  I appreciate that, sir.  You just don't
2    have an independent memory?

3    A    I do not.

4    Q    Fair enough.  Okay.  Now, according -- if --
5    assume you're right, and assume you are not part of that
6    meeting.  You are sitting outside of the meeting and
7    these officers are talking about arresting people on a
8    case that you worked on.  Is it fair to say that on the
9    drive back to Meade County you certainly would have been
10   informed by Sheriff Greer that he was going to go arrest
11   the suspects in a murder case that you were working on?

12   A    I'm not sure if he told me that.

13   Q    Not sure he told you that.

14   A    No.

15   Q    Okay.  Well, if Sheriff Greer testifies that
16   he told you that, you would have no reason to dispute
17   that, right, sir?

18   A    No.

19   Q    Okay.  Is it fair to say that you didn't
20   change the date of death until after -- on May 5, 1992,
21   a meeting took place where it was determined that
22   Mr. Clark and Mr. Hardin were going to be arrested and
23   charged with a murder of Ms. Warford?

24   A    That's not a fair statement.

25        MR. BOND:  Objection to the form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1      question.
 2           MR. ERVIN:  Objection to the form.
 3   BY MR. SLOSAR:
 4      Q    That's how you know it's a good question.  You
 5   can answer it now.  What was your answer?
 6      A    It's not a fair statement.
 7      Q    Oh, I'm not asking if it's a fair statement or
 8   not.  What I'm saying is, you changed the date on the
 9   certificate on May 7, 1992.  That's when you signed
10   this, right?
11      A    That's when I signed this.
12      Q    That's when you signed this?
13      A    Yes.
14      Q    And we already went over earlier, April 2nd up
15   here the 2 --
16      A    We did.
17      Q    -- is the same font that you signed this with,
18   correct?
19      A    It appears to be.
20      Q    Appears to be your typewriter, right?
21      A    Appears to be.
22      Q    Appears to be.  Now, assume -- well, let me
23   take -- let's go away from assumptions.  You didn't sign
24   this until two days after Keith Hardin and Jeff Clark
25   were charged with murder, correct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

1      A    That, I don't know.

2      Q    You know what?  Fair enough.  According to

3   this police report we just went over, you didn't sign

4   this until two days after they were at least arrested

5   for the murder of Rhonda Sue Warford, correct?

6      A    I'm not sure I knew they were arrested when I

7   signed it.

8      Q    Okay.  All right.  You're at least not

9   disputing -- because Sheriff Greer's report puts you at

10  the police station when there's an agreement.

11     A    That's fine.

12     Q    Yeah.

13     A    I understand that.

14     Q    You admit, based on the records that you've

15  looked at, that you were at least present at the

16  Louisville Police Department when the decision was made

17  to arrest Jeff Clark and Keith Hardin for the murder of

18  Rhonda Sue Warford, correct?

19     A    I was present at the police department, I

20  think.

21     Q    Okay.  And then you signed the death

22  certificate two days later on May 7, 1992, correct?

23     A    I'm sure that's the date signed.

24     Q    Uh-huh.  And you were at the autopsy on

25  April 5, 1992, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

212

```
 1        A    Yes.
 2        Q    And between April 5, 1992 and May 5, 1992, you
 3   didn't take any steps to initiate the signing of the
 4   death certificate, correct?
 5        A    I didn't have an autopsy report.
 6        Q    Well, you had the autopsy report, at the very
 7   least, by April 30, 1992 because --
 8        A    Right.
 9        Q    -- that's when you gave it to Sheriff Greer --
10        A    Right.
11        Q    -- right?  Between April 30, 1992 and
12   May 5, 1992, you didn't complete this form, right?
13        A    I guess not.  I signed it on --
14        Q    You didn't sign this form until after the two
15   suspects were arrested, right, sir?
16        A    That had nothing to do with when I signed the
17   form or not.
18        Q    Well, I'm not asking you.  A jury is going to
19   determine that, sir.  What I'm asking you is you didn't
20   sign this form until two days after a decision was made
21   to arrest the suspects in this case, correct?
22        A    As I said, I don't know when the decision was
23   made to arrest them, so I don't know if I signed the
24   form two days after or not.
25        Q    All right.  Is that your testimony, sir?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

1    A    Yes.

2    Q    Okay.  And sitting here today, it's your

3  testimony that it's possible that you were the one that

4  used whiteout and then put the 2 in there, correct?

5         MR. BOND:  Objection to the form.

6    Q    That was your testimony earlier?

7         MR. BOND:  Misleading, object to the form.

8         MR. ERVIN:  Objection to form.

9    A    I said it's possible.  I don't know.

10    Q    Okay.  Now, one thing you really don't know

11  sitting here today, all these years later, you have no

12  idea who killed Rhonda Sue Warford, correct?

13    A    That isn't my job.

14    Q    Yeah.  You weren't present when the murder

15  happened, right?

16    A    No.

17    Q    Sitting here today, you have no idea whether

18  she was killed in Meade County or Louisville, correct?

19    A    I know where she was found.

20    Q    That's all you know is where she was found,

21  right?

22    A    That's correct.

23         MR. SLOSAR:  Okay.  I don't have any further

24     questions.

25         MR. BOND:  How are you-all going to do it?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. ERVIN:  I've got a couple.

2          MR. BOND:  Do you-all want to -- well, can

3      you-all do it, you know --

4          MR. ERVIN:  I'll go ahead.  Start with me.

5          MR. BOND:  Okay.  You're not done.

6          THE WITNESS:  Okay.

7          MR. ERVIN:  You want to take a little break?

8      You want to stretch for a minute?

9          THE WITNESS:  I might take a bathroom break.

10          MR. ERVIN:  All right.

11          VIDEOGRAPHER:  Off the record at 3:56.

12                  (OFF THE RECORD)

13          VIDEOGRAPHER:  Back on the record at 4:04.

14                  CROSS EXAMINATION

15  BY MR. ERVIN:

16      Q    Mr. Adams, I want to direct your attention to

17  the report that you made of your visit with

18  Amy Remsburg.

19      A    Okay.

20      Q    Will you find that, sir?  I apologize.  The

21  only number I had was MCS0150 to 151.

22          MR. BOND:  Bill, try 293 in what you got in

23      front of you.

24      A    Okay.  I got it.

25      Q    And before we get to that, sir, I want -- I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   know you've been testifying now on and off for about

2   six hours.

3       A    Uh-huh.

4       Q    Have you ever had questions thrown at you like

5   this before in your life?

6            MR. BRUSTIN:  Objection to the form.

7            MR. SLOSAR:  Same objection.

8       A    Not that I can remember.

9       Q    Have you ever testified longer than say

10  perhaps that you testified in the trial of this case?

11      A    No.

12           MR. BRUSTIN:  Objection to form.

13      A    I don't think so.

14      Q    And how long was that, 15 minutes maybe?

15           MR. SLOSAR:  Objection to form.

16      A    Probably.

17      Q    Has anybody ever sat there and implied

18  straight to your face that you must be a liar trying to

19  change documents --

20           MR. BRUSTIN:  Objection to form.

21      Q    -- like they have today?

22      A    No, I don't think so.

23      Q    How does that make you feel?

24           MR. SLOSAR:  Objection to form.

25           MR. BRUSTIN:  I will let that stand.  I want to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      hear.

 2      A     Not good.

 3   BY MR. ERVIN:

 4      Q     Yes, sir.  In fact, how did it make you

 5   feel -- what -- did you have anything to do with why or

 6   how these men got convicted in this case?

 7            MR. BRUSTIN:  Objection to form.

 8      A     I don't think so, no.

 9      Q     Do you know why you're being sued in this

10   case?

11      A     Not really.

12      Q     Have you ever changed documents to try and

13   make something into false information?

14            MR. SLOSAR:  Objection to form.

15      A     No.

16      Q     I want to direct your attention now to this

17   memorandum that you wrote.  And the implication from

18   attorneys for the plaintiffs asking you questions about

19   it was that somehow you had been deputized to go up and

20   conduct a murder investigation with Amy Remsburg.  Is

21   that what happened?

22      A     No.

23      Q     Well, let's frame that correctly.  First, had

24   you been deputized at all in this case?

25      A     Not other than being the county coroner.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 217 of 262 PageID #:
27299
The Deposition of BILL ADAMS, taken on January 06, 2020
217

1          Q     Okay.  You didn't act outside of your role as

2    the coroner?

3          A     I don't think so.

4          Q     Okay.  And as I read this -- and let me ask

5    you, take just a minute to read through it carefully,

6    please, from the beginning to the end.

7          A     Okay.

8          Q     All right, sir.  As I read this, your

9    discussion with Ms. Remsburg was about what she knew

10   about Jeff Clark.

11              MR. BRUSTIN:  Objection to form.

12         Q     Is that a fair way of looking at that

13   interview?

14         A     I think so.  I did notice one thing in this

15   interview that -- I don't really see where I'm asking

16   questions.

17         Q     Right.

18         A     I think --

19         Q     For example, let me try and put it in the

20   perspective that I understand it.  The lawyers were

21   implying that because you didn't tell Sheriff Greer that

22   Ms. Remsburg knew anything about this murder that she

23   didn't know anything about this murder; is that right?

24              MR. SLOSAR:  Objection to form.  Calls for

25         speculation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    That's why.

2      Q    And I don't -- and I'm like you, did you ask

3  Amy Remsburg if she knew anything about the murder of

4  Rhonda Sue Warford?

5      A    Not that I'm aware of.

6      Q    For example, if you had asked her, "Did

7  Jeffrey Dewayne Clark confess to you that he murdered

8  Rhonda Sue Warford, if she had said, "Yes," do you think

9  you might have written that down in your statement?

10     A    I'm sure I would have.

11          MR. BRUSTIN:  Objection to form.

12     Q    And if she had said "No," do you think you

13  would have written down in your statement?

14     A    I'm sure I would have.

15          MR. BOND:  Let him finish Bill, please.

16     Q    So do you believe you were asking her any kind

17  of questions involving the nature of how, when, or where

18  the crime involving the murder of Rhonda Sue Warford

19  occurred?

20          MR. SLOSAR:  Objection to form.

21          MR. BRUSTIN:  Objection to form.

22     A    No.

23     Q    Okay.  And do you have any recollection of

24  that having been your responsibility or the reason why

25  you were conducting this interview or this -- had this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   conversation?

2          MR. SLOSAR:  Objection to form.

3      A    I don't know why we had this interview.

4      Q    Oh.

5      A    I can't.

6      Q    But it would appear that the only information

7   that you recorded from the interview was information in

8   relationship to what she knew about

9   Jeffrey Dewayne Clark and her relationship with him.  Is

10  that a fair statement?

11         MR. SLOSAR:  Objection to form.

12         MR. BRUSTIN:  Object to form.

13     A    Yes, sir.

14         MR. BRUSTIN:  Everybody okay with one objection

15     for both?

16         MR. ERVIN:  Sure.

17  BY MR. ERVIN:

18     Q    Now, I want to direct your attention to the

19  death certificate if you can find that page.

20         MR. GARVERICH:  Exhibit 35.

21         MR. BOND:  Hold on, she's going to hand it to

22     you.

23  BY MR. ERVIN:

24     Q    This is the document or a document about which

25  it's been implied that you were whiting out incorrect

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 220 of 262 PageID #:
7302
The Deposition of BILL ADAMS, taken on January 06, 2020
220

1    information and writing in new information.  Do you

2    recall that?

3          MR. BRUSTIN:  Objection to form.

4    A    I remember that being implied.

5    Q    Okay.  And one of the reasons was the

6    reference to the date in the top righthand corner of

7    April 2, 1992.  Do you recall that?

8    A    Yes.

9    Q    And the reference coming from the fact that

10   the number 2 in the date of April 2 appears to be from

11   the font of the same machine that provides the

12   information that you're responsible for on the bottom of

13   the page --

14   A    Yes.

15   Q    -- is that right?

16   A    That's right.

17   Q    Did you see where your font appeared in any of

18   the other upper information that appears above your

19   signature?

20   A    It appears that the Webster --

21   Q    Yes.

22   A    -- is different.

23   Q    And what is Webster?  What is that in

24   relationship to?

25   A    Place of death.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

221

```
 1        Q    Uh-huh.  Do you think that you whited out some
 2   other place and caused that to be typed there, or do you
 3   think that may have been left blank because you would
 4   have known the answer to that question?
 5             MR. SLOSAR:  Objection to form.
 6             MR. BRUSTIN:  Objection.
 7        A    I believe that they would have asked me to
 8   fill that in.
 9        Q    Yes, sir.  Because this funeral occurred at
10   Arch L. Heady, Taylor Boulevard in Louisville, right?
11        A    Yes.
12        Q    It's not in Meade County?
13        A    No.
14        Q    You don't know whether the funeral directors
15   there are from Meade County, do you?
16        A    No, I don't.
17        Q    Do you know whether they're familiar with the
18   great town of Webster, Kentucky is?
19             MR. SLOSAR:  Objection to form.
20        A    Actually, I doubt that they are.
21        Q    Right.  How many people live in Webster
22   proper?
23        A    I have no idea.  Webster actually is not in
24   Meade County.
25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

```
 1        A     The town of Webster is in Breckenridge County.
 2        Q     All right.
 3        A     But some Meade County areas have a Webster
 4    address.
 5        Q     All right.  And would Highway 823 have been
 6    considered in the area of Webster?
 7        A     Yes.
 8        Q     All right.  And so you -- would you agree with
 9    me that that word "Webster" is typed from the same
10    typewriter as that providing the information that you
11    gave?
12        A     It appears to be.
13        Q     And I think we established earlier in your
14    testimony that it was your responsibility as the
15    coroner, and not the responsibility of the funeral
16    director, to state the date of death?
17        A     That is true.
18              MR. BRUSTIN:  Objection to form.
19        Q     So is it just as possible, if not way more
20    probable, that the reason the font from what would
21    appear to be your typewriter puts the date of death in
22    up there in the right hand corner is because it was left
23    blank for you to carry out your responsibility?
24              MR. BRUSTIN:  Objection to form.
25              MR. SLOSAR:  Objection to form.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

```
 1        A    It's possible.
 2        Q    All right.  Do you think that more likely than
 3   you having whited something out and printed over
 4   something that they had put in?
 5             MR. BRUSTIN:  Objection to form.
 6             MR. SLOSAR:  Objection to form.
 7        A    I would think so.  Yeah.
 8        Q    And if you were going to white out
 9   corrections, why wouldn't you correct where the death
10   occurred?  You see, if you look there you have the town
11   of Webster where you filled in the blank.  If you look
12   directly to the left of that, they have -- the address
13   is Kentucky 831 Route 1.
14        A    They do.
15        Q    You see that?
16        A    Yes, sir.
17        Q    Does that have anything to do with this case,
18   that address?
19        A    Just where she was found.
20        Q    Well, that's not where she was found though,
21   is it?  Wasn't she found on Highway 823?
22        A    823.
23        Q    Yes.
24        A    Yes.
25        Q    Not 831.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

224

```
 1        A     That is true.

 2        Q     Right.

 3        A     I hadn't noticed that.

 4        Q     But you didn't white out anything there and

 5   type over it, did you?

 6        A     No.

 7        Q     You left it the way they had typed it?

 8        A     I did.

 9        Q     Okay.  As I recall your trial testimony, did

10   you form the impression that Ms. Warford was killed

11   there in the field?

12        A     I think so.

13        Q     Yes?

14        A     Yes.

15        Q     And what did you base that impression on?

16        A     Probably the amount of blood there at the

17   scene.

18        Q     All right.  And then did you come to any

19   conclusions about how -- that was in a place different

20   from where you found the body; is that right?

21        A     Yes.

22        Q     And do you know how -- did you-all form an

23   opinion as to how the body got from the place where she

24   was killed to that place where you found her?

25        A     I would think she had to be moved.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

225

```
 1        Q    Yes, sir.  She would have had to have been
 2   carried; is that right?
 3        A    I think so, yes.
 4             MR. BRUSTIN:  Objection to form.
 5        Q    Were there any drag marks to indicate she had
 6   been dragged?
 7        A    Not that I saw.
 8        Q    All right.  So the natural deduction would be
 9   that she was carried?
10        A    Yes.
11        Q    Okay.  If someone were to carry someone by
12   their feet or their legs, might they leave their legs
13   turned up when they let them go?
14             MR. SLOSAR:  Objection to form.
15        A    Yes, they could.
16        Q    Just in the position that you found
17   Ms. Warford?
18             MR. SLOSAR:  Objection to form.
19             MR. BRUSTIN:  Same objection.
20             MR. ERVIN:  Warford, excuse me.  I don't
21        believe I have anything further, sir.  Thank you.
22             THE WITNESS:  You're welcome.
23             MR. BOND:  Andrew?
24             MR. GARVERICH:  I don't have any.
25             MR. ROSENE:  Just a couple.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

226

```
 1                        EXAMINATION
 2   BY MR. ROSENE:
 3        Q    Mr. Adams, I'm Peter Rosene.  I know it's been
 4   a long day, but I just have a couple of questions.
 5   Toward the beginning of today, Mr. Brustin gave you a
 6   list of names and asked whether you were friends with
 7   any of them.  One of whom was Robert Thurman.  Do you
 8   remember that?
 9        A    I do.
10        Q    And am I remembering correctly that you said
11   that you were not friends with Robert Thurman, right?
12        A    No.
13        Q    Okay.  Can you explain if you had, in your
14   professional life, had your paths ever crossed?
15        A    Not that I'm aware of.
16        Q    Did you have any communications during the
17   pendency of the Warford investigation leading up to the
18   trial in 1995?
19        A    I don't know.
20        Q    Okay.  Since the beginning of this civil
21   action, have you had any communications with
22   Mr. Thurman?
23        A    Not that I know of.
24        Q    So you have probably -- am I -- would I be
25   correct in saying that you've probably never spoken with
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Robert Thurman?

2          A     If I have, I don't remember.

3          Q     Okay.

4          A     That's --

5               MR. ROSENE:  I think that's all I have.  Thank

6     you.

7               MR. BOND:  Unfortunately Bill, because they

8     asked, they get to go at you again.

9               MR. BRUSTIN:  But I need a five-minute break.

10              MR. SLOSAR:  I've got a couple of questions.

11    Can I go?

12              MR. BRUSTIN:  Sure.

13              MR. SLOSAR:  Okay.

14              COURT REPORTER:  Elliot.

15              MR. BOND:  You got a mic, I think.

16              MR. SLOSAR:  Thank you.  Thanks.

17                          RE-EXAMINATION

18    BY MR. SLOSAR:

19         Q     Sir, just looking at Exhibit 35, the --

20         A     Yes.

21         Q     -- report that Mr. Ervin was asking about.  I

22    believe you testified a few moments ago that in the box

23    labeled 9C, where it says, "Webster" --

24         A     Uh-huh.

25         Q     -- that you would agree that that was written

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

228

1    by the same typewriter that you were using to document

2    the information below your signature; is that right?

3        A    I thought I said --

4            MR. BOND:  Object to the form.  Go ahead.

5        Q    You can answer.

6        A    I thought I said it appeared to be.

7        Q    Oh, it appeared to be?  Okay.  And with that

8    box it may -- the entire box -- I believe you testified

9    the entire box may have been left blank.  Is that what

10   you testified to?

11       A    It appears that's the case.

12       Q    Okay.  But you don't remember, sitting here

13   today, whether whiteout was used to -- and then you

14   typed over with Webster.  You don't recall whether --

15       A    No, I don't.

16       Q    Okay.  That certainly would be a possibility,

17   right?

18       A    I don't remember.

19       Q    Don't remember.  Okay.  Now, remember when I

20   was asking you earlier about this meeting that you were

21   at least present at on May 5, 1992?  You remember being

22   asked some questions about that?

23       A    I do.

24       Q    Yeah.

25           MR. BOND:  That's not proper recross.  That

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        wasn't discussed in there.

 2             MR. SLOSAR:  Well --

 3             MR. BRUSTIN:  This is a deposition.

 4             MR. SLOSAR:  Yeah.

 5   BY MR. SLOSAR:

 6        Q    And certainly you recall during your

 7   investigation meeting a fellow from Louisville Police

 8   Department named Mark Handy?  Do you recall that, sir?

 9        A    I do.

10        Q    Yeah.  And did you find Detective Handy to be

11   a nice person to you during your interactions with him?

12        A    Seemed to be.

13        Q    Yeah.  In fact, you later came to meet

14   Mr. Handy again when he was at the Jefferson County

15   Coroner's Office; is that right, sir?

16        A    That's true.

17        Q    Yeah.  And you had the opportunity to chat

18   with him then as well; is that right?

19             MR. BOND:  Object to the form of the question.

20        Go ahead and answer.

21        A    In passing.

22             MR. PELLINO:  Object to the form.

23        Q    In passing.  Okay.  Did -- by the time you met

24   with Mr. Handy when he was at the Jefferson County

25   Coroner's Office, were you aware that he had resigned
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 230 of 262 PageID #: 27312
The Deposition of BILL ADAMS, taken on January 06, 2020

230

1   from the Louisville Police Department by then?

2       A     I would presume that he had to be a deputy

3   coroner.

4       Q     Okay.  Fair enough.  Were you aware that he

5   had been sued for participating in investigations that

6   led to the wrongful conviction of anybody else by the

7   time you encountered him at the Jefferson County

8   Coroner's Office?

9           MR. PELLINO:  Objection to form.

10      Q     You can answer.

11      A     Not that I'm aware of.  I know there's been

12  newspaper articles and things that I've seen, but I

13  don't know when I saw them or...

14      Q     Fair enough.  Now, when you met with

15  Detective Handy in this Warford investigation, did you

16  ever disagree with any of the decisions that

17  Detective Handy was making?

18      A     It was his job, not mine.

19      Q     Is it fair to say that you never took any

20  steps to stop Detective Handy in this case?

21          MR. PELLINO:  Objection to the form.

22          MR. BOND:  Objection to the form of the

23      question.

24  BY MR. SLOSAR:

25      Q     You can answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

1    A    No.

2    Q    Seemed to be a fine detective to you, right?

3    A    As far as I know.

4    Q    And sir -- and I believe Mr. Brustin's going

5    to go through this report a little bit more, but

6    remember when we were talking about the May 5th meeting

7    and that Sheriff Greer documents that you and him drove

8    from Meade County at 6:30 a.m. to a meeting at the

9    Louisville Police Department on May 5, 1992.  Do you

10    recall me asking you some questions about that?

11    A    I remember that, yes.

12    Q    Yeah.  And Detective Handy, according to the

13    report, was one of the officers present for that

14    meeting.  Do you recall reading that in the report?  I

15    believe --

16    A    I think so, yes.

17    Q    Okay.  Now, sir, is it fair to say that

18    outside of your participation in two interviews of

19    Ms. Remsburg on the 9th and 10th and your participation,

20    or at least observation, of the interrogation of

21    Jeff Clark, that outside of those three things, that you

22    didn't have any participation in witness interviews or

23    suspect interviews after the initial day that you were

24    brought on this case?

25         MR. PELLINO:  Objection to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 232 of 262 PageID #:
27314
The Deposition of BILL ADAMS, taken on January 06, 2020
232

```
 1        A    I'm not sure I understand what you're asking.

 2        Q    Okay.  So the initial day that you were on

 3   this case after the autopsy you went to go -- you were

 4   present when the Hardin family was spoken to and then

 5   later when the Warford's family was spoken to.  Do you

 6   recall reading that --

 7        A    Correct.

 8        Q    -- in the report?

 9        A    Yes.

10        Q    Okay.  And then after that day, the only

11   interviews that you either witnessed, participated in,

12   or observed would have been the April 9th interview with

13   Ms. Remsburg, the April 10th interview between

14   Sheriff Greer and Ms. Remsburg, and the interrogation of

15   Jeff Clark at the Louisville Police Department.  Is that

16   right to the best of your recollection, sir?

17             MR. GARVERICH:  Objection to the form of the

18        question.

19             MR. BOND:  Objection to the form.

20   BY MR. SLOSAR:

21        Q    You can answer.  It's okay.

22             MR. BOND:  Go ahead and answer.

23        A    I also was present during an interview that

24   Hope Greer did with James Tyrell.

25        Q    Okay.  I apologize.  I missed that one.  Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

1          MR. BOND:  And he referenced that earlier in

2     response to Nick.

3          Q    Sure.  And then -- that's fair.  I wasn't

4     trying to trick you, so I appreciate you bringing that

5     up.  Outside of those four interviews, after the initial

6     day, your involvement in this case would have been

7     limited to coroner responsibilities; is that fair?

8          A    That's fair.

9          Q    Yeah.  You weren't trying to investigate a

10    homicide and solve it outside the interviews --

11         A    No.

12         Q    -- you participated in --

13         A    No.

14         Q    -- right?  And I think you testified earlier,

15    outside of your interview on the 9th with Ms. Remsburg,

16    you were there mostly as an observer for these other

17    experiences as part of your desire to learn about

18    multijurisdictional investigations, right?

19         A    That's fair.

20         Q    Okay.  And certainly, after you received the

21    coroner report -- I'm sorry, not -- after you received

22    the post-mortem report, which would have been between

23    April 24th and April 30th --

24         A    Uh-huh.

25         Q    -- when you gave it to Sheriff Greer, after



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    you received that report, you weren't involved in any

2    interviews of witnesses or suspects in the case,

3    correct?

4        A    Not that I remember.

5        Q    Sure.  Certainly haven't seen any documents

6    that would lead you to believe that that was happening

7    during that time period, right, sir?

8        A    No.

9        Q    Okay.  And certainly, after you received the

10   post-mortem report, is it fair to say that your role was

11   limited to your normal responsibilities as a coroner?

12       A    That's true.

13       Q    Okay.  And so is it fair to say that on

14   May 5, 1992, when you went to the Louisville Police

15   Department for this meeting between members of the Meade

16   County Sheriff's Department and members of the

17   Louisville Police Department, that you would have been

18   there in your capacity as a coroner for Meade County?

19       A    I don't know if I would have been there as my

20   capacity as a coroner or as a friend of Joe Greer.

21       Q    Okay.  Well, certainly Sheriff Greer isn't

22   bringing in any, you know, any civilian friends to be

23   part of a meeting about a homicide, would you agree with

24   that?

25            MR. BOND:  Object to the form of the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

235

```
 1       A     Probably.
 2       Q     I mean, have you ever seen Sheriff Greer just
 3  bring his wife to, you know, a meeting --
 4       A     No.
 5       Q     -- about homicide investigations?
 6       A     No.
 7       Q     That's kind of wild, right?
 8       A     Right.
 9       Q     That's not happening.  Now, in -- is it fair
10  to say that you did not participate in any of the arrest
11  warrants or the search warrants that took place
12  immediately after that meeting on May 5, 1992 between
13  members of those two different law enforcement agencies?
14            MR. PELLINO:  Objection to the form.
15       Q     You can answer, sir.
16       A    I think I was present at one of the search
17  warrants when it was served.  I wasn't present for any
18  arrests.
19       Q     Okay.  And, so my understanding is on
20  May 5, 1992 that there were arrest warrants that were
21  issued and ultimately served.  Were you present for
22  either of the arrests?
23       A     No.
24       Q     Okay.  And do you recall the search warrant
25  that you were present when it was served, do you recall
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL Document 317-35 Filed 01/26/23 Page 236 of 262 PageID #: 27318
The Deposition of BILL ADAMS, taken on January 06, 2020
236

1   was that in April of 1992, not May?

2       A    I don't remember.

3       Q    And sitting here today, do you recall whether

4   you were present for a search warrant relating to

5   Mr. Clark's residence or Mr. Hardin's residence?

6       A    I think it was Clark's residence, but I'm not

7   sure.

8       Q    Is it fair to say that that search warrant

9   that you would have been present for, that that would

10  have happened right around the time, either before or

11  after, Jeff Clark was interrogated, the interrogation

12  that you observed?

13      A    That's possible.

14      Q    Okay.  But certainly, is it fair to say that

15  on May 5, 1992, that you certainly would not have

16  participated in either of the warrants leading to the

17  arrest of Jeff Clark or Keith Hardin?

18      A    I did not.

19           MR. PELLINO:  Objection to the form.

20      Q    And that is it fair to say that on May 5, 1992

21  that you were present at the Louisville Police

22  Department at the request of Joe Greer?

23      A    I presume.

24      Q    Sure.  You certainly wouldn't have known about

25  that meeting unless Sheriff Greer told you about it,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    right?

2        A    Right.

3        Q    Sure.  And at that time, your role in this

4    investigation was as the coroner, correct?

5             MR. BOND:  Object to form.

6        A    Yes.

7        Q    You weren't a homicide investigator on

8    May 5, 1992, right?

9        A    No.

10       Q    Okay.  In one of your roles as the coroner in

11   this case was to determine the date of death; is that

12   right?

13       A    That's correct.

14       Q    Sure.  And by May 5, 1992, the day that

15   Sheriff Greer requested for you to participate in this

16   meeting, you hadn't yet signed the death certificate.

17   Would you agree with that?

18            MR. BOND:  Object to the form of the question.

19       Q    You can answer.

20       A    I had not.

21            MR. SLOSAR:  Yeah.  And sir, isn't it true that

22        you haven't yet signed the death certificate by

23        May 5, 1992, by the time of that meeting on

24        May 5, 1992 because you hadn't yet determined --

25        well, let me withdraw that.  I have no further



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

238

```
 1        questions.
 2             MR. BOND:  Do you still want to take a break,
 3        Nick?
 4             MR. BRUSTIN:  No, I'm good.
 5             MR. BOND:  Okay.
 6                        REDIRECT EXAMINATION
 7   BY MR. BRUSTIN:
 8        Q    Is there a reason, Mr. Adams, why when you
 9   were asked questions by Mr. Ervin, the lawyer for the
10   city, you didn't say once you didn't remember?
11        A    I don't think he asked me a question that I
12   needed that answer.
13        Q    Your memory get better when he was asking you
14   questions?
15        A    No, I don't think so.
16        Q    All right.  And one of the things he started
17   by asking you was that he said that, in substance, you
18   were never deputized in this case to act outside of your
19   wall as coroner?
20        A    That's correct.
21        Q    You remember being asked that?
22        A    Yes.
23        Q    And you strongly answered, "That's true."  You
24   were never deputized to do anything outside of your role
25   as coroner?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

239

1       A     That's true.

2       Q     And you didn't take any steps in this case

3   outside of your role as coroner?

4       A     No.

5       Q     You were either acting as coroner or acting as

6   a good friend to Sheriff Greer; fair to say?

7       A     Pretty much, yes.

8       Q     That was your role in this case: Good friend

9   and coroner, right?

10      A     Yes.

11      Q     And nothing more, right?

12      A     Right.

13      Q     All right.  Take a look at Exhibit 1 -- I

14  mean, Exhibit 25, which you --

15      A     Okay.

16      Q     -- have in front of you.  And let's start with

17  page 553.

18      A     Okay.

19      Q     Let me know when you're there.

20      A     I'm there.

21      Q     All right.  This is a report.  If you go back

22  to the page before you can see that this is a report

23  that was created by Detective James Clark.  Do you

24  remember James Clark?

25      A     I remember the name.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

240

```
1        Q    Did you know him before this case?

2        A    No.

3        Q    All right.  Now, if you take a look at

4   page 553, you see where it says the third paragraph --

5   fourth paragraph at approximately 22:00 hours?

6        A    Uh-huh.

7        Q    Read that paragraph and the next two to

8   yourself.

9        A    Okay.

10        Q    This is the day the body was found, correct?

11   At the top.

12        A    Yes.

13        Q    All right.  And so it appears here that the

14   way in which the Louisville Police Department became

15   involved in this case is when you got on the phone and

16   called them, correct?  That's what it says, correct?

17        A    That's what it says.

18        Q    So the way that this homicide investigation

19   became a joint investigation is because you as the

20   coroner called the LPD detective office and told them

21   you needed their help, correct?

22        A    I don't remember doing that.

23        Q    Well, that's what this says, correct?

24        A    That's what it says.  I don't remember making

25   that call.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

241

```
 1        Q    All right.  But that's -- you have no reason
 2   to dispute that's what happened, do you?
 3        A    No.  If I made that call, it would have been
 4   at the request of Sheriff Greer --
 5        Q    Okay.
 6        A    -- or someone else.
 7        Q    Sure.  Was Sheriff Greer afraid to call the
 8   LPD on his own?
 9        A    I can't answer that.
10             MR. GARVERICH:  Objection to the form of the
11        question.
12        A    I don't speak for him.
13        Q    Were you just being a good buddy by asking the
14   LPD to get involved in this homicide investigation?
15        A    I don't think that is my role.  I don't think
16   that's what I did.
17        Q    Oh, I agree.  The role of a coroner is not to
18   set up a joint investigation in a homicide; fair to say?
19        A    That's fair to say.
20        Q    That would be deputizing you to be more than a
21   coroner, correct?
22        A    I have never been deputized.
23        Q    All right.  Well, I don't think he meant it in
24   the literal sense.  He meant it in a figurative sense.
25   Well, you're assuming this report is accurate,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    Sheriff Greer, or on your own, you called the
 2    Louisville Police -- withdrawn.  Either because
 3    Sheriff Greer asked you to, or because you decided to do
 4    it on your own, you started this joint homicide
 5    investigation, correct?
 6              MR. BOND:  Objection to the form.
 7    A     That's what it says.
 8    Q     But you have no memory of it whatsoever?
 9    A     I do not.
10    Q     It's a blank?
11    A     A total blank.
12    Q     Now, if you take a look next at page 560, this
13    is a description of the meeting that you're having with
14    the Louisville police detectives after you started the
15    joint investigation, okay?
16              MR. BOND:  Object to the form.
17    Q     Take a minute and look at this page.  You can
18    familiarize yourself with it.  I'm specifically
19    referring to -- actually, review the whole page.
20    A     Okay.
21    Q     So I describe this accurately.  This is the
22    meeting that you're having with LPD detectives and
23    Sheriff Greer after you call them about having a joint
24    investigation, correct?
25    A     I presume.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And your role in this meeting is to give them

2  information that you ascertained from the crime scene

3  and -- from the crime scene, correct?

4    A    From the autopsy.

5    Q    And from the autopsy.  And do you remember

6  earlier when you told us -- withdrawn.  In other words,

7  you're giving them information that you have in your

8  head about the different things that a coroner might

9  opine on, cause of death, time of death --

10    A    Right.

11    Q    -- things like that, correct?

12    A    Correct.

13    Q    All right.  That's your role when you're

14  meeting -- when you're meeting with LPD detectives, your

15  role is to give them information about what you know,

16  correct?

17    A    As the coroner.

18    Q    Either way.  You observed yourself at the

19  scene or what you learned from the coroner, correct?

20    A    From the medical --

21    Q    From the medical examiner.  One or the other,

22  that's what your role is?

23    A    Yes.

24    Q    That's what you're looking -- that's what they

25  were looking to you for --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A      Yes.

 2        Q      -- that kind of information?

 3        A      Yes.

 4        Q      And that's the kind of information you were

 5   giving them, right?

 6        A      Yes.

 7        Q      All right.  And here one of the things you

 8   talk about is the knife wound being approximately

 9   five-and-a-half to six inches?

10        A      That would have been something that

11   Dr. Nichols would have told me.

12        Q      All right.  Well, there's no mention of --

13             MR. BOND:  It says, "In addition, Dr. Nichols."

14        Q      Okay.  So you believe this is what Dr. Nichols

15   told you?

16        A      Yes.

17        Q      All right.  So you were repeating what you

18   learned from the autopsy?

19        A      That's --

20        Q      All right.

21        A      -- true.  So you had that meeting where you're

22   giving them medical information that you observed from

23   the scene or that Nichols told you, correct?

24        A      Correct.

25        Q      And you've already told us, by the way --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

245

```
 1    withdrawn.  You understand that Sheriff Greer is
 2    testifying repeatedly in his deposition that he included
 3    a time of death in this case as 4-4 or 4-5 based solely
 4    on information that you gave them?
 5              MR. BOND:  Object to the form.
 6         Q    Do you have any reason to dispute that?
 7         A    No.
 8         Q    All right.  And, in fact, one of the things
 9    that you were talking to Sheriff Greer about, even if
10    you don't specifically remember it today, the specifics
11    of it, is the reasons why you believe this murder
12    occurred on 4-4 or 4-5, correct?
13              MR. BOND:  Objection to the form.
14              MR. ERVIN:  Objection to the form.
15         A    Initially.
16         Q    Initially.  You were having those
17    conversations with him?
18         A    Initially.
19         Q    And obviously time of death is an important
20    element in a homicide investigation; fair to say?
21         A    Fair to say.
22         Q    It's something Sheriff Greer was interested
23    in?
24         A    Sure.
25         Q    And it's also something that the LPD
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  detectives became interested in once you started meeting

2  with them as part of your coroner responsibilities,

3  correct?

4      A    I'm sure, yes.

5      Q    That's one of the things you were talking with

6  them the various times that you met with them, right?

7      A    Probably.

8      Q    All right.  So we've got your meeting with

9  them that you were -- after you organized the task force

10  on the 5th.

11      MR. BOND:  Object to the form of the question.

12      Q    And then --

13      MR. BOND:  The form of the comment.

14      Q    -- if you take a look at page 591.  All right.

15  You -- let me know when you're with me.  Sorry.

16      A    Okay.

17      Q    591.  All right.  Read the first three

18  paragraphs on the page.  Let me know when you're done.

19      A    Okay.

20      Q    All right.  This is describing your activities

21  on April 8, 1992 with Sheriff Greer and Mark Handy.

22      A    Yes.

23      Q    Detective Handy, right?

24      A    Yes.

25      Q    By the way, no mention here of you acting as a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    friend to Sheriff Greer, correct?
2        A     Not that I see.
3        Q     No.  Your mentioned as someone who is
4    participating in interviews, correct?
5              MR. BOND:  Object to the form of the question.
6        A     It says I was there.
7        Q     Well, what it says is, "Mr. Clark was also
8    transported to the PAS office and re-interviewed in
9    connection with the above captioned case.  This was done
10   by myself, along with Sheriff Joe Greer and Bill Adams
11   of Meade County," right?
12       A     That's what it says.
13       Q     It says you're a part of the re-interview,
14   right?
15       A     That's what it says.
16       Q     Nobody -- apparently nobody mentioned to Handy
17   that you were just there as a good buddy?
18       A     That's possible.
19       Q     All right.  But in any case, you're
20   participating in two events here on April 8th.  You're
21   going to -- first you're meeting to execute the search
22   warrant, right?  On top, first paragraph.
23       A     I suppose.
24       Q     That's what it says, right?  Assuming it's
25   accurate.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
1        A    That's what it says.

2        Q    Okay.  And then you go back with everybody to

3   the PAS office to re-interview Mr. Clark, right?

4        A    I went back to the PAS office.

5        Q    Okay.  And I'll --

6             MR. BOND:  Let -- I can object.

7             MR. BRUSTIN:  Sure.

8             MR. BOND:  It doesn't say search warrant.  I

9        think he gave permission to search the vehicle.

10            MR. BRUSTIN:  I think that's right.

11            MR. BOND:  Okay.  I just --

12            MR. BRUSTIN:  No, I appreciate that.

13   BY MR. BRUSTIN:

14        Q    You were involved in a search of a vehicle --

15            MR. BOND:  There's a distinction.

16        Q    -- and a brief interview of Jeff Clark first,

17   correct?

18        A    I was there.

19        Q    Okay.  And then you go back, and you are

20   present for a second interview in the PAS office?

21        A    That's -- that's true.

22        Q    All right.  And presumably, one of the reasons

23   you're there, in addition to being a friend to

24   Sheriff Greer, is to provide the coroner type

25   information that you might have in the case?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 249 of 262 PageID #: 27331
The Deposition of BILL ADAMS, taken on January 06, 2020
249

1        A     Possibly.

2        Q     All right.  Now, you came to understand that

3   Detective Handy at this time was an experienced

4   detective, correct?

5        A     Yes.

6        Q     And one of the things that Detective Handy was

7   interested in was your views on time of death, correct?

8             MR. PELLINO:  Objection to the form.

9             MR. BOND:  Objection to the form

10       A     I don't remember -- recall whether he asked me

11   about that or not.  I'm sure he probably did.

12       Q     Of course he did, right?

13            MR. ERVIN:  Objection to the form.

14            MR. BOND:  I'm going to object to the form.

15       Q     Let me ask you this.  Is there any doubt in

16   your mind that during, and I'm going to get to more

17   meetings, but in those meetings that you had with Handy

18   and others, among other things, you were talking about

19   your views on time of death?  Any doubt in your mind

20   that that happened?

21       A     No.  I'm sure that --

22            MR. ERVIN:  Objection to the form.  It is beat

23      to death.

24            MR. PELLINO:  Objection to form.

25   BY MR. BRUSTIN:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      You said you're sure it did happen, correct?

2      A      I'm sure I discussed time of death.

3      Q      All right.  Now, let's take a look at

4   page 594.  No, skip that.  It's the same one.

5      A      Right.  That's a different one.

6      Q      608.

7      A      Okay.

8      Q      Paragraph beginning on "Tuesday afternoon..."

9   See that?

10          MR. BOND:  Fourth paragraph down.

11      A      Yes.

12          MR. BOND:  Excuse me.

13      Q      And this is describing the joint task force

14   splitting up into teams to do interviews, right?

15          MR. BOND:  Object to the form of the question.

16      A      I presume that's what you want to call it.

17      Q      Well, this is splitting up into teams to do

18   interviews, correct?  You're on a team, Sheriff Greer is

19   on another team, right?

20      A      I'm with one detective, he's with another.

21      Q      Any understanding if you were just there as

22   Sheriff Greer's friend, why you were on another team?

23      A      I don't know.  I --

24      Q      It sounds like they understood you to be doing

25   more than just being a friend to Sheriff Greer, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1        A     I don't see me asking any questions.

2        Q     All right.  Now, so this is another activity

3   that you're conducting, correct?

4              MR. BOND:  Object to the form.

5        A     I'm there.

6        Q     And they mention that you're there as the

7   coroner?

8        A     Right.

9        Q     Presumably, although you may not remember it,

10  you're talking about issues relating to -- potentially

11  you're talking about issues relating to what you observe

12  about time of death and things of that nature; fair to

13  say?

14             MR. BOND:  Objection to the form of the

15      question.

16       A     Or observe.

17             MR. ERVIN:  Object.

18             MR. BOND:  Go ahead and answer.

19       A     Or just observing the interview.

20       Q     Okay.  Which now brings us to May 5th, which

21  you have -- where you have another meeting with all the

22  fellows investigating this case from the various police

23  departments, okay?

24             MR. ERVIN:  Object to the form.

25             MR. BOND:  Object to the form of the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 252 of 262 PageID #: 27334
The Deposition of BILL ADAMS, taken on January 06, 2020
252

```
 1        Q    So let's take a look at that.
 2             MR. BOND:  It's not in the testimony.
 3             MR. SLOSAR:  He didn't even call it a joint
 4        task force that time.
 5             MR. BOND:  Well, he implied.  How about that?
 6   BY MR. BRUSTIN:
 7        Q    It's just a bunch of guys doing an
 8   investigation as friends.
 9             MR. BOND:  Don't exclude Ms. Greer.
10        Q    All right.  Take a look at page 22.
11        A    Okay.
12        Q    All right.  So at 6:30 in the morning on
13   May 5, 1992, the same day that Jeff Clark and Hardin are
14   going to be arrested, you go with not just
15   Sheriff Greer, but Cliff Wise, and Joe Wood, and
16   Tim Livers to the Louisville Police Department, correct?
17        A    That's what it says.
18        Q    The whole team goes, right?
19        A    That's what it says.
20        Q    Because -- and the reason you-all go is
21   because you know this day is a big deal in Meade County,
22   right?
23        A    I can't answer to that.
24        Q    Well, is that a fair assumption as to why all
25   of you go?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

1       A    I don't know why we all went.

2       Q    Right.  But you-all did, right?

3       A    According to that.

4       Q    And you didn't get up at 6:30 in the morning

5   and go with all these fellas and drive all the way to

6   Louisville without finding out what was going on, right?

7           MR. ERVIN:  Objection to the form.  We've been

8       over it, we've been over it, we've been over it.

9       A    I was there.

10      Q    All right.  And you were there to answer any

11  coroner type questions, right?

12      A    Or as an observer of what was happening.

13      Q    All right.  And that -- also that's the day

14  they were arrested?

15      A    That you can't prove that to me.  I don't

16  know.

17      Q    It's two days before you changed -- well, I'm

18  representing to you it's the day they were arrested.

19      A    Okay.

20      Q    It's two days before you changed the time of

21  death, right?

22          MR. ERVIN:  Objection to the form.

23          MR. BOND:  Objection to the form of the

24      question.

25          MR. ERVIN:  It misrepresents his testimony.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 254 of 262 PageID #: 27336
The Deposition of BILL ADAMS, taken on January 06, 2020
254

BY MR. BRUSTIN:

Q    **Wait a minute.  On May 7th you changed on your report the time -- the date of death from --**

A    On May the 7th I signed a death certificate.

Q    **All right.  On May 7th you changed on the death certificate, just let me finish the question, you changed the date of death from your original report from April 4th or 5th to April 2nd, correct?**

MR. ERVIN:  Objection to the form.

MR. BOND:  Objection to the form.  Go ahead Bill.

A    I signed the death certificate on that day. In my mind, I probably changed the date long before then.

BY MR. BRUSTIN:

Q    **You don't -- you've already made it very clear you have no memory whatsoever of when that happened, right?**

A    I don't, but -- never mind.  I'm sorry.

Q    **All right.**

MR. BOND:  Nick, we can sit here and ask questions.  I'm not going to let you ask the same thing over and over.

MR. BRUSTIN:  Okay.

MR. BOND:  Okay.  I'm going to instruct him not



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1     to answer --

 2          MR. BRUSTIN:  I'm almost done.

 3          MR. BOND:  -- okay?

 4          MR. BRUSTIN:  You can't do that.  You know you

 5     can't do it.  I'm not at that point yet.

 6          MR. BOND:  Whoa, whoa, whoa.

 7          MR. BRUSTIN:  I'm not at that point.

 8          MR. BOND:  Don't tell me what I can't do.

 9          MR. BRUSTIN:  I'm telling you, you can't

10     probably do that.  I am telling you that.

11          MR. BOND:  Well, let's move on.

12          MR. BRUSTIN:  All right.

13          MR. BOND:  Let's do something new.

14          MR. BRUSTIN:  All right.

15          MR. BOND:  Okay?

16          MR. BRUSTIN:  The reason --

17          MR. BOND:  I've let you shoot at him --

18          MR. BRUSTIN:  Sure.

19          MR. BOND:  -- a couple extra times.  I'm about

20     done.

21   BY MR. BRUSTIN:

22       Q    The reason why you changed the time of -- the

23   date of death on May 7th is because on May 5th, when all

24   the LPD detectives got together with all the Meade

25   County detectives, it was recognized that there was a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   problem with the date of death given the alibis,

2   correct?

3        A    I don't believe that.

4            MR. ERVIN:  Objection to the form.

5        A    I don't know.

6        Q    All right.  So your testimony is that when all

7   of you went down at 6:30 in the morning and met with the

8   LPD detectives before making arrest, no discussion about

9   date of death?

10           MR. BOND:  Object to the form of the question.

11       A    Not that I remember.

12       Q    All right.  We know you don't remember any of

13  it.  Would it be fair to say that's likely something you

14  talk about?

15           MR. ERVIN:  Objection to the form.

16       Argumentative.

17           MR. BOND:  Objection to the form.

18       A    I don't think at that particular time it would

19  have been something that we would have talked about.

20       Q    Well, what point in time did the LPD

21  detectives -- withdrawn.  Sheriff Greer has testified

22  very strongly and consistently that it was determined

23  through their -- through the joint investigation that

24  Keith Hardin and Jeff Clark had clear alibis for all

25  times other than Thursday.  You know that, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 257 of 262 PageID #: 27339
The Deposition of BILL ADAMS, taken on January 06, 2020

257

1        MR. ERVIN:  Objection to form.

2        MR. GARVERICH:  Objection to the form of the

3    question.

4        MR. PELLINO:  Objection to the form.  You can

5    answer.

6    A    I don't know that for sure.

7    BY MR. BRUSTIN:

8    Q    Well, I'm representing to you that's what he

9    testified to.

10   A    Okay.

11       MR. GARVERICH:  Same objection.

12   Q    At what point -- obviously he would have

13   raised that with the LPD detectives, you would expect

14   that Sheriff Greer is a competent guy, right?

15       MR. ERVIN:  Objection to the form.

16   Q    All right.  At what point did the LPD

17   detectives, including Detective Handy, ask you about

18   your initial recommendation on time of death?

19   A    I don't know.

20   Q    All right.  Obviously, they must have,

21   correct?

22   A    I'm sure they probably did.

23   Q    Do you look -- are you looking over there for

24   some help?

25   A    No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-35   Filed 01/26/23   Page 258 of 262 PageID #: 27340
The Deposition of BILL ADAMS, taken on January 06, 2020
258

1      Q    Why are you looking over there?

2      A    I'm looking everywhere.

3      Q    All right.  At some point, they must have

4 asked you why you initially -- whether you were sure

5 about your initial time of death; fair to say?

6      A    That's fair to say.

7      MR. BOND:  Object to the form of the question.

8   Go ahead.

9      Q    And at some point, you told the LPD detectives

10 that you would see what you could do about fixing it,

11 right?

12      MR. BOND:  Object to the form of the question.

13      A    That's not true.

14      Q    Well, you've made it very clear that the only

15 piece of new information, the only piece of new

16 information you had that caused you to change the date

17 of death was the fact that Hardin and Clark had alibis?

18      MR. ERVIN:  Objection.

19      MR. GARVERICH:  Objection.

20      MR. BOND:  Objection.

21      MR. ERVIN:  Not a question.  That's

22   argumentative.

23      MR. BOND:  That's not what he said.

24 BY MR. BRUSTIN:

25      Q    I'm questioning -- all right.  All right.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of BILL ADAMS, taken on January 06, 2020

259

 1   Now, although you don't specifically remember your

 2   interview with Amy Remsburg the night before your -- on

 3   April 9th, the night before the taped interview, your

 4   reason for going to her was solely to determine whether

 5   she had information about the murder, correct?

 6           MR. ERVIN:  Objection to the form.

 7   A    I don't know.

 8   Q    All right.

 9   A    I told you I don't remember even going to her.

10           MR. BOND:  12, 14 times he told you that.

11   Q    Sure.  What conceivable reason other than

12   finding out if she had information about the murder

13   could you have for going to talk to Amy Remsburg?  Were

14   you just catching up with an old friend?

15           MR. ERVIN:  Objection to the form of the

16       question.

17           MR. BOND:  Object to the form.  Nick, please.

18   A    I don't know.

19   BY MR. BRUSTIN:

20   Q    It was 10:30 at night when you're there.

21   Would it be fair to say the only conceivable reason for

22   going there was to see if she had information about

23   Jeff Clark's involvement in the murder?

24           MR. ERVIN:  Objection to the form.

25   A    I don't know why I was there.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of BILL ADAMS, taken on January 06, 2020

260

1      Q   Okay.  What other conceivable reason would you

2  have had for going to Amy Remsburg's house at 10:30 at

3  night?

4      A   I could have been asked by the

5  Deputy Sheriff Livers to talk to her.

6      Q   Right.  And see if she had information about

7  the homicide.

8      A   That's possible.

9      Q   Okay.  What other possibility could you have

10  gone there for other than determining if she had

11  information relevant to the homicide?

12      A   I wouldn't have had any other reason to go.

13      Q   That would have been the only reason, right?

14      A   Yes.

15      MR. BRUSTIN:  All right.  That's all I have.

16      MR. BOND:  Anybody?

17                RECROSS EXAMINATION

18  BY MR. ERVIN:

19      Q   Just looking at your statement, what you --

20  the information you learned from her is what she knew

21  about Jeffrey Dewayne Clark; is that right?

22      A   Yes.

23      MR. BRUSTIN:  Objection to form.

24      Q   You did not ask her questions based on what

25  you've written about the murder of Rhonda Sue Warford?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL  Document 317-35  Filed 01/26/23  Page 261 of 262 PageID #: 27343
The Deposition of BILL ADAMS, taken on January 06, 2020

261

1      A    No.

2           MR. ERVIN:  Thank you, sir.

3                 FURTHER DIRECT EXAMINATION

4  BY MR. BRUSTIN:

5      Q    Is it your --

6      A    I don't think.

7      Q    Sure I'm going to ask you another question

8  now.  Is it your testimony here under oath that you

9  don't believe you asked Ms. Remsburg whether she had

10 information about Jeffrey Clark's involvement in the

11 homicide at 10:30 at night when you went there?  Is that

12 your testimony, sir?

13     A    I may have.

14     Q    It's possible?

15     A    It's not in my notes.

16     Q    Is it possible?

17     A    It's possible.

18     Q    Is it possible you forgot to ask her that?

19     A    I don't know.

20          MR. BRUSTIN:  All right.

21          MR. BOND:  We're done.

22          VIDEOGRAPHER:  The time is 4:56.  That

23     concludes today deposition.

24               (DEPOSITION CONCLUDED AT 4:56 P.M.)

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              CERTIFICATE OF REPORTER
 2                STATE OF INDIANA
 3
 4   I do hereby certify that the witness in the foregoing
 5   transcript was taken on the date, and at the time and
 6   place set out on the Title page here of by me after
 7   first being duly sworn to testify the truth, the whole
 8   truth, and nothing but the truth; and that the said
 9   matter was recorded stenographically and mechanically by
10   me and then reduced to typewritten form under my
11   direction, and constitutes a true record of the
12   transcript as taken, all to the best of my skill and
13   ability.  I certify that I am not a relative or employee
14   of either counsel, and that I am in no way interested
15   financially, directly or indirectly, in this action.
16
17
18
19
20
21
22   LACEE TOWNSEND,
23   COURT REPORTER/NOTARY
24   COMMISSION EXPIRES:  06/19/2024
25   SUBMITTED ON:  01/15/2020
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com