1          IN THE UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF KENTUCKY

3                  LOUISVILLE DIVISION

4                  CASE NO. 17-CV-419

5                  HON. JUSTIN WALKER

6                 MAG. COLIN H. LINDSAY

7

8            JEFFREY DEWAYNE CLARK AND

9             GARR KEITH HARDIN,

10                   Plaintiffs

11

12                       v.

13

14              LOUISVILLE JEFFERSON

15           COUNTY METRO GOVT., ET AL.,

16                  Defendants

17

18

19

20

21

22

23    DEPONENT:  JAMES CLARK

24    DATE:      JANUARY 21, 2022

25    REPORTER:  KORTNEY CHASE



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 2 of 86 PageID #: 27432
The Deposition of JAMES CLARK, taken on January 21, 2022

2

```
 1                        APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, JEFFREY DEWAYNE CLARK:

 4   Elliot Slosar, Esquire

 5   Loevy & Loevy

 6   311 North Aberdeen Street

 7   Third Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: elliot@loevy.com

11   (Appeared via videoconference)

12

13   ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

14   Nick Brustin, Esquire

15   Katie McCarthy, Esquire

16   Nuefeld Scheck & Brustin, LLP

17   99 Hudson Street

18   Eighth Floor

19   New York, New York 10013

20   Telephone No.: (212) 965-9081

21   E-mail: nick@nsbcivilrights.com

22   katie@nsbcivilrights.com

23   (Appeared via videoconference)

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 3 of 86 PageID #: 27433
The Deposition of JAMES CLARK, taken on January 21, 2022

3

```
 1              (APPEARANCED CONTINUED)

 2

 3    AND

 4    Larry D. Simon, Esquire

 5    The Simon Law Office

 6    239 South Fifth Street

 7    Suite 1705

 8    Louisville, Kentucky 40202

 9    Telephone No.: (502) 822-2074

10    E-mail: larrysimonlawoffice@gmail.com

11    (Appeared via videoconference)

12

13    ON BEHALF OF THE DEFENDANTS, MEADE COUNTY, SHERIFF

14    JOSEPH GREER, ERNIE EMBRY, CLIFF WISE, AND WILLIAM

15    ADAMS:

16    R. Keith Bond, Esquire

17    Andrew T. Garverich, Esquire

18    Coleman Lochmiller & Bond

19    2907 Ring Road

20    Elizabeth, Kentucky 42702

21    Telephone No.:

22    E-mail: rkbond@clblegal.com

23    agarverich@clblegal.com

24    (Appeared via videoconference)

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    (APPEARANCES CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, LOUISVILLE JEFFERSON COUNTY

 4   METRO GOVT.:

 5   Peter Ervin, Esquire

 6   Jefferson County Attorney's Office

 7   531 Court Place

 8   Suite 900

 9   Louisville, Kentucky 40202

10   Telephone No.: (502) 574-6621

11   E-mail: peter.ervin@louisvilleky.gov

12   (Appeared via videoconference)

13

14   ON BEHALF OF THE DEFENDANT, MARK HANDY:

15   Kayla Campbell, Esquire

16   Dressman Benzinger LaVelle, PSC

17   321 West Main Street

18   Suite 2100

19   Louisville, Kentucky 40202

20   Telephone No.: (502) 630-1301

21   E-mail: kcampbell@dbllaw.com

22   (Appeared via videoconference)

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              (APPEARANCES CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, SERGEANT JIM WOOSLEY:

 4   Joey Klausing, Esquire

 5   O'Bryan, Brown & Toner, PLLC

 6   9102 North Meridian Street

 7   Suite 550

 8   Indianapolis, Indiana 46260

 9   Telephone No.: (317) 669-0087

10   E-mail: klausingj@obtlaw.com

11   (Appeared via videoconference)

12

13   Also Present: Dana Grant, Paralegal for Kayla Campbell;

14   Jahne Brown, Paralegal for Nick Brustin

15

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                         INDEX

 2                                          Page

 3     PROCEEDINGS                            8

 4     DIRECT EXAMINATION BY MR. BRUSTIN     10

 5

 6                       EXHIBITS

 7     Exhibit                              Page

 8     59 - James Clark Reports             35

 9     116 - Mark Handy Letter to Satanism  54

10           Professor, Ronald Holmes

11     92 - Mark Handy's Occult Crimes:     57

12         Reduction & Detection Certificate

13         - LMG006879

14     171 - LPD File on Humbert Homicide -  72

15         HUMBERT 000001-00100

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 7 of 86 PageID #:
27437
The Deposition of JAMES CLARK, taken on January 21, 2022
7

```
1                          STIPULATION

2

3    The VIDEO deposition of JAMES CLARK was taken at

4    KENTUCKIANA REPORTERS, 730 WEST MAIN STREET, SUITE 101,

5    LOUISVILLE, KENTUCKY 40202, via videoconference in which

6    all participants attended remotely, on FRIDAY the 21ST

7    day of JANUARY, 2022 at 2:31 p.m. EST; said VIDEO

8    deposition was taken pursuant to the FEDERAL Rules of

9    Civil Procedure.  The oath in this matter was sworn

10   remotely pursuant to FRCP 30.

11

12   It is agreed that KORTNEY CHASE, being a Notary Public

13   and Court Reporter for the State of ILLINOIS, may swear

14   the witness.

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1         PROCEEDINGS

2         COURT REPORTER:  We're now on the record.  My

3    name is Kortney Chase.  I'm the online video

4    technician and court reporter today representing

5    Kentuckiana reporters located at 730 West Main

6    Street, Suite 101, Louisville, Kentucky 40202.

7    Today is the 21st day of January 2022.  The time is

8    2:31 p.m. Eastern.  We are convened by

9    videoconference to take the deposition of Detective

10   James Clark in the matter of Jeffrey Dewayne Clark

11   and Garr Keith Hardin v. Louisville Jefferson County

12   Metro government, et al., pending in the United

13   States District Court, Western District of Kentucky,

14   Louisville Division, case number 17-cv-419.  Will

15   everyone but the witness please state your

16   appearance, how you are attending, and the location

17   you are attending from starting with plaintiff's

18   counsel?

19        MR. BRUSTIN:  Nick Brustin.  Neufeld Scheck &

20   Brustin for the plaintiff Hardin, and I'm in New

21   York.

22        MR. SIMON:  Larry Simon --

23        MR. SLOSAR:  Elliot --

24        MR. SIMON:  Oh, go ahead.

25        MR. SLOSAR:  Go Larry.  Go.  Sorry.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          MR. SIMON:  Larry Simon for the plaintiff
 2     Hardin.  I'm in the room with the deponent.
 3          MR. SLOSAR:  Elliott Slosar appearing remotely
 4     for plaintiff Clark.
 5          MR. ERVIN:  This is Peter Ervin for the Metro
 6     government, and its employees, and the witness Jimmy
 7     Clark.
 8          MS. CAMPBELL:  Kayla Campbell on behalf of Mark
 9     Handy, and Dana Grant, a paralegal from my office,
10     is also on.  We're both appearing remotely from our
11     office in Jefferson County, Kentucky.
12          MR. KLAUSING:  Joe Klausing for Jim Woosley
13     here in Louisville.
14          MR. BOND:  Keith Bond and Andrew Garverich,
15     Elizabethtown, Kentucky, appearing on behalf of
16     Meade County defendants.
17          COURT REPORTER:  Okay.  And Detective Clark,
18     will you please state your name for the record?
19          THE WITNESS:  Yeah.  My name is James E. Clark.
20          COURT REPORTER:  And do all parties agree that
21     the witness is, in fact, Detective James Clark?
22          MR. BRUSTIN:  Yes.
23          COURT REPORTER:  Okay.  Detective Clark, will
24     you please raise your right hand?  Do you solemnly
25     swear or affirm that the testimony you are about to
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    give will be truth, the whole truth, and nothing but

2    the truth?

3           THE WITNESS:  Yes.

4           COURT REPORTER:  Thank you.  You may begin.

5                DIRECT EXAMINATION

6    BY MR. BRUSTIN:

7       Q    Good afternoon, Detective Clark.

8       A    Good afternoon.

9       Q    Is Detective Clark okay?  To refer to you as

10   Detective -- is that okay with you?

11      A    Yes.

12      Q    Okay.

13           MR. ERVIN:  He achieved the rank of sergeant

14      before he retired.

15      Q    Would you prefer Sergeant?

16      A    I -- just Jimmy.

17      Q    Is that your -- sir, I can't do that.  Is

18   Sergeant your appropriate title?

19      A    Yes, sir.

20      Q    Okay.  I'll refer to you as Sergeant then.

21   Sergeant Clark, we met off the record.  I think we met

22   before, too.  My name is Nick Brustin.  I'm one of the

23   attorneys for plaintiff Hardin.  I'm going to be asking

24   a bunch of questions today.  I know it's a continuing

25   deposition, and other lawyers might also have questions

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    for you.  The only instruction I'll give you is if you

2    don't understand my question, please just tell me.  I'll

3    reframe it for you.  If you do answer, I'm going to

4    assume you understood it.  Okay?

5        A    Yes.  Yes.

6        Q    And it gets a little tough on Zoom. Sometimes,

7    it's -- I talk fast and -- so just let me know if you're

8    having any trouble.  Okay?

9        A    Yes.

10       Q    And by the way, you understand you're a

11   defendant in this case, correct?

12       A    Correct.

13       Q    And let me just state for the record.  You

14   were named as a defendant at the outset of this case

15   based on the information we had at that time.  We know

16   much more today, and that status may very well change.

17       A    Yes.

18       Q    So the first thing I want to talk to you about

19   -- just some general stuff, and I know this is a long

20   time ago but -- so maybe we could start with what you

21   did to prepare for today.  What documents you reviewed?

22       A    I was given some documents from Mr. Denny and

23   Mr. Ervin regarding my participation in this -- initial

24   participation and some witnesses that I interviewed.

25       Q    Okay.  Did you review any other reports other

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 12 of 86 PageID #:
27442
The Deposition of JAMES CLARKSON, taken on January 21, 2022
12

1    than documentation of witnesses you interviewed?

2         A    No.  I have not.

3         Q    All right.  And would it be fair to say that

4    your memory of your involvement in the Warford homicide

5    investigation is relatively limited -- your actual

6    memory?

7         A    That's correct, sir.

8         Q    What documents, if any, have you reviewed --

9    I'm sorry.  Let me withdraw that.  Have you reviewed any

10   additional documents in-between your last deposition and

11   this deposition other than what you've just described?

12        A    No, sir.  No, sir.

13        Q    You haven't reviewed any testimony?

14        A    I reviewed some testimony that Mr. Ervin gave

15   me regarding -- I think it's the West case.  My

16   testimony in that case.

17        Q    Okay.  Any other testimony you reviewed from

18   either or anybody else?

19        A    No, sir.

20        Q    And did you meet with Mr. Ervin in preparation

21   for today since your last deposition?

22        A    Yes, sir.

23        Q    When did you meet?

24        A    We met last week sometime.  I can't remember

25   specifically -- specifically what day it was.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  How many hours did you meet for?

2    A    Maybe an hour.  A little bit more.

3    Q    Was it just the two of you in the meeting?

4    A    No.  Mr. Denny was in the meeting.

5    Q    Okay.  Anybody else?

6    A    No, sir.

7    Q    Any other meeting since your last deposition?

8    A    No, sir.

9    Q    Have you had any communications with any of

10   the defendants in this case since you were named as a

11   defendant?

12   A    No, sir.

13   Q    Have you talked to your brother about his

14   deposition since he was deposed in this case?

15   A    Yeah.  The -- the last time I was deposed, I

16   talked to him about clarity on what he said and what I

17   said about recording audio.  And that's the only time

18   that we've ever talked -- discussed this case.

19   Q    Okay.  I'm going to ask you about some other

20   communications you may have had your brother and

21   connection with the Chandler case, but we'll get to that

22   a little bit later, okay?  So first of all, back in the

23   early '90s, you worked in the same unit as Mark Handy

24   but on different shifts; is that correct?

25   A    Correct, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    So at the time of the investigation in this
2  case as well as the Chandler and West cases, which
3  shifts were you on?
4    A    I don't recall what shifts I was on because I
5  -- it seems like we rotated shifts back then.  I just --
6  I'm -- I definitely know we were on different shifts.
7    Q    Okay.  Do you remember the shift you were
8  working in this case?  The Warford homicide
9  investigation?
10    A    I don't.  I don't remember which shift I was
11  working.
12    Q    All right.  But you do recall that you were
13  always on a different shift than Detective Handy?
14    A    That's correct, sir.
15    Q    You don't recall time when your shifts ever
16  overlapped; is that right?
17    A    Yeah.  We -- we would overlap.  Sometimes the
18  shifts would overlap.
19    Q    Okay.  But certainly, in the Chandler case,
20  you were working on different shifts, correct?
21    A    Yes, sir.
22    Q    Now, one of the things that your brother
23  talked about and other people have talked about this as
24  well -- your supervisors, other people -- is that both
25  you and your brother had a reputation for doing things

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 15 of 86 PageID #: 27445
The Deposition of JAMES CLARK, taken on January 21, 2022

15

1   by the book, following rules and regulations, trying to

2   do things properly, and taking pride in that.  Is that a

3   fair assessment of how you conducted yourself as a

4   detective?

5       A    Certainly tried to.  I -- I strive for that,

6   too.

7       Q    And particularly the more important rules.

8   Would be that be fair to say?

9       A    Could you repeat the question?

10      Q    Would it be fair to say that you even more

11  careful to carefully follow the more important rules and

12  regulations of the police department?

13          MR. ERVIN:  Objection to the form.

14      Q    I can be more specific if it's helpful.

15      A    Following the rules of the -- of the police

16  department?

17      Q    Yes, sir.

18      A    Yes, sir.

19      Q    Some rules are more important than others.

20  There's rules about how you wear your uniforms, and then

21  there's rules about protecting the constitutional rights

22  of people you come into contact with.  Right?  Some

23  rules are more important than others.

24      A    Yes, sir.

25      Q    And you were very careful to follow the more

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    important rules.  Is that fair to say?

2        A    Yes, sir.

3        Q    For example, you were careful to follow the

4    rules regarding carefully documenting witness

5    interviews, correct?

6        A    Yes.  Yes, sir.

7        Q    You always did your very best to write down as

8    close to verbatim as possible relevant information that

9    was provided to you by witnesses and information you

10   provided to witnesses during interviews.  Correct?

11       A    I did my very best.

12       Q    And to the extent that you determined that a

13   witness was giving you relevant information, you always

14   attempted, if possible, to tape record that

15   conversation?

16       A    If possible.  That's correct.

17       Q    Sometimes people would say no, but you always

18   -- if you had a witness and you were getting potentially

19   important information, you would always make an effort

20   to try to tape record, correct?

21       A    Yes, sir.  If it was a -- a pertinent witness

22   or someone that we deemed to be a suspect, I try to get

23   an audio recording.  And that didn't always come

24   through, but I tended to do that.

25       Q    Right.  And it was even more important, if

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 17 of 86 PageID #:
27447
The Deposition of JAMES CLARK, taken on January 21, 2022
17

1  possible, when interviewing a suspect or a potential

2  suspect in a serious crime to try to tape record those

3  interviews, if possible.  Correct?

4      A    If possible, sir.  You're correct.

5      Q    Certainly, you understood, through your

6  training and experience, that as a homicide

7  investigator, it was important to always attempt to tape

8  record an interview if possible.

9      A    Yes, sir.  The obvious words are "if

10 possible."

11     Q    Right.  Sometimes suspects would say, no, I

12 don't want to be taped.  Correct?

13     A    Correct.

14     Q    And unless you had a way to surreptitiously

15 tape them, you wouldn't be able to tape them, correct?

16     A    Correct, sir.

17     Q    But anytime you were able to do it, you always

18 wanted to do it, correct?

19     A    Correct.

20     Q    And that's because for obvious reasons.  If

21 you tape record a conversation with a suspect, then you

22 have 100 percent certainty of documenting exactly what

23 they said to you and what you said to them, correct?

24     A    Correct.

25     Q    It protects the suspect, correct?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Correct.

2      Q    And it protects honest police officers,

3   correct?

4      A    Yes, sir.

5      Q    And it's important for both of those reasons?

6      A    Yes, sir.

7      Q    And certainly, by 1992, every homicide

8   detective understood that, if possible, it was important

9   to tape.  Correct?  If you could.

10     A    If you could.  Yes, sir.  In 1992.

11     Q    All right.  Now, I had a chance to read your

12  testimony in the motion to suppress hearing in the

13  Warford case.  Have you had a chance to review that?

14  Maybe Peter --

15     A    I'm not sure.

16     Q    Maybe Peter can help.

17          MR. BRUSTIN:  Peter, do you know if Sergeant

18      Clark had a chance to look at that?

19          MR. ERVIN:  We have not provided that to him.

20     Q    Okay.  I'll show it to you if necessary.

21  Hopefully, I won't have to.  I'm assuming you'll

22  remember the stuff I'm going to ask you.  It's pretty

23  general.  One of the things that you made clear at the

24  motion to suppress hearing in the Warford case back -- I

25  think that was probably in '94 or '5, was that -- your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    involvement in this case, although you were the assigned

 2    detective, was quite limited.  Would you agree with that

 3    assessment?

 4         A    Yes, sir.

 5         Q    Your primary responsibility was to ensure that

 6    all of the reports that officers created were put into

 7    the file, correct?

 8         A    Correct, sir.

 9         Q    You weren't reviewing those reports for

10    substance, correct?  That wasn't your job.

11         A    No, sir.

12         Q    And you conducted a few interviews along with

13    other officers in the case, correct?

14         A    Correct, sir.

15         Q    But other than that, you had very limited

16    involvement, correct?

17         A    You're correct, sir.

18         Q    So for example, you never interviewed either

19    Keith Hardin or Jeff Clark in this case?

20         A    No, sir.

21         Q    All of those interviews were conducted by

22    Detective Handy from the Louisville Police Department as

23    well as representatives from the Meade County Sheriff's

24    Office, correct?

25         A    Correct.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    You weren't present for the polygraph,

2  correct?

3    A    No, sir.  I wasn't.

4    Q    Not for any of them?

5    A    No, sir.

6    Q    And in fact, you never met Keith Hardin before

7  he was arrested on the 5th, correct?

8    A    That's correct.

9    Q    And in fact, would it be fair to say that

10  based on your recollection and review of documents in

11  the case, no evidence that you gathered was used in

12  support of probable cause?

13    A    That's correct.

14    Q    Now, although you were the assigned detective,

15  it's clear from the reports that you reviewed that on

16  approximately April 6th, Detective Handy was brought in

17  to assist.  Correct?

18    A    I don't remember the specific date, but I know

19  that he participated in the investigation.

20    Q    And would it be fair to say that your

21  understanding as to his primary responsibility in this

22  case was to interrogate the suspects or interview the

23  suspects?

24    A    Interview -- interview the suspects.

25    Q    And that wasn't unusual.  There had been other

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    cases that you had been involved in where Detective

2    Handy was brought in to interview suspects, correct?

3        A    Correct.

4        Q    And that would include the Chandler case,

5    correct?

6        A    Correct, sir.

7        Q    And we're going to get to the Chandler case in

8    a minute but -- by the way, you understand today that

9    Edwin Chandler is innocent of the crime for which he was

10   convicted, correct?

11       A    Correct.

12            MR. SIMON:  Objection to the form.

13       Q    And nonetheless, according to Detective Handy,

14   Edwin Chandler gave him a detailed confession to a crime

15   he didn't commit, correct?

16       A    Yes, sir.  That's correct.

17       Q    And you understand that Detective Handy was

18   criminally charged and convicted of committing felonies

19   in connection with his investigation in the Chandler

20   case, correct?

21       A    Yes, sir.

22       Q    As well as in the West case?

23       A    On which case?

24       Q    As well as in the West case, the Keith West

25   case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A       Yes, sir.

2       Q       And in the Chandler case, for example, you

3   conducted a full interview with Mr. Chandler along with

4   Sergeant Pierce, correct?

5       A       Yes, sir.  That's correct.

6       Q       And you fully documented that interview,

7   correct?

8       A       Yes.  I believe I did document that interview.

9       Q       And in fact, you tape recorded it, correct?

10      A       Correct.  Yes, sir.

11      Q       And pursuant to your training and procedure in

12  the department, you did not use any coercive methods

13  with Mr. Chandler?

14      A       No, sir.

15      Q       You never threatened him in any way?

16      A       No, sir.

17      Q       You never threatened to take his kids away or

18  his sister's kids away, right?

19      A       No, sir.

20      Q       You would never do that, correct?

21      A       I would never do that, sir.

22      Q       And no officer acting in good faith in 1992

23  would ever do that, correct?

24      A       Correct.

25      Q       Any officer who would do that should be in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   jail, correct?

 2           MR. ERVIN:  Objection to the form.

 3       A   They should be admonished.  I don't -- I don't

 4   know what the -- any penalty should be.

 5       Q   Fair enough.  In any case, in the Chandler

 6   interview that you conducted with Sergeant Pierce, you

 7   were also careful not to provide Mr. Chandler with any

 8   non-public facts about how the crime was committed,

 9   correct?

10       A   Yes, sir.  That's correct.

11       Q   That's a basic rule that all investigators by

12   1992 were trained to understand, correct?

13       A   Yes, sir.

14       Q   And in fact, when you conducted a

15   comprehensive interview pursuant to your training,

16   correct?

17       A   Yes, sir.  I did.

18       Q   And throughout that interview, Mr. Chandler

19   vehemently maintained his innocence, correct?

20       A   Yes, sir.  He did.

21       Q   Made no admissions whatsoever?

22       A   No admissions whatsoever, sir.

23       Q   Seemed credible to you based on your

24   experience?

25       A   Yeah.  He seemed credible to me.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    And when you left the department that day,

2  your expectation was that Mr. Chandler would be

3  released, correct?

4    A    No, sir.  That wasn't my expectation.

5  Mr. Handy told me that he had confessed to a crime.  And

6  I can certainly tell you that in 1990 -- it's changed

7  over time, but in 1990, I'd never fathom anybody

8  confessing to a murder that they didn't do.

9    Q    Fair enough.  I asked you a bad question.  Let

10  me back up.  Certainly, when you were done with the

11  interview, you expected that the interrogation of Edwin

12  Chandler was over, correct?

13    A    I don't recall.  I can certainly say that

14  based on what he told me, that he would subsequently be

15  let go.

16    Q    Okay.  You certainly -- in your view, you

17  conducted a full and comprehensive interview, correct?

18    A    Correct.

19    Q    Along with another very experienced detective,

20  Sergeant Pierce.

21    A    Yes, sir.

22    Q    And you obtained no information towards

23  probable cause in that interview, correct?

24    A    Correct.

25    Q    And your expectation when you walked out of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   that room, at least at that point in time, was that he

2   would be released?

3        A    Correct, sir.  Yes.

4        Q    Now, back at that time, it was not uncommon

5   for Detective Handy to be brought in to interview

6   suspects, correct?

7        A    Correct, sir.

8        Q    Including suspects who had already been

9   interviewed by other experienced detectives, correct?

10       A    Correct, sir.

11       Q    Did people think that Detective Handy had some

12  kind of a magic wand where he could make people confess

13  when others couldn't?

14       A    No, sir.  It was my assessment at the time

15  that -- I guess, including myself, that he was just

16  better at interviewing and interrogating than -- than

17  me.

18       Q    Well, you certainly didn't see that.  Did you?

19       A    Pardon me, sir?

20       Q    You never observed Detective Handy conducting

21  interviews in a way that you thought was more effective

22  than you, did you?

23       A    No.  I -- I didn't.  But based on the results

24  that he got, I felt like he was better than not only me,

25  but some other folks in the unit.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-37  Filed 01/26/23  Page 26 of 86 PageID #:
27456
The Deposition of JAMES CLARK, taken on January 21, 2022

26

1    Q    Now, look, I understand that hindsight is

2  easy.  And it's not necessarily a fair thing to ask you.

3  But if you're being completely honest, would it be fair

4  to say that even back in 1992, you had some concerns

5  about how Detective Handy was getting confessions when

6  other detectives couldn't?

7    A    I -- I didn't have any concerns.  I -- I sat

8  in with him on some interviews and interrogations.

9  Again, I just thought he was effective at -- at getting

10 results.

11   Q    Well, would it be fair to say that --

12 withdrawn.  Did you have a conversation with Detective

13 Handy after he allegedly got a full confession from

14 Mr. Chandler about how he was able to do that?

15   A    You know, I think they asked me at that West

16 hearing specifically that -- what my reaction was and --

17 let me -- let me be perfectly honest.  It was so long

18 ago.  I can't recall what conversation I had with --

19 with anybody.  And to answer that at this point would be

20 conjecture on my part.  Again, what I remember is him

21 coming in and telling me that Edward [sic] Chandler had

22 confessed.  And again, to reiterate, what resonates with

23 me is if he confessed, you know, he's not going to

24 confess to a murder he didn't commit.

25   Q    Okay.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 27 of 86 PageID #: 27457
The Deposition of JAMES CLARK, taken on January 21, 2022

27

 1        A     That's what I remember.

 2        Q     Well, fair enough.  I didn't mean to cut you

 3   off.  Would it be fair to say, Sergeant, that to the

 4   extent that you did other interviews with Detective

 5   Handy, it should have been clear to Detective Handy that

 6   you would not tolerate any rule violations in any

 7   interrogation you were present for?

 8             MS. CAMPBELL:  Object to the form.

 9        A     That's correct.

10        Q     Okay.  And Sergeant, sorry.  I just lost you

11   on the screen.  We've got Kayla the screen now.  Not

12   sure what just happened.

13             MR. ERVIN:  We're here, Nick.

14             MS. MCCARTHY:  Nick, you probably -- I think

15   --

16             MR. BOND:  Nick, your-all last exchange was a

17        little garbled also.

18             MR. BRUSTIN:  Okay.

19             MS. MCCARTHY:  I could hear you okay, Nick, but

20        you probably want to hover over the video of

21        Sergeant Clark, and there should be three blue dots

22        that appear, and there's an option to pin him.  Do

23        you see that?

24             MR. BRUSTIN:  I don't see -- so where it says

25        "PErvin"?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MS. MCCARTHY:  Yes.  If you hover there, three

2     blue dots should appear in the right-hand upper

3     corner and then --

4          MR. BRUSTIN:  Got it.  Got it.

5          MS. MCCARTHY:  -- if you pin him, he'll stay.

6          MR. BRUSTIN:  Great.  Thank you.

7  BY MR. BRUSTIN:

8     Q    Okay.  Sergeant Clark, I think what I was

9  asking -- and it sounds like it may have been a little

10 garbled so I'll ask you again.  It should have been

11 clear to Detective Handy when he was conducting an

12 interview where you were present, that you weren't going

13 to tolerate any rule violations; fair to say?

14          MS. CAMPBELL:  Same objection.

15    A    Correct.

16    Q    And this is going to be a little bit of a

17 tough question, and I apologize in advance.  One of the

18 things that your brother told us, in substance, was that

19 as officers of color in the department in 1992, one of

20 the reasons why he took the rules and regulations so

21 seriously is to ensure that the rights of suspects,

22 particularly minority suspects in the community, were

23 being protected.  Did you share that view?

24          MR. ERVIN:  Objection to the form.

25    Q    Is that something you thought about?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    My -- my concern back in -- well, it's always

2  been my concern that anybody was treated fairly

3  regardless of color.

4    Q    Is that your full answer?

5    A    Yes.

6    Q    Okay.  Now, one of the things I also talked to

7  your brother about -- but I'll just ask you about it

8  straight.  Would it be fair to say that this is yet

9  another case where you're being dragged in to answer

10  questions in a case where Detective Handy is accused of

11  engaging in misconduct?

12    A    That's the first statement.  Yes, sir.

13    Q    And you're not very happy about it?

14    A    No, sir.  I'm not.

15    Q    You're not happy about it personally and how

16  it affects your reputation, correct?

17    A    My reputation meant everything to me.  I'm not

18  happy about it personally and professionally.  It

19  doesn't hold well for the Louisville Police Department.

20    Q    And would it be fair to say that you're

21  particularly unhappy about the things you've learned

22  recently about the misconduct that Detective Handy did

23  in fact, engage in including in Chandler?

24    A    Yes, sir.  That's correct.

25    Q    And obviously to the extent that you had any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  knowledge of the misconduct that we now know he engaged

2  in and Chandler back at that time, you would have

3  reported it through the chain of command, correct?

4      A    Correct.

5      Q    And ensured that it was addressed

6  appropriately, correct?

7      A    Well, that would've been up to the

8  supervisors, but I would've absolutely conveyed that

9  information to Sergeant Pierce at the time.

10     Q    So for example, if you had learned that the

11 manner in which Detective Handy had obtained a

12 confession was by threatening Edwin Chandler, that his

13 sister and children would be taken away unless he

14 confessed, you would have ensured that information got

15 to Sergeant Pierce, correct?

16     A    Yeah.  Now, you got to understand.  Again,

17 it's early '90s so I'm still feeling my way around the

18 unit.  But the example that you gave -- I -- I

19 definitely would've had a conversation with Sergeant

20 Pierce about it.

21     Q    You would have, correct?

22     A    (Inaudible).

23     Q    And that's a fair point.  Would it be fair to

24 say -- and I think your brother also talked about this

25 as did other officers in this case who testified.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Certainly, at that time in '92, the blue wall was in

2    effect in Louisville such that there was pressure for

3    police officers not to report other police officers,

4    even when they engaged in misconduct, correct?

5              MR. BOND:  Objection to the form of the

6         question.

7         Q    You can answer, sir.

8         A    Yes, sir.  That's correct.

9         Q    And that's what you were talking about.  That

10   although you would like to think that you would've had

11   the courage to report it, your only hesitation is there

12   was a lot of pressure not to report misconduct, correct?

13             MR. ERVIN:  Objection to the form.  It

14        misstates his answer completely.

15        Q    Unless he instructs you not to answer, you can

16   always answer, Sergeant.

17        A    Okay.  Can you repeat?  I'm sorry.

18        Q    Yeah.  I think I understood your answer to be

19   that your only hesitation as to whether or not you

20   would've reported that misconduct is the fact that there

21   was this blue wall of silence pressure not to report

22   misconduct, correct?

23             MR. ERVIN:  Objection to the form.  That

24        misstates his answer.

25        A    That's correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q     But certainly, you would've understood in 1992

2     that that was, in fact, serious misconduct, correct?

3     A     Correct.

4     Q     Now, I was asking you some questions about

5     tape recording.  I just want to ask you a few follow up

6     questions on that.  You told us about the importance of

7     taping generally when you've got relevant evidence.

8     Would it be fair to say that the most important

9     statement to tape, if possible, was any type of

10    incriminating statement from a suspect?

11    A     That's correct, sir.

12    Q     And again, there's a variety of reasons for

13    that.  One would be: If you have it on tape, there's no

14    way for the suspect to claim that they didn't state it,

15    correct?

16    A     Correct, sir.

17    Q     And similarly, there would be no way for the

18    suspect to withdraw.  That's the most important reason,

19    right?

20    A     That's the most important reason.  Yes.

21    Q     And sometimes, you can get a suspect to

22    provide a taped statement and sometimes, you can't,

23    right?

24    A     Correct.

25    Q     The only thing that every police officer

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    understood by 1992 was you always want to ask and try?

2         A    Correct, sir.

3         Q    And there was plenty of taping equipment

4    around the LPD in 1992.  There were handheld recorders,

5    larger recorders, all kinds of equipment, correct?  Let

6    me withdraw the question.  I'm going to withdraw the

7    question.  To the extent that you wanted to tape record

8    a statement in 1992, you always had access to tape

9    recording equipment; fair to say?

10        A    Yes, sir.  That's fair to say.

11        Q    Now, the other thing that we learned from some

12   of the other witnesses, including Sergeant Woosley, was

13   that anytime a suspect was being interviewed, the

14   general rule was that two officers would always be

15   present.  Is that consistent with your understanding?

16        A    Yes.  And I remember inquiring about that when

17   I first got up there.  And generally what was told to me

18   was, number one, you had two people in the room.  In --

19   in -- in case something happened to one, the other

20   person could testify to what transpired during the

21   interaction.  And then number two was to protect both

22   parties in case there was an allegation that the police

23   were doing something wrong.

24        Q    And I take it that there could be an emergency

25   situation where an officer wasn't available.  But

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 34 of 86 PageID #:
27464
The Deposition of JAMES CLARK Taken on January 21, 2022
34

1   otherwise, there would always be two officers in the

2   room, if possible, correct?

3        A    Yes, sir.  That was the general rule.

4        Q    All right.  And I take it also that if you're

5   doing an interview and it's not being taped, if an

6   officer was present for part of it and not present for

7   all of it, it would be important to document that,

8   correct?  When the witness was there or when he wasn't.

9        A    Yes, sir.  That's correct, sir.

10       Q    And that's just basic common sense policing,

11  right?

12       A    Yes, sir.

13       Q    And another important rule by 1992 in the LPD

14  was that any time a witness was interviewed, and it was

15  deemed sufficiently relevant to document, whether in a

16  report or in a taped recording, that statement or report

17  had to make its way to the police file, correct?

18       A    Correct, sir.

19       Q    The job of the detectives was to put any

20  potentially relevant information into the police file so

21  that the prosecutor could determine what was important

22  to use, what was important to give to the defense, those

23  kinds of decisions, correct?

24       A    Yes, sir.  That's correct.

25       Q    Can you think of any exception to the rule

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that a statement was deemed sufficiently important to

2    tape but not placed into the police file?

3         A    No, sir.

4         Q    And let me just show you an example of an

5    interview that you did in this case and how it should be

6    done.  So if you could take a look at Exhibit 59, which

7    I think you have in front of you or I think Peter has

8    it.  Larry brought it, I think.  And I'm going to refer

9    to the page numbers on the bottom left where it says

10   LMPD.

11              (EXHIBIT 59 MARKED FOR IDENTIFICATION)

12        A    Yes, sir.

13        Q    And if you could take a look at page 63.

14        A    Yes, sir.

15        Q    Actually, this is a report that you created,

16   correct?

17        A    Yes, sir.  It is.

18        Q    And take a look at page 65 in particular.

19        A    Yes, sir.

20        Q    And this is a statement that you took from

21   Mr. William Mahan, correct?

22        A    Yes, sir.

23        Q    And at some point during the interview -- and

24   now I'm looking on page 66.  You determined that he had

25   provided you sufficiently relevant information where you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    were going to ask to tape record it, correct?

2        A    Yes, sir.  That's correct.

3        Q    And you asked Mr. Mahan if you could tape it.

4    He agreed.  And then you, in fact, taped it, correct?

5        A    That's correct, sir.

6        Q    And you were also very careful to document the

7    conversation that you had with him prior to the taped

8    statement being conducted, correct?

9        A    Correct.

10       Q    And then you took a taped statement and you

11   included in the file both the taped statement and your

12   report, correct?

13       A    Yes, sir.  That's correct.

14       Q    And that was standard operating procedure,

15   correct?

16       A    Yes, sir.

17       Q    Which you followed in this case and all

18   others, correct?

19       A    Yes, sir.

20       Q    And should have been followed by all of the

21   detectives in this case and others, correct?

22       A    Correct, sir.

23       Q    And by the way, that rule that you have to

24   include in the file police reports of interviews with

25   witnesses -- that includes information from witnesses

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  whether it helps or hurts the case, correct?

2       A    That's correct.

3       Q    In fact, it is arguably even more important to

4  include evidence that might suggest innocence than it is

5  to include evidence of guilt, right?

6            MR. ERVIN:  Objection to the form.

7       A    In my opinion, exculpatory evidence was more

8  important.

9       Q    And you understood exculpatory evidence to

10 include evidence that could be used to impeach the

11 reliability of a prosecution witness, correct?

12      A    (Inaudible).

13      Q    I didn't hear your answer.  I'm sorry, sir.

14      A    Yes, sir.

15      Q    Equally important to document that evidence

16 and ensure that it made its way to the prosecutor,

17 correct?

18      A    Yes, sir.

19      Q    Now another important rule by 1992 in the LPD

20 was that absent an extraordinary circumstance, each

21 officer present for an interview, particularly in an

22 important interview of a suspect, had to create their

23 own report?

24      A    If they were in the room together?

25      Q    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     I'm going to be honest with you.  I don't

2   recall.  It seems like it was conveyed to me that as

3   long as one of the officers did the report and it made

4   its way into the file, that that would suffice.  That's

5   my recollection.

6      Q     All right.  Would it be fair to say that --

7   and I appreciate that this is a long time ago.  Would it

8   be fair to say though that to the extent one report was

9   created, the expectation was that both officers who were

10  present had to read it and sign off on it for accuracy?

11     A     Again, I don't remember two detectives signing

12  off on any reports.  Again, you have to -- you know,

13  it's so long ago -- I just -- it was my understanding as

14  long as the one officer created the report and signed

15  off on it, that that would be suffice.

16     Q     And when I say did sign off, I didn't

17  necessarily mean formally sign your name.  I meant that

18  to the extent that there was a report of a suspect

19  interview, particularly one where there was --

20     A     Oh, yes.  I'm -- I'm -- I'm -- I'm sorry.

21  You're correct.  You're absolutely correct.

22     Q     Both officers who were in that room would have

23  to read the report and agree that the information was

24  accurate?

25     A     At least one of the officers would read the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    report and -- and agree that that information was

2    accurate and sign off on it.

3         Q    All right.  Now, would it be fair to say that

4    as an experienced detective by 1992, any time you were

5    interviewing a witness in a case -- not a suspect but a

6    witness -- you were constantly assessing that witness

7    for both credibility and reliability?

8              MR. ERVIN:  Objection to the form.  You can

9       answer.

10        A    The answer to your question is absolutely. But

11   again, in 1992, I really didn't deem myself as an

12   experienced detective.  I -- I was still learning.

13        Q    Okay.  Would it be fair to say that by 1992,

14   your understanding was Detective Handy was an

15   experienced detective?

16        A    Oh, absolutely.

17        Q    And certainly, a few years down the road, when

18   you became more experienced, it became second nature for

19   you when interviewing an eyewitness, at least in your

20   mind, to be assessing whether the witness seemed to be

21   credible and reliable, correct?

22        A    Yes, sir.  That's correct.

23        Q    And there were a bunch of things you would be

24   looking for in determining credibility and reliability,

25   right?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JAMES CLARK, taken on January 21, 2022

40

1    A   I -- I guess every detective's different.

2 Credibility and rely -- reliability.  I trusted my

3 intuition.

4    Q   So let me give you some examples.  Here's what

5 I'm talking about.  Some basic things you're looking for

6 when you're interviewing witnesses.  You're looking for

7 contradictions that they tell you in their version of

8 events, right?

9    A   Absolutely.  Yes.  That's correct.  Uh-huh.

10    Q   Internal contradictions in their story or

11 contradictions with other witnesses, right?

12    A   Absolutely.

13    Q   Another thing you're looking for is whether or

14 not the witness might have a motive to misrepresent

15 information?

16    A   Absolutely.

17    Q   A bias one way or another.

18    A   Correct.

19    Q   Those are the kinds of things any detective is

20 looking for, correct?

21    A   Correct.

22    Q   And in asking questions and in documenting

23 interviews, you are asking questions to probe those

24 topics, correct?

25    A   Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JAMES CLARK, taken on January 21, 2022

```
 1        Q     You're never trying to cover those things up.
 2   You want to bring them up, correct?
 3        A     Yes, sir.
 4        Q     If you're interviewing somebody's
 5   ex-girlfriend, a suspect's ex-girlfriend for example,
 6   you're going to want to question that person about
 7   whether or not there may be some problems between the
 8   two of them that would affect their reliability, right?
 9        A     Absolutely.
10        Q     Just basic investigative work, right?
11        A     Yes, sir.
12        Q     And regardless of what the answer is, you
13   write it down?
14        A     Yes, sir.
15        Q     Whether it helps or hurts the case?
16        A     Yes, sir.
17        Q     And that's why it's important, to the extent
18   practicable, before you interview a witness,
19   particularly a witness who could be important, you want
20   to do basic research on that witness, correct?
21        A     Yes, sir.
22        Q     You want to find out if the witness has a
23   criminal record.
24        A     Yes, sir.
25        Q     And obviously to the extent a witness provides
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JAMES CLARK taken on January 21, 2022

```
 1   you information about potential physical evidence in a
 2   crime, you're going to always want to follow up on that
 3   information to try to find that physical evidence,
 4   correct?
 5       A    Yes, sir.
 6       Q    And that's important for a couple of reasons.
 7   It's important because if you can find physical evidence
 8   -- connection with a crime, that could help you to solve
 9   a crime, right?
10       A    Yes, sir.  That's correct.
11       Q    And it could also be important because to the
12   extent that that evidence is not where a witness tells
13   you, that could affect whether that witness is reliable
14   and credible?
15       A    Correct.
16       Q    And if a witness tells you that a suspect in
17   your case engaged in similar misconduct in other
18   circumstances, you're going to want to investigate and
19   talk to the people involved in those other
20   circumstances, right?
21       A    Yes.
22       Q    In fact, the only reason not to follow up on
23   those kinds of leads from witnesses is if you have
24   reason to believe that the information you're being
25   provided is not reliable.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1           MR. BOND:  Objection.

 2      Q    You can answer.

 3      A    Yeah.  I'm not sure I understand the question.

 4  If I'm -- if I've got information and that individual

 5  gives me some information, I always try to follow up on

 6  it.

 7      Q    Okay.  I guess it wasn't a good question.  If

 8  you have a witness that you deem is just completely

 9  unreliable, that might be a circumstance where you don't

10  follow up on; fair to say?

11      A    That may -- that may be a circumstance you

12  might not follow up on.

13      Q    But otherwise, you always want to follow up?

14      A    Yes, sir.

15      Q    And you want to document the information you

16  get whether it helps or hurts the case, correct?

17      A    Correct, sir.

18      Q    Now, I asked you a couple of questions about

19  providing non-public information to suspects during

20  interviews earlier today.  You recall that?

21      A    Yes.

22      Q    Just a few follow-ups on that.  So even as a

23  relatively new detective in 1992, you understood from a

24  variety of sources -- training, experience, working with

25  older officers -- how important it was to never provide

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  non-public information to suspects or witnesses,

2  correct?

3       A    Absolutely.

4       Q    You understood that, correct?

5       A    Yes, sir.

6       Q    You couldn't be an LPD detective in 1992 and

7  not understand that, correct?

8       A    Correct, sir.

9       Q    In fact, the best way to test the reliability

10  of a witness or a suspect is if they volunteer

11  non-public information about a crime, correct?

12       A    Yes, sir.

13       Q    Or an inability to volunteer non-public

14  information about a crime, correct?

15       A    Yes, sir.

16       Q    For a detective in 1992 in homicide, it was as

17  basic as walking and talking that you don't provide

18  non-public information to a suspect, right?

19            MR. ERVIN:  Objection to the form.  Asked and

20       answered.

21       A    You don't provide that type of information.

22       Q    Now, I think you told me this already, but I

23  just want to make sure.  You can't recall one way or

24  another whether or not you spoke to Detective Handy

25  after you finished interviewing Chandler about how he

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  was able to obtain the confession when you couldn't,

2  correct?  You just don't recall it today.

3      A    No.  I -- I -- I just don't recall.

4      Q    Would it also be fair to say that -- I know

5  you told us you didn't want -- you weren't working on

6  the same shift as Handy.  Would it be fair to say you

7  also weren't working on the same shift as Sergeant

8  Woosley?

9      A    Correct.  We didn't work the same shift.

10     Q    Now, one of the things that's come out in this

11 litigation -- and to be fair, it came out through

12 Detective Handy; he was pretty open about it -- was his

13 drinking problem.  Do you recall learning back in the

14 early '90s that Detective Handy was drinking to excess?

15     A    No, sir.

16     Q    Not by reputation, not by rumor, nothing about

17 it?

18     A    No, sir.

19     Q    Now, I understand that you were the assigned

20 detective on the Warford homicide, at least from the

21 LPD, but would it be fair to say that once Detective

22 Handy was brought in, he was acting in a lead detective

23 role?

24     A    Correct.

25     Q    And you and Detective Greer continued and some

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  others continued to do some investigative activities,

 2  but it became Detective Handy's case for all intents and

 3  purposes?

 4       A   Well, he continued to work on the case, but

 5  the case then -- let me back up.  He worked on the case,

 6  but it was a Meade County case.

 7       Q   Okay.  But to the extent that the LPD was

 8  working on the case, once he got on the case, he took a

 9  leadership role in investigating the case; fair to say?

10       A   Yes, sir.  That's -- that's a -- that's an

11  accurate assessment.

12       Q   And so for example, to your knowledge --

13  withdrawn.  Would it be fair to say that you didn't have

14  much communication in the case after the first few days

15  with Sheriff Greer or other deputies from the Meade

16  County Sheriff's Department about the case?

17       A   I remember having conversations with them. How

18  many?  I can't recall, but I do recall speaking with not

19  only Sheriff Greer, another Meade County officer, and

20  having conversations with the commonwealth attorney.

21       Q   Okay.  But you don't remember the substance of

22  any of those?

23       A   I don't.  I don't remember specifically -- or

24  specific conversations, I should say.

25       Q   Fair enough.  Would it be fair to say, though,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that once Handy got on the case, your understanding was

2  that most of the communication about the investigation

3  with Meade County was between Handy and the sheriff's

4  department?

5       A    I would say that's accurate, but I also

6  remember Joe Greer having some conversations with Meade

7  County, too.

8            MR. BRUSTIN:  Okay.  Can we take just a

9       two-minute break, please?

10           MR. ERVIN:  Sure.

11           MR. BRUSTIN:  Thanks.

12           COURT REPORTER:  We're off the record.  The

13      time is 3:28 p.m.

14              (OFF THE RECORD)

15           COURT REPORTER:  We're back on the record for

16      the deposition of Sergeant James Clark being

17      conducted by videoconference.  My name is Kortney

18      Chase.  Today is January 21, 2022.  The time is 3:34

19      p.m.

20  BY MR. BRUSTIN:

21      Q    So Sergeant Clark, I'm going to ask you some

22  specific questions about interviews you did conduct. But

23  before I do that, would it be fair to say that to the

24  best of your recollection, Detective Handy never told

25  you that he had received inculpatory admissions from

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Keith Hardin, including that he had been doing animal

2   sacrifices and wanted to move on to human sacrifice?

3       A   I don't remember who told me, but I was privy

4   to the information that one of the suspects -- deemed

5   suspects at the time had said something about graduating

6   from sacrificing animals and wanting to move on to

7   humans.

8       Q   Okay.

9       A   I -- I do remember that.

10      Q   Fair enough.

11      A   And I don't remember -- I don't recall who

12  told me that.

13      Q   Okay.  And I take it you also don't recall

14  when you learned that, correct?

15      A   Correct.

16      Q   You don't know -- it sounds like at some point

17  before the case was closed, you learned that; fair to

18  say?

19          MR. ERWIN:  Form.

20      A   Yes, sir.  That's correct.

21      Q   But you have no idea when in time you were

22  told that information, correct?

23      A   No, sir.  I -- I don't.

24      Q   And you don't recall ever speaking to

25  Detective Handy about it, for example, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A     Not him specifically.

2     Q     All right.  And it may well have been that you

3 saw it in a report; fair to say?

4     A     I would -- I would only be speculating, but it

5 -- it seems like somebody told me that.

6     Q     At some point during the investigation before

7 trial, you learned of it?

8     A     Correct.

9     Q     You have no idea when?

10    A     No, sir.

11    Q     And it could have been from a report?  And I

12 can tell you that it is in a report, and it could -- one

13 of the ways you could have run it was in a report,

14 correct?

15          MR. BOND:  Objection.

16    A     It -- it could have been.  Again, I -- I --

17 (Inaudible) --

18    Q     All right.  But you remember --

19    A     -- and being so far back (Inaudible)

20 speculate.

21    Q     I'm sorry for interrupting you.  I apologize.

22 You do recall having a conversation with somebody about

23 it at some point in time before trial?

24    A     That's correct.

25    Q     All right.  You certainly never heard any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  admissions from Keith Hardin or Jeff Clark, correct?

2      A    That's correct.

3      Q    And you have no idea whether or not Detective

4  Handy did, in fact, hear any such admissions, correct?

5      A    I don't recall.

6      Q    Okay.  Well, okay.  So let's take a look at

7  Exhibit 59, page 2.

8          MR. SIMON:  Right there.  That should be it.

9          THE WITNESS:  Is this it?

10         MR. SIMON:  Yeah.  Uh-huh.

11         THE WITNESS:  Okay.

12  BY MR. BRUSTIN:

13     Q    Now, I take it this is one of the reports that

14  you reviewed in preparation for today; is that correct?

15     A    Yes, sir.

16     Q    And I'm referring to the report beginning on

17  page 2 and going through page 7, correct?

18     A    Yes, sir.  You're correct.

19     Q    All right.  You reviewed this report before

20  today, correct?

21     A    Correct.

22     Q    And you would agree at some point in time, you

23  learned in this case that Satanism could have been part

24  of the motive for the crime, correct?  You heard that

25  theory in this case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 51 of 86 PageID #:
27481
The Deposition of JAMES CLARK, taken on January 21, 2022
51

1        A      Yes, sir.

2        Q      And would it be fair to say that in this

3    report that you created, there's no mention of you

4    obtaining or observing any objects relating to Satanism;

5    fair to say?

6        A      Yes, sir.  That's correct.

7        Q      And would it be fair to say, given your

8    practices at the time, to the extent that you had

9    observed any objects relating to Satanism, you would've,

10   of course, included that in your report?

11       A      Correct.

12       Q      And the reason that you called the ETU unit

13   out to process the scene was because that's what's done

14   in all homicide cases, correct?

15       A      The majority of them.  Yes.

16       Q      Standard operating procedure, correct?

17       A      Correct, sir.

18       Q      There was nothing unusual you observed about

19   this scene, but you wanted it to be processed because

20   that's what careful detectives do, correct?

21       A      Correct, sir.

22       Q      It had nothing to do with Satanism or the

23   occult, correct?

24       A      Correct.

25       Q      Now, if you take a look at page 8, this is a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    report by Detective Greer, correct?

2        A    Yes, sir.  That's correct.  Detective Greer.

3        Q    And you obviously were not present for any --

4    withdrawn.  If you could take a look at page -- have you

5    reviewed this report in preparation for today?

6        A    Yes, sir.

7        Q    Oh, good.  Okay.  So take a look at page 11.

8        A    Okay, sir.

9            MR. BOND:  This is Keith.  I apologize.  What

10       are you referencing, please, sir?

11           MR. BRUSTIN:  Yeah.  So this is Exhibit 59,

12       Bates stamped LMPD page 11.  So the Bates stamp's on

13       the left side.  And it's a report.

14           MR. BOND:  What's the date?  What's the date?

15           MR. BRUSTIN:  Yeah.  It's a report from

16       Detective Greer dated April 5, '92.

17           MR. BOND:  Okay.  Thank you.

18           MR. BRUSTIN:  Yeah.  No problem.

19   BY MR. BRUSTIN:

20       Q    All right.  So we're on page 11, and you see

21   on the top you along with Sheriff Greer and Coroner

22   Adams and Detective Greer go to 104 East Whitney,

23   correct?

24       A    Correct, sir.

25       Q    And it looks to me like -- and if you could

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   read to yourself the next two paragraphs.  Then I want

2   to ask you some questions about it.

3       A    Okay, sir.

4       Q    So my understanding of this -- you correct me

5   if I'm wrong -- well, first of all, this is where you

6   called ETU, correct?

7       A    Correct, sir.

8       Q    That's standard operating procedure, correct?

9       A    Yes, sir.

10      Q    My reading of this is that you stayed behind

11  to process the scene with ETU while the other three went

12  interviewed Mary Warford, correct?  Right?  Am I reading

13  this right?

14      A    Yes, sir.  Yes.

15           MR. BOND:  Objection.

16      Q    So you weren't present for that interview. You

17  remained at the crime scene?

18      A    That's correct.

19      Q    Now, do you remember ever learning that the

20  victim had an inverted cross on her chest?

21      A    I -- I didn't -- I didn't -- I don't remember

22  that coming up in the investigation, but I did peruse

23  through this and was able to ascertain that that was

24  part of the investigation but -- and I hope I'm

25  answering your question.  I -- I didn't recall that.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1        Q    Okay.  And would it be fair to say that you

2    didn't receive that information?  You learned it

3    sometime later in the investigation?

4        A    I -- I don't recall that even -- anybody even

5    conveying that to me in the investigation.  They could

6    have.  I just don't recall it.

7        Q    It certainly didn't stand out to you.  Fair to

8    say?

9        A    I'm sorry, sir?

10       Q    It certainly didn't stand out to you, or you

11   would remember it.

12            MR. BOND:  Objection.  Form of the question.

13       A    In my recollection?  No, sir.  It didn't

14   resonate with me.

15       Q    Okay.  I want to show you a copy of another

16   document that's been introduced in this case.  It's

17   Exhibit 116.

18            (EXHIBIT 116 MARKED FOR IDENTIFICATION)

19            MR. BRUSTIN:  Could we give that to the

20       witness, please?

21            MR. ERVIN:  I have 116.  114?

22            MR. BRUSTIN:  No.  116 is the letter that Handy

23       sent to the Satanism professor.

24            MR. ERVIN:  Oh.  You may have to bring it up,

25       Nick.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 55 of 86 PageID #: 27485
The Deposition of JAMES CLARK taken on January 21, 2022

55

1          MR. BRUSTIN:  That's fine.  No problem. Jahne?

2          MS. BROWN:  I can do that.  Yeah.

3          MR. BRUSTIN:  Oh, great.

4          MS. BROWN:  116?  That's what you wanted?

5          MR. BRUSTIN:  Yeah.  116.

6          MS. BROWN:  Okay.

7          MR. BRUSTIN:  It's the letter to University of

8     Louisville.

9          MS. BROWN:  Okay.  One moment.

10   BY MR. BRUSTIN:

11      Q    So this is a two-page letter.  I'm going to

12   show you the first part.  I mischaracterized it.  This

13   is actually a letter --

14          MR. BRUSTIN:  If you can go back to the second

15      page first, Jahne.  Just the bottom of the second

16      page.

17      Q    So this is a letter from Professor Ronald

18   Holmes to --

19          MR. BRUSTIN:  -- and then go back up the first

20      page, please --

21      Q    -- to Handy, dated April 8.  And I represent

22   to you -- you can read the letter if you want but for

23   the sake of time, Professor Holmes allegedly has some

24   expertise on Satanism, and he's responding to a request

25   from Mark Handy.  So first question is: Do you have any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   recollection of learning about the communication between

2   Mark Handy and this so-called Satanism professor?

3        A    Not this specific letter.  I -- I do know they

4   -- they had a close relationship.

5        Q    You knew that Handy and Holmes had a close

6   relationship?

7        A    Yes.

8        Q    How'd you know that?

9        A    When I say "close" -- when I say "close," I

10  mean, I -- I remember having conversations where Mark

11  talked about letting Professor Holmes look at cases to

12  get his opinion.

13       Q    Do you remember having those conversations

14  with Detective Handy before this case, or after this

15  case, or both?

16       A    It seems like certainly before this case

17  because it seems like -- well, I can't answer that.  I

18  don't recall.  I just remember him -- again, I don't

19  want to speculate.  I just remember him talking to

20  Mr. Holmes about looking through cases and giving his

21  expert opinion.

22       Q    All right.  And I take it your understanding

23  of the process would be that Detective Handy would

24  provide information to Professor Holmes and then

25  Professor Holmes would respond, as he did in this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   letter, with his theories about what happened, right?

 2        A    Correct.  Yes, sir.

 3        Q    And so it appears from this letter -- well,

 4   let me ask you this first.  Do you have any recollection

 5   of Professor Holmes having any involvement in this case?

 6        A    No.  Not until just -- I just read this.

 7        Q    All right.  Would it be fair to say that the

 8   first knowledge you had of Professor Holmes being

 9   involved in this case was when I just showed you this

10   letter?

11        A    I'm not going to say Mr. Handy and I didn't

12   discuss this.  I -- I'm just saying I -- I don't

13   remember that.

14        Q    All right.  Would it be fair to say you have

15   absolutely no recollection of Holmes' involvement in

16   this case?

17        A    Up until now.  That's correct.

18        Q    But I described the process accurately?  Handy

19   would give information to Holmes, and then, you know, a

20   week or so or days later, he would respond?

21             MR. BOND:  Objection.

22        A    He would subsequently respond.

23        Q    All right.  And let me show you what we marked

24   as Exhibit 92 in this case.  We'll put it up on the

25   screen for you.  So this is a certificate that Detective
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 58 of 86 PageID #:
27488
The Deposition of JAMES CLARK Taken on January 21, 2022
58

1  Handy got in 1989 concerning occult crimes.  Do you have

2  any knowledge that Detective Handy had taken some

3  courses on occult crimes?

4              (EXHIBIT 92 MARKED FOR IDENTIFICATION)

5      A    I -- I don't recall that.

6      Q    Do you remember learning that that was a

7  particular interest of his?

8      A    I -- I don't recall that, sir.

9      Q    Do you have any recollection of having any --

10  first of all, did you have any training in occult

11  crimes?

12     A    No, sir.

13     Q    So this wasn't a standard training for LPD

14  officers.  It was something he chose to do?  Well,

15  that's not a fair question.  You certainly didn't have

16  any training in occult crimes.  Fair to say?

17     A    That -- that's correct.

18     Q    Now, would it be fair to say -- I think you've

19  already answered this, but I just want to make sure.

20          MR. BRUSTIN:  We can take this down.  Thanks,

21     Jahne.

22     Q    You've already told us that to the -- if you

23  had found any evidence that could be related to Satanism

24  at the crime scene when you were there, you would've put

25  that in your report, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 59 of 86 PageID #:
27489
The Deposition of JAMES CLARK, taken on January 21, 2022
59

1    A    Yeah.  It would've been documented in a letter

2  that fell under the crime scene.

3    Q    And if you had called ETU specifically to

4  process evidence of Satanism or the occult, you would've

5  documented that, correct?

6    A    Your question is I would've called ETU?

7    Q    If you had called ETU for the specific purpose

8  of having them process specific evidence relating to

9  Satanism, for example, you would've documented that,

10  correct?

11    A    That's correct, sir.

12    Q    And to the extent that you had any -- to the

13  extent you did a very comprehensive report of your

14  activity as on April 5th, correct?

15    MR. KLAUSING:  Objection to the form.

16    A    I -- I tried to, sir.

17    Q    And to the extent that you had received

18  information during the course of your duties in

19  investigating the crime on that day, if you had received

20  information concerning Satanism, you would've included

21  it in your report, correct?

22    MR. BOND:  Object to the form.

23    Q    Sorry about that.  I just need to pause just

24  for a second so people can object.  I don't think we

25  heard your answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Yes, sir.  That's correct.

2      Q     And would it be fair to say that once

3   Detective Handy got on the case, he was the person, at

4   least from the LPD, who was primarily communicating with

5   the Warford family?

6      A     That I don't know.

7      Q     Well, would it be fair to say to the extent

8   you had any substantive contact with the Warford family

9   after your first interaction on the 5th, you would've

10   created a report?

11      A     Yes, sir.

12      Q     And just one more question about that letter

13   to Professor Holmes.  You certainly had no involvement

14   in involving Professor Holmes in this case, correct?

15      A     No, sir.  I didn't.

16      Q     Now, you would agree that one of the tools

17   available to criminal investigators in 1992 in the LPD

18   when interviewing suspects was to see if they would

19   volunteer to take polygraph exams, correct?

20      A     Correct.

21      Q     And obviously, you knew in '92 that polygraph

22   exams were not admissible in court, correct?

23      A     Correct, sir.

24      Q     But you understood that polygraph exams were a

25   legal mechanism that could be used to get evidence,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    correct?

2         A    Correct.

3         Q    And sometimes could lead to suspects

4    confessing, correct?

5         A    Yes, sir.

6         Q    And there were legal ways to use a polygraph

7    exam to try to get a confession, correct?

8         A    Correct, sir.

9         Q    And so you understood -- and I take it you

10   utilized that method.  You would sometimes -- when

11   interviewing a suspect, if they would agree to a

12   polygraph, you would sometimes offer that and utilize

13   it, correct?

14        A    Yeah.  I used it as a tool.

15        Q    Okay.  And in order to effectively use a

16   polygraph as a tool with a suspect, it would be

17   critically important to provide the polygraph examiner

18   all relevant information you received from the suspect

19   so they could properly design polygraph questions,

20   correct?

21        A    Correct.  I recall sitting down and -- and for

22   lack of a better word having an interview with the

23   polygrapher regarding the case.

24        Q    All right.  And in fact, one of the important

25   reasons -- there are many reasons, but one of the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    important reasons to document preliminary interviews

2    with suspects is so that you could provide that

3    information to the polygraph examiner so they could

4    properly create questions, correct?

5         A    Yes, sir.  That -- that's correct.

6         Q    And obviously the most important information

7    to provide to a polygraph examiner concerning a suspect

8    would be any admissions or near admissions that the

9    suspect had made, correct?

10        A    Yes, sir.

11        Q    Again, as basic as it gets for a detective,

12   right?

13        A    Yes, sir.

14        Q    If a suspect makes an incriminating statement

15   and agrees to talk to the polygraph examiner, the most

16   important information to give to the polygraph examiner

17   is that incriminating statement, correct?

18        A    Yes, sir.

19        Q    Now, another thing that sometimes happens with

20   detectives, and including LPD detectives in '92, was

21   that sometimes, detectives would pass off voluntarily a

22   suspect to another detective who may have a better

23   rapport with that suspect and might be able to get more

24   information.  That would happen from time to time,

25   correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-37  Filed 01/26/23  Page 63 of 86 PageID #:
27493
The Deposition of JAMES CLARK, taken on January 21, 2022
63

1      A     Yes, sir.

2      Q     So for example, if you had a suspect who you

3   thought might do better with a woman, you might have

4   them talk to a female detective?

5      A     Yes.  I've experienced that, and I've

6   experienced race.

7      Q     Okay.  But the most important thing when doing

8   a follow-up interview of a suspect after an initial

9   detective had already interviewed that suspect is to get

10  all the information that detective gathered from the

11  suspect, correct?

12     A     Yes, sir.

13     Q     Again, you would never want to continue an

14  interrogation or an interview of a suspect without

15  knowing what that suspect had already provided, correct?

16     A     Yes, sir.  That's correct.

17     Q     The detective who had done the first interview

18  would know to provide that information to the second

19  detective, correct?

20     A     Yes, sir.

21     Q     And the detective who was doing the second

22  interview would know to ask the first detective,

23  correct?

24     A     Yes, sir.

25     Q     And if they were on different shifts, it would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  be important that they either spoke by phone or spoke

2  through a supervisor, but you would never want to

3  conduct a follow-up interview of a suspect without

4  learning what that suspect had already told the first

5  detective, correct?

6      A    Correct, sir.

7      Q    Again, basic investigative work, right?

8      A    Yes, sir.

9      Q    Now, would it be fair to say that you had no

10  involvement whatsoever in the decision, first of all,

11  that Keith Hardin would receive a polygraph examination

12  in this case?

13      A    I don't recall that I did.

14      Q    Would it be fair to say to the extent you had

15  any role in that process, you would've created a report

16  to that effect?

17      A    Generally, a report would've been sent to me

18  regarding the polygrapher's involvement.

19      Q    But to the extent that you had any role in

20  directing that a polygraph be done, you would've created

21  a report on that process, correct?

22      A    If it's part of a continuing interaction, then

23  yes, sir.  That's correct.

24      Q    All right.

25      A    Then that interaction has to be documented.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 65 of 86 PageID #: 27495
The Deposition of JAMES CLARK, taken on January 21, 2022

65

1    Q    All right.  But to the extent -- but

2  certainly, you have no recollection whatsoever of

3  playing any role in that process, correct?

4    A    No, sir.  I don't.

5    Q    And you haven't seen any documentation

6  indicating you played any role in that process? Correct?

7    A    There was some documentation that was provided

8  to me about a polygraph, but I don't specific --

9  specifically remember who it was regarding.

10    Q    All right.  But no documentation you saw that

11  you directed a polygraph be done, correct?

12    A    That's correct.  Let me back up because it

13  seems like that report that I looked at said something

14  at the request of Detective James Clark.  But I don't

15  remember anything about the polygraph aspect of it.

16    Q    And I think I understand, but if you had

17  actually directed that a polygraph be done, you would

18  have documented that in some form, correct?

19    A    Yeah.  That's correct.

20    Q    All right.  Let's take a look at Exhibit 59

21  again.

22    A    Yes, sir.

23    Q    Page 65.

24    A    Yes, sir.

25    Q    Actually, let's start on page -- yeah, 65. You

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   see where it says in the middle of the page, the

2   paragraph beginning, "While outside the building"?

3       A    Yes, sir.  I see that.

4       Q    Could you read that paragraph to yourself,

5   please?  Let know when you're done.  Just that

6   paragraph.

7       A    Yes, sir.  Yes, sir.

8       Q    I take it you don't -- do you remember that

9   interview with Shawn Mattingly today?

10      A    No, sir.

11      Q    All right.  Fair to say, though, that if Shawn

12  Mattingly had given you any other relevant information,

13  you would've included it in this report?

14      A    Correct, sir.

15      Q    If, for example, he had mentioned that Jeff

16  Clark brought a cat's head to work, you would've put it

17  in your report?

18      A    Clark brought a what?

19      Q    A cat's head.  A head of a cat, cut off the

20  cat.  If he had mentioned that, you would've written it

21  down, right?

22      A    Yes, sir.  I would have.

23      Q    And if he mentioned any -- withdrawn.  In

24  fact, if you had deemed what Sean Mattingly -- the

25  information he was giving you to be important, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  would've asked him if he was willing to do a

2  tape-recorded statement, correct?  Just like you did

3  with Mahan a few minutes later.

4      A    It depended on what was going on at the time.

5  I -- I always try to do that if I think something was

6  extremely pertinent to the investigation to try to get

7  him to go on the tape.  But if it was just me and

8  another detective working, sometimes we were stretched

9  for time.  And there were occasions that I didn't ask

10 for a taped statement just based on what was going on in

11 the homicide unit at the time.

12     Q    Well, this seems -- and you correct me if I'm

13 wrong, but just further down the page, the same place,

14 you're doing another interview with Mahan, and you ask

15 him for a taped interview.

16     A    Correct.

17     Q    You deemed that sufficiently important.  So

18 that suggests if you had thought that what Shawn

19 Mattingly was giving you was relevant, you would've

20 asked him for a taped statement, correct?

21         MR. BOND:  Object to form.

22     Q    Do you agree with --

23     A    Correct.

24     Q    Okay.  And obviously, if you had asked him for

25 a taped statement and he said no, you would've written

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 68 of 86 PageID #: 27498
The Deposition of JAMES CLARK, taken on January 21, 2022

68

1    that in your report, correct?

2        A    Yes, sir.  That's correct.

3             MR. BRUSTIN:  What exhibit is the Handy/Mahan

4        interview, Jahne?  Do you know?

5             MS. BROWN:  I'm looking.  I'm not sure.

6             MR. BRUSTIN:  I don't think I mentioned it to

7        you.  I'm sorry about that.  Well, just give us a

8        minute off the record, if you don't mind, to try to

9        find that.

10            COURT REPORTER:  Okay.  We're off the record.

11       The time is 4:10 p.m.

12            (OFF THE RECORD)

13            COURT REPORTER:  We're back on the record for

14       the deposition of Sergeant James Clark being

15       conducted by videoconference.  My name is Kortney

16       Chase.  Today is January 21, 2022.  The time is 4:17

17       p.m.

18   BY MR. BRUSTIN:

19       Q    Detective Clark, in 1992, you did not have any

20   particular expertise in forensic analysis.  Fair to say?

21       A    In what?  Sorry, sir.

22       Q    Forensic analysis.

23       A    No, sir.  I did not.

24       Q    So for example, you had no particular

25   expertise in microscopic hair comparison analysis?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      No, sir.  I did not.

2      Q      But you did, in many cases, work with analysts

3   from the state crime lab, correct?

4      A      Yes.   That is correct.

5      Q      And to the extent that your job was to gather

6   and provide them evidence to test, correct?

7      A      Correct, sir.

8      Q      It wasn't your responsibility, and you didn't

9   have the expertise to actually analyze the evidence,

10  correct?

11     A      That's correct, sir.

12     Q      You were reliant on those examiners to

13  accurately report to you what results they received in

14  their testing, correct?

15     A      Correct, sir.

16     Q      And so any time that you were providing

17  information about forensic testing to put in the case

18  file or to prosecutors, that was always based on

19  information that was provided to you by a state crime

20  lab analyst, correct?

21     A      Yes, sir.

22     Q      Do you have any recollection in this case of

23  ever speaking to Mr. Thurman?

24     A      No, sir.  I don't.  I -- I'm not saying that I

25  -- I did, but I just don't recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q     All right.  But in this case, like any other

2   -- to the extent that you were reporting or documenting

3   any lab results, it was based on information that you

4   received from lab analysts like Thurman, correct?

5        A     Yes.  That's correct.

6        Q     All right.  Now I will represent to you that

7   in 1994, Detective Handy conducted a follow-up interview

8   of Mr. Mahan, the interview you just saw that you

9   conducted?

10       A     He conducted a follow-up interview?

11       Q     Yes.  He did a second interview with

12  Mr. Mahan, the same person you did an interview with in

13  '92.

14       A     Okay.

15       Q     Do you recall ever seeing that interview?

16       A     No, sir.

17       Q     All right.  Obviously, you would agree,

18  though, that to the extent Detective Handy did a

19  follow-up taped interview of Mr. Mahan, that interview

20  had to be placed into the file, correct?

21       A     Yes, sir.

22       Q     And to the extent that Mr. Mahan provided any

23  information that suggested he might have been involved

24  in the crime, Detective Handy had an obligation to fully

25  investigate that evidence, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BOND:  Object to the form.

2      A    If you're asking me if Mr. Mahan was

3   implicating himself?

4      Q    Well, let me be clear.  To the extent that

5   Mr. Mahan provided information?

6      A    Uh-huh.

7      Q    Withdrawn.  To the extent that Detective Handy

8   received information suggesting that Mr. Mahan could

9   have been involved in the crime, would it be fair to say

10  that he had an obligation to investigate that?

11     A    Yes, sir.

12     Q    And to document that investigation?

13     A    Yes, sir.

14     Q    And to follow up on any leads concerning

15  Mr. Mahan's involvement in the crime?

16     A    Yes, sir.

17     Q    Regardless of whether it helped or hurt the

18  case against Keith Hardin and Jeff Clark?

19     A    Correct, sir.

20     Q    All right.  Do you recall, Detective Clark --

21  in this case, we received a bunch of case files in other

22  cases.  And one of which you were involved in called the

23  Humbert case.  Do you remember that case?

24     A    The Humbert case?

25     Q    Yeah.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A     No.

2      Q     The victim was someone named Eric Humbert from

3  '92 around this same time period.  The person who was

4  arrested was a guy named Whitesides?

5      A     Over Indiana?

6      Q     Yes.

7      A     Yeah.  I do remember that case.

8      Q     Okay.  So I just want to ask you a couple of

9  questions about that case.

10          MR. BRUSTIN:  Do we send a copy there, Jahne,

11     or do we need to do it on the screen?

12          MS. BROWN:  I think it needs to be on the

13     screen.

14          MR. BRUSTIN:  All right.  Let's mark this as

15     -- what number are we on?

16          MS. BROWN:  I think this will be 171.

17          (EXHIBIT 171 MARKED FOR IDENTIFICATION)

18          MR. BOND:  There's going to be a contest about

19     that but go ahead.

20          MR. BRUSTIN:  Please.  Don't make me fight that

21     contest right now.

22          MR. BOND:  We're not going to, Nick.

23          MR. BRUSTIN:  All right.

24          MR. BOND:  I'm not going to.  Go ahead.

25  BY MR. BRUSTIN:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    All right.  So right now, it's 171.  So

2    Plaintiff 171 is the LPD file on the Humbert homicide.

3    It's Bates stamped pages 1 through 100.

4           MR. BRUSTIN:  And why don't we show Sergeant

5       Clark the first page just make sure we're on the

6       same page and he recognizes it?

7           MR. GARVERICH:  And when you get a chance,

8       Nick, can you send that around to all counsel?

9           MR. BRUSTIN:  We can do that, I think, right

10      now.  Right, Jahne?

11          MR. GARVERICH:  Thank you.

12          MS. BROWN:  Yes.  I can do that.  Do you want

13      me to do that before I put it on the screen or

14          MR. BRUSTIN:  Why don't you put it on the

15      screen and then send it to them all?

16          MS. BROWN:  Okay.

17   BY MR. BRUSTIN:

18      Q    Do you recognize this as the case, Sergeant

19   Clark, that you were involved in investigating?

20      A    I -- I remember the name, and it was an

21   Indiana case.  I just don't remember the specifics.

22      Q    All right.  Let's take a look at page --

23          MR. BOND:  Has this been produced at all, Nick,

24      or is this brand new?

25          MR. BRUSTIN:  This was produced by the LPD to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        us and you as well.

 2             MR. BOND:  Okay.  Okay.  Thank you.

 3             MR. BRUSTIN:  It's part of a huge document

 4        production.

 5   BY MR. BRUSTIN:

 6        Q    Let's take a look at page 60 -- let's start at

 7   58 and 59.  Actually, we're going to need to take a look

 8   at first page 51.  So you can see it's your report.  All

 9   right.  So this is a report that you created, correct?

10             MR. BRUSTIN:  You need to go up a little bit.

11        Sorry, Jahne.  Can't see that.

12        Q    Sergeant, this is your report, correct?

13        A    Yes, sir.  I'm sorry.  I was trying to

14   remember it.  But it's got -- it says submitted by me so

15   yes, sir.

16        Q    Okay.  So now let's take a look at page 59.

17   Actually, you know what?  Before we go to 59, let's

18   start with page 65.  Page 65 is a report from Detective

19   Handy, correct?

20        A    Yes, sir.

21        Q    Now take a look at page 66.  And if you could

22   read the first full paragraph to yourself.

23        A    Yes, sir.

24        Q    Let me know when you're done.

25        A    Yes, sir.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  It appears that this is another example

2  of you interviewing a witness, the witness being asked

3  if they would take a polygraph, the witness not agreeing

4  to take a polygraph, Handy coming in and convincing the

5  witness to do a polygraph, right?

6           MR. BOND:  Object to the form of the question.

7           MS. CAMPBELL:  Objection.

8      A     I'm going to look at this again because I

9  didn't read it that way.

10     Q     Well, let's a take a look -- you know what I'm

11 going to do then?  I'm going to have you read one other

12 part before you answer then.

13     A     Okay.

14     Q     Take a look at page -- well, I'm sorry.  It

15 appears you spoke to him.  He said he wasn't sure.  And

16 then Detective Handy spoke to him, and he agreed to it,

17 correct?

18     A     Let me -- let me look at it again.  Okay.

19 Yeah.  So your assessment is right based on the

20 conversation that I had with -- with Mr. Handy.

21     Q     Okay.

22     A     I did -- I didn't know if he would take it or

23 not.  And then Mr. Handy spoke with Mr. Whitesides.

24     Q     Now, take a look at page 59.  This is your

25 report.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. BRUSTIN:  Could go to the bottom, please?

2     Q    Just if you could read the last two paragraphs

3 on this page.

4     A    Yes, sir.  Yes, sir.

5     Q    All right.  And so you would agree that based

6 on your report and Handy's report, it appears what

7 happened -- you spoke to Whitesides, you told him he

8 could but didn't have to take a polygraph.  He told you

9 he wasn't sure.  Then Handy talked to him, and he agreed

10 to a polygraph.  Do I have it accurately?

11         MR. BOND:  Object to the form.

12    A    Yes, sir.  Yes, sir.

13    Q    Okay.  So this is an example of you talking to

14 a suspect, the suspect not committing to a polygraph,

15 Handy coming in and convincing the suspect to agree to a

16 polygraph?

17         MR. ERVIN:  Objection to the form.

18    A    Yes, sir.

19    Q    Now, Mr. Whitesides has told us that when he

20 spoke to Detective Handy, he asked for an attorney and

21 Detective Handy ignored his request.  Obviously, if that

22 happened, you didn't know about it, correct?

23         MR. BOND:  Objection.

24    A    Okay.  I'm going to apologize upfront.  It's

25 extremely hard for me to answer the questions when I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    don't even remember the case.

2        Q    Well --

3        A    I don't remember.

4        Q    First of all, to the extent that you were

5    aware that this suspect had invoked his right to remain

6    silent, you would've ensured that he not be questioned

7    further, correct?

8        A    Oh, absolutely.

9        Q    Okay.  Assuming it's true, you couldn't have

10   known that he asked -- if it's true, that he asked

11   Detective Handy for a lawyer and was refused, correct?

12       A    Correct.

13       Q    Okay.  Now, do you recall -- I'm going to ask

14   you just a couple more questions about the Chandler

15   case, okay?

16       A    Okay.

17       Q    And this may be tough for you to answer, but I

18   got to ask you.  One of the things that Sergeant Pierce

19   testified to is that he thought even by 1992, you were a

20   far superior detective to Detective Handy.  And that at

21   the time of the Chandler investigation, he was concerned

22   that Sherrard had brought in Handy to interview

23   Mr. Chandler instead of you.  First of all, do you

24   remember having that concern yourself?

25       A    No.  I don't remember having that concern.  My

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  personal response to me being a better detective than

2  Handy -- Mark had more experience at the time.  So I

3  would've probably referred to him.  But again, I'm just

4  speculating.

5       Q    Okay.  Would it be fair to say that by 1992,

6  it was clear to you who the most competent detectives

7  were in the division?

8            MR. BOND:  Object to form.

9       Q    It was a bad question.  Let me ask you a

10  better question.  Would it be fair to say that there

11  were certain detectives -- certain homicide detectives,

12  at least, who had a reputation for being at the top of

13  their game?  There were people that were uniformly

14  respected?

15       A    The best way for me to answer that is there's

16  a lot of different things that go into working homicide

17  cases.  And some detectives were better at certain

18  things or certain areas than others were.  For instance,

19  collecting evidence, interviewing, interrogations.  And

20  most importantly to me was how accurate detectives'

21  intuitions were correct.

22       Q    All right.  Well, you recall, for example,

23  that in the Chandler case, long before you interviewed

24  Edwin Chandler, Detective Handy had erased the crime

25  scene video.  Everybody knew that, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of JAMES CLARK Taken on January 21, 2022

1          MS. CAMPBELL:  Objection.

2     A     Chevron?

3     Q     **Yes.**

4     A     Yes, sir.  I was aware of that.

5     Q     **To the extent that detectives had reputations**

6  **in the department, would it be fair to say that**

7  **Detective Handy did not have a particularly good**

8  **reputation for being a top-notch detective?  That wasn't**

9  **his reputation?**

10         MS. CAMPBELL:   Objection to the form.

11    A     When I got to the homicide unit in 1990, I was

12  told -- and from what I saw, he was a very good

13  detective.

14    Q     **Okay.**

15    A     In 1992, I still thought he was a good

16  detective.

17    Q     **Okay.  Okay.  Fair enough.  Now, you do recall**

18  **-- in 1998, obviously, you spoke to your brother about**

19  **the information he received on the Chandler case,**

20  **correct?**

21    A     Correct.

22    Q     **And what your brother reported to you in**

23  **substance was that he interviewed a person in jail who**

24  **told him that a person gave the name of the person**

25  **actually committed the Chevron crime, correct?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    Correct.

2       Q    And that, as was his custom and your custom,

3  he documented that interview and put it in the file,

4  correct?

5       A    Correct, sir.

6       Q    And your understanding was that no action was

7  ever taken on that information, correct?

8       A    I -- I think he subsequently gave that

9  information to Lieutenant Sherrard.

10      Q    He did.  But your understanding was that no

11 follow-up investigation was ever conducted, at least to

12 your knowledge?

13      A    Not to my knowledge.

14      Q    And you understood that years later, a

15 fingerprint match was obtained to the person, John Grey,

16 who gave that information to your brother, correct?

17      A    I know a fingerprint was found years later.

18 Now, I don't recall the name.

19      Q    Do you recall that years later, the name that

20 your brother received from the person in jail was

21 matched to a fingerprint found at the scene?

22      A    That's correct, sir.

23      Q    Now, obviously, when you heard that, you must

24 have been quite upset?

25      A    Perplexed may be a better word.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 81 of 86 PageID #:
27511
The Deposition of JAMES CLARK taken on January 21, 2022
81

1     Q    By the way, has any -- go ahead.

2     A    Again, honestly, I was still having a hard

3 time understanding how anybody can confess to a homicide

4 he didn't commit.  But as I said earlier, I -- I know

5 better now.  So I think perplexed would've been a better

6 word.

7     Q    Fair enough.  Would it be fair to say, though,

8 that nobody from the LPD ever questioned you about your

9 involvement in the Chandler investigation in connection

10 with that information?

11    A    That's correct.

12    Q    Now, would it be fair to say that knowing your

13 brother and how he conducts himself on the job, you have

14 absolutely no doubt whatsoever that if he took a

15 statement from somebody in jail and received information

16 that another person committed a crime, he would have

17 documented that information and put it in the file?

18    A    Correct, sir.

19    Q    And that he would've reported that information

20 through the chain of command?

21    A    That's correct, sir.

22    Q    And that he would've reported that information

23 to the lead detective on the case?

24    A    I think that's what he would've done -- is

25 giving that information to the lead detectives.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q     So I just want to ask you a couple of

2   questions about identification procedures.  Now, you

3   understood that there were rules and regulations in the

4   department in terms of conducting identification

5   procedures, correct?

6      A     Correct.

7      Q     And would it be fair to say, though, that in

8   1992, detectives had a great deal of discretion on how

9   to conduct identification procedures?

10     A     That's correct, sir.

11     Q     And as far as you understood it, nobody was

12  looking over your shoulder about how you conducted

13  identification procedure, correct?

14     A     Correct.

15     Q     So for example, if you wanted to do a show up

16  identification with a single suspect and a witness, you

17  were free to obtain a waiver to do that if you wanted

18  to, correct?

19     A     Correct.

20          MR. BRUSTIN:  All right.  I am just about done.

21     If you give me five minutes to look through my

22     notes, I think I can be done by 5:00.

23          THE WITNESS:  Sounds good.  Thank you.

24          COURT REPORTER:  Okay.  We're off the record.

25     The time is 4:45 p.m.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-37   Filed 01/26/23   Page 83 of 86 PageID #: 27513
The Deposition of JAMES CLARK, taken on January 21, 2022

83

```
 1              (OFF THE RECORD)
 2              COURT REPORTER:  We're back on the record for
 3        the deposition of Sergeant James Clark being
 4        conducted by videoconference.  My name is Kortney
 5        Chase.  Today is January 21, 2022.  And the time is
 6        4:50 p.m.
 7    BY MR. BRUSTIN:
 8         Q    Sarge, just a few more questions.  First of
 9    all, do you remember a detective named Joe Carroll?
10         A    I don't remember a Joe Carroll.
11         Q    Well, let me try it this way.  Do you remember
12    there being an incident where a detective -- and he
13    wasn't in your unit -- but a detective getting in a very
14    serious incident in Florida where he was accused of
15    assaulting Florida police officers and members of his
16    family.  Do you remember anything about that?
17         A    No, sir.
18         Q    Okay.  Now, eventually, when you became a
19    sergeant, were you a sergeant in the same squad?  Tell
20    me where you --
21         A    In the homicide squad?
22         Q    Yeah.
23         A    When I initially got promoted, I went back to
24    patrol, and then came back to the homicide squad.
25         Q    Okay.  And would it be fair to say that during
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the time when you were a sergeant in the homicide squad

2    and when you were the detective in the homicide squad,

3    you're not aware of there being any internal procedure

4    book on best practices within the homicide squad?  You

5    never heard of anything like that, right?

6         A    No, sir.

7         Q    And would it be to say that if there was some

8    internal procedure book on best practices within the

9    homicide squad, you would've known about it?

10        A    Yes, sir.

11        Q    And would it be fair to say that, to your

12   knowledge, there was no file that was being maintained

13   by your supervisors and the homicide squad about your

14   conduct?

15        A    About my conduct?

16        Q    You being an officer.  Not you specifically,

17   but any officer?

18        A    Oh.  No, sir.

19        Q    And certainly when you were a sergeant, there

20   were not files being kept in the homicide squad

21   concerning the behavior of individual homicide

22   detectives, correct?

23        A    No, sir.

24        Q    And if there were any such files, you would've

25   been aware of them, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Correct, sir.

2         MR. BRUSTIN:  I think that's all I have.

3         THE WITNESS:  Thank you.

4         MR. BRUSTIN:  Anybody else?

5         MR. SLOSAR:  Nothing for plaintiff Clark.

6         COURT REPORTER:  Okay.  If nobody has any

7    questions, I'm going to get us off the record.

8    Everyone, please stay on the line.

9         MR. BRUSTIN:  Great.  Thanks, Sergeant.

10         THE WITNESS:  You're welcome.

11         COURT REPORTER:  We're off the record.  It is

12    4:53 p.m.

13              (DEPOSITION CONCLUDED AT 4:53 P.M. EST)

14

15

16

17

18

19

20

21

22

23

24

25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1                    CERTIFICATE OF REPORTER

2                      STATE OF ILLINOIS

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof, by me after

7    first being duly sworn to testify the truth, the whole

8    truth, and nothing but the truth; and that the said

9    matter was recorded by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the

12   best of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am

14   in no way interested financially, directly or

15   indirectly, in this action.

16

17

18

19

20

21

22   KORTNEY CHASE,

23   COURT REPORTER/NOTARY

24   MY COMMISSION EXPIRES: 09/24/2025

25   SUBMITTED ON: 02/03/2022

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com