In the Matter Of:

## JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

3:17-cv-00419-GNS-CHL

---

# MARK HANDY

*September 21, 2020*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
1                IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF KENTUCKY
2                        AT LOUISVILLE

3               File No. 3:17-cv-00419-GNS-CHL

4

5   JEFFREY DeWAYNE CLARK &
    GARR KEITH HARDIN,
6

7           Plaintiffs,

8   vs.

9   LOUISVILLE JEFFERSON COUNTY
    METRO GOVERNMENT, et al.,
10

11          Defendants.

12

13

14

15               VIDEOTAPED DEPOSITION OF
                       MARK HANDY
16

17

18

19   DATE:          September 21, 2020

20   TIME:          10:04 a.m. - 5:04 p.m.

21   LOCATION:      Regus - Downtown Charleston
                    170 Meeting Street, Suite 110
22                  Charleston, SC  29401

23   REPORTED BY:   Lorraine B. Whiteley

24

25
```



```
 1           This transcript may not be reproduced, emailed to

 2      another party or transcribed in any form or by any means,

 3      electronic, mechanical, photocopying, recording or

 4      otherwise, without the prior written permission of the

 5      Court Reporter.

 6

 7                     A-P-P-E-A-R-A-N-C-E-S

 8    For Plaintiff Garr Keith Hardin:

 9           By:  Nick Brustin, Esquire
                  Mary K. McCarthy, Esquire
10                NEUFELD SCHECK & BRUSTIN, LLP
                  99 Hudson Street, 8th Floor
11                New York, NY  10013
                  (212) 965-9081
12                nick@nsbcivilrights.com
                  katie@nsbcivilrights.com
13                (VIA ZOOM)

14                Larry D. Simon, Esquire
                  THE LARRY SIMON LAW OFFICE
15                239 S. Fifth Street, Suite 1700
                  Louisville, KY  40202
16                (502) 589-4566
                  larrysimonlawoffice@gmail.com
17                (VIA ZOOM)

18    For Plaintiff Jeffrey DeWayne Clark:

19
             By:  Molly Campbell, Esquire
20                LOEVY & LOEVY
                  311 N. Aberdeen, 3rd Floor
21                Chicago, IL  60607
                  (312) 243-5900
22                SEND TO:  elliot@loevy.com
                  (VIA ZOOM)
23

24

25    (APPEARANCES CONTINUE, NEXT PAGE.)
```



```
 1              A-P-P-E-A-R-A-N-C-E-S (Continued)

 2   For Defendants Louisville Jefferson County
     Metro Government, City of Louisville, Detective
 3   James Clark, in his Individual Capacity, Detective
     Kelly Jones, in his Individual Capacity, Detective
 4   Robert L. Ennis, in his Individual Capacity,
     Sergeant Charles Edelen, in his Individual Capacity,
 5   Sergeant Jim Woosley, in his Individual Capacity,
     Major James W. Griffiths, in his Individual Capacity:

 6

 7        By:  Peter Frank Ervin, Esquire
                JEFFERSON COUNTY ATTORNEY
 8              531 Court Place, Suite 900
                Louisville, KY  40202
 9              (502) 574-6621
                peter.ervin@louisvilleky.gov
10              (VIA ZOOM)

11   For Defendant Meade County, Defendant Sheriff Joseph
     Greer, in his Individual and Official Capacity,
12   Defendant Ernie Embry, in his Individual Capacity,
     Defendant Cliff Wise, in his Individual Capacity,
13   Defendant William Adams, in his Individual Capacity:

14        By:  Andrew T. Garverich, Esquire
                Robert K. Bond, Esquire
15              COLEMAN LOCHMILLER & BOND
                2907 Ring Road
16              Elizabethtown, KY  42702-1177
                (270) 737-0600
17              agarverich@clblegal.com
                SEND TO:  rkbond@clblegal.com

18

19   For Detective Mark Handy, in his Individual Capacity:

20        By:  Kent Wicker, Esquire
                William H. Brammel, Jr., Esquire
21              DRESSMAN BENZINGER LaVELLE, PSC
                321 W. Main Street, Suite 2100
22              Louisville, KY  40202
                (502) 572-2500
23              kwicker@dbllaw.com

24

25   (APPEARANCES CONTINUE, NEXT PAGE.)
```



```
 1              A-P-P-E-A-R-A-N-C-E-S (Continued)

 2   For Defendant Robert Thurman, in his Individual Capacity:

 3          By:   Peter J. Rosene, Esquire
                  McBRAYER, PLLC - Louisville
 4                500 W. Jefferson Street, Suite 2400
                  Louisville, KY  40202
 5                (502) 327-5400
                  prosene@mcbrayerfirm.com
 6                (VIA ZOOM)

 7   Also Present:  Ralph Mitchell, Legal Videographer
                    (VIA ZOOM)
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    INDEX TO EXAMINATIONS

2    MARK HANDY, sworn                                        Page

3        Direct Examination by Mr. Brustin                      7

4

5                       EXHIBIT INDEX

6    Plaintiff Garr Keith Hardin's: [Pre-Marked]

7    Exhibit 91   Performance Appraisal Form of Mark Handy,     63
                  December 1997 (9 Pages)
8

9    Exhibit 92   Certificate of Completion of Seminar On       92
                  Occult Crimes: Reduction & Detection
10                (1 Page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                     PROCEEDINGS
 2                     = = = = = =
 3          THE VIDEOGRAPHER:  So good morning.  We are
 4   now on the video record and the time is 10:04, September
 5   21st, 2020.  This begins the videotaped depation [ph] --
 6   deposition of Mark Handy taken in the matter of Jeffrey
 7   Dewayne Clark versus Louisville Jefferson County Metro
 8   Government and others, filed in the U.S. District Court
 9   for the Western District of Kentucky at Louisville, case
10   number of which is 3:17-cv-00419-GNS-CHL.
11          I'm Ralph Mitchell, your remote
12   videographer, the court reporter is Lori Whiteley, and
13   we're representing Esquire Solutions.
14              As a courtesy, I will now ask that everyone
15   who is not speaking, please make sure your microphone is
16   turned off, and, of course un-mute when you're ready to
17   speak.
18              So, Counsel, is you please state your name
19   and whom you represent, after which the court reporter
20   will swear in the witness.
21              MR. BRUSTIN:  Nick Brustin, Neufeld Scheck &
22   Brustin, for the Plaintiff Keith Hardin.
23              MS. McCARTHY:  Katie McCarthy, Neufeld Scheck
24   & Brustin, for the Plaintiff Keith Hardin.
25              MR. WICKER:  Kent Wicker for the witness,
```



```
1    Mark Handy.

2              MR. BRAMMEL:  Bill Brammel, also on behalf of

3    Mark Handy.

4              MR. GARVERICH:  Andrew Garverich on behalf of

5    the Meade County Defendants.

6              MR. ROSENE:  Peter Rosene, on behalf of

7    Robert Thurman.

8              MR. ERVIN:  Peter Ervin, for Louisville Metro

9    employees.

10             MR. SIMON:  Larry Simon, for Keith Hardin,

11   Plaintiff.

12             MADAM COURT REPORTER:  Mr. Handy, will you

13   raise your right hand, please, sir?  Do you swear or

14   affirm that the testimony you shall give today will be

15   the truth, the whole truth and nothing but the truth?

16             THE WITNESS:  I do.

17             MADAM COURT REPORTER:  Thank you.

18        (MARK HANDY, having been first duly sworn as

19   hereinbelow certified, deposes and says as follows:)

20                  = = = = = =

21                  DIRECT EXAMINATION

22   BY MR. BRUSTIN:

23        Q    Mr. Handy, I take it that you take this

24   matter very seriously.  Is that fair to say?

25        A    Yes, sir.
```



1    Q    And that you've done your very best to

2    prepare yourself to testify to all of event regarding the

3    investigation of Keith Hardin and Jeff Clark?

4    A    Yes.

5    Q    You've done your very best to refresh your

6    recollection on your involvement in that case?

7    A    Yes.

8    Q    And you're doing to do your very best to

9    answer questions, without reference to documents unless

10   it becomes necessary; is that fair to say?

11   A    Fair to say.

12   Q    All right.  Do you believe Mr. Hardin and

13   Mr. Clark were wrongfully convicted?

14   A    No.

15   Q    Do you believe they are innocent?

16   A    No.

17   Q    You believe they are guilty, I take it?

18   A    Yes.

19   Q    And I take it you're as convinced they are

20   guilty, today, as you were when you investigated this

21   case back in the nineties; fair to say?

22   A    You know, I -- I'm -- I'm not exactly -- you

23   know, I thought they were guilty, then; I think they're

24   guilty, now.  What percentage of what I think -- I -- to

25   answer it, I -- I believed they were guilty, then; I



1  believe they're guilty, now.  I don't know if I'm more

2  convinced today than I was then or -- you know.  I -- I

3  wouldn't know how to -- to -- to measure that.

4        Q    Fair enough.  I take it, then, you've seen

5  nothing in the intervening years between your involvement

6  in this case and today that's caused you to question

7  their innocence?

8        A    I really haven't seen much of anything.

9        Q    All right.  And so I take it you've never

10  attempted to apologize to Mr. Hardin or Mr. Clark; fair

11  to say?

12        A    Correct.  Absolutely fair to say.

13        Q    You haven't felt sick about their

14  convictions; right?

15        A    No, sir.

16        Q    You haven't asked for their forgivance

17  [ph] -- forgiveness; right?

18        A    Correct.

19        Q    And you haven't been living your life to try

20  to make amends for Mr. Hardin and Mr. Clark; have you?

21        A    No, sir.

22        Q    You haven't -- you haven't had any prayers

23  that they forgive you; fair to say?

24        A    Fair to say.

25        Q    Now tell me everything that you did after



1  their conviction to ascertain whether or not they were,

2  in fact, guilty.  So from the time they were convicted at

3  trial, what have you done since that time to ascertain

4  whether or not these men were wrongfully convicted?

5       A    I -- I haven't done anything since their

6  conviction to --

7       Q    Well, don't -- I didn't mean to interrupt

8  you.  I'm sorry.

9       A    I -- I --

10      Q    Sometimes it --

11      A    I --

12      Q    -- gets difficult on Zoom.

13      A    I understand.

14           I would say zero.

15      Q    Zero.  What documents, if any, have you

16  reviewed to ascertain whether or not these two men were

17  wrongfully convicted in an investigation that you took

18  part in?

19      A    Once again, zero.

20      Q    All right.  And what's the reason for that,

21  sir?

22      A    I have other cases that I worked on, and I

23  don't typically go back and look at cases from the past.

24  I didn't have any problems with their conviction.  I

25  didn't see anything to -- I really didn't see anything to



1    look at.  Nobody showed me anything, offered me anything,

2    and I didn't take any effort to look at anything.

3         Q    Okay.  You testified at a post-conviction

4    hearing which was convened to determine whether or not

5    these men's convictions should be reversed; correct?

6    That was in 2015.

7         A    Correct.

8         Q    And after that time, their convictions were

9    in fact reser -- reversed; correct?

10        A    Correct.

11        Q    And you learned about that; correct?

12        A    I did.

13        Q    What did you do after their convictions were

14   reversed to determine whether or not they had been

15   wrongfully convicted?  Did you do anything?

16        A    I did not do anything.

17        Q    And that was your choice.  You chose not to

18   do anything; correct?

19        A    Correct.

20        Q    You chose not to review any -- any documents

21   from the case to determine whether or not something had

22   gone wrong in their case, even if inadvertently, to cause

23   two men to be wrongfully convicted; correct?

24        A    Correct.

25        Q    Now, when you testified in the



1    post-conviction hearing in 2015, you understood that that

2    case was being looked at to determine whether or not

3    there had been a wrongful conviction; correct?

4         A    Correct.

5         Q    And that -- was that the first -- was that

6    the first hearing of that type that you'd ever

7    participated in?  In other words, a -- a hearing, post

8    conviction, years after a conviction, to determine

9    whether or not somebody was wrongfully convicted?

10        A    I -- I don't recall.

11        Q    Do you recall any others that you testified

12   in, other than the -- this case?

13        A    I -- I -- I don't recall.

14        Q    Well, so as you sit here today, you can't

15   recall any others; fair to say?

16        A    Fair to say.

17        Q    This is the only one you recall testifying

18   at?

19        A    Correct.

20        Q    And I take it that before testifying in 2015,

21   for the first time in your career, at a hearing to

22   reverse a conviction that was the purpose of the hearing,

23   you did your very best to prepare yourself to testify in

24   that hearing?

25        A    Unfortunately, I didn't read some of the



1  investigative letters that I believe, looking back, I

2  should have read.

3      Q    And why didn't you read those letters?

4      A    I -- I -- I can't answer that.  I simply

5  didn't read 'em.  I -- I felt like I was prepared, from

6  memory.

7      Q    So you determined -- you determined you

8  didn't need to read them, and it turned out you were

9  wrong?

10      A    It turned out I was wrong; correct.  I should

11  have been better prepared.

12      Q    Okay.  But you didn't -- you decided, on your

13  own, not to read those letters?  Nobody told you not to;

14  right?

15      A    Correct.

16      Q    In fact, you showed up at that hearing and

17  you didn't read a single thing; correct?

18      A    Correct.

19      Q    Doesn't sound like you took it very

20  seriously.  Am I wrong about that?

21      A    I did not take it as seriously as I should

22  have.

23      Q    Why didn't you?

24      A    I -- I -- I seriously didn't -- didn't know

25  what to expect.  I didn't understand what -- the line of



 1  questioning, and I thought I would be fine testifying

 2  from memory.  I -- I -- I just -- I didn't -- I didn't

 3  think that my involvement in that case was that

 4  significant to where, you know, there was gonna be a lot

 5  of issues raised I wasn't prepared to answer.

 6       Q    Uh-huh.  You still feel that way?

 7       A    No.  I -- as I said before, I wish I would

 8  have read some of the letters so I would have been better

 9  prepared.

10       Q    Now, even though you didn't prepare yourself

11  to testify in that case, I take it you took your oath

12  seriously.  Is that fair to say?

13       A    I did.

14       Q    All right.  And even though you reviewed --

15  so I take it -- with -- withdraw.

16            You didn't review any case reports prior to

17  testifying in 2015; correct?

18       A    Correct.

19       Q    You chose to just simply testify based on

20  your memory; correct?

21       A    Correct.

22       Q    And, by the way, at that time, you felt like

23  you had a decent memory of the case, and that's why you

24  made that decision; fair to say?

25       A    I -- you know, I can't say what my memory of



1  the case was, then.  I don't -- I mean it had been many
2  years and many cases ago and -- you know.  There were
3  things that -- that I later found out that I would have
4  known had I read an investigative letter prior to going,
5  so.  No; my memory was not as good as I wished it had
6  been.
7        Q     Mr. Handy, you remember me from your last
8  deposition; right?  That I took of you?
9        A     Vaguely.  Sure.
10        Q     Just not -- vague mem -- vague memory of that
11  deposition?  It doesn't stand out in your mind?
12        A     You -- you know, I -- I mean I -- I remember
13  bits and pieces.
14        Q     Right.  Well, let me tell you why I'm
15  reminding you, in case you don't remember.  I am going to
16  ask you some very specific questions, and I want you to
17  answer my questions.  Can I ask you to commit to doing
18  that, sir?
19        A     Yes, sir.
20        Q     And if you don't understand my question or
21  it's not clear, please tell me and I'll refine it.  Okay?
22        A     Yes, sir.
23        Q     But, otherwise, I want you to answer my
24  questions.  Okay?
25        A     I'll try.



1    Q    All right.  Now I take it that one reason why

2    you chose not to review any case reports in 2015 is

3    because you believed you had a sufficient memory to

4    testify about the case.  Is that fair to say?

5    A    That's fair to say.

6    Q    And although you did not read any case

7    documents, you -- you understood that you had an

8    obligation to tell the truth in that hearing; correct?

9    A    Correct.

10   Q    Did you tell the truth in that hearing?

11   A    I did.

12   Q    Were you truthful with all of your testimony

13   in that hearing?

14   A    I was.

15   Q    You didn't mis -- you didn't rep --

16   misrepresent any of your actions in that hearing; fair to

17   say?

18   A    I don't believe I did.

19   Q    But, obviously, you understood that, to the

20   extent you misrepresented any actions in that hearing,

21   that would be important in determining whether or not

22   Mr. Hardin and Mr. Clark were wrongfully convicted; fair

23   to say?

24   A    I'm not sure.  Could you -- could you explain

25   your question again, please?



1      Q     Sure.  If you lied in a -- in a hearing

2    regarding their wrongful conviction, that would be

3    relevant to whether or not they were wrongfully

4    convicted; fair to say?

5      A     No.

6      Q     Would it -- it wouldn't -- it wouldn't

7    pertain to your credibility as a witness?

8      A     My credibility as a witness may not have

9    anything to do with whether they were convicted or not

10   convicted.  It would really --

11     Q     Okay.

12     A     -- depend on what -- what my -- what my

13   witness -- witnessing, was.  I mean I -- I'm --

14   obviously, there's varying degrees of witnesses that are

15   important to a case or not important to a case,

16   peripheral to a case, central to a case.  Your opinion as

17   to a central witness and one I think may be peripheral

18   could be totally different.

19     Q     Fair enough.  I take it that it's your belief

20   you were simply a peripheral witness in the Hardin/Clark

21   case; is that fair to say?

22     A     I don't know.  "Peripheral" probably wouldn't

23   be accurate.  But I certainly wasn't a central witness.

24     Q     Okay.  You were, at most, a -- one of many

25   witnesses --



MARK HANDY                                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                              18

```
 1          A    I was --
 2          Q    Fair to say?
 3          A    I was one of how many ever witnesses they
 4     had.
 5          Q    Okay.  There was nothing particularly
 6     important about your role in the case; fair to say?
 7          A    Not particularly; no.
 8          Q    Okay.  That's fair.
 9          A    I mean other people --
10          Q    And -- but -- but most importantly --
11          A    Go ahead.  I'm sorry.
12               MR. WICKER:  Mr. Brustin, let him finish,
13     please.
14   BY MR. BRUSTIN:
15          Q    I interrupt -- I interrupted you.  I
16     apologize.
17          A    Well, I'm sorry.  I may have interrupted you.
18               I believe that many of the things, if not all
19     of the things that I participated in, could have been
20     testified to by other people that were present.  So if
21     I --
22          Q    Okay.
23          A    -- was available, I think they could have put
24     the same testimony on, without me.
25          Q    Okay.  Okay.  Now going back to your
```



 1  testimony in the 2015 proceeding, just to be clear, you

 2  didn't make any misrepresentations under oath in the

 3  Hardin post-trial proceedings; correct?

 4       A     Correct.

 5       Q     By the way, at that time you were still a --

 6  a sergeant in the Sheriffs Department; correct?

 7       A     Correct.

 8       Q     You were an active law-enforcement officer?

 9       A     Correct.

10       Q     And I take it in the same way you didn't make

11  any misrepresentations under oath in the Hardin

12  post-trial proceedings, you did not make any

13  misrepresentations under oath at Hardin and Clark's

14  criminal trial; correct?

15       A     Correct.

16       Q     And I take it that you are as confident that

17  you did not lie in the criminal trial as you are that you

18  did not lie in the post-trial proceedings; correct?

19       A     Correct.

20       Q     That's because you don't lie under oath;

21  correct?

22       A     Correct.

23       Q     Ever; right?

24             MR. WICKER:  Mr. Brustin, are you asking

25  about other cases which are barred by the court's --



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    20

1            MR. BRUSTIN:  You know what?  You're right.

2      I should have asked a clearer question.

3    BY MR. BRUSTIN:

4         Q    Other than in Chandler and West, you have

5      never lied under oath; correct?

6            MR. WICKER:  Objection.  I'll instruct him

7      not to answer.

8            MR. BRUSTIN:  Why?  Why is that --

9            MR. WICKER:  It --

10           MR. BRUSTIN:  -- Kent?

11           MR. WICKER:  It presumes issues about

12     Chandler and West and it --

13           MR. BRUSTIN:  I couldn't hear you.  I

14     apologize.

15           MR. WICKER:  And it asks about other cases.

16     Those subjects are stayed by the court's order.  So

17     please ask --

18           MR. BRUSTIN:  They're not.

19           MR. WICKER:  -- questions that --

20           MR. BRUSTIN:  You misunderstood the court's

21     order.  That's not -- not stayed by the court's order.

22     But I don't want to argue with you; I'm gonna move on.

23   BY MR. BRUSTIN:

24        Q    Now would it be fair to say that you prepared

25     yourself to testify prior to -- prior to testifying in



1    the Clark/Hardin criminal trial?

2         A    Correct.

3         Q    You would -- you would have reviewed your

4    reports carefully?

5         A    Correct.

6         Q    You would have met with the D.A. to ascertain

7    what areas the D.A. was going to go over with you in this

8    homicide trial?

9         A    I don't believe -- I supplied the in --

10   investigative letters to the court through, I guess, the

11   Sheriff.  But I don't really remember meeting with the

12   prosecutor.

13        Q    So let --

14        A    So, no; I didn't --

15        Q    This is a good --

16        A    I didn't --

17        Q    This is a --

18        A    Go ahead.  I'm --

19        Q    This is a good point.  This is a good point.

20   I assume you don't remember every -- everything that

21   happened in your investigation in 1992.  Fair to say?

22        A    Fair to say.

23        Q    Okay.  And even though you don't remember

24   meeting with the D.A., would it be fair to say that

25   before you testified in this homicide case, you would



1  have met with the D.A. at some point before getting on

2  the stand?

3       A    I -- I simply don't remember meeting with the

4  D.A.  I remember taking the stand and answering

5  questions, and I remember one of the questions he asked

6  was -- was something that I hadn't heard before, in the

7  way he asked it.  But I don't -- I don't remember talking

8  to him prior to this case.  Most -- all my --

9       Q    All right.

10      A    -- dealings were with Joe Greer.

11      Q    So you don't remember if you -- you don't

12  remember, one way or another, whether or not you met with

13  the V.A. in this case?

14      A    I -- I'm gonna say I didn't meet with him.

15  And the only --

16      Q    Your test --

17      A    -- thing --

18      Q    Your testimony is that you didn't?

19      A    I don't -- I don't believe I did.  That's my

20  testimony.  I do not believe that I did.

21      Q    All right.  It's your testimony that you

22  testified in this homicide trial without ever meeting

23  with the D.A. before trial?

24      A    I don't believe I met with him.  I supplied

25  him information as to what information that I had.  I



```
 1   knew he had the investigative letters, so -- I mean I --
 2        Q     Mr. Handy, simple question.  Your testimony
 3   is, you don't believe you met with Ken Smith --
 4        A     I do not believe --
 5        Q     -- before trial?
 6        A     -- I met with him before trial.  I -- I just
 7   -- I simply don't remember that.
 8        Q     All right.  But you were questioned about
 9   your reports; correct?
10        A     Correct.
11        Q     And you were scrupulously honest in all of
12   your testimony in the trial; correct?
13        A     Correct.
14        Q     The same way you were scrupulously honest in
15   your post-conviction testimony in the Clark/Hardin
16   matter?
17        A     Correct.
18        Q     On all issues; correct?
19        A     Correct.
20        Q     And you would agree that if you intentionally
21   lie during any -- any portion -- withdrawn.
22              You understand the difference between making
23   a mistake and telling a lie; right?
24        A     Correct.
25        Q     Anybody can make a mistake and say something
```



1  that didn't happen; right?

2       A      Correct.

3       Q      But a lie implies intent; right?

4       A      Correct.

5       Q      And as a detective for many years, one of the

6  things that you -- your job was to ascertain whether or

7  not people were telling you the truth:  Witnesses,

8  suspects; right?

9       A      Tried to.

10      Q      Well, you became very good at that; right?

11  That was one of the things you became good at over the

12  years?

13      A      No; I don't believe I -- you -- I think that

14  people can lie to you -- to this day, can lie to me and I

15  believe them.  And, unfortunately, I think that people

16  can lie convincingly and you can believe people you

17  shouldn't believe.  To this day, I still think people can

18  lie to me and get away with it and I believe them.  So,

19  no.

20      Q      Sure.  In your experience, people can look

21  you right in the eye; right?

22      A      Correct.

23      Q      They can talk in a very calm and rational

24  manner; right?

25      A      Correct.



1      Q     And lie through their teeth; right?

2      A     Correct.

3      Q     You've seen it all the time?

4      A     I believed people that I should not have

5   believed.

6      Q     People who looked honest and sound reasonable

7   but are just liars; right?

8      A     Well, I'm saying, specifically, they told me

9   things that I believed that proved not to be true.

10     Q     Right.  And they said it in a calm voice,

11   they looked you in the eye; right?

12     A     I -- I -- I don't remember specifics.

13     Q     Right.

14     A     I just remember there were people who I

15   believed that -- that weren't telling the truth.

16     Q     Okay.  But you would agree that if you

17   intentionally lied during any portion of the proceedings

18   in the Hardin/Clark criminal trial, it would be fair --

19   it would have been fair for the jury to disregard your

20   entire testimony?

21     A     I -- I -- I would say the a jury can do

22   whatever a jury wants to do with testimony.  I wouldn't

23   say -- I mean if -- if I understand your question

24   correctly, the jury can do whatever they wish with

25   someone's testimony.  They can choose to believe some of

1   it.  They can choose to believe all of it.  They can

2   choose to believe none of it.

3          Q      Well, let me be more specific, sir.  If, in

4   fact, you lied during the criminal proceedings involving

5   Mr. Clark and Hardin, in your view would it be fair for

6   the jury to disregard all of your testimony?

7          A      Once again, I don't know what would be fair

8   or not for the jury.  I mean I think the jurors can pick

9   and choose what they want to believe and not.  And

10  they say --

11         Q      Okay.

12         A      You know.  I mean they may go, oh, well, we

13  don't believe this, but, clearly, we believe that because

14  there were other things that would lead us to believe

15  that.  So I -- I don't --

16         Q      Fair enough.

17         A      You know.  They --

18         Q      No; that's -- that's a good oint.

19         A      A jury's gonna believe whatever --

20         Q      Were you --

21         A      -- they want, as much as they want or as

22  little as they want, regardless --

23         Q      Sure.

24         A      -- of what the witness says.

25         Q      And you -- you have had experience with

 1   witnesses where you caught them in a lie; right?

 2        A    I've had witnesses that didn't tell me the

 3   truth, if I believe --

 4        Q    Sir, listen to my question.

 5        A    Sure.

 6        Q    Have you had experience with witnesses who

 7   you've caught in a lie?

 8        A    I'm not sure I -- you know -- I mean caught

 9   them in a lie?  I've had people that lied about their

10   name and I later found out that their name wasn't what

11   they told me it was.  I don't know if I'd call that

12   "catching them in a lie."

13        Q    I'm asking you --

14        A    I learned later on that --

15        Q    -- something very simple --

16        A    -- their name --

17        Q    -- Mr. Handy.

18             MR. WICKER:  Mr. Brustin --

19   BY MR. BRUSTIN:

20        Q    Very simple.

21             MR. WICKER:  Mr. Brustin --

22   BY MR. BRUSTIN:

23        Q    When you interview -- when you interview a

24   witness --

25             MR. WICKER:  The court reporter is --



 1  BY MR. BRUSTIN:

 2       Q     -- and you believe --

 3             MR. WICKER:  -- asking that you --

 4  BY MR. BRUSTIN:

 5       Q     -- they are lying to you --

 6             MR. WICKER:  -- not talk over each other.

 7  BY MR. BRUSTIN:

 8       Q     -- does that cause you not to trust them,

 9    thereafter?

10             MR. WICKER:  Objection.  Asked and answered.

11             You can -- you can try --

12  BY MR. BRUSTIN:

13       Q     Answer, please.

14             MR. WICKER:  You can try.

15  BY MR. BRUSTIN:

16       Q     Unless your attorney tells you not to answer,

17    you just answer my -- all of my questions.

18       A     All right.  Repeat the question, please.

19       Q     Sure.  When you have experience interviewing

20    a witness and you determine they have lied to you about a

21    matter of importance, would it be fair to say that would

22    cause you to question whether they're telling you the

23    truth about anything?

24       A     It would certainly raise that question.

25       Q     Okay.  You've had -- you've had issues --



 1  you've -- I take it you've used informants over the

 2  years; fair to say?

 3       A     I'm sorry?

 4       Q     Have you ever used an informant?

 5       A     Oh.  I have; sure.

 6       Q     Okay.  And once an informant lies to you,

 7  that information, to -- to a large extent, is worthless;

 8  fair to say?

 9       A     No.

10       Q     No?  You have informants that lie to you,

11  that you still find to be reliable?

12       A     You know, I've had informants that had lied

13  and then, based on what they told me, I was able to prove

14  certain parts of what they said were accurate enough to

15  do something with it.  I mean informants can lie, and --

16  and -- and be honest and give you things that you can

17  actually use, even though maybe previously they weren't,

18  so.

19       Q     Okay.  So I think I understand.  So

20  sometimes, in your experience, witnesses lie to you.  But

21  that doesn't matter; you still trust them.  Is that what

22  you're telling us?

23       A     No.  I'm saying that they still may be able

24  to provide useful information if you can independently

25  verify what they're telling you --



MARK HANDY                                September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                  30

1        Q    Okay.

2        A    -- outside of what they told you, you can

3    independently verify it, it has value.  That's all I'm

4    saying.

5        Q    All right.  Now would you agree that if an

6    officer lied about feeding key non-public facts in a

7    capital murder case to get a persuasive confession, like

8    in Hardin, that would go to the honesty and integrity of

9    the officer?

10            MR. WICKER:  Objection.  Instruct him not to

11   answer.

12            MR. BRUSTIN:  I asked about Hardin.  What are

13   you talking about?  You can't just instruct him not to

14   answer.  What are you talking about?

15            MR. WICKER:  Objection.  Instruct him not to

16   answer.

17            MR. BRUSTIN:  On what basis?

18            MR. WICKER:  Because it's barred by the

19   court's pre-trial order.

20            Ask another question.

21            MR. BRUSTIN:  Explain to me how it's barred

22   by the order.  I asked him if he lied about feeding

23   non-public facts in a capital murder case like in Hardin.

24   How is that barred?

25            MR. WICKER:  You can go on.  We're not going



1    to argue about it.

2              MR. BRUSTIN:  Just give me your basis.

3              MR. WICKER:  I gave you the basis.  Move on.

4    BY MR. BRUSTIN:

5         Q    If you had a fellow officer that lied about a

6    significant material fact in an investigation like

7    Hardin, would you have trouble believing them in the next

8    case?

9              MR. WICKER:  We can answer that.

10        A    If I had an officer that I worked with that I

11   knew had lied in one case, would I have trouble believing

12   them in the next case?

13   BY MR. BRUSTIN:

14        Q    That is the simple question I asked you, sir.

15   And you answered previously, under oath.  Would you like

16   to answer it differently now or the same?

17        A    Well, I would like to answer it the same.

18   I -- I think I would have trouble believing them.

19        Q    And would it be fair to say that you were

20   just as honest in the Hardin case as you were in any

21   other case?

22        A    Yes.

23        Q    You were not any -- you were not any less

24   fair to the criminal defendants in this case than you

25   were in any other case that you investigated?



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                        32

```
 1        A     No.
 2        Q     You never lied under oath in this case;
 3   correct?
 4              MR. WICKER:  Objection.  Asked and answered.
 5   BY MR. BRUSTIN:
 6        Q     You never lied to your superiors in this
 7   case; correct?
 8        A     Correct.
 9        Q     You were the same honest detective in this
10   case as you were in all of your cases; fair to say?
11        A     Fair to say.
12        Q     No less; no more?
13        A     Fair to say.
14        Q     You understood, when you testified in the
15   Hardin and Clark post-trial hearing that there was DNA
16   evidence suggesting that they innocent; correct?
17        A     No.
18        Q     You didn't learn that until later on?
19        A     I'm not -- I -- I -- I still haven't learned
20   that.  I don't know what DNA evidence that there is, that
21   proves their innocence.
22        Q     Oh.  Let me ask you this.  What is your
23   understanding as to the DNA evidence in this case,
24   regarding Mr. Clark and Mr. Hardin, that was discovered
25   post conviction?
```



 1        A    I'm not -- I'm not familiar with it.

 2        Q    All right.  So as you sit here today, you

 3   have no understanding whatsoever as to what DNA evidence,

 4   if any, was found in this case?

 5        A    Correct.

 6        Q    And that -- and so are you curious about the

 7   DNA evidence that was found in a case that you

 8   investigated where two men were convicted and spent more

 9   than 20 years in prison?

10        A    Let me -- let me rephrase.  What I said was,

11   it appears that I've heard --

12        Q    Sir?  Sir?

13        A    Yes.

14        Q    I don't --

15        A    I'm trying to --

16        Q    You have -- you have to answer the question.

17   You can rephrase it --

18        A    Well, I can't --

19        Q    -- afterwards.  But first --

20        A    Yeah.  I mean --

21        Q    -- answer my question.

22        A    The reality is, if I heard something that I

23   thought was significant, that I might pay attention to

24   it.  You know, the fact that somebody is claiming DNA

25   evidence exonerates a person, is not something that I --



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                   34

1   you know, particularly, because I don't know where the

2   DNA came from, I don't know how it's being used, I don't

3   really understand the -- the facts of where it was

4   collected, who it was collected from, what specifically

5   was collected, what significant does it have to the

6   victim or to the perpetrators.  I don't know any of that.

7        Q    Okay.

8        A    So -- so --

9        Q    And I take it, sir --

10       A    -- consequently --

11       Q    That you --

12       A    -- I don't --

13       Q    I -- I'm sorry.  Go ahead.

14       A    I said I don't really have any -- I don't

15   know.

16       Q    Okay.  You don't?

17       A    I don't.

18       Q    Well, I -- I hear you.  Are you done

19   answering?  I don't want to interrupt you.  I'm saying --

20   I -- I had interrupted you --

21       A    Yeah.  I'm --

22       Q    -- that way?

23       A    -- finished answering.  I simply don't know

24   any of the facts of that.

25       Q    Fair to say.  And you have taken no steps



1    whatsoever to ascertain those facts; correct?

2          A    Correct.

3          Q    Okay.  You haven't asked anybody in the

4    world, hey, what is this new DNA evidence that they're

5    touting as -- as suggesting they're innocent; correct?

6          A    I have not asked anybody.

7          Q    I'm sorry?

8          A    No; I have not asked anybody what's this

9    new -- whatever.

10         Q    Okay.

11              UNKNOWN MALE:  -- listen to it.

12              MR. BRUSTIN:  What's going on?  I just lost

13   the witness.

14              THE WITNESS:  Well, I'm here.

15              MR. BRUSTIN:  Very good.

16              MS. McCARTHY:  I think he's just joined.

17              MR. BOND:  I just joined; yeah.

18              MR. BRUSTIN:  Okay.  If you could just mute

19   it.  Thank -- thank you, Keith.

20              MR. BOND:  Well, I didn't know it would do

21   that.  I apologize.

22              MR. BRUSTIN:  No problem.

23              MR. BOND:  I just signed my life away, so.

24   Come -- I've come in to work.

25   BY MR. BRUSTIN:



800.211.DEPO (3376)
EsquireSolutions.com

```
 1          Q     You understand --
 2                MR. BRUSTIN:  Keith, could you turn off
 3     your -- I -- I got Keith on my screen for some reason.
 4                MS. McCARTHY:  It -- he's on his iPhone.  I
 5     don't think that's right, Nick.
 6                MR. BRUSTIN:  I'm telling you, I don't have
 7     the witness anymore.
 8                MR. BOND:  My video's off, Nick.
 9                MS. McCARTHY:  Yeah.  Everyone's video's off
10     except for yours.
11                MR. BRUSTIN:  I'm not seeing the witness
12     anymore.  I'm just telling you.
13                MS. McCARTHY:  Do you want to take a break?
14                MR. WICKER:  Say something.
15                THE WITNESS:  Testing, one, two, three, four.
16     I don't --
17                MR. BRUSTIN:  Now I got -- I got it back.
18     I've got you back.  Okay.
19     BY MR. BRUSTIN:
20          Q     Now, you understood, Mr. Handy, that in
21     Hardin and Clark, it was your job to give all the
22     evidence that you collected, good and bad, to the
23     prosecutor; correct?
24          A     I -- I don't think I collected any evidence.
25          Q     When I say "evidence," I mean witness
```



1    statements, things of that nature.  Any --

2         A     All the --

3         Q     -- evidence in a case --

4         A     All the --

5         Q     -- that you collected.

6         A     All the investigative letters, which included

7    repor -- interviews, things of that nature, would have

8    been turned over to the prosecutor.

9         Q     That was your job?  Whether it helped or hurt

10   the case, you had to give all of your investigative

11   reports, based on interviews you conducted, to the

12   prosecutor; correct?

13        A     Correct.

14        Q     And you did that in this case, the Hardin

15   case; correct?

16        A     To the best of my ability.

17        Q     Just like you did in every case; correct?

18        A     Correct.

19        Q     No more, no less; right?

20        A     Correct.

21        Q     And you understood in this case, in creating

22   your reports, that you had an absolute obligation to

23   include all potentially relevant information, good and

24   bad, concerning a particular witness interview; correct?

25        A     Yes.



1        Q      You always put whatever info -- information

2    you were given into your records; correct?

3        A      Yes.

4        Q      You never attempted to mislead the

5    prosecutor, through your report writing, about what

6    transpired doing -- during a witness interview; correct?

7        A      Correct.

8        Q      Not in this case?

9        A      No.

10       Q      Not in any other; correct?

11       A      No.

12       Q      You were as scrupulous and conscientious in

13   this case, in that regard, as you were in all of your

14   cases; correct?

15       A      You know, to suggest that I didn't make

16   mistakes as far as interviews and -- and so -- you know,

17   I've worked on many cases, and mistakes happen.  Things

18   get sent to prosecutors all the time.  I mean I can't say

19   I never made a mistake and didn't send a prosecutor --

20   the wrong prosecutor something or I -- you know.  I've --

21       Q      Sure.

22       A      I've made mistakes.  I mean I -- I've -- I

23   admit that.

24       Q      That's fair.

25       A      So I mean I can sit here --



```
 1        Q     I mean what --

 2        A     -- and say I've --

 3        Q     No --

 4        A     -- never done this or I've never done that.

 5   I've made mistakes.

 6        Q     That's fair.  You attempted to be as

 7   scrupulous and meticulous in this case as in any other;

 8   is that fair to say?

 9        A     I've tried to do my best.

10        Q     Let me try it again.  You attempted to be as

11   scrupulous and meticulous in this case, in your report

12   writing, as in any other case; fair to say?

13        A     I tried to do my best.

14        Q     Are you unable to answer my question?  Do you

15   understand the words I'm suing?  Because you --

16        A     I understand.  My -- my answer to your

17   question is, I tried to do my best.

18        Q     Okay.  You tried to do your best in your

19   report writing; correct?

20        A     Correct.

21        Q     In this case, just like in all of your cases?

22        A     Correct.

23        Q     No better; no worse?

24        A     No better; no worse.

25        Q     Now do you have an understanding as to
```



 1   whether or not you're being indemnified in this case?  In

 2   other words, if you are found liable and we get a damage

 3   verdict against you for a large amount of money, will the

 4   City will be paying that verdict?

 5        A    I -- I don't know what agreements there are.

 6        Q    You're -- as you sit here today, you have no

 7   understanding as to whether or not the City is going to

 8   pay a judgment against you?

 9        A    I believe that if there's a judgment, it will

10   be paid for by the City.

11        Q    Okay.

12        A    Because the lawyers that represent me were

13   hired by the City to represent me.

14        Q    Okay.  And your understanding and your

15   testimony here today is that if you are found liable in

16   this case, the City will pay the judgment?

17        A    That's what I believe.

18        Q    Okay.  Now -- and do you understand that the

19   City will pay a judgment against you both for your

20   liability for damages caused by the wrongful conviction,

21   as well as punitive damages, if those are found against

22   you?

23        A    I -- I -- I don't know.

24        Q    All right.  Well, let me ask you quickly, do

25   you have any assets, major assess?  So -- so, for



1  example, do you own any real property, any homes?

2      A    I own a home.

3      Q    Where is your home?

4      A    Well, I have a home in Sarasota, Florida, and

5  then I have a home in Louisville, Kentucky.

6      Q    Okay.  And what are the approximate values of

7  those homes?

8      A    The home in Louisville, Kentucky, the

9  approximate value is somewhere around six hundred

10  thousand.  The home in Sarasota, Florida, the approximate

11  value is somewhere around $360,000.

12      Q    Do you have mortgages on those homes?

13      A    I've got an $85,000 home equity line of

14  credit on the one in Kentucky.

15      Q    Okay.  Do you have any other major assets,

16  say in excess of $10,000?

17      A    I have a collector car.  I have a '70 Mustang

18  fastback 302 that's valued at somewhere around $30,000.

19      Q    Anything else?

20      A    I have a pickup truck that I owe on that may

21  have some equity in it.

22      Q    Have you transferred any large funds in

23  excess of $10,000 to any other people, in the last three

24  years?

25      A    No.



1    Q    Have you tran -- have you changed the -- any

2    of the ownership of your homes in the last three years,

3    got -- added any additional owners or done anything like

4    that?

5    A    No.

6    Q    How much do receive in pension?

7    A    Approximately forty-seven hundred dollars a

8    month.

9    Q    How much do you have in retirement assets?

10   A    I don't have anything in retirement assets.

11        Oh, wait a minute.  I'm sorry.  I've got a

12   TIAA-CREF account that I believe has $26,000 in it.

13   Q    What documents have you reviewed in

14   preparation for your testimony here -- withdrawn.

15        Before I get to that, how many times have you

16   met with your attorneys in preparation for your

17   deposition here today, since the Complaint was filed?

18   A    Maybe five or six.

19   Q    How many times in person?

20   A    Several.  I don't really remember the exact

21   number.

22   Q    Three or four?

23   A    Probably.

24   Q    How long were those meetings?

25   A    An hour or so.



1       Q       I'm sorry?

2       A       An hour or so.

3       Q       Okay.  So would it be fair to say that you've

4    met with your -- have you met with your -- your attorneys

5    for more than six hours, in total?

6       A       I -- I think.  I -- I -- I didn't really time

7    it, so I don't know.

8       Q       How about in the last couple of weeks, have

9    you met with them?

10      A       Via Zoom.

11      Q       How much time did you spend meeting with

12   them?

13      A       A couple hours.

14      Q       And who was present for those meetings?

15      A       The same men that are present here.

16      Q       Okay.  How long -- for example, how long did

17   you spend meeting with Mr. Wicker?  Was he present for

18   all those meetings?

19      A       To my knowledge, he was.

20      Q       When's the last meeting you had?

21      A       Well, we met last night.

22      Q       For how long?

23      A       An hour.

24      Q       How about before that?

25      A       We had a Zoom meeting probably within the



1   past week or two.

2        Q     For how long?

3        A     A -- a -- an hour or so.

4        Q     What documents have you reviewed in

5   preparation for your deposition?

6        A     I reviewed my investigative letters.  I

7   reviewed my testimony in the trial.  And there was a

8   group of letters that was titled Pleadings, that I read.

9        Q     What was in those pleadings, generally, that

10  you recall?

11       A     Just the narrative of your -- or someone in

12  your capacity, that wrote about what they believe

13  happened.

14       Q     You read the Complaint in our case?

15       A     Correct.

16       Q     Okay.  Is that what you're talking about --

17       A     Correct.

18       Q     -- when you say "pleadings?"

19       A     Correct.

20       Q     It was a long document lading -- laying out

21  what we claim happened in this case?

22       A     Exactly.

23       Q     Okay.  So you've read your investi -- the

24  investigative letters that you created?

25       A     Correct.



1       Q      And your trial testimony; is that correct?

2       A      Correct.

3       Q      Did you read your post-con -- did you read

4    your post-conviction testimony?

5       A      I don't believe so.  I -- I may have looked

6    through it; I'm not real sure.

7       Q      Okay.  As you sit here today, you don't

8    recall reading it?

9       A      I -- I don't recall.

10       Q      Okay.  Did you read any other -- any other --

11    any other reports, other than the ones you created in

12    this case?

13       A      No.  I don't --

14       Q      Did --

15       A      -- think so.

16       Q      -- you read -- okay.  You haven't -- so, for

17    example, you haven't read [unintelligible] reports?

18       A      No.

19       Q      You haven't read Sheriff Greer's reports?

20       A      No.

21       Q      Have you read any testimony from any of the

22    other officers involved in the case, either at the time,

23    back then, or in their depositions in this case?

24       A      No.

25       Q      Do you have an understanding as to what any



1  of the other officers involved in this investigation

2  testified to during their depositions?

3       A     No.

4       Q     Okay.  Based on your review of the documents,

5  what investigative activities did you participate in, in

6  this case?

7       A     I -- I'm sorry.  You need to repeat the

8  question.

9       Q     Sure.  What investigative activities did you

10 participate in, in this case, based on your review of the

11 documents?

12      A     I was involved.  Came in for work and Sheriff

13 Greer, along with --

14      Q     Sir -- sir -- I'm sorry.  I'm gonna stop you.

15 I -- I -- I'm gonna get into everything, specifically.  I

16 just want an overview of the different activities:  I

17 interviewed Clark, I interviewed Hardin, I interviewed

18 other people.  That's all I'm asking you right now.

19      A     I interviewed people and submitted whatever

20 they told me to.  I believe it went through Sheriff

21 Greer.  It may have gone directly to the prosecuting

22 attorney.  I don't -- I -- I believe I just sent it to

23 Greer's office.

24      Q     Okay.  Who did you interview, sir?  You

25 interviewed -- did you interview Mr. Hardin?



MARK HANDY                                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                              47

1      A     I believe I did.

2      Q     How many times?

3      A     Maybe twice.

4      Q     Did you interview Mr. Clark?

5      A     Yes; I believe I did.

6      Q     How many -- how many times?

7      A     Maybe twice.

8      Q     Did you -- did you interview any other

9  witnesses?

10     A     I'm sure I did.

11     Q     Did you review any reports in preparation for

12  your deposition indicating you interviewed other

13  witnesses?

14     A     I did, but I don't recall their names

15  specifically.

16     Q     Okay.  How many other witnesses did you

17  interview?

18     A     Maybe five.  I didn't memorize them.

19     Q     How much time did you spend reviewing

20  documents, in total, in preparation for today?

21     A     Maybe an hour here, an hour there.

22     Q     Now, have you had any communications -- other

23  than your attorneys, Mr. Wicker and his colleagues, have

24  you had any communication with any other attorneys in

25  this case?



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                 48

1        A     No.

2        Q     For example, have you talk to Mr. Ervin or

3   any of the City attorneys on the case?

4        A     I have not.

5        Q     Not ever?

6        A     Not ever.

7        Q     Have you talked to Mr. McCon -- Mr. O'Connell

8   about this case?

9        A     No.

10       Q     Okay.  Now, you started with the Louisville

11  Police Department in 1986; correct?

12       A     Correct.

13       Q     And you got to Homicide in approximately

14  April of 1989?

15       A     Correct.

16       Q     And you were in -- you were transferred in

17  1995, to Robbery; correct?

18       A     That sounds right.  I don't remember the --

19       Q     And --

20       A     -- exact dates.

21       Q     And what was the reason why you were

22  transferred to Robbery?

23       A     I was worn out, and I thought that Robbery

24  would give me an opportunity to still be a detective and

25  not have the pressure that Homicide -- that I had,



1   working homicides.

2        Q    Okay.  So I take it, it's your testimony that

3   your transfer to Robbery had nothing to do -- withdrawn.

4             Your transfer to Robbery was something that

5   you asked to do; is that correct?

6        A    Correct.

7        Q    In other words, your transfer to Robbery, to

8   your knowledge, had nothing to with any criticism of your

9   work in Homicide by any other supervisors; is that fair

10  to say?

11       A    Correct.

12       Q    It was solely your choice?  You chose to do

13  it; correct?

14       A    Correct.

15       Q    And your understanding is, had you not asked

16  to be transferred to Robbery in 1995, you would have

17  remained in homicide indefinitely?

18       A    Correct.

19       Q    All right.  But in any case, there's no

20  question that you were not in Homicide for 14 years.  You

21  were only in Homicide for six years; correct?

22       A    Correct.

23       Q    The other eight years, you spent in Robbery;

24  correct?

25       A    Correct.  And then there was a portion of



1  time towards the end where I went back and worked some

2  cold -- cold cases in Homicide, with Homicide, probably

3  for a couple years.  I went back over and participated in

4  what they called "cold case" investigations which

5  involved homicides.

6          Q    Okay.  But you were never a Homicide detec --

7  or as that -- as that term is commonly known, after 1995?

8          A    Correct.

9          Q    And again, that had nothing to do with

10  criticisms from Sherrard; correct?

11          A    Correct.

12          Q    Nothing to do with criticisms from Pierce;

13  correct?

14          A    Correct.

15          Q    Or Woosley?

16          A    Correct.

17          Q    Okay.  By the way, would it be fair to say

18  that it was your understanding that those officers --

19  we'll start with Sherrard -- had a great deal of respect

20  for you and your abilities?

21          A    We -- we never -- we never discussed that.  I

22  mean I didn't -- he didn't -- you know, I -- I -- I

23  didn't have a lot of -- other than they were my bosses

24  and they dictated pretty much what I did, you know.

25  They -- those weren't the kind of guys that shared a lot



 1  of ...

 2      Q     That's fair.  Let me ask you more

 3  specifically, then.

 4      A     Yeah.

 5      Q     Did Sherrard, to your memory, ever criticize

 6  your work as a detective?

 7      A     Oh, sure.

 8      Q     Well, other than in a specific incident,

 9  did -- did you ever receive any corrections from Sherrard

10  about how you were doing your job?  Any overall

11  criticisms?

12      A     You know, I'm sure that there were things, as

13  an experienced investigator, that he shared with me as to

14  how I may do something better or do something different.

15  But I can't resp -- you know, specifically, know you,

16  point to one thing or another.  I mean they were

17  supervisors.  They supervised and --

18      Q     But nothing stands out in your memory?

19      A     No.

20      Q     All right.  And by the way, did your transfer

21  to Robbery have anything to do with any prob -- any

22  substance abuse problem?

23      A     No.

24      Q     Did you struggle with alcohol abuse during

25  the nineties?



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
52

1      A     You know, I've been what I would describe as
2   a heavy drinker, through the eighties and nineties, into
3   the two thousands, but I don't think I drank any more or
4   any less, you know.  I didn't -- you know.  No; I don't
5   think that I had any alcohol issues back in the nineties,
6   if that's your question.
7      Q     In other words, you -- you remained a heavy
8   drinker, a consistently heavy drinker, between the
9   eighties and the two thousands; correct?
10      A     I would say compared to a normal person, that
11   would be correct.
12      Q     Okay.  And did you ever consider yourself to
13   be an alcoholic?
14      A     I do consider myself to be an alcoholic.
15      Q     Okay.  And I take it that in retrospect, now,
16   you would agree that you were an alcoholic between
17   nine -- you were a -- you were a functioning alcoholic in
18   the eighties, nineties and two thousands?
19      A     I think that, looking back, somehow I was a
20   heavy drinker who -- who functioned, as far as work and
21   relationships and -- and -- and -- and family life and
22   this and that.  And then, about three years ago, my
23   drinking got out of hand and I realized that I had to do
24   something about it, which was to, you know, quit
25   drinking.



1    Q    Okay.  So let's -- let's take it a step at a

2    time.  So, first of all, you do not -- you do not believe

3    that you were an alcoholic in the nineties.  Is that what

4    you're telling us?

5    A    No.  I don't think I was an alcoholic.

6    Q    Did you receive treatment at any time -- are

7    you -- are you -- are you -- do you consider yourself to

8    be an alcoholic now, a recovering --

9    A    I --

10   Q    -- alcoholic?

11   A    I -- I'm an alcoholic.

12   Q    Okay.  And when's the last time you drank?

13   A    December 17th, 2017.

14   Q    Okay.  Now back in the 1990s, let's say

15   between -- let's take between 1992 and 1995, which I

16   think covers the entire scope of this investigation and

17   trial.  Okay?

18   A    Sure.

19   Q    Were you an alcoholic, at that time?

20   A    No.  I don't think I was an alcoholic.

21   Q    You con -- you -- you characterized yourself

22   as a heavy drinker.  How much were you drinking?

23   A    I was drinking anywhere from -- probably ten

24   beers a night, on a regular basis.

25   Q    Okay.  Six, seven days a week?



1    A    At least; yeah.  Seven days a week.

2    Q    Okay.  And I take it sometimes you would

3  drink more than ten beers; right?

4    A    Correct.

5    Q    Okay.  Sometimes as many as 20 in a given

6  night?

7    A    Probably didn't have a 20 night.

8    Q    All right.  Fifteen?

9    A    Maybe 12.

10    Q    Okay.  But that was most every night?

11    A    And that was at home.  I was a -- I drank at

12  home.  I didn't drink, out.

13    Q    Nowhere that you went, to drink?

14    A    I'm sorry?

15    Q    Nowhere that you went, to drink?  You always

16  drank at home?

17    A    I drank at home.

18    Q    All right.  And I take it that -- that some

19  of your duties and responsibilities as a homicide

20  detective -- you had -- you had odd hours; right?

21    A    Correct.

22    Q    And there were times when you were either

23  still inebriated or hung over on the job?

24    A    No.

25    Q    You never drank on the job?



1      A     Never drank on the job; no.

2      Q     Only after?

3      A     Only after.

4      Q     Do you believe that your habit -- and

5  let's -- let's -- let's keep it between -- in the

6  nineties.  Do you believe that your habit of drinking ten

7  or more beers per night affected your functioning as a

8  detective?

9      A     No; I don't believe it did.

10      Q     Did your drinking ever increase during that

11  time period?

12      A     No.

13      Q     Now, you were fired as the Chief Deputy

14  Coroner in 2007.  What was the basis for that?  Why were

15  you fired?

16      A     The coroner had -- had taken some money from

17  a -- it -- it's a little bit of a long story, but I'll

18  certainly share it with you.

19      Q     You know what?  Actually, I -- I -- my time

20  is limited, so I would like to, if I can, take a

21  shortcut.  What were -- what were the allegations against

22  you that caused you to be --

23      A     I --

24      Q     -- fired?

25      A     I publicly -- he was accused of stealing.



1  And when asked by the media if it was true, I said, yes;

2  it was.  And he came in the next day and fired me.

3       Q    Okay.  So you were fired for doing the right

4  thing?

5       A    I believe so.

6       Q    You were fired for standing up against

7  somebody who lied?

8       A    Well, I told him that I believed that he took

9  money from a fund that he shouldn't have and that --

10      Q    Okay.

11      A    -- I believed the Deputy Coroner that --

12 there was a question as to whether he or the Deputy

13 Coroner was telling the truth, and I said I believed the

14 Deputy Coroner was.

15      Q    Okay.  But you were fired, in general, for

16 standing up against somebody who acted unethically?

17      A    Right.  But I mean there were so many more

18 variables that -- we had not gotten along for -- that was

19 the last thing.  We had not gotten along for a period of

20 a month or two.

21      Q    But, Mr. Handy, you just told us that he lied

22 about his participation in stealing, and you came forward

23 and said he lied; right?

24      A    Correct.

25      Q    Because it's wrong to lie; right?



1       A    Sure.

2       Q    And you weren't going to stand for it; right?

3       A    Well, no.  I mean I should not have made that

4   comment, publicly.  And it was an opinion that I gave.

5   But my things in my office were already packed, so I was

6   about halfway out the door, anyway.

7       Q    Sir, you came forward and said he lied,

8   because you believed he lied; right?

9       A    I didn't come forward.  I was called and

10  asked by a media person, did I believe the Deputy Coroner

11  who had made the statement, and I said I believed the

12  Deputy Coroner.

13      Q    Okay.

14      A    That's --

15      Q    And you said --

16      A    -- specifically.

17      Q    You said it to the reporter because you

18  believed he lied, and that was wrong; right?

19      A    I believed the Deputy Coroner was telling the

20  truth.

21      Q    Okay.  And telling the truth is very

22  important to you; right?

23      A    Sure.

24      Q    Did -- do you know a detective named DeSpain?

25      A    I do know of him; sure.



1    Q    Any reason to question his honesty or

2    integrity?

3    A    No.

4    Q    Now, in 2007, he was interviewed by the FBI.

5    And he told them that you were a detective that was known

6    for taking shortcuts.  You were known as a "half-assed"

7    detective, and you were taken out of Homicide.  Do you

8    dispute that characterization of your abilities?

9    A    Yeah.  I dispute that; sure.

10   Q    Does it surprise you that Mr. DeSpain would

11   tell that to the FBI?

12   A    No.

13   Q    No one ever said that to you; right?

14   A    Not to my face.

15   Q    Well, Mr. DeSpain certainly never suggested

16   to you that you were someone who took shortcuts and was a

17   half-assed, sloppy detective; right?

18   A    No.  He never would.

19   Q    And none of your supervisors ever said that

20   to you; correct?

21   A    Correct.

22   Q    By the way, I take it that your supervisors

23   were -- withdrawn.

24        And, certainly, you dispute that you were

25   taken out of Homicide because you were a sloppy



1    investigator?

2          A     Correct.

3          Q     The first time you're hearing that is me --

4    is me telling you that DeSpain said it; fair to say?

5          A     Fair to say.

6          Q     No one's ever suggested to you that you were

7    removed from Homicide because you were a sloppy

8    detective; correct?

9          A     Correct.

10         Q     Now, Detective Pierce -- Sergeant Pierce --

11   was also interviewed by the FBI in 2013.  And he told

12   them that you were known as a sloppy investigator, that

13   you cut corners on reports, and administratively.  Does

14   that surprise you?

15         A     No.

16         Q     Well, did Pierce ever tell you that?

17         A     No.

18         Q     He never accused you of being a sloppy

19   investigator; fair to say?

20         A     Fair to say.

21         Q     He never accused you of cutting corners on

22   your reports; fair to say?

23         A     Fair to say.

24         Q     The first you're hearing that is me telling

25   you about it?



1     A     Correct.

2     Q     Sergeant Pierce never gave those criticisms

3  to you; correct?

4     A     Correct.

5     Q     Pierce also told the FBI that Woosley was

6  transferred for failing to meet the high standards of the

7  Physical Assault squad.  Did you hear that, as well?

8     A     I did not.

9     Q     The first you're hearing of it me telling

10  you; correct?

11     A     Correct.

12     Q     Have you ever received treatment for alcohol

13  abuse?

14     A     Yes; I did.

15     Q     Where did you receive treatment?

16     A     I went to the Hazelden Betty Ford in Naples,

17  Florida.

18     Q     When did you go there?

19     A     In December of 2017.

20     Q     For how long?

21     A     Five weeks.

22     Q     And how did you pay for that?

23     A     Insurance paid for some, and some I paid out

24  of my own pocket.

25     Q     Have you had any relapses since then?



1        A     I have not.

2        Q     And it's your testimony here today that even

3    after your treatment, your five weeks of treatment and

4    your continuing recovery, it's your testimony here today

5    that your drinking never affected your job performance in

6    the nineties?

7        A     That's my -- my -- my statement today; sure.

8        Q     Were you honest with your supervisors about

9    the extent of your drinking, in the nineties?

10       A     I -- I don't believe that ever came up.  I

11   don't think it was -- you know.  I mean that was never a

12   topic.

13       Q     Okay.

14       A     You know, I was --

15       Q     To your knowledge --

16       A     Go ahead.  I'm sorry.

17       Q     I -- I apologize.

18             To your knowledge, were your supervisors in

19   nine -- let's say between '92 and '95, during the

20   nineties -- were they aware of the extent of your

21   drinking:  Ten or more beers per evening?

22       A     No.

23       Q     Now, did you ever take the sergeant's exam?

24       A     One time.

25       Q     When was that?



1      A     I don't recall.

2      Q     Did you pass it?

3      A     I did.

4      Q     Now I know that you didn't read the testimony

5   from the post-conviction proceeding, but I want to just

6   ask you a couple questions about things you said there,

7   and follow up on it and confirm that that's still your

8   testimony.  Okay?

9      A     Sure.

10     Q     One of the things you said there was that you

11  were better than most people at interviewing witnesses

12  and suspects.  Do you stand by that?

13     A     "Better than most people" at inter-

14     Q     That's what you said.

15     A     You know, I think I was as good as any.  I

16  mean I'm not sure -- those were my exact words?

17     Q     I can read it to you, if you want.  You want

18  to see it?

19     A     No.  I -- you can paraphrase.

20     Q     You also testified that you took pride in it

21  and -- and you were known by other detectives and

22  supervisors as someone who was good at interviewing

23  witnesses and suspects.  Do you stand by that?

24     A     I stand by that.  I think I was good at

25  interviewing witnesses and suspects.



1     Q     And, in fact, do you recall getting a

2  performance evaluation stating that you were an

3  outstanding inter -- interviewer, including of suspects;

4  That you were known for it and you took pride in it?

5     A     No; I don't remember that.

6     Q     Well, let's -- let's actually show you that

7  one.

8           MR. BRUSTIN:  So, Katie, has that one been

9  marked yet or do we need to mark it?

10          MS. McCARTHY:  It has not been marked.

11          Lori, that should be the -- the nine-page

12  document that you printed and brought with you.

13          MADAM COURT REPORTER:  Okay.  Give me one

14  second to put my hands on it and get a sticker out.  Is

15  this --

16          MS. McCARTHY:  Okay.  And I believe we're on

17  Plaintiff's Exhibit 91.

18          MADAM COURT REPORTER:  Plaintiff's Exhibit

19  19.  Give me one second to put a sticker on it.  Do you

20  want me to show it to Counsel here before I hand it to

21  the witness?

22          MS. McCARTHY:  I -- sure.  It should be

23  entitled Performance Appraisal Form.

24      (Performance Appraisal Form of Mark Handy, December

25  1997 (9 pages), Plaintiff Garr Keith Hardin's Exhibit No.



```
 1    91 is marked for identification and made part of this

 2    deposition.)

 3              MADAM COURT REPORTER:  Okay.  I'm handing it

 4    to Mr. Wicker.

 5              MS. McCARTHY:  And for those on the Zoom,

 6    it's -- begins at Bates stamp Hardin 25553.

 7              MR. GARVERICH:  And, Katie, this is Andrew.

 8    Are you-all gonna send around a list of the exhibits you

 9    plan on introducing today?

10              MR. BRUSTIN:  Very few new ones.  I think

11    this is one of --

12              MS. McCARTHY:  Yeah.

13              MR. BRUSTIN:  -- maybe two.

14              Does the witness have it now?

15              THE WITNESS:  I have it.

16  BY MR. BRUSTIN:

17       Q    So you recognize this, Mr. Handy, as a

18    Performance Evaluation in '97?

19       A    Yes, sir.

20       Q    And your direct supervisor was James Woosley.

21    And above him was Greg Smith?

22       A    Correct.

23       Q    And this is something you received each year;

24    correct?

25       A    I believe so.
```



1       Q       And these were important documents for your

2   professional development; right?

3       A       Sure.

4       Q       You would have reviewed these; correct?

5       A       I would.

6       Q       Might be relevant to promotions; correct?

7       A       Maybe.

8       Q       Take a look at page 25561, the last page.

9   Let me know when you're there.

10      A       I mean I'm on the last page.

11      Q       25561.  It's the bottom right corner number.

12  Do you see that?

13      A       I think it's the second to last.  No.  The

14  last page, where all these signatures are?

15      Q       Yeah.  It says 25561 on the bottom right

16  corner.

17      A       Yes, sir.

18      Q       Okay.  You see on the top it says Completion

19  of Employment Year?

20      A       I do.

21      Q       And it says, "Detective Handy remains an

22  outstanding interviewer."  Do you see that?

23      A       I do.

24      Q       And that's the only comment, substantive

25  comment, that's on this evaluation; right?



1      A     Yes.

2      Q     And that's because, in fact, certainly by

3  this time, by 1997, you were known in the unit as an

4  effective interviewer; correct?

5      A     Well, certainly by this supervisor.

6      Q     Well, but you knew -- every -- that's what

7  everybody thought of you.  That's something you took

8  great pride in:  Being an effective interviewer.

9  Correct?

10     A     You know, I -- I mean he obviously has other

11 things I'm reading here, too.  That's not the only thing

12 that's in here.

13     Q     Well, the only substantive comment on the

14 last two pages for Employee Development is that you're --

15 you're an outstanding interviewer; right?

16     A     It also says, "Detective Handy works better

17 in stressful situations.  Detective Handy takes" --

18     Q     Where do you see that?

19     A     -- "incoming phone calls on everyone's cases

20 and does follow-up without being told."  I mean there's

21 not --

22     Q     No; I'm sorry.  I was right.  The last two

23 pages for Comments -- not the first two pages where it

24 has Performance Standards, but the last two pages, the

25 only comment here is that you're -- remain an outstanding



 1  interviewer; right?

 2       A    Yeah.  But that's not the only comments that

 3  are in here.  There's a handful of comments that are in

 4  here.

 5       Q    Okay.  Well, under -- under Appraisal

 6  Summary, the only comment is that you're an outstanding

 7  interviewer; correct?

 8       A    That's one of the many comments that are in

 9  here.

10       Q    Okay.  And -- but you considered yourself to

11  be an outstanding interviewer; right?

12       A    I -- I -- I certainly feel like I -- I could

13  interview people and -- and do a fine job; sure.

14       Q    Okay.  You have a good, folksy manner.  You

15  look people in the eye and you get them to tell you the

16  truth; right?

17       A    Well, I mean it depends on the person.

18  Everything's different.  There is no one single

19  approach --

20       Q    Okay.

21       A    -- to talking to anybody.  I -- it -- it's a

22  little more complicated than the old folksy sitting down.

23  Because if you're talking to a kid that's got, say, an

24  urban background, an old folksy, aw, shucks approach may

25  not work.  So I would suggest whoever said you have to



 1  gear your material to the audience would have been

 2  talking about interviews.

 3       Q     Right.  And you had a variety of techniques

 4  that you would use to get people to open up and make

 5  admissions; correct?

 6       A     I -- I -- there would be a variety; correct.

 7       Q     And that's the goal of any suspect -- or any

 8  interview of a suspect?

 9             Well, first of all, you agree that,

10  oftentimes, suspects say I want to talk to a lawyer, I

11  won't talk to you.  Right?  That happens all the time?

12       A     It certainly happens.

13       Q     Okay.  But when a suspect agrees to talk to

14  you, one of your skills was you had a variety of ways,

15  depending on the situation, to get people to feel

16  comfortable and make admissions; correct?

17       A     Correct.

18       Q     And that's the goal:  To get admissions;

19  right?

20       A     To get whatever information that have.

21       Q     Well, in a criminal investigation, when

22  you're talking to a suspect, one of the goals is to get

23  admissions; right?

24       A     You know, I don't know at what point they go

25  from witness to suspect to focus of the investigation.



1  If we have focused on them and we have other reasons to
2  believe they're involved, then, certainly, the objective
3  of the interview is to have them admit to their misdeed.
4       Q     Okay.  Are there --
5       A     And [unintelligible] --
6       Q     -- a variety --
7       A     -- of trying to -- because we interviewed
8  people that didn't do anything.
9       Q     Well, but once you have reason to suspect,
10 when somebody becomes a person of interest or a suspect,
11 you want to use legitimate means to convince them to make
12 admissions; correct?
13      A     Sure.
14      Q     All right.  And you -- you attempted to
15 cultivate those interviewing skills through training;
16 correct?
17      A     You know, the things that I learned, I
18 learned from watching detectives that were older and more
19 experienced than I was.
20      Q     Okay.
21      A     That's where I learned how to interview, if
22 you want to call it that.  That's why I learned that you
23 didn't have to get a guy to admit to murder; just
24 admit -- get him to admit that the gun was in his hand
25 when it went off.



1        Q      Right.

2        A      But those were from -- those were from senior

3   investigators that I had the good fortune to work with.

4        Q      In other words, you learned from senior

5   investigators how to get the strongest admissions

6   possible.  Fair to say?

7        A      Yeah.  How -- how do you -- how to conduct an

8   interview.

9        Q      Okay.  And you learned that from supervisors

10  like Pierce and Woosley and people like that; correct?

11       A      It was mostly from fellow detectives with

12  more time on.  It really -- supervisors had a different

13  role than the average detectives.  They weren't,

14  technically, out on the street working and doing

15  interviews with us.  Now that's not to say they couldn't

16  and wouldn't.  But, typically, when I went out on the

17  street, it was not with a supervisor.  It was --

18       Q      Okay.  I get that.

19       A      But, mostly, it was --

20       Q      But, for example -- I'm sorry?

21       A      It was mostly with senior investigators.

22       Q      Okay.  But, oftentimes, supervisors like

23  Pierce and Woosley would sit on -- would sit in on

24  interrogations; right?

25       A      Absolutely.  Or would drive with us when we



1   picked up a suspect and brought them back.  Sure.

2       Q    Right.  And you were at -- and -- and,

3   oftentimes, they -- you also had capability in the early

4   nineties for other people to listen to interviews that

5   you were conducting, from outside the room; correct?

6       A    I -- I can't tell you when that happened.

7       Q    Well, you remember there being two-way

8   mirrors in the interview rooms; correct?

9       A    Well, the only two-way mirror I knew of, and

10  I found out later, was one that was in the polygraph --

11  the main polygraphy room.  That's the only two-way mirror

12  I was familiar with.

13      Q    Okay.  But, certainly, you were acting --

14  you -- you were very comfortable engaging in your style

15  of interrogation, whether or not a supervisor was present

16  or not; correct?

17      A    Yeah.  Sure.  Of course.

18      Q    Okay.  And that -- that carried through in

19  all of your cases; fair to say?

20      A    I'm not sure I understand the question.

21      Q    You didn't handle yourself any differently

22  when Woosley or Pierce was in the room, as you would when

23  you were along?

24      A    I would handle myself the same whether

25  Woosley and Pierce were in there or whether they were



 1  not.

 2       Q     You were the same honest, conscientious

 3  interrogator --

 4       A     I would be the same --

 5       Q     -- as you were with them --

 6       A     I would use the same techniques to interview

 7  somebody with Woosley and Jay Pierce and Gene Sherrard in

 8  the room.  I wouldn't do anything --

 9       Q     Yeah.

10       A     -- different without them.  I wouldn't do

11  something differently because they weren't there.

12       Q     And that's the same -- that -- that's true in

13  Hardin?

14       A     That's true.  That's correct.

15       Q     And every other case?

16       A     The best I recall.

17       Q     Okay.  Now in addition to learning from

18  more-experienced detectives, you also received training

19  on interrogation.  For example, you did the two-day Reid

20  training course; correct?

21       A     Yes.

22       Q     And you were -- you understand that, back

23  when you did the Reid training course, Reid was the gold

24  standard for interrogation training for law enforcement

25  officers; correct?



1      A    I really don't know a whole lot about it.  We

2  were signed up for it and sent to it.  It was not a --

3  something I volunteered for.  And I participated in it.

4  How much I got out of it, I couldn't tell you.

5      Q    But you --

6      A    I didn't sign up for it.  I was signed up for

7  it by the department.

8      Q    You know that -- you know they wrote the

9  textbook on interrogations, inbound [ph] Reid; right?

10      A    No.

11      Q    You never heard of that before?

12      A    What's the --

13      Q    Inbound [ph] Reid on interrogatories.  You

14  never heard of that book?

15      A    Invalid Reid.

16      Q    Yeah.  Reid is the name of the training you

17  went to.

18      A    I -- I'm familiar with the name.

19      Q    You never saw the textbook they wrote?

20      A    I -- I don't recall.

21      Q    All right.  Who else went to that training

22  besides you?

23      A    I -- I don't remember.

24      Q    Did you sent -- did you ask to be sent to

25  that training?



1          A     I did not.

2                MR. WICKER:  Counsel, I'd like a break at

3     your next convenience.

4                MR. BRUSTIN:  I'm sorry, Kent?

5                MR. WICKER:  I'd like a break at your next

6     convenience.

7                MR. BRUSTIN:  Yeah.  Just give me one more

8     second.  Would it -- let me just finish this -- if you

9     don't -- do you mind if I take another two minutes?

10               MR. WICKER:  That's fine.

11    BY MR. BRUSTIN:

12         Q     Do you recall, at the Reid training and other

13    trainings like it, you learned that you don't provide

14    information to suspects, you simply get it.  Would that

15    be fair to say?

16         A     I would say that that would be fair to say;

17    correct.

18         Q     In other words --

19         A     I -- I don't --

20         Q     -- because --

21         A     -- specifically remember that coming from

22    that training, but I would say that would be fair to say.

23         Q     Okay.  That was consistent with all of your

24    interrogation training:  You don't provide non-public

25    facts to witnesses, you get their best memories on their



 1  own; correct?

 2       A    Yeah.  That's fair to say.

 3       Q    You don't lead them.  You let them give you

 4  information, themselves; correct?

 5       A    Well, you certainly may try and lead them.

 6       Q    Well, you don't provide them clues about what

 7  you want to get.  You get that information from them on

 8  their own; correct?

 9       A    I -- I -- I think that -- that you do the

10  best you can to try and solicit information.  And there

11  may be certain things that you use that you may get

12  benefit from, you know --

13       Q    Do you remem --

14       A    -- as far as --

15       Q    Do you remember testifying for hours in the

16  deposition I took of you where you talked about the

17  importance of never providing non-public information to

18  witnesses and suspects?

19       A    Well, yeah.  You --

20       Q    Do you recall that?

21       A    Well, yeah.  I -- I'm not disagreeing with

22  you.

23       Q    Okay.  I --

24       A    I just -- well, this is --

25       Q    Do you recall, Mr. Handy, that you've



1  testified previously how important it is not to lead

2  suspects, but to get information from them?

3        A     Well, sure.

4        Q     That's a very basic investigative rule;

5  correct?

6        A     Correct.

7        Q     Now one of the things it means to be an

8  effective interrogator is to get people to open up

9  voluntarily; correct?

10       A     Correct.

11       Q     You use a variety of different legitimate

12  tools at your disposal to get them to make admissions;

13  correct?

14       A     Correct.

15       Q     And one of the things that a skilled

16  interrogator does it they look for openings and they

17  follow up on those openings; correct?

18       A     I gue -- correct, I guess.

19       Q     You're looking for indications that somebody

20  wants to make admissions, and then you use your skills as

21  an interrogator to encourage them to make admissions;

22  correct?

23       A     I mean I'm not really sure how you're -- of

24  what -- what you mean by an "opening."

25       Q     Well --



```
1        A     If they make an opening?

2        Q     -- for example, if somebody makes a statement

3   that could be seen as inculpatory, it's always important

4   to try to follow up on those statements and get more

5   information; correct?

6        A     Well, sure.  Yeah, I guess.

7        Q     That's as basic as it gets; right?

8        A     I mean you use the word "opening."  I -- I'm

9   not sure -- you're saying that they say the -- something

10  incriminating, and so you just let them go on with it?

11       Q     You let them go on with that.  You ask them

12  follow-up questions.  You get them comfortable talking

13  about it?

14       A     Correct.

15       Q     Obviously, you want to get the strongest

16  admissions possible that's permissible under the law;

17  correct?

18       A     Correct.

19       Q     And one of the things that you learned

20  through your Reid training and your other training is

21  that it's important to try to tape-record statements, if

22  possible, to protect yourself and to protect admissions;

23  correct?

24       A     Sure.  Yeah.  When possible.

25       Q     All right.
```



```
 1                 MR. BRUSTIN:  This is a fine time for a
 2     break, Kent, if you want to take one.  How long do you
 3     need?
 4                 MR. WICKER:  Ten minutes.
 5                 MR. BRUSTIN:  Ten minutes.  Okay.
 6                 THE VIDEOGRAPHER:  Okay.  Do all parties
 7     agree to go off record?
 8                 MR. BRUSTIN:  Yeah.
 9                 THE VIDEOGRAPHER:  Okay.  We are now going
10     off the video record.  The time is 11:22.
11          (At this point there is a break in the deposition.)
12                 THE VIDEOGRAPHER:  We are recording to the
13     cloud and beginning the back-up recorder, as well.  The
14     time is 11:31.  We are back on the video record.
15   BY MR. BRUSTIN:
16          Q    All right.  Mr. Handy, you had a chance to
17     take a break and meet with your attorneys; is that right?
18          A    I had a break.  I didn't really meet with my
19     attorneys.
20          Q    Any testimony --
21          A    I used --
22          Q    -- you'd like to --
23          A    I used the restroom.
24          Q    Any testimony you'd like to change or amend?
25          A    No.
```



1      Q      Okay.  You laugh.  Why is that?

2      A      Well, that seemed like a funny question since

3  I hadn't talked to my attorneys.

4      Q      Ah.  Okay.

5             Now, back in 1992, Lieutenant Sherrard

6  oversaw the two -- the homicide; correct?

7      A      I -- I don't remember the exact years, but,

8  yes, I guess.

9      Q      Okay.  You recall that certainly, at the time

10 of this investigation --

11     A      Correct.

12     Q      -- Sherrard was in charge of --

13     A      That is correct.

14     Q      -- correct?

15     A      That -- that's correct.

16     Q      And Pierce had one platoon and Woosley had

17 the other; correct?

18     A      Seems like there was a third:  Bob Fraction.

19 Seems like there were three platoons.

20     Q      Okay.  But your -- your -- your sergeant in

21 1992 was Woosley; correct?

22     A      Correct.

23     Q      And there were approximately six to eight men

24 per platoon; correct?

25     A      Well, men and women.



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                  80

1       Q     And -- of course.   There -- there were six to
2   eight people in each platoon?
3       A     I -- I -- I wouldn't dispute that.
4       Q     Okay.  And your understanding was that each
5   was hand-picked.  It's -- it was a plum assignment to be
6   a Homicide investigator; correct?
7       A     I don't believe it was considered a plum
8   assignment.  There were a lot of people that were
9   recruited that turned it down because of the volume of
10  work, so.  I wouldn't call it a plum assignment.
11      Q     There weren't a lot of police officers in
12  Louisville who wanted to be homicide detectives?
13      A     If there were, they didn't make themselves
14  available.
15      Q     Okay.  You understand that, generally, in
16  policing, Homicide detective is a plum assignment?  Would
17  that be fair to say?  Do you understand that, generally?
18      A     I -- I -- you know, honestly, I have
19  absolutely no idea.
20      Q     All right.  Now, did you take Woosley
21  seriously, as a supervisor?
22      A     I did.
23      Q     And you looked up to Sherrard; correct?
24      A     I did.
25      Q     Now, one of the things that both DeSpain and



1   Pierce told the FBI in 2007 was that Woosley was a much

2   looser supervisor that Pierce.  Would you agree with that

3   assessment?

4        A    No.

5        Q    You found that Woosley was a strict

6   supervisor, or as strict as Pierce?

7        A    I never worked directly for Pierce.  I found

8   Woosley to be a strict supervisor.

9        Q    Okay.

10       A    I never worked for Jay Pierce.

11       Q    All right.

12       A    I --

13       Q    Well, would it be fair to say, though, that,

14  as a general matter, Sherrard was in charge of Homicide?

15  He made the --

16       A    Ab -- ab --

17       Q    -- policy for Homicide?

18       A    Absolutely.  No question.  Gene Sherrard ran

19  that show.

20       Q    Okay.  But buck stopped with him; right?

21       A    Correct.

22       Q    What he said, went; correct?

23       A    Absolutely.

24       Q    In terms of Homicide, in terms of policy and

25  procedure and training in Homicide, that was all Gene



MARK HANDY                                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                              82

1    Sherrard as of 1992; correct?

2         A     Well, there was a chief of detectives.  I'm

3    trying to remember his name.  Very, very, very --

4         Q     They --

5         A     -- powerful guy.  There was a hierarchy.

6    There was a captain over the Lieutenant, and there was a

7    chief of detectives.  They were very powerful people that

8    would have control over the Lieutenant and over the

9    sergeants.  The chief of detectives was a very popular

10   and powerful guy, so.  He's deceased.  I can't remember

11   his name.

12        Q     But, generally, people defer to Sherrard in

13   regard to Homicide; fair to say?

14        A     Fair to say, I guess; yeah.  I mean that's

15   who we went to.  He was my boss.

16        Q     And your understanding was that even the

17   higher-ups generally defer -- was your -- was it your

18   understanding that, generally, the higher-ups deferred to

19   Sherrard when it came to Homicide?

20        A     Ed Mercer was chief of detectives.  And,

21   clearly, without question, Ed Mercer was the one that ran

22   everything, that Sherrard would have answered to.

23        Q     Okay.

24        A     Now, occasionally, Ed Mercer would talk to

25   the detectives.  So, obviously, Ed Mercer was the chief



1    of detectives.  And he was a very well-liked, very --

2    he's deceased now, but a very powerful guy.

3         Q    Right.  But, generally, even the higher-ups

4    deferred to Sherrard in regard to Homicide; fair to say?

5         A    I -- I wouldn't know what they did.

6         Q    All right.  Now would it be fair to say that

7    by the -- by 1992, you were already an experienced

8    detective; correct?

9         A    Correct.

10        Q    And Woosley didn't micromanage you.  He

11   didn't ask you about any -- every interview you conducted

12   and scrutinize every report you created; correct?

13        A    Woosley was a very hands-on supervisor.  I

14   think that he pretty much knew everything we did and kept

15   track of -- the way it works in that unit is theres a

16   follow-up sheet that's left by detectives on their cases.

17             Say we have five cases that are currently

18   being worked on, and there is a follow-up sheet written

19   by the lead investigator.  And Woosley would go through

20   those sheets and he would make assignments based on his

21   interpretation of what needed to be done.  He would give

22   those assignments to us, and then he would look to see

23   that we completed them.

24        Q    Okay.

25        A    If that answers your question.  I think



1    it's --

2         Q    Well, I think it does.

3         A    -- a very thorough --

4         Q    I think it does.  So what -- what -- once you

5    got an assignment from Woosley, he would ensure that you

6    completed it.  But he wouldn't necessarily meet with you

7    and talk about the substance of what you did and

8    scrutinize your reports --

9         A    He -- he didn't --

10        Q    Fair to say?

11        A    No.  I mean it's not fair to say because it

12   would depend totally on what the information was.

13        Q    Okay.

14        A    And if he felt like --

15        Q    I got it.

16        A    -- it was something that he should personally

17   participate in or if we needed, say, you know, two people

18   and there was only one, Woosley would participate in that

19   he would go along.

20             But I think if it was something where we were

21   gonna take out -- go get someone wanted for a homicide,

22   that we considered to be a dangerous person, there's no

23   question in my mind that Woosley would be right there on

24   top of it, as a leader.

25        Q    Okay.  So you've reviewed your reports in



1   this case; correct?

2        A    I'm sorry?

3        Q    You've reviewed your reports in this case;

4   correct?

5        A    Right.  I would dictate them, and then --

6        Q    I'm not ask -- I just asked you if you

7   reviewed them, sir.  That's all I'm asking you.  Please

8   listen to my question.

9             Did you review them?

10       A    Yes.

11       Q    Did Woosley review those reports, to your

12  knowledge?

13       A    Yes.

14       Q    Did Woosley meet with you to discuss those

15  reports?

16       A    Not on a regular basis; no.

17       Q    Sir, the reports in this case; did Woosley

18  meet with you to discuss those interviews?

19       A    I -- I don't remember.

20       Q    Okay.  Do you have any reason to believe that

21  he did?

22       A    I don't have any reason to believe he did or

23  didn't.  I don't remember.

24       Q    Okay.  Sometimes he did, sometimes he didn't;

25  right?



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                 86

1        A     I simply don't remember.

2        Q     Sir, is there anything about the reports in

3    this case that would cause you to believe -- you've --

4    you just reviewed these reports to testify; right?

5        A     Right.

6        Q     Is there anything about the reports you

7    reviewed that would cause you to believe that you would

8    have me with Jim Woosley about the substance of those

9    reports?

10       A     No.

11       Q     Is there anything about those reports that

12   would cause you to believe that Woosley would have given

13   them more attention than others?

14       A     No.

15       Q     So, for example, you have no idea as you sit

16   here today, and no recollection, as to whether or not

17   Woosley reviewed the reports you created in regard to

18   your interaction with Keith Hardin; correct?

19       A     Well, the only thing -- I know the reports

20   that I turn in go to him.  I know he reviews them because

21   he initials them at the bottom to show that he reviewed

22   them.  And then they come back to me, to put in the case

23   file.

24       Q     Okay.

25       A     So I -- I know he's reviewed them, at a



```
 1    minimum, because he either initials them or signs them.
 2    There's a space for that, I believe.
 3         Q    Okay.  But you have no idea whether he looked
 4    at it to see if you did it or he actually read it?  You
 5    have no idea; right?
 6         A    I -- I didn't watch him, what he did; no.
 7         Q    And you have no recollection -- withdrawn.
 8              You have no reason to believe that you would
 9    have discussed that report with him after you created it;
10    correct?
11         A    No.
12         Q    And the same would be true with your
13    interactions with Jeffrey Clark; correct?  He initialed
14    them, but no bill; correct?
15         A    I don't remember Jeffrey Clark initialing
16    anything.
17         Q    I'm sorry?
18         A    I don't remember Jeffrey Clark initialing
19    anything.
20         Q    Okay.  I think I -- I -- I must have
21    misspoke, sir.  Did Woosley initial reports that you
22    created regarding Jeffrey Clark?
23         A    I believe Jim Woosley read everything I gave
24    them, he initialed it after he read it, and then he gave
25    it back to me.  That's what I believe.
```



MARK HANDY                                         September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                      88

1        Q     Okay.  And you have no recollection and no

2    reason to believe that you spoke with him after you

3    turned in those reports, about those reports; correct?

4        A     Correct.

5        Q     Okay.  He never came -- he never came back to

6    you and said -- withdrawn.

7              All right.  Now, certainly by 1992, Jim

8    Woosley was an experienced supervisor and investigator;

9    fair to say?

10       A     He seemed to me, to be.  I -- I don't really

11   know his background.

12       Q     But he was -- he was your supervisor.  You

13   worked with him all the time; right?

14       A     Yeah.  But, you know, he came from a

15   different area of the Department, and they brought him

16   and made him my supervisor.  I certainly didn't know what

17   his history was before he got to the Homicide unit.

18       Q     You certainly had no reason to question his

19   competency; correct?

20       A     I had no reason to, to question his

21   competency; no, sir.

22       Q     Now would it be fair to say that, typically,

23   when you were doing an interview of a suspect, typically

24   they would have -- you would have a sergeant present --

25       A     No.



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                  89

1      Q      -- or would that be atypical?

2      A      That would be atypical.  I mean if there was

3   a sergeant -- you would, typically, have two people.  And

4   sometimes, just based on the sheer numbers, one of those

5   people may be a sergeant.  Rarely would it be a

6   Lieutenant.

7      Q      And I think you told me this, but -- so

8   sergeant -- a sergeant like Pierce or Woosley?

9      A      Correct.

10     Q      Okay.

11     A      And --

12     Q      And that -- that happened all the time?  They

13   would often sit in on interviews with you; correct?

14     A      No, I wouldn't say often.

15     Q      All right.  It would be unusual when they

16   would sit in on interviews?

17     A      I wouldn't say it would be unusual.  I

18   would -- I would put the percentage as pretty low, you

19   know.  I mean I would throw out maybe 20, 25 percent,

20   which I don't think is incredibly low or high.  I

21   honestly don't really know.

22            I mean, typically, detectives go out and do

23   their work and the sergeants review it.  I can't tell you

24   what percentage of interviews I did with a sergeant

25   versus a detective.  I would think the sergeant would not



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                     90

 1 | be as often.
 2 |         Q     Oftentimes -- withdrawn.
 3 |               I think you've already told us that Sherrard
 4 | was a very hands-on Lieutenant; correct?
 5 |               MR. WICKER:  Objection.
 6 | BY MR. BRUSTIN:
 7 |         Q     Answer, please.
 8 |               MR. WICKER:  You can answer the question.
 9 |         A     I -- you know, I thought he was a good
10 | Lieutenant.  I thought he was very knowledgeable.  As far
11 | as being hands-on, I'm not sure I would use that to
12 | describe him.
13 | BY MR. BRUSTIN:
14 |         Q     Tell me about the training that you received
15 | in nineteen-ninety -- 1989, on occult crimes, please.
16 |         A     I mean I had training.  And I think, if --
17 | if -- if I remember correctly, the training that I had, I
18 | don't know whether I got it through the University of
19 | Louisville or through the police department.  I did have
20 | some training where we went out to a site that was
21 | considered a site where they did cult-type things there,
22 | and a very minimal amount of -- of -- of training.
23 |               I do remember thinking that to understand
24 | what was going on with these people and -- and the
25 | readings and things like that, it seemed to be difficult



```
 1  for your average person to understand.

 2       Q    Okay.

 3       A    I -- I didn't really --

 4       Q    So --

 5       A    -- understand any of it, to be candid with

 6  you.  I -- I didn't really get any of it.

 7       Q    You did your best to understand it; right?

 8       A    Well, I -- I -- I simply didn't understand

 9  it.  I mean I --

10       Q    Right.

11       A    It didn't really -- I didn't really see where

12  any of it fit together.  And I -- I thought that --

13  that -- that it -- it was -- I won't say it was over my

14  head.  It just didn't simply make any sense to me.

15       Q    Okay.

16       A    If I remember correctly --

17       Q    Well, let's mark -- let's mark as an exhibit

18  your training materials -- your training records from the

19  occult crime training.  Okay?

20       A    Okay.

21            MR. BRUSTIN:  Which one is that, Katie?

22            MS. McCARTHY:  So, Lori, that's the one page

23  that you printed.

24            MADAM COURT REPORTER:  Got it.  Give me one

25  second to put a sticker on it.  And it's Exhibit 92.
```



 1              MS. McCARTHY:  Yes.  And it's Bates-stamped

 2      LMG 6879.

 3              MADAM COURT REPORTER:  That's correct.

 4         (Certificate of Completion of Seminar on Occult

 5      Crimes: Reduction & Detection (1 page), Plaintiff Garr

 6      Keith Hardin's Exhibit No. 92 is marked for

 7      identification and made part of this deposition.)

 8              MADAM COURT REPORTER:  I'm going to hand it

 9      across the table to Mr. Wicker -- who now has it.

10              MR. BRUSTIN:  Okay.  Can you give that to the

11      witness, please, Kent?

12    BY MR. BRUSTIN:

13         Q    And you see that this indicates that, in

14      1989, you had this what's called occult training;

15      correct?

16         A    Correct.

17         Q    And you recall that.  Now that was what you

18      were referring to:  The training that you think may have

19      been a combination of University of Louisville and other

20      places?

21         A    Correct.

22         Q    And this was -- I think this was training --

23      this is training that was conducted by a professor at

24      Louisville named Ronald Holmes.  Do you remember him?

25         A    Of course.



MARK HANDY                                         September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    93

1        Q     And Ronald Holmes was the guy who did this

2   training; correct?

3        A     That sounds familiar.

4        Q     Okay.  And he's the same guy who issued a

5   report in this case; correct?

6        A     You know, I think that's true -- or accurate.

7        Q     Okay.  And I take it that you were the person

8   who mentioned to Sheriff Greer that Ronald Holmes was

9   someone he might consult regarding occult crimes?  That's

10  how he got you?

11       A     I -- I would agree.

12       Q     Okay.  And so in 1989, you took a training on

13  occult crimes; correct?

14       A     Correct.

15       Q     And -- and the -- the primary thing, as we

16  know about Mr. Holmes -- or Professor Holmes -- are the

17  primary occult crime that you were studying was people

18  who are involved in what's called "Satanism;" correct?

19       A     I -- I don't know.  I don't remember.

20       Q     Well, you certainly recall that was one of

21  the issues in that training, was Satanism?

22       A     I -- I -- I simply don't remember.

23       Q     Well, the reason that you referred Sheriff

24  Greer to Ronald Holmes is because you understood that

25  Satanism, an issue in this case, was one of his areas of



1    specialty; correct?

2         A     That's correct.  Well, the occult, whatever.

3    The Devil worship and stuff.

4         Q     The Devil -- I'm sorry.  That's -- let's

5    call -- let's call it -- let's call it "Devil

6    worshiping."  Devil worshiping was one of the issues that

7    you learned during your training with Professor Holmes,

8    how Devil worshiping could lead to criminal behavior;

9    correct?

10        A     I -- I simply don't recall.

11        Q     All right.  As a general matter, the person

12   of the -- the -- the training on occult crimes included,

13   in the -- among other things, how Devil worshiping

14   related to the commission of crimes; correct?

15        A     What I remember about it is, is that it

16   seemed more like an issue of defacing stuff.  It was more

17   like a graffiti issue.  These people were going into

18   areas and defacing them with paint and stuff, that I

19   didn't really have any kind of understanding of what any

20   of the signals or signs or anything meant -- and I never

21   did.  And it was more like they were defacing parts of

22   town through graffiti, is what it looked like --

23        Q     Okay.

24        A     -- to me.

25        Q     Well, you knew enough, early on in this



1  case -- there's -- we have a report in this case, which I

2  will show you in a moment, written by Ronald Holmes -- in

3  fact, let's look at it right -- let's take a look at it

4  right now.

5         So if you take a look at Exhibit 59, which

6  has already been marked and is in a binder for you.

7         MADAM COURT REPORTER:  Hold on one second.

8  Let me find it.  Exhibit 59, previously marked.  Hold on;

9  I've got two binders here.  Okay; I've found the tab.

10  Hold on a moment; I'm going to extract the exhibit.

11         MR. BRUSTIN:  You know what?  Actually, let's

12  go to exhibit -- instead, let's go to Exhibit 25.

13         MS. McCARTHY:  And, Lori, we don't want the

14  exhibits taken out of the binder.

15         MR. BRUSTIN:  Leave them in the binder.

16         MS. McCARTHY:  And -- and for Counsel's

17  reference, we've -- we put together a binder with some

18  previously-marked exhibits, to make it easier for the

19  deposition.  The exhibits included are Exhibit 25,

20  Exhibit 59, Exhibit 67 and Exhibit 72.

21         MADAM COURT REPORTER:  I have that open in

22  front of me.  Do you want me to put an exhibit sticker

23  No. 93 on what is marked --

24         MR. BRUSTIN:  No.  No exhibit stickers.

25         MADAM COURT REPORTER:  Okay.  Very good.



1    Thank you.  I'm handing the binder -- Mr. Wicker has his

2    hand out, so I'm handing it across the table to

3    Mr. Wicker.

4              MR. BRUSTIN:  Do you know what page the

5    letter's on, Katie?

6              MS. McCARTHY:  I do.  It's not in the excerpt

7    that we sent down, but I'm happy to share the letter that

8    we have, on the screen.

9              MR. BRUSTIN:  Yeah.  If you could, show that

10   on the screen.

11             MS. McCARTHY:  All right.  Hang on one -- so

12   this -- this is in Exhibit 25, and it's NSBMCSO 290.

13   BY MR. BRUSTIN:

14        Q    Okay.  Now Mr. Handy, this is the -- this is

15   the Professor Holmes that you were talking about;

16   correct?

17        A    Sure.

18             MS. McCARTHY:  So, Mr. Handy, you should look

19   at the screen.  I'm sharing the exhibit on your laptop

20   screen.

21             THE WITNESS:  Right.

22   BY MR. BRUSTIN:

23        Q    Did you review this letter, which is in the

24   file?

25        A    I don't believe so.



1    Q    You believe you did or you did not?

2    A    I did not.

3    Q    Okay.  But you do recall that Ronald Holmes,

4    your teacher in occult crimes, sent this letter early on

5    in the case?  The murder happened on the 1st; you didn't

6    get involved for a couple of days.  And by the 8th,

7    there's a letter addressed to Sheriff Greer from Holmes

8    about the possibility of Devil-worshiping being involved

9    in this case; correct?

10   A    I'm sorry.  I didn't get the -- get the

11   question.

12   Q    Sure.  By the 8th, only a few days after the

13   crime, Ronald Holmes, your teacher in occult crimes, has

14   written a letter to Sheriff Greer about the possibility

15   of Devil-worshiping being a part of this case; correct?

16   A    Correct.

17   Q    Okay.  And that's because when you learned

18   about the possibility of Devil-worshiping being involved,

19   you sent Sheriff Greer -- you gave him a reference to --

20   to Ronald Holmes; correct?

21   A    I -- I'm sure I did.

22   Q    Okay.  And because you understood, from your

23   training with Ronald Holmes, that Devil-worshiping, at

24   times, could involve things like animal sacrifices, and

25   even human sacrifices; correct?



MARK HANDY                                     September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON              98

1        A      Sure, I guess.

2        Q      And that, sometimes, people who are involved

3   in Devil-worshiping could engage in what's called "ritual

4   killings?"

5        A      Are you asking me if I'm familiar with that?

6        Q      Yeah.  That's one of the things you learned

7   from Ronald Holmes -- Ronald Holmes's training, and

8   that's one of the things that he's addressing in these

9   letters; correct?

10       A      Well, let me -- let me say this, that I did

11  not get much, if anything, from Ronald Holmes's training,

12  other than he apparently puts himself out as an expert in

13  this.  What we did is we went to areas that had a lot of

14  graffiti, where they so -- they had so-called ritual

15  stuff, and we looked at the graffiti.  And that was about

16  the extent of my education in it.

17       Q      Okay.  But you knew enough -- you learn --

18  you did learn enough from Ronald Holmes and his training

19  to recommend him to Sheriff Greer as somebody to consult;

20  correct?

21       A      Absolutely.  I thought he knew more about any

22  of this stuff than I ever would and that Sheriff Greer

23  might benefit from talking to him; correct.

24       Q      Okay.  And I -- and I take it, although you

25  may not recall, what must have happened, since you knew



1　him, is you would have called Ronald Holmes and made the

2　introduction; correct?

3　　　A　　That would be the -- that, or I would have

4　given Sheriff Greer, Holmes's name and he --

5　　　Q　　Okay.

6　　　A　　-- could have called him.  I -- I don't --

7　　　Q　　But, sir --

8　　　A　　-- remember how it happened.  But I certainly

9　would have been the one that put them together.

10　　　Q　　Okay.  You may have called him, you may just

11　have given him the number.  But one way or another, you

12　recognized that because of some of the issues in this

13　case and killing the -- including the possibility of it

14　being a ritual killing, you thought -- you thought Holmes

15　could be a good person to consult?

16　　　A　　Correct.

17　　　Q　　Okay.  And, obviously -- you know, you can

18　tell from this letter that by the time he wrote this

19　letter, it's clear that Mr. Holmes has already reviewed

20　materials and done an analysis such that he can write the

21　letter; correct?

22　　　A　　I can't speak to what he did or didn't do.  I

23　don't know --

24　　　Q　　Well, look at -- you can look at it see that;

25　right?  It's clear that he's looked at some -- he's



 1  received information about the case such that he is

 2  writing some opinions about it; correct?

 3       A    I -- once again, I -- you know, I -- I don't

 4  know what he did on this case.

 5       Q    Mr. Handy, look at the letter.  He's got

 6  information about the case; right?

 7       A    I have to put my glasses on.  Hold on just a

 8  second.

 9       Q    I don't want to trouble you, but if you don't

10  mind, that would be great.

11       A    You're not troubling me.

12            "In looking at the pictures and the video, I

13  would suggest that the person you're looking for is a

14  single male," blah, blah, blah.  I don't --

15       Q    So --

16       A    So, obviously, he looked at the pictures and

17  the video, based on --

18       Q    Mr. Handy --

19       A    Based on that.

20       Q    Mr. Handy, it appears that he has been given

21  materials and has reviewed them before he writes this

22  letter; correct?

23       A    Correct.

24       Q    And I take it that that -- so that means

25  that, right at the beginning of your involvement in this



1   case, you recommended that Sheriff Greer talk to Ronald

2   Holmes; correct?

3        A    I -- I don't know at one point -- at what

4   point that I heard that one of the guys may have been

5   into Satanism.  I would have certainly made the reference

6   to Holmes since I thought he knew more about that type of

7   thing than anybody else I knew.

8        Q    And you made it clear -- and you made it --

9   would have made it clear to Sheriff Greer, you had some

10  training from Mr. Holmes on that area; correct?

11       A    I doubt it.  I mean I would have just

12  referred him.  And the train -- you know, the training

13  that I had, like I said, was going to an open field and

14  looking at graffiti.  I mean that's all the information

15  that I had.  I didn't have any --

16       Q    So --

17       A    You know.

18       Q    Let me make it clear to you, Mr. Handy.  I am

19  going to speak to Mr. Holmes.  Is it your testimony that

20  the only training Mr. Holmes gave you was to bring you to

21  an open field?  Is that your testimony?

22       A    Look, Mr. Holmes is dead.  Okay?  He's had --

23  he's been dead for a period of time.  Mr. Holmes was the

24  Coroner that fired me from the Coroner's office.  I know

25  Mr. Holmes very well.



1    Q    Okay.

2    A    And I can --

3    Q    Did you talk to Mr. Holmes about -- about

4    occult crimes in many cases; fair to say?

5    A    No.  I did not.

6    Q    Have you talked to Mr. Holmes about occult

7    crimes in any other cases besides this one?

8    A    I -- to the best of my knowledge; no.

9    Q    Okay.  And you're not suggesting you didn't

10   talk to him in this case.  You just can't remember if you

11   just referred him or you spoke to him --

12   A    I would have --

13   Q    -- fair to say?

14   A    -- just referred him.  Because once again, I

15   didn't think there was --

16   Q    I didn't ask you why, sir.  I just asked you

17   if you --

18   A    Okay --

19   Q    -- referred him.

20   A    -- look; I'm trying to explain, to the best

21   of my ability.

22   Q    You don't need -- Mr. Handy, you need to

23   answer my questions.  I'm not asking for an explanation.

24   I want to know if you're certain that you referred him

25   [unintelligible]; that's it.  Please answer.



1       A       Well, I'm trying to answer as to the best of

2    my ability.  All I would have done was referred him.  I

3    didn't know anything about these -- cult stuff.  Most of

4    that, it would appear -- to me, it was over my head.  I

5    didn't understand any of it.  I really didn't even try to

6    understand any of it.

7       Q       Okay.  So you -- now you're testifying that

8    you did not meet with Mr. Holmes in regard to this case;

9    is that right?

10      A       I believe I just referred him, gave him the

11   information to -- to -- to talk to Joe Greer about it.  I

12   didn't have any information about what --

13      Q       All right.

14      A       -- they had at that scene --

15      Q       Now, did you --

16      A       -- or anything --

17      Q       Are you test --

18      A       -- about her.

19      Q       Is it your testimony that the only training

20   you received in your -- that you received your occult

21   trining certification for, was to go to a field?  There

22   was no classroom training?

23      A       I -- I -- you know, I just don't really

24   recall that training.  I remember going to a field and

25   seeing a bunch of graffiti, and maybe going to multiple



1  fields where some of this stuff allegedly took place.

2  And to my memory, that was about it.

3       Q     Now you would agree that the first thing you

4  do when you enter a case, whether you're lead detective

5  or just participating, is that you review reports that

6  have been created to date; correct?

7       A     Yeah.  Sure.

8       Q     You talk to the officers involved in the case

9  and you try to get information about their theories of

10 the case, any suspects, things of that nature; correct?

11      A     Yeah, I guess.  I don't about theories, but,

12 certainly, what the facts are.

13      Q     You're trying to -- when you're involved, in

14 a homicide case in particular, you're constantly trying

15 to compare what you're hearing from different people who

16 have information about the case; correct?

17      A     I'm constantly trying to hear from different

18 people --

19      Q     Compare what you're --

20      A     Compare --

21      Q     -- hearing from different people about the

22 case?

23      A     I mean I'm trying to get as much information

24 from the people that -- the -- the detectives that have

25 already done work on it.  If they can bring me up to



 1   speed on what's already been done and what they feel like

 2   needs to be done, it would benefit me and what I'm doing.

 3       Q    And one thing any good Homicide detective is

 4   always doing is to consider possible theories as to how

 5   and why a murder may have been committed; correct?

 6       A    Correct.

 7       Q    Now so, certainly by April 7th, you were

 8   aware of the allegations of Satanism in this case;

 9   correct?

10       A    I -- I can't tell you.  I -- I mean I

11   simply -- you know, I don't know who told me what, when,

12   where, how.  At some point I became aware that there was

13   some Satanism allegations of this or that, but I -- I

14   don't know where that -- that came up.

15            MR. BRUSTIN:  Okay.  Would you please hand

16   the witness his testimony binder?

17            MADAM COURT REPORTER:  One second.

18            MS. McCARTHY:  And again, this -- we want

19   this kept in the binder.  And this has all Mr. Handy's

20   prior testimony including in the Hardin/Clark trial and

21   in the Hardin/Clark 2015 post-conviction hearing.

22            MADAM COURT REPORTER:  Okay.  He has the

23   binder.

24   BY MR. BRUSTIN:

25       Q    Let me know when you have it.



1       A       I have it.

2       Q       Now take a look at the Hardin trial

3    testimony.   You see that tab?

4       A       Well, let me -- let me -- I've got it.

5       Q       Take a look at -- this is the -- the

6    proceedings on March 1st of 1995.   Take a look at page

7    316.  I'm going by the -- the page members on the bottom

8    middle.

9       A       And so you're saying bottom left?

10      Q       Bottom middle.

11      A       Bottom middle.

12      Q       316.

13      A       Oh, okay.   I gotcha.

14      Q       Let me know when you're there.

15      A       I'm there.

16      Q       Did you tell the truth at the criminal trial?

17      A       Sure.   Yeah.

18      Q       If you'll look at page -- you said, "Sure?"

19      A       Yes.

20      Q       Take a look at page -- lines 13 to 15.

21   Question by Mr. Rogers:  "Now you were obviously aware on

22   April 7th, 1992, that there was some satanic influence in

23   this case; right?"  Your answer:  "Correct."

24              Do you see that?

25      A       Yes, sir.



1        Q      And you reviewed this testimony in

2    preparation for today; correct?

3        A      I -- like I said, I didn't memorize it.

4        Q      Sir, did you review this testimony in

5    preparation for today?

6        A      I read through this; yes.

7        Q      Okay.  And so, in fact, on April 7th, you

8    were aware that there were satanic -- a Sat -- some

9    satanic influence in this case; correct?

10       A      Correct.

11       Q      And so days before you interviewed Mr. Hardin

12   in the car about Satanism, you were aware that Satanism

13   was an issue in this case; correct?

14       A      Correct.

15       Q      And you understand -- prior to that

16   interview, you were aware that there were allegations

17   that Hardin was into sacrificing animals; correct?

18       A      I -- I'm not sure sacrificing animals.  I

19   think it was just the Satanism.  But I could be wrong.

20   I'm not sure --

21       Q      Well --

22       A      Something about Satanism.

23       Q      You asked him about sacrificing animals.

24   That had to come from somewhere; correct?

25       A      Correct.



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                108

1     Q     It came from a combination of information you

2  received in this case as well as your training from

3  Professor Holmes; correct?

4     A     It certainly may have.  I don't know.

5     Q     I'm sorry?

6     A     I -- I -- I'm not sure where it came from.

7     Q     Well, you know that those were two -- at

8  least two of the sources where it would have come from.

9  You understood --

10     A     Those were --

11     Q     -- that --

12     A     Those sources --

13     Q     I'm not done, sir.

14          You understood from Professor Holmes that, as

15  part of Devil-worshiping, sometimes people sacrifice

16  animals and even humans; correct?

17     A     I mean -- you know, I can't really answer

18  correctly about sacrificing humans and what I knew about

19  that.  I -- you know, I don't -- there's people that

20  begin as sacrificing small animals to become fire

21  starters and sociopaths and --

22     Q     Let's do it this --

23     A     Small animals are not necessarily just for --

24  for -- for Satanists.

25     Q     All right.  Obviously, you were asked -- you



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
109

```
 1    asked Jeff Clark about his satanic involvement, on April
 2    6th.  So you knew of it by then; correct?
 3         A     Correct.
 4         Q     And the -- the fact -- the fact -- withdrawn.
 5               The information that you had going into the
 6    interview with Keith Hardin on the 9th included
 7    information from Holmes that one of the things people
 8    involved in Devil-worshiping might do is sacrifice
 9    animals; correct?
10         A    I -- I don't know if that came from Holmes.
11    I mean I simply -- I knew that -- that -- that people
12    sacrificed small animals.  Whether that came from Holmes
13    or just general knowledge, I don't know.  So I can't say
14    what I got it from Holmes or what I got from Sheriff
15    Greer or what I got from anybody, at that point.
16         Q    All right.  Let's make it -- let's make it
17    real easy for you.  Take a look at Exhibit 59.
18               MR. BRUSTIN:  Does the witness have Exhibit
19    69?
20               MR. WICKER:  Not yet.
21               MS. McCARTHY:  Well, that should be in the --
22    the binder that's titled Hardin Marked Exhibits.
23               MADAM COURT REPORTER:  Yes.
24               MS. McCARTHY:  And there's a Tab 59.
25               MR. BRUSTIN:  [Unintelligible], Mr. Handy.
```



```
 1              MADAM COURT REPORTER:  We're retrieving it

 2    for him.

 3         A    Okay.  I've got Exhibit 59.

 4  BY MR. BRUSTIN:

 5         Q    Okay.

 6         A    Yes, sir.

 7         Q    Now if you take a look at page 16.

 8         A    Once again, that's new.  Okay.

 9         Q    Top of the page.  Let me know when you're

10    there.

11         A    I'm there.

12         Q    This is when you were assigned to -- you were

13    assigned to the case on April 6th; correct?

14         A    Correct.

15         Q    And you were briefed on the case; correct?

16         A    Correct.

17         Q    Let's take a look at page 17, the next page.

18    See the last sentence of the paragraph beginning, "Mr.

19    Clark advised me?"

20         A    Yeah.  "Mr. Clark advised me that on Saturday

21    morning" --

22         Q    I'm not asking you to read it.  I'm just

23    asking if you see that.  Do you see that?

24         A    Is that the one we're speaking of?

25         Q    Yeah.  You see that paragraph; right?
```



MARK HANDY                                        September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                   111

1        A     Yes.

2        Q     You're asking Mr. Clark questions about a

3    knife and you're asking Mr. Clark questions about Devil

4    worship; right?

5        A     I don't think I've gotten to that one yet.

6        Q     I can't hear you, sir.

7        A     I don't believe I've gotten to that one yet.

8    You asked me --

9        Q     Let me read it to you, sir.  I'm gonna make

10   this real simple for you 'cause we -- we --

11       A     Okay.  Thank you.

12       Q     I want to use our time effectively.

13       A     All right.  I got it.

14       Q     Mister -- listen to me.  "Mark Clark advised

15   me that he does not have a knife and he has never seen

16   Keith with a knife.  Mr. Clark further advised me that he

17   is not into devil worship and does not know if Keith

18   Hardin is."

19             Do you see that?

20       A     Yes, sir.

21       Q     And that's because you asked Mr. Clark about

22   the knife and you asked him about Devil worship; right?

23       A     Yes.

24       Q     That's because you received information that

25   both of those things were relevant to the case; correct?



```
 1        A    Correct.
 2        Q    You knew that the murder weapon appeared to
 3   be a knife; correct?
 4        A    I believe so.
 5        Q    And you -- you believe so or you know so,
 6   fir?
 7        A    If you're asking me, I believe so.
 8        Q    Okay.  And you had received information that
 9   Devil-worshiping have been involved as a motive for this
10   killing.  That's why you asked about it; correct?
11        A    Correct.
12        Q    Those were two leads that you had in the case
13   regarding -- certainly, regarding a potential motive;
14   correct?
15        A    As motive?  I don't know.
16        Q    Well, Devil-worshiping -- if -- if this was a
17   ritualistic killing, that would be a motive; correct?
18        A    Well, I mean I -- I thought more that the
19   fact that Hardin was the victim's ex-boyfriend was a
20   little stronger motive than any of this stuff.  I mean
21   I --
22        Q    Did I ask you -- did I ask you anything about
23   what you thought was a stronger motive?
24        A    You asked me if I thought that was a motive.
25        Q    I'm asking you if that's relevant to motive.
```



MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                  113

1    A ritual killing could be relative to motive; correct?

2        A    Are we talking about this specific case?

3        Q    Sir --

4        A    Or just in general?

5        Q    Yeah.  The -- the question you asked was

6    about Devil-worshiping.  And the reason you're asking it

7    is you wanted to see if Devil-worshiping -- you were

8    exploring the possibility as to whether or not

9    Devil-worshiping played a role in this murder; correct?

10       A    I -- you know, I guess it just seemed like

11   the thing to ask.  I -- I don't --

12       Q    Sir --

13       A    I mean I -- it -- was it part of this?  I --

14   you know.  I -- I truly don't remember.  I guess, based

15   on this, I wanted to know if -- you know, it's sort of

16   creepy.  And when you're interviewing people and you want

17   to know just how creepy they are, that would certainly be

18   a question I would ask.  It seems pretty creepy to me.

19       Q    So the only reason you asked about

20   Devil-worshiping was it -- because it seemed creepy?

21       A    Well, because I -- apparently, I had been

22   told these guys were into that stuff.

23       Q    Okay.

24       A    And I was curious about --

25       Q    I mean the reason --



1      A      -- about how they would --

2      Q      -- you were asking --

3      A      -- answer --

4      Q      -- him about it -- sir, the reason -- as a

5  Homicide detective, the reason you were asking about it

6  is because you wanted to determine whether or not it

7  played any role in this homicide.  That's what you do

8  during a homicide investigation; right?

9      A      Yeah; I mean it is.  But at the same time,

10 you know, I may ask all kinds of questions that -- you

11 know, I -- I don't really -- I -- you know, I would have

12 asked because I was told they were involved in it.  If he

13 said he wasn't involved in it, I -- I would have went on

14 to other things.

15     Q      Okay.  Well, he did say you didn't go on

16 to -- he wasn't involved.

17     A      And then I went on to other things, I'm sure.

18     Q      Okay.  Okay.  And so your only -- the only

19 reason -- let me get this straight.  The only reason you

20 asked Jeff Clark about Satanism is because it was creepy;

21 fair to say?

22     A      Well, and because I had been told that these

23 guys were into Devil worship.

24     Q      Right.  And how was that rel -- how was that

25 potentially relevant to this case?

MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
115

1    A    Well, she was found out in a field, cut up,

2    from what I understand.

3    Q    So how was Devil -- why were you asking about

4    Devil-worshiping?  How could that be relevant?

5    A    I -- once again, I -- you know, it -- it --

6    I'm not sure.  Because, you know, if -- if I'd heard that

7    he handled, you know, prize dogs, I may have asked him

8    about that.  So I'm not --

9    Q    Don't --

10   A    -- really trying to -- I'm just saying

11   that -- you know, my conversation with him was I asked

12   him about the Devil-worshiping and I wrote down what he

13   told me.  And did I think that, at this point,

14   Devil-worshiping had anything to do with this homicide?

15   It certainly may have.  I don't know.

16   Q    Okay.  And you were exploring whether or not

17   Devil-worshiping could be a part of the motive for this

18   killing; correct?

19   A    I -- yeah.  I mean I was asking him questions

20   to see what he would tell me about it.

21   Q    Okay.  I'm not asking you that.  I'm asking a

22   very specific question.  Was one of the reasons you were

23   asking about Devil-worshiping, to determine whether or

24   not it could have been a motive in this case?

25   A    You know, I -- I would think yes.



1    Q    Okay.  Now you understand -- or you

2  understood, at the time, that satanic materials had been

3  found; correct?

4    A    I -- I -- I don't know what was found.

5    Q    I'm sorry?

6    A    I do not know what was found.

7    Q    Okay.  So your review --

8    A    I was not a part of that.

9    Q    You didn't learn that there were satanic --

10  that there were satanic materials that were found?

11    A    At some point during the investigation, I

12  believe I saw pictures that were recovered from maybe

13  Hardin's house, along with some drawings and some other

14  things.  But that -- that was quite a bit into the case.

15  I didn't --

16    Q    [Unintelligible] think so?

17    A    Yeah.  I think so.

18    Q    Okay.  Take a look at Exhibit 25.  Put your

19  glasses back on.

20    A    I will.  Yes, sir.

21    Q    And take a look at page 11.  And that's --

22  I'm going by the Bates-stamped pages on the left side.

23  NSB, those pages.  Do you see that?

24    A    Yes, sir.

25    Q    Take a look at page 11.



MARK HANDY                                   September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON              117

1        A     Okay.

2        Q     And you see -- this is when it's

3    discovered -- look at the top -- information here about

4    them being involved in satanic worship; correct?

5        A     All right.  Yeah; I'm reading it.

6        Q     Well, take a look at the paragraph beginning,

7    "Detective Clark advised."

8        A     Okay.

9        Q     Third paragraph.  Do you see that?

10       A     Right.

11       Q     So this is Detective Clark advising everybody

12   that there's satanic materials in her room; correct?

13       A     Correct.

14       Q     Now take a look -- this is -- this is all

15   on -- early on in the case; correct?

16       A     I'm sorry?  For --

17       Q     This is all -- this is all under the

18   description -- if you go back on page nine, this is all

19   describing what happened on April 5th.  Okay?  So he's

20   writing this on April 5th.

21             Now take a look at page 12 -- I'm sorry.

22   Page 13, on top of the page.  This is on 4/6, one day

23   later.  This is when you were assigned to the case;

24   correct?

25       A     Okay.



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
118

1    Q    And it says, "After discussing everything
2  with Handy, it was decided that a Jeff Clark should be
3  picked up;" correct?
4    A    Correct.
5    Q    So, certainly, you have no doubt that you
6  would have discussed the satanic materials that he found
7  in Rhonda's -- Rhonda's room, the next day when you saw
8  him; correct?
9    A    I don't know what he would have told me.
10 I -- I simply have no idea.
11   Q    So you think it's possible he failed to
12 mention to you anything about the satanic materials when
13 you spoke to him?
14   A    I mean he may have.  He may have; he may not.
15 I -- I -- I don't remember our conversation.
16   Q    Do you remember knowing about the inverted
17 cross that was on Rhonda's body, found on Rhonda's body?
18   A    No.
19   Q    No?  You don't remember learning that?
20   A    I don't remember.  I -- I don't remember a
21 lot about that.
22   Q    The best of your recollection, that's
23 probably something you were never told?
24   A    I -- I -- I simply do not recall being told
25 that.



1      Q     Okay.  Well, I understand you don't recall it

2   today.  But based on your review of the reports, would it

3   be fair to say you must have been told that?

4      A     I wouldn't say I must have been told

5   anything.

6      Q     All right.  And one of the things that

7   when -- when you were -- one of the things that you would

8   have talked to Sheriff Greer about when he was updating

9   you on the investigation thus far would be potential

10  theories and motives in the case; correct?

11     A     I -- I -- once again, I -- I don't recall

12  what Sheriff Greer -- now, we would have talked about --

13     Q     Mr. Hand, I understand you don't remember

14  what you talked about.  But as a Homicide detective, when

15  you get on a new case and there's an officer already on

16  the case, one of the things you're always looking for is

17  theories and motives; correct?  That's how you solve

18  crimes; right?

19     A     Yeah.  I -- yeah.  I mean that -- that's --

20  that's true.  I -- but if you're asking me for specifics,

21  not -- that's an awfully generalized statement for --

22     Q     Oh.

23     A     -- a very --

24     Q     So one of the things --

25     A     -- specific question.



1    Q    -- you would have asked Mister -- one of the

2  things you would have asked Sheriff Greer as soon as you

3  got on the case is, why and how they think this crime was

4  committed; correct?

5    A    I -- I don't remember what I -- you --

6    Q    Sir --

7    A    I don't --

8    Q    I understand you don't remember.  Would that

9  be something you would ask in any case you got involved

10  in:  What -- what do you have so far?  Why do you think

11  this happened?  Who do you think did it?

12    A    Probably what -- and -- and you're not far

13  off.  But I would have probably been more inclined to

14  want to know who lived in the area where she's found,

15  what's the status of her and her boyfriend, you know,

16  who's the guy in her life, you know.  Because I -- that's

17  just the -- the -- the obvious start, is ex-boyfriend or

18  boyfriend.  That's where I would have been thinking more

19  along the lines of.

20          And because this was a pretty obscure area

21  of -- of the country, who would have had ties to that

22  area.  I -- I would -- those would -- would have been

23  where my mind would have gone, is because --

24    Q    Mr. Handy, why --

25    A    Go ahead.



1        Q     Mr. Handy, I'm not asking you that.

2              Mr. Handy, why did you tell Sheriff Greer to

3    reach out to Ronald Holmes?

4        A     Because I must have heard something about

5    satanic stuff, and Holmes was the person that I knew that

6    had sustanic -- sustan -- satanic knowledge.  He would

7    have been --

8        Q     Okay.

9        A     -- probably the only person that knew that

10   would have had some kind of insight into Satanism and --

11       Q     Okay.

12       A     -- that type of thing.

13       Q     So -- so by the -- so by -- so certainly by

14   April -- April 6th, when you got involved in the case,

15   you knew a few things.  You knew that there were

16   allegations that the crime -- withdrawn.

17             You knew there was evidence that the crime

18   was committed with a knife; correct?

19       A     I believe so.

20       Q     And you knew that there were allegations that

21   Satanism might somehow be a part of the case; correct?

22       A     Sounds right.

23       Q     And you knew that there was a romantic

24   relationship between one of the persons of interest and

25   the victim?



1        A     I believe so.

2        Q     Okay.  Those are three important pieces of

3   information; right?  Murder weapon, a possible motive

4   with Satanism, and a possible motive with a relat -- a

5   romantic relationship; correct?

6        A     Correct.

7        Q     Any other information that you had going into

8   your interviews with Keith Hardin that you either recall,

9   or recall seeing in reports?

10       A     No.

11       Q     Those are the three most important pieces of

12  information that you had by the time you were meeting

13  with Keith Hardin; correct?  Satanism, knife, boyfriend;

14  right?

15       A     Well, I mean I think opportunity, you know;

16  did he have the opportunity to have done that would be

17  pretty significant.  You know, would he --

18       Q     Okay.

19       A     Would he have been available to have done

20  that?

21       Q     Did you have any information about whether or

22  not -- by the -- by the time you met with -- by the time

23  that you met with Keith Hardin on -- on the 7th, did you

24  have any information about whether he had an alibi, or

25  did you get that sometime after?



1       A    My first interview with both Hardin and
2   Clark, I would have gotten -- I believe I would have
3   gotten information from them on their whereabouts over
4   a --
5       Q    You --
6       A    -- certain period of time.
7       Q    All right.  So me add --
8       A    And --
9       Q    -- to your list.
10      A    -- I would have taken --
11      Q    So to get --
12      A    -- down whatever they told me.
13      Q    Yeah.  In fact, you did interview -- you did,
14  according to the reports, interview Jeff Clark before
15  Hardin.  Okay.  So going into your Keith Hardin info -- i
16  in -- info -- I'm sorry.  Going into your Keith Hardin
17  interview, you had four pieces of information.  You
18  had -- you had information about their whereabouts.  You
19  had information about the murder weapon -- a possible
20  knife.  You had information about Satanism, and you --
21  and you had information that Jeff -- that Keith Hardin
22  was a boyfriend.  Four pieces of information that were
23  important; correct?
24      A    Correct.
25      Q    Anything else that was important at that



1   time, to your knowledge, to your memory?

2       A    Well, I mean, obviously, did he have the

3   opportunity.  And what was the relationship like and --

4       Q    Well, the same thing.  They're -- oftentimes

5   you find, as a Homicide detective, murders happen as part

6   of a domestic dispute; right?  That happens all the time?

7       A    "If I can't have her, nobody else will."

8       Q    Right.

9       A    Right.

10      Q    So that's -- that -- you were exploring that

11  angle.  You were exploring the angle of the boyfriend.

12  You were exploring the angle of Satanism.  And you had

13  the murder weapon; correct?

14      A    I mean I didn't have the murder weapon, so

15  I'm not sure what --

16      Q    You had the type -- you had information about

17  the type of murder weapon; that it was a stabbing?

18      A    I believe she was stabbed to death.  I think

19  that's what I remember.

20      Q    Okay.  So you suspected -- you deduced that,

21  perhaps, it was a knife; right?

22      A    That was my understanding.

23      Q    Okay.  And those were three important facts

24  that you wanted to make sure you were following up on

25  with witnesses, going forward; correct?



1        A     Sure.  Yes.

2        Q     Okay.  And, obviously, you understand that

3   one way to solve a homicide is to figure out the motive.

4   That helps you solve crimes; right?

5        A     I think motive can certainly give you a area

6   to look in.  But I can tell you that there's been many

7   crimes solved where motive was ever established.

8        Q     Okay.  But that's something you're always

9   looking for to try to solve crimes; correct?

10       A     Oh, right.

11       Q     It's one tool --

12       A     Right.

13       Q     -- in your arsenal?

14       A     There's an -- there's an old Sherlock Holmes

15  thing, is the most obvious suspect's usually the correct

16  one.

17       Q     Right.  But in solving a crime, one thing

18  that is often helpful is figuring out the motive, if you

19  can?  Not always, but, certainly, that's one tool you

20  use?

21       A     Absolutely.

22       Q     Okay.  Now take a look at Exhibit 59.  Now

23  you see, on Exhibit 59 -- this is the -- this is your

24  report for what happened on April 7th, 1992; correct?

25       A     I mean I'm looking at James Clark.  I must --



1    I'm looking at the wrong one.

2         Q    Page 25, left corner.  25.

3         A    Yes, sir.

4         Q    Okay.  And the bottom of the page, on --

5    you're -- you're detailing what happened, beginning at

6    13:40 hours, which is 2:40; right?

7         A    Well, 1:40.

8         Q    1:40.  Sorry.  1:40, on April 7th of 1992;

9    correct?

10        A    Correct.

11        Q    And this is where you're detailing your

12   interaction with Keith Hardin; correct.

13        A    Correct.

14        Q    And that's contained all the way through --

15   your interaction with Keith Hardin goes all the way

16   through to page 27; correct?

17        A    Correct.

18        Q    This is you describing, in your report, all

19   of your interactions and everything you were told of

20   relevance from Keith Hardin on April 7th; correct?

21        A    That's correct.

22        Q    Yes?

23        A    Yes.

24        Q    And you reviewed this report carefully in

25   preparation for today; correct?



1    A    I reviewed it.

2    Q    You understand that we're claiming in this

3  case that you fabricated this report; correct?

4    A    Yes.

5    Q    Okay.  Now I'm going to take a look at page

6  26, the paragraph beginning the second -- the first full

7  paragraph, bottom right.  Just tell me when you're there.

8    A    I'm sorry?

9    Q    Are you here?

10    A    I'm here.

11    Q    Okay.  Let's do it together.  While in route

12  to the PAS Office, I asked -- I asked Keith Hardin if he

13  was in fact into Satanism, as I had previously been told,

14  and Keith admitted to me that he was not engaging in

15  satanic worship anymore, but that he, previously, for

16  approximately six years, that he had stopped

17  approximately one month ago.

18         Do you see that?

19    A    Yes.

20    Q    Okay.  And this is making clear that you

21  asked him about the Satanism because you had been

22  informed about his involvement in Satanism; correct?

23    A    Correct.

24    Q    And this, according to the report, is the

25  first question that you asked Keith Hardin when you met



1   him; correct?

2        A     Correct.

3        Q     The first thing you decided to ask him about

4   was Satanism; correct?

5        A     Yes.

6        Q     Then it says, I asked Keith Hardin if, in the

7   course of his satanic worship, if he had killed any cats

8   or other small animals.

9              Do you see that?

10       A     Yes.

11       Q     The reason you asked him that question is

12  because you understood that people involved in

13  Devil-worshiping sometimes sacrifice small animals;

14  correct?

15       A     Correct.

16       Q     That's why you asked him that question;

17  right?

18       A     Correct.

19       Q     And then, according to you, he acknowledged

20  to you that he had killed small animals; right?

21       A     Yes; he had.

22       Q     And then you asked him why he had stopped the

23  Devil-worshiping and he volunteered that he got tired of

24  looking at animals and began to want to do human

25  sacrifices; correct?



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    129

1        A     Correct.

2        Q     Now, by the way, you understood, at this

3    point in time, that one of the things that sometimes

4    happens in occult crimes is that people do human

5    sacrificing?  That's one possibility in -- in an -- in an

6    occult crime like Devil-worshiping; right?

7        A     Correct.

8        Q     Okay.  And according to you, Keith Hardin

9    volunteered to you that he was -- he was having urges to

10   kill human beings as part of a sacrifice?  He volunteered

11   that to you?

12       A     Correct.

13       Q     That's the first thing that Keith Hardin said

14   to you when you met him?

15       A     That was in response to a question I asked

16   him.

17       Q     Right.  You didn't even ask him about human

18   sacrifices.  He just volunteered to you.  The first thing

19   he told you was he volunteered to you that he was having

20   an urge to kill humans as part of a sacrifice; correct?

21       A     I asked Mr. Hardin why he had stopped the

22   Devil-worshiping and he advised me -- so this is in

23   response to a question.

24       Q     Right.

25       A     He didn't blurt it out.



800.211.DEPO (3376)
EsquireSolutions.com

MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                130

```
 1          Q    It's --

 2          A    This was in --

 3          Q    But you didn't ask him -- according to you --

 4          A    I --

 5          Q    -- you didn't even ask for it.

 6          A    I --

 7          Q    Listen to me --

 8          A    -- asked him --

 9          Q    Sir, listen to me.  You didn't even ask him

10     about human sacrifice.  He just volunteered it; right?

11          A    I then asked Mr. Hardin why he stopped the

12     Devil-worshiping and -- and he's --

13          Q    Sir --

14          A    -- trying --

15          Q    That's not my question.

16          A    -- [unintelligible] -- may I please -- please

17     finish?

18          Q    You need to listen to my question.

19               MR. WICKER:  He's answering your question.

20     Let him --

21     BY MR. BRUSTIN:

22          Q    Listen to my question.

23               MR. WICKER:  -- answer.  He --

24     BY MR. BRUSTIN:

25          Q    You didn't even ask him about human
```



1   sacrifice.  He volunteered it; correct?

2        A     I asked him why he had stopped the

3   Devil-worsiking [ph] -- worshiping, and he advised me

4   that he got tired of looking at animals and began to

5   do -- want to do human sacrifices.

6        Q     Okay.

7        A     That was the --

8        Q     So according --

9        A     -- conversation.

10       Q     Acc -- again, according to you, you never

11   asked him about human sacrifice.  He just volunteered it;

12   correct?

13       A     I asked him why he had stopped the

14   Devil-worshiping, and he advised me that he got tired of

15   looking at animals and began to want to do human

16   sacrifices.  That's -- that's the conversation.

17       Q     Right.  So you never raised the issue of

18   human sacrifice, according to you; he raised --

19       A     I never raised the --

20       Q     -- it himself?

21       A     I never raised it.

22       Q     Okay.  So one of the first things that --

23   that he raised on his own was that he was having an urge

24   to kill humans as a sacrifice; correct?

25       A     I don't remember him saying "urge."



 1        Q     Well, that's what it means.  You said he got

 2   tired of looking at animals --

 3        A     And he began to --

 4        Q     -- and began to --

 5        A     -- want to do --

 6        Q     -- want to do.  Isn't "began to want to do"

 7   another way of saying having an urge?

 8        A     I -- I just -- he said he began to want to do

 9   human sacrifices.

10        Q     So, in other words, he was wanting, in his

11   mind, to kill human beings as part of a sacrifice?

12   That's what he told you, according to you?

13        A     That's exactly what he said.

14        Q     Okay.  And so the first time you met this

15   homicide suspect, the first thing he said to you in

16   response to your question was that he had an urge in his

17   mind to want to kill human beings as part of a sacrifice?

18        A     I asked Keith Hardin if, in the course of his

19   satanic worship, if he had killed any cats or other small

20   animals, and he acknowledge to me that he had killed

21   small animals.  I then asked Mr. Hardin why he had

22   stopped the Devil-worshiping and he advised me that he

23   got tired of looking at animals and began to do want --

24   and want to do human sacrifi -- he said that in front of

25   me and Jim Woosley, both.



1    Q    Oh -- okay.  So I'm not sure what question

2  you're answering and I -- I will represent on the record,

3  and I will bring this up to the court, you are not

4  answering my questions.  You can keep trying not to do

5  it, but you're not answering my questions.  I asked you a

6  very simple question; you're not answering.

7          Now this portion I just read to you in this

8  report, that -- that is the -- that is the sum total of

9  your questioning of Keith Hardin that you've seen, in

10  regard to Satanism; correct?

11    A    I don't know how to answer the question,

12  because I'm looking at this one paragraph and that's what

13  it says.  And I'm not really --

14    Q    No.  Let's -- let me give you a hint.  You've

15  already told us -- and I asked you for a reason.  You've

16  already told us you reviewed all your -- all your

17  reports; correct?

18    A    Correct.

19    Q    Do you recall seeing any reporting of ether

20  [ph] -- of any other questioning of Keith Hardin in

21  regard to Satanism?

22    A    From me?

23    Q    Yes, sir.

24    A    No.

25    Q    Do you recall any additional questioning of



1  Keith Hardin on Satanism, other than the first questions

2  you asked him in the car on the way to the precinct?

3       A    No.

4       Q    Okay.  So this report, though -- this is

5  your -- the first questions you asked of Keith Hardin,

6  that -- those are your efforts to question him on one of

7  those four topic areas we discussed:  Satanism.  Right?

8       A    Correct.

9       Q    All right.  Let's take a look at what else

10  you asked him.  Take a look at page 27.  On page 27, at

11  the top, you asked him about whether or not he or Jeff

12  Clark had a knife; correct?

13       A    Yes.

14       Q    And you were asking about whether or not he

15  had a knife because he -- you understood that the murder

16  weapon was a knife; correct?

17       A    Sure.  Correct.

18       Q    And you were trying to connect him, possibly,

19  to the murder weapon; correct?

20       A    Yeah, I guess.  Sure.

21       Q    Okay.  So in the same way you asked about --

22  you were asking about Satanism, to see if it was possible

23  that Satanism played a role in this crime; correct?

24       A    Correct.

25       Q    And his answer was that he was having urges



1    to kill human beings; correct?

2         A    I mean I -- that's not how I phrased it, so.

3         Q    Well, you --

4         A    I mean I -- he said --

5         Q    -- he wanted to do --

6         A    He said he --

7         Q    -- human sacrifice --

8         A    -- was tired of --

9         Q    Right?

10        A    -- looking at animals and began to want to do

11   human sacrifices.  I -- the urges, you have to ask him.

12        Q    Sure.  Let me ask you this.  You're an ed --

13   you're an educated man; right?

14        A    I mean I went to college.

15        Q    Okay.  And would it be fair to -- would it be

16   a fair comparison to say wanting to do human -- human

17   sacrifices is similar to having an urge to do human

18   sacrifices?  Is that a fair comparison?

19        A    You know, I don't know.  "Urges" just seemed

20   like a different -- different, to me.  But the -- I mean

21   you're --

22        Q    Okay.

23        A    -- getting into --

24        Q    You tell me.  What does it mean to -- what

25   did you understand it to mean when he said he began -- he



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
136

```
 1   had to stop -- he had to stop Devil-worshing [ph] --
 2   wor -- worshiping because he want -- he began to want to
 3   do human sacrifice?  What did you understand that to
 4   mean?
 5        A    That he decided that that's just not how far
 6   along he was gonna get into it.
 7        Q    And, no; I'm sorry.  I'm asking you just to
 8   be more specific.  What did you understand him to mean
 9   when he said he began to want to do human sacrifice?
10   What did you understand that to mean?
11        A    That he didn't want to get any further into
12   it --
13        Q    No, no, no.
14        A    -- before --
15        Q    You still don't understand me.  What did
16   those words mean to you when he said he began to want to
17   do human sacrifice?  What did you understand those words
18   to mean?
19        A    This is why he wasn't any longer into -- to
20   Satanism.
21        Q    Are you -- are -- are you honestly answering
22   my question?  I'm asking you about specific words:
23   "Began to want to do human sacrifice."  What did you
24   understand those one, two, three, four, five -- six words
25   to mean, when he said them to you?  "Began to want to do
```



1  human sacrifice."  What did you understand those words to

2  mean?

3            MR. WICKER:  Objection.

4       A    I --

5            MR. WICKER:  Compound, and asked and

6  answered.

7            You can try --

8  BY MR. BRUSTIN:

9       Q    You can answer.

10           MR. WICKER:  Try again.

11      A    I mean I -- it -- it -- he got tired of

12  looking at animals and began to want to do human -- that

13  he was wanting to get out of Satanism, is how I took it.

14  BY MR. BRUSTIN:

15      Q    So you took him saying he began to want to do

16  human sacrifice as meaning he just wanted to stop

17  practicing Satanism?

18      A    Right.  That's how I took it.

19      Q    Okay.  What did you understand it to mean in

20  regard to doing human sacrifice?

21      A    I didn't really pay a lot -- I mean I -- I

22  think he was saying that, you know, he -- he'd got out of

23  it because that have maybe been the next step or

24  whatever.  I -- I didn't really take it that -- that --

25  you know.  I just believed that he meant that he was



1  wanting to get out of the Satanism thing.

2      Q    When he said he wanted to do human sacrifice,

3  began to want, did you -- what did you understand that to

4  mean?

5      A    I don't know that I did a lot of analysis on

6  it.  I wrote it down, I went on to the next one, and we

7  just kept going.  And Jim Woosley was there with me.  I

8  mean if there's some question as to what was said, Jim

9  Woosley --

10     Q    Yeah.  What was --

11     A    -- heart every word --

12     Q    What was --

13     A    -- of it.

14     Q    What was Jim's reaction when he said that and

15  you talked about it afterwards?

16     A    I don't think we reacted to it.  I think that

17  you just go on and -- and ask the next questions.  And

18  there's not -- I mean let me say this, and this --

19     Q    Nope.  You don't get -- you don't get to make

20  speeches.  I'm not asking you for that.

21     A    I'm not making a speech.

22     Q    Sir --

23     A    I'm not making a speech --

24     Q    I'm asking you about your conversation --

25     A    Well --



 1        Q     -- with Mr. Woosley.  That's it.

 2        A     And I'm trying to point out that --

 3        Q     You don't get --

 4        A     -- you don't make faces --

 5        Q     Sir --

 6        A     You do not --

 7              MR. BRUSTIN:  Kent, would you please tell

 8     your client to answer my questions.

 9              MR. WICKER:  He's answering your questions.

10        A     We don't make faces.

11              MR. BRUSTIN:  He's not.

12        A     We don't raise our eyebrows.  We go on to the

13     next question.

14     BY MR. BRUSTIN:

15        Q     After --

16        A     We don't look at each other and --

17        Q     After --

18        A     -- go, oh, did you see that?  Did you hear

19     that?  We don't do that.

20        Q     Mr. Handy, did you ever discuss with Jim

21     Woosley, at any time in the -- in the world, Mr. Hardin's

22     statement, according to you, that he began to want to

23     sacrifice humans?  Did you ever discuss that with

24     Woosley?

25        A     I -- I don't remember whether we did or not.



1    Q    Okay.  Did you --

2    A    It was just another --

3    Q    -- ever discuss --

4    A    -- interview.

5    Q    -- it with Woosley?

6    A    It was another interview.

7    Q    I'm sorry?

8    A    It was another interview, you know.  And --

9    Q    Sir --

10   A    -- we went on --

11   Q    I'm not --

12   A    -- and asked the next --

13   Q    I'm not asking --

14   A    -- question.

15   Q    -- you why you didn't discuss it with him.

16   I'm just asking you if you did.

17   A    I don't recall --

18   Q    Did you discuss it with him?

19   A    I do not recall dis -- what discussions I had

20   with Jim Woosley.

21   Q    Okay.  Do you recall discussing with anybody

22   in the world, before trial, Mister -- Mr. Hardin's

23   alleged admission that he wanted to do human sacrifice?

24   A    I do not recall any of that.

25   Q    All right.  Now you've also told me -- I



1  asked about the knife, and you told us why you asked

2  about the knife.  Take a look at -- by the way, when you

3  interviewed Keith -- take a look -- you see -- you've

4  already gone through Keith denying having a knife and

5  that Jeff Clark ever owned a knife; correct?  Page 27?

6       A    I'm on -- I'm on 27.

7       Q    Okay.  And, at trial, you testified that when

8  you interviewed Keith Hardin again on the 9th, he again

9  denied owning a knife or -- or that Jeff Clark owned a

10  knife.  You recall that; correct?

11      A    I -- I don't recall that, but.

12      Q    Well, in reviewing --

13      A    But if it's his testimony --

14      Q    -- your reports, do you recall that, when you

15  asked Keith Hardin again on the 9th whether he owned a

16  knife, he again denied it?

17      A    I -- I don't specifically -- I -- you know,

18  if I testified to that, I'll stick with my testimony.  I

19  don't have it in front of me.

20      Q    Sir, you told us that you were -- you

21  reviewed your police report.

22      A    I did review it.

23      Q    My question is --

24      A    I didn't memorize it.

25      Q    All right.



1    A    I didn't memorize every line and date.  You
2    know, if you ask me about something on the 8th and it was
3    something I did on the 7th -- you see the problem?
4    Q    Gotcha.
5         Take a look at page 26 now.
6    A    I'm on 26.
7    Q    Take a look at page 26.  And if you could,
8    look, middle of the page.  See the paragraph beginning,
9    "Keith Hardin advised me that he has been dating Rhonda?"
10   A    Yes.
11   Q    Okay.  So after asking about Satanism, you
12   asked him -- you started asking him questions about his
13   relationship, being the relationship angle; correct?
14   A    Correct.
15   Q    And according to you, he volunteered that he
16   had an incident of violence with Rhonda Sue Warford;
17   right?
18   A    What's the question?
19   Q    According to your report, when you asked him
20   about his relationship with Rhonda, he volunteered to you
21   that he had -- he had had an incident of violence with
22   Rhonda Sue Warford?
23   A    Right.  Correct.
24   Q    And that's -- if -- if he said that, that
25   would be an important admission, if there was a history



 1  of violence between the victim and the suspect; correct?

 2      A    Sure.

 3      Q    And so that's another important piece of

 4  information you allegedly received during the interview;

 5  right?

 6      A    Well, I mean he said it was minor.

 7      Q    Okay.

 8      A    He said it was minor.

 9      Q    And --

10      A    He did not recall the reason.

11      Q    So you -- so -- so you asked him about

12  Satanism, first.  Then you asked him about the

13  relationship.  Now if you go to the next paragraph, at

14  approximately 14:20 hours, you see that?

15      A    Yes.

16      Q    The last sentence there, "Keith further

17  advised that he was pretty drunk and that is all he

18  really remembers."  Right?

19      A    That they were drinking beer and looking for

20  Jeff's --

21      Q    Nope.  Just the last sentence.  "Keith

22  further advised that he was pretty drunk and that is all

23  he really remembers."  Correct?

24      A    Correct.

25      Q    Okay.  And now if -- if Keith Hardin said



1   that to you, that would also be important because that

2   suggests that he may have had so much to drink that he

3   may have done things that he doesn't remember; correct?

4        A    Well, he claims that this is all he really

5   remembers.

6        Q    Well, what it -- what it suggests to an

7   experienced Homicide detective is that he may have been

8   so drunk that -- you understand that drinking -- from

9   your experience as a detective, that drinking could cause

10  people to do things they wouldn't normally do; correct?

11       A    Correct.

12       Q    And so when he told you he was so drunk he

13  can't remember everything, that's important information

14  to -- to know about, potentially, how this crime

15  occurred; correct?

16       A    He just said that he was pretty drunk and

17  that is all he really remembers, is what he told me.

18       Q    And as a trained detective, you understand

19  that that could be important information:  That maybe he

20  got so drunk he did things he didn't mean to do; correct?

21       A    I -- I know -- that's not what -- didn't

22  cross my mind.

23       Q    That never crossed your mind?

24       A    No.

25       Q    Is -- is the fact that he was pretty drunk,



1   is that -- that's certainly relevant information; right?

2       A    Well, he wasn't drunk when he was talking to

3   me.

4       Q    The fact that he claims he was drunk the

5   night of the crime is important information, if he said

6   it; correct?

7       A    "Keith further advised that he was really

8   pretty drunk, and that is all he really remembers."

9   That's a statement about -- at 3:00 a.m.  That's all he

10  really remembers.  That he get --

11      Q    Mr. Handy --

12      A    He got home at 3:00 a.m. --

13      Q    Is information about him being drunk the

14  night of the crime relevant to your homicide

15  investigation?

16      A    Yeah.  It's got some relevance.

17      Q    That could -- that could have affected his

18  ability to control his options; correct?

19      A    I -- I don't know him that well.  Maybe.

20      Q    But that's what an investigator does.  You

21  check that out; right?  That's one of the things you're

22  looking for as to reasons as to why this would happen;

23  right?

24      A    You know, I have no idea how -- how --

25      Q    Mr. Handy, I'm going to --



1       A     -- Hardin handles --

2       Q     Well --

3       A     -- his alcohol.

4       Q     You understand that Keith Hardin claims you

5    made up that he told you he was drunk.  You understand

6    that; correct?

7       A     No; I don't.

8       Q     So you -- you are --

9       A     So you're telling me that --

10      Q     -- [unintelligible; talking over] --

11      A     -- Keith Hardin --

12      Q     -- at trial he wasn't drunk and never told

13   you that?

14      A     So what you're saying is, Keith Hardin says

15   that when he said that at 3:00 to 3:00 a.m. he got home

16   and he advised me that he was pretty drunk and that

17   that's all he remembers, he's saying I made that up and

18   that Jim Woosley made that up?  Is that what you're

19   saying?

20      Q     That is what he is claiming, sir.

21      A     Okay.

22      Q     Have you seen any reports from Jim Woosley

23   about what happened in the car?

24      A     This is -- you know, Jim Woosley was there,

25   word for word, and he signed off on this after he read



1   it.  He knows exactly the same things that I do as to

2   what was said.  And I have not talked to him one time

3   about this.

4           Q    Have you seen any --

5           A    Not one word.

6           Q    Have you seen any reports from Jim Woosley?

7           A    No.

8           Q    But you fully expect Jim Woosley to come in

9   and -- and confirm that what you claim Keith Hardin said

10  to you was actually stated; correct?

11          A    Yes; I do.

12          Q    All right.

13          A    Because he was with me and --

14          Q    Right.

15          A    -- heard everything I did.

16          Q    Okay.  Now in any case, you -- you

17  understand, though, that Keith Hardin is claiming you

18  made up these statements and attributed them to him?

19          A    Well, I understand that he's now claiming

20  that he didn't say the things that he said.  Is that what

21  you're asking me?

22          Q    That's exact -- it's -- it's a very simple

23  statement, sir:  That he is claiming you lied in this

24  report.  He never made these statements and you said he

25  did.  That's what he's claiming; right?

1      A    Well, it -- my understanding is that he

2  admitted to everything that happened during a parole

3  information that backed up everything that we claimed.

4  Now are you saying that after he admitted to all that, he

5  suddenly now comes over and says he -- I never said any

6  of that?  Is that what you're saying?

7      Q    That's exactly right, sir.

8      A    Okay.

9      Q    You understand that allegation?

10      A    I understand that.  I do.

11      Q    And -- and -- and in your mind, you can't

12  imagine how somebody could claim that you would simply

13  fabricate a police report; correct?

14      A    No.  I -- what I can't understand is, is if

15  it was just me and you thought, okay, I can just

16  discredit this guy, right?  But it wasn't just me.  Jim

17  Woosley heard everything that I heard.

18      Q    Okay.

19      A    And so you're gonna have to --

20      Q    And --

21      A    -- discredit us both, I believe.

22      Q    Well, you got -- you got a lot riding on Jim

23  Woosley; don't ya?

24      A    I haven't spoke to the man.

25      Q    Okay.  But you're confident that Jim



1  Woosley's going to come in here and he's going to say

2  that he remembers being in that car, and this is what was

3  stated?

4        A     I don't know what he'll testify to.

5        Q     All right.  So let me back to my initial

6  question which you failed to answer.  You can't imagine

7  that somebody would claim you would simply fabricate a

8  police report; right?

9        A     No.  I believe people say that all the time.

10 I -- I think that's --

11       Q     But you would never do that; right?

12       A     That I would fabricate a police report?

13       Q     Yes, sir.  Would you ever fabricate a police

14 report?

15       A     We're talking -- we're talking -- I mean

16 we're talking about a -- an investigation letter?

17       Q     Yes, sir.  Would you ever do that:  Make up

18 statements that weren't -- that -- that the witness never

19 said?

20       A     No.

21       Q     Okay.  And you didn't do it here; right?

22       A     No.

23       Q     But you do understand that that's what

24 Mr. Hardin is claiming in his lawsuit?  He is claiming

25 that you made up statements and attributed them to him;



```
 1   correct?

 2        A    I understand that's what you're saying that

 3   he's saying.

 4        Q    Okay.  He testified to that under oath at the

 5   criminal trial.  You understand that; correct?  That you

 6   never made these statements?

 7        A    I -- I never saw his testimony.

 8        Q    You didn't know that until I just told you?

 9        A    Right.  No; I didn't.

10        Q    Okay.  I will represent to you that

11   Mr. Hardin has claimed, at the trial and his deposition,

12   that you made up that he said he wanted to do human

13   sacrifices.  Do you understand that?

14        A    I do now.

15        Q    And he's claiming, at the trial and now, that

16   he never told you he was drunk.  You understand that?

17        A    Yes.

18        Q    And he is claiming that when you met with him

19   a second time on the 9th, he acknowledged to you that, in

20   fact, he did have knives and that Jeff Clark also had

21   knives.  You understand he's saying that; correct?

22        A    Yes.

23        Q    And you understand that he denies ever

24   telling you that he engaged in violence or threatened to

25   kill Rhonda Sue Warford.  Do you understand that?
```



MARK HANDY                                            September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                      151

1        A     That he's saying that?

2        Q     He's saying you made it up; correct?

3        A     Okay.  I mean I understand you're telling me

4    that.

5        Q     Okay.  But the first time you've ever heard

6    the allegation is me saying it to you right now?

7        A     I think so.

8        Q     You don't remember reading that in the

9    Complaint that we filed?

10       A     I've read through the Complaint.  And to be

11   candid with you, I sort of breezed through it because I

12   know that none of that's true.

13       Q     Okay.  And you can't even imagine that

14   someone would accuse you of something like that; can you?

15       A     Oh, I can imagine that.  I can certainly

16   imagine.  It's not hard to imagine.

17       Q     But you know yourself, and you know that you

18   would never do something like that; right?

19             MR. WICKER:  Objection.

20       A     You know --

21             MR. WICKER:  Asked and answered.

22   BY MR. BRUSTIN:

23       Q     Right?  Having trouble answering that one?

24       A     No.  My lawyer just objected.  I was --

25             MR. WICKER:  No; you can answer.



MARK HANDY                                     September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON              152

```
 1          A    Oh, no.
 2   BY MR. BRUSTIN:
 3          Q    You would never make up a statement in a
 4     police report and attribute it to a suspect; correct?
 5               MR. WICKER:  Objection.  Asked and answered.
 6          A    No.
 7               MR. WICKER:  Counsel --
 8   BY MR. BRUSTIN:
 9          Q    And you're --
10               MR. WICKER:  Counsel --
11   BY MR. BRUSTIN:
12          Q    You're offended --
13               MR. WICKER:  Counsel --
14   BY MR. BRUSTIN:
15          Q    -- that Mr. Hardin would accuse you of that;
16     correct?
17          A    I'm not offended.  I take no offense at any
18     of that.
19               MR. WICKER:  Counsel, I'd like to take
20     another break at a convenient spot.
21               MR. BRUSTIN:  Do you want to try -- why don't
22     we do a -- a lunch now.
23               MR. WICKER:  That's fine.
24               MR. BRUSTIN:  I can do -- I -- I'm -- I'm
25     happy to do as short as everybody would like.  Can we try
```



1   to do a half hour?

2           MR. WICKER:  Let's try that.

3           MR. BRUSTIN:  So why don't we try getting

4   back at one -- 1:30, if that works for everybody?

5           MR. WICKER:  Yep.  As close as we can to it.

6           MS. McCARTHY:  Could we please have the time

7   on the record?

8           THE VIDEOGRAPHER:  Certainly.  The total

9   time -- 23, 22 -- stand by.  This segment was 1:23, and

10  then 1:18.

11          MR. BRAMMEL:  Two and a half hours.

12          THE VIDEOGRAPHER:  2.41 total time.

13          MS. McCARTHY:  Thank you.

14          THE VIDEOGRAPHER:  The time is now 12:55 and

15  we are off the video record.

16      (At this point there is a lunch break.)

17          THE VIDEOGRAPHER:  Recording to the cloud,

18  and the back-up recording is now rolling, as well.  The

19  time is 1:44 and we are back on video record.

20          You're good, whoever -- whoever speaks

21  first.

22          MR. BRUSTIN:  Well, I'm try -- I'm trying to

23  get --

24          THE VIDEOGRAPHER:  There you go.  Very good.

25          MR. BRUSTIN:  I've got to get my



1     [unintelligible] Mr. Handy on the stand -- on the --

2     you're -- you're only coming up, though.

3               MS. McCARTHY:  I think when he talks, he'll

4     come up, Nick.  But --

5               THE VIDEOGRAPHER:  He will.

6               THE WITNESS:  Hello.  I'm here --

7               MS. McCARTHY:  Mister --

8               MR. BRUSTIN:  I'm here .

9               MS. McCARTHY:  Mister --

10              THE WITNESS:  One, two, three.

11    BY MR. BRUSTIN:

12         Q    Gotcha.  I'm just -- let's -- let's move

13    forward.

14              Mr. Handy, you understand, from reviewing

15    your reports and your testimony in preparation for today,

16    that by the time you got on the case, the only two

17    suspects at that time were Keith Hardin and Jeff Clark;

18    correct?

19         A    Yes.

20         Q    And, frankly, throughout your investigation,

21    they remained the only two suspects in the case; correct?

22         A    Yes.

23         Q    And you recall, from reviewing your reports,

24    that when you interviewed Keith Hardin a second time,

25    April 9th, he, according to you, again denied owning a



1   knife or knowing if J.C. owned any knives; correct?

2       A    Correct.

3       Q    And do you understand that, according to your

4   reports, you also claim that when you interviewed him a

5   second time on April 9th, Keith Hardin also admitted that

6   he threatened to kill Rhonda Sue Warford, that he

7   volunteered that information to you; correct?

8       A    Correct.

9       Q    Now you also understand -- or maybe you --

10  maybe you don't -- do you understand that, according to

11  Hope Grier and her report, that on April 8th, when she

12  interviewed Keith Hardin, he admitted to owning a knife

13  and to knowing that Jeff Clark owned numerous knives.  Do

14  you understand that?

15      A    I understand what you're saying.

16      Q    Okay.  Do you have any reason to dispute what

17  I'm saying?

18      A    No, sir.

19      Q    Okay.  Do you have an explanation as to --

20  and, by the way, you also understand that Keith Hardin,

21  both at the time of trial and today, denied telling you

22  on April 9th that he did not own a knife and that he did

23  not know Jeff Clark owned a knife?  Do you understand,

24  that was his position and remains his position?

25      A    I did not know that, but I -- I will accept



1    that today.

2         Q     Okay.  And you understand, similarly,

3    according to Keith Hardin, he claims that he never told

4    you he threatened to kill Rhonda Sue Warford.  You

5    understand that; correct?

6         A     I do today.

7         Q     Okay.  And your -- and your -- your position

8    is that he is lying; correct?  He did tell you those

9    things?

10        A     He did say that; correct.

11        Q     He volunteered those -- he volunteered that

12   information without any leading or suggestion from you;

13   correct?

14        A     I -- I don't remember the exact conversation.

15        Q     But he volunteered that information to you

16   and you wrote it down; correct?

17        A     Correct.

18        Q     Do you have any explanation as to why Keith

19   Hardin would admit to Hope Grier and -- that he owned

20   knives, the day before, and that Jeff Clark owned knives,

21   the day before, but deny that information to you when you

22   questioned him?

23        A     No; I do not.

24        Q     It doesn't make a lot of common sense; right?

25        A     I don't know how they were asked.  I don't



1   what they were thinking.

2       Q    Okay.  Now, certainly, you understand today

3   that Keith Hardin is claiming that you fabricated a

4   number of statements as having come from him; correct?

5       A    I understand that's what you telling me.

6       Q    Okay.  You understand that he's claiming you

7   made up the statement about human sacrifice; correct?

8       A    Correct.

9       Q    You understand that he's claiming you made up

10  the statement about the knives; correct?

11      A    Correct.

12      Q    You understand that he's claiming that you

13  fabricated that he told you he had an incident of

14  violence with Rhonda and that he threatened to kill her?

15  He's claiming you made that up; correct?

16      A    Correct.

17      Q    He's claiming he never told you that he was

18  drunk; correct?

19      A    Correct.

20      Q    Okay.  And you would agree that, in the event

21  that this case goes to trial -- and you have a lot of

22  experience with jury trials; right?

23      A    Some.  Sure.

24      Q    You've testified at many; right?

25      A    Some.



1    Q    You understand that one of the things the

2  jury's going to have to decide in this case is whether or

3  not you're telling the truth or Keith Hardin and Jeff

4  Clark are telling the truth; correct?

5    A    Correct.

6    Q    Okay.  Could you please tell us all of the

7  reasons why the jury should believe you're telling the

8  truth as supposed to Keith Hardin?

9    A    Well, I think the main reason is because I

10  believe in everything that Hardin or Clark, either one,

11  said -- there was someone else there with me that

12  witnessed and heard the same thing.  So, technically,

13  it's not me, myself, saying it, but there were other

14  witnesses they said either that or similar things to.

15    Q    Okay.  So your expectation would be any

16  witness -- there would be -- there will be other

17  witnesses who will be able to come to court and testify

18  to all of the statements you claim Clark and Hardin made;

19  correct?

20    A    Correct.

21    Q    Okay.  Any other reasons why the jury should

22  believe you as opposed to Keith Hardin and Jeff Clark?

23    A    That would be up to the jury.  I can't -- you

24  know.  I -- I don't have anything as far as why any juror

25  would believe one thing over another or --



1    Q     Maybe you're missing my point.  I'm giving

2  you an opportunity to tell me why the jury should believe

3  you.  Why -- why should -- why should the jury take your

4  word over theirs?  Is there any other reason?

5    A     Well, because -- and I've said it before, and

6  I guess I'll -- I'll say it again, is -- is that there

7  were other people that heard what they said, so it's just

8  not me.  And I --

9    Q     Yes, sir.  I'm not asking you --

10   A     -- [unintelligible] --

11   Q     -- to repeat the same things over and over.

12  I -- I --

13   A     We -- but you're asking me the same --

14   Q     -- [unintelligible] -- hold on --

15   A     -- question over and over --

16   Q     Hold on a second.  You've already said that.

17  I'm now going on from that and I'm asking you in

18  addition -- I'm accepting -- I'm accepting that.  In

19  addition to other people being present --

20   A     There's no reason --

21   Q     -- is there any other reason in the world you

22  can think of why the jury should believe you?

23   A     There's no other reason.  That should --

24  that's sufficient for me.

25   Q     Okay.  Is there any reason that you can think



1    of why the jury shouldn't believe you?

2        A    No.

3            MR. BOND:  Object to form.

4    BY MR. BRUSTIN:

5        Q    Okay.  No reason why the jury wouldn't -- no

6    reason, that you can think of, why the jury would have

7    reason to question your credibility or reliability?

8        A    No.

9        Q    Okay.  Now one of the things -- and I -- and

10   I recognize that you -- that you failed to review your

11   testimony from the -- from the post-trial hearing, but I

12   may ask you some more questions about that.  If I need to

13   show you, I will, but I would rather not if you can

14   answer the questions without it.  Okay?

15       A    Sure.

16       Q    So at the post-conviction hearing, you

17   admitted that the statement regarding sacrificing animals

18   and want to do humans is a damaging admission; correct?

19       A    Correct.

20       Q    And you admitted that you knew, at the time

21   it was -- that that statement was made to you, that it

22   was a damaging admission; correct?

23       A    Sure.

24       Q    And you also understood that part of the

25   admission that he previously threatened to kill Rhonda if



1   she cheated, is a damning admission?

2       A     Sure.

3       Q     And you also understood that part of his

4   admission that he previously threatened to kill Rhonda if

5   she cheated is a damning admission?

6       A     Sure.

7       Q     Those are the kinds of things that you know,

8   as a trained detective, can be used down the road to get

9   a conviction; right?

10      A     Correct.

11      Q     Obviously, admitting to prior violence with

12  your girlfriend who was murdered or threatening to kill

13  her in the past is important and causatory evidence;

14  correct?

15      A     Correct.

16      Q     And lying about access to the murder weapon,

17  that would be important and causatory evidence; correct?

18      A     Sure.

19      Q     And admitting that you may have been too

20  drunk to remember all of the details might be a damning

21  admission; correct?

22      A     I -- I don't know.  I can't answer that.

23      Q     Okay.  That one, you're not so sure about?

24      A     Not too sure.

25      Q     Well, but, certainly, you would not -- you



1    didn't sit through the opening statement, correct, at

2    trial?

3          A     No; I did not.

4          Q     And you didn't sit through closing arguments?

5          A     I did not.

6          Q     But you certainly wouldn't be surprised to

7    learn if those statements that you attributed to Keith

8    Hardin played a major role in the trial; correct?

9                MR. BOND:   Object to the form of the

10   question.

11               MR. WICKER:   You can answer.

12         A     I -- I -- I don't know.

13   BY MR. BRUSTIN:

14         Q     It -- you wouldn't be surprised.  They were

15   [unintelligible] admissions; right?

16         A     I -- I don't know what happened in the rest

17   of the trial.  I -- I don't know the significance --

18         Q     Well, let me give you an example.  The first

19   piece of evidence that Kenton Smith raised in his opening

20   statement was about Keith Hardin's alleged admissions

21   around -- about animal and human sacrifice.  Okay?

22         A     Okay.

23         Q     And the last thing he said to the jury in

24   opening statement is that Keith Hardin wanted to

25   sacrifice humans.  That would suggest to you that it was



```
 1    an important issue in the trial; correct?

 2            MR. BOND:  Object to the form.

 3         A    Correct.

 4    BY MR. BRUSTIN:

 5         Q    And that's not surprising, given -- given

 6    your recognition of how important those admissions might

 7    be; correct?

 8         A    Once again, I -- I don't know how the trial

 9    played out.  I don't know what --

10         Q    But it's certainly not surprising, given how

11    important you thought those admissions were; right?

12         A    You know, I don't know how the trial played

13    out.

14         Q    Oh.

15         A    I wasn't there.

16         Q    Now you recall that Kenton Smith actually

17    wrote a letter thanking you for your participation in the

18    trial and mentioning Satanism; correct?

19         A    I don't remember.  I -- I remember getting a

20    thank you.  I don't remember what it said.

21         Q    Well, let me show it to you.

22            MR. BRUSTIN:  What exhibit is this, Katie?

23            MADAM COURT REPORTER:  The next exhibit would

24    be --

25            MS. McCARTHY:  Well, what do you --
```



1        MADAM COURT REPORTER:  Ninety --

2        MS. McCARTHY:  You want to mark it, Nick

3   or --

4        MR. BRUSTIN:  Oh, we haven't marked -- I

5   thought we had marked it.  We haven't?

6        MS. McCARTHY:  I think it's 67.

7        MR. BRUSTIN:  Yeah.

8   BY MR. BRUSTIN:

9        Q    I just want to show you 67 on the screen.

10  We'll put it on the screen.

11       MS. McCARTHY:  Wait.  Let me -- well, if

12  it's --

13       MR. BOND:  We've got it.

14       MS. McCARTHY:  You want the --

15       MR. BOND:  We've got it.

16       MS. McCARTHY:  Is it the Kenton Smith letter?

17       MR. BRUSTIN:  Yes.

18       MS. McCARTHY:  It's in his binder.

19       MR. BRUSTIN:  Oh.  I'm sorry.

20  BY MR. BRUSTIN:

21       Q    So take a look in your binder, your exhibit

22  binder, if you would, and look at Exhibit 67.

23       A    Okay.  I've got it.

24       Q    Do you remember receiving this letter from

25  Kenton Smith?



MARK HANDY                                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                        165

```
 1        A     No.  Not really.

 2        Q     Okay.  Does this, by the way, refresh your

 3   recollection about meeting with Kenton Smith before

 4   trial?

 5        A     No.

 6        Q     Okay.  Now as you've already told us, you

 7   understood that when Keith Hardin volunteered to you that

 8   he stopped doing Satanism because he -- he want -- he was

 9   starting to want to sacrificing humans, that you thought

10   that was important; correct?

11        A     Yes.

12        Q     And one of the things it suggested to you, as

13   a trained, experienced investigator, is that there was a

14   possibility that this was a person who was having some

15   compulsions that he couldn't control?  That was one

16   possibility; correct?

17        A     I -- I don't remember thinking that; no.

18        Q     I'm sorry?

19        A     I don't remember thinking that this was one

20   person that had things he couldn't control.

21        Q     Okay.  Well, you only told what you thought

22   was important.  Why was it important?

23        A     Well, because she was murdered, and it very

24   well could have been a satanic killing.  I have no way of

25   knowing.
```



1    Q    Okay.

2    A    And he would --

3    Q    You would --

4    A    -- agree to that.

5    Q    -- agree --

6         MR. BRAMMEL:  Let him finish.  Let him --

7  BY MR. BRUSTIN:

8    Q    Well, he --

9         MR. BRAMMEL:  Okay?

10 BY MR. BRUSTIN:

11   Q    I'm sorry.  I didn't mean to interrupt.

12 Please go ahead.

13        MR. BRAMMEL:  Go ahead.  You can finish.

14   A    Well, I -- the -- the -- I didn't know.  I

15 mean I simply don't know how those things were gonna play

16 out.  That was what he said.  I wrote down what he said.

17 If he said I'd gone to Walmart that day, I would have

18 written that down.

19 BY MR. BRUSTIN:

20   Q    All right.  But going to Walmart that day

21 wouldn't have been an important admission.  Saying that

22 he wanted to do --

23   A    Well, that would have been in the letter.

24   Q    Let me finish.

25        Saying that he wanted to do human -- human



1  sacrifice, that's an important admission in a case that
2  may involve Satanism; correct?
3        A    I think it's important; sure.
4        Q    You understood that one possibility here,
5  when he said he wanted to do human sacrifice, was that he
6  want -- that this was a human sacrifice; right?  That was
7  one possibility?
8        A    It was one possibility.
9        Q    And you understand that -- that when someone
10  says to you that they wanted to kill someone, as a
11  trained investigator, that tells you this is someone who
12  may want to confess.  It's the start of a confession;
13  right?
14        A    No.
15        Q    No?  You never heard that before?  That when
16  someone says they have an urge to kill someone, that
17  might be someone who wants to confess?
18              MR. BRAMMEL:  Object to the form of the
19  question.
20              You can answer.  You can answer.
21        A    Well, now, I'm not sure what the question --
22  I don't -- the fact that --
23  BY MR. BRUSTIN:
24        Q    Sure.
25        A    -- he said that --



1        Q     Let me --

2        A     -- they all --

3        Q     No.  No, no, no, no, no.  If you don't

4    understand the question --

5        A     I don't --

6        Q     -- then I want --

7        A     -- understand the question.

8        Q     -- to rephrase it for you.

9        A     Please.

10       Q     Okay.  When he told you -- the first thing he

11   said to you was, I want to -- I -- I quit Satanism

12   because I wanted -- I started to want to do human

13   sacrifice, when he said that to you, did you consider the

14   possibility that perhaps I can use that statement to get

15   further admissions?

16             MR. BRAMMEL:  Object to the form of the

17   question.

18             You can answer.

19       A     Yeah.  No; I don't think I ever thought --

20   I -- I -- I think -- really, this was a conversation that

21   I was curious when he said he -- he didn't do it anymore.

22   And I said, well, why?  And he said it, and we went on.

23   BY MR. BRUSTIN:

24       Q     No.  So --

25       A     And then I --



1      Q      -- my question is --

2      A      I didn't --

3      Q      -- as -- as a trained investigator, when you

4   asked him questions about things you think are important,

5   you're listening to the answer so you can follow up on

6   that; correct?

7             MR. BRAMMEL:  I'd just --

8      A      Well, and --

9             MR. BRAMMEL:  -- like to interject and

10  just -- and, Nick, if you could let him -- if you could

11  listen to the end of his response before you ask your

12  next question.

13            MR. BRUSTIN:  I -- yeah.  I think I'm having

14  a little -- we're having a little trouble because of the

15  Zoom with that.  But I will make an effort to do that.

16            MR. BRAMMEL:  Thank you.  We appreciate it.

17     A      But -- but -- but if -- my letter flowed.  So

18  soon as he made the comment about that, we went on to

19  something else.  I didn't get -- you know, oh, wait a

20  minute, hold on, back up here; let's talk about you

21  wanting to do human sacrifice.  I went on to the next

22  topic.

23  BY MR. BRUSTIN:

24     Q      Well, my question is, why?  My question is,

25  when he made that what you claim to be an important



1   admission, you understood to be an important admission

2   about wanting to do human sacrifice, as an experienced

3   homicide investigator, why didn't you use that to try to

4   get further admissions, if he in fact said it?

5        A     Well, my thing would be is that I'm doing a

6   simple, casual interview with a guy and then -- well,

7   what's the next one?  Okay.  And I'm not trying to -- you

8   know, it's hard to describe the --

9              When I'm talking to him and if he says

10  something and lights go off, you know, it may not be in

11  my best interest, as an interviewer, to make a big deal

12  out of it.  It may be best to go on and say and -- and --

13  and go into something else.

14       Q     Right.

15       A     And -- because he may think that has some

16  huge significance, that I don't want him to think.  So as

17  soon as he said that, I go on to, well, this was your

18  girlfriend and problems and stuff, so.

19             You know, there's a lot of dynamics that, you

20  know, are not as plain as you may think that, because he

21  said that and I think that may be significant, I don't

22  suddenly stop and say, ah-ha; what are you -- you know,

23  why are you this, why that?  And I just casually go on to

24  something else like he never said it.

25       Q     Right.  No; that makes a lot of sense.  So



```
 1   that would be a really good reason not to ask that
 2   question in the car.  So can you explain why, when you
 3   heard that important admission and you put it in your
 4   head and you said, I'm gonna keep this in my head and
 5   remember it, when you got to the precinct and you
 6   questioned him for another two hours, why didn't you ask
 7   him about it then?
 8        A    It -- it was all done in writing.  He said
 9   what he said.  I asked him the other questions, you know.
10   That was as far as we went.  That was the end of it.  I
11   noted that Detec -- or Sergeant Woosley was with me, and
12   that was it.  I mean --
13        Q    Mr. Handy --
14        A    -- [unintelligible] --
15        Q    -- respectfully, you're not answering my
16   question.  I'm trying to be respectful to you, sir, but
17   you're not --
18        A    Well, I'm --
19        Q    -- answering my question.
20        A    -- trying to be respectful --
21        Q    I'm not asking --
22        A    -- to you.
23        Q    -- you, sir -- I'm asking you why, when you
24   got out of the car and you entered -- you got out at the
25   precinct, why didn't you ask him about his desire to do
```



1  human sacrifice, again?

2       A     We were into other parts of the interview, at

3  that point, you know.  I -- I don't really remember, 30

4  years ago or whatever the case is, as to what my mindset

5  was.  But I had an interview, albeit not a intense

6  interrogation.  It was an interview that I did with a guy

7  that was a peripheral suspect.

8            And, you know, I -- we didn't do it on -- we

9  didn't put anything on tape because, generally speaking,

10 if I have another investigator with me that heard the

11 same thing I did, we don't usually do that.  I just note

12 that the other person was there.  I can't answer --

13      Q     Right.

14      A     -- questions of what I was thinking 30 years

15 ago about one thing or another.

16      Q     Okay.  And why -- and you mentioned he's a

17 peripheral suspect.  You've already told us he was one of

18 only two suspects throughout the case; correct?

19      A     Yeah.  But it's early.  We don't know what

20 we're gonna find out.

21      Q     Okay.  And why --

22      A     I may find out that he was not even in the

23 area, at the time.

24      Q     Okay.  So you -- you can't remember why you

25 decided not to ask him about his -- his compulsion or his



1  wanting to do human sacrifice on the nine -- on the 7th,

2  when you were back in the precinct; correct?  You have no

3  memory as to why?

4        A     No.  I don't remember anything.

5        Q     Any memory as to why you didn't ask him, when

6  you met with him again on the 9th and he voluntarily came

7  in, why you didn't ask him, then?

8        A     No.

9        Q     Do you have any memory as to why you decided

10  not to tape-record the statement in the precinct when you

11  came back and asked him again the same questions?

12        A     You know, the general rule of thumb back then

13  is, is if there were two investigators that did the

14  interview, it just wasn't -- it wasn't something that we

15  typically did.  I would note that the other investigator

16  was there so if there -- if there's some question, they

17  heard the same thing I did.

18        Q     Okay.  And I take it that the rea -- so the

19  rule -- the rule, in 1992 -- or the -- the custom in 1992

20  was that if there was just one person interviewing

21  somebody, you might do a tape recording, but if it was

22  two, you typically wouldn't?

23        A     I don't recall there being a specific rule as

24  far as when you do this interview, you use a tape

25  recorder; when you do this interview, you don't.  I mean



1    I don't remember anything in written rules is -- you

2    know, some people carry tape recorders with them.

3         Q    Okay.

4         A    But I didn't have one.  The tape recorders

5    that we had were Dictaphones that were, you know, the

6    size of a laptop.

7         Q    I -- I'm not asking you about that, sir.

8         A    Well, I just trying --

9         Q    I'm just asking you --

10         A    -- to explain the whole process of

11    interviewing and --

12         Q    I'm not asking --

13         A    -- [unintelligible] --

14         Q    -- you about the whole the process.

15         A    -- and --

16         Q    I didn't ask you that.

17         A    Well, I -- I'm not --

18         MR. BRAMMEL:  Nick, you're driving --

19  BY MR. BRUSTIN:

20         Q    I'm not asking --

21         A    It was all different.  Everybody did things

22    differently.  There was no standardized we interviewed

23    this and we did a recording.

24         Q    Okay.

25         A    That's -- that's just the way it did it.



1    Sometimes, if we had --

2         Q    Okay.

3         A    -- a tape recorder and we thought it was

4    necessary, we'd tape record.  Sometimes, if there was two

5    detectives, we just went with what the two detectives

6    heard and --

7         Q    Okay.  Great.

8         A    To be honest with you, I don't --

9         Q    So you --

10        A    -- know that I could have ever imagined, 30

11   years ago, being -- sitting here, being asked these

12   questions.

13        Q    Sure.  That's fine.  And by the way, I'm just

14   going to let you know on the record that because you're

15   not answering my question, I'm going to be going back to

16   the judge and asking for more time to make sure you

17   answer my questions.  Let me try it again.

18             MR. BRAMMEL:  And, Nick, just for --

19   BY MR. BRUSTIN:

20        Q    It sounds like --

21             MR. BRAMMEL:  -- the sake of the record --

22   BY MR. BRUSTIN:

23        Q    It sounds like --

24             MR. BRAMMEL:  For the record, Nick --

25   BY MR. BRUSTIN:



```
 1          Q    Is that you had --

 2               MR. BRAMMEL:  -- you ask him --

 3               MR. BRUSTIN:  Stop interrupting me.

 4               MR. BRAMMEL:  No.  I'm going to get my -- the

 5     Magistrate Judge has asked that we make a record.  I'm

 6     going to make the record.

 7               You asked him whether or not -- or what his

 8     reason was for not tape-recording the interview.  He's

 9     tried to explain --

10               MR. BRUSTIN:  Not what I asked him.

11               MR. BRAMMEL:  -- it to you.  You can ask the

12     question again and he'll try to answer it again.  But I

13     ask that you allow him --

14               MR. BRUSTIN:  I didn't ask him that question

15     and you know it.

16               MR. BRAMMEL:  -- to answer and explain --

17     BY MR. BRUSTIN:

18          Q    What I'm asking you now is --

19               MR. BRAMMEL:  -- his answer.

20     BY MR. BRUSTIN:

21          Q    -- was there a -- so it sounds like what

22     you're saying is that there was complete discretion in

23     1992 as to whether or not to tape an interview.  Is that

24     correct?  You had discretion?

25          A    Correct.
```



MARK HANDY                                                September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                          177

1       Q      Okay.  And there was no custom or practice or
2   policy suggesting that you would -- should tape an
3   interview, if possible?
4       A      Not that I know of.
5       Q      Okay.  If it was in existence, nobody told
6   you about it?
7       A      Correct.
8       Q      Okay.  And is there a typ -- one of the
9   things that you do when you have a polygraph exam is that
10  you tell the polygraph examiner information that may be
11  important for them to ask about; correct?
12      A      I would answer whatever questions that they
13  asked me.
14      Q      Okay.  Is there a reason why you didn't
15  mention anything about human sacrifice to -- or
16  statements then for the polygraph exam?
17      A      If that's the case, it's because it's not
18  something they asked me.
19      Q      Okay.
20      A      All polygraph examiners --
21      Q      All right.
22      A      -- do their own --
23      Q      And --
24      A      -- thing.
25      Q      -- can you explain why you failed to question



 1   Mr. Hardin about his compulsion or his wanting to do

 2   human sacrifice when --

 3                MR. BRAMMEL:  We've lost your sound, Nick.

 4   We didn't hear the end of the question.

 5                THE WITNESS:  And his face is --

 6                MR. BRAMMEL:  You're mute.  Nobody can hear

 7   you here.

 8                THE WITNESS:  And his -- he's not moving.

 9   His face is still, still photo.

10                MR. BRAMMEL:  He's lost connection.

11                MADAM COURT REPORTER:  He's probably gonna

12   have to get back in, get out and come back in.

13                THE WITNESS:  Now it's a still screen.

14                MR. BRUSTIN:  [Unintelligible.]

15                MS. McCARTHY:  They're coming back on.

16                THE WITNESS:  He's back on.

17                MS. McCARTHY:  Yes.

18                MR. BRAMMEL:  So we went -- we lost you in

19   mid answer.  Can I -- can we --

20                THE VIDEOGRAPHER:  Yeah.  Let me go back on

21   record.  Stand by.  Recording to the cloud and recording

22   to our local back-up.  The time is 2:09.  We're back on

23   video record.

24                MR. BRAMMEL:  Nick, we lost you mid question.

25   It wasn't -- we weren't -- didn't answer yet.  We didn't



1   hear your -- the end of your question.

2            MR. BRUSTIN:  Fair enough.  Let's try it

3   again.

4   BY MR. BRUSTIN:

5        Q    Mr. Handy, I've asked you now about your

6   failure to question my -- Keith Hardin about those

7   admissions, those alleged admissions, when you got back

8   to the precinct.  Any other reason why you didn't

9   question him about those alleged admissions on the -- on

10  the 9th, when you met with him again?

11       A    I -- I don't recall.

12       Q    Okay.  Now by the way, you would agree that

13  each time you met with Keith Hardin, he was completely

14  cooperative?

15       A    To the best of my memory.

16       Q    He never refused to answer a single question?

17       A    To the best of my memory; no.

18       Q    He agreed to a polygraph exam?

19       A    I believe so.

20       Q    He agreed to talk to you multiple times about

21  a lawyer?

22       A    Correct.

23       Q    He agreed to give you physical evidence from

24  his body, from his person?

25       A    Correct.



MARK HANDY                                       September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                  180

1        Q     And one of your goals, in meeting with him on

2   the 7th and the 9th, as you've already told us, was to

3   try to get him to make admissions about the crime;

4   correct?

5        A     I -- I -- I don't recall.

6        Q     Are -- are you telling me, sir, under oath,

7   that you don't recall if one of your goals in

8   interviewing Mr. Hardin was to determine whether he would

9   make -- was to try to get him to make admissions about

10  the crime?

11       A     What I'm telling you is, I don't know who

12  else was present.

13       Q     I didn't ask you that, sir.

14       A     Well -- but what I'm trying to explain to you

15  is, is that if someone else was present -- let's say Joe

16  Greer was present.  Joe Greer would have been the one

17  answering the questions, not myself.  So --

18       Q     Sir --

19       A     -- I -- I'm not exactly sure who else was

20  present.  And if someone else was present, they may have

21  been the one asking the questions, not me.

22       Q     Well, you can tell from the way you write

23  your reports whether you were asking questions.  You can

24  tell, from your report that you reviewed in preparation

25  for today, that you were asking questions or -- let --



```
 1   let me finish the question.
 2         A     Sure.
 3         Q     You know, from reviewing your reports, that
 4   you were asking questions of Keith Hardin on the 7th and
 5   the 9th; correct?
 6         A     I -- I -- let me see.
 7         Q     You need to look at that, to answer that
 8   question?
 9         A     Well, because there -- other people may have
10   been there.  And if there were other people there, they
11   may have been the ones that were asking the questions.
12         Q     Well, we know -- I can represent to you, and
13   you can look at your report on page -- Exhibit 59, page
14   28 -- I'm sorry.  Exhibit 59, page 26 -- you've already
15   looked at this today.  This is you and Woolsey; right?
16         A     Woosley.
17         Q     Woosley; right?
18         A     Correct.
19         Q     And it's clear, from the report, that there
20   are many questions that you are asking him; correct?
21         A     Sure.  Yes.
22         Q     And -- and so one of your goals in your
23   questioning in the car and your questioning at the
24   precinct and your giving him a polygraph exam was to try
25   to get him to make admissions about the crime; correct?
```



1      A     Once again, I'm not sure -- you know,

2   admissions about the crime -- I'm just talking to him to

3   get comfortable with him, to see what he's willing to

4   talk about and to tell me.

5      Q     Sir, have you ever had a suspect in a

6   homicide, a brutal homicide, who was willing to talk to

7   you when you weren't interested in trying to get him to

8   admit to the crime?

9      A     I think there's times when you take your time

10  and, over a period of time, you build a rapport with

11  somebody and you try -- you know, there's an old saying

12  that, you know, the best -- you can get maybe some good

13  lies out of somebody:  May be the best you can get out of

14  them.  And so I --

15     Q     So --

16     A     -- was taking whatever Mr. Hardin was willing

17  to give me, and that's what I was taking.

18     Q     Right.  And you were trying to -- you were

19  trying to question him and follow up on information that

20  he was giving you; correct?

21     A     Right.  I was trying --

22     Q     Like any [unintelligible] --

23     A     -- to get an -- an alibi:  Where was he at

24  those times and dates, who was he with.

25     Q     Sir, were you trying to get -- were you --



1    were you interested -- you told me -- maybe you weren't.

2    So is it your testimony you had no interest in getting

3    any admissions from Mr. Hardin on the 7th?

4              MR. BRAMMEL:  Object to the form --

5          A    No.

6              MR. BRAMMEL:  -- of the question.

7          A    No; that's not what I'm telling you.

8    BY MR. BRUSTIN:

9          Q    Of course you did; right?  You were

10   interested in getting any admissions that he'd be willing

11   to give you; correct?

12         A    I was --

13         Q    That was one of your goals?

14         A    I was interested in getting whatever

15   information he was willing to give me.

16         Q    Sir --

17         A    I was interested in --

18         Q    I didn't ask you what information.  I'm

19   asking you about admissions.  Were you interested in

20   getting admissions, if possible, from Mr. Hardin?

21         A    I was interested in getting information.

22         Q    Sir, so you --

23         A    That's what I was inter --

24         Q    -- you weren't interested in getting

25   admissions?



1        A     Well, it -- admissions, information, both at

2     the --

3        Q     But --

4        A     -- same time.

5        Q     Sir, I'm not asking you about information.

6     I'm asking you about one very specific kind of piece of

7     information.  It's called an "admission."  It's what

8     Homicide detectives try to get.  My question is, just in

9     regard to admissions, were you interested in getting

10    admissions from Mr. Hardin, on April 7th?

11              MR. BRAMMEL:  I'm just going to object.  This

12    is asked and answered.  I know you don't like the answer.

13    He's answered it now three or four times.

14              Go ahead, Mark.  Try to answer again.

15       A     You know, I was asking him questions and I

16    was taking the information he gave me.  Whatever --

17    BY MR. BRUSTIN:

18       Q     Were you interested in getting admission --

19       A     Whatever he --

20       Q     Were you --

21       A     -- gave me is what I wrote down.

22       Q     Were you interested in getting admissions, if

23    you could, on April 9th, when you interviewed him again?

24              MR. BRAMMEL:  Same objection.

25       A     I did, in no way, shape or form, expect him



1    to tell me that he butchered that girl in that alley.  I

2    was just trying to get as much information as I could

3    from him, to follow up on future interviews.  You know,

4    I --

5    BY MR. BRUSTIN:

6          Q     Have you ever --

7          A     My -- my concern -- my concern is if I push

8    him too hard and I get on him and say -- you know, make

9    accusations that you are the killer and blah, whatever

10   the case may be, then he's gonna shut down.  You know, I

11   had these what I call casual interviews where I ask these

12   questions because I didn't want him to shut down.

13         Q     Right.  And were you interested in getting as

14   much information as you could about his wanting to do

15   human sacrifices, or no?

16         A     I didn't get back into that because I didn't

17   want him to shut down.  I wanted him to continue to talk.

18         Q     Okay.  So now I understand.  So your reason

19   for not questioning him about human sacrifices on the 7th

20   and the 9th was a -- an actual decision you made so that

21   he wouldn't shut down; correct?

22         A     I -- I'm not sure.  You know, we're going

23   back to -- whatever this date is, 1990-something -- 1992.

24   And I -- I have no recollection of why -- what decision I

25   made back then and why I made it.



1    Q    Were you interested in getting as much

2  information as you could about his wanting to do human

3  sacrifices or not?

4    A    Not at that point, necessarily; no.  I --

5  I --

6    Q    Well --

7    A    All I wanted him to do was to keep an open

8  line of communication between us.  I wasn't trying to hit

9  a home run the first time I met him and, you know, break

10  him down and here he suddenly admits to all this

11  homicide.  I was just trying to calmly, you know, treat

12  him in a way in which he would agree to speak to us more

13  times.  And --

14    Q    And he did; right?  You -- you spoke to him

15  three times?

16    A    He did --

17    Q    You spoke --

18    A    I -- I --

19    Q    Hold on.  Hold on, sir.  Hold on.

20         He spoke to you in the car on the way to the

21  precinct; correct?

22    A    Correct.

23    Q    He spoke to you again for hours at the

24  precinct that day, later that day, after the -- before

25  the polygraph; correct?



 1      A      I -- I don't recall.  I'll -- I'll go ahead

 2   and agree with that.  We spoke multiple times.

 3      Q      And then he came back on the 9th to speak to

 4   you again?

 5      A      So I would suggest everything that -- as far

 6   as being able to keep those lines of communication open,

 7   was accomplished.

 8      Q      That's right.  And did you think it would be

 9   important to ask him, during any of those times, about

10   his prior experience with animal sacrifices, which he

11   also admitted?

12      A      Once again, you know, I didn't -- I -- I

13   can't sit here today and simply tell you what I was

14   thinking in 1992 and why I did or didn't do anything.

15      Q      But that --

16      A      By and large -- by and large, when somebody

17   would say something to me about -- whether it be animal

18   sacrifice or anything of that nature, I wouldn't make --

19   I wouldn't show a reaction.

20      Q      Well, you say --

21      A      I wouldn't -- my eyes wouldn't light up, my

22   ears wouldn't perk -- I would just calmly keep writing,

23   in the hopes that they would tell me more about it.  And

24   then --

25      Q      [Unintelligible; talking over.]



1    A    -- I wouldn't act like it was a -- that big a

2    deal, and I would keep -- then I would ask them something

3    else.

4         Q    And you may come back to it later and ask

5    something about it, to try to get more information;

6    right?  That's what --

7         A    I might.

8         Q    -- a good detective does?

9         A    I might.  Or, I may go on to something else

10   that's come up.  I don't know.

11        Q    What would have been some of the ways you

12   could have -- as an -- as an experienced detective, in

13   retrospect, what would have been some of the ways you

14   could have -- you could have asked this compliant

15   witness, cooperative witness, about his wanting to do

16   human sacrifices?  What could you have asked him?

17        A    I could have asked him specifically, did he

18   have anybody in mind that -- you know, there -- there was

19   a particular person, and that's why he decided not to do

20   it.  I could have asked that, maybe.

21        Q    You could have asked him if he wanted to --

22   if he wanted to discuss -- for example, you could have

23   asked him if he wanted to discuss his feelings, if it

24   would make him feel better to discuss those feelings

25   about wanting to you -- wanting to do human sacrifices;



MARK HANDY                                            September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                       189

1    right?

2         A     I could have.

3         Q     You could have asked him in a very gentle

4    way; right?

5         A     I could have.

6         Q     And -- and you could have asked him if maybe

7    he -- maybe he feels -- he feels really bad about those

8    feelings and that could be what led him to do things he

9    didn't mean to do?  You could have asked him that; right?

10        A     I mean I never really interrogated, if that's

11   what you're -- you know, I never really tried to get

12   Keith Hardin or Jeff Clark to admit to anything.  I took

13   pretty much whatever they told me and I left that up

14   to -- to -- to Joe Greer and -- and his people, to do

15   more of the hardline questioning.  I didn't -- you know.

16             I mean if you wanted to say good guy/bad guy

17   kind of stuff, I -- I -- you know, I was the one that

18   would get the information.  I never pushed them.  I never

19   accused them, you know.  I mean I took what they gave me

20   and wrote it down and went on.  I didn't -- I never

21   really hollered at 'em or any of that stuff.  I never --

22   I never raised my voice to either one of those men.

23        Q     Don't know why you're bringing that up when

24   no one suggests that you did.

25             The question, though, is, is there any other



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
190

```
 1    reason why you decided not -- withdrawn.
 2              You would agree that there would be many
 3    gentle, unassuming ways to follow up on his statement
 4    that he wanted to do human sacrifice; correct?
 5              MR. BRAMMEL:  Object to the form of the
 6    question.
 7              You can answer, if you understand.
 8       A    Yeah.  I -- well, I mean I -- I -- I think
 9    I'm trying to explain that, basically, I was taking
10    whatever they gave me and I was writing it down and that
11    was about it.  I wasn't, you know, plotting or -- not
12    plotting.  Pushing to get more information out of them.
13    That really wasn't -- I was taking whatever they gave me,
14    and that's what I was using.  And --
15  BY MR. BRUSTIN:
16       Q    Can you -- can you explain then why you
17    asked -- you asked, on the 7th, about owning knives;
18    correct?
19       A    I -- knives?
20       Q    Yes, sir.
21       A    Yes.
22       Q    Why did you ask again on the 9th?
23       A    Maybe somebody had told me they did have 'em.
24    I don't remember.
25       Q    You asked about violent incidents with his
```



1   girlfriend on the 7th; correct?

2       A    I think he volunteered that.

3       Q    Why did you ask again on the 9th?

4       A    I -- I don't remember.

5       Q    You just told me that that's not your style,

6   that you don't like to follow up on things; you just want

7   to let them tell you what they want to tell you.

8       A    I didn't say I would never follow up and ask

9   another question.  My thing -- as -- as -- as I recall --

10  and, you know, I"m doing the best I can to recall -- is

11  that I would not have -- this was not what I would call

12  an interrogation where I was trying to lean on 'em and do

13  that --

14           Yeah; I've lost you.  I've got another

15  gentleman's face I'm looking at.

16      Q    Now obviously --

17      A    There you are.

18      Q    You don't have me on the screen?  All right.

19      A    There you are.

20      Q    Obviously, you asked these gentlemen whether

21  or not they committed the crime; correct?

22      A    I don't know that I did.

23      Q    You may never have asked them that?

24      A    I may never have asked them that.

25      Q    Now you -- is there any other reason you'd



MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    192

1  like to explain to us, any other reason in the world, as

2  to why you failed to ask them any follow-up questions

3  about his statement, according to you, that he wanted to

4  kill humans?

5       A    Well, the only thing -- and I -- and I'm

6  telling you what I think -- is that I wanted to continue

7  that -- that -- that line of the -- of -- of

8  communication, and that if I start getting on him and

9  asking him difficult questions, he may just shut up and

10 not say anything and ask for an attorney or think that

11 somehow we've focused on him and he better keep his mouth

12 shut, and all I'm trying to do is get him to keep talking

13 to us.

14      Q    You would agree that questions about having a

15 violent incident with his girlfriend who had just been

16 murder -- murdered, is a difficult question; right?

17      A    Well, I think he said it was minor and

18 nothing ever came of it.  So I don't think he thought

19 much of it.

20      Q    Take a look at page -- take a look at page

21 40, Exhibit 59.

22           MR. BRAMMEL:  Can you tell us which

23 investigative report this is, Nick?

24      A    I've got it.

25           MR. BRUSTIN:  This -- this is April 9th.



```
1                    MR. BRAMMEL:  Thank you.
2      BY MR. BRUSTIN:
3              Q     You're on page 40?
4              A     Yes, sir.
5              Q     This is -- this is your interview with Keith
6      Hardin.  Do you see that?
7              A     Yes, sir.
8              Q     The first thing you did with Keith Hardin
9      when you interviewed him on the 9th was you confronted
10     him with information you allegedly received from Crystal
11     Barnes that he threatened to kill Rhonda Warford;
12     correct?
13             A     Correct.
14             Q     That day -- that is a direct confrontational
15     question of this suspect; correct?
16             A     Correct.
17             Q     It's hard to imagine a question that might be
18     more likely to have him shut down than this one; correct?
19             A     Maybe; maybe not.  I don't know.  It depends
20     on the person.
21             Q     It's a very confrontational question; do you
22     agree?
23             A     Well, I -- I don't think -- once again,
24     sometimes it can be all in how you ask a question, more
25     so than the question.  And depending on how I asked it,
```



1   he may not have taken it that way at all.  He may have

2   taken it to where he -- he felt like I would believe that

3   the -- that -- that, you know, he said you blah, blah,

4   blah, have you ever cheated on him, he -- you know.

5        Q    So you may have found a nice way to ask him

6   whether or not he ever threatened to kill his dead

7   girlfriend?

8        A    Yeah.  Pretty much.

9        Q    That's what you're telling us, under oath?

10       A    I'm telling you under oath that I'm not sure

11   in what direct -- you know, how I asked him.  But there's

12   ways to say it that -- that are not as excusatory [sic]

13   as the others.

14       Q    Correct.  And there could have been many

15   ways --

16       A    Accusatory.

17       Q    -- to ask him about animal sacrifice and

18   human sacrifice that wouldn't --

19       A    Right.

20       Q    -- have been accusatory; correct?

21       A    And there were other people asking questions,

22   you know.  I wasn't --

23       Q    Well, sir --

24       A    -- the only one.

25       Q    You would agree that there are many other



 1   ways to ask him questions in a non-accusatory way about

 2   animal sacrifices and human sacrifices; correct?

 3        A    I'm sorry.  I didn't hear the question.

 4        Q    You would agree that there are many ways you

 5   could have asked him about animal sacrifices and human

 6   sacrifices, in a non-accusatory way?

 7        A    Sure.  Yeah.

 8        Q    But, instead, what you did -- your first

 9   question to him here is -- you are confronting him with

10   con -- with evidence from other witnesses that he

11   threatened to kill his girlfriend; correct?

12        A    That he told her that if she ever left him or

13   he ever caught her cheating on him, that he would kill

14   her.

15        Q    So he's threat -- you were confronting him

16   with evidence that he threatened --

17        A    I asked him --

18        Q    -- in the past to kill his girlfriend?

19        A    I asked him about that --

20        Q    Sir, did I accurately describe it?

21        A    Yeah.  It accurately describes it.

22        Q    In other words -- and there's no other way to

23   describe that, other than that being a confrontational

24   statement?

25        A    I don't think --



1     Q     You're confronting him with a --

2     A     I don't --

3     Q     -- incompentory [ph] --

4     A     See, that's where --

5     Q     Correct?

6     A     -- I think you fail to understand, is that

7  when I'm talking to him, I can put it to him in a way as

8  if I don't technically believe them, that -- that this is

9  what's said, Keith.  You know, I -- you're -- you're

10 saying that I'm, basically, interrogating this guy and

11 I'm putting it to him in some hardline, hard-core way,

12 when in fact I could be saying, hey, I heard this, Keith,

13 you know, and he comes back with something about, well,

14 you know, I said that to my -- all my girlfriends and

15 they're all still alive.  So I mean -- you know, is that

16 a serious statement by him?

17    Q     But the second thing you did in this

18 interview is you followed up with whether or not he owned

19 a knife; right?

20    A     Yes.  I asked him about owning a knife.

21    Q     And then the first question you asked him,

22 you asked him whether or not he had any involvement in

23 the case, whether he had any knowledge of what happened

24 to her; correct?  Last paragraph.

25    A     Right.



1    Q    And this would have been a time for you to
2    ask him questions in a gentle manner about the other
3    topic that he allegedly raised on April 7th, which was
4    his desire to kill humans; correct?

5    A    Well, once again, I would disagree with you,
6    is that I asked, he answered; that was it.  There's no
7    reason to continue on.  We had what -- you know, I'd
8    asked the questions I wanted to ask.  I had his answers.
9    And he was trans -- ready to -- transport home by Sheriff
10   Greer.

11   Q    Well --

12   A    I mean I did exactly what I wanted to do.

13   Q    Okay.  And you didn't -- you didn't want any
14   more.  You got everything you wanted; right?

15   A    Right.  At that moment.

16   Q    And so what you're telling us -- I think I
17   understand it completely.  What you're telling us is you
18   stand by your decision not to ask him any questions about
19   his volunteered statement that he wanted you do human
20   sacrifices.

21   A    Yes; I do.  I stand by that.

22   Q    There was no reason to ask anything about
23   that --

24   A    I didn't --

25   Q    -- right?



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                  198

1        A      -- say that.  I -- but I will stand by that
2   the decisions I made back in 1992 -- if I had the
3   opportunity to do these interviews over, would I ask
4   different questions in different ways?  Perhaps.
5        Q      Now, you also testified at the
6   post-conviction hearing that one reason why you know you
7   didn't fabricate evidence in this case is because you had
8   no reason to fabricate evidence.  Do you remember
9   testifying to that?
10       A      Sure.
11       Q      And what did you mean by that?
12       A      Well, what purpose would I have to do
13  anything?
14       Q      And I take it there's no reason in any case
15  to fabricate evidence; right?
16       A      Right.
17       Q      You would never do that; right?
18       A      Correct.
19       Q      You wouldn't do it in this case, you wouldn't
20  do it in any case; correct?
21       A      Correct.
22       Q      You can't even imagine being accused of it.
23  It's unheard of for you to --
24       A      Oh, I can imagine.  I can imagine being
25  accused of it.



1    Q    But you would agree, just hypothetically, if

2  you were a dishonest police officer, one reason to

3  fabricate evidence would be if you believed you had the

4  right guy but you didn't think you had enough evidence to

5  convict him.  That would be a reason; right?

6    A    No.

7    Q    It wouldn't be a good reason, but it would be

8  a reason; right?

9    A    No.

10    Q    No?  You're not following my logic there?  If

11  you're a dishonest police officer, you believe you have a

12  guilty person, but you don't have enough evidence to

13  convict them, that would be a reason to fabricate

14  evidence; right?

15    A    I don't think that any case that I've ever

16  been involved with was -- came down to one detective and

17  one defendant.  And, specifically this case, came down to

18  a group of people that came in and testified against

19  Hardin and Clark.  And my involvement, I don't believe,

20  was that great.

21    Q    I'm not sure what that's responsive to.  But

22  in any case, you understood, as you've already told us,

23  that by the time you interviewed Clark and Hardin, they

24  were the only suspects in the case; correct?

25    A    Correct.



MARK HANDY                                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                              200

```
1          Q     And as least Sheriff Greer believed that they
2    had done this crime; right?
3          A     Yes.
4          Q     And you knew there were no eyewitnesses in
5    the case; correct?
6          A     Not that I knew of; no.
7          Q     To the best of your knowledge, there weren't
8    going to be any eyewitnesses?  Nobody had come forward?
9          A     Not that I knew of.
10         Q     And you understood, at the time you
11   interviewed Hardin and Clark, that there was no physical
12   evidence connecting them to the crime?  None that you're
13   aware of?
14         A     At what point are you asking?
15         Q     So up -- certainly up on April 9th, when you
16   were interviewing Clark and Hardin, before they got
17   lawyers, before they were arrested, you had no
18   information suggesting that there was physical evidence
19   tying them to the crime; correct?
20         A     I knew, at some point, that the victim's
21   fingerprint and hair had been found in the back of
22   Jeffrey Clark's car.  Now, prior, I don't know.  I can't
23   tell you what date that was and when it was prior to.
24   But I was aware of that.
25         Q     Okay.  But you certainly don't think you were
```



1    aware of that in the first couple of days of the -- of

2    the -- of the investigation; correct?  Now I don't have

3    it handy, but I believe that to come out later.

4           A     I really [unintelligible; talking over] --

5           Q     [Unintelligible; talking over] --

6           A     -- later on, so.  I just don't know how much

7    later.

8           Q     Okay.  But certainly at the time, on the 7th,

9    when you interviewed Keith Hardin, you had no reason to

10   believe that there was physical evidence connecting him

11   to the crime?

12          A     Correct.

13          Q     All right.  And so -- and you also understood

14   that absent a confession at that time, it would be very

15   difficult, with the evidence you had, to prove a case

16   against him?

17          A     I -- you -- you know, I -- I don't think

18   that, given my position in the case and -- I didn't know

19   what all the case facts were.  I didn't know what

20   conversations Joe Greer had had with his people and what

21   they thought about getting a conviction or not getting a

22   conviction.  That's not really was my area.  It wasn't

23   something -- I didn't sit down and calculate how much

24   evidence they had versus, you know, can we prove this

25   beyond reasonable doubt type of stuff.



1        The -- the decision to go forward was -- was

2  strictly with Meade County and Joe Greer and -- and --

3        Q    Yeah.

4        A    -- and the problem --

5        Q    I'm not sure what --

6        A    -- [unintelligible; talking over] --

7        Q    Again, I'm not sure -- I'm not sure what

8  question you're answering.  But I'm gonna be -- I'm gonna

9  show -- I'm going to be showing you later on your reports

10  indicating that you were being briefed on the case and

11  your involvement in the case.

12        But as a general matter, and you've already

13  told us this, before you met with Hardin and Clark, you

14  did your very best to ascertain from Joe Greer what

15  evidence had already been gathered; correct?

16        A    I -- I guess Joe Greer told me what they had.

17  I -- I really don't remember.

18        Q    Okay.  But that's certainly something you

19  would have done as a competent, conscientious detective;

20  correct?

21        A    I would have expected Joe Greer to tell me

22  what they had.

23        Q    Okay.  And you understood, by the time you

24  interviewed Keith Hardin on the 7th and Jeff Clark on the

25  6th, that, if possible, it would be very helpful to get



1    admissions from them; correct?

2         A    I -- I don't remember that conversation.

3         Q    I'm not asking you about a conversation.  I'm

4    asking what was in your head.  You understood, based on

5    your knowledge of the evidence, that, on the 6th and the

6    7th, if possible, it would be very helpful to the case if

7    you could get admissions from Clark and Hardin, given

8    that there was no eyewitnesses, given that there was no

9    physical evidence connecting that.  You knew that would

10   be important; correct?

11              MR. BRAMMEL:  Objection to the form of the

12   question.

13              You can answer, if you understand.

14        A    Yeah.  I -- I -- at -- at the point that I

15   got involved, all I wanted to do was to go out, interview

16   those two men, write down whatever they had to tell me

17   about their whereabouts, what they did, in a certain

18   timeframe.

19   BY MR. BRUSTIN:

20        Q    So you didn't --

21        A    You know?

22        Q    -- care whether or not -- you didn't care

23   whether or not they made admissions or not.  All you were

24   interested in is just getting whatever they had to say

25   down on paper?



MARK HANDY                                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                              204

1          A     Right.  Because it was early on.  I didn't

2    think this was a sprint.  I knew this was something that,

3    you know, based on, you know, some experience, that you

4    don't need to rush in and start making allegations,

5    accusations.  We didn't really know what we had.  I

6    didn't know what they had.

7                I knew these two guys were, potentially,

8    involved.  And so as opposed to rushing in and start

9    making a bunch of allegations, I walked in and I took

10   down whatever information as far as what they were doing

11   that night, what they did the night before, were they

12   together, were they not, if they weren't, where'd they

13   go.  And that's what I wrote down.  I didn't make any

14   allegations.  I didn't accuse 'em of anything.

15         Q     Okay.  I just showed you, you accusing them

16   of lying -- I just -- I just showed you a statement where

17   the first thing you did was accuse him of threatening his

18   girlfriend.

19         A     That's not the first --

20         Q     Did you not see that?

21         A     That's not the first interview I had with

22   him.

23         Q     It was the second interview.

24         A     Well, the second interview, after I found out

25   more, I said what's the deal with this?  This girl said



1   that you had done -- whatever.

2        Q    Right.  My question is, and when you were

3   doing that, wouldn't that -- wouldn't it -- it --

4   assuming it happened, that would have been the time when

5   you say, oh, by the way, what did you mean when you told

6   me that you were feeling that you wanted to do human

7   sacrifices?  That would have been the time to ask that.

8        A    Well, you know, that -- that -- I don't

9   recall exactly why I asked the things I asked and in what

10  order.  I -- I don't -- you know.  Going back, you know,

11  28 years or whatever and trying to figure out why I -- I

12  didn't ask certain things in a certain sequence is just

13  not just something I'm capable of doing.

14       Q    That's fair.  You would agree that, by 1992,

15  you understood that, as a criminal investigator, one of

16  the tools in your arsenal, a legal tool, was that you

17  were allowed to lie to suspects in an effort to get them

18  to make admissions.  That was actually legal?

19       A    Correct.

20       Q    So, for example, you could tell a criminal

21  suspect during an interview that you found their blood at

22  the scene, even if you didn't find their blood at the

23  scene.  Right?

24       A    Correct.  Sure.

25       Q    Perfectly legitimate; right?



MARK HANDY
September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON
206

```
1        A      Yeah.

2        Q      Something you did all the time; correct?

3        A      Yeah.  Fairly often.

4        Q      It was a tactic that was legitimate, that you

5    would use?

6        A      Sure.

7        Q      And you were good at that tactic; correct?

8        A      No better; no worse.

9        Q      Well --

10       A      I -- I don't know.

11       Q      -- in any case, you certainly were -- you --

12   one of your skills was to be able to tell -- to tell a

13   suspect something you knew wasn't true and get them to

14   believe it so that they might make admissions; correct?

15       A      That was one of the things that we could do.

16       Q      But it was one of the things that you were

17   good at doing?  You were good at looking at suspects in

18   the eye and talking to them in a nice, soft voice and

19   getting them to believe things that weren't true in order

20   to have them make admissions; correct?

21              MR. BRAMMEL:  Objection.  Asked and answered.

22              You can answer the question.

23       A      But -- yeah.  I mean we -- that was one of

24   the things that we did; sure.

25   BY MR. BRUSTIN:
```



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON              207

1        Q     Okay.  And you were good at it; right?

2        A     I -- I -- you -- I'm not sure I'm a good

3   judge of that.

4        Q     All right.  Now you interviewed Jeff Clark on

5   April 4th; correct?

6        A     Yeah.  Yes.  I -- I don't know.  I don't have

7   it in front of me, but.

8        Q     Well, you reviewed your reports of your

9   interview with Jeff Clark --

10       A     I -- I didn't --

11       Q     -- for today; right?

12       A     Yeah, but I didn't -- I didn't memorize them.

13       Q     Okay.  But you certainly remember

14  interviewing Jeff Clark before you interviewed Keith

15  Hardin; correct?

16       A     Correct.

17       Q     And according to you, Jeff Clark told you

18  that he had never seen Keith with a knife and that he did

19  not have any knives; correct?

20       A     Correct.

21       Q     And you re-interviewed Jeff Clark on April

22  8th; correct?

23       A     Okay.

24       Q     Take a look at it.  We can take a look at

25  that.  That's page 35.  It's actually page 36; sorry.



1        A       Okay.

2        Q       Now on page 36 -- this is your interview with

3    Jeff Clark; correct?

4        A       Correct.

5        Q       And according to you, you're asking him

6    questions about the same topics.  You asked him questions

7    about the knives; right?

8        A       Correct.

9        Q       And, according to you, Jeff Clark admitted

10   that he lied to you when he told you that he didn't own

11   any knives?

12       A       Correct.

13       Q       This is you, confronting him with that lie;

14   correct?

15       A       I mean I'm asking him -- apparently, I

16   said -- he admitted to me that he had previously lied.  I

17   don't what I asked him.  He may have --

18       Q       He just volunteered it to you?

19       A       He may have volunteered that.

20       Q       He volunteered to you that I lied when I told

21   you I didn't have knives?

22       A       Right.  Right.

23       Q       Now you understand that, according to Jeff

24   Clark, he never said that to you.  Do you understand he

25   said --



1      A     I -- I don't know --

2      Q     -- [unintelligible; talking over]?

3      A     I -- I don't understand what Jeff Clark said.

4      Q     I'm sorry.  Do you -- do you understand today
5  that Jeff Clark is claiming that you lied when you
6  claimed that he told you he lied about the knives;
7  correct?

8      A     I do now.

9      Q     Okay.  But you stand by it?  You -- you stand
10  by the fact that he volunteered that information to you;
11  correct?

12     A     Correct.

13     Q     And then the next thing you asked him was
14  about Devil-worshiping again; right?

15     A     Right.

16     Q     So, obviously, you still think that
17  Devil-worshiping is still potentially relevant in this
18  case?

19     A     I -- I don't what I thought.

20     Q     Well, it's the second question you asked, so
21  you must have thought it was important or you wouldn't
22  have asked about it; right?

23     A     Well, I think it's important to get whatever
24  he wants to tell me down on paper.

25     Q     Well, he didn't vol -- well, it's clear from



1   your report, you asked him affirmatively about

2   Devil-worshiping --

3        A     Right.

4        Q     -- right?

5        A     Exactly.

6        Q     You made a decision to ask him more questions

7   about Devil-worshiping; right?

8        A     Correct.

9        Q     That means you thought it was worth asking

10  about; correct?

11       A     Sure.  Yeah.  Getting his response.

12       Q     He also -- you also -- right here you were

13  also asking questions about Mr. Hardin's relationship

14  with the victim; correct?

15       A     Correct.

16       Q     And according to you, Mr. Clark told you that

17  Keith Hardin told him that the victim thought she was

18  pregnant and that he definitively was -- that he was

19  definitively not going to have a child; right?

20       A     Correct.

21       Q     This is another potentially damning admission

22  attributed to Keith Hardin:  That he thought she might be

23  pregnant.  And that would be a motive for wanting to kill

24  her; correct?

25       A     I -- just wrote down what he told me.



1          Q      That's right.  But what -- basically, what --

2     I think what you're telling us, and I think I get it, is

3     you don't really think about what the people are saying

4     to you.  You just write it down like you're a court

5     reporter or a stenographer.  That's your job; right?

6                 MR. BRAMMEL:  Objection to the form of the

7     question.  Argumentative.

8                 Mark, you may the answer the question.

9          A      No.  I mean I write it down.  I think about

10    what they tell me, and then I make it a point to write it

11    down and then we discuss it later.  I --

12                You know, I don't know that any or all of

13    this, you know, back then, what it meant to me.  You

14    know, you're asking me to go back 28 years and explain to

15    you why this meant this or meant -- meant that.  I simply

16    don't remember.  And you're saying --

17    BY MR. BRUSTIN:

18         Q      All right.  Now you understand that Jeff

19    Clark claims he never told you that; correct?

20         A      Sure.

21         Q      And your -- and your position is that Jeff

22    Clark is lying and you are telling the truth; correct?

23         A      Correct.

24         Q      He also claims that you showed him

25    photographs.  But you didn't do that; correct?



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                       212

```
 1        A     Showed him photographs of what?
 2        Q     The crime scene.  You would never do --
 3        A     No, no.  I --
 4        Q     -- that with a suspect?
 5        A     -- I didn't have -- I've never had pho --
 6   I've never seen photographs of the crime scene.
 7        Q     You would ever do that with a suspect;
 8   correct?
 9        A     I didn't say that.  I said I've never had
10   photographs of that crime scene.  I didn't say --
11        Q     You've never seen --
12        A     -- I would never --
13        Q     You've never seen -- you've never seen
14   photographs of the crime scene?
15        A     I have never seen phone -- I have never seen
16   photographs of that particular crime scene.  I've never
17   seen 'em, and I've never had 'em in my possession to show
18   anybody.
19        Q     Right.  And you would agree, they would
20   never -- it would never be appropriate to show a suspect
21   crime scene photos and then lie about it; correct?
22        A     I -- I can't say it would or wouldn't be.  I
23   don't know.  It might be; it may not be.  It depends
24   on --
25        Q     I -- I think you're mis --
```



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                        213

1          A       There's so many variables.

2          Q       I think you're misunderstanding my question.

3    You would agree that it would never be appropriate to

4    show a suspect crime scene photos and then lie about it

5    in your report; correct?

6          A       Oh, yeah.  I don't think -- if you showed

7    somebody crime scene photographs and then, in your

8    report, you said you didn't, that would be inappropriate.

9          Q       Okay.  And you would agree that, generally,

10   it would be ap -- inappropriate -- it would have to be an

11   extraordinary circumstance, to show a suspect crime scene

12   photos; correct?

13         A       I -- I can't speak to that.

14         Q       Do you remember ever doing that?

15         A       I don't recall ever doing that.

16         Q       Well, you certainly didn't do it in this

17   case; correct?

18         A       No.  I've never seen the photographs in this

19   case.

20         Q       Sir, I'm asking you a simple question.  You

21   deny showing Jeff Clark crime scene photos; correct?

22                 MR. BRAMMEL:  Objection.

23         A       I'm telling you --

24                 MR. BRAMMEL:  Asked and answered.

25         A       -- I've never seen 'em.  I've never touched



1    'em.  I've never had 'em in my possession.  How much

2    better can I answer the question?

3  BY MR. BRUSTIN:

4         Q    But -- so Jeff Clark is lying when he says

5    you showed him crime scene photos?

6         A    Absolutely.  He -- it couldn't be true.

7    Never had 'em.

8         Q    Where were you sitting in the car when Keith

9    Hardin told you, according to you, that he was tired of

10   sacrificing animals and wanted to sacrifice units?

11        A    I don't remember.

12        Q    Where was Sergeant Woolsey -- Woosley,

13   sitting in the car?

14        A    I don't remember.

15        Q    Do you remember if you were driving?

16        A    I would say that if it was me and Sergeant

17   Woosley, I would have been the one driving since I would

18   be junior to him.  But there could be reasons why he was

19   driving, like my car was out of gas, my car was in the

20   shop.  I -- I simply don't remember.  Typically -- he's a

21   Sergeant; I'm a detective.  I would drive him.

22        Q    Right.

23        A    But I --

24        Q    So --

25        A    But I don't know.  I don't know the answer.



1        Q    Absent -- well, absent extraordinary

2   circumstance, you can assume you were driving?

3        A    Correct.

4        Q    All right.  And assuming you were driving

5   when you were bringing a suspect to the police statement,

6   that would mean that Woosley and the suspect would be

7   sitting in the back; correct?

8        A    Not necessarily.  Woosley could be sitting up

9   front, and the person they were bringing down could be

10   sitting in the back by themselves.  We didn't have --

11        Q    All right.  So --

12        A    -- a cage or --

13        Q    But just --

14        A    -- anything.  These were --

15        Q    Okay.  I'm not asking --

16        A    -- plainclothes --

17        Q    -- for an explanation.  I'm just asking.

18             Now so your best -- your best -- your belief

19   is that you and Woosley were both in the front seat?

20        A    I -- i don't know.  I'm telling you, I

21   don't -- simply do not know who was driving and who was

22   in the front seat and who's in the back seat.  I don't

23   remember.

24        Q    Right.  But, certainly, the car was small

25   enough so that any conversation between you and Keith



1   Hardin would readily be heard by anybody in the car;

2   correct?

3          A     Correct.

4          Q     And, obviously, you were both paying close

5   attention to what this homicide suspect was saying to you

6   in the car; correct?

7          A     I believe so.

8                MR. BRAMMEL:  Nick, it doesn't have to be

9   right now --

10               MR. BRUSTIN:  Yeah.

11               MR. BRAMMEL:  But when you're done with your

12  line of questioning, if we could take a break, I'd

13  appreciate it.

14               MR. BRUSTIN:  Sure.  Just give me -- let me

15  take a look here.

16  BY MR. BRUSTIN:

17         Q     Now you were with -- as you know -- as you

18  can tell from your report, you were with Mister --

19  Mr. Hardin on the 7th, which is beginning on page 26.

20  you were with him from 13:40 hours to 16:00 hours;

21  correct?

22               MR. BRAMMEL:  Can you direct him to the page?

23  BY MR. BRUSTIN:

24         Q     Page 25 is 13:40 hours it says, at the bottom

25  of the page.  And then 1600 hours is referenced at the



MARK HANDY                                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                              217

 1   bottom of page 27.

 2        A     Okay.  What's the question?  I'm looking at

 3   the times.

 4        Q     You were with him for two hours and 20

 5   minutes -- or two hours and thir -- and -- approximately

 6   two hours and 20 minutes; correct?

 7        A     Okay.  I see 13:40 hours.

 8        Q     I -- I'm trying to make this simple.  I just

 9   told you where to look.  The bottom of page 25, thirty --

10   13:40 hours --

11        A     I got that.

12        Q     -- correct?

13        A     I got that.

14        Q     The bottom of page 27:  1600 hours.  Correct?

15   Five lines up.

16        A     Yeah.  But it doesn't -- it just says I then

17   brought Keith Hardin and the kit back to the PA office,

18   placing the kit in the Property room under evidence, at

19   approximately 1600 hours.  So, at that point, I'm

20   guessing that they would have taken the suspect sample

21   kit, at that point.

22        Q     You had access to Keith Hardin.  He was in

23   the precinct or in your car for two hours and 20 minutes;

24   right?

25        A     Yeah.  But part of that time, he would have



 1    been having a suspect sample kit taken by the medical

 2    examiner.  So he wouldn't have been --

 3        Q    That's right.

 4        A    -- with me.

 5        Q    He was -- he was agreeing to anything you

 6    suggested to him.

 7        A    He did.

 8        Q    Giving samples.  Taking a polygraph.

 9    Answering questions.  Right?

10        A    Right.  Yeah.  I've never denied that.

11        Q    Take a look at page 26.  Now look at the

12    bottom of -- bottom of page 26.

13        A    Okay.

14        Q    When asked about the upside-down cross on

15    Rhonda's chest, Keith advised that he did that,

16    indicating that he placed the cross on her chest

17    approximately three months ago.

18             Do you see that?

19        A    Yes.

20        Q    Now this is an example of you asking him

21    questions about the upside-down cross; correct?

22        A    Apparently.

23        Q    In other words, you're asking him questions

24    about Satanism at the precinct; correct?

25        A    Or putting something on her body.



1    Q    The reason you're asking about the

2   upside-down cross is because you understand, by this

3   point in time, it's a symbol of Devil-worshiping;

4   correct?

5    A    I guess.  I -- I don't -- you know, you're

6   ask -- once again, you're asking me what I was thinking

7   28 years old, and I simply am not capable of answering

8   that.

9    Q    Sir, you can tell yourself that's what I'm

10   asking you, but that's not what I'm asking you.  You've

11   gone through your reports.  You've looked at the evidence

12   in the case.  You understand that there was an

13   upside-down cross on her body and that that upside-down

14   cross was seen as a symbol of Devil-worshiping; correct?

15    A    I -- I don't know.  I can't --

16    Q    Well --

17    A    You know --

18    Q    Sure.

19    A    It certainly would appear to be the case.

20   But I don't know what upside-down crosses --

21    Q    You never heard --

22    A    In this case --

23    Q    You never -- you don't --

24    A    In this case I would tend to agree that it

25   would have something to do with Devil-worshiping because



1   of what's involved.

2        Q    Okay.

3        A    I agree.

4        Q    And that's why you're -- and that's why

5   you're asking about it; correct?

6        A    Well, I may have just found out about it.

7        Q    You think you found out about the upside-down

8   cross in between the time you drove Keith Hardin to the

9   precinct and when you asked about it?

10       A    Maybe.

11       Q    Okay.  So what may have happened is you

12  received some more information about Satanism and you

13  asked about it?

14       A    Well, I may -- something about her -- her

15  description of her having an upside-down cross on her

16  that he allegedly put on her.

17       Q    And so it would have been another opportunity

18  for you to question him about his compulsion to sacrifice

19  human beings; correct?

20       A    I asked him about putting an upside-down

21  cross on her.

22       Q    I -- I know what you asked, sir.  What I'm

23  suggesting to you is that your failure to ask the other

24  question is evidence that you were lying.  Do you

25  understand my point?



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                221

1       A      No; I don't.  Because it's not evidence of

2    anything.  I disagree.

3       Q      All right.

4       A      I'm not -- I'm not in -- I'm not concurring

5    with you.

6       Q      Sure.  Let me show you another -- oh.  I'm

7    sorry.

8              MR. BRUSTIN:  Yeah.  I know you wanted -- you

9    wanted to take a -- a break, Bill.  Let's do that now.

10             MR. BRAMMEL:  Thanks.

11             MR. BRUSTIN:  How much time do you need,

12   Bill?

13             MR. BRAMMEL:  Like ten minutes.

14             MR. BRUSTIN:  Ten minutes?

15             MR. BRAMMEL:  Yeah.

16             THE VIDEOGRAPHER:  Do all parties agree?

17             MR. BRAMMEL:  Yes.

18             MS. McCARTHY:  I'll -- let me just have the

19   time on the record, please.

20             THE VIDEOGRAPHER:  Absolutely.  I just need

21   to make sure everybody agrees, first.  The time is 2:54

22   and we are off the video record.

23        (At this point there is a break in the deposition.)

24             THE VIDEOGRAPHER:  And recording on the

25   cloud.  Recording locally.  So the time is 3:06.  We are



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    222

```
 1     back on the video record.
 2               MR. BRUSTIN:  And just for the record, Bill,
 3     as we agreed, we're going to cut this deposition off at
 4     six hours running time to ensure that Plaintiff Clark has
 5     time to question during the next deposition, and then we
 6     can negotiate additional time or go to the court, at that
 7     time.
 8   BY MR. BRUSTIN:
 9        Q    Okay.  If you could, take a look from --
10     Mr. Handy, at Exhibit 59, page 28.
11        A    I've got it.
12        Q    Now this is a report from Hope Grier
13     concerning her interaction with Mark -- I'm sorry -- with
14     Keith Hardin on the 7th, after he -- after you brought
15     him back to the precinct.  Okay?
16        A    Yes.
17        Q    And I take it this is not a document you
18     reviewed; correct?
19        A    Correct.
20        Q    Now take a look at -- if you could, read to
21     yourself, beginning on page 28, on Tuesday afternoon.  Do
22     you see that?
23        A    Yes.
24        Q    And if you could, read just through the first
25     full paragraph on page -- I'm sorry.  Read from the
```



1    middle of the page on page 29, just to yourself.  Let me

2    know when you're done.

3         A    [Complying.]

4         Q    You can stop where it says, "I asked

5    Detective Handy."

6         A    I'm sorry?

7         Q    You can stop after the paragraph -- you can

8    stop at the -- after the paragraph beginning, "Detective

9    Handy stated that Keith informed him."

10        A    Okay.

11        Q    Just read down to that.

12        A    All right.  I'm there.

13        Q    Okay.  Great.  Now first of all, you -- you

14   understand that this report, although it's dated April

15   7th, may well have been made long after April 7th;

16   correct?

17        A    Right.  Right.

18        Q    The process would be that at some point in

19   the next days, few days, you are -- you -- you would --

20   withdrawn.

21             Your process was that within a few days of an

22   interview, you would dictate your notes into a tape

23   recording and then it would get typed up.  And, within a

24   week or so, the report would be created; correct?

25        A    Correct.



1    Q     And your understanding was that's probably

2    how Hope Grief did her reports; fair to say?

3    A     Fair to say.

4    Q     And so you certainly wouldn't have -- you

5    wouldn't have seen this report, perhaps at all, but

6    certainly not for a number of days; correct?

7    A     Correct.

8    Q     You may have never seen this report; right?

9    A     Correct.

10   Q     No reason to think you would; right?

11   A     Yeah.  I -- I wouldn't typically read her

12   reports.

13   Q     Okay.  And so let's look at what she says.

14   So first of all she says, is -- that you just read, is

15   that you -- you came and you filled her in about your

16   interaction with Keith Hardin on the 7th; correct?

17   A     Correct.

18   Q     And, in fact, she writes -- you briefed her

19   on the information that you received from Keith Hardin;

20   right?

21   A     Correct.

22   Q     There was a lot of reasons why you would do

23   that; correct?

24   A     Sure.

25   Q     One reason is, if she's going to be



 1  interviewing Keith Hardin again, it's important that she

 2  have all the information that you received from Keith

 3  Hardin; correct?

 4      A    It would be important she'd have some

 5  information.

 6      Q    Okay.  And you understand, as an experienced

 7  detective, that sometimes changing up interviewers could

 8  lead to different kinds of admissions; correct?

 9      A    Sometimes.

10      Q    And, in fact, one benefit of having a female

11  detective is that sometimes male vs. female dynamic might

12  allow for different admissions from suspects?  That's one

13  thing that happens sometimes?

14      A    Yeah.  Sometimes; sure.

15      Q    Okay.  And so one of the reasons why you were

16  filling in Detective Grief on what you learned from Keith

17  Hardin is so that she could follow up with Keith Hardin

18  and, perhaps, get additional or further admissions;

19  correct?

20      A    It may be that I was getting off work and she

21  was coming on work.

22      Q    Well -- but you understood -- you -- you

23  briefed her because she was going to take over

24  interactions with Keith Hardin; correct?

25      A    Right.  But you're -- the reason may have



```
 1   been that I was leaving work for the day and she had just
 2   come on, not for --
 3        Q    Okay.
 4        A    Not because of something greater than that,
 5   we thought she could solicit information I couldn't.
 6   I -- you're -- you're --
 7        Q    Sure.
 8        A    You're asking that when, in fact, it may have
 9   been just a platoon change.
10        Q    Sure.  But in any case, you briefed her
11   because you wanted her to have all the -- all the -- all
12   the benefits of your in -- of the information you
13   received, so she could follow up on it; correct?
14        A    I wanted her to -- to have some benefits of
15   what I knew.
16        Q    And look -- look at what you told her.  You
17   told her about the alibi that Keith gave; correct?
18        A    That -- whatever information, yeah, that he
19   was -- and that Keith said he was just a trailer away.
20   Yeah.  Pretty much.
21        Q    You told her about the alibi he gave; right?
22   Very simple question.
23        A    Right.  Very simple.
24        Q    All right.  You gave her -- you gave her the
25   details about the alibi he provided you; right?
```



1    A    Right.

2    Q    So, potentially, she could follow up on that;

3  correct?

4    A    Well, I assume they would -- could find the

5  same information.

6    Q    Sir, what other reason would you have for

7  providing her the details of the alibi, other than it

8  would enable her to follow-up on it?

9    A    I -- I guess I'm getting lost here.  Are you

10  talking about her information with -- with -- with

11  Hardin?

12    Q    Let's not get lost.  Let's be very, very

13  precise.

14    A    Yeah.  Let's not get lost.

15    Q    She says -- listen to me.  She says you

16  briefed her on the information you received from Hardin;

17  correct?

18    A    Right.

19    Q    That's a term of art in policing.  "Briefing"

20  means filling in another detective about what you

21  learned; right?  That's what a "briefing" is?

22    A    Correct.

23    Q    Okay.  And she is saying in her report that

24  you briefed her on the information you got from Hardin;

25  correct?



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                      228

1        A     Right.

2        Q     And one of the pieces of information you

3    briefed her on was the alibi he provided you; correct?

4        A     Correct.

5        Q     And you gave her all the detail that he

6    provided you, from your notes; correct?

7        A     I don't know that I gave her all the details.

8        Q     Well, you can read it right here.  You gave

9    her a lot of details; right?

10       A     I gave her some details.

11       Q     And the reason you gave her those details is

12   so that, potentially, she could follow up on it and

13   listen for what -- listen for inconsistencies or anything

14   different or in addition to what you were told; correct?

15       A     I -- I -- you know, this was very early on in

16   a -- in a foreign investigation that we had very little

17   information about and that -- you know, Joe Greer was in

18   charge of this case.  We were, basically, doing

19   interviews with people and trying to get information.

20             We had not -- you know, this wasn't us trying

21   to solve a case and lock people up that night.  This was

22   us trying to get basic information about what may or may

23   not have happened.  I -- I don't --

24       Q     Mr. Handy, you're not answering my question.

25   I think you're doing it on purpose.



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                229

```
 1        A    I'm not.  I'm not doing it --

 2        Q    Let me --

 3        A    -- doing it on purpose.

 4        Q    I want to be -- I want to be fair to you,

 5   sir.

 6        A    Yeah.  Be fair to me.

 7        Q    The other people have testified about basic

 8   police procedure in this case.  We're going to have an

 9   expert in this case who is an experienced supervisor.

10   And what I'm asking you is very basic police work.  And

11   I'm going to try it again.

12             The reason that you provided her information

13   about the alibi that Keith Hardin told you is so that she

14   could follow up on it; correct?

15        A    Correct.

16        Q    All right.  And the reason that you told her

17   about Keith denying that he had -- that he or -- that he

18   or Jeff had knives is so -- so she could follow up on

19   that; correct?  Next paragraph?

20        A    No.

21        Q    You -- you filled her in on that so she could

22   follow up on it, potentially; correct?

23        A    Sure.

24        Q    Okay.  So those are two informed pieces of

25   information that you got from Keith Hardin; correct?
```



1        A      Right.

2        Q      And, by the way, Keith Hardin admits that he

3   told you those things.  In fact, he admits that he told

4   you he didn't have a knife because he misunderstood and

5   thought you were asking if he had a knife on him.  You

6   understand's his position; correct?

7        A      I do not.

8        Q      And that's a reasonable mistake, if it was

9   made.  That's a possibility; right?

10       A      Sure.

11       Q      Okay.  But what's missing from this document,

12  Mr. Handy, is any mention of the statement that he wanted

13  to do animal sac -- that he was doing animal sacrifices

14  and wanted to do human sacrifice.  Why did you not

15  mention that to her when you briefed her?

16       A      I didn't read her my whole investigative

17  letter, you know.  I gave her the things that I had right

18  there.  I -- you know, the -- that was in my letter and

19  it was witnessed by Sergeant Woosley.  So I -- you know,

20  it -- it -- the fact is, I gave her the minimum of what

21  she needed to go forward, and that's what she did.

22       Q      Well, you gave her a detailed account of his

23  alibi, and you mentioned the knives; right?

24       A      Right.

25       Q      But you -- and you told us that you knew, as



1  soon as he said it, that the human sacrifice statement

2  was an important admission?

3         A     I mean I don't remember what I said.  But

4  it -- it was certainly an admission.

5         Q     And you -- and you also told us that he

6  admitted that it was important that he had a violent

7  incident with Rhonda Sue Warford.  And that's missing

8  from this document, too; right?

9         A     You know, it -- it -- it's missing from what

10  Hope Grief wrote down that I told her.  That's where it's

11  missing from.

12         Q     Well, that's a good point.  So do you think

13  what probably happened is that you told Hope Grief that

14  he said he wanted to do human sacrifice, and she failed

15  to write it down?  Is that what you think happened?

16         A     I -- I have no --

17               MR. BRAMMEL:  Objection to the -- objection

18  to the form of the question.  Calls for speculation.

19               You can answer the question --

20         A     I don't have --

21               MR. BRAMMEL:  -- to the best of your ability.

22         A     -- any idea.

23  BY MR. BRUSTIN:

24         Q     Can you explain, sir, what -- why -- is it

25  just a coincidence that the two statements that -- that



1    Keith Hardin claims you fabricated, were not reported to

2    Hope Grief when you got to the precinct, within an hour?

3                 MR. BRAMMEL:   Objection to the form of the

4    question.

5                 You can answer.

6       A    Once again, it -- the -- the -- the

7    information that I talked to Hope Grier about would have

8    been the basics, so that she could go on and do what she

9    was gonna do, which -- I think have him polygraphed.

10   BY MR. BRUSTIN:

11      Q    Okay.  So why did you determine that it was

12   important to -- it was important to give her the basics

13   about the alibi, and you give a lot of details here.  It

14   was important to give the basics about the knife.  But it

15   wasn't important for him for -- to give her the basics

16   about him claiming that he wanted to do human sacrifice

17   or that he had a violent incident with a murder victim?

18   Why wasn't those -- why weren't those things important to

19   mention?

20      A    I only -- you know, you're asking me to go

21   back 28 years, once again, and to ask why I did or didn't

22   do something, and I have no -- no way of knowing.  I gave

23   her some information.  I may have mentioned that to her,

24   and she didn't write it down because she knew I had it

25   writen -- written down.



1            I mean you don't know what Hope Grier knew or

2    didn't know.  I -- I don't know what she knew or didn't

3    know.  I can't remember what I told her, and I can't be

4    sure that everything I told her, she wrote down.

5       Q    Well one explanation --

6       A    I certainly would have had it written down.

7       Q    Well, one explanation is that you failed to

8    tell her about the statement regarding human sacrifice,

9    and you failed to tell her about the incident with his

10   girlfriend, because those are statements that you made up

11   sometime down the road?

12      A    Well, for one thing, that's not possible

13   because I had Sergeant Woosley with me, who's a

14   commanding officer, who heard everything that -- that was

15   said and signed off on that.  So, you know, I feel

16   totally comfortable that everything that was said, was

17   said.

18           Whether it was repeated to Hope Grier or not,

19   I don't whether it was and she didn't write it down, or

20   it wasn't.  But there's no question the man said what

21   I -- what he said.  No question.

22      Q    Well, there's no question that you were

23   present when -- Woosley came back with you to the

24   precinct; correct?

25      A    Yeah.  We were together.



1    Q    You were together when you interviewed him in

2    the car.  You were together when you interviewed him in

3    the precinct; correct?

4    A    Sure.

5    Q    And you were together when you spoke to Hope

6    Grief and briefed her about what happened in the car;

7    correct?

8    A    I -- I don't know if Woosley was there or

9    not.

10    Q    Well, did he leave for that part of the

11    interaction?

12    A    You know, we -- we -- we work in an office.

13    I can't tell you -- you know, this is -- once again -- I

14    hate to keep saying "28 years ago," but I can't tell you

15    who was standing where, when.

16    Q    Any other reasons that you can think of for

17    not mentioning to Hope Grier the admission about human

18    sacrifice or the admission -- the alleged admission about

19    a violent incident with his girlfriend?

20    A    I -- I'm not sure I didn't mention it to her.

21    Q    Okay.  So is it your test -- is it your

22    best -- is it your best theory as to what happened, that

23    you did mention it and she just simply failed to write it

24    down in --

25    A    I --



```
 1        Q     -- the notes --

 2        A     I don't --

 3        Q     -- on the briefing?

 4        A     I don't have a best theory to what happened.

 5        Q     You agree, one of those two things happened:

 6   Either you told her and she failed to write it down, or

 7   you simply just forgot to tell her?

 8        A     Or she wrote down the things that she thought

 9   she needed to continue on with what she was gonna do.

10        Q     So maybe she made a decision that it wasn't

11   important to write down that the homicide suspect --

12        A     She knew I had --

13        Q     Hold -- let me finish the question, sir.

14        A     Sure.

15        Q     Maybe she decided that it wasn't important to

16   write down in -- at -- on the brief -- in the briefing

17   section, that you told her that the homicide suspect told

18   you that he wanted to do human sacrifice?  That's

19   possible; right?

20              MR. BRAMMEL:  Objection to the form of the

21   question.  Calls for speculation.  Asked and answered.

22              You can answer the question to the best of

23   your ability.

24        A     Yeah.  I mean I have no idea why Hope would

25   or would not have done anything.  And so -- you know, we
```



1   had that information.  There was no secret.  You know,

2   Jim Woosley certainly heard the same thing I did.  And --

3   and Hope, she had information that I didn't have.  I'm

4   sure Hope had information from Clark, Hardin and -- both,

5   that she didn't share with me.

6   BY MR. BRUSTIN:

7        Q     Any other explanation?

8        A     No.  I -- that -- that, basically, that's

9   something that was discussed that since I had it already

10  in my letter, maybe she didn't feel like to put it in

11  hers.  It wasn't something -- she was gonna get something

12  else and put it in hers.  I -- you know, I don't know.

13       Q     And when's the last time you spoke to Jim

14  Woosley?

15       A     Ba, ba, ba, ba, ba, ba, ba -- I'm gonna guess

16  maybe ten years ago.

17       Q     Okay.  And would it be fair to say -- and

18  I -- I may have asked this, but I -- I want to make --

19  just make sure.  Would it be fair to say that, to the

20  best of your recollection, after April 7th of 1992, you

21  never spoke to Jim Woosley about the conversation that

22  you had in the car with Keith Hardin; correct?

23       A     I -- I -- you know, what I will tell you is

24  that Woosley and I worked together.  Did we discuss

25  things that happened at work?  Probably.  Did we discuss



1  things about this case?  Maybe.  Have I seen or spoke to

2  him in the last ten or more years?  No.  And if we did,

3  would we talk about this case?  I doubt it.

4       Q     You have no recollection of speaking to

5  Woosley about the interaction in the car with Keith

6  Hardin after the 7th; fair to say?

7       A     Yeah.  I don't re -- I -- I simply don't

8  remember.  It's fair to say I don't remember.

9       Q     And, by the way, nobody from the police

10 department or any -- or any entity, has questioned you,

11 other than in this civil lawsuit, about your conduct in

12 this case; is that fair to say?

13      A     As far as I can think.

14      Q     You don't remember anybody from Internal

15 Affairs or any supervisor, after the fact, coming back

16 and questioning you about your interaction with Keith

17 Hardin or Jeff Clark; correct?

18      A     Correct.

19      Q     The only time you've ever been accused of

20 misconduct in connection with Keith Hardin and Jeff Clark

21 is during this civil rights lawsuit; correct?

22      A     I believe so.

23      Q     To your knowledge, there's no -- there's

24 been -- never been an investigation from any other source

25 into your conduct in the Hardin/Clark case; correct?



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    238

1        A    Not that I'm aware of.

2        Q    No one ever talked to you about it?

3        A    No.

4        Q    No one ever accused you of misconduct before

5   we did, right, in this case?

6             MR. BRAMMEL:  Objection.  You've asked the

7   question three times now.  He's answered the question.

8             MR. BRUSTIN:  Right.  And I think that's --

9   that's fair.  I'll move on.

10  BY MR. BRUSTIN:

11       Q    All right.  Now just to be clear, you

12  mentioned that one of the tools that you use as an

13  investigator is that you give -- you give a suspect a

14  little time to breathe and you bring them back for a

15  second interview to ask them additional questions;

16  correct?

17       A    If possible, sure.

18       Q    Okay.  And, in fact, that was possible in

19  this case, both with Jeff Clark and Keith Hardin.  Both

20  of them agreed to multiple interviews over a period of

21  days; correct?

22       A    Correct.

23       Q    And when Keith Hardin came back on the 9th --

24  we've already talked about your failure to ask him

25  questions about human sacrifices.  What was the reason



1   why you decided not to tape Keith Hardin on April 9th?

2        A    I -- I don't remember.  Was there some --

3   I -- I -- I'd have to go back and look to see who else

4   was there.  But --

5        Q    Sheriff Greer was there.

6        A    Who was there?

7        Q    Sheriff Greer.

8        A    Well, then -- you know, Sheriff Greer was in

9   charge, and whatever Sheriff Greer did is what we all

10  did.  So if Sheriff Greer decided he wanted to do

11  something a certain way, we -- none of us would have ever

12  questioned that.

13       Q    So your rea -- the reason you didn't tape

14  Keith Hardin on the 9th is because Sheriff Greer didn't

15  suggest it?

16       A    Sheriff Greer was in charge.

17       Q    Sir, that's a very simple question.  It calls

18  for a "yes" or "no" answer.  The reason that you did not

19  tape Keith Hardin on the 9th is because Sheriff Greer

20  didn't suggest it; correct?

21       A    I -- I don't remember.

22       Q    All right.  Do you understand, by the way,

23  that Sheriff Greer has testified that he was never the

24  lead detective in a homicide case in his career, other

25  than this one?



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    240

1        A    I -- I don't know what Sheriff Greer has

2   testified to.  I take him --

3        Q    But --

4        A    -- as the man in charge.

5        Q    All right.  It sounds like what you're

6   saying -- and I think I understand -- is that -- that --

7   that Sheriff Greer was calling all the shots in this

8   case?

9             MR. BOND:  Object to form.

10  BY MR. BRUSTIN:

11       Q    Answer, please.

12       A    I -- to my knowledge, Sheriff Greer was the

13  person we looked to for decisions.

14       Q    Okay.  You didn't make any independent

15  decisions in this case; you simply did -- you simply

16  assisted Sheriff Greer?

17       A    Yes.

18       Q    You didn't do anything that he didn't ask you

19  to do; correct?

20       A    No.  What would happen is, is that there

21  would be a sheet that we would look at that would give us

22  people to be interviewed.  And that was either done by

23  Jim Clark, who was the lead investigator of this case --

24  you know -- you know, Jim Clark is the lead investigator,

25  and Sheriff Greer.



MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON            241

1      Q     You didn't --

2      A     And based on follow-ups that they would have,

3   that's what we would do.

4      Q     You didn't -- you didn't use any of your

5   discretion, like you would if you were lead detective in

6   this case.  You simply followed orders, either from

7   Woosley or from Sheriff Greer; correct?

8      A     Correct.

9      Q     Let's take a look at Exhibit 25, page 16.

10  And I'll represent to you that this is the report that

11  was created by Sheriff Greer in this case.  Would it be

12  fair to say you haven't read this report before?

13     A     I have not.

14     Q     And are you on page 16?

15     A     I am.

16     Q     And page 16 -- you can take a look at page

17  15.  If you look at the top, it's clear that you were

18  present for this interview; correct?  This 4/9 -- 4/9/92,

19  11:00 hours?

20     A     Right.

21     Q     This is an interview conducted with Sheriff

22  Greer; correct?

23     A     Right.  4/9/92, at 11:00 hours.

24     Q     Okay.  This is the day after -- this is --

25  this is the same day you met with Keith Hardin for the



1   second time; correct?

2        A     Okay.

3        Q     And you're interviewing -- you're -- you're

4   with Sheriff Greer, interviewing Mary Warford; correct?

5        A     Correct.

6        Q     And if you go further on the page, page 16

7   now, you also talked with Crystal Barnes with Sheriff

8   Greer; correct?

9        A     Yeah, I guess.  I -- I don't see it.  I mean

10  I see what you're saying.  I see the interview.  But I'm

11  assuming this is what Sheriff Greer did.

12       Q     Yeah.  And you were in there; right?

13       A     Right.

14       Q     It's got you with him; right?

15       A     Along with Gary Mason.

16       Q     Yeah.  This is an interview that you

17  conducted along with Sheriff Greer; correct?

18       A     I'm assuming it was Greer that did the

19  interview.

20       Q     So are you suggesting that if you sat with an

21  interview -- if you sat in an interview with Sheriff

22  Greer, you wouldn't ask your own questions?

23       A     Maybe not.  I might.  I mean I'm not saying I

24  did or didn't.  I -- I don't know.

25       Q     Well, if you take a look at your own



1 | reports -- don't -- don't lose this page; keep this page
2 | open and look at your own report on page 39, so Exhibit
3 | 59, page 39.  Are you there?
4 |     A    I am.
5 |     Q    It makes clear that you were asking Mary
6 | Warford questions and you were asking Crystal Barnes
7 | questions; right?
8 |     A    Okay.
9 |     Q    Right?
10 |     A    Right.
11 |     Q    Okay.  So now let's go back to Exhibit 25.
12 | Now according to Exhibit 25, Barnes told you and Greer
13 | that both Jeff Clark and Keith Hardin were into weird
14 | satanic stuff; correct?
15 |     A    Correct.
16 |     Q    And she told you, according to this report,
17 | that she knew for a fact that they had killed animals;
18 | right?  Page 16.
19 |     A    That's what -- I'm reading down.  I haven't
20 | gotten to it yet.
21 |     Q    The bottom of page -- that's ten lines up
22 | from the bottom of the page.  That she knew for a fact
23 | that they had killed animals and they had a lot of
24 | knives.  So you see that?
25 |     A    She knew for a fact -- okay.  Yes; I do.



1        Q     Okay.  And this interview is taking place

2    just before you go back and interview Keith Hardin on the

3    9th; correct?

4        A     I -- I guess.  I don't --

5        Q     Well, you don't have to guess.  You have a

6    report out.  Go back to your report and look on page --

7    [unintelligible] report on page 39.  First, you interview

8    Mary Warford.  Then you interview -- then you

9    interview --

10       A     Yeah.

11       Q     -- Crystal Barnes.  And then you have your

12   re-interview of Keith Hardin.

13       A     Right.

14       Q     You see that?

15       A     I do.

16       Q     Okay.  So after you interviewed Crystal

17   Barnes and Warford, then you went back and you talked to

18   Hardin; right?

19       A     Right.

20       Q     Okay.  And one of the things you got -- one

21   of the things you asked Crystal Barnes about was

22   sacrificing animals; correct?

23       A     Now I'm not sure I asked about that or that

24   the Sheriff did.

25       Q     Well, you were --



1   A   I'm not saying --

2   Q   -- there; right?

3   A   Well -- but you said did I ask.

4   Q   I -- I apologize.  You were either -- you
5   either asked or you heard; correct?

6   A   I -- I don't know.  I don't remember this
7   interview.

8   Q   Let me very --

9   A   See, I could have been --

10  Q   -- clear to you, sir.

11  A   -- in a different room.

12  Q   I understand you don't -- I understand you
13  don't remember the interview.  We know from the reports,
14  you were present; correct?

15  A   I could have been in another room.

16  Q   Sir, you did a report on being present at the
17  interview.

18  A   Right.  But I didn't put anything like that
19  in mine.  I just put what I did.

20  Q   Sir, is there anything suggesting you left
21  the room?

22  A   There's no -- I have no idea what room I was
23  in.  I don't remember this interview.  I don't remember
24  the house.  I don't remember these people.

25  Q   Okay.



1    A    I don't remember what was said and by whom.

2    Q    Fair enough.  You would agree, sir, that

3  according to Sheriff Greer's report, you were present,

4  and she stated that they were into sacrificing animals;

5  correct?

6    A    I would agree that Sheriff Greer has my name

7  dow here, that I was there, and that he apparently heard

8  them say that.  I don't know whether I heard them say it

9  or not.  I don't -- I --

10   Q    Would you --

11   A    -- you know.  I may not have --

12   Q    Have you ever --

13   A    -- been within earshot.

14   Q    You were -- you know you were there for the

15  interview; correct?

16   A    I know I was there.

17   Q    Okay.  And so one possibility is, you simply

18  didn't hear the questions about sacrificing animals?

19   A    I -- I have no idea.  I don't remember any of

20  it.

21   Q    All right.  But we know from your own report,

22  it indicates you were present for this interview;

23  correct?

24   A    Did I read that?  I mean it -- I clearly

25  asked her a couple questions and she gave me some



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                 247

```
 1   answers.
 2       Q    Okay.  Now -- and you -- there's nothing in
 3   your report suggesting that you -- you may have left that
 4   interview; correct?
 5       A    That I -- that I did what?
 6       Q    There is nothing in your report suggesting
 7   that you may have left that interview at some point in
 8   time; correct?
 9       A    No.  I mean there's nothing saying I stayed
10   or left.
11       Q    Okay.  Now -- and I think probably you know
12   where I'm going.  This is just -- this interview is just
13   before Keith Hardin -- assuming she said this, why didn't
14   you follow up with Keith Hardin about sacrificing
15   animals, right afterward?
16       A    You know, I don't remember exactly who was
17   conducting the interviews.  You know, my dealings with
18   Sheriff Greer was that if I was with Sheriff Greer, he
19   was the one that made the decisions.  And as far as what
20   was asked and answered -- obviously, these were things
21   Crystal Barnes told me.  I don't remember Crystal Barnes.
22   You know, I don't know her.  But --
23       Q    Not sure -- I'm not sure what question you're
24   answering.  My answer was, do you have an explanation as
25   to why you didn't follow up on this information from
```



1    Crystal Barnes when you interviewed Keith Hardin within

2    hours of it?

3         A     And I -- my answer was, I don't know that I

4    got that information from -- you're talking about Crystal

5    Barnes.  I've got they had no additional -- let's see.

6    That Rhonda told her that Keith Hardin told her that if

7    she ever -- is that what you're talking about?  Why I

8    didn't follow up on that?

9         Q     Sir, I just showed you her talking about --

10        A     You showed me a Joe Greer interview.

11        Q     Right.  Mister -- Mr. Handy, you can pretend

12   not to understand but it's not gonna work.  You

13   understand that you created a report in that interview

14   and Joe Greer created a report in that interview;

15   correct?

16        A     Yeah.

17        Q     One interview?

18        A     Correct.

19        Q     And they should be consistent; right?

20        A     Not necessarily.

21              MR. BOND:  Objection.

22   BY MR. BRUSTIN:

23        Q     All right.  In any case, according to Joe

24   Greer's version of that interview, she told you and Joe

25   Greer that they were into sacrificing animals; correct?



```
 1        A     She told Joe Greer --

 2        Q     She claims you were present for the

 3   interview.  Your report also claims you were present for

 4   the interview; correct?

 5        A     You know, I have no idea what Joe Greer was

 6   ask -- asked and answered.

 7        Q     Okay.

 8        A     And if I didn't hear --

 9        Q     So --

10        A     -- it, I didn't hear it.  If I did hear it, I

11   did hear it.  I still don't remember hearing it.

12        Q     All right.  And do you have -- I -- so I take

13   it your testimony is that when you were present for an

14   interview with Joe Greer, you didn't ask questions; you

15   simply let him ask questions.  Correct?

16        A     It -- it depends.  I may have asked questions

17   of a different witness.  I may have -- you know, it -- I

18   can't tell you specifically, 28 years ago, what a house

19   looked like, how we separated witnesses, who asked what,

20   how I contacted this or -- or how Joe did that.  I -- I

21   simply don't remember.

22        Q     Do you have any explanation for Crystal

23   Barnes's testimony at trial where she denies knowing

24   anything about them sacrificing animals?

25        A     I have no idea.  I didn't see the trial.
```



1    Q    Okay.  So what -- so it sounds like there's a
2    couple of possibilities here.  Either you left the room
3    when she talked about sacrificing animals -- that's one
4    possibility; right?
5    A    Or I was in the room and didn't hear it.
6    Q    That's another possibility.  It wasn't
7    important enough for you to pay attention to, so you
8    didn't hear it; right?
9    A    Well, it -- if -- if I heard her say they
10   were sacrificing animals, I believe I would've remembered
11   that.
12   Q    Okay.  In any case, according to re --
13   according to Grier's report, she said it.  And do you
14   have any explanation for not following up on that
15   information with Keith Hardin, assuming it was said?
16   A    Well, I -- she didn't say it to me.  And even
17   if she had, I think Hardin himself had already told me
18   about killing an animal or wanting to and doing whatever.
19   I mean I -- I never really thought about it being
20   disputed.
21   Q    You never thought about it being what?
22   A    I never thought anybody would dispute what
23   they did.  I -- I assume most people knew what those guys
24   were up to.
25   Q    You never dreamed somebody would claim that



1  you lied about what you put in a report; correct?

2       A    I -- yeah.  I never thought that -- that we

3  would be here discussing this.

4       Q    You know what --

5       A    It's a fact.

6       Q    Listen to my -- listen to my question,

7  because I'm being specific.  You never thought that

8  anybody would accuse you of lying in a report because you

9  never lied in reports; correct?

10      A    No.  I never thought --

11      Q    You agree with me; right?

12      A    No.  I -- I never thought that a report that

13  I did with Jim Woosley as my side person -- or Joe Greer,

14  for that matter -- that somebody would suggest that Joe

15  Greer, Jim Woosley or I were lying about an interview.

16      Q    Nope.  You can't -- you couldn't imagine that

17  happening; right?

18      A    No.

19      Q    Because you never would lie about an

20  interview; right?

21      A    No.

22      Q    You agree with me; right?

23      A    I agree with you about what?

24      Q    That you would never lie during an interview,

25  so why would someone accuse you of that?



MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                252

1          A     Well, I never thought that any of these

2     things would amount to anything more than what they did.

3          Q     Because you -- because you always tell the

4     truth, and you -- and you tell the truth in your reports?

5          A     Correct.  I had no reason not to.

6          Q     So why would anyone accuse you of lying;

7     right?

8          A     Well, no; I understand you-all's angle.  I

9     get that.

10         Q     Okay.

11         A     I understand that.

12         Q     When's your next court date in the Chandler

13    case?

14               MR. BRAMMEL:  Objection to the question.

15    We're not answering any questions about that proceeding

16    today.

17               MR. BRUSTIN:  I just want to know when his --

18    the next court date is.

19               MR. BRAMMEL:  You can look on court.net.  But

20    we're not gonna answer any questions about it.

21               MR. BRUSTIN:  Okay.

22    BY MR. BRUSTIN:

23         Q     One of things you testified to at the -- at

24    the post-conviction hearing was that this was,

25    essentially, a Meade County investigation and you were



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    253

1   doing nothing more than assisting.  Is that truthful

2   testimony?

3        A    Yes.

4        Q    That Meade County was in charge and that you

5   were simply acting under his direction; correct?

6        A    Correct.

7        Q    Now, you were not -- because they were in

8   charge, you were not making decisions about who, for

9   example, to interview.  That was Joe Greer; correct?

10       A    Or Jim Clark.

11       Q    But it wasn't you; right?

12       A    No.  I don't think so.

13       Q    Why would Jim Clark be making decisions about

14  who to interview?

15       A    Well, 'cause Jim Clark was the lead

16  investigator in Louisville.

17       Q    Oh.  I hadn't heard that yet.  When was -- so

18  who made Jim Clark the lead investigator in the case?

19       A    What happened is -- and this is -- you --

20  you -- you -- well, I won't comment on you.  He got the

21  case because it originated at a miss -- as a missing

22  person, originally.  And since Jim Clark got that case,

23  Jim Clark became the lead investigator, if you will, from

24  our office, because he had it as a missing person.  And

25  Joe Greer would have been the lead since it was a Meade



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                254

```
1    County case.  I mean that's --

2         Q    So you -- can you explain why you conducted

3    more interviews than Jim Clark?

4         A    I may have been working better hours.  I may

5    have -- he may have been working late watch and I was

6    working day work.  I don't know.

7         Q    Can you explain why you conducted all of the

8    interviews of the suspects in this case without Jim

9    Clark?

10        A    Once again, I may have been working the hours

11   that they were available and he wasn't.

12        Q    Any other explanation?

13        A    No.  I mean I -- if he'd have been available,

14   I would imagine he would have done it.

15        Q    But I take it that --

16        A    I mean I can't --

17        Q    -- what you were doing is, you were reporting

18   everything you learned to Jim Clark; correct?

19        A    Yeah.  What we do is, we -- we have a -- a

20   book that we write down in what we did that day.  It's a

21   follow-up book.  And then, based on that, they will put

22   additional information on a follow-up sheet for us to go

23   and look at and to -- to -- to -- to follow up.

24        Q    I -- I've got you something totally different

25   from that.  I'm not sure what you're answering.  When
```



1   you -- when you were conducting investigative activities,

2   were you reporting them to Jim Clark as the lead

3   detective?

4        A    Yeah.  I mean what we did is -- and I believe

5   I did answer that -- is that we wrote information down in

6   a log book of what we did that day, and it would be

7   started with the number of the case.

8        Q    Okay.

9        A    And then --

10        Q    But you wouldn't put -- you wouldn't put in

11   that log book what you learned from a witness.  You

12   would -- you would simply put interviewed this witness at

13   this time; correct?

14        A    No.  We would -- we may put in that log book,

15   if it was something significant --

16        Q    Okay.

17        A    -- that we thought needed to be followed up

18   on or something that -- that another witness -- you know,

19   one witness could lead to two more.

20        Q    Should that log book be maintained in the

21   file?  Should we have a copy of that log book if we have

22   the Homicide file?

23        A    I wouldn't have any idea what they do with

24   it.

25        Q    Well, if you were lead detective, what do you



1    do with it?

2         A    I wouldn't do anything with because they --

3    they -- they just continue on, year after year.  I mean

4    it's like a folder, binder.

5         Q    Gotcha.

6         A    And then you just --

7         Q    Would you ever --

8         A    -- put new paper in it.

9         Q    Would -- in addition to that book, would

10   you -- I take it you would have also been talking to Jim

11   Clark, the lead detective from Louisville, about what you

12   were getting from the witnesses you were interviewing,

13   particularly the suspects; correct?

14        A    Yeah.  If I had an opportunity to talk to

15   him, I would.  Like I said, we worked --

16        Q    So --

17        A    -- different shifts.

18        Q    So in addition to Jim Woosley knowing about

19   the statement of -- of violence toward his girlfriend and

20   wanting to do human sacrifices, that would have been

21   something you likely reported to Jim Clark, verbally;

22   correct?

23        A    I have no idea what Jim Clark knew.  I had --

24   like -- once again, we've --

25        Q    Sir, you're missing -- you're not answering



 1    my question.

 2          A     Yes; I am.

 3          Q     I asked you what he knew.  I'm asking you

 4    what you told him.

 5          A     I don't know what I told him.  I don't know

 6    when I saw him.  I don't know what interaction we had,

 7    back then.

 8          Q     Okay.  Any other information as to why you

 9    were conducting all of the interviews of the subjects in

10    this case, even though you weren't lead detective, other

11    than Jim Clark being busy?

12          A     I don't know that I was conducting all the

13    interviews in this case.

14          Q     Now by the way, you certainly had no less of

15    an obligation to accurately report the information you

16    received from witnesses, based on the fact that you were

17    not a lead detective; correct?

18          A     I'm not sure I understand your question.

19          Q     It wasn't a good question.

20                Regardless of whether or not you were the --

21    the lead Louisville detective, you had the same

22    obligation to accurately and honestly report your

23    interactions with witnesses; correct?

24          A     Oh, sure.  Of course.

25          Q     That had nothing to with the designation of



1  lead detective; correct?

2        A     No.

3        Q     In other words, fabricating evidence as -- in

4  a -- in a case, is illegal, whether or not you're the

5  lead detective or not; correct?

6        A     Sure.

7        Q     And you would agree that the allegations

8  against you of fabricating evidence in this case would --

9  are no better or no worse, based on your designation as

10  lead detective or assistant detective; correct?

11        A     It's no difference.

12        Q     The same obligations to carefully and

13  conscientiously inter -- investigate a case are in place

14  whether you're a lead or whether you're assisting;

15  correct?

16        A     Sure.

17        Q     And you would agree that whether you're a

18  lead or assisting detective, fabricating evidence --

19  fabricating a culpatory admission from a suspect is

20  illegal and could cause an innocent person to go to

21  prison; correct?

22        A     Correct.

23        Q     And the reason that you're trying to

24  emphasize that Jim Clark was a lead detective, because

25  you -- is because you think that will take the spotlight



 1    off of your misconduct in your case; isn't that true?

 2         A     No.

 3         Q     Now take a look at Exhibit 25 again, and

 4    let's look at page 16.  And I'm sorry; look at page 12.

 5    Read to yourself the paragraph on page -- the bottom of

 6    page 12, the last paragraph, through the next paragraph

 7    on the first -- on page 13.

 8         A     [Complying.]  Okay.

 9         Q     And this -- this makes clear that you were

10    brought on the case on April 6th, along with -- to assist

11    Clark and Greer; correct?

12         A     Right.

13               MR. BOND:  Object to the form of the

14    question.

15    BY MR. BRUSTIN:

16         Q     And you were brought on specifically by

17    Sherrard to participate in the interviews of suspects;

18    correct?

19         A     Correct.

20         Q     That's the reason you were brought on this

21    case?  The reason you were brought on the case is because

22    it was time to interview suspects, and you were known for

23    someone who is experienced and good at doing that;

24    correct?

25         A     No --



MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON            260

1              MR. BRAMMEL:  Objection.  Calls for

2    speculation.

3         A    No.  It's simply -- you know.  It's a change

4    of shift, it's whoever's available.  You know, you're --

5    you're -- you're -- you're -- you're off base, I believe.

6    BY MR. BRUSTIN:

7         Q    Okay.  So it's just a coincidence that you

8    were brought in at the time when Jeff Clark was going to

9    be picked up and interviewed; correct?

10        A    I think it's a coincidence.  It could have

11   been anybody there.

12        Q    And it's just a coincidence that you, as

13   opposed to Clark, participating in two days of interviews

14   with Jeff Clark and two days of interviews with Keith

15   Hardin; correct?

16        A    Yeah.  I mean I think it has more to do with

17   what hours I'm working versus what hours Clark is

18   working.

19        Q    Take a look at the last paragraph.  Tuesday,

20   4/7/92, on page 13.  "This officer contacted Detective

21   Handy, Louisville Police Department, and it was decided

22   that he would pick up Keith Hardin, the boyfriend of

23   Rhonda's, and approach him the same way Clark was

24   interrogated."

25              Do you see that?



1          A       Uh-huh.

2          Q       And this suggests that you and Greer talked

3   and you made a joint decision that you would be the one

4   that would interrogate Keith Hardin; correct?

5          A       Correct.

6          Q       That was a joint decision the two of you

7   made; right?

8          A       Yeah, I guess.

9          Q       And you understood, at that time, based on

10  your communications with Sheriff Greer, that you were a

11  far more experienced interrogator than Sheriff Greer;

12  correct?

13         A       No.  I never thought about that.  I never --

14         Q       You never thought about it?  Never discussed

15  that?

16         A       No.

17         Q       Then why was it decided that you would be the

18  person that would interview Keith Hardin, as opposed to

19  Sheriff Greer?

20         A       I don't know that it was.  Maybe I was the

21  one that was closest to Hardin.  Now Greer -- I don't

22  know if Greer was there.

23         Q       Well, there may be --

24         A       Maybe [unintelligible; talking over] -- Hope

25  Grier, not --



1    Q    We know --

2    A    Not Sheriff Greer.

3    Q    We know -- this -- this is Sheriff Greer's

4  report.

5    A    Okay.

6    Q    We know that Sheriff Greer wasn't present on

7  the 7th when you interviewed Keith Hardin because it's

8  not in your report; correct?

9    A    What's correct?

10    Q    That he wasn't there.  You were the one who

11  did it.

12    A    Okay.  He wasn't there; I was the one that

13  did it.

14    Q    The decision was made that you would be the

15  one to try to get admissions from Keith Hardin; correct?

16    A    I -- I -- you know, I don't know that I was

17  trying to get admissions.  I was trying to find -- you

18  know, lay the groundwork to see what we can do later.  I

19  mean I -- you know, early in an investigation, we weren't

20  running around making a bunch of allegations.

21    Q    Here's what he says.  "It was decided that he

22  would pick up Keith Hardin, the boyfriend of Rhonda's,

23  and approach him the same way Clark was interrogating."

24         What does it mean, to "interrogate" somebody?

25    A    I think it depends on the person who's using



1    the word.

2         Q     Well, "interrogate" means try to get

3    admissions; right?

4         A     I don't know --

5         Q     There's no --

6         A     -- what "interrogate" --

7         Q     Well, let me finish the question.  I'm going

8    to reframe the question.

9         A     Go ahead.

10        Q     When police officers say "interrogate," would

11   you -- would you agree that that generally means trying

12   to get confessions?

13        A     When I hear the word "interrogate," I think

14   of a much more aggressive interviewing than just, say, a

15   simple interview.

16        Q     In other words, "interrogate" means trying to

17   get a confession?

18        A     Well, yeah.  I mean it -- it depends on who's

19   using the word and how -- what they mean.  It means

20   different things to different people.  You know, I don't

21   use the word "interrogate" like some people do.

22        Q     Take a look at page -- Exhibit 25, page 14.

23        A     I'm there.

24        Q     Take a look at page 15, actually.  You see

25   4/9/92, 11:00 hours?  "Upon returning to Louisville, I



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    264

 1   met with Detective Handy who stated that he had talked to

 2   Warford's family and stated that he had set up a meeting

 3   for us with them at 12 o'clock hours, at their

 4   residence?"

 5        A    I see that.

 6        Q    This appears to be something that you did all

 7   on your own; right?

 8        A    No, I mean not necessarily.  I could have

 9   been directed by Jim Clark to set that up.  I don't know.

10   And I think Jim Clark was in more contact with her family

11   than -- than -- than I was.  I think he was more familiar

12   with them.  He was the one that took the missing persons

13   report from them.

14        Q    Take a look at page 13, the last paragraph.

15   I'm sorry; page -- take a look at page 14, middle of the

16   page.  It said, "We then proceeded to the Louisville

17   Police Department downtown to meet with Detective Handy,

18   for a meeting had been set up with other personnel to

19   discuss what had taken place so far and to also review

20   the videotape and photographs from the crime scene and

21   autopsy."

22             Do you see that?

23        A    I'm on page 14 --

24        Q    Yep.  Middle of the page, about two-thirds

25   down the page, Greer saying, "We then proceeded to the



1  Louisville Police Department to meet with Detective Handy

2  where a meeting had been set up with other personnel to

3  discuss what had taken place so far and to review the

4  videotape and the photographs from the crime scene and

5  the autopsy."

6          You see that?

7      A    Right.

8      Q    This is -- this is Sheriff Greer saying he

9  had a meeting with you where you went through the crime

10 scene photos; correct?

11     A    That's what it says.

12     Q    And you deny -- you've already denied under

13 oath that you ever saw the crime scene photos; correct?

14     A    I never saw the -- I never saw a picture, I

15 never saw a video.  I have absolutely no idea what that

16 crime scene looked like.

17     Q    So Sher -- Sheriff Greer is either -- either

18 mistaken or lying; correct?

19     A    I think he's mistaken.  I think he may have

20 brought pictures in and people looked at them, I just

21 wasn't one of 'em.

22     Q    Well, all you know is that he's wrong.  You

23 don't know whether it's a mistake or a lie; right?

24          MR. BOND:  Object to form.

25     A    Yeah.  I don't believe it's a lie.



MARK HANDY                                                September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                            266

1   | BY MR. BRUSTIN:

2   |          Q      Sheriff Greer --

3   |          A      I know --

4   |          Q      -- wouldn't lie; right?

5   |          A      I know --

6   |          Q      Sheriff -- Sheriff Greer wouldn't lie any

7   | more than you would lie; right?

8   |                 MR. BOND:  Object to the form.

9   |          A      I -- I never saw the pictures.  I never saw

10  | the crime scene.  Didn't go to the autopsy.  I have no

11  | idea -- I've never been to the field where this happened

12  | at, you know; never been on that street.

13  | BY MR. BRUSTIN:

14  |          Q      And then it says, "It was decided that we

15  | would pick up Jeff Clark again and see if he would

16  | consent to having his vehicle taken."  So this is just

17  | before you interviewed Jeff Clark for the second time;

18  | correct?

19  |          A      I guess.

20  |          Q      And it's just a coincidence that Jeff Clark

21  | is saying you showed him crime scene photos and Sheriff

22  | Greer is saying just before you showed -- you talked

23  | about it and saw the crime scene photos; correct?

24  |          A      I've never seen the crime scene photos.

25  | Never saw 'em, haven't seen 'em, don't know what they



1  look like, never had 'em in my hand.  And --

2      Q    I'm not sure why you're laughing.  I'm asking

3  you something else.

4      A    Well, it's so ridiculous.

5      Q    Is it --

6      A    I've told --

7      Q    Is it --

8      A    -- you once --

9      Q    -- so -- so --

10     A    I've never seen 'em.

11     Q    Sure.  And the fact -- it's just a

12 coincidence that Sheriff Greer is saying, just before you

13 went to a meeting with Jeff Clark where he's alleging you

14 showed him crime scene photos, you were discussing those

15 crime scene photos with Sheriff Greer.  It's just a

16 coincidence?

17     A    I'm not saying that Sheriff Greer or somebody

18 else didn't show him photos.  I have no idea.  I'm

19 telling you that I never saw the crime scene photographs.

20 To this day, I've never seen 'em.  I have no interest in

21 seeing 'em.  I've never been to anywhere where they were

22 shown.  I've never seen the field.  I've never seen

23 anything.  So if -- anybody that says that's inaccurate.

24 And if -- if -- if Sheriff showed 'em to whoever, that's

25 his business.



MARK HANDY                                      September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                  268

1        Q     Take a look at page 40 of Exhibit 59.  Skip

2    that.

3              MR. BRUSTIN:  Okay.  Let's take a five-minute

4    break.  And if you could, please tell me how much time we

5    have on the record.

6              THE VIDEOGRAPHER:  Okay.  We are 55 minutes

7    into this, so it will be four hours and 50 minutes,

8    roughly.  We have about another hour left.

9              MR. BRUSTIN:  All right.  Let's a take a

10   five-minute break, please.

11             THE VIDEOGRAPHER:  Okay.  The time is 4:02

12   and we are off the video record.

13       (At this point there is a break in the deposition.)

14             THE VIDEOGRAPHER:  Recording to the cloud and

15   back-up is recording.  4:09 right now; we are back on the

16   video record.

17   BY MR. BRUSTIN:

18       Q     Mr. Handy, you testified at the

19   post-conviction hearing that you've never in your career

20   threatened a witness.  Is that truthful testimony?

21       A     Yes.

22       Q     And, by the way, there are many different

23   kinds of ways to improperly threaten a witness; correct?

24       A     Correct.

25       Q     In other words, you don't necessarily have to



1    physically assault them to be threatening; correct?

2         A     Well, that's correct.

3         Q     You don't even have to raise your voice to be

4    threatening; correct?

5         A     That's correct.

6         Q     If you -- if you provide -- if you provide a

7    suspect with any improper threat of retribution or

8    leniency, that constitutes an illegal threat; correct?

9         A     It's -- I would think yes.

10        Q     And you would agree that putting a gun, a

11   handgun -- your handgun -- on a table and pointing it

12   towards a witness without saying a word, is a threat;

13   correct?

14        A     Absolutely.  It would -- it would be crazy.

15        Q     There would be no gray area there?  That

16   would be --

17        A     That --

18        Q     That would be a -- that would be illegal

19   coercion; correct?

20        A     You know, it would certainly be wrong, by any

21   standard.  I've never -- I've never heard of anybody

22   doing that.

23        Q     Okay.  But, certainly, it would also be an

24   implied threat?  If you put a gun facing someone on a

25   table, that's threatening; correct?



MARK HANDY                                         September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    270

1        A     Yeah.  I -- yeah.  It would be -- be some
2    type of threat.  I -- I don't -- really, I can't
3    visualize what that would look like.
4        Q     Okay.  Okay.  Well, I'm gonna help you
5    visualize it in a minute.  But --
6        A     Okay.
7        Q     -- whether -- whether you're a suspect or a
8    witness, putting a gun on a table and pointing it towards
9    that witness would be illegal; correct?
10        A     I think it would be illegal.
11        Q     And it would be threatening; correct?
12        A     I -- I think so.
13        Q     It's even worse if the barrel of the gun is
14    pointed at the witness; correct?
15        A     I think it's worse.
16        Q     And you can't think of any legitimate police
17    reason to place your handgun on a table and pointing it
18    towards a witness or a suspect; correct?
19        A     No.  Correct.
20        Q     If that ever happened for whatever reason, it
21    would be your obligation to document and report it;
22    correct?
23        A     I believe it would be; yes.
24        Q     And if you were present -- if you were
25    present for an interview where that type of conduct



1  occurred, it wouldn't matter whether you did it or just

2  saw it, you would have an equal obligation to report it;

3  correct?

4       A    Yeah.  I think you would -- I mean I -- I'm

5  not sure I quite understand the question because --

6       Q    Well --

7       A    -- [unintelligible] --

8       Q    -- don't answer it, then.  Don't --

9       A    No, no --

10      Q    -- answer the question if --

11      A    -- no.  I mean --

12      Q    No, no, no, no.  I want to make it clear.  If

13  you were conducting an interview with somebody else --

14      A    Right.

15      Q    -- and that other officer takes their gun out

16  of their holster and points it towards a witness, you are

17  equally responsible for that conduct if you don't report

18  it; correct?

19      A    I -- I think so; yes.

20      Q    And that kind of conduct would jeopardize the

21  admissibility of any information received from that

22  witness; correct?

23      A    Sure.  Yes.

24      Q    And you would also agree that any time a

25  suspect asks for a lawyer, you have an absolute



1    obligation to stop questioning and get that person a

2    lawyer?

3         A     I agree.

4         Q     Same way as pointing a gun:  There's no gray

5    area there?

6         A     Uh-huh.

7         Q     When someone asks for a lawyer, you stop

8    questioning?

9         A     There's no gray area.

10        Q     And again, just like with the gun example, if

11   you are present for an interrogation, you're -- you're --

12   you're one of the officers involved, and the suspect asks

13   the other officer for a lawyer, you are equally

14   responsible for stopping that interview and ensuring a

15   lawyer is provided; correct?

16        A     I think so; yes.

17        Q     Now you understand, in this case, that,

18   according to Jeff Clark, he claims that Sheriff Greer put

19   a gun on the table in between he and Sheriff Greer, while

20   you were standing in the doorway.  You understand that's

21   the allegation; correct?

22        A     No.  I -- I understood there was an

23   allegation that Sheriff Greer had put a gun on the table,

24   but believe that that happened in Meade County, not in

25   Jeff -- well, I believe the allegation was in Meade



1     County, not in Jefferson County.

2          Q     Well, the location, just so we're clear -- I

3     want to make sure you understand it.  The allegation is

4     that you were present when that happened.  You understand

5     that now?

6          A     I understand that's the allegation.

7          Q     Okay.  And you deny ever being present for

8     that conduct; correct?

9          A     I've never seen anything like that.

10         Q     You've never been present when any -- and, by

11    the way, it's very unusual allegation.  Would you -- be

12    fair to say it' --

13         A     Very unusual.  Very unusual.

14         Q     It's also very -- it's a very specific

15    allegation:  Putting a gun -- pointing towards a suspect

16    or a witness is a very specific allegation; right?

17               MR. BOND:  Object to the form.

18    BY MR. BRUSTIN:

19         Q     It's unusual?

20         A     Under those circumstances --

21               MR. BOND:  Object to the form.

22         A     It's extremely unusual, and it's not

23    something I've ever seen.

24    BY MR. BRUSTIN:

25         Q     You've never seen it and you've never done



1    it?

2          A      Never seen it; never done it.

3          Q      You deny seeing it or doing it; correct?

4                 MR. BRAMMEL:  Objection.

5          A      Absolutely.

6                 MR. BRAMMEL:  Asked and answered.

7    BY MR. BRUSTIN:

8          Q      And you deny doing that with Jeff Clark in

9    this case; correct?  You deny being present for it?

10         A      I've never seen that.

11         Q      Okay.  And you deny putting your gun on the

12   table in regard to any witness interviews that you

13   conducted in this case?

14         A      I've never, ever put my gun on a -- on a

15   table for anything.

16         Q      Anybody who claims --

17         A      [Unintelligible; talking over.]

18         Q      -- that you put a gun -- anybody who claims

19   that you put a gun on the table, pointing at them, would

20   by lying; correct?

21                MR. BOND:  Object to the form --

22         A      Absolutely.

23                MR. BOND:  -- of the question.  It misstates

24   the evidence -- or not the evidence, the testimony.

25   BY MR. BRUSTIN:



1      Q      And you would agree that telling a suspect

2  that if they simply confess, they will get to go to a

3  psych ward as opposed to prison, that would be illegal;

4  correct?

5      A      I would think it would be illegal unless you

6  had the authority from the prosecutor to make that type

7  of offer.

8      Q      And you've certainly --

9      A      Short --

10      Q      -- never --

11      A      Short of --

12      Q      -- had that --

13      A      Short of having that authority from the

14  prosecutor, you couldn't do it.

15      Q      And you certainly never had that authority in

16  this case; correct?

17      A      No.

18      Q      Or any case, that you recall; correct?

19      A      No.

20      Q      And you certainly didn't make that -- you

21  deny making that statement to Mr. Clark; correct?

22      A      Correct.

23      Q      You would agree that if you made that

24  statement to -- to -- to Mr. Clark, it would be illegal;

25  correct?



1        A     It would be inappropriate, at a minimum.

2        Q     And you didn't do it; right?

3        A     No.

4        Q     And you would agree that putting -- and you

5    would agree that telling a suspect that they won't do a

6    day in jail if they simply tell you that they took part

7    in the crime would be equally inappropriate; correct?

8        A     I would certainly say that if I didn't have

9    the authority of the prosecutor to cut a deal like that,

10   it would be grossly inappropriate.

11       Q     And you would agree that it would be even

12   worse to put a gun on the table in between you and a

13   suspect and ask that suspect if they want to reconsider

14   their denial; correct?

15             MR. BOND:  Object to the form of the

16   question.  Asked and answered.

17       A     I would think that would be extremely

18   inappropriate.

19   BY MR. BRUSTIN:

20       Q     Or to say that bad things happen to people

21   who don't cooperate with him:  Even more inappropriate;

22   correct?

23       A     Certainly --

24             MR. BOND:  Object to the form.

25       A     -- as inappropriate.



 1 | BY MR. BRUSTIN:

 2 |        Q    And you would never do that; correct?

 3 |        A    No.

 4 |        Q    And you would never tolerate anybody else

 5 | doing that; correct?

 6 |        A    I've never seen that.

 7 |        Q    And you would not tolerate it, if you did;

 8 | correct?

 9 |             MR. BOND:  Object.  Asked and answered.

10 |        A    I honestly can't tell you what I would do.

11 | I've just never seen anything like that.

12 | BY MR. BRUSTIN:

13 |        Q    Well, you would report it, if you saw that;

14 | right?

15 |        A    I honestly can tell you that I think I would.

16 | But, you know, I -- I've never seen anybody do that.

17 |        Q    Well, you understood, by 1992, that if you

18 | observe an officer in one of your investigations engaging

19 | in misconduct, you had an absolute obligation to report

20 | it and document it; correct?

21 |        A    Correct.

22 |        Q    And so if you did see something like that,

23 | you would have had to document it and report it; correct?

24 |             MR. BOND:  Object.  Asked --

25 |             MR. BRAMMEL:  Objection.



MARK HANDY                                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                              278

1                    MR. BOND:  -- and answered.

2        A    I -- it's -- I -- I -- you know, I can't sit

3    here today and tell you what I would have done 30 years

4    ago as a young guy, you know.  It certainly would have

5    been the most inappropriate thing.  And if asked had I

6    seen that, I would have acknowledged that I'd seen it.

7    BY MR. BRUSTIN:

8        Q    I think I understand.  I think what you're

9    saying is -- and I appreciate your honesty.  What you're

10   saying is, in 1992, even though you were supposed to

11   report that kind of misconduct, you might not have had

12   the courage to do so.  Is that what you're telling us?

13                   MR. BOND:  Objection.

14                   MR. BRAMMEL:  Objection to the form of the

15   question.  Misstates the witness's testimony.  Asked and

16   answered.

17                   You can answer the question, if you

18   understand it.

19       A    You know, I -- I simply can only say that

20   I've never seen that.  I never witnessed it.  I never saw

21   anything close to that.  What I would have done back in

22   1992, had somebody done that in my presence, I simply

23   can't tell you what I would have done.  The appropriate

24   thing would have been to -- to tell on them.

25   BY MR. BRUSTIN:



1        Q     Okay.  But you're not sure you would have

2    done it?

3        A     I -- I can't --

4              MR. BOND:  Objection.

5        A     -- tell you what I would have done.

6    BY MR. BRUSTIN:

7        Q     As a young man?

8              MR. BOND:  Objection.

9        A     As a young man.

10   BY MR. BRUSTIN:

11       Q     All right.  But you would agree that you

12   would be equally responsible for reporting another

13   officer who fabricated statements as having come from a

14   suspect; correct?

15       A     I would agree.

16       Q     But you would agree that, certainly in 1992,

17   regardless of the circumstances, there was a lot of

18   pressure on Louisville detectives and police officers not

19   to report or not to rat on fellow officers.  Fair to say?

20             MR. BRAMMEL:  Objection to the form of the

21   question.

22       A     I think there was a -- it was a different

23   time.

24   BY MR. BRUSTIN:

25       Q     Okay.  And at that time, it would be -- it



1    would be -- no matter what the conduct, there was a

2    unwritten rule that even if you observe another officer

3    engaging in misconduct, you don't report it; correct?

4          A     Well, let me --

5                MR. BOND:  Object to the form of the

6    question.

7          A     Let me simply say that if people cross the

8    line to the point they threatened with violence or they

9    threatened with handguns or they -- they did things like

10   that, that there's absolutely no question in my mind,

11   that would have been reported.

12   BY MR. BRUSTIN:

13         Q     Okay.

14         A     And that would have been -- that would have

15   taken steps to the higher-ups.  I would have reported it

16   to my boss, who would have reported it to his boss.

17   Because that would have shown some kind of instability,

18   in my mind, on the person that did it.

19         Q     But if somebody simply misrepresented a

20   statement and attributed it to a suspect, that's not

21   something, in 1992, you may have had the courage to

22   report.  Fair to say?

23         A     I -- I -- it -- it would depend on -- there

24   would be so many variables to that, I can't answer it.

25         Q     Well, but you agree, though, as a general



1  matter in 1992, there was a reluctance on the part of

2  police officers in Louisville, to report one another for

3  misconduct?

4       A     Absolutely.  And even before that, there was

5  a reluctance to tell on each other for stuff.

6       Q     Okay.  In other words, you understood, in

7  1992, that if you engaged in misconduct, it would be

8  unlikely that another officer would report it, and

9  vice-versa; correct?

10      A     Well, I think it would depend on the officer

11 and the conduct.  I understand your point and I'm not

12 disagreeing with you.  But I think there's just so many

13 variables, it's hard to say.

14      Q     Well, let's be specific.  In 1992, if, for

15 example, a detective included in their police report an

16 incriminating statement from a suspect that wasn't --

17 that wasn't actually made, that's the kind of conduct

18 that another officer may or may not report; correct?

19      A     Well, I -- I -- it's -- it just totally,

20 totally depends on the -- the officers, the statement,

21 the circumstances, who the officers are.

22      Q     Well, let's -- let's take you as an example.

23      A     Okay.

24      Q     Fair to say, if you're being -- if you're

25 being brutally honest, in 1992, if you saw another



1    officer intentionally misrepresent a statement from a

2    suspect in their report, you might not report it?

3         A    I -- you know, I simply can't answer that.

4    I'm sorry.  I -- I don't -- you know, that hasn't

5    happened.  And if it did, would I go to their supervisor

6    and say we have a problem?  You know, I -- I -- I'd like

7    to say I would go to their supervisor and say we have a

8    problem.

9         Q    Correct.

10        A    But as I sit here --

11        Q    But --

12        A    -- today, I don't know.

13        Q    One thing we can agree on is that, certainly

14   in 1992, there was a lot of pressure on police officers

15   in Louisville not to report misconduct of fellow

16   officers; correct?

17             MR. BRAMMEL:  Objection to the form of the

18   question.  Asked and answered.

19        A    You -- you -- you know, I go back before '92.

20   And I think that, prior to '92, back in the days when

21   there was a lot of drinking going on and a lot of --

22   of -- of misbehavior of a -- a variety of -- of -- of

23   things, that police were reluctant -- you know, drunk

24   driving, you know.  If they pulled each over, they had a

25   tendency to give each other a ride home, and things of



MARK HANDY                                           September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                      283

1    that nature.

2              And I think that, over a period of time, all

3    that was put a stop to.  And so things have, certainly,

4    changed.  I don't -- I -- the people that I worked with,

5    and certainly the ones that worked over in Homicides, did

6    the best to their ability to do things correct, to do

7    things accurate.

8              I don't know of anybody that's ever put a gun

9    on a table or threatened anybody.  I never saw that.  Had

10   I seen that --

11   BY MR. BRUSTIN:

12        Q    You don't know any -- you don't know anybody

13   that ever fabricated a statement from a suspect; right?

14        A    If they did, I'm not aware of it.

15        Q    All right.  And -- but you would agree that,

16   certainly into the nineties, there was a reluctance to

17   report things like drunk driving; correct?

18        A    Yeah.  I think -- sure.  They don't like

19   telling on each other.

20        Q    And there would be a reluctance to report

21   things like using more force than was strictly necessary

22   with a suspect?

23        A    Yeah.  I think that -- that that's -- you

24   know.  Times have changed.

25        Q    And you would think that, into the nineties,



 1  there was a reluctance to report officers using racial

 2  slurs, for example?

 3       A     Absolutely.

 4       Q     Those things were happening and they weren't

 5  being reported, on a regular basis; right?

 6       A     Unfortunately.  And -- and you may go back

 7  even earlier said that.

 8       Q     And you also mentioned that, you know, people

 9  were drinking too much, at the time; correct?

10       A     Yeah.  It was a problem.

11       Q     And you were -- and you were part of that

12  problem.  You were drinking too much, at the time;

13  correct?

14       A     Yeah.  But I never drank when I worked.

15       Q     I'm sorry?

16       A     I never drank when I worked.

17       Q     Okay.  Let's talk about -- let's talk

18  about -- and, by the way, the reason that you can't

19  specifically talk about the example of fabricating a

20  witness statement is because you never saw that or

21  participated in that; correct?

22            MR. BRAMMEL:  To the extent that you're

23  insinuating or trying to suggest that there's any -- to

24  the extent that your question suggests --

25            MR. BRUSTIN:  I'll withdraw the question.



MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON              285

1              MR. BRAMMEL:  -- [unintelligible] about

2       either -- or any of the matters covered by the stay or

3       the Protective Order in this case, I'm going to instruct

4       him not to answer.

5              MR. BRUSTIN:  Fair enough.

6  BY MR. BRUSTIN:

7       Q     Let's move on to another topic.  Let's talk

8       about caping [ph].  In the -- do you remember a case

9       involving a man named William Gregory, in Homicide?

10      A     I never worked it.

11      Q     I'm sorry?

12      A     I never had any dealings with Mr. Gregory.

13      Q     Do you remem -- do you remem -- you had a

14      case, though; right?

15      A     I'm familiar with the -- with some facts.

16             MR. BRAMMEL:  I'm going to object to the line

17      of questioning in accordance with -- in accordance with

18      the --

19             MR. BRUSTIN:  I -- I'm not ask -- I'm not

20      asking about the case, Bill.  Just bear with me.  I

21      promise.

22      A     Yeah.  Because I had no -- no -- nothing to

23      do with that case.

24      Q     Okay.  In any case, during that -- during

25      that case, Off -- Gene Sherrard testified about the



1  policy and practice in place in 1992 in regard to caping

2  [ph].  Okay?  And I want to read it to you.  And this is

3  from page two 239 and 240 of his deposition.

4        MR. BRAMMEL:  Nick, has this been produced?

5  If so, can you direct us to where it is?

6        MR. BRUSTIN:  I don't think it has been

7  produced.  I'm not gonna -- I'm just gonna read it to

8  you.  But we can give it to you, if you want.

9        MR. BRAMMEL:  Yeah.  If you're gonna --

10        MR. BOND:  Nick, this is Keith.  I'm gonna

11  place a concern on the record.  Every time we've deposed

12  somebody and we've had exhibits, even if they've been

13  introduced --

14        MR. BRUSTIN:  I'm not gonna make it an

15  exhibit.  It's just --

16        MR. BOND:  Let -- let me finish --

17        MR. BRUSTIN:  -- prior testimony I'm asking

18  about.

19        MR. BOND:  Nick, let me finish, please.

20  Okay?  I'm not encroaching on your time whatsoever.

21        We have provided either a list of everything

22  we're gonna reference, and if somebody's been in

23  attendance, produced all of those documents.  And for us

24  to sit here and to be blindsided with a document, not

25  know what it is, not have it, and for you to question a



1    witton [ph] about -- a witness about it, is blatantly

2    unfair and inappropriate.

3              MR. BRUSTIN:  No.  There's nothing --

4              MR. BOND:  I'm done.  Okay.  Go ahead.

5              MR. BRUSTIN:  There's no blindsiding here.

6    I'm -- I'm reading him one statement from a -- from

7    testimony.  You're welcome --

8              MR. BOND:  [Unintelligible; talking over] --

9              MR. BRUSTIN:  -- to look at it --

10             MR. BOND:  -- one page or 50 pages.  It's

11   just inappropriate.

12             MR. BRUSTIN:  Okay.

13             MR. BOND:  We've provided y'all --

14             MR. BRUSTIN:  You know what I'm gonna do?

15   I'm not even gonna -- I'm not even going -- you know what

16   I'm going to do?  I -- fair enough.  I'm not even gonna

17   show it to you.  That's fine.  I don't -- I don't want to

18   be unfair here, so let's not even show it to you.

19             MR. BOND:  Well, I -- I appreciate that.

20   BY MR. BRUSTIN:

21        Q    Mister -- Mr. Handy, would you agree that, as

22   of 1992, the practice or the custom in the Louisville

23   Police Department, when you take a formal statement as

24   opposed to an informal interview, was to try to tape it?

25        A    I mean I think the best interviews with



1    witnesses, especially important witnesses, the best

2    system would be to sit down with the tape recorder and

3    take a taped statement with not only the witness, but

4    with another investigator, so that you have three people

5    and a tape recorder.

6         Q    Okay.  I -- I appreciate your answer, but

7    that's not actually answering my question.  My first

8    question, my -- and I appreciate the information you gave

9    me.  But the first question is, do you agree that it was

10   the practice or the custom of the Department, the

11   Homicide division, in 1992, that when taking a formal

12   statement, if possible, to tape record it?  Yes or no?

13        A    I -- I don't remember that being a -- I'd say

14   no.  But I don't know -- recall.

15        Q    You don't remember?

16        A    I don't remember it being --

17        Q    Okay.  You don't remember that being true, at

18   that time?  Okay.

19        A    -- and -- and taught that way.

20        Q    Now by the way, you would agree that a formal

21   statement is any time you are interviewing a suspect in

22   the precinct, about a crime?  That would be a formal

23   statement; correct?

24        A    Well, it -- yes and no.  I mean I think that

25   if what they're gonna tell you is -- and you already know



```
 1   they're going to say, well, you know, I was in Louisiana
 2   at the time, you know, shucking beans, you know, I'm not
 3   sure why you'd want to get a tape recorder out for that.
 4   So I mean --
 5        Q     Okay.  So at any time --
 6        A     -- [unintelligible] tell you is a bunch of
 7   nonsense, you might as well write it down in a notebook.
 8        Q     Sure.
 9        A     If you think --
10        Q     But any --
11        A     -- they're gonna give you valuable
12   information --
13        Q     Sir, that's -- that's a bet -- that's a
14   better way of putting it.  Any time you have a suspect
15   who has given you some valuable information in an
16   informal interview and you're doing another interview,
17   that would be a formal interview where, if possible,
18   you'd try to tape it; right?
19        A     You know -- and once again, it depends on
20   what-all's going on and how busy you are.  The office
21   could be full of people so that trying to get an
22   interview where you have a quiet spot -- and --
23             And, by and large, the interviews that we
24   used were -- were transcription machines, so you couldn't
25   just grab it and go over in the corner and huddle up like
```



1  you could a little hand-held device, you know.  So there

2  was a lot of -- of -- of things that went into it.  And

3  it's hard to say yes or no when you don't know what was

4  going on in the office, at the time.  You know, we've had

5  an office --

6        Q    Okay.

7        A    -- full of --

8        Q    So what --

9        A    -- 40 screaming people.

10       Q    So I -- just let me take it a step at a time.

11  You would agree that if, in fact, you had the time and a

12  suspect was willing, if you have a suspect who's -- who's

13  already given you valuable information, if possible, it's

14  better to try to tape record the formal interview that

15  follows; correct?

16       A    I think it's best to, sure.

17       Q    Okay.

18       A    If possible.

19       Q    And you've given us a bunch of reasons why

20  you might not do that.

21       A    Sure.

22       Q    One reason is if you're too busy; right?

23       A    Sure.

24       Q    What are some other reasons why you wouldn't

25  tape record a witness who's volunteering to answer



1  questions, who's previously given you useful information,

2  other than being too busy?  What other reasons would

3  there be?

4      A    If you didn't feel the need to.  You

5  didn't --

6      Q    Okay.  So what would be some reasons as to

7  why you wouldn't feel --

8      A    If you didn't --

9      Q    -- the need --

10     A    -- think they were --

11     Q    Well, let me -- sir, let me finish the

12  question.

13     A    I'm sorry.  So go right ahead.

14     Q    What would be some reasons why you wouldn't

15  feel the need to ask a compliant suspect who's already

16  given you valuable information, whether or not they were

17  willing to have a follow-up formal interview, taped?

18     A    Well, there's multiple reasons, one of which

19  is you don't think they're gonna backtrack on anything

20  they've told you.  You expect for them to stick with what

21  they've already told you.  It's been witnessed by another

22  person who heard everything that was said, so if there's

23  some question, you've got another witness.

24          Some people, if you turn a tape recorder on,

25  decide they don't want to talk, you know.  There's been



1 | people that talked freely, and soon as the tape recorder

2 | came out, decided they didn't want to talk.  So sometimes

3 | people will back up and decide, nah, I don't think so; I

4 | don't want all this recorded.  When, in fact, you could

5 | sit and just write out everything they're telling you and

6 | never have that happen.

7 | Q   Right.  So -- okay.  So any other reasons?

8 | A   I -- I'm just -- off the top of my head,

9 | that's all I can think of.  There -- I'm sure there are

10 | plenty more.

11 | Q   Okay.  So let's take them one at a time.  So

12 | one reason would be that you have an -- and you've

13 | mentioned this before.  You have -- you have another --

14 | you have another witness present; correct?

15 | A   Have a what?

16 | Q   One good reason -- one good reason not to

17 | tape record a formal interview or a second interview with

18 | a compliant suspect who's given you good information is

19 | that you have a witness; correct?

20 | A   Right.  There's another person that's

21 | listening to the same thing.

22 | Q   Right.  And so -- so the second best thing,

23 | as opposed to having a -- a tape-recorded interview,

24 | would be -- well, first of all, you would agree that the

25 | best thing to have is a tape-recording; right?



1        A     I would think.

2        Q     Okay.  The second best thing would be to have

3   a second witness who creates a contemporaneous report

4   about what they heard; correct?

5        A     Sure.

6        Q     Okay.  And so in situations when you have a

7   witness, it's sufficient -- at least it was in '92 -- to

8   have a second person who creates a report about what they

9   heard so that they can later testify to that; correct?

10       A     Well, I mean that you would have the second

11  person -- there was usually only one report and you just

12  would -- said that the other person was present.

13             Usually, two detectives do an interview.

14  They do an investigation.  One will do the report and

15  just acknowledgment that the second detective was there,

16  so if there's some question, you've got the second one to

17  say, yeah; that's exactly what we did, that's what he

18  said.

19       Q     That's so interesting --

20       A     This is typical.

21       Q     -- you say that because -- no; that's very

22  interesting.  Because when I looked through the file, I

23  found multiple examples of interviews conducted by LPD

24  officers with two -- two police -- two people present,

25  where both of them created reports.



1        A     Some do.

2        Q     Any explanation -- some do?  Okay.  But you

3    didn't -- so it was your practice that even if you had

4    another witness for an important interview you conducted

5    that wasn't tape-recorded, it was sufficient to have one

6    report?

7        A     Yeah.  I would have thought sufficient.

8        Q     Okay.  And so -- so that's one rationale,

9    that if you have a witness --

10             By the way, you caught me -- you caught me

11   about halfway through that question.  Because the first

12   thing you told me under oath was that the reason it was

13   okay not to tape was because you'd have two reports.  And

14   then you caught yourself.

15       A     If you have two reports --

16             MR. BOND:  I'm gonna object to the extent --

17   BY MR. BRUSTIN:

18       Q     Yeah.  The -- the first time I asked you,

19   that's what you said.  And then you caught yourself.  It

20   was an example of -- it was an example of you lying in

21   the moment, trying to make up a new story as I was asking

22   you that.  Right?

23             MR. BRAMMEL:  Objection.

24       A     No.

25             MR. BRAMMEL:  Nick, just the -- the -- you



1    know, we really appreciate your commentary.  But if you

2    have questions for him, he's welcome to answer them.  He

3    has a --

4              MR. BRUSTIN:  That -- that is a question.

5              MR. BRAMMEL:  And he -- he may --

6    BY MR. BRUSTIN:

7         Q    What happened during my last question --

8              MR. BRAMMEL:  He -- if you don't mind me

9    finishing before you talk over me, he made it very

10   clear -- he made the answer very clear.  He's already

11   answered the question.

12   BY MR. BRUSTIN:

13        Q    Okay.  Now another reason you gave is that

14   you expect a suspect to stick with what they told you.

15   And again, understanding that we're gonna have a police

16   expert testify -- and I'm also gonna question your

17   supervisors -- it's been your experience as a homicide

18   investigator that, typically, people who commit homicides

19   usually stick with the truth of what they told you;

20   right?

21        A    Well, I mean I -- I think that's a -- as many

22   people as there are -- I mean you can't say one homicide

23   person, somebody that committed a homicide, they're not

24   all the same.  And some will --

25        Q    Well, you --



1    A    Some will admit to what they did, and fully

2  admit to it, and the first opportunity they get to go in

3  court, will admit to it to the judge.  Some will admit to

4  it and later retract.

5    Q    Well, you've told us -- you've told us about

6  a number of admissions, inculpatory admissions, that Jeff

7  Clark and Keith Hardin allegedly made to you.  What was

8  it about your interaction with Keith Hardin and Jeff

9  Clark that made you think that they would be truthful

10  about those admissions, down the road?

11    A    I didn't think anything about it.  I wrote

12  down what they told me and I didn't give it a lot of

13  thought.  I went on to the next things of whatever we

14  were going on to.

15    Q    Well, the reason I'm asking you the question,

16  Mr. Handy, is because you told us one of the reasons why

17  you didn't tape-record is because in case -- there were

18  cases where you didn't think the suspect would go back on

19  what they had --

20    A    I didn't --

21    Q    -- told you.

22    A    I didn't think they would.  I -- they said it

23  in front --

24    Q    Well --

25    A    -- of other people.  They -- I -- it never



MARK HANDY                                         September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                     297

1  crossed my mind that they would suddenly come up and say
2  I never said that.
3       Q    Okay.  So even -- even though you believe
4  that Keith Hardin and Jeff Clark committed this brutal
5  murder of a young woman, you believed that they would be
6  honest about what they told you, down the road?
7       A    Yeah.  They never admitted to me that they
8  killed the girl.
9       Q    That's not what I'm asking you.  What I'm
10 asking you is, why you didn't tape?  I'm taking the
11 excuses you gave for not taping and I'm questioning you
12 about it.  And one of the excuses you gave was that why
13 would somebody go back on what they told you?  That's one
14 of your excuses; right?
15      A    Yeah.  They didn't admit to killing her, to
16 my knowledge.
17      Q    Okay.  Now another reason you said not to
18 tape is because sometimes people clam up or don't want to
19 talk when you're tape-recording; correct?
20      A    Right.
21      Q    And one way around that problem is to simply
22 ask them, do you mind if I tape-record?  Because
23 sometimes they might not mind; right?
24      A    Correct.
25      Q    And another thing your -- you -- you had the



1  ability to do back in 1992 was to secretly tape a

2  conversation with a suspect with your mini tape recorder;

3  correct?

4      A    I -- I never had a mini tape recorder, so.

5  It was a.

6      Q    Well, what -- what did you use to dictate

7  your reports in?

8      A    It was a Dictaphone.  It was the size of this

9  laptop, with a little thing on the side here and a

10 cassette that went in there, and we dictated it.  And

11 that's what we used for interviews.

12     Q    But you would agree that neither Jeff Clark

13 nor Keith Hardin in any way suggested to you that they

14 didn't want it taped; correct?

15     A    I don't believe I ever asked them.

16     Q    And the way to determine whether or not

17 taping would bother them would be to ask them correct?

18     A    I -- yeah.  If I'd thought -- and I can't

19 have no reason to believe they'd have said no.

20     Q    Did you forget to ask them?

21     A    No.  I never thought to -- like I said, in my

22 mind, they're not admitting to killing anybody.

23     Q    Did you tape any interviews in this case?

24     A    No; I don't think so.  I may have.  It's

25 possible.



MARK HANDY                                September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON         299

1      Q    Okay.  Because, generally, you do tape

2  interviews; correct?

3      A    It just depends.  Sometimes, I did;

4  sometimes, I didn't.

5      Q    Well -- okay.  Let's talk about this case.

6  What were the reasons -- so -- yeah.  I think you've

7  given me reasons, but I want to make sure that you're not

8  talking in general.  Just to be clear, what were the

9  reasons why you didn't tape in this case?

10     A    I don't think I ever thought to.  I don't

11 think it ever -- you know, they weren't really telling me

12 anything that -- that I thought was ah-ha, you know,

13 that -- that -- that this is proof that they killed them

14 or whatever.  I don't -- I -- it -- it -- it didn't seem

15 anything too terribly significant.

16     Q    You understand that you've already told us

17 under oath that they were significant; right?

18     A    No; I mean --

19     Q    You testified to that today.

20     A    Ah, whatever.  I mean my point is that doing

21 the satanic stuff, wanting to do -- you know, saying I

22 don't want to do human sacrifices, you could say, well,

23 hell, that means he didn't do it because he didn't want

24 to do human sacrifices.  So you could look at this the

25 opposite of that and say, well, yeah; hell, that helps



1    him, you know.

2            Q      Okay.

3            A      He quit wanting to do that before the case,

4    right there --

5            Q      So --

6            A      -- [unintelligible; talking over].

7            Q      But the re -- the -- the reason you didn't

8    tape in this case is because you never thought of it?

9            A      It -- it -- you know, we interviewed as we

10   went along.  We were interviewing in a car, we were

11   interviewing in somebody's doorway, in somebody's home,

12   standing there.  Occasionally, we would be up in the

13   office.  We were pretty mobile.  And --

14           Q      Sir --

15           A      So [unintelligible, talking over] --

16           Q      I -- sir, I'm not -- I'm only -- you're not

17   answering my question.  I'm just asking you about Keith

18   Hardin and Jeff Clark.

19           A      And -- and --

20           MR. BRAMMEL:  And he did.  I believe he was

21   trying to answer your question before you cut him off.

22           MR. BRUSTIN:  He was not.  He's talking about

23   all kinds of witnesses.

24   BY MR. BRUSTIN:

25           Q      Let me just focus you on one thing.  Okay?



1   All I want to know is, when you conducted multiple

2   interviews of Jeff Clark and Keith Hardin, including at

3   the precinct, other than not thinking of it, are there

4   any other reasons why you didn't ask to tape-record?

5        A    I didn't think it was necessary.

6        Q    So you did -- so did you not think of it, or

7   not think it was necessary?  Which one?

8             MR. BOND:  Object to the form.

9        A    Sir, I didn't believe it was necessary.

10  BY MR. BRUSTIN:

11       Q    Okay.  So it's not that you didn't think of

12  it, it's that you made a determination it wasn't

13  necessary?

14       A    Well, it -- it -- you could say one or the

15  other:  I didn't think about it, it wasn't -- it

16  didn't -- something pressing on my mind.  I didn't think,

17  oh, wow; I got to get these guys on tape.  None of that.

18  None of that ever crossed --

19       Q    Sir --

20       A    -- my mind.

21       Q    You can say one or the other, but they can't

22  both be true.  Only one can be true.  Either you didn't

23  think about it, or you thought about it and decided not

24  to do it.  Which one is truthful?  You understand you're

25  under oath; right?



1          MR. BRAMMEL:  I'm going to object to the

2    question because he's already answered this question

3    multiple times.  He can answer [unintelligible; talking

4    over] --

5          MR. BRUSTIN:  He's answered it two different

6    ways.

7        (Unintelligible comments.)

8  BY MR. BRUSTIN:

9      Q    Let me rephrase the question.  There's been

10   an objection; I'm going to rephrase the question.

11         Either you didn't thinking of an -- asking

12   it, or you decided not to ask it.  Which one is true in

13   this case?

14     A    Okay.  In this case, going back 28 years,

15   roughly, I don't remember whether I didn't think about

16   it, or I thought about it and didn't think it was

17   necessary.  I apologize that it's hard to understand that

18   I don't remember, 28 years ago, whether I thought about

19   it and didn't do it or just didn't think about it.  It's

20   probably one or the other.

21     Q    I asked you some questions about the practice

22   at the Department in 1992 in regard to taping interviews.

23   Certainly there was no requirement that you taped

24   interviews; correct?

25     A    I -- I don't know.  I honestly don't know



1    what the requirements were.

2         Q    All right.  Well, certainly, nobody ever

3    questioned you from the Department about your decision

4    not to tape-record the interviews of Keith Hardin or Jeff

5    Clark, at any time; correct?

6         A    Correct.

7         Q    Nobody criticized you in any way for that

8    decision; correct?

9         A    Correct.

10        Q    Nobody even questioned it; right?

11             MR. BRAMMEL:  Objection.  Asked and answered

12   the exact question.

13             MR. BRUSTIN:  I -- I just want to make it

14   clear.  I -- I appreciate that.

15        A    No.

16             THE VIDEOGRAPHER:  Excuse me, Counsel.  We

17   are about five hours and 27 minutes into it, if you were

18   waiting that five and a half hour mark.

19             MR. BRUSTIN:  I appreciate it.  Thank you

20   very much.

21   BY MR. BRUSTIN:

22        Q    Okay.  Now I want to take a look at Exhibit

23   72, page 7882.

24        A    Okay.

25        Q    What I'm showing you here is a portion of



1   some grand jury testimony that a man named Mattingly

2   gave, implicating somebody named Mahan in this crime.

3   And this occurred in September of 1993.  So after the

4   initial investigation, this person came forward and said

5   he had information implicating somebody named Mahan.

6              And I'm asking you about this because I'm

7   about to show you an interview that you conducted with

8   this person Mahan a few months later.  And I just want to

9   make clear that you understood that the reason you were

10  interviewing Mr. Mahan is because of statements that

11  Mr. Mattingly made about him in the grand jury.

12             So the first question is, do you recall

13  learning, sometime after September of 1993, that,

14  according to this Mattingly person, Mahan was telling him

15  to lie about Jeff Clark and make up bad things about him.

16  Mahan worked with -- Mahan and Mattingly both worked with

17  Jeff Clark.  Do you recall learning about that?

18       A    No.

19       Q    Do you recall learning about Mahan going to

20  the crime scene with his family and taking pictures?

21       A    No.

22       Q    No memory of any of that?

23       A    No.  No.

24       Q    All right.  Now -- well, take a look at --

25  take a look at 7882.



1      A     I'm looking at it.

2      Q     Can you read that to yourself and let me know

3   when you're done?

4      A     The whole page?

5      Q     Yeah.

6      A     Yes, sir.

7      Q     Wait.  You know what?  Let's do it this way.

8   Read it long enough where you can -- you can -- you can

9   answer this question:  Does it appear that Mattingly is

10  getting information suggesting that Mahan may have been

11  involved in this crime?

12     A     [Reviewing.]

13     Q     Read 7883, as well.

14     A     Okay.  [Reviewing.]

15     Q     Had a chance to look at that?

16     A     Yeah.  Yeah.

17     Q     Now take a look at page 7893.  Let me know

18  when you're there.

19     A     Yeah.  I'm on 93.

20     Q     Okay.  And it says -- this is Mattingly

21  testifying.  "I don't have nothing against them, you

22  know, Bill, I mean.  I think he killed the girl.  I don't

23  know it, but he did."

24           You see that?

25     A     "I don't have nothing against him, you know,



1   Bill, I mean.  I think he killed the girl.  I don't know

2   it, but he didn't.  I mean Jack White nailed us a lot and

3   things like that.  But, no; I do not dislike him."

4        Q    And then the D.A. asked, "Tell me why you

5   think Bill Mahan killed her;" right?

6        A    Yeah, I guess.  I don't know.  It this

7   trial -- from the trial?

8        Q    This is grand jury, in '93, before the trial.

9             Now the reason I'm showing you all this, you

10  would agree, that I'm about to show you an interview

11  where you were following up on some of this information.

12  You would agree that the information that Mattingly is

13  giving here is -- first of all, you have no idea if it's

14  true or not; right?

15       A    Yeah.  I don't know anything about it.

16       Q    But it's important information to

17  investigate; correct?

18       A    Yeah.  I -- I mean I -- I'm have trouble

19  following what they're saying here.

20       Q    Okay.  But he is making accusations that you

21  have the wrong guy, that somebody else killed this girl;

22  right?

23       A    Well, he said, "Bill, I mean I think he

24  killed the girl.  I don't --

25       Q    Is it he's --



1       A     -- know it, but he did."

2       Q     I'm going to represent to you, he's referring

3   to Bill Mahan.

4       A     Okay.  It says Smith, "Tell me why you think

5   Bill Mahan killed her.  I know you told me.  Tell me

6   why."  "He paid Jeff an anaconda snake and a hundred

7   dollars paid as" --

8       Q     Yeah.  There's no -- there's no reason to

9   read the whole thing, sir.  My question is --

10      A     Well, I'm trying to understand it, and that's

11  what you want me to do.

12      Q     Well, I -- I have limited time, so I want to

13  try to short-circuit, if I can.

14      A     Yes, sir.

15      Q     It's clear -- it's clear here, based on what

16  you've read, that he -- this man is accusing someone else

17  of committing this murder; right?

18      A     That's what it appears to be.  So --

19      Q     And that needs to be investigated; correct?

20      A     Something like that.

21      Q     And that needs to be investigated; correct?

22      A     Well, I -- I -- I don't know enough about it.

23  I don't know who these people are or anything.

24      Q     All right.

25      A     [Unintelligible; talking over] --



```
 1        Q      Well, somebody --

 2        A      -- prudent, if somebody has information, that

 3    it would be prudent to check it out.

 4        Q      Right.  And it appears that you were the

 5    person who was checking it out.  Let's take a look at

 6    Exhibit 72.

 7        A      Where's that?

 8        Q      Same binder, Exhibit 72.  Let me know when

 9    you're there.  Page 7835.

10        A      I don't know where that is.  72?

11        Q      Exhibit 72.  There's a tab there that says --

12        A      I got it.

13        Q      -- Exhibit 72.

14        A      72.  7835?

15        Q      Yeah.  This is a few months after that grand

16    jury testimony, and you're interviewing Bill Mahan along

17    with Sheriff Greer.

18        A      Yeah.  Okay.

19        Q      Did you review this in preparation for today?

20        A      I -- I didn't see this.  I don't remember

21    this.

22        Q      Oh.  You know what I'm going to do then?

23    What I'm going to do, because I think it will save time,

24    can I ask you to review this so I can question you about

25    it at your next deposition?
```



1        A     Well, I can read through it quickly now.

2        Q     No, I don't have time for quickly.  This is a

3    25-page interview.  So what I'd like you to do is, I'd

4    like you to commit to reviewing it.  It's your -- it's

5    your interview.

6              MR. BRAMMEL:  And, Nick, if you have a

7    question, you're happy -- you can put it to him, and he

8    can review it.  Or --

9              THE WITNESS:  I mean I can answer your

10   questions.

11             MR. BRAMMEL:  -- if you don't have any

12   questions, then you can --

13             THE WITNESS:  I mean I don't know what you --

14             MR. BRUSTIN:  Well, I would have -- I would

15   have though, Bill, that you would have given him this to

16   review.  What I'm suggesting is, it would be easier to

17   question him about his inter -- he said he did -- he

18   re -- he reviewed all of his interviews.  He hasn't

19   reviewed this one.

20             THE WITNESS:  Sure.  Just --

21             MR. BRUSTIN:  Is that correct, sir?

22             MR. BRAMMEL:  So, Nick, if you'd like to ask

23   him a question, you're free to do it.  If you don't ask

24   him a question about it, you can go on or you can adjourn

25   the deposition.



MARK HANDY                                          September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON                    310

```
 1              MR. BRUSTIN:  Hey, Bill, I know what -- I
 2   know what I'm allowed to do.  I'm suggesting to you that
 3   it might be a better use of our time for you to have him
 4   read this so I can question him about it more
 5   efficiently.  Are you refusing to do that?
 6              MR. BRAMMEL:  No.  What I'm -- what I'm
 7   suggesting is that the best use of time would be if you
 8   ask questions.  So if you have a question, feel free to
 9   ask it.
10              MR. BRUSTIN:  That's -- that's -- that's a
11   nonsensical objection.  But I will -- I will,
12   nonetheless -- you know what I'm going to do?  Let's take
13   a two-minute break.  I'm going to decide if I'm gonna do
14   this or wait.
15              THE WITNESS:  Why don't we just do it?
16              MR. BRUSTIN:  We're off the record.  Yeah.
17   Don't -- don't even suggest it.  I'm gonna go off the
18   record.
19              THE VIDEOGRAPHER:  Okay.  Do all parties
20   agree to go off the record?
21              MR. BRAMMEL:  Yes.
22              THE VIDEOGRAPHER:  Okay.  It's 4:58 and we
23   are off the record.
24        (At this point there is a break in the deposition.)
25              THE VIDEOGRAPHER:  Cloud is recording and
```



MARK HANDY                                    September 21, 2020
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON              311

 1   back-up's recording.  It is 5:01.  We are back on the

 2   video record.

 3              MR. BRUSTIN:  So I am going to end the

 4   deposition for today at five and a half hours.  My

 5   request is that when we reconvene the deposition for

 6   Mr. Crep's [ph] questioning and for additional

 7   questioning on other cases, that Mr. Handy please review

 8   this interview, which is one of the interviews he

 9   conducted in the case.  You can simply take that under

10   advisement, but that's our position.

11              So for now we're gonna stop the deposition

12   and we will continue at a later date, to be agreed upon.

13   Hopefully, we can agree upon time.  If not, we'll go to

14   court.

15              MR. BRAMMEL:  Nick --

16              THE VIDEOGRAPHER:  Do all parties agree to go

17   off the video record?

18              MR. BRAMMEL:  No.  Nick, I think we need to

19   provide an opportunity, if Meade County or Metro has

20   questions, to -- to ask them.

21              MR. BRUSTIN:  No, no, no, no.  We're not done

22   with the deposition.  There's not going to be multiple

23   questions.  You can answer ques -- you can ask him

24   questions when we're all done with our deposition.

25              THE VIDEOGRAPHER:  Is that everyone?



1          MR. GARVERICH:  Meade County doesn't have any

2    questions at this time.

3          THE VIDEOGRAPHER:  Okay.  Well, this

4    concludes today's videoconference deposition --

5          MR. BRAMMEL:  Some -- somebody else is

6    talking.

7          MS. CAMPBELL:  I just want to make sure

8    the -- Plaintiffs Clark is reserving time for the sec --

9    second deposition.

10          MR. BRUSTIN:  Yeah.  We -- I made that clear.

11          MS. CAMPBELL:  Okay.  Thank you.

12          THE VIDEOGRAPHER:  Okay.  And I do have a

13    read-on and some questions to ask.

14          MADAM COURT REPORTER:  Me, too.

15          THE VIDEOGRAPHER:  So this concludes today's

16    videoconference deposition of Mark Handy.  We ask that

17    all participants please stay connected for just a moment

18    to provide your transcript and video orders.

19          Mr. Brustin, would you like a video copy of

20    this deposition?

21          THE VIDEOGRAPHER:  Yes.  Okay.  Do you want

22    it synced?

23          MR. BRUSTIN:  Not yet.

24          THE VIDEOGRAPHER:  Okay.  I have a long list

25    of other names.  Can you just tell me, is anyone here



| | |
|---|---|
| 1 | present that does also want a copy? |
| 2 | MR. BOND:  Meade County Defendants.  Keith |
| 3 | Bond does. |
| 4 | THE VIDEOGRAPHER:  Keith Bond, you said? |
| 5 | MR. BOND:  Yes. |
| 6 | THE VIDEOGRAPHER:  With a synch? |
| 7 | MR. BOND:  Yes. |
| 8 | THE VIDEOGRAPHER:  Okay.  Anyone else? |
| 9 | MR. ROSENE:  Counsel for Robert Thurmond |
| 10 | does, please. |
| 11 | THE VIDEOGRAPHER:  Okay.  Anyone else? |
| 12 | MR. WICKER:  Yeah.  Counsel for Handy would |
| 13 | like it, too, please. |
| 14 | THE VIDEOGRAPHER:  Wow.  That was fast.  I'm |
| 15 | sorry; who? |
| 16 | MR. WICKER:  Counsel for Handy, as well. |
| 17 | THE VIDEOGRAPHER:  Okay.  And anyone else. |
| 18 | Okay.  Very good.  Then let me finish this |
| 19 | real quick. |
| 20 | And, Madam Court Reporter, have you received |
| 21 | a copy of your orders? |
| 22 | MADAM COURT REPORTER:  No, I have not gotten |
| 23 | orders.  And I have spelling questions, as well. |
| 24 | THE VIDEOGRAPHER:  Okay.  Do you want those |
| 25 | spelling questions on the record? |



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
314

1          MADAM COURT REPORTER:  No.

2          THE VIDEOGRAPHER:  Okay.  Stand by, then.

3   Thank you, everyone.  We are now going off the video

4   record.  The time is 5:04, and we are off the video

5   record.

6       (The deponent was explained his right to read and

7   sign the transcript of the deposition and chose to

8   exercise that right.)

9          (The deposition concludes at 5:04 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    CERTIFICATE OF REPORTER

2        I, Lorraine B. Whiteley, Court Reporter and Notary

3   Public in and for the state of South Carolina, do hereby

4   certify that the aforementioned deposition of MARK HANDY

5   was recorded by me and transcribed through

6   computer-aided transcription by me to the best of my

7   ability.

8        I FURTHER CERTIFY that the foregoing transcript is

9   a true and correct transcript of the testimony given by

10   the said deponent at the time and place specified.

11       I FURTHER CERTIFY that I am neither attorney nor

12   counsel for, nor related to nor employed by any of the

13   parties to the action in which this deposition is taken,

14   neither am I financially interested in this action.

15       IN WITNESS WHEREOF, I have set my hand and seal

16   this 3rd day of October 2020.

17

18

19

20

21          _Lorraine B. Whiteley_

22

23

24   _____
     Lorraine B. Whiteley
     Notary Public for South Carolina

25   Commission Expires:  4/7/2027



```
 1              A-T-T-E-S-T-A-T-I-O-N

 2   In Re:  CLARK, ET AL. v. LOUISVILLE JEFFERSON COUNTY METRO
        GOVERNMENT, ET AL.
 3

 4   Case No.:  3:17-cv-00419-GNS-CHL

 5   Deposition of:  MARK HANDY

 6   Date Taken:  SEPTEMBER 21, 2020

 7   Taken Before:   LORRAINE B. WHITELEY

 8   Attorneys:   NICK BRUSTIN; MARY K. McCARTHY; LARRY D.
        SIMON; MOLLY CAMPBELL; PETER FRANK ERVIN; ANDREW T.
 9      GARVERICH; ROBERT K. BOND; KENT WICKER; WILLIAM H.
        BRAMMEL, JR.; PETER J. ROSENE
10

11        Having read my deposition, no changes are
     necessary: _____
12

13        Having read my deposition, I make the following
     changes:
14

15   Page ___ Line ___ Correction _____

16   Page ___ Line ___ Correction _____

17   Page ___ Line ___ Correction _____

18   Page ___ Line ___ Correction _____

19   Page ___ Line ___ Correction _____

20   Page ___ Line ___ Correction _____

21   Page ___ Line ___ Correction _____

22   Page ___ Line ___ Correction _____

23        Sworn to and subscribed before me this ___ day
     of _____, 2020.  My commission expires _____.
24

25        Signed: _____
```



**Exhibits**

5968788 Mar
k.
Handy PLAIN
TIFF.
EXHIBIT91
    5:7
    63:17,25
    64:1

5968788 Mar
k.
Handy PLAIN
TIFF.
EXHIBIT92
    5:9 91:25
    92:6
    293:7

---

**$**

$10,000
    41:16,23

$26,000
    42:12

$30,000
    41:18

$360,000
    41:11

$85,000
    41:13

---

**1**

1
    92:5

10:04
    6:4

11
    116:21,25

11:00
    241:19,23
    263:25

11:22
    78:10

11:31
    78:14

12
    54:9
    117:21
    259:4,6
    264:3

12:55
    153:14

13
    106:20
    117:22
    259:7
    260:20
    264:14

13:40
    126:6
    216:20,24
    217:7,10

14
    49:20
    263:22
    264:15,23

14:20
    143:14

15
    106:20
    241:17
    263:24

16
    110:7
    241:9,14,
    16 242:6
    243:18
    259:4

1600
    216:25

217:14,19

16:00
    216:20

17
    110:17

17th
    53:13

19
    63:19

1986
    48:11

1989
    48:14
    90:15
    92:14
    93:12

1990-
something
    185:23

1990s
    53:14

1992
    21:21
    53:15
    79:5,21
    82:1 83:7
    88:7
    106:22
    125:24
    126:8
    173:19
    176:23
    185:23
    187:14
    198:2
    205:14
    236:20
    277:17
    278:10,22
    279:16
    280:21
    281:1,7,
    14,25

282:14
    286:1
    287:22
    288:11
    298:1
    302:22

1993
    304:3,13

1995
    48:17
    49:16
    50:7
    53:15
    106:6

1997
    63:25
    66:3

1:18
    153:10

1:23
    153:9

1:30
    153:4

1:40
    126:7,8

1:44
    153:19

1st
    97:5
    106:6

---

**2**

2.41
    153:12

20
    33:9
    54:5,7
    89:19
    217:4,6,
    23

2007
    55:14
    58:4 81:1

2013
    59:11

2015
    11:6
    12:1,20
    14:17
    16:2 19:1
    105:21

2017
    53:13
    60:19

2020
    6:5

21st
    6:5

22
    153:9

23
    153:9

239
    286:3

240
    286:3

25
    89:19
    95:12,19
    96:12
    116:18
    126:2
    216:24
    217:9
    241:9
    243:11,12
    259:3
    263:22

25-page
    309:3

25553



64:6

**25561**
65:8,11,
15

**26**
127:6
142:5,6,7
181:14
216:19
218:11,12

**27**
126:16
134:10
141:5,6
217:1,14
303:17

**28**
181:14
205:11
211:14
219:7
222:10,21
232:21
234:14
249:18
302:14,18

**29**
223:1

**290**
96:12

**2:09**
178:22

**2:40**
126:6

**2:54**
221:21

_____

**3**

**30**
172:3,14
175:10

**278:3**

**302**
41:18

**316**
106:7,12

**35**
207:25

**36**
207:25
208:2

**39**
243:2,3
244:7

**3:00**
145:9,12
146:15

**3:06**
221:25

**3:17-cv-
00419-gns-
chl**
6:10

_____

**4**

**4/6**
117:22

**4/7/92**
260:20

**4/9**
241:18

**4/9/92**
241:18,23
263:25

**40**
192:21
193:3
268:1
290:9

**4:02**

**268:11**

**4:09**
268:15

**4:58**
310:22

**4th**
207:5

_____

**5**

**50**
268:7
287:10

**55**
268:6

**59**
95:5,8,20
109:17,24
110:3
125:22,23
181:13,14
192:21
222:10
243:3
268:1

**5:01**
311:1

**5:04**
314:4,9

**5th**
117:19,20

_____

**6**

**67**
95:20
164:6,9,
22

**6879**
92:2

**69**
109:19

**6th**
109:2
110:13
121:14
202:25
203:5
259:10

_____

**7**

**70**
41:17

**72**
95:20
303:23
308:6,8,
10,11,13,
14

**7835**
308:9,14

**7882**
303:23
304:25

**7883**
305:13

**7893**
305:17

**7th**
105:7
106:22
107:7
122:23
125:24
126:8,20
142:3
173:1
180:2
181:4
183:3
184:10
185:19

190:17
191:1
197:3
201:8
202:24
203:6
216:19
222:14
223:15
224:16
236:20
237:6
262:7

_____

**8**

**8th**
97:6,12
142:2
155:11
207:22

_____

**9**

**9**
63:25

**91**
63:17
64:1

**92**
61:19
91:25
92:6
282:19,20
293:7

**93**
95:23
305:19
306:8

**95**
61:19

**97**
64:18



**9th**
109:6
141:8,15
150:19
154:25
155:5,22
173:6
179:10
180:2
181:5
184:23
185:20
187:3
190:22
191:3
192:25
193:9
200:15
238:23
239:1,14,
19 244:3

---

**A**

**a.m.**
145:9,12
146:15

**ab**
81:16

**abilities**
50:20
58:8

**ability**
37:16
102:21
103:2
145:18
231:21
235:23
283:6
298:1

**absent**
201:14
215:1

**absolute**
37:22
271:25
277:19

**absolutely**
9:12
70:25
80:19
81:18,23
98:21
125:21
214:6
221:20
265:15
269:14
274:5,22
280:10
281:4
284:3

**abuse**
51:22,24
60:13

**Acc**
131:10

**accept**
155:25

**accepting**
159:18

**access**
161:16
217:22

**accomplishe
d**
187:7

**accordance**
285:17

**account**
42:12
230:22

**accurate**
17:23
29:14

**93:6**
283:7

**accurately**
195:20,21
257:15,22

**accusations**
185:9
204:5
306:20

**accusatory**
194:16,20

**accuse**
151:14
152:15
204:14,17
251:8,25
252:6

**accused**
55:25
59:18,21
189:19
198:22,25
237:19
238:4

**accusing**
204:15
307:16

**acknowledge**
132:20

**acknowledge
d**
128:19
150:19
278:6

**acknowledgm
ent**
293:15

**act**
188:1

**acted**
56:16

**acting**
71:13
253:5

**actions**
16:16,20

**active**
19:8

**activities**
46:5,9,16
255:1

**actual**
185:20

**add**
123:7

**added**
42:3

**addition**
72:17
159:18,19
228:14
256:9,18

**additional**
42:3
133:25
222:6
225:18
238:15
248:5
254:22
311:6

**addressed**
97:7

**addressing**
98:8

**adjourn**
309:24

**administrat
ively**
59:13

**admissibili
ty**

**271:21**

**admission**
140:23
142:25
160:18,
22,25
161:1,4,
5,21
166:21
167:1
170:1
171:3
184:7,18
210:21
231:2,4
234:17,18
258:19

**admissions**
68:5,16,
18,23
69:12
70:5
76:12,20,
21 77:16,
22
162:15,20
163:6,11
168:15
170:4
179:7,9
180:3,9
181:25
182:2
183:3,10,
19,20,25
184:1,9,
10,22
203:1,7,
23 205:18
206:14,20
225:8,12,
18
262:15,17
263:3
296:6,10



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
Index: admit..animal

admit
  38:23
  69:3,23,
  24 156:19
  182:8
  189:12
  296:1,2,3
  297:15

admits
  186:10
  230:2,3

admitted
  127:14
  148:2,4
  155:5,12
  160:17,20
  187:11
  208:9,16
  231:6
  297:7

admitting
  161:11,19
  298:22

advised
  110:19,20
  111:14,16
  117:7
  129:22
  131:3,14
  132:22
  142:9
  143:17,22
  145:7
  146:16
  218:15

advisement
  311:10

advising
  117:11

Affairs
  237:15

affected
  55:7 61:5

145:17

affirm
  7:14

affirmative
ly
  210:1

afternoon
  222:21

afterward
  247:15

aggressive
  263:14

agree
  23:20
  25:16
  30:5
  52:16
  68:9 78:7
  81:2
  93:11
  104:3
  157:20
  166:4,5
  179:12
  186:12
  187:2
  190:2
  192:14
  193:22
  194:25
  195:4
  199:1
  205:14
  212:19
  213:3,9
  219:24
  220:3
  221:16
  235:5
  246:2,6
  251:11,
  22,23
  258:7,17
  263:11

269:10
271:24
272:3
275:1,23
276:4,5,
11
279:11,
15,16
280:25
282:13
283:15
287:21
288:9,20
290:11
292:24
298:12
306:10,12
310:20
311:13,16

agreed
  179:18,
  20,23
  222:3
  238:20
  311:12

agreeing
  218:5

agreements
  40:5

agrees
  68:13
  221:21

ah-ha
  170:22
  299:12

ahead
  18:11
  21:18
  34:13
  61:16
  120:25
  166:12,13
  184:14
  187:1

263:9
287:4
291:13

albeit
  172:5

alcohol
  51:24
  52:5
  60:12
  146:3

alcoholic
  52:13,14,
  16,17
  53:3,5,8,
  10,11,19,
  20

alibi
  122:24
  182:23
  226:17,
  21,25
  227:7
  228:3
  229:13
  230:23
  232:13

alive
  196:15

allegation
  148:9
  151:6
  272:21,
  23,25
  273:3,6,
  11,15,16

allegations
  55:21
  105:8,13
  107:16
  121:16,20
  204:4,9,
  14 258:7
  262:20

alleged
  140:23
  162:20
  179:7,9
  234:18

allegedly
  104:1
  143:4
  193:10
  197:3
  220:16
  296:7

alleging
  267:13

alley
  185:1

allowed
  205:17
  310:2

amend
  78:24

amends
  9:20

amount
  40:3
  90:22
  252:2

anaconda
  307:6

analysis
  99:20
  138:5

Andrew
  7:4 64:7

angle
  124:11,12
  142:13
  252:8

animal
  97:24
  162:21



187:10,17
194:17
195:2,5
230:13
250:18

**animals**
107:17,
18,23
108:16,
20,23
109:9,12
128:8,13,
20,24
131:4,15
132:2,20,
21,23
135:10
137:12
160:17
214:10
243:17,23
244:22
246:4,18
247:15
248:25
249:24
250:3,10

**answering**
22:4
34:19,23
130:19
133:2,4,
5,6
136:21
139:9
151:23
171:15,19
175:15
180:17
202:8
218:9
219:7
228:24
247:24
252:15
254:25

256:25
288:7
300:17

**answers**
83:25
197:8
247:1

**anymore**
36:7,12
127:15
168:21

**ap**
213:10

**apologize**
9:10
18:16
20:14
35:21
61:17
245:4
302:17

**apparently**
98:12
113:21
208:15
218:22
246:7

**appeared**
112:2

**appears**
33:11
100:20
264:6
307:18
308:4

**Appraisal**
63:23,24
67:5

**approach**
67:19,24
260:23
262:23

**approximate**
41:6,9,10

**approximately**
42:7
48:13
79:23
127:16,17
143:14
217:5,19
218:17

**April**
48:14
105:7
106:22
107:7
109:1
110:13
117:19,20
121:14
125:24
126:8,20
154:25
155:5,11,
22
184:10,23
192:25
197:3
200:15
207:5,21
223:14,15
236:20
239:1
259:10

**area**
88:15
101:10
120:14,
20,22
125:5
172:23
201:22
269:15
272:5,9

**areas**
21:7
93:25
94:18
98:13
134:7

**argue**
20:22
31:1

**Argumentative**
211:7

**arguments**
162:4

**arrested**
200:17

**arsenal**
125:13
205:16

**art**
227:19

**ascertain**
10:1,3,16
21:6  24:6
35:1
202:14

**asks**
20:15
271:25
272:7,12

**assault**
60:7
269:1

**assess**
40:25

**assessment**
81:3

**assets**
40:25
41:15
42:9,10

**assigned**
110:12,13
117:23

**assignment**
80:5,8,
10,16
84:5

**assignments**
83:20,22

**assist**
259:10

**assistant**
258:10

**assisted**
240:16

**assisting**
253:1
258:14,18

**assume**
21:20
215:2
227:4
250:23

**assuming**
205:4
215:4
242:11,18
247:13
250:15

**attempted**
9:10  38:4
39:6,10
69:14

**attendance**
286:23

**attention**
33:23
86:13
216:5
250:7

**attorney**



28:16
46:22
192:10

**attorneys**
42:16
43:4
47:23,24
48:3
78:17,19
79:3

**attribute**
152:4

**attributed**
147:18
149:25
162:7
210:22
280:20

**atypical**
89:1,2

**audience**
68:1

**authority**
275:6,13,
15 276:9

**autopsy**
264:21
265:5
266:10

**average**
70:13
91:1

**aw**
67:24

**aware**
61:20
105:8,12
106:21
107:8,12,
16
200:13,24
201:1

238:1
283:14

———————

B

———————

**ba**
236:15

**back**
8:21
10:23
13:1
18:25
36:17,18
45:23
50:1,3
52:5,19
53:14
71:1
72:22
78:14
79:5
86:22
87:25
88:5
116:19
117:18
149:5
153:4,19
169:20
173:2,11,
12 175:15
178:12,
15,16,20,
22 179:7
185:16,
23,25
187:3
188:4
196:13
198:2
200:21
205:10
211:13,14
215:7,10,
22 217:17

222:1,15
232:21
233:23
237:15
238:14,23
239:3
243:11
244:2,6,
17 257:7
268:15
278:21
282:19,20
284:6
292:3
296:18
297:13
298:1
302:14
311:1

**back-up**
78:13
153:18
178:22
268:15

**back-up's**
311:1

**backed**
148:3

**background**
67:24
88:11

**backtrack**
291:19

**bad**
36:22
37:24
189:7
276:20
304:15

**Barnes**
193:11
242:7
243:6,12
244:11,

17,21
247:21
248:1,5

**Barnes's**
249:23

**barred**
19:25
30:18,21,
24

**barrel**
270:13

**base**
260:5

**based**
14:19
29:13
37:11
46:4,10
83:20
89:4
100:17,19
113:14
119:2
203:4
204:3
241:2
254:21
257:16
258:9
261:9
307:15

**basic**
76:4 77:7
228:22
229:7,10

**basically**
190:9
196:10
211:1
228:18
236:8

**basics**
232:8,12,

14,15

**basis**
30:17
31:2,3
53:24
55:14
85:16
284:5

**Bates**
64:6

**Bates-stamped**
92:1
116:22

**beans**
289:2

**bear**
285:20

**beer**
143:19

**beers**
53:24
54:3 55:7
61:21

**began**
128:24
131:4,15
132:3,4,
6,8,23
135:10,25
136:2,9,
16,23,25
137:12,15
138:3
139:22

**begin**
108:20

**beginning**
78:13
100:25
110:18
117:6



126:5
127:6
142:8
216:19
222:21
223:8

**begins**
6:5 64:6

**behalf**
7:2,4,6

**behavior**
94:8

**beings**
129:10
132:11,17
135:1
220:19

**belief**
17:19
215:18

**believed**
8:25 16:3
25:4,5,9,
15 56:8,
11,13
57:8,11,
18,19
137:25
199:3
200:1
297:5

**believing**
31:7,11,
18

**benefit**
75:12
98:23
105:2
225:10

**benefits**
226:12,14

**bet**

289:13

**Betty**
60:16

**big**
170:11
188:1

**bill**
7:2 87:14
221:9,12
222:2
285:20
305:22
306:1,5,
23 307:3,
5 308:16
309:15
310:1

**binder**
95:6,14,
15,17
96:1
105:16,
19,23
109:22
164:18,
21,22
256:4
308:8

**binders**
95:9

**bit**
55:17
116:14

**bits**
15:13

**blah**
100:14
185:9
194:3,4

**blatantly**
287:1

**blindsided**

286:24

**blindsiding**
287:5

**blood**
205:21,22

**blurt**
129:25

**Bob**
79:18

**body**
118:17
179:24
218:25
219:13

**Bond**
35:17,20,
23 36:8
160:3
162:9
163:2
164:13,15
240:9
248:21
259:13
265:24
266:8
273:17,21
274:21,23
276:15,24
277:9,24
278:1,13
279:4,8
280:5
286:10,
16,19
287:4,8,
10,13,19
294:16
301:8
313:2,3,
4,5,7

**book**
73:14
254:20,21

255:6,11,
14,20,21
256:9

**boss**
82:15
280:16

**bosses**
50:23

**bother**
298:17

**bottom**
65:11,15
86:21
106:7,9,
10,11
126:4
127:7
216:24
217:1,9,
14 218:12
243:21,22
259:5

**boyfriend**
120:15,18
122:13
123:22
124:11
260:22
262:22

**Brammel**
7:2
153:11
166:6,9,
13 167:18
168:16
169:7,9,
16 174:18
175:18,
21,24
176:2,4,
11,16,19
178:3,6,
10,18,24
183:4,6

184:11,24
190:5
192:22
193:1
203:11
206:21
211:6
213:22,24
216:8,11,
22
221:10,
13,15,17
231:17,21
232:3
235:20
238:6
252:14,19
260:1
274:4,6
277:25
278:14
279:20
282:17
284:22
285:1,16
286:4,9
294:23,25
295:5,8
300:20
302:1
303:11
309:6,11,
22 310:6,
21
311:15,18
312:5

**break**
36:13
74:2,5
78:2,11,
17,18
152:20
153:16
186:9
216:12
221:9,23



268:4,10,
13
310:13,24

**breathe**
238:14

**breezed**
151:11

**briefed**
110:15
202:10
224:18
225:23
226:10
227:16,24
228:3
230:15
234:6

**briefing**
227:19,21
235:3,16

**bring**
101:20
104:25
133:3
238:14

**bringing**
189:23
215:5,9

**brought**
63:12
71:1
88:15
217:17
222:14
259:10,
16,20,21
260:8
265:20

**Brustin**
6:21,22,
24 7:22
18:12,14
19:24

20:1,3,8,
10,13,18,
20,23
27:18,19,
21,22
28:1,4,7,
12,15
30:12,17,
21 31:2,
4,13 32:5
35:12,15,
18,22,25
36:2,6,
11,17,19
63:8
64:10,13,
16 74:4,
7,11
78:1,5,8,
15 90:6,
13 91:21
92:10,12
95:11,15,
24 96:4,
9,13,22
105:15,24
109:18,25
110:4
130:21,24
137:8,14
139:7,11,
14 151:22
152:2,8,
11,14,21,
24 153:3,
22,25
154:8,11
160:4
162:13
163:4,22
164:4,7,
8,17,19,
20 166:7,
10,19
167:23
168:23
169:13,23

174:19
175:19,
22,25
176:3,10,
14,17,20
178:14
179:2,4
183:8
184:17
185:5
190:15
192:25
193:2
203:19
206:25
211:17
214:3
216:10,
14,16,23
221:8,11,
14 222:2,
8 231:23
232:10
236:6
238:8,10
240:10
248:22
252:17,
21,22
259:15
260:6
266:1,13
268:3,9,
17
273:18,24
274:7,25
276:19
277:1,12
278:7,25
279:6,10,
24 280:12
283:11
284:25
285:5,6,
19 286:6,
14,17
287:3,5,

9,12,14,
20 294:17
295:4,6,
12
300:22,24
301:10
302:5,8
303:13,
19,21
309:14,21
310:1,10,
16 311:3,
21
312:10,
19,23

**brutal**
182:6
297:4

**brutally**
281:25

**buck**
81:20

**build**
182:10

**bunch**
103:25
204:9
262:20
289:6
290:19

**business**
267:25

**busy**
257:11
289:20
290:22
291:2

**butchered**
185:1

_____

C

_____

**cage**

215:12

**calculate**
201:23

**call**
27:11
69:22
80:10
94:5
185:11
191:11

**called**
50:4 57:9
92:14
93:18
98:3
99:1,6,10
184:7

**calling**
240:7

**calls**
66:19
231:18
235:21
239:17
260:1

**calm**
24:23
25:10

**calmly**
186:11
187:22

**CAMPBELL**
312:7,11

**candid**
91:5
151:11

**capability**
71:3

**capable**
205:13
219:7



capacity
44:12

caping
285:8
286:1

capital
30:7,23

captain
82:6

car
41:17
107:12
134:2
146:23
149:2
171:2,24
181:23
186:20
200:22
214:8,13,
19 215:24
216:1,6
217:23
234:2,6
236:22
237:5
300:10

care
203:22

career
12:21
239:24
268:19

carefully
21:4
126:24
258:12

carried
71:18

carry
174:2

case

6:9 8:6,
21 9:6
11:21,22
12:2,12
14:3,11,
16,23
15:1,15
16:2,4,6
17:15,16,
21 18:6
21:25
22:8,13
30:7,23
31:8,11,
12,20,21,
24,25
32:2,7,
10,23
33:4,7
37:3,10,
14,15,17,
21 38:8,
13 39:7,
11,12,21
40:1,16
44:14,21
45:12,22,
23 46:6,
10 47:25
48:3,8
49:19
50:4
72:15
85:1,3,17
86:3,22
93:5,25
95:1
97:5,9,15
99:13
100:1,4,6
101:1
102:10
103:8
104:4,8,
10,14,16,
22 105:8
106:23

107:9,13
108:2
110:13,15
111:25
112:12
113:2
114:25
115:24
116:14
117:15,23
119:10,
15,16
120:3,9
121:14,21
127:3
147:16
154:16,21
157:21
158:2
167:1
172:4,18
177:17
185:10
196:23
198:7,14,
19,20
199:15,
17,22,24
200:5
201:15,
18,19
202:10,11
203:6
206:11
209:18
213:17,19
219:12,
19,22,24
226:10
228:18,21
229:8,9
237:1,3,
12,25
238:5,19
239:24
240:8,15,
23 241:6,

11 248:23
250:12
252:13
253:18,
21,22
254:1,8
255:7
257:10,13
258:4,8,
13 259:1,
10,21
272:17
274:9,13
275:16,18
285:3,8,
14,20,23,
24,25
296:17
298:23
299:5,9
300:3,8
302:13,14
311:9

cases
10:22,23
15:2
19:25
20:15
32:10
38:14,17
39:21
50:2
66:19
71:19
83:16,17
102:4,7
296:18
311:7

cassette
298:10

casual
170:6
185:11

casually
170:23

catching
27:12

cats
128:7
132:19

caught
27:1,7,8
195:13
294:10,
14,19

causatory
161:13,17

caused
9:6 40:20
55:22

central
17:16,17,
23

certificate
92:4

certificati
on
103:21

certified
7:19

chance
78:16
305:15

Chandler
20:4,12
252:12

change
78:24
226:9
260:3

changed
42:1
283:4,24

changing
225:7



characteriz ation
  58:8

characteriz ed
  53:21

charge
  79:12
  81:14
  228:18
  239:9,16
  240:4
  253:4,8

cheated
  161:1,5
  194:4

cheating
  195:13

check
  145:21
  308:3

checking
  308:5

chest
  218:15,16

chief
  55:13
  82:2,7,9,
  20,25

child
  210:19

choice
  11:17
  49:12

choose
  25:25
  26:1,2,9

chose
  11:17,20
  14:19
  16:2

49:12
314:7

circumstanc e
  213:11
  215:2

circumstanc es
  273:20
  279:17
  281:21

City
  40:4,7,
  10,13,16,
  19 48:3

civil
  237:11,21

claim
  44:21
  147:9
  148:12
  149:7
  155:4
  158:18
  169:25
  250:25

claimed
  148:3
  150:11
  209:6

claiming
  33:24
  127:2
  146:20
  147:17,
  19,23,25
  149:24
  150:15,18
  157:3,6,
  9,12,15,
  17 209:5
  232:16

claims

144:4
145:4
146:4
156:3
211:19,24
232:1
249:2,3
272:18
274:16,18

clam
  297:18

Clark
  6:7 8:3,
  13 9:10,
  20 16:22
  26:5
  32:15,24
  36:21
  46:17
  47:4
  87:13,15,
  18,22
  109:1
  110:19,20
  111:2,3,
  14,16,21
  114:20
  117:7,11
  118:2
  123:2,14
  125:25
  134:12
  141:5,9
  150:20
  154:17
  155:13,23
  156:20
  158:4,10,
  18,22
  189:12
  199:19,23
  200:11,16
  202:13,24
  203:7
  207:4,9,
  14,17,21

208:3,9,
24 209:3,
5 210:16
211:19,22
213:21
214:4
222:4
236:4
237:17,20
238:19
240:23,24
243:13
253:10,
13,15,18,
22,23
254:3,9,
18 255:2
256:11,
21,23
257:11
258:24
259:11
260:8,13,
14,17,23
262:23
264:9,10
266:15,
17,20
267:13
272:18
274:8
275:21,24
296:7,9
297:4
298:12
300:18
301:2
303:5
304:15,17
312:8

Clark's
  19:13
  200:22

Clark/
hardin
  21:1

23:15

classroom
  103:22

clear
  15:21
  19:1
  99:19,25
  101:8,9,
  18 127:20
  181:19
  209:25
  238:11
  241:17
  243:5
  245:10
  259:9
  271:12
  273:2
  295:10
  299:8
  303:14
  304:9
  307:15
  312:10

clearer
  20:2

client
  139:8

close
  153:5
  216:4
  278:21

closest
  261:21

closing
  162:4

cloud
  78:13
  153:17
  178:21
  221:25
  268:14
  310:25



clues
  75:6

coercion
  269:19

coincidence
  231:25
  260:7,10,
  12 266:20
  267:12,16

cold
  50:2,4

colleagues
  47:23

collected
  34:4,5
  36:22,24
  37:5

collector
  41:17

college
  135:14

combination
  92:19
  108:1

comfortable
  68:16
  71:14
  77:12
  182:3
  233:16

commanding
  233:14

comment
  57:4
  65:24,25
  66:13,25
  67:6
  169:18
  253:20

commentary
  295:1

comments
  66:23
  67:2,3,8
  302:7

commission
  94:14

commit
  15:17
  295:18
  309:4

committed
  105:5
  120:4
  121:18
  191:21
  295:23
  297:4

committing
  307:17

common
  156:24

commonly
  50:7

communicati
on
  47:24
  186:8
  187:6
  192:8

communicati
ons
  47:22
  261:10

compare
  104:15,
  19,20

compared
  52:10

comparison
  135:16,18

competency

88:19,21

competent
  202:19

Complaint
  42:17
  44:14
  151:9,10

complete
  176:22

completed
  83:23
  84:6

completely
  179:13
  197:17

Completion
  65:18
  92:4

compliant
  188:14
  291:15
  292:18

complicated
  67:22

Complying
  223:3
  259:8

Compound
  137:5

compulsion
  172:25
  178:1
  220:18

compulsions
  165:15

con
  53:21
  195:10

concern
  185:7

286:11

concludes
  312:4,15
  314:9

concurring
  221:4

conduct
  70:7
  237:11,25
  270:25
  271:17,20
  273:8
  280:1
  281:11,17

conducted
  37:11
  83:11
  92:23
  241:21
  242:17
  254:2,7
  274:13
  293:23
  294:4
  301:1
  304:7
  311:9

conducting
  71:5
  247:17
  255:1
  257:9,12
  271:13

confess
  167:12,17
  275:2

confession
  30:7
  167:12
  201:14
  263:17

confessions
  263:12

confident
  19:16
  148:25

confirm
  62:7
  147:9

confrontati
onal
  193:14,21
  195:23

confronted
  193:9

confronting
  195:9,15
  196:1
  208:13

connect
  134:18

connected
  312:17

connecting
  200:12
  201:10
  203:9

connection
  178:10
  237:20

conscientio
us
  38:12
  72:2
  202:19

conscientio
usly
  258:13

consent
  266:16

considered
  67:10
  80:7
  84:22



90:21

**consistent**
74:23
248:19

**consistently**
52:8

**constantly**
104:14,17

**constitutes**
269:8

**consult**
93:9
98:19
99:15

**contact**
264:10

**contacted**
249:20
260:20

**contained**
126:14

**contemporaneous**
293:3

**continue**
185:17
192:6
197:7
235:9
256:3
311:12

**continuing**
61:4

**control**
82:8
145:18
165:15,20

**convened**
11:4

**convenience**
74:3,6

**convenient**
152:20

**conversation**
115:11
118:15
131:9,16
138:24
156:14
168:20
203:2,3
215:25
236:21
298:2

**conversations**
201:20

**convict**
199:5,13

**convicted**
8:13
10:2,4,17
11:15,23
12:9
16:22
17:4,9,10
33:8

**conviction**
10:1,6,24
12:3,8,22
17:2
32:25
40:20
161:9
201:21,22

**convictions**
9:14
11:5,8,13

**convince**
69:11

**convinced**
8:19 9:2

**convincingly**
24:16

**cooperate**
276:21

**cooperative**
179:14
188:15

**copy**
255:21
312:19
313:1,21

**corner**
65:11,16
126:2
289:25

**corners**
59:13,21

**coroner**
55:14,16
56:11,13,
14 57:10,
12,19
101:24

**Coroner's**
101:24

**correct**
9:12,18
11:5,7,9,
10,11,18,
19,23,24
12:3,4,19
13:10,15,
17,18
14:17,18,
20,21
16:8,9
19:3,4,6,
7,9,14,
15,18,19,
21,22

20:5
21:2,5
23:9,10,
12,13,17,
18,19,24
24:2,4,
22,25
25:2
32:3,7,8,
16 33:5
35:1,2,5
36:23
37:12,13,
15,17,18,
20,24
38:2,6,7,
10,14
39:19,20,
22 44:15,
17,19,25
45:1,2
48:11,12,
15,17
49:5,6,
11,13,14,
18,21,22,
24,25
50:8,10,
11,13,14,
16 52:9,
11 54:4,
21 56:24
58:20,21
59:2,8,9
60:1,3,4,
10,11
64:22,24
65:4,6
66:4,9
67:7
68:5,6,
16,17
69:12,16
70:10
71:5,8,16
72:14,20,
25 74:17

75:1,4,8
76:5,6,9,
10,13,14,
17,18,22
77:5,14,
17,18,23
79:6,11,
13,14,15,
17,21,22,
24 80:6,
23 81:21,
22 82:1
83:8,9,12
85:1,4
86:18
87:10,13,
14 88:3,
4,19
89:9,13
90:4
92:3,15,
16,21
93:2,5,
13,14,18
94:1,2,9,
14 96:16
97:9,15,
16,20,25
98:9,20,
23 99:2,
16,21
100:2,22,
23 101:2,
10 104:6,
10,16
105:5,6,9
106:23
107:2,9,
10,13,14,
17,24,25
108:3,16
109:2,3,9
110:13,
14,15,16
111:25
112:1,3,
10,11,14,



17 113:1, 9 115:18 116:3 117:4,12, 13,15,24 118:3,4,8 119:10,17 120:4 121:18,21 122:5,6, 13 123:23,24 124:13,25 125:9,15, 24 126:9, 10,12,13, 16,17,20, 21,25 127:3,22, 23 128:1, 2,4,14, 15,18,25 129:1,7, 12,20 131:1,12, 24 133:10, 17,18 134:8,12, 16,17,19, 23,24 135:1 141:5,10 142:13, 14,23 143:1,23, 24 144:3, 10,11,15, 20 145:6, 18 146:6 147:10 148:13 150:1,5, 21 151:2 152:4,16 154:18,21 155:1,2,

7,8 156:5,8, 10,13,16, 17 157:4, 7,8,10, 11,15,16, 18,19 158:4,5, 19,20 160:18, 19,22 161:10, 14,15,17, 21 162:1, 8 163:1, 3,7,18 165:10,16 167:2 169:6 172:18 173:2 176:24,25 177:7,11 179:22,25 180:4 181:5,18, 20,25 182:20 183:11 185:21 186:21, 22,25 190:4,18 191:1,21 193:12, 13,15,16, 18 194:14,20 195:2,11 196:5,24 197:4 198:18, 20,21 199:24,25 200:5,19 201:2,12 202:15,20

203:1,10 205:19,24 206:2,7, 14,20 207:5,15, 16,19,20, 22 208:3, 4,8,12,14 209:7,11, 12 210:8, 10,14,15, 20,24 211:19, 22,23,25 212:8,21 213:5,12, 17,21 215:3,7 216:2,3, 6,21 217:6,12, 14 218:21,24 219:4,14 220:5,19 222:18,19 223:16, 24,25 224:6,7, 9,16,17, 21,23 225:3,8, 19,24 226:13,17 227:3,17, 22,25 228:3,4, 6,14 229:14, 15,19,22, 25 230:6 233:24 234:3,7 236:22 237:17, 18,21,25 238:16,

21,22 239:20 240:19 241:7,8, 18,22 242:1,4, 5,8,17 243:14,15 244:3,22 245:5,14 246:5,15, 23 247:4, 8 248:15, 18,25 249:4,15 251:1,9 252:5 253:5,6,9 254:18 255:13 256:13,22 257:17,23 258:1,5, 10,15,21, 22 259:11, 18,19,24 260:9,15 261:4,5, 12 262:8, 9,15 265:10, 13,18 266:18,23 268:23,24 269:1,2, 4,5,8,13, 19,25 270:9,11, 14,18,19, 22 271:3, 18,22 272:15,21 273:8 274:3,9, 20 275:4, 16,18,21,

22,25 276:7,14, 22 277:2, 5,8,20, 21,23 279:14 280:3 281:9,18 282:9,16 283:6,17 284:9,13, 21 288:23 290:15 292:14,19 293:4,9 297:19,24 298:3,14, 17 299:2 302:24 303:5,6, 8,9 306:17 307:19,21 309:21

corrections
51:9

correctly
25:24 90:17 91:16 108:18

Counsel
6:18 63:20 74:2 152:7,10, 13,19 303:16 313:9,12, 16

Counsel's
95:16

country
120:21



County
  6:7 7:5
  202:2
  252:25
  253:4
  254:1
  272:24
  273:1
  311:19
  312:1
  313:2
couple
  43:8,13
  50:3 62:6
  97:6
  201:1
  246:25
  250:2
courage
  278:12
  280:21
court
  6:8,12,19
  7:12,17
  21:10
  27:25
  63:13,18
  64:3
  91:24
  92:3,8
  95:7,21,
  25
  105:17,22
  109:23
  110:1
  133:3
  158:17
  163:23
  164:1
  178:11
  211:4
  222:6
  252:12,18
  296:3
  311:14

312:14
313:20,22
314:1
court's
  19:25
  20:16,20,
  21 30:19
court.net.
  252:19
courtesy
  6:14
covered
  285:2
covers
  53:16
crazy
  269:14
created
  44:24
  45:11
  83:12
  86:17
  87:9,22
  104:6
  223:24
  241:11
  248:13,14
  293:25
creates
  293:3,8
creating
  37:21
credibility
  17:7,8
  160:7
credit
  41:14
creepy
  113:16,
  17,18,20
  114:20

Crep's
  311:6
crime
  91:19
  93:17
  97:13
  120:3
  121:16,17
  125:17
  129:6
  134:23
  144:14
  145:5,14
  180:3,10
  181:25
  182:2,8
  191:21
  200:2,12,
  19 201:11
  212:2,6,
  10,14,16,
  21 213:4,
  7,11,21
  214:5
  264:20
  265:4,9,
  13,16
  266:10,
  21,23,24
  267:14,
  15,19
  276:7
  288:22
  304:2,20
  305:11
crimes
  90:15
  92:5
  93:9,13
  94:12,14
  97:4,13
  102:4,7
  119:18
  125:4,7,9
  129:4

criminal
  19:14,17
  21:1
  25:18
  26:4
  31:24
  68:21
  94:8
  106:16
  150:5
  205:15,20
criticism
  49:8
criticisms
  50:10,12
  51:11
  60:2
criticize
  51:5
criticized
  303:7
cross
  118:17
  144:22
  218:14,
  16,21
  219:2,13,
  14 220:8,
  15,21
  280:7
crossed
  144:23
  297:1
  301:18
crosses
  219:20
Crystal
  193:10
  242:7
  243:6
  244:11,
  16,21
  247:21

248:1,4
  249:22
culpatory
  258:19
cult
  103:3
cult-type
  90:21
cultivate
  69:15
curious
  33:6
  113:24
  168:21
custom
  173:19
  177:1
  287:22
  288:10
cut
  59:13
  115:1
  222:3
  276:9
  300:21
cutting
  59:21

———————

D

D.A.
  21:6,7,24
  22:1,4,23
  306:4
damage
  40:2
damages
  40:20,21
damaging
  160:18,22



damning
  161:1,5,
  20 210:21

dangerous
  84:22

date
  104:6
  142:1
  185:23
  200:23
  252:12,18
  311:12

dated
  223:14

dates
  48:20
  182:24

dating
  142:9

day
  24:14,17
  56:2
  117:22
  118:7
  156:20,21
  166:17,20
  186:24
  193:14
  226:1
  241:24,25
  254:6,20
  255:6
  267:20
  276:6

days
  53:25
  54:1
  97:6,12
  107:11
  201:1
  223:19,21
  224:6
  238:21
  260:13,14

282:20

dead
  101:22,23
  194:6

deal
  50:19
  170:11
  188:2
  204:25
  276:9

dealings
  22:10
  247:17
  285:12

death
  124:18

deceased
  82:10
  83:2

December
  53:13
  60:19
  63:24

decent
  14:23

decide
  158:2
  291:25
  292:3
  310:13

decided
  13:12
  118:2
  128:3
  136:5
  172:25
  173:9
  188:19
  190:1
  235:15
  239:1,10
  260:21
  261:17

262:21
266:14
292:2
301:23
302:12

decision
  14:24
  185:20,24
  197:18
  202:1
  210:6
  235:10
  261:3,6
  262:14
  303:3,8

decisions
  198:2
  240:13,15
  247:19
  253:8,13

deduced
  124:20

defacing
  94:16,18,
  21

defendant
  199:17

defendants
  7:5 31:24
  313:2

defer
  82:12,17

deferred
  82:18
  83:4

definitivel
y
  210:18,19

degrees
  17:14

denial
  276:14

denied
  141:9,16
  154:25
  155:21
  218:10
  265:12

denies
  150:23
  249:23

deny
  156:21
  213:21
  265:12
  273:7
  274:3,8,
  9,11
  275:21

denying
  141:4
  229:17

department
  19:6
  48:11
  73:7
  88:15
  90:19
  237:10
  260:21
  264:17
  265:1
  287:23
  288:10
  302:22
  303:3

depation
  6:5

depend
  17:12
  84:12
  280:23
  281:10

depending
  68:15
  193:25

depends
  67:17
  193:19
  212:23
  249:16
  262:25
  263:18
  281:20
  289:19
  299:3

deponent
  314:6

deposed
  286:11

deposes
  7:19

deposition
  6:6 15:8,
  11 42:17
  44:5
  47:12
  64:2
  75:16
  78:11
  92:7
  95:19
  150:11
  221:23
  222:3,5
  268:13
  286:3
  308:25
  309:25
  310:24
  311:4,5,
  11,22,24
  312:4,9,
  16,20
  314:7,9

depositions
  45:23
  46:2

Deputy
  55:13



56:11,12,
14 57:10,
12,19

describe
52:1
90:12
170:8
195:20,23

describes
195:21

describing
117:19
126:18

description
117:18
220:15

designation
257:25
258:9

desire
171:25
197:4

Despain
57:24
58:10,15
59:4
80:25

detail
228:5

detailed
230:22

detailing
126:5,11

details
161:20
226:25
227:7
228:7,9,
10,11
232:13

detec

50:6
171:11

Detection
92:5

detective
24:5 32:9
48:24
51:6
54:20
55:8
57:24
58:5,7,17
59:8,10
65:21
66:16,17
80:16
83:8
89:25
104:4
105:3
114:5
117:7,11
119:14
124:5
144:7,9,
18 161:8
188:8,12
199:16
202:19
214:21
223:5,8
225:7,11,
16 227:20
239:24
241:5
255:3,25
256:11
257:10,
17,21
258:1,5,
10,18,24
260:20
264:1,17
265:1
281:15
293:15

detectives
62:21
69:18
70:11,13
72:18
80:12
82:2,7,9,
20,25
83:1,16
89:22
104:24
175:5
184:8
279:18
293:13

determinati
on
301:12

determine
11:4,14,
21 12:2,8
28:20
114:6
115:23
180:8
232:11
298:16

determined
13:7

determining
16:21

development
65:2
66:14

device
290:1

devil
94:3,4,5,
6,8,13
111:3,17,
22 114:23
115:3

Devil-
worshing
136:1

Devil-
worshiping
97:8,15,
18,23
98:3
108:15
109:8
112:9,16
113:6,7,
9,20
115:4,12,
14,17,23
128:13,23
129:6,22
130:12
131:14
132:22
209:14,17
210:2,7
219:3,14,
25

Devil-
worsiking
131:3

Dewayne
6:7

Dictaphone
298:8

Dictaphones
174:5

dictate
85:5
223:22
298:6

dictated
50:24
298:10

difference
23:22
258:11

differently
31:16
71:21
72:11
174:22

difficult
10:12
90:25
192:9,16
201:15

direct
7:21
64:20
193:14
194:11
216:22
286:5

directed
264:9

direction
253:5

directly
46:21
81:7

dis
140:19

disagree
197:5
221:2

disagreeing
75:21
281:12

discovered
32:24
117:3

discredit
148:16,21

discretion
176:22,24
241:5

discuss



85:14,18
139:20,23
140:3,15,
18
188:22,
23,24
211:11
236:24,25
264:19
265:3

**discussed**
50:21
87:9
118:6
134:7
236:9
261:14

**discussing**
118:1
140:21
251:3
267:14

**discussions**
140:19

**dishonest**
199:2,11

**dislike**
306:3

**disposal**
76:12

**dispute**
58:8,9,24
80:3
124:6
155:16
250:22

**disputed**
250:20

**disregard**
25:19
26:6

**District**

6:8,9

**division**
288:11

**DNA**
32:15,20,
23 33:3,
7,24 34:2
35:4

**document**
44:20
63:12
222:17
230:11
231:8
270:21
277:20,23
286:24

**documents**
8:9 10:15
11:20
16:7
42:13
44:4
46:4,11
47:20
65:1
286:23

**dogs**
115:7

**dollars**
42:7
307:7

**domestic**
124:6

**door**
57:6

**doorway**
272:20
300:11

**doubt**
101:11
118:5

201:25
237:3

**dow**
246:7

**downtown**
264:17

**drank**
52:3
53:12
54:11,16,
17,25
55:1
284:14,16

**drawings**
116:13

**dreamed**
250:25

**drink**
54:3,12,
13,15
144:2

**drinker**
52:2,8,20
53:22

**drinking**
52:23,25
53:22,23
55:6,10
61:5,9,21
143:19
144:8,9
282:21
284:9,12

**drive**
70:25
214:21

**driving**
174:18
214:15,
17,19
215:2,4,
21 282:24

283:17

**drove**
220:8

**drunk**
143:17,22
144:8,12,
16,20,25
145:2,4,
8,13
146:5,12,
16 150:16
157:18
161:20
282:23
283:17

**duly**
7:18

**duties**
54:19

**dynamic**
225:11

**dynamics**
170:19

—————————

**E**

—————————

**earlier**
284:7

**early**
71:3
94:25
97:4
117:15
172:19
204:1
228:15
262:19

**ears**
187:22

**earshot**
246:13

**easier**
95:18
309:16

**easy**
109:17

**ed**
82:20,21,
24,25
135:12

**educated**
135:13

**education**
98:16

**effective**
66:4,8
76:8

**effectively**
111:12

**efficiently**
310:5

**effort**
11:2
169:15
205:17

**efforts**
134:6

**eighties**
52:2,9,18

**em**
13:5
189:21
190:23
191:12
204:14
212:17
213:25
214:1,7
265:21
266:25
267:1,10,
20,21,24



emphasize
   258:24

Employee
   66:14

employees
   7:9

Employment
   65:19

enable
   227:8

encourage
   76:21

encroaching
   286:20

end
   50:1
   169:11
   171:10
   178:4
   179:1
   311:3

enforcement
   72:24

engage
   98:3

engaged
   150:24
   281:7

engaging
   71:14
   127:14
   277:18
   280:3

ensure
   84:5
   222:4

ensuring
   272:14

enter
   104:4

entered
   171:24

entire
   25:20
   53:16

entitled
   63:23

entity
   237:10

equal
   271:2

equally
   271:17
   272:13
   276:7
   279:12

equity
   41:13,21

Ervin
   7:8 48:2

Esquire
   6:13

essentially
   252:25

established
   125:7

ether
   133:19

evaluation
   63:2
   64:18
   65:25

evening
   61:21

event
   8:2
   157:20

everyone's
   36:9
   66:19

Everything's
   67:18

evidence
   32:16,20,
   23 33:3,
   7,25 35:4
   36:22,24,
   25 37:3
   121:17
   161:13,17
   162:19
   179:23
   195:10,16
   198:7,8,
   15 199:3,
   4,12,14
   200:12,18
   201:10,
   15,24
   202:15
   203:5,9
   217:18
   219:11
   220:24
   221:1
   258:3,8,
   18 274:24

ex-
boyfriend
   112:19
   120:17

exact
   42:20
   48:20
   62:16
   79:7
   147:22
   156:14
   303:12

exam
   61:23
   177:9,16
   179:18
   181:24

EXAMINATION
   7:21

examiner
   177:10
   218:2

examiners
   177:20

examples
   293:23

excerpt
   96:6

excess
   41:16,23

excusatory
   194:12

Excuse
   303:16

excuses
   297:11,
   12,14

exercise
   314:8

exhibit
   63:17,18,
   25 91:17,
   25 92:6
   95:5,8,
   10,12,19,
   20,22,24
   96:12,19
   109:17,18
   110:3
   116:18
   125:22,23
   163:22,23
   164:21,22
   181:13,14
   192:21
   222:10
   241:9
   243:2,11,
   12 259:3

263:22
   268:1
   286:15
   303:22
   308:6,8,
   11,13

exhibits
   64:8
   95:14,18,
   19 109:22
   286:12

existence
   177:5

exonerates
   33:25

expect
   13:25
   147:8
   184:25
   291:20
   295:14

expectation
   158:15

expected
   202:21

experience
   24:20
   26:25
   27:6
   28:19
   29:20
   144:9
   157:22
   187:10
   204:3
   295:17

experienced
   51:13
   69:19
   83:7 88:8
   144:7
   165:13
   170:2



188:12
225:6
229:9
259:23
261:11

**expert**
98:12
229:9
295:16

**explain**
16:24
30:21
102:20
171:2
174:10
176:9,16
177:25
180:14
190:9,16
192:1
211:14
231:24
254:2,7

**explained**
314:6

**explanation**
102:23
155:19
156:18
215:17
233:5,7
236:7
247:24
249:22
250:14
254:12
294:2

**exploring**
113:8
115:16
124:10,
11,12

**extent**
16:20

29:7
61:9,20
98:16
284:22,24
294:16

**extract**
95:10

**extraordina
ry**
213:11
215:1

**extremely**
273:22
276:17

**eye**
24:21
25:11
67:15
206:18

**eyebrows**
139:12

**eyes**
187:21

**eyewitnesse
s**
200:4,8
203:8

———————

**F**

———————

**fabricate**
148:13
149:7,12,
13 198:7,
8,15
199:3,13

**fabricated**
127:3
157:3,13
232:1
279:13
283:13

**fabricating**
258:3,8,
18,19
284:19

**face**
58:14
178:5,9
191:15

**faces**
139:4,10

**facing**
269:24

**fact**
10:2 11:9
13:16
26:4 31:6
33:24
63:1 66:2
95:3
107:7
109:4
112:19
123:13
127:13
144:25
145:4
150:20
167:22
170:4
196:12
209:10
224:18
225:10
226:8
230:3,20
237:15
238:18
243:17,
22,25
251:5
257:16
267:11
290:11
292:4

**facts**
30:6,23
34:3,24
35:1
74:25
104:12
124:23
201:19
285:15

**fail**
196:6

**failed**
118:11
149:6
160:10
177:25
192:2
231:14
233:7,9
234:23
235:6

**failing**
60:6

**failure**
179:6
220:23
238:24

**fair**
7:24
8:10,11,
21 9:4,
10,12,23,
24 12:15,
16 14:12,
24 16:4,
5,16,22
17:4,19,
21 18:2,
6,8 20:24
21:21,22,
24 25:18,
19 26:5,
7,16
28:21

29:2,8
31:19,24
32:10,11,
13 34:25
38:24
39:6,8,12
43:3 49:9
50:17
51:2
59:4,5,
19,20,22,
23 70:6
71:19
74:15,16,
22 75:2
80:17
81:13
82:13,14
83:4,6
84:10,11
88:9,22
102:4,13
114:21
119:3
135:15,
16,18
179:2
205:14
224:2,3
229:4,6
236:17,19
237:6,8,
12 238:9
241:12
246:2
273:12
279:19
280:22
281:24
285:5
287:16

**Fairly**
206:3

**familiar**
33:1
71:12



73:18
93:3 98:5
264:11
285:15

**family**
52:21
264:2,10
304:20

**fast**
313:14

**fastback**
41:18

**FBI**
58:4,11
59:11
60:5 81:1

**feeding**
30:6,22

**feel**
14:6
67:12
68:15
105:1
188:24
233:15
236:10
291:4,7,
15 310:8

**feeling**
205:6

**feelings**
188:23,24
189:8

**feels**
189:7

**fellow**
31:5
70:11
279:19
282:15

**felt**
9:13 13:5

14:22
84:14
194:2

**female**
225:10,11

**field**
101:13,21
103:21,24
115:1
266:11
267:22

**fields**
104:1

**Fifteen**
54:8

**figure**
125:3
205:11

**figuring**
125:18

**file**
86:23
96:24
255:21,22
293:22

**filed**
6:8 42:17
151:9

**filled**
224:15
229:21

**filling**
225:16
227:20

**find**
29:11
95:8
124:5
172:20,22
205:22
227:4
262:17

**fine**
14:1
67:13
74:10
78:1
152:23
175:13
287:17

**fingerprint**
200:21

**finish**
18:12
74:8
130:17
166:6,13,
24 181:1
235:13
263:7
286:16,19
291:11
313:18

**finished**
34:23

**finishing**
295:9

**fir**
112:6

**fire**
108:20

**fired**
55:13,15,
24 56:2,
3,6,15
101:24

**fit**
91:12

**five-minute**
268:3,10

**Florida**
41:4,10
60:17

**flowed**
169:17

**focus**
68:25
300:25

**focused**
69:1
192:11

**folder**
256:4

**folksy**
67:14,22,
24

**follow**
62:7
76:17
77:4
169:5
182:19
185:3
190:3
191:6,8
225:17
226:13
227:2
228:12
229:14,
18,22
247:14,25
248:8
254:23

**follow-up**
66:20
77:12
83:16,18
192:2
227:8
254:21,22
291:17

**follow-ups**
241:2

**force**
283:21

**Ford**
60:16

**foreign**
228:16

**forget**
298:20

**forgivance**
9:16

**forgive**
9:23

**forgiveness**
9:17

**forgot**
235:7

**form**
63:23,24
160:3
162:9
163:2
167:18
168:16
183:4
184:25
190:5
203:11
211:6
231:18
232:3
235:20
240:9
259:13
265:24
266:8
273:17,21
274:21
276:15,24
278:14
279:20
280:5
282:17
301:8

**formal**
287:23



288:11,
20,22
289:17
290:14
291:17
292:17

**fortune**
70:3

**forty-seven**
42:7

**forward**
56:22
57:7,9
124:25
154:13
200:8
202:1
230:21
304:4

**found**
15:3
27:10
33:4,7
40:2,15,
21 71:10
81:5,7
95:9
115:1
116:3,4,
6,10
118:6,17
120:14
194:5
200:21
204:24
205:21
220:6,7
293:23

**Fraction**
79:18

**frankly**
154:20

**free**
309:23

310:8

**freely**
292:1

**front**
95:22
132:24
141:19
207:7
215:9,19,
22 296:23

**full**
127:6
222:25
289:21
290:7

**fully**
147:8
296:1

**functioned**
52:20

**functioning**
52:17
55:7

**fund**
56:9

**funds**
41:22

**funny**
79:2

**future**
185:3

———————

G

———————

**Garr**
63:25
92:5

**Garverich**
7:4 64:7
312:1

**Gary**
242:15

**gas**
214:19

**gathered**
202:15

**gave**
31:3 57:4
60:2
87:23,24
97:19
101:20
103:10
184:16,21
189:19
190:10,13
226:17,
21,24
228:5,7,
8,10,11
230:17,
20,22
232:22
246:25
288:8
295:13
297:11,12
304:2

**gear**
68:1

**Gene**
72:7
81:18,25
285:25

**general**
56:15
81:14
94:11
109:13
113:4
173:12
202:12
280:25
299:8

**generalized**
119:21

**generally**
44:9
80:15,17
82:12,17,
18 83:3
172:9
213:9
263:11
299:1

**gentle**
189:3
190:3
197:2

**gentleman's**
191:15

**gentlemen**
191:20

**girl**
185:1
204:25
297:8
305:22
306:1,21,
24

**girlfriend**
161:12
170:18
191:1
192:15
194:7
195:11,18
204:18
233:10
234:19
256:19

**girlfriends**
196:14

**give**
7:14
29:16
31:2

36:21
37:10
48:24
63:13,19
74:7 75:3
83:21
91:24
92:10
125:5
133:14
162:18
179:23
182:17
183:11,15
216:14
232:12,
13,14,15
238:13
240:21
282:25
286:8
289:11
296:12

**giving**
159:1
181:24
182:20
218:8
306:13

**glasses**
100:7
116:19

**goal**
68:7,18

**goals**
68:22
180:1,7
181:22
183:13

**gold**
72:23

**good**
6:3 15:5
21:15,19



24:10,11
26:18
35:15
36:22
37:23
62:15,22,
24 67:14
70:3 90:9
95:25
99:15
105:3
153:20,24
171:1
182:12
188:8
189:16
199:7
206:7,17
207:1,2
231:12
257:19
259:23
292:16,18
313:18

**gotcha**
106:13
142:4
154:12
256:5

**Government**
6:8

**grab**
289:25

**graffiti**
94:17,22
98:14,15
101:14
103:25

**grand**
304:1,11
306:8
308:15

**gray**
269:15

272:4,9

**great**
50:19
66:8
100:10
175:7
199:20
223:13

**greater**
226:4

**Greer**
22:10
46:13,21
93:8,24
97:7,14,
19 98:19,
22 99:4
101:1,9
103:11
109:15
119:8,12
120:2
121:2
180:16
189:14
197:10
200:1
201:20
202:2,14,
16,21
228:17
239:5,7,
8,9,10,
14,16,19,
23 240:1,
7,12,16,
25 241:7,
11,22
242:4,8,
11,17,18,
22 243:12
246:6
247:18
248:10,
14,25

249:1,5,
14
251:13,15
253:9,25
259:11
261:2,10,
11,19,21,
22 262:2,
6 264:25
265:8,17
266:2,6,
22
267:12,
15,17
272:18,
19,23
308:17

**Greer's**
45:19
46:23
246:3
248:24
262:3

**Greg**
64:21

**Gregory**
285:9,12

**Grief**
224:2
225:16
231:10,13
232:2
234:6

**Grier**
155:11
156:19
222:12
232:7
233:1,18
234:17
261:25

**Grier's**
250:13

**grossly**
276:10

**groundwork**
262:18

**group**
44:8
199:18

**gue**
76:18

**guess**
21:10
76:18
77:6 79:8
82:14
98:1
104:11
113:10,14
134:20
159:6
202:16
219:5
227:9
236:15
242:9
244:4,5
261:8
266:19
306:6

**guessing**
217:20

**guilty**
8:17,20,
23,24,25
9:1 10:2
199:12

**gun**
69:24
269:10,24
270:8,13
271:15
272:4,10,
19,23
273:15
274:11,

14,18,19
276:12
283:8

**guy**
69:23
82:5,10
83:2
93:1,4
120:16
148:16
170:6
172:6
189:16
196:10
199:4
278:4
306:21

**guy/bad**
189:16

**guys**
50:25
101:4
113:22
114:23
204:7
250:23
301:17

---

**H**

---

**habit**
55:4,6

**hair**
200:21

**half**
153:1,11
303:18
311:4

**half-assed**
58:6,17

**halfway**
57:6
294:11



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
Index: hand..Hardin

**hand**
7:13
52:23
63:20
69:24
92:8 96:2
105:15
119:13
267:1

**hand-held**
290:1

**hand-picked**
80:5

**handful**
67:3

**handgun**
269:11
270:17

**handguns**
280:9

**handing**
64:3
96:1,2

**handle**
71:21,24

**handled**
115:7

**handles**
146:1

**hands**
63:14

**hands-on**
83:13
90:4,11

**handy**
6:6 7:1,
3,12,18,
23 15:7
23:2
27:17
36:20

56:21
63:24
64:17
65:21
66:16,17
75:25
78:16
96:14,18
100:5,18,
20 101:18
102:22
109:25
118:2
120:24
121:1,2
139:20
145:11,25
154:1,14
171:13
179:5
201:3
222:10
223:5,9
228:24
230:12
248:11
260:21
264:1,17
265:1
268:18
287:21
296:16
311:7
312:16
313:12,16

**Handy's**
105:19

**Hang**
96:11

**happen**
24:1
38:17
124:5
145:22
240:20

276:20
292:6

**happened**
21:21
44:13,21
71:6
89:12
97:5
98:25
99:8
117:19
120:11
125:24
126:5
146:23
148:2
162:16
196:23
205:4
220:11
228:23
231:13,15
234:6,22
235:4,5
236:25
253:19
266:11
270:20
272:24
273:4
282:5
295:7

**happening**
251:17
284:4

**happy**
96:7
152:25
309:7

**hard**
151:16
170:8
185:8
193:17
281:13

290:3
302:17

**hard-core**
196:11

**Hardin**
6:22,24
7:10 8:3,
12 9:10,
20 16:22
19:3,11,
13 26:5
30:8,12,
23 31:7,
20 32:15,
24 36:21
37:14
46:17,25
64:6
72:13
86:18
106:2
107:11,17
109:6,22
111:18
112:19
122:8,13,
23 123:1,
15,16,21
126:12,
15,20
127:12,25
128:6
129:8,13,
21 130:11
132:18,21
133:9,20
134:1,5
141:8,15
142:9
143:25
146:1,4,
11,14
147:9,17
149:24
150:11
152:15

154:17,24
155:5,12,
20 156:3,
19 157:3
158:3,8,
10,18,22
162:8,24
165:7
178:1
179:6,13
180:8
181:4
182:16
183:3,20
184:10
189:12
193:6,8
199:19,23
200:11,16
201:9
202:13,24
203:7
207:15
210:17,22
214:9
216:1,19
217:17,22
220:8
222:14
224:16,19
225:1,3,
17,24
227:11,
16,24
229:13,25
230:2
232:1
236:4,22
237:6,17,
20
238:19,23
239:1,14,
19 241:25
243:13
244:2,12,
18
247:13,14



248:1,6
250:15,17
260:15,22
261:4,18,
21 262:7,
15,22
296:7,8
297:4
298:13
300:18
301:2
303:4

**Hardin's**
63:25
92:6
116:13
139:21
140:22
162:20
210:13

**Hardin/
clark**
17:20
25:18
105:20,21
237:25

**hardline**
189:15
196:11

**hate**
234:14

**Hazelden**
60:16

**he'll**
149:4
154:3
176:12

**head**
91:14
103:4
171:4
203:4
292:8

**hear**
20:13
34:18
60:7
104:17
111:6
139:18
178:4,6
179:1
195:3
246:18
249:8,10,
11 250:5,
8 263:13

**heard**
22:6
33:11,22
73:11,14
101:4
115:6
121:4
147:15
148:17
151:5
158:12
159:7
167:15
171:3
172:10
173:17
175:6
196:12
216:1
219:21
233:14
236:2
245:5
246:7,8
250:9
253:17
269:21
291:22
293:4,9

**hearing**
11:4
12:1,6,7,

21,22,24
13:16
16:8,10,
13,16,20
17:1
32:15
59:3,24
60:9
104:15,21
105:21
160:11,16
198:6
249:11
252:24
268:19

**heart**
138:11

**heavy**
52:2,7,8,
20 53:22

**hell**
299:23,25

**helped**
37:9

**helpful**
125:18
202:25
203:6

**helps**
125:4
299:25

**hereinbelow**
7:19

**hey**
35:4
196:12
310:1

**hierarchy**
82:5

**high**
60:6
89:20

**higher-ups**
82:17,18
83:3
280:15

**hint**
133:14

**hired**
40:13

**history**
88:17
142:25

**hit**
186:8

**hold**
95:7,8,10
100:7
159:14,16
169:20
186:19
235:13

**hollered**
189:21

**Holmes**
92:24
93:1,8,
16,24
94:7 95:2
96:15
97:3,7,
13,20,23
98:7,18
99:1,14,
19 101:2,
6,10,19,
20,22,23,
25 102:3,
6 103:8
108:3,14
109:7,10,
12,14
121:3,5
125:14

**Holmes's**

98:7,11
99:4

**holster**
271:16

**home**
41:2,3,4,
5,8,10,13
54:11,12,
16,17
145:12
146:15
186:9
197:9
282:25
300:11

**homes**
41:1,7,12
42:2

**homicide**
21:8,25
22:22
48:13,25
49:9,17,
20,21
50:2,6
54:19
58:7,25
59:7 79:6
80:6,12,
16 81:14,
17,24,25
82:13,19
83:4
84:21
88:17
104:14
105:3
114:5,7,8
115:14
119:14
124:5
125:3
132:15
144:7
145:14



170:3
182:6
184:8
186:11
216:5
235:11,17
239:24
255:22
285:9
288:11
295:17,
22,23

**homicides**
49:1 50:5
283:5
295:18

**honest**
23:11,14
25:6
29:16
31:20
32:9 61:8
72:2
175:8
281:25
297:6

**honestly**
80:18
89:21
136:21
257:22
277:10,15
302:25

**honesty**
30:8 58:1
278:9

**Hope**
155:11
156:19
222:12
224:2
231:10,13
232:2,7
233:1,18

234:5,17
235:24
236:3,4
261:24

**hopes**
187:23

**hour**
42:25
43:2,23
44:3
47:21
153:1
232:2
268:8
303:18

**hours**
43:5,13
54:20
75:15
126:6
143:14
153:11
171:6
186:23
216:20,
24,25
217:4,5,
6,7,10,
14,19,23
222:4
241:19,23
248:2
254:4,10
260:17
263:25
264:3
268:7
303:17
311:4

**house**
116:13
245:24
249:18

**huddle**

289:25

**huge**
170:16

**human**
97:25
128:24
129:4,10,
17
130:10,25
131:5,11,
15,18
132:9,11,
17,24
135:1,7,
11,16,17
136:3,9,
17,23
137:1,12,
16,20
138:2
140:23
150:12
157:7
162:21
166:25
167:5,6
168:12
169:21
170:2
172:1
173:1
177:15
178:2
185:15,19
186:2
188:16,25
190:4
194:18
195:2,5
197:19
205:6
220:19
230:14
231:1,14
232:16
233:8

234:17
235:18
238:25
256:20
299:22,24

**humans**
108:16,18
129:20
131:24
139:23
160:18
162:25
165:9
192:4
197:4

**hundred**
41:9 42:7
307:6

**hung**
54:23

**hurt**
37:9

**hypothetica
lly**
199:1

_____

**I**

_____

**I"m**
191:10

**idea**
80:19
86:15
87:3,5
118:10
145:24
231:22
235:24
245:22
246:19
249:5,25
255:23
256:23

265:15
266:11
267:18
306:13

**identificat
ion**
64:1 92:7

**illegal**
258:4,20
269:8,18
270:9,10
275:3,5,
24

**imagine**
148:12
149:6
151:13,
15,16
193:17
198:22,24
251:16
254:14

**imagined**
175:10

**implicating**
304:2,5

**implied**
269:24

**implies**
24:3

**importance**
28:21
75:17

**important**
16:21
17:15
18:6
57:22
65:1 76:1
77:3,21
122:2,11
123:23,25
124:23



142:25
143:3
144:1,13,
19 145:5
161:13,17
163:1,6,
11
165:10,22
166:21
167:1,3
169:4,25
170:1
171:3
177:11
187:9
203:10
209:21,23
225:1,4
231:2,6
232:12,
14,15,18
235:11,15
250:7
288:1
294:4
306:16

**importantly**
18:10

**improper**
269:7

**improperly**
268:23

**inaccurate**
267:23

**inadvertent
ly**
11:22

**inappropria
te**
213:8,10
276:1,7,
10,18,21,
25 278:5
287:2,11

**inbound**
73:9,13

**incident**
51:8
142:16,21
157:13
192:15
231:7
232:17
233:9
234:19

**incidents**
190:25

**inclined**
120:13

**include**
37:23

**included**
37:6
94:12
95:19
109:6
281:15

**including**
63:3
99:13
105:20
301:2

**incoming**
66:19

**incompentor
y**
196:3

**inconsisten
cies**
228:13

**increase**
55:10

**incredibly**
89:20

**incriminati
ng**
77:10
281:16

**inculpatory**
77:3
296:6

**indefinitel
y**
49:17

**indemnified**
40:1

**independent**
240:14

**independent
ly**
29:24
30:3

**indicating**
47:12
202:10
218:16

**indications**
76:19

**inebriated**
54:23

**influence**
106:22
107:9

**info**
38:1
123:15,16

**informal**
287:24
289:16

**informant**
29:4,6

**informants**
29:1,10,
12,15

**information**
22:25
29:7,24
37:23
38:1
68:20
74:14
75:4,7,
10,17
76:2 77:5
84:12
100:1,6
101:14
103:11,12
104:9,16,
23 108:1
109:5,7
111:24
112:8
117:3
122:3,7,
12,21,24
123:3,17,
18,19,20,
21,22
124:16
143:4
144:13,19
145:1,5,
13 148:3
155:7
156:12,
15,21
177:10
182:19
183:15,
18,21
184:1,5,
7,16
185:2,14
186:2
188:5
189:18
190:12
193:10
200:18
204:10

209:10
220:12
224:19
225:2,5
226:5,12,
18 227:5,
10,16,24
228:2,17,
19,22
229:12,25
232:7,23
236:1,3,4
247:25
248:4
250:15
254:22
255:5
257:8,15
271:21
288:8
289:12,15
290:13
291:1,16
292:18
304:5
305:10
306:11,
12,16
308:2

**informed**
127:22
223:9
229:24

**initial**
87:21
149:5
304:4

**initialed**
87:13,24

**initialing**
87:15,18

**initials**
86:21
87:1



innocence
    9:7 32:21

innocent
    8:15
    32:16
    35:5
    258:20

insight
    121:10

insinuating
    284:23

instability
    280:17

instruct
    20:6
    30:10,13,
    15 285:3

Insurance
    60:23

integrity
    30:8 58:2

intense
    172:5

intent
    24:3

intentionally
    23:20
    25:17
    282:1

inter
    63:3
    183:23
    258:13
    309:17

inter-
    62:13

interaction
    86:18
    126:12,15
    222:13

224:16
234:11
237:5,16
257:6
296:8

interactions
    87:13
    126:19
    225:24
    257:23

interest
    69:10
    121:24
    170:11
    183:2
    267:20

interested
    182:7
    183:1,10,
    14,17,19,
    21,24
    184:9,18,
    22 185:13
    186:1
    203:24

interesting
    293:19,22

interject
    169:9

Internal
    237:14

interpretation
    83:21

interrogate
    261:4
    262:24
    263:2,6,
    10,13,16,
    21

interrogated
    189:10
    260:24

interrogating
    196:10
    262:23

interrogation
    71:15
    72:19,24
    74:24
    172:6
    191:12
    272:11

interrogations
    70:24
    73:9

interrogator
    72:3
    76:8,16,
    21 261:11

interrogatories
    73:13

interrupt
    10:7
    18:15
    34:19
    166:11

interrupted
    18:15,17
    34:20

interrupting
    176:3

intervening
    9:5

interview

27:23
37:24
38:6
46:24,25
47:4,8,17
67:13
68:8
69:3,21
70:8 71:8
72:6
83:11
88:23
107:16
109:6
123:1,13,
14,17
140:4,6,8
143:4
170:6
172:2,5,6
173:14,
24,25
176:8,23
177:3
193:5
196:18
203:15
204:21,
23,24
205:21
207:9
208:2
223:22
238:15
241:18,21
242:10,
16,19,21
244:1,2,
7,8,9
245:7,13,
17,23
246:15,22
247:4,7,
12
248:10,
13,14,17,
24 249:3,

4,14
251:15,
20,24
253:9,14
259:22
261:18
263:15
270:25
271:13
272:14
287:24
289:16,
17,22
290:14
291:17
292:17,23
293:13
294:4
304:7
306:10
309:3,5
311:8

interviewed
    46:17,19,
    25 47:12
    58:4
    59:11
    69:7
    107:11
    141:3,8
    154:24
    155:4,12
    174:22
    184:23
    193:9
    199:23
    200:11
    201:9
    202:24
    207:4,14
    234:1,2
    240:22
    244:16
    248:1
    255:12
    260:9



262:7
266:17
300:9

interviewer
63:3
65:22
66:4,8,15
67:1,7,11
170:11

interviewers
225:7

interviewing
28:19
62:11,22,
25 69:15
113:16
173:20
174:11
180:8
200:16
207:14
225:1
242:3,4
256:12
263:14
288:21
300:10,11
304:10
308:16

interviews
37:7,11
38:16
68:2
70:15
71:4
85:18
89:13,16,
24 122:8
185:3,11
198:3
228:19
238:20
247:17

254:3,8
257:9,13
259:17
260:13,14
274:12
287:25
289:23
293:23
298:11,23
299:2
301:2
302:22,24
303:4
309:18
311:8

introduced
286:13

introducing
64:9

introduction
99:2

Invalid
73:15

inverted
118:16

investi
44:23

investigate
258:13
306:17

investigated
8:20
31:25
33:8
307:19,21

investigation
8:3 10:17
21:21
31:6 46:1
53:16

68:21,25
79:10
114:8
116:11
119:9
145:15
149:16
154:20
201:2
228:16
237:24
252:25
262:19
293:14
304:4

investigations
50:4
277:18

investigative
13:1 15:4
21:10
23:1
37:6,10
44:6,24
46:5,9
76:4
192:23
230:16
255:1

investigator
51:13
59:1,12,
19 80:6
83:19
88:8
145:20
165:13
167:11
169:3
170:3
172:10
173:15

205:15
238:13
240:23,24
253:16,
18,23
288:4
295:18

investigators
70:3,5,21
173:13

involve
97:24
167:2

involved
45:22
46:1,12
50:5 69:2
93:18
97:6,8,18
98:2
104:8,13
109:8
112:9
114:12,
13,16
117:4
120:9
121:14
128:12
199:16
203:15
204:8
220:1
272:12
305:11

involvement
8:6 9:5
14:3
100:25
109:1
127:22
196:22
199:19
202:11

involving
26:4
285:9

iphone
36:4

issue
93:25
94:16,17
107:13
131:17
163:1

issued
93:4

issues
14:5
20:11
23:18
28:25
52:5
93:21
94:6
99:12

it'
273:12

_____

J

_____

J.C.
155:1

Jack
306:2

jail
276:6

James
64:20
125:25

Jay
72:7
81:10

Jeff
8:3 109:1



114:20
118:2
123:14,21
134:11
141:5,9
150:20
154:17
155:13,23
156:20
158:3,22
189:12
202:24
207:4,9,
14,17,21
208:3,9,
23 209:3,
5 211:18,
21 213:21
214:4
229:18
237:17,20
238:19
243:13
260:8,14
266:15,
17,20
267:13
272:18,25
274:8
296:6,8
297:4
298:12
300:18
301:2
303:4
304:15,17
307:6

**Jeff's**
143:20

**Jefferson**
6:7 273:1

**Jeffrey**
6:6
87:13,15,
18,22

200:22

**jeopardize**
271:20

**Jim**
86:8
87:23
88:7
132:25
138:7,8
139:20
140:20
146:18,
22,24
147:6,8
148:16,
22,25
236:2,13,
21
240:23,24
251:13,15
253:10,
13,15,18,
22,23
254:3,8,
18 255:2
256:10,
18,21,23
257:11
258:24
264:9,10

**Jim's**
138:14

**job**
24:6
36:21
37:9
51:10
54:23,25
55:1 61:5
67:13
211:5

**Joe**
22:10
103:11

180:15,16
189:14
201:20
202:2,14,
16,21
228:17
248:10,
14,23,24
249:1,5,
14,20
251:13,14
253:9,25

**joined**
35:16,17

**joint**
261:3,6

**judge**
175:16
176:5
207:3
296:3

**judgment**
40:8,9,
16,19

**junior**
214:18

**juror**
158:24

**jurors**
26:8

**jury**
25:19,21,
22,24
26:6,8
157:22
158:7,21,
23 159:2,
3,22
160:1,5,6
162:23
304:1,11
306:8
308:16

**jury's**
26:19
158:2

———————

K

———————

**Katie**
6:23 63:8
64:7
91:21
96:5
163:22

**Keith**
6:22,24
7:10 8:3
35:19
36:2,3
63:25
86:18
92:6
109:6
111:16,17
122:8,13,
23
123:15,
16,21
126:12,
15,20
127:12,
14,25
128:6
129:8,13
132:18
133:9,20
134:1,5
141:3,4,
8,15
142:9
143:16,
21,25
145:7
146:4,11,
14 147:9,
17
154:17,24

155:5,12,
20 156:3,
18 157:3
158:3,8,
22 162:7,
20,24
165:7
179:6,13
181:4
189:12
193:5,8
196:9,12
201:9
202:24
207:14,18
210:17,22
214:8
215:25
217:17,22
218:15
220:8
222:14
223:9
224:16,19
225:1,2,
16,17,24
226:17,19
229:13,
17,25
230:2
232:1
236:22
237:5,16,
20
238:19,23
239:1,14,
19 241:25
243:13
244:2,12
247:13,14
248:1,6
250:15
260:14,22
261:4,18
262:7,15,
22 286:10
296:7,8



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
Index: Ken..lead

297:4
298:13
300:17
301:2
303:4
313:2,4

**Ken**
23:3

**Kent**
6:25
20:10
74:4 78:2
92:11
139:7

**Kenton**
162:19
163:16
164:16,25
165:3

**Kentucky**
6:9 41:5,
8,14

**key**
30:6

**kid**
67:23

**kill**
129:10,20
131:24
132:11,17
135:1
150:25
155:6
156:4
157:14
160:25
161:4,12
167:10,16
192:4
193:11
194:6
195:11,
13,18
197:4

210:23

**killed**
128:7,20
132:19,20
243:17,23
297:8
299:13
305:22
306:1,5,
21,24
307:5

**killer**
185:9

**killing**
99:13,14
112:10,17
113:1
115:18
165:24
250:18
297:15
298:22

**killings**
98:4

**kind**
50:25
94:19
121:10
184:6
189:17
271:20
278:11
280:17
281:17

**kinds**
114:10
161:7
225:8
268:23
300:23

**kit**
217:17,
18,21
218:1

**knew**
23:1
31:11
66:6 71:9
83:14
94:25
98:17,21,
25 101:6,
7 108:18
109:2,11
112:2
121:5,9,
15,17,20,
23 160:20
200:4,6,
9,20
203:9
204:2,7
206:13
226:15
230:25
232:24
233:1,2
235:12
243:17,
22,25
250:23
256:23
257:3

**knife**
111:3,15,
16,22
112:3
121:18
122:13
123:20
124:21
134:12,
15,16
141:1,2,
4,5,9,10,
16 155:1,
12,22,23
196:19,20
207:18
230:4,5

232:14

**knives**
150:20,21
155:1,13
156:20
157:10
190:17,19
207:19
208:7,11,
21 209:6
229:18
230:23
243:24

**knowing**
118:16
155:1,13
165:25
232:22
249:23
256:18

**knowledge**
43:19
49:8
61:15,18
85:12
102:8
109:13
121:6
124:1
196:23
200:7
203:5
237:23
240:12
297:16

**knowledgeable**
90:10

―――――――

**L**

―――――――

**lading**
44:20

**laptop**
96:19
174:6
298:9

**large**
29:7 40:3
41:22
187:16
289:23

**Larry**
7:10

**late**
254:5

**laugh**
79:1

**laughing**
267:2

**law**
72:24
77:16

**law-enforcement**
19:8

**lawsuit**
149:24
237:11,21

**lawyer**
68:10
151:24
179:21
271:25
272:2,7,
13,15

**lawyers**
40:12
200:17

**lay**
262:18

**laying**
44:20

**lead**



26:14
75:3,5
76:1
83:19
94:8
104:4
225:8
239:24
240:23,24
241:5
253:15,
18,23,25
255:2,19,
25 256:11
257:10,
17,21
258:1,5,
10,14,18,
24

**leader**
84:24

**leading**
156:12

**leads**
112:12

**lean**
191:12

**learn**
32:18
98:17,18
116:9
162:7

**learned**
11:11
27:14
32:19
69:17,18,
21,22
70:4,9
74:13
77:19
94:7
97:17
98:6

225:16
227:21
254:18
255:11

**learning**
72:17
118:19
304:13,
17,19

**leave**
95:15
234:10

**leaving**
226:1

**led**
189:8

**left**
83:16
106:9
116:22
126:2
189:13
195:12
245:20
247:3,7,
10 250:2
268:8

**legal**
205:16,18

**legitimate**
69:11
76:11
205:25
206:4
270:16

**leniency**
269:8

**letter**
15:4
96:7,23
97:4,7,14
99:18,19,
21 100:5,

22 149:16
163:17
164:16,24
166:23
169:17
230:17,18
236:10

**letter's**
96:5

**letters**
13:1,3,13
14:8
21:10
23:1 37:6
44:6,8,24
98:9

**liability**
40:20

**liable**
40:2,15

**liars**
25:7

**lie**
19:17,18,
20 23:21,
23 24:3,
14,16,18
25:1
27:1,7,9,
12 29:10,
15,20
56:25
205:17
208:13
212:21
213:4
251:19,24
265:23,25
266:4,6,7
304:15

**lied**
17:1 20:5
25:17
26:4 27:9

28:20
29:12
30:6,22
31:5,11
32:2,6
56:7,21,
23 57:7,
8,18
147:23
208:10,
16,20
209:5,6
251:1,9

**lies**
29:6
182:13

**Lieutenant**
79:5
82:6,8
89:6
90:4,10

**life**
9:19
35:23
52:21
120:16

**light**
187:21

**lights**
170:10

**limited**
55:20
307:12

**lines**
106:20
120:19
187:6
217:15
243:21

**list**
64:8
123:9
286:21

312:24

**listen**
27:4
35:11
71:4 85:8
111:14
130:7,9,
18,22
169:11
227:15
228:13
251:6

**listening**
169:5
292:21

**lived**
120:14

**living**
9:19

**LMG**
92:2

**local**
178:22

**locally**
221:25

**location**
273:2

**lock**
228:21

**log**
255:6,11,
14,20,21

**logic**
199:10

**long**
42:24
43:16,22
44:2,20
55:17
60:20
78:2



223:15
305:8
312:24

**longer**
136:19

**looked**
12:2
25:6,11
45:5
80:23
87:3
94:22
98:15
99:25
100:16
181:15
219:11
240:13
249:19
265:16,20
293:22

**looser**
81:2

**Lori**
6:12
63:11
91:22
95:13

**lose**
243:1

**lost**
35:12
178:3,10,
18,24
191:14
227:9,12,
14

**lot**
14:4
50:23,25
73:1
80:8,11
98:13
118:21

137:21
138:5
148:22
156:24
157:21
170:19,25
224:22
228:9
232:13
243:23
279:17
282:14,21
290:2
296:12
306:2

**Louisiana**
289:1

**Louisville**
6:7,9 7:8
41:5,8
48:10
80:12
90:19
92:19,24
253:16
256:11
257:21
260:21
263:25
264:16
265:1
279:18
281:2
282:15
287:22

**low**
89:18,20

**LPD**
293:23

**lunch**
152:22
153:16

**lying**
28:5

156:8
161:16
204:16
211:22
214:4
220:24
251:8,15
252:6
265:18
274:20
294:20

——————

**M**

——————

**machines**
289:24

**Madam**
7:12,17
63:13,18
64:3
91:24
92:3,8
95:7,21,
25
105:17,22
109:23
110:1
163:23
164:1
178:11
312:14
313:20,22
314:1

**made**
14:24
38:19,22
39:5
57:3,11
64:1
81:15
88:16
92:7 99:1
101:5,8,9
146:5,17,
18

147:18,24
149:25
150:6,12
151:2
157:7,9,
15 158:18
160:21
169:18,25
185:20,25
198:2
203:23
210:6
223:15
230:9
233:10
235:10
247:19
253:18
261:3,7
262:14
275:23
281:17
295:9,10
296:7,9
301:12
304:11
312:10

**Magistrate**
176:5

**Mahan**
304:2,5,
8,10,14,
16,19
305:10
306:5
307:3,5
308:16

**main**
71:11
158:9

**maintained**
255:20

**major**
40:25

41:15
162:8

**make**
6:15 9:20
19:2,10,
12 23:25
38:15
68:4,16
69:11
76:12,20,
21 77:1
80:13
83:20
91:14
95:18
101:18
109:16
111:9
124:24
138:19
139:4,10
149:17
152:3
156:24
169:15
170:11
175:16
176:5,6
180:3,9
181:25
185:8
187:18
188:24
204:13
205:18
206:14,20
211:10
217:8
221:21
236:18,19
240:14
271:12
273:3
275:6,20
286:14
294:21



299:7
303:13
304:9,15
312:7

makes
77:2
170:25
243:5
259:9

making
23:22
127:20
138:21,23
204:4,9
253:8,13
262:20
275:21
306:20

male
35:11
100:14
225:11

man
135:13
148:24
233:20
240:4
279:7,9
285:9
304:1
307:16

manner
24:24
67:14
197:2

March
106:6

mark
6:6 7:1,
3,18
63:9,24
91:17
111:14
164:2

184:14
211:8
222:13
303:18
312:16

marked
63:9,10
64:1 92:6
95:6,8,23
109:22
164:4,5

Mary
242:4
243:5
244:8

Mason
242:15

material
31:6 68:1

materials
91:18
99:20
100:21
116:2,10
117:12
118:6,12

matter
6:6 7:24
23:16
28:21
29:21
81:14
94:11
202:12
251:14
271:1
280:1
281:1

matters
285:2

Mattingly
304:1,11,
14,16

305:9,20
306:12

Mccarthy
6:23
35:16
36:4,9,13
63:10,16,
22 64:5,
12 91:22
92:1
95:13,16
96:6,11,
18 105:18
109:21,24
153:6,13
154:3,7,9
163:25
164:2,6,
11,14,16,
18
178:15,17
221:18

Mccon
48:7

Meade
7:5 202:2
252:25
253:4,25
272:24,25
311:19
312:1
313:2

meaning
137:16

means
69:11
76:7
100:24
132:1
210:9
227:20
263:2,11,
16,19
299:23

meant
94:20
137:25
211:13,15

measure
9:3

media
56:1
57:10

medical
218:1

meet
22:14
60:6
78:17,18
84:6
85:14,18
103:8
264:17
265:1

meeting
21:11,24
22:3,22
43:11,17,
20,25
122:12
165:3
180:1
264:2,18
265:2,9
267:13

meetings
42:24
43:14,18

mem
15:10

members
106:7

memories
74:25

memorize
47:18

107:3
141:24
142:1
207:12

memory
13:6
14:2,20,
23,25
15:5,10
16:3
51:5,18
104:2
124:1
173:3,5,9
179:15,17
304:22

men
10:4,16
11:23
33:8
43:15
79:23,25
189:22
203:16

men's
11:5

mention
118:12
177:15
230:12,15
232:19
234:20,23

mentioned
93:8
172:16
230:23
232:23
238:12
284:8
292:13

mentioning
163:18
234:17



Mercer
  82:20,21,
  24,25

met
  21:6
  22:1,12,
  24 23:3,6
  42:16
  43:4,9,21
  122:22,23
  127:25
  129:14
  132:14
  150:18
  173:6
  179:10,13
  186:9
  202:13
  241:25
  264:1

meticulous
  39:7,11

Metro
  6:7 7:8
  311:19

micromanage
  83:10

microphone
  6:15

mid
  178:19,24

middle
  106:8,10,
  11 142:8
  223:1
  264:15,24

mind
  15:11
  74:9
  84:23
  100:10
  120:23
  132:11,17

Mercer
  144:22,23
  148:11
  188:18
  280:10,18
  295:8
  297:1,22,
  23 298:22
  301:16,20

mindset
  172:4

mine
  245:19

mini
  298:2,4

minimal
  90:22

minimum
  87:1
  230:20
  276:1

minor
  143:6,8
  192:17

minute
  42:11
  169:20
  270:5

minutes
  74:9
  78:4,5
  217:5,6,
  23
  221:13,14
  268:6,7
  303:17

mirror
  71:9,11

mirrors
  71:8

mis
  16:15
  212:25

misbehavior
  282:22

misconduct
  237:20
  238:4
  259:1
  277:19
  278:11
  280:3
  281:3,7
  282:15

misdeed
  69:3

mislead
  38:4

misrepresent
  16:16
  282:1

misrepresentations
  19:2,11,
  13

misrepresented
  16:20
  280:19

missing
  159:1
  230:11
  231:7,9,
  11
  253:21,24
  256:25
  264:12

misspoke
  87:21

misstates
  274:23
  278:15

mistake
  23:23,25

38:19
  230:8
  265:23

mistaken
  265:18,19

mistakes
  38:16,17,
  22 39:5

Mister
  111:14
  120:1
  140:22
  154:7,9
  216:18
  248:11
  287:21

misunderstanding
  213:2

misunderstood
  20:20
  230:4

Mitchell
  6:11

mobile
  300:13

moment
  95:2,10
  197:15
  294:21
  312:17

money
  40:3
  55:16
  56:9

month
  42:8
  56:20
  127:17

months
  218:17

304:8
  308:15

more-experienced
  72:18

morning
  6:3
  110:21

mortgages
  41:12

motive
  112:9,13,
  15,17,20,
  23,24,25
  113:1
  115:17,24
  122:3,4
  125:3,5,
  7,18
  210:23

motives
  119:10,17

mouth
  192:11

move
  20:22
  31:3
  154:12
  238:9
  285:7

moving
  178:8

multiple
  103:25
  179:20
  187:2
  238:20
  291:18
  293:23
  301:1
  302:3
  311:22



murder
  30:7,23
  69:23
  97:5
  105:5
  112:2
  113:9
  122:3
  123:19
  124:13,
  14,17
  134:15,19
  161:16
  192:16
  232:17
  297:5
  307:17

murdered
  161:12
  165:23
  192:16

murders
  124:5

Mustang
  41:17

mute
  35:18
  178:6

─────────

N

─────────

nah
  292:3

nailed
  306:2

named
  57:24
  92:24
  285:9
  304:1,2,5

names
  47:14
  312:25

Naples
  60:16

narrative
  44:11

nature
  37:1,7
  104:10
  187:18
  283:1

necessarily
  84:6
  108:23
  186:4
  215:8
  248:20
  264:8
  268:25

needed
  83:21
  84:17
  230:21
  235:9
  255:17

negotiate
  222:6

Neufeld
  6:21,23

nice
  194:5
  206:18

Nick
  6:21
  36:5,8
  154:4
  164:2
  169:10
  174:18
  175:18,24
  178:3,24
  192:23
  216:8
  286:4,10,
  19 294:25

309:6,22
311:15,18

night
  43:21
  53:24
  54:6,7,10
  55:7
  145:5,14
  204:11
  228:21

nine-page
  63:11

nineteen-
ninety
  90:15

nineties
  8:21
  51:25
  52:2,5,18
  53:3 55:6
  61:6,9,20
  71:4
  283:16,25

Ninety
  164:1

non-
accusatory
  195:1,6

non-public
  30:6,23
  74:24
  75:17

nonetheless
  310:12

nonsense
  289:7

nonsensical
  310:11

normal
  52:10

note

172:11
173:15

notebook
  289:7

noted
  171:11

notes
  223:22
  228:6
  235:1

NSB
  116:23

NSBMCSO
  96:12

number
  6:10
  42:21
  65:11
  99:11
  157:4
  224:6
  255:7
  296:6

numbers
  89:4

numerous
  155:13

─────────

O

─────────

O'CONNELL
  48:7

oath
  14:11
  19:2,11,
  13,20
  20:5
  31:15
  32:2
  150:4
  180:6
  194:9,10

265:13
294:12
299:17
301:25

object
  160:3
  162:9
  163:2
  167:18
  168:16
  183:4
  184:11
  190:5
  240:9
  259:13
  265:24
  266:8
  273:17,21
  274:21
  276:15,24
  277:9,24
  280:5
  285:16
  294:16
  301:8
  302:1

objected
  151:24

objection
  20:6
  28:10
  30:10,15
  32:4 90:5
  137:3
  151:19
  152:5
  184:24
  203:11
  206:21
  211:6
  213:22
  231:17
  232:3
  235:20
  238:6



248:21
252:14
260:1
274:4
277:25
278:13,14
279:4,8,
20 282:17
294:23
302:10
303:11
310:11

**objective**
69:2

**obligation**
16:8
37:22
257:15,22
270:21
271:2
272:1
277:19

**obligations**
258:12

**obscure**
120:20

**observe**
277:18
280:2

**obvious**
120:17
125:15

**occasionally**
82:24
300:12

**occult**
90:15
91:19
92:4,14
93:9,13,
17 94:2,
12 97:4,

13 102:4,
6 103:20
129:4,6

**occurred**
144:15
271:1
304:3

**odd**
54:20

**offended**
152:12,17

**offense**
152:17

**offer**
275:7

**offered**
11:1

**office**
46:23
57:5
101:24
127:12
217:17
234:12
253:24
289:20
290:4,5
300:13

**officer**
19:8
30:6,9
31:5,10
119:15
199:2,11
233:14
260:20
271:15
272:13
277:18
279:13
280:2
281:8,10,
18 282:1

**officers**
45:22
46:1
50:18
72:25
80:11
104:8
263:10
272:12
279:18,19
281:2,20,
21
282:14,16
284:1
293:24

**oftentimes**
68:10
70:22
71:3 90:2
124:4

**oint**
26:18

**older**
69:18

**one's**
59:6

**open**
68:4 76:8
95:21
101:13,21
186:7
187:6
243:2

**opening**
76:24
77:1,8
162:1,19,
24

**openings**
76:16,17

**opinion**
17:16
57:4

**opinions**
100:2

**opportunity**
48:24
122:15,16
124:3
159:2
198:3
220:17
256:14
296:2
311:19

**opposed**
158:22
204:8
260:13
261:18
275:3
287:24
292:23

**opposite**
299:25

**options**
145:18

**order**
20:16,21
30:19,22
205:10
206:19
285:3

**orders**
241:6
312:18
313:21,23

**originally**
253:22

**originated**
253:21

**outstanding**
63:3
65:22
66:15,25
67:6,11

**oversaw**
79:6

**overview**
46:16

**owe**
41:20

**owned**
141:5,9,
15 155:1,
13,23
156:19,20
196:18

**owners**
42:3

**ownership**
42:2

**owning**
141:9
154:25
155:12
190:17
196:20

---

**P**

---

**p.m.**
314:9

**PA**
217:17

**packed**
57:5

**pages**
63:25
66:14,23,
24
116:22,23
287:10

**paid**
40:10
60:23
307:6,7



paint
    94:18

paper
    203:25
    209:24
    256:8

paragraph
    110:18,25
    117:6,9
    127:6,7
    133:12
    142:8
    143:13
    196:24
    222:25
    223:7,8
    229:19
    259:5,6
    260:19
    264:14

paraphrase
    62:19

parole
    148:2

part
    10:18
    64:1 92:7
    97:15
    108:15
    113:13
    115:17
    116:8
    121:21
    124:5
    129:10,20
    132:11,17
    160:24
    161:3
    217:25
    234:10
    276:6
    281:1
    284:11

participants
    312:17

participate
    46:5,10
    84:17,18
    259:17

participated
    12:7
    18:19
    50:3 73:3
    284:21

participating
    104:5
    260:13

participation
    56:22
    163:17

parties
    78:6
    221:16
    310:19
    311:16

parts
    29:14
    94:21
    172:2

PAS
    127:12

pass
    62:2

past
    10:23
    44:1
    161:13
    195:18

pay
    33:23
    40:8,16,

19 60:22
    137:21
    250:7

paying
    40:4
    216:4

pension
    42:6

people
    18:9,20
    24:7,14,
    15,16,17,
    20 25:4,
    6,14 27:9
    41:23
    46:18,19
    62:11,13
    67:13,15
    68:4,15
    69:8
    70:10
    71:4 76:8
    80:2,8
    82:7,12
    84:17
    89:3,5
    90:24
    93:17
    94:17
    98:2
    104:15,
    18,21,24
    108:15,19
    109:7,11
    113:16
    128:12
    129:4
    144:10
    149:9
    159:7,19
    174:2
    181:9,10
    189:14
    194:21
    199:18

201:20
    211:3
    228:19,21
    229:7
    240:22
    245:24
    250:23
    263:20,21
    265:20
    276:20
    280:7
    283:4
    284:8
    288:4
    289:21
    290:9
    291:24
    292:1,3
    293:24
    295:18,22
    296:25
    297:18
    307:23

percent
    89:19

percentage
    8:24
    89:18,24

Perfectly
    205:25

performance
    61:5
    63:2,23,
    24 64:18
    66:24

period
    55:11
    56:19
    101:23
    123:6
    182:10
    238:20
    283:2

peripheral

17:16,17,
    20,22
    172:7,17

perk
    187:22

permissible
    77:16

perpetrators
    34:6

person
    33:25
    42:19
    52:10
    57:10
    67:17
    69:10
    84:22
    91:1 93:7
    94:11
    99:15
    100:13
    121:5,9
    165:14,20
    172:12
    173:20
    179:24
    188:19
    193:20
    199:12
    215:9
    240:13
    251:13
    253:22,24
    258:20
    261:18
    262:25
    272:1
    280:18
    291:22
    292:20
    293:8,11,
    12 295:23
    304:4,8,
    14 308:5



personally
84:16

personnel
264:18
265:2

persons
121:24
264:12

persuasive
30:7

pertain
17:7

Peter
7:6,8

ph
6:5 9:17
73:9,13
131:3
133:20
136:1
196:3
285:8
286:2
287:1
311:6

pho
212:5

phone
66:19
212:15

photo
178:9

photographs
211:25
212:1,6,
10,14,16
213:7,18
264:20
265:4
267:19

photos
212:21

213:4,12,
21 214:5
265:10,13
266:21,
23,24
267:14,
15,18

phrased
135:2

physical
60:7
179:23
200:11,18
201:10
203:9

physically
269:1

pick
26:8
260:22
262:22
266:15

picked
71:1
118:3
260:9

pickup
41:20

picture
265:14

pictures
100:12,16
116:12
265:20
266:9
304:20

piece
143:3
162:19
184:6

pieces
15:13

122:2,11
123:17,22
228:2
229:24

Pierce
50:12
59:10,16
60:2,5
70:10,23
71:22,25
72:7
79:16
81:1,2,6,
7,10 89:8

place
104:1
244:1
258:13
264:19
265:3
270:17
286:1,11

places
92:20

placing
217:18

plain
170:20

plainclothe
s
215:16

Plaintiff
6:22,24
7:11
63:25
92:5
222:4

Plaintiff's
63:17,18

Plaintiffs
312:8

plan

64:9

platoon
79:16,24
80:2
226:9

platoons
79:19

play
166:15

played
113:9
114:7
134:23
162:8
163:9,12

pleadings
44:8,9,18

plenty
292:10

plotting
190:11,12

plum
80:5,7,
10,16

pocket
60:24

point
21:19
22:1
51:16
68:24
78:11
101:3,4
105:12
109:15
115:13
116:11
129:3
139:2
153:16
159:1
172:3

186:4
200:14,20
203:14
211:10
217:19,21
219:3
220:25
221:23
223:18
231:12
247:7
268:13
280:8
281:11
299:20
310:24

pointed
270:14

pointing
269:11
270:8,17
272:4
273:15
274:19

points
271:16

police
48:11
80:11
90:19
141:21
148:13
149:8,12,
13 152:4
199:2,11
215:5
229:8,10
237:9
260:21
263:10
264:17
265:1
270:16
279:18
281:2,15



282:14,23
287:23
293:24
295:15

**policing**
80:16
227:19

**policy**
81:17,24
177:2
286:1

**polygraph**
71:10
177:9,10,
16,20
179:18
181:24
186:25
218:8

**polygraphed**
232:9

**polygraphy**
71:11

**popular**
82:9

**portion**
23:21
25:17
49:25
133:7
303:25

**position**
155:24
156:7
201:18
211:21
230:6
311:10

**possession**
212:17
214:1

**possibiliti
es**
250:2

**possibility**
97:8,14,
18 99:13
113:8
129:5
165:14,16
167:4,7,8
168:14
230:9
246:17
250:4,6

**possibly**
134:18

**post**
12:7
32:25

**post-con**
45:3

**post-
conviction**
11:3 12:1
23:15
45:4 62:5
105:21
160:16
198:6
252:24
268:19

**post-trial**
19:3,12,
18 32:15
160:11

**potential**
112:13
119:9

**potentially**
37:23
114:25
144:14
204:7

209:17
210:21
227:2
228:12
229:22

**powerful**
82:5,7,10
83:2

**practice**
177:1
286:1
287:22
288:10
294:3
302:21

**practicing**
137:17

**prayers**
9:22

**pre-trial**
30:19

**precinct**
134:2
171:5,25
173:2,10
179:8
181:24
186:21,24
217:23
218:24
220:9
222:15
232:2
233:24
234:3
288:22
301:3

**precise**
227:13

**pregnant**
210:18,23

**preparation**
42:14,16

44:5
47:11,20
107:2,5
126:25
154:15
180:24
308:19

**prepare**
8:2 12:23
14:10

**prepared**
13:5,11
14:5,9
20:24

**presence**
278:22

**present**
18:20
43:14,15,
17 71:15
88:24
159:19
180:12,
15,16,20
233:23
241:18
245:14,16
246:3,22
249:2,3,
13 262:6
270:24,25
272:11
273:4,7,
10 274:9
292:14
293:12,24
313:1

**pressing**
301:16

**pressure**
48:25
279:18
282:14

**presumes**
20:11

**pretend**
248:11

**pretty**
50:24
83:14
89:18
113:18
120:20
122:17
143:17,22
144:16,25
145:8
146:16
189:13
194:8
226:20
300:13

**previously**
29:17
31:15
76:1 95:8
127:13,15
160:25
161:4
208:16
291:1

**previously-
marked**
95:18

**pride**
62:20
63:4 66:8

**primary**
93:15,17

**printed**
63:12
91:23

**prior**
14:16
15:4
20:25



22:8
105:20
107:15
161:11
187:10
200:22,23
282:20
286:17

**prison**
33:9
258:21
275:3

**prize**
115:7

**prob**
51:21

**problem**
35:22
51:22
142:3
202:4
282:6,8
284:10,12
297:21

**problems**
10:24
170:18

**procedure**
81:25
229:8

**proceeded**
264:16,25

**proceeding**
19:1 62:5
252:15

**proceedings**
6:1 19:3,
12,18
25:17
26:4
106:6

**process**

174:10,14
223:18,21

**produced**
286:4,7,
23

**professional**
65:2

**professor**
92:23
93:16
94:7
96:15
108:3,14

**promise**
285:21

**promotions**
65:6

**proof**
299:13

**property**
41:1
217:18

**prosecuting**
46:21

**prosecutor**
21:12
36:23
37:8,12
38:5,19,
20 275:6,
14 276:9

**prosecutors**
38:18

**protect**
77:22

**Protective**
285:3

**prove**
29:13
201:15,24

**proved**
25:9

**proves**
32:21

**provide**
29:24
74:13,24
75:6
269:6
311:19
312:18

**provided**
226:25
228:3,6
229:12
272:15
286:21
287:13

**providing**
75:17
227:7

**prudent**
308:2,3

**psych**
275:3

**publicly**
55:25
57:4

**pulled**
282:24

**punitive**
40:21

**purpose**
12:22
198:12
228:25
229:3

**push**
185:7

**pushed**
189:18

**Pushing**
190:12

**put**
18:23
38:1
63:14,19
86:22
89:18
91:25
95:17,22
99:9
100:7
116:18
164:10
171:3
172:9
196:7
220:16
236:10,12
245:18,19
251:1
254:21
255:10,
12,14
256:8
269:24
272:18,23
274:14,
18,19
276:12
283:3,8
309:7

**puts**
98:12

**putting**
196:11
218:25
220:20
269:10
270:8
273:15
274:11
276:4
289:14

———————

**Q**

**ques**
311:23

**question**
9:6 15:20
16:25
20:2 23:2
25:23
27:4
28:18,22,
24 30:20
31:14
33:16,21
39:14,17
46:8
49:20
52:6
56:12
58:1
71:20
79:2
81:18
82:21
83:25
84:23
85:8
88:18,20
90:8
97:11
106:21
113:5,18
115:22
119:25
127:25
128:11,16
129:15,23
130:15,
18,19,22
132:16
133:1,6,
11 134:6
136:22
138:8
139:13



Case 3:17-cv-00419-GNS-CHL   Document 317-39   Filed 01/26/23   Page 358 of 376 PageID #:
27877

MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
Index: questioned..read

140:14
141:23
142:18
149:6
159:15
160:7
162:10
167:19,21
168:4,7,
17 169:1,
12,24
171:2,16,
19 173:16
175:15
176:12,14
177:25
178:4,24
179:1,6,
9,16
181:1,8
182:19
183:6
184:8
189:25
190:6
191:9
192:16
193:15,
17,21,24,
25 195:3,
9 196:21
202:8
203:12
205:2
206:22
209:20
211:7,8
213:2,20
214:2
217:2
220:18,24
222:5
226:22
228:24
231:18,19
232:4
233:20,

21,22
235:13,
21,22
238:7
239:17
247:23
251:6
252:14
257:1,18,
19 259:14
263:7,8
271:5,10
274:23
276:16
278:15,17
279:21
280:6,10
282:18
284:24,25
286:25
288:7,8,9
291:12,23
293:16
294:11
295:4,7,
11,16
296:15
300:17,21
302:2,9,
10 303:12
304:12
305:9
307:9
308:24
309:7,17,
23,24
310:4,8

**questioned**
23:8
156:22
171:6
237:10
239:12
303:3,10

**questioning**
14:1

133:9,20,
25 181:23
185:19
189:15
216:12
237:16
272:1,8
285:17
297:11
311:6,7

**questions**
8:9
15:16,17,
24 20:19
22:5
28:17
62:6
77:12
102:23
111:2,3
114:10
115:19
133:4,5
134:1,5
138:17
139:8,9
142:12
160:12,14
169:4
171:9
172:14
173:11
175:12,17
177:12
180:17,
21,23,25
181:4,11,
20 184:15
185:12
192:2,9,
14 194:21
195:1
197:2,8,
18 198:4
208:6
210:6,13

218:9,21,
23
238:15,25
242:22
243:6,7
246:18,25
249:14,
15,16
252:15,20
291:1
295:2
302:21
309:10,12
310:8
311:20,
23,24
312:2,13
313:23,25

**quick**
313:19

**quickly**
40:24
309:1,2

**quiet**
289:22

**quit**
52:24
168:11
300:3

— — — — —

**R**

— — — — —

**racial**
284:1

**raise**
7:13
28:24
139:12
269:3

**raised**
14:5
131:17,
18,19,21,

23 162:19
189:22
197:3

**Ralph**
6:11

**ran**
81:18
82:21

**rapport**
182:10

**Rarely**
89:5

**rat**
279:19

**rational**
24:23

**rationale**
294:8

**re-interview**
244:12

**re-interviewed**
207:21

**rea**
173:18
239:13

**reach**
121:3

**reacted**
138:16

**reaction**
138:14
187:19

**read**
12:25
13:2,3,5,
8,13,17
14:8 15:4
16:6



44:8,14,
23 45:3,
10,16,17,
19,21
62:4,17
87:4,23,
24 107:6
110:22
111:9
133:7
146:25
151:10
222:20,
24,25
223:11
224:11,14
228:8
230:16
241:12
246:24
259:5
286:2,7
305:2,8,
13 307:9,
16 309:1
310:4
314:6

**read-on**
312:13

**readily**
216:1

**reading**
45:8
66:11
117:5
151:8
243:19
287:6

**readings**
90:25

**ready**
6:16
197:9

**real**

41:1 45:6
109:17
111:10
313:19

**reality**
33:22

**realized**
52:23

**reason**
10:20
16:1 36:3
48:21
58:1 69:9
85:20,22
87:8
88:2,18,
20 93:23
113:6,19,
25 114:4,
5,19
128:11
133:15
143:10
155:16
158:9
159:4,20,
21,23,25
160:5,6,7
171:1
176:8
177:14
179:8
185:18
190:1
191:25
192:1
197:7,22
198:6,8,
14 199:2,
5,7,8,13
201:9
219:1
224:10,25
225:25
227:6

228:11
229:12,16
238:25
239:13,18
252:5
258:23
259:20,21
270:17,20
284:18
290:22
292:12,16
294:12
295:13
296:15
297:17
298:19
300:7
304:9
306:9
307:8

**reasonable**
25:6
201:25
230:8

**reasons**
69:1
115:22
145:22
158:7,21
214:18
224:22
225:15
234:16
290:19,24
291:2,6,
14,18
292:7
296:16
299:6,7,9
301:4

**recall**
12:10,11,
13,15,17
44:10
45:8,9

47:14
62:1 63:1
72:16
73:20
74:12
75:20,25
79:9
92:17
93:20
94:10
97:3
98:25
103:24
118:24
119:1,11
122:8,9
133:19,25
140:17,
19,21,24
141:10,
11,14
143:10
154:23
163:16
173:23
179:11
180:5,7
187:1
191:9,10
205:9
213:15
275:18
288:14
304:12,
17,19

**receive**
42:6 51:9
53:6
60:15

**received**
60:12
64:23
72:18
90:14
100:1
103:20

108:2
111:24
112:8
143:4
193:10
220:12
224:19
225:2
226:13
227:16
257:16
271:21
313:20

**receiving**
164:24

**recognition**
163:6

**recognize**
64:17
160:10

**recognized**
99:12

**recollectio n**
8:6 86:16
87:7 88:1
118:22
165:3
185:24
236:20
237:4

**recommend**
98:19

**recommended**
101:1

**reconsider**
276:13

**reconvene**
311:5

**record**
6:4 78:7,
10,14



133:2
153:7,15,
19 175:4,
14,21,24
176:5,6
178:21,23
221:19,22
222:1,2
268:5,12,
16 286:11
288:12
290:14,25
292:17
310:16,
18,20,23
311:2,17
313:25
314:4,5

recorded
292:4

recorder
78:13
173:25
175:3
288:2,5
289:3
291:24
292:1
298:2,4

recorders
174:2,4

recording
78:12
153:17,18
173:21
174:23
178:21
221:24,25
223:23
268:14,15
310:25
311:1

records
38:2

91:18

recovered
116:12

recovering
53:8

recovery
61:4

recruited
80:9

Reduction
92:5

reference
8:9 95:17
97:19
101:5
286:22

referenced
216:25

referred
93:23
101:12
102:11,
14,19,24
103:2,10

referring
92:18
307:2

refine
15:21

reframe
263:8

refresh
8:5 165:2

refused
179:16

refusing
310:5

regard
38:13
82:13

83:4
86:17
103:8
133:10,21
137:20
184:9
274:12
286:1
302:22

regular
53:24
85:16
284:5

Reid
72:19,23
73:9,13,
15,16
74:12
77:20

rel
114:24

relapses
60:25

relat
122:4

related
94:14

relationshi
p
121:24
122:5
124:3
142:13,20
143:13
210:13

relationshi
ps
52:21

relative
113:1

relevance
126:20

145:16

relevant
17:3
37:23
65:6
111:25
112:25
114:25
115:4
145:1,14
209:17

reliability
160:7

reliable
29:11

reluctance
281:1,5
283:16,20
284:1

reluctant
282:23

remain
66:25

remained
49:17
52:7
154:21

remains
65:21
155:24

remem
75:13
285:13

remember
15:7,12,
15 21:11,
20,23
22:3,4,5,
7,11,12
23:7
25:12,14
42:20

48:18
63:5 71:7
73:23
74:21
75:15
79:7
82:3,10
85:19,23
86:1
87:15,18
90:17,23
91:16
92:24
93:19,22
94:15
99:8
102:10
103:24
113:14
118:15,
16,19,20
119:13
120:5,8
124:19
131:25
139:25
144:3,13
151:8
156:14
161:20
163:19,20
164:24
165:17,19
171:5
172:3,24
173:4
174:1
190:24
191:4
198:8
202:17
203:2
207:13
211:16
213:14
214:11,
14,15,20



215:23
231:3
233:3
237:8,14
239:2,21
245:6,13,
23,24
246:1,19
247:16,21
249:11,21
285:8
288:13,
15,16,17
302:15,18
308:20

**remembered**
250:10

**remembers**
143:18,23
144:5,17
145:8,10
146:17
149:2

**reminding**
15:15

**remote**
6:11

**removed**
59:7

**rep**
16:15

**repeat**
28:18
46:7
159:11

**repeated**
233:18

**rephrase**
33:10,17
168:8
302:9,10

**repor**

37:7

**report**
38:5
39:11,19
83:12
87:9 93:5
95:1
125:24
126:18,24
127:3,24
133:8
134:4
141:21
142:19
147:24
148:13
149:8,12,
14 152:4
155:11
180:24
181:13,19
192:23
210:1
213:5,8
216:18
222:12
223:14,24
224:5,8
227:23
241:10,12
243:2,16
244:6,7
245:16
246:3,21
247:3,6
248:13,14
249:3
250:13
251:1,8,
12
257:15,22
262:4,8
264:13
270:21
271:2,17
277:13,

19,23
278:11
279:19
280:3,22
281:2,8,
15,18
282:2,15
283:17,20
284:1
293:3,8,
11,14
294:6

**reported**
232:1
256:21
280:11,
15,16
284:5

**reporter**
6:12,19
7:12,17
27:25
57:17
63:13,18
64:3
91:24
92:3,8
95:7,21,
25
105:17,22
109:23
110:1
163:23
164:1
178:11
211:5
312:14
313:20,22
314:1

**reporting**
133:19
254:17
255:2
279:12

reports
14:16
16:2 21:4
23:9
37:11,22
45:11,17,
19 47:11
59:13,22
84:8,25
85:3,11,
15,17
86:2,4,6,
9,11,17,
19 87:21
88:3
104:5
119:2
122:9
123:14
133:17
141:14
146:22
147:6
154:15,23
155:4
180:23
181:3
202:9
207:8
219:11
224:2,12
243:1
245:13
251:9
252:4
293:25
294:13,15
298:7

**represent**
6:19
40:12,13
133:2
150:10
181:12
241:10
307:2

**representin
g**
6:13

**request**
311:5

**requirement**
302:23

**requirement
s**
303:1

**reser**
11:9

**reserving**
312:8

**residence**
264:4

**resp**
51:15

**respect**
50:19

**respectful**
171:16,20

**respectfull
y**
171:15

**response**
129:15,23
132:16
169:11
210:11

**responsibil
ities**
54:19

**responsible**
271:17
272:14
279:12

**responsive**
199:21

**rest**



162:16

**restroom**
78:23

**retirement**
42:9,10

**retract**
296:4

**retribution**
269:7

**retrieving**
110:1

**retrospect**
52:15
188:13

**returning**
263:25

**reverse**
12:22

**reversed**
11:5,9,14

**review**
11:20
14:16
16:2
46:4,10
47:11
85:9,11
89:23
96:23
104:5
107:4
116:7
119:2
141:22
160:10
264:19
265:3
308:19,24
309:8,16
311:7

**reviewed**
10:16

14:14
21:3
42:13
44:4,6,7
65:4
84:25
85:3,7
86:4,7,
17,21,25
99:19
100:21
107:1
126:24
127:1
133:16
141:21
180:24
207:8
222:18
309:18,19

**reviewing**
47:19
141:12
154:14,23
181:3
305:12,14
309:4

**reviews**
86:20

**Rhonda**
142:9,16,
20,22
150:25
155:6
156:4
157:14
160:25
161:4
193:11
231:7
248:6

**Rhonda's**
118:7,17
218:15
260:23

262:22

**ride**
282:25

**ridiculous**
267:4

**riding**
148:22

**rights**
237:21

**ritual**
98:3,14
99:14
113:1

**ritualistic**
112:17

**road**
161:8
233:11
296:10
297:6

**Robbery**
48:17,22,
23 49:3,
4,7,16,23
51:21

**Robert**
7:7 313:9

**Rogers**
106:21

**role**
18:6
70:13
113:9
114:7
134:23
162:8

**rolling**
153:18

**romantic**
121:23
122:5

**Ronald**
92:24
93:1,8,24
95:2
97:3,13,
20,23
98:7,11,
18 99:1
101:1
121:3

**room**
71:5,11,
22 72:8
117:12
118:7
217:18
245:11,
15,21,22
250:2,5

**rooms**
71:8

**Rosene**
7:6 313:9

**roughly**
268:8
302:15

**route**
127:11

**rule**
76:4
173:12,
19,23
280:2

**rules**
174:1

**run**
186:9

**running**
222:4
262:20

**rush**
204:4

**rushing**
204:8

---

**S**

---

**sac**
230:13

**sacrifi**
132:24

**sacrifice**
108:15
109:8
128:13
129:10,20
130:10
131:1,11,
18,24
132:11,17
135:7
136:3,9,
17,23
137:1,16,
20 138:2
139:23
140:23
157:7
162:21,25
167:1,5,6
168:13
169:21
170:2
172:1
173:1
177:15
178:2
187:18
190:4
194:17,18
214:10
220:18
230:14
231:1,14
232:16
233:8
234:18



235:18

sacrificed
109:12

sacrifices
97:24,25
128:25
129:18
131:5,16
132:9
135:11,
17,18
150:13
185:15,19
186:3
187:10
188:16,25
195:2,5,6
197:20
205:7
230:13
238:25
256:20
299:22,24

sacrificing
107:17,
18,23
108:18,20
129:5
160:17
165:9
214:10
244:22
246:4,18
247:14
248:25
249:24
250:3,10

sake
175:21

sample
217:20
218:1

samples
218:8

Sarasota
41:4,10

sat
107:8
242:20,21

satanic
106:22
107:8,9
109:1
116:2,9,
10 117:4,
12 118:6,
12 121:5,
6 127:15
128:7
132:19
165:24
243:14
299:21

Satanism
93:18,21,
25 101:5
105:8,13
107:12,
19,22
114:20
121:10,21
122:4,13
123:20
124:12
127:13,
21,22
128:4
133:10,21
134:1,7,
22,23
136:20
137:13,17
138:1
142:11
143:12
163:18
165:8
167:2
168:11

218:24
220:12

Satanists
108:24

Saturday
110:20

save
308:23

scene
103:14
205:22,23
212:2,6,
10,14,16,
21 213:4,
7,11,21
214:5
264:20
265:4,10,
13,16
266:10,
21,23,24
267:14,
15,19
304:20

Scheck
6:21,23

scope
53:16

screaming
290:9

screen
36:3
96:8,10,
19,20
164:9,10
178:13
191:18

scrupulous
38:12
39:7,11

scrupulousl
y

23:11,14

scrutinize
83:12
84:8

seat
215:19,22

sec
312:8

secret
236:1

secretly
298:1

section
235:17

segment
153:9

Seminar
92:4

send
38:19
64:8

senior
70:2,4,21

sense
91:14
156:24
170:25

sentence
110:18
143:16,21

separated
249:19

September
6:4
304:3,13

sequence
205:12

sergeant
19:6
59:10

60:2
79:20
88:24
89:3,5,8,
24,25
171:11
214:12,
16,21
230:19
233:13

sergeant's
61:23

sergeants
82:9
89:23

set
264:2,9,
18 265:2

shape
184:25

share
55:18
96:7
236:5

shared
50:25
51:13

sharing
96:19

she'd
225:4

sheer
89:4

sheet
83:16,18
240:21
254:22

sheets
83:20

Sher
265:17



Sheriff
21:11
45:19
46:12,20
93:8,23
97:7,14,
19 98:19,
22 99:4
101:1,9
109:14
119:8,12
120:2
121:2
197:9
200:1
239:5,7,
8,9,10,
14,16,19,
23 240:1,
7,12,16,
25 241:7,
11,21
242:4,7,
11,17,21
244:24
246:3,6
247:18
261:10,
11,19
262:2,3,6
265:8,17
266:2,6,
21
267:12,
15,17,24
272:18,
19,23
308:17

Sheriffs
19:6

Sherlock
125:14

Sherrard
50:10,19
51:5,9

72:7
79:5,12
80:23
81:14,18
82:1,12,
19,22
83:4 90:3
259:17
285:25

shift
260:4

shifts
256:17

shop
214:20

short
152:25
275:9,11,
13

short-
circuit
307:13

shortcut
55:21

shortcuts
58:6,16

shots
240:7

show
63:6,20
81:19
86:21
95:2 96:9
160:13
163:21
164:9
187:19
202:9
212:17,20
213:4,11
221:6
267:18
287:17,18

304:7
306:10

showed
11:1
13:16
204:15,16
211:24
212:1
213:6
214:5
248:9,10
266:21,22
267:14,24

showing
202:9
213:21
303:25
306:9

shown
267:22
280:17

shucking
289:2

shucks
67:24

shut
185:10,
12,17,21
192:9,12
193:18

sic
194:12

sick
9:13

side
116:22
251:13
298:9

sign
73:6
314:7

signals
94:20

signatures
65:14

signed
35:23
73:2,6
146:25
233:15

significanc
e
162:17
170:16

significant
14:4 31:6
33:23
34:5
122:17
170:21
255:15
299:15,17

signs
87:1
94:20

similar
135:17
158:14

similarly
156:2

Simon
7:10

simple
23:2
27:15,20
31:14
111:10
133:6
147:22
170:6
213:20
217:8
226:22,23
239:17

263:15

simply
13:4
14:19
17:20
22:3 23:7
34:23
74:14
86:1
91:8,14
93:22
94:10
105:11
109:11
118:10,24
148:12
149:7
166:15
187:13
211:15
214:20
215:21
219:7
234:23
235:7
237:7
240:15
241:6
246:17
249:15,21
253:5
255:12
260:3
275:2
276:6
278:19,22
280:7,19
282:3
297:21
311:9

single
13:17
67:18
100:14
179:16



**sir**
7:13,25
9:15,21
10:21
15:18,19,
22 26:3
27:4
31:14
33:12
34:9
46:14,24
57:7
64:19
65:17
85:7,17
86:2
87:21
88:21
99:7
102:16
106:25
107:4
108:13
110:6
111:6,9,
20 113:3,
12 114:4
116:20,24
120:6
126:3
130:9,13
133:23
138:22
139:5
140:9
141:20
146:20
147:23
148:7
149:13,17
155:18
159:9
171:16,23
174:7
180:6,13,
18 182:5,
25
183:16,22
184:5
186:19
190:20
193:4,7
194:23
195:20
213:20
219:9
220:22
227:6
229:5
231:24
235:13
239:17
245:10,
16,20
246:2
248:9
256:25
289:13
291:11
300:14,16
301:9,19
305:6
307:9,14
309:21

**sit**
12:14
33:2
38:25
40:6 45:7
70:23
86:15
89:13,16
162:1,4
187:13
201:23
278:2
282:10
286:24
288:2
292:5

**site**
90:20,21

**sitting**
67:22
175:11
214:8,13
215:7,8,
10

**situation**
68:15

**situations**
66:17
293:6

**size**
174:6
298:8

**skilled**
76:15

**skills**
68:14
69:15
76:20
206:12

**Skip**
268:1

**sloppy**
58:17,25
59:7,12,
18

**slurs**
284:2

**small**
108:20,23
109:12
128:8,13,
20
132:19,21
215:24

**Smith**
23:3
64:21
162:19
163:16
164:16,25

165:3
307:4

**snake**
307:6

**so-called**
98:14

**sociopaths**
108:21

**soft**
206:18

**solely**
49:12

**solicit**
75:10
226:5

**Solutions**
6:13

**solve**
119:17
125:3,4,9
228:21

**solved**
125:7

**solving**
125:17

**somebody's**
286:22
300:11

**someone's**
25:25

**sort**
113:15
151:11

**sound**
13:19
25:6
178:3

**sounds**
48:18
93:3

**121:22**
175:20,23
176:21
240:5
250:1

**source**
237:24

**sources**
108:8,12

**space**
87:2

**speak**
6:17
99:22
101:19
186:12
187:3
213:13

**speaking**
6:15
110:24
172:9
237:4

**speaks**
153:20

**specialty**
94:1

**specific**
15:16
26:3 51:8
113:2
115:22
119:25
136:8,22
173:23
184:6
251:7
273:14,16
281:14

**specifically**
25:8 34:4
46:15



47:15
51:3,15
57:16
74:21
141:17
188:17
199:17
249:18
259:16
284:19

**specifics**
25:12
119:20

**speculation**
231:18
235:21
260:2

**speech**
138:21,23

**speeches**
138:20

**speed**
105:1

**spelling**
313:23,25

**spend**
43:11,17
47:19

**spent**
33:8
49:23

**spoke**
88:2
102:11
118:13
148:24
186:14,
17,20,23
187:2
234:5
236:13,21
237:1

**spot**
152:20
289:22

**spotlight**
258:25

**sprint**
204:2

**squad**
60:7

**stabbed**
124:18

**stabbing**
124:17

**stamp**
64:6

**stand**
15:11
22:2,4
57:2
62:12,23,
24 153:9
154:1
178:21
197:18,21
198:1
209:9
314:2

**standard**
72:24
269:21

**standardize
d**
174:22

**standards**
60:6
66:24

**standing**
56:6,16
234:15
272:20
300:12

**stands**
51:18

**start**
50:19
120:17
167:12
192:8
204:4,8

**started**
48:10
142:12
168:12
255:7

**starters**
108:21

**starting**
165:9

**state**
6:18

**stated**
147:10
149:3
223:9
246:4
264:1,2

**statement**
57:11
61:7 77:2
119:21
139:22
145:9
147:23
152:3
157:7,10
160:17,21
162:1,20,
24 168:14
173:10
190:3
192:3
195:24
196:16
197:19
204:16

215:5
230:12
231:1
233:8
256:19
275:21,24
280:20
281:16,20
282:1
283:13
284:20
287:6,23
288:3,12,
21,23

**statements**
37:1
77:4,21
147:18,24
149:18,25
150:6
157:4
158:18
162:7
177:16
231:25
233:10
279:13
304:10

**stating**
63:2

**status**
120:15

**stay**
285:2
312:17

**stayed**
20:16,21
247:9

**stealing**
55:25
56:22

**stenographe
r**
211:5

**step**
53:1
137:23
290:10

**steps**
34:25
280:15

**stick**
141:18
291:20
295:14,19

**sticker**
63:14,19
91:25
95:22

**stickers**
95:24

**stop**
46:14
136:1
137:16
170:22
176:3
223:4,7,8
272:1,7
283:3
311:11

**stopped**
81:20
127:16
128:22
129:21
130:11
131:2,13
132:22
165:8

**stopping**
272:14

**story**
55:17
294:21

**straight**
114:19



street
  70:14,17
  266:12

stressful
  66:17

strict
  81:5,6,8

strictly
  202:2
  283:21

stronger
  112:20,23

strongest
  70:5
  77:15

struggle
  51:24

studying
  93:17

stuff
  94:3,16,
  18 98:15,
  22 103:3
  104:1
  112:20
  113:22
  121:5
  170:18
  189:17,21
  201:25
  243:14
  281:5
  299:21

style
  71:14
  191:5

subjects
  20:16
  257:9

submitted
  46:19

substance
  51:22
  84:7 86:8

substantive
  65:24
  66:13

suddenly
  148:5
  170:22
  186:10
  297:1

Sue
  142:16,22
  150:25
  155:6
  156:4
  231:7

sufficient
  16:3
  159:24
  293:7
  294:5,7

suggest
  38:15
  67:25
  100:13
  162:25
  187:5
  239:15,20
  251:14
  284:23
  310:17

suggested
  58:15
  59:6
  165:12
  218:6
  298:13

suggesting
  32:16
  35:5
  102:9
  177:2
  200:18

220:23
  242:20
  245:20
  247:3,6
  305:10
  309:16
  310:2,7

suggestion
  156:12

suggests
  144:2,6
  189:24
  261:2
  284:24

suing
  39:15

sum
  133:8

Summary
  67:6

superiors
  32:6

supervised
  51:17

supervisor
  64:20
  66:5
  70:17
  71:15
  80:21
  81:2,6,8
  83:13
  88:8,12,
  16 229:9
  237:15
  282:5,7

supervisors
  49:9
  51:17
  58:19,22
  61:8,18
  62:22
  70:9,12,

22 295:17

supplied
  21:9
  22:24

supposed
  158:8
  278:10

surprise
  58:10
  59:14

surprised
  162:6,14

surprising
  163:5,10

suspect
  68:7,8,
  13,22,25
  69:9,10
  71:1
  88:23
  132:15
  143:1
  152:4
  172:7,17
  182:5
  193:15
  205:21
  206:13
  212:4,7,
  20 213:4,
  11 215:5,
  6 216:5
  217:20
  218:1
  235:11,17
  238:13
  258:19
  269:7
  270:7,18
  271:25
  272:12
  273:15
  275:1
  276:5,13

279:14
  280:20
  281:16
  282:2
  283:13,22
  288:21
  289:14
  290:12
  291:15
  292:18
  295:14
  296:18
  298:2

suspect's
  125:15

suspected
  124:20

suspects
  24:8
  62:12,23,
  25 63:3
  68:10
  74:14
  75:18
  76:2
  104:10
  154:17,21
  172:18
  199:24
  205:17
  206:17
  225:12
  254:8
  256:13
  259:17,22

sustan
  121:6

sustanic
  121:6

swear
  6:20 7:13

sworn
  7:18



**symbol**
219:3,14

**synced**
312:22

**synch**
313:6

**system**
288:2

―――――――――

**T**

**tab**
95:9
106:3
109:24
308:11

**table**
92:9 96:2
269:11,25
270:8,17
272:19,23
274:12,
15,19
276:12
283:9

**tactic**
206:4,7

**takes**
66:17
271:15

**taking**
22:4 58:6
182:16,17
184:16
190:9,13
218:8
244:1
288:11
297:10
304:20

**talk**
24:23

28:6 48:2
68:10,11,
13 82:24
84:7
101:1
102:3,10
103:11
104:8
169:20
179:20
182:4,6
185:17
237:3
256:14
284:17,19
285:7
291:25
292:2
295:9
297:19
299:5

**talked**
48:7
75:16
79:3
102:6
119:8,12,
14 138:15
147:2
232:7
238:2,24
242:7
244:17
250:3
261:2
264:1
266:22
292:1

**talking**
22:7
30:13,14
44:16
67:21,23
68:2,22
77:12
96:15

98:23
113:2
145:2
146:10
149:15,16
170:9
182:2
187:25
192:12
196:7
201:4,5
202:6
206:18
209:2
227:10
248:4,7,9
256:10
261:24
274:17
287:8
299:8
300:6,15,
22 302:3
307:25
312:6

**talks**
154:3

**tape**
172:9
173:21,24
174:2,4
175:3,4
176:23
177:2
223:22
239:1,13,
19 287:24
288:2,5,
12 289:3,
18
290:14,25
291:24
292:1,17
294:13
297:10,18
298:1,2,

4,23
299:1,9
300:8
301:17

**tape-record**
77:21
173:10
296:17
297:22
301:4
303:4

**tape-recorded**
292:23
294:5

**tape-recording**
176:8
292:25
297:19

**taped**
288:3
291:17
298:14
302:23

**taping**
297:11
298:17
302:22

**taught**
288:19

**teacher**
97:4,13

**technically**
70:14
158:12
196:8

**techniques**
68:3 72:6

**teeth**
25:1

**telling**
23:23
24:7
25:15
28:22
29:22,25
36:6,12
53:4
56:13
57:19,21
59:4,24
60:9
146:9
150:24
151:3
155:21
157:5
158:3,4,7
180:6,11
183:7
192:6
194:9,10
197:16,17
211:2,22
213:23
215:20
267:19
275:1
276:5
278:12
283:19
292:5
299:11
304:14

**tells**
28:16
167:11

**ten**
53:23
54:3 55:6
61:21
78:4,5
221:13,14
236:16
237:2
243:21



**tend**
219:24

**tendency**
282:25

**term**
50:7
227:19

**terms**
81:24

**terribly**
299:15

**test**
22:16
103:17
234:21

**testified**
11:3,25
12:11
18:20
21:25
22:22
32:14
46:2
62:20
76:1
141:7,18
150:4
157:24
198:5
199:18
229:7
239:23
240:2
252:23
268:18
285:25
299:19

**testify**
8:2  12:23
14:11,19
16:4
20:25
86:4
149:4

158:17
293:9
295:16

**testifying**
12:17,20
14:1,17
20:25
75:15
103:7
198:9
305:21

**testimony**
7:14
16:12
18:24
19:1
22:18,20,
21  23:2,
12,15
25:20,22,
25  26:6
40:15
42:14
44:7
45:1,4,21
49:2
61:2,4
62:4,8
78:20,24
101:19,21
103:19
105:16,20
106:3
107:1,4
141:13,18
150:7
154:15
160:11
183:2
249:13,23
253:2
268:20
274:24
278:15
286:17
287:7

304:1
308:16

**Testing**
36:15

**textbook**
73:9,19

**thanking**
163:17

**theories**
104:9,11
105:4
119:10,17

**theory**
234:22
235:4

**thing**
13:17
22:17
51:16
56:4,19
66:11
86:19
93:15
101:7
104:3
105:3
113:11
121:12
124:4
125:15,17
128:3
129:13,18
132:15
138:1
158:12,25
162:23
168:10
170:5
172:11,15
173:17
177:24
191:9
192:5
193:8

196:17
204:17
209:13
225:13
233:12
236:2
278:5,24
282:13
292:21,
22,25
293:2
294:12
297:25
298:9
300:25
307:9

**things**
15:3
18:18,19
24:6,11
25:9
26:14
29:16
37:1,7
38:17
51:12
57:5
62:6,10
66:11
69:17
75:11
76:7,15
77:19
80:25
90:21,25
94:13
97:24
98:6,8
104:10
109:7
111:25
114:14,17
116:14
119:6,7,
16,24
120:2

121:15
129:3
131:22
144:3,10,
20  145:21
147:1,20
156:9
158:1,14
159:11
160:9
161:7
165:12,20
166:15
169:4
174:21
177:9
189:8
191:6
205:9,12
206:15,
16,19,24
230:3,17
232:18
235:5,8
236:25
237:1
244:20,21
247:20
252:2,23
263:20
276:20
280:9
282:23,25
283:3,6,
7,17,21
284:4
290:2
296:13
304:15
306:3

**thinking**
90:23
120:18
157:1
165:17,19
172:14



187:14
219:6
301:3
302:11

**thir**
217:5

**thirty**
217:9

**thought**
8:23 14:1
33:23
48:23
66:7
90:9,10
91:12
98:21
99:14
101:6
112:18,
23,24
148:15
163:11
164:5
165:9,21
168:19
175:3
192:18
201:21
209:19,21
210:9,17,
22 226:5
230:5
235:8
250:19,
21,22
251:2,7,
10,12
252:1
255:17
261:13,14
294:7
296:13
298:18,21
299:10,12
300:8

301:23
302:16,18

**thousand**
41:10

**thousands**
52:3,9,18

**threat**
195:15
269:7,8,
12,24
270:2

**threaten**
268:23

**threatened**
150:24
155:6
156:4
157:14
160:25
161:4
193:11
194:6
195:11,16
268:20
280:8,9
283:9

**threatening**
161:12
204:17
269:1,4,
25 270:11

**throw**
89:19

**thumb**
173:12

**Thurman**
7:7

**Thurmond**
313:9

**TIAA-CREF**
42:12

**ties**
120:21

**time**
6:4 10:2,
3 11:8
12:21
14:22
19:5 25:3
38:18
43:6,11
45:22
47:19
50:1
53:2,6,
12,19
55:11,19
59:3
61:24
66:3
68:11
70:12
78:1,10,
14 79:9
88:13
89:12
99:18
101:23
111:12
114:9
116:2
122:12,22
123:6
124:1,6
129:3
132:14
139:21
147:2
149:9
150:19
151:5
153:6,9,
12,14,19
154:16,
17,24
155:5,21
160:20

172:23
175:16
178:22
179:13
182:9,10
184:4
186:9
197:1
199:23
200:10
201:8,14
202:23
205:4,7
206:2
217:25
219:3
220:8
221:11,
19,21,25
222:4,5,
6,7
236:13
237:19
238:14
242:1
247:8
255:13
259:22
260:8
261:9
266:17
268:4,11
271:24
279:23,25
283:2
284:9,12
286:11,20
288:18,21
289:2,5,
14 290:4,
10,11
292:11
294:18
303:5
307:12
308:23
309:2

310:3,7
311:13
312:2,8
314:4

**timeframe**
203:18

**times**
42:15,19
47:2,6
54:22
97:24
179:20
182:9,24
184:13
186:13,15
187:2,9
217:3
238:7
283:24
302:3

**tired**
128:23
131:4,14
132:2,23
135:8
137:11
214:9

**titled**
44:8
109:22

**today**
7:14 8:20
9:2,6
12:14
33:2
40:6,15
42:17
45:7
47:20
61:2,4,7
64:9
86:16
107:2,5
119:2



126:25
154:15
155:21
156:1,6
157:2
180:25
181:15
187:13
207:11
209:4
252:16
278:3
282:12
299:19
308:19
311:4

today's
312:4,15

told
13:13
25:8
27:11
29:13
30:2
46:20
56:8,21
58:5
59:11
60:5
66:20
81:1 89:7
90:3
105:11
113:22
114:12,22
115:13
118:9,23,
24 119:3,
4 123:12
126:19
127:13
129:19
132:12
133:15,16
140:25
141:1,20

144:12,17
146:5,12
150:8,16
156:3
157:13,17
165:6,21
168:10
172:17
177:5
180:2
183:1
189:13
190:23
191:5
195:12
199:22
202:13,16
205:5
207:17
208:10,20
209:6
210:16,
17,25
211:19
214:9
217:9
226:16,
17,21
228:14
229:13,16
230:3,25
231:5,10,
13 233:3,
4 235:6,
17
243:12,16
247:21
248:6,24
249:1
250:17
257:4,5
267:6
291:20,21
294:12
295:14,19
296:5,12,
16,21

297:6,13
299:16
307:5

tolerate
277:4,7

tool
125:11,19
205:16

tools
76:12
205:16
238:12

top
65:18
84:24
110:9
117:3,22
134:11
241:17
292:8

topic
61:12
134:7
169:22
197:3
285:7

topics
208:6

total
43:5
47:20
133:8
153:8,12

totally
17:18
84:12
233:16
254:24
281:19,20

touched
213:25

touting

35:5

town
94:22

track
83:15

trailer
226:19

train
101:12

trained
144:18
161:8
165:13
167:11
169:3

training
69:15
72:18,20,
23,24
73:16,21,
25 74:12,
22,24
77:20
81:25
90:14,16,
17,20,22
91:18,19
92:14,18,
22,23
93:2,12,
21 94:7,
12 97:23
98:7,11,
18
101:10,
12,20
103:19,
22,24
108:2

trainings
74:13

tran
42:1

trans
197:9

transcript
312:18
314:7

transcripti
on
289:24

transfer
49:3,4,7
51:20

transferred
41:22
48:16,22
49:16
60:6

transpired
38:6

transport
197:9

treat
186:11

treatment
53:6
60:12,15
61:3

trial
10:3
19:14,17
21:1,8
22:22,23
23:5,6,12
25:18
44:7 45:1
53:17
105:20
106:2,16
140:22
141:7
146:12
150:5,11,
15 155:21
157:21



162:2,8,
17 163:1,
8,12,18
165:4
249:23,25
306:7,8

**trials**
157:22

**trining**
103:21

**trouble**
31:7,11,
18 100:9
151:23
169:14
306:18

**troubling**
100:11

**truck**
41:20

**true**
25:9 56:1
72:12,14
87:12
93:6
119:20
151:12
206:13,19
214:6
259:1
288:17
301:22
302:12
306:14

**trust**
28:8
29:21

**truth**
7:15
16:8,10
24:7
25:15
27:3

28:23
56:13
57:20,21
67:16
106:16
158:3,4,8
211:22
252:4
295:19

**truthful**
16:12
253:1
268:20
296:9
301:24

**Tuesday**
222:21
260:19

**turn**
36:2
86:20
291:24

**turned**
6:16
13:8,10
37:8 80:9
88:3

**two-day**
72:19

**two-minute**
310:13

**two-thirds**
264:24

**two-way**
71:7,9,11

**tying**
200:19

**typ**
177:8

**type**
12:6
101:6

121:12
124:16,17
201:25
270:2,25
275:6

**typed**
223:23

**typical**
293:20

**typically**
10:23
70:16
88:22,23
89:3,22
173:15,22
214:20
224:11
295:18

──────────────

U

──────────────

**U.S.**
6:8

**Uh-huh**
14:6
261:1
272:6

**un-mute**
6:16

**unable**
39:14

**unassuming**
190:3

**understand**
10:13
13:25
15:20
23:22
25:23
29:19
34:3 36:1
39:15,16

40:18
71:20
72:22
80:15,17
90:23
91:1,5,7,
8 103:5,6
107:15
115:2
116:1
119:1,13
120:8
125:2
127:2
135:25
136:3,8,
10,15,17,
24 137:1,
19 138:3
144:8,18
146:4,5
147:17,19
148:9,10,
14 149:23
150:2,5,
13,16,21,
23,25
151:3
154:14
155:3,9,
10,14,15,
20,23
156:2,5
157:2,5,
6,9,12
158:1
167:9
168:4,7
185:18
190:7
196:6
197:17
203:13
208:23,24
209:3,4
211:18
219:2,12

220:25
223:14
225:6
239:22
240:6
245:12
248:12,13
252:8,11
257:18
271:5
272:17,20
273:3,4,6
278:8,18
281:11
299:16
301:24
302:17
307:10

**understand's**
230:6

**understanding**
32:23
33:3
39:25
40:7,14
45:25
49:15
50:18
80:4
82:16,18
94:19
124:22
148:1
224:1
295:15

**understood**
12:1
16:7,19
32:14
36:20
37:21
93:24
97:22



108:9,14
116:2
128:12
129:2
134:15
160:24
161:3
165:7
167:4
170:1
199:22
200:10
201:13
202:23
203:4
205:15
225:22
261:9
272:22
277:17
281:6
304:9

**unethically**
56:16

**unfair**
287:2,18

**unheard**
198:23

**unintelligible**
45:17
69:5
102:25
109:25
116:16
130:16
146:10
154:1
159:10,14
162:15
171:14
174:13
178:14
182:22
187:25

201:4,5
202:6
209:2
244:7
261:24
271:7
274:17
285:1
287:8
289:6
300:6,15
302:3,7
307:25

**unit**
66:3
83:15
88:17

**units**
214:10

**University**
90:18
92:19

**UNKNOWN**
35:11

**unusual**
89:15,17
273:11,
13,19,22

**unwritten**
280:2

**updating**
119:8

**upside-down**
218:14,21
219:2,13,
20 220:7,
15,20

**urban**
67:24

**urge**
129:20
131:23,25

132:7,16
135:17
167:16

**urges**
129:9
134:25
135:11,19

---

**V**

---

**V.A.**
22:13

**vague**
15:10

**Vaguely**
15:9

**valuable**
289:11,15
290:13
291:16

**valued**
41:18

**values**
41:6

**variables**
56:18
213:1
280:24
281:13

**variety**
68:3,6,14
69:6
76:11
282:22

**varying**
17:14

**vehicle**
266:16

**verbally**
256:21

**verdict**
40:3,4

**verify**
29:25
30:3

**version**
248:24

**versus**
6:7 89:25
201:24
260:17

**vice-versa**
281:9

**victim**
34:6
121:25
143:1
210:14,17
232:17

**victim's**
112:19
200:20

**video**
6:4
78:10,14
100:12,17
153:15,19
178:23
221:22
222:1
265:15
268:12,16
311:2,17
312:18,19
314:3,4

**video's**
36:8,9

**videoconference**
312:4,16

**videotape**
264:20

265:4

**view**
26:5

**violence**
142:16,21
143:1
150:24
157:14
161:11
256:19
280:8

**violent**
190:25
192:15
231:6
232:17
234:19

**visualize**
270:3,5

**voice**
25:10
189:22
206:18
269:3

**vol**
209:25

**volume**
80:9

**voluntarily**
76:9
173:6

**volunteered**
73:3
128:23
129:9,10,
18,19
130:10
131:1,11
142:15,20
155:7
156:11,15
165:7
191:2



197:19
208:18,
19,20
209:10

**volunteering**
290:25

—————

**W**

—————

**wait**
42:11
164:11
169:19
305:7
310:14

**waiting**
303:18

**walked**
204:9

**Walmart**
166:17,20

**wanted**
80:12
84:21
113:7,15
114:6
124:24
135:5
137:16
138:2
140:23
150:12
162:24
166:22,25
167:5,10
168:12
185:17
186:7
188:21,
22,23
189:16
190:4
192:3,6

197:8,12,
14,19
203:15
205:6
214:10
221:8,9
226:11,14
230:12,14
231:14
232:16
235:18
239:10

**wanting**
132:10
135:16
137:13
138:1
169:21
170:2
173:1
178:1
185:14
186:2
188:15,25
210:23
250:18
256:20
299:21
300:3

**ward**
275:3

**Warford**
142:16,22
150:25
155:6
156:4
193:11
231:7
242:4
243:6
244:8,17

**Warford's**
264:2

**watch**

87:6
254:5

**watching**
69:18

**ways**
68:14
188:11,13
190:3
194:12,15
195:1,4
198:4
268:23
302:6

**weapon**
112:2
122:3
123:19
124:13,
14,17
134:16,19
161:16

**week**
44:1
53:25
54:1
223:24

**weeks**
43:8
60:21
61:3

**weird**
243:13

**well-liked**
83:1

**West**
20:4,12

**Western**
6:9

**what-all's**
289:20

**whatsoever**
33:3 35:1

286:20

**when's**
43:20
53:12
236:13
252:12

**where'd**
204:12

**whereabouts**
123:3,18
203:17

**White**
306:2

**Whiteley**
6:12

**whoever's**
260:4

**Wicker**
6:25
18:12
19:24
20:6,9,
11,15,19
27:18,21,
25 28:3,
6,10,14
30:10,15,
18,25
31:3,9
32:4
36:14
43:17
47:23
64:4
74:2,5,10
78:4
90:5,8
92:9
96:1,3
109:20
130:19,23
137:3,5,
10 139:9
151:19,

21,25
152:5,7,
10,13,19,
23 153:2,
5 162:11
313:12,16

**William**
285:9

**wished**
15:5

**withdraw**
14:15
284:25

**withdrawn**
23:21
42:14
49:3
58:23
87:7 88:6
90:2
109:4
121:16
190:1
223:20

**witness's**
278:15

**witnessed**
158:12
230:19
278:20
291:21

**witnesses**
17:14,25
18:3 24:7
27:1,2,6
29:20
47:9,13,
16 62:11,
23,25
74:25
75:18
124:25
158:14,17
195:10



249:19
256:12
257:16,23
288:1
300:23

**witnessing**
17:13

**witton**
287:1

**woman**
297:5

**women**
79:25

**Woolsey**
181:15
214:12

**Woosley**
50:15
60:5
64:20
70:10,23
71:22,25
72:7
79:16,21
80:20
81:1,5,8
83:10,13,
19 84:5,
18,23
85:11,14,
17 86:8,
12,17
87:21,23
88:8 89:8
132:25
138:7,9
139:1,21,
24 140:5,
20
146:18,
22,24
147:6,8
148:17,23
171:11

181:16,17
214:12,17
215:6,8,
19 230:19
233:13,23
234:8
236:2,14,
21,24
237:5
241:7
251:13,15
256:18

**Woosley's**
149:1

**wor**
136:2

**word**
77:8
138:11
146:25
147:5
159:4
263:1,13,
19,21
269:12

**words**
12:7
39:15
40:2 49:7
52:7
62:16
70:4
74:18
132:10
136:16,
17,22,24
137:1
195:22
218:23
258:3
263:16
268:25
281:6

**work**

35:24
46:12
49:9 51:6
52:20
67:25
70:3
80:10
89:23
104:25
225:20,21
226:1
229:10
234:12
236:25
248:12
254:6

**worked**
10:22
31:10
38:17
50:1
81:7,10
83:18
88:13
236:24
256:15
283:4,5
284:14,16
285:10
304:16

**working**
49:1
70:14
254:4,5,
6,10
260:17,18

**works**
66:16
83:15
153:4

**world**
35:4
139:21
140:22
159:21

192:1

**worn**
48:23

**worse**
39:23,24
206:8
258:9
270:13,15
276:12

**worship**
94:3
111:4,17,
22 114:23
117:4
127:15
128:7
132:19

**worshiping**
94:6,8,13
131:3
136:2

**worth**
210:9

**worthless**
29:7

**would've**
250:10

**wow**
301:17
313:14

**write**
99:20
180:22
203:16
211:4,9,
10 231:15
232:24
233:19
234:23
235:6,11,
16 254:20
289:7
292:5

**writen**
232:25

**writes**
100:21
224:18

**writing**
38:5
39:12,19
100:2
117:20
171:8
187:22
190:10

**written**
83:18
95:2
97:14
166:18
174:1
232:25
233:6

**wrong**
11:22
13:9,10,
20 38:20
56:25
57:18
107:19
126:1
265:22
269:20
306:21

**wrongful**
12:3 17:2
40:20

**wrongfully**
8:13
10:4,17
11:15,23
12:9
16:22
17:3

**wrote**
44:12



MARK HANDY
JEFFREY DEWAYNE CLARK vs LOUISVILLE JEFFERSON

September 21, 2020
Index: y'all..Zoom

73:8,19
99:18
115:12
138:6
156:16
163:17
166:16
184:21
189:20
204:13
210:25
231:10
233:4
235:8
255:5
296:11

232:21
234:14
236:16
237:2
249:18
278:3
302:14,18

**you-all**
64:8

**you-all's**
252:8

**young**
278:4
279:7,9
297:5

**Y**

**y'all**
287:13

**ya**
148:23

**year**
64:23
65:19
256:3

**years**
9:5 12:8
15:2
24:5,12
29:2 33:9
41:24
42:2
49:20,21,
23 50:3
52:22
79:7
127:16
172:4,14
175:11
205:11
211:14
219:7

**Z**

**Zoom**
10:12
43:10,25
64:5
169:15

