UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
Case No. 3:17-CV-00419-DJH

JEFFREY DEWAYNE CLARK          )
and GARR KEITH HARDIN          )
                              )
              Plaintiff,       )
                              )
VS.                            )
                              )
LOUISVILLE/JEFFERSON COUNTY    )
METRO GOVERNMENT, ET AL        )
                              )
              Defendants.      )


VIDEO DEPOSITION OF JEFFREY DEWAYNE CLARK


The deposition of JEFFREY DEWAYNE CLARK,
taken before Lynn B. Kornick, Court Reporter
and Notary Public in and for the
Commonwealth of Kentucky, on the 26th day of
March, 2019, beginning at 9:01 A.M., at the
offices of the Jefferson County Attorney,
located at 531 Court Place, Suite 900,
Louisville, Kentucky.


---------------------------------------------

Lynn B. Kornick
Court Reporter & Videographer
11915 Brookmoor Drive
Louisville, Kentucky  40243
502.500.7627
lynnkornick@msn.com

APPEARANCES


FOR THE PLAINTIFFS:
       Amy R. Staples, Esq.
       Loevy & Loevy
       18 Village Plaza
       PMB 181
       Shelbyville, KY  40065


       Elliot Slosar, Esq.
       Loevy & Loevy
       311 N. Aberdeen Street, 3rd Floor
       Chicago, IL  60607


       Nick Brustin, Esq.
       Richard W. Sawyer, Esq.
       Neufield Scheck & Brustin, LLP
       99 Hudson Street, 8th Floor
       New York, NY  10013


       Larry D. Simon, Esq.
       239 South Fifth Street, Suite 1700
       Louisville, KY  40202


FOR THE DEFENDANTS:
       Peter F. Ervin, Esq.
       Annale Taylor, Esq.
       Office of Jefferson County Attorney
       531 Court Place, Suite 900
       Louisville, KY  40202


       Robert K. Bond, Esq.
       Andrew T. Garverich, Esq.
       Coleman Lochmiller & Bond
       2907 Ring Road
       P.O. Box 1177
       Elizabethtown, KY  42072-1177

(APPEARANCES - CONTINUED)

      Kent Wicker, Esq.
      Andrew D. Pellino, Esq.
      William H. Brammell, Jr., Esq.
      Dressman Benzinger LaVelle PSC
      321 West Main Street, Suite 2100
      Louisville, KY  40202


      James R. Hollon, Esq.
      McBrayer - Lexington
      201 East Main Street, Suite 900
      Lexington, KY  40507

ALSO PRESENT:
      Andrea Grant, Videographer
        502.612.9793
      Erin Shaughnessy, Clerk
        Dressman Benzinger LaVelle
      Dylan Valenti, Clerk
        Jefferson County Attorney's Office
      Garr Keith Hardin, Plaintiff


INDEX


                            PAGES

Examination by Mr. Ervin        4-136
                          328-345

Examination by Mr. Garverich   137-230
                          345-349

Examination by Mr. Hollon     230-265

Examination by Mr. Brammell   266-327

EXHIBITS

Defendants':
No. 1 Warford's Calendar Excerpt    219
No. 2 Lab Testing Results        239
No. 3 Answers to Interrogatories   262

4

1           JEFFREY DEWAYNE CLARK,
2    called upon oral examination by counsel for
3    Defendant Louisville/Jefferson County Metro
4    Government, having been first duly sworn,
5    was examined and testified as follows:
6           (VOLUME 1 of 2 of VIDEO RECORDING)
7
8    DIRECT EXAMINATION
9    BY MR. ERVIN:
10       Q.  Will you tell us your full name,
11   please?
12       A.  Jeffrey Dewayne Clark.
13       Q.  Where do you live, Mr. Clark?
14       A.  I live at 521 Parkside Drive,
15   Frankfort, Kentucky 40601.
16       Q.  How long have you lived there?
17       A.  Since October of 2016.
18       Q.  All right.  When were you released
19   from prison?
20       A.  August 15, 2016.
21       Q.  Are you employed?
22       A.  No, sir.  I do odd jobs.
23       Q.  What kind of odd jobs do you do?
24       A.  I work on cars, help repair houses,
25   when I can find people that need it.  I have

5

1    trouble finding a job.
2        Q.  Why do you have trouble finding a
3    job?
4        A.  Well, when I first got out, I
5    actually had a job for David Toles off
6    Versailles Road and then Attorney Bryan,
7    because I was still on bond, when it was
8    pending, he come to court and said that he
9    felt like that I moved to Frankfort to
10   threaten him, harass him and stuff, so I had
11   to resign from that job.
12          And then them people had talked to
13   me, discussed they had seen it on the news,
14   so they give me a position.
15          When I go to other jobs and stuff, a
16   lot of people don't really understand what
17   exoneration is and then, when they do
18   background checks and stuff, you know, it's
19   pretty bad when you've got -- still -- it's
20   got on there as dismissed which, when I was
21   trying to get a lot of the jobs, AOC, the
22   Meade County Clerk's office, had not sent
23   all the paperwork saying that it was
24   dismissed.
25          So they still had me on bonds,

6

1    curfew and everything, so nobody wanted to
2    mess with me at all.
3        Q.  Okay.  When is the last time you
4    applied for a job?
5        A.  I went to Kelly Temporary Service, I
6    think it was about three months ago, to try
7    to get through -- on there, and she
8    misconstrued everything because she thought
9    I was on bond, and she was saying that they
10   really don't take people that's on
11   restrictions, curfews and stuff like that.
12          And I think it was just a
13   misunderstanding, because -- me trying to
14   explain it to her so that they knew before
15   they did the background check, and, you
16   know, some people understand, some people
17   don't.
18       Q.  Do you have a copy of an order or
19   anything that you take with you when you
20   apply to demonstrate that you've been
21   dismissed?
22       A.  I have got it from the AOC there at
23   the house.  I don't have them with me.
24       Q.  All right.  Do you take that with
25   you when you apply for jobs?

7

1        A.  Yes, sir.
2        Q.  When did you find out that Kelly
3    Services was having trouble understanding
4    your situation?
5        A.  When I had talked to them that day.
6        Q.  Did you ever go back and try to
7    explain to them?
8        A.  No, sir.  I just figured it'd be
9    easier for me to find cars and houses.  A
10   lot of people in Frankfort, they've got
11   older houses.  Sometimes they need work.
12       Q.  How do they find you?
13       A.  Danny Slattery.  He used to be in
14   the military and then he was -- flew for the
15   National Guard and, on the side, he would do
16   houses and stuff like that.  He had rental
17   property when I first started working with
18   him.
19       Q.  How did you meet Danny?
20       A.  He was repairing the place that I'm
21   living at, and I went up there to help him
22   redo all the floors and stuff like that.
23       Q.  How was it that you ended up in
24   Frankfort?
25       A.  I had no place to live.  So the

8

1    investigator, Jimmer Dudley, give me -- him
2    and his family took me in.
3        Q.  Investigator Dudley --
4        A.  Yes.
5        Q.  -- did you say?  Who was he an
6    investigator for?
7        A.  At that time, he was an investigator
8    for the Kentucky Innocence Project.
9        Q.  And were you living in his home?
10       A.  Yes, sir.
11       Q.  In Frankfort?
12       A.  Yes, sir.
13       Q.  Okay.  Are you still living in that
14   home?
15       A.  No, sir.
16       Q.  Where are you -- whose house are you
17   living in now?
18       A.  I'm living at 521 Parkside Drive.
19   It's a trailer.  It's a rental property for
20   Judy Slattery.
21       Q.  Is that Danny's wife?
22       A.  No, it's his mother.
23       Q.  His mother.  Are you paying rent?
24       A.  Yes, sir, when I can.  Whenever I
25   get an odd job, I'll pay her.  I told her

9

1    I'll give her the money when I can.  I do a
2    lot of work on her property, also.
3        Q.  All right.  So you trade out --
4        A.  Yes, sir.
5        Q.  -- the value of your service against
6    what the rent should be?
7        A.  Yes, sir.
8        Q.  All right.  So is Danny generally
9    the person who either arranges for you to
10   get to work or who you work for?
11       A.  Yes, sir.  If he gets work, he'll
12   call me and ask me, you know, if I want to
13   help do it.
14       Q.  I guess my question is are other
15   people calling you to do work besides Danny
16   Slattery?
17       A.  There was a few people that had
18   work.  I had went to Lexington once and
19   worked on a woman's house named Beth.  She
20   needed insulation put up under the house.
21       Q.  Any other work outside of Frankfort?
22       A.  No, sir.
23       Q.  Do you have an automobile?
24       A.  Yes, sir.
25       Q.  What kind of an automobile do you

10

1    have?
2        A.  I have two automobiles; one is a
3    2000 Dodge Ram 3500 and the other one is a
4    2002 Dodge Ram 1500.  And I also have a
5    couple of other vehicles that are titled in
6    my name, but they don't run.  They're junk.
7            I had did work for Steve Collins.
8    And, anyway, he had give me a couple of
9    vehicles for putting a radiator and stuff in
10   his daughter's car.
11       Q.  Where do you keep those automobiles?
12       A.  At my landlord's property.
13       Q.  I understand that, while you were in
14   prison, you took some educational courses?
15       A.  Yes, sir.
16       Q.  Can you tell me what you took?
17       A.  I took the automotive class.  I took
18   college classes, and I got an Associate's in
19   Applied Science degree.
20       Q.  Who is that degree from?  Is that
21   from --
22       A.  Jefferson Community College.
23       Q.  -- Jefferson?  JCTC?
24       A.  Yes, sir.
25       Q.  And what facility were you in last?

11

1        A.  Western Kentucky Correctional
2    Complex.
3        Q.  How long were you there?
4        A.  I can't say for sure.  It could be
5    five to seven months.
6        Q.  Where else were you incarcerated?
7        A.  Luckett, Eastern.  I've been to the
8    hole at Eddyville.  Green River.
9        Q.  Do you know why you moved?  When you
10   would go from one place to the other, do you
11   know why you were going?
12       A.  No.
13           MR. SLOSAR:  Objection to form.  You
14   can answer if you understand the question.
15       Q.  What was your understanding of why
16   you were being moved?
17           MR. SLOSAR:  Objection to form and
18   foundation.  You can answer the question.
19       A.  I have no idea, except for one
20   incident.
21       Q.  All right, sir.  What was that?
22       A.  John Elmore had raped my sister and,
23   when they had transferred me to Luckett,
24   they had put me in the hole pending
25   transfer.

---

**12**

1  Q. To separate the two of you --
2  A. Yes, sir.
3  Q. -- or what? Okay. Did they put
4  John Elmore in the hole?
5  A. No, sir.
6  Q. They put you in the hole.
7  A. Yes, sir.
8  Q. Had there been any interaction
9  between you and Elmore?
10  A. No, sir. I didn't even know he was
11  there.
12  Q. Was he convicted of that crime?
13  A. Yes, sir.
14  Q. Where did you go when you were first
15  released from prison August 15th of 2016?
16  Where did you go to stay?
17  A. Jimmer Dudley, Lucas Lane.
18  Q. Lucas Lane in Frankfort?
19  A. Yes, sir.
20  Q. How long did you live there?
21  A. Between a month, month and a-half.
22  Q. And where did you go then after
23  that?
24  A. The residence that I'm at now, 521
25  Parkside Drive.

---

**13**

1  Q. Okay. So you got in with Danny
2  Satterly? Is it Satterly?
3  A. Slattery. Slattery.
4  Q. Slattery. Can you tell us what
5  you've done to get ready for this deposition
6  today?
7  MR. SLOSAR: And I don't think
8  you're asking for this, but you can answer
9  if you reviewed any documents or if you have
10  basic questions. Obviously, we're not going
11  to allow for him to testify about
12  conversations he had with counsel since
13  those are privileged --
14  MR. ERVIN: Don't want to know that.
15  MR. SLOSAR: Sure.
16  Q. (BY MR. ERVIN) I don't want to know
17  what you've talked to -- what you've talked
18  about with your attorneys. Okay? I don't
19  want to ask you to tell me that, but I want
20  to know whether you've met with your
21  attorneys to get ready for today.
22  A. I've met with them, but I've not
23  really prepared and -- right after I first
24  got out -- my video trial tapes, I had an
25  original copy of them, and I've viewed some

---

**14**

1  of them over the course since I've been out.
2  I think the last time I looked at one was
3  about two weeks ago.
4  Q. Okay. So you've reviewed some of
5  the video from the trial, including your
6  testimony?
7  A. Yes, sir.
8  Q. All right. Have you looked at any
9  of the documents in the case, like the
10  investigative letters of the police, any of
11  that material?
12  A. No, sir.
13  Q. Have you reviewed any written
14  documents at all to get ready for your
15  deposition?
16  A. No, sir.
17  Q. Have you reviewed any written
18  documents at all about your case since
19  you've been released from prison?
20  A. Could you please say that again?
21  Q. Have you reviewed any written
22  documents about your case since you've been
23  released from prison?
24  MR. SLOSAR: Objection to form. You
25  can answer if you understand the question.

---

**15**

1  A. The only thing I've really looked at
2  was the motions that were filed pending the
3  dismissal and then the lawsuit that was
4  filed. I read over it.
5  Q. You've read the Complaint in the
6  case? What you understood to be the
7  Complaint?
8  A. Yes, sir.
9  Q. All right. When is the last time
10  you met with your attorneys in preparation
11  for today?
12  A. Last night.
13  Q. Okay. Did you meet this morning
14  beforehand?
15  A. For breakfast. We didn't discuss
16  nothing.
17  Q. Okay. How long did you meet with
18  your lawyers yesterday?
19  A. I can't say for sure. Between three
20  and maybe five hours.
21  Q. Okay. And do you recall, when was
22  the last time that you met with them before
23  yesterday?
24  A. I ain't going to be exact on the
25  time, but I think it was maybe a week ago I

---

16

1  talked to Ms. Staples.
2      Q.  All right.  How did you choose your
3  lawyers?
4      MR. SLOSAR:  I'm going to object to
5  that question to the extent that it delves
6  into any communication that he's had with
7  either current counsel or post-conviction
8  counsel or both.
9      So, unless there's a way that that
10  question is posed that doesn't invoke any
11  attorney-client privilege in this case, he's
12  not going to answer it.
13      MR. ERVIN:  Are you instructing the
14  witness not to answer the question?
15      MR. SLOSAR:  To the extent that it
16  involves communication between his counsel,
17  I would.
18      Q.  (BY MR. ERVIN)  How was it that you
19  chose your attorneys in this case?
20      A.  I was referred to them.
21      Q.  Who made the referral?
22      A.  If I'm not mistaken -- don't quote
23  me exactly on this because -- it was either
24  Linda Smith or Jimmer Dudley.
25      MR. SLOSAR:  And, again, I'm going

17

1  to instruct you, Jeff, not to answer any
2  questions relating to this topic that would
3  involve conversations you've had with --
4      THE WITNESS:  Attorneys.
5      MR. SLOSAR:  -- Linda or any
6  attorney previously, so.
7      Q.  (BY MR. ERVIN)  Now, Mr. Dudley is
8  not a lawyer, is he?
9      MR. SLOSAR:  You know, Mr. Ervin --
10  you can answer that question.
11      A.  No.
12      MR. SLOSAR:  We would continue to
13  invoke the privilege as to any communication
14  between Mr. Clark and Mr. Dudley, as Mr.
15  Dudley was a member of the post-conviction
16  defense team.  He's also a member of our
17  civil team.
18      So, if there are questions are
19  related to Mr. Dudley that -- we're going to
20  assert the privilege.  That one obviously
21  didn't.
22      Q.  Did you ask Mr. Dudley for a
23  referral?
24      MR. SLOSAR:  Again, I'm going to
25  instruct the client not to answer that

18

1  question, based on the attorney-client
2  privilege.
3      Q.  I have read a lot about the criminal
4  case, Mr. Clark, in preparation for today.
5  One of the things I was curious about was
6  this snake that you owned.  Do you recall
7  that?
8      A.  Yes, sir.
9      Q.  What kind of a snake was it?
10      A.  It was a -- let me ask you a
11  question.
12      Q.  Sure.
13      A.  Which one were you talking about?
14      Q.  Well, I understood that you had a
15  snake that was lost at about the time of
16  Rhonda Warford's death; is that accurate?
17      A.  Yes, sir.
18      MR. SLOSAR:  Objection to form.
19      Q.  Okay.  Did you own more than one
20  snake at that time?
21      A.  Not at that time.
22      Q.  Okay.  Well, that's the snake I'm
23  asking about.  What kind of snake was it?
24      A.  It was a Solomon Island boa
25  constrictor.

19

1      Q.  I'm guessing there must be different
2  types of boa constrictors, but they all
3  operate basically the same; is that correct?
4      A.  Yes, sir.
5      Q.  Okay.  How would you feed that boa
6  constrictor?
7      A.  That one, I would feed -- you go to
8  the pet store.  You get baby mice that have
9  been born.  They're called pinkies, and
10  that's how you fed them.
11      Q.  Okay.  Would you just lay them out
12  or --
13      MR. SLOSAR:  Object to form.
14      Q.  -- what was the process of feeding
15  them?
16      A.  If the snake is healthy, you just
17  dangle it in front of it and it will eat
18  them.  When it's a smaller snake, the snake
19  was only about that long (gesturing).
20      Q.  Okay.  So were talking about at that
21  time a snake you had that was 12 to 18
22  inches long?  Is that a fair statement?
23      A.  Yes, sir.
24      Q.  Okay.  Did you ever find the snake?
25      A.  No, sir.

20

1      Q.  I want to talk to you some about the
2   Complaint that was filed in this case, and
3   I'm referring to the Amended Complaint, and
4   I want to ask you about some of the parties
5   to the Complaint, some of the people that
6   have been sued.
7         You understand that it's you who's
8   filed the lawsuit, correct?
9      A.  Yes, sir.
10     Q.  All right.  And so these are people
11  that you have sued.  Do you understand that?
12     A.  Yes, sir.
13     Q.  Can you tell me who Kelly Jones is?
14     A.  Can I see the Complaint?
15     Q.  We can get you a copy if you'd like.
16     A.  Yes, sir, if you don't care.
17     Q.  All right.  Let's get him a copy.
18  Do you know who Robert Ennis is?
19     A.  Robert Ennis?
20     Q.  Yes, sir.
21     A.  I would like to wait until I could
22  see a copy of it because --
23     Q.  I understand that.
24     A.  -- I wasn't really involved in the
25  case.  I don't know like lab technicians'

21

1   actual names and stuff, you know, except
2   from the record.
3      Q.  All right.  I understand that, but I
4   want to know what you do recall independent
5   of this document.  This document was
6   prepared by your lawyers, correct?
7      A.  Yes, sir.
8      Q.  Okay.  So do you know who Kelly
9   Jones is?
10        MR. SLOSAR:  I would -- Mr. Ervin,
11  I'm going to object to the form.  The
12  witness has told you that he'd like to see a
13  copy of the Complaint.  If your questions
14  are do you have an independent recollection
15  of X, Y and Z, I think that is fair.  But to
16  the extent that those aren't the questions,
17  I'd ask that you respect the witness's
18  request to review the Complaint as you go
19  along with who these defendants are.  I
20  think there are two different questions,
21  type of questions that you can ask.
22     Q.  So do you know who Kelly Jones is?
23     A.  I really don't want to say till I
24  look at it, to make sure that I get it
25  right, because I am under oath --

22

1      Q.  I understand that.
2      A.  -- and, you know, I ain't wanting --
3      Q.  All I'm just asking you is whether,
4   outside of this Complaint, do you know Kelly
5   Jones is?
6      A.  No, sir.
7      Q.  Okay.  Do you know who Robert Ennis
8   is?
9      A.  Ennis?
10     Q.  Yes, sir.
11     A.  Until I can see the form, I don't
12  know if they're a technician or not, you
13  know.
14     Q.  Sure.  But I want to know, do you
15  know who they are without looking at this
16  Complaint?
17     A.  No, sir.
18     Q.  Okay.  Do you know who Charles
19  Edelen is?
20     A.  Yes, sir.
21     Q.  All right.  Who is Charles Edelen?
22     A.  He is a police officer.
23     Q.  Okay.  Do you know who he works for
24  or who he worked for?
25     A.  If I'm not mistaken, it was the

23

1   Louisville Police Department.
2      Q.  All right.  Do you know Jim Woosley?
3      A.  I know the name.  I just can't
4   remember right offhand.
5      Q.  Do you know James Griffiths?
6      A.  No, sir.
7      Q.  All right.  Do you know Joseph
8   Greer?
9      A.  Yes, sir.
10     Q.  All right.  Who is that?
11     A.  That is the Sheriff of Meade County.
12     Q.  All right.  Do you know Ernie Embry?
13     A.  Yes, sir.
14     Q.  Who is he?
15     A.  He's part of Meade County or
16  Kentucky State Police.  I can't remember
17  which one.
18     Q.  Do you know Cliff Wise?
19     A.  Yes, sir.
20     Q.  Who is he?
21     A.  He is a member of Meade County
22  Police Department.
23     Q.  All right.  Do you know William
24  Adams?
25     A.  Is that first name, Bill?

24

```
1        Q.  He may go by Bill.
2        A.  If I'm not mistaken, that is the
3   Coroner of Meade County.
4        Q.  All right, sir.  Robert Thurman?
5        A.  He is with the Kentucky State
6   Police.
7        Q.  Do you know what he does there?
8        A.  He is a crime technician, I'm pretty
9   sure.
10       Q.  All right.  Do you know James Clark?
11       A.  If I'm not mistaken, he's with the
12  Louisville Metro Police Department.  I'm not
13  for sure, though.
14       Q.  Sure.  Do you know Mark Handy?
15       A.  Yes, sir.
16       Q.  You're sure of that one.
17       A.  Yes, sir.  I'm sure of Coroner Bill
18  Adams, Mark Handy, Joe Greer, Cliffy Wise.
19       THE REPORTER:  Say that last name
20  again?
21       THE WITNESS:  Cliffy Wise.
22       Q.  (BY MR. ERVIN)  You're sure then of
23  Mark Handy, Joseph Greer, Ernie Embry and
24  Cliff Wise.
25       A.  And Mr. Thurman.  I know that he's a
```

25

```
1   lab technician.
2        Q.  Yes, sir.  And Bill Adams.
3        A.  Yes, sir.
4        Q.  All right.  And did you say Cliffy
5   Wise?
6        A.  Yes, sir.  And Edelen.
7        Q.  Edelen?  Did you say you knew who
8   Jim Woosley was, or no?
9        A.  If I could look at the report, maybe
10  the document --
11       Q.  We'll get to that in a minute.  I'm
12  wanting to find out what you know
13  independent of this right now.
14       A.  Honestly, I can't say for sure
15  because I don't -- I've heard the name, but
16  I don't -- when it come to like the
17  technicians and stuff, I always seem to get
18  them confused.
19       And, like I said, with me being
20  under oath, I don't want to say anything
21  that you all could use against me.
22       Q.  Well, it's just trying to find out
23  what you know and don't know independent of
24  looking at this Complaint.  Okay?
25       A.  Yes, sir.
```

26

```
1        Q.  We understand that, if you look at
2   the Complaint, it might help you remember
3   something but, right now, I want to know
4   what you know without looking at the
5   Complaint.  Okay?
6        A.  Yes, sir.
7        Q.  So you don't know who Jim Woosley
8   is, as you sit there today.
9        MR. SLOSAR:  Objection to form.
10  Misstates his testimony.  You can answer,
11  Jeff.
12       A.  Right offhand, I don't.
13       Q.  Okay.  James Clark, I believe you
14  identified with Louisville Police; is that
15  correct?
16       A.  Yes, sir.
17       Q.  What did James Clark do in this case
18  that causes you to believe that he should be
19  responsible to you?
20       MR. SLOSAR:  Objection to form.  You
21  can answer the question to the extent you
22  understand it.
23       Q.  Well, let me ask a better question.
24  Why did you sue James Clark?
25       MR. SLOSAR:  Objection to form.
```

27

```
1        A.  If I'm not mistaken, he didn't take
2   no steps to stop the other police officers
3   from threatening me.
4        Q.  Who threatened you?
5        A.  Detective Mark Handy, Gene Sherrard,
6   Sheriff Greer, and Cliffy Wise and Coroner
7   Bill Adams was backing them up, and then
8   Hope Greer.  And then there was some other
9   girl, blonde-headed, that was there.
10       Q.  Okay.  We're talking about who made
11  threats to you, and you say it was Handy.
12       A.  Yes, sir.
13       Q.  Sherrard.
14       A.  Gene Sherrard.
15       Q.  Gene Sherrard.  Did you sue Gene
16  Sherrard?
17       A.  I thought he was supposed to be part
18  of it.
19       Q.  Sheriff Greer?
20       A.  Yes, sir.
21       Q.  Who else did you say threatened you?
22  Hope Greer?
23       A.  Hope Greer.
24       Q.  Who else threatened you?
25       A.  I don't know the blonde-headed girl
```

**28**

1 that was in there with her when they was
2 going back and forth between -- one was
3 saying that I was going to get raped in
4 prison if I didn't tell them what they
5 wanted to hear, and then the other one was
6 telling me, "If you just talk to me, we can
7 make this to where you don't have to worry
8 about it."
9      And then I know that Cliffy Wise was
10 there on one occasion, and then Coroner
11 Adams was there and he was backing Sheriff
12 Greer up the day he pulled the gun on me.
13      Q.  Tell me about that incident with --
14 was that Sheriff Greer who you say pulled a
15 gun out --
16      A.  Yes, sir.
17      Q.  -- or Cliff Wise?
18      A.  No, that was Sheriff Greer.
19      Q.  All right.  Who else was present
20 when this happened?
21      A.  I know Coroner Bill Adams was there,
22 and then Detective Handy was standing in the
23 doorway, and I think Cliffy Wise was there
24 for some of it.
25      Q.  Cliffy Wise was there for what?

**29**

1      A.  Some of it.
2      Q.  Okay.
3      A.  Because I think sometimes he stepped
4 out and stepped back in.
5      Q.  Where did this take place?
6      A.  Louisville Metro Police Department.
7      Q.  What happened?
8      A.  Well, after Handy had me in the
9 conference room -- does anybody remember the
10 old setup of Homicide Division?
11      Q.  Why don't you describe it for us?
12      A.  Anyway, when you first come in the
13 door, you've got Detective Handy's desk
14 there.  Then you walk up to the left.
15      You go in, you've got a big
16 conference table that's probably about half
17 the size of this with a metal bar and stuff
18 on it.
19      You know, you had video cameras
20 there, tape recorders and stuff there.  You
21 come out and I think that Clark's desk was
22 right there, if I'm not mistaken.  Hope
23 Greer and some other woman's desk was over
24 there (indicating).
25      And then the incident where Joe

**30**

1 Greer threatened me is, after Handy was in
2 the conference room, he come in there and
3 asked me -- asked Detective Handy if they
4 could take me somewhere where he could talk
5 to me.
6      So they took me to the break room.
7 When you walk out, go through the desks, the
8 break room is right up there to the right.
9 There was like a little lounge chair and two
10 other chairs and a table.
11      Q.  Okay.  What happened?
12      A.  When we went in there, Sheriff Greer
13 said, "Well, let me talk to you.  You're not
14 being that cooperative."  He said, "We don't
15 want you.  We want Keith Hardin.  He's got
16 an attorney.  He's over there giving you up
17 now.  We're trying to help you, but you need
18 to let me help you."
19      He said, "We can get you for
20 facilitation.  You probably won't do a day
21 in jail or anything."  He said, "You just
22 need to cooperate."  And I said, "I don't
23 know nothing.  Didn't do nothing."
24      So then he comes with the story
25 about that Rhonda was pregnant.  You know,

**31**

1 that I needed to say that, that all I did
2 was help him move the body, that he had did
3 it and that I would just help move the body.
4 He give me that whole story.
5      And, anyway, when I told him that I
6 didn't do nothing, I don't know what Keith's
7 talking about because I didn't do -- because
8 they was saying that Keith was blaming
9 everything on me.
10      So I told him, I said, "No."  I
11 said, "I didn't do nothing and I'm not going
12 to admit to something that I know nothing
13 about."
14      That's when he pulled his gun out
15 and he laid it on the table and he said,
16 "You might want to reconsider what I have to
17 say and think about what you have to say.  I
18 always get what I want.  Don't I, Mr.
19 Adams?"  Talking to the Coroner.  And the
20 Coroner said, "We always get what we want."
21      And Detective Handy just stood there
22 for a minute and then when I told them, I
23 said, "Well, you -- if you want to shoot me,
24 shoot me, you know, because I don't know
25 nothing and I'm not saying nothing."

---

**32**

1    So he said, "He's done." They got
2  irritated and that's when Detective Handy
3  took me -- he took me back in the conference
4  room.
5    He said, "Look. I'm here to help
6  you, to keep you from them type of people."
7  He said, "If you'll tell me what I want to
8  hear," he said, "I can make sure that you
9  never have to deal with them people again."
10 He said, "All you've got to do is tell me
11 exactly what happened," and I told him, "I
12 don't know what happened."
13   He goes out of the room. I can't
14 remember if that was the time that he brung
15 in the psychic or not, because I'm trying to
16 remember which way it went when Gene
17 Sherrard come in because, right after that
18 incident, I know that a psychic was brung
19 in.
20   Detective Handy brung some guy in
21 that wanted to sit Indian-style with me on
22 the floor and hold hands and when he -- I
23 didn't know what was going on, and he's
24 like, "I'm just here to talk to you and
25 stuff," and he asked me a couple of

---

**33**

1  questions, did I do the crime and stuff. I
2  said no.
3    The guy gets up and leaves, and then
4  Handy comes back in and said, "Well, we use
5  him in a lot of cases. He said you was
6  guilty as hell." He said, "Your
7  co-defendant is saying you're guilty. He's
8  saying you're guilty," and then he leaves
9  the room.
10   Well, after he left the room, then
11 he comes back in and they kept saying that
12 Keith had an attorney. Well, I asked for an
13 attorney. He handcuffed me to the bar on
14 the table at that time.
15   Well, anyway, then he leaves the
16 room again. He comes back in and then here
17 comes Gene Sherrard in. Gene Sherrard said,
18 "I need Mr. Clark." He said, "We've got a
19 new technology to get fingerprints off the
20 body. I'm taking him down there. We're
21 going to get these fingerprints and prove
22 that they're guilty as hell."
23   So Handy uncuffed me, told me to get
24 up. I got up. I went up to Gene Sherrard
25 and he said, "I'm going to make you dig her

---

**34**

1  up." I said, "That's fine because I didn't
2  do nothing," and he said, "You fucking
3  punk," and slammed me into the black lockers
4  right there on the inside of the door, and
5  he turned around and left out.
6    And then Handy handcuffed me back to
7  the table. He left and then that's when
8  Hope Greer and the other blonde-headed girl
9  come in.
10   And then they started talking about
11 that they was here to help me, they seen
12 what went on, you know, that they just want
13 to ease everything out, that sometimes they
14 get carried away, they just want to know the
15 truth.
16   So they was sitting there, and Hope
17 Greer was the one that was pretty much
18 saying that I was a pretty boy, you know,
19 that, if I went to prison, they would do
20 things to me, you know.
21   And then the other girl was telling
22 me, "If you'll just tell us what you know,
23 we will help you. We will make sure that
24 you never go or anything."
25   And then otherwise, as far as the

---

**35**

1  threats, the -- I can't say for sure if
2  Sheriff Greer put the jailer, Bennie Bruner,
3  up to it but, you know, they had talked
4  about sticking barbwire -- well, a rubber
5  hose up my ass and barbwire it to find out
6  the truth.
7    MR. SLOSAR: Let's take a little
8  break.
9    MR. ERVIN: Sure.
10   (OFF THE RECORD, 9:39-9:51 A.M.)
11   MR. SLOSAR: Before we get started,
12 I just want to put on the record, pursuant
13 to Federal Rules of Civil Procedure
14 30(d)(1), the plaintiff does not --
15 Plaintiff's counsel is going to object to
16 any questioning that exceeds the seven
17 hours.
18   I know that there are a number of
19 attorneys for the defendants that are here
20 today. You are all very experienced and
21 trust that you've discussed a split of the
22 time before the deposition today.
23   So, since we are only about 36
24 minutes in, I just wanted to provide you all
25 notice that we will object to any

---

36

1    questioning that exceeds the seven hours and
2    stop the deposition at that point.
3        So please proceed, Mr. Ervin.  I
4    just wanted to put that on the record for
5    all counsel.
6    Q.  (BY MR. ERVIN)  Who is Kenton Smith?
7        A.  He is the prosecutor of Meade
8    County.
9    Q.  Did you form an opinion about him
10   during the course of your case?
11       A.  I guess he's just the prosecutor
12   that goes by the information that he gets.
13   Q.  Who is Amy Remsburg?
14       A.  She is an ex-girlfriend of mine.
15   Q.  What was your relationship with her?
16       A.  Not very good.
17   Q.  How long were you in the
18   relationship with her?
19       A.  Don't quote me for sure.  I don't
20   know if it was six months to a year.
21   Q.  There was a time when you lived with
22   her with her parents in Meade County?
23       A.  I can't really say that I lived with
24   them, because I never brung in no property
25   or nothing.  I was working two jobs in

37

1    Louisville.  She was pregnant with the baby
2    and I would go down there to check on her.
3        The times that I stayed down there,
4    I would get there like at one o'clock and I
5    would leave at five o'clock in the morning
6    because I had to be at the garage.
7        And then her family said that it was
8    stressful and then I don't know what was
9    going on, and they wanted me not to come
10   back.
11   Q.  But you went down there with some
12   frequency for some time.
13       MR. SLOSAR:  Objection to form.  You
14   can answer to the extent you understand the
15   question.
16       A.  Like I hadn't really been to Meade
17   County that much.  Like I said, she lived in
18   Louisville, and whenever she got pregnant
19   and lost her place, she had lived with her
20   grandmother to begin with.  And then her and
21   her grandmother had a fight.  She had to
22   move out of there.
23       She stayed with me and my parents
24   for a while.  It was only a couple weeks.
25   Things weren't going good there, so she went

38

1    to her mom and dad's, and I tried to be
2    supportive because she was pregnant.
3    Q.  And so you would go visit her down
4    there at her parents'?
5        A.  Yes, sir.
6    Q.  All right.  Did you ever have
7    occasion to ride four-wheelers with her or
8    her family down there?
9        A.  Yes, but let me explain that.  They
10   only had one four-wheeler.  I never drove
11   the four-wheeler.  I rode on the back of the
12   four-wheeler with her brothers.  That was
13   it.
14   Q.  Okay.
15       A.  And most of the time, the only thing
16   I know is that we rode on her mother and
17   grandmother's property from what they said.
18   You know, that's all I know.
19   Q.  All right.  Do you recall whether
20   you all ever went out Dead Horse Hollow
21   Road?
22       A.  No, sir, not that I know of.  We
23   never got on the road.
24   Q.  Did you and Amy ever drive out that
25   road or go up to the Dead Horse Hollow

39

1    Tavern?
2        A.  No, she says we did but, if you had
3    known how many limited times I'd been down
4    there, because when you work all the way up
5    -- because, at Papercone, I worked sometimes
6    a couple hours over and stuff like that and,
7    by the time you get from Papercone down
8    there, it's early in the morning.  I had to
9    turn around and get back up to go out there.
10       And I think I had been out there one
11   other time to shoot guns.  She had, you
12   know, asked us all down, her brothers and
13   stuff had, and we did that right in the
14   front yard.
15       As far as where that place is, I've
16   never actually seen it and I don't know.
17   The only place that I do know is you --
18   Hardesty's store, that's where we turned at
19   and the house was down there on the right,
20   past her grandmother's.
21   Q.  Have you been back down that way
22   since you were released?
23       A.  For court.
24   Q.  Besides that?
25       A.  Not -- no, sir.  I think I went

40

1 through Muldraugh to go to Rough River last
2 summer and that's -- besides court, I don't
3 even go that way.
4     Q. Do you have any family living in the
5 Louisville area?
6     A. No, sir. Most of my family is dead.
7     Q. Are either of your parents still
8 living?
9     A. My mother is.
10     Q. Where does she live?
11     A. She lives in -- resides in Tennessee
12 right now.
13     Q. Where in Tennessee?
14     A. It's right beside Jackson. I really
15 don't know the name of the town.
16     Q. Do you have occasion to visit her?
17     A. No, sir.
18     Q. Why is that?
19     A. Because -- do you want to know the
20 truth?
21     Q. Yes, sir, I do.
22     A. I really dont get along with my
23 mother because her -- the first time I seen
24 the parole board, my mother has a cousin
25 that is on Probation and Parole. Everybody

41

1 told me that if I didn't admit to something,
2 that I wouldn't get out of prison. My dad
3 was dying of cancer, so I told them the
4 story that Joe Greer told me, all that I
5 could remember.
6     So, ever since then, my dad was so
7 upset about it, I felt bad about it, I don't
8 want to even discuss anything with my mom.
9 I talk to my brothers, my niece and nephew
10 every now and then but, after that ordeal, I
11 don't.
12     Q. All right. Let's back up, and take
13 a minute and catch your breath. So your
14 mother has a cousin or a nephew on the
15 parole board?
16     A. A cousin, I think it was a female,
17 that was on Probation and Parole.
18     Q. She had a female cousin who worked
19 for Probation and Parole.
20     A. Yes, sir.
21     Q. All right. And did that person talk
22 to you?
23     A. No, my mother said she had talked to
24 her and that that's what she advised to do.
25     Q. And what was it she advised for you

42

1 to do?
2     A. To admit to some kind of part of
3 guilt in it. That way I could make parole,
4 because she said that the parole board, if
5 you go in there claiming innocence, they are
6 not going to give you parole, that you've
7 got to take some kind of responsibility.
8     Q. And so you said then that you told
9 the story that Sheriff Greer had told you.
10     A. Yes, sir. The day that we was in
11 that little conference room, when he
12 threatened me and he was telling me that's
13 what I needed to say, that Rhonda was
14 pregnant, that Keith had killed her, all I
15 did is, later on, come back and helped move
16 the body. That same story he give me is
17 what I -- all I could remember.
18     Q. So who give you that story? Did
19 Greer give you that story or Handy gave you
20 that story?
21     MR. SLOSAR: Objection to form. You
22 can answer.
23     A. Greer actually stated everything
24 there, but Handy was standing at the door
25 with him, Bill Adams, and then Cliffy Wise

43

1 was coming in and out. I don't think he
2 actually knew about what was really being
3 said.
4     Q. Okay. Now, I understand that you
5 had either two or three interviews where you
6 came to the police station after Rhonda
7 Warford was found; is that correct?
8     A. Yes, sir.
9     Q. When you're talking about this, are
10 you able to distinguish what occurred on
11 which visit that you had?
12     A. Some of it I can, some of it, I
13 can't, because, when the interviews first
14 started out, they was more or less showing
15 me pictures of the crime scene, showing me
16 pictures of the victim, asking me where I
17 was.
18     And then, if I'm not mistaken on the
19 first interview, Detective Handy said I had
20 blood on my shoes. So I took off my shoes.
21 I give them to him. I told him he could
22 have anything else that he wanted, because I
23 didn't do anything. If he wanted my
24 clothes, whatever.
25     And then he took the shoes. He

44

1  bagged the shoes because him and I think Mr.
2  Clark was saying that that was actual blood
3  when they was looking at them.  So I went
4  home barefooted that night when they took me
5  back home.
6      Q.  Okay.  Do you recall what -- you're
7  thinking that that was the first time you went
8  in?
9      A.  Yes, sir, because the first time
10 that I went in, it was more relaxed.  It was
11 more, "We just want to know where you was
12 at.  We just want to help you so you can
13 eliminate yourself.  You know, that you're
14 not a suspect.  We just need to get through
15 a whole bunch of witnesses."
16     And then closer to the end of that
17 interview is when he started saying that I
18 had blood on my tennis shoes and he asked me
19 if I wore them all the time.  I said yes.
20     Q.  Aside from the incident that you
21 referred to -- I think you said that
22 Sherrard pushed you into the lockers?
23     A.  Yes, sir.  He called me a -- I know
24 the word "punk" was used.  I don't know if
25 there was actually a cussword in front of it

45

1  or not.  I know that, and he slammed me into
2  the black lockers over there.
3      Q.  Did you have any other dealings with
4  him?
5      A.  No, sir.  That was actually -- I
6  didn't even know who he was until he come in
7  and then, if it hadn't been for Hope Greer
8  mentioning his name, I wouldn't even have
9  known exactly who he was.
10     All I know is he come in, said that
11 he wanted me.  Handy un-handcuffed me.  I
12 got up and he said, "We're going down there
13 because we've got a new technology to take
14 fingerprints off this body.  You're going to
15 dig her up and we're going to get it and
16 prove that you all are guilty."
17     And when I said, "Well, let's do it.
18 I'll dig her up," you know, "I didn't do
19 nothing," that's when I'm pretty sure
20 said "fucking punk" and pushed me into the
21 lockers.  But don't -- I know the word
22 "punk" was used.
23     Q.  All right.
24     A.  And then I was handcuffed back to
25 the table.  He left and Detective Handy

46

1  left.
2      Q.  How did you get released that night?
3      A.  They actually released me.
4      Q.  How long were you left handcuffed to
5  the table?
6      A.  All that day from the time that he
7  handcuffed me, except for when Sheriff Greer
8  needed to talk to me out there and when Gene
9  Sherrard there -- because they kept saying
10 that Keith had an attorney and I kept saying
11 that, if Keith's got an attorney, he's lying
12 on me, I didn't do nothing, I want an
13 attorney.
14     And Handy said, to begin with, that
15 he would get one and then it didn't matter
16 as long as the day went, nothing, and then
17 finally when I come back in there, he said,
18 "You ain't getting nothing.  You're just
19 going to sit right there.  You're going to
20 answer my questions.  You're going to think
21 about what you have to say."
22     And that pretty much went on until
23 it was time for them -- and they took me
24 home.
25     Q.  Do you recall how long it was before

47

1  you went back?
2      A.  I can't say for sure.  It felt -- at
3  that -- all them interviews felt like a
4  lifetime.
5      Q.  When you first started seeing Amy
6  Remsburg, was she pregnant then?
7      A.  No, sir.
8      Q.  So she became pregnant after you all
9  started dating.
10     A.  Yes, sir.
11     Q.  Okay.  And did she have any other
12 children?
13     A.  Yes, sir.
14     Q.  What other children did she have?
15     A.  I think she had a boy named Randy.
16     Q.  And how old was he when you were
17 seeing Amy?
18     A.  Don't quote me on it for a fact, but
19 I think he was seven or eight.
20     Q.  Did you have occasion to report her
21 to the police for anything?
22     A.  I tried to report her to everybody,
23 and everybody thought I was crazy.
24     Q.  What do you mean?
25     A.  Because when I got my trailer out on

48

1  Newburg Road, like I said, I was working two
2  jobs but I had taken off one of them early
3  because she was always saying that I wasn't
4  there to help out or anything.
5      So, one afternoon, I come in.
6  Nobody's in the living room.  I go back to
7  the bedroom.  I open up the door.  She jumps
8  up.  She's naked and she's hollering, "It
9  ain't what you think it is."
10     Well, me, I'd seen Randy laying
11  there in the bed, but I didn't think nothing
12  about it.  I thought some guy was in there,
13  so I go over to the closet.  I'm like, "What
14  are you talking about?"  She's like, "It
15  ain't what you think it is."
16     I said, "Oh, no.  Where is he?"  You
17  know, so I start looking.  I open up the
18  closet.  There's nobody there.  And I went
19  to get up under the bed to check to see if
20  somebody was up under there, and then I got
21  up and I pulled the curtains up -- I mean
22  the blankets up -- and Randy was laying
23  there naked.  He was crying.
24     I said, "What are you talking about?
25  You started hollering it ain't what you

49

1  think it is."  I said, "What are you doing
2  to that kid?"  She's like, "Oh, it ain't
3  what you think it is," you know.  And I'm
4  like, "What are you doing with the kid?"
5      Because there had always been
6  accusations, but I never paid them
7  attention, because Randy's father would
8  always bring his son to me at the garage and
9  I was like, "Why are you bringing your son
10  to me?  That's your and Amy's kid."
11     You know, he said, "Well, you've
12  always been nice to me every time I've seen
13  you.  Randy always talks about you buying
14  him candy, stuff like that, and playing with
15  him," he said.
16     You know, he said, "It's just Amy
17  always" -- she did.  She'd say -- I heard
18  her tell Randy, "Call your daddy a bastard"
19  and stuff like that, you know, and it wasn't
20  good, because me and her would have
21  arguments over it.
22     But anyway, when I found that
23  incident out, I called her mother, told her.
24  I said, "You need to come and get this" --
25  and I called her a bitch -- "out of my

50

1  house.  I don't know what's going on, but
2  she's doing something with this kid.  I'm
3  calling the police."
4      So, anyway, her mother come up
5  there.  Amy was saying, "Ah, you've just got
6  it misunderstood, misunderstood," you know.
7  So I told her, I said, "Look, I don't want
8  you being nowhere around me."
9      And then that's when I got into the
10  argument with her about the other baby,
11  because I was like, "If that kid's supposed
12  to be mine, you ain't taking it," you know.
13  And she's like, "Well, it ain't yours."  And
14  I'm like, "If it's mine, you're not taking
15  that kid."
16     And she's like, "No, the kid is not
17  yours.  It's Scotty Padgett's.  I've been
18  down there at home, messing with him."  So,
19  when her mom got up there, I told her just
20  to take everybody out of there, because it
21  was getting really heated.
22     Well, if I'm not mistaken, the next
23  morning, the police actually showed up and
24  arrested me, and I got arrested for I think
25  it was domestic violence, terroristic

51

1  threatening, wanton endangerment and stuff
2  like that.
3      Well, when we went to court, my
4  attorney, John Rankin, I had told him about
5  everything.  I had tried to tell the Court
6  about it and that's when Amy kept saying --
7  because the Court -- because where she said
8  the domestic violence was there, it involved
9  a child.  You know what I'm saying?
10     So she told the Court that the kids
11  wasn't mine but -- that Heather wasn't mine
12  because I was wanting blood tests done.  So
13  the judge asked her, said, "So that child is
14  not Mr. Clark's?"  She said, "No, it's not
15  Mr. Clark's."
16     And then Rankin had said something
17  to the social worker about she was --
18  that I had caught her messing with one of
19  the kids, you know, and she goes off calling
20  him a bitch, said that she was going to
21  disbar him and all of that, and we had left
22  from there that day.
23  Q.  Did you ever report anything to the
24  police?
25  A.  I had told the Sheriff's Department

52

1    but, like I said, nobody really believed
2    anything I had to say because, by the time
3    they arrested me, they thought I was just
4    trying to get out of trouble myself.
5        Q.  Do you know whether she was ever
6    prosecuted?
7        A.  Yes, sir.  I do know that from -- I
8    heard rumors and I had looked it up and the
9    boy, Randy, when he got older, he had taken
10   charges out against her for all them years
11   ago.  And apparently she had kept on doing
12   it.
13       Q.  Where was that?  Where was it that
14   the boy had taken charges against his
15   mother?
16       A.  If I'm not mistaken, I think it was
17   -- the record shows Meade County because I
18   think Sam Monarch was the judge whenever I
19   read the document, because she had wound up
20   pleading guilty to assault charges on a
21   minor or something.  It was numerous ones.
22       Q.  Did you ever fill out a warrant or a
23   report on her?
24       A.  No, sir.  I never had a chance
25   because, by the time we had the hearing, I

53

1    had a restraining order against me and, at
2    that time, if Heather wasn't mine after what
3    she told the Court, I really didn't care at
4    that aspect, because when -- if you knew how
5    I met her, you would understand that it
6    wasn't no emotions between me and Amy.  It
7    had to do with the baby.
8        Q.  How was it you met her?
9        A.  Amy was actually dating a guy named
10   Tony who was -- I run around with a couple
11   of guys that was older than me and then she
12   -- Terry was having an affair with her,
13   which Terry was married, had kids.  But
14   that's who I mostly talked to.  Tony was his
15   friend.  So he started having an affair with
16   her.
17       Well, anyway, when he broke it off
18   with her, because Tony found out and was
19   mad, period, wouldn't have nothing to do
20   with nobody else, she started telling Terry
21   that if I did not go out with her, that she
22   was going to tell his wife.
23       Well, his wife and kids, they didn't
24   have nothing to do with anything.  It was
25   his actions, and that's what I kept telling

54

1    him.  He's like, "Look.  Just go out with
2    this girl.  If you go out with her, it
3    solves all the problems."
4        Well, didn't want to do it, but he
5    kept saying, "Look, this is my marriage.
6    I've got my kids, you know it's going to
7    ruin me," you know.  So I took her out.
8        Well, took her out a few times.  He
9    said just keep staying away.  Well, we got
10   drunk, had sex with her, next thing I know,
11   she's pregnant.
12       And so she was saying, at that time,
13   that the child was mine.  So I figured I'd
14   do the right thing, because of the child,
15   you know, and I figured I could just put up
16   with her.
17       Q.  Did you ever determine paternity?
18       A.  Six months before I got released on
19   this.  Heather Livers contacted me, said
20   that her aunt had told me that -- told her
21   that she was mine, because her mother always
22   told her that Scotty Padgett was her father.
23       So, anyway, I didn't believe her.  I
24   talked to my attorneys and stuff.  We had a
25   DNA test done and, yes, she is, in fact,

55

1    mine.
2        Q.  She is your daughter.
3        A.  Yes.
4        Q.  Do you have occasion to see her now?
5        A.  I talk to her every now and then,
6    yes, sir, I do.
7        Q.  Have you seen her since you've been
8    released?
9        A.  Yes, sir.  She's come to court, I
10   think -- don't quote me -- well, I think she
11   come and seen me in jail when I got back
12   down to Meade County; her, her husband and
13   the grandkids.
14       And then she come to court -- don't
15   quote me for a fact, but I think maybe two
16   to four times, and then she has come to see
17   me where I live now like three times, maybe
18   more.
19       Q.  Is her mother still around?
20       A.  I don't know.  I do not discuss --
21   and I had told her that.  I do not discuss
22   anything with her about her mother or
23   anything.  And that's one of the reasons why
24   I kind of looked at my trial tapes and
25   stuff, because I was trying to show her what

56

1   was said.
2       Q.  So Heather has reviewed the trial
3   tapes with you?
4       A.  She has looked at her mother's
5   testimony.
6       Q.  Just so I'm clear before we leave
7   it, you never filed any kind of a formal
8   complaint against Amy Remsburg about her
9   having abused her child.
10      MR. SLOSAR:  Objection to form.  You
11  can answer if you understand the question.
12      A.  I contacted Randy's father.  I
13  contacted Amy's mother.  I told the
14  Sheriff's Department that next morning when
15  they arrested me.  I told Bart Adams.  I
16  told my mother.  I told my father.
17      I told anybody that would listen to
18  me.  I even told the Court in Louisville and
19  was told to not speak out of place.
20      Q.  All right.
21      A.  There should be a videotape of that
22  if they kept it that long, of that hearing.
23      Q.  When was that in relationship to
24  Rhonda Warford's death; do you recall?
25      A.  That was in the summer of '91.

57

1       Q.  So what year was it you found out
2   that Heather was your daughter?
3       A.  It was in -- don't quote me for a
4   fact.  I think it was the end of 2015 or at
5   the beginning of 2016.
6       Q.  Where does she live now?
7       A.  She lives in Indiana.
8       Q.  What did Charles Edelen do in
9   relationship to your case?
10      A.  May I see that?  Because I'm trying
11  to remember what area he was in.
12      Q.  Let me ask you first.  Independent
13  of this, do you know what he may have done
14  in relationship to your case?
15      A.  I really don't want to say because I
16  don't -- I'm trying to remember exactly who
17  he was because, if he was one of the police
18  officers that was there, he didn't stop
19  everything that was going on.
20      And, like I said, I don't know if he
21  was or if he was -- I'm pretty sure -- I
22  think he might be, but I ain't going to say
23  for a hundred percent.  He could have been
24  the medical examiner, so I don't really want
25  to say.

58

1       Q.  All right.  I'm going to represent
2   to you that Kelly Jones and Robert Ennis are
3   polygraphers, people who run polygraph
4   machines.
5       Do you know what -- what
6   responsibility do you think they have in
7   this case?
8       MR. SLOSAR:  The only instruction
9   I'll have for you, Mr. Clark, is not to
10  testify as to any conversations you have had
11  between your counsel and you about why those
12  defendants are sued.  So, to the extent that
13  you know these defendants' involvement
14  outside of conversations with counsel, you
15  can answer the question.
16      A.  I guess they would be the ones that
17  do the polygraph tests.
18      Q.  All right.  Do you know why they
19  should be responsible to you in this case?
20      MR. SLOSAR:  Again, Mr. Clark, I'd
21  instruct you not to answer that question to
22  the extent that it divulges any
23  conversations you had between yourself and
24  counsel.
25      If you have knowledge as to why

59

1   these defendants should be sued outside of
2   conversations with your attorneys, then you
3   can answer the question.
4       A.  Honestly, I can't answer that.
5       Q.  All right.  You understand that it's
6   you who has filed the lawsuit and not your
7   lawyers, right?
8       A.  Yes, sir.
9       Q.  You're the one who says they've done
10  wrong, correct?
11      MR. SLOSAR:  Objection to form.
12      A.  I don't want to speculate because,
13  in that instance, I was given three
14  polygraph tests.  All right.  One of the
15  incidences, the polygraph examiner asked me,
16  "Do you know anything about this crime?"
17  And I told him -- and they wanted me to say
18  a yes or a no.
19      And I said I cannot say a yes or a
20  no because Detective Handy had done shown me
21  the crime scene, told me exactly what
22  happened, and I felt like it was a trick
23  question.
24      So they made me go on and answer
25  them questions.  Then I had to take two

60

1    other polygraph tests behind that one and,
2    if they're labeled in there, it's because
3    they didn't actually address my concerns
4    about that I had done been shown everything
5    and ask a proper question.
6        Q.  Do you know the amount that you have
7    claimed as damages in this case?
8        MR. SLOSAR:  Objection to form.
9        A.  No.
10       Q.  When did your father pass away?
11       A.  2007.
12       Q.  Do you have any brothers or sister?
13       A.  Yes, sir.  I have two brothers, one
14   sister.
15       Q.  Are all three of them living?
16       A.  Yes, sir.
17       Q.  Where do they live?
18       A.  My brother -- Matthew and Charity
19   live in Tennessee with my mother.  And then
20   my baby brother, Mark, I really don't know
21   where he lives because he was so young when
22   I got locked up, he doesn't remember me.  So
23   we've been trying to just talk to get to
24   know each other -- somewhere up north.
25       Q.  Now, I want to get back to your mom

61

1    and your relationship with her and try to
2    understand why you don't get along with her.
3    Is that a fair statement?
4        MR. SLOSAR:  Objection to form.  You
5    can answer the question.
6        A.  If you feel that's important.
7        Q.  I want to know.
8        A.  That's fine.
9        Q.  If I understood your earlier
10   testimony, it's that you -- are you angry
11   with your mom?
12       A.  Yes, sir.
13       Q.  Why is that?
14       A.  Because she led me into believing
15   that you had to do something to be able to
16   -- to be there for my father who was dying,
17   who she had done divorced.
18       My father died alone, because she
19   had all the kids.  She was in Florida at
20   that time.  And my mother, you know, she --
21   she has been abused a lot in her life.  So,
22   when things get squirrely, she runs.
23       Q.  Okay.  So why is it that you're
24   angry with her?
25       A.  Because of what she told me to do

62

1    with her and her cousin -- what she said her
2    cousin told her to do.  And then everybody
3    else on the yard, pre-parole and all that,
4    telling me, "Look.  You need to take some
5    kind of responsibility.  If you go in there
6    claiming your innocence, you're screwed.
7    You won't be served out, just like the other
8    people at that time."
9        Just like if you check the history
10   of serve-outs, 2006, that was when they was
11   serving a lot of people out and everybody --
12   and nobody wants to hear that you're
13   innocent.
14       You know, everybody seems to think
15   that people really care?  They don't.  When
16   it comes to the Department of Corrections,
17   you've got to take responsibility.
18       Just like I testified at my
19   evidentiary hearing.  Most of the programs I
20   was kicked out of.  You know why?  Because I
21   wouldn't admit guilt.
22       So you can't benefit anything.  You
23   know, I'm sure you're going to say my
24   college, right?  I was given the opportunity
25   for college.  You don't have to admit guilt

63

1    in a college.
2        And if it wasn't for being useful to
3    automotive and apprentice shop because of my
4    experience, I probably wouldn't have even
5    got that because, if you notice, all my time
6    from time of incarceration till 2007, what
7    did I have?
8        Well, I got a Legal Aid job in 2002.
9    It was pushing a broom.  That's all I was
10   allowed to have, because I was considered
11   non-red-zone clearance.  I was considered
12   violent.  Everybody thought I was crazy
13   because I was accused of Satanism.  Even
14   staff, they would not let me around nothing.
15       Q.  Did you have any discipline while
16   you were in prison?
17       A.  Yes, sir.
18       Q.  When was that?
19       A.  I can't say for exact dates but,
20   yes, sir, I've had disciplinary reports.
21       Q.  All right.  What were the issues?
22       MR. SLOSAR:  Objection to form,
23   foundation.  You can answer it, Jeff.
24       A.  All right.  One, this was right
25   before -- well, it was at Luckett.  I was in

64

```
 1   the dog program.  I got in a fight.  I was
 2   wroten (sic) up for possession or promoting
 3   contraband.
 4       Q.  What was the contraband?
 5       A.  They said that it was marijuana.
 6       Q.  Okay.
 7       A.  And I had appealed that, and it
 8   should be in the record on that.
 9       Q.  Any other occasions?
10       A.  I think I had been wroten up for
11   throwing a pen, and then I think I had too
12   many items.  Let's see.  May I see a copy of
13   my prison report?  And then, that way, I can
14   tell you exactly.
15       Q.  I don't have one.
16       A.  Does anybody have one?  That way, I
17   can tell you exactly the dates and
18   everything.
19       Q.  Sure.  I just want to know what you
20   remember.  Is that what you remember?
21       A.  I can remember a few write-ups when
22   I first went in, but I can't -- I think they
23   was for fighting.
24       Q.  Okay.  Were you ever mistreated in
25   prison?
```

65

```
 1       A.  Well, I've got a crooked finger.  My
 2   mother can testify where she called the
 3   prison trying to get me help on that.  By
 4   the time they got me out, I had my jaw
 5   broke, foot's messed up, you know.
 6          Yeah, go to prison being accused of
 7   Satanism, especially in the '90s, and see
 8   how it goes.  Prison's not nice to begin
 9   with.
10       Q.  So you had physical injuries there.
11       A.  Yes, sir.
12       Q.  Can you identify them for us?
13       A.  (Indicating hand)
14       Q.  Your right ring finger?
15       A.  Yes, sir.  Crooked.  My left foot.
16   Do I need to pull off my shoe?
17       Q.  No, sir.  Just tell me what happened
18   to your left foot.
19       A.  That was the incident where some
20   guys tried to jump me, which I don't think
21   that was all the way what caused the
22   problem.
23          A table, when I was helping staff
24   take a table up to chairs (sic), hit it,
25   shattered the bones in the top of it.
```

66

```
 1          By the time -- they kept saying it's
 2   just bruised.  Guess what?  They never fixed
 3   it and it's not bruised.  I've got a bone
 4   sticking up out of the side of it.  I've got
 5   calluses on the side of it.
 6          I will have trouble walking funny.
 7   That's the reason why I wear my tennis
 8   shoes.  I used to love cowboy boots.  I
 9   can't wear them because of it, you know.
10          Like I said, I've had my jaw broke.
11   I've had my hand broke.  The doctor said
12   that, to ever get it straightened up, my
13   wrist has been broke.  I think I've had a
14   few cracked ribs.
15       Q.  Anything else?
16       A.  Besides dental, that's about it.
17       Q.  Dental-wise, what have you had?
18       A.  Well, depending on what prison you
19   went at, sometimes they filled them and
20   then, other times, they yank them all out.
21   And that depends on what prison you're at.
22   Eastern normally just -- at that time, they
23   pulled them.  Green River would actually
24   fill some of them.
25       Q.  Did your father ever visit you in
```

67

```
 1   prison?
 2       A.  Yes, sir, when I got closer to home.
 3       Q.  Where was that?
 4       A.  Luther Luckett Correctional Complex.
 5       Q.  And where is Luther Luckett?
 6       A.  It's in LaGrange, Kentucky.
 7       Q.  LaGrange?  How long were you there?
 8       A.  Don't quote me exactly on the times,
 9   because my -- if I had my prison record, we
10   could know from -- but from what I am
11   saying, I think it was from 2007 until I got
12   transferred to Western, which was maybe
13   2015.
14       Q.  So you went to Luckett in 2007?
15       A.  Well, I had been shipped there once
16   before, but never made it to the yard.
17       Q.  What does that mean?
18       A.  That means, as soon as I arrived
19   there, was in property, they put me in the
20   hole because the guy that raped my sister
21   was there --
22       Q.  All right.
23       A.  -- and they would not allow me out
24   there.  And I can't remember exactly what
25   year that was.
```

68

1    Q.  All right.  But you came there then
2    to stay in 2007?
3    A.  Yes, sir.
4    Q.  And that's the same year that your
5    father passed away, correct?
6    A.  Yes, sir, because I had just seen
7    the parole board at Eastern.  A couple
8    months later, they up and shipped me to
9    Luckett.
10   Q.  All right.  How many times did you
11   see your dad?
12   A.  Don't quote me exactly, but I think
13   it was like five or six times.
14   Q.  Who else visited you while you were
15   there?
16   A.  At Luckett?
17   Q.  At any time in prison, what family
18   members visited you?
19   A.  Well, when I first got locked up, my
20   mother, my brothers, my sister.  I had a
21   girlfriend at the time.  My friend, Karelle
22   (phonetic).  I think a couple of the flea
23   market people that my dad knew, they come up
24   to see me.
25   And then that was about it.  And

69

1    that was right after I first got locked up.
2    Q.  All right.  After that, did people
3    continue to come visit?
4    A.  Every now and then I would get a
5    visit because I was so far away from home
6    and then, like I said, my mother had moved
7    to Florida.  So I never got no more visits
8    from her.
9    And then Dad was so bad sick,
10   fighting the cancer and stuff, that he would
11   make it up there when he could to Luckett
12   but, before then, he couldn't even come
13   nowhere because I was so far away.
14   Q.  Tell me about your knife collection.
15   MR. SLOSAR:  Objection to form,
16   foundation.
17   Q.  Did you have a knife collection?
18   MR. SLOSAR:  Same objection.  You
19   can answer the question to the extent you
20   understand it.
21   A.  Yes, sir.
22   Q.  How was it that you began to collect
23   knives?
24   A.  My Uncle Jimmy was in the military
25   and he would actually -- when he was

70

1    overseas and stuff, if he would see
2    something cool or somebody could make
3    something, he would give it to me, because
4    that's like after -- he had been to Vietnam.
5    Well, he give me his knife and all his
6    medals and all that stuff so that I could
7    put up, keep, and everything.
8    And then my stepdad, he had been in
9    National Guard and all that stuff, and their
10   medals and stuff, I would keep them
11   altogether.
12   Q.  And then did you have folding
13   knives, pocket knives also?
14   A.  Oh, yes, sir.
15   Q.  How many knives altogether would you
16   say you had at the time you were arrested in
17   this case?
18   MR. SLOSAR:  Objection to form.  You
19   can answer the question.
20   A.  Well, let me explain the reason why
21   I had the knives, because, see, my
22   stepfather set up at the flea markets.  Has
23   anybody been -- from Louisville -- been to
24   Shepherdsville flea market, Seventh Street
25   flea market, and all that?

71

1    Well, my dad, Bill McKeehan
2    (phonetic) and all them would set up booths,
3    and they would sell pocket watches, knives
4    -- back then, guns, you know, four-wheelers,
5    whatever, and I always set up with them.
6    I went with my dad most of the time
7    almost every weekend, except when I was
8    going to the racetrack racing or helping
9    somebody work on something.
10   Q.  Let me back up for a minute.  What
11   did you do at the track?
12   A.  We started out mini stock with a
13   Pinto and then, from there, we went to drag
14   racing at Ohio Valley.  Then we come back to
15   late model Bomber -- well, Bomber Division,
16   I think, first, then late model.  And then,
17   right at the end, it was modified figure
18   eight.
19   Q.  Now, back to the knife collection.
20   So you would go to the flea markets with
21   your dad.
22   A.  Yes, sir.
23   Q.  Did you set up your own table or did
24   you work just basically with him helping him
25   show items?  What did you do?

72

1    A.  I worked with him.
2    Q.  How many knives then do you think
3  that you had at the time of your arrest in
4  this case?
5    MR. SLOSAR:  Objection to form.
6    A.  May I see the actual file, and I can
7  tell you exactly how many I had.
8    Q.  I want you to tell me what your best
9  estimate is.
10    MR. SLOSAR:  Objection to form,
11  foundation.
12    A.  I can't -- I had quite a few.  You
13  know, you had Case pocket knives, you know.
14  The things were valuable, you know, because
15  some of them was older, you know.  There was
16  pearl-handled switchblades, you know.
17    So, if I could actually see the
18  actual police report and stuff of what they
19  confiscated, I could actually tell you
20  exactly, because some of the knives that
21  they said was mine was actually my father's,
22  because where they searched that at Cod.
23    But my knives were out in the garage
24  also, because every weekend, when he got
25  back, he would set everything in the garage.

73

1  Come the next weekend, that's when we would
2  load the truck up and go to the flea market.
3    Q.  Did you generally carry a knife?
4    MR. SLOSAR:  Objection to form,
5  foundation.  You can answer the question to
6  the extent you understand it, Jeff.
7    A.  Yes, I carried a pocket knife most
8  of the time.
9    Q.  What did you carry?
10    A.  I think it was a Case.  I think --
11  it'd depend on which knife I'd grab.  Most
12  of the time, it was just a pocket knife.
13    Q.  Would it be a three-blade, a
14  Stockman?  What would it be?
15    MR. SLOSAR:  Objection to form,
16  foundation.
17    A.  I can't say for a fact how many
18  blades.  I just know it was a pocket knife.
19  Some of them had two, some of them had
20  three.  It all depends.
21    Q.  How many hunting-type knives did you
22  have?
23    MR. SLOSAR:  Objection to form and
24  foundation.  You can answer.
25    A.  I had a few.  Can I say exactly how

74

1  many?  No.
2    Q.  What would you -- how would you
3  define a hunting knife?
4    A.  I would consider a hunting knife
5  anything over six inches in length that
6  either had a compass or you could skin
7  animals with.
8    Q.  Do you recall being asked about
9  whether you had knives when you were
10  interviewed by the police?
11    MR. SLOSAR:  Objection to form,
12  foundation.
13    A.  Yes, sir.
14    Q.  What did you tell them?
15    MR. SLOSAR:  Objection to form,
16  foundation.
17    A.  Well, Handy, as soon as I got there
18  for the first interview, asked me if I had a
19  knife on me and I told him no, and then he
20  started saying I denied owning knives.  I've
21  never denied owning knives.
22    I can't remember which police
23  officer I told but, when they asked me if I
24  had knives, I said yes.
25    Q.  Do you recall whether Hope Greer had

75

1  asked you whether you had knives?
2    A.  Yes, sir.
3    Q.  And what did you tell her?
4    A.  I told her that I did have knives.
5    Q.  Did you deny having a knife to
6  anyone other than Handy?
7    A.  If they asked me if I had a knife on
8  me, I didn't have a knife on me when I went
9  to the police station, so, yes, I would deny
10  that, of actually having one in my
11  possession.
12    As far as if they asked me if I had
13  knives, owned knives, I would have told them
14  that I did own knives, because everybody
15  under the sun knew that I had knives, I went
16  to the flea market.
17    Q.  Did you keep a knife in the car with
18  you usually?
19    MR. SLOSAR:  Objection to form,
20  foundation.  You can answer the question to
21  the extent you understand it.
22    A.  Sometimes, yes, sir.  I kept a
23  knife, a gun.
24    Q.  Did you have a butterfly knife that
25  you kept in the car?

76

1     MR. SLOSAR:  Objection to form,
2  foundation.
3     A.  I ain't going to say, because I
4  don't know if I've ever kept a butter knife
5  -- butterfly knife in there.  I know that I
6  did own a butterfly knife.
7     Q.  Do you recall, at trial, you were
8  testifying or did testify about having gone
9  to a Chevron station to buy cigarettes on
10  the night of April 1st into the early
11  morning hours of April 2nd --
12     A.  Yes, sir.
13     Q.  -- of 1991?  Do you recall that?  Or
14  '92?
15     MR. SLOSAR:  Objection to form.
16     Q.  Do you recall that?
17     A.  Yes, sir.
18     Q.  Where was that Chevron station?
19     A.  It was off Newburg Road.
20     Q.  Was it on the corner at Newburg?
21     A.  No, sir.  It was right before you
22  got on the freeway.
23     Q.  Okay.  Right before you got on the
24  freeway going north on Newburg or south?
25     A.  I can't --

77

1     Q.  I guess it would be going north,
2  wouldn't it?
3     A.  I can't really say.  I just know
4  that Bluegrass Mobile Homes was here,
5  Chevron station was here (indicating).  It's
6  freeway and then -- I don't know if it was
7  Taylorsville Road or --
8     Q.  Well, you would have been going
9  toward Louisville, wouldn't you?
10     A.  Yes, sir.
11     Q.  Okay.  So you'd have been going
12  north then on Newburg.
13     MR. SLOSAR:  Objection to form.
14     A.  I'm pretty sure.  If it leads to
15  Valley Station, yes, sir.
16     Q.  Do you recall whether you told the
17  police about having stopped at that Chevron
18  station?
19     A.  Yes, sir.  I remember telling
20  somebody about it, but I can't say who I
21  told about it.  But I did tell somebody
22  about the Chevron station when it got more
23  serious into the interviews because, to
24  begin with, they just -- I had the
25  understanding they just wanted to know where

78

1  I was that day.
2     I didn't know that I had to actually
3  account for every single moment until the
4  interview started progressing.
5     Q.  Did you understand that you needed
6  to be precise when you were talking to Hope
7  Greer?
8     MR. SLOSAR:  Objection to form.
9     A.  Yes, sir.  But at that time, after
10  everything that went on, I would try to
11  answer questions as best as I could.
12     Q.  Did Hope Greer explain to you how
13  serious the issues were in this case and how
14  significant everything you told her would
15  be?
16     MR. SLOSAR:  Objection to form.  You
17  can answer.
18     A.  Yes, sir.  I think she was making it
19  clear that if I didn't help them, that --
20  how serious it would be because, like I
21  said, when you talk about what's going to
22  happen to you in prison, yeah, I think I'm
23  -- at that point, I pretty much understood
24  that this was getting bad.
25     Q.  Did you recall then and tell her

79

1  about the Chevron stop?
2     A.  I can't honestly say, but I did tell
3  the police about the Chevron station.  I
4  can't say if it was Handy, Greer, but I did
5  tell them about it.
6     When it got serious and they wanted
7  to know exactly where all I had been that
8  day, you know, instead of just where was you
9  at for the day, you know.  When it started
10  getting serious, I started trying to account
11  for every single minute.
12     Q.  Are you sure that you told the
13  police that you stopped for cigarettes at
14  the Chevron station?
15     A.  Yes, sir.  I'm positive I did.
16     Q.  Who went in to buy the cigarettes,
17  you or Hardin?
18     A.  I did.
19     Q.  How many times -- was that a regular
20  stop for you?  Was there a reason you ended
21  up at that station?
22     A.  I was out of cigarettes and I needed
23  cigarettes for that night, so I stopped.
24     Q.  What brand did you smoke?
25     A.  Marlboros.

80

```
1        Q.  Are you still a smoker?
2        A.  Yes, sir.
3        Q.  Who was the attendant on duty at
4    that station?
5        A.  At the time --
6        MR. SLOSAR:  Objection to form,
7    foundation.  You can answer.
8        THE WITNESS:  Huh?
9        MR. SLOSAR:  You can answer.  I just
10   made my objection.
11       THE WITNESS:  I didn't know him at
12   the time, until he testified at my trial, so
13   I can't say that I knew his name, because I
14   had never talked to him before because, a
15   lot of times, there was different people
16   that worked there.
17       Q.  (BY MR. ERVIN)  Do you know his name
18   now?
19       A.  If I'm not mistaken, I think it's
20   Vincent or Ray Posey.
21       Q.  Have you had occasion to speak to
22   him since the trial?
23       A.  No, sir.
24       Q.  Did you ever have occasion to talk
25   to him other than when you bought the
```

81

```
1    cigarettes?
2        A.  No, sir.  May I use the restroom?
3        MR. ERVIN:  Yes, sir.  Let's take a
4    break.
5        (OFF THE RECORD, 10:47-11:01 A.M.)
6        Q.  (BY MR. ERVIN)  How is it you first
7    found out Rhonda Warford was missing?
8        A.  I had went by Keith's house, and he
9    had told me that somebody said that they
10   hadn't seen Rhonda.  I think they had called
11   him and asked if he had seen her, and I
12   didn't think nothing about it because I
13   actually -- I think I made things worse
14   because I joked about it to him and his mom
15   and his dad.
16       I said, "Well, she just found
17   somebody else."  Said -- don't quote me on
18   my exact words, but, "I think she said she's
19   done with you" or something like that,
20   joking, but as far as I didn't know what had
21   happened or anything was going to happen.
22       Q.  Had you ever known, during their
23   relationship, whether Rhonda had missed a
24   period?
25       A.  No, sir.
```

82

```
1        Q.  Had Keith ever said anything to you
2    about whether she had missed a period or
3    thought she may be pregnant?
4        A.  No, sir.
5        Q.  Never?
6        A.  Never.
7        Q.  Did you ever tell the police that?
8        A.  No, sir.
9        Q.  But you told that to the parole
10   board.
11       MR. SLOSAR:  Objection to form and
12   foundation.  You can answer the question.
13       A.  Yes, sir, because Greer, that's what
14   he had told me that day in the conference
15   room when he was trying to get me to state
16   his story.
17       And I told the parole board that,
18   because I figured, if I told them that, I
19   would be able to get out and be with my dad
20   and help him before he passed away.
21       I didn't know he was actually going
22   to pass away.  I just knew he needed help.
23       Q.  So did you -- were you lying to the
24   parole board?
25       A.  Yes, sir.
```

83

```
1        Q.  Were you lying to the parole board
2    because of what your mother had told you?
3        A.  I lied to the parole board for
4    several reasons.  One, I wanted to get back
5    to my father because, I mean, he was in
6    terrible health.  Two, I wanted my freedom.
7    Three, everybody in the yard or everywhere
8    said -- even pre-parole -- you know, the
9    people you talk to before you'd see the
10   parole board, caseworkers and stuff.
11       A prime example of how they don't
12   want to believe you.  In my record
13   somewhere, it shows that even before I went
14   up to the other one -- even after me telling
15   them all that stuff -- she said that I was
16   still in denial and I minimized the crime
17   because I wouldn't take responsibility.
18       You know, that's all them years
19   later, even after saying that.  So, yes, I
20   lied to the parole board hoping that I could
21   get there.
22       And anybody that has a family member
23   that is sick, do you want to be there for
24   them?  I mean the common person would want
25   to be and, yes, I wanted to be there for my
```

84

1 father.
2         So I was willing to tell them
3 anything if they would let me out.  And I
4 figured if I stated what Greer said, it
5 would get back to them.  Maybe somebody
6 would have some mercy, because one of the
7 pre-parole people was telling me that I
8 needed to give the victim's family closure
9 and, if I went out there and I claimed
10 innocence, all I'm doing is spitting in
11 their face.  So I did what I could.
12      Q.  Did you know Rhonda's parents?
13      A.  I think I had met her mother and
14 father once when I had dropped them (sic)
15 off.
16      Q.  Had you dated Michelle Warford?
17      A.  See, that is a misconstrue -- she
18 had a boyfriend.  All we was doing was
19 having an affair.  It wasn't a date, you
20 know.  It was messing around.  So I want to
21 make that clear.
22      Q.  Did you ever talk to her about
23 Rhonda having been missing?
24      A.  I think she had called me asking me
25 if I had seen Rhonda or if I had known that

85

1 she had been with Keith or anything like
2 that.  And I told her, no, I hadn't seen her
3 and I hadn't seen Keith with her or
4 anything.
5         Now, what day that was, I can't
6 remember, but it was in between somewhere
7 from the time she come up missing and the
8 time she was found.  Michelle Rogers called
9 me.
10      Q.  At the time all this happened, you
11 were living at your parents' home; is that
12 correct?
13      A.  Yes, sir.
14      Q.  And Keith was living at his parents'
15 home?
16      A.  Yes, sir, because he had moved out
17 -- I asked him to move out in January.  So,
18 yes, he would have been back at his mother
19 and father's home.
20      Q.  When you asked him to move out of
21 the trailer, were you still there?
22      A.  No, sir.  I had done moved back to
23 my mother's and them.
24      Q.  Did he ever pay you any rent?
25      A.  No, sir.

86

1      Q.  When did you sell the trailer?
2      A.  I think it wound up actually being
3 sold after I was locked up, because
4 everything that was going on with the
5 interviews and all that stuff, we didn't
6 have time to really sell nothing.
7      Q.  How frequently were you seeing --
8 did you see Hardin on a daily basis?  How
9 often did you see him?
10         MR. SLOSAR:  Objection to form,
11 foundation.  You can answer the question to
12 the extent you understand it.
13      A.  When are you talking about?
14      Q.  I'm talking about at or about the
15 time when Rhonda was found dead.
16      A.  I didn't see him every day.
17 Sometimes it would have been three days
18 maybe.  Sometimes -- I can't say for a fact,
19 because sometimes it would be a while before
20 I'd even stop by -- because I liked his mom
21 and dad.
22         I'd mostly stop -- that's the reason
23 why I started talking back to him, because I
24 would always stop and see how they were
25 doing.

87

1      Q.  Was he employed at the time?
2      A.  At what time?
3      Q.  At the time that Rhonda was found
4 dead.
5      A.  I don't know.  You'd have to ask him
6 about that.
7      Q.  You had lost your job at Papercone,
8 correct?
9      A.  Yes, sir.
10      Q.  Were you working anywhere else at
11 the time?
12      A.  I was drawing benefits from
13 Papercone, because the allegations I got
14 fired for, we went to -- I guess it's the
15 Human Resources or Unemployment office and,
16 by their determination from the witnesses of
17 Bill's dad and stuff, they determined that I
18 hadn't -- I got terminated, but I still got
19 my benefits and I was getting a check every
20 week and then I would -- I was supposed to
21 be working at Automotive Specialists also,
22 but Jimmy's dad had just give him a house
23 and stuff.
24         So I was out there helping them
25 restore the house, because Jimmy had a wife

88

1  and kids, newborn babies and stuff, so we
2  was trying to get it together as quick as we
3  could for them to move in it.
4    Q. So you weren't privately employed
5  anywhere at the time -- or publicly employed
6  anywhere at the time that this happened.
7    MR. SLOSAR: Objection to form,
8  foundation. You can answer.
9    A. I'm not going to say for sure, but I
10  think I was still working with the garage,
11  too, but I had taken time off to do the
12  other stuff and I was getting a check. I
13  can't say for sure.
14    Q. When you are receiving unemployment
15  benefits, are you allowed to continue
16  employment somewhere?
17    MR. SLOSAR: Objection to form.
18    A. I don't know, because I had had both
19  jobs before. So I don't know. I don't
20  know.
21    Q. So you don't recall for sure whether
22  you had public employment at the time of
23  Rhonda Warford's death or not.
24    MR. SLOSAR: Object to form, asked
25  and answered. You can answer.

89

1    A. Honestly, I can't say if I was
2  actually employed at Automotive Specialists
3  at that time, or if I was. You would have
4  to ask Kerry Trowbridge --
5    Q. All right.
6    A. -- or Dexter Trowbridge.
7    Q. All right. I do want to talk a
8  little bit about what happened out at
9  Papercone.
10    A. Yes, sir.
11    Q. Did your termination come as a
12  result of the gerbil or guinea pig head
13  incident?
14    A. No, sir, because Bill is the one
15  that give me the snake. He's the one that
16  kept accusing me of not feeding the snake,
17  because he would come by the house.
18    Me and Bill Mahan didn't -- was
19  not -- we did not get along at all. Bill
20  was hard to get along with everybody but I
21  had to work with him on second shift. He
22  was Jack Mahan's son.
23    And there was a combination of
24  things. It -- well, I'll let you --.
25    Q. So you all didn't get along but he

90

1  would come by your house?
2    A. Well, he would say it was because of
3  the snake, that he paid a thousand dollars
4  for the snake, he wanted to make sure that
5  it was taken care of.
6    Q. What happened to that snake?
7    A. It died in I think the first part of
8  December, or maybe the middle part.
9    Q. That would be December of '91 then?
10    A. Yes, sir.
11    Q. And you had -- why would you
12  decapitate animals before you would feed
13  them to the snake?
14    MR. SLOSAR: Objection to form. You
15  can answer.
16    A. All right. Well, Bill, being the
17  expert in snakes because he had a whole
18  bunch of snakes -- he would buy these snakes
19  and he would just try to pawn them off on
20  other people. But he said if the snake is
21  sick -- he would look at its eyes and
22  stuff -- he would say that you had to force
23  feed it.
24    Well, I didn't actually believe
25  that, so I talked to a pet shop -- I think

91

1  it was Shively Pet Store up there in the
2  mall -- and I asked them about it and they
3  said, yes, that it was common practice that,
4  if the snake was sick, not really wanting to
5  eat, that you would have to force feed the
6  snake or try to get it to eat. And if it's
7  sick and it's not performing, you cannot put
8  a live animal in there with it because it
9  would claw its eyes and stuff like that.
10    So, after listening to Bill, talking
11  to the pet shop owner, they said to kill the
12  snake (sic), take it, hang it, get it around
13  its mouth. Sometimes you would actually
14  have to shove it in its mouth to get it to
15  start eating.
16    Q. Is that what you had done?
17    A. Yes, sir.
18    Q. Had you done that on more than one
19  occasion?
20    A. When he first started talking about
21  it, I had tried it, you know, and I didn't
22  really like it, and I thought he was lying
23  about it.
24    So I went and tried to get
25  professional advice on it and then, when

92

1    they told me that, I was like, well, I need
2    to feed this before it dies.
3        Q.  So you used guinea pigs.  Did you
4    use rats or --
5        A.  Yes, on the earlier stage.
6        Q.  -- what other animals?
7        A.  Rats, some mice on an earlier stage.
8    The progression of the snake -- you've got
9    to remember, the snake with the guinea pig,
10   it was only eight months old and it was over
11   nine foot long, about that big around
12   (indicating).  It was an actual anaconda.
13       Q.  But that snake died.
14       A.  Yes, sir.
15       Q.  How many guinea pigs did you force
16   -- how many animals to your recollection did
17   you force feed --
18       MR. SLOSAR:  Objection.
19       Q.  -- that anaconda?
20       MR. SLOSAR:  Objection to form.
21       A.  I tried three different ways.  One,
22   I tried a liquid substance they had.  That
23   was the first thing I tried, where you take
24   it and you pour it down their throat, and
25   then that didn't work.  You know, it just

93

1    basically coughed it all up and stuff.
2        And after talking to the experts and
3    stuff, I think I tried one of the biggest
4    rats I could find and then a guinea pig.
5        Q.  So a rat and a guinea pig.
6        A.  Yes, sir.
7        Q.  And you had that snake at the time
8    you were seeing Amy Remsburg; is that
9    correct?
10       A.  No, sir.  I got it after I broke up
11   with her.
12       Q.  After?
13       A.  Yes, sir.
14       Q.  Did you have any snakes before that
15   one?
16       A.  No, sir.
17       Q.  When we first started, you told me
18   about threats that Handy, Sherrard, Sheriff
19   Greer, Hope Greer, Cliff Wise and Bill Adams
20   had made to you -- or against you; is that
21   correct?
22       A.  Yes, sir.
23       Q.  Is there anything else that you know
24   of, as you sit here today, that you think
25   makes them responsible for what happened to

94

1    you, makes them responsible for your
2    conviction?
3        MR. SLOSAR:  And, Jeff, I'd instruct
4    you not to -- when you respond to this
5    question not to include any information that
6    you received from your counsel, as those
7    conversations are privileged.  It's only
8    information that are contained outside of
9    conversation with your company.
10       MR. ERVIN:  And let me tell you so
11   that we can alleviate concerning your
12   attorney, I want you answer all the
13   questions that way.  All right?
14       THE WITNESS:  Yes, sir.
15       MR. ERVIN:  I'm not interested in
16   what your lawyer knows.
17       THE WITNESS:  Yes, sir.
18       MR. ERVIN:  I want to know what you
19   know.  Okay?
20       THE WITNESS:  Yes, sir.
21       MR. SLOSAR:  And Mr. Ervin, just for
22   the record, I'm not -- I appreciate that,
23   but what I'm also instructing my client is
24   not to testify as to any information that he
25   learned through conversations with us, not

95

1    just what I know but what he knows because
2    of what I know.  So I just want to make sure
3    --
4        MR. ERVIN:  I understand.  You're
5    being very clear.  Very clear.  I think that
6    your client understands you, and that's
7    probably the 12th time that you've made the
8    same warning or given the same warning to
9    your client.
10       MR. SLOSAR:  Sure.  Each time --
11       MR. ERVIN:  I think he understands
12   and I'm telling him that then, now and going
13   forward, I want to know what you know.
14       THE WITNESS:  Yes.
15       MR. ERVIN:  Okay?  Not what your
16   lawyer knows.
17       THE WITNESS:  Yes, sir.
18       MR. ERVIN:  All right.
19       Q.  (BY MR. ERVIN)  Now, is there
20   anything else about the conduct of Mark
21   Handy, James Clark, Kelly Jones, Robert
22   Ennis, Charles Edelen, or Jim Woosley, or
23   James Griffiths that you're aware of that
24   you believe contributed to your conviction?
25       MR. SLOSAR:  Objection to form.  You

## 96

1 can answer.
2    A. You're talking about anything other
3 than what I've told you already.
4    Q. Right. And let's talk about what
5 you've said. What you talked about was a
6 threat or threats that were made to you
7 during the course of an interview.
8    A. Yes, sir.
9    Q. In regard to Greer, you talked about
10 him laying a pistol on the table and
11 emphasizing the importance of your
12 cooperation.
13    A. Yes, sir.
14    Q. Hope Greer, I think you said talked
15 about what could happen in prison if you'd
16 gone to prison, correct?
17    A. Yes, sir.
18    Q. I think you said that Handy was a
19 witness to what Greer did; is that correct?
20    A. He had the door open and he would
21 stand at the door. He wasn't all the way in
22 there, but the other woman that was there --
23 I don't know her name, but she was a
24 blonde-headed woman -- she was sitting --
25 Hope Greer was here, she was sitting here

## 97

1 (indicating), and I was in between them.
2    Q. Did Handy make any specific threats
3 to you?
4    A. Whenever he -- when I kept asking
5 for an attorney, I don't know. Some people
6 would consider it a threat, some people
7 wouldn't, you know, when he's talking about
8 that, because he kept telling me he was
9 going to get me an attorney.
10    Whenever he kept saying that Keith
11 had an attorney, that he was giving me up,
12 that I'd better come clean, and then finally
13 I told him, I said, "I want an attorney,"
14 you know, and he kept saying, "Well, I'm
15 going to get you one, I'm going to get you
16 one."
17    And then finally he told me I wasn't
18 getting no -- I don't know if it was a
19 cussword or not, but I know he said I wasn't
20 getting an attorney, kept me handcuffed to
21 the table, and he didn't stop Gene Sherrard
22 or none of them from doing what they did.
23    Q. Okay. So Handy didn't get you a
24 lawyer when you asked for one, correct?
25    A. No, sir, because, as soon as I found

## 98

1 out that Keith had had an attorney, I
2 started asking questions about why I didn't
3 have an attorney, because he kept saying,
4 "You know, well, this is serious." If this
5 is so serious and Keith's got an attorney,
6 how come I don't have an attorney? And he
7 just kept going back to the questioning.
8    Q. Did you give him any more
9 information after you had asked for a
10 lawyer?
11    A. Yes, sir, he kept asking,
12 especially, like I said, once he told me I
13 wasn't getting none, he kept on questioning
14 me and I -- I had told my mother and father
15 about it, and one of them had actually
16 called the police station about the whole
17 incident of the threats and everything.
18    And then as far as -- that's like
19 they misconstrued -- took things and
20 misconstrued a lot of them. That's like the
21 day he asked for my car. You will see -- I
22 can give you my car. I was trying to show
23 him I didn't have nothing to do with this
24 crime.
25    I had a '74 Chevy Nova. The rear

## 99

1 quarter was rusted out. I was fixing it,
2 and they started accusing me of trying to
3 disguise the car, trying to throw them off
4 their investigation, and everything.
5    And I told him, I said, "No, you can
6 have the car." I said, "All I'm doing is
7 fixing a rust spot," and he's like, "No,
8 you're hiding evidence. We need everything
9 you've got." I told them, I said, "I've
10 done told you you can have every bit of my
11 clothes or everything."
12    Q. Well, you signed a consent for him
13 to search the Nova, correct?
14    A. Yes, sir. I told him he could take
15 the Nova.
16    Q. Is there anything else that you
17 recall that Mark Handy did that you thought
18 was wrong or improper?
19    MR. SLOSAR: Objection to form.
20    A. Well, I would say because of his
21 statement and his reports. They had plenty
22 of video cameras. Anybody that knew back
23 then, they had tape recorders and video
24 cameras and, if they would have recorded it,
25 we would know what the truth is.

100

1  Q. Okay. Anything else?
2  A. No, sir, not that I can think of.
3  Q. All right. What about James Clark?
4  Detective Clark?
5  A. Anything else besides what I've
6  already told you?
7  Q. Yes, sir.
8  A. No, sir.
9  Q. What about Detective Greer, Hope
10  Greer?
11  A. Not that I know of.
12  Q. Charles Edelen? Do you know of
13  anything that he did wrong?
14  MR. SLOSAR: Objection to form.
15  A. No, sir, because I don't know of the
16  procedures for it.
17  Q. Okay. And Jim Woosley?
18  A. No, sir, not that I know the
19  procedures.
20  Q. Is there a claim that Handy's
21  supervisors did something wrong?
22  MR. SLOSAR: Objection to form.
23  A. The claim I would make with that is
24  they should have stopped -- no matter what
25  police was in there -- Meade County,

101

1  Louisville or anything -- from doing what
2  they did.
3  They are the ones that are
4  responsible, you know, for their conduct of
5  their police officers and that's why, if
6  they're claimed in there, that's why I feel
7  they should be claimed in there.
8  Q. Okay. But you don't know of
9  anything specific that they did to cause
10  this to happen to you.
11  MR. SLOSAR: Objection to form,
12  asked and answered.
13  A. Yes. If they had watched over their
14  detectives and did the right thing, I might
15  not have been that wrongfully convicted, and
16  that is the truth.
17  Q. What information do you have that
18  they knew that Handy had, for example,
19  denied you a lawyer on that date?
20  MR. SLOSAR: Objection to form.
21  A. I don't know.
22  Q. Do you know who gave you a
23  polygraph? Whether it was Kelly Jones or
24  Robert Ennis?
25  A. Honestly, I don't know, because I

102

1  took three and I noticed that -- I think, at
2  one time, there was a different person
3  there. But I took three of them, so I don't
4  know who they was.
5  Q. Do you know whether they did
6  anything right or wrong during your
7  examination?
8  MR. SLOSAR: Objection to form.
9  A. Honestly, I wouldn't know because,
10  like I said, I don't know what their
11  procedures are.
12  Q. What did you know about Keith
13  Hardin's participation in Satanism or Satan
14  worship?
15  MR. SLOSAR: Objection to form,
16  foundation. You can answer.
17  A. When I was a kid, we was in school.
18  Anyway, Keith started reading a lot of
19  books. He started talking about it. I'm
20  from Alabama. We're Southern Baptists all
21  the way. You know, voodoo, whatever, you
22  just -- you don't mess with it. You don't
23  deal with it.
24  Anyway, when he started talking
25  about that stuff, I was like, "Why are you

103

1  reading all that?" He said, "Well," he
2  said, "I just want to know about different
3  stuff."
4  He had told me that he was had read
5  different religions and stuff, too, and I'm
6  like, "Dude, that's witchcraft, you know,
7  it's stupid," and I thought he was just
8  going to be done and over with. You know
9  what I'm saying? And then other people at
10  school started talking about he was checking
11  out these weird books.
12  So after --
13  Q. About what age was this? Pardon my
14  interruption.
15  A. Oh, man, let's see. I can't even
16  remember exactly what age. We was in high
17  school.
18  Q. All right. Go ahead.
19  A. So --
20  Q. You were talking about how he began
21  reading.
22  A. Yeah. So, when other people started
23  talking about it and stuff, I had told my
24  mom, because of everybody in my family was
25  religious, you know.

104

1    So she said, "Look.  People like
2  that, you need to stay the hell away from
3  because they ain't nothing but trouble.  You
4  know, just stay away from them."
5    So I actually quit running around
6  with him, and his mother wanted to know why
7  I just quit hanging out with him at all and
8  I had told her, you know, I said, "Because
9  of the Satanism stuff."  I said, "That
10  stuff's weird."  I said, "He's reading all
11  kinds of different stuff."
12    So she said that she understood and
13  then that was the end of it for a while.
14    Q.  Okay.  How was it you all got back
15  together?
16    A.  I would actually stop in about every
17  three months and talk to his mom and his
18  dad.  Especially if I seen them outside, I
19  would stop and talk to them and stuff.  And
20  then his mother had told me that he wasn't
21  doing none of that crazy stuff no more.
22    So he was there one day and that's
23  when we just started talking again.
24    Q.  How long was that before this
25  occurred -- Rhonda Warford's death?

105

1    A.  I think it was in the summer in '91.
2    Q.  So eight or 10 months before her
3  death?
4    A.  Yes, sir.
5    Q.  And at that point then did he become
6  your roommate?
7    A.  Well, his mom was telling me that
8  she'd like for him to get out of the house,
9  that he's always home and stuff.  He was
10  talking about he would want to move out.
11    So I was like, "Well, why don't you
12  start coming over every now and then, you
13  know, just hang out?"  You know what I'm
14  saying?
15    So he come over there a couple times
16  and then that's when he met Rhonda, because
17  I had already knew Rhonda and them, and they
18  hit it off.
19    And then when they hit it off, you
20  know, I asked him, I said, "Well, you just
21  want to move in?"  And that's what come
22  about him moving in.
23    Q.  So you invited him to move in
24  because of his relationship with Rhonda?
25    A.  Oh, no, sir.  No, sir.  I just

106

1  figured that if he was getting along with
2  people, you know, and that he was meeting
3  with friends, I figured that was a good
4  thing.
5    Q.  At the time that you all began to
6  associate together again and at about the
7  time that he moved in, were you aware that
8  he was still involved in satanic worship?
9    MR. SLOSAR:  Objection to form,
10  foundation.  You can answer the question.
11    A.  As far as I knew of, he wasn't.  He
12  told me he wasn't and his mother told me he
13  wasn't.  So that's the only reason why I
14  started talking to him again.
15    Q.  Did you know that he had tattooed
16  Rhonda?
17    A.  I found out about actually what it
18  was tattooed from the police after they had
19  found the body.  The night that I come home,
20  I seen that he was tattooing her, but I just
21  went to my bedroom.
22    I didn't actually sit there and know
23  what they was doing.  I have no tattoos, I'm
24  not into the tattoo stuff.  You know, like I
25  said, very Southern Baptist.  You know, you

107

1  don't mark up your body even though it's
2  normal now, you know, but I don't get into
3  that stuff.
4    Q.  So he was -- when you came home one
5  evening, he was tattooing her?
6    A.  Yes, sir.
7    Q.  But you never saw the tattoo.
8    A.  No, sir.
9    Q.  Would you know what it would have
10  meant if you would have seen it?
11    A.  I'd have probably got mad and kicked
12  his ass out right then and there.
13    Q.  So you would have recognized that as
14  an indication of satanic belief or worship.
15    MR. SLOSAR:  Objection to form.
16    A.  Yes, sir.  I guess I would take it
17  that way, because I mean if it's not normal,
18  it's --.
19    Q.  So you don't believe that it's
20  normal as you sit here today.
21    A.  No --
22    MR. SLOSAR:  Objection to form.  You
23  can answer.
24    A.  I still don't agree with it, you
25  know.  Even though people's beliefs are

108

1 their beliefs, I still don't agree with it.
2     Q.  So, if you had known at the time
3 that that's what Keith was tattooing on her,
4 you would have wanted him out of the house.
5     A.  Yes, sir.
6     Q.  How long before he moved out was it
7 that that occurred?
8     A.  I think it happened in November,
9 first part of December.  It was right after
10 that, because that's when I had started
11 asking her to leave because they wasn't
12 cleaning or nothing.  But they could sit
13 around, drink, do tattoos and stuff like
14 that.  So I -- it was time for them to move.
15     Q.  Where did they get money; do you
16 know?
17        MR. SLOSAR:  Objection to form.
18     A.  Well, as far as the food, I paid for
19 the food.  I paid the rent and the electric
20 and all that stuff.  Now, where Keith and
21 Rhonda got their money for Rhonda's
22 cigarettes and what Keith wanted, I have no
23 clue.
24     Q.  But neither one of them, to your
25 knowledge, worked.

109

1     A.  Oh, no, sir.  As far as I know of,
2 none of them worked.
3     Q.  Do you know why?
4     A.  No, sir.  When Keith first moved in,
5 he had a job for two days and then, after
6 that, he kept saying he would get another
7 one, and he didn't.
8     Q.  What was his job when he moved in?
9     A.  I don't even know.  I don't think I
10 even asked.
11     Q.  But as far as you know, he went to
12 work two days?
13     A.  Yeah, he went for two days of work.
14     Q.  Rhonda was not employed?
15     A.  No, sir.
16     Q.  Did you know why she wasn't working?
17     A.  I just figured she hated to work,
18 you know.  I didn't get in -- I was working,
19 at that time, two jobs.
20        I was still at Papercone.  I was
21 working at Automotive Specialists, so I
22 didn't really have a lot of time to
23 socialize with everybody.
24        I just know, when I kept coming in
25 and that the house was dirty and the dishes

110

1 wasn't done and stuff, that something needed
2 to change.
3     Q.  Where was the Automotive Specialists
4 located?
5     A.  Off Taylor Boulevard.  It's still
6 there today, except for I think they moved
7 to the shop up in front.
8     Q.  Was it a garage or a parts store?
9     A.  No, it's always been a garage.
10     Q.  Is it still there?
11     A.  Right after I first got out, I went
12 to court and I come back up through
13 Louisville and went by there, and the garage
14 that they had originally built was not zoned
15 because of the church beside of it.  So,
16 somewhere along the line, they got zoned and
17 they're using both garages now.
18     Q.  Did you tell me that Keith had told
19 you at first when Rhonda -- is that how you
20 found out that she was missing?
21        MR. SLOSAR:  Objection to form.
22     A.  Yes, sir.  He was there.  His mother
23 was there also.
24     Q.  His mother was there?
25     A.  Yeah.  It was in their living room.

111

1     Q.  Do you recall what day that was?
2     A.  I think it might have been the 3rd.
3 Now, don't quote me exactly on that --
4     Q.  Sure.
5     A.  -- because I don't know, was that a
6 Thursday?
7     Q.  I'm not sure of the day of the week.
8 That's your best recollection, that it was
9 the 3rd?
10     A.  Yes, sir.  That's my best
11 recollection.
12     Q.  And how did he describe the
13 situation to you?
14     A.  Oh, when I come in, he said that --
15 well, we was talking to begin with and he
16 said, "Yeah," he said, "Rhonda's family
17 called me wanting to know if she was over
18 here because they don't know where she's
19 at."  And then that's when I made the joke.
20        You know, I didn't think nothing of
21 it.  I was just like -- because I mean
22 Rhonda had so many friends.  You know, you
23 don't know if she'd spent the night with
24 them or not, you know.  And I didn't really
25 think about it, that their family was

112

```
1    calling and asking him, you know, to really
2    consider anything.
3         Q. So you weren't alarmed by it at all.
4         A. No, sir.
5         Q. And did Keith appear to be alarmed
6    by it at all?
7         A. No, sir. At that point in time he
8    didn't. He just said that, you know, he got
9    a call from Rhonda's family wanting to know
10   if she was there with him.
11        Q. Did you ever have occasion to speak
12   to him about that again before Rhonda's body
13   was found?
14        A. No, sir, because I think, even when
15   Michelle called me, I was like, "Michelle,
16   she's somewhere." I said, "I ain't seen
17   her. I don't know if he's been around her,
18   because I ain't seen him."
19        So, no, I don't think I said
20   anything else to him.
21        Q. When did Michelle call you in
22   relationship to when you saw him on the 3rd?
23        A. Don't quote me exactly. That's the
24   reason why -- because I think she called on
25   a Thursday. So it was either the 3rd, 4th
```

113

```
1    or something like that.
2         Q. Okay.
3         A. It was right around that time that
4    she had asked me if I had seen her or if I
5    had seen Keith with her.
6         Q. All right. But was that
7    conversation after your conversation with
8    Keith and his parents?
9         A. Yes, I think it was.
10        Q. Did she seem to be alarmed?
11        A. She was calling me, you know. And
12   for her to call me, I guess it was -- I
13   considered it, you know, might have been an
14   issue because, I mean, why would -- she
15   normally didn't call me because, like I
16   said, we had -- and we wasn't even seeing
17   each other at that time, you know. And when
18   we seen each other, it was just hookups.
19        Q. When Keith lived at your place, how
20   often did he see Rhonda?
21        A. Rhonda pretty much moved in.
22        Q. And then, after you asked her to
23   move back out, how frequently would he see
24   her?
25        MR. SLOSAR: Objection to form.
```

114

```
1         A. I wouldn't really know, because she
2    wasn't supposed to be at the trailer,
3    because I moved back to my mom and dad's and
4    I know, when I'd go out there, she wouldn't
5    be there, you know, so.
6         Q. When did you move back to your mom
7    and dad's?
8         A. In December.
9         Q. Why did you move back there?
10        A. Because I was having money -- you
11   know, money problems, that ordeal with
12   living with people, you know, a mess, and
13   decided to go on and sell the trailer, you
14   know. And all I was concerned, was getting
15   it fixed up and sell it.
16        And, in a way, when I moved back to
17   Mom and Dad's, I was hoping, if he didn't
18   have food and stuff, he'd just move back to
19   his mom and dad's and I wouldn't have to
20   have said nothing to him.
21        Q. And you never found the snake?
22        A. No, sir.
23        Q. And it was lost in the trailer?
24        A. Yes, sir.
25        Q. But you were living at your mom and
```

115

```
1    dad's.
2         A. Yes, sir. I had moved back in
3    there.
4         Q. And you had been there for three
5    months at the time that the snake was lost?
6         A. No. I moved back to my mom and
7    dad's in December of '91.
8         Q. Right.
9         A. So let's see.
10        Q. You were looking for the snake the
11   first of April of 1992.
12        A. I didn't buy that snake until -- I
13   can't remember when I bought it, but it was
14   a couple months after my other one died.
15   And my mom would not allow a snake in her
16   house.
17        Q. But did you own it before you moved
18   home or did you buy it after you moved home?
19        A. I bought it after I moved home.
20        Q. Okay. So, when you bought it, you
21   knew that it wouldn't be staying where you
22   stayed.
23        A. Oh, I knew that wasn't going to
24   happen. Not at my mom's house, if that's
25   what you're talking about.
```

116

1    Q.  Yes, sir.  When you bought it, you
2  knew it wasn't going to stay at the place
3  where you were living.
4    A.  Yes, sir, at my mom and dad's.
5    Q.  Right.
6    A.  Yeah, that wouldn't go over.
7    Q.  So you bought it with the intention
8  of keeping it up at the trailer.
9        MR. SLOSAR:  Objection to form.
10    A.  No, I figured I could keep it there
11  till I either sold it or I got -- because I
12  was still going to get me another place.
13    Q.  Did you have the money to get
14  another place?
15    A.  No, sir.  That's one of the reasons
16  why I was wanting to sell the trailer.
17    Q.  If you sold the trailer, would you
18  have been able to get another place?
19    A.  Yes, sir.  I'd have been able to
20  rent an apartment.
21    Q.  What was it about the trailer that
22  you didn't like?
23    A.  It was just a trailer.  I was trying
24  to move up from -- we grew up poor and stuff
25  and I was trying to move upward in life and

117

1  not backwards, because I couldn't work on
2  nothing out there.
3        Out there at the trailer park, you
4  cannot do nothing.  I mean, if a car breaks
5  down, you can have it towed and that's it.
6  So it was not worth being there.
7    Q.  They wouldn't want you -- or did you
8  understand that you could work on cars in
9  the parking lot at an apartment house, an
10  apartment building?
11    A.  No, I'm sure you couldn't.  You
12  know, some places back then, you could at
13  least change a battery and stuff like that.
14  You know, there, they -- you wasn't allowed
15  to do nothing.  Them rules were pretty
16  etched in.  If they drove around and your
17  hood was up on your car, they would actually
18  stop and talk to you.
19    Q.  So when did you buy the second
20  snake?
21    A.  I can't actually remember when.  It
22  was after -- a couple -- a couple months --
23  I think it was a month or two after my other
24  one died.
25    Q.  But you -- do you know when the

118

1  other one died?
2    A.  In December.
3    Q.  In December.  So January or
4  February?
5    A.  Yes, sir.  It was around there.
6    Q.  Were you using your trailer still to
7  party and do things like that or --
8    A.  Oh, no, sir.
9    Q.  No?  What were you doing to get it
10  sold?
11    A.  I had cleaned up the yard, stuff
12  like that, because of where I had
13  accumulated a lot of parts.  I had put them
14  in the shed and then they had got onto me
15  for stacking tires in between the trailer
16  and the shed.
17        So I had to get all them gone.  And
18  then as far as I was going to paint the
19  walls and stuff like that.  Try to make it
20  look better.
21    Q.  Had you painted the walls?
22    A.  No, sir, not yet.
23    Q.  Had you moved your furniture out?
24    A.  No, sir.  It was going with the
25  trailer.

119

1    Q.  Had the trailer been cleaned?
2    A.  No, sir.  That's the reason why we
3  went over there to clean it up.
4    Q.  When did you go to clean it up?
5    A.  I think -- I had went over there a
6  couple other times, started cleaning on it,
7  because the dishes in the sink and all that
8  stuff had done got moldy.
9        So, at the end of March, I started
10  actually working on cleaning it up.
11    Q.  So just about the time that Rhonda
12  disappeared you had begun to clean up the
13  trailer?
14        MR. SLOSAR:  Objection to form.
15    A.  I just know that, in March, I
16  started really cleaning it up, and that's
17  when I asked for Keith's help, because I
18  mean it was his mess.
19    Q.  So when did you have Keith come to
20  help you?
21    A.  The first time was at the end of
22  March.
23    Q.  Okay.  What do you mean by the end
24  of March?  Do you mean the last week of
25  March or --

120

1    A.  I just -- yeah, probably the last
2    week, because I hadn't really talked to him
3    since I had kicked him out and we started
4    talking a little bit, you know, here and
5    there.
6        And then, finally, I asked him, I
7    said, "Why don't you help me clean this
8    place up so I can get rid of it?"  And he
9    agreed to help me.
10   Q.  So did the trailer sit empty from
11   the time Keith left in January until you
12   came back to clean it up at the end of
13   March?
14   A.  Yes, sir.
15   Q.  You weren't using it to party in or
16   anything like that?
17   A.  Oh, no, sir.  At that time, no, I
18   wouldn't -- like I said, I was working two
19   jobs and then I had trouble with my car and
20   stuff.  So, yeah, I don't even -- I don't
21   even know if -- I think my dad stopped by a
22   couple times just to check on the place.
23   Q.  Okay.  So you weren't going there at
24   all.
25   A.  Not for a while, until I started

121

1    cleaning on it.
2    Q.  Okay.  And you didn't start cleaning
3    on it until the last week of March.
4    A.  Well, somewhere around there.  I
5    know I did take food over there.  I think I
6    had my mom take me once and my dad take me
7    once.  And that was probably the only times
8    I'd have even been over there.
9    Q.  What food were you taking over
10   there?
11   A.  For after I -- the time I bought the
12   snake.  You'd buy -- because, like I said,
13   it was about that long (indicating).  You'd
14   buy little pinkies at the pet store and just
15   throw it in there.  It was fine.
16   Q.  Why would you ask your mom or dad to
17   take you over there?
18   A.  Because they didn't want it in their
19   house and I wasn't just going to throw it
20   away.
21   Q.  But why did they need to take you
22   over there to feed it?
23   A.  Because I was having trouble with my
24   truck at that time -- truck and car.  I was
25   trying to work on them because I had a lot

122

1    of -- the Nova had been sitting all that
2    time, so I had tried to get the S-10 going.
3    That was taking a motor out, putting it in
4    the S-10.  It had a four-cylinder in it.
5    Q.  But the Nova was running, wasn't it?
6    A.  No.
7    Q.  Isn't the Nova what you were driving
8    the night that you were toting Keith around
9    and you all stopped to get cigarettes?
10   A.  Yes, but you're misinterpret --
11   between -- the Nova was sitting over there
12   for all that time.  My truck got wrecked,
13   and I had to get the Nova and I was having
14   to put the motor and all that stuff in it
15   within that timeframe.
16       It wasn't like I actually had a
17   vehicle I could jump into and go.
18   Q.  So you had -- the Nova was broken
19   down?
20   A.  I had --
21       MR. SLOSAR:  Objection to form,
22   foundation.  You can answer.
23   A.  I had taken the motor out of the
24   Nova and it sat at Automotive Specialists
25   out there for a long time because I had put

123

1    the motor in the S-10.  When I got the motor
2    in the S-10, my friend, Karelle, had wound
3    up wrecking the S-10.
4        So, because of the body damage,
5    frame bent and everything, I had to go get
6    the Nova and take the motor and put it back
7    in it.
8    Q.  When was the S-10 wrecked?
9    A.  Can I see the actual trial
10   testimony?  I can tell you exactly the day
11   that it was wrecked.
12   Q.  No, I want you to tell me based on
13   your memory first.
14   A.  I can't honestly say.  There's a
15   police report on it, because I was at
16   Caddy's.  Karelle had the truck.  So a whole
17   police report was made on it.
18   Q.  Okay.  Was that before you had asked
19   Rhonda to move out in December?
20   A.  About what part?  Could you clarify?
21   Q.  Was the truck wrecked before you
22   asked Rhonda to move out in December?
23   A.  No, sir.  I don't think it was.  The
24   Nova was still at Automotive Specialists.
25   Q.  Okay.  And how long had it been

124

1  sitting there at that point?
2  A.  I think I took the motor out at Mom
3  and Dad's in December and put it in the
4  S-10, and it had been sitting there.
5  Q.  So you -- I'm trying to -- I'm just
6  trying to understand what car you were
7  operating when.
8  A.  Well, and that's what I'm trying to
9  explain to you, because it's not easy to
10  take an engine and put it in a four-cylinder
11  truck, you know, so it took a while to
12  convert everything over.  I'm not trying to
13  be rude.
14  Q.  Sure.
15  A.  I'm just trying --
16  Q.  I understand.  I understand, but you
17  were driving the Nova in April, in March and
18  April, of 1992, weren't you?
19  A.  Yes, sir.  I think I was.
20  Q.  And you were driving the Nova in
21  December of 1991, weren't you?
22  A.  Yes, sir.
23  Q.  And you were driving the Nova in
24  January and February of 1992, weren't you?
25  A.  No, sir.

125

1  Q.  Explain that to me.
2  A.  Because I had to take the motor out
3  of the Nova and put it in the S-10, and I
4  drove the S-10 up until it got wrecked.
5  Q.  So you think you wrecked the S-10 in
6  February or March or when of 1992?
7  A.  I didn't wreck the --
8  MR. SLOSAR:  Objection to form,
9  asked and answered.  You can answer.
10  A.  My friend wrecked the S-10.
11  Q.  Okay.
12  A.  And then that's when I had to take
13  the motor out of the S-10 and put it back
14  into the Nova.
15  Q.  And when did you first change the
16  motor out of the Nova into the S-10?
17  MR. SLOSAR:  Objection to form,
18  asked and answered.
19  A.  I'm trying to remember an exact time
20  but I really -- I know it was either -- from
21  the time I moved in, because I think that's
22  one of the reasons why moved into Mom's
23  also, is to do that work, because I could do
24  it there.
25  So it would have to be at the end of

126

1  December to when the truck got wrecked is
2  when I took the motor out of the car.
3  Q.  Okay.  How were you getting to and
4  from work when you were in that process?
5  A.  I would have my dad take me, if I
6  actually went somewhere.
7  Q.  Did he take you to and from work
8  every day?
9  A.  If I had to go somewhere, he took me
10  because I didn't have no other way.
11  Q.  All right.  So that's my question.
12  Did he take you to and from work every day?
13  A.  Until I got the truck running, yes,
14  sir, him or my mother would.
15  Q.  And you were still working two jobs
16  at that time?
17  A.  I was working two jobs up until I
18  got fired at Papercone.
19  Q.  Okay.  And when was that?
20  A.  You've got the report, may I see it,
21  and I can tell you the exact date.
22  Q.  Just what you recall.
23  A.  February or March maybe.  I can't
24  remember exactly when.
25  Q.  Not too long before Rhonda was

127

1  missing?
2  MR. SLOSAR:  Objection to form.
3  A.  I guess so.
4  Q.  Your best recollection is it was
5  February or March when you lost the job at
6  Papercone.
7  A.  Yes, sir.
8  Q.  Who was the person who wrecked your
9  truck?
10  A.  Karelle Teetsman (phonetic).
11  Q.  Can you spell that last name?
12  A.  I don't know how to spell it.
13  Q.  Say it again.
14  A.  Teetsman.
15  Q.  Teetsman.  How did you know Karelle?
16  A.  She was a friend growing up.  She
17  was like a sister to me.  She was my first
18  wife's best friend.
19  Q.  How many times have you been
20  married?
21  A.  Twice.  I got married once in
22  prison.
23  Q.  Okay.  Tell me about that.  Who did
24  you marry while you were in prison?
25  A.  She was a girl I dated before I ever

128

1     went to prison.
2          Q.  And I would guess she must have been
3     one of your visitors?
4          A.  Yes, sir.
5          Q.  And she must -- was she a regular
6     visitor while you were in prison?
7          MR. SLOSAR:  Objection to form.  You
8     can answer.
9          A.  She was to begin with, until she got
10    with some other guy and got on crack and
11    stuff.
12         Q.  All right.  How long did you all see
13    one another before you married?
14         A.  Well, like I said, I had known her
15    before I got locked up.
16         Q.  Had you known her in a
17    boyfriend-girlfriend relationship --
18         A.  Oh, yes, sir.
19         Q.  -- or just as a friend?
20         A.  No, I had known as a
21    boyfriend-girlfriend relationship.
22         Q.  All right.  When did you date her in
23    relationship to Rhonda Warford's death?
24         A.  I didn't.  I met her after I got out
25    on bond.

129

1          Q.  Where did you meet her?
2          A.  Actually, Tony Baker, she was
3     related to him by his brother being married
4     to her sister.
5          MR. SLOSAR:  While the chimes go
6     off, can we take a break whenever you're at
7     a natural resting point?
8          MR. ERVIN:  We can go ahead and take
9     a break now.  Do you all want to break one
10    hour for lunch?
11         MR. SLOSAR:  Can we hold off on
12    that?  Maybe do another half an hour on the
13    record before we take a lunch?  Is that
14    okay?
15         MR. ERVIN:  That's fine.
16         MR. SLOSAR:  We would like five or
17    10 minutes.  Is that okay?
18         MR. ERVIN:  Yeah.
19         (OFF THE RECORD, 11:57 A.M.-12:11
20    P.M.)
21         Q.  (BY MR. ERVIN)  What was the point
22    of putting the engine from the Nova in the
23    S-10?
24         A.  It was kind of like a goal at that
25    time.  Everybody -- they didn't have motor

130

1     mount like they do now, you can just take a
2     put a V-8 in an S-10 and stuff.  And I had
3     been having trouble with the Nova sometimes.
4          So, you know, as far as body work
5     and stuff, it was an older car.  So I wanted
6     to get the S-10 because, in all reality, I
7     thought it would be cool.
8          Q.  Was it a V-8 that you put in?
9          A.  Yes, sir, out of the Nova.  It was a
10    Nova motor.
11         Q.  Do you recall your mother testifying
12    at trial?
13         A.  Yes, sir.  I remember she testified
14    at trial.
15         Q.  Do you recall that she testified
16    that you had told her -- that she had talked
17    to you after you had your first interview at
18    the police department?  Do you recall that?
19         A.  I had talked to her several times
20    about the interviews.
21         Q.  Do you recall talking to her -- that
22    you talked to her after your first interview
23    on April 6th?
24         A.  I'm sure I talked to her, her and my
25    father.

131

1          Q.  Do you recall that you told her at
2     that time about having bought cigarettes at
3     the Chevron?
4          MR. SLOSAR:  Objection to form.
5          A.  I don't know if we had that con -- I
6     know I told her later.  You know, I don't
7     know which time I told her, because we had
8     multiple conversations.
9          Q.  Do you know if that's what she
10    testified to at trial?
11         A.  I don't remember what she testified
12    to.  If I could see the record, we'd know
13    for a fact what she actually testified to.
14         Q.  Do you recall being examined at
15    trial?  By that, I mean asked questions
16    about whether you had told Greer or Handy or
17    Clark or any of the other detectives about
18    whether you had been to the Chevron station
19    to buy cigarettes that night?
20         MR. SLOSAR:  Objection to form.  You
21    can answer.
22         A.  And that was during trial?
23         Q.  Yes, sir.
24         A.  Yes, sir.
25         Q.  And do you recall that, at trial,

132

1 you admitted that you had not told them
2 that?
3     A. No, sir. From my recollection, I
4 think I told them from the get-go, from the
5 first interviews or something like that. I
6 hadn't told them about it until they got
7 specific about wanting to know my every
8 movement.
9     Q. But you told them that you had
10 bought the cigarettes --
11     A. Yes, sir, I did tell the police --
12     Q. -- at the Chevron?
13     A. -- before all them interviews was
14 over that I had went to the Chevron station.
15     Q. I want to direct your attention to
16 Page 70 of the transcribed testimony at
17 trial and ask you whether you testified --
18     MR. SLOSAR: Counsel, do you have a
19 copy of the transcript, if you're going to
20 be referring to it? Is this an exhibit?
21 Are you marking this as an exhibit?
22     MR. ERVIN: No.
23     MR. SLOSAR: Page 70 is right here.
24     THE WITNESS: (Reviews document)
25     MR. SLOSAR: Mr. Ervin, do you know

133

1 whether the documents that the plaintiff is
2 looking at -- whether they have been
3 disclosed in this litigation? Because I
4 don't see a Bates number on them.
5     MR. ERVIN: I don't know whether it
6 has or not.
7     MR. SLOSAR: Rick, have you seen any
8 trial transcripts disclosed?
9     MR. SAWYER: No. I was also
10 wondering the same thing.
11     MR. SLOSAR: I'd ask that the
12 counsel for the defendants, one of the dozen
13 attorneys here today, that, if transcripts
14 are going to be relied upon for tomorrow,
15 that the defendants' discovery responses be
16 supplemented before the plaintiff's
17 deposition tomorrow so that we have access
18 to documents that you all are reviewing
19 prior to deposing Mr. Hardin.
20     Is there a specific line on here, Mr.
21 Ervin?
22     Q. (BY MR. ERVIN) I'm referring to the
23 question at line 19 on Page 70, Mr. Clark.
24 Do you see that?
25     A. Yes, sir.

134

1     Q. And you told -- you testified at
2 that point that you had not told the
3 detectives that you'd stopped to get
4 cigarettes; isn't that correct?
5     A. Yes, sir, but, if you go up to nine,
6 you see that I did say I think I told
7 Sheriff Greer on the way over there, when he
8 was the one that give me the ride.
9     I told somebody about the Chevron
10 station. I don't know exactly where or
11 when. My recollection back then would have
12 been a lot clearer.
13     But that's -- at nine, I told
14 Sheriff -- I think I told him on the way
15 over there.
16     Q. And then, when you were asked
17 specifically whether you had said anything
18 about stopping at the Chevron station, you
19 said, "No, sir, I didn't."
20     A. Yes, sir. That was after the
21 interview back at the police station because
22 that was -- to me, that's two different
23 instances, once where you're riding over,
24 he's asking you questions, and the other
25 time where you're there.

135

1     But I did tell somebody there at the
2 police station about the Chevron station
3 when they started wanting specifics.
4     The first day wasn't really
5 specific. They just wanted to know where I
6 was at that day, and I didn't understand
7 them because I thought they was just wanting
8 -- like they said, they wanted to talk to
9 me, that way they could move on with their
10 investigation, they had to investigate
11 everybody that they knew of that was
12 involved in this.
13     I did not know that you had to
14 specifically account for every hour at that
15 time until they made it clear.
16     Q. Do you know of a reason why, for
17 example, Sheriff Greer or Mark Handy would
18 have anything against you?
19     MR. SLOSAR: Objection to form.
20     A. How do you think I've felt over the
21 years wondering why they would lie? I don't
22 know why they would lie, besides to try to
23 get a conviction. That's the only thing I
24 would know.
25     Otherwise than that, I have never

136

1 met Sheriff Greer and Mark Handy till this
2 incident.
3    Q.  Okay.  Do you know of any reason why
4 James Clark would have anything against you?
5       MR. SLOSAR:  Objection to --
6    Q.  Detective Clark?
7       MR. SLOSAR:  Objection to form.
8    A.  No, sir.  Till this incident, I
9 wouldn't even know who none of them people
10 were.
11    Q.  Same with Kelly Jones or Robert
12 Ennis or Charles Edelen or Jim Woosley?
13    A.  Yes, sir.  Till this incident, I
14 wouldn't know none of them people.
15       MR. ERVIN:  All right.  I think I'm
16 through for the time being.  I'm ready to
17 hand off.  Would you like to take lunch now?
18       MR. SLOSAR:  About how much time
19 have we been on the record?  Probably just
20 about like 2:45 or 2:50?  2:41?
21       THE VIDEOGRAPHER:  Right.
22       MR. SLOSAR:  Maybe we could keep
23 going till three hours and take a lunch at
24 that point.
25       MR. WICKER:  No.

137

1       MR. SLOSAR:  I'm sorry.  Who was
2 that?
3       THE REPORTER:  Are we off the record
4 or on?
5       MR. BOND:  We are on.  I think now
6 is a good time for a lunch break.
7       MR. SLOSAR:  Are you going next,
8 Kent?
9       MR. WICKER:  I am not, but my
10 co-counsel asked for a break.
11       MR. SLOSAR:  All right.
12       MR. BOND:  It seems practical.
13       THE VIDEOGRAPHER:  We are going off
14 the record.  The time is 12:22 P.M.
15       (OFF THE RECORD, 12:22-1:30 P.M.)
16       (VOLUME 2 of 2 of VIDEO RECORDING)
17       MR. GARVERICH:  Mr. Clark, good
18 afternoon.  I introduced myself a few
19 moments ago, but my name is Andrew Garverich
20 and I, along with Keith Bond, represent the
21 various Meade County Defendants.
22       THE VIDEOGRAPHER:  Let me see that
23 for just a second.  I'm sorry.  Let's go
24 back off the record for a minute.
25       (OFF THE RECORD, 1:30-1:32 P.M.)

138

1       THE VIDEOGRAPHER:  We're back on the
2 record at 1:32.
3
4 CROSS EXAMINATION
5 BY MR. GARVERICH:
6    Q.  Mr. Clark, I believe, earlier in
7 your testimony, you mentioned that you went
8 to Rough River Lake; is that correct?
9    A.  Yes, sir.
10    Q.  We you going there to fish, party
11 boat?
12       MR. SLOSAR:  Objection to form.
13 Foundation.  You can answer the question.
14    Q.  You can answer.
15    A.  My friend, Karelle, her husband had
16 cancer and he was basically dying of it and,
17 ever since I had got out, he had asked me to
18 come down, but this time he asked me to come
19 down there.  His name was Rick Clark.  He
20 just passed away like seven months ago.
21    Q.  Prior to 1992, did you hunt or fish?
22    A.  Yes, sir, but it was only in
23 Alabama.  I had never hunted or fished up
24 here.
25    Q.  So never been to Yellow Bank or

139

1 Spring Creek, nothing like that?
2    A.  No, sir.
3    Q.  Earlier, you were read off the names
4 of several defendants that you've filed suit
5 against in this lawsuit.  Do you remember
6 that?
7    A.  I remember being read names.
8    Q.  One of those individuals was Ernie
9 Embry.  And I think, at the time, you
10 mentioned that you thought he was with Meade
11 County or KSP?  Does that sound correct?
12    A.  Yes, sir.
13    Q.  Upon further reflection, can you
14 remember whether he was with Meade County or
15 KSP?
16       MR. SLOSAR:  Objection to form.  You
17 can answer.
18    A.  No, sir.
19    Q.  Do you have any independent
20 recollection or knowledge of what Ernie
21 Embry was involved in, in this
22 investigation?
23    A.  Honestly, no, sir.
24    Q.  If I was to represent you that
25 Mr. Embry was a deputy sheriff with the

140

1  Meade County Sheriff's Department at the
2  time, does that help refresh your
3  recollection?
4      MR. SLOSAR:  Objection to form.  You
5  can answer.
6      A.  No, sir.
7      Q.  Prior to April of 1992, did you know
8  who Ernie Embry was?
9      A.  No, sir.
10     Q.  And I believe you mentioned earlier
11  that you knew Cliff Wise was a member of --
12     A.  Yes, sir.
13     Q.  -- the Meade County Sheriff's
14  Department.  Prior to April of 1992, did you
15  know that?
16     A.  No, sir.
17     Q.  Did know Cliff Wise prior to that?
18     A.  No, sir.
19     Q.  What independent knowledge do you
20  have of what Cliff Wise was involved in, in
21  this investigation?
22     MR. SLOSAR:  Objection to form.  You
23  can answer, Jeff.
24     A.  My personal knowledge of what I seen
25  or heard or how do you --

141

1      Q.  And I'll give you the caveat that
2  Mr. Slosar told you before.  I don't want to
3  know what your attorneys have told you --
4      A.  Yeah, I --
5      Q.  -- okay?
6      A.  Yeah.
7      Q.  I just want to know what your
8  personal knowledge is of Cliff Wise and his
9  involvement in this investigation.
10     A.  All right.  Cliff Wise, I know that
11  he was there with Sheriff Greer on a couple
12  of occasions.  I know that he was involved
13  in some of the searches.
14         And I ain't going to say for sure,
15  but this is just what was told.  My two
16  neighbors, when they was trying to determine
17  that I had been out at the trailer by my
18  neighbors, because the trailers lived close
19  together, they had said that it was either
20  Handy or Cliff Wise that told them that they
21  found body parts in the trailer.
22         But you would have to ask Judy Reese
23  or my mother basically about that.  That's
24  what they told me.  Now, my personal
25  knowledge, I don't know.

142

1      Q.  Was Judy Reese one of your neighbors
2  --
3      A.  Yes, sir.
4      Q.  -- at the time?  Who was the other
5  neighbor?
6      A.  Well, it was Judy, Jim.  June was
7  their daughter.  Then, on the side of me, we
8  had the Silvers.  And then the people on the
9  right side of me, I don't even know who they
10  was.
11     Q.  And, Mr. Clark, just to clarify, I
12  think you mentioned two of your neighbors
13  had said something that -- about Handy or
14  Cliff Wise, and I'm just trying to identify
15  those two specific neighbors.
16     A.  Yes, sir.
17     Q.  Do you understand that question?
18     A.  Are you talking about at the trailer
19  or my mom and dad's house?
20     Q.  Well, what was told to you about
21  what Cliffy Wise did, or Cliff Wise did?
22     A.  Oh, that was the two neighbors at my
23  trailer -- beside my trailer.
24     Q.  And who were those two neighbors is
25  my question.

143

1      A.  One of their names was Kim and I
2  think the other one was Tammy.  I really
3  didn't know them real well.
4      Q.  Do you know their last names?
5      A.  No, sir.  They was -- I was at Lot
6  C-9, so they would probably be at Lot C-8.
7      Q.  Anything else about this
8  investigation that you recall Cliff Wise
9  being involved in?
10     A.  He was involved in the searches,
11  like I said, and then, there at the end when
12  we got found guilty, I was trying to state
13  that I was innocent and Cliffy Wise was
14  taking us back to the jail, and when I told
15  him, I said, "You know we didn't do this,"
16  you know what I'm saying?
17         And then he turned around and had
18  made a statement or something saying that I
19  admitted to it, when I didn't.
20     Q.  Did he tell you when you supposedly
21  admitted to this?
22     A.  When he was taking me back to the
23  jail after we was being found guilty.
24     Q.  Was anyone around you at the time?
25  Would anyone have overheard that comment

144

1    that you're aware of?
2        A. It was just me, Keith, Cliffy, and
3    maybe one of the jailers. I don't know if
4    he was all the way up there with us or not.
5        Q. And pertaining to Cliff Wise, you
6    mentioned that he was with Sheriff Greer on
7    a couple of occasions --
8        A. Yes, sir.
9        Q. -- initially? Were those during
10   interviews or interrogations of you?
11       A. Yes, sir.
12       Q. And to the best of your memory, was
13   Cliff Wise always with Sheriff Greer
14   whenever he interviewed you?
15           MR. SLOSAR: Objection to form. You
16   can answer.
17       A. Not always.
18       Q. Do you have any idea how many times
19   Joe Greer interviewed you?
20       A. Including in the cars and stuff like
21   that?
22       Q. Yes, sir.
23       A. I can't say for sure, but I'd say
24   four, maybe five times.
25       Q. And was this before you were

145

1    arrested?
2        A. That's including when I got
3    arrested.
4        Q. Do you remember that first interview
5    you had with Joe Greer?
6        A. Yes, sir.
7        Q. Do you remember the day, date, day
8    of the week, anything of that nature?
9        A. I think it was the first interview
10   -- I think was on a Monday. It was him,
11   Detective Handy and then the Coroner, Bill
12   Adams.
13       Q. The Meade County Coroner?
14       A. Yes, sir. I think Cliffy did come
15   with them on that day.
16       Q. So you believe there was Detective
17   Handy, Sheriff Greer, Bill Adams and Cliff
18   Wise.
19       A. Yes, sir.
20       Q. In notes I've reviewed or documents
21   I've reviewed, I've seen this first
22   interview dated April 6th of 1992. Do you
23   believe that's the correct date?
24           MR. SLOSAR: Objection to form.
25       A. May I see the documents, so that way

146

1    --
2        Q. I'm just asking you on your best
3    recollection, sir.
4        A. On my best recollection, that would
5    be the first interview, I think.
6        Q. And how did you become aware of this
7    interview request?
8            MR. SLOSAR: Objection to form.
9        A. Are you talking about how they
10   wanted to interview me?
11       Q. Yes, sir.
12       A. I had got home and when I got home,
13   my grandmother and them said that they had
14   left a card and wanted me to call them, they
15   needed to talk to me.
16       Q. And what address was this?
17       A. That was the Cod Drive address. I
18   can't remember the actual number, but it
19   should be in the file.
20       Q. So I'm assuming you called the
21   officers back.
22       A. Yes, sir.
23       Q. And did they come pick you up?
24       A. Yes, sir.
25       Q. Who came to your house?

147

1        A. It was -- if I'm not mistaken, it
2    was Handy, Joe Greer. I think them two
3    picked me up -- maybe Adams was there, but I
4    think he -- I don't know.
5            I ain't going to say because I know
6    two -- one of them or two of them was still
7    at the police station, and we went back and
8    then that's when the investigation begun.
9        Q. But you remember for sure that Handy
10   and Joe Greer came and picked you up?
11       A. Yes, sir.
12       Q. Okay. And there might have been
13   Bill Adams, might have been somebody else.
14   You're just not sure. Is that --
15       A. Yes, sir.
16       Q. -- fair? Whose vehicle were they
17   in?
18       A. I don't know.
19       Q. Do you remember who was driving?
20       A. I think Handy was driving.
21       Q. During this trip from the Cod Drive
22   address to, I'm assuming, the Louisville
23   Police Department -- is that where you went?
24       A. Yes, sir.
25       Q. Were you asked any questions?

148

1    A.  I had asked them about what it was,
2 and they said they would get to it, you
3 know, in a minute and stuff.  They said they
4 was here about a death investigation and
5 that they would go over it later.
6    Q.  But they didn't get into any detail
7 about the investigation or any questions?
8 They didn't ask you any questions on that
9 trip?
10    MR. SLOSAR:  Objection to form.
11    A.  No, sir.  I don't think they really
12 went into -- yeah, I think it was just a
13 little chit-chat about how are you doing,
14 you know, and stuff like that.
15    Q.  So, at that point, they didn't
16 mention anything about Rhonda Warford?
17    A.  No, sir.
18    Q.  So you get to the Louisville police
19 station.
20    A.  Yes, sir.
21    Q.  Do you go to, I guess, the
22 conference room?
23    A.  Well, actually, we sat out in front
24 of Handy's desk for a few minutes because
25 the other two people that was there, they

149

1 had to come back.  When they got there, we
2 went to the conference room.
3    Q.  When do you first start getting
4 questioned?
5    A.  As soon as I got there.  I sat down
6 in front of Detective Handy's desk.
7    Q.  So you're in front of Handy's desk.
8 Who's present at that time?
9    A.  Joe Greer at that time and then
10 Coroner Bill Adams, and I think that's when
11 Cliff Wise showed up, too.
12    Q.  Was Handy there as well?
13    A.  Yes, sir.
14    Q.  So it's Handy, Joe Greer, Bill Adams
15 and maybe Cliff Wise.
16    A.  Yes, sir.
17    Q.  Who's asking you questions at this
18 point?
19    A.  Handy and Joe Greer.  They were
20 taking turns.
21    Q.  Can you see if Joe Greer is wearing
22 a gun?
23    A.  Oh, yes, sir.  Every time they
24 talked to me, they had -- all of them had
25 guns, except I think the Coroner didn't.

150

1    Q.  Do you know what type of gun Joe
2 Greer had on him?
3    A.  Yes.  It was like chrome or
4 nickel-plated.
5    Q.  Was it a revolver or something else?
6    MR. SLOSAR:  Objection to form.
7    A.  It was -- from when he laid it down
8 on the table with the one incident, I'm
9 pretty sure it was a revolver.
10    Q.  Was this a gun he had on his belt?
11    A.  Yes, sir.  He pulled it off and laid
12 it.
13    Q.  I'm sorry, you might have mentioned
14 this, but you say it was chrome?
15    A.  Chrome or nickel-plated.
16    Q.  You're sitting there at Handy's desk
17 being asked questions by Sheriff Greer and
18 Detective Handy.  Does anybody else ask you
19 questions?
20    A.  No, sir.  They're the only two
21 that's asking me questions at that time.
22    Q.  Did Sheriff Greer threaten you at
23 any point during that initial interrogation?
24    A.  No, not that initial interrogation.
25    Q.  Okay.  Then what happens?  Do you

151

1 leave Handy's desk and go somewhere else?
2    A.  Yes.  We went to the conference
3 table when the other two people showed up.
4    Q.  Who were the other two people, if
5 you know?
6    A.  It was Adams and Cliffy Wise.
7    Q.  And just so I'm clear.  I thought
8 Cliffy Wise was already at Handy's desk when
9 you were being asked questions.
10    A.  No.  When we first got there, it was
11 Detective Handy and Joe Greer.  The other
12 two wasn't there -- in there yet.  They had
13 come in later on.  They had went out
14 somewhere.
15    Q.  So, when you're at Handy's desk, the
16 only two people there present asking you
17 questions are Handy and Sheriff Greer.
18    A.  Yes, sir.
19    Q.  At that time, are they asking you
20 questions about the murder and Rhonda
21 Warford's disappearance?
22    A.  Well, yes, they got into it, but
23 they started asking me what I did and stuff
24 like that, you know, and then they started
25 telling me that they was here for an

152

1   investigation, wanted to know if I knew
2   Rhonda Warford and stuff.
3       Q.  And trying to get timeline of your
4   activities basically?
5           MR. SLOSAR:  Objection to form.
6       A.  Yes, sir.
7       Q.  So you're taken to the conference
8   room and that's when Bill Adams and Cliff
9   Wise show up --
10      A.  Yes, sir.
11      Q.  -- correct?  Anybody else present?
12      A.  No, sir.  It was just them at that
13  time, I'm pretty sure.
14      Q.  What are you asked in the conference
15  room?
16      A.  Just questions about, you know, when
17  was the last time I had seen Rhonda, you
18  know, did I have any problems with Rhonda,
19  stuff like that.
20      Q.  At any time throughout the course of
21  that interview in the conference room do
22  additional people come in?
23      A.  There was one guy that come to the
24  door, just standing there listening for a
25  minute, but then he had to leave.  He never

153

1   really said anything.
2       Q.  Not sure who that is?
3       A.  No, sir.  I don't know.
4       Q.  So you're asked questions in this
5   conference room.  At some point, are you
6   taken somewhere else in the police station?
7       A.  I don't -- I know when they did the
8   crime sample stuff, it was done in the
9   conference room.
10      Q.  And I don't mean to interrupt you,
11  Mr. Clark, but I just want to make sure
12  we're on the same page.  I'm talking about
13  this initial first interview.  Okay?
14      A.  Yes, sir, because I can't remember
15  -- I'm trying to remember, because think the
16  -- it was the first day that they was
17  talking about that blood was on my shoes,
18  too.
19          But I think Greer -- no, Greer was
20  still there then.  I'm pretty sure of that,
21  because they was talking about my shoes, how
22  it had like, you know, red stains and stuff
23  on it, because they was switching back and
24  forth asking me about my shoes, you know, if
25  I wore them all the time and stuff, so.

154

1       Q.  At any time while you're in that
2   conference room during the first interview,
3   does Joe Greer threaten you?
4       A.  No, sir.
5       Q.  And same question.  At any time
6   while you're in that conference room during
7   the first interview, does Cliff Wise or Bill
8   Adams threaten you?
9       A.  No, sir.
10      Q.  Did any other Meade County personnel
11  arrive in that conference room that you're
12  aware of?
13      A.  No, sir.
14      Q.  Now, you mentioned earlier that you
15  were taken to a break room in the Louisville
16  police office.  Does that sound correct?
17      A.  Yes.
18      Q.  Was that during the first interview?
19      A.  No, sir.  I don't think that was
20  during the first interview.
21      Q.  So you're questioned in the
22  conference room during the first interview.
23  At some point, does it end?
24      A.  Yes, sir, and they take me home.
25      Q.  Who took you home?

155

1       A.  If I'm not mistaken, it was just Joe
2   Greer, Adams, and I think Cliffy Wise might
3   have been in the car at that time because
4   they -- if I'm not mistaken, I'm pretty sure
5   that he said he would drop me off on his way
6   back to Meade County.
7       Q.  So there were three people with you
8   at the time?
9       A.  Yes, sir.
10      Q.  Were you sitting in the back?
11      A.  Yes, sir.
12      Q.  Do you remember who was sitting next
13  to you?
14      A.  I think it was Coroner Adams.
15      Q.  Bill Adams?  Do you have any
16  discussions with Cliff Wise, Bill Adams or
17  Joe Greer on the car ride back?
18      A.  No, sir.
19      Q.  They don't ask you any questions
20  about the investigation?
21      A.  No, sir.  They was talking in
22  between each other.
23      Q.  At any time during that ride back
24  home, does Joe Greer, Bill Adams or Cliff
25  Wise threaten you?

156

1   A.  No, sir.
2   Q.  At any time during that first
3   interview, and I'm talking about car rides
4   to and from and also while you're at the
5   Louisville police headquarters, do you
6   mention to Sheriff Greer, Cliff Wise or Bill
7   Adams that you had went to a Chevron station
8   on the late hours of April 1st and the early
9   morning hours of April 2nd?
10      MR. SLOSAR:  Objection to form.
11      A.  I can't remember when I told them
12  exactly about the Chevron station.  I know
13  the first interview was basically they had
14  to talk to people, is what they was telling
15  me, they just wanted to know where I had
16  been that day, you know.
17      So I didn't really think it was -- I
18  didn't know that this was going to turn out
19  to be a total -- because they kept telling
20  me I wasn't even a suspect, that they just
21  wanted to see where I was that day, you
22  know, what I'm saying, and what I knew about
23  Keith and Rhonda and stuff.  So I don't
24  think it was the first time that I said
25  anything about no Chevron station.

157

1       I know I said something to Joe
2   Greer, but -- and I said something to a
3   couple of them, but I can't actually
4   remember what date and time.
5   Q.  During this initial interview, do
6   you know if Bill Adams was carrying a gun?
7   A.  No, sir.  I don't think he was
8   carrying no gun.
9   Q.  Did you take a polygraph test during
10  this first interview, to the best of your
11  knowledge?
12  A.  No, sir.  I don't think I -- to my
13  recollection, it wasn't on the first
14  interview.
15  Q.  So you're taken home to the Cod
16  Drive address, correct?
17  A.  Yes, sir.
18  Q.  And then another interview is
19  conducted at some point after that; is that
20  correct?
21  A.  Yes, sir.
22  Q.  And from my review of the documents,
23  it looks like that second interview occurred
24  two days later on April 8th of 1992.  To the
25  best of your independent knowledge, does

158

1   that sound correct?
2       MR. SLOSAR:  Objection to form.  You
3   can answer, if you know.
4   A.  I guess it is.  I can't say for
5   sure.
6   Q.  How did you find out that you needed
7   to be interviewed a second time?
8       MR. SLOSAR:  Objection to form.
9   A.  They told me I needed to be
10  interviewed again.
11  Q.  Who did?
12  A.  Handy and Greer.
13  Q.  Did they come to your house?
14  A.  They had told me that, that they
15  might have some more questions for me, and
16  then I know they showed up just one morning,
17  wanted me to come down again.
18  Q.  Where did they show up?
19  A.  At my mom and dad's house.
20  Q.  The Cod Drive address?
21  A.  Yes, sir.
22  Q.  And who arrived at the Cod Drive
23  address?
24  A.  Usually it was -- after that, it was
25  Handy and Greer.

159

1   Q.  Just Handy and Greer?
2   A.  Yes, sir.
3   Q.  At that time, was Joe Greer carrying
4   a gun?
5   A.  Yes, sir.  He always had his firearm
6   on him.  Him and Cliffy was.
7   Q.  Did it appear to be the same gun
8   that you had seen before?
9   A.  I can't really say, because I really
10  didn't remember the gun until it was pulled
11  out on the table.  So I can't say it was the
12  same gun.
13  Q.  But he was wearing a belt that had a
14  gun.
15  A.  Yes, sir.
16  Q.  Do you know if Cliff Wise or Bill
17  Adams were present during this second trip?
18  A.  I think it was Bill Adams, the
19  Coroner.
20  Q.  So Handy, Sheriff Greer and Bill
21  Adams picked you up from your Cod Drive
22  address.
23  A.  No, just Handy and Greer.
24  Q.  Okay.  Just Handy and Greer did.  So
25  they picked you up and they drove you to the

160

1 Louisville police station; is that accurate?
2     A. Yes, sir.
3     Q. Are you questioned during that trip?
4     A. They actually -- from what I
5 remember, they actually asked me some
6 questions then because they was -- because I
7 asked them how much longer was this going to
8 take, you know, and they said, well, we've
9 just got a few more questions and stuff, you
10 know.
11        So they asked me a few questions,
12 you know.
13     Q. Do you remember specifically telling
14 them about being at the Chevron station
15 during that trip?
16     A. I don't know if it was that trip or
17 not.
18     Q. So you're taken into the Louisville
19 police office, and I'm assuming you're
20 interviewed again.
21     A. Yes, sir.
22     Q. Who's present?
23     A. I think Handy started the actual
24 interview first that day in the conference
25 room.

161

1     Q. When Handy is in the conference room
2 asking you questions, who's there as well?
3     A. I can't remember who kept coming in
4 and out, but there was a couple of people
5 because the door was open.
6     Q. Was Sheriff Greer present?
7     A. Yes. He was there for some of it
8 and then he would go somewhere and he'd come
9 back.
10     Q. Was Cliff Wise present?
11     A. I can't really say. I don't think I
12 seen him on that day.
13     Q. What about Bill Adams?
14     A. I think Coroner Bill Adams was back
15 again.
16     Q. Did Bill Adams ask you any
17 questions?
18     A. No.
19     Q. Did Sheriff Greer ask you any
20 questions?
21     A. Yes, sir.
22     Q. While you were in the conference
23 room?
24     A. Yes, sir.
25     Q. While you're in the conference room,

162

1 does Sheriff Greer or Bill Adams ever
2 threaten you?
3        MR. SLOSAR: Objection to form.
4     A. Not while we're in the conference
5 room, no.
6     Q. Did they threaten you somewhere
7 else?
8     A. Yes, sir. It was -- I don't know if
9 it was a break room or what. All I can do
10 is tell you where the area was. You know, I
11 don't know -- that's the first time I'd ever
12 been to Louisville Homicide. And all I know
13 is what areas they walked me in.
14     Q. But it's during the second room --
15 second interview that you're taken to the
16 break room. Is that your understanding?
17     A. I can't remember if it was then or
18 the last interview. And, honestly, I can't
19 say exactly what day when all that went
20 down.
21     Q. Okay. So you're taken to the break
22 room at some point.
23     A. Yes, sir.
24     Q. Before you're arrested. Is that
25 correct?

163

1     A. Yes, sir.
2     Q. Who's present in the break room?
3     A. I know it was Joe Greer. It was
4 Coroner Adams. I think Cliffy was there
5 that day. And then Handy was at the door,
6 and then somebody else kept coming in and
7 out.
8     Q. Is the only person talking to you in
9 the break room at the time Sheriff Greer?
10     A. Greer.
11     Q. And what did Sheriff Greer say to
12 you, to the best of your knowledge?
13     A. He told me that, you know, Keith had
14 gotten an attorney, you know, that he was
15 saying that I did everything, you know, that
16 I needed to come clean. You know what I'm
17 saying?
18        And then he said that they was after
19 Keith, that they know he's lying, that he
20 wanted to get me for facilitation or
21 something like that, that if I would say
22 that Rhonda was pregnant or something like
23 that, you know, that he would make sure that
24 I wouldn't do no time in jail and stuff.
25        And when I kept telling him I didn't

164

1 do nothing and I'm not going to say
2 anything, that's when he pulled the gun and
3 laid it down and said that I needed to
4 really think about it and think about what
5 my decision is going to be because, he said,
6 he gets his way.
7        You know, and then that's when
8 Coroner Bill Adams, you know, said, "We
9 always get our way."
10       Q.  Does Sheriff Greer ever point the
11 gun at you?
12       A.  No.  He took the gun and just laid
13 it on the table, which I was sitting there
14 -- because I was like this, and the glass
15 table is there, and he just sat it at an
16 angle.
17       I don't know if he was really
18 pointing it at me or not because he scared
19 me when we went to pull the gun out.  I
20 didn't know what he was --.
21       Q.  Now, Bill Adams was present during
22 this entire exchange.
23       A.  Yes, sir.
24       Q.  Was Cliffy Wise present during the
25 entire exchange?

165

1       A.  Yes, sir.  I'm pretty sure he was.
2       Q.  Was Detective Handy present during
3 the entire exchange?
4       A.  Yes, he was at the door.  He was
5 coming in and out, and he had to know about
6 it, because after that interview is when he
7 took me to the break room and said that, if
8 I would help him, he would help me, to make
9 sure that I would not be with these people,
10 that they don't use that procedure that was
11 used on me.
12       Q.  That's what -- who told you?  I'm
13 sorry.
14       A.  Handy said that, in somewhat of the
15 words.
16       Q.  So are you taken back to the
17 conference room after you were in the break
18 room or are you taken home that day?
19       A.  No, I was taken back to the
20 conference room.
21       Q.  And questioned further?
22       A.  Yes, sir.
23       Q.  Who questioned you?
24       A.  Detective Handy, he questioned me
25 and then he had left.  I can't remember if

166

1 the psychic was brung at that time or not.
2 At least that's who Handy said he was, you
3 know.
4        And then that's when he left a
5 couple more times, and then that's when Gene
6 Sherrard come in there and said something
7 about that they've got this new technology
8 to take fingerprints off the body and stuff,
9 because at that time I was handcuffed to the
10 table.
11       Q.  And then you're taken home after
12 that interview interrogation?
13       A.  Yes, sir.
14       Q.  Who took you home?
15       A.  I think it was Handy.
16       Q.  Just Handy?
17       A.  Handy and somebody else.  I don't
18 remember who the other person was.
19       Q.  Any of the Meade County people?
20       A.  No, sir, I don't think they --.
21       Q.  And you're not sure if you had any
22 more interviews after that?
23       A.  Without looking at the records to
24 see how many interviews there was, I can't
25 say.  I just know that it got worse and then

167

1 that's when I got arrested.
2       Q.  And when you're mentioning the
3 records, what records are you talking about?
4       A.  The police records, you know.
5       Q.  The Louisville Police Department
6 reports; is that --
7       A.  Yes, because they state the times
8 that they had me down there.
9       Q.  Okay.  So you've reviewed those?
10       A.  No, I've seen them before we went to
11 trial.
12       Q.  But at some time you've seen them.
13       A.  Yes, sir.
14       Q.  The next date I'm able to find in
15 Sheriff Greer's case report is May 5th of
16 1992, when I'm assuming you were arrested.
17       A.  Yes, sir.
18       Q.  I don't see any other interviews
19 from the April 8th date until May 5, 1992,
20 from Sheriff Greer.  Okay?  So what I'm
21 asking you, are you aware or have any other
22 independent knowledge of any additional
23 interviews between April 8th and May 5th of
24 1992?
25       MR. SLOSAR:  Objection to form.

168

```
1        A.  The last time -- I know the last
2    interview I had with Joe Greer at that time
3    was when that incident happened.
4        Q.  The incident with the gun?
5        A.  Yes, sir.
6        Q.  Is that the only time that happened?
7            MR. SLOSAR:  Objection to form.
8        A.  Yes, sir.
9        Q.  Did any of the other Meade County
10   defendants, or that you could identify as a
11   Meade County defendant, pull a gun on you or
12   use a gun in a similar fashion?
13       A.  No, sir.  The only other incident
14   that I had as far as threatening was when I
15   got to Meade County.
16       Q.  After you were arrested?
17       A.  Yes, sir.
18       Q.  Tell me about that incident.
19       A.  I had seen Bennie Bruner, I think
20   was the jailer at that time, he was talking
21   to Sheriff Greer when they was putting me in
22   there.
23           And then, after I was in there for a
24   few, he comes, gets me out, takes me in
25   there and there was another deputy jailer
```

169

```
1    there.  And I can't remember if Mr. Brown
2    was there or not.
3            And the reason why I know Mr.
4    Brown's name is, because some of the
5    incidents that went on in the jail, he
6    actually had apologized to me, you know,
7    about some of the stuff that they was doing.
8            But, anyway, they took me to Bennie
9    Bruner's office and Bennie Bruner was
10   talking about you need to come clean with
11   the police.  He said, you know, down here
12   we've got a way of doing out stuff ourself.
13           He said something about a woman that
14   had been hung in the last jail or something
15   for being a witch or something like that,
16   and he said, "Down here we've got -- the way
17   we do things, if you don't tell us what we
18   want to hear, we'll take a water hose and
19   shove it up your ass, run barbwire up it and
20   pull the water hose out."  He said, "Then
21   you'll tell us whatever we want."
22       Q.  What did you respond to that?  Or
23   how did you respond to that?
24       A.  I didn't know how to respond to it.
25       Q.  Did you say anything?
```

170

```
1        A.  I don't think I said nothing, you
2    know, at all.
3        Q.  And did this happen only on one
4    occasion?
5        A.  Yes, sir, but Bennie, he seemed to
6    have a problem with -- because that's like I
7    was -- you was allowed to smoke then.
8    Anyway, I was in the corner cell all by
9    myself.
10           Anyway, he come back there one time
11   and he said that he smelled something
12   burning.  I told him, I said, "Well, I'm
13   smoking a cigarette."  And he said, "Nah,
14   that ain't what I'm talking about."  He
15   said, "I wonder if that's how you're going
16   to smell when you fry in the electric
17   chair."  Now, that was the jailer, Bennie
18   Bruner.
19       Q.  And this was the second occasion he
20   told you this.
21       A.  No, that was -- he only told me once
22   that one.
23       Q.  But they were two separate times is
24   what I'm asking.
25       A.  Yes, sir.
```

171

```
1        Q.  During this first instance when
2    you're in Jailer Bruner's office and he's
3    talking about this rubber hose, who was
4    present?
5        A.  I think Mr. Brown was and then there
6    was another deputy that -- I can't remember
7    his name -- he wasn't there too long.
8        Q.  Was Sheriff Greer present?
9        A.  No, sir.
10       Q.  Was Cliff Wise present?
11       A.  No, sir.
12       Q.  Was Bill Adams present?
13       A.  No, sir.
14       Q.  Was Ernie Embry present?
15       A.  No, sir, not unless he was the other
16   person that I didn't know.
17       Q.  Not to your knowledge basically.
18       A.  Yeah, not to my knowledge.
19       Q.  The second that you had, who was
20   present during it?
21       A.  That was just Bennie Bruner.
22       Q.  When is the first time you mentioned
23   the gun incident or the incident at the jail
24   to someone?
25       A.  I never told no one at the jail.  I
```

172

1    told my mom and my dad and my attorney, when
2    I finally got an attorney.
3        Q.   You told them about?
4        A.   Being threatened.
5        Q.   About the gun incident from Joe
6    Greer.
7        A.   Yes, sir.
8        Q.   And then about this incident that
9    happened in the jail with the barbwire.
10       A.   Yes, sir, because Bart Adams had
11   threatened them with a cruel and unusual
12   punishment suit, because I was the only one
13   in the jail that was not allowed to go out
14   to rec or nothing.
15       So, after he threatened them with a
16   cruel and unusual punishment suit, they got
17   two guards and they would walk me up and
18   down the hallway for 45 minutes to an hour.
19       Q.   To the best of your knowledge, was
20   the gun incident with Joe Greer, or either
21   incidents with this jailer, mentioned at
22   trial?
23       MR. SLOSAR:  Objection to form.
24       A.   To my knowledge, no, because --.
25       Q.   Then, after the trial and the

173

1    conviction, there were a multitude of
2    filings, motions.  Do you know what I'm
3    talking about?
4        A.   Yes, sir.
5        Q.   In any of those, is it mentioned or
6    alleged that Joe Greer threatened you with a
7    gun?
8        MR. SLOSAR:  Objection to form.  You
9    can answer.
10       A.   Any attorney I told about it, they
11   said that --
12       MR. SLOSAR:  Well, Jeff, you're not
13   -- I'm instructing you not to talk about
14   conversations --
15       THE WITNESS:  Right.
16       MR. SLOSAR:  -- that you had with
17   your counsel.  So, aside from communication
18   with your counsel, you can answer the
19   question.
20       THE WITNESS:  You would have to talk
21   to all my attorneys, my appealing attorneys
22   and everything about that.
23       Q.   (BY MR. GARVERICH)  And what I'm
24   asking you, do you know if it was mentioned
25   or brought up in a post-trial filing?

174

1        A.   No, sir.  Not that I know of.
2        Q.   So, to your knowledge, the first
3    time this gun incident with Joe Greer was
4    mentioned was the filing of the Complaint,
5    the civil complaint that we're here today
6    about.  Is that accurate?
7        MR. SLOSAR:  Objection to form.
8        A.   Yes, sir, but I've told plenty of
9    people about it, because my mother and
10   father called down there about it when it
11   happened.
12       Q.   And I want to talk about the trailer
13   that you owned back in 1991, 1992, okay?
14       A.   Yes, sir.
15       Q.   Do you remember the address?
16       A.   It was Lot C-9 and was Bluegrass
17   Mobile Homes.
18       Q.   What I've seen is 3510 Newburg Road,
19   Lot C-9, Louisville, Kentucky.  Does that
20   sound accurate?
21       A.   That could have been it.
22       Q.   When did you purchase this trailer?
23       A.   Actually, my mother purchased the
24   trailer.
25       Q.   And what's your mother's name?

175

1        A.   Zelma Jolene Cochran.
2        Q.   So the trailer was in her name.
3        A.   I guess.  It was either her or my
4    father's name.
5        Q.   Do you know approximately when the
6    trailer was purchased?
7        A.   The summer of '91, I think, and
8    don't quote me.
9        Q.   Were the utilities for the trailer
10   in your name?
11       A.   Yes, sir, because I paid them.
12       Q.   Did you have a phone in the trailer?
13       A.   Yes, sir.
14       Q.   Did you always have a phone in the
15   trailer?
16       A.   Yes, sir.
17       Q.   Where was it physically located in
18   the trailer, if you can remember?
19       A.   There was only one and that was on
20   the living room coffee table.
21       Q.   And did you move into that trailer
22   in the summer of '91?
23       A.   In when?
24       Q.   The summer of 1991, after it was
25   purchased?

**176**

1    A.  Yes.  It was somewhere around that
2  time when my mom purchased it that I moved
3  into it.  Me and Amy moved into it.
4    Q.  You and Amy Remsburg?
5    A.  Yes, sir.
6    Q.  And at some point Amy moves out.
7    A.  Yes, when I kicked her out.
8    Q.  And then Keith Hardin moves in.
9    A.  Well, that was later on, you know.
10    Q.  Any other tenants or roommates in
11  that trailer?
12      MR. SLOSAR:  Objection to form,
13  foundation.
14    A.  Besides Rhonda and her friends
15  staying there.  They didn't live there.
16  They just stayed there sometimes.
17    Q.  What was Rhonda's friend's name?
18    A.  Well, her sister, Michelle, would be
19  there sometimes.  I think -- here last name
20  was Greer, I think, or -- Hope -- Hope
21  Greer.  No.
22    Q.  I've seen Tonya Greer.
23    A.  Tonya Greer.  Yes, sir.  That was
24  --.
25    Q.  Now, when you're saying staying

**177**

1  there, just visiting or actually living in
2  the trailer?
3    A.  Well, Rhonda, after she met Keith,
4  she pretty much stayed there all the time.
5    Q.  Okay.  When do you believe Keith
6  Hardin moved into the trailer?
7    A.  Don't quote me for sure, but I think
8  it was around fall, almost winter.
9    Q.  Of 1991?
10    A.  Yes, sir.
11    Q.  And at the time he moved in, he had
12  a job briefly.  I think we've discussed
13  that.
14    A.  Yes, sir.
15    Q.  Did he have any vehicles?
16    A.  Yes, he had a -- I think it was a
17  Monte Carlo or something like that.
18    Q.  Just one vehicle?
19    A.  Yes, sir, as far as I know of.
20    Q.  And was that Monte Carlo at the --
21  outside of the trailer?
22    A.  Yes, sir, when he first moved in.
23    Q.  So it was operational, it ran?
24    A.  Yes, sir.
25    Q.  At some point, does that Monte Carlo

**178**

1  break down?
2    A.  Yes, sir.
3    Q.  When did that happen?
4    A.  Somewhere -- I ain't going to say
5  for sure, because it would be better if you
6  asked him when it actually broke down.  I
7  only know what he said, but I know it broke
8  down, I think, from my knowledge or memory,
9  somewhere in March.
10    Q.  March of 1992?
11    A.  Yes, sir.  I'm pretty sure.
12    Q.  At that point he's already moved out
13  of the --
14    A.  Yes, sir.
15    Q.  -- trailer.  So, to the best of your
16  knowledge, while he lived at the trailer his
17  car was fully operational.
18    A.  Well, it -- I think the night that I
19  had Rhonda leave, I think I had to give them
20  all a ride home because he car wasn't --
21  wouldn't start that night, but I think he
22  got it started again.
23    Q.  What night are you talking about?
24    A.  In December, the last time I had
25  seen Rhonda.

**179**

1    Q.  So in December of 1991?
2    A.  Yes, sir.
3    Q.  You had taken Rhonda from the
4  trailer to where?
5    A.  Her mom and dad's house.
6    Q.  When does Hardin move out of the
7  trailer?
8    A.  I think it was in January.
9    Q.  1992?
10    A.  Yes, sir.
11    Q.  And at that point you're not living
12  there anymore.
13    A.  No, sir.  I moved back with my mom
14  and dad in December '91.
15    Q.  And you asked him to leave; is that
16  --
17    A.  Yes, sir.
18    Q.  -- fair?  And the reason you asked
19  him to leave is why?
20    A.  Because he didn't have a job, wasn't
21  paying the bills, wasn't cleaning.  I
22  figured he'd move on out, you know.
23    Q.  So, from what you could observe,
24  what was he doing while he was in the
25  trailer?

180

1    MR. SLOSAR:  Objection to form,
2  foundation.
3    A.  I didn't go over there that much, so
4  I really don't know.
5    Q.  Do you know if Mr. Hardin drank
6  alcohol?
7    A.  Yes, sir.
8    Q.  And again, I'm talking about while
9  he was living in the trailer, okay --
10    A.  Yes, sir.
11    Q.  -- so we've got a timeframe.  What
12  type of alcohol would he drink?
13    MR. SLOSAR:  Objection to form,
14  foundation.
15    A.  I'm seen him with beer.  He drunk
16  beer and, most of them, they drunk beer.
17    Q.  Did he drink any other type of
18  liquor?
19    A.  Occasionally they might have.
20    Q.  What type?  That you've seen.
21    MR. SLOSAR:  Objection to form and
22  foundation.
23    A.  Whiskey.  You know, that's --
24    Q.  Would Mr. Hardin do any drugs that
25  you saw in the trailer?

181

1    A.  No, sir, not that I know of.
2    Q.  Have you ever seen Mr. Hardin ingest
3  any type of drug?
4    A.  No, sir.
5    Q.  At any time in your life, have you
6  been involved in Satanism?
7    A.  No, sir.
8    Q.  Ever been a part or saw or performed
9  any type of satanic ritual or witchcraft
10  ritual?
11    A.  No, sir.
12    Q.  Do you know what an inverted cross
13  is?
14    A.  Yes, sir.
15    Q.  Do you know the meaning behind it?
16    A.  No, sir.
17    Q.  Based upon what you can remember
18  about the investigation and the 1992 trial,
19  do you remember any specific individuals
20  claiming you were into Satanism?
21    MR. SLOSAR:  Objection to form,
22  foundation.  You can answer, if you
23  understand.
24    A.  Say that again, now.
25    Q.  Based upon what you remember at your

182

1  trial and the investigation leading up to
2  the trial, are you aware of any specific
3  individuals who accused you or said that you
4  were involved in Satanism?
5    MR. SLOSAR:  Same objection.
6    A.  I know that, from the record, I
7  think Amy Remsburg said something, I think
8  Sean Mattingly said something, and that's
9  --.
10    Q.  Those are the only two people?
11    A.  That I can remember.  Don't quote me
12  on it.
13    Q.  And where do you remember Amy
14  Remsburg saying something?
15    A.  I think on the stand.
16    Q.  At trial?
17    A.  Yes, sir.
18    Q.  What about Sean Mattingly?
19    A.  I think what he said was on the
20  stand.
21    Q.  Do you know who Mary Warford is?
22    A.  I think that's Rhonda's mother,
23  ain't it?
24    Q.  It is.  Do you know if she ever
25  accused you of practicing Satanism?

183

1    A.  I don't know.
2    Q.  And I'll represent to you, in a case
3  file that I reviewed of Sheriff Joe Greer,
4  there is an April 5, 1992 interview that he
5  had with Mary Warford, where she said that
6  both you and Hardin were involved in satonic
7  (phonetic) worship -- or satanic worship.
8  Okay?  Were you aware of that?
9    MR. SLOSAR:  Objection to form.
10  Foundation.  You can answer.
11    A.  Honestly, I don't think I knew she
12  had said that.
13    Q.  And at that time, April 5th of 1992,
14  do you have any explanation or reason why
15  she might say that?
16    MR. SLOSAR:  Objection to form.
17  Calls for speculation.
18    A.  Honestly, no, because I think I had
19  only even said something to her mother one
20  time.
21    Q.  And you know who Michelle Rogers is;
22  is that correct?
23    A.  Yes, sir.
24    Q.  To your knowledge, did Michelle
25  Rogers ever accuse you of practicing

184

1   Satanism?
2       A.  You got her trial testimony?
3       Q.  I do not.
4       A.  Well, then I can't honestly if she
5   ever has or not.
6       Q.  Not sure?
7       A.  No, sir.
8       Q.  If I represent to you that, in
9   reviewing Sheriff Greer's investigative file
10  in an April 9, 1992 interview he had with
11  Michelle Rogers, she said you were into
12  satonic (phonetic) worship -- satanic
13  worship, would you be aware of that -- or
14  were you aware of that?
15      MR. SLOSAR:  Objection to form.
16      A.  No, sir.  I was not aware of that.
17      Q.  Do you have any explanation of why
18  she might say that?
19      A.  I have no explanation at all.
20      Q.  Do you know who Tonya Greer is?
21      A.  Yes.
22      Q.  Who is she?
23      A.  That was Rhonda's friend.
24      Q.  Did you ever spend any time with
25  Tonya Greer?

185

1       MR. SLOSAR:  Objection to form,
2   foundation.
3       A.  Like how?
4       Q.  In 1992?
5       A.  She come to my place a few times.
6       Q.  She was staying at your trailer?
7       A.  Yes.
8       Q.  To your knowledge, did Tonya Greer
9   ever accuse you of practicing Satanism?
10      A.  Not that I know of.  I can't
11  remember what the -- I know she didn't like
12  me, because she was under age, and that's
13  one of the issues I had with Rhonda and
14  Keith having her come out there.
15      Q.  What do you mean by that, she was
16  under age?
17      A.  Because they was drinking.
18      Q.  And Tonya Greer was drinking as well
19  --
20      A.  Yes.
21      Q.  -- when she would come out there?
22  And you didn't approve of that; is that --
23      A.  No.
24      Q.  And that's the reason that she
25  didn't like you?

186

1       MR. SLOSAR:  Objection to form.
2       A.  Yes.
3       Q.  To your knowledge, do you have any
4   other reason to believe that Tonya Greer
5   didn't like you?
6       A.  That was about it.  That's the only
7   reason why I'd know why she wouldn't like
8   me.
9       Q.  Did you ever ask Tonya Greer if you
10  could place an upside-down cross on her
11  body?
12      A.  No.
13      Q.  To your knowledge, did Hope Jaggers
14  ever accuse you of practicing Satanism?
15      MR. SLOSAR:  Objection to form,
16  foundation.
17      A.  Not that I know of, because I think
18  I've only seen her just one time.
19      Q.  Who was she?
20      A.  I think she was a friend of
21  Rhonda's.
22      Q.  Did she come to the trailer that you
23  owned?
24      A.  From my recollection, I think her
25  and her boyfriend and them come over.

187

1       Q.  But you don't remember one occasion;
2   is that --
3       A.  Yes, sir.  That's the only --
4       Q.  -- correct?  I think you testified
5   earlier about Bill Mahan?
6       A.  Yes, sir.
7       Q.  And you worked with Mr. Mahan; is
8   that correct?
9       A.  Yes, sir.
10      Q.  To your knowledge, did Mr. Mahan
11  ever accuse you of practicing Satanism?
12      A.  Oh, yes.  Yeah.
13      Q.  When?
14      A.  Right after Keith had come there to
15  work through Kelly Temporary Service, Jack
16  Mahan found out I knew him because he was
17  working out in the plant.
18      So, anyway, Jack had him move back
19  there to stack paper, and Jack had said
20  something about, you know, him being weird,
21  you know.  And I said, well, I said, he just
22  needs to get on with his life.  This is back
23  probably the summer of '91 or something.
24      Anyway, Jack, my supervisor, his son
25  is Bill Mahan.  Well, apparently, he told

188

```
1    him everything and he told him the reason
2    why I quit running around with him.
3         So Bill -- that's when everything
4    really started happening out there.
5         Q.  And when you say when everything
6    started happening, what do you mean by that?
7         A.  Me and Bill just did not totally get
8    alone at all then.
9         Q.  So Bill didn't like you, basically,
10   from your understanding.
11        A.  Yes, sir.
12        Q.  And because he didn't like you, you
13   think he falsely accused you of practicing
14   Satanism.
15        MR. SLOSAR:  Objection to form.
16        A.  Well, because of what his dad had
17   told him, because there was never no
18   statements or nothing made until after that
19   incident.
20        Q.  And maybe I'm just missing it.  What
21   did his dad, Bill's dad, tell him that
22   you're aware of?
23        A.  The only thing I know that he told
24   him is why I had quit running around with
25   him and stuff, and he had said why he was
```

189

```
1    weird.
2         Q.  Why he was weird?
3         A.  Yeah.  Jack had asked me why he was
4    weird and stuff and why I quit running
5    around with him.
6         Q.  And "he" is Keith Hardin.
7         A.  Yes.
8         Q.  Okay.  Maybe I was misunderstanding
9    that.  So did Keith Hardin work at Papercone
10   or come out to Papercone?
11        A.  He had worked there for a little
12   while through Kelly Temporary Service.
13        Q.  Okay.  And I think you mentioned
14   that Sean Mattingly had accused you of
15   practicing Satanism; is that correct?
16        A.  From what I think of his testimony,
17   I can't say for sure.
18        Q.  Do you have any reason to believe
19   that -- why Sean would say that?
20        A.  Well, that's because he --
21        MR. SLOSAR:  Objection to form.  You
22   can answer.  Just let me make my objection
23   first.
24        THE WITNESS:  All right.  That's
25   because of him and Bill always -- they was
```

190

```
1    -- Sean was mainly -- I think he was joking
2    with me.  You know what I'm saying?  But
3    until he made a statement, I didn't know he
4    was being serious, you know, so.
5         Q.  (BY MR. GARVERICH)  And when do you
6    think Keith Hardin came out to Papercone,
7    approximately?
8         A.  I don't know.  You'd have to ask
9    him.
10        Q.  And when was your work history
11   there?  How long did you work there?
12        A.  Don't quote me exactly, but I think
13   it was from '88 to '92.
14        Q.  And you mentioned earlier you worked
15   second shift; is that correct?
16        A.  Yes, sir.
17        Q.  So what were your hours?
18        A.  If I'm not mistaken, I think it
19   started at 3:30 --
20        Q.  P.M.?
21        A.  Yes.
22        Q.  Okay.
23        A.  And then sometimes we'd work
24   overtime, sometimes we wouldn't.  So it just
25   depended on when I got off work.
```

191

```
1         Q.  Typically, on average, when would
2    you get off?
3         A.  Oh.  I think it was 11:30.
4         Q.  P.M.?
5         A.  Yes.  It could be 11:00 or 11:30.
6         Q.  And, in 1992, was that still your
7    same schedule, to the best of your
8    knowledge?
9         A.  Oh, yes, sir, as far as I know of.
10        Q.  And was this Monday through Friday?
11        A.  Yes, sir.
12        Q.  In 1992, you had another job as
13   well; is that correct?
14        A.  Yes, sir.
15        Q.  That was what?
16        A.  Working at Automotive Specialists.
17        Q.  What was your schedule there?
18        A.  I'd usually get there around six,
19   seven o'clock depending on -- I kind of got
20   leeway on first getting there in the morning
21   and I would leave from there and go to
22   Papercone.
23        Q.  How many hours would you work there
24   per week?
25        A.  How many hours a week?
```

192

```
1       Q. Yeah, at the automotive place in
2    1992.
3       A. I couldn't tell you.  I'd have to
4    add that up.
5       Q. Was that a Monday-through-Friday
6    type job?
7       A. Most of the time, yeah, but
8    sometimes it was so slow, we didn't have no
9    work, so I had to leave.
10      Q. While you were at Papercone, did you
11   ever get in trouble or some type of warning
12   or violation for placing an upside-down
13   cross on Papercone property?
14      MR. SLOSAR:  Objection to form.
15      A. I've never seen that until this
16   hearing -- well, my trial come out -- well,
17   actually, don't get me wrong, I think it was
18   the evidentiary hearing or something,
19   because I'd never even seen that before.
20      As far as work up till I was fired,
21   the only thing I know that I had ever been
22   in trouble for was using the telephone.
23      Q. So you never received any type of
24   written document at the time of the
25   purported violation of --
```

193

```
1       A. No, sir.  I do remember when Bill
2    was messing with me about that stuff and
3    that's right after Keith had left.
4       Q. Bill was messing with you about
5    what?
6       A. I didn't see him do it, but I'm
7    pretty sure he's the one that put that on
8    that plate.  And I never seen a write-up or
9    nothing over it --
10      Q. Well, what -- okay.  Tell me what
11   happened.
12      A. Well, after Keith had been there and
13   left, like I said, Bill started in on all
14   that crap, thinking it was funny and stuff,
15   and he would do stuff like that.  He'd go
16   over and mark on the plates and stuff like
17   that, call me a witch and stuff like this.
18      And then that's where it just got,
19   between me and him.  I could not stand him
20   and he could not stand me.  I went to the
21   bathroom one night and he come back and he
22   had did a plate like that.
23      He's the only other one there.  You
24   know, I can't say that I saw him, but it was
25   done and nothing else was said about it, and
```

194

```
1    then --
2       Q. And when you're saying a plate, what
3    is that?
4       A. It's a plate that goes on a printing
5    press.
6       Q. Okay.  And what was placed on that
7    plate?
8       A. A whole bunch of markings.
9       Q. What type of markings?
10      A. He had wrote a whole bunch of stuff
11   on it.  I really didn't pay attention,
12   because I took off the damn plate and sanded
13   it down.
14      Q. But you're not -- you can't remember
15   what the markings were.
16      A. At that time, I was so mad, no.  And
17   like I said, until this come up, I didn't
18   even know.
19      Q. Do you remember if there was an
20   upside-down cross on the plate?
21      A. Well, like during our evidentiary
22   hearing I think that's when we talked about
23   it.  I don't think it was an upside-down
24   cross.  It was actually more tig marks for a
25   piece of paper --
```

195

```
1       Q. Okay.
2       A. -- to make sure that your register
3    is in line -- it looks like a cross -- that
4    actually comes on the plates itself.  That
5    way when paper comes off the machine, you
6    flip through it to see if them register
7    marks -- you can check with any place that
8    does printing.  All of them's got it on
9    there.
10      There ain't no circles.  It's all --
11   because you line it up.
12      Q. Do you remember if there was a 666
13   mark placed on this plate?
14      A. I think there was something like
15   that on there.
16      Q. So you're not denying that there
17   were markings on this plate, you're just
18   denying that you did it; is that --
19      A. Yes, sir.
20      Q. -- accurate?  And you believe that
21   Bill Mahan did this.
22      A. Yes, sir.  And if we could have
23   called him as a witness, maybe we would have
24   found out.
25      Q. Then you mentioned that Amy Remsburg
```

196

1   had testified at trial that you had
2   practiced Satanism; is that correct?
3       A.  I don't know if she did or not.  I
4   just know she mentioned something about it.
5   If I could have her testimony, we could go
6   over it with you and see.
7       Q.  But, to the best of your memory, you
8   think at some point she's accused you of --
9       A.  Yes, sir --
10      Q.  -- being involved in Satanism.
11      A.  -- I think she has.  Yeah.
12      Q.  Do you have any reason to believe
13  why she would make that up?
14      MR. SLOSAR:  Objection to form.  You
15  can answer.
16      A.  Yeah, because I caught her molesting
17  her child.  She's convicted of it.  There's
18  record of it.
19      Q.  And she only had one child at the
20  time; is that correct?
21      A.  No, she had Heather Livers at that
22  time, too, which was a baby when she was
23  molesting her son.
24      Q.  And then the son's name was Randy?
25      A.  Randy.  It was something else.

197

1       Q.  And when did this molestation occur?
2       A.  It was the last time she lived in
3   the trailer.  It was, I think, the summer of
4   '91.
5       Q.  The summer of 1991?
6       A.  Yes, sir.
7       Q.  And I believe you had mentioned
8   earlier that Randy was about eight years old
9   at the time.
10      A.  Yes, sir.  He was somewhere around
11  there.  I can't say for sure.
12      Q.  Would it surprise you to know he was
13  only three years old at that time?
14      MR. SLOSAR:  Objection to form.
15      A.  No, I can't say I know.  He was
16  bigger.  He was walking around and jumping
17  around and stuff.  He was about this tall
18  (indicating), so.
19      Q.  So he could have been three is what
20  you're telling me?
21      MR. SLOSAR:  Objection to form.
22  Asked and answered.
23      A.  I ain't going to stipulate, because
24  I don't know.
25      Q.  And you had testified earlier today

198

1   that you might have lived with or spent a
2   few nights in a home owned by Amy Remsburg's
3   parents in Meade County; is that correct?
4       MR. SLOSAR:  Objection to form.
5       A.  I had stayed there a few nights.
6       Q.  Do you have any idea of the time
7   period?
8       A.  Like months -- month and stuff?
9       Q.  Yes, sir.
10      A.  I can't really remember.  If I could
11  look at my trial testimony or hers or
12  something maybe.
13      Q.  So, at this time, just based on your
14  independent recollection, you can't remember
15  if it was a few days, a few weeks, a month?
16      A.  Oh, no.  If you want to know about
17  that.
18      MR. SLOSAR:  Hold on -- let me --
19  objection to form.  Misstates his testimony.
20  You can answer the question, if you
21  understand it.
22      A.  No, I think it -- at the most -- at
23  the max, it would have been a week, if that
24  much.  I don't even think it was that much.
25      Q.  Do you happen to recall the address

199

1   of that house?
2       A.  Me having -- no, I've never had it.
3       Q.  And let me clarify.  Do you recall
4   the address of Amy's parents' house?
5       A.  Oh, no, sir.
6       Q.  And I think I've seen, in some of
7   the documents I've reviewed, a 3020 Highway
8   376, Webster, Kentucky.  Does that sound
9   familiar or ring any bells for you?
10      MR. SLOSAR:  Objection to form.
11      A.  The only thing that sounds familiar
12  of that is Amy saying Webster, Kentucky.
13      Q.  At any time prior to staying in
14  Amy's parents' house, had you been to Meade
15  County?
16      A.  I think I -- I'd been out there to
17  shoot guns.  I know that.
18      Q.  To shoot guns on whose property?
19      A.  Their property.
20      Q.  And by "their," do you mean Amy's
21  parents' property?
22      A.  Yes.
23      Q.  How many times?
24      A.  That was only one time.
25      Q.  Who did you shoot guns with?

200

1    A.  It was me, her two brothers, and I
2  think Bill had come down at that time.
3    Q.  Is that Bill Mahan?
4    A.  Yes, sir.
5    Q.  What are Amy's two brothers' names?
6    A.  I can't say for sure, but I think
7  Jeremy and Wayne.
8    Q.  Did you say Wayne?
9    A.  Wayne.  I think Wayne.
10    Q.  Do you remember the last name?
11    A.  I guess they're Liverses.
12    Q.  Livers?  So, other than when you
13  briefly stayed with Amy's parents in the
14  Webster house and shooting guns with Jeremy
15  and Wayne, had you ever been to Meade County
16  prior to 1992?
17    A.  I might have been once to take her
18  down there to drop her off.  I don't know.
19    Q.  But it had always been associated
20  with Amy's parents' property?
21    A.  Yes, sir, because I would either
22  take her down there or we go straight down
23  there and come back.
24    Q.  So, prior to April of 1992, did you
25  know anybody else that lived in Meade

201

1  County?
2    A.  No, sir.
3    Q.  Did you know anybody else that lived
4  in Breckinridge County prior to April of
5  1992?
6    A.  No, sir.
7    Q.  Do you remember how you would get to
8  Amy's parents' house?
9    A.  I would go down Dixie Highway, up
10  Muldraugh Hill, take a right, go down, I
11  think it was by Fort Knox.  You go down and
12  there is an intersection where you turn left
13  by -- and you go around a little store.
14     You come up and you go -- I think
15  there's a four-way, go down around, and then
16  Paynesville -- I'm trying to remember the
17  store now, because you would always turn at
18  that store that was on the corner.
19    Q.  And I think I've seen a Hardesty
20  store.  Is that --
21    A.  Hardesty --
22    Q.  -- what you're talking about?
23    A.  -- yes.
24    Q.  Okay.
25    A.  You turn right there and then you go

202

1  down.  Amy's mom's (sic) house was on the
2  right, and then her mom and dad's house was
3  right beside of it.
4    Q.  On the right as well?
5    A.  Yes, sir.
6    Q.  Do you know how much property Amy's
7  parents owned?
8    A.  No, sir, I don't.
9    Q.  And I think you had mentioned
10  earlier that you had went four-wheeling down
11  there on the property?
12    A.  I had rode on a four-wheeler.
13    Q.  Was that just one occasion?
14    A.  Yes, sir.  As far as I can remember,
15  it was just one occasion.
16    Q.  Was this when you were living at
17  Amy's parents' house?
18    A.  I can't say for sure, because I
19  worked and then, by the time I got there, it
20  was at night.  I think that the time we shot
21  guns was the only time I had ever rode on
22  the back of the four-wheeler.
23     I can't say for sure because, when
24  you're down there that day, you don't -- and
25  you ride a four-wheeler -- do you know what

203

1  I'm saying?  And you're on back of it, you
2  know.
3     I don't know if Wayne, Jeremy or --
4  I can't remember who actually rode it or if
5  both of them rode me around, but it was
6  supposed to have been on her mom and
7  grandmother's property.
8    Q.  Was there only one four-wheeler that
9  was --
10    A.  Yes, sir.
11    Q.  And this was the same day you all
12  were shooting guns; is that what you had --
13    A.  From my recollection, yes, sir.
14    Q.  And were you riding primarily
15  through woods, through fields, on roadways?
16    A.  They had -- from what I remember, it
17  was a trail that they had started from the
18  back of their house, come out -- wound up
19  coming out by their grandmother's house, the
20  big white house up there.
21    Q.  Was it located on that same road?
22    A.  Yes, sir.  You just keep going
23  straight when you come out down through
24  there and there's their house.
25    Q.  Have you ever been to the crime

204

1   scene of where Rhonda Warford was -- her
2   body was found?
3       A.  No, sir.
4       Q.  And based on that last answer, I'm
5   assuming that you can't say whether you went
6   four-wheeling around that area.
7       A.  No, sir.  I can't.
8       Q.  If Jeremy Livers or Wayne Livers
9   were to testify that, yeah, we went
10  four-wheeling close to that area or on that
11  property, would you have any reason to
12  dispute that?
13          MR. SLOSAR:  Objection to form.
14      A.  No, sir, I wouldn't.
15      Q.  Do you know who Annette Hardesty is?
16      A.  If I'm not mistaken, that's Amy's
17  sister.
18      Q.  In 1992, do you know if she lived in
19  Meade County?
20      A.  In '92?
21      Q.  Yes, sir.
22      A.  I couldn't say.
23      Q.  Not sure?  Prior to your arrest in
24  1992, did you know Clifford Capps?
25      A.  No, sir.

205

1       Q.  I believe I've seen, and in some of
2   the documents that have been produced, that
3   Clifford Capps went to high school with Amy
4   Remsburg?  Does that sound correct?
5       A.  Yes.
6           MR. SLOSAR:  Objection.
7       A.  That's what I've heard.
8       Q.  And once again, I don't want to know
9   any information that you might know from
10  your lawyers, but where did you hear that?
11      A.  In jail.
12      Q.  When?
13      A.  When -- I think it was Bones Nash or
14  somebody --
15      Q.  Can you repeat that name?
16      A.  -- was talking about -- Bones Nash
17  or somebody.  It was another inmate that
18  come in.
19      Q.  That was the inmate's name, Bones
20  Nash?
21      A.  Yes.
22      Q.  Okay.  So Bones Nash told you that
23  Remsburg and Clifford Capps went to high
24  school together.
25      A.  From what I'm understanding, he had

206

1   said it, because he said he had seen the
2   stuff in the news and he had told me that
3   they had went to school or something
4   together, and I told him I didn't -- not to
5   say nothing about my case.
6       Q.  Did he say which high school they
7   went to together?
8       A.  No, sir.
9       Q.  And can you give me a timeframe of
10  when you heard this from Mr. Nash?
11      A.  No, sir, I can't.  I don't --.
12      Q.  Was this after your trial?
13      A.  No, sir.
14      Q.  So it was before your trial.
15      A.  Yes, sir.
16      Q.  While you were being housed in the
17  Meade County Jail.
18      A.  Yes, sir.
19      Q.  Was it after you had found out that
20  Clifford Capps claimed that you had admitted
21  to committing the murder to him?
22          MR. SLOSAR:  Objection to form.
23      A.  No, sir, because I didn't even know
24  Clifford Capps had made the statements
25  until, I think, when we went to go to trial.

207

1   You know, in between that time of me getting
2   out on bond.
3       Q.  So how did it come up since you had
4   this conversation with Mr. Nash regarding
5   Clifford Capps and Amy Remsburg?
6       A.  He come in there, in jail, was
7   thrown -- they had a -- what is it -- like a
8   pod area and then you had your cells and
9   stuff.
10      He come in there saying that he --
11  had seen stuff on the news and everything
12  and then, like I said, a jailer by the name
13  of Mullins or something had went around and
14  told everybody about that Clifford Capps
15  worked for Kenton Smith.
16      He was being placed in each area to
17  try and to get information, because there
18  was a guy named Roy Milonsin (phonetic) that
19  was in the back and that that's where he was
20  in that cell at that time and that --
21      Q.  At what time?  I'm sorry.
22      A.  That when Mullins was telling us
23  that.
24      Q.  Okay.
25      A.  He had done been moved from one cell

208

1　block to the other and that to make sure
2　that if he comes over here, that he had
3　ratted on his son and stuff like this.  He
4　wished he could do something to him and that
5　he was a rat for Kenton Smith.
6　　　Q.  Okay.  That's what a deputy jailer
7　said?
8　　　A.  Yes, sir.
9　　　Q.  And the deputy jailer's last name
10　was Mullins.
11　　　A.  Yes, sir.  It was either first or
12　last.  That's what he went by.
13　　　Q.  So this Mullins comes around and
14　says this.
15　　　A.  Yes, sir.
16　　　Q.  You're not sure of the timeframe.
17　　　A.  No, sir, I'm not.
18　　　Q.  Are you in a cell with this Bones
19　Nash?
20　　　A.  No.
21　　　Q.  Okay.  Then how does that lead to
22　Bones Nash telling you that Clifford Capps
23　has went to high school --
24　　　A.  Because when they come in --
25　　　Q.  -- with Amy Remsburg?

209

1　　　A.  All right.  You've got -- you ever
2　seen Meade County Jail?
3　　　Q.  I have.
4　　　A.  The old jail?
5　　　Q.  I believe I have.
6　　　A.  All right.  The old jail ain't made
7　like the new jail, where everybody's piled
8　in there in certain places.  It's kind of
9　like -- you know the back felony pods?
10　　　Q.  Okay.
11　　　A.  All right.  You've got that area,
12　but then you have your cells.  It wasn't
13　overcrowded and stuff the way it is now.  So
14　they had put Bones Nash in there, because I
15　think they had like three felony cells, a
16　misdemeanor tank and stuff like that back
17　then.
18　　　　　So they had just put him in there.
19　He was in the front cell.
20　　　Q.  Okay.  So you're near Mr. Nash at
21　this time; is that correct?
22　　　A.  Yes.
23　　　Q.  This Jailer Mullins comes around,
24　says Clifford Capps is a snitch basically.
25　　　A.  Yes.

210

1　　　Q.  Then how do you have a conversation
2　with Nash about Remsburg and Capps?
3　　　A.  No, he's talking about it.  I don't
4　have a conversation with him.  He's talking
5　about he had seen stuff on the news.  He
6　recognized me, because I had been in jail so
7　long and stuff.
8　　　Q.  So it's your understanding, at that
9　point, Remsburg was in the news.
10　　　A.  I didn't know, because I had been
11　still locked up.  I hadn't seen the news.
12　　　Q.  But you hadn't mentioned anything to
13　Nash about Amy Remsburg.
14　　　A.  No, sir.  That's the reason why I
15　told him not to say nothing about my case to
16　me.
17　　　Q.  And after your arrest, you're
18　transported to the Meade County Jail.
19　　　A.  Yes, sir.
20　　　Q.  And that's approximately in May of
21　1992; does that sound correct?
22　　　A.  Yes, sir.
23　　　Q.  Okay.  When you first arrive at the
24　jail, who are you placed in the cell with?
25　　　A.  I was placed in a cell by myself.

211

1　　　Q.  At some point, are you put in a cell
2　with anybody else?
3　　　A.  No, actually, Jerry Mayberry
4　(phonetic) was placed in a cell with me.
5　　　Q.  Jerry Mayberry?
6　　　A.  Yes, sir.
7　　　Q.  How long after you're in?
8　　　A.  I can't really say, because I was in
9　there by myself for a long time.
10　　　Q.  Was anybody else ever placed in your
11　cell?
12　　　A.  I think, right after Jerry got out,
13　there was one other person that had made
14　bond or something right after that.  It was
15　a black guy.  I can't remember his name.  I
16　think he's related to John Brown or
17　something.
18　　　Q.  But that was after you made bond; is
19　that what you said?
20　　　A.  Right before I made bond.
21　　　Q.  Right before.  I'm sorry.  Right
22　before you made bond.  So your testimony is
23　at no point was Clifford Capps placed in a
24　cell with you?
25　　　A.  No, he was never in a cell with me.

212

1    Q. Was he ever near you?
2    A. They had put him over in the cell
3  area, like the pod area, you know --
4    Q. Okay.
5    A. -- where general inmates are at.
6    Q. How close in proximity is that to
7  you?
8    A. Probably about -- if it was the old
9  jail, would you say about three-quarters of
10 this room size? When you come out of your
11 cell.
12   Q. Okay.
13   MR. SLOSAR: Was it like 20 feet? I
14 don't know how big this room is.
15   Q. I'm fine with 20 feet. Does 20 feet
16 sound correct?
17   A. We'll just guess, because I can't
18 really say.
19   Q. To the best of your knowledge? And
20 how long is Capps in that area?
21   A. I can't really say, because I never
22 even talked to him.
23   Q. So could you talk to Capps at that
24 point? Could you hear what he was saying if
25 you wanted to carry on a conversation if you

213

1  wanted to know?
2    MR. SLOSAR: Objection to form and
3  foundation.
4    A. I can't really say, because we had a
5  radio, me and Jerry did, and we stayed in
6  the cell. Because like I said, I wasn't
7  allowed to go out to rec or nothing, so,
8  anybody they put in that area, I didn't even
9  go out and talk to them or get to know them.
10   Q. Could you hear anything that Capps
11 was saying?
12   A. No, sir, not that I know of.
13   Q. At any time while you were in the
14 Meade County Jail, are you placed in a cell
15 with Kevin Justis?
16   A. No, sir.
17   Q. Do you know who Kevin Justis is?
18   A. I know who he is now.
19   Q. You didn't know him at the time?
20   A. Oh, no, sir.
21   Q. Do you remember seeing him at the
22 time you were incarcerated?
23   A. No, sir, because I didn't -- unless
24 they brung me out to go to court or after
25 Bart filed a cruel and unusual punishment

214

1  suit, I got up to walking up and down the
2  hallway with just me and two guards. That
3  was it.
4    Q. But at no time while you were
5  incarcerated in the Meade County Jail did
6  you talk with Clifford Capps.
7    A. No.
8    Q. The first time you met Rhonda
9  Warford, do you have an approximate date?
10   A. No, I don't have an approximate
11 date.
12   Q. So Keith Hardin moves in your
13 trailer. Did you say in the fall of '91?
14   A. Yes, sir, or winter of '91. One of
15 the two.
16   Q. The fall or the winter of '91.
17 Okay.
18   A. I ain't going to be specific, but it
19 could be October, November, somewhere around
20 there.
21   Q. At that time, did you know Rhonda
22 Warford?
23   A. Yes, I knew Rhonda before he ever
24 knew her.
25   Q. A few months before that? Do you

215

1  have any idea?
2    A. It wasn't too -- don't quote me, but
3  I think it was just a couple weeks.
4    Q. Just a couple weeks?
5    A. From my --.
6    Q. Do you ever have any type of sexual
7  relationship with Rhonda Warford?
8    A. No.
9    Q. But you do with her sister, Michelle
10 Rogers?
11   A. Yes, I did with her sister, Michelle
12 Rogers.
13   Q. What about any of her friends, to
14 your knowledge?
15   A. No.
16   Q. And Rhonda was staying at the
17 trailer with Keith in 1991 to 1992; does
18 that sound accurate?
19   MR. SLOSAR: Objection to form,
20 foundation.
21   A. No, she never stayed there in '92.
22   Q. Okay. When did she leave then?
23   A. The last time I seen her was the
24 time I took her home in December of '91.
25   Q. Did you ask her to leave at that

216

1    point?
2    A. Yes.
3    Q. And what was the reason?
4    A. Because they did not have a job,
5    they did not clean.
6    Q. And just so I'm clear. Is that the
7    time that you asked both Keith Hardin and
8    Rhonda Warford to leave?
9    A. No, I never talked to Keith about
10    that until January --
11    Q. So at that -- go ahead.
12    A. -- about him leaving. That was
13    about Rhonda needing to leave.
14    Q. But neither Keith or Rhonda were
15    cleaning at that time.
16    A. No.
17    Q. Did you ask Rhonda to leave in
18    December of 1991 for any other reason?
19    A. No. Like I said, the only other
20    problem that I ever had with Rhonda was
21    about the underaged girl being there
22    drinking. And I think I had discussed that
23    with her before then.
24    Q. Any other issues with Rhonda that
25    you can recall?

217

1    A. No. Actually, Rhonda was my friend.
2    Q. So that's how you would describe
3    your relationship? You were friends with
4    Rhonda?
5    A. Yes, because I mean the only problem
6    I had with her is they didn't have a job and
7    didn't clean.
8    Q. And the last time you saw her was
9    the middle of December of 1991, when you
10    gave her a ride from the trailer to her
11    parents' home.
12    MR. SLOSAR: Objection to form.
13    Q. Is that correct?
14    A. It was in '91. I'm pretty sure it
15    was at the beginning of December.
16    Q. Who was riding with you on that
17    trip?
18    A. If I'm not mistaken -- you can check
19    testimony to see it -- I think it was me,
20    Keith, Michelle, and I think Karelle was
21    there.
22    Q. And Karelle was a female?
23    A. Yes.
24    Q. Was she your girlfriend?
25    A. No.

218

1    Q. What was you driving at the time?
2    A. The Nova.
3    Q. The Chevy Nova?
4    A. Yes.
5    Q. Did you ever happen to go play pool
6    with Rhonda and Keith?
7    A. No.
8    Q. Never?
9    A. No.
10    Q. Were you aware that Rhonda Warford
11    maintained a calendar?
12    A. No.
13    Q. No? Never seen it, I'm assuming?
14    A. No.
15    Q. And I'm going to show you a portion
16    of that calendar and, for the record, this
17    is Bates number MSC0 -- or MSCO-001549.
18    MR. SLOSAR: Do you have a copy for
19    me as well?
20    MR. GARVERICH: That's the only copy
21    I have, but I recited the Bates number.
22    MR. BRUSTIN: You're not marking it?
23    MR. GARVERICH: Pardon?
24    MR. BRUSTIN: You're not marking it
25    as an exhibit?

219

1    MR. GARVERICH: Yeah, I am. We can
2    make it Exhibit 1.
3    (THE DOCUMENT WAS MARKED FOR
4    PURPOSES OF IDENTIFICATION AS DEFENDANTS'
5    EXHIBIT 1.)
6    MR. SLOSAR: Let's take a short
7    break and I'll pull it up on my system since
8    there's not a copy. Do you have a question
9    or -- is that okay since you don't -- if
10    there's no copy, I'd like to pull it up
11    while you're questioning about.
12    MR. GARVERICH: I mean, yeah, you
13    can pull it up.
14    MR. BOND: There's a copy right
15    there.
16    MR. SLOSAR: In my client's hand,
17    sure, but there's no extra copy. Let's go
18    off the record.
19    THE VIDEOGRAPHER: Is that okay? Do
20    you want --
21    MR. BOND: No.
22    THE VIDEOGRAPHER: Stay on?
23    MR. SLOSAR: Fine. Stay on the
24    record, that's fine. I'll pull it up.
25    THE WITNESS: What part are you

220

1    wanting me --
2        MR. GARVERICH:  Well, we'll wait
3    until your attorney pulls it up on his
4    computer.  Okay?
5        MR. SLOSAR:  Just moving forward, is
6    this something that we're going to do in
7    this case, just not bring copies of exhibits
8    for counsel?  I just want to know so that we
9    do the same thing.  Do you know?
10       MR. GARVERICH:  Well --
11       MR. BRUSTIN:  We should all bring
12   copies of exhibits for depositions.  That's
13   how it works.
14       MR. GARVERICH:  -- with this many
15   parties here --
16       MR. SLOSAR:  I mean, usually I fly
17   and bring copies to Kentucky.
18       MR. BOND:  Well, shame on us.  Go
19   ahead and ask him your question.
20       MR. SLOSAR:  I actually still don't
21   have it pulled up yet.  So, hold on.
22       THE REPORTER:  Sir, may I have your
23   name, please?
24       MR. BRUSTIN:  Nick Brustin.
25       THE REPORTER:  Thank you.

221

1        MR. SLOSAR:  Almost there.  All
2    right.
3        MR. GARVERICH:  You have it pulled
4    up?
5        MR. SLOSAR:  I do.
6    Q.  (BY MR. GARVERICH)  Okay.  As I
7    indicated before, Mr. Clark, this is a
8    calendar that was provided that was -- of
9    Rhonda Warford's.  Okay?  Have you ever seen
10   this before?
11   A.  No, sir.
12   Q.  And a lot of this is written over,
13   but if you look at each of these individual
14   squares -- see, Sunday, Monday, Tuesday and
15   Wednesday -- there's dates in the top
16   right-hand corners of them.  Do you see what
17   I'm talking about?
18       So this first date here, it says the
19   2nd, or 2.  The next date is the 3rd.  Can
20   you see that, Mr. Clark?
21   A.  (Reviews document)  All right.
22   Yeah.  Now, I can see it.
23   Q.  Okay.  I know it's a little bit
24   difficult, because there's pen writing over
25   it.  And I'd like to direct your attention

222

1    to the 21st.  And to help you out, do you
2    see Valentine's Day, the heart?
3    A.  Yes, sir.
4    Q.  Right underneath that one.  Okay?
5        MR. SLOSAR:  The 21st.
6    Q.  And you tell me when you're there,
7    Mr. Clark.
8    A.  I'm here.
9    Q.  Are you there?  Okay.  (Reads from
10   document)  And it says, "Me, Keith and Jeff
11   went and played pool.  It was fun.  I love
12   Keith."
13       Did I read that correct?
14       MR. SLOSAR:  Objection to form.
15   A.  Yes, but we've never played pool.  I
16   never --.
17   Q.  So just so I understand it.  It's
18   your testimony that, on February 21st of
19   1992, you did not go play pool with Rhonda
20   Warford and Keith Hardin.
21   A.  No.
22   Q.  Okay.
23   A.  I've never played pool -- matter of
24   fact, I don't think I've -- besides them
25   coming over to the trailer, I don't think

223

1    I've ever did anything with them.
2        MR. GARVERICH:  I'd like to
3    introduce this as Exhibit 1, please.
4        THE WITNESS:  Do you want this?  Or
5    who gets this?
6        MR. GARVERICH:  You can keep that,
7    Mr. Clark, or give that to your counsel.
8        MR. SLOSAR:  That's nice.  Let's
9    keep it right here.
10   Q.  (BY MR. GARVERICH)  To the best of
11   your knowledge and memory, do you ever
12   remember Keith Hardin threatening to kill
13   Rhonda Warford?
14   A.  No, I don't ever remember it.
15   Q.  Do you remember telling anybody that
16   he had?
17       MR. SLOSAR:  Objection to form.
18   A.  When I was lying to the parole
19   board, I think that statement might have
20   been in there.
21   Q.  Do you ever remember Keith Hardin
22   threatening Rhonda Warford?
23       MR. SLOSAR:  Objection to form.
24   A.  Not that I can remember.  I can't
25   say.  If I could see my trial testimony or

224

1     --.
2         Q.  Mr. Clark, you've alleged in your
3     Amended Complaint that Sheriff Joseph Greer
4     has testified that a finger found in the
5     back -- or a fingerprint found in the back
6     of your Chevy Nova was a fresh print; do you
7     recall that?
8         MR. SLOSAR:  Objection to form.
9         A.  From what I remember, yes.
10        Q.  Do you remember in what proceeding
11    Sheriff Greer testified that it was a fresh
12    print?
13        A.  I can't remember what proceeding,
14    but I know there's a police report on it --
15        Q.  There's a police report on what?
16        A.  -- from my recollection.
17        Q.  There's a police report on what?
18        A.  That the fingerprint was fresh --
19    or, I know that there's a report somewhere.
20    I'm pretty sure it says that.  Don't count
21    me at a hundred percent.
22        Q.  Do you have any independent memory
23    or recollection that Joseph Greer testified
24    at your trial, saying this fingerprint was
25    fresh?

225

1         A.  Well, I know he told me that
2     whenever all the evidence come back and he
3     was doing questioning, too, that they found
4     the fingerprint.
5         Q.  Well, my question was, do you
6     remember if he testified to that fact at
7     trial?
8         MR. SLOSAR:  Objection to form.
9         A.  If I could see his testimony, then
10    maybe I'd know, because all I know is that
11    there was comments about fresh fingerprints.
12        Q.  So we just have to rely on what's on
13    the trial testimony?
14        A.  Yes.
15        MR. SLOSAR:  Objection to form.
16        Q.  Have you spoken to any of the jurors
17    in this case?
18        A.  No, sir.
19        Q.  Now, I think earlier in your
20    testimony you had mentioned that you had
21    taken three polygraphs; does that sound
22    correct?
23        A.  Yes, sir.
24        Q.  When were those?
25        A.  I can't remember what day, but I

226

1     know that I took three polygraphs I think
2     right after I'd got there.  Detective Handy
3     questioned me, and then I went and took the
4     polygraph tests.
5         Q.  So this was at the Louisville police
6     station.
7         A.  Yes, sir.
8         Q.  And when you're saying you took
9     three separate polygraphs, do you mean three
10    separate questions or three separate exams?
11        A.  No.  Three separate exams because,
12    after I took the first one, I come back
13    over.  Detective Handy discussed the case
14    with me more.  Then we went back over for
15    the other two.
16        Q.  Okay.  But all these took place the
17    same day?
18        A.  Yes, sir.
19        Q.  Have you taken any other polygraphs
20    other than those three?
21        A.  Um-mm.
22        THE REPORTER:  What was that?
23        THE WITNESS:  No, ma'am.  I'm sorry.
24        THE REPORTER:  That's okay.
25        THE WITNESS:  Can we take a break

227

1     for a while?
2         MR. GARVERICH:  Yeah.
3         MR. BOND:  We should have told you
4     we'd stop whenever you want a break.
5         (OFF THE RECORD, 3:02-3:16 P.M.)
6         Q.  (BY MR. GARVERICH)  Mr. Clark,
7     earlier in today's deposition, we were
8     talking about how you met Amy Remsburg, and
9     I think you had mentioned a Tony and a
10    Terry; does that sound correct?
11        A.  Yes, sir.
12        Q.  What was Tony's last name?
13        A.  I have no idea.
14        Q.  What about Terry?
15        A.  All I know is where we lived on Cod,
16    you go down -- not towards Miller, but you
17    turn right there and he lived on the corner.
18    Just put it this way, check DMV for anybody
19    that owned an ASC McLaren Capri back then.
20        Q.  Okay.
21        A.  There was only maybe two in the
22    whole state and he was in Valley Station.
23    They were specially-made cars.
24        Q.  And that would have been Tony?
25        A.  That would be Terry.

228

1   Q.  Terry.
2   A.  And that's the one that was married
3   with kids and stuff.
4   Q.  What were the names of your previous
5   two wives?
6   A.  Teresa Dietzman (phonetic).
7   Q.  Dietzman?
8   A.  Yeah.
9   Q.  With a "D"?
10  A.  Yes, sir.
11  Q.  Okay.
12  A.  And then I think Becky's maiden name
13  was Cofer (phonetic), but it's Clark now.
14  Q.  And are your two brothers' last
15  names Clark?
16  A.  No, sir.  They're Cochrans.
17  Q.  Cochran?
18  A.  C-O-C-H-R-A-N.
19  Q.  And that's Matthew and Mark?
20  A.  Yes, sir.
21  Q.  Have Matthew or Mark ever lived in
22  Meade County, to the best of your knowledge?
23  A.  No, sir.
24  Q.  And same thing with Breckinridge
25  County.  Have they ever lived in that

229

1   county?
2   A.  No, sir.
3   Q.  In late 1991 or early 1992, were
4   your parents working?
5   A.  Yes, sir.
6   Q.  What did your dad do?
7   A.  My dad, I can't remember if Larry
8   Virgin had already bought the business or
9   not, because Dad originally started a
10  professional sewing machine service, and
11  then Mom was helping him with the bills and
12  the records and stuff, kind of run it down.
13  Dad had to sell it, but Larry Virgin
14  bought the business and then Dad went to
15  work for him after that.  That's all I know.
16  Q.  Was this a Monday-through-Friday
17  type job?
18  A.  Yes, sir, and then he'd work the
19  flea markets on the weekend.
20  Q.  And was there a physical location
21  that your dad would go to for this selling?
22  MR. SLOSAR:  Objection.
23  A.  Yes.  Whenever he first started the
24  business, it was out of his home off Cod.
25  But when he went to work for Larry, it was

230

1   Smith -- Smith and Logsdon Necktie Company
2   there in Louisville, Kentucky.  I can't
3   remember what road it was off.
4   Q.  But you're just not sure of when the
5   company was sold.
6   A.  No, sir.  That's -- they would know
7   more about that than me.
8   Q.  Was it before you were arrested?
9   A.  I don't know.
10  Q.  And we talked about some of your job
11  hours at Papercone and the automotive place.
12  Were those around the same or similar of the
13  time that you were staying in Meade County
14  with Amy Remsburg's parents?
15  A.  Yes, sir.
16  MR. GARVERICH:  Mr. Clark, I believe
17  those are all the questions I have for you
18  at this time.
19  THE WITNESS:  Thank you.
20  MR. BOND:  Thank you, sir.
21  (OFF THE RECORD, 3:20-3:22 P.M.)
22  MR. HOLLON:  Hi, Mr. Clark.  My name
23  is Jason Hollon.  I represent Robert Thurman
24  in this matter.  I just want to remind you
25  that you're under oath and, just as you were

231

1   advised earlier, if you need to take a break
2   for any reason, just let me know.
3   THE WITNESS:  Yes, sir.
4   MR. HOLLON:  Again, just like
5   everyone else, I'm not looking for what your
6   attorneys have told you or get into anything
7   like that.  I just -- I want to know your
8   personal knowledge about the questions that
9   I ask you.  Okay?
10  THE WITNESS:  Yes, sir.
11
12  CROSS EXAMINATION
13  BY MR. HOLLON:
14  Q.  Do you know who Robert Thurman is?
15  A.  Yes, sir.
16  Q.  Okay.  And what is your personal
17  knowledge as to what Robert Thurman's
18  involvement in this case is?
19  A.  My personal knowledge is he
20  testified about the testing of evidence in
21  the case.
22  Q.  Okay.  And anything else?
23  A.  No, sir.
24  Q.  Okay.  And what did Robert Thurman
25  do to cause your damages in this matter?

232

1   A.  From my outtake of it, if it wasn't
2   for Robert Thurman's testimony, he pretty
3   much insinuated that the hairs were a match
4   to Garr Keith Hardin over the evidence that
5   convicted us both, sent us to prison, when,
6   in fact, it was not Garr Keith Hardin's.
7       So, therefore, it affects me
8   because, if the testimony hadn't been wrong
9   about Mr. Hardin, I probably would have
10  never went to prison, you know.
11      Q.  Do you know of any evidence that Mr.
12  Thurman had related to you, any sort of
13  forensic evidence or physical evidence that
14  he did not bring forward to the prosecutors
15  or to your defense counsel?
16      MR. SLOSAR:  Objection to form.
17      A.  I would probably leave that to my
18  attorneys because I don't want to speculate
19  about the legal process of testing, because
20  I'm not no expert on it.
21      I just know that I have read a lot
22  on what an expert's allowed to say and what
23  an expert's not allowed to say.  But like I
24  said, I'm not an expert, so.
25      Q.  Okay.  Did Robert Thurman ever

233

1   threaten you?
2       A.  No, sir.
3       Q.  You testified earlier about
4   occasions when you were at the police
5   station, the Homicide Division.  Was Robert
6   Thurman ever there?
7       A.  No, sir, that I know of.  I never
8   saw him there.
9       Q.  Did you ever see Robert Thurman
10  outside of a court proceeding?
11      A.  No, sir.
12      Q.  Did you know Robert Thurman before
13  this matter?
14      A.  No, sir.
15      Q.  Do you have any reason to believe
16  that Robert Thurman had anything against you
17  personally?
18      A.  No, sir.
19      Q.  In your Amended Complaint, you've
20  alleged that there was a conspiracy or an
21  agreement among the defendants against you.
22  What evidence do you have of that?
23      A.  What evidence do I have of that is,
24  had they properly did their job on the
25  scientific evidence, not lied and committed

234

1   other grievous acts, threatened me, denied
2   me an attorney and stuff, if there had just
3   been like proper police procedure,
4   videotaped it, recorded it, then everything
5   would have been proper.
6       They had it all.  That way the truth
7   would have been out and it wouldn't have
8   been --.
9       Q.  What specific items of evidence do
10  you allege that Mr. Thurman fabricated
11  against you?
12      A.  Against me?
13      Q.  Yes.
14      A.  Well, see, you've got to remember
15  that this affected me because of Mr. Hardin
16  because I was tried jointly with him.  Had I
17  not had a joint trial, his testimony against
18  me might not have come in.
19      I don't know.  I'm not a rule-on
20  expert, but that affected me because, with
21  him insinuating that that was a match to
22  Garr Keith Hardin when, in fact, it was not
23  -- you know, answer me a question.
24      You know, if somebody lied about the
25  evidence on you, insinuated that the hairs

235

1   matched you and then, come to find out, they
2   didn't, don't you think that affects me?
3   Because I was jointly tried.
4       Q.  So is your answer to that the hair?
5       A.  Yes, the hair.
6       Q.  Is there anything else?
7       A.  I don't know if he handled the blood
8   or not off of the rag, so I -- like I said,
9   I would probably defer most of that to the
10  scientific experts or attorneys to figure
11  that out.
12      Q.  Okay.  So are you referencing the
13  chalice and the handkerchief related to
14  that?
15      MR. SLOSAR:  Objection to form.
16      A.  Yes, sir.
17      Q.  Okay.  Is there anything else, aside
18  from the hair and the chalice and the
19  handkerchief?
20      MR. SLOSAR:  Objection to form.
21      A.  No, because I don't think he had
22  nothing to do with the fingerprints evidence
23  that I'm aware of.
24      Q.  Okay.  So, just based on your
25  testimony, you're aware that Mr. Thurman

236

1    prepared a forensic report relating to this
2    matter.
3        A.  At trial?
4        Q.  Yes.
5        A.  Yes, sir.
6        Q.  Okay.  And what is your
7    understanding of that report?
8        A.  Of that report, from my
9    understanding of it and from what I remember
10   at trial, he pretty much led the prosecution
11   and them into saying that the hair was a
12   match to Garr Keith Hardin when, in fact, it
13   wasn't.
14       Q.  Okay.  And how did he lead the
15   prosecution into saying that?
16       A.  Because I guess he -- if I'm not
17   mistaken, we could get the record and we
18   could look at it, but I think he said it was
19   a match.
20       Q.  In the report?
21       A.  Somewhere.  Either testified to it
22   or in the report.
23       MR. HOLLON:  Okay.  I'm going to
24   show you a document.  It's actually going to
25   be just a collective exhibit, but I'm going

237

1    to start out with one document and then
2    we'll just add to it and it'll be a
3    collective exhibit.  Would this be 2?
4        THE REPORTER:  Yes, sir.
5        MR. HOLLON:  I have copies.
6        MR. SLOSAR:  I appreciate that.
7        MR. HOLLON:  But I only have copies
8    for each plaintiff.
9        MR. SLOSAR:  Thank you.
10       MR. HOLLON:  And if you want to pass
11   these down.
12       THE WITNESS:  (Reviews document)
13       Q.  (BY MR. HOLLON)  So, if you can,
14   just take a minute to review this and let me
15   know if you've ever seen this document
16   before.  And I will state for the record, I
17   believe that the Bates stamp has been cut
18   off on the right-hand side due to either my
19   computer or that printer.  But I think it
20   does read "Hardin-000135" is what it should
21   read.
22       A.  (Reviews document)
23       Q.  Have you seen this document before?
24       A.  No, sir, I have not seen that
25   document before.

238

1        Q.  Okay.  If you'll look down in the
2    corner, what is the date on this document?
3    Left-hand corner there.
4        MR. SLOSAR:  Objection to form and
5    foundation.  You can answer it, if you
6    understand the question he's asking.
7        A.  Oh.  Right here?  4/30/92.
8        Q.  Okay.  And who does it appear has
9    signed this report?
10       MR. SLOSAR:  Objection to form,
11   foundation.
12       A.  Robert P. Thurman.
13       Q.  Do you see in the middle of Page 1
14   of this exhibit, it says "Examination
15   Requested."  Do you see that?
16       A.  Yeah, examination.
17       Q.  Okay.  (Reads from document)  And
18   right under that, it says serological
19   analysis and hair comparisons.  Do you see
20   that?
21       A.  Yes.
22       Q.  Okay.  (Reads from document)  And it
23   says to refer to Laboratory Report 92-21490
24   for Exhibits 19-B through 19-G.  Do you see
25   that?

239

1        A.  Yes, sir.
2        Q.  Okay.  I'm going to show you another
3    document, which will still be the same
4    exhibit.
5        A.  Sorry.
6        MR. HOLLON:  If you could just hang
7    onto that.
8        THE REPORTER:  Let me just mark it.
9        MR. HOLLON:  Okay.  It's all going
10   to be one exhibit.  They incorporate each
11   other.
12       (THE DOCUMENT WAS MARKED FOR
13   PURPOSES OF IDENTIFICATION AS DEFENDANTS'
14   EXHIBIT 2.)
15       Q.  (BY MR. HOLLON)  Mr. Clark, you can
16   look up in the corner there.  Do you see
17   where it has Laboratory Number 92-1490?  The
18   right-hand corner.
19       A.  1490, yes, sir.
20       Q.  Okay.  If you'll flip to Page 2.
21       A.  (Complies with request)
22       Q.  Do you see where it says, "Exhibit
23   19, Sexual Assault Evidence Collection Kit
24   from Jeffrey D. Clark?"
25       A.  Yes, sir.

240

1    Q.  And then it lists pubic hair
2  standards, head hair standards, four saliva
3  swabs, a blood standard and two control
4  swabs?
5    A.  Yes, sir.
6    Q.  Do you remember submitting to a
7  sexual assault evidence collection kit?
8    A.  Yes, sir.
9    Q.  Okay.  Would you agree with me that
10 it appears that Exhibit 19 is your sexual
11 assault evidence collection kit?
12   MR. SLOSAR:  Objection to form,
13 foundation.
14   A.  From these reports.  I ain't never
15 seen them, so I guess that is true.
16   Q.  Right, and I'm just asking on your
17 -- what you see on these documents.
18   A.  Yes, sir.
19   Q.  Okay.  You can sit that one to the
20 side.
21   A.  This one?
22   Q.  The one I just -- yeah, 1490, if you
23 want to keep that one to the side.
24   A.  Keep this one?
25   Q.  Keep the --

241

1    A.  All right.
2    Q.  -- the more -- the one with multiple
3  -- more than two pages.  I'm going to show
4  you another document which will also be in
5  this collective exhibit.
6    And, Mr. Clark, if you'll look up in
7  the right-hand corner, it says "Laboratory
8  Number 92-1498."  Do you see that?
9    A.  Yes, sir.
10   Q.  And then, if you flip over to Page 2
11 again, it says, "Material Submitted," and it
12 says Exhibit 21, Sexual Assault Evidence
13 Collection Kit from Garr Keith Hardin."  Do
14 you see that?
15   A.  Yes, sir.
16   Q.  And then again it lists pubic hair
17 standards, head hair standards, four saliva
18 swabs, blood standard and two control swabs?
19   A.  Yes, sir.
20   Q.  Okay.  Would you agree with me that,
21 based on this document, it appears that
22 Exhibit 2 -- or Exhibit 21 is the sexual
23 assault evidence kit from Garr Keith Hardin?
24   MR. SLOSAR:  Objection to form and
25 foundation.

242

1    A.  Yes, sir.  From your documents, I
2  would assume that is it.
3    Q.  Okay.
4    A.  Keep it?
5    Q.  You can sit that one to the side,
6  too.
7    A.  I'll put them in order.
8    Q.  If you'll flip back to the one
9  that's labeled "92-1424" up at the top
10 right-hand corner.
11   A.  Yes, sir.
12   Q.  And go to Page -- well, it's labeled
13 Page 18, but it's 4 of 4.  It's the last
14 page.
15   A.  Yes, sir.
16   Q.  So, if you'll go to the fifth line
17 there, will you read where it starts, "One
18 Caucasian head hair"?
19   A.  Do you want me to read it?
20   Q.  If you could.
21   A.  (Reads from document)  One Caucasian
22 head hair found on Exhibit 16 with similar
23 color and microscopic characteristics to
24 Exhibit 21-C and may have common origin.
25   Q.  And you would agree with me that

243

1  Exhibit 21-C is a hair from Garr Keith
2  Hardin?
3    MR. SLOSAR:  Objection to form.
4  Calls for speculation.
5    A.  From reading the paperwork, you
6  know.
7    Q.  Okay.  Do you see the word "match"
8  in that sentence anywhere?
9    A.  No, sir.
10   Q.  If you'll look at the paragraph
11 directly below that, and will you read that
12 paragraph, where it starts "Several
13 Caucasian head hairs"?
14   A.  (Reads from document)  Several
15 Caucasian head hairs found in Exhibit 9 and
16 16 were dissimilar to all hair standards
17 submitted.
18   Q.  And if you'll will flip to Page 3 of
19 this document, would you agree that this
20 document appears to represent that Exhibit 9
21 was hair taken from the right hand of Rhonda
22 Warford?
23   MR. SLOSAR:  Objection to form and
24 foundation.  Calls for speculation.  You can
25 answer, Jeff, to the extent you understand

244

1  the question.
2      A.  Well, hang on while I can figure it
3  out.  What page, you said?
4          MR. SLOSAR:  Seventeen.
5          THE WITNESS:  Seventeen.  (Reviews
6  document)
7          MR. HOLLON:  Page 16 is where
8  Exhibit 9 is.
9          MR. SLOSAR:  Sixteen.  Sorry.
10         THE WITNESS:  (Reviews document)  Do
11  what now?  Page 16?
12         MR. HOLLON:  It's the one that's got
13  "16" in the middle.
14         THE WITNESS:  All right.  Sixteen in
15  the middle, and I'll be going back to Page
16  17, right?
17         MR. HOLLON:  In just a second.
18     Q.  (BY MR. HOLLON)  And I'll repeat
19  what -- would you agree with me that Exhibit
20  9 represents that it is the hair taken from
21  the right hand of Rhonda Warford?
22     A.  Yes, sir.
23     Q.  Okay.  And if you would flip to
24  Exhibit 17 --
25     A.  Yes, sir.

245

1      Q.  -- or Page 17 -- would you agree
2  with me that the report represents that
3  Exhibit 16 is one pair of red sweatpants
4  worn by Rhonda Warford?
5      A.  Yes, sir.
6      Q.  Okay.  So would you understand this
7  report to represent that there were several
8  Caucasian head hairs found on Ms. Warford's
9  right hand and her red sweatpants?
10         MR. SLOSAR:  Objection to form and
11  foundation.  Calls for speculation.
12     A.  (Reads from document)  Several
13  Caucasian head hairs found in -- yes, sir.
14  From this report.
15     Q.  Okay.  Do you see anything on this
16  report that implicates you?
17         MR. SLOSAR:  Objection to form.
18     A.  No, sir.
19     Q.  Do you see anywhere on these reports
20  where the word "match" is used?
21     A.  No, sir.  Not on them reports.
22     Q.  Do you have any personal knowledge
23  as to whether, in his examinations, Mr.
24  Thurman found hairs that didn't match or
25  weren't similar in microscopic

246

1  characteristics or color to your hair, Mr.
2  Hardin's hair, or Mr. Warford's hair -- or
3  Ms. Warford's hair?  I'm sorry.
4          MR. SLOSAR:  Objection to form and
5  foundation.
6      A.  Unless I actually seen the tests and
7  knew scientific -- I'm not a scientist, so I
8  can only go by what the attorneys and the
9  experts testified to.
10     Q.  Did you ever hear anyone say that?
11     A.  Say what?
12     Q.  That Mr. Thurman had found hairs
13  that weren't similar to your hair, Mr.
14  Hardin's hair, or Ms. Warford's hair.
15         MR. SLOSAR:  Objection to form.
16     A.  If I'm not mistaken, yes.  I think
17  there was some hairs found that didn't match
18  nobody.
19     Q.  Okay.  And did your attorney know
20  that?
21         MR. SLOSAR:  Objection to form and I
22  would -- well, wait.  I would instruct my
23  client not to answer any questions that
24  would divulge attorney-client privileged
25  communication.  I think that this question

247

1  goes to that.  For that reason, I would
2  instruct him not to answer it.
3      Q.  Do you have any reason to believe
4  that your attorney did not receive a copy of
5  this report prior to trial?
6          MR. SLOSAR:  Again --
7      A.  I don't know what my -- sorry.
8          MR. SLOSAR:  Jeff, you need to wait.
9  Objection to form, foundation.  Calls for
10  speculation and would infringe on the
11  attorney-client privilege and, for that, I
12  would instruct you not to answer that
13  question.
14     Q.  What was your attorney's name in the
15  criminal action?
16     A.  Bart Adams.
17     Q.  Okay.  We've talked about it a
18  little bit before but, in your Complaint,
19  you make certain allegations about a chalice
20  and a piece of cloth.  What is your personal
21  knowledge about those items?
22     A.  My personal knowledge --
23     Q.  Mm-hmm.
24     A.  -- is that they was used against me
25  also in our trial, you know, because it was

248

1  a joint trial.
2      Q.  How were they used against you?
3      A.  Well, because the state was claiming
4  that animal blood and stuff was in it and it
5  was some part of a sacrificial.  You had
6  people up on the stand lying, saying I was a
7  Satanist.
8          And given that it was used against
9  Keith and Keith had said that it was his
10  blood, when there was other testimony or
11  speculations or whatever, that infringed
12  upon my freedom, because it convinced the
13  jury -- between the Satanism and the facts
14  of the hairs and the blood on the chalice
15  and stuff, that convinced -- in my opinion.
16  I can't say it did.  All I can do is tell
17  you is from my point of view.
18      Q.  Do you know if Mr. Thurman tested
19  those items?
20      A.  No, sir, I don't know.  I don't know
21  if he really tested the hair, besides that
22  signature.  You know, I can't say 100
23  percent.
24      Q.  Did anyone ever tell you that he
25  tested the chalice and the handkerchief?

249

1      A.  I knew somebody tested it.  I can't
2  remember if it was actually Robert Thurman.
3  If I could see a report on it, that if he
4  did a test on it, I'm sure his signature
5  would be on it.
6      Q.  Okay.  And I'm just looking for your
7  personal knowledge.  In your Complaint,
8  you've alleged that he tested the
9  handkerchief and that he confirmed the stain
10  was blood and then you state that (reads
11  from document) on information and belief, he
12  falsely reported that no further testing of
13  the blood stain could be done.
14      A.  And I would say that is probably
15  true.
16      Q.  And what's your basis for those
17  allegations?
18      MR. SLOSAR:  And consistent with all
19  of the instructions earlier, you can answer
20  that question without communication with us.
21      Q.  Again, your personal knowledge about
22  it.
23      A.  I would defer that to -- what did
24  you just say?
25      MR. SLOSAR:  I said you can answer

250

1  the question, just don't get into -- if you
2  know the answer because of conversations
3  with us, that's privileged, so.
4      THE WITNESS:  Yeah.  Well, then I
5  can't -- like I said, I'm not an expert on
6  the scientific stuff.  So I wouldn't be able
7  to testify in a court of law, you know, and
8  to have me say what is a -- could be tested
9  and what couldn't be tested is wrong.
10          And all I can do is leave it to the
11  experts at the lab and attorneys and other
12  lab technicians.  That's all I can say about
13  that.  I can't --
14      Q.  (BY MR. HOLLON)  So that allegation
15  came from your attorneys.
16      MR. SLOSAR:  Again, that, I'm going
17  to -- Jeff -- objection to form.  That
18  question actually intends to go into
19  attorney-client communication and we would
20  assert the privilege and I would instruct
21  you not to answer that question.
22      MR. BRUSTIN:  I also object to that
23  effort to invade the attorney-client
24  privilege.
25      Q.  (BY MR. HOLLON)  (Reads from

251

1  paragraph)  In Paragraph 64 of your
2  Complaint, you say that Thurman either
3  tested the blood stain and determined that
4  it was human blood and found that it was and
5  suppressed the results because they did not
6  support Detective Handy's theory that the
7  blood came from animals or he deliberately
8  failed to test the blood so no evidence
9  would undermine that theory.  What --
10      A.  May I see that report?
11      Q.  I'm just asking for your personal
12  knowledge.  That came from your Complaint.
13      A.  Yeah, but if I could see the actual
14  report that Mr. Thurman did, maybe I could
15  answer that.
16      Q.  Do you have any personal knowledge
17  that doesn't come from your attorneys about
18  that allegation?
19      A.  Yes.  I know that, during trial,
20  what Mr. Thurman testified to and then I
21  know what the truth of the matter come out
22  after actual lab testing.  I know that.
23          You know, I can't say as far as
24  anything else but, if you say that blood is
25  one thing and then, come to find out, it's

252

1  another thing, that a man admitted that he
2  cut hand on but yet you portray it as -- at
3  the trial trying to influence a jury that
4  you're a sick individual, yeah, I think that
5  affects it really hard.
6      And that is my opinion on it and I
7  think that is where that comes into play.
8      Q.  And what were those test results
9  that came back?
10     MR. SLOSAR:  Objection to form,
11  foundation.  You can answer.
12     A.  The tests come back and proved that
13  it was Keith's blood, just like he testified
14  to all along.
15     Q.  And did he testify at trial about
16  that?
17     A.  From my recollection -- we can get
18  the trial tapes and look at them but, from
19  my recollection, he said that that was his
20  blood.
21     Q.  And did you testify about the
22  chalice at trial?
23     A.  I didn't know nothing about the
24  chalice.
25     Q.  Okay.  But you were present at trial

253

1  whenever my client, Robert Thurman,
2  testified; is that correct?
3      A.  Yes, sir.
4      Q.  Okay.  And do you remember if his
5  testimony was over two separate days?
6      A.  I can't really say for sure.  That
7  was a long trial.  You know, all I could do
8  is we could look at the record and we could
9  see what he said and what he didn't say, if
10  you want to.
11     Q.  Do you remember if Mr. Thurman
12  testified that he was trained in hair
13  examination?
14     A.  Yes, sir.  I'm pretty sure he did.
15     Q.  Do you have any reason to believe
16  that he was not trained in hair comparison?
17     MR. SLOSAR:  Objection to form.
18  Calls for speculation.  You can answer, if
19  you know.
20     A.  Well, I'd rather just get the trial
21  tape and let's see what he said at trial,
22  and then we'll see whether we're
23  misconstruing the similar or a match and
24  whether he misled the -- because, if I'm not
25  mistaken, I think he did say that there was

254

1  a match, either that there -- I'm pretty
2  sure at the trial, and then he had Kenton
3  Smith, Joe Greer, and all them convinced
4  that it was a match.
5      You know, that's all I can say.  As
6  far as being an expert on this stuff, all I
7  can do is from my recollection of what was
8  said and what they kept arguing.  And if I'm
9  not mistaken, Joe Greer has a police report
10  that states that it was a match to Hardin.
11     Like I said, I'm just trying to
12  answer your questions.  I don't --.
13     Q.  I appreciate that.  Do you remember
14  if Mr. Thurman testified at trial that there
15  were two grey hairs and a brown hair found
16  in Warford's right hand?
17     A.  Yes, sir.  I'm pretty sure he did.
18     Q.  Do you remember if he testified that
19  the grey hairs were able to be tested?
20     A.  From my knowledge -- don't quote me
21  actually on it -- I think he said that maybe
22  they couldn't be tested or too degraded?  I
23  don't know.
24     Q.  Do you remember if Mr. Thurman
25  testified that he found several hairs on Ms.

255

1  Warford's sweatpants?
2      A.  Well, we can look at the report on
3  that one.  I'm pretty sure.  (Reviews
4  document)
5      Q.  I'm asking if you remember during
6  his testimony.
7      A.  Honestly, I -- I don't know if -- if
8  we could watch the tape, actually, that
9  would be great --
10     Q.  I understand --
11     A.  -- because then we'd know.
12     Q.  If you don't remember, that's fine.
13  Just say you don't remember.
14     MR. SLOSAR:  I would object to the
15  instruction as to how to testify, but you
16  can answer the question to the extent you
17  understand it.
18     THE WITNESS:  Yes, sir.
19     Q.  (BY MR. HOLLON)  Do you remember if
20  he testified that any of the hairs that he
21  tested matched any of your hairs?
22     A.  I think he testified none of them
23  matched me, from my recollection.
24     Q.  Do you remember if he testified that
25  any of the hairs were similar to your hairs?

256

1      A.  From my recollection, he didn't.
2  But like I said, if we can get the trial
3  tape, we could solve it all and answer all
4  the questions.
5      Q.  Do you remember if he testified at
6  trial that the other hairs from Ms.
7  Warford's sweatpants were dissimilar to any
8  of the hair standards that he tested?
9      A.  Honestly, I can't remember, because,
10  like I said, all I know is that "similar"
11  was said, "match" was said, and that's what
12  got me wrongfully imprisoned.
13      Q.  Do you remember if Mr. Thurman
14  testified about the hairs from a car?
15      A.  Yes, sir.  I think he said something
16  about them.
17      Q.  Do you remember if he testified that
18  any of those hairs matched any of your hair
19  standards?
20      A.  I can't remember.
21      Q.  Do you remember if he testified that
22  any of the hairs found in the car were
23  similar to any other hair standards?
24      A.  Honestly, without the reports, I'm
25  not going to speculate on this subject.

257

1      Q.  Do you remember if Mr. Thurman
2  testified at trial that he had the ability
3  in his lab to complete a test that would
4  establish whether hair is, as a matter of
5  fact, the same as a hair standard?
6      MR. SLOSAR:  Objection to form,
7  foundation.  You can answer the question to
8  the extent you understand it, Mr. Clark.
9      A.  I ain't even going to speculate
10  because, even if he said it, I wouldn't
11  understand the technology.
12      Q.  Okay.  Do you remember if Mr.
13  Thurman testified at trial that the grey
14  hairs that were found on Ms. Warford's right
15  hand did not come from yourself or Hardin?
16      MR. SLOSAR:  Objection to form.
17      A.  I think that's what he said, but I
18  can't be a hundred percent sure.
19      Q.  Do you remember if Mr. Thurman
20  testified at trial that he does not know if
21  the hair that was tested was actually Garr
22  Hardin's hair but it might be?
23      MR. SLOSAR:  Objection to form.
24      A.  You got the trial transcript?
25      Q.  I'm just asking what you remember,

258

1  sir.
2      A.  Oh, I know.  I just figured I could
3  let you know because if I read it -- it's
4  been so long since I've had that trial.  I'm
5  not going to speculate.  I don't know.  I
6  can't remember.
7      Q.  Do you remember if anybody else at
8  trial used the word "match" aside from the
9  individuals you've already referenced?
10      MR. SLOSAR:  Objection to form.
11      A.  Yes, sir.  I think there was a
12  couple, but I can't really say.  Like I
13  said, I don't remember who it was.
14      Q.  At any point in the trial, do you
15  remember that Mr. Thurman -- let me rephrase
16  that.  At any point at your trial, do you
17  remember if Mr. Thurman said that any of the
18  hairs he tested were similar in color and
19  characteristics to your hair?
20      MR. SLOSAR:  Objection to form.  You
21  can answer.
22      A.  Not that I remember.
23      Q.  Do you know if Mr. Thurman testified
24  before the grand jury?
25      A.  I wouldn't know.  I wasn't in the

259

1  grand jury hearing.
2      Q.  Do you have any copies of any grand
3  jury transcripts?
4      A.  No, sir.
5      Q.  Have you personally examined any of
6  these hairs?
7      A.  No, sir.
8      Q.  What personal knowledge do you have
9  to support your allegation that Mr. Thurman
10  manufactured blood evidence with Detective
11  Handy?
12      MR. SLOSAR:  Objection to form.
13      A.  Could you clarify that a little bit
14  about the interpretation of -- you said
15  fabricated?  Did you?
16      Q.  I said manufactured.
17      A.  Manufactured.
18      Q.  You've alleged in your Complaint
19  that Mr. Thurman manufactured or fabricated
20  blood evidence with Detective Handy.  What
21  is your personal knowledge about that?
22      A.  My personal knowledge of that would
23  be, if he's a trained expert, how would he
24  know that it wasn't my co-defendant's blood
25  like he said all along telling the truth?

260

1     Q.  Do you know of any conversations
2  that Mr. Thurman had with any other
3  defendants?
4     A.  No, sir.  I wasn't there.  I can't
5  -- I ain't --.
6     Q.  What evidence or facts do you have
7  to support that Thurman manufactured hair
8  evidence with Detective Handy?
9     A.  All I know is that, during trial, if
10  I'm not mistaken -- and don't quote me a
11  hundred percent -- somewhere, Robert
12  Thurman, they got him to admit that it was a
13  match to Garr Keith Hardin.  After testing,
14  through mitochondrial DNA, it proved that it
15  was not Garr Keith Hardin's hair.
16     Now, if he's the expert on it, you
17  know, he should have been able to state, you
18  know, what the actual fact is and not
19  mislead any of the police or detective --
20  from my opinion.
21     You know, this is my opinion.  If
22  you're an expert on it, you know what the
23  federal guidelines are.  You stay with them
24  guidelines.  No matter what a police officer
25  says or how they take it and twist it

261

1  around, he makes sure that he clarifies it.
2     Q.  So you believe that Mr. Thurman
3  misled Detective Handy, Sheriff Greer and
4  other defendants by using the word "match"?
5     MR. SLOSAR:  Objection to form.  It
6  calls for speculation.
7     A.  Yes, sir, I do.
8     Q.  Okay.  And you referenced the
9  federal guidelines.  What are you talking
10  about with that?
11     A.  That's something, while in prison, I
12  had read.  It was just articles from Time
13  magazine and stuff, where experts had been
14  in trouble for stating that evidence was a
15  match when they're not allowed to.
16     It showed their guidelines of how
17  they had to say that stuff was only similar
18  and that, if police took it to a different
19  level, they was to clarify and supposed to
20  make it clear about what the evidence
21  actually was.  That's me.
22     Q.  Okay.  And so you believe Mr.
23  Thurman violated those guidelines?
24     A.  Yes, sir, I do.
25     Q.  Do you believe that Mr. Thurman had

262

1  it as one of his goals to get you convicted?
2     MR. SLOSAR:  Objection to form.
3  Calls for speculation.
4     A.  I can't -- no, I don't know.
5     Q.  I'm going to show you another
6  document.  And I have copies.  I know that
7  you guys are going to want them, but it's a
8  copy of your interrogatories.  It's Mr.
9  Clark's Response to Defendant's First Set of
10  Interrogatories.  Have you ever seen that
11  document before?
12     MR. SLOSAR:  Are you going to mark
13  this as Exhibit 3?
14     MR. HOLLON:  I think we should.
15  This would be Defendants' Exhibit 3,
16  Defendants' Joint Exhibit 3.
17     (THE DOCUMENT WAS MARKED FOR
18  PURPOSES OF IDENTIFICATION AS DEFENDANTS'
19  EXHIBIT 3.)
20     Q.  (BY MR. HOLLON)  Have you ever seen
21  that document before, Mr. Clark?
22     A.  Honestly, if we could drive to my
23  house and I could pull out all my paperwork,
24  I could show you whether I had got it.  If I
25  got it all -- I don't act as pro se no more.

263

1  I've got attorneys, so.
2     Q.  Sure.  And I believe this was served
3  in response -- let's see what the date is --
4  on January 10, 2019.  And the reason I'm
5  asking you this, Mr. Clark, is I wanted to
6  verify that these were your answers.  We did
7  not receive a verification with these, and I
8  just wanted to do that on the record.  If
9  you want to follow up afterwards, we can.
10     MR. SLOSAR:  We'll provide a signed
11  verification to you.
12     MR. HOLLON:  Can we take just a
13  minute?
14     MR. SLOSAR:  Sure.
15     THE WITNESS:  Yeah.
16     MR. SLOSAR:  Let's take a break.
17     (OFF THE RECORD, 4:00-4:13 P.M.)
18     MR. HOLLON:  Okay, Mr. Clark.  I
19  just have a couple more questions for you.
20     Q.  (BY MR. HOLLON)  Do you remember if
21  Mr. Thurman testified at your trial about
22  the chalice?
23     A.  From my recollection, I think he
24  testified about the rag.
25     Q.  And do you have any personal

264

1    knowledge regarding any conversation between
2    Mr. Thurman and the prosecutor in this case?
3         A.  No, sir.  They wouldn't allow me to
4    be there.
5         Q.  And what evidence do you believe
6    that Mr. Thurman failed to come forward
7    with?
8         A.  It's my personal opinion that Mr.
9    Thurman failed to come forward with adequate
10   results on the rag, showing that it was my
11   co-defendant, Garr Keith Hardin, just like
12   he said it was, was his blood.
13        And given that the testing showed
14   that the hairs were not Keith's, you know, I
15   don't know if further tests could have been
16   run where he would have known the truth.
17   That's from my opinion.
18        Q.  Okay.  Anything else that he should
19   have came forward with?
20        A.  Like I said, I'm not a scientist, so
21   I don't know about all the other evidence
22   that maybe could have been tested further.
23   I don't know.  I'm not a scientific expert,
24   so.
25        Q.  Okay.  And at what point do you

265

1    believe that Mr. Thurman should have
2    intervened to protect your rights?
3         A.  I don't know what parts of the
4    trials that he did sit in on, but when the
5    prosecution was questioning him and stuff, I
6    feel that Mr. Thurman should have made it
7    clear on what the actual -- his standard was
8    and not to speculate anything out of it, and
9    I think the jury should have been told, from
10   his scientific expert, what that actually
11   meant.
12        MR. HOLLON:  Okay.  I don't believe
13   I have any other questions.  We'll go off
14   the record to switch out counsels.
15        (OFF THE RECORD, 4:16-4:18 P.M.)
16        MR. SLOSAR:  From Plaintiff Clark's
17   position, our understanding is that Mr.
18   Handy's counsel is about to question our
19   client relating to the underlying litigation
20   and, although we have not had time to
21   respond to the motion to stay discovery
22   filed on Mr. Handy's behalf, we do believe
23   that the fact that counsel for Mr. Handy is
24   prepared to ask questions on behalf of his
25   client and develop discovery that this will

266

1    certainly support the fact that the motion
2    to stay discovery should be denied.
3         We don't necessarily have an
4    objection to Mr. Handy's counsel asking
5    questions today, but we do we believe that
6    it supports Plaintiff's position that the
7    motion to stay is without merit.  So, with
8    that.
9         MR. BRAMMELL:  If I could just
10   respond to that.  Mr. Handy's counsel is
11   prepared to ask questions but if it's
12   Plaintiff's position that that's
13   inappropriate in light of the motion to
14   stay, we're happy to hold off questioning
15   after the stay has been ruled on.  We can
16   take the deposition back up and ask our
17   questions.
18        MR. SLOSAR:  And that's not
19   Plaintiff's position.  We don't have an
20   objection to you all asking questions.  We
21   just believe that it supports Plaintiff's
22   position, when we do respond, that the
23   motion to stay should be denied.
24        So we have no objection to you
25   questioning our client.  We believe that

267

1    Federal Rule 30(d)(1) provides for the
2    defendants for a single day of deposition
3    testimony of a party, up to seven hours.
4         So we would object to having a
5    second day for Plaintiff's deposition.  I
6    think there's roughly two hours left and
7    we're prepared for you to question our
8    client, so.
9         MR. BRAMMELL:  And just counsel for
10   Mr. Handy's position would be -- we would
11   point out that the plaintiff has not filed a
12   motion to stay discovery as to Handy and, in
13   light of the fact that a motion to stay
14   discovery as to -- or to stay Handy's
15   ability to take discovery has not been
16   filed, we believe it's appropriate to move
17   forward at this time.  I'm ready to move
18   forward with questioning if you all are.
19        MR. SLOSAR:  Yeah.
20        MR. BRAMMELL:  So, Mr. Clark, I'm
21   going to try not to repeat a lot of what has
22   been asked today.
23
24   CROSS EXAMINATION
25   BY MR. BRAMMELL:

268

1    Q.  You had mentioned earlier that you
2    were pro se at some point; is that correct?
3       A.  Yes, sir.
4       Q.  Can you tell me approximately when
5    that was?
6       A.  I have fought my case from the day
7    of conviction after the DPA, because you
8    have a natural right to direct appeal and
9    have attorney on it.
10         After that, I have been -- I think a
11   church helped me.  When I first went to
12   federal court, they had a guy that said he
13   was going to help.  All he did is filed the
14   form for federal habeas corpus, 2254, and I
15   got stuck with learning federal habeas
16   corpus and all that stuff.
17         When Bill Clinton enacted the
18   anti-terrorism and death penalty, it changed
19   the laws, you know.  So I had to file all
20   that and learn pro se.
21      Q.  So can you give me a ballpark from
22   the date of your conviction until -- so that
23   was in 1995, I believe; is that correct?
24      A.  Yes, sir.
25      Q.  So can you tell me when you attained

269

1    representation after that?
2       A.  All right.  From 1995 till the end
3    of my direct appeal when I -- if we had the
4    record, I could actually show you when the
5    end of the direct appeal was actually done,
6    ruled on and everything.  And then it would
7    also state that the attorney that originally
8    filed the federal habeas corpus petition.
9          After that is when I took over pro
10   se and had fought it all the way up until
11   2006, because I had wrote every Innocence
12   Project in the country trying to get
13   assistance and I had talked to numerous
14   attorneys.
15         You know, when you don't have money,
16   you know, you can either just get DPA --
17   hopefully, they'll step in and help you --
18   and then sometimes, you know, they won't.
19         But the Innocence Project --
20   Kentucky Innocence Project took over my case
21   in 2006.  That's when I started having legal
22   representation.
23      Q.  In that time when you were pro se,
24   did you have a paralegal inside the prison
25   system that helped you?

270

1       A.  No, I had to go to legal aide
2    training and do it myself, because anybody
3    that knows anything about prison, most of
4    the so-called legal aides in there are
5    called Little Debbie attorneys.
6          I don't know if people know what
7    that means, but you buy them canteen, they
8    give it to you and they fill out a form and
9    throw it in and, if there's any responses,
10   that's how most litigants in prison get time
11   barred, and it makes it easy on the state.
12      Q.  So you represented yourself from the
13   end of your direct appeal through 2006; is
14   that right?
15      A.  Yes, sir.
16      Q.  Okay.  And I don't want to ask you
17   anything about what lawyers have told you or
18   advice they have given.  I'm not trying to
19   get that attorney-client product information
20   here.
21      A.  Yes, sir.
22      Q.  So I want to ask you just a couple
23   questions about your applications to the
24   Innocence Project.
25         You said that you sent letters to

271

1    any Innocence Project you could find that
2    would present you; is that correct?
3       A.  Yes, sir.  I've sent -- filled out
4    forms to Seattle, Washington, New York,
5    Kentucky Innocence Project when they first
6    opened.
7          Let's see.  There was one other one.
8    Don't count me -- I don't know if it was
9    Wisconsin or Maine.
10      Q.  Did you receive responses to those
11   applications?
12      A.  A couple of them, I had, because
13   there was one that said that they wasn't
14   allowed to practice law in Kentucky.  You
15   know, that it would be too much of a burden.
16         And then, the only ones I actually
17   received anything from was the Kentucky
18   Innocence Project when they took over my
19   case.
20      Q.  When the Kentucky Innocence Project
21   took over your case in 2006, did you sign an
22   engagement letter or a contract with them?
23      A.  I would have to check with their
24   records.  I can't really say unless we check
25   the records.  It's been so long ago.  I've

272

```
1   went through so many different attorneys
2   through the Kentucky Innocence Project.
3       Q.  Do you have the Kentucky Innocence
4   Project -- is that a document that you would
5   have in your possession?
6       A.  In my possession?  No, because you
7   fill out the form.  You sign it, you send it
8   to them.  It's a questionnaire.  They go
9   over it to determine if you have any facts
10  or not.
11      MR. SLOSAR:  Hold on one second.  I
12  think that the process of retaining an
13  attorney would still be considered
14  attorney-client privilege.
15      So, to the extent that any
16  application to KIP or any communication
17  existed during the process that Mr. Clark
18  was seeking representation, that would be
19  privileged and so I think that -- although I
20  think that some of the basic questions, like
21  did you apply to Innocence Projects, did
22  they respond to you, I think those are, you
23  know, not out of bounds -- I think that
24  we're getting into an area now that would
25  invoke the attorney-client privilege, so.
```

273

```
1       MR. BRAMMELL:  For the record, I'm
2   just asking you questions about your
3   application and any engagement letter.  I do
4   not want any information that you would have
5   -- any attorney like guidance or advice that
6   would have been provided by a lawyer that
7   you retained.  I simply am asking about the
8   process before you retained a lawyer.
9       MR. SLOSAR:  I think even that -- I
10  think the process of retaining a lawyer,
11  whatever that process may be, is privileged.
12  Whatever the intake process, the standard
13  form or whatever that would be, I think
14  would be privileged.
15      I think that you were fine -- you
16  know, the original questions were fine.  I
17  know that you weren't intending to go into
18  that, but I think that you (indicating the
19  witness) shouldn't be telling him what is on
20  those forms or any communication you
21  directly had with KIP.
22      I think if you want to ask him if he
23  filled something out, I think that's sort of
24  where we would stop it.
25      MR. BRAMMELL:  That's fine.  I don't
```

274

```
1   want to know the substance of any of your
2   forms.  I'm just trying to figure out what
3   documents there are so that if we'd like to
4   have a discussion about the admissibility or
5   what are the relevance of those documents,
6   the lawyers can battle that out in the
7   pleadings.  So I just want to know.
8       THE WITNESS:  That's between you
9   all.
10      Q.  (BY MR. BRAMMELL)  Do you have those
11  documents in your possession, any of those
12  documents?
13      A.  No, sir, because I think they keep
14  them all and put them in a file.
15      Q.  Okay.
16      A.  You'd have to talk to my attorneys
17  that have represented me.
18      Q.  Who was your -- was there an
19  administrative point of contact for the
20  Kentucky Innocence Project in 2006 that you
21  recall?
22      A.  Could you clarify on what you mean
23  by that?
24      Q.  Do you remember who like the
25  Executive Director of the Innocence Project
```

275

```
1   would have been in 2006 for Kentucky?
2       A.  Am I allowed to say that?
3       MR. SLOSAR:  Yeah, sure.
4       A.  I think it was Margaret Hahn or
5   Margaret something.
6       Q.  Okay, thank you.  You testified
7   earlier that you believe that you met Rhonda
8   for the first time approximately in the fall
9   of 1991; is that right?
10      MR. SLOSAR:  Objection to form.
11  Misstates his testimony.  You can answer the
12  question.
13      A.  Yes, sir.  Like I said, if we could
14  actually look at a trial transcript or
15  whatever, we would know for a fact then.  It
16  was in the fall or winter.
17      Q.  I do not want to misstate your
18  testimony about this, but you said something
19  to the effect that, when you went and
20  visited with Keith and he told you that
21  Rhonda was missing, you were kind of joking
22  with him about how Rhonda might have dropped
23  him.  Do you recall that testimony?
24      A.  Yes, sir.
25      Q.  Do you remember exactly what you
```

276

1 said?
2    A.  Exact words?
3    Q.  Yes.
4    A.  If we could look at my trial
5  testimony or whatever statement I made to
6  that, that would be better because I can't
7  remember word for word.
8    Q.  Why were you giving him a hard time
9  about Rhonda maybe having moved on to
10  somebody else?
11    A.  I don't -- I was just joking with
12  him.  I didn't really -- I never dreamed
13  nothing would happen to Rhonda.  You know, I
14  was just messing with somebody, you know.
15    Q.  Do you know if Rhonda had a lot of
16  boyfriends?
17    A.  I know she had dated some, you know,
18  but all I knew is she had had trouble out of
19  some guy named Tim or somebody.  I can't --
20  don't quote me on that exact name but, as
21  far as her relationship, no, I don't know
22  who all she had been with.
23    Q.  I'm just going to ask you a few
24  names of people, and let me know if you
25  recognize them.  Do you know -- did you know

277

1  anybody named James that Rhonda dated?
2    A.  If I'm not mistaken, she had
3  mentioned a guy named James.  Her -- between
4  -- you've got to remember that her and Tonya
5  and Michelle would talk and they would
6  mention boyfriends and stuff like that, you
7  know, so.  It's actually hearsay, isn't it?
8    Q.  Well, maybe.  We'll find that out.
9  How about Carlos?  Do you remember her ever
10  talking about a Carlos?
11    A.  No.
12    Q.  Tommy?
13    A.  No.
14    Q.  Does that ring a bell?  How about a
15  David?
16    A.  Not to my recollection, no.
17    Q.  Matt ring a bell?
18    A.  Who?
19    Q.  Matt?
20    A.  No, sir, not to my recollection.
21  Like I said, I --.
22    Q.  How about a Chris B.?
23    A.  No, sir, not to my recollection.
24    Q.  Jeremy?
25    A.  No, sir, not to my recollection.

278

1    Q.  Keith Hardin.
2    A.  Well, I knew him.
3    Q.  I thought you did.  So was Rhonda --
4  you described earlier Rhonda as your friend;
5  is that right?
6    A.  Yes, sir.
7    Q.  Did she ever lie to you?
8    A.  I guess the only thing she ever lied
9  to me about was that she'd clean the house.
10  That was it.
11    Q.  Did she tell you she did clean the
12  house?
13    A.  No, she said she was going to.  She
14  never cleaned the house.
15    Q.  Do you have any reason to believe
16  that she's not trustworthy, or was not
17  trustworthy?
18    A.  No, sir.  I had no reason to really
19  believe that.
20    Q.  What's your birthdate, Mr. Clark?
21    A.  My birthdate?
22    Q.  Yes, sir.
23    A.  XX-XX-1970.  (Redacted by the court
24  reporter for identity protection purposes,
25  but may be retrieved from backup audio or on

279

1  video recording.)
2    Q.  I just want to ask you a few
3  questions about the Complaint.  In Paragraph
4  7, there's an allegation that Detective
5  Handy falsely reported that Hardin had
6  admitted to sacrificing animals as part of a
7  satanic ritual and later decided that he
8  wanted to do a human.
9      Are you familiar with that
10  allegation?
11    A.  I really don't feel like I should
12  make a statement on that.  I think Keith
13  needs to address that, because that was
14  between him and Mark Handy and I was not
15  there.
16    Q.  Okay.  So you don't have any
17  personal knowledge about that allegation.
18    A.  No, sir.
19    Q.  In Paragraph 7 of your Complaint,
20  you also say that Hardin had never actually
21  sacrificed an animal.  Do you know if that's
22  true?
23    A.  As far as I know of, he's never
24  sacrificed anything.
25    Q.  But it is possible that he might

280

1  have sacrificed an animal and you not know
2  about it; is that right?
3      A. I ain't going to spec --
4      MR. SLOSAR:  Objection to form.
5  Calls for speculation.
6      A. Yeah, I'm not going to speculate.  I
7  don't know, you know.
8      Q. So, to the best of your knowledge,
9  he's never sacrificed an animal?
10     A. No, not that I know of.
11     Q. (Reads from document)  In Paragraph
12 59 of your Complaint, you say or allege that
13 Detective Handy had falsely reported that
14 Hardin admitted that he threatened to kill
15 Warford out of jealousy.
16         Are you familiar with that
17 allegation?
18     A. You got a copy of that Complaint?
19 That way, I could read it all.
20     Q. I actually don't.
21     A. You don't?  Could you repeat that
22 question again, please?
23     Q. Sure.  (Reads from document)  In
24 Paragraph 59, you allege that Detective
25 Handy falsely reported that Hardin had

281

1  admitted he threatened to kill Warford out
2  of jealousy.
3         Are you familiar with that
4  allegation?
5      A. I've heard it.  People's mentioned
6  it, you know, and if it's not true, well,
7  then he falsely stated it, didn't he?
8      Q. Were you present with Detective
9  Handy and Keith Hardin when they -- during
10 their interviews?
11     A. No, sir.
12     Q. In Paragraph 92, you allege that a
13 witness had seen Rhonda alive on April 3rd.
14 Are you familiar with that allegation?
15     A. From statements, yes, they said that
16 they -- say that again?
17     Q. In Paragraph 92, you allege that a
18 witness had seen Rhonda alive on April 3rd.
19 Do you remember that?
20     A. If I'm not mistaken, they reported
21 it to the police and that's how we found out
22 knowledge of it.  I don't know if it was to
23 the Sheriff's office or to the Louisville
24 Police Department.
25     Q. So you don't know who that

282

1  information was reported to?
2      A. No, sir.  I just know that it come
3  out.
4      Q. Do you remember if that was
5  something that was discussed at trial?
6      A. If we could watch the tapes, we
7  could see what was actually said, because
8  there was so much stuff objected to and what
9  was allowed in and what wasn't.
10     Q. So I'm just asking you today if you
11 recall whether or not that was discussed at
12 trial.
13     A. I can't honestly say for a fact if
14 it was allowed in or not.
15     Q. Are you aware of the fact that your
16 parents wrote a letter to the judicial board
17 about Judge Monarch's conduct?
18     A. No, sir.  I don't -- I don't -- my
19 mom wrote so many different people, I don't
20 know what all places she did write.
21     Q. Okay.  Did Mr. Handy ever put a gun
22 to your head while trying to get a
23 confession?
24     A. No, sir.
25     Q. Have you ever listened to Keith

283

1  Hardin's parole board hearings?
2      A. Yes, sir.
3      Q. Have you ever talked to Keith Hardin
4  about those parole board hearings?
5      A. About what he said at them?
6      Q. Yes.
7      A. No.
8      Q. Do you recall when you heard
9  Hardin's parole board hearings?
10     A. I think I actually heard them at the
11 evidentiary hearing.
12     Q. So you are -- are you aware that
13 Hardin testified that you had both killed
14 Rhonda?
15     MR. SLOSAR:  Objection to form.
16     A. I'm aware from I heard at the
17 evidentiary hearings.
18     Q. Do you recall that Hardin, during
19 one of those statements to the parole board,
20 had said that you were drinking -- the two
21 of you were drinking and doing drugs before
22 the murder?
23     MR. SLOSAR:  Objection to form.
24     A. I don't remember that but, if you
25 could show me his transcripts or a hearing

284

```
1   where I could listen to it again, then I'd
2   be able to state that for a fact.
3       Q.  When was the last time that you
4   talked to Mr. Hardin?
5       A.  I think the last time I talked to
6   Ms. Hardin -- Mr. Hardin was probably for
7   maybe five seconds at the exoneration day,
8   when we stopped by where he was eating
9   lunch.  If -- that's from my memory.  I
10  ain't -- I don't talk to him.
11      Q.  Before that, do you remember the
12  last time you would have talked to him?
13      A.  Probably when we was sitting there
14  and when they brung us up to testify at the
15  Meade County Jail, when they've got you
16  sitting waiting for you to come out.
17      Q.  I'm sorry, when?
18      A.  At the evidentiary hearing.
19      Q.  At the evidentiary hearing.  Thank
20  you.  You all were in the same prison for a
21  little while; was that right?
22      A.  Yes, sir.
23      Q.  And what prison was that?
24      A.  Eastern Correctional Complex.
25      Q.  And do you remember when you all
```

285

```
1   overlapped there?
2       A.  What do you mean, overlapped?
3       Q.  Sorry.  That was a bad question.  Do
4   you remember, in terms of time, what dates
5   you all would have been in Eastern together?
6       A.  If you pull my institutional record,
7   you would actually see what time we was at
8   Eastern together and that would definitely
9   solve the issue, because I can't remember.
10      I've been transferred so much and,
11  if I'm not mistaken, he stayed at the same
12  prison.
13      Q.  But it's your testimony that you
14  didn't speak with him when he was at
15  Eastern; is that right?
16      A.  I think, out of the two times I had
17  been back to Eastern, I think I had only
18  spoke to him one time.
19      Q.  Do you remember if that was before
20  or after the Kentucky Innocence Project had
21  taken your case?
22      A.  That was way before the Kentucky
23  Innocence Project took my case.
24      Q.  Do you remember what you all talked
25  about?
```

286

```
1       A.  I remember I had asked Keith one
2   time -- the only thing I had really said to
3   him -- because I didn't talk to him, because
4   you've got to remember all these statements
5   come out during trial and, when I seen him,
6   I wanted to know if he knew anything about
7   this crime, because I was sick of it.  I
8   knew I didn't and I wanted to make sure that
9   hadn't did nothing.
10      So, yes, there were some harsh
11  words.
12      Q.  Can you provide any more details?
13  Harsh words.  What did you all say?
14      A.  I asked him if he wanted to say
15  anything about the crime and he told me he
16  didn't, you know, and my buddies kind of
17  forced the subject a little bit, too.
18      Q.  So you asked Mr. Hardin if he wanted
19  to know anything about the crime?
20      A.  No, if he knew anything about it.
21  And the only reason why I was asking that,
22  let's clarify this, is because we had been
23  wrongfully convicted.  There was so many
24  damn lies in it and I wanted to know the
25  truth, because I knew I didn't do it.  You
```

287

```
1   know what I'm saying?
2       And you've got to understand that I
3   know what I did.  I don't know what other
4   people did.  You know, I only know what they
5   did when they was with me.  You know what
6   I'm saying?  So I wanted to know.
7       Q.  So did you suspect at that time that
8   he might have done it?
9       MR. SLOSAR:  Objection to form.
10      MR. BRUSTIN:  Objection to form.
11      A.  No.  I just wanted to know.  You
12  know, wouldn't you?  You know, that's a
13  common thing that anybody would want to
14  know.
15      Q.  Do you recall what other friends of
16  yours in the prison spoke to Mr. Hardin
17  about the crime?
18      A.  I think it was Jesse Thomas and
19  Kenny Harris.
20      Q.  Why did you stop talking to Hardin?
21      MR. BRUSTIN:  Objection to form.
22      A.  The reason why I quit talking to
23  Hardin, and this is the truth, because I've
24  spent every bit of money that my father had,
25  that I could make, filing on all these pro
```

288

1   se litigants, fighting against what was done
2   to me.
3        And from what I know of, Hardin only
4   filed one thing from a rinky-dink legal aide
5   that basically piggybacked off everything I
6   said, and I felt like you don't fucking give
7   up.
8        My grandfather taught me if you did
9   wrong, you admit the fucking wrong; if you
10  didn't, you get your goddamned ass back up
11  if they knock you down.  And that's the
12  truth, and I was going to keep fighting.
13  And I was mad at him because he didn't keep
14  fighting.
15       So, yes, there was animosity.  I
16  didn't give a shit whether he lived or died,
17  and that's the truth.
18       MR. SLOSAR:  You all right?
19       THE WITNESS:  Yeah.
20       MR. BRAMMELL:  Do you all need a
21  break?
22       THE WITNESS:  No, we're all right.
23       MR. SLOSAR:  Okay.
24       Q.  (BY MR. BRAMMELL)  Earlier, you
25  testified that, in order to -- in order to

289

1   get out of a parole hearing, you've got to
2   tell them you're guilty.  That's summarizing
3   your testimony, but that's your general
4   opinion, right?
5        A.  Yes.  And if you actually do
6   research on it, you will see that mostly
7   what I'm saying is true.
8        Q.  So, if I recall correctly, in 2006,
9   you told the parole board that you helped
10  Hardin move the body after he had killed
11  her; is that right?
12       MR. SLOSAR:  Objection to form.
13       A.  The reason why I said that is
14  because that's exactly what Sheriff Greer
15  basically told me to say when he said that I
16  could get facilitation.
17       All I know is pre-parole was talking
18  about people was writing in letters and
19  stuff like that.  You know what I'm saying?
20  That I needed to give the victim's family
21  closure; that the parole board, for such a
22  heinous crime -- being satanic and all this
23  stuff -- I needed to go in there and admit
24  to something.  My father had cancer.  He was
25  dying.  There wasn't nobody up here to help

290

1   him.
2        You know, you go in a prison and ask
3   anybody and they'll tell you, if you don't
4   take responsibility, they don't give you
5   parole, you know.
6        No, I didn't get parole, but you've
7   got to remember that my mom had a cousin
8   that worked with Probation and Parole.  She
9   told my mother that if I did not admit to
10  something, that I would not make parole.
11       Q.  So I want to ask you a question
12  about what you just said.  I believe I'm
13  correct that you suggested that, in order to
14  get some leniency from the parole board, you
15  need to take responsibility; is that right?
16       A.  Yes.
17       Q.  So why didn't you -- if you're
18  creating a story, why didn't you create a
19  story where you actually did take
20  responsibility for Ms. Warford's murder?
21       A.  Because I am never going to admit
22  that I've killed somebody that I didn't, and
23  I went by Sheriff Greer's statement.  From
24  what I could remember, that was basically
25  what he told me to say so I could have got

291

1   facilitation back then.
2        Q.  In that statement to the parole
3   board, you suggested that Keith had told you
4   on Saturday that she was dead.  Do you
5   remember that part of your statement?
6        MR. SLOSAR:  Objection to form.
7        A.  Do you have a copy of that and I can
8   actually read it off and remember what I
9   said.
10       Q.  I don't.  I'm just -- I'm going to
11  suggest to you that the record -- that, in
12  your statement, you did say that Keith had
13  told you that she was dead on Saturday.  But
14  do you recall that independently?
15       MR. SLOSAR:  Objection to form.
16       A.  I don't want to answer that as a yes
17  or a no until I could actually look at it,
18  you know, because, if I could see it, we
19  could -- there ain't no lying about it.
20  You'll see it in writing, you know, so.
21       Q.  One of the other things you say in
22  the statement is that Keith had threatened
23  Rhonda in the past.  Do you recall that
24  portion of your statement?
25       MR. SLOSAR:  Objection to form.

292

1    A.  I remember that, but that's off what
2  Sheriff Greer had stated.
3    Q.  So did you ever actually witness
4  Keith threaten Rhonda in any way?
5    A.  No, sir, I haven't.
6    Q.  In 2014, when you went back in front
7  of the parole board, you told the board that
8  you had quit talking to Keith because he was
9  involved in Satanism.  Do you remember that?
10    A.  When they was asking me about facts
11  and stuff why -- because they was asking me
12  about the PSI.  You know what a pre-sentence
13  investigation report is?
14    Q.  Yes.
15    A.  All right.  It doesn't change over
16  your course of time in prison.
17    Q.  So you did not take responsibility
18  for any part of the crime in your 2014
19  parole board; is that correct?
20    A.  No.  After I didn't get parole and
21  my father died, I said I'd never give into
22  any horrors again, and that is the truth.
23    Q.  As you stand here today, do you
24  believe that providing false testimony that
25  might involve yourself in the crime to the

293

1  parole board, do you believe that assists
2  you in getting parole?
3    MR. SLOSAR:  Objection to form.
4    A.  Repeat that question again.
5    Q.  As you stand here today, do you
6  believe that providing false testimony about
7  your involvement in a crime assists you in
8  getting parole?
9    MR. SLOSAR:  Objection to form.
10    A.  Sometimes when I talk to students --
11  you all can write this name down -- Johnny
12  Rice.  You can check on him.  Check with the
13  parole board and stuff.  I know nobody
14  really wants to hear a story, but they're
15  going to hear why, when you admit guilt,
16  sometimes you make parole.
17    Johnny Rice and his co-defendant,
18  and I think another person, had robbed and
19  killed a person.  Johnny Rice's
20  co-defendant, during trial, admitted that he
21  was the one that did the murder.  He sent
22  letters to the parole board that Johnny was
23  there, he did steal property, but he did not
24  kill the victim.
25    Every time Johnny Rice went up for

294

1  parole, guess what?  He wouldn't admit to
2  taking a hammer and hitting the dude in the
3  head with his co-defendant.  So guess what?
4  He didn't get parole.
5    Anybody knows that the Department of
6  Corrections knows Phillip Campbell.  Phillip
7  Campbell told Johnny, he said, "Look.  You
8  don't understand the parole board.  They
9  want you to go in there and take
10  responsibility for a crime."
11    Johnny did not want to go in there
12  and do it, but guess what?  He went to the
13  parole board after -- I think it was his
14  fourth time after many had flopped -- went
15  in there and said that, after his
16  co-defendant had picked up the hammer and
17  hit him in the head, he picked it up and
18  made sure the dude was dead and then robbed
19  him.  Guess what?  He made parole.
20    There's numerous cases like that
21  where guys -- all right.  It's like PSI
22  reports.  Sometimes they're accurate,
23  sometimes they're not.  Guys that go into
24  the parole board, the parole board asks them
25  questions about it and they'll say, "Well,

295

1  that ain't right.  This is why it happened."
2    Even though they're admitting guilt,
3  just because it doesn't match that PSI
4  report, the parole board feels like they was
5  lying to them.
6    Q.  So you said that sometimes you talk
7  to students.  Tell me about that.
8    A.  I talk to -- yeah, I'm allowed to
9  say that.  I talk -- since I've been
10  exonerated and released, I go to like -- it
11  was Chase, UofK, and UofL.
12    Q.  And what do you talk about when you
13  are there?
14    A.  I talk about how I was wrongfully
15  convicted and I just tell them, as students,
16  to always keep an open mind, not to let
17  their minds be prejudiced by rumors.  Look
18  at the facts in the cases.
19    Q.  Are you talking to Kentucky
20  Innocence Project students?
21    A.  Sometimes it is.  Sometimes it
22  ain't.  It all depends on where they ask me
23  to come and talk to them.
24    Q.  Okay.  I want to ask you a few
25  questions about what you reported to the

296

1  police back in 2000 -- or in 1992.  Did you
2  report -- or on April 6th, were you
3  interviewed by members of the Meade County
4  Sheriff's Office and LMPD?
5      A.  Yes, sir.
6      MR. SLOSAR:  Objection to form.
7      Q.  Were Detective Handy, Sheriff Joe
8  Greer, and Bill Adams present during that
9  interview on April 6th?
10     A.  Yes.
11     Q.  Did you report, in that interview,
12 that you had known Keith Hardin since about
13 the eighth grade?
14     A.  From my recollection, I did, yes.
15     Q.  Did you report that Keith Hardin was
16 a close friend and that you saw him almost
17 daily?
18     A.  No, sir, I can't remember that part.
19     Q.  Just to be clear.  Is it your
20 testimony that you didn't say it or that you
21 just can't remember?
22     A.  No, my testimony to them, from what
23 I can remember, is that I told them that I
24 had quit talking to Keith for a long time.
25 That's from my recollection.

297

1      Q.  Do you recall telling them that the
2  last time you had seen Rhonda was in
3  December of 1991 at your trailer?
4      A.  That is true.
5      Q.  Do you remember reporting or telling
6  them in that interview that you had dated or
7  had a relationship with Michelle Rogers?
8      A.  No, that's their term of "dated."
9  Michelle had a boyfriend and we was just
10 messing around.
11     Q.  So do you recall telling them that
12 you had been messing around or had an affair
13 with Michelle Rogers?
14     A.  Yes.
15     MR. SLOSAR:  Objection to form.
16     Q.  I'm sorry?
17     A.  I had told them that.
18     Q.  Do you recall reporting, in the
19 April 6th interview, that you had been at
20 your trailer drinking beer and looking for
21 your pet snake with Keith Hardin on
22 Wednesday evening, April 1st, and Thursday
23 morning, April 2nd?
24     MR. SLOSAR:  Objection to form.
25     A.  If I'm not mistaken, I also said

298

1  that we was there cleaning house.
2      Q.  And do you recall telling them that
3  you had left the trailer at approximately
4  1:00 A.M. on April 2nd?
5      A.  If I'm not mistaken, I said between
6  1:00 and 1:30 or something like that.
7      Q.  Do you recall reporting in that
8  interview that you told the police you were
9  home all day on April 2nd and then went to
10 Keith's house and Jimmy McMackin's
11 apartment?
12     MR. SLOSAR:  Objection to the form.
13     A.  I'm trying to question the part --
14 because I don't even know if Jimmy -- I
15 think his dad had done bought him that house
16 that we was working on.
17     So I don't think it was an
18 apartment.
19     Q.  Okay.  With the exception of that
20 distinction, do you recall that you stayed
21 home -- or that you told the police that you
22 had stayed home on April 2nd and that went
23 over to Keith's house and then went and saw
24 Jimmy McMackin at his house or apartment?
25     A.  Yes, sir.  I'm pretty sure I made

299

1  that statement, from my recollection.
2      Q.  Do you recall telling the police
3  that you were home at Cod Drive until about
4  2:00 P.M. on Friday, April 3rd?
5      MR. SLOSAR:  Objection to form.
6      A.  Honestly, I'm trying to remember
7  what I -- If they had videotaped it or
8  recorded it, we'd know exactly what was
9  said.
10     Q.  Yeah, I'm just asking you if you
11 remember telling them that.
12     A.  I'm going to answer I don't know to
13 that question, because I can't remember on
14 -- because I'm trying to remember Friday.
15     Q.  Do you remember telling the police
16 that you went to the flea market with your
17 stepdad, Danny Cochran, on Saturday morning,
18 April 4th?
19     A.  I do remember that, because I had to
20 load the trucks.
21     Q.  Do you remember telling the police
22 that you were at Jimmy McMackin's house or
23 apartment on the evening of April 4th and
24 the early morning hours of April 5th?
25     A.  I know I helped Jimmy on his house.

300

1    So, to the best of my knowledge -- to my
2    recollection, and I did tell them that I was
3    working on Jimmy's house, because we was.  I
4    just can't remember what dates and times.
5        Q.  Okay.  Do you remember reporting to
6    the police in that April 6th interview that
7    you went to Keith Hardin's home on Sunday
8    evening, April 5th, and were advised by
9    Hardin that Rhonda had been found?
10       MR. SLOSAR:  Objection to form.
11       A.  I don't remember saying I went
12   there, because I think his mom called my
13   mom, telling her that they had found Rhonda
14   and she had been deceased.
15       Q.  So it's your recollection now that
16   your mom is the person who told you that
17   Rhonda was dead?
18       A.  Yes, sir.  From my recollection, I'm
19   pretty sure that --.
20       Q.  Do you remember when she told you
21   that?
22       A.  I think it was that Sunday.
23       Q.  Do you remember if she told you in
24   person or called you?
25       A.  I can't remember, because I can't

301

1    remember if I was at -- she might have
2    called me, because I know one time she
3    called me and told me to come home.
4        So you'd have to ask her about that
5    date or -- I can't really remember when she
6    actually called and told me to come home.
7        Q.  Do you recall if you told the police
8    in that April 6th interview that you did not
9    have a knife and had never seen Hardin with
10   a knife?
11       MR. SLOSAR:  Objection to form.
12       A.  I don't remember saying that,
13   because everybody knew that we all had
14   knives.  Most kids did have knives.
15       The only thing I remember from that
16   day is Detective Handy, when he brung me in,
17   he asked me, "Give me your knife."  And I
18   said, "I do not have a knife," and he bent
19   me over his desk and patted me down.  He
20   said, "Everybody always says you carry a
21   knife."
22       Q.  Do you remember, in that April 6th
23   interview, telling police that you were not
24   engaged in satanic worship or devil worship?
25       A.  That is true.  I've never been.

302

1        Q.  And you remember telling the police
2    that?
3        A.  If they asked me about it, yes, I
4    remember -- I told them -- I've never
5    admitted to it.
6        Q.  Do you remember telling the police,
7    in that interview, that you were unaware of
8    whether Hardin engaged in Satanism or devil
9    worship?
10       MR. SLOSAR:  Objection to form.
11       A.  Say that question again, please.
12       Q.  Do you remember telling the police
13   in that April 6th interview that you were
14   unaware of whether or not Hardin engaged in
15   Satanism or devil worship?
16       MR. SLOSAR:  Objection to form.
17       A.  Let me explain this.  I didn't
18   actually know if he was a Satanist or not.
19   I only knew that he had read books, from him
20   telling me when he was younger.  I did not
21   actually know if he was a Satanist, drew
22   blood.  He read books on Buddha and all that
23   stuff.  He said different religions.
24       So I don't know if he was actually a
25   Satanist or not.  So, if I did say that --

303

1    now, my mom, when I told my mom that he was
2    reading books on it, you know, she said that
3    I needed to stay away from him.
4        Q.  Do you recall if he ever brought any
5    books on Satanism or magazines on Satanism
6    to your trailer?
7        A.  Oh, no.  I made sure that there was
8    no craziness.  I made sure of that, because
9    his mom and him both told me that he was no
10   longer reading or in anything like that.
11       Q.  If a search warrant that had been
12   executed on your trailer included magazines
13   or books on Satanism, would those have been
14   yours or Hardin's?
15       MR. SLOSAR:  Objection to form.
16   Calls for speculation.
17       A.  They're not mine.  I've never been a
18   Satanist.
19       Q.  Do you recall reporting, in that
20   April 6th interview, to police that you had
21   no problems with Rhonda except she brought
22   guys to the trailer you didn't know?
23       A.  I remember one incident, I think.  I
24   can't remember for a fact, but I think it
25   was a guy named Tim or something showed up.

304

1    Q. Do you just remember telling the
2 police that?
3    A. Repeat that again.
4    Q. Do you remember telling the police
5 that you didn't have any problems with
6 Rhonda except that she had brought some guys
7 to your apartment that you didn't know?
8       MR. SLOSAR: Objection to form.
9    A. I don't know if I would have really
10 put it that way, because I didn't have a
11 problem with Rhonda. I just knew that her
12 and everybody else was talking about
13 somebody kept harassing her.
14    Q. Did you voluntarily consent to a
15 polygraph exam on April 6th?
16    A. Yes, sir.
17    Q. Did you voluntarily consent to
18 providing samples, suspect samples, on April
19 6th?
20    A. Yes, sir.
21    Q. Was Detective Handy in the room
22 during your polygraph examination?
23       MR. SLOSAR: Objection to form,
24 foundation.
25    A. I can't remember which ones, but he

305

1 was in there for, I think, one of them.
2    Q. So you said that there were three
3 polygraph examinations on April 6th; is that
4 right?
5    A. Yes, sir.
6    Q. After your polygraph examination,
7 did you voluntarily consent to talk to
8 Detective Hope Greer?
9       MR. SLOSAR: Objection to form.
10    A. I really don't feel like I
11 volunteered. They just had me at the table
12 because, when I talked to Hope Greer, I
13 think that was -- Handy had kept me
14 handcuffed to the table most of the time and
15 then I talked to her after all that
16 incident.
17    Q. Do you remember telling Hope Greer
18 during your interview that you did not own
19 or carry a knife?
20       MR. SLOSAR: Objection to form.
21    A. No. I don't re -- I don't remember
22 telling the police that I didn't own no
23 knives at all.
24    Q. After being asked about the
25 incident, do you remember telling Hope Greer

306

1 that you couldn't do that to somebody?
2    A. Yes, sir. I think I did make that
3 statement, and the reason why I made that
4 statement is because Detective Handy had
5 done shown me all the crime scene photos and
6 everything.
7    Q. Were you allowed to leave after your
8 interview with Hope Greer?
9    A. I had to wait on them.
10    Q. But they let you go home.
11    A. Yeah, they finally drove me home.
12    Q. And did you voluntarily consent to
13 participate in a further interview on April
14 8th?
15       MR. SLOSAR: Objection to form.
16    A. When it come to all the interviews,
17 I tried to assist police to the best that I
18 could. You know, if they needed to talk to
19 me to find out the truth, I was willing to
20 do that.
21    Q. And did you acknowledge during that
22 interview that you did own several knives?
23    A. Like I said, I've told -- I can't
24 remember who I actually told but I -- if
25 they asked me about if I owned knives, I

307

1 would have told them that.
2       MR. SLOSAR: Can we take a short
3 break?
4       MR. BRAMMELL: Sure.
5       (OFF THE RECORD, 5:02-5:18 P.M.)
6    Q. (BY MR. BRAMMELL) Mr. Clark, do you
7 remember whether or not you told the police
8 detectives in your April 8th interview,
9 again, that you were not involved in
10 Satanism or devil worship?
11    A. Yes, sir.
12    Q. Do you remember telling the police
13 detectives at that time that you weren't
14 sure of whether or not Hardin was involved
15 in it?
16       MR. SLOSAR: Objection to form.
17    A. I'm going to clarify that. I don't
18 actually know if he just read on it or if he
19 was actually involved in it, because I had
20 never seen anything, besides him telling me
21 he read books.
22    Q. And, again, I actually am not asking
23 you whether or not he was involved in
24 Satanism. I'm just asking whether or not
25 you remember telling the police on April 8th

308

1    that you did not -- or you were not aware
2    that he was involved in Satanism.
3         MR. SLOSAR:  Objection to form.
4         A.  I don't remember.
5         Q.  Okay.  Do you remember telling the
6    police that Keith had previously believed
7    Rhonda was pregnant?
8         A.  I've never stated that.
9         Q.  Have you ever talked to Keith about
10   whether or not Rhonda was pregnant?
11        A.  No, sir.
12        Q.  Have you ever talked to Rhonda about
13   whether or not she was pregnant?
14        A.  No, sir.
15        Q.  Do you remember reporting to the
16   police, during that April 8th interview,
17   that Keith Hardin had told you he was not
18   going to have a child?
19        A.  No, sir.
20        Q.  Do you remember telling the police,
21   during that April 8th interview, that you
22   didn't have any problems with Rhonda and you
23   weren't aware of anybody else who had
24   problems with Rhonda?
25        A.  Yes, sir.  At that time, I don't

309

1    think that there was.
2         Q.  Do you remember telling the police,
3    during that April 8th interview, that you
4    had been present with Hardin on the evening
5    of April 1 and the morning of April 2?
6         A.  Yes, sir.
7         Q.  Do you remember telling the police,
8    during that April 8th interview, that you
9    had been drinking beer with Keith Hardin but
10   were not drunk on the evening of April 1 and
11   the morning of April 2?
12        MR. SLOSAR:  Objection to form.
13        A.  Repeat that question again, please.
14        Q.  Yeah.  I just want to know whether
15   or not you remember telling the police that
16   you had been drinking with Keith Hardin but
17   were not intoxicated on the evening of April
18   1 and the morning of April 2 --
19        MR. SLOSAR:  Objection to form.
20        Q.  -- 1992.
21        A.  I could have.
22        Q.  Do you remember telling, in that
23   April 8th interview, that Rhonda had not
24   been in your car since December of 1991?
25        A.  Yes, sir.

310

1         Q.  Do you remember telling them in that
2    interview that you hadn't been in Meade
3    County since July of 1991?
4         A.  That could be true, because I
5    remember it was summertime.
6         Q.  And following the conclusion of that
7    April 8th interview, were you permitted to
8    leave?
9         A.  Yes, sir, even though I didn't think
10   I was going to.
11        Q.  On the date of your arrest, on May
12   5th, did you tell Detective Handy and
13   Sheriff Greer that you had not seen Rhonda
14   since December of 1991?
15        A.  I don't even think we had an
16   interview after I was arrested.  From my
17   recollection, I don't remember any interview
18   once they come to the garage and arrested
19   me.
20        Q.  So just so I can ask the question
21   clearly and get your answer.  You do not
22   remember any of the details of an interview
23   on May 5, 1992 with Detective Handy or
24   Sheriff Joe Greer?
25        MR. SLOSAR:  Objection to form.

311

1         A.  Could I see the police report to see
2    if -- because, as far as I remember, from my
3    recollection, they arrested me at the
4    garage.  They took me downtown, switched us
5    and headed to Meade County, from my
6    recollection.
7         Q.  If the police found Satanic
8    magazines when they searched your trailer,
9    it's your testimony they did not belong to
10   you; is that correct?
11        MR. SLOSAR:  Objection to form,
12   asked and answer.
13        A.  No.  I've never had nothing.
14        Q.  Is there anybody -- who else could
15   have left magazines in your trailer, if they
16   did not belong to you?
17        MR. SLOSAR:  Objection to form.
18   Asked and answered.
19        MR. BRAMMELL:  I don't think I've
20   asked.
21        Q.  (BY MR. BRAMMELL)  Who else would
22   have had access to your trailer to leave
23   magazines there?
24        MR. SLOSAR:  Objection to form.
25   Calls for speculation.

312

```
1        A.  Let's see who all has been over
2   there.  Let's see.  Jimmy McMackin, Karelle
3   Teetsman, Rhonda, Tonya, Michelle, Hope
4   Jargers (phonetic) or whatever.
5        Q.  Hope Jaggers?
6        A.  I guess that's her name.  I don't
7   know.  And then that other girl that come
8   over there.  I think her name was Crystal or
9   something -- and her boyfriend, whoever he
10  was.
11       Q.  You didn't list Keith.  Would Keith
12  have been able --
13       A.  Oh, he could have, you know.
14       Q.  Are you aware of whether or not
15  Jimmy -- I'm sorry, what's your friend's
16  name that starts with a C?  Carelle?  Is
17  that right?
18       A.  It's a "K."
19       Q.  A "K."  Is it Karelle?  Is that how
20  you pronounce it?
21       A.  Yes, sir.
22       Q.  Are you aware of whether or not
23  Jimmy, Karelle, Rhonda, Tonya, Michelle,
24  Hope Jaggers, Crystal -- did any of those
25  people, to your knowledge, ever practice
```

313

```
1   Satanism?
2        MR. SLOSAR:  Objection to form.
3        A.  Not to my knowledge.  You can ask
4   them and see.  As far as I know of, no.
5        Q.  Do you recall testifying, in your
6   2015 evidentiary hearing, that nobody had
7   found anything satanic in your trailer?
8        A.  You got my testimony?
9        Q.  I don't.  I'm just asking if you
10  recall saying it.
11       A.  I can't really recall.
12       Q.  Did you testify earlier that the
13  snake Bill Mahan gave you was worth a
14  thousand dollars?
15       A.  You can ask him.  That's what he
16  said he paid for it.
17       Q.  And what did you pay Bill Mahan for
18  the snake?
19       A.  I don't really -- I'm trying to -- I
20  can't even remember what it was, because he
21  was just basically trying to get rid of the
22  snake.  He didn't want it.
23       He had too many, so I don't -- I
24  would have to think about that, because I
25  don't remember what I would have give him
```

314

```
1   for the snake.
2        Q.  Do you remember if you did pay him
3   something for the snake?
4        A.  I can't remember if -- did I testify
5   to that?
6        Q.  I'm just asking you.  I don't
7   believe you did.  I'm just asking what your
8   recollection is.
9        A.  I can't remember if he just give it
10  to me or I did give him something for it.  I
11  can't remember.
12       Q.  Why did you have an interest in pet
13  snakes?
14       MR. SLOSAR:  Objection to form and
15  foundation.
16       A.  The snake deal started out because
17  Bill Mahan had a ton of snakes.  I was
18  trying to get along with this guy.  He
19  didn't want this snake, you know.  I need to
20  have this snake; you know what I'm saying?
21  And me trying to ease tensions and stuff, I
22  took the damn thing.
23       I figured it was a snake.  You put
24  it in a cage, keep it warm.  From everything
25  you've read, no big deal.  I did not really
```

315

```
1   have too much of a passion.
2        I liked the little Solomon Island
3   boa constrictor.  You know, it was a little
4   bitty thing that you could put in like a
5   fish tank how most people have fishes.
6        Q.  Now, did you have the small boa
7   constrictor -- was that your first snake or
8   your second snake?
9        A.  Second.
10       Q.  Okay.  So the first snake you had is
11  the one you received from Bill Mahan; is
12  that right?
13       A.  Yes, sir.
14       Q.  And where did you get the second
15  snake?
16       A.  At a pet store.
17       Q.  And do you remember how much that
18  would have cost?
19       A.  I think it was like -- and don't
20  quote me on exact price, but it would have
21  been between 30 and 50 bucks.
22       Q.  Since owning these snakes, have you
23  subsequently learned about their
24  significance in Satanism?
25       MR. SLOSAR:  Objection to form.
```

316

1    A.  No, sir, because I don't read on the
2  stuff, so I don't know.  I know there's been
3  rumors at trial.  I think D.A. Embry, or
4  somebody, might have made a comment but I
5  don't --.
6    Q.  Earlier, I believe you testified
7  that you would have told Detective Handy
8  that you owned knives because everybody knew
9  that you owned knives.  Do you recall saying
10  that?
11    A.  If they asked me if I owned knives,
12  I would have told them I owned knives,
13  because everybody knew I owned knives.
14    Q.  So, Keith Hardin, did he know that
15  you owned knives?
16    MR. SLOSAR:  Objection to form.
17    A.  I would say he did.  Most of my
18  knives were at my mom and dad's.
19    Q.  You did have -- did you have some
20  knives at the trailer when Keith lived
21  there?
22    A.  Yes.  I mean I --.
23    Q.  How often do snakes eat?
24    MR. SLOSAR:  Objection to form.
25    A.  From -- you want just my knowledge

317

1  on it or --
2    Q.  Let me ask you a more specific
3  question.  How often did you feed your pet
4  snakes?
5    A.  Quite a bit, if they'd eat.  When
6  they got sick, you know, that's when Bill
7  was saying that I needed to feed it more.
8    Q.  Did you feed them every single day?
9    A.  No.
10    Q.  Did you feed them once a week?
11    A.  Yeah.
12    Q.  When did you move out of your
13  trailer?
14    A.  I moved out, if I'm not mistaken,
15  December of '91.
16    Q.  And am I correct that Keith didn't
17  move out until January of 1992?
18    A.  Yes, sir.  I think that was it.
19    Q.  So there was an intervening period
20  there where Keith lived at the trailer and
21  you didn't; is that right?
22    A.  Yes, sir.
23    Q.  Do you know if Rhonda was staying
24  there with Keith?
25    A.  If she had come over when I wasn't

318

1  there, I wouldn't know.  But whenever I did
2  go over there, she wasn't ever there, so.
3    Q.  If there was evidence that Rhonda
4  had said she had moved out of the trailer in
5  the middle of January, would you have any
6  reason to dispute that?
7    MR. SLOSAR:  Objection to form.
8    A.  Yes, I would dispute it, because I
9  mean I'm the one that give her the ride home
10  and had the talk with her.  You know, this
11  is my friend that I -- my two friends that I
12  had to talk to about not cleaning up and
13  stuff, you know.
14    I shouldn't have never had to have
15  that talk with two adults to begin with, you
16  know, and it made me feel like I was being
17  an ass for trying to tell them, look, just
18  clean and get a job.
19    Q.  So just so I understand, though.
20  You weren't present between -- when you
21  moved out from December until Keith moved
22  out, were you at the trailer very much?
23    MR. SLOSAR:  Objection to form.
24    A.  No, sir.
25    Q.  Were you there at all?

319

1    A.  Well, I know that I had to show up
2  to tell Keith he had to move out.  So I do
3  know that was the day that I went.  I could
4  have stopped over maybe one or two other
5  times.  I can't really say for sure.
6    Q.  Did you think about this crime and
7  this case a lot while you were in prison?
8    MR. SLOSAR:  Objection to form.
9    A.  Yes, sir.  I thought about it every
10  day.
11    Q.  Is it safe to say that it -- strike
12  that.  So, after having thought about this
13  case, I'm curious when do you think Rhonda
14  Warford was actually killed?
15    MR. SLOSAR:  Objection to form.
16  Calls for speculation.
17    A.  How would I know?  I'm not a medical
18  examiner and I don't know what happened to
19  her.
20    Q.  Do you have a theory as to who
21  actually did murder Rhonda Warford?
22    A.  All right.  Now, clarify that.
23    Q.  Let me -- I'm just asking, do you
24  have a theory or do you have an opinion --
25  I'm not asking you right now what it is.

320

1    I'm just asking you, do you have a theory or
2    an opinion about who actually did kill
3    Rhonda Warford.
4        A.  Well, if the prosecution from Meade
5    County or Louisville Police would test James
6    Whitely, maybe we would know.
7        Q.  So I just want to ask you the
8    question again.  Do you have a theory or an
9    opinion about who actually killed Rhonda
10   Warford?
11       A.  From witnesses that come forward and
12   from evidence being hidden, you know,
13   there's a possibility it could be this guy
14   named James Whitely.  I don't know though
15   until he actually gets tested, compared to
16   everything else, you know.  I don't --.
17       Q.  So am I correct that you do have a
18   theory about who would have killed Rhonda
19   Warford?  That's my question for you, if you
20   could just answer my question.
21           MR. SLOSAR:  Objection to form.
22   He's answered it.
23       A.  I can't say because I don't know if
24   he did it or not until you actually question
25   him and talk to him, you know.  That's the

321

1    key.  Ask the witnesses that's come forward
2    on him.  You know, find out what the truth
3    is.  That's what I've been wanting.
4        Q.  Have you ever met James Whitely?
5        A.  No, sir.  I don't know who he is.
6        Q.  Are you aware of whether or not
7    Hardin has ever met James Whitely?
8        A.  No, sir, I don't know.
9        Q.  Did you ever hear Rhonda talk about
10   James Whitely?
11       A.  If I'm not mistaken, I remember she
12   mentioned a guy named James, but I don't
13   know if it was a Whitely or a Terrell
14   (phonetic).  So I don't --.
15       Q.  Did you go to Rhonda's funeral?
16       A.  No.
17       Q.  Why not?
18       A.  All right.  Think about it.  Would
19   you have went?
20       Q.  It's really not my role to answer
21   questions.  I'm just asking you.  You've
22   testified earlier that she was your friend,
23   and I'm just curious why you didn't go to
24   her funeral.
25       A.  Because, with everything that had

322

1    happened, I wasn't going to no funeral.  I
2    was being accused of something that I didn't
3    do.  You know, I feel sorry for what
4    happened to her, you know, and I just wanted
5    to find the truth but, no.
6        Q.  Do you know if, from conversations
7    with him, whether or not Keith went to the
8    funeral?
9            MR. SLOSAR:  Objection to form.
10       A.  Talking to him?  Could you repeat
11   that question again, please?
12       Q.  Do you know if Keith went to the
13   funeral?
14       A.  I had heard he went.  I don't -- I
15   can't remember who told me.  I think it
16   might have been the police saying it.
17       Q.  Did you know that Rhonda's mother
18   actually called the police and told them to
19   contact you or reach out to you in trying to
20   locate Rhonda?
21           MR. SLOSAR:  Objection to form.
22       A.  No, I did not know that.
23       Q.  Do you dispute that Rhonda's
24   fingerprint, fingerprints, would have been
25   -- possibly would have been in your car?

323

1            MR. SLOSAR:  Objection to form.
2        A.  It's real probable that they would
3    have been in my car.  She had been in there
4    numerous times.
5        Q.  Are you aware that a number of
6    witnesses had suggested that you talked with
7    them about killing people?
8        A.  From their testimony, they said it
9    but, if you look at most of the witnesses
10   that testified, they had problems with me,
11   too.
12       Q.  So I'm aware of Amy Remsburg and
13   Bill Mahan making those allegations.  Do you
14   know of any other witnesses that suggested
15   you had talked to them about killing people?
16           MR. SLOSAR:  Objection to form.
17       A.  Not that I can remember.
18       Q.  Can anybody besides Keith Hardin
19   testify as to where you were on the April
20   4th and 5th -- I'm sorry, on April 2nd?
21           MR. SLOSAR:  Objection to form.
22       A.  If the police had talked to my
23   neighbors instead of telling them they found
24   body parts, they would have verified that I
25   had been at my trailer.

324

1   If the police had actually talked to
2   the Chevron station whenever I mentioned it
3   during the interview, they probably could
4   have got a videotape recording of me
5   actually being there.
6   And then, if they had talked to my
7   neighbors or Keith's mom and dad about when
8   I dropped him off.
9   Q.  Do you recall earlier that you
10  testified that you told the police about the
11  Chevron station when things got serious?
12  A.  Yes, sir, I -- yeah, when I finally
13  realized they wanted me to account for every
14  single minute of the day.  I didn't know it
15  was -- because, initially, they said they
16  just wanted to know where I was that day.
17  Q.  And can you tell me which police
18  interview was it that where things got
19  serious in your mind?  Was it the April 2nd
20  interview, the April 8th interview, April
21  9th interview; do you recall?
22  MR. SLOSAR:  Objection to form.
23  A.  If I'm not mistaken, the best of my
24  recollection, I think it was on the 8th when
25  everything -- but, then again, I can't say

325

1   that because I think I told somebody on the
2   day before that incident.  So I can't really
3   remember.
4   Q.  So, Mr. Clark, I understand that you
5   maintain your innocence, but I'm curious as
6   to whether or not you understand, based on
7   the case against you, why you were a suspect
8   in this case.
9   MR. SLOSAR:  Objection to form.
10  Calls for speculation.
11  A.  I don't understand it.  I mean
12  you're talking about somebody that was my
13  friend, to begin with.  All I did is went
14  down to help out the police.
15  I give them everything they asked
16  for -- my car, my clothes, my shoes,
17  everything.  They didn't have to take it.  I
18  give them permission to everything.
19  Even my mom give them permission to
20  check the vehicles out there, told them, if
21  they wanted to, they could check anything.
22  Q.  I guess my question for you is, do
23  you understand why they were asking you
24  those questions?
25  MR. SLOSAR:  Objection to form.

326

1   Calls for speculation.
2   A.  Which time?
3   Q.  I'm just asking if that you
4   understand why, in general, the police were
5   asking to look at your shoes, look at your
6   car, look at your trailer, talk to you.
7   MR. SLOSAR:  Objection to form.
8   Calls for speculation.
9   A.  Yeah, because what they told me,
10  they was there just to eliminate me.  That
11  way, they could move on and find out who did
12  it.  If I would just be cooperative, they
13  was trying to find out the truth.  All I
14  wanted them to do was find the truth, too.
15  That was it.
16  You know, there wasn't no malice
17  until they caused the malice.  I tried to
18  help.  I tried to support them in every way
19  possible.
20  MR. BRAMMELL:  Thank you, Mr. Clark.
21  I don't think I have any other questions for
22  you right now.  These attorneys might have a
23  few followups, but I don't have anything
24  else for you.
25  (OFF THE RECORD, 5:41-5:51 P.M.)

327

1   MR. SLOSAR:  Plaintiff just wants to
2   put on the record that depositions, pursuant
3   to the Federal Rules, are supposed to
4   proceed in the same manner as we would at
5   trial.
6   Since the plaintiff has not done a
7   cross-examination of Mr. Clark, we actually
8   don't believe that the Federal Rules provide
9   a mechanism, once the final defense counsel
10  has rested, for a second -- for defense
11  counsel to then take a second crack at the
12  plaintiff through questioning.  That would
13  not happen at trial unless we ask a
14  question.  We have not asked questions of
15  our clients.
16  We do believe that any further
17  subsequent, second round of testimony by
18  defense counsel is not in accordance with
19  the Federal Rules.
20  But in effort not to bring this
21  issue before the Court, we are not going to
22  stop this, but we would ask for defense
23  counsel to keep their -- any potential
24  second round of questioning brief.  We do
25  not believe that the rules provide a

328

1  mechanism for a full hour of questioning
2  without us asking questions.
3      So I don't know how much questioning
4  you have, Mr. Ervin, or what you intend to
5  do, but we wanted to put our position on the
6  record.
7      MR. ERVIN:  Thank you.
8
9  REDIRECT EXAMINATION
10 BY MR. ERVIN:
11     Q.  During the examination by some of
12 the attorneys, Mr. Clark, you stated that
13 your mother and father had called to report
14 the incident where Sheriff Greer placed his
15 gun on the table and where you interpreted
16 that to be a threat to you.  Is that
17 correct?
18     A.  Yes, sir.
19     Q.  Do you know who they called?
20     A.  You would have to talk to them.  I
21 don't know who they talked to and who they
22 didn't.
23     Q.  Do you know when they called?
24     A.  Honestly, I don't know.  They was so
25 mad about the incident that I don't exactly

329

1  when they called and when they didn't.  And
2  I do not know who they talked to and who
3  they did not talk to.
4      Q.  Okay.  That incident, as I recall
5  your testimony, occurred at your second
6  interview?
7      A.  I don't want to say for sure.  I
8  think it was the third, but I am not going
9  to -- I can't remember when it happened,
10 because, in all honesty, after that
11 happened, I don't think my parents would
12 allow me to go back down there.
13     Q.  All right.  Let's back up just -- I
14 don't know whether there were two or three
15 interviews.  I think I've seen a record of
16 two.
17     Just by process of elimination, it
18 didn't occur in the first interview; is that
19 correct?
20     A.  No, sir.
21     Q.  All right.  So it would have been in
22 some interview that occurred after your
23 first interview.
24     A.  Yes, sir.
25     Q.  All right.  And did you tell your

330

1  parents about it that evening when you got
2  home?
3      A.  Yes, sir, because I was very scared.
4      Q.  But you don't know whether they made
5  the phone call, it was that night or at some
6  other time.
7      A.  All I know is hearing them and
8  saying, "Them bastards wouldn't talk to me.
9  They ain't going to treat my son that way."
10 That's all I know.
11     Q.  Okay.  Was that that night that you
12 told them about it?
13     A.  Yes.
14     MR. SLOSAR:  Object to form.
15     A.  Yes, sir.
16     Q.  Okay.  You testified about a Deputy
17 Jailer Mullins?
18     A.  Yes, sir.
19     Q.  Is that right?  And what was the
20 jailer's name?
21     A.  If I'm not mistaken, I'm pretty sure
22 it was Bennie Bruner was the jailer.
23     Q.  Bruner.  And as I recall your
24 testimony, Bruner made some threatening
25 remarks when you were first lodged in Meade

331

1  County Jail; is that correct?
2      A.  Yes, sir.
3      Q.  And that was when -- immediately
4  then after you were arrested and when you
5  were taken to Meade County?
6      A.  Yes, sir.  I think it was actually
7  that same night.
8      Q.  That same night.  And was Deputy
9  Mullins there at that time as well?
10     A.  No, sir.  He started -- I can't
11 honestly say when he started, but he wasn't
12 there then.
13     Q.  Okay.  Was Bruner the jailer when
14 Mullins was there?
15     A.  Yes, sir.
16     Q.  Okay.  And you testified that
17 Mullins was the person who told you that
18 Capps was a rat for Kenton Smith.
19     A.  Yes, sir.
20     Q.  Why did Mullins tell you that?
21     MR. SLOSAR:  Objection.
22     Q.  -- to your knowledge?
23     MR. SLOSAR:  Objection to form.
24     A.  Mullins told us that his son had
25 went to prison because of Capps lying on

332

1  him.  There was a -- some incident is what
2  he said and that Capps actually lied on him
3  to get him put in prison.
4      Q.  It sounds like Capps had been around
5  for some time.
6      MR. SLOSAR:  Objection to form.
7      A.  Well, from my knowledge, he was
8  taken to Colorado, too, and they wouldn't
9  use him out there because -- you need to
10  talk to the prosecutor out there because,
11  from everything they said, he lied.
12      He had -- a letter had produced
13  where he was trying to get his other friend
14  to make up stories, and that's all in
15  evidence.
16      Q.  One of your criticisms of Detective
17  Handy, as I understood you, was that he had
18  denied you an attorney when you had
19  requested one --
20      A.  Yes, sir.
21      Q.  -- is that correct?  And I believe
22  that was on that interview that occurred
23  after the first one --
24      A.  Yes, sir.
25      Q.  -- is that correct?  Did that occur

333

1  during the same interview that Sheriff Greer
2  put his pistol on the table?
3      A.  Yes, sir.  It was the same day, from
4  my memory.
5      Q.  All right.  And he was telling you
6  that Hardin had gotten a lawyer?
7      A.  Yes, sir, and that he had blamed
8  everything on me and that if I didn't come
9  clean, that I was going down for it.  I'd be
10  charged with a capital murder and I'd be put
11  to death.
12      Q.  All right.  So, after you got out of
13  that interview, did you go hire a lawyer?
14      A.  No, sir.
15      Q.  Why not?
16      A.  Because after all that whole ordeal,
17  and with my mom and all of them calling, we
18  figured that, if I was getting arrested, I'd
19  be seeing them any day.  And when they
20  didn't, I didn't see no need.
21      I think they, if I'm not mistaken --
22  you can talk to my mom, which you can't talk
23  to my dad, he's dead -- but I think they did
24  talk to Frank Haddad at the time.  Or Frank,
25  Jr.  I can't -- I don't know which one, but

334

1  I know that they did contact somebody.
2      Q.  Okay.  But you didn't hire an
3  attorney to your -- or they didn't hire a
4  lawyer to your understanding.
5      A.  Well, from -- can I say what I was
6  told?
7      Q.  Yes, you can.
8      MR. SLOSAR:  By whom?
9      THE WITNESS:  My mother and them.
10      MR. SLOSAR:  Yes.
11      THE WITNESS:  They said that the
12  attorn -- either Frank or Frank, Jr., they
13  said they told them if I -- because they had
14  called the police station or something and,
15  when they got back with them, they had said
16  he's not going to be arrested, if he was
17  going to be arrested, they would've done did
18  it.
19      And then they referred Bart Adams to
20  them later on, after I guess I got arrested
21  or --.
22      Q.  (BY MR. ERVIN)  Did you have a
23  lawyer at any time before you were arrested?
24      A.  No, sir.
25      Q.  Had you talked to a lawyer at any

335

1  time before you were arrested?
2      A.  No, sir.
3      Q.  When did you have occasion to talk
4  with Keith after that second interview?
5      A.  To be honest, I don't know if I ever
6  talked to him again or I was just trying to
7  stay away from all that stuff.  So -- I
8  can't say, because I might have stopped by
9  his mom and dad's house once or twice.  I
10  don't know.  I don't know if I did or not.
11      Q.  You don't remember talking to Keith
12  Hardin.
13      MR. SLOSAR:  Objection to form.  You
14  can answer.
15      A.  No, sir.  Really, after that whole
16  ordeal, I didn't want to talk to anybody
17  about anything.  I wanted to distance myself
18  from everything that was of anything of this
19  was going on.  I stayed with my dad, my mom,
20  or my friends.  I kept a perfect alibi, you
21  know, because they was accusing me of crap
22  that I didn't do.
23      Q.  So the last you had heard, at least
24  from Detective Handy, was that Keith Hardin
25  was throwing you under the bus.

336

1    A. Yes, sir.
2    Q. Right? And you didn't go talk to
3  Keith Hardin about that?
4       MR. SLOSAR: Objection to form,
5  asked and answered. You can answer it.
6    A. No, sir. I would not talk to nobody
7  about that, because why would I talk to him,
8  because then it would just cause a problem
9  and then the police would be all over me.
10      You know, I'm -- I was just trying
11  -- like I told you, I was trying to do the
12  right thing, let them find out the truth.
13  All I wanted them to know is that I had
14  nothing to do with anything.
15    Q. Well, just like you want to talked
16  to him at Eastern Correctional Complex,
17  didn't you want to talk to him after that
18  interview, where you were told he was
19  throwing you under the bus?
20      MR. SLOSAR: Objection to form,
21  asked and answered. You can answer again.
22    A. No. I really didn't want to talk to
23  nobody about none of this stuff, because I
24  couldn't believe it was happening.
25    Q. So you understood that he had --

337

1  from all you knew, he was throwing you under
2  the bus, correct?
3       MR. SLOSAR: Objection to form,
4  asked and answered for -- this is now the
5  fourth time, Mr. Ervin. You can answer one
6  more time, Jeff.
7    A. I've done answered the question.
8    Q. Well, I want to ask you the question
9  again, sir. All you -- the only knowledge
10  you had after that interview was that Keith
11  Hardin was throwing you under the bus. You
12  had no information to dispute that, did you?
13      MR. SLOSAR: Objection to form,
14  asked and answered.
15    A. No, sir, because when it's a lie,
16  how do you defend against a lie?
17    Q. Did you know it was a lie at the
18  time?
19    A. Yeah, because I know I hadn't did
20  nothing. I don't know what he was saying.
21  I never got to talk to him. I didn't see
22  him in the interview. All I know is that it
23  was a lie.
24    Q. That's my point. You thought it was
25  a lie, correct?

338

1       MR. SLOSAR: Objection to form.
2    A. Yes, sir.
3    Q. And as far as you knew, Keith had
4  told that lie, correct?
5       MR. SLOSAR: Objection to form,
6  asked and answered.
7    A. Yes, sir.
8    Q. But you didn't want to talk to him
9  about it.
10      MR. SLOSAR: Objection to form,
11  asked and answered. Mr. Ervin, I believe
12  that this is getting to be harassing. This
13  is the seventh time you've asked him the
14  question. He's answered your question each
15  and every time in the same manner.
16      Just because it's not an answer you
17  appreciate doesn't give you the right to
18  harass Mr. Clark, who's tried to be
19  forthcoming today.
20      I'll allow for him to answer it one
21  more time, but I'd respectfully ask you to
22  move on or else I'll instruct Mr. Clark to
23  not answer your question.
24    A. I don't cause conflict. I don't
25  know why they was saying he said it, but I

339

1  didn't want no part of any of it. And if
2  you don't understand how when you're sitting
3  there -- you just went through being
4  threatened. You've went through numerous
5  interviews.
6       You've tried to help the police
7  because you was raised in south Alabama,
8  where the Sheriff and stuff, they're
9  actually good people.
10      You know, here, they take and they
11  twist everything around. They lie on you.
12  They have video cameras in the conference
13  room. They have tape recorders. How come
14  they didn't record nothing so, that way,
15  they could back theirself up? Why did they
16  make simple notes? We're recording stuff
17  then. They had it then.
18      You know, you ask me. I don't know
19  why they was saying Keith said that. You
20  would have to talk to your client and ask
21  why he told me that.
22    Q. That's not the question that I've
23  asked you.
24    A. Yeah, and I just told you repeatedly
25  that I wanted to distance myself from every

340

1  bit of this. When somebody starts accusing
2  me of something I didn't do, yes, I don't
3  want nothing to do with them.
4       Q. You wouldn't have done the same
5  thing to Keith, would you?
6       MR. SLOSAR: Objection to form.
7       A. Did Detective Handy say that I did?
8       Q. I just asked you the question. You
9  wouldn't have done the same thing to him.
10      MR. SLOSAR: Objection to form.
11      A. Well, even when Joe Greer, Bill
12 Adams, Detective Handy and everything
13 allowed Sheriff Greer to pull a gun and tell
14 me that I needed to reconsider things, that
15 they always get what they want, I still
16 didn't do it. I didn't give them what they
17 wanted.
18      Q. And at -- but at your parole
19 hearing, you wouldn't admit that you had had
20 anything to do with killing Rhonda Warford
21 but you were willing to tell them that
22 Hardin had killed her, correct?
23      MR. SLOSAR: Objection to form,
24 foundation. There were multiple parole
25 hearings. You can answer.

341

1       A. Which one are you talking about?
2  2006?
3       Q. Yes, sir, 2006.
4       A. All right. To begin with, my father
5  was dying of cancer. I don't know whether
6  you have family or not. I don't know
7  whether you love your family or not. I
8  loved my family. I wanted to be there with
9  them.
10      I know I was locked up for a crime I
11 didn't commit. I know everybody was telling
12 me that you either take responsibility or
13 something or you're getting served out. I
14 had a life sentence.
15      Now, I don't know if anybody
16 understands that, in Kentucky, even though
17 you've got a parole date, they can still
18 serve you out on your life sentence where
19 you're never getting out on parole. That's
20 the only way to get out of prison.
21      Q. Now, I want you to listen to my
22 question.
23      You didn't take responsibility for
24 having had anything to do with Rhonda
25 Warford's death in that hearing, did you?

342

1       MR. SLOSAR: Objection to form,
2  asked and answered.
3       A. No.
4       Q. No. But you told the parole board
5  that Hardin had killed her, correct?
6       MR. SLOSAR: Objection to form,
7  asked and answered.
8       A. I told them exactly what Sheriff
9  Greer had told me to say the day that he
10 threatened me and offered me I think it was
11 facilitation, if I would just state that.
12      I tried to remember everything he
13 actually said. Figured if I said it, they
14 would grant me parole.
15      Q. You don't know whether Hardin killed
16 Rhonda, do you?
17      MR. SLOSAR: Objection to form,
18 asked and answered.
19      A. As far as I know of, no, I don't
20 know.
21      Q. There was evidence at trial that it
22 would have required two people to move
23 Rhonda's body without dragging it. Do you
24 recall that?
25      MR. SLOSAR: Objection to form.

343

1       A. Yes, sir. I think there was
2  testimony about that.
3       Q. Would you agree with that?
4       MR. SLOSAR: Objection to form,
5  foundation.
6       A. I'm no expert. I don't know the
7  crime scene. I don't know anything about
8  that stuff.
9       MR. SLOSAR: Let me finish my
10 objection before you answer next time.
11      THE WITNESS: Okay.
12      Q. (BY MR. ERVIN) Now, you testified
13 -- or -- yeah, you testified about Tonya
14 Greer and what her motivation may be to say
15 that you had been involved in Satanism; do
16 you recall that?
17      A. No, I made a speculative comment. I
18 don't know what her motivation would have
19 been. I was stating that that was the only
20 thing I know that she could have ever even
21 been upset with me about.
22      Q. And that was because you wouldn't
23 allow her to drink at her trailer?
24      A. Yes, sir.
25      Q. And why was that?

344

1    A. Because she was underage.
2    Q. Well, how old was she?
3    A. To begin with, I thought she was
4  older, but I think Rhonda had said, "Well,
5  she's 15. She'll be getting her driver's
6  license."
7        I overheard it, and I was like,
8  "Whoa. Well, wait. You cannot be having
9  nobody here drinking." And then that's when
10 I got upset about it.
11   Q. So you thought she was 15 years old?
12       MR. SLOSAR: Objection to form.
13   A. From my knowledge, from what they
14 said, yes, sir. I thought she was 15 years
15 old.
16   Q. Do you know how old Rhonda was?
17   A. Eighteen, 19 maybe.
18   Q. When did you learn that Rhonda was
19 not pregnant at the time of her death?
20   A. Honestly, I don't think I ever knew
21 whether she was pregnant or not pregnant.
22   Q. Did somebody tell you she wasn't
23 pregnant?
24   A. I think maybe it come up during
25 trial, as far as I know of. I don't know

345

1  for a fact.
2    Q. Do you recall whether one of the
3  detectives in your interviews told you she
4  was not pregnant?
5    A. No, sir. I don't remember nothing
6  like that.
7    Q. Do you deny that they told you that?
8        MR. SLOSAR: Objection to form.
9  Asked and answered.
10   A. I don't remember if they ever told
11 me or not.
12       MR. ERVIN: I believe that's all I
13 have, sir. Thank you.
14       (OFF THE RECORD, 6:12-6:23 P.M.)
15
16 RECROSS EXAMINATION
17 BY MR. GARVERICH:
18   Q. Mr. Clark, we've been discussing, at
19 least some portions here in this deposition,
20 testimony that you had given during an
21 evidentiary hearing in July of 2015. Does
22 that sound correct?
23   A. I know it was in 2015.
24   Q. So do you recall that evidentiary
25 hearing?

346

1    A. Yes, sir.
2    Q. During that evidentiary hearing, do
3  you remember being asked the following
4  question by Linda Smith? "Did anyone ever
5  threaten you while you were at the police
6  station?"
7        MR. SLOSAR: Objection to form.
8    A. If we actually had our transcript of
9  the evidentiary -- you got the transcript?
10 Anybody got a transcript of the evidentiary
11 --
12   Q. I'm asking you on your memory, sir.
13   A. I can't remember. If we had the
14 actual hearing or transcript, we could
15 actually check and see.
16   Q. And just so I understand your
17 testimony. You're not saying that that
18 question wasn't asked, you're just saying
19 that you cannot recall right now.
20       MR. SLOSAR: Objection to form.
21 Asked and answered.
22   A. I don't know. I don't remember if
23 that question was actually asked because, if
24 I did, I know what I would have said.
25   Q. At any time during that evidentiary

347

1  hearing, do you remember talking about Joe
2  Greer and this gun incident?
3    A. I simply asked (sic) what the
4  attorneys asked of me.
5    Q. And I understand that, but that's
6  not an answer to my question. What I'm
7  asking is, do you remember, having specific
8  recollection, of during this January 2015
9  evidentiary hearing, mentioning Joe Greer
10 threatened you with a gun?
11       MR. SLOSAR: Objection to form.
12       THE WITNESS: Do we have the actual
13 hearing here? That way, we could pull it
14 out and go through it.
15       MR. SLOSAR: You've got to ask him.
16       THE WITNESS: Oh.
17   Q. (BY MR. GARVERICH) Sir, I'm just
18 answer -- I'm just asking you a question
19 based upon your memory.
20       MR. SLOSAR: Objection to form.
21   A. I can't remember if any question was
22 asked like that that was straight offhand.
23 If you can give me the record, where we can
24 look at it and see.
25   Q. And I understand your answer in

348

1    regards to what question was asked, but my
2    question is, what I'm asking is do you
3    remember testifying during the July 2015
4    hearing that Joe Greer threatened you with a
5    gun?
6        MR. SLOSAR:  Objection to form.
7    Asked and answered.
8        Q.  It hasn't been answered.
9        A.  I don't remember.
10       Q.  Do you know who Pam Gibson is?
11       A.  Pam Gibson.  Pam Gibson.  Pam
12   Gibson.  No, sir.  Right offhand, I don't
13   know who she is.
14       Q.  Do you know who Eletha Madison is?
15       A.  I think I do know who two -- both of
16   them are now.  If I'm not mistaken -- this
17   is what I've heard -- is that they had come
18   forward and said that James Whitely was the
19   perpetrator.  I don't know if that's true or
20   not.
21       Q.  Okay.  Do you know whether Pam
22   Gibson or Eletha Madison testified before
23   the grand jury regarding James Whitely?
24       A.  My recollection is I think there was
25   some kind of grand jury testimony from

349

1    somebody.
2        Q.  Regarding James Whitely; is that
3    your understanding?
4        MR. SLOSAR:  Objection to form.
5        A.  I don't -- if it's from him, I found
6    out later on that there was supposed to be
7    two people that had testified or something.
8    Give a statement or something.
9        Q.  Now, this Chevron station that's
10   been mentioned before that you went to on
11   the -- I guess late at night on April 1st or
12   early morning on April 2nd, do you know how
13   long they maintain their surveillance film?
14       A.  No, sir.  I wouldn't know.
15       MR. GARVERICH:  Sir, those are all
16   the questions I have for you.  Thank you.
17       (OFF THE RECORD, 6:28 P.M.)
18
19       (Deposition concludes at
20   approximately 6:28 P.M.)
21       (Further, the deponent sayeth
22   naught.)
23
24
25

350

STATE OF KENTUCKY
COUNTY OF JEFFERSON

    I, Lynn B. Kornick, Court Reporter and
Notary Public in and for the Commonwealth of
Kentucky, State-at-Large, hereby certify
that, at the time and place stated herein,
the foregoing testimony was reported by me
and transcribed under my personal direction
and supervision and that said typewritten
transcript is complete and accurate to the
best of my ability and understanding; that
the appearances are as set forth in the
caption; that prior to giving the testimony
the witness was first duly sworn by me; that
I am not related by blood or marriage to any
of the parties hereto; and that I have no
interest in the outcome of this case.
    My Commission as Notary Public
expires June 14, 2020.
    Given under my hand the 4th day of
April, 2019, at Louisville, Kentucky.


_____
LYNN B. KORNICK, REPORTER
NOTARY PUBLIC