**In the Matter Of:**

COMMONWEALTH OF KY vs GARR KEITH HARDIN

---

**PROCEEDINGS - 3.01.95**

*March 01, 1995*

---



800.211.DEPO (3376)
EsquireSolutions.com

1

2

3

4

5

6

7   TRANSCRIPT OF CLARK AND HARDIN V. LOUISVILLE JEFFERSON COUNTY

8                    METRO GOVERNMENT et al

9

10

11

12                 DATE RECORDED:  MARCH 1, 1995

13

14

15

16

17

18

19

20

21

22

23

24  Job No.: J3589219

25



1               P R O C E E D I N G S

2

3          THE COURT:  Good morning.  Please be seated.  Ladies

4  and gentleman, I want to apologize to you for the delay.  But as

5  you know from our California debacle, there are always things,

6  logistic matters, procedural matters, evidentiary matters that

7  have to be taken care of as the trial progresses in order to

8  make it run smoothly, and those are some of the things that

9  we've taken care of this morning.  Mr. Smith, Mr. Adams, Mr.

10 Rogers, will you waive the roll call of the jury.

11          MR. ADAMS:  Yes, sir.

12          MR. ROGERS:  Yes, Judge.

13          THE COURT:  Are you ready to go forward, Mr. Smith?

14          MR. SMITH:  Yes, Your Honor.

15          THE COURT:  Ladies and gentleman, while he's getting

16 his next witness, did each of you comply with the admonition

17 that I gave you yesterday evening before we recessed?  All of

18 you?  Very good.  Come around, please, to be sworn.  There you

19 go.  Do you solemnly swear or affirm the testimony you're about

20 to give will be the truth, the whole truth, and nothing but the

21 truth, so help you God?

22          MARK HANDY:  I do.

23          THE COURT:  Please be seated.  Mr. Smith, you may go

24 forward.

25          MR. SMITH:  Thank you, Your Honor.  State your full

1   name for the record, please.

2               MARK HANDY:  Mark Dennis Handy.

3               MR. SMITH:  And what's your occupation?

4               MARK HANDY:  Police detective, City of Louisville.

5               MR. SMITH:  How long have you been a detective with

6   the city of Louisville?

7               MARK HANDY:  I was a district detective from '88 into

8   '89.  I've been with the homicide unit since April of '89.  What

9   did you do prior to that, Detective Handy.  I was a patrol

10  officer.

11              MR. SMITH:  How long were you a patrol officer?

12              MARK HANDY:  From '86 into '89 -- or '88, rather.

13              MR. SMITH:  What education or training do you have in

14  the police field?

15              MARK HANDY:  I've got a bachelor's degree from

16  University of Louisville on police administration.  I've got

17  training -- uh, recruit school training, uh, with the police

18  department, and then I've went to two-week homicide seminar at

19  SPI -- Southern Police Institute and in-service training --

20              MR. SMITH:  That's fine.

21              MARK HANDY:  -- uh, every year.

22              MR. SMITH:  How did you get involved with the murder

23  of Rhonda Sue Warford, Detective Handy?

24              MARK HANDY:  Um, Sheriff Greer and, uh, Bill Adams

25  came to our office requesting some assistance in this case.

1       MR. SMITH:  And what did you do, as far as the

2  assistance you accorded Sheriff Greer and Coroner Adams?

3       MARK HANDY:  Um, the majority of the things that I did

4  was, uh, conduct interviews along with Sheriff Greer and Mr.

5  Adams.  I also had Mr. Clark's car towed to our basement for

6  processing.  Uh, I interviewed with my boss, Jim Woosley (ph),

7  Mr. Hardin in this case.

8       MR. SMITH:  Now, when you say you had his, his car

9  towed in, the Nova vehicle?

10      MARK HANDY:  Yes, sir, that's correct.

11      MR. SMITH:  And when you say it was towed into your

12 basement, actually what do you mean by that?

13      MARK HANDY:  Well, in the basement of LPD headquarters

14 is where our evidence technician unit's office is.  We had a LPD

15 wrecker towed into the basement for our evidence people to

16 process it.

17      MR. SMITH:  And when we talk about evidence people

18 processing it, you're talking about them going over the car for

19 fingerprints, hair, any blood, anything like -- any evidence at

20 all?

21      MARK HANDY:  Anything at all.

22      MR. SMITH:  Okay.  And Ms. Margaret Haun is one of the

23 evidence technician unit with your department?

24      MARK HANDY:  Yes, sir.

25      MR. SMITH:  Okay.  She'll be down here to testify

1  later.  Now, who, uh, did you ever speak with the defendant,

2  Jeff Clark?

3            MARK HANDY:  I did.

4            MR. SMITH:  Can you tell me when the first time you

5  spoke with him was?

6            MARK HANDY:  April 6, 1992.

7            MR. SMITH:  Now, when you first spoke with the

8  defendant Clark, was he a suspect or under suspicion by the

9  department?

10            MARK HANDY:  Uh, not that I'm -- he was just someone

11  we needed to speak to in reference to this case.

12            MR. SMITH:  All right.  Tell us -- the first time you

13  talked to him was when?

14            MARK HANDY:  April 6, 1992.

15            MR. SMITH:  Where did you speak with him at?

16            MARK HANDY:  Uh, I did an interview with him up in our

17  office.  We picked him up at his home -- uh, Sheriff Greer, Bill

18  Adams and I -- and brought him up to our office and interviewed

19  him there.

20            MR. SMITH:  And is this the usual way you do things in

21  these type of cases?

22            MARK HANDY:  Uh, normally we, we bring 'em up to our

23  office for an interview.

24            MR. SMITH:  Let me see if I can't save a little time

25  here.  Did you also interview the defendant Hardin?

1          MARK HANDY:  I did.

2          MR. SMITH:  Let the record reflect, I'm showing

3  opposing counsel would have been marked for identification

4  purposes as commonwealth's Exhibits 18 and 19.  Now, --

5          THE COURT:  (Inaudible).

6          MALE SPEAKER:  (Inaudible).

7          MR. SMITH:  I will hand you what has been marked --

8          MR. ROGERS:  Judge, may we approach the bench?

9          THE COURT:  Sure.

10         MR. ROGERS:  Okay.  I don't see any need, any need to

11 introduce those photographs.

12         THE COURT:  I'm sorry, Mr.--

13         MR. ROGERS:  I really don't see what the purpose is of

14 introducing these photographs in there?  Uh, I mean, if

15 Detective Handy can identify the people sitting here, he could

16 identify who's sitting in an interview with him, he had an

17 interview with them.  What I find as objectionable is the way

18 they're dressed, you know, the way their hair is cut at that

19 particular time, which has nothing to do with this case, their

20 personal appearance.  And, uh, I think it creates a bad

21 impression on the jury to, to show up with them -- half of them

22 -- at one time taken out of the, you know, their home dressed in

23 that kind of --

24         THE COURT:  Let's go into chambers for a second.

25         (In chambers)



1          MR. SMITH:  Now, Detective Handy, handing you what has

2     been marked for identification purposes as commonwealth's

3     Exhibits 18 and 19.  Please tell me whether you can identify

4     those photographs.

5          MARK HANDY:  I can.

6          MR. SMITH:  Tell us what those two photographs depict?

7          MARK HANDY:  Uh, one is defendant Clark, the other is

8     defendant Hardin, and these were taken in our office downtown.

9          MR. SMITH:  And did you see the defendant Clark and

10    the defendant Hardin on or about the time that those photographs

11    were taken?

12         MARK HANDY:  I did.

13         MR. SMITH:  And do those photographs fairly and

14    accurately portray and depict how they looked on that occasion?

15         MARK HANDY:  They do.

16         MR. SMITH:  Move to introduce into evidence, you know,

17    is commonwealth's Exhibits 18 and 19 as previously marked.

18         THE COURT:  Let it be marked.  Objections noted.

19         MR. ROGERS:  Subject to the conversation, yeah.

20         MR. SMITH:  Thank you.  Request permission to show

21    them to the jury, Your Honor.

22         THE COURT:  You may do so.  I think if you want to go

23    forward, I don't believe we'd miss much.

24         MR. SMITH:  Right.  Thank you, Judge.  Now, Detective

25    Handy, tell us whether or not you can now identify Jeffrey

 1  Clark.

 2              MARK HANDY:  I can.

 3              MR. SMITH:  Would you identify him or point him out

 4  for the jury, please.

 5              MARK HANDY:  Mr. Clark's the gentleman right here

 6  directly in front of me.

 7              MR. SMITH:  Let the record reflect, Your Honor, that

 8  the witness has identified the defendant Jeffrey Clark.  Tell us

 9  --

10              MALE SPEAKER:  (Inaudible).

11              MR. SMITH:  Thank you.  Tell us whether or not you can

12  identify the defendant, uh, Garr Keith Hardin.

13              MARK HANDY:  I can.

14              MR. SMITH:  Point him out for the court, please.

15              MARK HANDY:  Uh, Mr. Hardin is the gentleman all the

16  way to the end of the table there.

17              MR. SMITH:  Let the record reflect that the witness

18  has identified the defendant Garr Keith Hardin, Your Honor,

19  please.

20              THE COURT:  So reflected.

21              MR. SMITH:  Now, Detective Handy, backing up, tell me

22  again when you first spoke with -- well, strike that.  As

23  between these two defendants, whom did you speak with first?

24              MARK HANDY:  On April 6th I spoke with Mr. Clark, so

25  that would be the first.

1          MR. SMITH:  And down at the, uh, down at the police

2   station as you said -- told us earlier?

3          MARK HANDY:  Yes, sir.

4          MR. SMITH:  Tell us what the defendant Clark told you

5   at that interview.

6          MARK HANDY:  Mr. Clark advised me that he has known

7   Keith Hardin since approximately the 8th grade.  Mr. Clark

8   describe -- described Keith Hardin as a close friend that he

9   would see almost daily.  Mr. Clark advised me that the last time

10  he saw the victim, Rhonda Warford, was in December 1991 at his

11  trailer on Newburg Road.  Mr. Clark further advised that he

12  dated Rhonda's sister, Michelle Rogers (ph) and the last time he

13  saw Michelle Rogers was on -- excuse me -- in November of 1991.

14  Mr. Clark advised me that the last time he was at his trailer

15  was Wednesday evening, Thursday -- into Thursday morning, April

16  1st and April 2nd, 1992.  Mr. Clark advised me that he was at the

17  trailer with Keith Hardin until approximately 0100 hours -- 1

18  a.m.  -- drinking beer and looking for his pet snake, which was

19  missing.

20         MR. SMITH:  Excuse me.  1 a.m. in the morning?

21         MARK HANDY:  Yes, sir.

22         MR. SMITH:  All right.  Early Thursday morning?

23         MARK HANDY:  Right.  It would have been Wednesday

24  evening into Thursday morning.

25         MR. SMITH:  Okay, thank you.  Go ahead, please.

1    MARK HANDY:  Mr. Clark advised that he and Keith

2  Hardin left the trailer at approximately 0100 -- 1 a.m., uh,

3  that he then took Keith home and then went home on Cod Drive.

4  Mr. Clark further advised me that he was at home all day

5  Thursday, the second of April, and that sometime early Thursday

6  evening he went to Keith Hardin's house and Keith did not want

7  to go anywhere so he then went to Jimmy McMackin's apartment on

8  Deering Road (ph) and then went home at approximately 2230 hours

9  -- 10:30 p.m. Thursday night.  Do you want me to continue on?

10    MR. SMITH:  Go ahead, please.

11    MARK HANDY:  Mr. Clark further advised that he was

12  home on Cod Drive until Friday afternoon, and on Friday

13  afternoon at approximately 1400 hours -- 2 p.m.  -- he went to

14  the Department for Human Services on Fern Valley Road. Mr. Cl-,

15  --

16    MR. SMITH:  Let me interrupt you at this point in

17  time.  That's where he went on and told you where he was the

18  rest of the week, right?

19    MARK HANDY:  That's correct.

20    MR. SMITH:  All right.  Did you question him at that

21  time about whether or not he owned any knives?

22    MARK HANDY:  Mr. Clark advised me that he does not

23  have a knife and has never seen Keith with a knife.

24    MR. SMITH:  Did you question Mr. Clark at all about

25  being involved in Satanism or devil worship?

1      MARK HANDY:  Mr. Clark further advised me that he has

2  not into devil worship and does not know if Keith Hardin is.

3      MR. SMITH:  Bear with me just a minute, detective.

4  Tell the jury whether or not you questioned him about the

5  knowledge -- any knowledge of Meade County.

6      MARK HANDY:  Mr. Clark further advised me that has not

7  been to Meade County in a long time and that Rhonda has not been

8  in his auto-, he said he'd not been to Meade County in a long

9  time.

10     MR. SMITH:  When did, when did he tell you the last

11 time that Rhonda Sue Warford was in his automobile?

12     MARK HANDY:  December of 1991.

13     MR. SMITH:  Bear with me just a minute, detective.

14 Now, when you interviewed him that first time -- that first time

15 you spoke with him, you're reading from your report, correct?

16     MARK HANDY:  Correct.

17     MR. SMITH:  And how does this work?  After you

18 interview someone, do you make a report like this?

19     MARK HANDY:  What we'll do is we'll take our written

20 notes and then we'll use a tape recorder and transcribe 'em and

21 then we've got a, um, people who take that transcription and

22 type up these for us.

23     MR. SMITH:  Now, was anyone with you at that first

24 interview?

25     MARK HANDY:  With Mr. Clark?

1        MR. SMITH:  Yes.

2        MARK HANDY:  Yes, sir.  Sheriff Greer and Bill Adams.

3        MR. SMITH:  Now, at that point in time the defendant,

4   Clark, was telling you his whereabouts in the wee morning hours

5   of that Thursday, correct?

6        MARK HANDY:  Correct.

7        MR. SMITH:  Did he mention to you anything about

8   stopping by a convenience store on the way home?

9        MARK HANDY:  He did not.

10        MR. SMITH:  Did he give you any names of anyone who

11   could identify seeing him on that occasion, that night?

12        MARK HANDY:  Other than Mr. Hardin?

13        MALE SPEAKER:  Right.

14        MR. SMITH:  Yes.  Other than Mr. Hardin, right.

15        MARK HANDY:  Uh, no, sir.

16        MR. SMITH:  Now, tell us, did you ever have an

17   occasion to speak with Mr. Clark again?

18        MARK HANDY:  I did.

19        MR. SMITH:  Before we get into that, I would like to

20   show you what has been marked for identification purposes -- get

21   my numbers straight here -- 13, 14, 15, 16, and 17.  Please take

22   a gander at those photographs for me.  I'm sorry.  Can you

23   identify those photographs for me?

24        MARK HANDY:  Yes, sir.

25        MR. SMITH:  Please tell the jury what those are

1  photographs of.

2         MARK HANDY:  Um, these are photographs of Mr. Clark's

3  Nova, the car that was towed to the basement of LPD

4  headquarters.

5         MR. SMITH:  Now, at that point in time, that first

6  interview -- I'm a come back to those photographs in just a

7  minute -- during that first interview, what facts did you tell

8  Mr. Clark about the body of Rhonda Sue Warford, if any?

9         MARK HANDY:  I, I don't recall, other than I may have

10  mentioned that she was found in Meade County.  But other than

11  that, I don't -- none.  Now, do these photographs that we have

12  previously marked for identification purposes, do they fairly

13  and accurately depict and portray how the car of Jeff Clark

14  looked on that particular occasion?

15         MARK HANDY:  They do.

16         MR. SMITH:  Okay.  Move to introduce into evidence,

17  Your Honor, as the number so marked.

18         MALE SPEAKER:  No objection.

19         THE COURT:  It will be introduced.

20         MR. SMITH:  We would request permission to show them

21  to the jury and, --

22         THE COURT:  Go ahead.

23         MR. SMITH:  -- and then I think we can move along too,

24  Your Honor, at this point if you have no objection.

25         THE COURT:  I will leave that with your discretion.

1   Any time you want to suspend questioning, you may do so.  If you

2   want to proceed with questioning, you may do that also.

3           MR. SMITH:  Now, as far as the defendant Clark and

4   Hardin, when was the next time you spoke with every one of them?

5           MARK HANDY:  April 7th I spoke with -- I along with my

6   sergeant, Jim Woosley (ph) spoke with Mr. Hardin.

7           MR. SMITH:  Now -- and where did this interview with

8   Mr. Hardin take place?

9           MARK HANDY:  We picked him up at home and transported

10  him down to our office.  Some of the interview took place in the

11  car and, uh, mo-, the majority of it in our office.

12          MR. SMITH:  Tell us what the defendant Hardin told you

13  on April the 7th on that interview.

14          MARK HANDY:  While en route to the office I asked

15  Keith Hardin if he was in fact into Satanism as I had previously

16  been told, and Keith admitted to me that he was not engaging in

17  Satanic worship anymore but that he had previously for

18  approximately six years.  That he had stopped approximately one

19  month ago.  I asked Keith Hardin if in the course of his Satanic

20  worship if he had killed any cats or other small animals and he

21  acknowledged to me that he had killed small animals.  I then

22  asked Mr. Hardin why he had stopped the devil worshipping and he

23  advised me that had gotten tired of looking at animals and began

24  to want to do human sacrifices.  Keith Hardin advised me that he

25  has been dating Rhonda Warford for approximately five months and

Case 3:17-cv-00419-GNS-CHL  Document 317-44  Filed 01/26/23  Page 16 of 95 PageID #: 28080

1  that they were getting along fine.  Keith Hardin further advised

2  me that he had, that he had --

3          MR. SMITH:  Let's, let's don't go into that.

4          MARK HANDY:  Okay.  You want me to start with Keith

5  Hardin advised that he had last saw Rhonda?

6          MR. SMITH:  Yes, yes.

7          MARK HANDY:  Keith Hardin adv-, further advised me

8  that he last saw Rhonda Warford on March 27th and March 28th, 1992

9  when he stayed at her house on Whitney.  Keith Hardin further

10  advised that he spoke with Rhonda every day and last spoke to

11  her on the telephone at approximately 1500 hours on Wednesday,

12  April 1, 1992 and that the victim told him that she would call

13  him back.

14          MR. SMITH:  Now, uh, this part of the interview took

15  place where, Detective Handy?

16          MARK HANDY:  In the car on our way back to our office.

17          MR. SMITH:  All right.  And then you got back to the

18  office --

19          MARK HANDY:  Right.

20          MR. SMITH:  -- and the interview continued.

21          MARK HANDY:  Correct.

22          MR. SMITH:  Go ahead and tell us what Mr. Hardin told

23  you at that point in time.

24          MARK HANDY:  Mr. Hardin advised me that on Wednesday

25  evening April 1, 1992 that he was with Jeff Clark at Jeff's

1 trailer on Newburg Road.  Mr. Hardin advised me that they were

2 drinking beer and looking for Jeff's snake, which was lost.  Mr.

3 Hardin further advised that they also went to the Bashford Manor

4 Mall and then Jeff took him home, arriving there at

5 approximately 0300 to 0330.  So, it's 3 a.m.  to 3:30 a.m.

6 Keith further advised that he as pretty drunk and that is all he

7 really remembers.

8          MR. SMITH:  Now, he told you he got home between 3:00

9 and 3:30 in the morning?

10          MARK HANDY:  Correct.

11          MR. SMITH:  And the day before the defendant Clark

12 told you he'd got home at 1:00, abouts?

13          MARK HANDY:  Well, I think he may have said they left

14 the trailer at 1:00.

15          MR. SMITH:  Okay.

16          MARK HANDY:  I'd have to look.

17          MR. SMITH:  All right.

18          MARK HANDY:  Is that correct?  I mean, I'd have to

19 look it up, but I believe he said they --

20          MR. SMITH:  That's --

21          MARK HANDY:  -- left the trailer at 1 a.m.

22          MR. SMITH:  All right.  Now, Hardin told you that they

23 went by Bashford Manor Mall.

24          MARK HANDY:  Correct.

25          MR. SMITH:  Did Hardin tell you anything about

1   stopping at any convenience store?

2          MARK HANDY:  No.

3          MR. SMITH:  Go ahead and tell me what else Mr. Hardin

4   told you at that point in time.

5          MARK HANDY:  Uh, when I asked about the upside down

6   cross on Rhonda's chest, Keith advised that he did not -- he did

7   that indicating that he placed a cross on her chest

8   approximately three months ago.

9          MR. SMITH:  Go ahead.

10         MR. ADAMS: Objection.  If you're going to continue in

11  that line.

12         MR. SMITH:  Did the defendant, Hardin --

13         (Overlapping Conversation)

14         THE COURT:  I'm sorry.  Give me a second.  You object?

15         MR. ADAMS: Yes, Judge.

16         THE COURT:  Well, then let's -- let's talk about it.

17         MR. ADAMS: It might not be necessary.  I --

18         MR. SMITH:  Wait just a minute, Judge.  Let me look at

19  that.  Okay, we do need to confer.

20         (In chambers)

21         THE COURT:  Okay.  Let's go forward.

22         MR. SMITH:  Detective Handy, when you talked to Hardin

23  on this occasion, did you ask him whether he owned any knives or

24  not?

25         THE COURT:  Let me back up and get it on the record

1  because I'm not sure we did.  Your objection a while ago is

2  sustained, Mr. Adams.

3          MR. ADAMS: Thank you, sir.

4          MARK HANDY:  Yes, sir, I did.  Keith Hardin advised

5  that he did not have a knife and that he did not ever know of

6  Jeff Clark to have a knife either.

7          MR. SMITH:  Bear with me just a minute.  Now, at that

8  time you requested that the defendant Harding give you some hair

9  samples.  I'm looking for the stipulation, Judge.

10         THE COURT:  I gave it to Ellen (ph).

11         MALE SPEAKER:  That's okay.

12         MR. SMITH:  Is that correct, detective?

13         MARK HANDY:  Yes, sir.

14         MR. SMITH:  And he did give you some hair samples?

15         MARK HANDY:  There were some collected; that's

16  correct.

17         MR. SMITH:  Right.  What -- af-, did we stipulate to

18  that?  We stipulated --

19         (Overlapping Conversation)

20         THE COURT:  To?

21         MR. SMITH:  -- the hair sample taken --

22         MALE SPEAKER:  Hair sample.

23         MR. SMITH:  -- and submitted to the lab.

24         MR. ADAMS: (Inaudible).

25         MR. SMITH:  Okay.

1              MR. ADAMS:  Yeah.

2              MR. SMITH:  Now, when did you subsequently speak with

3    anyone else?  I mean, not with anyone else -- with either

4    defendant, Detective Handy?

5              MARK HANDY:  On April 9th -- just double check -- I

6    believe the next time was April 9th I spoke with Mr. Hardin

7    again.

8              MR. SMITH:  Let me back up here a minute.  Did

9    defendant Clark agree for -- to have his vehicle processed?

10             MARK HANDY:  He did.

11             MR. SMITH:  Okay.  And then, who did you speak with

12   again, and on what occasion?  Uh, as far as these two

13   defendants.

14             MARK HANDY:  Right.  On April 9th Mr. Hardin was re-

15   interviewed.

16             MR. SMITH:  Mr. Hardin was reinterviewed?

17             MARK HANDY:  Right.  Reinterviewed Keith Hardin along

18   with Sheriff Greer.  Met and brought Keith Hardin back to our

19   office.

20             MR. SMITH:  I'm showing here -- did you speak with

21   Clark on April the 8th?

22             MARK HANDY:  I believe April the 8th is when --

23             MR. SMITH:  I'm showing a re-interview --

24             MARK HANDY:  -- (inaudible) --

25             MR. SMITH:  -- with Clark on April the 8th.  My -- I

1 | could be wrong on the dates.

2 |      MARK HANDY:  I've got -- and that was the same day,

3 | correct?  Uh, my fault.  That was the same day that we asked

4 | and, and, and he agreed to have his car, uh, searched.

5 |      MR. SMITH:  And then, did you re-, --

6 |      MARK HANDY:  Right.  It was a re-interview.  Jeff

7 | Clark.

8 |      MR. SMITH:  Why did you go back and interview him

9 | again, Detective Handy?

10 |      MARK HANDY:  Um, I don't recall offhand.  Um, it may

11 | be in -- I, I really don't recall what the reasoning was.

12 |      MR. SMITH:  At the second interview, who was there?

13 |      MARK HANDY:  Uh, Jo Greer and Bill Adams -- Sheriff

14 | Greer and Bill Adams.

15 |      MR. SMITH:  What did the defendant Clark tell you at

16 | this second interview?

17 |      MARK HANDY:  That he had previously lied about owning

18 | a knife, that he owned several.  And he denied any involvement

19 | in devil worshiping, explained to me that it is sick and that

20 | he does not know if Keith is into it or not, but he definitely

21 | is not.

22 |      MR. SMITH:  All right.  Hold up a minute here.  And

23 | what did he tell you on the second interview about the time that

24 | he got home?

25 |      MARK HANDY:  Again, he left the trailer at 1 a.m. and

 1  went home.

 2          MR. SMITH:  Now, on this occasion when he told you he

 3  again got home at one in the morning, --

 4          MARK HANDY:  I believe he said he left the trailer

 5  together on --

 6          MALE SPEAKER:  Objection.

 7          MR. SMITH:  You're right.  I'm sorry, I'm sorry.  I

 8  misspoke.  Now, on this occasion, did the defendant Clark tell

 9  you anything about stopping at any convenience store?

10          MARK HANDY:  No, sir.

11          MR. SMITH:  Did he make any statements to you about

12  going to Bashford Manor Mall?

13          MARK HANDY:  No, sir.

14          MR. SMITH:  And did he make any statements to you

15  about getting home at 3 or 3:30 in the morning?

16          MARK HANDY:  He did not.

17          MR. SMITH:  At this point in time, tell us whether or

18  not the defendant admitted knowing Meade County or being in

19  Meade County before?

20          MARK HANDY:  He advised that he has not been in Meade

21  County since July of 1991.

22          MR. SMITH:  Now, of these two defendants, who was the

23  next person that you interviewed, Detective Handy?

24          MARK HANDY:  Um, April 9th, uh, there as a re-interview

25  with Keith Hardin.

1      MR. SMITH:  Now, at -- where did this interview take

2  place?

3      MARK HANDY:  Um, Sheriff Greer and I brought him back

4  to the LPD headquarters and interviewed him there.

5      MR. SMITH:  Did the defendant Hardin tell you anything

6  about making any previous threats to Rhonda Sue Warford?

7      MARK HANDY:  Uh, Keith acknowledged that he had

8  previously told Rhonda that if she ever cheated on him or left

9  him that he would kill her.  Do you want me to continue on?

10      MR. SMITH:  Yes.

11      MARK HANDY:  But that he had told all his girlfriends

12  that and none of them were dead.

13      MR. SMITH:  Now, at this point in time at this re-

14  interview, tell the jury whether or not you again questioned him

15  about knives.

16      MARK HANDY:  I then asked Keith about owning a knife

17  and Keith again denied owning a knife and advised me that he

18  didn't --

19          (Overlapping Conversation)

20      MALE SPEAKER:  Objection.

21      MR. SMITH:  Well, hold up.  We gotta stop there.

22      MARK HANDY:  All right.

23      MR. SMITH:  Now, on this occasion, on this occasion,

24  did Keith Hardin say anything to you about getting home at any

25  other time other than the previously stated 3 to 3:30 in the

1  morning?

2          MARK HANDY:  I don't -- you know, I -- maybe that I

3  didn't ask or -- it's not in here, so he didn't or I didn't ask.

4          MR. SMITH:  Did he make any statements to you at this

5  point in time about being by any convenience store?

6          MARK HANDY:  He did not.

7          MR. SMITH:  And who was present at this interview?

8          MARK HANDY:   Sheriff Greer.

9          MR. SMITH:  Did you interview them at any other

10  occasion?  And I'm not showing you did?

11          MARK HANDY:  I believe, um, I interviewed -- or I

12  along with Sheriff Greer interview Mr. Clark one more time

13  briefly, I think.

14          MR. SMITH:  Did you keep any notes or anything on that

15  interview?

16          MARK HANDY:  There should be a letter generated May 5,

17  1992.

18          MR. SMITH:  May 5th of 1992 you interviewed what?

19          MARK HANDY:  Uh, defendant Clark.

20          MR. SMITH:  And --

21          MR. ADAMS: Judge, before we go any further, I, I don't

22  have that.

23          MALE SPEAKER:  Here.

24          MR. SMITH:  I don't have that.

25          MR. ADAMS: No, we never got it, Judge.  Neither one of

 1  us.

 2          THE COURT:  Well then, let's do this.  Let's take --

 3  give the jury a chance to stretch their legs and we'll go see

 4  where we are.  How's that?

 5          MR. SMITH:  That's fine, sir.

 6          THE COURT:  Ladies and gentleman of the jury, it is

 7  you duty not to permit anyone to speak to or communicate with

 8  you on any subject connected with this trial, and any attempt to

 9  do so should be immediately reported by you to the court.  Do

10  not converse or discuss among yourselves any subject connected

11  with the trial, nor form or express any opinion thereon when the

12  case is finally submitted to you for determination.  If anyone

13  should state anything within your hearing about this case,

14  promptly bring this matter to the attention of the court.  With

15  that, Officer Wright (ph), Alex will take the jury back to the

16  grand jury room.  You want to make sure that they've got some

17  coffee and so forth back there.  We'll see you in about 10

18  minutes.

19          THE COURT:  Okay, Mr. Smith, you may go forwards.

20          MR. SMITH:  Detective Handy, that last occasion that

21  you spoke with the defendant Clark, uh, was there anything he

22  told you on that occasion that was any different than what he

23  had already told you?

24          MARK HANDY:  No, sir.

25          MR. SMITH:  That's all the questions I have, Your



 1  Honor.

 2          THE COURT:  Okay.  Mr. Adams?

 3          MR. ADAMS: Yes, sir.  (Inaudible) this interview,

 4  Judge, (inaudible). Detective Handy, let's go over some of the

 5  other things that Mr. Clark advised you of during that first

 6  interview.  If you would go to your interview of, I guess, April

 7  the 6 <sup>th</sup>.  That's the first interview, correct?

 8          MARK HANDY:  Yes, sir.

 9          MR. ADAMS: And as I understand it -- as I understand

10  it, when you first went to Mr. Clark's home at 4519 Cod Drive

11  where he was living with his parents, his -- he was not home;

12  his grandmother was there and you left a card for him to call

13  you.

14          MARK HANDY:  Yes, sir.

15          MR. ADAMS: And he cooperated and called you when he

16  got home, correct?

17          MARK HANDY:  He, he did.

18          MR. ADAMS: Okay.  So then, did, did you have him just

19  come on in to this -- to the police department or did you go

20  pick him up and he came with you voluntarily?  Or what was the

21  situation?

22          MARK HANDY:  We, uh, picked him up and he came with us

23  voluntarily.

24          MR. ADAMS: Okay.  And at this time, as you've told the

25  ladies and gentleman of the jury, he was just somebody that was

1  a witness in a case that you wanted to talk to, correct?

2          MARK HANDY:  I, I don't know how his name came up.

3          MR. ADAMS: But regardless of that, he was not a

4  suspect that particular time and you did not read him his

5  rights.

6          MARK HANDY:  That's correct.

7          MR. ADAMS: Okay.  And I assume that you were just

8  interviewing him as you would any other witness, listing

9  whatever information you could?

10          MARK HANDY:  Correct.

11          MR. ADAMS: And did you tell him how important it was

12  for him to tell you exactly what it was that he was doing on

13  Wednesday night and Thursday night, that he might be a suspect?

14          MARK HANDY:  I think we just went over where he was

15  at.

16          MR. ADAMS: Generally.

17          MARK HANDY:  Generally, right.

18          MR. ADAMS: Okay, fine.  Now, do you have your original

19  notes from that interview, sir?

20          MARK HANDY:  No, I do not.

21          MR. ADAMS: And what happened to those original notes?

22          MARK HANDY:  What we do is, in, in, in just about

23  every case, is these become our original notes.

24          MR. ADAMS: Detective Handy, let's try this one more

25  time.  You have a spiral notebook, as I understand it, --

1          MARK HANDY:  Correct.

2          MR. ADAMS: -- in which you write down the interviews.

3          MARK HANDY:  Correct.

4          MR. ADAMS: Correct?  And that, from what you've told

5    the ladies and gentleman of the jury is, as I understand it and

6    from your testimony in other cases, is that you will, either

7    that day or the next or as soon as you can, as soon as time

8    permits, you will dictate off of your original notes a summary,

9    and that summary is transcribed and becomes your investigative

10   letter.

11         MARK HANDY:  Correct.

12         MR. ADAMS: What happens to the spiral notebook?  Are

13   they stored anyplace, are they --

14         (Overlapping Conversation)

15         MARK HANDY:  No, they're --

16         MR. ADAMS: -- destroyed?

17         MARK HANDY:  They're destroyed.

18         MR. ADAMS: Okay.  And they're never kept with the case

19   file?

20         MARK HANDY:  The only times -- and, and if, uh, if I

21   may, the only times that they are is when we receive a court

22   order to retain those, which we do receive from time to time and

23   then they're retained.

24         MR. ADAMS: Okay.  Now, we got up -- you were, you were

25   going through the, uh, what Mr. Clark had told you where he had

 1  been, etcetera.  If you would go to page three of your report at
 2  about -- on the 11th line down.  Excuse me.  Now, we got to the
 3  part where on Friday afternoon he was telling you where he had
 4  been and he told you that he had been at the Human Services --
 5  Department for Human Services on Fern Valley Road unemployment
 6  office.  And then -- then you were cut off and you went to
 7  something else.  So, let's, let's run through, if we might,
 8  exactly what he told you as to where he had been that entire
 9  time, okay?

10          MARK HANDY:  Sure.  Yes, sir.

11          MR. ADAMS: And again, he's not been advised of his

12  rights and, and he is cooperating fully with you?

13          MARK HANDY:  Yes, sir.

14          MR. ADAMS: All right.  All right.  Tell us further

15  what he advised where he had been during that weekend.

16          MARK HANDY:  After leaving the Department for Human

17  Services start there and go on?

18          MR. ADAMS: Yes, sir.

19          MARK HANDY:  And then he then went over to Keith

20  Hardin's house and was told by Keith Hardin that he had not

21  heard anything from Rhonda.  Mr. Clark further advised --

22          MR. ADAMS: I agree.

23          MARK HANDY:  Um, --

24          MR. ADAMS: That's my fault and --

25          THE COURT:  Detective, what we want you to do is to

1   exclude anything that Mr. Clark related to you as having heard

2   from a third-party.  Limit your testimony to what Mr. Clark said

3   that he did, okay?

4            MR. ADAMS: And I apologize, too.  That was my fault.

5   Okay.  Let me just -- let me -- I'll ask the question then you

6   can respond, okay?

7            MARK HANDY:  Yes, sir.

8            MR. ADAMS: Did Mr. Clark advise you that he went home

9   and stayed home all night Friday night?

10           MARK HANDY:  Yes, sir.

11           MR. ADAMS: Okay.  Did he then advise you that on

12  Saturday morning he went to the flea market with his stepfather

13  Danny Cochran?

14           MARK HANDY:  Yes, sir.

15           MR. ADAMS: Did he further tell you that he got home on

16  Saturday from the flea market at approximately 1400 hours -- 2pm

17  in the afternoon -- and that he then went to Jimmy McMackin's

18  house in Shepherdsville and that he came home at approximately

19  7:30 to 8:00 Saturday afternoon -- Saturday evening?

20           MARK HANDY:  Yes, sir.

21           MR. ADAMS: And that he then got cleaned up and went

22  back out to Jimmy's house in Shepherdsville off of East 44 and

23  was at Jimmy's house until approximately 3 a.m. Sunday morning?

24           MARK HANDY:  Yes, sir.

25           MR. ADAMS: And that he went home from there?

1          MARK HANDY:  Yes, sir.

2          MR. ADAMS: He further advised you that with Jimmy was

3   Jimmy's wife, uh, and Eddie Thrasher (ph) and Eddie's girlfriend

4   Kelly?

5          MARK HANDY:  Yes, sir.

6          MR. ADAMS: Okay.  And the Keith stuff we'll come back

7   to.  All right.  Now, also during this interview he told you

8   that Rhonda had been in his automobile but that he had -- she

9   had not been in it since December of 1991.

10         MARK HANDY:  Yes, sir.

11         MR. ADAMS: All right.  And at that particular time,

12  you asked Mr. Clark if he would voluntarily give you hair

13  samples and other samples; is that correct?

14         MARK HANDY:  Yes, sir.

15         MR. ADAMS: And, uh, you contacted the, uh, Dr. Cory

16  (ph) at the state medical examiner's office and made

17  arrangements for those samples to be taken.

18         MARK HANDY:  Correct.

19         MR. ADAMS: And that was all done voluntarily?

20         MARK HANDY:  Yes, sir.

21         MR. ADAMS: All right.  Now, further, sir, later on you

22  went out and interviewed people checking out this alibi that was

23  given to you concerning McMackin; is that correct?

24         MARK HANDY:  That's correct.

25         MR. ADAMS: And after you interviewed McMackin and/or

1  other individuals that were involved in that particular aspect

2  of where he was Saturday -- or what he told you about McMackin,

3  you concluded your interview with McMackin satisfied that

4  McMackin --

5          MR. SMITH:  Objection to the state of mind of this

6  witness.  Or the --

7          MR. ADAMS: Let me try to reword, Judge.  May I reword?

8          THE COURT:  Please.

9          MR. ADAMS: After you interviewed Mr. Mackin and the

10  others -- and/or others that were involved, you did no further

11  investigation as to the alibi that was offered to you by Mr.

12  Clark; is that correct?

13          MARK HANDY:  That's correct.

14          MR. ADAMS: All right.  Now, during these interviews

15  (inaudible), did you ask Mr. Clark at one time whether or not

16  you could take his tennis shoes because his -- he told you it

17  was the tennis shoes that he had on Wednesday night, Thursday

18  morning?

19          MARK HANDY:  Is there some -- I -- that -- I mean, at

20  some point that happened but I don't remember specifically

21  whether it was me or somebody else that asked that.

22          MR. ADAMS: Okay.  Regardless of whether or not it was

23  you, you are aware of the fact that he voluntarily gave up his

24  tennis shoes for testing?

25          MARK HANDY:  That sounds right.

1          MR. ADAMS: All right.  Also, during one of these

2   interviews, either the first or the second one, you talked to

3   him about his automobile and that you would like to search the

4   automobile.

5          MARK HANDY:  Correct.

6          MR. ADAMS: And he voluntarily said to you, "Of course

7   you may have my automobile and you may search it."

8          MARK HANDY:  Uh, that was the gist of it.  But he, he

9   --

10          MR. ADAMS: Okay.

11          MARK HANDY:  -- allowed us to do that.

12          MR. ADAMS: He allowed you to do it.  And you've been

13   in homicide for how long now, Detective Handy?

14          MARK HANDY:  Uh, since April 1989.

15          MR. ADAMS: And you have been involved and observed the

16   inventorying of automobiles?

17          MARK HANDY:  I have.

18          MR. ADAMS: Searching of.  And in this particular case,

19   is it fair for me to assume that there was a thorough search

20   done by the local police department evidence technician unit of

21   that automobile?

22          MARK HANDY:  That's who did that.  Right.

23          MR. ADAMS: Right.  And in that search, what they were

24   looking for in this particular case, was anything that might tie

25   that automobile to Rhonda Sue Warford or put Rhonda Sue Warford

 1 | in that automobile?

 2 |         MARK HANDY:  Correct.

 3 |         MR. ADAMS: Such as any bloodstains that might be in

 4 | the trunk or in the backseat of the car.

 5 |         MARK HANDY:  They were looking for anything, I

 6 | believe.

 7 |         MR. ADAMS: Bloodstains, fibers, --

 8 |         MARK HANDY:  Right.

 9 |         MR. ADAMS: -- the whole nine yards?

10 |         MARK HANDY:  Yes, sir.

11 |         MR. ADAMS: And as far as you know, the only thing that

12 | was found was a fingerprint that was found in the rear

13 | compartment of the car on the right window?

14 |         MARK HANDY:  I believe there may have been some hair

15 | that was consistent with hers too, but I'm not --

16 |         MR. ADAMS: In the backseat of the car?

17 |         MARK HANDY:  I, I believe so.

18 |         MR. ADAMS: Okay.

19 |         MARK HANDY:  Or maybe floorboard.

20 |         MR. ADAMS: However, Mr. Clark had told you that she

21 | had been in that car several times prior to, uh, mid-December of

22 | 1991?

23 |         MARK HANDY:  Correct.

24 |         MR. ADAMS: All right.  So there was absolutely no

25 | question about that at any time?

1          MARK HANDY:  No, sir.

2          MR. ADAMS: All right.  Detective Handy, there at the

3    local police department -- I've been there many times -- there

4    are in that homicide office innumerable tape recording machines;

5    is that correct?

6          MARK HANDY:  Correct.

7          MR. ADAMS: They are readily available to you and you

8    can use them at any time.

9          MARK HANDY:  Correct.

10         MR. ADAMS: That's what they're there for?

11         MARK HANDY:  Yes, sir.

12         MR. ADAMS: All right.  Tell the ladies and gentleman

13   of the jury, what is the criteria that is used by you and the

14   local police department in determining whether or not an

15   interview should be taped when you have all those machines

16   there?

17         MARK HANDY:  I, I think it's just an individual --

18   it's up to the individual detective.  Generally speaking, you

19   know, it's a judgmental call, I guess.  I don't, I don't know

20   how else to explain it.  And there is no set criteria when to or

21   when not to, I don't believe.

22         MR. ADAMS: Let's go back, Detective Handy, and talk

23   about what you knew and when you knew it as far as this

24   particular interview is concerned.  Before you went and

25   interviewed Detective Clark you had --

1          MALE SPEAKER:  Sorry.

2          MR. ADAMS: -- excuse me -- Jeffrey -- Jeffrey Clark,

3   my client.  You had talked to Detective Greer --

4          MARK HANDY:  Sheriff Greer.

5          MR. ADAMS: -- excuse me, Sheriff Greer -- and also to

6   Colonel Bill Adams.

7          MARK HANDY:  Correct.

8          MR. ADAMS: You said correct.  And they brought you up

9   to date as far as what had happened in this case up until that

10  time?

11         MARK HANDY:  I, I don't remember specifically what

12  they told me, no.

13         MR. ADAMS: You don't know?

14         MARK HANDY:  I mean, I -- about a girl being found in

15  a field in Meade County and that, uh, uh, I guess what the cause

16  of death was -- that type of information.  But I don't remember

17  specifically, no.

18         MR. ADAMS: Had the cause of death been on TV that

19  Sunday evening that the, the lady --

20         MARK HANDY:  I saw, I saw the, the news thing Sunday

21  evening, but I don't recall what exactly it was.

22         MR. ADAMS: If it said she'd been stabbed to death and

23  found in a field in Meade County?

24         MARK HANDY:  I don't remember.  I mean, I -- that was

25  not something I was unaware of.

1        MR. ADAMS: Okay.  Were you aware of the fact that

2   certain individual -- either detective or -- excuse me --

3   Sheriff Greer or other individuals had to the Warford house the

4   previous evening and had talked to and interviewed the Warford

5   family?

6        MARK HANDY:  Uh, I was aware of that.

7        MR. ADAMS: Okay.  Were you aware of, of the fact that

8   the Satanic issue, this devil worship thing had come up at this

9   time?

10       MARK HANDY:  At some point I became aware of that.  I,

11  I'm not too sure what -- at what point.

12       MR. ADAMS: Well, don't you think that it was previous

13  to the time that you went out and interviewed Jeff Clark and

14  brought him in?

15       MARK HANDY:  I don't -- I would think so, but I, I

16  don't know that, no.

17       MR. ADAMS: Okay.  So, you were also aware of the fact

18  that Jeff Clark was allegedly a friend of Keith Hardin's, who

19  was Rhonda Warford's girlfriend.

20       MARK HANDY:  Boyfriend.

21       MR. ADAMS: Boyfriend, I'm sorry.

22       MARK HANDY:  Uh, again, you know, I probably was.  I,

23  I don't really recall what, what I knew about that.

24       MR. ADAMS: Okay.  Knowing what you knew about the

25  particular case, did you feel that it may -- that Mr. Clark may

1   eventually become a suspect in the case at the time you

2   interviewed him?

3           MARK HANDY:  I, I really didn't know.  I mean, I

4   didn't know anything about any of it as far as who was sus-, you

5   know, suspect and who wasn't.  I…

6           MR. ADAMS: If you didn't really know anything about

7   who was a suspect and who wasn't, why was it that you ran

8   through with Mr. Clark his alibi and his whereabouts from
                                             st
9   Wednesday of Wednesday the 1  --

10          MARK HANDY:  Right.
                                         th
11          MR. ADAMS: -- until the 5  when the body was found?

12  Why did you want to get into what his alibi was and where he was

13  during that time if you did not think that he might be a

14  suspect?

15          MARK HANDY:  Well, I -- to eliminate him from being

16  one I guess would be the answer.  I mean, just to -- if in fact,

17  um, um, that that was the case then we could go out and verify

18  it and eliminate him.

19          MR. ADAMS: Okay.  You, you participated in a interview

20  of Mary Warford, mother of Rhonda Sue Warford on April 9, 1992?

21          MARK HANDY:  Yes, sir.

22          MR. ADAMS: During that time did Ms. Warford --

23          MR. SMITH:  Objection.

24          THE COURT:  Let him finish the question, and

25  Detective, don't answer until I can rule, okay?

1          MR. ADAMS: Thank you, Judge.  Were you made aware of

2    any phone calls that came in to the Warford House after 11 p.m.

3    on April 1, 1992?

4          THE COURT:  I'll let him answer the question was he

5    made aware of any (inaudible).

6          MR. ADAMS: (Inaudible).

7          MARK HANDY:  Yes, sir.  I'm sorry, would you repeat

8    the question?  Because I --

9          MR. ADAMS: After talking to Ms. Warford, were you made

10   aware of any phone calls that came in -- that came into the

11   house -- that were made into the house after 11 p.m. on April

12   the 1 ?
          st

13         MARK HANDY:  All right.  I'm not quite sure how to

14   answer that.

15         MR. ADAMS: Was there any statement made to you that

16   phone calls had come into the house after 11 p.m.?

17         MR. SMITH:  Same objection.

18         MARK HANDY:  I mean, I understand the question.

19         (Overlapping Conversation)

20         MR. ADAMS: Well, wait a minute.  Wait, wait.  Don't

21   say anything yet.

22         MARK HANDY:  I'm having a problem.

23         MR. ADAMS: Don't say anything yet.

24         MR. SMITH:  Can we approach?

25         THE COURT:  Yeah.

1          MR. ADAMS: It's kind of a hairy area here all of a
2    sudden.  Are you, are you going to put her on the stand?

3          MR. SMITH:  Yeah.

4          MR. ADAMS: If you'll put her on the stand, then I'm
5    not even going to worry about it.

6          MR. SMITH:  I'll put her -- she's going to testify.

7          THE COURT:  Okay.  And you're withdrawing the
8    question?

9          MR. ADAMS: I'll withdraw the question.  She's going to
10   --

11         THE COURT:  Here.  Come here, come here.

12         MR. ADAMS: Yes, sir.

13         THE COURT:  You know, I think he could answer it, but
14   not for the purposes of testifying whether or not phone calls
15   came in, but he could answer as to whether or not he was told
16   about the calls.  That's -- because that goes to what he --

17         MR. ADAMS: Well, let me ask him that, then.

18         MR. SMITH:  Well, --

19         THE COURT:  What he was --

20         MR. SMITH:  -- Judge, she, she's not a defendant.  It
21   doesn't meet any exception to the hearsay rule.  She's going to
22   testify.  Let's hear what she says about it.  I mean, it meets
23   no exception.  It's hearsay and it meets no exception.  It's not
24   -- it's explaining anything that he did.

25         MR. SMITH:  I think this may require putting Detective

 1   Handy on call.

 2             MR. ADAMS: I'm sorry, what?  I can't hear.

 3             MR. SMITH:  This may require putting Detective Handy

 4   on call to come back and testify to impeach her.

 5             MR. ADAMS: Let's do this.  Let's just -- if you're

 6   going to put her on the stand, --

 7             (Overlapping Conversation)

 8             THE COURT:  He's going to put her on the stand.

 9             MR. ADAMS: -- I'll withdraw the question.

10             THE COURT:  You can re-, --

11             MR. ADAMS: If we need to recall him, we'll recall him.

12             THE COURT:  You can reserve the right to recall him.

13             MR. ADAMS: Exactly, yes.  Now, Detective Handy, could

14   you please tell the ladies and gentleman of the jury again the

15   initial interview on April 6, 1992 that took place at the --

16   well, the police department, who was present for that interview?

17             MARK HANDY:  Sheriff Greer and Bill Adams.

18             MR. ADAMS: Okay.  And the re-interview with Mr. Clark

19   on the 8th day of April 1992, who was present?

20             MARK HANDY:  Uh, Sheriff Joe Greer and Bill, Bill

21   Adams.

22             MR. ADAMS: Okay.  Now, as I understand it, your

23   testimony as to what you say Mr. Clark told you on both of these

24   interviews -- he told you that on Wednesday night, Thursday

25   morning he had been with Keith Hardin at the trailer on Newburg

1   Road and that they -- they'd been drinking some beer, they had

2   been looking for the lost snake, and the left at approximately 1

3   a.m. and went home?

4           MARK HANDY:  Well, yes, sir.

5           MR. ADAMS: Okay.  Now, again, in the re-interview of

6   Mr. Clark on April 8, 1992 were you now aware of the fact,

7   without any question in your mind, that there was an allegation

8   of Satanism in this particular case?  Were you aware of it by

9   April the 8th?

10          MARK HANDY:  Again, I, I, I would only say that I

11  probably was.  I, I just don't remember at what point and what

12  exactly I heard about, but I, I would suggest I probably was

13  aware.

14          MR. ADAMS: And, obviously, from the context of the

15  interview when you ask him certain things about Mr. Hardin, you

16  were aware of the fact that it was alleged that he and Mr.

17  Hardin were friends.

18          MARK HANDY:  Correct.

19          MR. ADAMS: You were asking Mr. Clark specific

20  questions regarding Mr. Hardin; is that correct?

21          MARK HANDY:  Correct.

22          MR. ADAMS: Okay.  At this particular time has the

23  focus of this investigation begin to center on these

24  individuals?

25          MARK HANDY:  Again, you know, I don't know because it

1  really wasn't my responsibility to focus the investigation, so

2  I, I couldn't really answer that.  I mean, I don't…

3          MR. ADAMS: Good point, then.  Tell me who was running

4  the investigation?  Who were you answering to at this particular

5  point in time?

6          MARK HANDY:  I think Sheriff Greer probably would have

7  been in charge of everything.

8          MR. ADAMS: Are you telling us then that Sheriff Greer

9  was the man who was making decision as to what was to be done

10  and who was to be interviewed and when they would be

11  interviewed?

12          MARK HANDY:  This is going back a couple years.  As I

13  recall, whatever was being done probably was discussed first and

14  decisions were made amongst a group more so than one, but I, I

15  would suggest that he was in charge of what -- the case -- what

16  was going on.

17          MR. ADAMS: I mean, after all, to the Louisville Police

18  Department it was a foreign murder investigation; is that

19  correct?

20          MARK HANDY:  Right.  We were, we were assisting the

21  sheriff.

22          MR. ADAMS: You were aiding the sheriff --

23          MARK HANDY:  Correct.

24          MR. ADAMS: -- in his investigation.

25          MARK HANDY:  Correct.

1          MR. ADAMS: Now, if you would, Detective Handy, you've

2    made some statements about some things that Mr. Hardin said

3    about sacrifices -- that he was tired of doing animals and

4    wanted to -- was humans or something, I think is what you said.

5          MARK HANDY:  Correct.

6          MR. ADAMS: And that was said in an automobile.

7          MARK HANDY:  Correct.

8          MR. ADAMS: A police car.

9          MARK HANDY:  Exactly.

10         MR. ADAMS: And who was present in that police car?

11         MARK HANDY:  My sergeant, Jim Woosley.

12         MR. ADAMS: Jim Woosley was present?

13         MARK HANDY:  Correct.

14         MR. ADAMS: Okay.  There any investigative letters in

15   the file from your sergeant Jim Woosley that you're aware of?

16         MALE SPEAKER:  No.

17         MR. ADAMS: Now, Detective Handy, tell the ladies and

18   gentleman of the jury as an investigator and a police officer,

19   is it true that your primary job is to record the evidence as

20   best you can?

21         MARK HANDY:  I don't know that that's the primary job;

22   it's certainly one of our responsibilities.

23         MR. ADAMS: And in recording the evidence as best you

24   can, that includes the taping of statements?

25         MARK HANDY:  Sometimes, correct.

1          MR. ADAMS: And is it -- would you agree with me that

2    the best evidence of what is said during a conversation is if

3    that conversation is taped so that a jury can hear exactly what

4    was said?

5          MARK HANDY:  I would agree with that, yes, sir.

6          MR. ADAMS: And that it is in fact the best practice in

7    investigating, so that everybody will know exactly what

8    happened, to record those conversations?

9          MARK HANDY:  I think it depends.  There's a lot of

10   things that factor in.  Sometimes obviously in a moving car that

11   may not be practical.  If there's other people -- there's other

12   individuals present when the interview's being taken that may

13   not be necessary.

14         MR. ADAMS: Have you ever destroyed physical evidence

15   in a case because it did not meet your criteria of what you

16   wanted to hear?

17         MARK HANDY:  Well, what happened -- to answer your

18   question, yes.

19         MR. ADAMS: All right.  Now, I, I will ask the

20   questions from here on, okay?  You may explain you answer.

21         MR. SMITH:  I think can -- yes.

22         MR. ADAMS: You may explain your answer.  All right.

23   In approximately Feb in -- or March of 1992 in Louisville,

24   Kentucky -- or one of the investigators on a case called

25   Commonwealth versus Keith West.

1          MARK HANDY:  Correct.

2          MR. ADAMS: All right.  That was approximately the same

3  time that this particular investigation was taking place; is

4  that correct?

5          MARK HANDY:  It would have been prior to.

6          MR. ADAMS: Little bit prior?  A month or so?

7          MARK HANDY:  Correct.

8          MR. ADAMS: Okay.  And in taking an interview -- taking

9  an interview with one of the witnesses in this particular case -

10  - and what was his name --

11         MARK HANDY:  Uh, Robert Ross.

12         MR. ADAMS: -- in taking Robert Ross' initial statement

13  in the case, you stopped the tape recorder, correct?  --

14         MARK HANDY:  Correct.

15         MR. ADAMS: -- and began to talk to Mr. Ross about the

16  statement that he had just given you.

17         MARK HANDY:  Correct.

18         THE COURT:  Let me see the attorneys for a second,

19  please.  I when think that it would be appropriate at this time

20  to admonish the jury that this line of questioning is relevant

21  only to the extent that it bears upon the credibility of the

22  witness.

23         MR. ADAMS: I agree with that.

24         MR. SMITH:  Oh, I understand.  Absolutely.

25         THE COURT:  Ladies and gentleman, the line of

1  questioning is dealing with a collateral matter.  It is relevant

2  to this case and shall be considered by you only to the extent

3  that it bears upon the credibility of the witness, if it does so

4  at all.  With that admonition, you may go forward, Mr. Adams.

5          MR. ADAMS: Thank you, sir.  Mr. Ross, while you were

6  recording his statement -- he, he gives you a statement and you

7  stop the recorder, correct?  --

8          MARK HANDY:  Correct.

9          MR. ADAMS: -- at this point.  You stopped the recorder

10  because you feel that his not being forthcoming with you because

11  he may be afraid of the defendant in this case?

12          MARK HANDY:  Correct.

13          MR. ADAMS: And instead of leaving your conversation on

14  the tape with Mr. Ross, you stop the tape and go back and start

15  all over again --

16          MARK HANDY:  Correct.

17          MR. ADAMS: -- as if the initial interview never took

18  place.

19          MARK HANDY:  Correct.

20          MR. ADAMS: All right.  And while you are doing that

21  you get a more solid identification of the defendant, Keith West

22  --

23          MARK HANDY:  Correct.

24          MR. ADAMS: -- and you are more satisfied with his

25  answer, therefore you end the interview when it's over.

1          MARK HANDY:  Correct.

2          MR. ADAMS: However, unbeknownst to you, the first

3   interview that you did with Mr. West -- excuse me, Mr. Ross --

4   went about this far on the tape and the second interview where -

5   - that you erased and came back went about approximately that

6   far.  In other words, there was tape leftover from interview

7   number one.

8          MARK HANDY:  Correct.

9          MR. ADAMS: Okay.  When you sent the tape to the

10  transcriber --

11         MR. SMITH:  Your Honor, I object to this ongoing

12  thing, and how far are we going to go with this?  And the

13  witness has admitted what he did.

14         THE COURT:  I'm going to give you a little bit of

15  leeway, but let's, let's get to the, to the point.

16         MR. ADAMS: Judge, I'm really trying to.

17         THE COURT:  Okay.  Go forwards.

18         MR. ADAMS: And I'm trying to do it as quickly as I

19  can.

20         THE COURT:  Go forwards.

21         MR. ADAMS: Thank you, sir.  So, your transcriber

22  transcribes what amounts to being the second interview, and then

23  when she comes to the first interview she transcribes that too.

24         MARK HANDY:  Correct.

25         MR. ADAMS: Okay.  Now, that is sent over to the



1  commonwealth attorney's office in Louisville.

2         MARK HANDY:  Correct.

3         MR. ADAMS: And that is sent over sometime in '92?

4         MARK HANDY:  I believe that's correct.

5         MR. ADAMS: Okay.  You proceeded to trial on this

6  particular case in February the -- or you gave testimony in this

7  case on February 21, 1995.

8         MARK HANDY:  Correct.

9         MR. ADAMS: And about a week to 10 days before that

10 there was a  hearing that was held concerning this particular

11 tape.

12        MARK HANDY:  Correct.

13        MR. ADAMS: During your questioning about that tape or

14 about that investigation you made the statement that there had

15 been no erasures of any tapes in the case; is that correct?

16        MARK HANDY:  Correct.

17        MR. ADAMS: You were secondly asked had there been any

18 stopping of the interviews during this particular case and

19 initially you answered no.

20        MARK HANDY:  Uh, that sounds correct.

21        MR. ADAMS: All right.  Eventually, when you were

22 confronted with the fact that the transcriber had transcribed to

23 this point and then picked up interview number one, you admitted

24 that, in fact, you had purposely --

25        MARK HANDY:  Went back.  Correct.

1          MR. ADAMS: -- went back and erased the tape.  Your

2    explanation, however, was that it had occurred in 1992 fully --

3    24 -- about 34 months before the time that you testified.

4          MARK HANDY:  Correct.

5          MR. ADAMS: And you had forgotten that you had done

6    that and you had absolutely nothing to hide.  You sent it on

7    over.

8          MARK HANDY:  I -- correct.

9          MR. ADAMS: Okay.  Nonetheless, you did answer

10   incorrectly under oath that none of this had happened

11   beforehand; is that correct?

12         MARK HANDY:  Correct.

13         MR. ADAMS: Now, did any of that happen in any of these

14   -- in this case?

15         MARK HANDY:  No, sir.

16         MR. ADAMS: All right.  And you're telling the ladies

17   and gentleman of the jury that your parole evidence, what you

18   say that is not recorded is accurate in this case?

19         MARK HANDY:  Correct.

20         MR. ADAMS: And that the fact that in the past you had

21   purposely erased physical evidence has absolutely nothing to do

22   with this case?

23         MARK HANDY:  Correct.

24         MR. ADAMS: Just one second, Judge.  Please, sir, go to

25   your interview --

Case 3:17-cv-00419-GNS-CHL   Document 317-44   Filed 01/26/23   Page 51 of 95 PageID #: 28115

1          MALE SPEAKER:  We're not back to substantive issues?

2          MR. ADAMS: We're back to substantive issues, yes, sir.

3  The collateral issues, I think, bears directly upon the

4  substantive.

5          MR. SMITH:  Objection.  Speeches.

6          THE COURT:  I'd admonish the jury as to how to

7  interpret that.  So, don't fall into the substantive matters.

8          MR. ADAMS: Thank you, sir.  Now, I will again want to

9  get back to you about what your knowledge as on April the 5th --

10  April the 6th  when you interviewed Mr. Clark.  You, again, ask

11  him on April the 6th  about his knowledge of Keith Hardin, do you

12  not?  It'll be page two of that interview, detective, in the

13  second paragraph of Interview Jeffrey Clark.

14          MARK HANDY:  Now, I'm sorry, what was the question

15  again?

16          MR. ADAMS: You ask him specifically about Keith Hardin

17  and how well he knew him.

18          MARK HANDY:  Correct.

19          MR. ADAMS: All right.  So at that point at least you

20  knew there was an allegation that they were friends, etcetera.

21          MARK HANDY:  Correct.

22          MR. ADAMS: All right.  You also ask him at when's the

23  last time he saw Rhonda Sue Warford.  Right?

24          MARK HANDY:  Correct.

25          MR. ADAMS: And you also ask him the last time she'd

1  been in the trailer.

2          MARK HANDY:  Correct.

3          MR. ADAMS: And he responded, "Sometime in December of

4  '91."

5          MARK HANDY:  Correct.

6          MR. ADAMS: Okay.  So, at, at least at that point, even

7  on the first interview, you find it important to ask him about

8  his relationship with Hardin, when she had been at his trailer.

9  Did you ask him when he'd been -- she'd been in the car?

10         MARK HANDY:  Is there someplace where I -- I --

11         (Overlapping Conversation)

12         MR. ADAMS: No, I'm --

13         MARK HANDY:  -- 'cause I don't see it.

14         MR. ADAMS: All right.  And you found it important

15  enough to go all the way through and ask him about we're his

16  whereabouts may have been from the first of April to the 5th of

17  April when the body was found.

18         MARK HANDY:  Correct.

19         MR. ADAMS: All right.  But at the same time you didn't

20  tell him how important it was to make sure he got every detail

21  correct because possibly he was a suspect.

22         MARK HANDY:  I don't remember what, as far as things

23  like that, was said, no.

24         MR. ADAMS: Okay.  You were just doing a general

25  interview, correct?

PROCEEDINGS - 3.01.95                                    March 01, 1995
COMMONWEALTH OF KY vs GARR KEITH HARDIN                          52

1          MARK HANDY:  I don't know what you mean by "general

2     interview."

3          MR. ADAMS: You were not, you were not, at that time --

4     according to your testimony, you did not have sufficient

5     evidence or information to believe that he was a suspect.  Is

6     that correct?

7          MARK HANDY:  Correct.

8          MR. ADAMS: All right.  Therefore, you did not tell him

9     his rights, correct?

10         MARK HANDY:  Correct.

11         MR. ADAMS: You did not tell him that anything he said

12    might be used in court, that it might be very important to go

13    into minute detail about where he was on the early morning hours

14    of April the 2nd.

15         MARK HANDY:  Correct.

16         MR. ADAMS: All right.  And it is very possible that as

17    a result of that, he just forgot to tell you about the Chevron

18    station.

19         MARK HANDY:  Correct.

20         MR. ADAMS: Certainly a person who has been advised of

21    their rights and has told that they may be a suspect in a murder

22    case is more apt to --

23         MR. SMITH:  Objection.

24         THE COURT:  You're calling for a conclusion there.

25    Sustained.

1          MR. ADAMS: Judge, that's all, that's all I have at

2   this time.

3          THE COURT:  Okay.

4          MR. ADAMS: Thank you, sir.

5          THE COURT:  Jury, y'all in good shape?  Can we run

6   onto lunch?  Okay.  Mr. Rogers, would you like to go forward,

7   sir?

8          MR. ROGERS:  Detective, approximately after you do

9   these interviews with people like Mr. Hardin here -- Keith --

10  how soon after that do you dictate the (inaudible)?

11         MARK HANDY:  It really depends on how busy we are.

12         MR. ROGERS:  Okay.

13         MARK HANDY:  Sometimes right away and sometimes it can

14  do some time.  And it depends on -- in a case like this, since

15  we're going to be providing those to Sheriff Greer, you know,

16  they may have been done quicker.

17         MR. ROGERS:  Okay.  Now, you know, you first

18  interviewed Mr. Hardin on April 7, 1992; is that correct?

19         MARK HANDY:  Correct.

20         MR. ROGERS:  Do you know when, or can give me any

21  idea, after that that you dictated the investigative letter of

22  that interview?

23         MARK HANDY:  I couldn't.  I, I really don't have --

24  independently, I don't remember.

25         MR. ROGERS:  Would it have been within 30 days, to

 1  | your recollection?

 2  |           MARK HANDY:  I, I would believe that to be the case.

 3  | I -- again, I just don't --

 4  |           MR. ROGERS:  And --

 5  |           MARK HANDY:  -- independently remember.

 6  |           MR. ROGERS:  And then, if I understand what you're

 7  | telling me, after you dictate your investigative letter you

 8  | destroy the notes you made in your notebook?

 9  |           MARK HANDY:  What we do is, we compare those to the

10  | notes to make sure the information's the same and then we

11  | discard the notes, correct.

12  |           MR. ROGERS:  Okay.  So, by the time Mr. Hardin was

13  | actually arrested on May 5th and was formally charged with this,

14  | your notes of that interview with him probably already been

15  | destroyed?

16  |           MARK HANDY:  Again, I don't recall the timeframe

17  | between when they were dictated and when not.  Again, I don't --

18  | independently, I just don't remember, you know, when they were

19  | dictated.  Now, it's possible.

20  |           MR. ROGERS:  And you indicated that you only keep

21  | those notebooks if you're ordered to do so by a court; is that

22  | correct?

23  |           MARK HANDY:  Correct.  We, we get court orders

24  | indicating to keep the original notes as well as some other

25  | things.

1          MR. ROGERS:  Okay.  Would you agree with me that it

2    would be kinda difficult to get a court order before they get

3    into court?

4          MALE SPEAKER:  Objection.

5          THE COURT:  I think the answer is self-explanatory,

6    but go ahead and ask it (inaudible).

7          MR. ROGERS:  Okay.  What I'm asking is, it would have

8    been rather difficult for Mr. Hardin to get a court order --

9          MALE SPEAKER:  Objection.  He doesn't know how

10   difficult it is for Mr. Hardin to get a court order.

11         THE COURT:  Well, he's getting ready to ask, 'cause

12   you can't get a court order to protect something that's already

13   been destroyed.

14         MARK HANDY:  Correct.

15         MR. ROGERS:  Correct.

16         MARK HANDY:  Correct.  Yes, sir.

17         MR. ROGERS:  Thank you.  I just wanted -- thank you,

18   Judge.  And destruction of those notes makes it difficult for me

19   to question you as to is there any difference between the notes

20   and the letter, doesn't it?

21         MARK HANDY:  Correct.

22         MR. ROGERS:  Makes it damn near important, doesn't it?

23         MARK HANDY:  I would suggest important.

24         MR. ROGERS:  Is there some type of reason, like a

25   space consideration that you can't store all these notes, and

1  they are that bulky you couldn't store them?

2          MARK HANDY:  My guess is, is that it goes back many,

3  many years and for what reason -- I mean, that's just the way

4  that I was taught and I assume that's something that they've

5  done for years.  I, I've never asked why.

6          MR. ROGERS:  But as far as you know there's, there's -

7  - they've never said, "We can't store all these notes because we

8  don't have enough file cabinets" or anything?

9          MARK HANDY:  I, I've not heard --

10          (Overlapping Conversation)

11          MR. ROGERS:  Has that ever been given as a reason?

12          MARK HANDY:  I, I've -- no, sir, I've not heard that.

13          MR. ROGERS:  Now, you were obviously aware on April 7,

14  1992 that there was some Satanic influence in this case, right?

15          MARK HANDY:  Correct.

16          MR. ROGERS:  'Cause that's the first thing you asked

17  Mr. Hardin about.

18          MARK HANDY:  Apparently so, right.

19          MR. ROGERS:  Okay.  And you say apparently so 'cause

20  that's the first thing in your letter, right?

21          MARK HANDY:  Right.

22          MR. ROGERS:  And you don't know if that's the first

23  thing in your notes or not; is that correct?

24          MARK HANDY:  Well, I mean, I, I would --

25          (Overlapping Conversation)

1          MR. ROGERS:  Did you make any note --

2          MARK HANDY:  -- dictate my letters directly from the

3   notes.

4          MR. ROGERS:  Okay.  Did, did you make notes of the

5   conversation you had in the car with him?

6          MARK HANDY:  No, I did not.  I did when I got back to

7   the office.  I didn't while I was driving, no.

8          MR. ROGERS:  You were driving?

9          MARK HANDY:  Correct.

10          MR. ROGERS:  And Mr. Hardin told you that he was, in

11  fact, for about six years previous to that involved in Satanic

12  religion; is that correct?

13          MARK HANDY:  Correct.

14          MR. ROGERS:  And he told you that he was no longer

15  involved in it, correct?

16          MARK HANDY:  I believe he said he'd quit a month

17  prior.

18          MR. ROGERS:  Okay.  Did you ever, uh, discover any

19  information to indicate that his statement that he had

20  relinquished this religion a month ag was untrue?

21          MARK HANDY:  I, I -- no, sir.

22          MR. ROGERS:  Now, did you -- how did you come by this

23  information as to him sacrificing small animals?

24          MARK HANDY:  I'm sorry?  He told me that.

25          MR. ROGERS:  Okay.  Did you ask him that or did he

1   just voluntarily say, "I, I did this."

2          MARK HANDY:  No, I, I asked him that.

3          MR. ROGERS:  Okay.  Now, what was the question you

4   asked him, to the nearest of your recollection, about that to

5   elicit the response?

6          MARK HANDY:  Had he ever sacrificed small animals.

7          MR. ROGERS:  Okay.  And his response was?

8          MARK HANDY:  That he had.

9          MR. ROGERS:  Okay.  Did you follow up on that and say

10  when, where, how, why?

11         MARK HANDY:  No.  I think to follow -- well, to answer

12  your question specifically, no, I did not ask him when, where,

13  how, why.

14         MR. ROGERS:  Did you ask him when the last time was

15  that he had done that or anything?

16         MARK HANDY:  No, I had not.

17         MR. ROGERS:  And when he said, "I was thinking about

18  doing a human sac-", now, what -- did -- again -- let me start

19  from the beginning.  Did you ask him then about human

20  sacrifices?

21         MARK HANDY:  No, I did not.  I asked him why, if he

22  had been doing it for six years that he'd recently stopped.  And

23  that was the response that he gave me.

24         MR. ROGERS:  Okay.  Did you in any way follow up on

25  that, to your recollection, and say, "Well, you know, what kind

1  of human sacrifices or how would you do that" or anything?  As I

2  understand, you got to your office about 2:20, right?  That's

3  2:20 in the afternoon, correct?  That's on the --

4          MARK HANDY:  Correct, 2:20 p.m.

5          MR. ROGERS:  April 7 th.  Okay.

6          MARK HANDY:  Correct.

7          MR. ROGERS:  Now, just (inaudible) -- back up.  Just

8  prior to that time, Keith told you that he had spent the night

9  of March 27 th, March 28 th with Rhonda at her house; is that

10 correct?

11         MARK HANDY:  Correct.

12         MR. ROGERS:  Okay, okay.  So, you get to the office at

13 2:20 and continue the interview; is that correct?

14         MARK HANDY:  Correct.

15         MR. ROGERS:  And who is present in that interview?

16         MARK HANDY:  Uh, Sergeant Woosley, I believe.

17         MR. ROGERS:  Again -- and, again, in connection with

18 that, do I understand your testimony that, that to your

19 knowledge, Detective Woosley never --

20         (Overlapping Conversation)

21         MARK HANDY:  Sergeant Woosley.

22         MR. ROGERS:  -- wrote up any -- Sergeant, Sergeant

23 Woosley -- never wrote up any investigative letters or anything

24 as his part in his case?

25         MARK HANDY:  Correct.

1        MR. ROGERS:  Okay.  He gave you an alibi as to his

2   whereabouts on the night -- early morning hours when Rhonda

3   disappeared, correct?

4        MARK HANDY:  Correct.

5        MR. ROGERS:  And I believe he told he got home between

6   3 and 3:30.

7        THE COURT:  Let's, let's refer to people by name since

8   we have two defendants.

9        MR. ROGERS:  Oh, okay.

10       THE COURT:  So, "he", "she", and "it" is not very

11  definitive.

12       MR. ROGERS:  Mr. Hardin.  I'm asking you about Mr.

13  Hardin.

14       MARK HANDY:  Right.

15       MR. ROGERS:  I'm not concerned with Mr. Clark.  Okay.

16  Keith told you he got home 3, 3:30.  Okay.  Now, did he say "I

17  looked at the clock and saw what time it was", or "That's best -

18  - my best estimate", or how did he phrase that?  You know?

19       MARK HANDY:  I, I've just got what time that --

20  arriving there at approximately 3 to 3:30.

21       MR. ROGERS:  Okay.  Did you tell him, "It's important

22  to me to know exactly what time you got home 'cause I'm trying

23  to account for your whereabouts"?

24       MARK HANDY:  I, I don't remember what comments were

25  made.



1        MR. ROGERS:  But it was important for you to account

2   for his whereabouts, wasn't it, that night?

3        MARK HANDY:  Well, I, I was trying to get that type of

4   information.

5        MR. ROGERS:  Okay.  But at that point, that was

6   something that was important to you, was it not?

7        MARK HANDY:  What time he got home?

8        MR. ROGERS:  Yeah.

9        MARK HANDY:  Correct.

10       MR. ROGERS:  Okay.  In determining what time he got

11  home, did you ever go to his home and ask his family if they

12  remember or were aware of what time he got home?

13       MARK HANDY:  I did not, no.

14       MR. ROGERS:  Okay.  Do you know if anybody ever did?

15       MARK HANDY:  I, I, I don't personally know, no, sir.

16       MR. ROGERS:  Now, you ask him -- and if I, if I

17  understand your testimony and your report correct, he told you

18  that he did not have any knives.  And the word is "have",

19  correct?  I think it's on top of page, --

20       MARK HANDY:  Page four.

21       MR. ROGERS:  -- four.  Yeah.  About third line down.

22       MARK HANDY:  Said okay.

23       MR. ROGERS:  He did not "have" a knife, correct?

24       MARK HANDY:  Correct.

25       MR. ROGERS:  Now, after you interviewed him, it was

1  that same night, a couple -- three hours later he was

2  interviewed by Detective Hope Greer, isn't that correct?

3          MARK HANDY:  It's my understanding.

4          MR. ROGERS:  Okay.  You never talked to Hope Greer

5  about that?

6          MARK HANDY:  Uh, no.  I've recent --

7          MR. ROGERS:  About her interview?

8          MARK HANDY:  No, I recently looked through the file

9  and read that, but no, I hadn't, uh --

10          MR. ROGERS:  So, you would not have any personal

11  knowledge of whether or not a couple hours later he told her he

12  did, in fact, own knives?

13          MARK HANDY:  He very well could have.  I, I mean, I

14  just don't remember the conversations back then.

15          MR. ROGERS:  But you do remember her interviewing him

16  --

17          (Overlapping Conversation)

18          MARK HANDY:  I, I --

19          MR. ROGERS:  -- a couple -- three hours after, --

20          MARK HANDY:  -- left, I believe, and then she --

21          MR. ROGERS:  -- after (inaudible)?

22          MARK HANDY:  -- was still there, so…

23          MR. ROGERS:  Well, as a matter of fact, you talked to

24  her, didn't you?

25          MARK HANDY:  I'm sure I did.

1    MR. ROGERS:  Okay.  As a matter of fact, did you tell

2    her, uh, that in fact, he had indicated to you that he didn't

3    have any knives?

4    MARK HANDY:  Again, I, I had a conversation with her.

5    I don't remember the exact content of it.  But if that's what he

6    told me, I'm sure that's what I would have told her.

7    MR. ROGERS:  Okay.  And do you remember telling her

8    that -- something about there was the two and half hour period

9    between 1:00 -- 1 a.m. that, that was unaccounted for?

10    MARK HANDY:  Again, I, I -- if that's what she

11    indicates in her letter I probably did.  I just don't

12    independently remember that.

13    MR. ROGERS:  Okay.  Did you make any notes in your

14    notebook of your conversations with Hope Greer as to what you

15    told her in connection with this case?

16    MARK HANDY:  No, I -- do that.

17    MR. ROGERS:  Did you ever specifically ask Keith --

18    Mr. Hardin -- "Did you stop anywhere on the way home from Jeff's

19    trailer before you got home?"

20    MARK HANDY:  Uh, no, I probably didn't.  I don't

21    recall doing that.

22    MR. ROGERS:  So then, if they did stop someplace he

23    wouldn't have had any way of knowing you wanted to know about

24    it, would he?

25    MALE SPEAKER:  Objection; speculation.

1           THE COURT:  Sus-, sustained.

2           MR. ROGERS:  Okay.

3           THE COURT:  He doesn't know what's in the defendant's

4    mind.

5           MR. ROGERS:  Okay.  If you were concerned about this

6    two-and-a half-hour period between 1:00 when they were allegedly

7    at the trailer and 3 to 3:30 when Mr. Hardin got home, did you

8    make any effort to ask Mr. Hardin if anyone else had seen him

9    during that period of time?

10          MARK HANDY:  Again, I don't recall the exact

11   conversation.  I think I would have just asked him to tell me

12   where he was, who he was with, where they went -- that type of

13   thing.  I don't --

14          MR. ROGERS:  Okay.  Does, does your letter reflect

15   that, that, that you in any way ask him where he went or who he

16   was with, other than you knew he was with Mr. Clark?

17          MARK HANDY:  Now, you're talking about the one on

18   April 7th ?

19          MR. ROGERS:  April 7th , sir.

20          MARK HANDY:  I'm sorry, could you repeat the question.

21          MR. ROGERS:  I was just wondering if there was

22   anything in your letter that would refresh your le-,

23   recollection as to if you did in fact ask him where -- if there

24   was someplace else he went or something else they did other than

25   drive straight from the trailer home?

1        MARK HANDY:  I, I would have just asked where they,

2   uh, just basically, "Where did you go?"  I mean, --

3        MR. ROGERS:  Okay.

4        MARK HANDY:  -- "to give me that type of information,

5   please." But I didn't specifically say, "Did you stop at

6   anywhere?", if that's what you're asking me.

7        MR. ROGERS:  Okay.

8        MARK HANDY:  And I wouldn't a known to ask.

9        MR. ROGERS:  You said you wouldn't have known to ask

10  him?

11       MARK HANDY:  Well, I mean, I would have asked, "Where

12  you went and who were you with?"  I, I -- it's like I wouldn't

13  have known to say -- well, go ahead, I'm sorry.

14       MR. ROGERS:  Okay.  I mean, you would know

15  specifically ask him, "Did you stop at Chevron station?"

16       MARK HANDY:  Right.  'Cause I -- or, or "Did you stop"

17  --

18       MR. ROGERS:  No way to know.

19       MARK HANDY:  -- "at Bashford Manor?"  I, I -- there

20  was just no way I could have known that to ask.

21       MR. ROGERS:  Were you aware at some point in the

22  investigation that the fact came up that they did supposedly

23  stop at Chevron station?  Were you ever aware of that?

24       MARK HANDY:  Uh, seems like it's sometime much, much

25  later I heard that, but I don't recall from who or under what

1   circumstances.

2           MR. ROGERS:  Did you do any follow-up investigation to

3   verify whether or not that was correct?

4           MARK HANDY:  I -- no.  I, I, I believe after probably
        th
5   May 5 .  I, I believe I sit in with one interview with the

6   sheriff, uh, sometime later than that.  But no, I, I didn't do

7   any work, I don't believe.

8           MR. ROGERS:  And so after that time, the sheriff or no

9   one else from your department asked you to go out and --

10          MALE SPEAKER:  Objection.  There's no way he can know

11  what the sheriff -- I'm sorry.

12          MR. ROGERS:  If I can finish.

13          THE COURT:  Well, what triggered the response was you

14  asking what other people in the department may have known.

15          MR. ROGERS:  No.

16          THE COURT:  Limit the question to what he knows and

17  I'll let him answer.

18          MR. ROGERS:  I, I said what other people in the

19  department told him.  Did, did, did the sheriff --

20          (Overlapping Conversation)

21          THE COURT:  No.  Ask him (inaudible) --

22          MR. ROGERS:  -- or anyone in your department tell you

23  to go out and --

24          MALE SPEAKER:  Objection; hearsay.

25          THE COURT:  Well, I'll let him answer that.  That's

1  not hearsay.

2          MR. ROGERS:  -- and, and see if you could verify he

3  was at the convenience store?

4          MARK HANDY:  No, sir.

5          MR. ROGERS:  And would you say that's probably why you

6  didn't do any follow-up?

7          MARK HANDY:  Had I been asked to do something, I would

8  have done it.

9          MR. ROGERS:  Okay.  Now, uh, when you talked to Mr.

10  Hardin, he, he came to the police station voluntarily; is that

11  correct?

12          MARK HANDY:  Correct.

13          MR. ROGERS:  Okay.  And he came down two occasions

14  voluntarily; is that correct?  The 7th and the 9th?

15          MARK HANDY:  Did I speak with him on the 9th?  I mean,

16  the 7th it was -- I did.  Uh, on the 9th -- I mean, everything

17  that, that he did was voluntary, to answer your question.

18          MR. ROGERS:  Okay, okay.  And -- well, would you agree

19  with me that you, that you've got a re-interview with him on the

20  9th?

21          MARK HANDY:  Correct.

22          MR. ROGERS:  Okay.  Do you remember who was present at

23  that interview on the 9th?  I think you, you said Sheriff --

24          MARK HANDY:  Sheriff Greer.

25          MR. ROGERS:  Okay.  By -- again, on the 9th you ask him

1   about knives; is that correct?

2           MARK HANDY:  Correct.

3           MR. ROGERS:  Okay.  At that time, had you had any

4   conversation with Hope Greer about her conversation with knives

5   with him?

6           MARK HANDY:  I, I don't believe so, no.

7           MR. ROGERS:  And that's the time where he told you

8   that he had made some comment if Rhonda ever cheated on him,

9   he'd kill her, right?

10          MARK HANDY:  I believe I asked that question based on

11  what somebody else had told me.  Correct.

12          MR. ROGERS:  And he made some comment about he had

13  told other girlfriends that and none of them were dead, right?

14          MARK HANDY:  Correct.

15          MR. ROGERS:  Did you ever follow-up to see if any of

16  his other girlfriends were dead?

17          MARK HANDY:  No, I did not.

18          MR. ROGERS:  Did you ever follow-up, or to your

19  knowledge anyone else do any follow-up information to see if in

20  fact Rhonda Warford was cheating or running around on him?

21          MARK HANDY:  I mean, I did other interviews, um, and I

22  believe, uh, information as far as, um, that type of information

23  was probably included from some of the friends or some of the

24  people that I interviewed.

25          MR. ROGERS:  Did Mr. Har-, --

1        MARK HANDY:  Oh, go ahead.  I'm sorry.

2        MR. ROGERS:  Did, did Mr. Hardin ever tell you that he

3   believed she was running around on him, or that he had heard she

4   was running around on him.

5        MARK HANDY:  I might need to go back through the --

6        MR. ROGERS:  Okay.  I --

7        MARK HANDY:  I mean, go ahead.  I'm listening.

8        MR. ROGERS:  From the information that I have, the

9   only place that's mentioned is in the interview on, on the 9th,

10  detective.  If you've got some other letters I don't have.  But

11  --

12       MARK HANDY:  Well, no, I don't believe I have any

13  letters that you don't have.  I was just going to make sure on

14  the original interview if we covered that.  Because, because I

15  did an interview somebody whose name had come up.

16       MR. ROGERS:  Did you do an interview -- and speaking

17  of that, where the name of, of another ex-boyfriend had come up,

18  uh, let's see.  Um, James Tyrell.  James.  You know, I, I don't

19  think it -- do you remember doing any interviews in which any

20  other ex-boyfriends names or anything came up?

21       MARK HANDY:  I, I believe so.

22       MR. ROGERS:  But I guess what I'm getting at here,

23  detective, is -- what we're talking about is he makes a

24  statement that if Rhonda ever cheated on him, he'd kill her and

25  what I'm asking is did you ever have any information that he

1  believed that was the situation?

2          MALE SPEAKER:  Objection; he can't tell what he

3  believed or not.

4          MR. ROGERS:  Did Mr., did Mr. Hardin ever make any

5  comments to you that he believe Rhonda was running around on

6  him?

7          MARK HANDY:  I don't believe so, no.  I just -- all I

8  can rely on are these notes.

9          MR. ROGERS:  And that's because you destroyed your

10 original notebooks, right?

11         MARK HANDY:  Well, no.  It's because these become the

12 notes.

13         MR. ROGERS:  At one point in the investigation you

14 became aware of information that some guy had followed --

15         MALE SPEAKER:  Objection.

16         THE COURT:  The…

17         MR. ROGERS:  Let, let --

18         THE COURT:  I want you to rephrase your question, sir.

19         MR. ROGERS:  I'll rephrase the question.  Rephrase the

20 question.

21         THE COURT:  And you will recall our conversation

22 yesterday; I told you how I would let you ask it.

23         MR. ROGERS:  Okay.  Let me just ask you this: did you

24 do any follow-up investigation to determine whether or not some

25 man had followed Rhonda Warford home from Kroger's and was

1  yelling at her at approximately 7:00 on the same day she

2  disappeared?

3           MARK HANDY:  I did not.

4           MR. ROGERS:  To your knowledge, did anybody else do

5  any follow-up investigation on that information?

6           MARK HANDY:  I, I don't know.

7           MR. ROGERS:  Okay.  Do I take it from the fact that

8  you didn't do any follow-up investigation, no one asked you to -

9  - the sheriff or any of your department asked you to do any

10  follow-up invest-, --

11           MALE SPEAKER:  Objection.

12           THE COURT:  I'll let him answer that.  Did someone ask

13  -- did someone ask you to --

14           (Overlapping Conversation)

15           MARK HANDY:  No, I don't believe I was requested --

16           THE COURT:  -- look at those allegations?

17           MARK HANDY:  -- to do that.

18           MR. ROGERS:  I was going to say, did someone ask you

19  and you not do it?

20           MARK HANDY:  No, I was not asked.  I would do what I

21  was asked.

22           MR. ROGERS:  Okay.  Just a second, detective.  Did

23  you, in connection with your interviews or the investigation

24  that you did in this case, did you ever come across any

25  information to indicate that Keith Hardin was not being truthful

1   with you when he told you he was Jeff Clark in the early morning
                      st   nd
2   hours of April 1 , 2 ?

3          MALE SPEAKER:  Objection.

4          THE COURT:  Sustained.

5          MR. ROGERS:  I mean, --

6          THE COURT:  Ask your question a different way.

7          MR. ROGERS:  Okay.  Did you ever interview anybody

8   (inaudible) -- it is correct, is it not, from your interview

9   with Mr. Hardin and from the interview with Mr. Clark that they
                                                              st
10  said they were together in the early morning hours April 1 ,
            nd
11  April 2 ?

12         MARK HANDY:  Correct.

13         MR. ROGERS:  Okay.  Did you ever interview any

14  witnesses that disputed that fact?

15         MARK HANDY:  No, sir.

16         MR. ROGERS:  Did you ever any -- interview anybody who

17  saw them anywhere else other than where they said they were?

18         MARK HANDY:  Correct.

19         MR. ROGERS:  Did you ever interview anybody who said

20  they saw them in Meade County at that time?

21         MALE SPEAKER:  Objection.

22         THE COURT:  Overruled.

23         MR. ROGERS:  Did you ever -- any -- interview anybody

24  --

25         MARK HANDY:  No, sir.

1        MR. ROGERS:  -- interview anybody who saw them in

2   Meade County?

3        MARK HANDY:  No, sir.

4        MR. ROGERS:  Did you ever ask Mr. Hardin if he had

5   ever been to Meade County?

6        MARK HANDY:  I don't recall whether I did or not.

7        MR. ROGERS:  If you did ask --

8        MARK HANDY:  It would be reflected -- whatever

9   response --

10        MR. ROGERS:  In your --

11        MARK HANDY:  -- whatever response would be reflected

12   here.  I mean, if there's no, if there's no response, then the

13   question wouldn't have been asked.  In connection with your

14   interview on the 7th, you asked Mr. Hardin if he knew anybody

15   that would want to do Rhonda harm; is that correct?  I'm looking

16   at page four about halfway down the paragraph.

17        MARK HANDY:  Correct.

18        MR. ROGERS:  And he said she had an old boyfriend

19   named James.

20        MARK HANDY:  Correct.

21        MALE SPEAKER:  Objection.

22        MR. ROGERS:  Statements of the defendant, Judge.

23        THE COURT:  I think if you'll look at -- what is it?

24   -- it says that (inaudible) declaration against interest.  That

25   statement is self-serving.

1          MR. ROGERS:  Nah.

2          THE COURT:  I'll talk to you about it in chambers.

3          (In chambers)

4          THE COURT:  Let's go forward, sir.

5          MR. ROGERS:  (Inaudible).

6          THE COURT:  Yes.

7          MR. ROGERS:  Now, as to the exact form of question --

8          THE COURT:  What?

9          MR. ROGERS:  As to exact form of the question so I

10   don't screw up here, I may ask him if Mr. Hardin --

11          THE COURT:  Did during your investigation did the

12   names of any other suspects come up, and did you follow up on

13   those leads?

14          MR. ROGERS:  Okay.

15          THE COURT:  That's basically what you want to know?

16          MR. ROGERS:  Can I ask him did he get those from Mr.

17   Hardin?

18          THE COURT:  No.

19          MR. ROGERS:  Okay.  During your investigation, did the

20   names of any possible suspects come up?

21          MARK HANDY:  They did.

22          MR. ROGERS:  Did you follow-up on those?

23          MARK HANDY:  I interviewed one individual and I

24   believe another one was interviewed.

25          MR. ROGERS:  By someone else?

1          MARK HANDY:  By someone else, correct.

2          MR. ROGERS:  Okay, okay.  Who was the person that you

3   interviewed?

4          MARK HANDY:  A man by the name, I believe, Timmy Tab

5   (ph). If I can -- uh, Timothy Tab.

6          MR. ROGERS:  Okay.  That, that's all.  Thank you.

7          THE COURT:  You may redirect.  Doug, go in on my desk

8   (inaudible).

9          MR. SMITH:  Detective Handy, when you're talking about

10  writing down notes, just jotting down rough notes like what

11  everybody does.

12         MARK HANDY:  I'm, I'm sorry?

13         MR. SMITH:  When you're talking about -- when you're

14  interviewing someone like these defendants and you're jotting

15  down notes, just crude notes like everybody takes --

16         MARK HANDY:  Well, I, I write down whatever it is that

17  responds to my questions are in longhand.

18         MR. SMITH:  Right.  All right.  And then you take

19  those notes and you dictate from them into your final report.

20         MARK HANDY:  Correct.

21         MR. SMITH:  And, uh, in your final report -- tell us

22  whether or not your final report, which is provided to everybody

23  -- in that final report, is everything that was in your notes

24  contained in this final report?

25         MARK HANDY:  Correct.

Case 3:17-cv-00419-GNS-CHL   Document 317-44   Filed 01/26/23   Page 77 of 95 PageID #: 28141

1           MR. SMITH:  All right.  And then, it's been the policy

2   of the Louis Police Department that that becomes your notes and

3   the handwritten stuff's destroyed?

4           MARK HANDY:  Correct.

5           MR. SMITH:  All right.  Let me ask you something:

6   Wallace Rogers ever give you any of his notes?

7           MARK HANDY:  Uh, not that I'm aware of.

8           MR. SMITH:  All right.  Now, uh, and Sergeant Woosley,

9   who was there when you took the statement from the defendant

10  Hardin is still available if they want to call him --

11          MARK HANDY:  That's correct.

12          MR. SMITH:  -- and question him what was said in that

13  car --

14          MARK HANDY:  That's correct.

15          MR. SMITH:  -- about getting tired of killing animals

16  and wanting to do humans.

17          MARK HANDY:  That's correct.

18          MR. SMITH:  All right.  Now, they -- Clark or Hardin

19  one gave you some tennis shoes.

20          MARK HANDY:  I -- again, uh, that sounds familiar --

21          (Overlapping Conversation)

22          MR. SMITH:  All right.

23          MARK HANDY:  -- but I don't know.

24          MR. SMITH:  But you don't know, you don't know if

25  those were the shoes worn that night or not, do you?

1          MARK HANDY:  No, I do not.

2          MR. SMITH:  And as far as the hair samples and the car

3   that were searched, if they had not consented to it you could

4   have got a court order to do it?

5          MARK HANDY:  I, I, I could certainly try.

6          MALE SPEAKER:  (Inaudible) --

7          (Overlapping Conversation)

8          MALE SPEAKER:  Uh, that calls for conclusion.  He

9   can't answer the man.

10          THE COURT:  He doesn't know.  Sustained.

11          MR. ADAMS: Judge, Judge, in addition to that, he is

12   still the witness of the commonwealth and I'm objecting to the

13   leading plus the asking for a conclusion.

14          THE COURT:  Okay.

15          MR. SMITH:  I'll move along.

16          THE COURT:  Unsustainable.

17          MALE SPEAKER:  Correct.

18          MALE SPEAKER:  Thank you, sir.

19          MR. SMITH:  Now, when you went out, did you ever go

20   out and see the defendant Clark working on that vehicle?

21          MARK HANDY:  Uh, when Sheriff Greer, Bill Adams, and I

22   pulled up in the driveway, um, I believe he was sanding or doing

23   something on the -- with the side of it.  I -- I believe he was

24   sanding it.

25          MR. SMITH:  Do you know whether or not he was painting

1 | that vehicle?

2 |         MARK HANDY:  I -- again, I remember he -- that he was

3 | doing something on the side of it when we pulled up.  I don't

4 | remember specifically what.

5 |         MR. SMITH:  Now, Mr. Rogers and Mr. Adams has asked

6 | you about tape recording.  Now, --

7 |         THE COURT:  Are we going to the collateral issue?

8 |         MR. SMITH:  Uh, no.

9 |         THE COURT:  Okay.

10 |         MR. SMITH:  Now, uh, in looking through the file that

11 | has been turned over to these two lawyers, there were a lot of

12 | witnesses interviewed by various people.

13 |         MARK HANDY:  Correct.

14 |         MR. SMITH:  And is it the policy of the Louisville

15 | Police Department to tape record every single person you talk

16 | to?

17 |         MARK HANDY:  I don't believe -- and, and -- and,

18 | again, I don't believe there's any policies that deal with, uh,

19 | uh, tape recording, uh, individuals versus taking hand-written

20 | notes.  I've certainly not seen any.

21 |         MR. SMITH:  What is, in your experience in

22 | interviewing people, if a tape recorder is put in front of

23 | someone, tell us whether or not they are usually reluctant to

24 | talk to you.

25 |         MALE SPEAKER:  Objection, Judge.  That's way beyond

 1  his expertise.

 2          MR. SMITH:  (Inaudible).

 3          MALE SPEAKER:  (Inaudible) psychologist.

 4          THE COURT:  I want to sustain it.

 5          MALE SPEAKER:  Yeah.

 6          MR. SMITH:  Now, Mr. Adams -- now we're going into

 7  this.  Mr. Adams has asked you a while ago did you destroy

 8  evidence.

 9          THE COURT:  Okay.  Ladies and gentleman, same admonish

10  that I gave you a while ago with respect to Mr. Adams' interview

11  with the collateral matter.  This line of questioning is not

12  substantive, but it will be considered by you to the extent that

13  it bears on the credibility and reliability of this witness, if

14  it does.  Go ahead, Mr. Smith.

15          MR. SMITH:  Detective Handy, I would like for you to

16  explain exactly what happened on the occasion that Mr. Adams has

17  asked you about.

18          MARK HANDY:  I was taking a tape recorded interview

19  with a witness in a case.  Uh, during that interview another

20  detective brought in a photograph and handed it to me.  Uh,

21  generally speaking with witnesses, I like to know everything

22  that they're going to tell me prior to turning the tape recorder

23  on so I know what to ask and I'm prepared.  This witness started

24  backing up.  I mean, not wanting to identify the individual

25  after he --

1        MR. SMITH:  Now, wait.  Let me interrupt you.  When

2   you say "backing up", what do you mean, "backing up"? Tell us

3   what you mean backing up.

4        MARK HANDY:  He, uh, uh, was, was not very clear on

5   it.

6        MR. SMITH:  And was this the consistent or

7   inconsistent with what this witness had told you before?

8        MARK HANDY:  I don't even recall.  I mean, it's been

9   three years ago.

10        MR. SMITH:  All right.

11        MARK HANDY:  And after I turned the tape recorder on I

12   talked to him about it.  He was -- he, he was scared, uh, and I

13   said, "Okay.  There's nothing to be scared about." Again, this

14   was a conversation that he and I had.  I backed the tape

15   recorder up and did an interview with him -- a complete

16   interview, uh, uh, over top the first one.  Uh, and again, this

17   was three years ago.

18        MR. SMITH:  That's all I have, detective.  Thank you.

19        THE COURT:  Mr. Adams.

20        MR. ADAMS:  Yes, sir.  Thank you.  I, I'm sorry,

21   Detective Handy, I'm a little bit hung up again on what you knew

22   and when you knew it and, and non-recording of this April the 5th

23   statement.  On April the 5th -- if you'll look again at your

24   notes --

25        MARK HANDY:  Is there one April 5th or April 6th?

1        MR. ADAMS:  April 6th.  I'm sorry, it's April 6th.

2        MARK HANDY:  All right.

3        MR. ADAMS:  You indicated you weren't sure if you knew

4    anything, I, I think -- I'm not sure -- I don't want to put

5    words in your mouth, but you indicated you weren't sure about

6    any Satanic involvement?

7        MARK HANDY:  Again, I, I don't recall at what point --

8        MR. ADAMS:  Look at the last paragraph of your, your

9    interview with Mr. Clark.  Do you ask him about Satanic

10   involvement on April the 6th?

11       MARK HANDY:  Can you --

12       MR. ADAMS:  Yes, sir, I can show it to you.

13       MARK HANDY:  If you could.

14       MR. ADAMS:  Just a second.

15       MARK HANDY:  Sure.  Correct, I did.

16       MR. ADAMS:  You did ask him?  So then, you did have

17   some knowledge about allegations of Satanic involvement by at

18   least one of the defendants in this case --

19       MARK HANDY:  Apparently.

20       MR. ADAMS:  -- at this time.

21       MARK HANDY:  Correct.

22       MR. ADAMS:  You had talked to Greer, you had been

23   brought up to date by him, but still you didn't think it was

24   important enough to tape record the interview with Jeff Clark?

25       MARK HANDY:  Correct.

1          MR. ADAMS:  All right.  Now, let's talk about some

2    other things in this case.  I'd like to know what you knew and

3    when you knew 'em.  When was the arrest on Mr. Clark effective

4    in this case?

5          MARK HANDY:  I believe it was May 5th, May 5th.

6          MR. ADAMS:  All right.  Now, let's talk about up until

7    May the 5th of 1992.  Were you aware on May the 5th of 1992 that

8    there had been found this lone fingerprint in the back of the

9    car?

10         MARK HANDY:  Correct.

11         MR. ADAMS:  All right.  And did Detective Greer talk

12   with you people at the LPD and say to you --

13         MALE SPEAKER:  Objection.

14         THE COURT:  Go ahead, Mr. Adams.

15         MR. ADAMS:  -- say to you, "Fellas, we might have a

16   problem there because both these both say that that girl had

17   been in that girl up until mid-December of 1991?"

18         MARK HANDY:  I, I don't -- I mean, I was aware of what

19   they'd said.  I don't remember the exact conversation the

20   sheriff and I had.  I don't --

21         MR. ADAMS:  Did detective -- did, did Sheriff Greer

22   say, "Boys, this is a red flag, this might be a problem for us

23   because that girl's been in that car"?

24         MARK HANDY:  I, I mean, what you're telling me is what

25   I was aware of as well as Sheriff Greer, so I don't know.  I --

Case 3:17-cv-00419-GNS-CHL   Document 317-44   Filed 01/26/23   Page 84 of 95 PageID #: 28148

1  we did have a conversation, but I don't remember, uh, the exact

2  content of it, but I was aware that the allegation had been made

3  that she'd been in -- that -- been in there previously.

4           MR. ADAMS:  Did Sheriff Greer say to you, "Fellas, she

5  was in that car.  Now, we all know that she was in that car,

6  that fingerprint might not mean anything"?

7           MARK HANDY:  Again, I don't remember the conversation.

8  I was certainly aware of that information.

9           MR. ADAMS:  Certainly take Sheriff Greer's word for

10 it, whatever he testified.

11          MARK HANDY:  If -- I certainly would.  I just don't

12 recall specifically what conversations he and I had.

13          MR. ADAMS:  Who made the decision to make the arrest?

14 Was that a joint decision, or did LPD make the decision?

15          MARK HANDY:  Meade County is in charge of, of this

16 case.

17          MR. ADAMS:  Meade County is in this case.  On May the

18 5th, 1992 when the decision was made to effect this arrest, were

19 you aware of the fact that the two head hairs that were found in

20 Rhonda Sue Warford's right hand did not belong to either one of

21 these individuals?

22          MARK HANDY:  I --

23          MR. ADAMS:  Were you made aware of that?

24          MARK HANDY:  Again, I -- at some point I heard that.

25 Exactly --

1          MR. ADAMS:  At some point?

2          MARK HANDY:  I, I don't remember.  I mean, we're going

3   back some years and I don't remember what I heard and from who

4   about things like that.

5          MR. ADAMS:  Do you know when that lab report came

6   back, Detective Handy?

7          MARK HANDY:  No, I do not.

8          MR. ADAMS:  Let me show this to you.  Lower left-hand

9   corner.

10         MARK HANDY:  Completed April 30th of '92.

11         MR. ADAMS:  I need to show you so that there's no

12  question about it.  Let me show you the rest of the report.

13  Exhibit 9 says --

14         MALE SPEAKER:  Objection.

15         THE COURT:  Do you want him to testify the report, or

16  are you just asking him --

17         MR. ADAMS:  I'm just trying so that there's no

18  question that this is the report of the 30th -- that the report

19  was completed on the 30th is all I'm trying to do in this --

20         THE COURT:  (Inaudible).

21         MARK HANDY:  No.

22         MR. ADAMS:  Stipulate that the report was completed on

23  the 30th.

24         MARK HANDY:  If that's what it says.  I don't have it

25  in front of me.

1        MR. ADAMS:  (Inaudible).

2        MARK HANDY:  I'll take your word for it.

3        MALE SPEAKER:  It is.

4        MR. ADAMS:  Thank you.  Detective Handy, you were also

5   aware of the fact that the local police department did soil

6   analysis and took soil from the scene and compared it to --

7        MARK HANDY:  I --

8        MR. ADAMS:  -- you're not --

9        MARK HANDY:  I believe that would have been done by

10  the state.  I don't think we've -- I, I'm really not sure what,

11  as far as the evidence and things like that in this case was

12  done.  But I believe if that was done, it would have been done

13  by the state.

14       MR. ADAMS:  Well, --

15       MARK HANDY:  I -- again, I don't --

16       MR. ADAMS:  -- before, before the arrest was made,

17  before the decision was to go headlong into this thing, how much

18  of the scientific evidence was back; do you know?

19       MARK HANDY:  I do not know.  I do not.

20       MR. ADAMS:  You know -- however, from what I've just

21  shown you, and you may have even known then.  You don't know

22  what you knew on May the 5th ; is that right?

23       MARK HANDY:  I, I don't recall what conversations I

24  had with the sheriff back then.

25       MR. ADAMS:  What do you know about fingerprint and

1  how, how long they may last under certain circumstances?

2          MARK HANDY:  I, I don't know anything about that.

3          MR. ADAMS:  What about the ser-, serological?  The,

4  the blood tests that were done in this particular case?  Were

5  they back before the decision was made?

6          MARK HANDY:  Again, I -- you know, that's just not

7  anything, as far as taking control of those reports and putting

8  them in the file -- that type of thing -- I, I didn't do any of

9  that.  I wasn't involved in any of that.

10         MR. ADAMS:  Is, is it your testimony, then, that it

11 was not -- did you participate in the decision to arrest Jeff

12 Clark?

13         MARK HANDY:  Did I participate in a discussion of

14 whether or not to go forward with it?

15         MR. ADAMS:  Yes.

16         MARK HANDY:  Is that your que-, --

17         (Overlapping Conversation)

18         MR. ADAMS:  Yes, that's my question.

19         MARK HANDY:  I, I don't recall.  I certainly may have.

20 I don't recall what conversations we had.

21         MR. ADAMS:  Thank you, sir.  That's all I have.

22         THE COURT:  Mr. Rogers, do you have any further cross?

23         MR. ROGERS:  Just, just a couple questions, Judge.

24 Detective, did Mr. Hardin -- did Keith ever object to you test -

25 - tape recording any interviews?

1          MARK HANDY:  Uh, no.  I don't believe that that was

2    ever an offer.

3          MR. ROGERS:  I mean, he never said, "I'll talk to you,

4    but don't tape record it"?

5          MALE SPEAKER:  Objection.

6          MALE SPEAKER:  He said that he never objected to it.

7          MARK HANDY:  Correct.

8          MR. ADAMS: (Inaudible). Can I have maybe just one

9    second?

10         MALE SPEAKER:  You can.

11         MR. ADAMS: Judge, I have just one question, if, if

12   Wallace says it's all right.

13         THE COURT:  Were you finished, Mr. Rogers?

14         MR. ROGERS:  I, I've got just, just one or two more

15   quick questions.

16         THE COURT:  I'll let you ask yours, but keep this in

17   an orderly fashion.

18         MR. ADAMS: I'm sorry.  Right.

19         MR. ROGERS:  Prosecutor, uh, asked you if I'd ever

20   furnished you any notes.  I haven't, have I?

21         MARK HANDY:  No, sir.  Not that I'm aware of.

22         MR. ROGERS:  Did you ever ask me for any?

23         MARK HANDY:  No, I did not.

24         MR. ROGERS:  After you knew I was representing Mr.

25   Hardin did you ever call me up and say, "Wallace, I need to

1  talk" --

2          THE COURT:  Ladies and gentleman of the jury, let me

3  tell you something.  What, what these fellas are bantering back

4  and forth is covered by what we call the rules of discovery.

5  This court entered an order in compliance with those rules and

6  until shown contrary, we will assume that all the parties have

7  complied with the orders of this court.  What has been

8  furnished, they furnish pursuant to court orders.  What they

9  withheld, they withheld because they had a right to do so.  And

10  we will operate on that basis until something is shown to the

11  contrary.  So, that we can eliminate now our badgering.

12          MALE SPEAKER:  Okay.

13          MR. ROGERS:  I don't remember, but you never asked me

14  for any notes or any information?

15          MARK HANDY:  No, I did not.

16          MR. ROGERS:  Thank you, sir.

17          MR. ADAMS: May I (inaudible)?

18          THE COURT:  Mr. Smith, I think it's your turn if you

19  want to ask something.

20          MR. SMITH:  Did you check with the evidence technician

21  units about the freshness of that fingerprint?

22          MARK HANDY:  What -- again, it was something that I

23  was told, as far as where -- to, to answer your question, I, I

24  did have a discussion, uh, about where it was located and the

25  condition of that.  But again, when, uh, it would have been back



1  at the point that, that shortly after it was collected from the

2  car, um, and it was in an office with a group of people and I

3  don't recall who all was there.

4         MR. SMITH:  That's all.

5         THE COURT:  Now, --

6         MR. ADAMS:  Thank you, --

7         THE COURT:  -- Mr. Adams.

8         MR. ADAMS:  -- Judge.  In response to Mr. Smith's

9  question about the furnishing of witnesses, etcetera, would you

10 please -- that is a letter dated July 8, 1992; is that correct?

11        MARK HANDY:  I'm sorry.  It's July 8, 1992, correct.

12        MR. ADAMS:  And it is on my stationery; --

13        MARK HANDY:  Correct.

14        MR. ADAMS:  -- it is addressed to Mr. Kenton Smith.

15        MARK HANDY:  That's correct.

16        MR. ADAMS:  Would you read that paragraph, please.

17        MR. ROGERS: Objection.  This letter was addressed to

18 me, not to him, and he can't introduce it to him.

19        THE COURT:  Eh.

20        MR. ADAMS:  You may.  Last -- the bottom paragraph

21 that's marked, Judge, is what's germane.

22        THE COURT:  The one that's March?

23        MR. ADAMS:  Yes, sir, the bottom one.

24        THE COURT:  What's, what's your question?

25        MR. ADAMS:  He asked, "Did they furnish you anything?"

1  We're talking about alibis and everything.  He asked did you

2  furnish him anything?  I furnished him this information on July
        th
3  the 8 .

4          MR. ROGERS: I was talking about notes.

5          THE COURT:  Well, I thought, I thought that I had

6  cleared that up.

7          MR. ROGERS: I was talking about notes.

8          THE COURT:  I'm trying to keep this from getting into

9  a name calling contest or another Miss Clark, Johnny Cochran

10 sort of deal by telling that you've all complied with all the

11 rules of discovery.

12          MR. ROGERS: I understand, but what -- you know, Mr.

13 Smith (inaudible) ask him whether or not, you know, I furnished

14 him, nobody ever asked me to furnish him anything, he never

15 asked to talk to my --

16          THE COURT:  What?

17          MR. ROGERS:  You know, and, and he created a false

18 impression --

19          THE COURT:  You know, --

20          MR. ROGERS: -- that we're not cooperating with these

21 people.

22          THE COURT:  Are we trying -- has Mr. Smith not given

23 you something that he's supposed to give?

24          MR. ADAMS:  Oh, no, no.  But what he has implied by

25 asking the question is, that we had an obligation to turn things

1  over.

2         THE COURT:  Well, I'm going to tell him one more time

3  that this court is under the understanding that all the

4  attorneys have done exactly what they were supposed to with

5  respect to sharing information and that no references to the

6  contrary will be drawn from anything.

7         MALE SPEAKER:  Okay.  Thank you, Judge.

8         THE COURT:  Will that satisfy everybody?

9         MR. ADAMS:  Sir, if I can ask him this question: were

10 you ever directed by anyone to go out and talk to June Calliver

11 in response to a letter I sent to Mr. Smith?

12        MALE SPEAKER:  I don't think he can refer to any

13 letter to Mr. Smith.  I think he can say, did anybody ever ask

14 him --

15        MR. ADAMS:  But, Judge, the problem is that Mr. Smith

16 opened the door by inferring that we had done something wrong.

17 I have told Mr. Smith every time --

18        (Overlapping Conversation)

19        THE COURT:  What do I have to do to close the door?

20        MR. ADAMS:  Judge, they gotta end all this badgering

21 him about those field notes.  Now, you and I know we've both

22 dealt with field notes and this, sir, 'cause field notes are not

23 even discoverable.  They had no right to his notes, and they

24 brought all of this up about somehow he ought to given them his

25 field notes.  He was under no obligation to, just like they



1  don't have to give us their notes.

2         THE COURT:  I don't know.

3         MR. ADAMS:  I don't know of any case law that says

4  that field notes are not discoverable --

5         (Overlapping Conversation)

6         THE COURT:  Yeah, there is, John.

7         MR. ADAMS:  -- in this jurisdiction.

8         MALE SPEAKER:  There is.  There is, son.

9         MR. ADAMS:  Well, they're -- I --

10        THE COURT:  But, anyway.  What do you -- come with me,

11 fellas.

12        (In chambers)

13        THE COURT:  Ladies and gentleman, I want to put

14 something to bed before it ever actually rears its ugly head.

15 You need to understand that the trial, everybody involved in a

16 very stressful situation and sometimes things are said or

17 implied or inferred that are not intended.  Now, with the --

18 with respect to the issue of discovery that has just recently

19 cropped up, um, the fact is that each and every attorney

20 involved has complied completely with this court's orders and

21 each have indicated that the other has gone, gone beyond the

22 court's orders in being open and honest with each other.  So,

23 we're not going to -- from this point further we're not going to

24 even question that fact.  So, that's where we are.  If there's

25 been any inference, uh, prior to this point to the contrary that

1  somebody has not been completely or open with respect to the

2  attys -- or as between the attorneys, that will be put to rest

3  because it's not factual.  That's where we are.

4          MR. ADAMS:  Yes, sir.

5          THE COURT:  Now, do we have any other questions of

6  Detective Handy?

7          MR. ADAMS:  No, sir.

8          THE COURT:  Is he subject to recall or may he be

9  finally excused?

10          MR. ADAMS:  Judge, I -- in this particular case, I

11 think he ought to be subject to recall.  We can hold him in

12 Louisville if we need him.

13          THE COURT:  Okay.  Detective, make sure that someone

14 knows how to get in touch with you.  And I assume you can get

15 back with us an hour, hour and a half's notice?

16          MALE SPEAKER:  Except for tomorrow, Judge.

17          MARK HANDY:  Tomorrow and Friday; I'm a be tied up

18 both days.

19          MALE SPEAKER:  There's some training that only comes

20 around once every two years.

21          MARK HANDY:  It's a, it's a sergeant's assessment

22 center and I have to be present for both -- well, I mean,

23 obviously this court can, can order me to be here.  But I mean,

24 if, if important --

25          THE COURT:  I don't want to put you in that position.

1   We'll try to accommodate you, but basically have someb-, make

2   sure that somebody there knows where you are at all times, okay?

3               MARK HANDY:  Yes, sir.

4               THE COURT:  Detective, I do want to admonish you not

5   to discuss the questions that you were asked or the answers that

6   you gave with any other witnesses.  Obviously, you're free to

7   discuss anything with the attorneys.  Okay?

8               MARK HANDY:  Thank you.

9               THE COURT:  Thank you for being with us.  Ladies and

10  gentleman, I'm going to break for lunch and sheriff's office has

11  made arrangements -- will make arrangements to take you out to

12  lunch again today.  Before I discharge you, it is my duty to

13  give you this admonition: it is your duty not to permit anyone

14  to speak to or communicate with you on any subject connected

15  with this trial, and any attempt to do so should be immediately

16  reported by you to the court.  Do not converse or discuss among

17  yourselves any subject connected with the trial, nor form or

18  express any opinion thereon until the case is finally submitted

19  to you for determination.  If anyone should state anything

20  within your hearing about this case, promptly bring that matter

21  to the attention of court.  Hey, Mr. Wright, you got lunch set

22  up?

23              MALE SPEAKER:  Yes, sir, I have.

24              THE COURT:  Okay.  Ladies and gentleman, if you would

25  go with Deputy Wright and he'll see that you're fit.  Let's do