```
         UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF KENTUCKY

                              NO. 3:17-CV-00419-DJH

    ----------------------------------------------------X

    JEFFREY DEWAYNE CLARK AND
    GARR KEITH HARDIN,
                    Plaintiffs,

    v.

    LOUISVILLE JEFFERSON COUNTY
    GOVERNMENT, ET AL.,
                    Defendant.

    ----------------------------------------------------X

                    DEPOSITION OF
                      JOHN RYAN
                TAKEN AUGUST 23, 2022
                AT THE LAW OFFICES OF
                         REGUS
                  10 DORRANCE STREET
                PROVIDENCE, RHODE ISLAND



    Reporter:  Rebecca J. Gladu
```

Page 132

1 leave out of a warrant information that cuts
2 against an informant's credibility, just basic
3 stuff right?
4            MR. GARVERICH: Objection to
5      form.
6      A.     Yes, but that's a totally different
7 issue. The Mendez case involved a guy that they
8 arrested. They never had any dealing with him
9 before. They didn't know who he was. He had a
10 load of drugs on him. And they said, Give us
11 somebody else, and he points out a house that --
12 they do no background. They did nothing.
13     Q.     Fair enough.
14     A.     So that's a totally different
15 situation.
16     Q.     But if you have credible, reliable
17 evidence that cuts against a witness's
18 reliability, that's information you need to put
19 into your report, correct?
20     A.     If that's the only information you
21 have, they certainly have to include that. If
22 it's a one-witness deal, then of course.
23     Q.     Most importantly, when you are
24 seeking probable cause, when you are seeking law

Page 133

1 enforcement authority, you have to report the
2 facts as they were reported to you, not the way
3 you want them to be?
4     A.    That, I would say of course.
5     Q.    That's as basic as it gets,
6 correct?
7     A.    I mean, you've got to be honest
8 with the facts.
9     Q.    You can't change a witness's
10 statement to fit your theory of the case?
11     A.    Absolutely.
12     Q.    And is it your testimony that you
13 did not see any evidence of Sheriff Greer doing
14 that in this case?
15     A.    I don't know.  You'd have to point
16 it out to me, but I don't believe so.
17     Q.    Well, is that something you were
18 looking for?
19     A.    Of course.  I put down everything
20 in the case.
21     Q.    And so, as you sit here today, you
22 can't think of a single example of evidence that
23 Sheriff Greer did that?
24     A.    No.  I would have it in my report

Page 157

1     Q.     Right.  If what she's saying --
2     A.     If on, you know, one of the first
3  days, before she makes the statement on the 9th,
4  somebody else tells her from the police
5  department, Hey, you know, these guys are into
6  this, and then regurgitates that back to Greer
7  and Greer doesn't know where she learned that
8  from or she says, I heard this --
9     Q.     But you saw in her deposition she
10 said she never reported that to the police.  If
11 that's true and he made it up, that would be a
12 fabrication, correct?
13    A.     If Sheriff Greer totally made it
14 up, yes.
15    Q.     And that's what she's saying in her
16 deposition, that she never told him that?
17              MR. BOND:  Object to the form.
18    A.     I don't know that that's true.  I'd
19 have to see -- you'd have to show me that.
20 BY MR. BRUSTIN:
21    Q.     She said she never spoke to Jeff
22 Clark about satanism, Jeff never spoke to her
23 about satanism, and prior to trial she was
24 unaware of whether Jeff was involved at all?

1      A.     Jeff?
2      Q.     Yes.  And Sheriff Greer reported
3  that she told them they were both into satanism.
4  If she never said that to him, that would be a
5  fabrication, right?
6      A.     Unless he misunderstood, then -- I
7  mean, he can't make something up.
8      Q.     Which is what her testimony
9  suggests he did?
10            MR. GARVERICH:  Objection to
11     form.
12     A.     I don't know that it does.
13            ZOOM ATTORNEY:  Nick, it's
14     12:30.  What are we going to do about
15     lunch?
16     (Off-record conference)
17            MR. BRUSTIN:  Back on the
18     record.
19 BY MR. BRUSTIN:
20     Q.     And you also saw Rogers' testimony
21 that, to her knowledge, Rhonda Sue Warford was
22 very happy in her relationship with Keith, her
23 mother was very happy about the relationship
24 with Keith, and that she never reported

Page 165

1    be appropriate to provide that kind of
2    information to a witness, correct?
3               MR. BOND:  Well, object to the
4        form.
5               ZOOM ATTORNEY:  Same.
6        A.     It would depend on whether or not
7    there was an investigation purpose for doing it.
8    Normally, you don't provide information to the
9    witnesses.
10       Q.     Can you think of --
11       A.     You let them provide the
12   information to you.
13       Q.     Based on the interviews that you
14   saw in this case of these witnesses, you would
15   agree that there would have been no conceivable
16   purpose of providing that information to them as
17   opposed to getting it from them?
18              MR. BOND:  Object to the form.
19       A.     To lead them to give you that
20   information, no.
21   BY MR. BRUSTIN:
22       Q.     And if you had provided that
23   information to them and misrepresented that they
24   volunteered it, that would be a fabrication?

Page 166

1   A.   If you made up that they said it,
2   then that would be totally inappropriate.
3   Q.   That's what these witnesses are
4   saying.  They're saying that that information
5   was provided to them by the police opposed to
6   them volunteering it, correct?
7                MR. BOND:  Object to the form.
8                ZOOM ATTORNEY:  Objection to
9   form.
10               ZOOM ATTORNEY:  Same.
11  BY MR. BRUSTIN:
12  Q.   That's what they're saying in
13  depositions today?
14  A.   I think only one person says.  I
15  think you identified --
16  Q.   No.  I gave you two people.
17  Michelle Rogers testified that she learned after
18  her sister's death, the sister of the victim,
19  she thinks from police, that Jeff and Keith did
20  animal sacrifices and were arrested at some
21  point for doing that.  And then you have Crystal
22  Barnes who testified that it was either Greer or
23  Handy who told her that.
24  A.   So in the first instance, she

Page 177

```
 1   have you --
 2        Q.    Fair enough.  You would agree to
 3   the extent he asked Keith Hardin whether she had
 4   an inverted cross tattooed on her body and he
 5   said, Yes, she did, this would be a
 6   misrepresentation?
 7        A.    Depending on the timing of that.
 8   If he initially did not tell him and then he
 9   subsequently offers it, then no.
10        Q.    But if he initially told him, it
11   would be a fabrication?
12        A.    But if he told him right from the
13   get-go, Yeah, I put an inverted cross on her,
14   then yes.
15        Q.    In other words, if Keith Hardin is
16   telling the truth and he told him that from the
17   get-go, this would be a fabrication?
18        A.    From the get-go meaning from the
19   initial meeting where they went to get the flyer
20   and they were trying to identify if it was the
21   same person.
22        Q.    The first time you asked him if she
23   had tattoos, Keith Hardin claims he told him,
24   Yes, she has an inverted cross.  If it's true,
```

Page 218

1    That's the kind of intimidation
2    you've seen in other cases; fair to say?
3             MR. BOND:  Object to the form.
4        A.   I don't think I've ever seen the
5    officer put the gun on the table in any case,
6    but that's certainly more than a subtle threat.
7    BY MR. BRUSTIN:
8        Q.   And, obviously, if that actually
9    happened and Greer and Handy are lying about it,
10   that would put all of their actions into
11   question in this case; fair to say?
12       A.   If anybody put a gun on a table for
13   a witness or the suspect, it would be totally
14   outside any kind of generally accepted practice.
15       Q.   And that would cause any reasonable
16   supervisor or prosecutor to question all of
17   their conduct in the case; fair to say?
18            ZOOM ATTORNEY:  Objection.
19       A.   It may.  It may, depending on what
20   other evidence you had.  If you separate out
21   that from the other evidence and there's still
22   plenty of other evidence, then maybe not.
23   BY MR. BRUSTIN:
24       Q.   Well, you would agree if you became