Amy Hatfield - January 31, 2020

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF KENTUCKY
                          SOUTHERN DIVISION

   JEFFREY DEWAYNE CLARK,     )
   and GARR KEITH HARDIN,     )
                              )
         Plaintiffs,          ) Case No.
                              ) 3:17-CV-419-JRW
   v.                         )
                              ) JUDGE JUSTIN R. WALKER
   LOUISVILLE JEFFERSON       )
   COUNTY METRO               ) MAGISTRATE COLIN H.
   GOVERNMENT, et al.,        ) LINDSAY
                              )
         Defendants.          )
   _____)




              Video Deposition of:


              AMY HATFIELD


              Taken on behalf of the Defendants


              January 31, 2020



   _____


              CLEETON DAVIS COURT REPORTING, LLC
                 402 BNA Drive, Suite 108
                 Nashville, Tennessee 37127
                       (615) 726-2737
                   www.cleetondavis.com
```

Amy Hatfield - January 31, 2020

```
 1   For Defendant Meade County:

 2        Robert K. Bond, Esq.
          Andrew T. Garverich, Esq.
 3        Coleman Lochmiller & Bond
          2907 Ring Road
 4        P. O. Box 1177
          Elizabeth, Kentucky 42702-1177
 5        270.737.0600
          rkbond@clblegal.com
 6        agarverich@clblegal.com

 7   For Defendant Robert Thurman:

 8        Peter J. Rosene, Esq.
          McBrayer, McGinnis, Leslie & Kirkland, PLLC
 9        201 East Main Street
          Suite 900
10        Lexington, Kentucky 40507-1361
          859.231.8780
11        prosene@mcbrayerfirm.com

12   For Defendant Mark Handy:

13        William H. Brammell, Jr., Esq.
          Dressman Benzinger LaVelle, PSC
14        321 West Main Street
          Suite 2100
15        Louisville, Kentucky 40202
          502.572.2500
16        bbrammell@dbllaw.com

17   Videographer:  Michael Mitchell, VCE

18   Also present:

19        Brian Peters, Louisville Metro Police
          Department
20

21

22

23

24

25
```

Amy Hatfield - January 31, 2020

```
 1   around the roads in Jefferson County, I guess,
 2   where he lived because I wasn't really familiar
 3   with it.  And he had taken me on some of the back
 4   roads and said, you know, Hey, me and Keith did
 5   this one time.  I was, like, What the hell, but
 6   okay.  Yeah.  He talked about that they had killed
 7   animals and hung them and different things, yes,
 8   ma'am.
 9       Q  Okay.  So when you said neither of you had a
10   house to live in or be in, what do you mean by
11   that?
12       A  When I say that, I mean, it wasn't his
13   house, it wasn't my house.  It was either his mom's
14   or my grandmother's or my mom and dad, and they
15   didn't really want us living together.  So we
16   didn't really live together.  We may stay the
17   nights once and a while together, but after my
18   ex-husband got the trailer that we had on
19   Greenwood, then it was -- we was trying to just see
20   each other when we could.
21       Q  Okay.  And when he talked about killing
22   animals with Keith Hardin, did he say that that was
23   specifically related to satanism?
24          MR. BRUSTIN:  Objection to form.
25       A  Yes, ma'am.  They would sacrifice the
```

Amy Hatfield - January 31, 2020

```
 1      A   I do not remember exact dates, months.  I do
 2   know that we could go down there.  My parents would
 3   come in from Ohio because my dad worked in Ohio.
 4   How often, I don't remember.  I do know that we'd
 5   go down there.  We'd ride the back roads.  I showed
 6   him where family lived, what we owned, or what they
 7   owned, but, no.
 8      Q   Was this -- do you know if it was before or
 9   after you had Heather?
10      A   It would have been both.  We did this before
11   we had Heather and we did it after.  Maybe a few
12   times after we had her.
13      Q   What about before you and Mr. Clark lived in
14   Meade County at their home?
15      A   Before we lived in the home, yes, we had
16   been down there several weekends.  And I say it was
17   on the weekends because he worked during the week.
18   And when we'd get time on the weekends we would go
19   down.
20      Q   Okay.  Other than four-wheeling with your
21   brothers, do you know if Mr. Clark ever -- do you
22   recall any times Mr. Clark would be outdoors in
23   Meade County near where your mom and dad lived?
24      A   Well, he would have to be outdoors and be
25   going from Meade County to Louisville because
```

```
 1   this son or sexually assaulted this son in any way,
 2   why at the age of 13 when things can happen would
 3   they give this child back to me?  I received
 4   custody back of Randy at that time.
 5       Q   And after that point you received custody of
 6   Randy, did you try and get the child abuse
 7   convictions vacated?
 8       A   I did.  I went to -- I looked it up online
 9   how to get it vacated.  I went to Dennie Hardin, an
10   attorney in Bowling Green.  And he said, Let's look
11   at it.  We sat down.  We looked at it.  He talked
12   to Randy.  And he said, Why did you say this?  He
13   said, I was told what to say.  He said, How do you
14   know we're not being told what to say now by your
15   mother?  He said, Because I haven't been.
16           Dennie and I took it back to trial, took it
17   back to court, I should say.  And Kenton Smith come
18   up with the same allegations.  Randy, how do we
19   know you're telling the truth now and not then?
20   And they would not vacate it.
21           But if anybody reads the paperwork, I have a
22   real nice cesarean scar that my son could not even
23   identify.  Now, if my son couldn't identify that at
24   seven or eight, at 13 he sure could have, but he
25   didn't, did he?  Even the attorneys told him or the
```

Amy Hatfield - January 31, 2020

1  cops that investigated said, There's no way this
2  happened.  He can't identify scars or tattoos.  And
3  these are things that I had prior to these
4  allegations being brought to.
5      You-all helped Jeff get off, but by God I'm
6  the one who's always paid.  I've paid a price for
7  nothing.  The guilty always get off and the
8  innocent always pay the price, always.  You'll
9  never convince me otherwise this man didn't do it.
10 You won't.  In my heart of hearts I know this man
11 done it.  And you will never convince me otherwise.
12 He wants to sit here and say he brought charges
13 against me, that he seen me do this.  He's a liar.
14 Straight-up liar.  He is a narcissist.  He will
15 tell you anything you want to hear and always has.
16 I'm the victim, not him.
17           MR. SLOSAR:  We appreciate that, ma'am.
18           MR. BRUSTIN:  Is there anything else?
19           MR. ERVIN:  Objection.
20           MS. TAYLOR:  I think we need to take a
21      break.
22           MR. BRUSTIN:  Why?  Do you need a break?
23           THE WITNESS:  I need a break.
24           MR. ERVIN:  You're interrupting.
25           MR. BRUSTIN:  I didn't interrupt

Amy Hatfield - January 31, 2020

```
 1      anything.  That was awesome.
 2             MR. BOND:  Well, the comments.
 3             MR. BRUSTIN:  Okay.  All right.  We'll
 4      just write down what she just said.
 5             MR. BOND:  That's fine.  Then you can
 6      question her.
 7             MR. BRUSTIN:  That's good.
 8             MR. BOND:  And I know you will, sir.
 9             MS. TAYLOR:  Can we go off the record?
10             MR. BRUSTIN:  Do you have an estimate of
11      how much longer?  Whenever you want, of course.
12             MS. TAYLOR:  Not too much longer.
13             MR. BRUSTIN:  Not too much longer.
14             MS. TAYLOR:  No.
15             THE VIDEOGRAPHER:  Off the record at
16      10:47.
17             (A break was taken.)
18             THE VIDEOGRAPHER:  We're back on the
19      record at 10:58.  This is the beginning of
20       Disc 2.
21   BY MS. TAYLOR:
22      Q   Ms. Hatfield, I have just a few more
23   questions for you.  From 1992 to 1996, did you have
24   any contact or communication from any Louisville
25   Metro -- or back then it was the Louisville Police
```

Amy Hatfield - January 31, 2020

```
 1   Department in relation -- any other detectives in
 2   relation to the investigation of Mr. Clark and
 3   Mr. Hardin?
 4            MR. SLOSAR:  Objection to form.
 5       A   No, ma'am, not that I can recall.
 6   BY MS. TAYLOR:
 7       Q   Okay.  Do you know a detective or a
 8   Louisville Police Department officer of the name
 9   James Griffiths?
10       A   Not that I can recall.
11       Q   James Clark?
12       A   Not that I can recall.
13       Q   Jim Woosley?
14       A   Not that I can recall.
15       Q   Charles Edelen?
16       A   Not that I can recall.
17       Q   Robert Ennis?
18       A   Not that I recall.
19       Q   Kelly Jones?
20       A   No, ma'am, not that I recall.
21       Q   Okay.  I don't have any further questions
22   for you, but I think some of the other attorneys
23   will.
24       A   Okay.  Thank you.
25            MR. BOND:  We don't have any questions on
```

Amy Hatfield - January 31, 2020

```
 1   victim in this case; do you remember saying that?
 2       A    Yes.
 3       Q    And, frankly, it's your belief that you're
 4   one of the most important victims in this case
 5   that's never been recognized; fair to say?
 6            MS. TAYLOR:  Objection to form.  You can
 7       answer.
 8       A    If you want to look at it that way, yes.
 9   BY MR. BRUSTIN:
10       Q    That's how you feel, right?
11       A    I feel that I was done wrong by Jeff, yes.
12       Q    Okay.  And the whole process, right?
13       A    Sure.
14       Q    You're a victim here.
15       A    Yes.
16       Q    Is Jeff responsible for your kids being
17   taken away?  Do you blame him in some ways?
18       A    No.
19       Q    Okay.  That was your grandmother's doing?
20       A    No.
21       Q    Okay.  One of the reasons you said you were
22   so sure that everybody knew that you had not raped
23   your son is because he didn't even know that you
24   had a cesarean mark on your stomach, right?
25       A    Exactly.
```

Amy Hatfield - January 31, 2020

```
 1      Q   And, obviously, if he didn't even know you
 2   had a cesarean mark on your stomach, that would be
 3   a smoking gun that he -- that you couldn't have
 4   raped him, correct?
 5      A   Exactly.
 6      Q   On the other hand, if he did know you had a
 7   cesarean mark on your stomach, that would be
 8   unusual for a little boy to know, right?
 9      A   I would think so.
10      Q   Okay.  So let's take a look at what we're
11   going to mark as exhibit --
12      A   73.
13           MS. TAYLOR:  This is defendants'
14      exhibits.
15           THE WITNESS:  Oh.
16           MR. BOND:  I do want to ask for the
17      record, it was intimated, and I may have
18      misunderstood, but these have been previously
19      produced.  Okay.  Did I misunderstand or have
20      they been previously produced?
21           MS. McCARTHY:  I don't believe these have
22      been produced.
23           MR. BOND:  I'm sorry, ma'am?
24           MS. McCARTHY:  I don't believe these have
25      been produced.
```

Amy Hatfield - January 31, 2020

```
 1   Detective McIntosh is asking questions.  How many
 2   times do you think this happened?  Randal Remsburg:
 3   Fourteen or fifteen times.  I'm not sure though,
 4   that's just a guess.
 5       A   I'm sorry.  Let me interrupt you one moment.
 6   You said start down here where it said "yeah."  I
 7   did start down here where he said "yeah."  So, no,
 8   I did not read up there.  If you would like, I
 9   would be more than happy to read that.
10       Q   What's he describing?
11       A   I guess he's describing how many times this
12   would happen and how long it would take.  Two
13   hours.
14       Q   Let's go next.  If you want to know where
15   she had her scar at, it was about right where her
16   stomach was.  What scar?  Randy:  Where she had her
17   babies.  Michael McIntosh:  That's where the,
18   that's what the scar from where you guys were born
19   at?  Yeah.
20           Remember when you stood up and showed us
21   your scar?
22       A   Uh-huh.
23       Q   This is Randy describing where the scar was,
24   correct?
25       A   I assume, yes.
```

Amy Hatfield - January 31, 2020

```
 1    Q   This is Randy describing what you told us he
 2  couldn't know unless in fact he was telling the
 3  truth and you had raped him, correct?
 4    A   You're correct.
 5        MR. ERVIN:  Objection to the form.
 6  BY MR. BRUSTIN:
 7    Q   So remember when you just told us a moment
 8  ago that the reason that you knew Randy was making
 9  this up is because he didn't know your cesarean
10  scar, correct?
11    A   Yes, that is correct.  Excuse me.  If we
12  can --
13    Q   Sure.
14    A   Do you have all of the notes in here from
15  the detectives, everyone?  Did you read all of the
16  handwritten notes from McIntosh because when Randy
17  did do this interview, his dad and his stepmother
18  Jeannelle went and bought books.  They showed him
19  things.  I'm sorry.  You probably don't have the
20  last testimony where we went back to court in
21  Hardin County.  You probably don't have that where
22  Randy says, I was showed these things and that's
23  why I said these things.  So I'm sure you don't
24  have it.  But I will be more than happy to go to my
25  car and get any and every note on this case for
```

Amy Hatfield - January 31, 2020

```
 1            MR. BRUSTIN:  I'm calling it human
 2     resources.  It's 71.  Department for Social
 3     Services.  It says Cabinet for Human Resources.
 4     71.
 5            MR. ERVIN:  Joe Greer's?
 6            MR. BRUSTIN:  No, no.  71.
 7            MR. SLOSAR:  Defendants' 71.
 8            MR. BRUSTIN:  It says Cabinet for Human
 9     Resources, Department for Social Services.
10            MR. BRAMMELL:  Okay.
11            MR. BRUSTIN:  That's what I'm referring
12     to.
13  BY MR. BRUSTIN:
14     Q   Even at that time you decided, you know
15  what, even though I know Sheriff Greer, even though
16  I know Adams, even though they know my family, I am
17  not -- I'm going to go to social services, but I'm
18  not going to tell them.
19     A   I'm sorry but this --
20            MR. BOND:  Object to the form of the
21     question.
22     A   This was not done in Meade County.  This was
23  done in Jefferson County.  So, no, I did not go to
24  them because I was not there.
25  BY MR. BRUSTIN:
```

Amy Hatfield - January 31, 2020

```
 1      Q   Good point.  Why didn't you go to Jefferson
 2   County police at that time?
 3      A   What is this?  I'm assuming I did go
 4   somewhere.
 5      Q   Oh, so you thought that was a police report?
 6      A   I'm assuming.
 7      Q   Okay.  And there's probably another police
 8   report where you mention the gun in the mouth?
 9      A   I'm assuming.
10      Q   All right.  So you did go to Louisville
11   Police Department and make a complaint?
12      A   I did, yes.
13      Q   Okay.  Do you know what happened with that
14   complaint?
15      A   Like I said, I know it was set aside at one
16   time and then he got in trouble.  And when he got
17   in trouble he was convicted.  He got ten years.
18      Q   Are you suggesting that there was a criminal
19   proceeding against Jeff Clark for putting the gun
20   in your mouth?
21      A   Yes.
22      Q   When was that?
23      A   Domestic violence in Jefferson County.
24      Q   All right.
25      A   May we take a break?
```

Amy Hatfield - January 31, 2020

```
 1       Q    Sure.
 2              THE VIDEOGRAPHER:  Watch your
 3       microphones, please.  Off the record at 12:01.
 4              (A break was taken.)
 5              THE VIDEOGRAPHER:  We're back on the
 6       record at 12:10.  This is the beginning of
 7        Disc 3.
 8   BY MR. BRUSTIN:
 9       Q    What's your relationship like today with
10   Randal and Heather?
11       A    I see Randy and Erica, his wife, and their
12   three children, Haley, Brody, and Huntsley, once a
13   month maybe.
14       Q    They live in the same area?
15       A    No.  They live in Kentucky.
16       Q    Okay.  And how about Heather?
17       A    I see Heather maybe once every six months.
18   I talk to her by text.
19       Q    Okay.  Now, one of the things that you said
20   is that you wanted to work things out with Jeff
21   after these incidents and still be a family, right?
22       A    Yes.
23       Q    And that you had -- and after the incident
24   with Jeff happened, where he put a gun in your
25   mouth and after he had almost killed you by choking
```

Amy Hatfield - January 31, 2020

```
 1      A   I don't know what he'll say.  I know what I
 2   remembered, and he did not say anything to me about
 3   Jeff Clark's case.
 4   BY MR. BRUSTIN:
 5      Q   All right.  Now, let's take a look at
 6   page 150.  Take a minute and read 150 and 151.
 7      A   (Witness complies.)  Yes, sir.
 8      Q   And this is your pleading guilty to reduced
 9   charges of assault on the second degree and
10   custodial interference, correct?
11      A   Yes, sir.
12            MS. TAYLOR:  Object to the form of that
13       question.
14            MR. BOND:  It says custodial shall be
15       dismissed.
16   BY MR. BRUSTIN:
17      Q   Oh, I'm sorry.  This is you
18   pleading -- you're right.  This is you pleading
19   guilty to amended charges of assault in the second
20   degree, seven counts, correct?
21      A   Yes, sir.
22      Q   You're pleading guilty not to raping your
23   son, but to assaulting your son in the second
24   degree, correct?
25      A   Yes.
```

Amy Hatfield - January 31, 2020

```
 1      Q    And you understood that was a felony,
 2   correct?
 3      A    Yes.
 4      Q    And one of the facts of the case -- you
 5   signed this document, correct?
 6      A    Yes.
 7      Q    You signed this document understanding --
 8   obviously, you read this before you signed it,
 9   right?
10      A    Yes.
11      Q    And you were pleading guilty where it
12   says -- see facts of the case?
13      A    Yes.
14      Q    Defendant is accused of having a sexual
15   relationship with her child.
16      A    Yes.
17      Q    You pled guilty to those facts, correct?
18      A    Yes.
19           MR. BOND:  Object to the form of the
20      question.
21   BY MR. BRUSTIN:
22      Q    And then it says, The defendant has now had
23   a hysterectomy.
24      A    Yes.
25      Q    When did that happen?
```

Amy Hatfield - January 31, 2020

| | |
|---|---|
| 1 | Q   Then he asked you, With a knife?  Did he |
| 2 | ever tell you?  You say, Ah. |
| 3 | A   Uh-huh. |
| 4 | Q   Then maybe how or the best place to.  And |
| 5 | then you say, Oh, yeah, he'd tell you right away |
| 6 | where the best place to get them.  And then he |
| 7 | describes where you kill somebody with a gun and |
| 8 | then where you kill somebody with a knife, right? |
| 9 | A   Yes, sir. |
| 10 | Q   And then he asked you specifically after |
| 11 | that, Did he ever mention the brain stem through |
| 12 | the neck? |
| 13 | A   And I said, Right.  Yeah. |
| 14 | Q   Okay.  So the first -- so I'm going to go |
| 15 | back now.  So the reason he asked you brain stem is |
| 16 | because the first place you showed him wasn't the |
| 17 | brain stem, correct? |
| 18 | A   I would assume. |
| 19 | Q   Do you remember where you showed him? |
| 20 | A   I do not. |
| 21 | Q   Okay.  But it wasn't the brain stem because |
| 22 | he specifically referenced the brain stem after? |
| 23 |        MR. ERVIN:  Objection to the form of the |
| 24 | question. |
| 25 | A   I would assume. |