CLARK AND HARDIN 3.07.95                                March 07, 1995
COMMONWEALTH OF KY vs GARR KEITH HARDIN                          209

1  people they've got, all the lab technicians, all the

2  laboratories, all the police officers, all the evidence they've

3  got, you're his last line of defense against them.  And with all

4  those people and all those laboratory reports and all that

5  information on all these fingerprints, they still can't show you

6  he had anything to do with her disappearance, anything to do

7  with her stab wound, was ever in Meade County during the time of

8  her disappearance.  We're going to ask you to make a decision

9  based on the evidence that's been presented to you, return a

10 verdict of not guilty on behalf of my client.

11          THE COURT:  Ladies and gentlemen, would any of you

12 like to stretch your legs, so to speak?  All of you want to

13 stretch your legs.  Bailiff, place you in charge of the jury.

14 Do not permit any communication by anyone to the jury while

15 under your charge.  Do not communicate to them yourself anything

16 about the case.  Okay?

17          THE BAILIFF:  Yes, sir.

18          THE COURT:  Let you take them all to the grand jury

19 room, give them a chance to stretch their legs, have them back

20 here in 10 minutes for the Commonwealth's summation.  Okay?

21          THE BAILIFF:  All right, Judge.

22          (Recess.)

23          MR. SMITH:  May it please the court, opposing counsel,

24 ladies and gentlemen of the jury, I will be as brief as my great

25 responsibility to the citizens of this county will allow because

CLARK AND HARDIN 3.07.95                                      March 07, 1995
COMMONWEALTH OF KY vs GARR KEITH HARDIN                              210

1  after all, ladies and gentlemen, I'm not the government.  That's

2  just one attempt to pull the wool over your eyes that has been

3  made here today.  I'm the Commonwealth attorney and I represent

4  the Commonwealth.  I represent you all.  I represent these

5  people out here.  I'm not the government, never have been, don't

6  want to be, and never will be.

7         After hearing the great eloquence that came before me,

8  I do almost feel like I want to pull my shirt legs -- or my

9  shirt pants up.  Thank goodness that you all are on my side.

10 Now, you all are saying, you're not on my side.  And that's

11 true, you're really not.  But you did sit here and watch all the

12 evidence as it came out.  And what they say isn't necessarily

13 what we heard.

14        Now, I haven't got to see much of my children this

15 week and last night I was -- they were sound asleep, but I'll be

16 doggone, I'd had enough of this and I was going to read them a

17 bedtime story anyway whether they were asleep or not.  And I

18 read this -- I was reading to them Lewis Carroll "Through the

19 Looking Glass."  It's one of those books with Alice in

20 Wonderland that my daughters like.  And I come to this part.

21 When I use a word Humpty Dumpty said in a rather scornful tone,

22 it means just what I choose it to mean, neither more nor less.

23 The question is to Alice whether you can make words means so

24 many different things.

25        Now, respectfully to my opposing counsel, they have



1  attempted to make words mean so many things.  But you all saw

2  the evidence and you know what those words will mean.  Now, I

3  listened to it.  I've been doing this work for nine and a half

4  years, ladies and gentlemen, and I listen to it and I've been

5  prosecuting.  And when you prosecute, you represent the case on

6  behalf of the people.  And for eight and a half years, for eight

7  and a half years, I've stood in front of juries and I've

8  listened to defense lawyers and I always hear reasonable doubt,

9  always.  But I have yet, I have yet to hear the word justice

10  come out of their mouth.  And in the hour and a half that we

11  have listened before, I didn't hear it again.

12         Now, that ladies and gentlemen, is why we're here to

13  do justice.  And that's what you all need to think about.  What

14  is just in this case?  I thank you for your service.  I'll

15  digress here a minute.  I know it's an imposition.  Seven days

16  is a long time for people to be away from their businesses and

17  to sit in here.  But it's a great thing.  It's a great thing and

18  it's something that people like myself will never get to do.

19  Heck, nobody ever want me on a jury.  And so now, ladies and

20  gentlemen, it's time for a verdict.  It's time for a verdict.

21  It's time for a verdict.  And verdict, ladies and gentlemen,

22  means truth.  Nothing more and nothing less.

23         Wouldn't it be wonderful and wouldn't your jobs be

24  simple if when you came in here to court and you heard a case

25  that somebody's house was broken into, if somebody's car was



1  stolen, if somebody's cows were stolen, if somebody was raped or

2  if somebody was killed, ladies and gentlemen, wouldn't your job

3  be easy if the persons who do these things would come in here

4  and sit in this stand and tell you.  Wouldn't need juries, would

5  we?  But they never do.  They never do.

6        My momma came to watch me try one of my first cases.

7  She was proud of me.  I don't know how proud she was after that

8  case was over with.  And we presented a case and she came out

9  and she said she was offended -- she was offended, she said, my

10 God (inaudible), people come in that courtroom and swore to tell

11 the truth and, well, they were lying.  I said, yeah, mom, it

12 happens every trial.  It happens every trial.  And this trial is

13 no exception because you see, ladies and gentlemen, opposing

14 counsel, the best lawyers in Louisville, if they can spread

15 enough smoke screen, if they can get your mind off the ball, if

16 they can get you thinking about anything else and if they scream

17 reasonable doubt at the top of their lungs, they don't want us

18 to talk about justice.  They want to talk about reasonable

19 doubt.  And just maybe, just maybe you all will let guilty

20 people walk out to do this type of thing again.

21       And I am -- I cannot tell you -- I don't get to tell

22 you what reasonable doubt is.  I can't.  The law does not allow

23 me.  So I can't tell you what it is.  But each one of you, each

24 one of you 12 will have to look down in your heart and you will

25 have to make that decision for yourself.  And when you do,



1   please use your common sense.

2          I want to give you two examples.  Well, first let me

3   back up a minute.  Again, as I told you, this case, you have to

4   decide who is telling the truth and who is lying.  And I will

5   submit to you that once you decide who is telling the truth --

6   and I wish you did not have to make that decision, but you do.

7   And I will submit to you that once you decide who is telling the

8   truth by viewing the evidence and once you make a decision who

9   to believe and who not to believe, then there will be no

10  reasonable doubt and there will be no doubt, no doubt at all.

11  So who we going to believe here, ladies and gentlemen?

12         Let me digress here a minute.  Let's talk about

13  complicity.  I read the indictments to you when we started and

14  we talked about either one of these people either individually

15  or in complicity with others.  Now, the judge has given you an

16  instruction on complicity.  I will submit to you that what that

17  basically means is that these two people are -- if these two

18  people are out, if they are acting together, if they've done

19  anything to aid and abet the other person in committing this

20  crime, that's what complicity is.  Then we don't have to prove

21  who actually did the stabbing, but I think we have and I'll talk

22  to you about that in a minute.  That's what complicity is.

23         Now, let's talk about evidence.  We've seen here that

24  eye witnesses -- if we had someone who actually witnessed this

25  crime in its creation, then the eloquence of these lawyers would



1  get up and they'd cross them up and they'd question it.  It's a

2  heck of a thing to sit there in that box.  Let's talk about

3  evidence and let's talk about cases come together and I want to

4  give you some examples.

5          I grew up on my grandfather's farm.  Between here and

6  Midway, my grandfather's farm.  We farmed tobacco and baled hay,

7  the square bales and some round bales, but no big round bales.

8  We put it up.  I figured there had to be an easier way to make a

9  living because that work was hard.  I didn't care much for that

10 tobacco.  You had to work all year long.  And we used to go out

11 and walk in the fields cutting thistles and checking on the

12 cattle and things like that.  And there's some things, ladies

13 and gentlemen, by the circumstances, there's some things you see

14 as you look at particular circumstances that you just know

15 that's the way it is.  And we're walking through this woods one

16 day and we see a tree stump.  We see a tree stump.  And my

17 grandfather says, "Kenton, somebody's been back in this field

18 hunting and they didn't get my permission."  And I said, "Well,

19 how do you know?"  And he said, "Look at that tree stump over

20 there."  He said, "There's a turtle up on it."  And he said,

21 "Boy, ain't you got enough sense to know that turtles don't get

22 up on no tree stumps by themselves."  And there's some things

23 and some evidence in this case that the only way it can be, the

24 only reasonable conclusion will be that these two people are

25 guilty as charged.

1           Now, let me give you one more example.  On Saturday,
2  my wife teaches school and on Saturday it's my job to clean the
3  kitchen up and some time for me to spend some time with the
4  children.  And last Saturday, last Saturday, my wife took my
5  youngest daughter and went to the grocery store and I cleaned
6  the kitchen up.  And I wiped that counter clean.  And I've got a
7  daughter that likes sugar.  She likes sugar.  Her tea can't be
8  sweet enough.  She eats it plain.  It's the dangdest thing I
9  ever seen in my born days.  And just she and I were home, just
10 she and I were home.  Well, I wiped the counter down slick as a
11 whistle, had all the dishes out of the sink.  Boy, I was doing
12 my good deed.  I was getting my honey do's out of the way.

13          And I walked outside and took the garbage out and I
14 was out about 15 minutes dealing with the dog and I came back
15 in, ladies and gentlemen, and lo and behold, there was sugar on
16 the counter.  Well, I knew that since my daughter and I were the
17 only ones home, somebody had been in the sugar.  I knew it.  And
18 I brought her in there and unlike a criminal defendant, she
19 didn't know she had the right to a lawyer, she fessed up.  She
20 fessed up.  And so there are some things you know, ladies and
21 gentlemen.  When those turtles are up on that tree stump and
22 when the sugar is on the counter, there is just some things
23 you're going to know.

24          Now, ladies and gentlemen, no case is perfect.  Every
25 case we bring in here has some warts on it.  And I'd like to



1  talk with you.  I want to be forthright with you about some of

2  the warts in this case.  All right.  We'll talk about what the

3  defendants say and why what they say and we'll talk about their

4  motivation to lie, but let's talk about this case just a little

5  bit.  All right.  I guess Billy Carter could be a tremendous

6  wart, couldn't he, because after all, Billy Carter comes in here

7  and he says, "Well, I saw her."  Ladies and gentlemen, he is

8  supposedly an eye witness and as you can tell from what he

9  testified to, his testimony doesn't hold up.  He says that on

10 Friday, it's dark enough that the streetlights are on.  He's

11 going up towards big O and there is this car coming out there

12 and he ain't never seen Rhonda Sue Warford before in his born

13 days and he says, "That's her."

14         Now, I'm not telling you that Billy Carter is coming

15 in here and lying to you.  I'm not.  There is some of them that

16 have and I'll talk about that in a minute.  But ladies and

17 gentlemen, Billy Carter is mistaken.  I mean, Rhonda Sue Warford

18 didn't have a driver's license.  She knew no friends whatsoever

19 that had a Mustang and even if she did, Billy Carter's going

20 along, it's dark or near dark, he sees her in the car, doesn't

21 see her build or anything, sees her three days later and says

22 that's her.  That just doesn't hold up.  That just doesn't hold

23 up.

24         Now, let's talk about Mr. Pozzie.  Well, lo and

25 behold, I wonder where Mr. Pozzie was.  Now I know Mr. Pozzie in

1  Clay County.  No wonder I never got to talk to Mr. Pozzie, not

2  that I would.  I probably would have.  But the Commonwealth

3  takes their witnesses as we find them, ladies and gentlemen.  We

4  don't prepare them.  You heard Amy Remsburg testify she never

5  talked to me.  We don't get up there and tell them how to say or

6  put them on the video camera and get them all slicked up.

7        Let's talk about Mr. Pozzie.  Mr. Pozzie says that it

8  could have been May, it could have been June, it could have been

9  July when he was talked about -- when he was talked to.  If you

10 believe Mrs. Cochran, it was in May.  And I do not mean to pick

11 on Mrs. Cochran.  I will stipulate to the citizens of this

12 Commonwealth that there is no truer love than the love a mother

13 has for her son.  And I take no issue with Ms. Cochran.  I don't

14 pick a fight with her at all.  But Mr. Pozzie, he didn't even

15 remember when he was talked to.  He doesn't remember when it

16 was.  He doesn't remember a loud car that everybody else

17 remembers.  He can't tell you who was in the car.  He can't tell

18 you what the defendant Clark was wearing.  He can't tell you

19 whether he was drinking or not.  He can't tell you anything

20 about that except to say it's on April Fool's Day when in fact,

21 when in fact, it wasn't on April Fool's Day.  It was in the

22 early morning hours of April 2.

23        We know -- I will submit to you -- I will submit to

24 you that Mr. Pozzie did see Jeff Clark in that Chevron station.

25 I'm not going to -- I am not telling you that Mr. Pozzie is

1  lying.  I'm telling you that when he's asked a month later --

2  and wouldn't it be nice -- these two defendants were down at

3  that police station for six, seven -- you heard however long it

4  was.  Six, seven, or eight hours.  They were interviewed three

5  times.  One time with this sheriff right here, Bill Adams,

6  Handy, and they never ever mentioned Chevron.  And they knew as

7  Hardin said, the kimchi was getting deep.  They knew this was

8  serious and they never mentioned Chevron.

9          The defendant Hardin never mentioned Chevron to Hope

10  Greer, never mentioned Chevron to the occasions on the tape to

11  Handy because they knew they weren't at Chevron.  Not on this

12  occasion.  We know that they were out very late here on March 31

13  which was actually April Fool's Day, the wee hours.  We know

14  they were out late here and here.  Jimmy McMackin told you that

15  he saw them on all three occasions, but isn't it funny that

16  Jimmy McMackin did not see them on this occasion.  Sugar, folks.

17  That turtle's up on the stump.  The circumstances a lot of times

18  can speak louder than words.

19          So no, ladies and gentlemen, no, ladies and gentlemen,

20  I am not telling you that Mr. Pozzie intended to come in here

21  and deceive you because he truly did not.  But there's no way

22  that Mr. Pozzie can say with any degree of reason that it was on

23  that exact occasion that they were in there.  And don't you

24  think these two would have been screaming it at the top of their

25  lungs.  I mean, I don't even find out about this until July.

1  Wonder why.  Probably that's when Mr. Adams found out about it.

2  And isn't it convenient -- isn't it convenient that the family

3  of defendant Clark waits until after we can't get the camera to

4  check Mr. Pozzie.

5          So let's talk about what really happened in this case.

6  Let me back up a minute.  I want to talk to you about the two

7  defendants and their testimony and why you should not believe a

8  word they're saying.  They -- we have heard all about everyone

9  else's motivation to lie.  They are the only ones that have any

10 motivation to lie.  They are trying to save their butts.  And

11 they are -- if they can pull the wool over your eyes, if they

12 can even get one of you all to buy into this, then they walk

13 out.  They walk out.  Now, one way they're trying to pull the

14 wool over your eyes --

15         MR. ADAMS:  Judge, I'm going to object.  That's not a

16 true statement in law whatsoever.  A hung jury does not --

17         THE COURT:  I understand.

18         MR. ADAMS:  Well, it's not a correct statement.

19         THE COURT:  I understand, Mr. Adams.  It takes 12 to

20 reach a verdict one way or the other and I'll so instruct the

21 jury.

22         MR. ADAMS:  Thank you, sir.

23         MR. SMITH:  Excuse me.  I want to talk to you.  I

24 don't know a whole lot about Albert Schweitzer, but I read a

25 quote the other day and it said, "A man is ethical and

1   believable only when life is sacred to him." And, ladies and
2   gentlemen, life is far from sacred to either one of these
3   defendants.
4           Let's talk about the defendant Clark. The first
5   interview -- now, boy, what we do, what we do, what we allow
6   lawyers to do to witnesses I guess is necessary, but sometimes
7   it stinks because what has -- the attempt to smear Detective
8   Handy of the Louisville Police Department is terrible and is
9   slanderous. What did Detective Handy do that was so bad?
10  Forget the fact that Coroner Adams and Sheriff Greer were with
11  him when he took this interview. First of all, when they
12  interviewed -- they interview a bunch of people. You've heard
13  evidence that they talked to a bunch of people and maybe they
14  should tape every single interview. But you know what I think
15  is going to happen? I think as soon as you set that tape
16  recorder down in front of somebody, they don't talk. It's
17  intimidating. And what did Detective Handy do to deserve, my
18  gosh, these fine two lawyers coming down on him? Well, he was
19  interviewing a witness who told him he was a witness of a crime
20  and the witness was scared and was backing up. He said, wait a
21  minute and he stopped the interview. He said, what's wrong?
22  And the witness told him he was scared. And he reassured him
23  and he started the thing over. Terrible crime, isn't it, ladies
24  and gentlemen? It's a terrible thing for any person involved in
25  law enforcement to show any type of compassion at all for



1  anybody else, isn't it?

2          But it doesn't matter -- it does not matter because

3  Sheriff Greer was there and Coroner Adams was there and these

4  folks have been very careful not to attack them because they

5  know that's not going to fly.  So first interview, Clark says,

6  last saw Rhonda Warford December '91.  I don't have any knives.

7  I don't even know if Hardin is into the Devil or not.  Says he

8  hadn't been to Meade County in a long time and he does not

9  mention Chevron at all.

10         Then we have a second interview later on that day.  He

11  admits that he lied before about the knives and he says he left

12  at 1:00.  He don't mention nothing about any Chevron station.

13  Now, the cock's crowed for the second time here, folks.  Now we

14  go into the third interview with Hope Greer and I guess Hope

15  Greer is part of this terrible conspiracy to wrongfully convict

16  these two people.  Hope says the defendant told her -- now, see,

17  it's hard, ladies and gentlemen, the truth never changes.  The

18  truth never changes.  But when you lie, it's hard to tell the

19  same lie twice.

20         And so we have the third interview and this time Clark

21  tells Hope Greer, "well, I'm not familiar with Meade County."

22  Now, we know that's a lie.  And then Hope tied him down.  "Do

23  you own or possess any knives?"  He said, "No."  He denied

24  knives there, forgot what he said before.  And then he says, "I

25  couldn't kill her and do what was done to her."  And Hope Greer

1   said, "What do you mean, what was done to her?  How do you know

2   what was done to her?"  And you know what he did, he shut up.

3   He didn't say, well, I read in the paper she was stabbed.  He

4   shut up.  He shut up and the turtle is up on the stump, folks.

5          Now let's talk about the defendant Hardin.  Let's talk

6   about his credibility.  First of all, the wonderful story about

7   the chalice.  He cut his hand on her, folks.  He cut his hand on

8   this chalice so we came back and introduced it into evidence.

9   You can't cut your hand on that chalice.  And he never cut his

10  hand on this chalice.  And he lied to you about the animal

11  deals.  He's had blood in this chalice.  Not a thing he told

12  y'all was worth believing.  Obviously, he's covering his butt.

13         Let's talk about what Hardin told you or told them.

14  Well, Handy and Woosley -- you know, I dragged one witness down

15  here after another and I want to digress here a minute.  I want

16  to tell you about Sean Mattingly.  Sean Mattingly comes in and

17  tells the police one thing.  Then Sean Mattingly comes back and

18  gives this wonderful story.  I swear, ladies and gentlemen, I

19  believe he knows who killed JFK.  And the reason I got mad about

20  it is because of him, because of him, I called a special grand

21  jury in here and I went through one day going down wild goose

22  chases.

23         And I am not saying that Mr. Adams did anything at

24  all.  He's a friend of mine and he's a fine lawyer, the finest I

25  know.  But I would have liked to have known that Sean Mattingly

1  was friends with this man.  I would have liked to have known

2  that Sean Mattingly had been out bar hopping with this man and I

3  would have liked to have known that they were even close enough

4  to where they had the same lawyer.  And when I found out about

5  it, it made me mad because I wasted a lot of the Commonwealth's

6  time and money chasing these wild goose chases down.

7          Now, let's talk about what they told Handy and

8  Woosley, what Hardin told them.  Didn't have any knives.  This

9  is his first interview on April 7 and he didn't know if Clark

10  had any knives.  He says he quit the Devil one month before.

11  And Hardin told Handy and Woosley that he had been sacrificing

12  animals and that he had gotten to where he wanted to do humans.

13  Says he got home at 3:00 or 3:30 and there was no mention of

14  Chevron in that interview.  We getting a little -- kind of

15  following a little trend here, folks?

16          Then they switch him over.  They have Hope Greer

17  interview him because, you know, my goodness, Handy and Woosley

18  both, I reckon they could just be lying so they switch it over.

19  Thank goodness they have Hope Greer interview him and we hear

20  about these visions.  We hear about these visions of Rhonda Sue

21  Warford -- he didn't say dreams.  He told you dreams here.  When

22  we hear about these visions, ladies and gentlemen, of Rhonda Sue

23  Warford being dressed in red screaming in a field, in a field.

24  He told you all he didn't know where to look for her at.  But he

25  had these visions.

1    And Hope Greer, I mean, she tied it down pretty good.

2  She asked him, "Do you own or possess any knives?"  And he

3  finally hedges and said, "Well, I got one knife."  And then he

4  comes around and says, "Well, Clark, he's got a bunch of

5  knives."  That's not what he told Handy and Woosley.  That's

6  what he's telling Hope Greer.  Then Hope Greer, she had no

7  motivation to lie, folks, no motivation to lie whatsoever and

8  she's believable and she said she asked him if he had anything

9  to do with the death of Rhonda Sue Warford and he would not

10  answer her.

11    And once you decide who to believe in this case,

12  ladies and gentlemen, there's not any doubt at all, much less

13  any reasonable doubt.  And she said, "Well, have you told me

14  everything you know about this?"  And he said, "Yes."  And he

15  didn't say nothing about no Chevron station.  His cock's crowed

16  twice too and they both crow the third time.

17    And then on April 9, Handy re-interviews him.  He's

18  forgot what he said before so he comes back again and says,

19  "Well, I don't have any knives."  But he does admit this time

20  that he had threatened to kill her if she cheated on him.  And

21  again on this occasion, he makes no mention of the Chevron

22  station whatsoever.

23    Now let's talk about motive.  First of all, there has

24  been a lot of misstatements about motive, ladies and gentlemen.

25  The Commonwealth has never -- and I told you all in opening



1  statement, we have never contended that this was a ritual with

2  candles up, with candles up.  Who knows what evil lurks in the

3  minds of men?  Who knows why people like Clark and Hardin do

4  what they do?  But Hardin told Handy and Woosley that he was

5  tired of killing animals and wanted to do a human.  And then

6  like so many other people, he has this jailhouse baptism.  He

7  sees the light, despite the fact, despite the fact that someone

8  from his own family saw it necessary to send him a book in jail

9  about getting someone out of Satanism.  Despite the fact he

10  tells you, well, I quit and we see all this stuff.  And that's

11  what all this -- all this Satan stuff is, ladies and gentlemen.

12  That's what all this is is a fact that he's lied, he's lied

13  repeatedly and he's lying to you all.  Don't buy into it.

14        Why does Hardin want to kill this girl?  I don't know.

15  I don't know because I cannot get inside his mind.  But we read

16  this poem.  It was introduced into evidence.  Look at it.  "A

17  beautiful flower is a rose with a nice long stem, leaves, and a

18  pretty face, but I must be careful how I handle her because this

19  rose has thorns.  Once my flower's thorns cut me deep, they cut

20  me bad, I wanted my flower dead.  I almost laid her to waste,

21  but my love for her got in the way.  My wound healed and I still

22  have her this day."

23        And isn't it something -- isn't it something that so

24  much of this stuff -- so much of this stuff, ladies and

25  gentlemen, is not dated -- is not dated, but these poems he

1  writes after her death, they do show up with dates on them.
2  He's trying to cover his butt.  When you go back there, read
3  some of these things, ladies and gentlemen.  When you go back
4  there, look at some of these sketches and you'll see one of a
5  young lady laying over a coffin.  I don't know -- I don't know
6  why people do what they do.  I simply don't know why.  But by
7  the defendant Hardin's own statements, by the defendant Hardin's
8  own statement, he was into this type of thing and he talked
9  about killing people.
10         Now, let's talk about -- he's admitted threatening
11 her.  Let's talk about the defendant Clark.  You heard Mr.
12 Mattingly talk about him speaking of killing.  You heard Amy
13 Remsburg testify that he thought it would be a challenge to kill
14 somebody and get away with it.  This man carried knives with him
15 and he'd had no love lost for Rhonda Sue Warford at all.  Now,
16 let's talk about what Amy Remsburg said.  Let's go back here.
17 Amy Remsburg has no malice towards this defendant no matter what
18 they tell you.  She went to court on a domestic violence
19 petition.  He shows up and says, "That child is not mine."  She
20 says, "Fine.  Fine.  It's yours, but if you don't want to claim
21 the child, fine."  So they sign an agreed judgment to where he's
22 adjudged not to be the child's father.  She can't get any child
23 support out of him, ladies and gentlemen.  But despite that,
24 despite being in court for a domestic violence against the
25 defendant, she still calls when the child goes in the hospital.

1  Despite the fact that this person does not claim his own child,

2  she still calls him and says the child is in the hospital.  And

3  she still allows him to come down and see the child.  Now, does

4  that sound like someone who has a tremendous malice against this

5  guy?  I don't think so.  I don't think so.

6          Oh.  Let's go back to the credibility of Clark, by the

7  way.  He says, no, no, I ain't never been four-wheeling off of

8  the Livers' place.  And we know he's been four-wheeling right by

9  the very crime scene, ladies and gentlemen.  I guess he didn't

10  think we'd be able to track down Amy's younger brother who went

11  four-wheeling.  I guess that young high school senior has a

12  motivation to lie too.  You know where the motivation to lie is.

13  You decide who to believe and who not to believe.  And again,

14  there is no doubt.

15          Let's talk about what happened on this terrible crime.

16  Let's talk about it.  Rhonda Warford had no plans to go out that

17  night whatsoever.  You all remember the evidence and we built

18  this case block by block on minor detail and that's the way we

19  have to do it because we're not there and I would love for

20  Rhonda Sue Warford to be able to come in here and talk with you

21  and tell you what happened, but that's not the way it works in

22  murder cases.  She had no plans to go out that night.  She

23  didn't say anything to Crystal Barnes or her mother about going

24  out that night.  And you know what we know about Ms. Warford's

25  testimony?  There were no outgoing calls made because the next

1  morning, Ms. Warford pressed the redial which shows you the last

2  call that was made and that call went into Crystal.  There were

3  no outgoing calls.

4          It's 12:00.  Ms. Warford goes to bed.  That phone is

5  in the living room.  Ms. Warford can't hear the phone ring.

6  That phone ends up the next morning on the bed of Rhonda Sue

7  Warford.  The only reasonable conclusion is that a call did come

8  in.  Why would the phone have been moved?  Why would Rhonda Sue

9  Warford have moved the phone?  Rhonda Sue Warford -- you heard

10 Mr. Tyrell.  They called him as a witness.  She never went

11 anywhere at night and she never went anywhere at night at that

12 hour even when they were fighting.  And she never went anywhere

13 at night by herself.  And look at the circumstances which -- who

14 else would she have gone out to meet, ladies and gentlemen, but

15 somebody she knew and somebody she trusted?  And there's only

16 one rational conclusion of who she went out to meet that night

17 and that's him.  He called her.  The call came in.  It's just

18 like that sugar and just like that turtle, folks.  The call came

19 in.  It's a shame that Crystal Barnes called early the next

20 morning.  If Crystal Barnes hadn't have called her the next

21 morning, that old star 69 or whatever would have showed us where

22 that call came in.

23         So the defendant Hardin is the only person that Rhonda

24 Sue Warford would have left that house with.  And do we think

25 it's a mere coincidence that this girl who has no connection

1  with Meade County whatsoever, do we think it's merely just blind

2  luck and a coincidence that she ends up in a remote area of

3  Meade County and I apologize to the people from Dead Horse

4  Holler -- is it merely circumstance and coincidence that she

5  ends up at the very place where this man right here has been

6  four-wheeling by?  He knows.  He knows.

7          So she gets in the car.  They pick her up.  Ms.

8  Warford goes to bed at 12:00.  Between 12:00 and 12:30 at the

9  latest, Ms. Warford told you it was 12:30 at the latest and I

10  would suggest to you it is around 12:15, at 12:15 Rhonda comes

11  in there and says, "going down there."  Did the defendant tell

12  her not to tell anybody where she was going?  I don't know.  Did

13  the defendant tell her to put on red pants?  I don't know.  But,

14  ladies and gentlemen, if she was just going out for a minute, if

15  she was going out, she had on white pants.  She could have worn

16  them.  What did she do?  She got Ms. Warford's pants.  She got

17  Ms. Warford's pants that had been cleaned.  She put those pants

18  on because those were the pants that they were found in -- she

19  was found in.

20          So ladies and gentlemen, it's between 12:15 and 12:30.

21  Defendant Clark and Hardin come down to this place in Meade

22  County that only they know, that only Clark knows where it's at.

23  It takes 45 minutes to get to Meade County -- I mean to

24  Brandenburg from the Whitney.  You heard Ms. Warford tell you

25  that.  I would suggest to you another 10 minutes to Dead Horse

 1   Holler.  Don't forget, they can make the trip quicker now

 2   because it's 12:00 at night.  There ain't no traffic on the

 3   road.  And these pants, ladies and gentlemen, are what she has

 4   on.

 5          Now, Rhonda Sue Warford weighed 220 pounds.  You heard

 6   that.  Big girl.  They pull in down there.  She gets out of the

 7   car.  No sign of a struggle whatsoever.  Don't you think, ladies

 8   and gentlemen, that if Rhonda Sue Warford had been with somebody

 9   she didn't know, not to mention the fact that they wouldn't have

10   been down in Dead Horse Holler anyway, if she would have been

11   with somebody that she did not know, she'd have been fighting,

12   kicking, and screaming.  And she'd have probably whooped

13   somebody's butt and probably could have whooped my butt.  She

14   weighed -- I'm a big old guy and she weighed more than I do.  So

15   she gets out.  She left with only her keys.  And again, you have

16   to piece this together looking at the circumstances.  She gets

17   out.  What happens, ladies and gentlemen, when she gets out, she

18   gets out, ladies and gentlemen, they cut her throat -- they cut

19   her throat where that big blood spot is.  Look at the pictures

20   when you go back there.  The first wound went to her throat and

21   she bled -- pardon my expression, Mrs. Warford -- like a stuck

22   hog.  She bled a lot.

23          MR. ADAMS:  Judge, may we approach?

24          (Discussion off the record.)

25          THE COURT:  Take the jury into the jury room for a

1  minute, will you, please.  Close the door, please.  I want to

2  address the family members.  Ladies and gentlemen, I understand

3  that this is a horrible ordeal for you to go through, a very

4  vivid description of the death of this young lady.  And I have

5  every compassion and sympathy for you.  But I can't let you sit

6  there and cry in front of the jury.  If you can control

7  yourself, control that aspect of your emotion, you're more than

8  welcome, I want you to stay in.  But I can't let you sit there

9  and cry.  The jury has got to make a decision on the evidence

10 and they can't make a decision based on the fact that they feel

11 sorry for you and want to do something for you.  Do you all

12 understand that?  Okay.  If you need to step out, I'll let you

13 step out.  We can give you a moment to get yourself under

14 composure.  You okay?  Okay.  Can we put the Kleenexes away and

15 hide the tears and so forth for the rest of the closing

16 argument?  Okay.  If you feel that you're going to have trouble

17 constraining yourself, please get up and go out the courtroom.

18 Okay?  We all in good shape?  Okay.  Bring the jury back.  Mr.

19 Smith, you may go forwards.  I apologize (inaudible).

20         MR. SMITH:  After the cut to the throat, ladies and

21 gentlemen, Rhonda Sue Warford fell to her knees.  How do we know

22 that?  Look at the mud on the knees of these sweatpants.  That's

23 when the defendant Clark stabbed her through here, killed her

24 instantly.  She was so dead, as you heard Dr. Nichols say, that

25 she couldn't even bleed anymore.  The body would not bleed

1  anymore.  And I guess it's another one of those mere

2  coincidences that this girl was killed just like the defendant

3  Clark showed Amy Remsburg.  Identically.

4         And let's talk about that.  Sheriff Greer when he

5  interviewed Ms. Remsburg, he did not even tell her -- he did not

6  even tell her that Rhonda Sue Warford was stabbed when she was

7  showing him this stuff.  But see, that wasn't enough for these

8  two people.  And again, who knows what evil lurks in the minds

9  of men?  That wasn't enough.  They stabbed her nine more times

10 for the fun of it.  We know there was two of them because then

11 they pick her up.  They carry her over until they get to the

12 fence.  She is 220 pounds heavy and then drop her.  All this

13 takes place, ladies and gentlemen, in a matter of seconds or

14 minutes at the most.  They can easily get down to that area and

15 do this, easily do this by 1:25.  They weren't at the Chevron

16 station that night, ladies and gentlemen.  They might have been

17 there the night before.

18        Then they get -- they decide this isn't as much fun as

19 they thought it would be and they panic.  They get in their car

20 and they hightail it back to their homes.  And I agree, I agree

21 with Ms. Calthorn and the other lady.  They got home at 2:20.

22 You all think about these times.  Ms. Cochran admitted that she

23 could get down here from her home in 30 minutes to Brandenburg.

24 If you add another 10 minutes to get to Dead Horse Holler or 15

25 at the most, there was time to do this.  And they came in and

1  wasn't it something, see, sometimes, ladies and gentlemen, the

2  truth does rear its ugly head and it does get in the way.  It

3  does get in the way.  Now, if this lady was abducted by somebody

4  else that she wouldn't know, what motive would anybody else have

5  to do this?  There was no sex.

6          THE COURT:  15 minutes, Mr. Smith.

7          MR. SMITH:  Thank you, Your Honor.  I'll try to be

8  done quicker than that.  But the truth does get in the way and

9  as Ms. Cochran testified, Ms. Cochran testified that he got up

10  the next morning and was fooling with his car.  Now, you were

11  told earlier that's what happened, ladies and gentlemen.  And

12  let's look at the other evidence that is left over from this

13  crime and not just the circumstances.

14          You were told earlier that there were head hairs in

15  Rhonda's hand.  Well, that wasn't what we heard, was it?  Two

16  other people.  That was not what we heard.  First of all, look

17  at the pictures.  The hands had bags placed over them and there

18  was a brown head hair that matched up to Rhonda Sue Warford's on

19  her own hand.  And there were two gray hairs and we can't tell

20  whose gray hairs those were.  I would suggest to you the most

21  reasonable explanation is they belong to my find gray-headed

22  friend over here.

23          MR. ADAMS:  Then let them do the test, Judge.

24          MR. SMITH:  You can't test gray hairs.  You heard the

25  man tell you that.



1          THE COURT:  Jury will remember the evidence.

2          MR. SMITH:  Now, these sweatpants were her mother's.

3  These sweatpants were her mother's.  They were clean.  And yet,

4  they have a hair just like the defendant Hardin's on them.  Not

5  only that, they have other -- at least three other hairs on them

6  just like she had been sitting in the back of a dirty Nova.  A

7  hair just like the defendant's on sweatpants that had been clean

8  before this happened.

9          And let's talk about this fingerprint.  Thank goodness

10 you all can use your common sense and talk about this

11 fingerprint.  They told you, Clark says she has not been in that

12 car since December of 1991.  Mr. Trowbridge or whatever his name

13 was said that car had been sitting out January, February, I

14 think, and March.  We know that fingerprints are made up of 98

15 or 99 percent moisture.  We know that heating and cooling can

16 have an effect on them.  So as a matter of common sense, ladies

17 and gentlemen, based upon that alone, you should reasonably

18 conclude that that was her fingerprint in that car made right

19 here.  But think about this.  Don't take my word for that and

20 don't make your decision just based on that alone.

21         Let's also consider -- remember all the people that

22 were in that car in December.  This lady with the red curly hair

23 that testified and the defendant Clark and Hardin, they were all

24 in that car.  Don't you think if those fingerprints were left

25 over from December that their fingerprints would have been on

1  there too?  But there were only two prints able to be lifted

2  from that car.  One of Rhonda Sue Warford's and one of somebody

3  we could not identify.  The defendant Clark's fingerprints

4  weren't even on that car and the defendant Hardin's fingerprints

5  weren't even on that car.  That fingerprint was fresh.  Use your

6  common sense.  It got in there that night.

7         Let's talk about Cliff Capps.  Let's talk about Cliff

8  Capps because again, it's kind of terrible what we do to people

9  when we bring them in here to testify.  Now, I don't know

10  anybody that has been treated -- we sit here and we talk about

11  these cases.  Now, I told you all, I told you all that

12  defendants never came in here and told you they did it.  But you

13  know, there's one exception to that rule.  Every time Cliff

14  Capps got in trouble and my Lord all mighty, it was a bunch,

15  every time he admitted it and he took his punishment.  And if

16  Cliff Capps wants to be mad at anybody, it should be me.  He got

17  14 years.  He's going to get 14 years and that's what he had and

18  if you read the transcript, that's what he knew he had.  There's

19  probably people that kill people that don't get that much time.

20  So I don't think that Cliff Capps -- and I tell you Cliff Capps

21  was not cut any deals by me and if Cliff Capps wanted to dump on

22  the defendant Hardin, if he wanted to dump on him, he could have

23  made up a better story than just saying, well, he told me he did

24  it.

25         And let me digress here a minute.  The reason Capps



1  came on the stand the first time and said -- we were able to

2  introduce the statement made by Jeffrey Clark, the fact that I

3  did it, at that point in time by law, I was not allowed to

4  introduce the statement he made shortly after that that said, we

5  did it.  I could not introduce that statement until Clark took

6  the stand.  It has something to do with the technical procedural

7  rules of cross-examination.  That's why he said that later when

8  he came out.  I could not put that evidence on until that time.

9            Now, if Capps wanted to make up a better story, he

10 knew the facts of this case.  He knew what was going on.  He

11 read the papers.  He could have done better than that.  And when

12 Cliff Capps went out to Colorado and testified -- first of all,

13 he never testified, but there was a man in his cell called

14 Malonson.  And if he wanted to have got Malonson, he could have

15 said, yeah, Roy Malonson told me he did it.  But he never did.

16 All Roy Malonson told him, that Colorado would be a good place

17 to bury a body.  Capps has been promised nothing, ladies and

18 gentlemen, and yet, you know what, we got TV cameras here and

19 what's Capps' treatment going to be when he gets back to the pen

20 and people know that he came down here and testified?  I submit

21 to you it's not going to be very good.  If Capps had any

22 motivation whatsoever to lie, would be to lie to hurt me and it

23 would be to lie to cover himself up so when he gets back to

24 Marion Justice Center, he's not going to be mistreated.

25            And Mabry, he told you -- Mabry said, he flat didn't



1   like me.  Now, why did I bring the records in about who was in

2   the cell?  As sure as shooting if I had not done that, they

3   would have gotten up in closing argument and said, the

4   Commonwealth is hiding these records from you.  They were right

5   back there in the jail and they didn't bring them in here.  So I

6   brought them in here.  Let's lay it all on the table, ladies and

7   gentlemen, deal with this stuff fairly.

8          And, no, ladies and gentlemen, we don't have the

9   murder weapon.  I haven't prosecuted one yet to where I've had

10  the murder weapon.  They ain't got O.J.'s weapon and as I told

11  you, I can't pull the plug on the Ohio river.  The river that I

12  would like to pull the plug on in this case is the Salt River

13  which the defendants crossed over when they went back to

14  Louisville.  That's probably where the murder weapon is.

15         I'm going to ask you, ladies and gentlemen -- I told

16  you in my opening statement, Hardin said he wanted to kill

17  somebody.  I told you Clark said he thought it would be a

18  challenge to kill somebody to see if he could get away with it.

19  Don't let them get away with it.  Don't do it.  I am going to

20  ask you to send a message to these defendants and all out there

21  like it, all of them out there, not in this Commonwealth and not

22  in Meade County.

23         Ladies and gentlemen, to those of whom much is given,

24  much is expected.  When we are finally judged as a success or

25  failure, we have to answer four questions.  Were we men and



1  women of dedication?  Were we men and women of integrity?  Were

2  we men and women of courage?  And were we men and women of

3  judgment?  And I ask you to use that dedication, to use that

4  integrity, to use that courage, and to use that judgment and

5  sort through the evidence as we've laid it out for you.

6         All it takes for the bad folks to win, ladies and

7  gentlemen, is for 12 good and honest people not to do anything

8  about it.  The only reasonable verdict in this case based upon

9  the evidence, based upon that stump turtle, based upon that

10  sugar being there, folks, is a verdict of guilty on both counts.

11  The law requires it, the evidence compels it, and more

12  importantly, justice demands it.  Thank you.  And I'm sorry I

13  took so long.

14         THE COURT:  Mr. Wright, Deputy Wright, are you going

15  to be the only one with the jury through the process?  Is that

16  right?

17         MR. WRIGHT:  There will be others if you need it.

18         THE COURT:  Whoever.  I'm going to swear them,

19  bailiffs.

20         MR. WRIGHT:  (Inaudible).  All three of us, Judge,

21  will be working.

22         THE COURT:  Okay.  Each of you raise your right hand.

23  Do each of you swear or affirm that as bailiffs in charge of

24  this jury of the Meade Circuit Court you shall not allow any

25  communication to be made to the jury while under your charge nor

1  make any yourself except to ask them if they have agreed upon

2  their verdict unless by order of this court?  And do you further

3  swear or affirm that you will not before their verdict is

4  rendered communicate to any person the state of their

5  deliberation or the verdict agreed upon so help you God?  Each

6  acknowledge by saying I do.

7          MR. WRIGHT:  I do.

8          MALE SPEAKER:  I do.

9          MALE SPEAKER:  I do.

10          THE COURT:  Okay.  Check -- first check the -- we

11  going to use this jury room?

12          MR. WRIGHT:  Yes, sir.

13          THE COURT:  Check the jury room and make sure there

14  are no documents, papers or anything of that nature in the jury

15  room.

16          MALE SPEAKER:  They would request to use a grand jury

17  room, sir, if they could because it's got a blackboard.

18          THE COURT:  That's fine.  I want you -- gentlemen,

19  help Mr. Wright.  Take this back, put it in the center of the

20  table.  Take the exhibits, set them in the center of the table.

21  Make sure there are no other documents or papers of any nature

22  in the jury room.

23          MALE SPEAKER:  Judge, are the stipulations included?

24          THE COURT:  There's a stipulation of facts.  We need

25  to dig that out.

1          MALE SPEAKER:  There are several, I believe.

2          THE COURT:  I only remember one written stipulation.

3          MR. ROGERS:  No.  There was two.

4          MALE SPEAKER:  There was two there.

5          THE COURT:  Okay.  I'll let you gentlemen dig those

6    out.  They're probably in the file since they're not down here.

7          MALE SPEAKER:  Sir, you want to check this box, see if

8    there's any stipulations in that box?

9          MR. SMITH:  Sure.  I thought that one of them may have

10   gone in there earlier on.

11         MALE SPEAKER:  The other box is under the podium

12   there.

13         THE COURT:  We're going to the grand jury room.  Okay.

14   Ladies and gentlemen, while I've got all of you here -- and

15   again, I'm addressing the people in the courtroom.  The grand

16   jury room is in the hall to my right, to your left, the same

17   hall where the county judge executive's office and the sheriff's

18   office is.  I want you all to stay out of that hall during the

19   jury deliberation process.  You can stay out front part of the

20   courthouse or anyplace else, but stay out of that one hall.

21   Okay?  Well, let me get the jury back in the grand jury room and

22   we can have the bailiff -- we'll dig them out and let the

23   bailiff deliver them.

24         MALE SPEAKER:  These are they.

25         THE COURT:  Is that it?

1       MALE SPEAKER:  Yes, sir.

2       THE COURT:  Okay.  Then give them to the bailiff.  Let

3  Mr. Rogers also see them and Mr. Smith.  Make sure that there's

4  no confusion or question.  Ladies and gentlemen, in just a few

5  moments, I'm going to place you in the charge of the bailiff or

6  bailiffs.  He will take you to the jury room to commence your

7  deliberation.  Let me make several suggestions to you.

8       First, each of you have a copy of the jury

9  instructions.  They are marked copy.  They are strictly for your

10  convenience so that all 12 of you do not have to try to read the

11  original document.  The original jury instructions, the ones

12  that bear my signature with the verdict form attached is the

13  only document that you will return to me.  Again, the copies are

14  for your convenience and they will not be returned to me, nor

15  will they be completed by you.  The only one that is returned to

16  me is the original document which bears my signature and the

17  verdict form which should remain attached.  Okay?

18       Next, my suggestion to you is that when you reach the

19  jury room, you're probably familiar with it by now, I would

20  first get seated around the table, get comfortable.  I would

21  then suggest to you that you elect from among your numbers a

22  foreperson.  Then I would suggest to you that you re-read your

23  instructions and commence your deliberations.  I want to remind

24  you that you are each one among 12 equals.  Each of you, what

25  you remember about the evidence, your input, your thought

1  process is important.  So each of you take an active role in the

2  decision-making process.  I can't think of anything else at this

3  time.  So, Mr. Wright, I will -- yes, ma'am.

4          FEMALE SPEAKER:  Is there chalk and an eraser in there

5  if we need?

6          THE COURT:  I assume there is.  Oh.  If any of you

7  made any notes during the trial, then I want you to leave --

8  give those notes to the bailiff.  You're not to take any notes

9  to the jury room with you.

10         MALE SPEAKER:  (Inaudible).

11         THE COURT:  Okay.  Ladies and gentlemen, please go

12  with the bailiff.  Oh.  I --

13         MR. ROGERS:  We'd like the diagram --

14         THE COURT:  Oh.  I want to digress one second.

15         MR. ROGERS:  Judge, the diagram needs to go.

16         THE COURT:  Okay.  We'll do that too.

17         MALE SPEAKER:  The smaller diagram.

18         THE COURT:  We will bring the diagram.  Ladies and

19  gentlemen, I don't think that at any time during the trial I

20  have said anything or had any facial expression that would

21  indicate a preference with respect to this case or any feelings

22  by me with respect to anything.  But if I have made such an

23  expression or if you have inferred something like that, put it

24  out of your mind.  You are the triers of fact.  My sole job is

25  as a referee in the case and I have no feelings one way or the

 1  other, other than to see that both sides receive a fair trial.

 2  So there should be no inference from me in any shape, form, or

 3  fashion.  And we will bring the chalkboard back with you.  Okay.

 4  Ladies and gentlemen, court will be in recess until the jury

 5  returns.

 6          MR. SMITH:  There's one in the grand jury room

 7  already.

 8          THE COURT:  Huh?

 9          MR. SMITH:  There's a chalkboard in the grand jury

10  room.

11          THE COURT:  Okay.  But these need to be taken in

12  because the diagram; is that right?

13          MALE SPEAKER:  No.  They just want a chalkboard.

14          MALE SPEAKER:  No.

15          THE COURT:  Okay.

16          (Recess.)

17          (Discussion off the record.)

18          THE COURT:  Okay.  Everyone be seated, please.  Okay.

19  I don't want to know what it is, but have you reached a verdict?

20          FOREPERSON:  We have, Your Honor.

21          THE COURT:  Okay.  Don't tell me what it is.  Bring

22  it, lay it on my bench face down.  Okay.  Ladies and gentlemen,

23  you're in exactly the same situation that I am in.  You don't

24  know what the verdict is.  In just a moment, I am going to read

25  it into the record and we'll all learn at the same time.  Before