1                IN THE UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF KENTUCKY

3                   HON. CHARLES R. SIMPSON III

4                    MAG. COLIN H. LINDSAY

5                    CASE NO. 17-CV-419

6

7                   JEFFREY DEWAYNE CLARK,

8                        PLAINTIFF

9                          V.

10    LOUISVILLE JEFFERSON COUNTY METRO GOVT., ET AL.,

11                       DEFENDANTS

12

13                   HON. CHARLES R. SIMPSON III

14                    MAG. DAVE WHALIN

15                    CASE NO. 17-CV-420

16

17                    GARR KEITH HARDIN,

18                        PLAINTIFF

19                          V.

20    LOUISVILLE JEFFERSON COUNTY METRO GOVT., ET AL.,

21                       DEFENDANTS

22

23    DEPONENT:  CLIFFY WISE

24    DATE:      JULY 11, 2019

25    REPORTER:  LACEE TOWNSEND

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

2

APPEARANCES

ON BEHALF OF THE PLAINTIFF, JEFFREY DEWAYNE CLARK:

ELLIOT SLOSAR

AMY ROBINSON-STAPLES

LOEVY & LOEVY

311 NORTH ABERDEEN STREET

THIRD FLOOR,

CHICAGO, ILLINOIS 60607

TELEPHONE NO.: (312) 243-5900

E-MAIL: ELLIOT@LOEVY.COM; AMY@LOEVY.COM


ON BEHALF OF THE PLAINTIFF, GARR KEITH HARDIN:

LEN H. KAMDANG

RICK SAWYER

ANNA HOFFMANN

NEUFELD SCHECK & BRUSTIN, LLP

99 HUDSON STREET

EIGHTH FLOOR

NEW YORK, NEW YORK 10013

TELEPHONE NO.: (212) 965-9081

E-MAIL: LEN@NSBCIVILRIGHTS.COM

NICK@NSBCIVILRIGHTS.COM

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                   APPEARANCES (CONTINUED)

 2

 3    AND

 4    LARRY D. SIMON

 5    SIMON LAW OFFICE

 6    239 SOUTH FIFTH STREET

 7    SUITE 1705

 8    LOUISVILLE, KENTUCKY 40202

 9    TELEPHONE NO.: (502) 589-4566

10

11    ON BEHALF OF THE DEFENDANTS, LOUISVILLE JEFFERSON

12    COUNTY METRO GOVT. AND LOUISVILLE METRO POLICE

13    OFFICERS, INDIVIDUALLY:

14    PETER F. ERVIN

15    JEFFERSON COUNTY ATTORNEY

16    531 COURT PLACE

17    SUITE 900

18    LOUISVILLE, KENTUCKY 40202

19    TELEPHONE NO.: (502) 777-2812

20    E-MAIL: PETER.ERVIN@LOUISVILLEKY.GOV

21

22

23

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISEMAN, taken on July 11, 2019

4

```
 1                    APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, MEADE COUNTY:

 4   ANDREW T. GARVERICH

 5   R. KEITH BOND

 6   COLEMAN LOCHMILLER & BOND

 7   2907 RING ROAD

 8   ELIZABETHTOWN, KENTUCKY 42701

 9   TELEPHONE NO.: (270) 737-0600

10   E-MAIL: AGARVERICH@CLBLEGAL.COM

11   KBOND@CLBLEGAL.COM

12

13   ON BEHALF OF THE DEFENDANT, MARK HANDY:

14   ANDREW PELLINO

15   DRESSMAN BENZINGER LAVELLE

16   321 WEST MAIN STREET

17   SUITE 2100

18   LOUISVILLE, KENTUCKY 40202

19   TELEPHONE NO.: (502) 630-1301

20   E-MAIL: APELLINO@DBLLAW.COM

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

5

```
 1              APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, ROBERT THURMAN:

 4   PETER J. ROSENE

 5   MCBRAYER, PLLC

 6   201 EAST MAIN STREET

 7   SUITE 900

 8   LEXINGTON, KENTUCKY 40507

 9   TELEPHONE NO.: (859) 231-8780

10   E-MAIL: PROSENE@MMLK.COM

11

12   ALSO PRESENT:  JEFFREY DEWAYNE CLARK, PLAINTIFF; NAT

13   FLACK, LAW STUDENT; GREG BURRESS, VIDEOGRAPHER

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1                            INDEX

2                                            Page

3    PROCEEDINGS                               8

4    DIRECT EXAMINATION BY MR. SLOSAR          9

5    EXAMINATION BY MR. KAMDANG              188

6    CROSS EXAMINATION BY MR. ERVIN         245

7    EXAMINATION BY MR. ROSENE              264

8    REDIRECT EXAMINATION BY MR. SLOSAR     266

9    EXAMINATION BY MR. BOND                276

10   FURTHER DIRECT EXAMINATION BY MR. SLOSAR  277

11

12

13                          EXHIBITS

14                                           Page

15   11- CLIFFY WISE TRIAL TESTIMONY TRANSCRIPT  114

16   12- SEARCH WARRANT - LMPD693 - 697        124

17   13- AFFIDAVIT FOR SEARCH WARRANT - LMPD710

18       - 714                                131

19   14- KEVIN LEE JUSTIS INTERVIEW - MSCO973

20       - 978                                139

21   15- AFFIDAVIT - MSCO983 - 985            206

22   16- SUPPLEMENTARY REPORT - MSCO1065      184

23   17- SUPPLEMENTARY REPORT                 210

24

25
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

7

STIPULATION

The VIDEO deposition of CLIFFY WISE taken at KENTUCKIANA REPORTERS, LLC, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE, KENTUCKY 40202 on THURSDAY, the 11TH day of JULY 2019 at approximately 10:07 a.m.; said VIDEO deposition was taken pursuant to the FEDERAL Rules of Civil Procedure. It is agreed that LACEE TOWNSEND, being a Notary Public and Court Reporter for the State of INDIANA, may swear the witness.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

8

PROCEEDINGS

1          PROCEEDINGS

2          VIDEOGRAPHER:  My name is Greg Burress. I'm the

3      videographer today.  Lacee Underwood is the court

4      reporter.  Today is the 11th day of July 2019. The

5      time is 10:07.  We're at the offices of Kentuckiana

6      Court Reporters in Louisville, Kentucky to take the

7      deposition of Cliffy Wise in the matter of Jeffrey

8      Dewayne Clark v. Louisville Jefferson County Metro

9      Government et al. pending in the District Court of

10     the United States, Western District of Kentucky,

11     Case number 17-CV-419.  Counsel, please identify

12     themselves for the record.

13         MR. SLOSAR:  Elliot Slosar for the plaintiff,

14     Jeff Clark.

15         MS. ROBINSON-STAPLES:  Amy Robinson-Staples for

16     the plaintiff, Jeff Clark.

17         MR. SIMON:  Larry Simon for the plaintiff,

18     Keith Hardin.

19         MR. KAMDANG:  Lynn Kamdang and Anna Benvenutti

20     Hoffman, Neufeld Scheck & Brustin for plaintiff,

21     Keith Hardin.

22         MR. PELLINO:  Andrew Pellino on behalf of

23     Detective Mark Handy.

24         MR. ERVIN:  Peter Ervin on behalf of Louisville

25     Metro and its employees.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. ROSENE:  Peter Rosene on behalf of Robert

2     Thurman.

3          MR. GARVERICH:  Andrew Garverich on behalf of

4     the Meade County defendants.

5          MR. BOND:  Keith Bond on behalf of the Meade

6     County defendants and specifically Cliff Wise.

7          VIDEOGRAPHER:  Sir, will you please your right

8     hand for the reporter?

9          COURT REPORTER:  Do you solemnly swear or

10    affirm the testimony you are about to give will be

11    the truth, the whole truth, and nothing but the

12    truth?

13          THE WITNESS:  I do.

14          COURT REPORTER:  Thank you.

15                    DIRECT EXAMINATION

16  BY MR. SLOSAR:

17     Q    Good morning, Mr. Wise.

18     A    Good morning.

19     Q    We haven't had an opportunity to meet, but my

20  name is Elliot Slosar.  I represent one of the

21  plaintiffs in this matter --

22     A    Yes, sir.

23     Q    -- and I appreciate you coming in here today,

24  okay?  I want to go through some of the rules before we

25  get started.  Have you given a deposition before?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     Not in this case.

2        Q     Okay.  Have you given a deposition in another

3    --

4        A     Yes.

5        Q     -- civil case before?

6        A     Yes, sir.

7        Q     And what civil case would that have been?

8        A     There's -- there's several.  I couldn't tell

9    you.

10       Q     When was the last time you gave a deposition?

11       A     2000s.

12       Q     Okay.  And --

13       A     Somewhere in there.

14       Q     Okay.  And can you tell me -- it sounds like

15   you testified multiple -- at multiple depositions in the

16   2000s; is that right?

17       A     Yes, sir.

18       Q     Okay.  Let me go through some of the rules,

19   and then I'm going to ask you some questions about those

20   depositions later on, okay?  The first rule, which may

21   be helpful for all of us, especially the nice court

22   reporter over here, is when I ask you questions, if you

23   can give verbal responses, it would be very helpful for

24   the court reporter and for the nice folks in New York

25   who can't see if you're nodding or not --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

11

1      A    Yes, sir.

2      Q    -- is that all right?  Now, you have lawyers

3  here today.  It's going to be a longer day.  If at any

4  point in time you want to go take a break and use the

5  washroom or get something to eat or whatever you want to

6  do, just let me know, and I'd be happy to give you a

7  break, okay?

8      A    Yes, sir.

9      Q    The only thing I'm going to ask is that if

10  there's a question pending, that you answer the question

11  before taking a break; is that fair?

12      A    Yes, sir.

13      Q    All right.  And I'm going to ask you a lot of

14  questions, and you're going to see this very quickly.

15  I'm not perfect at asking questions, and oftentimes they

16  might not make sense.  So if I ask you a question and

17  you don't understand it, just let me know, and I'd be

18  happy to ask it a better way; does that sound all right?

19      A    Yes, sir.

20      Q    In that same respect, if you answer a question

21  that I ask you, I'm going to understood that you -- I'm

22  going to assume that you understood what was being

23  asked; is that fair?

24      A    Yes, sir.

25      Q    All right.  There are a lot of lawyers here

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

12

1    today, and those lawyers have a job to do.  I anticipate

2    that they will make objections, especially your nice

3    lawyers over here.  On almost every occasion, you're

4    going to still answer the question, but I ask for you to

5    allow for them to make their objection and then answer

6    unless your attorneys tell you not to, okay?

7         A    Yes, sir.

8         Q    All right.  Mr. Wise, are you currently

9    employed?

10        A    Self-employed.

11        Q    Okay.  What do you do, sir?

12        A    I own my own business.  Portable toilets,

13   dumpsters.

14        Q    Okay.  And how long have you been doing that?

15        A    Since '94.

16        Q    In 1990 -- prior to owning your own business,

17   what were you employed as?

18        A    Meade County Sheriff's Department, and during

19   that time, too.

20        Q    When did you leave the Meade County Sheriff's

21   Department?

22        A    2006 was my last year.

23        Q    What was your position at that time?

24        A    Sheriff.

25        Q    Is there any particular reason why you left

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the sheriff's office in 2006, sir?

2        A    The election.

3        Q    Okay.

4        A    You're elected in Kentucky.

5        Q    Okay.  Did you run in that election?

6        A    Yes, sir.  I lost by one vote.

7        Q    One vote.  Oh, goodness.  Who'd you run up

8    against?

9        A    Butch Kerrick.

10       Q    Okay.  And had Mr. Kerrick -- do you know how

11   to spell his name?

12       A    K-E-R-R-I-C-K.

13       Q    That was for the court reporter, not for me,

14   but we'll do it as we go.  Mr. Kerrick, was he working

15   at the Meade County Sheriff's Department before he ran

16   against you?

17       A    No, sir.

18       Q    Okay.  So he was an outsider?

19       A    Yes, sir.

20       Q    Okay.  And when you last ran your election,

21   did you have the support of your friend, Joe Greer?

22       A    Yes, sir.

23       Q    Yeah.  He backed you in that election?

24       A    Yes, sir.

25       A    And when he was running for election, did you



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  back him, too?

2      A    Yes, sir.

3      Q    All right.  Now, sir, what do -- do your close

4  friends and family call you by any names?

5      A    Cliffy.

6      Q    Cliffy.  Okay.  Is -- so -- and would you

7  agree that it's -- do people who you consider to be

8  friends call you Cliffy?

9      A    Yes.

10      Q    Yeah.  And do your loved ones call you Cliffy?

11      A    Most people do.

12      Q    Yeah.  And how often do you get called Cliffy?

13      A    Most of the time.

14      Q    Most of the time.  All right.  Now, Mr. Wise,

15  I'm going to ask you about another person who has your

16  first name named Clifford Capps.  How long have you

17  known Mr. Capps?

18      A    Since the '80s.

19      Q    And how did you first meet Mr. Capps in the

20  '80s?

21      A    I arrested him.

22      Q    Do you remember what kind of case you arrested

23  Mr. Capps on?

24      A    I don't remember.  Some kind of theft case,

25  but I don't remember exactly.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

```
 1        Q     Some sort of theft case?

 2        A     Yes.

 3        Q     Did that theft case take place in Meade

 4   County?

 5        A     Yes, sir.

 6        Q     Okay.  And were you working at the Meade

 7   County Sheriff's Department when that happened?

 8        A     Yes, sir.

 9        Q     Okay.  When you arrested Mr. Capps on the

10   theft case in the '80s, do you recall whether Sheriff

11   Greer was working at that sheriff's department at the

12   time?

13        A     Yes.  He was sheriff.

14        Q     He was sheriff.  Was he involved in that theft

15   case with Mr. Capps, too?

16        A     Not that I recall.

17        Q     Okay.  Did you have a chance to talk to Mr.

18   Capps after you arrested him for theft?

19        A     Did Joe?

20        Q     Did you?

21        A     Did I?  Yes, sir.  I've talked to Mr. Capps

22   several times --

23        Q     Okay.  And just about --

24        A     -- through the years.

25        Q     And just about that theft case.  Let's stick
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

16

```
 1   on that in the 1980s.
 2        A    Well, can I --
 3        Q    Did you get a chance to question him about
 4   that theft?
 5        A    Yes.
 6        Q    Okay.  Did he admit that he had done that to
 7   you?
 8        A    Yes, sir.
 9        Q    Okay.  And did you take a statement from him
10   where he confessed to that?
11        A    I don't recall.
12        Q    Do you recall:  When Mr. Capps told you that
13   he committed a crime, did you write that down anywhere?
14        A    Well, there've been so many times.  I couldn't
15   tell you.
16        Q    Fair enough.  Clifford Capps was committing a
17   lot of crimes in Meade County during your career?
18        A    Well, piddly.  Uh-huh.  Yes, sir.
19        Q    And I'm sorry.  And to you, I'm sure I have an
20   accent, and so if there are things that I'm saying
21   because I'm from Chicago -- if there's things that I'm
22   saying that you don't understand, I'll ask it a better
23   way, okay?  And I apologize in advance, but I may ask
24   you the same if there are some things that I don't
25   understand from you.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    Yes, sir.

2      Q    Okay.  All right.  So is your -- prior to the

3  Warford investigation, you were pretty familiar with Mr.

4  Capps due to your role as a law enforcement officer in

5  Meade County; is that fair?

6      A    Yes, sir.

7      Q    And prior to 1992, about how many times do you

8  recall arresting Mr. Capps in criminal cases?

9      A    I don't recall.

10      Q    Do you recall the nature -- I know you said

11  you remember arresting him in the '80s for theft.  Do

12  you recall the nature of any of the other criminal

13  investigations that you arrested Mr. Capps for?

14      A    Theft by deception.  I remember that just --

15      Q    And theft by deception, can you describe that?

16      A    Bad checks.

17      Q    Bad checks.  Okay.  So you were --

18          MR. BOND:  Let him finish --

19          THE WITNESS:  Okay.

20          MR. BOND:  -- before you answer, okay?

21  BY MR. SLOSAR:

22      Q    And I'm going to do -- and I'm going to try

23  and do the same, okay?  So if I ever cut you off, it's

24  not intentional, and your attorney --

25      A    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q     -- Mr. Bond over there is very capable, and I

2  have a feeling he might remind me to let you finish that

3  answer.  So when -- would you agree that theft by

4  deception is a crime that would indicate that somebody

5  may be a dishonest person?

6     A     Yes.

7     Q     Yeah.  People who are writing bad checks

8  probably aren't the most credible people, right?

9     A     True.

10     Q     Yeah.  And prior to 1992, you had investigated

11  Mr. Capps for criminal offenses that led you to believe

12  that he had some issues with the truth, right?

13          MR. ERVIN:  Objection to the form.

14     Q     You can answer, sir.

15     A     Somewhat.  What I perceived of Capps, he --

16  it's just 50/50 on him, you know.

17     Q     What do you mean by that, sir?

18     A     Well, once you arrest him, he's -- he's pretty

19  cooperative.  Beforehand, he's not.

20     Q     Would you agree that after you arrested Mr.

21  Capps for criminal offenses in the '80s and prior to

22  1992 that he would tell you whatever he could to get out

23  of that crime?

24          MR. ERVIN:  Objection to the form.

25          MR. BOND:  Object to the form.  Go ahead and



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

19

```
 1      answer.

 2      A    No.

 3      Q    Cliff Capps, prior to 1992, did he ever ask

 4  you to give him a break on any of those cases?

 5      A    Not that I recall.

 6      Q    No.  He was just -- do you recall whether he

 7  pled guilty in those cases?

 8      A    Most of the time.  Yes, sir.

 9      Q    Most of the time.  And in any of those cases,

10  did Mr. Capps -- did your investigations lead you to

11  believe that Mr. Capps had committed any of those crimes

12  with other people?

13      A    Yes.

14      Q    Okay.  And did Mr. Capps, in any of those

15  investigations prior to 1992, offer to give you

16  information against those other people that he committed

17  crimes with?

18      A    I don't recall.

19      Q    If he gave you that information, would you

20  have written it down?

21      A    Yes.

22      Q    Yeah.  And do you recall whether Mr. Capps

23  ever offered to give you information against any of

24  these co-conspirators of his in criminal offenses?

25      A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

20

1      Q      No.  Never made those offers, right?

2      A      Not to me.

3      Q      Do you know whether he made those offers to

4  any other deputies at the Meade County Sheriff's

5  Department?

6      A      No, sir.

7      Q      No.  Prior to 1992, did Mr. Capps on occasion

8  also give you some information about other people in

9  Meade County who were committing crimes?

10     A      No.

11     Q      Never once?

12     A      No.

13     Q      You don't recall ever taking any statements

14  from Clifford Capps prior to 1992 where he gave you

15  information implicating people in other crimes?

16     A      No, sir.

17     Q      All right.  Now, sir, how would you describe

18  your relationship with Clifford Capps today?

19     A      I see him time to time, but there's no

20  relationship.

21     Q      And you talk to him on the phone time to time,

22  too, right?

23     A      I have.

24     Q      You talk to him on the phone.  You've talked

25  on the phone to Clifford Capps even after the plaintiffs

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

21

1  in this case were convicted at trial in

2  1995?

3      A    Yes, sir.

4      Q    And you talked to Mr. Capps on the phone

5  before plaintiffs ever went to trial in 1995?

6      A    I have, yes.

7      Q    Now, is it fair to say that you don't talk on

8  the phone to all the people that you arrest for crimes?

9      A    True.

10     Q    Yeah.  You know, and is it fair to say that a

11 lot of the people that you arrested for crimes as a

12 Meade County Deputy Sheriff, that those people don't

13 affectionately call you Cliffy?

14     A    As that question again.

15     Q    Sure.  Would you agree that most of the people

16 that arrested you for crimes -- that you arrested for

17 crimes as a deputy sheriff, that those people didn't

18 refer to you as Cliffy?

19     A    Most everybody did.

20     Q    Everybody?

21     A    Yes, sir.

22     Q    Even those people that you were putting in

23 handcuffs and charging with criminal offenses?

24     A    Yes, sir.

25     Q    But, again, those people weren't calling you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

22

1    on your home phone, correct?

2        A    Some do.

3        Q    Some do.  All right.  James -- well, let's

4    stick with Clifford Capps.  Before plaintiffs went to

5    trial in 1995, was Clifford Capps calling you on your

6    home phone?

7        A    Not -- not that early.  It was later on.

8        Q    Later on?

9        A    Uh-huh.

10       Q    But you did talk to Mr. Capps on the phone

11   prior to plaintiff's trial, correct?

12       A    Yes.

13       Q    Yeah.  And what type of stuff would you talk

14   to Mr. Capps about on the phone prior to plaintiff's

15   trial?

16       A    My business.

17       Q    What type of business was that?

18       A    I've got a portable toilet and septic and

19   dumpster business.

20       Q    And, in fact, prior to 1995, Mr. Capps had

21   worked for you at your business, correct?

22       A    No, sir.

23       Q    Prior to 1995, in these telephone

24   conversations, what was Mr. Capps communicating with you

25   about?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 23 of 279 PageID #:
28356
The Deposition of CLIFFY WISE, taken on July 11, 2019
23

1      A    He'd always want a friend's septic tank pumped

2    or give me business.

3      Q    Okay.  So prior to 1995, Mr. Capps helped your

4    business out; is that right?

5      A    Yes, sir.  All during my business, he -- he

6    still helps me.

7      Q    Still helps you.

8      A    He'll call you every now and then.

9      Q    Mr. Capps is -- prior to taking his statement

10   in 1992, Mr. Capps had helped you get business, right?

11        MR. BOND:  Object to the form of the question

12     Q    You can answer.

13     A    From '94.  That's when I went in business.

14     Q    1994.

15     A    Yes, sir.

16     Q    Okay.  So ever since you started your business

17   in 1994, Mr. Capps did whatever he could to get you

18   business; is that right?

19        MR. BOND:  Object to the form of the question.

20     Q    You can answer.

21     A    Yes, sir.

22     Q    Okay.  And did you tell Mr. Capps that you

23   appreciated his help?

24     A    I don't remember telling him.  No.

25     Q    Okay.  Well, you did appreciate his help,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

24

1    right?

2        A    I appreciate anybody's help.

3        Q    Yeah.  It's tough getting a business off the

4    ground, right?

5        A    It is.

6        Q    And do you have some competitors out there in

7    Meade County?

8        A    Some.

9        Q    Some.  All right.  But Mr. Capps went to you,

10   right?

11       A    Yes, sir.

12       Q    And he went to you with other people that he

13   was recommending to you, right?

14       A    Yes, sir.

15       Q    Yeah.  And you never wrote that down in any

16   type of report prior to plaintiff's trial, right?

17       A    No, sir.

18       Q    Yeah.  Never told that to the prosecutor,

19   right?

20       A    I don't recall.

21       Q    Yeah.  Well --

22       A    I wouldn't have cared to, you know.

23       Q    Yeah.  There'd be no reason for you to tell

24   Kenton Smith that you were working on your business

25   interests with Clifford Capps, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           MR. BOND:  Object to the form of the question.

2      Q    You can answer, sir.  Is that right?

3      A    I don't remember.

4      Q    Okay.  You don't have any notes that would

5  refresh your memory, right?

6      A    No, sir.

7      Q    Yeah.  You don't have any police reports to

8  refresh your memory, right?

9      A    No, sir.

10     Q    All right.  So as best you can tell, you

11  didn't tell anybody at the prosecutor's office.  You

12  didn't ever write an investigative letter that you were

13  working on your business with Clifford Capps prior to

14  plaintiff's trial, correct?

15          MR. BOND:  Object to the form of the question.

16     Q    You can answer.  Is that right?

17     A    No.

18     Q    That's not right?

19     A    No.  I wasn't working with Cliff -- Cliff

20  Capps.

21     Q    I understand.  Let me phrase the question a

22  better way, Mr. Wise, okay?

23     A    Prior to plaintiff's trial, you had never

24  written down in a report or told the prosecutor that

25  Clifford Capps was helping you get business, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

```
 1       A    No.

 2       Q    That's not correct?  I -- let me --

 3       A    You're confusing me on the -- ask the question

 4  again.

 5       Q    Let me ask it a better way.  So this is good.

 6  This is a good learning lesson for me.  So when I ask

 7  you a question and you don't understand it, if you do

 8  something like that, start shaking your head, then I

 9  know that I did something wrong.  So let me ask you a

10  better way, okay?  Prior to plaintiff's trial, you had

11  never told the Commonwealth or written down in an

12  investigative letter that Clifford Capps was helping you

13  get business, correct?

14       A    Prior to trial?

15       Q    Yes.

16       A    I wasn't in business prior to trial.

17       Q    The trial was in 1995.  Okay.  And your

18  business opened in 1994, correct?

19       A    Yes.  But it was probably up in the '90s

20  before Cliff ever came around, would talk to me.

21       Q    Yeah.  And you didn't inform the prosecutor or

22  write it down in a letter, correct?

23       A    That's -- no, sir.

24       Q    Okay.  That's correct, right?

25       A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Okay.  Now, do you know what type of
 2   relationship Mr. -- Sheriff Greer had with Clifford
 3   Capps prior to Plaintiff's trial?
 4        A    No, sir.
 5        Q    No.  Now, were you working at the Meade County
 6   Sheriff's Department back in 1990?
 7        A    Yes.
 8        Q    Okay.  I'm going to ask you a lot of easy
 9   questions.  That was an easy question, right?  In 1990,
10   what position did you have there; do you remember?
11        A    1990.  Chief deputy.
12        Q    Chief deputy.  Was that right beneath Sheriff
13   Greer?
14        A    Yes, sir.
15        Q    Okay.  You did all his hard work, right?
16        A    Yes.
17             MR. BOND:  Object to the form.
18        Q    He represents you and Sheriff Greer --
19        A    I know.
20        Q    -- so he's got -- he's looking out for both of
21   you.  Now, when you were the chief deputy back in 1990,
22   fair to say that you were involved in the major
23   investigations that were taking place at the Meade
24   County Sheriff's Department?
25        A    I would be informed.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

28

1      Q     Okay.  You would've been aware of them, right?

2      A     I was aware, yes.

3      Q     Yeah.  So if there was a murder that went down

4  in Meade County in or around 1990, you would've known

5  about that investigation, right?

6      A     Yes, sir.

7      Q     All right.  So in 1990, do you recall a murder

8  occurring where Clifford Capps was actually a suspect in

9  it?

10     A     In '90?

11     Q     In or around 1990.  It may not have been 1990

12 exactly.  Early 1990s.

13     A     Yes, sir.

14     Q     Okay.

15     A     I do.

16     Q     And it's been a long time, so if you remember

17 this, I think we'll all be surprised, but do you happen

18 to remember the name of the victim in that case?

19     A     No.  I do not.

20     Q     Okay.  Tell us what you remember about that

21 murder from when you were chief deputy, as best you can

22 recall.

23     A     It was a lady that worked at a gas station,

24 and she was murdered one night, and his name came up and

25 someone else.  I can't remember who it was, and -- but

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

29

1   we cleared them real quick.

2       Q    And did you actually work on that

3   investigation, or were you a supervisor of it?

4       A    I was -- no.  The state police actually worked

5   it.  I was just aware.

6       Q    Okay.  Did your department assist the Kentucky

7   State Police?

8       A    Yes, sir.

9       Q    Okay.  And were you one of the officers

10  involved in assisting the Kentucky State Police in that

11  investigation?

12      A    Yes, sir.

13      Q    And do you recall:  Did you go to the crime

14  scene?

15      A    No.  I did not.

16      Q    Okay.  How early in that investigation did you

17  get involved?

18      A    The next day.

19      Q    And when you --

20      A    When we started getting tips.

21      Q    And when you started getting tips, did you get

22  a tip that Clifford Capps was at that gas station before

23  that woman was killed?

24      A    I don't remember what the tip was, but his

25  name came up in the investigation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

30

1     Q     And would those tips have been written down at

2  all?

3     A     The state police might have it.

4     Q     Yeah.

5     A     I'm sure, but I don't.

6     Q     If your department got tips about that

7  homicide, would you-all have written that down?

8     A     Probably our dispatch.  Someone -- someone's

9  got it.

10    Q     Someone should though, right?

11    A     Yes.

12    Q     Yeah.  It's a murder case.  If you're getting

13 tips in a murder case back in 1990, it should've been

14 documented, correct?

15    A     Well, I'm not sure it was '90.  Somewhere --

16    Q     Fair enough.

17    A     Yeah.

18    Q     Late '80s/early '90s, or early '90s?

19    A     Somewhere in there.

20    Q     Okay.  But it was definitely prior to the

21 murder of Ms. Warford, correct?

22    A     Yes, sir.

23    Q     Yeah.

24    A     It was that.

25    A     And you got involved, you thought, on the day

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

31

1    after it happened, correct?

2        A    Yes.

3        Q    Was Sheriff Greer involved in that one?  And,

4    you know what?  Let me strike that question.  Was

5    Sheriff Greer involved in that investigation, to your

6    knowledge?

7        A    I do not know.

8        Q    Would've been aware of it, though, right?

9        A    Probably, yes.

10       Q    I would hope that that sheriff would've been

11   aware of it, right?  To your knowledge --

12       A    You would hope to.

13       Q    Yeah.  When Sheriff Greer was sheriff of Meade

14   County, as best you can recall as his chief deputy, was

15   he kept apprised of homicide investigations going on

16   there?

17       A    Yes, sir.

18       Q    Yeah.  And were you one of the people keeping

19   him up to date?

20       A    Yes, sir.

21       Q    Yeah.  That was one of your responsibilities,

22   right?

23       A    Yes.

24       Q    Chief deputy.  Were there any other chief

25   deputies when Sheriff Greer was in charge?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A      Yeah, before me.

 2      Q      Oh.  Before you.

 3      A      Yes.

 4      Q      Okay.  You became chief deputy in 1990?

 5      A      I couldn't tell you the year.

 6      Q      Okay.

 7      A      Somewhere in the '80s.

 8      Q      Somewhere in the '80s?

 9      A      Yes, sir.

10      Q      And when did Sheriff Greer leave the sheriff's
11  department?

12      A      2002 was his last year.

13      Q      And from the late '80s until 2002, did you --
14  was your position chief deputy at Meade County Sheriff's
15  Department?

16      A      Yes, sir.

17      Q      Under the supervision of Mr. Greer?

18      A      Yes.

19      Q      Got a lot of sheriffs in my mind, so I almost
20  messed up there.  I'm sorry about that.  I almost threw
21  the Knox County sheriff into this, John Pickard.  Do you
22  know Mr. Pickard?

23      A      No.

24      Q      No.  He's a nice guy.  You'd like him.  So
25  now, you find about this murder the day after.  Do you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    question Mr. Capps?

2        A    No.

3        Q    Okay.  Who does?

4        A    State police.

5        Q    Okay.  Was your department involved in that?

6        A    I don't know.  I don't remember.

7        Q    At that time, you knew Mr. Capps fairly well

8    because you had investigated him for another -- of other

9    crimes in the 1980s, right?

10       A    Yes, sir.

11       Q    Okay.  But you don't recall being involved in

12   that questioning?

13       A    No.  I wasn't involved.

14       Q    Okay.  Do you know whether Sheriff Greer was

15   involved in that?

16       A    I do not.

17       Q    How -- prior to 1992, how often would Sheriff

18   Greer get involved in the questioning of witnesses in

19   criminal investigations?

20       A    Often.

21       Q    Pretty often?

22       A    Yes, sir.

23       Q    Would you describe Sheriff Greer as a hands-

24   on sheriff?

25       A    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

34

```
 1        Q    Okay.  Liked to be involved in the underlying
 2   criminal investigations, right?
 3        A    Yes, sir.
 4        Q    What about you as chief deputy?  Were you
 5   hands on?
 6        A    Not so much the major cases.
 7        Q    No.  What kind of cases did you like to
 8   investigate?
 9        A    I ran the patrol units mostly.
10        Q    Okay.  A little bit less stressful?
11        A    Yes.
12        Q    Let Sheriff Greer deal with the stress, right?
13        A    Yes.
14        Q    Now, what else do you recall about this murder
15   investigation back in 1990 -- or not 1990, early '90s?
16        A    Early '90s?
17        Q    Or late '80s.
18        A    Yes.
19        Q    Okay.
20        A    What else I recall.  The only thing I can
21   recall to definitely is the arrest was made in the
22   murder.
23        Q    Do you remember who made the arrest?
24        A    State police.
25        Q    And by then, Mr. Capps had been questioned,
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   correct?

2       A    Yes.

3       Q    Yeah.  I know you didn't personally question

4   him, but you acknowledge that he was questioned in that

5   murder case, correct?

6       A    Someone did, yes.

7       Q    Yeah.  And they kept you apprised of whatever

8   they learned, right?

9       A    Yes, sir.

10      Q    Yeah.  And if any reports were created, they

11  would've given you one of those reports, correct?

12      A    Should have.  Yes.

13      Q    And you would've reviewed that report,

14  correct?

15      A    Yes.

16      Q    You should have, right?

17      A    Should have.

18      Q    Now, do you recall why Cliff Capps was

19  ultimately excluded as a suspect?

20      A    I do not.

21      Q    No.  Okay.  And all you know today is that Mr.

22  Capps was a suspect in that murder, but someone else was

23  ultimately arrested for it; is that right?

24           MR. BOND:  Objection to form.

25      Q    You can answer, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

36

```
 1        A     Yes.
 2        Q     Okay.  Do you have -- did you interview any of
 3   the other witnesses in that case?
 4        A     I don't recall.
 5        Q     Okay.  It's been a long time, right?
 6        A     Been a long time.
 7        Q     Okay.  Do you recall whether that -- the
 8   person who was charged, do you recall whether that
 9   person was ever convicted?
10        A     Yes, sir.
11        Q     Okay.  Do you recall that person's name?
12        A     I do not.
13        Q     Do you recall what county he would've been
14   convicted in?
15        A     He's from out of state.
16        Q     He was out of state.
17        A     Uh-huh.
18        Q     Do you recall whether he was -- was he charged
19   in Meade County?
20        A     Yes, sir.
21        Q     Okay.  And so even after that murder
22   investigation where Clifford Capps was a suspect at some
23   point, he continued -- when you started your business,
24   he eventually helped you get some business, right?
25        A     Yes, sir.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

37

```
 1        Q     Okay.  And how would you describe your
 2   relationship with Mr. Capps today?
 3        A     I'll speak to him time to time when I see him.
 4   There is no relationship.
 5        Q     Now, Mr. Capps told some police officers
 6   recently that you and him used to work together; is that
 7   true?
 8        A     In that respect, he would call and give me
 9   some names or someone needed something done.
10        Q     Okay.
11        A     Uh-huh.
12        Q     Okay.  So he -- I see.  So that's what you've
13   been testifying about this morning, right?
14        A     Yes.
15        Q     This business relationship that you and Mr.
16   Capps have?
17        A     It's not a business relationship.  You've got
18   to know Capps.  He just -- he's just friendly guy, and
19   I've never held anything against him, and he'll call you
20   from time to time and say, "Hey, I've got a friend that
21   needs a tank pumped, and I recommended you."
22        Q     Yeah.
23        A     You know.  It's that.
24        Q     Did he ever --
25        A     It's that simple.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

38

```
 1        Q     Would you ever, you know, give him any sort of
 2   referral fee in exchange for that business?
 3        A     No, sir.
 4        Q     Okay.  What benefit was there to Mr. Capps for
 5   helping you out?
 6        A     I guess me being -- being good to him.  I
 7   don't know.  You'd have to ask him.
 8        Q     And what do you mean by that, sir?
 9        A     I was just always good to him.  You know, I've
10   arrested him numerous times, but I always treated him
11   like a person, and he always respected that.
12        Q     Would you always help Mr. Capps out the best
13   you could?
14             MR. BOND:  Object to the form.
15        Q     You can answer.
16        A     I would help him, you know, if he needed
17   anything, yes.
18        Q     Yeah.
19        A     He needed a ride or something.  You know, yes.
20   I -- but --
21        Q     Did you do that -- did -- now, with the -- Mr.
22   Capps told some police officers recently that, like,
23   when he was working if people at his business got
24   tickets, that he'd come down there and talk to you or
25   Sheriff Greer, and you'd sometimes help him out; is that
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

39

1    right?

2        A    I don't recall that.

3        Q    Okay.  Did that happen with other people,

4    though?

5        A    You'd have to ask that better.

6        Q    I appreciate that.  So if Mr. Capps said that

7    you would help him out with him get rid of some, like,

8    traffic tickets, do you recall ever doing that?

9        A    I don't recall doing it for him, no.

10       Q    Okay.  Not saying it's not true.  You're just

11   saying you don't remember, right?

12       A    Yes.  I'm not saying it's not true, but I just

13   don't remember.

14       Q    Okay.  Now, when's the last time you recall

15   talking to Mr. Capps on the phone?

16       A    Oh, it's been a long time.  I see him in -- in

17   the store every now and then --

18       Q    What --

19       A    -- basically.

20       Q    What store?

21       A    Irvington, the grocery store.

22       Q    Grocery store.  Okay.  Sometimes you see Mr.

23   Capps in the grocery store?

24       A    Yes.  I see him there sometime, but I don't

25   know his number.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

40

1      Q     Yeah.  You see Mr. Capps at the grocery store.

2   Last time you saw Mr. Capps at the grocery store, do you

3   remember what you-all talked about?

4      A     There's no telling with him.  I don't recall.

5      Q     Does he like to talk a lot?

6      A     He likes to talk.

7      Q     Yeah.  What does he like to talk to you about

8   when you see him?

9      A     Just business.

10     Q     Okay.  Does he ever talk to you about this

11  case?

12     A     No, sir.

13     Q     No.  Mr. Capps, on all those occasions where

14  you run into him at the grocery store or he gives you a

15  call to help you get some business, you're saying that

16  none of those calls he ever brought up Jeff Clark or

17  Keith Hardin?

18         MR. ERVIN:  Object to form.

19     A     No, sir.  He has not.

20     Q     And Mr. Capps ever ask you for updates on what

21  was going on in the case?

22     A     No, sir.

23     Q     No.  Now, do you know what type of

24  relationship Sheriff Greer had with Mr. Capps prior to

25  1992?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        A     No.  I do not.

2        Q     Okay.  And by now, you're well aware that Mr.

3     Capps ultimately gave a statement in an underlying

4     homicide case, right?

5        A     Yes.

6        Q     Yes.  He gave that statement to Sheriff Greer,

7     right?

8        A     Yes, sir.

9        Q     And when Mr. Capps gave that statement to

10    Sheriff Greer, you were chief deputy, right?

11       A     Yes, sir.

12       Q     Yeah.  And when Mr. Capps gave that statement

13    -- well, let me ask it a different way.  When did you

14    first find out that Mr. Capps wanted to give a statement

15    to Sheriff Greer in the Warford homicide investigation?

16       A     I don't recall.

17       Q     Do you recall whether Mr. Capps told you or if

18    Mr. Greer told you?

19       A     No.  I don't recall.

20       Q     Okay.  Sheriff Greer talked to you about the

21    statement that he was going to get from Mr. Capps before

22    he took it?

23       A     No.

24       Q     No.  When -- were you present in the room with

25    Mr. Greer and Mr. Capps when the statement was taken?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

42

```
 1        A     What year was that?

 2        Q     This would've been '92?

 3        A     Yes, sir.

 4        Q     Yeah.  You were there, right?

 5        A     Yes, sir.

 6        Q     And prior to Mr. Capps giving that statement,

 7   how long did you and Sheriff Greer talk to him?

 8        A     I don't recall.

 9        Q     But some sort of pre-interview took place

10   before the recording started, right?

11        A     Yes, sir.

12        Q     And when the pre-interview was taking place,

13   it was just you and Sheriff Greer and Mr. Capps,

14   correct?

15        A     Ask it again.

16        Q     When the pre-interview was taking place, so

17   before that little recorder got turned on, it was just

18   you, Sheriff Greer, and Clifford Capps, correct?

19        A     I don't remember.

20        Q     Don't know if anybody else was in the room?

21        A     I don't know.

22        Q     Okay.  Can you give an approximate amount of

23   time that you and Sheriff Greer talked to Mr. Capps

24   before that recorder was turned on in 1992?

25              MR. BOND:  Objection.  Asked and answered.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A    No, sir.

2      Q    Okay.  Don't have any -- you don't have any

3  notes at home that would refresh your memory, right?

4      A    No.

5      Q    Okay.  Do you have any notes at home?

6      A    No.

7      Q    Okay.  Sometimes -- you know, sometimes we

8  hear crazy things --

9      A    I know.

10      Q    -- you know.  So no boxes -- no Warford

11  homicide boxes in your garage, right?

12      A    No, sir.

13      Q    Okay.  I was going to say basement, but that's

14  a Chicago thing.  Do you-all have basements here?

15      A    Yes.

16      Q    You do.  Okay.  And you didn't write any sort

17  of investigative letter or report about what was said

18  with Mr. Capps in 1992 before that recorder was turned

19  on, correct?

20      A    No, sir.

21      Q    Yeah.  In fact, you never wrote any sort of

22  report about that -- the interview that led to the

23  recorded statement of Mr. Capps at all, correct?

24      A    No, sir.

25      Q    That's correct, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

44

1     A    Yes.

2     Q    Okay.  And I'm going to ask you some

3  questions, and these -- I think I know your answers, and

4  I'm sorry I've got to do this, okay?  Prior to that

5  recorder being turned on, and this would've been -- one

6  moment, sir -- December 2, 1992.  Prior to that recorder

7  being turned on on December 2, 1992, what did you say to

8  Mr. Capps?

9     A    I don't remember.

10    Q    Prior to that recorder being turned on on

11 December 2, 1992, what did Mr. Capps say to you and

12 Sheriff Greer?

13    A    I don't remember.

14    Q    And prior to that recorder being turned on on

15 December 2, 1992, what did Sheriff Greer tell Mr. Capps?

16    A    I don't recall.

17    Q    Okay.  And you also don't recall how long that

18 pre-interview that was not recorded took place, correct?

19    A    No, sir.

20    Q    Okay.  And there's no notes or reports that

21 would ever refresh your memory in that regard, correct?

22    A    I don't know of any.

23    Q    Okay.  Fair enough.  All right.  Now, sitting

24 here today, do you have any recollection as to how Mr.

25 Capps contacted the Meade County Sheriff's Department to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  tell them that he had information about the Warford

2  homicide?

3      A    I do not.

4      Q    Have you ever seen any type of report or notes

5  that gave any indication of how that initial contact

6  happened?

7      A    Not that I recall.

8      Q    And did Sheriff Greer to this day ever tell

9  you how Mr. Capps got involved in the Warford

10  investigation?

11      A    No.

12      Q    Now, prior to 1992, in any of the criminal

13  investigations that you were working on, had you ever

14  had people down there at the jail say that other inmates

15  confessed to them to certain crimes?

16      A    Not that I recall.

17      Q    Is Clifford Capps the first case that you ever

18  worked on, Mr. Wise, where an inmate said that somebody

19  else confessed to them at the Meade County Jail?

20          MR. BOND:  Object to the form of the question.

21      Q    You can answer.

22      A    I don't recall.

23      Q    You can't recall one way or the other?

24      A    Yeah.  It could've happened, could not have.  I

25  just don't recall.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

46

1      Q    What about Sheriff Greer?  Do you know if
2  there were any investigations that he was involved in
3  prior to 1992 where jailhouse informants were used?
4      A    I don't know.
5      Q    Okay.  Fair to say there wasn't any sort of
6  procedures at the Meade County Sheriff's Department on
7  how to deal with informants back in 1992?
8      A    No.
9      Q    Yeah.  Something you-all hadn't dealt with
10  before, right?
11         MR. BOND:  Object to the form of the question.
12      Q    To your knowledge?
13      A    To my knowledge, no.
14      Q    Mr. Wise, I'm going to ask you some easy
15  questions right now, okay.  Should innocent people be
16  charged with crimes they did not commit?
17      A    No.
18      Q    And as a law enforcement officer, did you do
19  the best of your ability to make sure that innocent
20  people didn't go to jail?
21      A    Always.
22      Q    Yeah.  Fair to say you couldn't control what
23  other law enforcement officers did on investigations; is
24  that right?
25      A    True.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

```
 1        Q    Yeah.  You didn't have any control over what
 2   officers from the Louisville Police Department were
 3   doing in the Warford investigation, right?
 4        A    No.
 5        Q    You also didn't have any control over what
 6   Sheriff Greer did in the Warford investigation, right?
 7        A    No.
 8        Q    You could only control what you did, right?
 9        A    Yes, sir.
10        Q    Now, at the time between 1992 and 1995, so
11   when Ms. Warford was found dead in 1992 and in 1995 when
12   Mr. Clark and Mr. Hardin were convicted, what was your
13   position at the Meade County Sheriff's Department?
14        A    Chief deputy.
15        Q    Okay.  During that entire period of time; is
16   that right?
17        A    Yes, sir.
18        Q    All right.  And from the Meade County
19   Sheriff's Department perspective, who was the lead
20   investigator from that end?
21        A    I don't -- I don't really recall.
22        Q    Would -- from the Meade County Sheriff's
23   Department, who do you recall being involved in the
24   Warford homicide investigation?
25        A    Joe Greer.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

48

1    Q    Okay.  And you were involved as well, right?

2    A    To a limited, yes.

3    Q    More limited capacity?

4    A    Yes.

5    Q    And back in 1992, did you know the Meade

6  County Coroner, Mr. Adams?

7    A    Yes, sir.

8    Q    All right.  And was Mr. Adams involved in the

9  underlying Warford homicide investigation?

10   A    Yes, sir.

11   Q    In fact, he participated in more interviews

12 than you did; isn't that right?

13   A    Yes, sir.

14        MR. BOND:  Object to the form of the question.

15   Q    Prior to 1992, had you ever been involved in

16 any criminal investigation where the Meade County

17 Coroner was questioning suspects?

18   A    Yes.

19   Q    Was that something that regularly happened

20 down in Meade County?

21   A    Yes, sir.

22   Q    And was Mr. Adams a person who was questioning

23 suspects in these other cases?

24   A    Yes.

25   Q    How long did that go on for prior to 1992 to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   the best you can recall?

2       A    Long as he was coroner.  He was very active.

3       Q    Very active.  What do you mean by that, Mr.

4   Wise?

5       A    He -- he was just involved.

6       Q    Yeah.  He was -- was Mr. Adams involved just

7   like a -- well, let me -- that's going to be a bad

8   question.  I'll get objected to.  In these other cases

9   where Mr. Adams was involved in questioning suspects or

10  witnesses, was he acting more like a deputy than a

11  coroner?

12      A    No.  As coroner.

13      Q    Okay.  His title was coroner, right?

14      A    Yes, sir.  Several years.

15      Q    But he was questioning those people like a

16  police officer, right?

17          MR. BOND:  Object to the form of the question.

18      Q    You can answer.

19      A    Yes.

20      Q    Yeah.  Mr. Adams didn't just limit himself to

21  determining the cause of somebody's death, would you

22  agree with that?

23      A    No.  He --

24          MR. BOND:  Object to the form of the question.

25      Q    You can answer.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    No.  That's not true.  He -- he -- he kept the

2  coroners.

3       Q    Okay.  But he went above and beyond what a

4  coroner was supposed to do back then, right?

5       A    I don't think so.

6       Q    Okay.  So the -- have you ever seen any other

7  county coroner participate in interrogation of suspects

8  in a homicide?

9       A    I'm not aware of any.

10       Q    Only person you've ever seen do that is Mr.

11  Adams, right?

12       A    Yes, sir.

13       Q    Yeah.  And that's how it happened down in

14  Meade County, right?

15       A    It's a small county.

16       Q    Yeah.  Did you ever -- let me ask you a better

17  way.  You were the chief deputy when Mr. Adams was

18  participating in some of these questionings of suspects

19  in criminal cases, right?

20       A    Yes, sir.

21       Q    Yeah.  Sheriff Greer was -- Joe Greer was the

22  sheriff, right?

23       A    Yes.

24       Q    Yeah.  Did you or Sheriff Greer ever tell Mr.

25  Adams not to participate in the questioning of suspects

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  in criminal investigations?

2      A    I did not.

3      Q    No.  In the Warford investigation, did you

4  ever tell Mr. Adams that he was overstepping his bounds

5  by participating in these interrogations?

6      A    I did not.

7      Q    Did Sheriff Greer, to your knowledge?

8      A    Not to my knowledge.

9      Q    Okay.  Both you and Sheriff Greer never

10  intervened to stop Mr. Adams from questioning suspects

11  or witnesses in the Warford investigation, correct?

12     A    No.

13         MR. BOND:  Objection.  Asked and answered.  Go

14     ahead.

15     Q    Is that correct?

16     A    Yes.

17     Q    Yes.  All right.  Now, tell me about the first

18  time you met a Louisville police officer named Mark

19  Handy.  Do you remember Mr. Handy?

20     A    Vaguely.  It was during the search warrant.

21     Q    What do you remember about Mr. Handy and the

22  search warrant?

23     A    I -- he's just a detective.  I don't remember

24  anything out -- outstanding, you know.

25     Q    Yeah.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

52

```
 1        A     I wouldn't know him if he walked in.

 2        Q     Nothing remarkable, right?

 3        A     No.

 4        Q     And -- is that right?

 5        A     Yes.

 6        Q     Yeah.  Do you recall ever having any specific

 7   conversations with Handy when you were assisting on the

 8   search warrant?

 9        A     I don't recall any.

10        Q     Outside of the Warford homicide, have you ever

11   worked on any other investigations with Mr. Handy?

12        A     No.

13        Q     Okay.  To your knowledge, has anybody at the

14   Meade County Sheriff's Department worked on any other

15   investigations with Mr. Handy outside of this case?

16        A     Not to my knowledge.

17        Q     Okay.  Is it fair to say that you and your

18   agency assisted Detective Handy and the Louisville

19   Police Department in the investigation into Ms.

20   Warford's death?

21        A     Ask that again.

22        Q     Is it fair to say that the Meade County

23   Sheriff's Department, including yourself, assisted Mr.

24   Handy and the Louisville Police Department in the

25   investigation into the death of Ms. Warford?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

53

1        A      Into the search warrant.

2        Q      Let me break it down, okay?

3        A      Uh-huh.

4        Q      I'll ask it a better way.  Is it fair to say

5    that the Meade County Sheriff's Department assisted the

6    Louisville Police Department in the investigation into

7    Rhonda Warford's death?

8        A      Yes.

9        Q      Okay.  And I know what you were going at,

10   which is that one of the limited things you did in that

11   investigation was participate in the search warrants

12   with officers from the Louisville Police Department.

13       A      Yes.

14           MR. BOND:  Object to the form of the question.

15       Q      And I said --

16           MR. BOND:  Give me time, okay.

17       Q      And I said search warrants pleural because you

18   actually partic -- you alleged to have participated in

19   the search warrant of both Mr. Hardin and Mr. Clark's

20   residences, correct?

21       A      Yes.

22       Q      Okay.  You didn't write any police reports

23   about those searches, right?

24       A      I did not.

25       Q      Okay.  You didn't fill out those search

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   warrants, right?

 2        A    No, sir.

 3        Q    Didn't take any notes during those searches,

 4   right?

 5        A    Not that I'm aware.

 6        Q    Didn't take any pictures during those

 7   searches, right?

 8        A    No, sir.

 9        Q    Okay.  But Meade County assisted Louisville in

10   conducting those searches, correct?

11        A    I was there.

12        Q    And is that right that your department

13   assisted?

14        A    Yes.

15        Q    Okay.  Anybody else from your department that

16   you can recall there when those searches went down?

17        A    Yes.  Another deputy.

18        Q    Do you remember who?

19        A    Joe Wood.

20        Q    Joe Wood.  Okay.  Do you know:  Is Mr. Wood

21   still alive today?

22        A    Yes.

23        Q    He is.  Does he live in Meade County?

24        A    Yes, sir.

25        Q    Okay.  Sir, your involvement in the underlying
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

55

```
 1   investigation was pretty limited, right?

 2        A    Very limited.

 3        Q    Yeah.  Nobody ever confessed to you, right?

 4        A    No, sir.

 5        Q    Jeff Clark never confessed to you, right?

 6        A    No, sir.

 7        Q    Keith Hardin never confessed to you, right?

 8        A    No, sir.

 9        Q    You weren't there where the murder happened,

10   right?

11        A    No, sir.

12        Q    You didn't conduct any of the forensic

13   testing, right?

14        A    No, sir.

15        Q    Fair to say that sitting here today you don't

16   have a personal opinion about who actually killed Rhonda

17   Sue Warford?

18        A    No, sir.

19        Q    Is that fair to say?

20        A    Yes.

21        Q    You don't know who done it, right?

22        A    Sir?

23        Q    You don't know who did it, right?

24        A    No.

25        Q    Fair to say it wasn't your decision to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    initiate criminal charges against Mr. Clark and Mr.

2    Hardin?

3        A    No, sir.  It wasn't.

4        Q    You didn't recommend that those changes be

5    brought, correct?

6        A    No.

7        Q    You didn't tell anybody that you thought

8    probable cause was met, correct?

9        A    No.

10       Q    That's correct, right?

11       A    Yes.

12       Q    But after Mr. Clark and Mr. Hardin were

13   charged, did you do anything to stop it?

14       A    No.

15           MR. BOND:  Object to the form of the question.

16       Go ahead and answer.

17       Q    You can answer.

18       A    No.

19           MR. SLOSAR:  Let's take a short break.  Is that

20       okay?

21           MR. BOND:  Yeah.  That's fine.  I need --

22           VIDEOGRAPHER:  The time is 10:53.  We're off

23       the record.

24                      (OFF THE RECORD)

25           VIDEOGRAPHER:  The time is 11:08.  We're back

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

57

1      on the record.

2   BY MR. SLOSAR:

3      Q     All right, Mr. Wise.  So let me ask you a

4   quick question about that murder we were talking about

5   earlier, not the Warford one, but the one that happened

6   in Meade County at the gas station.  Do you know what

7   I'm talking about?

8      A     Yes, sir.

9      Q     Okay.  Do you remember what city that was in?

10     A     Brandenburg.

11     Q     Brandenburg.  Okay.  That's where the

12  courthouse is, right?

13     A     Yes, sir.

14     Q     See, I know a little bit about Meade County.

15  And you believed it was a woman who was killed; is that

16  right?

17     A     Yes, sir.

18     Q     Okay.  All right.  Let me back up a little bit

19  to when you were in grade school and high school. Where

20  did you graduate from high school from?

21     A     West Hardin.

22     Q     Is that --

23     A     In Hardin County.

24     Q     In Hardin County.  And after -- approximately

25  what year did you graduate high school?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISEMAN, taken on July 11, 2019

58

```
 1        A      '70.
 2        Q      Okay.  After high school, what did you do next
 3   in your life?
 4        A      What work did I do?
 5        Q      Yeah.  Did you go to -- did you do any formal
 6   schooling after 1970?
 7        A      No, sir.
 8        Q      Okay.  So what'd you do for work after
 9   graduating high school?
10        A      I actually drove a truck for several years.
11        Q      Oh.  And was that in Kentucky or all over?
12        A      All over.
13        Q      How many years were you a truck driver?
14        A      Approximately ten.
15        Q      Do you still have your CDL today?
16        A      No, sir.
17        Q      No.  So from about 1970 to 1980, you were
18   driving truck; is that right?
19        A      Yes, sir.
20        Q      When did you first -- do you consider Sheriff
21   Greer a friend of yours?
22        A      No, sir.  Before that?
23        Q      I'm -- let me ask you a different way.  Your
24   lawyer got real --
25               MR. BOND:  My head kind of snapped when he said
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, Taken on July 11, 2019

59

```
 1      no.
 2          Q    Real concern.  Let me ask you another way. Is
 3      Sheriff Greer a friend of yours today?
 4          A    Yes, sir.
 5          Q    Yeah.  Okay.  And how long have you and
 6      Sheriff Greer been friends?
 7          A    Since 1982 when he became sheriff.
 8          Q    Okay.  Did you know Sheriff Greer before he
 9      became sheriff?
10          A    No, sir.
11          Q    Okay.  So from 1970 to 1980, you're driving
12      trucks.  And what do you -- what makes you leave the
13      trucking business?
14          A    Money.  Times was hard then.  I just sold my
15      truck, and a friend of mine was at the sheriff's
16      department and talked me into going into law
17      enforcement.
18          Q    Who was that friend?
19          A    Stan Heslep.
20          Q    And after 19 -- after graduating high school,
21      did you get married?
22          A    Yes, sir.
23          Q    Yeah.  Did you have a family?
24          A    Yes, sir.
25          Q    Okay.  And so by 1980, you wanted to provide
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

60

1    better for your family, right?

2        A    Yes, sir.

3        Q    Yeah.  And in 1980, did you apply to be a law

4    enforcement officer at any other agencies?

5        A    No, sir.

6        Q    Okay.  Just Meade County?

7        A    Just Meade County.

8        Q    Okay.  Tell us a little bit about what that

9    application process was like, best you can recall.

10       A    In the '80s, you just applied, and either the

11   sheriff hired you, or he didn't hire you.  You know,

12   simple.

13       Q    All right.  Did you have to do an interview?

14       A    Yes.

15       Q    Yeah.  And do you remember who you interviewed

16   with?

17       A    Joe Greer.

18       Q    Okay.  So this was -- you would've applied to

19   the Meade County Sheriff's Department in 1982?

20       A    '82.

21       Q    Okay.

22       A    And he hired me as a part-time officer in

23   '82.

24       Q    And aside from meeting with Sheriff Greer,

25   what other stuff -- did you have to take any tests as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

61

1    part of the application process?

2        A    No, sir.

3        Q    Okay.  Did you have to do any law enforcement

4    training as part of that process?

5        A    After you was hired, yes.

6        Q    Okay.  But before you were hired, you didn't

7    have to have it --

8        A    No, sir.

9        Q    -- right?  And you didn't have any formal

10   education in law enforcement prior to interviewing with

11   Sheriff Greer in 1982, correct?

12       A    No, sir.

13       Q    Okay.  Is that right?

14       A    Yes.

15       Q    I know what you mean when you say no, sir, but

16   I think it may come off as a double negative on here, so

17   I'm going to do my best to make sure we're on the same

18   page, okay?

19       A    Okay.

20       Q    Okay.  Now, after -- did Sheriff Greer tell

21   you in that interview that he was going to hire you?

22       A    I don't recall.

23       Q    Okay.

24       A    It was shortly afterwards, if not.

25       Q    Okay.  Yeah.  You're a likeable guy, so I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CLIFFY WISE, taken on July 11, 2019

62

1   imagine it didn't take Sheriff Greer too long to warm up

2   to you; is that right?

3       A    I hope not.

4       Q    And when he told you that you were going to be

5   a part-time deputy for the Meade County Sheriff's

6   Department, what was the next thing that happened in

7   terms of your employment at the Meade County Sheriff's

8   Department?

9       A    Somewhere in 1983, I don't know which month,

10  but the -- the chief deputy left, and I was hired to

11  take his place.

12      Q    Okay.  So between 1982 and 1983, you worked

13  part-time; is that right?

14      A    Yes, sir.

15      Q    And what was your rank or title?

16      A    Just deputy, part-time deputy.

17      Q    Okay.  As a part-time deputy, did you have to

18  go to any formal law enforcement academy?

19      A    No, sir.

20      Q    Okay.  Kentucky didn't require that, right?

21      A    No, sir.  You're right.

22      Q    All right.  And after you were hired back in

23  1982, is it fair to say that the Meade County Sheriff's

24  Department didn't have any written policies or

25  procedures in place at that time?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    A    No, sir.

 2    Q    Okay.  And, in fact, even in 1992, they didn't

 3 have any written policies or procedures in place,

 4 correct?

 5    A    I don't recall if he did or did not.

 6    Q    Okay.  Sitting here today, you don't recall

 7 ever having seen any written policies or procedures of

 8 the Meade County Sheriff's Department prior to 1992; is

 9 that right?

10    A    Prior -- I just don't recall.  Somewhere in

11 the '90s, we did.  I just don't remember when it

12 happened.

13    Q    Okay.  Could it have happened after Mr. Clark

14 and Mr. Hardin were convicted in 1995?

15    A    Could have.

16    Q    Yeah.  And you don't have any notes or any

17 documents at home that would refresh your memory, right?

18    A    No, sir.

19    Q    Okay.  And I'll represent to you, sir, as an

20 officer of the Court, that there haven't been any

21 written policies or procedures produced in this

22 litigation.  So if you do find some, I'd love to see it,

23 okay?

24    A    Yes, sir.

25    Q    All right.  Now, in 1982 when you were hired

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   as a part-time deputy by Sheriff Greer, what sort of
 2   training did you get?
 3        A    At that point, none.
 4        Q    And in 1983, when you were transitioned to a
 5   chief deputy?
 6        A    Yes, sir.
 7        Q    Okay.  Did you have any formal training at the
 8   Meade County Sheriff's Department at that time?
 9        A    No, sir.
10        Q    Okay.  And still you don't remember seeing any
11   written policies or procedures back in the '80s,
12   correct?
13        A    I do not.
14        Q    Okay.  At any point in time prior to 1992,
15   were you ever sent off to any formal police training
16   academy?
17        A    No, sir.
18        Q    At any point in time prior to 1995, were you
19   ever sent off to any formal police training academy?
20        A    I don't recall what year.  Somewhere in the
21   '90s, we started taking some training, and it just got
22   more training, more training, but somewhere in the '90s.
23   It might have been '93, '4, '5.  I just don't know.
24        Q    Okay.
25        A    Somewhere in there.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

65

1       Q    Would you agree that at the time that Mr.

2  Clark and Mr. Hardin were charged with the murder of

3  Rhonda Warford, you hadn't received any formal training

4  by that point?

5         MR. BOND:  Object to the form of the question.

6       Q    You can answer, sir.

7       A    It's like I said.  It's somewhere in the '90s.

8  I just don't know where -- when it -- when it was.

9       Q    Okay.

10      A    What month or day or...

11      Q    Okay.

12      A    Somewhere.

13      Q    Now, what academy -- what was the first law

14  enforcement training academy that you recall going to?

15      A    Eastern Kentucky.

16      Q    Okay.  EKU?

17      A    Uh-huh.

18      Q    Yes?

19         MR. BOND:  Yes?

20      A    Yes.

21      Q    We're both going to remind you.  He's going to

22  remind me, and I'll remind you.

23         MR. BOND:  I will.

24      Q    Happens to all of us.

25         MR. BOND:  That's only the first time, though.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Yeah.  You're doing great.  You're doing
 2   great.  So -- and do you remember the name of the EKU
 3   academy?  It's escaping me.
 4        A     I can't -- I can't remember right now.
 5   Richmond.
 6        Q     Richmond.
 7        A     Yes.
 8        Q     Yeah.  Do you remember how long you were there
 9   for?
10        A     Two weeks at a time.
11        Q     Okay.
12        A     Most of them.
13        Q     Yeah.  And the first time you went to Richmond
14   Academy, this would've been sometime in the mid-1990s;
15   is that right?
16        A     Somewhere in the '90s.
17        Q     Somewhere in the '90s.
18        A     Yes, sir.
19        Q     Prior to going to EKU somewhere in the '90s,
20   you had not received any formal training on how to be a
21   law enforcement officer; is that right?
22        A     Just on the job.
23        Q     So was my question right?
24        A     Yes.
25        Q     Okay.  Prior to going to Richmond, you had
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    never reviewed any written policies or procedures of the

2    Meade County Sheriff's Department, correct?

3        A    True.

4        Q    Okay.  And at the time of the Warford

5    investigation, fair to say that the Meade County

6    Sheriff's Department didn't have any unwritten policies

7    or procedures in place?

8        A    It's like I answered before.  I don't know

9    when.  I don't know if it did or not.

10       Q    So at some point, the Meade County Sheriff's

11   Department had written policies and procedures relating

12   to criminal investigations; is that right?

13       A    Somewhere in the '90s --

14       Q    Okay.

15       A    -- Joe did, yes.

16       Q    Yeah.  But prior to that, prior to Sheriff

17   Greer creating these written policies and procedures,

18   there were none in place; is that right?

19       A    True.

20       Q    Okay.  Not only were there no written policies

21   or procedures in place prior to Sheriff Greer creating

22   some, but there were also no unwritten policies or

23   procedures that were in place at the Meade County

24   Sheriff's Department, correct?

25       A    True.



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Okay.  And were you -- because you were chief

2   deputy when these written policies and procedures were

3   eventually created in the '90s; is that right?

4      A     Somewhere in the '90s, yes.

5      Q     Yeah.  Were you part of the process of

6   creating these written policies and procedures?

7      A     No.  I was not.

8      Q     No.  Who was, to the best you can recall?

9      A     The sheriff, Joe Greer.

10      Q     All right.  Aside from Joe Greer, was anybody

11   else involved to your knowledge?

12      A     Not that I know of.

13      Q     Okay.  After Joe Greer created these written

14   policies and procedures in the '90s, did he ever give

15   you a copy?

16      A     Yes.

17      Q     Okay.  Did you review those?

18      A     Yes.

19      Q     Okay.  And when Sheriff Greer gave you a copy

20   of these written policies or procedures, do you know

21   whether those, that written copy, whether that was ever

22   maintained at the Meade County Sheriff's Department?

23      A     It should be in the personnel files.

24      Q     It should be in the personnel files.  So in

25   Meade County when you were employed there from 19 --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    well, let me -- let's back up a little bit, okay?  In
 2    1982 when you had that interview with Sheriff Greer and
 3    he asked you to come on board afterwards, did you sign
 4    some documentation about being hired on?
 5         A    Not that I'm aware of.
 6         Q    All right.  Well, at some point, you would've
 7    had to give them your Social Security number, your
 8    address so you could get paid, right?
 9         A    Yes.
10         Q    Basic information.  You would've had to sign
11    something, right?  Probably had to sign some sort of
12    oath to be a part-time deputy, too, right?
13         A    You had to take an oath.
14         Q    You had to take an oath.
15         A    Uh-huh.
16         Q    Okay.  And you took that oath, right?
17         A    Yes, sir.
18         Q    Yeah.  Similar to the oath you took here
19    today, right?
20         A    It's a little bit more involved.
21         Q    A little bit more involved in taking an oath
22    as a police officer than a regular citizen, right?
23         A    Yes, sir.
24         Q    Yeah.  Because you have serious constitutional
25    rights that you have to look out for, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.

14    Q    And you took those rights seriously, right?

15    A    Every day.

16    Q    Every day.  Now, when you were a chief deputy

17    beginning in 1983 at the Meade County Sheriff's

18    Department, can you describe between 1983 and, say, the

19    time of the Warford homicide investigation, if somebody

20    was going to make a complaint about a Meade County

21    Sheriff's Officer, like a citizen or even another police

22    officer, can you describe the process for how that

23    complaint would have been handled?

24    A    They would go to Sheriff Greer.

25    Q    And if it was as complaint about a police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  officer, would those complaints have been put into a

2  personnel file?

3       A    Yes.

4       Q    And have you ever seen your personnel file,

5  Mr. Wise?

6       A    Yes, sir.

7       Q    Okay.  When was the last time you saw that

8  personnel file?

9       A    2005 or '06.

10       Q    Right around the time you left?

11       A    Uh-huh.  Yes, sir.

12       Q    Yeah.  And when you were sheriff, you

13  maintained those personnel files, correct?

14       A    Yes, sir.

15       Q    Yeah.  Because those pers -- and is it fair -

16  - well, let me back up.  Did those personnel files

17  contain sensitive information about officers at the

18  Meade County Sheriff's Department?

19       A    It could, yes.

20            MR. BOND:  Object to the form of the question.

21       Q    Okay.  For instance, could those -- would

22  those personnel files -- if somebody got injured on the

23  job, like a -- had some medical bills as a result of

24  that, would those personnel files potentially contain

25  documentation about the injury and whatever medical



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    expenses are related to it?

2         A    Yes.

3         Q    Yeah.  Would those personnel files also

4    contain any complaints that were made against police

5    officers when they were working at the Meade County

6    Sheriff's Department?

7         A    I can definitely tell you after 2002 it was,

8    yes.

9         Q    Yeah.  Why can you say that?

10        A    Because I maintained them.

11        Q    Okay.  And did those personnel files, to your

12   knowledge, sir, as the former sheriff of Meade County,

13   did they also contain any discipline that was levied

14   against officers at the Meade County Sheriff's

15   Department during their employment there?

16        A    It could have, yes.

17        Q    Yeah.  So if somebody got disciplined and it

18   was a written reprimand, that would've been maintained

19   as part of the disciplinary file, correct?

20        A    Yes, sir.

21        Q    And when you left the sheriff's department in

22   2005/2006, was your personnel file still maintained

23   there?

24        A    Yes, sir.

25        Q    Yeah.  And where do you -- when you stopped

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

1    being sheriff in 2005/2006, where do you recall those

2    personnel files being located at the Meade County

3    Sheriff's Department?

4         A    In the -- in the sheriff's department.

5         Q    Like where at, though, were they stored?

6         A    In a file cabinet.

7         Q    Where was that file cabinet?

8         A    In the main office.

9         Q    Okay.  And who would've had -- was that file

10   cabinet -- did it have some sort of lock on it?

11        A    Yes, sir.

12        Q    Okay.  And explain just for the transcript.

13   It's one of those dumb questions that I've got to ask

14   you.  Can you explain why it was important that the

15   personnel files at the Meade County Sheriff's Department

16   were under a lock?

17             MR. ERVIN:  Objection to the form.

18        Q    Why was that, sir?

19        A    Well, it just wasn't anybody else's business,

20   you know.

21        Q    And who would've had the ability -- when you

22   were sheriff in 2005/2006 at the time you left, who

23   would've had access to the files?

24        A    Myself and the chief deputy.

25        Q    And you were the chief deputy since 1983; is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

74

 1   that right?

 2        A    Yes, sir.

 3        Q    Okay.  Between 1983 and 2005, were personnel

 4   files at the Meade County Sheriff's Department stored in

 5   that same location?

 6        A    Yes.

 7        Q    Yeah.  And to your knowledge, between 1983 and

 8   2005, would those personnel files only have been able to

 9   have been accessed by the chief deputy or the sheriff?

10        A    From -- from '83 to 2003, would be only the

11   sheriff.

12        Q    Okay.

13        A    After that, 2003, '04, '05, and '06 would be

14   the sheriff and chief deputy.

15        Q    I see.  So between 1983 -- I just want to make

16   sure I have this right.  Between 1983 and 2003, the only

17   person that would've had access to the personnel files

18   of officers at the Meade County Sheriff's Department

19   would've been Sheriff Joe Greer; is that right?

20        A    Yes, sir.

21        Q    Okay.  From 2003 to 2005 or 2006 when you left

22   the Meade County Sheriff's Department, the only person

23   that would've had access to those personnel files

24   would've been yourself as sheriff or the chief deputy

25   under your command; is that right?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes, sir.

 2        Q     And who is that chief deputy?

 3        A     Tommy Stiles.

 4        Q     Okay.  And when you were the chief of the

 5   Meade County Sheriff's Department, did you ever see a

 6   personnel file in there for Sheriff Greer?

 7        A     Not that I recall.

 8        Q     And when did you take over as sheriff again,

 9   sir?

10        A     2003.

11        Q     Okay.

12        A     January.

13        Q     Now, you never had a reason to look for

14   Sheriff Greer's personnel file, right?

15        A     No, sir.

16        Q     Okay.  But when you were looking in that file

17   cabinet, you never saw one in there for Sheriff Greer;

18   is that right?

19        A     Not that I recall.

20        Q     Okay.  But when you left in 2005 or 2006, your

21   personnel file was maintained there; is that right?

22        A     Yes.  It was left there.

23        Q     Okay.  Now, did you ever -- did you review

24   that file in 2005 or '06 prior to leaving?

25        A     Yes, sir.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

76

```
 1        Q     Okay.  And can you describe to us the type of
 2   documents that were in that file when you looked at it?
 3        A     Just contact information, training, any
 4   discipline, you know. just regular files.  Any -- mostly
 5   training in there.
 6        Q     Okay.  And to your recollection, is that your
 7   own personnel file contains whatever training you
 8   received as a law enforcement officer; is that right?
 9        A     Yes, sir.
10        Q     Okay.  And it's your recollection that your
11   personnel file would've also included any documents
12   relating to discipline that you received at the Meade
13   County Sheriff's Department; is that right?
14        A     Yes.
15        Q     Okay.  Now, you went to EKU sometime in the
16   '90s; is that right?
17        A     Yes, sir.
18        Q     Okay.  And at the time you went to EKU, you
19   had never had any formal law enforcement training prior
20   to that point; is that right?
21        A     Correct.
22        Q     Okay.  And by formal training, what I mean is
23   the Meade County Sheriff's Department had never trained
24   you on how to be a law enforcement officer prior to you
25   going to EKU; is that right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          A    Correct.

2               MR. BOND:  Object to the form of the question.

3          Q    That's correct?

4          A    Correct.

5          Q    And you had also never been sent out to any

6     outside law enforcement academy prior to going to EKU in

7     the mid-'90s; is that right, sir?

8          A    Correct.

9          Q    Okay.  Now, after you went to EKU in the mid

10    '90s, at some point, did you go to any other outside law

11    enforcement training academies?

12         A    No, sir.

13         Q    Okay.  Now, the EKU that you're referring to,

14    would that have been a basic training?

15         A    Yes.

16         Q    Okay.  And did you live in Richmond for a

17    little while when you were doing that training?

18         A    Two weeks at a time most of the time.

19         Q    Yeah.  Would you come back on the weekends and

20    see your family?

21         A    Yes, sir.

22         Q    Yeah.  I know you testified earlier that you

23    had testified in a number of depositions before; is that

24    right?

25         A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q   Okay.  And I think that you said that some of

2  those were in the early 2000s; is that right?

3     A   Yes.

4     Q   Okay.  What was your role in these cases? Had

5  you ever -- were you a defendant in any of those cases?

6         MR. BOND:  Well, you've asked two questions.

7         MR. SLOSAR:  Sorry.  I did ask two questions.

8         MR. BOND:  Yeah.  Please.

9         MR. SLOSAR:  Let me strike the first one --

10        MR. BOND:  Yeah.

11        MR. SLOSAR:  -- and the second one and ask it a

12   better way.

13 BY MR. SLOSAR:

14     Q   Prior to this lawsuit, have you ever been a

15  party to a lawsuit before, and by party, I mean have you

16  ever been a plaintiff or a defendant?

17     A   Yes, sir.

18     Q   Okay.  Let me start on the plaintiff side, all

19  right?  Have you ever been a plaintiff in a lawsuit

20  before?

21     A   No.

22     Q   Okay.  So prior to this case, you had been

23  sued before, and I'm going to assume from your long

24  career as a law enforcement officer at the Meade County

25  Sheriff's Department; is that fair?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

79

```
 1        A    Yes.
 2        Q    Okay.  Have you ever been sued for any type of
 3   case that didn't relate to your duties as a officer for
 4   the Meade County Sheriff's Department?
 5        A    No, sir.
 6        Q    Okay.  Tell us a little bit about these other
 7   lawsuits, the best you can recall.  What is the most
 8   recent lawsuit that you were a party in?
 9        A    I couldn't tell you --
10        Q    Okay.
11        A    -- the most recent.  That's been a long time
12   ago.
13        Q    How many -- approximately how many lawsuits
14   have you had to deal with?
15        A    I don't -- I don't recall.
16        Q    Was Mr. Bond a little bit younger when he
17   represented you in those cases -- I see you looking
18   over.
19             MR. BOND:  I'm sorry.  I thought you were
20        finished.
21             MR. SLOSAR:  You're still young.
22             MR. BOND:  Object to the form -- no, I'm not.
23        Object to the form of the question.  I've never
24        represented him.
25             MR. SLOSAR:  Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. BOND:  But that's --

 2              MR. SLOSAR:  Okay.

 3              MR. BOND:  Okay.

 4              MR. SLOSAR:  He looked over at you, so I didn't

 5       know if he was looking for -- looking --

 6              MR. BOND:  There's a question of whether the

 7       firm has, okay.

 8              MR. SLOSAR:  Okay.

 9              MR. BOND:  Okay.

10   BY MR. SLOSAR:

11       Q    Has Mr. Bond's firm ever represented you

12   before, sir?

13       A    Yes.

14       Q    Okay.  All right.

15              MR. BOND:  And it may have been before I was

16       there.

17              MR. SLOSAR:  Yeah.

18              MR. BOND:  Okay?

19              MR. SLOSAR:  See, you were way young, which is

20       why you weren't even there yet.

21   BY MR. SLOSAR:

22       Q    All right.  What -- generally, do you recall

23   any of the allegations of these other lawsuits that you

24   were a party to, Mr. Wise?

25       A    You know, I just don't recall.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1        Q     Okay.

2        A     They was during arrest.  Someone would get

3   hurt.  One case where a gentleman got his arm broke, and

4   I do remember that one, but there's just several through

5   the years.  Or I was a party when they got arrested, got

6   drug into the lawsuit.

7        Q     You were, like, a witness?

8        A     Yes.

9        Q     Yeah.  In any of those other cases, did

10  anybody ever allege that they were wrongfully charged

11  with a crime they didn't commit?

12       A     Not that I'm aware of.

13       Q     Okay.  Now, you gave some depositions in these

14  other cases, right?

15       A     Yes.

16       Q     Okay.  Do you recall approximately how many

17  you gave?

18       A     I don't -- I don't recall.  There's more than

19  three.  You know, two or three.

20       Q     And when you gave those depositions, were you

21  the Meade County Sheriff?

22       A     No, sir.

23       Q     Okay.  You would've been deputy chief still?

24       A     Yes.

25       Q     Okay.  Sheriff Greer would've been sheriff

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1   still?

 2       A    Yes.

 3       Q    Okay.  In any of those cases, did they go to a

 4   trial that you're aware of?

 5       A    No, sir.

 6       Q    No.

 7       A    Not that I'm aware of.

 8       Q    Okay.  So you never testified at a civil

 9   trial, right?

10       A    Not that I can ever remember.

11       Q    Okay.  That's fair.

12       A    Yeah.

13       Q    Have you ever been in the military, sir?

14       A    No, sir.

15       Q    Now, when you were a chief deputy from 1983 to

16   2003, did you receive any commendations?

17       A    Not written.

18       Q    Okay.  I'm sure sheriff -- did Sheriff Greer

19   ever give you some verbal recognition?

20       A    Yes, sir.

21       Q    Okay.  And on occasion, did Sheriff Greer ever

22   give you some verbal reprimand?

23       A    Yes.

24       Q    Now, between 1983 and 2003, did the Meade

25   County Sheriff's Department have any officers that were


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    assigned to handle internal investigations?

2        A    No, sir.

3        Q    Okay.  And between 1983 and 2003, would

4    Sheriff Greer have been the person responsible for

5    disciplining officers at the Meade County Sheriff's

6    Department?

7        A    Yes.

8        Q    Yeah.  And is it fair to say that it would've

9    been his exclusive control to discipline officers who

10   committed misconduct under his supervision?

11       A    Yes.

12       Q    Yeah.  And as sheriff, to your knowledge, was

13   there anybody over Mr. Greer who would've been

14   overseeing any discipline that he may have committed?

15       A    No.

16       Q    Yeah.  You didn't have any power to discipline

17   Sheriff Greer, right?

18       A    No.

19       Q    Yeah.  Now, between 1983 and 1995 when Mr.

20   Clark and Mr. Hardin were convicted, did Sheriff Greer

21   ever give you any written performance evaluations?

22       A    Ask that again.

23       Q    Between '83 and '95 when they got convicted,

24   did you ever receive any written performance

25   evaluations?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A     Written performances?  I don't have -- no.  I
 2   don't -- no.  The answer would be no.
 3        Q     Okay.  Now, prior to the Warford homicide
 4   case, you talked about one other that you had had some
 5   limited involvement in that occurred in Bradenburg
 6   [sic]; is that right?
 7        A     Yes, sir.
 8        Q     Okay.  Outside of the Warford case and the
 9   Bradenburg murder, prior to 1992, have you ever worked
10   on any other homicides?
11        A     I'm sure I did.  I just don't recall.
12        Q     Okay.  After -- between 1983 and 1992, how
13   often were homicides occurring in Meade County?
14        A     From '82 to '83, you said?
15        A     To '93.  I'd say about ten years.  '80 --
16   let's do '83 to -- let's do '82 to '92.  Okay.  I'm
17   sorry.  I'm confusing myself over here.  So let me ask a
18   better question.  From 1982 to 1992 when Warford
19   happened, about how often were homicides occurring in
20   Meade County?
21        A     It wasn't something happening every day, but
22   there was -- there was a few.
23        Q     Okay.  Was it -- I mean, would you agree that
24   Meade County was a pretty safe community?
25        A     Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Yeah.  Would you agree that murders weren't
2  happening in Meade County regularly?
3     A    Not in Meade -- far as Meade County, that's a
4  -- that's a hard question to answer.  The people in
5  Meade County, you're right, but there was a lot dropped
6  off.  Like, we -- we're close to Fort Knox.  You'd find
7  several bodies through the years, and I don't know how
8  many, would be dropped off.
9     Q    Wow, so people were -- prior to 1992, people
10  were committing murders and leaving the bodies in Meade
11  County?
12     A    That happened -- that happened a few times.
13     Q    Wow.
14     A    We joined the reservation.
15     Q    What does that mean?
16     A    Fort Knox.
17     Q    Okay.
18     A    And then, of course, you get the -- you get
19  the jurisdiction of it, you know.  You get the body.  But
20  as far as Meade County, no.  There wasn't that many
21  murders, but a lot of drop offs, I call them.
22     Q    A lot of drop offs.  How -- were you able to -
23  - was your department able to solve a lot of those?
24     A    State police usually handled all murders --
25     Q    Okay.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     -- in Meade County at that time.

2      Q     Okay.  Prior to the Warford investigation in

3  1992, from the time you were hired in 1982, would you

4  agree with me that the Meade County Sheriff's Department

5  was not responsible for investigating homicides in Meade

6  County?

7      A     If there was a state police detective

8  available, no.

9      Q     Yeah.  And from -- so you would agree with me,

10  correct?

11      A     Yes.

12      Q     Okay.  And from 1982 to 1992, can you think of

13  a single homicide investigation that Meade County took

14  the lead on?

15      A     I'm sure there is, but I can't recall.

16      Q     Sitting here today, you can't recall one,

17  right?

18      A     No.

19      Q     Is that right?

20      A     I can't.

21      Q     Okay.  Prior to 1992 when the Warford

22  investigation happened, how many homicide investigations

23  have you personally been involved in investigating?

24      A     I can't recall.

25      Q     Okay.  Aside from the Bradenburg one which you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

87

1    described some limited involvement earlier, the one that
2    Capps was a suspect in, can you think of a single other
3    homicide investigation that you participated in prior to
4    Warford?
5         A    The only one that I can remember in -- because
6    I knew the lady.  A lady was killed at one of the local
7    taverns, and I was with a state trooper when we get the
8    call, and we arrested him.  I have limited on that, you
9    know.  Anything I did back then was limited.
10        Q    Would that have been in the 1980s?
11        A    No.  It'd have been the '90s somewhere.
12        Q    Okay.  Was that before or after --
13        A    Late '80s/early '90s.
14        Q    Okay.  So that was before Warford, correct?
15        A    Yes.  It was.
16        Q    Okay.  Do you recall what responsibilities you
17   had in that investigation?
18             MR. BOND:  Are you talking about the one at the
19        tavern?
20             MR. SLOSAR:  Yeah.
21             MR. BOND:  Okay.
22        A    During the arrest.  Well, I actually arrested
23   him.
24   BY MR. SLOSAR:
25        Q    Were you there -- did you arrest that person

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 88 of 279 PageID #: 28421
The Deposition of CLIFFY WISE, taken on July 11, 2019

88

1    with the assistance of KSP?

2        A    I was riding with the trooper, and the call

3    came in.  We happened to be right -- right in front of

4    the tavern when he went out the door with a gun.

5        Q    Okay.

6        A    So I arrested him, and that's all I had

7    involved.

8        Q    You had no choice but to be involved in that

9    investigation given where you were?

10       A    No choice.

11       Q    All right.  Fair enough.  Prior to the Warford

12   investigation, can you recall a single time that you had

13   ever questioned a witness in a homicide investigation?

14       A    I would not.

15       Q    Okay.  And sitting here today, is it your

16   testimony that you do not believe that prior to the 1992

17   investigation into the death of Rhonda Warford that you

18   had ever questioned a witness in a homicide

19   investigation?

20       A    I would not.

21           MR. BOND:  Object to the form of the question.

22       Q    You can answer, sir.

23       A    I would not.

24       Q    Okay.  And in that same respect, is it fair to

25   say that prior to 1992, you had never questioned a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   suspect in a homicide investigation?
 2        A    I would not.
 3        Q    Yeah.  And when you say you would not, are you
 4   agreeing with me that prior to 1992 --
 5        A    Yes.
 6        Q    Okay.  All right.  Sorry.  I think I know what
 7   you mean.  I just want to make sure the transcript's
 8   clear.  Is it fair to say that prior to 1992 that you
 9   were not experienced in conducting homicide
10   investigations?
11        A    It would be true.
12        Q    So fair to say that prior to 1992, that you
13   weren't trained on how to conduct homicide
14   investigations?
15        A    True.
16        Q    Is it fair to say that prior to 1992 you had
17   never reviewed any policies or procedures that gave you
18   any guidance on how to conduct homicide investigations?
19        A    Not that I'm aware of.
20        Q    Okay.  That's --
21        A    True, yes.
22        Q    And is it fair to say that prior to 1992 you
23   had certainly never been the lead investigator in any
24   type of homicide investigation?
25        A    Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CLIFFY WISE, taken on July 11, 2019

90

```
 1        Q    Okay.  Is it fair to say that prior to 1992
 2   that you had never personally worked on a criminal
 3   investigation that involved a jailhouse informant?
 4        A    True.
 5        Q    Sir, I'm going to ask you some questions about
 6   just, like, different people you may have talked to over
 7   the years, okay?
 8        A    Uh-huh.
 9        Q    And one of the things that I want to caution
10   you about is when I ask you these questions, for
11   instance, on conversations you had with Sheriff Greer, I
12   only want to know the substance of the conversations you
13   had with these people when your lawyers weren't present,
14   okay?  So if your lawyers were with you and, you know,
15   at some restaurant or at their office talking with
16   Sheriff Greer, you just let me know that your lawyers
17   were there because none of us want to get into that,
18   okay?
19        A    Yes, sir.
20        Q    What I want are conversations you had with
21   people outside the presence of your counsel, okay?
22        A    Yes, sir.
23        Q    Okay.  Now, after Mr. Clark and Mr. Hardin
24   were convicted in March of 1995, did you have a
25   conversation with Sheriff Greer?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

91

```
 1        A     After?

 2        Q     Yeah.

 3        A     I probably did but just don't recall.

 4        Q     Yeah.

 5        A     I'm sure we did talk, but I just don't recall

 6   what about.

 7        Q     Yeah.  Did you ever tell Sheriff Greer that

 8   you weren't sure if they really did it?

 9        A     Not that I recall.

10        Q     Okay.  Did Sheriff Greer ever tell you that he

11   wasn't sure that they really did it?

12        A     No.  He never did.

13        Q     Now, after Mr. Clark and Mr. Hardin went to

14   trial and were convicted in 1995, did you ever have any

15   conversations with officers from the Louisville Police

16   Department about the Warford case?

17        A     No.

18        Q     Okay.  And aside from participating in some

19   search warrants and the limited investigation you had in

20   this case, do you recall ever having any conversations

21   with members of the Louisville Police Department prior

22   to the trial in 1995?

23        A     No.

24        Q     Okay.  So, for instance, you don't recall ever

25   having any conversations with Mark Handy prior to trial,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   correct?

 2       A    No, sir.

 3       Q    And I know earlier you testified that he may

 4   have been there at the search warrant, but you don't

 5   recall anything specifically between you and him; is

 6   that right?

 7       A    True.

 8       Q    Okay.  And after the 1995 trial, have you had

 9   any conversations with Mark Handy or any of the other

10   officers who worked on this case from the Louisville

11   Police Department?

12       A    Maybe Lieutenant Sherrard.  And I just don't

13   remember when that was, but I have talked to him several

14   times about other cases.

15       Q    Okay.

16       A    I always thought he was an excellent detective

17   and chief of police.

18       Q    All right.  So you're a big fan of Lieutenant

19   Gene Sherrard?

20       A    Yes, sir.

21       Q    And he used to be chief, right?

22       A    He was chief.

23       Q    Were you both chiefs at the same time?

24       A    Sir?

25       Q    Were you both chiefs at the same time?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A     Yes.

2      Q     Yeah.  All right.  Maybe see him at the

3  chief's conference?  There's the annual chief

4  conference.

5      A     I probably have.  I just don't recall.

6      Q     Okay.  All right.  Tell me about the first

7  time you remember speaking to Lieutenant Sherrard about

8  the Warford case.

9      A     The day of the search warrant is the first

10  time I ever met him.

11      Q     Okay.  And that's because Lieutenant Sherrard

12  was present for the searches, correct?

13      A     I believe he was a lieutenant at that time,

14  yes.

15      Q     Yeah.  And what do you recall about that

16  conversation?

17      A     I don't recall a conversation.  I just met him

18  at that search warrant.

19      Q     Okay.  After meeting Lieutenant Sherrard at

20  the search warrants, and this would've been in May of

21  1992.  Does that seem right to you?

22      A     That seems right, yes.

23      Q     Okay.  After seeing Lieutenant Sherrard at the

24  search warrants, did you ever have any additional

25  conversations with him about the case?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

94

1     A     No, sir.

2     Q     Okay.  Is there anybody else that you recall

3  speaking to from the Louisville Police Department about

4  this case?

5     A     No, sir.

6     Q     And how about Meade County?  Have you ever

7  talked to Mr. Adams before trial about the substance of

8  the Warford investigation?

9     A     Probably did.  But I just don't recall

10  anything.

11     Q     You don't have any notes or anything that

12  would refresh your memory, right?

13     A     No, sir.

14     Q     Okay.  What about after trial?  You talked to

15  Mr. Adams at all about this case?

16     A     I could have.  He was a real good friend of

17  mine, so we probably did talk, but...

18     Q     No specific recollection, though, right?

19     A     No.  None.

20     Q     When's the last time you spoke to Sheriff

21  Greer outside the presence of your counsel about the

22  Warford case?

23     A     Yesterday.

24     Q     What did you and Sheriff Greer talk about

25  yesterday?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

95

```
 1        A    I seen him at the Ford dealership getting his
 2   car worked on and just told him I was set up for a
 3   deposition.  He said, "Good luck," and that's about it,
 4   you know.
 5        Q    What was wrong with his truck?
 6        A    I don't know why he was there.  He just -- he
 7   was just there.
 8        Q    He has a truck, right?
 9        A    I think so.
10        Q    Yeah.
11        A    I think you're right.
12        Q    Now, that was a guess by me, but I assumed
13   that Sheriff Greer would be driving around in a truck,
14   but...
15        A    He trades so often, I -- I mean, he did have a
16   truck, so...
17        Q    What -- how did he seem when he talked to you
18   yesterday?
19        A    He's frail.  He can't hardly get around.
20        Q    How long has he been sick like that?
21        A    Joe's been sick a few years now.
22        Q    Do you know whether he has been diagnosed with
23   anything?
24        A    I don't know what, but there's several things
25   wrong with him right now.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Yeah.

2      A    He's got some heart trouble, COPD, maybe.  I -

3  - he's got several things wrong with him.

4      Q    Okay.  How about around the time -- when was

5  the first time you found out that the DNA testing was

6  done in this case?

7      A    I don't know -- I don't know about anything

8  -- any DNA.

9      Q    Before today, has anybody ever told you that

10  DNA excludes Keith Hardin and Jeff Clark from

11  contributing the hairs found on the body?

12     A    Have not.

13     Q    No.  You never knew that?

14     A    Nobody's talked to me.

15     Q    Nobody.  Nobody ever told you that?

16     A    No.

17     Q    When -- have you ever read through the

18  complaint that was filed in this case?

19     A    I don't recall.  I might have read a little

20  bit.  Whatever the attorney gave me, I read --

21     Q    Yeah.

22     A    -- but I don't recall anything on it.

23     Q    I will admit it is probably too long of a

24  document, so I wouldn't blame you if you didn't read the

25  whole thing.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 97 of 279 PageID #: 28430
The Deposition of CLIFFY WISE, taken on July 11, 2019

97

1      A     I didn't.  I can tell you.

2      Q     And I haven't seen a Cliff Notes version yet.

3  But -- so prior to today, you didn't know that DNA

4  excluded Keith Hardin and Jeff Clark from contributing

5  the hairs found on the body?

6      A     I did not.

7      Q     No.  And during the underlying investigation,

8  do you remember the hairs coming into the -- into play,

9  per se?

10     A     I do not.

11     Q     No.  You --

12     A     No, sir.

13     Q     During -- prior to trial --

14     A     I had a very limited part of this deal.

15     Q     Okay.

16     A     I sat in on a couple of interviews or, you

17  know, just very limited.  I had more to do than -- my

18  job was pretty hard back then.

19     Q     Yeah.  You had a lot of responsibilities,

20  though, right?

21     A     I had a lot of responsibility.

22     Q     Yeah.  Do you recall participating in some

23  interviews with a person named Kevin Justice?

24     A     I don't remember sitting in on interviews, no.

25     Q     Well, maybe I characterized it the wrong way.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Do you recall meeting with Kevin Justice in the

2    underlying Warford investigation?

3         A    Was it '95?  Can --

4         Q    So we have a transcript from '95.

5             MR. BOND:  He's asked you if you remember.

6        Okay.  That's the question.

7         A    I just don't remember right now.

8         Q    You don't remember the exact years that you

9    would've met with him; is that right?

10        A    I just -- I don't remember.

11        Q    Let me ask you a better way.  Let's start way

12   back.  Prior to the Warford investigation, you knew who

13   Kevin Justice was, right?

14        A    Yes.

15        Q    Okay.  You had some prior run-ins with Mr.

16   Justice, right?

17        A    Yes.

18        Q    Not as many run-ins as you had with Mr. Capps

19   though, right?

20        A    Probably not.

21        Q    And in the Warford investigation, you became

22   aware that Sheriff Greer wanted to meet with Mr.

23   Justice; is that right?

24        A    Yes.

25        Q    Yeah.  And you became aware during the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 99 of 279 PageID #: 28432
The Deposition of CLIFFY WISE, taken on July 11, 2019

99

1  underlying investigations prior to trial that Mr. Greer

2  wanted to meet with Mr. Justice because of some

3  information that Cliff Capps had given him?

4       A   Yes.  I do --

5           MR. BOND:  Object to the form of the question.

6       Q   You can answer.

7       A   I do remember.

8       Q   Yeah.  And, in fact, after you learned this

9  prior to trial, you joined Sheriff Greer meeting with

10 Mr. Justice, correct?

11      A   Was it over another charge?  I think we met

12 with him over some gasoline being stolen.  That sticks

13 in my mind.  And then Joe told me that Mr. Justice would

14 not talk to him about anything.

15      Q   Okay.

16      A   But I can't remember the years or exactly who

17 was there.

18      Q   Do you remember Sheriff Greer ever telling you

19 that Mr. Justice had told him about a letter from Cliff

20 Capps?

21      A   I remember a letter, but I don't remember

22 exactly anything about it.

23      Q   Yeah.  Did Sheriff Greer ever tell you that he

24 got a hold of that letter?

25      A   No.  He didn't.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 100 of 279 PageID #: 28433
The Deposition of CLIFFY WISE, taken on July 11, 2019

100

1    Q    He didn't?

2    A    Not that I remember.

3    Q    Okay.  What do you remember about the letter?

4    A    I just remember a letter coming in during the

5    gasoline.  We was talking to him about some stolen

6    gasoline.

7    Q    Did -- and when you say "coming in," do you

8    mean he gave you a letter?

9    A    No.  Joe was asking him.  It's in my

10   affidavit.  I just can't remember exactly how it went

11   down.

12   Q    What do you remember about it?

13   A    I remember talking to Mr. Justice about some

14   stolen gasoline from stations, and he was just

15   uncooperative.  He wouldn't tell us anything.

16   Q    And  --

17   A    He never would.

18   Q    And were you and Sheriff Greer also trying to

19   question Mr. Justice about some information that Mr.

20   Capps had passed along?

21   A    I just don't recall.  I think so.

22        MR. BOND:  No.  That's not that question.  He

23   asked you if you remember.

24   A    I don't remember.

25   Q    And did you take any notes during that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     interview with Mr. Justice?

2          A     No.

3          Q     Did you ever create a report about that?

4          A     No.

5          Q     Okay.  Is it fair to say that you don't

6     remember one way or the other as to whether Mr. Justice

7     gave Sheriff Greer a letter in that meeting?

8          A     I do not.

9          Q     Okay.  So you're not denying that Mr. Justice

10    gave a letter?  You just don't recall?

11         A     I just don't recall.

12         Q     Okay.  And do you remember if Sheriff Greer

13    recorded that conversation?

14         A     I do not.

15         Q     Did you record that conversation?

16         A     No, sir.

17         Q     You remember that?

18         A     I remember that.

19         Q     If you recorded that conversation, would you

20    have maintained that as part of a file?

21         A     Yes.

22         Q     Now, the day that you and Sheriff Greer spoke

23    to Mr. Justice, that was down at the Breckinridge

24    Courthouse; is that right?

25         A     I never did go to Breckinridge County.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     Never went to Breckinridge?

2      A     No, sir.

3      Q     Okay.  Let me back up a little bit, okay?  We

4   talked a little bit about you knowing Mr. Justice and

5   Mr. Capps prior to the Warford investigation, correct?

6      A     Yes, sir.

7      Q     Fair to say that you also knew of a person

8   named James Whiteley prior to the murder investigation

9   into the death of Rhonda Sue Warford?

10     A     James who?

11     Q     Whiteley.

12     A     It doesn't ring a bell.

13     Q     Doesn't ring a bell?

14     A     No.

15     Q     Don't remember ever investigating Mr. Whiteley

16  for anything prior to 1992?

17     A     No, sir.

18     Q     Now, prior to 1992 but after you were hired in

19  1982, the Meade County Sheriff's Department had never

20  given you any formal training on how to interview

21  witnesses in a criminal investigation, correct?

22     A     Correct.

23     Q     They had never provided you with any formal

24  training on how to interrogate suspects in a criminal

25  investigation prior to 1992, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    Correct.

2       Q    Meade County Sheriff's Department had never

3  given you any formal training on what type of

4  information needed to be documented in a police report

5  prior to 1992, correct?

6       A    Correct.

7       Q    Have you ever investigated someone with a very

8  strange nickname of Plowboy prior to 1992?

9       A    I'm -- I don't recall.

10      Q    Doesn't ring a bell?

11      A    Plowboy?

12      Q    Don't ask me.  I'm just the messenger.

13      A    I don't recall.

14      Q    Okay.  I definitely don't know what that

15 represents.  Prior to 1992, you had never received any

16 training from the Meade County Sheriff's Department on

17 what type of information needed to be disclosed to

18 prosecutors in a criminal investigation, correct?

19      A    No, sir.

20      Q    Is that correct?

21      A    Yes.

22      Q    Okay.  Prior to 1992, you had never received

23 any training on whether you were required to document

24 promises made to witnesses in a criminal investigation,

25 correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1            MR. BOND:  Object to the form of the question.

 2            MR. ERVIN:  Object to the form.

 3   BY MR. SLOSAR:

 4       Q    You can answer.

 5       A    You've got to ask that again.

 6       Q    Prior to 1992, the Meade County Sheriff's

 7   Department had never provided you with any training to

 8   document when promises are made to witnesses in a

 9   criminal case, correct?

10            MR. BOND:  Object.  Excuse me.  Object to the

11       form of the question.  Go ahead and answer.

12       A    You can't make promises, so yes -- the answer

13   would be yes.  I was told not to do that, yes.

14       Q    You were told not to make promises to

15   witnesses?

16       A    Yes, sir.  You can't do it.

17       Q    When were you told not to make promises to

18   witnesses?

19       A    I mean, when you first start.  That's, you

20   know, first -- Joe Greer's first rule.  Don't make

21   promises you can't keep.

22       Q    Don't make promises you can't keep.

23       A    Yes.

24       Q    Okay.  Now, did Sheriff Greer -- back in 1992,

25   you had a relationship with Kenton Smith, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    With Cliff Capps?

 2      Q    Kenton Smith.

 3      A    Kenton Smith.  I'm sorry.

 4      Q    Yeah.  Yeah.

 5      A    Yes.

 6      Q    Okay.  And by relationship, you knew Mr. Smith

 7  as a Commonwealth Attorney, correct?

 8      A    Very well.

 9      Q    Yeah.  And if you wanted help on something,

10  would you go to Mr. Smith?

11      A    Good luck.

12      Q    What do you mean by that?

13      A    I would, but he's a straight up attorney. He's

14  a prosecutor.

15      Q    He didn't want to do it very much?

16      A    No.  He didn't want to make any -- he wouldn't

17  make any promises.

18      Q    Yeah.  Did you ever go to him to try to get

19  some promises fulfilled?

20      A    I've asked.

21          MR. BOND:  Object to the form of the question.

22      Q    Did you ask Mr. Smith prior to 1992?

23      A    I have.  Yes.

24      Q    Yeah.  Yeah.  So you knew prior to 1992 that

25  you can make promises to witnesses, but it was really up

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to the prosecutor to fulfill those promises, right?

2       MR. BOND:  Object to the form of the question.

3    A    Ask that again.

4    Q    Yeah.  So prior to 1992, if a witness said,

5  "Hey, Cliffy, can you help me with this, and I'll help

6  you with that," you knew that you would need the

7  Commonwealth Attorney to go along with something in

8  order for you to successfully fulfill that promise?

9    A    True.

10       MR. BOND:  Object to the form of the question.

11   Q    Yeah.  And on occasion prior to 1992, you had

12  actually went to Mr. Smith to see if he would fulfill a

13  promise made to a witness, correct?

14       MR. BOND:  Object to the form of the question.

15   A    I don't know if it was prior to '92, but I

16  have.

17   Q    Okay.

18   A    There was so many years there.  I just don't

19  know what year, but I have asked him, yes.

20   Q    Yeah.  Is it fair to say that when you asked

21  Commonwealth Attorney Smith to fulfill a promise, that

22  you didn't make any documentation of that?

23   A    No.

24   Q    Yeah.  Is that fair to say?

25   A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 107 of 279 PageID #: 28440
The Deposition of CLIFFY WISE, taken on July 11, 2019
107

1    Q    Yeah.  And is it fair to say that when you
2  originally would've made that promise to the witness,
3  that you wouldn't have written that down either?
4    A    I wouldn't have made a --
5        MR. BOND:  Object to the form of the question.
6    Go ahead and answer.
7    A    I wouldn't have made a promise.
8    Q    Okay.  Well --
9    A    I would tell him I would ask.  I wouldn't have
10  made it.
11   Q    I appreciate that.  Let me ask it in a better
12  way.  Prior to 1980 -- 1992, had you ever told witnesses
13  when you were investigating a criminal case that you
14  would see if you could help them?
15   A    See, you're getting in -- so many years went
16  by.  Prior to '92, I just don't know.  I can't recall.
17  But I have --
18   Q    Okay.
19   A    -- in the past.
20   Q    You've done that before with witnesses.  You
21  just don't remember when it started?
22   A    I don't know what years it was.
23   Q    Okay.  And when you would tell witnesses that
24  you would -- can see if you can do something to help
25  them out, is it fair to say that you wouldn't have

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

1    documented that information?

2        A    I would not.

3            MR. BOND:  Object to the form of the question.

4        He's answered.  Go ahead.

5        A    I would not.

6        Q    Okay.  And you wouldn't have documented that

7    type of information because you never received any

8    training from the Meade County Sheriff's Department

9    telling you that you did have to document that type of

10   stuff, right?

11           MR. ERVIN:  Objection to form.

12       A    True.

13       Q    Yeah.  Because if you received training

14   telling you to document -- I'm going to -- those types

15   of statements made to witnesses, then you would've done

16   what you were trained to do --

17           MR. BOND:  Object.

18       Q    -- correct?

19           MR. BOND:  Excuse me.  Object to the form of

20       the question.

21       Q    Is that right?

22       A    Ask it again.

23       Q    Yeah.  You wouldn't -- if you were trained to

24   document when you were telling witnesses that you can

25   see -- you would see what can be done, right, if you had

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    received any training telling you to document those

2    types of representations made to witnesses, you would

3    have followed that training and documented it, correct?

4        A    Yes.

5        Q    Yeah.  So the only reason why you would not

6    have documented those types of statements made to

7    witnesses is because you were never told that you had

8    to, correct?

9            MR. BOND:  Object to the form of the question.

10       Q    You can answer.

11       A    True.

12       Q    Yeah.  Because throughout your career as a law

13   enforcement officer, you did everything you could to

14   follow whatever training you were given; is that right?

15       A    Yes.

16       Q    And throughout your career as a law

17   enforcement officer, you did whatever you could to

18   follow whatever written policies or procedures were in

19   place at the Meade County Sheriff's Department, correct?

20       A    True.

21       Q    But before those written policies and

22   procedures were in place and before you ever received

23   any training, there was simply nothing for you to

24   follow, correct?

25           MR. ERVIN:  Objection.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 110 of 279 PageID #:
28443
The Deposition of CLIFFY WISE, taken on July 11, 2019
110

1            MR. BOND:  Object to the form of the question.

2    BY MR. SLOSAR:

3        Q    **You can answer.**

4        A    Well, there was but just not in writing.

5        Q    **Is that right?**

6        A    Yes.

7            MR. SLOSAR:  Let's take a little bit of a

8    break, okay?  Is that okay?  You up for a break?

9            THE WITNESS: Fine.

10            VIDEOGRAPHER:  The time is 12:05.  We're off

11    the record.

12                    (OFF THE RECORD)

13            VIDEOGRAPHER:  The time is 12:24.  We're back

14    on the record.

15    BY MR. SLOSAR:

16        Q    **All right.  Sir, prior to 1992 and the Warford**

17    **investigation, had you ever had any interactions with my**

18    **client, Jeff Clark?**

19        A    No.

20        Q    **Okay.  Have you ever investigated him for any**

21    **crime?**

22        A    No.

23        Q    **To your knowledge, have you ever had a**

24    **conversation with him about anything?**

25            MR. BOND:  Prior to '92?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

```
 1        Q    Prior to '92.  Sorry.

 2        A    No.

 3        Q    Okay.  Fair to say that prior to 1992 you

 4   didn't have any opinions of Mr. Clark one way or the

 5   other; is that right?

 6        A    No.

 7        Q    That correct?

 8        A    Still don't.

 9        Q    Okay.  Still don't.  All right.  And with

10   respect to Mr. Hardin, who's not physically here, did

11   you know him prior to 1992?

12        A    Not prior.  No.

13        Q    No.  Okay.  Never arrested him to your

14   knowledge for any crime; is that right --

15        A    No, sir.

16        Q    -- prior to 1992?  Okay.  And did you have any

17   opinions of Mr. Hardin prior to 1992?

18        A    No, sir.

19        Q    Do you have any opinions of him today?

20        A    No.

21        Q    Okay.  Now, we talked about some witnesses

22   earlier, so I'm going to cross some of these people off

23   here.  Did you -- prior to the Warford investigation,

24   did you know of a woman by the name of Amy Remsburg?

25        A    I've heard the name.  I just can't remember
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   how I knew her.  Yes.  I have -- I know the name.
 2        Q    Okay.  Did she come up in any past criminal
 3   investigations prior to the Warford one, to your
 4   knowledge?
 5        A    I just don't recall.
 6        Q    If you recall how you met or knew of Ms.
 7   Remsburg at any point in the deposition, will you just -
 8   - will you let me know?
 9        A    I will.
10        Q    Give me a holler?
11        A    Yes.
12        Q    All right.  Now, what about the victim's
13   sister in this case, a woman by the name of Michelle
14   Rogers?  Did you know her prior to the Warford
15   investigation?
16        A    No, sir.
17        Q    Now, did you know Rhonda Warford prior to her
18   death?
19        A    No, sir.
20        Q    Yeah.  Never heard of her prior to this
21   investigation?
22        A    No, sir.
23        Q    During the course of the --
24        MR. SLOSAR:  And, you know, let me withdraw
25     that question.  I should've asked:  Are the people
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          in New York on the phone?

2                 MS. HOFFMAN:  Yes, this is Anna Hoffman.

3                 MR. SLOSAR:  I'm sorry, Anna.  I just want to

4          make sure that we didn't lose you guys.  I'm going

5          to do better on checking to make sure of that before

6          we go on the record, so sorry about that.

7                 MS. HOFFMAN:  No problem.  I have it on mute so

8          I don't bother anybody.

9                 MR. SLOSAR:  Sure.

10    BY MR. SLOSAR:

11         Q    All right.  Sir, you testified a little bit

12    earlier today that in May of 1992 that you were involved

13    or were present when some search warrants were served;

14    is that right?

15         A    Yes.

16         Q    Okay.  And, I guess, served probably isn't a

17    good word on my part.  They were executed; is that fair?

18         A    Yes.  Yes, sir.

19         Q    Okay.  And at that time, were you the chief

20    deputy still at the Meade County Sheriff's Department?

21         A    Yes, sir.

22         Q    And do you recall testifying at Mr. Clark's

23    trial on March 2, 1995?

24         A    I know I did.  I just don't recall it.

25         Q    Okay.  That's fair.  Let me hand you what

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   we'll mark as  Exhibit 11 if we're going consecutive.

2   Although, it's difficult for me.  Exhibit 11.  This is a

3   transcript.

4              (EXHIBIT 11 MARKED FOR IDENTIFICATION)

5            MR. BOND:  Is that the entire transcript?

6            MR. SLOSAR:  It's his --

7            MR. BOND:  That's what I meant.  I meant his.

8            MR. SLOSAR:  Yeah.  Yeah.

9            MR. BOND:  I meant his testimony.

10  BY MR. SLOSAR:

11       Q    Fortunately for all of us, Mr. Wise, and the

12  copy machine, your testimony was very short.

13            MR. SLOSAR:  Can you pass it around?  I think

14       we're going to need some on this side, too.

15            MR. BOND:  We got a copy.  You've got a copy,

16       right?

17  BY MR. SLOSAR:

18       Q    And, sir --

19            MR. BOND:  Does somebody need one?

20       Q    All right.  So we're going to mark this as

21  Exhibit number 11.  Mr. Wise, did you have a chance to

22  meet with your lawyers prior to this deposition?

23            MR. BOND:  You can answer that.  You can say

24       yes or no.

25       A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1          Q     Yes.

 2                MR. BOND:  Okay.

 3          Q     And I'm going to give you a warning -- not a

 4    warning but just cautionary instruction.  I don't want

 5    to know what you-all talked about.  What I am going to

 6    ask you is about some documents that you reviewed prior

 7    to testifying, okay?

 8          A     Yes.

 9          Q     Okay.  How many times did you meet with your

10    lawyers to prepare for today's deposition?

11          A     I believe two.

12          Q     Okay.  And when was the last time?

13          A     I don't remember.  That's awful, but I just

14    -- we --

15          Q     Sometime this year?

16          A     Yes.

17          Q     Okay.

18          A     Oh, yeah.  It's -- it's been -- I lose track

19    of time.  It's a couple of weeks ago, maybe.  But it was

20    lately.

21          Q     Was Sheriff Greer present for that?

22          A     No.

23          Q     Okay.  And about how long did that meeting

24    last?

25          A     Well, the meeting itself didn't last long. We

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

1    talked a few minutes afterwards.  Probably a half- hour.

2    It was -- it was short.

3        Q    Did you look at any documents when you were

4    there?

5        A    Yes.

6        Q    Yeah.  And what do you remember looking at?

7        A    The affidavit and I just don't remember.

8        Q    Did you look at any police reports?

9        A    No.

10       Q    That affidavit that you're referring to, is

11   that the Kenton Smith drafted for you in 1995?

12       A    Do you have that affidavit where I can look at

13   it?

14       Q    I do, and I'm going to give it to you a little

15   bit later.

16       A    Yeah.

17       Q    So I will give it to you.  But my question

18   isn't about the substance of it, but isn't it true that

19   the Commonwealth Attorney Kenton Smith wrote that

20   affidavit out for you?

21           MR. BOND:  Object to the form of the question.

22       Q    Typed that affidavit out for you in 1995?

23           MR. BOND:  Object to the form of the question.

24       Go ahead and answer.

25       A    I just don't remember.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 117 of 279 PageID #:
28450
The Deposition of CLIFFY WISE, taken on July 11, 2019

117

```
 1        Q    Okay.  Were you -- do you recall meeting with
 2   Kenton Smith prior to signing that affidavit?

 3        A    I don't recall.

 4        Q    Okay.  Were you using a computer to type up

 5   documents back in 1995?

 6        A    No.

 7        Q    Okay.  So you didn't personally type that

 8   affidavit, correct?

 9        A    Correct.

10        Q    Okay.  And sitting here today 24 years later,

11   you just don't recall who exactly was responsible for

12   typing it up for you, correct?

13        A    No.

14        Q    And do you have any independent recollection

15   of any of the conversations that you had with Mr. Smith

16   prior to that affidavit being drafted out for you to

17   sign?

18             MR. BOND:  Let's think a second.  Okay.  Don't

19        answer.  Here's what I'm struggling with.  That's in

20        the context of the prosecution.  He was a witness

21        for the Commonwealth.  He was the Commonwealth

22        Attorney.

23             MR. SLOSAR:  There's no privilege.

24             MR. BOND:  Well, I just want to act cautiously,

25        okay.  Give me a second, okay.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

118

1          MR. SLOSAR:  If you want to take a break, too.

2          MR. BOND:  No.  No.  I don't have to think that

3     long.  I just -- okay.  Go ahead and answer the

4     question.  Go ahead and answer the question.

5    A   Ask it again.

6          MR. BOND:  I apolog -- no.  You're fine.

7  BY MR. SLOSAR:

8    Q   Sitting here today 24 years later, fair to say

9  that you don't recall the person who is responsible for

10  drafting that affidavit back in March of 1995 for you to

11  sign?

12         MR. BOND:  Object to the form of the question.

13    Go ahead and answer it.

14    A   I do not.

15    Q   Okay.  You didn't draft that affidavit,

16  correct?

17         MR. BOND:  Object to the form of the question.

18    A   I do not know.  I -- I -- I don't know.

19    Q   Well, you weren't typing out -- you weren't

20  using the computer to type documents back in 1995,

21  correct?

22    A   Correct.

23    Q   Okay.  So you -- because you were not using a

24  computer to type out documents, is it fair to say that

25  you did not type out that document in March of 1995?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, Taken on July 11, 2019

119

```
 1        A     That'd be true.
 2        Q     Okay.  Now, I'm going to ask you again if you
 3   remember at any point in time today who actually typed
 4   that document out for you or who drafted that for you
 5   just let us know, okay?
 6        A     Okay.
 7              MR. BOND:  Object to the form of that question.
 8              MR. SLOSAR:  Okay.
 9              MR. BOND:  Okay.
10   BY MR. SLOSAR:
11        Q     All right.  So aside from the affidavit, are
12   there any other documents that you recall reviewing in
13   preparation for today's deposition?
14        A     The affidavit I reviewed a little bit, but no,
15   I didn't really review the rest of it to be honest.
16        Q     Okay.  Yeah.  Do you recall if you were
17   provided other documents that you just didn't review?
18        A     Yes.
19        Q     And do you recall what those documents were?
20        A     I can't recall.
21        Q     Okay.  Did you recycle those documents at
22   least?
23        A     Sir?
24        Q     Do you recycle them?
25        A     No.  In fact, I've still got them.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 120 of 279 PageID #: 28453
The Deposition of CLIFFY WISE, taken on July 11, 2019
120

1      Q    Okay.  All right.  I was just joking with you.

2      A    No.

3      Q    All right.  Let's talk a little bit about this

4  transcript, sir.  I know in Kentucky they do things on

5  video in court, and so we had that court proceeding

6  transcribed, so that's what you're looking at here,

7  okay?

8      A    Okay.

9      Q    Okay.  Do you remember testifying back at the

10  criminal trial for Jeff Clark and Keith Hardin in March

11  of '95?

12      A    This says I did.

13      Q    Okay.  And I know that you don't remember the

14  specific date, but do you remember testifying there?

15      A    I truthfully don't.

16      Q    Okay.

17      A    This says I did.  I'm sure I did.  But I just

18  don't remember.

19      Q    Why don't you take a few minutes, sir, and

20  review the transcript?  And then I just want to ask you

21  some questions to see if your recollection is refreshed

22  after reviewing it, okay?  It's incredibly short.  I

23  think it's about four or five pages.  So just let me

24  know when you're done, and we can move forward, okay?

25      A    Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 121 of 279 PageID #: 28454
The Deposition of CLIFFY WISE, taken on July 11, 2019
121

1        Q     Did you get a chance to read that, sir?

2        A     Pretty much.

3        Q     Okay.  Your testimony is pretty short, right?

4        A     Yes.

5        Q     Yeah.  Now, I want to -- does that refresh

6   your recollection as to whether you testified at trial

7   in 1995?

8        A     Yes.

9        Q     Okay.  And you testified at Mr. Clark and Mr.

10  Hardin's trial, correct?

11       A     Yes, sir.

12       Q     Okay.  Now, sir, you test -- isn't it true --

13  well, let me withdraw that question.  Did you testify on

14  March 2, 1995 that you executed a search warrant at Jeff

15  Clark's residence?

16       A     I was with LPD.

17       Q     Sure.  But --

18       A     But I was there at the, yes, execution.

19       Q     Okay.  And you testified to that effect at

20  trial, right?

21       A     Yes, sir.

22       Q     Okay.  And at trial, you testified that you

23  were able to identify a number of items that were seized

24  from Mr. Clark's home, correct?

25       A     Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      Q    Okay.  And I believe you testified that you

2    recall seeing some knives and a display case; is that

3    right?

4      A    Yes, sir.

5      Q    Okay.  Now, fair to say that you gave limited

6    testimony about what you saw during the execution of the

7    search warrants from May of 1992?

8           MR. BOND:  Object to the form of the question.

9      Q    You can answer.

10          MR. BOND:  The testimony speaks for itself.

11     A    Ask it again.

12     Q    Okay.  Is it fair to say that your testimony

13   was pretty limited about what you saw during the

14   execution of the May '92 search warrants?

15     A    Yes, sir.

16     Q    Yeah.  And you were -- let me withdraw this.

17   Is it fair to say that you testified to whatever

18   personal knowledge you had of the execution of the

19   search warrants at trial?

20     A    Yes.

21     Q    And, sir, would you agree that it is important

22   to document steps taken in a criminal investigation?

23     A    Yes.

24     Q    Yeah.  And that's because as a law enforcement

25   officer you're responsible for investigating more than

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   one crime at a time, right?

 2        A     Yes.

 3        Q     And it's hard to remember everything when

 4   you've got so much going on, right?

 5        A     Yes, sir.

 6        Q     And as chief deputy at the Meade County

 7   Sheriff's Department in 1992, you had a lot of different

 8   responsibilities, right?

 9        A     Yes.

10        Q     Yeah.  And what were some of those

11   responsibilities aside from investigating criminal

12   cases?

13        A     Serving paperwork, patrol, domestics, just

14   complaints from the dispatch, which was a lot.

15        Q     What was  like -- you know, how -- in 1992,

16   what type of hours were you putting in on a weekly

17   basis, generally?

18        A     60, 70.

19        Q     Yeah.

20        A     A lot.

21        Q     Did your family ever tell you you need to work

22   a little bit less and be home more?

23        A     Oh, yeah.  Cost me a marriage.

24        Q     Oh, I am sorry to hear that, Mr. Wise.  But

25   you were working so much that you knew that it was
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 124 of 279 PageID #: 28457
The Deposition of CLIFFY WISE, taken on July 11, 2019
124

1   important to document steps taken because you just might

2   not remember stuff later on, right?

3       A    True.

4       Q    And would you agree that it's important to be

5   accurate in documenting the investigative steps taken in

6   a criminal investigation?

7       A    Yes.

8       Q    And especially during the recovery of evidence

9   in a homicide investigation, correct?

10          MR. ERVIN:  Objection to form.

11      A    Yes.

12      Q    Would you agree that it's important to

13  document evidence recovered in a homicide investigation?

14      A    Yes.

15      Q    Okay.  And you knew that back in 1992,

16  correct?

17      A    Yes.

18      Q    Now, I'm going to show you what we'll mark as

19  Exhibit 12.

20          MR. SLOSAR:  Here's a copy for you, a copy for

21      you, one for me.

22      Q    For the record, this is Bates LMPD693-697.

23  Will you review that, sir, and just let me know when

24  you're done reviewing it.  I'll have some questions for

25  you, okay?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1              (EXHIBIT 12 MARKED FOR IDENTIFICATION)

 2      A    Okay.

 3      Q    Did you get a chance to review that exhibit,

 4   sir?

 5      A    Uh-huh.

 6      Q    Is that a "yes"?

 7      A    Yes.

 8      Q    Okay.  And would you agree with me that this

 9   search warrant appears to be in relation to a search of

10   a residence that Keith Hardin had occupied in 1992?

11      A    Yes.

12      Q    Okay.  And was this search warrant related to

13   the investigation into the death of Rhonda Sue Warford?

14      A    Yes.

15      Q    Okay.  And from looking at the first page of

16   the search warrant, are you able to determine the name

17   of the officer who completed it?

18      A    Detective Jim Clark.

19      Q    Okay.  So you did not complete this search

20   warrant, correct?

21      A    No.  I did not.

22      Q    Okay.  Now, on the second page for you because

23   yours is single-sided, it's got LMPD694 at the bottom;

24   is that right?

25      A    Yes, sir.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Okay.  And according to the second page, do

2    you see where it has the items that were seized by

3    Officer Ed Lynn on May 5, 1992 as a result of the search

4    warrant?

5     A    I do see that.  Yes.

6     Q    Okay.  And was that a search that you were

7    present at, sir?

8     A    I was present, yes.

9     Q    Okay.  And to your knowledge, was Mr. Ed Lynn

10   the detective responsible at the search for documenting

11   the information recovered?

12    A    Yes, sir.

13    Q    Okay.  And this is a search that you

14   participated in as well; is that right?

15    A    Yes.

16    Q    Okay.  And looking at -- and is it fair to say

17   that the handwritten documentation of what was actually

18   recovered at the search that that would be the most

19   accurate in terms of what was actually discovered?

20    A    Yes.

21    Q    Okay.  And that's because this information was

22   being written down at the search itself, right?

23    A    Yes, sir.

24    Q    Okay.  Now, do you remember having any

25   conversations with Detective Ed Lynn when you were at

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    the search?

2         A    No.

3         Q    Okay.  Do you recall seeing him there?

4         A    Yeah.  I'm sure I did.  I just -- I don't

5    recall at all.

6         Q    Okay.  There were a number of Louisville

7    police officers there; is that right?

8         A    There were several.

9         Q    Yeah.  Now, according to the handwritten

10   document, what items were recovered from the bathroom

11   ceiling over the sink by Lieutenant Sherrard?

12        A    Gun belt with .22 caliber ammunition.  I

13   really don't know.  It just says here -- it's all in a

14   line.  I don't know exactly what was found.  Am I

15   reading it wrong?

16        Q    Let me as you the question in a different way,

17   sir.  When you were conducting a -- when you were

18   participating in the search, did you go through the

19   different rooms in the residence?

20        A    With -- with one of the officers, yes.

21        Q    Yes.  Okay.  When you were going through those

22   rooms, did you ever see any satanic catalogs or

23   magazines?

24        A    I just -- I don't remember personally, no.

25        Q    And if you had seen something like that,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that's probably something you'd remember, right?

2       A    I just don't know.  I don't -- I don't

3    remember.

4       Q    But you have no recollection of ever seeing

5    any items relating to satanic beliefs when you were

6    executing the search, correct?

7       A    It says here, but I don't remember.  Just no.

8       Q    You have no memory of that?

9       A    No.

10      Q    You never -- you have no memory of ever seeing

11   anything like that during the search, correct?

12      A    No, sir.

13      Q    Now, according to your trial testimony, you

14   were not the person who actually recovered any of this

15   evidence; is that right?

16         MR. BOND:  Object to the form of the question.

17      The testimony --

18         MR. SLOSAR:  Well, let me --

19         MR. BOND:  Okay.

20         MR. SLOSAR:  Let me withdraw the question.

21      That's fair.

22   BY MR. SLOSAR:

23      Q    You were not the officer responsible for

24   recovering any of the evidence from the May 5, 1992

25   search that took place at Mr. Hardin's residence; is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 129 of 279 PageID #: 28462
The Deposition of CLIFFY WISE, taken on July 11, 2019
129

1      that right?

2          A     True.

3              MR. BOND:  Object to form.  Let me object to

4      the form of the question.  He's answered it.  To

5      preserve the record.

6   BY MR. SLOSAR:

7          Q     And you have no idea sitting here today as to

8   whether Lieutenant Sherrard actually recovered any of

9   the evidence listed here, correct?

10             MR. ERVIN:  Object to the form.

11         A     I don't have any knowledge.

12         Q     For instance, you weren't with Lieutenant

13  Sherrard -- well, let me withdraw that question.  You

14  -- remember earlier you testified that you were with

15  another officer as you were going through the different

16  rooms?

17         A     Yes.

18         Q     Do you recall which officer you were with?

19         A     I do not.

20         Q     Okay.  At any point during that search, did

21  Lieutenant Sherrard ever show you any magazines or

22  catalogs related to satanism?

23         A     I don't remember.

24         Q     You have no memory of that ever occurring,

25  correct?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A    I don't remember.

2           MR. BOND:  Object to the form of the question.

3      Q    And you don't have any notes that would

4  refresh your memory, correct?

5      A    No, sir.

6      Q    After looking through these documents, it

7  still hasn't refreshed your memory, correct?

8      A    No, sir.

9      Q    All right.  And you never testified at trial

10  about seeing any satanic catalogs or magazines in the

11  Hardin residence, correct?

12     A    No.

13     Q    And you told the truth at trial, correct?

14     A    Yes, sir.

15     Q    You were under oath just like you're under

16  oath today, right?

17     A    Yes, sir.

18     Q    And you certainly wouldn't lie under oath,

19  correct?

20     A    Definitely not.

21     Q    Now, when you were going through the Hardin

22  residence, did you take any notes on what you actually

23  saw?

24     A    No, sir.

25     Q    After the search was conducted on May 5, 1992,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    did you ever draft any sort of investigative letter

2    documenting what you saw?

3        A    No, sir.

4        Q    Okay.  I want to show you -- now, do you

5    recall participating in a second search -- let me

6    withdraw that.  Do you recall participating on May 5,

7    1992 of the execution of a second search warrant?

8        A    We went to a residence, yes.

9        Q    Okay.  And that residence would've related to

10   Jeff Clark, correct?

11       A    Yes.

12       Q    Okay.  I'm going to show you what I'll mark as

13   Exhibit 13.

14            MR. SLOSAR:  Here you go, sir.

15            MR. BOND:  Thank you.

16            MR. SLOSAR:  Take one.

17   BY MR. SLOSAR:

18       Q    Sir, take a few minutes to review this,

19   however much time you need, and let me know when you're

20   finished.  I'll give you a hint that I'm mainly going to

21   be asking you about the last page.

22            (EXHIBIT 13 MARKED FOR IDENTIFICATION)

23            MR. BOND:  Is his single or double?

24            MR. SLOSAR:  His is single.

25            MR. BOND:  Do you want him to read the whole



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    thing or just focus on the last page?

2        MR. SLOSAR:  Yeah, no, he can -- I think if you

3    focus on the last page, but feel free to read it.

4        MR. BOND:  Well, he turned it immediately when

5    you referenced it is why I'm asking.

6        MR. SLOSAR:  I'm really only going to ask him

7    about the last page.

8        MR. BOND:  Okay.  Okay.  That's fine.

9    A    I'll go ahead.

10  BY MR. SLOSAR:

11    Q    You all right?  You ready?

12    A    Uh-huh.  Yes.

13    Q    Okay.

14        MR. BOND:  Elliot, just for the record, please,

15    LMPD714, please.

16        MR. SLOSAR:  I appreciate that.  Sorry about

17    that.

18        MR. BOND:  Okay.  Thank you.

19  BY MR. SLOSAR:

20    Q    Now, before I ask you about the last page, let

21  me just ask you a very basic question about the first

22  page, sorry.  I knew -- after -- I knew after I said

23  that I was going to mess it up.  Sir, looking at the top

24  of the first page, were you the affiant who completed

25  the affidavit for this search warrant?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

133

1      A     Sir?

2      Q     Were you the affiant who completed the search

3  warrant?

4      A     No.

5      Q     Okay.  Who was that?  It's at the top.

6      A     Yeah, James Clark.

7      Q     Okay.  And that's an LPD officer, correct?

8      A     Yes, sir.  A detective.

9      Q     Okay.  Let's go back to that last page, sir.

10  Now, according to the last page, was there a search

11  executed on May 5, 1992 around 7:45 that day?  There's

12  no indication whether it's a.m. or p.m.  Do you remember

13  participating in a search May 5, 1992 at a residence

14  that was linked to Jeffery Clark with the address being

15  4519 Cod Drive in Louisville?

16     A     Yes.

17     Q     Okay.  And, again, at that residence, did you

18  have the ability to walk around and search the rooms?

19     A     With another officer.

20     Q     Okay.

21     A     An LPD officer.

22     Q     Do you remember which LPD officer?

23     A     I don't remember.

24     Q     Was -- do you know whether that officer was

25  Lieutenant Sherrard?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

134

```
 1        A     I don't remember.

 2        Q     Do you know whether that officer was Detective

 3   Sang?

 4        A     I just don't remember.

 5        Q     Okay.  But you would not have been searching

 6   the house or the residence with Deputy Wood because he

 7   was from Meade County, correct?

 8        A     Yes.

 9        Q     Okay.  And your recollection is that you were

10   joining the search team and that you were walking

11   through the residence with an LPD officer?

12        A     Yes, sir.

13        Q     Okay.  Now, do you have a specific

14   recollection of anything that was -- well, let me

15   withdraw this.  Bad question.  You testified at trial

16   that there were some knives that you saw in a display

17   case --

18        A     Yes, sir.

19        Q     -- at Mr. Clark's residence; is that right?

20        A     Yes.

21        Q     And to this day, do you remember those knives

22   being in a display case when you searched the residence?

23        A     Yes.

24        Q     Okay.  Now, were you with Lieutenant Sherrard

25   -- I'm going to go top to bottom, okay?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Okay.

2    Q    Were you with Lieutenant Sherrard when he

3  searched the basement bedroom and found three pairs of

4  blue jeans?

5    A    I don't recall.

6    Q    Okay.  Were you with Detective Sang when he

7  found one pair of denim jacket, one pair of brown cowboy

8  boots, and one pair of green coveralls on the back porch

9  west of the rear door?

10    A    I don't recall.

11    Q    Were you with Detective Sang when he found one

12  folding --

13    A    Lock blade knife.

14    Q    -- lock blade knife on the back porch on a

15  table?

16    A    No, sir.

17    Q    Were you with Detective Sang when he located a

18  notebook from the northwest basement bedroom?

19    A    I don't remember any of them.

20    Q    Okay.  Were you with Detective Ed Lynn when he

21  found a pair of blue jeans in the northeast basement

22  bedroom?

23    A    I don't remember.

24    Q    Were you with deputy -- well, we already

25  talked about Deputy Wood.  You were not conducting the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   search with Deputy Wood, correct?

2        A    We -- we could've been together, but there

3   would've been an LPD officer there, too.

4        Q    Okay.

5        A    They did all the work.  We were just watching.

6        Q    Okay.  But you don't have any specific

7   recollection of the items recovered from Mr. Clark's

8   residence; is that right?

9        A    No, sir.

10       Q    Okay.  And, again, this document would've been

11  the most accurate documentation of what was recovered

12  from Mr. Clark's residence on May 5, 1992; is that

13  right?

14       A    Yes.  It would have been.

15            MR. BOND:  Object to the form of the question.

16       Q    And that's because it would've been drafted

17  contemporaneously with the search, correct?

18            MR. BOND:  Object to the form of the question.

19       Q    You can answer.

20       A    Yes.  It would.

21       Q    Sir, when you were present for the search of

22  Mr. Clark's residence on May 5, 1992, you did not

23  testify about any satanic items being recovered at his

24  residence; is that right?

25       A    Correct.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    And, likewise, you've never testified as to

2    you seeing any items relating to satanic worship at Mr.

3    Hardin's residence when you participated in that search

4    on May 5, 1992, correct?

5    A    Correct.

6    Q    Were you present when photographs were taken

7    of the different rooms of -- during the two searches on

8    May 5, 1992?

9    A    I don't remember.

10   Q    Okay.  Did you personally take any photographs

11   when you were assisting on the searches?

12   A    No, sir.

13   Q    Okay.  And when you participated in the

14   execution of a search warrant on Jeff Clark's trailer on

15   May 5, 1992, you did not see the recovery of any satanic

16   materials, correct?

17        MR. BOND:  Objection.  Asked and answered twice

18   already.

19   Q    You can answer.

20   A    I just don't remember.

21        MR. BOND:  Go ahead and answer again.

22   A    I don't remember.

23   Q    And you don't have any notes or investigative

24   reports that would indicate that any such materials ever

25   existed at Mr. Clark's residence, correct?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

138

```
 1    A    No, sir.
 2    Q    Is that correct?
 3    A    Yes.
 4         MR. SLOSAR:  I'm going to take a short break,
 5    and I wonder if it might be a good time for lunch,
 6    like a short lunch break.
 7         MR. BOND:  I'll leave that up to Cliff..
 8         MR. SLOSAR:  I honestly think that I have maybe
 9    an hour.  So...
10         MR. BOND:  I'm sorry?
11         MR. SLOSAR:  Maybe an hour.  So if you want to
12    take, like, a half hour --
13         MR. KAMDANG:  I'm going to have questions, so
14    we should --
15         MR. ERVIN:  You're going to have questions as
16    well?
17         MR. KAMDANG:  Yeah.
18         MR. BOND:  I mean, we're going to have to go
19    around the table.  I don't care.  If you-all want to
20    take a lunch break, that's fine.  If Cliff wants to
21    take a lunch break, that's fine.  If he wants to
22    endure, that's fine, too.
23         MR. SLOSAR:  You want to keep going?
24         THE WITNESS:  It's up to you-all.  I'm here for
25    the day.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          MR. SLOSAR:  Let's take a little lunch break.
 2      We'll make sure --
 3          MR. BOND:  Okay.  That's fine.
 4          VIDEOGRAPHER:  The time is 1:01.  We're off the
 5      record.
 6                   (OFF THE RECORD)
 7          VIDEOGRAPHER:  The time is 2:02.  We're back on
 8      the record.
 9  BY MR. SLOSAR:
10      Q    All right.  Mr. Wise, we're in the home
11  stretch.  I want to switch gears a little bit.  Now, in
12  March of 1995, do you recall you and Sheriff Greer
13  taking a recorded statement from Kevin Justice?
14      A    I don't remember it.
15      Q    Okay.  I'm going to hand you what we'll mark
16  as Exhibit --
17          MR. BOND:  You want to take those from him?
18      Q    -- 14.
19          MR. SLOSAR:  Yeah.  As Lacee knows, I cannot
20      have possession of these.  Or else they will be
21      lost. Here you go, Mr. Wise.  Oh, thanks.  Thanks.
22      Thank you.  Here you go.  For the folks on the
23      phone, this is Meade County 973 to 978.
24          (EXHIBIT 14 MARKED FOR IDENTIFICATION)
25      A    Yes.  I do remember that day.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL Document 317-60 Filed 01/26/23 Page 140 of 279 PageID #: 28473
The Deposition of CLIFFY WISE, taken on July 11, 2019
140

1    BY MR. SLOSAR:

2        Q    Okay.  So March --

3        A    That date.

4        Q    On March 10, 1995, yourself -- you accompanied

5    Sheriff Greer to interview Mr. Justice; is that right?

6        A    At the Meade County Sheriff's Office.

7        Q    Yeah.  But you accompanied Sheriff Greer

8    there, correct?  I'm sorry, not there.  You were working

9    there.

10       A    Yes.

11       Q    You accompanied Sheriff Greer in the March 10,

12   1995 interview of Mr. Justice, correct?

13       A    I didn't -- I was there at his office.

14       Q    You joined them?

15       A    Yes.

16       Q    Okay.

17       A    Okay.  I --

18       Q    Yeah.  I'm sorry.  That was my fault. Earlier

19   I told you -- and you tried giving me hints that that

20   question was bad, so that's my fault.  Now, when you and

21   Mr. Greer -- eventually at some point in that meeting

22   with Mr. Justice -- and I'm going to ask you some

23   questions.

24       A    Okay.

25       Q    I'm going to ask you some stuff about that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, Taken on July 11, 2019

141

1   later, but right now I just want to get what's in your

2   memory, okay?  Before turning -- did Sheriff Greer have

3   a recorder in his office for that meeting?

4       A    I don't remember.

5       Q    Okay.  Now, isn't it true that you and Sheriff

6   Greer spoke to Mr. Justice before the recorder being

7   turned on?

8           MR. BOND:  Object to the form of the question.

9       Q    You can answer.

10      A    I don't remember.

11      Q    So you're not denying that yourself or Sheriff

12  Greer spoke to Mr. Justice before the recorder got

13  turned on?  You just don't have an independent memory,

14  correct?

15      A    I just don't have an independent memory, yes.

16      Q    Okay.  And you don't have any notes that would

17  refresh your memory, correct?

18      A    No, sir.

19      Q    Okay.  And you never created an investigative

20  report based upon your 1995 conversation with Mr.

21  Justice, correct?

22      A    No, sir.

23      Q    Sitting here today, do you recall what Sheriff

24  Greer told Mr. Justice prior to taking the recorded

25  statement?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1          MR. BOND:  Object to the form of the question.

 2     Q    You can answer.

 3     A    No, sir.

 4     Q    Do you recall what you told Mr. Justice before

 5  a recorder was turned on?

 6     A    No, sir.

 7     Q    Do you recall any information that Mr. Justice

 8  gave yourself or Sheriff Greer before a recorder was

 9  turned on during the March 10, 1995 interview?

10          MR. BOND:  Object to the form of the question.

11     Q    You can answer.

12     A    No, sir.

13     Q    Okay.  Do you recall how long Mr. Justice was

14  in -- let me withdraw that.  To your recollection, where

15  do you recall yourself and Mr. Greer meeting with Kevin

16  Justice on March 10, 1995?

17     A    It would have to be at the sheriff's office.

18     Q    Okay.  Now, and at the sheriff's office, do

19  you recall specifically, like, what room it would've

20  been in?

21     A    It'd be Joe's office.

22     Q    Okay.  And that's Sheriff Joe --

23     A    Yes.

24     Q    -- Greer?

25     A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

```
 1        Q     And now, were you present the entire time for
 2   Mr. Justice's March 10, 1995 meeting with Sheriff Greer?
 3        A     I don't remember.
 4        Q     Okay.  Don't remember one way or the other,
 5   right?
 6        A     No, sir.
 7        Q     Okay.  Do you remember how Mr. Justice got to
 8   the sheriff's department that day?
 9        A     I don't remember.
10        Q     Okay.  And I've only been to that Meade County
11   courthouse about a half dozen times, but my recollection
12   was that the jail was connected to the courthouse; is
13   that right?
14        A     Yes.
15        Q     Okay.  And was the Meade County Sheriff's
16   Department located in the same building as the jail?
17        A     Yes.  It's connected.
18        Q     It's connected.  Okay.
19        A     Yes.
20        Q     So the sheriff's department is connected to
21   the jail; is that right?
22        A     Yes.  Yes, sir.
23        Q     All right.  So could you -- in 1995, were you
24   able to go talk to inmates in the jail without actually
25   leaving the building?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A     Yes, sir.

 2        Q     Okay.  So there was some sort of doors you

 3   could walk through?

 4        A     Yeah.  As long as a jailer would let you in.

 5        Q     Okay.  And the jailer, what was his name back

 6   in '95?

 7        A     At that time, Benny Bruner.

 8        Q     Okay.  And was Mr. Burner a friend of yours

 9   back in '95?

10        A     Yes, sir.

11        Q     Was he a friend of yours in '92?

12        A     Yes.

13        Q     And to your knowledge, between '92 and '95

14   when Mr. Clark and Mr. Hardin went to their criminal

15   trial, was Mr. Benny Bruner a friend of Sheriff Greer's

16   as well?

17        A     Yes, sir.

18        Q     Yeah.  Did you-all work together?

19        A     Yes, sir.

20        Q     Okay.  Now, in 1995, before this meeting with

21   Mr. Justice, did you know of a lawyer by the name of

22   Bart Adams?

23        A     I know of him.

24        Q     Knew of him.

25        A     Yes, sir.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

145

1      Q     Okay.  Small town, right?

2      A     Yes.

3      Q     Not a lot of lawyers out in Meade County?

4      A     Well, he's actually from Jefferson County, I

5  think.

6      Q     Oh, okay.  All right.  But --

7      A     He wasn't from Meade County anyway.

8      Q     You were familiar with Bart Adams prior to

9  meeting Mr. Justice; is that right?

10          MR. BOND:  Object to the form of the question.

11     A     I knew who he was.

12     Q     Okay.  And prior to March 10, 1995, did you

13  and Sheriff Greer talk about some allegations that Bart

14  Adams was making in relation to Clifford Capps?

15     A     I don't remember.  Without reading this, I

16  don't remember.

17     Q     Okay.  And it's not going to be in this

18  document, so let me just ask you some questions based on

19  your memory, okay?  So did Sheriff Greer ever tell you

20  that Bart Adams filed a motion for a new trial based on

21  some withheld evidence relating to Clifford Capps and

22  Kevin Justice?

23          MR. BOND:  Object to the form of the question.

24          MR. PELLINO:  Objection to the form.

25  BY MR. SLOSAR:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    You can answer.

2    A    I don't remember.

3    Q    Okay.  Now, did Sheriff Greer tell you why he

4  wanted to meet with Kevin Justice on March 10, 1995?

5    A    I don't recall.

6    Q    And you don't have any notes or investigative

7  reports to refresh your memory, right?

8    A    No, sir.

9    Q    Okay.  By March 10, 1995, this was just after

10  the criminal trial, by then, you had been familiar with

11  the Warford case for about three years; is that fair?

12    A    Yes, sir.

13    Q    Yeah.  And you testified earlier that you knew

14  Mr. Capps well before he gave a statement in the Warford

15  case, correct?

16    A    Yes, sir.

17    Q    Yeah.  And, in fact, even in 1994, Mr. Capps

18  was helping you get some business, correct?

19    A    Yes.

20      MR. ERVIN:  Objection to the form.

21    Misstatement.

22    Q    Now, when you're saying today that you don't

23  have any independent memory of any information that

24  Sheriff Greer shared with you about why he wanted to

25  meet with Mr. Justice on March 10, 1995, is that your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 147 of 279 PageID #:
28480
The Deposition of CLIFFY WISE, taken on July 11, 2019
147

```
 1    testimony, sir?
 2         A    Yes.
 3         Q    And there's no documents that you're aware of
 4    that might refresh your memory as to conversations that
 5    you had with Sheriff Greer that led to this March 10,
 6    1995 meeting, correct?
 7         A    Unless you've got them.  I don't.
 8         Q    Okay.  None that you're aware of, correct?
 9         A    No.
10              MS. ROBINSON-STAPLES:  (Sneezes.)
11              MR. SLOSAR:  Bless you.
12              MR. BOND:  Bless you.
13              MS. ROBINSON-STAPLES:  Excuse me.
14    BY MR. SLOSAR:
15         Q    Now, prior -- and this isn't -- I'm actually
16    done with that exhibit for now, okay.
17         A    Okay.
18         Q    Now --
19              MR. BOND:  Hand that to her.
20              MR. SLOSAR:  Now everybody know --
21              MR. BOND:  Well, we don't want it lost.
22              MR. SLOSAR:  Everybody knows not to give me
23         original  exhibits.  I appreciate that.  My wife
24         does the same thing at home.
25    BY MR. SLOSAR:
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     So now March 10, 1995, you testified a little

2    bit about this earlier.  March 10, 1995 wasn't the first

3    time that you had had contact with Mr. Justice in the

4    Warford case, correct?

5      A     Well --

6            MR. BOND:  I object to the form of that

7       question, but go ahead and answer it.

8      Q     You can answer it.

9      A     Ask it again.

10     Q     Let me ask it a better way, okay?

11     A     Yeah.  Need be.

12     Q     All right.  You had joined Sheriff Greer a

13   meeting with Mr. Justice prior to 1995.  Do you remember

14   that?

15     A     I just can't remember right now.  I'm --

16     Q     Okay.

17     A     I'm sure we did.  I just don't remember.

18     Q     Earlier this morning, you testified that you

19   had met with Mr. Justice in 1992 and you had questioned

20   him maybe about some type of criminal case that he was

21   involved in.  Do you recall testifying about that?

22     A     I remember telling you, and I got them dates

23   mixed up, I'm pretty sure.  If I look at the affidavit,

24   I could tell you for certain.

25     Q     Well, from your memory, do you recall -- tell

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 149 of 279 PageID #:
28482
The Deposition of CLIFFY WISE, taken on July 11, 2019
149

1   me what you were going to say.

2        A    I just don't remember truthfully about it.

3        Q    Okay.  So you don't remember whether you met

4   with Mr. Justice in 1992 about the Warford case.  Is

5   that your testimony, sir?

6        A    I don't remember.

7        Q    Okay.  Not saying it didn't happen.  You just

8   don't have an independent memory, correct?

9        A    Yes.  Unless you show me something.  I mean, I

10  might remember.

11       Q    Okay.  And you testified to earlier that you

12  didn't actually type that affidavit up that you signed

13  in 1995, correct?

14       A    Correct.  Yeah.  Somebody else wrote that for

15  you, correct?

16       A    Yes, sir.

17            MR. BOND:  Object to the form of the question.

18       That's not what he testified to.

19       Q    Sir, did you draft that affidavit in 1995?

20            MR. BOND:  Object to the form of the question.

21       Q    You can answer.

22       A    No, sir.

23            MR. BOND:  Elliot, when I object to the form of

24       the question, you don't have to tell him he can

25       answer.  He knows to answer, sir.  Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1              MR. SLOSAR:  Well, I'm --

2              MR. BOND:  And that may be your habit, and I

3      understand, I'm just trying to clean up the record.

4              MR. SLOSAR:  Okay.  All right.  I'm sorry.

5    BY MR. SLOSAR:

6         Q     All right.  So, for instance, before 1995, you

7    had met with Mr. Justice -- you joined Sheriff Greer in

8    interviewing Mr. Justice at the Breckinridge County

9    Courthouse, correct?

10        A    I never went to Breckinridge County.  I can

11   tell you that.

12        Q     Well, why do you remember that so vividly,

13   sir?

14        A    Because I wouldn't have went to Breckinridge

15   County.

16        Q     Why not?

17        A    Well, there would be deputies there if he

18   needed a witness or anything.  We was shorthanded.  You

19   know, we had a two-man, three-man department.

20        Q     Uh-huh.

21        A    And I wouldn't have went, and I can tell you

22   that.  I wouldn't have went there.

23        Q     But you joined Sheriff Greer on interviews in

24   criminal investigations pretty often, right?

25        A    Long as it was Meade County, yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

151

1      Q    Yeah.  And, in fact, prior to 1995 when Mr.
2  Clark and Mr. Hardin had their criminal trial, you were
3  Sheriff Greer's right-hand man, right?
4      A    Yes.
5      Q    Yeah.  And you testified earlier that Sheriff
6  Greer was a hands-on sheriff, right?
7      A    Certainly, yes.
8      Q    Liked to get deep into the investigations,
9  right?
10         MR. BOND:  Object to the form of the question.
11     Q    You can answer.
12     A    Yeah.  When he -- yes.
13     Q    I've got a question for you a little bit
14  different.  Back in 1992, did you have a service weapon?
15     A    Yes.
16     Q    Yeah.  And did you carry that with you?
17     A    Yes, sir.
18     Q    Yeah.  Were you required to carry that on you
19  as --
20     A    Yes.
21     Q    Okay.  What kind of service weapon did you
22  have back then in 1992?
23     A    Lord, I've carried so many I couldn't tell
24  you.
25     Q    A lot of them.  All right.  Did Sheriff Greer

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   back in 1992 carry a service weapon as well?
 2        A    Very seldom.
 3        Q    Very --
 4        A    Very seldom.
 5        Q    Why do you say that?
 6        A    He just didn't do it.
 7        Q    Okay.  When Sheriff Greer did carry a service
 8   weapon, do you recall what type of weapon it was that he
 9   had?
10        A    Most of the time it would be somebody else's.
11   He'd ask for a gun, maybe.  You know, he'd asked for
12   your gun.
13        Q    Okay.
14        A    He didn't wear a gun very often.  I couldn't
15   tell you what kind of gun he carried.
16        Q    Okay.  Did the department back in 1992 have
17   any type of standard weapon?
18        A    No.  You carried whatever you want.  You had
19   to buy your own weapon.  So you just carried what you
20   had.
21        Q    Was the weapons that were carried by the
22   officers -- did you ever have to, like, document what
23   type of weapon you had?
24        A    Yes.  You did.
25        Q    Where would you document that information?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

153

1        A     Joe kept track of that.  It should be in your

2   personnel file.

3        Q     Okay.  All right.  And those are the personnel

4   files that you testified to earlier that were kept in

5   the same filing cabinet from 1983 to 2005 when you left?

6        A     Yes.

7        Q     Okay.  And between '83 and 2003, only Sheriff

8   Greer had access to those, right?

9        A     Yes.

10       Q     Yeah.  And then when you became sheriff in

11  2003 to 2006, only you and the chief deputy had access

12  to those personnel files, correct?

13       A     Yes, sir.

14       Q     Okay.  Sitting here today, if there was an

15  interview that you participated in with Kevin Justice in

16  1992, do you recall how long that interview would've

17  lasted?

18       A     I cannot.

19            MR. ERVIN:  Objection to the form.

20       Q     I know earlier you said that, you know, you

21  might have been a little bit mixed up about the dates

22  that you met with Mr. Justice, correct?

23       A     Yes.

24       Q     Okay.  That -- I want to ask you some

25  questions about this interview that you do recall, even

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

1    though you don't remember the exact date of it, okay?  Is

2    that all right?

3        A    I don't even think there was an interview. But

4    you'd have to show me something on paper, I mean, to be

5    honest.

6        Q    Okay.  I -- Mr. Wise --

7        A    I just -- I don't remember any interview with

8    him.

9        Q    Okay.  You testified earlier that you

10   remembered questioning him sometime about some criminal

11   case, right?

12       A    Yeah.  But --

13           MR. BOND:  Object to the form of the question.

14       Q    You can answer.  It's a habit.  I don't know

15   --

16           MR. BOND:  And that's fine.  If it's habit, I

17       understand.  Here we say okay, okay?

18           MR. SLOSAR:  Okay.

19       A    There was so many interviews, I'm just not

20   sure if there ever was one with -- during this case.

21   There was a lot of interviews with him and back and

22   forth.

23   BY MR. SLOSAR:

24       Q    With Mr. Justice?

25       A    Yes.  And Cliff Capps.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Okay.

2      A    So I -- I -- I just don't think -- I don't

3  remember -- my mind doesn't remember ever interviewing

4  him on this case.

5      Q    Prior to Mr. Clark and Mr. Hardin's trial in

6  1995, had you ever participated in an interview with

7  Kevin Justice and Sheriff Greer?

8      A    Not that I can remember.

9      Q    In any of the interviews that you had with Mr.

10  Justice, do you recall whether Sheriff Greer ever became

11  present?

12      A    I'm not sure.  I don't remember.

13      Q    Do you recall prior to Mr. Clark and Mr.

14  Hardin's trial whether Kevin Justice ever gave a letter

15  to Sheriff Greer that was written to him by Clifford

16  Capps?

17      A    I don't -- I don't know.

18      Q    Okay.  Not saying it didn't happen, you just

19  don't have a memory of it, correct?

20      A    Correct.

21      Q    Okay.  If Mr. Justice gave Mr. Greer a letter

22  that was written to him about Cliff Capps, or by Cliff

23  Capps, would you have expected Sheriff Greer to maintain

24  that letter as part of the investigation?

25          MR. ERVIN:  Object to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 156 of 279 PageID #:
28489
The Deposition of CLIFFY WISE, taken on July 11, 2019
156

1        A     Definitely.

2        Q     Yeah.  And you would've expected Sheriff Greer

3    to turn that letter over to the Commonwealth, correct?

4        A     Yes.  No doubt in my mind.  Yes.

5        Q     Yeah.  And if Mr. Justice gave a letter that

6    was written to him by Cliff Capps, you would've expected

7    Sheriff Greer to not only maintain the letter but to

8    document in some sort of investigative report the

9    contents of what that letter described, correct?

10            MR. BOND:  Object to the form of the question.

11       Go ahead and answer.

12       A     Yes.  He would.

13       Q     You would expect him to do that?

14       A     I would expect it, and he would, too.

15       Q     And if Mr. Justice gave Sheriff Greer that

16   letter, as the person receiving the letter, you would've

17   expected that Sheriff Greer would've taken on the

18   obligation of disclosing that evidence and documenting

19   it in a proper way, correct?

20       A     Yes.  No doubt in my mind he would do that.

21       Q     Yeah.  And if that happened, you would not

22   have separately needed to document anything that you

23   learned in a separate report, correct?

24       A     True.

25            MR. BOND:  Object to the form of the question.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CLIFFY WISE, taken on July 11, 2019

157

```
 1        Go ahead and answer.

 2        A    True.

 3        Q    Yeah.  You would've expected Sheriff Greer to

 4   do what he was supposed to do, correct?

 5             MR. BOND:  Object to the form of the question.

 6        Q    Is that right?

 7        A    Yes.

 8        Q    Yeah.  Now, I'm going to show you what we'll

 9   mark as  Exhibit number 15, and for the folks on the

10   phone, this is Meade County N831085 and -

11             MR. SLOSAR:  Keith, do you know what the --

12             MR. BOND:  I'm sorry?

13             MR. SLOSAR:  Do you know what the -- the MSCO,

14        do you know that that is?

15             MR. BOND:  Meade County Sheriff's Office. Okay?

16             MR. SLOSAR:  Down there it was -- I think it's

17        reversed a little bit in the Bates numbers.  I

18        didn't know if I was --

19             MR. BOND:  It is.

20             MR. SLOSAR:  Sorry.

21             MR. BOND:  Okay.

22             MR. SLOSAR:  I thought I was missing --

23             MR. BOND:  No, no.  We -- it's --

24             MR. SLOSAR:  Sorry about that.

25             MR. BOND:  It's our typo.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 158 of 279 PageID #:
28491
The Deposition of CLIFFY WISE, Taken on July 11, 2019

158

1              MR. SLOSAR:  No.  No.  No.

2              MR. BOND:  It's MSCO, and it should be MCSO.

3              MR. SLOSAR:  Okay.  Well, we're not changing

4      Bates --

5              MR. BOND:  No, we're not going to change them.

6              MR. SLOSAR:  We're --

7              MR. BOND:  We've killed enough trees in this

8      case.

9              MR. SLOSAR:  Yeah.

10             MR. BOND:  Okay?

11     BY MR. SLOSAR:

12         Q    Okay.  Cliff, I want you to read the first

13     page of this.

14         A    Okay.

15         Q    And I want you -- actually, let me ask you

16     some questions about the last page, if you could flip

17     there.  Is that your signature on the back?

18         A    Yes.  It is.

19         Q    Okay.  And when did you sign this affidavit,

20     sir?

21         A    May 1, 1995.

22         Q    Okay.  And, again, you testified -- earlier, I

23     was asking you some questions about an affidavit.  Is

24     this that affidavit that you reviewed prior to today's

25     deposition?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CLIFFY WISE, taken on July 11, 2019

159

1      A    Yes, sir.

2      Q    Okay.  And this is the affidavit that was

3  typed for you by someone else, correct?

4      A    Yes, sir.

5      Q    Okay.  Now, looking at paragraph 3 --

6  actually, let's go through this a little bit. Paragraph

7  1 says that you were a deputy sheriff in Meade County.

8  You worked there since 1983; is that true?

9      A    Yes.

10     Q    Okay.  Paragraph 2 said that you had discussed

11  the Clark and Hardin cases many times with Sheriff

12  Greer; is that true?

13     A    Yes.

14     Q    Okay.  So prior to May 1, 1995 you had

15  discussed the criminal cases relating to Keith Hardin

16  and Jeff Clark with Sheriff Greer; is that right?

17     A    Yes.

18     Q    Do you recall what you and Sheriff Greer

19  specifically discussed in relation to Mr. Clark and Mr.

20  Hardin's criminal cases?

21     A    Just where it stood and what we need to do.

22     Q    Okay.  Did Sheriff Greer ever give you any

23  instructions on what he needed you to do?

24     A    Yeah.  When he was gone just to make sure

25  things run right.  That's basically what we talked

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    about.  He was gone a lot on that and worked on it

 2    pretty hard.

 3          Q     On this criminal case?

 4          A     Yes.

 5          Q     Okay.  So when Sheriff Greer was gone, was it

 6    your obligation to make sure the sheriff's department

 7    stayed together?

 8          A     Yes, sir.

 9          Q     That was a lot of -- and you said that Sheriff

10    Greer -- how'd you put it?  That he was gone a lot on

11    this case?

12          A     Yeah, he was gone quite a bit, I mean, in and

13    out.  He put a lot of time in this case.

14          Q     Yeah.  And did Sheriff Greer keep you informed

15    as to how the investigation was proceeding?

16          A     I don't recall if he kept me informed how it

17    was proceeding, just what he was doing.

18          Q     Okay.

19          A     He'd be gone, or he'd be back, or, you know,

20    that thing.

21          Q     Did Sheriff Greer tell you that he was going

22    back and forth to Breckinridge County to meet with Cliff

23    Capps and Kevin Justice?

24          A     Yes.

25          Q     Yeah.  And did he tell you that Mr. Capps told

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

161

```
 1   him to go speak to Mr. Justice?
 2        A    I don't recall that, but he probably did. Yes.
 3   I don't recall it.
 4        Q    Now, in your affidavit, it says in the second
 5   paragraph about five lines down --
 6        A    Okay.
 7        Q    -- "I remember when Sheriff Greer went to
 8   Breckinridge County to interview Kevin Justice and
 9   Clifford Capps.  Upon Sheriff Greer's return, he told me
10   that Clifford Capps had given him a statement, but that
11   Kevin Justice refused to speak to him."  Do you see
12   that, sir?
13        A    Yes.  I do remember Kevin refused to speak,
14   yes.
15        Q    Okay.  Yeah.  And how do you remember that,
16   sir?
17        A    From reading this.
18        Q    Okay.  So you don't have an independent
19   memory, but...
20        A    No.
21        Q    Okay.
22        A    But if it was wrote down, I did it.
23             MR. BOND:  Object to the form of the question.
24        Q    Now, in paragraph 3, do you see where you
25   acknowledged that you were present in the fall of 1994
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 162 of 279 PageID #:
28495
The Deposition of CLIFFY WISE, taken on July 11, 2019
162

1    when you and Sheriff Greer were questioning Kevin

2    Justice about stealing gasoline from local gas stations?

3        A    Yes, sir.

4        Q    Okay.  Sitting here today, do you have an

5    independent recollection of that 1994 conversation with

6    Mr. Justice?

7        A    No.  I do not.

8        Q    Okay.  Do you --

9        A    But reading this, yes.

10       Q    Okay.  So you're not disputing what's in here,

11   but it still doesn't bring back any memories for you?

12       A    It does not ring a bell to you.

13       Q    Okay.  So let me ask you some questions that

14   aren't on here, okay?

15       A    Okay.

16       Q    During this 1994 meeting that you had with Mr.

17   Justice and Sheriff Greer, do you remember any

18   information that Sheriff Greer told Mr. Justice in your

19   presence?

20       A    No.

21       Q    Okay.  Do you remember any information that

22   you provided to Mr. Justice in your presence?

23       A    No.

24       Q    Do you remember any information that Mr.

25   Justice provided to you and Sheriff Greer?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        A     No, sir.
 2        Q     Do you remember whether Mr. Justice gave
 3   Sheriff Greer a letter that was written to him by
 4   Clifford Capps during this meeting in the fall of 1994?
 5        A     No, sir.
 6        Q     You have no recollection one way or the other,
 7   correct?
 8        A     No.  No, sir.
 9        Q     Okay.  And you have no way -- is that correct?
10        A     Yes.  Correct.
11        Q     Okay.  I know what you meant, but we just got
12   to make sure talking to the transcript.  And you have no
13   notes or investigative reports that you created from
14   that 1994 meeting, correct?
15        A     I do not.
16        Q     Okay.  Do you remember in this fall 1994
17   meeting whether Mr. Justice told you that Clifford Capps
18   tried to get him to lie against Mr. Clark and Mr.
19   Hardin?
20        A     I do not recall it.
21        Q     Okay.  You're not denying that it happened.
22   You just have no independent memory, correct?
23        A     Correct.
24             MR. BOND:  Object to the form of the question.
25         Go ahead.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 164 of 279 PageID #: 28497
The Deposition of CLIFFY WISE, taken on July 11, 2019

164

```
 1        A     Correct.

 2        Q     And, again, and I know I'm being a little bit

 3   repetitive, you don't have any documents or

 4   investigative reports that could ever refresh your

 5   memory, correct?

 6        A     No, sir.

 7        Q     Is that correct?

 8        A     Yes.

 9        Q     Okay.  I know what you mean, but -- all right.

10   Now, do you remember being a part of any conversation

11   where the Commonwealth Attorney, Kenton Smith, came into

12   the room with Mr. Justice?

13        A     I have no memory of it.

14        Q     Okay.  And you've reviewed this affidavit

15   prior to even coming into the deposition, correct?

16        A     Yes.

17        Q     And even after reviewing it, it hasn't

18   refreshed your memory at all; is that right?

19        A     It has not.

20        Q     Okay.  So sitting here today, you're not sure

21   whether a meeting took place in 1992 between yourself,

22   Mr. Justice, and Sheriff Greer, correct?

23             MR. BOND:  Object to the form of the question.

24        Q     You can answer.

25        A     Ask it again.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

165

1     Q    In 1992 -- sitting here today, you have no

2   independent recollection of whether a meeting took place

3   in 1992 with yourself, Sheriff Greer, and Kevin Justice,

4   correct?

5     A    Correct.

6          MR. BOND:  Object to the form of the question.

7     Q    Okay.  Sitting here today, you have no memory

8   of any information that was provided by Mr. Justice to

9   yourself or Sheriff Greer in a 1992 meeting, correct?

10         MR. BOND:  Object to the form of the question.

11    Q    Is that correct?

12    A    Correct.

13    Q    And similarly, sitting here today, you have no

14  independent recollection as to whether Mr. Justice gave

15  Sheriff Greer a letter that was written to him by

16  Clifford Capps in a 1992 meeting, correct?

17         MR. BOND:  Object to the form of the question.

18      Go ahead, Cliff.

19    A    Correct.  No memory.

20    Q    Okay.  And you have no documents that could

21  refresh your memory, correct?

22    A    Correct.

23    Q    Now, if -- earlier you testified -- and I

24  don't want to belabor this, but you testified earlier

25  that if Mr. Justice had given him -- had given Sheriff

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 166 of 279 PageID #:
28499
The Deposition of CLIFFY WISE, taken on July 11, 2019
166

1   Greer a letter that indicated that Mr. Capps was asking

2   Mr. Justice to lie against Mr. Clark and Mr. Hardin,

3   that you would've expected Sheriff Greer to document

4   that information in an investigative report, correct?

5        MR. ERVIN:  Objection.  Asked and answered ten

6     times.

7        MR. BOND:  Object to the form of the question.

8        MR. PELLINO:  Objection to form.

9   BY MR. SLOSAR:

10       Q    You can answer.

11       A    I would expect it, but more importantly, he

12  would expect it from his self.

13       Q    Yeah.  Okay.

14       A    Yes.

15       Q    And if such a letter was given to Sheriff

16  Greer prior to Mr. Clark and Mr. Hardin's criminal trial

17  in 1995, you would've expected Sheriff Greer to disclose

18  that letter to the Commonwealth Attorney in charge of

19  the case, correct?

20       MR. BOND:  Object to the form of the question.

21     Go ahead.

22       Q    You can answer.

23       A    That's been asked several times.

24       Q    I know.

25       A    There was no doubt in my mind.  Yes, I would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 167 of 279 PageID #: 28500
The Deposition of CLIFFY WISE, taken on July 11, 2019
167

1    expect it.  But there's no doubt in my mind that he

2    wouldn't do it.  You just got to know him.  He's just

3    straight up.  Even hurt the case or whatever.  But, yes,

4    I would expect it.

5        Q    Sure.  And I know I've asked you this

6    repeatedly.

7        A    I know.

8        Q    My -- I'm asking you about 1992 right now,

9    1994, and you would've -- whether that letter was given

10   to Sheriff Greer in your presence in 1992 or 1994, you

11   would've expected Sheriff Greer to document it and

12   maintain it as part of the investigative file, correct?

13           MR. BOND:  Object to the form of the question.

14       Q    You can answer.

15       A    Yes.

16       Q    Okay.  I'm sorry.  I know --

17       A    I know.

18       Q    I know it's repetitive.  All right.  Sir, I

19   want to ask you some questions about a few interactions

20   with Jeff Clark and police officers on three separate

21   dates: April 6th, April 8th, and May 5th of 1995, okay?

22   So let me just frame that for you.  On April 6, 1992, do

23   you recall being present when Mr. Clark was being

24   questioned about the murder of Mr. Warford?

25       A    I do not.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

168

1      MR. ERVIN:  Excuse me, Counsel.  I want to ask

2  the reporter to go back a couple of questions where

3  the witness represented that there was no doubt in

4  his mind that Sheriff Greer would've turned it over.

5  I think that the witness' testimony actually was

6  that he wouldn't have.  And so I want to be sure

7  that I'm clear on what the witness' testimony is.

8      MR. SLOSAR:  Can we go off the record?  And I

9  think Lacee can pull that up for you on the break,

10 Mr. Ervin.  I do think you have the ability to ask

11 questions later, and that is your right.

12     MR. ERVIN:  Well, I think it might be more

13 difficult for the reporter to find it later than it

14 is now.

15     MR. SLOSAR:  Sure.  So we can take a break, and

16 you can see whatever you want to see, but I

17 certainly don't think it's appropriate to stop my

18 examination of a party to have a question read back

19 that was asked ten minutes ago.

20     MR. ERVIN:  Well, I'm just trying to avoid the

21 record being misleading.

22     MR. SLOSAR:  Well, it's interesting you have

23 that concern in light of the disclosures or lack

24 thereof.  Let's take a five-minute break.  We'll

25 come right back, and then we're going to be done.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

169

```
 1            THE WITNESS:  All right.

 2            VIDEOGRAPHER:  The time is 2:34.  We're off the

 3       record.

 4                  (OFF THE RECORD)

 5            VIDEOGRAPHER:  The time is 2:48.  We're back on

 6       the record.

 7  BY MR. SLOSAR:

 8       Q    All right.  Sir, I forgot exactly where we

 9  were, but --

10            MR. GARVERICH:  Elliot, I'm sorry.  Do you want

11       to check to see if they're on the phone?

12            MR. SLOSAR:  Are you-all there?  New York?

13            MR. SAWYER:  Yes.  We're here.

14            MR. SLOSAR:  Okay.

15            MR. SAWYER:  Hello.

16            MR. SLOSAR:  Yes.  Yes.  Okay.  We're going to

17       start playing some New York, New York when we come

18       back.

19  BY MR. SLOSAR:

20       Q    All right.  Sir, I want to jump into some of

21  the questioning sessions that my client went through

22  with different police officers to see if you were a part

23  of any of those, okay, Mr. Wise?

24       A    Okay.

25       Q    On April 6, 1992, were you present when
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Jeffery Clark was questioned by any officers from the

2   Louisville Police Department or the Meade County

3   Sheriff's Department?

4        A    No.

5        Q    On April 6, 1992, or in or around that time,

6   did you have any conversations with Sheriff Greer about

7   his participation on questioning Mr. Clark for the

8   murder of Ms. Warford?

9        A    I don't recall that.

10        Q    You also, if you did have such conversations,

11   you wouldn't have any notes or reports that would

12   refresh your memory, correct?

13        A    No.

14        Q    Is that right?

15        A    Yeah.  That's right.

16        Q    Okay.  And so it's your testimony that on

17   April 6, 1992, so the first day that my client was

18   questioned for the murder, that you did not walk into

19   any room as Mr. Adams, Sheriff Greer, or Mr. Handy were

20   questioning Jeff Clark about the murder of Ms. Warford?

21        A    I never participated in any interview with the

22   Hardin and -- Clark or Hardin, no.

23        Q    Okay.  And what I'm asking you is a little bit

24   different.  And I appreciate what you said, that you

25   didn't participate, but on April 6, 1992, did you walk

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 171 of 279 PageID #: 28504
The Deposition of CLIFFY WISE, taken on July 11, 2019
171

1    into any questioning session of Mr. Clark by any of

2    those officers that I just named?

3        A    No.

4        Q    Okay.  So not just asking questions but

5    whether you ever walked in or out of the room on April

6    6, 1992?

7        A    No.

8        Q    Okay.  So since your testimony is that you

9    were not part of any questioning session of Mr. Clark on

10   April 6, 1992, is it fair to say that you don't know

11   what any of those officers said to Mr. Clark during that

12   meeting?

13       A    I do not.

14       Q    Okay.  Is it also fair to say that you don't

15   know any actions or activity that those officers may

16   have engaged in with regard to Mr. Clark in an

17   interrogation room on April 6, 1992?

18       A    I do not.

19       Q    So sitting here today, you don't know -- you

20   have no knowledge of whether Sheriff Greer ever took a

21   gun out during the April 6, 1992 questioning of Jeff

22   Clark?

23       A    I do not.

24       Q    Okay.  And, likewise, sitting here today, you

25   have no knowledge of any threats that were made by law

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 172 of 279 PageID #:
28505
The Deposition of CLIFFY WISE, taken on July 11, 2019
172

1    enforcement against Mr. Clark on April 6, 1992?

2          MR. BOND:  Object to the form of that question.

3      A    I do not.

4      Q    Okay.  And that's because, to your

5    recollection, you did not participate in the April 6,

6    1992 questioning of Mr. Clark for the murder of Ms.

7    Warford; is that right?

8          MR. ERVIN:  Object to form.

9          MR. BOND:  Object to the form of that question.

10         MR. PELLINO:  Objection to form.

11   BY MR. SLOSAR:

12     Q    You can answer.

13     A    I did not.

14     Q    When everybody objects, it's a great question.

15   That's what I tell myself.  All right.  I want to go to

16   the next -- well, on April 6, 1992, when Mr. Clark was

17   first questioned about the murder, did you have any

18   involvement in picking Mr. Clark up and bringing him to

19   the police station?

20     A    No.

21     Q    Okay.

22         MR. BOND:  Just for the record, Louisville

23     police station.

24         MR. SLOSAR:  Yes.

25         MR. BOND:  Just for the record, please.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    BY MR. SLOSAR:

2        Q     So did you have any involvement in bringing

3    Mr. Clark on April 6, 1992 to the Louisville Police

4    Department for questioning?

5        A     No.

6        Q     Okay.  Did you have any involvement in bring

7    Mr. Clark home from the Louisville Police Department?

8        A     No.

9        Q     Okay.  On April 7, 1992, did you have any

10   involvement in the questioning of Keith Hardin for the

11   murder of Ms. Warford?

12       A     No.

13       Q     Okay.  Did you ever walk into any questioning

14   session between law enforcement officers and Keith

15   Hardin on April 7, 1992?

16       A     No.

17       Q     Okay.  Do you know any knowledge as to whether

18   any of the officers involved in that questioning of Mr.

19   Hardin made any threats to him?

20       A     No.

21       Q     Do you have any knowledge of any statements

22   that those officers made to Keith Hardin while he was

23   questioned on April 7, 1992?

24       A     No, sir.

25       Q     Did you have any involvement in either

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 174 of 279 PageID #:
28507
The Deposition of CLIFFY WISE, taken on July 11, 2019
174

1    bringing Mr. Hardin or taking Mr. Hardin home from the

2    Louisville Police Department on April 7, 1992?

3        A    No, sir.

4        Q    You had no involvement and no knowledge of any

5    of the questioning with regard to Mr. Hardin on that

6    day, correct?

7        A    Correct.

8        Q    On April 8, 1992, did you have any involvement

9    in the questioning of Jeff Clark for the murder of Ms.

10   Warford?

11       A    No.

12       Q    Okay.  And did you have any involvement in

13   either bringing Mr. Clark to or taking him home from the

14   Louisville Police Department on April 8, 1992?

15       A    No.

16       Q    At any point in time on April 8, 1992, did you

17   ever walk into an interrogation session between law

18   enforcement officers and Jeff Clark for the murder of

19   Ms. Warford?

20       A    No.

21       Q    Okay.  Sitting here today, do you have any

22   knowledge as to whether any of the law enforcement

23   officers involved, like Mr. Handy, Sheriff Greer, and

24   Mr. Adams, whether any of those officers made any

25   threats to Mr. Clark during the April 8, 1992

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 175 of 279 PageID #: 28508
The Deposition of CLIFFY WISE, taken on July 11, 2019
175

1  questioning in relation to the Warford homicide?

2      A    No.

3      Q    Do you have any knowledge as to whether

4  Sheriff Greer ever took out a weapon and threatened Mr.

5  Clark during the April 8, 1992 questioning?

6      A    No.

7      Q    Okay.  You don't know one way or the other,

8  correct?

9          MR. BOND:  Objection.

10     A    That's a hard question.  I -- I -- I know he

11  wouldn't do it.  So yes.

12     Q    How do you know what Sheriff Greer would do

13  when he's not in your presence, sir?

14     A    Well, I worked -- I worked with the man many

15  year.  That just didn't happen, but your answer is no. I

16  don't have any.

17     Q    You weren't in the room with Sheriff Greer

18  when he was interrogating Mr. Clark, correct?  On April

19  8, 1992; is that right?

20     A    Yes.  I wasn't there.

21     Q    Okay.  All right.  And I know you think

22  Sheriff Greer is a fine police officer, right?

23     A    No doubt about it.

24     Q    Okay.  And did -- in your experience with

25  Sheriff Greer, did he document interviews and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 176 of 279 PageID #: 28509
The Deposition of CLIFFY WISE, taken on July 11, 2019
176

1   investigative reports that he conducted in criminal

2   investigations?

3        A    He did.

4        Q    Yeah.

5        A    Very thorough.

6        Q    Very thorough.  Are you aware of any occasion

7   where Sheriff Greer ever failed to document an interview

8   that he conducted in a criminal investigation?

9        A    Not that I'm aware of, no.

10       Q    And if Sheriff Greer -- when you-all were

11  working on criminal investigations, if he had made

12  promises to a witness, in your experience, would he have

13  always documented that those types of promises in an

14  investigative report?

15       A    Yes, if he --

16            MR. BOND:  Object to the form of the question.

17       A    If he did, yes, he would document it.

18       Q    Yeah.  And in all your years of working with

19  Sheriff Greer, have you ever heard him testify falsely

20  before a grand jury or a judge at trial?

21       A    No.

22       Q    No.

23       A    Definitely not.

24       Q    You certainly never heard Sheriff Greer

25  exaggerate evidence before a grand jury to get an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 177 of 279 PageID #:
28510
The Deposition of CLIFFY WISE, taken on July 11, 2019
177

1  indictment, right?

2      MR. BOND:  Object to the form of the question.

3   Q    Is that right, sir?

4   A    Ask it again.

5   Q    You certainly never heard Sheriff Greer

6  exaggerate evidence while he was testifying before a

7  grand jury?

8   A    No, sir.

9   Q    In your opinion, Sheriff Greer wouldn't do

10  stuff like that, right?

11  A    He would not.

12  Q    Okay.  And in all your years of working with

13  Sheriff Greer, have you ever seen him do something that

14  you just disagreed with in a criminal investigation?

15      MR. BOND:  Object to the form of the question.

16    Go ahead and answer.

17  A    I think if you work with somebody, you always

18  disagree.  But disagreement's good.

19  Q    Yeah.  And when you disagreed with Sheriff

20  Greer, would he still do what he wanted to do?

21  A    No.  He would listen.  If you could change his

22  mind for better, he would.  But most of the time, he was

23  right.

24  Q    Most of the times, he did what he was going to

25  do anyways, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

178

```
 1              MR. BOND:  Object to the form of the question.
 2        Q    You can answer.
 3        A    No.  He wouldn't -- he'd look at -- if you had
 4   a disagreement with him.  He would look at it and --
 5        Q    Yeah.
 6        A    -- but yeah, he, ultimately he made the last
 7   decision.
 8        Q    Yeah.  That's because he was sheriff, right?
 9        A    He was sheriff.
10        Q    Yeah.  And in all your years of working under
11   Sheriff Greer, did he ever get disciplined for anything
12   he did?
13        A    Not that I ever knew of.
14        Q    Yeah.  That's probably because he was sheriff,
15   right?
16        A    Not necessarily.  That's not --
17        Q    Well, you couldn't discipline him, right?
18        A    I couldn't.  But I could.  He'd -- he'd --
19   he'd take it.  I mean, let me clarify something.  I
20   think I need to because you -- what I disagreed with Joe
21   a lot was Joe went too far -- I always thought as a
22   deputy, he went too far for the -- the person that was
23   charged.  He was always just extra good, and that's not
24   -- in my older age, I realize that's not a bad thing,
25   but then, I did think so.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

179

```
 1        Q    What do you mean he went too far for the
 2   person that was charged?
 3        A    Well, he was just extra nice, you know, overly
 4   good to the defendant.
 5        Q    Yeah.  Went out of his way to help them?
 6        A    Oh, he'd go out of his way.
 7        Q    Yeah.
 8        A    I mean, even -- even hurt our case.
 9        Q    And you never -- you know, you'd never seen
10   Sheriff Greer violate anybody's constitutional rights,
11   right?
12        A    Well, that's -- he definitely --
13             MR. BOND:  Well, object to the form of the
14       question.  Go ahead and answer.
15        A    He definitely wouldn't.
16        Q    No.
17        A    Uh-uh.  No, sir.
18        Q    Not in all your years of experience with him,
19   right?
20        A    That's in my whole experience with him, yes.
21        Q    Yeah.  A good man, right?
22        A    In my book, he is, yes.
23        Q    Yeah.  But Sheriff Greer wasn't always right
24   in his --
25        A    We're never -- we're never always right.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     -- criminal investigations.  Huh?

2      A     We're never always right.

3      Q     Yeah.  Sometimes Sheriff Greer could get

4  things wrong, right?

5      A     We all do.

6      Q     Yeah.  And sitting here today, you have no

7  opinion as to whether in this case Sheriff Greer maybe

8  got something wrong and charged the wrong guys, right?

9            MR. BOND:  Object to the form of the question.

10     Q     Got no opinion about that?

11     A     Yeah.  I got an opinion.  But it's not fact.

12     Q     Yeah.  Not based on any evidence that you

13  collected, right?

14     A     Yes.

15     Q     Is that right?

16     A     Yes.

17     Q     Now, on May 5, 1992, did you participate in

18  any questioning of Jeff Clark for the murder of Ms.

19  Warford?

20     A     No.

21     Q     At any point on May 5, 1992, did you walk into

22  any room where Mr. Clark was being questioned for the

23  murder of Ms. Warford?

24     A     No.

25     Q     Okay.  Did you ever know -- were you ever

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 181 of 279 PageID #: 28514
The Deposition of CLIFFY WISE, taken on July 11, 2019
181

1    informed that in one of the questioning sessions that

2    the Louisville Police Department brought in a psychic to

3    meet with Mr. Clark?

4         A     No.

5         Q     No.  Did Meade County ever use a psychic

6    during questioning sessions before?

7         A     Not that I can remember.

8         Q     It's probably something that you would

9    remember, right?

10        A     I -- I think so.

11        Q     Yeah.  Now, you don't know -- you were never

12   present when Sheriff Greer was interrogating Jeff Clark

13   for the murder of Rhonda Warford on any occasion --

14        A     No.

15        Q     -- is that right?  So sitting here today, you

16   have no idea whether Sheriff Greer ever made any

17   threats, correct?

18        A     Do I have -- ask that again.

19        Q     Let me ask you a better way.  I know you're

20   struggling because you have a lot of love for Sheriff

21   Greer, but what I'm asking you about --

22        A     Well, that's the truth.

23        Q     -- is your personal knowledge, okay?  Do you

24   have any personal -- were you ever personally present

25   when Sheriff Greer questioned Jeff Clark about the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

182

1  murder of Ms. Warford?

2      A    No.

3      Q    Okay.  Were you ever personally present when

4  Sheriff Greer questioned Keith Hardin --

5      A    No.

6      Q    -- about the murder of Ms. Warford?  So is it

7  fair to say you have no personal knowledge as to whether

8  or not Sheriff Greer ever threatened Mr. Clark or Mr.

9  Hardin for the murder of Rhonda Sue Warford?

10     A    I do not.

11     Q    Okay.  Sir, to your knowledge, has Jeff Clark

12 always maintained his innocence in Ms. Warford's murder?

13     A    I don't know.

14     Q    Okay.  Certainly never confessed to you,

15 right?

16     A    No, sir.

17     Q    Is that right?

18     A    That's right.

19     Q    Okay.  We're doing the negatives again, so I

20 just --

21         MR. BOND:  Yeah.

22     Q    -- want to make sure.  And to your knowledge,

23 Mr. Clark never confessed to Sheriff Greer, correct?

24     A    Right.

25     Q    To your knowledge, Mr. Clark never confessed

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

183

1    to anybody in law enforcement, correct?

2        A    Not to my knowledge.

3        Q    And, in fact, when you were working on the

4    investigation, you learned that Mr. Clark voluntarily

5    met with law enforcement officers for questioning on

6    three different occasions; is that right?

7            MR. BOND:  Object to the form of the question.

8        Q    You can answer.

9        A    I don't know.

10       Q    Okay.  Well, you don't have any knowledge of

11   Mr. Clark ever requesting a lawyer during those

12   questioning sessions, right?

13       A    I do not.

14       Q    Okay.  And, in fact, Mr. Clark -- did you

15   learn in the underlying investigation that Mr. Clark

16   submitted to swabbing that was done in April of 1992 to

17   determine if any of his bodily fluids or hair matched

18   those found at the scene?

19       A    I do not.

20       Q    Okay.  No personal knowledge, right?

21       A    No.

22       Q    Sir, I'm going to show you -- this is my last

23   thing.

24           MR. BOND:  We're just harassing you.

25           MR. SLOSAR:  It's a pretty streamlined

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

184

```
 1      deposition for me, I thought.
 2           MR. BOND:  We're just harassing you.
 3  BY MR. SLOSAR:
 4      Q    All right.  And we're on  Exhibit number 16
 5  ironically, so all right.  I'm going to show you Exhibit
 6  16.  It's MSCO1065 for the folks on the phone. Mr. Wise,
 7  please take a look at this report and let me know when
 8  you're finished.
 9           (EXHIBIT 16 MARKED FOR IDENTIFICATION)
10      A    Okay.
11      Q    Okay.  And did you make this report, sir?
12      A    Apparently, I did, but I just don't have any
13  recollection of it.
14      Q    That's fine.  According to the report, did you
15  create this on March 8, 1995?
16      A    According to the report, yes.
17      Q    Yeah.
18      A    And according to this report, did you have a
19  conversation with Mr. Clark on March 7, 1995 after
20  leaving the courthouse?
21           MR. BOND:  Object to the form of the question.
22      A    According to this, I didn't.
23      Q    Well --
24      A    I wouldn't anyway, but yes.
25      Q    I -- let me ask it a better way. Conversation,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 185 of 279 PageID #: 28518
The Deposition of CLIFFY WISE, taken on July 11, 2019
185

1    I guess, is two-way.  So let me ask it a better way.

2    After court, according to this report -- well, first of

3    all, let me ask you a different way.  Do you have any

4    independent memory of any conversation or communication

5    that you and Jeff Clark had on March 7, 1995 after

6    court?

7         A    No.

8         Q    Okay.  No independent recollection?

9         A    No independent, yes.

10        Q    Okay.  From looking at this report, does it

11   refresh your memory at all as to any comments that Mr.

12   Clark made to you on March 7, 1995?

13        A    It doesn't refresh my memory.

14        Q    Okay.  Now, you would never write something in

15   a report that wasn't truthful, correct?

16        A    I would not.

17        Q    Okay.  So you have no reason to dispute that

18   the stuff you wrote in here was truthful at the time you

19   wrote it, right?

20        A    Yes.

21        Q    Okay.  And according to this report, on March

22   7, 1995, did Jeff Clark tell you something to the

23   effect, "You know that we did not kill her Wednesday

24   night."?

25        A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 186 of 279 PageID #: 28519
The Deposition of CLIFFY WISE, taken on July 11, 2019
186

1      Q     Okay.  But you have no independent memory of

2  that?

3      A     No.  I do not.

4      Q     Okay.  And according to this report, Mr. Clark

5  was telling you that he didn't have any involvement in

6  the murder, correct?

7           MR. PELLINO:  Objection to form.

8      Q     You can answer.

9      A     That's not on here.

10      Q     Well, the -- Mr. Clark certainly didn't

11  confess to you in that statement, correct?

12      A     You would -- yeah, you could take it either

13  way.

14      Q     You think you can take it either way?

15      A     Yeah.  I wrote this.  I advised Jeff not to

16  say anything because I knew he had an attorney.

17      Q     Sure.

18      A     Yeah.

19      Q     Yeah.

20      A     So if -- if there was a conversation, and I

21  say it was because I wrote it, it'd be very short like

22  that.

23      Q     Okay.  You have no independent memory one way

24  or the other?

25      A     I do not have no memory.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

187

1      Q    And was anybody -- well, you don't remember
2  whether anybody else was there, correct?

3      A    I do not.

4      Q    Okay.  And miss -- at no point in that
5  conversation did Mr. Clark ever tell you that he or
6  Keith Hardin had any involvement in the murder of Ms.
7  Warford, correct?

8      A    No.

9      Q    Is that correct?

10     A    Yes.  Correct.

11     Q    Okay.  He never told you that he or Keith
12  Hardin killed her on any other night, correct?

13     A    Correct.

14     Q    Because if he had told you that, you would've
15  wrote it down, right?

16     A    I would've wrote it.

17         MR. SLOSAR:  Okay.  Can we take a two-minute
18     break?  I think I'm done.  I think I'm done.

19         MR. BOND:  That's going to get you to 20, which
20     is twice of ten, okay?

21         VIDEOGRAPHER:  The time is 3:08.  We're off the
22     record.

23                    (OFF THE RECORD)

24         VIDEOGRAPHER:  The time is 3:14.  We're back on
25     the record.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    EXAMINATION
 2  BY MR. KAMDANG:
 3        Q    We met off camera.  My name is Len Kamdang.
 4  I'm one of the lawyers who represents Keith Hardin. How
 5  are you?
 6        A    Just fine.
 7        Q    Do you prefer to be addressed as Officer Wise
 8  or --
 9        A    No.
10        Q    -- Mr. Wise?
11        A    Just Mr. Wise would be fine.
12        Q    Okay.  Thank you for sitting today.  I know
13  it's been a long day, and I thank you for accommodating
14  the break.  I think we were able to cut out a lot of the
15  questions that I was able to ask, and I promise we'll
16  try and get you out of here as soon as possible. I just
17  wanted to go back and talk about, first of all, some of
18  the things that you testified to this morning.
19  Approximately how many homicide cases would you say
20  you've worked in your career?
21        A    I couldn't tell you.
22        Q    Okay.  I think you've mentioned three, or
23  you've talked about three that you've done today?
24        A    No.  Three before the date.
25        Q    Three before the date.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

189

1      A      Yeah.

2      Q      Okay.

3      A      Far as I'm working them, I don't think I

4   actually worked them, but I've been involved in them.

5      Q      Okay.  So before the Rhonda Sue Warford

6   investigation, how many homicide cases have you worked

7   on?

8      A      I think I testified to that I can remember two

9   -- two to three.

10     Q      Two to three, and one of them involved you

11  simply making an arrest?

12     A      Yes.

13     Q      Okay.  And you mentioned that, unfortunately,

14  Meade County is a place where bodies are dumped.

15     A      Back then, it was, yes.

16     Q      Back then around '92?

17     A      Uh-huh.

18     Q      How many homicides would be a normal amount

19  for a year back in '92?

20     A      I couldn't even guess.

21     Q      Would it be -- and so I live in New York, so

22  there are hundreds of homicides a year.  Would two be a

23  lot for a year?

24     A      Probably, yeah.  Two to three, yeah.  I'm --

25  that's a good guess now without looking at records.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

190

```
 1      Q    It's an estimate, right?

 2      A    Yes.

 3      Q    And if there were more than three homicides in

 4  a year back in '92, you would think that was a

 5  particularly bad year for homicides?

 6      A    There was some bad years.

 7      Q    And if there were less --

 8      A    There were some good ones.

 9      Q    And if there were less than three homicides,

10  you would say it was a good year?

11      A    Yes, sir.

12      Q    Okay.  Now, the Rhonda Sue Warford

13  investigation, fair to say there was a good deal of

14  press attention on that case; do you recall?

15      A    I -- I don't recall if there was much anyway.

16      Q    Okay.

17      A    I don't recall.

18      Q    Do you recall it being in the newspapers at

19  all?

20      A    It was in the newspapers, yes.

21      Q    Okay.  Do you recall it being on television at

22  all?

23      A    I don't recall.

24      Q    Okay.  Did -- do you recall Sheriff Greer

25  giving interviews for the newspaper about the case?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

191

```
 1        A     Yes.  He did.
 2        Q     Okay.  Over the course of your career, how
 3   many cases would you say that you were the lead
 4   investigator on?
 5        A     I -- I couldn't guess.
 6        Q     Over 100?
 7        A     No.  It wouldn't be that many.
 8        Q     Okay.  More than 50?
 9        A     Over my whole career?
10        Q     Yes.
11        A     Maybe.
12        Q     More than 50?
13        A     Yeah.
14        Q     Okay.
15        A     Probably.
16        Q     And how many interrogations would you say
17   you've assisted on or worked on over the course of your
18   career?
19        A     The last part of my career, it would be
20   several.
21        Q     Several.
22        A     Uh-huh.
23        Q     Is several 20, more than 20?
24        A     We're talking statistics.  I don't know.  If I
25   had to guess, it --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 192 of 279 PageID #: 28525
The Deposition of CLIFFY WISE, taken on July 11, 2019
192

1           MR. BOND:  I don't want you to guess.

2      A     Yeah, you know, it's hard.

3      Q     Okay.  Would you think you would've done more

4  than 20 interrogations in the course of your career?

5      A     What do you call interrogation?

6      Q     Questioning a suspect to see if they committed

7  a crime.

8      A     Over anything?

9      Q     Over anything.

10     A     Misdemeanor, or felony, or not just

11 necessarily murder?

12     Q     Sure, misdemeanor, felony?

13     A     Yes.  There'd be several, probably 50 or

14 better.

15     Q     50 or better?

16     A     Uh-huh.

17     Q     Thank you.  And in an average year around '92,

18 how many interrogations do you think would be a normal

19 amount for you to have done?

20     A     I couldn't answer that, not in '92.

21     Q     Okay.  And I'm not asking about the specific

22 year '92.  I'm talking about back then what would be a

23 normal amount in your view.  Does that help you or make

24 it easier to answer?

25     A     Well, just thinking back, our caseload, our

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

193

1  cases run between 100 to 200 cases, but that's

2  everything.  You start splitting it off --

3       Q     Okay.

4       A     -- we get in the 200s sometimes.

5       Q     So around '92 at any given time, the Meade

6  County Sheriff's Office would be handling between 100

7  and 200 cases?

8       A     That's a -- that's a good guess.

9       Q     Okay.  And that would involve misdemeanors?

10      A     Yeah, it'd be -- it's everything.

11      Q     Felonies?

12      A     Uh-huh.

13      Q     Okay.  How many cases do you recall working on

14  that involves an informant, a confidential informant or

15  a police informant?

16      A     I couldn't answer.  I don't know.

17      Q     Would that be -- would a case with a police

18  informant be something that was -- would that be

19  something you would find unusual, or would it be

20  something that was common?

21      A     That's common.

22      Q     That's common.  Now, we've talked a lot about

23  Sheriff Greer.  And we're going to talk more about

24  Sheriff Greer.  Have you spoken to Ernie Embry about

25  this case at all?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

194

1      A     No.

2      Q     Okay.  How about Bill Adams?  Have you spoken

3  to him about this case?

4      A     I have not.

5      Q     Okay.  How about Robert Thurman?  Have you

6  spoken to him about this case?

7      A     Don't know him.

8      Q     You don't know him?  Okay.

9      A     But to answer, no.

10     Q     Okay.  And I think you answered this question,

11  but have you spoken to Mark Handy about this case at

12  all?

13     A     No.

14     Q     Have you spoken to James Clark about this case

15  at all?

16     A     No.

17     Q     Have you spoken to Kelly Jones about this case

18  at all?

19     A     No.

20     Q     Have you spoken to Robert Ennis about this

21  case at all?

22     A     No.

23     Q     Have you spoken to Charles Edolin (phonetic)

24  about this at all?

25     A     No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q      Have you spoken to Jim Woosley about this case

2  at all?

3      A      No, sir.

4      Q      Have you spoken to James Griffiths about this

5  case at all?

6      A      No, sir.

7      Q      How about Kenton Smith?  Have you spoken to

8  him at all about this case?

9      A      No, sir.

10     Q      Okay.  How many people were working in the

11  Meade County Sheriff's Office in the early 1990s?

12     A      Two to three people.

13     Q      Two to --

14     A      Full-time, there's, yeah, two to three people.

15     Q      Okay.  So there was a sheriff?

16     A      And myself and then maybe one deputy or two

17  deputies just according with the budget.  Every year it

18  changed.

19     Q      Okay.  But in the early '90s, there would be

20  three to four officers?

21     A      Yes.

22     Q      Okay.  Was there any staff, like a secretary

23  or...?

24     A      Uh-huh.  Yes.  Secretary.  Probably three

25  people in the office for taxes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

196

```
 1      Q    Three people who do the taxes?

 2      A    Uh-huh.  Yes, sir.

 3      Q    You each had your own personal accountant?

 4      A    Well, we collect taxes.

 5      Q    Oh, I understand.

 6           MR. BOND:  The sheriff's office in Kentucky

 7      collects property taxes.

 8      Q    I did not know that.

 9      A    I'm sorry.

10      Q    Well, that's why I'm asking these questions. I

11  want to learn about the Meade County Sheriff's Office.

12  Okay.  So there were three to four officers who

13  investigated crimes, right?

14      A    And rode, served papers.

15      Q    Okay.

16      A    The sheriff's office does a lot of different

17  things in Kentucky.  Your main primary is to serve

18  papers and do the court system, collect taxes. Anything

19  else comes extra.

20      Q    Let me ask that in a cleaner way.  In general,

21  in 1992, what did the Meade County Sheriff's Office do?

22      A    Collect taxes, serve paperwork for the court,

23  and if you had any time, patrol and answer complaints.

24      Q    Okay.  Now, when you said that there were

25  three people who worked on taxes, were they separate
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   from the three to four officers?

 2        A    Yes, sir.

 3        Q    Okay.  And there was one secretary?

 4        A    One secretary and two people collecting taxes

 5   as a rule.

 6        Q    And two people -- so in 1992, there would be -

 7   - around 1992 there would be anywhere from seven to ten

 8   people working in the office?

 9        A    Total?

10        Q    Total.

11        A    That'd be stretching it, yes.

12        A    Okay.

13        Q    I might have missed it, but I think earlier

14   you mentioned that there were some disciplinary issues

15   in your personnel file?

16        A    No.  I did not.

17        Q    You did not?

18        A    Uh-uh.

19        Q    To your -- to the best of your recollection,

20   have you ever been reprimanded or in any way formally

21   through your work as -- at the Meade County Sheriff's

22   Office?

23        A    No.

24        Q    Okay.  And I apologize if I misunderstood

25   that.  Now, I suspect that one of the reasons why you
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  were never reprimanded was because to the best of your

2  ability you bent over backwards to conduct every

3  investigation with integrity?

4        MR. ERVIN:  Objection to form.

5    A    Yes.

6        MR. ERVIN:  Objection to form.

7    Q    Okay.  And Sheriff Greer, you would agree that

8  Sheriff Greer also is somebody who in all of his

9  investigations did his best to conduct every

10 investigation with integrity?

11   A    Yes, sir.

12   Q    You're aware of no instances of times where

13 you questioned Sheriff Greer's integrity in an

14 investigation?

15   A    Never.

16   Q    Okay.  You mentioned something in passing that

17 you believe that Sheriff Greer would place integrity in

18 the work even if it hurt the case?

19   A    Yes.

20   Q    Integrity in investigations was Sheriff

21 Greer's highest priority at all times?

22   A    Yes, sir.

23   Q    He absolutely understood that it would be

24 wrong to bully or harass any witnesses in questioning

25 them?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A     That's true.

2      Q     He, with no exceptions, would never use --

3   with no exceptions, Sheriff Greer would never bully or

4   harass a witness into giving false testimony?

5      A     Absolutely not.

6           MR. ERVIN:  Objection to the form.

7      Q     Okay.  Sheriff Greer was a guy who, in your

8   view, believed that a guilty man should go free before

9   an innocent man would be convicted?

10     A     Correct.

11     Q     Okay.  I'm sorry.  It's a little bit --

12     A     That's all right.

13     Q     I'm trying to take out questions, so...  And

14  we talked a little bit about discipline.  As the deputy

15  chief, was one of your responsibilities to discipline

16  officers?

17     A     Yes.

18     Q     If you observed misconduct, you would report

19  it?

20     A     Yes, sir.

21     Q     Okay.  Sheriff Greer is somebody who also had

22  that responsibility, right?

23     A     Yes, sir.

24     Q     If he observed misconduct, do you believe that

25  he would report it?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Oh, yeah.

 2        Q    And he would record it somehow?

 3        A    Yes.

 4        Q    With no exceptions?

 5        A    No exceptions, if it was me or whoever.

 6        Q    Okay.  So you mentioned that the Meade County

 7   Sheriff's Department, a big part of the work is

 8   collecting taxes and serving papers, right?

 9        A    That's the biggest part.

10        Q    And it's fair to say that murder

11   investigations would constitute a small part of the

12   work, not in importance, but in terms of this whole

13   amount of work?

14        A    It would be a small part.

15        Q    But although it's a small part of the job, it

16   was an incredibly important part of the job for any

17   Meade County Sheriff's officer, right?

18        A    Yes.

19        Q    And especially for Sheriff Greer?

20        A    Yes, sir.

21        Q    So if -- so Sheriff Greer, if he was

22   investigating a murder investigation, would do

23   everything by the book?

24        A    Yes.

25        Q    He would -- he's the type -- he was the type
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    of sheriff who would cut no corners?

 2        A    He would not cut any corners.

 3        Q    He would carefully document every

 4    investigative step that he took?

 5        A    Yes, sir.

 6        Q    He would not make promises that he couldn't

 7    keep to witnesses?

 8        A    No.

 9            MR. BOND:  Object to the form of the question.

10            MR. KAMDANG:  Sure.

11    BY MR. SLOSAR:

12        Q    Were you aware of Sheriff Greer ever

13    reporting another officer for misconduct?

14        A    Not that I'm aware of.

15        Q    And how many years did you work with Sheriff

16    Greer?

17        A    From '83 to 2006.

18        Q    From '80 -- so from 1983 to 2006 --

19        A    Yes.

20        Q    -- you're unaware of Sheriff Greer ever

21    reporting another officer in his command for misconduct?

22        A    Never.

23        Q    Okay.  And how many years did you work in the

24    Meade County Sheriff's Office?

25        A    I was there 24-and-a-half years altogether.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

202

```
 1        Q    Okay.  In your 24-and-a-half years, how many
 2   officers have you ever formally reported for misconduct?
 3        A    None.
 4        Q    I take it then in your 24-and-a-half years
 5   you've never observed any fellow officer commit any
 6   misconduct?
 7        A    Not at the Meade County Sheriff's Department I
 8   haven't.  No.  That was just something that wasn't
 9   tolerated.  Just you knew it.
10        Q    So you never saw a fellow officer threaten a
11   witness?
12        A    No.
13        Q    You never saw a fellow officer pay money to a
14   witness for their cooperation under the table?
15        A    No.
16        Q    You never saw a Meade County Sheriff's officer
17   physically assault another -- a witness or a suspect?
18        A    No.
19        Q    You never even saw a Meade County Sheriff's
20   officer put the cuffs on too tight?
21        A    No.
22        Q    Okay.
23        A    Not -- not that I felt like.  Yes.
24        Q    Okay.
25        A    Maybe they got tight, you know, during a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

203

```
 1   struggle or something but not intentionally, put it that
 2   way.
 3        Q    Right.
 4        A    Not intentionally.
 5        Q    Not intentionally.
 6        A    Yes.
 7        Q    But if -- in your entire career, if there was
 8   a suspect who was handcuffed who said, "I'm sorry.  The
 9   cuffs are a little bit too tight.  Can you loosen them,"
10   in your entire career, any Meade County Sheriff's
11   officer would loosen the cuffs?
12        A    Yes.  Especially Joe Greer.
13        Q    Especially Joe Greer?
14        A    He'd take them off.
15        Q    Would it be fair to say that Sheriff Joe Greer
16   was somebody who, once he was assigned to a case,
17   understood the responsibility to thoroughly investigate
18   a case?
19        A    Yes.
20        Q    Sheriff Joe Greer would take all the necessary
21   steps to get the right guy?
22        A    Yes.
23        Q    And Sheriff Greer is -- was the type of
24   sheriff who also understood that it's -- it was equally
25   important to not get the wrong guy?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

204

```
 1        A    Yes.
 2        Q    I imagine you and Sheriff Greer probably share
 3   the same view that it would be a horrible tragedy if
 4   somebody was ever convicted of a crime that they did not
 5   commit?
 6             MR. BOND:  Objection to form.
 7        A    True.
 8        Q    Would you agree with that statement?
 9        A    Yes.
10        Q    Okay.  Sheriff Greer was the type of sheriff
11   who believed in diligent investigation?
12        A    Yes.
13        Q    Sheriff Joe Greer was somebody who kept an
14   open mind at all times in an investigation?
15        A    Yes.  Very.
16        Q    Even if Sheriff Greer had a suspect in mind,
17   he didn't stop investigating a case?
18        A    That's true.
19        Q    And even if Sheriff Greer had a suspect in
20   mind and found information that would lead to another
21   suspect, Sheriff Joe Greer would never ignore evidence
22   that led to another suspect?
23        A    True.
24        Q    He was essentially like an investigative
25   vacuum cleaner?  He would just take all of the evidence
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

1   that he could get?

2        A    Yes, sir.

3        Q    Good or bad?

4             MR. ERVIN:  Objection to form.

5        Q    Sheriff Joe Greer was the type of investigator

6   who avoided tunnel vision?

7             MR. BOND:  Object to the form of the question.

8        Go ahead.

9        A    No.

10       Q    Every time I'm pausing, I'm cutting time off

11  of this deposition.  Let's talk about documentation. Is

12  -- well, would it be fair to characterize Sheriff Joe

13  Greer as an experienced investigator?

14       A    Yes, sir.

15       Q    And in 1992, it would be fair to characterize

16  him as an experienced investigator?

17       A    No.

18       Q    In 1992, you don't think Sheriff Joe Greer was

19  --

20       A    In '82?

21       Q    '92.

22       A    '92.

23       Q    Yeah.  No.  He -- he was experienced.

24       Q    Okay.  I might have misspoke, so let me ask

25  again.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 206 of 279 PageID #:
28539
The Deposition of CLIFFY WISE, taken on July 11, 2019
206

1          MR. BOND:  I think he misunderstood.

2          MR. KAMDANG:  Sure.

3     Q    So in 1992, would you agree that Sheriff Joe

4  Greer was an experienced criminal investigator?

5     A    Yes, sir.

6     Q    In 1992, would you agree that Sheriff Joe

7  Greer was a highly skilled criminal investigator?

8     A    Yes.  I would.

9     Q    Okay.  And because he was an experienced

10 investigator, Sheriff Joe Greer understood in 1992 the

11 importance of documenting an investigation?

12    A    Yes.

13    Q    Sheriff Joe Greer was somebody who understood

14 that every investigative step needed to be documented

15 carefully?

16    A    Yes.

17    Q    And you were somebody who agreed with that as

18 well, right?

19    A    Yes.

20    Q    I think the last exhibit, which I think was

21 Exhibit 15, was about a conversation that you had in

22 passing in 1995 with Jeff Clark?

23          (EXHIBIT 15 MARKED FOR IDENTIFICATION)

24    A    Yes, sir.

25    Q    You were literally transporting him somewhere

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  else?

2        A    Back to the jail.

3        Q    And he had a -- he made an offhand comment to

4  you?

5        A    Yes.

6        Q    But even something -- and that was a situation

7  where it wasn't a formal interrogation, right?

8        A    True.

9        Q    But because he said anything to you that

10 related to the case, you took the step of writing a

11 report?

12       A    Yes.

13       Q    And you learned that from Sheriff Joe Greer?

14       A    Yes.

15       Q    That everything that you do in a case needs to

16 be carefully documented?

17       A    His favorite saying, if you don't write it

18 down, it didn't happen.

19       Q    Sheriff Joe Greer's favorite saying was if you

20 didn't write it down, it didn't happen?

21       A    Didn't happen.

22       Q    In addition to not just writing things down,

23 it was also important to write -- to document

24 investigative steps that you took as soon as possible

25 after the step was taken?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

208

```
 1        A     Yes.
 2        Q     You wouldn't just fill out -- it would be --
 3   Sheriff Joe Greer was somebody who understood that it
 4   would be wrong to fill out paperwork after a criminal
 5   trial, for example?
 6        A     Oh, yeah.  You wouldn't do that.
 7        Q     No.  Sheriff Joe Greer wouldn't do that?
 8        A     No.
 9        Q     And you wouldn't do that?
10        A     No.
11        Q     Sheriff Joe Greer would document the steps
12   that he took as he was taking the investigative steps?
13        A     True.
14        Q     He wouldn't wait until the end of the
15   investigation to fill -- to backfill all the paperwork?
16        A     No.
17        Q     And you wouldn't either?
18        A     Uh-uh.  No.
19        Q     Now, when you documented an investigative step
20   that you took, it'd be important to document who was
21   involved in the investigative step?
22        A     Yes.
23        Q     What the investigative step was?
24        A     Yes.
25        Q     When the investigative step happened?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

209

```
 1      A     Yes.

 2      Q     Where the investigative step happened?

 3      A     Yes.

 4      Q     And the circumstances, why you took the

 5  investigative step?

 6      A     Yes.

 7      Q     All of those aspects of a investigative step

 8  are an important part of documentation?

 9      A     Yes, sir.

10      Q     Now, how -- when I said it's important to

11  document things as quickly -- as soon as possible to

12  when it happened, what would be a normal amount of time

13  -- what would be a reasonable amount of time to wait

14  before writing a document?

15            MR. ERVIN:  Objection.

16      A     Well, every -- every case would be different

17  but as soon as possible.

18      Q     Now, as soon as possible, so within a day or

19  so --

20      A     It should be.  Yes.

21      Q     -- would be a good rule of thumb?  Now, I want

22  to get a sense of how documentation worked in the Meade

23  County Sheriff's Office.  Can you give me one second?

24  Okay.  So as -- and I'm just asking you to explain it to

25  me.  One of the things that -- well, I'll -- I'm going
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   to mark this as --

2          MR. BOND:  Len, can we get what's in front of

3   him out of the front of him --

4          MR. KAMDANG:  Sure.

5          MR. BOND:  -- so we don't comingle it or lose

6   it.

7          COURT REPORTER:  I'll take those.

8          THE WITNESS:  She wants that.

9          MR. BOND:  I think those are hers.

10          MR. KAMDANG:  I was going to give them to

11   Elliot.

12          MR. SLOSAR:  Don't pass it down here.

13          MR. KAMDANG:  I'm going to mark this as

14   plaintiff's Exhibit 11.

15          COURT REPORTER:  17.

16             (EXHIBIT 17 MARKED FOR IDENTIFICATION)

17          MR. BOND:  Or is it something that's already

18   been introduced?

19          MR. KAMDANG:  Well, we have gaps, so we can do

20   17.  That's fine.

21          MS. ROBINSON-STAPLES:  No, we don't.  We just

22   haven't been keeping track.

23          MR. KAMDANG:  That's fine.  Okay.  So I'm going

24   to mark this --

25          COURT REPORTER:  Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. KAMDANG:  Yeah.  Sorry.  I'm going to pass
 2        this around.
 3    BY MR. KAMDANG:
 4        Q    This is a document that was previously
 5    produced by Meade County Sheriff's Office in full, and
 6    yester -- I'll put on the record that yesterday we went
 7    to investi -- to look through files at the -- in
 8    Leitchfield.
 9              MR. BOND:  The Commonwealth Attorney's office.
10        Q    The Commonwealth Attorney's office, and I
11    found a copy that was a little bit clearer than the one
12    that Meade County had turned over previously.  It is the
13    same document, but I'm going to mark that one just
14    because it's a little bit clearer.  So what I'm handing
15    you looks to be an investigative report that was written
16    by Sheriff Joe Greer, and that appears to be the
17    investigative report in this case.  Do you mind taking a
18    look at it real quick?
19        A    It seems to be.  Yes.
20        Q    Okay.  So this was the type of report that
21    Sheriff Joe Greer would fill out in a criminal
22    investigation?
23        A    Yes.
24        Q    All right.  And what he would do is he --
25    well, would a document like this be filled out after the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    investigation or after an arrest, or would it be filled

2    out as the investigation was going on?

3        A    Well, it'd be -- it'd be parts of it as the

4    investigation going on.

5        Q    Okay.  So it would be -- so as steps in the

6    investigation were continuing, he would add onto this

7    document and make it longer?

8        A    Yes.

9        Q    Okay.  And you said that Sheriff Joe Greer was

10   a very thorough documenter --

11       A    Yes.

12       Q    -- of steps?  And so if sheriff -- and this

13   document, once it was completed, would be a thorough

14   document that contained all of the investigative steps

15   that were taken in an investigation run by Sheriff Joe

16   Greer?

17           MR. BOND:  Object to the form of the question.

18       A    In my opinion, yes.

19       Q    Yeah.  If -- what was the expression that he

20   used?  If you don't write it down, it didn't happen?

21       A    Yeah.  If you don't write it down.

22       Q    Right.  So this is what Sheriff Greer wrote

23   down, so if he didn't write it down there, it didn't

24   happen?

25       A    That's right.  You're right.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q     Is that fair?

2     A     That's a fair question.

3     Q     And that's a fair answer?

4     A     A fair answer.

5     Q     Okay.  And he was particularly known for being

6  very thorough in his documentation?

7     A     Yes.

8     Q     If you -- Sheriff Joe Greer was somebody who

9  if you read his report and closed your eyes you can

10  envision every step of a criminal investigation?

11     A     Yes.

12     Q     Sheriff Joe Greer would never leave out an

13  important investigative step when he filled -- in

14  filling out a police report like this?

15     A     Correct.

16     Q     And that's something that he taught you and he

17  taught everyone who worked for him?

18     A     Yes.

19     Q     Okay.  So -- and I'm just curious, and I don't

20  know the answer.  If you took an investigative step but

21  Sheriff Joe Greer was the one who was writing the

22  report, how would a step you took make its way into the

23  report?

24     A     I would have to write it out, and he would

25  enter it in the report.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

214

```
 1        Q    Okay.  So sheriff -- you said Sheriff Joe
 2   Greer was extremely active as a sheriff?
 3        A    Yes.
 4        Q    He would speak to everybody working in -- on a
 5   case with him?
 6        A    Yes.
 7        Q    And if he was working -- you said he spent a
 8   lot of time on the Rhonda Sue Warford case?
 9        A    He did.
10        Q    Fair to say that he was in daily contact with
11   every single person in the Meade County Sheriff's
12   Department -- Meade County Sheriff's Office as they took
13   steps in this case?
14             MR. BOND:  Object to the form of the question.
15        A    No.  Not -- not in the sheriff's office.
16   Whoever was involved in the case, he would, but he
17   wouldn't take -- you know, tell everybody, no.
18        Q    I'm sorry.
19        A    Yeah.  Anybody that was in the case, you know,
20   he would.
21        Q    So if somebody were involved in the
22   investigation of --
23        A    Yes.
24        Q    -- Rhonda Sue -- in Rhonda Sue Warford's
25   criminal investigation, Sheriff Joe Greer would speak to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

215

```
 1   any officer in the Meade County Sheriff's Office as soon
 2   as they took an investigative step?
 3        A    Yes.
 4        Q    And this was a joint investigation, right?
 5        A    With Louisville, it was.
 6        Q    With Louisville.
 7        A    Yes.
 8        Q    And because there were two -- because you were
 9   coordinating an investigation with two other offices --
10   with two offices, Sheriff Joe Greer was somebody who
11   understood that it was important to be in constant
12   communication with Louisville?
13        A    Yes.
14        Q    He would speak near daily throughout the
15   investigation with the Louisville Police Department to
16   talk about the steps that had been taken?
17        A    You'll have to ask him that, but I don't know
18   if it would be daily or not.
19        Q    Okay.  Is that what you'd expect of him?
20        A    As often as necessary.
21        Q    Okay.  So let's say from April -- the murder -
22   - Rhonda Sue Warford's body was found on April 5, 1992,
23   and I believe the arrest of Jeff Clark and Keith Hardin
24   happened on May 5, 1992, so that's about a month, right?
25        A    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q    Within that month when the investigation was

2  extremely active, do you recall Sheriff Greer working on

3  this case?

4      A    Yes.

5      Q    And he was working very hard?

6      A    Very hard.

7      Q    Okay.  And the case was active.  Things were

8  happening nearly every day?

9      A    Yes.

10      Q    Okay.  So within that period between April 5,

11  1992 and May 5, 1992, for that period, he would be -- he

12  was in near daily contact with the Louisville Metro

13  Police Department, right?

14          MR. BOND:  Objection.

15      A    I would say so.

16      Q    You would say so.  Okay.  Now, the other thing

17  is Louisville Metro does a lot more -- well, Louisville

18  Metro had more experience investigating homicides --

19      A    Yes.

20      Q    -- right?  And do you know how it came to be a

21  joint investigation between Louisville Metro and Meade

22  County?

23      A    I do not.

24      Q    Okay.  Was that common where there -- to do an

25  investigation with Louisville Metro?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

217

```
 1        A     If there was a connection, but I'm not sure
 2   why it was.
 3        Q     Okay.  But the Meade County Sheriff's Office
 4   would rely on Louisville Metro for investigative
 5   assistance, right?
 6        A     If there was a connection, yes.
 7        Q     Well, they would ask Louisville Metro for
 8   assistance in scientific testing?
 9        A     No.  That all goes to Frankfort.
10        Q     It goes to Frankfort?
11        A     Yes.
12        Q     Okay.  Well, we looked at search warrants,
13   right, earlier in the day?
14        A     Yes.
15        Q     And you were somebody who assisted in the
16   search warrants, right?
17        A     I was there, yes, sir.
18        Q     But Louisville Metro took the lead on
19   executing the search warrants?
20        A     They were the lead officers.
21        Q     Okay.  And that happened a lot over the course
22   of this investigation.  Louisville Metro would take the
23   lead on certain investigative steps, right?
24        A     Yes.
25        Q     And would it be fair to say that if there was
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   a disagreement on -- well, withdrawn.  Would it be fair
 2   to say that Louisville Metro throughout the
 3   investigation took the lead on most of the investigative
 4   steps?
 5        A    I can't answer that.  I don't -- I don't know.
 6        Q    Okay.  Louisville Metro had more manpower?
 7        A    Well, they definitely had more manpower.
 8        Q    Right.  And there were only -- Sheriff Greer
 9   was in the office at the time?
10        A    Yes.
11        Q    You were in the office at the time?
12        A    Yes.
13        Q    And you said you played a very limited role in
14   the investigation, correct?
15        A    Yes.
16        Q    Tommy Stiles was in the office at the time?
17        A    No.  He -- he was a state police detective.
18        Q    He was a state police detective.  Who else was
19   there, Ernie Embry?
20        A    Ernie was a deputy, yes.
21        Q    Okay.  And was he actively involved in the
22   Rhonda Sue Warford investigation?
23        A    No.
24        Q    He wasn't.  Was there anyone else in the Meade
25   County Sheriff's Office at the time?
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.  Tim Livers.

 2        Q    Was Tim Livers actively involved in --

 3        A    No.  None of the deputies was.

 4        Q    Okay.  So Sheriff Greer was the only person

 5   working the case?

 6        A    Yes.  Active working.  He might ask you to do

 7   something or be there.

 8        Q    Right.

 9        A    But actively, yeah.

10        Q    And so he was mostly working with Louisville

11   Metro on the case?

12        A    Yes, sir.

13        Q    And any steps that needed to be taken, if

14   Sheriff Greer didn't do it, he would rely on Louisville

15   Metro to take -- to conduct the investigation?

16        A    Yes.

17        Q    And he would trust that Louisville Metro would

18   do the right thing?

19        A    You can ask him, but I'm sure, yes.

20        Q    Yeah.  And we talked about someone named Mark

21   Handy.  Was that a name you had heard?  I know you've

22   only spoken to him maybe once; is that what you said?

23        A    Maybe once at the --

24        Q    Okay.

25             MR. KAMDANG:  Okay.  We're going to take a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      quick break.

 2              VIDEOGRAPHER:  The time is 3:47.  We're off the

 3      record.

 4                      (OFF THE RECORD)

 5              VIDEOGRAPHER:  The time is 3:54.  We're back on

 6      the record.

 7   BY MR. KAMDANG:

 8      Q    Okay.  So we were talking about the

 9   relationship between Louisville Metro and Meade County

10   Sheriff's Office in the Rhonda Sue Warford

11   investigation.  Do you recall that -- talking about that

12   before the break?

13      A    Yes.

14      Q    Okay.  And I think what you essentially said

15   was that from the Meade County Sheriff's Office Sheriff

16   Joe Greer who was actively working the case?

17      A    Yes.

18      Q    All of the other people all who were

19   conducting witness interviews and evidence collection

20   and all those other steps came from -- all that manpower

21   came from the Louisville Metro Police Department, right?

22              MR. ERVIN:  Objection to form.

23      A    Most of it, yes.

24      Q    Yeah.  Well, you weren't doing it?

25      A    Yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q And certainly it was getting done?

2  A Yes.

3  Q The Louisville Metro Police Department has a

4 great reputation for -- in 1992, they had a great

5 reputation for being thorough investigators, right?

6  A Yes.

7   MR. SLOSAR:  Objection to form.

8  Q They had a lot of experience investigating

9 murders?

10  A Yes.

11  Q Would it be fair to say that Louisville Metro

12 had more experience than Sheriff Joe Greer -- even than

13 Sheriff Joe Greer in investigating murders?

14  A Yes.

15  Q And so Sheriff Joe Greer would rely on their

16 expertise throughout the investigation --

17   MR. ERVIN:  Objection to the form.

18  Q -- as he ran a joint investigation in the

19 Rhonda Sue Warford murder, right?

20  A I would think so, yes.

21  Q Okay.  Let's talk about -- let's go back to

22 documentation.  Sheriff Joe Greer was somebody who

23 understood that it was important to document every

24 witness that he interviewed --

25   MR. ERVIN:  Objection.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    -- or that anyone interviewed in an

2  investigation?

3    A    Yes.

4        MR. ERVIN:  Objection to the form.

5    Q    And Sheriff Joe -- even though it was a joint

6  investigation, Sheriff Joe Greer documented all the

7  steps that Meade County took.  He didn't just rely on

8  Louisville Metro to do the paperwork?

9    A    Yes.

10        MR. BOND:  Object to form.

11    Q    Right?

12    A    Yes.  Should be.  Yes.

13    Q    Okay.  And if he did an interrogation with a

14  suspect, he would document a suspect -- or if he did an

15  interview with a suspect or a witness, he would document

16  any relevant admissions that were made in the interview

17  carefully, right?

18    A    Yes.

19        MR. BOND:  Okay.  Are you talking in general or

20      specific?

21        MR. KAMDANG:  In general.

22        MR. BOND:  Okay.  Okay.

23        MR. KAMDANG:  In general.

24        MR. BOND:  Well, you kind of -- the question

25      right before was about this case and then --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

223

```
 1              MR. KAMDANG:  That's fine.

 2              MR. BOND:  Okay.

 3              MR. KAMDANG:  And now I'll ask specifically.

 4              MR. BOND:  Okay.  Thank you.

 5    BY MR. KAMDANG:

 6        Q    In this case, to the best of your knowledge,

 7    Sheriff Joe Greer documented all of his witness

 8    interviews that he did?

 9        A    Yes.

10        Q    And all witness interviews that anyone in the

11    Meade County Sheriff's Office did?

12        A    Yes.

13        Q    He even documented interviews that Louisville

14    Metro officers did because it connected to his

15    investigation, right?

16        A    He should have, yes.

17        Q    Okay.  And he's somebody who knew -- because

18    he was so thorough, he -- if there was any question, he

19    would document it?

20        A    Yes.

21        Q    Okay.  He would document admissions that

22    witnesses made?

23        A    Yes.

24        Q    And he would also understand that it's also

25    important to document denials?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1              MR. ERVIN:  Objection to the form.

2              MR. PELLINO:  Objection.

3      A     Yes.  Now, we're still talking in general?

4      Q     In general.

5      A     Okay.  Because I -- I wasn't in the interviews

6  up there, so I don't -- we're just talking in general.

7      Q     I understand.

8      A     Okay.

9      Q     So in general, if Sheriff Joe Greer were

10 interviewing a suspect accused of a murder and the

11 suspect denied being involved in the murder, Sheriff Joe

12 Greer would document that the interview happened?

13     A     Yes.

14     Q     Without exception?

15     A     Without exception.

16     Q     And he would document the denial?

17     A     Yes.

18     Q     And denials often have evidentiary value,

19 right?

20     A     Yes.

21     Q     Because sometimes when people deny things,

22 they're -- they actually admit things without knowing

23 it, right?

24     A     True.

25     Q     And Sheriff Joe Greer is somebody who
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 225 of 279 PageID #: 28558
The Deposition of CLIFFY WISE, taken on July 11, 2019
225

1   understood that?

2        A    He understood that.

3        Q    Right.  So, for example, in a murder case, if

4   Sheriff Joe Greer would ask somebody, "Did you murder

5   this person at the courthouse in Brandenburg," and the

6   person said, "I was at the courthouse in Brandenburg,

7   but I did not murder that person," he would write it

8   down, right?

9        A    Yes.

10            MR. ERVIN:  Objection to the form.

11       Q    Because the person would be admitting that

12   they were on the scene?

13       A    Yes.

14       Q    And that would have evidentiary value?

15       A    Yes, sir.

16       Q    And sometimes if you were to do other

17   investigative work and you could go back and you could

18   prove that somebody was lying in their denials, right?

19       A    Yes.

20       Q    So -- and it's critical -- Sheriff Joe Greer

21   is somebody who understood that it's critically

22   important to write down all of the details when you're

23   documenting an interview?

24       A    Yes.

25            MR. ERVIN:  Objection to the form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

226

```
 1        Q     Whether he thinks they're helpful or not, to
 2   the extent possible, Sheriff Joe Greer would write down
 3   everything possible on all of the witnesses that he
 4   interviewed?
 5        A     Yes.
 6        Q     And then he would make sure that it ended up
 7   in his investigative report?
 8        A     Yes.
 9        Q     Sheriff Joe Greer is somebody who would
10   understand -- or who would be very careful to document
11   even evidence that he thought was hurtful to his case.
12   He would put that in his investigative reports?
13        A     Yes.  He would.
14        Q     Even if he ultimately concluded, "I think this
15   person did it," Sheriff Joe Greer is somebody who would
16   include every single piece of evidence that could
17   possibly show that his suspect might be innocent?
18        A     Yes, sir.
19        Q     Because he would understand that as the only
20   fair way to conduct an investigation?
21        A     That's right.
22        Q     And so we've talked a lot about Clifford
23   Capps, for example.  If Sheriff Joe Greer had any
24   inkling whatsoever that Clifford Capps was being
25   untruthful or was lying, he would put that in his
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 227 of 279 PageID #: 28560
The Deposition of CLIFFY WISE, taken on July 11, 2019
227

1    investigative report?

2        A    Yes.

3        Q    Even if he thought the people who were

4    arrested were guilty, right?

5        A    Yes.

6        Q    And that's true for any evidence, if it's a

7    report -- a scientific report that says that -- that

8    undermined his prosecution theory, he would put it -- he

9    would make sure it was documented carefully in his

10   investigative reports?

11       A    Yes.

12       Q    If there was a witness who said, "I don't know

13   if -- I don't think that person, the suspect, was on the

14   scene," Sheriff Joe Greer would put that in the report?

15       A    Yes.

16            MR. ERVIN:   Object to the form.

17       Q    Even if he thought the person was wrong?  Let

18   me -- I'm going to withdraw the question.  So let's say

19   there's a situation where a witness says, "Well, I saw

20   your suspects coming into the house at 2:00 in the

21   morning.  They were coming home around 2:00."  If that

22   was something that supported an alibi, for example,

23   Sheriff Joe Greer would put that on the report even if

24   he thought that witness was mistaken?

25       A    Yes.


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CLIFFY WISE, taken on July 11, 2019

228

```
 1            MR. ERVIN:  Objection to the form.  We can do
 2       all kinds of scenarios and not accomplish any more
 3       than what we have in the last 15 minutes.
 4            MR. KAMDANG:  And we can do a lot more, too.
 5            MR. ERVIN:  I guess we can.  Seven hours'
 6       worth.  Let's go.
 7            MR. SLOSAR:  We've got flights in the way, so
 8       hopefully...
 9  BY MR. KAMDANG:
10       Q    Now, another thing that Sheriff Joe Greer was
11  able to do and that was a capability in the Meade County
12  Sheriff's Department was to record interviews, right?
13       A    Yes.
14       Q    That was a common practice back in 1992 in the
15  Meade County Sheriff's Office?
16       A    Yes.  It was.
17       Q    Sheriff Joe Greer would have a portable tape
18  recorder?
19       A    Yes.
20       Q    And when he was going out and doing
21  interviews, he would tape record his interviews?
22       A    Yes.
23       Q    He would tape record all of his interviews?
24       A    Yes.
25       Q    Without exception?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CLIFFY WISE, taken on July 11, 2019

229

1      A    Yes.

2      Q    Okay.  Or if he didn't tape record an

3  interview, he would arrange to have a court reporter

4  there if he was doing an interview?

5      A    Yes.

6      Q    But the point is Sheriff Joe Greer is somebody

7  who understood that it was important to document

8  carefully every interview?

9      A    Yes.

10     Q    And he understood that witnesses often change

11  their stories?

12     A    Oh, yeah.

13     Q    And that's one of the reasons why he kept that

14  --

15     A    Yes, sir.

16     Q    -- that tape recorder with him at all times,

17  right?

18     A    Yes.

19     Q    And without exception, if he was speaking to a

20  witness about a case, he would tape record that

21  interview so that there was a record, right?

22     A    Yes.

23     Q    So if that person came back and said, "I never

24  said that," he would say, "I have it on tape?"

25     A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

230

```
 1        Q    Right?  That was just a precaution that he
 2   knew he had to take as a routine part of any criminal
 3   investigation?
 4        A    Yes.
 5             MR. ERVIN:  Objection to the form.
 6             MR. PELLINO:  Objection to the form.   Q And
 7        that's something that he did in this case, right?
 8        A    Yes.
 9   BY MR. KAMDANG:
10        Q    Okay.  So I don't know if you've ever heard
11   the expression "a belt and suspenders approach."  Not
12   only would Sheriff Greer make sure that he documented
13   and wrote every single thing that he did in his
14   investigation in his investigative report, he would also
15   take the additional step of recording all of his
16   interviews and making sure they were documented either
17   recorded or with a court reporter or on the tape, right?
18        A    Yes.
19        Q    It's better to be cautious and doubly careful,
20   right?
21        A    Yes.  Yes, sir.
22        Q    Now, we talked a little bit about when Sheriff
23   Joe Greer would conduct interviews.  Sometimes there was
24   a pre-interview, right?
25        A    Sometimes there is.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

231

```
 1        Q    Yeah.  And that's something that would happen
 2   in an investigation, right?
 3        A    Sometimes, yes.
 4        Q    So let's just -- let's start generally, for
 5   example, so I can understand how it works.  So Sheriff
 6   Joe Greer would either have a court reporter or the tape
 7   recorder with him, right?
 8        A    Yes.
 9        Q    And before having the court reporter start
10   writing stuff or before taping anything, he would
11   interview a witness just to get a sense of what they
12   knew?
13        A    You could, yes.  That could happen.
14        Q    Right.  And either everything that he said in
15   that pre-interview --
16             MR. SLOSAR:  Let's take a break.
17             MR. BOND:  Come on, guys.  Let's get done. This
18        is getting ridiculous.
19             VIDEOGRAPHER:  The time is 4:05.  We're off
20        record.
21                      (OFF THE RECORD)
22             VIDEOGRAPHER:  The time is 4:13.  We're back on
23        the record.
24   BY MR. KAMDANG:
25        Q    Let's talk about jailhouse informants.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Interviewing somebody at the jail can present unique

2   challenges.  Do you think -- was that a fair -- I'm

3   going to withdraw that.  When you're informing -- when

4   you're interviewing somebody who's a potential jailhouse

5   informant, one of the things you know before anything is

6   that the person is in jail?

7        A    Yes.

8        Q    Right?  And because the person is in jail, any

9   jailhouse informant has a built-in incentive to lie,

10  right?

11       A    Yes.

12       Q    And so because -- and Sheriff Joe Greer is

13  somebody who would recognize that --

14       A    Definitely.

15       Q    -- when interviewing a jailhouse informant?

16       A    Yes.

17       Q    And because some -- when people have powerful

18  incentives to lie, you have -- Sheriff Joe Greer is

19  somebody who would understand that you have to be extra

20  careful?

21       A    Yes.

22       Q    Right?  Because the person might change their

23  story, as we talked about earlier?

24       A    Yes.

25       Q    The person might make allegations of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

233

```
1   misconduct against the police officer?
2        A    Yes.
3        Q    The person might say anything that they can
4   think of just to get out of jail, correct?
5        A    Yes.
6        Q    And so because of that, it's important to --
7   Sheriff Joe Greer is somebody who understood that it
8   would be important to document any jailhouse interview?
9             MR. ERVIN:  Objection to the form.
10       A    Yes.
11       Q    Right?  And by documented, I mean make sure
12  that it shows up in his investigative report?
13       A    Yes.
14       Q    Sheriff Joe Greer is somebody who would
15  understand that it's important to take the other step of
16  recording the interview somehow?
17            MR. ERVIN:  Objection to the form.
18       Q    Right?  Either through a tape recorder or
19  arranging for a court reporter to be there?
20            MR. ERVIN:  Objection to the form.
21       A    Yes.
22       Q    And the other thing that Sheriff Joe Greer
23  would do is he would know that he should bring a witness
24  with him, right?
25       A    Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

234

```
 1              MR. BOND:  Objection.

 2              MR. ERVIN:  Objection to the form.

 3       Q    And Mr. Slosar asked you about an interview

 4   that you sat in with Sheriff Joe Greer with Kevin

 5   Justice in May of 1995.  Do you remember those

 6   questions?

 7       A    Yes.

 8       Q    And I think you said you didn't really

 9   remember the circumstances of the interview, but the

10   reason you were there was because you were a third-

11   party witness, right?

12       A    As a rule, yes.

13       Q    Yeah.  It was a rule?

14       A    Yes.

15       Q    Whenever you interviewed a jailhouse witness,

16   you would bring -- any -- Sheriff Joe Greer understood

17   that whenever he interviewed a jailhouse witness, he

18   would bring a third-party witness as an observer?

19              MR. ERVIN:  Objection to the form.

20       A    Yes.

21       Q    Without exception?

22              MR. ERVIN:  Same objection.

23       A    Yes.

24       Q    And if he brought that third party -- a third

25   party witness, he would make sure to document that he
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

235

1    brought that third -party witness in his paperwork?

2        A    Yes.

3        Q    And you were his chief deputy in 1992?

4        A    Yes.

5        Q    Fair to say that you were his right-hand man?

6        A    Yes.

7        Q    So the responsibility of being a third-party

8    witness in jailhouse interviews often fell to you?

9        A    Yes.

10           MR. BOND:   Objection.

11       Q    But if you weren't available, Sheriff Joe

12   Greer would find somebody else to come with him?

13       A    Yes.

14       Q    To do a jailhouse interview?

15       A    Yes.

16       Q    He would never interview a third-party -- a

17   jailhouse informant alone?

18           MR. BOND:   Object to the form of the question.

19       Q    Correct?

20       A    Yes.

21       Q    Thanks.  Beyond jailhouse informants, would

22   Sheriff Joe Greer bring witnesses with him to interview

23   witnesses out on the street?

24       A    If at all possible.

25       Q    If at all possible?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A      Yes.

2      Q      So unless there was some reason preventing it,

3  Sheriff Joe Greer would always bring a partner with him

4  to observe any witness interviews?

5      A      He would attempt to, yes.

6      Q      Yes.  And he would document who came with him

7  when he conducted interviews on the street?

8      A      Yes.

9      Q      And in this case, Bill Adams is somebody who

10 accompanied him on a number of interviews?

11     A      Yes.

12     Q      Now, when conducting -- so Sheriff Joe Greer

13 was -- in 1992, he was an experienced interrogator?

14     A      Yes.

15     Q      And one of the most important things when

16 conducting an interview is being able to assess the

17 credibility of people -- of witnesses, right?

18     A      Yes.

19     Q      And there are certain techniques that

20 experienced investigators like Sheriff Joe Greer use to

21 make sure that he is getting reliable information,

22 right?

23     A      Yes.

24     Q      And in 1992, he was -- sorry.  Withdrawn.  So

25 one of the things that a trained investigator is trained

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

237

```
 1   to do is to keep some facts of the case out of the
 2   public, right?
 3        A    Yes.
 4        Q    So that if a witness in an interview tells
 5   them things that are nonpublic facts, that the
 6   investigator will know that the information is reliable?
 7        A    That's true.
 8        Q    And Sheriff Joe Greer definitely understood
 9   that in 1992?
10        A    Yes.
11        Q    Sheriff Joe Greer would never feed nonpublic
12   facts to a witness when conducting an interview?
13        A    Never.
14        Q    But if he did, if he -- even if he did it by
15   accident, he would document that in his paperwork?
16        A    Yes.
17        Q    Especially with the case of a potential
18   jailhouse informant, Sheriff Joe Greer would know that
19   it was critically important not to feed nonpublic facts
20   to a potential jailhouse informant witness, right?
21             MR. ERVIN:  Objection to the form.
22        A    That's true.
23        Q    But if he did, he would carefully document it
24   in his report?
25        A    Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 238 of 279 PageID #: 28571
The Deposition of CLIFFY WISE, taken on July 11, 2019
238

1    Q    Even if it hurt his prosecution?

2    A    Yes.  Even if it hurt.

3        MR. SLOSAR:  While we've got a little bit of a

4    break, I just want to put something on the record.

5    Can we reach an agreement?  I know this is our first

6    defendant deposition, but can we reach an agreement

7    to reserve punitive damages questions until after

8    summary judgment?  I think it's something that we

9    usually do down here with defendants in these types

10   of cases.

11       MR. BOND:  I apologize, Elliot.  To be honest

12   with you, I'm a little hard of hearing.  I'll be

13   honest with you.  I did not hear what you said.  I'm

14   sorry.

15       MR. SLOSAR:  Okay.  I just wanted to put on the

16   record I wanted to reach an agreement with you-all

17   in these party depositions to reserve questions

18   related to punitive damages so financial assets,

19   that sort of stuff until after summary judgment.

20       MR. BOND:  Exactly.  Absolutely.

21       MR. SLOSAR:  Is that okay?

22       MR. BOND:  Absolutely.  I'm not going to let

23   him answer any financial questions.

24       MR. ERVIN:  Right.  We're not agreeing to do it

25   later.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 239 of 279 PageID #: 28572
The Deposition of CLIFFY WISE, taken on July 11, 2019
239

 1            MR. BOND:  Yeah.  We'll address that issue,

 2       later.

 3            MR. ERVIN:  No.  We're not agreeing to do it

 4       later.

 5            MR. SLOSAR:  Well, then if you're not --

 6            MR. ERVIN:  We're not agreeing to let him

 7       testify to it today either.

 8            MR. SLOSAR:  Oh, all right.

 9            MR. ERVIN:  We object to --

10            MR. BOND:  We'll take it up, okay?

11            MR. SLOSAR:  Peter, I guess we'll deal with

12       your first client, but, okay.  It sounds like we're

13       on the same page.

14  BY MR. KAMDANG:

15       Q    All right.  A couple more questions on

16  documentation.  In addition to coordinating with the

17  Louisville Metro Police Department on the Rhonda Sue

18  Warford case, another entity that Sheriff Joe Greer was

19  coordinating on with was the prosecutor's office, right?

20       A    Yes.

21       Q    And that's common in any criminal

22  investigation, right?

23       A    Yes.

24       Q    So in this case, in the Rhonda Sue Warford

25  investigation, Sheriff Joe Greer was coordinating with

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

240

```
 1   Kenton Smith?

 2        A    I'm sure.  Yes.

 3        Q    Yes.

 4             MR. BOND:  If you know.

 5        A    Yeah.  Yes.

 6        Q    You know that Kenton Smith was a prosecutor on

 7   the case?

 8        A    Yeah.  He's thorough.

 9        Q    Who's thorough?

10        A    Kenton Smith.

11        Q    Kenton Smith is thorough?

12        A    He's thorough.

13        Q    When you say he's thorough, he's the type of

14   prosecutor who would ask --

15        A    Yes.

16        Q    -- law enforcement to go out and take

17   investigative steps?

18        A    Yes.

19        Q    He's the type of person that would say, "Hey,

20   this is important.  Can you go talk to this witness?"

21        A    Definitely.

22        Q    And Sheriff Joe Greer was the type of sheriff

23   who was thorough and would comply, right?

24        A    Yes.

25        Q    If Kenton Smith asked Sheriff Joe Greer to go
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 241 of 279 PageID #:
28574
The Deposition of CLIFFY WISE, taken on July 11, 2019
241

1  out and speak to a witness, Sheriff Joe Greer would go

2  out and speak to the witness?

3      A    Definitely.

4      Q    And in that situation, he would absolutely

5  record the interview and document it in his police

6  report?

7      A    Yes.

8      Q    The one that you're holding right now?

9      A    Yes.

10     Q    Because that's a no brainer.  If a prosecutor

11  is telling you something is important --

12          MR. BOND:  Object to the form of the question.

13     Q    Sheriff Joe Greer would understand that if a

14  prosecutor told him something was important, that it was

15  important, and it needed to be documented, correct?

16          MR. ERVIN:  Objection to the form.

17     A    Yes.

18     Q    Whether or not it was the witness had helpful

19  information, right?

20     A    Yes.

21     Q    Even if the prosecutor said, "I want you to go

22  and speak to a witness," and Sheriff Joe Greer went and

23  spoke to the witness and the witness said, "I'm not

24  talking to you," Sheriff Joe Greer would document that

25  in his paperwork and say --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Yes.

 2        Q    -- "He told me -- the prosecutor told me to go

 3   speak to this person.  I did it.  He refused, and it's

 4   in my report?"

 5        A    Yes.

 6        Q    Sheriff Joe Greer understood that.  He was

 7   that thorough of an investigator?

 8        A    Yes.

 9        Q    Search warrants are an important part of an

10   investigation, right?

11        A    Yes.

12        Q    Executing -- and Sheriff Joe Greer understood

13   that search warrants were an important part of an

14   investigation, right?

15        A    We're talking in general, yes.

16        Q    Yeah.  Filling out a search warrant and

17   submitting to the Court is an important part of

18   investigation?

19        A    Yes.

20        Q    And Sheriff Joe Greer understood that?

21        A    Yes.

22             MR. ERVIN:  Object to the form.

23        Q    And actually executing a search warrant is an

24   important step in investigation -- is an important part

25   of an investigation, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

243

```
 1            MR. ERVIN:  Objection to the form.
 2      A    Yes.
 3      Q    And Sheriff Joe Greer understood that?
 4            MR. ERVIN:  Objection to the form.
 5            MR. BOND:  Are you talking about in general?
 6      Q    Sheriff Joe Greer understood that in general
 7  --
 8      A    Yes.
 9      Q    -- search warrants were an important part of
10  an investigation --
11      A    Yes, sir.
12      Q    -- and --
13            MR. ERVIN:  Objection to the witness's
14      testimony of what Sheriff Joe Greer could've
15      understood.
16            MR. BOND:  That's what -- just let it go.
17            MR. ERVIN:  Did understand or knew.
18  BY MR. KAMDANG:
19      Q    And so if a Meade County Sheriff's officer
20  took part in the execution of a search warrant, Sheriff
21  Joe Greer was the type of sheriff -- or Sheriff Joe
22  Greer without exception would document that in his
23  police report?
24            MR. BOND:  Object to the form of the question.
25      A    If he was the lead officer, yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    I didn't un -- if Sheriff Joe Greer was the
 2   lead officer?
 3        A    Yes.  If it was his case, he would, yes.
 4        Q    Well, right.  If he was the lead officer --
 5        A    Yes.
 6        Q    -- who was responsible for writing the
 7   investigative report?
 8        A    Yes.
 9        Q    If sheriff -- if one of Sheriff Joe -- if one
10   of the officers in Sheriff Joe Greer's command took part
11   in executing a search warrant, Sheriff Joe Greer would
12   make sure to document that in his investigative report?
13        A    Or he would make sure it was done, yes.
14        Q    He would make sure it was documented?
15        A    Someone did it, yes.
16        Q    That it was -- and by it, you mean documented
17   in the report?
18        A    Yes.
19        Q    Thank you.
20            MR. KAMDANG:  I know no one in the room will
21        believe me, but I have no further questions.
22            THE WITNESS:  Thank you.
23            MR. KAMDANG:  Some of them might have
24        questions.
25            MR. ERVIN:  I do.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 245 of 279 PageID #:
28578
The Deposition of CLIFFY WISE, taken on July 11, 2019
245

1              MR. BOND:  Do you have a mic, Peter?

2              MR. ERVIN:  I don't.

3                  (OFF-THE-RECORD COMMENTS)

4                  CROSS EXAMINATION

5    BY MR. ERVIN:

6         Q    Mr. Wise, my name is Peter Ervin, and I

7    represent the City of Louisville and several of the

8    police officers that have been sued by Mr. Clark and Mr.

9    Hardin in this case.  You've been sued as well; is that

10   right?

11        A    Yes, sir.

12        Q    Early in your testimony you were asked about

13   your relationship to Clifford Capps; do you recall that?

14        A    Yes.

15        Q    And you were asked whether you had a business

16   relationship with him, and I believe your testimony was

17   that you did not.

18        A    Did not.

19        Q    In fact, what you're referring to is the fact

20   that on occasion he may refer folks to you to have their

21   septic tanks pumped or what have you, correct?

22             MR. SLOSAR:  Objection to form.

23        A    Yes.

24             MR. ERVIN:  What's the objection, Counsel?

25             MR. SLOSAR:  I said to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

246

```
 1            MR. ERVIN:  Right.  What's the matter with the
 2      form?
 3            MR. SLOSAR:  Well, I appreciate you giving me
 4      the opportunity.  Yesterday you refused when I asked
 5      you the basis of your form objection, but since
 6      you're asking, I'll be courteous and actually
 7      respond.
 8            MR. ERVIN:  Thank you for your courtesy,
 9      Counsel.  I appreciate that.
10            MR. SLOSAR:  You're welcome.  He is a defendant
11      just on the side of the table that you're on. This
12      is not an adverse examination for you like it was
13      for us, so you should not be leading him as we were.
14      As the form objection, the judge will deal with it
15      later on.  You can continue.
16            MR. ERVIN:  He's not my client.
17            MR. SLOSAR:  Mr. Ervin, I appreciate that. I'm
18      going to make my form objection.
19            MR. ERVIN:  Thank you.
20            MR. SLOSAR:  Sure.
21            MR. ERVIN:  I expect to continue to hear them.
22   BY MR. ERVIN:
23       Q    And I believe you said you started your
24   business in about 1994?
25       A    Yes, sir.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

247

```
 1        Q    And you don't -- as I understood your
 2   testimony, you don't recall that Mr. Capps had contacted
 3   you in 1994 to make any referral?
 4             MR. SLOSAR:  Objection to form.
 5        Q    Is that correct?
 6             MR. SLOSAR:  And that misstates the record.
 7        A    I can't hardly hear you.
 8        Q    As I recall your testimony, you don't remember
 9   that Mr. Capps was referring business to you in 1994 or
10   1995; is that correct?
11             MR. SLOSAR:  Objection to form and --
12        A    I didn't know what year it was.
13             MR. SLOSAR:  -- it misstates the record.
14        Q    You don't know when the first time was that he
15   did that?
16        A    I do not.
17             MR. SLOSAR:  Objection to form.
18        Q    Okay.  And do you know the frequency that he's
19   done that over the years?
20        A    Just -- just every now and then.
21        Q    Okay.  Was it every week?
22        A    It wasn't -- no.  It wasn't every week, no.
23        Q    Was it every month?
24        A    No.
25        Q    Do you know whether it was even every year?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL   Document 317-60   Filed 01/26/23   Page 248 of 279 PageID #: 28581
The Deposition of CLIFFY WISE, taken on July 11, 2019
248

1        A     You know, maybe a couple of times a year. I'd

2    be guessing.  I just don't know.

3        Q     Okay.

4        A     Just off and on.

5        Q     Okay.

6        A     Just like anyone else, you know.

7        Q     Did you have any agreement where you would pay

8    him anything, anything like that?

9        A     No.

10       Q     Okay.  You were asked questions earlier about

11   whether Sheriff Greer carried a gun; do you recall that?

12       A     Yes.

13       Q     And I got the impression from your testimony

14   that if he were to carry a gun, it likely would be in

15   circumstances where his safety may be at stake; is that

16   a fair statement?

17       A     Maybe.  At times.

18       Q     He may do it at that time?

19       A     Yeah.  Not all -- sometimes his safety was in

20   harm -- harm's way, and he wouldn't wear a gun.  He was

21   just a different guy.

22       Q     Did you ever know him to wear a gun into the

23   jail to conduct an interview?

24       A     No.  Definitely not.

25       Q     Why is that?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

249

1       A     Jail won't allow it.

2       Q     Okay.  And where was the interview in -- of

3    Kevin Justice on March the 10th, 1995 conducted?

4       A     I don't recall.

5       Q     Okay.

6       A     Can you -- was it in Breckenridge County?

7       Q     No.

8       A     No?

9       Q     I believe it says it was in the sheriff's

10   department.

11           MR. SLOSAR:  Objection to form.

12      A     If it was in the sheriff's department, it

13   would be the sheriff's office.

14      Q     Okay.  During -- and you -- that's recorded on

15   Exhibit 14.  Do you want to see that?

16           MR. SLOSAR:  Objection to form to the extent

17      there's a question.

18      A     You're talking about '95?

19      Q     Yes, sir.

20      A     The place was the Meade County Sheriff's

21   Department.

22      Q     All right.  Were you present?

23      A     Yes.

24      Q     All right.  At any time before, during, or

25   after that interview, did Sheriff Greer pull out his gun

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

The Deposition of CLIFFY WISE taken on July 11, 2019

250

```
 1   and make any sort of a threat to Kevin Justice?
 2        A    No.
 3        Q    Are you sure of that?
 4        A    Absolutely.
 5        Q    Okay.  Well, now you've testified --
 6        A    Without a doubt.
 7        Q    All right.  Well, you testified earlier that
 8   there were a lot of things about that that you don't
 9   remember.
10        A    That's true.
11        Q    Right?  But you remember to a certainty that
12   Sheriff Greer did not pull out his pistol or make any
13   kind of a threat to Kevin Justice?
14             MR. SLOSAR:  Objection to the form.
15        A    True.
16        Q    Why is it that you remember that he did not do
17   that?
18        A    Because that never happened.  I've never seen
19   that out of him or anyone else.  It just -- it just
20   wouldn't happen.
21        Q    Is that something that you would consider to
22   be completely out of his character?
23        A    Oh, yes.
24        Q    Speaking of what he would or wouldn't do, I'm
25   going to ask the reporter to pull up an earlier part of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

251

1   your testimony where you were talking about whether

2   Sheriff Greer would have disclosed a letter if it had

3   been provided to him by Kevin Justice.  And at the time,

4   you said you were sure that he wouldn't have done it.

5       A    He would have.

6       Q    He would have?

7       A    Yes.

8       Q    Well, let me ask her to play it back, first,

9   let you hear what you said, and ask you whether you

10  would like to correct it in any way.

11      A    Okay.

12           COURT REPORTER:  All right.  Give me one

13      second, guys.

14           THE WITNESS:  Sorry about that.

15           MR. BOND:  We'll blame Elliot's double

16      negatives.

17           (REPORTER PLAYS BACK REQUESTED TESTIMONY)

18      A    Yeah.  He wouldn't do that.  That's what I

19  said; wasn't it?

20      Q    Well, he wouldn't withhold it if I understand

21  --

22           MR. SLOSAR:  Objection to form.

23      A    He would not withhold it.  That's what I --

24  that's what I meant.

25      Q    All right.  Is it your testimony that there's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 252 of 279 PageID #: 28585
The Deposition of CLIFFY WISE, taken on July 11, 2019
252

1   no doubt in your mind that if he had received such a

2   letter, he would have turned it over to the prosecutor

3   and put it in the investigative file?

4           MR. SLOSAR:  Objection to form.

5       A    Yes, sir.

6       Q    All right.

7           MR. SLOSAR:  So I'm going to sneak in there

8       sometimes.  Sorry about that.

9           THE WITNESS:  You're all right.

10  BY MR. ERVIN:

11      Q    You made mention of the fact that when Sheriff

12  Greer conducted an interview in Breckenridge County of

13  if he conducted an interview in Breckenridge County, you

14  wouldn't have gone; is that right?

15      A    That's true.

16          MR. SLOSAR:  Objection to form.

17      Q    And as I recall your testimony, you said it

18  was because you had responsibilities in Meade County,

19  and he would have the opportunity to have another deputy

20  from Breckenridge County to act as a witness if he

21  conducted an interview?

22          MR. SLOSAR:  Objection to form.

23      A    True.

24      Q    Is that right?

25      A    Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    All right.  Would he need a witness to the
2    interview if he had his tape recorder?
3         MR. SLOSAR:  Objection to form.  Foundation.
4    A    It's a good idea, but you wouldn't have to.
5    No.  But it's a good idea.
6    Q    If he had his tape recorder, he'd be able to
7    memorialize it; is that right?
8    A    Yes.
9         MR. SLOSAR:  Objection to form.  Foundation.
10   Q    You were asked some other questions about
11   whether and when he recorded, and you said words to the
12   effect that he always made a recording of interviews; do
13   you recall that?
14   A    Yes.
15   Q    Now, have you been present for all of the
16   interviews he's conducted?
17   A    No.
18   Q    Okay.  So you don't know from personal
19   knowledge that he always recorded an interview; is that
20   correct?
21   A    That's true, but he was asking in general.
22   Q    Yes, sir.
23   A    Yes.
24   Q    In general, it was your experience that he
25   would record interviews?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A    Yes.

 2      Q    All right.  Do you know whether he would

 3  record an interview of witnesses that were being

 4  interrogated in Louisville?

 5      A    I don't have any idea on that one.

 6      Q    If he conducted an interview and somehow

 7  didn't have his recorder, would he nevertheless

 8  memorialize the interview?

 9      A    Should.

10      Q    By that, I mean make a note to the

11  investigative file?

12      A    Should.

13      Q    Was it your experience that he did?

14      A    If you're talking in general, yes.

15      Q    Yeah.  All right.  You were asked earlier

16  about the policies and procedures in the office of the

17  Meade County Sheriff's Office; do you recall that?

18      A    Yes, sir.

19      Q    And I understood your testimony to be that at

20  least up through 1992 and perhaps sometime after that,

21  there were no written policies and procedures in place

22  in the sheriff's office; is that correct?

23      A    I believe that to be so, yes.

24      Q    All right.  You were also asked the question

25  of whether there were any oral or understood policies

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 255 of 279 PageID #:
28588
The Deposition of CLIFFY WISE, taken on July 11, 2019
255

1    and procedures, and I believe your question was that

2    there were none of those either -- or your answer was

3    that there were none of those either?

4         A    Probably not.  Yes.

5         Q    Okay.  I want to talk to you about that some.

6    For example, you were asked some questions about whether

7    you would make a promise to a witness, whether you would

8    promise to ask the prosecutor for this or that if they

9    would tell you this or that; do you recall that?

10        A    Yes.

11        Q    And you testified that one of the first things

12   that Joe Greer told you was you don't make promises like

13   that?

14        A    That's true.

15        Q    Do you remember that?

16        A    True.

17             MR. SLOSAR:  Objection to form.

18        Q    So would it be fair to say that you had a

19   policy in the office, even though it wasn't written down

20   --

21        A    Yes.  You could say that.

22        Q    It was a policy that you wouldn't make

23   promises like that; wasn't it?

24        A    Yes, sir.

25             MR. SLOSAR:  Objection to form.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

256

1      Q     Do you -- was there also a policy in the

2  office that you didn't beat suspects?

3            MR. SLOSAR:  Objection to form.

4      A     Yes.

5      Q     Nobody beat up on any suspects while you were

6  in office; did they?

7      A     No.  No, sir.

8      Q     At any time from 1982 to 2010, are you aware

9  of any officer in the Meade County Sheriff's Office who

10 abused a suspect in interrogation?

11     A     Them dates would be from '83 to 2006.

12     Q     All right.  Are you aware of that occurring at

13 any time during your employment with that office?

14     A     No, sir.

15     Q     And would there -- was there a policy against

16 that or an understanding, a code, if you will, that

17 would've prohibited that?

18           MR. SLOSAR:  Objection to form.

19     A     Yes.

20     Q     All right.  Likewise, would that code have

21 prevented -- prohibited you from threatening?  Did you

22 understand you shouldn't threaten a suspect who may be

23 being interrogated?

24           MR. SLOSAR:  Objection to form.

25     A     Yeah.  Yes, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    And you understood, as you testified earlier,

 2   you have a duty to record both good and bad evidence; is

 3   that right?

 4             MR. SLOSAR:  Objection to form.

 5        A    Yes, sir.

 6        Q    Now, let me direct your attention to what's

 7   been marked as Exhibit 16.

 8        A    Okay.

 9        Q    That was your note regarding a statement that

10   Mr. Clark made to you; is that correct?

11        A    Yes, sir.

12        Q    You made this a written note, correct?

13        A    Yes.

14        Q    Did you type this note?

15        A    No.  Probably one of the secretaries did.

16        Q    All right.  Would you have dictated to her, or

17   how would she have taken this down?

18             MR. SLOSAR:  Objection to form.

19        A    I would've wrote it down.

20             COURT REPORTER:  I'm sorry.  What?

21        A    Wrote -- I would write it down.

22        Q    You would've written it?

23        A    Yeah.  I would've written it on a tablet and

24   had her to type it.

25        Q    All right.  And where did you learn to make a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1    recording like this?

 2         A    It wasn't a recording.

 3         Q    Well, to record the conversation.

 4         A    Oh.

 5         Q    This is a record of the conversation, correct?

 6         A    The sheriff, Joe Greer.

 7         Q    All right.  And so a lot of things you learned

 8    on the job; is that a fair statement?

 9         A    The first several years, yes.

10         Q    So whether or not you'd been to EKU, you knew

11    how to record evidence in an investigative file; didn't

12    you?

13         A    Yes, sir.

14              MR. SLOSAR:  Objection to form.

15         Q    And the reason you did that was because there

16    was a policy in your office that you should record

17    evidence and put it in the file; is that right?

18              MR. SLOSAR:  Objection to form.

19         A    Yes, sir.

20              COURT REPORTER:  Let him get his objection out

21         before you answer.

22              THE WITNESS:  All right.  I'm sorry.

23              COURT REPORTER:  Thank you.

24              THE WITNESS:  I'll slow up.

25              MR. SLOSAR:  I'm sorry, Cliff.  It's the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 259 of 279 PageID #: 28592
The Deposition of CLIFFY WISE, taken on July 11, 2019
259

1       questions.

2    BY MR. ERVIN:

3        Q    And not only the note but the nature of the

4    note, is that something that you learned from Joe Greer?

5        A    Yes, sir.

6        Q    In other words, this is information that

7    arguably could be exculpatory.  Do you know what that

8    word means?

9        A    Yes.

10       Q    All right.  Do you agree that this could be

11   that type of information?

12       A    It could be.

13       Q    Yes, sir.  But it doesn't say that he denied -

14   - do you know -- they found her body on a Sunday

15   morning; do you recall that?

16       A    I don't.

17       Q    Okay.  I'll represent to you that it was on a

18   Sunday morning that they found her body.

19       A    Okay.

20       Q    All right.  And this shows that he told you

21   they didn't kill her on Wednesday night, correct?

22       A    Yes.

23       Q    Did he tell you they didn't kill her on

24   Thursday night?

25       A    No.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

260

```
 1        Q    Did he tell you they didn't kill her on Friday
 2   night?
 3        A    No.
 4        Q    Did he tell you they didn't kill her on
 5   Saturday night?
 6        A    No.
 7        Q    So you don't know whether they did kill her on
 8   Thursday night; do you?
 9        A    No.
10        Q    You don't know whether they did kill her on
11   Friday night; do you?
12        A    No.
13        Q    You don't know whether they did kill her on
14   Saturday night; do you?
15        A    No, sir.
16             MR. BOND:  Do you need to take a break?
17             THE WITNESS:  No, I'm fine.
18             MR. BOND:  Okay.
19   BY MR. ERVIN:
20        Q    You were asked a question about bodies being
21   dumped in Meade County.
22        A    Yes.
23        Q    And as I understood your testimony, you
24   associated that somehow with proximity to Fort Knox?
25        A    Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Can you help me understand that?
 2        A    Meade County borders Fort Knox Reservation,
 3   and, you know, I can't tell you how many, but I remember
 4   back through the years been a few that would get
 5   murdered in Radcliffe or Fort Knox, and they would dump
 6   them out in the county.  We've got Otter Creek Park.  I
 7   can remember just, you know, there would be a dumping
 8   ground.  I mean, I can't tell you how many or nothing,
 9   but I just do remember that.
10        Q    Okay.  This case and the investigation
11   involving Rhonda Sue Warford was of a murder in Meade
12   County?
13        A    Sir?
14        Q    This was a murder -- the investigation of
15   Rhonda Sue Warford was of a murder that occurred in
16   Meade County; is that right?
17             MR. SLOSAR:  Objection to form.
18        A    I do not know that.
19        Q    Okay.  Do you --
20        A    I don't know where it occurred.
21        Q    Okay.  Did you understand or were you aware of
22   the evidence that in the field where she was found there
23   was an area where a lot of blood loss had occurred?
24             MR. SLOSAR:  Objection to form.
25        A    No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

262

```
 1        Q    Okay.  You've been asked some questions about
 2   Kenton Smith, the Commonwealth's Attorney.
 3        A    Yes, sir.
 4        Q    How long have you known Mr. Smith?
 5        A    Since I started at the sheriff's department.
 6        Q    Okay.  So at least since 1980?
 7        A    3.
 8        Q    3?
 9        A    Yes, sir.
10        Q    All right.
11        A    And probably before, but at least that.
12        Q    How long did he serve as Commonwealth's
13   Attorney?
14        A    I can't remember.  Several years.
15        Q    Okay.  Was he Commonwealth's Attorney when you
16   started?
17        A    No.
18        Q    Okay.  Do you know whether he served more than
19   one term?
20        A    Yes.
21        Q    Okay.  And his terms were four years?
22        A    I believe so.  I'm just not sure about that.
23   It could be six.
24        Q    All right.  All right.
25        A    I believe it is six.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

263

```
 1        Q    But I'm gathering from you, your perception of
 2   him is a someone with a strong personality?
 3        A    Yes.
 4        Q    He was in control of his prosecutions; is that
 5   a fair statement?
 6             MR. SLOSAR:  Objection to form.
 7        A    Very much so.
 8        Q    You made mention of the fact of his
 9   thoroughness.  Is that --
10        A    Yes.
11        Q    All right.  Was it your perception of him that
12   he would analyze evidence of a case and make his own
13   judgment as to how to present it?
14        A    Yes.
15             MR. SLOSAR:  Objection to form.
16        Q    In other words, did you feel like you would be
17   in a position to explain to him how he ought to try a
18   case?
19             MR. SLOSAR:  Objection to form.
20        A    You have to repeat that again.
21        Q    Did you ever feel like you were in a position
22   to tell him how he ought to try a case?
23             MR. SLOSAR:  Same objection.
24        A    No.
25        Q    Did you ever feel you were in a position to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

264

 1    tell him that one piece of evidence was more important

 2    than another in his trial of a case?

 3        A    No.

 4        Q    And I believe, as I understood your testimony,

 5    the law enforcement side of your office in and around

 6    the time of 1992 was approximately four officers; is

 7    that right?

 8        A    Approximately.

 9        Q    All right.

10        A    Joe could probably tell you exactly, but I

11    just don't remember.  It's approximately.

12        Q    All right.  Well, there was you, Joe, and I

13    think you said two others?

14        A    Yeah, Ernie Embry, Joe Wood.  There might be a

15    couple of part-time people, but that -- that was

16    basically the full-time.

17            MR. ERVIN:  I believe that's all I have for

18       now.  Oh, no wait.  Wait.  That's all I have.

19            MR. ROSENE:  Yeah.  I have a couple of

20       questions.

21                        EXAMINATION

22    BY MR. ROSENE:

23        Q    Hi, Mr. Wise.  My name is Peter Rosene.  I

24    represent Robert Thurman in this case.  I just have a

25    couple of questions for you.  So given one of your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

265

1   answers to one of Len's earlier questions, this should

2   be fairly short.  So I think -- is it accurate that

3   earlier you said that you did not know Robert Thurman?

4        A    I do not.

5        Q    And by that, do you mean personally?

6        A    Personally.

7        Q    Okay.  Did you know who he was back in 1992 at

8   the time of the investigation or in 1995 whenever the

9   trial was going on?

10       A    A Louisville Metro officer?

11       Q    Sorry.

12       A    He was a Louisville Metro officer?

13       Q    No.  So by that, you were not aware of what

14  his -- in what capacity his participation was in the

15  1995 --

16       A    I do not.

17       Q    Okay.  So before the filing of this lawsuit,

18  had you ever heard of Robert Thurman?

19       A    Not that I know of.  No.

20       Q    So you had never heard of any officers or

21  anybody talking about Robert Thurman?

22       A    No.

23            MR. ROSENE:  Okay.  That's all I have.  Thank

24       you.

25            MR. PELLINO:  I don't have any questions for

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    you, Mr. Wise.  Thank you.

2          MR. SLOSAR:  I have some very limited follow-

3    up, and then we're all going to get out of here.

4    All right.

5          MR. BOND:  And I apologize.  And let me say

6    something on the record, and I do want to -- Mr.

7    Clark, don't think for one second any of this levity

8    is in disrespect to you.  It's not.  I just -- well,

9    sometimes us lawyers kind of banter about with each

10   other because it's one way we survive, and I don't

11   mean any disrespect whatsoever to anybody in this

12   proceeding.  Okay.

13         MR. SLOSAR:  I appreciate that.

14         MR. BOND:  Well, I just -- I kind of thought,

15   you know, he's not part of this process on a regular

16   basis, and he may not understand that we try to beat

17   each other's brains out inside these four walls, but

18   outside these four walls, we can have a

19   relationship. And I just -- I didn't want that

20   misconstrued in any way.  Okay.

21         MR. SLOSAR:  Very nice of you.  I appreciate

22   that.

23              REDIRECT EXAMINATION

24   BY MR. SLOSAR:

25         Q    Mr. Wise, good afternoon.  We started in the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1   morning.  We're going to get out of here before the
 2   evening.
 3           MR. BOND:  It's Friday.
 4       Q    Mr. -- I don't know what your lawyer said, but
 5   I wish it was.  Mr. Ervin was asking you some questions
 6   earlier about a code.  Do you remember him bringing up
 7   that word?
 8       A    A what?
 9       Q    A code.  When you said that there weren't --
10   do you remember testifying earlier that there weren't
11   any written policies or procedures prior to the
12   investigation into Ms. Warford's death at the Meade
13   County Sheriff's Department?
14       A    Yes.
15       Q    Okay.  And there -- at that time, there also
16   were not any unwritten policies or procedures, correct?
17       A    Well, not really but there was, too, I guess.
18   Since you bring up the question.  So Joe did teach us a
19   few things.  But I -- that's in training, I -- I take
20   it.
21       Q    Okay.  Now --
22       A    But you can take it either way.
23       Q    -- Mr. Ervin mentioned a word, a code.  And
24   have you ever heard of a code of silence?
25       A    I don't remember him saying that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1        Q    No, no.  He didn't say that.  I'm asking -- it
 2   made me -- rang a bell with me.  Have you ever heard of
 3   the phrase "a code of silence" in reference to police
 4   officers not openly revealing misconduct that other
 5   police officers committed?
 6             MR. PELLINO:  Objection to form.
 7        Q    Have you ever heard of that?
 8        A    Yes.
 9        Q    Yeah.  You've heard of a code of silence,
10   right?
11        A    I have.
12        Q    Yeah.  Did you hear about that when you were
13   working at the Meade County Sheriff's Department?
14        A    No.
15        Q    When did you hear about that?
16        A    Probably TV.
17        Q    All right.
18        A    On one of the shows.  I don't know.  I watch
19   some of them police shows.  I shouldn't, but I do.
20        Q    That's fine.  And earlier Mr. Ervin was
21   talking to you about that conversation you had with Mr.
22   Clark, I believe, on March 7, 1995 after court.  Do you
23   remember him asking you some questions about that?  I'm
24   not referring you to the report yet --
25        A    Yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1       Q    -- but that is the report.  You've got it
 2  right there.
 3       A    Yes.
 4       Q    Yeah.  And I think he was generally asking
 5  you, you know, if Mr. Clark made any comments of them
 6  not killing her on any other day of the week or
 7  something to that effect.
 8       A    Yes.
 9       Q    Do you recall being asked those questions?
10       A    Yes.
11       Q    Sitting here today, you don't have any first-
12  hand knowledge based on the investigation that you
13  conducted as to who killed Ms. Warford, correct?
14       A    I do not.
15       Q    Okay.  Could have been anyone because you just
16  don't know, right?
17       A    I just don't know.
18       Q    Okay.  Now, Mr. Ervin asked you some questions
19  about whether Mr. Greer would ever bring his gun into
20  the Meade County Jail.  Do you recall him asking you
21  some questions like that?
22       A    Yes.
23       Q    Back in 1992, was there any formal process for
24  how an officer would check their gun in before they
25  walked into the jail?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A    Yes.  They had a box that you locked it in.

2     Q    And sometimes you would go over to the jail

3  and talk to Mr. Brewer, right?

4     A    Yes.

5     Q    Yeah.  And sometimes when you talked to Mr.

6  Brewer, you would have your service weapon on you,

7  right?

8     A    He wouldn't allow it.  You could not go inside

9  the jail with a weapon.

10    Q    And who would check it in when you went there?

11    A    You had to check it out or leave it in the

12  office or whatever.

13    Q    Okay.  Was there anybody that would frisk you

14  before you went in there?

15    A    No.  It was the honor system.

16    Q    Okay.  So there --

17    A    It was a rule.

18    Q    Yeah.  So it was an honor system type thing,

19  right?

20    A    Yes.  He wouldn't check you, but --

21    Q    Yeah.  He trusted that you would follow it,

22  right?

23    A    Yes.  And we followed it.

24    Q    Yeah.  Because it was for the safety of

25  yourself, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A      Uh-huh.  Yes, sir.

2       Q      And it was also for the safety of the inmates,

3    right?

4       A      Yes.

5       Q      And we don't want to see inmates getting a

6    hold of a gun, right?

7       A      No.

8       Q      And --

9       A      Nightmare.

10      Q      Yeah.  But nobody at the Meade County Jail

11   prior to 1995, to your knowledge, was actually checking

12   to make sure that people didn't bring in guns, correct?

13      A      Of the inmates?

14      Q      Law enforcement.

15      A      Now, ask that again because --

16      Q      Let me -- yeah, you're right.  Do you remember

17   me -- that's a bad question.  Prior to 1995, between

18   1992 and 1995, there wasn't somebody responsible for

19   actually checking to see whether law enforcement were

20   checking in their guns at the jail, right?

21      A      Right.

22      Q      Okay.  It was just an honor system, correct?

23      A      Yes.

24      Q      All right.  Now, earlier, a few minutes ago,

25   Mr. Ervin asked you some questions about some informal

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 272 of 279 PageID #: 28605
The Deposition of CLIFFY WISE, taken on July 11, 2019
272

1  rules that maybe Mr. Greer, Sheriff Greer, had set up.

2  Do you recall him asking you some questions about that?

3      A    Yes.

4      Q    Yeah.  And it's different than what you

5  testified to this morning, correct?

6          MR. BOND:  Object to the form of the question.

7          MR. SLOSAR:  Oh, let me withdraw the question.

8      You're right.  Let me withdraw that question.

9  BY MR. SLOSAR:

10     Q    Mr. Ervin asked you some questions about Cliff

11  Wise earlier; do you recall that?

12         MR. BOND:  He is Cliff Wise.

13         MR. SLOSAR:  Oh, my God.  I am tired.

14         MR. BOND:  Maybe we do need to quit.

15  BY MR. SLOSAR:

16     Q    He did ask you questions about yourself, so

17  it's not --

18         MR. BOND:  He did.

19     Q    -- totally false, but you-all knew that I

20  wasn't meaning that.  Mr. Ervin asked you some questions

21  about Clifford Capps.  Do you remember that?

22     A    Yes.

23     Q    Yeah.  Did you tell anybody from LPD prior to

24  1995 that you had been getting some business from Mr.

25  Capps prior to trial?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

273

1          MR. BOND:  Object to the form of the question.

2          MR. ERVIN:  Object to the form.  It

3     misrepresents what his testimony has been.

4   BY MR. SLOSAR:

5      Q    You can answer.

6      A    That's now wholly true.  It was sometime after

7   that, not during that time.  I'd have to think of the

8   years.  And let me clear -- just let me clear this up

9   real quick.  Cliff Capps worked for another company in

10  the -- in the sewage business.

11     Q    Who did he work for?

12     A    Allen Thomas.  It was called Bluegrass Septic.

13  He worked for them.  Bluegrass -- we bought Bluegrass'

14  equipment and business, so that come sometime -- it's

15  later on in the '90s, maybe in 2000.  Then, Cliff would

16  refer us business because he worked for that guy, and he

17  tried to get a job, and I wouldn't hire him.  So I would

18  just take his business.

19     Q    So at some point in time --

20     A    So that's --

21     Q    At some point in time, Clifford Capps actually

22  asked you for a job?

23     A    Oh, yeah.

24     Q    Yeah.  And earlier, you remember testifying

25  earlier that you've known Capps since the early '80s,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:17-cv-00419-GNS-CHL  Document 317-60  Filed 01/26/23  Page 274 of 279 PageID #:
28607
The Deposition of CLIFFY WISE, taken on July 11, 2019
274

1  right?

2      A    Oh, yeah.  I know Capps all -- since I was a

3  policeman.

4      Q    Yeah.  And in or around 1990, Mr. Capps was

5  actually a suspect in a homicide that you were

6  investigating, right?

7      A    Yeah.

8      Q    Yeah.  And --

9      A    Yes.

10     Q    -- earlier this morning, you had testified

11  that you started your company in 1994, right?

12     A    Yes, sir.

13     Q    Yeah.  And you couldn't remember exactly when

14  Capps first started referring people to you, but earlier

15  you testified before lunch break that you believed it

16  was in 1994, correct?

17          MR. ERVIN:  Objection.

18          MR. BOND:  Objection.

19     A    If I did, I was wrong.

20     Q    Okay.

21     A    And I can tell you exactly when it was now,

22  after I thought about it a minute.  It was actually 2006

23  when I left the sheriff's department.

24     Q    And you're saying that -- and that's after

25  we've had what, about maybe a couple of hours' worth of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    breaks today?

2        A    Yes.

3        Q    Yeah.  Yeah.  And before we took a lunch

4    break, you remembered something a little bit different,

5    right?  Is that right, sir?

6        A    Well, you tell me what you remember.

7        Q    Well, you tell me --

8            MR. BOND:  I object to the form of the

9        question.  He's answered you.

10        Q    -- I can't tell you.  I think --

11            MR. BOND:  Next question.

12        Q    Let me ask you this:  When you went to your

13    lunch break, was Mr. Ervin there?

14        A    No.

15        Q    No.  You went on a lunch break with your own

16    lawyers, right?

17        A    Yes.

18        Q    Yeah.  I don't want to talk to you about the

19    content of your conversation --

20            MR. BOND:  Well, let me clear this up.  He's

21        had absolutely no contact with any other lawyer in

22        this room, okay.

23            MR. SLOSAR:  I appreciate that, Keith.  I

24        appreciate that.

25    BY MR. SLOSAR:

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

```
 1      Q    And that lunch break lasted about an hour,
 2   correct?
 3      A    Yes.
 4      Q    Yeah.  Okay.
 5           MR. BOND:  No, no.  No questions.
 6           MR. SLOSAR:  I think, Cliff -- Mr. Wise,
 7      Sheriff Wise, thank you so much for your time.  We
 8      don't have any more questions for you.
 9           THE WITNESS:  All right.  Thank you.
10           MR. BOND:  Anybody else?
11           UNIDENTIFIED MALE SPEAKER:  No.
12           MR. BOND:  Okay.  I've got one question - or
13      two questions, guys.
14           MR. SLOSAR:  You're going to reserve?
15           MR. BOND:  Huh?
16           THE WITNESS:  You get these?
17           MR. SLOSAR:  You're going to reserve signature?
18           MR. BOND:  No, I'm going to ask him two
19      questions so you-all will understand one thing,
20      okay?
21                     EXAMINATION
22   BY MR. BOND:
23      Q    Okay.  Can you explain to these folks why Joe
24   Greer investigated this murder?
25      A    Because Tommy Stiles, which was a Kentucky
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  State Police Detective, was on vacation.

2      Q     Had he not been on vacation, who would've

3  investigated it?

4      A     Kentucky State Police.

5      Q     Okay.  That's --

6      A     There wasn't anybody else.

7      Q     I just did that because Tommy's name had come

8  up earlier.  Okay.

9          MR. BOND:  Now, if you-all want to ask

10     something else, you go ahead.

11               FURTHER DIRECT EXAMINATION

12  BY MR. SLOSAR:

13     Q     Let me ask you real quick.  Once Mr. -- did

14  Mr. Stiles come back from vacation sometime after Ms.

15  Warford's death and prior to the 1995 trial for Mr.

16  Clark?

17     A     Yes.  He came back to work.

18     Q     Did KS -- did Mr. -- did Sheriff Greer, to

19  your knowledge, ever ask KSP to take the investigation

20  over?

21     A     No.  Case -- they've got a standing -- if they

22  don't get involved on the start, they won't take it

23  over, so to answer you.

24          VIDEOGRAPHER:  The time if 5:02.  That

25     concludes today's deposition.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    (DEPOSITION CONCLUDED AT 5:02 P.M.)



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of CLIFFY WISE, taken on July 11, 2019

1           CERTIFICATE OF REPORTER

2              STATE OF INDIANA

3

4   I do hereby certify that the witness in the foregoing

5   transcript was taken on the date, and at the time and

6   place set out on the Title page hereof by me after first

7   being duly sworn to testify the truth, the whole truth,

8   and nothing but the truth; and that the said matter was

9   recorded by me and then reduced to typewritten form

10  under my direction, and constitutes a true record of the

11  transcript as taken, all to the best of my skills and

12  ability. I certify that I am not a relative or employee

13  of either counsel, and that I am in no way interested

14  financially, directly or indirectly, in this action.

15

16

17

18

19

20

21

22  LACEE TOWNSEND,

23  COURT REPORTER / NOTARY

24  COMMISSION EXPIRES ON: 06/19/2024

25  SUBMITTED ON:  07/22/2019

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com