```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DIVISION OF KENTUCKY
 2                       AT LOUISVILLE

 3   File No. 3:17-cv-00419-DJH

 4   _____

 5   VIDEOTAPED DEPOSITION OF HARVEY PALEFSKY

 6   June 24, 2019

 7   _____

 8
     JEFFREY DEWAYNE CLARK and
 9   GARR KEITH HARDIN,

10          Plaintiffs,

11   V.

12   LOUISVILLE JEFFERSON COUNTY
     METRO GOVERNMENT, et al,
13
            Defendants.
14   _____

15

16           Videotaped deposition of HARVEY PALEFSKY, a Witness

17   herein, called by Plaintiff Hardin in the above entitled

18   matter on Monday, the 24th day of June, 2019, commencing at

19   the hour of 12:08 p.m., at 236 Main Street, Grand Junction,

20   Colorado, before Elizabeth P. Whitton, Registered

21   Professional Reporter and Notary Public within and for the

22   State of Colorado; said deposition being taken pursuant to

23   Subpoena and the Federal Rules of Civil Procedure.

24

25
```



```
 1                REMOTE COUNSEL:  Objection, objection,
 2   objection.  It speaks for itself.  He was sworn to tell the
 3   truth.  He swore he's telling the truth now, regardless of
 4   his license.  Please.
 5          Q     (By Mr. Kamdang)  Who is Roy Melanson?
 6          A     He was the defendant I was representing in
 7   1993.
 8          Q     How did you come to represent Mr. Melanson?
 9          A     Well, I was in Montrose at the time.  They
10   asked me to help out on this case, which was a Gunnison
11   County case.  There was another attorney by the name of Sam
12   McClure, who was the lead counsel.  Sam was about to leave to
13   do death penalty work in Texas, so they asked me to become
14   lead counsel.  So that's how I got involved.
15          Q     What charges was Roy Melanson facing?
16          A     It was first-degree murder.
17          Q     And do you recall when, in relationship to the
18   affidavit that you signed, the murders occurred that he was
19   charged with?
20          A     Well, it occurred, as I wrote in the
21   affidavit, it was 19 years prior to when he was prosecuted or
22   when the trial occurred.
23          Q     And did Mr. Melanson's case go to trial?
24          A     It did.
25          Q     Do you recall when Mr. Melanson's case went to
```



```
 1   which I'll read into the record.
 2               "Mr. Justis advised us that he had given the
 3   letter to Sheriff Joseph Greer, who had made copies of the
 4   letter."
 5               Did I read paragraph 8 correctly?
 6       A       You did.
 7       Q       When you swore off paragraph 8 in 1995, was it
 8   true to the best of your -- true and accurate to the best of
 9   your knowledge?
10       A       It was.
11       Q       Okay.  What did --
12               MR. KAMDANG:  Did you have an objection?
13               MR. BOND:  No.
14       Q       (By Mr. Kamdang)  What did Kevin Justis tell
15   you he had done with the letter he received from Clifford
16   Capps that he told you was asking him to lie on behalf of
17   Clifford Capps?
18       A       He told me that he gave the letter to Sheriff
19   Greer, that Sheriff Greer made copies of the letter, and I
20   believe he said his mother had a copy of the letter.
21       Q       Okay.  What investigative steps -- withdrawn.
22               When did you realize that the Capps letter
23   could be used as potential impeachment evidence?
24               MR. BOND:  You mean in the Melanson case?
25               MR. KAMDANG:  In the Melanson case.  Yes, let
```



```
 1   said letter but was unable or unwilling to provide a copy of
 2   the same, whereupon Mr. Palefsky obtained a copy from the
 3   mother of either Capps or Justis."
 4              Did I read paragraph 8 correctly?
 5        A     You did.
 6        Q     With respect to the representations of what
 7   you told Michael Argall, was Michael Argall's affidavit,
 8   correct?
 9              MR. BOND:  Object to the form.
10        A     If Michael Argall said it, then it's correct.
11   But part of our conversation happened on the record, and
12   there was a heated conversation in the hallway outside the
13   courtroom --
14        Q     (By Mr. Kamdang)  Okay.
15        A     -- before we went back on the record.
16        Q     Okay.  And you said that the criminal trial of
17   Roy Melanson was in August of 1993?
18        A     I believe that that was when it went to trial.
19   It was a two-week trial.
20        Q     Okay.  And you referenced a conversation about
21   the letter that you had with Michael Argall during the trial?
22        A     Correct.
23        Q     That was heated?
24        A     It was heated.
25        Q     Okay.  What did you tell Michael Argall in
```



```
 1   that he lied so I chinned" -- I don't think that's accurate
 2   "-- I chinned of started being friends with him at that
 3   point."
 4              Did I read that accurately?
 5        A     You read what it says, yes.
 6        Q     And are you aware that Mr. Justis has
 7   testified or given statements to the effect that he was in
 8   the cell with Roy Melanson while Melanson was incarcerated in
 9   the Meade County Detention Center?
10              MR. KAMDANG:  Objection.
11        A     Am I aware he testified at what proceeding?
12        Q     (By Mr. Bond)  Or has given statements to that
13   effect, that he was in the cell with Mr. Melanson.
14        A     Back in 1993?
15        Q     Well, it had to have been 1992.
16        A     Right.
17        Q     Mr. Melanson was incarcerated.
18        A     But when did he make the statement?
19        Q     I'm just asking you are you aware; the answer
20   is yes or no, sir.
21        A     No.
22        Q     Okay.  Thank you.
23              Where's the recorded statement of Clifford
24   Capps that you took on June the 27th, 1993?
25              MR. KAMDANG:  Objection.
```

