COMMONWEALTH OF KENTUCKY
MEADE CIRCUIT COURT
FILE NO. 92-CR-42 AND 92-CR-43



COMMONWEALTH OF KENTUCKY          PLAINTIFF/RESPONDENTS

VS.     **<u>ORDER GRANTING MOTION FOR NEW TRIAL, VACATING
CONVICTIONS AND ORDERING NEW TRIAL</u>**

JEFFREY DEWAYNE CLARK
GARR KEITH HARDIN                         DEFENDANTS/MOVANTS

This cause came before this Court on Movants' Motion for New Trial ("Motion") filed on February 26, 2015, based upon newly discovered evidence and federal constitutional violations. The Movants are Jeffrey Dewayne Clark and Garr Keith Hardin. The Commonwealth of Kentucky filed a Response to the Motion and Movants submitted a Reply. On July 10 and 13, 2015, this Court held an evidentiary hearing and heard argument and evidence on the claims raised in the Motion. At the conclusion of this hearing, this Court ordered Movants to file a brief and Proposed Findings of Fact and Conclusions of Law on or before August 14, 2015 and ordered the Commonwealth to file a brief and Proposed Findings of Fact and Conclusions of Law on or before September 14, 2015. This Court heard final arguments on January 8, 2016. Consequently, this Court finds that this matter is appropriate for review and disposition under K.R.S. § 422.285(12) and Kentucky Rule of Civil Procedure 60.02(f).



1



The Court has considered the pleadings and materials submitted by Movants and the Commonwealth, the testimony and evidence presented to the Court, the arguments of counsel, the various submissions of the parties and is sufficiently advised.

## **BACKGROUND**

The Supreme Court of Kentucky in a published opinion, *Hardin v Commonwealth*, 396 S.W.3rd 909 (Ky. 2013) sets forth an excellent background for this case as follows:

On April 1, 1992, at approximately 7:00 p.m., nineteen-year-old Rhonda Sue Warford went to the Kroger grocery store near her Louisville home. When she arrived home around 7:30 p.m., she told her mother that as she was leaving the parking lot, a strange man harassed her and told her he wanted to marry her. Just after midnight, Rhonda left home and never returned. Family members surmised that she was going back to the grocery. Three days later, authorities found her dead body approximately fifty miles away in a remote area of Meade County. Police officers preserved the evidence at the scene, including the placement of plastic bags over the victim's hands. The medical examiner concluded that the victim's death was the result of multiple stab wounds following a close-range violent struggle, as evidenced by defensive wounds on the victim's hands. Evidence obtained at the autopsy included three hairs recovered from the victim's right hand and hairs found on the victim's red sweatpants. Fingernail scrapings were obtained as well.

At the time of the murder, Rhonda was dating Appellant, Garr Keith Hardin. Appellant, Jeffrey Dewayne Clark, was a close friend of Hardin's and had socialized with Rhonda's sister, Michelle, at one time. At the time of the murder, Hardin and Clark were 22 and 21 years old, respectively. Following discovery of the body, Rhonda's mother told police she believed that Rhonda, Michelle, and both Appellants were involved in Satanism. Thereafter, the authorities zeroed in on Appellants as suspects in the murder.

Appellants were interviewed multiple times and denied any involvement in the murder. They claimed to have been together in Louisville at the time

2



in question. Clark denied owning a knife or being involved in Satanism. Hardin initially denied owning a knife, but subsequently admitted to such and also to being involved in Satanism. Pursuant to search warrants, knives were found in Clark's residence and numerous occult related items and knives were found in Hardin's residence. None of the knives found were determined to be linked to the murder. A tire cast obtained from the crime scene did not match any vehicles Appellants were known to have access to.

A few weeks after the murder, a forensics report was issued analyzing the hairs recovered at the autopsy. The hairs were analyzed using the available technology at the time, i.e., microscopic comparison to hair standards taken from the victim, Hardin, and Clark. Of the three hairs recovered from the victim's right hand, two were gray and did not match the victim, Hardin, or Clark. The third hair was deemed similar to the victim's own hair. Several hairs were recovered from the victim's red sweatpants as well, one of which was analyzed to have characteristics similar to Hardin's head hair. The rest of the hairs recovered from the pants were not microscopically similar to those of the victim, Hardin, or Clark.

The police concluded that Hardin and Clark had been involved in satanic worship, which became the Commonwealth's theory at trial as to Appellants' motive for the murder. Appellants were tried jointly in a seven-day trial in February and March, 1995. There were no witnesses who could place Appellants with the victim that night. Despite the Commonwealth's theory that the killing was Satanism related, the Commonwealth's expert on the subject testified the murder did not appear to be a satanic ritual sacrifice. No motive other than Satanism was offered.

The physical evidence the Commonwealth asserted linked the Appellants with the murder consisted of (1) a single finger-print matching the victim's which was lifted from the interior back seat passenger window of Clark's car; and (2) the one hair described as similar to Hardin's found on the victim's red sweatpants.

As to the fingerprint, it was undisputed that the victim, who was dating Hardin and was acquainted with Clark, had been in Clark's car on a number of occasions. The Commonwealth tried to assert that the print was fresh, thus disproving Clark's statement to police that the victim had not been in his car since December of 1991 (approximately four months before the murder). However, the Commonwealth's fingerprint expert conceded that fingerprints cannot be time-dated.

The Commonwealth further asserted that the one hair deemed similar to Hardin's found on the victim's pants disproved Hardin's statement of when he had last seen her. Hardin claimed he last saw the victim on March 27



and 28. 1992, when he had spent the night at her house. The victim's mother testified that the red sweatpants the victim was wearing at the time of her death had been laundered on the night of April 1, 1992. The Commonwealth asserted that the presence of one of Hardin's hairs on the freshly washed pants did not coincide with his story that he had not seen her since March 27 and 28.

The most incriminating testimony was offered by Clifford Capps. who had shared a cell with Clark at the Meade County jail. Capps claimed that Clark confessed twice to the murder. once jokingly and once seriously. Evidence was also presented through various witnesses showing that Appellants had an interest in knives. that both were heavily involved in Satanism, and that both had made false statements to law enforcement.

Appellants presented an alibi defense that they were in Louisville during the time frame at issue. not in Meade County where the victim was killed. Defense counsel argued that the true perpetrator would not be known until a match was found for the two unidentified gray hairs found in the victim's hand. The Commonwealth argued that the hairs could belong to the sheriff.

After Appellants' 1995 trial, a letter surfaced indicating that Clifford Capps may have committed perjury at the trial when he claimed Clark confessed to the murder. In the letter, dated November 17, 1992. Capps attempted to solicit another inmate, Kevin Justis. to fabricate testimony to bolster Capps' story that Clark had confessed. Capps' apparent motive in incriminating Clark was to gain favor with the Commonwealth in order to receive shock probation. Appellants claimed Capps' letter was newly discovered evidence and became the basis for their motion for a new trial. The trial court's denial of this motion was also raised as an issue on direct appeal to this Court. Appellants argued therein that if Capps was soliciting someone else to commit perjury to bolster his testimony. he may very well have committed perjury himself and. hence. a new trial was warranted.

We concluded the trial court did not err in denying the motion on grounds that this newly discovered evidence, with reasonable certainty, would not have changed the verdict had a new trial been granted. Hardin v. Commonwealth, 95-SC-000461-MR (Ky. Aug. 29, 1996); Clark v. Commonwealth. 95-SC-000453-MR (Ky. Oct. 2. 1997). This Court ultimately affirmed Hardin's and Clark's convictions, although acknowledging that the evidence against them was "highly circumstantial." Hardin v. Commonwealth, Id., slip op. at 17.



## PROCEDURAL HISTORY

### Trial

Clark and Hardin were jointly tried before a jury of the Meade Circuit Court in a seven (7) day trial during February and March 1995.  They were each found guilty of murder.

### Post-Trial Motions and Proceedings

After the trial there were various motions for new trials, direct appeals to the Kentucky Supreme Court, a petition for federal writ of habeas corpus which was heard by the United States District Court and the United States Court of Appeals and motions pursuant to RCr 11.42.  Both the United States Supreme Court and the Kentucky Supreme Court have denied certiorari.  None of these procedures were successful for the Movants.

### Motion for Release of Physical Evidence for DNA testing

In July, 2009 the Movants filed motions for the release of physical evidence for DNA testing.  The circuit court denied said motions and the Kentucky Supreme Court in April, 2013 reversed the trial court and directed the Commonwealth to release the physical evidence for DNA testing.  *Hardin v Commonwealth*, 396 S.W.3d 909 (Ky. 2013).



### DNA Testing

Between February and October, 2014, Mitotyping Technologies of Pennsylvania, received and analyzed the hair samples which police acquired in 1992.

### Clark's Parole Hearing

On February 5, 2015, Clark appeared before the Kentucky Parole Board but continued to protest his innocence.  An audio CD recording of Clark's parole hearing is in the record.

### Hardin's Confession at Parole Hearing

On February 25, 2014, Hardin appeared before the Kentucky Parole Board and admitted that he stabbed Rhonda Sue Warford to death.  He also implicated co-defendant Clark.  Hardin admitted that he had been involved in Satanism at the time of the murder.  An audio CD recording and a transcript of Hardin's statements to the Parole Board have already been admitted into the record.

### The Second (Present) Motion for New Trial

On February 26, 2015, Clark and Hardin filed the present motion for new trial, arguing that the DNA testing proves their innocence and/or entitles them to a new trial.  The remaining extensive procedural history is set forth in detail in the pleadings.



## FINDINGS OF FACT

### Advances in Technology since Trial

1.      This Court notes the advances in technology which have occurred since this case was tried in 1995.  DNA testing can now be used to provide insight into facts and evidence in highly accurate and precise ways that were not available nor possible in the past.

### Parole Board Admissions by Movants

2.      Based upon the testimony and evidence presented to the Court, the Court finds that there is reason for candidates for parole to believe that failing to admit culpability or otherwise take responsibility for the crime(s) for which they are imprisoned, will adversely affect the likelihood of obtaining parole. Thus, the Court finds that the admissions made by both Movants during their parole hearings has little legal relevance in the Court's determination herein and the Court attaches little weight to this evidence.

### DNA Testing of Crime Scene Hairs

3.      This Court finds that the record and pleadings submitted by the parties along with the testimony and evidence presented, including the documentary exhibits submitted to the Court, establish as fact as follows:



4.      At Movants' 1995 trial, the Commonwealth presented the testimony of Robert Thurman, a forensic scientist at the Kentucky State Police Crime Laboratory, who conducted microscopic hair comparison to investigate the victim's death.  Thurman testified that microscopic hair comparison was generally accepted as reliable in the field of forensic science.  Thurman testified that one hair found on the victim's red sweatpants, labeled Exhibit 16, was "similar in color and microscopic characteristics" to Mr. Hardin's head hair.

5.      When comparing two hairs under the microscope, Mr. Thurman testified at trial that "in order for us to call a match, the [two hairs] have to match in characteristics" and, when doing a side-by-side comparison, the two hairs must look like "one continuous hair running" and "they must match that way also."

6.      At the July, 2015 evidentiary hearing, Thurman testified that the slide containing the hairs from the victim's red sweatpants was labeled Exhibit 16. Thurman testified that when three or more hairs were on a slide, it was often his custom and practice to place a check mark on the slide, in marker, next to the hair that he identified to be "similar in color and microscopic characteristics" to a known standard.  He testified that he placed this check mark on the slide in the event someone needed to look at that hair again.

7.      Charity Holland, a DNA analyst from Mitotyping Technologies, LLC, the laboratory that performed post-conviction DNA testing on the hairs in this case,



testified that before each hair was removed from a slide, Mitotyping documented the location of each hair on the slide. A check mark in blue was made on the slide labeled Warford Exhibit 16. (Movants' Joint Hearing Exhs. 2, 11 and 13.) This check mark was observed on the slide when it was received from the Kentucky State Police Crime Lab. Ms. Holland testified that the check mark was next to the end of the hair which Mitotyping labeled Q1 and adjacent to the hair which Mitotyping labeled Q4. Mr. Hardin and Mr. Clark were excluded as the source of both hairs through mitochondrial DNA testing.

8.    At the evidentiary hearing, Thurman acknowledged that he used the term "match" at trial when he found a comparison between a crime scene hair and a known standard. "I was saying the characteristics that I found in this one 'matched' the characteristics that I found in that one."

9.    At trial, the Commonwealth further used the term "match" to describe the hair comparison results:

> Commonwealth:  If you're looking at two hairs in a microscope, and let's say you get what I would call a match. Is that the word you use, 'match'? Or how do you grade these hairs?
>
> Thurman:  If something looks like it's a match, we say it's similar in color and microscopic characteristics.
>
> Commonwealth:  So, in other words, if you're looking at two hairs under a microscope and if they match up in these 15 characteristics that



you're talking about, you use the word 'similar in characteristics'?

Thurman:  That's correct.

10.    In his opening statement at trial, the Commonwealth's Attorney stated that the victim was found wearing red sweatpants.  He told the jury that the victim's clothes were analyzed and a hair "exactly like" Hardin's hair was found on her sweatpants.  The Commonwealth's Attorney told the jury that the victim's mother "will tell you that these red sweatpants worn by [the victim] were [the victim's mother's] pants and they were cleaned prior to [the victim] getting them and putting them on and going out that night."  "The Commonwealth asserted that the presence of one of Hardin's hairs on the freshly washed pants did not coincide with his story that he had not seen [the victim] since March 27 and 28." *Hardin,* 396 S.W.3d at 911.

11.    The victim's mother testified that the red sweatpants belonged to her, that she had washed them shortly before the victim changed into them on the night of April 1, and that they were clean.

12.    At trial, Sheriff Greer testified that the hair on the victim's red sweatpants that was "similar in microscopic characteristics" to Mr. Hardin's hair was "significant" from an investigative standpoint.

13.    The Commonwealth's Attorney argued, in response to defense motions for a directed verdict, that the Movants "lied to the police about



everything involved in this case" and that evidence that the victim's red sweatpants which were "not even hers" but which were borrowed from her mother – had a hair "just like" Mr. Hardin's on them was "certainly probative."

14.    In his closing argument, the Commonwealth's Attorney told the jury: "These sweatpants were her mother's. These sweatpants were her mother's. They were clean. And yet they have a hair just like the defendant Hardin's on them."

15.    In his closing, the Commonwealth's Attorney again told the jury that the pants were borrowed and "cleaned" before the victim put them on to negate any inference that Mr. Hardin's hair could have been innocently deposited at an earlier time: "She got Mrs. Warford's pants. She got Mrs. Warford's pants that had been cleaned."

16.    The Commonwealth's Attorney again argued in closing: "A hair just like the defendant's on sweatpants that had been cleaned before this happened."

17.    This hair was the only physical evidence connecting the Movants to the crime scene. This Court finds that the post-conviction DNA evidence, including the documentary exhibits submitted to the Court, establish as scientific fact that the hair that was determined to "match" Mr. Hardin did not come from Mr. Hardin. This evidence is based upon scientific findings.

18.     The Commonwealth introduced no evidence contradicting the DNA test results or the supporting documentary evidence submitted by Mr. Hardin and Mr. Clark.

19.     The mitochondrial DNA test results obtained as a result of the post-conviction DNA testing ordered in 2013 were not in Mr. Hardin or Mr. Clark's possession at the time of their criminal trial and could not have been discovered by them (or their counsel) in the exercise of reasonable diligence in 1995.

20.     The Court finds this new evidence is relevant, material and exculpatory.

21.     The Court finds this new evidence is not merely cumulative, collateral or impeaching.

22.     The Court finds Thurman's testimony that one hair on the victim's red sweatpants was "similar in color and microscopic characteristics" to Mr. Hardin's hair was material to the Commonwealth's case at trial.

23.     There was much discussion at the hearing and argument as to whether or not the Commonwealth used the word "match" when describing the hair analysis. The testimony at trial, based on the hair analysis available at that time, was that the hair found on the victim's red sweatpants was "similar in color and microscopic characteristics and may have common origin" to Mr. Hardin's head hair. See Defendant's Joint Exhibit 1 at July 10, 2015 hearing. The

Commonwealth at the hearing and argument spent much effort explaining that the word "match" was not used to describe the hair found on the sweatpants as Mr. Hardin's, however the Commonwealth certainly argued to the Jury that this was a key piece of evidence and that science supported their theory.  Science that has developed since the trial has proven this to be totally false.  It is a scientific fact that the hair found on the sweatpants is not from Mr. Hardin's head.  This Court finds that even if the Commonwealth used the word "match" to refer to the 15 characteristics of hair testified about, it is hard to argue that the jury was not urged to believe the hairs matched rather than their characteristics.

24.    This new evidence demonstrates that Thurman's testimony and the Commonwealth's argument to the Jury were inaccurate and materially misleading.

25.    The Court finds that this new evidence undermines the credibility of the Commonwealth's case.

### FBI's Announcement on Microscopic Hair Comparison

26.    This Court finds that the record and pleadings submitted by the parties along with the testimony and evidence presented, including the documentary exhibits submitted to the Court, establish as fact as follows:

27.    The FBI announced in 2013 that testimony that a crime scene hair is a "match" to a particular defendant's hair through microscopic hair comparison implies a level of certainty that exceeds the limits of science.



28.     The FBI's admission, which was made public in 2013, could not have been discovered by Mr. Hardin and Mr. Clark (or their counsel) in the exercise of reasonable diligence in 1995.

29.     There is no dispute in the pleadings that this evidence is competent and accurate as it is based upon findings and facts that are not controverted.

30.     This Court finds that the FBI's admission is relevant, material and exculpatory.

31.     This evidence is not merely cumulative, collateral or impeaching.

32.     This Court finds this new evidence demonstrates that Thurman's testimony and the Commonwealth's argument to the Jury were inaccurate and scientifically invalid.

33.     This new evidence undermines the credibility of the Commonwealth's case.

### DNA Testing of Blood-Stained Cloth

34.     This Court finds that the record and pleadings submitted by the parties along with the testimony and evidence presented, including the documentary exhibits submitted to the Court, establish as fact as follows:

35.     A review of the record reveals that the Commonwealth's theory at trial was that Mr. Hardin and Mr. Clark were "devil worshipers" and the victim was killed to enhance their standing with Satan. *Hardin*, 396 S.W.3d at 911 ("The



police concluded that Hardin and Clark had been involved in satanic worship, which became the Commonwealth's theory at trial as to [the] motive for the murder. . . . No motive other than Satanism was offered.").

36.     During an in-chambers pre-trial conference, Commonwealth's Attorney Kenton Smith stated, "what I intend to prove [is] that both of these people are involved in Satanism and that is their motive, and their motive is they wanted to whack this girl because it would enhance their standing in this particular Satanism." The trial court stated that "Kenton [Smith]'s position is that he's going to try to show motive" through the introduction of the Satanic evidence and ruled that such evidence was admissible "for purposes of establishing motive." (stating that "[the Commonwealth's Attorney] may be walking out on a pretty long limb")).

37.     At the close of the Commonwealth's case at trial, the Commonwealth's Attorney argued to the court that "the motive for this killing was the Defendants' involvement with Satanism."

38.     No credible evidence was presented at trial that the murder was related to or motivated by satanic worship. In his opening and closing, the Commonwealth's Attorney argued that Mr. Hardin "had been sacrificing animals and he had gotten to where he wanted to do humans."

39.     To prove its theory that Mr. Hardin killed small animals and wanted to advance from animal to human sacrifices, the Commonwealth introduced into



evidence Kentucky State Police ("KSP") Exhibit 77, a broken glass "chalice" and a blood-stained cloth seized from Mr. Hardin's bedroom.

40.    In his testimony at trial, Mr. Hardin testified that he had dropped the glass cup and tried to catch it before it hit the ground; however it broke and cut his hand.  He testified that he used the cloth to wipe the blood from his hand.  Mr. Hardin repeatedly testified that the blood on the cloth was his own.

41.    In his closing argument, the Commonwealth's Attorney told the jury that Mr. Hardin lied when he said he cut his hand on the "chalice" and lied when he said it was his blood on the cloth.  The Commonwealth's Attorney argued in closing argument that the blood was deposited during a ritual animal sacrifice and that the cup was a "chalice" from which Mr. Hardin drank the blood of the animals he sacrificed for Satan.

42.    At the July, 2015 evidentiary hearing, Dr. Julie Heinig, Assistant Lab Director of the Forensics Department at DNA Diagnostics Center and a DNA Technical Leader, testified that she received from KSP Crime Lab small sections of fabric with reddish-brown discoloration labeled Exhibit 77A and Exhibit 77B.  Dr. Heinig testified that serological testing confirmed that the stains were human blood and Mr. Hardin could not be excluded as the source.



43.     Based on the statistical calculation, Dr. Heinig testified that with a reasonable degree of scientific certainty, Mr. Hardin was the donor of the blood stains on the fabric.

44.     This Court finds that the post-conviction DNA evidence, including the documentary exhibits submitted to the Court, establish as scientific fact that the blood that the Commonwealth argued was deposited during an animal sacrifice was in fact Mr. Hardin's blood.

45.     There is no dispute in the pleadings that this evidence is competent and accurate as it is based upon scientific findings and facts that are not controverted.

46.     The Commonwealth introduced no evidence contradicting the DNA test results or the supporting documentary evidence submitted by Mr. Hardin and Mr. Clark.

47.     The STR DNA test results obtained as a result of the post-conviction DNA testing ordered in 2013 were not in Mr. Hardin or Mr. Clark's possession at the time of their criminal trial and could not have been discovered by them (or their counsel) in the exercise of reasonable diligence in 1995.

48.     This Court finds this new evidence is relevant, material and exculpatory.

49.     This new evidence is not merely cumulative, collateral or impeaching.

50.   This new evidence proves that Mr. Hardin was testifying truthfully at trial about the source of the blood.

51.   The Commonwealth's argument and the implication that the blood on the cloth in Mr. Hardin's bedroom was deposited during a satanic animal sacrifice was material to the Commonwealth's case at trial.

52.   The blood-stained cloth was the only physical evidence presented at trial to support the Commonwealth's theory that Mr. Hardin engaged in animal sacrifice.

53.   This new evidence demonstrates that the Commonwealth's argument to the Jury was inaccurate and materially misleading.

54.   This new evidence significantly undermines the Commonwealth's theory at trial of this murder and, in particular, the motive for the murder.

55.   This new evidence undermines the credibility of the Commonwealth's case.

### Louisville Metro Police Detective Mark Handy

56.   This Court finds that the record and pleadings submitted by the parties along with the testimony and evidence presented, including the documentary exhibits submitted to the Court, establish as fact as follows:

57.   The investigation in this case was conducted by the Meade County Sheriff's Department and the Louisville Metro Police Department ("LMPD").  The



interviews with Mr. Hardin and Mr. Clark took place at the LMPD.  It is undisputed that those interviews were not tape recorded.

58.     The majority of the interviews of Mr. Hardin and Mr. Clark were conducted by LMPD Detective Mark Handy.  Det. Handy acknowledged that he had a reputation within the LMPD as an effective interviewer of suspects and witnesses in criminal cases and that other officers sometimes brought Det. Handy into cases to talk to a suspect or a witness.

59.     To connect the blood-stained cloth found in Mr. Hardin's home to the Commonwealth's theory at trial, the prosecution relied on Det. Handy's uncorroborated April 7, 1992 investigative letter and uncorroborated testimony that Mr. Hardin told him that he had killed animals and "got tired of looking at animals and began to want to do human sacrifices."

60.     The defense argued at trial that these incriminating statements were manufactured by Det. Handy, but Mr. Hardin was left to rely on his word against a law enforcement officer.

61.     There is no dispute in the pleadings that the misconduct that then-LMPD Sergeant Denver Butler determined Det. Handy engaged in when Det. Handy was the lead investigator in the 1993 murder of Brenda Whitfield – falsely attributing incriminating statements to a criminal defendant, Edwin Chandler, and

testifying falsely under oath about those statements – is the same misconduct Mr. Hardin and Mr. Clark have asserted occurred in this case.

62.     Det. Handy testified under oath at Chandler's trial in February, 1995, just a few weeks before he testified under oath at Mr. Hardin and Mr. Clark's trial.

63.     There is no dispute in the record that during another murder investigation in 1992, Det. Handy erased an eyewitness's initial taped statement and recorded over it with a second statement.  At the pre-trial suppression hearing of the defendant, Keith West, Det. Handy testified under oath that he did not erase or copy over any tapes.  This sworn testimony by Det. Handy was in February, 1995, shortly before he testified under oath at Mr. Hardin and Mr. Clark's trial.

64.     As the lead investigator, Det. Handy's testimony and account of the police investigation are matters that were material and critical in Mr. Hardin and Mr. Clark's trial.

65.     Sgt. Butler's findings and recommendation that Det. Handy be criminally investigated for his misconduct in the Chandler case, and Chandler's exoneration are material impeachment evidence.  This new evidence significantly undermines Det. Handy's credibility and testimony at trial.

66.     This Court finds the Commonwealth introduced no evidence contradicting Sgt. Butler's findings or the supporting documentary evidence submitted by Mr. Hardin and Mr. Clark.



67.    The Court finds this new evidence would have been material to the jury's determination of Mr. Hardin and Mr. Clark's credibility.

68.    This new evidence would have been material to the jury's ultimate determination of Mr. Hardin and Mr. Clark's innocence and, if known and if available at the time of trial, would have led the jury to reject Det. Handy's testimony at trial about key "admissions" allegedly made by Mr. Hardin and Mr. Clark.

69.    This new evidence was not in Mr. Hardin and Mr. Clark's possession at the time of their criminal trial and could not have been discovered by them (or their counsel) in the exercise of reasonable diligence in 1995.

70.    This new evidence is competent, relevant and exculpatory.

71.    This new evidence is not merely cumulative, collateral and does not merely impeach a non-material witness.

72.    This new evidence discredits the integrity of the police investigation.

73.    This new evidence undermines the credibility of the Commonwealth's case.

Based upon the foregoing FINDINGS OF FACT, this Court enters the following CONCLUSIONS OF LAW.



## CONCLUSIONS OF LAW

74.     The evidence discussed in this Order is newly discovered evidence in that it was unknown and unavailable to Mr. Hardin and Mr. Clark at the time of their trial and could not have been discovered in the reasonable exercise of due diligence; is competent, accurate and exculpatory; materially bears on their innocence; is not merely impeaching, cumulative or collateral; and undermines the credibility of the Commonwealth's theory at trial.

75.     In addition, Kentucky's post-conviction DNA statute provides that, if the results of DNA testing are "favorable" to the defendant, the court "shall . . . make any further orders that are required pursuant to this section or the Kentucky Rules of Criminal Procedure." K.R.S. § 422.285(12).

76.     The post-conviction DNA results are favorable to Mr. Hardin and Mr. Clark.

77.     This Court concludes that each piece of newly discovered evidence, by itself, makes it reasonably probable that a jury would reach a different result at another trial.

78.     This Court further concludes that the newly discovered evidence, when considered cumulatively and viewed in light of the entire trial record, "is substantial, if not pivotal" and is "of such decisive value or force that it would, with reasonable certainty, have changed the verdict or that it would probably



change the result if a new trial should be granted." *Bedingfield v. Commonwealth*, 260 S.W.3d 805, 810, 814-15 (Ky. 2008); *Foley v. Commonwealth*, 425 S.W.3d 880, 886 (Ky. 2014).

79.    Based upon the Findings of Fact and the record and evidence presented in this case, it is clear that the Movants were convicted based, in part, on suppositions that we now know to be fundamentally false and material.  This violated fundamental concepts of justice and deprived Mr. Hardin and Mr. Clark of a fair trial, "understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *U.S. v. Bagley*, 473 U.S. 667, 682 (1985).

80.    This Court is "confronted with the stark reality" that Mr. Hardin and Mr. Clark were convicted based on "suppositions that we now know to be fundamentally false." *Bedingfield*, 260 S.W.3d at 813.  This false evidence "cast[s] a long shadow" on the trial.  *Id*. at 815.

## CONCLUSION

This case has similar circumstances as *Bedingfield*.  This Court finds it appropriate to quote the conclusion from said case.  The principles and reasoning in the following quote are very much applicable to the case presently before this Court.

> For clarity's sake we emphasize: the presence of sperm which
> DNA testing proves did not belong to Appellant does not exonerate

23

him; however, the presence of this new evidence does cast a long shadow and assuredly merits consideration in the form a new trial. It cannot be overlooked that in Appellant's initial trial, all other arguments were enhanced and corroborated by the supposition that the sperm found belonged to Appellant. Indeed, this theme was central to the Commonwealth's prosecution. Because the technology was not available for Appellant to refute that claim, Appellant was left to rely on his word against that of the Commonwealth. This new evidence is substantial, if not pivotal, and we are inclined to believe that it is precisely the type of evidence that is envisioned by the rule and that may change the result if a new trial were granted.

Based upon the foregoing findings of fact and conclusions of law, and pursuant to CR 60.02(f) and K.R.S. § 422.285(12), this Court finds and concludes that newly discovered evidence entitles Mr. Hardin and Mr. Clark to a new trial. Consequently, the Defendants' Motion for New Trial is **GRANTED** and IT IS HEREBY ORDERED, ADJUDGED and DECREED that Mr. Hardin and Mr. Clark's convictions be and are hereby **VACATED** and a new trial in these cases is ordered.

This is a final and appealable Order and there is no just cause for delay in its entry.

Dated this $\underline{14}$ day of July, 2016.

Bruce T. Butler, Circuit Judge
Division I
Meade Circuit Court