Exhibit 20
Sheriff Greer
Date 8/7/19

Commonwealth vs. Hardin and Clark
Special Grand Jury
May 7, 1993

Smith: . . . Kentucky versus Garr K. Hardin and Jeffrey D. Clark. Mr. Foreman, would you please swear the witness.

Unknown: Could you give me a second please.

(Witness sworn)

Smith: Sheriff Greer, I don't know any better way to start on this case than for you just to tell the Grand Jury, uh, what's going on, and I know you've worked your rear off on the case. Tell them what's happened.

Greer: Uh, on April the 5th, 1992, I received a call to my residence about shortly after 8 o'clock in the morning that, uh, an elderly man and woman were down off Kentucky 823--that runs out of Midden 261 toward Webster, turn on 823, goes back into Dead Horse Hollow. They were out early in the morning because they'd heard that they was five and a half so acres for sale down somewhere, and they just wanted to go down, take a look at it--early risers. Uh, just to be blunt with you, the man had to go to the bathroom. So, they pulled off of the highway which was right out here, pulled back this lane and stopped.

And his wife says, "Look, what's that over there. Looks like a mannequin."

Laying over here which you can't see right there, back down in here in the woods. I have a picture later that you can see.

Smith: Yeah.

Greer: So, they stopped, got out of the vehicle, and just a few steps and looked again.

And says, "My God, that's a body."

They turned around, left, went to their home in Irvington, called Deputy Sheriff Emery, who is one of my deputies. It was his mother-in-law and father-in-law. He immediately got a hold of me at my house shortly after eight, and this was at 7:30 when they seen what they seen. Uh, I met, uh, them down on 79 near Irvington there at, uh, 260 or 428 that goes over to 261, go left to Guston. And proceeded out there. Uh, we discreetly, or as good as we could, I told them to watch where they were going just, you know, in case there was something there. So, we pulled off. I walked in,

uh, to where I could see what it was, and it was, no doubt, a body--female, male at that time, I wasn't sure of. I op-, I, uh, had them to leave the area. We went back out, and I took a brief statement from them at that time up to what I told you--they were out looking for real estate, he had to go to the bathroom, they pulled off, they seen what they thought was a mannequin. Uh, I called other police in at that time. Uh, my personnel, uh, the coroner, we proceed for the next couple of hours, uh, to try to collect any type of physical evidence, uh, anything, you know, that would help us in this case, prior to removing the body--photographs, videotapes, measurements, uh, you name it. Uh, somewhere around eleven-- don't hold me to that time--or twelve o'clock, we finally removed the body. Uh, I left other police there. Again, we sketched the area, drew a map, drew drawings of the area, and everything, measured it. Myself and Bill Adams proceeded to Louisville with the body. I left people there with metal detectors, because there's no doubt, after we examined the body at the scene--as much as we could without disturbing anything--uh, she was stabbed. And again, we'd identified it as a female, and she was stabbed up pretty bad. We made one note at this time that's interesting in the case, you know, if and when I get an indictment, and I go to trial that could be very important. At this time, I think I'll show you one picture, and see if you can observe the same thing that I can.

Smith: Just a minute. Let me see the picture. Okay.

Greer: This one's even better, Mr. Smith. It's closer.

Smith: Okay. Let the record reflect that I'm passing two pictures to the Grand Jury to look at.

Greer: My observation at the scene--now, you know, after we got through examining her, as good as we could, without disturbing any physical evidence that might be on her or in her pockets or anything--how clean the clothing is. Her shoes were clean. Those red pants were clean. The back of this jacket's clean. You'll notice no scratch marks on her back. Again, we haven't seen her front. Between, uh, again, Mr. Smith.

Smith: Again, let the record reflect some pictures were passed to the Grand Jury.

Greer: Between where that body's laying and that spot right there, which you've got a picture of right now, appears to be blood. Is this correct? A large amount of blood. It's twenty-seven feet between that body and there. There wasn't

a leaf out of place, a drop of blood anywhere, and you see how she was laying.

Smith: Let the record reflect that Sheriff Greer is, uh, pointing to a diagram that was prepared at the scene. And Sheriff Greer, what you're implying is, obviously, she was carried. . .

Greer: She was carried.

Smith: . . .from the first bloody spot to where the body was ultimately found.

Greer: And in my opinion, the way the body is laid, it's almost obvious that she was carried.

Smith: There's no sign of drag marks on the girl's sweat clothes or anything like that?

Greer: The only thing that's on those clothes, which we'll come to, is her knees have got leaf marks and dirt, more leaf marks stains than anything. Again, this area of the blood, it was saturated five days later, 'cause I paid many visits to that scene. That blood had penetrated the gap-, uh, the ground, something terrible. And again, later on when I show you a picture, you will see why that it was. All indication at the scene was that she was picked up, face down, possibly her hair could have been dragging the leaves a little bit, very little, and she was laid. And her feet hit this briar, and sticks right there so they couldn't fall down. She's spread out like this. Uh, clothes are in tact, clean except, you know, on the bottom where they might have laid a little bit, but still clean on the bottom, indicating to me that she was packed because I have no drag marks. Uh, naturally from the back. You can look at the picture and see that. After arriving at the autopsy, Dr. Nichols' Medical Center, a thorough examination. . .

Smith: Dr. George Nichols who is the. . .

Greer: George Nichols is the state medical.

Smith: He examines and performs autopsies, uh, to help with forensic evidence and these type of things.

Greer: Right, we, uh. . .

Smith: Just a second.

Monarch: Excuse me. When you get a minute, I need to see

155

MCSO000183
EXHIBIT 19

you.

Smith: Oh, okay. This is the last case.

Monarch: Okay, well, before you bring the Grand Jury back, let me talk to you for a second.

Smith: Yeah, okay, I was going to anyway.

Greer: Uh, before any Post Mortem starts, there's a lot of things that has to be done. You, you go over the body for evidence. You delicately remove items, her clothes. You check pockets. You take fingernail scrapings. You take hair samples. You take sexual assault kits. You take everything. I mean, you name it, it was done, which was done in this case. Her clothes were protected. When we took them off, we put them in bags, which was ultimately submitted to the Crime Lab by me. Everything that came off this young lady was submitted. I, uh, again these clothes come off. Yes, this top part here was bloody, a mess. I mean that stands to reason. 'Round here was blood. There was puncture holes in her jacket, through her shirt, even caught part of her bra in one of them in her. These blows, according to Dr. Nichols, is not fatal. We did a complete examination of the body. She had 11 stab wounds, which is what you all probably heard. But there was one other wound she had too. Her throat was cut from here to here.

Smith: When you, let the record reflect, you're talking about the whole front of her head?

Greer: No, I'm talking about the center to right.

Smith: Center to up the right side, about even with the lower part of the ear.

Greer: These pictures are not pretty. Now, have you still got my pictures on the. . . That's where she was killed. There is no doubt in our minds where she was killed.

Smith: And you say, what you are sure of, Sheriff Greer, for the record, you're pointing to the, to the spot on the ground where there's a whole lot of blood.

Greer: All kinds of blood.

Smith: Okay. And so, based upon what you observed, she was killed in one place and carried to another place.

Greer: This is correct. What happened, again, it's a

theory, but what else have I got is theories, and evidence. She was stabbed in the front, which would not have killed her, she went to the ground on her knees, in my opinion due to the dirt and the leaf marks on her knees. The cut is consistent with her head being pulled back, and her throat split from here to here, and she fell on her face because her face will basically show that.

Smith: Let the record reflect Sheriff Greer is (inaudible).

Greer: None of these wounds would kill her. She would bleed to death because her heart was still pumping. This indicates to me why I have got all of this. Her heart was pumping, and the blood was pumping good. Then, the wound that killed her is there.

Smith: Which is the wound on the back. . .

Greer: Brain stem.

Smith: . . .at the base of the neck.

Greer: The brain stem.

Unknown: What's this. . .

Greer: It severed her brain stem.

Unknown: What's this mark here.

Greer: That, we'll get to that. That wound there penetrated her brain stem thereby instantly killing her. Otherwise, she would have been there a while and bled to death. So, it indicates that after she fell, her throat was cut, pumping all that blood, she was stuck in the neck with a knife, which indicates could be a 5 to a 5 and a 1/2 inch blade knife, razor sharp, approximately an inch, inch and a half wide, according to the pathologist who did the mar-, or autopsy, post mortem. Uh, after completion of the autopsy, and again, Mr. Smith. Upon completion of the autopsy, which we were there for quite a while, I called on Jefferson County Police Evidence Technician Unit to come over to assist. Uh, we fingerprinted her before we left Louisville. We made sure that we had legible fingerprints, and that means it's not very easy to do this. But, before we left, we had those fingerprints taken to an examiner, which the Department of Corrections in Jefferson County has experts in fingerprinting. They read the fingerprints and grouped them. You know, so many points. You don't have enough points, you can't--I'm not, don't pretend to be a fingerprint expert.

That's why they have people like this in these labs that does this. They were able, we were able to get a good set of prints, and they were classified for me that day, that evening by the examiners. Right now, I'm not in possession of those prints. Those prints are with the identification section where they have to stay, and you will realize why in a few minutes. We departed, came back to Meade County. I decided to call a T.V. station in Louisville, and went. . . Keep in mind, also, that we had put a nationwide teletype out to all police agencies. We personally teletype all surrounding agencies to include Louisville, Jefferson County, trying to find somebody that had a unidentified female. This was a Jane Doe at that time, weighing 221 pounds, 5 foot 11 and a 1\2, uh, then again, that indicates one person didn't pick this young lady up and carry her without touching the ground and moving her, putting her in that position. Uh, the pathologist told Dr. Nichols that no, no one person could have and we, we knew that too. There had to be two or more involved. Uh, we came back to Meade County about 5:30--don't hold me to the times, they are in the case report. I received a phone call from a Mrs., Miss Howser or Mrs. Howser, who stated that his, her brother's girlfriend was missing, and when she was missing. I took the address down to her, uh, advised her we'd be en route to Louisville. In the mean time, I had, uh, and they also had a missing persons report, a copy of it, but didn't know what police agency. I had Deputy Sheriff Livers, who was on duty at Dispatch at that time, to make contacts with Jefferson County and LPD, Louisville Police Department. If you hear LPD it's Louisville Police Department. Uh, to contact them for missing persons report on any white female fitting the description and the type of clothing that we had, you know to call us and find out if they had a report. We then proceeded to Louisville, myself and the coroner, William Adams who is the Meade County Coroner. We went to the Keith Hardin residence, later identified at Garr Keith Hardin. He is a boyfriend of this girl. I interviewed him.

I think the first thing that was said to me when I got there: "Does he need a lawyer?", which didn't set too well with me.

"No, ma'am, you don't need a lawyer. We're trying to find out who this missing girl is."

He had a flyer on her. I got it from him. The flyer matched all but one thing, white sweat pants. I had red sweat pants. So after talking to him, a few minutes later, a contact was made with me at this residence by Detective Clark of either, we call it the physical assault unit, Louisville Police Department or Homicide. We talked to him briefly. Uh, we agreed to meet at third district police headquarters on Taylor, substation on Taylor Boulevard, whereby I met with

MCSO000186
EXHIBIT 19

Detective Jim Clark of Louisville Homicide and Detective Hope Greer of, uh, Louisville Homicide, and went over with them with what we had. He furnished me a copy of the missing persons report itself. Again, everything is fine except the white pants, and I've got red pants. We talked it over. Then, we sure we had our victim, Rhonda Sue Warford, age 19, white female. We proceeded to the Mrs. Warford residence at 104 East Whitney where we talked to her what we could get out of her because she was emotionally a wreck. Uh, we found things in Rhonda's room that disturbed us, to do with Satanic type material. And let me back up one thing. I asked Mr. Hardin if he had any kind, if she had any kind of markings on her, anything--scars, marks, tattoos, or
you name it. He seemed to think that she might have a tattoo. And I didn't tell him where. Uh, so, back to the Hardin, or Warford residence, after talking it over, we were sure we had the girl. We knew her. We so informed Mrs. Warford that, I guess, this was probably her daughter, but she insisted on the white pants. So, along with myself and Detective Hope Greer and Bill and members of the family, we left to go to the medical examiners office for a positive I.D. on the victim. Detective Clark, we made a decision there, due to what was in that room, that we should call Louisville Evidence Technician Unit to process that room, photograph it, and get Mrs. Warford to turn us over anything that might be helpful in this case, which she did, which we do have a lot of things out of her room. A lot of it we haven't even had a chance to go through yet. Uh, the ETU, evidence technician unit, came out. They processed the residence, mainly Rhonda's room. Uh, this was getting close to midnight. Uh, the family was hysterical. It was no use for us to try to get too much out of them except that they hated Keith Hardin, and they hated a Jeff Clark so bad it was pathetic. I mean, Sa-,

"I think they're in Satanic. They got my daughter into Satanic worshipping." Uh, "They like to kill animals."

Uh, you know, and then they, I think that night, maybe it was the next day, I got out that Rhonda broke up their friendship back in December of '91 when they lived, Jeff Clark and Hardin lived in a trailer. Uh, Rhonda came between that friendship. And, uh, I think it came out there from Mrs. Warford that night, and maybe her, one of her daughters, they got back together three weeks prior to her being missing. Uh, I asked about the Satanic cross--they call that an inverted cross--above her left breast. She informed me that, uh, Mr. Hardin put that on his daughter, sewed it on with a needle and thread with dye.

Smith: Now, let me ask you something here, Joe. You mean, a man took a needle and thread. . .

MCSO000187

EXHIBIT 19

Greer: That's correct.

Smith: . . . and sewed it through the skin of her breast, a tattoo.

Greer: That's correct.

Smith: All right, go ahead.

Greer: Keep in mind what I said while ago when I interviewed Hardin. "Has she got any marks, scars, or tattoos?" And I guess he neglected to tell me that he sewed a inverted cross on her left, over her left breast. But made a point of it, you know.

Smith: Is an inverted cross. . .

Greer: That is Sa-, a sign of Satanism.

Smith: Okay.

Greer: Uh, the next day, after getting all my evidence ready early that next morning and that night, during the night, a packaged, marked and exhibited to go to the crime lab in Louisville. I went to, proceeded to Louisville, uh, to the Louisville, Jefferson Regional Crime Lab and turned all my, turned over my physical evidence that I had obtained either from the body or the scene. And, by the way, the leaf mark where all that blood was, Rhonda's blood. Okay, that also helped me say that was the point, that she bled out, right there, and she did bleed out. Uh, after there, uh, they did me a fast attenative assault kit test, rape kit. And, uh, I was unofficially informed at that time, by the lab technicians, that she was not sexually assaulted. That told me a lot. . .

Smith: Just for the purposes of the Grand Jury a rape kit is basically where they take swabs of the vaginal area. . .

Greer: That's right.

Smith: . . .to see if there is any type of sexual activity within the last few (Inaudible).

Greer: Also, uh, hair combings, uh, you know pubic hair, and everything like this, because if I ever come up with a suspect and if she was raped, you know, we could, uh, match something. . .

Smith: (Inaudible), match up the hair.

MCSO000188
EXHIBIT 19

Greer: We could match up the hair fibers and DNA testing on, uh, semen, or anything like this.

Smith: And also, Sheriff Greer, let me interrupt you just briefly. The significance of that is on normal abduction by a stranger. . .

Greer: I was going to get to that.

Smith: . . .sex is involved, a lot of times.

Greer: Uh. . .

Smith: Or a rape is involved I should say.

Greer: The next day, uh, I proceeded to the crime lab. And after getting done there, I proceeded to Louisville Homicide. Whereby, apparently, they were all waiting on me, because I think they were all glad to see me. I asked them to enter the case with me, because Detective Clark, the night before, had opened a case, what they call a foreign case--that means it's not, they're not the original caseworker. They're foreign to the case that we're working, for murder here. They did enter the case with me. A Lieutenant Sherrards, Homicide Unit, uh, we talked over a game plan of how we would proceed, and we elected to take Clark and Hardin first. And along with interviewing all of her friends, we have interviewed people upon top of people. We picked Clark up. We brought him to Louisville Homicide, whereby he was interrogated. He agreed to submit to a salt kit and other things. Uh, he knew nothing about it. He alibied. We picked on a day, though, for the alibi of Saturday. She was found Sunday. Keep in mind we don't know when this girl was killed. We had an ideal, what we thought. So, he alibied Saturday beautiful, wonderful. Uh. . .

Smith: When you say alibied, in other words. . .

Greer: Where he was at.

Smith: Right.

Greer: And then we let him go back and alibi Wednesday night, Thursday, Thursday morning. Him and Hardin were together Wednesday night and Thursday morning. Uh, we ultimately went back. We let him go.

Smith: So, the only place that they, I mean, they could not place themselves on Wednesday night or Thursday morning with any other person, other than each other.

Greer: That's correct.

Smith: Okay.

Greer: Uh, we went back and interviewed Ms. Warford again, ultimately, and I'm just going through, skipping days, and everything else here. Uh, she stated that the last contact with Rhonda had had with, uh, Hardin was on the 28th of March. He called her on Wednesday, April the 1st at 3 o'clock in the afternoon, which he had told us that was the last time he had talked to her. Uh, she come down on Mr. Hardin pretty hard. The whole family did, on Mr. Clark. Again, that they broke up their friendship, and now they've been back together three weeks. We interviewed other people that had made statements that they were in Satanic worship.
"We told Rhonda to get out of it. It's not good. But she loved Keith Hardin so much that it was pathetic. And, uh, would she leave the house."
This came out through numerous interviews. Again, keep in mind, no sexual assault, clothes clean. Her panties were clean. She was not beat up. All she did--and it's sad--she was cut to death. Keeping all this in mind, we've ruled out a stranger abduction. The girl would not leave the house at 12:30 at night, or in the morning, with only keys to the house, and says, "I'm going down here." That's all she said to her mother.

Smith: So, it was at 12:30. . .

Greer: In the morning.

Smith: . . . early Thursday morning.

Greer: That's correct.

Smith: And she left the house.

Greer: That's correct. Uh, all the witnesses we've talked to has told us how either weird they were or violent they were. We're talking about Clark or Hardin and Satanic.
"Rhonda don't get messed into it."
Uh, I have statements here "putting gun in mouth." Amy Rimsburg, who I lucked out on that one. I run a criminal history on Mr. Clark, and I come up with the name Ramy, Amy Rimsburg, and I can't place her, until one morning it dawned on me. That's the one that come to my office and cussed everybody out. She lived down here. So, uh, I had Ra-, Amy Rimsburg to come in. I interviewed her. She went with Clark. Here we are--Louisville, Taylor Boulevard--and we find a body nine miles from nowhere in the edge of a wooded

field. Somebody had to know the area. I can went to Bullitt County and dropped this body. I could have went to Otter Creek Park. I could have went to Iroquois Park. I could have went anywhere. But, again, stranger abduction never entered our mind. She left the house to meet somebody she knew. And Clark lived at Joyce Livers' for five weeks with Amy Rimsburg. That was Amy's boyfriend. Amy had to leave the state, and took warrants out for him for threatening to kill her. I interviewed her back here. I asked her about knives. They denied to us they owned knives. He had more knives than Carter had liver pills. He had guns. Did Hardin have knives? Yes. Everything that we interviewed on, we caught them in lies.

Smith: And it was verified that they had been down in that area. . .

Greer: Yeah.

Smith: . . . where the body was found.

Greer: Riding four-wheelers with Joe Livers' boys. So, I had my connection, I felt, in the lower end of the county. Still, to me, the case was getting more and more, because everywhere I turn I come back to the boyfriend and his buddy, boyfriend and his buddy--anywhere I turned to, what people told me, cutting guinea pigs' heads off and putting them on your bosses desk as a Christmas present. But still, needed more. So, we went back. Clark, uh, had, uh, Hardin interviewed. He got tired of animals. So, he thought he might get out of it quick, because he thought humans would be better. Uh, still, closest I ever got to the house was Taylor Boulevard. So, we went back to Clark again. Clark readily agreed to let us have his car, and we would give it back to him. We took it to the LPD ETU unit--that's Evidence Technician Unit, Louisville Police Department--whereby two technicians spent quite a few hours going over this car. I think we submitted sixty-something pieces of evidence out of that car to the crime lab along with what I'd already submitted off the body and the scene. Uh, we continued for quite a few days, interviewing people. We picked them up and interviewed them again. I told them where we'd caught them in lies.
    They finally admitted, "Yeah, I have this. Yeah, but I quit Satanic worship. Yeah, I did this."
    They had been to the Valley Station Satanic Hill a few times. Then, the other morning, I got a call.

Smith: Let's back up a minute, Joe.

MCSO000191
EXHIBIT 19

Greer: Okay. I've cut a lot out.

Smith: Uh, they denied, as far as the car goes, and any evidence that the technicians were looking for.

Greer: Uh, thank you.

Smith: Tell them.

Greer: Okay, in the statement that we took, or on the talks we had with Clark, "When's the last time you seen, uh, Rhonda?"

"December of '91."

"Is that right?

And "Hardin don't have a car. Hardin don't have a car running."

"Well, Wednesday, who was you with, Hardin?"

"Uh, we were in, uh, Clark's car, his Nova."

Because I don't, you know, he didn't have a car. When he visited, uh, Rhonda on the 28th, his mother picked him up and took him home. "What does he do sitting around the house?"

"He smokes. Go in the bedroom. Talk to Rhonda."

Also, at some of these interviews, Rhonda felt that he wanted to dump her.

Also in these interviews he said that, "You ever mess around on me, I'm going to kill you." That's in some of the interviews.

Uh, then we picked up his car. We processed it at the ETU, you know, LPD. All of this was submitted to the crime lab. Last week, (Inaudible). Last Friday--I believe. Don't hold me to that date. But I got it officially, so it really doesn't matter--I received a phone call from, uh, Robert Burman, who is a technician with the Jefferson Regional Crime Lab in Louisville, uh, whereby he give me a preliminary report on the evidence that was submitted, uh, out of the car and mine. Uh, first thing, and I do have the official report on this. I got it in the mail. On Exhibit 16--let's go back to the list real fast, very important. Uh, we interviewed the mother and her daughters was there. She insisted that Rhonda had white sweat pants on. I says, "No, ma'am, she didn't. She had red sweat pants on."

"Well, she never wore them."

"Well, would you mind checking and seeing if the white sweat pants are back in the, are back in her room or something?"

Her other daughter went back, Michelle, and, lo and behold, come out with the red sweat pants and her panties still stuck in them.

Smith: The white sweat pants?

Greer: The white sweat pants with the panties stuck in them. And Mom made a comment. Says, "I, that girl, I never could get her to take her panties out of her pants when she took off." And she said, "Well, when I went to bed at 11:30, she had those white pants on."

"I says, "Well, she's had to, she's changed."

She goes back in the back to bed by herself. In the dresser drawer, the red sweat pants are missing. Naturally, Rhonda had them on. She changed unbeknownst to mother. So, now let's get to the crime lab. Exhibit 16, red sweat pants. 21c, Exhibit, head hair belonging to Keith Hardin on the red sweat pants.

Smith: What about the shape of the red sweat pants when she put them on her (Inaudible).

Greer: They were folded up, washed. They belonged to Momma. In the drawer.

Smith: So. . .

Greer: That was done after I got this report. You know, I had to account for those red pants. LPD, Detective Handy, you know, this, this is information. This is good evidence. But we needed to know where those red pants were at. We went back to find out where those red pants at without Momma still doesn't know what we've found.

Smith: Momma doesn't know about the hair on the pants.

Greer: That's right. That's what I meant, the hair. So, we leaded into it. I even talked to her on the phone. I got her out of bed at 6:30 Friday morning. This was Thursday I got the phone call on this. And I called her. And, Handy, in the mean time, during the night, he worked, uh, that midnight 'til, or, uh, their ten until three shift, he had went out and interviewed her, because it concerned him, too. Tie these red pants down. We did. They were washed, folded up in the drawer. They belonged to Momma. Rhonda very seldom ever wore them. And then we checked what was she wearing the last few days. She had a lot of red sweat pants, or white sweat pants. That's what she wore Wednesday. So, then we come up with Exhibit 16, red sweat pants. They compare with 21c, which is, uh, that's an exhibit number 21c, which happens to be out of the assault kit that we took off of Keith Hardin, the boyfriend. One hair.

Smith: In other words, the hair's matched.

Greer: They matched. Then we went to Exhibit A3, this is on the phone, but since that I've went through the report and wrote it so I don't have to go through all that and try to figure it out again. Exhibit A3, driver's side rear seat and back sea-, back rest. 5c. 5c is Rhonda's hair. One each found. Exhibit A4, driver's side rear floorboard. 5c. Two each. Two hair. Remember, I said we took and assault and rape kit off of Rhonda and we wacked off some of her hair. We do this in case we come up with anything. Exhibit 88, passenger side rear floorboard. One hair, Rhonda's. Exhibit A13, back seat cover. Again, 5c. Several of Rhonda's hair. Just one other thing.

Smith: They had denied that she'd been in the car?

Greer: That's correct. Since December. I'd give them the benefit of the doubt on 3, 4, 8, and 13. But I don't give them no benefit of the doubt on Exhibit 16. Hardin's hair on her red pants. But also during that processing of this car by these technicians, God love them, they lifted two fingerprints on the inside of that car. One of them they couldn't bring it out. But the other one they did. I had Rhonda's fingerprints. I didn't have them classified.

Smith: When you say classified, you took. . .

Greer: Where they could be read. Classified, in other words, if that fingerprint wasn't any good, we'd have had to take another one before we could bury this young lady, to where we could get readable fingerprints. But there was one readable fingerprint lifted.

Smith: From the car, you mean?

Greer: That's right. Latent Print 2. Print. Interior passenger rear window. I had submitted Rhonda's to, Rhonda's fingerprints back to Louisville. I'd picked them up at Jefferson County Police Department. I took them back up, turned them over to Sargent Allen of the EPU unit, LPD, who in turn, took these fingerprints to the ID section, Jefferson Department of Corrections, to, uh, Sargent Jones where they compared. In the mean time, they had taken this print and eliminated Mr. Hardin and Mr. Clark as being his fingerprint 'cause his is on file. There's one on file with the police, Department of Corrections in Louisville. So, they eliminated them. I have a foreign fingerprint. They compared the fingerprint to Rhonda's. Rhonda's fingerprint on the inside window behind the passenger.

Smith: Joe, fingerprints are caused by the moisture in the

MCSO000194

EXHIBIT 19

166

hand.

Greer: This is correct.

Smith: And, I mean, they don't last forever, in other words.

Greer: Oh, I questioned that. I had, I had to, uh, Kenton, because I knew maybe in December she had been in this car. But, I went to them and asked them, "Could this be an old print?"
   "Lord, no. You couldn't lift an old print. The car's filthy. It's dusty."
   The fingerprint, there, you might lift it tomorrow, but as time goes by, dust will keep piling on that fingerprint. Because remember, moisture, moisture. This was a fresh print.

Smith: Again, they denied her being in the car.

Greer: Denied her being in the car, and, yet, they're their own alibi. Folks, I can put him, her, put her in the car.

Smith: Okay, move on.

Greer: We executed Search Warrants at 7:30 the other morning when we arrested these two in Louisville. Again, Mr. Smith, I have several, several pieces that we're packaging of, we're going to Louisville and we're packaging. And I've got notes and letters, Satanic material that we've got to go through and read and read and see. Uh, we've got knives. We're going to send everything to the crime lab.

Smith: And they denied having any knives?

Greer: Oh, they denied having any knives.

Smith: And when you executed the search warrant?

Greer: Then they admitted, after about the second, third interview, that they did have knives. One of them did. Then when we executed the search warrant, we found knives. We found Satanic material. Also, done a psychological profile on the killer. I had Dr. Hord, Heard of University of Louisville do a psychological profile for me of the man, or the person that would kill this woman, and the way she was killed, in the violent manner she was killed. Uh, basically he, uh, we had to tell him a little bit about the case to do the psychological profile, but he said has to be somebody she knew, uh, and then what, uh, let's see what his name is. Ronald M. Holmes, Professor at the University of Louisville,

MCSO000195
EXHIBIT 19

he, uh, is an expert in Satanic worship, Satanic killings. Uh, what it means, I don't know. Uh, he said that, uh, that it's hard to say if it's Satanic or not Satanic, but it was brutal. It was by somebody she knew. He asked me one question. And he was given the wrong answer. And it's, it's a point, uh, he asked me which way the body was laid. And I told him, "East to west."

He says, "Well, they don't know their Satanic material. Their things. The body has to be north to south."

Would you believe that body is north to south? It is not east to west. I made a mistake on it. Basically, just questions. I, I know there is a lot of stuff there. A lot of writing. I skipped a lot. I have interviews from people. I have, uh, police agencies, uh, that was with me. They had to write me up reports of what they done, and I've still got all kinds of reports that's not in yet.

Smith: Any questions for Sheriff Greer? Mr. Foreman, may this witness be excused?

Foreman: You may be excused.

Greer: Thank y'all very much.

Smith: That's mine.

Greer: That's Kenton's.

Unknown: (Inaudible)