Russell Fischer
2290 W. Marion Avenue
Punta Gordan, FL 33950
Cell Phone: (786) 367-5000
Email: mesrfish@aol.com

Nick Brustin
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013

Elliot Slosar
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607

**Re: Jeffrey Clark & Garr Keith Hardin v. Louisville Jefferson County Metro Government et al.**

Dear Mr. Brustin and Mr. Slosar:

I have been retained by Neufeld Scheck and Brustin, LLP, and Loevy & Loevy to review materials and render an opinion regarding the City of Louisville and Meade County Kentucky investigation of the April 5, 1992 homicide of Rhonda Sue Warford.

**<u>Qualifications and Experience</u>**

I retired from the Miami-Dade Police Department after 33 years of employment. I retired as the Chief of the Criminal Investigations Division, specifically in charge of all investigative matters relating to homicide, robbery, sex crimes, domestic crimes and related functions. I also served as the Chief of Uniform Services Division. Prior to my promotion to Chief, I held command level assignments in the Robbery Bureau, Northwest District, and Professional Compliance, Economic Crimes and Narcotics Bureaus. In addition, I also served as a uniform officer and a detective and held investigative supervisory positions in the Robbery and Homicide Bureaus.

I have instructed police personnel in specialized topical areas since 1986, had been the lead instructor for the International Association of Chiefs of Police (IACP) as it relates to Internal Affairs: Legal and Operational Issues, and continue to provide instruction to investigators and police managers for homicide training.com.  In addition, the United States Department of Justice has retained my services as a consultant/instructor and as a peer reviewer. I have a Master of Public Administration degree from the University of Miami and a Master of Science degree from St. Thomas University in Miami. I am also a graduate of the Federal Bureau of Investigation National Academy.

My curriculum vitae, attached as **Exhibit A**, provides further information about my professional background. I have been retained as a police practices expert and provided testimony in two cases,

1

attached as **Exhibit B**. I have authored an article regarding supervision and managerial accountability that was published in The Police Chief magazine entitled: "A Local Perspective on Major Event Planning in a Post-September 11 Environment: Super Bowl XLI Miami, Florida, The Police Chief, September 2007." Also, the FBI Law Enforcement Bulletin published my article regarding the investigation and police management of the Valujet Flight 592 crash in the Florida Everglades.

## Compensation

For my engagement in this case, I will be compensated at a rate of $300.00 per hour for my work on this case, except that I will be compensated at a rate of $3000.00 for any deposition or trial testimony and a $1000.00 travel fee plus expenses for travel outside the state of Florida.

## Methodology

My evaluation of the Rhonda Sue Warford homicide investigation is based on my training, experience, background and my knowledge of policies and practices of police agencies around the country as well as testimony and documents memorializing relevant police practices of the Louisville Metro Police Department (LMPD) and the Meade County Sheriff's Office. I applied that knowledge and expertise to my examination of deposition testimony, trial testimony, and other materials, which document the Rhonda Sue Warford homicide investigation and other criminal investigations conducted by Defendants in this case. The documents that were provided to me are listed in **Exhibit C.**

I compared the actions of LMPD officers and supervisors as well as the Meade County sheriff and deputies in this case to acceptable police practices and training in order to form opinions about whether those actions deviated from minimally acceptable police practices. My understanding of police practices and training is based on my professional experience, knowledge, and training in homicide investigation and police supervision as well on the facts and materials in this case regarding the policies, practices, and procedures that applied to law enforcement officers at relevant times. My opinions are therefore based on the facts and materials reviewed, and also on my experience, knowledge and training.

Through my training, experience, and background I am familiar with minimally acceptable police practices—the investigative tasks that any competent police investigator must accomplish at each stage of a criminal investigation, including during witness and suspect interviews. Minimally acceptable police practices are not best practices, which may vary considerably over time and from department-to-department. Instead, minimally acceptable police practices have been consistent for decades, are well-known to any competent police officer working in the United States and constitute the bare minimum of required conduct that must be completed in any major criminal investigation.

I am aware that the key events relevant to my opinions in this matter occurred in the early 1990s. I have taken this into account and my opinions are based upon minimally acceptable police practices in those years.

I have not made any credibility determinations and although it is not my role to decide issues of credibility, I have noticed and evaluated apparent inconsistencies in the record, which is consistent with generally acceptable police practices, including in particular investigative and supervisory practices. acceptable.  Further, while I do not resolve credibility issues, I have offered opinions based upon alternate, legitimate, factual disputes. Ultimately, it will be for a jury to determine what facts to apply. My duty is to provide my professional opinions, some of which are dependent upon alternate versions of disputed facts.

Should I be asked to review any additional documents, I am prepared to render additional opinions or supplement the opinions stated within this report.

At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool; I will ensure that they are made available for review, if requested, prior to their use.

## Case Background

On April 5, 1992, the body of Rhonda Sue Warford, 19 years of age, was found in a field in a remote area of Meade County. She had been missing since the early morning hours of April 2, 1992, her family filed a missing person's report with the Louisville Metro Police Department (LMPD). Ms. Warford's body was found fully clothed, face down, and lying next to a fence.  She had suffered eleven stab wounds and had defensive injuries. During the autopsy, hairs were found in the victim's hands and on her sweatpants.

The homicide investigation was conducted by the LMPD in collaboration with the Meade County Sheriff's Department, as Ms. Warford's body was found in Meade County. Sheriff Joseph Greer assumed the role as the lead investigator for the County, assisted by Coroner William Adams. LMPD Detectives James Clark and Hope Greer of the LMPD Physical Assault Squad (PAS) were originally assigned as the investigators however, Detective Handy would later assume many primary duties including many of the key interviews.

Early in the investigation, on April 5, the Warford family reportedly told investigators that Ms. Warford had been dating Keith Hardin and that Hardin and his friend, Jeffrey Clark, were involved in Satanism. From that point, the investigation focused on Hardin and Clark as the primary suspects in the murder, and evidence in the record indicates that LMPD Detective Handy and Sheriff Greer were investigating the homicide as a possible satanic crime from very early in the investigation. For example, Handy's testimony makes clear that he reached out to a Satanism professor and was inquiring about Satanism at least days before receiving the professor's response dated April 8 and that, unlike other officers involved in the case, Handy had received specific training on Satanism and occult crimes.

Based on LMPD records I reviewed, Hardin and Clark voluntarily cooperated with the investigation in the days and weeks following the crime. Separately and without counsel, Hardin and Clark each sat for multiple interviews, consented to polygraph examinations, and voluntarily provided saliva, blood, hair, and pubic hair samples. Detective Handy conducted interviews of

Clark on April 6 and April 8, and Hardin on April 9 at LMPD Headquarters. Some of these interviews were attended by Sheriff Greer.

On April 7, Handy along with his supervisor, Sergeant Jim Woosley, transported Hardin to the station for questioning. According to Handy's investigative report and his testimony at trial, on that drive Hardin made inculpatory statements to him regarding his involvement in Satanism, specifically that he had sacrificed small animals but then "got tired" of animals and "began to want to do human sacrifices." These statements reportedly made by Hardin were utilized to frame the motive as Satanic worship for Hardin and Clark allegedly killing Ms. Warford.

On May 7, 1993, Hardin and Clark were indicted by a Meade County grand jury on capital murder charges.  The trial began in February 1995.  Hardin and Clark pled not guilty and, in a joint trial, were tried by a jury in Meade County. On May 18, 1995 both Hardin and Clark were convicted of murder and sentenced to life in prison. On July 14, 2016 the Meade County Circuit Court vacated the conviction. The indictment was dismissed on February 26, 2018. Clark and Hardin both served 22 years in prison until their release.

The evidence used to convict both Hardin and Clark for the murder of Ms. Warford was primarily circumstantial in nature. In addition to the statements reportedly made by Hardin to Handy, the prosecution also relied on statements reportedly made to law enforcement by a former girlfriend of Clark, Amy Remsburg, that Clark was involved in Satanic worship and had guns and knives, the testimony from an inmate at the Meade County Jail, Clifford Capps, that Clark purportedly confessed to the murder of Warford, as well as other limited circumstantial evidence from witnesses about odd behavior or alleged Satanic involvement, i.e., a chalice with possible animal blood, and testimony that a hair found on the victim's sweatpants "matched" Hardin's hair. It's my understanding that subsequent DNA testing has shown no hairs gathered from the crime scene matched either Hardin or Clark, and the blood from the cloth was in fact Hardin's blood.

## Summary of Findings and Opinions

Based on my review of the materials listed in Exhibit C, it is clear that the LMPD and Meade County Sheriff's investigation into the homicide of Rhonda Warford suffered from several basic investigative failures and deviations from minimally acceptable police practices of the early 1990s.

These investigative failures and deviations from minimally acceptable police procedures include direct evidence of the failure to record and memorialize important investigative information and the failure to investigate other potential suspects. There is also evidence in the record of the following deviations and red flags in the Warford investigation:

- Indications that Defendant Handy fabricated a false inculpatory statement from Hardin during the April 7 car ride that is not otherwise documented, in particular there is no evidence in the record demonstrating any attempt by Handy to memorialize the reported statement in a formal report or tape recording despite Hardin's cooperation during subsequent interviews and a polygraph examination;

4

- Record evidence of other fabricated witness statements that matched Handy and Greer's theory of the case, including those attributed to Mary Warford, Michelle Rogers, and Crystal Barnes;

- Direct evidence that officers and supervisors failed to document significant investigative steps and record and memorialize important witness interviews, including evidence that Defendants misrepresented or omitted details in their police reports and/or engaged in suggestion and coercion with suspects and witnesses that was not documented;

  Record evidence showing that alternative suspects were not thoroughly investigated, despite information that other individual(s) may be responsible for the Warford murder;

- Evidence that the LMPD supervisors failed to properly supervise their subordinate officers and take corrective action and/or were complicit in investigative misconduct committed by detectives;

- Record evidence of mischaracterization and false attribution of physical evidence; and

- Evidence of the improper use of a jailhouse informant.

If credited, this evidence that shows a pattern of misrepresentations including outright fabrication of inculpatory witness statements, witness and suspect suggestion/coercion, and basic interrogation irregularities were used to build a case premised on false evidence against Hardin and Clark. This misconduct is most notable because of its similarity to other documented misconduct as evidenced by the prosecution of and Detective Handy's guilty plea to similar actions in two other homicide investigations during the same time period as the Warford case.

Further, based on my experience supervising investigations, I conclude these blatant deviations from police practices would have been obvious to any minimally trained supervisor in the early 1990s and that the cumulative effect of these failures to investigate and document should have raised red flags to any minimally trained supervisor and triggered more supervisory involvement, correction, and intervention.

Additionally, the substantial investigative participation of the Meade County Sheriff's Office deputies and Sheriff, an individual who acknowledges his lack of any type of formalized law enforcement training and any specialized training in the realm of criminal investigation and homicide investigation, is wholly contrary to generally acceptable police practices in the early 1990s and now. Moreover, the difference between purported interviews of witnesses by Greer and Handy and the later testimony of those witnesses is further evidence of similar fabrications used to aid the prosecution.

## Evidence of Fabrication of Suspect Admissions – Keith Hardin

According to Handy's April 7, 1992 investigative letter, Detective Handy and his supervisor Sgt. Woosley went to Hardin's home on that date and Hardin agreed to be interviewed at the Physical Assault Squad (PAS). Handy further reported that, while he and Woosley were transporting Hardin to PAS, Hardin stated he was involved in Satanic worship for six years but stopped approximately

one month prior to Warford's murder. Handy also reported that Hardin explained that he killed small animals and upon being asked why he stopped devil worship by Handy, said he was tired of looking at animals and began to want to do human sacrifices. These inculpatory statements purportedly made by Hardin were relied on to prosecute and convict Hardin and Clark on the theory that Warford was murdered as a part of a Satanic ritual.

It is my understanding that Hardin denies ever making those statements to Handy. The only other witness to these purported statements—Sgt. Woosley—did not testify at trial and did not write an investigative letter memorializing any such statements. According to his deposition testimony, Woosley has no recollection of that statement by Hardin despite the important nature of the statement and his close proximity to Hardin and Handy in the car on the way to PAS when Handy reports the statement was made.

Based on the testimony I've reviewed, LMPD supervisors and other detectives testified that it would be obvious to any law enforcement officer that, if this statement was made, it would be very powerful incriminating evidence that needed to be documented and followed up on for further admissions.

**Failure to Attempt to Obtain Recorded or Written Statement**

I have seen no evidence in the record that Handy or Woosley ever obtained a written or recorded statement of these reported admissions from Hardin—a suspect who cooperated with police by waiving his rights and voluntarily submitting to interviews and a polygraph and the collection of biological samples from early April through his arrest on May 7. In fact, there is no taped statement from Hardin at all although he was interviewed on several occasions and LMPD officers, including Handy, had the ability to record statements in 1992. Nor does the record reflect that there was even an attempt by Handy, Woosley, or other officers to record or otherwise memorialize these alleged admissions made by Hardin—not even asking Hardin if he was willing to give a taped statement.

**Failure to Ask Follow-Up Questions**

Critically, there is also no evidence in the record that Handy, Woosley, or any other officer made any attempt in the following days to pursue a line of questioning exploring Hardin's interests and beliefs in Satanism and alleged interest in human sacrifice—basic questions that would have been obvious for any investigator to ask as follow up to a murder suspect stating that he was involved in animal sacrifice and interested in "doing humans." From an investigative perspective, the failure to ask any basic follow up questions or ask Hardin if he was willing to give a recorded statement is inexplicable given the consistent evidence in the record that Hardin continued to cooperate with investigators throughout the investigation including in interviews. I have also not seen any evidence indicating Detective Hope Greer was briefed by Handy or Woosley about Hardin's reported admissions as an area of follow-up inquiry even though she conducted the follow-up interview of Hardin on April 7, nor were any questions relating to Satanism or sacrifice asked in Hardin's polygraph examination on that date. It would have been another obvious investigative step to brief Detective Kelly Jones, the polygraph examiner, of this alleged statement before administering the examination to Hardin on that date and questioning Hardin about it during the course of his polygraph examination.

The lack of action in this instance, when police have a suspect such as Hardin, who was cooperating and compliant with the requests of law enforcement, is contrary to the actions of a reasonable homicide investigator and inconsistent with minimally acceptable police practices at the time.  There is no conceivable legitimate police reason as to why any criminal investigator would not pursue an aggressive line of follow up questioning after a homicide suspect openly and freely admitted that he had interest in moving from animal to human sacrifices. There is also no legitimate law enforcement reason to not at least ask a suspect who is cooperating to give a recorded or formal written statement once at PAS to memorialize these purported admissions.

Although I make no credibility determinations, I note the above significant irregularities and gross departures from minimally acceptable police practices should have raised concerns by any supervisor regarding the reliability of the alleged statement—especially a supervisor, like Woosley, who was present when Hardin purportedly made statements regarding human sacrifice. When Woosley was asked at his depositions, he indicated that he could not think of a legitimate law enforcement reason not to follow-up on Hardin's alleged inculpatory statement. He also agreed that questions about impulses to kill should be followed up on. These fundamental investigative steps would all have been obvious to any minimally trained supervisor, yet were not addressed by any of Handy's supervisors. Based on the uncontradicted evidence in the record, Woosley either provided no supervision of Handy or was complicit.

If Handy did in fact falsely report that Hardin made these inculpatory statements, the fabrication of such statements by a suspect in a murder investigation and use of those alleged statements as the foundation for motive for the murder would constitute egregious police misconduct and a serious deviation from minimally acceptable procedures. And if Woosley knew the statements were never made, that is equally egregious police misconduct.

**<u>Evidence of the Fabrication of Other Witness Statements</u>**

By April 6, the day after Warford's body was found, Handy was assigned to the case for LMPD by Lieutenant Eugene Sherrard after he met with Greer. Sheriff Greer, Handy, and other LMPD officers collaborated closely in the investigation including conducting many witness interviews and suspects interrogations together. Based on record evidence, it is clear that Sheriff Greer and Handy "discussed everything" in the case early on), and were collaborating closely to determine next steps in the investigation and on case developments. For example, Handy and Greer interviewed Clark together on April 6; Handy and Greer discussed and decided that Handy would pick up Hardin for an interview on April 7; Handy and Greer met on April 9 at LMPD to discuss case developments and next steps; Handy and Greer met again on April 14 to interview other witnesses; and the record shows that this sort of collaboration and communication continued throughout the investigation.

By the time of the Warford investigation, Handy, Woosley, and the other LMPD officers were experienced investigators working as detectives in the Physical Assault Squad, investigating the most serious crimes on behalf of LMPD. Handy, by his own testimony, was an experienced interviewer who considered himself good at interviewing witnesses and interrogating suspects.

Neither Sheriff Greer of Meade County nor anyone in his chain of command had ever been lead in a homicide investigation. By their own admission, Meade County officers did not have experience investigating homicide cases and generally called Kentucky State Police investigators to take the lead in such cases. In the Warford homicide, Sheriff Greer and other Meade County officers collaborated with LMPD and took a more active role in the investigation than they typically would in a homicide investigation. As Greer testified at his deposition, he was not an experienced homicide detective and would not have been actively involved in this investigation if it wasn't for the fact that a Kentucky State Police detective who usually conducted homicide investigations in Meade County was away on vacation and unavailable.

In addition to the red flags suggesting that Detective Handy fabricated a false inculpatory statement from Hardin on April 7, there is similar evidence suggesting that Handy, Sheriff Greer, and other officers fabricated and/or improperly influenced other witness statements. In particular, there are reports by Greer, Handy and other officers that witnesses made certain statements inculpating Hardin and Clark but those witnesses testified they never made such statements. If Handy, Greer, or other Defendants did fabricate or improperly influence witness statements, that is a substantial breach of minimally acceptable police practices and would constitute serious investigative misconduct.

**Mary Warford, Michelle Rogers, and Crystal Barnes**

On April 5, 1992, Sheriff Greer, Meade County Coroner Adams, and LMPD Detectives James Clark and Hope Greer went to the Warford residence to interview the victim's mother, Mary Warford, and other family members including her sister Michelle Rogers. According to Greer's investigative report, on this date Warford told investigators that Hardin and Clark were into Satanic worship.

It is my understanding that Mary Warford testified that she never made statements of the type reflected in the reports of her interview. And a recorded statement was never obtained from her by either law enforcement agency. Given Warford's relationship to the victim and the information she allegedly shared with law enforcement, it is highly unusual that during the only documented follow-up interview with her on April 30, 1992, Det. Handy did not inquire further about Warford's reported knowledge of Hardin and Clark's involvement in Satanism. It is also notable that a recorded statement was never obtained or attempted to be obtained from Warford.

As to Rogers, I have seen evidence reflecting statements purportedly made by her to Defendants including Sheriff Greer and Handy that Hardin and Clark were involved in Satanism and that she had seen Clark with a big hunting knife. But at trial and her deposition, Rogers testified she was not aware of Clark being involved in Satanism and never saw him with a knife. Notably, at his deposition, Sheriff Greer testified that he did not know why he didn't take a taped statement from Rogers and agreed that was contrary to his practice. Although Greer denied misreporting statements by Rogers, at a minimum, the inconsistencies between Greer's account and Rogers' account are a red flag regarding the reliability of these statements.

I've seen similar evidence in the record with respect to statements reportedly made to Defendants by witness Crystal Barnes, a friend of the victim, to Defendants Greer and Handy. No Defendant

ever took a recorded statement from Barnes, although she purportedly stated to law enforcement that she heard Hardin threaten Warford prior to her death. At trial and in her deposition, Barnes testified she did not make inculpatory statements attributed to her by Defendants. Greer could not explain this inconsistency when asked about it at his deposition.

If it is acceptable that Warford, Rogers, and/or Barnes did not make the statements attributed to them—as they have now testified—and Handy, Greer, or any other Defendant reported that these witnesses made statements in support of their investigative theory, that is blatantly contrary to minimally acceptable police practices.  It would also be egregious investigative misconduct consistent with Handy having potentially fabricated the inculpatory "human sacrifice" statements he reported Hardin as having made on April 7, though Hardin denies ever having made such statements.

**Amy Remsburg**

I have also seen evidence in the record that raises red flags regarding the interviews and information provided by witness Amy Livers Remsburg, who was an ex-girlfriend of Clark. On April 9, 1992 at 10:32 p.m., unknown Meade County deputies interviewed Remsburg and drafted a summary of that interview. Notably, in that interview summary, there is no mention of Remsburg making any statements regarding Clark or Hardin engaging in Satanism or Satanic ritual/sacrifice.

The next day, on April 10, Remsburg was interviewed by Sheriff Greer. Notably, Greer testified that he had known Remsburg and her family for years prior to Warford investigation, and that Remsburg had been to the sheriff's office multiple times before. Remsburg's uncle, Tim Livers, was a part-time sheriff's deputy and dispatcher.  On April 10, Greer called Remsburg and asked her to come to the office. Based on his testimony, Greer had no idea when he called Remsburg whether she knew anything about the murder, but Greer knew she knew Clark—who was already a suspect at that time. Greer also testified that he had been told by Handy about Hardin's alleged involved in animal sacrifice by this time.

Even though, based on his testimony, Greer had no reason to believe Remsburg had relevant information about the homicide or the victim—unlike with other witnesses, including the victim's family members—Greer and Meade County Coroner William Adams took a recorded statement from Remsburg on that date. Before recording Remsburg's statement, Greer conducted a pre-interview with her. At his deposition, Greer testified he could not recall now what he told Remsburg in the pre-interview or what she told him and, because the pre-interview was not recorded or formally documented, there is no contemporaneous record of what was said. According to Greer's report and the taped interview, on April 10, Remsburg told Sheriff Greer that Clark and Hardin had sacrificed animals, were thinking of sacrificing humans, and that Clark had lived with her in Meade County where they roamed the countryside on four-wheelers.

None of this information appeared in the draft interview summary from Remsburg the day before. Especially given the pattern of discussed above with other witnesses, the addition of this inculpatory information in Remsburg's April 10 statement raises serious red flags regarding the source of this information and its reliability. If Greer fabricated or improperly influenced Remsburg's statement about Clark and Hardin being involved in Satanism and/or sacrifice, that is

a substantial breach of minimally acceptable police practices and would constitute serious investigative misconduct.

A reasonable, minimally trained investigator would also question the reliability of information coming a witness such as Remsburg, unless verified through independent means. Based on Greer's testimony, Remsburg was angry at Clark including because Clark accused Remsburg of having sexual abused her young son—charges that Remsburg later pled guilty to. Greer testified that Rmsburg was an important witness and acknowledged that she had a motive to make false allegations against Clark. But Greer admitted he did not do any investigation to corroborate information she allegedly provided. I also did not see evidence in the record of any attempt by Sheriff Greer or the LMPD to investigate and verify that which was stated by Remsburg including information that would have been obvious to follow-up on.

**Clifford Capps**

At trial, a jailhouse informant, Clifford Capps, testified that Clark confessed twice to the Warford murder while they were sharing a cell at the Meade County jail. I have seen substantial evidence in the record indicating that this testimony was untruthful and, more troubling, that Defendants had reason to know that Capps was unreliable. Plaintiff Clark at his deposition denied ever sharing a cell with Capps or confessing to him. And another inmate, Kevin Justis, testified that Capps asked him in a letter to lie about Clark and Hardin, in particular to testify dishonestly that Hardin "jokingly admitted to the murder."

According to Justis, he provided that letter from Capps to Greer and Deputy Cliff Wise before trial; that Greer thanked him for providing the information; and told him they would not want to put Capps on the stand knowing he was lying. If Sheriff Greer did have the letter and/or information from Justis and did not give it to the prosecutor, that would be a clear violation of, generally acceptable police practices of the time, which required immediate disclosure. In fact, Greer admitted the letter was exculpatory and should have been turned over.

At his deposition, Sheriff Greer also admitted to telling witnesses, during unrecorded pre-interviews, that he would speak with the prosecutor to gain favor for him. Information in the record suggests that Capps may have been given special consideration – probation – for his statement against Clark and Hardin. If true, that information also should have been disclosed to the criminal defense team.

I have seen additional red flags in the file relating to the credibility and reliability of Capps and Greer's knowledge of his unreliability. For example, Greer admitted that before 1992, he had various interactions with Capps, knew Capps "most definitely" had issues with lying, and knew that Capps had been arrested for committing crimes of dishonesty. But Greer did not take any investigative steps to determine whether Capps' information was reliable, including basic investigative work like speaking with other inmates housed with Capps and Clark.

reasonable, minimally trained investigator would question the reliability of information coming from a witness such as Capps unless corroborated – especially given Greer's knowledge that Capps had been untruthful in the past. Failing to take even simple steps to verify the information here

constitutes a substantial breach of minimally acceptable police practices at the time and serious investigative misconduct.

## Other Red Flags of Investigative Misconduct

### Failure to Record and Memorialize

At the time of the Warford homicide investigation in 1992, well-established minimally acceptable police standards gave police officers very little discretion over what evidence must be documented; because of *Brady* and other case law, detectives at the time of this investigation were trained and understood the need to document and disclose all potentially relevant evidence whether it helped or hurt their case.

Officers and supervisors in this case have testified that they understood the same—explaining the importance of documenting statements, recording important witness interviews, and their responsibility to investigate and document every significant investigative step in a complete and accurate manner. At his deposition, Lieutenant Sherrard affirmed that both Detective Handy and his supervisor Sgt. Woosley would have and should have understood the importance of doing so at the time of the investigation. Detective Handy's immediate supervisor, Sergeant Woosley, also testified at his deposition that he recognized the importance of doing so, agreeing that if you can get a statement on the record from a suspect, an officer should always try and record it. Additionally, Woolsey noted that important eyewitnesses would be taped and, if a witness is willing to be taped, it would be an advantage to tape. Specifically, Woolsey agreed that getting an admission/culpable statement from Hardin if he committed the crime was important.

Based on my review of the police file and deposition testimony, there were many occasions when statements should have been contemporaneously documented by law enforcement investigators in this case. The most important of which was the April 7 statement attributed to Hardin by Detective Handy. Furthermore, the record does not reflect that a formal or recorded statement was taken from Hardin, Clark, Warford, Rogers, Barnes or Capps or that there was any an attempt to do so by any Defendant even though these suspects and witnesses were reported to have provided important investigative information. Notably, a recorded statement was taken by LMPD Detective James Clark of William Mahan, a former supervisor of Clark, even though – from an investigative perspective – Mahan did not provide such important (or inculpatory) information. Sheriff Greer noted that a taped statement was taken from Remsburg, after first conducting an unrecorded interview with her, but could not offer an explanation as to why he did not take any other recorded statement.

The obvious inconsistencies in when and from whom statements were taken raise serious red flags regarding the reliability and credibility of inculpatory statements reported as being made by suspect Hardin and witnesses in this homicide investigation. The lack of any recording—or even any attempt to ask Hardin, Clark, or any of these witnesses if they were willing to provide a recorded statement—would have been evident to any supervisor. Minimally acceptable police practices at the time required documentation of all relevant circumstances surrounding suspect and witness interviews, and also dictated that every attempt should be made to formally document important evidence from willing suspects and witnesses. The lack of any record evidence of investigators, including experienced investigators like Handy and Woosley, attempting to take

such statements provides additional indicia of reliability for the testimony from Hardin and other witnesses that they never made the inculpatory attributed to them by Defendants.

**Use of Coercive Interrogation Practices**

At his deposition, Plaintiff Clark testified that during an interview at LMPD with Greer, Handy, and others, after he kept telling Defendants officers that he did not do anything, he was threatened by Greer taking out his gun and laying it on the table while encouraging Clark to reconsider his position and making a statement to the effect of "always getting what [he, Greer] wants." Hardin testified to a similar interaction during an interview where he was being interrogated and Greer pulled out his revolver and put it on the table at an angle in front of Hardin. Greer then told Hardin that "bad things happen to people who don't cooperate" with him.  I have seen additional evidence in the record that supports Clark and Hardin's accounts, in particular the deposition testimony of William Mahan – a former co-worker of Clark – who was questioned as part of the investigation by Greer and detectives. According to Mahan, one of the officers took out his gun and laid it on the table at an angle pointed towards him. Mahan also testified it was his belief that they were trying to scare him and that he felt intimidated.

If credible, the threats and intimidation tactics employed by Sheriff Greer and the other officers to elicit an admission are wholly inconsistent with the acceptable police practices in place at the time and serious misconduct. Police officers are trained in interview and interrogation techniques that are designed to get truthful answers and to avoid coercive and threatening tactics—like placing a gun on the table pointed toward a suspect or witness. If this did occur, it would also be a violation of minimally acceptable police practices to not have documented these circumstances.

**Failure to Investigate Other Potential Suspects**

I have not seen any evidence from this criminal investigation that suggests suspects other than Hardin and Clark were substantially investigated for involvement in the Warford homicide despite information indicating that other individual(s) may be responsible for the Warford murder.

Information provided by the victim's mother in the early days of the investigation that the victim left the house on April 2, 1992, at 3:00AM to "go down there." Other information obtained by investigators indicated that "going down there" was a reference to going to the local grocery store. In fact, on three separate occasions Mrs. Warford told police about a strange man who followed the victim home from Kroger's and harassed her on the night she disappeared: (1) to LMPD on April 2, when she reported her daughter missing; (2) to Det. Greer on April 5, the day the victim's body was found; and (3) to Det. Handy on April 9. It appears Defendants never asked the victim's mother for additional information about this incident and the record does not explain what if any effort was made to follow up on this information in the initial investigation.

Basic investigative steps that would have been obvious to take would include focusing on that locale and canvassing its surroundings, and attempting to identify and locate the individual who followed Warford that night. The lack of investigation into this lead is especially concerning given that the victim's sister, Michelle Rogers, told police on April 5 "how stupid" she and Warford had been at times because they'd gotten into cars with men they didn't know very well.

The record also indicates that testimony was given during a Grand Jury investigation that named an individual allegedly responsible for the murder, yet the record does not reflect any investigative efforts to act on that information. These are red flags suggesting that from early in the investigation, investigators Handy and Greer may have had tunnel vision focusing on Hardin and Clark, and their theory that the murder was a Satanic crime. Focusing on a suspect or suspects to the exclusion of other information that comes to light during an investigation is inconsistent with minimally acceptable police practices.

## Mischaracterization of Physical Evidence

I have also seen evidence in the record that Defendants, including Sheriff Greer, mischaracterized physical evidence to support their theory that Clark and Hardin committed the Warford homicide. That evidence includes the areas summarized below:

## Latent Fingerprint

According to the record, on April 30, after Clark's car was processed for fingerprints, one latent print found on the interior rear passenger side window was reported as being consistent with the victim Warford's fingerprint.  Clark told police that the victim had been in his car on several occasions and that the last time the victim was in his car was in December 1991, several months before the crime. Sheriff Greer learned about the fingerprint on May 4 and it was used to obtain an arrest warrant for Clark.

Despite this explanation for the victim's fingerprint being Clark's car—as Warford was dating Hardin, who was friends with Clark—Greer gave sworn testimony that the fingerprint found in Clark's vehicle was a "fresh print," which suggested the victim had recently been in his car.

This erroneously suggested that the victim had very recently been in Clark's vehicle.  Clark himself had stated that she had been in his vehicle on a prior occasion but not recently. To the extent Greer intentionally and knowingly gave false testimony without any scientific support, that would be not only an intentional deviation from minimally acceptable police procedure required at the time of this investigation, it would be perjury.

## Time of Death Modification

Based on testimony and record evidence, Defendant Greer and others interviewed Clark early in the investigation and determined that Clark and Hardin both had alibis for the Warford's originally reported time of death: April 4 into April 5, shortly before Warford's body was found "fresh" the morning of April 5. Greer in fact testified that Clark "alibied beautifully" for Saturday, April 4. I have also seen testimony from Defendants, including Greer, that they determined the only time that Clark and Hardin did not have an alibi for was Wednesday night into Thursday morning (April 1 into April 2), the night Warford went missing.

Based on Greer's testimony, it was only after making that determination that Defendants contacted Medical Examiner George Nichols to see if Warford could possibly have been killed on April 1 or

early April 2, despite his original report of April 4 into April 5. From my review of Nichols testimony in this case, it appears that if Nichols had been questioned at the time, he would have said it was very unlikely that the crime occurred at that time. Indeed, in his deposition, Nichols testified that, in his best estimate, Warford was killed within 24 hours of when she was found on April 5—a time when Clark and Hardin both had alibis.

Record evidence suggests that Defendants not only ignored this exculpatory evidence but also altered reports of the victim's time of death without any medical or scientific basis. For example, early reports list the crime as having occurred "April 4 to April 5" and note that Warford's body appeared fresh when discovered. But I have seen evidence that, after learning Clark and Hardin had alibis for the night of April 4 into April 5, the reported time of death was changed to April 2 in police reports and official documents. For example, after Clark and Hardin's first interviews with police, Sheriff Greer made the following notation in a supplemental report:

> Upon further discussion with [Coroner] Adams and determining that both Clark and Hardin had alibis for Saturday night, 4-4-92, we decided to contact Dr. Nichols, Medical Examiner, Wednesday morning 4-8-92, to see if it was possible that her (Warford) death could have been sooner, possibly Thursday morning, 4-2-92.  Both Clark and Hardin were alibiing each other for Wednesday night, 4-1-92, and Thursday, 4-2-92[.]

Defendants were unable to provide an explanation for this change except that Hardin and Clark had alibis for the time Warford was originally believed to have been murdered. If Greer, Adams, and/or other Defendants intentionally misreported or requested that medical examiner Nichols misrepresent the likely time of death based on the alibis of suspects Hardin and Clark, that is an egregious act of investigative misconduct and intentional deviation from minimally acceptable police practices. The fact that a suspect has an alibi is never a basis to change the reported time of death. Moreover, minimally acceptable police practices then, as now, would require a thorough investigation into alternate suspect(s) and theories given Hardin and Clark's alibis for the most likely time of death.

**Blood and hair evidence**

From my review of the record, it appears the prosecution and conviction of Hardin and Clark also relied on the suggestion that a chalice wrapped in a cloth stained with animal blood was recovered from Hardin's home, consistent with the alleged inculpatory statement Handy reported Hardin as having made about sacrificing animals and wanting to "do humans." It's my understanding that post-conviction DNA testing has demonstrated that the blood was human blood—not animal blood—and was in fact Hardin's blood, consistent with his testimony that he cut himself on a glass and that was the source of the blood on the cloth.  Similarly, I understand that the prosecution relied on reports from law enforcement that a hair recovered from the victim's sweatpants "matched" Hardin's hair but that post-conviction DNA testing has demonstrated that neither Hardin nor Clark was the source of any hair recovered from the crime scene.

While much of the blood and hair evidence was primarily used improperly at trial, generally, a reasonable, trained homicide investigator should recognize the limitations and parameters of hair evidence and limitations of dating fingerprint evidence.

## Evidence of the LMPD's Failure to Supervise

Fundamentally, there appears to have been a breakdown in supervision and management concerning major investigative developments, case review, and compliance in this investigation. From my review of the record evidence, it should have been immediately evident to any minimally trained and experienced supervisor—such as Sgt. Woosley or Lieutenant Eugene Sherrard— that minimally acceptable police practices were not being followed in several aspects of this investigation, requiring the supervisor to take immediate corrective action. While the red flags regarding investigative deviations—like failing to record and memorialize important suspect admissions and witness interviews—discussed above each alone should have been evident to supervisors in this case, the cumulative effect of these failures to investigate and document should not only have raised red flags to any minimally trained supervisor but should have triggered more supervisory involvement, correction and intervention. But based on my review of the evidence, these supervisory actions were absent from the Warford homicide investigation.

Sergeant Woosley was the immediate supervisor of Detective Handy during the course of the Warford murder investigation, as well as during the Edwin Chandler and Keith West homicide investigations during the same time. Handy has now pled guilty to felony charges in both those cases, specifically perjury in the first degree in the Chandler case and tampering with physical evidence in the West case. Handy's criminal conduct in these two cases was contemporaneous to his involvement in the Warford investigation and lends additional indicia of reliability to reports from Hardin, Clark, and other witnesses regarding his fabrication of evidence in this investigation.

Based on Woosley's own testimony and the testimony of other LMPD supervisors, Woosley was a "hands off" sergeant who—by his own admissions—was complict in the coercion and *Brady* violations described below in the Edwin Chandler case.

## The Edwin Chandler Case

In February 1995, Edwin Chandler was convicted of the 1993 robbery and shooting of a store clerk at a Chevron station in Louisville, Kentucky and sentenced to 30 years after Handy reported that Chandler confessed to the crime. Based on Handy's guilty plea and evidence from that case, it appears that confession was coerced and that non-public details in the confession were fed to Chandler by Handy. In particular, evidence reveals that from 1993 to 1995, Det. Handy and other members of the LMPD deliberately manufactured a case against Chandler despite the absence of any evidence linking the innocent Chandler to the crime.

A surveillance video in the gas station documented the robbery and shooting of victim Brenda Whitfield. The videotape showed the perpetrator, wearing a particular hat, getting a Colt 45 beer bottle from a cooler before shooting Whitfield, the store clerk, in the face and grabbing cash from the open register. Early on in the investigation, Handy taped over the surveillance videotape—the only direct evidence of the shooting—by recording over critical frames of the video with footage

15

from an episode of *The Tonight Show*. Handy claimed that the erasure was accidental. By his own admissions, Handy had a serious drinking problem at the time of that investigation.

Edwin Chandler, who lived near the gas station and had an outstanding warrant for his arrest, apparently became a suspect in the case. Chandler voluntarily cooperated with the LMPD to try to clear his name. He told police and testified at trial that he was watching a movie with his girlfriend in his sister's apartment about half a mile from the station on the night of the crime. At least two witnesses confirmed his alibi. It is my understanding that Chandler resembled neither the gas station surveillance video stills of the shooter nor the descriptions provided by two eyewitnesses who saw the perpetrator.

During the investigation, Chandler was eliminated as the source of forensic evidence left by the real perpetrator at the crime scene. In particular, he was excluded as the source of any latent prints lifted from the Colt 45 beer bottle but Handy failed to report this exclusion in any police report. In addition, the perpetrator left behind a pair of sunglasses and a blue knit cap with a Georgetown Hoyas logo. Chandler was excluded as the source of the hair collected from the hat. Chandler testified that after his initial interrogation with two LMPD officers, he voluntarily took a polygraph examination which police told him he had failed. At this point, Handy was brought in to re-interview Chandler. Woosley was Handy's direct supervisor in this investigation as in the Warford homicide investigation.

Handy acknowledged that he falsely told Chandler that a customer at the store identified him as the perpetrator even though Handy knew that the eyewitness did not identify him. Handy also acknowledged that he falsely told Chandler that investigators found his fingerprints on a beer bottle. Most importantly, during his interrogation of Chandler, Handy threatened to arrest Chandler's sister for harboring a fugitive, told Chandler that he had a squad car waiting outside his sister's home, and that his sister's children would be taken away from her if he did not confess. This threat was not documented in any police report. Failure to clearly and accurately document Handy's threat, which is undoubtedly exculpatory information that any minimally competent law enforcement officer would have known must be disclosed to prosecutors under *Brady v. Maryland*, violated minimally acceptable police customs and practices. Critically, Woosley testified at his deposition in this case that he was aware that Handy threatened Chandler during the interrogation and that this threat was not documented in Handy's investigative report of the interrogation. Yet Woosley did not ensure that these critical facts were documented or otherwise shared with the defense and prosecution in that investigation or in the Clark/Hardin investigation. Of particular concern is the fact that Woosley testified at his deposition that—as long as there was a confession from Chandler—the type of deceptive statements used by Handy did not have to be documented in any report and that the use of this deception did not raise any red flag to him as a supervisor, even though he was aware of them at the time. Woosley's testimony that it was completely appropriate not to document and report this threat is evidence of the LMPD's custom and/or policy of not disclosing *Brady* material.

Handy's interrogation of Chandler and his report of Chandler's false confession occurred in October 1993, after Hardin and Clark had been arrested but before their trial in March 1995. Based on the record I've reviewed, none of Handy's misconduct with Chandler was documented or disclosed to the prosecution in the Clark/Hardin case even though it is clearly *Brady*/impeachment

evidence against Handy. Like Clark and Hardin, Chandler maintained his innocence during his pre-trial suppression hearing and criminal trial.  He testified that Handy provided him with detailed facts about the crime, of which Chandler was unaware, to use in his confession.

If true, as corroborated by Handy's guilty plea to perjury in that case, Handy's investigative report falsely represented that all of the critical non-public details about the crime originated with Chandler. Handy also repeated these misrepresentations to the prosecutor, to the court at Chandler's suppression hearing, and to the jury at Chandler's 1995 trial, testifying under oath that Chandler voluntarily and spontaneously confessed to the crime.  Handy's testimony was material to the proceedings against Chandler and led to his wrongful conviction. For his perjurious testimony, Detective Handy was indicted and pled guilty to one count of Perjury First Degree in May 2021.

It is especially notable that Handy continued to deny under oath in post-conviction proceedings in the Chandler case that he provided non-public details to Chandler, although he has now pled guilty to having done so. This is particularly concerning given record evidence that another LMPD detective received credible information by 1996 regarding another suspect in the Whitfield homicide, whose fingerprints were found at the scene; that the detective documented this information and provided it to supervisors including Handy, Jay Pierce, Woosley, and Sherrard, but nothing was done with this exculpatory information, which now does not appear in the file.

In sum, based on my review of the record evidence, Detective Handy's documented misconduct in the Chandler case not only constitutes egregious departures from minimally acceptable police practices but is also strikingly similar to the misconduct he is alleged to have committed in this case—which was investigated just months prior and went to trial *after* Chandler was wrongfully convicted in February 1995. Here, just as in the Chandler case, Handy's investigative letters and trial testimony attribute an unrecorded inculpatory statement to Hardin that fits squarely within Handy's theory of the crime—that Hardin and Clark had sacrificed the victim as part of a Satanic ritual. As discussed above, there are several overt red flags as to the reliability of this statement that was purportedly witnesses by Woosley, Handy's supervisor in the Chandler case as well.

**The Keith West Case**

In 1995, Keith West was convicted of the 1992 murders of 24-year-old Gerald White and 27-year-old Kevin Harraway.  There was no dispute at trial as to whether Mr. West shot both men, rather, Mr. West's defense focused on his claims of self-defense. Mr. West claimed that he was threatened with sodomy by individual possessing a weapon and held hostage in a moving vehicle, threats that forced him to use deadly force before fleeing the vehicle.   The central issue at trial was whether Mr. West had a legitimate basis to claim self-defense. Mr. West's conviction was reversed in 1997 due to a *Brady* violation.  Mr. West would later take an *Alford* plea in 1998.  In 2019, Mr. West received an unconditional pardon after submitting an actual innocence pardon application.

At trial, Defendant Handy testified about his investigation, including interactions with Robert Ross, a witness developed during the investigation.  That testimony has been determined to be false and Mr. Handy has since pled guilty to a felony related to his misconduct with Mr. Ross during the underlying investigation.  At that trial, Mr. Ross did not testify as the parties were under

17

the misimpression that he was a fugitive on the run—as Defendant Handy had testified.  Years later, it was uncovered that Mr. Ross was not a fugitive on the run, but rather, in custody at the time of trial.  The most critical evidence at trial against Mr. West was from Ruth Bowie, who testified that she saw the car stopped at the stop sign for "about three minutes" before seeing it move.  Based largely on the testimony of Mr. Handy, Mr. Ross, and Ms. Bowie, Mr. West was convicted of two counts of wanton murder on February 24, 1995 and sentenced to life in prison.

A review of the record demonstrates that the case against Mr. West constitutes egregious departures from minimally acceptable police practices and is strikingly similar to the misconduct that occurred in this case (and Chandler) – which was investigated during the same time period here and went to trial just after Mr. West was wrongfully convicted in 1995.

The evidence introduced at trial stemmed from a woefully inadequate investigation that included misconduct and contravening the generally acceptable practices and standards in place by 1992. During the underlying investigation, on February 20, 1992, Defendant Handy questioned Mr. Ross. Mr. Ross has since come forward and revealed that he informed Defendant Handy that he did not see anyone get out of the vehicle nor see anything fly out, the car was being driven at a really high speed, and he never saw anyone drop the hat while fleeing the scene.  Mr. Ross maintains that Defendant Handy recorded this conversation, a point supported by the record.

In fact, before Mr. West's trial, it was learned that Defendant Handy taped over the first statement given that the recording included the final portion of the first statement.  Defendant Handy provided false testimony about such events during a pretrial hearing.

Q: Have you erased any tapes with reference to this investigation?

A: I have not.

Q: The transcripts of the interviews that we've got don't involve any erasures?

A: Not that I'm aware of, no.  They should all be intact.

Q: And you never obliterated or taped over any tape in this case?

A: No, not that I'm aware of, no.

Afterward, Defendant Handy was presented with the taped statement, where he again denied recording over the statement.  At one point, Defendant Handy even blamed the court reporter, suggesting it was a "typo" and a "nonissue."   Eventually, Defendant Handy admitted that he recorded over the first statement and would do that as a matter of course during witness interviews. Lt. Sherrard, Defendant Handy's supervisor at the time, testified at his deposition that he would have never recorded over a witness interview without documenting it and without it being the request of a witness.  In his view, "there should have been a really good reason for it and it should have been documented."  In sum, Lt. Sherrard claims to have strongly disagreed with the actions of Defendant Handy during the *West* investigation even though he would have been a supervisor of Handy at the time and did nothing to stop nor discourage it from occurring.

18

Going further, Defendant Handy informed the court that the only deviation between the statements was Mr. Ross's identification of Plaintiff after seeing a photograph. According to Defendant Handy, "the information Mr. Ross gave is what he gave, and it's totally consistent." But Mr. Ross reveals otherwise. At a later post-conviction proceeding in 2019, Mr. Ross revealed that Defendant Handy refused to accept his recollection of events, stopped the recorder, and told him what to say. Mr. Ross maintained that Defendant Handy used coercive measures to fabricate a false statement implicating Mr. West in the crimes charged. Mr. Ross maintains that Defendant Handy would later record over the first statement after he agreed to repeat it. Mr. Ross testified that he repeated the false information Defendant Handy told him to repeat.

If Mr. Ross's testimony is credited, that would constitute egregious misconduct and would be a deviation from minimally acceptable police practices at the time. Defendant Handy did not disclose that he coerced and fabricated the statement for Mr. Ross at that trial. For his destruction of evidence, Detective Handy was indicted and pled guilty to one count of Tampering with Physical Evidence in May 2021.

Mr. Ross was not alone in implicating Defendant Handy in misconduct, Ms. Bowie has done the same, actions that remained undisclosed until a post-conviction proceeding in 2019. At that proceeding, Ms. Bowie claims that Defendant Handy met with her immediately before she testified at Mr. West's 1995 trial. In this conversation, Defendant Handy told Ms. Bowie to falsely testify that the car was stopped at the stop sign for three to five minutes before accelerating. It's clear that Defendant Handy's request, if Ms. Bowie's testimony is credited, was done to help defeat Mr. West's claims of self-defense. By this time, Defendant Handy knew that if the car was stopped at the stop sign for a prolonged period of time, instead of moving at a rapid speed as Mr. West claimed, that would not support Mr. West's claims of innocence and self-defense. None of this was disclosed to Mr. West prior to his trial, in contravention of generally acceptable practices in place by the time.

Defendant Handy's deviation from minimally acceptable police practices during the *West* investigation is not limited to interactions with witnesses. In fact, a pretrial proceeding on February 14, 1995 revealed action and inaction of Defendant Handy in significant respects. There, Defendant Handy testified that he inventoried the vehicle after questioning Mr. West, where he learned that there was a claim of self-defense being made. Given this defense, Defendant Handy admitted at the proceeding that it would be critical for an investigator "to purely show what's in the car." At the hearing, Defendant Handy repeatedly was forced to admit that he did not document evidence that would support Mr. West's claim of self-defense.

The evidentiary hearing transcripts from 2019 and depositions in this litigation of Defendants Handy, Woolsey, and Lt. Sherrard confirm that Mr. Handy was not the only person in the *West* investigation to have deviated from the minimally acceptable police practices. For instance, Lt. Sherrard's deposition and the investigative file demonstrate that he participated in the interrogation of Keith West. While that interrogation took place, attorneys appeared at the police department requesting to speak with Mr. West. Instead of allowing for that to occur, the attorneys were denied that opportunity. Lt. Sherrard was the supervisor on duty. Because they were refused access to Mr. West, the attorneys obtained a court order requiring that they be permitted to see their client.

19

That order stopped the interrogation from continuing any further.  Once that order was presented to the supervisory officials, Mr. West left the police station with counsel while police were informed that Mr. West was represented by counsel and refused to speak with police.

That day, Mr. West was arrested for the murders.  Defendant Woosley brought Mr. West to the Louisville Police Department for a second time.  Like in *Chandler*, Defendant Handy was chosen to be the interrogator, even though he had no part in the first interrogation.  Lt. Sherrard was the supervisor.  At the time, Mr. West was represented by counsel, in custody, and charged with the murders.  As Lt. Sherrard reveals, under these circumstances it would have been a violation of Mr. West's constitutional rights for an officer to initiate another questioning of Mr. West.  In his words, "I'm not a lawyer, but my understanding of the law is, yes, that would be correct."  According to Lt. Sherrard, Defendant Handy should not have questioned Mr. West about the underlying murder given that he was charged, in custody, and represented by counsel.  In fact, Lt. Sherrard agrees that such conduct would be unconstitutional and a violation of the "policy and procedures."  At his deposition, Lt. Sherrard alleged that Defendant Handy's subsequent interrogation of Mr. West would have, "made me question his judgment and his understanding of the law, and if – if it wasn't – if – if it was that week, I wouldn't have left him in the – the homicide office.  It didn't seem like he understood the law."  Lt. Sherrard also understood that such misconduct would necessitate the removal of Defendant Handy from homicide.

Yet, the investigative file and depositions confirm that's exactly from Defendant Handy did – question an in-custody Mr. West, who was charged with the murders and represent by counsel with an instruction for him to not be questioned without counsel's presence.

In sum, based on my review of the record evidence, the documented misconduct in the West case not only constitutes egregious departures from minimally acceptable police practices but also bears strikingly similar circumstances to the misconduct alleged to have committed in this case—which was investigated just months prior and went to trial *after* West was wrongfully convicted in February 1995.

**The William Gregory Case**

In 1993, William Gregory was convicted of the 1992 rape and burglary of two women who lived in his apartment complex in Louisville and sentenced to 70 years imprisonment.  Both victims purportedly identified Gregory as the perpetrator in a show-up procedure.  A forensic analyst testified that hairs found in a stocking cap worn by the assailant were of Negroid origin and were similar in color and microscopic characteristics to Gregory's head hair standard.  Seven years later, post-conviction DNA testing revealed that none of the hairs belonged to Gregory.  In 2000, all charges against Gregory were dismissed and Gregory was exonerated.

 In 2001, Gregory filed a lawsuit against the City of Louisville and individual LMPD officers, including Hope Greer who investigated the Warford homicide along with Handy, alleging violations of his civil rights. An appellate court ultimately found evidence of the LMPD's custom and practice in 1992 and 1993 of failing to train officers in their *Brady* obligations and reinstated Gregory's constitutional claim against the City based in part on the City's failure to train LMPD

officers on their duty to disclose exculpatory material.  I further understand that in 2007, the City of Louisville and the State of Kentucky settled the lawsuit for $4.6 million.

The failure to train on and follow *Brady* requirements found in the Gregory case is particularly concerning given Woosley's admissions that the coercive conduct Handy engaged in during the Chandler case, described above, did not need to be documented or disclosed to the defense in that Chandler case—or this case, as Hardin and Clark were tried after Chandler's interrogation by Handy.

**The Kerry Porter Case**

On August 31, 1998, Kerry Porter was found guilty of the Tyrone Camp murder and eventually sentenced to 60 years imprisonment. At trial, the Commonwealth's case focused on a cross-racial identification and testimony from a jailhouse informant named Greg Gulley. Gully would testify that Mr. Porter confessed details of the Camp homicide to him.  Mr. Gulley denied receiving benefits in exchange for his information.  A statement by Ralph Philpot, which supposedly connected Mr. Porter to a weapon used in the crime. was also an issue at trial.  Mr. Porter's defense centered on his innocence and the guilt of Juan Sanders and Cecelia Camp, who Porter maintained were the true perpetrators responsible for the crime.

By 2008, Sgt. Denny Butler began a reinvestigation into the Tyrone Camp homicide.  Through that investigation. Mr. Butler located a taped statement from Francois Cunningham implicating Juan Sanders and his associates in various murders.  Cunningham eventually proffered a statement revealing that "Juan Sanders actually committed the murder of Camp, and that Kerry Porter was not involved with it."  Sgt. Butler later found that Kerry Porter was not involved in the murder of Tyrone Camp, and that Juan Sanders and Cecelia Camp were the individuals responsible.  Mr. Porter's exoneration then occurred at the request of the Commonwealth.

In 2012, Mr. Porter filed a civil lawsuit against the City of Louisville and individual LPD officers, including Gene Sherrard and Julius Clark, alleging violations of his civil rights.  During the course of that lawsuit, Mr. Porter was able to uncover previously undisclosed evidence gathered during the criminal investigation.  Some of that evidence stemmed from the victim's brother, other withheld evidence even derived from a former LPD officer named Jackie Hollingsworth.  However, the most critical withheld exculpatory evidence derived from Francois Cunningham.

Mr. Cunningham testified at his deposition that Juan Sanders apparently offered him a $50,000 bounty to kill Camp, gave him the times and location where Camp could be found, and explained the plan for the murder.  Mr. Cunningham also testified that Sanders showed Cunningham the weapon to be used and explained how the silencer would operate (at trial, the Commonwealth attempted to connect the shotgun and silencer to Mr. Porter through testimony).  Thus, this evidence would have not only implicated Sanders in the murder, it would have undercut the credibility of third-party witnesses presented by the Commonwealth at Mr. Porter's trial.  Juan Sanders also informed Mr. Cunningham of the motive, the collection of life insurance policies. After the murder, Sanders is alleged to have confessed to the murder to Cunningham.  Mr. Cunningham testified that he provided Lt. Sherrard and another officer with the information he knew implicating Juan Sanders and Cecelia Camp in the Camp homicide in September 1997 – prior to Mr. Porter's trial.  That information was critical, as explained above by Mr. Cunningham.

According to Mr. Porter, none of this information was disclosed prior to trial. The factual circumstances of this situation are similar in nature to those in Chandler, where Lt. Sherrard is alleged to have been informed of information implicating an alternate suspect and seemingly prevented such information from coming to light. Such actions are a serious departure from minimally acceptable police practices in place at the time.

Mr. Porter's lawsuit also uncovered that the jailhouse informant, Mr. Gulley, was provided information and promises of consideration by Detective Kidd during the questioning for the Louisville Police Department. According to Mr. Gulley's deposition, Detective Kidd "said that he could give [him] a deal" as he was "trying to get [his] situation over." Mr. Gulley would later agree that he cooperated with Detectives Kidd and Clark "in exchange" for undocumented consideration. The lawsuit also unearthed that Gulley was a longtime informant used by the Louisville Police Department nearly 100 times prior to Mr. Porter's criminal case. For his work, Mr. Gulley had been paid more than $12,000 and led to the arrest of dozens of individuals, including Mr. Porter. While discovery in the Porter litigation indicated that Detective Kidd was made aware of this information, neither Mr. Porter nor the Commonwealth knew of it. Such a withholding is an extreme departure from the minimally acceptable practices in place by the time.

Information during the lawsuit affirmed instances where third-party witnesses, like Ralph Philpot and Joe Tucker, allege that LPD officers fabricated false statements for them implicating Mr. Porter in the murder. For instance, in 1998 Detectives Clark and Kidd questioned Philpot in jail and created a report used to implicate Mr. Porter in the murder. In the report, it was documented that the detectives "explained to Mr. Philpot that there was nothing [they] could do in regard to his cases that he was being incarcerated on…" But evidence developed in the lawsuit revealed that Detective Kidd "promised to help [Philpot] with [his] Jefferson County cases. [Philpot's] understanding was that Det. Kidd would provide assistance on [his] Jefferson County case as long as [he] agreed with what he wanted [Philpot] to say." Mr. Philpot revealed in the affidavit that his statement was false and fabricated by LPD. If this information is credited, Philpot is not alone, as Joe Tucker, too, alleges that a report was falsely fabricated during the course of the criminal investigation. Such actions and misconduct are an extreme departure from the minimally acceptable practices in place by the time.

With this record, the federal court provided Mr. Porter with a trial against several of the Defendants, including Lt. Sherrard, for the withheld exculpatory evidence described above. I further understand that in 2017, the City of Louisville settled the lawsuit for $7.5 million. The failure to follow *Brady* requirements found in the Porter case is particularly concerning given what happened here.

## Summary of LMPD Investigative and Supervisory Lapses

Sgt. Woosley acknowledges that he was responsible for the actions and supervision of his subordinate investigators and as such, was responsible for reviewing and approving the reports and investigative actions taken by Handy. Specifically, part of his responsibility included the review and approval of police reports (investigative letters) written by detectives and the case file that compiled their investigative work product. Woosley signed off on the investigative letters

prepared by Handy in this criminal investigation. In doing so, he was approving the investigative actions as documented in the reports while ensuring those actions were consistent with department policy and procedures as well as the law. Woolsey has also testified that, in doing so, was affirming their accuracy, thoroughness and completeness.  Based on deposition testimony, it is clear the Sergeant Woosley was obligated to meaningfully supervise the investigative steps of Detective Handy and others under his charge.

Investigative police reports or letters are in large part the means through which a supervisor evaluates the work product of subordinates, and such reports are later utilized by prosecutors in the furtherance of a criminal prosecution. Any minimally trained and experienced supervisor should understand that comprehensive and thorough documentation is essential and take seriously his or her responsibility to closely review reports prior to signing off on them.   Yet, Woosley noted that he may have signed off on those reports as completed without critically looking at the substance of those reports. Sergeant Woosley asserted that at some point during his supervision of Handy—which concluded in 1995, when I understand Handy was transferred out of the PAS Unit—that Handy required more supervision, that he had to follow him more closely, and that Handy was told to get letters in on time and to take more pride in his work. Woosley indicated Handy didn't follow up on work as he should and took shortcuts by the time of the Clark/ Hardin criminal trial.

Incredibly, Woosley agreed that if a detective put in a report an incriminating statement from a suspect that wasn't actually made, because of the blue wall of silence he may or may not report it. This is a gross deviation from minimally acceptable practices and completely at odds with the role of a supervisor in an investigation. Notably, at his deposition, Sergeant Woosley also did not dispute that he was transferred from the PAS unit for reasons that included concerns over his supervision. These type of acknowledgments from Woosley given his duties and responsibilities as an investigative supervisor in serious investigations—including the Warford homicide investigation—are further evidence corroborating accounts from individuals like Chandler, West, Clark, Hardin, and witnesses in the Warford homicide investigation that Handy fabricated and/or misreported statements made by them. If credited, these actions by Handy—as supervised by Woosley—clearly deviate from minimally acceptable police practices and, in some situations, violates the law.

Lieutenant Sherrard was the immediate supervisor of Woosley and was responsible for the PAS unit activities which included the investigation of homicides.  Based upon my review of the record, Sherrard and Woosley communicated and collaborated regularly on investigative matters, the progress of homicide investigations and personnel related matters. As such, there were many opportunities to detect and correct violations of minimally acceptable police practices of investigative issues clearly within their purview.   The investigation of the Warford murder continued for many weeks before arrests were made on May 7.  Woosley and/or Sherrard could have and should have directed Handy and investigators to obtain recorded statements from those with important relevant information and from suspects Hardin and Clark who were consistently cooperating with law enforcement. Likewise, there was ample time and opportunity to have Handy ask follow up questions of Hardin regarding his suspected motives. Supervisors Woosley and Sherrard also should have insisted that other potential suspects and motives were fully explored and investigated until they were reasonably excluded.

If for some unexplained reason Woosley and Sherrard—who did participate directly in aspects of the investigation and were directly supervising detectives including Handy—did not take any action or provide input contemporaneously, there were additional opportunities to do so.   At the time investigative letters, reports, and the case file were submitted for supervisory review and approval, it would have and should have been readily apparent that the necessary and appropriate steps were not taken.

As explained above, Sgt. Woosley's self-assessment about his own serious supervisory deficiencies range from not critically reviewing investigative reports—including statements, not addressing formally or taking corrective action against Handy's declining performance which included taking shortcuts and not following up—the very serious performance issues present in this case, to his equivocation about what if any action he would take against general police misconduct, including putting in a report an incriminating statement from a suspect that wasn't actually made.  An investigative supervisor who does not instruct, correct, and hold subordinates accountable, serves to embolden a law enforcement officer who is inclined to not follow policy, engage in serious misconduct, and break the law.

The apparent absence of supervision of Detective Handy in this investigation is especially troublesome when this investigation and its deviations from minimally acceptable police practices are compared to other investigations that were conducted at or around the time of this investigation including the Chandler and West investigations. Notably, the Keith West investigation occurred during February 1992; the Warford homicide investigation into Hardin and Clark took place from April to May 1992, the Gregory investigation occurred the summer of 1992; Gregory was tried in August 1993; the investigation and prosecution of Edwin Chandler began in September/October 1993; Chandler was wrongfully convicted in February 1995; days later, in February 1995, Handy testified in pre-trial hearing in the Keith West case and was impeached as having taped over a critical witness statement; Keith West was wrongfully convicted later that month; Handy then testified in the Clark/Hardin trial a month later, in March 1995; and Hardin and Clark were convicted on March 7, 1995.

In sum, at the same time, Hardin and Clark were investigated and prosecuted for the murder of Rhonda Warford, there is significant credible evidence—in particular Handy's guilty plea—that Handy and other LMPD officers were engaging in investigation misconduct and/or clear deviations from minimally acceptable police practices in a number of other felony investigations. This misconduct includes evidence that Handy and other LMPD officers falsely attributed incriminating statements to suspects, repeated those misrepresentations to the prosecuting attorneys, the court, and the jury, failed to document exculpatory statements from suspects and witnesses in their investigative reports, destroyed key exculpatory evidence, testified falsely under oath, and concealed their misconduct.

Particularly troubling is that much of this was known by Handy's supervisors at the time of the Hardin/ Clark criminal trial in March 1995—including Woosley's admissions that he knew Handy deceptively threatened Edwin Chandler but did not document those threats. This evidence that Handy had a practice of falsifying incriminating statements—misconduct that is substantively the same as that which Hardin and Clark maintain occurred in this case—would have been powerful

impeachment evidence and, in a case that hinged on whether the jury believed the police witnesses or the defendants, likely would have been critical to the jury's determination of guilt or innocence.

Although I make no credibility determinations, I note there is substantial evidence in the record that the misconduct committed by Handy and supervisory failures in the Chandler and West cases was both proximate in time and remarkably similar to the misconduct alleged here. If true, that would constitute yet another example of egregious misconduct and utter failure to supervise.

At a minimum, all of these cases demonstrate, significant lapses or, possibly, complicity by LMPD supervisors given the obvious red flags regarding investigative misconduct by Detectives including Handy and the pattern of repeated investigative deviations in documentation and follow-up. In sum, it should have been evident to any minimally trained and experienced supervisor that basic police practices were not being followed on a regular basis in the LMPD, both by Handy as well as others, in the early 1990s and immediate corrective action was needed.

## Evidence of the Meade County Sheriff's Office Failure to Supervise

Similar to the supervisory failures of the LMPD, there appears to have been an utter lack of supervision and management in this investigation by Sheriff Greer of the Meade County Sheriff's Office (MCSO). From my review of the record evidence, it should have been immediately evident to any minimally trained and experienced supervisor, that minimally acceptable police practices were not being followed in several facets of this investigation, requiring the supervisor to take immediate corrective action. However, it is not surprising that there is substantial evidence that Sheriff Greer did not properly supervise this investigation given he indicated at his deposition that he wasn't required to have training to become Sheriff nor were deputies or constables. When he became sheriff, on the job training was the form of training utilized. He further explained that he had no formal training on conducting murder investigations and the only training he ever had was on the job training watching Kentucky State Police (KSP) officers or LMPD officers and supervisors.

At his deposition, Sheriff Greer stated that prior to the Warford homicide, the Meade County Sheriff's Department had never been the lead agency on a homicide investigation. Instead, as the record reflects, the Sheriff would normally rely on the services of the KSP. These acknowledgements by the Sheriff, the top law enforcement executive of the MCSO and the individual responsible for the policies of his agency, serve to explain at least in part, the errors and deficiencies of this murder investigation. Any criminal investigation, let alone a murder investigation whose findings would become the bases of a prosecution that carried the promise of a life sentence for the person found guilty, is not territory an untrained law enforcement officer should venture into without appropriate guidance, training, and supervision, as well as a firm understanding of the law and proper police procedure. To undertake such an endeavor, as Sheriff Greer did in the Warford homicide investigation, is contrary to minimally acceptable police practices. As a result, where there should have been an extra series of checks on the investigative missteps by the LMPD, there was complicity in the violations of minimally acceptable police practices, which, as noted previously, include statement fabrication, coercive interrogation tactics (i.e. displaying a gun during an interrogation), inconsistencies in recording witness statements,

lack of follow up on critical issues, misuse of a jailhouse informant, as well as misrepresentation of physical evidence

As the policymaker of his agency, Sheriff Greer should have understood that he was not qualified to lead and actively participate in critical investigative matters and offer testimony as an expert in any discipline. Yet, that is exactly what he did.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

By: _____          Dated: _____4·15-2022_____

Russell Fischer

# Exhibit A

*C.V.*

**Russell Fischer**
**2290 W. Marion Avenue**
**Punta Gorda, FL  33065**
Cell Phone:  (954) 368-4664
Email:  mesrfish@aol.com

## PROFILE

Thirty-three years police, managerial and investigative background (retired) including the planning, implementation and management of a variety of organizational programs and activities. Responsible for multi-million dollar annual budgets and specialized major crimes initiatives. Consultant and instructor for the U.S .Department of Justice in Colombia regarding violent crime (homicide) and for homicidetraining.com as to Officer-Involved shootings and In-Custody deaths. Retained by the Department of Justice, National Institute of Justice as a peer reviewer. Eight years an instructor for the International Association of Chiefs of Police (IACP) for a course entitled Internal Affairs: Legal and Operational Issues.

Retained as a police practices expert regarding homicide and internal affairs related matters in both federal and state jurisdictions.

## ACCOMPLISHMENTS

- Managed, executed and shared in the development of the Department's first-ever venture to provide comprehensive police service for a contracted municipality. Ensured contract compliance, staffing selection, implementation and regular oversight with elected town officials and a professional manager while simultaneously managing a police district.

- Free Trade Area of the Americas and Miami-Dade General Elections principal in support of operational personnel.  Management role for the International Association of Chiefs of Police and Major Cities Chiefs September 2005 conferences.

- Super Bowl XLI Incident Commander.  Responsible for planning, designing, and implementing a federal, state, and local security model involving over 50 agencies.

- Shared Homicide managerial responsibility for the recovery and investigative operations as it related to the ValuJet Flight 592 crash in the Florida Everglades.

- Management of and funding procurement for various federal, state, and local task force projects concerning organized violent crime and narcotics groups and community-based programs.

- Part-time lecturer and instructor at the Metropolitan Police Institute, Miami-Dade College, International Association of Chiefs of Police (IACP), and for newly assigned detective/supervisory personnel, police recruits, and in-service training sessions.  Author of published articles for the Police Chief (IACP) magazine and Federal Bureau of Investigation Law Enforcement Bulletin.

- Served as the Department Hurricane and Emergency Operations Coordinator. Multiple committee participation and leadership roles, including the Electronic Control Device Committee, Use of Force Committee, and Post-Police Shooting Committee, committee chairperson and author of the Department's multi-million dollar Robbery Intervention Detail Program, which specializes in addressing violent crimes in the greater Miami area.

**EDUCATION**

University of Miami, Coral Gables, Florida
Graduated 1998        Master of Public Administration

St. Thomas University, Miami, Florida
Graduated 1984        Master of Science Degree

John Jay College of Criminal Justice, New York, New York
1973 – 1975               All M.A. graduate course work completed, Criminal Justice

William Paterson University, Wayne, N.J.
1973   B.A.  Degree

F.B.I. National Academy, Quantico, Virginia
December 1995 Graduate

**PROFESSIONAL EXPERIENCE    Miami-Dade Police Department 1975-2008**

**CHIEF**
**2004-2008**                        **Miami-Dade Police Department**
Criminal Investigations Division, Uniform Services and Special Services Division Chief responsible for the management of major departmental elements, including Homicide, Robbery, Sexual Crimes, Domestic Crimes, Community Affairs, Central Records, Court Services and Warrants Bureaus, as well as the Miami International Airport, Port of Miami and the Special Patrol Bureau.

**POLICE MAJOR/CAPTAIN**
**1996-2004**                        **Miami-Dade Police Department**
Command-level assignments within investigative and operational areas, including Robbery, Professional Compliance (Internal Affairs), Economic

Crimes, and Narcotics Bureaus, as well as the Northwest District/Miami Lakes Commander.

**POLICE OFFICER/ DETECTIVE/ SERGEANT/ LIEUTENANT**

**1975-1995                                        Miami-Dade Police Department**
Assignments as a uniformed police officer, detective, sergeant, and police lieutenant in a varied number of commands including robbery/sexual battery, homicide, and auto theft.

# Exhibit B

*Prior Testimony*

Russell Fischer
April 15,2022

Cases where testimony provided in the last four years:

- *Maurice Caldwell v City and County of San Francisco 2020* 12-cv -1892 EDL

- *McIntyre et al. v. Unified Government of Wyandotte County and Kansas City, Kansas et al,*. No. 2:18-cv-02545-KHV-KGG

# Exhibit C

*Materials Made Available*

_Clark and Hardin v. Louisville Jefferson County Metro Government et al_ Deposition Transcripts

1. 30b6 – Donnie Burbrink
2. Amy Hatfield
3. Bart Adams
4. Bill Adams
5. Charles Edelen
6. Cliff Wise
7. Clifford Capps
8. Crystal Barnes
9. Ernie Embry
10. Garr Keith Hardin
11. Gene Sherrard
12. George Nichols
13. Harvey Palefsky
14. James Clark
15. James Whitely
16. Jay Pierce
17. Jeff Clark
18. Jim Woosley
19. Joe Greer
20. Jon Heck
21. Judy Cochran
22. Julius Clark
23. Kelly Jones
24. Kenton Smith
25. Kevin Justis
26. 30b6 – Lavita Chavous
27. Luanne Thomas
28. Mark Handy
29. Mary Warford
30. Michael Mattingly
31. Michelle Rogers
32. Mike O Connell
33. Robert Thurman
34. Tommy Stiles
35. Vicki Budd
36. Vickie Howser
37. Vinent Pozzie
38. Wallace Rogers
39. William Mahan

_Clark and Hardin v. Louisville Jefferson County Metro Government et al_ Deposition Summaries

1. 30b6 – Lavita Chavous
2. Bill Adams
3. Charles Edelen

4.  Clifford Capps
5.  Gene Sherrard
6.  George Nichols
7.  Garr Keith Hardin
8.  Mark Handy
9.  Cliff Wise
10. Joe Greer
11. Harvey Palefsky
12. James Clark
13. James Whitely
14. Jay Pierce
15. Jeff Clark
16. Jim Woosley
17. Julius Clark Digest
18. Kenton Smith
19. Kevin Justis
20. Robert Thurman
21. Tommy Stiles
22. Luanne Thomas
23. William Mahan

*Misc.*

1.  Exhibits marked in depositions in *Clark & Hardin v. Louisville Jefferson County Metro Government*
2.  *Clark & Hardin v. Louisville Jefferson County Metro Government* Amended Complaint
3.  *Chandler v. Louisville Jefferson County Metro Government et al* Complaint and Amended Complaint
4.  Deposition Transcript of Mark Handy from *Chandler v. Louisville Jefferson County Metro Government, et al.*
5.  Defendant Handy's Motion for a Bill of Particulars in *Commonwealth v. Handy,* October 29, 2018
6.  Grand Jury Indictment and Summons against Mark Handy in *Commonwealth v. Handy*
7.  Opinion in n *Gregory v. City of Louisville et al,* April 11, 2006
8.  Timeline of Relevant *Monell* Cases
9.  Summary of Case and Theory of Liability in *Chandler v. City of Louisville*
10. Order Granting Motion for New Trial, Vacating Convictions and Ordering New Trial in *Commonwealth of Kentucky vs. Clark and Hardin,* July 14, 2016
11. *Commonwealth vs. Keith West* Court File
12. *Commonwealth vs. Keith West* Trial Transcripts
13. *Commonwealth vs. Keith West* Hearing Transcript, July 18, 2019
14. *Commonwealth vs. Keith West* Hearing Transcript, August 6, 2019
15. *Commonwealth of Kentucky vs. Kerry Porter* documents, CLARK 16414-23808
16. *Commonwealth of Kentucky vs. Clark and Hardin* Transcript of Hearing on Motion for A New Trial Day, July 13, 2015