UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:17-CV-00419-GNS-CHL

JEFFREY DEWAYNE CLARK; and
GARR KEITH HARDIN                                                    PLAINTIFFS

v.

LOUISVILLE-JEFFERSON COUNTY
METRO GOVERNMENT, KENTUCKY et al.                       DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motions to Bar Expert Testimony from Jon

Heck (DN 288, 289) and John Ryan (DN 290), and Motion to Exclude Opinions and Testimony

from Dr. William Rodriguez III (DN 329).  The motions have been fully briefed and are ripe for

adjudication.   For the following reasons, Plaintiffs' Motions to Exclude Heck and Ryan are

**GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs' Motion to Exclude Dr. Rodriguez

is **GRANTED**.

## I.      STATEMENT OF FACTS AND CLAIMS

On April 5, 1992, 19-year-old Rhonda Sue Warford ("Warford") was found stabbed to

death in Meade County, Kentucky, after disappearing from Louisville early on April 2, 1992.  (Am.

Compl. ¶ 40, DN 38; Am. Compl. ¶ 40, DN 39 [collectively hereinafter Am. Compls.]).  The

murder was investigated jointly by Detective Mark Handy ("Handy") of the Louisville Police

Department ("LPD") and Sheriff Joseph Greer ("Greer") on behalf of the Meade County Sheriff's

Office ("MCSO").  (Am. Compls. ¶¶ 45-46).  Plaintiffs Jeffrey Dewayne Clark ("Clark") and Garr

Keith Hardin ("Hardin") (jointly "Plaintiffs") were investigated as suspects, and Handy

1

purportedly directed the investigation to fit his theorized motive that Plaintiffs committed the murder as part of a satanic ritual.  (Am. Compls. ¶¶ 51-112).  In May 1993, Plaintiffs were indicted in Meade Circuit Court (Kentucky) for Warford's murder and eventually convicted by jury and sentenced to life imprisonment.  (Am. Compls. ¶¶ 116, 124).  The prosecution allegedly relied in part on the satanic ritual theory and evidence obtained during the joint investigation.  (Am. Compls. ¶¶ 117-24).  Plaintiffs unsuccessfully sought relief through direct appeals and post-conviction proceedings.  (Am. Compls. ¶¶ 125-26).  In 2013, physical evidence relating to Warford's murder underwent DNA testing.  (Am. Compls. ¶ 130); *see Hardin v. Commonwealth*, 396 S.W.3d 909 (Ky. 2013).  Plaintiffs' convictions were ultimately vacated, and a new trial was ordered.  (Am. Compls. ¶¶ 131-33; *see* Defs.' Mot. Summ. J. Ex. 14, at 24, DN 286-20); *Commonwealth v. Clark*, 528 S.W.3d 342, 348 (Ky. 2017).  The indictments were dismissed in February 2018.  (Am. Compls. ¶¶ 135-41; *see* Pls.' Resp. Defs.' Mot. Summ. J. Ex. 74, at 1, DN 317-74).

Plaintiffs initiated this civil rights action against Meade County, Greer, Meade County Sheriff's Deputy Cliff Wise ("Wise"), Meade County Coroner William Adams ("Adams") (collectively "Defendants"), and others.[1]  (Am. Compls. ¶¶ 176-267).  Plaintiffs brought various claims under 42 U.S.C. § 1983 and Kentucky law, alleging that Defendants and Handy, *inter alia*, suppressed exculpatory and impeachment evidence, fabricated inculpatory statements attributed to Plaintiffs and other witnesses, supplied non-public investigative information to witnesses to bolster false inculpatory statements, altered Warford's reported date of death to circumvent

---

[1] Defendants James Clark, Kelly Jones, Robert Ennis, Charles Edelen, James Griffiths, Ernie Embry, Mark Handy, Jim Woosley, and Louisville Metro Government have since been dismissed from this action.  (*See* Am. Agreed Order, DN 275; Agreed Order, DN 283; Agreed Order, DN 284; Agreed Order, DN 325; Agreed Order, DN 331; Joint Status R., DN 372).

Plaintiffs' alibi, and misrepresented or falsely testified about physical evidence to the grand jury and at trial.  (Am. Compls. ¶¶ 51-112).

## II.   JURISDICTION

The Court exercises subject matter jurisdiction over this matter through federal question jurisdiction and supplemental jurisdiction over the state law claims.  28 U.S.C. §§ 1331, 1367(a).

## III.   STANDARD OF REVIEW

Fed. R. Evid. 702 governs the admissibility of expert witnesses.  It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)      the testimony is based on sufficient facts or data;
>
> (c)      the testimony is the product of reliable principles and methods; and
>
> (d)      the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Rule contains three requirements:  "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008) (internal citations omitted) (quoting Fed. R. Evid. 702).  A court does not assess the "qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *In re Welding Fume Prod. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *5 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").  The expert's proponent bears the burden

of demonstrating that the expert is qualified to testify. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

Fed. R. Evid. 704 governs the appropriate scope of expert testimony. Experts may testify to ultimate issues, which must be factual issues and not legal conclusions. *Berry*, 25 F.3d at 1353 (citing Fed. R. Evid. 704(a)). An expert's testimony may "suggest the answer to the ultimate issue or . . . give the jury all the information from which it can draw inferences as to the ultimate issue." *Id.* It may not, however, contain legal conclusions that "convey[] the witness'[s] unexpressed, and perhaps erroneous, legal standards to the jury[,]" which would interfere with the court's duty to determine and instruct the jury on the applicable law. *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (citation omitted). To determine whether testimony contains an improper legal conclusion, courts often look at "whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." *Id.* at 151 (citation omitted). Similarly, experts may not define legal terms which is the province of the court. *Berry*, 25 F.3d at 1353; *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." (citation omitted)). Experts also offer impermissible legal conclusions when their "opinions [] would merely tell the jury what result to reach . . . ." Fed. R. Evid. 704 advisory committee's note to 1972 proposed rules.

# IV.   DISCUSSION

## A.   Motions to Exclude Jon Heck (DN 288, 289)[2]

Jon Heck ("Heck") is a former special prosecutor for the Office of the Attorney General of the Commonwealth of Kentucky.  (Pls.' Mot. Exclude Heck Ex. 1, at 2, DN 289-1 [hereinafter Defs.' Disclosure]).  In 2017, after Plaintiffs' convictions were vacated and a new trial was ordered, Heck was assigned to prosecute the murder charges against Plaintiffs.  (Defs.' Disclosure 2; Pls.' Mot. Exclude Heck Ex. 2, at 4-5, 11, DN 289-2 [hereinafter Indictment Dismissal]).  In 2018, he moved to dismiss their 1992 indictments.  (Defs.' Disclosure 2; Indictment Dismissal 4-5, 11).  Pursuant to Fed. R. Civ. P. 26(a)(2)(C), Defendants disclosed Heck as a non-retained expert to "testify consistent with his deposition testimony of July 1, 2021, including, but not limited to, testimony regarding probable cause and his willingness to try the case and submit the guilt or innocence of Clark and Hardin to a Meade County jury in 1995 . . . ."  (Defs.' Disclosure 2-3).  More specifically, Defendants seek to use Heck's testimony to rebut elements of Plaintiffs' Section 1983 malicious prosecution claim, namely the absence of probable cause to prosecute Plaintiffs and that the criminal proceedings were terminated in their favor.  (Defs.' Resp. Pls.' Mot. Exclude Heck 6-8, DN 312).

Plaintiffs move to exclude the proffered testimony because it contains impermissible legal conclusions.  (Pls.' Mot. Exclude Heck 3-4, DN 289).  They argue that testimony about probable cause is inappropriate because the jury must determine whether there was probable cause to prosecute Plaintiffs and Heck may not define probable cause for the jury.  (Pls.' Mot. Exclude Heck 3-4).  Courts in the Sixth Circuit have repeatedly held that expert testimony regarding the

---

[2] DN 289 is the corrected version of the motion filed at DN 288.  For simplicity, only DN 289 will be cited in addressing these motions.

existence of probable cause is improper. *See, e.g.*, *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006) (holding that an expert who testified that "a reasonable officer on the scene would not have concluded at the time that there existed probable cause" expressed a legal conclusion); *Walden v. Pryor*, No. 5:18-CV-171-TBR, 2022 WL 736115, at *4 (W.D. Ky. Mar. 10, 2022) (excluding an expert's testimony that the defendant lacked probable cause for the plaintiff's prosecution); *Brown v. Lewis*, No. 12-14953, 2014 WL 354007, at *5 (E.D. Mich. Jan. 31, 2014) (striking an expert who opined that "[o]fficers had 'probable cause' to believe criminal activity was occurring . . . .").

The same conclusion is warranted here. Heck's expert testimony does far more than "suggest the answer to the ultimate issue . . . ." *Berry*, 25 F.3d at 1353. Heck defines probable cause, opines that probable cause existed at each stage of the criminal prosecution and states that the case was properly submitted to the jury. (Heck Dep. 119:14-120:1, 131:8-132:11, Jul. 1, 2021, DN 289-3). Whether Defendants had probable cause to prosecute Plaintiffs, however, is the question which must be answered by the jury. *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (listing a lack of probable cause as one of the elements of malicious prosecution); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (citing *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989) (noting that in Section 1983 cases, the existence of probable cause is generally a jury question). Heck may not tell the jury what result to reach, and he may not instruct them on probable cause. Fed. R. Evid. 704 advisory committee's note on 1972 proposed rules; *Berry*, 25 F.3d at 1353.

Plaintiffs similarly argue that whether Heck would have been willing to try the case in 1995 "is a thinly veiled attempt to elicit an improper probable cause opinion." (Pls.' Mot. Exclude Heck 4). Indeed, whether Heck would have tried the case in 1995 would encompass his belief

regarding probable cause, as he conceded in his deposition.  (*See* Heck Dep. 131:22-134:6).  The Sixth Circuit has warned against "overstat[ing] . . . the scope of [its] ultimate legal conclusion case law" by excluding experts whose opinions merely "suggest the answer to the ultimate issue" as opposed to experts who testify in "specialized legal terminology[] that a defendant violated (or did not violate) the law." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (internal quotation marks omitted) (citation omitted).  A "carefully phrased question [can] elicit[] similar information and avoid[] the problem of testimony containing a legal conclusion." *Torres*, 758 F.2d at 151.  Still, if an expert properly testifies only to ultimate factual issues and not legal conclusions, it is improper to "base [the expert's] opinion of the ultimate issue on facts that [are] for the jury to determine." *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989); *cf. Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) ("For a witness to stack inference upon inference and then state an opinion regarding the ultimate issue is even more likely to be unhelpful to the trier of fact."  (citing *Shahid*, 889 F.2d at 1547)).  The Court will allow Heck's opinion to the extent that he can testify without making legal conclusions about probable cause or relying on facts which must be determined by the jury.[3]

Defendants also expect Heck to testify regarding the reasons he sought to dismiss the indictments and that he thought Plaintiffs remained suspects in the ongoing murder investigation. (Defs.' Resp. Pls.' Mot. Exclude Heck 2).  Plaintiffs first argue that those opinions should be excluded because Defendants did not include them in their disclosure.  (Pls.' Reply Mot. Exclude

---

[3] Plaintiffs also argue that Heck's expert testimony should be excluded because it is "irrelevant, speculative, and confusing" because he does not have personal knowledge of the events in 1995 and because he did not become an attorney until 2001.  (Pls.' Mot. Exclude Heck 5).  Experts are not required to base their opinions on personal knowledge; they may rely on facts or data that counsel gave them.  *See* Fed. R. Evid. 602, 703.  Further, Plaintiffs do not cite any cases, rules, or statutes to support their argument that Heck's testimony should be excluded because he became an attorney in 2001.  (*See* Pls.' Mot. Exclude Heck 2, 5).

Heck 2, DN 342).  Fed. R. Civ. P. 26(a)(2)(C) requires parties to disclose non-retained experts and provide the subjects of their expert testimony and a summary of the facts and opinions to which they will testify.  A non-retained expert may testify as a fact witness and an expert witness, but the disclosure requirement only applies to the expert opinions.  Fed. R. Civ. P. 26(a)(2)(C) advisory committee's note to 2010 amendment.  Why Heck moved to dismiss the indictments and whether he thought Plaintiffs were still suspects are based on his personal knowledge from his involvement in the case.  *See* Fed. R. Evid. 602.  This testimony is unrelated to any expert opinion Heck may provide and are therefore not subject to the disclosure requirement.  *See* Fed. R. Civ. P. 26(a)(2)(C).

Plaintiffs next posit that Heck may not offer that testimony because it is not relevant to the favorable termination element of malicious prosecution.  (Pls.' Reply Mot. Exclude Heck 5-6).  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Plaintiffs establish  favorable termination of their criminal prosecution when they "show that the criminal prosecution ended without a conviction"; proving the prosecution "ended with some affirmative indication of innocence" is not required.  *Thompson v. Clark*, 596 U.S. 36, 39, 49 (2022).

Defendants insist that Heck's testimony will show that the motion to dismiss did not prove Plaintiffs' innocence or that they were exonerated.  (Defs.' Resp. Pls.' Mot. Exclude Heck 7-8).  While that may not pertain to favorable termination, Defendants also seek to use this testimony to bolster the existence of probable cause for the prosecution.  (Defs.' Resp. Pls.' Mot. Exclude Heck 6-7).  Heck's reasons for seeking dismissal of the indictment and that he still considered Plaintiffs to be suspects may assist the jury as they weigh the relevant facts and circumstances to determine whether probable cause existed for the Plaintiffs' prosecution and continued detention.  *See*

*Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (citations omitted) (explaining that probable cause exists when based on a totality of the circumstances, a reasonable police officer would believe that the suspect committed a crime); *see generally Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (explaining that Section 1983 malicious prosecution claims are not limited to the indictment phase but may be based on "continued detention without probable cause." (citation omitted)).  Heck may offer that testimony to the extent that it makes the existence of probable cause more or less probable, bearing in mind, however, that he may not offer legal conclusions about probable cause.[4]  *See* Fed. R. Evid. 401; *Berry*, 25 F.3d at 1353.  Accordingly, Plaintiffs' motion to exclude Heck is granted in part.

### B.  Motion to Exclude John Ryan (DN 290)

John Ryan ("Ryan") is a police practices expert with decades of experience in law enforcement and a background in law.  (Pls.' Mot. Exclude Ryan Ex. 1, ¶¶ 1-3, DN 290-1 [hereinafter Ryan Expert R.]).  He has a law degree and a master's degree in the administration of justice.  (Ryan Expert R. ¶ 2).  He is a co-director of the Legal Liability Risk Management Institute, where he authors and edits its law enforcement legal update, provides trainings, and evaluates training practices of law enforcement agencies.  (Ryan Expert R. ¶¶ 4-5).  Defendants have retained Ryan to testify that Defendants' actions complied with generally accepted police practices from 1992 to 1995.  (Defs.' Resp. Pls.' Mot. Exclude Ryan 1-2, DN 310).

Plaintiffs move to exclude many of Ryan's opinions as legal conclusions, arguing that he may not opine that Defendants had probable cause or that Defendants complied with "legal

---

[4] "It is difficult for the Court to provide in advance complete guidance to the parties as to 'where the lines will be drawn' at trial." *In re Welding Fume Prod. Liab. Litig.*, 2005 WL 1868046, at *8. This is especially true when, as here, the admissibility determinations will depend on context and the precises question asked.  *See id.*

mandates." (Pls.' Mot. Exclude Ryan 3-10). They also contend that his testimony invades the province of the court by defining legal terms and assessing some witnesses' credibility. (Pls.' Mot. Exclude Ryan 10-12). Plaintiffs do not challenge Ryan's qualifications to serve as an expert. (Pls.' Reply Mot. Exclude Ryan 3, DN 343).

### 1.   *Legal Conclusions and Definitions*

The Sixth Circuit "permit[s] experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004) (citations omitted). Because of the nature and subject of an expert witness's testimony, there is a subtle but important difference between a police practices expert's proper opinions that assist the trier of fact and improper legal conclusions that do not. *See Berry*, 25 F.3d at 1353. A police practices expert may testify about specific police practice standards and whether, if the jury believes that an officer committed certain actions, those actions met or violated that standard. *See Champion*, 380 F.3d at 908; *Gough v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:12-CV-849-DJH-CHL, 2016 WL 4535663, at *2 (W.D. Ky. Aug. 30, 2016); *Harrison v. Ellison*, No. 3:21-CV-174-RGJ, 2023 WL 4141050, at *7 (W.D. Ky. June 22, 2023). A police practices expert may not, however, testify to legal conclusions or define legal terms. *Berry*, 25 F.3d at 1353-54.

Plaintiffs submit that many of Ryan's opinions contain legal conclusions or otherwise improperly invade the province of the court. (Pls.' Mot. Exclude Ryan 3-11). Because Ryan may explain specific police practices, the opinions contained in paragraphs 476, 483, and 485 are permissible. (Ryan Expert R. ¶¶ 476, 483, 485); *Champion*, 380 F.3d at 908. Those opinions explain specific police practices that are relevant to the case, do not impermissibly define legal terms, and do not express legal conclusions. (Ryan Expert R. ¶¶ 476, 483, 485); Fed. R. Evid.

401; *Berry*, 25 F.3d at 1353-54.  Indeed, Ryan does not apply those police practices to the facts of the case, so even his references to unspecified "legal mandates" are not legal conclusions there. (Ryan Expert R. ¶¶ 476, 483, 485).

Because Ryan may not testify to legal conclusions, the opinions contained in paragraphs 475, 487, and 488 are excluded.  In those paragraphs, Ryan does not point to specific police procedures nor explain whether, in his opinion, Defendants' actions conformed with them.  (*See* Ryan Expert R. ¶¶ 475, 487, 488); *Champion*, 380 F.3d at 908; *Gough*, 2016 WL 4535663, at *2; *Harrison*, 2023 WL 4141050, at *7.  Instead, he "tell[s] the jury what result to reach" by repeatedly concluding that the murder investigation and the decision to arrest Plaintiffs was consistent with police training and, more significantly, "legal mandates." (Ryan Expert R. ¶¶ 475, 487); *Berry*, 25 F.3d at 1354.  The Federal Rules of Evidence allow expert opinions on the ultimate issue if they are factual, but they do not allow experts to opine on the "ultimate question of liability."  *Berry*, 25 F.3d at 1353.  In this case, the jury must determine, *inter alia*, whether Defendants fabricated evidence, maliciously prosecuted Plaintiffs, and suppressed evidence, so Ryan's testimony that all of Defendants' actions in the investigation and the decision to seek arrest warrants complied with policy, training, and "legal mandates" is conclusory and improper.  (Am. Compls. ¶¶ 51-112). Like Heck, Ryan likewise may not express legal conclusions that Defendants had probable cause to prosecute Plaintiffs.  (*See* Ryan Expert R. ¶ 488); *see Berry*, 25 F.3d at 1354.

Ryan's opinions contained in paragraphs 480, 481, and 486 are also excluded.  In those paragraphs, Ryan defines Terry stops, probable cause, and the totality of the circumstances test. (Ryan Expert R. ¶¶ 480, 481, 486).  "It is the responsibility of the court, not testifying witnesses, to define legal terms."  *Berry*, 25 F.3d at 1353.  Defendants suggest that Ryan may testify to "certain indicia of probable cause" and that Ryan's opinions permissibly explain how police

11

officers are trained.  (Defs.' Resp. Pls.' Mot. Exclude Ryan 7, 13-14 (citing *Fair v. Franklin Cnty.*, 215 F.3d 1325, 2000 WL 659418 (6th Cir. 2000) (unpublished table decision)).  Defendants' argument is not well-taken.  In *Fair*, the Sixth Circuit affirmed a district court's decision to admit expert testimony about training cadets regarding probable cause despite the plaintiff's arguments that the testimony impermissibly defined probable cause.  *Fair*, 2000 WL 659418, at *2, *4.  The Court, however, did not consider whether the trial court properly admitted the testimony because it held that it was harmless, and it noted that the expert did not explicitly define probable cause. *Id.*

Ryan offers general definitions of probable cause, "Terry stops," and the totality of the circumstances test, but prefacing the concepts with the phrase "[o]fficers throughout the United States are trained that . . ." does not cure the error.  (*See* Ryan Expert R. ¶¶ 480, 481, 486); *see Burkhart*, 112 F.3d at 1213.  Similarly, paragraphs 489 and 493, impermissibly explaining *Brady* and *Giglio*, are only admissible to the extent that Ryan can testify about specific police procedures regarding exculpatory or impeachment evidence without expressing legal conclusions.  (Pls.' Mot. Exclude Ryan 10); *see Champion*, 380 F.3d at 908; *Berry*, 25 F.3d at 1353.

## 2.  *Recited Testimony and Credibility Determinations*

"A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *Ellis v. City of Providence*, No. 4:17-CV-00042-GNS, 2023 WL 4919683, at *7 (W.D. Ky. Aug. 1, 2023) (quoting *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)); *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (same).  Moreover, expert witnesses may not "base their conclusions on an evaluation of a witness's credibility, because credibility determinations are not an appropriate subject for expert

testimony." *Esch v. Cnty. of Kent*, 699 F. App'x 509, 517 (6th Cir. 2017); *cf. Shahid*, 889 F.2d at 1547 (explaining that an expert may not "base [the expert's] opinion of the ultimate issue on facts that [are] for the jury to determine."). Plaintiffs object that many of Ryan's opinions violate these principles. (*See* Pls.' Mot. Exclude Ryan 11-13; Pls.' Reply Mot. Exclude Ryan 10-11).

Ryan's opinions in paragraphs 482 and 494 are excluded on this basis. He explains that officers cannot make decisions based on information they do not possess and that, accordingly, any information Greer or the MSCO learned after obtaining arrest warrants does not "change the propriety" of the decision to seek the warrants. (Ryan Expert R. ¶¶ 482, 494). These opinions are not helpful to the jury. What Defendants knew and when will be explored extensively at trial, and jurors do not need an expert to explain that officers cannot rely on facts they do not know. (*See, e.g.*, Greer Dep. 267:16-24 (discussing whether Greer knew Handy "had a habit of fabricating statements from witnesses"), 244:19-245:24 (discussing when Greer first learned of Capps' letter to Justis), Aug. 7, 2019, DN 317-19); *see Ellis*, 2023 WL 4919683, at *8. Ryan's opinions in paragraphs 482 and 494 are thus improper. Similarly, the portion of paragraph 491 in which Ryan recites testimony that jurors will hear in the case will be also excluded. (Ryan Expert R. ¶ 491); *see Ellis*, 2023 WL 4919683, at *8. To the extent that any of Ryan's trial testimony assumes facts the jury must determine or evaluates witness credibility, the testimony will not be allowed. *See In re Welding Fume Prod. Liab. Litig.*, 2005 WL 1868046, at *8. Accordingly, Plaintiffs' motion to exclude Ryan is granted in part.

### C.   Motion to Exclude Dr. William Rodriguez III (DN 329)

Dr. William Rodriguez III ("Dr. Rodriguez") is a forensic anthropologist who Defendants hired "to provide insight and opine as to the time since death in regard to the physiological state of post-mortem rigor." (Rodriguez Expert R. 1, DN 329-2; Pls.' Mot. Exclude Rodriguez Ex. K,

at 1, DN 329-12 [hereinafter Rodriguez CV]).  Plaintiffs state that Dr. Rodriguez should be excluded because he is not qualified to opine about time of death in this case.  (Pls.' Mot. Exclude Rodriguez 8, 16, DN 329).

Dr. Rodriguez earned a Ph.D. in physical anthropology from the University of Tennessee in 1985 and worked for a coroner's office and medical examiner's office before joining the Armed Forces Institute of Pathology.  (Rodriguez CV 1).  He has served as a professor at several universities and as a member of the editorial board of various forensic publications.  (Rodriguez CV 2).  Dr. Rodriguez has consulted for several state medical examiners' offices and the FBI, CIA, U.S. State Department, and the Department of Justice on projects like the 9-11 terrorist bombings, Desert Storm, and war crimes in Iraq and in former Yugoslavia.  (Rodriguez CV 3).

Plaintiffs do not dispute that Dr. Rodriguez is a qualified forensic anthropologist; rather, they contend that forensic anthropologists are not qualified to analyze soft tissue and thus may only opine about time of death in cases where the body is decomposed.  (Pls.' Mot. Exclude Rodriguez 6).  Plaintiffs assert that because Warford's body was fresh and had not been disturbed by insects or predators, Dr. Rodriguez cannot opine about Warford's time of death.  (Pls.' Mot. Exclude Rodriguez 9).  Specifically, Plaintiffs argue that Dr. Rodriguez is not qualified to opine regarding time of death based on rigor mortis which is a soft tissue process and, as an anthropologist and not a pathologist, he is qualified to opine only on the body's hard structures.[5] (Pls.' Mot. Exclude Rodriguez 10).

___

[5] Defendants respond that Plaintiffs improperly distinguish between anthropologists and pathologists and that Dr. Rodriguez should not be excluded based solely on his title.  (Defs.' Resp. Pls.' Mot. Exclude Rodriguez 2, 4-5, 9, DN 347).  True, "[t]he court's investigation of qualifications should not be onerous or inordinately exacting, but rather must look to underlying competence, not labels." *Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003).  Plaintiffs' objection, however, is not limited to labeling Dr. Rodriguez as an

14

Defendants fail to demonstrate that Dr. Rodriguez is qualified to opine when Warford died based on post-mortem rigor.[6]  *Berry*, 25 F.3d at 1351; *Pride*, 218 F.3d at 578; (Rodriguez Expert R. 1).  Defendants point to Dr. Rodriguez's experience generally, reciting several of his previous positions, publications, and presentations from his CV.  (Defs.' Resp. Mot. Exclude Rodriguez 3). Defendants, however, fail to explain how these experiences inform his opinion about time of death based on rigor mortis.  (*See* Defs.' Resp. Mot. Exclude Rodriguez 3).  In fact, none of the cited publications include discussion of rigor mortis or early stages of human decomposition.  (*See* Defs.' Resp. Mot. Exclude Rodriguez 3-5).  Moreover, few of Dr. Rodriguez's publications and none of his cited presentations are available for review, which are therefore unverifiable.  (*See* Defs.' Resp. Mot. Exclude Rodriguez 3-5).

Defendants cite several cases permitting anthropologists to testify about time of death, none of which depended on analysis of rigor mortis.  *See State v. Willis*, 496 S.W.3d 653, 675 (Tenn. 2016) (forensic anthropologist based time of death on organ decomposition); *Scott v. Commonwealth*, 685 S.W.2d 184, 185 (Ky. 1984) (time of death based on insect predation); *State v. Miller*, 429 N.W.2d 26, 39 (S.D. 1988) (time of death testimony of forensic anthropologist based on insect predation was improperly admitted under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)).  They also cite two cases in which Dr. Rodriguez was qualified to testify about time of death, but again, neither case involved rigor mortis or early stages of decomposition.  *See Taylor*

---

"anthropologist"—they contend that he does not have the training and experience to opine on the specific issue raised in this case.  (Pls.' Mot. Exclude Rodriguez 9).

[6] Defendants' response frames the question Dr. Rodriguez was retained to answer more broadly than his report.  (Defs.' Resp. Mot. Exclude Rodriguez 5-6 ("The question that Rodriguez and Melinek have been called to answer is what did or did not happen to Warford's body after death, specifically how the body interacted with outside forces—the air temperature, the substrate, the insects and animals, etc.")).  To the contrary, Dr. Rodriguez's report identifies time of death based on rigor mortis as the specific question he was retained to answer, discusses rigor in detail throughout, and heavily relies on it to form his opinion.  (*See* Rodriguez Expert R.).

*v. Hannigan*, No. 93-3147, 1998 WL 239640, at \*24 (D. Kan. Feb. 4, 1998); *Rubenstein v. State*, 941 So. 2d 735, 770 (Miss. 2006) (same).[7]

Dr. Rodriguez's deposition does not provide any additional information to demonstrate his qualification to opine on time of death in this case. Defendants insist that he has been qualified to opine in cases with similar facts, but they do not cite any such cases for review. (Rodriguez Dep. 169:16-170:9, DN 329-3; Defs.' Resp. Mot. Exclude Rodriguez 12). Dr. Rodriguez explained that his expertise lies in the hard structures of the body and that he may work with fresh bodies and soft tissue to identify the body or injuries sustained. (Rodriguez Dep. 171:19-175:6). He insists, however, that he has analyzed time of death based on rigor for the U.S. government in war zones abroad, but these assertions are wholly unverified (and are not mentioned in his curriculum vitae). (Rodriguez Dep. 193:14-197:1 ("Now, getting that information will be impossible for you as you do not have the clearance.")). Dr. Rodriguez also did not point to any specific articles he has published or presentations he has given on rigor; he merely pointed to his CV, which does not demonstrate his qualifications to answer the specific question in this case. (Rodriguez Dep. 178:18-180:16; 191:7-192:17; *see* Rodriguez CV).[8]

---

[7] Defendants also urge that Dr. Rodriguez is qualified to testify based on an "analytical evaluation" of his specialized knowledge. (Defs.' Resp. Mot. Exclude Rodriguez 9, 12-13). They cite *United States v. Ferri*, 778 F.2d 985 (3d Cir. 1985), a pre-*Daubert* case, arguing in essence that because "Dr. Rodriguez's professional status is well-established" and he uses the same generally accepted methodology as Plaintiffs' expert Dr. Melinek, he is qualified to testify. (Defs.' Resp. Mot. Exclude Rodriguez 12-13). Those factors based on outdated law, however, have no bearing on whether Dr. Rodriguez is qualified to testify on the *specific* question at issue. *Berry*, 25 F.3d at 1351.

[8] Plaintiffs also argue that Dr. Rodriguez's methodology is unreliable, but because he is excluded based on his qualifications, the Court need not reach the question of reliability. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528-29.

Defendants have failed to establish that Dr. Rodriguez is qualified to testify about when Warford died based on rigor mortis, and his testimony will therefore be excluded. *Berry*, 25 F.3d at 1351; *Pride*, 218 F.3d at 578.

## V.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Plaintiffs' Motions to Exclude Jon Heck (DN 288, 289) are **GRANTED IN PART** and **DENIED IN PART**.

2.    Plaintiffs' Motion to Exclude John Ryan (DN 290) is **GRANTED IN PART** and **DENIED IN PART**.

3.    Plaintiffs' Motion to Exclude Dr. William Rodriguez III (DN 329) is **GRANTED**.

Greg N. Stivers, Chief Judge
United States District Court

January 4, 2024

cc:    counsel of record