UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:17-CV-00419-GNS-CHL

JEFFREY DEWAYNE CLARK; and
GARR KEITH HARDIN                                             PLAINTIFFS


v.


LOUISVILLE-JEFFERSON COUNTY
METRO GOVERNMENT, KENTUCKY et al.                     DEFENDANTS


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Motion for Summary Judgment (DN 286) on behalf of

Defendants Meade County, Joseph Greer, Cliff Wise, and William Adams; Plaintiffs' Motion to

Strike (DN 318); and Plaintiffs' Motion for Leave to File a Sur-Reply (DN 351). The motions are

ripe for adjudication.

### I.        SUMMARY OF THE FACTS

Plaintiffs Jeffrey Dewayne Clark ("Clark") and Garr Keith Hardin ("Hardin") (jointly

"Plaintiffs") initiated this civil rights action against Meade County, Meade County Sheriff Joseph

Greer ("Greer") in his individual and official capacities, Meade County Sheriff's Deputy Cliff

Wise ("Wise") in his individual capacity, Meade County Coroner William Adams ("Adams") in

his individual capacity (collectively "Moving Defendants"), and others.[1]  (Am. Compl. ¶¶ 176-

267, DN 38; Am. Compl. ¶¶ 176-267, DN 39 [collectively hereinafter Am. Compls.]).

---

[1] Defendants James Clark, Kelly Jones, Robert Ennis, Charles Edelen, James Griffiths, Ernie
Embry, Mark Handy, Jim Woosley, and Louisville Metro Government have since been dismissed
from this action.  (*See* Am. Agreed Order, DN 275; Agreed Order, DN 283; Agreed Order, DN
284; Agreed Order, DN 325; Agreed Order, DN 331; Agreed Order, DN 373).

The events giving rise to this matter began with the 1992 murder of Rhonda Sue Warford ("Warford"), who was found stabbed to death in Meade County, Kentucky, on April 5, 1992, after disappearing from Louisville early on April 2, 1992. (Am. Compls. ¶ 40). The murder was investigated jointly by Detective Mark Handy ("Handy") of the Louisville Police Department ("LPD") and Greer on behalf of the Meade County Sheriff's Office ("MCSO").[2] (Am. Compls. ¶¶ 45-46). Plaintiffs were investigated as suspects, and Handy purportedly directed the investigation to fit his theorized motive that Plaintiffs committed the murder as part of a satanic ritual.[3] (Am. Compls. ¶¶ 51-112).

Plaintiffs allege that Moving Defendants and Handy, *inter alia*, suppressed exculpatory and impeachment evidence, fabricated inculpatory statements attributed to Plaintiffs and other witnesses, supplied non-public investigative information to witnesses to bolster false inculpatory statements, altered Warford's reported date of death to circumvent Plaintiffs' alibi, and misrepresented or falsely testified about physical evidence to the grand jury and at trial. (Am. Compls. ¶¶ 51-112). Moreover, Plaintiffs claim that Meade County is liable because Greer was a policymaker for the County and he created unconstitutional policies concerning handling witnesses and evidence. (Am. Compls. ¶ 115).

Plaintiffs were indicted for Warford's murder in May 1993, convicted by a jury, and sentenced to life imprisonment. (Am. Compls. ¶¶ 116, 124). The prosecution allegedly relied in part on the satanic ritual theory and evidence obtained during the joint investigation. (Am. Compls. ¶¶ 117-24). Plaintiffs unsuccessfully sought relief through direct appeals and post-conviction proceedings. (Am. Compls. ¶¶ 125-26); *see Clark v. Commonwealth*, Nos. 95-SC-453-MR, 96-

---

[2] Plaintiffs recently settled their claims against LPD and Handy. (Agreed Order, DN 373).
[3] Hardin acknowledges that he previously practiced "modern satanism" but asserts that this belief "forbids blood sacrifice and killing of any kind." (Am. Compls. ¶¶ 52, 55).

SC-146-TG, 1997 Ky. Unpub. LEXIS 1 (Oct. 2, 1997); *Clark v. Commonwealth*, No. 2003-CA-001184-MR, 2004 Ky. App. Unpub. LEXIS 720 (Dec. 3, 2004); *Clark v. O'Dea*, 257 F.3d 498 (6th Cir. 2001); *Hardin v. Commonwealth*, No. 95-SC-461-MR, 1996 Ky. Unpub. LEXIS 1 (Aug. 29, 1996); *Hardin v. Commonwealth*, No. 2001-CA-001782-MR, 2003 Ky. App. Unpub. LEXIS 1024 (May 16, 2003).  In 2013, physical evidence relating to Warford's murder underwent DNA testing which excluded Plaintiffs as a source of a hair found on the victim's body.  (Am. Compls. ¶ 130); *see Hardin v. Commonwealth*, 396 S.W.3d 909 (Ky. 2013).  Plaintiffs' convictions were ultimately vacated, and a new trial was ordered.  (Am. Compls. ¶¶ 131-33; *see* Defs.' Mot. Summ. J. Ex. 14, at 24, DN 286-20); *Commonwealth v. Clark*, 528 S.W.3d 342, 348 (Ky. 2017).  The indictments were dismissed in February 2018.  (Am. Compls. ¶¶ 135-41; *see* Pls.' Resp. Defs.' Mot. Summ. J. Ex. 74, at 1, DN 317-74).

Plaintiffs assert seven claims under consideration here, six under 42 U.S.C. § 1983 and one under Kentucky law:  (1) violations of their Due Process rights related to alleged *Brady* violations (against Greer and Wise); (2) violations of their Fourth and Fourteenth Amendment rights related to allegedly fabricated evidence (against Greer, Wise, and Adams); (3) malicious prosecution under both Section 1983 and Kentucky law (against Greer); (4) failure to intervene (against Greer, Wise, and Adams); (5) conspiracy to deprive their constitutional rights (against Greer, Wise, and Adams); and (6) municipal liability against Meade County.  (Am. Compls. ¶¶ 176-203, 213-28, 234-39, 249-55; Pls.' Resp. Defs.' Mot. Summ. J. 22-50, DN 317 [hereinafter Pls.' Resp.]).[4] Moving Defendants now seek summary judgment in their favor.  (Defs.' Mot. Summ. J., DN 286).

---

[4] Plaintiffs initially asserted twelve claims against Moving Defendants but have abandoned or voluntarily dismissed all except for the seven mentioned here, namely Supervisory Liability (Count IV) and various state law claims (Counts IX-XIII).  (*See* Am. Compls. ¶¶ 176-228, 234-67; Pls.' Resp. 22-49, 22 n.8).  As such, summary judgment is granted in Moving Defendants' favor as to the abandoned claims.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th

## II.     JURISDICTION

The Court exercises subject matter jurisdiction over this action through federal question jurisdiction and supplemental jurisdiction over the state law claims.  28 U.S.C. §§ 1331, 1367(a).

## III.     DISCUSSION

### A.     Plaintiffs' Motion to Strike (DN 318)

LR 7.1(d) limits motions and responses to no more than 25 pages, absent leave of Court for additional pages.  Moving Defendants previously sought such leave, requesting 150 pages for their present motion.  (*See* Defs.' Status R. 2-9, DN 271; Defs.' Mot. Leave File Excess Pages 2, DN 272).  The Magistrate Judge acknowledged the complexity of this action, the breadth of discovery taken, and that the parties agreed that some relief was appropriate (but disagreed to what extent) before concluding that "[t]he Parties' proposals are . . . more than quadruple the amount the Court permits in a typical case" and fixed a limit of 50 pages for motions and responses.  (Order 1-2, DN 276).  This Court, over Moving Defendants' objection, affirmed the Magistrate Judge's conclusion.  (Defs.' Obj., DN 285; Order, DN 298).

Moving Defendants' memorandum in support of their present motion offers 50 pages of substantive arguments but, at issue here, also includes several appendices containing endnotes and comparisons of allegedly fabricated witness statements.  (Defs.' Mot. Summ. J. App. A, DN 286-3; Defs.' Mot. Summ. J. App. C, DN 286-5; Defs.' Mot. Summ. J. App. D, DN 286-6).[5]  Plaintiffs contend Moving Defendants improperly circumvented the Orders concerning page limits by filing

---

Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011))).

[5] The appendices at DN 285-5 and 286-6 are both labeled "Appendix D."  Because DN 286-3 and DN 286-4 are Appendices A and B, the Court refers to DN 285-5 as "Appendix C."

improper exhibits as appendices.  Plaintiffs move to strike Appendices A, C, and D.[6]  (Pls.' Mot. Strike 4-6, DN 318; *see also* Defs.' Obj. Ex. 1, DN 285-2 (proposed Mem. Supp. Mot. Summ. J.)).

Moving Defendants' Appendices C and D appear to be repackaged narrative from their proposed 110-page memorandum attached to their objection to the Magistrate Judge's Order and consist of further arguments on the merits outside the page limit.  (*Compare* Defs.' Mot. Summ. J. App. C, at i-iv, *with* Defs.' Obj. Ex. 1, at 58-62; *compare* Defs.' Mot. Summ. J. App. D, at i-iii, *with* Defs.' Obj. Ex. 1, at 64-66).  Appendix A lists 148 endnotes denoting in-text citations in their memorandum and references various exhibits in support of Moving Defendants' motion.  (*See* Defs.' Mot. Summ. J. App. A).  These citations would ordinarily be included within a party's memorandum and not attached separately as an appendix.  (*See, e.g.*, Defs.' Mem. Supp. Mot. Summ. J., DN 287-1; Def.'s Mem. Supp. Mot. Summ. J., DN 292-1).

Despite Plaintiffs' reference to Fed. R. Civ. P. 12(f), Fed. R. Civ. P. 56(c)(2) applies given that the violative materials are included in Moving Defendants' motion for summary judgment.  Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence[,]" which is the essence of Plaintiffs' argument, as they contend that the appendices are not exhibits that would be admissible at trial.  (*See* Pls.' Mot. Strike 4-6).  Much like an objection at trial, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment; *cf. Ramirez v. Bolster & Jeffries Health Care Grp., LLC*, 277 F. Supp. 3d 889, 897 (W.D. Ky. 2017) ("In ruling

---

[6] Plaintiffs do not move to strike Appendix B, which is a list of the exhibits attached to Moving Defendants' motion.  (*See* Pls.' Mot. Strike 9; Defs.' Mot. Summ. J. App. B, DN 286-4).

on a motion for summary judgment, the Court must consider only evidence that would be admissible at trial." (citation omitted)).

Moving Defendants' response does not alleviate concerns about these filings, as they primarily rely on "whataboutism" arguments. (Defs.' Resp. Pls.' Mot. Strike 2-5, DN 335); *see Leapers, Inc. v. SMTS, LLC*, No. 14-12290, 2016 WL 8732507, at *7 (E.D. Mich. Mar. 25, 2016) (noting that "the *tu quoque* informal logical fallacy" is an "'appeal to hypocrisy' that is intended to discredit the validity of the opponent's logical argument by asserting the opponent's failure to act consistently in accordance with its stated position."). Moving Defendants do not attempt to show that their appendices are admissible or otherwise support their filings, other than by noting that this was counsel's "effort[] to succinctly present an argument to the Court without simply referencing numerous pages and attaching thousands of pages of transcripts . . . ." (Defs.' Resp. Pls.' Mot. Strike 5).

Notwithstanding Moving Defendants' nonchalance toward accusations that they flaunted the Orders and because motions to strike are disfavored, a court may choose to deny the motion to strike but disregard the inadmissible evidence. *Ramirez*, 277 F. Supp. 3d at 897 (citation omitted); *cf.* Fed. R. Civ. P. 56 (providing that sanctions are available under Rule 56(h) but not under Rule 56(c)). A sister court faced with similar filings also chose this course of action. *Pethtel v. Anderson Cnty. Casa*, No. 3:10-CV-469-TAV-HBG, 2021 WL 3891061, at *4 (E.D. Tenn. Aug. 31, 2021). Moreover, "[b]ecause citations are highly relevant in a legal brief," relegating legal citations to footnotes "makes brief-reading difficult." *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2014 WL 289924, at *1 n.1 (D. Ariz. Jan. 24, 2014); *accord Ma v. Densmore*, No. 2:20-CV-1355-RAJ, 2021 WL 2682569, at *8 (W.D. Wash. June 30, 2021) ("[T]he Court strongly

disfavors footnoted legal citations, which serve as an end-run around page limits and formatting requirements dictated by the Local Rules." (citation omitted)).

Therefore, Plaintiffs' motion to strike will be denied, but Appendices A, C, and D to Moving Defendants' summary judgment motion will not be considered. This conclusion does not serve to condone Moving Defendants' filings. Rather, Moving Defendants' counsel is admonished for this cavalier disregard of the Court's and the Magistrate Judge's authority. *Van Buren v. Walmart Stores of Am., Inc.*, No. 3:19-0533, 2020 WL 6900470, at *2 (M.D. Tenn. Nov. 24, 2020) ("[W]hen a party has been ordered by the court to take specific actions . . . the party simply does not get to pick and choose how or when to respond. The party must follow the court's directive.").

### B.    Plaintiffs' Motion for Leave to File a Sur-Reply (DN 351)

"Generally speaking, sur-replies are 'highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter." *Crenshaw v. Portfolio Recovery Assocs., LLC*, 433 F. Supp. 3d 1057, 1063 (W.D. Ky. 2020) (citation omitted); *accord N. Harris Comput. Corp. v. DSI Invs., LLC*, 608 F. Supp. 3d 511, 531 (W.D. Ky. 2022). Regardless, "such filing may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (alteration in original) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)); *accord Crenshaw*, 433 F. Supp. 3d at 1063 ("Even so, granting leave to file a sur-reply may be appropriate in the district court's discretion when 'a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief.'" (quoting *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008))).

In their reply, Moving Defendants argue that Plaintiffs failed to address arguments regarding preclusion and asserted new theories of liability not presented in their Amended Complaints or discovery responses.  (Defs.' Reply Mot. Summ. J. 6, 9, DN 337 [hereinafter Defs.' Reply]).  Plaintiffs request leave to file a sur-reply to rectify purported mischaracterizations of their claims and to address new arguments raised in Moving Defendants' reply, and the failure to do so would potentially concede these arguments.  (Pls.' Mot. Leave File Sur-Reply 1, DN 351); *see Humphrey v. U.S. Att'y Gen.'s Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) (holding that a party waives opposition to an argument by failing to respond).  As such, the motion is granted.

### C.      **Defendants' Motion for Summary Judgment (DN 286)**

Defendants Meade County, Greer, Wise, and Adams move for summary judgment. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party can demonstrate that there are no disputed material facts, the burden shifts to the nonmoving party to present specific factual issues essential to the case beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The court must consider the evidence "in a light most favorable" to the nonmoving party and give that party "the benefit of all reasonable inferences."  *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (citing *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

8

1.    **Brady *Violation (Count I)***

Clifford Capps ("Capps") was an inmate at Meade County Detention Center who testified at Plaintiffs' criminal trial about inculpatory statements Clark purportedly made about Warford's murder.  (Am. Compls. ¶¶ 11, 75, 79-80); *see Hardin*, 1996 Ky. Unpub. LEXIS 1, at *10-11.  Plaintiffs allege that Greer and Wise twice violated their right to Due Process by withholding impeachment evidence concerning Capps' credibility:  (1) a letter written by Capps to Kevin Justis ("Justis"), another inmate at Meade County Detention Center, soliciting statements to corroborate Capps' testimony, which Justis allegedly provided to Greer; and (2) evidence related to Capps' reputation for dishonesty and his history of lying to law enforcement.  (Am. Compls. ¶¶ 81-86; Pls.' Resp. 22-28; *see* Pls.' Resp. Defs.' Mot. Summ. J. Ex. 62, DN 317-62 (Capps' letter to Justis)).

The Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *Brady*'s requirements also apply to officers, who have "an analogous or derivative obligation . . . to disclose evidence whose exculpatory value is apparent to [them]." *Army v. Collins*, 488 F. App'x 957, 961-62 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 388 (6th Cir. 2009)).  The duty to disclose apparent exculpatory evidence, however, "is discharged once an officer delivers such evidence to the prosecutor's office."  *Id.* at 962 (citing *Moldowan*, 578 F.3d at 381).[7]

---

[7] The Sixth Circuit has recently clarified an issue of first impression:  "whether a *Brady* disclosure obligation extends to investigating officers in a non-prosecuting jurisdiction when they work together with police in the prosecuting jurisdiction." *Colemon v. City of Cincinnati*, No. 21-5968, 2023 WL 5095804, at *5 (6th Cir. Aug. 9, 2023).  The Sixth Circuit held that "[w]here a prosecuting jurisdiction is in full possession of the exculpatory information possessed by police in

A *Brady* violation has three components:  "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Chinn v. Warden, Chillicothe Corr. Inst.*, 24 F.4th 1096, 1102 (6th Cir. 2022) (alteration in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  *Brady* also requires the disclosure of impeachment evidence because "a jury's reliance on the credibility of a witness can be decisive in determining the guilt or innocence of the accused."  *Wilson v. Sheldon*, 874 F.3d 470, 478 (6th Cir. 2017) (citation omitted).  "A deprivation of due process occurs where all three aspects are present."  *United States v. White*, 492 F.3d 380, 410 (6th Cir. 2007).

### a.    Capps' Letter to Justis

Moving Defendants argue that Greer and Wise did not violate Plaintiffs' due process rights under *Brady* because Plaintiffs' criminal defense counsel knew or should have known about the letter prior to the criminal trial, that the letter was not material to the outcome of the trial, and that Capps' letter to Justis was not in their possession prior to Plaintiffs' criminal trial.  (Defs.' Mem. Supp. Mot. Summ. J. 13-15, DN 286-2 [hereinafter Defs.' Mem.]).[8]

---

the non-prosecuting jurisdiction, that information is subject to the *Brady* disclosure obligation of the police and prosecutor in the prosecuting jurisdiction."  *Id.* at *6.  The Court continued that "where a *non*-prosecuting jurisdiction shields exculpatory information from the prosecuting jurisdiction, the *Brady* duty extends to require, at the least, that the exculpatory information be disclosed to police in the prosecuting jurisdiction."  *Id.*  Here, Plaintiffs were prosecuted in Meade Circuit Court, so Greer, Wise, and the Meade County Sheriff's Office were part of the prosecuting jurisdiction.  (*See* Defs.' Mot. Summ. J. Ex. 6, DN 286-12 (order by the trial court detailing trial proceedings, verdict, and sentencing)).

[8] Moving Defendants insist that, considering the Kentucky courts' rulings on this issue, the *Rooker-Feldman* doctrine, res judicata, and collateral estoppel bar relitigation.  (Defs.' Mem. 5-12).  Because the prior case were vacated, however, none of those rulings apply.  *Gillispie v. City of Miami Twp.*, No. 3:13-CV-416, 2020 WL 5629677, at *16 (S.D. Ohio Sept. 21, 2020) (citations omitted) (holding that the *Rooker-Feldman* doctrine does not apply because vacated judgments do not exist for the court to review and reject); *Webb v. Compton*, 98 S.W.3d 513, 516 (Ky. App. 2002) (holding that res judicata does not apply to vacated judgments); *Dodrill v. Ludt*, 764 F.2d

### i.        Criminal Defense Counsels' Knowledge

Moving Defendants maintain that Plaintiffs' criminal defense attorneys—Clark was represented Bart Adams ("Attorney Adams") and Hardin's counsel was Wallace Rogers ("Attorney Rogers")—knew or should have known about Capps' letter, so there cannot be a *Brady* violation.  (*See* Defs.' Mem. 12-14).  Indeed, "[t]he prosecution is not obligated under *Brady* to disclose information to the defense that the defense already knew or should have known[,]" nor is there a *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information."  *United States v. Paulus*, 952 F.3d 717, 724-25 (6th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018)); *cf. Virgil v. City of Newport*, 545 F. Supp. 3d 444, 461 (E.D. Ky. 2021) ("[I]nformation discoverable with such 'minimal investigation' cannot give rise to a *Brady* claim."  (citing *Jalowiec v. Bradshaw*, 657 F.3d 293, 311 (6th Cir. 2011)); *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (noting that no *Brady* violation exists "if the information was available to [the defendant] from another source."  (internal quotation marks omitted) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000))).  Even then, "*Brady* 'does not [allow] the State simply to turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs.'"  *Paulus*, 952 F.3d at 725 (alteration in original) (quoting *Barton v. Warden*, 786 F.3d 450, 468 (6th Cir. 2015)).  The Supreme Court also noted its

---

442, 444 (6th Cir. 1985) ("[T]he general rule is that a judgment which is vacated, for whatever reason, is deprived of its conclusive effect as collateral estoppel."  (citation omitted)).  Moving Defendants make a similar argument regarding the Sixth Circuit's conclusions when reviewing Clark's petition for a writ of habeas corpus, but that argument also fails because the Kentucky court proceeding they were evaluating was vacated.  *See Chandler v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:10-CV-470-H, 2011 WL 781183, at *2 (W.D. Ky. Mar. 1, 2011) ("Considering the nature of habeas proceedings, particularly the deference given to state court findings of fact and law, this Court is unconvinced that a federal court's habeas rulings based upon discredited and vacated state proceedings are worthy of preclusive effect.").

"decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004). "A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696; *cf. Jefferson v. United States*, 730 F.3d 537, 546 (6th Cir. 2013) ("[T]he government's position that [the defendant] failed to exercise due diligence because he did not seek information 'the very existence of which the [prosecution] had improperly withheld in violation of *Brady* . . . is fundamentally at odds with *Brady* itself.'" (quoting *Willis v. Jones*, 329 F. App'x 7, 16-17 (6th Cir. 2009))).

Plaintiffs' criminal defense attorneys deny knowing about, let alone possessing, the letter from Capps to Justis before trial. (Attorney Adams Decl. ¶ 11, DN 317-77; Attorney Rogers Decl. ¶ 7, DN 317-78). Moreover, although Attorney Adams "knew that prosecutors did not call Capps to testify at a criminal trial in Colorado[,]" he "had no knowledge of the circumstances surrounding the decision not to utilize Capps . . . ." (Attorney Adams Decl. ¶ 10; *cf.* Attorney Adams Dep. 260:2-22, Jan. 27, 2020, DN 317-50 [hereinafter Attorney Adams Dep. I] (confirming that Attorney Adams would have used Capps' letter for impeachment purposes at trial if he had known about it). To the extent that Moving Defendants rely on Attorney Adams' line of questioning to Capps as a basis to show that counsel was aware of the letter, the argument is unpersuasive. (*See* Defs.' Mem. 13-14). Attorney Adams indeed questioned Capps about his statement in another criminal case in Colorado, but nothing in the content of that questioning demonstrates any knowledge about the existence of Capps' letter to Justis. (*See* Capps Trial Test. 139:24-140:25, 147:6-148:3, Mar. 7, 1995, DN 317-57 [hereinafter Capps Mar. 7 Test.] (inquiring whether Capps was interviewed to be a witness against another inmate in a Colorado criminal case without asking

about the letter to Justis)).  To the contrary, Attorney Adams' assault on Capps' credibility was derived from Capps' generalized status as a jailhouse snitch, vague suggestions that his testimony was not truthful, and the parole board's decision to release Capps within two weeks after providing an inculpatory statement to Greer.  (*See* Capps Trial Test. 81:4-12, 82:6-10, 88:25-90:18, 92:18-94:15, 98:18-99:16, Mar. 3, 1995, DN 317-56 [hereinafter Capps Mar. 3 Test.]).

Attorney Adams conceded he did not speak with Justis or Capps before trial but noted that the decision was made when "[t]here was no question in [his] mind that there was some kind of a jailhouse confession that was coming" and "that they would not speak to [him]." (Attorney Adams Dep. 88:21-89:15, Feb. 5, 2020, DN 286-23 [hereinafter Attorney Adams Dep. II]).  Moreover, Attorney Adams explained that "[i]f the letter had been disclosed, I would have interviewed Justis and called him to testify at trial regarding the circumstances surrounding and the substance of the letter from Capps." (Attorney Adams Decl. ¶ 11).

Finally, Moving Defendants contend that Justis directed his father to give the letter to Plaintiffs' criminal defense counsel before trial, so counsel should have known about it.  (*See* Defs.' Mem. 13).  Justis testified that he contacted his parents in December 1992 and asked them to provide the letter to Attorney Adams.  (Justis Dep. 60:17-61:11, May 28, 2019, DN 286-22). According to Justis, his mother purportedly delivered the letter, but he does not indicate when this delivery occurred.  (*See* Justis Dep. 61:14-18).  In his deposition, however, Attorney Adams explained that Justis' mother informed him about the letter several days after the 1995 trial and that a copy was obtained only after an investigator met with her.  (Attorney Adams Dep. II 37:17-38:2).

Therefore, notwithstanding evidence suggesting that Attorney Adams did not receive the Capps letter until 1995—over two years after Justis asked for its disclosure—the record

demonstrates a genuine issue of material fact regarding Plaintiffs' criminal defense counsel's knowledge of the letter before trial.  *See Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011) (in considering motions for summary judgment "credibility judgments and weighing of the evidence are prohibited."  (quoting *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010))).

<strong>ii.        Possession of the Letter Before Trial</strong>

There is no dispute that Greer and Wise first disclosed Capps' letter to the prosecution on March 10, 1995—three days after Plaintiffs' trial.  (*See* Pls.' Resp. Defs.' Mot. Summ. J. Ex. 88, DN 317-88 (Wise's investigative note about disclosing an envelope from Justis' parents to the prosecution); Defs.' Mot. Summ. J. Ex. 7, at 1, DN 286-13 (post-trial notice of discovery)); *see also Army*, 488 F. App'x at 962 (citing *Moldowan*, 578 F.3d at 381) (noting that the duty to disclose apparent exculpatory evidence "is discharged once an officer delivers such evidence to the prosecutor's office.").  Further, Greer explicitly conceded the exculpatory value of Capps' letter was apparent.  (*See* Greer Dep. 54:1-12, 56:10-16, Aug. 7, 2019, DN 317-19 [hereinafter Greer Dep. I]).

There is a clear factual dispute, however, regarding when Greer and Wise first knew about Capps' letter.  Greer denies and Wise does not recall receiving Capps' letter until after Plaintiffs' 1995 criminal trial.  (*See* Greer Dep. I 34:7-24, 37:8-39:2, 244:19-23; Wise Dep. 155:13-20, 163:2-10, 165:13-22, July 11, 2019, DN 317-60; Defs.' Mot. Summ. J. Ex. 7, at 4-8; *see also* Attorney Adams Dep. II 38:9-25 (recounting that, when Attorney Adams called Greer about the letter, Greer "hemmed and hawed, didn't say much except, 'I don't know anything about this, and I've got to talk to [the prosecutor] . . . .'")).  Wise also documented two interactions on March 10, 1995:  (1) Greer, Wise, and another detective received an envelope from Justis' parents that contained two pieces of paper that a jury could reasonably believe to be a copy of Capps' letter; and (2) Greer

14

and Wise produced the envelope to the prosecution.  (*See* Pls.' Resp. Defs.' Mot. Summ. J. Ex. 88).  To the contrary, Justis insists that he produced the letter to Greer and Wise in December 1992. (Justis Dep. 55:1-59:13, DN 286-22; Justis Dep. 53:1-54:25, 91:3-25, DN 317-61).  Moreover, the attorney involved in the Colorado case also submitted an affidavit stating that Greer was notified of the letter, and acknowledged this notice, in 1993—two years before Plaintiffs' criminal trial. (*See* Palefsky Aff. ¶¶ 7-12, DN 317-63).

This factual dispute presents a genuine issue of material fact regarding whether Greer and Wise possessed Capps' letter before Plaintiffs' trial.  "[T]he contradictory testimony requires a determination of the testifying witnesses' credibility.  The credibility of witnesses is peculiarly within the province of the jury, and a trial court should never substitute its opinion of the credibility of witnesses for that of the jury." *Jordan v. Blount Cnty.*, 458 F. Supp. 3d 870, 881 (E.D. Tenn. 2020) (citation omitted); *accord Alspaugh*, 643 F.3d at 168.  Therefore, considering the factual dispute regarding whether Plaintiffs' criminal defense counsel knew of Capps' letter before trial, the materiality discussion above, and the dispute about when Greer and Wise obtained the letter, a genuine issue of material fact exists regarding whether Greer and Wise violated *Brady*.

### iii.        Materiality of the Letter

Moving Defendants further contend that Capps' letter was not material evidence under *Brady*, as "there is no compelling evidence [that] the Capps letter would have led to a different verdict."  (Defs.' Mem. 14).  As recounted above, a *Brady* violation occurs if the prosecution suppresses evidence favorable to the defendant and the defendant suffers prejudice.  *Chinn*, 24 F.4th at 1102 (citing *Strickler*, 527 U.S. at 281-82).  Whether the defendant suffered prejudice "depends on whether the suppressed evidence is material." *Id.* (citation omitted).  "Evidence is 'material,' if it creates a 'reasonable probability of a different result,' such that its suppression

'undermines confidence in the outcome of the trial.'"  *Id.* (internal citation omitted) (citation omitted); *cf. Kyles v. Whitley*, 514 U.S. 419, 433 (1995) ("The [Supreme Court] found a duty on the part of the Government even [when the defendant did not request the exculpatory evidence] . . . , though only when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))); *but see Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." (quoting *United States v. Avelelino*, 136 F.3d 249, 257 (2d Cir. 1998))).

To support their contention, Moving Defendants rely on the opinions of the Kentucky Supreme Court and Sixth Circuit during Plaintiffs' post-conviction proceedings. (*See* Defs.' Mem. 14).  Despite Moving Defendants' conclusion to the contrary, those opinions are not dispositive on the materiality of Capps' letter, given that the underlying criminal convictions were vacated. *See United States v. Ayres*, 76 U.S. 608, 610 (1869) (noting that the vacation of the judgment "render[s] it null and void, and the parties are left in the same situation as if no trial had ever taken place in the cause."); *Chandler*, 2011 WL 781183, at *2 (acknowledging that the Sixth Circuit's examination of a habeas petition "reviewed the state court findings and rulings which are now literally banished to judicial netherland.").

Moreover, Capps' letter does not pertain to an ancillary part of the prosecution's case-in-chief; rather, it directly undermines a key piece of evidence and purportedly part of the only proof placing Plaintiffs at the scene of Warford's murder.  (*See* Capps Mar. 3 Test. 75:9-15, 87:17-88:24; Capps Mar. 7 Test. 139:15-22); *see also Banks*, 540 U.S. at 699-703 (holding that a witness falsely

testifying about not taking money from the police was material under *Brady* when the witness'
testimony was "the centerpiece" of the prosecution's case); *Provience v. City of Detroit*, 529 F.
App'x 661, 665-66 (6th Cir. 2013) (holding that an officer's progress note was exculpatory
evidence because "it support[ed] a viable alternative theory of the crime," and "help[ed] cast doubt
on the prosecution's theory of the case . . . ."). Justis testified at his deposition that it was clear to
him that Capps wanted Justis to provide a false statement about Plaintiffs' culpability in Warford's
murder, so Capps would receive a more favorable sentence. (*See* Justis Dep. 32:14-33:25, 37:1-
17, 38:10-44:22, May 28, 2019, DN 317-61). As recounted above, Attorney Adams' questioning
of Capps simply sought to undermine Capps' credibility with generalized references about
potential benefits Capps would have received from the statement and vague suggestions that his
testimony was not truthful. (*See* Capps Mar. 3 Test. 81:4-12, 82:6-10, 88:25-90:18, 92:18-94:15,
98:18-99:16; Capps Mar. 7 Test. 139:24-140:25, 147:6-148:3); *see also On Lee v. United States*,
343 U.S. 747, 757 (1952) ("The use of informers, . . . false friends,
or . . . other betrayals which are 'dirty business' may raise serious questions of credibility. To the
extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-
examination and to have the issues submitted to the jury with careful instructions.").

The letter does not simply illustrate minor inconsistencies with Capps' testimony that could
slightly discredit him or otherwise serve to characterize Capps as a jailhouse snitch. *See Agurs*,
427 U.S. at 109-10 ("The mere possibility that an item of undisclosed information might have
helped the defense, or might have affected the outcome of the trial, does not establish 'materiality'
in the constitutional sense."); *accord Byrd*, 209 F.3d at 518. Instead, defense counsel could have
used the letter to illustrate that the entire basis of Capps' testimony was fabricated. (*See* Attorney
Adams Decl. ¶ 11; Attorney Adams Dep. I 259:19-260:22; *contra* Capps Mar. 3 Test. 99:24-25

(averring that his testimony was the truth)); *see also Smith v. Cain*, 565 U.S. 73, 76 (2012) (holding that the suppression of a witness's statements that would contradict his trial testimony, and the witness's testimony was the only evidence linking the defendant to the crime, undermines confidence in the conviction and constitutes a *Brady* violation); *Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) ("It makes little sense to argue that because [the defendant] tried to impeach [the key witness] and failed, any further impeachment evidence would be useless.  . . . [The defendant] may have failed to impeach [the key witness] because the most damning impeachment evidence in fact was withheld by the government."  (alterations in original) (quoting *United States v. Serv. Deli Inc.*, 151 F.3d 938, 944 (9th Cir. 1998))).  Therefore, Capps' letter was material under *Brady* and to the extent a jury believes Greer and Wise knew of the letter and failed to disclose it could support a finding in Plaintiffs' favor on their *Brady* claims.

### b.    Capps' Dishonesty

Plaintiffs allege that Greer and Wise also violated their right to Due Process by withholding other impeachment evidence related to Capps' general reputation for dishonesty and his history of lying to law enforcement.  (Am. Compls. ¶¶ 81-86; Pls.' Resp. 22-28).  Moving Defendants' Motion for Summary Judgment does not specifically address the claim that Greer and Wise withheld information about Capps' dishonesty.  Moving Defendants argue that Plaintiffs did not include that claim in their Amended Complaints but instead raised it for the first time in their response, so it should not be considered.  (Defs.' Reply 6-7).

"[W]hen a party is alleged to be asserting a new claim at the summary judgment stage, the inquiry is whether the party is attempting to expand the claims already brought[,] [and] . . . courts consider whether the allegedly new claim causes 'unfair surprise' to the defendant."  *Grinnell v. City of Taylor*, No. 21-2748, 2022 WL 1562291, at *5 (6th Cir. May 18, 2022) (internal citation

omitted) (citation omitted).   Surprise is not present, however, as the Amended Complaints thoroughly alleges Capps' dishonesty to law enforcement, and this claim was discussed in Greer's and Capps' depositions and by the parties' expert witnesses.   (*See* Am. Compls. ¶¶ 11, 75-86, 123, 137-140, 178; Greer Dep. I 41:17-42:4, 44:9-19, 98:1-101:20; Capps Dep. 31:8-20, July 10, 2019, DN 317-85; Pls.' Mot. Exclude Ex. 1, at 30-32, 66-67, 113, DN 290-1; Pls.' Resp. Defs.' Mot. Summ. J. Ex. 85, at 10-11, DN 314-86).

Because Moving Defendants did not raise the claim regarding Capps' dishonesty in their motion, summary judgment on that claim is not properly before this Court despite Moving Defendants' arguments rebutting the claim in their reply.   (*See* Defs.' Reply 6-9).   Indeed, "reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)).   Thus, summary judgment on the Due Process claim regarding Capps' dishonesty is denied.

### c.      Witness Who Allegedly Saw Warford Alive

Moving Defendants also move for summary judgment on Plaintiffs claim that they suppressed a witness's April 5 statement to the MCSO that the witness saw Warford alive on April 3, the day after she disappeared.   (Defs.' Mem. 15; Am. Compls. ¶¶ 92-93).   Moving Defendants contend that Plaintiffs' Amended Complaints acknowledge that Plaintiffs' criminal defense counsel was aware of the evidence, so Moving Defendants were not obligated under *Brady* to disclose it.   (Defs.' Mem. 15; Am. Compls. ¶¶ 92-93).   Plaintiffs do not respond to this argument,

so the claim on those facts is abandoned, and summary judgment is granted as to this witness statement. *Brown*, 545 F. App'x at 372 (citation omitted).

### 2. *Fabrication of Evidence (Count II)*

Moving Defendants seek summary judgment on Plaintiffs' fabrication of evidence claims related to:  (1) Greer and Adams' alleged manipulation of Warford's date of death; (2) Greer's alleged fabrication of Capps' recorded statement and trial testimony; and (3) Greer's alleged fabrication of a recorded statement and trial testimony from Clark's ex-girlfriend.[9]  (Defs.' Mem. 17-24).

"The Fourteenth Amendment bars an officer from knowingly creating false evidence to obtain a conviction." *Sanford v. City of Detroit*, 815 F. App'x 856, 859 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019); *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).  "The basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (alterations in original) (quoting *Stemler*, 126 F.3d at 872).  Whether the false evidence could have affected the jury's judgment does not depend on "whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the

---

[9] Moving Defendants also move for summary judgment on Plaintiffs' fabrication claim related to (1) Moving Defendants' involvement in allegedly fabricated statements that Handy attributed to Hardin that Hardin had sacrificed animals and wanted to try human sacrifice, (2) Greer's alleged statement that blood on Hardin's handkerchief was from animal sacrifice, and (3) Greer's testimony to the grand jury that the hair found on Warford's sweatpants "matched" Hardin and that Clark's car contained a "fresh" fingerprint from Warford.  (Defs.' Mem. 15-30).  Because Plaintiffs do not address Moving Defendants' arguments, Plaintiffs abandon their fabrication claims as to those facts, and summary judgment is granted.  *Brown*, 545 F. App'x at 372; *accord Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 759 (E.D. Ky. 2019) (explaining that when a plaintiff fails to respond to arguments in a summary judgment motion, they concede those that they fail to address).

decision of the jury." *Jackson*, 925 F.3d at 816.   Thus, a Section 1983 claim may lie when fabricated evidence "'is used as [the] basis for a criminal charge' . . . because, absent that evidence, there would have been no jury." *Id.* (alteration in original) (citation omitted); *see also Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015) ("[E]ven if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect."  (citation omitted)).[10] Fabrication claims often rely on circumstantial evidence, and circumstantial evidence is sufficient to defeat summary judgment if it would allow a reasonable jury to infer the elements of the claim. *Ferris v. City of Cadillac*, 726 F. App'x 473, 479 (6th Cir. 2018); *see Jackson*, 925 F.3d at 814.

### a.      Date of Death

Plaintiffs allege that Greer and Adams manipulated Warford's estimated date of death by changing it from April 4, 1992, when Clark and Hardin had independently verifiable alibis, to April 2, 1992, when they did not.  (Am. Compls. ¶¶ 87-90).   Moving Defendants argue that summary judgment is appropriate because Plaintiffs cannot prove that Greer and Adams knowingly fabricated evidence regarding the date of death or that the fabricated evidence had a reasonable likelihood of impacting the jury's judgment.[11]   (Defs.' Mem. 26; Defs.' Reply 12); *Mills*, 869 F.3d at 484.

---

[10] Plaintiffs also assert a fabrication of evidence claim under the Fourth Amendment.  (Am. Compls. ¶¶ 187-93).  Plaintiffs do not respond to any of Moving Defendants' Fourth Amendment fabrication arguments, and they omit any discussion of their Fourth Amendment fabrication claim from their response, instead arguing the elements of a Fourteenth Amendment fabrication claim. (*See* Pls.' Resp. 31-37).   Accordingly, Plaintiffs have abandoned the Fourth Amendment fabrication claim, for which summary judgment is granted.  *Brown*, 545 F. App'x at 372 (citation omitted).

[11] Moving Defendants also argue that summary judgment is proper because in 1992, Adams was "statutorily obligated" to determine the date of death, citing KRS 213.090, which was repealed in 1990.  (Defs.' Mem. 26; Defs.' Reply 13).  They do not explain how Adams' supposed obligation

### i.      **Knowingly Fabricated**

Dr. Nichols, the state medical examiner, performed the autopsy on Warford's body on April 5, 1992.  (Nichols Dep. 16:11-14, Jan. 28, 2020, DN 317-10).  Moving Defendants argue that Dr. Nichols has consistently said that Warford could have died on April 2 and that estimates about date of death are unreliable, so Plaintiffs cannot prove that the April 2 date was false.  (Defs.' Mem. 25-26).  Plaintiffs, however, have raised enough evidence that could allow the jury to find that Warford did not die on April 2.  At the time of the autopsy, Dr. Nichols said that his best estimate of Warford's date of death was April 4 or 5.  (Nichols Dep. 181:12-186:6).  Greer and Adams called Dr. Nichols on April 8 to ask if it was possible that Warford died on April 2, and Dr. Nichols told them it was.  (Nichols Dep. 190:13-191:24).  Dr. Nichols admitted, however, that he meant that April 2 was possible because "anything is possible" and that nothing actually changed medically between the autopsy, when the best estimate of the date of death was April 4 or 5, and the call on April 8.  (Nichols Dep. 187:4-10, 191:13-21).  Dr. Nichols did testify that "estimates are of no value in terms of science," and yet he thought that Warford died "more proximate to the time her body was found" on April 5, likely within 24 hours.  (Nichols Dep. 153:2-10, 154:1-4).  Despite Dr. Nichols' equivocations about April 2 being a "possible" date of death, he consistently expressed his opinion that Warford died on April 4 or 5.  If the jury finds that Greer and Adams did change Warford's date of death, the jury could infer that Greer and Adams changed it to conform to an opinion that *Dr. Nichols arguably did not actually hold* based on his forensic examination.

---

to determine the date of death would somehow absolve him had he determined the date of death and then changed it to implicate Plaintiffs, which is their allegation.

Even more, Plaintiffs' expert Dr. Melinek opines that Warford died within 12-24 hours of being found. (Melinek Expert R. 3-4, DN 317-16). In her report, she explains the expected condition of Warford's body if she died on April 2, and explicitly states that an April 2 date of death contradicts the evidence.[12] (Melinek Expert R. 4-5). Taking Dr. Nichols' and Dr. Melinek's opinions in light most favorable to Plaintiffs, there is sufficient evidence for a reasonable jury to find that Warford did not die on April 2, but that she died on April 4 when Plaintiffs had a verified alibi. *Anderson*, 477 U.S. at 255 (citation omitted) (noting that at the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).

Plaintiffs also point to evidence in the record that would allow a reasonable jury to find that Greer and Adams *knowingly* fabricated the date of death. Greer and Adams attended the autopsy and observed that Warford's body appeared "pristine," or untouched by insects or predators. (Greer Dep. I 172:25-173:4, 15:8-19; Adams Dep. 128:12-14, 76:21-24). They each understood the date of death to have been April 4 or 5, and they listed that date in their initial reports. (Greer Dep. I 15:24-16:2; Adams Dep. 124:11-13; *see, e.g.*, Pls.' Resp. Defs.' Mot. Summ. J. Ex. 8, at 195, DN 317-8 (Adams' Coroner's Investigative R.); Pls' Resp. Defs.' Mot. Summ. J. Ex. 55, at 1, DN 317-55 (Greer's Pre-Polygraph Interview R.)). Only *after* speaking with each other about Clark and Hardin's alibi for April 4 did Greer and Adams decide to call Dr. Nichols to ask if it was possible that Warford died on April 2, when Clark and Hardin were alone together. (Pls.' Resp. Defs.' Mot. Summ. J. Ex. 8, at 14 (Greer's Investigative R.)). Greer even

---

[12] Moving Defendants argue that Dr. Melinek relies on information or methodology not available in 1992, but that is irrelevant at this stage, especially considering that Dr. Nichols' initial estimate of Warford's date of death was April 4 or 5. (Defs.' Reply 14). Moving Defendants will have the opportunity to address Dr. Melinek's methods and argue at trial that Warford could have died on April 2.

admitted that Plaintiffs' April 4 alibi was a reason he thought the death must have occurred earlier. (Greer Dep. I 270:19-271:2).  Despite Greer's early reports listing the date of death as April 4 or 5, Greer's uniform offense report lists April 2.  (Pls.' Resp. Defs.' Mot. Summ. J. Ex. 8, at 1). Plaintiffs insist that Greer's report shows that he initially wrote April 4 on the report but later changed it using Wite-Out.  (Pls.' Resp. 17).

Similarly, Plaintiffs argue that Adams changed the date of death on the death certificate from April 4 to April 2.  (Pls.' Resp. 17).  According to Adams, the funeral home fills out the top portion of the death certificate, which contains a space for the date of death.  (Adams Dep. 89:22-90:25; Pls.' Resp. Defs.' Mot. Summ. J. Ex. 54, DN 317-54 (Death Certificate)).  He acknowledged that the "2" of the "April 2" in the date of death space appears to be a different font from the rest of the text in the top portion, and he admitted that the "2" may have been from his typewriter. (Adams Dep. 91: 1-12; 98:10-99:8).  Adams did not recall whether he knew about Plaintiffs' alibis when he completed the death certificate, but he admitted that he did not change his mind about date of death because of any information relating to the condition of Warford's body.  (Adams Dep.  163:3-16; 197:22-198:16).  Taking this evidence in light most favorable to Plaintiffs, the jury could reasonably infer that Greer and Adams knowingly fabricated Warford's date of death as April 2 because Plaintiffs did not have an alibi for that day.

### ii.      Impact on the Jury

Moving Defendants next argue that because Adams did not testify about the date of death, the death certificate was not admitted at trial, and Dr. Nichols did not rely on any of Adams' materials when he testified about the date of death, Plaintiffs cannot show that there is a reasonable likelihood that the allegedly fabricated date of death impacted the jury.  (Defs.' Reply 12).  "[T]he relevant question[,]" however, "is not whether the fabricated evidence was *shown* to the jury; it is

whether the statement *affected* the decision of the jury." *Jackson*, 925 F.3d at 816.  That requirement is satisfied when fabricated evidence "'is used as [the] basis for a criminal charge' . . . because, absent that evidence, there would have been no jury." *Id.* (alteration in original) (citation omitted).  Thus, it is irrelevant that the above materials and testimony were not presented to the jury.  If the date of death was April 4 and was so reflected on the death certificate, a jury could reasonably believe that there would have been no trial because Plaintiffs had verified alibis on that date.

### b.   Capps' Statement

Plaintiffs allege that Greer and Wise fabricated Capps' statement that Clark confessed to him twice while they were inmates in Meade County Jail.  (Am. Compls. ¶¶ 75-76).  Moving Defendants argue that Plaintiffs have not produced any evidence that Greer fabricated Capps' testimony, primarily because Capps was consistent and never recanted, and he either denies that it was fabricated or does not recall the events in question.  (Defs.' Mem. 23-24).

In this regard, Plaintiffs have successfully raised sufficient facts to preclude summary judgment.  First, they have adduced sufficient evidence for a jury to find that Capps' testimony was false:  Clark denies ever speaking to Capps, which certainly creates a genuine issue of material fact.  (Clark Trial Test. 238:5-13, DN 317-13; Clark Dep. 214:4-7, DN 317-43).  More significantly, as explained above, the jury could reasonably conclude based on Capps' 1992 letter to Justis that Capps' testimony was fabricated.  In the letter, Capps purportedly asks Justis to testify to help Capps get out of prison, writing that Justis should respond to the letter before the court date to "tell what were [sic] going to say" and that Capps would do the same.  (Pls.' Resp. Defs.' Mot. Summ. J. Ex. 62, at 1 (Capps' Letter to Justis)).  Capps also provided Justis a list of details to implicate Plaintiffs in the crime.  (Pls.' Resp. Defs.' Mot. Summ. J. Ex. 62, at 2).

25

Second, Plaintiffs have raised enough evidence to allow a reasonable jury to infer that Greer and Wise knowingly fabricated Capps' testimony. If the jury determines that Greer and Wise had Capps' letter to Justis before trial and suppressed it, they could reasonably infer that Greer and Wise withheld it to suborn Capps' testimony. Indeed, before Capps informed them of his statement about Clark's purported jailhouse confession, Greer and Wise conducted an unrecorded pre-interview with him, the length and contents of which Greer and Wise insist they do not remember. (Greer Dep. I 91:23-94:12; Wise Dep. 41:24-44:22). These facts, at minimum, present a triable question for the jury. *See Alspaugh*, 643 F.3d at 168 ("When 'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.'" (quoting *Schreiber*, 596 F.3d at 333)); *see also United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004) ("[D]etermining the credibility of witnesses is a task for the jury, not this court." (citation omitted)).

Third, the parties do not dispute that Capps' trial testimony implicating Plaintiffs could have influenced the jury. (*See* Capps Mar. 3 Test. 75:9-15, 87:17-88:24; Capps Mar. 7 Test. 139:15-22). In sum, Plaintiffs have raised sufficient facts from which a reasonable jury could infer that Greer and Wise fabricated Capps' testimony.

### c. Remsburg's Statement

Plaintiffs allege that Amy Remsburg ("Remsburg"),[13] Clark's ex-girlfriend, falsely described Clark as a satanist who was interested in human sacrifice. (Am. Compls. ¶¶ 9, 70-74). They argue that Greer fabricated Remsburg's statements by feeding her nonpublic details about

---

[13] The record refers to Amy as Amy Remsburg, Amy Livers, and Amy Hatfield, but for clarity, the Court will refer to her as Remsburg only. (*See* Livers Interview with Detectives Peters & Scott 58:13-59:9, July 15, 2019, DN 286-31 [hereinafter Remsburg Interview with Peters & Scott]; Hatfield Dep. 65:17-23, Jan. 31, 2020, DN 286-32 [hereinafter Remsburg Dep.]; Remsburg Interview with Greer 5, Apr. 10, 1992, DN 286-30).

the crime, namely that Warford had died from a stab wound severing her brain stem and that the investigators theorized that Hardin and Clark murdered Warford in a satanic ritual sacrifice. (Am. Compls. ¶¶ 70-74). Plaintiffs posit Remsburg had a motive to frame Clark because he had reported her for sexually abusing her eight-year-old-son, so "armed with" the information from Greer, she allegedly falsely claimed that: (1) Clark and Hardin had sacrificed animals in a satanic ritual; (2) Clark told her he wanted to kill a human; and (3) Clark told her he knew how to kill someone with a knife and demonstrated cutting her neck. (Am. Compls. ¶¶ 70-74). Plaintiffs insist that Clark was never involved in satanism, never sacrificed an animal, and never expressed interest in human sacrifice. (Am. Compls. ¶ 74).

Moving Defendants contend the record contains no evidence of fabrication. (Defs.' Mem. 20). They point out that Remsburg gave consistent testimony and never recanted it, that she denies that Greer fed her any nonpublic information about the crime, and that Greer likewise denies feeding her information. (Defs.' Mem. 20-22). They also submit there is no evidence that Greer knowingly fabricated Remsburg's testimony or knew she was lying. (Defs.' Mem. 20-22).

Plaintiffs rely on Adams' notes from an interview with Remsburg the night before her recorded statement with Greer as proof that Greer fed her the incriminating information because the notes do not mention the three contested statements. (Pls.' Resp. 35-36). They argue that because Clark denies that he practiced satanism, sacrificed animals, or was interested in human sacrifice, the testimony must have been fabricated. (Pls.' Resp. 36). They also point to Remsburg's alleged motive to lie and Greer's "failure to corroborate" Remsburg's testimony. (Pls.' Resp. 36).

Plaintiffs fail to meet their burden to raise facts indicating a genuine issue of material fact beyond "some metaphysical doubt" with respect to this claim. *Matsushita Elec. Indus. Co.*, 475

U.S. at 586-87. They do not provide any evidence, even circumstantial, that Remsburg's testimony was fabricated, nor that Greer knowingly fabricated it. They argue that Clark was never a satanist or interested in ritual sacrifice, and that there is "ample evidence" that Remsburg's testimony is false, but they cite no evidence in the record supporting these assertions. (Am. Compls. ¶ 74; *see* Pls.' Resp. 34-37). Their response cites Clark's trial testimony that he did not practice satanism, but Clark conceded he may have mentioned satanism to an ex-girlfriend as a joke. (Clark Trial Test. 206:3-11).

Even assuming Remsburg's statements are false, any evidence that Greer knowingly fabricated them is purely speculative. Plaintiffs' response does not dispute that Remsburg and Greer each deny that Greer fed her information. (Remsburg Interview with Peters & Scott 58:13-59:9; Remsburg Dep. 65:17-23; Greer Dep. 207:6-9, Nov. 4, 2019, DN 317-18 [hereinafter Greer Dep. II]). Plaintiffs' only support on this issue is Adams' page-and-a-half summary of his conversation with Remsburg that did not mention satanism or animal or human sacrifice. (*See* Pls.' Resp. 35-36). Greer's recorded interrogation of Remsburg was consistent with what could be expected in a homicide investigation. He asked her if Clark was involved in satanism, and she answered that Clark had told her that he was. (Remsburg Interview with Greer 5). Remsburg volunteered that Clark told her he thought murder would be thrilling, that Clark and Hardin used to meet in Valley Station to engage in satanic activities, and that they had sacrificed a cat and dog. (Remsburg Interview with Greer 5, 23-24). Remsburg also says that she told Greer about the brain stem on her own, which she says was before she knew Warford died of stab wounds. (Remsburg Interview with Greer 24-25; Remsburg Dep. 64:21-65:23, 69:15-24). Plaintiffs suggest that Greer

coached Remsburg before he started recording her interview, despite Remsburg's explicit denials. (Pls.' Resp. 14; Remsburg Dep. 65:7-23).

Plaintiffs argue that Greer knew Remsburg had a motive to lie but failed to corroborate her statements, which "illustrates that he knew her statements were false." (Pls.' Resp. 36-37). That argument is not persuasive. A fabrication claim "customarily requires knowing or intentional conduct by the alleged fabricator . . . ." *Ricks v. Pauch*, No. 20-1778, 2021 WL 4775145, at *6 (6th Cir. Oct. 13, 2021). Plaintiffs do not explain why knowing of a motive to lie equates to Greer knowingly or intentionally fabricating allegedly false statements. Plaintiffs' argument that Greer's other alleged fabrications throughout the investigation proves that Remsburg's testimony was fabricated is similarly not well taken. (Pls.' Resp. 36). Without more, a jury could not reasonably infer that her testimony was fabricated. *See Fox v. Amazon.com, Inc.*, 930 F.3d 415, 425 (6th Cir. 2019) ("[S]ummary judgment 'does not allow, much less require that [the court] draw strained and unreasonable inferences in favor of the nonmovant.'" (quoting *Audi AG v. D'Amato*, 469 F.3d 534, 545 (6th Cir. 2006))).

Plaintiffs have not pointed to evidence that Greer fabricated Remsburg's testimony, and their insistence that a jury must weigh the witnesses' credibility is not enough. "[A] nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence. Instead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted). Plaintiffs fail to do so. Thus, summary judgment is granted on this claim.

**3.      *Malicious Prosecution (Counts III and XI)***

Plaintiffs assert malicious prosecution claims against Greer under both 42 U.S.C. § 1983

and Kentucky law.

**a.      Federal - 42 U.S.C. § 1983**[14]

A malicious prosecution claim under Section 1983 requires proof that:

> (1) a criminal prosecution was initiated against the plaintiff and the defendant "made, influenced, or participated in the decision to prosecute"; (2) there was a lack of probable cause for the criminal prosecution; (3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Caskey v. Fenton*, No. 22-3100, 2022 WL 16964963, at *8 (6th Cir. Nov. 16, 2022) (quoting *Sykes*

*v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)).  The parties dispute only the first two elements.

(*See* Defs.' Mem. 30-37; Pls.' Resp. 39).

**i.      Made, Influenced, or Participated**

Moving Defendants first argue that Greer is entitled to summary judgment on the federal

malicious prosecution claim against him because as a grand jury witness, he is entitled to absolute

immunity and did not actually participate in the decision to prosecute.  (Defs.' Mem. 32).  In

*Rehberg v. Paulk*, 566 U.S. 356 (2012), the Supreme Court held that officers who testify before a

grand jury enjoy absolute immunity for their testimony, including preparing to testify and even

conspiring to testify falsely.  *Id.* at 369-70.  The Sixth Circuit explained in *King v. Harwood*, 852

F.3d 568 (6th Cir. 2017), however, that *Rehberg* does not entirely foreclose a plaintiff's ability to

---

[14] Plaintiffs initially brought this claim against "all Defendants," but they only mention Greer in their response, failing to address any of Moving Defendants' arguments regarding Adams and Wise.  (Am. Compls. ¶¶ 194-203; *see* Pls.' Resp. 38-43).  Accordingly, Plaintiffs have abandoned their federal malicious prosecution claim against Adams and Wise, for whom summary judgment is granted.  *Brown*, 545 F. App'x at 372 (citation omitted).

sue a grand jury witness for malicious prosecution for actions that are "prior to, and independent of, [the witness's] grand jury testimony." *Id*. at 586-89.  The Sixth Circuit explained:

> *Rehberg* does not affect the thin but conspicuous line between, on the one hand, law-enforcement officers who only provide grand-jury testimony . . . and, on the other hand, law-enforcement officers who either (1) set the wheels of government in motion by instigating a legal action, or (2) falsify affidavits or fabricate evidence concerning an unsolved crime.

*Id.* at 584 (internal quotation marks omitted) (internal citation omitted) (citations omitted).  In other words, while Greer has absolute immunity from Plaintiffs' claim based on his grand-jury testimony, *Rehberg* and *King* still allow malicious prosecution liability to the extent that Greer participated in the decision to prosecute independent from his testimony, such as including "misstatements and falsehoods in his investigatory materials" that influenced the prosecutor's decision to charge Plaintiffs.  *King*, 852 F.3d at 586; *see also Jackson*, 925 F.3d at 821 (citation omitted).  Here, as discussed in more depth below, Plaintiffs have raised facts from which a reasonable jury could find that Greer included a fabricated date of death in the investigative report he submitted to the prosecutor sufficient to show Greer's participation in the decision to prosecute apart from his grand jury testimony.  *See Jackson*, 925 F.3d at 821.

### ii.        Lack of Probable Cause

Moving Defendants next argue that Plaintiffs cannot prove a lack of probable cause because of presumptions created by the arrest warrant and the grand jury indictment and because, even without the presumptions, the undisputed facts are sufficient to establish probable cause. (Defs.' Mem. 32-37).  Beginning with the arrest warrant, Moving Defendants state that there is no record evidence that Greer presented fabricated evidence to get the arrest warrant, so it is presumptively valid and a "complete defense" to the malicious prosecution claim.  (Defs.' Mem. 33-35).  To support this proposition, Moving Defendants cite to authority relating to false arrest.

(Defs.' Mem. 35 (citing *Sykes*, 625 F.3d at 305)).  Malicious prosecution claims, however, are distinguishable from false arrest claims in that the crucial question is whether probable cause existed at the time of the indictment.  *See Sykes*, 625 F.3d at 310-11.  An arrest warrant might be relevant to malicious prosecution—for instance, as *Sykes* discussed, if probable cause was lacking at the arrest stage, it may also be true that probable cause was lacking at the indictment stage—but a presumptively valid arrest warrant does not necessarily foreclose a malicious prosecution claim. *See id.*

Moving Defendants similarly argue that the grand jury indictment conclusively establishes probable cause and defeats the malicious prosecution claim.  (Defs.' Mem. 35).  While generally true, the Sixth Circuit held in *King* that the presumption of probable cause created by a grand jury indictment is rebuttable when:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury) . . . .

*Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (citation omitted); *King*, 852 F.3d at 587-88.

Plaintiffs have raised material factual issues as to each of the elements necessary to rebut the probable cause presumption.  First, there is ample evidence from which a reasonable jury could find that Greer set Plaintiffs' prosecution in motion.  Greer was a lead investigator in the case; he procured the arrest warrants and arrested Plaintiffs; and he sent all his investigatory materials to the prosecutor.  (Greer Dep. I 48:16-23, 79:15-17. 227:14-16; Greer Dep. II 102:2-9, 193:10-194:10; Defs.' Mot. Summ. J. Ex. 2, DN 286-8); *King v. Harwood*, No. 3:15-CV-762-CHB, 2020 WL 1578615, at *12 (W.D. Ky. Apr. 1, 2020) (noting that an officer set a prosecution in motion

when he was the lead investigator, created numerous investigative reports, applied for search warrants, and either sought an arrest warrant or presentation before the grand jury); *cf. Rehberg*, 566 U.S. at 370 (citation omitted) (recognizing procurement of an arrest warrant as an example of an activity not shielded by absolute immunity).  A reasonable jury could conclude that Greer set the prosecution in motion and included false statements in his investigative report or fabricated evidence because, as discussed above with respect to a fabricated date of death, they could find that Greer's investigative report falsely implicated Plaintiffs despite their alibi for Warford's initial estimated date of death.[15]

Second, Plaintiffs have raised a genuine issue of material fact concerning the materiality of the allegedly fabricated date of death.  Whether fabricated evidence was material is a jury question unless reasonable minds could not differ.  *See Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) (citation omitted).  A reasonable jury could find that the fabricated date of death was material to the prosecution because, as noted above, if the jury believed Warford died on April 4 and not April 2, Plaintiffs would not have been charged because of their alibis.  (Pls.' Resp. Defs.' Mot. Summ. J. Ex. 8, at 14).

Third, a reasonable jury could find that the false statements or fabricated evidence existed apart from grand jury testimony or preparation for that testimony.  The allegedly fabricated evidence appeared in Greer's investigative report, which is distinct from his testimony, and it was not the "preparatory activity," or "preliminary discussion in which the witness relates the substance

---

[15] In their response, Plaintiffs argue that the probable cause presumption is rebuttable by listing several alleged fabrications and false statements from Greer's grand jury testimony.  (Pls.' Resp. 41-42).  Under *King*, however, Plaintiffs must point to Greer's actions "prior to and independent of his grand-jury testimony" and "may not bring in evidence of the grand-jury testimony *itself* to do so." *King*, 852 F.3d at 590.  Thus, the only part of their analysis rebutting the presumption of probable cause that the Court may consider is the date of death which Plaintiffs connect to Greer's actions other than his testimony before the grand jury.

of his intended testimony," that *Rehberg* held was cloaked with absolute immunity. *Rehberg*, 566 U.S. at 370.

Because Plaintiffs have raised a genuine issue of material fact for each element of the *King* test, the presumption of probable cause attached to the indictment is rebuttable. *King*, 852 F.3d at 588. To satisfy the second element of malicious prosecution, however, Plaintiffs must establish not just that the presumption of probable cause is rebuttable but also that the prosecution lacked probable cause. *King*, 2020 WL 1578615, at *17; *see Mills*, 869 F.3d at 481 (analyzing whether the plaintiff could prove a lack of probable cause after determining that the grand jury presumption was rebuttable). Moving Defendants urge that even without the claimed fabrications, the undisputed facts still established probable cause. (Defs.' Mem. 35). "[P]robable cause to initiate a criminal prosecution exists where 'facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged.'" *Webb*, 789 F.3d at 660 (alteration in original) (quoting *MacDermid v. Discover Fin. Servs.*, 342 F. App'x 138, 146 (6th Cir. 2009)).

In Section 1983 cases, probable cause poses a jury question unless only one reasonable determination is possible. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (citing *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989)). That is not the case here. The problem with Moving Defendants' argument is many of the facts that they point to as undisputed are in fact highly contested. (*See* Defs.' Mem. 35-37). Their recitation of facts purportedly establishing probable cause includes disputed facts about Plaintiffs' connections with satanism and animal and human sacrifice, the timeline of the crime, and allegedly fabricated witness statements. (*See* Defs.' Mem. 35-37). Moving Defendants do not explain which of the listed facts are supposedly

34

undisputed and do not cite any case authority supporting their contention that a reasonable person would believe that Plaintiffs were guilty under comparable facts.  (*See* Defs.' Mem. 35-37).

Regardless, probable cause crumbles to the extent a jury could believe that Greer and Adams fabricated Warford's date of death to implicate Plaintiffs.  Greer knew that if Warford died on April 4 or 5, Plaintiffs could not have killed her.  (Greer Dep. II 166:21-25).  If the jury finds, as they reasonably could, that Greer or Adams knowingly changed her date of death to implicate Plaintiffs, that seriously undermines the existence of probable cause.  The date of death was the "linchpin of the prosecution's probable cause" and, if untrue, "would have collapsed [its] foundations . . . ."  *Mills*, 869 F.3d at 480-81 (holding that an exculpatory DNA report falsely marked inconclusive would have undermined probable cause).  At minimum, Plaintiffs have established genuine issues of material fact regarding probable cause that must be resolved by a jury.  "[I]t is a classic jury question whether the full picture of all the evidence in this case . . . constitutes facts and circumstances sufficient to lead an ordinarily prudent person to believe that [the plaintiff] was guilty of murder."  *King*, 2020 WL 1578615, at *23; *Hoskins v. Knox Cnty.*, No. 6:17-CV-84-REW-HAI, 2020 WL 1442668, at *28 (E.D. Ky. Mar. 23, 2020) ("[A] jury trial is appropriate where reasonable disputes of material fact exist on facts underlying a probable cause determination."  (citing *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005)); *see Pyles*, 60 F.3d at 1215.  Accordingly, Greer is not entitled to summary judgment on Plaintiffs' federal malicious prosecution claim.

**b.**      **State Law Claim**

Plaintiffs also bring a malicious prosecution claim against Greer individually under Kentucky law.[16]   (Am. Compls. ¶¶ 249-55; Pls.' Resp. 22 n.8 (voluntarily dismissing the state malicious prosecution claim against all Moving Defendants except Greer)).   The elements of a malicious prosecution claim under Kentucky law are essentially the same as under federal law except Kentucky's addition of a malice requirement.   *See Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016), as corrected (Sept. 22, 2016).

Moving Defendants argue that Plaintiffs cannot prove malice because there was probable cause to arrest and indict them.   (Defs.' Mem. 48).   Malice, however, "is an issue of fact to be decided by the jury and may be inferred, or not, from the absence of probable cause."   *Martin*, 507 S.W.3d at 6 (citing *Mosier v. McFarland*, 106 S.W.2d 641, 642-43 (1937)); *Ostafi v. Gabbard*, No. 2020-CA-1040-MR, 2021 WL 4126868, at *7 (Ky. App. Sept. 10, 2021) (holding that probable cause is a jury question when the evidence creates a factual dispute that the jury must resolve).   As explained above, Plaintiffs have raised genuine issues of material fact regarding the existence of probable cause which similarly precludes summary judgment with respect to malice, and the state law claim for malicious prosecution against Greer individually may proceed.

---

[16] Plaintiffs also assert a state law claim of malicious prosecution against Greer in his official capacity, but that claim fails as a matter of law.  (Am. Compls. ¶¶ 249-55; Pls.' Resp. 22 n.8, 43-44 n.17).  "When sued in their official capacity, officials are 'cloaked with the same immunity as the government or agency he/she represents.'"  *Daughtery v. Louisville-Jefferson Cnty. Metro Gov't*, 495 F. Supp. 3d 513, 520 (W.D. Ky. 2020) (quoting *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 169 (Ky. 2003)); *see also Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008) ("Because the county is a political subdivision of the state, it is 'cloaked' with sovereign or governmental immunity . . . .  [A] sheriff, as a county official, has absolute official immunity at common law for torts . . . when sued in his official capacity."  (citations omitted)).  As such, Plaintiffs' state law claim of malicious prosecution against Greer in his official capacity fails as a matter of law, and summary judgment is granted as to this claim.

### 4.     *Failure to Intervene (Count V)*

Plaintiffs also assert a Section 1983 failure to intervene claim.  (Am. Compls. ¶¶ 213-19).  Officers have a duty to intervene to prevent other officers from violating a person's constitutional rights.  *Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001).  Because a failure to intervene claim is based on another officer's unconstitutional actions, "to succeed on a claim for failure to intervene, a plaintiff must show that there was an underlying constitutional violation."  *Greene v. Crawford Cnty.*, 22 F.4th 593, 615 (6th Cir. 2022) (internal quotation marks omitted) (citation omitted).

Moving Defendants seek summary judgment on Plaintiffs' failure to intervene claim only as to Wise's alleged failure to intervene with Greer's illegal interrogation tactics, namely allegedly threatening Plaintiffs with a gun during their interrogations.  (Defs.' Mot. 39).  They argue, *inter alia*, that because Plaintiffs did not allege a constitutional violation to serve as the basis for the failure to intervene claim, it must fail.  (Defs.' Mot. 39).  Plaintiffs do not include any discussion of Greer's allegedly illegal interrogation tactics in their substantive response.  (*See* Pls.' Resp. 22-50).  Thus, they have abandoned the failure to intervene claim as to those facts, and summary judgment will be granted in favor of Wise.  *Brown*, 545 F. App'x at 372 (citation omitted).

Plaintiffs argue instead that Wise failed to intervene with Greer's fabrication of Remsburg's statements.  (Pls.' Resp. 37).  As explained above, however, Plaintiffs have not shown that Greer fabricated Remsburg's statements, which is the underlying constitutional violation Plaintiffs rely upon to support the claim.[17]  *See Greene*, 22 F.4th at 615.  Accordingly, summary judgment is granted to Wise on the failure to intervene claim based on Remsburg's statements.

---

[17] Plaintiffs also assert that Wise failed to intervene with Greer's fabrication of Capps' statements and Greer and Adams failed to intervene with the other's fabrication of Warford's date of death, but because Moving Defendants do not argue summary judgment on those facts until their reply,

### 5.   *Conspiracy to Deprive Constitutional Rights (Count VI)*

Plaintiffs also claim a conspiracy to deprive them of their constitutional rights under Section 1983.  (Am. Compls. ¶¶ 220-28).  "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action."  *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).  To prevail on a Section 1983 conspiracy claim, a plaintiff must prove that "(1) a single plan existed; (2) defendants shared in the general conspiratorial objective to deprive the plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the plaintiff's injury." *Jacobs v. Alam*, 915 F.3d 1028, 1043 (6th Cir. 2019) (internal quotation marks omitted) (citing *Webb*, 789 F.3d at 670).  The claim also requires an underlying claim for a constitutional violation.[18]  *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) (citation omitted).

---

summary judgment is not appropriate on those claims.  (Pls.' Resp. 37); *Scottsdale Ins. Co.*, 513 F.3d at 553 (citation omitted).

[18] It is not entirely clear from the parties' briefing what the underlying constitutional violation is or whether Wise, as opposed to only Greer and Adams, was also a member of the alleged conspiracy.  Plaintiffs allege that Moving Defendants agreed to "frame" or "railroad" Plaintiffs, which suggests that malicious prosecution is the underlying constitutional violation.  (Am. Compls. ¶ 221; Pls.' Resp. 38).  Plaintiffs reference the alleged *Brady* violation and the various alleged fabrication of evidence claims in their conspiracy section, but those appear to support a conspiracy to maliciously prosecute, not to form separate conspiracy claims based on those alleged violations.  (*See* Am. Compl. ¶¶ 220-28; *see also* Pls.' Resp. 37-38).  Plaintiffs do not analyze each alleged violation separately; instead, they appear to connect each alleged violation to the resulting deprivation of liberty from their wrongful prosecution.  (*See* Am. Compl. ¶¶ 220-28; *see also* Pls.' Resp. 37-38).  As for Wise's membership in the conspiracy, Plaintiffs' response does not reference Wise except in a footnote that assumes his membership in the conspiracy without explaining it.  (Pls.' Resp. 38 n.15).  Moving Defendants argue that as a result, Plaintiffs abandoned their conspiracy claim as to Wise.  (Defs.' Mem. 4).  True, when a plaintiff fails to respond to an argument in a motion for summary judgment, the claim is abandoned; Moving Defendants, however, did not include any arguments about Wise in their initial submissions to merit a response.  *Brown*, 545 F. App'x at 372 ; (*see* Defs.' Mem. 41-42).  Moving Defendants argue that the claim is barred as to all of them because of the intracorporate conspiracy doctrine and because Plaintiffs cannot prove two of the conspiracy elements.  (*See* Defs.' Mem. 41-42).  Plaintiffs responded to these arguments, thus did not abandon the conspiracy claim as to Wise.  *See Brown*, 545 F. App'x at 372.  Wise's alleged participation in the conspiracy is also clear in the Amended Complaints

Moving Defendants first argue that the conspiracy claim is barred by the intracorporate conspiracy doctrine.  (Defs.' Mem. 41).  Under the intracorporate conspiracy doctrine, if "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy . . . ."  *Jackson*, 925 F.3d at 817 (quoting *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839-40 (6th Cir. 1994)).  The Sixth Circuit has held that the intracorporate conspiracy doctrine applies to Section 1983 conspiracy claims.  *Id.* at 818.  According to Moving Defendants, Greer and Wise, of the MCSO, and Adams, the Meade County Coroner, were members of the same entity because they all worked for Meade County, but they do not cite any cases supporting the proposition that an entity under the intracorporate conspiracy doctrine can encompass an entire county.  (*See* Defs.' Mem. 41).  Regardless, because Plaintiffs argue that Greer, Wise, and Adams conspired with Handy, who did not work for Meade County, the intracorporate conspiracy doctrine does not apply.  (Pls.' Resp. 38 n.15); *Virgil*, 545 F. Supp. 3d at 489 (noting that a conspiracy between the officers of two separate police departments would overcome the intracorporate conspiracy doctrine).

Moving Defendants next submit that the conspiracy claim must fail because the evidence is insufficient for Plaintiffs to prove the first two elements of the claim—that there was a single plan and shared conspiratorial objective.  (Defs.' Mem. 40-42).  Because direct evidence of a conspiracy is rare, however, circumstantial evidence may be sufficient to prove a conspiracy, where a reasonable jury could infer the elements of the claim.  *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (citation omitted); *see Jackson*, 925 F.3d at 814.

---

because Plaintiffs discuss the *Brady* violation as part of the conspiracy, and that claim directly involves Wise.  (*See* Am. Compls. ¶ 226).

Plaintiffs have successfully raised facts from which a reasonable jury could infer that Greer, Adams, Wise, and Handy shared a single plan and conspiratorial objective to maliciously prosecute Plaintiffs.  Taking facts in the light most favorable to Plaintiffs, a jury could reasonably find, as explained above, that:  (1) Greer and Wise fabricated Capps' testimony; (2) Greer and Wise suppressed Capps' letter to Justis, which could have seriously undermined a key part of the prosecution's case; and (3) Greer and Adams changed Warford's date of death to implicate Plaintiffs despite their verified alibi for her original estimated date of death.

There is also evidence that Greer and Handy fabricated statements from Warford's cousin, Crystal Barnes ("Barnes").[19]  Greer's investigative report summarized a conversation he and Handy had with Barnes on April 9 that they did not record, which Greer admitted was against his standard practice. (Pls.' Resp. Mot. Summ. J. Ex. 8, at 15; Greer Dep. I 283:2-11).  In the report, Greer wrote that Barnes said she disliked Hardin, that he was getting Warford involved in satanism, and that Warford told her Hardin had hit her. (Pls.' Resp. Mot. Summ. J. Ex. 8, at 16).  Handy similarly wrote that Barnes said Warford was into satanism only to make Hardin happy and that Warford told Barnes that Hardin threatened to kill her if she ever cheated. (Handy R. 412-413,

---

[19] Plaintiffs assert a fabrication claim based on Barnes' statements and the statements of Warford's mother, Mary Warford ("Mary"), and sister, Michelle Rogers ("Rogers"). (Pls.' Resp. 8-11). Moving Defendants did not address that claim in their motion, and they contend that Plaintiffs first raised this in their response, so it should not be considered. (See Defs.' Mem. 15-30; Defs.' Reply 15). There is no "unfair surprise" indicative of expanded claims, however, considering Plaintiffs alleged that Moving Defendants "fabricated [inculpatory] statements attributed to Clark, Hardin, and witnesses"; Mary, Rogers, and Barnes were all deposed; and the statements were discussed by the parties' expert witnesses. (See Am. Compls. ¶¶ 8-9, 51, 54, 70, 72-74, 77-80, 188; Mary Warford Dep. 67:5-12, 122:13-22, Sept. 24, 2021, DN 317-1; Rogers Dep. 132:4-133:6, Jan. 31, 2022, DN 317-2; Barnes Dep. 17:9-18:12; Pls.' Mot. Exclude Ex. 1, at 15-16, 18-20, 23, 70-71, 110; Pls.' Resp. Defs.' Mot. Summ. J. Ex. 85, at 8-9); see also Grinnell, 2022 WL 1562291, at *5. Accordingly, summary judgment on that claim is not properly before this Court despite Moving Defendants' arguments rebutting the claim in their reply. (See Defs.' Reply 6-9); Scottsdale Ins. Co., 513 F.3d at 553 (citation omitted).

DN 317-47).  Barnes later testified, however, that she did not think that Hardin, Clark, or Warford were involved in satanism until she heard it from the police after Warford was murdered.  (Barnes Dep. 17:9-18:12, Jan. 31, 2022, DN 317-5).  She said she thought Hardin was nice, that he never did anything that concerned her, and that Warford never told her that she was afraid of Hardin or said anything bad about him.  (Barnes Dep. 20:19-21:8).

Greer, Wise, Adams, and Handy's alleged misconduct may not have been part of a single plan or common objective to frame Plaintiffs, but the overlap between their actions could allow a reasonable jury to infer that it was.  "While each of these alleged misdeeds may have occurred independently, they are sufficiently intertwined so as to suggest an agreement between the perpetrators."  *Webb*, 789 F.3d at 671 (holding that a reasonable jury could infer a "shared conspiratorial plan to frame" plaintiffs where defendants allegedly misdated recordings of drug buys to suggest that they were planned, deleted exculpatory evidence from another recording, and falsely reported the details of a drug buy).  Moreover, Plaintiffs could point to any of the above misdeeds by any of the alleged coconspirators to satisfy the element that one of them committed an overt act in furtherance of the conspiracy.  *See id.* at 671.

### 6.  *Qualified Immunity*

Moving Defendants seek summary judgment on Plaintiffs' various Section 1983 claims based on qualified immunity.[20]  (*See* Defs.' Mem. 2-50).  "Qualified immunity protects public officials from civil liability for damages when their conduct does not violate the plaintiff's 'clearly

---

[20] Moving Defendants also contend that KRS 72.470 precludes the Section 1983 claims against Adams.  (Defs.' Mem. 4, 24; Defs.' Reply 3, 12); *see also* KRS 72.470 ("Any coroner . . . acting in good faith within the scope of his official duties, shall have immunity from any civil liability that might otherwise be incurred or imposed.").  As noted above, however, Plaintiffs have voluntarily dismissed their state law claims against Adams, and state law immunities are irrelevant to Section 1983 claims.  (*See* Pls.' Resp. 22 n.8); *Dean v. Byerley*, 354 F.3d 540, 555 (6th Cir. 2004) (citations omitted).

established statutory or constitutional rights of which a reasonable person would have known.'" *Jackson*, 64 F.4th at 745 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Once raised, Plaintiffs bear the burden of demonstrating that each Defendant is not entitled to qualified immunity. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citation omitted).  This is satisfied by "plausibly alleg[ing] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Jackson*, 64 F.4th at 745 (internal quotation marks omitted) (quoting *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659-60 (6th Cir. 2021)).  The allegedly violated right must be "so clearly established in a particularized sense that a reasonable officer confronted with the same situation would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted).  Unless both aspects are established, qualified immunity shields a defendant against liability.  *Shumate v. City of Adrian*, 44 F.4th 427, 439 (6th Cir. 2022); *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999).

The preceding discussion of each Moving Defendants' alleged constitutional violations illustrates that genuine issues of material fact exist as to nearly all[21] of Plaintiffs' claims, satisfying Plaintiffs' first requirement under the qualified immunity analysis.  *See Jackson*, 64 F.4th at 745. The following subsections will consider whether the rights were clearly established at the time of the alleged constitutional violations.[22]

---

[21] Plaintiffs failed to raise facts that would allow a reasonable jury to conclude that Remsburg's statements were fabricated, which provided a basis for a failure to intervene claim against Wise. Summary judgment is granted on those claims, and any qualified immunity analysis of them is not necessary.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).
[22] Moving Defendants do not argue that the rights were not clearly established at the time of the events in question, instead focusing whether they violated Plaintiffs' constitutional rights.  (*See* Defs.' Mem. 3-42).  The genuine issues of material fact regarding the constitutional violations

### a.    *Brady* Violation

As explained above, Plaintiffs have raised facts that would allow a reasonable jury to infer that Greer and Wise violated Plaintiffs' due process rights by withholding Capps' letter to Justis. Qualified immunity applies unless Plaintiffs demonstrate that the right was clearly established when Greer and Wise allegedly withheld the letter.  *Jackson*, 64 F.4th at 745; *see Shumate*, 44 F.4th at 439; *Spurlock*, 167 F.3d at 1005.  "*Brady* violations are, of course, clearly established violations of constitutional rights."  *Mills*, 869 F.3d at 486 (noting the right to be clearly established as of 1992).  Indeed, that *Brady* obligations apply equally to police has been clearly established in the Sixth Circuit since at least 1990.  *Moldowan*, 578 F.3d at 382.  Moreover, it was clearly established by 1991 that "impeachment evidence that would tend to undermine the credibility of an important government witness falls within the *Brady* rule."  *United States v. Smith*, 941 F.2d 1210, 1991 WL 158699, at *11 (6th Cir. Aug. 19, 1991) (unpublished table decision) (citing *United States v. Presser*, 844 F.2d 1275, 1278 (6th Cir. 1988)).  Therefore, Plaintiffs have demonstrated that Greer and Wise are not entitled to qualified immunity against the *Brady* claim related to Capps' letter to Justis.  Accordingly, summary judgment is denied as to this claim.

### b.    Fabrication of Evidence

Plaintiffs have raised facts which would allow a reasonable jury to infer that Greer and Adams fabricated Warford's date of death and that Greer and Wise knowingly fabricated Capps' testimony.  The Sixth Circuit has held that fabricating evidence violates a clearly established right "as far back as 1935 . . . ."  *Jackson*, 925 F.3d at 825.  The Sixth Circuit does not define this clearly

---

render pretrial resolution inappropriate, even on the issue of qualified immunity.  *See Perez v. Simpson*, 83 F.4th 1029, 1031 (6th Cir. 2023) (holding that the Court lacked jurisdiction on an interlocutory appeal of a district court's denial of qualified immunity where the denial was based on disputed material facts).

established right with a narrow degree of particularity because it "violates 'the fundamental conceptions of justice [that] lie at the base of our civil and political institutions.'" *Id.* (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  Even "general statements of the law are capable of giving clear and fair warning to officers even where the very action in question has [not] previously been held unlawful."  *Smith v. Cupp*, 430 F.3d 766, 776 (6th Cir. 2005) (alteration in original) (internal quotation marks omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  This is especially true here because "the obvious injustice inherent in fabricating evidence . . . put [the defendant] on notice that his conduct was unlawful."  *Jackson*, 925 F.3d at 825; *see also Smith*, 430 F.3d at 777 ("Thus, where a general constitutional rule applies with 'obvious clarity' to a particular case, factually similar decisional law is not required to defeat a claim of qualified immunity."  (citation omitted)).  Greer, Wise, and Adams are therefore not entitled to qualified immunity on the surviving fabrication of evidence claims.

### c.     Malicious Prosecution and Conspiracy to Deprive

Plaintiffs have also raised facts that would allow a reasonable jury to infer that Greer maliciously prosecuted Plaintiffs and that Wise and Adams conspired with Greer and Handy to maliciously prosecute Plaintiffs.  As the Sixth Circuit has held:

> [I]ndividuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits . . . ."

*King*, 852 F.3d at 582-83 (quoting *Webb*, 789 F.3d at 659-60).  That right has been clearly established since 1990.  *See Spurlock*, 167 F.3d at 1005-06 ("[The defendant] cannot seriously contend that a reasonable police officer would not know that such actions [fabrication of evidence, malicious prosecution, conspiracy to maliciously prosecute] were inappropriate and performed in

violation of an individual's constitutional and/or statutory rights." (citations omitted)). As with fabrication of evidence, the right is not narrowly defined. *Jones v. Clark Cnty.*, 959 F.3d 748, 767 (6th Cir. 2020) ("The specifics of the case only mattered with respect to assessing the viability of the malicious prosecution claim under the standard for summary judgment, not as a means of narrowly defining the right at issue."), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022). Therefore, Greer is not entitled to qualified immunity as a matter of law with respect to the malicious prosecution claim,[23] and he, Wise, and Adams are not entitled to qualified immunity on the conspiracy claim.

Greer is likewise not entitled to qualified immunity related to the Kentucky malicious prosecution claim. Qualified immunity under Kentucky law requires officers to act in good faith, so the jury question regarding malice, which would negate good faith, prevents the Court from resolving the issue of qualified immunity at this stage. *Martin*, 507 S.W.3d at 5-6 ("[T]he very same evidence that establishes the eponymous element of a malicious prosecution action simultaneously negates the defense of official immunity. . . . Consequently, when a plaintiff must prove malice to sustain his cause of action, a defense of qualified official immunity has little meaning and no effect."). Thus, summary judgment is denied.

---

[23] Greer is, of course, entitled to absolute immunity on the malicious prosecution claim predicated on his grand jury testimony.

7.   ***Municipal Liability (Count VII)***[24]

Moving Defendants also seek summary judgment on Plaintiffs' *Monell* claim against Meade County.[25]  (Defs.' Mem. 42-44).  "A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible" but "only for its own wrongdoing, not the wrongdoings of its employees."  *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690 (1978); *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015)); *see also D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) ("A municipality may not be held liable . . . '*solely* because it employs a tortfeasor.'"  (quoting *Monell*, 436 U.S. at 691)).  Thus, liability "attaches only under a narrow set of circumstances . . . ."  *Jackson*, 925 F.3d at 828 (citation omitted).  A party bringing a *Monell* claim faces a "high bar," and it "is exceedingly rare" for the claim to survive summary judgment.  *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 541-42 (6th Cir. 2018).

A *Monell* claim requires proof that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Jackson*, 925 F.3d at 828 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).  A plaintiff achieves this by "showing that the municipality had a 'policy or custom' that caused the violation of his rights."  *Id.* (citing *Monell*, 436 U.S. at 694).  A plaintiff may do so by proving one or more of the following:  "(1) the existence of an

---

[24] Because Meade County is a party to the suit and the Section 1983 claims against Greer in his official capacity are duplicative of the claims against Meade County, the Court will follow the common practice of the Western and Eastern Districts of Kentucky and dismiss those claims.  *See Scott v. Louisville/Jefferson Cnty. Metro Gov't*, 503 F. Supp. 3d 532, 541 (W.D. Ky. 2020) (citations omitted).

[25] Moving Defendants insist that the "claims for punitive damages against the Meade County government are expressly barred by state and federal law and should be dismissed with prejudice." (Defs.' Mem. 49).  Plaintiffs do not assert a separate cause of action for punitive damages, nor do they seek such damages from Meade County.  (*See* Am. Compls. 57 (seeking "compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against *each of the individual Defendants* . . . ."  (emphasis added)).

illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

Plaintiffs seek to prove their *Monell* claim based upon a "single-act" theory of municipal liability.[26]  (Pls.' Resp. 44-46).  The Supreme Court recognized the single-act theory of liability in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), holding that a single decision could be "official policy" and support municipal liability, but only under "appropriate circumstances." *Id.* at 480, 483.  *Monell* requires proof of an official policy "to distinguish acts of the *municipality* from acts of the *employees* of the municipality", as opposed to municipal liability based on *respondeat superior*.  *Id.* at 478-80.  Accordingly, the Court held that a single-act theory only supports municipal liability when the official is "responsible for establishing final government policy respecting such activity" which the official has authority under state law to do.  *Id.* at 482-83.  The Court "hasten[ed] to emphasize," however, "that not every decision by municipal officers automatically subjects the municipality to [Section] 1983 liability."  *Id.* at 481.  Indeed, a policymaking official does not act in a "policymaking capacity" in every instance.  *See Wooten v. Logan*, 92 F. App'x 143, 146 (6th Cir. 2004).

Moving Defendants argue that summary judgment is appropriate because Greer was not acting in a policymaking capacity when he allegedly committed the misconduct attributed to him. (Defs.' Mem. 43).  Plaintiffs respond that because Greer was a policymaker for Meade County,

---

[26] Plaintiffs also seek to prove their *Monell* claim on the basis of inadequate training or supervision, but because Moving Defendants do not seek summary judgment on that ground until their reply, it is not properly before this Court, and summary judgment is denied.  (Am. Compls. ¶¶ 186, 203; Pls.' Resp. 46-49); *Scottsdale Ins. Co.*, 513 F.3d at 553 (citation omitted).

his actions were official policies of Meade County.  (Pls.' Resp. 45).  They assert that "the same misconduct . . . that establishes Greer's own individual liability[] also establishes the liability for Meade County."  (Pls.' Resp. 45-46).  They do not explain why Greer was a policymaker under Kentucky law, which of his alleged misdeeds establishes Meade County's liability, or whether he was acting as a policymaker when he engaged in the misconduct.  (*See* Pls.' Resp. 45-46).  Instead, they focus on Greer's alleged general misbehavior during the investigation and attempt to attribute it to Meade County in a way that appears indistinguishable from *respondeat superior*.  (*See* Pls.' Resp. 45-46).

Imposing municipal liability based on any "'law enforcement' activity (e.g., stop, arrest, etc.) by a sheriff (or other chief law enforcement official)–whether a matter of official business or a misuse of power to advance a private agenda . . . would institute the doctrine of *respondeat superior*."  *Wooten*, 92 F. App'x at 147 (internal citation omitted) (holding a sheriff was not acting in his policymaking capacity for municipal liability to attach when he used his position as a police officer to effectuate a sexual assault); *see also Hoskins*, 2020 WL 1442668, at *39 (holding that plaintiffs failed to show that a sheriff charged with malicious prosecution, civil conspiracy, and failure to intervene was acting in his policymaking capacity when he allegedly committed the misconduct).  Greer's actions, as Plaintiffs have alleged them, appear to be "a misuse of power to advance a private agenda" rather than policymaking.  *Wooten*, 92 F. App'x at 147.  Plaintiffs assert that Greer's misconduct was committed "during the underlying investigation[] and encouraged subordinate officers to commit."  (Pls.' Resp. 45-46 n.18).  Plaintiffs do not explain how "encouragement" equates to policymaking or cite to record evidence of how or when Greer encouraged subordinate officers to commit constitutional violations.  (*See* Pls.' Resp. 45-46 n.18).  "It is not the district court's . . . duty to search through the record to develop a party's claims; the

litigant must direct the court to evidence in support of its arguments before the court." *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008) (citation omitted); *accord McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)).

The three cases Plaintiffs cite in support of Meade County's liability only address a single-act theory generally; none of them clarify whether Greer's deliberate actions were in pursuit of his own agenda or constituted policymaking to attach municipal liability. (Pls.' Resp. 44-45); *see Bible Believers v. Wayne Cnty*., 805 F.3d 228, 260 (6th Cir. 2015) (holding county liable for county attorney's actions directing and authorizing the police to threaten protestors with arrest); *Paterek v. Vill. of Armada*, 801 F.3d 630, 652 (6th Cir. 2015) (holding city was liable for town council and building inspector's zoning decisions that violated the First Amendment); *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (holding that a county was not liable for an officer's "after-the-fact" approval of an unconstitutional investigation where the officer's action did not cause the plaintiff harm).

Accordingly, Plaintiffs have failed to meet their summary judgment burden on the *Monell* claim based upon a single-act theory, and summary judgment is granted in favor of Meade County.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Plaintiffs' Motion to Strike (DN 318) is **DENIED**.

2.      Plaintiffs' Motion for Leave to File a Sur-Reply (DN 351) is **GRANTED**.

3.      Defendants' Motion for Summary Judgment (DN 286) is **GRANTED IN PART** and **DENIED IN PART**.

a.      The claim against Defendant Meade County for an illegal official policy is **DISMISSED**.  The claim for failure to train may proceed.

b.      The claims against Defendant Joseph Greer in his official capacity are **DISMISSED**.

c.      The following claims against Defendant Joseph Greer in his individual capacity are **DISMISSED**:  (i) allegedly suppressing evidence of a witness who saw Warford alive after she disappeared; (ii) fabrication of evidence in violation of the Fourth Amendment; (iii) fabrication of evidence in violation of the Fourteenth Amendment regarding his involvement in statements Handy allegedly falsely attributed to Hardin, his alleged statement that Hardin's handkerchief had blood from human sacrifice, his alleged statement that Hardin's hair matched one found on Warford, his alleged statement that Clark's car had a fresh print from Warford, and his alleged fabrication of Remsburg's statement and testimony; (iv) supervisory liability; and (v) state law claims, except the state law claim for malicious prosecution.  All other claims may proceed.

d.      The claims against Defendant William Adams in his individual capacity are **DISMISSED**:  (i) fabrication of evidence in violation of the Fourth Amendment; (ii) violations of state law; (iii) and malicious prosecution.  All other claims may proceed.

e.      The following claims against Defendant Cliff Wise in his individual capacity are **DISMISSED**:  (i) allegedly suppressing evidence of a witness who saw Warford alive after she disappeared; (ii) fabrication of evidence in violation of the Fourth Amendment; (iii) malicious prosecution; (iv) failing to intervene with Greer's alleged

Remsburg fabrication and his allegedly illegal interrogation tactics; and (v) violations of state law.  All other claims may proceed.

Greg N. Stivers, Chief Judge

United States District Court

January 4, 2024

cc:    counsel of record