UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:17-CV-00419-GNS-CHL

JEFFREY DEWAYNE CLARK; and
GARR KEITH HARDIN                                                    PLAINTIFFS

v.

LOUISVILLE-JEFFERSON COUNTY
METRO GOVERNMENT, KENTUCKY et al.                        DEFENDANTS

## **MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Mark Thurman's Motion for Summary Judgment (DN 292) and Plaintiffs' Motion to Exclude the Opinions and Testimony of Defendant's Expert Witness Jack Reid (DN 293). The motions are ripe for adjudication. For the reasons below, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs' motion is **DENIED**.

### I.   **SUMMARY OF THE FACTS**

Plaintiffs Jeffrey Dewayne Clark ("Clark") and Garr Keith Hardin ("Hardin") (jointly "Plaintiffs") initiated this civil rights action against Defendant Robert Thurman ("Thurman") in his individual capacity, and others.[1] (Am. Compl. ¶¶ 176-267, DN 38; Am. Compl. ¶¶ 176-267, DN 39 [collectively hereinafter Am. Compls.]).

---

[1] Defendants James Clark, Kelly Jones, Robert Ennis, Charles Edelen, James Griffiths, and Ernie Embry previously have been dismissed from this action. (*See* Am. Agreed Order, DN 275; Agreed Order, DN 283; Agreed Order, DN 284; Agreed Order, DN 325; Agreed Order, DN 331).

The events giving rise to this matter began with the 1992 murder of Rhonda Sue Warford ("Warford"), who was found stabbed to death in Meade County, Kentucky, after disappearing from Louisville. (Am. Compls. ¶ 40). Detective Mark Handy ("Handy") and the Louisville Police Department ("LPD") jointly investigated the murder alongside the Meade County Sheriff's Office and Sheriff Joseph Greer ("Greer"). (Am. Compls. ¶ 46). Handy, Meade County, and Louisville-Jefferson County Metro Government, as successor to LPD's interests,[2] are also Defendants. (Am. Compls. ¶¶ 26-34). Plaintiffs were investigated as suspects, and Handy purportedly directed the investigation to fit his theorized motive that Plaintiffs committed the murder as part of a satanic ritual.[3] (Am. Compls. ¶¶ 51-112).

During the investigation, Hardin's home was searched, and police discovered a bloodstained handkerchief which Hardin claimed was from a cut he sustained when cleaning up a broken wine glass. (Am. Compls. ¶ 61). Thurman, a forensic serologist with the Kentucky State Police, tested the handkerchief and confirmed only that the stain was blood without a determination whether animal or human. (Am. Compls. ¶ 63). Plaintiffs contend that Thurman falsely reported that no further testing could be conducted on the handkerchief, when in fact Thurman either: (1) tested the blood to determine whether the blood was human, concluded it was, and suppressed the result because it contradicted Handy's theory of the blood being from animal sacrifices; or (2) deliberately failed to test whether the blood was human to avoid undermining Handy's theory.

---

[2] The City of Louisville merged with Jefferson County in January 2003 to create the Louisville-Jefferson County Metro Government, which "is the post-merger successor to the City of Louisville . . . ." *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 14 (Ky. App. 2009) (citation omitted). LPD also merged with the Jefferson County Police Department to create the Louisville Metro Police Department. *See Killary v. Thompson*, No. 2020-CA-0194-MR, 2022 Ky. App. LEXIS 63, at *2 n.1 (Ky. App. June 24, 2022).

[3] Hardin acknowledges that he previously "practiced modern Satanism" but states that this belief "forbids blood sacrifice and killing of any kind." (Am. Compls. ¶¶ 52, 55).

(Am. Compls. ¶¶ 63-64).   Moreover, Plaintiffs assert that Thurman falsely reported a hair recovered from Warford's clothing was a "match" to Hardin.  (Am. Compls. ¶¶ 97-99).

Plaintiffs were indicted in May 1993, convicted by jury, and sentenced to life imprisonment. (Am. Compls. ¶¶ 116, 124).  The prosecution purportedly relied on Handy's satanic ritual theory and representations that the bloody handkerchief was from animal sacrifices and that Hardin was the source of a hair found on Warford's body, which were based on Thurman's testing. (Am. Compls. ¶¶ 65, 101, 117-24).  Plaintiffs unsuccessfully sought relief through direct appeals and post-conviction proceedings.  (Am. Compls. ¶ 125-26); *see Clark v. Commonwealth*, Nos. 95-SC-453-MR, 96-SC-146-TG, 1997 Ky. Unpub. LEXIS 1 (Ky. Oct. 2, 1997); *Clark v. Commonwealth*, No. 2003-CA-001184-MR, 2004 Ky. App. Unpub. LEXIS 720 (Ky. Dec. 3, 2004); *Clark v. O'Dea*, 257 F.3d 498 (6th Cir. 2001); *Hardin v. Commonwealth*, No. 95-SC-461-MR, 1996 Ky. Unpub. LEXIS 1 (Ky. Aug. 29, 1996); *Hardin v. Commonwealth*, No. 2001-CA-001782-MR, 2003 Ky. App. Unpub. LEXIS 1024 (Ky. App. May 16, 2003).  In 2013, physical evidence relating to Warford's murder was released so DNA testing could be conducted.  (Am. Compls. ¶ 130); *see Hardin v. Commonwealth*, 396 S.W.3d 909 (Ky. 2013).  Based on the testing, Plaintiffs' convictions were ultimately vacated and a new trial was ordered.  (Am. Compls. ¶¶ 131-33); *see Commonwealth v. Clark*, 528 S.W.3d 342 (Ky. 2017).  The indictments were dismissed in February 2018.  (Am. Compls. ¶¶ 135-41; *see* Pls.' Resp. Defs.' Mot. Summ. J. Ex. 97, DN 314-98; Pls.' Resp. Defs.' Mot. Summ. J. Ex. 100, DN 314-101).

Plaintiffs allege two claims against Thurman pursuant to 42 U.S.C. § 1983:  (1) violation of their rights to Due Process; and (2) violations of their Fourth, Fifth,[4] and Fourteenth

---

[4] Only Hardin alleges a Fifth Amendment violation.  (*See* Am. Compl. ¶¶ 187-93, DN 38).

Amendments rights.  (Pls.' Resp. Def.'s Mot. Summ. J. 29-35, DN 316 [hereinafter Pls.' Resp.]; Am. Compls. ¶¶ 176-93).[5]  Thurman moves for summary judgment in his favor.  (Def.'s Mot. Summ. J., DN 292).

## II.    <u>JURISDICTION</u>

The Court exercises subject-matter jurisdiction over this matter through federal question jurisdiction and supplemental jurisdiction over the state law claims.  28 U.S.C. §§ 1331, 1367(a).

## III.    <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If this lack of material fact is established, the burden then shifts to the nonmoving party to present specific evidence indicating a genuine issue of a disputed material fact essential to the case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Specifically, the nonmoving party must present facts demonstrating that a material factual dispute must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial"; the evidence, however, is "not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).  If the record taken as a whole could not support a finding of fact in favor of the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

---

[5] Plaintiffs initially alleged eight claims against Thurman but have abandoned all except for the two mentioned above.  (*See* Am. Compls. ¶¶ 194-203, 213-228, 249-267; Pls.' Resp. 29 n.8).  As such, summary judgment is granted in Thurman's favor as to the abandoned claims. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

## IV.   **DISCUSSION**

### A.   **Plaintiffs' Motion to Exclude Jack Reid**

During the investigation into Warford's murder, Thurman examined four unknown hairs

discovered on Warford's body and compared them against a hair sample provided by Hardin.  (*See*

Am. Compls. ¶¶ 97-99).  Thurman concluded in his report that one of the hairs was microscopically

similar to Hardin's sample.  (Am. Compl. ¶¶ 97-99; Pls.' Resp. Def.'s Mot. Summ. J. Ex. 35, at 9,

DN 316-36 [hereinafter Lab Reports]).  The unknown hairs were later subjected to DNA testing,

labelled Q1, Q2, Q3, and Q4; the slide preserving the hairs had a blue checkmark adjacent to Q1

and Q4.[6]  (Pls.' Mot. Exclude Ex. A, at 2, DN 293-1; Pls.' Mot. Exclude Ex. C, DN 293-3; Melton

Aff. ¶¶ 3-4, DN 293-2).  Q2 and Q3 were entirely consumed by testing, but a 0.2-centimeter section

of Q1 and a 2-centimeter portion of Q4 remain.  (Pls.' Mot. Exclude Ex. A, at 2).  DNA testing

excluded Plaintiffs as the sources of Q1, Q2, and Q4, but Q3 did not produce any results.  (Pls.'

Mot. Exclude Ex. A, at 6-7).

Jack Reid ("Reid"), a supervisor at the Kentucky State Police Lab, reviewed Thurman's

notes and report and compared the remaining segment of Q4 with the Hardin's 1992 sample.  (Pls.'

Mot. Exclude Ex. E, at 1-3, DN 293-5 [hereinafter Reid Report]).  Reid opined that:   (1)

"Thurman's description in his notes of [Q4] . . . and the head hair standard collected from [] Hardin

was consistent with other trained hair analysts' notes at the time the hairs were examined"; (2) he

"observed the microscopic characteristics listed in [] Thurman's notes to be present in [Q4]"; (3)

he "observed the microscopic characteristics listed in [] Thurman's notes to be present in the head

hair standard collected from [] Hardin"; and (4) he agreed with Thurman's conclusion that Q4 and

---

[6] Thurman previously testified in the criminal action that, when an evaluated hair appeared similar in microscopic characteristics to the standard, he would place a blue checkmark next to the evaluated hair as a reminder.  (*See* Def.'s Reply Mot. Summ. J. Ex. 4, at 2, DN 339-4).

the sample from Hardin were similar in color and microscopic characteristics.  (Reid Report 1).[7] Plaintiffs move to exclude Reid's opinions as irrelevant, unreliable, prejudicial, and inadmissible. (Pls.' Mot. Exclude 7-16, DN 293; *see* Pls.' Mot. Exclude 3 (noting that Plaintiffs do not contest Reid's qualifications)).

Fed. R. Evid. 702 governs expert witness testimony, which is admissible if:  (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the testimony is relevant, so it assists the jury in understanding the evidence or determining a fact in issue; and (3) the testimony is reliable.  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702).  Thus, courts act as gatekeepers to ensure conformity with these requirements. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

The proffering party bears the burden of establishing the admissibility of expert testimony, and "[a]ny doubts . . . should be resolved in favor of admissibility."  *Commins v. Genie Indus., Inc.*, No. 3:16-CV-00608-GNS-RSE, 2020 U.S. Dist. LEXIS 43123, at *8 (W.D. Ky. Mar. 12, 2020) (alteration in original) (quoting *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001); *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (quoting Fed. R. Evid. 702 advisory committee's note to the 2000 amendment).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596 (citation omitted).

---

[7] Reid also opined that "Thurman testified to his findings in an honest and accurate manner." (Reid Report 1).  Plaintiffs have disclaimed Thurman's trial testimony as a source of liability, so their motion to exclude this opinion is denied as moot.  (*See* Pls.' Resp. 33 n.9).

1.    *Hair Examination*

a.    **Relevance**

Fed. R. Evid. 401 categorizes evidence as relevant if it "has any tendency to make a fact of consequence in determining the action more or less probable," with the phrase "any tendency" indicating an "extremely liberal" standard.  *Frye v. CSX Transp., Inc.*, 933 F.3d 591, 598-99 (6th Cir. 2019); *see Cambio Health Sols., LLC v. Reardon*, 234 F. App'x 331, 338 (6th Cir. 2007) ("The Federal Rules of Evidence set a low bar for relevance." (citation omitted)).  "[A] piece of evidence does not need to carry a party's evidentiary burden in order to be relevant; it simply has to advance the ball."  *Dortch v. Fowler*, 588 F.3d 396, 401 (6th Cir. 2009).  Generally, relevant evidence is admissible, subject to other evidentiary rules.  *See* Fed. R. Evid. 402.

Evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless cumulative evidence.  Fed. R. Evid. 403.  "In order to exclude evidence under Rule 403, it must be more than damaging to the adverse party; it must be *unfairly* prejudicial."  *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 378 (6th Cir. 1983).  Evidence is viewed "in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect[,]" and "[t]he test is strongly weighted toward admission."  *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984)); *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018).

Reid's testimony about Q4 is clearly relevant, as it relates to Thurman's conclusion regarding microscopic similarities and whether Thurman's report was fabricated.  *See* Fed. R.

Evid. 401.  To the extent a jury must determine whether Thurman's checkmark was indicative of Q1 or Q4 is an issue of credibility and the weight given to Reid's examination and testimony about Q4, not admissibility.  *See Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 535-36 (6th Cir. 2010) ("[D]etermining the weight that should be afforded to [an expert witness]'s testimony is a function that clearly belongs in the realm of the trier of fact."); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("[M]ere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993))); *cf. V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 468 (6th Cir. 2012) ("Expert opinion can also be based on an inference and can embrace an ultimate issue."  (citing Fed. R. Evid. 704(a))).  As for Hardin's contentions that a jury may erroneously afford Reid's testimony more weight based on his employment or believe that he conducted a more substantive review, these issues are best addressed with proper jury selection, limiting instructions, and cross-examination.  *See Daubert*, 509 U.S. at 596; *Sutkiewicz v. Monroe Cnty. Sheriff*, 110 F.3d 352, 360 (6th Cir. 1997); *Koloda*, 716 F.2d at 378.

### b.      Reliability

The Sixth Circuit has explained that the reliability "inquiry is 'a flexible one,' and '[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (alteration in original) (quoting *Daubert*, 509 U.S. at 594); *cf. L.E. Cooke Co.*, 991 F.2d at 342 ("[T]he law of evidence . . . favors a broad rule of admissibility and is designed to permit the admission of all evidence which is relevant and material to the issues in controversy, unless there is a sound and practical reason for excluding it."  (citation omitted)).  Hardin argues Q4 has been "radically"

altered to the extent it "no longer exists" as the sample which Thurman examined.  (*See* Pls.' Mot. Exclude 7-10 (citing *Rose v. Truck Centers, Inc.*, 388 F. App'x 528 (6th Cir. 2010))).  In *Rose*, an expert witness "concluded that 'the cause of [the] accident was the loss of power steering fluid due to . . . loose valve housing bolts.'"  *Rose*, 388 F. App'x at 530 (alteration in original) (citation omitted).  Undermining this conclusion was the "assumption that on the day [the expert] inspected the steering gear, the bolts were at the precise degree of looseness that they were at the time of the accident."  *Id.* at 535.  A photograph taken of the steering gear four months before the expert's inspection, however, "indicate[d] that the position of the bolts was altered between the time of the accident and [the expert]'s examination."  *Id.*  As the expert's assumptions were "contradicted by evidence in the record," his conclusions were considered unreliable.  *Id.* at 536 (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 481-82 (6th Cir. 2008)).

Q4 was originally a 4-centimeter strand of hair; a 2-centimeter segment remains.  (Reid Report 1; Pls.' Mot. Exclude Ex. A, at 2).  Neither party asserts that the color or microscopic characteristics of the remaining section of Q4 was changed in any respect by the DNA testing.  (*See* Pls.' Mot. Exclude 7-10; Def.'s Resp. Pls.' Mot. Exclude 14-15, DN 313).  Reid concedes he cannot speculate regarding the microscopic characteristics of the consumed portion of Q4.  (*See* Reid Dep. 143:24-25, Sept. 15, 2022, DN 316-15).  Unlike in *Rose*, however, there is no evidence that the characteristics of Q4 examined by Reid were altered in a manner to render his review unreliable.

Finally, Hardin insists "Reid did not employ the same methodology here as he would if he were conducting an independent examination."  (Pls.' Mot. Exclude 11).  Indeed, experts must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field[,]" and their "testimony must be 'the product of reliable principles and methods' and must 'reliably appl[y] the principles and methods to the facts of the case.'" *Garvin v. Ethicon, Inc.*, 616 F. Supp. 3d 658, 680 (W.D. Ky. 2022) (third alteration in original) (quoting *Kumho Tire Co.*, 526 U.S. at 152; Fed. R. Evid. 702(c)-(d)).  Reid concedes he did not create notes or draft an official report but did "issue[] a letter stating [his] findings."  (Reid Dep. 98:24-99:3; *see* Reid Dep. 99:14-100:3, 161:18-24 (explaining that his letter is not the same as an "official state police laboratory report" during a police investigation); *see also* Reid Report).  Moreover, Reid used the same analytical technology and looked for the same characteristics as Thurman's initial review.  (Reid Dep. 79:6-80:5, 141:20-142:5).

Therefore, Reid's examination is relevant, reliable, not unfairly prejudicial, and demonstrates a reasonable factual basis for his conclusions.  As such, Reid's opinions will not be excluded.  *See Daubert*, 509 U.S. at 596; *Rogers*, 328 F. Supp. 2d at 691.

### 2.    *Credibility Testimony*

Hardin contends that Reid's conclusion in agreement with Thurman's report merely bolsters Thurman's credibility and is inadmissible as expert testimony.  (Pls.' Mot. Exclude 12-13; Reid Report 1).  Indeed, the jury must weigh each witness' credibility, and an expert witness may not encroach on this role.  *Cf. Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019) (affirming that "expert witnesses 'may not testify about the credibility of other witnesses' because '[i]t is the province of the jury to assess the credibility of witnesses.'" (alteration in original) (citation omitted)); *Esch v. Cnty. of Kent*, 699 F. App'x 509, 517 (6th Cir. 2017) ("Expert witnesses are generally not permitted to base their conclusions on an evaluation of a witness's credibility, because credibility determinations are not an appropriate subject for expert testimony."  (citations omitted)).

10

As explained above, Reid reliably and independently reviewed Thurman's conclusions.  To the extent Reid's opinions align with Thurman's observations, this does not impermissibly bolster Thurman's credibility.  *Cf. Youngberg v. McKeough*, 534 F. App'x 471, 479 (6th Cir. 2013) ("It is not helpful to the jury when expert testimony gives lay testimony interpreting the facts of the case or 'address[ing] matters that [are] equally within the competence of the jurors to understand and decide.'"  (alterations in original) (quoting *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988))).  Rather, Reid explained his personal observations and did "not tell the jury 'what result to reach' on 'ultimate legal question[s]' . . . ."  *Babb*, 942 F.3d at 316 (alteration in original) (citation omitted); *cf. United States v. Volkman*, 797 F.3d 377, 388 (6th Cir. 2015) ("An expert may not opine on the overarching question of guilt or innocence, but he or she may 'stat[e] opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue.'"  (alteration in original) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994))).  Therefore, exclusion is not warranted here.

### 3. *Comparability of Notetaking*

Finally, Hardin contends that Reid cannot comment on Thurman's notetaking and whether it was "consistent with other trained hair analysts' notes at the time the hairs were examined[,]" as Reid did not begin working at the Kentucky State Police Lab until 2000 and did not perform hair comparison analyses until 2002.  (Pls.' Mot. Exclude 15-16; Reid Report 1).  Hardin asserts that this testimony is irrelevant and that Reid does not have the specialized knowledge necessary to opine about this information.  (Pls.' Mot. Exclude 15-16).

Reid's opinion regarding Thurman's notetaking is relevant to the issues in this action, given that Hardin's claim against Thurman chiefly relies on Thurman's observation notes, as the opinion pertains to whether Thurman properly detailed the hair descriptions he purportedly observed and

whether Thurman employed proper methodology when analyzing multiple hairs simultaneously. *See* Fed. R. Evid. 401; *Cambio Health Sols., LLC*, 234 F. App'x at 338.  As for Reid's knowledge of analyst notetaking techniques in 1992, "[e]xperts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge."  *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 468 (6th Cir. 2012) (quoting *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000)); *cf. Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (noting that the specialized knowledge requirement of Rule 702 "has always been treated liberally . . . .").  Even then, Reid testified during his deposition that he has previously reviewed hair analysis cases from 1992 to 1995.  (Reid Dep. 112:17-113:4, 114:21-24.  Accordingly, Reid has the specialized knowledge to discuss notetaking techniques in 1992, so he may opine whether Thurman's notes aligned with those techniques.

Therefore, Plaintiffs' motion to exclude Reid's opinions and testimony is denied.[8]

### B.    Thurman's Motion for Summary Judgment

Plaintiffs allege that Thurman fabricated evidence and suppressed exculpatory evidence, which led to their "unjust criminal conviction[s]" and violated their rights to due process and a fair trial.  (Am. Compls. ¶¶ 176-93); *see Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017) (explaining that claims such as these should be analyzed separately).  Thurman contends that he did not violate Plaintiffs' constitutional rights, so he is entitled to qualified immunity.  (Def.'s Mem. Supp. Mot. Summ. J. 30-42, DN 292-1 [hereinafter Def.'s Mem.]).

"Qualified immunity protects public officials from civil liability for damages when their conduct does not violate the plaintiff's 'clearly established statutory or constitutional rights of

---

[8] Plaintiffs also move to exclude Julie Howenstine, an expert witness for Thurman, and opinions attributed to George Nichols, the forensic pathologist who performed the autopsy on Warford's body.  (*See* Pls.' Mot. Exclude, DN 291; Pls.' Mot. Exclude, DN 328).  These experts are not addressed in the summary judgment motion.

which a reasonable person would have known.'" *Jackson v. City of Cleveland*, 64 F.4th 736, 745 (6th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *cf. Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022) ("Qualified immunity is intended to protect public officials from unnecessary interference with their duties, while also holding them accountable 'when they exercise power irresponsibly.'" (citation omitted)).  Once raised, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.  *See Jarvela v. Washtenaw Cnty.*, 40 F.4th 761, 764 (6th Cir. 2022); *cf. Harris v. City of Saginaw*, 62 F.4th 1028, 1033 (6th Cir. 2023) ("The individualization of the analysis is axiomatic to qualified immunity, as [the plaintiff] must show that each defendant personally violated his rights." (citation omitted)).  This is established by "plausibly alleg[ing] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Jackson*, 64 F.4th at 745 (internal quotation marks omitted) (quoting *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659-60 (6th Cir. 2021)).  Unless both aspects are established, qualified immunity shields a defendant against liability.  *See Shumate v. City of Adrian*, 44 F.4th 427, 439 (6th Cir. 2022); *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999).

### 1. *Claims by Clark*

Thurman first argues that Clark's claims must be dismissed, given that Clark never alleged that he was erroneously incriminated by Thurman or that Thurman committed misconduct implicating Clark.  (Def.'s Mem. 27-29).  Clark disputes this conclusion, as Plaintiffs "were tried jointly on the theory they participated in the crime together" and the Kentucky Supreme Court affirmed the vacating of both their convictions.  (Pls.' Resp. 33); *see Clark*, 528 S.W.3d at 346.

Indeed, the only allegation of misconduct by Thurman in Clark's Amended Complaint relates to Hardin.  (*See* Am. Compls. ¶¶ 61-65 (testing of Hardin's handkerchief), ¶¶ 97-101

(whether Hardin was the source of a hair on Warford's pants)).   Thurman did not report any similarities between Clark's hair sample and the evidence collected by officers.  (*See* Lab Reports 8-9).   Moreover, Thurman testified at trial that Clark was excluded as the source of the hair on Warford's body and clothing.  (*See* Thurman Test. 206:7-207:23, 209:16-210:22, Mar. 2, 1995, DN 292-15).   While Plaintiffs rely on their joint trial and the prosecution's theory of the case, this does not excuse Plaintiffs' burden to show individually a genuine issue of material fact as to each claim in their respective Amended Complaints, just as it did not affect the prosecution's burden of proving each charge against them individually.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *cf. United States v. Frazier*, 584 F.2d 790, 795 (6th Cir. 1978) ("The jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately." (citation omitted)).   Therefore, Thurman is entitled to qualified immunity against Clark's claims, and summary judgment is granted on these claims.

### 2.   *Hardin's Fabrication of Evidence Claims*

"The basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'"   *Mills*, 869 F.3d at 484 (alterations in original) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)); *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (citation omitted)).   "But the relevant question is not whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the decision of the jury."  *Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019).   Thus, a Section 1983 claim may lie when the "fabricated evidence that 'is used as [the] basis for a criminal charge' . . . because, absent that evidence, there would have been no jury."  *Id.* (alteration in original) (citation omitted); *cf. Webb v. United States*, 789 F.3d 647, 670 (6th Cir.

2015) ("[E]ven if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect." (citation omitted)); *Sanford v. City of Detroit*, 815 F. App'x 856, 859 (6th Cir. 2020) ("The Fourteenth Amendment bars an officer from knowingly creating false evidence to obtain a conviction." (citations omitted)).  This applies likewise to forensic examiners.  *See Ferris v. City of Cadillac*, 726 F. App'x 473, 478 (6th Cir. 2018); *Moldowan v. City of Warren*, 578 F.3d 351, 397 (6th Cir. 2009) ("[E]xpert forensic examiners 'act in an investigatory fashion when they interpret and document physical evidence,' and thus . . . 'the intentional fabrication of a forensic report' is subject to the same considerations applied to the intentional fabrication of evidence by a police officer or prosecutor.'" (quoting *Gregory*, 444 F.3d at 740)).

### a. Handkerchief

The first basis for Hardin's fabrication of evidence claim is Thurman's testing, or lack thereof, concerning the bloody handkerchief.  (Am. Compls. ¶¶ 63-64).  Thurman's report indicated that chemical tests of the handkerchief showed the presence of blood, but the record does not contain any evidence to suggest that Thurman conclusively determined whether the blood was human or animal, nor did he document such information in his reports.  (Def.'s Mot. Summ. J. Ex. 35, at 5, DN 292-37).  Rather, Thurman noted that further analysis was unsuccessful "due to the age and condition of the blood . . . ." (Def.'s Mot. Summ. J. Ex. 35, at 5).  Hardin does not address or dispute Thurman's report concerning the handkerchief and only takes issue with Thurman's hair analysis.  (*See* Pls.' Resp. 28-33).  Therefore, Thurman is entitled to qualified immunity, and summary judgment is proper with respect to Hardin's claims against Thurman based upon the handkerchief.  *See Humphrey v. U.S. Att'y Gen.'s Off.*, 279 F. App'x 328, 331 (6th Cir. 2008).

### b.      Hair Comparison

Hardin primarily advances his claim based on Thurman's assessment that Hardin's hair was similar in color and microscopic characteristics to a hair discovered on Warford's body.  (Am. Compls. ¶¶ 97-99).  As previously noted, Hardin disclaims "seek[ing] to hold [Thurman] liable for his trial testimony" and instead limits his claim only to the alleged "pre-trial fabrications of evidence included in his report and representations to Greer and [the prosecutor]" concerning the results of the hair analysis.  (Pls.' Resp. 33 n.9).  In his 1992 report, Thurman articulated, "One (1) Caucasian head hair found on Exhibit 16 was similar in color and microscopic characteristics to Exhibit 21C and may have common origin."  (Lab Reports 9; *see* Lab Reports 2, 7-8 (noting that Exhibit 16 was Warford's pants and Exhibit 21C was the hair sample provided by Hardin)).  Hardin proffers two grounds supporting his contention that Thurman fabricated his conclusions:  (1) "DNA testing definitively proved that the hair could not have come from Hardin"; and (2) "[b]ased on [Thurman's] own analysis, the microscopic characteristics of this hair were dissimilar to Hardin's hair."  (Am. Compls. ¶ 98; Pls.' Resp. 17 (citations omitted)).

It must be recognized initially that the DNA testing does not establish that Thurman fabricated his conclusions.  The DNA results do not indicate the color or characteristics of the four unknown hairs that Thurman microscopically observed, nor have the parties so suggested.  Rather, Hardin agrees with Thurman that "even when hairs are microscopically indistinguishable, they often come from different people."  (Am. Compls. ¶ 99; Def.'s Mem. 40).  Thus, even if Thurman examined a hair that appeared microscopically similar to Hardin's, non-corroborating DNA testing would not establish that fabrication occurred.

Hardin next points to Thurman's observation notes regarding the microscopic characteristics of the hairs.   He contends that any distinctions in color or microscopic

characteristics would render Hardin's sample dissimilar from the hairs discovered on Warford's clothing, and that Thurman's conclusion to the contrary shows deceit. (*See* Pls.' Resp. 16-20, 29-34). Thurman's notes documented characteristics that he purportedly observed when examining the hairs under a microscope, such as color, length, diameter, scaling, and pigmentation. (*See* Pls.' Resp. Def.'s Mot. Summ. J. Ex. 7, DN 316-8 [hereinafter Exam Notes]). Thurman chronicled that Hardin's hair was brown, fine-to-medium in diameter, and had a medium width medulla; the unknown hair[9] was light-brown-to-brown, fine in diameter, and had a medium-to-thick medulla. (Exam Notes 4, 7). At the bottom of his notes to Exhibit 16, Thurman noted "[s]everal hairs dissimilar to Ex. 19C and 21C". (Exam Notes 7; *see* Thurman Dep. 186:23-188:12, Feb. 13, 2020, DN 316-5 (indicating that "several" meant "three or more" hairs); Trial Tr. 23:15-25, Mar. 3, 1995, DN 292-4 (same); *see also* Lab Reports 2, 4 (noting that Exhibit 21C is Hardin's known head hair standard and Exhibit 19C is Clark's known head hair standard)). When reviewing his observation notes, Thurman arguably conceded that his notes may not have precisely reflected that the unknown hair was similar in color and microscopic characteristics to Hardin's hair. (*See* Thurman Dep. 181:3-182:3). Even then, Reid is the only expert witness in the record who observed the unknown hairs microscopically, and he stated that he observed "the microscopic characteristics listed in [] Thurman's notes to be present in [Q4]" and "in the head hair standard collected from [] Hardin" and that he agreed with "[Thurman's] conclusion of 'similar in color and microscopic characteristics.'" (Reid Report 1).

---

[9] It is unclear which of the four unknown hairs was described in Thurman's notes, given that the checkmark was at the end of Q1 and to the side of Q4. (*See* Dimick Dep. 49:8-16, 57:5-10; Pls.' Mot. Exclude Ex. C; Melton Aff. ¶¶ 3-4). This ambiguity does not alter this Court's conclusion, considering Hardin's lack of expert testimony about the color and microscopic characteristics for any of the unknown hairs to dispute Thurman's reported conclusions, which is discussed below.

When viewing this evidence in the light most favorable to the nonmovant, Hardin only demonstrates that Thurman's notes may be inconsistent with his final report.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Ferris*, 726 F. App'x at 480-83 (affirming summary judgment in favor of a forensic pathologist, despite the plaintiff's expert witnesses purportedly "identif[ying] numerous errors in the analysis and conclusions of Defendants[,]" because "[t]he question . . . is not whether a self-interested litigant can find an expert to say the defendants got it wrong, but whether the evidence . . . creates a genuine issue of material fact that Defendants fabricated that evidence.").  Hardin presents no expert proof from actual examination of the color and microscopic characteristics of the unknown hairs, nor has any expert opined that Thurman's conclusions in his report were factually incorrect, let alone fabricated.  (*See* Pls.' Resp. 33 n.9 (limiting his claim to Thurman's report)); *see also Ferris*, 726 F. App'x at 479 (noting that Sixth Circuit precedent "simply recognized that whether evidence is 'fabricated' will often turn on circumstantial evidence and some expert reports can be so grossly deficient that they raise a triable issue of fact as to whether the explanation for their deficiency is fabrication."); *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.").  Hardin instead offers testimony from Luanne Thomas ("Thomas"), Thurman's former supervisor at the Kentucky State Police Lab.  (Thomas Dep. 190:17-194:4, Aug. 5, 2020, DN 316-9).  Thomas did not microscopically examine the unknown hairs, and she reiterated the same conclusion Thurman arguably conceded:  his notes may not have reflected that Hardin's hair was similar to one of the unknown hairs.  (*See* Thomas Dep. 192:5-193:1).  Notably, Thomas acknowledged there was some subjectivity when examining hairs and that analysts may have different interpretations of the characteristics of the same hair.  (Thomas

Dep. 275:19-278:19; *accord* Reid Dep. 168:16-19); *see Caminata v. Cnty. of Wexford*, 664 F. App'x 496, 501 (6th Cir. 2016) (affirming qualified immunity and summary judgment considering the lack of evidence showing deliberate fabrication of evidence and because "Plaintiff's expert witness acknowledged that fire investigators viewing the same body of evidence sometimes reach different conclusions, and that he found no evidence that [the defendant] removed evidence from the scene, planted evidence at the scene, or fabricated evidence."). Thomas further emphasized that "the conclusion is made looking at the hairs. You can't really look at the [notes] sheet and come to a conclusion. You have to be looking at the hairs." (Thomas Dep. 75:3-6). Thus, although Thomas found inconsistency between Thurman's notes and his finding of similarity, she *did not* dispute Thurman's finding that one of the hairs taken from the victim's clothing was microscopically similar to Hardin's. To the contrary, Thomas explicitly stated that disproving Thurman's conclusion of similarity would require actual comparison of the two samples. Apparently no expert, aside from Reid, has conducted such a comparison, so that there is no expert proof that Thurman's reported finding of similarity was false or fabricated.

In *Gregory*, the Sixth Circuit affirmed the denial of qualified immunity and summary judgment to a forensic examiner, one who worked in the same lab as Thurman and who allegedly fabricated evidence and withheld exculpatory evidence. *Gregory*, 444 F.3d at 744-45. The examiner reported that five hairs were recovered from a rape scene, despite knowing that seven were recovered, and that all the hairs were similar in color and microscopic characteristics to a hair from the plaintiff, though it was unclear whether any of them were actually similar. *Id.* at 732. Moreover, the plaintiff's expert witnesses opined that the examiner's findings were "far afield of what any reasonable forensic examiner would find from the evidence[,]" which the Sixth Circuit held was "sufficient evidence from which a jury might reasonably infer that [the examiner]

fabricated her report. *Id.* at 744. Similarly, the Sixth Circuit affirmed the denial of qualified immunity and summary judgment to two firearm examiners where "the record indicate[d] the officers' error was so egregious that a jury could find their actions were knowing or intentional." *Ricks v. Pauch*, No. 20-1778, 2021 U.S. App. LEXIS 30978, at \*14 (6th Cir. Oct. 13, 2021). There, "[o]ne of [the plaintiff]'s experts found the officers' error so 'catastrophic' as to be incompetence at best and intentional misconduct at work, surmising 'an error of this magnitude would never be made by a competent firearms examiner, let alone two firearm examiners.'" *Id.* "Even the officers' own expert believed that their conclusion was either 'a horrible mistake' or 'deliberate.'" *Id.* Finally, the Sixth Circuit reversed the dismissal of a fabrication of evidence claim against an analyst who allegedly knew "the DNA results . . . were unmistakably exonerating but [] chose to report that they were consistent with Mills' liability in order to support the prosecution's case and a guilty verdict." *Mills*, 869 F.3d at 485.

These holdings further support the need for expert testimony to support Hardin's assertion that Thurman's conclusion was demonstrably false and that Thurman knew his finding of microscopic similarity was wrong at the time, as a jury would otherwise be left only to speculate about the accuracy of Thurman's finding that the hairs were microscopically similar. *See EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 632 (6th Cir. 2019) (concluding that expert testimony is required when "the relevant inquiry is not 'so apparent that a layperson with general knowledge would have no difficulty recognizing it . . . .'" (citation omitted)).

The conclusions in Thurman's report are dissimilar and distinguishable from the actions of the defendants in *Gregory*, *Ricks*, and *Mills*. Hardin has not marshalled any qualified proof that microscopic comparison of the two hairs were not similar. *See Caminata*, 664 F. App'x at 501 (affirming qualified immunity precluding claims of fabrication of evidence and malicious

prosecution, notwithstanding expert testimony that "cast[s] doubt on the soundness of [an investigator]'s conclusions," when the plaintiff "fail[s] to show that [the investigator] acted intentionally or recklessly in his investigation" or "offer[s] no testimony or affirmative evidence" to dispute that evidence was not deliberately fabricated). Given that there is no expert proof that Thurman's finding of similarity was false, Hardin has certainly not demonstrated that Thurman's report was so "far afield", "egregious", or "catastrophic" to suggest that it was false or a knowing or intentional fabrication. *See Anderson v. Knox Cnty.*, No. 22-5280, 2023 U.S. App. LEXIS 17970, at *14 (6th Cir. July 13, 2023) ("But fabrication means more than just wrong information— it means evidence offered 'knowingly' or in bad faith." (citations omitted)); *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014) (incorrect testimony "should not be treated as fabricated merely because it turns out to have been wrong" but instead requires "persuasive evidence supporting a conclusion that the proponents . . . were aware that the [testimony] was incorrect, and . . . offered the evidence in bad faith."); *Stinson v. Gauger*, 868 F.3d 516, 533-34 (7th Cir. 2017) (en banc) (Sykes, J., dissenting) (a fabrication of evidence claim "requires evidence from which a reasonable jury could infer that the opinion was both wrong *and* that the expert *knew it was wrong* at the time he gave it. In other words, it requires evidence that the expert was not just badly mistaken but that he *lied*." (emphasis in original)). As such, Thurman is entitled to qualified immunity, and summary judgment is appropriate regarding the hair comparison conclusions in his report.

### c.   Conversations with Law Enforcement

Thurman further contends that he did not falsely report his results to law enforcement, specifically that Hardin's hair was a "match" to the one found on Warford's body; instead, Thurman maintains he properly reported that the hair was similar in color and microscopic characteristics. (*See* Def.'s Mem. 40-41). Hardin does not appear to dispute this conclusion, as

his arguments focus on whether the findings were fabricated, not Thurman's purported characterization to law enforcement.  (*See* Pls.' Resp. 29-33).

Thurman relayed his conclusions to Greer during an April 30, 1992, phone call and a May 4, 1992, visit by Greer to the Kentucky State Police Lab.  (*See* Pls.' Resp. Def.'s Mot. Summ. J. Ex. 83, at 20-21, DN 316-79).  Greer's investigative log documented Thurman stating on the April 30 call "that one hair found on the red sweatpants worn by the victim at the time of death was significantly similar to hair samples from suspect Keith Hardin."  (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 83, at 21).  Greer's notes, however, do not purport to quote Thurman's exact language. During Greer's visit to the Kentucky State Police Lab on May 4, 1992, Greer and Thurman "discussed evidence that had been previously submitted," and "Thurman advised that the reports were completed . . . ."  (Pls.' Resp. Def.'s Mot. Summ. J. Ex. 83, at 21).  The log does not detail what was discussed or support the claim that Thurman relayed falsely fabricated evidence against Hardin.

An affidavit supporting a search warrant request for Hardin's home on May 4, 1992, stated several grounds supporting probable cause for issuance, including that "[t]he physical evidence submitted [by Plaintiffs] revealed . . . a hair sample, similar in microscopic characteristics to that of Keith Hardin, was found on Rhonda Warford's pants the day her body was found."  (Def.'s Mot. Summ. J. Ex. 34, at 2, DN 292-36).  A subsequent suppression hearing produced testimony that this information was not from Thurman's report but instead came from Greer, who was relating his phone conversation with Thurman.  (*See* Def.'s Mot. Summ. J. Ex. 37, at 2-4, DN 292-39).  Both Greer and the affiant testified that Thurman told them the hair samples had similar color and microscopic characteristics.  (*See* Def.'s Mot. Summ. J. Ex. 37, at 2-4).  This evidence demonstrates that Thurman conveyed his conclusions to Greer, who relayed the information to the

officer preparing the search warrant affidavit.  To the extent Greer's testimony to the grand jury differs from his own notes regarding Thurman's verbal report or from Thurman's written report, any such inconsistency cannot be blamed on Thurman.  (*See* Def.'s Mot. Summ. J. Ex. 10, at 13-14, DN 292-12).

There is no proof that Thurman classified the hairs as a "match," as opposed to properly reporting that the samples were "similar in microscopic characteristics."  As there is no genuine issue of material fact to the contrary, Thurman is entitled to qualified immunity with respect to the claim that he falsely reported his findings as a match.  Even if the record plausibly suggested that Thurman mischaracterized the comparison as a match, Thurman would be entitled to qualified immunity in the absence of evidence demonstrating that any such characterization was intentional or knowing.  *See Ferris*, 726 F. App'x at 478-79.  Accordingly, Thurman is entitled to qualified immunity as to this claim, and summary judgment is appropriate in his favor.

### 3.    **Brady** *Violation*

The Supreme Court has held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *cf. Army v. Collins*, 488 F. App'x 957, 961-62 (6th Cir. 2012) ("Although *Brady* imposes an absolute duty of disclosure only on prosecutors, . . . 'the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police' to disclose evidence whose 'exculpatory value' is 'apparent' to officers."  (emphasis omitted) (quoting *Moldowan*, 578 F.3d at 388)); .  Thus, "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or

inadvertently; and prejudice must have ensued." *Chinn v. Warden*, 24 F.4th 1096, 1102 (6th Cir. 2022) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  "A deprivation of due process occurs where all three aspects are present." *United States v. White*, 492 F.3d 380, 410 (6th Cir. 2007).  *But see Army*, 488 F. App'x at 962 (noting that the duty to disclosure apparent exculpatory evidence "is discharged once an officer delivers such evidence to the prosecutor's office." (citing *Moldowan*, 578 F.3d at 381)).

Like constitutional violations for fabrication of evidence, "*Brady* violations are, of course, clearly established violations of constitutional rights." *Mills*, 869 F.3d at 486 (noting the right to be clearly established as of 1992); *Moldowan*, 578 F.3d at 382 (recognizing that the right was clearly established in 1990); *cf. Spurlock*, 167 F.3d at 1005 ("[I]f the right at issue was clearly established at the time the governmental actor committed the violation in question, 'the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982))).  Hardin maintains that Thurman violated *Brady* by failing to provide his observation notes to the prosecutor, who would have been required to provide them to Hardin, and to disclose that the reported conclusion was inconsistent with Thurman's lab notes.[10]  (Pls.' Resp. 34-35).  Thurman insists he "received requests for forensic testing from law enforcement who had garnered evidence in the field; he processed these requests; and he issued his reports," which "were produced by the Commonwealth in response to Court Ordered discovery."  (Def.'s Mem. 32).

---

[10] Hardin also alleged *Brady* claims against Thurman for failing to test grey hairs found on Warford's hand and for not assessing whether the blood on the handkerchief was human or animal. (Am. Compls. ¶¶ 61-65, 107-09).  Hardin does not address or dispute Thurman's arguments concerning these claims, so summary judgment is appropriate on this claim.  (*See* Pls.' Resp. 28-33); *Humphrey*, 279 F. App'x at 331.

At the time of Hardin's prosecution, the Kentucky State Police Lab maintained a policy to provide only final reports to the prosecution, which were then produced to the defendant.[11]  In accordance with this policy, Thurman's observation notes were not included in the file which was provided to Hardin.  (Thurman Dep. 54:5-55:10).  Therefore, a jury could find that Thurman's notes were withheld from the prosecutor and from Hardin.  *See Moldowan*, 578 F.3d at 381; *Army*, 488 F. App'x at 962.

Notwithstanding the Lab policy, however, Thurman acknowledged in his deposition that he "had an obligation to ensure that all exculpatory information was documented and provided" to the prosecution.  (Thurman Dep. 54:5-11).  Considering Thurman's concession that his observation notes may be inconsistent with his report, Thurman's notes would have been exculpatory.  (Thurman Dep. 181:3-182:3; Thomas Dep. 192:5-193:1); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . falls within the *Brady* rule." (citation omitted)); *Wilson v. Sheldon*, 874 F.3d 470, 478 (6th Cir. 2017) ("Impeachment evidence is also encompassed within the *Brady* rule because a jury's reliance on the credibility of a witness can be decisive in determining the guilt or innocence of the accused." (citation omitted)).  Thurman acknowledged that his "final report had to be an accurate and thorough reflection of the data [he] found and the conclusions [he] drew, both inculpatory an[d] exculpatory[.]"  (Thurman Dep. 55:3-7; *accord* Thurman 54:22-25 (averring that he "had to ensure that any exculpatory information [he] found was included in [his] communications to law enforcement . . . .")).  Thurman's report, however, did not mention the inconsistencies between his observation notes and conclusion.  (*See* Lab Reports 9; Exam Notes 4, 7).  Therefore, the exculpatory value of Thurman's observation notes arguably should have been readily apparent to Thurman.  *See Army*, 488 F. App'x at 961-62; *see*

---

[11] Hardin does not challenge the existence of, or that Thurman complied with, the policy.

*also Provience v. City of Detroit*, 529 F. App'x 661, 665-66 (6th Cir. 2013) (holding that an officer's progress note was exculpatory evidence because "it support[ed] a viable alternative theory of the crime . . . and help[ed] cast doubt on the prosecution's theory of the case.").

Finally, a *Brady* violation occurs if prejudice results from the suppression of evidence favorable to the defendant. *See Chinn*, 24 F.4th at 1102. Whether prejudice ensued "depends on whether the suppressed evidence is material." *Id.* (citation omitted). "Evidence is 'material,' if it creates a 'reasonable probability of a different result,' such that its suppression 'undermines confidence in the outcome of the trial.'" *Id.* (internal citations omitted); *cf. Kyles v. Whitley*, 514 U.S. 419, 433 (1995) ("The Court found a duty on the part of the Government even [when the exculpatory evidence was never requested], though only when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976))); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (where a witness's credibility was "an important issue in the case," the failure to disclosure impeaching evidence related to credibility implicated *Brady* concerns).

Thurman's conclusion regarding the microscopic similarities between Hardin's sample and the unknown hair was not ancillary to the prosecution's case-in-chief; rather, it addressed the sole physical evidence ostensibly placing Hardin at the scene of Warford's murder. *See Banks v. Dretke*, 540 U.S. 668, 699-703 (2004) (a witness falsely testifying about not taking money from the police was material under *Brady* when the witness' testimony was "the centerpiece" of the prosecution's case). The unavailability of Thurman's observation notes for cross-examination by Hardin's counsel could certainly be seen to seriously undermine confidence in the outcome of Hardin's trial. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (the suppression of a witness's statements that would contradict his trial testimony, and the witness's testimony was the only evidence linking

the defendant to the crime, undermines confidence in the conviction and constitutes a *Brady* violation); *Agurs*, 427 U.S. at 112 ("[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.").  This materiality is underscored by the fact that Plaintiffs' convictions were reversed when DNA testing excluded Hardin's hair as a match with the unknown sample which Thurman found was microscopically similar.  This supports the conclusion that Thurman's notes were material and that prejudice ensued from withholding these notes.  *See Chinn*, 24 F.4th at 1102.

Therefore, Hardin has demonstrated that Thurman is not entitled to qualified immunity as to his *Brady* claim, so summary judgment is not appropriate in Thurman's favor.  *Jackson*, 64 F.4th at 745; *Jarvela*, 40 F.4th at 764.  Thurman is entitled to qualified immunity and summary judgment against Hardin's fabrication of evidence claim, but not against Hardin's *Brady* claim concerning the failure to produce Thurman's observation notes.

## V.     CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.     Plaintiffs' Motion to Exclude the Opinions and Testimony of Defendant's Expert Witness Jack Reid (DN 293) is **DENIED**.

2.     Defendant's Motion for Summary Judgment (DN 292) is **GRANTED IN PART** and **DENIED IN PART**.

3.     Plaintiff Clark's claims against Defendant Thurman are **DISMISSED**.

4.     Plaintiff Hardin's claims against Defendant Thurman, except for the *Brady* claim related to the disclosure of Thurman's observation notes, are **DISMISSED**.  Plaintiff Hardin's *Brady* claims against Defendant Thurman for the withholding of the observation notes shall continue.

5.      Plaintiffs' Motions to Exclude the Opinions and Testimony of Defendant's Expert

Dr. Julie Howenstine (DN 291) and to Exclude Opinions Falsely Attributed to Dr. George Nichols

(DN 328) are **DENIED AS MOOT** in light of the dismissal of Hardin's fabrication of evidence

claims against Thurman.

Greg N. Stivers, Chief Judge
United States District Court

January 4, 2024

cc:      counsel of record