# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| JEFFREY DEWAYNE CLARK and GARR KEITH HARDIN, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| MEADE COUNTY, et al., | ) ) ) |
| Defendants. | ) ) |

HON. GREG N. STIVERS

HON. COLIN H. LINDSAY

Case No. 17-CV-419-GNS-CHL

## PLAINTIFFS' MOTION FOR A JURY QUESTIONNAIRE

Plaintiffs Jeffrey Dewayne Clark and Plaintiff Garr Keith Hardin, by and through undersigned counsel, move for the Court to issue the proposed juror questionnaire, attached as **Exhibit A**, as part of the *voir dire* process in this case. Plaintiffs rely on the attached brief in support of their motion. On April 9, 2024, counsel for Plaintiffs, Meade County Defendants, and Defendant Robert Thurman met and conferred. During that conference, Defendants indicated that they would consider the use of a jury questionnaire in this case and asked that Plaintiffs send a draft questionnaire for consideration. On April 29, Plaintiffs provided the juror questionnaire attached as **Exhibit A** to Defendants and requested their position. To date, Plaintiffs have not received a response. However, Plaintiffs remain happy to confer with Defendants to draft an agreed-upon questionnaire to be submitted to the Court for approval.

Dated:  May 1, 2024           Respectfully submitted,

*/s/ Katie McCarthy*
Barry Scheck

Nick Brustin
Anna Benvenutti Hoffmann
Emma Freudenberger
Katie McCarthy
Rhianna Rey
Sophia Villarreal
NEUFELD SCHECK BRUSTIN HOFFMANN &
FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014

/s/Larry Simon
Larry D. Simon (Ky. Bar No. 64355)
Attorney at Law
American Life Building, Suite 200
471 West Main Street
Louisville, KY 40202

**Attorneys for Plaintiff Garr Keith Hardin**

/s/Elliot Slosar
Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607

**Attorneys for Plaintiff Jeffrey Clark**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| **JEFFREY DEWAYNE CLARK and GARR KEITH HARDIN,** | ) ) ) |
| **Plaintiffs,** | ) ) ) |
| v. | ) ) ) |
| **MEADE COUNTY, et al.,** | ) ) ) |
| **Defendants.** | ) ) |

HON. GREG N. STIVERS

HON. COLIN H. LINDSAY

Case No. 17-CV-419-GNS-CHL

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR A JURY QUESTIONNAIRE**

**I.  INTRODUCTION**

In their upcoming civil rights trial, Plaintiffs Jeffrey Clark and Garr Keith Hardin seek redress for the 22 years they spent imprisoned for the 1992 murder of Rhonda Sue Warford, a crime they did not commit. Plaintiffs' § 1983 claims, which will be decided by the jury, allege that their wrongful convictions were caused by some of the most serious misconduct by government officials imaginable: that Meade County Defendants Joseph Greer, Bill Adams, and Cliff Wise and Kentucky State Police Officer Robert Thurman fabricated evidence that falsely inculpated Plaintiffs, while suppressing critical exculpatory evidence that would have helped them demonstrate their innocence.

Moreover, this § 1983 wrongful conviction suit is going to trial at a time of especially heightened polarization in opinions about police accountability—biases that are likely to affect jurors' consideration of this case. This case is also likely to implicate biases associated with beliefs or practices outside of mainstream Christianity, in particular stereotypes surrounding the practice of Satanism. And finally, this case has generated extensive local and national publicity:

1

first of the crime for which Plaintiffs were wrongfully convicted (including the prosecutor's attempt to seek the death penalty based on the alleged Satanic nature of the crime); followed by Plaintiffs' post-conviction and vacatur proceedings (including coverage of the vindictive prosecution of Plaintiffs), and most recently regarding Plaintiffs' settlement with the City of Louisville in this civil litigation. Given the high-profile nature of Plaintiffs' case and the allegations, Plaintiffs anticipate that the civil rights trial will likewise generate significant press coverage.

Because there is a significant risk, absent adequate *voir dire* into these issues, that bias will infect jury deliberations—leading to a hung jury, mistrial, or grounds for reversal of a verdict—Plaintiffs (and Defendants, who are former law enforcement officers) all have an interest in ensuring sufficient inquiry to identify any relevant juror biases. As described in further detail below, Plaintiffs respectfully submit that a written questionnaire, followed up as needed with individualized *voir dire*, provides the most efficient and effective means for ensuring a fair and impartial jury. Plaintiffs' proposed questionnaire is attached as **Exhibit A.** Plaintiffs are happy to modify the questionnaire at the Court's direction.

## II.     LEGAL STANDARD

*Voir dire* is designed to protect the right to a fair trial "by exposing possible biases, both known and unknown, on the part of potential jurors." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). Indeed, as the Sixth Circuit has recognized, implicit biases have a "proven impact" on "individuals' behavior and decision-making." *United States v. Ray*, 803 F.3d 244, 259–60 (6th Cir. 2015).

Although district courts have broad discretion in terms of how to conduct *voir dire*, "[i]t is an abuse of discretion for the district court to refuse to probe the jury adequately for bias or

prejudice about material matters on request of counsel." *Pitasi v. Stratton Corp.*, 968 F.2d 1558, 1563 (2d Cir. 1992) (quoting *Darbin v. Nourse*, 664 F.2d 1109, 1113–14 (9th Cir. 1981)). Indeed, the Sixth Circuit has found it reversible error to fail to conduct sufficient *voir dire* into areas where some jurors may be likely to harbor biases. *United States v. Laird*, 239 Fed. App'x 971, 975 (6th Cir. 2007); *see also Fietzer v. Ford Motor Co.*, 622 F.2d 281, 286 (7th Cir. 1980) (reversing jury verdict in civil negligence case where district court "fail[ed] to sufficiently probe the jury," explaining that questions inquiring into jurors' past involvement in events similar to the topic of the case and knowledge of pretrial publicity should have been given).

"District courts routinely employ questionnaires to facilitate *voir dire* in a number of circumstances," such as when there has been "extensive pre-trial publicity." *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007). "The use of such a procedure as a preliminary screening tool falls well within the district court's broad discretion in conducting *voir dire*." *Id.* at 300; *see also Skilling v. United States*, 561 U.S. 358, 384, 395 (2010) (finding that *voir dire* process adequately addressed juror bias and exposure to pretrial publicity when *voir dire* began with a 77-item "comprehensive questionnaire" that "helped identify prospective jurors for cause and served as a springboard for further questions"); *United States v. Rahman*, 189 F.3d 88, 121 (2d Cir. 1999) (using 19-page questionnaire); *Hines v. City of Columbus, Ohio*, 676 F. App'x 546, 551 n.4 (6th Cir. 2017) (referring to fact jury questionnaire was given at trial in a § 1983 case); *see also, e.g.*, *United States v. Darden*, 346 F. Supp. 3d 1096, 1139–40 (M.D. Tenn. 2018) ("The Court agrees with the parties that a questionnaire sent to prospective jurors would be of benefit."); *United States v. Abdulmutallab*, 2011 WL 4343851, at *4 (E.D. Mich. Sept. 14, 2011) ("Here, the Court has fashioned an extensive written questionnaire that will probe each prospective juror's exposure to any pretrial publicity. Through these measures, the Court can

determine whether jurors have seen or heard anything about this case, whether they have been affected by it, and whether they can lay aside any preconceived impressions or opinions they may have formulated.").

Searching *voir dire* is especially important in cases where, like this one, officer credibility is the key issue. *Brown v. United States*, 338 F.2d 534, 545 (D.C. Cir. 1964) ("[W]hen important testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested."); *see also Butler v. City of Camden*, 352 F.3d 811, 815–19 (3d Cir. 2003) (granting new trial in § 1983 case where district court failed to conduct adequate *voir dire* on law enforcement bias); *Darbin*, 654 F.2d at 1111–13 (same); *Laird*, 239 Fed. App'x at 974–75 (discussing *Darbin* at length).

To Plaintiff's counsel's own knowledge, jury questionnaires have been used in other wrongful conviction civil rights cases across the country similar to this case, including *Trulove v. D'Amico, et al.*, No. 16-cv-0050-YGR (N.D. Cal. 2018); *Gates v. District of Columbia, et al.*, No. 11-cv-0040 (D.D.C. 2015); *Restivo & Halstead v. Nassau County et al.*, No. 06-cv-6720 (E.D.N.Y. 2014); *Fields v. City of Chicago et al.*, 10-cv-1168 (N.D. Ill. 2014); *Mayes v. City of Hammond et al.*, 03-cv-00379 (N.D. Ind. 2006); and *Washington v. Wilmore*, No. Civ. A. 3:02-CV-00106, 2006 WL 2471611, at *5 (W.D. Va. Aug. 23, 2006). Questionnaires have also been used in other civil rights cases, including cases involving police and official misconduct. *E.g.*, *Burns v. City of Redwood City et al.*, No. C-08-2995 (N.D.Ca 2014); *M.H. v. County of Alameda et al.*, No 11-2868 (N.D. Ca. 2014); *Palmer v. Reader's Digest Ass'n, Inc.*, 84 CIV. 8397 (CSH), 1996 WL 345888, at *1 (S.D.N.Y. June 21, 1996) (using questionnaire in discrimination suit).

4

The use of jury questionnaires in these cases follows the American Bar Association's endorsement of specialized jury questionnaires as a best practice, recommending that "[i]n appropriate cases, the court should consider using a specialized questionnaire addressing particular issues that may arise." American Bar Association, *Principles for Juries and Jury Trials*, at 65 (2005) (Principle 11), *available at* http://aja.ncsc.dni.us/conferences/2010Annual/ SpeakerMaterials/44%20-%20Mize%20ABA%20jury%20principles.pdf.

In particular, the ABA recommends that "[t]he court should permit the parties to submit a proposed juror questionnaire" and "[a]ll completed questionnaires should be provided to the parties in sufficient time before the start of *voir dire* to enable the parties to adequately review them before the start of that examination." *Id.* at 65. The Comments to Principle 11 explain that the "purpose of questionnaires is to shorten the time required for the *voir dire*, and thereby streamline the trial process." *Id.* at 70.

> There are several benefits to providing questionnaires to counsel before *voir dire*. First, repetitive *voir dire* questioning can be minimized. Second, prospective jurors may be more willing to divulge sensitive information on the written form than to discuss the same information in open court. Third, the questionnaires, by providing relevant information early, permit the court and counsel to conduct a more focused *voir dire*.

*Id.* (internal citations omitted).

The Federal Judicial Center has likewise long recommended the use of prescreening questionnaires to empanel a jury in a high-publicity case, noting that questionnaires can help the court and parties "make preliminary determinations" with respect to juror biases and "save time" in *voir dire*. Federal Judicial Center, *Handbook on Jury Use in the Federal District Courts*, at 54–55 (1989), *available at* https://www.fjc.gov/sites/default/files/2012/JuryUse.pdf; *see also* Federal Judicial Center, Manual for Complex Litigation (Third) § 32.32, at 288 (1995) ("Jury questionnaires are frequently used . . . [and] helpful to counsel in preparing for voir dire of

5

individual jurors and the exercise of peremptory challenges."). This is consistent with the guidance from the Sixth Circuit that individualized *voir dire*, including through use of juror questionnaires, is the appropriate way to ensure no party is prejudiced by pretrial publicity. *See, e.g., United States v. Poulsen*, 655 F.3d 492, 507–08 (6th Cir. 2011).

### III.   ARGUMENT

#### A. A jury questionnaire targeting the specific areas of potential bias in this case is the most efficient and effective way to begin *voir dire.*

Given the many sensitive areas of potential bias in the jury pool, Plaintiffs propose that submitting a short, written questionnaire to prospective jurors, followed with individualized *voir dire* as necessary, is the most efficient and effective way to ensure an impartial jury. The American Bar Association recommends that specialized questionnaires "should be designed to permit the court and counsel to gain specialized information needed for effective *voir dire* in an efficient manner." *Principles for Juries and Jury Trials*, *supra*, at 70. With that in mind, Plaintiffs have drafted a proposed, 4-page questionnaire with questions specifically designed to address the several areas of potential bias in this case:

**1. Exposure to information about Plaintiffs' case and inflammatory information about Satanism.**

For many years there has been sustained and extensive media coverage regarding Plaintiffs' criminal proceedings. First, during Plaintiffs' criminal prosecution, there was local and statewide coverage of the crime, including several inflammatory media pieces falsely characterizing Plaintiffs as "devil worshippers" who committed human sacrifice. *See, e.g.*, T.L. Stanley, "Murder Committed to 'Profit' Devil Worshipers, Prosecutor Says," *The Courier-Journal* (July 5, 1992). The vacatur of Plaintiffs' wrongful convictions also received significant media attention: although the Court found there was no credible evidence that the murders were

6

motivated by Satanic worship and ordered new trials based on exonerating DNA evidence, the Meade Commonwealth Attorney nevertheless tried to re-prosecute Plaintiffs. *See, e.g.*, Chris Kenning, "Men Still Jailed Despite Ruling," *The Courier-Journal* (Aug. 5, 2016). Two years later, there was again extensive press coverage of that attempted re-prosecution after the Court found the Attorney General's Office engaged in "clear and actual vindictive prosecutorial action." *See, e.g.*, Andrew Wolfson, "Prosecutor 'Vindictive' in Meade Murder Case," *The Courier-Journal* (Jan. 30, 2018).

During that same time period, there was also much press coverage of former-Defendant Louisville Police Detective Mark Handy, who was criminally prosecuted for his similar role in two other wrongful conviction cases during the same time period. *See, e.g.*, Phillip M. Bailey, "Investigate Former Cop," *The Courier-Journal* (Mar. 18, 2018); Andrew Wolfson, "Plea Rejected for Notorious Detective," *The Courier-Journal* (Aug. 30, 2020). And most recently, there was both local and national coverage of Plaintiffs' settlement with the City of Louisville in this case. *See, e.g.*, "Louisville to Pay $20 Million to Two Wrongly Convicted Men," *New York Times* (Sept. 9, 2023); "2 Kentucky Men Exonerated in 1990s Killing Awarded More Than $20 Million," *U.S. News & World Report* (Sept. 8, 2023); "Kentucky Men Exonerated in 1990s Killing Awarded More Than $20 Million," *Messenger-Inquirer* (Sept. 9, 2023).

This case has been covered not only in print media, but also recently on a nationwide podcast: Small Town Murder. That episode—entitled "The Satanic Corporate Ladder"—discusses the underlying criminal investigation through exoneration, including the role of Mark Handy and Defendants Joseph Greer and Cliff Wise. *See* Small Town Murder Podcast, Ep. 379 (Apr. 19, 2023); *see also* Rae Johnson, "Satanic Rituals, Crooked Kentucky Cop Featured on National Podcast," *The Courier-Journal* (May 9, 2023).

7

Notably, nearly all of the news coverage of Plaintiffs' case discusses the underlying facts of their conviction and exoneration, including the evidence used against them at trial. In particular, many of these articles link Plaintiffs with the practice of Satanism or describe the theory that this crime was a satanic ritual killing. This sort of press carries a particularly serious risk of biasing the jury pool, as it is likely to implicate biases associated with beliefs or practices outside of mainstream Christianity, especially stereotypes surrounding the practice of Satanism.[1]

To address the above concerns, the proposed jury questionnaire includes a few questions designed to determine whether a juror has any background knowledge of this case or the parties, or exposure to the media about the case or related cases that may affect the juror's impartiality. For example, Question 28 asks whether a juror has heard or read anything about the 1995 criminal trial or release of Plaintiffs, and Question 29 asks whether jurors have read or heard anything about this lawsuit or the events leading up to it. And critically, Question 35 addresses the issue of Satanism, asking "During this trial, there may be discussions of the practice of Modern Satanism and/or religious customs outside of mainstream Christianity. How would your thoughts, feelings, or beliefs impact your assessment of this evidence, if at all?"

2. **Financial implications of the case**

Wrongful conviction plaintiffs suffer uniquely high damages. Indeed, juries in wrongful conviction cases like Plaintiffs' have awarded damages in the range of $2 million per year of unjust incarceration and more; those damage awards have repeatedly been upheld on appeal. *See, e.g.*, *Limone v. United States*, 497 F. Supp. 2d 143, 243 (D. Mass. 2007), *aff'd*, 579 F.3d 79 (1st Cir. 2009) (noting that "[i]n recent years both juries and courts sitting without juries have found

---

[1] Plaintiffs address the introduction of evidence of Satanism at this § 1983 civil rights trial in separate motions *in limine*.

8

that wrongfully imprisoned plaintiffs were entitled to compensation of at least $1 million per year of imprisonment" and then awarding $1 million per year of wrongful imprisonment to four plaintiffs whose incarceration ranged from 13 to 29 years) (collecting cases); *Ayers v. City of Cleveland,* No. 12-CV-00753, 2014 WL 2042254 (N.D. Ohio May 6, 2014) ($13.2 million jury verdict for 11 years' wrongful imprisonment), *aff'd* 773 F.3d 161 (6th Cir. 2014); *White v. McKinley*, 605 F.3d 525 (10th Cir. 2010) (affirming § 1983 jury verdict of $14 million compensatory damages for 5.5 years' wrongful incarceration, or $2.5 million per year); *see also Deskovic v. City of Peekskill, et. al,* No. 07-cv-08150 (S.D.N.Y. 2014) ($41.65 million verdict for 16.5 years' wrongful imprisonment, or $2.5 million per year); *Trulove v. D'Amico*, No. 16-CV-050 YGR, Dkt. 589 (N.D. Cal. 2018) ($10 million jury verdict for 6.5 years' wrongful incarceration, or $1.5 million per year).

Certain jurors may have biases against awarding a high damages award in the many millions of dollars—even when justified. Complicating this matter further is the fact that Meade County is a Defendant and certain jurors may have biases regarding the financial implications of any such award on the County. The matter is further complicated by Plaintiffs' settlement with the City of Louisville and Louisville Police Department Defendants, discussed above.

A juror is presumed biased and may not serve if he has "even a tiny financial interest in the case." *United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000); *see also Caterpillar Inc. v. Sturman Industries, Inc.*, 387 F.3d 1358, 1371–73 (Fed. Cir. 2004) (same); *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1050 (4th Cir. 1984) ("That a stockholder in a company which is party to a lawsuit is incompetent to sit as a juror is so well settled as to be black letter law.") (internal citation and quotation omitted); *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122 (10th Cir. 1995) (holding district court abused its discretion by failing to dismiss juror

9

whose "financial well-being was to some extent dependent upon defendant's" and therefore must be "presume[d] bias[ed]").

To that end, the proposed questionnaire includes a few narrow questions designed to identify jurors who may have biases with respect to Defendants' financial circumstances and/or large damage awards in general and who may require additional individualized *voir dire* on that topic.

### 3. Law enforcement bias

As discussed in Section II above, an additional area that requires special *voir dire* in this case, as in many cases in which one side's witnesses are primarily law enforcement officials, is the extent of bias in favor of (or against) law enforcement. *See, e.g., Butler*, 352 F.3d at 816–19; *Darbin*, 654 F.2d at 1111–13 (refusal to inquiry into favorable bias jurors might accord testimony of law enforcement constitutes an abuse of discretion). In this case, the issue of police accountability and credibility warrants questions that specifically address potential police bias, i.e. whether a juror may automatically credit testimony by a law enforcement officer or, conversely, be inclined to target police officers given heightened polarization around policing in recent years. Plaintiffs have proposed several questions that relate to background knowledge, experiences, and opinions relating to law enforcement officers designed to probe this potential area of bias and identify jurors for whom focused and individualized *voir dire* may be necessary. Such bias could be extensive enough to require that the jury be excused for cause, or it could provide the basis for a peremptory challenge. Additionally, it could highlight issues on which it is critical that the Court provide instruction and ensure jurors will be able to follow the law.

### 4. Additional case-specific considerations

Given the unique issues and high-profile nature of this case, a jury questionnaire most effectively and efficiently allows the Court and the parties to evaluate a potential juror's knowledge of pretrial publicity and opinions about this case—and thereby "reduce the risk that such knowledge and opinions would taint the entire jury pool if orally expressed by an individual juror in open court." *Hubers v. Commonwealth*, 617 S.W. 3d 750, 762–63 (Ky. 2020) (discussing how each juror received a packet consisting of a two-page letter, a three-page questionnaire regarding pretrial publicity and knowledge of the case, and an extra lined-page if the juror needed more space to explain an answer, and that based on responses the parties jointly agreed that 61 jurors be excused for cause in advance of *voir dire*); *see also id.* at 774 ("As mentioned, included with the detailed questionnaire mailed to prospective jurors was a letter admonishing them not to research or listen to any news pertaining to the case. In our view, the trial court took appropriate and significant measures to ensure the impaneling of a fair and impartial jury.").

Although Plaintiffs have submitted the proposed questionnaire in **Exhibit A,** Plaintiffs note that there may be additional areas appropriate for inquiry depending on the Court's rulings regarding the parties' motions *in limine*. And Plaintiffs remain happy to confer with Defendants to submit an agreed-upon questionnaire or to modify the questionnaire as directed by the Court.

### 5. CONCLUSION

For the foregoing reasons Plaintiff respectfully requests that the Court issue the attached written questionnaire followed up by individualized *voir dire*.

DATED: May 1, 2024

*/s/ Katie McCarthy*
Barry Scheck

Nick Brustin
Anna Benvenutti Hoffmann
Emma Freudenberger
Katie McCarthy
Rhianna Rey
Sophia Villarreal
NEUFELD SCHECK BRUSTIN HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014

*/s/Larry Simon*
Larry D. Simon (Ky. Bar No. 64355)
Attorney at Law
American Life Building, Suite 200
471 West Main Street
Louisville, KY 40202

*Attorneys for Plaintiff Garr Keith Hardin*

*/s/Elliot Slosar*
Arthur Loevy
Jon Loevy
Michael Kanovitz
Elliot Slosar
Amy Robinson Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607

*Attorneys for Plaintiff Jeffrey Clark*

## CERTIFICATE OF SERVICE

  I, Mary McCarthy, hereby certify that on May 1, 2024, I filed the foregoing motion via the Court's CM/ECF System and thereby served a copy on all counsel of record.

                <u>/s/ Mary Katherine McCarthy</u>
                *Attorney for Plaintiff Hardin*