# Exhibit A

Thurman's Opening Appellate Brief

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Case No. 24-5061

On Appeal from the United States District Court
for the Western District of Kentucky at Louisville

Civil Action No. 3:17-cv-00419


JEFFREY DEWAYNE CLARK; GARR KEITH HARDIN

     Plaintiffs - Appellee

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT

     Defendant

and

ROBERT THURMAN, Kentucky State Police Crime Lab Forensic Serologist, in
his individual capacity

     Defendant – Appellant


## BRIEF FOR APPELLANT ROBERT THURMAN

<div style="margin-left:40%">

Ed Monarch
Peter J. Rosene
MCBRAYER PLLC
500 West Jefferson Street, Suite 2400
Louisville, Kentucky 40202
Phone: (502) 327-5400
Email: EMonarch@McBrayerfirm.com
     PRosene@McBrayerfirm.com

*Counsel for Appellant Robert Thurman*

</div>

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
### Case No. 24-5061

JEFFREY DEWAYNE CLARK; GARR KEITH HARDIN

      Plaintiffs - Appellee

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT

      Defendant

and

ROBERT THURMAN, Kentucky State Police Crime Lab Forensic Serologist, in his individual capacity

      Defendant – Appellant

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1, Appellant, Robert Thurman, makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?
      If Yes, list below the identify of the parent corporation or affiliate and the relationship between it and the named party:
      <u>No</u>
2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?
      If yes, list the identity of such corporation and the nature of the financial interest.
      <u>No</u>

Date: March 18, 2024          <u>*/s/ Ed Monarch*</u>
                              Ed Monarch

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL
INTEREST ............................................................................................. i

TABLE OF AUTHORITIES ....................................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................... vii

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE .................................................................. 4

    A. Nature of the case .......................................................................... 4

    B. Proceedings in the Trial Court .................................................... 9

STATEMENT OF THE FACTS ................................................................ 12

    A. The Murder of Rhonda Sue Warford .......................................... 13

    B. Robert Thurman's Investigation ................................................. 15

    C. Robert Thurman's 1995 Trial Testimony .................................. 17

    D. Appeals and Post-Trial Proceedings .......................................... 20

    E. Plaintiffs Have Offered No Expert Testimony Critical of
       Robert Thurman ......................................................................... 22

SUMMARY OF THE ARGUMENT ......................................................... 25

ARGUMENT .............................................................................................. 27

    A. The Standard of Review .............................................................. 27

    B. Thurman is entitled to qualified immunity under proper application of
       Sixth Circuit precedent .............................................................. 28

  *1. The District Court held in error that Hardin had a
   clearly established right to obtain Thurman's bench notes
   in 1995* ...........................................................................31*

  *2. Thurman is entitled to qualified immunity as there was no
   apparent exculpatory value to his notes and thus, no* Brady
   *violation occurred* ......................................................36

   A. Thurman's notes were not exculpatory or impeaching ..38

   B. Evidence was not suppressed by the state, either willfully
    or inadvertently ............................................................41

   C. Hardin was not prejudiced in his defense. . . . . . . . . . .44

CONCLUSION ........................................................................46

CERTIFICATE OF COMPLIANCE.......................................................48

CERTIFICATE OF SERVICE ............................................................48

ADDENDUM ............................................................................49

# TABLE OF AUTHORITIES

## **Cases**

*Abdur-Rahim v. City of Columbus, Ohio*, 825 F. App'x 284 (6th Cir. 2020)..........33

*Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).....33

*Baker v. Goodrich*, 649 F.3d 428 (6th Cir. 2011) ....................................................29

*Brady v Maryland*, 373 U.S. 83 (1963) ...........................................................passim

*Brown v. Stacy*, No. 6:16-cv-91, 2017 WL 8813480, *3
(E.D. Ky. Dec. 5, 2017) ........................................................................................28

*Caminata v. Cnty. Of Wexford*, 664 F. App's 496, 501 (6th Cir. 2016).................39

*Campbell v. City of Springboro, Ohio*, 700 F.3d 779 (6th Cir. 2012)....................29

*Chastain v. Ansman*, No. 3:07CV-601-MO, 2012 WL 13000958
(W.D. Ky. Feb. 3, 2012) .......................................................................................45

*Chinn v. Warden*, 24 F.4th 1096 (6th Cir. 2022) ..............................................37, 44

*Cochran v. Gilliam*, 656 F.3d 300 (6th Cir. 2011) ....................................................1

*Coffey v. Carroll*, 933 F.3d 577 (6th Cir. 2019)....................................................29

*Courtright v. City of Battle Creek*, 839 F.3d 513 (6th Cir. 2016) ..........................30

*D'Ambrosio v. Marino*, No. 1:11 CV 933, 2012  WL 4504523
(N.D. Ohio Oct. 1, 2012) ......................................................................................35

*Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473 (6th Cir. 2018).................29, 46

*Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000)...........................................27

*Gillispie v. Miami Twp., Ohio*, 18 F.4th 909 (6th Cir. 2021) .................................27

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) .... 28, 32, 33, 34, 35, 41

*Hamilton v. Myers*, 281 F.3d 520 (6th Cir. 2002) ..................................................27

*Hardin v. Com.*, 396 S.W.3d 909 (Ky. 2013)...................................................21, 22

*Hutsell v. Sayre*, 5 F.3d 996 (6th Cir. 1993)...........................................................28

*Johnson v. Moseley*, 790 F.3d 649 (6th Cir. 2015)...........................................29, 46

*Kisela v. Hughes*, 584 U.S. 100 (2018) ..................................................................33

iv

*Kolb v. Goldring, Inc.*, 694 F.2d 869 (1st Cir. 1982) .............................................45

*LeFever v. Ferguson*, 956 F. Supp. 2d 819 (S.D. Ohio 2013)..........................33, 34

*Malley v. Briggs*, 475 U.S. 335 (1986) ..........................................................34, 46

*Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013).......................29

*Mitchell v. Forsyth*, 472 U.S. 511(1985)..................................................................1

*Moldowan v. City of Warren*, 578 F.3d 351
(6th Cir. 2009)...................................................... 33, 34, 35, 37, 42, 43, 44

*Mullenix v. Luna*, 577 U.S. 7 (2015) .......................................................................34

*Ouza v. City of Dearborn Heights*, 969 F.3d 265 (6th Cir. 2020) ..........................27

*Pearson v. Callahan*, 555 U.S. 223 (2009)...................................................29, 33, 36

*Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002) .........................................................10

*Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*,
880 F.3d 791 (6th Cir. 2018) .............................................................................45

*Rafferty v. Trumbull Cnty., Ohio*, 915 F.3d 1087 (6th Cir. 2019) ..........................30

*Reichle v. Howards*, 566 U.S. 658 (2012) ..............................................................34

*Saucier v. Katz*, 533 U.S. 194 (2001) .....................................................................33

*Schulkers v. Kammer*, 955 F.3d 520 (6th Cir. 2020)............................29, 30, 33, 36

*Siggers v. Alex*, Case No. 22-1182, 2023 WL 5986603
(6th Cir. Sept. 12, 2023)............................................................................34. 46

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) ..................................33, 34, 35

*Strickler v. Greene*, 527 U.S. 263 (1999)..............................................................37

*Troutman v. Mut. Life Ins. Co. of N.Y.*, 125 F.2d 769 (6th Cir. 1942) ....................45

*United States v. Agurs*, 427 U.S. 97 (1976) ...........................................................37

*United States v. White*, 492 F.3d 380 (6th Cir. 2007)...............................................37

*White v. Pauly*, 580 U.S. 73 (2017) .......................................................................34

**<u>Statutes</u>**

42 U.S.C. § 1983 ........................................................................1, 9, 33, 42, 43

28 U.S.C. § 1291 ...........................................................................................1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This is an interlocutory appeal upon grounds of qualified immunity. In its Memorandum Opinion and Order, the District Court properly granted summary judgment in Appellant Robert Thurman's ("Appellant" or "Thurman") favor as Appellee Keith Hardin ("Appellee" or "Hardin") came forward with no evidence that Thurman, acting in his official capacity as a Kentucky state forensic serologist, falsified evidence against him. The District Court erred, however, in denying Appellant Thurman the protections of qualified immunity as to Hardin's claim of a Due Process violation under *Brady v Maryland*, 373 U.S. 83, 87 (1963).

Under a proper application of precedent, Thurman is entitled to qualified immunity as to Hardin's alleged *Brady* violation. Hardin cited no case law, nor made any argument that, as of his 1995 criminal trial, he had a clearly established constitutional right to Thurman's preliminary bench notes. Further, Thurman's notes have no exculpatory value as a matter of law, and their impeachment value was speculative, given the evidence before the District Court.

Appellant believes that oral argument will assist this Honorable Court to understand the questions of law presented upon this complex factual background.

## STATEMENT OF JURISDICTION

Appellee Hardin was convicted of the murder of Rhonda Sue Warford; this conviction was later set aside after DNA analysis called into question hair comparison evidence that the jury considered in reaching its verdict. After his conviction was set aside, Appellee filed this civil action in the United States District Court for the Western District of Kentucky; he asserted federal question claims against Appellant Thurman under 42 U.S.C. § 1983, including claims under *Brady v. Maryland*. [(Hardin Amend. Compl.) RE 38, PageID #:181].

On Motion for Summary Judgment, Thurman raised the defense of qualified immunity on all of Hardin's § 1983 claims, as his sole involvement in this case was as a serologist for the Kentucky State Police ("KSP"). [(Def. Mem. in Support of Mot. for Summ. J.) RE 292-1, PageID #: 4068-69]. The District Court ultimately dismissed all of Appellee Hardin's claims in the Amended Complaint against Thurman, except one *Brady* claim against which qualified immunity was denied. [(Mem. Op. and Order) RE 390, PageID #: 34377].

An aggrieved party has the right to appeal when the district court enters a final order or judgment. 28 U.S.C. § 1291. The Supreme Court has held, however, that under the collateral order doctrine, the denial of qualified immunity is an immediately appealable final decision. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), *see also Cochran v. Gilliam*, 656 F.3d 300, 305-06 (6th Cir. 2011) (in which

the Sixth Circuit held that the denial of summary judgment upon assertion of qualified immunity is immediately appealable).

The Court entered its Memorandum Opinion and Order on January 4, 2024 denying Thurman qualified immunity based upon issues of law. This Court obtained appellate jurisdiction over this case by means of Thurman's timely-filed Notice of Interlocutory Appeal on January 19, 2024. [(Notice of Interlocutory Appeal) RE 394].

## STATEMENT OF ISSUES

I.      Whether, in 1995, there was a clearly established statutory or
constitutional right to the production of laboratory bench notes.

II.     Whether Plaintiff Hardin is precluded from asserting a claim that his
rights were violated in this civil action by his failure to request Thurman's notes
during discovery in the criminal trial.

III.    Whether Defendant Thurman's compliance with Kentucky State Police
policy in not producing notes is *prima facie* evidence of good faith.

IV.     Whether, as a matter of law, Thurman's trial testimony cured any error
in not producing his notes.

V.      Whether the jury would be asked to speculate as to the evidentiary value
of Thurman's bench notes regarding the appearance of hairs when there is no
evidence that the subject hairs actually differ in appearance.

## STATEMENT OF THE CASE

**A.     Nature of the case. [1]**

While the civil action from which this interlocutory appeal arises began in

2017, the underlying facts of the case reach back more than thirty years. Rhonda Sue

Warford, a nineteen-year-old girl from Louisville, was found murdered in a remote

field in rural Meade County, Kentucky on April 5, 1992. [(Police Rep. of Det. James

Clark) RE 292-19, PageID #:4354]. After more than thirty years, Appellee Hardin

and his co-plaintiff in this civil case, Jeffrey Clark ("Clark"),[2] are the only suspects

for her murder.

The investigation of Ms. Warford's disappearance began on April 2, 1992,

when her mother reported her missing to the Louisville Police Department, now the

Louisville Metro Police Department ("LMPD"). [(Missing Persons Rep.) RE 292-

14, PageID #: 4307-08]. Three days after her disappearance, her body was found

near a wooded area approximately thirty feet from a place adjacent to the rural

roadway where her blood saturated the ground. [RE 292-19, PageID #:4354]. Ms.

---

[1]     The facts, evidence, and conclusions of law recited herein were before the District Court on summary judgment and are taken from Thurman's principal Motion for Summary Judgment and attached exhibits [RE 292]; Hardin's Response brief and attached exhibits [RE 316]; Thurman's Reply in Support of the Motion for Summary Judgment and attached exhibits [RE 339]; and the District Court's Memorandum Opinion and Order [RE 390].

[2]     The District Court dismissed all of Clark's state and federal claims against Thurman at the summary judgment stage, and thus, he is not a party to this Appeal.

Warford was six feet tall and weighed about two hundred pounds. [(Greer Grand Jury Testimony) RE 292-12, PageID #: 4295]. After being stabbed more than a dozen times, she was carried, not dragged, from a pool of her blood to the edge of the woods. [(Greer Grand Jury Testimony) RE 292-12, PageID #: 4292]. She had no defensive wounds, save only small cuts on her right hand and index finger. [(Trial Tr. 2/28/95), RE 292-20, PageID #: 4361]. She had not been bound, gagged, drugged, or intoxicated. [*Id.*, PageID #: 4357-58, 4361-62]. She had no injuries to indicate that she had been raped or robbed. [RE 292-12, PageID #: 4297]. Because there was no evidence of resistance, and because Ms. Warford left her Louisville home voluntarily after midnight on April 2, 1992, police suspected that she knew her attackers; that she had voluntarily traveled with them to rural Meade County; that she had been surprised by her attackers in the rural field; and that her body had been carried by two men. [RE 292-20, PageID #: 4357]. At that time, the only men in Ms. Warford's life were her boyfriend, Appellee Keith Hardin, and his friend, Jeffrey Clark. [(Mary Warford Dep.) RE 292-16, PageID #: 4345].

An extensive joint investigation among three law enforcement agencies began. The investigators included the Louisville Police Department; the Meade County Sheriff's Department; and Appellant Robert Thurman, a forensic examiner with the Kentucky State Police ("KSP"). Along with the Meade County Coroner, the

persons and agencies who conducted this investigation are the defendants in Hardin
and Clark's civil action.

 The investigation included over 90 items seized by police pursuant to search
warrants executed at Hardin's parent's home; Clark's parent's home; Clark's trailer;
and Clark's car. [(KSP Lab Request) RE 316-74, PageID #: 24891-95]. The items
seized from Hardin included materials used in satanic worship including books,
candles, chalices, knives, Hardin's own sketchbook of satanic drawings, and his
"Book of Shadows," in which he had hand-written various incantations and biblical
passages. [*Id.*, PageID #: 24894; (Sketchbook) RE 292-9, PageID #: 4251-84]. The
items seized from Clark's car included hairs, which appeared to come from Ms.
Warford and Hardin, and Ms. Warford's fingerprint on his inside rear window. [RE
316-74, PageID #: 24895]. Except for the fingerprint, Thurman analyzed these items
for blood and other questions of evidentiary value. [*Id.*, PageID #: 24891-95]. As of
1992, forensic assessment of hair evidence involved the subjective evaluation of up
to fifteen characteristics that describe a hair, such as its width, color, the distribution
of its pigments, the presence and width of its medulla, and so on. [(Thurman Trial
Tr. 3/2/95) RE 316-48, PageID #: 23938-39]. DNA analysis was not readily
available to police in 1992 or at the time of trial in 1995. [(Dimick Dep.) RE 292-
42, PageID #: 4484].

Sheriff Greer of the Meade County Sheriff's Department testified before the Meade County Grand Jury on May 7, 1993. [RE 292-12, PageID #: 4290]. The grand jury indicted Hardin and Clark for Ms. Warford's murder. Both men were represented by private counsel, and extensive efforts, including a suppression hearing and discovery requests, were extended on behalf of each defendant. [(Suppression Hr'g Tr.) RE 316-59, PageID #: 24641-24716]. In his discovery responses, Commonwealth Attorney Kenton Smith turned over Thurman's final evidentiary reports. [(Discovery) RE 292-46, PageID #: 4501]. The presence of all items in evidence, including the hairs found on Ms. Warford's body and Thurman's analysis of them, was disclosed to defense counsel by means of Thurman's final reports. There were no discovery requests for notes taken by Thurman during his analysis of the items seized in evidence.

Thurman's analysis of one hair found on Ms. Warford's sweatpants is at issue in this Appeal. When Thurman compared a hair found on Ms. Warford's body to Hardin's head hair standard, he determined them to be "similar in color and microscopic characteristics." [(Lab Report No. 92-2-1424) RE 316-77, PageID #: 24961]. Thurman reported this finding to law enforcement, and it was among the bases for an Affidavit for Search Warrant of Hardin's home. [(Affidavit for Search Warrant) RE 292-36, PageID #: 4438-39]. Later, officers testified regarding

Thurman's conclusion during the suppression hearing. [RE 316-59, PageID #: 24641-24716].

At Appellee Hardin and Plaintiff Clark's criminal trial, Thurman was called by the Commonwealth to testify as to the comparison of the hair found on Ms. Warford's body with Hardin's head hair standard; on cross-examination by Hardin's counsel, Thurman testified:

| Counsel: | Okay. So, we found one hair on her sweatpants that matched Mr. Hardin's correct? Or was similar to? |
| Thurman: | Correct. |
| Counsel: | So, you don't know if it was actually [Hardin's] hair or not, but it may be? |
| Thurman: | Correct. |

[(Thurman Trial Tr. 3/3/95) RE 316-49, PageID #: 23963].

Hardin and Clark's trial took place over seven days in Meade County in 1995, where the jury heard testimony from numerous witnesses, including Thurman. After hearing all the evidence, Hardin and Clark were convicted by a unanimous jury and sentenced to life in prison for Ms. Warford's murder. Following an evidentiary hearing in 2015 pertaining to this hair, their sentences were vacated unless and until such time as the Commonwealth could retry them. [(7/13/2015 Hr'g) RE 316-16, PageID #: 23159-66; (7/13/2015 Hr'g) RE 316-17, PageID #: 23168-69].

Proclaiming their innocence, Appellee Hardin and his co-plaintiff Clark filed this civil action.

**B.      Proceedings in the Trial Court.**

On July 12, 2017, Appellant and Clark filed identical lawsuits against the Meade County Sheriff's Department, the Meade County Coroner, the LMPD, and Appellant Thurman alleging that fourteen law enforcement officials and agencies engaged in a conspiracy to convict Hardin and Clark for the murder of Ms. Warford. With respect to Thurman, Hardin's Amended Complaint [RE 38] initially alleged numerous federal claims under 42 U.S.C. § 1983 and Kentucky state law claims including Due Process violations (Count I); Fourth and Fourteenth Amendment violations for fabrication and falsification of evidence (Count II); federal and state claims for malicious prosecution (Count III and XI respectively); failure to intervene (Count V); conspiracy to deprive constitutional rights (Count VI); and claims for intentional and negligent infliction of emotional distress (Count XII and XIII respectively).

After years of litigation, Appellant filed his summary judgment motion on December 2, 2022 on all of Hardin's and Clark's[3] state and federal claims. In his

---

[3]      The District Court granted summary judgment on all of Clark's claims against Thurman based on qualified immunity; Thurman's evidentiary analysis excluded him as a source of any hair or other physical evidence found at the murder scene. [RE 390, PageID #: 34363-64].

Memorandum in Support of his Motion for Summary Judgment, Thurman raised the

defense of qualified immunity, including against the *Brady v. Maryland* allegations

set forth in Hardin's Amended Complaint. [RE 292-1, PageID #: 4068-69 (citing

*Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002)]. The allegations in Hardin's

Amended Complaint involved an alleged failure to test two gray hairs found on Ms.

Warford's body and an alleged failure to test blood found on a broken chalice and

handkerchief. [RE 38, PageID #: 194-95; 202-03]. In his Response to Thurman's

Memorandum in Support [(Pl. Resp. to Def. Mot. for Summ. J.) RE 316], Hardin

abandoned these *Brady* claims, and the District Court accordingly entered summary

judgment in favor of Thurman pertaining to the gray hairs and the bloody

handkerchief. [RE 390, PageID #: 34365, 34374, n. 10].

For the first time, Hardin's Response raised a *Brady* violation not found in his

Amended Complaint; he contended that Thurman intentionally suppressed

exculpatory, material evidence in the form of the preliminary bench notes Thurman

wrote while comparing these two hairs. [RE 316, PageID #: 20919-20]. In his

Response, Hardin asserted this new *Brady* claim and a single claim that Thurman

fabricated evidence by opining that a hair found on Ms. Warford's body was "similar

in color and microscopic characteristics" to Hardin's head hair standard. [RE 316,

PageID #: 20914-18]. With respect to his *Brady* claim, Hardin cited no case to

establish that he had a clearly established right to Thurman's notes. [RE 316, PageID

#: 20919-20]. Summary judgment motions were fully briefed and submitted to the District Court on February 21, 2023.

On January 4, 2024, the District Court issued its Memorandum Opinion and Order granting in part and denying in part Appellant's Motion for Summary Judgment. [RE 390]. The District Court correctly held that Hardin failed to establish any genuine issue of material fact that Thurman fabricated the hair evidence. [*Id.*, Page ID #: 34371]. Even though there was no evidence that Thurman fabricated evidence or falsely reported his findings, the District Court denied Thurman the protections of qualified immunity from Hardin's *Brady* claim related to Thurman's notes. [*Id.*, PageID #: 34374].

With respect to the first prong of the qualified immunity analysis, the District Court held generically that "'*Brady* violations are, of course, clearly established violations of constitutional rights.'" [*Id.*, PageID #: 34377]. The District Court did not analyze or find whether Hardin's right to Thurman's notes was clearly established at the time of the alleged violation.[4] Regardless, the District Court found that not producing the bench notes resulted in a constitutional violation. [*Id.*, PageID #: 34376-77]. The District Court acknowledged that Thurman followed KSP policy by producing only his final reports, but it did not address whether Hardin had a

---

[4]    Hardin failed to argue this prong of the qualified immunity analysis in response to Thurman's summary judgment briefing.

clearly established right to a forensic examiner's notes; instead, the District Court placed the burden on Thurman by stating, "the exculpatory value of Thurman's observation notes arguably should have been readily apparent to Thurman." [*Id.*, Page ID #: 34375].

Although the District Court dismissed Hardin's fabrication of evidence claim and found no evidence that Thurman falsified his testimony about the similar appearance of the hairs [*Id.*, PageID #: 34363-64], the District Court nonetheless held that "[t]he unavailability of Thurman's observation notes for cross-examination by Hardin's counsel could certainly be seen to seriously undermine confidence in the outcome of Hardin's trial." [*Id.*, PageID #: 34375-76]. Without analysis as to any fact at issue that the notes could clarify, the District Court concluded that Thurman's notes had impeachment value. [*Id.*, PageID #: 34375-76]. In a finding inconsistent with the notes having value, the District Court also held that "Hardin presents no expert proof from actual examination of the color and microscopic characteristics of the unknown hairs, *nor has any expert opined that Thurman's conclusions in his report were factually incorrect . . . .*" [*Id.*, PageID #: 34368 (emphasis provided)].

With no evidence of fabrication or falsity in his reports or testimony, nor any analysis as to how his notes could rebut reports that were honest or testimony that was true, qualified immunity was denied to Thurman on Hardin's novel *Brady* claim. This Interlocutory Appeal followed.

## STATEMENT OF THE FACTS

**A.      The Murder of Rhonda Sue Warford.**

After midnight on Thursday, April 2, 1992, Rhonda Sue Warford voluntarily

left her mother's house in Louisville without her purse, without her billfold, without

any cash, without any form of identification, and without a change of clothing. [RE

292-16, PageID #: 4342-43]. When she left, she locked the door behind her. [*Id.*,

PageID #: 4342-43].

On Sunday, April 5, 1992 at approximately 7:00 a.m., Ms. Warford's body

was found face down in a field off Highway 823 in Meade County, Kentucky. [RE

292-19, PageID #: 4354]. Nearer to the road, about twenty-seven feet from her body,

there was a puddle of her blood that saturated the ground and her keys were next to

it. [RE 292-20, PageID #: 4357]. The physical evidence indicated that Ms. Warford

had been transported of her own free will from Louisville to a dark field in rural

Meade County after voluntarily leaving her home at 12:30 a.m. with no evidence

that she had been tied up, nor evidence that she had been drugged, tried to run, fight,

or escape any form of confinement. [*Id.*, PageID #: 4357-58, 4361-62]. She had been

stabbed ten times, including a deep puncture wound to her left chest that caused her

to lose about a liter and a half of blood into her left pleural cavity. Her throat was

cut. [*Id.*, PageID #: 4363, 4366-67; (Nichols Dep.) RE 292-25, PageID #: 4410]. Her

spinal cord was severed by a stab wound between her cervical vertebrae.

[(Postmortem Examination Rep.) RE 292-22, PageID #: 4371-75]. She was not robbed of any possessions and still had a silver anklet around her ankle. [(Trial Tr. 3/2/1995) RE 292-15, PageID #: 4319; (Lab Rep. No. 92-2-1800) RE 292-26, PageID #: 4413]. According to her mother, the only persons Ms. Warford would have trusted to drive her into a rural area without a fight were Keith Hardin and his friend Jeff Clark. [RE 292-16, PageID #: 4345].

Years later, during Hardin and Clark's parole board hearings, both men admitted that they killed Ms. Warford and recounted specific details consistent with evidence found at the crime scene. In Clark's April 18, 2006 parole board hearing, he admitted that "I helped [Hardin] pick[] her up and move the body" and that "[s]he was already dead in a field when I put her by the fence . . . ." [(Clark 2006 Parole Board Hr'g) RE 292-27, PageID #: 4416]. Ms. Warford, indeed, was found by a fence. [(Greer Dep.) RE 316-50, PageID #: 24140]. As to the motive for Ms. Warford's murder, Clark admitted, "if I had done the right thing and called the police whenever Keith was threatening to kill Rhonda she'd be alive today," and "[Hardin] had been telling everybody he was going to kill her because he said that she was pregnant . . . ." [RE 292-27, PageID #: 4414-16].

On April 19, 2006, Hardin also admitted to Ms. Warford's murder before the parole board, and his parole was denied. [(Hardin 2006 Parole Bd. Hr'g) RE 292-28, PageID #: 4418]. Hardin appeared before the parole board a second time in 2014

14

where he recounted further details of her murder. [(Hardin 2014 Parole Bd. Hr'g)
RE 292-29, PageID #: 4419-24]. Hardin testified that he and Clark called Ms.
Warford and then picked her up, after which Clark took them to a field close to his
ex-wife's house "[o]ut in this open field, somewhere." [*Id.*, RE 292-29, PageID #:
4420]. He recalled that Ms. Warford went with them willingly and was not bound;
that she begged for her life before they stabbed her; that they were in shock when it
was over; and that they did not sexually assault her. [*Id.*, PageID #: 4421-24].
Hardin's parole was again denied.

## B.    Robert Thurman's Investigation.

Ms. Warford's body was found by passing motorists on Sunday, April 5,
1992, and the Meade County Sherriff's department was called to the scene. [RE 292-
12, PageID #: 4290]. A joint investigation with Meade County, LMPD, and KSP
began, with KSP's Lab taking responsibility for forensic testing. [*Id.*, PageID #:
4297-98]. During the investigation of Ms. Warford's murder, police recovered
dozens of items of evidence that were sent to the KSP Lab. On April 6, 1992,
Appellant Thurman received in evidence eighteen designated exhibits. [RE 316-77,
PageID #: 24959-60]. Of particular interest to this appeal was Exhibit 16, a pair of
red sweatpants worn by Ms. Warford, from which four hairs were recovered. [*Id.*,
PageID #: 24959-60]. Thurman compared the hairs on Exhibit 16 to known head
hair standards under a microscope, including those of Hardin and Clark. [RE 316-

48, PageID #: 23938-23939]. As Thurman examined the hairs, took notes of his observations on worksheets provided by KSP; these worksheets are referred to as Thurman's "bench notes." [*Id.*, PageID #: 23939]. Based upon his observations, Thurman prepared and issued a series of final reports on April 30, May 5, and June 12, 1992. [RE 316-77, PageID #: 24958-61; RE 292-1, PageID #: 4053].

Thurman's April 30, 1992 report is pertinent to this Appeal. There, he documented that "One (1) Caucasian head hair found on Exhibit 16 was *similar* in color and microscopic characteristics to Exhibit 21C and *may have* common origin." [RE 316-77, PageID #: 24961 (emphasis provided)]. Exhibit 21C was Keith Hardin's head hair standard. [*Id.*, PageID #: 24944]. Thus, Thurman identified in this report a hair retrieved from the crime scene that was similar in color and microscopic characteristics to the head hair standard from Hardin. [RE 292-1, PageID #: 4050].

The undisputed facts before the District Court established that it was KSP practice for serologists to produce only their final reports to law enforcement. [(Thurman Dep.) RE 316-5, PageID #: 21083]. Thus, Thurman's conclusions were communicated through his final reports, and KSP did not have a policy for examiners to produce their notes to law enforcement, nor the Commonwealth. [*Id.*, PageID #: 21083]. The Commonwealth did not request his notes. [*Id.*, PageID #: 21083]. Thurman's notes subjectively describe the characteristics he observed when he

compared under a microscope the hairs recovered from Ms. Warford's sweatpants to Hardin's known hair standard. [(Bench Notes) RE 339-10, PageID #: 30578-79]. At the bottom of the Exhibit 16 column, Thurman wrote "one (1) hair is similar to Ex. 21C 92-2-1498 Hardin HHS" and "several hairs dissimilar to 5C, 19C, and 21C," which conclusions are consistent with the report he provided to law enforcement. [*Compare* RE 339-10, PageID #: 30579 *with* RE 316-77, PageID #: 24959-61]. Although most of the characteristics listed for Exhibits 16 and 21C contain identical descriptions, Thurman described the Exhibit 16 hair as "light brown to brown" in color and the Exhibit 21C hair as "brown." [RE 339-10, PageID #: 30578-79]. Similarly, he described the Exhibit 16 hair as having an "average to light" pigment and the Exhibit 21C hair as having an "average to slightly heavy" pigment. [(Bench Notes) RE 339-10, PageID #: 30578-79]. These descriptive terms are Appellee's basis to contend that Thurman's notes were not consistent with his final report and, thus, his argument that the notes were exculpatory. [RE 316, PageID #: 20904-05].

## C.    Robert Thurman's 1995 Trial Testimony.

Following indictment by the Meade County Grand Jury on May 7, 1993, Clark and Hardin proceeded to jury trial in the Meade Circuit Court on February 27, 1995. The Commonwealth called Thurman to testify on March 2 and 3, 1995 about his hair comparison analysis. [RE 316-48, PageID #: 23936-57; RE 316-49, PageID #: 23959-66]. For nearly six pages of Thurman's trial testimony, Thurman explained

in specific detail the science and limitations of visual hair comparison under a microscope to the jury; he testified:

Q.     Okay. Now, when – tell us how hairs are analyzed.

A.     Okay. Hairs are analyzed – we do a visual look at the hairs to see if they look similar. We also do what we call a microscopic examination where we look at the hairs under a microscope. Hairs have approximately 15 different characteristics that we look for. A hair is a – you can compare it to like a pencil. A pencil has basically three parts, it's the lead that's down the center, the wooden part that surrounds the lead, and the paint on the outside. A hair has a medulla which runs down the center, it's surrounded by what we call the cortex, and that's covered by an outer layer called scales, and each of these areas have characteristics that we look for. We write down the characteristics from the standards of the people that we know the hairs belong to, and we compare any unknown hairs to those standards to see if they are similar.

Q.     And you do this microscopically?

A.     Yes.

Q.     Do you look at these hairs with a microscope like we might be used to seeing in biology class, or is it something more advanced than that?

A.     The microscope we use is called a comparison microscope, and it's set up where there are two different stages. So, we can have two hairs on two different stages and look through the lens and we can see both the hairs at the same time. And in order for us to call a match, they have to match in characteristics. Also we do a side-by-side comparison, putting two hairs together, and they

18

> have to look like one continuous hair running instead of – and
> they must match that way also.

[RE 316-48, PageID #: 23938-39]. Thurman described the characteristics of the hair

that are the subject of a forensic examination, including the scales on the outside of

the hair; the root of the hair; the thickness of the hair; the pigment; damage; dyes,

and so on. [*Id.*, PageID #: 23939-43]. Commonwealth Attorney Smith then asked

him about the language used by forensic serologists to describe their findings; he

stated:

> Q.    Okay. Now, if you're looking at two hairs in the microscope, and
>       let's say you get what I would call a match, is that the word you
>       use, "a match," or how do you grade these hairs?
>
> A.    If something looks like it's a match, we say it's 'similar in color
>       and microscopic characteristics'.
>
> Q.    So, in other words, if you're looking at two hairs under the
>       microscope, and if they match up in these 15 characteristics that
>       you're talking about, you use the words 'similar in
>       characteristics'?
>
> A.    That's correct.
>
> Q.    And if they – if they are not similar, then what do you say about
>       it?
>
> A.    Dissimilar.

[*Id.*, PageID #: 23943-44].

As to the four hairs found on Exhibit 16, Ms. Warford's sweatpants, Thurman

testified that there were three hairs on her sweatpants that were dissimilar from

Clark and Hardin's hair standards. [RE 316-49, PageID #: 23961]. When questioned

by Hardin's trial counsel as to the one hair on Exhibit 16 that was similar to Hardin's

head hair standard, Thurman testified:

> Hardin's Counsel:  **So, you don't know if it was actually [Hardin's]
> hair or not, but it may be?**
>
> Thurman:  **Correct.**

[(Thurman Trial Tr. 3/3/95) RE 316-49, PageID #: 23963 (emphasis provided)].

After seven days of trial, Hardin and Clark were convicted of Ms. Warford's murder.

## D.    Appeals and Post-Trial Proceedings.

Appeals were taken and the verdict upheld. Motions pursuant to Kentucky's

RCr 11.42 to set aside the verdict for ineffective assistance of counsel were filed and

overruled. Neither defendant challenged Thurman's hair comparison analysis on

appeal. In this civil litigation, Commonwealth Attorney Smith was asked whether

the hair comparison evidence was important to the conviction; he stated, "I didn't

think the hair was that important." [(Smith Dep.) RE 292-40, PageID #: 4455].

Despite Hardin's current argument as to the importance of this hair, it did not

definitively place him at the murder scene in light of evidence that it may have gotten

on Ms. Warford's sweatpants when Hardin spent the night with her in her mother's

home. [(Hardin Trial Tr. 3/7/95) RE 292-5, PageID #: 4140-41]. Thurman also

testified that he could not determine how long the subject hair had been on Ms. Warford's clothing. [RE 316-49, PageID #: 23964].

In 2009, Hardin and Clark's claims of innocence caught the attention of the Innocence Project, Inc. and the Department of Public Advocacy Kentucky Innocence Project. [(Clark Dep.) RE 292-6, PageID #: 4158]. Kentucky Innocence Project petitioned the trial court for authority to test the hairs found on Exhibit 16 by mitochondrial DNA analysis – a technique that was not widely available to law enforcement at the time of Thurman's hair comparison analysis. *Hardin v. Com.*, 396 S.W.3d 909, 912 (Ky. 2013). In an Order dated January 14, 2010, the trial judge denied the motion, stating:

> Regardless of the failure of the gray hair(s) to match Ms. Warford, Mr. Clark, or Mr. Hardin, the subject hair(s) and the alternate perpetrator theory is not new to either defendant. To now identify the source of those hair(s) would not be a new breath of fresh air for either Mr. Clark or Mr. Hardin and would certainly not serve to exonerate either of them. This is particularly true when one considers the fact that the jury who convicted the defendants knew that the hair(s) were from an unidentified source but, nevertheless, found sufficient evidence elsewhere to adjudge Mr. Clark and Mr. Hardin to be guilty beyond a reasonable doubt.

*Id.* at 913. The Trial Court's January 14, 2010 Order that denied DNA testing was appealed to the Kentucky Court of Appeals, and the Kentucky Supreme Court accepted transfer to consider the issue of post-conviction DNA testing in a non-capital case. *Id.* at 910. To secure this testing, the Kentucky Innocence Project

asserted its suspicions that a gentleman named James Whitely, who allegedly
admitted to Ms. Warford's murder in front of a friend of a friend of Ms. Warford
may be the guilty party. *Id.* at 912. Despite this representation, DNA testing ruled
out James Whitely as a potential contributor of any unknown hair, and there is no
evidence of any involvement by him in Ms. Warford's death. [RE 292-42, PageID
#: 4470]. The Kentucky Innocence Project also argued, "if the DNA did not belong
to Whitely, counsel proposed that it could be compared to the Kentucky and FBI
DNA databases of convicted offenders"; if this was done, it has failed to identify any
suspects other than Hardin and Clark. *Hardin v. Com.*, 396 S.W.3d 909, 912 (Ky.
2013). By Order rendered April 25, 2013, the Kentucky Supreme Court granted
Clark and Hardin the DNA testing they sought. *Id.* at 915. When three of the four
hairs on Exhibit 16 were demonstrated not to be Hardin's by DNA analysis, a
subsequent judge of the Meade Circuit Court set aside their convictions by Order
entered July 14, 2016; this civil action followed.

**E.    Appellee Offered No Expert Testimony Critical of Robert Thurman.**

In this civil action, Hardin and Clark represented to the District Court that
DNA testing excluded Hardin as the source of hair found on Ms. Warford's
sweatpants, but this is not necessarily correct. Of the four brown hairs retrieved from
Ms. Warford's sweatpants that were submitted for DNA testing, one hair produced

no results. [(Mitotyping Report) RE 316-68, PageID #: 24841-43; RE 292-42,
PageID #: 4480].

As to the claim against Thurman, Plaintiffs did not retain an expert in forensic
serology. Their DNA expert, Gloria Dimick, is not a forensic serologist, and she is
not trained in hair comparison. [RE 292-42, PageID #: 4466-67]. Ms. Dimick did
not use the type of microscope that would be used for hair comparison. [*Id.*, PageID
#: 4477]. She did not review any reports by Thurman, nor did she review his
testimony. [*Id.*, PageID #: 4468-69]. She did not undertake any hair comparison
analysis, and she offered no opinions or criticisms of how he compared one hair to
another. [*Id.*, PageID #: 4469]. Ms. Dimick provided only a superficial description
of the hairs she received on Exhibit 16, which was four "[p]ale to light brown,
extremely thin, approximately four centimeters in length with telogen root." [*Id.*,
PageID #: 4473]. Ms. Dimick also was not confident to which of the four hairs the
"blue check" mark that Thurman made on the original slide applied to or what that
check mark was intended to signify. [*Id.*, Page ID #: 4474].

Hardin designated Luanne Thomas, Thurman's supervisor at the Kentucky
State Lab during Ms. Warford's murder investigation, as an unretained expert after
deposing her without notice that she would be asked to offer expert opinions. [(Pl.
Resp. to Def. Mot. for Summ. J.) RE 316, PageID #: 20915]. Ms. Thomas testified
that Thurman was an analyst whom, "I would trust him to be ethical . . . in all things."

[(Thomas Dep.) RE 292-44, PageID #: 4493]. She "found him to be an exemplary employee in every way" and honest in all his reporting about hair comparison analysis. [*Id.*, PageID #: 4494-95]. Before her deposition, she did not review the case file, any of his reports, or Thurman's trial or deposition testimony. [*Id.*, PageID #: 4489-90]. She has no recollection of Ms. Warford's murder case and was not involved in testing any evidence in the case. [*Id.*, PageID #: 4490, 4497]. Nonetheless, Plaintiffs' counsel questioned Ms. Thomas for seven hours regarding Thurman's notes. Ms. Thomas testified, "*But it still has to be understood that the conclusion is made looking at the hairs. You can't really look at the sheet [i.e., the notes] and come to a conclusion. You have to be looking at the hairs.*" [*Id.*, PageID #: 4496 (emphasis provided)].

To defend his visual comparison, Thurman contacted Jack Reid of the KSP Lab to ask that he visually observe the remaining 2 cm fragment of Exhibit 16, also known as Mitotyping Technologies, Inc.'s number Q4. [(Reid Report) RE 292-45, PageID #: 4498]. In his expert report, Mr. Reid stated, "I observed the microscopic characteristics listed in Robert Thurman's notes to be present in the hair found on the sweatpants of R. Warford. I also observed the microscopic characteristics listed in Robert Thurman's notes to be present in the head hair standard collected from G. Hardin. Based on Robert Thurman's characterizations in his notes of the hair collected from the sweatpants of R. Warford and the head hair standard collected

from G. Hardin, I agree with his conclusion of 'similar in color and microscopic characteristics.' Robert Thurman testified to his findings in an honest and accurate manner." [*Id.*, PageID #: 4498]. Appellee presented no contrary evidence. [RE 292-1, PageID #: 4064].

In ruling that Thurman's notes were "exculpatory" and "material," the District Court erred by disregarding the unrebutted testimony of every forensic serologist who testified; all agreed that the conclusion that two hairs are "similar in color and microscopic characteristics" as documented in Thurman's final lab report is based upon what a serologist sees when comparing hairs visually under the microscope, and not based upon what was written in their lab notes. [(Reid Dep.) RE 316-15, PageID #: 22973; (Howenstine Dep.) RE 316-34, PageID #: 23448, 23475; (Thurman Dep.) RE 316-5, PageID #: 21212-13; (Thomas Dep.) RE 292-44, PageID #: 4496].

## SUMMARY OF THE ARGUMENT

Appellant has been denied qualified immunity, even though Appellee has come forward with no evidence that Appellant was on notice to produce his notes; no evidence that Appellant's notes would have changed the outcome of his criminal trial; and no evidence that Appellant acted in bad faith. To Appellant's research, there are no cases from 1995 or before in which a forensic technician faced liability for failing to produce notes that contain only his or her thoughts and impressions, when

it is undisputed that they fully disclosed all evidence in their possession and accurately reported their findings in reports that they produced to the state and the defense. Further the notes at issue have no "impeachment" value, because they do not contradict the conclusions of Appellant's reports, and any jury asked to apply the legal standard for a *Brady* violation based upon these notes would be called upon to speculate as to the probative difference between the words "light brown" and "brown."

In its Memorandum Opinion and Order, the District Court erred in applying a sweeping maxim that "'*Brady* violations are, of course, clearly established violations of constitutional rights.'" [RE 390, PageID #: 34374]. Neither Hardin nor the District Court identified any case in which a forensic examiner was required to produce his or her notes in 1995 or earlier; thus, there is no proof in this case that Thurman was on notice to produce the notes he took while preparing his final reports. Further, the District Court erred by not requiring Appellee to prove that a constitutional violation occurred. Hardin's claims of falsified evidence against Thurman were dismissed; Thurman accurately conveyed his findings to law enforcement and defense counsel through his final reports; and the notes he took while preparing his final reports had no value in impeaching his honest testimony as to the similar appearance of the hairs in issue. The District Court did not, in any way, require Hardin to come forward with evidence that the outcome of his criminal trial would have differed if the notes had

26

been produced, and the notes do not reach the substance of Thurman's reports or his

testimony.

## ARGUMENT

### A.    The Standard of Review.

Thurman appeals the District Court's denial of qualified immunity. It is

established law in the Sixth Circuit that "[q]ualified immunity is a question of law

and, as such is reviewed *de novo* . . . ." *Hamilton v. Myers*, 281 F.3d 520, 530 (6th

Cir. 2002) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000)). For

interlocutory qualified immunity appeals, appellate courts "'have jurisdiction to

review whether the district court properly adopted the plaintiff's version of the facts

in assessing qualified immunity . . . .' But that analysis is meant only to facilitate

review of 'the "purely legal" question of 'whether the legal norms allegedly violated

by the defendant were clearly established at the time of the challenged actions.'"

*Gillispie v. Miami Twp., Ohio*, 18 F.4th 909, 915-16 (6th Cir. 2021) (quoting *Ouza v.

City of Dearborn Heights*, 969 F.3d 265, 276-77 (6th Cir. 2020)). Further, the

appellate court does "have jurisdiction to review whether the district court properly

adopted the plaintiff's version of the facts in assessing qualified immunity (*i.e.,*

whether it applied the correct summary judgment standard)." *Ouza*, 696 F.3d at 277.

Here, the District Court erred in two ways. First, it misapplied the qualified

immunity standard when it held that Hardin had a clearly established constitutional

right to obtain Thurman's preliminary notes. Hardin did not even attempt to confront this issue in his Response to Thurman's Summary Judgment brief. Second, in assessing the substantive *Brady* claim, the District Court concluded in error that Thurman's notes had exculpatory value. Should this Honorable Court agree on either grounds, Thurman is entitled to qualified immunity and reversal of the lower court is appropriate.

**B.    Thurman is entitled to qualified immunity under proper application of Sixth Circuit precedent.**

Qualified immunity is an absolute defense to civil rights claims against government officials. *Brown v. Stacy*, No. 6:16-cv-91, 2017 WL 8813480, *3 (E.D. Ky. Dec. 5, 2017) ("Qualified immunity . . . provides an absolute defense for good faith government actors engaged in discretionary decision making."). To evaluate an assertion of qualified immunity, courts in the Sixth Circuit consider "'(1) whether the plaintiff has asserted a violation of a known [ ] constitutional right; and (2) whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights.'" *Gregory v. City of Louisville*, 444 F.3d 725, 745 (6th Cir. 2006) (quoting *Hutsell v. Sayre*, 5 F.3d 996, 1003 (6th Cir. 1993)). In this case, it was undisputed that KSP policy did not require Thurman to produce his unfinalized notes. In his Response to Thurman's Motion for Summary Judgment, Hardin did not come forward with any case law to establish a bright line rule that

Thurman failed to follow as of the 1995 murder trial. [(Pl. Resp. to Def. Mot. for Summ. J.) RE 316, PageID #: 20919-20]. Respectfully, the District Court erred by not requiring that Hardin do so. *See Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012) ("Qualified immunity 'shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Baker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011)).

"These steps may be addressed in any order, and the official need only prevail on one of them to be granted qualified immunity." *Coffey v. Carroll*, 933 F.3d 577, 584 (6th Cir. 2019); *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013); *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) ("If the court finds that the plaintiff's right was not clearly established at the time of the defendant's conduct, the court does not need to determine whether the alleged conduct was in fact unconstitutional." (citing *Pearson v. Callahan*, 555 U.S. 223, 236-43 (2009)).

Even in cases where a Constitutional violation occurs, not every violation will render a government official liable; qualified immunity provides "ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th Cir. 2018) (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). Once

29

the defense is raised, "[t]he plaintiff bears the burden of showing that an officer is not entitled to qualified immunity." *Schulkers v. Kammer*, 955 F.3d 520, 533 (6th Cir. 2020); *Rafferty v. Trumbull Cnty., Ohio*, 915 F.3d 1087, 1093 (6th Cir. 2019); *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

As distinct from every other case in this Circuit involving notes, Thurman's notes do not contain any conversation with an otherwise unknown witness; they do not support any alternative theory of how Ms. Warford's murder was committed; nor do they list any item of otherwise undisclosed physical evidence. Thurman's notes reflect only his own preliminary thoughts and impressions. In them, there are identical descriptions of approximately fifteen characteristics observed on the hair from Exhibit 16 and Hardin's head hair standard in Exhibit 21C, except that the Exhibit 16 hair was described as "light brown to brown" in color and the Exhibit 21C hair was described as "brown" [RE 339-10, PageID #: 30578-79], and the Exhibit 16 hair was described as having an "average to light" pigment while the Exhibit 21C hair as having an "average to slightly heavy" pigment [*Id.*, PageID #: 30578-79]. In Thurman's final report [RE 316-77], which was provided to law enforcement and defense counsel, he stated that these two hairs were "similar in color and microscopic characteristics," not identical. At trial, he testified that he did not know whether the hair found on Ms. Warford's sweatpants was, or was not, Keith Hardin's hair. [RE 316-49, PageID #: 23963].

Should one argue that these minor discrepancies have "impeachment value," they do not. The Exhibit 16 hair was never definitively attributed to Hardin and, therefore, definitive attribution was not a fact in issue. Even if it were, every forensic serologist who testified in this civil case agreed that the conclusions contained in the final lab report come from visual observations under the microscope, not from notes. [(Reid Dep.) RE 316-15, PageID #: 22973; (Howenstine Dep.) RE 316-34, PageID #: 23448, 23475; (Thurman Dep.) RE 316-5, PageID #: 21212-13; (Thomas Dep.) RE 292-44, PageID #: 4496]. In denying Thurman qualified immunity, the District Court did not require Hardin to explain how these minor, semantic differences would have changed the outcome of his trial for Ms. Warford's murder; thus, qualified immunity was denied, despite there being no evidence that Hardin's constitutional rights were violated.

Reversal of the District Court is appropriate upon two independent grounds; first, Hardin came forward with no clearly established precedent to put Thurman on notice that he was required to produce his preliminary notes and, second, the lack of Thurman's notes at his criminal trial caused Hardin no prejudice and, therefore, did not violate his constitutional rights under *Brady*.

### 1.    *The District Court held in error that Hardin had a clearly established right to Thurman's bench notes in 1995.*

In a *de novo* review, this Honorable Court must determine whether Appellant Thurman violated Hardin's clearly established constitutional or statutory rights in

1995 when he produced his hair comparison findings as a final lab report but did not produce the notes he took while generating this report.

Hardin never alleged this issue in his Amended Complaint, only raising it for the first time in his Response to Thurman's Motion for Summary Judgment, and he entirely failed in his burden to rebut Thurman's defense of qualified immunity on this point. [RE 316, PageID #: 20919-20]. While the District Court correctly considered a criminal defendant's right to the state's exculpatory evidence generally, it did not require Hardin to come forward with any case that would have put Thurman on notice of an obligation to produce the notes of his thoughts and impressions.

With Hardin having produced no case law to establish a clear right to Thurman's bench notes, the District Court's entire analysis consisted of one sentence: "'*Brady* violations are, of course, clearly established violations of constitutional rights.'" [RE 390, PageID #: 34374]. Such a broad standard would require every police officer or forensic examiner to retain and produce every scrap of paper upon which his or her thoughts were recorded. Instead, the correct inquiry is whether there was a clearly established right *to the evidence in issue* at the time of the alleged violation such that suppression that specific evidence constituted a *Brady* violation. *Gregory*, 444 F.3d at 745. "If the court finds that the plaintiff's right was not clearly established at the time of the defendant's conduct, the court does not need

to determine whether the alleged conduct was in fact unconstitutional." *Schulkers*, 955 F.3d at 532 (citing *Pearson*, 555 U.S. at 236-43).

As stated in *LeFever v. Ferguson*, 956 F. Supp. 2d 819 (2013), "In evaluating whether a right was 'clearly established' during the relevant time period, "we must determine whether the right has been recognized 'in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)). At best, *Moldowan v. City of Warren* established that a forensic examiner may be subject to suit under § 1983 for "deliberately withholding the existence of exculpatory evidence or fabricating forensic evidence" and that the "legal norm" for such liability was established "at least as early as April or May of 1990." *Moldowan*, 578 F.3d at 397 (citing *Gregory*, 444 F.3d at 744 and *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999)).

The *Moldowan* Court held, "This inquiry . . . must be taken in light of the specific context of the case, not as a broad general proposition." *Moldowan*, 578 F.3d at 375 (citing *Saucier v. Katz*, 533 U.S. 194, 194 (2001)); *see also Abdur-Rahim v. City of Columbus, Ohio*, 825 F. App'x 284, 286 (6th Cir. 2020) (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (in which the Supreme Court held that courts should not define clearly established rights with a high level of generality)). "To be

clearly established, a right must be sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (emphasis provided and internal quotation marks omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "In determining whether a right is clearly established, we 'may rely on decisions of the Supreme Court, decisions of this court and courts within this circuit, and in limited instances, on decisions of other circuits.'" *Moldowan*, 578 F.3d at 381–82 (citing *Spurlock*, 167 F.3d at 1006). "If officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Siggers v. Alex*, Case No. 22-1182, 2023 WL 5986603 (6th Cir. Sept. 12, 2023).

Appellant has been unable to uncover any case law in this Circuit or that of the U.S. Supreme Court supporting the contention that Hardin had a clearly established constitutional or statutory right in 1995 to bench notes containing only Thurman's thoughts and impressions. A handful of cases in this Circuit impose duties upon forensic examiners to not intentionally fabricate evidence and to disclose patently exculpatory evidence, but none go so far as to require the production of an examiner's unfinished notes. *See, e.g., Gregory*, *Moldowan*, *and LeFever*. In each of these cases where qualified immunity was denied, the Plaintiff presented a viable

fabrication of evidence claim or a claim that involved the deliberate suppression of exculpatory factual information or exculpatory physical evidence; none required a state examiner to disclose the process of his or her subjective analysis that was later disclosed through a final report. *See D'Ambrosio v. Marino*, No. 1:11-cv-933, 2012 WL 4504523, *6 (N.D. Ohio Oct. 1, 2012) ("[T]he Sixth Circuit has only denied qualified immunity to non-prosecutors who intentionally fabricated evidence upon which they later testified at trial." (citing *Moldowan, Gregory,* and *Spurlock*, *supra*)).

In his deposition and in the facts as held by the District Court, Thurman acknowledged that there may be inconsistencies between his notes and the report. [RE 390, PageID #: 34375]. Thurman never conceded, and the District Court did not assess, whether the notes in issue contained any facts that were not otherwise disclosed. Instead, the District Court erred by finding that the notes themselves had "impeachment" value, without assessing what factual representation or misrepresentation called for impeachment. [RE 390, PageID #: 34376]. Thurman reported that the hairs were "similar" and "may have" a common origin; his notes do not make either statement more or less true. [RE 316-77, Page ID #: 24961].

As of 1995 and to date, there is no case law that would place forensic examiners on notice that they were constitutionally required to turn over the preliminary documentation of their observations. If this was the law, every first draft

35

of every report, indeed every note or mark, would have to be retained and produced. In Thurman's case, Hardin did not address and, the District Court did not consider, the unrebutted testimony of every forensic examiner who agreed that notes are not the basis of hair comparison; it is instead a visual determination of similarity or dissimilarity reached while looking through a microscope. [(Reid Dep.) RE 316-15, PageID #: 22973; (Howenstine Dep.) RE 316-34, PageID #: 23448, 23475; (Thurman Dep.) RE 316-5, PageID #: 21212-13; (Thomas Dep.) RE 292-44, PageID #: 4496].

Because the District Court erred in applying too broad a legal standard and because Hardin entirely failed to meet his burden to rebut Thurman's qualified immunity defense in his Response, Appellant respectfully requests that this Court reverse the lower court's denial of qualified immunity. *See Schulkers*, 955 F.3d at 532 ("[i]f the court finds that the plaintiff's right was not clearly established at the time of the defendant's conduct, the court does not need to determine whether the alleged conduct was in fact unconstitutional." (citing *Pearson v. Callahan*, 555 U.S. 223, 236-43 (2009)).

**2.** ***Thurman is entitled to qualified immunity as there was no apparent exculpatory value to his notes and thus, no* Brady *violation occurred.***

The second dispositive inquiry under a qualified immunity analysis is whether a constitutional violation under *Brady* occurred. There was no constitutional violation. Thurman acted in good faith and in accordance with KSP policy; there was

no apparent exculpatory value to his preliminary notes; and no prejudice to Hardin occurred as a result of the notes not being produced.

"There are three components of a *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Chinn v. Warden*, 24 F.4th 1096, 1102 (6th Cir. 2022) (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "A deprivation of due process occurs where all three aspects are present." *United States v. White*, 492 F.3d 380, 410 (6th Cir. 2007). The exculpatory or impeaching value of the evidence in question must be readily apparent to law enforcement. *Moldowan*, 578 F.3d at 388. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

Here, the unrebutted testimony of the four serologists deposed in the case established that the bench notes were not exculpatory; the state did not willfully or inadvertently suppressed the bench notes because there was neither a policy for turning the notes over, nor were they requested; and because the notes were not exculpatory, Hardin was not prejudiced at trial in 1995.

### A.    Thurman's notes were not exculpatory or impeaching.

Hardin presented no evidence that Thurman's bench notes would have been favorable to him. Thurman described every characteristic of the two hairs to be identical except that he described the Exhibit 16 hair as "light brown to brown" and having "average to light" pigment, whereas he described the Exhibit 21C hair as "brown" and having "average to slightly heavy" pigment. [(Bench Notes) RE 339-10, PageID #: 30578-79]. These distinctions do not undermine Thurman's reported opinion that the hairs were "similar in color and microscopic characteristics." Thurman did not definitively attribute the hair on Ms. Warford's body to Hardin [RE 316-49, PageID #: 23963], and Hardin has come forward with no testimony from his criminal trial that the appearance of the hair found on Ms. Warford's sweatpants was in issue. In his reports and at Hardin's criminal trial, Thurman contended only that the two hairs "may have a common origin," and he testified that he could not definitively attribute the hair on Ms. Warford's sweatpants to Hardin. *Id.* Thus, even the slight discrepancies in Thurman's notes do not impeach his report or his testimony, nor do these discrepancies exculpate Hardin.

It is important to consider the District Court's findings on the fabrication claim in the context of Hardin's alleged *Brady* violation. On the fabrication claim, the District Court held:

> It must be recognized initially that the DNA testing does not establish
> that Thurman fabricated his conclusions. The DNA results do not

indicate the color or characteristics of the four unknown hairs that
Thurman microscopically observed, nor have the parties so suggested.
Rather, Hardin agrees with Thurman that "even when hairs are
microscopically indistinguishable, they often come from different
people." (Am. Compls. P. 99; Def.'s Mem. 40). Thus, even if Thurman
examined a hair that appeared microscopically similar to Hardin's, non-
corroborating DNA testing would not establish that fabrication
occurred.

[RE 390, PageID #: 34366].

In a finding that would appear to completely nullify any impeachment value

of Thurman's notes, the District Court recognized that there may have been some

minor, inconsistent descriptions between the two hairs at issue, but evidence of

fabrication (and, therefore, true impeachment value) required a visual comparison

of the evidence. [*Id.*, PageID #: 34368]. Again, in the context of its decision on the

fabrication claim in favor of Thurman, the District Court held:

Hardin instead offers testimony from Luanne Thomas ("Thomas"),
Thurman's former supervisor at the Kentucky State Police Lab.
(Thomas Dep. 190:17-194:4, Aug. 5, 2020, DN 316-9). Thomas did not
microscopically examine the unknown hairs, and she reiterated the
same conclusion Thurman arguably conceded: his notes may not have
reflected that Hardin's hair was similar to one of the unknown hairs.
(*See* Thomas Dep. 192:5–193:1). Notably, Thomas acknowledged there
was some subjectivity when examining hairs and that analysts may
have different interpretations of the characteristics of the same hair.
(Thomas Dep. 275:19-278:19; *accord* Reid Dep. 168:16-19); *see
Caminata v. Cnty. Of Wexford*, 664 F. App's 496, 501 (6th Cir. 2016)
(affirming qualified immunity and summary judgment considering the
lack of evidence showing deliberate fabrication of evidence and
because "Plaintiff's expert witness acknowledged that fire investigators
viewing the same body of evidence sometimes reach different
conclusions, and that he found no evidence that [the defendant]
removed evidence from the scene, planted evidence at the scene, or

39

fabricated evidence."). ***Thomas further emphasized that "the
conclusion is made looking at the hairs. You can't really look at the
[notes] sheet and come to a conclusion. You have to be looking at the
hairs." (Thomas Dep. 75:3-6). Thus, although Thomas found
inconsistency between Thurman's notes and his finding of similarity,
she did not dispute Thurman's finding that one of the hairs taken
from the victim's clothing was microscopically similar to Hardin's.
To the contrary, Thomas explicitly stated that disproving Thurman's
conclusion of similarity would require actual comparison of the two
samples.*** Apparently no expert, aside from Reid, has conducted such a
comparison, so that there is no expert proof that Thurman's reported
finding of similarity was false or fabricated.

[*Id.*, PageID #: 34368-9 (emphasis provided)].

Despite having acknowledged that Hardin's only expert testified that
"disproving Thurman's conclusion of similarity would require actual comparison of
the two samples," the District Court also held, "[c]onsidering Thurman's concession
that his observation notes may be inconsistent with his report, Thurman's notes
would have been exculpatory." [*Id.*, PageID #: 34375]. Respectfully, to hold that the
bench notes were exculpatory *Brady* material while at the same time finding no
evidence "that Thurman's conclusions in his report were factually incorrect" was
error. [*Id.*, PageID #: 34368]. It cannot both be true that disproving Thurman's
conclusion of similarity requires actual comparison of the two samples and also that
notes can disprove a conclusion of similarity. [RE 390, *compare* PageID #: 34368
*with* PageID #: 34375]. The District Court further supported its conclusion that the
bench notes were important by relying upon the findings of DNA analysis, which all

parties agree was not available in 1995 and which the District Court and all parties agree had no relevance to the appearance of the hairs. [*Id.*, PageID #: 34377].

Thus, because of the limited exculpatory value of the notes and because there was no evidence that Thurman's final conclusions were incorrect, Hardin failed to meet this prong of the *Brady* analysis.

## B.    Evidence was not suppressed by the state, either willfully or inadvertently.

In the context of the fabrication claim, the District Court's findings establish that Thurman's notes were not "evidence." Because the hair comparison is visual, and Thurman reported "*similar* in color and microscopic characteristics," the notes do not prove or disprove any fact at issue.

As far as any willful or inadvertent "suppression," there has been exactly zero evidence of bad faith on the part of Thurman. It was undisputed that Kentucky State Police policy did not require Thurman to produce his preliminary bench notes. [*Id.*, PageID #: 34375]. It was undisputed that neither Hardin's, nor Clark's, criminal defense counsel requested Thurman's notes, nor made any request to examine the underlying physical evidence. Unlike Ms. Katz in the *Gregory* decision, Thurman fully disclosed the existence of all physical evidence in his possession through his final reports. [RE 316-77, PageID #: 24961]; *Gregory*, 444 F.3d at 744 ("Katz deliberately withheld the existence of [] two nonmatching hairs."). Finally, the District Court granted summary judgment as to all Hardin's claims of fabrication of

41

evidence because there was no evidence that Thurman fabricated any aspect of his reports. [RE 390, PageID #: 34364-73].

*Moldowan, supra.,* is instructive. Plaintiff Moldowan spent nearly twelve years in prison before being acquitted of abduction and sexual assault; he brought claims under § 1983 against various government officials, including Detective Ingles, a police officer who investigated the crime. *Id.* at 963. It later became known that there was a witness who had seen four men – not including Moldowan – standing around a woman lying on the street and heard these men bragging about participating in the assault. *Id.* The witness claimed he reported this information to a police officer, whom he believed to be civil defendant Detective Ingles, but Ingles never reported this account to the prosecutor or defense counsel. *Id.* at 382. Moldowan thus alleged that Detective Ingles wrongfully withheld exculpatory statements from the witness and violated his rights under *Brady v. Maryland. Id.*

In evaluating whether a constitutional violation occurred, the court easily found that the information had exculpatory value because the statement cast serious doubt on the identification of Moldowan as one of the attackers. *Id.*at 382. Det. Ingles argued, however, that Moldowan could not prevail because he could not demonstrate that he had withheld the evidence in bad faith. *Id.* In considering the issue of bad faith, the court placed heavy emphasis on whether the exculpatory value of evidence is apparent to officers; the *Moldowan* court explained:

We acknowledge that a number of courts, including the Supreme Court, have held that ***a showing of bad faith is required to prevail on a claim that the police deprived a defendant of due process by concealing or withholding evidence that is only "potentially useful."*** But, where the police are aware that the evidence in their possession is exculpatory, the Supreme Court's decisions in this area indicate that the police have an *absolute* duty to preserve and disclose that information. ***The critical issue in determining whether bad faith is required thus is*** not whether the evidence is withheld by the prosecutor or the police, but rather ***whether the exculpatory value of the evidence is "apparent" or not.***

*Id.* at 383-84. (emphasis provided). The *Moldowan* court concluded:

> ***[W]here the police are concerned, the "exculpatory value" of the evidence must be "apparent."*** This additional burden, however, merely reflects that materiality is a legal question that the police are not trained to make, and thereby accounts for the practical concern that the ***police cannot be held accountable for failing to divine the materiality of every possible scrap of evidence.*** It does not imply, however, that the police are entirely shielded from liability unless a defendant shows "bad faith." ***Where the exculpatory value of a piece of evidence is "apparent," the police have an unwavering constitutional duty to preserve and ultimately disclose that evidence.*** The failure to fulfill that obligation constitutes a due process violation, regardless of the whether a criminal defendant or § 1983 plaintiff can show that the evidence was destroyed or concealed in "bad faith." The reason no *further* showing of animus or bad faith is required is that, where the police have in their possession evidence that they know or should know "might be expected ***to play a significant role*** in the suspect's defense," the destruction or concealment of that evidence can *never* be done "in good faith and in accord with their normal practice[.]"

*Id.* at 388–89. (emphasis provided; internal citations omitted). The *Moldowan* court thus attempted to strike a balance between the importance of bad faith in denying qualified immunity and the importance of ensuring compliance with *Brady*'s disclosure requirements. The *Moldowan* court arrived at the balance where the

exculpatory value of the evidence is so apparent that it could not be withheld in good faith.

Here, Thurman has the same expertise as all other forensic serologists who testified in this case, all of whom agreed the notes did not matter to the conclusion. [(Reid Dep.) RE 316-15, PageID #: 22973; (Howenstine Dep.) RE 316-34, PageID #: 23448, 23475; (Thurman Dep.) RE 316-5, PageID #: 21212-13; (Thomas Dep.) RE 292-44, PageID #: 4496]. The District Court recognized that the comparison of hairs is visual and, thus, the notes did not prove fabrication or even dissimilarity. [RE 390, PageID #: 34369]. Further, Thurman's notes contain only his thoughts and impressions, which he fully disclosed through his final reports. Importantly, there is no case law to put him on notice that production of his thoughts and impressions was required.

Accordingly, because Thurman turned over the final lab report and had a good faith basis for not turning over his notes, Hardin failed to prove that Thurman's notes were suppressed by the state, either willfully or inadvertently. *See Chinn v. Warden*, 24 F.4th 1096, 1102 (6th Cir. 2022) (exculpatory or impeaching evidence "must have been suppressed by the State, either willfully or inadvertently . . . . ").

## C.    Hardin was not prejudiced in his defense.

Hardin has come forward with no evidence that Thurman's report was incorrect and, therefore, there is no evidence that he suffered prejudice at trial. Even

if he were to emphasize the minor inconsistencies between the notes and the report to their fullest extent, Hardin still would not have established that Thurman's visual conclusions were incorrect. The District Court correctly recognized that Jack Reid concluded Thurman's observations were correct by the only means available, which was to observe the underlying evidence. [RE 390, PageID #: 34368-9].

To ask a jury to assess whether words on a page support a visual conclusion is to ask the jury to speculate without evidence. One cannot discern by words alone whether there is a difference between "light brown to brown" and "brown," or a difference between "average to light" pigment and "average to slightly heavy" pigment. [RE 339-10, PageID #: 30578-79]. There is no expert testimony to support that these words were the basis of the visual conclusion, nor is there any basis in these words for a jury to make such a determination. Any contention of prejudice is speculative. *See Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 801 (6th Cir. 2018) ("[A] jury verdict based on speculation, supposition, or surmise is impermissible."), *Troutman v. Mut. Life Ins. Co. of N.Y.*, 125 F.2d 769, 772 (6th Cir. 1942) ("It is well settled in Kentucky, as in this circuit and elsewhere, that a jury is not permitted to speculate upon its verdict."), *and Chastain v. Ansman*, No. 3:07CV-601-MO, 2012 WL 13000958, at *1 (W.D. Ky. Feb. 3, 2012) ("A jury may not render a verdict based on speculation or guesswork." (citing *Kolb v. Goldring, Inc.*, 694 F.2d 869, 873 (1st Cir. 1982)).

45

## CONCLUSION

Appellant Robert Thurman is not an attorney.  Hardin presented no evidence that he had a clearly established right to Thurman's notes, nor that Thurman acted in bad faith by producing only his final reports.  "If officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Siggers v. Alex*, Case No. 22-1182, 2023 WL 5986603 (6th Cir. Sept. 12, 2023).  All appropriate denials of qualified immunity and all actionable violations of *Brady v. Maryland* require that the civil servant engage in some aspect of willful suppression of exculpatory evidence or, at the least, the inadvertent withholding of evidence with apparent exculpatory value.  Thurman should be granted qualified immunity.  Qualified immunity provides "ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" (*Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th Cir. 2018), citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). Thurman did not knowingly violate the law and, if this was a mistaken judgment, he should be granted ample room to have made it.

Hardin also failed to demonstrate prejudice.  Looking for a moment beyond the fact that he twice confessed to the brutal murder of Ms. Warford, Hardin presented no evidence to the District Court that his criminal conviction would not have occurred if only he had been known that Exhibit 16 was described as "light

brown." Every serologists in this case recognized that the comparison of hairs was visual, and the District Court found this to be fact. The District Court held Hardin presented no expert proof that Thurman's conclusions in his report were factually incorrect. In light of these findings, Hardin can demonstrate no violation of his constitutional rights.

For these reasons, respectfully, the District Court's denial of qualified immunity should be reversed.

Respectfully submitted,


*/s/ Ed Monarch*
Ed Monarch
Peter J. Rosene
MCBRAYER PLLC
500 West Jefferson Street, Suite 2400
Louisville, Kentucky 40202
Phone: (502) 327-5400
Email: EMonarch@McBrayerfirm.com
        PRosene@McBrayerfirm.com

**Counsel for Appellant Robert Thurman**

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 11,439 words excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Local Rule 32(b)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in 14-point Times New Roman.

Date: March 18, 2024                     */s/ Ed Monarch*
                                         Ed Monarch

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document was filed electronically on March 18, 2024, and will be served upon all counsel of record via the Court's ECF system.

                                         */s/ Ed Monarch*
                                         Ed Monarch

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RE | DESCRIPTION | PAGE ID# |
|---|---|---|
| 38 | Hardin Amend. Compl. | 181; 194-95; 202-03 |
| 292-1 | Def. Mem. In Support of Mot. for Summ. J. | 4050; 4053; 4064; 4068-69 |
| 292-5 | Hardin Trial Tr. 3/7/95 | 4140-41 |
| 292-6 | Clark Dep. | 4158 |
| 292-9 | Sketchbook | 4251-84 |
| 292-12 | Greer Grand Jury Testimony | 4290; 4292, 4295; 4297-98 |
| 292-14 | Missing Persons Rep. | 4307-08 |
| 292-15 | Trial Tr. 3/2/1995 | 4319 |
| 292-16 | Mary Warford Dep. | 4342-43; 4345 |
| 292-19 | Police Rep. of Det. James Clark | 4354 |
| 292-20 | Trial Tr. 2/28/95 | 4357; 4361; 4366-67 |
| 292-22 | Postmortem Examination Rep. | 4371-75 |
| 292-25 | Nichols Dep. | 4410 |
| 292-26 | Lab Rep. No. 92-2-1800 | 4413 |
| 292-27 | Clark 2006 Parole Board Hearing | 4414-16 |
| 292-28 | Hardin 2006 Parole Board Hearing | 4418 |
| 292-29 | Hardin 2014 Parole Board Hearing | 4419-24 |
| 292-36 | Affidavit for Search Warrant | 4438-39 |
| 292-40 | Smith Dep. | 4455 |
| 292-42 | Dimick Dep. | 4466-69; 4470; 4473-4; 4477; 4480; 4484 |
| 292-44 | Thomas Dep. | 4489-90; 4493-97 |
| 292-45 | Reid Report | 4498 |
| 292-46 | Discovery | 4501 |
| 316 | Pl. Resp. to Def. Motion for Summ. J. | 20904-05; 20914-20 |
| 316-5 | Thurman Dep. | 21083; 21212-13 |
| 316-15 | Jack Reid Dep. | 22973 |
| 316-16 | 7/13/2015 Hr'g | 23159-66 |
| 316-17 | 7/13/2015 Hr'g | 23168-69 |
| 316-34 | Howenstine Dep. | 23448; 23475 |
| 316-48 | Thurman Trial Tr. 3/2/95 | 23936-57 |

| 316-49 | Thurman Trial Tr. 3/3/95 | 23959-66 |
| 316-50 | Greer Dep. | 24140 |
| 316-59 | Suppression Hr'g Tr. | 24641-24716 |
| 316-68 | Mitotyping Report | 24841-43 |
| 316-74 | KSP Lab Request | 24891-95 |
| 316-77 | Lab Rep. No. 92-2-1424 | 24944; 24958-61 |
| 339-10 | Bench Notes | 30578-79 |
| 390 | Mem. Op. and Order | 34363-76 |
| 394 | Notice of Interlocutory Appeal | |

4872-8685-5587, v. 3