Page 1

COMMONWEALTH OF KENTUCKY
MEADE CIRCUIT COURT
CRIMINAL ACTION NO. 92-CR-043 & 42


COMMONWEALTH OF KENTUCKY                    PLAINTIFF

VS.

JEFFREY DEWAYNE CLARK
AND
GARR KEITH HARDIN                          DEFENDANTS




          Transcript of videotaped testimony of BART

ADAMS and WALLACE ROGERS, recorded on July 10, 2015,

before the Honorable Bruce T. Butler.




          JENNIFER R. JANES, RPR, CRR
     McLendon-Kogut Reporting Service, LLC
          Anchorage Office Park
     2525 Nelson Miller Parkway, Suite 204
       Louisville, Kentucky 40223-3153
              (502) 585-5634
         jjanes@mclendon-kogut.com
           www.mclendon-kogut.com

Page 2

 1                           C O N T E N T S

 2                                                              Page
     Appearances                                                 2

 3

     Testimony of Bart Adams
 4   Direct Examination By Ms. Smith                             3
     Cross-Examination By Mr. Ryan                              48
 5   Cross-Examination By Mr. Williams                          51
     Redirect Examination By Ms. Smith                          64

 6

     Testimony of Wallace Rogers
 7   Direct Examination By Mr. Simon                            67
     Cross-Examination By Mr. Ryan                              87
 8   Notary Certificate                                         96

 9   Exhibits
     Movants' Exhibit 15                                        47
10   Movants' Exhibit 16                                        47
     Movants' Exhibit 17                                        47
11   Movants' Exhibit 18                                        47
     Movants' Exhibit 19                                        83

12

13

14                   *          *          *

15                        APPEARANCES

16   FOR COMMONWEALTH OF KENTUCKY:
     Mr. David Williams
17   Mr. Perry T. Ryan

18

     FOR DEFENDANT JEFFREY DEWAYNE CLARK:
19   Ms. Linda Smith
     Ms. Amy Robinson Staples

20

21   FOR DEFENDANT GARR KEITH HARDIN:
     Mr. Larry Simon
22   Ms. Seema Saifee

23

24

25                   *          *          *

Page 3

1               TESTIMONY OF BART ADAMS

2          (Testimony commenced at Video Counter 12:48:33)

3          THE COURT:  Good afternoon.

4          THE WITNESS:  Good afternoon, Judge.

5          MS. SMITH:  You swear or affirm the testimony

6      you're about to give is the truth, the whole truth,

7      and nothing but the truth?

8          THE WITNESS:  I do.

9          THE COURT:  Have a seat in the witness chair.

10     Make yourself comfortable.  I know you know to speak

11     up so we can make a good record, and we'll start off

12     by you stating your name, please.

13         THE WITNESS:  My full name is James B. Adams,

14     Jr., and I go by the name Bart Adams.

15         THE COURT:  All right.  Thank you.  You may

16     ask.

17              *         *         *         *

18         Bart Adams, called by the Movants, having been

19     first duly sworn, testified as follows:

20                   DIRECT EXAMINATION

21     By Ms. Smith:

22     Q.    Mr. Adams, could you please tell the Court what

23     your occupation is?

24     **A.    I'm an attorney.**

25     Q.    How long have you been an attorney, sir?

Page 4

1     **A.     I graduated from law school in May of 1973,**

2     **graduated -- or graduated May of '73, took the bar**

3     **and passed it in September of '73.  Went to work for**

4     **the public defender's office in March of '74, left**

5     **there in August of '75, and have been in private**

6     **practice ever since.**

7     Q.     So you have been an attorney over --

8     **A.     Forty-two years.**

9     Q.     Thank you for --

10     **A.     Too many.**

11     Q.     -- doing the math for me.

12     **A.     Way too many.**

13     Q.     And at some point in your career, let's say

14     1992, did you begin to represent Jeff Clark in this

15     matter?

16     **A.     I did.**

17     Q.     And at that time, you were -- let's back up.

18     Have you primarily -- would you primarily consider --

19     **A.     I'd say 99.5 percent of my practice was**

20     **criminal.**

21     Q.     Was criminal defense?

22     **A.     Yes.**

23     Q.     Thank you, sir.  And when you started

24     representing Jeff, you know, and up through the end

25     of this, I mean, is this a case that you remember

Page 5

1   clearly, sir?

2   **A.      Very, very clearly.**

3   Q.      And why is that?

4   **A.      I thought it was the most fundamentally unfair**

5   **trial I have ever seen.**

6        MR. WILLIAMS:  I object to that.

7   **A.      And now I feel even more strongly.**

8        THE COURT:  Hang on just a second.

9        MR. WILLIAMS:  I'll object.

10       THE COURT:  Hold on, Mr. Adams.

11       What's your objection?

12       MR. WILLIAMS:  I mean, I don't think it's --

13   the trial can be watched by you, the trial can be

14   watched by third persons and make the determination

15   as to whether or not it's unfair.  I don't think he

16   can -- he's in a position to speak about the

17   unfairness of it.

18       MS. SMITH:  Judge, I would say that he was --

19   first of all, he was the defense attorney in this

20   trial.  He's been a practicing attorney, as you just

21   heard, for 42 years.

22       He claimed -- you know, he's telling the Court

23   that he's been primarily a criminal defense attorney

24   for all of that time.  I think he's more than

25   qualified to be considered an expert attorney at this

Page 6

1   point.

2          I think his opinion is relevant, and the Court,

3   I think, again, can decide what weight to put on his

4   opinion.

5          THE COURT:  Overruled.  I'll let him testify.

6          MR. RYAN:  Your Honor, I'd like to put

7   something else on the record.  If he's going to

8   testify as to any matters that are covered by the

9   attorney/client privilege, his client needs to waive

10  that on the record.

11         THE WITNESS:  Your Honor, I believe the client

12  waived it when he filed 1142.

13         MR. RYAN:  This is a motion for new trial.

14  1142, there is case law that says that it's waived

15  under 1142, but this is slightly different.

16         MS. SMITH:  He waives it, Your Honor.

17         THE COURT:  Raise your right hand.  Do you

18  swear or affirm the testimony you're about to give is

19  the truth, the whole truth, and nothing but the

20  truth?

21         MR. CLARK:  Yes, sir, I do.

22         THE COURT:  State your name, please.  Put your

23  hand down.

24         MR. CLARK:  My name is Jeffrey Dewayne Clark.

25         THE COURT:  And do you waive the

Page 7

1   attorney/client privilege between you and Mr. Adams?

2        MR. CLARK:  Yes, sir, I do.

3        THE COURT:  Okay.  We may proceed.

4   By Ms. Smith:

5   Q.    Getting back to where we were, you felt like

6   this trial was fundamentally unfair.

7   **A.    In the 42 years that I've practiced, I would**

8   **estimate that I have tried between 250 and 300 felony**

9   **cases, maybe 25 to 30 murder cases, 10 to 15 of which**

10  **were capital.  This is the most fundamentally unfair**

11  **trial I have ever participated in, yes.**

12  Q.    You have a lot of strong emotion, it seems, as

13  if this case has haunted you.

14  **A.    I have more facts bothering me than my**

15  **emotions.  What I -- what I observed I could not**

16  **really put my head around.**

17  Q.    So having had time to contemplate what took

18  place, you know, can you give this court an

19  understanding of, you know, what it was like to try

20  to defend someone in a case that involved the

21  allegation of satanism?

22  **A.    Excuse me.  Well, that made it -- that, of**

23  **course, made it very, very difficult because that**

24  **casts a shadow that was almost unable to be overcome**

25  **over all of the proceedings.**

Page 8

1          Back then, you know, back in the '80s and the

2     early '90s, there was this big fad about cult

3     killings and devil worship and all that, and of

4     course that was brought on by the Manson cult thing,

5     and it just carried on over, but I -- in my

6     experience, there were very few really devil worship

7     cases that really came to fruition, at least that I

8     knew of.

9     Q.    And was this one that you believe to have

10    involved satanic or ritualistic killing?

11    **A.    No, absolutely not.  When I found out who the**

12    **expert was for -- for the prosecution, I got all of**

13    **his articles and read them and prepared for**

14    **cross-examination, submitted them to the judge.**

15          There was -- and he testified under oath that

16    no, there was nothing at all that indicated that this

17    was a satanic ritualistic killing.  We moved for

18    mistrial based upon that because that's what they

19    based everything on in their opening argument:  This

20    is what happened.

21          Well, of course that was overruled, but by that

22    time the jury, in my mind, was tainted by the --

23    Q.    Now --

24    **A.    If it had probative value, okay, fine, but you**

25    **still have to look at the prejudicial effect, but in**

Page 9

1    **this case the judge told him, "Kenton, if you don't**

2    **tie this in real tight, you're risking a mistrial or**

3    **a reversal."**

4         Well, he didn't tie it in tight.  As a matter

5    of fact, the expert said there's no way.  So that's

6    my answer.

7    Q.    Now, in terms of the proof that was -- that the

8    state had against Mr. Clark and Mr. Hardin, I'd like

9    to take you through the physical proof, the physical

10   forensic evidence.

11   **A.      Sure.**

12   Q.    There was quite a bit of it in terms of what

13   was taken from the crime scene.  Soil samples.

14   **A.      Exculpatory.**

15   Q.    And so the tests came back on the soil samples?

16   **A.      Right, they did not belong to any of the**

17   **vehicles that Mr. Clark owned or that he had control**

18   **of.**

19   Q.    Did they come back as to his shoes?

20   **A.      Shoes all negative, which, by the way, he**

21   **voluntarily went in on two or three different**

22   **occasions without a lawyer and volunteered completely**

23   **and gave Greer and the investigators everything that**

24   **they wanted.**

25   Q.    How many times was Mr. Clark interviewed, and

Commonwealth v. Clark and Hardin            07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 10

1    were you representing him at that point?

2    **A.      No.  Oh, no.  I believe three.**

3    Q.      Three times?

4    **A.      Now that I'm not positive about.  I believe**

5    **three.**

6    Q.      You're absolutely right.  Do you know whether

7    or not he was given a polygraph examination?

8    **A.      Sheriff Greer told me that he had been given**

9    **one.**

10          MR. RYAN:  Your Honor, I object.  It's hearsay.

11          THE COURT:  Sustained.

12   **A.      Do I know for a fact?  I was not there, no, I**

13   **do not know.**

14   Q.      Now, did you ever receive any tape recorded

15   statements given by Mr. Clark in this case, any

16   transcripts or anything like that?

17   **A.      Oh, no, no, no.  No.  At that time, Handy and**

18   **most of the Louisville Police Department did not**

19   **record taped statements for very specific reasons.**

20          MR. RYAN:  Object on what Handy does.

21          THE COURT:  Hold on just a second.

22   **A.      No, that is within my knowledge.**

23          THE COURT:  What's your objection?

24          MR. RYAN:  I object as to what the Louisville

25   police officers do as a matter of course.  I don't

Page 11

1    think that's really within his knowledge, but --

2    Q.     How long have you been practicing in

3    Louisville, sir?

4    **A.     Since 1973.**

5    Q.     And you --

6         THE COURT:  Overruled.  I'll allow it.

7    Q.     Okay.  So back to the physical evidence.  Do

8    you know whether or not footprints, do you remember

9    whether or not footprints were taken, casts, at the

10   crime scene?

11   **A.     Yes, they attempted to do all the forensic**

12   **things that need to be done at a crime scene, and**

13   **they were all negative as to the two defendants.**

14   Q.     Do you remember whether or not Jeff's shoes,

15   they tested those against the footprints?

16   **A.     Yes, they were.**

17   Q.     Do you remember whether or not the fingernail

18   scrapings from the victim were -- they tried to test

19   those to see if they matched either one of these --

20   **A.     Right, and no match.**

21   Q.     No match.  What about -- let me think.  In

22   the -- in the cars, or with the cars, were fibers

23   looked at?  Do you remember if there were fiber

24   looked at?

25   **A.     I think there was fiber analysis, and nothing**

Page 12

1    came back.  The only thing that came back was the

2    fingerprint that was in on the rear window -- rear

3    left window, I believe, of Jeff's Nova, and of course

4    we established through fingerprint experts that even

5    though Sheriff Greer testified before the grand jury

6    that that was a fresh print, prints cannot be graded

7    as fresh.  You cannot tell when they were there.

8          MR. RYAN:  Your Honor, again, I object.  He

9    can't testify to the science.

10   Q.    Cannot time stamp.

11   A.    That's right, cannot time stamp them.

12         MS. SMITH:  I beg your pardon.

13         THE COURT:  Sustained.

14   Q.    Now, well, let me -- let me ask it this way.

15   The fingerprint analysis that was -- the person who

16   testified as to the fingerprints in the trial, did

17   they testify as to whether or not you can time stamp

18   a fingerprint?

19   A.    Yes, it cannot be done.

20   Q.    Now, did you move for a separate trial?

21   A.    Yes, at one time I did.

22   Q.    And do you -- obviously that was not -- not

23   granted at the time?

24   A.    It was going to be granted, and the more I

25   thought about it, the more I considered it, the

Page 13

1     more --

2          MR. RYAN:  I object that it was going to be

3     granted.  The record will speak for itself.

4          THE COURT:  Sustained.

5     **A.     The answer is we went to a joint trial.**

6     Q.     Okay.  Now, was notice filed as to seeking the

7     death penalty?

8     **A.     It was.**

9     Q.     And what was the aggravator alleged to have

10    been?

11    **A.     The Commonwealth's theory in this case was that**

12    **the murder was for profit in that the people who**

13    **committed it were seeking Satan's favor, and**

14    **therefore they profited.  The judge didn't go for**

15    **that and overruled it.**

16    Q.     Now, searches were conducted of the homes of

17    both the defendants, were they not?

18    **A.     That's correct.**

19    Q.     Was any evidence of satanic anything collected

20    from Jeff Clark's home or mobile home or his car or

21    anything?

22    **A.     Nothing.**

23          MR. RYAN:  Your Honor, the record will reflect

24    what happened there.  I object to him testifying.

25          MS. SMITH:  Well, Your Honor, I'm trying to sum

Page 14

1    up --

2         THE COURT:  Overruled.

3         MS. SMITH:  Thank you.

4    Q.    Let's go back.  So no satanic things found in

5    Jeff's possession at all.

6    **A.    None.**

7    Q.    Do you remember how many -- how many knives

8    were collected?

9    **A.    I don't remember the number of knives, but I do**

10   **know the history of the knives.  His father or**

11   **grandfather collected knives and gave him the**

12   **collection.**

13   Q.    And so were those looked at --

14   **A.    They were seized, yes.**

15   Q.    -- to see if they were murder weapons or

16   anything like that?

17   **A.    They were.  They were examined and determined**

18   **not to be the murder weapon.**

19   Q.    And they were knives that were in his -- under

20   glass, were they not?

21   **A.    That's correct, they were.  Now, Jeff did carry**

22   **a small pocketknife with him almost all the time.**

23   Q.    Okay.  So I would think other people do that as

24   well.

25   **A.    Yes.**

Page 15

1   Q.    Okay.  Oh, tire treads, do you remember if

2   those came back?

3   **A.    Negative.**

4   Q.    Okay.  Blood on any of the clothing of Jeff

5   Clark or Keith Hardin or his car?

6   **A.    Nothing.**

7   Q.    Any confessions made to the police after three

8   interrogations of Jeff?

9   **A.    No confessions, although Handy tried to say**

10  **that somebody -- I'm not -- no, I'm not sure about**

11  **that.  I can't answer that question.**

12  Q.    Okay.  That's all right.  But you didn't have

13  to combat --

14  **A.    No.**

15  Q.    -- a confession.

16  **A.    No.**

17  Q.    And as you said, Jeff cooperated in every way,

18  gave --

19  **A.    Yes, ma'am.**

20  Q.    -- samples, et cetera?

21  **A.    Yes, ma'am.**

22  Q.    Was the rape kit negative as well?

23  **A.    Yes, it was, and of course the medical examiner**

24  **said that didn't mean anything, but it was negative.**

25  Q.    So the one piece of evidence you said was the

Page 16

1    fingerprint in Jeff's car.

2    **A.    Yes.**

3    Q.    Was there testimony to explain how that

4    fingerprint had gotten there?

5    **A.    Yes.**

6    Q.    And that was?

7    **A.    She had been in the car many, many times.  They**

8    **had become friends.  She was dating Mr. Hardin, and**

9    **Jeff used to go pick them both up, and they'd go to**

10   **his -- his trailer, and they would party and drink**

11   **and do whatever, so they were friends.  She had been**

12   **in that car many, many times.**

13   Q.    Now, let's talk about the hair that was said to

14   have been Keith's that was on her sweatpants.

15   **A.    Yes.**

16   Q.    If you remember, was that the basis for the

17   search warrants?

18         MR. RYAN:  Your Honor, I'd like to ask the

19   Court to direct Counsel to characterize the evidence

20   the way the witness characterized it.

21         When you say it was "found," the witness

22   testified that the hair was similar in color and

23   microscopic characteristics.  The Court just heard

24   that, and you're asking -- the form of your question

25   assumes that the Commonwealth introduced the evidence

Page 17

1    as a match, or it was said to be his.

2         That's -- that's in the record.  The record

3    will speak for itself.

4         MS. SMITH:  Your Honor, I think the record

5    shows that there was -- it was called a match.

6    Q.    Do you remember whether or not --

7    **A.    It was called a match, yes, it was.  It was**

8    **called a match.**

9    Q.    It was declared a match by the prosecution in

10   their closing argument?

11   **A.      The expert himself testified exactly as this**

12   **gentleman just said, similar in characteristic, et**

13   **cetera.   That's what he said.**

14        The prosecutor continuously, three or four

15   times in closing argument and during questioning,

16   said it was a match, the exact hair.  He misstated

17   what the evidence was.

18   Q.    Yes, sir.

19   **A.      Not the expert, but the prosecutor.**

20   Q.    Now, your memory is that -- is your memory that

21   the hair was the basis for the search warrants?

22   **A.    It is.**

23   Q.    Now, before Ms. Warford went missing, was there

24   any -- was there any testimony that came in or any

25   kind of indication that Keith and the victim were

Page 18

1    unhappy and had been fighting?

2    **A.      None whatsoever.  In fact, it was elicited that**

3    **they had been getting along very well.**

4    Q.    Was there any kind of domestic violence

5    accusations or any of that?

6    **A.      None.**

7    Q.    Now, the satanic evidence, there were some

8    sketches that were admitted into evidence.

9    **A.      Correct.**

10    Q.    Do you remember those?

11    **A.      Yes.**

12    Q.    Now, what was the relevance of those sketches,

13    sir?

14    **A.      To me, there was no relevance whatsoever.  We**

15    **based our objection on the lack of relevance and the**

16    **prejudicial quality of that, but it was allowed in**

17    **and harped upon ad infinitum, on and on and on, by**

18    **the prosecution.**

19    Q.    Would you have -- would you characterize it as,

20    you know, that the knife evidence and the satanic

21    evidence might have been like propensity evidence?

22    In other words, I mean, you had moved for exclusion

23    of certain evidence under 404(b), did you not?

24    **A.      Yes, I did.**

25    Q.    And was that -- was that motion granted, to

Page 19

1    your memory?

2    **A.      No.**

3    Q.     And did you move to preclude the use of the

4    satanic evidence?

5    **A.      Absolutely.**

6    Q.     The sketches?

7    **A.      As did my cocounsel, yes.**

8    Q.     So the evidence was mainly books that were

9    found in Keith's house?

10   **A.      Uh-huh.**

11   Q.     Sketches?

12   **A.      Uh-huh.**

13   Q.     What else?  What else?

14   **A.      Oh, there was a chalice and the handkerchief**

15   **and, you know, a few other things.**

16   Q.     Okay.

17   **A.      But again, don't forget that their own expert**

18   **had said, both experts said there is no evidence of**

19   **satanic ritualistic killing present in this case, yet**

20   **it was still admitted.**

21   Q.     Now, I'd like to ask you about the proof

22   that -- the proof that Amy Remsberg and Amy Remsberg

23   Padgett, her testimony against Jeff.  What -- if you

24   recall, was there -- did Jeff bring to you a concern

25   about --

Page 20

1    **A.      Yes.**

2    Q.      -- her testimony?

3    **A.      He certainly did, and what he told me was that**

4    **he had caught her, he had come into the house and**

5    **caught her abusing her eight-year-old child.**

6         MR. RYAN:  Your Honor, going (indiscernible).

7    **A.      At that point --**

8         THE COURT:  Hold on just a second.  Stop.  We

9    have an objection.

10        MR. RYAN:  Well, I just think that's

11   outrageous, but --

12        MS. SMITH:  Well, in our motion, Judge, we have

13   the -- you know, she later pled guilty to raping her

14   son.

15        THE COURT:  I'll hear it.  Overruled.

16   **A.      Yes, Jeff came to me with that, and at that**

17   **point, with everything else that was being accused, I**

18   **was afraid of bringing that thing out because, you**

19   **know, he told her parents, but her parents aren't**

20   **going to tell me, well, yeah, he told us that.**

21        I knew she would deny it, and I just thought we

22   would look like desperate fools if we brought that

23   before the jury, so based on my advice, he refrained

24   from talking about that.

25   Q.      Now, obviously that -- there was some bias

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 21

1    there on her part when she testified against Jeff,

2    wouldn't you say?

3    **A.     Yeah, and there was -- there was pretty obvious**

4    **bias from the beginning, but if I had been able to**

5    **get her parents to testify or something, might have**

6    **been a different story, but no, there was clear bias**

7    **for sure.**

8    Q.     Now, I'd like to -- I'd like to ask you to talk

9    to the court about a witness named Vincent Pozzie

10   from the Chevron station?  I'm saying Pozzie.  It

11   could be Posey, P-O-Z-Z-I-E, who had been a gas

12   station attendant.

13   **A.     Yes, and I can tell you I'm not sure how we**

14   **came about that witness.  I hired Jerry Hall, who was**

15   **a retired Jefferson County homicide detective, to**

16   **help me with this case, and I don't know if he -- I**

17   **don't know if Jeff told him about it or Keith did.  I**

18   **don't know exactly how we got on to him, but Jerry**

19   **went out and interviewed him, and that's how he came**

20   **about.**

21   Q.     And the significance of this witness was

22   that --

23   **A.     He saw them -- he saw the two of them, or Jeff,**

24   **buying cigarettes at a time which would have made it**

25   **almost virtually impossible for them to have**

Page 22

1   **kidnapped her, taken her to Meade County, killed her,**

2   **and came back and bought the cigarettes.  That was**

3   **the significance.**

4   Q.    Now, did the police retrieve the --

5        MR. WILLIAMS:  I wasn't really clear about

6   whether he actually talked to the witness that says

7   that or whether he --

8        THE WITNESS:  He testified --

9        MS. SMITH:  I'm sorry?

10        THE WITNESS:  He testified in trial.

11        MS. SMITH:  Oh, did he testify at the trial?

12        THE WITNESS:  Yes.

13   Q.    Now, were the police able to retrieve the

14   surveillance tape from the Chevron?

15   **A.    They were not.  I think in that particular**

16   **case, the surveillance tape was kept seven days or**

17   **three days or something.  Anyway, no.  The answer is**

18   **no.**

19   Q.    Now, there was a witness that was put on by the

20   prosecution by the name of Shawn Mattingly.

21   **A.    Right.**

22   Q.    Do you recall what happened during that, during

23   his testimony?

24   **A.    Yes, I do.  There had been accusations that**

25   **Jeff had referred to his -- his little pocketknife as**

Page 23

1    a sacrificial knife, and I had represented Mattingly

2    about four or five years before in Louisville on a

3    stabbing case, and I didn't put it all together at

4    first, but I got a phone call from him, and Jeff had

5    told me about him.

6         I left a number, he called me back, and he

7    explains to me, "Well, no, some other guy in the

8    place used to refer" --

9         MR. WILLIAMS:  I'll object to that.

10        THE COURT:  What's the objection?

11        MR. WILLIAMS:  Phone calls from somebody who's

12   not here, not a witness, not --

13        THE WITNESS:  He testified.

14        THE COURT:  Sustained.

15   Q.   Okay.

16   A.   I'll just give you the background of how that

17   came about.

18   Q.   Sure.

19   A.   So anyway, we get him in to testify that Jeff

20   never referred to it as a sacrificial knife and

21   several other things that were just -- just crazy.

22        So at any rate, Shawn comes in, and he's

23   telling about it and everything, and, you know, he

24   was hurting the Commonwealth, and so Kenton Smith,

25   the prosecutor, gets up and makes a big deal out of

Page 24

1    the fact, "Oh, you're the one who stabbed the

2    Louisville football player.  Who was your lawyer?"

3    Knowing that it was me.

4         So, you know, I moved for a mistrial based

5    upon, well, first of all, he's attacking my

6    integrity, that's one thing, but he's trying to make

7    it look like it's all conjured up, you know, and but

8    that was a tactic that he used effectively throughout

9    the trial.  Not that particular one, but he used it

10   pretty effectively.

11   Q.    Would Judge Monarch rule that certain evidence

12   couldn't be brought out?

13   **A.    Yes, Judge Monarch would rule in our favor on**

14   **certain things saying it was prejudicial, it**

15   **shouldn't come in, whatever it might be, and Kenton**

16   **would come back out and get right into it, no matter**

17   **what the judge said.**

18        I would object, we'd go back up, the judge

19   would say, "Now, Kenton, you know you shouldn't be

20   doing that."  That's about the way it went, and that

21   is no exaggeration.  You can look at the tape.

22   Q.    I'd like to get into the jailhouse --

23   **A.    Capps and Justis.**

24   Q.    -- incentivized witness.

25   **A.    Yes.**

Page 25

1   Q.    Yes, Clifford Capps?

2   **A.    Right.**

3   Q.    Were you able to impeach him during the trial

4   because --

5   **A.    He was not --**

6   Q.    First of all, what did he testify to, sir?

7   **A.    Well, he testified --**

8   Q.    In summary.

9   **A.    He testified, in a brief summary, that Jeff, my**

10  **client, admitted to him to having committed the**

11  **killing, and one time it was while he was smiling,**

12  **and another time he was very serious, and one time he**

13  **said "We did it," of those two times.**

14      So was I able to completely impeach him?  I did

15  a decent job on him because the fact he was coming up

16  for parole, he was coming up for shock probation, but

17  I didn't know about the Colorado case and him writing

18  the letter to Justis trying to get Justis to commit

19  perjury so that he can get out.

20      MR. RYAN:  Your Honor, this is an issue we've

21  already raised, but first of all, Mr. Capps was

22  subjected to cross-examination during the trial.

23      This has come up during at least one

24  post-conviction relief proceeding.  It's already been

25  reviewed by the appellate courts, and I --

Page 26

1          THE COURT:  Hold on.  Motion for a new trial?

2          THE WITNESS:  It was, Your Honor.

3          MR. RYAN:  Yeah.  This is about the --

4          MS. SMITH:  Directly after the trial, Your

5     Honor.  If --

6          MR. RYAN:  And then beyond that, you can't use

7     somebody else -- somebody's other crimes, other bad

8     acts, to show a propensity to commit perjury.  That's

9     KRA 404, so I object to the admission that Mr. Capps

10    suborned perjury in another case or --

11         THE COURT:  Overruled.  Go ahead.

12         MS. SMITH:  Judge, may I approach the witness?

13         THE COURT:  Yes.

14         MS. SMITH:  Actually, I don't know how we're

15    doing -- am I to give you this one?  I am approaching

16    with a letter that has been marked as Defense Exhibit

17    14, Your Honor.  I'm giving one to you and then

18    let -- it also was included in our motion for a new

19    trial, Judge.

20    Q.   Do you recognize that letter?

21    **A.   I do, and if I may give you the background, I'd**

22    **be pleased to do so.**

23    Q.   Please do.

24    **A.   Shortly after -- a day or two after the**

25    **convictions of these two young men, I received a**

Commonwealth v. Clark and Hardin                07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 27

1    **phone call either from Jeff or from his mother**

2    **indicating that I needed to get down and talk to him**

3    **because there was a letter that had been written by**

4    **Capps to Justis, who was his friend, trying to get**

5    **him to cooperate with Capps because Capps wanted to**

6    **get out of jail immediately, as soon as he could.**

7            There was a shock probation hearing that was

8    coming up, and he knew that if he could testify on

9    behalf of the Commonwealth that he might receive

10   favorable consideration.

11           Now, the significance of this is that it was

12   known, in my opinion.

13   Q.    Yes, sir.

14   **A.    We have three affidavits in the record.**

15   Q.    I'm going to get those to you.  I can do all

16   three if you want to, or one at a time.

17   **A.    However you want to do it.**

18   MR. SIMON:  Just one exhibit or --

19   MS. SMITH:  I labeled them individually.

20   MR. SIMON:  That's fine.

21   MS. SMITH:  So we can do 15, 16, and 17?

22   MR. SIMON:  Yes.

23   MS. SMITH:  Get those to the clerk, Your Honor,

24   and let me give you a copy.

25   Q.    So if you -- if you will, Mr. Adams, you

Page 28

1   received this -- how did you get a copy of the

2   letter, if you remember?

3   **A.      Mr. Justis's mother.**

4   Q.    Mr. Justis's mother?

5   **A.      Yes, that's what I believe, where I believe I**

6   **got it because she kept the original.  She insisted**

7   **on keeping the original.**

8   Q.    I see.  And Mr. Justis's mother gave you a copy

9   of this letter.  Had it been also alleged to have

10  been given in 1992 to Sheriff Greer?

11  **A.      Yes.**

12  Q.    And -- okay.  Let's -- let's back up for a

13  second.

14  **A.      Can I go ahead and do the background on that**

15  **real quick?**

16  Q.    I wish you would.  (Indiscernible).

17  **A.      There was a murder investigation that had some**

18  **age to it that was going on in Colorado.  Two lawyers**

19  **that were representing the defendant and the**

20  **prosecutor -- first of all, the two lawyers became**

21  **aware of the fact that there had been this letter**

22  **written by Capps to Justis eliciting his help in**

23  **concocting a story to convict these people.**

24          As a result, they come to Kentucky, and they

25  investigate.  They come and talk to Justis and to his

Commonwealth v. Clark and Hardin                07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 29

1    mother, and they say, "Yeah, here's the letter.  As a

2    matter of fact, we gave it to Sheriff Greer some

3    months ago, so he's quite aware of it."

4         The lawyers, according to their affidavits,

5    called Sheriff Greer, and Sheriff Greer says, "Yes,

6    Mrs. Justis has a copy of it.  She has the original,

7    I have a copy, I'll get them for you."

8         So he does.  He cooperates with the defense

9    lawyers.  When the trial -- when it goes to trial in

10   Colorado, the prosecutor there is notified about the

11   existence of this letter casting aspersions, of

12   course, and doubt upon the testimony that Capps is

13   about to give in the murder case, as well as Justis.

14        So they decide not to call him whatsoever, the

15   point being that in 1992, these lawyers, sworn

16   members of the bar in Colorado, two defense attorneys

17   and a prosecutor know that Sheriff Greer was aware of

18   this letter.

19        Now, it is exculpatory in nature by any way you

20   look at it.  Greer was aware of it, without any

21   question, and it was never given to us pretrial or

22   during trial.

23        Had I had this, Mr. Capps would have been

24   totally destroyed and nobody would have believed a

25   word about the confession.  I was denied this.  This

Page 30

1    was essential, essential to these two boys' defense.

2            MR. WILLIAMS:  Judge, he has mentioned several

3    people in other states, he's drawn conclusions about

4    what they knew and what they didn't know.  He's

5    ranted and raved about what happened, and, you know,

6    a lot of it is pure hearsay.  It's stuff we have no

7    way of cross-examining the people he's talked about.

8    I mean, it's conjecture to some extent, and, you

9    know --

10           THE COURT:  Are you objecting?

11           MR. WILLIAMS:  Yes, sir.

12           THE COURT:  Overruled.

13   Q.    Your Honor -- or --

14           MS. SMITH:  I'm sorry, Your Honor.

15   Q.    Mr. Adams.

16   **A.    Yes, ma'am.**

17   Q.    Now, the letter from Mr. Capps to Kevin Justis,

18   does it mirror in any way how Capps testified?  I beg

19   your -- I thought I had done that.

20   **A.    I've done it a thousand times.**

21   Q.    Does it mirror how Capps testified, sir?  You

22   know, in that he -- you talked about him jokingly

23   saying it, the second page of that letter.

24   **A.    Oh, yeah, because he --**

25   Q.    I'll draw your attention to the second page --

Page 31

1   **A.      Yeah, I know what you're talking about.**

2   Q.      -- of the handwritten letter.

3   **A.      Yes, and it's on the second page, Judge.  It**

4   **says, (Reading) Remember this, Keith jokingly**

5   **admitted to the murder.  They were -- wait.  They**

6   **were driving a black Nova.  Keith said Jeff wanted to**

7   **jump -- dump the body down there to scare his ex.**

8   So I don't remember him saying about dumping

9   the body to scare his ex, but those are the things

10  that he said during the trial, yes.

11  Q.      The "jokingly" part.

12  **A.      Yes.**

13  Q.      Now, so the main evidence against Jeff and

14  Keith was the fingerprint and the hair.  The bloody

15  cloth, can you explain to the Court how that was

16  included in terms of the satanic paraphernalia or

17  whatever?

18  **A.      Mr. Smith insisted that as part of the satanic**

19  **ritual that Keith was supposedly involved in that he**

20  **would drink blood from this chalice, animal blood, I**

21  **think urine, I mean, it was -- but anyway, and so**

22  **Keith took the stand and said, "No, that's not the**

23  **case at all.  I did -- I was into the satanism until**

24  **about six months ago, but a completely different**

25  **brand.  Didn't have anything to do with human**

Commonwealth v. Clark and Hardin        07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 32

1   **sacrifice, animal sacrifice, anything.**"

2        And so Kenton says, "But this blood right here

3   from this chalice," and "That's where it came from,

4   from animal blood, human blood, whatever it might

5   have been."

6        And Keith had insisted, of course, no.  Well,

7   he used it over and over again in his closing, and

8   his cross-examination.  The innuendo and the contempt

9   that he showed the defendant with by the use of this

10  handkerchief was something to really see.  I mean,

11  really you had to be there to believe it.

12       But at any rate, yes, they used it -- he used

13  it over and over again and at least five or six times

14  in the closing, the point being, of course, that once

15  we were able to have the DNA, that it was, in fact --

16  Keith had said, "Hey, I cut myself on the chalice,

17  and I used that to rub my hand."

18       Well, you know, Keith had said, of course -- I

19  mean Kenton told the jury over and over again that he

20  lied to the cops all the way through, he lied to

21  them, you know, over and over, but at any rate, now

22  that we have DNA testing, we know that, in fact, that

23  blood was, in fact, Keith's, and that it was there.

24  Q.   He was telling the truth.

25  **A.   Yes, he was telling the truth.**

Page 33

1  Q.    Now, I know this is hard to do, but had you

2  been -- had you been able to prove and have DNA

3  testing on the hair on the sweatpants, in your mind

4  was that evidence material in terms of how -- the

5  prosecution's case against Jeff and against Keith?

6  **A.    Without that evidence, there is -- in my**

7  **opinion, there is no conviction.**

8  Q.    Why do you say that, sir?

9  **A.    At all.  I say that because that was the only**

10 **evidence.  You have the hair that was on the**

11 **sweatpants, okay, of similar characteristics, et**

12 **cetera.**

13       Kenton always referred -- not always, that is

14 an overstatement.  50 percent of the time he would

15 say it's the exact same hair, it's the same, it's the

16 same.

17       It wasn't the same.  It didn't belong to him,

18 to either one of the defendants.  Without -- what was

19 the other part of the question?  I'm sorry.

20 Q.    I'm saying how -- you know, why did you feel

21 like without the hair evidence there would not have

22 been a conviction?

23 **A.    The hair evidence is the only connection**

24 **whatsoever, physical evidence that could possibly**

25 **place her with him that night because mother says she**

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 34

1    washed the red pants, and therefore they were totally

2    clean, and it had to be after she picked up those

3    pants and went out that night.

4    Q.    So, in other words, the -- just to back you up

5    a bit, Ms. Warford -- Mrs. Warford.

6    A.    Yes.

7    Q.    She testified what about the red sweatpants?

8    A.    That she had washed them that day, that they

9    were totally clean, that her daughter Rhonda must

10   have taken them before she went back out to Kroger's

11   that night.  She was indicating she was going down

12   there, meaning Kroger's.

13   Q.    I see.  So when the sweatpants had one of

14   Keith's hairs --

15   A.    But it didn't.

16   Q.    Well, I know that, but in terms of what the

17   jury believed, because they were recently washed,

18   that hair could not have gotten on there from an

19   innocent purpose, is that --

20   A.    That was the conclusion that was drawn, yes, in

21   my opinion.

22   Q.    Yes, sir.  So, in other words, you would call

23   that evidence, the hair evidence, material.

24   A.    Absolutely.  Of course.

25   Q.    What would you -- how would you characterize --

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 35

1   **A.    It wasn't just material.  It was crucial to the**
2   **Commonwealth's case.**
3   Q.    How would you characterize the bloody cloth
4   thing with the animal sacrifice, would you say that
5   was important evidence?
6   **A.    As I said at the time to the judge, Kenton**
7   **didn't care what answer he was getting.  He was**
8   **asking the questions for the effect to prejudice the**
9   **jury.**
10          If, in fact, we were able to prove at that time
11   that that handkerchief had Keith's blood on it and
12   not the implied animal sacrifice blood, then it would
13   not have been admissible at all, it could not have
14   been used.  So absolutely it was crucial, critical.
15   Q.    Now, in terms of alternate suspects, do you
16   recall if -- if there were people in Rhonda's, or
17   Ms. Warford's, life that might have wanted -- you
18   know, that might have been likely suspects to have
19   committed the murder?
20   **A.    Well, the most likely one is the one who**
21   **allegedly confessed to having committed the murder**
22   **and told, you know, where he did it, how he picked**
23   **her up at Kroger's, et cetera, a guy by the name of**
24   **James Whitley.  Now --**
25          MR. RYAN:  Your Honor, we're going to get in --

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 36

1    I object to getting into this again.

2         THE COURT:  I'll hear it.

3    **A.    James Whitley was, as this lady had testified**

4    **to before a grand jury here in Meade County, had**

5    **given her a confession and said that he had gotten**

6    **into it with her, and she threatened to call his**

7    **parole officer, let the parole officer know what he**

8    **was doing, and that was the reason for the murder, to**

9    **shut her up.**

10        That's what he told this individual that

11   testified for the grand jury.  Now, why in the

12   world -- I'm sorry.

13   Q.    Let's just be really clear.  Why was there a

14   grand jury called?  Was this before or after these

15   two were charged?

16   **A.    This was after they -- this was after they had**

17   **been charged, and Mr. Smith had said, "I'm going to**

18   **get to the bottom of this."  We had talked about**

19   **this.  He said, "I'm going to get to the bottom of**

20   **this."**

21        Well, getting to the bottom of this to me means

22   finding out what kind of evidence -- you've got head

23   hair evidence?  Then get -- testify before the grand

24   jury, get a grand jury subpoena for Whitley's hair,

25   and compare it.  That was never done.

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 37

1          I have no idea why a grand jury was called if

2     you're not going to follow up on the evidence.  I

3     just can't answer that question, and why you wouldn't

4     get a subpoena to get standards from him is beyond

5     me.

6     Q.    Yes, sir.  Now, were there other people, other

7     men that -- you know, at the time of her

8     disappearance -- let's go back.

9          You said she had gone down to Kroger.  Was

10    there any testimony that she had complained about

11    another person?

12    **A.    Yeah, there was apparently a guy.  She had gone**

13    **to Kroger's earlier in the afternoon, and there was**

14    **testimony that she had come back and complained to**

15    **her mother or her sister or both about this guy**

16    **yelling, "I want to marry you, I want to marry you,"**

17    **and, you know, he was really bugging her, that --**

18    **yes, that happened.**

19         But there was also, and even more critical

20    testimony was from -- from a friend and from her

21    sister that "I can't believe what the things that we

22    do.  We get in cars with men we barely knew.  Boy, we

23    took all kinds of chances.  It was just crazy the

24    things that we did."

25         I mean, that was another thing that was very

Page 38

1   substantial, that she had a habit of getting in cars

2   with strangers.

3   Q.    I see.

4         THE COURT:  Wasn't this all -- hold on just a

5   second.  Wasn't that all presented at trial?

6         MS. SMITH:  Yes.

7         THE WITNESS:  Yes.

8         THE COURT:  What are we talking about that now

9   for?  The jury heard that, didn't they?

10        MS. SMITH:  Yes, sir, they did.

11        THE COURT:  Okay.  That's not new evidence.

12        MS. SMITH:  No, sir, but I think it does go to

13   the weight -- I believe that the alternate suspects

14   that were -- that were probable at that time, that

15   could have been investigated and were not, go to how

16   significant that evidence is now.

17        THE COURT:  Okay.  I understand your

18   argument --

19        MS. SMITH:  Yes, sir.

20        THE COURT:  -- but we all know this.

21        MS. SMITH:  You'd like me to move on?

22        THE COURT:  Yes.

23   Q.    Now, let's talk about, did Jeff and Keith alibi

24   each other for that evening?

25   **A.    Yes, they did.  They were looking for Jeff's**

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 39

 1   pet snake at his trailer, and I think -- I think the

 2   testimony was they left there about 1:00 a.m.

 3   Q.    Did the Commonwealth ever come to you to see if

 4   Jeff would testify against Keith, or did you ever

 5   know of any vice versa going on?

 6   A.    You know, I don't know.  I can't really

 7   remember that, but there was -- there was a

 8   significant thing there, though.

 9         Oh, yes.  We were talking about the alibi.  I

10   think it's important to note, and I think this is

11   newly discovered evidence.  No, actually it's not.

12   I'm going to retract that.

13   Q.    Okay.  All these years have you believed Jeff

14   Clark to be an innocent man who was in prison?

15         MR. RYAN:  I'll object to that.

16         THE COURT:  Sustained.

17   A.    I'll tell you one thing I do know:  It was the

18   most unfair trial I have ever seen.  Whether they're

19   innocent or guilty, I'd say there's one chance in a

20   hundred thousand that they're guilty.

21         MR. RYAN:  I would object to that, ask to be

22   stricken.

23         THE COURT:  Sustained.

24         MS. SMITH:  Now, Your Honor, Mr. Adams has

25   mentioned, you know, the repeated use of the Satan

Page 40

```
 1   evidence.  We've taken some clips out of the trial to
 2   help give the Court an understanding of exactly what
 3   he's talking about.
 4        I'd ask -- (indiscernible) -- okay.  I'm being
 5   asked to play a clip about the hair because Mr. Adams
 6   mentioned or testified that Kenton Smith had called
 7   it a match over and over again, and in closing
 8   argument.
 9        THE COURT:  This is closing argument?
10        MS. SMITH:  Yes, sir.
11        THE COURT:  Okay.
12        MS. SMITH:  A part of it.
13        THE COURT:  All right.  The way I understand
14   the testimony and evidence up to here is, about the
15   hair, is that the expert testified that they were
16   similar, but they were not a match, and you-all are
17   saying that Mr. Smith kept repeatedly referring to it
18   as a match.  Is that -- is that what the testimony
19   is?
20        THE WITNESS:  May I?
21        MS. SMITH:  Yes.
22        THE WITNESS:  May I, Your Honor?
23        THE COURT:  Uh-huh.
24        THE WITNESS:  There are 15 characteristics to
25   look at in a hair.  So he testified, that expert
```

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 41

1    testified, you know, you look at these

2    characteristics, and as a matter of fact, when you're

3    looking at them in two different sides of a

4    microscope, they must look like they're the same hair

5    in order to be identified, so what he testified to

6    was, and all they could do at that time was "similar

7    in characteristics."  Nobody could match them at that

8    time.

9         THE COURT:  I think that's what the testimony

10   was.

11        THE WITNESS:  That's right.

12        THE COURT:  But you-all are saying that

13   Mr. Smith took it a step farther.

14        THE WITNESS:  Oh, yes.

15        THE COURT:  And that's what they're going to

16   show me here?

17        MS. SMITH:  Yes.

18        UNIDENTIFIED SPEAKER:  I think we'll also

19   see --

20        MS. SMITH:  Your Honor, the difference, I

21   think, between what you had initially said and

22   what -- I think it can be easily kind of summed up.

23        The hair examiners, and this is what the FBI

24   has recently kind of admitted and why there's the

25   study that's going on and in terms of hair examiners,

Page 42

1    is hair examiners were saying, you know, it's -- it's

2    that the hairs are similar in, you know, color and

3    characteristic as opposed to saying they match.  They

4    didn't have a scientific basis to say match, but what

5    would happen is --

6            MR. WILLIAMS:   Judge, I don't think she's an

7    expert, can testify about expert --

8            THE COURT:  I think we're talking about what

9    the testimony was.

10           MS. SMITH:  Yes, sir.  So what would -- what

11   would happen is, or what did happen here is the

12   expert said that phrase, and then Kenton Smith took

13   it and said, "So when you say that, that means the

14   hair is a match."

15           THE COURT:  Isn't that what I said?

16           MS. SMITH:  Yeah, I think it is.

17           THE COURT:  What are we arguing about?

18           MS. SMITH:  I don't know.

19           THE COURT:  I think I understand the evidence.

20           MR. WILLIAMS:  Well, she's telling us all kinds

21   of scientific data.

22           THE COURT:  Well, my question was simple.  I

23   think the testimony has been that the expert

24   testified that the hairs were similar in

25   characteristics or quality or whatever, but you-all

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 43

1  are saying that Mr. Smith took it one step further to

2  say they were a match.

3          MS. SMITH:  Yes.

4          UNIDENTIFIED SPEAKER:  I think that the

5  record -- the CD will speak for itself, and both the

6  expert used the term "match," Mr. Smith used the term

7  "match," and Mr. Smith actually used some additional

8  terms that we will --

9          THE COURT:  All right.  Let's hear it.  Now,

10  will this be as an exhibit to the record here?

11          MS. SMITH:  Yes, sir.

12          MR. SIMON:  So it would be 18.  This would

13  be -- this disk would be 18.

14          THE COURT:  None of these others have been

15  admitted into evidence yet.

16          MR. SIMON:  Not yet, correct.  They've been

17  marked and numbered.

18          THE COURT:  We'll take care of that in a

19  minute, I guess then.

20          MS. SMITH:  Yes, sir.

21          THE COURT:  Okay.

22          MS. SMITH:  We can take care of it now, if

23  you'd like.

24          THE COURT:  Let's do it now.  Let's talk about

25  number 14 has been admitted, hasn't it?

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 44

1          MS. SMITH:  Yes, Your Honor.

2          THE COURT:  That's the letter from --

3          MR. SIMON:  Mr. Capps.

4          THE COURT:  -- Mr. Capps.  That's the last

5    exhibit.  Number 15 is an affidavit of Michael

6    Argall; is that right?

7          MS. SMITH:  Yes, sir.

8          THE COURT:  And you're moving to introduce

9    that.

10          MS. SMITH:  Yes, sir, I would.

11          THE COURT:  Any objection to that?

12          UNIDENTIFIED SPEAKER:  Judge, I've got 15 as

13    the affidavit of Natalie Frei.

14          THE COURT:  Maybe I've got them mixed up then.

15          MR. SIMON:  Just for the record, Judge, I'm

16    sitting here, the 15, 16, 17 just referred to as

17    affidavits, so whatever --

18          THE COURT:  They haven't been identified yet.

19          MR. SIMON:  They have not been identified.

20          THE COURT:  Well, I've identified 15 as being

21    Michael A-R-G-A-L-L.

22          UNIDENTIFIED SPEAKER:  (Indiscernible).

23          THE COURT:  Huh?  Oh, you've already got it --

24    okay, we'll do that then, just so we're consistent.

25    Fifteen then is the affidavit of Natalie F-R-E-I.

Page 45

1   Q.     And just so for the identification purposes,

2   Mr. Adams, Natalie Frei or Frei, however you say it,

3   was she one of the defense attorneys?

4   **A.     She was the assistant, yes.**

5   Q.     Okay.  In the Colorado case?

6   **A.     That's correct.**

7          THE COURT:  Okay, so that's 15.  What do you

8   got at 16, Debbie?

9          THE CLERK:  I've got (indiscernible).

10         MS. SMITH:  That's how I'm saying it too.

11  Q.     And, Mr. Adams, just so we're particular,

12  Harvey Palefsky was one of the public defenders?

13  **A.     That's correct.**

14  Q.     In the Colorado case?

15  **A.     That's correct.**

16         THE COURT:  That's 16.

17         UNIDENTIFIED SPEAKER:

18         THE CLERK:  And then 17, Judge, was Michael

19  Argall.

20  Q.     And Mr. Argall, for the record, he was the

21  prosecutor you mentioned.

22  **A.     Prosecutor, yes.**

23         THE COURT:  That's 17.  Okay.  17, 16, 15.

24  Okay, and 18 is going to be the excerpts, what are

25  you going to call this?

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 46

1          MS. SMITH:  Eighteen, we'll call this the hair

2     montage.

3          THE COURT:  References to the hair in evidence?

4          MS. SMITH:  Thank you, sir.

5          THE COURT:  Okay.

6          MS. SMITH:  That's easier to spell.

7          THE COURT:  Reference to hair by the expert and

8     by the prosecutor, right?

9          MS. SMITH:  Yes, sir.

10         THE COURT:  Now, do you-all have -- does the

11    Commonwealth have objections to those being

12    introduced into evidence?

13         MR. RYAN:  I would say, Your Honor, first of

14    all, affidavits stand on their own, but I can't

15    cross-examine an affidavit.  You know, it's very

16    difficult to -- it's subject to interpretation.

17         I would also note that, and I have earlier,

18    that all of this about Clifford Capps and -- has been

19    raised before, appellate courts have reviewed it

20    before, and I'm just going to stand on that.

21         THE COURT:  Well, and again, I think you-all

22    are operating on two different parallel roads here.

23    Most of these things have been reviewed by our

24    supreme court.

25         MR. RYAN:  At least.  And appellate court.

Page 47

1          THE COURT:  But I believe that the movants'

2     theory is that you add it all together, it puts more

3     significance on this hair that looks like DNA is

4     indicated is not a match, and the blood.  Is that

5     what your-all's theory?

6          MS. SMITH:  Yes, sir.

7          THE COURT:  So I understand and overrule your

8     objection, but I understand your objection, and I

9     understand your theory too, and I guess that's my

10    decision to make in the long run.

11         MS. SMITH:  It is, and, Judge, we're trying to

12    sum up a seven-day trial so that the Court has the

13    highlights, essentially.

14         THE COURT:  I understand.  Objection noted,

15    overruled.  Play the CD.

16         (Movants' Exhibits 15, 16, 17, and 18

17    admitted.)

18         (Video played from Video Counter 1:38:28 to

19    1:47:33)

20         MS. SMITH:  I guess that's the end.  I think

21    those are all of my questions for Mr. Adams, Your

22    Honor.

23         THE COURT:  All right.  Thank you.

24    Cross-examination?

25

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

1                        CROSS-EXAMINATION

2      VIDEO COUNTER 1:47:55

3      By Mr. Ryan:

4      Q.    I have a couple questions.  Could you describe

5      what your strategy was in defending -- you defended

6      Mr. Hardin, right?

7      **A.    To use the facts to establish reasonable doubt.**

8      Q.    But what -- what specifically was your

9      strategy?  What evidence did you take, and what did

10     you try to show the jury?  I mean, I realize --

11     **A.    Tried to show the jury that there was**

12     **reasonable doubt that these men were involved, and I**

13     **think that would have been done without the**

14     **prejudicial actions of the prosecutor by ignoring the**

15     **judge's rulings, and also if these other -- if**

16     **science had advanced as far as it is now, there would**

17     **never have been a conviction, and I doubt if there**

18     **would ever have been an arrest.**

19     Q.    So I want to ask you one more time, what was

20     your strategy?

21     **A.    I have answered that question.**

22            MR. RYAN:  Your Honor, typically when we ask

23     that you get an answer of, "Well, I tried to show the

24     hairs did not match either defendant."

25     Q.    I mean, I don't -- I realize it's a broad

Page 49

1  question, but you obviously had a strategy, didn't

2  you?  I mean, can't you elaborate a little bit on --

3  **A.    My job as a defense attorney is to examine the**

4  **evidence, what I know the facts to be, and use those**

5  **facts in an honest and professional manner and try to**

6  **establish reasonable doubt, and again, it would have**

7  **been done effectively if we had not had the**

8  **prejudicial actions of the prosecutor and science had**

9  **advanced enough they would have been able to say that**

10  **was his hair, it's just like his hair, that was not**

11  **his blood, it was animal blood he was drinking out of**

12  **the chalice.**

13      Those two things are so highly prejudicial,

14  almost impossible to overcome, and after Sheriff

15  Greer kept that letter suborning perjury from us, it

16  made it impossible to us effectively representing

17  these men.

18  Q.    And you said you explored the question of -- at

19  trial about the dirty old man.

20  **A.    No, it was brought up.  It was brought up.  Did**

21  **I explore it?  I didn't explore it.  The reason I**

22  **didn't because, to me, it was just an old drunk**

23  **chasing a young lady down the street.**

24      The more effective thing, the more thing that I

25  was more worried about was once the Whitley thing

Page 50

1   came up.  I was more concerned about that.

2   Q.    What use did you make of the fact that the

3   hairs that were on or around or in Rhonda Sue

4   Warford's hair?

5   **A.    On the hand?**

6   Q.    Right.

7   **A.    Is that what you're asking?**

8   Q.    Right.

9   **A.    Well, we tried to establish that there would**

10  **probably be another person that was there that had**

11  **committed the murder, but Sheriff Greer actually got**

12  **up and said, "Those hairs came from my head when I**

13  **was bagging the body."  That's what he actually said**

14  **under oath in court, that's what was his conclusion.**

15      Obviously that was so ridiculous that I thought

16  we won the case right there.  I mean, it was just

17  unbelievable for the man stood up and say that, and

18  now we know that those hairs have been tested, and

19  they don't belong to Greer either.

20  Q.    So the trial has been 20 years ago?

21  **A.    That's right.**

22  Q.    I'm sure you're like the rest of us, that

23  memories fade in 20 years.  If the record shows

24  otherwise on anything you've testified to, would you

25  defer to the record?

Page 51

1  **A.      If something that's black and white and**

2  **recorded, I would certainly defer to that, of course.**

3  **In color in this case.   Excuse me.**

4        MR. WILLIAMS:  I have a few questions.

5        THE COURT:  Sure.

6                    CROSS-EXAMINATION

7  VIDEO COUNTER 1:52:07

8  By Mr. Williams:

9  Q.   One of the first things you talked about,

10 Mr. Adams, you clearly said that this trial --

11       MS. SMITH:  Judge, I object.  I mean, are we

12 going to have two prosecutors?  We represent

13 different people here, that's why there's different

14 people asking questions on this side of the room.

15 I'm not sure I understand why there's two

16 representatives of the Commonwealth ganging up on us

17 here.

18       THE COURT:  There has been no objection up to

19 this point.  They've been doing it all day.

20       MS. SMITH:  They haven't asked simultaneous

21 questions of a witness, Judge.

22       THE COURT:  I'm going to (indiscernible) this

23 witness.  This witness can take care of himself.

24 I'll let them talk to this witness.

25       MS. SMITH:  Yes, sir.

Page 52

1          THE COURT:  Go ahead.

2     By Mr. Williams:

3     Q.    Okay.  You expressed the very definite opinion

4     that this case was the most fundamentally unfair case

5     that you have ever been involved in.

6     **A.    That's correct.**

7     Q.    And you testified, I think, that you have tried

8     in excess of 200 cases.

9     **A.    Easily.**

10    Q.    And that's in all over courts in Kentucky?

11    **A.    Correct.**

12    Q.    And talking about all counties or a lot of

13    counties in Kentucky or --

14    **A.    I have never observed what happened in this**

15    **courtroom, ever.**

16    Q.    And I assume when you talk about that, you're

17    talking about the prosecutor or the judge?

18    **A.    I am talking about a system that I perceived to**

19    **be one washing the other's hands and them covering**

20    **for each other when one of them may have gotten in**

21    **trouble.  That is exactly the system that I observed,**

22    **and I observed it especially when Greer kept that**

23    **letter from us.**

24         When we gave the judge these affidavits from

25    everybody that Greer knew about that letter, he

Page 53

1    refused to give us a new trial or a hearing on it.

2    He summarily overruled that, and it's a very

3    important piece of evidence.  There should have been

4    a hearing on it.  That solidified my belief of what I

5    observed in this courtroom to be correct.

6    Q.    Okay.  And it's particularly Meade County?

7    **A.    In 1995 in Meade County I observed what**

8    **happened in this courtroom, and my statement speaks**

9    **for itself.  The most prejudicial trial I have ever**

10   **seen.**

11   Q.    And that -- you said that the prosecutor was

12   covering for the sheriff, the sheriff was covering

13   for the prosecutor, and the judge was covering for

14   the --

15   **A.    You asked me, sir, my opinion of what went on**

16   **in this courtroom.**

17   Q.    And so that's what --

18   **A.    And I will tell you again that the judge would**

19   **tell Kenton Smith, "Don't do that, Kenton.  You know**

20   **you can't do that."**

21          He'd come right out here and do it again.  We'd

22   go up to the bench, and it was, "Okay, Kenton, now

23   you know" -- and he'd do it over and over again.  It

24   was a repeated scenario throughout the trial.

25          Now, do I think that they did something

Page 54

1    nefarious on purpose?  No.  I think it's an inbred

2    situation when you have this small of a place, and

3    they're all friends, everybody knows each other.

4    They don't want to hurt him.  We don't want to hurt

5    him.  I mean, that's just the way it is, and that's

6    what I saw.

7    Q.     Okay.  So that tape and that record should bear

8    what you're saying, and that tape and that record has

9    been reviewed by the Kentucky Court of Appeals.

10          That tape and that record has been reviewed by

11    the Kentucky Supreme Court, and I assume you -- you

12    determined that those people that sit on the Kentucky

13    Supreme Court are almost maybe as smart as you.

14    **A.     I think they're a hell of a lot smarter than I**

15    **am, and you're not going to lead me down that road.**

16    **What I will tell you is that you know as well as I do**

17    **how that works, and how that works is one or two**

18    **clerks may review a case and look at it, and they'll**

19    **talk with the justices about it.  I don't know that a**

20    **single judge sat and looked at this tape.  I have no**

21    **idea whether or not they did.**

22          I have seen miscarriages of justice throughout

23    my life because we don't know if the thing has been

24    properly reviewed.  What I do know now is that a

25    supreme court that is sitting has said, "Give these

Page 55

1   boys a review.  Let's look at the evidence and review

2   it scientifically, and let's take a look at it."

3          Whoever was there in 1995, in my opinion, did

4   not give these boys a fair look.  That's my opinion.

5   Q.    On the supreme court?

6   **A.    Whoever.  Whoever it was in -- whoever reviewed**

7   **this case, yes.**

8   Q.    Have you read the supreme court opinion?

9   **A.    I've read -- it's been a while, but I haven't**

10  **read -- I haven't read it recently.**

11  Q.    Okay.  They talk about the satanism issue in

12  that opinion, don't they?

13  **A.    I don't remember.  I haven't read it in quite**

14  **some time.**

15  Q.    Well, I think, if you'll read the opinion, I

16  think they talked about the satanism issue, and they

17  stated that the judge did not do anything improper by

18  allowing that evidence in, if my memory is correct on

19  that.  Does that -- does that seem unfair to you?

20  **A.    Absolutely.  I disagree completely with that**

21  **decision, absolutely.**

22  Q.    So Meade County was unfair, and the Supreme

23  Court of Kentucky was also completely unfair.

24  **A.    For entirely different reasons.  For entirely**

25  **different reasons.**

Page 56

1  Q.    But they both were extremely fundamentally

2  unfair.

3  **A.    The trial was extremely fundamentally unfair.**

4  **The reviewing process, I have no idea what happened.**

5  I don't know who looked at it and who didn't look at

6  it.  I have no idea who discussed it.  Those things

7  are not made public, as you well know.

8  Q.    But they didn't come to the same conclusions

9  that you come to.

10 **A.    No, they didn't.**

11 Q.    And so for that reason they're unfair.

12 **A.    I would say they reached the wrong conclusion.**

13 I don't know if they reached it through a fair

14 process, if they were prejudiced in any way.  The

15 conclusion, in my opinion, is not correct.  I can't

16 say it was prejudiced.  I just say it's incorrect.

17 Q.    You also talked about probative value and

18 prejudicial effect.

19 **A.    Right.**

20 Q.    And, you know, we hear that's a very broad

21 language.

22 **A.    Of course it is.**

23 Q.    And, you know, I guess it's broad because it's

24 subject to interpretation by the trial judge, and

25 trial judge, if I remember correctly, trial judges

Page 57

```
 1   are given pretty much a lot of leeway in determining

 2   what is probative value and weighing its prejudicial

 3   effect, and it comes up almost in every trial,

 4   doesn't it?

 5   A.    It's 100 percent in the purview of the trial

 6   court.

 7   Q.    Yeah.  And how many times have you argued that,

 8   "Judge, I know it has probative value, but the

 9   prejudicial effect is so" --

10   A.    Numerous.

11   Q.    -- "outrageous"?

12   A.    Numerous.  Numerous.

13   Q.    You've argued that numerous times.

14   A.    Absolutely, yes.

15   Q.    Okay.  And so there can be differences of

16   opinion on that, can't there?

17   A.    There can certainly be differences of opinion.

18   Q.    It's kind of a judgment call, isn't it?

19   A.    It's the judge's call, right.

20   Q.    It's a judgment call by the sitting circuit

21   judge.

22   A.    Of course it is.

23   Q.    And it's rarely disturbed.

24   A.    Well, it's -- it's -- it's disturbed if there's

25   a gross -- a gross abuse of that discretion.
```

Page 58

1    Q.    But there was -- there was no finding in this

2    case that there was a gross abuse --

3    **A.    There was no finding in this case, but what**

4    **you're forgetting, I think, with this line of**

5    **questioning, if I may say this, there are other**

6    **grounds upon which this motion is being brought, and**

7    **that has to do with whether or not these advances in**

8    **science make this result completely and totally**

9    **unfair, and that's part of what we're talking about.**

10       Now, if you want to pursue me, we can talk

11   about this all day long, and I'll be glad to answer

12   them, and of course it's up to the judge, but there's

13   more to this motion than that.

14   Q.    Okay.  You were allowed to argue, you were

15   allowed to cross-examine every witness that was

16   produced by the Commonwealth; is that correct?

17   **A.    That's correct.**

18   Q.    And you were allowed to produce your own

19   witnesses at this trial --

20   **A.    That's correct.**

21   Q.    -- to disprove what they said or maybe just to

22   prove what your clients were saying were true.

23   **A.    Yes, that's true.**

24   Q.    Your clients testified, didn't they?

25   **A.    Yes, they did.**

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 59

1    Q.    And the jury heard all that.

2    **A.    The jury heard all that, but let me remind you**

3    **while you're saying that is, number one, I was -- I**

4    **was kneecapped by not getting the Capps letter as far**

5    **as cross-examining Capps.**

6         I was not allowed to go into Handy when he had

7    erased -- I had him dead to rights.  He had erased a

8    statement in a trial that had taken two weeks before,

9    and the judge just really cut me off on that, but I

10   had Handy.  I could prove that he was in the habit of

11   lying about these cases, and subsequent events has

12   proven that in Louisville.

13        Louisville has paid out well over $10 million

14   in verdicts because of Handy and the way he

15   misidentified evidence and the way he perjured

16   himself in court.

17        MR. RYAN:  I object to that too, Your Honor.

18        THE COURT:  Overruled.

19   Q.    So you were allowed to question every witness

20   for the Commonwealth, and you were allowed to argue

21   in your closing argument that they had -- that

22   basically they were all liars.

23   **A.    I don't think I characterized it that way.  I**

24   **may have.**

25   Q.    I don't mean say call them liars.  I mean you

Page 60

1  have a nicer way of doing it.

2  **A.     Well, you asked me the question.**

3  Q.     Just like you have a nicer way of calling us

4  liars.

5  **A.     Well, I'm not calling you liars.  I don't even**

6  **know you guys.  I'm talking about what happened in**

7  **'95.  I have nothing against either one of you.**

8  Q.     Was the discovery process unfair?

9  **A.     Absolutely.  We didn't get the discovery.  We**

10  **didn't get the letter.**

11  Q.     Did you complain to the judge about that?

12  **A.     I didn't know about the letter.  I couldn't**

13  **complain about it if I don't know about it.**

14  Q.     Did you complain about --

15  **A.     Only Greer knew about it.**

16  Q.     -- about any other discovery?

17  **A.     No, discovery was okay except for that, that**

18  **I'm aware of.**

19  Q.     Didn't you stand up one time before the jury

20  and say -- or maybe it was Mr. Smith, I can't

21  remember.  I lost part of it.  "We're friends.

22  Mr. Smith and I are friends, and he's very

23  resourceful."

24         Did you state that one time?

25  **A.     I may well have said that, and I may say things**

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

1    in front of a jury about an adversary during a trial

2    just so they don't know how much I really don't like

3    what he's doing.

4    Q.    And that was your strategy here.  You said that

5    because you --

6    A.    If I did that, that's why I did it because I

7    was aware of how we were being danced around the

8    courtroom.  Of course I was aware of that.

9    Q.    Were you allowed to argue in your closing

10   argument that there was possibly a third person out

11   there who was --

12   A.    Oh, I'm sure I was allowed to.

13   Q.    Did you argue that?

14   A.    I'm not sure.

15   Q.    You don't remember whether you argued that or

16   not?

17   A.    I haven't reviewed it.  It's been 20 years ago.

18   I haven't reviewed my closing.

19   Q.    If the record shows that you argued that,

20   you'll defer to the record.

21   A.    I've already said that, yes.

22   Q.    So if you argued that then, that there was

23   possibly a third person out there.

24   A.    Uh-huh.

25   Q.    I guess at another trial you would argue the

Page 62

1    same thing.

2    **A.    Well, except that I would have the benefit of**

3    **the fact that the hair does not match him, the blood**

4    **is his, you know, so that's a big, big thing.**

5    Q.    A jury heard that.

6    **A.    Jury didn't hear that.**

7    Q.    A jury heard your arguments about the fact

8    that --

9    **A.    I now would have proof positive in my hand, not**

10   **speculation.**

11   Q.    Have you heard that Mr. Hardin has admitted

12   this to the parole board?

13   **A.    I have been told that.**

14   Q.    I'm sorry?

15   **A.    I have been told that.**

16   Q.    Have you read his statement?

17   **A.    I have not.**

18   Q.    Would you like to read his statement?

19   **A.    If you want me to I'll be glad to.**

20        MS. SMITH:  Judge, I'm going to object as to

21   the relevancy.  Obviously Mr. Adams hasn't read it.

22   Mr. Adams didn't represent Mr. Hardin, he represented

23   Mr. Clark.  I don't think it's relevant.  Again,

24   the -- the burden that we have, Judge, is that --

25        MR. SIMON:  Excuse me just a moment.  May we

Page 63

1    have a moment?

2          THE COURT:  Yes.

3          MS. SMITH:  I was getting all wound up.

4          MR. SIMON:  I know.  Me too.

5          (Off-the-record discussion.)

6          MS. SMITH:  Withdraw my objection.

7          THE COURT:  Okay.

8          UNIDENTIFIED SPEAKER:  We actually have an

9    audio, if you would like to play it.

10          MR. WILLIAMS:  Can we take a break just a

11   minute?

12          THE COURT:  Let's take about a 10 minute break.

13   It's 10 after 2:00.  I think we all need a break.

14          (Recess from Video Counter 2:04:33 to 2:14:54)

15          THE COURT:  Court will come to order.

16          THE BAILIFF:  Court come to order.

17          THE COURT:  I believe all the parties, or the

18   defendants and the Commonwealth are here and counsel.

19   We were contemplating, Mr. Williams was thinking

20   about doing something with the parole board

21   transcript.

22          MR. WILLIAMS:  Well, I was thinking about

23   asking about him -- well, I did ask him about if he

24   had heard the testimony of Mr. Hardin before the

25   parole board where Mr. Hardin confessed that he was

Page 64

1   involved in this murder and that also Mr. Clark was

2   involved, and I was going to show him the statement

3   because that statement has been transcribed, and I

4   think I'm going to wait and do that on another

5   witness.

6           THE COURT:  All right.

7           MR. WILLIAMS:  So I don't think I want to ask

8   him about that.

9           THE COURT:  Do you have any other questions of

10  Mr. Adams?

11          MR. WILLIAMS:  I don't think I do.  He's

12  expressed himself very well.

13          THE COURT:  Mr. -- or Ms. Smith?

14          MS. SMITH:  Yes, sir, yes, sir.

15          THE COURT:  Ms. Smith, any redirect?

16          MS. SMITH:  I just have a couple of questions,

17  Your Honor.

18                  REDIRECT EXAMINATION

19  VIDEO COUNTER 2:15:56

20  By Ms. Smith:

21  Q.    Obviously, Mr. Adams, you did not rewatch the

22  transcript of this entire proceeding --

23  **A.    Oh, no.**

24  Q.      -- in preparation for today.

25  **A.    No.**

Page 65

1    Q.    Would it surprise you if I said you had called

2    18 witnesses in defense?

3    **A.    No, wouldn't surprise me.**

4    Q.    You know --

5    **A.    I mean, I don't know.  I really don't know.  I**

6    **mean, I --**

7    Q.    I'm just saying --

8    **A.    I've tried to wipe it out of my mind.**

9    Q.    -- the question -- there had been some question

10   as to whether or not you had defended the case.

11   **A.    I don't think he meant it that way.**

12   Q.    That's the way I took it.

13        Now, as far as the supreme court opinion,

14   Judge -- Judge -- Mr. Adams?

15   **A.    Yes.**

16   Q.    You know what, nevermind.  I was just going to

17   point out that there was a dissent by Justice Stumbo,

18   so you could have looked at that if you wanted to,

19   but I think we're good.

20        Was there anything that you wish that you could

21   have done at that time --

22   **A.    I'm sure there's a thousand things I wish I**

23   **would have done, you know?  I -- I personally feel**

24   **responsible that they're in, but there was not -- I**

25   **was steamrolled.  There was nothing we could do.  I**

Page 66

1    **mean, we were had from the beginning, and that was**

2    **it.**

3          THE WITNESS:  And I'm sorry, guys.  I've -- I

4    am.

5          MS. SMITH:  Nothing else, Your Honor.

6          THE COURT:  Any recross?

7          MR. WILLIAMS:  No, sir.

8          THE COURT:  May this witness be excused?

9          MR. WILLIAMS:  Yes, sir.

10          THE COURT:  Thank you for your testimony,

11    Mr. Adams.

12          MS. SMITH:  Thank you, Judge.

13          THE COURT:  You may call your next witness.

14          MR. SIMON:  Call Wallace Rogers.

15          THE COURT:  Okay.

16          THE BAILIFF:  (Indiscernible).

17                    *              *              *

18

19

20

21

22

23

24

25

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 67

1                    TESTIMONY OF WALLACE ROGERS

2          THE COURT:  Good afternoon.  How are you doing

3     today?

4          THE WITNESS:  Afternoon, Judge.

5          THE COURT:  You swear of affirm the testimony

6     you're about to give is the truth, the whole truth,

7     and nothing but the truth?

8          THE WITNESS:  I do, Judge.

9          THE COURT:  Have a seat in the witness chair,

10    sir, and be sure, as you know, to speak up so we can

11    hear you and make a record, and let's start off by

12    you stating your name and spelling your last name.

13         THE WITNESS:  My name is Wallace Rogers.  Last

14    name is spelled R-O-G-E-R-S.

15         THE COURT:  Thank you.

16         You may ask.

17                    DIRECT EXAMINATION

18    By Mr. Simon:

19    VIDEO COUNTER 2:18:57

20    Q.    Good afternoon, Mr. Rogers.

21         THE COURT:  Oh, one thing before we get

22    started.

23         MR. SIMON:  Go ahead.

24         THE COURT:  About this objection you had on the

25    last witness.  The point is well taken about the two

Page 68

1   lawyers double-timing.  Normally only one lawyer can

2   examine or cross-examine each witness, so I'll

3   enforce that rule, but either one of you can do it,

4   but only one at a time.

5        MS. SMITH:  Yes, sir.  Thank you.

6        THE COURT:  I'll sustain that.

7        MS. SMITH:  Thank you, sir.

8   Q.   Mr. Rogers, you're a licensed attorney in

9   Kentucky?

10  **A.   That is correct.**

11  Q.   And how long have you been licensed to practice

12  law in the Commonwealth?

13  **A.   Over 30 years.**

14  Q.   And can you tell us, where did you graduate law

15  school?

16  **A.   U of L.**

17  Q.   And briefly can you advise the Court and inform

18  the Court what -- what types of legal experience have

19  you had, what type of law you practiced and when?

20  **A.   When I graduated law school, I went to work for**

21  **the Commonwealth Attorney's Office in Jefferson**

22  **County under Ernie Jasmin, who was the county**

23  **attorney at that time and commonwealth attorney.**

24       I spent several years in the office there

25  prosecuting, then went out to do work as a criminal

Page 69

1  defense.  I do a variety of work, including personal

2  injury, domestic type situations.  What type of work

3  I do on a given day just depends on what type of

4  cases I'm in court on.

5  Q.      And you practice in courts besides Jefferson

6  County?

7  **A.      Oh, all over the state.  I've gone as far as**

8  **Pikeville down to Paducah, all the surrounding**

9  **counties around Jefferson and down this area quite a**

10 **bit.**

11 Q.      How many years were you an assistant

12 commonwealth's attorney?

13 **A.      Four or five, I think.**

14 Q.      And prior to attending law school and obtaining

15 a JD, what other experiences, work experience do you

16 have pertinent to the type of work that you're doing

17 now?

18 **A.      I actually graduated from University of**

19 **Kentucky, went to work for the United States Treasury**

20 **Department, worked in several states with the U.S.**

21 **Treasury Department.**

22         Worked with the Florida Department of Law

23 Enforcement as a special agent.  Spent about five

24 years down there chasing Cubans around buying

25 cocaine.  That's what you do in Florida.

Page 70

1           I came back.  I worked for the Kentucky State

2      Police as a civilian investigator in white collar

3      crimes in the special investigations unit while I

4      went to U of L law school at night.

5      Q.    And so the time period that you were on staff

6      with Kentucky State Police, can you estimate that

7      time period?

8      **A.    That was four years.  That was basically when I**

9      **was in law school, a little over four years.**

10     Q.    Thank you.  You represented Mr. Hardin at the

11     trial level of this case back in 1995, was it?

12     **A.    That is correct, sir.**

13     Q.    And were you retained?

14     **A.    That is correct.**

15     Q.    And do you know at what stage of the

16     proceedings you began representing Mr. Hardin?

17     **A.    I was pretty much in it from the very**

18     **beginning.**

19     Q.    Now, there's been evidence in just the record

20     of the case and also the testimony at this hearing

21     that Mr. Hardin was cooperative with the law

22     enforcement officers that were investigating this

23     homicide.  Was that consistent with your memory?

24     **A.    I believe that would be an accurate statement,**

25     **yes.**

Page 71

1          MR. RYAN:  Excuse me, I do think we need to get

2     on the record a waiver of the attorney/client

3     privilege again.  I don't know, you may have been

4     intending to cover that, but --

5          THE COURT:  Good point.  Will your client

6     waive --

7          MR. SIMON:  Yes.

8          THE COURT:  Would you raise your right hand?

9     Do you swear or affirm the statement you're about to

10    make is the truth, the whole truth, and nothing but

11    the truth?

12         MR. HARDIN:  Yes, sir, Your Honor.

13         THE COURT:  You want to ask him the appropriate

14    questions?

15         MR. SIMON:  Very good.  Mr. Hardin, the Court

16    is requesting that you get on the record, you haven't

17    done already, do you waive any attorney/client

18    privilege that you might have with Mr. Rogers as it

19    pertains to this proceeding?  You're waving, in other

20    words you say it's okay for Mr. Rogers to talk about

21    that?

22         MR. HARDIN:  Yes.

23         THE COURT:  You have to say yes or no.

24         MR. HARDIN:  Yes.

25         THE COURT:  Okay.  Thank you.

Page 72

1          You may proceed.

2     By Mr. Simon:

3     Q.     So let me go back.  I think the question was at

4     what point in the investigation phase or the

5     prosecution phase, if you remember, were you retained

6     and you came on board representing Mr. Hardin?

7     **A.     Pretty much from the very beginning.**

8     Q.     All right.  Had he been charged at that time?

9     **A.     I do not believe he had been charged at that**

10    **time when I first met with him.**

11    Q.     When Mr. Hardin, as indicated in the record, if

12    Mr. Hardin had spoken to police officers and

13    detectives in the case, particularly with the

14    Louisville Police Department, do you know whether you

15    were representing him at that time?

16    **A.     I think that he may have spoke to some of the**

17    **detectives prior to the time I represented him.  I**

18    **think that he spoke to some even after I was**

19    **representing him.**

20    Q.     Do you know whether or not he spoke with any

21    detectives of the Louisville Police Department while

22    in your company?  Do you have any memory of that?

23    **A.     Not specifically, I do not, but if I would have**

24    **been representing him, I would have been present at**

25    **any interviews after I was retained.**

Page 73

1  Q.     And if that was the case, that would -- you

2  would expect that to be documented in Louisville

3  Police Department investigative reports?

4  **A.     I can't speak to that.  I've read some of the**

5  **reports.  I don't know.  That's their records.  I**

6  **don't know whether they would have written that down**

7  **or not.**

8  Q.     Now, Mr. Rogers, really for your benefit and

9  the Court, Mr. Adams was here just right before you

10 and testified, and I don't want to be totally

11 cumulative, but you did have a different client,

12 although you were counsel at that trial, so let me

13 ask you some of those questions.

14       I may not go into a lot of the details, but

15 in -- you have a memory of defending Mr. Hardin in

16 this courtroom that many years ago?

17 **A.     I do.**

18 Q.     And at the time this case was tried to the

19 jury, what did you consider the most significant

20 pieces of evidence that the -- that the government

21 had in making a case against your client?

22 **A.     Well, the case was basically circumstantial.**

23 **They had no blood, no DNA, no video.  The primary**

24 **proof that they put in for any kind of motive was**

25 **that my client was a, quote/unquote, devil worshiper**

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 74

1     **or engaged in satanic religious activities.**

2     Q.    Now, you had mentioned some physical evidence.

3     Do you have a memory of any hair evidence that was

4     examined by state police exam?

5     **A.    Yes, I do.**

6     Q.    Okay.  And what's your memory of that evidence?

7     **A.    There was a hair that was in the victim's hand.**

8     **Her hand apparently was clenched, and there was a**

9     **hair that had been in her hand.  By, I guess,**

10    **microscopic analysis, it was gray.**

11         I specifically remember Kenton Smith saying,

12    "That gray hair may have come from my good old friend

13    Joe Greer," and pointed to the sheriff when we were

14    in closing arguments in trial.

15    Q.    Do you have a memory of testimony being

16    elicited from a microscopic hair analyst with the

17    Kentucky State Police Laboratory saying that one of

18    those hairs that was collected from that item of

19    clothing of the victim was similar in microscopic

20    characteristics that were exam -- similar in

21    microscopic characteristics to your client,

22    Mr. Hardin, during the trial?

23    **A.    I do recollect some information to that effect,**

24    **but I'm sure, as most of the people know, just**

25    **recently there has come out evidence that this**

Commonwealth v. Clark and Hardin     07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 75

1     **microscopic analysis done by the FBI has been greatly**

2     **flawed over the years.**

3           I just looked up an article because I've got

4     another murder case now where that may come up, and

5     that in most of the cases that the FBI did the

6     analysis on, they had misanalyzed the evidence in

7     favor of the prosecution as opposed to the

8     defendants, and now they're going back and trying to

9     do mitochondrial DNA to try to get that straightened

10     out, just a recent study just came out within the

11     past few weeks.

12     Q.     Looking at another item of evidence that was

13     utilized by the government in this case, do you

14     remember the significance of a chalice that was in

15     Mr. Hardin's possession, as well as either a

16     handkerchief or some cloth that had traces of blood

17     on it?

18     **A.     Yes, the -- the claim was that that may have**

19     **been the victim's blood on that, but there was no**

20     **scientific analysis to verify that.**

21     Q.     Let me go back and see if I can refresh your

22     memory.  There was -- you talked about satanic

23     rituals and evidence to that effect, and I'm going to

24     ask you some further questions about that.

25           Out of the two defendants, who is the person,

Commonwealth v. Clark and Hardin                07/10/2015    Testimony of Bart Adams and Wallace Rogers

1    according to the government's case, was the person

2    that was practicing this type of --

3    **A.      It would be my client, Keith Hardin.**

4    Q.    Okay.  And that was, what, buttressed in the

5    case by items that were recovered during a search?

6    **A.      That is correct.  I think in the bottom of his**

7    **closet he had a box of books, one of which was like**

8    **the Satanic Bible or called the "Book of Shadows" or**

9    **something like this.  They were found, as I**

10   **recollect, in a box in the bottom of his closet.**

11   Q.    Do you have a specific recollection of the

12   cross-examination that was put to Mr. Hardin by the

13   Commonwealth attorney in the case regarding the books

14   and other items that were recovered?

15   **A.      My recollection is that Keith said at one time**

16   **he was interested in just seeing what that was about,**

17   **and this sort of thing.  Did not, in fact, practice**

18   **any type of religious activities in that, and had**

19   **just thrown the books in the bottom of the closet in**

20   **that book -- in that box where they were found in the**

21   **search warrant.**

22   Q.    Now, in the -- let me ask you this:  Do you

23   have a memory of the argument made by the

24   Commonwealth in the trial against Mr. Hardin about

25   the significance of the chalice and the blood that

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

1   was recovered on some cloth associated with that, you

2   know, with that cup or chalice?

3   **A.     As I recollect, there was some question whether**

4   **it was animal blood or not at one point in time, as**

5   **opposed to human blood.  The initial inference was it**

6   **may have been associated with the victim, but that**

7   **was not proven, so then there was an allegation that**

8   **it might have been --**

9        (Cell phone rang.)

10       THE BAILIFF:  Turn cell phones off.

11  **A.     That it might have been an animal blood.**

12  Q.     Okay.  And do you remember a statement

13  attributed to Mr. Hardin by Detective Handy during

14  the trial, an oral statement --

15       (Cell phone rang.)

16       THE BAILIFF:  Take the phone outside.

17       UNIDENTIFIED SPEAKER:  It's off.

18       THE COURT:  Okay.  Start your question again,

19  please.

20       MR. SIMON:  Thank you.

21  Q.     Do you remember a statement or testimony of

22  Detective Handy, excuse me, Detective Handy in the

23  case attributing performance of animal sacrifices by

24  Mr. Hardin?

25  **A.     Yes.**

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

1    Q.    Okay.  And that was a statement attributed to

2    Mr. Hardin by that Louisville police detective?

3    **A.    Yeah, Mark Handy.**

4    Q.    Okay.  And what, do you have any further memory

5    of what the significance of the animal sacrifice was

6    to the Commonwealth's theory in this case?

7    **A.    Well, as I recollect the testimony, that**

8    **allegedly Keith had made a statement to Detective**

9    **Handy that he did, in fact, participate in**

10   **sacrificing animals and had thought about or**

11   **considered moving on to human sacrifice or something**

12   **to that effect.**

13   Q.    And did your client testify in his own defense

14   at this trial?

15   **A.    Yes.**

16   Q.    Okay.  What was your client's testimony in

17   regard to that allegation or the attributing that

18   statement to him by this detective?

19   **A.    He denied making that statement to Detective**

20   **Handy.**

21   Q.    I'm going to follow up on the satanic

22   references and the rituals and so forth in a moment,

23   but let me hit a couple other points first.

24         Do you remember an individual witness named

25   Capps being called to testify?

Page 79

1   **A.      Oh, yeah.**

2   Q.     All right.  What was the significance of Mr.

3   Capps's testimony?

4   **A.      Well, supposedly there was like some jailhouse**

5   **statements that had been made to Mr. Capps by the**

6   **defendant.**

7   Q.     Okay.

8          THE COURT:  By Mr. Hardin or Mr. Clark?

9          THE WITNESS:  Judge, I believe they were

10  allegedly made by Mr. Hardin.

11         THE COURT:  Okay.  Thank you.

12  Q.     And so Mr. Capps testified at trial?

13  **A.      He did.**

14  Q.     Okay.  And subsequent to his testifying at

15  trial, were you made -- did certain facts come to

16  your attention of a letter that he had written?

17  **A.      Yes.  Apparently there was some correspondence**

18  **that he had written that was in conflict with the**

19  **statements he had made to the police and the**

20  **testimony he gave at trial.**

21  Q.     And do you -- did you participate in the motion

22  for a new trial presented to the trial court, based

23  upon that disclosure?

24  **A.      I did not.  No, not directly, no.**

25  Q.     Okay.  So, in other words, you were not counsel

Page 80

1  of record for Mr. Hardin?

2  **A.    No, not counsel of record.  I know that I was**

3  **asked some questions about it and talked to the**

4  **people, but I did not directly participate in that,**

5  **no.**

6  Q.    Very good.

7      What -- can you give an estimate as to the

8  number of times there were references to your

9  client's satanic ritual activity, for lack of a

10  better term, during the trial in this case?

11  **A.    I could not give you an accurate number.  I**

12  **know that it was many.**

13  Q.    Okay.  And did you hear mention of that type of

14  topic tied to your client at what stages of the

15  trial?

16  **A.    Well, obviously before the trial started, we**

17  **were aware that they were going to try to use that as**

18  **a potential motive for him allegedly committing the**

19  **homicide.**

20  Q.    So you dealt with it in pretrial motions?

21  **A.    Yeah, we did, and even at trial, that there was**

22  **not sufficient foundation laid of the nature of the**

23  **crime, that it was a satanic ritual killing, that**

24  **that should even be an issue that should be placed**

25  **before the jury.**

Page 81

1   Q.    However, ultimately there was testimony that

2   was introduced.

3   **A.    That is correct.**

4   Q.    Okay.  And do you have -- do you have a present

5   memory of the specifics of that testimony?

6   **A.    I do not have a recollection of any specifics**

7   **of the -- of the testimony.  I know that there were**

8   **several instances in which references were made about**

9   **Mr. Hardin being a, quote/unquote, devil worshiper.**

10  Q.    What we've been able to do is put together a

11  group of portions of the trial in which had mentioned

12  this -- this evidence or that assertion by the

13  Commonwealth.

14       MR. SIMON:  If the Court would please, we'd

15  like to show that to the witness, see if it refreshes

16  his memory as to observing that at the trial as

17  counsel.

18       THE COURT:  Yes.

19       MR. SIMON:  Thank you very much.

20       THE WITNESS:  And, Judge, I was furnished a

21  copy of some of the information for trial by the

22  defense counsel.  I did not view that disk because I

23  did not just want to view portions of it so the

24  prosecution could not say I only reviewed portions of

25  it, so I decided not to review any of it at all, so I

Page 82

1    have not seen any of these presentations up to this

2    point in time, just to be fair to the prosecution.  I

3    didn't review statements or portions of it at all.

4         THE COURT:  This is going to be -- what are we

5    going to be seeing or hearing here?

6         MR. SIMON:  Yes.

7         THE COURT:  What is it?

8         MR. SIMON:  This is similar to the -- this is

9    like a montage --

10         THE COURT:  Okay.

11         MR. SIMON:  -- of references to --

12         THE COURT:  At trial?

13         MR. SIMON:  At trial.

14         THE COURT:  Okay.

15         Is this recorded into the record?

16         THE CLERK:  Judge, the audio is, yes.

17         THE COURT:  Directly in or just what the

18    speakers pick up?

19         THE CLERK:  (Indiscernible).

20         (Video played from Video Counter 2:36:52 to

21    3:33:22.)

22         MR. SIMON:  That disk would be Movants' Exhibit

23    19.

24         THE COURT:  Any objection?

25         MR. RYAN:  No.

Page 83

1      THE COURT:  Be admitted without objection,

2   Exhibit Number -- Movants Number 19.

3      (Movants' Exhibit 19 admitted.)

4   Q.    Mr. Rogers, while we're breaking that down, let

5   me ask you a few questions.  What you saw on the --

6   on that video, that montage, is that accurate, to the

7   best of your memory, of an accurate record of the

8   proceedings both in chambers, pretrial motions,

9   discussions, as well as the record in the case?

10  **A.    Yes, sir, it is.**

11  Q.    In looking at the -- the items that we broke

12  down and highlighted in this montage as it pertained

13  to satanic rituals, occult information, both from the

14  testimony of purported expert witness of the

15  Commonwealth, in the statements, the direct and

16  cross-examination of Mr. Hardin and Mr. Clark,

17  what -- what in your opinion are the -- were the most

18  significant items of evidence that contributed to

19  this guilty verdict?

20  **A.    Well, in one instance, you know, Kenton Smith,**

21  **the prosecutor, says he's not going to claim this is**

22  **a ritualistic type killing.  I don't think he can do**

23  **that because obviously the nature of the killing does**

24  **not indicate that even by his own witness, but then**

25  **he says, "But I want to use this to show that this**

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 84

1   **killing would advance them in the satanic religion."**
2   **He's saying the same thing that he says he's not**
3   **going to say, just in another way.**
4       Anytime -- I mean, you know, this is not
5   anybody's first rodeo here.  Anytime something comes
6   up in a case like that, particularly a case like this
7   where there's purely circumstantial evidence, a
8   defense attorney has a more egregious job.
9       I've got to convince the jury that my guy is
10  not a satanist, and I've got to get them to try to
11  look at the evidence to show there's reasonable doubt
12  whether or not he committed this crime.
13      The problem that you deal with is that the more
14  I try to show the jury he's not a satanist, the more
15  I have to bring it up in front of the jury, which
16  distracts them from looking at the evidence, which
17  there was simply no evidence.  It was all
18  circumstantial.
19      There was really no hard evidence of any kind.
20  They never even found the murder weapon.  We don't
21  even know what she was killed with.  Don't know when
22  she was killed.
23      So that is the problem when that type of
24  information is brought up in that manner, and, you
25  know, the bottom line is that the expert witness they

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

1    got, this guy is a shade tree mechanic.

2        I noticed they did not call Dr. Ron Holmes from

3    University of Louisville who might have qualified as

4    an expert, and he's a social worker, and he's a shade

5    tree mechanic, and even he said it's not a satanic

6    killing.

7        That's, I guess, the best you can do from a

8    defense attorney's standpoint, is their own expert

9    witness says that, but then again Kenton Smith goes,

10   "Well, we're not saying it's a satanic killing, but

11   we're saying they advanced themselves in satanism by

12   this killing."  He speaks out of both sides of his

13   mouth.

14   Q.   What -- what items of evidence do you feel was

15   the most critical in -- in contributing to the

16   verdict that has changed with the passage of time and

17   new forensic testing, or testing -- forensic testing

18   that was not available at that time?

19   **A.   Well, clearly we have the hair evidence at this**

20   **point in time.  Back in those days DNA was in its**

21   **infancy, mitochondrial DNA was just a thought, so you**

22   **could not have analyzed that item, but if the victim**

23   **had hair in their hand, I mean, you got the system**

24   **called CODIS now.  You can not only run DNA against**

25   **potential suspects, you can run DNA against people**

Commonwealth v. Clark and Hardin                07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 86

1     who have been arrested, have been convicted.  You

2     know, that probably needs to be done with that hair

3     that's found in the victim's hand.

4          If you run that in a DNA match, and you've got

5     somebody in CODIS who is in jail, or you run it

6     against an unknown suspect in another rape case, you

7     know, that would clearly be exculpatory evidence.

8          Again, I'm not involved in the appeal, I don't

9     know that much about it.  I do know I've got a

10    similar murder case I'm working on in Jefferson

11    County right now.  That's why I'm investigating some

12    of these alteratives that we're talking about here.

13    Q.    Now, as to the testing of the handkerchief or

14    the cloth that was alleged in the -- in the record in

15    this case by the Commonwealth as being animal blood,

16    are you aware of the testing of that --

17    A.    I was not.  Again, I -- at that point in time,

18    apparently the forensic said that we can't test it

19    because it's too (indiscernible) or too old or

20    something.  I don't know whether or not that

21    particular sample at this point in time could be

22    tested to determine its origin or not.

23    Q.    Well, what effect -- do you have an opinion as

24    to the effect of the testing now of that showing that

25    it was blood of Mr. Hardin?

Commonwealth v. Clark and Hardin                07/10/2015   Testimony of Bart Adams and Wallace Rogers

1   **A.    Well, clearly that substantiates his testimony**

2   **and shoots down part of Kenton Smith's argument that**

3   **was his basic argument in closing, that he lied about**

4   **that.**

5         Again, any kind of case like this where you

6   don't have any direct evidence, it's circumstantial

7   evidence, it comes down to the credibility of the

8   parties involved as opposed to whether or not they

9   have told the truth in front of the jury as to their

10  testimony.

11        MR. SIMON:  May I have a moment, please?  May I

12  have a moment, Your Honor?

13        THE COURT:  Sure.  You doing okay?

14        THE WITNESS:  Bart and I got old, didn't we?

15        THE COURT:  I don't know.  Still got your hair.

16        THE WITNESS:  Yeah.

17        MR. SIMON:  Mr. Rogers, that's all the

18  questions I have at this time.  Please answer

19  Counsel's questions or the Court's questions.

20        THE COURT:  You may cross the witness.

21        MR. RYAN:  All right.  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23  VIDEO COUNTER 3:39:45

24  By Mr. Ryan:

25  Q.    First question I wanted to ask you is to the

Commonwealth v. Clark and Hardin                07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 88

1   extent that any -- well, first of all, I'll

2   acknowledge it's been 20 years ago, and any person,

3   most of us would have trouble remembering everything

4   from 20 years ago, but to the extent that the record

5   itself would conflict with anything that you've said,

6   would you defer to what the record --

7   **A.     Oh, obviously.  I mean, it is what it is, and**

8   **again, like I say, I specifically did not review any**

9   **information that they gave me because I wanted to**

10  **come in here and be as fair to you and both sides as**

11  **I could by not reviewing just portions of the record.**

12  Q.     Okay.  Were you present when Rhonda Sue

13  Warford's body was discovered or during any of that

14  process when the police recovered the body?

15  **A.     Negative, sir.  I mean, I did go afterwards,**

16  **view the crime scene, look at the photographs, drove**

17  **out there several times myself to the area where it**

18  **was recovered, but was not that high involved in**

19  **anything prior to that.**

20  Q.     I noticed a few minutes ago you testified that

21  it was the prosecutor's theory that this was a

22  potential motive, correct?

23  **A.     That is correct.**

24  Q.     Okay.  When you were in chambers discussing

25  this "Book of Shadows," I noticed you didn't object

Page 89

1  to anything but that one page.  Did you have a

2  strategy?

3  **A.    Well, I mean, the bottom line, it is what it**

4  **is, the judge's rule that this was going to come in.**

5  I felt that there were certain parts of it that were

6  more prejudicial than they were of any type

7  evidentiary value of proving anything, so I limited

8  my objections to just the specific portions of it I

9  felt I could justify being more prejudicial than as

10  relevant evidence.

11  Q.    Okay.  Could you just briefly summary --

12  summarize what your strategy was in the case, given

13  what you can remember and evidence as it was, what

14  was your strategy to represent them as their defense

15  counsel?

16  **A.    Well, in connection with the case, like I said,**

17  **the first thing you've got -- we all know this.  When**

18  **the prosecutor comes in and goes, "I'm going to**

19  **prove," you know, "that this guy is involved in**

20  **satanic ritual and devil worship, and that's a**

21  **potential motive for this case," you've got to deal**

22  **with that.**

23      Secondly, you've got to try to keep the jury

24  focused on what the actual evidence was in connection

25  with the case and not let them be distracted by the

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 90

1    potential motive.

2         That's one of the things that I tried to do in

3    connection with the case, to indicate that

4    Mr. Hardin -- no question, he had in the past done

5    it.  We did not deny that he had in the past dabbled

6    in this religion, but there was never any evidence,

7    other than the alleged statements of Detective Handy,

8    that he had done anything like animal sacrifices or

9    wanting to move to human sacrifices or anything like

10   that.  That was the only statement that he had ever

11   made to anyone about any such activities as that.

12        The other information, there was no physical

13   evidence to indicate to tie either one of these

14   suspects to Rhonda Sue Warford on the event that this

15   occurred.  There were no hair, there were no fibers,

16   there was no murder weapon ever recovered, there was

17   no blood, there was no bodily fluids.

18        One of the things that I thought important was

19   that, again, I tried to stress this even in opening

20   statement, Keith Hardin was seen in Jefferson County

21   at such and such a time that night.  Later that night

22   his mother testified that he came home so many hours

23   later.

24        She said -- and we went into that in detail.

25   She said, "I'm a night owl.  I watch movies.  I know

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 91

1    what time Keith came in."

2          There was no way in the world Keith Hardin

3    could have been in Jefferson County at the time, and

4    his mother saw him come home, he could have driven

5    down here, dropped that body off, and driven back

6    here.  I mean, I admit I drive like a bat out of

7    hell.  I couldn't have driven it that fast.

8          There's no way he could have gotten -- because

9    I drove to that place.  I've been out there, and I

10   tried to stress that and put the jury's emphasis on

11   the actual evidence that we had, not on a potential

12   motive that, you know, was blown entirely out of

13   proportion, I believe, by the prosecution.

14   Q.    Okay.  And this evidence you just mentioned

15   about the time factor, you explored that at trial,

16   correct?

17   **A.    Yes.**

18   Q.    And you -- you did the best that you could to

19   defend these individuals.

20   **A.    Oh, obviously, yes, sir.**

21   Q.    And you heard -- now, another piece of evidence

22   that was introduced had to do with Mr. Hardin at one

23   point being concerned that Rhonda Sue Warford might

24   be pregnant and making some threatening comments

25   about -- do you remember anything to that effect?

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 92

1    A.     I do remember that, and that was, I guess, a --

2    a secondary motive, the boyfriend/girlfriend fallout

3    with each other kind of thing, but that was, again,

4    paled in proportion to the satanic ritual motive of

5    the killing.

6    Q.    Now, you used the word "ritual."  I don't know

7    that -- I mean, we heard Mr. Smith say, clarify

8    pretty specifically that he was not trying to show

9    that it was a part of a satanic ritual, but I think

10   what he -- I mean, it sounded to me like he was

11   saying that it could be part of still satanism.  I

12   mean, is that correct?

13   A.     And I guess what I'm struggling with is that if

14   you did not do the satanic ritual killing in the

15   correct manner in which you were supposed to have

16   done it, then it would not have given you any power

17   in satanism, and clearly it was not done, because

18   even their experts said there was no bloodletting,

19   there wasn't anything like this, there were no

20   pentagrams found, there was no candles burned, so if

21   it wasn't a satanic ritual killing done in a way in

22   which you could have gained power, then just to do it

23   to -- because you're a satanist wouldn't have given

24   you any benefit in that religion, so you can't -- you

25   can't separate one without the other.

Page 93

1   Q.    Okay.

2          MR. RYAN:  We have no other questions, Your

3   Honor.

4          THE COURT:  Any redirect questions, Mr. Simon?

5          MR. SIMON:  No, Judge.  If I haven't done it

6   already, I believe the witness has verified that part

7   of the record that we've put on disk number 19.  I'd

8   ask for the introduction of Exhibit 19.

9          THE COURT:  I thought we had already done that.

10  It's already in.

11         MR. SIMON:  Excuse me?

12         THE COURT:  I've already admitted that.

13         MR. SIMON:  Very good.  Thank you.

14         THE COURT:  But we need to give a copy to the

15  clerk, or give it to the clerk.

16         MR. RYAN:  Your Honor, if it will speed up

17  things, we're not going to object to any part of the

18  record.  I mean, the record is what it is.

19         THE COURT:  Okay.  Okay.  Do you have that CD

20  yet?

21         THE CLERK:  I do not, Judge.

22         THE COURT:  Could you provide that to the

23  clerk?

24         THE CLERK:  I need both of them.  I don't have

25  either one.

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 94

 1          THE COURT:  You don't have either one?  What,

 2   the last one or the next to last one?

 3          THE CLERK:  Correct.

 4          MR. SIMON:  We had 18 was one disk that was

 5   references to hair.

 6          THE COURT:  Yeah, we need that one and 19.

 7          MS. SMITH:  Yes, sir.  We have them.

 8          THE COURT:  And they've both been admitted into

 9   the record --

10          MR. SIMON:  Thank you, Judge.

11          THE COURT:  -- without objection.

12          Do you-all need a break, or do you want to go

13   on?

14          MS. SMITH:  I personally do, Your Honor.

15          THE COURT:  Let's take a short break.  Let's

16   take a break till 4:00, ten minutes.

17          Hold on just a second.  Are you through with

18   this witness?

19          MR. SIMON:  Yes, I am.

20          THE COURT:  May he be excused?

21          MS. SMITH:  Yes, sir.

22          THE COURT:  Thank you very much.

23          THE WITNESS:  Thank you, sir.

24          THE COURT:  You can stay with us if you want

25   to.

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 95

1          THE WITNESS:  I need to get back.  I've got to

2     be a good son and go pick up a prescription for my

3     mother.

4          THE COURT:  I understand.

5          THE WITNESS:  Thank you, sir.

6          THE COURT:  Good to see you.

7          THE WITNESS:  Thank you.

8          THE COURT:  Let's take a short break.

9          (Testimony concluded at Video Counter 3:47:49)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 96

```
 1    STATE OF KENTUCKY           )
                                  )
 2                                )   SS.
                                  )
 3    COUNTY OF JEFFERSON         )

 4

 5            I, Jennifer R. Janes, a Notary Public

 6    within and for the State at Large, my commission as

 7    such expiring 1 May 2023, do hereby certify that the

 8    foregoing was transcribed by me from a DVD provided

 9    by the law firm of Dressmen, Benzinger & Lavelle.

10

11            WITNESS my hand this 12th day of August, 2019.

12

13                         _____
                           Notary Public, State at Large
14                         Certified Realtime Reporter
                           Registered Professional Reporter
15

16

17

18

19

20

21

22

23

24

25
```

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 97

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25