Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 3

1                    TESTIMONY OF BART ADAMS

2              (Testimony commenced at Video Counter 12:48:33)

3         THE COURT:  Good afternoon.

4         THE WITNESS:  Good afternoon, Judge.

5         MS. SMITH:  You swear or affirm the testimony

6    you're about to give is the truth, the whole truth,

7    and nothing but the truth?

8         THE WITNESS:  I do.

9         THE COURT:  Have a seat in the witness chair.

10   Make yourself comfortable.  I know you know to speak

11   up so we can make a good record, and we'll start off

12   by you stating your name, please.

13        THE WITNESS:  My full name is James B. Adams,

14   Jr., and I go by the name Bart Adams.

15        THE COURT:  All right.  Thank you.  You may

16   ask.

17              *        *        *        *

18        Bart Adams, called by the Movants, having been

19   first duly sworn, testified as follows:

20                   DIRECT EXAMINATION

21   By Ms. Smith:

22   Q.   Mr. Adams, could you please tell the Court what

23   your occupation is?

24   **A.   I'm an attorney.**

25   Q.   How long have you been an attorney, sir?

DEFENDANT'S
EXHIBIT

CASE
NO. 3:17-CV-419-GNS

EXHIBIT
NO.   107

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 4

1  A.     I graduated from law school in May of 1973,

2  graduated -- or graduated May of '73, took the bar

3  and passed it in September of '73.  Went to work for

4  the public defender's office in March of '74, left

5  there in August of '75, and have been in private

6  practice ever since.

7  Q.    So you have been an attorney over --

8  A.     Forty-two years.

9  Q.    Thank you for --

10  A.     Too many.

11  Q.    -- doing the math for me.

12  A.     Way too many.

13  Q.    And at some point in your career, let's say

14  1992, did you begin to represent Jeff Clark in this

15  matter?

16  A.     I did.

17  Q.    And at that time, you were -- let's back up.

18  Have you primarily -- would you primarily consider --

19  A.     I'd say 99.5 percent of my practice was

20  criminal.

21  Q.    Was criminal defense?

22  A.     Yes.

23  Q.    Thank you, sir.  And when you started

24  representing Jeff, you know, and up through the end

25  of this, I mean, is this a case that you remember

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 5

1    clearly, sir?

2    **A.     Very, very clearly.**

3    Q.     And why is that?

4    **A.     I thought it was the most fundamentally unfair**

5    **trial I have ever seen.**

6          MR. WILLIAMS:  I object to that.

7    **A.     And now I feel even more strongly.**

8          THE COURT:  Hang on just a second.

9          MR. WILLIAMS:  I'll object.

10          THE COURT:  Hold on, Mr. Adams.

11          What's your objection?

12          MR. WILLIAMS:  I mean, I don't think it's --

13    the trial can be watched by you, the trial can be

14    watched by third persons and make the determination

15    as to whether or not it's unfair.  I don't think he

16    can -- he's in a position to speak about the

17    unfairness of it.

18          MS. SMITH:  Judge, I would say that he was --

19    first of all, he was the defense attorney in this

20    trial.  He's been a practicing attorney, as you just

21    heard, for 42 years.

22          He claimed -- you know, he's telling the Court

23    that he's been primarily a criminal defense attorney

24    for all of that time.  I think he's more than

25    qualified to be considered an expert attorney at this

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 6

1    point.

2          I think his opinion is relevant, and the Court,

3    I think, again, can decide what weight to put on his

4    opinion.

5          THE COURT:  Overruled.  I'll let him testify.

6          MR. RYAN:  Your Honor, I'd like to put

7    something else on the record.  If he's going to

8    testify as to any matters that are covered by the

9    attorney/client privilege, his client needs to waive

10   that on the record.

11         THE WITNESS:  Your Honor, I believe the client

12   waived it when he filed 1142.

13         MR. RYAN:  This is a motion for new trial.

14   1142, there is case law that says that it's waived

15   under 1142, but this is slightly different.

16         MS. SMITH:  He waives it, Your Honor.

17         THE COURT:  Raise your right hand.  Do you

18   swear or affirm the testimony you're about to give is

19   the truth, the whole truth, and nothing but the

20   truth?

21         MR. CLARK:  Yes, sir, I do.

22         THE COURT:  State your name, please.  Put your

23   hand down.

24         MR. CLARK:  My name is Jeffrey Dewayne Clark.

25         THE COURT:  And do you waive the

Page 7

1    attorney/client privilege between you and Mr. Adams?

2         MR. CLARK:  Yes, sir, I do.

3         THE COURT:  Okay.  We may proceed.

4    By Ms. Smith:

5    Q.    Getting back to where we were, you felt like

6    this trial was fundamentally unfair.

7    **A.    In the 42 years that I've practiced, I would**

8    **estimate that I have tried between 250 and 300 felony**

9    **cases, maybe 25 to 30 murder cases, 10 to 15 of which**

10   **were capital.  This is the most fundamentally unfair**

11   **trial I have ever participated in, yes.**

12   Q.    You have a lot of strong emotion, it seems, as

13   if this case has haunted you.

14   **A.    I have more facts bothering me than my**

15   **emotions.  What I -- what I observed I could not**

16   **really put my head around.**

17   Q.    So having had time to contemplate what took

18   place, you know, can you give this court an

19   understanding of, you know, what it was like to try

20   to defend someone in a case that involved the

21   allegation of satanism?

22   **A.    Excuse me.  Well, that made it -- that, of**

23   **course, made it very, very difficult because that**

24   **casts a shadow that was almost unable to be overcome**

25   **over all of the proceedings.**

Commonwealth v. Clark and Hardin          07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 8

1      Back then, you know, back in the '80s and the

2      early '90s, there was this big fad about cult

3      killings and devil worship and all that, and of

4      course that was brought on by the Manson cult thing,

5      and it just carried on over, but I -- in my

6      experience, there were very few really devil worship

7      cases that really came to fruition, at least that I

8      knew of.

9   Q.    And was this one that you believe to have

10     involved satanic or ritualistic killing?

11  **A.     No, absolutely not.  When I found out who the**

12  **expert was for -- for the prosecution, I got all of**

13  **his articles and read them and prepared for**

14  **cross-examination, submitted them to the judge.**

15     There was -- and he testified under oath that

16     no, there was nothing at all that indicated that this

17     was a satanic ritualistic killing.  We moved for

18     mistrial based upon that because that's what they

19     based everything on in their opening argument:  This

20     is what happened.

21     Well, of course that was overruled, but by that

22     time the jury, in my mind, was tainted by the --

23  Q.    Now --

24  **A.     If it had probative value, okay, fine, but you**

25  **still have to look at the prejudicial effect, but in**

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 9

1    this case the judge told him, "Kenton, if you don't

2    tie this in real tight, you're risking a mistrial or

3    a reversal."

4          Well, he didn't tie it in tight.  As a matter

5    of fact, the expert said there's no way.  So that's

6    my answer.

7    Q.    Now, in terms of the proof that was -- that the

8    state had against Mr. Clark and Mr. Hardin, I'd like

9    to take you through the physical proof, the physical

10   forensic evidence.

11   A.    Sure.

12   Q.    There was quite a bit of it in terms of what

13   was taken from the crime scene.  Soil samples.

14   A.    Exculpatory.

15   Q.    And so the tests came back on the soil samples?

16   A.    Right, they did not belong to any of the

17   vehicles that Mr. Clark owned or that he had control

18   of.

19   Q.    Did they come back as to his shoes?

20   A.    Shoes all negative, which, by the way, he

21   voluntarily went in on two or three different

22   occasions without a lawyer and volunteered completely

23   and gave Greer and the investigators everything that

24   they wanted.

25   Q.    How many times was Mr. Clark interviewed, and

Page 10

1     were you representing him at that point?

2     **A.     No.  Oh, no.  I believe three.**

3     Q.     Three times?

4     **A.     Now that I'm not positive about.  I believe**

5     **three.**

6     Q.     You're absolutely right.  Do you know whether

7     or not he was given a polygraph examination?

8     **A.     Sheriff Greer told me that he had been given**

9     **one.**

10          MR. RYAN:  Your Honor, I object.  It's hearsay.

11          THE COURT:  Sustained.

12     **A.     Do I know for a fact?  I was not there, no, I**

13     **do not know.**

14     Q.     Now, did you ever receive any tape recorded

15     statements given by Mr. Clark in this case, any

16     transcripts or anything like that?

17     **A.     Oh, no, no, no.  No.  At that time, Handy and**

18     **most of the Louisville Police Department did not**

19     **record taped statements for very specific reasons.**

20          MR. RYAN:  Object on what Handy does.

21          THE COURT:  Hold on just a second.

22     **A.     No, that is within my knowledge.**

23          THE COURT:  What's your objection?

24          MR. RYAN:  I object as to what the Louisville

25     police officers do as a matter of course.  I don't

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 11

1    think that's really within his knowledge, but --

2    Q.    How long have you been practicing in

3    Louisville, sir?

4    **A.    Since 1973.**

5    Q.    And you --

6         THE COURT:  Overruled.  I'll allow it.

7    Q.    Okay.  So back to the physical evidence.  Do

8    you know whether or not footprints, do you remember

9    whether or not footprints were taken, casts, at the

10   crime scene?

11   **A.    Yes, they attempted to do all the forensic**

12   **things that need to be done at a crime scene, and**

13   **they were all negative as to the two defendants.**

14   Q.    Do you remember whether or not Jeff's shoes,

15   they tested those against the footprints?

16   **A.    Yes, they were.**

17   Q.    Do you remember whether or not the fingernail

18   scrapings from the victim were -- they tried to test

19   those to see if they matched either one of these --

20   **A.    Right, and no match.**

21   Q.    No match.  What about -- let me think.  In

22   the -- in the cars, or with the cars, were fibers

23   looked at?  Do you remember if there were fiber

24   looked at?

25   **A.    I think there was fiber analysis, and nothing**

Page 12

1    came back.  The only thing that came back was the

2    fingerprint that was in on the rear window -- rear

3    left window, I believe, of Jeff's Nova, and of course

4    we established through fingerprint experts that even

5    though Sheriff Greer testified before the grand jury

6    that that was a fresh print, prints cannot be graded

7    as fresh.  You cannot tell when they were there.

8         MR. RYAN:  Your Honor, again, I object.  He

9    can't testify to the science.

10   Q.   Cannot time stamp.

11   A.   That's right, cannot time stamp them.

12        MS. SMITH:  I beg your pardon.

13        THE COURT:  Sustained.

14   Q.   Now, well, let me -- let me ask it this way.

15   The fingerprint analysis that was -- the person who

16   testified as to the fingerprints in the trial, did

17   they testify as to whether or not you can time stamp

18   a fingerprint?

19   A.   Yes, it cannot be done.

20   Q.   Now, did you move for a separate trial?

21   A.   Yes, at one time I did.

22   Q.   And do you -- obviously that was not -- not

23   granted at the time?

24   A.   It was going to be granted, and the more I

25   thought about it, the more I considered it, the

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 13

1    more --

2         MR. RYAN:  I object that it was going to be

3    granted.  The record will speak for itself.

4         THE COURT:  Sustained.

5    **A.    The answer is we went to a joint trial.**

6    Q.    Okay.  Now, was notice filed as to seeking the

7    death penalty?

8    **A.    It was.**

9    Q.    And what was the aggravator alleged to have

10   been?

11   **A.    The Commonwealth's theory in this case was that**

12   **the murder was for profit in that the people who**

13   **committed it were seeking Satan's favor, and**

14   **therefore they profited.  The judge didn't go for**

15   **that and overruled it.**

16   Q.    Now, searches were conducted of the homes of

17   both the defendants, were they not?

18   **A.    That's correct.**

19   Q.    Was any evidence of satanic anything collected

20   from Jeff Clark's home or mobile home or his car or

21   anything?

22   **A.    Nothing.**

23        MR. RYAN:  Your Honor, the record will reflect

24   what happened there.  I object to him testifying.

25        MS. SMITH:  Well, Your Honor, I'm trying to sum

Page 14

1    up --

2          THE COURT:  Overruled.

3          MS. SMITH:  Thank you.

4    Q.    Let's go back.  So no satanic things found in

5    Jeff's possession at all.

6    **A.    None.**

7    Q.    Do you remember how many -- how many knives

8    were collected?

9    **A.    I don't remember the number of knives, but I do**

10   **know the history of the knives.  His father or**

11   **grandfather collected knives and gave him the**

12   **collection.**

13   Q.    And so were those looked at --

14   **A.    They were seized, yes.**

15   Q.    -- to see if they were murder weapons or

16   anything like that?

17   **A.    They were.  They were examined and determined**

18   **not to be the murder weapon.**

19   Q.    And they were knives that were in his -- under

20   glass, were they not?

21   **A.    That's correct, they were.  Now, Jeff did carry**

22   **a small pocketknife with him almost all the time.**

23   Q.    Okay.  So I would think other people do that as

24   well.

25   **A.    Yes.**

Page 15

1   Q.    Okay.  Oh, tire treads, do you remember if

2   those came back?

3   **A.    Negative.**

4   Q.    Okay.  Blood on any of the clothing of Jeff

5   Clark or Keith Hardin or his car?

6   **A.    Nothing.**

7   Q.    Any confessions made to the police after three

8   interrogations of Jeff?

9   **A.    No confessions, although Handy tried to say**

10  **that somebody -- I'm not -- no, I'm not sure about**

11  **that.  I can't answer that question.**

12  Q.    Okay.  That's all right.  But you didn't have

13  to combat --

14  **A.    No.**

15  Q.    -- a confession.

16  **A.    No.**

17  Q.    And as you said, Jeff cooperated in every way,

18  gave --

19  **A.    Yes, ma'am.**

20  Q.    -- samples, et cetera?

21  **A.    Yes, ma'am.**

22  Q.    Was the rape kit negative as well?

23  **A.    Yes, it was, and of course the medical examiner**

24  **said that didn't mean anything, but it was negative.**

25  Q.    So the one piece of evidence you said was the

Page 16

1   fingerprint in Jeff's car.

2   **A.    Yes.**

3   Q.    Was there testimony to explain how that

4   fingerprint had gotten there?

5   **A.    Yes.**

6   Q.    And that was?

7   **A.    She had been in the car many, many times.  They**

8   **had become friends.  She was dating Mr. Hardin, and**

9   **Jeff used to go pick them both up, and they'd go to**

10  **his -- his trailer, and they would party and drink**

11  **and do whatever, so they were friends.  She had been**

12  **in that car many, many times.**

13  Q.    Now, let's talk about the hair that was said to

14  have been Keith's that was on her sweatpants.

15  **A.    Yes.**

16  Q.    If you remember, was that the basis for the

17  search warrants?

18        MR. RYAN:  Your Honor, I'd like to ask the

19  Court to direct Counsel to characterize the evidence

20  the way the witness characterized it.

21        When you say it was "found," the witness

22  testified that the hair was similar in color and

23  microscopic characteristics.  The Court just heard

24  that, and you're asking -- the form of your question

25  assumes that the Commonwealth introduced the evidence

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 17

1    as a match, or it was said to be his.

2         That's -- that's in the record.  The record

3    will speak for itself.

4         MS. SMITH:  Your Honor, I think the record

5    shows that there was -- it was called a match.

6    Q.   Do you remember whether or not --

7    **A.   It was called a match, yes, it was.  It was**

8    **called a match.**

9    Q.   It was declared a match by the prosecution in

10   their closing argument?

11   **A.      The expert himself testified exactly as this**

12   **gentleman just said, similar in characteristic, et**

13   **cetera.   That's what he said.**

14        The prosecutor continuously, three or four

15   times in closing argument and during questioning,

16   said it was a match, the exact hair.  He misstated

17   what the evidence was.

18   Q.   Yes, sir.

19   **A.      Not the expert, but the prosecutor.**

20   Q.   Now, your memory is that -- is your memory that

21   the hair was the basis for the search warrants?

22   **A.   It is.**

23   Q.   Now, before Ms. Warford went missing, was there

24   any -- was there any testimony that came in or any

25   kind of indication that Keith and the victim were

Page 18

1    unhappy and had been fighting?

2    **A.    None whatsoever.  In fact, it was elicited that**

3    **they had been getting along very well.**

4    Q.    Was there any kind of domestic violence

5    accusations or any of that?

6    **A.    None.**

7    Q.    Now, the satanic evidence, there were some

8    sketches that were admitted into evidence.

9    **A.    Correct.**

10   Q.    Do you remember those?

11   **A.    Yes.**

12   Q.    Now, what was the relevance of those sketches,

13   sir?

14   **A.    To me, there was no relevance whatsoever.  We**

15   **based our objection on the lack of relevance and the**

16   **prejudicial quality of that, but it was allowed in**

17   **and harped upon ad infinitum, on and on and on, by**

18   **the prosecution.**

19   Q.    Would you have -- would you characterize it as,

20   you know, that the knife evidence and the satanic

21   evidence might have been like propensity evidence?

22   In other words, I mean, you had moved for exclusion

23   of certain evidence under 404(b), did you not?

24   **A.    Yes, I did.**

25   Q.    And was that -- was that motion granted, to

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 19

1   your memory?

2   **A.      No.**

3   Q.      And did you move to preclude the use of the

4   satanic evidence?

5   **A.      Absolutely.**

6   Q.      The sketches?

7   **A.      As did my cocounsel, yes.**

8   Q.      So the evidence was mainly books that were

9   found in Keith's house?

10  **A.      Uh-huh.**

11  Q.      Sketches?

12  **A.      Uh-huh.**

13  Q.      What else?  What else?

14  **A.      Oh, there was a chalice and the handkerchief**

15  **and, you know, a few other things.**

16  Q.      Okay.

17  **A.      But again, don't forget that their own expert**

18  **had said, both experts said there is no evidence of**

19  **satanic ritualistic killing present in this case, yet**

20  **it was still admitted.**

21  Q.      Now, I'd like to ask you about the proof

22  that -- the proof that Amy Remsberg and Amy Remsberg

23  Padgett, her testimony against Jeff.  What -- if you

24  recall, was there -- did Jeff bring to you a concern

25  about --

Page 20

1   **A.      Yes.**

2   Q.      -- her testimony?

3   **A.      He certainly did, and what he told me was that**

4   **he had caught her, he had come into the house and**

5   **caught her abusing her eight-year-old child.**

6        MR. RYAN:  Your Honor, going (indiscernible).

7   **A.      At that point --**

8        THE COURT:  Hold on just a second.  Stop.  We

9   have an objection.

10       MR. RYAN:  Well, I just think that's

11  outrageous, but --

12       MS. SMITH:  Well, in our motion, Judge, we have

13  the -- you know, she later pled guilty to raping her

14  son.

15       THE COURT:  I'll hear it.  Overruled.

16  **A.      Yes, Jeff came to me with that, and at that**

17  **point, with everything else that was being accused, I**

18  **was afraid of bringing that thing out because, you**

19  **know, he told her parents, but her parents aren't**

20  **going to tell me, well, yeah, he told us that.**

21       I knew she would deny it, and I just thought we

22  would look like desperate fools if we brought that

23  before the jury, so based on my advice, he refrained

24  from talking about that.

25  Q.      Now, obviously that -- there was some bias

Commonwealth v. Clark and Hardin         07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 21

 1   there on her part when she testified against Jeff,

 2   wouldn't you say?

 3   **A.    Yeah, and there was -- there was pretty obvious**

 4   **bias from the beginning, but if I had been able to**

 5   **get her parents to testify or something, might have**

 6   **been a different story, but no, there was clear bias**

 7   **for sure.**

 8   Q.    Now, I'd like to -- I'd like to ask you to talk

 9   to the court about a witness named Vincent Pozzie

10   from the Chevron station?  I'm saying Pozzie.  It

11   could be Posey, P-O-Z-Z-I-E, who had been a gas

12   station attendant.

13   **A.    Yes, and I can tell you I'm not sure how we**

14   **came about that witness.  I hired Jerry Hall, who was**

15   **a retired Jefferson County homicide detective, to**

16   **help me with this case, and I don't know if he -- I**

17   **don't know if Jeff told him about it or Keith did.  I**

18   **don't know exactly how we got on to him, but Jerry**

19   **went out and interviewed him, and that's how he came**

20   **about.**

21   Q.    And the significance of this witness was

22   that --

23   **A.    He saw them -- he saw the two of them, or Jeff,**

24   **buying cigarettes at a time which would have made it**

25   **almost virtually impossible for them to have**

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 22

1    **kidnapped her, taken her to Meade County, killed her,**

2    **and came back and bought the cigarettes.  That was**

3    **the significance.**

4    Q.    Now, did the police retrieve the --

5        MR. WILLIAMS:  I wasn't really clear about

6    whether he actually talked to the witness that says

7    that or whether he --

8        THE WITNESS:  He testified --

9        MS. SMITH:  I'm sorry?

10        THE WITNESS:  He testified in trial.

11        MS. SMITH:  Oh, did he testify at the trial?

12        THE WITNESS:  Yes.

13    Q.    Now, were the police able to retrieve the

14    surveillance tape from the Chevron?

15    **A.    They were not.  I think in that particular**

16    **case, the surveillance tape was kept seven days or**

17    **three days or something.  Anyway, no.  The answer is**

18    **no.**

19    Q.    Now, there was a witness that was put on by the

20    prosecution by the name of Shawn Mattingly.

21    **A.    Right.**

22    Q.    Do you recall what happened during that, during

23    his testimony?

24    **A.    Yes, I do.  There had been accusations that**

25    **Jeff had referred to his -- his little pocketknife as**

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 23

1   a sacrificial knife, and I had represented Mattingly

2   about four or five years before in Louisville on a

3   stabbing case, and I didn't put it all together at

4   first, but I got a phone call from him, and Jeff had

5   told me about him.

6        I left a number, he called me back, and he

7   explains to me, "Well, no, some other guy in the

8   place used to refer" --

9        MR. WILLIAMS:  I'll object to that.

10       THE COURT:  What's the objection?

11       MR. WILLIAMS:  Phone calls from somebody who's

12  not here, not a witness, not --

13       THE WITNESS:  He testified.

14       THE COURT:  Sustained.

15  Q.   Okay.

16  A.   I'll just give you the background of how that

17  came about.

18  Q.   Sure.

19  A.   So anyway, we get him in to testify that Jeff

20  never referred to it as a sacrificial knife and

21  several other things that were just -- just crazy.

22       So at any rate, Shawn comes in, and he's

23  telling about it and everything, and, you know, he

24  was hurting the Commonwealth, and so Kenton Smith,

25  the prosecutor, gets up and makes a big deal out of

Page 24

1    the fact, "Oh, you're the one who stabbed the

2    Louisville football player.  Who was your lawyer?"

3    Knowing that it was me.

4        So, you know, I moved for a mistrial based

5    upon, well, first of all, he's attacking my

6    integrity, that's one thing, but he's trying to make

7    it look like it's all conjured up, you know, and but

8    that was a tactic that he used effectively throughout

9    the trial.  Not that particular one, but he used it

10   pretty effectively.

11   Q.    Would Judge Monarch rule that certain evidence

12   couldn't be brought out?

13   **A.    Yes, Judge Monarch would rule in our favor on**

14   **certain things saying it was prejudicial, it**

15   **shouldn't come in, whatever it might be, and Kenton**

16   **would come back out and get right into it, no matter**

17   **what the judge said.**

18       I would object, we'd go back up, the judge

19   would say, "Now, Kenton, you know you shouldn't be

20   doing that."  That's about the way it went, and that

21   is no exaggeration.  You can look at the tape.

22   Q.    I'd like to get into the jailhouse --

23   **A.    Capps and Justis.**

24   Q.    -- incentivized witness.

25   **A.    Yes.**

Page 25

1  Q.    Yes, Clifford Capps?

2  **A.    Right.**

3  Q.    Were you able to impeach him during the trial

4  because --

5  **A.    He was not --**

6  Q.    First of all, what did he testify to, sir?

7  **A.    Well, he testified --**

8  Q.    In summary.

9  **A.    He testified, in a brief summary, that Jeff, my**

10  **client, admitted to him to having committed the**

11  **killing, and one time it was while he was smiling,**

12  **and another time he was very serious, and one time he**

13  **said "We did it," of those two times.**

14      So was I able to completely impeach him?  I did

15  a decent job on him because the fact he was coming up

16  for parole, he was coming up for shock probation, but

17  I didn't know about the Colorado case and him writing

18  the letter to Justis trying to get Justis to commit

19  perjury so that he can get out.

20      MR. RYAN:  Your Honor, this is an issue we've

21  already raised, but first of all, Mr. Capps was

22  subjected to cross-examination during the trial.

23      This has come up during at least one

24  post-conviction relief proceeding.  It's already been

25  reviewed by the appellate courts, and I --

Page 26

1          THE COURT:  Hold on.  Motion for a new trial?

2          THE WITNESS:  It was, Your Honor.

3          MR. RYAN:  Yeah.  This is about the --

4          MS. SMITH:  Directly after the trial, Your

5     Honor.  If --

6          MR. RYAN:  And then beyond that, you can't use

7     somebody else -- somebody's other crimes, other bad

8     acts, to show a propensity to commit perjury.  That's

9     KRA 404, so I object to the admission that Mr. Capps

10    suborned perjury in another case or --

11         THE COURT:  Overruled.  Go ahead.

12         MS. SMITH:  Judge, may I approach the witness?

13         THE COURT:  Yes.

14         MS. SMITH:  Actually, I don't know how we're

15    doing -- am I to give you this one?  I am approaching

16    with a letter that has been marked as Defense Exhibit

17    14, Your Honor.  I'm giving one to you and then

18    let -- it also was included in our motion for a new

19    trial, Judge.

20    Q.   Do you recognize that letter?

21    **A.    I do, and if I may give you the background, I'd**

22    **be pleased to do so.**

23    Q.   Please do.

24    **A.    Shortly after -- a day or two after the**

25    **convictions of these two young men, I received a**

Page 27

1    **phone call either from Jeff or from his mother**

2    **indicating that I needed to get down and talk to him**

3    **because there was a letter that had been written by**

4    **Capps to Justis, who was his friend, trying to get**

5    **him to cooperate with Capps because Capps wanted to**

6    **get out of jail immediately, as soon as he could.**

7         There was a shock probation hearing that was

8    coming up, and he knew that if he could testify on

9    behalf of the Commonwealth that he might receive

10   favorable consideration.

11        Now, the significance of this is that it was

12   known, in my opinion.

13   Q.    Yes, sir.

14   **A.    We have three affidavits in the record.**

15   Q.    I'm going to get those to you.  I can do all

16   three if you want to, or one at a time.

17   **A.    However you want to do it.**

18        MR. SIMON:  Just one exhibit or --

19        MS. SMITH:  I labeled them individually.

20        MR. SIMON:  That's fine.

21        MS. SMITH:  So we can do 15, 16, and 17?

22        MR. SIMON:  Yes.

23        MS. SMITH:  Get those to the clerk, Your Honor,

24   and let me give you a copy.

25   Q.    So if you -- if you will, Mr. Adams, you

Page 28

1   received this -- how did you get a copy of the

2   letter, if you remember?

3   **A.     Mr. Justis's mother.**

4   Q.    Mr. Justis's mother?

5   **A.     Yes, that's what I believe, where I believe I**

6   **got it because she kept the original.  She insisted**

7   **on keeping the original.**

8   Q.    I see.  And Mr. Justis's mother gave you a copy

9   of this letter.  Had it been also alleged to have

10  been given in 1992 to Sheriff Greer?

11  **A.     Yes.**

12  Q.    And -- okay.  Let's -- let's back up for a

13  second.

14  **A.     Can I go ahead and do the background on that**

15  **real quick?**

16  Q.    I wish you would.  (Indiscernible).

17  **A.     There was a murder investigation that had some**

18  **age to it that was going on in Colorado.  Two lawyers**

19  **that were representing the defendant and the**

20  **prosecutor -- first of all, the two lawyers became**

21  **aware of the fact that there had been this letter**

22  **written by Capps to Justis eliciting his help in**

23  **concocting a story to convict these people.**

24        As a result, they come to Kentucky, and they

25  investigate.  They come and talk to Justis and to his

Page 29

1  mother, and they say, "Yeah, here's the letter.  As a

2  matter of fact, we gave it to Sheriff Greer some

3  months ago, so he's quite aware of it."

4       The lawyers, according to their affidavits,

5  called Sheriff Greer, and Sheriff Greer says, "Yes,

6  Mrs. Justis has a copy of it.  She has the original,

7  I have a copy, I'll get them for you."

8       So he does.  He cooperates with the defense

9  lawyers.  When the trial -- when it goes to trial in

10 Colorado, the prosecutor there is notified about the

11 existence of this letter casting aspersions, of

12 course, and doubt upon the testimony that Capps is

13 about to give in the murder case, as well as Justis.

14      So they decide not to call him whatsoever, the

15 point being that in 1992, these lawyers, sworn

16 members of the bar in Colorado, two defense attorneys

17 and a prosecutor know that Sheriff Greer was aware of

18 this letter.

19      Now, it is exculpatory in nature by any way you

20 look at it.  Greer was aware of it, without any

21 question, and it was never given to us pretrial or

22 during trial.

23      Had I had this, Mr. Capps would have been

24 totally destroyed and nobody would have believed a

25 word about the confession.  I was denied this.  This

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 30

1    was essential, essential to these two boys' defense.

2         MR. WILLIAMS:  Judge, he has mentioned several

3    people in other states, he's drawn conclusions about

4    what they knew and what they didn't know.  He's

5    ranted and raved about what happened, and, you know,

6    a lot of it is pure hearsay.  It's stuff we have no

7    way of cross-examining the people he's talked about.

8    I mean, it's conjecture to some extent, and, you

9    know --

10        THE COURT:  Are you objecting?

11        MR. WILLIAMS:  Yes, sir.

12        THE COURT:  Overruled.

13   Q.   Your Honor -- or --

14        MS. SMITH:  I'm sorry, Your Honor.

15   Q.   Mr. Adams.

16   **A.   Yes, ma'am.**

17   Q.   Now, the letter from Mr. Capps to Kevin Justis,

18   does it mirror in any way how Capps testified?  I beg

19   your -- I thought I had done that.

20   **A.   I've done it a thousand times.**

21   Q.   Does it mirror how Capps testified, sir?  You

22   know, in that he -- you talked about him jokingly

23   saying it, the second page of that letter.

24   **A.   Oh, yeah, because he --**

25   Q.   I'll draw your attention to the second page --

Page 31

1   **A.      Yeah, I know what you're talking about.**

2   Q.      -- of the handwritten letter.

3   **A.      Yes, and it's on the second page, Judge.  It**

4   **says, (Reading) Remember this, Keith jokingly**

5   **admitted to the murder.  They were -- wait.  They**

6   **were driving a black Nova.  Keith said Jeff wanted to**

7   **jump -- dump the body down there to scare his ex.**

8           So I don't remember him saying about dumping

9   the body to scare his ex, but those are the things

10  that he said during the trial, yes.

11  Q.      The "jokingly" part.

12  **A.      Yes.**

13  Q.      Now, so the main evidence against Jeff and

14  Keith was the fingerprint and the hair.  The bloody

15  cloth, can you explain to the Court how that was

16  included in terms of the satanic paraphernalia or

17  whatever?

18  **A.      Mr. Smith insisted that as part of the satanic**

19  **ritual that Keith was supposedly involved in that he**

20  **would drink blood from this chalice, animal blood, I**

21  **think urine, I mean, it was -- but anyway, and so**

22  **Keith took the stand and said, "No, that's not the**

23  **case at all.  I did -- I was into the satanism until**

24  **about six months ago, but a completely different**

25  **brand.  Didn't have anything to do with human**

Page 32

1    **sacrifice, animal sacrifice, anything.**"

2        And so Kenton says, "But this blood right here

3    from this chalice," and "That's where it came from,

4    from animal blood, human blood, whatever it might

5    have been."

6        And Keith had insisted, of course, no.  Well,

7    he used it over and over again in his closing, and

8    his cross-examination.  The innuendo and the contempt

9    that he showed the defendant with by the use of this

10   handkerchief was something to really see.  I mean,

11   really you had to be there to believe it.

12       But at any rate, yes, they used it -- he used

13   it over and over again and at least five or six times

14   in the closing, the point being, of course, that once

15   we were able to have the DNA, that it was, in fact --

16   Keith had said, "Hey, I cut myself on the chalice,

17   and I used that to rub my hand."

18       Well, you know, Keith had said, of course -- I

19   mean Kenton told the jury over and over again that he

20   lied to the cops all the way through, he lied to

21   them, you know, over and over, but at any rate, now

22   that we have DNA testing, we know that, in fact, that

23   blood was, in fact, Keith's, and that it was there.

24   Q.    He was telling the truth.

25   **A.    Yes, he was telling the truth.**

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 33

1    Q.    Now, I know this is hard to do, but had you

2    been -- had you been able to prove and have DNA

3    testing on the hair on the sweatpants, in your mind

4    was that evidence material in terms of how -- the

5    prosecution's case against Jeff and against Keith?

6    **A.    Without that evidence, there is -- in my**

7    **opinion, there is no conviction.**

8    Q.    Why do you say that, sir?

9    **A.    At all.  I say that because that was the only**

10   **evidence.  You have the hair that was on the**

11   **sweatpants, okay, of similar characteristics, et**

12   **cetera.**

13         Kenton always referred -- not always, that is

14   an overstatement.  50 percent of the time he would

15   say it's the exact same hair, it's the same, it's the

16   same.

17         It wasn't the same.  It didn't belong to him,

18   to either one of the defendants.  Without -- what was

19   the other part of the question?  I'm sorry.

20   Q.    I'm saying how -- you know, why did you feel

21   like without the hair evidence there would not have

22   been a conviction?

23   **A.    The hair evidence is the only connection**

24   **whatsoever, physical evidence that could possibly**

25   **place her with him that night because mother says she**

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 34

1    washed the red pants, and therefore they were totally

2    clean, and it had to be after she picked up those

3    pants and went out that night.

4    Q.    So, in other words, the -- just to back you up

5    a bit, Ms. Warford -- Mrs. Warford.

6    A.    Yes.

7    Q.    She testified what about the red sweatpants?

8    A.    That she had washed them that day, that they

9    were totally clean, that her daughter Rhonda must

10   have taken them before she went back out to Kroger's

11   that night.  She was indicating she was going down

12   there, meaning Kroger's.

13   Q.    I see.  So when the sweatpants had one of

14   Keith's hairs --

15   A.    But it didn't.

16   Q.    Well, I know that, but in terms of what the

17   jury believed, because they were recently washed,

18   that hair could not have gotten on there from an

19   innocent purpose, is that --

20   A.    That was the conclusion that was drawn, yes, in

21   my opinion.

22   Q.    Yes, sir.  So, in other words, you would call

23   that evidence, the hair evidence, material.

24   A.    Absolutely.  Of course.

25   Q.    What would you -- how would you characterize --

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 35

1    **A.     It wasn't just material.  It was crucial to the**
2    **Commonwealth's case.**
3    Q.     How would you characterize the bloody cloth
4    thing with the animal sacrifice, would you say that
5    was important evidence?
6    **A.     As I said at the time to the judge, Kenton**
7    **didn't care what answer he was getting.  He was**
8    **asking the questions for the effect to prejudice the**
9    **jury.**
10          If, in fact, we were able to prove at that time
11   that that handkerchief had Keith's blood on it and
12   not the implied animal sacrifice blood, then it would
13   not have been admissible at all, it could not have
14   been used.  So absolutely it was crucial, critical.
15   Q.     Now, in terms of alternate suspects, do you
16   recall if -- if there were people in Rhonda's, or
17   Ms. Warford's, life that might have wanted -- you
18   know, that might have been likely suspects to have
19   committed the murder?
20   **A.     Well, the most likely one is the one who**
21   **allegedly confessed to having committed the murder**
22   **and told, you know, where he did it, how he picked**
23   **her up at Kroger's, et cetera, a guy by the name of**
24   **James Whitley.  Now --**
25          MR. RYAN:  Your Honor, we're going to get in --

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 36

1    I object to getting into this again.

2         THE COURT:  I'll hear it.

3    A.    **James Whitley was, as this lady had testified**

4    **to before a grand jury here in Meade County, had**

5    **given her a confession and said that he had gotten**

6    **into it with her, and she threatened to call his**

7    **parole officer, let the parole officer know what he**

8    **was doing, and that was the reason for the murder, to**

9    **shut her up.**

10        That's what he told this individual that

11   testified for the grand jury.  Now, why in the

12   world -- I'm sorry.

13   Q.    Let's just be really clear.  Why was there a

14   grand jury called?  Was this before or after these

15   two were charged?

16   A.    **This was after they -- this was after they had**

17   **been charged, and Mr. Smith had said, "I'm going to**

18   **get to the bottom of this."  We had talked about**

19   **this.  He said, "I'm going to get to the bottom of**

20   **this."**

21        Well, getting to the bottom of this to me means

22   finding out what kind of evidence -- you've got head

23   hair evidence?  Then get -- testify before the grand

24   jury, get a grand jury subpoena for Whitley's hair,

25   and compare it.  That was never done.

Page 37

1        I have no idea why a grand jury was called if

2    you're not going to follow up on the evidence.  I

3    just can't answer that question, and why you wouldn't

4    get a subpoena to get standards from him is beyond

5    me.

6    Q.    Yes, sir.  Now, were there other people, other

7    men that -- you know, at the time of her

8    disappearance -- let's go back.

9        You said she had gone down to Kroger.  Was

10   there any testimony that she had complained about

11   another person?

12   **A.    Yeah, there was apparently a guy.  She had gone**

13   **to Kroger's earlier in the afternoon, and there was**

14   **testimony that she had come back and complained to**

15   **her mother or her sister or both about this guy**

16   **yelling, "I want to marry you, I want to marry you,"**

17   **and, you know, he was really bugging her, that --**

18   **yes, that happened.**

19       But there was also, and even more critical

20   testimony was from -- from a friend and from her

21   sister that "I can't believe what the things that we

22   do.  We get in cars with men we barely knew.  Boy, we

23   took all kinds of chances.  It was just crazy the

24   things that we did."

25       I mean, that was another thing that was very

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 38

1    substantial, that she had a habit of getting in cars

2    with strangers.

3    Q.    I see.

4          THE COURT:  Wasn't this all -- hold on just a

5    second.  Wasn't that all presented at trial?

6          MS. SMITH:  Yes.

7          THE WITNESS:  Yes.

8          THE COURT:  What are we talking about that now

9    for?  The jury heard that, didn't they?

10         MS. SMITH:  Yes, sir, they did.

11         THE COURT:  Okay.  That's not new evidence.

12         MS. SMITH:  No, sir, but I think it does go to

13   the weight -- I believe that the alternate suspects

14   that were -- that were probable at that time, that

15   could have been investigated and were not, go to how

16   significant that evidence is now.

17         THE COURT:  Okay.  I understand your

18   argument --

19         MS. SMITH:  Yes, sir.

20         THE COURT:  -- but we all know this.

21         MS. SMITH:  You'd like me to move on?

22         THE COURT:  Yes.

23   Q.    Now, let's talk about, did Jeff and Keith alibi

24   each other for that evening?

25   **A.    Yes, they did.  They were looking for Jeff's**

Commonwealth v. Clark and Hardin          07/10/2015  Testimony of Bart Adams and Wallace Rogers

Page 39

1    **pet snake at his trailer, and I think -- I think the**

2    **testimony was they left there about 1:00 a.m.**

3    Q.    Did the Commonwealth ever come to you to see if

4    Jeff would testify against Keith, or did you ever

5    know of any vice versa going on?

6    **A.    You know, I don't know.  I can't really**

7    **remember that, but there was -- there was a**

8    **significant thing there, though.**

9         Oh, yes.  We were talking about the alibi.  I

10   think it's important to note, and I think this is

11   newly discovered evidence.  No, actually it's not.

12   I'm going to retract that.

13   Q.    Okay.  All these years have you believed Jeff

14   Clark to be an innocent man who was in prison?

15        MR. RYAN:  I'll object to that.

16        THE COURT:  Sustained.

17   **A.    I'll tell you one thing I do know:  It was the**

18   **most unfair trial I have ever seen.  Whether they're**

19   **innocent or guilty, I'd say there's one chance in a**

20   **hundred thousand that they're guilty.**

21        MR. RYAN:  I would object to that, ask to be

22   stricken.

23        THE COURT:  Sustained.

24        MS. SMITH:  Now, Your Honor, Mr. Adams has

25   mentioned, you know, the repeated use of the Satan

Commonwealth v. Clark and Hardin                07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 40

1    evidence.  We've taken some clips out of the trial to

2    help give the Court an understanding of exactly what

3    he's talking about.

4         I'd ask -- (indiscernible) -- okay.  I'm being

5    asked to play a clip about the hair because Mr. Adams

6    mentioned or testified that Kenton Smith had called

7    it a match over and over again, and in closing

8    argument.

9         THE COURT:  This is closing argument?

10        MS. SMITH:  Yes, sir.

11        THE COURT:  Okay.

12        MS. SMITH:  A part of it.

13        THE COURT:  All right.  The way I understand

14   the testimony and evidence up to here is, about the

15   hair, is that the expert testified that they were

16   similar, but they were not a match, and you-all are

17   saying that Mr. Smith kept repeatedly referring to it

18   as a match.  Is that -- is that what the testimony

19   is?

20        THE WITNESS:  May I?

21        MS. SMITH:  Yes.

22        THE WITNESS:  May I, Your Honor?

23        THE COURT:  Uh-huh.

24        THE WITNESS:  There are 15 characteristics to

25   look at in a hair.  So he testified, that expert

Page 41

1   testified, you know, you look at these

2   characteristics, and as a matter of fact, when you're

3   looking at them in two different sides of a

4   microscope, they must look like they're the same hair

5   in order to be identified, so what he testified to

6   was, and all they could do at that time was "similar

7   in characteristics."  Nobody could match them at that

8   time.

9          THE COURT:  I think that's what the testimony

10   was.

11          THE WITNESS:  That's right.

12          THE COURT:  But you-all are saying that

13   Mr. Smith took it a step farther.

14          THE WITNESS:  Oh, yes.

15          THE COURT:  And that's what they're going to

16   show me here?

17          MS. SMITH:  Yes.

18          UNIDENTIFIED SPEAKER:  I think we'll also

19   see --

20          MS. SMITH:  Your Honor, the difference, I

21   think, between what you had initially said and

22   what -- I think it can be easily kind of summed up.

23          The hair examiners, and this is what the FBI

24   has recently kind of admitted and why there's the

25   study that's going on and in terms of hair examiners,

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 42

1    is hair examiners were saying, you know, it's -- it's

2    that the hairs are similar in, you know, color and

3    characteristic as opposed to saying they match.  They

4    didn't have a scientific basis to say match, but what

5    would happen is --

6         MR. WILLIAMS:   Judge, I don't think she's an

7    expert, can testify about expert --

8         THE COURT:  I think we're talking about what

9    the testimony was.

10        MS. SMITH:  Yes, sir.  So what would -- what

11   would happen is, or what did happen here is the

12   expert said that phrase, and then Kenton Smith took

13   it and said, "So when you say that, that means the

14   hair is a match."

15        THE COURT:  Isn't that what I said?

16        MS. SMITH:  Yeah, I think it is.

17        THE COURT:  What are we arguing about?

18        MS. SMITH:  I don't know.

19        THE COURT:  I think I understand the evidence.

20        MR. WILLIAMS:  Well, she's telling us all kinds

21   of scientific data.

22        THE COURT:  Well, my question was simple.  I

23   think the testimony has been that the expert

24   testified that the hairs were similar in

25   characteristics or quality or whatever, but you-all

Page 43

 1   are saying that Mr. Smith took it one step further to

 2   say they were a match.

 3          MS. SMITH:  Yes.

 4          UNIDENTIFIED SPEAKER:  I think that the

 5   record -- the CD will speak for itself, and both the

 6   expert used the term "match," Mr. Smith used the term

 7   "match," and Mr. Smith actually used some additional

 8   terms that we will --

 9          THE COURT:  All right.  Let's hear it.  Now,

10   will this be as an exhibit to the record here?

11          MS. SMITH:  Yes, sir.

12          MR. SIMON:  So it would be 18.  This would

13   be -- this disk would be 18.

14          THE COURT:  None of these others have been

15   admitted into evidence yet.

16          MR. SIMON:  Not yet, correct.  They've been

17   marked and numbered.

18          THE COURT:  We'll take care of that in a

19   minute, I guess then.

20          MS. SMITH:  Yes, sir.

21          THE COURT:  Okay.

22          MS. SMITH:  We can take care of it now, if

23   you'd like.

24          THE COURT:  Let's do it now.  Let's talk about

25   number 14 has been admitted, hasn't it?

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 44

1          MS. SMITH:  Yes, Your Honor.

2          THE COURT:  That's the letter from --

3          MR. SIMON:  Mr. Capps.

4          THE COURT:  -- Mr. Capps.  That's the last

5     exhibit.  Number 15 is an affidavit of Michael

6     Argall; is that right?

7          MS. SMITH:  Yes, sir.

8          THE COURT:  And you're moving to introduce

9     that.

10         MS. SMITH:  Yes, sir, I would.

11         THE COURT:  Any objection to that?

12         UNIDENTIFIED SPEAKER:  Judge, I've got 15 as

13    the affidavit of Natalie Frei.

14         THE COURT:  Maybe I've got them mixed up then.

15         MR. SIMON:  Just for the record, Judge, I'm

16    sitting here, the 15, 16, 17 just referred to as

17    affidavits, so whatever --

18         THE COURT:  They haven't been identified yet.

19         MR. SIMON:  They have not been identified.

20         THE COURT:  Well, I've identified 15 as being

21    Michael A-R-G-A-L-L.

22         UNIDENTIFIED SPEAKER:  (Indiscernible).

23         THE COURT:  Huh?  Oh, you've already got it --

24    okay, we'll do that then, just so we're consistent.

25    Fifteen then is the affidavit of Natalie F-R-E-I.

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 45

1   Q.    And just so for the identification purposes,

2   Mr. Adams, Natalie Frei or Frei, however you say it,

3   was she one of the defense attorneys?

4   **A.    She was the assistant, yes.**

5   Q.    Okay.  In the Colorado case?

6   **A.    That's correct.**

7        THE COURT:  Okay, so that's 15.  What do you

8   got at 16, Debbie?

9        THE CLERK:  I've got (indiscernible).

10       MS. SMITH:  That's how I'm saying it too.

11   Q.    And, Mr. Adams, just so we're particular,

12   Harvey Palefsky was one of the public defenders?

13   **A.    That's correct.**

14   Q.    In the Colorado case?

15   **A.    That's correct.**

16       THE COURT:  That's 16.

17       UNIDENTIFIED SPEAKER:

18       THE CLERK:  And then 17, Judge, was Michael

19   Argall.

20   Q.    And Mr. Argall, for the record, he was the

21   prosecutor you mentioned.

22   **A.    Prosecutor, yes.**

23       THE COURT:  That's 17.  Okay.  17, 16, 15.

24   Okay, and 18 is going to be the excerpts, what are

25   you going to call this?

Page 46

1          MS. SMITH:  Eighteen, we'll call this the hair

2     montage.

3          THE COURT:  References to the hair in evidence?

4          MS. SMITH:  Thank you, sir.

5          THE COURT:  Okay.

6          MS. SMITH:  That's easier to spell.

7          THE COURT:  Reference to hair by the expert and

8     by the prosecutor, right?

9          MS. SMITH:  Yes, sir.

10         THE COURT:  Now, do you-all have -- does the

11     Commonwealth have objections to those being

12     introduced into evidence?

13         MR. RYAN:  I would say, Your Honor, first of

14     all, affidavits stand on their own, but I can't

15     cross-examine an affidavit.  You know, it's very

16     difficult to -- it's subject to interpretation.

17         I would also note that, and I have earlier,

18     that all of this about Clifford Capps and -- has been

19     raised before, appellate courts have reviewed it

20     before, and I'm just going to stand on that.

21         THE COURT:  Well, and again, I think you-all

22     are operating on two different parallel roads here.

23     Most of these things have been reviewed by our

24     supreme court.

25         MR. RYAN:  At least.  And appellate court.

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 47

1          THE COURT:  But I believe that the movants'

2    theory is that you add it all together, it puts more

3    significance on this hair that looks like DNA is

4    indicated is not a match, and the blood.  Is that

5    what your-all's theory?

6          MS. SMITH:  Yes, sir.

7          THE COURT:  So I understand and overrule your

8    objection, but I understand your objection, and I

9    understand your theory too, and I guess that's my

10   decision to make in the long run.

11         MS. SMITH:  It is, and, Judge, we're trying to

12   sum up a seven-day trial so that the Court has the

13   highlights, essentially.

14         THE COURT:  I understand.  Objection noted,

15   overruled.  Play the CD.

16         (Movants' Exhibits 15, 16, 17, and 18

17   admitted.)

18         (Video played from Video Counter 1:38:28 to

19   1:47:33)

20         MS. SMITH:  I guess that's the end.  I think

21   those are all of my questions for Mr. Adams, Your

22   Honor.

23         THE COURT:  All right.  Thank you.

24   Cross-examination?

25

Page 48

1                        CROSS-EXAMINATION

2    VIDEO COUNTER 1:47:55

3    By Mr. Ryan:

4    Q.    I have a couple questions.  Could you describe

5    what your strategy was in defending -- you defended

6    Mr. Hardin, right?

7    **A.    To use the facts to establish reasonable doubt.**

8    Q.    But what -- what specifically was your

9    strategy?  What evidence did you take, and what did

10   you try to show the jury?  I mean, I realize --

11   **A.    Tried to show the jury that there was**

12   **reasonable doubt that these men were involved, and I**

13   **think that would have been done without the**

14   **prejudicial actions of the prosecutor by ignoring the**

15   **judge's rulings, and also if these other -- if**

16   **science had advanced as far as it is now, there would**

17   **never have been a conviction, and I doubt if there**

18   **would ever have been an arrest.**

19   Q.    So I want to ask you one more time, what was

20   your strategy?

21   **A.    I have answered that question.**

22        MR. RYAN:  Your Honor, typically when we ask

23   that you get an answer of, "Well, I tried to show the

24   hairs did not match either defendant."

25   Q.    I mean, I don't -- I realize it's a broad

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 49

1    question, but you obviously had a strategy, didn't

2    you?  I mean, can't you elaborate a little bit on --

3    **A.    My job as a defense attorney is to examine the**

4    **evidence, what I know the facts to be, and use those**

5    **facts in an honest and professional manner and try to**

6    **establish reasonable doubt, and again, it would have**

7    **been done effectively if we had not had the**

8    **prejudicial actions of the prosecutor and science had**

9    **advanced enough they would have been able to say that**

10   **was his hair, it's just like his hair, that was not**

11   **his blood, it was animal blood he was drinking out of**

12   **the chalice.**

13       Those two things are so highly prejudicial,

14   almost impossible to overcome, and after Sheriff

15   Greer kept that letter suborning perjury from us, it

16   made it impossible to us effectively representing

17   these men.

18   Q.    And you said you explored the question of -- at

19   trial about the dirty old man.

20   **A.    No, it was brought up.  It was brought up.  Did**

21   **I explore it?  I didn't explore it.  The reason I**

22   **didn't because, to me, it was just an old drunk**

23   **chasing a young lady down the street.**

24       The more effective thing, the more thing that I

25   was more worried about was once the Whitley thing

Commonwealth v. Clark and Hardin                07/10/2015     Testimony of Bart Adams and Wallace Rogers

Page 50

1    came up.  I was more concerned about that.

2    Q.    What use did you make of the fact that the

3    hairs that were on or around or in Rhonda Sue

4    Warford's hair?

5    **A.    On the hand?**

6    Q.    Right.

7    **A.    Is that what you're asking?**

8    Q.    Right.

9    **A.    Well, we tried to establish that there would**

10   **probably be another person that was there that had**

11   **committed the murder, but Sheriff Greer actually got**

12   **up and said, "Those hairs came from my head when I**

13   **was bagging the body."  That's what he actually said**

14   **under oath in court, that's what was his conclusion.**

15        Obviously that was so ridiculous that I thought

16   we won the case right there.  I mean, it was just

17   unbelievable for the man stood up and say that, and

18   now we know that those hairs have been tested, and

19   they don't belong to Greer either.

20   Q.    So the trial has been 20 years ago?

21   **A.    That's right.**

22   Q.    I'm sure you're like the rest of us, that

23   memories fade in 20 years.  If the record shows

24   otherwise on anything you've testified to, would you

25   defer to the record?

Page 51

1    **A.      If something that's black and white and**

2    **recorded, I would certainly defer to that, of course.**

3    **In color in this case.   Excuse me.**

4         MR. WILLIAMS:  I have a few questions.

5         THE COURT:  Sure.

6                         CROSS-EXAMINATION

7    VIDEO COUNTER 1:52:07

8    By Mr. Williams:

9    Q.   One of the first things you talked about,

10   Mr. Adams, you clearly said that this trial --

11        MS. SMITH:  Judge, I object.  I mean, are we

12   going to have two prosecutors?  We represent

13   different people here, that's why there's different

14   people asking questions on this side of the room.

15   I'm not sure I understand why there's two

16   representatives of the Commonwealth ganging up on us

17   here.

18        THE COURT:  There has been no objection up to

19   this point.  They've been doing it all day.

20        MS. SMITH:  They haven't asked simultaneous

21   questions of a witness, Judge.

22        THE COURT:  I'm going to (indiscernible) this

23   witness.  This witness can take care of himself.

24   I'll let them talk to this witness.

25        MS. SMITH:  Yes, sir.

Page 52

1          THE COURT:  Go ahead.

2    By Mr. Williams:

3    Q.    Okay.  You expressed the very definite opinion

4    that this case was the most fundamentally unfair case

5    that you have ever been involved in.

6    **A.    That's correct.**

7    Q.    And you testified, I think, that you have tried

8    in excess of 200 cases.

9    **A.    Easily.**

10   Q.    And that's in all over courts in Kentucky?

11   **A.    Correct.**

12   Q.    And talking about all counties or a lot of

13   counties in Kentucky or --

14   **A.    I have never observed what happened in this**

15   **courtroom, ever.**

16   Q.    And I assume when you talk about that, you're

17   talking about the prosecutor or the judge?

18   **A.    I am talking about a system that I perceived to**

19   **be one washing the other's hands and them covering**

20   **for each other when one of them may have gotten in**

21   **trouble.  That is exactly the system that I observed,**

22   **and I observed it especially when Greer kept that**

23   **letter from us.**

24       **When we gave the judge these affidavits from**

25   **everybody that Greer knew about that letter, he**

Page 53

1    refused to give us a new trial or a hearing on it.

2    He summarily overruled that, and it's a very

3    important piece of evidence.  There should have been

4    a hearing on it.  That solidified my belief of what I

5    observed in this courtroom to be correct.

6    Q.    Okay.  And it's particularly Meade County?

7    **A.    In 1995 in Meade County I observed what**

8    **happened in this courtroom, and my statement speaks**

9    **for itself.  The most prejudicial trial I have ever**

10   **seen.**

11   Q.    And that -- you said that the prosecutor was

12   covering for the sheriff, the sheriff was covering

13   for the prosecutor, and the judge was covering for

14   the --

15   **A.    You asked me, sir, my opinion of what went on**

16   **in this courtroom.**

17   Q.    And so that's what --

18   **A.    And I will tell you again that the judge would**

19   **tell Kenton Smith, "Don't do that, Kenton.  You know**

20   **you can't do that."**

21        He'd come right out here and do it again.  We'd

22   go up to the bench, and it was, "Okay, Kenton, now

23   you know" -- and he'd do it over and over again.  It

24   was a repeated scenario throughout the trial.

25        Now, do I think that they did something

Page 54

1  nefarious on purpose?  No.  I think it's an inbred

2  situation when you have this small of a place, and

3  they're all friends, everybody knows each other.

4  They don't want to hurt him.  We don't want to hurt

5  him.  I mean, that's just the way it is, and that's

6  what I saw.

7  Q.    Okay.  So that tape and that record should bear

8  what you're saying, and that tape and that record has

9  been reviewed by the Kentucky Court of Appeals.

10       That tape and that record has been reviewed by

11  the Kentucky Supreme Court, and I assume you -- you

12  determined that those people that sit on the Kentucky

13  Supreme Court are almost maybe as smart as you.

14  **A.    I think they're a hell of a lot smarter than I**

15  **am, and you're not going to lead me down that road.**

16  **What I will tell you is that you know as well as I do**

17  **how that works, and how that works is one or two**

18  **clerks may review a case and look at it, and they'll**

19  **talk with the justices about it.  I don't know that a**

20  **single judge sat and looked at this tape.  I have no**

21  **idea whether or not they did.**

22       I have seen miscarriages of justice throughout

23  my life because we don't know if the thing has been

24  properly reviewed.  What I do know now is that a

25  supreme court that is sitting has said, "Give these

Page 55

1    boys a review.  Let's look at the evidence and review

2    it scientifically, and let's take a look at it."

3          Whoever was there in 1995, in my opinion, did

4    not give these boys a fair look.  That's my opinion.

5    Q.    On the supreme court?

6    **A.    Whoever.  Whoever it was in -- whoever reviewed**

7    **this case, yes.**

8    Q.    Have you read the supreme court opinion?

9    **A.    I've read -- it's been a while, but I haven't**

10   **read -- I haven't read it recently.**

11   Q.    Okay.  They talk about the satanism issue in

12   that opinion, don't they?

13   **A.    I don't remember.  I haven't read it in quite**

14   **some time.**

15   Q.    Well, I think, if you'll read the opinion, I

16   think they talked about the satanism issue, and they

17   stated that the judge did not do anything improper by

18   allowing that evidence in, if my memory is correct on

19   that.  Does that -- does that seem unfair to you?

20   **A.    Absolutely.  I disagree completely with that**

21   **decision, absolutely.**

22   Q.    So Meade County was unfair, and the Supreme

23   Court of Kentucky was also completely unfair.

24   **A.    For entirely different reasons.  For entirely**

25   **different reasons.**

Commonwealth v. Clark and Hardin          07/10/2015   Testimony of Bart Adams and Wallace Rogers

Page 56

1   Q.    But they both were extremely fundamentally

2   unfair.

3   **A.    The trial was extremely fundamentally unfair.**

4   **The reviewing process, I have no idea what happened.**

5   I don't know who looked at it and who didn't look at

6   it.  I have no idea who discussed it.  Those things

7   are not made public, as you well know.

8   Q.    But they didn't come to the same conclusions

9   that you come to.

10  **A.    No, they didn't.**

11  Q.    And so for that reason they're unfair.

12  **A.    I would say they reached the wrong conclusion.**

13  I don't know if they reached it through a fair

14  process, if they were prejudiced in any way.  The

15  conclusion, in my opinion, is not correct.  I can't

16  say it was prejudiced.  I just say it's incorrect.

17  Q.    You also talked about probative value and

18  prejudicial effect.

19  **A.    Right.**

20  Q.    And, you know, we hear that's a very broad

21  language.

22  **A.    Of course it is.**

23  Q.    And, you know, I guess it's broad because it's

24  subject to interpretation by the trial judge, and

25  trial judge, if I remember correctly, trial judges

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 57

1    are given pretty much a lot of leeway in determining

2    what is probative value and weighing its prejudicial

3    effect, and it comes up almost in every trial,

4    doesn't it?

5    **A.    It's 100 percent in the purview of the trial**

6    **court.**

7    Q.    Yeah.  And how many times have you argued that,

8    "Judge, I know it has probative value, but the

9    prejudicial effect is so" --

10   **A.    Numerous.**

11   Q.    -- "outrageous"?

12   **A.    Numerous.  Numerous.**

13   Q.    You've argued that numerous times.

14   **A.    Absolutely, yes.**

15   Q.    Okay.  And so there can be differences of

16   opinion on that, can't there?

17   **A.    There can certainly be differences of opinion.**

18   Q.    It's kind of a judgment call, isn't it?

19   **A.    It's the judge's call, right.**

20   Q.    It's a judgment call by the sitting circuit

21   judge.

22   **A.    Of course it is.**

23   Q.    And it's rarely disturbed.

24   **A.    Well, it's -- it's -- it's disturbed if there's**

25   **a gross -- a gross abuse of that discretion.**

Page 58

1  Q.    But there was -- there was no finding in this

2  case that there was a gross abuse --

3  **A.    There was no finding in this case, but what**

4  **you're forgetting, I think, with this line of**

5  **questioning, if I may say this, there are other**

6  **grounds upon which this motion is being brought, and**

7  **that has to do with whether or not these advances in**

8  **science make this result completely and totally**

9  **unfair, and that's part of what we're talking about.**

10        Now, if you want to pursue me, we can talk

11  about this all day long, and I'll be glad to answer

12  them, and of course it's up to the judge, but there's

13  more to this motion than that.

14  Q.    Okay.  You were allowed to argue, you were

15  allowed to cross-examine every witness that was

16  produced by the Commonwealth; is that correct?

17  **A.    That's correct.**

18  Q.    And you were allowed to produce your own

19  witnesses at this trial --

20  **A.    That's correct.**

21  Q.    -- to disprove what they said or maybe just to

22  prove what your clients were saying were true.

23  **A.    Yes, that's true.**

24  Q.    Your clients testified, didn't they?

25  **A.    Yes, they did.**

Page 59

1   Q.    And the jury heard all that.

2   **A.    The jury heard all that, but let me remind you**

3   **while you're saying that is, number one, I was -- I**

4   **was kneecapped by not getting the Capps letter as far**

5   **as cross-examining Capps.**

6         I was not allowed to go into Handy when he had

7   erased -- I had him dead to rights.  He had erased a

8   statement in a trial that had taken two weeks before,

9   and the judge just really cut me off on that, but I

10  had Handy.  I could prove that he was in the habit of

11  lying about these cases, and subsequent events has

12  proven that in Louisville.

13        Louisville has paid out well over $10 million

14  in verdicts because of Handy and the way he

15  misidentified evidence and the way he perjured

16  himself in court.

17        MR. RYAN:  I object to that too, Your Honor.

18        THE COURT:  Overruled.

19  Q.    So you were allowed to question every witness

20  for the Commonwealth, and you were allowed to argue

21  in your closing argument that they had -- that

22  basically they were all liars.

23  **A.    I don't think I characterized it that way.  I**

24  **may have.**

25  Q.    I don't mean say call them liars.  I mean you

Page 60

1    have a nicer way of doing it.

2    **A.     Well, you asked me the question.**

3    Q.     Just like you have a nicer way of calling us

4    liars.

5    **A.     Well, I'm not calling you liars.  I don't even**

6    **know you guys.  I'm talking about what happened in**

7    **'95.  I have nothing against either one of you.**

8    Q.     Was the discovery process unfair?

9    **A.     Absolutely.  We didn't get the discovery.  We**

10   **didn't get the letter.**

11   Q.     Did you complain to the judge about that?

12   **A.     I didn't know about the letter.  I couldn't**

13   **complain about it if I don't know about it.**

14   Q.     Did you complain about --

15   **A.     Only Greer knew about it.**

16   Q.     -- about any other discovery?

17   **A.     No, discovery was okay except for that, that**

18   **I'm aware of.**

19   Q.     Didn't you stand up one time before the jury

20   and say -- or maybe it was Mr. Smith, I can't

21   remember.  I lost part of it.  "We're friends.

22   Mr. Smith and I are friends, and he's very

23   resourceful."

24          Did you state that one time?

25   **A.     I may well have said that, and I may say things**

Page 61

1    **in front of a jury about an adversary during a trial**

2    **just so they don't know how much I really don't like**

3    **what he's doing.**

4    Q.     And that was your strategy here.  You said that

5    because you --

6    **A.     If I did that, that's why I did it because I**

7    **was aware of how we were being danced around the**

8    **courtroom.  Of course I was aware of that.**

9    Q.     Were you allowed to argue in your closing

10   argument that there was possibly a third person out

11   there who was --

12   **A.     Oh, I'm sure I was allowed to.**

13   Q.     Did you argue that?

14   **A.     I'm not sure.**

15   Q.     You don't remember whether you argued that or

16   not?

17   **A.     I haven't reviewed it.  It's been 20 years ago.**

18   **I haven't reviewed my closing.**

19   Q.     If the record shows that you argued that,

20   you'll defer to the record.

21   **A.     I've already said that, yes.**

22   Q.     So if you argued that then, that there was

23   possibly a third person out there.

24   **A.     Uh-huh.**

25   Q.     I guess at another trial you would argue the

Commonwealth v. Clark and Hardin                07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 62

1    same thing.

2    **A.      Well, except that I would have the benefit of**

3    **the fact that the hair does not match him, the blood**

4    **is his, you know, so that's a big, big thing.**

5    Q.    A jury heard that.

6    **A.      Jury didn't hear that.**

7    Q.    A jury heard your arguments about the fact

8    that --

9    **A.      I now would have proof positive in my hand, not**

10   **speculation.**

11   Q.    Have you heard that Mr. Hardin has admitted

12   this to the parole board?

13   **A.      I have been told that.**

14   Q.    I'm sorry?

15   **A.      I have been told that.**

16   Q.    Have you read his statement?

17   **A.      I have not.**

18   Q.    Would you like to read his statement?

19   **A.      If you want me to I'll be glad to.**

20        MS. SMITH:  Judge, I'm going to object as to

21   the relevancy.  Obviously Mr. Adams hasn't read it.

22   Mr. Adams didn't represent Mr. Hardin, he represented

23   Mr. Clark.  I don't think it's relevant.  Again,

24   the -- the burden that we have, Judge, is that --

25        MR. SIMON:  Excuse me just a moment.  May we

Page  63

1    have a moment?

2          THE COURT:  Yes.

3          MS. SMITH:  I was getting all wound up.

4          MR. SIMON:  I know.  Me too.

5          (Off-the-record discussion.)

6          MS. SMITH:  Withdraw my objection.

7          THE COURT:  Okay.

8          UNIDENTIFIED SPEAKER:  We actually have an

9    audio, if you would like to play it.

10          MR. WILLIAMS:  Can we take a break just a

11   minute?

12          THE COURT:  Let's take about a 10 minute break.

13   It's 10 after 2:00.  I think we all need a break.

14          (Recess from Video Counter 2:04:33 to 2:14:54)

15          THE COURT:  Court will come to order.

16          THE BAILIFF:  Court come to order.

17          THE COURT:  I believe all the parties, or the

18   defendants and the Commonwealth are here and counsel.

19   We were contemplating, Mr. Williams was thinking

20   about doing something with the parole board

21   transcript.

22          MR. WILLIAMS:  Well, I was thinking about

23   asking about him -- well, I did ask him about if he

24   had heard the testimony of Mr. Hardin before the

25   parole board where Mr. Hardin confessed that he was

Commonwealth v. Clark and Hardin          07/10/2015    Testimony of Bart Adams and Wallace Rogers

Page 64

 1    involved in this murder and that also Mr. Clark was

 2    involved, and I was going to show him the statement

 3    because that statement has been transcribed, and I

 4    think I'm going to wait and do that on another

 5    witness.

 6              THE COURT:  All right.

 7              MR. WILLIAMS:  So I don't think I want to ask

 8    him about that.

 9              THE COURT:  Do you have any other questions of

10    Mr. Adams?

11              MR. WILLIAMS:  I don't think I do.  He's

12    expressed himself very well.

13              THE COURT:  Mr. -- or Ms. Smith?

14              MS. SMITH:  Yes, sir, yes, sir.

15              THE COURT:  Ms. Smith, any redirect?

16              MS. SMITH:  I just have a couple of questions,

17    Your Honor.

18                    REDIRECT EXAMINATION

19    VIDEO COUNTER 2:15:56

20    By Ms. Smith:

21    Q.    Obviously, Mr. Adams, you did not rewatch the

22    transcript of this entire proceeding --

23    **A.    Oh, no.**

24    Q.      -- in preparation for today.

25    **A.    No.**

Page 65

1    Q.    Would it surprise you if I said you had called

2    18 witnesses in defense?

3    **A.    No, wouldn't surprise me.**

4    Q.    You know --

5    **A.    I mean, I don't know.  I really don't know.  I**

6    **mean, I --**

7    Q.    I'm just saying --

8    **A.    I've tried to wipe it out of my mind.**

9    Q.    -- the question -- there had been some question

10   as to whether or not you had defended the case.

11   **A.    I don't think he meant it that way.**

12   Q.    That's the way I took it.

13         Now, as far as the supreme court opinion,

14   Judge -- Judge -- Mr. Adams?

15   **A.    Yes.**

16   Q.    You know what, nevermind.  I was just going to

17   point out that there was a dissent by Justice Stumbo,

18   so you could have looked at that if you wanted to,

19   but I think we're good.

20         Was there anything that you wish that you could

21   have done at that time --

22   **A.    I'm sure there's a thousand things I wish I**

23   **would have done, you know?  I -- I personally feel**

24   **responsible that they're in, but there was not -- I**

25   **was steamrolled.  There was nothing we could do.  I**

Page 66

1    **mean, we were had from the beginning, and that was**

2    **it.**

3         THE WITNESS:  And I'm sorry, guys.  I've -- I

4    am.

5         MS. SMITH:  Nothing else, Your Honor.

6         THE COURT:  Any recross?

7         MR. WILLIAMS:  No, sir.

8         THE COURT:  May this witness be excused?

9         MR. WILLIAMS:  Yes, sir.

10        THE COURT:  Thank you for your testimony,

11   Mr. Adams.

12        MS. SMITH:  Thank you, Judge.

13        THE COURT:  You may call your next witness.

14        MR. SIMON:  Call Wallace Rogers.

15        THE COURT:  Okay.

16        THE BAILIFF:  (Indiscernible).

17                   *              *              *

18

19

20

21

22

23

24

25